UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
:
In re                                      :    Chapter 11 Case No.
:
GENERAL MOTORS CORP., *et al.*,            :    09-50026 (REG)
:
          Debtors.                         :    (Jointly Administered)
:
-------------------------------------------------------------x


BENCH DECISION[1] AND ORDER ON MOTIONS
FOR § 158(D)(2) CERTIFICATION, OR IN THE
ALTERNATIVE, FOR STAY PENDING APPEAL[2]


APPEARANCES:
WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and Debtors in Possession
767 Fifth Avenue
New York, New York 10153
By:   Harvey R. Miller (argued)
      Stephen Karotkin
      Joseph H. Smolinsky

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel for the Official Committee*
*of Unsecured Creditors*
1177 Avenue of the Americas
New York, New York 10036
By:   Thomas Moers Mayer (argued)
      Kenneth H. Eckstein
      Jeffrey S. Trachtman

---

[1] I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have less in the way of citations and footnotes, and have a more conversational tone.

[2] Not cite checked; subject to revisions and corrections.

LEV L. DASSIN
*Acting United States Attorney for the*
*Southern District of New York*
86 Chambers Street, Third Floor
New York, New York 10007
By:     David S. Jones
        Jeffrey S. Oestericher
        Matthew L. Schwartz (argued)
        Joseph N. Cordaro
Assistant United States Attorneys

-and-

CADWALADER, WICKERSHAM & TAFT LLP
Counsel to the United States of America
One World Financial Center
New York, New York 10281
By:     John J. Rapisardi

VEDDER PRICE P.C.
*Counsel to Export Development Canada*
1633 Broadway, 47th Floor
New York, NY 10019
By:     Michael J. Edelman
        Michael L. Schein

CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Counsel to the UAW*
One Liberty Plaza
New York, NY 10006
By:     James L. Bromley

THE COLEMAN LAW FIRM
*Attorneys for Callan Campbell, Kevin Junso, Edwin Agosto, Kevin Chadwick, and Joseph Berlingieri*
77 West Wacker Dr., Suite 4800
Chicago, IL 60601
By:     Steve Jakubowski (argued)
        Elizabeth Richert

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA P.C.
*Counsel For Ad Hoc Committee of Asbestos Personal Injury Claimants*
2323 Bryan Street, Suite 2200
Dallas, TX 75201
By:   Sander L. Esserman (*pro hac vice*)
      Robert T. Brousseau (*pro hac vice*)
      Peter D'Apice (argued)
      Jo E. Hartwick (*pro hac vice*)

CAPLIN & DRYSDALE, CHARTERED
*Attorneys for Mark Buttita, personal representative of Salvatore Buttita*
375 Park Avenue, 35th Floor
New York, NY 10152-3500
By:   Elihu Inselbuch
      Rita C. Tobin
One Thomas Circle
Washington, D.C. 20005
By:   Peter Van N. Lockwood
      Ronald E. Reinsel (*pro hac vice*)

DIANA G. ADAMS
United States Trustee
Office of the United States Trustee
33 Whitehall Street
21st Floor
New York, NY 10004
By:   Andrew D. Velez-Rivera
      Brian Shoichi Masumoto

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In this contested matter in the jointly administered cases of GM and its affiliates, I have motions for certification to the Circuit, under 28 U.S.C. §158(d)(2), and, alternatively for a stay, pursuant to Fed.R.Bankr.P. 8005, of the effectiveness of my July 5 Order. Both motions are denied.

The following are my Findings of Fact, Conclusions of Law, and bases for the exercise of my discretion in connection with these determinations.

Findings of Fact

Familiarity with the background facts underlying these motions is assumed. *See* my July 5 decision, as corrected --- B.R. ---, ECF #2985 (the "**Decision**"). My Findings of Fact as set forth in the Decision are incorporated by reference here. I thus note only additional facts put forward on this motion that are potentially relevant to the issues before me this evening.

