Hearing Date: July 13, 2009, at 9:45 a.m. (Eastern Time)
Objection Deadline: July 8, 2009, at 4:00 p.m. (Eastern Time)

Harvey R. Miller
Stephen Karotkin
Jeffrey L. Tanenbaum
Joseph H. Smolinsky
Robert J. Lemons
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
In re                                              :        Chapter 11 Case No.
                                                   :
**GENERAL MOTORS CORP.,** *et al.*,                :        09-50026 (REG)
                                                   :
                    Debtors.                       :        (Jointly Administered)
                                                   :
---------------------------------------------------------------x

**DECLARATION OF RICK WESTENBERG**
**IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING**
**(I) MASTER DISPOSITION AGREEMENT FOR PURCHASE OF CERTAIN**
**ASSETS OF DELPHI CORPORATION, (II) RELATED AGREEMENTS,**
**(III) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS,**
**(IV) AGREEMENT WITH PENSION BENEFIT GUARANTY CORPORATION,**
**AND (V) ENTRY INTO ALTERNATIVE TRANSACTION IN LIEU THEREOF**

I, Rick Westenberg, declare as follows:

    1.      I am a Director of Business Development for General Motors Corporation

(together with its direct and indirect subsidiaries, "**GM**"). I have personal knowledge of the facts

set forth herein or have conducted a reasonable inquiry to determine that such statements are true

and correct.

2. I received a Bachelor of Business Administration degree in 1996 from the University of Notre Dame. After graduating from college, I spent five years working as an auditor and financial consultant at Ernst & Young LLP. Thereafter I attended the University of Chicago and received an MBA.

3. I was hired by GM in 2003 and have been employed continuously since then. During my employment at GM I have held several positions in the New York Treasurer's Office focusing on different aspects of corporate finance. I am currently Director of Business Development and have held this position since 2008. As Director of Business Development, I am responsible for supporting the restructuring activities related to GM's involvement in the chapter 11 cases of Delphi Corporation ("**Delphi**"), which has operated under chapter 11 protection since October 2005. I previously supported these same restructuring activities as Manager of Business Development in 2005 through 2006.

4. I have been integrally involved in the negotiations between Delphi, GM and Parnassus Holdings II, LLC ("**Parnassus**") in connection with the purchase by each of GM and Parnassus of certain of Delphi's assets (the "**Proposed Transaction**").

5. I make this declaration in support of GM's motion to approve (i) the purchase, and guarantee of purchase, of certain assets of Delphi pursuant to the MDA[1], (ii) entry into the SPA, the Operating Agreement, the Loan Agreement, the Commercial Agreements, and the Ancillary Agreements with Parnassus in connection with Parnassus's purchase of substantially all of the remaining operating assets of Delphi, (iii) assumption of certain executory contracts in connection with the sale of certain of Delphi's assets and assignment of such

---

[1] Capitalized terms not defined herein have the meaning ascribed to such terms in the Motion.

contracts and leases to Vehicle Holdings, (iv) entry into an agreement with the PBGC in connection with such transaction, and (v) entry into an Acceptable Alternative Transaction with the successful bidder, if applicable, in the auction of Delphi's assets (the "**Motion**").

**I.**   *GM's Support to Date to Delphi's Chapter 11 Cases*

6. During the Delphi Cases, GM has been forced to spend billions of dollars and incur billions of dollars of additional liabilities primarily to protect its supply base by supporting Delphi. The following are some of the most significant contributions made by GM in the Delphi Cases:

- *Labor Solutions During Delphi's Cases*. GM made several critical contributions to facilitate Delphi's implementation of new agreements with its unions in 2006, 2007, and 2009, including paying or assuming billions of dollars of liabilities to allow Delphi to implement special attrition programs for certain of its hourly employees, providing opportunities for certain hourly employees to flow back to work for GM, the transfer of significant pension and post-retirement health care obligations to GM, and entering into memoranda of understanding with Delphi's unions to subsidize certain payments that GM believes Delphi would otherwise have had to make to its hourly employees.

- *Global Settlement Agreement/Master Restructuring Agreement*. To resolve many of the issues between GM and Delphi and increase Delphi's ability to exit chapter 11, GM and Delphi entered into a Global Settlement Agreement (as amended, the "**GSA**") and a Master Restructuring Agreement (as amended, the "**MRA**"), both of which have been amended several times during the Delphi Cases.[2] The GSA and the MRA both became effective in the fall of 2008. Pursuant to the GSA and the MRA, GM agreed, among other things:

    o to assume post-retirement health care and basic life insurance benefits for the vast majority of Delphi's U.S. hourly retirees (beyond such assumptions already contemplated in the labor contributions described above);

---

[2] All summaries in this Declaration of any agreements are qualified in their entirety by the terms of such agreements and, in the event of any conflict between any summary and the applicable agreement, the terms of such agreement control.

