Hearing Date and Time: August 3, 2009, 9:45 a.m. (ET)

WM. DAVID COFFEY & ASSOCIATES
13810 FM 1826
Austin, TX 78737
Telephone:    (512) 328-6612
Facsimile:    (512) 328-7523
Wm. David Coffey, III (*Pro Hac Vice Admission Pending*)
Martin Alaniz (*Pro Hac Vice Admission Pending*)

*Attorneys for Cardenas Autoplex, Inc.*

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------------X
In re:                                    :    Chapter 11
                                          :
GENERAL MOTORS CORP, et al.,              :    Case No. 09-50026 (REG)
                                          :
Debtors                                   :    Jointly Administered
---------------------------------------------------------------X
```

### OBJECTION OF CARDENAS AUTOPLEX, INC., TO GM'S MOTION PURSUANT TO 11 U.S.C. §365 AUTHORIZING (A) THE REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF CERTAIN DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF

Cardenas Autoplex, Inc. ("Cardenas"), by and through its undersigned counsel,

respectfully submits this objection to the "Rejection Motion," Document No. 2995, filed

by debtor General Motors Corporation and the above captioned Debtors and Debtors in

Possession (hereinafter, "GM" or "Debtors").

### INTRODUCTION

1.    In the Rejection Motion, Document No. 2995, GM asks the Court to authorize

Debtor to reject Cardenas Autoplex Inc.'s Cadillac franchise agreement, effective July

10, 2009.[1]

---

[1] See GM's Rejection Motion p.1-2 Document No. 2995.

2.       This is an objection to GM's notice of rejection of Cardenas Autoplex, Inc.'s
Cadillac franchise operated at 111 South Loop 499, Harlingen, Texas, dealer operator:
Mr. Rene Cardenas.  Simply stated, continuation of the Cardenas Cadillac franchise
benefits the Debtor's estate.  Rejection of the franchise under the pertinent facts is
unconscionable.

3.       In 2007, the Cardenas Cadillac franchise was sold to Weslaco Motors, LP, in
Weslaco, Texas, dealer operator: Mr. Edwin (Bud) Payne, with the intent that Mr. Payne
relocate the franchise to his GM dealership in Weslaco, Texas, where it would be
operated with Mr. Payne's other GM lines. GM approved the sale and relocation by
Letter of Intent dated August 12, 2008. (See copy enclosed as Exhibit A.) The Motor
Vehicle Division of the Texas Department of Transportation approved the acquisition and
was prepared to license Weslaco with the Cadillac franchise when the license application
was protested by Bert Ogden Chevrolet, Inc., d/b/a Bert Ogden Cadillac, in Mission,
Texas, under a state law which allows same line dealers to protest relocation license
applications.

4.       The protest went to trial at the Texas State Office of Administrative Hearings
("SOAH") in December, 2008. On April 27, 2009 a Proposal for Decision ("PFD") issued
from the SOAH approving the relocation of the Cardenas Cadillac franchise to Weslaco,
Texas, and it's licensure in Weslaco Motors, LP. (See PFD of April 27, 2009 enclosed as
Exhibit B.)  Weslaco Motors, LP, will combine Cadillac with its other GM franchises as
approved by GM in the referenced Letter of Intent.

5.       Since GM has approved the acquisition and relocation, and since the parties have
expended substantial sums pursuing the contested case licensing process, in reliance on

2

that approval, it came as a surprise when GM issued the attached May 14, 2009 Notice of

Nonrenewal of the Cardenas Cadillac franchise. (See Exhibit C) It came as even more of

a surprise when Debtor issued the notice of rejection of Cardenas' Cadillac franchise.

6.      The Administrative Law Judge in the Texas Motor Vehicle Division licensing

case has determined that the relocation of Cardenas' Cadillac franchise from Harlingen to

Weslaco could result in another 200 Cadillac sales per year based on 2007 data. The

Administrative Law Judge also determined that Cadillac customer convenience in the

Lower Rio Grande Valley would be substantially improved by relocating Cardenas

Cadillac to Weslaco, Texas, under the operations of Mr. Edwin (Bud) Payne. (See PFD

enclosed, Exhibit B.) Retaining the contract will benefit the Debtor's estate.

7.      Finally, it would be unconscionable for GM to reject the Cardenas Cadillac

franchise after both Cardenas and Payne have devoted so much time and money to the

acquisition and relocation of the franchise based on GM's written approval of that

acquisition and relocation.

8.      Cardenas Autoplex, Inc., respectfully requests, therefore, that its Cadillac

franchise be retained so that the sale to Weslaco Motors and its relocation can be

concluded for the benefit of all parties.

### PRAYER

WHEREFORE, Cardenas respectfully requests that the Court enter the attached

Order:

(a) sustaining this Objection as to Cardenas Autoplex, Inc. and overruling GM's

Motion to reject Cardenas' Cadillac franchise to the extent it requests relief inconsistent

with this Objection, and

3

(b) providing Cardenas with such other and further relief as is appropriate. (See

Proposed Order 1)

Dated: July 15, 2009
      Austin, Texas

           /s/ Wm. David Coffey, III
           Wm. David Coffey, III
           Martin Alaniz
           WM. DAVID COFFEY & ASSOCIATES
           13810 FM 1826
           Austin, TX 78737
           Telephone:    (512) 328-6612
           Facsimile:    (512) 328-7523
           Email:    wdcoffeylaw@yahoo.com

           *Attorneys for Cardenas Autoplex, Inc.*

**EXHIBIT A**

 **CONFIDENTIAL**



<u>CERTIFIED MAIL</u> – 7001 2510 0000 2547 4842
<u>RETURN RECEIPT REQUESTED</u>

General Motors Corporation
Dealer Contractual Group
Mail Code 482-A06-C66
100 GM Renaissance Center
Detroit, MI 48265-1000

<u>PERSONAL & CONFIDENTIAL</u>

August 12, 2008

Payne Pike Development Co.
d/b/a Payne Weslaco Motors
2401 E. Expy 83
Weslaco, TX 78596

Dear Edwin Payne, President:

This constitutes the response of General Motors Corporation ("GM") to the request that GM enter into a General Motors Dealer Sales and Service Agreement for Cadillac ("Dealer Agreement") with Payne Weslaco Motors ("Dealer Company") naming Edwin Payne as Dealer Operator for a Cadillac, Chevrolet, Buick Pontiac GMC dealership to be located at 2401 E Expy 83 in Weslaco, TX ("Proposal"). This Proposal also includes the discontinuation of Cadillac dealership operations at 111 S Loop 499 Harlingen, TX 78550 and subsequent relocation to 2401 E Expy 83 Weslaco, TX 78596 ("Location"). Dealer Company and Edwin Payne are hereafter referred to as the "Applicants".

GM hereby approves the Proposal subject to and conditioned upon Applicants' acceptance of the terms, conditions, and requirements set forth in the Letter Agreement. Applicants' acceptance must be communicated to GM by executing and returning an unaltered counterpart of this Letter Agreement to the attention of LaRenta Farley, 100 Renaissance Center, M/C 482-A07-C66, Detroit, MI 48265, within 30 days of receipt of this Letter Agreement.

Upon fulfillment of and subject to all terms, conditions, and requirements of this Letter Agreement, GM agrees to offer the then current standard form GM Dealer Sales and Service Agreement ("Dealer Agreements") to Dealer Company for the Cadillac, Chevrolet, Buick Pontiac GMC dealership point at 2401 E Expy 83 Weslaco, TX 78596 ("Location"). In order to effectuate the intent of each of the parties to relocate Cadillac dealership operations to the above Location, the Applicants represent and the parties agree as follows:

1. **Documents and Information required for execution of Dealer Agreement.** Applicants will provide GM with the documents and information listed below:

   - The following items applicable to GM Dealership Identification signage:

        -The attached GMDI Assignment form executed by the appropriate parties. The original document must be received in order to initiate a change of the dealership name on the signs. (Sample form included)
        -The attached GMDI Request for Survey form for a new location.

   - The following items applicable to GM Pulsat:
        GM Pulsat Landowner Consent Form

   - A letter from the selling Dealer voluntarily terminating its General Motors Dealer Sales and Service Agreement on the same date of GM signing the new Dealer Agreement with Payne Pike Development Co. d/b/a Payne Weslaco Motors. In addition, the letter should request a waiver of the thirty-day notification as set forth in Article 14.1 of the Dealer Agreement and the address and telephone where the selling dealer may be contacted at after the termination.

CONFIDENTIAL

- Prior to or at the time of the execution of the new Dealer Agreement, Applicants must provide a fully executed bill of sale, stock transfer documentation, or such other documentation acceptable to GM evidencing the transfer of assets as detailed in the Purchase Agreement dated August 8, 2007 between Cardenas Autoplex Inc. and Payne Weslaco Motors.

- Enclosed for your reference is Parts and Accessories Terms of Sale Bulletin, No. 2002-1 U.S. Please refer to this bulletin for questions regarding General Motors parts, specifically under "III Return Plan", Section I. *Buy/Sell Dealer Termination Parts Return Assistance Policy.*

2. **Capital Stock:** All of the capital stock of the Dealer Company will be personally and directly owned by Edwin Payne and others on a basis that is acceptable to GM. In any event, Dealer Operator shall own and continue to own on a personal and direct basis an unencumbered interest of at least 15 percent [15%], based upon the greater of:

   a) The total equity investment of the Dealer Company (excluding real estate); or

   b) The sum of Dealer Company's net working capital standard amount plus all fixed and other assets (excluding real estate) net of depreciation.

3. **Site Approval:** This Letter Agreement pertains to the *relocation* of Cadillac dealership operations to the Location and shall constitute GM's approval of the Location. GM's site approval extends only to this Location.

4. **Facility Image:** Applicants will cause Dealer Company to provide and maintain facilities at the Location satisfactory to GM in both appearance and layout. The facilities and premises shall be adequate in size for a Cadillac,Chevrolet, Buick Pontiac GMC dealer to effectively perform and conduct dealership operations at the Location. The facility will satisfy all of GM's reasonable facilities requirements as set forth in GM Dealer Bulletin GM 01-18 and shall be completed utilizing the GM Facility Image Program and appropriate product identification signage. Please refer to the GM Facility website for image and product identification requirements at www.gmfacilityimage.com.

5. **Facility (Space/Premises) Requirements:** GM facility requirements are detailed in GM Dealer Bulletin GM 01-18 (copy attached), and these include a requirement that a dealership meet space requirements satisfactory to GM. Based upon average historical dealership performance/ operations in similar size markets, GM recommends that the proposed dealership premises meet the following space requirements:

| Space Requirements (Estimates) | GM Use | |
|---|---|---|
| New Vehicle Display-Interior | 4 | Stalls |
| New Vehicle Display-Exterior | 4 | Stalls |
| Used Vehicle Display | 125 | Stalls |
| Productive Service – Mechanical | 23 | Stalls |
| Service-Reception | 4 | Stalls |
| Parking-Customer | 55 | Stalls |
| New Vehicle Storage | 208 | Stalls |
| Employee Parking & Miscellaneous | 52 | Stalls |
| | | |
| Total Building (Includes Gen Office & Parts) | 28,589 | square feet |
| General Office (Memo) | 3,136 | square feet |
| Parts (Memo) | 5,567 | square feet |
| Usable Lot (less any required green space | 182,520 | square feet |
| Total Usable Premises (Total Bldg + Usable Lot) | 211,109 | square feet |

(Specific space standards by category are available at www.gmfacilityimage.com)

If Applicants want to propose changes to the above space requirements based upon their individual dealership operations, such requests and a detailed explanation of the circumstances must be provided in writing to GM before preliminary plans are submitted to GM for review. The space requirements for the proposed dealership operations are set forth above, except for any changes approved in writing by GM.

CONFIDENTIAL

6.  **Non-GM Dual Policy/Excess Facilities Policy:** An excessively large or expensive facility is strongly discouraged and generally will not be approved by GM. A dealer shall not be entitled to any special consideration with respect to distribution or any other aspect of its relationship with GM by reason of any excessive premises or facility. Furthermore, GM's policy, (refer to GM Dealer Bulletins, GM 01-18, General Motors Facility Requirements, and GM 01-19, Non-GM Dual Policy, dated October 1, 2001), is that non-GM products should not be sold or serviced from GM dealerships, and Dealer represents and agrees that the proposed dealership premises and facilities for Chevrolet, Buick Pontiac GMC and Cadillac dealership operations will not be utilized for any non-authorized non-GM dealership operations.

7.  **GM Pulsat Equipment:** If the relocation entails the removal and reinstallation of your GM Pulsat equipment to the Location, Dealer Company agrees to reimburse GM Pulsat Administration for all costs and expenses incurred by it in effecting the removal and reinstallation of the GM Pulsat equipment.

8.  **Line of Credit:** Prior to execution of a Dealer Agreement, Applicants will cause the Dealer Company to provide GM evidence that the Dealer Company has obtained a separate line of credit from a creditworthy financial institution acceptable to GM to enable the Dealer Company to sufficiently finance the purchase of a sufficient number of new GM vehicles to meet its obligations under the Dealer Agreements.

9.  **Net Working Capital:** Applicants will cause the Dealer Company to make available and maintain for use in its GM sales and service business an unencumbered amount of actual net working capital as set forth in the minimum Capital Standard Addendum executed with the Dealer Company.

10. **Independent Analysis:** Applicants acknowledge, represent and agree that their Proposal as submitted is based upon their independent analysis of the business opportunity they wish to pursue. Applicants further represent and agree that in determining to enter into this Letter Agreement and to pursue the underlying business opportunity, they are not relying on any representation, promise, guaranty, or information provided by GM or any employee, agent or representative of GM except as expressly set forth in this Letter Agreement.

11. **Premises Liability Disclaimer:** Nothing in this Letter Agreement, including GM's recommended space guides or GM's approval of facility plans, shall create or impose upon GM any obligations or liabilities with respect to the dealership premises and/or facility beyond those specifically set forth in Article 15 of the Dealer Agreement.

12. **Term and Extensions:** As protest litigation has been filed challenging the relocation of the Cadillac dealership at this Location, and such litigation is still pending, this Letter Agreement shall be automatically extended until either (i) such litigation is resolved in a manner which prevents the relocation of dealership operations to the Location, or (ii) six months after resolution of such litigation in a manner permitting the relocation of dealership operations to the Location. In its sole discretion and reasonable judgment, GM may extend any dates set forth in this Letter Agreement further if Dealer Company requests an extension of time in writing prior and GM determines that additional time is necessary as a result of circumstances beyond Dealer Company's reasonable control.

