HEARING DATE AND TIME: July 22, 2009 at 9:45 a.m. (Eastern Time)
OBJECTION DEADLINE: July 17, 2009 at 4:00 p.m. (Eastern Time)

Garry M. Graber
Deborah J. Piazza
HODGSON RUSS LLP
60 East 42nd Street, 37th Floor
New York, NY 10165-0150
Telephone: (212) 661-3535
Facsimile: (212) 972-1677

Bruce R. Leaverton (*pro hac vice* application pending)
Mary Jo Heston     (*pro hac vice* application pending)
Heidi C. Anderson   (*pro hac vice* application pending)
LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101
Telephone: (206) 223-7000
Facsimile: (206) 223-7107

Attorneys for Stillwater Mining Company

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| **GENERAL MOTORS CORP.,** *et al.*, | 09-50026 (REG) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF U.S./MONTANA BASED STILLWATER MINING COMPANY TO THE DEBTORS' MOTION TO REJECT ITS MINERAL SUPPLY CONTRACT IN <u>FAVOR OF FOREIGN MINERAL SUPPLY CONTRACTS</u>**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ...............................................................................................................1

II. RELIEF REQUESTED ........................................................................................................3

III. FACTUAL BACKGROUND ..............................................................................................3

    A. The Rejection of the Stillwater Contract Will Negatively Impact Stillwater's Income and Sustainability, Local Communities, Jobs and Its Access to Credit.................................................................................................3

    B. Public Policy Considerations in GM Chapter 11 and Its Treatment of Its Suppliers. .............................................................................................................5

    C. Stillwater's Enjoys an Excellent Working Relationship With GM...................6

    D. The Sale Order Generally Contemplates a Joint Decision by Old GM and New GM on the Disposition of Executory Contracts. ..............................7

IV. ARGUMENT .......................................................................................................................9

    A. The Joint Business Decision to Reject the Stillwater Contract, while Assuming Similar Contracts with Foreign Suppliers, is Not Supported by Evidence Justifying Debtors' Business Judgment and Must be Denied Accordingly...........................................................................................9

        1. Debtors' Third Omnibus Motion is devoid of any facts or evidence supporting the allegation that rejection of the Stillwater Contract will benefit the estate or the general unsecured creditors. ......................................................................................10

        2. Rejection of the Stillwater Contract will cause damage grossly disproportionate to any benefit to be derived by the general creditors of Debtors estate................................................................11

    B. GM's Additional Business Justifications, If Any, for the Rejection of the Stillwater Contract, Should Only be Permitted in a New Motion Giving Stillwater an Opportunity to Engage in Limited Discovery................12

    C. Debtors' Disguised Request to Reject the Stillwater Contract Nunc Pro Tunc Should be Denied. .............................................................................13

V. CONCLUSION..................................................................................................................14

# TABLE OF AUTHORITIES

Page

**Cases**

*In re Balco Equities Ltd., Inc.*, 323 B.R. 99 .................................................................... 10

*In re Fleming Companies, Inc.,* 304 B.R. 85 (Bankr. D. Del. 2003) ................................. 13

*In re G Survivor Corp.*, 171 B.R. 755 (Bankr. S.D.N.Y. 1994) ............................................ 9

*In re G Survivor Corp.*, 171 B.R. 758 ............................................................................. 9, 10

*In re Lavigne*, 114 F.3d 379 (2d. Cir. 1997) ....................................................................... 12

*In re Meehan*, 46 B.R. 96 (Bankr. E.D.N.Y. 1985) ............................................................... 9

*In re National Record Mart, Inc.,* 272 B.R. 131 (Bankr. W.D. Pa. 2002) ............................ 13

*In re Sundial Asphalt Co., Inc.*, 147 B.R. 72 ........................................................................ 9

*In re: Old Carco LLC*, 40 B.R. 180 (S.D.N.Y. 2009) ................................................. 9, 12, 13

**Statutes**

11 U.S.C. § 365(a) ................................................................................................................ 13

Bankruptcy Code, § 363 ......................................................................................................... 2

Bankruptcy Code, § 365 ................................................................................................. 2, 3, 8

