1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


GENERAL MOTORS CORPORATION, et al.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            July 1, 2009

            7:59 AM




B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Debtors Motion Pursuant to 11 U.S.C. §§ 105, 363(b),

3    (f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002, 6004,

4    and 6006, to (i)Approve (a)the Sale Pursuant to the Master Sale

5    and Purchase Agreement with Vehicle Acquisition Holdings LLC, a

6    U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens,

7    Claims, Encumbrances, and Other Interests; (b)the Assumption

8    and Assignment of Certain Executory Contracts and Unexpired

9    Leases; and (c)Other Relief; and (ii)Schedule Sale Approval

10   Hearing

11

12   HEARING re Notice of Settlement of an Order Denying Motion of

13   the Unofficial Committee of Family & Dissident GM Bondholders

14   for an Order Directing the United States Trustee to Appoint an

15   Official Committee of Family & Dissident Bondholders

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

3

1

2      A P P E A R A N C E S :

3      WEIL, GOTSHAL & MANGES LLP

4           Attorneys for Debtor General Motors Corporation

5           767 Fifth Avenue

6           New York, NY 10153

7

8      BY:  HARVEY R. MILLER, ESQ.

9           STEPHEN KAROTKIN, ESQ.

10          JOSEPH H. SMOLINSKY, ESQ.

11          JOHN A. NEUWIRTH, ESQ.

12

13     JENNER & BLOCK LLP

14          Special Counsel for Debtors and Debtors-in-Possession

15          919 Third Avenue

16          37th Floor

17          New York, NY 10022

18

19     BY:  PATRICK J. TROSTLE, ESQ.

20

21

22

23

24

25

4

```
1

2    JENNER & BLOCK LLP

3          Special Counsel for Debtors and Debtors-in-Possession

4          330 North Wabash Avenue

5          Chicago, IL 60611

6

7    BY:  DANIEL R. MURRAY, ESQ.

8

9    KRAMER LEVIN NAFTALIS & FRANKEL LLP

10         Attorneys for Official Committee of Unsecured Creditors

11         1177 Avenue of the Americas

12         New York, NY 10036

13

14   BY:  KENNETH ECKSTEIN, ESQ.

15         ADAM ROSOFF, ESQ.

16         THOMAS MOERS MAYER, ESQ.

17         ROBERT T. SCHMIDT, ESQ.

18

19

20

21

22

23

24

25
```

5

UNITED STATES DEPARTMENT OF JUSTICE

    Office of the United States Trustee

    33 Whitehall Street

    21st Floor

    New York, NY 10004


BY:  TRACY HOPE DAVIS, ESQ.

    BRIAN MASUMOTO, ESQ.


U.S. DEPARTMENT OF JUSTICE

    United States Attorney's Office

    Southern District of New York

    86 Chambers Street

    New York, NY 10007


BY:  MATTHEW L. SCHWARTZ, AUSA

    DAVID S. JONES, AUSA

6

1

2    ARENT FOX LLP

3         Attorneys for The Timken Company, Superior Industries

4          International, Inc., Discovery Communications, LLC,

5          Harman Becker Automotive Systems and its affiliated

6          companies, Toyota Boshoku America, Inc., and JJF

7          Management Services, Inc.

8         1675 Broadway

9         New York, NY 10019

10

11   BY:   JAMES M. SULLIVAN, ESQ.

12

13   ATTORNEY GENERAL OF TEXAS

14        Counsel to State of Texas On Behalf of Texas Department of

15         Transportation

16        P.O. Box 12548

17        Austin, TX 78711

18

19   BY:   J. CASEY ROY, ASSISTANT ATTORNEY GENERAL

20

21

22

23

24

25

7

1

2    CADWALADER, WICKERSHAM & TAFT LLP

3        Attorneys for U.S. Treasury Auto Task Force

4        One World Financial Center

5        New York, NY 10281

6

7    BY:  JOHN RAPISARDI, ESQ.

8

9    CADWALADER, WICKERSHAM & TAFT LLP

10       Attorneys for U.S. Treasury Auto Task Force

11       1201 F Street, N.W.

12       Washington, DC 20004

13

14   BY:  PETER M. FRIEDMAN, ESQ.

15

16   CAPLIN & DRYSDALE, CHARTERED

17       Attorneys for Mark Buttita

18       375 Park Avenue

19       35th Floor

20       New York, NY 10152

21

22   BY:  RITA C. TOBIN, ESQ.

23

24

25

8

CAPLIN & DRYSDALE, CHARTERED

    Attorneys for Mark Buttita

    One Thomas Circle N.W.

    Suite 1100

    Washington, DC 20005


BY:  RONALD E. REINSEL, ESQ.


CLEARY GOTTLIEB STEEN & HAMILTON LLP

    Attorneys for The International Union, United Automobile

    Aerospace and Agricultural Implement Workers of America,

    AFL-CIO

    One Liberty Plaza

    New York, NY 10006


BY:  AVRAM E. LUFT, ESQ.

    JAMES BROMLEY, ESQ.

9

1

2    CLIFFORD CHANCE US LLP

3        Attorneys for ABN AMRO BANK N.V., RBS Citizens N.A., Royal

4         Bank of Scotland plc

5        31 West 52nd Street

6        New York, NY 10019

7

8    BY:  ANDREW BROZMAN, ESQ.

9

10   COHEN, WEISS AND SIMON LLP

11       Attorneys for United Auto Workers

12       330 West 42nd Street

13       New York, NY 10036

14

15   BY:  BABETTE CECCOTTI, ESQ.

16

17   THE COLEMAN LAW FIRM

18       Attorneys for Product Liability Claimants:  Callan

19        Campbell, Kevin Junso, et al.; Edwin Agosto, Kevin

20        Chadwick, et al., and Joseph Berlingieri

21       77 West Wacker Drive

22       Suite 4800

23       Chicago, IL 60601

24

25   BY:  STEVE JAKUBOWSKI, ESQ.

10

```
 1

 2   DLA PIPER US LLP

 3        Attorneys for Hewlett-Packard Company and all of its

 4         Affiliates, Domestic and International, Including but not

 5         Limited to Electronic Data Systems Corporation, and HP

 6         Company and Hewlett-Packard Financial Services Company

 7        550 South Hope Street

 8        Suite 2300

 9        Los Angeles, CA 90071

10

11   BY:  KAROL K. DENNISTON, ESQ.

12

13   FORMAN HOLT ELIADES & RAVIN LLC

14        Attorneys for Rose Cole, Guardian of Timothy L. Montis, a

15         Disabled Adult

16        80 Route 4 East

17        Paramus, NJ 07652

18

19   BY:  KIMBERLY J. SALOMON, ESQ.

20

21

22

23

24

25
```

11

1

2   GIBSON, DUNN & CRUTCHER LLP

3        Attorneys for Wilmington Trust Co., as Indenture Trustee

4        200 Park Avenue

5        New York, NY 10166

6

7   BY:  MATTHEW J. WILLIAMS, ESQ.

8        DAVID M. FELDMAN, ESQ.

9

10   GORLICK, KRAVITZ & LISTHAUS, P.C.

11        Attorneys for International Union of Operating Engineers

12         Local 18S, 101S and 832S, United Steelworkers, IUE- CWA

13        17 State Street

14        4th Floor

15        New York, NY 10004

16

17   BY:  BARBARA S. MEHLSACK, ESQ.

18

19   HISCOCK & BARCLAYS

20        Attorneys for The Schaeffer Group

21        One Park Place

22        300 South State Street

23        Syracuse, NY 13202

24

25   BY:  SUSAN R. KATZOFF, ESQ.

12

1

2    KELLEY DRYE & WARREN LLP

3         Attorneys for Law Debenture Trust Company of New York, as

4          Successor Indenture Trustee

5         101 Park Avenue

6         New York, NY 10178

7

8    BY:  JENNIFER A. CHRISTIAN, ESQ.

9

10   KENNEDY JENNIK AND MURRAY, PC

11        Attorneys for IUE-CWA

12        113 University Place

13        Floor 7

14        New York, NY 10003

15

16   BY:  THOMAS M. KENNEDY, ESQ.

17        JOHN HOFFMAN, ESQ.

18

19   KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP

20        Attorneys for Manufactures Traders & Trust

21        260 South Broad Street

22        Philadelphia, PA 19102

23

24   BY:  BRIAN CROWLEY, ESQ.

25

13

1

2    LAW OFFICES OF OLIVER ADDISON PARKER

3         Attorney Pro Se

4         4900 North Ocean Blvd.

5         Suite 421

6         Lauderdale By the Sea, FL 33308

7

8    BY:  OLIVER A. PARKER, ESQ.

9

10   MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

11        Attorneys for Henry Case Class Plaintiffs

12        1350 Broadway

13        Suite 501

14        New York, NY 10018

15

16   BY:  EDWARD J. LOBELLO, ESQ.

17        HANAN KOLKO, ESQ.

18

19

20

21

22

23

24

25

14

1

2    N.W. BERNSTEIN & ASSOCIATES, LLC

3         Attorneys for Environmental Conservation and Chemical

4         Corporation Site Trust Fund

5         800 Westchester Avenue

6         Suite N319

7         Rye Brook, NY 10573

8

9    BY:  NORMAN W. BERNSTEIN, ESQ.

10

11   NATIONAL ASSOCIATION OF ATTORNEYS GENERAL

12        2030 M Street, NW

13        8th Floor

14        Washington, DC 20036

15

16   BY:  KAREN CORDRY, ESQ.

17

18

19

20

21

22

23

24

25

15

1

2    PUBLIC CITIZEN LITIGATION GROUP

3        Attorneys for Product Liability Claimants:  Center for

4         Auto Safety, Consumer Action, Consumers for Auto

5         Reliability and Safety, National Association of Consumer

6         Advocates, and Public Citizen

7        1600 20th Street NW

8        Washington, DC 20009

9

10   BY:  ADINA H. ROSENBAUM, ESQ.

11        ALLISON M. ZIEVE, ESQ.

12

13   ORRICK, HERRINGTON & SUTCLIFFE LLP

14        Attorneys for GM Unofficial Dealer Committee

15        Columbia Center

16        1152 15th Street, NW

17        Washington, DC 20005

18

19   BY:  RICHARD H. WYRON, ESQ.

20        ROGER FRANKEL, ESQ.

21

22

23

24

25

16

1

2    ORRICK, HERRINGTON & SUTCLIFFE LLP

3         Attorneys for Finmeccenica S.p.A. and Ansaldo Ricercke

4          S.p.A.; Ad Hoc Dealer Committee

5         666 Fifth Avenue

6         New York, NY 10103

7

8    BY:  ROBERT M. ISACKSON, ESQ.

9         ALYSSA D. ENGLUND, ESQ.

10

11   PATTON BOGGS LLP

12        Attorneys for Unofficial Committee of Family Bondholders

13        1185 Avenue of the Americas

14        30th Floor

15        New York, NY 10036

16

17   BY:  MICHAEL P. RICHMAN, ESQ.

18

19   PATTON BOGGS LLP

20        Attorneys for Unofficial Committee of Family Bondholders

21        2550 M Street, NW

22        Washington, DC 20037

23

24   BY:  MARK A. SALZBERG, ESQ.

25

17

```
 1
 2    PATTON BOGGS LLP
 3          Attorneys for Unofficial Committee of Family Bondholders
 4          2001 Ross Avenue
 5          Suite 3000
 6          Dallas, TX 75201
 7
 8    BY:  JAMES CHADWICK, ESQ.
 9          (TELEPHONICALLY)
10
11    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
12          Attorneys for Ad Hoc Bondholders Group
13          1285 Avenue of the Americas
14          New York, NY 10019
15
16    BY:  ANDREW N. ROSENBERG, ESQ.
17          JONATHAN KOEVARY, ESQ. (TELEPHONICALLY)
18
19    PENSION BENEFIT GUARANTY CORPORATION
20          United States Government Agency
21          1200 K Street NW
22          Washington, DC 20005
23
24    BY:  MICHAEL A. MARICCO, ESQ.
25          ANDREA WONG, Assistant Chief Counsel
```

18

1

2    ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

3         Attorneys for Greater New York Automobile Dealers

4          Association

5         1345 Avenue of the Americas

6         New York, NY 10105

7

8    BY:  RUSSELL P. MCRORY, ESQ.

9

10   ROBINSON WATERS & O'DORISIO, PC

11        Attorneys for Environmental Testing Corporation

12        1099 18th Street

13        Suite 2600

14        Denver, CO 80202

15

16   BY:  ANTHONY L. LEFFERT, ESQ.

17

18   SCHNADER HARRISON SEGAL & LEWIS LLP

19        Attorneys for Ad Hoc Committee Consumer Victims

20        1600 Market Street

21        Suite 3600

22        Philadelphia, PA 19103

23

24   BY:  BARRY E. BRESSLER, ESQ.

25

19

```
 1

 2    SCHNADER HARRISON SEGAL & LEWIS LLP

 3         Attorneys for Ad Hoc Committee Consumer Victims

 4         824 North Market Street

 5         Suite 1001

 6         Wilmington, DE 19801

 7

 8    BY:  RICHARD A. BARKASY, ESQ.

 9

10    STATE OF MICHIGAN

11         Office of the State Attorney General

12         G. Mennen Williams Building

13         525 West Ottawa Street

14         6th Floor

15         Lansing, MI 48909

16

17    BY:  CELESTE R. GILL, Assistant Attorney General

18

19    STATE OF NEW YORK

20         Office of the Attorney General

21         The Capitol

22         Albany, NY 12224

23

24    BY:  MAUREEN F. LEARY, Assistant Attorney General

25
```

20

1

2      STATE OF NEW YORK

3              Office of the Attorney General

4              120 Broadway

5              New York, NY 10271

6

7      BY:   KATHERINE KENNEDY, Special Deputy Attorney General

8

9      STEMBERG FEINSTEIN DOYLE & PAYNE, LLC

10             Attorneys for Class Representatives in Henry Case

11             1007 Mt. Royal Blvd.

12             Pittsburgh, PA 15223

13

14     BY:   WILLIAM T. PAYNE, ESQ.

15

16     STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

17             Attorneys for Ad Hoc Committee of Unsecured Creditors

18             2323 Bryan Street

19             Suite 2200

20             Dallas, TX 75201

21

22     BY:   SANDER L. ESSERMAN, ESQ.)

23

24

25

21

```
 1

 2    VEDDER PRICE P.C.

 3         Attorneys for Export Development Canada

 4         1633 Broadway

 5         47th Floor

 6         New York, NY 10019

 7

 8    BY:  MICHAEL L. SCHEIN, ESQ.

 9

10    WILMER CURLER PICKERING HALE AND DORR LLP

11         Attorneys for Pension Benefit Guaranty Corporation

12         399 Park Avenue

13         New York, NY 10022

14

15    BY:  PHILIP D. ANKER, ESQ.

16

17    WINDELS MARK LANE & MITTENDORF, LLP

18         Attorneys for Lloyd Good; Plastic Omanna et al.;

19          Progressive Stamping Company; Morgan Adhesives Co. d/b/a

20           MACTAC; Western Flyer Express

21         156 West 56th Street

22         New York, NY 10019

23

24    BY:  LESLIE S. BARR, ESQ.

25
```

22

1

2    TELEPHONIC APPEARANCES:

3    ALLARD & FISH, P.C.

4        Attorneys for Creditor Severstal North America, Inc.

5        535 Griswold

6        Suite 2600

7        Detroit, MI 48226

8

9    BY:   DEBORAH L. FISH, ESQ.

10       (TELEPHONICALLY)

11

12   ARNALL GOLDEN & GREGORY LLP

13       Attorneys for Verizon Communications

14       171 17TH Street NW

15       Suite 1200

16       Atlanta, GA 30363

17

18   BY:   DARRYL S. LADDIN, ESQ.

19       FRANK N. WHITE, ESQ.

20       (TELEPHONICALLY)

21

22

23

24

25

23

1

2     ATTORNEY GENERAL'S OFFICE, STATE OF CALIFORNIA

3          Attorneys for State of California

4          California Dept. of Justice

5          P.O. Box 744255

6          Sacramento, CA 94244

7

8     BY:  MARGARITA PACFILLA, ESQ.

9          (TELEPHONICALLY)

10

11    ATTORNEY GENERAL'S OFFICE, STATE OF ILLINOIS

12         Attorneys for State of Illinois

13         100 West Randolph Street

14         Chicago, IL 60601

15

16    BY:  JAMES NEWBOLD, ESQ.

17         (TELEPHONICALLY)

18

19

20

21

22

23

24

25

24

1

2    ATTORNEY GENERAL'S OFFICE, STATE OF MICHIGAN

3         State of Michigan Department of Treasury

4         G. Mennen Williams Building

5         7th Floor

6         525 West Ottawa Street

7         Lansing, MI 48909

8

9    BY:   JULIUS O. CURTING, ESQ.

10        (TELEPHONICALLY)

11

12   ATTORNEY GENERAL'S OFFICE, STATE OF NEW JERSEY

13        Attorneys for State of New Jersey Department of

14         Environmental Protection Agency

15        Richard J. Hughes Justice Complex

16        8th Floor, West Wing

17        25 Market Street

18        Trenton, NJ 08625

19

20   BY:   RACHEL LEHR, ESQ.

21        (TELEPHONICALLY)

22

23

24

25

25

1

2   ATTORNEY GENERAL'S OFFICE, STATE OF TENNESSEE

3        Attorneys for Tennessee Department of Revenue

4        Office of the Attorney General

5        P.O. Box 20207

6        Nashville, TN 37202

7

8   BY:  MARVIN CLEMENTS, ESQ.

9        (TELEPHONICALLY)

10

11  ATTORNEY GENERAL'S OFFICE, STATE OF TEXAS

12       Attorneys for Texas Department of Transportation Motor

13        Vehicle Division

14       300 West 15th Street

15       Austin, TX 78701

16

17  BY:  HAL F. MORRIS, ESQ.

18       RON DEL VENTO, ESQ.

19       (TELEPHONICALLY)

20

21

22

23

24

25

26

1

2      DAVIS POLK & WARDWELL

3            Attorneys for Interested Party Ford Motor Company

4            450 Lexington Avenue

5            New York, NY 10017

6

7      BY:  BRIAN M. RESNICK, ESQ.

8            (TELEPHONICALLY)

9

10     DLA PIPER LLP U.S.

11           Attorneys for Creditor Hewlett Packard

12           550 South Hope Street

13           Suite 2300

14           Los Angeles, CA 90071

15

16     BY:  KAROL K. DENNISTON, ESQ.

17           (TELEPHONICALLY)

18

19

20

21

22

23

24

25

27

1

2    DRINKER BIDDLE & REATH LLP

3        Attorneys for Cross-Complainant/Defendant, Manufacturers

4         and Trust Company and Wells Fargo Bank Northwest

5        1500 K Street, N.W.

6        Washington, DC 20005

7

8    BY:  KRISTIN K. GOING, ESQ.

9        STEPHANIE WICKOUSKI, ESQ.

10       (TELEPHONICALLY)

11

12   FOLEY & LARDNER LLP

13       Attorneys for Toyota Motor Corp.

14       One Detroit Center

15       500 Woodward Avenue

16       Suite 2700

17       Detroit, MI 48226

18

19   BY:  KATHERINE R. CALANESE, ESQ.

20       JOHN A. SIMON, ESQ.

21

22

23

24

25

28

1

2    FOLEY & LARDNER LLP

3         Attorneys for Toyota Motor Corp.

4         407 West Broadway

5         Suite 2100

6         San Diego, CA 92101

7

8    BY:  MATTHEW J. RIOPELLE, ESQ.

9         (TELEPHONICALLY)

10

11   FREEBORN & PETERS LLP

12        Attorneys for Trico Products & PGW LLC

13        311 South Wacker Drive

14        Suite 3000

15        Chicago, IL 620606

16

17   BY:  THOMAS R. FAWKES, ESQ.

18        (TELEPHONICALLY)

19

20

21

22

23

24

25

29

1

2   FROST BROWN TODD LLC

3        Lexington Financial Center

4        250 West Main

5        Suite 2800

6        Lexington, KY 40507

7

8   BY:   ROBERT V. SARTIN, ESQ.

9        (TELEPHONICALLY)

10

11  FULBRIGHT & JAWORSKI L.L.P

12        Attorneys for Bell Atlantic

13        2200 Ross Avenue

14        Suite 2800

15        Dallas, TX 75201

16

17  BY:   ELIZABETH N. BOYDSTON, ESQ.

18        (TELEPHONICALLY)

19

20

21

22

23

24

25

30

1

2      GOULSTON & STORRS P.C.

3          Attorneys for Creditor 767 Fifth Partners, LLC

4          400 Atlantic Avenue

5          Boston, MA 02110

6

7      BY:   DOUGLAS B. ROSNER, ESQ.

8          (TELEPHONICALLY)

9

10     HANGLEY ARONCHICK SEGAL & PUDLIN

11         Attorneys for NCR Corporation

12         One Logan Square

13         18th & Cherry Streets

14         27th Floor

15         Philadelphia, PA 19103

16

17     BY:   MATTHEW A. HAMERMESH, ESQ.

18         (TELEPHONICALLY)

19

20

21

22

23

24

25

31

1

2      HONIGMAN MILLER SCHWARTZ & COHN

3           2290 First National Building

4           660 Woodward Avenue

5           Detroit, MI 48226

6

7      BY:   SETH A. DRUCKER, ESQ.

8            JOSEPH R. SGROI, ESQ.

9            (TELEPHONICALLY)

10

11     KEMP KLEIN LAW FIRM

12          Attorneys for Custom Automotive Services, Inc.

13          201 West Big Beaver Road

14          Suite 600

15          Troy, MI 48084

16

17     BY:   GLORIA M. CHON, ESQ.

18           (TELEPHONICALLY)

19

20

21

22

23

24

25

32

1

2    MASTROMARCO FIRM

3        Attorneys for Gerald Haynor, Interested Party

4        1024 North Michigan Avenue

5        Saginaw, MI 48602

6

7    BY:  VICTOR MASTROMARCO, ESQ.

8        (TELEPHONICALLY)

9

10   MCDONALD HOPKINS CO., LPA

11       Attorneys for Swegalok Company

12       39533 Woodward Avenue

13       Bloomfield Hills, MI 48304

14

15   BY:  JAYSON B. RUFF, ESQ.

16       (TELEPHONICALLY)

17

18   MCNAMEE, LOCHNER, TITUS & WILLIAMS, PC

19       Attorneys for The Saint Regis Mohawk Tribe

20       677 Broadway

21       Albany, NY 12201

22

23   BY:  JACOB F. LAMME, ESQ.

24       (TELEPHONICALLY)

25

33

1

2     MILLER, CANFIELD, PADOCK AND STONE, P.L.C.

3         Attorneys for Creditor Ford Motor Company

4         150 West Jefferson

5         Suite 2500

6         Detroit, MI 48226

7

8     BY:  MARC N. SWANSON, ESQ.

9         (TELEPHONICALLY)

10

11    MORRIS JAMES LLP

12        Attorneys for Monster Worldwide

13        500 Delaware Avenue

14        Suite 1500

15        Wilmington, DE 19801

16

17    BY:  CARL N. KUNZ, III, ESQ.

18        (TELEPHONICALLY)

19

20

21

22

23

24

25

34

1

2      OFFICE OF SANTA CLARA COUNTY COUNSEL

3          Attorneys for County of Santa Clara Tax Collector

4          70 West Hedding Street

5          9th Floor, East Wing

6          San Jose, CA 95110

7

8      BY:  NEYSA A. FIGOR, ESQ.

9          (TELEPHONICALLY)

10

11     OHIO ATTORNEY GENERAL'S OFFICE

12         Attorneys for State of Ohio

13         State Office Tower

14         30 East Broad Street

15         17th Floor

16         Columbus, OH 43215

17

18     BY:  LUCAS C. WARD, ESQ.

19         (TELEPHONICALLY)

20

21

22

23

24

25

35

PEPPER HAMILTON LLP

    Attorneys for Creditor SKF USA Inc.

    400 Berwyn Park

    899 Cassatt Road

    Berwyn, PA 19312


BY:  HENRY J. JAFFE, ESQ.

    (TELEPHONICALLY)


PERDUE, BRANDON, FIELDER, COLLINS & MOTT LLP

    Attorneys for Arlington ISD et al.

    4025 South Woodland Park Boulevard

    Suite 300

    Arlington, TX 76013


BY:  ELIZABETH BANDA, ESQ.

    (TELEPHONICALLY)

36

1

2    ROTH & DEMPSEY P.C.

3        Attorneys for Burton Taft

4        436 Jefferson Avenue

5        Scranton, PA 18510

6

7    BY:   MICHAEL G. GALLACHER, ESQ.

8        (TELEPHONICALLY)

9

10   SCHIFF HARDIN LLP

11       Attorneys for Columbia Gas of Ohio; Columbia Gas of

12       Virginia

13       233 South Wacker Drive

14       Suite 6600

15       Chicago, IL 60606

16

17   BY:   JASON TORF, ESQ.

18       (TELEPHONICALLY)

19

20

21

22

23

24

25

37

1

2    SINGER & LEVICK, P.C.

3        Attorneys for ACS Affiliated Computers Services, Inc.

4        16200 Addison Road

5        Suite 140

6        Addison, TX 75001

7

8    BY:   LARRY A. LEVICK, ESQ.

9        (TELEPHONICALLY)

10

11   WOLFSON BOLTON PLLC

12       Attorneys for Guardian Industries

13       3150 Livernois

14       Suite 275

15       Troy, MI 48084

16

17   BY:   SCOTT A. WOLFSON, ESQ.

18       (TELEPHONICALLY)

19

20

21

22

23

24

25

38

P R O C E E D I N G S

1

2      THE COURT:  Good morning.  Have seats, everybody.

3  All right.  We're here on GM, the motion of Manufactures and

4  Traders for relief from the stay.  I have no objection to it

5  from the debtors.  Folks, why are we here?  I have never seen

6  such a slam dunk entitlement to relief from the stay in a

7  commercial case and I have no objection from the debtors.  Mr.

8  Smolinsky, are you appearing for the debtors on this?

9      MR. SMOLINSKY:  Yes, Your Honor.  I think the reason

10  why we're here is simply because we received a draft

11  stipulation a day or so before the hearing.  And it just took

12  time to allow the unsecured creditors' committee to review it

13  and for us to review it.  So we apologize for the Court's

14  inconvenience.  We had tried to move it to a time that was

15  consistent with our other hearings in the case.  But we're

16  prepared to stipulate we reviewed the stipulation.  We had a

17  call last night and finalized the verbiage of the stipulation.

18      THE COURT:  Well, I'm here anyway.  But this

19  situation required a lawyer to come up from Philly for such a

20  plain entitlement?  Let me tell you what else is bothering me,

21  Mr. Smolinsky.  After some bad experiences in the Lyondell

22  Chemical case, I built into my case management order a

23  provision that before people move for emergency relief from the

24  stay, they'd have to contact the debtor to see if the debtor

25  would consensually agree to give them whatever relief from the

39

1    stay or adequate protection they were asking for.  And even to

2    require a certification that they had tried to work it out with

3    the debtor to avoid the expense of dealing with the matter of

4    this character.

5           So I looked very hard for the certification because I

6    couldn't believe that a creditor had to make a motion of this

7    character if they had picked up the phone and discussed it with

8    the debtor.  And the certification that I have here says that

9    on June 16th, counsel for the movant called your firm's office

10   where they were directed to the number of the debtors' noticing

11   and claims agent.  And that they subsequently spoke to a

12   representative of the claims agent and left a detailed message

13   that presumably wasn't responded to.  And then on that same

14   day, they made additional efforts to reach debtors' counsel

15   telephonically and left a message with the attorney purportedly

16   assigned to the debtors' case.  And according to the

17   certification, in three days they never got a response?  That

18   exactly frustrates the purpose of the certification mechanism

19   and required counsel to appear on a motion which if there were

20   an eight second phone call with a second year associate, one

21   who'd have been admitted to the bar for a week, we could have

22   avoided this.

23           MR. SMOLINSKY:  Your Honor, let me -- if I can

24   explain?  First of all, in terms of counsel being here, we

25   accommodated them to the utmost.  We told them that they didn't

40

1   need to appear.  If the committee needed more time to review

2   the stipulation -- as I said, we had the stipulation for less

3   than a day while all the sale hearing activities were going

4   forward.  We told counsel that they didn't need to appear, that

5   we would simply tell the Court that there was a resolution and

6   that we would submit a stipulation.

7         In terms of the calls, I can only say, and I'm not

8   saying this for any excuse, but we've been receiving, as you

9   can imagine, tens of thousand of calls.  We put a process in

10   place, as well as General Motors put a process in place, where

11   an attorney would return every phone call.  And if it was a

12   creditors' call, it would be referred to the supplier hotline

13   call center that you've heard about.  There was no physical way

14   for myself to return all of the calls --

15         THE COURT:  Well, I wouldn't expect a partner to

16   respond to a call of this character but you've got to have a

17   first year associate -- or, if you think that it requires

18   practicing law, a second year associate -- return a call from

19   another lawyer.

20         MR. SMOLINSKY:  Your Honor, we did have an attorney

21   return all the calls.  Why it wasn't taken as a call that could

22   be -- that could result in an immediate settlement, I don't

23   know.  It was referred to the call center.  I think the call

24   center has been getting back to people but they may not have

25   been -- they may not understand how to deal with a motion to

41

1    lift stay.  We're been working with counsel.  They sent us the

2    perfection documents.  We looked at them quickly and there's

3    been no impediment to getting a stipulation done other than the

4    short period of time that we had to review it.

5            THE COURT:  All right.  I can understand why you

6    can't make a deal without consulting the creditors' committee.

7    But what I do expect is that when a lawyer for a creditor in

8    the case calls, at least one who's saying that he needs

9    emergency relief and wants relief from the stay, that some

10   lawyer at your firm, at debtors' counsel or your co-counsel,

11   will answer the guy's call, will return the guy's call.  And if

12   you can't make a deal, say I've got to call the creditors'

13   committee, I'll get back to you as soon as you can.  I'll pay

14   or I'll authorize payment from the estate but you need to put

15   an extra general associate on the matter to return calls of

16   this character.  But I won't pay or authorize payment for the

17   need to respond to motions of this character.

18           The motion's granted and we're adjourned until 9:00.

19           MR. SMOLINSKY:  Thank you, Your Honor.

20       (Recess from 8:05 a.m. until 9:21 a.m.)

21           THE COURT:  I want to apologize to any of you who may

22   have been waiting for us to begin.  We had some business we had

23   to take care of before now.  Mr. Miller?

24           MR. MILLER:  Good morning, Your Honor.  Harvey Miller

25   on behalf of the debtors.  Your Honor, just one housekeeping

42

1    detail.

2            THE COURT:  Yes?

3            MR. MILLER:  We referred yesterday to the amended

4    MSPA and I neglected to move it into evidence, Your Honor.  So

5    I would ask that it be marked in evidence as Debtors' Exhibit

6    6A so that it will come right after the original that was filed

7    on June 1st.

8            THE COURT:  Okay.  That's the amended one?

9            MR. MILLER:  Yes.

10           THE COURT:  Any objection?  Hearing none, it's

11   admitted.

12           MR. MILLER:  Thank you, Your Honor.

13   (Debtors' Exhibit 6A, amended MSPA, was hereby received into

14   evidence as of this date.)

15           THE COURT:  Are we up to the cross-examination of Mr.

16   Wilson?

17           MR. MILLER:  I think Mr. Repko was first, Your Honor.

18           THE COURT:  I'm sorry?

19           MR. MILLER:  Mr. Repko.

20           THE COURT:  Oh, Mr. Repko first.  Okay.  You want to

21   remain standing to be sworn?  Karen?

22       (Witness duly sworn)

23           THE COURT:  Have a seat, Mr. Repko.

24   CROSS-EXAMINATION

25   BY MR. RICHMAN:

43

1    Q.    Good morning, Mr. Repko.

2    A.    Good morning, sir.

3    Q.    I'm Michael Richman from Patton Boggs representing

4    dissident bondholders' committee.  I think between you and Mr.

5    Koch and Mr. Miller, we have a veritable hall of fame of

6    bankruptcy professionals.  Would you talk to us generally about

7    your background in the industry, not just with Evercore but

8    prior to that in your experience with bankruptcy cases?

9    A.    Yes.  I was with JPMorgan predecessor institutions for

10    thirty-two years; various responsibilities from the pure

11    workout function acting for the bank's own interests to an

12    advisory business internationally; and then for the last

13    fifteen or so years, as head of the restructuring group which

14    was designed to deliver capital to troubled companies both in

15    court and out of court.

16    Q.    Could you comment on your experience generally in creating

17    and/or valuing bankruptcy spinoffs under Chapter 11 plans?

18    Creation of new companies from the best assets of the old

19    debtors?

20    A.    Well, as part of the capital delivery problem, the credit

21    decision, at least the way I practice it, not only involved the

22    process of financing the company that was in trouble but also

23    identifying the process by which the company would get out of

24    trouble and reorganize because in order to satisfy yourself as

25    a DIP lender, you need to understand how the company will exit

44

1    and how it will finance itself.

2    Q.   So you have extensive experience with valuing reorganized

3    debtors?

4    A.   I think so, yes.

5    Q.   Now, in connection with your assignment for the debtors in

6    this case, were you the main spokesperson for Evercore with the

7    board of directors of GM?

8    A.   I was -- I was one of them.  There were four senior people

9    involved for Evercore, the first and foremost being our

10   chairman and then chief executive officer, Roger Altman;

11   another senior managing director, William Hiltz; myself and

12   Stephen Worth.  And there were others.

13   Q.   Were you present during board meetings when the fairness

14   opinion that Evercore prepared was presented to the board?

15   A.   Yes.

16   Q.   Were you also part of the chain of communications in GM's

17   board giving the assignment to do the fairness opinion?

18   A.   I'm sorry?

19   Q.   Who asked you to prepare the fairness opinion?

20        MR. MILLER:  Excuse me.  As Mr. Repko or Evercore?

21   Q.   Who asked Evercore to prepare the fairness opinion?

22   A.   General Motors did.

23   Q.   And what were the parameters in those -- were you privy to

24   that discussion?

25   A.   I don't believe I was present for that discussion.

45

1    Q.   Who was the discussion with?

2    A.   I believe that discussion was with Mr. Worth, primarily,

3    and Mr. Hiltz.

4    Q.   At any time, to your knowledge, did GM's board ask

5    Evercore to value New GM if New GM were created under a Chapter

6    11 plan rather than a 363 sale?

7    A.   I don't believe so.

8    Q.   Were you instructed not to do that?

9    A.   We had specific instructions on how to perform the

10   valuation which are contained in Mr. Worth's declaration, I

11   believe.

12   Q.   So there was no -- to your knowledge, no valuation

13   whatsoever was performed with respect to the creation of a new

14   GM under a plan as distinct from a 363 sale?

15   A.   Not to my recollection.

16   Q.   If you assume with me that financing would be available

17   for New GM in comparable numbers to what is now being proposed

18   or promised, could a new GM be created under a Chapter 11 plan

19   with the same or comparable values to the new GM which is being

20   created under the 363 sale?

21        MR. MILLER:  Your Honor, I think there has to be a

22   foundation laid as to the assumptions.

23        THE COURT:  Well, I think that it's debatable whether

24   the assumption is there.  And if he's an expert, if you create

25   the assumptions and you want to get his assumption on some

46

1    alternate theory, you can, although, Mr. Richman, you're going

2    to have to address whether that opinion would have any

3    relevance if that financing weren't available.  Objection

4    overruled.

5                MR. RICHMAN:  Thank you, Your Honor.  And I'm just --

6                THE COURT:  And that's on the premise that he's an

7    expert.  I'm assuming that you concede that he's an expert, Mr.

8    Richman.

9                MR. RICHMAN:  Absolutely, Your Honor.  I do and I'm

10   asking to assume that the financing is available for New GM

11   under a plan.

12   A.    Would you repeat the question?

13   Q.    So assuming financing is available for New GM but created

14   through a plan of reorganization rather than a 363 sale, would

15   you expect the value of New GM to be comparable to the value in

16   the fairness opinion?

17   A.    I haven't done that analysis and that's, I think, the --

18   given the assumption, without the analysis, they would go

19   behind -- beyond that opinion.

20   Q.    Well, what analysis would you do differently than what is

21   already in the fairness opinion?

22   A.    Well, in the first instance would be the amount of time

23   taken to achieve a plan of reorganization versus the

24   transactions that's before the Court.  And I don't -- I have --

25   I don't have a particular view on how long that might take but

47

1    I suspect it would be longer.  And that has certain aspects of

2    the business' performance, in my view, probably negative.  And

3    then there's a real question about whether the financing would

4    be available and that -- that is assumption is a large one.

5    Q.   Well, assume with me that the financing is available.  And

6    assume with me that a Chapter 11 plan is filed on the petition

7    date on an accelerated schedule so that you're still within the

8    same sixty to ninety days that GM told the public it hoped to

9    emerge from bankruptcy.  With those assumptions, would you

10   expect New GM to have the same or comparable value that it has

11   under the fairness opinion?

12        MR. MILLER:  Your Honor, please, same objection.

13   What is meant by "accelerated"?

14        MR. RICHMAN:  I said within sixty to ninety days

15   emergence.

16        THE COURT:  Overruled.  Mr. Repko, answer the

17   question but as you see fit.

18        THE WITNESS:  Yes, Your Honor.

19   A.   Given the assumptions that you've made, it could be.

20   Q.   Are you familiar with how the fairness opinion valued the

21   collective bargaining agreement, UAW settlement?

22   A.   Broadly.

23   Q.   Does the fairness opinion include the value of the

24   consideration being paid to the VEBA?

25        MR. MILLER:  Your Honor, please, is this in the

48

1    nature of cross or is Mr. Richman calling Mr. Repko as his

2    witness because this is way beyond Mr. Repko's declaration.

3             MR. RICHMAN:  It is both adverse direct and cross,

4    Your Honor.  It's related directly to the fairness opinion and

5    the valuations.

6             MR. MILLER:  Mr. Repko was not proffered, Your Honor,

7    as a valuation witness.  He was proffered in connection with

8    getting debtor-in-possession financing.

9             MR. RICHMAN:  Actually, the exhibit list indicates

10   that his -- I believe, if I read it correctly, that he was

11   being proffered both for the 363 sale as well as the DIP

12   financing.

13            MR. MILLER:  In respect of financing and not as the

14   valuation.

15            MR. RICHMAN:  Well, so --

16            THE COURT:  All right.  I've had enough.  If that's

17   deemed to be an objection, it is overruled.  The fact that this

18   fellow wasn't on the point on the valuation is obviously

19   irrelevant to whether I should consider it as undercutting the

20   persuasiveness of any evidence or testimony that might be

21   inconsistent with the valuation.  But I can understand the

22   difference.  And I can understand how many of the questions are

23   inconsistent -- use assumptions that are inconsistent with the

24   record.  The objection is overruled.  Mr. Repko can answer the

25   questions as he sees fit.  And both sides can point out to me

49

1    why they think the testimony should be regarded as relevant

2    more or less in light of the entirety of the record.  Go ahead,

3    Mr. Richman.

4    BY MR. RICHMAN:

5    **Q.    Mr. Repko, do you remember the question?  No?  Do you know**

6    **whether the consideration being paid by New GM into the VEBA**

7    **was part of the fairness opinion?**

8    **A.    Without looking at it again and thinking about it, I don't**

9    **really recall.**

10    **Q.    Okay.**

11            MR. RICHMAN:  One second, Your Honor.

12            THE COURT:  Sure.

13            MR. RICHMAN:  Nothing further at this time.

14            THE COURT:  Very well.  Other objectors who wish to

15    question Mr. Repko?  All right.  None?  Any redirect, Mr.

16    Miller?

17            MR. MILLER:  No, Your Honor.

18            THE COURT:  All right.  Mr. Repko, you're excused --

19            THE WITNESS:  Thank you, Your Honor.

20            THE COURT:  -- from the court.  Okay.  Can we go

21    right to the material on material on Wilson?

22            MR. SALZBERG:  Yes, Your Honor.

23            THE COURT:  Mr. Salzberg, come on up.

24            MR. SALZBERG:  Your Honor, in connection with Mr.

25    Wilson's testimony, it might be useful at this point to

50

1    introduce the four exhibits proffered by the government.

2    That's Mr. Wilson's declaration and three what I'll refer to as

3    the intercreditor agreements.

4        THE COURT:  Okay.  Is there any objection?  Hearing

5    none, the exhibits are in evidence.

6    (Government Exhibits 1-4, Declaration of Mr. Wilson and three

7    intercreditor agreements, were hereby received into evidence as

8    of this date.)

9        THE COURT:  And --

10       MR. SALZBERG:  If you'd like, I have a --

11       THE COURT:  Yeah.  That would be handy.  Thank you.

12   Mr. Wilson?

13       THE WITNESS:  Yes.

14       THE COURT:  Come up, please.  Mr. Wilson, I've got to

15   impose the same rules on you as I've imposed on everybody else

16   in the courtroom.  Leave the soda there and give him some

17   water.  Remain standing here.  Karen?

18   (Witness duly sworn)

19       THE COURT:  Have a seat, please, Mr. Wilson.

20   CROSS-EXAMINATION

21   BY MR. SALZBERG:

22   **Q.   Good morning, sir.**

23   **A.   Good morning.**

24   **Q.   For the record, Mark Salzberg, Patton Boggs, on behalf of**

25   **the unofficial committee of family and dissident bondholders.**

51

1    Since your declaration has now been entered into evidence, I'm

2    going to dispense with the preliminary background information.

3    But suffice it to say that you are a member of the auto task

4    force?

5    A.   Yes.

6    Q.   And when did you join the auto task force?

7    A.   In the first week of March 2009.

8    Q.   And as a member of the auto task force, you have primary

9    responsibility with regards to the U.S. Treasury's interactions

10   with GM, is that correct?

11   A.   Among other things, yes.

12   Q.   Okay.  And even though you joined the auto task force in

13   mid-2009, or the first quarter of 2009, you're familiar with

14   the activities of the auto task force prior to that time with

15   regards to GM, is that right?

16   A.   Some of them.

17   Q.   Now, the Treasury entered into a loan and security

18   agreement on December 31, 2008, is that correct?

19   A.   Yes.

20   Q.   And in your declaration -- and I'm referring to page 4,

21   paragraph 10 -- you state in a parenthetical that many of the

22   terms and covenants of that agreement were more lenient or

23   favorable than "market terms".

24        MR. SCHWARTZ:  Does Mr. Salzberg have a copy for the

25   witness?

52

1          MR. SALZBERG:  I'm sorry.  I thought that you had

2     presented that.

3          THE COURT:  All right.  Just give him a second to

4     follow along in his declaration.  One or another, provide him

5     with a copy.

6          MR. SALZBERG:  I apologize, Your Honor.

7     (Pause)

8          MR. KENNEDY:  A copy is in the IUE exhibit book as

9     Wilson 1.  That's the large volume of --

10         MR. SALZBERG:  Thank you.  Yeah.  Your Honor, if I

11    may approach the witness?

12         THE COURT:  Sure.

13         THE WITNESS:  Thank you.

14    **Q.   And again, I'm referring to page 4, paragraph 10.  Do you**

15    **see the paragraph I referred to?**

16    **A.   Yes.**

17    **Q.   And what were the terms and covenants which were more**

18    **lenient or favorable than market terms?**

19    **A.   Well, as a general matter, I think the interest rate**

20    **associated with the loan was probably below what a purely**

21    **commercial lender would charge at that point in time given the**

22    **financial distress evident at General Motors.**

23    **Q.   Any other terms and conditions which were more favorable**

24    **to market terms?**

25    **A.   It's not clear to me that a lender wouldn't -- another**

53

1    purely commercial lender would not have imposed restrictions on

2    cash flows beyond what we imposed.

3    Q.   Okay.  How far below market rate was the interest rate

4    under the LSA?  And by LSA, that's the term that you use in

5    your declaration to refer to loan and security agreement.

6    A.   I've never performed any analysis on that front.

7    Q.   Okay.  Were there any other sources for financing for GM

8    at that time?  And by "that time", I'm referring to December

9    31, '08.

10   A.   As you know --

11        MR. MILLER:  Excuse me, Your Honor.  Mr. Wilson was

12   not at the Treasury in December of 2008.

13        THE COURT:  I'm going to sustain but you can lay a

14   foundation as to his knowledge.  And then if a satisfactory

15   foundation is laid, we can take it from there, Mr. Salzberg.

16        MR. SALZBERG:  Thank you, Your Honor.

17   Q.   You joined the auto task force in March of 2009, is that

18   correct?

19   A.   Yes.

20   Q.   Okay.  And even though you joined in March 2009, you

21   became familiar with the activities of the auto task force that

22   were done prior to that time, is that correct?

23   A.   I believe, as I testified earlier, some of them.

24   Q.   And in your -- did you review the activities of the auto

25   task force that occurred prior to the time that you joined?

54

1    **A.    Some of them.**

2    **Q.    Okay.  And is one of the things that --**

3                MR. MILLER:  Objection Your Honor.  Objection Your

4    Honor.  There was no auto task force in December 2008.

5                THE COURT:  Wait.  I couldn't hear you, Mr. Miller.

6                MR. MILLER:  There was no automobile task force in

7    2008 or in the first three months of 2009.

8                MR. SALZBERG:  Your Honor, I can clarify.

9                THE COURT:  Okay.  By the way, does anybody know

10   what's causing that noise?

11               MR. SALZBERG:  Is it me?

12               THE COURT:  It's obviously something near some mic.

13               MR. SALZBERG:  It might me.  Sorry.

14               MR. MILLER:  It could be two, Your Honor.

15               UNIDENTIFIED SPEAKER:  It sounds like somebody on the

16   phone --

17               MR. SALZBERG:  Okay.

18               THE COURT:  Go ahead, Mr. Salzberg.

19               MR. SALZBERG:  I'll try not to breathe as much.  Just

20   every minute or two.  Okay.

21   **Q.    In paragraph 1 of your declaration, you refer to the auto**

22   **team, is that right?**

23   **A.    Yes.**

24   **Q.    Okay.  And so I misspoke when I say auto task force.  I'm**

25   **referring to the auto team as you defined that in your**

55

1   declaration, okay?

2   A.   Okay.

3   Q.   Okay.  As part of your efforts to become familiar with the

4   activities of the auto team that occurred prior to your

5   joining, did you review the loan and security agreement?

6   A.   Yes.

7   Q.   Did you review the other sources of financing, if any,

8   that were available to GM in December of 2008?

9   A.   No, I did not.

10   Q.   Okay.  The total amount -- what was the total amount

11   extended or loaned to GM pre-petition by the U.S. Treasury?

12   A.   19.4 billion dollars.

13   Q.   And how much was extended -- of that loan, how much was

14   extended in December of 2008?

15   A.   I believe on December 31st, the first day of the LSA, it

16   was 4.0 billion dollars.

17   Q.   Now when this 4.0 billion dollars was lent to GM, do you

18   know if GM had any other sources of financing?

19   A.   I don't know.

20   Q.   Was GM at that time solvent?

21   A.   As I testified in my deposition, Mr. Salzberg, under the

22   same question from you, I indicated at that point that we did

23   not perform that analysis.

24   Q.   Okay.  Subsequent amounts were lent by the government to

25   GM prior to the petition date, correct?

56

1    A.    That's correct.

2    Q.    And those amounts were lent in January, February, March,

3    April and in May, is that correct?

4    A.    January, February, April and May, I believe.

5    Q.    Okay.  So not in March.  And do you know at any of those

6    times when those monies were lent by the Treasury to GM, was GM

7    solvent?

8    A.    We did not perform a solvency analysis at that point in

9    time.  Our focus was primarily upon do we believe that the loan

10   had a reasonable likelihood of being repaid 'cause I think most

11   lenders would use that test.

12   Q.    How did the government anticipate that this loan would be

13   repaid?

14   A.    Well, as you'll recall, the company was operating under a

15   Viability Plan 2 at that point in time that was prior -- for

16   much of that time not all of that time.  And under the auspices

17   of Viability Plan 2, we believed that the transaction that was

18   proposed, which was the financing that we advanced combined

19   with the equitization of two-thirds of the bonds and half the

20   obligation of VEBA allowed for a reasonable probability of

21   repayment.

22   Q.    Just so I understand, was the repayment to the Treasury

23   dependent upon a reorganization of GM's business?

24   A.    No.  It was dependent upon a restructuring of certain

25   obligations as evidenced in the LSA.

57

1    Q.   And the government's anticipated repayment was based upon

2    a viability plan?  I think you said Viability Plan 2, is that

3    correct?

4    A.   It was around a certain set of assumptions, at that point,

5    best embodied in Viability Plan 2.

6    Q.   Okay.  And Viability 2 was not accepted by the

7    government -- by the auto team, was it?

8    A.   We believe that Viability Plan 2 did not provide a

9    substantial enough restructuring of the operation of General

10   Motors and rejected it as a result of that.

11   Q.   Okay.  Just to be clear, it was rejected by the

12   government.

13   A.   That's what I said.  It was rejected because of that, yes.

14   Q.   Okay.  Would you say that as --

15            MR. SALZBERG:  Well, strike that.

16   Q.   Was the Treasury the lender of last resort for GM after

17   December of 2008?

18   A.   Most likely, that's yes.  I mean, we encouraged General

19   Motors on a number of occasions to try and identify private

20   alternatives.  We said a number of times we would prefer a

21   private alternative to our involvement.  And as a result of the

22   fact, there did not seem to be any private alternatives either

23   at that point or at this point, for that matter.  I think it's

24   reasonable to conclude we were effectively the lender of last

25   resort.

58

1  Q.   Would you say that as the lender of last resort, the

2  United States government had leverage over General Motors?

3  A.   I think that's fair to say.

4  Q.   Would it be fair to say -- or to call that leverage

5  extraordinary leverage?

6  A.   I think that was a comment that was introduced in the

7  question at my deposition but I don't think it's a word that I

8  used.  I think it would certainly be significant.

9           MR. SALZBERG:  May I have a moment, Your Honor?

10          THE COURT:  Of course.

11          MR. SALZBERG:  Your Honor, may I approach the

12  witness?  I have a copy of the deposition transcript that was

13  taken of Mr. Wilson.

14          THE COURT:  Yes, you may.

15          MR. SALZBERG:  Okay.  And, Your Honor, I have a copy

16  for you.

17          THE COURT:  Thank you.

18  Q.   Sir, if you could turn to page 155 and 156.

19  A.   Who is the question in this case, Mr. Salzberg?  Is it

20  you?

21  Q.   These were questions that I posed to you, Mr. Wilson.

22  A.   Okay.

23  Q.   And just for the record, this is a transcript of the

24  deposition that was taken of you on Monday of this week.  Do

25  you recall that deposition?

1   A.   Yes.

2   Q.   And I would point you to page 155, line 13.

3          MR. SALZBERG:  And, Your Honor, if I may read the

4   question and answer.

5   Q.   My question was:  "You had said in response to prior

6   questioning that the Treasury had leverage.  I think you used

7   the term 'extraordinary leverage' with regard to GM in the

8   negotiations.  Do you recall that testimony?"  Your answer was:

9   "Yes.  I think that was in the context of my saying.  There

10  were no other lenders.  We were the lenders of last resort in

11  this instance."

12  "Q.  You used the term 'extraordinary leverage', is that right?

13  "A.  I think in a situation where a company needs cash and

14  doesn't have any other access to cash, I think that's a

15  reasonable way to characterize it."

16         MR. SCHWARTZ:  Objection.  If he wants --

17         THE COURT:  Before you -- okay, wait.  Before you

18  answer, Mr. Wilson, wait for this to play out.  Mr. Salzberg,

19  you haven't asked a question yet.  Mr. Schwartz has risen to

20  object.  Let's get the full question out and then I'll rule on

21  it before there's an answer.

22  Q.   I asked you before, sir, if the government's leverage was

23  extraordinary and my recollection of your answer was not -- was

24  no, you did not characterize it as extraordinary although in

25  your deposition earlier this week, you did call it

60

1    **extraordinary.**

2         THE COURT:  All right.  Now I'll hear Mr. Schwartz.

3    The implication is that he's given an inconsistent statement?

4         MR. SALZBERG:  Yes, Your Honor.

5         THE COURT:  All right.  Mr. Schwartz?

6         MR. SCHWARTZ:  If Mr. Salzberg is trying to impeach

7    Mr. Wilson on the word "extraordinary", he should go to the

8    part of the deposition where Mr. Wilson actually uses the word

9    "extraordinary" if there is such a word.  The passage that he

10   just quoted began with his question:  I think you used the word

11   "extraordinary".  And I heard Mr. Wilson testify in his answers

12   today earlier that it was a word all along that Mr. Salzberg

13   had introduced in his question.

14        THE COURT:  All right.

15        THE WITNESS:  I'd like to answer, Your Honor.

16        THE COURT:  Beg your pardon?

17        THE WITNESS:  Can I answer, Your Honor?

18        THE COURT:  You certainly can if you and your

19   counsel, which, I guess, is Mr. Schwartz here, want to waive

20   his rights under Rule 32 and have Mr. Salzberg read more.  Mr.

21   Schwartz, are you happy with the witness just answering?

22        MR. SCHWARTZ:  I'm always happy with the witness

23   answering.  But I do think I made my point here and he doesn't

24   have to answer.

25        THE COURT:  Okay.  Look, folks, the reason that Rule

61

1    32 allows and requires more to be said is to protect the

2    witnesses.  It sounds to me like the witness is capable of

3    answering himself.  And under those circumstances, Mr.

4    Schwartz, are you okay with withdrawing your objection or your

5    requirement that there be a Rule 32 designation?

6            MR. SCHWARTZ:  That's fine.

7            THE COURT:  Okay.  Go ahead, Mr. Wilson.

8            THE WITNESS:  Thank you, Your Honor.

9    A.    Mr. Salzberg, as you can see in the passage you read, I

10   did not use the word extraordinary.  You used the word

11   extraordinary.  I went back later to my deposition once it was

12   filed to determine if I had used the word extraordinary and did

13   not.  You used the word extraordinary.  I was agreeing to a

14   general concept not to every single word you spoke.  And I

15   think it's a mischaracterization of my statement throughout the

16   deposition as well as today to contend otherwise.

17   Q.    Just so I'm clear, has your counsel filed an errata sheet

18   to your deposition yet?

19   A.    I don't know.

20   Q.    Okay.  All right.

21           THE COURT:  Mr. Salzberg, as I took down the

22   testimony and the notes, Mr. Wilson said in words or in

23   substance it's fair to say that the government had leverage.

24   You want to make an issue of the word "extraordinary" that you

25   would put into that question?

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

62

1          MR. SALZBERG:  No, Your Honor.  I think we'll move

2     on.

3          THE COURT:  Okay.

4          MR. SALZBERG:  Okay.

5     Q.    Did the government have the ability to call the loans, to

6     make the loans due and payable if a viability plan submitted by

7     GM was deemed by the auto team to be insufficient?

8     A.    I believe that's correct.

9     Q.    And those loans would be due and payable within sixty days

10    after that determination was made, is that correct?

11    A.    Yes.

12    Q.    At the time that the loans were extended by the government

13    starting December 2008, was GM able to pay its debts as they

14    became due as a result of the loans?

15    A.    Yes.

16    Q.    But not before the loans had been extended, is that

17    correct?

18    A.    That is what necessitated the loans.

19    Q.    Now, with the leverage that the Treasury had, the Treasury

20    was able to exert influence over GM, is that correct?

21    A.    Well, we certainly engaged in an active dialogue with the

22    company around the terms of their operating restructuring.  But

23    we never once said to the company we intend to call the loans.

24    Q.    All right.

25         THE COURT:  Mr. Salzberg, before you go on --

63

1          MR. SALZBERG:  I'm sorry.

2          THE COURT:  -- and I know I'm going to sound

3    inconsistent here, and, Mr. Wilson, you're allowed to breathe

4    and we may hear your breathing.  But I am going to ask that you

5    keep the microphone closer to you.

6          THE WITNESS:  Closer to me?

7          THE COURT:  Yes, please.

8          THE WITNESS:  Okay.

9          THE COURT:  Go ahead, Mr. Salzberg.

10         MR. SALZBERG:  Okay.  Thank you, Your Honor.

11   Q.    The CEO presently of GM is Mr. Henderson, correct?

12   A.    Yes.

13   Q.    And his predecessor was Mr. Wagoner, is that correct?

14   A.    Yes.

15   Q.    And the auto team informed Mr. Wagoner in March of 2009

16   that the auto team did not have confidence in his leadership,

17   is that correct?

18   A.    Yes.

19   Q.    And shortly thereafter --

20         MR. SALZBERG:  Well, strike that.

21   Q.    That was conveyed to Mr. Wagoner by, I believe, Mr.

22   Rattner --

23   A.    That's correct.

24   Q.    -- who was the head of the auto team, is that right?

25   A.    That's correct.

64

1    Q.   Okay.   And shortly after Mr. Rattner informed Mr. Wagoner

2    of the lack of confidence, Mr. Wagoner resigned as CEO, is that

3    right?

4    A.   That's correct.

5    Q.   The Treasury required that the assets that are the subject

6    of the sale motion today require that those assets be sold

7    through a 363 process as opposed to being disposed of through a

8    plan of reorganization, is that correct?

9    A.   Yes.

10           MR. SALZBERG:  Your Honor, if I may, yesterday we

11   introduced for limited purposes Bondholder Exhibit number 2.

12   And I'd like to show the witness Bondholder Exhibit number 2

13   but I don't have the original.

14           THE COURT:  You can certainly show it to the witness.

15           MR. SALZBERG:  Do you have the original?

16           THE COURT:  Do I have the original?

17           MR. SALZBERG:  No, no.  I was talking to the clerk.

18   I'm sorry.

19           THE COURT:  I don't know if the clerk does.  I think

20   that as people were marking exhibits, they kind of gave me

21   working copies.  And I don't know if they were official copies

22   or not.

23           MR. SALZBERG:  Your Honor, may I approach the

24   witness?

25           THE COURT:  Yes, you may.  Give me a second to get my

65

1    copies.  Mr. Salzberg, it says on the front "Use of Section 363

2    to Expedite Restructuring of Distressed OEMs"?

3              MR. SALZBERG:  Yes, Your Honor.

4              THE COURT:  Okay.  I'm with you.  Go ahead.

5              MR. SALZBERG:  Okay.  And for the record, this is

6    Bondholder Exhibit number 2 which bears Bates stamps GMPR92336

7    through 92360.

8    Q.   You see the first page of Bondholder Exhibit 2 referenced

9    to Cadwalader Wickersham & Taft?

10   A.   Yes.

11   Q.   And they were the government's outside counsel in this

12   transaction, is that correct?

13   A.   They were the counsel to the U.S. Treasury, yes.

14   Q.   Okay.  Do you recognize Bondholder Exhibit number 2?

15   A.   I know we went through this several times in the course of

16   my deposition on Monday.

17   Q.   I'm asking you if you recognize this document.

18   A.   Yes.

19   Q.   Okay.  Did you see this document as part of your

20   responsibilities as a member of the auto team?

21   A.   I, at this time, no longer recall what I saw prior to

22   Monday on this document.  I'm sure at my deposition I explained

23   to you whether I had seen it prior to Monday or not.  I just

24   can't recall at this point after having gone through it several

25   times.

66

1    Q.   Do you have any reason to doubt -- well, do you remember

2    if this document was provided to you by the Treasury's outside

3    counsel?

4    A.   I'm not sure what you're asking, sir.  And I'm answering

5    the same way.  I believe that I saw this several times on

6    Monday.  At the beginning of my deposition on Monday, I

7    testified as to whether or not I had seen it before.  At this

8    point, I can no longer recall 'cause I went through it so many

9    times on Monday.

10   Q.   Okay.  All right.  If I can ask you to turn to page 3 of

11   this document?  Before I point you to specific parts of page 3,

12   did Cadwalader provide advice to the U.S. Treasury regarding

13   potential processes for accomplishing the disposition of the

14   assets being sold under the sale motion?

15   A.   Yes.

16   Q.   Okay.  So, in other words -- that was kind of a convoluted

17   question.  Your counsel told you of the different ways in which

18   the assets can be disposed of.

19   A.   That's correct.

20   Q.   Okay.  And one of the ways that was highlighted by your

21   counsel was under Section 363 of the Bankruptcy Code.

22   A.   That's correct.

23   Q.   And the other way was through a plan of reorganization, is

24   that right?

25   A.   There were other alternatives.  The plan was one of them.

67

1   Q.   Okay.  So two of the alternatives that were discussed are

2   referenced on this page 3.  Do you see that?

3   Q.   And would it be fair to say that your counsel identified

4   strategic benefits of a 363 sale as compared to a plan?

5   A.   I think this page, sir, describes the tradeoff associated

6   with either of the 363 sale or the plan.

7   Q.   Without reference to page 3 of the document, I'm just

8   asking did your attorneys advise you of the strategic benefits

9   available under Section 363 as opposed to under a plan

10  confirmation process.

11         MR. SCHWARTZ:  Objection.  I think we're getting

12  dangerously close to privileged information.

13         THE COURT:  All right.  Well, the substance of

14  privileged advice is privileged.  The subject matter of

15  privileged advice -- or of legal advice is not privileged.  You

16  can ask subject matter, Mr. Salzberg, but not substance.  Or,

17  of course, if you lay a foundation that somebody was present in

18  a nonprivileged communication or in a communication that might

19  have otherwise been privileged.  And if the privilege was

20  broken, you can do that.

21         MR. SALZBERG:  Your Honor, I'll restrict my questions

22  right now to the actual document that's in front of the witness

23  which, I believe, would take care of the privilege issues.

24         THE COURT:  Thank you.

25  Q.   If you look at page 3 under the Section 363 column, there

68

1    are a number of bullet points.  Do you see that?

2    A.   Yes.

3    Q.   And is it fair to say that your attorneys, in this

4    document, advised you that one of the benefits, strategic

5    benefits, of a 363 sale is that the consent of creditors and

6    shareholders were not required?

7    A.   That is what this bullet point says, yes.

8    Q.   Okay.  Fair to say that your counsel advised you that one

9    of the strategic benefits available under Section 363 is that

10   the standards are lower than under a plan confirmation process.

11        MR. SCHWARTZ:  Objection.  Same objection.  What his

12   counsel advised him is not appropriate.

13        THE COURT:  If you're going beyond what the document

14   says, as I sense you are, Mr. Salzberg, the objection is

15   sustained.

16        MR. SCHWARTZ:  We also don't have on this record that

17   Mr. Wilson has seen this document and been through this

18   document with anyone.

19        MR. SALZBERG:  I believe, Your Honor, what the --

20        THE COURT:  Well, what we have on the record is that

21   he saw it on Monday and he doesn't remember whether or not he

22   saw it before.

23        MR. SCHWARTZ:  Right.

24        THE COURT:  I will not permit him to construe the

25   document upon the state of the record.  If you think something

69

1    useful is to be served by reading him a section of the document

2    as a predicate for a further question, I'll permit that,

3    namely, to get whatever you ask him in the question.

4         MR. SALZBERG:  Okay.

5    **Q.   Do you recall --**

6         MR. SALZBERG:  Well, strike that.

7    **Q.   I'll point you to the fourth bullet point on page 3 under**

8    **the left-hand column.  Would it be fair to say that you -- a**

9    **strategic benefit under Section 363 was that dissenting parties**

10   **had significantly less ability to hold up a sale than under a**

11   **plan.**

12        MR. MILLER:  Objection, Your Honor.  Is he asking for

13   Mr. Wilson's conclusion or is that this exhibit says that?  Mr.

14   Wilson is not an attorney and that is calling for a legal

15   conclusion.

16        THE COURT:  I'm going to sustain that objection and

17   I'll hear the next question.  What you've got to do, Mr.

18   Salzberg, is find out whether he formed either an independent

19   view that that statement was true or that he got that advice in

20   some means out of a privileged communication.  I don't know

21   whether that's so or not but those are the areas where you can

22   appropriately inquire.  But I won't ask him to construe a

23   document that he was neither the author of nor if he remembers

24   whether he saw it before his deposition was taken.  And those

25   are the general parameters.  I'll rule on specific objections

70

1    if and when they're made.

2  Q.  Prior to the petition date, did you, as a member of the

3  auto team, form an opinion as to whether Section 363 provided a

4  strategic benefit as opposed to a plan confirmation process?

5  A.  Yes.

6  Q.  What was the strategic benefit that you determined was

7  available?

8  A.  I believe there were a number of benefits to the 363

9  process three of which we discussed on Monday which were speed,

10  certainty and ability to be behind liabilities, did not have a

11  commercial necessity for the new enterprise.

12  Q.  Was one of the benefits that you determined to exist --

13       MR. SALZBERG:  Strike that.

14  Q.  What about bargain -- the need to bargain with debt

15  holders?  Was that a benefit that you determined would be

16  gained by the 363 process?

17  A.  I think it depends on the context of your question, sir.

18  As evidenced by the process, we did bargain with parties in

19  interest.  We bargained actively with the representatives of

20  the bondholders who consented to this transaction as

21  structured.  So I don't think either the evidence or the

22  history suggest that we would not have to talk to individuals.

23  Q.  You're breathing into that microphone again.

24  A.  Sorry.  I can't do both.  I can't speak louder and not

25  breathe.  Sorry.

71

1          THE COURT:  On balance, I'd rather hear your

2    testimony than do without your breathing.  If you think it's

3    possible for you to come up with the answer and then back off.

4          THE WITNESS:  I'll do my best, sir.

5          THE COURT:  I think maybe the best way will be

6    something upon which everybody in the room would have a

7    consensus.  But do the best you can and everybody's going to

8    understand.

9          THE WITNESS:  Yes, sir.

10   **Q.   Was document Bondholder Exhibit number 2 -- was this**

11   **produced to you by your attorneys in the ordinary course of the**

12   **auto team's business?**

13         MR. SCHWARTZ:  Objection.  Foundation.

14         THE COURT:  I'm going to overrule that.  If they gave

15   it to you and you can remember it, you can answer.  If you

16   don't remember, you can say so or if your answer is no, you can

17   say so.  That doesn't go to either foundation or legal

18   inference.  Did you get it or not?  That's what I understand

19   the question as.

20         MR. SALZBERG:  That's fair.

21   **A.   I think I testified earlier today that I don't recall**

22   **whether I saw this prior to Monday.**

23         MR. SALZBERG:  Excuse me one second, Your Honor.

24   **Q.   When was the decision made by the U.S. Treasury that a 363**

25   **sale process would be employed?**

72

1    A.    There was a constant dialogue in thinking through our

2    options.  As you know, the bond exchange was pending up until

3    the last week of May.  And we began to narrow our options over

4    the course of April and May as we approached the June 1 bond

5    maturity.

6    Q.    Okay.  So when was the ultimate decision made to employ

7    363 as opposed to a plan?

8    A.    I think sometime in the month of May we included that if

9    the bond exchange was unsuccessful.  And GM was not able to

10   restructure in an out of court basis as had been their

11   preference.  The 363 was the only viable path forward for the

12   company.

13   Q.    And who made that decision on behalf of the U.S. Treasury?

14   A.    That was a product of discussions amongst a group of us.

15   Q.    By "us", you're including yourself, Mr. Rattner and

16   outside counsel among others?

17   A.    Among others, that's correct.

18   Q.    Okay.  And as you sit here today, can you tell me

19   specifically why, in your mind, 363 provided a strategic

20   benefit as opposed to the plan process?

21   A.    Well, I think the answer, sir, is much broader than the

22   question.  Just what provided a strategic benefit?  There are a

23   whole host of considerations that went into our calculus.

24   Q.    Okay.  What were the whole host of considerations?

25   A.    The fundamental question, sir, was can General Motors

73

1    survive anything approaching a traditional Chapter 11 process.

2    We talked to dozens of experts, industry consultants, people

3    who had observed General Motors for decades, obviously the

4    management team and a number of folks who are well-versed in

5    the bankruptcy process.  And we could not find any reasonable

6    measure of -- in fact, I can't recall anyone off the top of my

7    head who felt that General Motors could survive a traditional

8    Chapter 11 process.  One of the leading commentators on GM who

9    wrote the most recent book on General Motors, wrote it as

10   recently as May 26th, that we were making a tragic mistake in

11   pursuing the filing of General Motors.  And so, it became clear

12   to us that a traditional Chapter 11 process would be so

13   injurious to this company as to not allow for its viability

14   going forward.

15   Q.   What do you mean by a traditional bankruptcy process?

16   A.   The Chapter 11 process.

17   Q.   You talking about actually filing a bankruptcy case and

18   then proposing a plan and providing a disclosure statement?

19   A.   That would be -- those would be the elements of it, yes.

20   Q.   Okay.  The time frame, in your opinion -- the auto team's

21   mind --

22            MR. SALZBERG:  Well, strike that.  Let me rephrase

23   that.

24   Q.   When the auto team was considering the traditional

25   bankruptcy process, what was the time frame that the auto team

74

1   was thinking of in terms of how long the bankruptcy would take?

2   A.   We thought that the earliest it could be when you run

3   through the various notice periods, it could be three months,

4   an extraordinarily quick process and that if any roadblocks

5   developed in the process or if the process spun out of control,

6   as many bankruptcies have, it could take many years.

7   Q.   Okay.  So you were thinking that the best case scenario

8   was ninety days, is that right?

9   A.   I think that was a reasonable best estimate of what the

10  plan process would take.

11  Q.   Okay.  The government is providing DIP financing in this

12  case?

13  A.   That's correct.

14  Q.   Approximately, combined with the Canadian contribution, of

15  thirty-three billion dollars, is that right?

16  A.   33.3 billion, yes.

17  Q.   33.3.  And the DIP fund --

18  A.   Yeah.  Back up.

19  Q.   The DIP funding period goes through when?

20  A.   I know that the sale order expires on July 10 -- or,

21  sorry, our funding expires and comes due on July 10th if the

22  sale order is not approved.

23  Q.   Well, under the DIP budget that's been approved by the

24  Court last week, is it not true that it's a nine-week DIP

25  funding budget?

75

1    A.    I think that's correct.  I think that the last draw is

2    scheduled to be sometime in July.

3    Q.    I have a copy of the DIP order with me and it provides an

4    Annex 1 to the budget, DIP financing, week ending August 2nd.

5    Does that -- I would ask the Court to take judicial notice of

6    the DIP order.  But does that sound reasonable to you?

7    A.    That sounds approximately right.

8    Q.    Okay.  All right.  So ninety days out from a June 1 filing

9    would bring you to August 31, is that right?

10   A.    I think it's technically August 29th or something, but

11   yes.

12   Q.    Okay.  All right.  So it's a few weeks beyond the end of

13   the DIP funding period as approved by this final DIP order, is

14   that right?

15   A.    Yes.  If everything went perfectly smoothly and ninety

16   days was achieved, that is twenty-eight days beyond August 2nd.

17   Q.    All right.  Now you mentioned the July 10th deadline.

18   What is that deadline?

19   A.    That is, I believe, the deadline for the approval of the

20   sale motion.

21   Q.    And what happens if that deadline is not met?

22   A.    Then our DIP would terminate.

23   Q.    Is it your testimony that if the sale order is not entered

24   by July 10th that on July 11th the DIP funding will terminate?

25   A.    As I testified several times when you asked me that

1    question, sir, we have no intention to further fund this

2    company if the sale motion is entered by July 10th.

3    Q.   Okay.  I understand that we had a deposition a few days

4    ago but we need to talk about the testimony today.  Is it the

5    government's position that if the sale order is not entered on

6    July 10th that on July 11th the government will terminate the

7    DIP funding.

8    A.   That's been our position, yes.

9    Q.   Has that position been conveyed to General Motors?

10   A.   I believe General Motors is well aware of our timeline and

11   our expectations that this process needs to be expeditious.

12   Q.   So if there were public pronouncements by General Motors

13   representatives that it is unlikely that the government would

14   cease funding if the sale order was not entered on July 10th,

15   those public pronouncements would be incorrect?

16           MR. SCHWARTZ:  Objection.  If there are such public

17   pronouncements, we should see them.

18           THE COURT:  I'll overrule that.  You can answer it as

19   you see fit.

20   A.   Sir, I'm not aware of any announcements that say that the

21   government is expected to fund for sixty to ninety days.  I'm

22   aware of announcements that I believe that Mr. Henderson made

23   in one instance that I'm aware of that he expected the process

24   to extend sixty to ninety days but that was to accommodate

25   perceived antitrust filings.

77

Q.   No.  I understand, sir.  But my question is that if public

pronouncements were made by General Motors that it is unlikely

that the government would cease funding on July 11th if the

sale order is not entered on July 10th, would those public

pronouncements be incorrect.

          MR. MILLER:  Is that a hypothetical question, Your

Honor?  I object.  Is there such a statement?

          THE COURT:  I'm going to sustain that objection.  If

there is a particular statement that you want to point him to,

you can premise it on that.  This fellow, unlike Repko, for

whom I authorized the hypothetical, is not an expert.  That's a

distinction that is meaningful and that as a matter of

evidentiary law, I believe he's not here to testify as an

expert unless I'm missing something.

          MR. SALZBERG:  Your Honor, just by way of

explanation, on the way over, there were reports that I read on

my BlackBerry, news reports, where those public pronouncements

were made.  If I may reserve my right, we're getting copies of

those articles as we speak.

          THE COURT:  Well, certainly, if you want to withdraw

the pending question and let me rule on that later, that's, of

course, acceptable.

          MR. SALZBERG:  Yes, Your Honor.  If we would have the

right to recall Mr. Wilson for that --

          THE COURT:  Oh.  You're talking about bringing him

78

1    back again?

2            MR. SALZBERG:  Well, I would that --

3            THE COURT:  Let's see where we are when this

4    examination is completed.

5            MR. SALZBERG:  Okay.  We're waiting for those

6    articles, Your Honor.

7    BY MR. SALZBERG:

8    Q.   I would ask you to turn to page -- I'm sorry -- page 6 of

9    your declaration, paragraph 13.  I'm going to ask you about the

10   end of that paragraph but please read the entire paragraph or

11   as much before and after as you need to.  Okay.  Do you see

12   that?

13   A.   Yes.

14   Q.   Okay.  You state in your declaration that it's the

15   Treasury's belief that only a rapid and certain emergence from

16   bankruptcy can provide consumers with confidence, if necessary,

17   to make a major purchase like an automobile.  What was the

18   Treasury's definition of the word "rapid"?

19   A.   We were trying to do it in thirty, forty days, sir.

20   Q.   Sorry?

21   A.   We were trying to do it in thirty to forty days.

22   Q.   You heard testimony -- were you in court yesterday?

23   A.   Yes.

24   Q.   Okay.  And you heard testimony from Mr. Henderson

25   regarding pronouncements that GM would exit bankruptcy within

79

1    sixty to ninety days?

2    A.    That is what he said publicly, yes.

3    Q.    Okay.  So is the sixty to ninety day emergence from

4    bankruptcy at odds with the Treasury's belief as to what is

5    needed for a rapid emergence?

6    A.    You asked me the question of what we thought would be a

7    rapid emergence and what we expected.  And I testified that it

8    was thirty to forty days.

9    Q.    And I'm asking you the follow-up question whether or not

10   that differs from GM's pronouncement that it would likely exit

11   bankruptcy between sixty to ninety days.

12   A.    I can't speak to Mr. Henderson's thinking, sir.  I can

13   only suspect that he was trying to build some cushion in the

14   minds of the consumer which, obviously, is of paramount

15   concern.

16   Q.    Okay.  In the next sentence, you use the word "languish",

17   that "The Treasury cannot make an open-ended commitment to GM.

18   The Treasury will continue to fund GM's operations if GM's

19   critical assets languish in the bankruptcy process."  What did

20   you mean by that?

21   A.    I think "languish" means if they are residing in the

22   bankruptcy process for longer than is absolutely necessary.

23   Q.    Okay.  Was there a time period that the government had in

24   mind as to what would constitute languishing in the bankruptcy

25   process?

80

1    A.    Beyond thirty to forty days.

2    Q.    Okay.  All right.  Would it be fair to say that the

3    Treasury made a strategic decision that 363 allowed the sale of

4    good assets with providing a minimal opportunity for

5    objections?

6    A.    No.  I think I testified earlier that certainty and speed

7    were two primary considerations.  But it wasn't without taking

8    note of considerations of the process.  Obviously, if we

9    believed that there wasn't any impediment to a quick process,

10    we wouldn't have provided any consideration for OldCo, as an

11    example, which, as you know, the consideration is substantially

12    in excess of that which -- that would be taking OldCo through a

13    liquidation process.

14    Q.    Okay.  If you can turn back to Bondholder Exhibit 2 -- I

15    apologize for moving you back and forth between exhibits but

16    again, page 3 on Bondholder Exhibit 2.  And under the Section

17    363 column, the fourth bullet point, did you come to a

18    conclusion prior to the filing of the bankruptcy that 363 would

19    provide significantly less ability of dissenting parties to

20    hold up the approval process?

21    A.    I think that it's clear that in a 363, you don't have the

22    traditional voting requirements of a plan which is what allows

23    for the speed of a 363 process.  So that was -- at least as I

24    understood that bullet and as we applied it to our own

25    thinking, how we thought about it.

81

1    Q.   But it was the Treasury's thought that 363 -- the 363

2    process would provide less of an opportunity for objections to

3    the actual sale of the assets, is that right?

4    A.   Sir, I think we've had -- you know, we spoke with every

5    party in interest who approached us before June 1st.  We took

6    dozens of meetings of various constituencies ranging from

7    dealers to splinter unions to a whole host of different inter

8    parties in interest.  We heard all their concerns and we spoke

9    with them throughout the process.  And as part of this process,

10   I think all those parties in interest had the opportunity to

11   object which is obviously part of the process we're engaged in

12   right now.

13   Q.   Right.  But, respectfully, sir, I don't think you answered

14   my question.  My question is was it the Treasury's position

15   that this 363 process that we're involved in right now would

16   provide less of an opportunity to object than a standard plan

17   confirmation process.

18   A.   We believe the ability -- the time associated with it is

19   less.  But on the core issues of valuation, for example, it is

20   my understanding, although I'm not an attorney, that the

21   ability to pursue questions of valuation are as meaningful in

22   the context of a 363 sale for the assets involved as they would

23   be in a plan of reorganization.

24   Q.   And would I be correct in stating that the U.S. Treasury

25   saw a strategic benefit in using the 363 process because the

82

1    standards for the sale are lower than as in the plan

2    confirmation process?

3              MR. SCHWARTZ:  Objection.  Asked and answered.

4              THE COURT:  Sustained.

5              MR. SALZBERG:  Respectfully -- sorry.

6    Q.    We talked about ceasing funding of the DIP on July 11th if

7    the sale order is not entered.  Do you recall that?

8    A.    Yes.

9    Q.    Okay.  On July 11th, what will the total amount of pre and

10   post-petition lending be by the government?

11   A.    I'm not certain what it will be on July 11th.  I know as

12   of roughly today, it's approximately ten or eleven billion

13   dollars post-petition.  And 19.4 billion pre-petition.

14   Q.    I'm sorry.  You said --

15             THE COURT:  Could you repeat those numbers, please,

16   Mr. Wilson?

17             THE WITNESS:  Yes, sir.  That as of, I believe,

18   today, or plus or minus twenty-four hours, that the amount of

19   post-petition financing is in the range of ten to eleven

20   billion dollars.  Not all of that is from the U.S. Treasury.

21   Some of that is from our various Canadian partners.  And that

22   the U.S. pre-petition financing was 19.4 billion dollars.

23   Q.    Out of the ten to eleven billion dollars post-petition

24   financing, how much is that from the Canadian government?

25   A.    I'm not sure off the top of my head, sir.

83

1    Q.   Is it more than twenty-five percent of that amount?

2    A.   If I had to guess, which is what you're asking me to do, I

3    would say it's between fifteen to twenty percent.

4    Q.   Okay.  So assuming twenty percent, we're talking about

5    post-petition financing from the U.S. Treasury of approximately

6    eight billion dollars, is that a fair estimate?

7    A.   I think in that zip code, yes.

8    Q.   Okay.  So that would render the entire financing or the

9    entire loan amount both pre and post as of now around twenty-

10   seven billion dollars from the U.S. government, correct?

11   A.   Assuming eight billion of post-petition, yes.

12   Q.   Okay.  If the DIP terminated on July 11th and assuming,

13   again, that we're talking about the same amount outstanding

14   that we just discussed, around twenty-seven billion dollars,

15   what is the U.S. Treasury's anticip -- what is the result that

16   the Treasury anticipates?  What would happen?

17   A.   What would happen in what regard, sir?

18   Q.   Let me rephrase that.  That was a horrible question.  The

19   U.S. Treasury ceases its DIP funding on July 11th.  What does

20   the Treasury anticipate would happen in this case?

21   A.   In this bankruptcy case or in the case of General Motors

22   or in what?

23   Q.   In this bankruptcy case.

24   A.   I think it would be up to Judge Gerber to decide what

25   would happen in this bankruptcy case.

84

1    Q.    Okay.  If the case liquidates, if the company liquidates

2    on July 11th, what is the U.S. Treasury's expected recovery on

3    its approximate twenty-seven billion dollars of lending?

4    A.    We have not performed a separate liquidation analysis.

5    But I don't have any reason to doubt the analysis performed by

6    Mr. Koch described yesterday.

7    Q.    Okay.  And based upon Mr. Koch's liquidation analysis,

8    what do you believe would be the U.S. Treasury's recovery on it

9    twenty-seven billion dollars of lending?

10           MR. SCHWARTZ:  Objection.  I just want to clarify

11    that Mr. Wilson testified that he doesn't know what the amount

12    of lending will be as of July 10th or 11th.  The twenty-six

13    billion dollars was as of today.

14           THE COURT:  I'm going to sustain that.  When it gets

15    to be argument time, Mr. Salzberg, you can pull out that

16    liquidation analysis that Mr. Koch prepared and remind me of

17    the figure and to remind me that Mr. Wilson said that he had no

18    reason to doubt what Koch said.  But I don't think this should

19    be a memory test of whether Mr. Wilson remembers what Mr. Koch

20    said.

21           MR. SALZBERG:  Okay.  Thank you, Your Honor.

22    Q.    The unsecured claim in this case, do you know the total

23    approximate amount, what's projected at this time?

24    A.    I do not know the projected amount.

25    Q.    Is it true that the unsecured claim class is primarily

1  consisting of the bondholders' claims?

2  A.    Under the terms of this transaction, that's correct.

3  Q.    Okay.  And what will the bondholders' recovery be from

4  this bankruptcy as a percent of the dollar amount of their

5  claim?

6  A.    I think it depends, sir, on the equity performance of

7  NewCo since the primary asset of OldCo will be the equity and

8  warrants of NewCo.

9  Q.    Okay.  Now, there is a UAW retiree settlement that is part

10  of the sale motion, correct?

11  A.    That's correct.

12  Q.    And the debtor has scheduled the UAW retiree claim and one

13  of the largest unsecured claims in this case, is that correct?

14  A.    I believe so.

15  Q.    Okay.  So the bondholders' claims are of the same priority

16  level as the retirees' claims, is that correct?

17         MR. SCHWARTZ:  Objection.  It calls for a legal

18  conclusion.

19         MR. SALZBERG:  I'll withdraw, Your Honor.

20  Q.    What will the retirees' recovery be from this bankruptcy?

21  A.    Can you be specific?  Which retiree, sir?

22  Q.    UAW retirees.

23  A.    As I believe we've discussed, we do not think about it in

24  the terms of a recovery in the sense that we negotiated a

25  commercial transaction to acquire the assets that will

86

1    constitute NewCo.  As part of that commercial transaction, we

2    needed a skilled workforce to build cars since that would be

3    the primary business of NewCo.  And as part of that negotiation

4    with the UAW as the only representative of that skilled

5    workforce, we structured a transaction as evidenced in the sale

6    motion filed on June 1st.

7    Q.    Okay.  There is reference in the sale motion that the --

8         MR. SALZBERG:  Well, let me rephrase that.

9    Q.    The collective bargaining agreement between Old GM and the

10   UAW was amended just recently, is that correct?

11   A.    Yes.

12   Q.    And the amended CBA was ratified by the union members

13   sometime in late May of 2009, is that correct?

14   A.    Yes.

15   Q.    And that amended CBA is now in force and effect, is that

16   right?

17   A.    I do not know.  I do not know if it's conditioned upon the

18   sale motion or not.

19   Q.    Okay.  Do you know of any provision in the amended

20   collective bargaining agreement with the UAW that makes its

21   enforcement or enforceability contingent upon the approval of

22   the UAW retiree settlement agreement?

23   A.    I don't know.

24   Q.    Okay.

25        MR. SALZBERG:  Your Honor, if I may approach and show

87

1  the witness what is marked as Bondholders' Exhibit 3.  And for

2  the record, this is my copy but there are no notations on the

3  relevant page.

4          THE COURT:  Okay.

5          MR. MILLER:  Can I have a copy?

6          MR. SALZBERG:  It was introduced yesterday,

7  Bondholder Exhibit 3.  It's the May 18th UAW -- page 12.

8          MR. MILLER:  What page?

9          MR. SALZBERG:  12.

10  Q.    First of all, do you recognize this document?

11  A.    Yes, I do.

12  Q.    Okay.  And what is this document?

13  A.    This is a document we also discussed on Monday that has --

14  I believe it was produced by GM in the context of the

15  negotiations with the UAW.

16  Q.    Was it produced to the Treasury during the run-up to the

17  bankruptcy?

18  A.    I don't know if this whole document was.  I certainly

19  recall this page.

20  Q.    I'm sorry.

21  A.    I don't know if this whole document was.  I certainly

22  recall this page.

23  Q.    You saw that page prior to the bankruptcy?

24  A.    I believe so.

25  Q.    Okay.  And that's page 12.

88

1    A.   That's correct.

2    Q.   Okay.  And we were talking a minute ago regarding recovery

3    of the retirees from the bankruptcy process.  Do you recall

4    that?

5    A.   Yes.

6    Q.   Okay.  And that document, page 12, shows line item

7    recoveries of certain interest holders in the debtor, is that

8    correct?

9    A.   It appears to, yes.

10   Q.   Okay.  And one of the line items, I believe the second

11   line item, refers to the retirees, is that correct?

12   A.   Refers to the new VEBA.

13   Q.   The new VEBA which is a trust fund to pay the medical

14   benefits of the UAW retirees, correct?

15   A.   That's correct.

16   Q.   Okay.  And the last column, if you go to the right side,

17   has a recovery.  It's entitled "Recovery", correct?

18   A.   It's entitled "Percent Recovery", yes.

19   Q.   Okay.  And that actual percentage recovery was calculated

20   based upon an earlier proposal to the new VEBA, is that

21   correct?

22   A.   I believe so, yes.

23   Q.   And I believe, at that point, it was approximately a

24   fifteen percent share in the common stock of New GM, correct?

25   A.   Among other things, yes.

89

1   Q.   Yes.  And I'm talking simply about the common stock.  And

2   that later, the deal that was agreed to by the new VEBA that's

3   included within the UAW retirees' settlement agreement is

4   actually more advantageous to the new VEBA than the agreement

5   that's reflected on page 12, correct?

6   A.   As is the bondholder deal.  We were unsuccessful in

7   achieving the transaction we hoped to achieve.

8   Q.   I'm asking specifically, sir, for the new VEBA line item.

9   The deal that's in the settlement agreement that's at issue now

10  is more advantageous to the new VEBA than the deal that's

11  reflected on page 12, correct?

12  A.   They succeeded in having a higher percentage of the

13  equity, yes.

14  Q.   I'm just looking for a yes or no.

15  A.   I don't know what you mean by more advantageous, sir.

16  Higher --

17  Q.   Better?

18  A.   It's a higher percentage, sir.

19          THE COURT:  There are lots of questions he asks which

20  are incapable of being answered yes or no.  But I think the

21  last one is capable of being answered yes or no.

22  A.   Yes.

23  Q.   Okay.  And that document that was in front of you was

24  prepared by whom?

25  A.   I believe it was prepared by GM.

90

1    Q.    Okay.  And so GM, at least, was calculating recovery to

2    the new VEBA, correct?

3    A.    In this page, yes.

4            MR. SALZBERG:  May I have a moment, Your Honor?

5            THE COURT:  Yes.

6            MR. SALZBERG:  Your Honor, simply subject to my

7    request to ask Mr. Wilson some additional questions once we get

8    the news report in, I have no further questions.

9            THE COURT:  All right.  Who's next?

10           MR. BRESSLER:  Your Honor, by agreement with the

11   committee and the unions, we'll examine next and Mr. Barkasy

12   would conduct it.

13           THE COURT:  Sure.  Come on up, please.

14           MR. BARKASY:  Thank you, Your Honor.

15           THE COURT:  Mr. Bressler, I didn't get your

16   colleague's name so that when he comes up to the microphone,

17   I'm going to ask him to repeat it.

18           MR. BARKASY:  Your Honor, Richard Barkasy from

19   Schnader Harrison Segal & Lewis representing the ad hoc

20   committee of consumer victims of General Motors.

21           THE COURT:  Okay.  Go ahead, Mr. Barkasy.

22   CROSS-EXAMINATION

23   BY MR. BARKASY:

24   Q.    Mr. Wilson, GM made significant efforts to restructure out

25   of court, is that correct?

1   A.   Yes.

2   Q.   And it was Treasury's preference that GM restructure out

3   of court, correct?

4   A.   If it could be done so under the proper terms and

5   establish a viable GM, yes.

6   Q.   In an effort to restructure out of court, GM extended a

7   bond exchange offer on or about April 27, 2009, correct?

8   A.   Yes.

9   Q.   The bond exchange offer was conditioned on, among other

10   things, the conversion to equity of at least fifty percent of

11   GM's U.S. Treasury debt as of June 1, 2009, correct?

12   A.   The way it was structured, sir, was that that was what

13   General Motors had indicated in the exchange offer but it also

14   indicated that the Treasury not commit to that at this point.

15   Q.   But that was what was included in the exchange officer

16   (sic) of the conversion of at least fifty percent of GM's U.S.

17   Treasury debt to equity?

18   A.   Yes, I believe so.

19   Q.   All right.  And it was contemplated by Treasury that there

20   would be an exchange of Treasury debt to equity in some amount,

21   in some form, under the bond exchange offer, correct?

22   A.   There had been discussions of it but at that point we had

23   not concluded that we were willing to do that --

24   Q.   All right.

25   A.   -- which is why it was structured the way it was.

92

1    Q.    If GM's efforts to restructure out of court had been

2    successful, it would not have avoided liability for any

3    products liability claims, correct?

4            MR. SCHWARTZ:  Objection.  Calls for a legal

5    conclusion.

6            THE COURT:  Sustained but if you want to get his

7    businessman's understanding, which trumps by any conclusions

8    that a lawyer might draw or that I might make, if you want to

9    amend your question that way, I'll permit it.

10   Q.    Mr. Wilson, it is your understanding that if GM's efforts

11   to restructure out of court had been successful, it would not

12   have avoided liability for any products liability claims,

13   correct?

14   A.    I believe that's correct, sir.

15   Q.    Leading up to the bankruptcy filing, Treasury had

16   discussion with a number of stakeholders, including unsecured

17   bondholders, is that correct?

18   A.    Yes.

19   Q.    And as we saw from Exhibit Bondholder 3 that you testified

20   about a few minutes ago, those discussions had an impact on the

21   structure of the sale transaction that was ultimately proposed,

22   correct?

23   A.    Yes.

24   Q.    Products liability claims were identified by GM to

25   Treasury as being potentially politically sensitive, is that

93

1   correct?

2   A.   If I could provide some context, sir.  We had a planning

3   meeting on May 1st with the June 1 bond maturity staring at us

4   and developed a host of work streams.  In the context of that I

5   asked the General Motors team to develop a list of viabilities

6   that we considered politically sensitive that we would consider

7   in the context of a 363 sale.  And I explicitly asked them to

8   use an expansive use of that term.

9   Q.   Products liability claims, given an expansive use of the

10  term, were identified by GM to the treasury as being

11  potentially politically sensitive, correct?

12  A.   Yes.

13  Q.   Treasury did not have any discussions before the

14  bankruptcy with any tort claimants or groups representing

15  products liability claimants, did it?

16  A.   To the best of my knowledge, sir, we were never approached

17  by any groups representing them.  We took, literally, dozens if

18  not over 100 meetings from various parties-in-interest.  And

19  our general approach we said publicly and talked amongst

20  ourselves was to take basically any meeting.  So I don't recall

21  and I'm not aware of any approaches that were received, nor of

22  any meetings that took place.

23  Q.   Did you follow the Chrysler bankruptcy?

24  A.   Yes, I did.

25  Q.   And did you -- were you aware that there were groups

94

1    representing tort claimants who objected to the sale

2    transaction in Chrysler?

3    A.    I was not aware of that.

4    Q.    Did you review any of the Supreme Court filings made by

5    groups representing tort claimants?

6    A.    I did not.

7    Q.    Are you aware of any groups representing tort claimants

8    contacted GM and requested to have discussions regarding a

9    restructuring before the bankruptcy was filed?

10   A.    I am not aware of any such contacts.

11   Q.    Did Treasury do anything to determine who tort claimants

12   might be?

13   A.    No, we did not.

14   Q.    Did Treasury review any pleadings, or other documents

15   reflecting the larger tort claims that were pending against GM

16   while the negotiation of the sale transaction were ongoing?

17   A.    Not that I'm aware of.

18   Q.    The principal negotiators for GM -- let me ask one more

19   question.  Did Treasury ask GM to identify for it any groups

20   that might represent tort claimants so that it could engage in

21   discussions with tort claimants?

22   A.    No.

23        (Pause)

24        MR. BARKASY:  May I approach, Your Honor, with a

25   binder of documents?

95

1          THE COURT:  Yes, you may.

2          MR. BARKASY:  Thank you.

3     Q.   Mr. Wilson, this is a binder of ad hoc committee of

4     consumer victims of General Motors exhibits.  Some of them have

5     already been utilized in the hearing.  If you could turn to

6     Exhibit number 1, marked Exhibit AHCCV-01 on the bottom right-

7     hand corner, under tab 1.  Did GM --

8          MR. BARKASY:  And this is a letter from my partner,

9     Barry Bressler, to Mr. Miller dated April 7, 2009.

10    Q.   Did GM make Treasury aware of Mr. Bressler's letter?

11    A.   Not that I'm aware of.

12    Q.   Did GM make Treasury aware of the existence of the

13    Committee of Consumer Victims of General Motors?

14    A.   Not that I'm aware of.

15    Q.   Please turn to Exhibit 2 in the binder, tab 2, marked

16    AHCCV-02 in the bottom right-hand corner.

17         MR. BARKASY:  This is an April 9, 2009 letter from

18    Mr. Miller to Mr. Bressler.

19    Q.   Did GM make Treasury aware of Mr. Miller's response to Mr.

20    Bressler's letter regarding the Committee of Consumer Victims

21    of General Motors?

22    A.   Not that I'm aware of.

23    Q.   Mr. Wilson, the principal negotiators for GM -- let me

24    start again.  Who were the principal negotiators for Old GM?

25    A.   In our conversation of Old as part of the transaction, the

96

1    principal negotiators was Mr. Henderson; Ray Young, the chief

2    financial officer; Walter Borst, the corporate treasurer; and

3    Mr. Bob Osborne, general counsel; as well as their advisors.

4    Q.    And who were the principal negotiators for New GM?

5    A.    As the purchaser it was representatives of the Treasury

6    Department and their advisors, including myself.

7    Q.    At the time of the negotiations you anticipated that Mr.

8    Henderson, Mr. Young, and Mr. Borst would in all likelihood be

9    joining New GM, correct?

10   A.    That is correct.

11   Q.    Mr. Henderson would be the CEO of New GM if the sale

12   transaction is approved, correct?

13   A.    That is correct.

14   Q.    Mr. Wilson, do you still have in front of you Exhibit

15   Bondholder 3, which is the last document Mr. Salzberg -- I

16   think you have your hand on it right there.

17   A.    Is this it?

18   Q.    Yes, the May 18 --

19        (Pause)

20   Q.    Please turn to page 12, this is what Mr. Salzberg was

21   questioning you about.  Did Treasury perform a recovery

22   analysis similar to the recovery analysis contained on page 12

23   of this GM document?

24        MR. SCHWARTZ:  Objection, asked and answered.

25        THE COURT:  If that was asked and answered, I don't

1    recall it.

2           MR. SCHWARTZ:  Mr. Wilson testified that Treasury had

3    never conceived of anything in terms of recoveries to

4    stakeholders and had to prepare its own -- hadn't thought of

5    things that way.  In addition, if we get into the sort of

6    materials that Treasury prepared for its own internal

7    deliberations we run up against a governmental privilege

8    regarding internal government deliberative processes.

9           THE COURT:  Well, that would be for the next question

10   that was asked by Mr. Schwartz.

11          MR. SCHWARTZ:  Correct.

12          THE COURT:  I'm going to overrule the objection.  I'm

13   trying pretty hard to pay attention, and my inability to

14   remember that question and answer is going to be the basis for

15   my ruling.

16   **A.   Could you repeat the question?**

17   **Q.   Sure.  Did Treasury perform a recovery analysis similar to**

18   **the recovery analysis contained on page 12 of Exhibit**

19   **Bondholder 3?**

20   **A.   Not similar to this.  As we testified earlier, in the**

21   **context of the VEBA, it was really a discussion around what**

22   **they needed to do in order to ratify the agreement and become a**

23   **workforce of New GM.  Is your question around the new VEBA or**

24   **is it around the bondholders/unsecured claims?**

25   **Q.   I'm just asking did Treasury perform a recovery analysis**

98

1   regarding U.S. Treasury, new VEBA, bondholders, existing

2   shareholders similar to the one that's contained on page 12 of

3   Exhibit Bondholder 3?

4   A.   Not similar to this, sir, but we did think about the

5   recoveries to the OldCo creditors as part of the transaction.

6   Q.   And the VEBA was a creditor of -- let me start that again.

7   The VEBA is a creditor of Old GM, correct?

8   A.   Well, I believe the existing VEBA would be a creditor of

9   Old GM under the terms of our sale motion, but the new VEBA

10   would be, obviously, a new entity.

11   Q.   The current UAW-VEBA is a creditor of Old GM, is that what

12   I take it?

13   A.   Yes.

14   Q.   It is not the United Autoworkers Union that is a creditor

15   of Old GM, correct?

16   A.   I'm not certain of the exact legal relationship between

17   the VEBA and the UAW.  I know as part of our discussions they

18   were intertwined throughout our discussions.

19   Q.   You understand the claim held by the UAW VEBA against Old

20   GM to be a contractual claim, is that correct?

21   A.   Yes, I believe so.

22   Q.   And you understand the claim held by the UAW-VEBA against

23   Old GM to be an unsecured claim, correct?

24   A.   I believe so, yes.

25   Q.   Under the proposed sale transaction, if approved, it is

99

1    the VEBA trust that is going to be issued the common stock in

2    New GM, not the UAW, correct?

3    A.   Yes.

4    Q.   The UAW-VEBA is administered by a board of trustees,

5    correct?

6    A.   I believe so.

7    Q.   It is your understanding that the trustees of the UAW-VEBA

8    will ultimately decide what will happen to the stock to be

9    issued to the UAW-VEBA pursuant to the sale transaction, not

10   the union, correct?

11          MR. SCHWARTZ:  Your Honor, please, I object to this

12   line of questioning on the grounds of relevance.

13          THE COURT:  I'm going to overrule on relevance, but

14   sustain on lack of foundation.  You have to establish whether

15   or not he has an understanding.

16   Q.   Do you have an understanding as to who will decide what

17   will happen to the stock to be issued to the UAW-VEBA pursuant

18   to the sale transaction, if approved?

19   A.   Not very much.

20   Q.   Mr. Wilson, do you have a copy of your deposition

21   transcript still in front of you?  If not, I'll give you

22   another copy.

23   A.   Yes, I do.

24   Q.   Please turn to page 108.

25   A.   Sir, I must have different pagination.

100

1    Q.    I will cure that to make sure --

2    A.    Thank you.

3         (Pause)

4    A.    Oh, I'm sorry, I was looking at my declaration, it was my

5    mistake.

6         (Pause)

7    Q.    Mr. Wilson, if you could turn to page 108 at line 18,

8    where you're asked this question and did you give this answer?

9    "Q.    Is it your understanding that the trustees of the UAW-VEBA

10   will ultimately decide what will happen to the stock issued to

11   the UAW-VEBA, not the United Autoworkers Union?

12   "A.    Yes, that is my understanding."

13        Were you asked that question and did you give that answer?

14   A.    Yes.

15   Q.    You understand that the UAW-VEBA's pre-petition unsecured

16   claim against GM is about approximately twenty billion dollars,

17   correct?

18   A.    I understood it to be slightly higher than that, but in

19   that zip code.

20   Q.    In excess of twenty billion dollars?

21   A.    Yes.

22   Q.    If the sale is approved the UAW-VEBA will no longer have a

23   twenty billion dollar claim against GM, correct?

24   A.    I believe they agreed to release their claim as part of

25   the sale.

101

1   Q.   And if the sale is approved the UAW-VEBA will receive 17.5

2   percent of the common equity in New GM plus other

3   consideration, correct?

4   A.   Yes.

5   Q.   You understand that the unsecured claims, including those

6   of bondholders against GM exceed thirty billion dollars,

7   correct?

8   A.   I'm not sure what the ultimate resolution will be, but I

9   recognize that the bonds are twenty-seven to twenty-eight

10   billions and there are other claims.

11   Q.   How much of the common equity do unsecured creditors

12   receive under the sale transaction?

13   A.   The creditors of OldCo as part of the sale transaction

14   will receive ten percent of NewCo plus warrants in two

15   tranches.   The first tranche is for seven and a half percent of

16   NewCo at a strike price of fifteen billion dollars, and with a

17   seven year maturity.   And a second tranche, another seven and a

18   half percent of NewCo ten-year maturity at a thirty billion

19   dollar strike price.

20   Q.   Is it your understanding that the retirees cover under the

21   UAW-VEBA will be the same retirees covered under the new VEBA

22   that will be established pursuant to the sale transaction, if

23   approved?

24   A.   Other than new retirees and unfortunate deaths, I believe

25   so, yes.

102

1   Q.   The purchase agreement has been modified such that New GM

2   will now be assuming responsibility for future products

3   liability claims, correct?

4          MR. SCHWARTZ:  Objection.  Could we get a definition

5   for what Mr. Barkasy means by future products liability?

6          THE COURT:  Yes, especially in light of all the areas

7   where I asked a slice and dice distinction.

8          MR. BARKASY:  Just trying to speed things up a bid.

9          THE COURT:  No, I understand that.  Different kinds

10  of combinations are not insignificant in this case.

11         MR. BARKASY:  I understand, Your Honor.

12  Q.   Mr. Wilson, the purchase agreement has been modified in

13  regards to the products liability claims to be assumed by New

14  GM, correct?

15  A.   Yes.

16  Q.   What is your understanding of the modification?

17  A.   My understanding is that as of the documents filed on June

18  1st, NewCo would not assume responsibility for the product

19  liability lawsuits as a result of cars sold prior to the

20  closing, but with accidents incurred post-closing.  And that

21  the modification we made was that NewCo would, in the revised

22  documentation, would assume responsibility for those lawsuits.

23  Q.   Did New GM agree to the modification because of concerns

24  that it had regarding consumer confidence?

25  A.   That was part of it.  As a general matter, sir, we

103

1    approached all the liabilities we agreed to assume what was

2    commercially necessary for the success of NewCo.  And as we

3    considered the various options prior to June 1st, we actually

4    had an active debate with our team about the product liability

5    associated with cars purchased before June 1st, but with

6    accidents and claims occurring post-closing.  And, obviously,

7    for each one conclusion in the days leading up to June 1st and

8    then upon further consideration, I've reached a different

9    conclusion.

10   Q.   Would consumer confidence be enhanced if New GM also

11   assumed responsibility for products liability claims arising

12   from accidents that occurred pre-bankruptcy filing?

13        MR. MILLER:  Objection, Your Honor.  Mr. Wilson is

14   not an expert on consumer --

15        THE COURT:  Sustained.

16   Q.   Did the Treasury conduct any market research to determine

17   whether consumer confidence would be enhanced if New GM also

18   assumed responsibility for products liability claims arising

19   out of accidents that occurred before the bankruptcy?

20   A.   No, we make a decision based on our business judgment.

21   Q.   Did Treasury seek out the advice of any experts to

22   determine whether consumer confidence would be enhanced if New

23   GM would also assume responsibility for products liability

24   claims arising pre-bankruptcy?

25   A.   We had sensitive discussions with the management team who

104

1    were the closest things to experts that we had in that regard.

2    Q.   And that's the management team that's going to be moved

3    over to New GM if the sale's approved, correct?

4    A.   Most of them, yes.

5    Q.   You would agree that New GM would remain viable if it

6    assumed responsibility for tort claims arising before the

7    bankruptcy was filed, wouldn't you?

8    A.   As we discussed the other day, we did not see it as our

9    obligation to take on claims to the point at which New GM was

10   no longer viable.  It wasn't a determination, or frankly, a

11   consideration in our thinking.  Our thinking is a commercial

12   buyer of the assets that will constitute NewCo was to assess

13   what viabilities were commercially necessary for the success of

14   NewCo.  And any other liabilities from our perspective were --

15   should not be part of the transaction.

16   Q.   You would not quarrel with Mr. Henderson's business

17   judgment as to whether New GM would be viable if it assume

18   responsibility for products liability claims arising before the

19   bankruptcy was filed, would you?

20   A.   Well, I'd quarrel with the approach, because the test

21   cannot be any one liability, if it were assumed would be the

22   difference between viability and lack of viability.  Of course,

23   on that basis, there are a number of things that could easily

24   fall within the bucket of not tipping the balance between

25   viability and not viable.  Our job is to create the most

105

```
1    attractive NewCo we possibly can.  And any one liability,

2    whether it's one of dollar -- 100 million dollars, even a

3    billion dollars, may of may not tip the balance, but that's not

4    the exercise we ever engaged in.

5    Q.   So you never sought to determine -- well, let me ask this

6    question.  If New GM assumed an additional 950 million dollars

7    in obligations, would it still be viable?

8              MR. MILLER:  Objection again, Your Honor.  Mr. Wilson

9    is not an expert as to viability.

10             THE COURT:  I'm going to sustain it.

11   Q.   As part of its consideration of the sale transaction did

12   the Treasury seek to determine how much debt New GM could carry

13   and still remain viable?

14   A.   We had some discussion around the proper capital structure

15   for New GM.

16   Q.   And you were part of that, correct?

17   A.   Yes.

18   Q.   And you, yourself, performed analyses of the appropriate

19   capital structure and how much debt New GM could carry and

20   remain viable, correct?

21   A.   I supervised and discussed analyses, but did not perform

22   them myself.

23   Q.   Did during the course of -- in supervising and discussing

24   analyses did the Treasury consider whether New GM would have

25   remained viable if it assumed responsibility of tort claims
```

106

1    arising before the bankruptcy was filed?

2            MR. SCHWARTZ:  Objection, Your Honor.  This really

3    does now begin to invade the government's deliberative process

4    privilege.  He's asking how the Treasury came about reaching

5    its decision.

6            THE COURT:  Unless you show me some more to the

7    contrary, we'll deal with it the same way we deal with

8    attorney-client privilege area.  I would rule that he can't be

9    required to discuss the substance of those communications, but

10   he can answer whether the subject matter was discussed.

11   A.    Can you repeat the question?

12   Q.    I'll try.  In the course of your supervision of and

13   discussion of analyses of the capital structure of New GM, did

14   you seek to determine whether New GM would be viable if it

15   assumed responsibility for products liability claims arising

16   before the bankruptcy was filed?

17   A.    No, we never tried to apply that standard.

18        (Pause)

19   Q.    Is it fair to say that from Treasury's perspective, as the

20   purchaser of assets of Old GM Treasury was not concerned with

21   the relative priority of liabilities under the Bankruptcy Code?

22   A.    I think that's fair to say, we're focused on which assets

23   and which liabilities we needed for the success of New GM.

24   Q.    And you did not believe under a 363 sale the relative

25   priority of liabilities was relevant, correct?

107

1   A.   That was my understanding, yes.

2   Q.   What is the standard that Treasury applied in determining

3   which liabilities to assume and which liabilities that it would

4   not assume?

5        MR. MILLER:  Your Honor, please, Mr. Wilson has

6   answered that question in four different versions.

7        MR. BARKASY:  I have one more question, it's a

8   predicate for the next question.  I don't want to face a

9   foundation argument.

10       THE COURT:  I'm going to sustain the objection with

11  the corollary that is I won't give you too much heat on the

12  predicate -- or on the foundation assuming the next question's

13  otherwise fair.

14  Q.   Treasury is not a run of the mill commercial asset

15  purchaser, is it?

16  A.   I'm not sure that run of the mill commercial asset

17  purchaser would like that comparison.  But I think, no, it's

18  probably not the right way to describe us.

19  Q.   And it's not an average commercial lender, is it?

20  A.   I don't think so.

21  Q.   And there were considerations in Treasury's decision to

22  invest in GM beyond those that would normally apply to a

23  commercial asset purchaser or commercial lender, is that

24  correct?

25  A.   Sir, I think that the way we approach this entire

108

1    transaction, particularly once our team was developed, which

2    was not, as you know, at the very beginning of Treasury's

3    involvement at General Motors.  Because our team was developed

4    to approach the entire transaction on a commercial basis.

5    Q.   Mr. Wilson, I don't have any further questions, thank you.

6            MR. BARKASY:  Your Honor, absent objection, I would

7    move Exhibits 1 and 2, the letters from Mr. Bressler to Mr.

8    Miller and Mr. Miller's response, into evidence.

9            THE COURT:  Any objection.

10           MR. MILLER:  No objection.

11           THE COURT:  They're admitted.

12   (AHCCV's  Exhibit 1, letter from Mr. Bressler to Mr. Miller,

13   was hereby received into evidence as of this date.)

14   (AHCCV's Exhibit 2, response of Mr. Miller to Mr. Bressler was

15   hereby received into evidence as of this date.)

16           THE COURT:  All right.  Let's try to keep moving

17   forward.  We've been going almost two hours.

18           How long do you think you're going to be, Mr.

19   Jakubowski?

20           MR. JAKUBOWSKI:  Very short, no more than ten

21   minutes, I would think.

22           THE COURT:  All right.  Then let's continue and then

23   we'll take a short break.

24           MR. JAKUBOWSKI:  Thank you, Your Honor.

25   CROSS-EXAMINATION

109

1    BY MR. JAKUBOWSKI:

2    Q.    Good morning, Mr. Wilson.

3    A.    Good morning.

4    Q.    I'd like to mark as PLCA Exhibit 2 a document that is an

5    e-mail and attachment from Mr. Worth to you, Mr. Wilson, that

6    attaches a -- that was the subject matter warrant strike price

7    calculation.

8            MR. JAKUBOWSKI:  May I approach the witness, Your

9    Honor?

10           THE COURT:  You may.

11           THE WITNESS:  Thank you.

12   Q.    Do you recall seeing this document before at your

13   deposition, Mr. Wilson?

14   A.    Yes.

15   Q.    And Mr. Worth is with Evercore, correct?

16   A.    Yes.

17   Q.    And he's the same gentleman who testified yesterday,

18   correct?

19   A.    Yes.

20   Q.    And page 2 of this is a spreadsheet that identifies the

21   shares that are expected to be issued under the proposed

22   transaction, correct?

23   A.    Yes.

24   Q.    Along with the warrants, correct?

25   A.    Yes.

110

1   Q.   And would you say this is a fair representation to the

2   best of your knowledge of the shares and warrants that are

3   going to be issued under the proposed transaction as it exists

4   today?

5   A.   Yes, I believe so.

6   Q.   And the bottom line is that the U.S. Government on a fully

7   diluted basis will always remain in control of the purchaser,

8   correct?

9   A.   Well, on this basis, yes.  But there is the opportunity

10  for share sales by the company or share sales by us.

11  Q.   Understood.  But certainly with respect to the closing

12  date, on a fully diluted basis, Treasury is in control of the

13  purchaser?

14  A.   Yes.

15  Q.   And as a result of that, it would have the opportunity, I

16  take it, to select members to the board of directors?

17  A.   That's correct.

18  Q.   Okay.  And to ultimately determine who management is,

19  correct?

20  A.   The board will not have the exact mechanics -- but

21  certainly the board will ultimately be able to determine that

22  and we would expect them to have that authority.

23  Q.   Okay.  Thank you.  Now, I take it that it is Treasury's

24  believe that the value of GM as it exists today whether on a

25  liquidation or going concerns basis is less than the value of

111

1    Treasury's debt?

2    A.   Yes.

3    Q.   And as a result of that it believes that in a 363 sale it

4    really is entitled to everything of GM, correct?

5    A.   Yes.

6    Q.   Except for the senior secured debt?

7    A.   That's correct.

8    Q.   And so I take it that from Treasury's perspective,

9    everything that it gives away in cash with a proposed

10   transaction is virtually in the nature of a gift?

11   A.   I wouldn't use exactly those terms because, from our

12   perspective, there was a transaction that we needed to get done

13   and we did what we thought was commercially necessary to

14   facilitate that transaction, including, as you know, our

15   negotiations with the UAW.

16   Q.   So it's fair to say then that you basically gave away the

17   least amount that you needed to give away in order to get a

18   deal done, correct?

19   A.   That was our intention, yes.

20   Q.   And to that extent the relative priorities of the various

21   creditor classes in Old GM were irrelevant to the purchaser,

22   correct?

23   A.   That's correct.  We focused on which assets we wanted to

24   buy and which liabilities were necessary for the commercial

25   success of New GM.

112

1   Q.   So I would like to direct your attention to yesterday's

2   binder, which has Mr. Henderson's transcript in there.

3       Let me try to help you.

4   A.   Thank you.

5       (Pause)

6       MR. JAKUBOWSKI:   Your Honor, I believe it's in a

7   binder that says "Exhibits 9 through 12, Deposition

8   Transcripts".

9       THE COURT:   Yes.

10      MR. JAKUBOWSKI:   And in there is Exhibit 10.

11      THE COURT:   Right.

12      MR. JAKUBOWSKI:   And from there if you go to Tab 6,

13  which is the contingency planning of the 363 analysis.

14      THE COURT:   Okay.

15  Q.   And what I'd like to do, Mr. Wilson, is please direct your

16  attention to PowerPoint pages 10 and 11.

17      (Pause)

18  Q.   Now, this exhibit contains -- these pages contain an

19  identification of the liabilities on the balance sheet of

20  General Motors at 12/31/08, do you see that?

21  A.   Yes, I do.

22  Q.   And you see that there is also in the far-right column a

23  description of what's going to happen to those liabilities in a

24  363 scenario, correct?

25  A.   I think these were scenarios that General Motors had run

113

1     to illustrate that at the early stages of planning, yes.

2     Q.   But it's at least a good reference to the kind of

3     categories that Treasury and GM were considering while they

4     were negotiating over the kinds of the relative priorities of

5     treatment of various creditor classes, correct?

6     A.   I think this is a -- I'm not sure I heard your entire

7     question.  I think this is a full catalogue of all the

8     liabilities in the company's balance sheet.

9     Q.   And the question that was posed to Treasury and GM was

10    which liabilities is Treasury going to assume and which

11    liabilities is Treasury not going to assume?

12    A.   If we were to pursue a 363 sale, yes.

13    Q.   Which is where we are, correct?

14    A.   Yes.

15    Q.   So if you look down the column that says 363 scenario you

16    see that there is a sub column for OldCo right?

17    A.   Yes.

18    Q.   And sub column for NewCo?

19    A.   Yes.

20    Q.   And the OldCo column represents, effectively, the

21    liabilities that will be left behind in the sale, correct?

22    A.   I believe so.

23    Q.   And the NewCo column would represent the liabilities that

24    will be assumed, correct?

25    A.   Yes.

114

1    Q.   Now, if you look at, for example, line 2 for accounts

2    payable, don't those reflect the unsecured trade payables of

3    GM?

4    A.   As of the December 31 balance sheet, I believe that is

5    correct, yes.

6    Q.   And it's the intention of the purchaser to assume all of

7    those liabilities at closing, correct?

8    A.   I do not believe that's correct, sir.  I believe that's

9    what this document suggests, but I don't believe that's

10   actually what we intend to do.

11   Q.   Aren't most of the pre-petition unsecured liabilities of

12   trade vendors going to be assumed as part of the sale?

13   A.   Most practically, you said all in you question.

14   Q.   I apologize.  And you're absolutely right.  Most of them

15   are, though?

16   A.   Yes.  And the reason, of course, is because those

17   suppliers are critical to the operations of General Motors.

18   Q.   Okay.  And with respect to the pension obligations, OPEB,

19   same thing, you have a lot of unsecured debt that is going to

20   be assumed by NewCo, correct?  Under the current deal?

21   A.   A lot of it.  But I believe we made a number of changes to

22   a number of these categories over the course of May.

23   Q.   But there still is a significant amount of pension debt

24   that is going to be assumed by NewCo, correct?

25   A.   Yes.

115

1    Q.   And that is all unsecured?

2    A.   Yes.

3    Q.   Okay, that's fine.  Thank you.

4         (Pause)

5    Q.   You talked earlier about the fact that Treasury had come

6    to a decision that it would assume certain claims related to

7    accidents that occur after the closing date, correct, for

8    product liability claims?

9    A.   Yes.

10   Q.   And have you at any time, until sitting hear today, ever

11   advised anyone at the debtor that there would be any change in

12   the purchase price as a result of that decision?

13   A.   At this point we have not.

14             MR. JAKUBOWSKI:  No further questions, Your Honor.

15             THE COURT:  Okay.  Let's take ten minutes and

16   continue with anyone else who wants to do a cross.  Before I

17   finish speaking, I would appreciate it if you not get up.  Mr.

18   Wilson, while we're in recess, keep to yourself.  And we'll

19   continue --

20             MR. MILLER:  Your Honor, can we ask how many more

21   interrogators there are?

22             THE COURT:  All right, I think that might be helpful

23   for all of us.

24             MR. JAKUBOWSKI:  Your Honor, I move to admit PLCA 2

25   into evidence.

VERITEXT REPORTING COMPANY

1          THE COURT:  Is there any objection.

2          MR. MILLER:  Okay, that's admitted.

3   (PLCA's Exhibit 2, e-mail from Mr. Worth to Mr. Wilson, was

4   hereby received into evidence as of this date.)

5          THE COURT:  How many other people are going to want

6   to question Mr. Wilson on cross?  All right.  Five.  We'll

7   continue in ten minutes.

8          MR. MILLER:  Thank you, Your Honor.

9      (Recess from 11:09 a.m. until 11:23 a.m.)

10          MS. DAVIS:  Good afternoon, Your Honor.  Tracy Hope

11   Davis for the United States trustee.  I'm here to introduce

12   Alan Shapel who is the ombudsmen who has delivered a report to

13   us with respect to the sale.  We wanted to introduce him with a

14   consent of the debtor and the committee.  We just wanted to

15   give you a moment to say hello.

16          THE COURT:  Certainly.  You said Shapel.

17          MR. SHAPEL:  Yes, sir.

18          THE COURT:  Good morning, Mr. Shapel.

19          MR. SHAPEL:  My firm is called Shapel & Associates,

20   and I was appointed by the U.S. trustee's office as the privacy

21   ombudsmen.  And my role here is to, among other things, is

22   assist the Court that the transfer of personally identifiable

23   information is contemplated by debtor, is done so in accordance

24   with applicable law.  And to that end I've compiled a report

25   which to my understanding either has been filed or will shortly

117

1    be filed, so that Your Honor is free to review the entire

2    report.

3           I'm happy to go into as much detail as Your Honor

4    would like, but I thought I would begin with a very high level

5    overview of my recommendations and that should take

6    approximately five to seven minutes, if that's okay with you,

7    Your Honor.

8           THE COURT:  People okay with interrupting here with

9    that overview?

10          MR. MILLER:  Yes, Your Honor.

11          THE COURT:  Okay; go ahead.

12          MR. SHAPEL:  I do have additional copy right now if

13   Your Honor would like to --

14          THE COURT:  Okay.

15          MR. SHAPEL:  May I approach?

16          THE COURT:  Yes.

17          MR. SHAPEL:  So, essentially, my role is to evaluate

18   what, if any, representations were made by debtor to consumers

19   at the point that the consumers were making their consent

20   decisions.  So in other words, did debtor adequately inform

21   consumers regarding how the debtor would use their information.

22   And as the transfer of consumer information is contemplated

23   here in accordance with debtors' representations.

24          So I've reviewed under other documents GM's privacy

25   policy, the privacy policy of the Chevrolet Saturn dealership

118

1    in Harlem, and the privacy policies of several thousand of GM's

2    independent dealership.

3         I also had multiple conference calls and e-mail

4    exchanges with debtor and debtors' counsel to help me

5    understand debtors' privacy practices.

6         So most of the information at issue here was

7    collected under GM's privacy policy.  This includes the

8    information contained within GM's master customer relationship

9    management database.  So GM's privacy policy did not

10   specifically address the transfer of information per a

11   bankruptcy proceeding, therefore, I'm recommending to the Court

12   that the Court require GM to notify those consumers who had

13   provided their information under GM's privacy statement that

14   such information will be transferred into New GM and that New

15   GM provides those consumers with the opportunity to opt-out of

16   such transfer.

17        THE COURT:  You mean to tell Old GM that it doesn't

18   want New GM to know about?

19        MR. SHAPEL:  To provide them with the opportunity so

20   that Old GM is not allowed to transfer their information into

21   New GM.  Now, in my experience as a privacy professional, Your

22   Honor, the percentage of consumers that will exercise that type

23   of opt-out choice is very low.  And, specifically, here we're

24   talking about the GM CRM database, which is essentially used

25   for marketing purposes.  So to be clear, we're not talking

119

1    about information that's used for warranty purposes or for

2    recall purposes or for a host of reasons which would be a

3    public policy.

4         THE COURT:  To continue to get that information.  So

5    if there's something they need to know about their cars, they

6    would get it.

7         MR. SHAPEL:  Correct.  So regarding the information

8    collected by the Harlem Dealership my recommendation is the

9    same.  Provide those consumers with some notification and offer

10   them opt-out choice.

11        There were also several thousand dealerships that

12   have been already offered deferred termination pursuant to an

13   agreement between those dealerships and GM.  While typically in

14   bankruptcy proceedings, privacy ombudsmen will only look at the

15   privacy representations made specifically by debtor, and here

16   these representations were made by debtors' independent

17   dealerships.

18        However, here the agreement between GM and what I'm

19   calling the deferred termination dealerships stipulates the

20   transfer of consumer information that was collected by those

21   dealerships to New GM.  And potentially, the transfer of

22   information to other of GM's independent -- or New GM's

23   independent dealerships.

24        So in light of this I thought it was appropriate to

25   review the representations made by the deferred termination

120

1    dealerships and include that analysis in my report.

2         So to that end, I obtained a confidential list of the

3    deferred termination dealerships from GM.  Most of those

4    deferred termination dealerships posted privacy policies that

5    were substantially similar to GM's privacy policy and the

6    privacy policy of the Harlem dealerships.  So my recommendation

7    there is the same.  That for those consumers that they be

8    offered notice and opt-out choice.

9         However, there were about fifty of the deferred

10   termination dealerships that had privacy policies that in my

11   opinion prohibited the transfer of information as contemplated

12   today.  For those dealerships my recommendation to the Court is

13   slightly different.  Require GM and New GM to provide notice to

14   those consumers.  However, require GM to obtain what is known

15   as their affirmative consent of those consumers, opt-in

16   consents or their permission, before one of two things

17   happening.  Before the transfer of those consumers' information

18   from GM to New GM, again for marketing purposes.  Or number 2,

19   before the transfer of information from a deferred termination

20   dealership to the new dealership.

21        Did I state that clearly enough, Your Honor?  I know

22   there's a lot there.

23        THE COURT:  I understand what you're saying.

24        MR. SHAPEL:  All right.  Good.  Okay.  So that, in

25   summary, is what my recommendation is to the Court.  I'm happy

121

1    to go into some of the specific laws that we addressed both at

2    a federal and state level.  But, again, that's covered in

3    pretty good detail in the report.

4            THE COURT:  Subject to people who want to be heard,

5    I'm confident that you -- Mr. Miller, do you or any of your

6    folks or any parties-in-interest, want to come on what he said?

7            MR. MILLER:  No, Your Honor.  We really didn't have

8    an opportunity to review the report, but I don't have any

9    comments at the present time.

10           THE COURT:  Okay.  All right.  Thank you very much,

11   Mr. Shapel.

12           MR. SHAPEL:  Thank you, Your Honor.

13           THE COURT:  I think that you always have to have the

14   opportunity to be here and then we'll figure out what, if

15   anything to do, or if anybody has any type of different

16   perspective to your report.

17           MR. SHAPEL:  Okay.  Thank you, Your Honor.  May I be

18   excused?

19           THE COURT:  Yes, you may.

20           MR. SHAPEL:  Thank you.

21           THE COURT:  Okay.  Back to cross-examination.  Is it

22   Mr. Esserman?

23           MR. ESSERMAN:  Thank you, Your Honor.  I just have a

24   few minutes of cross-examination.

25   CROSS-EXAMINATION

122

BY MR. ESSERMAN:

Q.   Mr. Wilson, my name is Sandy Esserman, and I represent the

ad hoc committee of asbestos claimants.  And have a few

questions for you.  First, I'd like to discuss the wind down

expenses in this estate.  I believe you address that in your

declaration, is that correct?

A.   I believe so.

Q.   And the wind down expenses for the estate is estimated by

you -- at least the government has agreed to so far, is 950

million dollars, is that correct?

A.   As of the date of my declaration, yes.

Q.   Okay.  Has that changed?

A.   Well, there's been -- I think you may be aware from

yesterday's testimony, there is an ongoing dialogue between

ourselves and the AlixPartners team as the fiduciaries and

representatives for OldCo as to what the appropriate amount

would be.

Q.   And is that -- has that amount been determined, or is

that -- are those negotiations continued?

A.   They're continuing.

Q.   Do you know when they'll be concluded?

A.   We believe they'll be concluded very soon.  Frankly,

they've been a little bit delayed because my participation is

integral to that conclusion, and I was obviously been

committing time here.  My expectoration is that as soon as I'm

123

1    done here, I would be able to reengage in those discussions.

2    And our expectation would be that we would likely conclude them

3    as soon as Friday morning.

4    Q.   Would you anticipate then that those discussions would be

5    concluded prior to the time that the sale, to the extent this

6    Court determines to approve it, would be approved?

7    A.   I can only speculate on the latter, because that's

8    obviously Judge Gerber's decision.  But on the former we would

9    work as expeditiously as possible and would commit to not

10   creating any delays as a result of that.

11   Q.   Okay, thank you.  Let's talk a little bit about claims of

12   people who have received asbestos disease as a result of

13   exposure to General Motors' products, I'd like to discuss that

14   subject with you.

15       Are you aware that there's been a report that General

16   Motors, in fact, put in their 10K and I believe 10Q from HR&A

17   that provides for a 650 million dollar approximate estimate of

18   future claims over the next ten years?

19   A.   I'm familiar with that estimate, I'm not familiar with the

20   underlying work to a significant extent, but I'm familiar with

21   the number.

22   Q.   Okay.  Are you generally familiar with the asbestos claim

23   against GM, what they're based on?

24   A.   Not in any great level of detail, no.

25   Q.   But generally, as a result of exposure to asbestos in

124

1   brakes, are you generally familiar with that?

2   A.   Yes, I'm familiar with that part of the issue.

3   Q.   And one of the things you're asking this Court to do is to

4   sell this Old GM to New GM free and clear of any asbestos

5   claims, is that your intention?

6   A.   Yes.

7   Q.   And you're aware that there are claims that are going to

8   occur at various points in the future, that is the people that

9   have been exposed to GM asbestos?

10          MR. MILLER:  Objection.  I just want to be clear when

11   Mr. Esserman uses the word claim, he's not using that

12   necessarily in the Bankruptcy Code context, but --

13          MR. ESSERMAN:  That's correct.

14          MR. MILLER:  -- current to the annual?

15          MR. ESSERMAN:  Yes.

16          THE COURT:  All right.  It's clarified by Mr.

17   Esserman.  Do you remember the question?

18   A.   Can you please repeat it?

19   Q.   Let me start over and break it down a little bit, Your

20   Honor, in a couple of different sections.  You're aware that

21   there's currently lawsuits on file against General Motors based

22   on claims of exposure to asbestos from GM products, is that

23   correct?

24   A.   Yes.

25   Q.   And you're aware, in fact, based on the HR&A report that

125

1    there will be such claims post-sale in the future that will

2    arise?

3    A.   Again, I'm not --

4          MR. MILLER:  Please.  The 650 million dollars, first

5    of all, Your Honor, are not claims.  The include the cost of

6    defense.  And there is no concession that these are valid

7    claims, in any sense of the rule.

8          MR. ESSERMAN:  I'm not seeking a determination of the

9    validity.

10          THE COURT:  I understand that.  And on the one hand

11    I'm going to sustain the objection.  But on the other hand, it

12    would be helpful if everybody understands that I'm generally

13    aware of the issues.  Mr. Esserman, either be more precise in

14    your questions.  Don't try to monetize them, we have to

15    monetize them.  (Inaudible)

16          MR. ESSERMAN:  That's fine.  Let me attack it simpler

17    and briefly, Your Honor.

18    BY MR. ESSERMAN:

19    Q.   To the extent there are any claims that arise post-sale,

20    would it be the intention of you, as the purchaser, or the

21    government as the purchaser that anyone that has a claim or

22    demand based on asbestos exposure be asserted against OldCo

23    rather than NewCo?

24    A.   Well, if I could answer your question this way, NewCo is

25    not acquiring any of the liabilities associated with any of the

126

1    asbestos claims.

2    Q.   And that's a decision that has been made by the Auto Task

3    Force?

4    A.   As we've reviewed all the liabilities that we can pick and

5    choose from in the context of the General Motors' balance

6    sheet, we applied that same commercially necessary

7    determination to each of them.  And may of these cases, and

8    some cases obviously quite tragic, we did not feel that any of

9    them had a commercial bearing on the future success of New GM.

10   Q.   Okay.  So just so I'm clear and I'm almost done with my

11   questions here, to the extent that there's a claim that arises

12   in the future based on asbestos exposure to a GM product, it

13   is -- you're requesting that this Court not pass that claim to

14   NewCo, but that it remain with OldCo, is that correct?

15   A.   That's correct.

16           MR. ESSERMAN:  Thank you, Your Honor.

17           THE COURT:  Mr. Eckstein.

18   (Pause)

19   CROSS-EXAMINATION

20   BY MR. ECKSTEIN:

21   Q.   Mr. Wilson, good morning.  My name is Kenneth Eckstein,

22   I'm representing the official creditors' committee in this

23   case.

24       Let me just start by returning to the question that you

25   were asked a moment ago with respect to the wind-down budget.

127

1    You were in Court yesterday and you heard Mr. Koch's testimony

2    with respect to the status of that budget, am I correct?

3    A.    Yes, I did.

4    Q.    And is it my understanding that you're working principally

5    with Mr. Koch and his team in order to, I guess, refine the

6    estimate of the wind down expenses?

7    A.    The status so far has been that members of my team and

8    members of Mr. Koch's team have been working together on

9    exactly that.  And I have not, because I hadn't gotten to the

10   point where it was ready for me, frankly, had not yet gotten

11   involved in any level of detail.

12   Q.    And is it fair for me to assume that the goal of this

13   exercise is to try to refine the estimate of the wind down

14   expenses so that ultimately the wind down expenses can be

15   satisfied in full with the amount of revised DIP loan that's

16   provided to this estate?

17   A.    That's correct.  As we indicated in our discussions with

18   representatives of the bondholders on a pre-petition basis, we

19   indicated we would fund reasonable expenses associated with the

20   wind-down of OldCo.

21   Q.    Thank you, sir.  Mr. Wilson, do I understand correctly,

22   that you were one of the principal negotiators of the summary

23   term sheet that provided the basis for the master purchase and

24   the sale agreement?

25   A.    Which summary term sheet, sir?

128

1    Q.   Were you one of the principal negotiators on behalf of the

2    treasury of the transaction that is being presented to the

3    Court for approval today?

4    A.   Yes.

5    Q.   And as part of those -- as part of this transaction did

6    you have the occasion to negotiate with representatives of the

7    ad hoc bondholders committee prior to the commencement of the

8    case?

9    A.   Yes.

10   Q.   And who were the individuals that you principally

11   negotiated with on behalf of the ad hoc bondholders?

12   A.   The lead members were Mr. Eric Siegert from Houlihan Lokey

13   and Mr. Andrew Rosenberg from Paul Weiss.

14   Q.   And approximately when did those negotiations take place?

15   A.   Well, they had approached the Treasury Department earlier

16   in the case.  We indicated to them that we needed to work

17   through the operating restructuring plan with the company in

18   order to determine what obligations the company could bear on a

19   restructured or in the ultimate revolution of the case on a

20   NewCo basis and then engaged with them in earnest in late May.

21   Q.   And am I correct that as a result of those negotiations an

22   understanding was reached that provided for ten percent of the

23   NewCo equity to be left in the OldCo estate for the benefit of

24   unsecured creditors?

25   A.   That was a portion of consideration, yes.

129

1    Q.    And in addition to the ten percent of the equity, there

2    were also warrants, is that correct?

3    A.    Yes.

4    Q.    And was there also a provision, Mr. Wilson, that provided

5    for the possibility of additional direct equity to be provided

6    to the OldCo estate?

7    A.    Yes.   In the event that claims exceeded thirty-five

8    billion dollars, which we considered unlikely at the time, that

9    there would be a sliding scale from thirty-five to forty-two

10   billion dollars, where up to two percent of additional equity

11   would be awarded to -- two percent of the equity of NewCo would

12   go to the creditors of OldCo.

13   Q.    So that was, essentially, an equity cushion in the even

14   claims exceeded what was expected to be the likely amount of

15   allowed general unsecured claims, is that correct?

16   A.    Yes.

17   Q.    And at the time that you conducted these negotiations, did

18   you have an understanding as to the amount of general unsecured

19   claims other than the bondholder claims that you thought would

20   be allowed against OldCo in this case?

21   A.    No, we did not.   We were focused at that point as NewCo as

22   the purchaser of certain assets and the assumption of certain

23   liabilities.   And had not really worked through what the

24   unsecured claims against OldCo could be.

25   Q.    Am I correct that you understood that the bondholder

130

1   claims were approximately twenty-seven to twenty-eight billion

2   dollars, is that correct?

3   A.   Yes.

4   Q.   And the level at which the two percent equity cushion

5   kicked in you said was thirty-five billion dollars, is that

6   correct?

7   A.   That's when it started to kick in, yes.

8   Q.   So if I understood your testimony that you didn't think

9   the thirty-five billion dollars was going to be exceeded, is it

10  fair to assume that you didn't think the other unsecured claims

11  against OldCo was going to exceed eight billion dollars?

12  A.   I think seven to eight, between the bonds being twenty-

13  seven to twenty-eight.

14  Q.   Did you have any general sense of what you think the

15  number was likely to be?

16  A.   We thought it would be less than that.

17  Q.   Do you have any recollection as to whether that number was

18  intended to be approximately three to four billion dollars?

19  A.   I don't recall that specific point in time, I know we had

20  some discussions around it.  But it was certainly expected to

21  be less than the seven billion, but I can't recall exactly what

22  we thought at that point in time.

23  Q.   And did you have any sense as to what categories of claims

24  made up the claims other than the bondholder claims that were

25  going to be allowed claims against OldCo?

1    A.    Sure.  Much of the claims have been the subject of today's

2    discussions.  It was the claims from the so-called splinter

3    unions, the asbestos claimants, the product liability claims

4    we've discussed, and any other unsecured claim that may come

5    forth.

6    Q.    And at that point in time you had also taken into account

7    workers' compensation claims?

8    A.    I believe so, that was part of the company's balance

9    sheet.

10    Q.    Mr. Wilson, in connection with this transaction, my

11    understanding is that the U.S. Treasury is intending to receive

12    approximately 72.5 percent of the NewCo equity, is that

13    correct?

14    A.    No, it's not correct.

15    Q.    What is the percentage of equity that the U.S. Treasury

16    expects to receive?

17    A.    It will be approximately 60.8 percent.

18    Q.    60.8 percent, thank you.  And the U.S. Treasury is

19    receiving this equity in connection with a credit bid, in

20    connection with its outstanding indebtedness, is that correct?

21    A.    As well as additional funding, yes.

22    Q.    And am I correct that the credit bid is in respect of,

23    both pre-petition debt and debtor-in-possession financing?

24    A.    Yes.

25    Q.    And there's also going to be some additional financing

132

1   over and above the pre-petition plus the debtor-in-possession

2   financing?

3   A.   Well, I think it depends on the point in time.   The

4   debtor-in-possession financing as contemplated under the DIP

5   order, plus the pre-petition financing I believe is the

6   subtotal of our credit bid.

7   Q.   And am I correct that the pre-petition financing that is

8   the subject of the credit bid is approximately 21.4 billion

9   dollars?

10  A.   I believe the pre-petition financing is 19.4 billion

11  dollars.

12  Q.   19.4 billion dollars.  And what do you expect would be the

13  amount of the --

14      MR. ECKSTEIN:  Well, let me withdraw that.

15  Q.   What is the amount of the debtor-in-possession financing

16  that's outstanding as of today?

17  A.   As of today, the -- well, I'm sorry.  AS of the last I

18  knew, which is roughly yesterday or today, was approximately

19  ten to eleven billion dollars.

20  Q.   And have you made any estimates as to the amount of

21  debtor-in-possession financing that you expect to be

22  outstanding at the time of the closing?

23  A.   Yes.  It is our understanding and expectation that the

24  entire DIP budget will be used.

25  Q.   And that will be how much, sir?

133

1    A.   33.3 billion dollars.

2    Q.   Thank you.  And has U.S. Treasury made any allocation of

3    the NewCo equity that it expects to receive as between the pre-

4    petition debt and the debtor-in-possession financing?

5    A.   No.

6    Q.   Does it expect to do so prior to the closing, sir?

7    A.   We don't see any reason why we would.

8    Q.   Thank you very much, sir, I have no further questions.

9           MR. HOFFMAN:  Good morning, Your Honor.  John Hoffman

10   on behalf of the IUE and the other objecting unions.

11   CROSS-EXAMINATION

12   BY MR. HOFFMAN:

13   Q.   Good morning, Mr. Wilson.

14   A.   Good morning.

15   Q.   I think I'll be very brief.  Do you recall when I took

16   your deposition this Monday?

17   A.   Yes, sir.

18   Q.   And do you recall this morning when you told Mr. Salzberg

19   that you did not recall whether or not you had seen Exhibit

20   2 -- Bondholder Exhibit 2 prior to that deposition?

21   A.   Yes.

22   Q.   Do you have Bondholder Exhibit 2 up there, at this point,

23   Mr. Wilson?

24   A.   Is this it?

25   Q.   Yes, sir.

134

1   A.    Yes, I have it.

2   Q.    And do you have your deposition transcript up there, at

3   this point?

4   A.    Yes.

5   Q.    And do you recall at that deposition when I asked you

6   these two questions?

7            MR. MILLER:  Can you give a page, please?

8            MR. HOFFMAN:  Yes, at page 22, line 20, through 23,

9   line 6.

10  Q.    And what we had in front of you I believe at that point

11  was Exhibit 3 to your deposition, which is now Bondholder

12  Exhibit 2.  Do you recall when I asked you these questions and

13  you gave these answers?

14  "Q.  And did you attend the meeting at which Cadwalader had

15  presented this?  I think it's actually a deck of slides?

16  "A.  Actually, I don't recall meeting.  I don't know if I did

17  or not.

18  "Q.  So you don't know whether you attended the meeting at

19  which this was presented, but you saw it in some respect during

20  your work at the task force?

21  "A.  That's correct."

22            And did you give those answers to me on Monday?

23  A.    That's correct and that's a helpful reminder.

24  Q.    Pardon?

25  A.    I said that's correct and it's a helpful reminder.

135

1    Q.    Pleased to be of service, Mr. Wilson.  And I'm going to

2    ask you to turn to page 12 of Bondholder Exhibit 2.  And let me

3    just set a predicate here.  Before you joined the task force in

4    March of this year, you did have some experience with Section

5    363 of the Bankruptcy Code, is that correct?

6    A.    Yes.

7    Q.    And it was your understanding that one of the

8    considerations that made a Section 363(b) sale attractive was

9    the ability of the purchase to cherry pick the liabilities it

10    assumed?

11    A.    Yes.

12    Q.    And that was one of the considerations that you used and

13    the Task Force used in deciding on the form of this sale, is

14    that correct?

15    A.    Yes.

16    Q.    And in deciding what liabilities New GM was going to

17    assume your task was solely that the assets assumed should be

18    commercially necessary for the viability or help for the New

19    GM, is that correct?

20    A.    That was the focus of our assessments, yes.

21    Q.    That was the test you used?

22    A.    The primary test, yes.

23    Q.    And you didn't give any consideration to Section 1114 of

24    the Bankruptcy Act or the priorities of those liabilities under

25    the Bankruptcy Code, is that correct?

136

1   A.   Well, to the extent that Section 1114 was relevant, we

2   consider that a consideration for the creditors of OldCo.

3   Q.   And you didn't consider it in terms of what assets you

4   were going to purchase in NewCo?

5   A.   Well, we did not believe that any of the assets we were

6   purchasing required any of the liabilities associated that

7   would fall under the question you're asking.

8   Q.   In deciding what liabilities NewCo was going to assume you

9   did not consider any of the effects of Section 1114 of the

10  Bankruptcy Code, is that correct?

11  A.   I think that's fair to say.

12  Q.   I'm sorry; what was that?

13  A.   I think that's fair to say.

14  Q.   Okay.  Could you turn, in the large book of exhibits, to

15  your deposition and following that Exhibit 12, and these are in

16  evidence at this point.  Exhibit 12 to your deposition.  If you

17  need help, I can come up and, I think, help you.

18  A.   Is this it?

19  Q.   No.

20       MR. HOFFMAN:  May I approach the witness, Your Honor?

21       THE COURT:  Yes.

22       (Pause)

23  Q.   And I really want to refer you to the third to the last

24  page of this exhibit, Mr. Wilson.  It has the heading salaried

25  and splinter union benefit obligations guideline objectives.

137

1          MR. HOFFMAN:  May I approach?

2          THE COURT:  Yes.

3      (Pause)

4          MR. HOFFMAN:  Exhibit 12, the third to the last page.

5  **Q.   And did there come a time when the task force set, for GM**

6  **management, a target of two-thirds reduction in certain retiree**

7  **benefits?**

8  **A.   Yes.**

9  **Q.   And did GM come back and --**

10         THE COURT:  Are people in the back of the room able

11  to hear me and Mr. Hoffman?  All right.  ECRO -- do we have

12  electronic record?  So we don't know if it's going to any of

13  the other room and we need to make sure.  I think we have no

14  choice but to take a recess and see if we can resolve this.

15  Let's go to a recess.  We'll try to be beck within five minutes

16  after it gets fixed but I don't know how long it will take to

17  have it fixed.

18      (Recess from 11:55 a.m. until 11:59 a.m.)

19         THE COURT:  I'll give folks a chance to be seated and

20  then we can continue.

21      (Pause)

22         MR. HOFFMAN:  May I proceed, Your Honor?

23         THE COURT:  Yes, sir.

24         MR. HOFFMAN:  Thank you.

25  **Q.   Focusing, again, on the third to the last page of Exhibit**

138

1    12, Mr. Wilson, does this reflect the proposal that GM

2    management made to the task force concerning its request for a

3    two-thirds reduction in the 7.9 billion dollars in retiree

4    benefits?

5    A.   Yes, this was the first response from the General Motors

6    management team.

7    Q.   Right.  And in it they had reflected a reduction in the

8    retiree basic life insurance and the 10,000 dollars flat, is

9    that correct?

10   A.   Yes.

11   Q.   And they had not further cut salaried retiree healthcare

12   recognizing that it had been cut at the beginning of the year,

13   is that correct?

14   A.   Yes.

15   Q.   They cut executive non-qualified pensions by thirty-two

16   percent, is that correct?

17   A.   Yes.

18   Q.   And that's what we call a SERP, right?

19   A.   Yes, I believe that line item is the SERP.

20   Q.   And what they did was for retired executives earning less

21   than one hundred thousand dollars on their retirement SERP

22   benefit, they got a ten percent reduction -- excuse me, a

23   combined retiree pension and SERP benefit of less than one

24   hundred thousand dollars, they got a ten percent reduction.

25   A.   Yes.  But just to clarify one thing I said earlier, I

139

1   think, as it says here, there's -- this is part SERP and part

2   just ERP.  So I think there are elements of this program that

3   are not just the SERP.

4   Q.   Okay.  So let's take it as a benefit as a whole.

5   A.   Yes.

6   Q.   They got a ten percent reduction if they had under a

7   hundred thousand dollars total retirement payments, right?

8   A.   Yes.

9   Q.   Per year.  And if they had a two-thirds reduction of any

10  amount over a hundred thousand dollars, is that correct?

11  A.   Yes.

12  Q.   And the executives lost their life insurance but they

13  still had the retiree basic life insurance, is that correct?

14  A.   I believe so.  Yes.

15  Q.   And the splinter unions, as they're called, they were

16  proposing we're going to lose eighty-four percent of the value

17  of their health insurance, correct?

18  A.   That was the end result of a policy to provide the same

19  level of benefits for the splinter union retirees as for the

20  salaried retirees.  The math of that became eighty-four percent

21  Q.   And -- excuse me, I didn't mean to interrupt but to you

22  and the task force, symmetry between the retiree healthcare

23  benefits and the splinter union healthcare benefits was an

24  important factor, wasn't it?

25  A.   Well, we struggled with this issue for some time, Mr.

140

1    Hoffman.  And the -- one of the things we wrestled with was no

2    assumption of retiree benefits.  And we felt that that was, at

3    least initially, a reasonable position as a buyer of the assets

4    for New GM.  And the response we received from the management

5    team was that that would have a significant deleterious effect

6    on the moral of management, most of whom are coming over to

7    NewCo as we've discussed, and we should modify that.  And in

8    the course of -- as a result of many, many discussions around

9    this topic concluded that we settled on the two-thirds

10   reduction overall and felt that we really left it to the

11   management team to decide how to do that.  And this was, of

12   course their, as I discussed earlier, their first proposal on

13   that.

14   Q.   Thank you.  And the task force's response to this proposal

15   was what?

16   A.   We said two-thirds and we meant two-thirds.

17   Q.   Yeah.  So come back again and tell us how you're going to

18   do the two-thirds, in words or substance, correct?

19   A.   I missed the second half of what you said, sir.

20   Q.   So GM management, come back again and tell us how you're

21   going to achieve two-thirds, in words or substance that's what

22   you told them, right?

23   A.   Yes.

24   Q.   Yeah.  Could you turn to Exhibit 13, the second page,

25   please?

141

1          (Pause)

2     Q.    And do you believe the second page reflects where GM

3     management came back and told you how they were going to reach

4     the two-thirds?

5     A.    Yes, absent the black lining, but yes.

6     Q.    And what they did was move the cost share on retiree

7     health to forty-five percent cost share, and that resulted in

8     salaried healthcare losing twenty-five percent of their benefit

9     and the unions losing eighty-seven percent of their benefit, is

10    that correct?

11    A.    Yes, sir.

12          MR. HOFFMAN:  Other than that, Your Honor, we'll rely

13    on the deposition of Mr. Wilson.

14          THE COURT:  Okay.

15          MR. HOFFMAN:  Thank you, Mr. Wilson.

16          THE WITNESS:  You're welcome.  Thank you.

17          THE COURT:  Anyone else?  Ms. Cordry?

18          MS. CORDRY:  Thank you, Your Honor.  Karen Cordry on

19    behalf of the Attorneys General.  I'd like to ask the witness

20    some questions about the proposed sale order that's part of the

21    sales motion.  It's obviously something the Court can take

22    judicial notice of.  I can put it in as an exhibit separately

23    if you'd prefer.

24          THE COURT:  It might be easier, Ms. Cordry, if you'd

25    consider it an exhibit as well.

142

```
 1          MS. CORDRY:  Attorneys General Exhibit 1, I guess.
 2   (Attorney General's 1, proposed sale order, was hereby marked
 3   for identification as of this date.)
 4          MS. CORDRY:  And I have a copy for the witness if I
 5   may approach.
 6          THE COURT:  Yes.  Thank you.  Do you have an extra
 7   for me?
 8          THE WITNESS:  Thank you.
 9   CROSS-EXAMINATION
10   BY MS. CORDRY:
11   Q.   Okay.  First, have you seen what's been labeled Attorney
12   General's Exhibit 1 that I've handed to you?
13   A.   I have skimmed this before, yes.
14   Q.   Okay.  Have you -- you said you skimmed, does that mean
15   you have read it all the way through?
16   A.   I skimmed it all the way through.
17   Q.   Okay.  Who on Treasury's side is responsible, in depth,
18   for the actual terms of that order, the specific language going
19   into that order?
20   A.   Well, the general business principles I would be primarily
21   responsible for.  But the actual language would be my
22   colleague, Matthew Feldman.
23   Q.   Okay.
24   A.   Who's an attorney.
25   Q.   But as the business principals you would be familiar with
```

143

1    the terms that are in here and what -- to the extent the order

2    encompasses the decision by Treasury to assume liabilities, to

3    refuse to assume liabilities, those kind of trade offs you're

4    familiar with that, is that correct?

5    A.    Certainly the high level.

6    Q.    Okay.  To your knowledge, is this order still the only one

7    that's been filed with the court?

8    A.    To the best of my knowledge, yes.

9    Q.    There are ongoing discussions, are there not, with respect

10   to the terms of this order, various negotiations with various

11   objecting parties to you knowledge?

12   A.    There had been, I don't know that they're continuing.

13   Q.    Do you know -- have you been party to any of those

14   discussions?

15   A.    Not on a day-to-day basis, no.

16   Q.    Okay.  To your knowledge, have all those discussions been

17   resolved and placed into an order?

18   A.    To the best of my knowledge we have heard all the issues

19   that are outstanding.  We've formulated a view on what we're

20   willing to do and I think we've resolved that view.

21        What's been communicated to the various parties or what's

22   been set forth in the documents, I'm not familiar with.

23   Q.    Okay.  And who is communicating those views to -- is your

24   position being communicated to the debtors, to the other

25   parties, how is that communication being made?

144

1    A.   I'm not certain.  I believe that there's been direct

2    dialogue between at least our outside counsel at Cadwalader

3    with the various parties.  But since I'm not part of those

4    conversations I'm not exactly sure who's in those

5    conversations.

6    Q.   Okay.  Could you look at paragraph 27 in that order; it's

7    on page 23.

8        (Pause)

9    Q.   The second sentence there -- it says, "The purchaser shall

10   not be deemed as a result of any action taken in connection

11   with the MPA or any of the transactions or documents ancillary

12   thereto or contemplated thereby or in connection with the

13   acquisition to purchase assets to (i)be it legal successor or

14   otherwise be deemed a successor to the debtors other than with

15   respect to any obligations arising under the purchase

16   agreements from and after the closing; (ii)have de facto or

17   otherwise merged with or into the debtors; or (iii)be a mere

18   continuation or substantial continuation of the debtors or the

19   enterprise of the debtors."  That's a correct reading of what's

20   there?

21   A.   Yes.

22   Q.   Okay.  With that statement there, do you know if a legal

23   analysis was made as to whether under the facts of these

24   transactions the debtor is in fact the new debtor, the New GM,

25   the purchaser and this new enterprise would be considered to be

145

1    a successor of Old GM?

2         MR. SCHWARTZ:  To be clear, the question is whether

3    an analysis was performed?

4         MS. CORDRY:  Yes, that's the question.

5         THE COURT:  That's exactly the way to do it without

6    blowing a privilege.

7         MS. CORDRY:  Right.

8         THE COURT:  And with the clarification, especially, I

9    think it's clear that the question can and should be answered.

10        MR. SCHWARTZ:  Could we make clear that it's a yes or

11   no question?

12        MS. CORDRY:  Well that question, I think, probably is

13   a yes or no question, yes.

14        THE COURT:  I think it is a yes or no question.

15   A.   Could you please repeat it?

16   Q.   Okay.  Do you know whether any legal analysis was made as

17   to whether under the actual facts of this transaction would the

18   purchaser, the new GM enterprise, be a successor to Old GM?

19   A.   I believe so.

20   Q.   And who would have made that analysis?

21   A.   I believe it would have been Mr. Feldman in conjunction

22   with outside counsel.

23   Q.   And do you know whether they analyzed that under federal

24   law or state law?

25   A.   I don't know.

146

1    Q.    And did they come to a conclusion on that?

2          THE COURT:  Answer yes or no.

3    A.    Yes.

4    Q.    Okay.  And I'll ask this --

5          MS. CORDRY:  You can object if you want.

6    Q.    -- was the conclusion that under all circumstances and for

7    all types of claims that they were not a legal successor?

8          MR. SCHWARTZ:  Objection.

9          THE COURT:  Sustained.  That question can't be

10   answered without getting into substance.

11         MS. CORDRY:  Okay.

12   Q.    The order also states that --

13         MR. SCHWARTZ:  With respect, I'm going to object to

14   the relevance of the entire line of questioning.  I understand

15   that the attorneys general have a legal objection that is set

16   forth in their objections about some of the terms of the sale

17   order.  I also understand that there is a work through of many

18   of the issues that objectors have raised and that the document

19   is in flux.  I'm not sure that it makes sense to question this

20   witness about that document.  It's a legal issue.

21         THE COURT:  Mr. Schwartz, I'll be the judge of that.

22         MR. SCHWARTZ:  Of course.

23         THE COURT:  Ultimately, the decision is a legal one

24   for the Court.  Within the bounds of reason, I'm going to let

25   the parties develop factual records.  I have no doubt that I'm

147

1    going to hear in summation argument on the legal issues, and

2    frankly I'll tell you, Ms. Cordry, what kind of homework people

3    do before that is relevant to my legal decision but I'm going

4    to cut you a little slack in this regard, as long as you don't

5    abuse it.

6              MS. CORDRY:   Right.   Because I think the question I'm

7    asking, although I'd be happy to know what their answer was,

8    the question I'm asking is in this order it appears to say, and

9    I think your various testimony appears to be that the purchaser

10   will not proceed unless it's really a successorship liability

11   in a broad sense.   And I'm trying to parse through that a

12   little bit and try to find out what the intentions actually

13   are, depending on the legal analysis of the Court and whether

14   that analysis will have any affect on what the government is

15   prepared to do.

16             THE COURT:   Well, we can limit some but I'll let you

17   question.

18             MS. CORDRY:   Thank you.

19   **Q.   So my question is, going to that point that the order is**

20   **asking for a determination that under all circumstances this**

21   **purchaser is not a successor of the old debtor, if the Court**

22   **finds to the contrary, so I'm not asking you to make a legal**

23   **determination -- if the Court finds to the contrary as to one**

24   **or more aspects of the claims that in fact this purchaser would**

25   **be a legal successor, is the purchaser -- is Treasury prepared**

148

1    to walk away at that point.

2    A.   It is, of course, hard to answer a hypothetical without

3    knowing the terms of that -- of the outcome of that.  But

4    certainly our strong view is that we are not going to be seen

5    as successor and cannot take on successor liability.

6    Q.   Okay.  And that's what I'd like you to distinguish now,

7    the difference between being seen as a successor and then the

8    second aspect as successor liability which is, this order is

9    also asking the Court to determine that the sale can be made

10   free and clear of successor liability.  Is that your

11   understanding?

12   A.   Yes.

13   Q.   So that even if you were a successor it is asking that the

14   sale be made, that the Court find that legally the sale can be

15   made without regard to any liabilities that you might have, is

16   that your understanding?

17   A.   Yes.

18   Q.   Okay.  With that distinction between those two aspects of

19   successor liability, if the Court found the latter, that it

20   could be sold free and clear of successor liability, but either

21   found that you were a successor perhaps more properly said I

22   don't need to find if you are a successor or not because I'm

23   allowing you to sell free and clear that liability, is Treasury

24   prepared to walk away if they don't get that legal finding that

25   you are not a successor?

149

```
 1    A.    I'm not sure my legal knowledge, is extent to one

 2    constitutional law class would give me enough basis to kind of

 3    assess exactly what your question is.  But I can tell you that

 4    the sale motion was put together very deliberately and it was

 5    certainly based on the predicate that we will not have any

 6    successor liability and that the sale motion would find that we

 7    were not a successor.

 8    Q.    I understand.  But I am asking you and I think the Court

 9    needs an answer before we go to this and I don't know whether

10    you're prepared to give the answer at this point or not.  But

11    if the Court found that you were not going to be held liable

12    for successor claims but found that you were still a successor,

13    because those are two very different issues and have two very

14    different consequences, I'm asking you as a business judgment

15    whether the Treasury has even considered the distinction

16    between those two aspects of successor liability?

17              MR. SCHWARTZ:  Objection.  Mr. Wilson has already

18    answered that if the sale order is not entered by July 10th it

19    is Treasury's intention not to fund.  What Ms. Cordry is really

20    trying to do is negotiate the language of the sale order with

21    Mr. Wilson on the stand.

22              THE COURT:  I don't think so, Mr. Schwartz.  Ms.

23    Cordry, I'm not going to let you question as to their

24    deliberations but if Treasury or the task force now has formed

25    a view on what it will do if I rule adversely on any element of
```

150

1    successor liability, you've got to tell me.

2         THE WITNESS:  We do not have any intention to move

3    forward if the sale order, with regards to successor liability,

4    is not entered as described in here.

5    Q.   Okay.  Now, on the other hand you are continually drafting

6    the order so in fact you are prepared to make some changes in

7    this order and I believe that some of those go to successor

8    liability.

9    A.   Well, I think that's where we started the conversation.

10   And what I indicated was we're taking all kinds of perspectives

11   and views and input, all which we had received prior to June 1

12   because it was clear what was happening in General Motors and

13   there are no surprises.  But even despite that, we still were,

14   we believe, extraordinarily accommodating in taking all sorts

15   of input from all sorts of people post June 1.  And at this

16   point in time we've taken all the input we intend to take and

17   have formulated our final views on that.

18   Q.   Okay.  But that really was not my question.  My question

19   was, in fact, the draft orders that are going around have

20   changes in provisions that relate to successor liability, do

21   they not?

22   A.   Yes.

23   Q.   Okay.  So this order is not the one you're going to

24   necessarily ask the Court to enter, correct?

25   A.   That is correct.

1    Q.    Thank you.  And again, just to be absolutely clear, your

2    position now is that you want the Court to say that even if the

3    Court finds that legally you would be a successor but that the

4    Court would relieve you of free and clear -- would allow you to

5    sell free and clear of that liability, that your position would

6    be you would walk away from that unless the Court allows you to

7    sell -- I'm sorry.  You would walk away unless the Court finds

8    that you are not a successor regardless of what the law might

9    say?

10   A.    That's our position.

11   Q.    Okay.  So the order would have to find you're not a

12   successor regardless of what the Court finds the law to be in

13   order for the sale to go forward.

14   A.    Ma'am, I think honestly you're stretching well beyond the

15   boundaries of my legal knowledge.  I explained to you the

16   business principles underlying our position.

17   Q.    That is the business principles I'm asking you for --

18        THE COURT:  Time out, Ms. Cordry.  If you don't like

19   his answer you can move to strike but you can't interrupt him

20   in the middle.

21        MS. CORDRY:  I'm sorry.  I'm sorry, Your Honor.

22   Q.    And I'm sorry, Witness.  Please complete your answer.

23   A.    No problem.  And as I testified at the very beginning, I'm

24   more than happy to answer any questions on the business

25   principles outlined herein and that's been the basis of my

152

1    answers throughout my testimony.  But to the extent you're

2    asking for legal distinctions that are beyond my knowledge, I

3    can't answer it thoughtfully or accurately.

4    Q.   I think I was looking at the business judgment that that

5    was where they would take the order but let me move on to one

6    other set of questions.

7         In terms of, you said, this order was very carefully

8    drafted, I believe you said, correct?

9    A.   I don't recall if I said that or not but I certainly hope

10   it was.

11   Q.   Okay.  One of the things that has come up here, certainly

12   in our discussion and I think with other peoples and so forth,

13   is the question of just how broadly this free and clear sale

14   might extend and so forth and what might be covered by this.

15   Someone made copies of this but apparently, I'm sorry, they

16   only made copies of -- it was a double-sided page and it was

17   only made with single-sided pages.

18        MS. CORDRY:  Could I possibly borrow back your

19   originally order and we'll substitute corrected one.

20        THE COURT:  You're talking about the proposed order?

21        MS. CORDRY:  Yes.

22        THE COURT:  Yes, you can borrow it.

23        MS. CORDRY:  I'm sorry.

24   (Pause)

25   Q.   If you look at paragraph T there, which talks about

153

1    selling free and clears of liens and claims and encumbrances

2    and so forth, can you just briefly read down that paragraph and

3    then I'll ask you a question about it.

4         THE COURT:  Ms. Cordry, pause please.

5         MS. CORDRY:  Yes.

6         THE COURT:  I'll see if I have another copy.

7    (Pause)

8         THE COURT:  Mr. Miller, can one of your folks provide

9    me with one?  You may approach.

10        MR. MILLER:  Just give us a moment, Your Honor.

11        THE COURT:  Sure.

12   (Pause)

13        THE COURT:  You want to make a reference to T, if I

14   recall?

15        MS. CORDRY:  T, right.  It would be page 8.

16   (Pause)

17   Q.   Have you had a chance to finish reading that?

18   A.   Yes.

19   Q.   Okay.  If you go through that paragraph, if you'll notice

20   at the top it refers to claims with a small (c).  If you look

21   halfway down it refers to claims, with a small (c) (as defined

22   in the Bankruptcy Code).  And I believe towards the ends it

23   talks about large (C) claims in the next to last line.

24   A.   I see the -- I see the large (C) claims in the second to

25   last line, I don't see your other two references.

154

1   Q.   Okay.  It would be seven lines from the bottom is the

2   claims (as that term is defined in the Bankruptcy Code), do you

3   see that?

4   A.   Yes.

5   Q.   And I believe up at the beginning of it, when it starts

6   talking about what's being sold free and clear of liens,

7   claims, encumbrances and so forth, do you see that?

8   A.   Yes.

9   Q.   Okay.  Without the parenthetical?

10  A.   Yes.

11  Q.   Is it your understanding that those three terms are meant

12  to be something different in the same paragraph?

13          MR. SCHWARTZ:  Objection.  Mr. Wilson testified he

14  had only skimmed the document and he wasn't a draftsman of the

15  document.

16          THE COURT:  All right.  I'm going to sustain that but

17  you are entitled to question, Ms. Cordry, as to whether he, as

18  a businessman or as a government official, has a businessman's

19  understanding as to whether he was intending to make any

20  distinctions between the two.

21  Q.   As the judge stated, as a businessman is it your

22  understanding that this document was intending, in that

23  paragraph, to make a distinction between those three sets of

24  uses of the term claim?

25  A.   I haven't spent any time on the details of the document.

155

1    I know there was some discussion yesterday around the

2    distinction between lower case C and upper case C, but I didn't

3    spend any time on that issue.

4    Q.   And are you aware of what the defined definition of -- the

5    upper case C defined definition of a claim is, according to the

6    master purchase and sale agreement?

7    A.   Not off the top of my head, no.

8    Q.   Are you aware that it goes beyond a bankruptcy claim that

9    includes things like defenses and investigations and right to

10   recoupment?

11   A.   I'm not aware of that.

12   Q.   Okay.  But if I state to you that that's what it says,

13   would you doubt that your purchase and sale agreement goes

14   beyond a simple bankruptcy claim?

15          MR. SCHWARTZ:  Objection.  Calls for a legal

16   conclusion.

17          THE COURT:  Sustained.

18   Q.   I'm simply asking, do you disagree with me that the master

19   purchase and sale agreement says that if I make a

20   representation to you that it says that, do you disagree with

21   that?

22          MR. SCHWARTZ:  Objection.  The document speaks for

23   itself.

24          THE COURT:  Well, Mr. Schwartz, documents often

25   speaks for themselves but when a document is drafted in this

156

1     fashion that's debatable.

2              MR. SCHWARTZ:  At least the document should be in

3     front of the witness.

4              THE COURT:  No.  Forgive me, Mr. Schwartz.  I'm not

5     going to get into a debate with you.  That objection is

6     overruled.  I'm going to reiterate, Ms. Cordry --

7              MS. CORDRY:  Yes.

8              THE COURT:  -- that you're free to ask him his

9     understanding, as a non-lawyer, what he's trying to accomplish.

10             MS. CORDRY:  Yes, Your Honor.

11             THE COURT:  I am not going to have him construe this

12    document.

13             MS. CORDRY:  No, Your Honor.

14             THE COURT:  It may be tough enough for me to construe

15    the document.

16             MS. CORDRY:  Yes, sir.

17             THE COURT:  And even if he had read it more

18    extensively, which the record indicates he hasn't done, the

19    question would, in my view, be inappropriate.

20             MS. CORDRY:  Okay.

21             THE COURT:  So while I don't go as far as Mr.

22    Schwartz' objections or to sustain them, the ground rules for

23    this examination are that you're allowed to find out his

24    businessman's understanding and to the extent he has intentions

25    what they are.

157

1          MS. CORDRY:  Yes, sir.

2          THE COURT:  Go ahead.

3          MS. CORDRY:  Okay.

4     Q.   For purposes of this question, I'll simply make the

5     representation that as a factual matter the defined term claim

6     says it includes small C claims and those other matters that I

7     mentioned, things like defenses, right to recoupment,

8     investigations.  So for the moment I'm simply saying that's

9     what the words say, are you prepared to accept that as my

10    representation that that's in fact what your document says?

11    A.   I don't have any reason to doubt your integrity, no.

12    Q.   Okay.  Thank you.  Are you aware if there's been any

13    analysis of whether any rights under the Bankruptcy Code to

14    sell free and clear of bankruptcy claims extends beyond that to

15    the extent of the matters covered by your defined term claim?

16    A.   I haven't spent any time on that issue.

17    Q.   I'm not asking you that.  I'm asking you has there been

18    any legal analysis done as to whether there's a distinction in

19    terms of the ability to sell free and clear between the

20    bankruptcy term claim and your defined term claim?

21    A.   Not that I'm aware of.

22    Q.   Okay.  Has there been any determination, then, as to

23    whether if the Court limited the sale free and clear of claims

24    to the bankruptcy definition claim, rather than your defined

25    term claim, whether the Treasury would pull out of this

158

1    agreement?

2    A.    Since we haven't discussed it I can't -- of course we

3    don't have a position on it because we haven't discussed it.

4    Q.    If -- all right.  So if the Court found that it was

5    illegal to go beyond a bankruptcy claim and could not extend

6    the free and clear to your defined term claim, you at this

7    point have no position as to whether or not the Treasury would

8    need to terminate the sale or not, is that what I hear you

9    saying?

10    A.    Yes.

11    Q.    Okay.  Conversely, the purchaser has not yet taken the

12    position -- has not determined that it will only complete the

13    sale if the Court finds that it can -- if the Court includes a

14    provision in the order that says regardless of what the law is

15    you can have your defined term claim as what can be sold free

16    and clear?

17    A.    For the same reasons, that we haven't discussed this

18    issue, yes.

19    Q.    Okay.  Thank you.

20         MS. CORDRY:  That's all, Your Honor

21         THE COURT:  Okay.  Mr. Bernstein?

22    CROSS-EXAMINATION

23    BY MR. BERNSTEIN:

24    Q.    Good afternoon, Mr. Wilson.  My name is Norman Bernstein.

25    Just a few quick questions.  During the run up to the

159

1    bankruptcy, after December and before May 30th, were there any

2    conversations that you're aware of regarding GM's bidding for

3    this then ongoing environmental obligations?

4    A.    Could you repeat the question?

5    Q.    Sure.  During the period, December through May 30,

6    December 19, 2008 through May 30th of 2009, were there any

7    conversations, that you are aware of, regarding GM's continuing

8    to pay for its ongoing environmental obligations?

9    A.    I guess the reason I asked you to repeat the question is I

10    wanted to make sure I understood it.  Are you talking about GM

11    in the context of that period of time?

12    Q.    Yes.

13    A.    And its obligation during that period of time?

14    Q.    Yes.

15    A.    We assume that they're doing what they should be doing

16    under law.

17    Q.    What would be the basis for that assumption?

18    A.    Perhaps it was ill founded but certainly our expectation

19    was that in all aspects of the business they were complying

20    with the law.

21    Q.    Apart from expectations, if those expectations turned out

22    to be incorrect, was there any conversation that you know of

23    relating to that subject?

24    A.    Not that I'm aware of.

25    Q.    If this Court were to conclude that a, what I'll call de

160

1    minimis exception to the successor liability in the amount of

2    62,700 dollars was appropriate because of conduct by general

3    motors in or about May of 2009, would that prevent, the 62,700

4    change, prevent the Treasury from going forward?

5    A.    I'd have to, obviously, review the facts and circumstances

6    of this year to ultimately opine.  But it's hard to see, even

7    though as I've said many times that we've only what is

8    absolutely commercially necessary and it's hard to draw a fine

9    line on viability.  It is hard to say that the 62,000 dollars

10   would swing the difference.

11            MR. BERNSTEIN:  Thank you very much, Your Honor.

12            THE COURT:  Before you leave, Mr. Bernstein.

13            MR. BERNSTEIN:  Yes.

14            THE COURT:  When we eventually get to summations, I

15   want both sides to address a question that I'm likely to ask at

16   the beginning of argument which is that when you have a consent

17   decree that requires the payment of money, is that regarded as

18   an obligation of law on the one hand or an ordinary contractual

19   obligation on the other?

20            MR. BERNSTEIN:  I believe --

21            THE COURT:  I don't want you to answer it now.

22            MR. BERNSTEIN:  Yes.

23            THE COURT:  I want both parties to address that when

24   it's time.

25            MR. BERNSTEIN:  Thank you, Your Honor.

161

1          THE COURT:  Okay.

2          MR. BERNSTEIN:  And also, Your Honor, I have attached

3    to my affirmation about four documents, Judge Nolan's order,

4    the consent decree, the trust agreement and the assessment.

5    Could those be deemed marked in evidence?

6          THE COURT:  Well, certainly marked.  I assume that

7    you mean is admitted into evidence.  Any objection?

8          MR. MILLER:  No, Your Honor.

9          THE COURT:  No objection; they're all admitted.

10   (Judge Nolan's order was hereby received into evidence as of

11   this date.)

12   (Consent decree was hereby received into evidence as of this

13   date.)

14   (Trust agreement was hereby received into evidence as of this

15   date.)

16   (Assessment was hereby received into evidence as of this date.)

17         MR. BERNSTEIN:  Thank you, Your Honor.

18         THE COURT:  Okay.  Ms. Cordry?

19         MS. CORDRY:  Could Attorney General's Exhibit 1 also

20   be admitted into evidence?  I'm sorry.  I forgot to ask

21   earlier.

22         THE COURT:  Any objection?

23         MR. MILLER:  No objection.

24         THE COURT:  All right.  It's admitted for what I

25   understood it to be, which was to be a proposed order that was

162

1    tendered at the time.  Okay.

2    (Attorney General Exhibit 1, proposed sale order, was hereby

3    received into evidence as of this date.)

4            THE COURT:  All right.  Who else?  Anyone?  Mr.

5    Parker?

6    CROSS-EXAMINATION

7    BY MR. PARKER:

8    Q.   Good morning, Mr. Wilson.  I'm Oliver Parker.

9    A.   Good afternoon.

10   Q.   Give me one second.

11        (Pause)

12   Q.   I know you weren't with the government in December of 2008

13   when the LSA was executed, the loan and security agreement

14   between general motors and the U.S. Treasury.  But as part of

15   your job with the Treasury since March of 2008 have you had

16   cause to review the LSA?

17   A.   Yes.

18   Q.   Okay.  The loan that the U.S. Treasury gave to General

19   Motors, was that loan for the purpose of purchasing new

20   property?

21   A.   No.

22   Q.   Okay.  The property that was liened under the terms of

23   that loan or mortgaged under the terms of that loan, was that

24   property that was already owned by General Motors?

25            MR. MILLER:  Your Honor, objection.  This testimony -

163

1    - the answers to these questions are already in the record.  We

2    can stipulate to them and save a lot of time.

3            THE COURT:  All right.  You may offer a stipulation,

4    Mr. Miller.

5            MR. MILLER:  I would stipulate, Your Honor, that the

6    funds were not used for the purpose of buying property to

7    attach liens.  What was the next one?

8            MR. PARKER:  The liens --

9            THE COURT:  Come next to him on the microphone so

10   that whatever you said will be gotten down.

11           MR. PARKER:  The properties that were liened were

12   properties that were already owned by General Motors.

13           MR. MILLER:  Correct.

14           MR. PARKER:  And that the liens were not given to

15   secure partial progress advance or other payments pursuant to

16   any contract or --

17           MR. MILLER:  So stipulate.

18           THE COURT:  Okay.  Fair enough.  We can move onward.

19           MR. PARKER:  One final question on this, maybe he

20   wishes to stipulate that as well, that stockholder equity

21   was -- the stockholder equity -- sorry -- the loans were

22   greater than twenty percent of the existing stockholder equity.

23           MR. MILLER:  No.

24           MR. PARKER:  No.  Okay.

25   BY MR. PARKER:

164

1    Q.   In your course of work with the Treasury, have you come to

2    review the financial statements of general motors in December

3    of 2008?

4    A.   In some level of detail, yes.

5    Q.   Okay.  Is it your understanding that General Motors'

6    liabilities were in the neighborhood of 190 billion dollars?

7    A.   That sounds about right.

8    Q.   And their assets were in the neighborhood of eighty to

9    ninety billion dollars?

10        THE COURT:  You mean book value of assets or measured

11   by some different standard?

12        MR. PARKER:  Book value, sir.

13   A.   Yes, on a book value basis I think both the liability

14   number you quote and the asset number is about correct.

15   Q.   Okay.  Are you aware of any other valuation number for

16   those assets?

17   A.   At that point in time I'm not aware of any valuation work

18   that General Motors had undertaken, no.

19   Q.   Okay.  Is there any reason for thinking that those assets

20   had a greater value than book value?

21   A.   Well, sir, as I'm sure you're aware, the book value of the

22   assets is never a predictor of market value of the assets.  So

23   if anything the market value would almost certainly be

24   different then the book value.

25   Q.   Okay.  Is it safe to say that at least under book value

165

1    the stockholder equity was negative in December of 2008?

2    A.    Yes.

3    Q.    Okay.  Also, were the share prices of General Motors stock

4    roughly between four dollars and five dollars a share in

5    December of 2008?

6    A.    I believe so.

7    Q.    And since there are 600 to 650 million shares, the total

8    market value of the shares would have been somewhere between

9    two and a half and three and a half billion dollars, is that

10   correct?

11   A.    That's roughly correct.

12   Q.    And the initial loan on December 31st was four billion,

13   the initial advance?

14   A.    Yes.

15   Q.    And that would be greater than twenty percent of two and a

16   half to three and a half billion?

17   A.    I believe your math is correct, yes.

18   Q.    Okay.  Thank you.  I believe that you stated that the

19   United States Treasury and General Motors negotiated with

20   regard to the master sale and purchase agreement, is that true?

21   A.    Yes.

22   Q.    And that they've been in negotiations since, what, March,

23   somewhere in that area?

24   A.    Well, not on the specifics of the MSPA, no.

25   Q.    But of how General Motors ought to reorganize itself?

166

1    A.   Well, yes there's been an ongoing dialogue between

2    Treasury and General Motors around a range of restructuring or

3    sale options.

4    Q.   Okay.  Is it true the General Motors management --

5         MR. PARKER:  Strike that one second.  I'm going to

6    come back to that.

7    Q.   There was one other thing I needed to ask you; was the

8    United States Treasury aware, when they issued the or when they

9    entered into the security agreement with the LSA with General

10   Motors that there was a limitation on the liens provision in

11   the bonds?

12   A.   Sir, I can't speak to the Treasury's knowledge at that

13   point in time.

14   Q.   Okay.  Did General Motors management forcefully negotiate

15   with regard to executive retirement benefits?

16   A.   Yes.

17   Q.   Okay.  Did they forcefully negotiate for items that they

18   felt were important to the continuation of the business going

19   forward?

20   A.   Yes.

21   Q.   Did they forcefully negotiate for what sort of payment

22   should be given to the bondholders?

23   A.   Yes.

24   Q.   Who determined the ten percent figure?

25   A.   Which ten percent, sir?

167

Q.   The ten percent offer to the bondholders of share equity?

A.   But sir, as part of the exchange offer or as part of the sale?

Q.   Well, let's start with the exchange offer, as part of the exchange offer?

A.   Well, the circumstances around that time, is the management team wanted to pursue an exchange offer and they felt the more equity they could offer to the bonds the greater the likelihood of success to that exchange offer.  They knew that we would have to approve the terms of any exchange offer, in particular because part of the exchange offer expected or was requesting some equitization of Treasury loans.  And in the context of those discussions, we told them under no circumstances are we willing to allow more than ten percent of the equity to the bonds and that we weren't sure that we would actually allow ten percent of the equity of the bonds.

Q.   So the ten percent upper limit on equity in exchange for bonds was set by the Treasury?

A.   Well, I think that General Motors management did not want to launch an exchange offer with no chance of success.  And so they approached us and said obviously one of the conditions of the exchange offer was the commercial terms under which Treasury would agree to.  And that was the basis for the discussion that is described.

Q.   But General Motors wanted to give more than ten percent,

168

1   is that correct?

2   A.   They -- yes, as I stated.

3   Q.   And it was Treasury that decided that ten percent was the

4   highest number that should be offered?

5   A.   We communicated that the most we'd be willing to entertain

6   would be ten percent.

7   Q.   Okay.  Did -- with regard to the present offer of ten

8   percent equity in the master sale and purchase agreement, who

9   made that determination?

10  A.   That was a Treasury decision.

11  Q.   Okay.  Did the United States Treasury ever negotiate with

12  the Main Street Bondholder Association?

13  A.   I don't believe they ever approached us, sir.

14  Q.   Okay.  Is it true that in April of 2008, I believe it was

15  the ad hoc bondholder group, made a counterproposal to General

16  Motors of a bond exchange?

17  A.   I don't know if they made a formal proposal, I know there

18  was some press discussion about their desire for more equity.

19  Q.   And they wanted to do a sixty percent exchange, is that

20  correct?

21  A.   I think that was roughly right.  I don't remember the

22  exact terms.

23          MR. MILLER:  It's '09.

24          MR. PARKER:  You're right.  It's '09, I stand

25  corrected.  It was '09.

169

1    Q.    Did General Motors negotiate with the ad hoc committee?

2    A.    I don't know how much interaction they had with the ad hoc

3    committee at that point in time.

4    Q.    Okay.  Just to be clear on something, do I understand

5    correctly it is the intention of the United States Treasury to

6    fully fund the administrative and priority claims of the

7    remainder of the General Motors estate after the sale?

8    A.    Do you mean in connection with the wind down budget we

9    discussed earlier?

10   Q.    Yes.

11   A.    It is, as we said in our term sheet with the

12   representatives of the bondholders back in May, and as I stated

13   earlier today, it is our intention to fund reasonable expenses.

14   Q.    Okay.  So you're in negotiations to raise the figure above

15   the 950?

16   A.    We're in negotiations around what would be reasonable

17   expenses, yes.

18   Q.    Okay.  Do you have -- does Treasury have any idea of how

19   long they would expect before the stock and warrants are

20   distributed to the unsecured creditors?

21   A.    That is part of the discussions we're having.  We

22   understand that the creditors of OldCo would like to see that

23   as soon as possible.  We're certainly supportive of that.  The

24   question, of course, becomes how quickly could the AlixPartners

25   folks do the work they need to do at OldCo.  And we have an

170

1    incentive for them to do it in an orderly basis.  The creditors

2    of OldCo have an incentive for them to do it in an orderly

3    basis.  And we're trying to think through how that mechanic

4    would actually work.

5    Q.   Well if I recall correctly, Mr. Koch testified yesterday

6    that he believed the heavy lifting could take two to three

7    years and that further wind up could take another two to three

8    years.  What I'm curious about is it is anticipated that the

9    unsecured creditors will have to wait until the estate is fully

10   administered before they get their distribution?

11             MR. MILLER:  Objection, Your Honor.  Mr. Wilson's not

12   an expert on administration of cases under Chapter 11.

13             THE COURT:  Sustained.  If you've formed a view on

14   that, Mr. Wilson, you can tell him.  But if you haven't formed

15   a view on that, tell him that also.

16             THE WITNESS:  I don't have a view.

17   Q.   Okay.  Mr. Wilson, is it -- am I correct in understanding

18   that the funding for the purchase of the assets from General

19   Motors are coming from TARP?

20   A.   I believe --

21   Q.   Is that a yes, sir?

22   A.   I believe so.

23   Q.   Okay.  Is the government a commercial lender?

24   A.   How would you define commercial lender?

25   Q.   Are they in the business of lending money?

171

1    A.    Not under normal circumstances but we're not living under

2    normal circumstances, sir.

3    Q.    Okay.

4    A.    I think we'd both know if we hadn't this company would

5    have liquidated a long time ago.

6    Q.    I understand.  I just want to know if that's -- I think

7    you've answered your question.

8        THE COURT:  Move on to another question please, Mr.

9    Parker.

10       MR. PARKER:  Yeah, I will.

11   Q.    Did you testify earlier that no commercial lender is large

12   enough to fund a GM restructuring?

13   A.    I think at this point in the economic cycle that is

14   correct.

15   Q.    Okay.

16   A.    As evidenced by the events of the last few months.

17   Q.    I'd like to talk about the credit bid for a minute and the

18   factors that would influence an allocation of shares that the

19   Treasury's going to keep in NewCo relative to the DIP financing

20   and relative to the pre-bankruptcy loan of 19.4 billion.

21       If I understand correctly, NewCo is going to have

22   approximately -- NewCo is going to owe the U.S. Treasury a

23   little over seven billion dollars, is that correct?

24   A.    In the form of debt, yes.

25   Q.    And that will be -- that seven billion dollars is from the

172

1    DIP facility, is that correct?

2    A.    I believe so.

3    Q.    Okay.  Also, of the 33.3 billion in DIP financing, is part

4    of that being contributed by the Canadian government?

5    A.    A portion is being contributed by Canadian governments,

6    the federal government and the government of Ontario.

7    Q.    Right.  Okay.  By Canadian governments, a portion of it

8    is?

9    A.    Yes.

10    Q.    And do you know how large of a portion?

11    A.    I believe it's 3.2 billion dollars.

12    Q.    Okay.  So the amount of DIP financing that is being

13    replaced by equity by the governments is roughly twenty

14    billion, is that correct?

15    A.    I'm not sure how you developed that math, Mr. Parker.

16    Q.    I subtracted seven billion debt and 3.2 billion that

17    Canada's contributed, because they're also getting equity.  And

18    when you subtract it from 33.3 billion that leaves twenty

19    billion.

20    A.    I would have thought closer to twenty-three.

21    Q.    You're right, twenty-three.  But isn't General Motors also

22    getting -- I'm sorry, not General Motors.  Isn't the United

23    States Treasury also getting two billion in preferred stock?

24    A.    It's just over two billion, yes.

25    Q.    Okay.  So when you subtract that out, that would leave

173

1    twenty-one, is that correct?

2    A.   Roughly.

3    Q.   So the split between DIP financing that's being converted

4    to equity and old loans that's being converted to equity is

5    something like a fifty-five/forty-five split.  The fifty-five

6    being for DIP, the forty-five being for old debt.

7    A.   We haven't thought about it that way, sir.

8    Q.   Okay.  But it would be one way to think about it?

9    A.   No, not necessarily.  I guess it would be a conceivable

10   way to think about it but we also could have structured it in a

11   range of different ways.  We thought about it as was the sum

12   total of our investment/loan into the company.

13   Q.   Okay.  So you really haven't done an analysis one way or

14   the other?

15   A.   I think I testified to that earlier.

16   Q.   Right.  Okay.

17           MR. PARKER:  I believe that's all I have.  Thank you.

18           THE COURT:  Has everybody now had a chance to --

19           MR. SALZBERG:  Your Honor.

20           THE COURT:  Mr. Salzberg?

21           MR. SALZBERG:  Yes, we had reserved a right on one

22   specific issue, if I may?

23           THE COURT:  You May.

24           MR. SALZBERG: Your Honor, I'd like to mark for the

25   record Bondholders' Exhibit 4.  And if I may approach?

174

(Bondholders' Exhibit 4, printout of an article released by The

Detroit News on their website, was hereby marked for

identification as of this date.)

      THE COURT:  Yes.

  (Pause)

CROSS-EXAMINATION

BY MR. SALZBERG:

Q.   **Sir, have you had a chance to read this?  What is**

**Bondholders' Exhibit 4?**

A.   **Yes.**

Q.   **And you see that it is a printout of an article released**

**today by the Detroit News on their website?**

A.   **That's what it appears to be.**

Q.   **Okay.  And you would agree with me, would you not, that**

**what the article addresses is the July 10th deadline which we**

**discussed earlier today in your testimony, that being the**

**deadline set by the U.S. Treasury for entry of the sale order?**

      MR. MILLER:  Objection, Your Honor.  The article is a

report on the proceedings that happened before the Court

yesterday and a description of those proceedings.

      THE COURT:  Well, if your point is what happened

before me as the best evidence and that the article is hearsay,

I agree.  So, Mr. Salzberg, I've got to figure out where you're

going to see whether you're relying on some hearsay exception

or something for which this is probative evidence of something

1 I should be assuming as prohibited.

2    MR. MILLER:  I would also add, Your Honor, that this

3 morning counsel said -- I believe the question that was

4 propounded was would Mr. Wilson agree with Mr. Henderson saying

5 that the government would not walk.  The article doesn't refer

6 to Mr. Henderson saying anything in that respect, Your Honor.

7    THE COURT:  I'll need help from you on this respect,

8 Mr. Salzberg.

9    MR. SALZBERG:  I'm sorry?

10    THE COURT:  I need help from you --

11    MR. SALZBERG:  Yes.

12    THE COURT:  -- from you to address the points Mr.

13 Miller raised on how to rule on this.

14    MR. SALZBERG:  The first issue is, Your Honor, I

15 asked the witness whether or not the U.S. Treasury's position

16 on the July 10th deadline was at odds with public

17 pronouncements made by General Motors.  And I specifically

18 referenced some news articles.  And then I said that we did not

19 have the articles since they just were released this morning.

20 So that's what we were talking about this morning and that's

21 what we reserved our right to come back and ask the witness

22 about this afternoon.

23    On the second issue regarding the hearsay, if I may,

24 we're not introducing this exhibit into evidence at this point.

25 I've just asked him to identify it and if I can point him to

176

1    one section of the article and ask if that section of the

2    article is consistent or inconsistent with the U.S. Treasury's

3    position as testified to by Mr. Wilson earlier today.

4            MR. MILLER:  It's still -- it's double hearsay, Your

5    Honor.

6            THE COURT:  Sustained.

7            MR. SALZBERG:  May I attempt to ask a question and

8    get around the hearsay issue because we're not introducing this

9    exhibit to prove the truth of the matter asserted.

10           THE COURT:  I only ruled on the last objection.  You

11   can ask another question and I'll rule on it if there's a

12   further objection.

13   BY MR. SALZBERG:

14   **Q.   Mr. Wilson, would you take a look at the top of page 2 of**

15   **the article and the first paragraph that reads, "While the**

16   **government could stop funding GM" --**

17           MR. MILLER:  He's introducing it into the record,

18   Your Honor, that's not the way you do it.

19           THE COURT:  You're right, Mr. Miller.  The way you've

20   got to do this, if I remember from the twenty years I did this

21   before I became a judge, permit the witness to read it to

22   himself without putting it before the judge.  Obviously,

23   there's a little bit of a fiction because I have the exhibit

24   before me.  The distinction would be more meaningful if this

25   were a jury trial, obviously.

177

1          MR. SALZBERG:  Right.

2          THE COURT:  In this case, the witness can read it and

3     you can ask him a question premised on what he read without

4     taking his statement as being established or as refreshing his

5     recollection.  But this is not evidence as to either what the

6     GM's spokeswoman said, intentionally being a little bit vague

7     or whether what she said was true.  If there is a memory that

8     the witness has, you can ask him that.  If there is a non-

9     repetitive understanding that he has that hasn't been

10    previously asked, you can ask that.

11         But Mr. Miller is right that depending on the portion

12    of it, this article is hearsay, double hearsay or perhaps

13    hearsay and speculation.  And it doesn't have any value in

14    establishing that you asked a question in good faith.

15         MR. SALZBERG:  Okay.  Well, with that in mind I would

16    ask Mr. Wilson to read the first paragraph on page 2.  And my

17    question to Mr. Wilson is --

18    **Q.   Is that section that you just read inconsistent with your**

19    **prior testimony today as to the Treasury's position on the July**

20    **10th deadline?**

21    **A.   I'll answer it this way, Mr. Salzberg.  I've spent**

22    **hundreds of hours inside this company.  I've met probably**

23    **upwards of a hundred executives.  I know, you know, the vast --**

24    **I know probably well north of a hundred executives on a first-**

25    **name basis.  I have never once met, nor even heard the name,**

178

1    Renee Rashid Marren (ph.) before.  I have no idea who she is

2    and under whose authority she speaks.  She clearly has

3    absolutely no insight into the position of the United States

4    auto task force.

5    Q.   Again, my question, sir, is the statement that you read

6    consistent or inconsistent with the U.S. Treasury's position to

7    which you testified earlier today?

8    A.   Her statement is inconsistent with what I testified to

9    earlier.  But as you can tell, it's not even a complete

10   sentence.  And what I don't know is what she may have said in

11   the either lead up to this quote that was quoted, if the quote

12   is accurate or if she said a bunch of other things that aren't

13   incorporated into this article.

14   Q.   So would the U.S. Treasury be motivated to continue

15   funding if the July 10th deadline is not met, given the amount

16   funded to them at that point?

17            MR. MILLER:  On the basis of this newspaper article?

18            MR. SALZBERG:  No.

19            THE COURT:  Is that a free-standing question?

20            MR. SALZBERG:  Free-standing question, Your Honor.

21            MR. MILLER:  Objection, Your Honor.

22            THE COURT:  All right. The objection is then moot.

23   Let me hear that -- that objection is moot but I need to hear

24   the question again, Mr. Salzberg.

25   Q.   Would the U.S. Treasury be motivated to continue funding

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

179

1      **General Motors if the July 10th deadline for entry of the sale**

2      **order is not met?**

3             MR. MILLER:  Objection, Your Honor.  He's answered

4      that question four or five times today.

5             THE COURT:  Sustained.

6             MR. SALZBERG: I have no further questions, Your

7      Honor.

8             THE COURT:  Have I now given all objectors a chance

9      to cross?  All right.  Mr. Miller or anyone else want to

10     redirect?  Mr. Schwartz or Mr. Jones?

11            MR. SCHWARTZ:  Could we confer for one moment?

12            THE COURT:  Sure.  Try to do it in place, though.  I

13     don't want to take a recess.

14        (Pause)

15     REDIRECT EXAMINATION

16     BY MR. SCHWARTZ:

17     Q.   **Mr. Wilson, when Treasury extended its first loans to GM**

18     **under the LSA in December of 2008, did it have an expectation**

19     **of being repaid?**

20     A.   **I wasn't at Treasury at that time.**

21     Q.   **Have you subsequently come to have an understanding about**

22     **whether Treasury had an expectation that it would be repaid?**

23     A.   **Yes.**

24     Q.   **And what is that understanding?**

25     A.   **That based on both the collateral package for the loans as**

180

1   well as the seniority of the loans and the prospects for

2   General Motors' business, yes that the loan would be repaid.

3   Q.   You referred to the collateral package; did Treasury have

4   a view as to whether it was adequately secured under the loans

5   extended pursuant to the LSA?

6   A.   I don't know if there was a specific analysis done around

7   the value of the security package at that point in time.

8   Q.   Okay.  Do you have a view as to whether Treasury was

9   oversecured, undersecured?

10  A.   The only view I have now is the liquidation analysis that

11  was done by Mr. Koch who suggests we were, in retrospect,

12  undersecured.

13  Q.   In response to Mr. Salzberg's first line of questioning,

14  you talked about the decision to pursue a 363 transaction as

15  opposed to a plan, do you recall that?

16  A.   Yes.

17  Q.   What was GM's involvement in that decision?

18  A.   Well, we pursued -- we considered a variety of different

19  options.  We had extensive discussions with the management team

20  to try to understand the implications for the business.  The

21  ways in which it could be effectuated; obviously in the course

22  of a 363 sale there would significant operational issues

23  regarding the separation of assets from Old General Motors.

24  And so we had extensive discussions along those lines.

25  Q.   And was the ultimate decision to pursue a 363 transaction

181

1    a decision that was made jointly with General Motors?

2    A.    No, it was really a decision by the Treasury.

3    Q.    Okay.  Subsequently to making that decision, did General

4    Motors and Treasury enter into negotiations on what became the

5    MSPA?

6    A.    It was parallel tracked but yes.

7    Q.    And could you describe the tenor of those negotiations?

8    A.    Contentious, often difficult, sometimes exasperating.

9    Q.    Could you elaborate on what particular subjects were the

10   negotiations contentious?

11   A.    Well, there are a number of issues where we, as the

12   purchaser, as I mentioned many times earlier, were only willing

13   to acquire -- we wanted to acquire the best assets and we want

14   to only acquire the liabilities that we thought were

15   commercially necessary for the success of NewCo.  And there's,

16   kind of, much discussion around both the assets as well as the

17   liabilities.

18   Q.    After General Motors filed for bankruptcy, the United

19   States extended further credit pursuant to a DIP facility, is

20   that correct?

21   A.    Yes.

22   Q.    And the funds for both the LSA and the DIP were TARP

23   funds, is that right?

24   A.    I believe so.

25   Q.    The transaction that's before the Court today, the 363

182

1    transaction, does that involve any additional funding from

2    Treasury?

3    A.    I don't believe so.  No.

4    Q.    It's a pure credit bid, is that correct?

5    A.    Yes.

6    Q.    So in response to Mr. Parker's questioning, when he asked

7    whether the assets for the purchase of GM came from TARP, you

8    were referring to the loans that were extended under the DIP

9    and the LSA, is that right?

10    A.    Yes.

11    Q.    Okay.  You testified, on a few occasions, that Treasury

12    had no intention to fund General Motors after July 10th if the

13    sale order is not entered, is that right?

14    A.    Yes.

15    Q.    Why not?

16    A.    Well, it goes to the core principle or concern about any

17    Chapter 11 proceeding, which is that this business cannot

18    withstand the uncertainty of an open-ended process or a process

19    of uncertain duration.  We did an extraordinary amount of work,

20    sir, on this issue in the months leading up to June 1.  We

21    talked to, as I mentioned earlier, dozens of experts, advisors,

22    consultants, industry experts, who collectively had thousands

23    of years of experience in the automotive industry, as well as,

24    obviously, the management team at great length.  And throughout

25    that period of time, I -- as I mentioned earlier, I can't

183

1    recall a knowledgeable consultant or expert who thought that

2    General Motors could survive a bankruptcy.  There were tons of

3    critical articles written about us as the cowboys in Washington

4    who don't understand the business, who felt that this was a

5    recipe for a disaster and that, even after the successful

6    resolution of the Chrysler case in early May, there are

7    articles to that effect that General Motors is far too large,

8    far too complex and far too complicated to be able to survive a

9    Chapter 11 process.

10         So when -- that was what animated much of our thinking

11   around a 363 sale, as we discussed, and that is what our

12   concerns are about any kind of change to the process.  General

13   Motors' market share today is dramatically lower than it was a

14   year ago before the financial distress entered in.  Market

15   share this time last year was about twenty-two percent.  It's a

16   little bit over eighteen percent now.  That's a massive

17   erosion.  And that was based on the fears of distress and

18   despite the intervention of the U.S. Treasury.  I imagine if

19   there was concern about how that would play out over time, it

20   would only be dramatically larger, in our estimation.

21         So that's why we cannot take an open-ended commitment.  We

22   have a fiduciary duty to the U.S. taxpayers.  We've made a

23   judgment that the funding associated with this process was

24   appropriate but that any incremental funding we are not willing

25   to provide.

184

1    Q.    Now, I notice in your response you did refer to the

2    liquidation analysis that was performed by AlixPartners.

3    You're familiar with that?

4    A.    Yes.

5    Q.    And that shows that the government's recovery on its

6    secured claims in a liquidation scenario would be not good, is

7    that right?

8    A.    I think "not good" is a fair characterization.

9    Q.    Does that affect Treasury's ability to fund -- Treasury's

10   inclination to fund further if a sale order is not entered by

11   July 10?

12   A.    Well, the way we look at this, and the reason we look at

13   it the way we do, is it's better to cut one's losses and that,

14   while we would certainly have substantial losses if GM entered

15   into a liquidation in July, for sure we'd have extremely

16   significant losses.  We believe that that is an economically

17   more rational decision than funding into an open-ended process

18   whereby the losses could be much, much more dramatic.

19         Obviously, entering into that process, sir, there are no

20   certain outcomes.  It could be that we fund even more money and

21   have no more of a recovery and therefore lose more.  It could

22   be that we fund more money and have an outcome that's not

23   commercially satisfactory to the U.S. Treasury.  There are a

24   whole range, in fact arguably an infinite number, of outcomes

25   that many of which could lead to much more substantial losses.

185

1    Q.    Now, in response to questioning by the representative of

2    the state's attorney general, you remember about big (C) Claim

3    versus little (c) claim?

4    A.    Yes.

5    Q.    You said that Treasury hadn't made a determination about

6    whether it would fund if the sale order released little C

7    claims but not big C Claims; remember that?

8    A.    Yes.

9    Q.    And then another questioner asked you about the 62,000

10   dollars, what Treasury would do if that were a de minimis

11   payment.  Do you recall that?

12   A.    Yes.

13   Q.    I believe you testified earlier that Treasury was in the

14   process of considering or maybe had already considered all of

15   the objections that had been filed to the sale, is that

16   correct?

17   A.    Yes.

18   Q.    And that you and your designates and your counsel were

19   negotiating a final version of the sale order, is that correct?

20   A.    Yes.

21   Q.    And is it your expectation that that final sale order,

22   when it is submitted to Judge Gerber, will reflect the

23   Treasury's final position on all of the objections that have

24   been filed?

25   A.    That's correct.

186

1    Q.   And if that final order, as it reflects Treasury's

2    resolution of all of the objections that have been filed, is

3    not entered on or before July 10th, does Treasury have an

4    intention to fund?

5    A.   No.

6              MR. SCHWARTZ:  Thank you.

7              THE COURT:  Okay.  Anybody else on redirect?  Mr.

8    Miller?

9    REDIRECT EXAMINATION

10   BY MR. MILLER:

11   Q.   Mr. Wilson, prior to your joining the Treasury, what was

12   your occupation?

13   A.   I was an investor, sir.

14   Q.   And what does that encompass?

15   A.   Well, I spent virtually all of my career post-college

16   investing in companies, many of which, in most cases, that were

17   troubled.

18   Q.   Distressed companies?

19   A.   Oftentimes, yes.

20   Q.   And often on the side representing a secured investor?

21   A.   Typically, yes.

22   Q.   And in your --

23   A.   More often, yes, excuse me.

24   Q.   I'm sorry.

25   A.   I'm sorry, I meant to say "often".  I didn't -- I

187

1    shouldn't say "typically".

2    Q.    And in your experience over the course of years as a

3    secured creditor representing a secured creditor, have you

4    found it unusual for a secured creditor to lose confidence in a

5    CEO?

6    A.    Unfortunately, no.  It happens all the time.

7    Q.    And what does a secured creditor do in those kind -- in

8    that circumstance?

9    A.    It depends on the situation.  If there are no -- there's

10   no breach of covenants or no need for incremental capital, a

11   secured creditor could complain.  But in the events where, as I

12   faced a number of times in my past, where the company requires

13   additional funding or is in violation of a covenant or some

14   other term of the loan agreement, it would be typical for that

15   lender to indicate their dissatisfaction with management and

16   indicate they're not willing to fund unless certain things take

17   place.

18   Q.    And in connection with this situation, Mr. Wilson, the --

19   after February 7, the viability plan that General Motors had

20   submitted was deemed to be inadequate by the Treasury?

21             THE COURT:  Pause, Mr. Wilson.  Mr. Richman's --

22             MR. RICHMAN:  I apologize.

23             THE COURT:  Come to a microphone, please.

24             MR. RICHMAN:  I listened to a few of the questions to

25   try to understand where this is going.  I don't really think

188

1   there's any foundation in the record for this witness to be

2   qualified as an expert in connection with his prior

3   experiences.  There isn't anything of record that really

4   explained -- he said he was an investor and, from that, Mr.

5   Miller extrapolated that he had some knowledge of how secured

6   creditors act.  I don't believe there's any foundation for that

7   and I would ask that the background and foundations be laid

8   before we continue with this line of questioning.

9        THE COURT:  All right, well, there's a Second Circuit

10  case on point and which I relied on; I think it was the Perry

11  Koplik case.  You're right that he can't give lay-opinion

12  testimony.  There is some room under Second Circuit authority,

13  and I'd have to take a recess to get the name of the case that

14  I cited in Perry Koplik for observations that were made.  But

15  on balance, Mr. Miller, if he's trying to talk about what's

16  common in the industry, you have to lay a foundation for what

17  he knows about the industry.

18       MR. MILLER:  No, Your Honor, I asked him what his --

19  in his experience as an investor and a secured creditor, in the

20  course of his career, his experience, not common in the

21  industry.

22       THE COURT:  The problem, Mr. Richman, is you put into

23  issue whether the government was acting unusually when it

24  expressed its concerns about Mr. Henderson's predecessor.

25       MR. RICHMAN:  Your Honor, I agree with that.  I just

189

1    don't understand, from the record so far, what this particular

2    witness's experience actually is.  I don't know who he worked

3    for, how many years, how many transactions like this he was

4    involved in.  Are we talking about --

5              MR. MILLER:  He could take him, Your Honor.

6              MR. RICHMAN:  -- two cases?  Are we talking about ten

7    cases?  That's the kind of foundation I would need.

8              THE COURT:  I'm going to sustain the objection on

9    this record, but I'm going to let you inquire more, Mr. Miller,

10   as to his ability to observe.  And you're not to ask him a

11   question of opinion.  You're only to ask him a question as to

12   what he observed.

13             MR. MILLER:  Yes, sir.

14   BY MR. MILLER:

15   Q.   Mr. Wilson, would you briefly describe to us your business

16   experience since graduating from college?

17   A.   Sure.  I graduated from Harvard College in 1993.  I went

18   to work in the investment banking division of Goldman Sachs,

19   which involves a number of advisory transactions, and assessed

20   a number of principal transactions.  At that point I

21   transitioned to a full-time investment role for the balance of

22   my career, first at a firm called Clayton Dubilier & Rice, with

23   a break to attend Harvard and graduate from Harvard Business

24   School.  I then joined The Blackstone Group in the private

25   equity division and then left there to help build a firm called

190

1   Silver Point Capital, which is extraordinarily active in

2   distressed and troubled situations.

3   Q.   And during -- how many years were you at Silver Point

4   Capital?

5   A.   I was at Silver Point for about five -- a little bit over

6   five years.

7   Q.   And during that period of time, you were involved in

8   situations involving distressed entities?

9   A.   Many situations, yes.

10   Q.   In which Silver Point had an investment?

11   A.   Yes.  And during that period of time, Silver Point,

12   through its principal finance business where I sat on the

13   investment committee for that business, and it was the

14   investment committee that approved all the loans of that

15   business, probably made between fifty and a hundred secured

16   loans, typically to distressed companies.

17   Q.   And in connection with circumstances involving distressed

18   companies, what did you observe in terms of workouts and

19   restructurings as to the eventual disposition of the CEO?

20   A.   It would depend on the circumstances.  But in situations

21   where the lender no longer had confidence in the management

22   team, and particularly the CEO, and that company was either --

23   needed capital from us, additional capital beyond what had

24   already been lent, or was in violation of a covenant or some

25   other breach under the agreement, we would be not shy about

191

1    communicating our position.

2    Q.    Thank you.  Now, in connection with Mr. Henderson, Mr.

3    Wilson, has the Treasury offered Mr. Henderson any contract of

4    employment?

5    A.    I believe Mr. Henderson realizes and knows that we intend

6    for him to be the CEO, but I don't believe we've offered a

7    contract.

8    Q.    Do you know if Mr. Henderson has an employment contract

9    now?

10   A.    I do not think he does.

11   Q.    Has the Treasury offered employment contracts to any of

12   the executives at GM who may be going to New GM?

13   A.    Not at this point in time, no.

14   Q.    Who is Mr. Ron Bloom?

15   A.    He is a colleague of mine on the auto task force.

16   Q.    And did Mr. Bloom participate in all of the negotiations

17   concerning General Motors?

18   A.    A very small number.

19   Q.    In the negotiations with the UAW, who participated in

20   those negotiations?

21              MR. RICHMAN:  Your --

22              THE COURT:  All right, pause.

23              MR. RICHMAN:  Your Honor, I think we're beyond

24   anything that was covered in cross, so I really don't know

25   where this is going.  But I --

192

1          THE COURT:  Sustained, unless you can come back

2     closer to what we --

3          MR. MILLER:  Okay.

4          THE COURT:  -- covered in cross, Mr. Miller.

5     Q.   Mr. Wilson -- I'm sorry, Mr. Wilson, you were cross-

6     examined in connection with the agreement made with the UAW

7     VEBA?

8     A.   Yes.

9     Q.   Do you remember that?

10    A.   Yes.

11    Q.   And the shares of stock in NewCo which will be given to

12    the VEBA?

13    A.   Yes.

14    Q.   Who's giving those shares of stock to the VEBA?

15    A.   NewCo.

16    Q.   And NewCo is the Treasury-sponsored entity?

17    A.   Yes.

18    Q.   And that's coming out of the shares that are being

19    acquired by the Treasury in NewCo?

20    A.   That's correct.

21    Q.   Does the Treasury have any plans as to the disposition of

22    its equity position?

23    A.   Well, certainly over time we anticipate selling our

24    shares.

25    Q.   Is there any contemplation of an IPO?

193

1    A.    We're anticipating an IPO sometime in 2010.

2    Q.    2010, thank you.   Mr. Parker examined you about the credit

3    bid.   Do you remember if -- were you here during the testimony

4    of Mr. Worth?

5    A.    Yes, I was.

6    Q.    And did you hear Mr. Worth testify as to the estimated

7    purchase price?

8    A.    I believe so.   I wasn't, frankly, paying complete

9    attention to it, but I do remember him talking about it

10   briefly.

11   Q.    Do you recall Mr. Worth using a figure of ninety-one-plus

12   billion dollars as the net purchase price?

13   A.    No, actually I don't recall that.

14   Q.    In connection with the purchases, the Treasury -- excuse

15   me, has New GM assumed liabilities?

16   A.    Yes.

17   Q.    So that the purchase price includes a series of elements:

18   the credit bid, the assumption of liabilities, the stock which

19   is going to OldCo?

20   A.    Yes.

21   Q.    And has the Treasury done a calculation as to what that

22   total purchase price would be?

23   A.    We have not.

24   Q.    Are you familiar with the Chapter 11 case of Delphi

25   Corporation?

194

1    A.    Yes.

2    Q.    Is the Treasury involved in that Chapter 11 case?

3    A.    We're involved and to the respect of we -- in working with

4    General Motors to provide the funding that will be associated

5    with that case.

6    Q.    And do you know how long that Chapter 11 case has been

7    pending?

8          MR. RICHMAN:  Your Honor, I have to object --

9    A.    I believe a file --

10         THE COURT:  Wait.

11         MR. RICHMAN:  -- to this line.  Again, I don't see

12   what relevance this has to anything that we've had on record or

13   the motion.

14         THE COURT:  Mr. Miller?

15         MR. MILLER:  Your Honor, the Treasury is intimately

16   involved in the Delphi case.  The Delphi case is a Chapter 11

17   case which was supposed to be confirmed two years ago.

18         THE COURT:  All right, I don't want you to

19   testifying, but you've satisfied me that it's relevant and it's

20   within the scope of cross.  So the objection's overruled, but I

21   don't want you testifying --

22         MR. MILLER:  Yes.

23         THE COURT:  -- Mr. Miller.  It's got to come out of

24   Mr. Wilson, a witness.

25   BY MR. MILLER:

195

1   Q.   Mr. Wilson, do you know how long the Delphi case has been

2   pending?

3   A.   I believe they filed in the fall of 200 -- well, it's

4   three and a half -- little bit over three and a half years ago,

5   so the fall of 2005.

6   Q.   October of 2005?

7   A.   That sounds correct.

8   Q.   And is the Delphi case administratively solvent?

9   A.   Delphi's been on the verge of liquidation for, in my

10  opinion, months.

11            MR. MILLER:  Thank you, Your Honor.  That's all.

12            THE COURT:  Anybody else for redirect?

13            Any recross?

14            MR. RICHMAN:  One second, Your Honor.

15            THE COURT:  Mr. Richman, sure.

16            MR. RICHMAN:  No, Your Honor.

17            THE COURT:  Any other --

18            MR. JAKUBOWSKI:  I have one --

19            THE COURT:  Mr. Jakubowski, come up, please.

20  RECROSS-EXAMINATION

21  BY MR. JAKUBOWSKI:

22  Q.   Mr. Wilson, on redirect you were -- you said that the auto

23  task force decided to pursue the sale and made decisions about

24  the separation of assets and liabilities, right?

25  A.   Yes.

196

1  Q.   And you had said that what, quote, "we wanted to do was to

2  acquire only the commercially necessarily liabilities for the

3  success of the business," correct?

4  A.   Yes.

5  Q.   So I'd like to understand a little bit of just who "we"

6  is, or "we" are.  So the auto task force is comprised primarily

7  of four individuals, right, in terms of the decision-makers?

8  A.   Well, I'm not sure which four you're --

9  Q.   Well, let me ask this.  The auto task force is a division

10  of Treasury?

11  A.   I don't -- to be honest with you, I have no idea --

12  Q.   It's --

13  A.   -- how the bureaucracy works.

14  Q.   But it is part of the executive branch, correct?

15  A.   Yes.

16  Q.   And the head of the executive branch is President Obama,

17  correct?

18  A.   Yes.

19  Q.   Now, has anyone --

20        MR. SCHWARTZ:  Objection.  This is really quite

21  beyond the scope of redirect.

22        MR. JAKUBOWSKI:  I have one final question, Your

23  Honor, with respect to the question of "we", and that's it.

24        THE COURT:  Why don't you go back to that question,

25  then?

197

1          MR. JAKUBOWSKI:  Okay.

2     **Q.   Was the head of the executive branch, President Obama,**

3     **ever advised about the treatment of preexisting product**

4     **liability --**

5          MR. SCHWARTZ:  Objection.

6     **Q.   -- claims in the sale?**

7          MR. SCHWARTZ:  Objection.  That's privileged.

8          MR. JAKUBOWSKI:  I just asked whether he was advised.

9     I didn't ask --

10         MR. SCHWARTZ:  Objection.  There's a presidential

11    privilege.

12         THE COURT:  Sustained.

13         MR. JAKUBOWSKI:  I have no further questions, Your

14    Honor.

15         THE COURT:  Okay.  All right, any re-redirect?  All

16    right, Mr. Wilson, you're excused.

17         THE WITNESS:  Thank you.

18         THE COURT:  It's now about 1:20.  Mr. Kennedy, you're

19    rising to cross whom?

20         MR. KENNEDY:  No, Your Honor.  I'm not rising to

21    cross anyone.  I'm rising on a sort of a housekeeping matter

22    because I had a sense that we might be moving into a break.

23    And I have a number of witnesses that have been here, prepared

24    to be available for cross-examination, which I don't think will

25    occur, in connection with declarations.

198

1          THE COURT:  Well, you're reading my mind, Mr.

2     Kennedy, because I wanted to get my arms around who we have

3     left to cross.  And if there are people who are not going to be

4     crossed, subject to your rights to be heard, I'm of the view

5     that I should excuse them from having to be in the courtroom.

6     That's kind of your point, Mr. Kennedy?

7          MR. KENNEDY:  Exactly, Your Honor.

8          THE COURT:  Okay.  Mr. Miller or the folks on the

9     movant's side, you made a motion to strike the testimony -- or

10    to exclude the testimony of what I think were Mr. Kennedy's

11    folks.  My tentative (sic) on that, subject to your right to be

12    heard, and I won't make Mr. Kennedy respond unless you want to

13    push it --

14          MR. KENNEDY:  Your Honor --

15          MR. MILLER:  It wasn't Mr. Kennedy, Your Honor.

16          MR. KENNEDY:  -- there is no such motion.

17          THE COURT:  I'm sorry?  I thought I got an indication

18    of a desire to exclude those affidavits --

19          MR. MILLER:  No, Your Honor.

20          THE COURT:  -- a written document to that effect.

21    I'll try to find it.

22          MR. MILLER:  Hold on just a moment, Your Honor, if

23    you may.

24          THE COURT:  Sure.

25          UNIDENTIFIED SPEAKER:  Well, it's a big firm, but at

199

1    least Mr. Miller has said he's not prepared to --

2            MR. MILLER:  Your Honor, if there was such a motion

3    it's withdrawn.

4            THE COURT:  Fine.  Is there a desire to cross-examine

5    Mr. Kennedy's folks?

6            MR. MILLER:  Not by the debtors, Your Honor.

7            THE COURT:  Is there a desire by anybody to cross-

8    examine Mr. Kennedy's folks?

9            UNIDENTIFIED SPEAKER:  No.

10           THE COURT:  All right.  With no response, Mr.

11   Kennedy, your guys' declarations or affidavits or whatever they

12   are, are deemed to be part of the record and cross has been

13   deemed to be waived.  You can tell them, if you choose to, that

14   they needn't stay, but if they want to stay they may.

15           MR. KENNEDY:  Thank you, Your Honor.  Just for the

16   record, that constitutes the declarations of James Clark, Debra

17   Turner, Dennis Bingham, David Hill, Earl Williams, Joe Patrick,

18   Betty Humphrey and John Humphrey, all of which have previously

19   been put onto the docket of the case.  And I'll just note that

20   we are also of course moving for the admission of Exhibits 9

21   through 12, which is the large book that had previously been

22   tendered to the Court and, in fact, a number of parties have

23   used during this proceeding.

24           THE COURT:  All right.  Is there any objection to or

25   disagreement with what Mr. Kennedy said?

200

1          MR. MILLER:  No, Your Honor.

2          THE COURT:  All right, hearing none, your stuff is

3     admitted, Mr. Kennedy.  And my ruling on what your folks get

4     into, if they choose to, remains.

5     (IUE-CWA's Exhibit 9, transcript of deposition of Michael

6     Raleigh dated 6/28/09 and supporting documents, were hereby

7     received into evidence as of this date.)

8     (IUE-CWA's Exhibit 10, transcript of deposition of Fritz

9     Henderson dated 6/28/09 and supporting documents, were hereby

10    received into evidence as of this date.)

11    (IUE-CWA's Exhibit 11, transcript of deposition of Harry Wilson

12    dated 6/25/09 and supporting documents, were hereby received

13    into evidence as of this date.)

14    (IUE-CWA's Exhibit 12, IUOE documents, were hereby received

15    into evidence as of this date.)

16          THE COURT:  Okay, to what extent, folks, do we have

17    further cross at this point?

18          MR. BROMLEY:  Your Honor, James Bromley of Cleary

19    Gottlieb on behalf of the UAW.  We also have a declaration of

20    David Curson to be offered into evidence, and he's available

21    for cross.  We just wanted to --

22          THE COURT:  Right.

23          MR. BROMLEY:  -- clarify that.

24          THE COURT:  Is there any objection to the Curson

25    declaration being taken as his direct testimony?

201

1          MR. MILLER:  Not by the debtors, Your Honor.

2          THE COURT:  And not by anybody.  Okay, the Curson

3     declaration is in as direct testimony.  Is there a desire to

4     cross Mr. Curson?

5          MR. RICHMAN:  Yes, Your Honor.

6          THE COURT:  Okay.  Mr. Richman, what's your extent as

7     to how long you want to take to do that, you or your partner?

8          MR. SALZBERG:  Your Honor, ten, fifteen minutes at

9     most.

10         THE COURT:  What I think I would like -- and thank

11    you, Mr. Salzberg.  Is there anybody who is going to see a need

12    to cross-examine anybody besides Mr. Curson?  I think we've

13    covered all of the declarants, if I'm not mistaken.  No

14    response.  What we're going to do, Mr. Bromley, Mr. Salzberg,

15    we're going to take -- I'm going to take Mr. Curson on cross

16    now.  That should complete all of the testimonial evidence

17    unless the debtors have rebuttal beyond what they did by

18    redirect.  Mr. Miller, do you have a sense as to whether you

19    will?

20         MR. MILLER:  I doubt it, Your Honor.

21         THE COURT:  Okay.  Then what I would be of a mind to

22    do is to take -- let people have a lunch break, about an hour,

23    and to get into argument after the lunch break.  Mr. Parker?

24         MR. PARKER:  Your Honor, I had attached to my

25    original declaration two determinations by the Treasury

1    Department, and I'd like them to be admitted.

2              THE COURT:  What exactly are we talking about?

3              MR. PARKER:  It's in regard to the TARP issue, Your

4    Honor.  I simply wish the record to show that Treasury had --

5    well, what the position of the Treasury had been on TARP on two

6    particular occasions.

7              THE COURT:  What I think I would like you to do -- if

8    you're talking about documents out of government files, it's

9    possible that it's an evidentiary matter, putting aside your

10   standing issues.  You and Mr. Schwartz can agree on whether or

11   not I should take judicial notice of them.  If there are

12   particular exhibits that are of a different character, I need

13   to have a dialogue on what they are so I can make the necessary

14   evidentiary rulings.

15             MR. PARKER:  All right, I'll --

16             THE COURT:  But frankly, folks, I have Mr. Curson

17   waiting to be crossed here.

18             MR. PARKER:  Right.  Okay.

19             THE COURT:  And I think, out of courtesy to him and

20   to all the other lawyers in the room, the other two or three

21   rooms, the overflow rooms, I would like to complete the

22   opportunities for cross and redirect of Mr. Curson.  And then

23   it might make sense for you and Mr. Schwartz to talk over the

24   lunch break to see whether he has any problems with your

25   exhibits.  And when I said "Mr. Schwartz", I didn't mean to

203

1    exclude anybody else, but I assume he's the guy who's

2    principally going to care about that.

3              MR. PARKER:  Right.  Thank you, Your Honor.  I just

4    thought I should bring it up now.

5              THE COURT:  Sure.  I understand.  Okay, is --

6              MR. MILLER:  Your Honor, one housekeeping detail.

7              THE COURT:  Yes.

8              MR. MILLER:  I'd like to move into evidence, Your

9    Honor, the affidavit of service of the Garden City Group Inc.

10             THE COURT:  Could you come closer to a mic --

11             MR. MILLER:  Yes.

12             THE COURT:  -- because I didn't hear you.

13             MR. MILLER:  I would move to admit into evidence,

14   Your Honor, the second amended certificate of service of

15   Jeffrey Stein, the vice president of business reorganization

16   with the Garden City Group Inc.

17             THE COURT:  Okay.  Any objection?  No objection.

18   It's admitted.

19   (Debtors' Exhibit 17, second amended certificate of service of

20   Jeffrey Stein of the Garden City Group, was hereby received

21   into evidence as of this date.)

22             MR. MILLER:  That would be, I think, Your Honor --

23   that is Exhibit 17.

24             UNIDENTIFIED SPEAKER:  Yes.

25             MR. MILLER:  Thank you, Your Honor.

204

1          THE COURT:  Okay.

2          MR. SCHWARTZ:  And just so the record is clear on the

3     other issue, the two determinations that Mr. Parker were

4     referring to were attached as exhibit to the government

5     statement on the opening day and can be incorporated into the

6     record here without objection, or, as you did at the DIP

7     hearing, you can take judicial notice of the two

8     determinations.

9          THE COURT:  Either way, then, it's in.  And that's no

10    longer a matter of dispute between you and Mr. Parker?

11         MR. SCHWARTZ:  Exactly, subject to, as Your Honor

12    said, the arguments about standing and relevance.

13         MR. PARKER:  So they're a part of the record now?

14         THE COURT:  The two documents Mr. Schwartz was

15    talking about are, yeah, but I got the impression that you had

16    another two, Mr. Parker.

17    (Two Treasury Department determinations were hereby received

18    into evidence as of this date.)

19         MR. PARKER:  No, no, just those two.

20         THE COURT:  All right, then that discussion --

21         MR. PARKER:  I mean, plus the one I'd already

22    introduced, Parker's Exhibit 1.

23         THE COURT:  Fair enough.

24         MR. PARKER:  Would these bear exhibit -- his exhibit

25    numbers or what?

205

1    THE COURT:  I don't think it makes a whole lot of

2    difference, folks, what numbers are given to exhibits.  Okay.

3    Is Mr. Curson here -- oh, Mr. Eckstein?

4    MR. ECKSTEIN:  Your Honor, I'm sorry, I understand

5    that you'd like to hear Mr. Curson, and I have no objection to

6    that.  Once he concludes, I'd like to just address the Court

7    with respect to some issues regarding the closing arguments but

8    I thought I would do it after the testimony.

9    THE COURT:  Absolutely.  Mr. Curson, come up, please.

10   Come on over here, please, Mr. Curson, and remain standing for

11   a minute.  Karen?

12   THE CLERK:  Please raise your right hand.

13   (Witness duly sworn)

14   THE COURT:  Have a seat, please, Mr. Curson.  Mr.

15   Salzberg, whenever you're ready.

16   MR. SALZBERG:  Thank you, Your Honor.

17   CROSS-EXAMINATION

18   BY MR. SALZBERG:

19   Q.    Good afternoon, Mr. Curson.

20   A.    Good afternoon.

21   Q.    Just a few questions.  You are -- your declaration's

22   proffered on behalf of the UAW, is that correct?

23   A.    That is correct.

24   Q.    Okay.  And the UAW had a collective bargaining agreement

25   with General Motors pre-petition, is that correct?

206

1   A.   We did.

2   Q.   And that CBA, we'll call it, was amended on, I believe, in

3   May of 2009, is that correct?

4   A.   That is correct.

5   Q.   So, prior to the petition date, the CBA was amended?

6   A.   Yes.

7   Q.   Okay.  How is the CBA -- procedurally, how was the CBA

8   amended?

9   A.   How was the CBA amended?  In December of 2008, Chrysler

10  and General Motors came to us; they had requested a bridge loan

11  from the government in order to survive.  The bridge loan --

12  the terms of the bridge loan set a number of targets that

13  General Motors and Chrysler had to meet in order to receive

14  bridge loans.  Some of those targets included being

15  competitive, having labor agreements that were competitive with

16  transplants; that's foreign-owned auto manufacturers that are

17  located in the United States.  They approached us and required

18  to bargain amendments to the 2007 labor agreement in order to

19  meet those targets, in order to get the bridge loans, in order

20  to survive.  So we agreed and we entered into the negotiations.

21  Q.   Okay.  And once the parties -- the parties being the UAW

22  and General Motors -- reached agreement, was the proposed

23  amended CBA submitted to the union members for ratification?

24  A.   Well, it's a little more complicated than that.  We

25  reached an initial tentative agreement in February, February

207

1    17th, which we thought met the targets of the terms of the loan

2    agreement.  And shortly thereafter, President Obama said

3    that -- that labor agreement was folded into a plan, an overall

4    plan by both General Motors and Chrysler, and submitted to the

5    government for their proposal to be a company that could

6    survive after the loans.

7           President Obama came out and announced on March 30th, I

8    believe was the date, that the companies didn't go far enough

9    and the labor agreements didn't go far enough, and we were

10   charged with the responsibility to go back in and renegotiate

11   what we had already negotiated as an amendment to the 2007

12   agreement, which then -- we began -- in ultimately about May

13   23rd we reached a tentative agreement, the second tentative

14   agreement that we presented to our members for ratification.

15   Q.   Okay.  And so, just so I'm clear, the amended CBA was

16   submitted to your membership for ratification sometime after

17   May 23, 2009?

18   A.   That is correct.

19   Q.   And when was the amended CBA actually ratified?

20   A.   It was ratified -- the vote was consolidated and announced

21   on May 29th.

22   Q.   And when did the --

23           MR. SALZBERG:  Well, strike that.

24   Q.   Is the amended CBA now in place?

25   A.   The amended CBA is effective now, yes.

208

1    Q.    When did it become effective, sir?

2    A.    The Monday following ratification.

3    Q.    Do you know the date?

4    A.    I don't know the date --

5    Q.    Okay.

6    A.    -- but I --

7    Q.    Was the effectiveness of the amended CBA contingent upon

8    anything happening apart from ratification?

9    A.    Certainly.  All of the amendments are considered ratified

10   based on the terms of ratification.  That means all of the

11   components of the amendments were voted on in ratification by

12   our members.  That meant our members couldn't -- and as an

13   example, the collective bargaining agreement versus the VEBA,

14   the agreement for our retirees' health care, they were two

15   major components of the agreement, but they were voted on in

16   one vote.  Our members had to vote it up or vote it down.  And

17   if either one -- if there wasn't compliance with either one, we

18   would consider the amendments not ratified and not in play.

19   Q.    So is it -- I'm sorry, sir, is it your testimony that

20   there is a provision within the amended CBA that says if the

21   new VEBA agreement is not approved by the Court, the amended

22   CBA is not effective?

23   A.    We would consider it -- yes, if it -- if the new VEBA --

24   if the terms of the agreement -- if the health care for our

25   retired members was not going to be provided for any reason, if

209

1    the Court denied the VEBA, if the company couldn't fund the

2    VEBA or couldn't fund at any point, that they couldn't deliver

3    what they agreed to deliver to our retired members, we, at that

4    point, would have a right to withdraw all of the amendments to

5    that agreement.

6    Q.    Okay.  And are those terms regarding the UAW's right to

7    withdraw from the CBA, are they contained in a memorandum of

8    understanding?

9    A.    They're in the settlement agreement.

10   Q.    In the UAW retiree settlement agreement?

11   A.    It's in the settlement agreement for the amendments for

12   the collective bargaining agreement that we signed on the 29th.

13   Q.    I'm sorry, sir, is that attached -- is that agreement

14   attached to your declaration?

15   A.    Yeah, I believe it is, yes.  It's in with the white book.

16   Q.    Yeah.

17         (Pause)

18   Q.    Well, there are multiple attachments to your declaration.

19   Do you know --

20   A.    It's entitled "The White Book".  I don't have it with me.

21   I don't have it in front of me.

22         MR. SALZBERG:  It's in the declaration?  Okay.

23         (Pause)

24   A.    Okay, I have it here.

25   Q.    Does it bear a page number on the bottom?

210

1    A.    It's -- it looks like an "i".

2          MR. SALZBERG:  If I may approach, Your Honor.

3    A.    Roman numeral i.

4          THE COURT:  Yes, you may approach.

5    Q.    All right.  And so, sir, you pointed to the 2009

6    modifications to the 2007 UAW/GM agreement, contract settlement

7    agreement, dated May 17th, 2009, is that correct?

8    A.    That is correct.

9          MR. SALZBERG:  May I approach, Your Honor?

10         THE COURT:  Yes.

11   Q.    And just so the record's clear, it is the UAW's position

12   that if the -- that that agreement provides that if the new

13   VEBA is not approved by the bankruptcy court in the UAW retiree

14   settlement agreement, the amendments to the collective

15   bargaining agreement can be nullified?

16   A.    That is correct.

17   Q.    Okay.  All right.

18         MR. SALZBERG:  No further questions, Your Honor.

19         THE COURT:  Okay.  Anybody else want to question Mr.

20   Curson?  Mr. Bromley, any redirect?

21         MR. BROMLEY:  No redirect, Your Honor.  Just to move

22   admission of the declaration and exhibits into evidence as

23   UAW-1.

24         THE COURT:  Okay.  Any objection?

25         MR. MILLER:  No objection.

211

1          THE COURT:  No objection.  Hearing no objection, it's

2    admitted.

3    (UAW-1, declaration of David Curson and accompanying exhibits,

4    was hereby received into evidence as of this date.)

5          MR. MILLER:  Beyond Mr. Bromley, does anybody have

6    redirect?  All right, folks, am I correct that everybody who

7    wanted to have a chance to ask questions of Mr. Curson has had

8    that opportunity?  No response.  Mr. Curson, thank you.  You're

9    excused.

10         THE WITNESS:  Thank you.

11         THE COURT:  Okay.  Before we break for lunch, folks,

12   to what extend does anybody have a desire to put anything

13   further into the evidentiary record at this point?  I took an

14   extra long pause this time.  Mr. Bressler?

15         MR. BRESSLER:  Your Honor, I just wanted to confirm,

16   we did submit our deposition designations and it's subject to

17   counter-submissions.  I would move their admission.

18         THE COURT:  Okay.  Once those counterdesignations are

19   made, my tentative, subject to your rights to be heard, is

20   they're a part -- they also become part of the record.  Anybody

21   have a different view?  No.  Okay.  They're in, Mr. Bressler --

22         MR. BRESSLER:  Thank you, Your Honor.

23         THE COURT:  -- or will be in when counterdesignations

24   arrive.  Is there --

25         MR. ROY:  Excuse me, Your Honor.

212

1          THE COURT:  Excuse me, I don't know your name.

2          MR. ROY:  It's Casey Roy with the Texas AG's office.

3     May I have just a moment with counsel?

4          THE COURT:  Sure.  Sure.

5          MR. ROY:  Thank you.

6        (Pause)

7          MR. ROY:  Your Honor, this is the exhibit list that

8     was filed by the state of Texas.

9        (Pause)

10         MR. ROY:  Your Honor, for the Court's information,

11    these are the participation agreement documents that relate to

12    the dealer modifications.  And for the record, Your Honor, all

13    of this was timely filed.

14       (Pause)

15         MR. ROY:  Your Honor, we move to offer into evidence

16    Exhibits 1 through 9 for the state of Texas.

17         THE COURT:  Okay.  Any objections?

18         MR. MILLER:  No objection.

19         THE COURT:  No objections.  They're admitted.

20    (Texas AG-1, General Motors Corp. cover letter dated 6/1/09

21    regarding proposed Participation Agreements relating to GM's

22    dealer agreements and restructuring plans, was hereby received

23    into evidence as of this date.)

24    (Texas AG-2, General Motors Corp. proposed Participation

25    Agreement dated 6/1/09 regarding GM dealer sales and service

213

1  agreements, was hereby received into evidence as of this date.)

2  (Texas AG-3, General Motors Corp. proposed letter agreement

3  dated 6/1/0/ modifying the Participation Agreement, was hereby

4  received into evidence as of this date.)

5  (Texas AG-4, informal request for production to Weil Gotshal

6  and Manges, LLP dated 6/23/09 from J. Casey Roy, was hereby

7  received into evidence as of this date.)

8  (Texas AG-5, e-mail dated 6/23/09 from J. Casey Roy to Weil

9  Gotshal and Manges, was hereby received into evidence as of

10  this date.)

11  (Texas AG-6, General Motors Corp. cover letter dated 6/1/09

12  accompanying the final version Participation Agreements, was

13  hereby received into evidence as of this date.)

14  (Texas AG-7, General Motors Corp. final version of

15  Participation Agreement dated 6/1/09, was hereby received into

16  evidence as of this date.)

17  (Texas AG-8, General Motor Corp. final version of proposed

18  letter agreement dated 6/9/09 modifying Participation

19  Agreement, was hereby received into evidence as of this date.)

20  (Texas AG-9, e-mail dated 6/26/09 from Evert Christensen

21  forwarding Exhibits 7 & 8 to J. Casey Roy was hereby received

22  into evidence as of this date.)

23      MR. ROY:  Thank you, Your Honor.

24      THE COURT:  All right.  Just hand it up personally to

25  me, please, Mr. Roy.

214

1           MR. ROY:  Thank you.

2           THE COURT:  Thank you.  Okay, now that we took care

3    of Mr. Roy's needs and concerns, anybody else?  Mr. Parker, I

4    thought your issues were addressed.

5           MR. PARKER:  Yeah, I only have one other, Your Honor,

6    which is how can I get a list of all the exhibits?

7           THE COURT:  By checking the docket like every other

8    party in the case.

9           MR. PARKER:  Oh, because, I mean, like, I have a

10   witness and exhibit list, but I don't have -- I don't know

11   whether they put them in that order or not.

12          THE COURT:  Mr. Parker, I'm not in a position to give

13   you any more help than any of the other lawyers in the case

14   that are subject to --

15          MR. PARKER:  Thank you.

16          THE COURT:  Okay.  All right, the evidentiary record

17   is now closed, ladies and gentlemen.  Mr. Eckstein, you had

18   some matters you wanted to bring to my attention.

19          MR. ECKSTEIN:  Your Honor, thank you.  I was simply

20   going to rise in response to the suggestion that Your Honor had

21   made about the timing for the closing arguments.  And I gather

22   Your Honor's initial inclination is to move forward today with

23   closing arguments, and I assume Your Honor would like to try to

24   wrap this up as promptly as possible.  The only point I wanted

25   to bring out was, putting aside -- I'm sure there are certain

1    parties who would always like a little more time to prepare,

2    but with that one issue to one side, there are several

3    significant issues that we've heard about both yesterday and

4    today, in a conference with Your Honor and in testimony, that

5    appear to be very close to favorable resolution.  And at least

6    from the committee's perspective and, I believe, listening to

7    the objections from various other parties, it would seem to me

8    that the resolution of those issues would dramatically narrow

9    the issues that are the subject of debate and that will have to

10   be considered by Your Honor.  And I simply wanted to raise with

11   Your Honor whether or not there was an opportunity to see if we

12   could actually bring closure to some of the issues that seem to

13   be on the verge of resolution and --

14          THE COURT:  That would no doubt narrow matters --

15          MR. ECKSTEIN:  Dramatically, Your Honor, I believe.

16          THE COURT:  I hear you, but I don't know how to get

17   my arms around it, Mr. Eckstein.  Let me throw out a thought

18   not in the nature of a ruling, which is, do you think it would

19   be productive for you to have a caucus with other parties-in-

20   interest over the lunch break to see if people are in a

21   position to make joint recommendations to me as to how we

22   should handle argument?

23          MR. ECKSTEIN:  Sure, I'd be happy to, Your Honor.

24   And we can certainly consult.

25          THE COURT:  Consulting is always easier than

216

1    agreeing, I will understand that, but the practical problem I

2    have that I would ask everybody in the room to consider is

3    that, given the company's liquidity and the July 10th date that

4    we have, certainly everybody understands my desire to use my

5    time as efficiently as possible and to allow as much time as I

6    can allow myself to give you guys a decision of the quality

7    that you all deserve.  So what I need to do, and to ask you all

8    to do, is to figure out a way to balance the need to keep

9    things moving forward to avoid a lot of argument on matters

10   that could be resolved in the manner that you articulated, Mr.

11   Eckstein.

12          So my thought would be that when argument begins it

13   will be from the debtor with the chance for people with

14   different perspectives to respond and for the debtor to reply.

15   But so long as the debtor understands that if we go forward

16   it's going to be up at bat first, it seems to me that it's no

17   harm, no foul and maybe very sensible to have the kind of

18   dialogue we're talking about over the lunch break for you and

19   Mr. Miller to agree, and other folks like Mr. Richman and tort

20   litigants and AGs and the like, as to how we should do it.

21          A propos that, full stop, you, Mr. Eckstein, and the

22   two indentured trustees on your committee are in kind of a

23   hybrid capacity because you support the motion in some respects

24   and you have concerns about it in others.

25          MR. ECKSTEIN:  That's correct, Your Honor.

217

1          THE COURT:  I would like to get your views --

2     probably not fair to ask for them now, but probably after lunch

3     -- as to when and how you and the two indentured trustees

4     should be heard and whether you want to bifurcate your argument

5     or what.  And when I said I would be hearing from the debtors,

6     I did not mean to exclude from argument opportunity folks who

7     generally agreed with the debtors, like the government, the

8     UAW, the larger bondholder group and anybody -- both the

9     Canadian government and anybody else who I might have

10    overlooked.

11         So what I'm of a mind -- I don't know if you're going

12    to be successful or not, Mr. Eckstein, but I think it couldn't

13    hurt to have that dialogue and that we propose that you have it

14    over the lunch hour.

15         MR. ECKSTEIN:  We'll do that, Your Honor, and

16    obviously we'll include Treasury in that discussion because

17    they're a critical participant in these discussions.  And it

18    may be that certain of the arguments will naturally carry over

19    to tomorrow morning in any event, and that may actually provide

20    the window to resolve some of the issues that are open and

21    hopefully can get closed.  But I don't know whether that will

22    or will not get accomplished.

23         THE COURT:  All right, well, given our track record,

24    I think it would take extraordinarily favorable circumstances

25    to finish all oral argument this afternoon or even this

218

1    evening.  Mr. Miller?

2        MR. MILLER:  Your Honor, a propos of that statement,

3    which I don't think is a subject for the luncheon conference,

4    is Your Honor going to set any time limits on oral argument?

5        THE COURT:  That's a good point.  Probably, I think,

6    I need to.  And while I would not do it the way this circuit

7    does, or even the Supreme Court, we can limit a party to twenty

8    minutes or whatever it is before the yellow and red lights go

9    on.  I think I would like recommendations, when we resume after

10   the lunch break, as to what would be fair for the various

11   objectors and what would be consistent with due process on the

12   one hand and not turning this into a circus on the other.

13       MR. MILLER:  Yes, sir.

14       THE COURT:  Okay.  But I'm not going to decide it

15   this minute.  I got to think about that one myself.

16       MR. MILLER:  Thank you, Your Honor.

17       THE COURT:  All right, thank you.  Ms. Cordry, do you

18   want to rise before we break?

19       MR. CORDRY:  I would just like to second Mr.

20   Eckstein's position because the Attorneys General, as you know,

21   had filed an omnibus objection and had quite a few issues on

22   the table.  I think we're extremely close on virtually all of

23   them, except successor liability we have some real

24   determinations there.  But it's been very difficult to close

25   the sale, if we can use an auto term there, on most of these,

219

1    at least in part, because everyone who needs to deal with those

2    issues has been very tied up in being in this hearing and so

3    forth.  And we've been at a stage of almost-done for several

4    days now.  So I think, in fact, if there was a clear period of

5    a few hours where both on their side and our side, everyone,

6    could sit down there, work through the pieces and make sure

7    that both Treasury and the GM side are okay with that, I think

8    we and, I think, some of the other folks would be able to

9    dramatically reduce the amount of our argument.  So --

10            THE COURT:  Well, fair enough.  I can't obligate

11    anybody to agree with anything.

12            MR. CORDRY:  Clearly not.

13            THE COURT:  But it would help me do my job, just like

14    it would help Mr. Eckstein and you do yours, if I get my arms

15    around what has been resolved and what's still outstanding.  In

16    fact, that was why I asked --

17            MR. CORDRY:  Right.

18            THE COURT:  -- you guys to give me those supplemental

19    sheets so I knew which issues you had which you perceived as

20    not being satisfactorily or fully addressed and those that are

21    now behind us.  Am I right that you're allied with the brief I

22    got from the Nebraska AG --

23            MR. CORDRY:  Yes, yes.  I'm arguing that brief, yes.

24            THE COURT:  -- that seventy-one page brief?

25            MR. CORDRY:  Yes, and -- I'm sorry, and we did file

220

1    table of contents last night --

2           THE COURT:  Well, you weren't -- you didn't sign the

3    brief, but I suspect you were a co-conspirator --

4           MR. CORDRY:  Yes.  Yes --

5           THE COURT:  -- as part of that submission?

6           MR. CORDRY:  I actually looked at the Local Rules and

7    I did not see the table of contents; we were very late on time.

8    It turns out it's in the case management order, which I had not

9    seen, and I deeply apologize, Your Honor.

10          THE COURT:  All right, well, you understand why I

11   want to get your perception on TWA and compare it with theirs

12   and --

13          MR. CORDRY:  Exactly.

14          THE COURT:  -- all the others.

15          MR. MILLER:  Exactly.

16          THE COURT:  And, with agreement, those issues are

17   going to be narrowed.  And what I need to -- I think they've

18   already been narrowed, but I need everybody's help on the

19   extent to which they remain.

20          MR. CORDRY:  Right.  I would note that the narrowing

21   is actually in some of the areas such as the dealer agreements,

22   the warranty provisions and those sort of things, some of which

23   are starting to come into being filed with the master purchase

24   agreement, some of which are in draft orders which have not

25   been filed yet, some environmental --

221

```
 1            THE COURT:  So you're talking about a narrowing of

 2     two different types --

 3            MR. CORDRY:  Right.

 4            THE COURT:  -- their being narrow on some of your

 5     dealer provisions where there may or may not have been

 6     comparable progress on successor liability issues?

 7            MR. CORDRY:  Right.  All of the issues, I say, apart

 8     from successor liability, are very close to being done.  But we

 9     don't have everything done; we don't have it in filed orders.

10     We kind of -- until we see the actual written piece of paper,

11     we'll need those.

12            On the successor liability, we certainly -- I think

13     there's room -- if we actually sat down and talked some more to

14     Treasury, I think there's room that we could narrow that some

15     more.  I've seen the draft order; it has some language there

16     that comes part of the way.  We have not had any chance to

17     discuss that language with them to see where their thoughts are

18     on that.

19            THE COURT:  All right, here's what I'd like to do,

20     not ordering, suggesting.  If Mr. Miller and U.S. Attorney's

21     folks and Mr. Eckstein think that your attendance at their

22     lunchtime chat will be productive, maybe that would be a good

23     idea.

24            But I understand, Mr. Eckstein, you can't have the

25     kind of caucus you're talking about if it has thirty-five
```

222

1    objectors in the room.  You're going to have to figure out

2    what's most appropriate in terms of how you think you can get

3    the dialogue that you think is constructive.  I mean, I can see

4    that one extra person for dinner is no big deal.  If you have

5    forty people coming into your living room, it can be a bigger

6    production.

7         MR. ECKSTEIN:  Without getting too far into the

8    weeds, my sense is that we probably can break the issues out

9    into essentially what I would give the umbrella of the

10   successor liability-type issues, and then there are financial

11   issues.  I believe the financial issues are the ones that, at

12   least based upon what we've heard so far, should be

13   susceptible, at least in the ideal world, to a resolution and

14   clarity.  And I believe that it would be very constructive if

15   we can, if we can, to try to get those issues as resolved as

16   possible before launching into closing arguments.

17        I believe that the successor liability issues warrant

18   discussion, but the sense that I have at least is that we all

19   have -- we know what the positions are, and those will probably

20   have to be argued.  Obviously, if there can be more movement

21   and clarity, I think that'd be great.  But I think that, for

22   purposes of the closing arguments, at least my assumption is

23   that we're working off of the record that we have.  And I think

24   that Your Honor is going to want to hear the legal arguments

25   associated with --

223

1           THE COURT:  Right, and I would be surprised if

2   anything that was being done is going to alleviate Mr.

3   Richman's concerns, and probably Mr. Parker's as well.

4           MR. ECKSTEIN:  I believe that's probably right, Your

5   Honor.

6           THE COURT:  Nevertheless, the debtor will have the

7   first argument.

8           Mr. Richman, I don't know if you are rising or not or

9   merely to point out what I just recognized.

10          MR. RICHMAN:  Just wanted to add my own two cents,

11  Your Honor, to try to be constructive.  I don't mind admitting

12  that the influx of information that has come in over the last

13  two days has been rapid, and in some sense it's overwhelming.

14  We haven't yet been able to get transcripts from yesterday or

15  today.  I did my best to take notes, particularly during Mr.

16  Wilson's deposition -- I mean, his testimony.  He spoke very

17  fast; I wasn't able to get it all down.  And when Your Honor

18  talks about limiting argument, I would submit, not just for

19  myself but, I think, generally for everybody, that with some

20  more time to organize notes and prepare to be able to refer to

21  particular testimony in support of particular legal arguments,

22  all of the arguments will be more streamlined and better

23  organized and shorter in length.

24          So my view, and particularly taking into account the

25  need of parties to confer to narrow issues, and in particular

224

1    our need to organize the arguments as in a streamlined and

2    effective a fashion as we can, is that we should commence

3    argument in the morning, take a break this afternoon, let

4    people have the discussions they want to have, let people

5    organize the way they need to and coordinate other issues and

6    presentations.

7            THE COURT:  Mr. Miller, unless you're sure you know

8    what you want to do now, I was going to suggest you think about

9    that over the lunch break and let me know if you prefer to

10   start this, your argument, since you're the number one batter,

11   this afternoon, or whether or prefer to start tomorrow.

12           MR. MILLER:  Your Honor, certainly will think about

13   it, but I would note, Your Honor, there is an urgency to the

14   situation.  You have an enormous record before you. You have a

15   lot to do, as you said, to render a decision.  Time is really

16   of the essence.  Now, in terms of transcripts, there were

17   depositions all weekend.  A lot of the testimony, Your Honor,

18   and, Your Honor, it was redundant, it was over and over.  I

19   think the issues are very clearly drawn.  If there can be a

20   resolution on -- some of these are narrow -- some of these

21   issues, that's fine.  But I really believe, Your Honor, it's

22   important to move forward.  There are a lot of things waiting

23   that have to happen in connection with this transaction, if it

24   is approved.  And lots of physical, mechanical things have to

25   be done that will take time.  And if this transaction's

225

1    approved, the faster this transaction is consummated, the

2    better the chances that that ten percent of stock that's going

3    to OldCo is going to have some real value.  So time is of the

4    essence, Your Honor.

5         THE COURT:  All right, well, let me know if that

6    remains your thinking after the lunch break.

7         MR. MILLER:  Yes, sir.

8         THE COURT:  Okay.  Now, by my watch, a minute or two

9    before 2:00.  We'll resume in an hour.  We're in recess.

10       (Recess from 1:58 p.m. until 3:05 p.m.)

11       THE COURT:  All right, everybody, have a seat,

12   please.  Mr. Miller, Mr. Eckstein, is there any consensus on

13   approach?  I'm going to ask Mr. Richman the same question.

14       MR. ECKSTEIN:  Your Honor, I think I was reasonably

15   effective at herding as many cats as I could over the last

16   hour, and I think the consensus that we have is as follows.  I

17   think people are prepared to go forward now.

18       THE COURT:  Again?

19       MR. ECKSTEIN:  People are prepared to go forward this

20   afternoon with the closing arguments.  My understanding is that

21   the company is going to begin and parties in support are going

22   to argue.  And I gather that -- it sounded to me like it was

23   probably under an hour and a half for the arguments on that

24   side.  And to the extent I've been able to speak to the various

25   objectors, and I haven't spoken directly with each of them, by

226

1    my count, Mr. Richman is going to be speaking and I'm told that

2    they would like to reserve somewhere between thirty and forty-

3    five minutes.  Mr. Bressler is going to be speaking and he

4    thinks he needs approximately fifteen minutes.  I haven't had a

5    chance to speak directly to Mr. Jakubowski, but I'm assuming

6    that he will speak in addition to Mr. Bressler, and I assume

7    approximately ten minutes because that was going to be covered

8    together.  Mr. Kennedy is going to speak, and he told me that

9    he needs approximately twenty minutes.  Mr. Esserman and Mr.

10   Reinsel are going to speak, and they have told me they need

11   approximately twenty minutes; that's for the --

12            THE COURT:  For the --

13            MR. ECKSTEIN:  Those are the asbestos --

14            THE COURT:  Oh.  Okay.  Oh, Esserman you said.

15            MR. ECKSTEIN:  Yes.

16            THE COURT:  Okay.

17            MR. ECKSTEIN:  Mr. Esserman and Mr. Reinsel are both

18   going to both speak in support of the asbestos objections.  The

19   Attorneys General, there are three objectors and they've told

20   me that they need between thirty and forty-five minutes

21   collectively.  And I haven't had the opportunity to speak

22   directly to Mr. Parker; I'm assuming he's going to want to

23   speak as well, and I assumed approximately twenty minutes for

24   that as well.  That looks to me like it's somewhere between two

25   and a half and three hours if you assume everybody takes the

1    allotted time that I mentioned.  And I'd be prepared, Your

2    Honor, to describe where the committee is right now and where

3    things stand with respect to our discussions with U.S.

4    Treasury, which I think are productive.  And I can do that

5    either now or I can do that when Your Honor is prepared to

6    shift to the merits.

7         THE COURT:  Okay.  Mr. Eckstein, were you

8    contemplating talking about the successor liability issues, or

9    are you going to leave that to the tort litigants and the AGs?

10        MR. ECKSTEIN:  Your Honor, at present I think I'm

11   going to probably leave that to the individual objectors and

12   the AGs.  We do have a call with our committee for this

13   afternoon at 4:30 which we'd like to have to update them

14   generally upon where a variety of issues are.  And if there's

15   anything further that I need to say, I would ask Your Honor to

16   give us the opportunity after that call to do so, but I don't

17   think it will require Your Honor to interrupt the proceedings

18   for us to have some representatives of our firm out

19   participating in the call.

20        THE COURT:  All right.

21        MR. ECKSTEIN:  But I would like to speak on the other

22   aspect of our objection and how we believe that is being dealt

23   with based upon discussions we've had with the government.

24        THE COURT:  Would you prefer to wait a little longer

25   before you speak to that, or were you looking for an early

228

1    opportunity to do that?

2            MR. ECKSTEIN:  I'd probably do that early, Your

3    Honor, because I think we have a direction that is -- at least

4    as far as I can tell, works for the government, works for the

5    committee and I think is satisfactory at least to the

6    individual committee members who have an interest in the issue

7    and have heard where we are on that.

8            THE COURT:  Would it be your preference to address it

9    before or after Mr. Miller and other movants speak?

10           MR. ECKSTEIN:  Probably before, Your Honor.

11           THE COURT:  Okay with you, Mr. Miller?

12           MR. MILLER:  Okay with me.

13           MR. ECKSTEIN:  I can --

14           THE COURT:  Oh, wait, Mr. Bernstein, you rose your

15   hand -- raised your hand.

16           MR. BERNSTEIN:  Mr. Eckstein omitted --

17           MR. ECKSTEIN:  I'm sorry.

18           THE COURT:  I'm sorry, Mr. Bernstein?

19           MR. BERNSTEIN:  Mr. Eckstein omitted me from the

20   list.  And, in addition, Your Honor specifically asked us to

21   address a particular legal issue in oral argument.  I'm having

22   that researched right now and would very much prefer, if it's

23   possible, and oral arguments getting over till tomorrow, to

24   maybe have -- to address that issue in the morning rather than

25   this afternoon.

229

1          THE COURT:  Well, I won't make you argue it today.

2     You can either do it tomorrow, or if we're somehow done with

3     everything today I'll take a -- you can just give me a letter

4     or a short memo.

5          MR. BERNSTEIN:  That'd be fine, thank you, Your

6     Honor.

7          THE COURT:  Okay.  All right, go ahead, Mr. -- Mr.

8     Esserman?

9          MR. ESSERMAN:  Very quickly, Your Honor.

10          THE COURT:  Come to a microphone, please.

11          MR. ESSERMAN:  Yes.  Your Honor, I definitely --

12     Sandy Esserman, for the record.  I definitely don't want to

13     slow the train down, but I do think it is a little unfair to

14     have to go into argument without understanding what kind of

15     order the debtor is seeking.  And, as I understood it, that is

16     moving around and it could have issues on claims, capital C or

17     small C claims, that could have an effect on what we argue and

18     how we argue it.  I wanted to raise that because it certainly

19     would be nice to know what they are seeking.

20          THE COURT:  You know what the debtor's asking for

21     now, and you can only do better than that, right?

22          MR. ESSERMAN:  I don't know.  I hope so.

23          THE COURT:  I would assume that the debtor's not

24     going to -- I have difficulty seeing how they could make it any

25     worse, from your perspective.

230

1          MR. ESSERMAN:  I agree.  But it would be nice to

2     know --

3          THE COURT:  It seems to comport with your due process

4     needs and concerns.  And if the debtor -- or the government,

5     more likely, makes a decision that some of the stuff that

6     bothered you you're not going to ask for, I assume that you

7     will either not complain and you will say I'm not complaining

8     about that portion but I'm complaining about the portion you

9     didn't take care of.

10         MR. ESSERMAN:  Correct.

11         THE COURT:  It sounds like it skins the cat, to me,

12    Mr. Esserman.

13         MR. ESSERMAN:  Okay, thank you.

14         THE COURT:  Okay.  Mr. Richman.

15         MR. RICHMAN:  Your Honor, my concern is a little

16    different.  And, first, you've run a superb trial under

17    difficult conditions, incredibly speedy in the circumstances.

18    As I indicated before lunch, I feel that I have not had an

19    adequate opportunity, given the importance of the issues that I

20    want to be able to address as articulately as possible to this

21    Court, to effectively marshal all of the evidence that came in

22    at rapid speed and be in a position to respond to the arguments

23    for a large number of people who I think are relying on us to

24    articulate a position for them.

25         I don't believe that the difference between having

231

1     all of the closings today or tomorrow morning can credibly be

2     considered material, even if one accepts that July 10 is an

3     important date for the debtors.  I don't think anybody could

4     have predicted that the testimony would have been over today

5     and the hearings might have gone over until tomorrow in any

6     event.

7              And so all I ask, with all due respect and no

8     criticism of the Court intended, is that I be given an

9     opportunity for additional preparation time so that I can

10    present a more effective argument with reference to the

11    evidence in the morning.  I have no objection to other parties

12    wanting to start today if they feel ready and prepared to go

13    forward.  I'm not trying to put anybody at disadvantage.  I'm

14    also fine if the debtors would rather have it all done -- and

15    it sounds like it's about three hours in total.  So three hours

16    in the morning to take care of argument and maybe have other

17    things cleaned up in the meantime still seems to me to be fair

18    to everybody, give due process to everybody.  And so I would

19    respectfully ask that Your Honor consider that and consider a

20    recess until the morning.

21             THE COURT:  I'm going to do a variant of that, Mr.

22    Richman, because I do believe in due process.  And it's now a

23    quarter after 3.  I'm going to make you second to last, and I'm

24    going to take all of the object -- or take the movants and all

25    of the other objectors today, except for Parker, Mr. Parker.

232

1    Mr. Parker's arguments are so duplicative of yours that I want

2    to hear them from you first.  And then any that he wants to

3    make that you haven't satisfactorily addressed he can make.  So

4    I'll hear everybody else, and you can have first thing in the

5    morning.

6              MR. RICHMAN:  Thank you, Your Honor.

7              THE COURT:  All right.

8              MR. PARKER:  Your Honor, thank you.

9              THE COURT:  Okay.  Mr. Miller, I guess we're ready

10   for your closing at this point.  Just pause for a second.

11             MR. KAROTKIN:  Not Eckstein?

12             THE COURT:  Oh, yes.  Forgive me, Mr. Eckstein.

13   Yeah, thank you, Mr. Karotkin.  Let me just hear from Mr.

14   Eckstein.

15             MR. ECKSTEIN:  Thank you, Your Honor.  Just to tie a,

16   I guess, a ribbon around the issue that I've been referring to,

17   what I had suggested before the break, and I feel that it was

18   worth the effort, one of the significant issues that has

19   influenced the committee from the outset and remains an

20   important part of our view of this transaction is that the

21   business support for this transaction at the committee level,

22   and similarly before the case was commenced from the ad hoc

23   bondholders committee level, was the understanding that the

24   stock and the warrants that were being left with OldCo were

25   going to be available for distribution to unsecured creditors

233

1    and that U.S. Treasury was going to be providing DIP financing

2    on a limited recourse basis in an amount sufficient to fund the

3    wind-down and transition and administrative expenses of the

4    estate.  And that originally had been estimated at being 950

5    million dollars.  And as Your Honor has heard, there were

6    negotiations that were ongoing and discussions to ultimately

7    increase that amount based upon further estimates.

8        What I've been told based on discussions with

9    representatives of the U.S. Treasury is that they are highly

10   confident that those discussions will conclude now that Mr.

11   Wilson is off the stand and is able to refocus on the issue,

12   that those will conclude so that the parties are in a position

13   to come back to court, I'm told, by tomorrow morning and

14   represent to the Court and the parties what the increased

15   amount is going to be.  And what we understand is that it's

16   going to be an amount that JayAlix (sic) is satisfied, in its

17   view, will be adequate to fund what they believe are reasonable

18   wind-down transition and administrative expenses.

19       UNIDENTIFIED SPEAKER:  Not Jay.

20       MR. ECKSTEIN:  AlixPartners?  Thank you.

21       And I've been told that we should assume, for

22   purposes of how we proceed, that that is going to in fact take

23   place and that if for some reason it doesn't play out that way,

24   that the Treasury understands that all bets are off and parties

25   would have the right to continue to advance the arguments that

234

1    we had intended to advance in the first instance.

2        We would obviously prefer that matter to be resolved.

3    Similarly, there was an issue that was discussed earlier this

4    morning with respect to workers' compensation claims and where

5    those are going to reside.  And we've been told that those --

6    that issue also has been resolved favorably for OldCo.  Those

7    will continue to be obligations at NewCo, and we are told that

8    that issue has been resolved with the state so that we no

9    longer have to be concerned about a material modification in

10   the amount of unsecured liabilities moving from NewCo to OldCo.

11   And, similarly, I've been told by the Treasury that that issue,

12   if for some it does not get confirmed by tomorrow morning, then

13   parties will have an opportunity to come back and reopen that

14   issue.

15       So, based upon those representations, Your Honor, we

16   feel that that is quite productive.  And we're prepared not to

17   argue further on that issue today and to give the Treasury and

18   AlixPartners the opportunity to finish that process and

19   hopefully come back and confirm tomorrow morning the business

20   resolution.

21       THE COURT:  All right.  Fair enough.  I think we're

22   ready for you then, Mr. Miller.

23   MR. MILLER:  Thank you, Your Honor.  I was beginning to

24   feel I'd never get here.  Good afternoon, Your Honor, on behalf

25   of the debtors.  Your Honor, since the publication of the

235

1    notice of the hearing to consider the 363 transaction, and

2    starting with the middle of June 2009 and up through June 19,

3    2009, the bar date for filing of objections to the transaction,

4    and thereafter, more than 850 written objections to the sale

5    have been filed.  Many of these objections relate primarily to

6    the portion of the motion dealing with Section 365 of the

7    Bankruptcy Code and the assumption and assignment of executory

8    contracts and unexpired leases of real property.  Those

9    objections, Your Honor, are directed primarily to the cure

10   amounts that have been stated by General Motors.  It's the

11   intention of the debtors to deal with those objections in

12   accordance with procedures that will enable the resolution of

13   the cure amount objections in an orderly process.

14            THE COURT:  Pause, please.  Is there anybody who

15   thinks that the mechanisms you proposed aren't fair?  I mean I

16   understand why they want their needs and concerns taken care

17   of, but there aren't any real procedural objections, am I

18   correct?

19            MR. MILLER:  Not that I'm aware of, Your Honor.

20            THE COURT:  Okay.

21            MR. MILLER:  Okay.  There remain several hundred

22   other objections to the 363 transaction.  In reviewing those

23   objections, Your Honor, certain salient facts resonate from all

24   of the objections.

25            One, no party suggests or indeed opposes the

236

1    consummation of a sale of the General Motors' assets.

2            Two, no party suggests or proposes an alternative

3    viable -- alternative viable to a sale of the General Motors'

4    assets.

5            Three, no party suggests or proposes a source of

6    alternative financing that would be sufficient to satisfy the

7    secured indebtedness of approximately fifty billion dollars

8    that would owed to the Treasury and the governments of Canada.

9            No person has come forward with or an expressed

10   interest to propose a higher or better offer for the assets

11   that are to be sold pursuant to the Section 363 transaction.

12           No person has come forward to contest the liquidation

13   analysis that has become part of the record made by Alix

14   Partners and Mr. Koch.

15           In addition, notwithstanding the huge media or

16   congressional attention to the claim plight of dealers,

17   virtually no GM dealers have objected to the 363 transaction.

18   And, in fact, approximately 99.6 percent of the dealers who

19   have been offered the opportunity to continue as GM dealers

20   have agreed to new ongoing participation agreements.  And over

21   98 percent of the dealers who will be discontinued have

22   accepted wind down agreements.

23           THE COURT:  What's the percentage again, please?

24           MR. MILLER:  Ninety-eight percent of the

25   discontinued, Your Honor.

237

1          All of such agreements are to be assumed by the

2   purchaser.  Various attorneys general and regulators, despite

3   the agreement of the dealers, do object to the application of

4   Section 363(f) to state franchise laws but not to the sale, per

5   se.  The limited objection in deposed by the general unsecured

6   creditors' committee, which represents a constituency composed

7   of bondholders, unionized employees, dealers, suppliers, cloth

8   and asbestos claimants, there's a reflection of the common

9   theme of the objections.

10          The official committees' objection states that it is,

11   and I'm quoting, "Satisfied there is that no viable

12   alternative" and I'm inserting this, to the 363 transaction,

13   "exists to prevent the far worse harm that would flow from the

14   liquidation of GM."  And, the "current transaction is the only

15   option on the table."

16          The official committee further states that the

17   Section -- that the 363 transaction, "serves the core purpose

18   of the bankruptcy code and constitutes a strong business

19   justification under Section 363 of the code to sell the

20   debtors' assets outside of the plan process."

21          Despite this universal appreciation of the fact that

22   the sale of the GM assets is in the best interest of all

23   economic stakeholders, we do have these hundreds of objections.

24   The essence of the objections soon becomes apparent.

25          First, the recurring demand of the objectors, "I want

238

1    more" or "Cut someone else out."

2         Second, "I don't like the process and with more time

3    I might be able to have more leverage and thus extract more

4    consideration."

5         The objectors fail to recognize that what we are

6    dealing with is an asset sale of fragile assets.  To an

7    independent purchaser, that is their sole source of financing

8    and investment.  They ignore the central characteristics of a

9    purchase and sale transaction.  The purchaser makes the

10   decisions as to what it is willing to purchase and on what

11   terms it will purchase those assets and what it will pay and

12   what it will assume.

13        The desire for more is characteristic of creditors in

14   the world of bankruptcy.  Such desire doesn't equate to a

15   legally cognizable objection.  It doesn't mean that a

16   transaction is fatally or otherwise flawed or, indeed, that the

17   purchase price is unfair.  While everybody empathizes with

18   everybody who is suffering because of what is happened to

19   General Motors both in the monetary, emotional or physical

20   sense, bankruptcy, in all its permutations, Your Honor, whether

21   Chapter 11 or Chapter 7 is a zero-sum game.

22        A 363 sale enables the establishment of the value of

23   the assets and leads to a determination of what the pie will be

24   and ultimately, in subsequent proceedings, who will share in

25   that pie.  There can be no doubt that Section 363 empowers the

239

1    Court to consider and approve the sale proposed by the debtors.

2    As the Court has noted many times, one must start with the

3    words of the statute.

4        Section 363(b) is unambiguous.  "The debtors after

5    notice and a hearing may sell property other than in the

6    ordinary course of business with the approval of the Court."

7    There is no prohibition contained in Section 363 or any other

8    provisions of the bankruptcy code that prohibits a Section 363

9    transaction.  The Section 363 interpretive cases fortify the

10   plain meaning of the statute and establish the determinative

11   criteria that a Court should look to to exercise its decisional

12   power.

13       The Lionel case in this circuit and its progeny,

14   including the TWA case in the Third Circuit and the scores of

15   cases that this Court and other courts have ruled on in

16   connection with the application of Section 363(b) sales,

17   particularly in the last two years, likewise establish beyond

18   any doubt the power of the Court to authorize a sale of

19   substantially all of the assets of a debtor pursuant to Section

20   363.  The Lionel line of cases stand for the principle that if

21   there is an articulated business justification for the sale of

22   the assets by the debtor, the sale should be approved.  The

23   reasonable exercise of business judgment on the part of the

24   sale proponent, the debtor, and the good faith of the purchaser

25   establish the basis for the approval of a Section 363 sale.

1          In the case of GM, Your Honor, the record that has

2     been made over the last day and a half is replete with

3     articulated business reasons which justify the approval of a

4     363 transaction.  The case in favor of GM's decision is even

5     more precedent as the assets that are being sold are so prone

6     to substantial deterioration and loss of value.  And there is

7     no alternative to the sale without substantial prejudice and

8     detriment to all economic stakeholders.

9          No party in interest disputes the need to preserve

10    the going concern value over GM assets.  The only way to save

11    that value is through the approval of a 363 transaction.  The

12    alternative, as clearly set forth by Mr. Henderson, a chief

13    executive officer of GM, and confirmed by Mr. Wilson, on behalf

14    of the Treasury, is liquidation.

15         Implementation of the Section 3 -- of the 363

16    transaction is the only way to begin the process of stopping

17    recurring losses that have been incurred by the debtors and to

18    reshape and reinvigorate the transfer of assets to form the new

19    GM.  There is no other option that is available to the debtors

20    and their economic stakeholders.

21         The F&B bond holder's assert, Your Honor, that this

22    is not the right process to follow but rather a Chapter 11 plan

23    process should be affected and in some magical way there will

24    be an accelerated Chapter 11 plan that possibly could be

25    confirmed in ninety days.  Yet there is nothing in the record,

241

1        Your Honor, to substantiate that contention.  And the major

2    premise upon which the F&B bondholders are relying upon, as it

3    developed in today's testimony, was that the UAW employees

4    would be bound under the amended collective bargaining

5    agreement that was ratified in May of 2009 and, therefore,

6    would have to perform services even if the sale is not

7    approved.  The testimony of David Curson, just before the

8    luncheon break, established unequivocally that if UAW retirees

9    settlement is not approved, all the modifications of the

10   amended collective bargaining agreement are withdrawn and GM is

11   put back into the same position that it was before those

12   amendments with labor rates, work conditions, etcetera, which

13   were unsatisfactory in the operation of a business,

14   unsatisfactory to the Treasury.  So saying that the 363 process

15   is not the right process without more is just a conclusion.

16   And doesn't take into account what would happen in a Chapter 11

17   case.  We have seen in these proceedings, Your Honor, how many

18   objections have come forward.  I wouldn't call it a Tower of

19   Babel but we were pretty close, I think.

20        Your Honor has enough experience in Chapter 11 cases

21   to know that things go awry.  And this morning when I was

22   examining Mr. Wilson I referred to the Delphi case.  And in the

23   Delphi case, Your Honor, there was a sale.  There was a

24   proponent for a sale.  And because of what occurred in the

25   Delphi case, the proponent backed out of the sale.  And in a

242

1   case that was filed in October in 2005 in which it was

2   represented at the first day hearings that that case would be

3   over in sixteen months, we are now approaching the fourth

4   anniversary of that case.  And what has happened to that case,

5   Your Honor?  At one point in time, the plan of reorganization

6   was contemplating close to a hundred percent distribution to

7   creditors -- general unsecured creditors.  The current state of

8   that case is that the debtor-in-possession financing is

9   undersecured.  And that the --

10          THE COURT:  The DIP is undersecured?

11          MR. MILLER:  -- undersecured, Your Honor -- that

12   there aren't sufficient funds to pay the debtor-in-possession

13   financing in full.

14          In effect, Your Honor, the estate is administratively

15   insolvent.  And GM is very actively involved in that estate,

16   Your Honor, because Delphi is a major supplier of parts.  If

17   you transpose that, Your Honor, to a Chapter 11 case for

18   General Motors, Delphi did not have the problem of worrying

19   about consumers.  All Delphi had to worry about was

20   suppliers -- I mean raw material suppliers.

21          THE COURT:  Pause here.  To what extent, if any, was

22   any of the stuff you said about the Delphi case not

23   ascertainable for me reading the documents?

24          MR. MILLER:  It's all ascertainable from reading the

25   documents in the case Your Honor.

1          THE COURT:  All right.  And anywhere in putting any

2     embellishment on it, all of those facts are set forth by me

3     just looking at pleadings?

4          MR. MILLER:  Yes, sir.

5          THE COURT:  All right.  Continue.

6          MR. MILLER:  I was about say, Your Honor, Delphi was

7     dealing with an industry providing raw materials, etcetera.  GM

8     is dependant upon consumers; hundreds of thousands of

9     consumers.  A GM in bankruptcy will always give rise to the

10    issue of is it going to be a successful bankruptcy?  Will these

11    vehicles that are being produced have resale value?  Will they

12    be serviced?  The President can talk about warranties, but

13    somebody has to service those warranties.  And if GM is not

14    there to service those warranties, how do they get serviced?

15         This is a different situation, Your Honor, than the

16    situation which Delphi faced in just convincing its suppliers

17    to keep going along with it.  Here you have a consumer

18    community, which as we pointed out previously, Your Honor, the

19    purchase of an automobile is a major expenditure for a

20    consumer.  The consumer is looking for reliability, a good

21    product, resale value and a future that in reliance upon the

22    reliability of the manufacturer.  That will disappear, Your

23    Honor.  Any kind of an extended Chapter 11 case.

24         Beyond that, Your Honor, I think it was Mr. Richman

25    who was examining Mr. Repko this morning for substantially less

244

1     than forty-five minutes in which he made an assumption about

2     financing during this accelerated somehow Chapter 11 case.  The

3     record is absolutely clear; there is not other source of

4     financing for this company.  As the record also demonstrates,

5     this company is losing money every month.

6              As Mr. Parker so eloquently pointed out, Your Honor,

7     there's a negative stockholders' equity that is almost fifty

8     percent -- I'm sorry, the liabilities exceed the assets on book

9     values by over a hundred percent.  And the market value today,

10    obviously, has gone down substantially.

11             In this economy, with a credit crunch that has been

12    pervasive since September of 2008, who is going to finance a

13    continuing Chapter 11 debtor called General Motors?  In a

14    malage, Your Honor, that would have to take out the treasury.

15    The treasury would have to be primed or taken out.  And as Mr.

16    Repko said in his direct -- in his declaration, which is his

17    direct testimony, there was no debtor-in-possession financing

18    available in anything close to the amount that would be

19    necessary to continue the operations of GM.

20             So the alternative of suddenly converting this into

21    an ordinary Chapter 11 or an accelerated Chapter 11, whatever

22    you wish to call it, is not an alternative.  And we have the

23    testimony of Mr. Wilson that if the sale approval, or whatever,

24    is not entered on June 10th the treasury is not going to go

25    ahead and continue financing and will call the loan.

245

1              What does that mean?  That means, Your Honor, we then

2    have to revert to Mr. Koch's liquidation analysis.  And when

3    Your Honor looks at that exhibit that Mr. Koch testified to,

4    the recoveries, the general unsecured creditors, is zero.  And

5    as Mr. Wilson testified, even the U.S. Treasury claims will be

6    impaired.  So in the context of what we're talking about where

7    the only alternative is liquidation, these are exactly the

8    circumstances in which Section 363 comes into play.  That's why

9    it's in the statute, that's why it's been recognized by

10   bankruptcy courts, over and over again starting from pre-code

11   law when the issue was are the assets in some danger; are they

12   burdensome?  When the code was adopted in 1978, it brought

13   forward those principles but on the basis of business judgment.

14   You no longer had to establish that the assets were

15   deteriorating.  It was an exercise of business judgment.

16             And again, Your Honor, what this record demonstrates

17   beyond any doubt whatsoever, is that General Motors considered

18   its alternatives.  It considered various alternatives and it

19   came to the conclusion the exercise of reasonable business

20   judgment, after a lot of study and a lot of paper produced,

21   that the best alternative to preserve the going concern value

22   of these assets was the consummation of a Section 363

23   transaction provided that the United States Treasury, which was

24   its largest secured creditor, was willing to go along with it

25   and would finance the new GM.  And that's what happened, Your

246

1     Honor.

2          And as Mr. Wilson testified, those negotiations were

3     frustrating, difficult and strenuous.  And they occurred over a

4     period of time.  Mr. Wilson is an extremely adroit negotiator.

5     And fortunately, for the creditors, Your Honor, when you look

6     at the purchase price for these assets and you look at, if Your

7     Honor recalls, the testimony of Mr. Worth yesterday and the

8     exhibits to which he referred to, the net purchase price,

9     assuming the value of the equity, which is going to be issued

10    is as Mr. Worth testified, is approximately ninety-plus billion

11    dollars.  I venture to say, Your Honor, there is no one else in

12    the world who would pay ninety billion dollars for these

13    assets.  And maybe it's a great compliment for the bargaining

14    acumen of the GM team that they were able to get that

15    bargaining -- that purchase price.  So the concept that there's

16    some sort of a Chapter 11 process that's going to work here,

17    just isn't true, Your Honor.  It's not going to happen.

18         363 sales are consistent with the concept of allowing

19    the market to establish the value of assets as directed by the

20    Supreme Court in 203 North LaSalle Street, a case in 1999 at

21    526 U.S. 434.  In these cases despite, as I said the extreme

22    notoriety of GM's distress and the thirty-day period that was

23    provided for under the sales procedure order, no party, not one

24    party desired to conduct due diligence for the purpose of

25    proposing a different or other offer for the assets of General

1    Motors.

2           The purchaser in this case is the treasury sponsored

3    vehicle, now New GM Co. or NGMCO, Inc.  The treasury is a

4    holder of the prepetition secured obligation of the debtors in

5    the amount of 19.4 billion dollars.  Since the onset of these

6    Chapter 11 cases, pursuant to the June 25 order, another 33.3

7    billion dollars in the IP financing has been provided.  And as

8    Mr. Wilson testified, that amount will be drawn before the

9    consummation of this transaction.

10          Under the terms of the 363 transaction, I could read

11   into the record but I'm not going to do it, Your Honor, in the

12   interest of time, a description of the purchase price.  Maybe I

13   should do that, sir.  In the --

14          THE COURT:  I mean I have read the purchase --

15          MR. MILLER:  And I will not do it, Your Honor.

16          THE COURT:  Is there a particular part that you

17   wanted to bring to my attention?

18          MR. MILLER:  No, Your Honor.  I was just taking it

19   out of the MSPA -- the MPA --

20          THE COURT:  All right.  Go ahead, explain it.

21          MR. MILLER:  Okay.

22          "The consideration for the purchase -- of the

23   purchase assets will be:

24          A) A bankruptcy code Section 363 credit bid in the

25   amount equal to; 1) The amount of indebtedness owed by the

248

1    parent and its subsidiaries as of the closing as defined below.

2         Pursuant to the existing sponsor credit facilities

3    and 2) The amount of indebtedness of parent and its

4    subsidiaries as of the closing under the debtor-in-possession

5    credit facility, the DIP facility, less 8,022,488,605 dollars

6    which is going to be assumed by New GM as part of the exit

7    financing. Plus,

8         B) The return of the warrant issued by parent, that's

9    GM, to sponsor in consideration of the secured indebtedness

10   owed by parent to sponsor under the existing sponsor credit

11   facilities.  Plus,

12        C) The issuance by purchaser to parent of 50,000 --

13   I'm sorry, 50 million shares of common stock of purchaser (the

14   parent shares) and warrants to acquire 90,909,090 shares of

15   common stock of purchaser ("parent warrants"), plus

16        D) The assumption by purchaser of the assumed

17   liabilities."

18        All of that, according to Mr. Worth's testimony, adds

19   up to a net purchase price of in excess of 90 billion dollars.

20   There is no comparable offer.  Nothing even close to it, Your

21   Honor, for the assets that are to be sold and transferred.

22        The purchaser has added an increment, obviously, to

23   the purchase price in the interest of serving national

24   interest.  "No other entity can compete with the purchase price

25   that has been offered by the purchaser."

249

1          In considering the 363 sale and referring to the

2    Lionel case, Your Honor, the factors that are cited in that

3    case, the Second Circuit noted that one of the more important

4    factors, or maybe the most important factors is whether the

5    assets are deteriorating.  And in this case, Your Honor, that

6    is a fact.

7          There has been testimony about the June sales and the

8    June sales were better than the downside projection.  But

9    yesterday, Mr. Henderson testified, taking into account

10   everything the month was a terrible month.  It was thirty

11   percent less than the same period in 2008.  And also, as Mr.

12   Henderson testified, fleet sales, which are a very important

13   component on the sales of General Motors, had substantially

14   decreased because of the uncertainty in the minds of fleet

15   owners.  That uncertainty, Your Honor, could only appreciate

16   and grow in the event that this sale is not consummated and

17   there is some effort to continue this Chapter 11 process.  But

18   that's not even in the cards because the treasury has said,

19   there will be no financing.  And that, I am sure, Your Honor,

20   will be in newspapers and blogs tomorrow.  And when dealers --

21   I'm sorry, excuse me, Your Honor, not dealers -- fleet owners

22   and even consumers read what has transpired here, the level of

23   uncertainty will go even higher.  And then the potential for

24   revenue perishability, loss of market share will be right in

25   the front of this company and will severely damage its value.

250

1          Now, in breaking down the objections, Your Honor, the

2     way I look at them, there are essentially four categories.

3          The first is that the 363 transaction constitutes a

4     sub rosa plan.

5          The second, the sale results in unfair treatment of

6     hourly retiree employees and perhaps others.

7          Three, the conditions of the sale violates state

8     franchise law as relating to dealers.

9          Four, the scope of Section 363(f) as it relates to

10    successor liability issues.

11         The objections, Your Honor, from our perspective, as

12    you might anticipate, are without merit and should be

13    overruled.

14         The 363 transaction in no way constitutes a sub rosa

15    plan.  There is no provision in the 363 transaction or relating

16    to the 363 transaction that prescribes the treatment of

17    creditor claims in the liquidating Chapter 11 cases.  The

18    portion of the purchase price consisting of shares of common

19    stock in the warrants of a purchaser will constitute the

20    debtors' estate for eventual disposition in a plan of

21    liquidation to be negotiated with the debtors' allowed claim

22    holders.  How that portion of the purchase price will be

23    allocated to holders of allowed claims in the Chapter 11 cases

24    is in no way dictated by the Section 363 transaction.

25         The Section 363 transaction does not contravene the

1    holding of the Braniff case.  It is consistent with the Lionel

2    line of cases and the recent decision in the Chrysler case.

3    The precise arguments made by the objectors here were made in

4    Chrysler.  That Fiat -- the Fiat sale was a sub rosa plan.

5    Judge Gonzalez, in his decision of May 31, soundly rejected

6    that argument.  It must be assumed that the United States Court

7    of Appeals for the Second Circuit, in affirming Judge

8    Gonzalez's decision, likewise, found the sub rosa argument

9    without merit.

10           The 363 transaction is no more and no less than a

11   sale of assets for the best possible price available and with

12   no other conditions imposed on the debtors as to the

13   disposition of the consideration received by the debtors.  Some

14   objectors assert that the UAW, the collective bargaining agent

15   and the UAW VEBA, will represent over sixty thousand employees

16   of the debtors are receiving a high recovery on its Chapter 11

17   plan than others and therefore not only is the Section 363

18   transaction unfair, but it rises to a sub rosa plan.

19           As the testimony demonstrates, Your Honor, without

20   any contravention, the recovery by the UAW retirees' claim is

21   coming directly from the purchaser and not from the debtors.

22   It is a transaction that was negotiated by the US Treasury

23   directly with the UAW.  And why was it negotiated?  It was

24   negotiated because the purchaser, like any purchaser in a 363

25   transaction who is buying the assets that conduct the business,

252

1        needs to have the wherewithal to conduct that business.

2              There are sixty thousand UAW employees who operate

3        these plants.  Without those employees, there is no business.

4        And if there is no business there is no going concern value.

5        So in order to protect its investment, the purchaser had to

6        reach an arrangement, an agreement with the UAW and that is an

7        arrangement between the U.S. Treasury and the UAW.  And part of

8        that arrangement, Your Honor, is that the UAW is releasing its

9        claim against the debtors' assets.  That claim, Your Honor, is

10       in excess of twenty million dollars.  Not quite as big as the

11       bondholders, but pretty damn close; which would certainly

12       dilute any recovery that bondholders might make as long as that

13       claim was there in the Chapter 11 cases.  So there is a benefit

14       from what the U.S. Treasury has negotiated with the UAW.

15              THE COURT:  Mr. Miller, am I right or off base if I

16       looked at the UAW's willingness to proceed with New GM under

17       more pro management terms as consideration for New GM?

18              MR. MILLER:  Yes, Your Honor; intangible but more

19       consideration.

20              THE COURT:  Okay.

21              MR. MILLER:  My view, Your Honor, the concessions

22       that were made -- if I can go back a minute, if Your Honor may

23       recall in Mr. Wilson's testimony -- I'm sorry, Mr. Curson's

24       testimony, Mr. Curson said, "The union was advised that as far

25       as the treasury was concerned in connection with the bridge

253

1    loans that were made commencing on December 31, 2008 and into

2    2009, the treasury had made it perfectly clear that the cost of

3    operations of GM had to be reduced and that included the cost

4    of unionized hourly employees.  And those concessions were made

5    in the context of allowing GM to survive to get to the point

6    where there can now be a New GM which has these modified

7    terms -- and this is not unusual, Your Honor, 363 buyers come

8    in in companies that have been unionized and are able to

9    negotiate new concessions in appropriate cases.  This case is

10   extremely complicated because of the size of the case the size

11   of the financing needed.  But in my view, Your Honor, it

12   certainly is a concession.

13        THE COURT:  So strictly speaking, the new collective

14   bargaining agreement was entered into with the existing GM and

15   wouldn't last for as long as Old GM and the principal

16   beneficiary of accommodations being made with the New GM?

17        MR. MILLER:  The structure of the transaction, Your

18   Honor, if the new agreement was negotiated with the debtor on

19   the premise that it would be assumed and assigned to New GM.

20        THE COURT:  Assumed and assigned in its modified

21   form?

22        MR. MILLER:  That's correct, Your Honor.  Subject to

23   the consummation of this transaction.  As Mr. Curson said, "If

24   the transaction is not approved, all of those concessions are

25   withdrawn."  The ratification of that new agreement is no

254

1  longer effective.

2          It's a well established rule, Your Honor, that in

3  connection with 363 sales, the purchaser may elect, in its

4  discretion, what liabilities should be assumed and what

5  arrangements the purchaser may make with the employees of the

6  debtor.  This was clearly evidenced, Your Honor, in a case in

7  this district in the Maxwell Publications Chapter 11 cases in

8  connection with the sale of the Daily News to Mortimer

9  Zuckerman, in which Mr. Zuckerman made direct agreements with

10 the various unions involved in the Daily News case.  The

11 unhappiness, Your Honor, of retired hourly employees, who are

12 both distressed and envious of the status of the UAW

13 represented employees, is unfortunate.

14         However, Your Honor, as your testimony and the record

15 indicates, essentially, there are no active employees who are

16 represented by the IUE.  And from the perspective of the

17 purchaser, as Mr. Wilson testified, the purchaser, the U.S.

18 Treasury and the government was looking to the creation of a

19 viable entity on the other end of this transaction.  And

20 viability of a business entity very much depends on its capital

21 structure and its cost base.  So the determination was made by

22 the U.S. Treasury that essentially the principle that it was

23 operating on was what expenses should be assumed that are

24 necessary to make NewCo, or New GM, a viable company?

25         If everybody here could do it, Your Honor, on this

255

1    side, they would move all liabilities to New GM.  And we have

2    another company that maybe overleveraged.  And in particular,

3    Your Honor, the IUE, as testimony demonstrates, continuation of

4    the hourly retiree health and medical benefits is not an

5    insignificant fund.  It's over 300 million dollars a year.  And

6    unfortunately, Your Honor, the way the world is, those

7    employees, or retirees, I should say, are not contributing any

8    benefits to the New GM.  And the increase of that liability may

9    affect the ongoing business of New GM.  Right now, Your Honor,

10   the seasonally adjusted annual rate of sales of vehicles in the

11   North American market is approximately 9.95 million to 10

12   million vehicles a year.  At that rate, Your Honor, no OEM is

13   making any money.  And so when, Your Honor, when you read the

14   reports, its not only GM and Chrysler and Ford that are losing

15   money, but the giants like Toyota, Honda, etcetera.

16        At 9.5 million units, over 10 million units, GM is

17   not at a breakeven point.  So this entity that's going forth,

18   this New GM, has a challenge before it.  It has to materially

19   increase sales.  It has to lower its cost of operation.  It

20   cannot afford to take on unnecessary expenses.  And that's the

21   underlying guiding principle that resulted in the IUE hourly

22   retirees being left behind.  But being left behind, Your Honor,

23   did not leave them with nothing.

24        There was a process to try and deal with the issue.

25   And that process, as the record demonstrates, was to give them

256

1    the same benefits, and it's for all the splinter unions Your

2    Honor, as GM was offering to its retired salaried employees.

3    Now, granted they are reduced benefits, but they are benefits

4    just the same, Your Honor.  Mr. Kennedy pointed out that in

5    connection with the salaried retirees there was also an

6    increase in the pension at the same time that reductions were

7    made in the past year by increasing the pensions by 300 dollars

8    per month.  Well, that did not come out of a hide of GM, Your

9    Honor.  That came out of the pension fund.  An overfunded

10   pension fund that hadn't increased benefits for a long period

11   of time, according to Mr. Henderson's testimony.  The --

12            THE COURT:  Pause, please.  Let me make sure I'm

13   keeping up with you.

14            MR. MILLER:  Yes.

15            THE COURT:  The 300 bucks a month that were given to

16   the salaried --

17            MR. MILLER:  Retirees.

18            THE COURT:  -- retirees, which I gather they could

19   use either for paying for supplemental health coverage or for

20   putting in their pockets, came out of the qualified pension

21   trust as contrasted to GM?

22            MR. MILLER:  That's correct, Your Honor.

23            THE COURT:  All right.

24            MR. MILLER:  And so, it did not affect the cash flow

25   of the operating company.

257

1          So it's unfortunate, as I said, Your Honor, that

2     there is harm and frustration and damages as a result of what's

3     happened to GM.  The fact that the retired hourly employees

4     believe that the UAW has been favored, is not a substantive

5     legal objection to the 363 transaction.  There sole complaint

6     is a claim with insufficient benefits to them.

7          In the most recent filing by the IUE, which I think

8     was made the day -- Monday, perhaps, it's asserted that the 363

9     transaction was structured as part of a conscious and

10    deliberate conspiracy to deprive IUE hourly retirees of their

11    health and medical benefits.  The IUE claims that the 363

12    transaction was structured to circumvent the provisions of

13    Section 1114 of the bankruptcy code.

14         The surreply, if I can refer to it as that, fails to

15    take cognizance of the fact that from the purchaser's

16    perspective, there are no benefits to the New GM as the IUE

17    represents no active employees.  In total disregard of the

18    economics and the intention to have a viable, successful,

19    economically viable New GM that will enhance the value of the

20    shares of stock that will be held by Old GM, the IUE casually

21    asserts that the purchaser must assume the IUE health and

22    medical benefits obligations.  I believe, Your Honor, the cases

23    are legend.  That the bankruptcy court cannot direct a

24    purchaser as to what obligations it will assume or pay.  These

25    are obligations that run into the millions of dollars per

258

1    month.

2         The IUE also asserts that the 360 transactions are

3    simply unfair because more could have been taken from other

4    entities, such as executives.  It doesn't note that executives

5    previously took sharp and significant reductions over the years

6    while reductions could not be taken in respect of the splinter

7    unions because those benefits were subject to collective

8    bargaining agreements.

9         The fact that the purchaser has voluntarily

10   contracted to provide benefits to UAW employees is self-

11   evident, they are a necessity to operate the business and

12   enhance the assets.  That doesn't give IUE and the other

13   splinter objectors a legally sufficient objection to the 363

14   transaction.  And I would point out to Your Honor that certain

15   other small splinter unions have agreed to the proposal that GM

16   has made to equate hourly's with salaried retirees and have

17   NewCo assume that obligation.

18        It is an unfortunate economic circumstance but not

19   the result of any conspiracy.  The 363 transaction offers the

20   IUE retirees and other splinter union retirees an opportunity

21   to receive benefits and recoveries that will be lost if the 363

22   transaction is not approved.

23        The liquidation analysis demonstrates, and it is

24   unchallenged, Your Honor, that there will be no recoveries to

25   IUE retirees and all unsecured creditors.  A result that should

259

1    not be allowed simply to seek the envy of IUE retirees, vis a

2    vis UAW represented employees and retirees.

3         IUE also points out that salaried employees in

4    connection with a reduction in their health and medical

5    benefits -- I've spoken to that already, given the cost, Your

6    Honor, of the IUE health and medical benefits plan, its

7    axiomatic that during the course of the pending Chapter 11

8    cases and probably sooner than later the debtors will move to

9    reject the IUE retirees' health and medical plans as Mr. Koch

10   testified.

11        Just one minute, Your Honor.

12        Hourly employees will stand pari passu with salaried

13   retirees as to health and medical benefits.  The number of IUE

14   retirees is the largest and most significant group of hourly

15   employees who have not accepted the proposal.  That, in and of

16   itself, Your Honor, is unfortunate, but as I said does not

17   create an impediment to the approval of a 363 transaction.

18        The record is now clear, Your Honor, that the U.S.

19   Treasury will not go forward with continued financing absent

20   approval of the -- of a sale and the collective bargaining

21   agreement with the UAW will fall apart, as Mr. Salzberg

22   established this morning through Mr. Curson.

23        In connection, Your Honor, with Section 363 sales and

24   successor liabilities in this circuit, it has been consistent

25   that Section 363 sales have been approved as free and clear of

260

1    all claims, encumbrances, interests, etcetera, and successor

2    liabilities pursuant to Sections 363(f) and 105 of the

3    bankruptcy code.  Various parties have objected to the scope of

4    the requested relief.  The same issues came up in the Chrysler

5    case and in Judge Gonzalez's decision in relation to the

6    rejection of dealer contracts that was decided on June 19, 2009

7    and Judge Gonzalez again denied the same objections that have

8    been raised in connection with this 363 transaction.

9           Protection against successor liabilities is a

10   standard provision and appropriate in respect of Section 363

11   sales.  Moreover, since the filing of the objections and a

12   connection with product liability claims, the MPA has been

13   revised so the purchaser, as established by the record, will

14   assume all express warranty claims and all product liability

15   claims that arise subsequent to the closing of the 363

16   transaction, irrespective of when the vehicle purchased.  And

17   as Your Honor questioned yesterday in connection with the

18   indemnification agreements, mostly the GM dealers are

19   indemnified in connection with product liability claims.  So

20   eventually, they leach up to General Motors.  And I --

21          THE COURT:  The guys that you're terminating, the

22   dealers who are underneath the termination agreements with the

23   "soft landing" so to speak, if one of those terminated dealers

24   gets sued by somebody injured, do you still have massive

25   indemnification?

261

 1          MR. MILLER:  I don't know the answer to that

 2    question, Your Honor.

 3          UNIDENTIFIED SPEAKER:  Yes.

 4          MR. MILLER:  Yes, Your Honor.

 5          THE COURT:  Okay.

 6          MR. MILLER:  And, Your Honor, I would just -- one

 7    minute -- the situation we have before the Court today, Your

 8    Honor, is a situation in which the choices are between

 9    approving a sale and from the debtors' perspective liquidating

10    this company.  And I think in that context, facts and

11    circumstances, Your Honor, I believe that the decision in the

12    Third Circuit, in the TWA case, is right on point.  And the

13    Third Circuit said, "Given the strong likelihood of a

14    liquidation, absent the asset sale to American", that's

15    American Airlines, "a fact which appellants do not dispute, we

16    agree with the bankruptcy court that a sale of the assets of

17    TWA at the expense of preserving successor liability claims was

18    necessary in order to preserve 20,000 jobs including those of

19    certain named individuals and to provide funding for employee-

20    related liabilities including certain retiree benefits."

21          Now, in the case before Your Honor, it's not 20,000

22    employees, there are over 90,000 employees in the North

23    American operations and globally for GM, it's over 200,000

24    employees.  The consequence of liquidation to those employees

25    will be horrific.

262

1          In respect of the asbestos claims, Your Honor, that's

2     an issue for OldCo.  This is not an asbestos driven case as

3     Your Honor's previously noted.  And 1114 is not applicable to

4     the purchaser.

5          THE COURT:  I think you mean 524(g).

6          MR. MILLER:  Oh, I'm sorry; 524(g).

7          THE COURT:  But I have a question on that.  The

8     proposed order in the last form I saw it, and I understand it's

9     being looked over again and may be amended, but I think it has

10    an injunction in it.  It actually has the words "are enjoined

11    from proceeding with asbestos claims".  Does that walk and

12    quack a little bit like a 524(g) --

13         MR. MILLER:  No, Your Honor.

14         THE COURT:  -- or the entity that's being protected

15    is the purchaser of NewCo rather than the insurance company?

16         MR. MILLER:  I don't believe so, Your Honor, because

17    it's not only a question of the assertion of the claim.  When

18    claims are asserted you have to defend against them.  That

19    costs money.  That takes time and effort.  Here, what we're

20    trying to do is effectuate a sale where a purchaser will

21    acquire these assets, work these assets and not be subjected to

22    lawsuits.  And it's different in the other cases, Your Honor,

23    because OldCo will still be there.  And OldCo will have to

24    decide how to deal with these asbestos claims, including

25    perhaps, Your Honor, the future claims.  In connection with the

263

 1    motion that was made to appoint a committee -- an additional

 2    committee of asbestos claimants, Your Honor denied that motion

 3    without prejudice pending further developments that may occur

 4    in connection with the administration of that estate.  And

 5    there are various alternatives that can be adopted in the

 6    administration of the liquidating Chapter 11 case that it's

 7    going to be a negotiated plan of liquidation.  There could be a

 8    fund created to deal with the future claims so that's set aside

 9    and as future claims arise, they will have a resource to go to.

10    But that's an issue for the old company.  What we have is a

11    purchaser who's laid down some conditions that are certainly

12    within the power and jurisdiction of this Court consistent with

13    the TWA decision, consistent with Lite Motor; this is within

14    the power of the Court.  And I believe, Your Honor, that the

15    injunction is necessary because without in any way being

16    disrespectful, asbestos claimants know how to pursue litigation

17    whether it's with merit or without merit.  And that's expensive

18    litigation.

19         THE COURT:  Talk about the similarities and

20    differences between what you're asking for and -- in the way of

21    asbestos protection and what was given by Judge Gonzalez and

22    affirmed by the Circuit in Chrysler?

23         MR. MILLER:  As I understood the Chrysler decision,

24    Your Honor, I will defer to anybody else who -- it is the

25    equivalent of -- first, it's free and clear of all claims and

264

1    encumbrances and I believe there's an injunction in that order.

2          THE COURT:  I guess the best evidence of that is

3    whatever Judge Gonzalez entered?

4          MR. MILLER:  Yes, Your Honor.

5          And so, Your Honor, we would submit that the

6    successor liability issues are simply not issues that should

7    deter this Court from exercising its approval of this 363

8    transaction because it complies with Section 363 for all the

9    reasons stated in Lionel and it's the progeny of Lionel.

10         The dealer issues, Your Honor, which came to the

11   forefront soon after the commencement of the Chapter 11 cases

12   and relate to the reconfiguration and the dealer relationships

13   certainly created a tempest in a teapot.  GM, in contrast to

14   what occurred in Chrysler, carefully and meticulously undertook

15   to work with its dealers to efficiently downsize the dealer

16   network.  Rather than rejecting the dealer contracts under

17   Section 365, GM undertook to agree on mutually satisfactory

18   arrangements that would alleviate the costs and effects of

19   termination and changes.  As the dealers who GM has proposed to

20   continue receive participation agreements with proposed

21   amendments to the dealer agreements that were explained to such

22   dealers, as I said before, the overwhelming acceptance, 99.6,

23   that is a tremendous statement of the position of the dealers

24   that they want to continue, they want to support a new GM.

25         As I said with respect to the proposed discontinuing

265

1    with dealers, over ninety-eight percent accepted the wind down

2    agreements.  And those wind down agreements, Your Honor,

3    provide for some financial support for these discontinued

4    dealers.  It's giving them an opportunity of twelve or more

5    months to liquidate their inventories with support from New GM.

6    These agreements are being assumed by New GM.

7            The ultimate objective of the dealer program is to

8    reduce the total number of GM dealers from approximately 5900

9    dealers to approximately 3500 to 3600.  Over 900 discontinued

10   dealers filed appeals for review.  What GM did, Your Honor, is

11   it set up a process that even after giving a notice of

12   discontinuance, if that's the appropriate term, the dealer had

13   an opportunity to object to the discontinuance and enter into

14   an appeal process.  Nine hundred discontinued dealers did file

15   appeals and currently over sixty decisions have been reversed.

16           As a general proposition, the dealer community is

17   relatively satisfied with the approach taken by GM.

18   Unfortunately, various state's attorney general and regulators

19   contend that the participation agreements are violative of

20   state franchise laws and therefore impermissible.  Again, the

21   Chrysler case is instructive.  The same arguments were

22   presented to Judge Gonzalez.  In his decision of June 9, 2009,

23   in connection with the rejection of dealer contracts, which is

24   cited at 2009 LEXIS 1382, Judge Gonzalez ruled that "Under the

25   supremacy clause of the United States constitution, state

266

1    franchise laws, which do not concern public safety or health

2    and welfare but are rather economic in orientation, were

3    subject to the overarching jurisdiction of the bankruptcy court

4    to the extent necessary to implement the objectives and

5    policies of the bankruptcy code."  And these state statutes,

6    Your Honor, are clearly economic in orientation.

7            THE COURT:  The distinction you are making was

8    between regulatory provisions that are regulating their health

9    and safety or the public health and welfare?  Did I hear you

10   right?

11           MR. MILLER:  Yes, Your Honor.

12           THE COURT:  And the contrast fee and those that are

13   essentially economic in nature?

14           MR. MILLER:  That's correct, Your Honor.

15           THE COURT:  All right.  Continue.

16           MR. MILLER:  The arguments which I presented Your

17   Honor, apply with equal force to the arguments which have been

18   made by the consumer victims committee.  The arguments to which

19   have been made on behalf of the five product liability

20   claimants represented with my -- Mr. Jakubowski.  And then,

21   Your Honor, it likewise applies to the other objections, I

22   think Mr. Parker was making an objection along those lines

23   also.  But Mr. Parker's primary objective, Your Honor, as I

24   understand it anyway, is that GM in some mystical way violated

25   its obligations under certain indentures and granted liens

267

1    and --

2              THE COURT:  Under the equitable and ratable clause

3    that it contends exists?

4              MR. MILLER:  Yes, Your Honor.  The fact of the

5    matter, Your Honor, no lien or security interest was granted to

6    the United States Treasury in violation of any of those

7    indentures.  And --

8              THE COURT:  They're equal in ratable salary?

9              MR. MILLER:  Equal in ratables, sir.

10             Section 406 of the indenture that Mr. Parker referred

11   to states, and I'm going to paraphrase, Your Honor, GM is not

12   going to put any liens on any principle domestic manufacturing

13   property of GM or any manufacturing subsidiary or upon any

14   shares of stock or indebtedness --

15             THE COURT:  Except excluded assets?

16             MR. MILLER:  I'm sorry, Judge?

17             THE COURT:  Except excluded assets?

18             MR. MILLER:  These are the excluded assets, Your

19   Honor.

20             THE COURT:  Okay.  So the issue is do we have a

21   definition of excluded assets?

22             MR. MILLER:  It's put in the record, Your Honor.  And

23   it is the principle domestic manufacturing properties and

24   manufacturing subsidiaries -- the shares of manufacturing

25   subsidiaries.  Those are excluded Your Honor.

1          THE COURT:  Okay.

2          MR. MILLER:  And in January 7, 2009, GM issued an 8-

3    K, and it said on the 8-K that the "The seller is secured by

4    substantially all of GM's and the guarantors U.S. assets that

5    were not previously encumbered including their equity interest

6    in most of the domestic subsidiaries and their intellectual

7    property that real estate, other than their manufacturing

8    plants or facilities".  And in Section 401 of the loan and

9    security interests, it states, Your Honor, it is -- that's

10   where the definition of excluded assets come from and it

11   states, "Excludes a lien on any property that gives rise to an

12   obligation to grant a lien to another party, such as the

13   bondholders".  And it states --

14          THE COURT:  All right.  So you're saying that if it

15   would have triggered the equal and ratable clause it was listed

16   amongst the excluded assets and, therefore, when the deal was

17   structured it was an intentional effort to avoid triggering the

18   equal and ratable clause?

19          MR. MILLER:  Absolutely, Your Honor.

20          THE COURT:  Go ahead, Mr. Miller.

21          MR. MILLER:  And beyond that, Your Honor, Mr.

22   Henderson testified that there was no violation of the

23   indentures.  There was nothing in the record.  Mr. Parker has

24   not produced any notification or record of the filing of any

25   liens against the excluded properties.  So this record is clean

269

1    that are no such liens.

2           Mr. Parker --

3           THE COURT:  So you --

4           MR. MILLER:  Sorry.

5           THE COURT:  So you're saying the debtors didn't

6    purport to subject the critical property to a security

7    interest.  In fact, evidenced the intention to avoid it.  And

8    apart from that, didn't throw a mortgage or a UCC lien on the

9    affected property.

10          MR. MILLER:  That's correct, Your Honor.  I might

11   even point out there's actually a provision that if by accident

12   a lien had been granted it would be invalidated because it

13   violated the indenture.

14          Mr. Parker also makes an argument, Your Honor, for

15   recharacterization over equitable subordination of the

16   treasury's claim, including I think what he's saying some

17   concept of deepening insolvency, there is nothing in the

18   record, Your Honor, that in any way would establish the grounds

19   for equitable subordination or recharacterization and should

20   not be --

21          THE COURT:  Forgive me, Mr. Miller, before you get

22   too far, can you give me the cites to the definition of

23   excluded assets and of the section of the financing agreement.

24   I think we're talking about the December LFA, December 2008, on

25   that granted a lien but also was a carve out previously --

270

1          MR. MILLER:  Yes, Your Honor.

2          THE COURT:  -- well, could one of your guys do that?

3          MR. MILLER:  Could I furnish that to Your Honor by

4     this afternoon?

5          THE COURT:  Yes, I just need to be able to read it

6     for myself.

7          MR. MILLER:  Yes, sir.

8          THE COURT:  To second-guess you in that regard.

9          MR. MILLER:  Your Honor, the --

10          THE COURT:  With you and Mr. Parker.

11          MR. MILLER:  Yes, sir.  And, Your Honor, in

12     connection with the infamous 62,700 dollars, an unfortunate

13     incident.  Your Honor asked the question as to what would be

14     the status of claiming of that 62,700 dollars?  I would refer

15     Your Honor to the case of Doe v. Pataki, 481 F.3d --

16          THE COURT:  George Patki?

17          MR. MILLER:  Pataki, a former governor.

18          THE COURT:  My classmate?

19          MR. MILLER:  I didn't know that, Your Honor.  You're

20     a fortunate man indeed.

21          THE COURT:  Go on.  Doe versus Pataki.

22          MR. MILLER:  481 F.3d 69 and 75-76, a Second Circuit

23     decision in 2007.

24          THE COURT:  What was the jump cite?

25          MR. MILLER:  I'm sorry, sir?

1              THE COURT:  The page cite.

2              MR. MILLER:  75-76.

3              THE COURT:  Okay.

4              MR. MILLER:  And I'm quoting, Your Honor, "The basic

5    principles governing interpretation of consent decrees and

6    their underlying stipulations are well-known.  Such decrees

7    reflect a contract between the parties (as well as a judicial

8    pronouncement) and ordinary rules of contract are generally

9    applicable", citing United States v. ITT Continental Baking

10   Co., at 420 U.S. 223, 236-37 (1975), see Crumpton v. Bridgeport

11   Education Associates, 993 F.2d, 1023,1028 (2d Cir. 1993).  In

12   the face of the holding in that case, Your Honor, we would

13   conclude that, unfortunately, that the 62,700 dollars is a

14   contract claim.

15             THE COURT:  A contract claim and, therefore, it's

16   just like all the other contract claims that you can only take

17   for the remaining unsecured community?

18             MR. MILLER:  Exactly, Your Honor.

19             Your Honor, the arguments that have been made, and

20   which are not supported by the record, that disapproving the

21   363 transaction would be a benefit for bondholders, in

22   particular, and maybe the consumer victims make the same

23   argument.  But, Your Honor, the economics that are before the

24   Court don't change if this transaction is not approved.  They

25   just get worse.

272

1          GM is in a losing position now.  Continuation of this

2     case in Chapter 11 will lead inevitably to a liquidation.  A

3     liquidation which will have systemic results, Your Honor.

4     There is a whole community of suppliers that rely upon GM that

5     have been acknowledged by the federal government to be in the

6     danger zone if this company should be liquidated.  There are

7     hundreds of thousands of jobs in the supplier industry that

8     would be affected and would deepen whatever the economic

9     crisis -- whether you want to call our economic crisis a

10    recession or a depression, but it would deepen that crisis to

11    the detriment not only of the economic stakeholders in this

12    case but to the nation as a whole.  And in all of the

13    circumstances that have been presented, again, I have to say

14    Your Honor, there is no alternative.  It is liquidation or this

15    sale and liquidation is draconian.

16          So we submit, Your Honor, that the 363 transaction

17    complies with the applicable principles of law.  The debtors

18    have amply justified the exercise of their reasonable business

19    judgment and have articulated the rationale for their judgment.

20    There is no realistic alternative to preserve the going concern

21    value of the business and the assets to be sold.  In support of

22    the motion the debtors have filed all of the declarations and

23    exhibits that support this transaction.  The testimony of Mr.

24    Worth is not challenged as to the values here by any other

25    financial expert.  The testimony of Mr. Repko is not challenged

273

1   in any way as to the lack of financing.  The testimony of Mr.

2   Henderson, including his declaration, sets forth at length and

3   in detail the considerations that went into the commencement of

4   this 363 transaction.  The considerations that the company went

5   through in the negotiations with the U.S. Treasury --

6          THE COURT:  Pause, Mr. Miller.

7          MR. MILLER:  I'm pausing.

8          THE COURT:  Back to fairness opinion, if there aren't

9   any competing bidders or any alternatives to liquidation, how

10  important is it that anybody trying if the consideration is as

11  much as Worth thought, I would think that if the secured

12  lenders pushes the credit bid and as long as it's more than the

13  liquidation analysis and if that bid is the only game in town,

14  does it matter if the liqui -- if the fairness opinion was

15  right or not?

16         MR. MILLER:  I'm going to give you my view, Your

17  Honor before everybody jumps up in the back from the investment

18  banking community and jumps on me.

19         THE COURT:  You going to tell me that they give a lot

20  of money for something they didn't need?

21         MR. MILLER:  No, Your Honor.  We're dealing with one

22  of America's largest corporations.  We're dealing with a

23  company which has a public board of directors.  Almost all the

24  directors, with the exception of Mr. Henderson, are independent

25  directors.

274

1          THE COURT:  And he'd like to be protected against

2     claims of breach of fiduciary duty and due care and the like?

3          MR. MILLER:  Exactly, Your Honor.

4          THE COURT:  I assume they had -- do they have their

5     own counsel?

6          MR. MILLER:  Yes, Your Honor.  The board of direct --

7     the independent members of the board of directors are

8     represented by Cravath, Swain & Moore.

9          THE COURT:  All right.  And to the extent that you

10    are relying beyond a good business reason that the ordinary

11    stuff we look at on any ordinary business judgment test getting

12    a fairness opinion goes a long way to helping and business

13    judgment?

14         MR. MILLER:  Exactly, Your Honor.

15         THE COURT:  All right.  Continue.

16         MR. MILLER:  So, Your Honor, we conclude that this

17    transaction is in the best interest of these debtors.  Is in

18    the best interest of every economic stakeholder and benefits

19    the general unsecured creditor body.  Because without this

20    transaction, there is no recovery for general unsecured

21    creditors and it may be a very valuable recovery.  I mean a

22    large recovery, Your Honor.  As Mr. Wilson testified this

23    morning, it's the intention of the treasury to try and

24    facilitate an initial public offering as early as 2010, which

25    will provide liquidity to these shares of stock.  And there is

1    downside protection that was granted in the context of the

2    warrants that are part of the deal that was made between the

3    treasury and the bondholders.  A deal that was negotiated

4    directly with the treasury and a voluntary contribution by the

5    U.S. Treasury to provide more consideration.

6         So, Your Honor, this is a classic 363.  I don't think

7    I can recall a case that demanded the necessity for

8    consummation to avoid what would be horrific consequences for

9    all of the parties involved and all of the communities in which

10   this company does business and all of the communities in which

11   its suppliers do business.  So we ask Your Honor to approve the

12   transaction.  Thank you very much.

13        THE COURT:  Does the government, Mr. Jones or Mr.

14   Schwartz want to be --

15        MR. JONES:  Yes, Your Honor.

16        THE COURT:  Before you get up, Mr. Jones, how long do

17   you think you're going to be?  If you're going to be more than

18   ten minutes, I wouldn't mind taking a break.

19        MR. JONES:  Your Honor, I expect to be less than

20   that.

21        THE COURT:  Okay.  Let's do it.

22        MR. JONES:  May it please the Court, David Jones,

23   Assistant U.S. Attorney for the Southern District of New York.

24        The United States joins and strongly supports the 363

25   motion before the Court.  As we've stated throughout the case,

276

1    the United States has committed enormous public resources to

2    achieve the swift certain creation of a commercially sound new

3    General Motors.  The evidence is overwhelming and

4    uncontradicted.  The only feasible way to achieve that goal is

5    through the 363 motion before the Court today and the

6    transaction confers enormous value on the estate that will

7    remain to be administered through the bankruptcy process.

8         This transaction more than meets with the

9    requirements of Section 363.  The evidence is abundantly clear

10   that it was negotiated intensively and at arm's length.  It is

11   far and away the highest and best offer achieved through sales

12   approval -- sales procedures that this Court has previously

13   approved and, indeed, no other offer has come in.  The

14   transaction far exceeds the estate's liquidation value and the

15   record is also undisputed that liquidation, which would be

16   calamitous and a freefall situation, is the only alternative to

17   this sale.

18        As the evidence also has made clear, time is

19   absolutely of the essence as New GM's commercial viability

20   requires rapid completion of the sale.  We have unambiguous

21   testimony during the hearing that the government conditions its

22   funding on a prompt sale order.  That has been a condition of

23   the government's lending throughout.  And we heard during the

24   hearing that it remains a condition of the government's

25   willingness to participate.

1          The government acted based on its sound and

2     independent business judgment that it cannot and will not risk

3     public dollars on the slower and less certain process and that

4     the 363 transaction contemplated is both legally appropriate

5     and necessary.

6          Your Honor, there's been -- has been or may be some

7     question or allegation the government has not acted in good

8     faith.  But to the contrary, the government has exhibited

9     paramount good faith at every aspect in its -- in every aspect

10    of its dealings with General Motors.  There's no evidence of

11    collusion or improper conduct to undermine the bonafides of

12    this sale.  Indeed the government was motivated first by acting

13    as a prudent lender and then in connection with the 363

14    transaction as a purchaser, as Mr. Wilson repeatedly testified,

15    motivated simply by the goals of serving it's commercial

16    necessity as it moved into a phase where it would be operating

17    the new GM.

18         Your Honor, I won't dwell on the objections.  My

19    remarks would be just duplicative of Mr. Miller's in which I

20    join.  But no one has seriously called any of what I've just

21    said as to the fundamental merits of the transaction into

22    doubt.  And there is no basis to call those assertions into

23    doubt.  We do join in Weil's analysis of why each and every

24    objection lacks merit.  And for these reasons, we join General

25    Motors and urge the prompt approval of the 363 motion.  Thank

278

1      you, Your Honor.

2              Oh, I'm sorry, Your Honor, I have one more narrow

3      comment to say which is in response or in elaboration to some

4      questions directed to Mr. Miller regarding the Chrysler sale

5      order, in case it may be helpful.

6              THE COURT:  Yes, thank you.

7              MR. JONES:  The 363 order in Chrysler, which was

8      entered on June 1st, and I apologize I don't have extra copies,

9      but I think --

10             THE COURT:  I think I can find it on ECA.

11             MR. JONES:  -- yes, it's obviously available --

12     defines the claims that are being -- that the property of the

13     debtor was delivered free and clear of on pages 2 and 3 of the

14     document, that's where the defined term is located.  In turn,

15     that paragraph 9 on page 26 of the order, the order provides

16     that the assets are transferred free and clear of claims as

17     defined earlier in the document at pages 2 and 3.  And Mr.

18     Miller finally was correct that the order includes injunction

19     language.  That's located in paragraph 12 of the order at pages

20     28 and 29.

21             So, Your Honor, the broad principles I've just

22     enunciated and we strongly support the motion, and I do note

23     that the remarks I just made and the particulars of the

24     Chrysler sale order make clear that what's being done today is

25     perhaps unprecedented in economic scope in some respects, but

279

 1    precedented and fully supportable as a matter of bankruptcy

 2    law.  Thank you.

 3              THE COURT:  All right, thank you.  Who else is --

 4    Canadian government?

 5              MR. SCHEIN:  Yes --

 6              THE COURT:  All right.  Canada and Ontario.  Mr.

 7    Schein, come on up, please.

 8              MR. SCHEIN:  Good afternoon, Your Honor.  Michael

 9    Schein for Export Development Canada on behalf of the

10    governments of Canada and Ontario and as the DIP lender and a

11    contemplated equity owner of New GM.  Your Honor, Canada has

12    and continues to support the prompt emergence of GM and the

13    sale transaction before this Court.  Canada believes the

14    arguments made by the debtors and supported by U.S. Treasury,

15    in respect of the consummation of this sale, both is supported

16    by the record before this court as well as applicable law.

17    Moreover, Your Honor, timely closing of this transaction is

18    important to Canada and marks a historic restructuring and the

19    alternative, Your Honor, liquidation, is in no one's interest

20    including Canada.

21              According, Your Honor, we respectfully request that

22    the Court approve the sale transaction and overrule all of the

23    objections for the reasons set forth by debtor's counsel.

24    Thank you, Your Honor.

25              THE COURT:  Thank you, Mr. Schein.  UAW want to be

280

1    heard?  It'll be you, Mr. Bromley, or Ms. Ceccotti?

2           MR. BROMLEY:  Actually, Your Honor, if I could ask

3    your indulgence, it would be both of us for a reason I'll

4    explain.

5           THE COURT:  Sure.  Sure.

6           MR. BROMLEY:  Just to start, the UAW is obviously

7    very supportive of this transaction representing over 500,000

8    Americans who are concerned about the rapid emergence of

9    General Motor.  The UAW has spent a lot of time, several years

10   indeed, working with all of the major automobile companies in

11   the United States to guarantee their continued viability.

12          THE COURT:  The 500,000 you're talking about talking

13   is more than the number who work for GM in North America but

14   includes the suppliers who would be adversely affected by --

15          MR. BROMLEY: Well there are 61,000 -- I'm sorry, Your

16   Honor.

17          THE COURT: No.  Go ahead.

18          MR. BROMLEY: There are 61,000 active UAW members, as

19   well as 475,000 retirees.

20          THE COURT:  I see, okay.  Continue, please.

21          MR. BROMLEY:  And in connection with all the work

22   that has been done over the past several years, the UAW entered

23   into the VEBA arrangements several years ago.  And in the fall

24   of 2008, stood by, side by side, in the person of President Ron

25   Gettelfinger with the chairman and CEO of each of Ford,

1    Chrysler, and GM, when they appeared before congress looking

2    for assistance.  And as Mr. Curson testified, the UAW

3    negotiated two complete collective bargaining agreements, one

4    prior to the February deadline, and another prior to the May

5    deadline, in order to help facilitate the rehabilitation, not

6    only of General Motors but of Chrysler as well.

7         And we stood before Judge Gonzales less than a month

8    ago, urging his indulgence and the approval of the deal

9    relating to Chrysler and we stand here again today asking the

10   same from you, Your Honor.  Mr. Curson's declaration in his

11   testimony made clear that the collective bargaining agreement

12   amendments were needed and required by the U.S. Treasury, and

13   that those amendments are part and parcel of the deal with the

14   VEBA.  Indeed, without one there would not be the other.  And

15   were the deal not to go forward on the consolidated basis, that

16   the modifications to the collective bargaining agreement would

17   not be honored and be in effect.

18        So, Your Honor, we believe that the arguments that

19   have been made with respect to the UAW being advantaged here,

20   did not take into account the issues that Mr. Miller raised,

21   and indeed, the issues that Mr. Wilson raised, which are that

22   there are certain commercially necessary liabilities that the

23   new company needs, and those liabilities relate to a workforce

24   that can come in and bring this company back up onto its feet

25   very quickly.  And without the VEBA, and without the amendments

282

1    to the collective bargaining agreement, it would be impossible

2    to do so.  Indeed it's a condition to the DIP, and it's part

3    and parcel of the master sale and purchase agreement.

4          So for these reasons, Your Honor, we certainly urge

5    that the deal be approved.  We also reserve any rights to

6    respond to any comments that are made by the objectors in

7    connection with the UAW.  With respect to Ms. Ceccotti, there's

8    also a list of objections that have been raised by individual

9    retirees, because part of the motion is the approval of the UAW

10   retiree settlement agreement.  And so it's with respect to

11   those specific retiree objections that Ms. Ceccotti would

12   approach the Court.

13         THE COURT:  Sure.  Ms. Ceccotti come on up, please.

14         MS. COCCOTTI:  Good afternoon, Your Honor, Babette

15   Ceccotti, Cohen, Weiss & Simon, LLP, co-counsel to the UAW, and

16   as Mr. Bromley indicated, we submitted two filings in support

17   of the sale transaction.  The first response dealing with the

18   matters that Mr. Bromley referred to, and in addition, we

19   submitted a supplemental statement in support of the

20   transaction specifically directed to approval of the UAW, the

21   document that is known in the various documents in this

22   proceeding as the UAW retiree settlement.  Here we have

23   specifically addressed responses in individual letters that

24   have been submitted by UAW retirees expressing their objection

25   to approval of the retiree settlement agreement.

1          In case it hasn't been mentioned before, I should

2     point out that the UAW retiree settlement agreement is an

3     exhibit, it's Exhibit D to the MSPA, which I believe is in

4     evidence as Exhibit 6A.  The supplemental response is at docket

5     number 2631 and Mr. Curson's declaration is also submitted in

6     support of our supplemental statement, I should note.  Out of

7     approximately half a million retirees and others -- and here

8     I'll just pause to explain a little bit more about the numbers,

9     since your Honor raised the question a moment ago.

10          The number of roughly 475,000, we think it's probably

11     closer to half a million at this point, that refers to

12     retirees, surviving spouses and dependents.  So -- all of whom

13     we consider "UAW represented retirees" when we talk about

14     retiree health benefits and the group for whom UAW serves as

15     the 1114 representative in the bankruptcy context.  So we

16     have -- in discussing the settlement we basically, roughly use

17     the figure a half a million.  I'm going to reference in a

18     moment a joinder to our statement in support of approval that

19     was filed by class representatives in the Henry 1 and Henry 2

20     litigations that you'll note that they are using a number of --

21          THE COURT:  Pause, please.

22          MS. COCCOTTI:  Yes, they're --

23          THE COURT:  The number between 475,000 and 500,000

24     that's all folks who either they or their spouses had once

25     worked for GM?

1          MS. COCCOTTI:  Correct.  Yes.  And they, for

2     example --

3          THE COURT:  Compare and contrast it to other big

4     three manufacturers or supplier companies.

5          MS. COCCOTTI:  This is strictly GM only.  I should

6     say GM only, in addition there are some Delphi retirees; Delphi

7     was once part of GM and now going to be returning to default,

8     so with those two groups, Your Honor.  So out of this, let's

9     call it half a million, retirees and others, the UAW was able

10    to indentify fifty-six individuals whose letters indicated or

11    could be read to indicate or state an objection to the approval

12    of the retiree settlement agreement.  We compiled those

13    letters -- we did two things actually, Judge.  We submitted to

14    your chambers copies of the letters in this format.  If you

15    don't have that I'm happy to hand you up another one, just for

16    convenience, we pulled them straight off the docket so that you

17    could read them.

18         THE COURT:  I think your gathering them up is helpful

19    so if you can hand it up at some point, that would be useful.

20         MS. COCCOTTI:  I will do that, Judge. We also have a

21    chart at the back of our supplemental statement that, again,

22    lists these individuals and just attempts to characterize the

23    nature of their objection as best as can be determined.

24    Perhaps, not surprisingly, most of those who have written

25    letters have focused on changes in the plan of benefits that

1   will go into effect almost immediately upon approval of the

2   retiree settlement agreement, if it's approved by this court.

3   Individuals understandably concerned and unhappy about the loss

4   of dental benefits, vision, and the like.

5           There were some other objections as well, we had

6   several retirees who objected based on the fact that under the

7   UAW's governing constitution, they do not vote in the

8   ratification process that Mr. Curson described to us this

9   afternoon.  There were some scattered other objections, some

10  concerned about pension benefits, some which were just sort of

11  blanket "I object," "I object to the GM bankruptcy," "I object

12  to sort of everything about the process."  And as we stated in

13  our papers, the courts have generally found that where we have

14  such generalized objections, they don't help the court in

15  determining how to deal with them, and in general they're not

16  considered beyond that.

17          With respect to the others, we have said in our

18  papers that, in essence, the types of objection having to do

19  with changes in benefits and reductions in benefits are

20  objections that the courts, in dealing not only with the Henry

21  1 and Henry 2 settlements have addressed, but also courts in

22  similar -- in addressing similar settlements involving retiree

23  health, particularly where retiree health obligations shift, as

24  they did in GM, from the employer to an independent VEBA.  And

25  what these courts have said and which we think is right on

286

1   target here as well, is that while the benefit reductions are

2   regrettable, the alternative to this transaction and the

3   alternative to approval of the retiree health settlement is as

4   Mr. Miller described and therefore placing the benefits that

5   those retirees enjoy today at great risk.  So that while the

6   reductions may be regrettable, over all the settlements --

7   settlement, we believe, should be considered fair, reasonable,

8   and adequate, vis a vis the retiree class and vis a vis these

9   retirees on that basis and should be approved, notwithstanding

10  their objections.

11          I did note, and I would like to note again, the

12  joinder of the class representatives in the class actions,

13  Henry 1 and Henry 2, their joinder is at docket 2636 and they

14  are supportive, as well, of approval of the retiree settlement

15  agreement, in essence having joined our supplemental statement.

16  With that, your Honor, I would be prepared to rest on our

17  papers unless the court has other questions.

18          THE COURT:  No, I don't.

19          MS. COCCOTTI:  Okay.  In that case, your Honor, I

20  will hand you up the individual objections.

21          THE COURT:  Thank you.  Is there anyone -- any other

22  folks who want to speak for the motion?  I see no response.

23  We'll take ten minutes and then we'll take the first objector.

24  I said Mr. Richman would be able to start tomorrow so who will

25  be the first person to speak under those circumstances.

287

1          MR. BRESSLER:  We'll be happy to start, Your Honor.

2          THE COURT:  Okay, Mr. Bressler.  See you after the

3     break.  Thank you.  We're in recess.

4          (Recess)

5          THE COURT:  All right, Mr. Bressler.

6          MR. BRESSLER:  Thank you, Your Honor.  Barry Bressler

7     from Schnader, Harrison, Segal & Lewis, for the Ad Hoc

8     Committee of Consumer Victims of General Motors.  As Mr.

9     Richmond noted, I hope Your Honor will give me some indulgence.

10    We'd be a little better prepared if it was tomorrow having

11    heard half the evidence today but we appreciate the

12    opportunity.  I represent a fragile financial and physical

13    constituency.  I know Your Honor appreciated it yesterday;

14    there were some of our clients in the courtroom, coming from

15    all over the country.  These are folks who have suffered

16    accidents, and if deprived of the opportunity for full redress,

17    will lose the chance to recover from medical benefits, will

18    lose the chance to replace their lost wages and will lose their

19    chance to recover for pain and suffering and will be thrown

20    into the unsecured creditors' pool.

21          I heard Mr. Henderson say that he's concerned about

22    the humane treatments of the GM employees and I would hope that

23    someone, either the Treasury or GM would also be equally

24    concerned about the humane treatment of GM customers and

25    product tort liability claimants.  I will try and address

288

1    myself, Your Honor, to our first two objections and I will

2    leave the argument over the 363 sale to the Attorney's General

3    and to other counsel who have addressed it in their papers.

4         Mr. Miller has told us that this is a routine 363

5    sale case but I think I just heard the Attorney General say

6    that this is an extraordinary case and I believe it's an

7    extraordinary case.  I think it's an extraordinary case because

8    the purchaser, the debtor in possession financier, and the

9    prepetition lender are all, in this case, the federal

10   government.  I'm not sure that that's ever happened before and

11   I'm not sure in a regular commercial case that Your Honor might

12   not have a different reaction if the prepetition lender, the

13   DIP lender and the largest shareholder of the purchaser was all

14   the same entity.

15        We do commend the Treasury for agreeing to assume

16   future product liability tort claimants.  And we do agree that

17   that will help the reputation and the ability of New GM to sell

18   cars.  We have not heard anything that convinces us that not

19   assuming current product liability claimants will not hurt the

20   ability of New GM cars.  And whether the assumption was because

21   of the commercial reasons that were articulated or because this

22   was a politically sensitive issue or because of comments made

23   by the Second Circuit in Chrysler doesn't matter.  It is

24   commendable that the future tort claimants are being assumed.

25   But here, the standards are not necessarily being met for a 363

1    sale.  And unfortunately I am in the position of saying to Your

2    Honor under those circumstances, I would hope that you would

3    turn down the sale motion with some indication that if the

4    successor liability issues were addressed in a different way

5    that the sale might go through.

6              Let me briefly address some of the reasons.  First of

7    all, this in not the Chrysler case.  There is no independent

8    buyer.  We were beaten to death in Chrysler with Fiat as an

9    independent buyer, putting in a new technology that's going to

10   teach Chrysler to build smaller, more fuel efficient vehicles.

11   That's what the government said.  That's what the purchaser

12   said.  Here, we have GM, which as I understand the testimony

13   will sell the same vehicles; Cadillac, Chevrolets, Buick and

14   GMC brand vehicles.  They will have largely the same

15   executives, will have largely the same workforce which they

16   made an arrangement with the union for -- we'll talk about that

17   later -- which will use most of the same plants, which will

18   have the same dealer network.  That doesn't sound to me like a

19   totally independent buyer.  I also do believe that Mr. Wilson

20   is a very --

21             THE COURT:  Mr. Bressler's, to what extent would be

22   Fiat era Chrysler stop selling Jeep Cherokees and all of the

23   other types of vehicles for which we now think of Chrysler.

24             MR. BRESSLER:  And I would say that I made the

25   argument in Chrysler that it was not an independent buyer and

290

1      was rebuffed and I understand Judge Gonzales' decision.  But I

2      think that Fiat made it clear that over the course of two

3      years, they were going to switch around the technology and that

4      they couldn't immediately stop selling the other vehicles and

5      wouldn't stop selling the other vehicles but that they were

6      going to introduce a smaller Fiat model as soon as possible and

7      that the consideration that they were putting in the

8      transaction was no cash but technology valued, depending on

9      which point you looked at it, at between ten and thirty billion

10     dollars for small car platforms, small car engines, small car

11     power trains that they though Chrysler lacked and they would

12     turn it over a period of time.  They also had new management

13     that they thought could run the company better and they brought

14     in independent management that came over.  And the new

15     president was going to be a gentleman who was with Fiat and was

16     coming in to run the company.  That is not the same here.

17            THE COURT:  Before you get too far, because I didn't

18     want to interrupt you for a side but I'm afraid you're going to

19     lose the train of thought.  You made reference in your earlier

20     remarks about comments made by the Second Circuit.  The only --

21     I mean I have obtained and read the transcript of the argument

22     of the Second Circuit, and insofar as I'm aware, the only thing

23     that's formally issued for the Second Circuit yet, is something

24     that says in substance, we affirm for substantially the reasons

25     of -- stated by the Bankruptcy Court.

291

1          MR. BRESSLER:  That is correct, Your Honor.

2          THE COURT:  Okay.  What was it in the comments made

3     by the Second --

4          MR. BRESSLER:  There was a comment --

5          THE COURT:  -- that you were referring to?

6          MR. BRESSLER:  I apologize.  There was comment made

7     by one of the judges.  I think it largely went to the futures,

8     that would a State Court really enforce the order of a

9     Bankruptcy Court as to an accident that didn't happen for which

10    there was no notice, that was going to happen several years

11    after the sale transaction was confirmed.

12         THE COURT:  I hear you.  But at least seemingly, that

13    would apply only to an unmanifested asbestos claim or a tort

14    claim of the type for which your folks have now gotten the

15    debtors consensual movement.

16         MR. BRESSLER:  That is correct, Your Honor. And that

17    was my point.  That whatever the reason for moving over there,

18    I commend that movement.  I'm not sure which of the three

19    reasons it was.

20         THE COURT:  All right.  Continue, please.

21         MR. BRESSLER:  Thank you, Your Honor.  The proposed

22    transaction, while called an asset sale transaction, looks very

23    much like a debt-for-equity exchange and the US Treasury

24    currently owns one hundred percent of the New GM entity.  Not

25    withstanding Mr. Wilson's negotiating skills, I think it's

292

1    probably easier for him to negotiate with a company where the

2    executive officers are all going to be working for him, within

3    a very short period of time, if the transaction is approved.

4           Mr. Henderson testified, and Mr. Wilson for the

5    Treasury, that it was the UAW VEBA receiving a percentage

6    recovery substantially greater than that of other unsecured

7    creditors.  I understand the argument that essentially the VEBA

8    and the UAW are the same party but I'm not sure that the legal

9    differentiation here between them should not carry weight with

10   the Court.  There is an independent board for the VEBA, as we

11   established.  The VEBA is a separate trust fund administered by

12   an independent board of trustees and the VEBA trustees have a

13   fiduciary duty to the retired workers, specifically, and not to

14   the UAW.  And it is the VEBA trustees who decide what will

15   happen to the stock in New GM that the VEBA receives.

16          That sounds to me like it satisfies some of the

17   criteria for sub rosa plan argument, which is the one that we

18   were making.  The code says that under those sorts of

19   circumstances, if you do a Chapter 11 proceeding, it is

20   intended that there will be some delay.  It is intended that

21   there will be time for objection.  It is intended that there

22   will be some collaboration and negotiation and that those

23   procedural and substantive safeguards are set up under the plan

24   process.  It did not sound like the difference between a sixty-

25   day period and a ninety-day period was so substantial that the

293

1    planned  process could not have been gone through.

2          I understand Mr. Miller's argument.  I understand his

3    argument about all the terrible things that could happen if the

4    planned process dragged on.  But I also have seen, Your Honor

5    conduct a streamlined procedure and I am sure that you also

6    could have conducted as streamlined a procedure for an

7    expedited plan if that's the way that the debtor and the

8    Treasury had decided to proceed.  Good faith of the purchaser

9    under Abbots insures that a 363(b)1 will not be employed to

10   circumvent the creditor protections of Chapter 11 that I've

11   just talked about.

12         THE COURT:  Well Abbots is a Third Circuit case, if

13   I'm not mistaken.  Would I be more appropriately looking at

14   Gucci in the Second Circuit for that proposition --

15         MR. BRESSLER:  I understand --

16         THE COURT:  -- on that issue?

17         MR. BRESSLER:  I understand Your Honor's distinction

18   and I understand where you're going with it.

19         THE COURT:  All right.  Continue, please.

20         MR. BRESSLER:  And I understand also the DWA is a

21   Third Circuit case but that we now have Chrysler in the Second

22   Circuit, so that's where we are.  The testimony has shown that

23   assuming the existing tort claims will not affect the viability

24   of the new company, that discriminating against the existing

25   tort claimants will not help the consumer confidence and

1    reputation of New GM.  Does anyone really believe that the US

2    Treasury, for its enunciated reasons of supporting the 363

3    sale, for the jobs, for the position in the American economy,

4    etcetera, would allow the sale to go down for covering what is

5    probably five hundred million dollars but at most nine hundred

6    million dollars worth of tort claims?

7            I want to cover one more area before I sit down, Your

8    Honor, because I think that the Court has a misapprehension.

9    It is correct -- and it sounds like most of the dealers are

10   indeed indemnified by New Co however the Court should know, and

11   we will submit supplemental papers if given the opportunity,

12   that there are states where one cannot sue the dealer for

13   product liability claims.  It's a minority of states but there

14   are such states.  And the nature of the suits is also different

15   in many other states where the standards for proving a case

16   against the dealer are more stringent and higher than proving a

17   case against the manufacturer and, of course, there are the

18   economic and social realities of, in some rural states, the

19   General Motors dealer being a person in town who is known to --

20           THE COURT:  Or he's little league and stuff like

21   that?

22           MR. BRESSLER:  Exactly.  Your Honor took the words

23   out of my mouth.  And the type of recoveries that could be had

24   by a person who's severely injured are certainly different, as

25   I think Your Honor could take judicial notice, against a large

1    national manufacturer deep pocket or against a local dealer.  I

2    think I have covered my arguments as to good faith.  I think I

3    have covered my arguments as to sub rosa plan and I will let

4    others cover the 363 arguments as to why claims and not just

5    interests should not be release under these circumstances.

6              THE COURT:  Okay. Thank you very much.

7              MR. BRESSLER:  Thank you, Your Honor.

8              THE COURT:  Jakubowski, are you up next?

9              MR. JAKUBOWSKI:  Yes, thank you, Your Honor.  Your

10   Honor, Steve Jakubowski for five product liability claimants,

11   Callan Campbell, Mr. Junso, Mr. Chadwick, Mr. Agosto and, I'm

12   sorry, Mr. Berlingieri.  First, Your Honor, I would like to say

13   that it has been a great pleasure to be here.  I teach mock

14   trial at a local high school in Chicago and I'm going to use

15   this transcript as a way of teaching them some of the

16   evidentiary rules, some of the mistakes that can be made and

17   some of the proper ways to address the Court in terms of

18   evidence and I appreciate that.

19             I also would like to thank the lawyers from Weil

20   Gotshal, the -- from the U.S. attorney's office.  We have been

21   acting under extreme time pressures.  I personally got involved

22   in the case because of my shock at the Chrysler decision.  I'm

23   from the Southern Circuit and we look at things differently out

24   there.

25             THE COURT:  Especially certain of your circuit

296

1    judges.

2            MR. JAKUBOWSKI:  Exactly.  And in fact Your Honor, so

3    within that short time frame I can say that while Gotshal has

4    been fantastic in terms of responding to document requests

5    promptly, providing thirty-five gig data -- document production

6    that had a full concordance index that was fully OCR-ed that

7    enabled us to quickly get to the heart of the issues and I

8    think that's why the trial was as speedy as it was and again

9    the same for the U.S. attorney's office.

10           So, I went to school with Judge Posner and he was my

11   professor and now he's my Circuit Court judge.  And again, we

12   look at things differently out there.  To us, successor

13   liability is a matter of statutory interpretation and it is not

14   a constitution that we are expounding but a statutory scheme

15   that we are interpreting.  And while TWA represents one circuit

16   view, and it's unclear, based on your discussion and what we

17   know from what's happened in the Second Circuit, it's unclear

18   what exactly the Second Circuit holds as to successor liability

19   claims.

20           And so, we also have the Sixth Circuit.  And the

21   Sixth Circuit says in the Michigan Wolverine case which is

22   cited in the long footnote in my brief, that case says that

23   363(f) does not allow for in personam claims to be treated as

24   interest in property; they're just not.  So, I recall at one of

25   the national conference of bankruptcy judges that -- yes, Your

1   Honor?

2          THE COURT:  You think that Michigan Wolverine

3   therefore should be regarded as overruling the White Motor

4   which agrees with you on one of your points but disagrees with

5   you on the bottom line?

6          MR. JAKUBOWSKI:  Well, what I think that what White

7   Motor does is -- it agrees with White Motor on the 363(f) point

8   that White Motor says which is that 363(f) does not provide for

9   in personam claims to be treated as interest in property.  It

10  says that very clearly and it's --

11         THE COURT:  And then issues a free and clear order

12  anyhow.

13         MR. JAKUBOWSKI:  And why?  And I don't mean to ask

14  you questions but that's rhetorical.

15         THE COURT:  I think that we agree there's an

16  implication of 105(a).

17         MR. JAKUBOWSKI:  Exactly.  And that was in 1986, well

18  before a number of Supreme Court decisions came out which

19  significantly constrained the ability of Bankruptcy Courts to

20  use Section 105 as a roving manner of equity and that's the

21  Raleigh case.

22         THE COURT:  We're rolling on the textual analysis and

23  I agree with you that that's where an analysis would start.

24  Let's -- the dance with the textual analysis --

25         MR. JAKUBOWSKI:  Okay.

298

1        THE COURT:  -- dance for as long as you can.

2        MR. JAKUBOWSKI:  Okay. I dance for a while.

3        THE COURT:  But I -- I beg your pardon?

4        MR. JAKUBOWSKI:  I can dance for a while on that

5   issue.

6        THE COURT:  All right.  We still have to stay within

7   the --

8        MR. JAKUBOWSKI:  I will.  Well, I'm not sure I will.

9        THE COURT:  Claims is defined in 101 of the code but

10   interest is not --

11        MR. JAKUBOWSKI:  Sure.  Right.

12        THE COURT:  -- nor is the expression interest in

13   property

14        MR. JAKUBOWSKI:  Right.

15        THE COURT:  And we're going to come back to stare

16   decisis because of -- I might come to the view that 363(f) when

17   combined with an undefined interest in property under 101 is

18   ambiguous.  That stare decisis might be the way that one needs

19   to go.

20        MR. JAKUBOWSKI:  I'm sorry, Your Honor.  Stare --

21        THE COURT:  Forgive me.

22        MR. JAKUBOWSKI:  Okay.  I'm sorry.

23        THE COURT:  But I guess my question to you is when

24   the reason by which a tort litigant can go after a New Co, a

25   purchaser, is solely by reason of the transfer of the property

299

1    or the acquisition of the property, isn't that something as to

2    which the code is silent and leaves us with a hole that

3    requires judicial interpretation?

4         MR. JAKUBOWSKI:  I think the answer to that is no,

5    obviously.  That's why I'm here.  And the reason I think it's

6    no is for several reasons.  First we start with Butner, in

7    terms of what is an interest in property.  And Butner says

8    interest in property defined --

9         THE COURT:  Well, Butner speaks as property rights.

10         MR. JAKUBOWSKI:  Property interests and that's -- and

11    that's no different than interest in property.

12         THE COURT:  Doesn't Butner deal with what is

13    property?

14         MR. JAKUBOWSKI:  No.  It deals with who has the

15    authority -- that where -- how are those rights determined.

16    Under what law are those rights determined.  And those rights

17    are state law rights; they're founded in state law.  And the

18    problem with Chrysler in determining that all tort liabi -- all

19    product liability claims of all fifty states are interest in

20    property that can be rejected as -- they can be sold free and

21    clear is that it doesn't recognize that that determination is a

22    state law determination and unless Chrysler has gone out and

23    examined every single one of the fifty states to determine

24    whether or not it is an interest in property in that state, I

25    think it erred.  And worse than that, I don't think it even had

300

1    the jurisdiction to be able to do that because at the end of

2    the day, Your Honor, this is a question -- this is a case of

3    boundaries.  And the questions are from a statutory perspective

4    or from a jurisdictional perspective, how far can we go here?

5    And I think we're limited by the jurisdiction of 157.

6          THE COURT:  Well, the problem I have with 157 is that

7    distinguishes between a lowly bankruptcy judge, like me, can

8    decide and the higher level Article 3.  But wouldn't the same

9    issue exist at district judge who are asked to make the same

10   decision that I'm asked to make?

11         MR. JAKUBOWSKI:  Yes.

12         THE COURT:  All right.

13         MR. JAKUBOWSKI:  Yes, it would.  But they still could

14   at least apply the law of the state.  And determine whether or

15   not it's an interest in property under the law of the

16   particular state.  In some states it may be and some states it

17   may not be.  The general tendency among the states that are

18   surveyed in my brief in the long footnote, is that from a

19   statutory perspective, these are not interest in properties.

20   So, in a way, we just have to get beyond that and see -- well

21   and so -- and deal with the policy issue of whether or not from

22   a policy perspective it makes sense to sell the assets free and

23   clear.  In most of the cases it doesn't really matter.  But

24   when you're dealing with a case where there's sixty-nine

25   million vehicles on the road and we know there's nine

1    hundred -- well let's take out the future claims -- there's

2    five hundred, six hundred, something like that, million dollars

3    worth of reserves out there for future claims, I think we -- I

4    think we have to step back and see whether or not the policy --

5    you know, how to deal with the policy issues that are

6    applicable here.  And one of the -- one of the things that was

7    raised in the reply brief from Weil Gotshal is it cites all

8    these string cites that of cases that successful liability

9    orders were entered.

10           Now, I have two problems with that.  One is a

11    procedural problem and that is that your case management order

12    said very specifically, that when they string cite orders that

13    have not -- that are not in books that we can find on LexLaw,

14    that they have to go forward and lay out the procedural

15    background and the context and why that's relevant.  They

16    didn't with respect to any of those.  And I don't think the

17    burden should be on the parties to figure out what the

18    relevance of each one of these is or whether it's even

19    distinguishable.  So, I would ask, and I think that the case

20    management order says that you will not consider those cases

21    and I ask that you not consider them.

22           THE COURT:  Well, I hear you on that.

23           MR. JAKUBOWSKI:  That's --

24           THE COURT:  But since I know the cases of that

25    character that was --

1          MR. JAKUBOWSKI:  Um-hum.

2          THE COURT:  -- decided on my watch --

3          MR. JAKUBOWSKI:  Okay.  True.  Which ones were those,

4    Your Honor?

5          THE COURT:  I'd have to go back in your brief but I

6    suspect it was Bearing Point --

7          MR. JAKUBOWSKI:  Okay.

8          THE COURT:  -- perhaps Adelphia.

9          MR. JAKUBOWSKI:  Okay.

10         THE COURT:  And perhaps one or two others.  I do know

11   that for the most part 363(f) has not been disputed and ruled

12   upon by the judge but at least in one exception, when using

13   corporation of America, I think Mr. Smolinsky's in the

14   courtroom, I ruled against your opponent, the United States

15   government on that when their local U.S. attorney's office was

16   representing the EPA and was asking for successor liability

17   when I felt the environmental disaster was being sold from one

18   -- from the debtor to the purchaser.

19         MR. JAKUBOWSKI:  Um-hum.

20         THE COURT:  And I ruled in that case after a 363

21   analysis that from day one the purchaser would be liable for

22   the mess and for continuing duties from then on to keep it

23   clean and/or to clean it up --

24         MR. JAKUBOWSKI:  Um-hum.

25         THE COURT:  -- but that it wasn't liable for the

303

1    original debtor's liabilities to the U.S. government for

2    penalties and for prepetition duties to comply with orders to

3    clean it up.  That U.S. attorney wasn't very happy with me then

4    but they did not appeal.

5         MR. JAKUBOWSKI:  Um-hum.

6         THE COURT:  Now, I guess they're very happy they

7    didn't appeal.  But you're quite right that the practice in

8    this district and in Delaware, and maybe in other parts of the

9    country, are just throwing out a bunch of orders with -- where

10   something was done without the judge ruling on it ain't the

11   most persuasive precedent.

12        THE COURT:  Right.  So --

13        THE COURT:  -- but what they're doing has been ruled

14   upon by a Bankruptcy Court affirmed by the Second Circuit,

15   which is where I really need your help --

16        MR. JAKUBOWSKI:  Okay, and I will be --

17        THE COURT:  -- because --

18        MR. JAKUBOWSKI:  Um-hum.

19        THE COURT:  -- I don't like to cross the circuit.

20        MR. JAKUBOWSKI:  I understand that.

21        THE COURT:  And --

22        MR. JAKUBOWSKI:  And I can't blame you.

23        THE COURT:  Earlier this evening.  I politely

24   suggested to the circuit that it reconsider something because I

25   thought it was really very wrong but until the circuit told me

304

1    I could, I did what the circuit tells me to do.

2          MR. JAKUBOWSKI:   Okay.  So, here's -- obviously, I've

3    thought of that issue and I don't necessarily have the greatest

4    answers in the world, but I think I have good answers.  First,

5    the circuit has not come out with his opinion yet and so we

6    don't really know what they've held with respect to this issue.

7    They've said substantially the reasons but these have different

8    facts and we'll go through some of the facts that are

9    different, that particularly make this different from a ruling

10   on a policy grounds as in TWA and Chrysler.  Because at the end

11   of the day, TWA and Chrysler were decided on policy grounds.

12   If you throw away the statutory, they were decided in the

13   alternative.  And you throw away the statutory ground and you

14   say, okay, well, we got it wrong on the statutory ground but it

15   doesn't matter because it's affirmed on the policy ground.

16   Here I think that the policy grounds are different, and I'll

17   get into that in a little bit.  So, that's the first thing.

18          The second is -- and that -- the fact is there is a

19   split in the circuits.  I mean, my circuit comes down very

20   strongly in this issue and Judge Posner is very articulate on

21   this and he's no patsy to the plaintiff's bar by any stretch of

22   the imagination.  And when he comes down and says there are

23   boundaries to 363(f), this decision came down two weeks after

24   TWA.  And he specifically cites to that and says, it's -- this

25   is not a lien we're talking about, this is possessory interest.

305

1    It's not anything but it is an interest.  It is -- it has

2    something tangible and it has a right to that property.

3          So, I think that -- so let me get to the pot -- let

4    me get to the facts here and why I think this is

5    distinguishable from Chrysler.  And so, I don't know if you

6    have the Chrysler opinion in front of you, if you don't, Your

7    Honor, I'd be happy to certainly read through what I think are

8    the key aspects of it.

9          THE COURT:  Give me a second.  I'm not sure if I

10    brought it out with me or not.

11          UNIDENTIFIED SPEAKER:  If Your Honor would like a

12    copy.

13          THE COURT:  Yes, thank you.  Just hold on a second.

14    I found my White Motors so maybe there's something funny --

15          MR. JAKUBOWSKI:  Okay.

16          THE COURT:  I have a TWA.  I have the Chrysler

17    opinion.

18          MR. JAKUBOWSKI:  Okay.

19          THE COURT:  Go ahead.

20          MR. JAKUBOWSKI:  All right.  So, I start at -- I

21    don't know if you have the West version of it --

22          THE COURT:  I have the West one.

23          MR. JAKUBOWSKI:  I start at headnote 14, which starts

24    with Category 3 consists of tort and consumer objections.  It

25    says, the leading case on this issue --

306

1          THE COURT:  Time out.

2          MR. JAKUBOWSKI:  I'm sorry.  The page number?

3          THE COURT:  You have a jump cite --

4          MR. JAKUBOWSKI:  Yeah.  I do --

5          THE COURT:  Mine actually has page references

6     already.

7          MR. JAKUBOWSKI:  Okay.  It's -- I think it's 110 --

8     111.  And it starts Headnote 14.

9          THE COURT:  Okay.

10          MR. JAKUBOWSKI:  Okay.  So, I'd like to start with

11     first, however, the leading case on this issue, In re: TWA.

12     So, I guess as long as we'll do a little exegesis here.  First,

13     I don't think that's a leading case on this issue.  It may be

14     the leading -- it may have -- it may be -- Collier says it's

15     kind of a trend, but if you look at even the quote in the

16     omnibus reply from the debtor and you actually read what

17     Collier says, it doesn't say that everybody follows TWA now.

18     And in fact, when you look at the case law, when it comes to

19     363(f), nobody follows TWA.  Policy is another story.  We'll

20     talk about policy.  But in terms -- I don't think it's a

21     leading case.  That's number one.  Number two -- and you've

22     got Fairchild -- I mean there are a whole bunch of cases that I

23     cited in my brief that go against what TWA says with respect to

24     the statutory 363(f).  And then the next sentence, the code

25     court overrules TWA, overrules the objections.  Even so --

307

1          THE COURT:  No, it says the court follows TWA --

2          MR. JAKUBOWSKI:    -- follows --

3          THE COURT:  -- and overrules the objections.

4          MR. JAKUBOWSKI:  I'm sorry.  I apologize, Your Honor,

5    that's correct.  And then it goes on, and I would like to

6    criticize this next line.  Even so, in personam clients,

7    including any potential successor, state successor or

8    transferring liability claims against New Chrysler, as well as

9    in rem interest are encompassed by 363(f) and are therefore

10   extinguished by the sale transaction, okay, citing White Motor

11   which we've already talked about, does not hold that at all.

12   And Ashburn was decided on policy grounds.  It doesn't even

13   mention 363(f) from a statutory perspective.  So you can't say

14   don't --

15         THE COURT:  By that you mean, it was a 363(f)

16   decision but it didn't engage in textual analysis --

17         MR. JAKUBOWSKI:  None.

18         THE COURT:  -- of the type that you think should be

19   engaged in.

20         MR. JAKUBOWSKI:  Has to be.  The court says that --

21   the Supreme Court says Ron Pair, BFP -- I mean one after the

22   other, just start with the text.  And you branch out and I

23   wanted to get to Judge Waldron.  I mean, he at the NCBJ, right

24   after BAPCPA rule came down -- everybody's pulling their hair

25   out -- how do you determine this stupid statute?  And so they

308

1    say, you have a toolbox.  And the toolbox, you start with plain

2    meaning.  And after -- and you look.  Is it plain?  Is it

3    clear?  And you -- okay.  Well maybe it is.  Maybe it's not.

4    But then you look at Piccadilly and you look at some of these

5    other cases and they say, well look at how else it's being used

6    in the code.  So that's why I attached to the brief the forty

7    times that the words "interest in property" are used in the

8    code.  And there's not a single time that you can replace the

9    word interest with claim and have it make any sense at all.

10   And then you look at -- and then you say, okay, well

11   are there any Supreme Court cases that have looked at interest

12   in property.  Look at Barnhill head.  Barnhill's a great case.

13   You know -- it's known for when -- when is the date of

14   transfer.  It's not when is the date of transfer.  It's when

15   did the interest in property -- when was the interest in

16   property transferred?  And the interest in property was

17   transferred when there was an interest in the property.  And

18   the claim against the debtor for a dishonored check, for a

19   bounced check, is not an interest -- or for a check, for the

20   right under a check, is not an interest in the property in the

21   debtor's account.  That is a critical case.

22   Now, the other case that's a great case is BFP, which

23   Judge Scalia is looking at the tortured definition of

24   reasonable equivalent value and says you just -- you can't

25   torture the language of the bankruptcy code to cut -- you know,

309

1    this left-handed, around your back, you know, to scratch your

2    nose.  You just can't do that.  Because you'll give no meaning

3    to what the code is.  And that's what TWA did.  Because by

4    saying that they had to elevate -- that basically, if the

5    debtor had never used the assets in the way the way they used

6    it, the claim never -- would have never come up in the first

7    place.  Well that's -- then anything is a property in interest.

8    It has -- that's why Judge Scalia said in -- it needs to be the

9    majority, not the dissent but the majority in BFP, he said, you

10   know, that would be infinitesimal -- to put reasonable and

11   equivalent value the way that you wanted to -- you may as well

12   have reasonable infinite value.  You may as well mean anything.

13   And it's the same here.  If you're going to say that an

14   interest in property is any -- arises with respect to any claim

15   as to which there's -- from simple deployment of the debtor's

16   assets, then you're basically saying  there's nothing that's

17   not an interest in property.  So, anyway, that's kind of my

18   response to that issue.

19          The second -- the next point kind of leaves the

20   statute and goes to policy.  Now before leaving the statute and

21   going to policy, there are other tools in the toolbox that I

22   think are important, that I raised in my brief and I'm not

23   going to explain them here, but that are important to look at.

24   And the first tool after you go through the language, and you

25   look at interest in property, you then go to Congressional

310

1    intent.  And so how do you determine it here?  And there's

2    three basic rules.  First, you look at the other use in the

3    code.  And 1141(c) is a perfect example of how Congress could

4    have structured 363(f) to read exactly the way everybody who's

5    a proponent for the sale wants to read it, because it includes

6    interest in property whereas 363 -- claims and interest in

7    property and not just interest.  And so I've cited to this

8    footnote of the National Bankruptcy Review Commission.  It was

9    chaired by Marcia Goldstein, where they specifically -- this

10   was the precursor to BAPCPA.  This was the 1997 --

11        THE COURT:  Yeah, but -- time out here, because she

12   pointed out that Congress could have said it a lot clearer.

13   But the fact that Congress has not said things as clearly as it

14   could, and I don't want to be disrespectful of Congress, but

15   they're a bucketful and --

16        MR. JAKUBOWSKI:  I --

17        THE COURT:  -- especially messy.  But across the

18   code, where Congress could have said stuff a lot better to

19   express itself.

20        MR. JAKUBOWSKI:  And --

21        THE COURT:  I mean, the Catapult rule.  Do you think

22   for half a second that Congress intended that a reorganized

23   debtor couldn't use his own intellectual property?

24        MR. JAKUBOWSKI:  No.  But again, we're not talking

25   about Supreme Court case law.  There are Supreme Court cases

311

1    that say, that Congress meant what it says and it says what it

2    means.  And that is -- I mean if anything's binding on you,

3    Your Honor, it's the Supreme Court.  And that is the rule that

4    it follows through the Second Circuit.  And we saw the Groom

5    versus United States case, where you -- you mention something,

6    it's you know, it assumes that it's not there.  And it's not

7    like this is -- it's not like this is BAPCPA but it's not

8    BAPCPA.  It was identified in '97.  And it would -- nothing

9    could have been a more pro-business change to the code than

10   2005.  And it's not there.

11         So, I think you can't presume that Congress, you

12   know, was lazy or didn't know what it was doing.  I think in

13   this instance, I don't think that's a fair presumption and I

14   think in that respect, you're better off sticking with the

15   Supreme Court guidelines that say, as in Decone v. Dela Cruz

16   (ph.) case, cited Gratzluf (ph.) and all the ones that I've

17   cited, that you're better off -- you're safer assuming that

18   Congress says what it meant and meant -- and knows how to do

19   that.

20         The next -- and then, of course, you look at pre code

21   law.  Pre code law was actually cited in the Second Circuit

22   case in Manville.  And so you ask, what is the Second Circuit's

23   view on this?  And until -- until Chrysler, I assumed the

24   Second Circuit's view on all of this was the Johns-Manville

25   case that just reversed by the Supreme Court, the Traveler's

312

1    case.  But it got reversed by the Supreme Court on such a

2    narrow ground that it didn't reverse it at all on any of the

3    other issues which were, you know -- which were, I think,

4    controlling in this case.  You can't condition financial -- you

5    can't condition releases on financial participation.  That's an

6    abuse.  And it cites the Carta case.  And it cites the

7    Combustion Engineering.  I mean, you -- the idea that you

8    can -- that you can condition a major transaction in a

9    bankruptcy, whether it's a sale or whether it's a plan on the

10   financial participation, the do or die conditioning of the

11   purchaser, is an abuse.  That's what the Second Circuit calls

12   it.  An abuse.

13        And you look at the transcript in Travelers.

14   There's -- you don't find a justice on the Supreme Court that

15   disagrees with what Justice Stevens and Justice Ginsberg said

16   in their dissent that when it comes to jurisdiction and

17   releases of non-debtor parties that -- that you can't do that

18   in a bankruptcy case without extreme, extreme protections.  The

19   Court just doesn't have that power.  Doesn't --it's beyond the

20   boundaries.  Out of bounds.  So, I think, Your Honor, that

21   maybe this is the time, before the Second Circuit rules, to get

22   it right.  You have the opportunity, as nobody else will after

23   you, to tell -- to give the Second Circuit some guidance as it

24   comes down with that opinion.

25        THE COURT:  Usually it goes the other way around.

1          MR. JAKUBOWSKI:  Usually it does but here's -- but

2     here you do have that opportunity because they haven't ruled

3     yet.  And my guess is that they're pulling their hair over this

4     issue.  And as I read the news reports about what happened in

5     the transcript was -- should we just let the Supreme Court hear

6     it?  Okay, let's take it over there.  Everybody said, yeah,

7     let's go there.  But the Supreme Court does --

8          THE COURT:  I lost you.

9          MR. JAKUBOWSKI:  I thought that -- I thought that the

10    expedited nature of that process was so fast, that I'm not sure

11    that the Second Circuit had the opportunity to give it the kind

12    of serious consideration, with respect to this issue, the other

13    issue I don't have any quarrels with.  But this issue, I don't

14    think that that was the focus.

15         THE COURT:  Is that the kind of judgment that I, as a

16    Court, two levels below the Circuit, am I allowed to make?

17         MR. JAKUBOWSKI:  Yes.  I think that --

18         THE COURT:  Yes?

19         MR. JAKUBOWSKI:  I think so.

20         THE COURT:  Meaning --

21         MR. JAKUBOWSKI:  Here today.

22         THE COURT:  -- assuming arguendo that I agree with

23    you on textual analysis, I mean, I don't think I'm going to

24    lose my job if they disagree with me but I -- I really think

25    I've got to follow my Circuit.

314

```
 1          MR. JAKUBOWSKI:  I don't -- I don't know what they

 2    said on that issue.  I don't know what they said.  And I don't

 3    how they applied it to this case.

 4          THE COURT:  If anything, Judge Gonzales, where I'm on

 5    record in four, five, six decisions as saying that -- in

 6    believing in stare decisis and that the interest of consistency

 7    and predictability for the financial community, certainly in

 8    this district but nationwide since so many people look to law

 9    out of our district, is that we should follow each other's

10    decision.  I'm not talking about district judges; I'm talking

11    bankruptcy judges who know bankruptcy.

12          MR. JAKUBOWSKI:  Okay.  And you know what?

13          THE COURT:  Forgive me.

14          MR. JAKUBOWSKI:  I'm sorry.

15          THE COURT:  And we follow each other's decisions in

16    the absence of manifest error.  And assuming without now

17    deciding that I agreed with you on textual analysis, and/or

18    believing that Fairchild is a better reading than somebody

19    else's reading of 363(f) and its related provisions, I sure

20    don't think Judge Gonzales' decision is fine here.

21          MR. JAKUBOWSKI:  Well, I'll tell you why I think it's

22    distinguishable.  Because let's assume that it's error on part

23    A but who cares because you can decide in the alternative.  And

24    so let me explain why I think this case differs from Chrysler

25    on policy grounds and therefore is -- will fit within the
```

315

1    Second Circuit's ruling on policy -- on policy grounds.  And

2    for that, let's turn to the next Headnote 15, 16 and 17.  The

3    first -- there're two basic policy grounds in Chrysler.  One

4    is -- well, excuse me.  The two basic policy grounds in TWA.

5    The one of them is picked up in Chrysler.  But let me talk to

6    TWA's -- both of their policy arguments because I think they're

7    both important in terms of being able to ground your decision

8    here.

9         And let me deal with the easy one.  The easy one is

10   TWA decided the way it did in large measure because of the fact

11   that they were unwilling to accept the idea that some creditors

12   would do better than others.  They were unwilling to upset the

13   relative priorities among the creditors by giving one a leg up

14   and a second bite at the apple as Judge Posner said is fine,

15   TWA said is not fine.  They weren't -- they just weren't

16   comfortable with that idea.  Well, that, as we know, does not

17   apply here.  The relative priorities were irrelevant to the

18   purchaser and there's -- the relative priorities are being

19   undermined at every single level of debt.

20        So some creditors are getting paid in full, some

21   aren't and everything depends on one issue.  One issue only.

22   And that is, as Mr. Wilson well stated, is the -- any liability

23   was assumed that was necessary to advance the commercial

24   interests of the successor.  That was it.  That was the sole

25   basis for the decision.  Not relative priorities, that actually

1    didn't matter and the reason that it didn't matter because

2    nobody was getting anything in this case anyway so they could

3    do whatever they wanted.  That was the whole point of why it

4    wasn't sub rosa and all that stuff.

5            So, the question then is okay, let's put issue A from

6    TWA aside and now let's look at the other issue.  And this is

7    the key issue and Judge Gonzalez touches on it in the first

8    sentence of Headnote 15.  And he says other objections are

9    premised on the category that a free and clear sale would be

10   fundamentally unfair, inequitable or in bad faith.  The

11   policy -- that I really highlight that word; the policy, not

12   the law -- the policy underlying 363(f) is to allow a purchaser

13   to assume only the liabilities that promote its commercial

14   interests.  See Fish -- New England Fish And White Motor.  That

15   is true.  That's what those cases hold.  It's policy.

16           But the question is can you decide -- can you hold

17   here that the policy applies.  In Chrysler, there was a real

18   issue on whether or not the buyer would really actually

19   continue would the successor liab -- if the successor

20   liabilities were in place.  Here, I don't think the evidence

21   shows that.  And I think you need to make a factual finding on

22   this.  And the reason I don't think -- and that's what I think

23   will distinguish this case from the ones before you or the ones

24   to the side of you or above you and the factual finding is

25   this.  The debtor and the treasury sat down and they split up

317

1      the liabilities and they had this -- there were pensions that

2      were being assumed, and credit bids of secured debt and other

3      secured debt would be assumed and they went through the whole

4      laundry list.

5              And there was -- if you look at Exhibit 6 to the

6      Henderson deposition, there were 176 billion dollars of

7      liabilities on the balance sheet of GM at 12/31/08.  And they

8      took six billion and put them in a bucket on the side and said

9      these are our politically sensitive assets and liabilities.

10     We've got environmental product liability, asbestos, splinter

11     unions and some other miscellaneous.  Add total, six billion

12     dollars.  So, those were politically sensitive in the sense

13     that nobody really knew, as of May 7th, how they wanted to deal

14     with those yet because of the ramifications of them from a

15     business perspective and from a political perspective; that's

16     the testimony.  And so they had continuing discussions about it

17     and continuing phone calls and letters from senators as to all

18     this stuff.  And as time went on, decisions were made as to

19     whether to assume them or reject them or visa versa.

20             And as of -- and when Mr. Henderson went to the board

21     on May 29th, they reached a decision as to what that

22     segregation would be.  And you look at the PowerPoint that's

23     attached to his deposition as Exhibit 31 which I know it's been

24     designated.  You will see that at page, I believe, 8, it's the

25     section that's entitled liabilities to be assumed at closing.

318

1    So, at the bottom there's a bullet; No purchase price

2    adjustment regardless.   And what that meant was that there

3    would be no segrega -- that once that decision was made as to

4    the liabilities that would be segregated in that politically

5    sensitive bucket, there would be no further adjustment to the

6    purchase price either a higher purchase price for the purchaser

7    or a diminution in the estate -- to the estate in terms of

8    proceeds, if subsequent decisions were made that changed that

9    allocation as to that bucket.

10            And how do we know that that's true?   Because there

11   were two changes that were made with respect to product

12   liability claims and neither of them resulted in a change of

13   the consideration.   There's not a single case out there that

14   holds that if there's no change in consideration that TWA

15   analysis doesn't apply.   Because in all those cases, there's --

16   in TWA, there's a possibility of a discounted bid.   Every case

17   where there's an issue with respect to the effect of the estate

18   because of the diminution in consideration, then you had a TWA

19   issue and that's why they were able to approve the sale and

20   that's what Chrysler was about.   But that's not the case here

21   with respect to this bucket.

22            THE COURT:   I understand.   Continue.

23            MR. JAKUBOWSKI:   Okay.   So, I guess --

24            THE COURT:   And forgive me Mr. Jakubowski.   I've been

25   hearing a lot --

319

1          MR. JAKUBOWSKI:  I know and I --

2          THE COURT:  -- that you've got the most important

3    issue on the motion today.

4          MR. JAKUBOWSKI:  Thank you, Your Honor.

5          THE COURT:  But try to --

6          MR. JAKUBOWSKI:  Believe me, I think I've said just

7    about everything -- I've danced just about as far as I can

8    here.  Obviously, I have other things that I say in my brief

9    but I would like --

10          THE COURT:  Which I've read and I'll read again.

11          MR. JAKUBOWSKI:  Thank you.  I would like to raise a

12    couple of issues with respect to the argument of counsel.

13    First, maybe other parties want more.  This is really not a

14    question, in my view, of giving some -- of simply giving

15    somebody more.  This is a question of what can you do?  What

16    does the law -- what are your boundaries?  What does the law

17    allow you to do?  And that's different.  That's why we're here.

18    You know, bankruptcy is what it is and you roll the dice with

19    the way they are but there are issues -- this isn't just a

20    question of wanting more.  This is a question of what you can

21    do.

22          Now, one of the things that I haven't heard yet that

23    I think is critical here and that surprises me is that the idea

24    that if you change this bucket and say look with respect to

25    this bucket that's politically sensitive, that there was no

320

1    change in consideration, I'm not going to allow -- I don't

2    think I have the authority under TWA or any other case to allow

3    those not to be assumed, I'm sorry.  You know, you challenge

4    lenders -- they want to be a commercial lender, come into

5    court -- how many times have you told a commercial lender you

6    can't do it, I'm sorry.  Go back, come back with something

7    else.  That's what they want to be, I think that's what you

8    have to do here.  And there's a number -- there's a lot in

9    Second Circuit authority about telling lenders to go home and

10   come back with a new proposal.

11           But more importantly, let's say they were --

12           THE COURT:  DIP lenders overreach all the time.

13           MR. JAKUBOWSKI:  Well, exactly.  Okay, but --

14           THE COURT:  But I don't know if there's the same

15   basis for conclusion that the United States government is

16   trying to avoid a systemic risk that's going to affect not just

17   a couple of hundred thousand North American employees or maybe

18   the couple of hundred thousand is beyond North America, I'm not

19   sure but many, many employees.  And as importantly, the

20   supplier community that needs GM to survive so they could

21   survive and the communities that look to GM for their economic

22   health.  You really think that's analogous to the way that

23   commercial lenders behave?

24           MR. JAKUBOWSKI:  Well, in this instance with respect

25   to this issue, yes.  And the reason is for -- twofold.  First,

321

1    Mr. Wilson, if he didn't say anything, he said I am a

2    commercial lender.  That's one thing -- in this case I'm a

3    commercial lender, it's a commercially reasonable, I'm going to

4    do what a lender's going to do.

5          THE COURT:  Wasn't the context of that where people

6    were trying to say that forty-nine million bucks of taxpayer

7    money should be converted to --

8          MR. JAKUBOWSKI:  No.  No, it wasn't.  It was in

9    response to my questions.  It was a response to the question of

10   does the lender -- why are you rejec -- why are you not

11   assuming these?  Because I'm a purchaser.  I'm basically -- I'm

12   a credit bid lender.  I'm not interested in this stuff.  I have

13   no -- what obligation do I have to pick these up?  That's what

14   every lender in the world that comes in with a credit bid says.

15   So, with respect to this issue, they're acting like a

16   commercial lender and I think they should be treated as such

17   and that's the way they want to be treated and that's why

18   they're being so hardnosed here.

19          Now, the other thing is that if they were -- let's

20   say they were to come in and say, Your Honor, congratulations,

21   you just killed GM.  I would turn to the Creditors Committee

22   and say, when are you filing the complaint for breach of

23   contract?  They have a contract here.  They have a contract

24   that they are required to act commercially reasonable under.

25   They can't walk because of -- because there's a few -- for

1    62,000 bucks in some bucket.  They can't do that.  And I'm sure

2    the Creditor's Committee would jump on that.

3            So, I think it's different.  I don't think they can

4    come in here and just walk away.  They signed a contract.  They

5    put us all through a significant amount of work and toil with

6    respect to this.  And they can't just walk away from that

7    contract without exercising commercial reasonableness.  And

8    walking away from a bucket that is inappropriate as a matter of

9    law to walk away from, that there's no effect on the estate if

10   they're required to take it, is commercially unreasonable

11   breach of contract were they to take that position.  And they

12   would be, in my view, responsible for all the damage to the

13   estate for that, whether it's a -- whether it's a subordination

14   that they're in, so you subordinate their debt.  You know the

15   good thing is?  You make that decision.

16           THE COURT:  I would think the Court of Claims would

17           MR. JAKUBOWSKI:  Well, I don't know.  In Court of

18   Claims of Chicago it's about a two hundred and fifty dollar

19   limit.  That's why I'm laughing.

20           THE COURT:  A court -- a Federal Court?

21           MR. JAKUBOWSKI:  Ok.  That's -- I guess that's right.

22           THE COURT:  That's suffering from any --

23           MR. JAKUBOWSKI:  Well that's right.

24           THE COURT:  -- issue that's subordinated --

25           MR. JAKUBOWSKI:  Well, no I think it is.

323

1          THE COURT:  -- and --

2          MR. JAKUBOWSKI:  I don't think it is here because

3    they came in.  They're acting like a commercial lender.  They

4    signed a contract they're subject to.  They're subject to the

5    normal laws of contract.  If you're a defense contract, the

6    U.S. breaches the contract, they come before a Court of Claims

7    and get sued and pay up if they have to.

8          THE COURT:  Go on.

9          MR. JAKUBOWSKI:  Now the other thing is that there is

10   no -- there is no factual basis in the record to say that they

11   will -- they will walk.  In fact, I think, because I don't have

12   the transcript, but I think when we see the transcript of Mr.

13   Wilson's testimony, he will say that there were an infinite

14   number of possibilities of what could happen.  And he did go

15   through all the scenarios of what they might do and how they

16   might respond.  So, I don't think it's -- this is -- they are a

17   commercial lender and they're not a commercial lender.  Right.

18   They're a commercial lender in the way they're acting but

19   they're not a commercial lender in the sense that they're in --

20   it's a national priority -- and Mr. Wilson himself said that we

21   will respond.  We don't know how they're going to respond.

22   They don't know how they're going to respond.  But that's why

23   it's in your hands.

24          Now, what's interesting is that just the way the

25   world is set up here, they negotiated with everybody but they

324

1    can't come to the Court and say, Your Honor, what's acceptable

2    to you?  We'll make this part of the deal.  They said -- Mr.

3    Wilson said, we paid the least amount we could possibly pay for

4    this.  It turned out to be ninety billion dollars.  Okay, so

5    they paid ninety billion dollars for the company.  But that was

6    the least amount they had to pay to get the deal done, because

7    it was so important to them to get the deal done, that's what

8    they paid.  Now what is this -- so -- but they couldn't come to

9    you and say, Your Honor we think -- we talked to counsel, we

10   think we know what the law is and there's been a lot of

11   precedent in the Circuit, there's Chrysler, there's all these

12   other decisions.  But they can't come to you -- they didn't

13   even know you -- who -- whether you were going to be the judge,

14   and negotiate out what would be an appropriate resolution in

15   advance.

16        So, we had to go through all of this and come here

17   and they say to you, okay negotiations are over, this is what -

18   - take it or leave it.  How fair is that?  I mean, it's only

19   because of the way it's set up that they didn't come to you in

20   advance.  But they went to everybody else in advance, they got

21   everybody else's agreement so why don't make them come back to

22   you with the right response and get the right answer and follow

23   the law and respect the boundaries and do the right thing?

24        I have nothing else, Your Honor.

25        THE COURT:  Thank you.  Okay.  I'll hear other people

325

1    on the tort side.  But, obviously -- I think we've pretty much

2    covered things.  Mr. Esserman, I'll hear from you next.  Mr.

3    Esserman, I think at this point I'd prefer if you limit

4    yourself to things that relate to asbestos.

5            MR. ESSERMAN:  That's what -- I'm sorry.

6            THE COURT:  Okay, go ahead.

7            MR. ESSERMAN:  Sandy Esserman for the ad hoc

8    committee.  That's what I was intending to do, Your Honor, I

9    was not going to cover any other of the topics that were either

10   covered by other parties or covered in my brief.  And to a

11   certain extent Mr. Jakubowski covered certain things that I was

12   going to cover.  In fact, his presentation sounded like the

13   presentation of "This is My Life", he cited so many cases that

14   I either argued and won or lost or have been in.

15           But anyway I want to focus strictly on the future

16   clients' issues which I think is to me one of the more

17   troubling aspects of this -- of this sale.  And a week or so

18   ago I asked that there be a future clients tort czar appointed

19   in this case.  Well, why did I ask that?  Because what I felt

20   GM was doing, in fact they are doing, is trying to bind the

21   futures in some way without having the futures present or

22   having the futures represented.  And the way I left the hearing

23   was, it's -- it was and is the choice of GM on that issue.

24           There was a way to do this; they chose not to.  With

25   asbestos claims in particular it's very specific about how you

326

1    bind future claims and that's through a Manville type 524(g)

2    type solution.  We think that's clear from the statute and why

3    is it clear from the statute?  It's a matter of -- it's not

4    just the statute is a matter of constitutional due process.

5    The futures are here, I don't represent the futures, I don't --

6    I may have a future claim, I don't know it.  I sure hope not.

7         But we're -- we're talking about a claimant that is

8    going to develop a disease two, three, four, five, six, seven

9    years down the road.  We have testimony that there's an

10   estimate of ten-year present value that there's going to be

11   asbestos claims.  Ten years.  Up to at least ten years from

12   now, probably more.  There's a long incubation period.  This is

13   very well known and those people are not present.  They cannot

14   speak and it's hard to see under the constitutional due process

15   binding them in any way.

16        There's no notice that can be given or should be

17   given.  And I think we need to look not just to the statue of

18   524(g) but also the practical implications of the whole thing.

19   Let me just give You Honor an example.  This is how the case

20   could well come down.  Your Honor could approve the sale.  This

21   could be a wrap-up in say two years, perhaps, maybe less.

22   Maybe within a year Your Honor's going to institute a bar date,

23   there's going to be a claims bar date.  Probably a year or two

24   or so there's going to be distributions, year three or day two

25   plus one someone is going to get sick of cancer and die.

327

1    Someone who was a mechanic that been working on a GM -- on GM

2    cars.  It has a twenty, thirty, forty, ten-year -- who knows

3    how long incubation period.

4         Where is that person going to go?  Well, you heard

5    some testimony, they can't, according to the -- the purchaser,

6    the purchaser says no, not me, I'm not taking any of that

7    liability.  So if -- if Your Honor would uphold that, that

8    claimant has -- cannot go to New GM, notwithstanding the

9    successor claims issues that have been discussed so far, and he

10   can't go to OldCo, because there's been a distribution made and

11   a bar date has been instituted.

12        And that's the problem and that's why 524(g) has been

13   instituted.  In addition we've had a decision that came down

14   that won in the Second Circuit and lost in the Supreme Court

15   but I don't think it's really a loss, and that's the Manville

16   case, also known as Travelers v. Bailey, which came down and I

17   think this Court is going to need to reconcile anything that it

18   does in this decision with regard to future tort claims --

19   future asbestos claims with the June 18th, 2009 decision of the

20   Supreme Court.

21        These -- I think that court very clearly held that --

22   and it was an unusual decision, Second Circuit decision had a

23   lot to it also that wasn't necessarily reversed.  But in

24   essence it held that when you're before the court, for

25   instance, my tort committee, they're all current claimants,

328

1    they're before -- they're before your Court.  They're going to

2    be bound whatever you do and say, whether it's extra-

3    jurisdictional or not.

4           But what the Supreme Court said a couple weeks ago

5    were those people that were not there cannot be bound by

6    anything that happens in the bankruptcy court.  And in that

7    decision, the slip opinion at page 17, they specifically cite

8    how they could be bound and what kind of channeling injunction

9    has to -- can be issued specifically citing 524(g).  And they

10   say on direct review today "A channeling injunction of the cert

11   issued by the bankruptcy court in 1986 would have to be

12   measured against the requirements of Section 524(g) (to begin

13   with at least)" and that's a direct quote.

14          And in that decision of a couple weeks ago we're

15   going back to the Second Circuit, unfortunately Judge

16   Sotomayor, who was on my panel is -- will no longer be there

17   probably, but the other judges will be.  And we're going to

18   have to determine whether my clients in that case in fact were

19   bound by the 1986 decision, because the Supreme Court left open

20   the issue and said we are not necessarily bound by the 1986

21   decision or injunction, channeling injunction of the court, if

22   they somehow were not present or represented or did not exist

23   or whatever and they said the same thing for the Chubb

24   Insurance Company.

25          So I think to a certain extent the issues that Your

329

1    Honor has to wrestle with are constitutional and jurisdictional

2    as well -- as well as sale.  And in my view, dollar-wise I

3    don't want to say it's a pimple on the elephant but this is not

4    an asbestos driven case; we know that.  But these are

5    constitutional and due process issues that we consider to be

6    very, very important and have to be dealt with, with

7    appropriate consideration.

8            So I would urge Your Honor to reconcile whatever he

9    does with that opinion of the Supreme Court.  In addition, Mr.

10   Bressler referred to some colloquy of the Second Circuit in the

11   Chrysler decision, and there's been some discussion of that.

12   I'm sure I'm misremembering this and the record will reflect

13   what actually happened but I actually think that was colloquy

14   that I had with Judge Sack and Judge Sack was saying to me

15   during that oral argument, because I was involved in that one

16   too, while future claims clearly, you know, they may not be --

17   well, you just go ahead -- you just go ahead and institute

18   suit.  And my response to that was that's sending the wrong

19   message to ignore a court order or to try and get around a

20   court order or hope a state court will ignore a successful

21   liability or the court that says you cannot do something.

22           THE COURT:  One of the problems I have, Mr. Esserman,

23   is how I should work with things the judge is saying as a part

24   of the back and forth with counsel in oral argument  I remember

25   an instance in Adelphia where somebody cited me a transcript

330

1    from a certain district judge and I couldn't believe some of

2    the things she said, but then I realized that judges say all

3    sorts of things in oral argument, at least sometimes they do

4    want to be devils' advocates; sometimes they mean them and

5    sometimes they're just probing and other times they haven't

6    thought about it as much they would after the argument was over

7    and they sit down and they read the cases.  And how do I slice

8    and dice comments in oral argument to know which of those

9    multiple categories something can be in?

10             MR. ESSERMAN:  I agree with Your Honor, I just wanted

11   to comment on it, you've got to wait for the opinion or at

12   least look at the opinion when it comes down -- when and if it

13   comes down before you can really do anything because as Your

14   Honor knows, Your Honor may ask the question that indicates one

15   thing and completely rule the opposite.  And I understand that.

16   It was just a very telling comment to me by Judge Sack and it

17   would have been consistent with everything he's ever written

18   that I've ever read that he would hold that future claimants

19   would not be bound.  But that assumes that he's going to be

20   consistent with his other opinions, which I think you have to

21   look at.

22             THE COURT:  Then there is room for me to try to make

23   a judgment as to whether the appellate judge is really

24   telegraphing the way he's thinking as compared to being the

25   devil's advocate?

331

1              MR. ESSERMAN:  Your Honor, I would not urge that on

2     this Court, I think that that's a -- that would be -- I think

3     it is -- it should be of interest perhaps to the Court but I

4     don't Your Honor ought to base any ruling on that.  I think

5     Your Honor has to base his ruling on current decisions and as

6     Mr. Jakubowski quoted, and as I'm quoting to you Supreme Court

7     decisions, I think that those and -- and due process decisions,

8     I think that that's the safer -- that's the safer play.

9              Of course we don't have an opinion from the Second

10    Circuit.  We don't what they're doing, we don't know what their

11    hold -- what they're really going to hold, we don't know

12    whether they're going to make some broad policy arrangement or

13    decision because Chrysler was in fact a shut down company in

14    which nobody was working, everyone had been thrown out of work,

15    the plants had been shuttered, every one of them.  They stopped

16    production; it wasn't like a GM which is an operating business.

17    Chrysler was not an operating business; Chrysler was shut down

18    and if Fiat didn't come to the rescue, it was going to stay

19    shut down.

20             So we don't know exactly what is going through the

21    Court's mind there other than saving 30, 40,000 jobs it may

22    have been more for the Chrysler Company, which is frankly -- I

23    would say GM has some similarities there because there's a

24    reason the Treasury is here.  It's not just because they are a

25    commercial lender; this is highly unusual.  We all recognize

1    that, we all know that the stakes are just not a loan to a

2    corporation that this is -- this had been one of the more

3    important companies in American history and to the American

4    economy and that cannot be ignored.  The Treasury wouldn't be

5    doing what they are doing.  Reminded of a phrase made by a guy

6    named Charlie Wilson, who a few people off to my right I'm sure

7    know but probably nobody else, and this isn't the Charlie

8    Wilson of Charlie Wilson's war, he's a former --

9           THE COURT:  I saw the movie if that's the one.

10          MR. ESSERMAN:  I did too; different Charlie Wilson.

11          UNKNOWN SPEAKER: He was secretary of defense, Your

12   Honor.

13          MR. ESSERMAN:  He was secretary of defense --

14          THE COURT:  Probably a different war too.

15          MR. ESSERMAN:  Yes, Secretary of Defense under

16   Eisenhower and he says "For years I thought what was good for

17   our country was good for General Motors and vice versa".  And

18   of course President Obama said the same, paraphrased it, he

19   actually thought he was quoting it but I actually quoted it.

20          THE COURT:  Not without knowing the name of the guy

21   who saw that I'm old enough to remember that.

22          MR. ESSERMAN:  Well, unfortunately -- I am, too,

23   although I look much younger.  Strike that from the record,

24   please.

25          Anyway, Your Honor, this has been a long two days;

333

1    it's been a hot two days too.  We recognize the issues and

2    truly the weighty issues that Your Honor has to wrestle with.

3    Nobody would like to be in your seat right now.  I understand

4    the pressures, both political, national/international to

5    approve this -- approve this sale.

6            I'm officially telling you that I'm resting on my

7    papers, but I certainly can understand a decision whereby you

8    try and reconcile some of these issues and approve a sale.  But

9    carve out certain things:  carve out the issues of future

10   claims in which we have testimony that that's not material to

11   the company and that the company couldn't handle these claims

12   without a problem -- without a problem financially.  We had

13   testimony from the CEO of GM on that.  Thank you very much.

14           THE COURT:  Thank You.  Ms. Cordry, I think you're up

15   on deck but I think some of the things you were going to say

16   we're pretty ably handled by the two guys there.

17           MS. CORDRY:  All right.

18           THE COURT:  Come to a mic if you would, please.

19       (Pause)

20           MS. CORDRY:  As I suggested earlier today that we are

21   still trying to talk to Treasury and the debtors to resolve

22   these issues and we've had some more discussions -- true,

23   everyone's been popping in and out of the door every few

24   minutes.

25           THE COURT:  But the truth that has preoccupied us.

334

1              MS. CORDRY:  Yes.

2              MS. CORDRY:  Good.  Better than watching me go in and

3     out.  I have talked to Treasury, we are -- have another set of

4     proposals on the table.  I indicated that because there are

5     forty-five odd attorneys general on these papers and staff and

6     in order -- the discussion's at a point where that I wanted to

7     talk to them some more before I could make a commitment --

8              THE COURT:  Would it be helpful if I put you behind

9     Mr. Richman tomorrow?

10             MS. CORDRY:  Exactly.  So that's what we discussed is

11    that I'd prefer go in the morning.  Thank you.

12             THE COURT:  Sure.  Thank you.  Who's next?

13             MR. KENNEDY:  I believe we are, Your Honor.

14             THE COURT:  Okay, Mr. Kennedy, come on up, please.

15        (Pause)

16             MR. KENNEDY:  Good evening, Your Honor, Tom Kennedy,

17    the IUE-CWA, the steelworkers and the operating engineers.  I

18    want to join my colleagues in expressing appreciation to the

19    Court for the time and attention you've paid to these matters,

20    for your obvious preparation and for the concern that you've

21    expressed for the participants.

22             The numbers that are involved in our programs I want

23    to share with you just to again frame the magnitude of the

24    problems that we think the Court needs to deal with.  There are

25    26,500 IUE represented retirees.  There are 4,000 USW

335

1    represented retirees.  Counting the dependants of those

2    individuals who are involved in the health programs that

3    General Motors is seeking to terminate, we have 47,000

4    Americans.

5            We've presented a number of their statements today; I

6    think they speak eloquently to the human cost that would be

7    involved in the benefit terminations and modifications that

8    have been urged by General Motors.  But we think there are

9    critical issues in this case, legal issues.  Not just the human

10   cost that we think is so hot.

11           May a creditor with substantial post retirement

12   health benefit obligation choose to sell its assets through a

13   363 process when one of the express purposes of that process is

14   to deprive the participants of the otherwise applicable

15   protections of Section 1114?  Can a creditor who opts for a

16   Section 363 sale proceeding in order to defeat the rights of

17   some, but not all, of its unionized retirees sell those assets

18   free and clear under Section 363(f) of the Section 7 rights of

19   those retirees?  And finally of the retirees represented by the

20   objecting unions --

21           THE COURT:  Stop, Mr. Kennedy.  Section 7, what did

22   you mean by that?

23           MR. KENNEDY:  What I mean by that is that there's

24   been quite a bit of discussion this afternoon about the meaning

25   of the kinds of interests that are dischargeable in effect

336

1    under -- 363 that -- 363(f).  And in our view, it's important

2    for the Court to reconcile the rights under 1114 with 363.  And

3    in our view the rights under 1114 would survive a 363(f)

4    transaction and that the participants whom we represent should

5    be entitled to exercise their 1114 rights against both Old GM

6    and New GM.

7            THE COURT:  I understand that argument, but I thought

8    you said Section 7 rights, and I don't know what you mean by

9    that.

10           MR. KENNEDY:  No, I did not.  I use that phrase so

11   often as a labor lawyer I may have fallen into it, but I didn't

12   mean to.  I meant to say --

13           THE COURT:  Is that an important labor law context?

14           MR. KENNEDY:  Yes, that would be --

15           THE COURT:  Are we -- is it just like -- one of the

16   provisions of the Taft-Hartley Act?

17           MR. KENNEDY:  Yes, it is, the heart of the Taft-

18   Hartley Act from the point of view of union members is Section

19   7; it protects the right to form, join and assist labor

20   organizations.

21           THE COURT:  Oh, Okay.

22           MR. KENNEDY:  I don't believe it has anything to do

23   with this proceeding.

24       (Laughter)

25           THE COURT:  Okay.

337

1          MR. KENNEDY:  Certainly not the way the employers

2    have been acting.

3          THE COURT:  I had something so long ago that I don't

4    claim any remaining expertise with it, assuming that my

5    professor thought I once did.

6          MR. KENNEDY:  I'm sure he did, Your Honor, I 'm sure

7    you did well and any questions I'd be happy to answer but --

8          (Laughter)

9          MR. KENNEDY:  -- from the point of view of the

10   Bankruptcy Code, which is what we really focus on today, we do

11   think that Section 363(f), the interests that are dischargeable

12   under it, do not include rights under Section 1114.  And then I

13   think you have to ask whether the retirees represented by our

14   unions have been treated fairly and equitably in this process,

15   and since they manifestly have not what are the consequences of

16   that to this proposed sale?

17          Now a number of people had mentioned to you, and I

18   think it's the right thing to do, that we start any statutory

19   analysis with the words of the statute itself.  And 1114 could

20   not be clearer that it was intended to protect in ways unlike

21   almost any other interest under the code the rights of retirees

22   to continue their medical benefits unless there are certain

23   procedures that are followed.  In fact, what we think is very

24   significant in terms of harmonizing 363 and 1114 is Subsection

25   (e)(1), the very first operative section of the statute, which

338

1    begins "Notwithstanding any other provision of this title"

2    there is an effort by Congress to elevate 1114 other -- over

3    other aspects of the code and in our view specifically over

4    other general sections of the code like 363.

5           The second part of the statutory analysis under 1114

6    is to observe -- and you cannot read the statute without

7    observing that it is based on the notion of fair treatment,

8    full disclosure, equal treatment to the retirees that are

9    involved.  The only proposal that a trustee is permitted to

10   make, the debtor-in-possession is permitted to make, is one

11   that "under Section (f)(1)(A) that assures all creditors, the

12   debtor, and all of the affected parties are treated fairly and

13   equitably".  That's extraordinary language; not just the

14   participants, but the creditors, the debtor and all of the

15   affected parties.  Clearly the IUE-CWA, USW and IUOE retirees

16   have not been treated fairly and equitably, there are others

17   who have been preferred over them; could not pass the merits of

18   1114 the treatment to which they have been subject.

19          Section (f)(2) states that the trustee, before he can

20   impose -- before he can come to court and ask that there be a

21   termination of retiree benefits he has to demonstrate, having

22   conferred in good faith that attempting to reach mutually

23   satisfactory modifications of retiree benefits.  There's been

24   no good faith negotiations between these parties.  And what you

25   find if you look further into the statute that in order to

1    achieve a termination of benefits the -- the company has to

2    show that the union involved, in a unionized situation, has

3    refused to accept any proposal they had made without good

4    cause.  And in our view the discrimination against the splinter

5    unions, as opposed to the IUE -- the UAW members would

6    inevitably establish good cause to reject any proposal the

7    company made which had the effect that we're sitting here today

8    and observing.

9          And I would notice, Your Honor, that it's not only

10    our observation that the unions would have good cause to reject

11    this proposal, but in evidence there's an e-mail from the labor

12    relations representatives of General Motors in which they

13    inform the upper leadership, including Mr. Henderson, that the

14    unions would not accept an offer which provided only twenty

15    percent return to them from what their book value had been on

16    the OPEB obligations.  This offer was thirteen percent, there

17    is no chance that the unions would accept that offer, they had

18    good cause to reject it; this approach could never withstand

19    1114.

20          Then I wanted to make an observation is that under

21    (f) -- excuse me, (g)(3), Your Honor, any modification that

22    would be approved has to "assure that all creditors, the

23    debtor, and all of the affected parties are treated fairly and

24    equitably", which is -- harks back to something earlier in the

25    statute, but this section ads "and is clearly favored by the

340

1    balance of the equities".  So equities would have to balance,

2    as well, in favor.

3            Now if you look at that statutory history it's

4    interesting because it is precisely condemns what General

5    Motors is attempting to do.  Senator Heinz, when 1114 was

6    enacted, stated that Congress was also concerned over the

7    treatment of retirees after a company filed for bankruptcy.

8    There's one sentence I want to use here, "Once the retirees

9    lost their benefits they were forced by the bankruptcy law to

10   go to the end of the line of creditors and patiently wait for

11   years to get a small cash settlement."  That notion of

12   translating retirement benefits into a claim in bankruptcy

13   court as an unsecured creditor is precisely what Congress was

14   attempting to preclude through 1114.  Senator -- excuse

15   Representative Edwards, at the same time this bill was being

16   passed, said it is important we pass this bill to give retirees

17   peace of mind by removing the possibility of any sudden and

18   unilateral termination of retiree health benefits.  They are

19   suddenly and unilaterally terminating health benefits for

20   25,000 of the 30,000 individuals that are covered under the

21   IUE-CWA and other unions.

22           There is simply no suggestion in the statue, 1114, or

23   its legislative history that these retiree protections can be

24   avoided in a Chapter 11 proceeding by the simple expediency of

25   disposing of the assets of the debtor through Section 363

341

1   instead of having the debtor accomplish it on its own.  And

2   what we know here, and it's important to remember this, is that

3   this is not suspicion on our part, that the IUE-CWA OPEB in

4   particular was a motivating reason for this 363 transaction.

5   If you look at Exhibit Raleigh 13, Raleigh 14, both of them are

6   internal reports by General Motors to its labor relations and

7   top management people in which they specifically say we are

8   seeking to leave IUE in OldCo.  They mean by that they want to

9   turn the IUE OPEB obligation from a enforceable benefit into a

10  claim that retirees can wait years to enjoy.

11          Under item 16, under Raleigh Exhibit 16 that's a May

12  1st review with the U.S. trustee at page 4 under the listing GM

13  Liabilities to New GM, "leave behind splinter group health/life

14  obligations".  That was one of the reasons they selected 363 as

15  the forum under which this bankruptcy proceeding would be

16  conducted.  That was repeated on April 15th.  April 15th, very

17  important document, it's number 3 under Mr. Henderson's

18  exhibits.  It's a specific analysis, it's a long document, 107

19  pages, exhaustively analyzing should we go 363, should we try a

20  pre-packaged planned bankruptcy.  Under the 363 advantages, it

21  states "IUE and other splinter group obligation may be more

22  addressable in 363."  You could not be clearer that 363 was

23  chosen specifically to defease our clients of their rights to

24  their health benefits and to do it in a manner which did not

25  have to comply with 1114.

342

1          THE COURT:  Are you saying that was the purpose or an

2     effect?

3          MR. KENNEDY:  I'm saying it was a purpose.  I think

4     there's one other document which is very --

5          THE COURT:  Dominant purpose or an incidental

6     purpose?

7          MR. KENNEDY:  More than incidental, I think dominant,

8     and I will tell you exactly what I mean by that.  If you look

9     at Mr. Worth's affidavit, Exhibit F, is the board of directors'

10    report by his firm to the board of directors of General Motors

11    on May 31st, 2009, the meeting at which they approved the

12    filing of the bankruptcy, he identifies the capital structure

13    of the new company once they approve the 363 application.  In

14    that description of the new company they call out specifically,

15    and the only obligation that they're being able to dump through

16    the 363 that they call out specifically, is the gain from the

17    elimination in non-UAW OPEB.  If this were not a dominant, if

18    this were not a motivating factor in their deciding to use 363,

19    it would not have been the only discharged obligation mentioned

20    in that report to the board of directors at the critical

21    meeting by individuals who had opportunity to know and that

22    decided what the important elements were going to be.  And I

23    asked Mr. Worth, I said did you include this particular item on

24    this sheet of paper it's a bullet point sheet of paper, it's

25    not a string cite, there's about probably a hundred words on

1    it, and eight of them are "gain from the elimination in non-UAW

2    OPEB".  It's clear that this was an important and a motivating

3    influence.

4            THE COURT:  Please, Mr. Kennedy, what's the citation

5    of source for what you were just talking about?

6            MR. KENNEDY:  Exhibit F, the Worth affidavit, it's a

7    board of directors report 5/31/09.  I will get you a page

8    citation before we leave today; it's not one of my exhibits and

9    I don't have it with me, Your Honor.

10           It's important to note in evaluating the relationship

11   between 1114 and 363 that despite the worried tales of ugly

12   negotiations these people were talking to themselves.  Who is

13   kidding who?  Mr. Henderson is the CEO of Old GM, he's the CEO

14   of New GM; that's true for every single executive.  It's true

15   for most of the workers, it's true for most of the assets.

16   They carefully selected the people they were throwing

17   overboard, fine.  But that doesn't make it tough negotiations

18   between completely independent and arm's-length parties.  To --

19   even if you could imagine a circumstance in which the

20   commercial reality was such that a 363 transaction had to occur

21   and there were unionized OPEB individuals who were affected by

22   that, if it were truly arm's length, truly independent

23   relationship, that would be one level of analysis.

24           Here where we do not have an arms-length independent

25   relationship, we have as seamless a transition as the -- all of

1    the participants in this party could make it, it's particularly

2    inappropriate to suggest that they had a right under 363 to

3    ignore their otherwise applicable obligations under 1114.  The

4    deliberative process in this case, in the months of April, May

5    and June, were specifically and repeatedly intended to

6    accomplish the elimination of splinter union OPEB and the only

7    explanation that's been given for that is Mr. Wilson's candid

8    acknowledgement -- yeah, I think Mr. Henderson, to be candid,

9    said more or less the same thing, but he was -- I thought Mr.

10   Wilson was clearer that they used a doctrine of commercial

11   necessity.  If they didn't have to keep a liability, they

12   wouldn't do so.

13           Well, you know, that's a great doctrine from the

14   point of view of the individuals who are going to end up

15   running this company.  But the doctrine of commercial necessity

16   and the obligations under 1114 with its repeated and specific

17   obligations of good faith are simply incompatible.  That

18   commercial necessity can't be an eraser which eliminates all of

19   the rights under 1114.  The value of the offer made to IUE-CWA

20   retirees, also USW and IUOE, is shockingly low.  It's thirteen

21   percent of the value that GM admits for their OPEB as of

22   December 31st, 2008.

23           And that itself is exaggerated.  The actual recovery

24   by these participants could be much lower.  Mr. Miller said an

25   interesting thing in his presentation.  I wrote it down, "We

1    did not leave them with nothing".  Well, that's not true; they

2    did leave them with nothing.  And although I don't want to get

3    too deeply into the weeds about the details in a particular

4    health plan I think a few details will illustrate just how much

5    nothing in fact this plan constitutes.  First it's the position

6    of the unions, and always has been, that their rights to

7    retiree health coverage are vested, uncancellable by the

8    company.

9         In fact the evidence shows in the Raleigh exhibits

10   that in October of 2008, only eight months ago, General Motors

11   agreed to fund 2.455 billion for an IUE VEBA.  Essentially the

12   same deal that had been set aside for the UAW.  We had that

13   agreement in place, in fact, as our brief reports; they advised

14   Congress in December of 2008 that they had reached an agreement

15   with the IUE on the creation of a VEBA.  They repudiated that

16   agreement in January, and they did because UST, U.S. Treasury,

17   had imposed obligations on them that were inconsistent with the

18   funding that had been agreed to during 2008.

19        My point beyond that is to observe that if they

20   really had a claim that these rights to OPEB benefits were

21   cancellable or voidable by them, they would not have agreed to

22   fund two and a half billion dollars into an IUE-CWA OPEB VEBA.

23   So let's look at what in fact they're giving to our retirees.

24   Well, of the 26,500 IUE retirees, approximately 20,000 are just

25   eliminated.  Benefit over, see you later.  The other 6,000 are

346

1    being, because they're pre sixty-five, are being given the so-

2    called salary plan.  But the salary plan has the following

3    provision:  NewCo." reserves the right to amend, modify or

4    terminate the plan at any time.

5           They want and have insisted that the IUE-CWA concede

6    that even this crummy plan is terminable at will by General

7    Motors at any point.  They could do it January 1, 2010.  The

8    value, the thirteen percent value they've ascribed to their

9    offer, that 470 bill -- million, rather, 470 million, assumes

10   that the benefit stays in place throughout the period of time

11   that any pre sixty-fives remain short of that age and second,

12   assumes full participation by IUE-CWA members.

13          In fact, neither is true.  The company has a right to

14   cancel it at any time and the second is that the benefits are

15   such that it is a programmed failure plan.  Let's remember how

16   this works.  There are caps on company expenditure, low caps.

17   Caps, in fact, from 2006 of 4,000 dollars an individual.  Now,

18   that 4,000 dollar cap is multiplied by the number of

19   participants.  Let's say we start with 6,000 participants.  You

20   can do the arithmetic, 6,000 times 4,000 comes up with a

21   number.  If they can drive the number of participants down to

22   3,000, their cap for a year is only 3,000 times 4,000.

23          Normal medical inflation will make this plan more

24   expensive for participants.  In fact, as it is now, the first

25   8,000 dollars for retirees comes out of the member's pocket.

347

1    They then go into a zone of coverage.  But the first 8,000

2    comes out of their pocket.  Our members can't afford 8,000

3    dollars up front as medical expenses when right now their out-

4    of-pocket medical expense is probably around the order of 800

5    dollars a year under the current plan.  To go to 8,000 a year,

6    though, our people won't take the plan and as we indicated in

7    the declarations that we submitted, that will be a significant

8    number of people.

9         Once people start dropping out of the plan it's the

10   healthy ones that don't take the insurance.  The people who say

11   "well, gee, 8,000 is a lot of money, but it's better than the

12   50,000 I'm going to incur in medical expenses this year", will

13   drive the cost of that plan sky high.  And it is specific in

14   this offer in a way I've never seen before.  I must have

15   evaluated 500 company proposals over the years; I've never seen

16   one say, as this one does, that you must agree in advance that

17   every dollar over 4,000 in any given year will be recaptured by

18   the company by making the plan terms worse the following year.

19   So if you track this out, seven or eight years from now you

20   would have to pay 50,000 dollars in premiums to get 4,000

21   dollars in coverage.  This plan is a sop, it only reflects the

22   reality that there are political considerations, as the company

23   acknowledged, they wanted to make it look like they were doing

24   something, in fact they're doing nothing.  There is no

25   protection for IUE-CWA steelworker or operating engineer

348

1    retirees under this proposal and there's no way you can take

2    this 4,000 dollar cap and make it seem a real health plan

3    because it's not.

4          The treatment afforded to IUE-CWA steelworker and

5    operating engineer retirees is dramatically worse than other

6    similarly situated unsecured creditors of General Motors.

7    Let's look at the interplay between Treasury and General Motors

8    about how the IUE-CWA and other union people ended up where

9    they were.  The story is, I suppose it's correct, is that at

10   some point Treasury said well, we're not going to get too far

11   into this, we're going to take a group of obligations that are

12   all unfunded, that collectively are 7.9 billion dollars, and

13   we're going to say to General Motors we want you to reduce

14   those by two-thirds, okay?  General Motors looks at that; one

15   of the components is executive SERP, another component is

16   salaried life.  Most of the components, four or five of them,

17   are for salaried executive individuals.  Now we know, because

18   of the Sprague case, that all of them are cancellable by the

19   company at will.  General Motors had the right to terminate

20   each one of those programs.  The same is not true, in our view,

21   with respect to the splinter union health and life.  But

22   because none of them are funded, Treasury apparently concluded

23   that they would take that 7.9 billions dollars and they would

24   determine that the two-thirds would be applied as against that.

25   What Mr. Wilson told them, I quoted his testimony, "We told GM

349

1    to cut two-thirds; we told them to figure out how to do it."

2    That's Mr. Wilson's testimony.

3            The mechanics on it are reflected by Mr. Henderson's

4    Exhibit 12 -- excuse me, I believe it's -- it's the -- yeah,

5    excuse me, it's Henderson 14 where the -- and you've seen this

6    chart before, Your Honor, where they charted out the total of

7    7.9 billion and the percentage deductions that would be

8    applicable to each, and I'm referring to page 2, as I said, of

9    Exhibit 14 of the Henderson deposition.  Retiree life was cut

10    sixty-six percent.  Salaried retiree health care, in the first

11    iteration to Treasury by General Motors, was cut zero, no cut

12    at all.  Executive nonqualified pension, that's the SERP, was

13    cut thirty-two percent.  Executive life, Treasury told them

14    they had to dump that, wasn't vested, no claim to continuation,

15    that they eliminated.  The splinter unions on the other hand,

16    their health care was cut eighty-four percent.  Eighty-four

17    percent.  Now the package of cuts came to sixty-two percent,

18    and this -- this is pretty late day, this is June 4th, by the

19    way.  On June 4th the e-mail was sent, correct -- I should say

20    responding to the fact that the sixty-two percent was rejected

21    by Treasury.  Treasury said no, we said two-thirds and we meant

22    it, you need to go back and get that extra -- that extra five

23    percent, from sixty-two to sixty-seven.  Now that five percent

24    represents million dollars of value in the benefit program.

25    The executives of General Motors --

350

1          THE COURT:  The incremental five percent is --

2          MR. KENNEDY:  It's four hundred million, sir.

3          THE COURT:  Four hundred million additional?

4          MR. KENNEDY:  Yes, it moves the cuts, if you want the

5     exact numbers, from 4.8 billion to 5.2 billion.  Started with

6     7.9, they had proposed 4.8, Treasury said it's got to be 5.2.

7     That four hundred million, the executives of General Motors

8     took every penny of it out the salaried health care, but more

9     importantly they took it out of the splinter union health care.

10    Because by lumping them into the same program, that program I

11    told you about a moment ago, the -- what they did is they took

12    that 4,000 dollar cap and reduced it for the year 2010 and

13    going forward so that now medical inflation will bump up

14    against the lower cap and that allowed them the present value

15    of the number at a smaller rate and allowed them to put an even

16    worse plan out on the table.  A worse plan that as time goes on

17    will get worse and worse and worse till the point rapidly where

18    there is no health coverage at all for the 47,000 people that I

19    mentioned we represent.  That's wrong.  And there was not a

20    union member, not a union leader, not a union person involved

21    in those negotiations or decisions.

22          One of the points of 1114 is to be able to say to the

23    unions and the representatives and the participants here's what

24    the company wants to do, be part of the process.  If you have a

25    problem with it, if you think it's unfair the bankruptcy court

351

```
 1    will hear you and will give you relief, will give you the

 2    opportunity to demonstrate that it's unjust.  We don't have

 3    that.  We heard the head of Ajax, what was -- that outfit is,

 4    saying that within a week from now they were going to start an

 5    1114 proceeding.  Now when they do that we'll be dealing with

 6    Old GM that has 1.25 billion dollars in cleanup money that's

 7    well spoken for and shares and warrants that won't be subject

 8    to cashing out for some time -- for some years.

 9         There's no room to continue the IUE-CWA health

10    benefits under Old GM; they know it.  They know the 1114 will

11    be a sham, but they intend the sham 1114 traction because --

12    transaction because they drained the assets out of New GM --

13    excuse me, out of Old GM and put them into new -- into New GM.

14         Now the other thing that I want to call to your

15    attention, Your Honor, is that -- the alleged equity of

16    including union retirees with salaried retirees for purposes of

17    a health ban -- plan is all set by one critically important

18    fact.  On January 1, 2009, just six months ago, the salaried

19    retirees who had -- had their insurance taken away were

20    provided a 300 dollar a month pension increase from the salary

21    pension fund.

22         THE COURT:  Yes, I understand that, but your

23    opponents say that that didn't come from GM; that came from a

24    qualified pension trust.

25         MR. KENNEDY:  That's true.
```

352

1          THE COURT:  It was overfunded.

2          MR. KENNEDY:  I believe it came from something called

3     the salaried retirement plan, the SRP, I think that's correct.

4     I don't think it's overfunded by the way, Your Honor, it's well

5     funded, but I don't think it's overfunded.  The hourly help --

6     the hourly pension plan, in our view, could similarly sustain a

7     pension increase to our members, the -- there are carrying

8     costs involved with any pension increase, there's an

9     amortization period and the amortization period would have some

10    impact, but from the point of view of the members, from the

11    point of view of the individuals that no longer have insurance,

12    were given money with which they could purchase insurance, the

13    fact that we can say well, don't worry about that, it didn't

14    come from GM, you're not being treated unequally because that

15    came from the salaried pension plan, I don't think that's a

16    very convincing response.  They've made no effort to

17    demonstrate that that same 300 dollars couldn't be paid from

18    the hourly pension plan.

19         And the reason I bring it up is to demonstrate that

20    their suggestion that there is a parity between these groups,

21    salaried and non-UAW unionized, is false, untrue and a lie.  It

22    was not a parity; it was dramatically different because they

23    provided alternative funds with which to purchase insurance.

24         I want to look at two other pieces of the General

25    Motors conduct in this.  They've made the -- they and as I

353

1    said, Mr. Wilson, contend that there is no commercial necessity

2    for bringing on the IUE-CWA and other non-UAW union OPEB.  Well

3    let's look at that principle applied in other situations.  If

4    we look at the SERP obligation, the SERP obligation that they

5    agreed to assume by New GM is 730 million dollars.  They didn't

6    have to assume that.  More than three-quarters of that is for

7    retired executives.  Not for people currently working for

8    General Motors.  There's no distinction between covering our

9    retirees who are no longer currently working for General Motors

10   and retired executives who are no longer working for General

11   Motors.  There's no reason why one would be preferred over the

12   other, except there was an act in this little drama that

13   probably led to it.

14           Mr. Henderson, legitimately concerned over his group,

15   sent an e-mail to Mr. Rattner lobbying, advocating for two

16   types of insurances to be maintained.  The first was the SERP

17   plan and the second was the salaried health plan.  There were

18   no similar e-mails lobbying for continuation of unionized

19   benefits.  We weren't at the table; we didn't have the

20   opportunity to make that claim.  Had they been forced to go

21   through an 1114 proceeding before any of these benefits were

22   changed that wouldn't be true, we'd have had notice,

23   opportunity to be heard, standards applied and the

24   demonstration that what was going on was fundamentally unfair.

25           Now the Court has mentioned on several occasions the

354

1    Chrysler case, and I just want to address that for a minute.

2    The Chrysler case, in our view, has little to teach us about

3    this particular transaction from our perspective.  I'm sure

4    there are things that are overlap well between Chrysler and GM,

5    but from our perspective, which is to say what happens to non-

6    UAW members that don't have opportunity to participate in a

7    VEBA.  There were no similar union objections in Chrysler.

8              Chrysler did not, was not asked to, and the Chrysler

9    Corp was not asked to and did not rule on the relationship

10   between 1114 and 363.  What Judge Gonzalez did say is that even

11   after a court determines that the criteria of Section 363 had

12   been met, that has not happened here and we hope it does not,

13   but if it were to be true, the Court must then determine

14   whether the elements of Section 363(f) are satisfied.  And in

15   our view the free and clear of any interest in such property

16   cannot apply to interest that the unions that represent members

17   have under 1114; they are contractual, statutory under the

18   Bankruptcy Code, statutory under ERISA, they are an important

19   web of deeply, deeply significant interests that these

20   individuals have and to have them washed out is fundamentally

21   inconsistent with the language of 1114 that says that

22   notwithstanding any other portion of the code these protections

23   will apply.

24             Now I just want to touch on two things that were said

25   by Mr. Miller.  Mr. Miller used the word "jealousy".  And

VERITEXT REPORTING COMPANY

212-267-6868                                                516-608-2400

355

1    that's not true, Your Honor.  It's a misreading of everything

2    we stand for.  Everything the unions I represent have brought

3    to you today.  We care not that the UAW members have gotten

4    something in exchange for their OPEB.  We're delighted that as

5    retired Americans they're going to have the opportunity for

6    some health care protection.  Our concern is that we were not

7    given that same opportunity.  It's not jealousy; this isn't a

8    party, this isn't high school.  These are people being deprived

9    of fundamental rights.  Rights that in the absence of the

10   insurance will affect not only them but their families and for

11   decades.

12           There was also a notion of conspiracy, now I think

13   that was chosen as a word, because I believe Mr. Miller choses

14   (sic) his words carefully because he wanted to minimize the

15   extent of the unions' complaint, the notion that we saw some

16   vast conspiracy in which we were somehow deprived of benefits

17   and we're suggesting that nameless, shapeless forces were

18   somehow behind it.  We don't need to do that, we've got their

19   documents.  Their documents prove that through -- that the

20   ability to eliminate our OPEB was a substantial motivating

21   force behind selecting the 363.  If he wants to call it a

22   conspiracy, be my guest, but it's not nameless and it's not

23   faceless, we know who it was, we know when it happened and we

24   who did it.  And who were the victims, we were.  It's unfair

25   and we ask the Court if you would -- to not approve this sale

1    as it's currently constructed.  If it is approved, we ask that

2    you approve it conditionally upon their satisfying the rights

3    under 1114 -- or their obligations, I should say, under 1114

4    with respect to our members.

5           And finally that if a sale does go through, in our

6    view any 1114 process would extend to both Old GM and New GM,

7    we should have the opportunity to demonstrate a week from now,

8    when they start the 1114 proceeding -- procedure that they

9    promised that we have a right to all of those assets as an

10   opportunity to demonstrate that the only fair result is one in

11   which we maintain our benefits.  Thank you, Your Honor.

12   Otherwise I rely on my papers.

13          THE COURT:  Okay.  Fair enough.  Who do we still have

14   for tonight?

15          MR. MCRORY:  Russell McRory for the Greater New York

16   Auto Dealers' Association.

17          THE COURT:  Fine, Mr. McRory.

18          MR. MCRORY:  Good afternoon, Your Honor, I'll be

19   short.  My name is Russell McRory from Robinson Brog Leinwand

20   Greene Genovese and Gluck on behalf of the Greater New York

21   Automobile Dealers' Association.  Your Honor, the association

22   does not oppose the sale.  The association indeed supports and

23   looks forward to GM's revitalization.  The association

24   recognizes and appreciates that GM has treated its wind-down

25   dealers much better than Chrysler treated its rejected dealers.

357

1    And the association also applauds the appeals process

2    instituted by GM in contrast to what Chrysler has done with a

3    lack of an appeals process for its rejected dealers.

4         There is however one issue of concern to the

5    association.  That concern is that the approval of the 363 sale

6    involves the ratification of conduct by the debtors that is

7    deemed unlawful by New York's Franchise Motor Vehicle Dealer

8    Act and impermissible under the Federal Automobile Dealers' Day

9    in Court Act.  That conduct is this, that the debtor has

10   coerced its dealers to sign away their state law protections

11   and federal law protections through the execution of

12   participation in wind-down agreements.  This was done at the

13   proverbial point of the gun.  Dealers were told to sign these

14   agreements or else they would be rejected and end up exactly

15   like the Chrysler's rejected dealers.

16        This conduct violated the Federal Automobile Dealers'

17   Day in Court Act, which proscribes the manufacturer from using

18   intimidation and coercion in its dealings with its franchisees.

19   Virtually all fifty states, including New York, have similar

20   proscribe -- laws proscribing such conduct.  I realize of

21   course, Your Honor, that in the usual bankruptcy case the

22   debtors will use their powers to assign or to assume or reject

23   contracts, to extract concessions from its contract

24   counterparties and then assume those contracts as amended.

25   However this is not the usual case.

358

1        In this case, Your Honor, as I mentioned above, the

2   Automobile Dealers' Day in Court Act, as well as state laws,

3   have a say in the matter.  The usual contract counterparty is

4   not protected by such laws.  And it is not without irony, Your

5   Honor, that the -- that Chrysler did not try to do this in its

6   bankruptcy.  Chrysler did not attempt to extract concessions

7   from its continuing dealers as a -- in exchange for being

8   assumed and not rejected.

9        THE COURT:  Pause please, Mr. McRory, you said half a

10  second ago that GM is trying to do better for its folks than

11  was done by Chrysler Corporation; it's kind of sounding like no

12  good deed goes unpunished.  I mean, I can understand how you'd

13  be pretty upset if Chrysler had just -- excuse me, if GM had

14  just rejected all of these folks.  And it's giving them a soft

15  landing and you're saying that because it did, but because it's

16  saying that we're giving you a soft landing under certain

17  terms, it should be penalized for that.

18       MR. MCRORY:  Your Honor, these are two different

19  groups of dealers.  The -- it was the rejected dealers in

20  Chrysler that were just rejected.  Here in -- and GM is giving

21  a soft landing to its wind-down dealers, the dealers that

22  otherwise would have been rejected.

23       THE COURT:  So you're not complaining about the

24  terminated group --

25       MR. MCRORY:  No.

359

1        THE COURT:  --  dealers, you're complaining about

2    those who have an even better deal which is that they're

3    continuing.

4        MR. MCRORY:  They are continuing, Your Honor, however

5    as I've to draw the distinction that in the Chrysler case the

6    continuing dealers had their franchise agreements assumed

7    without -- without amendment and without being put through the

8    course of process of having their agreements amended.

9        THE COURT:  But of course if they hadn't been amended

10   then we have a bloated dealership structure that addressing

11   which was an important element of restructuring GM.

12       MR. MCRORY:  No, it doesn't change the fact, Your

13   Honor, that the wind-down dealers are eventually leaving GM, it

14   doesn't change the fact --

15       THE COURT:  No, but for those who are going forward

16   there was a decision, as I understand the evidence, that you

17   had to amend those agreements or you wouldn't be in a position

18   where you could assume them.

19       MR. MCRORY:  Your Honor, that is not -- that is not

20   the case.  As I understand it, GM could simply have assumed the

21   continuing dealers franchise agreements exactly as Chrysler did

22   for its continuing dealers.  There was no require -- there was

23   no requirement that they be amended first through a

24   participation agreement.

25       THE COURT:  Go on, I'll check the record on that.

360

1            MR. MCRORY:  Sure.  And, Your Honor, as evidence of

2     that I just cited exactly what happened to Chrysler.  That is

3     what happened to Chrysler.  The Chrysler dealers who were

4     continuing had their franchise agreements assumed as-is.  The

5     specific incit --

6            THE COURT:  Okay.  The problem I'm having, Mr.

7     McRory, is it seems to me that GM's program both for the

8     continuing dealers and for the terminated ones was more fine-

9     tuned to both sides' needs and concerns than Chrysler was.  And

10    it sounds to me like GM, if I were to accept your arguments,

11    would be penalized for that

12           MR. MCRORY:  No, Your Honor, I don't think it's a

13    matter of being penalized, I think it's a matter of -- that

14    we're dealing with -- we're not dealing with the same situation

15    where GM is either accepting or -- either assuming or rejecting

16    the continuing dealers -- dealer agreements.  They're doing an

17    extra step.  And that is that extra step of causing an

18    amendment to those agreements to be signed first before

19    assuming those agreements.  That is the sole focus of what I'm

20    talking about now.

21           And the reason why I'm focusing on that -- those

22    amendments to the continuing dealers' franchise agreements is

23    because it was brought about through a coercive process.  And

24    those were in violation of state law, in violation of federal

25    law.  And 28 U.S.C. 959(b) says that a debtor-in-possession

1    must manage and operate its business in accordance and with

2    valid state laws.

3            And -- so the -- essentially, Your Honor, what the

4    association is arguing is that it was a bridge too far, in

5    effect, for GM to not simply assume the -- assume the

6    continuing dealers' franchise agreements, but the bridge too

7    far, and which violated the state dealer laws which are made

8    applicable through 959(b) was to coerce the execution of the

9    participation agreements which took away otherwise their state

10   law rights.

11           And let me emphasize, this is not a challenge to the

12   debtor's right to sell its assets in a 363 sale.. We're not

13   challenging the debtor's rights, generally, to reject contracts

14   or assume contracts in its sound business judgment.  What we're

15   challenging is the debtor's post-petition conduct, its post-

16   petition conduct in coercing its dealers in violation of the

17   state dealer laws and the Automobile Dealers' Day in Court Act

18   to rewrite their franchise agreements.

19           Now clearly there's a tension between 959(b) and the

20   Bankruptcy Code.  The question is when does a state law have to

21   yield to the debtor's rights under the Bankruptcy Code or when

22   is a debtor obligated to follow those state laws under 959(b)?

23   And the case law cited in our brief includes -- holds that that

24   tension is resolved by looking at whether the debtor's ability

25   to circumvent state law gives that debtor an unfair advantage

1    in the marketplace.  And in addition to the cases cited we also

2    list Stable Mews here in the Southern District which cited

3    Butner v. United States for that basic concept.

4          And that is precisely what is occurring here.  Ford

5    cannot simply rewrite its dealer agreements in this way.

6    Toyota, Honda, Mercedes and the other import brands cannot do

7    so and indeed, Your Honor, as I pointed out earlier, Chrysler

8    did not do so in its bankruptcy proceeding.  In other words the

9    debtors violating of state dealer laws during the pendency of

10   this proceeding has given GM a substantial competitive

11   advantage against every other manufacturer in the marketplace.

12         THE COURT:  But the complaint's not coming from Ford

13   or Chrysler or even Toyota; it's coming from people who by not

14   having their dealerships rejected are benefitting from the

15   opportunity to continue to be GM dealers

16         MR. MCRORY:  They are benefitting from the

17   opportunity to continue to be a -- be GM dealers, Your Honor,

18   but again it was done at the proverbial point of the gun to

19   sign this agreement or else.  And that is the coercive --

20         THE COURT:  Mr. Miller, I'm going to give you a

21   chance to reply but --

22         MR. MILLER:  Your Honor, I just want to make one

23   statement if I might, Your Honor.  Counsel keeps talking about

24   coercion, I would just like to point out, Your Honor, an oral

25   argument, closing argument should relate to the record.  There

1    is absolutely no evidence --

2          THE COURT:  Okay, yes, but we haven't up to this

3    point and I would like to continue, Mr. Miller, not

4    interrupting each other making the argument.  You can certainly

5    point out when it's you turn to reply, which I guess you will

6    be able to do tomorrow, that Mr. McRory has distorted the

7    record or spoken to hoarse the record or whatever.

8          MR. MCRORY:  You Honor, I think it's clear just by

9    the very words of the wind-down agreements and the cover

10   letters from GM that they were told in bold print in those

11   letters that if they did not sign, their agreements would be

12   rejected.  So however one wants to look at that, it is the

13   positi -- it is -- you can look at it as coercion or something

14   else, but if you're told sign or your dealer -- or your

15   agreements will be rejected that, in my understanding of the

16   word, is coercion.  And those are GM letters and documents that

17   they submitted to every single dealer.

18         THE COURT:  Okay.

19         MR. MCRORY:  So, Your Honor, to wind up, so to speak,

20   the debtor has gone far beyond simply jettisoning unwanted

21   contracts and assuming the contracts that it wants to assume.

22   In -- what it is doing is rewriting the rules applicable to

23   dealer and factory relationships, rules that every other

24   manufacturer has to adhere to.  And that is precisely the

25   situation with 959(b) applies and demands that debtors comply

364

```
1    with the same laws that all other manufacturers have to comply

2    with.  Thank you, Your Honor.

3              THE COURT:  All right, thank you.  All right, we

4    covered everybody for tonight?  I think so.  All right.

5    Tomorrow we have Mr. Richman and then Mr. Parker -- oh, I have

6    duplicates.  Mr. Mayer, you would care to be heard as well?

7    Well, you or Mr. Eckstein?  I guess you've relieved him at this

8    point.

9              MR. MAYER:  Your Honor, if I may, this is a

10   placeholder.  Mr. Eckstein said on his piece on some particular

11   issues -- said the committee's piece on some particular issues

12   at the beginning.  We are holding a committee call at 8 p.m.

13   tonight.  It is possible we will have a short statement

14   tomorrow, and I would like to reserve some time to do that.

15             THE COURT:  Why don't we put you in right after Mr.

16   Richman and Mr. Parker.  By then you should have a better

17   handle, I would hope, on what you want to tell me.

18             MR. MAYER:  Thank you, Your Honor, that would be

19   appropriate.

20             THE COURT:  Okay, we'll put it down.  And then

21   tomorrow, Mr. Miller, I'll hear rebuttal from you, your reply

22   on all of the folks who spoke after you did today along with

23   comparable opportunities for -- oh, I have indentured trustees.

24   Okay, just --

25             MR. FELDMAN:  Your Honor, I don't intend to speak
```

365

1    tonight, I'm happy to -- David Feldman, Gibson Dunn & Crutcher,

2    on behalf of Wilmington Trust, the indentured trustee for more

3    than twenty-two billion dollars of bonds in this case.  It's

4    our intention to make a brief statement tomorrow in connection

5    with our joinder to the committee's response.  I think it would

6    make more sense for us to go tomorrow when as Mr. Eckstein

7    described we'll have a better clarity on where we are in

8    particular with regard to the wind-down budget issue, which is

9    a very central issue to our joinder papers.  And as a result I

10   would ask that we be able to follow the committee tomorrow --

11   tomorrow morning.

12           THE COURT:  Sure, Mr. Feldman.  And I suspect I'm

13   going to get the same request from the other indentured

14   trustee.

15           MR. FELDMAN:  I expect you might.

16           THE COURT:  I know you're -- I note you're from

17   Kelley Drye but forgive me, I forgot your name.

18           MS. CHRISTIAN:  That's correct, Jennifer Christian.

19           THE COURT:  Go ahead, Ms. Christian.

20           MS. CHRISTIAN:  From Kelley Drye & Warren, we

21   represent Law Debenture Trust Company of New York and we would

22   just make the same request that we be allowed to follow the

23   committee counsel.

24           THE COURT:  Sure.

25           MS. CHRISTIAN:  Thank you.

366

1          THE COURT:  Sure.  Okay.  Yes, sir?

2          MR. BACON:  Excuse me, Your Honor, my name's Doug

3    Bacon, I'm with Latham and Watkins and I represent GE Capital.

4    We have filed an objection, and we've been -- I've been in the

5    courtroom next door for two days.  We have a solution and a

6    stipulation and I just want to make sure I get a place in line

7    at the right point and that I'm not estopped from speaking.  We

8    had a settlement with the debtor and I don't know how

9    procedurally you want that layered in.

10         THE COURT:  If you think you can state it now and

11   that the debtor thinks it's a good time, I would say let's do

12   it right now or if they prefer tomorrow morning I wouldn't

13   deprive you of the opportunity to do it if you had something.

14         MR. BACON:  Thank you, Your Honor, I'll do whatever

15   they prefer.

16         MR. WEISS:  Your Honor, Robert Weiss, Honigman Miller

17   Schwartz and Cohn.

18         THE COURT:  Sorry, but -- do you have a cell phone in

19   your pocket, Mr. Bacon?

20         MR. BACON:  I have a BlackBerry, but --

21         THE COURT:  You have -- no, BlackBerries destroy our

22   sound system.  Mr. Bacon, your product liability case in --

23         (Laughter)

24         THE COURT:  All right, okay.  Can I ask you, now that

25   you're not being drowned out, to repeat who are?

1          MR. WEISS:  My name is Robert Weiss, I'm with

2    Honigman Miller Schwartz and Cohn, special counsel to General

3    Motors Corporation.

4          THE COURT:  Okay, Mr. Weiss.

5          MR. WEISS:  You Honor, we have been in negotiations

6    and discussions with Mr. Bacon as well as the creditors'

7    committee.  There have been a number of revisions to the

8    stipulations made continuously throughout the day and into this

9    afternoon.  I have not had an opportunity to discuss the latest

10   revisions with my client and I'd like the opportunity to do so

11   before we can present a stipulation.

12         THE COURT:  Can I ask you then, Mr. Weiss, and --

13   forgive me, did I see you on the aircraft rejection list?

14         MR. WEISS:  Yes, you did, Your Honor.

15         THE COURT:  Yes, I acknowledge that.  Why don't you

16   caucus with whomever you need to caucus with tonight and then

17   put it on the record in the morning, if that's not a problem.

18         MR. WEISS:  That'd be fine.  Thank you, Your Honor.

19         THE COURT:  Mr. Bacon, you cool with that too?

20         MR. BACON:  That'd be fine, Your Honor, thank you.

21         THE COURT:  Okay.  All right, then.  What else do we

22   have for tonight?  Sir, are you waiting to come up to see me,

23   speak to me?

24         MR. QUIGLEY:  Yes, sir.  Sorry to delay, Judge, Sean

25   Quigley from Lowenstein Sandler on behalf of a bunch of

368

1   dealerships.  I don't know if you want me to put a statement on

2   the record tomorrow or --

3          THE COURT:  I think at this point I want all

4   statements tomorrow, including those who haven't spoken yet.

5          MR. QUIGLEY:  All right.

6          THE COURT:  And at this point we're going to adjourn

7   for the evening.  Mr. Richman, would you be in a position where

8   you could start at 9 tomorrow instead of 9:45?

9          MR. RICHMAN:  Yes, Your Honor.

10         THE COURT:  Okay.

11         MR. MILLER:  Are we in this courtroom?

12         THE COURT:  Yes, we will be.  And you folks can leave

13  your stuff here under the same understandings that you did

14  yesterday.

15         MR. MILLER:  Could we have someone stand, Your Honor,

16  on time for Mr. Richman and Mr. Parker?

17         THE COURT:  Well, Mr. Richman, I think you told me

18  something once but I don't remember what it was.

19         MR. RICHMAN:  Well, I think Mr. Miller argued for a

20  little over an hour by my reckoning.  I don't expect to be that

21  long.

22         THE COURT:  Yes, but he was taking care of seven

23  different groups of objections.

24         MR. RICHMAN:  I guessed earlier thirty to forty-five

25  and I think I'll still be in that range.

369

1          THE COURT:  Okay.

2          MR. RICHMAN:  Thank you, Your Honor.

3          THE COURT:  All right, see you folks tomorrow, we're

4     adjourned.  Good night.

5       (Whereupon these proceedings were concluded at 7:02 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

370

```
1
2                        I N D E X
3
4                    T E S T I M O N Y
5    WITNESS                 EXAM BY              PAGE    LINE
6    William Repko           Mr. Richman           43      1
7    Harry Wilson            Mr. Salzberg          50     20
8    Harry Wilson            Mr. Barkasy           90     22
9    Harry Wilson            Mr. Jakubowski       109      2
10   Harry Wilson            Mr. Esserman         122      2
11   Harry Wilson            Mr. Eckstein         126     19
12   Harry Wilson            Mr. Hoffman          133     11
13   Harry Wilson            Ms. Cordry           142      9
14   Harry Wilson            Mr. Bernstein        158     22
15   Harry Wilson            Mr. Parker           162      6
16   Harry Wilson            Mr. Salzberg         174      6
17   Harry Wilson            Mr. Schwartz         179     15
18   Harry Wilson            Mr. Miller           186      9
19   Harry Wilson            Mr. Jakubowski       195     20
20   David Curson            Mr. Salzberg         205     17
21
22                    E X H I B I T S
23   NO.          DESCRIPTION                   ID.    EVID.
24   Debtors' 6A  Amended MSPA                            42
25   Gov't 1      Declaration of Harry Wilson            50
```

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

371

1

2                           I N D E X, cont'd

3

4                           E X H I B I T S

5    NO.            DESCRIPTION                    ID.     EVID.

6    Gov't 2-4      Three intercreditor agreements          50

7    AHCCV-1        Letter from Mr. Bressler to Mr.        108

8                   Miller

9    AHCCV-2        Response of Mr. Miller to Mr.          108

10                  Bressler

11   PLCA-2         E-mail from Mr. Worth to Mr.           116

12                  Wilson

13   AG-1           Proposed sale order           141     162

14                  Judge Nolan's order; consent           161

15                  decree; trust agreement; and

16                  assessment

17   Bondholder-4   Article released by The Detroit   174

18                  News on their website

19   IUE-CWA-9      Deposition transcript of Michael      200

20                  Raleigh dated 6/28/09 and supporting

21                  documents

22   IUE-CWA-10     Deposition transcript of Fritz        200

23                  Henderson dated 6/28/09 and

24                  supporting documents

25

372

I N D E X, cont'd


E X H I B I T S

| NO. | DESCRIPTION | ID. | EVID. |
|-----|-------------|-----|-------|
| IUE-CWA-11 | Deposition transcript of Harry Wilson dated 6/25/09 and supporting documents | | 200 |
| IUE-CWA-12 | IUOE documents | | 200 |
| Debtors-17 | Second amended certificate of service of Jeffrey Stein of the Garden City Group | | 203 |
| | Two Treasury Department determinations | | 204 |
| UAW-1 | Declaration of David Curson and accompanying exhibits | | 211 |
| TX AG-1 | General Motors Corp. cover letter dated 6/1/09 re proposed Participation Agreements | | 212 |
| TX AG-2 | General Motors Corp. proposed Participation Agreement dated 6/1/09 | | 212 |
| TX AG-3 | General Motors Corp. proposed letter agreement dated 6/9/09 modifying Participation Agreement | | 213 |

373

I N D E X, cont'd

E X H I B I T S

| NO. | DESCRIPTION | ID. | EVID. |
|-----|------------|-----|-------|
| TX AG-4 | Informal request for production from J. Casey Roy to Weil Gotshal dated 6/23/09 | | 213 |
| TX AG-5 | E-mail dated 6/23/09 from J. Casey Roy to Weil Gotshal | | 213 |
| TX AG-6 | General Motors Corp. cover letter dated 6/1/09 accompanying final version Participation Agreements | | 213 |
| TX AG-7 | General Motors Corp. final version Participation Agreement dated 6/1/09 | | 213 |
| TX AG-8 | General Motor Corp. final version of proposed letter agreement dated 6/1/09 modifying Participation Agreement | | 213 |
| TX AG-9 | E-mail dated 6/26/09 from Evert Christensen, Weil Gotshal forwarding Exhibits 7 & 8 to J. Casey Roy | | 213 |

374

1

2                           I N D E X, cont'd

3

4                            R U L I N G S

5     DESCRIPTION                                      PAGE      LINE

6     Motion of Manufactures and Traders Trust Company    41       18

7     for relief from stay granted

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

375

C E R T I F I C A T I O N

I, Lisa Bar-Leib, certify that the foregoing transcript is a
true and accurate record of the proceedings.


_____

LISA BAR-LEIB

AAERT Certified Electronic Transcriber (CET**D-486)


Also transcribed by:  Esther Accardi

                      Pnina Eilberg

                      Clara Rubin

                      Ellen Kolman

                      Tzippy Geralnik

                      Rivka Cubine


Veritext LLC

200 Old Country Road

Suite 580

Mineola, NY 11501


Date:  July 6, 2009