Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                           :

**In re**                      :          **Chapter 11 Case No.**
                           :

**MOTORS LIQUIDATION COMPANY, *et al.*,**  :         **09-50026 (REG)**
     **f/k/a General Motors Corp., *et al.***  :
                           :

               **Debtors.**     :          **(Jointly Administered)**
                           :
----------------------------------------------------------------x

**REPLY OF DEBTORS TO OBJECTION BY**
**STILLWATER MINING COMPANY TO THIRD OMNIBUS**
**MOTION OF DEBTORS TO REJECT CERTAIN EXECUTORY CONTRACTS**

# TABLE OF CONTENTS

**Page**

Background ........................................................................................................... 1

The Debtors' Third Omnibus Rejection Motion and Stillwater's Objection ................................. 1

The Stillwater Contract is Substantially Over-Market and its Rejection  is a Sound Exercise of the Debtors' Business Judgment ................................................................. 3

The Impact of Rejection on Stillwater Does Not Alter the Court's  Application of the Business Judgment Standard ........................................................................... 5

The Rejection Should be Effective as of the Proposed Rejection Date ........................................ 7

Notice ................................................................................................................. 10

## TABLE OF AUTHORITIES

### FEDERAL CASES

*BP Energy Co. v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp., et al.)*,
No. 02 Civ. 6419 (NRB), 2002 WL 31548723 (S.D.N.Y. Nov. 15, 2002) ........................9, 10

*In re Amber's Stores, Inc.*, 193 B.R. 819 (Bankr. N.D. Tex. 1996) .................................................9

*In re Jamesway Corp.,* 179 B.R. 33 (S.D.N.Y. 1995) ......................................................................9

*In re Old Carco LLC*, No. 09-50002, 2009 Bankr. LEXIS 1382 (Bankr. S.D.N.Y. June
19, 2009) ...........................................................................................................................6, 7

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
4 F.3d 1095 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994) .........................................5

*Phar Mor, Inc. v. Strouss Building Associates*, 204 B.R. 948 (Bankr. N.D. Ohio 1997)...............5

*In re Pilgrim's Pride Corp.*, 403 B.R. 413 (Bankr. N.D. Tex. 2009).............................................7

*In re Riodizio, Inc.*, 204 B.R. 417 (Bankr. S.D.N.Y. 1997)..........................................................5

*In re Thinking Machine Corp. v. Mellon Finance Services*, 67 F.3d 1021 (1st Cir. 1995) ......9, 10

### STATUTES

11 U.S.C. § 105............................................................................................................................1

11 U.S.C. § 363............................................................................................................................1

11 U.S.C. § 365..................................................................................................................1, 6, 7, 9

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation ("**GM**")) and its

affiliated debtors, as debtors in possession in the above-captioned chapter 11 cases (collectively,

the "**Debtors**"), respectfully represent:

**Background**

1.    On June 1, 2009, the Debtors filed a motion (the "**Sale Motion**"),

requesting, *inter alia*, an order (the "**Sale Order**"), pursuant to 11 U.S.C. §§ 105, 363(b), (f), and

(m), and 365, authorizing and approving (i) the sale of substantially all of the Debtors' assets

pursuant to a proposed Master Sale and Purchase Agreement and related agreements (the

"**MPA**") among the Debtors and Vehicle Acquisition Holdings LLC ( "**New GM**"), a purchaser

sponsored by the United States Department of the Treasury (the "**U.S. Treasury**"), free and clear

of liens, claims, encumbrances, and other interests, including any successor liabilities (the "**363**

**Transaction**"), (ii) the assumption and assignment of certain executory contracts and unexpired

leases of personal property and of nonresidential real property, and (iii) the approval of the UAW

Retiree Settlement Agreement, subject to higher or better offers.

2.    On July 5, 2009, the Court approved the 363 Transaction, and on July 10,

2009, the 363 Transaction closed.  Accordingly, the Debtors no longer operate as manufacturers

of Motor Vehicles.

**The Debtors' Third Omnibus Rejection Motion and Stillwater's Objection**

3.    On July 7, 2009, the Debtors filed their Third Omnibus Motion to Reject

Certain Executory Contracts (the "**Motion**")[1] [Docket No. 937].  On July 16, 2009, Stillwater

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion.

Mining Company ("**Stillwater**") filed an objection to the Motion, and specifically to the

Debtors' proposed rejection of a substantially above market-rate supply contract for palladium

and rhodium (the "**Metals"**) between the Debtors and Stillwater. [2]  The Metals historically were

used by GM and provided to certain of its third party auto parts suppliers to manufacture

catalytic converters for GM branded vehicles.  Although Stillwater has substantial mining

operations in the domestic United States, Stillwater is a majority owned subsidiary of MMC

Norilsk Nickel ("**MMC**"), a Russian mining company.[3]  *See* Statement on Form 10K of

Stillwater Mining Company, dated March 16, 2009 ("**Stillwater 2008 10K**"), p. 8.[4]

        4.      As discussed in the Motion and in more detail below, the Debtors are

seeking authorization to reject the Stillwater Contract because it was not assumed and assigned

to New GM pursuant to the 363 Transaction and is not needed for the wind-down of the Debtors'

remaining business operations.  Unlike the Debtors' other Metals supply contracts that were

assumed and assigned to New GM, the Stillwater Contract contains floor pricing minimums that

are substantially above the current spot market rate for palladium.  The Stillwater Contract also

contains minimum quantity requirements which actually increase in 2010 despite an overall

reduction in anticipated usage by New GM.  As a leaner and more efficient vehicle

manufacturer, the Debtors understand that New GM has no need for the Metals from Stillwater

---

[2] Palladium and Rhodium Sales Agreement, dated August 8, 2007 (the " **Original Supply Contract**"), as amended pursuant to the First Amendment, dated December 9, 2008 (the "**First Amendment**"), the Second Amendment dated March 5, 2009 (the "**Second Amendment**") (collectively referred to as the "**Stillwater Contract**").  The Stillwater Contract is attached hereto as Exhibit A.

[3] Stillwater goes on at length in its Objection, without any legal support or justification, about the apparent lack of patriotism in New GM continuing supply contracts with foreign suppliers while not continuing Stillwater's over-market supply contract.  Ironically (or accidentally), Stillwater references its own parent MMC as one such foreign Metal supplier retained by New GM.  Thus, Stillwater's corporate parent still maintains a Metals supply agreement with New GM.

[4] A copy of the relevant sections of the 2008 10K is attached hereto for the Courts reference as Exhibit B.

that are priced significantly higher than current market levels.  Accordingly, New GM elected
not to purchase the Stillwater Contract in the 363 Transaction.

5.      Following the close of the 363 Transaction, the Debtors no longer
manufacture vehicles.  Therefore, the Debtors have no business reason to continue to purchase
palladium or any other metals from Stillwater, especially in huge quantities and on inflated
pricing terms.  As described below, if the Debtors are required to continue to perform under the
terms of the Stillwater Contract, it would cost the Debtors' estates more than $3 million per
month in 2009 and $6 million per month in 2010, while providing no corresponding benefit.  The
Debtors therefore requested authority to reject the Stillwater Contract, effective as of July 9,
2009— a date after Stillwater received notice of the Debtors intended rejection, but before any
new shipments of Metals were made by Stillwater for the month of July, 2009.

6.      Stillwater's Objection relies on two primary arguments:  (i) "the Debtors
are not properly exercising [and did not justify] their business judgment in seeking to reject the
Stillwater Contract" and (ii) the rejection of the Stillwater Contract will cause damage that is
"disproportionate to any benefit to be derived by the general creditors of the Debtors' estate" and
therefore the Court should employ a heightened balancing of equities test instead of the
traditional business judgment standard.  (Objection at 9-12.)  In addition, Stillwater argues that
the Debtors have no legal or other justification for the proposed rejection effective date of July 9,
2009, requested in the Debtors' Motion.  (Objection at 13, 14.)  As addressed in detail below,
Stillwater's arguments are without merit under the facts and applicable case law and the
Objection should be denied.[5]

---

[5] Stillwater also seeks limited discovery on GM's business justifications for rejecting its contract.  However, the
Debtors believe that the facts and circumstances stated herein and as found and determined by this Court in other
proceedings in these chapter 11 cases clearly justify rejection under section 365 of the Bankruptcy Code without the

**The Stillwater Contract is Substantially Over-Market and its Rejection
<u>is a Sound Exercise of the Debtors' Business Judgment</u>**

7.      As noted, the Stillwater Contract is a supply contract under which GM

purchased palladium and rhodium prior to the commencement of these chapter 11 cases.  The

terms of the Stillwater Contract required GM to purchase large quantities of palladium on a long

term basis pursuant to the following quantity and minimum floor pricing terms:

| <u>Year</u> | <u>Monthly Quantity</u> | <u>Floor Price (Per Ounce)</u> | <u>Monthly Cost</u> |
|---|---|---|---|
| 2008 | 10,000 Ounces | $300 | $3,000,000 |
| 2009 | 10,000 Ounces | $300 | $3,000,000 |
| 2010 | 20,000 Ounces | $300 | $6,000,000 |
| 2011 | 10,000 Ounces | $300 | $3,000,000 |
| 2012 | 10,000 Ounces | $300 | $3,000,000 |

*See* Original Supply Contract, §§4(a), 5(a).  As Stillwater admits in its Objection, the floor price

of $300 per ounce that GM must pay under the terms of the Stillwater Contract are *substantially*

higher then the current spot market rates for which the Debtors (and now New GM) can purchase

the Metals from its other suppliers.  (*See* Objection at 4.)  Indeed, as of July 10, 2009, the date of

the closing of the 363 Transaction, the spot market price for palladium was approximately $235

per ounce.  The average daily price of palladium during 2009 has been $197 per ounce.  *See*

Stillwater 2008 10K at 33.

