**EXHIBIT: A**



# THE
# CONSTITUTION
of the United States





# We the People *of the United States*

We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America.

# Article. I.

## SECTION. 1.

All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

## SECTION. 2.

The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.

[Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons.]* The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct. The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative; and until such enumeration shall be made, the State of New Hampshire shall be entitled to chuse three, Massachusetts eight, Rhode-Island and Providence Plantations one, Connecticut five, New-York six, New Jersey four, Pennsylvania eight, Delaware one, Maryland six, Virginia ten, North Carolina five, South Carolina five, and Georgia three.

When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.

The House of Representatives shall chuse their Speaker and other Officers; and shall have the sole Power of Impeachment.

## SECTION. 3.

The Senate of the United States shall be composed of two Senators from each State, [chosen by the Legislature thereof,]* for six Years; and each Senator shall have one Vote.

Immediately after they shall be assembled in Consequence of the first Election, they shall be divided as equally as may be into three Classes. The Seats of the Senators of the first Class shall be vacated at the Expiration of the second Year, of the second Class at the Expiration of the fourth Year, and of the third Class at the Expiration of the sixth Year, so that one third may be chosen every second Year; [and if Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies.]*

No Person shall be a Senator who shall not have attained
to the Age of thirty Years, and been nine Years a Citizen of
the United States, and who shall not, when elected, be an
Inhabitant of that State for which he shall be chosen.

The Vice President of the United States shall be
President of the Senate, but shall have no Vote, unless
they be equally divided.

The Senate shall chuse their other Officers, and also a
President pro tempore, in the Absence of the Vice
President, or when he shall exercise the Office of
President of the United States.

The Senate shall have the sole Power to try all Impeach-
ments. When sitting for that Purpose, they shall be on
Oath or Affirmation. When the President of the United
States is tried, the Chief Justice shall preside: And no
Person shall be convicted without the Concurrence of two
thirds of the Members present.

Judgment in Cases of Impeachment shall not extend
further than to removal from Office, and disqualification to
hold and enjoy any Office of honor, Trust or Profit under
the United States: but the Party convicted shall nevertheless
be liable and subject to Indictment, Trial, Judgment and
Punishment, according to Law.

### SECTION. 4.

The Times, Places and Manner of holding Elections for
Senators and Representatives, shall be prescribed in each
State by the Legislature thereof: but the Congress may at
any time by Law make or alter such Regulations, except as
to the Places of chusing Senators.

The Congress shall assemble at least once in every Year, and
such Meeting shall be [on the first Monday in December,]*
unless they shall by Law appoint a different Day.

### SECTION. 5.

Each House shall be the Judge of the Elections, Returns
and Qualifications of its own Members, and a Majority
of each shall constitute a Quorum to do Business; but a
smaller Number may adjourn from day to day, and may be
authorized to compel the Attendance of absent Members,
in such Manner, and under such Penalties as each House
may provide.

Each House may determine the Rules of its Proceedings,
punish its Members for disorderly Behaviour, and, with the
Concurrence of two thirds, expel a Member.

Each House shall keep a Journal of its Proceedings, and
from time to time publish the same, excepting such Parts
as may in their Judgment require Secrecy; and the Yeas
and Nays of the Members of either House on any question
shall, at the Desire of one fifth of those Present, be entered
on the Journal.

Neither House, during the Session of Congress, shall, with-
out the Consent of the other, adjourn for more than three
days, nor to any other Place than that in which the two
Houses shall be sitting.

### SECTION. 6.

The Senators and Representatives shall receive a Compen-
sation for their Services, to be ascertained by Law, and paid
out of the Treasury of the United States. They shall in all
Cases, except Treason, Felony and Breach of the Peace, be
privileged from Arrest during their Attendance at the Ses-
sion of their respective Houses, and in going to and return-
ing from the same; and for any Speech or Debate in either
House, they shall not be questioned in any other Place.

No Senator or Representative shall, during the Time for
which he was elected, be appointed to any civil Office
under the Authority of the United States, which shall have
been created, or the Emoluments whereof shall have been
encreased during such time; and no Person holding any
Office under the United States, shall be a Member of either
House during his Continuance in Office.

## SECTION. 7.

All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.

Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively, If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.

## SECTION. 8.

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

To borrow Money on the credit of the United States;

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States;

To coin Money, regulate the Value thereof, and of foreign Coin, and fix the Standard of Weights and Measures;

To provide for the Punishment of counterfeiting the Securities and current Coin of the United States;

To establish Post Offices and post Roads;

To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;

To constitute Tribunals inferior to the supreme Court;

To define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations;

To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;

To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

To provide and maintain a Navy;

To make Rules for the Government and Regulation of the land and naval Forces;

To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards and other needful Buildings; -And

To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

## SECTION. 9.

The Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight, but a Tax or duty may be imposed on such Importation, not exceeding ten dollars for each Person.

The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.

No Bill of Attainder or ex post facto Law shall be passed.

[No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.]*

No Tax or Duty shall be laid on Articles exported from any State.

No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State, be obliged to enter, clear, or pay Duties in another.

No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.

No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

## SECTION. 10.

No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress.

No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

# Article. II

## SECTION. 1.

The executive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four Years, and, together with the Vice President, chosen for the same Term, be elected, as follows:

Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

[The Electors shall meet in their respective States, and vote by Ballot for two Persons, of whom one at least shall not be an Inhabitant of the same State with themselves. And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate. The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted. The Person having the greatest Number of Votes shall be the President, if such Number be a Majority of the whole Number of Electors appointed; and if there be more than one who have such Majority, and have an equal Number of Votes, then the House of Representatives shall immediately chuse by Ballot one of them for President; and if no Person have a Majority, then from the five highest on the List the said House shall in like Manner chuse the President. But in chusing the President, the Votes shall be taken by States, the Representation from each State having one Vote; A quorum for this Purpose shall consist of a Member or Members from two thirds of the States, and a Majority of all the States shall be necessary to a Choice. In every Case, after the Choice of the President, the Person having the greatest Number of Votes of the Electors shall be the Vice President. But if there should remain two or more who have equal Votes, the Senate shall chuse from them by Ballot the Vice President.]*

The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President: neither shall any person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States.

[In Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the Same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected.]*

The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:- "I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States."

## SECTION. 2.

The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices, and he shall have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment.

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.

## SECTION. 3.

He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

## SECTION. 4.

The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.

# Article. III.



## SECTION. 1.

The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

## SECTION. 2.

The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; - to all Cases affecting Ambassa- dors, other public Ministers and Consuls; - to all Cases of admiralty and maritime Jurisdiction; - to Controversies to which the United States shall be a Party; - to Controversies between two or more States; - [between a State and Citizens of another State;-]* between Citizens of different States, - between Citizens of the same State claiming Lands under Grants of different States, [and between a State, or the Citi- zens thereof;- and foreign States, Citizens or Subjects.]*

In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Con- gress shall make.

The Trial of all Crimes, except in Cases of Impeachment: shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

## SECTION. 3.

Treason against the United States, shall consist only in levy- ing War against them, or in adhering to their Enemies, giv- ing them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corrup- tion of Blood, or Forfeiture except during the Life of the Person attainted.

# Article. IV.

## SECTION. 1.

Full Faith and Credit shall be given in each State to the
public Acts, Records, and judicial Proceedings of every oth-
er State. And the Congress may by general Laws prescribe
the Manner in which such Acts, Records and Proceedings
shall be proved, and the Effect thereof.

## SECTION. 2.

The Citizens of each State shall be entitled to all Privileges
and Immunities of Citizens in the several States.
A Person charged in any State with Treason, Felony, or
other Crime, who shall flee from Justice, and be found in
another State, shall on Demand of the executive Author-
ity of the State from which he fled, be delivered up, to be
removed to the State having Jurisdiction of the Crime.

[No Person held to Service or Labour in one State, under
the Laws thereof, escaping into another, shall, in Conse-
quence of any Law or Regulation therein, be discharged
from such Service or Labour, but shall be delivered up on
Claim of the Party to whom such Service or Labour may be
due.]*

## SECTION. 3.

New States may be admitted by the Congress into this
Union; but no new State shall be formed or erected within
the Jurisdiction of any other State; nor any State be formed
by the Junction of two or more States, or Parts of States,
without the Consent of the Legislatures of the States con-
cerned as well as of the Congress.

The Congress shall have Power to dispose of and make all
needful Rules and Regulations respecting the Territory or
other Property belonging to the United States; and nothing
in this Constitution shall be so construed as to Prejudice
any Claims of the United States, or of any particular State.

## SECTION. 4.

The United States shall guarantee to every State in this
Union a Republican Form of Government, and shall
protect each of them against Invasion; and on Application
of the Legislature, or of the Executive (when the Legislature
cannot be convened) against domestic Violence.

# Article. V.

The Congress, whenever two thirds of both Houses shall
deem it necessary, shall propose Amendments to this Con-
stitution, or, on the Application of the Legislatures of two
thirds of the several States, shall call a Convention for pro-
posing Amendments, which in either Case, shall be valid to
all Intents and Purposes, as Part of this Constitution, when
ratified by the Legislatures of three-fourths of the several
States, or by Conventions in three fourths thereof, as the
one or the other Mode of Ratification may be proposed by
the Congress; Provided that no Amendment which may be
made prior to the Year One thousand eight hundred and
eight shall in any Manner affect the first and fourth Clauses
in the Ninth Section of the first Article; and that no State,
without its Consent, shall be deprived of its equal Suffrage
in the Senate.

# Article. VI.

# Article. VII.

All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation.

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

The Ratification of the Conventions of nine States, shall be sufficient for the Establishment of this Constitution between the States so ratifying the Same.

Done in Convention by the Unanimous Consent of the States present the Seventeenth Day of September in the Year of our Lord one thousand seven hundred and Eighty seven and of the Independence of the United States of America the Twelfth In Witness whereof We have hereunto subscribed our Names,

Go. Washington--Presidt:
and deputy from Virginia

## NEW HAMPSHIRE

    John Langdon
    Nicholas Gilman

## MASSACHUSETTS

    Nathaniel Gorham
    Rufus King

## CONNECTICUT

    Wm. Saml. Johnson
    Roger Sherman

## NEW YORK

    Alexander Hamilton

## NEW JERSEY

    Wil: Livingston
    David Brearley
    Wm. Paterson
    Jona: Dayton

## PENNSYLVANIA

    B Franklin
    Thomas Mifflin
    Robt Morris
    Geo. Clymer
    Thos. FitzSimons
    Jared Ingersoll
    James Wilson
    Gouv Morris

## DELAWARE

Geo: Read
Gunning Bedford jun
John Dickinson
Richard Bassett
Jaco: Broom

## MARYLAND

James McHenry
Dan of St. Thos. Jenifer
Danl Carroll

## VIRGINIA

John Blair-
James Madison Jr.

