**FOLEY & LARDNER LLP**

Ann Marie Uetz *(Admitted Pro Hac Vice)*
One Detroit Center
500 Woodward Avenue, Suite 2700
Detroit, MI 48226-3489
Telephone: (313) 234-7100
Facsimile: (313) 234-2800

Keith Owens *(Pro Hac Vice Admission Pending)*
555 South Flower Street
Suite 3500
Los Angeles, CA 90071-2300

*Attorneys for CalsonicKansei North America, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X
In re:                                                          :    Chapter 11
                                                                :
GENERAL MOTORS CORP., *et al.*,                                 :    Case No. 09-50026 (REG)
                                                                :
                                     Debtors                    :    Jointly Administered
                                                                :
----------------------------------------------------------------X

**SUPPLEMENTAL OBJECTION OF CALSONICKANSEI NORTH AMERICA, INC. TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND CURE AMOUNTS RELATED THERETO, AND RESERVATION OF RIGHTS**

CalsonicKansei North America, Inc. ("Supplier"), by its attorneys Foley & Lardner LLP, hereby submits this supplemental objection (the "Supplemental Objection") to the Debtors' assumption and assignment of certain executory contracts and the Debtors' proposed Cure Amounts related thereto. Supplier and counsel for the Debtors have had various discussions related to the proposed assumption of contracts by the Debtors. This Supplemental Objection is filed to clarify Supplier's position in light of those discussions.

DETR_1248731.1

## **PRELIMINARY STATEMENT**

1.  On or about June 15, 2009, Supplier received by mail that certain Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Real Property, and Unexpired Leases of Nonresidential Real Property and (II) Cure Amounts Related Thereto (the "Assumption and Assignment Notice"), dated June 5, 2009, in which the Debtors purport to designate certain agreements (the "Assumable Executory Contracts") between Supplier and the Debtors that may be assumed and assigned to Vehicle Acquisition Holdings LLC (the "Purchaser").

2.  As of this date, Supplier has not executed the essential supplier trade terms letter with GM. Therefore, Supplier has not consented to assumption of any contracts.

3.  The Debtors have listed 82 Assumable Executory Contracts related to Supplier. The Debtors previously confirmed to Supplier that all of the Debtors' production contracts with Supplier expired or were resourced to another supplier and no obligations remain outstanding by Supplier prior to the Petition Date.

4.  The Debtors have now confirmed to Supplier that they intend to assume only one contract, which is contract no. 21PB0003 (the "Contract")[1]. See Exhibit A. A copy of the contract header, line item detail and contract attachment which form the Contract is attached as Exhibit B.

5.  The Contract includes reference to six part numbers: P/N 22627868; 22625546; 22627869; 22627870; 21995325; and 21995324.

---

[1] This contract number has, in some cases, alternately been referred to as contract no. "21P80003."

2

6. Counsel for the Debtors has stated that the Debtors intend to assume only one of the six part numbers that are referenced in the Contract, which is p/n 22627868. This is a service part. However, the Debtors may not elect to assume only part of the Contract. The Debtors must assume all or none of the Contract.

7. A debtor-in-possession must either reject a contract in full or assume a contract in full. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) (holding that a party who assumes an executory contract must assume it in its entirety; it may not be assumed in part and rejected in part); *In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir. 1951). It is well settled that if a debtor receives benefits of contract, it must also adopt its burdens. *See Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 82 F.2d 36, 40 (3d Cir. 1989); *Covington v. Covington Land L.P.*, 71 F.3d 1221, 1226 (6th Cir. 1995) ("When a debtor assumes the lease or contract under § 365, it must assume both the benefits and the burdens of the contract. Neither the debtor nor the bankruptcy court may excise material obligations owing to the nondebtor contracting party").

