1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


GENERAL MOTORS CORPORATION, et al.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                U.S. Bankruptcy Court

                One Bowling Green

                New York, New York


                July 22, 2009

                9:45 AM




    B E F O R E:

    HON. ROBERT E. GERBER

    U.S. BANKRUPTCY JUDGE

2

1

2     HEARING re Motion to Reject Lease or Executory Contract

3

4     HEARING re Motion to Reject Lease, Unexpired Leases of

5     Nonresidential Real Property

6

7     HEARING re (Doc. 2647 & 2648) Amended Debtors' Second Omnibus

8     Motion Pursuant to 11 U.S.C. Section 365 to Reject Certain

9     Executory Contracts

10

11    HEARING re Debtors' Third Omnibus Motion Pursuant to 11 U.S.C.

12    Section 365 to Reject Certain Executory Contracts

13

14    HEARIG re Motion of Debtors for Entry of Order Pursuant to 11

15    U.S.C. Section 521 and Fed. R. Bankr. P. 1007(C) Further

16    Extending Time to File Schedules of Assets and Liabilities,

17    Schedules of Executory Contracts and Unexpired Leases, and

18    Statements of Financial Affairs

19

20

21

22

23

24    Transcribed By:  Clara Rubin

25

3

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Debtors, Motors Liquidation Company,

5         f/k/a General Motors

6        767 Fifth Avenue

7        New York, NY 10153

8

9    BY:   EVAN S. LEDERMAN, ESQ.

10        JOSEPH H. SMOLINSKY, ESQ.

11

12

13   HODGSON RUSS LLP

14       Attorneys for Stillwater Mining Company

15       The Lincoln Building

16       60 East 42nd Street

17       37th Floor

18       New York, NY 10165

19

20   BY:   DEBORAH J. PIAZZA, ESQ.

21

22

23

24

25

4

```
1

2    JENNER & BLOCK LLP

3         Special counsel for Debtors, Motors Liquidation Company,

4          f/k/a General Motors

5         919 Third Avenue

6         37th Floor

7         New York, NY 10022

8

9    BY:   DANIEL H. TEHRANI, ESQ.

10

11   KRAMER LEVIN NAFTALIS & FRANKEL

12         Attorneys for Official Creditors' Committee

13         1177 Avenue of the Americas

14         New York, NY 10036

15

16   BY:   GORDON Z. NOVOD, ESQ.

17         JENNIFER SHARRET, ESQ.

18

19   LANE POWELL PC

20         Attorneys for Stillwater Mining Company

21         1420 Fifth Avenue

22         Suite 4100

23         Seattle, WA 98101

24

25   BY:   MARY JO HESTON, ESQ.
```

5

1

2      DENNIS A. PRIETO, IN PRO PER (TELEPHONICALLY)

3          Interested Party

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

                    P R O C E E D I N G S

1

2          THE COURT:  Good morning.  Be seated, please.

3     Okay, GM.

4     (Pause)

5          THE COURT:  Let's see if we can make some room at the

6     counsel table for everybody who wants room at the counsel

7     table, please.

8          MR. LEDERMAN:  Good morning, Your Honor.  Evan

9     Lederman, Weil, Gotshal & Manges, for the debtors.

10         THE COURT:  Good morning, Mr. Lederman.

11         MR. LEDERMAN:  Good morning, Your Honor.  We have one

12    contested matter on today.

13         THE COURT:  Yes.

14         MR. LEDERMAN:  If Your Honor would like us to start

15    with that, or if you want to go through the uncontested

16    matters?

17         THE COURT:  No, normally what I would prefer,

18    Mr. Lederman, is you deal with the uncontested matters, freeing

19    me up to take the argument that's necessary or appropriate on

20    the contested one.

21         MR. LEDERMAN:  Go through the uncontested matters

22    first, Your Honor?

23         THE COURT:  Yes, sir.

24         MR. LEDERMAN:  Okay, sure.  The first uncontested

25    matter is our -- the debtors' motion to reject certain

7

1    unexpired leases of nonresidential real property; that was

2    filed by our co-counsel Jenner & Block.  I'll call up Daniel

3    Tehrani to address that motion.

4           THE COURT:  All right.

5           Mr. Tehrani is it?

6           MR. TEHRANI:  Good morning, Your Honor.  My name is

7    Daniel Tehrani, Jenner & Block, as special --

8           THE COURT:  You want to pull the microphone closer to

9    you?

10          MR. LEDERMAN:  Sure.

11          THE COURT:  And I think I heard your name but I wasn't

12    sure.  Tehrani was it?

13          MR. TEHRANI:  Yeah, Tehrani --

14          THE COURT:  Okay.

15          MR. TEHRANI:  -- from Jenner & Block, special counsel

16    to the debtors, Motors Liquidation Company, formally General

17    Motors, in support of two unopposed motions --

18          THE COURT:  Can I ask you to speak slower, louder and

19    into the microphone, please?

20          MR. TEHRANI:  I'm sorry.  In support of two unopposed

21    motions to reject certain executory contracts and unexpired

22    leases.  The motions are unopposed and draft orders have been

23    submitted to Your Honor's chambers.

24          THE COURT:  Okay, they're granted.

25          Mr. Lederman?

8

1          MR. LEDERMAN:  Your Honor, the next uncontested matter

2     is the fourth item on the agenda, the debtors' amended second

3     omnibus motion to reject certain executory contracts.  There

4     was one objection that was filed by Macquarie Equipment

5     Finance.  The debtors have been able to resolve that objection

6     and they filed a notice of withdrawal.  So that objection has

7     been resolved.

