Hearing Date: August 3, 2009 at 9:45 a.m. (Prevailing Eastern Time)
Objection Deadline: July 28, 2009

LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
David L. Neale (DN 1948)

Attorneys for Dealer, First United Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
                                        :
In re                                   :   Chapter 11 Case No.
                                        :
GENERAL MOTORS CORP., *et al*           :   09-50026 (REG)
                                        :
                    Debtors.            :   (Jointly Administered)
                                        :
                                        :
-----------------------------------------------------------x

**OPPOSITION OF FIRST UNITED INC. TO DEBTORS' MOTION PURSUANT TO 11
U.S.C. § 365 AUTHORIZING (A) THE REJECTION OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC DEALERS AND (B)
GRANTING CERTAIN RELATED RELIEF**

# TABLE OF CONTENTS

OVERVIEW ..................................................................................................................2

BACKGROUND .......................................................................................................... 2

    A.      Events Leading Up To GM's Requested Rejection Of The Agreement ...........2

    B.      Dealer's Performance Record And The Impact Of Rejection Of The
           Agreement ............................................................................................................4

ARGUMENT ................................................................................................................7

    A.      Given That Dealer Exceeds GM's Criteria For Assumption And
           Assignment Of Dealership Agreements, GM's Decision To Reject
           Dealer's Agreement Can Only Be Characterized As A Decision Made
           In Bad Faith, On a Whim, or Capriciously .......................................................7

    B.      Even If The Court Finds That GM Has Exercised Sound Business
           Judgment, GM's Attempt To Reject The Agreement Should Still Be
           Denied Because The Negative Impact Upon Dealer Is Grossly
           Disproportionate To Any Purported Benefit To The Debtors Or Creditors
           Of The Debtors' Estates ....................................................................................10

    C.      GM's Request For Preemption Should Be Denied Because It Is
           Overly Broad ......................................................................................................12

CONCLUSION ............................................................................................................13

i

## TABLE OF AUTHORITIES

Cases

*In re Balco Equities Ltd., Inc.*,
    323 B.R. 85 (Bankr. S.D.N.Y. 2005) .......... 7

*In re Chipwich, Inc.*,
    54 B.R. 427 (Bankr. S.D.N.Y. 1985) ..........10

*In re G Survivor Corp.*,
    171 B.R. 755 (Bankr. S.D.N.Y. 1994),
    *aff'd* by *John Forsyth Co., Inc. v. G Licensing Ltd.*,
    187 B.R. 111 (S.D.N.Y. 1995).......... 7

*In re Old Carco, LLC*,
    406 B.R. 180 (Bankr. S.D.N.Y. 2009) ..........9, 10, 12, 13

*In re Petur U.S.A. Instrument Co., Inc.*,
    35 B.R. 561 (Bankr. W.D.Wash. 1983) .......... 10, 11

*The Monarch Tool & Mfg. Co. v. Monarch Product Sales Corp. (In re Monarch)*,
    114 B.R. 134 (Bankr. S.D. Ohio 1990) ..........11

*In re Riodizio, Inc.*,
    204 B.R. 417 (Bankr. S.D.N.Y. 1997) .......... 7

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

1.  First United Inc. ("**Dealer**") hereby files this (the "**Opposition**") to the motion (the "**Motion**") filed by General Motors Corporation ("**GM**") and its affiliated debtors and debtors in possession in the above-captioned, jointly-administered bankruptcy cases (the "**Debtors**") to reject that certain 2005 GM Dealer Sales and Service Agreement, as amended or modified (the "**Agreement**") by and between Dealer and GM.

## OVERVIEW

2.  There exists no business justification for GM's decision to reject the Agreement. GM's purported "rationalization" of the Dealer Network, as it relates to Dealer, is in reality an ill-advised and unreasonable decision detrimental to the estate and creditors of the estate, which, based upon GM's own standards appears to be made not in the exercise of sound business judgment, but rather, capriciously, in bad faith or on a whim. Furthermore, where rejection will result in not merely a disappointment of legitimate expectations but the complete ruination of a business, rejection should not be allowed. Dealer, a top performer with a twenty nine year track record of success among all dealers in the country, has fulfilled its obligations to GM and exceeds the criteria GM has allegedly utilized in determining whether to assume or reject dealership agreements. Under these circumstances, Dealer respectfully requests that this Court deny GM's Motion as it pertains to Dealer, and compel GM to assume and subsequently assign the Agreement.

