**Hearing Date: August 3, 2009 at 9:45 a.m. (Prevailing Eastern Time)**
**Objection Deadline: July 28, 2009**

LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
David L. Neale (DN 1948)

Attorneys for Dealer, First United Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
|  | : |  |
| **GENERAL MOTORS CORP.,** *et al* | : | **09-50026 (REG)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |
|  | : |  |

-------------------------------------------------------------x

**AFFIDAVIT OF ROQUE DE LA FUENTE IN SUPPORT OF OPPOSITION OF FIRST**
**UNITED INC. TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. § 365**
**AUTHORIZING (A) THE REJECTION OF EXECUTORY CONTRACTS AND**
**UNEXPIRED LEASES WITH CERTAIN DOMESTIC DEALERS AND**
**(B) GRANTING CERTAIN RELATED RELIEF**

I, Roque De La Fuente II, hereby declare pursuant to section 1746 of Title 28 of the

United States Code as follows:

1.      I am the President of First United, Inc. ("Dealer") and also the "named" Dealer

in that certain 2005 GM Dealer Sales and Service Agreement, as amended or modified (the

"Agreement"). In my capacity as President and as Dealer, I have access to the books and

records of Dealer and am familiar with all aspects of Dealer's business operations. I have thirty

five years experience in the automotive sales industry and in particular, am familiar with GM's practices and procedures as they relate to Dealer as well as other dealers.

2.      I have personal knowledge of the facts set forth herein, and where applicable, I have obtained these facts from my review of records, business documents, correspondence and other relevant documents, all of which are maintained by Dealer in the ordinary course of its business. To the extent necessary, I have conducted a reasonable inquiry to determine that my statements herein are true and correct. If called upon to testify, I would testify to the facts set forth in this Affidavit.

3.      I am submitting this Affidavit in support of the "Opposition Of First United Inc. To Debtors' Motion Pursuant To 11 U.S.C. 365 Authorizing (A) The Rejection Of Executory Contracts And Unexpired Leases With Certain Domestic Dealers And (B) Granting Certain Related Relief" filed by Dealer.

4.      Dealer and GM are parties to the Agreement.

5.      It is my understanding that on or about June 1, 2009, GM commenced its bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Southern District of New York.

6.      On or about June 2, 2009, Dealer received from GM a letter dated June 1, 2009 (the "**Termination Letter**") advising Dealer, without any explanation whatsoever, that the "Cadillac Dealer Agreement between GM and your dealer company will not be continued by GM on a long term basis." A true and correct copy of the Termination Letter is attached hereto as Exhibit "A." The Termination Letter also attached a "Wind-Down Agreement," which provided that GM "has considered moving ... to reject the Dealer Agreement" unless Dealer executed the Wind-Down Agreement.

2

7.      On June 8, 2009, and again on June 12, 2009 and June 21, 2009, Dealer responded to the Termination Letter and made a Request for Review.   Copies of this correspondence are attached hereto as Exhibit "B."

8.      The Mayor of the City of El Cajon also wrote to GM on Dealer's behalf.  A true and correct copy of this letter is attached hereto as Exhibit "C."

9.      During that time, Dealer continued to market Cadillac vehicles and requested that GM deliver additional vehicles for sale.  Since the Agreement had not been terminated, Dealer repeatedly requested clarification from GM as to whether warranty and service obligations would be honored by GM.

10.      GM failed to respond to Dealer's inquiries for several weeks, while Dealer continued to operate its dealership in reliance upon and conformity with the Agreement.  Only recently was Dealer advised by GM that, because Dealer has elected not to sign the Wind-Down Agreement, Dealer will no longer be supplied new vehicles, and warranty and service obligations will not be honored.

11.      In the meantime, GM has sold substantially all of its assets to Vehicle Acquisition Holdings LLC (**"Purchaser"**).  In connection with the sale of its assets to Purchaser, GM assumed and assigned certain dealership agreements but did not assume and assign Dealer's Agreement.

12.      GM has assumed and assigned to Purchaser certain dealer agreements with other dealers located in the same general geographic area as Dealer, despite Dealer's superior performance and long history of sales. Dealer is in the process of investigating whether GM's decision concerning the dealers whose dealerships are to be protected is a fair trade practice. Competition is being eliminated, and it appears to me that it is GM's intent to take all of the

customer lists and other information gleaned from almost thirty years of operation from Dealer
to give to other dealer(s) in Dealer's region. No explanation has been offered for this practice,
and Dealer is concerned that the Mexican-American heritage of Dealer's owners could be a
factor in GM's decision. Dealer intends to take such steps as may be necessary to protect its
rights and pursue its available claims.

13.     For the last twenty nine years, Dealer has done business in San Diego County,
California, under the name "De La Fuente Cadillac." Dealer's business has been owned and
operated by the Mexican-American De La Fuente family since its formation, and is the only
exclusive Cadillac dealer in San Diego County.

14.     Dealer received GM's Master Dealer Award in 1987, 2000, 2002 and 2003, one
of 100 awards given nationwide to the best performers among all Cadillac dealers in the United
States, and has also received the Platinum Performer Award (SFE Platinum Award) in 1997,
1998, 1999, 2000, 2007 and 2008, one of only eight-five Cadillac dealers nationwide to receive
this yearly prestigious award, and one of only two dealers in the State of California to receive
this honor in both 2007 and 2008, for achieving the highest level of customer satisfaction.

15.     There are four dealers that sell the Cadillac brand in San Diego County. Dealer
has received more performance awards and accolades than the other three dealerships
combined. Dealer has consistently outperformed its competitors and is now essentially being
forced to hand over its business to them.

16.     There are nine Cadillac dealers in the United States that refused to sign Wind-
Down Agreements offered by GM. Dealer is one of those dealerships, and one of only two
stand-alone Cadillac dealers whose agreement is being rejected.

4

17.    The differences between Dealer and the other dealers whose agreements are being rejected are significant. Of the areas which are serviced by these dealers, San Diego Metro East County – the primary area serviced by Dealer – has the largest customer base. Dealer's immediate customer / population base, within a range of six miles from Dealer (which includes the cities of El Cajon, La Mesa, Santee and Lemon Grove, California) is over 375,000.

18.    Unlike other dealerships being terminated by GM, Dealer has a proven track-record of success, with annual gross sales in excess of $20 million. In addition, Dealer's Retail Sales Index rating, which can be likened to a thermometer for the health of a business and customer's satisfaction, which was historically high, has steadily increased on a yearly basis since 2005. In 2008, Dealer's Retail Sales Index was 151.59, exceeding GM's requirements by over 51 %.

19.    Dealer sells more than fifty cars per year, and in fact has sold an average of more than 300 new Cadillacs per year for the last six years (2002-2008). In calendar year 2009, Dealer has already sold more than fifty new Cadillacs.

20.    Dealer is one of two Cadillac dealers in California to receive the 2007, 2008 SFE Platinum Performer Award for customer satisfaction.

