# AG 1

*FOR DISCUSSION PURPOSES ONLY*
*PRIVILEGED AND CONFIDENTIAL*
*SUBJECT TO FRE 408*
*WG&M DRAFT 06/30/2009*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
|  | : |  |
| **GENERAL MOTORS CORP.,** *et al.,* | : | **09-50026 (REG)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |

-----------------------------------------------------------x

## ORDER (I) AUTHORIZING SALE OF ASSETS PURSUANT TO MASTER SALE AND PURCHASE AGREEMENT WITH NGMCO, INC., A U.S. TREASURY-SPONSORED PURCHASER; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE; AND (III) GRANTING RELATED RELIEF

Upon the motion, dated June 1, 2009 (the "**Motion**"), of General Motors

Corporation ("**GM**") and its affiliated debtors, as debtors in possession (collectively, the

"**Debtors**"), pursuant to sections 105, 363, and 365 of title 11, United States Code (the

"**Bankruptcy Code**") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**") for, among other things, entry of an order authorizing and

approving (A) that certain Master Sale and Purchase Agreement, dated as of June 1, 2009, by

and among GM and its Debtor subsidiaries (collectively, the "**Sellers**") and NGMCO, Inc. (the

"**Purchaser**"), a purchaser sponsored by the United States Department of the Treasury (the "**U.S.**

**Treasury**"), together with all related documents and agreements as well as all exhibits,

schedules, and addenda thereto (as amended, the "**MPA**"), a copy of which is annexed hereto as

Exhibit "A" (excluding certain commercially sensitive information); (B) the sale of the

Purchased Assets[1] to the Purchaser free and clear of liens, claims, encumbrances, and interests (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability; (C) the assumption and assignment of the Assumable Executory Contracts; (D) the establishment of certain Cure Amounts; and (E) the UAW Retiree Settlement Agreement (as defined below); and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with this Court's Order, dated June 2, 2009 (the "**Sale Procedures Order**"), and it appearing that no other or further notice need be provided; and a hearing having been held on June 30, 2009, to consider the relief requested in the Motion (the "**Sale Hearing**"); and upon the record of the Sale Hearing, including all affidavits and declarations submitted in connection therewith, and all of the proceedings had before the Court; and the Court having reviewed the Motion and all objections thereto (the "**Objections**") and found and determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rule 6003 and is in the best interests of the Debtors, their estates and creditors, and other parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Motion or the MPA.

FOUND AND DETERMINED THAT:

A. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014.

B. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C. This Court has jurisdiction over the Motion, the MPA, and the 363 Transaction pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

D. The statutory predicates for the relief sought in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code as supplemented by Bankruptcy Rules 2002, 6004, and 6006.

E. As evidenced by the affidavits and certificates of service and Publication Notice previously filed with the Court, in light of the exigent circumstances of these chapter 11 cases and the wasting nature of the Purchased Assets and based on the representations of counsel at the Sale Procedures Hearing and the Sale Hearing, (i) proper, timely, adequate, and sufficient notice of the Motion, the Sale Procedures, the 363 Transaction, the procedures for assuming and assigning the Assumable Executory Contracts as described in the Sale Procedures Order (the "**Modified Assumption and Assignment Procedures**"), the UAW Retiree Settlement Agreement, and the Sale Hearing have been provided in accordance with Bankruptcy Rules 2002(a), 6004(a), and 6006(c) and in compliance with the Sale Procedures Order; (ii) such notice was good and sufficient, reasonable, and appropriate under the particular circumstances of these

chapter 11 cases, and reasonably calculated to reach and apprise all holders of liens, claims,

encumbrances, and other interests, including rights or claims based on any successor or

transferee liability, about the Sale Procedures, the sale of the Purchased Assets, the 363

Transaction, and the assumption and assignment of the Assumable Executory Contracts, and to

reach all UAW-Represented Retirees about the UAW Retiree Settlement Agreement; and (iii) no

other or further notice of the Motion, the 363 Transaction, the Sale Procedures, the Modified

Assumption and Assignment Procedures, the UAW Retiree Settlement Agreement, the UAW

Claims Agreement, and the Sale Hearing or any matters in connection therewith is or shall be

required. With respect to parties who may have claims against the Debtors, but whose identities

are not reasonably ascertainable by the Debtors (including, but not limited to, potential

contingent warranty claims against the Debtors), the Publication Notice was sufficient and

reasonably calculated under the circumstances to reach such parties.

       F.      On June 1, 2009, this Court entered the Sale Procedures Order approving

the Sale Procedures for the Purchased Assets. The Sale Procedures provided a full, fair, and

reasonable opportunity for any entity to make an offer to purchase the Purchased Assets. The

Debtors received no bids under the Sale Procedures for the Purchased Assets. Therefore, the

Purchaser's bid was designated as the Successful Bid pursuant to the Sale Procedures Order.

       G.      As demonstrated by (i) the Motion, (ii) the testimony and other evidence

proffered or adduced at the Sale Hearing, and (iii) the representations of counsel made on the

record at the Sale Hearing, in light of the exigent circumstances presented, (a) the Debtors have

adequately marketed the Purchased Assets and conducted the sale process in compliance with the

Sale Procedures Order; (b) a reasonable opportunity has been given to any interested party to

make a higher or better offer for the Purchased Assets; (c) the consideration provided for in the

MPA constitutes the highest or otherwise best offer for the Purchased Assets and provides fair

and reasonable consideration for the Purchased Assets; (d) the 363 Transaction, as a transfer of deteriorating assets, is an extraordinary, nonmarket transaction, the consideration for which exceeds that which would have been available in a transaction subject to ordinary market forces; (e) the 363 Transaction is the only alternative to liquidation available for the Debtors; (f) if the 363 Transaction is not approved, the Debtors will be forced to cease operations altogether; (g) the failure to approve the 363 Transaction promptly will lead to systemic failure and dire consequences, including the loss of hundreds of thousands of auto-related jobs; (h) prompt approval of the 363 Transaction is the only means to preserve and maximize the value of the Debtors' assets; (i) the 363 Transaction maximizes fair value for the Debtors' parties in interest; (j) the Debtors are receiving fair value for the assets being sold; (k) the 363 Transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, including liquidation under chapters 7 or 11 of the Bankruptcy Code; (l) no other entity has offered to purchase the Purchased Assets for greater economic value to the Debtors or their estates; (m) the consideration to be paid by the Purchaser under the MPA exceeds the liquidation value of the Purchased Assets; and (n) the Debtors' determination that the MPA constitutes the highest or best offer for the Purchased Assets and that the 363 Transaction represents a better alternative for the Debtors' parties in interest than an immediate liquidation constitute valid and sound exercises of the Debtors' business judgment.

H.    The actions represented to be taken by the Sellers and the Purchaser are appropriate under the circumstances of these chapter 11 cases and are in the best interests of the Debtors, their estates and creditors, and other parties in interest.

I.    Approval of the MPA and consummation of the 363 Transaction at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

J.      The Debtors have demonstrated compelling circumstances and a good,

sufficient, and sound business purpose and justification for the sale of the Purchased Assets

pursuant to the 363 Transaction prior to, and outside of, a plan of reorganization and for the

immediate approval of the MPA and the 363 Transaction because, among other things, the

Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Motion

is not granted on an expedited basis.  In light of the exigent circumstances of these chapter 11

cases and the risk of deterioration in the going concern value of the Purchased Assets pending

the 363 Transaction, time is of the essence in (i) consummating the 363 Transaction, (ii)

preserving the viability of the Debtors' businesses as going concerns, and (iii) minimizing the

widespread and adverse economic consequences for the Debtors, their estates, their creditors,

employees, the automotive industry, and the national economy that would be threatened by

protracted proceedings in these chapter 11 cases.

K.      The consideration provided by the Purchaser pursuant to the MPA (i) is

fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a

greater recovery to the Debtors' estates than would be provided by any other available

alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the

District of Columbia.

L.      The 363 Transaction must be approved and consummated as promptly as

practicable in order to preserve the viability of the business to which the Purchased Assets relate

as a going concern.