The Eisenband Affidavit, submitted by the Creditors' Committee in opposition to the stay request, sets forth significant matter relevant to the impact on parties of a stay. In reliance in material part on the May 31 Worth Declaration, Mr. Eisenband points out the total New GM enterprise value after completion of the proposed 363 transaction is between $63.1 billion and $73.1 billion. (Eisenband Decl. ¶¶ 5, 6). Mr. Eisenband further shows that the total imputed value of the equity and warrants in New GM that will go to unsecured creditors of the GM estate is between $7.4 billion and $9.8 billion. (*Id.* ¶ 6).

By contrast, the estimated net proceeds that would be available for distribution to all creditors in a liquidation, assuming the 363 transaction did not occur (net of wind

down expenses), would be only between $6.5 billion and $9.7 billion. (*Id.* ¶ 5) And even that can be deceptive when comparing it to the amount that would be available to unsecured creditors. In a liquidation, the estate would not get the benefit of the U.S.-Canadian credit bid (approximately $49 billion), the billions in assumed obligations that New GM agreed to pay (approximately $48.4 billion), or the greatly compromised amount that the UAW VEBA Trust agreed to take in stock, instead of cash. Thus a much bigger claims pool would share that limited liquidation value, but the secured debt alone would wipe out unsecured creditor recoveries. As I noted in the Decision, in the event of a liquidation, unsecured creditors would get nothing.

Mr. Eisenband points out, persuasively, that the loss to the estate from anything that would result in a liquidation would be between $53.4 and $66.6 billion, and the loss to the unsecured creditor community alone (not counting the loss to the secured creditors) would be no less than $7.4 billion. (*Id.* ¶ 7).

I'll note additional facts as I go along, so I don't need to address them twice.

## Discussion

*Motion for Certification*

The Individual Litigants and the Asbestos Litigants first ask me to certify the July 5 Order that was entered in accordance with the Decision under 28 U.S.C. §158(d)(2).

Section 158 of the Judicial Code, 28 U.S.C., deals with appeals from orders and judgments in bankruptcy cases. Its subsection (d)(2) provides, in relevant part, with respect to appeals to the Circuit:

> (A) The appropriate court of appeals shall have
> jurisdiction of appeals described in the first
> sentence of subsection (a) if the bankruptcy court,
> the district court, or the bankruptcy appellate panel
> involved, acting on its own motion or on the request

2

>of a party to the judgment, order, or decree … or all the appellants and appellees (if any) acting jointly, certify that--
>
>>(i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
>>
>>(ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
>>
>>(iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken;
>
>and if the court of appeals authorizes the direct appeal ….

Thus the Judicial Code, as amended by the BAPCPA amendments, establishes a procedure under which certain appeals can be certified by the bankruptcy court, or the district court (there being no BAP in this Circuit), for direct appeal to the Circuit if one or more of the three factors identified in the romanettes, being linked by an "or," is satisfied. The Circuit does not have to take the appeal, however, and can decide whether or not to do so in the exercise of its discretion.

The Circuit has explained the thrust of §158(d)(2):

>The focus of the statute is explicit: on appeals that raise controlling questions of law, concern matters of public importance, and arise under circumstances where a prompt, determinative ruling might avoid needless litigation.

3

*Factor (i):*

The first of the three factors is whether the issue on appeal "involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance."

I can't agree with the Individual Tort Litigants when they suggest, with respect to successor liability, that this factor is satisfied because there is "a very distinct split in the circuits on this issue." (Indiv. Tort Litigants Motion ¶ 4.) While it's true that there's a Circuit Split, the statute requires that there be "no controlling decision of the court of appeals *for the circuit.*" (Emphasis added). And while the Circuit hasn't yet issued its written decision explaining *why* it affirmed, there has been, as the Tort Litigants acknowledge, *id.*, "a controlling judgment issued by the Second Circuit in *Chrysler*." I can't agree with the Individual Tort Litigants' suggestion, orally argued this evening, that when the Circuit said "affirmed for substantially the reasons stated in the opinions below," that wasn't a "decision."