- o that the GM hourly pension plan would assume $2.1-2.4 billion of net liability of Delphi's hourly pension plan in exchange for an allowed administrative expense claim equal to 77.5% of the transferred net liability;[3]

- o to subsidize through 2015 Delphi's U.S. hourly labor costs and, until closure or sale, the costs of operating several of Delphi's U.S. facilities;

- o to a revenue plan to provide Delphi with a substantial, long-term book of GM business (in some cases, at pricing GM believes to be higher than market competitive levels) and enhanced opportunities to win future GM business; and

- o to reduce GM's unsecured claims against the Delphi Debtors from an asserted amount in excess of $13 billion to an allowed claim of $2.7 billion.

- *Liquidity Support*. While looking for alternatives to exit chapter 11, Delphi sought support from GM in the spring of 2008 to address Delphi's liquidity issues and avoid a shut down. As a result, GM agreed to advance Delphi up to $650 million in exchange for claims with a priority junior to the claims of the Delphi DIP Lenders (as amended, the "**GM-Delphi Financing Agreement**"). Since then, GM has made certain amendments to the GM-Delphi Financing Agreement such that GM's commitment to fund loans to Delphi thereunder is currently $550 million (inclusive of outstanding loans). In addition, GM accelerated the payment of $300 million in trade payables to Delphi over a three month period beginning in the first quarter of this year.

Notwithstanding the billions of dollars of support GM has already provided to Delphi, Delphi continues to need further liquidity support. In addition, Delphi's postpetition financing loans (the "**Delphi DIP Loans**") – in the current principal amount of approximately $3.3 billion – matured on December 31, 2008 and are currently in default. Delphi's DIP Lenders entered into a series of forbearance agreements, but the forbearance may expire as early as July 10, 2009, at which point the Delphi DIP Lenders may seek to foreclose on all or some portion of Delphi's

---

[3] GM also agreed that if Delphi could consummate a reorganization plan meeting certain criteria, (i) the GM hourly pension plan would assume an additional approximately $3.2 billion of net liability (based on current estimated liabilities and asset values) of Delphi's hourly pension plan, (ii) GM would accept preferred stock in reorganized Delphi in lieu of repayment of GM's administrative and general unsecured claims against Delphi, and (iii) GM would, under certain conditions, share a portion of such preferred stock with Delphi's unsecured creditors. Due to the state of the Delphi Cases, GM strongly believes that Delphi will not be able to consummate a reorganization plan meeting such criteria.

assets. The chaos that could ensue as a result of such foreclosures could lead to a cessation of some or all of Delphi's operations. A cessation of operations by Delphi, whether due to liquidity constraints or foreclosures by the Delphi DIP Lenders, could shut down GM's production and lead to the attendant consequences described in the Declaration of Randall L. Pappal in support of the Motion, filed contemporaneously herewith (the "**Pappal Declaration**").

## II.     *The Need for the Proposed Transaction*

7.      For the reasons set forth in the Pappal Declaration, in GM's relationship with Delphi, protection of supply is paramount. GM must take measures to secure continuity of supply. Due to Delphi's current liquidity crisis and the potential for foreclosure by Delphi's postpetition secured lenders (the "**Delphi DIP Lenders**") in the absence of a consensual resolution, it is imperative that the Debtors immediately secure the supply of parts from Delphi in order for GM's own reorganization to succeed. In light of current circumstances, GM can only obtain confidence that its supply of Delphi's parts will not be threatened by obtaining control of certain of Delphi's assets and/or through a transfer of Delphi's assets to an entity that GM is comfortable will be a stable and well-capitalized long-term supplier of parts to GM.

## III.     *Search for Other Alternatives to the Proposed Transaction*

8.      Over the past several months, GM and Delphi have discussed with various parties, including the Delphi DIP Lenders and another potential purchaser of Delphi's assets, potential transactions to resolve the Delphi Cases. Platinum Equity Capital Partners II, L.P. ("**Platinum**") was the only party to present a viable business, operating, and restructuring plan, including stability of supply to GM, and to commit to a binding transaction on the expedited timeline required by the current situation. Accordingly, after extensive negotiations with Delphi and Platinum, GM determined that its most reliable and cost-effective option to secure the supply

of parts from Delphi's facilities would be to enter into agreements with Delphi, Parnassus (which was formed by Platinum), Platinum, and certain of Platinum's affiliates to provide for Delphi's sale of substantially all of its operating assets to GM (including to certain of GM's non-debtor affiliates) and Parnassus.

## IV.    *The Benefits of the Proposed Transaction*

9.      Accordingly, to stabilize and secure for itself the supply of essential parts, GM has entered into the Proposed Transaction with Delphi and Parnassus, which would be partly owned by GM, whereby GM (primarily through wholly-owned non-debtor affiliates) would purchase certain of Delphi's assets used primarily to manufacture parts for GM, and Parnassus would purchase substantially all of Delphi's remaining operating assets (which are also used to produce parts for GM and other customers).

10.     More specifically, GM has decided to obtain control of Delphi's global steering business and Delphi's U.S. plants that employ workers represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "**UAW**") because those plants supply parts primarily to GM and, in the case of the U.S. UAW plants, are important to GM's relationship with the UAW.  Operating assets of other Delphi businesses where GM is generally either not the principal customer or where the components are not as critical to GM production interests will be transferred to a third party.  Because no other party has been willing to provide sufficient capital to fully reorganize these other assets, GM has agreed to provide significant funding to the entity that will own these assets under the Proposed Transaction to allow such entity to reorganize the assets and become a stable supplier to GM.