13. **Licenses:** Applicants will cause Dealer Company to obtain all necessary licenses to operate Cadillac, Chevrolet, Buick Pontiac GMC dealership operations at this Location. It will be Dealer Company's sole responsibility to take all necessary steps in a timely manner to obtain such licenses under the provisions of any applicable statutes and regulations. GM shall not be responsible for any costs, expenses, damages or delays incurred as a result of efforts to obtain such licenses.

14. **Third Party Protest:** GM's approval of the relocation is subject to and conditioned upon the satisfactory and final resolution of all disputes, protests, or complaints arising out of or related to the relocation. Accordingly, GM is not responsible or liable for the consequences, including any costs, expenses, or damages, resulting from actions taken by any government entity or other third party which result in the delay or prevention of the relocation of a Cadillac dealership at this Location, including any such costs, expenses or damages resulting from actions or proceedings filed or commenced by existing GM dealers or others in any administrative, judicial or other governmental forums, under the GM Dispute Resolution Process, or as a result of adverse rulings in such proceedings. Dealer Company agrees to cooperate fully and use best efforts to assist GM in any litigation filed or action taken by GM or others concerning the relocation of a dealership to the Location, including but not limited to actions filed by third parties seeking to prevent or

CONFIDENTIAL

delay the relocation of dealership operations to the Location. GM has the sole right and discretion to determine whether and to what extent it will pursue, defend, or join any litigation, arbitration or other action necessary to relocate dealership operations to the Location, including whether to appeal or challenge any court or government agency order or decision.

15. **General Liability Disclaimer:** GM is not responsible or liable for any obligations or liabilities incurred by the Applicants which arise out of or in connection with the compliance to the terms, conditions, and requirements stated herein.

16. **Selling Dealer's Commitments to GM:** Prior to entering into a Dealer Agreement with Dealer Company, selling Dealer shall have satisfied all of its commitments to GM, including but limited to satisfying any indebtedness of selling Dealer to GM.

17. **Dispute Resolution:** Applicants consent to the use of the GM Dispute Resolution Process, a copy of which is attached hereto, to resolve any disputes between Applicants and GM under this Letter Agreement.

18. **Attorneys' Fees:** Applicants recognize that an existing Cadillac Dealer has contested the relocation of Cadillac to this Location. Should GM incur expenses, including attorneys' fees, expert witness fees, and other litigation costs in reliance on Applicants' commitment to fulfill its obligations under this Letter Agreement and if such a contest is successfully resolved, but Applicants do not fully comply with their obligations under this Letter Agreement, then Applicants agree to reimburse GM for all GM's expenses incurred in connection with any such contest, including but not limited to attorneys' fees, expert witness fees and other litigation and dispute resolution costs.

This paragraph shall not apply, if and only if, Applicants' failure to comply is the result of either (i) labor strikes, material shortages, fires or acts of God, or (ii) a final, unappealable order of decision from a court, governmental agency or other third party preventing dealership operations at the Location.

19. **Accurate Representations/Data:** Applicants represent that all of the written materials submitted in support of their proposal, including without limitation the Application, Source of Funds Statement, and related documents, are complete, true and accurate. Inasmuch as GM's obligations to provide Dealer Company with a Dealer Agreement for the Location is contingent upon the terms and conditions set forth above, and on accuracy of the representations contained in Applicants' Application and related documents, Applicants agree that should the Dealer Company fail or refuse to proceed to fulfill all the terms and conditions set forth herein, or should GM determine that the application and related documents were inaccurate, untrue or incomplete, or should GM be prevented in any way from appointing Dealer Company as a dealer at the Location, then GM may at its option terminate its commitments herein.

20. **Dealer Agreement:** Applicants will cause Dealer Company to fulfill all of the terms and conditions set forth in the Dealer Agreements. Upon execution of this Letter Agreement by Applicants, the obligations set forth herein are incorporated by reference into the Dealer Agreement.

21. **Dealer Operator/Assignment Limitations:** GM executes this Letter Agreement in reliance on the personal services, business experience and financial qualifications of Edwin Payne. Accordingly, Applicants may not assign, transfer or convey this Letter Agreement, in whole or in part, without the express written consent of GM. Moreover, GM shall not be obligated, under any circumstances, to enter into a Dealer Agreement with any entity, unless Edwin Payne is named Dealer Operator thereof in accordance with the terms of this Letter Agreement. Although this Letter Agreement is entered in reliance on the personal services, business experience, and financial qualifications of the Dealer Operator, the Dealer Company is the only party to the Dealer Agreements with GM. Upon execution of a Dealer Agreements as contemplated by this Letter Agreement, the provisions of the Dealer Agreements shall supersede the inconsistent terms, conditions and requirements of this Letter Agreement, except that GM will continue to be entitled to rely upon the representations of the Applicants contained in this Letter Agreement.

There are no other agreements or understandings written or verbal between the parties with regard to the matters covered by this Letter Agreement. The parties acknowledge and represent that this Letter Agreement: 1)

CONFIDENTIAL

shall be construed according to the laws of the State of Michigan, 2) cannot be modified except by a writing executed by an authorized individual of behalf of all parties, and 3) no representative of GM is authorized to modify this Letter Agreement or any of its terms, conditions, and requirements orally.

If Applicants agree to the terms, conditions, and requirements herein, please indicate by signing the two enclosed duplicates of this Letter Agreement. One signed original should be maintained for your records and return the other signed original to LaRenta Farley at the address listed below within 30 days of receipt of this Letter Agreement.

The documents and information required in this Letter Agreement should be sent to the attention of: LaRenta Farley, 100 Renaissance Center, M/C 482-A06-C66, Detroit, MI 48265. The Dealer Agreement(s) will become effective on the first business day following the date on which the contracts were signed by the Dealer Company and GM, and unless otherwise noted, will reflect an expiration date of 10/31/2010 to coincide with the expiration date of the standard GM Dealer Agreement(s).

Very truly yours,

James Freitus
Zone Manager
General Motors Corporation

Attachments: Dispute Resolution Process
                    GM Dealer Bulletins: GM 01-18 and GM 01-19

Acknowledged and agreed this _____ day of _____, 2008.

Payne Weslaco Motors                         Edwin Payne

By: _____

                                                      _____
Title: _____                 Individually

## EXHIBIT B

SOAH DOCKET NO. 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.LIC

| | | |
|---|---|---|
| WESLACO MOTORS, L.P., | § | BEFORE THE STATE OFFICE |
| Applicant | § | |
| | § | |
| v. | § | OF |
| | § | |
| BERT OGDEN CHEVROLET, INC. | § | |
| Protestant | § | ADMINISTRATIVE HEARINGS |

## PROPOSAL FOR DECISION

### TABLE OF CONTENTS

I.      JURISDICTION, NOTICE, AND PROCEDURAL HISTORY............................1
II.     DISCUSSION,.................................................................................................2
        A.      Back ground .......................................................................................2
        B.      Applicable Law ..................................................................................3
        C.      Evidence .............................................................................................4
                1.      Applicant's Evidence ...........................................................4
                        a.      Testimony of Edwin Payne .......................................4
                        b.      Testimony of Bob Grooms .......................................14
                2.      Protestant's Evidence ..........................................................26
                        a.      Dr. George Berry's reports and testimony ..............27
                        b.      Testimony of Robert Vackar ....................................30
        D.      Analysis .............................................................................................31
                        a.      Adequate Representation of Cadillac .......................33
                        b.      Substantial Compliance with Franchise ...................35
                        c.      Desirability of Competitive Marketplace ..................35
                        d.      Any Harm to the Protesting Franchised Dealer ........36
                        e.      The Public Interest....................................................38
        E.      Recommendation ..............................................................................41
III.    FINDINGS OF FACT ..................................................................................41
IV.     CONCLUSIONS OF LAW............................................................................47

SOAH DOCKET NO. 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.LIC

| | | |
|---|---|---|
| WESLACO MOTORS, L.P., | § | BEFORE THE STATE OFFICE |
| Applicant | § | |
| | § | |
| v. | § | OF |
| | § | |
| BERT OGDEN CHEVROLET, INC. | § | |
| Protestant | § | ADMINISTRATIVE HEARINGS |

### PROPOSAL FOR DECISION

Weslaco Motors, L.P., (Applicant or Weslaco Motors) seeks approval of its application filed with the Motor Vehicle Division (MVD) of the Texas Department of Transportation (TxDot) to amend its dealership license to add the Cadillac passenger auto and light truck lines by General Motors to its current dealership located in Weslaco, Hidalgo County, Texas. Bert Ogden Chevrolet, Inc. d/b/a Bert Ogden Cadillac (Protestant or Bert Ogden Cadillac), an existing Cadillac dealer in Hidalgo County, protested the application. Having considered the evidence submitted in this matter and arguments of the parties, the Administrative Law Judge (ALJ) finds that Weslaco Motors established good cause for approving its application. Consequently, the ALJ recommends approval of the application by the MVD.

### I. JURISDICTION, NOTICE, AND PROCEDURAL HISTORY

The MVD of TxDot has jurisdiction over this matter, pursuant to TEX. OCC. CODE (CODE) §§ 2301.652; 2301.701-713; and 43 TEX. ADMIN. CODE (TAC) §§ 8.105-8.107. The State Office of Administrative Hearings has jurisdiction over all matters related to convening the contested case hearing, including the authority to issue a proposal for decision containing findings of fact and conclusions of law, pursuant to Code § 2301.704.

The issue of notice was not disputed by the parties; consequently, that issue will be set out in the findings of fact and conclusions of law without further discussion here.

The hearing convened on December 2, 2008, before ALJ Suzanne Formby Marshall in the William P. Clements Building, 300 West 15th Street, Fourth Floor, Austin, Texas. William David Coffey, III, of David Coffey, III, & Associates in Austin, Texas, appeared and represented Weslaco Motors. Dudley McCalla, attorney, appeared and represented Bert Ogden. The hearing concluded on December 4, 2008, and the record was held open in order to receive a transcript of the hearing and written closing arguments by the parties.[1]  The record closed on February 24, 2009.

## II.    DISCUSSION

### A.    Background

Weslaco Motors seeks approval to amend its franchise license in order to establish and operate a Cadillac dealership to be located at 2401 E. Expressway 83, in Weslaco, Texas.[2]  Bert Ogden operates a Cadillac dealership located at 1400 E. Expressway 83, in Weslaco, and it filed a protest to Weslaco Motors' application.[3]  Weslaco Motors is located approximately twenty miles from Bert Ogden Cadillac.[4]    General Motors (GM) did not appear, intervene, or otherwise participate in this case.[5]

Weslaco Motors has entered into an agreement with Cardenas Autoplex (Cardenas),[6] a Cadillac dealership in Harlingen, Texas, to buy the assets of the Cardenas Cadillac franchise, which

---

[1] During this period of time, it was also necessary to clarify which portions of the record were subject to confidentiality protection due to the disclosures made during the hearing of Mr. Payne's financial worth and to receive supplemental pages to exhibits that were admitted into evidence at the hearing, under the optional completeness doctrine.

[2] Currently, Weslaco Motors also operates a GM dealership (comprised of Pontiac, Buick, Chevrolet, and GMC) at this location. Applicant's Ex. A-3. (Reference to Applicant's Exhibits will be A-1, 2, etc., indicating exhibits that are tabbed and numbered, with a notebook (Exhibit A). For example, Ex. A-3 refers to TAB 3 in Applicants exhibit notebook.)

[3] The protest was filed on February 28, 2008.

[4] Mr. Ogden has standing to bring this protest because the proposed Weslaco Motors Cadillac dealership will be located within the same county as his dealership. Code § 2301.652(b)(1).

[5] GM's participation would have assisted the ALJ by providing evidence related to its rationale for approving the Weslaco Motors application, market representation, areas of primary responsibility (APRs), and acceptable levels of competition.

[6] Cardenas Autoplex also operates a Mercedes-Benz dealership at the same location.

will be used in operating the proposed Weslaco Motors Cadillac dealership.[7] GM has given approval to the transaction as well as the relocation.[8] The TxDot MVD has approved the transaction, subject to the protest.

## B.   Applicable Law

As the applicant, Weslaco has the burden of proving "good cause" for establishing and operating the proposed dealership. Code § 2301.652(a). The following factors are to be considered by the MVD in assessing whether good cause has been shown:

      (1)   whether the manufacturer or distributor of the same line-make of new motor vehicle is being adequately represented as to sales and service;

      (2)   whether the protesting franchised dealer representing the same line-make of new motor vehicle is in substantial compliance with the dealer's franchise, to the extent that the franchise is not in conflict with this chapter;

      (3)   the desirability of a competitive marketplace;

      (4)   any harm to the protesting franchised dealer; and

      (5)   the public interest.[9]

---

[7] Applicant's Ex. A-1. Throughout the hearing, Weslaco Motors referred to this scenario as a "relocation" of Cardenas Autoplex to Weslaco. There are currently three Cadillac dealers in the Lower Rio Grande Valley area: Bert Ogden (in Mission), Luke Fruia (in Brownsville), and Cardenas Autoplex (in Harlingen). If Weslaco Motors' application is approved, there will continue to be three Cadillac dealers in the region - giving rise to the Applicant's assertion that a "relocation" will occur if its application is approved. However, use of the term "relocation" is somewhat inaccurate to the extent that Weslaco Motors currently does not have a Cadillac dealership to relocate. However, this is a relocation in the sense that the Cadillac APR associated with Cardenas Autoplex also currently encompasses the proposed Weslaco Motors location. *See* Applicant's Ex. A-11 (Dr. Ernest Manuel's report) at Tab 2, p. WM-00-1157.

[8] Applicant's Ex. A-2. If the application is approved, GM will issue a new franchise to Weslaco Motors. There is a pending case in which GM seeks to terminate the franchise of Cardenas Autoplex. Cardenas Autoplex has filed a protest. That matter has been abated, pending the outcome of this case.

[9] Code § 2301.652(a).

## C.    Evidence

### 1.    Applicant's Evidence

Applicant presented the testimony of Mr. Edwin "Bud" Payne, the dealer/principal of Weslaco Motors, Bob Grooms, chief financial officer of Weslaco Motors, the expert testimony of Dr. Ernest H. Manuel, and numerous exhibits.