TO:   THE HONORABLE ROBERT E. GERBER,
       UNITED STATES BANKRUPTCY JUDGE

## I.   INTRODUCTION

Stillwater Mining Company ("Stillwater") is a Montana-based mining company *and* direct supplier to the Old GM of the minerals palladium and rhodium[1] for use in both Old and New GM's manufacture of catalytic converters[2] for GM automobiles.[3] Declaration of John Stark ("Stark Decl") ¶ 2. Stillwater is the only U.S. supplier of these critically important manufacturing materials. *Id.* The other two mining companies and direct substantial suppliers of such minerals – Mining and Metallurgical Company Norilsk Nickel (MMC Norilsk Nickel) ("Norilsk") and Impala Platinum Holdings Limited ("Implats")[4] – are based respectively in Russia and in South Africa. Declaration of James Binando ("Binando Decl." ¶ 5). The Debtors' motion (the "Third Omnibus Motion") offers no business justification for this joint decision by Old GM and New GM. Debtors are instead inexplicably assuming and assigning these two foreign mineral supply contracts to New GM while seeking permission pursuant to a canned

---

[1] Stillwater also mines and can supply platinum, the third primary mineral in the "platinum group minerals" ("PGMs") used in the manufacture of catalytic converters, although its current supply contract does not provide for the supply of platinum to GM. Stark Decl. ¶ 3.

[2] Auto catalysts are significantly the largest user of palladium which helps in the elimination of harmful emissions produced by internal combustion engines. Palladium is softer than platinum and is more resistant to oxidization. *See* www.stillwaterpalladium.com

[3] New GM is a company that is essentially carrying on the same car manufacturing operations of Old GM albeit stripped of some of its old debt obligations and operations and its old Union contract while being owned and financed substantially by the United States Treasury. New GM has rehired its same employees and retained virtually all of its 500 suppliers in order to preserve its infrastructure and preserve U.S. jobs. This is clearly not a situation where there is an independent separate purchaser (i.e. Fiat) with existing supplier contracts that is acquiring the debtor's assets.

[4] The Debtors also obtain such minerals from a Pennsylvania-based recycler, but upon information and belief the amounts of Platinum Group Minerals from such entity are significantly less than the amounts supplied by the three mining supply companies, Norilsk, Implats and Stillwater.

1

Section 365 motion to reject Stillwater's supply contract[5] *nunc pro tunc*[6] without any specific justification for such inconsistent and unsupportable decisions concerning GM's respective PGM supply contracts.[7]  Notably, the Third Omnibus Motion is wholly devoid of any viable justification for the joint business decision by Old GM and New GM to reject the Stillwater Contract.  Debtors further fails to acknowledge or address the significant disparate impact such rejection may have on Stillwater, its business operations, its employees in Montana and local Montana communities.  Rather, it would appear from Debtors' sparse brief that the decision was a matter of mere convenience to Old GM and New GM.  *See discussion infra*. at pp. 7-8; *see also* Binando Decl. ¶¶ 8-10.

The Debtors have not met their burden under Section 365.  Their request to reject the Stillwater Contract under the facts and circumstances of this extraordinary bankruptcy case is contrary to the policies, purposes and reasoning articulated in this Court's July 5, 2009 decision (the "July 5th Decision") supporting the July 5, 2009 order authorizing Old GM to transfer substantially all of its assets free and clear of liens to New GM, and to assign certain executory contracts pursuant to Sections 363 and 365 of the Bankruptcy Code (the "July 5th Order").  Moreover, the rejection of the Stillwater Contract is contrary to the justifications and purposes articulated by President Obama's administration and the Auto Taskforce for the U.S. Treasury's

---

[5] Palladium and Rhodium Sales Agreement, dated August 8, 2007 (the "Original Contract"), as amended pursuant to the First Amendment dated December 9, 2008 (the "First Amendment") and the Second Amendment dated March 5, 2009 (the "Second Amendment") (collectively referred to as the "Stillwater Contract").  *See* Stark Decl. ¶ 4; Binando Decl. ¶ 4.

[6]  The *nunc pro tunc* aspect of the Third Omnibus Motion's attempted rejection of the Stillwater Contract is not discussed, justified or addressed in any way by Debtors and is merely silently slipped into the schedule of contracts and the column marked rejection date. As more fully set forth below, there is no justification for such *nunc pro tunc* relief.

[7] The Third Omnibus Motion, like the First and Second Omnibus Motion, sets forth general case law standards for rejection without discussion of the Stillwater Contract or the assumed and assigned foreign platinum mineral supply contracts.