8.      Thus, if the Debtors are obligated to continue to perform under the terms

of the Stillwater Contract, they would be forced to expend $3 million per month for the

remainder of 2009 and approximately $6 million per month beginning in 2010.  Since the

Debtors no longer manufacture vehicles and New GM had no need to purchase Stillwater's

---

need for costly, time-consuming, and unnecessary discovery.  Moreover, even if Stillwater was to demonstrate
through evidence the matters asserted in the Objection, the Debtors would still be entitled to the relief requested.

above market supply contract,[6] the Debtors have absolutely no business reason to continue to

perform under the Stillwater Contract.  If forced to do so, the Debtors would have no choice but

to seek to resell the Metals in the open market, which at average prices for 2009, *would result in*

*more than $500,000 per month in losses* for the Debtors and their estates.  Therefore, the Debtors

decision to reject the Stillwater contract is clearly a sound exercise of its business judgment and

not a "matter of mere convenience to Old GM and New GM" as alleged in the Objection.

(Objection at 2.)

   9. Courts generally will not second-guess a debtor's business judgment

concerning the assumption or rejection of an executory contract or unexpired lease.  *See In re*

*Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) ("[A] court will ordinarily defer to the

business judgment of the debtor's management."); *accord Phar Mor, Inc. v. Strouss Bldg.*

*Assocs.*, 204 B.R. 948, 951-52 (Bankr. N.D. Ohio 1997) ("Whether an executory contract is

'favorable' or 'unfavorable' is left to the sound business judgment of the debtor. . . .  Courts

should generally defer to a debtor's decision whether to reject an executory contract.").  Indeed,

"the purpose behind allowing the assumption or rejection of executory contracts is to permit the

trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and

abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion*

*Pictures Corp.*), 4 F.3d 1095, 1098 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994).

   10. The Debtors have articulated a clear business purpose for rejecting the

Stillwater Contract, which, if continued would be extremely burdensome to the Debtors' estates

---

[6] Contrary to Stillwater's unsubstantiated assertions, New GM also has no need to retain the costly over-market Stillwater Contract.  Due to decreased manufacturing of GM branded vehicles, New GM's projected supply need for Palladium in 2009 is approximately 35% less than GM's supply need in 2007.

without providing any corresponding benefit.  Accordingly, the Court should approve the

rejection of the Stillwater Contract as a sound exercise of the Debtors' business judgment.

**The Impact of Rejection on Stillwater Does Not Alter the Court's
Application of the Business Judgment Standard**

11.     In an attempt to side-step the clear business justification for the Debtors'

proposed rejection, Stillwater argues that such rejection will have a significant impact on its

bottom line and therefore the Court "may refuse to authorize rejection where the party whose

contract is to be rejected would be damaged disproportionately to any benefit to be derived by

the general creditors of the estate rejection of its contract."  (Objection at 9.) (citations omitted).

12.     However, as noted above, continued performance under the Stillwater

Contract would *substantially* harm the Debtors' estates and creditors by forcing the Debtors to

purchase metals *it cannot use* at a post-mitigation loss in excess of  $500,000 to $3 million per

month.  By contrast, the Stillwater Contract only accounted for 12% of Stillwater's revenue in

2008 and approximately 11% of its year to date revenue.  (*See* Objection at 4.)  Therefore, if any

party is disproportionately effected, it is the Debtors, who are already in a bankruptcy proceeding

and are attempting to use section 365 as it was expressly intended— to maximize the recovery

for its estate and creditors by eliminating burdensome contracts.  *See In re Old Carco LLC*, No.

09-50002, 2009 Bankr. LEXIS 1382 at *5 (Bankr. S.D.N.Y. June 19, 2009) ("***Chrysler***") ("[T]he

authority to reject an executory contract is vital to the basic purpose to a Chapter 11

reorganization, because rejection can release the debtor's estate from burdensome obligations

that can impede a successful reorganization.") (citations omitted).

13.     Further, to the extent Stillwater argues in its Objection that the Court

should employ a heightened public policy standard and "balance the equities" instead of

applying the business judgment standard, Stillwater's argument also fails.  Judge Gonzales made

clear recently in *Chrysler* with respect to the rejection and attendant shut down of certain

dealerships that, "absent Congressional authority, such as through a separate section of the

Bankruptcy Code (e.g., § 1113) or a specific carve-out within § 365 itself, *the court is not free to*

*deviate from the business judgment standard* and weigh the effect of rejection on debtor's

counterparty or the counterparty's customers." *Id.* at *21-22 (emphasis added).  Judge Gonzalez

went on to add in *Chrysler* that while the "Court is sympathetic to the impact of the rejections on

the dealers and their customers and communities,[]such sympathy does not permit the Court to

deviate from well-established law and "balance the equities" instead of applying the business

judgment standard."  *Id.* at * 20-21.

        14.     Thus, while the Debtors' proposed rejection of the Stillwater Contract will

impact Stillwater and perhaps even the local economy, that is not a reason to second guess the

Debtors' clear business judgment in seeking the rejection.  *See In re Pilgrim's Pride Corp.*, 403

B.R. 413, 425 (Bankr. N.D. Tex. 2009) ("While the impact of rejection on the [counterparties']

community may be significant, that is not an uncommon result of the cut-backs that typically

accompany a restructuring in chapter 11. Moreover, it would not be equitable or consistent with

public policy to cause the unsecured creditors of the Debtors to subsidize Stillwater or its

surrounding local interests.  Whether through contract rejections or plant closings, contraction of

a debtor's business will often have a harmful effect for one or more local economies. If the

bankruptcy court must second-guess every choice by a trustee or debtor in possession that may

economically harm any given locale, the business judgment rule applicable to contract rejection

and many other decisions in the chapter 11 process will be swallowed by a public policy

exception.")

15.     Accordingly, the scope of the Court's inquiry is limited to an evaluation of whether the rejection of the Stillwater Contract is an exercise of the Debtors' sound business judgment.  For the reasons discussed in detail above, the Debtors submit that rejection of the Stillwater contract is clearly a sound business decision that will substantially benefit the Debtors' estate and its creditors.

### The Rejection Should be Effective as of the Proposed Rejection Date

16.     Finally, Stillwater argues that the Debtors are seeking to reject the Stillwater Contract retroactively and that such relief should be denied.  As noted above, the Debtors filed the Motion with this Court on July 7, 2009, and sought to reject the Stillwater Contract on July 9, 2009, more than a week after verbal notice of the rejection was provided to Stillwater and one day after Stillwater received formal notice of the rejection via overnight mail.  Contrary to Stillwater's suggestion that the Debtors chose to "silently slip the requested date of rejection into the attached schedule of contracts," the Debtors plainly stated in the Motion that any contract with a proposed rejection date that was earlier than July 22, 2009, would receive notice via overnight mail.  (*See* Objection at 13;  Motion ¶ 9.)

17.     Further, prior to July 9, 2009, the Debtors and Stillwater engaged in multiple discussions in which the Debtors, in an effort to incentivize New GM to take on assignment of the Stillwater Contract and eliminate potential rejection damage claims, sought to modify the pricing and quantity terms of the Stillwater Contract.  After it became clear that Stillwater was unwilling to accept market terms, the Debtors informed Stillwater on July 1, 2009, of their need to reject the Stillwater Contract.  At that time, the Debtors also informed Stillwater that it should discontinue shipping any Metals because the Debtors had no desire to compel further performance under the contract.  Consequently, Stillwater received both formal and informal notice prior to, and including, the date of the proposed rejection and should have ceased

shipping Metals accordingly.  As such, the Debtors do not believe that they have sought to reject the Stillwater Contract retroactively.