## NORTH CAROLINA

Wm. Blount
Richd. Dobbs Spaight
Hu Williamson

## SOUTH CAROLINA

J. Rutledge
Charles Cotesworth Pinckney
Charles Pinckney
Pierce Butler

## GEORGIA

William Few
Abr Baldwin

Attest William Jackson Secretary

In Convention Monday September 17th, 1787.
Present
The States of
New Hampshire, Massachusetts, Connecticut, Mr. Hamilton from New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, North Carolina, South Carolina and Georgia.

Resolved,

That the preceeding Constitution be laid before the United States in Congress assembled, and that it is the Opinion of this Convention, that it should afterwards be submitted to a Convention of Delegates, chosen in each State by the People thereof, under the Recommendation of its Legislature, for their Assent and Ratification; and that each Convention assenting to, and ratifying the Same, should give Notice thereof to the United States in Congress assembled. Resolved, That it is the Opinion of this Convention, that as soon as the Conventions of nine States shall have ratified this Constitution, the United States in Congress assembled should fix a Day on which Electors should be appointed by the States which shall have ratified the same, and a Day on which the Electors should assemble to vote for the President, and the Time and Place for commencing Proceedings under this Constitution.

That after such Publication the Electors should be appointed, and the Senators and Representatives elected: That the Electors should meet on the Day fixed for the Election of the President, and should transmit their Votes certified, signed, sealed and directed, as the Constitution requires, to the Secretary of the United States in Congress assembled, that the Senators and Representatives should convene at the Time and Place assigned; that the Senators should appoint a President of the Senate, for the sole Purpose of receiving, opening and counting the Votes for President; and, that after he shall be chosen, the Congress, together with the President, should, without Delay, proceed to execute this Constitution.

By the unanimous Order of the Convention

Go. Washington-Presidt:
W. JACKSON Secretary.

\* Language in brackets has been changed by amendment.

# THE AMENDMENTS TO THE CONSTITUTION OF
# THE UNITED STATES AS RATIFIED BY THE STATES

*Preamble to the
Bill of Rights*

CONGRESS OF THE UNITED STATES
BEGUN AND HELD AT THE CITY OF NEW-YORK, ON
WEDNESDAY THE FOURTH OF MARCH,
ONE THOUSAND SEVEN HUNDRED AND EIGHTY NINE

THE Conventions of a number of the States, having at
the time of their adopting the Constitution, expressed
a desire, in order to prevent misconstruction or abuse
of its powers, that further declaratory and restrictive
clauses should be added: And as extending the ground
of public confidence in the Government, will best
ensure the beneficent ends of its institution.

RESOLVED by the Senate and House of
Representatives of the United States of America,
in Congress assembled, two thirds of both Houses
concurring, that the following Articles be proposed to
the Legislatures of the several States, as amendments
to the Constitution of the United States, all, or any of
which Articles, when ratified by three fourths of the said
Legislatures, to be valid to all intents and purposes, as
part of the said Constitution; viz.

ARTICLES in addition to, and Amendment of the
Constitution of the United States of America, proposed
by Congress, and ratified by the Legislatures of the
several States, pursuant to the fifth Article of the
original Constitution.

*(Note: The first 10 amendments to the Constitution were
ratified December 15, 1791, and form what is known as
the "Bill of Rights.")*

*Amendment I.*

Congress shall make no law respecting an establishment of
religion, or prohibiting the free exercise thereof; or abridg-
ing the freedom of speech, or of the press, or the right
of the people peaceably to assemble, and to petition the
Government for a redress of grievances.

*Amendment II.*

A well regulated Militia, being necessary to the security of
a free State, the right of the people to keep and bear Arms,
shall not be infringed.

*Amendment III.*

No Soldier shall, in time of peace be quartered in any
house, without the consent of the Owner, nor in time of
war, but in a manner to be prescribed by law.

*Amendment IV.*

The right of the people to be secure in their persons, hous-
es, papers, and effects, against unreasonable searches and
seizures, shall not be violated, and no Warrants shall issue,
but upon probable cause, supported by Oath or affirma-
tion, and particularly describing the place to be searched,
and the persons or things to be seized.

*Amendment V.*

No person shall be held to answer for a capital, or otherwise
infamous crime, unless on a presentment or indictment of
a Grand Jury, except in cases arising in the land or naval
forces, or in the Militia, when in actual service in time of
War or public danger; nor shall any person be subject for
the same offence to be twice put in jeopardy of life or limb;
nor shall be compelled in any criminal case to be a witness
against himself, nor be deprived of life, liberty, or property,
without due process of law; nor shall private property be
taken for public use, without just compensation.

## Amendment VI

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him: to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

## Amendment VII

In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

## Amendment VIII

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

## Amendment IX

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

## Amendment X

The powers not delegated to the United States by the Constitution, not prohibited by it to the States, are reserved to the States respectively, or to the people.

## AMENDMENTS 11-27

## Amendment XI

Passed by Congress March 4, 1794. Ratified February 7, 1795.

*(Note: A portion of Article III, Section 2 of the Constitution was modified by the 11th Amendment.)*

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

## Amendment XII

Passed by Congress December 9, 1803. Ratified June 15, 1804.

*(Note: A portion of Article II, Section 1 of the Constitution was changed by the 12th Amendment.)*

The Electors shall meet in their respective states, and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;-the President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;-The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed: and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. But in choosing the President, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or members from two-thirds of the states, and a majority of all the states shall be necessary to a choice. [And if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the Vice-President shall act as President, as in case of the death or other constitutional disability of the President.-]* The person having the greatest number of votes as Vice-President, shall be the Vice-President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice-President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall he necessary to a choice. But no person constitutionally ineligible to the office of President shall be eligible to that of Vice-President of the United States.

*Superseded by Section 3 of the 20th Amendment.

## Amendment XIII

Passed by Congress January 31, 1865. Ratified December 6, 1865.

*(Note: A portion of Article IV, Section 2 of the Constitution was changed by the 13th Amendment.)*

### SECTION 1.

Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

### SECTION 2.

Congress shall have power to enforce this article by appropriate legislation.

## Amendment XIV

Passed by Congress June 13, 1866. Ratified July 9, 1868.

*(Note: Article I, Section 2 of the Constitution was modified by Section 2 of the 14th Amendment.)*

### SECTION 1.

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

### SECTION 2.

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, [being twenty-one years of age,]* and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

### SECTION 3.

No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

### SECTION 4.

The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

### SECTION 5.

The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

*Changed by Section 1 of the 26th Amendment.

# Amendment XV.

Passed by Congress February 26, 1869. Ratified February 3, 1870.

## SECTION 1.

The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

## SECTION 2.

The Congress shall have the power to enforce this article by appropriate legislation.

# Amendment XVI.

Passed by Congress July 2, 1909. Ratified February 3, 1913.

*(Note: Article I, Section 9 of the Constitution was modified by the 16th Amendment.)*

The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration.

# Amendment XVII.

Passed by Congress May 13, 1912. Ratified April 8, 1913.

*(Note: Article I, Section 3 of the Constitution was modified by the 17th Amendment.)*

The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.

When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: Provided, That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.

This amendment shall not be so construed as to affect the election or term of any Senator chosen before it becomes valid as part of the Constitution.

# Amendment XVIII.

Passed by Congress December 18, 1917. Ratified January 16, 1919. Repealed by the 21st Amendment, December 5, 1933.

## SECTION 1.

After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited.

## SECTION 2.

The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation.

## SECTION 3.

This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of the several States, as provided in the Constitution within seven years from the date of the submission hereof to the States by the Congress.

# Amendment XIX.

Passed by Congress June 4, 1919. Ratified August 18, 1920.

The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex.

Congress shall have power to enforce this article by appropriate legislation.

# *Amendment XX*

Passed by Congress March 2, 1932. Ratified January 23, 1933.

*(Note: Article 1, Section 4 of the Constitution was modified by Section 2 of this Amendment. In addition, a portion of the 12th Amendment was superseded by Section 3.)*

## SECTION 1.

The terms of the President and the Vice President shall end at noon on the 20th day of January, and the terms of Senators and Representatives at noon on the 3d day of January, of the years in which such terms would have ended if this article had not been ratified; and the terms of their successors shall then begin.

## SECTION 2.

The Congress shall assemble at least once in every year, and such meeting shall begin at noon on the 3d day of January, unless they shall by law appoint a different day.

## SECTION 3.

If, at the time fixed for the beginning of the term of the President, the President elect shall have died, the Vice President elect shall become President. If a President shall not have been chosen before the time fixed for the beginning of his term, or if the President elect shall have failed to qualify, then the Vice President elect shall act as President until a President shall have qualified; and the Congress may by law provide for the case wherein neither a President elect nor a Vice President shall have qualified, declaring who shall then act as President, or the manner in which one who is to act shall be selected, and such person shall act accordingly until a President or Vice President shall have qualified.

## SECTION 4.

The Congress may by law provide for the case of the death of any of the persons from whom the House of Representatives may choose a President whenever the right of choice shall have devolved upon them, and for the case of the death of any of the persons from whom the Senate may choose a Vice President whenever the right of choice shall have devolved upon them.

## SECTION 5.

Sections 1 and 2 shall take effect on the 15th day of October following the ratification of this article.

## SECTION 6.

This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of three-fourths of the several States within seven years from the date of its submission.

# *Amendment XXI*

Passed by Congress February 20, 1933. Ratified December 5, 1933.

## SECTION 1.

The eighteenth article of amendment to the Constitution of the United States is hereby repealed.

## SECTION 2.

The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

## SECTION 3.

This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by conventions in the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress.

## Amendment XXII

Passed by Congress March 21, 1947. Ratified February 27, 1951.

### SECTION 1.

No person shall be elected to the office of the President more than twice, and no person who has held the office of President, or acted as President, for more than two years of a term to which some other person was elected President shall be elected to the office of President more than once. But this Article shall not apply to any person holding the office of President when this Article was proposed by Congress, and shall not prevent any person who may be holding the office of President, or acting as President, during the term within which this Article becomes operative from holding the office of President or acting as President during the remainder of such term.

### SECTION 2.

This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of three-fourths of the several States within seven years from the date of its submission to the States by the Congress.

## Amendment XXIII

Passed by Congress June 16, 1960. Ratified March 29, 1961.