8. The Debtors have indicated a Cure Amount of $3285.40.

9. The Cure Amount is not accurate and would not cure all defaults under the Contract.

10. Supplier is owed the sum of $155,261.69 related to p/n 22627868. In addition, Supplier is owed additional sums related to the remaining part numbers under the Contract:

22625546:   $1,589,640.46
21995325:   $111,836.92
21995324:   $59,055.97

3

DETR_1248731.1

11. The total amount owed to cure all defaults under the Contract is therefore $1,915,795.04.

12. Supplier's counsel continues to discuss this issue with the Debtors' bankruptcy counsel, and will continue to work toward resolution of this assumption issue. Supplier files this Supplemental Objection in order to: (i) clarify the progress made to date, in that now the Debtors and Supplier agree that the Debtors do not seek to assume all 82 Assumable Executory Contracts initially listed by the Debtors; and (ii) move forward toward resolution of the correct Cure Amount for assumption of the Contract.

## RELIEF REQUESTED

WHEREFORE, Supplier requests that the Court enter an order denying the Debtors' request to assume and assign any of Supplier's contracts, and grant such other and further relief as the Court deems just and proper, or in the alternative, enter an order granting assumption only as to contract no. 21PB0003 and together with a cure amount to be paid by the Debtors of $1,915,795.04.

Dated: July 23, 2009
New York, New York

FOLEY & LARDNER LLP

/s/ Ann Marie Uetz

Ann Marie Uetz *(Admitted Pro Hac Vice)*
500 Woodward Avenue, Suite 2700
Detroit, MI 48226-3489
Telephone: (313) 234-7100
Facsimile: (313) 234-2800

Keith Owens *(Pro Hac Vice Admission Pending)*
555 South Flower Street, Suite 3500
Los Angeles, CA 90071-2300

*Attorneys for CalsonicKansei North America, Inc.*

4

DETR_1248731.1

# EXHIBIT A

---

**From:** Adams, Daniel N. [mailto:DAdams@honigman.com]
**Sent:** Thursday, June 25, 2009 5:06 PM
**To:** Owens, Keith C.; ignacio.peralta@gm.com
**Cc:** Uetz, Ann Marie
**Subject:** RE: Calsonic - Follow up

This is the contract info for the contract that GM intends to assume and assign. 21PB0003 is the contract number.

| | | | | | |
|---|---|---|---|---|---|
| 690536768 | CALSONIC KANSEI CORP | 5716-00935977 | CALSONIC KANSEI CORP | assume | 21PB00( |

**Daniel N. Adams - Associate**
Honigman Miller Schwartz and Cohn LLP
660 Woodward Avenue
2290 First National Building
Detroit, MI 48226-3506
Office: (313) 465-7684
Fax: (313) 465-7685
dadams@honigman.com

# EXHIBIT B

09-50026-mg    Doc 3350    Filed 07/23/09    Entered 07/23/09 19:36:49    Main Document
Pg 7 of 18

Contract Header Page:     1 of 1

# CONTRACT HEADER



*Saturn*

SATURN

**SUPPLIER NAME AND ADDRESS INFORMATION:**

DUNS Number:     00000167791
KANTUS CORP
C/O UMC ELECTRONICS (DONGGUAN) CO L
YUQUAN ELECTRONICS INFO INDUSTRY
HUANGDONG VILLAGE FENGGANG TOWN
523690 DONGGUAN-CITY  GUANGONG
CHINA

Mailing Address Information:
YUQUAN ELECTRONICS INFO INDUSTRY
HUANGDONG VILLAGE FENGGANG TOWN
523690 DONGGUAN-CITY  GUANGONG
CHINA

| Contract Header Number: | 21PB0 |
|---|---|

This contract sets forth the exclusive terms and conditions under which seller shall sell and buyer shall purchase the goods or services described in the line item detail of this contract for the period(s) specified therein. Terms and conditions proposed by seller which are different from or in addition to the provisions of this contract are unacceptable to buyer, are expressly rejected by buyer, and shall not become a part of this contract. Any modification of this contract shall be made only in accordance with the provisions of paragraph 31 of the contract terms and conditions.