8          There are no other objections to this motion.  It is

9     seeking rejection of various contracts, including engineering

10    service contracts, human resources contracts and other related

11    purchase agreements that are not in the best interests of

12    debtors' estate to retain on an ongoing basis.

13         Seeing that there is no other objection, we ask Your

14    Honor to approve that motion.

15         THE COURT:  Yes, granted.

16         MR. LEDERMAN:  Thank you, Your Honor.  The next

17    uncontested matter is also a -- I'm sorry, the next uncontested

18    matter is the motion for the debtors to extend their time to

19    file schedules.  We are working with the U.S. Trustee's Office

20    to try and figure out the best format and way to present these

21    schedules following the 363 transaction, and when we decide on

22    a format we'll come back to Your Honor and present that.  So at

23    this time we have no further update besides to let you know

24    that we're trying to work out a good format with the United

25    States Trustee's Office.

9

1    THE COURT:  Okay.  That's fine.  How should we deal

2    with that as a matter of docketing and calendaring and so

3    forth, in your view, Mr. Lederman?

4    MR. LEDERMAN:  I think we would ask Your Honor to

5    approve the extension while we work out the format with the

6    U.S. Trustee's Office.

7    THE COURT:  Okay.  And you've got a proposed order to

8    do that?

9    MR. LEDERMAN:  We do, Your Honor.

10    THE COURT:  Okay.  Fair enough.

11    MR. LEDERMAN:  Thank you.  The third matter was an

12    adjourned matter; it's an adversary proceeding that will be

13    going forward, I believe, on September 30th at 10:30 a.m., Your

14    Honor.

15    THE COURT:  Okay.  So --

16    MR. LEDERMAN:  And that concludes the uncontested and

17    adjourned matters.

18    THE COURT:  All right, so now we're down to the third

19    omnibus rejection motion, and I assume on that you'll want me

20    to grant the unopposed ones and we'll hear argument on the one

21    that is opposed?

22    MR. LEDERMAN:  Yes, Your Honor.

23    THE COURT:  Stillwater Mining Company?

24    MR. LEDERMAN:  Yes, Your Honor.

25    THE COURT:  All right, it's granted for the non-

10

1    objectors.  And I'll hear appearances for those who are going

2    to appear on Stillwater Mining.

3         MR. NOVOD:  Good morning, Your Honor.  Gordon Novod of

4    the law firm of Kramer Levin Naftalis & Frankel.  I'm joined by

5    my colleague Jennifer Sharret on behalf of the creditors'

6    committee of Motors Liquidation Company.

7         THE COURT:  Okay, Mr. Novod.

8         MS. HESTON:  Good morning, Your Honor.  Mary Jo Heston

9    from the law firm of Lane Powell, appearing for Stillwater

10   Mining Company.

11        THE COURT:  Okay, Ms. Heston.

12        MS. PIAZZA:  Good morning, Your Honor.  Deborah

13   Piazza, Hodgson Russ, appearing for Stillwater Mining Company.

14        THE COURT:  All right, Ms. Piazza.

15        Mr. Lederman, are you going to argue Stillwater Mining

16   on behalf of the debtor?

17        MR. LEDERMAN:  I am, Your Honor.

18        THE COURT:  Okay.

19        MR. LEDERMAN:  Would you like to hear the debtors

20   first or the objector, Your Honor?

21        THE COURT:  I think on this one I'll hear the debtor

22   first.

23        MR. LEDERMAN:  Sure, Your Honor.  The debtors submit

24   that this contract, which we propose to reject, is an exercise

25   of the debtors' business judgment that is prototypical for 365

11

1    and exactly what Congress intended for a proper rejection to

2    maximize the benefit for the estate and the recovery for the

3    creditors.

4         What we have here is a metal supply contract for

5    rhodium and palladium that has a floor price on it that

6    requires the debtors to purchase palladium at 300 dollars per

7    ounce, 10,000 ounces per month.  It increases in 2010 to 20,000

8    ounces per month, again at 300 per ounce.

9         The current spot market on palladium, Your Honor, is

10   south of 250 dollars an ounce.  So the debtors right now, if

11   they're forced to continue to perform under this contract, will

12   be required to perform at a loss of approximately 500,000

13   dollars a month.

14        It is also important to note that following a 363

15   transaction the debtors no longer manufacture vehicles;

16   therefore, they have absolutely no use for this metal

17   whatsoever.  And what they'd have to do is be forced to go out

18   into the open market and resell this metal at a substantial

19   loss if they're forced to continue performance under the

20   contract.

21        General Motors, New General Motors, was not interested

22   in purchasing this contract because it had a floor price on it

23   and they would have also been having to perform under the

24   contract at a loss.  There were other supply contracts that

25   were assumed and assigned to New GM; they were contracts that

12

1   had metal pricing for palladium and rhodium based on spot

2   market prices.  So they're much more advantageous for New

3   General Motors.  Those are the ones that they decided to

4   continue forward with.

5          Contrary to what the objectors state in their papers,

6   it had absolutely nothing to do with the location of the

7   supplier; it had to do with the terms of the contract.  The

8   terms of those contracts were a spot market contract.  They

9   were much more advantageous.  Couple that with the fact, as

10  Your Honor is well aware, the New General Motors is going to be

11  a much more leaner, efficient manufacturer, they have a reduced

12  need for the metal supply.  So those two factors were decisive

13  in New General Motors not wanting to continue with the contract

14  of Stillwater.  Again, nothing to do with the location of the

15  manufacturers.

16         I also note that the objectors are majority owned by

17  one of the companies that they reference in their objection as

18  being one of the foreign suppliers that New General Motors is

19  continuing relationship with.