## BACKGROUND

### A.    Events Leading Up To GM's Requested Rejection Of The Agreement

3.  On or about June 1, 2009, GM commenced its bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Southern District

2

of New York. No trustee has been appointed, and GM continues to operate its business and manage its affairs as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4. On or about June 2, 2009, Dealer received from GM a letter dated June 1, 2009 (the "**Termination Letter**") advising Dealer, without any explanation whatsoever, that the "Cadillac Dealer Agreement between GM and your dealer company will not be continued by GM on a long term basis." A true and correct copy of the Termination Letter is attached as Exhibit "A" to the Affidavit of Roque De La Fuente (the "**De La Fuente Affidavit**") filed contemporaneously herewith. The Termination Letter also included a "Wind-Down Agreement," which provided, *inter alia*, that GM "has considered moving ... to reject the Dealer Agreement" unless Dealer executed the Wind-Down Agreement. The Wind-Down Agreement contained terms which were extremely economically harmful to Dealer and which Dealer believed to be highly unfair and improper: GM offered Dealer only $150,000 to compensate for the loss of the goodwill associated with a business that has existed for almost thirty years. Thus, Dealer was presented not with an opportunity for what GM has characterized as a "soft landing" but rather with a "Hobson's Choice" – either accept unfavorable wind down terms that provided little, if any, value to Dealer, or face termination of the Agreement which will destroy Dealer's business entirely.

5. On June 8, 2009, and again on June 12, 2009 and June 21, 2009, Dealer responded to the Termination Letter and made a Request for Review. Copies of this correspondence are attached as Exhibit "B" to the De La Fuente Affidavit.

6. During that time, Dealer continued to market Cadillac vehicles and requested that GM deliver additional vehicles for sale. Since the Agreement had not been terminated,

3

Dealer repeatedly requested clarification from GM as to whether warranty and service obligations would be honored by GM.

7. GM failed to respond to Dealer's inquiries for several weeks, while Dealer continued to operate its dealership in reliance upon and conformity with the Agreement. Only recently was Dealer advised by GM that, because Dealer has elected not to sign the Wind-Down Agreement, Dealer will no longer be supplied new vehicles, and warranty and service obligations will not be honored.

8. In the meantime, GM has sold substantially all of its assets to Vehicle Acquisition Holdings LLC (**"Purchaser"**). In connection with the sale of its assets to Purchaser, GM assumed and assigned certain dealership agreements but did not assume and assign Dealer's Agreement.

9. GM has assumed and assigned to Purchaser certain agreements with other dealers located in the same general geographic area as Dealer, despite Dealer's superior performance and long history of sales. Dealer is in the process of investigating whether GM's decision concerning the dealers whose dealerships are to be protected is a fair trade practice. Competition is being eliminated, and it is apparently GM's intent to take all of the customer lists and other information gleaned from almost thirty years of operation from Dealer to give to other dealer(s) in Dealer's region.[1] Dealer intends to take such steps as may be necessary to protect its rights and pursue its available claims.

**B.    Dealer's Performance Record And The Impact Of Rejection Of The Agreement**

10. For the last twenty nine years, Dealer has done business in San Diego County, California, under the name "De La Fuente Cadillac." Dealer's business has been owned and

---

[1] Dealer is concerned that the Mexican-American heritage of Dealer's owners could also be a factor in GM's decision.

4

operated by the Mexican-American De La Fuente family since its formation, and is the only exclusive Cadillac dealer in San Diego County. Dealer received GM's Master Dealer Award in 1987, 2000, 2002 and 2003, one of 100 awards given nationwide to the best performers among all dealers in the United States, and has also received the Platinum Performer Award (SFE Platinum Award) in 1997, 1998, 1999, 2000, 2007 and 2008, one of only eight-five dealers nationwide to receive this prestigious award, and one of only two dealers in the State of California to receive this honor, for achieving the highest level of customer satisfaction. There are four dealers that sell the Cadillac brand in San Diego County. Dealer has received more performance awards and accolades than the other three dealerships combined. Dealer has consistently outperformed its competitors and is now essentially being forced to hand over its business to them.

11.    There are nine Cadillac dealers in the United States that refused to sign Wind-Down Agreements offered by GM. Dealer is one of those dealerships, and one of only two stand-alone Cadillac dealers whose agreement is being rejected.

12.    The differences between Dealer and the other dealers whose agreements are being rejected are significant. Of the areas which are serviced by these dealers, San Diego Metro East County – the primary area serviced by Dealer -- has the largest customer base.[2] These customers will essentially be left with no choice but to switch brands. Unlike other dealerships being terminated by GM, Dealer has a proven track-record of success, with annual gross sales in excess of $20 million. In addition, Dealer's Retail Sales Index (**"RSI"**) rating,

---

[2] Dealer's immediate customer/population base within a range of six miles from Dealer – which includes the cities of El Cajon, La Mesa, Santee and Lemon Grove, California – is over 375,000.