21.    Dealer possesses more than three times GM's required working capital. While GM's standard for Dealer is $556,000 working capital, Dealer has in excess of $1.8 million.

22.    Dealer has shown monthly profits for a majority of the last three years (from 2006 to 2008).

23.    Dealer does not sell non-GM brands or discontinued GM brands, and operates from state of the art facilities in a large metro market. By way of example and not limitation,

just last year, Dealer spent in excess of $600,000 in enhancing its facilities by making its new
and used car display contiguous, for greater visibility, accessibility and marketability, by
creating over one-ninth of a mile (600 feet) frontage on East Main Street in the city of El
Cajon, California.

24.    Based on Dealer's facts and figures in the categories GM has utilized to derive a
Dealer Performance Score, Dealer has scored well above the threshold "established" by GM.

25.    In other words, Dealer exceeds GM's own criteria for determining whether to
reject or accept a dealership agreement. Every factor that GM has allegedly considered as the
basis justifying rejection of the Agreement is actually in Dealer's favor and evidences the
absence of sound business judgment in connection with the proposed rejection of the
Agreement.

26.    Finally, the effect of rejecting the Agreement is devastating for Dealer in
particular. Dealer, as an exclusive Cadillac dealer, will be put completely out of business if the
Motion is granted. Dealer is wholly reliant on the existence of the Agreement to conduct
business and, without GM's assumption and assignment of the Agreement, Dealer will cease to
exist. Thus, whereas other dealers whose agreements are being rejected or who accepted Wind-
Down Agreements may be able to continue business because such dealers may sell other
brands, such is not the case for Dealer.

I declare under penalty of perjury under the laws of the United States of America that
the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 24th day of July, 2009.

Roque De La Fuente II

6

# EXHIBIT A



## General Motors Corporation

June 1, 2009

VIA Federal Express

First United Inc.
1385 E Main St
El Cajon, CA 92021

Attention: Roque De La Fuente II

This letter is to advise you that the Cadillac Dealer Agreement between GM and your dealer company will not be continued by GM on a long-term basis. This is a difficult step, but one that is part of GM's court supervised restructuring efforts. Subject to bankruptcy court approval, we are willing to assist you in winding down your Cadillac dealership operations to allow for the sale of new vehicle and other inventories in an orderly fashion. In order for us to provide you with this assistance, you must execute, and GM must receive, the enclosed agreement on or before **June 12, 2009**.

In summary and subject to bankruptcy court approval, the enclosed agreement, which you should carefully read, provides:

- For the termination of the Dealer Agreement no earlier than January 1, 2010 and no later than October 31, 2010
- For the assignment and assumption of the Dealer Agreement, as supplemented by the enclosed agreement, by a purchaser of certain assets of GM in the bankruptcy (the "363 Acquirer")
- For the payment of financial assistance in installments in connection with the orderly winding down of your Cadillac operations
- For the waiver of any other termination assistance of any kind
- For a release of claims against GM, the 363 Acquirer and their related parties
- For dealership operations to continue pursuant to the Dealer Agreement, as supplemented by the enclosed agreement, through the effective date of termination of the Dealer Agreement, except that you shall not be entitled to order any new vehicles from GM or the 363 Acquirer

Given that the enclosed agreement provides your dealership with the ability to wind-down the Cadillac dealership operations on an orderly basis, we recommend you carefully consider executing the agreement. We have enclosed a return Federal Express envelope, addressed to GM, for your convenience. Due to extremely short court deadlines in the bankruptcy process, we must receive the enclosed agreement on or before **June 12, 2009**. If we receive the executed agreement by that date, we will not move to reject your Dealer Agreement in the bankruptcy and plan to assign your Dealer Agreement (as supplemented by the enclosed agreement) to the 363 Acquirer as part of the court supervised restructuring of our dealer network. If we do not receive the enclosed agreement executed by you on or before **June 12, 2009**, GM will apply to the bankruptcy court to reject your Dealer Agreement. If we reject the Dealer Agreement, we cannot offer any wind-down or termination assistance in connection with such Dealer Agreement.

While these are challenging and unprecedented economic circumstances in the industry, we are pleased that we are able to offer you the enclosed agreement to allow you to wind down your Cadillac dealership business and to sell your Cadillac new Motor Vehicle inventory in an orderly fashion.

If you have any questions, please direct them to the Dealer Call Center at 877.868.8071.

Sincerely,

GENERAL MOTORS CORPORATION

### WIND-DOWN AGREEMENT

THIS WIND-DOWN AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between First United Inc. ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

### RECITALS

A.      Dealer and GM are the parties to Dealer Sales and Service Agreement (the "Dealer Agreement") for Cadillac motor vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreement.

B.      GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").      No trustee has been appointed and GM is operating its business as debtor-in-possession.

C.      GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.      GM has considered moving and may, at its option, move to reject the Dealer Agreement in the Bankruptcy Case, as permitted under the Bankruptcy Code, unless Dealer executes and delivers this Agreement to GM on or before June 12, 2009.

E.      In return for the payments set forth herein and GM's willingness not to pursue the immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this Agreement, (i) to allow Dealer, among other things, to wind down its Dealership Operations in an orderly fashion (specifically including the sale of all of Dealer's new Motor Vehicles), (ii) to provide for Dealer's voluntary termination of the Dealer Agreement, GM's payment of certain monetary consideration to Dealer, and Dealer's covenants regarding its continuing Dealership Operations under the Dealer Agreement, as supplemented by the terms of this Agreement (the "Subject Dealership Operations"), and (iii) to provide for Dealer's release of GM and its related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals) as follows:

1.      Assignment-363 Sale. Dealer acknowledges and agrees that GM has the right, but not the obligation, to seek to assign the Dealer Agreement and this Agreement in the Bankruptcy Case to the 363 Acquirer.  As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the Dealer Agreement and this Agreement to the 363 Acquirer.  If GM elects to exercise its option to assign the Dealer Agreement and this Agreement, Dealer specifically agrees to such assignment and agrees not to object to or protest any such assignment.

2. <u>Termination of Dealer Agreement.</u>  Subject to the terms of Section 1 above:

(a)  Dealer hereby covenants and agrees to conduct the Subject Dealership Operations until the effective date of termination of the Dealer Agreement, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreement, as supplemented by the terms of this Agreement. Accordingly, Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof, such termination to be effective on October 31, 2010. Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreement to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party. In addition, and notwithstanding the foregoing, if Dealer has sold of all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Dealer Agreement prior to January 1, 2010, Dealer may request GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b)  Concurrently with its termination of the Dealer Agreement, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealership Operations, and within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records. Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3. <u>Payment to Dealer.</u>

(a)  Subject to Sections 1 and 2 above, in consideration of (i) Dealer's execution and delivery to GM of this Agreement, (ii) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (iii) the termination of the Dealer Agreement by written agreement in accordance with Section 14.2 thereof (as set forth in Section 2 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of  $150,632 (the "<u>Wind-Down Payment Amount</u>"), subject to the terms herein. This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use the customer lists and service records.