M.      The MPA was entered into and none of the Debtors, the Purchaser, or the

Purchasers' present or contemplated owners have entered into the MPA or propose to

consummate the 363 Transaction for the purpose of hindering, delaying, or defrauding the

Debtors' present or future creditors. None of the Debtors, the Purchaser, nor the Purchaser's present or contemplated owners is entering into the MPA or proposing to consummate the 363 Transaction fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to any of the foregoing.

N.    In light of the extensive prepetition negotiations culminating in the MPA, the Purchaser's commitment to consummate the 363 Transaction is clear without the need to provide a good faith deposit.

O.    Each Debtor (i) has full corporate power and authority to execute the MPA and all other documents contemplated thereby, and the sale of the Purchased Assets has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the MPA, (iii) has taken all corporate action necessary to authorize and approve the MPA and the consummation by the Debtors of the transactions contemplated thereby, and (iv) needs no consents or approvals, other than those expressly provided for in the MPA which may be waived by the Purchaser, to consummate such transactions.

P.    The consummation of the 363 Transaction outside of a plan of reorganization pursuant to the MPA neither impermissibly restructures the rights of the Debtors' creditors, allocates or distributes any of the sale proceeds, nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors. The 363 Transaction does not constitute a *sub rosa* plan of reorganization. The 363 Transaction in no way affects distribution of the Debtors' property to creditors and does not impinge upon any chapter 11 plan that may be confirmed.

Q.    The MPA and the 363 Transaction were negotiated, proposed, and entered into by the Sellers and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions. Neither the Sellers nor the Purchaser has engaged in any conduct that would cause or permit the MPA to be avoided under 11 U.S.C. § 363(n). The Purchaser is a newly-formed Delaware corporation that, as of the date of the Sale Hearing, is wholly-owned by the U.S. Treasury. The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. The Purchaser is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

R.    Upon the Closing of the 363 Transaction, the Debtors will transfer to the Purchaser substantially all of its assets. In exchange, the Purchaser will provide the Debtors with (i) cancellation of billions of dollars in secured debt; (ii) assumption by New GM of a portion of the Debtors' business obligations and liabilities that New GM will satisfy; and (iii) no less than 10% of the stock of the Purchaser (as well as warrants), which the Debtors' financial expert values at between $3.8 billion and $4.8 billion.

S.    The Purchaser, not the Debtors, has determined its ownership composition and capital structure. New GM will assign ownership interests to certain parties based on New GM's belief that the transfer is necessary to conduct New GM's business going forward, that the transfer is to attain goodwill for New GM and to increase New GM's sales after completion of the 363 Transaction. These obligations will be satisfied through allocation of New GM equity or assumption, including the UAW Collective Bargaining Agreement obligation and workers' compensation claims that must be satisfied to obtain beneficial self-insured status. The assignment by New GM of ownership interests is neither a distribution of estate assets, discrimination by the Debtors on account of prepetition claims, nor allocation of proceeds from

the sale of the Debtors' assets. The distribution is the product of a separately negotiated agreement between New GM and its equity holders. Likewise, the value that the Debtors will receive on consummation of the 363 Transaction is the product of arm's-length negotiations between the Debtors and the Purchaser.

T.      The U.S. Treasury has extended credit to, and acquired a security interest in, the assets of the Debtors as set forth in the DIP Credit Facility and as authorized by the Interim Order and Final DIP Credit Facility (Docket Nos. 292 and 2529). Before entering into the DIP Credit Facility [and the Existing UST Loan and Security Agreement], the Secretary of the Treasury, in consultation with the Chairman of the Board of Governors of the Federal Reserve System and as communicated to the appropriate committees of Congress, found that the extension of credit to the Debtors is "necessary to promote financial market stability," and is a valid use of funds pursuant to the statutory authority granted to the Secretary of the Treasury under the Emergency Economic Stabilization Act of 2008, 12 U.S.C. § § 5201 et seq. ("**EESA**"). The U.S. Treasury's extension of credit to, and resulting security interest in, the Debtors as set forth in the DIP Credit Facility and as authorized in the Interim Order and Final Order is a valid use of funds pursuant to EESA.

U.      This Court has previously authorized the Purchaser to credit bid the amounts owed under both the DIP Credit Facility and the Existing UST Loan and Security Agreement and held the Purchaser's credit bid to be, for all purposes, a "Qualified Bid" under the Sale Procedures Order.

V.      The Debtors, the Purchaser, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "**UAW**"), as the exclusive collective bargaining representative of the Debtors' employees and the authorized representative of the persons in the Class and the Covered Group (as described in the UAW

Retiree Settlement Agreement) (the "**UAW-Represented Retirees**") under section 1114(c) of

the Bankruptcy Code, engaged in good faith negotiations in conjunction with the 363

Transaction regarding the funding of "retiree benefits" within the meaning of section 1114(a) of

the Bankruptcy Code and related matters. Conditioned upon the consummation of the 363

Transaction and approval of the Bankruptcy Court, the Purchaser and the UAW will enter into

that certain Retiree Settlement Agreement, dated as of the Closing Date (the "**UAW Retiree**

**Settlement Agreement**"), which is Exhibit E to the MPA, which resolves the ongoing provision

of certain retiree benefits to UAW-Represented Retirees. As set forth in the UAW Retiree

Settlement Agreement, the Purchaser has agreed to make contributions of cash, stock, and

warrants of New GM, as well as to transfer the assets of an existing voluntary employees'

beneficiary association sponsored by GM and to be acquired by the Purchaser in the 363

Transaction, to a new voluntary employees' beneficiary association sponsored by the UAW (the

"**New VEBA**"), which will have the obligation to fund certain health and welfare benefits for the

the UAW-Represented Retirees. GM and the UAW, as the authorized representative of the

UAW-Represented Retirees, as well as the representatives for the class of plaintiffs in a certain

class action against GM (the "**Class Representatives**"), through class counsel, Stemper,

Feinstein, Doyle and Payne LLC ("**Class Counsel**"), negotiated in good faith the UAW Claims

Agreement, which requires the UAW and the Class Representatives to take further actions to

effectuate the extinguishment of certain claims against the Debtors, among others, relating to

retiree benefits in the event the 363 Transaction is consummated and the Bankruptcy Court

approves, and the Purchaser becomes fully bound by, the UAW Retiree Settlement Agreement,

subject to reinstatement of such claims to the extent of any adverse impact to the rights or

benefits of UAW-Represented Retirees under the UAW Retiree Settlement Agreement resulting

from any reversal or modification of the 363 Transaction, the UAW Retiree Settlement
Agreement, or the approval of the Bankruptcy Court thereof.

W.      Effective as of the Closing of the 363 Transaction, the Debtors will
assume and assign to the Purchaser the UAW Collective Bargaining Agreement. The Debtors,
the Purchaser, the UAW and Class Representatives intend that their actions in connection with
the UAW Retiree Settlement Agreement and related undertakings incorporate the compromise of
certain claims and rights and shall be deemed to satisfy the requirements of 29 U.S.C. §
186(c)(2).

X.      The transfer of the Purchased Assets to the Purchaser will be a legal, valid,
and effective transfer of the Purchased Assets and, except for the Assumed Liabilities, will vest
the Purchaser with all right, title, and interest of the Sellers to the Purchased Assets free and clear
of liens, claims, encumbrances, and other interests (other than Permitted Encumbrances),
including rights or claims based on any successor or transferee liability, including, but not
limited to (i) those that purport to give to any party a right or option to effect any forfeiture,
modification, right of first refusal, or termination of the Sellers' or the Purchaser's interest in the
Purchased Assets, or any similar rights and (ii) (a) those arising under all mortgages, deeds of
trust, security interests, conditional sale or other title retention agreements, pledges, liens,
judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, if
any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income,
or other exercise of any attributes of ownership and (b) all debts arising in any way in connection
with any agreements, acts, or failures to act, of any of the Sellers or any of the Sellers'
predecessors or affiliates, claims (as that term is defined in the Bankruptcy Code), obligations,
liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions,
interests and matters of any kind and nature, whether known or unknown, contingent or

otherwise, whether arising prior to or subsequent to the commencement of these chapter 11

cases, and whether imposed by agreement, understanding, law, equity or otherwise, including,

but not limited to, Claims otherwise arising under doctrines of successor or transferee liability, to

the extent permitted by law.