While a circuit split might be an appropriate matter for consideration for the Supreme Court, in deciding whether or not it wishes to grant *certiorari*, it doesn't satisfy §158(d)(2).

To the extent that I can go beyond textual analysis (and it is unclear whether I should, because in this respect the statutory text does seem to be subject to plain meaning analysis), common sense is consistent with that reading. If there were a conflict between bankruptcy courts, district courts, or some combination of the two, that could in many circumstances suggest that the Circuit might want to resolve the conflict. But where the Circuit has already decided the bottom line (it being remembered that appellate courts

4

"review judgments, not statements in opinions, " see Decision at 5 & n.1, citing *In re O'Brien*, 184 F.3d 140, 142 (2d Cir. 1999)), there's no conflict for the Circuit to resolve.

The next of the two subfactors within Factor (i) is whether the issue is of "public importance." Starting, once more, with textual analysis, " public importance" is not defined in the Code, nor does the Code articulate standards for deciding it. And ultimately, "public importance" is a relative thing, and it doesn't necessarily mean what a litigant considers to be important.

Certainly, many people would agree that the GM's *well-being* is a matter of public importance; that's one of the reasons why the U.S. Treasury and EDC put billions of dollars at risk to keep GM alive. But what the statute requires is that " the judgment, order, or decree involves *a question of law*" that "involves a matter of public importance." (Emphasis added).

Whether successor liability can be imposed in section 363 sales is hardly a trivial issue as a matter of bankruptcy law and policy, and undoubtedly it's important to the individual litigants concerned, who understandably wish to proceed against as many parties as they can to recover on their claims. But it's ultimately a matter of statutory interpretation and common law analysis—as contrasted, for example, to constitutional issues, except as litigants try to elevate their state law rights to sue additional parties to matters of constitutional dimension. And it's already been decided by the Circuit; deciding it again is not a matter of public importance. I further agree with the Creditors' Committee when (noting Judge Griesa's comments that the TARP issues implicated "a very, very important matter of great public interest") the Committee contrasts the TARP

5

authorization issues that were an element of the *Chrysler* appeal, and with the Debtors when they contrast the constitutional issues that *Chrysler* lenders raised.

*Factor (ii)*

What I've just said concerning Factor (i) overlaps with my consideration of Factor (ii)—resolution of conflicting decisions. There are no conflicting decisions within the Second Circuit for the Circuit to resolve. And the decisions from *outside* the Circuit are not a basis for §158(d)(2) review. Moreover, the decisions from outside the Circuit that are relevant here are the same ones that were available for consideration by the Circuit's *Chrysler* panel.

*Factor (iii)*

Factor (iii), calling for consideration of whether an immediate appeal "may materially advance the progress of the case," likewise hasn't been satisfied here.

Frankly, the most important consideration in advancing the progress of the case is enabling GM to complete the sale of its assets that is essential to its survival, and which is stayed until Thursday at noon, but not beyond that. The Individual Tort Litigants aren't asking me to block the sale, presumably understanding the serious consequences that would have—discussed below in connection with the request, in the alternative, for a stay. The Asbestos Litigants want to block the sale only if I deny certification, and the appeal thus must go to the district court. But even if I were to grant certification (and the Circuit were to decide to take the appeal) it is hard to see how the Circuit could rule on this issue in the two days before the existing Rule 6006(h) stay expires. If the Individual Tort Litigants did indeed have such an expectation, that would be wholly inconsistent with their statements as to how important this issue is.

6

And if, as I sense, the Individual Tort Litigants want to take the issue of 363(f) construction to the Supreme Court, how could a decision presented and decided to the Second Circuit in two days (or on any other expedited basis) be helpful to the bankruptcy community, or the public, or the Supreme Court? If the Supreme Court is to decide an issue that's the subject of a Circuit split, doesn't it deserve the best decision the Second Circuit can provide? As the Circuit noted in *Weber*:

> [A]lthough Congress emphasized the importance of our expeditious resolution of bankruptcy cases, it did not wish us to privilege speed over other goals; indeed, speed is not necessarily compatible with our ultimate objective—answering questions wisely and well. In many cases involving unsettled areas of bankruptcy law, review by the district court would be most helpful. Courts of appeals benefit immensely from reviewing the efforts of the district court to resolve such questions. Permitting direct appeal too readily might impede the development of a coherent body of bankruptcy case-law.