11.     The Proposed Transaction would meet GM's goal of stabilizing the supply of parts currently manufactured by Delphi.  While acquiring certain critical assets directly, the

other assets used to produce parts for GM would be transferred to a stable entity that would be well-capitalized and controlled by Platinum, which has the experience necessary to successfully operate the assets.[4] In the unlikely event that Parnassus encounters financial difficulties, GM will have greater means to protect itself due to enhanced rights it is obtaining under commercial agreements with Parnassus. Finally, because Parnassus will be properly capitalized and GM has confidence in Parnassus's business, operating, and restructuring plan, GM believes that it will eventually be able to recover most, if not all, of the funds that it will invest in and loan to Parnassus.

**V.**    *Consideration to Be Paid by GM*

12.    Under the Proposed Transaction, GM is providing the following consideration for the GM Purchased Assets:

- Assumption of certain ordinary course of business liabilities associated with the GM Purchased Assets;

- Assumption or payment of amounts necessary to cure defaults under Delphi's executory contracts that are to be assigned to GM (GM estimates this amount will be no more than $90 million);

- Payment to Delphi of approximately $900 million in cash;
- Payment to Delphi of up to $50 million to fund certain expenses of winding down the Delphi Debtors' estates;

- Payment of 50% of Delphi's professional fees (such payment is capped at $15 million), plus the costs of solicitation of votes for Delphi's Modified Plan (such payment is capped at $12 million); and

---

[4] Platinum has a successful track record of investing in and operating, among other types of companies, manufacturing and industrial companies. More importantly, Platinum has been doing due diligence on Delphi's assets for more than three years and has devised a comprehensive business plan for Parnassus that is not dependent for success on the automotive industry returning to pre-recessionary sales levels and that GM believes will result in the financial and operational success of Parnassus.

- Payment to Delphi of up to approximately $145.5 million of the first net proceeds of the Plan Investor Litigation.

## VI. *Involvement of U.S. Treasury*

13. The United States Department of Treasury (the "**U.S. Treasury**") is the Debtors' largest prepetition secured creditor and their postpetition secured lender. As such, the U.S. Treasury was kept abreast of and participated in the negotiations over the Proposed Transaction and approved GM's entry into the Proposed Transaction.

14. Additionally, GM's postpetition secured loan will enable GM to fund the Proposed Transaction or an Acceptable Alternative Transaction that requires funding by GM. To that end, with the approval of the U.S. Treasury, GM's anticipated expenditures with respect to Delphi were built into the initial 13-week budget submitted to the Court as part of approval of GM's postpetition financing (the "**DIP Budget**") and the final DIP Budget reflects all of the projected expenditures to be paid by GM or the other GM Buyers, including funding of capital to Parnassus under the SPA, in connection with the Proposed Transaction or an Acceptable Alternative Transaction.

## VII. *The PBGC Discussions*

15. Delphi's hourly and salaried pension plans are currently significantly underfunded (the hourly plan has a net underfunded liability of approximately $3.2 billion and the salaried plan has a net underfunded liability of approximately $2.1 billion). The PBGC has asserted liens against the assets of Delphi's non-debtor affiliates (which include the foreign assets under the Proposed Transaction) to attempt to secure certain of the PBGC's pension-related claims against Delphi's ERISA control group. Although Delphi has disagreed that these asserted liens are valid or enforceable, neither GM nor Parnassus (nor presumably any other

potential purchaser) is willing to purchase the assets (or shares in the non-debtor affiliates that own the assets) while they are subject to the threat of the PBGC liens.  As a result, conditions precedent to the obligations of GM and Parnassus under the MDA are that the PBGC shall have agreed to remove its alleged liens on the assets subject to the Proposed Transaction. Additionally, Delphi's obligations under the MDA are conditioned on Delphi not being subject to liability in respect of its hourly pension plan after the closing of the MDA.

16. GM, Delphi, the PBGC, and the U.S. Treasury have engaged in discussions regarding an agreement to satisfy these conditions and render saleable the assets subject to the PBGC's asserted liens (a "**PBGC Agreement**").  Although no PBGC Agreement has yet been reached, as part of any PBGC Agreement that may be ultimately reached, GM may agree to make a cash payment to the PBGC and/or assume all or some portion of the net underfunded liability of Delphi's hourly pension plan.  GM will only agree to make these contributions if they are necessary to enable the Proposed Transaction or any Acceptable Alternative Transaction to proceed and the contributions are clearly outweighed by the benefits GM would receive from the Proposed Transaction or an Acceptable Alternative Transaction.  In such circumstances, the GM contributions would be a sound exercise of GM's business judgment.  Additionally, as with the other aspects of the Proposed Transaction, any GM contributions under a PBGC Agreement will be subject to U.S. Treasury consent.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 8, 2009
      New York, New York

/s/ Rick Westengerg
RICK WESTENBERG