#### a.    Testimony of Edwin Payne

Mr. Payne was born in Weslaco and has lived there all his life. He owns a Dodge-Chrysler-Jeep franchise, a Ford-Mercury franchise, and a Chevrolet-Buick-Pontiac-GMC franchise, all located in Weslaco. He also has a Mitsubishi-Jeep dealership in Harlingen, and a Volkswagen-Suzuki dealership in Brownsville that, until 2008, also included Lincoln-Mercury.[10] He and his wife split the ownership of Weslaco Motors on a 50-50 basis. Neither have been convicted of a felony.[11] As a dealer, Mr. Payne is required by GM to stay in compliance with all GM franchise agreements. He testified that he is in compliance with them. Mr. Payne described the qualities he believes make a good auto dealer: having an innate love of the business, having a servant's heart, being actively engaged in, and giving back to, the community,[12] and training.

---

[10] The Lincoln-Mercury store was sold by Mr. Payne as part of a transaction involving the closing of a Ford dealership in Mercedes, Texas. Ford assigned its right of first refusal (to own the franchise in Mercedes) to Mr. Payne and Bob Bogus, another motor vehicle dealer in the Valley, who both owned Ford dealerships. Mr. Vackar, the owner/principal of Bert Ogden, also wanted to purchase the Mercedes franchise but, essentially, he was cut out of the deal through the actions of Ford, Mr. Payne, and Mr. Bogus. It appears that this transaction has created tension between Mr. Payne and Mr. Vackar. Mr. Payne sold his Lincoln-Mercury franchise to Mr. Bogus who moved it to his existing Lincoln-Mercury dealership in Harlingen. Tr. 36.

[11] Tr. 55.

[12] Mr. Payne described his involvement in the community. He is a member of a number of organizations and has served on their boards: The Valley Chamber of Commerce, the Land Fund (a non-profit that works to preserve the South Texas native habitat), the Nature Center (preservation organization for the Mid-Valley area), Knapp Hospital, Weslaco Chamber of Commerce, Economic Development Board, Rio Grande Valley Economic Development Council, Humane Society of Hidalgo County, the Texas Automobile Dealers Association, and the Valley Auto Dealers Association. Additionally, the dealership contributes to the Little League system and a scholarship program.

Mr. Payne said that he seeks to amend his license so that he can add the Cadillac franchise to his existing Chevrolet-Buick-Pontiac-GMC store.[13] The addition of another product line will allow him to use some currently unused space in the facility and will provide an opportunity for him to expand and maximize his existing resources related to the sales of used vehicles and the service department.[14] He has sold Cadillacs in the past and testifies that he is generally familiar with the product.[15]

### Demographics of the Valley

As a lifetime resident of the Lower Rio Grande Valley (Valley or LRGV), Mr. Payne testified about its characteristics and demographics. He said the Valley has a population comprised of approximately 85-87% Hispanic residents. Noting that the Valley has low overall household income figures, he testified it is common for many families to combine their resources in order to contribute to the economic family.[16] But, he added, there are also quite a few wealthy people in the Valley, especially in the Mission/McAllen area.

According to Mr. Payne, employment rates in the Valley have increased in recent years, and the overall unemployment rate has decreased to just a point above the national average during the last three to four years. He noted that the area has one of the fastest growing populations in the United States, particularly among the 18 to 29-year-old age range.

Mr. Payne provided testimony about the sizes of towns in the Lower Rio Grande Valley. He said that the population of McAllen is 80-90,000; the population of Weslaco is 40,000; the population of Harlingen is 60,000; the population of Brownsville is over 200,000, and the population of Mission is around 65,000. The communities of Harlingen, Brownsville, San Benito, La Feria, Olmito, and South Padre Island are located in Cameron County, which has an overall county

---

[13]  Tr. 38.

[14]  Tr. 77-78; Applicant's Ex. A-5. There is about 6,000 square feet of unused space. Tr. 127.

[15]  Mr. Payne said that he had sold program Cadillacs and used Cadillacs in the past.

[16]  Tr. 56.

population of approximately 400,000. The communities of Mission, McAllen, Weslaco, and Mercedes are located in Mission County. The population of Mission County is about 800,000. If Mr. Payne's application is approved, the Cadillac dealership will be moved from Harlingen in Cameron County to Weslaco, in Hidalgo County.[17] The population count in Hidalgo County is two to one that of Cameron County.

Additionally, he noted the proximity of several cities in nearby Mexico, including Matamoros, with a million-plus people, and Reynosa, with about 750,000 people, to the Valley. In addition, there are approximately 500,000 people living between those two communities. Also, in close proximity is Monterrey, which Mr. Payne said was an hour and a half away from the Valley and was made up of around four million people. He testified that the Valley was the closest place for people in those cities to shop for many types of retail sales, including luxury vehicles.

Mr. Payne testified that automobiles in the United States can be legally sold to Mexican citizens if the purchaser has a U.S. address. He identified several bridges between the United States and Mexico: a bridge in the Mid-Valley area five miles south of Weslaco leading to Nuevo Progresso, Mexico; three bridges and a free-trade bridge used mainly for truck traffic in Brownsville; a bridge that will soon be built south of Donna; and a bridge in Reynosa. These bridges provide access to the Valley for Mexican citizens. Mr. Payne testified that sales to Mexican citizens are an important part of the revenue stream of his GM dealerships.

In Harlingen, eleven Cadillacs were sold in the area of primary responsibility (APR) for that dealership in 2007.[18] The majority were "pump-ins"[19] by Luke Fruia. Mr. Payne said that most of the business available to a car dealer in the Valley comes from Valley residents who tend to purchase

---

[17] Tr. 63-65.

[18] An APR is the area a manufacturer allots for a franchise. There is only one dealer of the same make in each APR; however, a dealer is not restricted to making sales only within his APR.

[19] A "pump-in" occurs when a vehicle is sold into the APR of another dealer as demonstrated by its registration in that APR. Tr. 121.

vehicles from dealerships located closest to them. As an example, he said that 90% of the business for his Chevrolet dealership in Weslaco comes from within 25 miles of his dealership, while only about 2% of his GM sales come from outside the Valley.[20]

### Distances between Valley communities

Mr. Payne discussed the distances between various towns in the Valley, including the three that currently have Cadillac dealerships. He testified that the Bert Ogden Cadillac dealership, located in Mission, is approximately 22 miles from Weslaco.[21] There are approximately five miles between Weslaco and Mercedes. According to Mr. Payne, it is about 11 miles from Mercedes to Harlingen, and 20 miles from Harlingen to Brownsville. McAllen is about 19 miles from Weslaco. Mr. Payne said that Weslaco is viewed as the center of the Valley, although the McAllen/Mission/Edinburg area is the economic driver and population center.

### Agreement to buy Cardenas Cadillac franchise in Harlingen

In order to purchase the Cadillac assets of Cardenas Autoplex, Mr. Payne has entered into an Asset Purchase agreement (a buy-sell agreement) with Cardenas.[22] He testified that his dealership was looking for ways to strengthen its Weslaco operations, and a former GM sales representative suggested buying the Cadillac dealership in Harlingen and moving it to Weslaco, while keeping it within its APR.

Mr. Payne discussed the rationale behind APRs, *i.e.*, to allow dealers some exclusivity so that they will have a sufficient market to support their operations, due to the high cost in purchasing, building, and running a dealership. As testified to by Mr. Payne, GM allows a dealer to move his

---

[20]  Tr. 123-124.

[21]  Tr. 39-40.

[22]  An Asset Purchase agreement (a buy-sell agreement) and an Advance Agreement constitute the documents that memorialize that transaction. Tr. 66; Applicant's Ex. A-1. Cardenas Autoplex cannot literally sell the franchise; only GM can approve a franchise.

dealership within his own APR, subject to its approval. As part of a relocation process, a dealer submits guidelines (describing areas and space devoted to parts, service, sales, capital requirements,[23] image, tools, facility size, training, and personnel[24]) for GM's approval.

In this case, Mr. Payne described the Asset Purchase agreement as giving him the right to do business in the Cardenas APR, as well as ownership of the customer list, parts, service equipment, manuals, and signage. The purchase price was $1.5 million.[25] However, he has not yet taken title to any of the assets due to the pending protest by Bert Ogden, even though GM and the MVD have approved the sale.[26]   At the present time, Cardenas is still operating the Cadillac franchise in Harlingen, although Mr. Payne stated that he did not believe it was aggressively doing so.

According to Mr. Payne, an auto manufacturer has a "right of first refusal" in a situation in which a dealer enters into a buy-sell agreement with another party.   This right allows the manufacturer to buy the franchise itself and then get rid of it, buy it, and give it to somebody else, or to buy it and close the dealership.  GM has not exercised its right of first refusal in the Weslaco-Cardenas buy-sell scenario.

Noting that the Cardenas operation has been a disappointment to GM to the extent that GM has sent a notice of termination of the franchise, Mr. Payne said the relocation will help the Cadillac brand because it will have increased sales, better awareness of the product, stronger marketing, more accessibility to customers, and good service if relocated to Weslaco. He also testified that Cardenas has not dedicated himself to taking care of the Cadillac customer.[27]

---

[23] To insure there is enough working capital in the company to promote, sell, and service the product. Tr. 70.

[24] Mr. Payne testified that a Cadillac dealer was required to have factory-trained and certified Cadillac technicians. Further, he stated that it is prudent to also have certified salespeople. Tr. 71. The dealer pays for the costs associated with travel and lodging for training; the factory provides the training.

[25] Mr. Payne described the Advance Agreement that provides for payment of the $1.5 million up front, to be returned if the relocation is not approved. Mr. Payne conceded that the payment arrangement was unconventional, but that, at the time, Mr. Cardenas "had some issues" and the purchase was negotiated that way. Tr. 74-75.

[26] Tr. 72-73.

[27] Tr. 111-112.

### Opportunity for better service to Cadillac customers

Mr. Payne testified that with the addition of Cadillac, his GM dealership could be much stronger in the parts and service departments, resulting in better service to his customers due to GM's requirement to have trained and certified repair technicians.

Mr. Payne also discussed the two types of repair service: warranty service and retail (or customer-paid) service. He said that only a certified GM dealer can perform warranty work, absent a unique situation. In order to service their Cadillac, a consumer has to go to either the Cardenas dealership in Harlingen (20 miles from Weslaco; 40 miles from Mission), the Bert Ogden dealership in Mission (22-23 miles from Weslaco; 40 miles from Harlingen) or the Luke Fruia dealership in Brownsville (40 miles from Weslaco; 60 miles from Mission). Mr. Payne testified that he has seen studies indicating a buyer of a new vehicle is located within 13 miles of the nearest dealership carrying that product. For used cars, most buyers are located within seven miles of the dealership from which the vehicle is purchased. For service, he believes that people want to be closer than 13 miles.[28]

Mr. Payne testified about the types of reports used by General Motors to determine the performance of the dealerships. One report is a customer satisfaction index (CSI); another is the standards for excellence program (SFE). Mr. Payne testified that his dealership generally ranks well on these. The SFE is an exclusive GM program that measures sales performance and customer satisfaction, including purchase delivery satisfaction (for new vehicle deliveries) against the ratings of other dealers. There is a financial reward depending on the performance of the dealer.[29]

---

[28] Tr. 103-104.

[29] Tr. 52-54.

### Location advantages for Weslaco Cadillac dealership

Mr. Payne testified that the Weslaco facility is located on Expressway 83 upon which approximately 70,000 cars travel each day.[30] He said that this volume is around 50 times greater than the number of vehicles that travel on the roadway to get to the Cardenas dealership. He said that factors such as visible location, accessibility, and a high traffic count are important to the financial success of a dealership.[31]

Mr. Payne described the process for starting up a new product line. If his application is approved, he will order new Cadillac product from the Cadillac Division and will receive a monthly allocation that can be chosen based on availability and the dealer's production. According to Mr. Payne, a dealer pays for the vehicles "up front" through financing with GMAC; the dealer then pays GMAC.[32] For used cars, a dealer obtains them through trades, purchases on the wholesale market (through auctions and wholesalers), purchases from individuals, and consignments.[33]

"Dualing" means to add a franchise to an existing parts and service department or, put another way, to add another line, product, or make to a dealership.[34] "Dualing" Cadillac with the other GM brands at his dealership in Weslaco will allow Mr. Payne to share personnel, training, expenses, parts, and service similar to the operations at Bert Ogden's dealership in Mission, creating a "synergy" between the product lines. He said that he has sold program Cadillacs and used Cadillacs and is familiar with the product.

At his current location, Mr. Payne plans to use an existing empty building to house the Cadillac showroom. GM has approved the facility plans, including the sales and service center. The

---

[30] Tr. 79; Applicant's Ex. A-6.

[31] Tr. 80.

[32] This method of payment is called "floorplanning" or "whole floorplan financing." Tr. 86.

[33] Tr. 86. There are also certified used cars bought through GMAC or GM, depending on the owner. Tr. 87.

[34] Tr. 181.

dealership will follow GM's rules for selling and servicing product in Weslaco, including making required changes to the facility related to the appearance or image.

Mr. Payne testified that he cannot operate the Cadillac line in Harlingen because he does not own a facility there and it would cost between $2.5 to $4 million to build one. Further, he said that he does not believe that a stand-alone Cadillac dealership anywhere in the Valley (except possibly the Mission/McAllen area) could return a profit because there would not be enough sales volume or parts and service business.[35]

He does not believe that moving Cadillac out of the Harlingen area will inconvenience Cadillac customers because west Harlingen is as close to Weslaco as it is to Cardenas (who is on the east side), and there have been so few Cadillac sales from that dealership.[36]

### National economic situation's effect on auto industry

Mr. Payne testified that, in general, manufacturers are downsizing the number of dealers to obtain efficiencies in marketing and distribution processes. This is so because of the declining domestic market share. Other manufacturer considerations may be under-performing dealers, bad locations, or bad facilities. The downsizing process affects markets in which there are too many or under-performing dealers.

With respect to the current economy, Mr. Payne testified that, in his opinion, the auto business is cyclical. He has seen downturns and upturns and he has observed that the people who position themselves for the long term seem to come out ahead. He believes that if GM goes into a bankruptcy, it will be a planned one to alleviate a lot of their financial problems. He plans to position himself with the Cadillac franchise for the long term and believes that the business will be profitable.