2

intervention in financing both Old and New GM with U.S. taxpayer's dollars. Accordingly, Debtors' request to reject the Stillwater Contract *nunc pro tunc* should be denied.

## II.    RELIEF REQUESTED

That Debtors' Third Omnibus Motion seeking to reject certain executory contracts be DENIED as respects the rejection of the Stillwater Contract for failure to establish a *prima facie* case for rejection under Section 365 of the Bankruptcy Code.

Alternatively, should the Court determine the Third Omnibus Motion should nevertheless be granted, for a continuance of this hearing and entry of an Order permitting Stillwater Mining Company to engage in discovery as respects Debtors' justification for seeking to reject the Stillwater Contract, while assuming similar PGM supply contracts held by foreign-based suppliers, and permitting Stillwater Mining Company to continue shipping pursuant to the terms of the Stillwater Contract.

## III.   FACTUAL BACKGROUND

**A.    The Rejection of the Stillwater Contract Will Negatively Impact Stillwater's Income and Sustainability, Local Communities, Jobs and Its Access to Credit.**

Stillwater[8] is engaged in the development, recycling, extraction, processing, smelting, refining, and marketing of palladium, platinum and associated metals (e.g. rhodium) in southern Montana. The area known as the J-M Reef, which Stillwater owns, is the *only* known significant source of PGMs in the United States. Binando Decl. ¶ 2.

Stillwater currently employs 1322 employees in its Montana operations making it the largest employer in the counties of Stillwater and Sweet Grass, and one of Montana's largest statewide employers. Binando Decl. ¶ 3. The Stillwater Contract is one of two long-term auto company sales contracts held by Stillwater, which together represented 42.8% of Stillwater's

---

[8] For additional background information on Stillwater and its operations go to www.stillwatermining.com.

2008 revenue. *See* Stillwater's March 16, 2009 10K[9] ("2008 10K"), p. 36. The Stillwater Contract constituted approximately 12% of Stillwater's revenue in 2008 and approximately 11% of Stillwater's year-to-date revenue[10]. Binando Decl. ¶ 7. The Stillwater Contract provides for specific quantities of palladium[11] and rhodium to be delivered to GM on a monthly basis at prices slightly discounted from the market price, and includes floor and ceiling pricing for certain PGMs. Such floor pricing provides essential stability to Stillwater's income from the sale of these PGM minerals. Binando Decl. ¶ 6.

If the Stillwater Contract is rejected pursuant to Debtors' request, Stillwater will be required to sell the GM designated palladium and rhodium at the spot market price. Spot market pricing for palladium and rhodium is volatile and has recently experienced a significant downturn, in large part due to the recent worldwide economic decline. Binando Decl. ¶8. For example between March 2008 and December 2008, the spot price for palladium varied between $582 per ounce and $164 per ounce. *See* 2008 10K[12] p. 34. As of June 30, 2009, the palladium price was approximately $250 per ounce. Based on June 30, 2009 market prices, Stillwater's losses from the rejection of the Stillwater Contract will be approximately $500,000.00 per month.[13] If such losses continue for a sustained period of time, or if Stillwater's losses increase significantly due to an additional decline in the spot market price for PGMs, it will have the

---

[9] A copy of the relevant excerpt from the 2008 10K is attached hereto as Exhibit "A" for the Court's convenience.

[10] The reduction in revenue for 2009 is due in part to the fact that the First and Second Amendments to the Stillwater Contract reduced the amount of rhodium delivered to GM during the first six months of 2009.

[11] Through the two auto company long term sales contracts Stillwater has committed 100% of its mined palladium production. Ex. A (2008 10K) p. 36.

[12] A copy of the relevant excerpt from the 2008 10K is attached hereto as Exhibit "A" for the Court's convenience.

[13] The rejection of the contract will subject not only Stillwater to the above described significant consequences and financial losses, but will result in a very large claim for breach of contract. Binando Decl. ¶ 11.

4

likely effect of putting hundreds of Stillwater employees' jobs at risk. Binando Decl. ¶ 9-10. At current spot market prices, Stillwater is not currently sustainable without the pricing floors in the long term auto sales contracts. Binando Decl. ¶ 8.

In addition to the potential for significant job loss, although Stillwater currently has substantial cash reserves, rejection of the Stillwater Contract may impact Stillwater's ability to obtain third party financing and access to the credit markets, should it require credit in the future. Stark Decl. ¶ 9.