18.     Nevertheless, if the fact that a contract is rejected after notice but prior to entry of an order deems a rejection retroactive, applicable law still clearly permits such retroactive rejection.  Although section 365 of the Bankruptcy Code does not specifically address whether the Court may order retroactive rejection, many courts, including those in this district, have held that bankruptcy courts may, in their discretion, authorize rejection retroactively to a date prior to entry of the order authorizing such rejection.  *See, e.g. BP Energy Co. v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp., et al.)*, No. 02 Civ. 6419 (NRB), 2002 WL 31548723, at *3 (S.D.N.Y. Nov. 15, 2002) (finding that retroactive rejection is valid when the balance of equities favor such treatment); *In re Jamesway Corp.*, 179 B.R. 33, 36 (S.D.N.Y. 1995) (stating that section 365 does not include "restrictions on the manner in which the court can approve rejection"); *In re Thinking Mach. Corp. v. Mellon Fin. Servs.*, 67 F.3d 1021, 1028 (1st Cir. 1995) (approving retroactive orders of rejection where the balance of equities favors such relief); *In re Amber's Stores, Inc.*, 193 B.R. 819, 827 (Bankr. N.D. Tex. 1996) (holding that where the debtor has taken affirmative steps to reject certain leases and executory contracts, the debtor should not be penalized for the period of lag time that occurs between filing the motion and the entry of an order by the court).

19.     *In re Bethlehem Steel Corp.*, a decision of the District Court for the Southern District of New York affirming an order of the Bankruptcy Court, is directly on point and dispositive.  In *In re Bethlehem Steel Corp.*, Bethlehem was party to a long-term gas purchase agreement that contained annual "floor" prices with BP Energy Company ("**BP**").  Soon after Bethlehem filed for bankruptcy protection, the spot price for natural gas fell

significantly below the annual "floor" price required by the agreement, costing Bethlehem approximately $450,000 per month over market terms. *Id.* at *6. As a result of the potential loss to Bethlehem's estate and creditors, Bethlehem found an alternative source for gas at spot market prices and filed a motion to reject the contract with BP, effective five days after the motion was filed but fourteen days before the hearing date to consider the proposed rejection. *Id.* at *1. Bethlehem specifically informed BP to cease performing under the contract as of the proposed rejection date, but BP continued to perform past that date. *Id.* BP, like Stillwater, objected to the rejection date of the contract, claiming that retroactive rejection would be inconsistent with the Bankruptcy Code. *Id.*

20.    The court found that the retroactive rejection of a contract is permitted "when the principles of equity so dictate." *In re Bethelehem Steel Corp.,* 2002 WL 31548723, at *3 *citing In re Thinking Mach. Corp. v. Mellon Fin. Servs.*, 67 F.3d at 1028. Specifically, because BP had been put on advance notice of the proposed effective date and because BP's services provided Bethlehem with no benefit after the proposed date of rejection, the counterparty suffered no additional "prejudice" and "the Bankruptcy Court was not precluded as a matter of law from assigning [Bethelehem's] rejection date." *In re Bethelehem Steel Corp.*, 2002 WL 31548723, at *5, 6.

21.    As in *In re Bethelehem Steel Corp.* and as set forth above, the Debtors provided Stillwater with advance notice of their intent to reject the over-market Stillwater Contract and received no benefit to the estate for use of that contract after the July 9, 2009 proposed rejection date. As such, rejection of the Stillwater Contract should be deemed effective as of July 9, 2009.

## Notice

Notice of this Reply has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the United States Department of the Treasury, (iii) the attorneys for Export Development Canada, (iv) the attorneys for the statutory committee of unsecured creditors appointed in these chapter 11 cases, (v) the attorneys for the ad hoc bondholders committee, (vi) the U.S. Attorney's Office, S.D.N.Y., (vii) the attorneys for Stillwater, and (viii) all entities that requested notice in these chapter 11 cases under Fed. R. Bankr. P. 2002.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested herein and in the Motion and such other and further relief as is just and proper.

Dated: New York, New York
July 21, 2009

/s/ Joseph H. Smolinsky
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**<u>Exhibit A</u>**

WGM_TRAILER

## PALLADIUM AND RHODIUM SALES AGREEMENT

This PALLADIUM AND RHODIUM SALES AGREEMENT (this "Agreement") is made and entered into this 8th day of August, 2007, by and between STILLWATER MINING COMPANY, a Delaware corporation, whose address is 1321 Discovery Drive, Billings, Montana 59102 ("SMC"), and GENERAL MOTORS CORPORATION, a Delaware corporation, with a place of business at 777 Joslyn Ave., Pontiac, Michigan 48340-2925 ("GM").

### RECITAL

GM and SMC are interested in entering into an arrangement by this Agreement whereby SMC will supply GM certain agreed upon amounts of palladium sponge of .9995 minimum purity and rhodium sponge of .9990 minimum purity.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, SMC hereby agrees to sell and deliver and GM hereby agrees to purchase palladium and rhodium of the quantity and quality hereinafter set forth, upon the following terms and conditions:

Section 1.    <u>Definitions and Terminology</u>.  Unless the context indicates otherwise, capitalized terms have the meaning set forth in this Section 1.

*Actual Mined Metal* means Palladium mined from SMC's East Boulder Mine and/or Stillwater Mine.

*Actual Monthly Production* means the actual amount of mined metal out-turned by SMC or on behalf of SMC by a third party refinery during any one calendar month.

*Business Day* means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in the United States are authorized or obligated by law or executive order to close.

*Contract Year* shall mean the twelve consecutive calendar months commencing with January of each calendar year.

*Delivery Point* means GM's pool account at Heraeus Metals Processing, USA and/or Johnson Matthey, USA, as designated by GM on or before the last Business Day of the Pricing Month.  If GM fails to designate which location, delivery will be made to the same Delivery Point(s) as the previous delivery.

#785260.4

*Old Agreement* means the Palladium and Platinum Sales Agreement dated as of August 17, 1998, as amended by the First Amendment Agreement to Palladium and Platinum Sales Agreement dated as of November 20, 2000, and by the Second Amendment Agreement to Palladium and Platinum Sales Agreement dated as of February 20, 2001, and the Third Amendment to Palladium and Platinum Sales Agreement dated as of August 8, 2007, and as the same may be amended from time to time.

*Delivery Start Date* means January 2008 for Rhodium deliveries and the month following the date of the last delivery of Palladium pursuant to the Old Agreement.

*JM Reference Price Average* means the monthly average of the daily Johnson Matthey North America reference price for Rhodium, as published by Johnson Matthey Inc. Precious Metals Marketing, USA, at approximately 9:30 am Eastern Time.

*London PM Fix Average* means the monthly average of the daily London Platinum & Palladium Market (LPPM) PM Fix for Palladium, as published on LPPM website www.lppm.org.uk.

*Metal* means the palladium and/or rhodium to be sold under this Agreement.

*Ounce* is a troy ounce equivalent to 31.1035 grams.

*Palladium* means refined palladium in sponge form with .9995 minimum purity.

*Palladium Option* shall have the meaning set forth in Section 4(a).

*Pricing Month* means the month during which pricing is determined pursuant to Section 5 of this Agreement, and (i) with respect to Palladium, is the month prior to the month of delivery (*e.g.* March 2008 for delivery in April 2008), and (ii) with respect to Rhodium, is the month that is three months prior to the month of delivery (*e.g.* October 2007 for delivery in January 2008).

*Rhodium* means refined rhodium in sponge form with .9990 minimum purity

*Rhodium Option* shall have the meaning set forth in Section 4(b).

Section 2.    Term. This Agreement shall have an initial term from January 1, 2008, through and including December 31, 2012. This Agreement is subject to earlier termination pursuant to Section 9 and extension pursuant to Section 15.

Section 3.    Delivery. Beginning on the Delivery Start Date, SMC will sell and deliver Metal FOB Delivery Point, and GM will purchase the quantities of Metal set forth in Section 4, which shall be delivered no later than the 20th day of the month following the Pricing Month. All Metal to be sold in any one calendar month shall be delivered to a single Delivery Point.

2

Section 4.    <u>Quantity and Source</u>.