### SECTION 1.

The District constituting the seat of Government of the United States shall appoint in such manner as Congress may direct:

A number of electors of President and Vice President equal to the whole number of Senators and Representatives in Congress to which the District would be entitled if it were a State, but in no event more than the least populous State; they shall be in addition to those appointed by the States, but they shall be considered, for the purposes of the election of President and Vice President, to be electors appointed by a State; and they shall meet in the District and perform such duties as provided by the twelfth article of amendment.

### SECTION 2.

The Congress shall have power to enforce this article by appropriate legislation.

## Amendment XXIV

Passed by Congress August 27, 1962. Ratified January 23, 1964.

### SECTION 1.

The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay poll tax or other tax.

### SECTION 2.

The Congress shall have power to enforce this article by appropriate legislation.

## Amendment XXV

Passed by Congress July 6, 1965. Ratified February 10, 1967.

*(Note: Article II, Section 1 of the Constitution was modified by the 25th Amendment.)*

### SECTION 1.

In case of the removal of the President from office or of his death or resignation, the Vice President shall become President.

### SECTION 2.

Whenever there is a vacancy in the office of the Vice President, the President shall nominate a Vice President who shall take office upon confirmation by a majority vote of both Houses of Congress.

### SECTION 3.

Whenever the President transmits to the President pro tempore of the Senate and the Speaker of the House of Representatives his written declaration that he is unable to discharge the powers and duties of his office, and until he transmits to them a written declaration to the contrary, such powers and duties shall be discharged by the Vice President as Acting President.

### SECTION 4.

Whenever the Vice President and a majority of either the principal officers of the executive departments or of such other body as Congress may by law provide, transmit to the President pro tempore of the Senate and the Speaker of the House of Representatives their written declaration that the President is unable to discharge the powers and duties of his office, the Vice President shall immediately assume the powers and duties of the office as Acting President.

Thereafter, when the President transmits to the President pro tempore of the Senate and the Speaker of the House of Representatives his written declaration that no inability exists, he shall resume the powers and duties of his office unless the Vice President and a majority of either the principal officers of the executive department or of such other body as Congress may by law provide, transmit within four days to the President pro tempore of the Senate and the Speaker of the House of Representatives their written declaration that the President is unable to discharge the powers and duties of his office. Thereupon Congress shall decide the issue, assembling within forty-eight hours for that purpose if not in session. If the Congress, within twenty-one days after receipt of the latter written declaration, or, if Congress is not in session, within twenty-one days after Congress is required to assemble, determines by two-thirds vote of both Houses that the President is unable to discharge the powers and duties of his office, the Vice President shall continue to discharge the same as Acting President; otherwise, the President shall resume the powers and duties of his office.

## Amendment XXVI

Passed by Congress March 23, 1971. Ratified July 1, 1971.

*(Note: Amendment 14, Section 2 of the Constitution was modified by Section 1 of the 26th Amendment.)*

### SECTION 1.

The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.

### SECTION 2.

The Congress shall have power to enforce this article by appropriate legislation.

## Amendment XXVII

Originally proposed Sept. 25, 1789. Ratified May 7, 1992.

No law, varying the compensation for the services of the Senators and Representatives, shall take effect, until an election of representatives shall have intervened.

**EXHIBIT: B**



**FDIC**

## Federal Deposit Insurance Corporation



Enter Search Text Submit Search

>   .        >            > FDIC Quarterly

## FDIC: Feature Article

## The 2009 Economic Landscape

### Recession Adds to Long-Term Manufacturing Challenges in the Industrial Midwest

The manufacturing sector has long been a primary economic driver of the Industrial Midwest. This region, wh comprises eight states in the north-central United States, is known for its durable goods manufacturing, a sect includes the production of automobiles and other types of heavy machinery. The emphasis on manufacturing t challenges for the region as the sector has contracted. This article discusses manufacturing trends in the Indu Midwest, particularly with respect to the troubled auto sector, and the economic outlook for the region.

**The Industrial Midwest Has Not Recovered from the Last Recession**

The U.S. manufacturing sector has struggled throughout this decade. Historically, nationwide manufacturing-re employment has tended to decline a few quarters before the U.S. economy contracts and then recover in tand the broader economy. However, job growth in the U.S. manufacturing sector did not rebound after the 2001 re even while overall U.S. economic growth was strong (see Chart 1).

Chart 1



These manufacturing weaknesses have had a disproportionate effect on the Industrial Midwest economy. In e
the region, manufacturing employment as a percentage of total employment is higher than the nation's. Moreo
**Indiana**, **Wisconsin**, **Michigan**, and **Ohio** have the highest concentrations of manufacturing employment in th
Because of its reliance on manufacturing during a period of weakness in this sector, total employment in the re
yet to return to pre-2001 levels (see Chart 2).

Chart 2



Two long-term issues are adversely affecting manufacturing in the Industrial Midwest. First, over the past two
much of the region's manufacturing base has been lost to competition, both foreign and domestic. Second, tec
improvements in U.S. factories have led to much higher productivity levels. These productivity advances have
brought about by capital investments that require fewer low-skilled workers.

More recently, the erosion of market share and structural cost problems at General Motors (GM), Chrysler, and
have led to large-scale restructurings and job losses. These challenges at U.S. automakers have contributed t
of more than 140,000 manufacturing jobs since 2005. Hundreds of thousands of additional workers at auto as

plants and auto parts suppliers could potentially lose their jobs during the current downturn.

Auto sector layoffs have disproportionately affected Michigan, Ohio, and Indiana, the states most exposed to t auto sector. These states were essentially in recession before the nation as a whole, with Michigan preceding national downturn by more than three years (see Chart 3). Michigan is the state most heavily concentrated in a manufacturing, with the most motor vehicle manufacturing jobs and the highest number and proportion of direc indirect jobs connected to motor vehicle parts production.

Chart 3



**Employment Weakness Has Also Spilled into the Region's Housing Markets**

Although the Industrial Midwest did not experience the significant home price appreciation of the post-2001 ho boom to the same degree as other regions, its residential real estate markets have still suffered. Existing home the Industrial Midwest declined 33 percent from their second quarter 2005 peak, roughly in line with the nation decline.  In 2008, home prices fell in all of the region's states, led by Michigan, where prices declined by more percent.  Further, in half of the Industrial Midwest states, foreclosure rates are at or slightly higher than the na rate.

Weak housing markets have, in turn, adversely affected the region's construction industry. Construction emplc virtually unchanged across the Industrial Midwest from 2003 through 2006, while it grew more than 10 percent nationwide. Since 2006, the construction sector in the Industrial Midwest has declined by 7.7 percent, or 96,00

**The Industrial Midwest Faces a Potentially Long Road to Recovery**

Employment in the Industrial Midwest has declined substantially during the current downturn, and the near-ten for **Detroit's** auto industry remains unclear. Automakers have been shrinking their businesses to match reduce share. In addition, financial press reports and analytical studies indicate that hundreds of thousands of jobs are potentially at stake as Chrysler and GM continue to negotiate restructuring plans with the Obama administratio task force. Though foreign-based automakers with production facilities in the region might increase output to p offset this gap, their new hiring likely would not fully absorb jobs shed by Detroit automakers.

Two other economic indicators also point to a prolonged path to recovery. First, the outlook for the metal fabric machinery manufacturing industries has diminished. These industries, which include companies involved in th transformation of metal into intermediate or final products and the production of machines used in industrial ap provided some economic stability to the Industrial Midwest following the last recession. However, the weakeni economy has softened demand for their products. Nationally, investment in machinery and other fixed assets

**EXHIBIT: C**

# W$o Rules America?

Professor G William Domhoff, Sociology Dept., University of California at Santa Cruz

Power at the National Level

Wealth, Income, & Power

How Corporate Moderates Created Social Security

Interlocking Directorates in the Corporate Community

Federal Advisory Committees

Social Cohesion & the Bohemian Grove

Pension Fund Capitalism

What Happened in the 2006 Midterm Elections

# Wealth, Income, and Power

## by G. William Domhoff

### September 2005 (updated May 2009)

This document presents details on the wealth and income distributions in the United St: and explains how we use these two distributions as power indicators.

Some of the information might be a surprise to many people. The most amazing numbe come last, showing the change in the ratio of the average CEO's paycheck to that of the average factory worker over the past 40 years.

First, though, two definitions. Generally speaking, "wealth" is the value of everything a person or family owns, minus any debts. However, for purposes of studying the wealth distribution, economists define wealth in terms of *marketable assets*, such as real estate stocks, and bonds, leaving aside consumer durables like cars and household items beca they are not as readily converted into cash and are more valuable to their owners for us purposes than they are for resale (Wolff, 2004, p. 4, for a full discussion of these issues the value of all marketable assets is determined, then all debts, such as home mortgage: credit card debts, are subtracted, which yields a person's net worth. In addition, econom use the concept of *financial wealth*, which is defined as net worth minus net equity in o occupied housing. As Wolff (2004, p. 5) explains, "Financial wealth is a more 'liquid' c than marketable wealth, since one's home is difficult to convert into cash in the short te thus reflects the resources that may be immediately available for consumption or variou forms of investments."

We also need to distinguish wealth from *income*. Income is what people earn from wag dividends, interest, and any rents or royalties that are paid to them on properties they ov theory, those who own a great deal of wealth may or may not have high incomes, depe: on the returns they receive from their wealth, but in reality those at the very top of the v distribution usually have the most income.

## The Wealth Distribution

In the United States, wealth is highly concentrated in a relatively few hands. As of 200- top 1% of households (the upper class) owned 34.3% of all privately held wealth, and t 19% (the managerial, professional, and small business stratum) had 50.3%, which mea: just 20% of the people owned a remarkable 85%, leaving only 15% of the wealth for th bottom 80% (wage and salary workers). In terms of financial wealth (total net worth mi the value of one's home), the top 1% of households had an even greater share: 42.2%. 1 and Figure 1 present further details drawn from the careful work of economist Edward Wolff at New York University (2007).

**Table 1: Distribution of net worth and financial wealth in the United States, 1983**

| | Total Net Worth | | |
|---|---|---|---|
| | Top 1 percent | Next 19 percent | Bottom 80 percent |
| 1983 | 33.8% | 47.5% | 18.7% |
| 1989 | 37.4% | 46.2% | 16.5% |

one-tenth of one percent -- had more combined pre-tax income than the poorest 120 mi people (Johnston, 2006).

A key factor behind the high concentration of income, and the likely reason that the concentration has been increasing, can be seen by examining the distribution of what is "capital income": income from capital gains, dividends, interest, and rents. In 2003, jus all households -- those with after-tax incomes averaging $701,500 -- received 57.5% of capital income, up from 40% in the early 1990s. On the other hand, the bottom 80% rec only 12.6% of capital income, down by nearly half since 1983, when the bottom 80% n 23.5%. Figure 5 and Table 7 provide the details.