Contract Line Item Page:        1 of 6                          Issue Date: 11-Jan-2008
Standard Blanket Contract Number: 21PB0003
Amendment Number: 001                                           Part Number: 000000022627868



# LINE ITEM DETAIL
*Saturn*

This Line Item is effective from    29-Jul-2007    through    01-Sep-2010

**Part Description:**                                           INDICATOR ASM-I/P INFL RST MDL

**Amendment Reason:**                                           Supplier Capacity Change

**Manufacturing DUNS Number:**
00000167791

**Supplier Name and Manufacturing Address:**
KANTUS CORP
C/O UMC ELECTRONICS (DONGGUAN) CO L
YUQUAN ELECTRONICS INFO INDUSTRY
HUANGDONG VILLAGE FENGGANG TOWN
523690 DONGGUAN-CITY  GUANGONG
CHINA

**Buyer Name:**
Ge, Yvette
Buyer Code:                 828
Phone:                      21-28987520
Fax:                        21-28987053

**Sample Date:**                                                26-Sep-2007
**Drawing Number:**                                             000000025787428
**Hazardous Material Indicator:**                               N

**Line Item Notes:**
==========================================================================
Contract amended to change Duns #(s) as follows:

Header/Manufacturing Duns #: 000162529
Delivery Duns #: 131049041
Remit Duns #: 131049041
Schedule To Duns #: 131049041
Ship From Duns #: 131049041

Affected P/N(s): 22625546, 22627868.

Model Year: 2007
PPAP date: 8-Jun-07
Supplier Contact: Mark Joyce
Supplier Quote/Letter Dated: 7-Jun-07

| | | |
|---|---|---|
| Contract Line Item Page: | 2 of 6 | Issue Date: 11-Jan-2008 |
| Standard Blanket Contract Number: | 21PB0003 | |
| Amendment Number: 001 | | Part Number: 000000022627868 |

Contract Duration: LG+SPO

Notes: To facilitate manufacturing location change for CK Electronics to
UMC in Guangdong, China, update contracts for P/N: 22625546 & 22627868.
This is for BTAB item# 2360. Contract effective date is July 29, 2007.

Nelson Kumar for Yvette Ge
06/14/2007
==================================================================
The Run @ Rate was 14,750 in 24 hours. The production is based on a 5 day work per week.
Here are the part number breakdown:
22625546    11,166  pcs
22627868    2,139   pcs
22627869    782     pcs
22627870    59      pcs
21995325    354     pcs
21995324    251     pcs

Yvette Ge, Aug.7,2007
==================================================================
Description:
New Contracts will be issued for these part numbers with respective
contract effective dates:
21995325            - November 4,2007
22627870            - November 18,2007
22627869            - December 2,2007
21995324            - December 2, 2007
22625546 / 22627868 - July 29,2007

DUNS numbers for new contracts:
MFG & Header:  000167791
Delivery:      131049041
Remit :        131049041
Schedule :     131049041
Ship-From:     131049041

Affected P/N(s):
21995325
22627870
22627869
21995324
22625546
22627868

PPAP date: 9/26/2007
Supplier Contact: Mark Joyce
Supplier Quote/Letter Dated: 9/28/2007 which is referenced for pricing and technical
purposes only. Buyer's Terms and Conditions apply.
Contract Duration : LG+SPO

Anoop Balakrishnan for Yvette Ge
10/15/2007
==================================================================

Terms & Conditions:
Longterm Agreement Eff 10/03

| | |
|---|---|
| Contract Line Item Page: 3 of 6 | Issue Date: 11-Jan-2008 |
| Standard Blanket Contract Number: 21PB0003 | |
| Amendment Number: 001 | Part Number: 000000022627868 |

This Period effective from    01-Jan-2008    through    31-Jul-2008

**Freight Terms:** Collect
**Payment Terms:** (88) MNS-2, On average, payment shall be made on the second day of the second month following Buyers receipt date of goods or services.
**Delivery Terms:** Free on Board (FOB)
**Delivery DUNS:** 00131049041
**Ship From DUNS:** 00131049041
**Daily Capacity:** 2,900
**Hours Per Day:** 24
**Price Type:** Returnable

**Price Composition:**
The Total Price is composed of Base Price plus any Base Material costs, Price Component costs and any applicable taxes.