20         So those two factors, we think, under 365, one, that

21  it's an over-market contract in which the debtors would have to

22  continue to perform at a substantial loss for if Your Honor

23  forced continued performance, and second, that there's

24  absolutely no need for this metal in any case.  We think it's a

25  sound exercise of the business judgment of the debtor to seek

13

1    rejection of this contract.

2         I'd like to briefly address the objectors' points that

3    they raise in their motion:  The first I think we addressed was

4    that it's not a proper exercise of the debtors' business

5    judgment; the second is that the rejection would cause

6    disproportionate harm to Stillwater.  Again, as I stated, the

7    post-mitigation loss of the debtors having to continue this

8    contract would be, at a minimum, 500,000 dollars a month, and

9    that assumes that they can even sell this metal in the open

10   market.  If they're not able to sell this metal in the open

11   market, the loss could be three million dollars a month for the

12   debtors.  That is a substantial risk and a substantial harm

13   that would be caused to the debtors and their estates and would

14   certainly impact recovery for the unsecured creditors, whereas

15   in Stillwater's case we don't deny it's an important contract

16   for that company.  Unfortunately, that is the consequences of

17   having a contract with a company that goes through this

18   process.

19        As they stated in their papers, this contract

20   represents approximately ten percent of their revenue in 2008

21   and approximately eleven percent of their revenue year to date.

22   So while it's an important contract, it is not an

23   overwhelmingly substantial portion of their business.  Their

24   management has stated publicly that they will be able to

25   continue on just fine if this contract is rejected.

14

1          I think the other important issue that's raised in

2     their papers is the contract rejection date, when this

3     rejection will be effective.  The debtors propose the rejection

4     date should be July 9th.  We filed this motion on July 7th.

5     Stillwater received the notice of motion and the actual motion

6     papers via overnight mail on July 8th.  Also, there was

7     communications and negotiations of this contract that started

8     back in Q4 of 2008 and continued up through the debtors'

9     filing.

10          THE COURT:  Pause, please --

11          MR. LEDERMAN:  Sure.

12          THE COURT:  -- Mr. Lederman.

13          MR. LEDERMAN:  Sure.

14          THE COURT:  When I reviewed the papers, it appeared to

15    me that the principal issue was the appropriate rejection date.

16    Did Stillwater Mining ship after you told them that you were

17    about to reject, in other words, after the motion had actually

18    been filed?

19          MR. LEDERMAN:  Stillwater's counsel, I think, will be

20    able to address that, but I believe the answer is that they

21    attempted to ship on July 20th.  Certainly the motion was filed

22    well before then.  Also, the debtors reached out --

23          THE COURT:  Forgive me, Mr. Lederman.  You didn't

24    answer my question.

25          MR. LEDERMAN:  I believe Stillwater attempted to ship

15

1   on July 20th.  The debtors did not accept that shipment.

2         THE COURT:  All right, so you're not holding rhodium

3   and palladium that they had shipped after the motion was filed?

4         MR. LEDERMAN:  That's correct, not for the month of

5   July, Your Honor.

6         THE COURT:  Well --

7         MR. LEDERMAN:  There's --

8         THE COURT:  Well, at any time?  In other words, to

9   what extent, if any, do I have to figure out what is fair to

10  both sides in terms of paying them for stuff that was shipped

11  and accepted between the time the motion was filed and today?

12        MR. LEDERMAN:  There is nothing that's been accepted

13  by the debtors since the motion was filed, Your Honor.

14        THE COURT:  All right.  Continue, please.

15        MR. LEDERMAN:  So we contend since, again, the

16  proposed shipment date, as Stillwater put in their objection,

17  was July 20th, we wanted to make sure we got this motion on

18  file and got proper notice to Stillwater well before the

19  proposed ship date.  The debtors did that in two matters, Your

20  Honor.  First, it was communicated on July 1st to Stillwater

21  that the debtors were intending to reject that contract, they

22  should not ship metals for the month of July.  They explained

23  the rationale at that time that it was an over-market contract,

24  the debtors no longer need the supply because they don't

25  manufacture vehicles.

16

1          Secondly, we filed our motion and they received notice

2   well ahead of the --

3          THE COURT:  Pause, please --

4          MR. LEDERMAN:  Yes, Your Honor.

5          THE COURT:  -- Mr. Lederman.  In light of the answer

6   to the question you just gave me that there was no shipment

7   between the time that you first filed the motion and now, what

8   difference does the rejection date make?

9          MR. LEDERMAN:  Your Honor, I think Stillwater did

10  attempt to ship on July 20th.  The debtors did not accept that

11  shipment.  So that's why we wanted to make the rejection date

12  prior to this hearing.

13         THE COURT:  I see.  So your point is that if I didn't

14  make it retroactive, then arguably GM would have been obligated

15  to accept that shipment?

16         MR. LEDERMAN:  Arguably, Your Honor.  We again would

17  contend that this in no way provides any benefit to the estate.

18  So it would still be a pre-petition unsecured claim.  There

19  would not be an administrative expense that would accrue.  But

20  we wanted to prevent even having to go there and made sure to

21  provide ample advance notice to Stillwater not to ship on July

22  20th, and that's why we made the date July 9th.

23         THE COURT:  All right.  Continue, please.

24         MR. LEDERMAN:  I think those are the primary arguments

25  that the debtors would like to put forth regarding this issue.

17

1    And we think that it is, you know, a prototypical example of

2    365 for the debtors to reject this contract.  While the law and

3    365 itself is not clear on an effective rejection date, we

4    think there's ample support in the case law for Your Honor

5    making the rejection date retroactive to this hearing and to

6    the order.