5

which can be likened to a thermometer for the retail sales health of the business and customer satisfaction, which was historically high, has steadily increased on a yearly basis since 2005.

13. Applying GM's own criteria for evaluating dealer agreements shows:

- Dealer sells more than fifty Cadillacs per year, with an average of 309+ new Cadillac sales per year (from 2002 to 2008). In 2008, Dealer's RSI was over 51%, and in 2009 Dealer has already sold more than fifty new Cadillacs;

- Among other accolades, Dealer is one of two dealers in California to receive the SFE Platinum Performer Award for customer satisfaction (in 2007 and 2008);

- Dealer possesses more than three times GM's required working capital;

- Dealer has shown monthly profits for the majority of the last three years (from 2006-2008);

- Dealer does not sell discontinued GM brands;

- Dealer does not sell non-GM brands;

- Dealer has state of the art facilities.

14. Every factor that GM has allegedly considered as the basis justifying rejection of the Agreement is actually in Dealer's favor and evidences the absence of sound business judgment in connection with the proposed rejection of the Agreement.

15. The effect of rejecting the Agreement is devastating for Dealer in particular. Dealer, as an exclusive Cadillac dealer, will be put completely out of business if the Motion is granted. Dealer is wholly reliant on the existence of the Agreement to conduct business and, without GM's assumption and assignment of the Agreement, Dealer will cease to exist. Thus, whereas other dealers whose agreements are being rejected or who accepted Wind-Down

Agreements may be able to continue business because such dealers may sell other brands, such is not the case for Dealer.

16. Dealer now faces nothing less than economic catastrophe which appears to be a punitive response to Dealer's unwillingness to accept the minimal consideration offered in the Wind-Down Agreement. For the reasons stated herein, the Court should deny the Motion and instead enter an order compelling GM to assume and assign the Agreement to permit Dealer to assure its customers that it will be able to continue to serve their needs as Dealer has for the last almost thirty years.

## ARGUMENT

A. **Given That Dealer Exceeds GM's Criteria For Assumption And Assignment Of Dealership Agreements, GM's Decision To Reject Dealer's Agreement Can Only Be Characterized As A Decision Made In Bad Faith, On A Whim, Or Capriciously**

17. It is a debtor's burden to establish that the rejection of a contract will benefit a debtor's bankruptcy estate, as a court cannot simply "rubber stamp" a debtor's decision to reject a contract. *See In re Riodizio, Inc.*, 204 B.R. 417, 426 (Bankr. S.D.N.Y. 1997) (holding that the record was insufficient to determine whether the debtor should be permitted to reject a particular contract where, having only outlined some of the relevant benefits and burdens of the contract at issue, the debtor had failed to quantify the rights and obligations under the contract or provide an evidentiary basis to support the decision to reject). In order to obtain approval to reject an executory contract, a debtor is required to show that such rejection will benefit the debtor's estate. *In re Balco Equities Ltd., Inc.*, 323 B.R. 85, 99 (Bankr. S.D.N.Y. 2005) (citing *In re G Survivor Corp.*, 171 B.R. 755, 758 (Bankr. S.D.N.Y. 1994) *aff'd by John Forsyth Co., Inc. v. G Licensing Ltd.*, 187 B.R. 111 (S.D.N.Y. 1995)). Here, GM has failed to provide an

7

evidentiary basis for rejecting the Dealer's Agreement because the evidence as it pertains to Dealer flies directly in the face of GM's conclusions.

18. By GM's own standards, the Agreement should be assumed. In fact, every single factor noted by GM which GM purportedly utilized in determining to reject the Agreement actually supports assumption of Dealer's Agreement. GM states that it reviewed the following factors in assigning each dealer a Dealer Performance Score: dealership sales, customer satisfaction index, capitalization and profitability. Dealerships which obtained a Dealer Performance Score less than 70 would not be retained by GM. Based on Dealer's facts and figures in these categories, Dealer scored well above that threshold, with annual gross sales in excess of $20 million, numerous customer satisfaction accolades, and a proven track record of success.[3]

19. Additionally, dealerships which sold non-GM brands, discontinued GM brands, and sold less than fifty cars per year were apparently not retained by Purchaser. However, Dealer does not sell non-GM brands or discontinued GM brands. Dealer has sold an average of 309+ new Cadillacs per year for the six past years (from 2002-2008), and far greater than fifty cars each year. In calendar year 2009, Dealer has already sold in excess of fifty new Cadillacs. Nonetheless, GM seeks to treat Dealer as it is treating dealers who sell less than fifty cars per year.