(b)  GM shall pay twenty-five percent (25%) of the Wind-Down Payment Amount (the "<u>Initial Payment Amount</u>") to Dealer by crediting Dealer's open account maintained by GM on the GM Dealer Payment System (the "<u>Open Account</u>"), in accordance with GM's standard practices, within ten (10) business days following the later of (i) GM's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement. GM or the 363 Acquirer, as applicable, shall pay the balance of the Wind-Down Payment Amount (the "<u>Final Payment Amount</u>") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with its standard practices, within ten (10) business days after all of the following have occurred: (i) Dealer has sold all of its new Motor Vehicle inventory for the Existing Model Line prior to the termination of the Dealer Agreement, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time

periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of certificates of applicable taxing authorities that Dealer has paid all sales, use, and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreement in accordance with Section 2(a) above, (v) Dealer's compliance with the terms of Section 4(c) below, (vi) GM's or the 363 Acquirer's receipt of the fully executed Supplemental Wind-Down Agreement in substantially the form attached hereto as Exhibit A (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals. GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c) In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the Wind-Down Payment Amount may, in GM's or the 363 Acquirer's, as applicable, reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates (as defined below), and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealership Operations including, but not limited to, all or any part of the Wind-Down Payment Amount (each, a "Competing Claim"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Wind-Down Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4. Complete Waiver of All Termination Assistance Rights. In consideration of the agreements by GM hereunder, upon the termination of the Dealer Agreement, as provided in this Agreement, and cessation of the Subject Dealership Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreement or applicable laws, all of which rights Dealer hereby waives:

(a) Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever.

(b) Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c) Dealer shall eliminate or remove from the Dealership Premises all Dealer-owned signs (freestanding or not) for the Subject Dealership Operations within thirty (30) days following the effective date of termination at no cost to the either GM or the 363 Acquirer, as applicable. Dealer understands and agrees that neither GM nor the 363 Acquirer, as applicable, will purchase any Dealer-owned signs used in connection with the Subject Dealership Operations. Dealer hereby waives any rights it may have to require either GM or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Dealership Operations. Dealer shall provide, or shall cause the owner of the Dealership Premises to provide, GMDI access to the Dealership Premises in order for GMDI to remove all GM signs leased to Dealer by GMDI. Dealer understands and agrees that the Wind-Down Payment Amount was determined by GM in part based on Dealer's agreement that it will timely remove all signs for the Subject Dealership Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreement or any applicable statutes, regulations, or other laws.

6. Subject Dealership Operations. From the effective date of this Agreement until the effective date of termination of the Dealer Agreement (which shall not occur prior to January 1, 2010, subject to Section 2(a) above):

(a) Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives.

(b) Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement. Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("RIM") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

(c) Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable, (under Section 12.2 of the Dealer Agreement or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person; provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section 12.1 of the Dealer Agreement upon the death or incapacity of the Dealer Operator, except that the term of any new dealer agreement under Subsection 12.1.5 shall expire on October 31, 2010, subject to the terms of this Agreement. Accordingly, neither GM nor the 363 Acquirer, as applicable, shall have any obligation (under Section 12.2 of the Dealer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d) In addition to all other matters set forth herein, the following portions of the Dealer Agreement shall not apply; Sections 6.1 and 6.3.1 (concerning ordering of new Motor Vehicles), Article 8 (Training), Article 9 (Review of Dealer's Performance), Sections 12.2 and 12.3 (Changes in Management and Ownership), Article 15 (Termination Assistance), and Article 16 (Dispute Resolution).

(e) Except as expressly otherwise set forth herein, the terms of the Dealer Agreement, shall remain unmodified and in full force and effect.

7. No Protest.

(a) GM or the 363 Acquirer, as applicable, may desire to relocate or establish representation for the sale and service of the Existing Model Line in the vicinity of Dealer's Dealership Premises identified in the Dealer Agreement. In consideration of GM's and the 363 Acquirer's, as applicable, covenants and obligations herein, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or other tribunal or dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, any establishment or relocation whatsoever of a motor vehicle dealership for the Existing Model Line.

(d) Dealer expressly agrees that the provisions of Article 15 of the Dealer Agreement do not, by their terms, apply to this termination.

(e) Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in the Dealer Agreement or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement.

(f) The terms of this Section 4 shall survive the termination of this Agreement.

5.  Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates. GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination and cancellation, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination and cancellation, except that GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby

expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code,
which reads as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO
> EXIST IN HIS OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR
> HER MUST HAVE MATERIALLY AFFECTED HIS OR HER
> SETTLEMENT WITH THE DEBTOR."**

Dealer expressly assumes the risk that after the execution and delivery of this Agreement by
Dealer, Dealer may discover facts which are different from those facts which Dealer believed to
be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or
effectiveness of the release contained herein.

(c) As set forth above, GM reaffirms the indemnification provisions of Section 17.4 of
the Dealer Agreement and specifically agrees that such provisions apply to all new Motor
Vehicles sold by Dealer.

(d) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue,
protest, institute or assist in instituting any proceeding in any court or administrative proceeding,
or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a)
above or (ii) any claim that is based upon, related to, arising from, or otherwise connected with
the assignment of the Dealer Agreement or this Agreement by GM to the 363 Acquirer in the 363
Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable,
violates any applicable law or contravenes any agreement. As a result of the foregoing, any such
breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and
permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from
contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and
prohibiting any further act by Dealer in violation of this Section 7. In addition, GM or the 363
Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this
Section 7 by Dealer, including, without limitation, the right to specific performance.

(e) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against
any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages,
costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which
may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or
caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution
or delivery of or performance under this Agreement. "Affiliate" means, with respect to any
Person (as defined below), any Person that controls, is controlled by or is under common control
with such Person, together with its and their respective partners, venturers, directors, officers,
stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited
liability company, association, corporation or other entity. A Person shall be presumed to have
control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the
management or policies of another Person, whether through ownership of voting securities, by
contract, or otherwise.

(f) The terms of this Section 5 shall survive the termination of this Agreement.

(b) Dealer, for itself and for each and all of the other Dealer Parties, hereby releases and forever discharges the GM Parties, from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including, without limitation, attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of such Existing Model Line.

(c) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

Dealer expressly assumes the risk that after the execution and delivery of this Agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein..

(d) Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 7. Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 7. Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(e) Dealer acknowledges that, upon a breach of this Section 7 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer, as applicable, to the same position it would occupy in the absence of breach. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

8. Due Authority. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

9. <u>Confidentiality</u>. Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

10. <u>Informed and Voluntary Acts</u>. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

11. <u>Binding Effect</u>. This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that GM assigns the Dealer Agreement and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

12. <u>Effectiveness</u>. This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

13. <u>Continuing Jurisdiction</u>.     By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 13 shall survive the termination of this Agreement.

14. <u>Other Agreements</u>.