Y.    The Sellers may sell the Purchased Assets free and clear of all liens,

claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted

Encumbrances), including rights or claims based on any successor or transferee liability,

because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the

Bankruptcy Code has been satisfied. Those (i) holders of liens, claims, encumbrances, and other

interests, including rights or claims based on any successor or transferee liability, and (ii) non-

Debtor parties to the Assumable Executory Contracts who did not object, or who withdrew their

Objections, to the 363 Transaction or the Motion are deemed to have consented pursuant to

section 363(f)(2) of the Bankruptcy Code. Those (i) holders of liens and encumbrances, and (ii)

non-Debtor parties to the Assumable Executory Contracts who did object, fall within one or

more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately

protected by having their liens and encumbrances, if any, attach to the proceeds of the 363

Transaction ultimately attributable to the property against or in which they assert a lien or

encumbrance.

Z.    Under the MPA, GM is transferring all of its title and interest in the

Memphis, TN SPO Warehouse and the White Marsh, MD Allison Transmission Plant (the "TPC

Property") to the Purchaser pursuant to section 363(f) of the Bankruptcy Code free and clear of

all liens, claims, encumbrances, and interests (other than Permitted Encumbrances), including

any liens on the TPC Property granted or extended pursuant to and any Claims relating to the

Second Amendment and Restated Participation Agreement and Amendment of Other Operative

Documents (the "**Participation Agreement**") dated as of June 30, 2004, among GM, as Lessee,

Wilmington Trust Company, a Delaware corporation, not in its individual capacity except as

expressly stated herein but solely as Owner Trustee (the "**Trustee**") under GM Facilities Trust

No. 1999-I (the "**Trust**"), as Lessor, GM, as Certificate Holder, Hannover Funding Company

LLC, as CP Lender, Wells Fargo Bank Northwest, N.A., as Agent, Norddeutsche Landesbank

Girozentrale (New York Branch), as Administrator, and Deutsche Bank, AG, New York Branch,

HSBC Bank USA, ABN AMRO Bank N.V., Royal Bank of Canada, Bank of America, N.A.,

Citicorp USA, Inc., Merrill Lynch Bank USA, Morgan Stanley Bank, collectively, as Purchasers

(collectively, with CP Lender, Agent and Administrator, the "**Lenders**"), together with all

related loan documents (collectively, the "**Operative Documents**"), which include, without

limitation, the following:

(i)    Amended and Restated Loan Agreement (the "**Loan Agreement**") dated as of June 30, 2004, among Trustee under the Trust, as Lessor, Hannover Funding Company LLC, as CP Lender, Wells Fargo Bank Northwest, N.A., as Agent, and Norddeutsche Landesbank Girozentrale (New York Branch), as Administrator for the CP Lenders and Liquidity Agent for the Purchasers;

(ii)    Non-Recourse CP Note (the "**Note**") dated June 30, 2004, Note Number 2004-1, in the original face amount of $270,300,000, made by Trustee under the Trust, to Hannover Funding Company LLC, Lender;

(iii)    Trust Agreement (the "**Trust Agreement**"), of the Trust, dated as of May 28, 1999, between Trustee and GM as the Certificate Holder  and beneficiary (successor in interest to Security Pacific Leasing Corporation, Lease Plan North America, Inc., Norddeutsche Landesbank Girozentrale (New York Branch and/or Cayman Islands Branch);

(iv)    Maryland Master Lease and Mortgages dated as of September 8, 1999, between GM, as the Lessee, and Trustee under the Trust, as the Lessor, as supplemented by Lease Supplement dated September 8, 1999, between GM, as Lessee, and Trustee under the Trust, recorded in the Land Records of Baltimore County, Maryland, in Liber 14019, folio 505, as amended by Amendment to Lease Supplement dated June 30, 2004, between GM, as Lessee, and Trustee under the Trust, recorded in the Land Records of Baltimore County, Maryland, in Liber 20387, folio 053 (as so supplemented and amended, the "**Maryland Master Lease**");

(v)    Mortgage dated September 8, 1999, between Amendment to Maryland Mortgage and Assignment of Leases and Rents dated June 30, 2004, between Trustee under the Trust, to First Security Bank, N.A., recorded in the Land Records of Baltimore County, Maryland, in Liber 14019, folio 525, as amended by Amendment to Maryland Mortgage and Assignment of Leases and Rents dated June 30, 2004, recorded in the Land Records of Baltimore County, Maryland, in Liber 20387, folio 66 (as so amended, the "**Maryland Mortgage**");

(vi)    Assignment of Leases and Rents dated September 8, 1999, by Trustee under the Trust, as Assignor, to First Security Bank, N.A., as Assignee, recorded in the Land Records of Baltimore County, Maryland, in Liber 14019, folio 541, as amended by Amendment to Maryland Mortgage and Assignment of Leases and Rents dated June 30, 2004, recorded in the Land Records of Baltimore County, Maryland, in Liber 20387, folio 66 (as so amended, the "**Maryland Assignment of Leases and Rents**");

(vii)    Tennessee Master Lease and Open End Leasehold Deeds of Trust dated as of November 18, 1999, between GM, as Lessee, and Trustee under the Trust, as the Lessor or Beneficiary or Mortgagor, and Joseph B. Pitt, Jr., as Deed of Trust Trustee, as supplemented by Lease Supplement dated as of November 18, 1999, between GM, as Lessee, and Trustee under the Trust, as the Lessor and Beneficiary, and Carla Peacher-Ryan, as deed of trust trustee, and recorded as JW1270 in the records of the Shelby County Register of Deeds, as amended by Amendment to Lease Supplement dated as of June 30, 2004, between GM, as Lessee, and Trustee under the Trust, as the Lessor and Beneficiary, and Carla Peacher-Ryan, as deed of trust trustee (as so supplemented and amended, the "**Tennessee Master Lease**");

(viii)    Tennessee Leasehold Deed of Trust dated as of November 18, 1999, from Trustee under the Trust, as Grantor, to Joseph B. Pitt, Jr., as Deed of Trust Trustee for the benefit of First Security Bank, N.A., as Agent on behalf of the Lenders, as Beneficiary, recorded as JW1272 in the records of the Shelby County Register of Deeds, as amended by Amendment to Tennessee Leasehold Deed of Trust and Tennessee Assignment of Leases and Rents dated as of June 30, 2004, between Trustee under the Trust, as Lessor, and Wells Fargo Bank Northwest, N.A., as Agent on behalf of the Lenders, recorded as Instrument No. 04126731 in the records of the Shelby County Register of Deeds (as so amended, the "**Tennessee Mortgage**"); and

(ix)    Tennessee Assignment of Leases and Rents dated as of November 18, 1999, from Trustee under the Trust, as Assignor, to First Security Bank, N.A., as Agent for the Lenders, as Assignee, recorded as JW1273 in the records of the Shelby County Register of Deeds, as amended by Amendment to Tennessee Leasehold Deed of Trust and Tennessee Assignment of Leases and Rents dated as of June 30, 2004, between Trustee under the Trust, as Lessor, and Wells Fargo Bank Northwest, N.A., as Agent on behalf of the Lenders, recorded as Instrument No. 04126731 in the records of the Shelby County Register of Deeds (as so amended, the "**Tennessee Assignment of Leases and Rents**"); and

(x)    Indemnity Leasehold Mortgage dated September 8, 1999, by Maryland Economic Development Corporation to First Security Bank, N.A., as Agent, and recorded among the Land Records of Baltimore County, Maryland, in Liber 14019, folio 583..

AA.    The Purchaser would not have entered into the MPA and would not consummate the 363 Transaction (i) if the sale of the Purchased Assets was not free and clear of all liens, claims, encumbrances, and other interests (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability or (ii) if the Purchaser would, or in the future could, be liable for any such liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability (collectively, the "**Retained Liabilities**"), other than, in each case, the Assumed Liabilities. The Purchaser will not consummate the 363 Transaction unless this Court expressly orders that none of the Purchaser, its affiliates, their present or contemplated members or shareholders (other than the Debtors as the holder of equity in the Purchaser), or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability or Retained Liabilities, other than as expressly provided herein or in the MPA.