484 F.3d at 160. And if the issue is not to be decided in the next two days, by which time the transaction can close, it makes no difference whether or not the district court looks at these issues first, or if the Circuit gets less frenzied briefing on the issues—other than the appellants' apparent desire to get a rushed decision out from which they can seek *certiorari*.

In short, I can't find that the requested order would expedite things in any way.

*Request for Stay*

The Asbestos Litigants (though not the Individual Tort Litigants) alternatively request, pursuant to Fed.R.Bankr.P. 8005, that if their appeal goes to the district court, I grant a Rule 8005 stay.

Fed.R.Bankr.P. 8005 provides, in relevant part:

7

> A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for ... relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance.... A motion for such relief, or for modification or termination of relief granted by a bankruptcy judge, may be made to the district court ... but the motion shall show why the relief, modification, or termination was not obtained from the bankruptcy judge. The district court ... may condition the relief it grants under this rule on the filing of a bond or other appropriate security with the bankruptcy court.

The decision as to whether or not to grant a stay of an order pending appeal lies within the sound discretion of the court. *See*, *e.g.*, *In re Overmyer,* 53 B.R. 952, 955 (Bankr. S.D.N.Y. 1985) ("A motion for a stay pending appeal, as authorized under Bankruptcy Rule 8005, is discretionary.").

Though the factors that must have to be satisfied have been stated in slightly different ways, and sometimes in a different order, it is established that to get a stay pending appeal under Rule 8005, a litigant must demonstrate that:

>  (1) it would suffer irreparable injury if a stay were denied;
>
>  (2) there is a substantial possibility, although less than a likelihood, of success on the merits of movant's appeal;
>
>  (3) other parties would suffer no substantial injury if the stay were granted; and that
>
>  (4) the public interest favors a stay.

*See, e.g., Hirschfeld v. Bd. of Elections,* 984 F.2d 35, 39 (2d Cir. 1992); *In re DJK Residential, LLC*, 2008 WL 650389 (S.D.N.Y. Mar. 7, 2008) (Lynch, J.); *In re WestPoint Stevens, Inc.,* No. 06 Civ. 4128, 2007 WL 1346616, at *4 (S.D.N.Y. May 9, 2007) (Swain, J.).

8

The burden on the movant is a "heavy" one. *See, e.g.*, *DJK*, 2008 WL 650389 at *2; *see also United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir. 1995). To be successful, the party must "show satisfactory evidence on all four criteria." *In re Turner,* 207 B.R. 373, 375 (2d Cir. B.A.P. 1997) (citations and internal quotation marks omitted)  Moreover, if the movant "seeks the imposition of a stay without a bond, the applicant has the burden of demonstrating why the court should deviate from the ordinary full security requirement." *DJK*, 2008 WL 650389 at *2;  *WestPoint Stevens,* 2007 WL 1346616, at *4.

While, as Judge Lynch noted in *DJK*, the 2d Circuit BAP has held that failure to satisfy any prong of the 4-part test "will doom the motion," citing *Turner*, the Circuit and more recent cases have engaged in a balancing process with respect to the four factors, as opposed to adopting a rigid rule. I'll assume, without deciding, that the balancing approach is the more appropriate, but also note that it doesn't matter here, since the last three factors—likelihood of success, prejudice to those opposing the stay, and the public interest—so overwhelmingly compel denying the stay.

 *(1) Irreparable Injury*

Turning first to the requirement of irreparable injury, this issue turns on whether the risk of the inability to overturn my order after a closing on the underlying sale transaction constitutes irreparable injury. The request comes in the context of the equitable mootness doctrine that is applied in connection with bankruptcy appeals. And I assume, without being the one who'll ultimately decide, that if the sale closes, there's at least a very high probability that the appeal will be dismissed as moot. That's why I tried very hard to get the decision right, and I burdened people with having to read an 87 page decision.