---

[35] Tr. 95-96.

[36] Tr. 116-117.

Mr. Payne believes that some of the money given by the federal government to the auto industry will be used to help the current strained availability of credit resources. He noted that GMAC has cut back on financing for customers with beacon credit scores under 700; however, he believes that a lot of Cadillac consumers have credit scores exceeding 700. He testified that he was not required to use GMAC financing solely, although there is an incentive to do so. Mr. Payne described a qualified buyer for Cadillac as someone, in general, with a $50,000-plus income level, with good credit.

Mr. Payne testified that his dealership did well in 2006 and 2007. His sales of new vehicles increased in 2006 over those in 2005, but were about the same in 2006 and 2007.[37] In 2008, he said the increased pressure resulting from emphasis of the "green movement" for more environment-friendly vehicles and the increased price of gas greatly affected sales. As he described it, truck sales (which has comprised the bulk of his sales) came to a roaring halt.[38] Mr. Payne testified that a dealer cannot adjust operations rapidly when dealing with inventories in order to respond to changing economic times. However, he stated that he wishes to position himself for the long term and needs to acquire the Cadillac franchise and product now because of the difficulty in doing so on an accelerated basis when the economy improves.[39]

In 2008, the Weslaco dealership experienced a decrease in profitability, and sold about an equal number of trucks and cars. For the period January to September 2008, the dealer showed a loss of $382,451.[40] The number of new cars sold during that time was 119. New truck sales totaled 382.[41]

---

[37] Tr. 177-178.

[38] Tr. 179-180.

[39] Tr. 180-181.

[40] Tr. 152-153; Protestant's Ex. P-9.

[41] Tr. 154-155; Protestant's Ex. P-9.

Mr. Payne believes that adding Cadillac will not take away from his truck sales because Cadillac is a luxury product, and there is a market for Cadillacs in the Mid-Valley area. He testified that Cadillac does not compete with a lot of other products in the Valley - it sells 4 to 1 over Lincoln.[42]

In 2008, Weslaco Motors reported a profit through September of $103,272.[43] In 2006, the dealership made a profit of $631,984.[44]

### Advertising

Mr. Payne testified that GM establishes marketing associations in which dealers within a defined area develop a marketing plan for the product within that area. He said that advertising can increase sales in a good market, but may not work in a bad market. However, he noted that advertising can raise the perception of the brand in the community. Also, the point of advertising is not only to increase sales, but also to increase the image of the dealership and achieve top-of-the-mind awareness by the consumer of the product. Advertising can also lead to "bleedover" sales for another dealer.[45] Mr. Payne believes that having two dealers in Mission and Weslaco will result in more awareness of the Cadillac product.

With respect to the Bert Ogden dealership, Mr. Payne described Bob Vackar, the principal/owner of Bert Ogden, as a very good dealer with aggressive marketing. He believes it is a strong and well-capitalized competitor. According to Mr. Payne, the Bert Ogden dealership spends more on advertising and is twice as big as any other auto group. He described Bert Ogden as being the largest dealer group in the Valley in terms of new units sold, with either the Payne or Bogus dealerships being the next largest.

---

[42] Tr. 192-193.

[43] Tr. 197; Applicant's Ex. A-4.

[44] Tr. 200.

[45] Tr. 101.

Mr. Payne believes that he will sell a lot of used cars as a periphery to the Cadillac franchise. He believes he can compete successfully with Bert Ogden and that there is enough business to support three Cadillac dealers (after the relocation from Harlingen to Weslaco) because all the dealers carry products in addition to Cadillac, yielding economies of scale in the costs of operations.[46]

b.    Testimony of Bob Grooms

Mr. Grooms is the chief financial officer for Weslaco.[47] He testified that the application to the TxDot MVD was a request to amend its current dealership license to add the Cadillac line to its other GM lines.[48]

Mr. Grooms was responsible for preparing the application to GM for a Cadillac franchise. Originally, Weslaco Motors proposed operating the Cadillac franchise as a stand-alone franchise, but GM indicated that it should be made part of the overall group of franchises operated at that location.[49]    According to Mr. Grooms, Weslaco Motors was required to resubmit part of its application to GM with that modification, among others, through the internet.[50]

GM also requested a revision of the number of new retail units projected to be sold by Weslaco Motors. Mr. Grooms testified that the first pro forma (a forecast of sales) submitted with the original application to GM projected sales of 480 new units per year. This number was changed

---

[46]  Tr. 115-116.

[47]  He has also been a motor vehicle dealer for Ford, Nissan, and Subaru in Denver, Colorado, and for Chevrolet-Hyundai in Beaumont, Texas.  Tr. 211.

[48]  Tr. 246-247.

[49]  Tr. 226.

[50]  The application admitted into evidence does not include the re-submitted changes. Applicant's Ex. A-2; Tr. 225.

when he and Mr. Payne were advised that the GM planning volume (number of units GM expected to be sold) was 220 new units per year.[51]  Because Weslaco Motors was exceeding its planning volume for sales of the other lines, Mr. Grooms stated that they decided to revise the number to 300, instead of 220.[52]

The pro forma also includes a gross profit projection of $3,000 per unit for new cars,[53] and a gross profit per unit for used cars of $949.[54]  According to Mr. Grooms, the dealership will be profitable if it sells more than 90 units a year, although profits become marginal at the 90 unit-per-year level.[55]  While Mr. Grooms acknowledged the recent change in the economic climate, he testified that a projection of 220 units is still a reasonable forecast for sales.[56]  He testified that the dealership spends more than half a million dollars to advertise its GM products each year.

Mr. Grooms stated that Weslaco has completed all the conditions that GM required in order to approve the application, with the exception of some facility imaging.[57]  He also discussed some of the other GM requirements that Weslaco Motors had complied with, such as maintaining a line of credit, requiring the dealer operator to own at least 15% of the business and maintaining sufficient net working capital (the operating capital available to operate the dealership, including parts inventories, used car inventories, and prepared assets that are current).  Mr. Grooms said that GM required the dealer to have $2.4 million in operating capital with a line of credit of $1.5 million, and that GMAC issued a line of credit for that amount.

---

[51]  Tr. 216. Another change that has occurred since the application was submitted was a change in the number of employees. He testified that Weslaco Motors no longer employs 300 people in the Valley. Tr. 231.

[52]  Tr. 234-236. Although 120% of 220 units would result in 265 units, Mr. Grooms testified that the number was rounded-up to 300 based on discussions with the sales managers and Mr. Payne. Tr. 236.; Applicant's Ex. A-2; p. WM-00312.

[53]  Tr. 240.

[54]  The pro forma included a projection of 381 used cars to be sold from all the line makes, including Cadillac, Buick, Pontiac, and GMC. Tr. 242; Applicant's Ex. A-2, p. WM-00312.

[55]  Tr. 245.

[56]  Tr. 239.

[57]  Tr. 213.

Mr. Grooms reviewed the financial statements provided by Bert Ogden Cadillac. He noted that the dealership did not report its profits derived from used car sales for 2006, 2007, or 2008.[58] According to Mr. Grooms, the failure to report the vehicle sales distorts the profitability as reported by the dealership.[59] He also discussed other discrepancies in the financial statements. For example, he questioned the report of a negative parts inventory. Noting that a service department must be able to service vehicles, Mr. Grooms said that the dealer would have to maintain a parts inventory from which to draw necessary parts for the repairs. He added that a negative parts inventory, such as that reported by Bert Ogden, essentially means that it did not have any parts.

He also observed that the reported net profit of $1.1 million for 2006 cannot be verified because the supporting information for the dealer's financial statements was not provided. In 2006, it appeared that Bert Ogden sold 522 new Cadillac vehicles, with an overall gross profit per vehicle (including cars and trucks) of $2,402 (compared to Weslaco's projected overall gross profit per vehicle of $3,000).[60] He could not account for the difference because he did not know what Bert Ogden included in the cost of sales.

     c.    **Dr. Ernest Manuel report and testimony**

Dr. Ernest Manuel is president of The Fontana Group which provides economic consulting services and expert testimony regarding the retail motor vehicle industry, among other industries. Protestant did not object to Dr. Manuel's qualifications to provide expert testimony in this case.[61] Dr. Manuel concludes that the Protestant has standing to bring his protest because: (1) both dealerships will be located in the same county, Hidalgo; (2) the relocation is greater than one mile; and (3) the proposed location will be closer to Protestant than before the relocation.

---

[58] Tr. 254-255.

[59] Tr. 254-255.

[60] Tr. 265-266.

[61] Dr. Manuel's qualifications can be found in Applicant's Ex. A-11. Dr. Manuel prepared an initial report, Applicant's Ex. A-11, and a rebuttal report, Applicant's Ex. A-30. Additionally, he prepared supplemental exhibits A-105 through A-108.

### Location of Proposed Dealership

Dr. Manuel performed an optimal location analysis and determined that the "optimal location"[62] for the Cardenas Cadillac franchise is far to the west of its current Harlingen location and even farther west than the proposed Weslaco location.[63] However, he concluded that the proposed location in Weslaco would better serve the consumers in the market and offer more convenience for current and prospective Cadillac customers than one in the Harlingen area. Additionally, he notes that there are substantially higher traffic counts at the Weslaco dealership than at Cardenas providing increased sales opportunities.

According to Dr. Manuel, the proposed relocation of the Harlingen franchise to Weslaco would result in it being located 20 miles away from the Protestant's Cadillac dealership and more than 25 minutes away in actual drive time. When considering the distance between the Weslaco location and the Bert Ogden Cadillac location in terms of "air miles," the proposed Welaco location is approximately 21 miles air distance from Bert Ogden and 26 minutes away in drive time.[64] This is comparable, Dr. Manuel found, to the distance between the current Cardenas location and the Luke Fruia location in Brownsville which are presently 20 miles apart and approximately 28 minutes away in drive time.

Dr. Manuel observed that relocating the Cadillac franchise from Harlingen to Weslaco will likely result in GM abolishing the Harlingen APR and creating a Weslaco APR for the Applicant. The new APR will be comprised of census tracts taken from both the current Harlingen APR and the McAllen APR. The remaining Harlingen APR census tracts would be reassigned to the Brownsville APR. Because GM has not yet defined the new APRs, Dr. Manuel attempted to approximate the

---

[62] An "optimal location" analysis determines the location for a relocated dealership that provides the greatest efficiency in the average travel time for a prospective and current Cadillac customer to get to one of the three dealerships. Applicant Ex. A-11, p. WM-00-1113; Tr. 318.

[63] A consequence of this would be much less impact on the Bert Ogden dealership. Tr. 318.

[64] According to Dr. Manuel, GM establishes APR territories based on the use of "air distance" miles and census tracts. Applicant's Ex. A-11.

APR, based on his understanding of how GM defines them. In doing so, he assigned the census tract in the market to the dealer that was closest in air distance to the centroid of the census tract.[65]

Dr. Manuel stated that the air distance dealer area represents the geography within which a dealer has an absolute proximity advantage over every other dealer of the same brand. A customer within that APR will find it more convenient to shop at the resident dealership than at any other dealership of the same brand. He said that most manufacturers and distributors use the air distance dealer area as the starting point for evaluating a dealer's sales performance.[66]

Dr. Manuel also concluded that the Lower Rio Grande Valley's demographic patterns favor the relocation because there is a greater concentration of high income households in the western portion of the market near the proposed Weslaco location than in the current Harlingen location. Households and population in the areas surrounding both the Applicant and Protestant are projected to continue their substantial growth in the coming years.[67]

More households with income levels of over $100,000 are located on the western side of the market. The Payne dealer area is projected to grow in population from 331,397 in 2007 to 358,191 in 2012. This dealer area is expected to increase by 8.1% in population and 9.1% in number of households. The Bert Ogden area is expected to grow at a much higher rate. In 2007, the estimated population was 561,209 with a projected population of 647,560 in 2012. About 188,407 households are projected by 2012. The dealer area is projected to grow 15.4% in population and 16.8% in number of households.

With respect to registration and demographic trends, registrations of new retail Cadillacs sold to customers who registered them to addresses in the Lower Rio Grande Valley increased nearly

---

[65] Tr. 346-348; 450-459.

[66] Dr. Manuel used the terms "APR" and air distance dealer area interchangeably. Applicant's Ex. A-11, p. WM-00-1115.

[67] Dr. Manuel relies upon data from Claritas, Inc., concerning population, household counts, projections, and income. Applicant's Ex. A-11, p. WM-00-1113.

300% in 2007, from 281 in 2001 to 838 in 2007. In 2008, it is expected that Cadillac registrations will be 1,027. There was similar growth in Cadillac registrations in McAllen and Weslaco dealer areas, but it leveled off in the McAllen area after 2006.

### Assessment of the Marketplace and Representation of the Brand

Dr. Manuel states that many luxury brands, including Acura, Audi, Infiniti, Lexus, and Porsche, among others, do not have a dealer in the Lower Rio Grande Valley. He concludes that there is much less inter-brand competition for Cadillac than in other markets in Texas who have a greater number of luxury dealers. Because of the lower competition with other luxury brands, he explained, the Cadillac brand should, and does, achieve a higher market share in the Lower Rio Grande Valley than in Texas as a whole.[68]

With respect to measuring a brand's market share performance, Dr. Manuel noted that several methods could be used. The simplest method compares the number of Cadillac registrations in the area to the number of registrations of all brands. The resulting ratio is the market share of the brand, also called "market share," "market penetration," and "market performance."[69]

Once a brand's market share in an area has been calculated, that market share can be compared to the market share in a benchmark area. As a benchmark area, GM uses the market share for the state as a whole. Other manufacturers use a local area, the state, a multi-state region, or the nation as a whole for their benchmarks.

Another refinement in measuring market share performance is to apply "segmentation analysis." Segments refer to vehicle categories such as small car, mid-size car, large car, small SUV, small pickup, etc. Segmentation analysis adjusts the expected brand market share in the local market

---

[68] "Market share" refers to the number of sales of that brand divided by the number of sales of all brands combined. Applicant's Ex. 1-11, p. WM-00-1112. Dr. Manuel notes that for a brand such as Cadillac, a more common definition of market share is the number of Cadillac sales divided by the number of sales of all brands' models that GM considers to be competitive with Cadillac's models, together with the Cadillac models.