In summary, the narrative in Stillwater's 2008 10K commented as follows on the relationship between Stillwater's business operations and the fate of long term sales automotive contracts, including the Stillwater Contract:

> Should the Company [Stillwater] be unable to renew these sales contracts, and the market price of PGMs proves insufficient to cover the Company's operating and capital costs of production, then the Company operations might have to be curtailed, suspended or closed.[14]

### B.  Public Policy Considerations in GM Chapter 11 and Its Treatment of Its Suppliers.

Due to the broad economic and societal policies implicated in this case, this is not the typical Chapter 11 bankruptcy case, as the Court repeatedly points out in the July 5th Decision. As such, the result is an alteration of the normally narrower application of bankruptcy principals and procedures. *See e.g.* July 5th Decision, at. p. 6, pp. 13-14 and p. 15. The U.S. and Canadian Governments' willingness to employ billions of their respective taxpayers' dollars to save a long-time critical North American industry further suggests the need for a different approach, with social impacts and public policy considerations becoming paramount over the typically

---

[14] 2008 10K p. 37, a copy of the relevant excerpt of which is attached hereto as Exhibit "A" for the Court's convenience.

5

predominant economic factors. Specifically in this regard, this Court states as follows in the July 5th Decision:

> Only the U.S. and Canadian Governmental authorities were prepared to invest in GM-and then not so much by reason of the economic merit of the purchase, but rather to address the underlying societal interests in preserving jobs and the North American auto industry, **the thousands of suppliers to that industry,** and the health of communities, in the U.S. and Canada, in which GM operates.

See July 5th Decision, at p. 15 (emphasis added).

In keeping with these public policy priorities, the Court notes: "Substantially all of the old GM executory contracts with direct suppliers are likely to be assumed and assigned to New GM." A review of the recently filed motions to reject executory contracts comports with that statement, with almost no supplier contracts being rejected aside from the rejection of the Stillwater Contract. Even those dealers whose contracts are not being assumed have been given what the Court referred to as a "softer landing and orderly termination" through an approximately 17 month termination notice. Notably, New GM is apparently assuming Russian and South African PGM supply contracts like the Stillwater Contract without giving Stillwater, a company headquartered in the U.S. and employing thousands of people in the State of Montana, the opportunity to continue with New GM. Stillwater has been given no such soft landing or consideration.

**C.    Stillwater's Enjoys an Excellent Working Relationship With GM.**

Stillwater has consistently maintained an excellent working relationship with GM and has worked closely with them through their financial difficulties by amending the Stillwater GM Agreement on not one, but two occasions since 2007, to reduce the amount of rhodium to meet Old GM's supply needs. Stark Decl. ¶ 5. Neither Old nor New GM discussed their joint decision to reject the Stillwater Contract prior to making the decision to reject. Instead,

6

Stillwater representatives were contacted by their GM contract representative who advised that the decision had been made to reject the Stillwater Contract. *See* Stark Decl. ¶ 6. When Stillwater inquired as to the reasons behind GM's decision, it was informed that pricing under the Stillwater Contract was not the deciding issue. Rather, the GM representative cited the reduced manufacturing capacity as a reason for the company's decision to consolidate its suppliers of PGM metals. *See* Stark Decl. ¶ 6.

No justification was given to Stillwater representatives as to why GM chose to retain two foreign suppliers over the only PGM mining company in the United States. *See Id*. This lack of justification is particularly relevant where the negative impacts on this U.S. supplier may lead to significant job loss and business interruptions in several Montana communities dependant on Stillwater.

Stillwater has always performed under the terms of the Stillwater Contract and is ready willing and able to continue to do so.[15] Stark Decl. ¶ 7. As of the date of this Objection, there are no cures due under the terms of the Stillwater Contract.

### D. The Sale Order Generally Contemplates a Joint Decision by Old GM and New GM on the Disposition of Executory Contracts.