(a)    <u>Palladium</u>.  SMC will sell and deliver and GM will purchase the following quantities of Palladium:

| Year | Monthly Quantity |
|------|------------------|
| 2008 | 10,000 Ounces |
| 2009 | 10,000 Ounces |
| 2010 | 20,000 Ounces |
| 2011 | 10,000 Ounces |
| 2012 | 10,000 Ounces |

GM shall have the option to increase the number of Ounces of Palladium purchased monthly during 2011 and 2012 from SMC from 10,000 Ounces to 20,000 Ounces (the "Palladium Option"); <u>provided</u> GM gives written notification to SMC of GM's exercise of the Palladium Option on or before December 31, 2009.  SMC will provide written notification of the expiration of the Palladium Option 60 days in advance of its expiration.  Of the Ounces of Palladium delivered to GM each month, at least that number of Ounces that is equal to 20% of Actual Monthly Production for a given month (40% for months during 2011 and 2012 if the Palladium Option has been exercised) must be Actual Mined Metal, with the remaining Ounces from such other sources that SMC may chose in its sole discretion.  For example, if Actual Monthly Production is 40,000 Ounces for a given month, at least 8,000 Ounces of the 10,000 Ounces delivered by SMC to GM for such month must be Actual Mined Metal, and up to 2,000 Ounces may be from other sources at SMC's sole discretion; and if GM has exercised the Palladium Option, at least 16,000 of the 20,000 Ounces delivered by SMC to GM for any months during 2011 and 2012 must be Actual Mined Metal.

(b)    <u>Rhodium</u>.  SMC will sell and deliver and GM will purchase 500 Ounces of Rhodium each month starting in January 2008 and ending in December 2012.  GM shall have the option to increase the number of Ounces of Rhodium purchased monthly during 2011 and 2012 from SMC from 500 Ounces to 1,000 Ounces (the "Rhodium Option"); <u>provided</u> GM gives written notification to SMC of GM's exercise of the Rhodium Option on or before December 31, 2009.  SMC will provide written notification of the expiration of the Rhodium Option 60 days in advance of its expiration.  The source of all of the Ounces of Rhodium delivered to GM will be at SMC's discretion.

Section 5.    <u>Pricing</u>.  The price per Ounce to be paid to SMC by GM for the actual quantities of Metal delivered pursuant to this Agreement shall be based on the London PM Fix Average for Palladium and the JM Reference Price Average for Rhodium for the Pricing Month less a discount and, in the case of Palladium, subject to certain minimum, as set forth below.

3

(a)    Palladium.  The price per Ounce to be paid to SMC by GM for the actual quantities of Palladium delivered pursuant to this Agreement shall be based on the London PM Fix Average for the Pricing Month less a discount of (i) 1% if the London PM Fix Average for the Pricing Month is at or between US$300.00 per Ounce and US$399.99 per Ounce; (ii) 2% if the London PM Fix Average for the Pricing Month is at or between US$400.00 per Ounce and US$499.99 per Ounce; and (iii) 3% if the London PM Fix Average for the Pricing Month is at or above US$500.00 per Ounce.  Notwithstanding the foregoing, the parties agree that 100% of the actual quantities of Palladium delivered will be subject to a minimum price of US$300 per Ounce, net of the applicable discount.

(b)    Rhodium.  The price per Ounce to be paid to SMC by GM for the actual quantities of Rhodium delivered pursuant to this Agreement shall be based on the JM Reference Price Average for the Pricing Month less a discount of (i) US$8.00 per Ounce if the JM Reference Price Average for the Pricing Month is equal to or less than US$1,999.99 per Ounce; (ii) US$12.00 per Ounce if the JM Reference Price Average for the Pricing Month is at or between US$2,000.00 and US$3,999.99 per Ounce; (iii) US$20.00 per Ounce if the JM Reference Price Average for the Pricing Month is at or between US$4,000.00 and US$4,999.99 per Ounce; and (iv) US$30.00 per Ounce if the JM Reference Price Average Average for the Pricing Month is at or above US$5,000.00 per Ounce.

Section 6.    Payment Terms.  On the first Business Day following each Pricing Month (ie., the first Business Day of the month of delivery), SMC will inform GM in writing via facsimile as to the formula-based pricing computations set forth in Section 5 above for the actual quantities of Metal to be delivered by SMC pursuant to this Agreement during the following month.  GM will forward such payment amount for 100% of the actual quantities by wire transfer to SMC (pursuant to written wire transfer instructions which will be provided by SMC) by the third Business Day following the confirmation of receipt.  All payments will be made in U.S. Dollars.  If GM does not agree with SMC's pricing computations, GM shall timely notify SMC of the disagreement and the parties shall seek resolution of such dispute as to the calculation of the payment amount prior to the date payment is due.

Section 7.    Suspension of Delivery for Failure to Pay.  Ten business days after receipt by GM of written notice from SMC to GM of GM's failure to pay pursuant to the terms of Sections 6 and 7 (Why the reference to section 7) above, SMC may suspend delivery of Metal to GM until such time as payment has been received by SMC.  This right shall not be deemed to be an exclusive right or remedy.

Section 8.    Risk of Loss; Title.  Title and risk of loss for all Metal delivered hereunder shall pass to GM upon delivery to the Delivery Point.

Section 9.    Warranty.  SMC warrants that the Palladium supplied hereunder shall have a minimum purity of .9995; that the Rhodium supplied hereunder shall have a minimum purity of .9990; and that SMC will convey good title to the Metal, free and clear of all liens and encumbrances payable by SMC.  In respect of Metal supplied by release from SMC's pool account to GM's pool account, the parties agree that such Metal shall be deemed to have a minimum purity of .9995 for Palladium and .9990 for Rhodium.

4

OTHER THAN THOSE EXPRESSLY STATED IN THIS AGREEMENT, THERE ARE NO REPRESENTATIONS, GUARANTEES OR WARRANTIES, EXPRESSED OR IMPLIED, OF ANY KIND. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SMC EXPRESSLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY, FITNESS, OR SUITABILITY FOR A PARTICULAR PURPOSE OR USE NOTWITHSTANDING ANY COURSE OF PERFORMANCE, USAGE OF TRADE OR LACK THEREOF INCONSISTENT WITH THIS SECTION.

SMC'S SOLE LIABILITY FOR BREACH OF WARRANTY SHALL BE LIMITED TO REPLACEMENT OF THE NONCONFORMING METAL.

Section 10.    Default and Termination. Either party shall be entitled to terminate this Agreement in the event of (i) the other party generally not paying its debts as such debts become due, or admitting in writing its inability to pay its debts generally or making a general assignment for the benefit of creditors, the appointment of a receiver for the other party or any of its assets, the filing by the other party of a voluntary petition in bankruptcy or any form of reorganization, or the filing of an involuntary petition in bankruptcy against the other party which is not dismissed with prejudice within 60 days of such filing, or the making of an assignment for the benefit of creditors of the other party; or (ii) a breach by the other party of any of the material terms or conditions of this Agreement, which breach is not cured within 10 business days of notice of such breach by the non-breaching party. SMC shall be entitled to terminate this Agreement in the event GM does any of the following: (i) acquire, or agree, offer or propose to acquire, directly or indirectly, from SMC or any other person, any business or assets of, or securities issued by, SMC or any right, warrant or option to acquire any of the foregoing; (ii) propose to enter into, directly or indirectly, any merger or business combination involving SMC or any of its subsidiaries or to purchase, directly or indirectly, a material portion of the assets of SMC or any of its subsidiaries; (iii) make any proposal or request to SMC or any of its officers or directors relating, directly or indirectly, to any action referred to in clause (i) or (ii) of this paragraph or to any modification or waiver of any provision of this paragraph; (iv) make or participate in, directly or indirectly, any "solicitation" of "proxies" (as those terms are used in the proxy rules of the Securities and Exchange Commission) to vote or seek to advise or influence any person with respect to the voting of any voting securities of SMC or any of its subsidiaries; (v) form, join or in any way participate in a "group" (within the meaning of Section 13(d)(3) under the Exchange Act) with respect to any voting securities of SMC or any of its subsidiaries; (vi) act alone or in concert with others to seek to control or influence the management, Board of Directors or policies of SMC; (vii) advise, assist or enter into any discussions, negotiations, arrangements or understandings with any other person with respect to any of the foregoing; or (viii) make any public statement or disclosure of any kind with respect to any matter addressed by this paragraph (unless required by law) or take any other action which might reasonably be expected to result in any such public disclosure. Otherwise, unless this Agreement is extended pursuant to Section 14, this Agreement will terminate on December 31, 2012 (except that the provisions of Sections 6, 9, 12, 13, 16 and 19 of this Agreement will survive such termination).

5

Section 11.    Taxes and Assessments.  GM shall be responsible for the payment of all sales, use, excise, transfer, value added and other similar taxes imposed by an governmental authority in any jurisdiction in connection with the transactions contemplated herein.  If any personal property taxes are assessed against the Metal by any governmental authority, such assessment shall be the responsibility of and shall be paid by the party having title to the Metal at the time of assessment.