**Figure 5: Share of capital income earned by top 1% and bottom 80%, 1979-2(
(From Shapiro & Friedman, 2006.)**



**Table 7: Share of capital income flowing to households in various income categ**

|      | Top 1% | Top 5% | Top 10% | Bottom 80% |
|------|--------|--------|---------|------------|
| 1979 | 37.8%  | 57.9%  | 66.7%   | 23.1%      |
| 1981 | 35.8%  | 55.4%  | 64.6%   | 24.4%      |
| 1983 | 37.6%  | 55.2%  | 63.7%   | 25.1%      |
| 1985 | 39.7%  | 56.9%  | 64.9%   | 24.9%      |
| 1987 | 36.7%  | 55.3%  | 64.0%   | 25.6%      |
| 1989 | 39.1%  | 57.4%  | 66.0%   | 23.5%      |
| 1991 | 38.3%  | 56.2%  | 64.7%   | 23.9%      |
| 1993 | 42.2%  | 60.5%  | 69.2%   | 20.7%      |
| 1995 | 43.2%  | 61.5%  | 70.1%   | 19.6%      |
| 1997 | 45.7%  | 64.1%  | 72.6%   | 17.5%      |
| 1999 | 47.8%  | 65.7%  | 73.8%   | 17.0%      |
| 2001 | 51.8%  | 67.8%  | 74.8%   | 16.0%      |
| 2003 | 57.5%  | 73.2%  | 79.4%   | 12.6%      |

Adapted from Shapiro & Friedman (2006).

**EXHIBIT: D**



Search Law School

LII / Legal Information Institute

# U.S. Code collection

TITLE 29 > CHAPTER 18 > SUBCHAPTER III > Subtitle D > § 1362

## § 1362. Liability for termination of single-employer plans under a distress termination or a termination by corporation

**(a) In general**

In any case in which a single-employer plan is terminated in a distress termination under section 1341 (c) of this title or a termination otherwise instituted by the corporation under section 1342 of this title, any person who is, on the termination date, a contributing sponsor of the plan or a member of such a contributing sponsor's controlled group shall incur liability under this section. The liability under this section of all such persons shall be joint and several. The liability under this section consists of—

**(1)** liability to the corporation, to the extent provided in subsection (b) of this section, and

**(2)** liability to the trustee appointed under subsection (b) or (c) of section 1342 of this title, to the extent provided in subsection (c) of this section.

**(b) Liability to corporation**

**(1) Amount of liability**

**(A) In general**

Except as provided in subparagraph (B), the liability to the corporation of a person described in subsection (a) of this section shall be the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan, together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the corporation.

**(B) Special rule in case of subsequent insufficiency**

For purposes of subparagraph (A), in any case described in section 1341 (c)(3)(C)(ii) of this title, actuarial present values shall be determined as of the date of the notice to the corporation (or the finding by the corporation) described in such section.

**(2) Payment of liability**

**(A) In general**

Except as provided in subparagraph (B), the liability to the corporation under this subsection shall be due and payable to the corporation as of the termination date, in cash or securities acceptable to the corporation.

**(B) Special rule**

Payment of so much of the liability under paragraph (1)(A) as exceeds 30 percent of the collective net worth of all persons described in subsection (a) of this section (including interest) shall be made under commercially reasonable terms prescribed by the corporation. The parties involved shall make a reasonable effort to reach agreement on such commercially reasonable terms.

Any such terms prescribed by the corporation shall provide for deferral of 50 percent of any amount of liability otherwise payable for any year under this subparagraph if a person subject to such liability demonstrates to the satisfaction of the corporation that no person subject to such liability has any individual pre-tax profits for such person's fiscal year ending during such year.

### (3) Alternative arrangements

The corporation and any person liable under this section may agree to alternative arrangements for the satisfaction of liability to the corporation under this subsection.

### (c) Liability to section 1342 trustee

A person described in subsection (a) of this section shall be subject to liability under this subsection to the trustee appointed under subsection (b) or (c) of section 1342 of this title. The liability of such person under this subsection shall consist of—

(1) the sum of the shortfall amortization charge (within the meaning of section 1083 c)(1) of this title and 430(d)(1) [1] of title 26) with respect to the plan (if any) for the plan year in which the termination date occurs, plus the aggregate total of shortfall amortization installments (if any) determined for succeeding plan years under section 1083 (c)(2) of this title and section 430 (d)(2) of title 26 (which, for purposes of this subparagraph, shall include any increase in such sum which would result if all applications for waivers of the minimum funding standard under section 1082 (c) of this title and section 412 (c) of title 26 which are pending with respect to such plan were denied and if no additional contributions (other than those already made by the termination date) were made for the plan year in which the termination date occurs or for any previous plan year), and

(2) the sum of the waiver amortization charge (within the meaning of section 1083 1) of this title and 430(e)(1) [1] of title 26) with respect to the plan (if any) for the plan year in which the termination date occurs, plus the aggregate total of waiver amortization installments (if any) determined for succeeding plan years under section 1083 (e)(2) of this title and section 430 (e)(2) of title 26,

together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the corporation. The liability under this subsection shall be due and payable to such trustee as of the termination date, in cash or securities acceptable to such trustee.

### (d) Definitions

#### (1) Collective net worth of persons subject to liability

##### (A) In general

The collective net worth of persons subject to liability in connection with a plan termination consists of the sum of the individual net worths of all persons who—

(i) have individual net worths which are greater than zero, and

(ii) are (as of the termination date) contributing sponsors of the terminated plan or members of their controlled groups.

##### (B) Determination of net worth

For purposes of this paragraph, the net worth of a person is—

(i) determined on whatever basis best reflects, in the determination of the corporation, the current status of the person's operations and prospects at the time chosen for determining the net worth of the person, and

(ii) increased by the amount of any transfers of assets made by the person which are determined by the corporation to be improper under the circumstances, including any such transfers which would be inappropriate

under title 11 if the person were a debtor in a case under chapter 7 of such title.

**(C) Timing of determination**

For purposes of this paragraph, determinations of net worth shall be made as of a day chosen by the corporation (during the 120-day period ending with the termination date) and shall be computed without regard to any liability under this section.

**(2) Pre-tax profits**

The term "pre-tax profits" means—

**(A)** except as provided in subparagraph (B), for any fiscal year of any person, such person's consolidated net income (excluding any extraordinary charges to income and including any extraordinary credits to income) for such fiscal year, as shown on audited financial statements prepared in accordance with generally accepted accounting principles, or

**(B)** for any fiscal year of an organization described in section 501 (c) of title ¹  , the excess of income over expenses (as such terms are defined for such organizations under generally accepted accounting principles),

before provision for or deduction of Federal or other income tax, any contribution to any single-employer plan of which such person is a contributing sponsor at any time during the period beginning on the termination date and ending with the end of such fiscal year, and any amounts required to be paid for such fiscal year under this section. The corporation may by regulation require such information to be filed on such forms as may be necessary to determine the existence and amount of such pre-tax profits.

**(e) Treatment of substantial cessation of operations**

If an employer ceases operations at a facility in any location and, as a result of such cessation of operations, more than 20 percent of the total number of his employees who are participants under a plan established and maintained by him are separated from employment, the employer shall be treated with respect to that plan as if he were a substantial employer under a plan under which more than one employer makes contributions and the provisions of sections 1363, 1364, and 1365 of this title shall apply.

---

¹ So in original. Probably should be preceded by "section".

LII has no control over and does not endorse any external Internet site that contains links to or references LII.

**EXHIBIT:** E

... / ....... information institute

# U.S. Code collection

>           > ........ .. ... > ........ . > § 1303

## § 1303. Operation of corporation

(a) Investigatory authority; audit of

### statistically significant number of terminating plans

The corporation may make such investigations as it deems necessary to enforce any provision of this subchapter or any rule or regulation thereunder, and may require or permit any person to file with it a statement in writing, under oath or otherwise as the corporation shall determine, as to all the facts and circumstances concerning the matter to be investigated. The corporation shall annually audit a statistically significant number of plans terminating under section ........ of this title to determine whether participants and beneficiaries have received their benefit commitments and whether section ........ of this title has been satisfied. Each audit shall include a statistically significant number of participants and beneficiaries.

### (b) Discovery powers vested in board members or officers designated by the chairman

For the purpose of any such investigation, or any other proceeding under this subchapter, the Director, any member of the board of directors of the corporation, or any officer designated by the Director or chairman, may administer oaths and affirmations, subpena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records which the corporation deems relevant or material to the inquiry.

### (c) Contempt

In the case of contumacy by, or refusal to obey a subpena issued to, any person, the corporation may invoke the aid of any court of the United States within the jurisdiction of which such investigation or proceeding is carried on, or where such person resides or carries on business, in requiring the attendance and testimony of witnesses and the production of books, papers, correspondence, memoranda, and other records. The court may issue an order requiring such person to appear before the corporation, or member or officer designated by the corporation, and to produce records or to give testimony related to the matter under investigation or in question. Any failure to obey such order of the court may be punished by the court as a contempt thereof. All process in any such case may be served in the judicial district in which such person is an inhabitant or may be found.

### (d) Cooperation with other governmental agencies

In order to avoid unnecessary expense and duplication of functions among government agencies, the corporation may make such arrangements or agreements for cooperation or mutual assistance in the performance of its functions under this subchapter as is practicable and consistent with law. The corporation may utilize the facilities or services of any department, agency, or establishment of the United States or of any State or political subdivision of a State, including the services of any of its employees, with the lawful consent of such department, agency, or establishment. The head of each department, agency, or establishment of the United States shall cooperate with the corporation and, to the extent permitted by law, provide such information and facilities as it may request for its assistance in the performance of its functions under this subchapter. The Attorney General or his

US CODE, Title 29, 1303, Operation of corporation
09-50026-mg  Doc 3317-1  Filed 07/20/09  Entered 07/22/09 17:06:18  Exhibits  Page 2 of 3
Pg 33 of 69

representative shall receive from the corporation for appropriate action such evidence developed in the performance of its functions under this subchapter as may be found to warrant consideration for criminal prosecution under the provisions of this or any other Federal law.

**(e) Civil actions by corporation; jurisdiction; process; expeditious handling of case; costs; limitation on actions**

(1)  Civil actions may be brought by the corporation for appropriate relief, legal or equitable or both, to enforce

(A)  the provisions of this subchapter, and

(B)  in the case of a plan which is covered under this subchapter (other than a multiemployer plan) and for which the conditions for imposition of a lien described in section 3059 (g)(A)(A) and (B) of this title or section 322 (c)(A)(A) and (B) of title 23 have been met, section 1083 of this title and section 413 of title 23 .