All Prices are expressed in    USD
**Base Price:**    2.737824

| | |
|---|---|
| Total Price: | 2.737824 |
| UOM: | EACH |

**Receiving Plants and Plant Percentage**
As scheduled    100%

**Terms & Conditions:**
Saturn Prototype (0091PROTO)
Saturn Purchase Order
C4
Saturn LBE
Saturn ROL3
Schedule
TTUC

This Period effective from    01-Aug-2008    through    31-Aug-2008

**Freight Terms:** Collect
**Payment Terms:** (88) MNS-2, On average, payment shall be made on the second day of the second month following Buyers receipt date of goods or services.

| | |
|---|---|
| Contract Line Item Page:  4 of 6 | Issue Date: 11-Jan-2008 |
| Standard Blanket Contract Number: 21PB0003 | |
| Amendment Number: 001 | Part Number: 000000022627868 |

| | |
|---|---|
| **Delivery Terms:** | Free on Board (FOB) |
| **Delivery DUNS:** | 00131049041 |
| **Ship From DUNS:** | 00131049041 |
| **Daily Capacity:** | 2,900 |
| **Hours Per Day:** | 24 |
| **Price Type:** | Returnable |

**Price Composition:**
The Total Price is composed of Base Price plus any Base Material costs, Price Component costs and any applicable taxes.

| | |
|---|---|
| All Prices are expressed in   USD | |
| **Base Price:** | 2.737824 |
| **Total Price:** | 2.737824 |
| **UOM:** | EACH |

**Receiving Plants and Plant Percentage**
As scheduled                                                                 100%

**Terms & Conditions:**
Saturn Prototype (0091PROTO)
Saturn Purchase Order
C4
Saturn LBE
Saturn ROL3
Schedule
TTUC

| This Period effective from | 01-Sep-2008 | through | 31-Aug-2009 |
|---|---|---|---|

| | |
|---|---|
| **Freight Terms:** | Collect |
| **Payment Terms:** | (88) MNS-2, On average, payment shall be made on the second day of the second month following Buyers receipt date of goods or services. |
| **Delivery Terms:** | Free on Board (FOB) |
| **Delivery DUNS:** | 00131049041 |
| **Ship From DUNS:** | 00131049041 |
| **Daily Capacity:** | 2,900 |
| **Hours Per Day:** | 24 |
| **Price Type:** | Returnable |

**Price Composition:**
The Total Price is composed of Base Price plus any Base Material costs, Price Component costs and any

| | | |
|---|---|---|
| Contract Line Item Page: 5 of 6 | | Issue Date: 11-Jan-2008 |
| Standard Blanket Contract Number: 21PB0003 | | |
| Amendment Number: 001 | | Part Number: 000000022627868 |

applicable taxes.

All Prices are expressed in    **USD**
Base Price:                                                                                      2.628311

| | |
|---|---|
| Total Price: | 2.628311 |
| UOM: | EACH |

**Receiving Plants and Plant Percentage**
As scheduled                                                          100%

**Terms & Conditions:**
Saturn Prototype (0091PROTO)
Saturn Purchase Order
C4
Saturn LBE
Saturn ROL3
Schedule
TTUC

| | | | | |
|---|---|---|---|---|
| This Period effective from | 01-Sep-2009 | through | 01-Sep-2010 | |

| | |
|---|---|
| **Freight Terms:** | Collect |
| **Payment Terms:** | (88) MNS-2, On average, payment shall be made on the second day of the second month following Buyers receipt date of goods or services. |
| **Delivery Terms:** | Free on Board (FOB) |
| **Delivery DUNS:** | 00131049041 |
| **Ship From DUNS:** | 00131049041 |
| **Daily Capacity:** | 2,900 |
| **Hours Per Day:** | 24 |
| **Price Type:** | Returnable |

**Price Composition:**
The Total Price is composed of Base Price plus any Base Material costs, Price Component costs and any applicable taxes.