7           We think that Bethlehem Steel, which we cite in our

8    papers, is a case that is directly on point here.  It was also

9    a supply contract; in that instance it was for gas.  The

10   debtors also were obligated to purchase the gas at a floor

11   price that was well above the current spot market price at that

12   time.  They were able to ascertain supply from another gas

13   supplier and they sought rejection of the gas supply a date

14   effective before the hearing.  They provided advance notice to

15   the gas supplier, just like the situation is here, and the

16   Court in that case allowed for the retroactive rejection.  We

17   would ask for the same relief.

18           THE COURT:  Okay.  Thank you.

19           MR. LEDERMAN:  Thank you, Your Honor.

20           THE COURT:  All right, do I properly assume that it

21   would be Ms. Heston?  Oh, forgive me, creditors' committee?

22           MR. NOVOD:  Yes.  Again, for the record, Your Honor,

23   Gordon Novod of the law firm of Kramer Levin Naftalis & Frankel

24   on behalf of the committee.  Rather than repeat all the

25   comments that the debtors made previously on the record, I just

18

1    want to reiterate for the Court that the creditors' committee

2    supports the debtors' judgment here and their election to

3    reject this contract.  There is no benefit for the old estate

4    that the assumption of this contract can have, as the old

5    estate is not in the business of manufacturing cars.  I'd also

6    note for Your Honor's benefit that obviously the accrual of

7    administrative expense costs with respect to the assumption of

8    this contract would diminish the wind-down budget, which

9    obviously, based on our prior record of this hearing and the

10   sale hearing which concluded on July 2nd, is of great matter

11   and significance to the creditors' committee.

12        That said, Old GM should not be in a position where it

13   has to bear the burden of this contract.  The debtors, in their

14   business judgment, have elected to reject this contract.  And

15   as you've heard from the debtors, they provided notice prior to

16   the attempted shipment date of this month.  And it's in the

17   best interest of the debtors and the unsecured creditors of Old

18   GM to reject this contract nunc pro tunc to the date on which

19   the motion was filed.

20        THE COURT:  All right.

21        MR. NOVOD:  Thank you.

22        Ms. Heston?

23        MS. HESTON:  Thank you.  For the record, Mary Jo

24   Heston appearing for Stillwater Mining Company, Your Honor.

25   One thing that I would like to say at the outset is, in

19

1    reviewing the papers that have been presented by this debtor,

2    there's not a single shred of evidence presented by this debtor

3    to support this decision.  There's not a single declaration --

4        THE COURT:  Do you mean as of the time the motion was

5    originally filed or even now after --

6        MS. HESTON:  Even now --

7        THE COURT:  -- their reply has been filed?

8        MS. HESTON:  -- there's not a single declaration.

9    There's not a single -- it's all ex cathedra statements by

10    counsel --

11        THE COURT:  Yes, but remember, we have a case

12    management order in this case that says that allegations and

13    motion papers are taken as true unless disputed.

14        MS. HESTON:  Well --

15        THE COURT:  Now, to what extent do you factually

16    dispute their contentions that this is a requirements contract,

17    that it has a floor of 300 bucks per ounce, that the contract

18    obligates payments -- excuse me, taking 10,000 ounces -- I'm

19    not sure if that's per month or per year -- in 2009, 20,000 in

20    2010, and the allegation that the business happened to wind up

21    with your affiliate rather than you?  Are those facts -- if I

22    gave you an evidentiary hearing on that, would you be able to

23    contest any of those facts?

24        MS. HESTON:  I would be able to contest several of

25    those facts, Your Honor.

20

1          THE COURT:  Be more specific.

2          MS. HESTON:  Okay.  First of all, all of the

3    statements concerning negotiations on this contract, all of the

4    negotiations on this contract, and there's in the record, in

5    the form of the contract that they put into the record, which

6    by the way had a confidentiality clause in it, there was

7    modifications of the contract, and all discussions related to

8    our contract prior to July 4th when we were first informed of

9    the decision to not assume and assign this contract, reduced --

10   were related to reduction of the quantity.  And there was never

11   a single discussion concerning the floor price.

12          So there are --

13          THE COURT:  Forgive me.  You're talking about

14   discussions to modify the existing contract.  To what extent,

15   Ms. Heston, do I have factual disputes concerning what the

16   contract provides?

17          MS. HESTON:  You have factual disputes concerning the

18   amount that is currently under the amendment for the contract;

19   it's 7,500.  And the parties had been in negotiations in terms

20   of a third amendment.  You have disputes in terms of what the

21   decision was and what the context of the decision was, because

22   in every contract on a commodity the parties seek to hedge.

23   And so the question in this case is why did they assume and

24   assign the other two contracts and not assume and assign our

25   particular contract?

21

1       THE COURT:  Forgive me.  That's a matter of confession

2   and avoidance.  And I will take your legal argument on those

3   matters after I ascertain the extent to which I need to give

4   you an evidentiary hearing on disputed facts --

5       MS. HESTON:  Okay.

6       THE COURT:  -- or whether on undisputed facts the

7   debtor has already established its entitlement to rely upon the

8   business judgment rule.

9       MS. HESTON:  There is --

10      THE COURT:  Is there a difference -- forgive me,

11  Ms. Heston.  Since you're having some delays, if not

12  difficulty, in answering my specific questions, I need to do

13  this just like it's a cross-examination.

14      MS. HESTON:  Sure.

15      THE COURT:  Do you disagree that the floor on this

16  contract is 300 dollars per ounce?

17      MS. HESTON:  No.

18      THE COURT:  All right.  Do you dispute the fact that

19  GM no longer makes vehicles?

20      MS. HESTON:  No.

21      THE COURT:  Do you dispute the fact that the price on

22  this is fixed as a floor as compared and contrasted to spot

23  pricing?