---

[3] GM has not provided the Court or Dealer with its formula for Dealer Performance Score, nor has GM provided any information as to how GM weighed each factor of the Dealer Performance Score, thus there is no way of knowing whether GM's analysis is an exercise of business judgment or simply arbitrary.

8

20.     Dealer, who has worked with GM for approximately thirty years, also works from a state of the art facility (another factor GM purportedly considered).[4] The commitment to GM that Dealer has maintained throughout the course of this long-standing relationship cannot be discounted, but appears to have been overlooked by GM in its purported decision to reject the Agreement.

21.     Finally, GM asserts that dealerships unprofitable for three years in a row *with* inadequate working capital also were not retained. By GM's own admission, as of the commencement of GM's bankruptcy cases, "more than half of the Dealerships in the Dealership Network were unprofitable." (*See* Motion, para. 14, pg. 6.) Nevertheless, more than fifty percent of dealerships will be retained. Thus, simply because a dealership was not profitable did not mean that GM would reject the agreement with such a dealership. Regardless, Dealer possesses three times the required working capital and has shown monthly profits for the majority of the past three years (from 2006-2008). Thus, this factor also favors Dealer.

22.     Under these circumstances, where every single factor GM purports to have used in exercising its business judgment weighs in favor of assuming and assigning the Agreement, the only conclusion that one can draw is that GM's decision to reject Dealer's Agreement is a product of bad faith, whim, or caprice. *See In re Old Carco, LLC*, 406 B.R. 180, 190 (Bankr. S.D.N.Y. 2009).

///

///

---

[4] By way of example and not limitation, just last year, Dealer spent in excess of $600,000 in enhancing its facilities by making its new and used car departments contiguous, resulting in greater visibility, accessibility and marketability.

9

B.  **Even If The Court Finds That GM Has Exercised Sound Business Judgment, GM'S Attempt to Reject The Agreement Should Still Be Denied Because The Negative Impact Upon Dealer Is Grossly Disproportionate To Any Purported Benefit To The Debtors Or Creditors Of The Debtors' Estates**

23.    Where rejection would result in a nondebtor being forced out of business because the nondebtor's entire business was based upon the contract in question, a debtor's request to reject the contract should be denied. *See In re Chipwich, Inc.*, 54 B.R. 427, 431 (Bankr. S.D.N.Y. 1985) (explicitly considering whether party objecting to rejection of contract will be damaged disproportionately to any benefit to be derived by the debtor and the general creditors of the estate) (citing *In re Petur U.S.A. Instrument Co., Inc.*, 35 B.R. 561 (Bankr. W.D. Wash. 1983)).[5]

24.    Here, Dealer is in the business of selling exclusively Cadillac vehicles. Were the Agreement to be rejected, Dealer would no longer be able to conduct any business whatsoever. While Dealer concedes that the mere disappointment of legitimate expectations of a non-debtor party may not necessarily prevent a debtor from rejecting an executory contract, when rejection goes beyond merely disappointing expectations and instead results in the ruination of an otherwise ongoing business, rejection should not be authorized. *In re Petur U.S.A. Instrument Co., Inc.*, supra, at 563 (denying debtor's request to reject executory contract

---

[5] While the court in *In re Old Carco, LLC* respectfully disagreed with the analysis and distinguished the facts in *In re Petur*, the facts of this case, especially as they pertain to Dealer, render the analysis in *In re Petur* relevant in this case. Like the facts in *In re Petur*, the rejection of the executory contract at issue here would completely destroy the business of Dealer. Additionally, *In re Old Carco, LLC* did not consider or overrule *In re Chipwich, Inc.*, a Second Circuit bankruptcy court opinion that expressly considered the *In re Petur* analysis in determining whether rejection of a contract is appropriate. *In re Chipwich, Inc.*, 54 B.R. at 431 (permitting rejection since, unlike the facts in *In re Petur*, there was no showing that non-debtor would be damaged grossly disproportionately to any benefit to be derived by debtor and creditors of the estate).

because, notwithstanding fact that debtor exercised business judgment, such rejection would destroy non-debtor's business and be grossly disproportionate to any benefit derived by creditors); *See also The Monarch Tool & Mfg. Co. v. Monarch Product Sales Corp. (In re Monarch)*, 114 B.R. 134, 137 (Bankr. S.D. Ohio 1990) (disproportionate damage to the other party to the contract provides a ground for disapproving rejection).