(a)  Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer, as applicable, and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer, as applicable.  In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

(b)  The term "<u>Channel Agreements</u>" shall mean any agreement (other than the Dealer Agreement) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "<u>Termination Agreement</u>"), (ii) any performance agreement of any kind between Dealer and GM (each a "<u>Performance Agreement</u>"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("<u>AHI</u>"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the

terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its
option, to move to reject any currently outstanding Termination Agreements or Performance
Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at
any time, sue, protest, institute or assist in instituting any proceeding in any court or
administrative proceeding, or otherwise assert any objection or protest of any kind with respect to
GM's rejection of such Termination Agreements or Performance Agreements.

     (c) All of the Channel Agreements shall automatically terminate and be of no further
force or effect on the effective date of termination of the Dealer Agreement, except that those
provisions that, by their terms, expressly survive termination of the Channel Agreements shall
survive the termination contemplated under this Agreement. Following the effective date of
termination of the Dealer Agreement, Dealer and GM shall execute and deliver documents in
recordable form reasonably satisfactory to GM or the 363 Acquirer, as applicable, confirming the
termination of any Channel Agreements affecting title to real property owned or leased by Dealer
or Dealer's Affiliates.

     15. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with,
the laws of the state of Michigan.

     16. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which when signed
by all of the parties hereto shall be deemed an original, but all of which when taken together shall
constitute one agreement.

     17. <u>Breach</u>. In the event of a breach of this Agreement by Dealer, GM and the 363 Acquirer shall
each have all of its remedies at law and in equity, including, without limitation, the right to specific
performance.

     18. <u>Complete Agreement of the Parties</u>. This Agreement, the Dealer Agreement, and the
schedules, exhibits, and attachments to such agreements (i) contain the entire understanding of the parties
relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations
and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in
entering into this Agreement, they have not relied upon any oral or written agreements, representations,
statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver,
modification, amendment or addition to this Agreement is effective unless evidenced by a written
instrument signed by an authorized representative of the parties, and each party acknowledges that no
individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties
expressly waive application of any law, statute, or judicial decision allowing oral modifications,
amendments, or additions to this Agreement notwithstanding this express provision requiring a writing
signed by the parties.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written.

First United Inc.

By: _____

Name:_____
Title:_____

**GENERAL MOTORS CORPORATION**

By _____

Authorized Representative

**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

## EXHIBIT A

## SAMPLE SUPPLEMENTAL WIND-DOWN AGREEMENT

THIS SUPPLEMENTAL WIND-DOWN AGREEMENT (this "Agreement") is made and entered into as of the _____ day of _____, 20__, by _____, a _____ ("Dealer"), for the use and benefit of _____, a _____ ("GM") and _____, a _____ corporation ("363 Acquirer").

### RECITALS

A.    Dealer and GM are parties to a Dealer Sales and Service Agreement for _____ motor vehicles (the "Dealer Agreement").

B.    Dealer and GM are parties to that certain Wind-Down Agreement dated June __, 2009 (the "Original Wind-Down Agreement"). All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Wind-Down Agreement.

C.    [IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [GM assigned all of its right, title and interest in the Dealer Agreement and the Original Wind-Down Agreement to the 363 Acquirer.]

D.    Pursuant to the Original Wind-Down Agreement, Dealer agreed to terminate and cancel the Dealer Agreement and all rights and continuing interests therein by written agreement and to release GM and its related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between [GM or the 363 Acquirer] and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

E.    Dealer executes this Agreement in accordance with Section 3 of the Original Wind-Down Agreement.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer hereby agrees as follows:

1.    Termination of Dealer Agreement.

(a) Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof.  The effective date of such termination shall be _____, 20__.

(b) Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer.

(c) Dealer shall be entitled to receive the Final Payment Amount in accordance with the terms of the Original Wind-Down Agreement.

2.  Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners,
venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives,
successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels,
discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts,
liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and
nature whatsoever (specifically including any claims which are pending in any court,
administrative agency or board or under the mediation process of the Dealer Agreement), whether
known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer
or anyone claiming through or under Dealer may have as of the date of the execution of this
Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members,
partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal
representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to
(i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation
of the dealership for the Existing Model Line, (iv) any facilities agreements, including without
limitation, any claims related to or arising out of dealership facilities, locations or requirements,
Standards for Excellence ("SFE") related payments or bonuses (except that the 363 Acquirer shall
pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and the 363 Acquirer shall
not collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or
thereafter), and any representations regarding motor vehicle sales or profits associated with
Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims,
discussions or circumstances of any kind arising in whole or in part prior to the effective date of
this Agreement, provided, however, that the foregoing release shall not extend to
(x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such
claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to
Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in
its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement,
all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM
of any amounts due or to become due to GM or any of its Affiliates. GM shall not charge back to
Dealer any Manufacturer warranty claims approved and paid by GM prior to the effective date of
termination and cancellation, as described in Section 1 above, after the later to occur of (A) the
date six (6) months following payment, or (B) the effective date of termination and cancellation,
except that GM may make charge-backs for false, fraudulent or unsubstantiated claims within two
(2) years of payment.

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release
extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind
whatsoever, known or unknown, suspected or unsuspected.  In this regard, Dealer hereby
expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code,
which reads as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO
EXIST IN HIS OR HER FAVOR AT THE TIME OF
EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR
HER MUST HAVE MATERIALLY AFFECTED HIS OR HER
SETTLEMENT WITH THE DEBTOR."**

Dealer expressly assumes the risk that after the execution and delivery of this Agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein.

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert [(i)] any Claim that is covered by the release provision in subparagraph (a) above **[IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or Original Wind-Down Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.]** Notwithstanding anything to the contrary, Dealer acknowledges and agrees that GM will suffer irreparable harm from the breach by any Dealer Party of this covenant not to sue and therefore agrees that GM shall be entitled to any equitable remedies available to them, including, without limitation, injunctive relief, upon the breach of such covenant not to sue by any Dealer Party.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3.  Due Authority. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4.  Confidentiality. Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5.  Informed and Voluntary Acts. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

6.  Binding Effect. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns. This Agreement shall be binding

upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or
assigns, and shall benefit any of GM's successors or assigns.

      7.  <u>Continuing Jurisdiction</u>. By executing this Agreement, Dealer hereby consents and agrees
that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and
adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The
terms of this Section 7 shall survive the termination of this Agreement.

      8.  <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with,
the laws of the state of Michigan.

      9.  <u>No Reliance</u>. The parties represent and agree that, in entering into this Agreement, they have
not relied upon any oral or written agreements, representations, statements, or promises, express or
implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to
this Agreement is effective unless evidenced by a written instrument signed by an authorized
representative of the parties, and each party acknowledges that no individual will be authorized to orally
waive, modify, amend or expand this Agreement. The parties hereto expressly waive application of any
law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement
notwithstanding this express provision requiring a writing signed by the parties.

***[Signature Page Follows]***

IN WITNESS WHEREOF, Dealer has executed this Agreement through its duly authorized officer as of the day and year first above written.