BB.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumable Executory Contracts to the Purchaser in connection with the consummation of the 363 Transaction, and the assumption and assignment of the Assumable Executory Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest. The Assumable Executory Contracts being assigned to, and the liabilities being assumed by, the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser, and, accordingly, such assumption and assignment of the

Assumable Executory Contracts and liabilities are reasonable, enhance the value of the Debtors'

estates, and do not constitute unfair discrimination

       CC.    For the avoidance of doubt, and notwithstanding anything else in this

Order to the contrary:

- The Debtors are neither assuming nor assigning to the Purchaser the agreement to provide certain retiree medical benefits specified in (i) the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between the Company and the UAW, and (ii) the Settlement Agreement, dated February 21, 2008, between the Company and the UAW;

- at the Closing, the UAW Collective Bargaining Agreement shall be assumed by the Debtors and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code effective on and subject to the occurrence of the Closing. Assumption and assignment of the UAW Collective Bargaining Agreement is integral to the 363 Transaction and the MPA, are in the best interests of the Debtors and their estates, creditors, employees, and retirees, and represent the exercise of the Debtors' sound business judgment;

- the UAW, as the exclusive collective bargaining representative of employees of the Purchaser and the "authorized representative" of the UAW-Represented Retirees under section 1114(c) of the Bankruptcy Code, GM, and the Purchaser engaged in good faith negotiations in conjunction with the 363 Transaction regarding the funding of retiree health benefits within the meaning of section 1114(a) of the Bankruptcy Code. Conditioned upon the consummation of the 363 Transaction, the UAW and the Purchaser have entered into the UAW Retiree Settlement Agreement, which, among other things, provides for the financing by the Purchaser of modified retiree health care obligations for the Class and Covered Group (as defined in the UAW Retiree Settlement Agreement) through contributions by the Purchaser as well as the transfer of certain UAW-related accounts maintained or sponsored by the Sellers to the New VEBA (as defined in the UAW Retiree Settlement Agreement). The Debtors, the Purchaser, and the UAW specifically intend that their actions in connection with the UAW Retiree Settlement Agreement and related undertakings incorporate the compromise of certain claims and rights and shall be deemed to satisfy the requirements of 29 U.S.C. § 186(c)(2);

- the Debtors' sponsorship of the Existing Internal VEBA (as defined in the UAW Retiree Settlement Agreement) shall be transferred to the Purchaser under the MPA.

DD.    The Debtors have (i) cured and/or provided adequate assurance of cure (through the Purchaser) of any default existing prior to the date hereof under any of the Assumable Executory Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumable Executory Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser has provided adequate assurance of future performance under the Assumable Executory Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code. The Modified Assumption and Assignment Procedures are fair, appropriate, and effective and, upon the payment by the Purchaser of all Cure Amounts (as hereinafter defined) and approval of the assumption and assignment for a particular Assumable Executory Contract thereunder, the Debtors shall be forever released from any and all liability under the Assumable Executory Contracts.

EE.    The Debtors are the sole and lawful owners of the Purchased Assets, and no other person has any ownership right, title, or interest therein. The Debtors' non-Debtor Affiliates have acknowledged and agreed to the 363 Transaction and, as required by, and in accordance with, the MPA and the Transition Services Agreement, transferred any legal, equitable, or beneficial right, title, or interest they may have in or to the Purchased Assets to the Purchaser.

FF.    The Debtors currently maintain certain privacy policies that govern the use of "personally identifiable information" (as defined in section 101(41A) of the Bankruptcy Code) in conducting their business operations. The 363 Transaction may contemplate the transfer of certain personally identifiable information to the Purchaser in a manner that may not be consistent with certain aspects of their existing privacy policies. Accordingly, on June __, 2009,

the Court directed the U.S. Trustee to promptly appoint a consumer privacy ombudsman in

accordance with section 332 of the Bankruptcy Code, and such ombudsman was appointed on

June 10, 2009. The Privacy Ombudsman is a disinterested person as required by section 332(a)

of the Bankruptcy Code. The Privacy Ombudsman filed his report with the Court on _____,

2009 (Docket No. __) (the "**Ombudsman Report**") and presented his report at the Sale Hearing,

and the Ombudsman Report has been reviewed and considered by the Court. The Court has

given due consideration to the facts, including the exigent circumstances surrounding the

conditions of the sale of personally identifiable information in connection with the 363

Transaction. No showing has been made that the sale of personally identifiable information in

connection with the 363 Transaction violates applicable nonbankruptcy law, and the Court

concludes that such sale is appropriate in conjunction with the 363 Transaction.

GG.    Pursuant to Section 6.7(a) of the MPA, GM offered Wind-Down

Agreements and Deferred Termination Agreements (collectively, the "**Deferred Termination**

**Agreements**") in forms prescribed by the MPA to franchised motor vehicle dealers, including

dealers authorized to sell and service vehicles marketed under the Pontiac brand (which is being

discontinued), dealers authorized to sell and service vehicles marketed under the Hummer,

Saturn and Saab brands (which may or may not be discontinued depending on whether the

brands are sold to third parties) and dealers authorized to sell and service vehicles marketed

under brands which will be continued by the Purchaser. The Deferred Termination Agreements

were offered as an alternative to rejection of the existing Dealer Sales and Service Agreements of

these dealers pursuant to section 365 of the Bankruptcy Code and provide substantial additional

benefits to dealers which enter into such agreements. Approximately [99%] of the dealers

offered Deferred Termination Agreements accepted and executed those agreements and did so

for good and sufficient consideration.

HH.    Pursuant to Section 6.7(b) of the MPA, GM offered Participation Agreements in the form prescribed by the MPA to dealers identified as candidates for a long term relationship with the Purchaser. The Participation Agreements provide substantial benefits to accepting dealers, as they grant the opportunity for such dealers to enter into a potentially valuable relationship with the Purchaser as a component of a reduced and more efficient dealer network. Approximately 99% of the dealers offered Participation Agreements accepted and executed those agreements.

II.    This Order constitutes approval, pursuant to Bankruptcy Rule 9019, of the compromise and settlement embodied in the UAW Retiree Settlement Agreement, and such compromise and settlement meets all of the requirements set forth in Bankruptcy Rule 9019.

JJ.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

### <u>General Provisions</u>

1.    The Motion is granted in its entirety, and entry into and performance under, and in respect of, the MPA and the 363 Transaction is approved.

2.    All Objections to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or resolved, and all reservation of rights included in such Objections, are overruled on the merits other than a continuing Objection (each a "**Limited Contract Objection**") that does not contest or challenge the merits of the 363 Transaction and that is limited to (a) contesting a particular Cure Amount(s) (a "**Cure Objection**"), (b)

determining whether a particular Assumable Executory Contract is an executory contract that may be assumed and/or assigned under section 365 of the Bankruptcy Code, and/or (c) challenging, as to a particular Assumable Executory Contract, whether the Debtors have assumed, or are attempting to assume, such contract in its entirety or whether the Debtors are seeking to assume only part of such contract. Limited Contract Objections shall not constitute objections to the 363 Transaction, and to the extent such Limited Contract Objections remain continuing objections to be resolved before the Court, the hearing to consider each such Limited Contract Objection shall be adjourned to July __, 2009 at __:__ _.m. (the "**Limited Contract Objection Hearing**"). Within two (2) business days of the entry of this Order, the Debtors shall serve upon each of the counterparties to the remaining Limited Contract Objections a notice of the Limited Contract Objection Hearing. The Debtors or any party that withdraws, or has withdrawn, a Limited Contract Objection without prejudice shall have the right, unless it has agreed otherwise, to schedule the hearing to consider a Limited Contract Objection on not less than fifteen (15) days notice to the Debtors, the counterparties to the subject Assumable Executory Contracts, the Purchaser, and the Creditors' Committee, or within such other time as otherwise may be agreed by the parties.

### Approval of the MPA

3.     The MPA, all transactions contemplated thereby, and all the terms and conditions thereof (subject to any modifications contained herein) are approved. If there is any conflict between the MPA and this Order, this Order shall govern.

4.     Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized to perform their obligations under, and comply with the terms of, the MPA and consummate the 363 Transaction pursuant to, and in accordance with, the terms and provisions of the MPA and this Order.