9

In *DJK*, whose analysis of this area is the most recent, and in my view the most comprehensive, Judge Lynch focused on the principal claim of irreparable injury here—that by application of the equitable mootness doctrine, the appellants may lose their rights. This case, like most of those addressing the issue, comes with both sides wanting to hedge their bets. The Individual Tort Litigants and the Asbestos Litigants don't want to concede that their appeals would be dismissed by reason of equitable mootness, and GM and the others supporting the sale don't want to give up the ability to argue that the appeals will be equitably moot after the 363 sale closes.

This tension was most extensively addressed by Judge Kaplan in *St. Johnsbury Trucking,* 185 B.R. 690 (S.D.N.Y. 1995). He there noted that the appellant was correct in its assertion that there was a risk that its appeal would be mooted absent a stay, and that the appellant thus was threatened with irreparable injury. *Id.* at 687. He recognized that there were a number of cases that held that the threat of mootness of an appeal was not alone sufficient to establish a threat of irreparable injury, but said that he "need not quarrel with that proposition to find a threat of irreparable injury" there. He went on to say that it was the "threatened loss rather than the loss of the right to appeal *vel non* that [gave] rise to the Court's irreparable injury finding." *Id.* at 690.

Since the time Judge Kaplan issued that decision, as observed in one of the *Adelphia* appeals, a "majority of courts have held that a risk of mootness, standing alone, does not constitute irreparable harm." *See In re Adelphia Communications Corp.,* 361 B.R. 337, 347 & n.39 (citing cases) ("***Adelphia***"). Though for that reason, among others, the matter is close, I think I should assume, without deciding, that on balance Judge Kaplan was right. And thus I'll assume that the threat of equitable mootness is

enough to satisfy the requirement of showing *some* irreparable injury—enough to get on the scoreboard with respect to this issue. How much that should be weighed, however— and especially how it should be weighed against different kinds of irreparable injury that others would suffer—is a very different question.

*(2) Possibility of Success on the Merits.*

The next factor is colloquially referred to as "likelihood of success" or "possibility of success." It has been more precisely articulated by the Circuit as "whether the movant has demonstrated "a substantial possibility, although less than a likelihood, of success" on appeal. *LaRouche v. Kezer,* 20 F.3d 68, 72 (2d Cir. 1994); *Hirschfeld v. Board of Elections*, 984 F.2d 35, 39 (2d Cir. 1993).

Under the circumstances here, this requirement is not satisfied for an appeal to the district court, as the district court will be bound by the judgment of the Second Circuit just as much as I am. And I would also think that it would be as sensitive as I am to the importance of *stare decisis* in bankruptcy cases, and thus similarly follow Judge Gonzalez's *Chrysler* decision, when it is so closely on point. At most it will provide extra analysis for the benefit of the Circuit, though, as noted above, extra analysis is something the Circuit values. Similarly, I do not see any substantial possibility that the Individual Tort Litigants or Asbestos Litigants would prevail at the Second Circuit, given the Circuit's affirmance of the *Chrysler* judgment. It is possible, of course, that the Circuit could reverse the decision of the panel upon *en banc* review, but that theoretical possibility does not, in my view, equate to a *substantial* possibility.

Then it is possible that the Individual Tort Litigants could file a *certiorari* petition. And given the law in the Second Circuit, I think they'd have to, if they wished to prevail. Then, of course, they'd have to hope that the *certiorari* petition would be

11

granted, and that they'd ultimately prevail in the Supreme Court, based on arguments that the contrary decisions are right and the Second Circuit is wrong.