[69] These terms are used interchangeably, according to Dr. Manuel. Applicant's Ex. A-11; p. WM-00-1117.

for differences between the local area and the benchmark area in the relative demand for each product segment. The adjustment is performed by calculating the number of registrations that the brand would need to have in each product segment in the local area in order to have the same market share in each product segment that the brand has in the benchmark area. Adding the numbers across all segments in the local area results in a number of "expected" registrations for the brand in the local area that are needed to match the market share of the brand in each product segment in the benchmark area.[70]

A limitation to segmentation analysis (though it is widely used) is that it does not adjust for differences in inter-brand competition between a benchmark area and the market under study. This limitation is a significant problem in using the whole state of Texas as a performance benchmark for measuring the Lower Rio Grande Valley because the Valley has no representation of many inter-brand competitors, such as Acura, Audi, Infiniti, Lexus, Porsche, etc., that are normally considered competitive with Cadillac. Therefore, Cadillac performance in the Valley is artificially elevated when compared to Texas.[71]

Dr. Manuel compared the performance of all represented competitive brands in the Lower Rio Grande Valley based on those brands' performance in Texas. Without the competition found elsewhere in Texas, those brands (as a whole) performed approximately 40% better in the Lower Rio Grande Valley than in the state of Texas as a whole. Dr. Manuel concluded that using the state of Texas as the benchmark is using too low of a benchmark.

Dr. Manuel reported that Cadillac's segment-adjusted market share is not uniform throughout the Lower Rio Grande Valley. It performs much better in the eastern portion (containing Brownsville) than in the western portion (containing McAllen and Weslaco). This reduced performance, he claims, offers substantial available opportunity for additional Cadillac sales by the relocated franchise. If Cadillac had performed as well in the McAllen and Weslaco area as it

---

[70] Applicant's Ex. A-11; p. WM-00-1117.

[71] Applicant's Ex. A-11, p. WM-00-1118.

performed in the Brownsville area, there would have been nearly 200 additional Cadillac sales in the McAllen and Weslaco areas in 2007.

"Registration effectiveness" refers to the ratio of the actual number of registrations to the expected number. When the ratio is 1, the brand is 100% "registration effective". In determining market share performance for brands like Cadillac (with a limited product line), another method is to take the number of Cadillac registrations in the area divided by the number of registrations in the area of all brands' models that GM considers to be competitive with Cadillac's models. This model is called a "competitive" registrations model.[72]

When the state of Texas is used as the benchmark, using data from 2007, there were 3,183 competitive registrations among the six GM-defined segments for Cadillac, leading to a calculation of 585 expected Cadillac registrations in the Valley. The actual number of registrations in the Valley in 2007 was 838, thus showing a ratio of 143.25%. Thus, Cadillac was 143.25 percent registration effective in the Valley based on the Texas benchmark.[73]

Cadillac's market share as a percent of competitive registrations is much higher in the Valley than in the rest of the state (for 2005, it was 144%, for 2006, it was 166%, for 2007, 167% and through March 2008, it was 174%).[74] Cadillac registrations in the state of Texas as a percent of competitive registrations are 15.67%; for the lower Rio Grande Valley, it is 26.33%.[75] The LRGV outperforms the state by 167.98%.[76]

Dr. Manuel determined that an appropriate benchmark to determine whether the brand is adequately represented in the market would be a more-similar market than the state of Texas as a whole. He determined that using the Brownsville dealer area, after the proposed relocation, as a

---

[72] Applicant's Ex. A-11, p. WM-11-1117.

[73] Tr. 344.

[74] Applicant's Exs. A-11 and A-4.

[75] Tr. 342.

[76] Tr. 342.

benchmark was appropriate because the Texas benchmark was too low; the Brownsville demographics, including income and ethnicity, were more similar to McAllen and Weslaco than the Texas demographics; inter-brand competition with the Brownsville dealer area after relocation is comparable to that in the combined McAllen-Weslaco dealer areas; and, Cadillac has strong customer acceptance in the Valley.[77] Further, it is Dr. Manuel's opinion that Brownsville is more like the rest of the Valley than is the state of Texas.[78]

This analysis, involving the consideration of census tracts and measuring performance against the Brownsville dealer area after relocation, demonstrates that there is substantial shortfall on the western side of the market between Weslaco and McAllen. According to Dr. Manuel, this is because of the weak performance by Cardenas, who sold only 13 new Cadillacs in 2007.[79] In contrast, Bert Ogden Cadillac reported selling 492 new Cadillacs in 2007.

Dr. Manuel testified that he was aware that it had been reported in the newspaper that GM plans to close nine plants and 1,750 dealerships by 2012.[80] However, because of the superior performance of Cadillac in the Valley, he believes it is unlikely that GM will reduce dealerships there.

### Competition

Cardenas (in Harlingen) made only 11 new retail Cadillac sales that were registered in 2007. Replacing this weak dealer with a stronger dealer in Weslaco will provide a more competitive marketplace for current and prospective Cadillac consumers.

---

[77] Tr. 314.

[78] Tr. 315. Using Brownsville as a benchmark resulted in an apples to apples comparison. Tr. 451.

[79] Only 11 Cadillacs were registered as a retail sale in 2007.

[80] Tr. 430-431.

The Weslaco dealer will provide a much larger sales facility than the Cardenas dealership and will spend substantially more money on advertising, thereby increasing consumer awareness of the Cadillac brand in the Valley and leading to an overall increase in Cadillac sales.

Replacing Cardenas with a stronger, better-located competitor will provide a more competitive marketplace for current and prospective Cadillac consumers.

Impact on Protestant

In determining harm to dealer, Dr. Manuel considers "harm" to be a material injury to profit on a long-term basis.[81] He views one to two years as a short-term period, with five years or more as a long-term period. He noted that quantifying a material injury is difficult, but he testified that the state of New Jersey has determined a loss in profit of 25% to constitute a material injury. Dr. Manuel thinks that the New Jersey standard may provide a good threshold benchmark, but that other factors should be considered. [82]

He suggests that the most important factor is the expected number of sales a new dealer would likely make, in comparison to the available sales opportunity in the area. If the opportunity is larger than the expected number of sales, most or all of the new dealer's sales are probably incremental additions to the market rather than sales taken from an existing dealer. He believes that is the situation with Weslaco. The second factor to consider is the size of impact that would occur in the event the new dealer's sales are not mostly incremental. If this were the situation (which he disputes), Bert Ogden would lose 7% of its Cadillac registrations, 8.8% of expected Cadillac registrations, and 8.3% of competitive registrations. Using 2007 data, the Bert Ogden dealer area would lose 20.9% of its population and 19.6% of its households. The number of high income households, a better indicator of potential Cadillac customers, would decrease by 9.7%. The 2012 data predicts similar changes.

---

[81]   Tr. 330.

[82]   Tr. 332.

Dr. Manuel emphasizes that Mr. Payne sells more GM vehicles than the number that GM expects him to sell ("expected sales") given the size of Mr. Payne's market area. If he is as successful in his Cadillac franchise, the sales above the number sold by Cardenas would still be lower than the available opportunity for Cadillac sales in the McAllen/Weslaco areas, suggesting that the adverse impact on Bert Ogden from the proposed relocation would be low, and Bert Ogden would remain highly profitable and a strong competitor with Weslaco.

Even after the proposed relocation to Weslaco, the Bert Ogden dealer area will still be substantially larger than the other two dealer areas; containing more than five times the number of Cadillac registrations as the proposed Weslaco dealer, and more than four times the number of expected Cadillac and competitive registrations. Bert Ogden's dealer area would also remain substantially larger than that of Luke Fruia. It would still contain approximately 70% more people and households than the proposed Weslaco dealer area, and over 90% more people and households than the Brownsville dealer area. It would also have more than twice as many households with incomes of $100,000 or more than the other dealer areas. Based upon these factors, Dr. Manuel concluded that Bert Ogden Cadillac would still have a very substantial business base even after the relocation.[83]

After reviewing Bert Ogden's information on sales and repair orders, Dr. Manuel concludes that approximately 5.9% of Bert Ogden's Cadillac customers in 2007 would have been closer to the Payne dealership than Bert Ogden in 2007, resulting in a possible loss of used Cadillac sales of 14.3%, lost service sales of 8.1%, and lost body shop sales of 8%. He noted that this suggested possible lost sales by Bert Ogden in the event of the proposed relocation. However, he used a retail sales index analysis using the Brownsville dealer area as a benchmark. The number of expected Cadillac registrations in the dealer areas containing the Applicant and Protestant were 152 and 626 units, for a total of 778 units in 2007. When compared to the 580 actually registered in those two dealers areas, 580 (91 plus 489), there is a shortfall of 198 units (778-580), demonstrating a lost opportunity for sales.

---

[83] Applicant Ex. A-11, p. WM-00-1113 and pp. WM-00-1121-1123.

Weslaco's overall sales effectiveness for its four GM franchises was 120.92% in 2007.[84] Applying that sales effectiveness ratio to the number of expected Cadillac registrations in the proposed Weslaco dealer area, Weslaco would have sold 184 Cadillacs nationwide in 2007 (which is 173 units higher than those sold by Cardenas who sold 11.) Because the 173 unit projected increase is lower than the 198 units of lost opportunity for Cadillac in McAllen and Weslaco, it demonstrates that there will be a low risk of adverse impact to Bert Ogden. If Dr. Manuel had used the state average, the projected increase in sales would be even lower. In analyzing lost sales, Dr. Manuel concluded that it could cost an estimated reduction of $141,382 in net profit before taxes for 2007. However, he noted that Bert Ogden would also have had a 22% profit as a percentage of net worth, the industry average in 2007. Profit as a percent of sales would have been 2.4% which was well above the industry average of 1.5% in 2007. However, the more likely outcome is that there would be little or no impact at all.

According to Dr. Manuel, Bert Ogden is a strong dealer for Cadillac, offering an attractive facility, high levels of customer satisfaction, competitive new vehicle gross profits,[85] above average profitability and above state average sales performance.[86] It has had strong financial performance over the past several years and should be able to compete effectively against the proposed Weslaco dealership.

In summary, Dr. Manuel concluded that increased market share can be achieved in the Lower Rio Grande Valley by relocating the franchise from Harlingen to Weslaco, improving accessibility and visibility for the Cadillac brand for the higher income households in the Valley. The large amount of uncaptured Cadillac opportunity in the McAllen and Weslaco dealer areas, together with the strengths of the Bert Ogden dealership, should allow the relocation to occur without any material

---

[84] Dr. Manuel stated that GM uses this ratio to evaluate sales performance of its dealers. The ratio is called the Retail Sales Index. Applicant's Ex. A-11, p. WM-00-1122. The ratio is calculated by the number of new vehicles that the dealer sold anywhere that year in the numerator divided by the number of expected registrations in the dealer's APR in the denominator.

[85] According to Dr. Manuel, "gross profits" refers to the dealer's markup on the car, i.e., the difference between what the dealer paid for the car and what the customer paid for the car. Applicant's Ex. A-11, p. WM-00-1114.

[86] Applicant's Ex. A-11, p. WM-00-1124.

impact on Bert Ogden. Even is some impact occurred, it is likely to be small and Bert Ogden would still be highly profitable.[87]

Dr. Manuel criticized Dr. George Berry's (Protestant's expert witness) projected impact to Bert Ogden of 28 to 30% loss of profits because his analysis was premised on the use of Highway 81 as the western boundary for the Weslaco APR, which Dr. Manuel said is contrary to the way any manufacturer does it.[88] By moving the boundary east of 281, Dr. Manuel claims that Dr. Berry took a number of census tracts outside the Mission-McAllen dealer area and put them into the Weslaco dealer area, resulting in an inflated loss of territory for Mission and McAllen.[89] Dr. Manuel contended that, even using drive times based on the actual highway network and population centroids, the Weslaco dealer area would still fall short of Highway 281.

Dr. Manuel noted that the reports related to profitability for Bert Ogden do not contain information about the used car business because it is reported as part of its Chevrolet store.[90] According to Dr. Manuel, this means a profit center is missing from the financial statement so that the reported profitability for the dealership is probably understated, leading to an impression that it would suffer greater loss from the operations of the Weslaco dealership than it actually would. He noted that this is so because, usually, the used car component of a dealership is a profitable..

   2.   Protestant's Evidence

Protestant presented the testimony of Dr. George Berry and Robert Vackar, the dealer/principal of Bert Ogden Cadillac, and numerous exhibits.

---

[87] After preparing his report, Dr. Manuel was deposed and Dr. Berry were deposed. Based on those depositions and in response to supplemental exhibits from Protestant, Dr. Manuel prepared some updated exhibits. Applicant's Exs. A-105, 106, 107, and 108. Dr. Manuel recalculated "available opportunity" of Dr. Berry's conclusion that Weslaco could make 91 retail sales. He subtracted the 11 actual Cardenas sales and concluded that there would be a projected sales gain of 80 retail sales (instead of the 198 he calculated) for the available opportunity. Tr. 311-312; Ex. A-105.

[88] According to Dr. Manuel, manufactures assign individual census tracts based on proximity to the dealer. Accordingly, he used the same method in his analysis.

[89] Tr. 471-472.

[90] Tr. 477.

a.    Dr. George Berry's reports and testimony

Dr. Berry provided economic, demographic and financial consulting services primarily within the State of Texas. His qualifications can be found in Protestant's Ex. P-1. Applicant did not object to Dr. Berry's qualifications to provide expert testimony in this matter.

Dr. Berry asserted that the impact of the relocation of the Cadillac dealership to Weslaco to Bert Ogden will be from a number of factors: (1) the current trend for a declining Cadillac market; (2) the decline in total sales for motor vehicles; (3) the negative general conditions; (4) the apparent financial problems of General Motors; and (5) a number of other factors. He further contended there will probably be no incremental increase in the market because it is already super-adequately served.[91] He further asserts that there will be an impact on Bert Ogden caused by the loss of almost 33% of the market area population, 24% of the households with incomes of $50,000 or more, and an 18% loss in the number of households with incomes of $100,000 or more.[92]

Dr. Berry testified that his main point of disagreement with Dr. Manuel was that Dr. Manuel failed to consider the current economic situation. He notes that Dr. Manuel's information is based upon data from 2007 and partial 2008. He testified that he believes the focus for determining impact on Burt Ogden should be on the last three to four months. Dr. Berry testified that GM's plan of reorganization includes cutting down 1,750 dealerships and that Congress must help GM to survive. He also testified that Cadillac sales were down 55% on a national average and that Cadillac sales with Bert Ogden were down 50%. He anticipated a continued decline of sales into the future, citing to *Automotive News* that reports Cadillac's 2008 share of the market through September was 1.2%.[93] The reported sales for September 2007 vehicles were 20,398 vehicles and for September 2008, the sales were 12,432, indicating a decline in sales of 39.1%.[94] .