The July 5th Order which approved the terms of the purchase and sale agreement (the "MPA") addresses the post-sale treatment of Old GM's executory contracts. *See* Section 6.6 and 6.7 of the MPA attached hereto as Exhibit A. These sections generally provide that Old GM and New GM will jointly make decisions as to the disposition of the Debtors' executory contracts at

---

[15] Stillwater has a delivery due and scheduled for July 20th under the terms of the Stillwater Contract which it intends to fulfill. Stark Decl. ¶ 7

7

least until the "Executory Contract Deadline"[16] with certain limited exceptions not relevant to this proceeding. Until the Executory Contract Deadline, New GM may specify in writing additional executory contracts to those specifically identified in the MPA that it wishes to designate as assumable and to include it in the Assumable Executory Contract Schedule. *See* MPA § 6.6(a). As to "Rejectable Contracts"[17] New GM, with Old GM's consent, may designate such contracts for assumption and assignment unless such contract has previously been rejected by Old GM pursuant to Section 365 of the Bankruptcy Code. *See* MPA, § 6.6(a). Similarly, New GM may designate contracts as "Proposed Rejectable Contracts" which Old GM may, but is not obligated to, reject pursuant Section 365 of the Bankruptcy Code. *See* MPA,§ 6.6(b). The MPA further provides that Old GM shall have the right, but not the obligation, to reject, at any time, any Rejectable Executory Contract with certain limited exceptions not relevant to this proceeding. *See* MPA § 6.6(c). Finally, New GM is generally obligated to pay for costs and cure amounts related to assumable contracts as well as certain designated contracts pending the Executory Contract Deadline and share costs and expenses related to other contracts pending such deadline. *See* MPA § 6.6(d). Under these circumstances it is clear that both Old GM and New GM are jointly exercising their business judgment in determining the fate of contracts such as the Stillwater Contract and whether such contracts will be part of the go forward business of GM and are jointly apportioning the respective costs and cure amounts pending such decisions.

---

[16] The term "Executory Contract Designation Deadline" means thirty (30) calendar days following the Closing Date or if mutually agreed upon by the Parties, any later date up to and including the Business Day immediately prior to the date of the confirmation hearing for Sellers' plan of liquidation or reorganization.

[17] The term Rejectable Contract means "an Executory Contract that Sellers may, but are not obligated to, reject pursuant [sic] Section 365 of the Bankruptcy Code." Section 6.6(b).

8

## IV.  ARGUMENT

**A.  The Joint Business Decision to Reject the Stillwater Contract, while Assuming Similar Contracts with Foreign Suppliers, is Not Supported by Evidence Justifying Debtors' Business Judgment and Must be Denied Accordingly.**

Debtors are not properly exercising their business judgment in seeking to reject the Stillwater Contract. Stillwater agrees that the decision to assume or reject an executory contract is within the business judgment of Debtors. "Generally, absent a showing of bad faith, or an abuse of business discretion, the debtor's business judgment [in determining to reject an executory contract will not be altered." *In re G Survivor Corp. Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994). However, the "business judgment" test permits the court to consider the rights of other parties affected by the rejection of a contract. *In re Sundial Asphalt Co., Inc.*, 147 B.R. 72, 81 (E.D.N.Y. 1992) *citing In re Meehan*, 46 B.R. 96 (Bankr. E.D.N.Y. 1985). In that regard, "the Court may refuse to authorize rejection where the party whose contract is to be rejected would be damaged disproportionately to any benefit to be derived by the general creditors of the estate." *Id. But compare In re: Old Carco LLC*, 40 B.R. 180, 188 (S.D.N.Y. 2009) (stating that under the business judgment standard, "the effect of rejection on the other entities is not a material fact to be weighed . . . but under a heightened standard or a balancing of the equities such effect would be a fact to be weighed.")

Case law supports the consideration of a wide variety of factors in evaluating whether the debtor employed reasonable business judgment in its decision to reject a contract, including: "(a) whether the contract burdens the estate financially; (b) whether rejection would result in a large claim against the estate; (c) whether the debtor <u>showed real economic benefit</u> resulting from the rejection; and (d) whether <u>upon balancing the equities, rejection will do more harm to the other party to the contract than to the debtor if not rejected</u>." *In re Balco Equities Ltd., Inc.*, 323 B.R.

9

85, 99 (S.D.N.Y. 2005) *quoting G Survivor*, 171 B.R. at 758 (emphasis added) (internal citations omitted).

In this instance, Debtors have failed to provide <u>any</u> facts or evidence establishing <u>any</u> economic benefit to either Old GM or New GM through rejection of the Stillwater Contract in support of their motion. In contrast, rejection of the Stillwater Contract will cause great harm to Stillwater's business and place hundreds of U.S. jobs in jeopardy. In this case, Debtors' motion to reject the Stillwater Mining Contract must be denied.