Section 12.    Claims.  Claims as to shortage in quantity shall be made by written notice from GM to SMC within five Business Days after the delivery in question, or else any such claims shall be deemed to have been waived.  Except as otherwise provided in Section 9 or this Section 12, all other claims shall be made by written notice from GM to SMC within one year of delivery of the Metal in question, or else any such claims shall be deemed to have been waived.  EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, NO CLAIMS WHATSOEVER SHALL BE MADE HEREUNDER FOR SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES.

Section 13.    Limitation of Liability.  GM shall not be liable for any special, indirect or consequential damages.  SMC shall not be liable for any prospective or speculative profits or special, indirect, consequential, punitive or exemplary damages and the liability of SMC with respect to this Agreement or any action in connection herewith whether in contract, tort, or otherwise shall not exceed the price of that portion of the Metal on which liability is asserted.

Section 14.    Compliance with Laws.  To the extent applicable, the parties agree to comply with all laws, ordinances rules, codes, regulations and lawful orders of any federal, state or local governmental authority applicable to performance of the Agreement. Stillwater represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor in the supply of Metals under this Agreement, or engage in abusive employment or corrupt business practices. At GM's request Stillwater will certify in writing its compliance with the foregoing.

Section 15.    Force Majeure.

(a)    Effect of Occurrence.  In the event that either party is rendered unable, wholly or in part, by force majeure applying to it, to carry out its obligations under this Agreement, it is agreed that such obligations of such party, so far as they are affected by such force majeure, shall be suspended during the continuance of any inability so caused, but for no longer period..  The parties agree that the various periods and terms provided for herein shall be extended for a period equivalent to such period of force majeure.  The party claiming that an event of force majeure has occurred will promptly notify the other party of the commencement and termination of any event of force majeure.  Prompt notice of force majeure shall be given by the party invoking it to the other party, setting out the nature and full details thereof, the extent of the interruption and the anticipated duration of the interruption.

(b)    Definition.  The term "force majeure" as employed herein, shall mean causes beyond the reasonable control of the parties, including, but not limited to, acts of God, explosions, fires, floods, breakdowns or damage to SMC's mine(s) or related equipment or

6

facilities, failure of plant or equipment to operate according to plans or specifications, war or warlike hostilities, riots, strikes, labor disputes, lockouts, unavoidable accidents, uncontrollable delays in transportation, non-availability of any means of transportation, any state or federal laws, regulations or requirements (expressly including inability to obtain or amend necessary governmental approvals, licenses or permits on reasonably acceptable terms), geological, technical, metallurgical, mining, construction or processing problems, non-availability of supplies, court orders, acts of military authority, acts or failures to act of federal, state or local agencies or regulatory bodies and inability to obtain timely refining of appropriate quantity of materials necessary to produce the required amounts of Metal; provided, however, that performance shall be resumed within a reasonable period of time after such cause has been removed; and provided further that neither party shall be required against its will to adjust any labor dispute or to question the validity of or to refrain from judicially testing the validity of any federal, state or local order, regulation or statute or to refrain from pursuing its legal or equitable remedies against any third party. Notwithstanding the foregoing, the parties agree that this Section 15 is not intended to provide relief from economic conditions such as, but not limited to, market situations that provide lower or higher prices than in effect under this Agreement.

Section 16.    Dispute Resolution.  Except as otherwise provided in this Agreement, the parties hereby agree that any dispute, controversy or claim arising under this Agreement, or the breach thereof (a "Dispute"), shall first be subject to the informal dispute resolution procedures set forth in this Section 16.  The party asserting the existence of a Dispute as to the interpretation of any provision of this Agreement or the performance by the other party of any of its obligations hereunder shall notify the other party in writing of the nature of the asserted Dispute.  Within 10 Business Days of receipt of such notice, representatives from each party shall arrange and have a personal or telephone conference in which they attempt to resolve such Dispute.  If those individuals are unable to resolve the Dispute within such time frame, the Dispute shall be settled by arbitration administered in the State of New York under the rules of the American Arbitration Association then in effect for the resolution of commercial disputes by an arbitrator(s) selected by mutual agreement of the parties, or by the American Arbitration Association absent such mutual agreement, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  Any findings of such arbitration shall be final and binding on the parties, and all reasonable costs (including attorneys' fees) incurred as a result of a Dispute being referred to arbitration will be borne by the party against whom any award is made.

Section 17.    Representations and Warranties.    Each of the parties represents and warrants as follows:

(a)    Good Standing.  That it is a corporation duly incorporated and in good standing in its state of incorporation and that it is qualified to do business and is in good standing in those states where necessary in order to carry out the purposes of this Agreement;

(b)    Performance.  That it has the corporate capacity to enter into and perform this Agreement and all transactions contemplated herein and that all corporate and other actions required to authorize it to enter into and perform this Agreement have been properly taken;

7

(c)    <u>No Breach</u>.  That it will not breach any other agreement or arrangement by entering into or performing this Agreement; and

(d)    <u>Due Execution and Delivery</u>.  That this Agreement has been duly executed and delivered by it and is valid and binding upon it and enforceable against it in accordance with its terms; provided, however, that no representation or warranty is made as to the remedy of specific performance or other equitable remedies for the enforcement of this Agreement or any other agreement contemplated hereby, and provided further that this representation is limited by applicable bankruptcy, insolvency, moratorium, and other similar laws affecting generally the rights and remedies of creditors and secured parties.

Section 18.    <u>Notices</u>.  Any notice, election, report or other correspondence (collectively, "Notices") required or permitted hereunder shall be in writing and (i) delivered personally to an officer of the party to whom directed; (ii) sent by registered or certified United States mail, postage prepaid, return receipt requested; (iii) sent by reputable overnight courier; or (iv) sent by facsimile transmission with confirmation of receipt.  All such Notices shall be addressed to the party to whom directed as follows:

|        |                                            |
|--------|--------------------------------------------|
| SMC:   | Stillwater Mining Company                  |
|        | 1321 Discovery Drive                       |
|        | Billings, Montana 59102                    |
|        | Attn:  Metals Marketing                    |
|        | Facsimile: (406) 373-8723                  |
|        | with a copy to: General Counsel            |
|        | Facsimile: (406) 373-8723                  |
|        |                                            |
| GM:    | General Motors Corporation                 |
|        | 777 Joslyn Avenue                          |
|        | Mail Code 483-720-350                      |
|        | Pontiac, Michigan 48340-2925              |
|        | Attn: PGM GM Global Commodity Manager      |
|        | Facsimile: (248) 857-0068                  |
|        | with a copy to: Director, Nonferrous Metals|
|        | Facsimile: (248) 857-0064                  |

Either party may, from time to time, change its address for future Notices hereunder by Notice in accordance with this Section 18.  All Notices shall be complete and deemed to have been given or made when mailed or sent by overnight courier, or upon personal delivery when delivered personally or when receipt is confirmed when sent by facsimile transmission.

Section 19.    <u>Publicity</u>.  Neither SMC nor GM will issue or approve an advertisement, promotional material, news release or other form of publicity concerning this Agreement or the transactions contemplated herein without the prior approval of the other party as to the contents of such advertisement, promotional material, news release or publicity and the timing of its release, which approval cannot be unreasonably withheld.

8

Section 20.    <u>Entire Agreement</u>.  This Agreement represents the complete agreement between the parties hereto and supersedes all prior or contemporaneous oral or written agreements of the parties to the extent they relate in any way to the subject matter hereof.

Section 21.    <u>Relationship of the Parties</u>.  Nothing contained in this Agreement shall be deemed to constitute either party the partner of the other, nor, except as otherwise herein expressly provided, to constitute either party the agent or legal representative of the other, nor to create any fiduciary relationship between them.  It is not the intention of the parties to create, nor shall this Agreement be construed to create, any mining, commercial or other partnership. Neither party shall have any authority to act for or to assume any obligation or responsibility on behalf of the other party, except as otherwise expressly provided herein.  The rights, duties, obligations and liabilities of the parties shall be several and not joint or collective.  Each party shall be responsible only for its obligations as herein set out and shall be liable only for its share of the costs and expenses as provided herein.  Each party shall indemnify, defend and hold harmless the other party, its directors, officers, employees, agents and attorneys from and against any and all losses, claims, damages and liabilities arising out of any act or any assumption of liability by the indemnifying party, or any of its directors, officers, employees, agents and attorneys done or undertaken, or apparently done or undertaken, on behalf of the other party, except pursuant to the authority expressly granted herein or as otherwise agreed in writing between the parties.

Section 22    <u>No Implied Covenants</u>.  There are no implied covenants contained in this Agreement other than those of good faith and fair dealing.