(2)  Except as otherwise provided in this subchapter, where such an action is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the violation took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

(3)  The district courts of the United States shall have jurisdiction of actions brought by the corporation under this subchapter without regard to the amount in controversy in any such action.

(4)  Repealed. Pub. L. 98-369, title IV, § 402(33), Nov. 8, 1984, 98 Stat. 867 .

(5)  In any action brought under this subchapter, whether to collect premiums, penalties, and interest under section 1307 of this title or for any other purpose, the court may award to the corporation all or a portion of the costs of litigation incurred by the corporation in connection with such action.

(6)

(A)  Except as provided in subparagraph (C), an action under this subsection may not be brought after the later of—

(i)  6 years after the date on which the cause of action arose, or

(ii)  3 years after the applicable date specified in subparagraph (B).

(B)

(i)  Except as provided in clause (ii), the applicable date specified in this subparagraph is the earliest date on which the corporation acquired or should have acquired actual knowledge of the existence of such cause of action.

(ii)  If the corporation brings the action as a trustee, the applicable date specified in this subparagraph is the date on which the corporation became a trustee with respect to the plan if such date is later than the date described in clause (i).

(C)  In the case of fraud or concealment, the period described in subparagraph (A)(ii) shall be extended to 6 years after the applicable date specified in subparagraph (B).

**(f) Civil actions against corporation; appropriate court; award of costs and expenses; limitation on actions; jurisdiction; removal of actions**

(1)  Except with respect to withdrawal liability disputes under part 1 of subtitle E of this subchapter, any person who is a fiduciary, employer, contributing sponsor, member of a contributing sponsor's controlled group, participant, or beneficiary, and is adversely

affected by any action of the corporation with respect to a plan in which such person has an interest, or who is an employee organization representing such a participant or beneficiary so adversely affected for purposes of collective bargaining with respect to such plan, may bring an action against the corporation for appropriate equitable relief in the appropriate court.

**(2)** For purposes of this subsection, the term "appropriate court" means—

   **(A)** the United States district court before which proceedings under section or    of this title are being conducted,

   **(B)** if no such proceedings are being conducted, the United States district court for the judicial district in which the plan has its principal office, or

   **(C)** the United States District Court for the District of Columbia.

**(3)** In any action brought under this subsection, the court may award all or a portion of the costs and expenses incurred in connection with such action to any party who prevails or substantially prevails in such action.

**(4)** This subsection shall be the exclusive means for bringing actions against the corporation under this subchapter, including actions against the corporation in its capacity as a trustee under section 1342 or 1349 of this title.

**(5)**

   **(A)** Except as provided in subparagraph (C), an action under this subsection may not be brought after the later of—

      **(i)** 6 years after the date on which the cause of action arose, or

      **(ii)** 3 years after the applicable date specified in subparagraph (B).

   **(B)**

      **(i)** Except as provided in clause (ii), the applicable date specified in this subparagraph is the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action.

      **(ii)** In the case of a plaintiff who is a fiduciary bringing the action in the exercise of fiduciary duties, the applicable date specified in this subparagraph is the date on which the plaintiff became a fiduciary with respect to the plan if such date is later than the date specified in clause (i).

   **(C)** In the case of fraud or concealment, the period described in subparagraph (A) (ii) shall be extended to 6 years after the applicable date specified in subparagraph (B).

**(6)** The district courts of the United States have jurisdiction of actions brought under this subsection without regard to the amount in controversy.

**(7)** In any suit, action, or proceeding in which the corporation is a party, or intervenes under section    of this title, in any State court, the corporation may, without bond or security, remove such suit, action, or proceeding from the State court to the United States district court for the district or division in which such suit, action, or proceeding is pending by following any procedure for removal now or hereafter in effect.

See References in Text note below.

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

**EXHIBIT: F**

LII / Legal Information Institute

# U.S. Code collection

‹‹‹ ‹ › ‹ › ‹ ‹›‹ ‹‹‹‹ › ‹‹‹‹ ‹‹‹‹‹ ‹‹‹ › ‹ ‹‹‹‹ › **§ 1367**

## § 1367. Recovery of liability for plan termination    The corporation is
authorized to make
arrangements with contributing sponsors and members of their controlled groups who are or may
become liable under section ‹‹‹‹, ‹‹‹, or ‹ ‹‹‹ of this title for payment of their liability, including
arrangements for deferred payment of amounts of liability to the corporation accruing as of the
termination date on such terms and for such periods as the corporation deems equitable and
appropriate.

*LII has no control over and does not endorse any external Internet
site that contains links to or references LII.*

EXHIBIT: G



LII / Legal Information Institute

# U.S. Code collection

TITLE 29 >    CHAPTER 18 > SUBCHAPTER I > Subtitle B > part 3 > § 1083

## § 1083. Minimum funding standards for single-employer defined benefit pension plans

**(a) Minimum required contribution**

For purposes of this section and section 1082 (a)(2)(A) of this title, except as provided in subsection (f), the term "minimum required contribution" means, with respect to any plan year of a single-employer plan—

    **(1)** in any case in which the value of plan assets of the plan (as reduced under subsection (f)(4)(B)) is less than the funding target of the plan for the plan year, the sum of—

        **(A)** the target normal cost of the plan for the plan year,

        **(B)** the shortfall amortization charge (if any) for the plan for the plan year determined under subsection (c), and

        **(C)** the waiver amortization charge (if any) for the plan for the plan year as determined under subsection (e); or

    **(2)** in any case in which the value of plan assets of the plan (as reduced under subsection (f)(4)(B)) equals or exceeds the funding target of the plan for the plan year, the target normal cost of the plan for the plan year reduced (but not below zero) by such excess.

### (b) Target normal cost

For purposes of this section, except as provided in subsection (i)(2) with respect to plans in at-risk status, the term "target normal cost" means, for any plan year, the present value of all benefits which are expected to accrue or to be earned under the plan during the plan year. For purposes of this subsection, if any benefit attributable to services performed in a preceding plan year is increased by reason of any increase in compensation during the current plan year, the increase in such benefit shall be treated as having accrued during the current plan year.

### (c) Shortfall amortization charge

#### (1) In general

For purposes of this section, the shortfall amortization charge for a plan for any plan year is the aggregate total (not less than zero) of the shortfall amortization installments for such plan year with respect to the shortfall amortization bases for such plan year and each of the 6 preceding plan years.

#### (2) Shortfall amortization installment

For purposes of paragraph (1)—

##### (A) Determination

The shortfall amortization installments are the amounts necessary to amortize

**EXHIBIT: H**

LII / Legal Information Institute

# U.S. Code collection

> ... > ... > ... > § 1341

## § 1341. Termination of single-employer plans

### (a) General rules governing single-employer plan terminations

#### (1) Exclusive means of plan termination

Except in the case of a termination for which proceedings are otherwise instituted by the corporation as provided in section ____ of this title, a single-employer plan may be terminated only in a standard termination under subsection (b) of this section or a distress termination under subsection (c) of this section.

#### (2) 60-day notice of intent to terminate

Not less than 60 days before the proposed termination date of a standard termination under subsection (b) of this section or a distress termination under subsection (c) of this section, the plan administrator shall provide to each affected party (other than the corporation in the case of a standard termination) a written notice of intent to terminate stating that such termination is intended and the proposed termination date. The written notice shall include any related additional information required in regulations of the corporation.

#### (3) Adherence to collective bargaining agreements

The corporation shall not proceed with a termination of a plan under this section if the termination would violate the terms and conditions of an existing collective bargaining agreement. Nothing in the preceding sentence shall be construed as limiting the authority of the corporation to institute proceedings to involuntarily terminate a plan under section ____ of this title.

### (b) Standard termination of single-employer plans

#### (1) General requirements

A single-employer plan may terminate under a standard termination only if—

> **(A)** the plan administrator provides the 60-day advance notice of intent to terminate to affected parties required under subsection (a)(2) of this section,

> **(B)** the requirements of subparagraphs (A) and (B) of paragraph (2) are met,

> **(C)** the corporation does not issue a notice of noncompliance under subparagraph (C) of paragraph (2), and

> **(D)** when the final distribution of assets occurs, the plan is sufficient for benefit liabilities (determined as of the termination date).

#### (2) Termination procedure

##### (A) Notice to the corporation

As soon as practicable after the date on which the notice of intent to terminate is provided pursuant to subsection (a)(2) of this section, the plan administrator

**EXHIBIT: I**

LII / Legal Information Institute

# U.S. Code collection

>                    > ... > ... > § 1369

## § 1369. Treatment of transactions to evade liability; effect of corporate reorganization

### (a) Treatment of transactions to evade liability

If a principal purpose of any person in entering into any transaction is to evade liability to which such person would be subject under this subtitle and the transaction becomes effective within five years before the termination date of the termination on which such liability would be based, then such person and the members of such person's controlled group (determined as of the termination date) shall be subject to liability under this subtitle in connection with such termination as if such person were a contributing sponsor of the terminated plan as of the termination date. This subsection shall not cause any person to be liable under this subtitle in connection with such plan termination for any increases or improvements in the benefits provided under the plan which are adopted after the date on which the transaction referred to in the preceding sentence becomes effective.

### (b) Effect of corporate reorganization

For purposes of this subtitle, the following rules apply in the case of certain corporate reorganizations:

#### (1) Change of identity, form, etc.

If a person ceases to exist by reason of a reorganization which involves a mere change in identity, form, or place of organization, however effected, a successor corporation resulting from such reorganization shall be treated as the person to whom this subtitle applies.

#### (2) Liquidation into parent corporation

If a person ceases to exist by reason of liquidation into a parent corporation, the parent corporation shall be treated as the person to whom this subtitle applies.

#### (3) Merger, consolidation, or division

If a person ceases to exist by reason of a merger, consolidation, or division, the successor corporation or corporations shall be treated as the person to whom this subtitle applies.

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

EXHIBIT: J

LII / Legal Information Institute

# U.S. Code collection

··· ··· > ··· ····· ·· > ···· ····· ··· > ·· ···· ·· > § 1362

## § 1362. Liability for termination of single-employer plans under a distress termination or a termination by corporation

### (a) In general

In any case in which a single-employer plan is terminated in a distress termination under section ···· ··· of this title or a termination otherwise instituted by the corporation under section ···· of this title, any person who is, on the termination date, a contributing sponsor of the plan or a member of such a contributing sponsor's controlled group shall incur liability under this section. The liability under this section of all such persons shall be joint and several. The liability under this section consists of—

(1)  liability to the corporation, to the extent provided in subsection (b) of this section, and

(2)  liability to the trustee appointed under subsection (b) or (c) of section ··42 of this title, to the extent provided in subsection (c) of this section.