All Prices are expressed in    **USD**
Base Price:                                                                                      2.549461

| | |
|---|---|
| Total Price: | 2.549461 |
| UOM: | EACH |

**Receiving Plants and Plant Percentage**

Contract Line Item Page:      6  of  6
**Standard Blanket Contract Number:** 21PB0003
**Amendment Number:** 001

As scheduled

**Terms & Conditions:**
Saturn Prototype (0091PROTO)
Saturn Purchase Order
C4
Saturn LBE
Saturn ROL3
Schedule
TTUC

Issue Date:  11-Jan-2008

**Part Number:** 000000022627868

100%

Contract Attachment Page:    1 of 4

# CONTRACT ATTACHMENT



*Saturn*

**Contract Header Number:**    21PB0

The attachments in this section apply to the standard terms and conditions associated with the GM legal business entity and the terms and conditions associated with the line item details for contract number.

**Contract Terms & Conditions:**                    **Detailed Description**
**Short Description**

Terms & Conditions Global 1

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws Employment/Business Practices).

1. ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2. SHIPPING AND BILLING:
Seller agrees: (a) to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination (b) to route shipments in accordance with Buyers instructions (c) to make no charge for handling, packaging, storage or transportation of goods, unless otherwise stated as an item on this contract (d) to provide with each shipment packing slips with Buyers contract and/or release number and date of shipment marked thereon (e) to properly mark each package with a label/tag according to Buyers Instructions (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyers Instructions. Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyers instructions and the carriers requirements. The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased. Seller further agrees: (a) to accept payment based upon Buyers Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer and (b) to accept payment by electronic funds transfer. The payment date is set forth in the Line Item Detail of this contract, or if not stated, shall be the date established by Buyers Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following. In the case of the Buyers North American facilities, Sellers shipment date of goods or date of services, and, for all of Buyers other locations, Buyers receipt date of the goods or date of services. Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3. DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyers schedules. Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyers delivery schedules. Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract. Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4. PREMIUM SHIPMENTS:
If Sellers acts or omissions result in Sellers failure to meet Buyers delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Sellers sole expense.

5. CHANGES:
Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes. Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct. Any changes to this contract shall be made in accordance with Paragraph 31.

6. SUPPLIER QUALITY AND DEVELOPMENT INSPECTION:

Contract Attachment Page:        2   of   4

Seller agrees to participate in Buyers supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000. In addition, Buyer shall have the right to enter Sellers facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract. Buyers inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

7. NONCONFORMING GOODS:
Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections. To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically be reduced unless Buyer otherwise notifies Seller. Seller will not replace quantities so reduced without a new contract or schedule from Buyer. Nonconforming goods will be held by Buyer in accordance with Sellers instructions at Sellers risk. Sellers failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyers option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller. Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyers right to assert any legal or equitable remedy, or relieve Sellers responsibility for latent defects.

8. FORCE MAJEURE:
Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter). During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract. In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Sellers labor contract(s). If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days. If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

9. WARRANTY:
Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect. In addition, Seller acknowledges that Seller knows of Buyers intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

10. INGREDIENTS DISCLOSURE SPECIAL WARNINGS AND INSTRUCTIONS:
If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct (a) a list of all ingredients in the goods (b) the amount of all ingredients and (c) information concerning any changes in or additions to such ingredients. Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

11. INSOLVENCY:
Buyer may immediately terminate this contract without liability to Seller in any of the following or any other comparable events: (a) insolvency of Seller (b) filing of a voluntary petition in bankruptcy by Seller (c) filing of any involuntary petition in bankruptcy against Seller (d) appointment of a receiver or trustee for Seller or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event. Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorneys or other professional fees.