24      MS. HESTON:  No.

25      THE COURT:  Do you dispute the fact that one of the

22

1   two other companies that got the business for the palladium and

2   the rhodium is a corporate affiliate of yours?

3       MS. HESTON:  They are a majority owner but they are --

4   they have nothing to do with our management.  They are

5   precluded from all management decisions.  The fact that they

6   got that contract, we derive no benefit from that, Your Honor.

7   So the -- and the fact that it was -- that they happen to own

8   stock, it's a publicly traded company, Your Honor.  And they

9   have absolutely nothing to do with our mining operations which

10  are wholly U.S.-owned and U.S.-run with U.S. employees.

11      THE COURT:  If I gave you an evidentiary hearing, what

12  would you tell me about the contract that is being rejected

13  being different than what the debtor and the creditors'

14  committee say it provides?

15      MS. HESTON:  I would tell you that, first of all, this

16  concept that's set forth in the reply that there are going to

17  be all of these losses is insulting to the intelligence of

18  anybody that has an even basic rudimentary understanding of

19  commodity pricing.  Everyone -- we have a floor in our

20  contract, but if you look there is also a ceiling.  And so, for

21  example, in 2008 the pricing was extremely favorable under this

22  contract for the first nine months of 2008.  And as set forth

23  in our papers, the pricing on these metals is extremely

24  volatile.

25      So, you know, and we don't know what the other

23

1    contracts were, but everyone attempts to hedge, and in the

2    commodities market that that hedging sometimes works for you

3    and sometimes works against you.  So this whole concept that

4    we're going to project out, based on today's palladium price,

5    what the losses are, is ridiculous.

6        And I really -- I guess I apologize, but I am

7    offended.  We all throw around these concepts of business

8    judgment or adequate protection or all the words that we have

9    used in all of our careers, but those decisions have to be made

10   in -- I think in a business context.  And there's nothing in

11   this record in terms of -- and if you look -- I mean, I read

12   every word of your decision, Your Honor.  And, you know, if you

13   look at the context of this business judgment rule, I think you

14   have to look at it in the context of preserving U.S. jobs.

15       And the concept that Old GM and New GM, as set forth

16   in our papers and in the purchase and sale agreement -- this is

17   clearly a joint decision by these parties to assume and assign

18   these contracts.

19       THE COURT:  Well, I think that's a permissible

20   inference for me to draw, but wouldn't it be an equally

21   permissible inference for me to draw that, if Stillwater Mining

22   and its Russian sixty-one percent majority stockholder cared so

23   much about saving U.S. jobs, it would not have been impossible

24   for the sixty-one percent stockholder to say listen, for the

25   same price we'll fill the New GM needs with palladium and

24

1    rhodium extracted in the U.S. instead of bringing it in from

2    Russia?

3          MS. HESTON:  Your Honor, as indicated, the Russian

4    majority owner is not involved in any way in our management.

5    They do not -- the parties --

6          THE COURT:  Do you think your management could have

7    picked up the phone --

8          MS. HESTON:  No.

9          THE COURT:  -- and talked to the Russian parent if

10   they're not obligated to listen to orders from the Russian

11   parent?

12         MS. HESTON:  No.  They don't discuss and there's

13   nobody on our board from them.  They're precluded from being on

14   our board because of the Russian ownership.  And, candidly,

15   there was a discussion after the decision was made and they're

16   laughing at us all.  I mean, the thought that, you know -- do

17   you think for one second a Russian company -- if this was a

18   Russian-backed company that they would, you know, have assumed

19   the U.S. contract over the Russian contract, I mean, it's

20   absurd.

21         So the whole concept of --

22         THE COURT:  Did your company offer to give New GM

23   spot -- the same economic deal that the Russian company did?

24         MS. HESTON:  They never asked.  I talked to my

25   client -- first of all, you have to understand, Your Honor,

25

1    what was in the initial pleading was not what was in the reply,

2    which was received at 6 o'clock last night and I barely had a

3    chance to talk to my client.  But I talked to them about

4    several factual inaccuracies, including the ones that we have

5    discussed.  One of them is that this concept that there was all

6    of these discussions, Your Honor, is simply false.  What was

7    discussed was a reduction of the amount of palladium provided

8    to this debtor.  They never discussed with our client,

9    according to the parties that I talked to and my client last

10   night, they never discussed a floor price.  They never said --

11   and, in fact, as set forth in our declarations, when we

12   received the call for the first time on July 4th and talked to

13   this David -- I forget his last name, I apologize, it's in the

14   declaration -- but talked to the party that we had been dealing

15   with at GM, he was just obviously flabbergasted himself by the

16   decision.  He basically said I'm really sorry, the lawyers have

17   made this decision, it's not based on price.  That's what he

18   told our client.  And I recognize that's hearsay but that's

19   what we were told.

20        My client has told me that they were never asked --

21   they were never told that the flooring price was the problem

22   here.  And we have shown good faith in renegotiating this

23   contract, not once, not twice but there was a third amendment

24   to the contract that had been orally agreed to.  And, again, it

25   was not based on flooring price; it was based on the amount of

26

1    palladium to be provided to this debtor for the rest of the

2    year.  So until July 4th we were told that our contract was

3    going to be assumed and assigned as part of this process.

4         And I guess one last thing -- and so I guess I think

5    there is -- I think that, based on this record, there are

6    several factual disputes and that an evidentiary hearing should

7    be held with limited discovery rights.

8         THE COURT:  All right.  Thank you.

9         Reply?

10        Mr. Lederman.

11        MR. LEDERMAN:  Thank you, Your Honor.  At the outset,

12   the debtors would like to note that we had talked to

13   Stillwater's counsel and we had agreed that this would not be

14   an evidentiary hearing.  We explained and we thought the

15   uncontested facts were clear and if Your Honor wished for an

16   evidentiary hearing we could set that for a later date but that

17   we didn't think that that would be necessary.