25. In *In re Petur U.S.A. Instrument Co., Inc.*, a debtor which had continually shown significant losses and whose future profitability depended on the outcome of its chapter 11 case sought to reject an executory licensing agreement with a relatively successful and ongoing business enterprise. *In re Petur U.S.A. Instrument Co., Inc.*, supra, at 562. All of the non-debtor's business and income was based upon the agreement with the debtor. *Id.* The *In re Petur* court denied the debtor's request to reject that agreement, concluding that even though the debtor had utilized its business judgment, the fact that the non-debtor's ongoing business would be completely destroyed prohibited rejection of the contract on which the non-debtor's business was entirely based. *Id.* at 563. The bankruptcy court's conclusion was supported by several factors including the fact that there was no evidence that the debtor therein would be able to reorganize and continue its business and the evidence indicated that the non-debtor party to the contract was a successful and ongoing business. *Id.* at 564.

26. Here, Dealer is a successful, ongoing and longstanding business, whose operations and income are based solely upon its Agreement with GM, similar to the non-debtor's business and agreement with the debtor in *In re Petur*. The impact upon Dealer of GM's rejection of the Agreement would be devastating both to Dealer and the City of El Cajon. *See, e.g.*, Exhibit "C" to the De La Fuente Affidavit (letter from Mayor of the City of El Cajon to GM). The business that Dealer has established and preserved for almost thirty years stands

11

on the precipice of disaster. In the Motion, GM has not considered or addressed this particular scenario, where rejection would lead to the complete destruction of Dealer's business. GM has not discussed what benefit, if any, would result to general creditors of the estates by way of rejecting this particular Agreement and how that compares to the negative impact felt upon a dealer whose business would be completely destroyed. Where a business would be wholly destroyed, simply resting on the assertion that GM has exercised its business judgment should not be enough to warrant rejection of an executory contract.

27.     Dealer believes that its activities in San Diego County have been of benefit to GM over the years, and can be of benefit to a newly-restructured GM. In essence, Dealer is a valuable franchisee for an otherwise terribly run franchisor. If anything, the assumption and assignment of the Agreement to Purchaser would only serve to benefit creditors of the estates by eliminating Dealer's substantial contract rejection claim which Dealer would assert against the Debtors' estates. Under these circumstances, GM's Motion should be denied.

C.   **GM's Request For Preemption Should Be Denied Because It Is Overly Broad**

28.     By way of the Motion, GM seeks a determination from this Court that "any state and local statutes, rules and regulation of any kind or nature whatsoever, are preempted by the Bankruptcy Code to the extent that they purport to, or could be interpreted or applied to, interfere with, undermine **or impact** the full and complete rejection of the Affected Dealer Agreements[.]" (Emphasis added.) Read plainly, this request would foreclose a dealer from asserting any contract rejection damages against the Debtors' estates.

29.     While the court in *In re Old Carco, LLC*, supra, determined that the Bankruptcy Code preempted state dealer laws in that case, that court also specifically noted that "[o]f course, as with contract rejections in general, damages are still calculated according to state

12

law." *Id.* at 199. Here, GM is requesting that the Court determine that any and all state statutes that would have any "impact" on rejection be ignored. While the Motion does provide that, notwithstanding the Bankruptcy Code's purported preemption of State dealer laws, Dealer may pursue rejection damages "consistent with the claims resolution process that will be established by the Court[,]" Dealer is left to wonder exactly what process that is. Pursuant to the expansive relief requested by GM quoted above, GM appears to be requesting that damage calculations pursuant to state law should be preempted. This is wholly inappropriate and should be denied. *See In re Old Carco, LLC*, 406 B.R. at 199 (contract rejection damages are calculated pursuant to state law).

## CONCLUSION

30.  For these reasons, Dealer requests entry of an order denying GM's Motion and requiring GM to assume and assign Dealer's Agreement.

DATED: July 24, 2009               LEVENE, NEALE, BENDER, RANKIN
                                   & BRILL L.L.P.

                             By:   */s/ David L. Neale*
                                   DAVID L. NEALE (DN 1948)
                                   10250 Constellation Blvd., Suite 1700
                                   Los Angeles, CA 90067
                                   Telephone: (310) 229-1234
                                   Facsimile: (310) 229-1244
                                   dln@lnbrb.com

                                   Attorneys for Dealer, First United Inc.

13