_____

By: _____

Name: _____

Title: _____

# EXHIBIT B

 *De La Fuente Cadillac*

June 8, 2009                                                        VIA EMAIL ONLY

General Motors
515 Marin Street
Thousand Oaks, CA 91360

Reference: BAC No: 119153
           De La Fuente Cadillac
           El Cajon, California

Gentlemen:

We have received a copy of the notice for the non renewal of our Franchise Agreement.
We have no intention of executing the *Wind-Down Agreement* and returning it to your office by
the imposed deadline. We believe that the path chosen by GM in severing ties with such a large
number of its dealers is both unprecedented, improper, and hardly in the best interest of General
Motors, itself. This letter is tendered to appeal your arbitrary decision to sever ties with our
company and shall serve as a Request for Review.

The potential damage to the image of GM caused by the cancellation of its dealership network is
irreversible, as long-standing retailers are forced out of business. Franchisees are not creditors,
whose claims bring about insolvency. On the contrary, they are assets of GM, whose future
viability depends on a dynamic dealer network to serve as its representatives and promoters in
the market place.

De La Fuente Cadillac has been serving San Diego's East County for almost 30 years, and a
member of the Better Business Bureau, where it has attained an "A+" rating, for almost 25 years.
For calendar year 2008, it merited a Retail Sales Index rating of 151.59. While it was not ranked
in the top 15% of Cadillac dealers in 2008, over the years, it has always been a consistent
performer. Last year it finished 30th out of the Western Region's 75 dealerships, selling in excess
of 50 percent more vehicles than the state average. In these twelve months, De La Fuente
Cadillac sold nearly twice as many mid size luxury sedans than the state average. In fact, our

Page 2
June 8, 2009
General Motors

operation exceeded the state average in every classification with the exception of Escalade ESV.
For the years 2003 through 2007 our RSI rating has been 131.20, 105.57, 101.23, 108.61, and
112.22, respectively. By your own criteria, our performance has never been evaluated as
anything less than satisfactory.

While total sales at our dealership declined in 2008 from that of the previous year, our ranking in
the Western Division surged from 47th position to 30th. De La Fuente Cadillac has retained a
satisfactory Retail Sales Index rating, year after year, always out performing the state's average
number of sales. We need not dwell on the financial health of the American automotive industry,
where in the first four months of 2009, 22 of the 25 Cadillac dealers in Southern California
experienced a decrease in sales over the same period from the previous year. What is sometimes
lost in an analysis of all the numbers is that De La Fuente has been a steady consistent performer
for GM. In a robust economy, certain dealerships prevail, but they are but a *flash in the pan* in a
tough market. In the first four months of 2009, De La Fuente experienced the smallest decline in
sales of the four San Diego Cadillac franchises, over the same period compared with 2008.
While the numbers are certainly not great, our drop in sales has been less than the average 50%
reported by like dealers in the Western Region. This is indicative of the fact that our operation
has been a dependable and steadfast vendor for Cadillac, year in and year out. Consistency is one
of the most valuable, but often overlooked, qualities in automotive dealerships.

But these are not just a mere agglomeration of figures. Let us share with you some additional
facts, of which you may not be aware. De La Fuente Cadillac has been recognized as a Platinum
Dealer in six of the last twelve years. In 2007, we were one of only two Cadillac dealerships in
the State to receive this special award and last year one of only three. Proclaimed a General
Motors Master Dealer in 2000, 2002, and 2003, we were the recipient of the President's Award
Trophy, a special honor bestowed only to an elite group of GM dealers who exemplify retail
sales and customer satisfaction excellence. In every year since, we have been in the top 10% tier
of Western Region dealers and in 2008 finished fifth out of 144 dealers. Our accomplishments
were acknowledged by then district general manager, Michael Jackson, and zone manager, Ron
McCants, reinforcing the fact that such accolades are a byproduct of hard work, commitment,
dedication, and teamwork.

Sales figures tell only a part of the story. Since January 1, 2007 to date, we have purchased over
$20 million in new vehicle inventory. In the last three years, De La Fuente Cadillac has
purchased over $1 million in parts from the factory and last year, alone, nearly three-quarters of a
million dollars from GM's Smart Auction. It is sometimes overlooked that dealerships, such as
De La Fuente Cadillac, serve as the face of Cadillac in the community, where service after a sale
is one of the most critical factors taken into account by automotive consumers. We are proud that
we have had no complaints filed against our company with the California Department of Motor
Vehicles. Our American flag, which flies high above the tree line in El Cajon, is a site noted by
thousands of commuters and travelers who daily drive through East County. Seldom does a day
pass where we don't find ourselves conversing with customers whose parents or grandparents
were proud owners of Cadillacs purchased at our dealership.

Page 3
June 8, 2009
General Motors

As a stand alone franchise, De La Fuente Cadillac is a great benefit to GM because, by not
offering any competing automaker inventories, it does not siphon off any potential sales for the
factory. We are the only Cadillac exclusive dealer in San Diego County. Multiple-brand
dealerships may be a model of success for the dealers themselves, but offer little in return to the
car manufacturers. Our market area is not just the City of El Cajon, but includes La Mesa,
Lemon Grove, Alpine, Santee, Lakeside, and a large portion of South Bay - a demographic area
in excess of million people. In addition, with the closure of the Cadillac franchise in Imperial
County, the potential service area of De La Fuente would extend to Calexico, Brawley, and El
Centro. The situation is compounded with the potential closure of Bob Baker Chevrolet in El
Cajon. The car buying population in this region will simply stop buying your product line. GM
is, in essence, abandoning a large geographic market for a short term gain.

The role of De La Fuente Cadillac extends beyond the dollars it returns to GM. Since receiving
our franchise, we have generated almost $1 million in sales tax for the City of El Cajon – money
that is used by local government to pay for services utilized by our customer base. Since 2001,
alone, our operation has generated nearly $1 million in payroll taxes and over half a million
dollars in employer paid Social Security taxes. Again, these are not just meaningless numbers,
but represent employees and customers, past, present, and future. No business can succeed if the
community it serves is not well positioned for future growth and success, and, at De la Fuente
Cadillac, we take seriously our responsibility to support the community we serve.

Eliminating dealerships will not solve GM's problems. The severing of our long term
relationship benefits no one – neither Cadillac nor the taxpayers who have provided TARP
funds, and certainly not the community and our loyal customers. Even if the official position of
GM is that there are too many Cadillac dealers in San Diego County, it makes no difference to
GM's bottom line. Dealerships are not a cost burden. Granted, some stores will not survive the
current economic environment, but that has no effect either. We take exception to the claim that
excess dealerships are somehow to blame for failing to deliver a retail experience that could help
woo customers back to Detroit's domestic cars and trucks.

In conclusion, this calamitous decision to consolidate dealerships is sending the wrong message
to potential purchasers of the GM line of vehicles. That's all your need to remember is that when
Marvin K Brown purchased the Guy Hill dealership, there was not an incremental sales increase
of vehicles. We believe that by closing our operation will drive business to both Lexus and
BMW - East County representative of luxury cars. Accordingly, we respectfully request your
office reconsider its decision to terminate its franchise agreement with De la Fuente Cadillac.