5.      The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the MPA, together with all additional instruments and documents that the Sellers or the Purchaser deem necessary or appropriate to implement the MPA and effectuate the 363 Transaction, and to take all further actions as may reasonably be required by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to possession the Purchased Assets or as may be necessary or appropriate to the performance of the obligations as contemplated by the MPA.

6.      This Order and the MPA shall be binding in all respects upon the Debtors, their affiliates, all known and unknown creditors of, and holders of equity security interests in, any Debtor, including any holders of liens, claims, encumbrances, or other interests, including rights or claims based on any successor or transferee liability, all non-Debtor parties to the Assumable Executory Contracts, all successors and assigns of the Purchaser, each Seller and their Affiliates and subsidiaries, the Purchased Assets, all interested parties, their successors and assigns, and any trustees appointed in the Debtors' chapter 11 cases or upon a conversion of any of such cases to cases under chapter 7 of the Bankruptcy Code and shall not be subject to rejection. Nothing contained in any chapter 11 plan confirmed in any of the Debtors' chapter 11 cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the MPA or this Order.

### Transfer of Purchased Assets Free and Clear

7.      Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance with the MPA, and, upon the Closing, shall be free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted Encumbrances),

including rights or claims based on any successor or transferee liability, and all such liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, shall attach to the net proceeds of the 363 Transaction in the order of their priority, with the same validity, force, and effect that they now have as against the Purchased Assets, subject to any claims and defenses a Seller or any other party in interest may possess with respect thereto.

8.       Except as expressly permitted or otherwise specifically provided by the MPA or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against or in a Seller or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the Closing, or the 363 Transaction, are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

9.       This Order (a) shall be effective as a determination that, as of the Closing, (i) no Claims other than Assumed Liabilities, will be assertable against the Purchaser, its affiliates, successors, or assigns, or any of their respective assets (including the Purchased Assets); (ii) the Purchased Assets shall have been transferred to the Purchaser free and clear of all Claims (other than Permitted Encumbrances); and (iii) the conveyances described herein have

been effected; and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the MPA.

10.    The transfer of the Purchased Assets to the Purchaser pursuant to the MPA constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title, and interest of the Sellers in and to the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability, other than the Assumed Liabilities.

11.    On the Closing of the 363 Transaction, each of the Sellers' creditors and any other holder of a lien, claim, encumbrance, or other interest, is authorized and directed to execute such documents and take all other actions as may be necessary to release its lien, claim, encumbrance, or other interest in the Purchased Assets, if any, as such lien, claim, encumbrance, or other interest may have been recorded or may otherwise exist.

12.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing a lien, claim, encumbrance, or other interest in the Sellers or the Purchased Assets shall not have delivered to

the Sellers prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all liens, claims, encumbrances, or other interests, which the person or entity has with respect to the Sellers or the Purchased Assets or otherwise, then (a) the Sellers are authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Sellers or the Purchased Assets, and (b) the Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever in the Sellers or the Purchased Assets.

13.    All persons or entities in possession of any of the Purchased Assets are directed to surrender possession of such Purchased Assets to the Purchaser or its respective designees at the time of Closing of the 363 Transaction.

14.    Following the Closing of the 363 Transaction, no holder of any lien, claim, encumbrance, or other interest shall interfere with the Purchaser's title to, or use and enjoyment of, the Purchased Assets based on, or related to, any such lien, claim, encumbrance, or other interest, or based on any actions the Debtors may take in their chapter 11 cases.

15.    All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the MPA and this Order; *provided, however*, that the foregoing restriction shall not prevent any person or entity from appealing this Order or opposing any appeal of this Order.

16.    To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets sold, transferred, or conveyed to the

Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of
the 363 Transaction contemplated by the MPA.

17. From and after the Closing, the Purchaser shall comply with the
certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety
Act, as amended and recodified, including by the Transportation Recall Enhancement,
Accountability and Documentation Act, the Clean Air Act, the California Health and Safety
Code, and similar Laws, in each case, to the extent applicable in respect of motor vehicles,
vehicles, motor vehicle equipment, and vehicle parts manufactured or distributed by the Sellers
prior to the Closing.

18. Notwithstanding anything to the contrary in this Order or the MPA, (a)
any Purchased Asset that is subject to any mechanics', carriers', workers', repairers', shippers',
marine cargo, construction, toolers', molders', or similar lien or any statutory lien on real and
personal property for property taxes not yet due shall continue to be subject to such lien after the
Closing Date if and to the extent that such lien (i) is valid, perfected and enforceable as of the
Commencement Date (or becomes valid, perfected and enforceable after the Commencement
Date as permitted by section 546(b) or 362(b)(18) of the Bankruptcy Code), (ii) could not be
avoided by any Debtor under sections 544 to 549, inclusive, of the Bankruptcy Code or
otherwise, were the Closing not to occur; and (iii) the Purchased Asset subject to such lien could
not be sold free and clear of such lien under applicable non-bankruptcy law, and (b) any Liability
as of the Closing Date that is secured by a lien described in clause (a) above (such lien, a
**"Continuing Lien"**) that is not otherwise an Assumed Liability shall constitute an Assumed
Liability with respect to which there shall be no recourse to the Purchaser or any property of the
Purchaser other than recourse to the property subject to such Continuing Lien. The Purchased
Assets are sold free and clear of any reclamation rights, *provided, however,* that nothing, in this

Order or the MPA shall in any way impair the right of any claimant against the Debtors with

respect to any alleged reclamation right to the extent such reclamation right is not subject to the

prior rights of a holder of a security interest in the goods or proceeds with respect to which such

reclamation right is alleged, or impair the ability of a claimant to seek adequate protection

against the Debtors with respect to any such alleged reclamation right. Further, nothing in this

Order or the MPA shall prejudice any rights, defenses, objections or counterclaims that the

Debtors, the Purchaser, the U.S. Treasury, EDC, the Creditors' Committee or any other party in

interest may have with respect to the validity or priority of such asserted liens or rights, or with

respect to any claim for adequate protection.

### Approval of the UAW Retiree Settlement Agreement

19.     The UAW Retiree Settlement Agreement, the transactions contemplated

therein, and the terms and conditions thereof, are fair, reasonable, and in the best interests of the

retires, and are approved. The Debtors, the Purchaser, and the UAW are authorized and directed

to perform their obligations under, or in connection with, the implementation of the UAW

Retiree Settlement Agreement and to comply with the terms of the UAW Retiree Settlement

Agreement, including the obligation of the Purchaser to reimburse the UAW for certain expenses

relating to the 363 Transaction and the transition to the New VEBA arrangements. The

amendments to the Trust Agreement (as defined in the UAW Retiree Settlement Agreement) set

forth on Exhibit E to the UAW Retiree Settlement Agreement, are approved, and the Trust

Agreement is reformed accordingly.

20.     In accordance with the terms of the UAW Retiree Settlement Agreement,

(a) as of the Closing, the requirement of Section 15 of the Settlement Agreement, dated July 31,

2008, in the class action styled *Int'l Union, UAW, et al. v. General Motors Corp.*, Civil Action

No. 07-14074 (E.D. Mich. filed Sept. 9, 2007) to amend the General Motors Hourly-Rate

Employees Pension Plan shall be terminated and void, and (b) on the later of December 31, 2009, or the Closing of the 363 Transaction, (i) the committee and the trustees of the Existing External VEBA (as hereinafter defined) are directed to transfer to the New VEBA all assets and liabilities of the voluntary employees' beneficiary association established pursuant to the settlement agreement in the class action styled *UAW et al. v. General Motors Corp.*, No. 05-CV-73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006), *aff'd, Int'l Union, UAW v. General Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) (the "**Existing External VEBA**") within fifteen (15) days thereafter, and coverage under the Existing External VEBA as to the Class and Covered Group (each as defined in the UAW Retiree Settlement Agreement) shall terminate upon the completion of such transfer, and (ii) all obligations and liabilities of the Purchaser relating to retiree medical benefits for the Class and Covered Group shall terminate, and the Purchaser shall not thereafter have any such obligations and liabilities, in each case as provided in and in accordance with Section 5(D) of the UAW Retiree Settlement Agreement.