But what we have so far as to the possibility of success in such an endeavor is not helpful to the Individual Tort Litigants. In denying the request for a stay pending appeal in the *Chrysler* case, the Supreme Court stated that the applicants have "not carried [the] burden" of demonstrating "'(1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari or to note probable jurisdiction; (2) a fair prospect that a majority of the Court will conclude that the decision below was erroneous; and (3) a likelihood that irreparable harm will result from the denial of a stay.'" *Ind. State Police Pension Trust v. Chrysler LLC*, 129 S. Ct. 2275, 2276-77 (2009) (citing *Conkright v. Fommert*, 556 U.S. __, __ (2009) (slip op., at 1-2) (Ginsburg, J., in chambers)). The failure to satisfy the first two deficiencies noted provides little basis for optimism with respect to the chances of a reversal by the United States Supreme Court.

Thus I must rule that this factor isn't satisfied at all (in terms of justifying a stay), and that, in a balancing exercise, it either must be disregarded or be considered to weigh against granting a stay.

*(3) Injury to Other Parties*

The third factor is injury to other parties, in this case to GM, GM's other creditors, and GM's employees, retirees, dealers and suppliers. Any grant of a stay would result in extraordinary prejudice to all of the other parties in this case, in both direct monetary terms and terms of *irreparable* injury.

In my Findings of Fact in the Decision, I included a whole section on the "Need for Speed," at pages 22 to 25 at that decision. I incorporate those factual findings by reference here. As I found as facts in the underlying Decision, GM will lose its funding

12

if approval of this transaction is not secured by July 10. The U.S. Government is not willing to keep funding GM while creditors block the 363 transaction to improve upon their individual recoveries. The only alternative to an immediate sale is liquidation— which would be a disastrous result for GM's creditors, its employees, the suppliers who depend on GM for their own existence, and the communities in which GM operates.

The continued availability of the financing provided by Treasury is expressly conditioned upon approval of this motion by July 10, and prompt closing of the 363 Transaction by August 15. Without such financing, GM faces immediate liquidation.

Even if funding were available for an extended bankruptcy case, many consumers would not consider purchasing a vehicle from a manufacturer whose future was uncertain and that was entangled in the bankruptcy process.

We simply don't have the luxury of letting GM languish in bankruptcy while an appellate court considers the issues the Tort Litigants and Asbestos Litigants want to raise.

Cases expressing a willingness to grant a brief stay pending expedited appeal are distinguishable from what we have here. For example, when Judge Kaplan granted a brief stay in *St. Johnsbury Trucking*, the stay resulted merely in the delay of payments to creditors, including employees, who had been waiting for about two years. Here the consequences, by reason of the loss of liquidity and the loss of consumer confidence, would be disastrous. We're not talking about delaying distributions to creditors for a little longer. We're talking about the death of a company. If I or any other court were to grant the requested stay, GM would soon have to liquidate.

*(4) Public Interest*

Last, while hardly least, we must consider the public interest.

13

While there is undoubtedly a public interest in giving litigants the ability to appeal, there are here huge contrary public interests, which is why the U.S., Canadian and Ontario governments are so involved in this case. This case involves not just the ability of GM creditors to recover on their claims. As I found in my Findings of Fact in the Decision, and which nobody has suggested will be challenged on appeal, it involves the interests of 225,000 employees (91,000 in the U.S. alone); an estimated 500,000 retirees; 6,000 dealers and 11,500 suppliers. If GM were to have to liquidate, the injury to the public would be staggering. This case likewise raises the specter of systemic failure throughout the North American auto industry, and grievous damage to all of the communities in which GM operates. If GM goes under, the number of supplier bankruptcies that we already have, in this District and elsewhere—another filed for bankruptcy in this district today—is likely to multiply exponentially. If employees lose their paychecks or their healthcare benefits, they will suffer great hardship. And states and municipalities would lose the tax revenues they get from GM and the people employed by GM, and the Government would be paying out more in unemployment insurance and other hardship benefits.

Under these circumstances, I find it hardly surprising that the U.S., Canadian, and Ontario governments would not stand idly by and allow those consequences to happen.