---

[91]    Exhibit P-1, p. 13.

[92]    Dr. Berry's report, Exhibit P-1, Tab 10.

[93]    Tr. 502; 661.

[94]    Tr. 505-508.

According to Dr. Berry, Bert Ogden has calculated a break even point of 25 Cadillac units per month. He said that they sold 20 units or less in November 2007, so they are operating unprofitably. In that situation, he testified that each additional lost sale will magnify the losses even more.[95] He contended that the state is in a recession, and it is appropriate to look at the near future to determine whether the proposed relocation should be approved.[96]

Dr. Berry asserted that the percentage of households with an income level of $100,000 or above is lower in Weslaco than in the Brownsville or Mission/McAllen areas, and the median household income is lower in Weslaco than those areas, as are the per capita income and the population growth. Consequently, he believes that Weslaco is not comparable to the other two areas and wholly rejected use of the Brownsville dealer area as a basis for determining whether the brand is adequately represented and whether there will be harm to Bert Ogden.[97]

Dr. Berry testified that Bert Ogden is operating at a loss and any additional competition would cause additional harm to Bert Ogden to the general detriment of the public.[98] As he noted, "you can continue to operate unprofitably, and you can survive for a period of time, but you can't survive indefinitely."[99]

The opening and closing of a Cadillac dealership in Weslaco would not be in the public interest.[100] Dr. Berry said it is the usual practice for a manufacturer to intervene in these proceedings and take a position, one way or the other, but that GM did not do so.[101] He believes competition would be ruinous because it would cause loss to Bert Ogden.[102]

---

[95]  Tr. 507.

[96]  Tr. 523-526.

[97]  Tr. 533-556.

[98]  Tr. 584.

[99]  Tr. 529.

[100]  Tr. 585.

[101]  Tr. 585-586.

[102]  Tr. 589.

Dr. Berry disputed that Payne's experience in GM products provides a plausible comparison to Cadillac sales because Weslaco's GM line includes lower-priced and more popular vehicles (Chevrolet and GMC light trucks) in contrast to the higher priced Cadillac, with a smaller consumer population. If this assumption is used, Dr. Berry claimed that Bert Ogden would experience 28% lost sales.

Dr. Berry says the impact of the proposed dealership will be significant and will render Bert Ogden unprofitable due to the loss of market area and declining sales due to unfavorable economic conditions. In particular, Dr. Berry opined that the APR of Bert Ogden would be changed if the relocation is approved and would most likely result in the Weslaco market being extended to Highway 281.[103] However, Dr. Berry agreed that GM would not use this method of locating the market area, agreeing that GM used the population centroids and straight-line distance as discussed by Dr. Manuel.[104] He also admitted that moving the western boundary for the Weslaco market area allowed him to count more households into his adverse impact analysis.[105]

The impact analysis used by Dr. Berry showed a loss for new car sales ranging from 18 to 30%.[106] At the 18% level, Dr. Berry testified this would mean that Weslaco would take 89 vehicles from Bert Ogden. A 20% level would mean that Weslaco would take 98 vehicles; a 28% level would mean that Weslaco would take 138 units; a 30% level means that Weslaco would take 138 units; and a 30% level is derived from lost sales of 148 units.[107] However, he acknowledged that he does not believe Weslaco will make 91 sales as predicted by Dr. Manuel.[108]

Dr. Berry contended that the investment and method of operation for Bert Ogden are effective and that this dealership has demonstrated its ability to provide excellent service to the general public.

---

[103]  Tr. 552-555.

[104]  Tr. 552-556.

[105]  Tr. 555-556.

[106]  Tr. 559.

[107]  Tr. 559-560.

[108]  Tr. 560-561.

As such, Dr. Berry contended Bert Ogden should be allowed to continue with his successful operation without the hardship that will result from the Weslaco dealer's operations.

### b.    Testimony of Robert Vackar

Mr. Vackar is the principal of Bert Ogden Cadillac. He testified that he is in compliance with his dealer's franchise from GM. He has been in the Cadillac business since 1997. It is his understanding that Cadillac will likely drop some of its product lines as a result of the economic situation. He testified that GMAC used to have a Smart Buy program to help younger buyers purchase the Cadillacs; however, that was cancelled in October 2008. GMAC has run into financial difficulty. Mr. Vackar testified that he turned down more inventory that was offered by GM because he had plenty of inventory that was available for sale.[109]

Mr. Vackar testified that he does not believe in the future of the GM brand and he cannot sell his GM franchise, although others have contacted him to buy some of his other franchises, such as Nissan/BMW. He said he would sell his GM franchise to the factory if they would pay him for the real estate.[110] Mr. Vackar also testified that he was concerned about the ability to get product from Cadillac in the future.[111]

Mr. Vackar testified that it was difficult to move buyers of the other luxury lines into Cadillacs because they were more definite about what they wanted. Mr. Vackar said that he can be profitable if he makes 25 sales of Cadillacs per month. In November 2007, he only sold 22. Mr. Vackar testified that if sales were only 20 units per month, he will lose $250,000. He has had to cut pay at the dealerships, cut bonuses, forfeit his consultant fee per car, and forfeit collecting rent, among other measures, in order to cut costs. He testified that he believes he will lose $500,000 based on Cadillac sales of only 20 units per month. He testified that he believed the economy would stay in a downturn for a while longer, probably until 2011 or so.

---

[109]  Tr. 610.

[110]  Tr. 618-619.

[111]  Tr. 626.

Mr. Vackar's Cadillac franchise has made a profit since 1997. However, in November 2007, it did not. He reported profits as follows: in 2003, $136,000; in 2004, $923,000; in 2005, $995,000; in 2006, $1,099,328; in 2007, $526,000; in 2008, through September, $526,000; and in October 2008, $10,000.[112]

Mr. Vackar disputed Dr. Manuel's conclusion that he could increase his sales of Cadillac because of the inter-brand competition with Mercedes, BMW, Land Rover, Volvo, and Jaguar. He said "I'd love to have a Cadillac dealership in Harlingen or Brownsville. I have no competition. I'm getting - I'm getting beat to death. I tell you, I'm very, very satisfied with my numbers. I don't think there's anywhere to go.[113] He claims that he is successful because there are, in reality, only two Cadillac dealers in the Valley with sixty miles between them.[114]

### D.   Analysis

This is a difficult case, due to factors related to the Lower Rio Grande Valley (LRGV) and the current economic situation in the nation. It is undisputed that the LRGV is an insular region, with unique characteristics when compared to the rest of the state of Texas. It contains a population that continues to greatly increase in number, unemployment rates that have closed the gap to be almost the same as that of the rest of the country (after being much greater for years), and an income level lower than the median income level for households in Texas.

News of the national financial situation has been prominent for the past months. As the parties discussed, the auto manufacturers have requested money from the federal government to continue their operations. Even upon receiving the funds, it is not certain that the major domestic manufacturers will continue to stay in business. GM may be required to file for bankruptcy. While there is much speculation about whether and when the economy will rebound, no one knows for certain. It is not known how the national economic situation will affect the various states, including

---

[112]   Tr. 624-625.

[113]   Tr. 628.

[114]   Tr. 628.

the State of Texas and, in particular, the portion comprising the LRGV. Consequently, there are many unknowns about the financial stability of the auto manufacturers and the country that, while undoubtedly may have an effect on the final result in this matter, are too speculative to attempt to predict. Consequently, the ALJ does not purport to "see into the future" to make predictions about the future economic situation or to base her recommendation in this case on such matters.

Instead, the evidence clearly demonstrates that Cadillac is a strong luxury automobile product that is bought and registered in the LRGV at a rate far exceeding the Texas average, despite the lower overall income level of the population in the LRGV. Further, other luxury model cars are also bought and registered in the LRGV at a rate exceeding their overall sales average for the rest of the state. It is clear that luxury vehicles have a viable and active purchasing market within the LRGV and, while there was evidence that the immediate demand for these products may have slowed, there was no evidence that it has been extinguished.

The evidence established that Edwin Payne of Weslaco Motors and Bob Vackar of Bert Ogden Cadillac are experienced and successful dealers. They have each consistently scored well in measures for success for the GM products sold. Both dealers understand the dealer business and competently run their dealerships. However, they strongly disagree that Weslaco Motors should be allowed to amend its license to obtain a Cadillac franchise. Mr. Vackar of Bert Ogden contends that this would significantly affect his business, and that his currently unprofitable Cadillac business would further decline to a point of severe, negative impact. Weslaco Motors contends that there is sufficient lost sales opportunity and an overall market in the LRGV that will satisfactorily support three Cadillac dealers when the relocation of the Cardenas Cadillac franchise occurs.

The two expert witnesses in this case are both well-qualified, experienced economists. They provided useful analysis in this matter. However, the ALJ was ultimately persuaded by Dr. Manuel's testimony and reports because his analysis appeared to be based on specific conclusions, based upon the performance of dealers in the same location of the State, thereby resulting in a more accurate prediction of lost sales opportunity and impact on Bert Ogden. The ALJ will address each of the statutory factors in light of the evidence presented.

a.    Adequate Representation of Cadillac

In the mid-Valley Cadillac market, every GM dealer outperformed the Texas average market share benchmark for their GM products by 20% to 74%.[115] Dr. Manuel contends this is due to disparate demographics between the benchmark (Texas) market and the Valley market, creating the appearance that dealers are over-performing when that might not be the case. For example, he contended that consumers in the market may prefer the product at issue to a greater degree than the consumers in the benchmark market. Because of this, Dr. Manuel advocated the use of a different benchmark other than the Texas benchmark.[116] On the other hand, Dr. Berry contended that the Texas benchmark is an appropriate one and indicates that there is adequate representation in the Valley.

Dr. Manuel developed a different benchmark which he referred to as the "Brownsville benchmark." He noted that in the Valley, there is considerably less competition for luxury vehicles than in the state of Texas as a whole.[117] This leads to the expectation that Cadillac dealers in the Valley will outperform the Texas average market share because of less competition. Dr. Manuel's testimony that the Brownsville benchmark is more appropriate for the analysis was persuasive. He noted that income levels, employment levels, product preferences, inter-brand competition levels, ethnicities, and proximity to the Mexican market were more similar to the mid-Valley market than was the state of Texas market.[118] By comparing the performance of the Cadillac dealers serving the mid-Valley area to the Cadillac dealers serving the Brownsville market, he concluded that there would be an additional 200 sales based upon 2007 data.[119] These additional sales represent "lost

---

[115] Payne sold approximately 120% of the Texas benchmark in 2007 for all GM brands combined (Applicant's Exhibit A-13, Tab 18, p. 1); Bert Ogden sold approximately 127% in 2007 (Applicant's Ex. A-13, Tab 26, p. 5); Fruia Cadillac sold approximately 174% in 2007.

[116] There was evidence that GM uses the Texas benchmark. Applicant explains that most manufacturers use a benchmark geography which can be used conveniently and consistently for the maximum number of dealers, such as a state, region, or national market share. Tr. 460-461. Dr. Berry did not sufficiently explain why he believed his deviation of the 6m methodology was warranted.

[117] He noted that a number of luxury brands are not present in the Valley, such as Acura, Infinity, Audi, Lexus, and Porsche.

[118] Tr. 314-316.

[119] Tr. 311-312, Applicant's Ex. A-13, p. 4.

opportunity" in the mid-Valley Cadillac market and demonstrate inadequate representation. Applicant contends he will be able to capture the lost opportunity by moving the Harlingen Cadillac store to the Weslaco store.

Applicant suggests that Mr. Vackar's testimony regarding Cadillac inventory that he refused, coupled with his testimony that he no longer believed in the future of Cadillac, may be indicia of inadequate representation. The ALJ is not persuaded by this argument. It was clear from Mr. Vackar's testimony that he was frustrated with the state of the economy and his dealership. Applicant did not present any authority to support such a finding and the ALJ declines to adopt this rationale.

Dr. Manuel also supported his belief of inadequate representation by performing an optimal location analysis. This analysis looks at the registration data from purchases to determine the location of those buyers who have purchased a high line product, such as Cadillac, BMW, or Mercedes. Dr. Manuel concluded that an optimal location for an additional Cadillac dealer would be several miles west of Highway 281; however, this would put the Weslaco dealership inside Bert Ogden's APR. After relaxing his criteria, Dr. Manuel determined that the optimal available location would be within the census tract in the vicinity of Weslaco Motors. Locating the dealership here will result in improved customer convenience and should result in increased sales of the brand. Further, customer service and sales should increase for actual and prospective customers in the McAllen/Mission/Edinburg area because they will have to travel only 20 miles to Weslaco for competitive sales and service. Additionally, the Harlingen customers will also be better served because it is more convenient for customers on the west side of Harlingen to travel to Weslaco than to travel to the east side where Cardenas is located.

#### b.     Substantial Compliance with Franchise

Applicant acknowledges that this issue would not normally be of concern because both dealers testified that they were in compliance with their respective franchise agreements.[120] However, Applicant cites to Mr. Vackar's testimony that he was not currently buying Cadillac product from GM as evidence of a contractual breach of his franchise agreement.[121]  However, the ALJ is unpersuaded that this testimony establishes a lack of substantial compliance. Mr. Vackar also testified that he had plenty of inventory available at his dealership when he was asked to take some. Based on his reduced sales volume of only 22 Cadillacs per month, he told GM that he did not need any additional inventory. No evidence was offered indicating that a one-time refusal of additional inventory violated the franchise agreement, nor that GM considered Mr. Vackar to have breached his franchise agreement. Based upon the evidence presented that related to this issue, the ALJ finds that Protestant was in substantial compliance with his franchise.[122]

#### c.     Desirability of a Competitive Marketplace

Approval of the proposed license and the resulting operations of a third, active Cadillac dealership in the Valley will result in increased competition for Cadillac sales in this part of the state of Texas. As demonstrated above, the ALJ was persuaded that Applicant met its burden of showing that there is a "lost opportunity" for sales. As such, the three dealers will be in active competition for those sales, resulting in more opportunities for the public to be exposed to Cadillac through additional advertising. While the Protestant does not want increased competition, it did not offer evidence or legal authority for the proposition that an application should not be approved because it

---

[120]  Mr. Payne at Tr. 76; Mr. Vackar at Tr. 596.