   1.   <u>Debtors' Third Omnibus Motion is devoid of any facts or evidence supporting the allegation that rejection of the Stillwater Contract will benefit the estate or the general unsecured creditors</u>.

Debtors seek to reject various executory contracts, including the Stillwater Contract, in a conclusory brief relying solely on the sale of substantially all its assets to New GM. In support of Debtors' request, the Third Omnibus Motion states merely that: (1) "continuing the Executory Contracts would be costly and would provide no corresponding benefit or utility to the Debtors or their estates" and "would impose unnecessary costs and burdens on the Debtors' estates"[18]; (2) the executory contracts are no longer necessary for or beneficial to Debtors' estates; and (3) no meaningful value would be realized by Debtors if the Executory Contracts were assumed and assigned to third parties.[19] As noted above, the Third Omnibus Motion fails to provide any facts or evidence to support these assertions and contains no proper justification for rejecting the Stillwater Contract.

The only facts in the record evidencing the "business judgment" exercised by Debtors imply that the decision to reject the Stillwater Contract in favor of the remaining PGM suppliers are without basis. *See* Stark Decl. ¶ 6. This decision was not based upon pricing concerns

---

[18] Third Omnibus Motion ¶¶ 6, 8.
[19] *See* Third Omnibus Motion ¶ 13.

10

related to the Stillwater Contract, nor the performance by Stillwater under the terms of the Stillwater Contract. *See Id.* In fact, Debtors have provided no concrete rationale to either Stillwater or to the Court for New GM's decision to retain Norilsk and Impala as PGM suppliers while not retaining Stillwater. Aside from expressing a general desire to consolidate suppliers, the only major supplier (whose products are not obsolete to New GM) that appears to have been eliminated to-date out of several hundred GM suppliers is Stillwater.[20] *See* Stark Decl.¶ 6; *see also,* Third Omnibus Motion, Ex. A. Such disparate and discriminatory treatment without a correspondingly sound business reason or showing of concrete harm by the assumption of the Stillwater Contract by New GM or Old GM is an abuse of the Debtors' discretion.

Debtors reliance on the sale under the above described circumstances wholly ignores the reality of the joint decision making process proscribed by the MPA, and New GM's direct participation with Old GM in the designation of assumable and rejectable executory contracts. *See discussion supra.* Such a joint decision making process inherently requires a business justification for the actual decision to designate for assumption the Russian and South African PGM supply contracts, while rejecting the Stillwater Contract. Debtors' Third Omnibus Motion is remarkably devoid of any such business justification, and the motion should accordingly be denied.

        2.    <u>Rejection of the Stillwater Contract will cause damage grossly disproportionate to any benefit to be derived by the general creditors of Debtors estate.</u>

Rejection of the Stillwater Contract will cause great harm to Stillwater while conferring no benefit to the Debtors' general creditors. In this case, GM currently does not have any cure amount due to Stillwater under the Stillwater Agreement. As such, the assumption of this

---

[20] In the Fourth Omnibus Motion there appears to be the rejection of two manufacturing supply contracts related to discontinued vehicle brands which discontinuation likely provides a rationale for such rejection. Such is not the case with the PGM suppliers.

11

contract would not harm the Debtors' unsecured creditors or New GM. Stillwater is capable of providing all three PGM minerals required in New GM's current manufacturing operations, and thus would arguably support New GM's efforts to consolidate suppliers.

By contrast, as set forth more fully in the attached declarations of John Stark and James Binando, rejection of the Stillwater Contract will cause substantial harm to Stillwater's operations in Montana. Moreover, the rejection of the Stillwater Contract may subject Debtors' estate to a large damage claim for breach of contract arising from certain losses resulting from declining spot market pricing for PGMs. *See In re: Old Carco LLC*, 406 B.R. 180, 190 (Bankr. S.D.N.Y. 2009) *citing In re Lavigne*, 114 F.3d 379, 387 (2d. Cir. 1997) (noting that a debtor's rejection of an executory contract gives rise to a breach of contract claim against the debtor's bankruptcy estate).

Finally, the unique circumstances of this case involving U.S. Taxpayer financing, mandate that the Court factor the disproportionate impact that rejection of the Stillwater Contract will have on this U.S. company, and by extension, U.S. jobs. This is particularly relevant when considered in the context of New GM assuming the contracts of virtually every other supplier, and the fact that New GM would experience no harm by assuming the Stillwater Contract in addition to, or in place of, one or both of the foreign PGM suppliers. Such an imbalance of interests suggests a clear abuse of Debtors' business judgment under their retained assumption and rejection responsibilities.