Section 23.    <u>Binding Effect; No Assignment</u>.  This Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and may not be assigned by either party without the consent of the other party, which consent shall not be unreasonably withheld, except with respect to (i) any assignment to provide security in connection with any financing, expressly including, by way of example and not limitation, assignments of royalty, overriding royalties or net profits interests or production payments, or (b) any merger, consolidation or other reorganization or transfer by operation of law, or by purchase of the business of or substantially all of the assets of one of the parties, with respect to which such consent by the nonassigning party will not be required.

Section 24.    <u>Amendment and Waiver</u>.  Except as otherwise provided herein, no modification, amendment or waiver of any provision of this Agreement shall be effective against either party unless such modification, amendment or waiver is approved in writing by the parties hereto.  The failure by either party to demand strict performance and compliance with any part of this Agreement during the term of this Agreement shall not be deemed to be a waiver of the rights of such party under this Agreement or by operation of law.  Any waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach thereof.

Section 25.    <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under

9

any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or affect the validity, legality or enforceability of any provision in any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

Section 26.    Governing Law.  The parties hereby agree that this Agreement shall be construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

Section 27.    Construction.  This Agreement has been fully negotiated between the parties.  In interpreting this Agreement, there shall be no presumption that either party drafted the language but rather the parties shall be deemed to have shared equally in the drafting of the provisions of this Agreement.

Section 28.    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

Section 29.    Attorneys' Fees.  In the event of any controversy, claim, or dispute between the parties hereto, arising out of or relating to this Agreement or the breach thereof, the prevailing party shall be entitled to recover from the losing party reasonable expenses, attorneys' fees, and costs.

Section 30.    Further Documents.  At the request of either party, the parties shall execute and deliver any further instruments, agreements, documents or other papers reasonably requested by that party to effect the purposes of this Agreement and the transactions contemplated hereby.

[SIGNATURE PAGE FOLLOWS.]

10

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

STILLWATER MINING COMPANY

GENERAL MOTORS CORPORATION

By: _____
Name:  Francis R. McAllister
Title:    Chairman & CEO

By: _____
Name:  Enrique J. Driessen
Title:  Director Non ferrous Metals

Formatted: Subscript

By: _____
Name:  John R. Stark
Title: Vice-President

By: _____
Name:
Title:

11

12/4/08

# FIRST AMENDMENT AGREEMENT
## TO
## PALLADIUM AND RHODIUM SALES AGREEMENT

This FIRST AMENDMENT AGREEMENT TO PALLADIUM AND RHODIUM SALES AGREEMENT (this "Amendment") is made and entered into as of this 9th day of December, 2008, by and between STILLWATER MINING COMPANY, a Delaware corporation, whose address is 1321 Discovery Drive, Billings, Montana 59102 ("SMC"), and GENERAL MOTORS CORPORATION, a Delaware corporation, with a place of business at 777 Joslyn Ave., Pontiac, Michigan 48340-2925 ("GM").

WHEREAS, SMC and GM are parties to a Palladium and Rhodium Sales Agreement dated as of August 8, 2007 (the "Original Contract," and, as the same may be amended from time to time, the "Agreement"); and

WHEREAS, GM has requested and SMC has agreed to an amendment to the Agreement, subject to the terms and conditions hereof.

Accordingly, the parties hereto agree as follows:

SECTION 1.    Definitions; Interpretation.

(a)    Terms Defined in Agreement. All capitalized terms used in this Amendment and not otherwise defined herein shall have the meanings assigned to them in the Agreement.

(b)    Interpretation. Headings in this Amendment are for convenience of reference only and are not part of the substance hereof.

SECTION 2.    Amendments to the Agreement.

(a)    Amendments. The Agreement shall be amended as follows:

(i)    Section 4(b) shall be amended by amending and restating the first sentence to read as follows:

> SMC will sell and deliver and GM will purchase 500 Ounces of Rhodium each month starting in January 2008 and ending in December 2012, except that (1) for the first quarter of calendar 2009, the quantity will be reduced to 300 Ounces of Rhodium per month; and (2) for the second, third and fourth quarters of 2009, upon the request of GM to consider a reduction in the quantity of Rhodium to an amount less than 500 Ounces per month (which request must be made by the end of the first month of the previous quarter), SMC will review such request and notify GM within five (5) business days of receipt of GM's request for reduction as to whether or not SMC can accommodate such reduction in quantity, and if so, whether or not SMC will adjust the pricing of such reduced quantity; if SMC's proposal is acceptable to GM, the Parties shall amend this Agreement to adjust the quantity and, if applicable, the price for the Ounces of Rhodium to be delivered during such quarter in 2009.

#879195.2

12/4/08

(ii)    Section 5(b) of the Agreement shall be amended by adding the following sentence at the end of such section:

Notwithstanding anything in this Agreement to the contrary, the price per Ounce to be paid to SMC by GM for the actual quantities of Rhodium delivered during the first quarter of 2009 will be based on the JM Reference Price Average for the Pricing Month, with no discount.

(b)    <u>References Within Agreement</u>.    Each reference in the Agreement to "this Agreement" and the words "hereof," "herein," "hereunder," or words of like import, shall mean and be a reference to the Agreement as amended by this Amendment.

SECTION 3.    <u>Conditions of Effectiveness</u>.    The effectiveness of Section 2 of this Amendment shall be subject to the satisfaction of the following condition precedent:

(a)    <u>Agreement</u>.    SMC and GM shall have each received a signed counterpart of this Amendment, or a facsimile copy thereof, signed by the other party hereto.

SECTION 4.    <u>Miscellaneous</u>.

(a)    <u>Agreement Otherwise Not Affected</u>.    Except as expressly amended pursuant hereto, the Agreement shall remain unchanged and in full force and effect and is hereby ratified and confirmed in all respects.

(b)    <u>No Reliance</u>.    Each party hereto hereby acknowledges and confirms to the other that such party is executing this Amendment on the basis of its own investigation and for its own reasons without reliance upon any agreement, representations, understanding or communication by or on behalf of any other Person.

(c)    <u>Binding Effect</u>.    This Amendment shall be binding upon, inure to the benefit of and be enforceable by each party hereto and their respective successors and assigns.

(d)    <u>Governing Law</u>.    THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK UPON THE SAME TERMS AND CONDITIONS AS THOSE SET FORTH IN SECTION 26 OF THE AGREEMENT.

(e)    <u>Counterparts</u>.    This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement.

[SIGNATURES FOLLOW ON NEXT PAGE.]

2

**12/4/08**

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment, as of the date first above written.

STILLWATER MINING COMPANY

By: _____
Name: _____
Title: _____

GENERAL MOTORS CORPORATION

By: _____
Name: _____
Title: _____

# SECOND AMENDMENT AGREEMENT
# TO
# PALLADIUM AND RHODIUM SALES AGREEMENT

This SECOND AMENDMENT AGREEMENT TO PALLADIUM AND RHODIUM SALES AGREEMENT (this "Amendment") is made and entered into as of this 5th day of March, 2009, by and between STILLWATER MINING COMPANY, a Delaware corporation, whose address is 536 E. Pike Avenue Columbus, Montana 59019 ("SMC"), and GENERAL MOTORS CORPORATION, a Delaware corporation, with a place of business at 777 Joslyn Ave., Pontiac, Michigan 48340-2925 ("GM").

WHEREAS, SMC and GM are parties to a Palladium and Rhodium Sales Agreement dated as of August 8, 2007 (the "Original Contract," and, as the same may be amended from time to time, the "Agreement" as amended by the First Amendment Agreement dated as of December 9, 2008); and

WHEREAS, GM has requested and SMC has agreed to an amendment to the Agreement, subject to the terms and conditions hereof.

Accordingly, the parties hereto agree as follows:

SECTION 1.    Definitions; Interpretation

(a)    Terms Defined in Agreement. All capitalized terms used in this Amendment and not otherwise defined herein shall have the meanings assigned to them in the Agreement.

(b)    Interpretation. Headings in this Amendment are for convenience of reference only and are not part of the substance hereof.

SECTION 2    Amendments to the Agreement.

(a)    Amendments. The Agreement shall be amended as follows:

(i)    Section 4(b) shall be amended by amending and restating the first sentence to read as follows:

> SMC will sell and deliver and GM will purchase 500 Ounces of Rhodium each month starting in January 2008 and ending in December 2012, except that (1) for the first quarter of calendar 2009, the quantity will be reduced to 300 Ounces of Rhodium per month; (2) for the second quarter of calendar 2009 the quantity delivered will be reduced to 200 Ounces of Rhodium in April and 0 (zero) Ounces in May and June; and (3) for the third and fourth quarters of 2009, upon the request of GM to consider a reduction in the quantity of Rhodium to an amount less than 500 Ounces per month (which request must be made by the end of the first month of the previous quarter), SMC will review such request and notify GM within five (5) business days of receipt of GM's request for reduction as to whether or not SMC can

1

accommodate such reduction in quantity, and if so, whether or not SMC will adjust the pricing of such reduced quantity; if SMC's proposal is acceptable to GM, the Parties shall amend this Agreement to adjust the quantity and, if applicable, the price for the Ounces of Rhodium to be delivered during such quarter in 2009

(ii)    Section 5(b) of the Agreement shall be amended by adding the following sentence at the end of such section:

Notwithstanding anything in this Agreement to the contrary, the price per Ounce to be paid to SMC by GM for the actual quantities of Rhodium delivered during the first and second quarters of 2009 will be based on the JM Reference Price Average for the Pricing Month, with no discount.