### (b) Liability to corporation

#### (1) Amount of liability

##### (A) In general

Except as provided in subparagraph (B), the liability to the corporation of a person described in subsection (a) of this section shall be the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan, together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the corporation.

##### (B) Special rule in case of subsequent insufficiency

For purposes of subparagraph (A), in any case described in section ··41 ···· ··(C)(ii) of this title, actuarial present values shall be determined as of the date of the notice to the corporation (or the finding by the corporation) described in such section.

#### (2) Payment of liability

##### (A) In general

Except as provided in subparagraph (B), the liability to the corporation under this subsection shall be due and payable to the corporation as of the termination date, in cash or securities acceptable to the corporation.

##### (B) Special rule

Payment of so much of the liability under paragraph (1)(A) as exceeds 30 percent of the collective net worth of all persons described in subsection (a) of this section (including interest) shall be made under commercially reasonable terms prescribed by the corporation. The parties involved shall make a reasonable effort to reach agreement on such commercially reasonable terms.

Any such terms prescribed by the corporation shall provide for deferral of 50 percent of any amount of liability otherwise payable for any year under this subparagraph if a person subject to such liability demonstrates to the satisfaction of the corporation that no person subject to such liability has any individual pre-tax profits for such person's fiscal year ending during such year.

### (3) Alternative arrangements

The corporation and any person liable under this section may agree to alternative arrangements for the satisfaction of liability to the corporation under this subsection.

## (c) Liability to section 1342 trustee

A person described in subsection (a) of this section shall be subject to liability under this subsection to the trustee appointed under subsection (b) or (c) of section 1342 of this title. The liability of such person under this subsection shall consist of—

**(1)** the sum of the shortfall amortization charge (within the meaning of section ... of this title and 430(d)(1) of title 26) with respect to the plan (if any) for the plan year in which the termination date occurs, plus the aggregate total of shortfall amortization installments (if any) determined for succeeding plan years under section ... of this title and section 430(d)(2) of title 26 (which, for purposes of this subparagraph, shall include any increase in such sum which would result if all applications for waivers of the minimum funding standard under section 1083 of this title and section ... of title 26 which are pending with respect to such plan were denied and if no additional contributions (other than those already made by the termination date) were made for the plan year in which the termination date occurs or for any previous plan year), and

**(2)** the sum of the waiver amortization charge (within the meaning of section ... of this title and 430(e)(1) of title 26) with respect to the plan (if any) for the plan year in which the termination date occurs, plus the aggregate total of waiver amortization installments (if any) determined for succeeding plan years under section ... of this title and section 430(e)(2) of title 26,

together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the corporation. The liability under this subsection shall be due and payable to such trustee as of the termination date, in cash or securities acceptable to such trustee.

## (d) Definitions

### (1) Collective net worth of persons subject to liability

#### (A) In general

The collective net worth of persons subject to liability in connection with a plan termination consists of the sum of the individual net worths of all persons who—

**(i)** have individual net worths which are greater than zero, and

**(ii)** are (as of the termination date) contributing sponsors of the terminated plan or members of their controlled groups.

#### (B) Determination of net worth

For purposes of this paragraph, the net worth of a person is—

**(i)** determined on whatever basis best reflects, in the determination of the corporation, the current status of the person's operations and prospects at the time chosen for determining the net worth of the person, and

**(ii)** increased by the amount of any transfers of assets made by the person which are determined by the corporation to be improper under the circumstances, including any such transfers which would be inappropriate

under title 11 if the person were a debtor in a case under chapter 7 of such title.

### (C) Timing of determination

For purposes of this paragraph, determinations of net worth shall be made as of a day chosen by the corporation (during the 120-day period ending with the termination date) and shall be computed without regard to any liability under this section.

## (2) Pre-tax profits

The term "pre-tax profits" means—

**(A)** except as provided in subparagraph (B), for any fiscal year of any person, such person's consolidated net income (excluding any extraordinary charges to income and including any extraordinary credits to income) for such fiscal year, as shown on audited financial statements prepared in accordance with generally accepted accounting principles, or

**(B)** for any fiscal year of an organization described in section 501 (c) of title 26, the excess of income over expenses (as such terms are defined for such organizations under generally accepted accounting principles),

before provision for or deduction of Federal or other income tax, any contribution to any single-employer plan of which such person is a contributing sponsor at any time during the period beginning on the termination date and ending with the end of such fiscal year, and any amounts required to be paid for such fiscal year under this section. The corporation may by regulation require such information to be filed on such forms as may be necessary to determine the existence and amount of such pre-tax profits.

## (e) Treatment of substantial cessation of operations

If an employer ceases operations at a facility in any location and, as a result of such cessation of operations, more than 20 percent of the total number of his employees who are participants under a plan established and maintained by him are separated from employment, the employer shall be treated with respect to that plan as if he were a substantial employer under a plan under which more than one employer makes contributions and the provisions of sections 1363, 1364, and 1365 of this title shall apply.

So in original. Probably should be preceded by "section".

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

**EXHIBIT: K**

LII / Legal Information Institute

# U.S. Code collection

>            >            :       >   :    :   >  § 1363

## § 1363. Liability of substantial employer for withdrawal from single-employer plans under multiple controlled groups

### (a) Single-employer plans with two or more contributing sponsors

Except as provided in subsection (d) of this section, the plan administrator of a single-employer plan which has two or more contributing sponsors at least two of whom are not under common control—

**(1)** shall notify the corporation of the withdrawal during a plan year of a substantial employer for such plan year from the plan, within 60 days after such withdrawal, and

**(2)** request that the corporation determine the liability of all persons with respect to the withdrawal of the substantial employer.

The corporation shall, as soon as practicable thereafter, determine whether there is liability resulting from the withdrawal of the substantial employer and notify the liable persons of such liability.

### (b) Computation of liability

Except as provided in subsection (c) of this section, any one or more contributing sponsors who withdraw, during a plan year for which they constitute a substantial employer, from a single-employer plan which has two or more contributing sponsors at least two of whom are not under common control, shall, upon notification of such contributing sponsors by the corporation as provided by subsection (a) of this section, be liable, together with the members of their controlled groups, to the corporation in accordance with the provisions of section         of this title and this section. The amount of liability shall be computed on the basis of an amount determined by the corporation to be the amount described in section
    of this title for the entire plan, as if the plan had been terminated by the corporation on the date of the withdrawal referred to in subsection (a)(1) of this section multiplied by a fraction—

**(1)** the numerator of which is the total amount required to be contributed to the plan by such contributing sponsors for the last 5 years ending prior to the withdrawal, and

**(2)** the denominator of which is the total amount required to be contributed to the plan by all contributing sponsors for such last 5 years.

In addition to and in lieu of the manner prescribed in the preceding sentence, the corporation may also determine such liability on any other equitable basis prescribed by the corporation in regulations. Any amount collected by the corporation under this subsection shall be held in escrow subject to disposition in accordance with the provisions of paragraphs (2) and (3) of subsection (c) of this section.

### (c) Bond in lieu of payment of liability; 5-year termination period

**(1)** In lieu of payment of a contributing sponsor's liability under this section, the contributing sponsor may be required to furnish a bond to the corporation in an amount not exceeding 150 percent of his liability to insure payment of his liability under this section. The bond shall have as surety thereon a corporate surety company which is an acceptable surety on Federal bonds under authority granted by the Secretary of the

Treasury under sections 9304–9308 of title ³¹. Any such bond shall be in a form or of a type approved by the Secretary including individual bonds or schedule or blanket forms of bonds which cover a group or class.

**(2)** If the plan is not terminated under section 1341 (c) or 1342 of this title within the 5-year period commencing on the day of withdrawal, the liability is abated and any payment held in escrow shall be refunded without interest (or the bond cancelled) in accordance with bylaws or rules prescribed by the corporation.

**(3)** If the plan terminates under section 1341 (c) or 1342 of this title within the 5-year period commencing on the day of withdrawal, the corporation shall—

  **(A)** demand payment or realize on the bond and hold such amount in escrow for the benefit of the plan;

  **(B)** treat any escrowed payments under this section as if they were plan assets and apply them in a manner consistent with this subtitle; and

  **(C)** refund any amount to the contributing sponsor which is not required to meet any obligation of the corporation with respect to the plan.

### (d) Alternate appropriate procedure

The provisions of this subsection apply in the case of a withdrawal described in subsection (a) of this section, and the provisions of subsections (b) and (c) of this section shall not apply, if the corporation determines that the procedure provided for under this subsection is consistent with the purposes of this section and section 1364 of this title and is more appropriate in the particular case. Upon a showing by the plan administrator of the plan that the withdrawal from the plan by one or more contributing sponsors has resulted, or will result, in a significant reduction in the amount of aggregate contributions to or under the plan, the corporation may—

  **(1)** require the plan fund to be equitably allocated between those participants no longer working in covered service under the plan as a result of the withdrawal, and those participants who remain in covered service under the plan;

  **(2)** treat that portion of the plan funds allocable under paragraph (1) to participants no longer in covered service as a plan terminated under section 1363 of this title; and

  **(3)** treat that portion of the plan fund allocable to participants remaining in covered service as a separate plan.

### (e) Indemnity agreement

The corporation is authorized to waive the application of the provisions of subsections (b), (c), and (d) of this section whenever it determines that there is an indemnity agreement in effect among contributing sponsors under the plan which is adequate to satisfy the purposes of this section and of section 1364 of this title.

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

**EXHIBIT: L**

LII / Legal Information Institute

# U.S. Code collection

... , ' >          ... > ... > ... > § 1364

## § 1364. Liability on termination of single-employer plans under multiple controlled groups

**(a)** This section applies to all contributing sponsors of a single-employer plan which has two or more contributing sponsors at least two of whom are not under common control at the time such plan is terminated under section 1341 (c) or 1342 of this title, or who, at any time within the 5 plan years preceding the date of termination, made contributions under the plan.

**(b)** The corporation shall determine the liability with respect to each contributing sponsor and each member of its controlled group in a manner consistent with section 1362 of this title, except that the amount of liability determined under section 1362 (b)(1) of this title with respect to the entire plan shall be allocated to each controlled group by multiplying such amount by a fraction—

> **(1)** the numerator of which is the amount required to be contributed to the plan for the last 5 plan years ending prior to the termination date by persons in such controlled group as contributing sponsors, and

> **(2)** the denominator of which is the total amount required to be contributed to the plan for such last 5 plan years by all persons as contributing sponsors,

and section 1362 of this title shall be applied separately with respect to each controlled group. The corporation may also determine the liability of each such contributing sponsor and member of its controlled group on any other equitable basis prescribed by the corporation in regulations.