12. TERMINATION FOR BREACH OR NONPERFORMANCE SALE OF ASSETS OR CHANGE IN CONTROL:
Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller: (a) repudiates or breaches any of the terms of this contract, including Seller's warranties (b) fails to perform services or deliver goods as specified by Buyer (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach. In addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock that effects a change in the control of Seller.

13. TERMINATION FOR CONVENIENCE:
In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller. Upon such termination, Buyer shall pay to Seller the following amounts without duplication: (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material. Buyer will make no payments for finished goods, services, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Sellers standard stock or that are readily marketable. Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods or services that would be produced or performed by Seller under delivery or release schedules outstanding at the date of termination. Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract. Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as

Contract Attachment Page:        3  of  4

Buyer shall request. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14. INTELLECTUAL PROPERTY:
Seller agrees: (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services. Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire' to the extent that the works do not qualify as 'works made for hire.' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15. TECHNICAL INFORMATION DISCLOSED TO BUYER:
Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

Terms & Conditions Global 2

16. INDEMNIFICATION:
If Seller performs any work on Buyer's premises or utilizes the property of Buyer, whether on or off Buyer's premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorneys and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Seller's performance of work or use of Buyer's property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17. INSURANCE:
Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyer's written request. The certificate will provide that Buyer will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Seller's furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18. SELLER'S PROPERTY:
Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ("Seller's Property") necessary for the production of the goods. The cost of changes to Seller's Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer. Seller shall insure Seller's Property with full fire and extended coverage insurance for its replacement value. Seller grants Buyer an irrevocable option to take possession of and title to Seller's Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has previously paid to Seller for the cost of such items, provided, however, that this option shall not apply if Seller's Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19. BUYER'S PROPERTY:
All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis (Buyer's Property). Seller shall bear the risk of loss of and damage to Buyer's Property. Buyer's Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract, shall be deemed to be personalty, shall be conspicuously marked by Seller as the property of Buyer, shall not be commingled with the property of Seller or with that of a third person, and shall not be moved from Seller's premises without Buyer's prior written approval. Buyer shall have the right to enter Seller's premises at all reasonable times to inspect such property and Seller's records with respect thereto. Upon the request of Buyer, Buyer's Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B. transport equipment at Seller's plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyer's Property for work performed on such property or otherwise.

20. SERVICE AND REPLACEMENT PARTS:
Seller will sell to Buyer goods necessary for it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that shall not, in the aggregate, exceed the price of the system or module less assembly costs. During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyer's past model service and replacement parts requirements. Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases. For the remainder of this period, the price(s) for goods shall be as agreed to by the parties. When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyer's service part sales activities.

21. REMEDIES:
The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity. Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

22. CUSTOMS EXPORT CONTROLS:
Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to

Contract Attachment Page:    4 of 4

Buyer. Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any. Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s). Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

**23. SETOFF/RECOUPMENT:**
In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries, and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

**24. NO ADVERTISING:**
Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials.

**25. COMPLIANCE WITH LAWS EMPLOYMENT/BUSINESS PRACTICES:**
Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract. At Buyer's request, Seller shall certify in writing its compliance with the foregoing. Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**26. NO IMPLIED WAIVER:**
The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

**27. NON-ASSIGNMENT:**
Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations under this contract without Buyer's prior written consent.

**28. RELATIONSHIP OF PARTIES:**
Seller and Buyer are independent contracting parties and nothing in this contract shall make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

**29. GOVERNING LAW JURISDICTION:**
This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law. Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

**30. SEVERABILITY:**
If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

**31. ENTIRE AGREEMENT:**
This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements. This contract may only be modified by a contract amendment issued by Buyer.