18        THE COURT:  No, don't focus on what you said to them;

19   focus on what they said back to you.  They agreed that it was

20   not going to be an evidentiary hearing?

21        MR. LEDERMAN:  That's correct, Your Honor.

22        THE COURT:  And that today would not be an evidentiary

23   hearing or that there would not be an evidentiary hearing at

24   any point?

25        MR. LEDERMAN:  No, that today would not be an

27

1    evidentiary hearing.

2         THE COURT:  Yeah, but you're not focusing on the

3    distinction I'm making.  The question I'm asking is whether the

4    agreement you had with Stillwater Mining's counsel was that

5    merely that today would not be an evidentiary hearing or that

6    the entire controversy could be resolved without an evidentiary

7    hearing.

8         MR. LEDERMAN:  No, just merely that today would not be

9    an evidentiary hearing.

10        THE COURT:  You understand why that's not responsive,

11   then, to what I need to ascertain?

12        MR. LEDERMAN:  I understand, Your Honor.  I just

13   wanted to point that at the outset and I'll go into the

14   substantive arguments now.

15        As Your Honor's well aware, we think under 365 that

16   contract rejection is intended to be a summary hearing to

17   determine whether or not the debtors have made a sound business

18   judgment in seeking to reject the contract.

19        The undisputed facts here, as Your Honor elicited from

20   Stillwater's counsel, are clear.  There is a supply contract

21   for which the debtors have absolutely no use for the supply.

22   They no longer manufacture vehicles; therefore, at any price

23   they wouldn't need it.  However, more importantly, the contract

24   terms are clear.  It has a floor price of 300 dollars per

25   ounce, 10,000 ounces per month, which escalates to 20,000

28

1      ounces per month.  The debtors would be forced to go to those

2      markets --

3              THE COURT:  Pause please, Mr. Lederman.

4              MR. LEDERMAN:  Yes, Your Honor.

5              THE COURT:  Do you agree or disagree with Ms. Heston

6      when she says that you're wrong when you say it's 10,000, it

7      should only be 7,500?

8              MR. LEDERMAN:  We disagree, but even if it was 7,500

9      we don't think the outcome is any different.  So even if we

10     concede that it's 7,500, it's still 7,500 ounces at floor price

11     of 300 for metal that can't be used by the debtors and a spot

12     price that is 50 dollars above what the current market price

13     is.  So the post-mitigation loss of the debtors would still be

14     substantial, even at 7,500.  So even if we concede that, which

15     we don't think is correct, but we're fine to concede that we

16     don't think the outcome changes.

17             I also want to bring up the point that, again, the

18     debtors are cognizant and aware that this is an important

19     contract for Stillwater and that it could have an impact on

20     their business and indeed maybe even the local economy.  But we

21     think that Judge Gonzalez in Chrysler and the Pilgrims case

22     makes it pretty clear that that is not a determinative factor

23     that this Court should weigh in considering whether or not it's

24     a proper exercise of the debtors' business judgment to reject

25     the contract; it is the harm that it will cause the estate, the

29

1    harm that it will cause its creditors.

2            And we think here the undisputed facts are clear that

3    if the debtors are forced to continue to perform they would be

4    at a substantial loss; it would be a substantial drain on the

5    estate.  We think those are undisputed facts.

6            We think that having an evidentiary hearing would be a

7    cost that is unnecessary for the debtors.  It would be time-

8    consuming and expensive and a further drain on the estate.  And

9    we don't think, at all, it changes the outcome.  We think the

10   undisputed facts substantiate clearly that the debtors are

11   exercising their sound business judgment in seeking rejection

12   of this contract.

13           THE COURT:  Okay.

14           MR. LEDERMAN:  And we think, in fact, it would be a

15   breach of our fiduciary duties if we didn't seek to reject it.

16           THE COURT:  All right.

17           Mr. Novod, anything further?

18           MR. NOVOD:  Your Honor, Gordon Novod again, for the

19   record.  I just wanted to echo our support for the debtors

20   again.  This is not a contract which the debtors are going to

21   be using in their business.   No administrative expenses should

22   accrue in connection with this contract and we believe that the

23   contract should be rejected as the debtors have requested in

24   their papers.

25           THE COURT:  All right.

30

1          MR. NOVOD:   Thank you.

2          THE COURT:   Thank you.  All right.  We'll take a

3     recess.  I want everybody back by 10:30.

4          (Recess from 10:17 a.m. until 11:30 a.m.)

5          THE COURT:   I apologize for keeping you all waiting.

6     In this contested matter in the Chapter 11 cases of General

7     Motors Corporation, now known as Motors Liquidation Corporation

8     and its affiliates, the debtors move to reject a contract for

9     the purchase of rhodium and palladium with Stillwater Mining,

10    described more fully below.

11          After appropriate consideration, I've determined that

12    there are no material disputed issues of fact and that the

13    motion can and should be decided on the present record without

14    the need for a supplemental evidentiary hearing.  The motion is

15    granted.

16          The following are my findings of fact, conclusions of

17    law and bases for the exercise of my discretion in this regard.

18    As facts, I find that GM, referred to for clarity by many as

19    Old GM and now known as Motors Liquidation Corporation, entered

20    into a requirements contract dated August 8, 2007 with

21    Stillwater Mining for the purchase of palladium and rhodium

22    used in the manufacture of the catalytic converters that are in

23    modern motor vehicles.  The contract was twice amended on

24    December 9, 2008 and on March 5, 2009, respectively.  See Stark

25    (ph.) Declaration, paragraph 4.