Sincerely

Roque De La Fuente II
President



June 12, 2009

Mr. Mark LaNeve
General Motors
100 Renaissance Center
Detroit, MI 48243

Dear Mark,

The automotive industry is experiencing the most difficult economic times in its entire
history. So far, I have stayed on the sidelines, viewing the turmoil which has unfolded
before me, eying it with a third party perspective. Now, however, as present events
unfold, I realize I must become actively involved in the controversy.

## By the numbers --

# "29" years as a Cadillac dealer.
Only exclusive Cadillac dealer in San Diego County.

# Master Dealer Award

# 1987,    2000,    2002,    2003,

We are all aware that the Master Dealer Award formulas are meant to reward the dealers
which sell a **1000 ++** vehicles. And I must compete for three awards in a huge field,
getting four Master Dealer Awards and coming in fifth in 2008 is quite an
accomplishment.

In 1987 our planning potential was 300 Cadillacs
We sold 518 new Cadillacs, exceeding our PP by 173%

1

We sold new Cadillacs.

| Year - | Sales | RSI |
| --- | --- | --- |
| 2002 – | 326 | |
| 2003 - | 340 | 131.20 |
| 2004 - | 372 | 105.57 |
| 2005 - | 331 | 101.23 |
| 2006 - | 298 | 108.61 |
| 2007 - | 268 | 112.22 |
| 2008 - | 191 | 151.59 |

Customer  Satisfaction  Award

1995,

SFE  Platinum  Performer  Award

1997,   1998, 1999,  2000,  2007,  2008,

Better Business Bureau
29 Years with an A+ Rating,

2

## Personal
## Roque De La Fuente II

### Sales
My team and I have sold over of 30,000 vehicles in the San Diego market since 1968.

**First Mega-Dealer in the USA.**

28 different automobile manufacturers by 1982.

Today only **one**      **– Cadillac –**

**In 1982,** I was chosen by my fellow dealers as

**Chairman of the National Dealer Council**

for the then 3rd largest auto manufacturer in the world. Youngest person ever elected to this office.

**In 1988, Chairman of the Mexican-American Foundation.**

**Then President Reagan  Proclaimed  I was a role model for all Californians to follow.**

**In 1992, I was elected to the Democratic National Convention as a Delegate-At-Large.**

One of 5 in the State. (Super - Super - Delegate.) To lead the California delegation.

**Hispanic Business Magazine**

One of the 100 most influential Hispanics in the country.

3

# Our Market

## RSI (Retail Sales Index)

For the years 2003 thru 2008 RSI Rating has been
131.20, 105.57, 101.23, 108.61, 112.22, & 151.59 respectively

We are currently one of 4 Cadillac dealers in San Diego County,
only dealer which is exclusively Cadillac.
Our current market is :

| We currently serve : | As of | Population |
|---|---|---|
| County of San Diego/ including Tijuana | 2008 | 5,009,170 |
| County of San Diego | 2008 | 3,001,072 |
| City of San Diego | 2009 | 1,353,993 |

Our immediate market is :

| | | |
|---|---|---|
| City of El Cajon | 2000 | 97,500 |
| City of La Mesa | 2000 | 54,749 |
| City of Santee | 2000 | 54,709 |
| City of Lemon Grove | 2000 | 24,918 |
| Lakeside | 2000 | 19,560 |
| Alpine | 2000 | 13,143 |
| Rancho San Diego | 2000 | 20,155 |
| Spring Valley | 2000 | 26,663 |
| La Presa | 2000 | 32,721 |
| Winter Gardens | 2000 | 19,771 |
| Mount Helix | 2000 | 18,874 |
| Bostonia | 2000 | 15,169 |

We also serve all the eastern communities of San Diego County,
including :
Casa De Oro
San Diego Country Estates
Jamul
Crest

Granite Hills, and many more.
And with the closing of the Cadillac dealer in El Centro,
California,
We will now service :

| City of El Centro | 2000 | 40,563 |
| City of Brawley | 2000 | 22,052 |
| City of Calexico, and | 2000 | 36,005 |
| Their sister city of | | |
| Mexicali, BC, Mexico | 2008 | 1,001,010 |

and with the closing of the Cadillac dealer in Yuma, Arizona, we
are the closest dealer from the Arizona border to the County of San
Diego – over 200 miles.

Our current market San Diego County is serviced by :

# 5   BMW dealerships

**Cunningham BMW – City of El Cajon**

# 4 Lexus dealerships

**Bob Baker Lexus – City of El Cajon**

# 3  Mercedes Benz dealerships

5

**In 1979, Cadillac registered over 3,500 sales in San Diego County.**

**This can be achieved with :**
**1 - Product**
**2 – Service**
**3 – Loyal Customers (Over 30,000 sales in San Diego County)**
**4 - Loyal Exclusive Dealers (29 years)**

Mark, I have been your Cadillac dealer for over 29 years. I have another 29 years left in me. I am only 54 years old, plus 29 more years would only put me at 83.

I respectfully request you review the above information and expect to see you at the next Master Dealers Conference.

Very truly yours,

Roque De La Fuente II
President

Cell.    (858) 353 - 5252

6

Shopping in 92020
Sunday, June 21, 2009
12:30 PM



(858) 353 - 5252

June, 21, 2009

## Mr. Mark LaNeve
## General Motors
## 100 Renaissance Center
## Detroit, MI 48243

# Dear Mark,

By the numbers –

"29" years as a Cadillac dealer.
Only exclusive Cadillac dealer in San Diego County.

Master Dealer Award

1987,    2000,  2002,  2003,

SFE  Platinum  Performer  Award

1997,    1998,  1999,  2000,  2007,  2008,

## ★ Mark.......

# You want to buy

# a car or truck   ?????

? You live in 92020

## City of  El Cajon

☆ **Or  you live in one of this community's**

**What are your options.    ???????**

# **Our Market**

| We currently serve : | As of | Population |
|---|---|---|
| Our immediate market is : | | |
| City of El Cajon | 2000 | 97,500 |
| City of La Mesa | 2000 | 54,749 |
| City of Santee | 2000 | 54,709 |
| City of Lemon Grove | 2000 | 24,918 |
| Lakeside | 2000 | 19,560 |
| Alpine | 2000 | 13,143 |
| Rancho San Diego | 2000 | 20,155 |
| Spring Valley | 2000 | 26,663 |
| La Presa | 2000 | 32,721 |
| Winter Gardens | 2000 | 19,771 |
| Mount Helix | 2000 | 18,874 |
| Bostonia | 2000 | 15,169 |

Our immediate market is :

| City | | |
|---|---|---|
| City of El Cajon | 2000 | 97,500 |
| City of La Mesa | 2000 | 54,749 |
| City of Santee | 2000 | 54,709 |
| City of Lemon Grove | 2000 | 24,918 |
| Lakeside | 2000 | 19,560 |
| Alpine | 2000 | 13,143 |
| Rancho San Diego | 2000 | 20,155 |
| Spring Valley | 2000 | 26,663 |
| La Presa | 2000 | 32,721 |
| Winter Gardens | 2000 | 19,771 |
| Mount Helix | 2000 | 18,874 |
| Bostonia | 2000 | 15,169 |

We also serve all the eastern communities of San Diego County,
including :

Casa De Oro

San Diego Country Estates

Jamul

Crest

☆   **You can buy and service you car or truck within 3 miles
of your home or business......
shop on one or more of the following options from
fine automobile dealerships.**

# Lexus



Dealer in the vicinity of **92020**

Dealer    Dealership Hours    Distance



Bob Baker Lexus   El Cajon

1000 Arnele Avenue        Mon-Fri 9am - 8pm          **Distance:**      0.96 Miles
El Cajon, CA 92020        Sat 9am - 7pm
Phone: (619) 440-5398     Sun 10am - 6pm

.