### Assumption and Assignment to the Purchaser of Assumable Executory Contracts

21.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and subject to and conditioned upon (a) the Closing of the 363 Transaction, (b) the occurrence of the Assumption Effective Date, and (c) the elimination of any relevant Limited Contract Objections, other than a Cure Objection, by order of this Court overruling such objection or upon agreement of the parties, the Debtors' assumption and assignment to the Purchaser of each Assumable Executory Contract (including, without limitation, the UAW Collective Bargaining Agreement) is approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied.

22.     The Debtors are authorized and directed in accordance with sections 105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Purchaser, effective as of

the Assumption Effective Date, as provided by, and in accordance with, the Sale Procedures
Order and the MPA, those Assumable Executory Contracts that have been designated by the
Purchaser for assumption pursuant to section 6.6 of the MPA and that are not subject to a
Limited Contract Objection other than a Cure Objection, free and clear of all liens, claims,
encumbrances, or other interests of any kind or nature whatsoever (other than Permitted
Encumbrances), including rights or claims based on any successor or transferee liability, other
than the Assumed Liabilities, and (ii) execute and deliver to the Purchaser such documents or
other instruments as the Purchaser reasonably deems may be necessary to assign and transfer
such Assumable Executory Contracts and Assumed Liabilities to the Purchaser. Upon the
Assumption Effective Date as to a particular Assumable Executory Contract, the Purchaser shall
promptly pay the following (the "**Cure Amount**"): (a) all amounts due under such Assumable
Executory Contract as of the Commencement Date as reflected on the website established by the
Debtors which is referenced and is accessible as set forth in the Assumption and Assignment
Notice (the "**Prepetition Cure Amount**"), less amounts, if any, paid after the Commencement
Date on account of the Prepetition Cure Amount (such net amount, the "**Net Prepetition Cure
Amount**"), plus (b) any such amount past due and owing as of the Assumption Effective Date
exclusive of the Net Prepetition Cure Amount. For the avoidance of doubt, all of the Debtors'
rights to assert credits, chargebacks, setoffs, rebates, and other claims under the Purchased
Contracts are purchased by and assigned to the Purchaser as of the Assumption Effective Date.
As used herein, "prompt" payment means (i) with respect to any Cure Amount (or portion
thereof, if any) which is undisputed, payment as soon as reasonably practicable, but not later than
five (5) business days after the Assumption Effective Date, and (ii) with respect to any Cure
Amount (or portion thereof, if any) which is disputed, payment as soon as reasonably
practicable, but not later than five (5) business days after such dispute is resolved and, in the

event Bankruptcy Court approval is required, upon entry of a final order of the Bankruptcy

Court. On and after the Assumption Effective Date, the Purchaser shall pay all undisputed

obligations that arise or come due under each Assumable Executory Contract in the ordinary

course. Notwithstanding any provision in this Order to the contrary, the Purchaser shall not be

obligated to pay any Cure Amount or any other amount due with respect to any Assumable

Executory Contract before such amount becomes due and payable under the applicable payment

terms of such Contract.

      23.    The Assumable Executory Contracts shall be transferred and assigned to,

pursuant to the Sale Procedures Order and the MPA, and thereafter remain in full force and

effect for the benefit of, the Purchaser, notwithstanding any provision in any such Assumable

Executory Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of

the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and,

pursuant to section 365(k) of the Bankruptcy Code, the Sellers shall be relieved from any further

liability with respect to the Assumable Executory Contracts after such assumption and

assignment to the Purchaser. Each Assumable Executory Contract is an executory contract or

unexpired lease under section 365 of the Bankruptcy Code. The Debtors may assume each of

their respective Assumable Executory Contracts in accordance with section 365 of the

Bankruptcy Code. The Debtors may assign each Assumable Executory Contract in accordance

with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumable

Executory Contract that prohibit or condition the assignment of such Assumable Executory

Contract or terminate, recapture, impose any penalty, condition renewal or extension, or modify

any term or condition upon the assignment of such Assumable Executory Contract, constitute

unenforceable antiassignment provisions which are void and of no force and effect in connection

with the transactions contemplated hereunder. All other requirements and conditions under

sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment

to the Purchaser of each Assumable Executory Contract have been satisfied. At such time as

provided in the Sale Procedures Order and the MPA, in accordance with sections 363 and 365 of

the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and

interest of each Purchased Contract. With respect to leases of personal property that are true

leases and not subject to recharacterization, nothing in this Order or the MPA shall transfer to the

Purchaser an ownership interest in any leased property not owned by a Debtor. Any portion of

any of the Debtors' unexpired leases of nonresidential real property that purport to permit the

respective landlords thereunder to cancel the remaining term of any such leases if the Sellers

discontinue their use or operation of the Leased Real Property are void and of no force and effect

and shall not be enforceable against the Purchaser, its assignees and sublessees, and the landlords

under such leases shall not have the right to cancel or otherwise modify such leases or increase

the rent, assert any Claim, or impose any penalty by reason of such discontinuation, the Sellers'

cessation of operations, the assignment of such leases to the Purchaser, or the interruption of

business activities at any of the leased premises.

24.    Except in connection with any ongoing Limited Contract Objection, each

non-Debtor party to an Assumable Executory Contract is forever barred, estopped, and

permanently enjoined from (a) asserting against the Debtors or the Purchaser, their successors or

assigns, or their respective property, any default arising prior to, or existing as of, the

Commencement Date, or, against the Purchaser, any counterclaim, defense (other than defenses

interposed in connection with, or related to, credits, chargebacks, setoffs, rebates, and other

claims asserted by the Sellers or the Purchaser in its capacity as successor) setoff, or other Claim

asserted or assertable against the Sellers and (b) imposing or charging against the Purchaser or its

Affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the

Sellers' assumption and assignment to the Purchaser of the Assumable Executory Contracts. The validity of such assumption and assignment of the Assumable Executory Contracts shall not be affected by any dispute between the Sellers and any non-Debtor party to an Assumable Executory Contract.

25.    Except as expressly provided in the MPA or this Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities other than certain Cure Amounts as provided in the MPA, and all holders of such Claims are forever barred and estopped from asserting such Claims against the Debtors, their successors or assigns, and their estates.

26.    The failure of the Sellers or the Purchaser to enforce at any time one or more terms or conditions of any Assumable Executory Contract shall not be a waiver of such terms or conditions, or of the Sellers' and the Purchaser's rights to enforce every term and condition of the Assumable Executory Contracts.

27.    The authority hereunder for the Debtors to assume and assign an Assumable Executory Contract to the Purchaser includes the authority to assume and assign an Assumable Executory Contract, as amended.

28.    Upon the assumption by a Debtor and the assignment to the Purchaser of any Assumable Executory Contract and the payment of any Cure Amount, all defaults under the Assumable Executory Contract shall be deemed to have been cured, and any counterparty to such Assumable Executory Contract shall be prohibited from exercising any rights or remedies against any Debtor or non-Debtor party to such Assumable Executory Contract based on an asserted default that occurred prior to the Closing.

29.    The assignments of each of the Assumable Executory Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

30.     Entry by GM into the Deferred Termination Agreements with accepting dealers is hereby approved.  Executed Deferred Termination Agreements represent valid and binding contracts, enforceable in accordance with their terms.

31.     Entry by GM into the Participation Agreements with accepting dealers is hereby approved.  Accepted Participation Agreements represent valid and binding contracts, enforceable in accordance with their terms, except that the Court makes no finding as to whether any specific provision of any Participation Agreement governing the obligations of Purchaser and its dealers with respect to future conduct is enforceable under applicable provisions of state law.  Any disputes that may arise under the Participation Agreements with respect to the future conduct of the parties thereto shall be adjudicated on a case by case basis in an appropriate forum other than this Court.

32.     Nothing contained in the preceding two paragraphs shall impact the authority of any state to regulate Purchaser subsequent to the Closing.

33.     Notwithstanding any other provision in the MPA or this Order, no assignment of any rights and interests of the Debtors in any federal license issued by the Federal Communications Commission ("**FCC**") shall take place prior to the issuance of FCC regulatory approval for such assignment pursuant to the Communications Act of 1934, and the rules and regulations promulgated thereunder.