Causing all of those interests to be sacrificed for these litigants' ability to avoid mootness arguments is an intolerable result. If the Asbestos Litigants, asking me for a stay here, could compensate the American and Canadian public for all the loss that would result, I'd consider, as I'll discuss below, a bond of sufficient size, but here, with the death of GM on the line, the damage to the public interest would be irreparable. It would

14

be incalculable. Here the public interest does not favor a stay; it compels the denial of one. While I am of course going through a balancing, I must say that this is a monumental factor.

*(5) Balancing*

When I look at all of the factors together, I don't regard the balancing as close. For instance, the injury in *St. Johnsbury Trucking* was a few weeks delay for creditors in getting their distributions. Here it is the destruction of General Motors, and all of the other systemic damage that I described.

So that the Asbestos Litigants can improve their odds of winning an equitable mootness argument, or to consolidate cases in the Supreme Court (in either case to thereby preserve the chance to argue that they can sue an additional defendant), they would have me or another court stay GM's exit from bankruptcy, when the Government has already told us it is not prepared to continue funding GM indefinitely. As Mr. Henderson testified, when that funding stops, GM liquidates. It comes as no surprise to me that the Individual Tort Litigants did not ask me for a stay.

*Bond*

Normally I would be inclined to nevertheless consider a stay if one or more of the appellants were to post a bond that could compensate for the damage caused by an improper stay. I turn to that now.

A bond may sometimes be a practical alternative where the injury to the estate from delay is merely a matter of money, and the injury to the estate caused by delay, while serious, would not be irreparable. That was the case, for instance, in the *Adelphia* chapter 11 cases, where a number of hedge funds were appealing the confirmation order, and the estate would suffer (as it did suffer) monetary losses of $2.33 million per day

15

during the period that the effectiveness of the confirmation order was stayed. The district court in that case required a bond, in the amount of $1.3 billion, *see* 361 B.R. at 368, which the hedge funds (some of whom had short positions in Adelphia bonds, and would profit from reduced recoveries by other Adelphia creditors), ultimately declined to post.

Here I've received, by affidavit, several reasonable estimates of the losses the estate would suffer, ranging from a low of $7.4 billion (that being the loss to unsecured creditors only, which I find to be quite conservative) and a high of about $80 billion. But I don't need to determine which of those two is more appropriate, since by the Asbestos Litigants' admission, they're not in a position to post anything more than a "nominal bond." So even if I imposed a bond requirement at the low end of the amount at risk, $7.4 billion, the Asbestos Litigants wouldn't post it anyway. And then we'd get to a huge consideration, identified by Judge Lynch in *DJK*. He stated that the party seeking the stay:

> argues, with some force, that it cannot be expected to post a bond, because the cost of a bond would be prohibitive in light of the magnitude of the potential loss to Debtors. *But this argument only serves to highlight the substantial risk of dramatic injury to Debtors and other creditors if the Bankruptcy Court's orders were erroneously stayed. Absent a bond, such injuries would be substantial and irreparable.*

2008 WL at 650389 at *5 (emphasis added).

So I find that a bond would have to be posted in an amount no less than $7.4 billion, even if any and all other concerns could be addressed. But the Asbestos Litigants have told us they couldn't do that, and thus this underscores the potential loss to the estate.

16

But there's a second factor as well. This isn't a case, like *Adelphia*, where the estate's monetary loss can be quantified, such as by the $49 million Adelphia lost during the time that the effectiveness of its confirmation order was stayed without a bond. We're here faced with *irreparable* injury to the interests of 225,000 GM employees, an estimated 500,000 GM retirees, 11,500 suppliers, and 6000 dealers whose lives turn on the ability to allow this sale to close. We're here faced with potentially grievous systemic damage to the automobile industry and the states and municipalities where GM workers, retirees and dealers reside. Even as I once more note my sympathy for asbestos victims, granting a stay on this showing (or lack of showing), at the expense of all of those other interests—and especially, without the bond that would be necessary to give them the slightest semblance of compensation—would be unconscionable.

Both motions are denied.

SO ORDERED.

Dated: New York, New York            *s/Robert E. Gerber*
       July 7, 2009                       United States Bankruptcy Judge