[121]  Tr. 620; Applicant's Ex. A-12, "Standard Provisions," Article 6.4, p. GM-00147.

[122]  The significance of a finding that a Protestant is not in substantial compliance is that the Protestant may not have standing to maintain his protest. *See, e.g., Gene Hamon Ford v. David McDavid Nissan*, 997 S.W.2d 298, 311 fn. 16 (Tex. App. - Austin 1999)

will result in increased competition. Protestant, a large and successful dealership, will have sufficient ability to compete with Weslaco Motors. Additionally, the degree of harm that will result to the Protestant by approving the application is not so great that it should outweigh the desirability for a competitive marketplace. While there were claims that another dealer would significantly harm Bert Ogden Cadillac, there simply was not sufficient evidence presented to support this contention.

Further, the additional customer market from Mexico and the demographics indicating that the Valley population will continue to grow, along with income and employment levels support a conclusion that, despite the current national economic crisis, the Valley is a viable market, with the potential for greater sales.

### d.     Any Harm to the Protesting Franchised Dealer

The evidence established that Protestant will suffer some harm as a result of the insertion of Weslaco Motors into the Cadillac business in the area. However, the ALJ found the expert report and testimony of Dr. Manuel to be more persuasive on this issue in terms of quantifying the degree of harm. Dr. Manuel's analysis showed that Protestant will experience an 8-10% decrease in profitability due to the sales anticipated by Weslaco Motors. This level of loss does not approach the 20-25% factor that has been considered by the state of New Jersey to demonstrate significant harm. While the MVD has not adopted a similar standard of harm, the New Jersey standard is useful in determining the degree of harm that is relevant in evaluating whether the positive effects resulting from increased competition outweigh the detrimental effects to the protesting dealer, including the possibility that the dealer would be forced out of business. It seems illogical that any showing of harm to a Protestant should result in a *per se* denial of an application and the Protestant in this case does not present this argument. Instead, the Protestant offered evidence, through Dr. Berry and Mr. Vackar, that they believe the level of harm would be a significant harm, resulting in potentially devastating consequences.

It is Dr. Berry's opinion that Protestant would be harmed by 20 to 30% in lost sales as a result of Weslaco's designation as a Cadillac dealer. Dr. Berry believes that the proximity of the Weslaco

dealership (some 20 miles away) necessarily means that some of the Ogden Cadillac customers will be attracted to the Weslaco dealership, resulting in sales through that dealer. In short, this evidence amounts to the conclusion that there is a fixed amount of potential customers ("the pie") and every customer for Weslaco means there is one less customer for Bert Ogden. While this argument has intuitive appeal, Dr. Manuel's evidence indicates that the pie is larger than that due to the opportunity for lost sales and that some of the customers who will purchase from Weslaco are not customers that Bert Ogden would have made a sale to anyway. It is the placement of the dealership in Weslaco, as opposed to Harlingen, that expands the overall pie of available customers.

Additionally, the Harlingen dealer did not appear to be attempting to fully develop his Cadillac business. A model of harm that assumes the existing number of Cardenas customers comprises the only available customer base, as suggested by Protestant, does not appear to acknowledge other factors suggested by Dr. Manuel, such as the inaccessibility of the Harlingen dealership in terms of being located away from a visible location by a major roadway and the overall absence of any sales promotion, which would explain why that customer base is so low. By changing these factors, Dr. Manuel concludes that the Weslaco dealership will increase the "pie" so to speak, and consequently, expand the overall customer base. Indeed, based on the analysis of Dr. Manuel, the relocation will result in the Luke Fruia dealership gaining customers while the Bert Ogden dealership may lose a small percentage of customers.

Additionally, Dr. Manuel's analysis did not include projected sales based upon the projections for increased population growth in the Valley, increased household income levels, and increased employment opportunities. If this market area continues to expand, there will be potentially more opportunities for sales for all three dealers. Consequently, Dr. Manuel's projections may be less than what can be reasonably anticipated.

Dr. Berry's analysis of harm appeared to be based on reports of dealer profitability that may not have included complete information, given the lack of information regarding used car sales and the failure to explain why this was reported on the Chevrolet-line reports that were not submitted by Protestant as part of the record. This lack of information called into question the accuracy of

Dr. Berry's overall impact analysis. Dr. Manuel testified that this was puzzling and resulted in impact numbers that may be inaccurate. The ALJ was persuaded by this argument. It seems that the profitability conclusions reached by Dr. Berry may be distorted and incomplete, resulting in an inflated assertion of harm.

This factor is also related to the factor of competition. Some level of competition is desirable - it encourages a dealer to continue to provide high quality performance such as for repairs, maintaining the appearance of the dealership, and operations, among other things. If a dealer believes that he may lose sales due to a nearby competitor, he may be more likely to insure that his dealership has something more to offer to the customers, such as improved service. If so, the public will benefit from this scenario.

### e.   The Public Interest

The evidence supports a finding that the public interest will be served by approval of the application and harmed if the application is not approved. If Weslaco begins operations as a Cadillac dealer, the public will have three active Cadillac dealers from which to choose in terms of competitive shopping. Currently, while there are three dealers, one is not very active and a proposal for termination of its franchise is pending. As noted by Applicant, if the Cardenas franchise is terminated, it will result in a greater amount of area to be covered by only two dealers, requiring Cadillac customers to drive a greater distance. For example, a potential customer from the McAllen-Edinburg-Mission area (Bert Ogden dealer area) will have to travel 60 miles to Brownsville (Luke Fruia dealer area) in order to comparison shop. Likewise, a prospective consumer from Brownsville would have to travel 60 miles to Mission to comparison shop. A Weslaco consumer would have to travel either 20 miles to Mission (the closest dealer) or 40 miles to Brownsville (Luke Fruia), while a Harlingen consumer would have to travel 20 miles to Brownsville (Luke Fruia) or 20 miles to Mission (Bert Ogden).

Mr. Payne testified that new vehicle buyers generally purchase vehicles within 13 miles of their residence, while used car buyers purchase used vehicles within a seven mile radius. He added

that service customers usually seek service within a 10 mile radius.[123] Mr. Vackar also testified that a majority of his sales come from within 25 miles of his dealership. Consequently, having 60 miles between two dealers (Bert Ogden and Luke Fruia) will not serve the public's interest in either ability to purchase vehicles or obtain service.[124] This takes on greater significant in the area of warranty service. The evidence in this case established that only authorized Cadillac dealers are permitted to perform warranty service on Cadillacs, except under limited circumstances.[125] In this situation, it is even more important for customers to be able to access a dealer within a reasonable distance in order for the warranty-covered repairs to be made.[126]

Besides offering a convenience factor to the public, Mr. Payne's dealership offers a background of operation by someone who is an experienced and competent dealer. Mr. Payne is the dealer principal for a Dodge-Chrysler-Jeep store in Weslaco, a Ford-Mercury store in Weslaco, a Volkswagen-Suzuki dealership in Brownsville, a Mitsubishi-Jeep dealership in Harlingen, and the Pontiac, Buick, Chevrolet and GMC dealership in Weslaco. Mr. Payne's history has a successful dealer gives confidence to the public that the Cadillac dealership will be operated in a competent manner and that they can rely upon his past experience to do so. The evidence also established that Mr. Payne is actively involved in the local community and has engaged in substantial charitable and community service work.

Further, the application has been approved by GM, giving rise to an inference that GM finds some validity to the concept of having three Cadillac dealers in the LRGV. If not, it would have simply proposed to terminate the Cardenas dealership and disapproved Weslaco's application. This would have resulted in there being only two Cadillac dealers in the LRGV, a fact of which GM was aware. It is significant that the relocation of the dealership is within the same APR as the Cardenas

---

[123] Tr. 103.

[124] Tr. 641-642.

[125] Applicant's Exhibit A-109.

[126] As noted by Applicant, one of the MVD's key duties is to "provide for compliance with manufacturer's warranties." TEX. OCC. CODE § 2301.001(2). This duty may be undermined if consumers' accessibility to service in compliance is diminished because they will be more likely to have the service performed by someone other than an authorized Cadillac dealer.

dealership. There was testimony that the APR is the population base to which the dealer is most conveniently located, thereby providing sufficient business to the dealer.[127]  GM reserves the contractual right to approve or disapprove relocations of its franchises and, as a policy matter, will ordinarily only allow relocations within the relocating dealer's own APR.[128]  Because the auto dealership business is so capital-intensive, the establishment of an APR contributes to the financial viability of the business because the majority of sales most likely will come from within that APR.[129]

In particular, while not having received evidence from GM that specifically states so, the ALJ has inferred from its approval of the Weslaco application and the relocation of a Cadillac dealership from Harlingen (the Cardenas dealership) that GM has concluded that three Cadillac dealerships in the LRGV are appropriate at this time.  GM has provided a notice of termination of the Cardenas Cadillac franchise in which it states that the basis for termination is non-compliance with the franchise of the Cardenas dealership.

The MVD has also approved the application, subject to the protest.  No evidence was presented to the ALJ as to what weight should be given to the MVD's approval.  Nonetheless, the MVD's approval can be interpreted as establishing that there was nothing on the face of the application that caused concern to the MVD about the application.

As discussed above, the evidence does not support a finding that approval of the application and the resulting Cadillac operations by Weslaco Motor will result in the failure of an existing dealer, that of Bert Ogden, or a reduction of service to the public.[130]

---

[127]  Tr. 68-69.

[128]  Exhibit A-12, pp. GM 00139-140, Sections 4.1-4.3; Tr. 69.

[129]  Applicant contended that GM's contractual right to approve or disapprove relocations of franchise would be prejudiced if the application is not approved.  The record does not contain evidence as to whether other remedies would exist to GM and the ALJ does not have to make this finding in order to concur with the rationale behind it.

[130]  See, e.g., *Austin Chevrolet, Inc. d/b/a Munday Chevrolet/Geo and General Motors v. Motor Vehicle Board and Motor Vehicle Division of the Texas Department of Transportation*, 212 S.W.3d 425 (Tex. App. - Austin 2006).

## E.   Recommendation

Based upon the evidence and argument presented by the parties and the proposed Findings of Fact and Conclusions of Law set forth below, the Administrative Law Judge recommends that the Motor Vehicle Division approve the application filed by Weslaco Motors, L.P., to operate a Cadillac dealership at 2401 E. Expressway 83, Weslaco, Hidalgo County, Texas, and dismiss the protest to the application filed by Bert Ogden Chevrolet, Inc. d/b/a Bert Ogden Cadillac.

## III.   FINDINGS OF FACT

1.   On or about August 8, 2007, Weslaco Motors, L.P. (Weslaco Motors or Applicant) as purchaser, entered into an Asset Purchase Agreement and an Advance Agreement with Cardenas Autoplex, Inc., of Harlingen, as seller, to purchase certain assets constituting substantially all of the assets of seller as a Cadillac automobile dealership.

2.   The principal dealer operator of Weslaco Motors is Mr. Edwin "Bud" Payne.

3.   By letter of September 20, 2007, Weslaco Motors submitted an application to General Motors (GM) for a Cadillac franchise to be located at 2401 E. Expressway 83, Weslaco, Hidalgo County, Texas.

4.   Weslaco Motors currently operates a GM facility at the same location at which it proposes to sell Cadillac. It sells Chevrolet, GMC, Buick, and Pontiac motor vehicles as part of its GM facility.

5.   By letter of November 29, 2007, GM approved the proposal of Weslaco Motors, subject to certain conditions, including obtaining all licenses necessary to operate a Cadillac dealership at the proposed location.

6.   On or about December 7, 2007, Weslaco Motors submitted an application to the Motor Vehicle Division (MVD) of the Texas Department of Transportation to amend its Motor Vehicle Dealer's License to operate a Cadillac dealership at 2401 E. Expressway 83 in Weslaco, Hidalgo County, Texas.

7.   On February 28, 2008, Berg Ogden Chevrolet, Inc. d/b/a Bert Ogden Cadillac, Inc., (Bert Ogden or Protestant) filed a notice of protest to the license application of Weslaco Motors with the MVD.

8.   GM did not intervene in this matter and did not participate in the contested case hearing.

9.    Bert Ogden's Cadillac franchise is currently located at 1400 E. Expressway 83 in Mission, Hidalgo County, Texas.

10.    The Cadillac area of primary responsibility (APR) of Bert Ogden as designated by GM extends to Texas Avenue in Weslaco, Texas. It also includes Mission, McAllen, and Edinburg.

11.    The proposed location of the Applicant's Cadillac franchise is approximately 21 miles from the Weslaco proposed Cadillac dealership and more than 25 minutes away in drive time.

12.    The Applicant's Cadillac dealership, if approved, and the Protestant's Cadillac dealership will both be located in Hidalgo County, Texas.

13.    Protestant is in compliance with its franchise from GM.

14.    The MVD has approved Applicant's license application, subject to resolution of the protest by Ogden Cadillac.

15.    GM has approved the application of Weslaco Motors to acquire the Cadillac franchise in Harlingen, Texas, and relocate it within the Harlingen APR established by GM.

16.    GM has approved Applicant's proposed location, facility, and operations by a Letter of Intent, dated August 12, 2008.

17.    An APR is a geographic area assigned by manufacturers to dealers and it is used to measure the effectiveness of dealer representation. It is comprised of a collection of census tracts assigned to a dealer by GM on an equidistance basis, and it is calculated to provide a penetrable population base sufficient to support a dealership.

18.    Applicant's dealer principal, Edwin M. (Bud) Payne, is a skilled and experienced dealer operator who is capable of adequately serving the public interest in the mid-Valley market of the Lower Rio Grande Valley (Valley).

19.    The Valley is comprised of the counties of Hidalgo, Starr, Cameron, and Willacy.

20.    The mid-Valley market area of the Valley is comprised of the communities of Weslaco, Mercedes, and the surrounding communities.

21.    The Valley is a relatively insular market for Cadillac because it is so far removed, geographically, from neighboring Cadillac markets, such as San Antonio and Corpus Christi, as to experience relatively low "in-sell" from markets outside the Valley.