**B.    GM's Additional Business Justifications, If Any, for the Rejection of the Stillwater Contract, Should Only be Permitted in a New Motion Giving Stillwater an Opportunity to Engage in Limited Discovery.**

The rejection of the Stillwater Contract should be denied based upon the Old and New GM's failure to establish its *prima facie* burden of showing it exercised proper business

judgment in making this decision. Any additional justification presented by Debtors should be made only in renewed motion on sufficient notice to provide Stillwater with the opportunity to conduct limited discovery of those individuals involved in the decision to reject the Stillwater Contract and assume the foreign PGM Contracts prior to the Court making a decision on the rejection of the Stillwater Contract. *See generally, In re: Old Carco LLC*, 406 B.R. 180 (Bankr. S.D.N.Y. 2009) (acknowledging that while motion to assume or reject is a summary proceeding that limited discovery is warranted).

    **C.    Debtors' Disguised Request to Reject the Stillwater Contract Nunc Pro Tunc Should be Denied.**

Debtors seek to reject the Stillwater Contract *nunc pro tunc*, as indicated only by a notation in the schedule of contracts attached to the Third Omnibus Motion. Moreover, Debtors' motion fails to explicitly request *nunc pro tunc relief*, let alone address the reasons why such relief is warranted in this case. As such, the Court should decline to grant Debtors' motion to reject the Stillwater Contract effective on July 9, 2009.

As a general rule, rejection becomes effective only upon entry of a court order approving a motion to reject an executory contract. 11 U.S.C. § 365(a). *In re Fleming Companies, Inc.* 304 B.R. 85, 96 (Bankr. D. Del. 2003) *citing, e.g., In re National Record Mart, Inc.,* 272 B.R. 131, 133 (Bankr. W.D. Pa. 2002) (agreeing with the general principle that the effective date of a debtor's rejection of an unexpired lease is the date the court enters the order).

As noted above, Debtors failed to explicitly request such relief, choosing instead to silently slip the requested date of rejection into the attached schedule of contracts. The motion itself is devoid of any reference to *nunc pro tunc* relief, including any case law supporting such relief. In that regard, Debtors have failed to provide the Court with "exceptional circumstances" justifying the retroactive rejection of the Stillwater Contract and, in fact, has failed to provide the

13

Court with <u>any</u> circumstances justifying this extraordinary relief. As such, Debtors have clearly failed to meet the burden required for obtaining *nunc pro tunc* relief in this case and its request should be denied accordingly.

## V. CONCLUSION

Old and New GM have failed to satisfy their *prima facie* burden of showing that they exercised reasonable business judgment in rejecting the Stillwater Contract. The Debtors' reliance on the sale of assets to justify its decision is, at best, misplaced, particularly in light of the facts of this case and the joint involvement of Old and New GM in the decisions concerning the fate of executory contracts. As a long time and loyal supplier of palladium and rhodium to GM that has worked to accommodate GM's needs and financial difficulties, Stillwater and its Montana-based employees and communities deserve better. Stillwater and others are entitled to the real answer as to why Old and New GM chose the Russian and South African suppliers of PGM minerals over a U.S. based supplier who will be significantly harmed if the Stillwater Contract is rejected. This is particularly true where, as here, Stillwater appears to be the only substantial supplier to GM whose contract is being rejected without a "soft landing" or any opportunity to discuss the matter with GM. The Debtors added insult to injury in seeking *nunc pro tunc* relief without any discussion or notice. The purpose, policies and intent discussed in this Court's July 5th Order concerning the U.S. Government backing of New GM have not been honored or fulfilled in the filing of the Motion Accordingly, Stillwater respectfully requests that the relief requested in the Third Omnibus Motion be summarily Denied.

Dated: New York, New York.

July 16, 2009

/s/ Garry M. Graber
Garry M. Graber

14

Deborah J. Piazza
HODGSON RUSS LLP
60 East 42nd Street, 37th Floor
New York, NY  10165-0150
Telephone: (212) 661-3535
Facsimile:  (212) 972-1677

Bruce R. Leaverton
Mary Jo Heston
Heidi C. Anderson
LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101
Telephone:  (206) 223-7000
Facsimile:  (206) 223-7107
*Attorneys for Stillwater Mining Company*

15