(b)    <u>References Within Agreement</u>  Each reference in the Agreement to "this Agreement" and the words "hereof," "herein," "hereunder," or words of like import, shall mean and be a reference to the Agreement as amended by this Amendment.

SECTION 3.  <u>Conditions of Effectiveness</u>.  The effectiveness of Section 2 of this Amendment shall be subject to the satisfaction of the following condition precedent:

(a)    <u>Agreement</u>.  SMC and GM shall have each received a signed counterpart of this Amendment, or a facsimile copy thereof, signed by the other party hereto

SECTION 4.  <u>Miscellaneous</u>.

(a)    <u>Agreement Otherwise Not Affected</u>.  Except as expressly amended pursuant hereto, the Agreement shall remain unchanged and in full force and effect and is hereby ratified and confirmed in all respects.

(b)    <u>No Reliance</u>.  Each party hereto hereby acknowledges and confirms to the other that such party is executing this Amendment on the basis of its own investigation and for its own reasons without reliance upon any agreement, representations, understanding or communication by or on behalf of any other Person.

(c)    <u>Binding Effect</u>.  This Amendment shall be binding upon, inure to the benefit of and be enforceable by each party hereto and their respective successors and assigns.

(d)    <u>Governing Law</u>.  THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK UPON THE SAME TERMS AND CONDITIONS AS THOSE SET FORTH IN SECTION 26 OF THE AGREEMENT.

(e)    <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement.

[SIGNATURES FOLLOW ON NEXT PAGE.]

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment, as of the date first above written.

STILLWATER MINING COMPANY

By: _____

Name: John R. Stark

Title: VP

GENERAL MOTORS CORPORATION

By: _____

Name: _____

Title: _____

3

**<u>Exhibit B</u>**

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

☑    **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
for the fiscal year ended December 31, 2008.

OR

☐    **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
for the transition period from _____ to _____

**Commission File Number 1-13053**

# STILLWATER MINING COMPANY

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | **81-0480654** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**536 EAST PIKE AVENUE, COLUMBUS, MONTANA 59019**
(Address of principal executive offices and zip code)

**(406) 373-8700**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock, $0.01 par value | The New York Stock Exchange |
| Preferred Stock Purchase Rights | The New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer (as defined in Rule 405 of the Securities Act). ☐ YES    ☑ NO

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐ YES    ☑ NO

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☑ YES    ☐ NO

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a

smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐    Accelerated filer ☑    Non-accelerated filer ☐    Smaller reporting company ☐

(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). ☐    YES    ☑    NO

As of June 30, 2008, assuming a price of $11.83 per share, the closing sale price on the New York Stock Exchange, the aggregate market value of shares of voting and non-voting common equity held by non-affiliates was approximately $826,523,463.

As of March 6, 2009, the Company had outstanding 94,021,089 shares of common stock, par value $0.01 per share.

## DOCUMENTS INCORPORATED BY REFERENCE

Certain information required in Part III of this Annual Report on Form 10-K is incorporated herein by reference to the registrant's Proxy Statement for its 2009 Annual Meeting of Stockholders.

STILLWATER MINING CO /DE/ - 10-K - 20090318 - FORM    Page 15 of 150
09-50026-mg    Doc 3267    Filed 07/21/09    Entered 07/21/09 17:34:58    Main Document
Pg 36 of 41

7

Table of Contents

assurance that further steps to conserve cash will not be required in the future. The restructuring efforts are discussed in more detail in " *Management's Discussion and Analysis of Financial Condition and Results of Operations* ."

- In 2008, the Company produced a total of 498,900 ounces of palladium and platinum compared to 537,500 ounces in 2007. Total consolidated cash cost per ounce (a non-GAAP measure) was $396 in 2008, compared with $331 in 2007. This increase in cash costs per ounce reflected the effect of higher material costs and lower PGM production at both mines. Mine production for 2009 is projected at 495,000 ounces of palladium and platinum. Total cash costs per ounce (a non-GAAP measure) for 2009, are projected at $399 per ounce. See Part II, Item 6 " *Selected Financial and Operating Data* " for further discussion of non-GAAP measures.

- Revenues from PGM recycling grew 45.6% during 2008, increasing to $475.4 million in 2008, from $326.4 million in 2007, driven by higher average realized PGM prices and by modest volume growth. Recycled ounces sold, excluding tolled material, increased in 2008 to 275,000 ounces compared to 245,000 ounces in 2007 and the Company's combined average realization on recycling sales (which include palladium, platinum and rhodium) increased to $1,716 per ounce in 2008 from $1,312 per ounce in 2007. In addition to purchased material, the Company processed 126,000 ounces of PGMs on a tolling basis in 2008 up from 112,000 tolled ounces in 2007. In total, recycled volumes fed to the smelter increased to 398,100 ounces of PGMs in 2008 up 6.7% from 373,000 ounces in 2007. The Company experienced a serious decline in the volumes of recycled material received during the fourth quarter of 2008, the result of the worldwide financial and credit crises and associated drop in PGM prices during the quarter. The downturn has created problems for the Company in collecting on its advances on inventory purchases, although the Company cash balances have benefitted from a reduction of the working capital required to sustain recycling activities. The Company's operating income from the recycling segment is directly related both to the volumes of material processed and to the underlying prices; in general, after adjusting for processing times, a 50% reduction in either recycling volumes processed or average realized PGM prices would reduce recycling income by half. Working capital associated with these recycling activities as inventories and advances was $23.3 million and $83.7 million at December 31, 2008 and 2007, respectively. The year-end 2008 balance reflects a write-down of $26.0 million against *Advances on inventory purchases* in the fourth quarter of 2008.

- The Company's 2008 capital expenditures totaled $82.3 million, down from $87.9 million in 2007. Capital spending in both years reflected continuing efforts to advance the developed state of the mines by accelerating the delineation and development of proven reserves and by completing various major infrastructure projects. Capitalized development expenditures totaled $55.9 million in 2008, down from $65.5 million in 2007. Development expenditures were lower in 2008 because the Company's mines are approaching optimal development levels. Improving the developed state of the mines allows for earlier and better economic analysis of appropriate mining methods in each area, supports growth in mining rates and contributes to more efficient and cost-effective mining. Major infrastructure projects undertaken during 2008 include the continuation of the dedicated electric-truck haulage ramp and related shop facilities that will access the lower levels of the Stillwater Mine and the construction of a second electric furnace at the smelter. Capital spending in 2009, reflecting cash conservation efforts, is currently budgeted at about $39 million. For a discussion of certain risks associated with the Company's business, please read " *Business and Properties — Current Operations", and "— Risk Factors"* and *"Management's Discussion and Analysis of Financial Condition and Results of Operations* ".

- On March 12, 2008, the Company issued and sold $181.5 million aggregate principal amount of senior convertible debentures due 2028 ("debentures"). The debentures pay interest at 1.875% per annum, payable semi-annually on March 15 and September 15 of each year, commencing September 15, 2008. The debentures will mature on March 15, 2028, subject to earlier repurchase or conversion. Each $1,000 principal amount of debentures is initially convertible, at the option of the holders, into approximately 42.5351 shares of the Company's common stock, at any time prior to the maturity date. The conversion rate is subject to certain adjustments, but will not be adjusted for accrued interest or any unpaid interest. The conversion rate initially represents a conversion price of $23.51 per share. Holders of the debentures may require the Company to repurchase all or a portion of their debentures on March 15, 2013, March 15, 2018 and March 15, 2023, or upon the occurrence of certain events including a change in control. The Company may redeem the debentures for cash beginning on or after March 22, 2013.

## HISTORY OF THE COMPANY

Mineral exploration in the Stillwater Complex dates from at least the late nineteenth century, with early mining activities — primarily for chromium — beginning in the 1920s. Palladium and platinum were discovered in the J-M Reef within the Stillwater Complex, by geologists from Johns Manville Corporation ("Manville") in the early 1970s. In 1979,

8

Table of Contents

a Manville subsidiary entered into a partnership agreement with Chevron U.S.A. Inc. ("Chevron") to develop PGMs discovered in the J-M Reef. Manville and Chevron explored and developed the Stillwater property and commenced commercial underground mining in 1986.