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

**EXHIBIT: M**

LII / Legal Information Institute

# U.S. Code collection

TITLE 29 > CHAPTER 18 > SUBCHAPTER I > Subtitle B > part 2 > § 1054

## § 1054. Benefit accrual requirements

### (a) Satisfaction of requirements by pension plans

Each pension plan shall satisfy the requirements of subsection (b)(3) of this section, and—

**(1)** in the case of a defined benefit plan, shall satisfy the requirements of subsection (b)(1) of this section; and

**(2)** in the case of a defined contribution plan, shall satisfy the requirements of subsection (b)(2) of this section.

### (b) Enumeration of plan requirements

**(1)**

**(A)** A defined benefit plan satisfies the requirements of this paragraph if the accrued benefit to which each participant is entitled upon his separation from the service is not less than—

**(i)** 3 percent of the normal retirement benefit to which he would be entitled at the normal retirement age if he commenced participation at the earliest possible entry age under the plan and served continuously until the earlier of age 65 or the normal retirement age specified under the plan, multiplied by

**(ii)** the number of years (not in excess of 331/3) of his participation in the plan.

In the case of a plan providing retirement benefits based on compensation during any period, the normal retirement benefit to which a participant would be entitled shall be determined as if he continued to earn annually the average rate of compensation which he earned during consecutive years of service, not in excess of 10, for which his compensation was the highest. For purposes of this subparagraph, social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after such current year.

**(B)** A defined benefit plan satisfies the requirements of this paragraph of a particular plan year if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 1331/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year. For purposes of this subparagraph—

**(i)** any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years;

**(ii)** any change in an accrual rate which does not apply to any individual who is or could be a participant in the current year shall be disregarded;

**EXHIBIT: N**

LII / Legal Information Institute

# U.S. Code collection

> > § 1828

## § 1828. Regulations governing insured depository institutions

(a) Insurance logo
(1) Insured depository institutions

### (A) In general

Each insured depository institution shall display at each place of business maintained by that institution a sign or signs relating to the insurance of the deposits of the institution, in accordance with regulations to be prescribed by the Corporation.

### (B) Statement to be included

Each sign required under subparagraph (A) shall include a statement that insured deposits are backed by the full faith and credit of the United States Government.

### (2) Regulations

The Corporation shall prescribe regulations to carry out this subsection, including regulations governing the substance of signs required by paragraph (1) and the manner of display or use of such signs.

### (3) Penalties

For each day that an insured depository institution continues to violate this subsection or any regulation issued under this subsection, it shall be subject to a penalty of not more than $100, which the Corporation may recover for its use.

## (b) Payment of dividends by defaulting depository institutions

No insured depository institution shall pay any dividends on its capital stock or interest on its capital notes or debentures (if such interest is required to be paid only out of net profits) or distribute any of its capital assets while it remains in default in the payment of any assessment due to the Corporation; and any director or officer of any insured depository institution who participates in the declaration or payment of any such dividend or interest or in any such distribution shall, upon conviction, be fined not more than $1,000 or imprisoned not more than one year, or both: Provided, That, if such default is due to a dispute between the insured depository institution and the Corporation over the amount of such assessment, this subsection shall not apply if the insured depository institution deposits security satisfactory to the Corporation for payment upon final determination of the issue.

## (c) Merger transactions; consent of banking agencies; emergency approval; notice; uniform standards; antitrust actions; review de novo; limitations; report to Congress; money laundering; applicability

(1) Except with the prior written approval of the responsible agency, which shall in every case referred to in this paragraph be the Corporation, no insured depository institution shall—

(A) merge or consolidate with any noninsured bank or institution;

EXHIBIT: O

LII / Legal Information Institute

# U.S. Code collection

> > § 1820

## § 1820. Administration of Corporation

### (a) Board of Directors; use of mails; cooperation with other Federal agencies

The Board of Directors shall administer the affairs of the Corporation fairly and impartially and without discrimination. The Board of Directors of the Corporation shall determine and prescribe the manner in which its obligations shall be incurred and its expenses allowed and paid. The Corporation shall be entitled to the free use of the United States mails in the same manner as the executive departments of the Government. The Corporation with the consent of any Federal Reserve bank or of any board, commission, independent establishment, or executive department of the Government, including any field service thereof, may avail itself of the use of information, services, and facilities thereof in carrying out the provisions of this chapter.

### (b) Examinations

#### (1) Appointment of examiners and claims agents

The Board of Directors shall appoint examiners and claims agents.

#### (2) Regular examinations

Any examiner appointed under paragraph (1) shall have power, on behalf of the Corporation, to examine—

**(A)** any insured State nonmember bank or insured State branch of any foreign bank;

**(B)** any depository institution which files an application with the Corporation to become an insured depository institution; and

**(C)** any insured depository institution in default,

whenever the Board of Directors determines an examination of any such depository institution is necessary.

#### (3) Special examination of any insured depository institution

In addition to the examinations authorized under paragraph (2), any examiner appointed under paragraph (1) shall have power, on behalf of the Corporation, to make any special examination of any insured depository institution whenever the Board of Directors determines a special examination of any such depository institution is necessary to determine the condition of such depository institution for insurance purposes.

#### (4) Examination of affiliates

##### (A) In general

In making any examination under paragraph (2) or (3), any examiner appointed under paragraph (1) shall have power, on behalf of the Corporation, to make such examinations of the affairs of any affiliate of any depository institution as

EXHIBIT: P

The New York Times

November 5, 1999

# CONGRESS PASSES WIDE-RANGING BILL EASING BANK LAWS

### By STEPHEN LABATON

Congress approved landmark legislation today that opens the door for a new era on Wall Street in which commercial banks, securities houses and insurers will find it easier and cheaper to enter one another's businesses.

The measure, considered by many the most important banking legislation in 66 years, was approved in the Senate by a vote of 90 to 8 and in the House tonight by 362 to 57. The bill will now be sent to the president, who is expected to sign it, aides said. It would become one of the most significant achievements this year by the White House and the Republicans leading the 106th Congress.

"Today Congress voted to update the rules that have governed financial services since the Great Depression and replace them with a system for the 21st century," Treasury Secretary Lawrence H. Summers said. "This historic legislation will better enable American companies to compete in the new economy."

The decision to repeal the Glass-Steagall Act of 1933 provoked dire warnings from a handful of dissenters that the deregulation of Wall Street would someday wreak havoc on the nation's financial system. The original idea behind Glass-Steagall was that separation between bankers and brokers would reduce the potential conflicts of interest that were thought to have contributed to the speculative stock frenzy before the Depression.

Today's action followed a rich Congressional debate about the history of finance in America in this century, the causes of the banking crisis of the 1930's, the globalization of banking and the future of the nation's economy.

Administration officials and many Republicans and Democrats said the measure would save consumers billions of dollars and was necessary to keep up with trends in both domestic and international banking. Some institutions, like Citigroup, already have banking, insurance and securities arms but could have been forced to divest their insurance underwriting under existing law. Many foreign banks already enjoy the ability to enter the securities and insurance industries.

"The world changes, and we have to change with it," said Senator Phil Gramm of Texas, who wrote the law that will bear his name along with the two other main Republican sponsors, Representative Jim Leach of Iowa and Representative Thomas J. Bliley Jr. of Virginia. "We have a new century coming, and we have an opportunity to dominate that century the same way we dominated this century. Glass-Steagall, in the midst of the Great Depression, came at a time when the thinking was that the government was the answer. In this era of economic prosperity, we have decided that freedom is the answer."

In the House debate, Mr. Leach said, "This is a historic day. The landscape for delivery of financial services will now surely shift."

But consumer groups and civil rights advocates criticized the legislation for being a sop to the nation's biggest financial institutions. They say that it fails to protect the privacy interests of consumers and community lending standards for the disadvantaged and that it will create more problems than it solves.

The opponents of the measure gloomily predicted that by unshackling banks and enabling them to move more freely into new kinds of financial activities, the new law could lead to an economic crisis down the road when the marketplace is no longer growing briskly.

"I think we will look back in 10 years' time and say we should not have done this but we did because we forgot the lessons of the past, and that that which is true in the 1930's is true in 2010," said Senator Byron L. Dorgan, Democrat of North Dakota. "I wasn't around during the 1930's or the debate over Glass-Steagall. But I was here in the early 1980's when it was decided to allow the expansion of savings and loans. We have now decided in the name of modernization to forget the lessons of the

**EXHIBIT: Q**

US CODE 0026-in CHAPTER 1—MONOPOLIES AND COMBINATIONS IN RESTR... Page 1 of 3
Case 08-13141-KJC Doc 3317-1 Filed 07/20/09 Entered 07/22/09 17:06:18 Exhibits

Pg 61 of 69

LII / Legal Information Institute

# U.S. Code collection

> CHAPTER 1

## CHAPTER 1—MONOPOLIES AND COMBINATIONS IN RESTRAINT OF TRADE

- . Trusts, etc., in restraint of trade illegal; penalty

- . Monopolizing trade a felony; penalty
- . Trusts in Territories or District of Columbia illegal; combination a felony
- . Jurisdiction of courts; duty of United States attorneys; procedure
- . Bringing in additional parties
- . Forfeiture of property in transit
- . Conduct involving trade or commerce with foreign nations
- . "Person" or "persons" defined
- . Trusts in restraint of import trade illegal; penalty
- . Jurisdiction of courts; duty of United States attorneys; procedure
- . Bringing in additional parties
- . Forfeiture of property in transit
- . Definitions; short title
- . Discrimination in price, services, or facilities
- . Discrimination in rebates, discounts, or advertising service charges; underselling in particular localities; penalties
- . Cooperative association; return of net earnings or surplus
- . Exemption of non-profit institutions from price discrimination provisions
- . Sale, etc., on agreement not to use goods of competitor
- . Suits by persons injured
- . Suits by United States; amount of recovery; prejudgment interest
- . Limitation of actions
- . Actions by State attorneys general
- . Measurement of damages
- . Distribution of damages

- . Actions by Attorney General
- . Definitions
- . Applicability of parens patriae actions
- . Judgments
- . Antitrust laws not applicable to labor organizations
- . Acquisition by one corporation of stock of another
- . Premerger notification and waiting period
- . Interlocking directorates and officers
- . Repealed.]
- . Repealed.]
- . Enforcement provisions
- . Actions and proceedings pending prior to June 19, 1936; additional and continuing violations
- . District in which to sue corporation
- . Suits by United States; subpoenas for witnesses
- . Liability of directors and agents of corporation
- . Restraining violations; procedure
- . Injunctive relief for private parties; exception; costs
- . Restrictions on the purchase of gasohol and synthetic motor fuel
- . Application of antitrust laws to professional major league baseball
- . Effect of partial invalidity
- . Transferred
- . Repealed.]
- . Appeals
- . Repealed.]
- . Repealed.]
- . Repealed.]
- . Definitions applicable to sections 34 to 36
- . Recovery of damages, etc., for antitrust violations from any local government, or official or employee thereof acting in an official capacity
- . Recovery of damages, etc., for antitrust violations on claim against person based on official action directed by local government, or official or employee thereof acting in an official capacity
- . Immunity from antitrust laws
- . Definitions
- . Confirmation of antitrust status of graduate medical resident matching programs

**EXHIBIT: R**



 PRINTTHIS

Powered by

# Traditional company pensions are going away fast

**By Sandra Block, USA TODAY**

Nine years ago, Devon Group, a small public relations and marketing group based in Middletown, N.J., began offering a traditional pension plan to its employees.