31

1          Under the contract, Old GM was required to accept a

2     fixed amount of palladium at a floor price of 300 dollars per

3     ounce.  Old GM was obligated to buy 10,000 ounces per month of

4     palladium in 2009 and 20,000 ounces per month in 2010.  See old

5     contract section 4(a).  With that price and quantity, the

6     palladium would cost Old GM three million per month in 2009 and

7     six million per month in 2010.

8          Also, under the original contract Old GM was

9     originally obligated to accept 500 ounces of rhodium each month

10    starting in January 2008 and ending in December 2012.  See

11    contract section 4(b).  Though the quantities were later

12    changed in the first and second amendments to provide that for

13    the first quarter of calendar 2009, the rhodium quantity would

14    be reduced from 500 to 300 ounces per month and then to 200

15    ounces in April, zero ounces in May and June.  And under the

16    first and then second amendments, various mechanisms were

17    created for a kind of negotiation process to deal with rhodium

18    needs for periods thereafter.

19         There was some oral argument with respect to different

20    numbers.  My findings of fact are based on the numbers as I

21    read them from the underlying contractual documents, although I

22    will find, in the event of any appeal, that the differences

23    would not be material under any circumstances.

24         Palladium is a commodity, and the spot price for

25    palladium rises and falls with market conditions.  At-present

32

1  market conditions, the 300 dollars per ounce that GM would have

2  to pay for the palladium, assuming that Old GM wanted it or

3  needed it, would be substantially above market.  As of July 10,

4  the date of the closing of Old GM's recent Section 363

5  transaction, the spot price was approximately 235 dollars per

6  ounce.  The average daily price for palladium during 2009 has

7  been 197 dollars per ounce.  See Stillwater Mining's 10-K.

8       While I well understand that people enter into

9  contract at fixed prices to address the fact that commodity

10 prices go up and down, the undisputed fact is that the contract

11 price is substantially in excess of the sport market price.

12 Also, of course, though this is a hugely important point and

13 perhaps needed to be addressed first, Old GM no longer makes

14 cars and trucks; it does not need the palladium or the rhodium.

15 And under the contract, Old GM -- remember that's Motors

16 Liquidation Company -- is forced to expend three million

17 dollars per month for the remainder of 2009, and six million

18 dollars per month beginning in 2010 for palladium that it does

19 not need or use.  I further note, assuming arguendo that it

20 were relevant, that even New GM would not require increased

21 palladium now that what is surviving is downsized, even at the

22 fair market price, much less than the higher-than-market price

23 under this contract.

24      It's a fair inference to draw that Old GM and New GM

25 conferred when New GM decided which contracts New GM wished to

33

1   assume and that this contract wasn't one of them.  But

2   ultimately the decision as to whether to take an assumption of

3   this agreement, and thus to take the agreement itself, was New

4   GM's, not the decision of Motors Liquidation Company.  And when

5   this contract wasn't assumed by New GM, Motors Liquidation

6   Company, at the risk of stating the obvious, didn't need the

7   palladium itself.

8           There is no cure due on the contract.  See Stark

9   declaration, paragraph 8.  However, it appears that Stillwater

10   Mining attempted to deliver product on or about July 20 and its

11   delivery was refused.  Thus, I do not need to deal with what

12   would have happened if GM was holding palladium that had been

13   delivered under the contract in the period in between the time

14   of its motion to reject and the time of this hearing.

15           Though these facts ultimately are not relevant, I

16   find, for the sake of completeness, that Stillwater is a U.S.

17   manufacturer employing U.S. workers, that two other entities

18   will be supplying the product that Stillwater provided to New

19   GM, one of which is a Russian entity that is the sixty-one

20   percent majority stockholder of Stillwater Mining.

21           Given Motors Liquidation Company's right to relief

22   under these undisputed facts, I don't need to find additional

23   facts such as what may have been discussed between the parties

24   vis-a-vis a consensual resolution that might have obviated the

25   motion to reject or reasons anyone at Old GM might have given

34

1    for its decision to reject.

2         Now turning to my conclusions of law and bases for the

3    exercise of my discretion on this motion, I find, as

4    conclusions of law or mixed questions of fact and law, that

5    courts generally will not second-guess a debtor's business

6    judgment concerning the rejection of an executory contract.

7    See, for example, In re Riodizio 204 B.R. 417, 424 (Bankr.

8    S.D.N.Y. 1997) and In re Farmore 204 B.R. 948, 951-952 (Bankr.

9    N.D. Ohio, 1997) and that the reasons underlying the debtor's

10   business judgment here are both apparent and obvious in fact.

11        The purpose beyond allowing debtors to reject

12   executory contracts is to allow them to abandon burdensome

13   property.  See, for example, In re Orion Pictures, 4 F.3d 1095,

14   1098, a decision of the Second Circuit, and In re Old Car Co

15   LLC, that being the liquidation name for the former Chrysler

16   Corporation, 2009 B.R. LEXIS 1382, p. 5.  Here, Motors

17   Liquidation's business purpose is easy to understand, as

18   counsel for the creditors' committee, supporting the debtors'

19   motion, made clear:  Motors Liquidation no longer makes cars

20   and trucks; it doesn't need any product.

21        Moreover, the contract requires a purchase of

22   palladium and rhodium in minimum quantities that aren't needed.

23   And the price for the palladium is way over the spot price;

24   it's way over market.  Even if Motors Liquidation needed the

25   palladium and the rhodium, which it obviously doesn't, it's a

35

1    classic example of a contract that's burdensome to the estate.