Posted from <http://www.lexus.com/lexus/LexusSearchSubmitWithMap.do?dealerLocator.omaDealersOnly=false&application=LexusApp&radius=50&brandId=2
&Street=null&city=null&state=null&zipCode=92020&searchType=zipcode&distanceColumn=yes>

# BMW

9:45 AM

## Dealer Locator
June 21, 2009



## Search Results
BMW centers found. Click on the links below to see location details for each dealer's vehicle
.

BMW South County
Dealer Website
720 El Cajon Blvd
El Cajon, CA 92020-4906
Phone: 619-873-4386
Fax: 619-401-0318

                                  Distance from ZIP code,        <1 mile

BMW Service
BMW South County
Dealer Website
875 El Cajon Blvd
El Cajon, CA 92020-5714
Phone: 619-442-8888
Fax: 619-440-3876

                                  Distance from ZIP code,        <1 mile

Hours of operation:
Mon,Tue,Wed,Thu,Fri
8:00 AM - 8:00 PM
Sat 9:00 AM - 7:00 PM

# Ford

**Dealer**

**1.** El Cajon Ford                                    Distance: 0.86 miles

1595 E Main
El Cajon, CA 92021

Tel: (619) 588-7647
Fax: (619) 441-8521


**2.** Drew Ford                                       Distance: 2.53 miles

8970 La Mesa Blvd
La Mesa, CA 91941

Tel: (619) 464-7777
Fax: (619) 668-7717


# Honda

The following dealers were found near 92020
Show Map
1

Tipton Honda
889 Arnele Ave
El Cajon, CA 92020
(888)902-1155
                                                        0.4 miles away


2
DCH Honda of Lemon Grove
3615 Lemon Grove Ave
Lemon Grove, CA 91945
(619)461-2600
                                                        4.8 miles away


3
Honda Mission Valley
5812 Mission Gorge Rd
San Diego, CA 92120
(619)563-1095
                                                        7.3 miles away


# Toyota

## Dealers near "92020"

| | DEALER | MAP & DISTANCE |
|---|---|---|
| 1 | Toyota Of El Cajon<br>300 El Cajon Blvd.<br>El Cajon, CA 92020<br>(619) 270-3000 | 0.39 Miles Away |
| 2 | Toyota Of El Cajon Toyota Certified Service Center<br>9135 Mission Gorge Road<br>Santee, CA 92071<br>(619) 596-7700 | 3.74 Miles Away |
| 3 | Bob Baker Toyota Lemon Grove | 6.41 Miles Away |

8.04 Miles Away
6800 Federal Boulevard
Lemon Grove, CA 91945
(619) 287-2400

4    Toyota San Diego                                    8.04 Miles Away
     5910 Mission Gorge Road
     San Diego, CA 92120
     (619) 280-4100

Pasted from <http://www.toyota.con/dealers/?zip=92020&x=178y=17>

# ===City of El Cajon ===

El Cajon Car Dealers

Bob Baker Chevrolet          **Soon to be close by GM**
900 Arnele Ave
El Cajon, CA , 92020

El Cajon Kia
720 El Cajon Blvd
El Cajon, CA , 92020

Saturn Of El Cajon
541 N Johnson Ave
El Cajon, CA, 92020

Cunningham BMW
875 El Cajon Blvd
El Cajon, CA , 92020

Mossy Nissan El Cajon
1170 W Main St
El Cajon, CA , 92020

Toyota Of El Cajon
300 El Cajon Blvd
El Cajon, CA , 92020

De La Fuente Cadillac          **Soon to be close by GM**
1385 E Main St
El Cajon, CA , 92021

El Cajon Ford
1595 E Main St
El Cajon, CA , 92021

Suzuki Of El Cajon
792 El Cajon Blvd
El Cajon, CA , 92020

Tipton Honda
889 Arnele Ave
El Cajon, CA , 92020

El Cajon Mitsubishi
247 El Cajon Blvd
El Cajon, CA , 92020

Bob Baker Lexus El Cajon
1000 Arnele Ave
El Cajon, CA , 92020

Bob Baker Subaru
900 Arnele Ave
El Cajon, CA 92020

# ===City of la Mesa ===

| | |
|---|---|
| La Mesa Car Dealers<br>Drew Isuzu<br>8850 Grossmont Blvd<br>La Mesa, CA , 91941 | **Distance: 2.65 miles** |
| Bob Stall Chevrolet<br>7601 Alvarado Rd<br>La Mesa, CA , 91941 | **Distance: 4 miles** |
| Drew Ford<br>8970 La Mesa Bl<br>vd<br>La Mesa, CA , 91941 | **Distance: 2.53 miles** |
| Carl Burgers Dodge World<br>Highway 8 at Jackson Dr<br>La Mesa, CA , 91942 | **Distance: 3.15 miles** |
| Carl Burgers Chrysler Jeep World<br>8333 Hercules St<br>La Mesa, CA , 91942 | **Distance: 3.14 miles** |
| Drew Volkswagon<br>8850 Grossmont Blvd<br>La Mesa, CA 91941 | **Distance: 2.65 miles** |
| Drew Hyundai<br>8850 Grossmont Blvd<br>La Mesa, CA , 91941 | **Distance: 2.65 miles** |

# ==City of Lemon Grove ==

Lemon Grove        Car Dealers

| | |
|---|---|
| Bob Baker Toyota Lemon Grove<br>6800 Federal Blvd<br>Lemon Grove, CA . 91945<br>PH: (619) 287-2400  ¡ FX: (619) 265-3199 | 6.41 Miles Away |
| DCH Honda of Lemon Grove | **4.8 miles away** |
| 3615 Lemon Grove Ave<br>Lemon Grove, CA 91945 | |

San Diego   East County

| | |
|---|---|
| Toyota San Diego<br>5910 Mission Gorge Rd<br>San Diego, CA , 92120<br>PH: (619) 280-4100  | FX: (619) 280-5468 | 8.04 Miles Away |
| HONDA  Mission Valley<br>5812 Mission Gorge Rd<br>San Diego, CA 92120<br>(619)563-1095 | |
| | **7.3 miles away** |