### TPC Property

34.     The Participation Agreement and the other Operative Documents are a secured financing, which shall be Retained Liabilities under the MPA.  To the extent they have a valid, perfected, enforceable, and nonavoidable lien on the TPC Property, as protection under section 363(e) of the Bankruptcy Code, the Lenders shall be entitled to a lien equal to the value of the TPC Property as at the Closing Date in the proceeds received by the Sellers under the 363

Transaction. If the Debtors, the Creditors' Committee, and the Lenders are unable to agree on the value of the TPC Property as of the Closing Date for the purpose of determining the amount of the Lenders' secured claim, the Debtors, the Creditors' Committee, or the Lenders shall file a motion with this Court seeking a determination of the amount of the Lenders' secured claim.

35.    In connection with the foregoing, and pursuant to Section 11.2 of the Trust Agreement, GM, as the sole Certificate Holder and Beneficiary under the Trust, together with the consent of GM as the Lessee, effective as of the date of the Closing, (a) exercises its election to terminate the Trust and (b) in connection therewith, assumes all of the obligations of the Trust and Trustee under or contemplated by the Operative Agreements to which the Trust or Trustee is a party and all other obligations of the Trust or Trustee incurred under the Trust Agreement (other than obligations set forth in clauses (i) through (iii) of the second sentence of Section 7.1 of the Trust Agreement).

36.    In connection with the termination of the Trust, effective as of the date of the Closing, all of the assets of the Trust (the "**Trust Assets**") shall be distributed to GM, as sole Certificate Holder and beneficiary under the Trust, including without limitation the following:

(i)    Industrial Development Revenue Real Property Note (General Motors Project) Series 1999-I, dated November 18, 1999, in the principal amount of $21,700,000, made by the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, to PVV Southpoint 14, LLC, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the Trustee of the Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds (the "**Tennessee Ground Lease**");

(ii)    Real Property Lease Agreement dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Lessor, and PVV Southpoint 14, LLC, as Lessee, recorded as JW1262 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Real Property Lease dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the Trustee of the Trust, as Assignee, recorded as JW1267 in the records of the Shelby County Register of Deeds;

(iii)      Deed of Trust dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Grantor, in favor of Mid-South Title Corporation, as Trustee, for the benefit of PVV Southpoint 14, LLC, Beneficiary, recorded as JW1263 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the Trustee of the Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds;

(iv)      Assignment of Rents and Lease dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Assignor, and PVV Southpoint 14, LLC, as Assignee, recorded as JW1264 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the Trustee of the Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds;

(v)      The Tennessee Master Lease;

(vi)      A certain tract of land being known and designated as Lot 1, as shown on a Subdivision Plat entitled "Final Plat – Lot 1, Whitemarsh Associates, LLC Property", which Plat is recorded among the Land Records of Baltimore County in Plat Book SM No. 71 at folio 144, Maryland, together with a certain tract of land being known and designated as "1.1865 Acre of Highway Widening", as shown on a Subdivision Plat entitled "Final Plat – Lot 1, Whitemarsh Associates, LLC Property", which Plat is recorded among the Land Records of Baltimore County in Plat Book SM No. 71 at folio 144, Baltimore, Maryland, saving and excepting from the above described property all that land conveyed to the State of Maryland to the use of the State Highway Administration of the Department of Transportation dated November 24, 2003, and recorded among the Land Records of Baltimore County in Liber 19569, folio 074, Maryland, together with all rights, easements, covenants, licenses and appurtenances associated with the ownership thereof in any way, including without limitation those easements benefiting Parcel 1 set forth in the Declaration and Agreement Respecting Easements, Restrictions and Operations, between the Trust, GM and Whitemarsh Associates, LLC, recorded among the Land Records of Baltimore County in Liber 14019, folio 430, as amended (collectively, the "**Maryland Property**");

(vii)      alternatively to transfer of direct interest in the Maryland Property pursuant to item (vi) above, if such documents are still extant, the following interests shall be transferred:  (a) Ground Lease Agreement dated as of September 8, 1999, between the Trustee of the Trust. as lessor, and Maryland Economic Development Corporation, as lessee, recorded among the Land Records of Baltimore County in Liber 14019, folio 565, (b) Sublease Agreement dated as of September 8, 1999, between the Maryland Economic Development Corporation, as sublessor, and the Trustee of the Tryust, as sublessee, recorded among the Land Records of Baltimore County in Liber 14019, folio 589, together with (c) all agreements, loan agreements, notes, rights, obligations and interests held by the Trustee of the Trust and/or issued by the Trustee of the Trust in connection therewith; and

     (viii) The Maryland Master Lease.

  37. As a result of the distribution of the Trust Assets, effective as of the date of the Closing, title to the leasehold interest of the Trustee of the Trust under the Tennessee Ground Lease and the lessor's interest under the Tennessee Master Lease shall be held by GM, as are the lessor's and lessee's interests under the Tennessee Master Lease, and as permitted by the Trust Agreement, the Tennessee Master Lease shall hereby be terminated, and GM shall succeed to all rights of the lessor thereunder to the property leased thereby, together with all rights, easements, covenants, licenses and appurtenances associated with the ownership thereof in any way.

  38. As a result of the distribution of the Trust Assets, effective as of the date of the Closing, title to the Maryland Mortgaged Property, the lessor's and lessee's interests under the Maryland Master Lease shall be held by GM, and as permitted by the Trust Agreement, the Maryland Master Lease shall hereby be terminated, and GM shall succeed to all rights of the lessor thereunder to the property leased thereby, together with all rights, easements, covenants, licenses and appurtenances associated with the ownership thereof in any way.

  39. All of the Trust Assets and the TPC Property are Purchased Assets under the MPA and shall be transferred by GM to the Purchaser free and clear of all liens, claims, encumbrances, and interests (other than Permitted Encumbrances).  To the extent any of the Trust Assets and TPC Property are executory contracts and unexpired leases, they shall be Assumable Executory Contracts, which shall be assumed by GM and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code and the Sale Procedures Order.

### Additional Provisions

  40. Except for the Assumed Liabilities expressly set forth in the MPA, none of the Purchaser, its successors or assigns, or any of their respective affiliates shall have any

liability for any Claim that arose prior to the Closing Date, relates to the production of vehicles prior to the Closing Date, or otherwise is assertable against the Debtors or is related to the Purchased Assets prior to the Closing Date. The Purchaser shall not be deemed, as a result of any action taken in connection with the MPA or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets, to: (i) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations arising under the Purchased Assets from and after the Closing); (ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors. Without limiting the foregoing, the Purchaser shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Claims, including, but not limited to, under any theory of successor or transferee liability, de facto merger or continuity, environmental, labor and employment, and products or antitrust liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted, or unasserted, fixed or contingent, liquidated or unliquidated.

41.    Effective upon the Closing and except as may be otherwise provided by stipulation filed with or announced to the Court with respect to a specific matter, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser, its successors and assigns, or the Purchased Assets, with respect to any (i) Claim against the Debtors other than Assumed Liabilities, or (ii) successor or transferee liability of the Purchaser for any of the Debtors, including, without limitation, the following actions: (a) commencing or continuing any action or other proceeding pending or threatened against the Debtors as against the Purchaser, or its successors, assigns, affiliates, or

their respective assets, including the Purchased Assets; (b) enforcing, attaching, collecting, or

recovering in any manner any judgment, award, decree, or order against the Debtors as against

the Purchaser, its successors, assigns, affiliates, or their respective assets, including the

Purchased Assets; (c) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance

against the Debtors as against the Purchaser or its successors, assigns, affiliates, or their

respective assets, including the Purchased Assets; (d) asserting any setoff, right of subrogation,

or recoupment of any kind for any obligation of any of the Debtors as against any obligation due

the Purchaser or its successors, assigns, affiliates, or their respective assets, including the

Purchased Assets; (e) commencing or continuing any action, in any manner or place, that does

not comply, or is inconsistent with, the provisions of this Order or other orders of this Court, or

the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating,

or failing or refusing to renew any license, permit, or authorization to operate any of the

Purchased Assets or conduct any of the businesses operated with such assets.  Notwithstanding

the foregoing, a relevant taxing authority's ability to exercise its rights of setoff and recoupment

are preserved.