22.    "In-sell" refers to the registrations in the Valley market by dealers located outside the Valley market. This is also known as a "pump-in."

23.    A motor vehicle dealer can make sells of vehicles to anyone, whether they reside within the
       dealer's APR or not.

24.    All new vehicles are required to be registered in the location where the purchaser resides.

25.    Mexican citizens can purchase vehicles in the United States so long as they are registered to
       an address within the United States maintained by the purchaser.

26.    There are currently three franchised Cadillac dealers in operation in the Valley: Bert Ogden
       in Mission, Luke Fruia in Brownsville, and Cardenas Autoplex in Harlingen.

27.    GM has filed a Notice of Termination to terminate the Cadillac franchise of the Cardenas
       Autoplex, located in Harlingen. That proceeding is currently abated.

28.    In 2007, Cardenas made only eleven new retail sales of Cadillac.

29.    The proposed relocation of the Cadillac franchise from Cardenas Autoplex in Harlingen to
       Payne Motors in Weslaco would still be within the Harlingen APR.

30.    A motor dealer can relocate its GM dealership within his designated APR, subject to notice
       and approval by GM.

31.    "Adequate representation" is defined, for purposes of these proceedings, as the number and
       placement of Cadillac dealerships in such a manner as to conveniently serve current and
       prospective Cadillac customers in the mid-Valley area without material harm to other
       Cadillac dealers.

32.    GM measures Cadillac adequacy of representation using a Texas benchmark which is a
       comparison of Cadillac registration performance in a given area to Cadillac performance in
       the entire state of Texas.

33.    The "Texas benchmark" for Cadillac registrations as a percent of competitive registrations in
       2007 was 15.67 % in the State and 26.33% in the Valley.

34.    In 2007, actual Cadillac registrations in the Valley, by segments, were 143.25% of expected
       Cadillac registrations based on comparison to the Texas benchmark. (Manuel Tab 6, p. 1).

35.    Adequacy of representation can be determined by using methods other than the Texas
       benchmark.

36.    One way of determining adequacy of representation is by comparing Cadillac market shares
       between the mid-Valley market and a like-kind benchmark market.

37.   A "like-kind" benchmark market to the mid-Valley market is the Brownsville market because it is substantially similar to the mid-Valley market in terms of demographics, product preferences and proximity to the Republic of Mexico market.

38.   A comparison of the Cadillac market shares between the Brownsville market and the mid-Valley market reveals available opportunity for a Cadillac dealer in the mid-Valley market.

39.   Inter-brand luxury competition in the Lower Rio Grande Valley market is less than in the State of Texas market because a number of luxury brands are not available at franchised dealers in the Valley, such as Acura, Audi, Infiniti, Lexus, and Porsche.

40.   The lack of inter-brand luxury competition has resulted in higher market shares for Cadillac in the (Valley) than in Texas as a whole. It also has resulted in a higher segmented-adjusted market share than in Texas as a whole.

41.   "Market share" is the number of sales of a brand divided by the number of sales of all brands combined. In the case of Cadillac, which has a limited product line, it is defined as the number of Cadillac sales divided by the number of sales of all brands that GM considers to be competitive with Cadillac.

42.   In general, the population buys new cars from dealers located between 10-25 miles from them and will go to a dealer located 7-13 miles for service.

43.   If the Cardenas Cadillac franchise is terminated and Applicant does not receive approval for its license to operate a Cadillac franchise, there will be only two Cadillac dealers in the Valley, i.e., Luke Fruia in Brownsville and Bert Ogden in Mission.

44.   The distance between the Luke Fruia and Bert Ogden Cadillac dealerships is approximately 60 miles.

45.   Only authorized Cadillac dealers are permitted to perform warranty work on Cadillacs, except under emergency conditions.

46.   If Applicant's application is denied, current and prospective Cadillac owners in the mid-Valley market would have to travel up to 20 miles to Mission or 40 miles to Brownsville for Cadillac sales or service.

47.   An "optimal location" for a dealership is a location which conveniently services the highest and densest concentration of actual and prospective customers of the brand represented by the dealer.

48.   Applicant's designated location for its Cadillac dealership is within the optimal location for a Cadillac dealer.

49.  Cadillac's segment-adjusted market share is not uniform throughout the (Valley). In the eastern portion of the Valley (containing Brownsville), Cadillac performs much better than it does in the western portion (containing McAllen and Weslaco).

50.  If Cadillac performed as well in the McAllen and Weslaco areas as it performed in the Brownsville area, there would have been nearly 200 additional Cadillac sales in the McAllen and Weslaco areas in 2007.

51.  There is a competitive marketplace for Cadillac motor vehicles in the Valley.

52.  There is an available opportunity for additional Cadillac sales by the proposed franchise.

53.  All Cadillac dealers in the Lower Rio Grande Valley have access to a large, but unquantifiable, base of consumers in nearby Mexico.

54.  The demographics for households and population conducive to the purchase of luxury vehicles are projected to continue their substantial growth in the Lower Rio Grande Valley in the coming years.

55.  High income households, which are more likely to purchase Cadillac vehicles, are more concentrated in the western portion of the market near the proposed Weslaco location than in the current Harlingen location.

56.  The Luke Fruia Cadillac dealership in Brownsville accounted for 83.1% of Cadillac sales in the Brownsville APR in 2007.

57.  Luke Fruia made 29 sales in the McAllen/Mission APR in 2007.

58.  Luke Fruia and Bert Ogden Cadillac dealerships accounted for 65.7% of Cadillac sales in the Harlingen APR in 2007.

59.  The Bert Ogden Cadillac dealership is a well-run dealership in an attractive facility with high levels of customer satisfaction and an above average sales performance.

60.  Bert Ogden Cadillac accounted for 83.8% of Cadillac sales made in its APR in 2007.

61.  One contributor to the above average sales performance of Bert Ogden Cadillac has been the weak Cadillac sales performance of Cardenas Autoplex.

62.  Bert Ogden Cadillac's sales through November of 2006 were 460. In 2007, sales were 445 and through November of 2008, they were 371.

63.  Bert Ogden's Cadillac dealer principal, Mr. Robert Vackar, is a capable and experienced dealer operator.

64. Bert Ogden Cadillac enjoys above GM-average profitability with competitive new car grosses.

65. Bert Ogden's Cadillac dealer location enjoys high traffic counts on Expressway 83, as well as advantageous expense and personnel sharing between its GM lines in Mission, Texas.

66. Bert Ogden Cadillac is a component of the largest "dealer group" in the Lower Rio Grande Valley and spends more money on advertising than any other dealer group in the Lower Rio Grande Valley.

67. A "dealer group" is an organization that owns and/or manages multiple dealerships.

68. Bert Ogden Cadillac is a profitable dealership and is not operating at an overall loss.

69. Bert Ogden Cadillac is positioned to successfully compete with Weslaco Motors Cadillac at its designated location.

70. Bert Ogden Cadillac will not be materially harmed by approval of the requested application.

71. In its initial application to GM, Applicant submitted a pro forma projecting sales of 480 Cadillac vehicles in the first year of operation.

72. GM has suggested that Applicant use a planning volume of 220 Cadillac vehicles.

73. Applicant projects sales of 300 Cadillac vehicles in the first year of operation.

74. If Applicant's application is approved, it is likely that there will be increased Cadillac sales in the mid-Valley market for the benefit of both the Cadillac brand and Cadillac dealers.

75. Approval of the application will result in increased Cadillac advertising and brand awareness in the Lower Rio Grande Valley, producing more opportunity for Cadillac sales.

76. Increasing Cadillac sales in the mid-Valley market will benefit the Cadillac brand and contribute to more adequate representation of the brand in the mid-Valley market.

77. From October 2007 to October 2008, total Cadillac sales in the United States decreased by 55%, from 21,267 to 9,541.

78. The overall economy of the United States and the financial soundness of the automobile manufacturers has decreased substantially in late 2007 and continues to date.

79. Domestic auto manufacturers, including GM, are downsizing product lines and dealerships to reflect decreased overall market share.

80.     By 2012, GM intends to close nine plants and 1,750 dealerships.

81.     Despite the current state of the economy, Applicant would like to have a GM franchise for
        the long-term prospects of profitability.

82.     In 2007, Bert Ogden Cadillac sold 508 new cars, for an average of 42 per month.

83.     In November of 2008, Bert Ogden sold 22 Cadillacs.

84.     Approval of the application may result in decreased profitability to Bert Ogden, but it does
        not appear to be substantial harm over the long-term.

85.     Operation of the application as proposed will promote the public interest.

86.     On March 5, 2008, the MVD notified the parties that a hearing on the matter was referred to
        the State Office of Administrative Hearings. The notice contained a statement of the time,
        place, and nature of the hearing; a statement of the legal authority and jurisdiction under
        which the hearing was to be held; a reference to the particular sections of the statutes and
        rules involved; and a short, plain statement of the matters asserted.

87.     The hearing on the merits was held on December 2-4, 2008. All parties appeared and
        participated in the hearing. The record was held open to allow for the preparation of the
        hearing transcript and to allow the parties to file post-hearing written closing arguments. The
        record closed on February 24, 2009.

## IV. CONCLUSIONS OF LAW

1.      The Texas Department of Transportation's Motor Vehicle Division has jurisdiction and
        authority over the subject matter of this case. TEX. OCC. CODE §§ 2301.652; 2301.701-713;
        and 43 TEX. ADMIN. CODE (TAC) §§ 8.105-8.107.

2.      The State Office of Administrative Hearings has jurisdiction over all matters relating to the
        conduct of a hearing in this matter, including the preparation of a proposal for decision with
        findings of fact and conclusions of law. TEX. OCC. CODE § 2301.704; TEX. GOV'T CODE
        ch. 2003.

3.      Notice of the protest and of the hearing on the merits was provided as required. TEX. OCC.
        CODE §§ 2301.652; Tex. Gov't Code 2001.051 and 2001.052; 43 TAC § 8.106.

4.      Protestant is in substantial compliance with its franchise agreement.

5.      The Cadillac brand is not adequately represented as to the service and sale in the existing
        Harlingen APR of Cardenas Autoplex.

SOAH DOCKET NO. 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.LIC          PROPOSAL FOR DECISION          PAGE 48

6.      The establishment of a Cadillac dealership as proposed by Applicant will not result in substantial, long-term harm to Protestant.

7.      The establishment of a Cadillac dealership as proposed in Weslaco, Texas, will promote a competitive marketplace.

8.      The public interest will be best served by the establishment of a Cadillac dealership by Weslaco Motors in Weslaco, Texas.

9.      Based upon the above Findings of Fact and Conclusions of Law, Applicant has demonstrated good cause to establish the proposed Cadillac dealership at 2401 E. Expressway 83, Weslaco, Hidalgo County, Texas.

SIGNED April 27, 2009.

SUZANNE FORMBY MARSHALL
ADMINISTRATIVE LAW JUDGE
STATE OFFICE OF ADMINISTRATIVE HEARINGS

**EXHIBIT C**





COPY

<u>VIA FEDERAL EXPRESS</u>
<u>PERSONAL & CONFIDENTIAL</u>

117713    7902
RENATO G CARDENAS
CARDENAS AUTOPLEX INC.
111 S LOOP 499
HARLINGEN, TX 78550

May 14, 2009

Attention: RENATO G CARDENAS

This letter is being delivered to CARDENAS AUTOPLEX INC. to meet the commitment we made to communicate to dealers during the week of May 11th concerning our restructuring efforts.

We recently filed a Form S-4 with the Securities and Exchange Commission setting forth our offer to the GM bondholders to exchange debt for equity. The Form S-4 also describes our restructuring plan. The unprecedented economic conditions in the United States and in our industry have made it necessary for us to restructure our business and operations significantly. The restructuring plan also includes addressing GM's dealer network in order to maintain GM's long term viability. Part of that restructuring is a planned reduction in the number of GM dealerships. As we have communicated to all dealers, our revised restructuring plan is a result of GM being challenged to move more aggressively and faster in its restructuring efforts.

In our planning, we have identified those attributes that GM dealers must have to be a successful part of the dealer network going forward. We also reviewed historical performance factors such as sales effectiveness, sales volume, CSI performance, capitalization, profitability, location, facilities, and dualing patterns, among other market factors. We have conducted an analysis of your dealership's operations and market. We now are providing you with our current planning regarding your dealership in connection with our dealer network plans, in the spirit of open and candid communication.

Based on our review and current and foreseeable market conditions and your dealership's historical performance, we do not see that GM can have a productive business relationship with CARDENAS AUTOPLEX INC. over the long term. Generally speaking, we would not expect our contractual relationship to continue past October, 2010. Please understand that our planning in this regard is not finalized, and we are prepared to give you until the end of the month to submit any information you would like to us. We know this is a difficult situation. However, we feel that it is best to openly communicate our planning to you. The need for this review and analysis was forced on us by extremely difficult economic conditions both of us face in the industry. Simply put, we must have a viable, competitive dealer network going forward and all our planning is focused on this goal.

If you have any information you would like to submit or have questions concerning this communication, please contact us at GMDealerNetworkquestions@gm.com.

Sincerely,

General Motors Corporation



EXHIBIT

A

General Motors Corporation, Dealer Business Planning Group, Mail Code 482-A06-C66, 100 GM Renaissance Center, Detroit, MI 48265-1000

## PROPOSED ORDER 1

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

In re:                                                          :        Chapter 11
                                                                :
GENERAL MOTORS CORP, *et al.,*                                  :        Case No. 09-50026 (REG)
                                                                :
Debtors                                                         :        Jointly Administered

-----------------------------------------------------------------X

## ORDER GRANTING THE OBJECTION OF CARDENAS AUTOPLEX, INC., TO GM'S MOTION PURSUANT TO 11 U.S.C. §365 AUTHORIZING (A) THE REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF CERTAIN DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF

**ORDERED**, that the Objection of Cardenas Autoplex, Inc. is sustained and

General Motors Corporations' Rejection Motion is overruled to the extent it rejects

Cardenas Autoplex, Inc.'s franchise.

Dated: August ___, 2009
New York, New York


                                    _____
                                    HONORABLE ROBERT E. GERBER
                                    UNITED STATES BANKRUPTCY JUDGE