Stillwater Mining Company was incorporated in 1992 and on October 1, 1993, Chevron and Manville transferred substantially all assets, liabilities and operations at the Stillwater property into the Company, with Chevron and Manville each receiving a 50% ownership interest in the Company's stock. In September 1994, the Company redeemed Chevron's entire 50% ownership. The Company subsequently completed an initial public offering in December 1994 and Manville sold a portion of its shares through the offering, reducing its ownership percentage to approximately 27%. In August 1995, Manville sold its remaining ownership interest in the Company to a group of institutional investors. The Company's common stock is publicly traded on the New York Stock Exchange (NYSE) under the symbol "SWC".

On June 23, 2003, the Company completed a stock purchase transaction with MMC Norilsk Nickel ("Norilsk Nickel"), whereby a subsidiary of Norilsk Nickel became a majority stockholder of the Company. On that date, the parties entered into a Stockholders Agreement governing the terms of Norilsk Nickel's investment in the Company. A copy of the Stockholders Agreement was included in the Company's Report on Form 8-K filed on June 23, 2003.

## GEOLOGY OF THE J-M REEF

The Stillwater Complex, which hosts the J-M Reef ore deposit, is located in the Beartooth Mountains in south central Montana. It is situated along the northern edge of the Beartooth Uplift and Plateau, which rise to elevations in excess of 10,000 feet above sea level. The plateau and Stillwater Complex have been deeply incised by the major drainages and tributaries of the Stillwater and Boulder Rivers down to elevations at the valley floor of approximately 5,000 feet.

Geologically, the Stillwater Layered Igneous Complex is composed of a succession of ultramafic to mafic rocks derived from a large complex magma body emplaced deep in the Earth's crust an estimated 2.7 billion years ago. The molten mass was sufficiently large and fluid at the time of emplacement to allow its chemical constituents to crystallize slowly and sequentially, with the heavier mafic minerals settling more rapidly toward the base of the cooling complex. The lighter, more siliceous suites crystallized more slowly and also settled into layered successions of norite, gabbroic and anorthosite suites. This systematic process resulted in mineral segregations being deposited into extensive and uniform layers of varied mineral concentrations.

The uniquely PGM-enriched J-M Reef and its characteristic host rock package represent one such layered sequence. The geosciences community believes that the PGM-enriched suite and other minerals characterizing the J-M Reef accumulated at the same time and by the same mechanisms of formation as the rocks enclosing them. Over time, the orientation of a portion of the original horizontal reef and layered igneous complex was faulted an estimated 20,000 feet to the northeast and was tilted upward at angles of 50 to 90 degrees to the north by the Beartooth Uplift. Localized faulting and intrusive mafic dikes are also evident along the 28-mile strike length of exposed Stillwater Complex. The impact of these structural events is localized along the J-M Reef and may affect the percent mineable tonnage in an area, create additional dilution, or result in below cut-off grade and barren zones within the reef. The impacts on ore reserves of these events are quantified in the percent mineable discussion under "Ore Reserves." The upper portion and exposed edge of the uplifted reef complex were eroded forming the lenticular-shaped surface exposure of the Stillwater Complex and J-M Reef package evident today.

The J-M Reef package has been traced at its predictable geologic position and with unusual overall uniformity over considerable distances within the uplifted portion of the Stillwater Complex. The surface outcrops of the reef have been examined, mapped and sampled for approximately 28 miles along its east-southeasterly course and over a known expression of over 8,200 feet vertically. The predictability of the J-M Reef has been further confirmed in subsurface mine workings of the Stillwater and East Boulder Mines and by over 27,000 drill hole penetrations.

The PGMs in the J-M Reef consist primarily of palladium, platinum and a minor amount of rhodium. The reef also contains significant amounts of nickel and copper and trace amounts of gold and silver. Five-year production figures from the Company's mining operations on the J-M Reef are summarized in Part II, Item 6, " *Selected Financial and Operating Data* ."

9

from recycling provided 1.08 million ounces of palladium and 970,000 ounces of platinum, up from 955,000 ounces of palladium and 905,000 ounces of platinum in 2007.

32

Table of Contents

## PRICES

Stillwater Mining Company's revenue and earnings depend significantly on world palladium and platinum market prices. The Company has no direct control over these prices, which tend to fluctuate widely. The Company does have the ability to hedge prices, however, and is working to foster PGM demand growth by encouraging new uses for its products. See " *Management's Discussion and Analysis of Financial Condition and Results of Operations – Revenue"* and *"Factors That May Affect Future Results and Financial Condition ."* The volatility of palladium and platinum prices is illustrated in the following table of the London Metals Exchange afternoon postings of annual high, low and average prices per ounce since 1996. The accompanying charts also demonstrate this volatility. (See " *Business and Properties – Risk Factors – Vulnerability to metals price volatility – Changes in supply and demand could reduce market prices ,"* in the following section.)

| | PALLADIUM | | | PLATINUM | | |
|---|---|---|---|---|---|---|
| YEAR | HIGH | LOW | AVERAGE | HIGH | LOW | AVERAGE |
| 1996 | $ 144 | $ 114 | $ 128 | $ 432 | $ 367 | $ 397 |
| 1997 | $ 239 | $ 118 | $ 177 | $ 497 | $ 343 | $ 396 |
| 1998 | $ 419 | $ 201 | $ 284 | $ 429 | $ 334 | $ 372 |
| 1999 | $ 454 | $ 285 | $ 358 | $ 457 | $ 342 | $ 377 |
| 2000 | $ 970 | $ 433 | $ 680 | $ 622 | $ 414 | $ 544 |
| 2001 | $1,090 | $ 315 | $ 604 | $ 640 | $ 415 | $ 529 |
| 2002 | $ 435 | $ 222 | $ 338 | $ 607 | $ 453 | $ 539 |
| 2003 | $ 269 | $ 148 | $ 201 | $ 840 | $ 603 | $ 691 |
| 2004 | $ 333 | $ 178 | $ 230 | $ 936 | $ 767 | $ 846 |
| 2005 | $ 295 | $ 172 | $ 201 | $1,012 | $ 844 | $ 897 |
| 2006 | $ 404 | $ 261 | $ 320 | $1,355 | $ 982 | $ 1,143 |
| 2007 | $ 382 | $ 320 | $ 355 | $1,544 | $1,118 | $ 1,303 |
| 2008 | $ 582 | $ 164 | $ 352 | $2,273 | $ 763 | $ 1,576 |
| 2009* | $ 218 | $ 179 | $ 197 | $1,090 | $ 918 | $ 999 |

*    (Through March 6, 2009)

## AVAILABLE INFORMATION

The Company's Internet Website is http://www.stillwatermining.com . The Company makes available, free of charge, through its Internet Website, its annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, corporate proxy statements, and any amendments to those reports, as soon as reasonably practicable after the Company electronically files such materials with, or furnishes them to, the Securities & Exchange Commission. These documents will also be provided free of charge in print, upon request.

## RISK FACTORS

Set forth below are certain risks faced by the Company.

## THE WORLDWIDE FINANCIAL AND CREDIT CRISES CREATES VULNERABILITY FOR THE COMPANY

The Company has not been immune to the ongoing world financial crisis. In light of world events and the sharp decrease in PGM prices, during the fourth quarter of 2008, the Company restructured its operations in an effort to conserve cash and reduce anticipated losses. The restructuring of the Company's operations resulted in dramatic changes and essentially reduced the scope of its mining operations. The Company recognizes that the combined effect of low PGM prices, the upcoming expiration of its automobile contracts containing floors on pricing and reduced demand for its metals have negatively impacted the Company. The Company believes that it is in the interests of shareholders for management to seek to maintain some stability in its operations while looking forward to a turnaround in pricing and the markets, as to which there can be no assurance and the timing of which cannot be predicted.

The Company's primary business remains in the mining of PGM's. As a high cost producer, over the years management has continued to focus on ways to lower its costs. In the current low price environment, management has restructured the business to focus on maintaining cash and remaining in a position to take advantage of improved pricing, if and when that should occur. Thus, the Company may be said to be in preservation mode in order to minimize cash costs, maintain operations at its mines and keep employed its skilled set of miners.

As a result of the sale of an issue of convertible debentures in March 2008, the Company raised approximately

$181.5 million, the proceeds of which were used to eliminate an outstanding bank credit agreement balance and for general corporate purposes. The Company is seeking to maintain its current liquidity in order to navigate beyond the current financial crisis, but no assurances can be given that the Company will be successful. The Company has been unsuccessful in the current environment in obtaining a successor credit agreement. The Company is therefore vulnerable if conditions worsen, which could in turn negatively impact its relative liquidity.

33