Business was booming, and the costs of offering the benefit "seemed very reasonable," says Jeanne Achille, Devon's chief executive officer. A pension plan also provided some valuable tax benefits for the firm, she says.

But after the economy deteriorated last year, "We realized that this was going to be too rich a benefit for us to continue," Achille says. "You're required to fund the plan every year, regardless of whether your profits are where you'd like them to be." Rather than continue funding the plan, Devon Group voluntarily terminated its pension and sent each employee a check for the amount accrued.

**SHAKY GUARANTEE:** Pension insurance agency is in the red

The number of companies offering traditional defined benefit pension plans was shrinking even before the recession, but the downturn has accelerated the decline. Since the beginning of the year, at least 20 companies have frozen their defined pension plans, exceeding the number of plan freezes for all of 2008. A recent survey by Watson Wyatt found that, for the first time, the majority of *Fortune* 100 companies are offering new salaried employees only one type of retirement plan: a 401(k) or similar "defined contribution" plan.

The rapid disappearance of traditional pensions comes at a time when many workers have seen their retirement savings eviscerated by the bear market. The average 401(k) balance plummeted 27% last year, according to Fidelity Investments. While younger workers have time to make up the difference, workers in their 50s and 60s will have a hard time recovering their losses before retirement.

"The market collapse has just proven how fundamentally flawed 401(k) plans are as a vehicle to provide retirement income," says Karen Friedman, policy director for the Pension Rights Center.

But increasingly, employees can't rely on traditional pensions, either. Reasons they're endangered:

•**Declining profits.** In late April, Lockheed Martin said its first-quarter earnings fell 8.7% because rising pension costs outweighed an increase in sales. The defense contractor plans to continue its pension plan for existing participants, a company spokesman said.

But some plan sponsors fear they'll have to close plants or take other drastic actions unless they lower their pension costs, says Lynn Dudley, senior vice president, policy, for the American Benefits Council, a trade group for companies that offer employee benefits. Freezing a plan, she says, "is better than laying people off."

•**New funding requirements.** Investment losses in 2008 shrank the assets of the nation's largest pension plans to 79% of projected liabilities, down from 109% at the end of 2007, according to Watson Wyatt. At the same time, pension plan sponsors are facing stricter funding requirements to strengthen the long-term health of pension plans.

Those requirements, combined with the investment losses, are forcing companies to shovel more money into their pension plans at a time when they can least afford it, says Dena Battle, director of tax policy for the National Association of Manufacturers.

"The cost of that is jobs, a reduction in capital expenditures, a reduction in benefits, and unfortunately, that includes plan

freezes," she says.

NAM and other groups representing plan sponsors are pressing lawmakers for temporary relief from the funding rules. So far, Congress hasn't acted. Some Democratic lawmakers and pension-rights advocates have proposed tying funding relief to a guarantee that a company won't freeze its pension for at least five years.

"If we do give employers more time to fund their plans, there should be something employers promise in return," Friedman says.

Battle says companies wouldn't accept such conditions because they would limit their ability to manage their businesses. In addition, she says, forcing companies to continue offering a pension would set a dangerous precedent, because this nation's employer-sponsored retirement system has always been voluntary.

Concerns that taxpayers could be on the hook for underfunded pension plans could also complicate efforts to ease the funding requirements.

On Wednesday, the Pension Benefit Guaranty Corp., which insures pensions for 44 million retirees, reported a $33.5 billion deficit for the first half of fiscal 2009, up from $11 billion in fiscal 2008. That shortfall, the largest in the agency's 35-year history, could increase dramatically if the agency is forced to take over pension obligations for General Motors and Chrysler. The PBGC says it has enough money to cover current liabilities.

•**Competitive pressures.** Even if Congress approves funding relief, some companies may go ahead and freeze their plans because their competitors aren't offering pensions, says Scott Jarboe, senior retirement consultant in for Mercer, a human resources consulting firm.

Health insurance giant Cigna, which announced this month that it will freeze its pension July 1, said in a statement its retirament package was "significantly higher" in value than plans provided by its competitors. "While the company continues to be financially stable, making this change will improve our competitive cost position," Cigna said.

•**Lack of interest.** When Devon Group adopted a traditional pension, the company thought it was offering a valuable benefit for its employees, chief executive Achille says. But she soon learned that young job candidates were more interested in a 401 (k) plan, because they assumed they would change jobs several times during their careers. The company plans to offer a 401 (k) plan later this year.

Company 401(k) plans offer "visibility and portability," says Alan Glickstein, senior retirement consultant at Watson Wyatt. "Everyone understands what an account is worth. With a traditional defined benefit plan, it's hard for employees to really understand their value."

However, huge losses in 401(k) plans — readily apparent to anyone who looks at an account statement — could change employees' attitudes toward traditional pensions, says Norman Stein, professor at the University of Alabama School of Law and a pension expert. In this environment, he says, "It shouldn't be a tough sell to get employees to say these are actually pretty valuable plans."

### Older workers hardest hit

When a company freezes its pension, employees get to keep the benefits they've already accrued, but they usually won't earn any more.

That makes pension freezes particularly hard on older employees, who have less time to make up the difference by saving more. In addition, traditional pensions "are worth a lot more at the end of your career than at the beginning of your career," Friedman says. "If the freeze comes in your 40s and 50s, you end up with a much smaller benefit."

John Gaz, 46, a flight simulator technician for Delta Air Lines, saw his pension frozen in 2005. While the company upped matching contributions to his 401(k) plan, Gaz says he'll never be able to contribute enough to make up for the loss of his benefits. Gaz plans to leave his job at Delta at age 52, the first year he'll be eligible to draw money from his pension. "I will walk away from the airline industry, because there's nothing to keep me here anymore," he says.

In the past, most pension freezes were accompanied by improvements to the company's 401(k) plan. But in these tight-fisted times, that's no longer the case. Retail chain Talbots froze its traditional pension this year and also suspended matching contributions to its 401(k) plan. Similarly, Boise Cascade froze its pension plan for salaried employees and suspended matching contributions during the first quarter.

While 401(k) plans are considered less costly than traditional pensions, they're not immune from cutbacks during tough times. Since the beginning of the year, more than 200 employers have reduced or suspended contributions to their 401(k) plans, according to the Pension Rights Center.

**Hybrid pensions could be coming**

The cutbacks in 401(k) matches and pension freezes reflect companies' struggles to survive during extraordinarily difficult economic times, Glickstein says. And with unemployment approaching 9%, he says, "People aren't going to be haggling over benefits if they can keep their job."

But Glickstein says he's not ready to write the obituary for pension plans.

When the economy recovers, he predicts, more companies will consider adopting a cash-balance pension plan, a hybrid pension that combines features of a 401(k) plan and a traditional pension. These plans can play a valuable role in encouraging older workers to retire, an important part of workforce management, Glickstein says.

Millions of workers are postponing retirement because they're afraid they can't afford to stop working.

"If people can't leave when they're ready to leave and you're ready to have them leave," Glickstein says, "that's an issue."

**Find this article at:**
http://www.usatoday.com/money/perfi/retirement/2009-05-21-traditional-pensions-dying_N.htm

Check the box to include the list of links referenced in the article.

Copyright 2008 USA TODAY, a division of Gannett Co. Inc.

**EXHIBIT: S**

**EXHIBIT: T**

The New General Motors Company Launches Today: Part 3

The New General Motors Company Launches Today: Part 2

The new General Motors Company began operations today with a new corporate structure, a stronger balance sheet, and a renewed commitment to make the customer the center of everything the new GM does.

"Today marks a new beginning for General Motors, one that will allow every employee, including me, to get back to the business of designing, building and selling great cars and trucks and serving the needs of our customers," said Fritz Henderson, president and CEO. "We are deeply appreciative for the support we have received during this historic transformation, and we will work hard to repay this trust by building a successful new General Motors."

Created from the old GM's strongest operations in an asset sale approved by the bankruptcy court on July 5, the new GM is built on:
• Four core brands in the U.S. and the largest, strongest dealer network in the country,
• A fresh lineup of Chevrolet, Cadillac, Buick and GMC cars, trucks and crossovers, each with leading-edge designs and technologies that matter to both consumers and the environment,
• A competitive cost structure, a cleaner balance sheet, and a stronger liquidity position that will enable GM to invest in new products, key technologies, and its future,
• A winning culture focused on customers and products.

"One thing we have learned from the last 100 days is that GM can move quickly and decisively," said Henderson. "Today, we take the intensity, decisiveness and speed of the past several months and transfer it from the triage of the bankruptcy process to the creation and operation of a new General Motors.

Committed to great cars and trucks

The new General Motors launches with a clear and simple vision – to design, build and sell the best vehicles in the world.

Despite the recent downturn, GM has maintained its cadence of strong new products. In the U.S., for example, the Chevy Camaro has surged past its rivals to lead its segment, while the new Chevy Equinox, Cadillac SRX, and Buick LaCrosse are earning strong initial reviews. Later this year, the Cadillac CTS Sport Wagon and GMC Terrain debut, followed next year by the Chevy Volt, Chevy Cruze and Cadillac CTS Coupe.

GM 363 Asset Sale Approved by U.S. Bankruptcy Court

GM selects plants for future small car assembly

What Quality Gap?

GM, Koenigsegg Group AB Reach Tentative Agreement on Saab

GM Opens Largest, Most Advanced Automotive Battery Lab In The U.S.

Fritz Henderson's Senate Testimony on Dealer Consolidation