2         Stillwater Mining notes that this contract provides

3    that it was about eleven to twelve percent of its revenue.  And

4    I assume that losing this business is indeed a hardship to

5    Stillwater Mining.  I understand that and I sympathize with it.

6    But this is, sadly, one of the many decisions that I've been

7    forced to make in this case and in others, and that I may well

8    have to make in the future in this case and in others, where I

9    have to deal with the unfortunate consequences of corporate

10   financial distress.  So that others do not suffer even more,

11   the Bankruptcy Code provides means for debtors to shed

12   burdensome obligations, of which this is a classic example.

13        For purposes of this motion, I must consider the

14   reasons underlying the debtors' business judgment.  And even if

15   I were to apply the more rigorous test of what's in the best

16   interests of the estate, I'd have to reach the same conclusion

17   as comments made by creditors' committee's counsel strongly

18   suggest.  Likewise, there's, unfortunately or fortunately but

19   simply as a matter of reality, no basis in the law, nor has

20   been any cited to me, for considering hardship to the

21   counterparty on a motion of this character where, for example,

22   Congress hasn't directed us to consider competing

23   considerations, as we're required to consider for collective

24   bargaining agreements, as noted by Judge Lynn in Pilgrim's

25   Pride Corp., 403 B.R. 413, 425 (Bankr. N.D. Texas, 2009), just

36

1    a short time ago:  While the impact of rejection on the

2    counterparty's community may be significant, that is not an

3    uncommon result of the cutbacks that typically accompany a

4    restructuring in Chapter 11.  Judge Lynn went on to say, in

5    Pilgrim's Pride, whether through contract rejections or plant

6    closings, contraction of a debtor's business will often have a

7    harmful effect for one or more local economies.

8         If the Bankruptcy Court must second-guess every choice

9    by a trustee or debtor-in-possession that may economically harm

10   any given locale, the business judgment rule applicable to

11   contract rejection and many other decisions in the Chapter 11

12   process will be swallowed by a public policy exception.

13        Also, of course, I note that Stillwater Mining will

14   still have the ability to file a proof of claim and presumably

15   to recover on a claim for its resulting rejection damages, a

16   claim for the loss of the profit it would have made under this

17   contract.

18        Turning then to the matter of the appropriate

19   rejection date, I start with the fact, as I and other courts

20   have held previously, that a bankruptcy court may make its

21   rejection order retroactive under appropriate circumstances,

22   or, putting it in the terms that we more commonly put it, to

23   make its determination nunc pro tunc to the time of the filing

24   of the motion.

25        I did so for a much longer period in the Adelphia

37

1    Business Solutions case, and my decision to make it retroactive

2    there for a period of several years was ultimately affirmed by

3    the circuit in Adelphia Business Solutions, Inc. v. Abnos, 482

4    F.3d 602.  There the circuit assumed, without deciding, that

5    the power exists, when it noted the decisions of many other

6    courts that had recognized this power.  See Pacific Shores

7    Development LLC vs. At Home Corp., In re At Home Corp.,

8    392 F.3d 1064, 1071, (9th Cir. 2004); Thinking Machines Corp.

9    vs. Mellon Financial Services Corp, In re Thinking Machines

10   Corp., 67 F.3d 1021, 1028 (1st Cir. 1995); and Constant Limited

11   Partnership vs. Jamesway Corp., In Re Jamesway Corp.,

12   179 B.R. 33, 39 (S.D.N.Y. 1995).

13        Here the duration of the requested nunc pro tunc

14   period is very modest, going back only about two weeks to the

15   filing of the motion after Old GM had long before given notice

16   of its intention to reject and where Old GM declined delivery

17   of the product and thus was not unjustly enriched by its

18   contract counterparty providing it with something for which

19   appropriate payment hadn't been made.

20        In fact, if I had permitted Stillwater Mining to force

21   Motors Liquidation Corp. to accept delivery of product that

22   Motors Liquidation Corp. didn't want or need, that would have

23   been an even more unjust result, especially if Motors

24   Liquidation had then had to dispose of that unneeded product at

25   a loss.  Making the effective date of the rejection nunc pro

38

1    tunc to the date of the filing of the motion under these facts

2    is the just thing to do.

3          Accordingly, the debtors are to settle an order in

4    accordance with this ruling stating no more than that for the

5    reasons set forth on the record.  The motion is granted.  The

6    time to appeal from this decision will run from the time of the

7    entry of the ultimate order and not from the date of this

8    dictated oral decision.

9          We have no further business.  We're adjourned for

10   today.  Thank you.

11        (Proceedings concluded at 11:47 AM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

39

1                              I N D E X

2

3                            R U L I N G S

4      DESCRIPTION                                  PAGE      LINE

5      Debtors' motion to reject lease or            7         24

6      executory contract granted

7      Debtors' motion to reject unexpired leases    7         24

8      of nonresidential real property granted

9      Debtors' amended second omnibus motion to     8         15

10     reject certain executory contracts granted

11     Debtors' third omnibus motion to reject       9         25

12     certain executory contracts as to

13     non-objecting parties granted

14     Debtors' third omnibus motion to reject      30         15

15     certain executory contracts as to

16     Stillwater Mining Company granted nunc pro

17     tunc to date of the filing of the motion

18

19

20

21

22

23

24

25

40

1

2                        C E R T I F I C A T I O N

3

4        I, Clara Rubin, certify that the foregoing transcript is a true

5        and accurate record of the proceedings.

6

7        _____

8        Clara Rubin

9        AAERT Certified Transcriber (CET**D-491)

10

11       Veritext LLC

12       200 Old Country Road

13       Suite 580

14       Mineola, NY 11501

15

16       Date:  July 23, 2009

17

18

19

20

21

22

23

24

25