Posted from <http://by129w.bay129.mail.live.com/mail/InboxLight .aspx?FolderID=00000000-0000-0000-0000-000000000000 |
&InboxSortAscending=False&InboxSortBy=Date&n=133117592 >

# 3 Regional
# Shoping Center
## Serve the
## San Diego East County Market

### Westfield Parkway Plaza   CITY OF EL CAJON
Yet another Westfield mall, Parkway Plaza is the regional mall serving East County. This indoor, single level mall is in El Cajon. Malls tend to reflect their clientele, and Parkway serves the unpretentious, middle America of East County. Young adult shops, a Regal Cinema and a food court make this the area's teen hangout. A two-story Wal-Mart is the newest tenant. Tidbit: A Family Lounge is located in the Food

Posted from <http://sandiego.about.com/od/shopping/tp/top_malls.htm>
### . Grossmont  Center       CITY OF LA MESA
This quaint mall in La Mesa is the shopping center that time forgot. It's a cozy, well-maintained outdoor mall in La Mesa that is lacking in pizazz and choices - in fact, it's a bit dull. But in the world of mega-malls, sometimes dull is OK. Anchored by a two-story Target, a smallish Macy's, Grossmont also has a nice Pacific Cinema, and a two-level Wal-Mart. Tidbit: There's a surprisingly good choice of sitdown restaurants, including the new Casa de Pico and Shakey's Pizza for families.

Posted from <http://sandiego.about.com/od/shopping/tp/top_malls.htm>

### Otay Ranch Town Center     CITY OF CHULA VISTA
OK, Otay Ranch Town Center just opened in fall 2006. So what makes it so special? Well, it's the first regional mall to open in 20 years. And it's not your traditional mall, but a "lifestyle" mall. Think: a neighborhood business district, only with upscale shops and department stores. Tidbit: The "main street" allows parking in front of many stores. It's pedestrian friendly, with a dog park, too. For entertainment, an AMC theatre (soon) and lots of dining.

Posted from <http://sandiego.about.com/od/shopping/tp/top_malls.htm>

  **or**   drive two or more cities away to buy

or service your auto or truck...
Consumers are not dumb...... to the contrary,
There are very smart, I will bet on them......
Today within 5 miles from De La Fuente Cadillac
6 dealers sell over 3000 cars & trucks with 3 Brands
(2 Ford, 2 Toyota, 2 Honda)
every Month over  36,000 a year.....
and not one of them is a GM product from
the new or old GM.
The new GM can not afford to make this kind of

mistake…..

A 29 year Dealer.

Very truly yours,

Roque De La Fuente II
President

Cell.   (858) 353 - 5252

Master Dealer (4)
  1987, 2000, 2002,  2003
SFE Platinum Performer (6)
  1997, 1998, 1999, 2000, 2007. 2008

P.S.

This Market (San Diego East County) has the highest
truck/auto sales ratio in any Metro Market in the Country
Yet it does not have a Buick or GMC Dealer.
 Or maybe No New GM Representation
(Cadillac, Chevrolet, Buick, GMC)

This is a Mature & Growing market yet Land is very
difficult to come by…..and quickly absorb by aggressive
Manufactures.

This Market used to be home to:
Cunnigham BMW/Pontiac/GMC……"rip" now BMW
Tipton Oldmobile/Honda……………….."rip" now Honda
McClelan Buick/Pontiac/GMC……….."rip" now Toyota

Bob Baker Chevrolet......................."rip" Lexus Expansion

The New GM (Cadillac, Chevrolet, Buick, GMC, ) needs
to be in this Market.......25% of all San Diego County
Auto/Truck Sales come from this market......
The New GM can not afford not to be in this Market.

With a good Faithfull Dealer

CC.  Bill G. Beasley......bill.g.beasley@gm.com

# EXHIBIT C



# CITY OF EL CAJON

## MAYOR AND CITY COUNCIL

June 8, 2009

General Motors
515 Marin Street
Thousand Oaks, CA 91360

Reference:    De La Fuente Cadillac
              BAC 119153

Gentlemen:

I have known the family that owns De La Fuente Cadillac for many years. They are one
of the larger employers in the City of El Cajon. It is difficult for me to believe that, after
nearly 30 years in our community, the dealership will close because someone at GM
believes that it is necessary to trim the number of Cadillac franchises.

Simply stated, this decision to cancel De La Fuente's franchise with Cadillac poses a
grave economic threat to my community. I am deeply concerned, not only about the
potential loss of the local auto dealership jobs, but the ripple effect such a closure will
bring about as well. It is very easy to overlook the fact that, as a local elected official, I
have the responsibility to my constituents to explain the sacrifices they are going to
endure as a result of events outside my control. You see, It's not just the Cadillac store
that closes, there are also the local vendors. It's the gas station across the street which
loses 20% of it business where all those new Cadillac vehicles were fueled. It's the
restaurant down the block where customers spend their money while having their
vehicles serviced. The decrease in tax revenue at a time where every municipality is
struggling to address deficits is catastrophic.

As mayor, I feel the pain every time a local business suffers, and let me assure you,
local auto dealerships are about as homegrown of a business as they come. Auto
dealers, such as De La Fuente Cadillac are small business owners in towns, big and
small, with a proud legacy of philanthropy and profitability. They placed their faith in
Detroit, selling and servicing the product line in good times and bad. They staked their
family names on it. They and their employees reflect the spirit of El Cajon, and in some
ways, they represent every local business here. They don't just offer a product and
service, they give a little bit of themselves to make their community a better place to
live. Whether it's coaching Little League or volunteering in their church or school, auto
dealerships such as De La Fuente Cadillac, as much as any local business, exist to
serve the community.

Page 2
June 8, 2009
Re: De La Fuente Cadillac

No one at the dealership could explain to me any clear justification for this decision. Its
closing will cause excessive disruptions, bankruptcies and increased unemployment in
my community. I need to understand how the closing of De La Fuente Cadillac will help
General Motors become profitable and restore the viability of the domestic auto
industry.

I may be old fashioned, but I have come to believe that dealers, like De La Fuente,
know how to best sell cars in their individual communities. Through the years they have
cultivated an immense reservoir of local goodwill for Cadillac. Convenient and
dependable companies, like theirs, provide a connection to the automotive factory.
Customer satisfaction has always been their number one goal.

This decision by GM could not have come at a worst time. Not a day passes where I
don't read of increased unemployment and failed businesses. But this is different. This
is not about a business that has failed. Rather, some other criteria has been applied in
the decision making process. One of the strengths of the American economy has
always been that the market should decide which companies succeed and which should
fail. At this juncture it appears that profitable dealerships have been targeted to avoid
what, under normal circumstances might require expensive buy-outs. The end result is
that residents will need to travel farther for warranty and service. For those seeking a
new vehicle, the lack of competition will mean higher prices and fewer choices.

On behalf of myself, and all those people whose livelihood depends on De La Fuente
Cadillac, I am asking you to reconsider your decision to close the dealership by not
renewing its franchise agreement.

Sincerely,

Mark Lewis
Mayor