   42. Except for the Assumed Liabilities, or as expressly permitted or otherwise

specifically provided for in the MPA or this Order, the Purchaser shall have no liability or

responsibility for any liability or other obligation of the Sellers arising under or related to the

Purchased Assets.  Without limiting the generality of the foregoing, and except as otherwise

specifically provided in this Order and the MPA, the Purchaser shall not be liable for any Claims

against the Sellers or any of their predecessors or Affiliates, and the Purchaser shall have no

successor, transferee, or vicarious liabilities of any kind or character, including, but not limited

to, any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto

merger, or substantial continuity, whether known or unknown as of the Closing, now existing or

hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Sellers or any obligations of the Sellers arising prior to the Closing, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing.

43.    The Purchaser has given substantial consideration under the MPA for the benefit of the holders of liens, claims, encumbrances, or other interests. The consideration provided by the Purchaser for the Purchased Assets under the MPA is greater than the liquidation value of the Purchased Assets and shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

44.    The consideration provided by the Purchaser for the Purchased Assets under the MPA is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

45.    If there is an Agreed G Transaction (determined no later than the due date, with extensions, of GM's tax return for the taxable year in which the 363 Transaction occurs), (i) the MPA shall, and hereby does, constitute a "plan" of GM and the Purchaser solely for purposes of sections 368 and 354 of the Tax Code, and (ii) the 363 Transaction, as set forth in the MPA, and the subsequent liquidation of the Sellers, are intended to constitute a tax reorganization of GM pursuant to section 368(a)(1)(G) of the Tax Code.

46.    This Order (a) shall be effective as a determination that, except for the Assumed Liabilities, at Closing, all liens, claims, encumbrances, and other interests of any kind or nature whatsoever existing as to the Sellers with respect to the Purchased Assets prior to the Closing have been unconditionally released and terminated, and that the conveyances described

in this Order have been effected, and (b) shall be binding upon and govern the acts of all entities,

including, without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies,

governmental departments, secretaries of state, federal, state, and local officials, and all other

persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register, or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any of the Purchased

Assets.

47.    Each and every federal, state, and local governmental agency or

department is authorized to accept any and all documents and instruments necessary or

appropriate to consummate the transactions contemplated by the MPA.

48.    Any amounts that become payable by the Sellers to the Purchaser pursuant

to the MPA (and related agreements executed in connection therewith, including, but not limited

to, any obligation arising under Section 8.2(b) of the MPA) shall (a) constitute administrative

expenses of the Debtors' estates under sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code

and (b) be paid by the Debtors in the time and manner provided for in the MPA without further

Court order.

49.    The transactions contemplated by the MPA are undertaken by the

Purchaser without collusion and in good faith, as that term is used in section 363(m) of the

Bankruptcy Code, and were negotiated by the parties at arm's length, and, accordingly, the

reversal or modification on appeal of the authorization provided in this Order to consummate the

363 Transaction shall not affect the validity of the 363 Transaction (including the assumption

and assignment of any of the Assumable Executory Contracts), unless such authorization is duly

stayed pending such appeal. The Purchaser is a purchaser in good faith of the Purchased Assets and is entitled to all the protections afforded by section 363(m) of the Bankruptcy Code.

50.    Subject to further Court order and consistent with the terms of the MPA and the Transition Services Agreement, the Debtors and the Purchaser are authorized to, and shall, take appropriate measures to maintain and preserve, until the consummation of any chapter 11 plan for the Debtors, (a) the books, records, and any other documentation, including tapes or other audio or digital recordings and data in, or retrievable from, computers or servers relating to or reflecting the records held by the Debtors or their affiliates relating to the Debtors' business, and (b) the cash management system maintained by the Debtors prior to the Closing, as such system may be necessary to effect the orderly administration of the Debtors' estates.

51.    The Debtors are authorized to take any and all actions that are contemplated by or in furtherance of the MPA, including transferring assets between subsidiaries and transferring direct and indirect subsidiaries between entities in the corporate structure, with the consent of the Purchaser.

52.    Upon the Closing, the Purchaser shall assume all liabilities of the Debtors arising out of, relating to, in respect of, or in connection with workers' compensation claims against any Debtor, except for workers' compensation Claims against the Debtors with respect to Employees residing in or employed in, as the case may be as defined by applicable law, the states of Alabama, Georgia, New Jersey, and Oklahoma.

53.    During the week after Closing, the Purchaser shall send an e-mail to the Debtors' customers for whom the Debtors have usable e-mail addresses in their database, which will provide information about the Purchaser and procedures for consumers to opt out of being contacted by the Purchaser for marketing purposes. For a period of ninety (90) days following the Closing Date, the Purchaser shall include on the home page of GM's consumer web site

(www.gm.com) information about the Purchaser, procedures for consumers to opt out of being

contacted by the Purchaser for marketing purposes, and a notice of the Purchaser's new privacy

statement. The Debtors and the Purchaser shall comply with the terms of established business

relationship provisions in any applicable state and federal telemarketing laws.

54.     Nothing in this Order or the MPA releases, nullifies, or enjoins the

enforcement of any liability to a governmental unit under environmental statutes or regulations

(or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any

entity would be subject to as the owner or operator of property after the date of entry of this

Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to

deem the Purchaser as the successor to the Debtors under any state law successor liability

doctrine with respect to any liabilities under environmental statutes or regulations for penalties

for days of violation prior to entry of this Order. Nothing in this paragraph should be construed

to create for any governmental unit any substantive right that does not already exist under law.

*ENV*

55.     Nothing contained in this Order shall in any way (i) diminish the

obligation of the Purchaser to comply with Environmental Laws, or (ii) diminish the obligations

of the Debtors to comply with Environmental Laws consistent with their rights and obligations as

debtors in possession under the Bankruptcy Code.

56.     No law of any state or other jurisdiction relating to bulk sales or similar

laws shall apply in any way to the transactions contemplated by the 363 Transaction, the MPA,

the Motion, and this Order.

57.     The Debtors shall comply with their tax obligations under 28 U.S.C.

§ 960, except to the extent that the Purchaser, pursuant to the MPA, assumes the applicable

liabilities.

58.      Notwithstanding anything contained in their respective organizational documents or applicable state law to the contrary, each of the Debtors is authorized and empowered, upon and in connection with the Closing, to change their respective names, and any amendment to the organizational documents (including the certificate of incorporation) of any of the Debtors to effect such a change is authorized and approved.  Upon any such change with respect to GM, the Debtors shall file with the Court a notice of change of case caption within two (2) business days of the Closing, and the change of case caption for these chapter 11 cases shall be deemed effective as of the Closing.

59.      The terms and provisions of the MPA and this Order shall inure to the benefit of the Debtors, their estates, and their creditors, the Purchaser and its respective affiliates, successors, and assigns.

60.      The failure to specifically include any particular provisions of the MPA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the MPA be authorized and approved in its entirety, except as modified herein.

61.      The MPA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

62.      The provisions of this Order are nonseverable and mutually dependent on each other.

63.      Pursuant to Bankruptcy Rules 6004(g) and 6006(d), this Order shall not be stayed for ten days after its entry and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the 363 Transaction immediately upon entry of this Order.

64.    This Court retains exclusive jurisdiction to enforce and implement the
terms and provisions of this Order, the MPA, all amendments thereto, any waivers and consents
thereunder, and each of the agreements executed in connection therewith, including the Deferred
Termination Agreements and the Participation Agreements, in all respects, including, but not
limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Purchaser,
(b) compel delivery of the purchase price or performance of other obligations owed by or to the
Debtors, (c) resolve any disputes arising under or related to the MPA, except as otherwise
provided therein, (d) interpret, implement, and enforce the provisions of this Order, (e) protect
the Purchaser against any of the Retained Liabilities or the assertion of any lien, claim,
encumbrance, or other interest, of any kind or nature whatsoever, against the Purchased Assets,
and (f) resolve any disputes with respect to or concerning the Deferred Termination Agreements;
except that notwithstanding the forgoing the Court does not retain jurisdiction to hear disputes
arising in connection with the application of the Participation Agreements to future conduct,
which disputes shall be adjudicated as necessary under applicable state or federal law in any
other court or administrative agency of competent jurisdiction.

Dated: New York, York
_____ __, 2009


_____
UNITED STATES BANKRUPTCY JUDGE

EXHIBIT A

## **MASTER SALE AND PURCHASE AGREEMENT**

TO BE INSERTED