# **Debtors 10**

**10**

FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON NOVEMBER 14, 1995

REGISTRATION NO.33-

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549-1004

FORM S-3

REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

GENERAL MOTORS CORPORATION
---------------

| | |
|---|---|
| State of Delaware | 38-0572515 |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization No.) | Identification |

767 Fifth Avenue, New York, New York 10153-0075; (212) 418-6100
3044 West Grand Boulevard, Detroit, Michigan 48202-3091; (313) 556-5000
(Address, including zip code, and telephone number, including area
code, of registrant's principal executive offices)

J. Michael Losh
Executive Vice President
General Motors Corporation
3044 West Grand Boulevard
Detroit, Michigan 48202-3091
(313) 556-3549
(Name, address, including zip code, and telephone number,
including area code, of agent for service)

Copies to:

| | |
|---|---|
| Martin I. Darvick, Esq. | Francis J. Morison, Esq. |
| General Motors Corporation | Davis Polk & Wardwell |
| 3031 West Grand Boulevard | 450 Lexington Avenue |
| Detroit, Michigan 48202-3091 | New York, New York 10017-3904 |

Approximate date of commencement of proposed sale to the public: From time to time after the effective date of this Registration Statement as determined by market conditions.

If the only securities being registered on this form are being offered pursuant to dividend or interest reinvestment plans, please check the following box.[]

If any of the securities being registered on this form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. [X]

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. []

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. []

If delivery of the prospectus is expected to be made pursuant to rule 434, please check the following box. []

CALCULATION OF REGISTRATION FEE
IIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIII

| TITLE OF EACH CLASS OF SECURITIES TO BE REGISTERED | AMOUNT TO BE REGISTERED*(1)(2) | PROPOSED MAXIMUM OFFERING PRICE PER UNIT | PROPOSED MAXIMUM AGGREGATE OFFERING PRICE(3) | AMOUNT OF REGISTRATION FEE |
|---|---|---|---|---|
| Debt Securities | $2,000,000,000 | Various | $2,000,000,000 | $400,000 |
| Debt Warrants (2) | | | | |

*Or, if any Debt Securities (1) are denominated or payable in a foreign or composite currency or currencies, such principal amount as shall result in an aggregate initial offering price equivalent to $2,090,500,000, at the time of initial offering, (2) are issued at an original issue discount, such greater principal amount as shall result in an aggregate initial offering price of $2,090,500,000, or (3) are issued with their principal amount payable at maturity to be determined with reference to a currency exchange rate or other index, such principal amount as shall result in an aggregate initial offering price of $2,090,500,000.

(1) The amount of Debt Securities and Debt Warrants (the "Securities") being registered together with $90,500,000 remaining Debt Securities registered on November 16, 1990 (Registration No. 33-37737), represents the maximum aggregate principal amount of Securities which, on or after November 14, 1995, are expected to be offered for sale.

(2) Debt Warrants may be offered and sold entitling the holder to purchase any of the Debt Securities as permitted by Rule 457(g); no registration fee is attributable to the Debt Warrants registered hereby.

(3) Estimated solely for the purpose of determining the amount of the registration fee.

Pursuant to Rule 429 under the Securities Act of 1933, the prospectus included in this Registration Statement also relates to debt securities of the registrant registered and remaining unissued under Registration Statement No. 33-37737

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT WHICH SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(a), MAY DETERMINE.

PROSPECTUS

## GENERAL MOTORS CORPORATION

### DEBT SECURITIES
### WARRANTS TO PURCHASE DEBT SECURITIES

General Motors Corporation (the "Corporation" or "General Motors"), directly, through agents designated from time to time, or through dealers or underwriters also to be designated, may offer from time to time its debt securities (the "Debt Securities") or its warrants to purchase any of the Debt Securities (the "Debt Warrants"), for issuance and sale, at an aggregate initial offering price not to exceed $2,000,000,000 or the equivalent thereof in other currencies, including composite currencies such as the European Currency Unit ("ECU") (the "Specified Currency"), on terms to be determined at the time of sale. The Debt Securities and the Debt Warrants are herein collectively called the "Offered Securities." The Debt Securities may be offered either together or separately and in one or more series, in amounts, at prices and on terms to be set forth in supplements to this Prospectus. The Securities may be sold for U.S. dollars or the Specified Currency and the principal of and any premium and interest on the Securities may likewise be payable in U.S. dollars or the Specified Currency. The Specified Currency for which the Securities may be purchased and the Specified Currency in which principal of and any premium and interest on the Securities may be payable are set forth in the accompanying Prospectus Supplement (the "Prospectus Supplement").

The Debt Securities will be issued in fully registered definitive form ("Certificated Securities") or in the form of global securities which may be held and registered only in the name of a depositary institution ("Book-Entry Securities").

The terms of the Debt Securities, including the specific designation, aggregate principal amount, authorized denominations, purchase price, maturity, interest rate (which may be fixed or variable) and time of payment of interest, if any, any redemption or repayment terms, and the Specified Currency in which the Debt Securities shall be payable (and similar information with respect to the Debt Securities purchasable upon exercise of each Debt Warrant), are set forth in the accompanying Prospectus Supplement (the "Prospectus Supplement"). Where Debt Warrants are to be offered, a Prospectus Supplement shall set forth the offering price and terms of the Debt Warrants, including the purchase price, exercise price or prices, detachability, expiration date or dates, exercise period or periods, the Specified Currency in which such Debt Warrants are exercisable, the price or prices, if any, at which the Debt Warrants may be redeemed at the option of the holder or will be redeemed upon expiration, and the Warrant Agent acting under the Warrant Agreement pursuant to which the Debt Warrants are to be issued.

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

The Securities may be sold directly by the Corporation, through agents of the Corporation designated from time to time, or through underwriters or dealers, or through a combination of such methods. If any agents, underwriters or dealers are involved in the sale of the Offered Securities, the names of such agents, underwriters or dealers and any applicable commissions or discounts are set forth in the accompanying Prospectus Supplement. Any Agents, underwriters or dealers participating in the offering may be deemed "underwriters" within the meaning of the Securities Act of 1933, as amended. See "Plan of Distribution" for possible indemnification arrangements for the agents, underwriters and dealers. The Corporation reserves the sole right to accept and, together with its agents from time to time, to reject in whole or in part any proposed purchase of Securities to be made directly or through agents.

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

The date of this Prospectus is December ___, 1995

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

No dealer, salesman or any other person has been authorized to give any information or to make any representations not contained or incorporated by reference in this Prospectus, Prospectus Supplement, and Pricing Supplement, if any, and, if given or made, such information or representation must not be relied upon as having been authorized by the Corporation or by any agent, underwriter or dealer. Neither the delivery of this Prospectus, Prospectus Supplement and Pricing Supplement, if any, nor any sale made thereunder shall, under any circumstances, create any implication that the information therein is correct at any time subsequent to the date thereof. This Prospectus, Prospectus Supplement and Pricing Supplement, if any, shall not constitute an offer to sell or a solicitation of an offer to buy any of the Securities offered hereby by anyone in any jurisdiction in which such offer or solicitation is not authorized or in which the person making such offer or solicitation is not qualified to do so or to any person to whom it is unlawful to make such offer or solicitation.

## AVAILABLE INFORMATION

The Corporation is subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and in accordance therewith files reports, proxy statements and other information with the Securities and Exchange Commission (the "Commission"). Such reports, proxy statements and other information can be inspected, and copies may be obtained at the Public Reference Section of the Commission, 450 Fifth Street, N.W., Washington, D.C. 20549, at prescribed rates, as well as at the following Regional Offices of the Commission: Citicorp Center, 500 Madison Street, Suite 1400, Chicago, Illinois 60661-2511 and Seven World Trade Center, Suite 1300, New York, New York 10048. The Corporation's Common Stock, $1-2/3 Par Value, is listed on the New York, Chicago, Pacific and Philadelphia Stock Exchanges. Reports, proxy statements and other information concerning the Corporation can also be inspected at the offices of the New York Stock Exchange, Inc., 11 Wall Street, New York, New York 10005, where the Corporation's Common Stock, $1-2/3 Par Value, Class H Common Stock, $.10 par value, and Class E Common Stock, $.10 par value, are listed and at the offices of the following other stock exchanges where the Common Stock, $1-2/3 Par Value, is listed in the United States: the Chicago Stock Exchange, Inc., One Financial Place, 440 South LaSalle Street, Chicago, Illinois 60605, the Pacific Stock Exchange, Inc., 233 South Beaudry Avenue, Los Angeles, California 90012 and 301 Pine Street, San Francisco, California 94104, and the Philadelphia Stock Exchange, Inc., 1900 Market Street, Philadelphia, Pennsylvania 19103.

The Prospectus constitutes a part of a Registration Statement filed by the Corporation with the Commission under the Securities Act of 1933, as amended (the "Securities Act of 1933"). This Prospectus omits certain of the information contained in the Registration Statement in accordance with the rules and regulations of the Commission. Reference is hereby made to the Registration Statement and related exhibits for further information with respect to the Corporation and the Offered Securities. Statements contained herein concerning the provisions of any document are not necessarily complete and, in each instance, reference is made to the copy of such document filed as an exhibit to the Registration Statement or otherwise filed with the Commission. Each such statement is qualified in its entirety by such reference.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The Corporation's Annual Report on Form 10-K for the year ended December 31, 1994, Quarterly Reports on Form 10-Q for the quarters ended March 31, 1995, June 30, 1995 and September 30, 1995, filed with the Commission pursuant to Section 13 or 15(d) of the Exchange Act are incorporated by reference in this Prospectus.

All documents filed by the Corporation with the Commission pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act subsequent to the date of this Prospectus and prior to the termination of the offering of the Securities shall be deemed to be incorporated by reference in this Prospectus and to be a part thereof from the date of filing of such documents. Any statement contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Prospectus to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Prospectus.

THE CORPORATION WILL PROVIDE WITHOUT CHARGE UPON WRITTEN OR ORAL REQUEST, TO EACH PERSON TO WHOM THIS PROSPECTUS IS DELIVERED, A COPY OF ANY OR ALL OF THE DOCUMENTS DESCRIBED ABOVE WHICH HAVE BEEN OR MAY BE INCORPORATED BY REFERENCE IN THIS PROSPECTUS, OTHER THAN EXHIBITS TO SUCH DOCUMENTS. SUCH REQUEST SHOULD BE DIRECTED TO:

GENERAL MOTORS CORPORATION
3044 WEST GRAND BOULEVARD, ROOM 11-243
DETROIT, MICHIGAN 48202-3091
(TELEPHONE NUMBER: (313) 556-2044)

## GENERAL MOTORS CORPORATION

While the major portion of General Motors' operations is derived from the automotive products industry segment, General Motors also has financing and insurance operations and produces products and provides services in other industry segments. The automotive products segment consists of the design, manufacture, assembly and sale of automobiles, trucks and related parts and accessories. General Motors financing and insurance operations assist in the merchandising of General Motors' products as well as other products. General Motors Acceptance Corporation ("GMAC") and its subsidiaries offer financial services and certain types of insurance to dealers and customers. In addition, GMAC and its subsidiaries are engaged in mortgage banking and investment services. General Motors' other products segment consists of military vehicles, radar and weapon control systems, guided missile systems and defense and commercial satellites; the design, installation and operation of business information and telecommunications systems; as well as the design, development and manufacture of locomotives. For additional information on General Motors, see the General Motors Annual Report on Form 10-K for the year ended December 31, 1994 which is incorporated herein by reference, and the other documents incorporated herein by reference.

General Motors principal executive offices are located at 3044 West Grand Boulevard, Detroit, Michigan 48202-3091 (Telephone Number (313) 556-5000), and 767 Fifth Avenue, New York, New York 10153-0075 (Telephone Number (212) 418-6100).

### USE OF PROCEEDS

Unless otherwise set forth in the applicable Prospectus Supplement, net proceeds from the sale of the Securities will be used for general Corporate purposes, including the repayment of existing indebtedness.

### RATIOS OF EARNINGS TO FIXED CHARGES

The following table sets forth the consolidated ratio of earnings to fixed charges for the Corporation for the periods indicated.

| Nine Months Ended SEPTEMBER 30 | | YEARS ENDED DECEMBER 31 | | | | |
|---|---|---|---|---|---|---|
| 1995 | 1994 | 1994 | 1993 | 1992 | 1991 | 1990 |
| 2.57 | 2.50 | 2.51 | 1.43 | * | * | * |

*In the years 1992, 1991 and 1990, earnings were inadequate to cover fixed charges by $3,112.6 million, $5,522.9 million and $2,121.7 million, respectively.

For purposes of computing the ratio of earnings to fixed charges, "earnings" consist of consolidated income (loss) before cumulative effect of accounting change plus income taxes (credit) and fixed charges included in net income (loss) after eliminating the amortization of capitalized interest and the undistributed (earnings) losses of associates; "fixed charges" consist of interest and related charges on debt, that portion of rentals deemed to be interest, and interest capitalized in the period.

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

## DESCRIPTION OF DEBT SECURITIES

The following description of the terms of the Debt Securities sets forth certain general terms and provisions of the Debt Securities to which any Prospectus Supplement may relate. The particular terms of the Debt Securities in respect of which this Prospectus is being delivered and the extent, if any, to which such general provisions may not apply thereto will be described in the Prospectus Supplement relating to such Debt Securities.

The Debt Securities offered hereby are to be issued under an Indenture (the "Indenture"), dated as of December ___, 1995, between the Corporation and Citibank, N.A., as Trustee (the "Trustee"), a copy of which is filed as an exhibit to the Registration Statement. The following statements are subject to the detailed provisions of the Indenture, a copy of which is filed as an exhibit to the Registration Statement. Numerical references in parentheses below are to sections in the Indenture. Wherever particular provisions of the Indenture are referred to, such provisions are incorporated by reference as a part of the statements made, and the statements are qualified in their entirety by such reference. Capitalized terms used in this description but not defined herein have the meanings provided in the Indenture.

GENERAL

The Indenture does not limit the amount of Debt Securities that can be issued thereunder and provides that Debt Securities may be issued thereunder up to the aggregate principal amount which may be authorized from time to time by the Corporation.

Reference is made to the Prospectus Supplement relating to the particular series of Debt Securities offered thereby for the following terms of the Debt Securities (to the extent such terms are applicable to such Debt Securities):

(i)     the designation of such Debt Securities;

(ii)    the authorized denominations and the aggregate principal amount of such Debt Securities;

(iii)   the percentage of their principal amount at which such Debt Securities will be issued;

(iv)    the date or dates on which such Debt Securities will mature (or the manner of determining the same);

(v)     the rate or rates per annum, if any, which may be fixed or variable, at which such Debt Securities will bear interest, if any, and, if the rate is variable, the manner of calculation thereof;

(vi)    the date or dates from which interest, if any, shall accrue or the method by which such date or dates shall be determined and the date or dates at which such interest, if any, will be payable and the record dates therefor;

(vii)   the period or periods within which, the terms and conditions upon which, such Debt Securities may be redeemed and the redemption price or prices;

(viii)  any mandatory or optional sinking fund or analogous provisions;

(ix)    the provisions, if any, for the defeasance of the Debt Securities;

(x)     the form (registered or bearer) in which Debt Securities may be issued, any restrictions applicable to the exchange of one form for another and to the offer, sale and delivery of Debt Securities in either form;

(xi)    whether and under what circumstances the Corporation will pay additional amounts (the "Additional Amounts") on Debt Securities held by a person who is not a United States person (as defined in the Prospectus Supplement) in respect of specified taxes, assessments or other governmental charges withheld or deducted, and if so, whether the Corporation has the option to redeem the affected Debt Securities rather than pay such Additional Amounts;

(xii)   the Specified Currency for which such Debt Securities may be purchased and the Specified Currency in which the principal of, and premium, if any, and interest, if any, on, such Debt Securities may be payable;

(xiii)  the exchanges, if any, on which such Debt Securities may be listed;

(xiv)   whether such Debt Securities are to be issued in book-entry form and, if so, the identify of the Depositary for such

book-entry Securities;

(xv)    the place or places where the principal of, premium, if any, and interest, if any, on the Debt Securities will be payable; and

(xvi)    any other specific terms of the Debt Securities, including any additional covenants applicable to such Debt Securities and any terms which may be required or advisable under applicable laws or regulations. (Sections 2.04 and 4.02 of the Indenture.)

The Securities will be unsecured and will rank equally and ratably with all other unsecured and unsubordinated indebtedness of the Corporation (other than obligations preferred by mandatory provisions of law).

Unless otherwise specified in a Prospectus Supplement, principal, premium, if any, interest, if any, and Additional Amounts, if any, will be payable, and, unless the Debt Securities are issued in book-entry form, the Debt Securities offered hereby will be transferable, at the office of the Trustee, 111 Wall Street, New York, New York 10043, provided that payment of interest may be made at the option of the Corporation by check mailed to the address of the person entitled thereto. Principal of and premium, if any, interest, if any, and Additional Amounts, if any, on Debt Securities in bearer form, and coupons appertaining thereto (the "Coupons"), if any, will be payable against surrender of such Debt Securities or Coupons, as the case may be, subject to any applicable laws and regulations, at such paying agencies outside the United States as the Corporation may appoint from time to time at the places and subject to the restrictions set forth in the Indenture, the Debt Securities and the Prospectus Supplement. (Section 4.02 of the Indenture.) Debt Securities in bearer form and the Coupons, if any, appertaining thereto will be transferable by delivery. No service charge will be made for any transfer or exchange of such Debt Securities, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. (Section 2.05 of the Indenture.)

Debt Securities may be issued, from time to time, with the principal amount payable on any principal payment date, or the amount of interest payable on any interest payment date, to be determined by reference to one or more currency exchange rates, commodity prices, equity indices or other factors. Holders of such Debt Securities may receive a principal amount on any principal payment date, or a payment of interest on any interest payment date, that is greater than or less than the amount of principal or interest otherwise payable on such dates, depending upon the value on such dates of the applicable currencies, commodities, equity indices or other factors. Information as to the methods for determining the amount of principal or interest payable on any date, the currencies, commodities, equity indices or other factors to which the amount payable on such date is linked and certain additional United States Federal income tax considerations will be set forth in the Prospectus Supplement relating thereto.

As used herein, the term Debt Securities shall include Debt Securities denominated in United States dollars or, at the option of the Corporation if so specified in the applicable Prospectus Supplement, in any other freely transferable currency or units based on or relating to foreign currencies, including European Currency Units.

If a Prospectus Supplement specifies that Debt Securities are denominated in a currency or currency unit other than United States dollars, such Prospectus Supplement shall also specify the denominations in which such Debt Securities will be issued and the coin or currency in which the principal, premium, if any, and interest, if any, on such Debt Securities, will be payable, which may be United States dollars based upon the exchange rate for such other currency existing on or about the time a payment is due.

Some of the Debt Securities may be issued as discounted Debt Securities (bearing no interest or interest at a rate which at the time of issuance is below market rates) to be sold at a substantial discount below their stated principal amount. Special considerations applicable to the Debt Securities of any series, including any special United States Federal income tax consequences applicable to any discounted Debt Securities or to certain Debt Securities issued at par which are treated as having been issued at discount or to Debt Securities denominated or payable in foreign currencies or currency units, will be described in the Prospectus Supplement relating thereto.

If a Prospectus Supplement specifies that the Debt Securities will have a redemption option, the "Option to Elect Repurchase" constitutes an issuer tender offer under the Exchange Act. The Corporation will comply with all issuer tender offer rules and regulations under the Exchange Act, including Rule 14e-1, if such redemption option is elected, including making any required filings with the Commission and the furnishing of certain information to the holders of the Debt Securities.

BOOK-ENTRY SECURITIES – DELIVERY AND FORM

Unless otherwise indicated in the Prospectus Supplement, the Debt Securities will be issued in the form of one or more fully registered global securities (collectively, the "Registered Global Debt Securities") which will be deposited with or on behalf of The Depository Trust Corporation ("DTC") or other

depositary (DTC or such other depositary as is specified in the applicable Prospectus Supplement is herein referred to as the "Depositary") and registered in the name of the Depositary or the Depositary's nominee. No single Registered Global Security shall exceed U.S.$200,000,000. Except as set forth below, the Registered Global Debt Securities may be transferred, in whole and not in part, only to another nominee of the Depositary or to a successor of the Depositary or its nominee.

DTC has advised the Corporation that it is a limited-purpose trust company organized under the laws of the State of New York, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered under the Exchange Act. DTC was created to hold securities of its participants and to facilitate the clearance and settlement of securities transactions among its participants in such securities through electronic book-entry changes in accounts of the participants, thereby eliminating the need for physical movement of securities certificates. DTC's participants include securities brokers and dealers (including the agents and/or underwriters named in any Prospectus Supplement), banks, trust companies, clearing corporations and certain other organizations, some of whom (and/or their representatives) own DTC. Access to DTC's book-entry system is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly. Persons who are not participants may beneficially own securities held by DTC only through participants. The rules applicable to DTC and its participants are on file with the Commission.

Upon the issuance ·by the Corporation of Securities represented by a Registered Global Debt Security, the Depositary will credit, on its book-entry registration and transfer system, the participants' accounts with, the respective principal amounts of the Securities represented by such Registered Global Debt Security beneficially owned by such participants. The accounts to be credited shall be designated by the agents, underwriters or dealers participating in the distribution of such Securities, or the Corporation, if such Securities are offered and sold directly by the Corporation, as the case may be. Ownership of beneficial interests in a Registered Global Debt Security will be limited to participants or persons that hold interests through participants. Ownership of beneficial interests in Securities represented by a Registered Global Debt Security will be shown on, and the transfer of that ownership will be effected only through, records maintained by the Depositary (with respect to interests of participants in the Depositary), or by participants in the Depositary or persons that may hold interests through such participants (with respect to persons other than participants in the Depositary). The laws of some states require that certain purchasers of securities take physical delivery of such securities in definitive form. Such limits and such laws may impair the ability to transfer beneficial interests in a Registered Global Debt Security.

So long as the Depositary for a Registered Global Debt Security, or its nominee, is the registered owner of the Registered Global Debt Security, the Depositary or its nominee, as the case may be, will be considered the sole owner or holder of the Book-Entry Securities represented by such Registered Global Debt Security for all purposes under the Indenture. Except as provided below, owners of beneficial interests in Book-Entry Securities represented by a Registered Global Debt Security or Securities will not be entitled to have Book-Entry Securities represented by such Registered Global Debt Securities registered in their names, will not receive or be entitled to receive physical delivery of Book-Entry Securities in definitive form and will not be considered the owners or holders thereof under the Indenture.

Accordingly, each person owning a beneficial interest in a Registered Global Debt Security must rely on the procedures of the Depositary and, if such person is not a participant, on the procedures of the participant through which such person owns its interest, to exercise any rights of a holder under the Indenture or a Registered Global Debt Security. The Corporation understands that under existing policy of the Depositary and industry practices, in the event that the Corporation requests any action of holders or that an owner of a beneficial interest in such a Registered Global Debt Security desires to give any notice or take any action which a holder is entitled to give or take under the Indenture or a Registered Global Debt Security, the Depositary would authorize the participants holding the relevant beneficial interests to give such notice or take such action. Any beneficial owner that is not a participant must rely on the contractual arrangements it has directly, or indirectly through its financial intermediary, with a participant to give such notice or take such action.

Payments of principal of, premium, if any, and interest, if any, on the Securities represented by a Registered Global Debt Security registered in the name of the Depositary or its nominee will be made by the Corporation through the Trustee to the Depositary or its nominee, as the case may be, as the registered owner of a Registered Global Debt Security. None of the Corporation, the Trustee, any paying agent or any other agent of the Corporation will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of a Registered Global Debt Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests. The Corporation expects that the Depositary, upon receipt of any payment of principal, premium, if any, or interest, if any, in respect of a Registered Global Debt Security, will immediately credit the accounts of the related participants with payment in amounts proportionate to their respective holdings in principal amount of

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

beneficial interest in such Registered Global Debt Security as shown on the records of the Depositary. The Corporation also expects that payments by participants to owners of beneficial interests in a Registered Global Debt Security will be governed by standing customer instructions and customary practices as is now the case with securities held for the accounts of customers in bearer form or registered in "street name" and will be the responsibility of such participants.

If the Depositary is at any time unwilling or unable to continue as depositary or ceases to be a clearing agency under the Exchange Act and a successor depositary registered as a clearing agency under the Exchange Act is not appointed by the Corporation within 90 days, the Corporation will issue Debt Securities in definitive form in exchange for all the Registered Global Debt Securities. In addition, the Corporation may at any time, and in its sole discretion, determine not to have the Debt Securities represented by the Registered Global Debt Securities and, in such event, will issue Debt Securities in definitive form in exchange for all the Registered Global Debt Securities. In either instance, an owner of a beneficial interest in Registered Global Debt Securities will be entitled to have Debt Securities equal in principal amount to such beneficial interest registered in its name and will be entitled to physical delivery of such Debt Securities in definitive form. Debt Securities so issued in definitive form will be issued in denominations of $1,000 and integral multiples thereof and will be issued in registered form only, without Coupons; however, Medium-Term Notes issued pursuant to a Prospectus Supplement will be issued in denominations of $100,000 or any amount in excess thereof which is an integral multiple of $1,000 (or in such other denominations as shall be provided in an applicable Pricing Supplement) and will be issued in registered form only, without Coupons. No service charge will be made for any transfer or exchange of such Debt Securities, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. (Section 2.05 of the Indenture.)

The Debt Securities of a series may also be issued in the form of one or more bearer global securities (a "Bearer Global Debt Security") that will be deposited with a common depositary for the Euroclear System and Cedel Bank, societe anonyme or with a nominee for such depositary identified in the Prospectus Supplement relating to such series. The specific terms and procedures, including the specific terms of the depositary arrangement, with respect to any portion of a series of Debt Securities to be represented by a Bearer Global Debt Security will be described in the Prospectus Supplement relating to such series.

CERTAIN COVENANTS

DEFINITIONS APPLICABLE TO COVENANTS. The following definitions shall be applicable to the covenants specified below:

(i) "Attributable Debt" means, at the time of determination as to any lease, the present value (discounted at the actual rate, if stated, or, if no rate is stated, the implicit rate of interest of such lease transaction as determined by the chairman, president, any vice chairman, any vice president, the treasurer or any assistant treasurer of the Corporation), calculated using the interval of scheduled rental payments under such lease, of the obligation of the lessee for net rental payments during the remaining term of such lease (excluding any subsequent renewal or other extension options held by the lessee). The term "net rental payments" means, with respect to any lease for any period, the sum of the rental and other payments required to be paid in such period by the lessee thereunder, but not including, however, any amounts required to be paid by such lessee (whether or not designated as rental or additional rental) on account of maintenance and repairs, insurance, taxes, assessments, water rates, indemnities or similar charges required to be paid by such lessee thereunder or any amounts required to be paid by such lessee thereunder contingent upon the amount of sales, earnings or profits or of maintenance and repairs, insurance, taxes, assessments, water rates, indemnities or similar charges; provided, however, that, in the case of any lease which is terminable by the lessee upon the payment of a penalty in an amount which is less than the total discounted net rental payments required to be paid from the later of the first date upon which such lease may be so terminated and the date of the determination of net rental payments, "net rental payments" shall include the then-current amount of such penalty from the later of such two dates, and shall exclude the rental payments relating to the remaining period of the lease commencing with the later of such two dates.

(ii) "Debt" means notes, bonds, debentures or other similar evidences of indebtedness for money borrowed.

(iii) "Manufacturing Subsidiary" means any Subsidiary (A) substantially all the property of which is located within the continental United States of America, (B) which owns a Principal Domestic Manufacturing Property and (C) in which the Corporation's investment, direct or indirect and whether in the form of equity, debt, advances or otherwise, is in excess of $2,500,000,000 as shown on the books of the Corporation as of the end of the fiscal year immediately preceding the date of determination; provided, however, that "Manufacturing Subsidiary" shall not include Electronic Data Systems Corporation and its Subsidiaries, Hughes Electronics Corporation and its Subsidiaries, General Motors Acceptance Corporation and its Subsidiaries (or any corporate

successor of any of them) or any other Subsidiary which is principally engaged in leasing or in financing installment receivables or otherwise providing financial or insurance services to the Corporation or others or which is principally engaged in financing the Corporation's operations outside the continental United States of America.

(iv) "Mortgage" means any mortgage, pledge, lien, security interest, conditional sale or other title retention agreement or other similar encumbrance.

(v) "Principal Domestic Manufacturing Property" means any manufacturing plant or facility owned by the Corporation or any Manufacturing Subsidiary which is located within the continental United States of America and, in the opinion of the Board of Directors, is of material importance to the total business conducted by the Corporation and its consolidated affiliates as an entity.

(vi) "Subsidiary" means any corporation of which at least a majority of the outstanding stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by the Corporation, or by one or more Subsidiaries, or by the Corporation and one or more Subsidiaries. (Section 4.08 of the Indenture.)

LIMITATION ON LIENS. For the benefit of the Debt Securities, the Corporation will not, nor will it permit any Manufacturing Subsidiary to, issue or assume any Debt secured by a Mortgage upon any Principal Domestic Manufacturing Property of the Corporation or any Manufacturing Subsidiary or upon any shares of stock or indebtedness of any Manufacturing Subsidiary (whether such Principal Domestic Manufacturing Property, shares of stock or indebtedness are now owned or hereafter acquired) without in any such case effectively providing concurrently with the issuance or assumption of any such Debt that the Debt Securities (together with, if the Corporation shall so determine, any other indebtedness of the Corporation or such Manufacturing Subsidiary ranking equally with the Debt Securities and then existing or thereafter created) shall be secured equally and ratably with such Debt, unless the aggregate amount of Debt issued or assumed and so secured by Mortgages, together with all other Debt of the Corporation and its Manufacturing Subsidiaries which (if originally issued or assumed at such time) would otherwise be subject to the foregoing restrictions, but not including Debt permitted to be secured under clauses (i) through (vi) of the immediately following paragraph, does not at the time exceed 20% of the stockholders' equity of the Corporation and its consolidated subsidiaries, as determined in accordance with generally accepted accounting principles and shown on the audited consolidated balance sheet contained in the latest published annual report to the stockholders of the Corporation.

The above restrictions shall not apply to Debt secured by:

(i) Mortgages on property, shares of stock or indebtedness of any corporation existing at the time such corporation becomes a Manufacturing Subsidiary;

(ii) Mortgages on property existing at the time of acquisition of such property by the Corporation or a Manufacturing Subsidiary, or Mortgages to secure the payment of all or any part of the purchase price of such property upon the acquisition of such property by the Corporation or a Manufacturing Subsidiary or to secure any Debt incurred prior to, at the time of, or within 180 days after, the later of the date of acquisition of such property and the date such property is placed in service, for the purpose of financing all or any part of the purchase price thereof, or Mortgages to secure any Debt incurred for the purpose of financing the cost to the Corporation or a Manufacturing Subsidiary of improvements to such acquired property;

(iii) Mortgages securing Debt of a Manufacturing Subsidiary owing to the Corporation or to another Subsidiary;

(iv) Mortgages on property of a corporation existing at the time such corporation is merged or consolidated with the Corporation or a Manufacturing Subsidiary or at the time of a sale, lease or other disposition of the properties of a corporation as an entirety or substantially as an entirety to the Corporation or a Manufacturing Subsidiary;

(v) Mortgages on property of the Corporation or a Manufacturing Subsidiary in favor of the United States of America or any State thereof, or any department, agency or instrumentality or political subdivision of the United States of America or any State thereof, or in favor of any other country, or any political subdivision thereof, to secure partial, progress, advance or other payments pursuant to any contract or statute or to secure any indebtedness incurred for the purpose of financing all or any part of the purchase price or the cost of construction of the property subject to such Mortgages; or

(vi) any extension, renewal or replacement (or successive extensions, renewals or replacements) in whole or in part of any Mortgage referred to in the foregoing clauses (i) to (v); provided, however, that

the principal amount of Debt secured thereby shall not exceed by more than 115% the principal amount of Debt so secured at the time of such extension, renewal or replacement and that such extension, renewal or replacement shall be limited to all or a part of the property which secured the Mortgage so extended, renewed or replaced (plus improvements on such property). (Section 4.06 of the Indenture.)

LIMITATION ON SALE AND LEASE-BACK. For the benefit of the Debt Securities, the Corporation will not, nor will it permit any Manufacturing Subsidiary to, enter into any arrangement with any person providing for the leasing by the Corporation or any Manufacturing Subsidiary of any Principal Domestic Manufacturing Property owned by the Corporation or any Manufacturing Subsidiary on the date that the Debt Securities are originally issued (except for temporary leases for a term of not more than five years and except for leases between the Corporation and a Manufacturing Subsidiary or between Manufacturing Subsidiaries), which property has been or is to be sold or transferred by the Corporation or such Manufacturing Subsidiary to such person, unless either:

(i) the Corporation or such Manufacturing Subsidiary would be entitled, pursuant to the provisions of the covenant on limitation on liens described above, to issue, assume, extend, renew or replace Debt secured by a Mortgage upon such property equal in amount to the Attributable Debt in respect of such arrangement without equally and ratably securing the Debt Securities; provided, however, that from and after the date on which such arrangement becomes effective the Attributable Debt in respect of such arrangement shall be deemed for all purposes under the covenant on limitation on liens described above and this covenant on limitation on sale and lease-back to be Debt subject to the provisions of the covenant on limitation on liens described above (which provisions include the exceptions set forth in clauses (i) through (vi) of such covenant), or

(ii) the Corporation shall apply an amount in cash equal to the Attributable Debt in respect of such arrangement to the retirement (other than any mandatory retirement or by way of payment at maturity), within 180 days of the effective date of any such arrangement, of Debt of the Corporation or any Manufacturing Subsidiary (other than Debt owned by the Corporation or any Manufacturing Subsidiary) which by its terms matures at or is extendible or renewable at the option of the obligor to a date more than twelve months after the date of the creation of such Debt. (Section 4.07 of the Indenture.)

DEFEASANCE

If the terms of a particular series of Debt Securities so provide, the Corporation may, at its option, (a) discharge its indebtedness and its obligations under the Indenture with respect to such series or (b) not comply with certain covenants contained in the Indenture with respect to such series, in each case by depositing funds or obligations issued or guaranteed by the United States of America with the Trustee. The Prospectus Supplement will more fully describe the provisions, if any, relating to such defeasance. (Section 12.02 of the Indenture.)

MODIFICATION OF THE INDENTURE

The Indenture provides that the Corporation and the Trustee may enter into supplemental indentures without the consent of the holders of the Debt Securities to (a) evidence the assumption by a successor corporation of the obligations of the Corporation, (b) add covenants for the protection of the holders of the Debt Securities, (c) add or change any of the provisions of the Indenture to permit or facilitate the issuance of Debt Securities of any series in bearer form, (d) cure any ambiguity or correct any inconsistency in such Indenture, (e) establish the form or terms of Debt Securities of any series as permitted by the terms of the Indenture and (f) evidence the acceptance of appointment by a successor trustee. (Section 10.01 of the Indenture.)

The Indenture also contains provisions permitting the Corporation and the Trustee to modify or amend the Indenture or any supplemental indenture or the rights of the holders of the Debt Securities issued thereunder, with the consent of the holders of not less than a majority in principal amount of the Debt Securities of all series at the time outstanding under such Indenture which are affected by such modification or amendment (voting as one class), provided that no such modification shall (i) extend the fixed maturity of any Debt Securities, or reduce the principal amount thereof, or premium, if any, or reduce the rate or extend the time of payment of interest or Additional Amounts thereon, or reduce the amount due and payable upon acceleration of the maturity thereof or the amount provable in bankruptcy, or make the principal of, or interest, premium or Additional Amounts on, any Debt Security payable in any coin or currency other than that provided in such Debt Security, (ii) impair the right to initiate suit for the enforcement of any such payment on or after the stated maturity thereof, or (iii) reduce the aforesaid percentage of Debt Securities, the consent of the holders of which is required for any such modification, or the percentage required for the consent of the holders to waive defaults, without the consent of the holder of each Debt Security so affected. (Section 10.02 of the Indenture.)

EVENTS OF DEFAULT

An Event of Default with respect to any series of Debt Securities is

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

defined in the Indenture as being: (a) default in payment of any principal or premium, if any, on such series; (b) default for 30 days in payment of any interest or Additional Amounts on such series; (c) default for 90 days after notice in performance of any other covenant applicable to the Debt Securities; or (d) certain events of bankruptcy, insolvency or reorganization. (Section 6.01 of the Indenture.)

No Event of Default with respect to a particular series of Debt Securities issued under the Indenture necessarily constitutes an Event of Default with respect to any other series of Debt Securities issued thereunder. In case an Event of Default under clause (a), (b) or (c) shall occur and be continuing with respect to any series, the Trustee or the holders of not less than 25% in aggregate principal amount of Debt Securities of each such series then outstanding may declare the principal (or, in the case of discounted Debt Securities, the amount specified in the terms thereof) of such series to be due and payable. In case an Event of Default under clause (d) shall occur and be continuing, the Trustee or the holders of not less than 25% in aggregate principal amount of all the Debt Securities then outstanding (voting as one class) may declare the principal (or, in the case of discounted Debt Securities, the amount specified in the terms thereof) of all outstanding Debt Securities to be due and payable. Any Event of Default with respect to a particular series of Debt Securities may be waived by the holders of a majority in aggregate principal amount of the outstanding Debt Securities of such series (or of all the outstanding Debt Securities, as the case may be), except in a case of failure to pay principal or premium, if any, or interest or Additional Amounts in respect of such Debt Security for which payment had not been subsequently made. (Section 6.01 of the Indenture.) The Indenture provides that the Trustee may withhold notice to the securityholders of any default (except in payment of principal, premium, if any, or interest or Additional Amounts) if it considers it in the interests of the securityholders to do so. (Section 6.07 of the Indenture.)

Subject to the provisions of the Indenture relating to the duties of the Trustee in case an Event of Default shall occur and be continuing, the Trustee shall be under no obligation to exercise any of its rights or powers under the Indenture at the request, order or direction of any of the securityholders, unless such securityholders shall have offered to the Trustee reasonable indemnity. (Sections 7.01 and 7.02 of the Indenture.) Subject to such provisions for the indemnification of the Trustee and to certain other limitations, the holders of a majority in aggregate principal amount of the Debt Securities of all series affected (voting as one class) at the time outstanding shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee. (Section 6.06 of the Indenture.)

CONCERNING THE TRUSTEE

Citibank, N.A. is the Trustee under the Indenture. Citibank, N.A. acts as depositary for funds of, makes loans to, acts as trustee and performs certain other services for, the Corporation and certain of its subsidiaries and affiliates in the normal course of its business.

DESCRIPTION OF DEBT WARRANTS

GENERAL

The Corporation may issue, together with Debt Securities or separately, Debt Warrants for the purchase of Debt Securities. If the Debt Warrants are issued together with any Debt Securities, they may be attached to or traded separately from such Debt Securities. The Debt Warrants are to be issued under one or more separate Warrant Agreements (each a "Debt Warrant Agreement") between the Corporation and a banking institution organized under the laws of the United States or one of the States thereof (each a "Warrant Agent").

The following statements with respect to the Debt Warrants are summaries of the Debt Warrant Agreement, a form of which is filed as an exhibit to the Registration Statement. Such summaries of certain provisions of the Debt Warrant Agreement and the Debt Warrants do not purport to be complete and such summaries are subject to the detailed provisions of the Debt Warrant Agreement to which reference is hereby made for a full description of such provisions, including the definition of certain terms used herein, and for other information regarding the Debt Warrants. Wherever particular provisions of the Debt Warrant Agreement or terms defined therein are referred to, such provisions or definitions are incorporated by reference as a part of the statements made, and the statements are qualified in their entirety by such reference.

The Debt Warrants will be evidenced by Debt Warrant Certificates (the "Debt Warrant Certificates") and, except as otherwise specified in the Prospectus Supplement accompanying this Prospectus, may be traded separately from any Debt Securities with which they may be issued. Debt Warrant Certificates may be exchanged for new Debt Warrant Certificates of different denominations at the office of the Warrant Agent. The holder of a Debt Warrant does not have any of the rights of a holder of a Debt Security in respect of, and is not entitled to any payments on, any Debt Securities issuable (but not yet issued) upon exercise of the Debt Warrants. The Debt Warrants may be issued in one or more series, and reference is made to the Prospectus Supplement accompanying this Prospectus relating to the particular series of Debt Warrants offered thereby for the terms of, and other information with respect to, such Debt Warrants, including:

(i)     the title and the aggregate number of Debt Warrants;

(ii)    the designation, aggregate principal amount, currency or currencies and terms of the Debt Securities that may be purchased upon exercise of the Debt Warrants;

(iii)   the price or prices at which such Debt Warrants are exercisable;

(iv)    the currency or currencies in which such Debt Warrants are exercisable;

(v)     the places at which such Debt Warrants are exercisable and the date on which the right to exercise the Debt Warrants shall commence and the date on which such right shall expire (the "Debt Warrant Expiration Date") or, if the Debt Warrants are not continuously exercisable throughout such period, the specific date or dates on which they will be exercisable (each, a "Debt Warrant Exercise Date", which term shall also mean, with respect to Debt Warrants continuously exercisable for a period of time, every date during such period);

(vi)    the terms of any mandatory or optional call provisions;

(vii)   the price or prices, if any, at which the Debt Warrants may be redeemed at the option of the holder or will be redeemed upon expiration;

(viii)  the identity of the Debt Warrant Agent;

(ix)    the exchanges, if any, on which such Debt Warrants may be listed;

(x)     whether such Debt Warrants shall be issued in book-entry form;

(xi)    if applicable, the designation and terms of the Debt Securities with which the Debt Warrants are issued and the number of Debt Warrants issued with each of such Debt Securities;

(xii)   if applicable, the date on and after which the Debt Warrants and the related Debt Securities will be separately transferable;

(xiii)  whether the Debt Warrant Certificates will be in registered form or bearer form or both;

(xiv)   any applicable United States Federal income tax consequences;

(xv)    the price at which the Debt Warrants will be issued; and

(xvi)   any other terms of the Debt Warrants.

EXERCISE OF DEBT WARRANTS

Debt Warrants in registered form may be exercised by payment to the Warrant Agent of the exercise price, in each case in such currency or currencies as are specified in the Debt Warrant, and by communicating to the Warrant Agent the identity of the Debt Warrantholder and the number of Debt Warrants to be exercised. Upon receipt of payment and the Debt Warrant Certificate properly completed and duly executed, at the office of the Warrant Agent, the Warrant Agent will, as soon as practicable, arrange for the issuance of the applicable Debt Securities, the form of which shall be set forth in the Prospectus Supplement. If less than all of the Debt Warrants evidenced by a Debt Warrant Certificate are exercised, a new Debt Warrant Certificate will be issued for the remaining amounts of Debt Warrants. A more complete summary for the exercise of Debt Warrants in registered form and for exercises of Debt Warrants in bearer form is contained in the Prospectus Supplement accompanying this Prospectus.

PLAN OF DISTRIBUTION

The Corporation may sell the Securities being offered hereby in any of four ways: (i) directly to purchasers, (ii) through agents, (iii) through underwriters, and (iv) through dealers.

Offers to purchase Securities may be solicited directly by the Corporation or by agents designated by the Corporation from time to time. Any such agent, who may be deemed to be an underwriter as that term is defined in the Securities Act of 1933, involved in the offer or sale of the Securities in respect of which this Prospectus is delivered will be named, and any commissions payable by the Corporation to such agent set forth, in the Prospectus Supplement. Unless otherwise indicated in the Prospectus Supplement, any such agent will be acting on a reasonable best efforts basis for the period of its appointment (ordinarily five business days or less). Agents may be entitled under agreements which may be entered into with the Corporation to indemnification by the Corporation

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

against certain civil liabilities, including liabilities under the Securities Act of 1933, and may be customers of, engage in transactions with, or perform services for, the Corporation and its subsidiaries in the ordinary course of business.

If an underwriter or underwriters are utilized in the sale, the Corporation will enter into an underwriting agreement with such underwriters at the time of sale to them and the names of the underwriters and the terms of the transaction will be set forth in the Prospectus Supplement, which will be used by the underwriters to make resales of the Securities in respect of which this Prospectus is delivered to the public. The underwriters may be entitled, under the relevant underwriting agreement, to indemnification by the Corporation against certain liabilities, including liabilities under the Securities Act of 1933.

Among others, one or more of the following firms may act as managing underwriter(s) with respect to the offering of the Securities: Bear, Stearns & Co. Inc., Lehman Brothers, Lehman Brothers Inc., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith, J.P. Morgan Securities Inc., Morgan Stanley & Co. Incorporated and Salomon Brothers Inc.

If a dealer is utilized in the sale of the Securities in respect of which this Prospectus is delivered, the Corporation will sell such Securities to the dealer as principal. The dealer may then resell such Securities to the public at varying prices to be determined by such dealer at the time of resale. Dealers may be entitled to indemnification by the Corporation against certain liabilities, including liabilities under the Securities Act of 1933.

If so indicated in the applicable Prospectus Supplement, the Corporation will authorize agents and underwriters to solicit offers by certain institutions to purchase Securities from the Corporation at the public offering price set forth in the Prospectus Supplement pursuant to Delayed Delivery Contracts ("Contracts") providing for payment and delivery on the date stated in the Prospectus Supplement. Each Contract will be for an amount not less than, and unless the Corporation otherwise agrees the aggregate principal amount of Securities sold pursuant to Contracts shall be not less nor more than, the respective amounts stated in the Prospectus Supplement. Institutions with whom Contracts, when authorized, may be made include commercial and savings banks, insurance companies, pension funds, investment companies, educational and charitable institutions, and other institutions but shall in all cases be subject to the approval of the Corporation. Contracts will not be subject to any conditions except that the purchase by an institution of the Securities covered by its Contract shall not at the time of delivery be prohibited under the laws of any jurisdiction in the United States to which such institution is subject. A commission indicated in the applicable Prospectus Supplement will be paid to underwriters and agents soliciting purchases of Securities pursuant to Contracts accepted by the Corporation.

The place and time of delivery for the Securities in respect of which this Prospectus is delivered are set forth in the accompanying Prospectus Supplement.

--------------------

John G. Smale and Dennis Weatherstone, directors of J. P. Morgan & Co. Incorporated, of which J. P. Morgan Securities Inc. is an indirect wholly-owned subsidiary, are directors of the Corporation. In addition, John G. Smale is Chairman of the Board of Directors of the Corporation. In the ordinary course of their respective businesses, affiliates of the Agents have engaged, and will in the future engage in commercial banking and investment banking transactions with General Motors and certain of its affiliates.

EXPERTS

The consolidated financial statements and the financial statement schedule included in the Corporation's 1994 Annual Report on Form 10-K, incorporated by reference herein, have been audited by Deloitte & Touche LLP (as to financial statements and the financial statement schedule of General Motors and as to financial statements of GM Hughes Electronics Corporation (now Hughes Electronics Corporation)) and KPMG Peat Marwick LLP (as to financial statements of Electronic Data Systems Corporation), independent auditors, as stated in their respective reports appearing therein, and have been so incorporated by reference in reliance upon such reports given upon the authority of such firms as experts in accounting and auditing.

LEGAL OPINIONS

Unless otherwise indicated in the Prospectus Supplement relating to the Securities, the legality of the Securities will be passed upon for the Corporation by Martin I. Darvick, Attorney, Legal Staff, of the Corporation. Mr. Darvick owns shares, and has options to purchase shares, of the Corporation's Common Stock, $1-2/3 Par Value.

Unless otherwise indicated in the Prospectus Supplement relating to the Securities, certain legal matters relating to the Securities will be passed upon for the Underwriters by Davis Polk & Wardwell. Davis Polk & Wardwell acts as counsel to the Executive Compensation Committee of the Board of Directors of the Corporation and has acted as counsel for the Corporation and its subsidiaries in various matters.

----------------------

No dealer, salesman or any other person has been authorized to give any information or to make any representations not contained or incorporated by reference in this Prospectus, Prospectus Supplement, and Pricing Supplement, if any, and, if given or made, such information or representation must not be relied upon as having been authorized by the Corporation nor by any agent, underwriter or dealer. Neither the delivery of this Prospectus, Prospectus Supplement and Pricing Supplement, if any, nor any sale made thereunder shall, under any circumstances, create any implication that the information therein is correct at any time subsequent to the date thereof. This Prospectus, Prospectus Supplement and Pricing Supplement, if any, shall not constitute an offer to sell or a solicitation of an offer to buy any of the Securities offered hereby by anyone in any jurisdiction in which such offer or solicitation is not authorized or in which the person making such offer or solicitation is not qualified to do so or to any person to whom it is unlawful to make such offer or solicitation.

----------------------

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

TABLE OF CONTENTS

PAGE

Available Information ..........................
Incorporation of Certain
  Documents by Reference ..................
General Motors Corporation.................
Use of Proceeds....................................
Ratios of Earnings to Fixed
  Charges..........................................
Description of Debt Securities.............
Description of Debt Warrants..............
Plan of Distribution.............................
Experts.................................................
Legal Opinions.....................................

GENERAL MOTORS CORPORATION
DEBT SECURITIES
DEBT WARRANTS

Prospectus Dated December ___, 1995

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 14.  OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION.

The following  table sets forth the  estimated  expenses to be incurred in
connection with the offering described in this Registration Statement:

| | |
|---|---:|
| Securities and Exchange Commission registration fee.....$ | 400,000 |
| Blue Sky filing and counsel fees......................... | 25,000 |
| Fees and expenses of Trustee and Debt Warrant Agent..... | 20,000 |
| Printing Registration Statement, Prospectus, Indenture, | |
| Debt Warrant Agreement and other documents.............. | 40,000 |
| Auditors'fees  ......................................... | 20,000 |
| Rating Agencies'fee..................................... | 180,000 |
| Miscellaneous expenses.................................. | 25,000 |
| Total............................................$ | 710,000 |

--------------------

ITEM 15.  INDEMNIFICATION OF DIRECTORS AND OFFICERS.

Under  Section 145 of the Delaware  Corporation  Law, the  Corporation  is
empowered to indemnify its directors and officers in the  circumstances  therein
provided.

The Corporation's Certificate of Incorporation,  as amended, provides that
no director shall be personally  liable to the  Corporation  or its  stockholders
for  monetary  damages for breach of  fiduciary  duty as a director,  except for
liability  (i) for any breach of  the  director's  duty  of  loyalty  to the
Corporation,  or its stockholders,  (ii) for acts or omissions not in good faith
or which involve  intentional  misconduct or a knowing  violation of law,  (iii)
under Section 174, or any  successor  provision  thereto, of  the  Delaware
Corporation  Law, or (iv) for any transaction from which the director derived an
improper personal benefit.

Under  Article V of its  By-Laws,  the  Corporation  shall  indemnify  and
advance  expenses to every  director  and officer (and to such  person's  heirs,
executors,  administrators  or other legal  representatives)  in the manner and to
the full extent  permitted  by applicable  law as it presently  exists,  or may
hereafter be amended,  against any and all amounts (including judgments,  fines,
payments in settlement,  attorneys' fees and other expenses) reasonably incurred
by or on behalf of such person in  connection  with any  threatened,  pending or
completed action, suit or proceeding, whether civil, criminal, administrative or
investigative  ("a proceeding"),  in which such director or officer was or is made
or is  threatened  to be made a party or is otherwise  involved by reason of the
fact that such person is or was a director or officer of the Corporation,  or is
or was  serving  at the  request  of the  Corporation  as a  director,  officer,
employee,  fiduciary  or  member of any other  corporation,  partnership,  joint
venture,  trust,  organization or other enterprise.  The Corporation shall not be
required to indemnify a person in connection with a proceeding initiated by such
person if the  proceeding  was not  authorized  by the Board of Directors of the
Corporation.  The Corporation  shall pay the expenses of directors and officers
incurred  in defending any  proceeding  in advance  of its final  disposition
("advancement  of expenses");  provided,  however,  that the payment of expenses
incurred  by a director  or officer in advance of the final  disposition  of the
proceeding  shall be made only upon receipt of an undertaking by the director or
officer to repay all amounts advanced if it should be ultimately determined that
the director or officer is not entitled to be indemnified under Article V of the
By-Laws or otherwise.  If a claim for indemnification or advancement of expenses
by an officer or  director  under  Article V of the  By-Laws is not paid in full
within ninety  days after a written  claim  therefor  has been  received by the
Corporation,  the  claimant  may file suit to recover the unpaid  amount of such
claim and, if successful  in whole or in part,  shall be entitled to be paid the
expense of prosecuting such claim. In any such action the Corporation shall have
the  burden of proving  that the  claimant  was not  entitled  to the  requested
indemnification  or advancement of expenses  under  applicable  law. The rights
conferred  on any person by Article V of the By-Laws  shall not be  exclusive of
any other  rights  which such  person may have or hereafter  acquire  under any
statute,  provision of the Corporation's Certificate of Incorporation or By-Laws,
agreement, vote of stockholders or disinterested directors or otherwise.

The  Corporation  is  insured  against  liabilities  which it may incur by
reason of Article V of its  By-Laws.  In addition,  directors and officers are
insured,  at the  Corporation's  expense,  against some liabilities  which might
arise  out of their  employment  and not be  subject  to  indemnification  under
Article V of the By-Laws.

Pursuant to a resolution  adopted by the Board of Directors on December 1,
1975,  the  Corporation  to the  fullest  extent  permissible  under  law  will
indemnify,  and has purchased  insurance on behalf of,  directors or officers of
the  Corporation,  or any of them,  who incur or are  threatened  with  personal
liability, including expenses, under the Employee Retirement Income Security Act
of 1974, as amended,  or any amendatory or comparable  legislation or regulation

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

thereunder.

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

ITEM 16.    EXHIBITS

| | | |
|---|---|---|
| *1(a) | -- | Form of proposed Underwriting Agreement (including Form of _____ Delayed Delivery Contract) |
| *1(b) | -- | Form of proposed Purchase Agreement |
| *1(c) | -- | Form of proposed Selling Agent Agreement |
| 1(d) | -- | Form of Prospectus Supplement (Medium-Term Notes) |
| 4(a) | -- | Indenture, dated as of December___, 1995. between the Corporation and Citibank, N.A., Trustee |
| *4(b) | -- | Form of proposed Debt Warrant Agreement |
| *4(c) | -- | Form of Debt Warrant Certificate (included in Exhibit 4(b)) |
| *4(d) | -- | Forms of Global Note and Medium-Term Notes |
| 5 | -- | Opinion and Consent of Martin I. Darvick, Esq., Attorney, Legal Staff of the Corporation |
| 8 | -- | Opinion and Consent of Robert N. Dietz, Tax Counsel of the Tax Staff of the Corporation. |
| 12 | -- | Computation of Ratios of Earnings to Fixed Charges for the five years ended December 31, 1994 and the nine months ended September 30, 1995 and 1994 incorporated by reference to Exhibit 12 to the following documents: |

(a) Annual Reports on Form 10-K of General Motors Corporation for the years ended December 31, 1994, 1993 and 1992.

(b) Quarterly Report on Form 10-Q of General Motors Corporation for the quarter ended September 30, 1995

| | | |
|---|---|---|
| 23(a) | -- | Consent of Deloitte & Touche LLP |
| 23(b) | -- | Consent of KPMG Peat Marwick LLP |
| 23(c) | -- | Consent of Counsel (included in Exhibit 5) |
| 25 | -- | Form T-1 Statement of Eligibility and Qualification under the Trust Indenture Act of 1939 of Citibank, N.A. |

- --------------------
*  Incorporated by reference to Exhibits 1 through 4(d),
   respectively, to Registration Statement No. 33-41557.

ITEM 17.    UNDERTAKINGS.

The undersigned Registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made of the securities registered hereby, a post-effective amendment to this registration statement:

(i) To include any prospectus required by section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in this registration statement;

(iii) To include any material information with respect to the plan of distribution not previously disclosed in this registration statement or any material change to such information in the registration statement;

provided, however, that the undertakings set forth in paragraphs (i) and (ii) above do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in periodic reports filed by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in this registration statement;

(2) That for purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(3) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered herein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(4) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

The undersigned registrant hereby further undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to section 13(a) or section 15(d) of the Securities Exchange Act of 1934 that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered herein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors and officers of the Corporation pursuant to the provisions discussed in Item 15 above, or otherwise, the Corporation has been advised that in the opinion of the Commission such indemnification is against public policy as expressed in the Securities Act of 1933 and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Corporation of expenses incurred or paid by a director or officer of the Corporation in the successful defense of any action, suit or proceeding) is asserted by such director or officer in connection with the securities being registered, the Corporation will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act of 1933 and will be governed by the final adjudication of such issue.

----------------------

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant, General Motors Corporation, certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Detroit, and State of Michigan, on November 14, 1995.

                                    GENERAL MOTORS CORPORATION

                                    By:  /S/ JOHN F. SMITH, JR.
                                         (John F. Smith, Jr.
                                         Chief Executive Officer,
                                         President and Director)

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed on November 14, 1995 by the following persons in the capacities indicated.

| SIGNATURE | TITLE | |
|---|---|---|
| /S/ JOHN G. SMALE<br>(John G. Smale) | Chairman of the Board<br>of Directors | |
| /S/ JOHN F. SMITH, JR.<br>(John F. Smith, Jr.) | Chief Executive Officer,<br>President and Director | |
| /S/ J. MICHAEL LOSH<br>(J. Michael Losh) | Executive Vice President<br>and Chief Financial<br>Officer | (Principal<br>Financial<br>Officers) |
| /S/ LEON J. KRAIN<br>(Leon J. Krain) | Vice President and<br>Group Executive | |
| /S/ HEIDI KUNZ<br>(Heidi Kunz) | Vice President and<br>Treasurer | |
| /S/ WALLACE W. CREEK<br>(Wallace W. Creek) | Comptroller | (Principal<br>Accounting<br>Officers) |
| /S/ JAMES H. HUMPHREY<br>(James H. Humphrey) | Chief Accounting Officer | |
| /S/ ANNE L. ARMSTRONG<br>(Anne L. Armstrong) | Director | |
| /S/ JOHN H. BRYAN<br>(John H. Bryan) | Director | |
| /S/ THOMAS E. EVERHART<br>(Thomas E. Everhart) | Director | |
| /S/ CHARLES T. FISHER, III | Director | |

(Charles T. Fisher, III)

/S/ J. WILLARD MARRIOTT, JR.      Director
(J. Willard Marriott, Jr.)

/S/ ANN D. MCLAUGHLIN      Director
(Ann D. McLaughlin)

/S/ EDMUND T. PRATT, JR.      Director
(Edmund T. Pratt, Jr.)

/S/ LOUIS W. SULLIVAN      Director
(Louis W. Sullivan)

/S/ DENNIS WEATHERSTONE      Director
(Dennis Weatherstone)

/S/ THOMAS H. WYMAN      Director
(Thomas H. Wyman)

------------------------

EXHIBIT INDEX

|  |  | Page |
|---|---|---|
| EXHIBIT NO. | | |
| *1(a) | Form of proposed Underwriting Agreement (including Form of Delayed Delivery Contract) | |
| *1(b) | Form of proposed Purchase Agreement | |
| *1(c) | Form of proposed Selling Agent Agreement | |
| 1(d) | Form of Prospectus Supplement (Medium-Term Notes) | |
| 4(a) | Indenture, dated as of December ___, 1995, between the Corporation and Citibank, N.A., Trustee | |
| *4(b) | Form of proposed Debt Warrant Agreement | |
| *4(c) | Form of Debt Warrant Certificate (included in Exhibit 4(b)) | |
| *4(d) | Forms of Global Note and Medium-Term Notes | |
| 5 | Opinion and Consent of Martin I. Darvick, Esq., Attorney, Legal Staff of the Corporation | |
| 8 | Opinion and Consent of Robert N. Dietz, Tax Counsel of the Tax Staff of the Corporation. | |
| 12 | Computation of Ratios of Earnings to Fixed Charges for the five years ended December 31, 1994 and the nine months ended September 30, 1995 and 1994 incorporated by reference to Exhibit 12 to the following documents: | |
| | (a) Annual Reports on Form 10-K of General Motors Corporation for the years ended December 31, 1994, 1993 and 1992. | |
| | (b) Quarterly Report on Form 10-Q of General Motors Corporation for the quarter ended September 30, 1995 | |
| 23(a) | Consent of Deloitte & Touche LLP | |
| 23(b) | Consent of KPMG Peat Marwick LLP | |
| 23(c) | Consent of Counsel (included in Exhibit 5) | |
| 25 | Form T-1 Statement of Eligibility and Qualification under the Trust Indenture Act of 1939 of Citibank, N.A. | |

- -----------------------
\* Incorporated by reference to Exhibits 1 through 4(d), respectively, to Registration No. 33-41557.

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

Exhibit 1(d)

PROSPECTUS SUPPLEMENT
(To Prospectus Dated December ___ , 1995)

U.S. $2,000,000,000
GENERAL MOTORS CORPORATION
MEDIUM-TERM NOTES
DUE NINE MONTHS OR MORE FROM DATE OF ISSUE

General Motors Corporation (the "Corporation") may offer from time to time its Medium-Term Notes Due Nine Months or More from Date of Issue (the "Notes"). The Notes offered by this Prospectus Supplement will be limited to up to U.S. $2,000,000,000 aggregate initial offering price or the equivalent thereof in other currencies, including composite currencies such as the European Currency Unit ("ECU") (the "Specified Currency"), subject to reduction as a result of the sale of other Debt Securities or Debt Warrants to purchase other Debt Securities (as such capitalized terms are defined in the accompanying Prospectus). The Notes will be offered at varying maturities due nine months or more from the date of issue (the "Issue Date"), as selected by the purchaser and agreed to by the Corporation, and may be subject to redemption at the option of the Corporation or repayment at the option of the holder thereof prior to the maturity date thereof (as further defined herein, the "Maturity Date"). Each Note will be denominated in U.S. dollars or in the Specified Currency, as set forth in a Pricing Supplement (the "Pricing Supplement") to this Prospectus Supplement. See "Important Currency Exchange Information" and "Risk Factors - -Foreign Currency Risks."

The interest rate on each Note will be either a fixed rate established by the Corporation at the Issue Date of such Note (a "Fixed Rate Note"), which may be zero in the case of certain Notes issued at a price representing a substantial discount from the principal amount payable upon the Maturity Date, or at a floating rate as set forth therein and specified in the applicable Pricing Supplement (a "Floating Rate Note"). A Fixed Rate Note may pay a level amount in respect of both interest and principal amortized over the life of the Note (an "Amortizing Note"). See "Description of Notes---Fixed Rate Notes" and "Description of Notes---Floating Rate Notes." The principal amount payable at the Maturity Date of, or any interest and premium, if any, on, a Note, or both, may be determined by reference to one or more Specified Currencies (a "Currency Indexed Note"), or by reference to the price of one or more specified securities or commodities or to one or more securities or commodities exchange indices or other indices or by other methods (an "Indexed Note," such term to include Currency Indexed Notes) as described in the applicable Pricing Supplement. See "Description of Notes---Currency Indexed Notes," "Description of Notes---Other Indexed Notes and Certain Terms Applicable to All Indexed Notes" and "Risk Factors Indexed Notes Risks."

Unless otherwise specified in the applicable Pricing Supplement, interest on each Fixed Rate Note (other than an Amortizing Note) is payable semiannually each May 15 and November 15 (a "Semiannual Pay Note") or, if annually, May 15 (an "Annual Pay Note"), as selected by the purchaser and agreed to by the Corporation, and at Maturity (as defined herein). Interest on each Floating Rate Note is payable on the dates set forth herein and in the applicable Pricing Supplement. Amortizing Notes will pay principal and interest semiannually each May 15 and November 15, or quarterly each February 15, May 15, August 15 and November 15, and, in either case, at Maturity, or otherwise, as specified in the applicable Pricing Supplement. See "Description of Notes---Payment of Principal and Interest." Interest rates, interest rate formulae and other variable terms are subject to change by the Corporation, but no change will affect any Note already issued or as to which an offer to purchase has been accepted by the Corporation.

The Notes may be issued in whole or in part in the form of a certificate issued in definitive form (a "Certificated Note") or in the form of a master Note to be deposited with or on behalf of The Depository Trust Corporation ("DTC") or other depositary (DTC or such other depositary as is specified in the applicable Pricing Supplement is herein referred to as the "Depositary") and registered in the name of the Depositary's nominee representing book-entry notes (a "Book-Entry Note"). The Certificated Notes and the Book-Entry Notes are hereinafter together referred to as the "Notes." Beneficial interests in Book-Entry Notes will be shown on, and transfers thereof will be effected only through, records maintained by the Depositary, with respect to the beneficial owners' interests, by the Depositary's participants. Book-Entry Notes will not be issuable as Certificated Notes except under limited circumstances described herein. See "Description of Notes---Book-Entry Notes."

Unless otherwise specified in the applicable Pricing Supplement, Notes will be issued only in registered form in minimum denominations of U.S. $100,000 (and any amount in excess thereof that is an integral multiple of U.S. $1,000) or, in the case of Notes denominated in a Specified Currency other than U.S. dollars, the authorized denominations set forth in the applicable Pricing Supplement. See "Description of Notes---General." Unless otherwise specified in the applicable Pricing Supplement, the Notes may not be redeemed by the Corporation or repaid at the option of the holder prior to their Maturity. See "Description of Notes---Redemption and Repayment." Notes will be transferable without service charge.

The Specified Currency, any applicable interest rate or formula, the issue

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

price, the Maturity Date, any interest payment dates, any principal payment dates, any redemption and/or repayment provisions, whether such Note is a Fixed Rate Note, a Floating Rate Note, an Amortizing Note or an Indexed Note, whether such Note will be represented by a global Note and any other terms applicable to each Note and established at the time of offering, unless otherwise described herein, will be described in the applicable Pricing Supplement.

The Corporation may also issue from time to time warrants to purchase Notes ("Note Warrants"). The Note Warrants may be issued together with or separately from any Notes and, if issued together with Notes, may be attached to or separate from such Notes. The particular terms of any issue of Note Warrants, the terms of the Warrant Agreement under which such Note Warrants are issued, the Notes issuable upon exercise of such Note Warrants, any initial public offering price, any net proceeds to the Corporation and any other specific terms of such issue of Note Warrants will be set forth in a supplement to this Prospectus Supplement respecting such issue of Note Warrants (a "Note Warrant Supplement"). Unless accompanied by a Note Warrant Supplement, no Note Warrants are offered by this Prospectus Supplement.

----------------

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS SUPPLEMENT, ANY PRICING SUPPLEMENT OR THE PROSPECTUS TO WHICH IT RELATES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

| | PRICE TO PUBLIC (1)(2) | AGENT'S DISCOUNTS AND COMMISSIONS (2)(3) | PROCEEDS TO CORPORATION (2)(3)(4) |
|---|---|---|---|
| Per Note | 100.00% | .05%---.75% | 99.95%---99.25% |
| Total U.S. | $2,000,000,000 | U.S. $1,000,000- | U.S. $1,999,000,000- |
| | | U.S. $15,000,000 | U.S.$1,985,000,000 |

(1)   Unless otherwise specified in the applicable Pricing Supplement, Notes will be issued at 100% of their principal amount.

(2)   Or the equivalent thereof in the Specified Currency.

(3)   The commission payable to Morgan Stanley & Co, Incorporated, Bear, Stearns & Co. Inc., Lehman Brothers, Lehman Brothers Inc., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, J. P. Morgan Securities Inc. and Salomon Brothers Inc, (collectively, "the Agents") for each Note sold through such Agent will be computed based upon the Price to Public of such Note and will depend on such Note's Maturity Date. The Corporation also may sell Notes to an Agent, as principal for its own account for resale to one or more investors and other purchasers at varying prices related to prevailing market prices at the time of resale, as determined by such Agent, or if so agreed, at a fixed public offering price. No commission will be payable on any Notes sold directly to purchasers by the Corporation. The Corporation has agreed to indemnify each Agent against certain liabilities, including liabilities under the Securities Act of 1933, as amended. See "Plan of Distribution."

(4)   Before deducting expenses payable by the Corporation estimated at $1,000,000.

Offers to purchase the Notes are being solicited from time to time by the Corporation through one or more of the Agents listed below and each of the Agents have agreed to use its reasonable best efforts to solicit offers to purchase the Notes. In addition, the Notes may be sold by the Corporation to any Agent as principal for its own account for resale to one or more investors and other purchasers at varying prices related to prevailing market prices at the time of resale, as determined by such Agent or, if so agreed, at a fixed public offering price. The Corporation reserves the right to sell Notes directly on its own behalf in those jurisdictions where it is authorized to do so. In addition, the Corporation may arrange for the Notes to be sold through other agents, dealers or underwriters. Unless specified in the applicable Pricing Supplement, the Notes will not be listed on any securities exchange, and there can be no assurance that the Notes offered hereby will be sold or that there will be a secondary market for the Notes. The Agents have advised the Corporation that they may from time to time purchase and sell Notes in the secondary market, but the Agents are not obligated to do so. No termination date for the offering of the Notes has been established. The Corporation reserves the right to withdraw, cancel or modify the offer made hereby without notice. The Corporation or the Agent that solicits any offer may reject such offer in whole or in part. See "Plan of Distribution."

--------------------

Morgan Stanley & Co. Incorporated
Bear, Stearns & Co. Inc.
Lehman Brothers Inc.
Merrill Lynch & Co.
J. P. Morgan Securities Inc.
Salomon Brothers Inc

The date of this Prospectus Supplement is December ____, 1995.

Source: GENERAL MOTORS CORP. S-3, November 14, 1995

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

No dealer, salesman or any other person has been authorized to give any information or to make any representation not contained or incorporated by reference in this Prospectus Supplement, any Pricing Supplement and the accompanying Prospectus in connection with the offer contained in this Prospectus Supplement, any Pricing Supplement and the accompanying Prospectus and, if given or made, such information or representation must not be relied upon as having been authorized by the Corporation or by any Agent. Neither the delivery of this Prospectus Supplement, any Pricing Supplement and the accompanying Prospectus nor any sale made hereunder shall, under any circumstances, create any implication that the information therein is correct at any time subsequent to the date thereof or that there has been no change in the affairs of the Corporation since the dates as of which information is given in this Prospectus Supplement, any Pricing Supplement and in the accompanying Prospectus. This Prospectus Supplement, any Pricing Supplement and the accompanying Prospectus shall not constitute an offer to sell or a solicitation or an offer to buy any of the Notes offered hereby by anyone in any jurisdiction in which such offer or solicitation is not authorized or in which the person making such offer or solicitation is not qualified to do so or to any person to whom it is unlawful to make such offer or solicitation.

## RISK FACTORS

THIS PROSPECTUS SUPPLEMENT DOES NOT DESCRIBE ALL OF THE RISKS OF AN INVESTMENT IN NOTES THAT RESULT FROM SUCH NOTES BEING DENOMINATED OR PAYABLE IN OR DETERMINED BY REFERENCE TO A CURRENCY OR COMPOSITE CURRENCY OTHER THAN UNITED STATES DOLLARS OR TO ONE OR MORE INTEREST RATES, CURRENCIES, OR OTHER INDICES OR FORMULAS, EITHER AS SUCH RISKS EXIST AT THE DATE OF THIS PROSPECTUS SUPPLEMENT OR AS THEY MAY CHANGE FROM TIME TO TIME. PROSPECTIVE INVESTORS SHOULD CONSULT THEIR OWN FINANCIAL AND LEGAL ADVISORS AS TO THE RISKS ENTAILED BY AN INVESTMENT IN SUCH NOTES. SUCH NOTES ARE NOT AN APPROPRIATE INVESTMENT FOR INVESTORS WHO ARE UNSOPHISTICATED WITH RESPECT TO FOREIGN CURRENCY TRANSACTIONS OR TRANSACTIONS INVOLVING THE APPLICABLE INTEREST RATE, CURRENCY, OR OTHER INDICES OR FORMULAS.

RISKS ASSOCIATED WITH EXCHANGE RATES AND EXCHANGE CONTROLS

An investment in Notes that are denominated in, or the payment of which is related to the value of, a Specified Currency other than U.S. dollars ("Foreign Currency Notes") entails significant risks that are not associated with a similar investment in a security denominated in U.S. dollars. Similarly, an investment in a Currency Indexed Note entails significant risks that are not associated with a similar investment in non-Indexed Notes. See "Risk Factors-Indexed Notes Risks." Such risks include, without limitation, the possibility of significant changes in the rate of exchange between United States dollars and such Specified Currency (and, in the case of Currency Indexed Notes, the rate of exchange between the Specified Currency and the Indexed Currency for such Currency Indexed Note), changes resulting from official redenomination with respect to a Specified Currency (or, in the case of each Currency Indexed Note, with respect to the Specified Currency or the Indexed Currency therefor) and the possibility of the imposition or modification of foreign exchange controls by either the United States or foreign governments. Such risks generally depend on economic and political events over which the Corporation has no control. In recent years, rates of exchange between the U.S. dollar and certain foreign currencies, and between certain foreign currencies and other foreign currencies, have been highly volatile and such volatility may be expected in the future. The exchange rate between the U.S. dollar and a foreign currency or composite currency is at any moment a result of the supply and demand for such currency or the currencies comprising such composite currency, and changes in the rate result over time from the interaction of many factors, among which are rates of inflation, interest rate levels, balance of payments and the extent of governmental surpluses or deficits in the countries of such currencies. These factors are in turn sensitive to the monetary, fiscal and trade policies pursued by such governments and those of other countries important to international trade and finance. Fluctuations in any particular exchange rate that have occurred in the past are not necessarily indicative, however, of fluctuations in the rate that may occur during the term of any Foreign Currency Note or any Currency Indexed Note.

Depreciation of the Specified Currency for a Foreign Currency Note against U.S. dollars would result in a decrease in the effective yield of such Foreign Currency Note below its applicable interest rate and, in certain circumstances, could result in a loss to the investor on a U.S. dollar basis. Similarly, depreciation of the Denominated Currency with respect to a Currency Indexed Note against the applicable Indexed Currency would result in the principal amount payable with respect to such Currency Indexed Note at the Maturity Date being less than the Face Amount of such Currency Indexed Note which, in turn, would decrease the effective yield of such Currency Indexed Note below its stated interest rate and, in certain circumstances, could also result in a loss of all or a substantial portion of the principal of such Note to the investor. See "Description of Notes---Currency Indexed Notes."

Governments have from time to time imposed, and may in the future impose, exchange controls that could affect exchange rates as well as the availability of a Specified Currency at the time of payment of principal of, premium, if any, or interest, if any, on, a Foreign Currency Note. There can be no assurances that exchange controls will not restrict or prohibit payments of principal, and premium, if any, or interest, if any, in any Specified Currency other than U.S.

dollars. In addition to the risks associated with relative currency valuations discussed above, the imposition of exchange controls might impact the liquidity of any Note denominated in, or the value of which is linked to, a foreign currency. Even if there are no actual exchange controls, it is possible that the Specified Currency for such Note would not be available to the Corporation when payments on such Note are due because of circumstances beyond the control of the Corporation. In that event, the Corporation will make required payments in U.S. dollars on the basis described herein. See "Description of Notes---Payment Currency" and "Description of Notes---Currency Indexed Notes--Payment of Principal and Interest."

The information set forth in this Prospectus Supplement is directed to prospective purchasers who are residents of the United States, and the Corporation disclaims any responsibility to advise prospective purchasers who are residents of countries other than the United States with respect to any matters that may affect the purchase, holding or receipt of payments of principal of, premium, if any, and interest, if any, on the Notes. Persons who are not residents of the United Sates should consult their own legal advisors with regard to such matters.

Pricing Supplements relating to Foreign Currency Notes or Currency Indexed Notes will contain information concerning historical exchange rates for the applicable Specified Currency against the U.S. dollar or other relevant currency, (including in the case of Currently Indexed Notes, the applicable Indexed Currency), a description of the currency or currencies and any exchange controls affecting such currency or currencies. The information contained therein concerning exchange rates is furnished as a matter of information only and should not be regarded as indicative of the range of or trends in fluctuations in currency exchange rates that may occur in the future.

RISKS ASSOCIATED WITH INDEXED NOTES RISKS

An investment in Notes indexed, as to principal or interest, or both, to one or more values of currencies (including exchange rates between currencies), commodities or interest rate indices entails significant risks that are not associated with similar investments in a conventional fixed-rate debt security. If the interest rate of such a Note is so indexed, it may result in an interest rate that is less than that payable on a conventional fixed-rate debt security issued at the same time, including the possibility that no interest will be paid, and, if the principal amount payable at maturity may be less than the original purchase price of such Note if allowed pursuant to the terms of such Note, including the possibility that no principal will be paid. The secondary market for such Notes will be affected by a number of factors, independent of the creditworthiness of the issuer and the value of the applicable currency, commodity or interest rate index, including the volatility of the applicable currency, commodity or interest rate index, the time remaining to the Maturity of such Notes, the amount outstanding of such Notes and market interest rates. The value of the applicable currency, commodity or interest rate index depends on a number of interrelated factors, including economic, financial and political events, over which the Corporation has no control. Additionally, if the formula used to determine the principal amount or interest payable with respect to such Notes contains a multiple or leverage factor, the effect of any change in the applicable currency, commodity or interest rate index will be increased. The historical experience of the relevant currencies, commodities or interest rate indices should not be taken as an indication of future performance of such currencies, commodities or interest rate indices during the term of any Note. Accordingly, prospective investors should consult their own financial and legal advisors as to the risks entailed by an investment in such Notes and the suitability of such Notes in light of their particular circumstances.

JUDGMENTS

The Notes will be governed by and construed in accordance with the laws of the State of New York. In the event an action based on Notes denominated in a Specified Currency other than U.S. dollars were commenced in a court in the United States, it is likely that such court would grant a judgment relating to the Notes only in U.S. dollars. If an action based on Notes denominated in a Specified Currency other than U.S. dollars were commenced in a New York court, however, such court would render or enter a judgment or decree in the Specified Currency. Such judgment would then be converted into U.S. dollars at the rate of exchange prevailing on the date of the entry of the judgment or decree.

EFFECT OF OPTIONAL REDEMPTION

Any optional redemption of Notes might affect the market value of such Notes. Since the Corporation may be expected to redeem such Notes when prevailing interest rates are relatively low, an investor might not be able to reinvest the redemption proceeds at an effective interest rate as high as the interest rate on such Notes.

NO ESTABLISHED TRADING MARKET

The Notes will not have an established trading market when issued, and there can be no assurance of a secondary market for the Notes or the continued liquidity of such market if one develops. See "Plan of Distribution."

CREDIT RATINGS

Any credit ratings assigned to the Corporation's medium-term note program

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

may not reflect the potential impact of all risks related to structure and other factors on the market value of the Notes. Accordingly, prospective investors should consult their own financial and legal advisors as to the risks entailed by an investment in the Notes and the suitability of such Notes in light of their particular circumstances.

## DESCRIPTION OF NOTES

The following description of the particular terms of the Notes offered hereby (which constitute "Debt Securities" as described in the accompanying Prospectus) supplements, and to the extent inconsistent therewith replaces, the description of the general terms and provisions of Debt Securities set forth under the heading "Description of Debt Securities" in the accompanying Prospectus, to which reference is hereby made. The particular terms of the Notes sold pursuant to any Pricing Supplement will be described therein.

THE TERMS AND CONDITIONS SET FORTH HEREIN WILL APPLY TO EACH NOTE UNLESS OTHERWISE SPECIFIED HEREIN OR IN THE APPLICABLE PRICING SUPPLEMENT AND IN SUCH NOTE.

Unless otherwise indicated in the applicable Pricing Supplement, the Notes will be denominated in U.S. dollars, and payment of principal of, premium, if any, and interest, if any, on, the Notes will be made in U.S. dollars. If any Note is not to be denominated in U.S. dollars, the applicable Pricing Supplement will specify the currency or currencies, including composite currencies such as the ECU, in which such Note is to be denominated (the "Specified Currency") and, if different, the currency or currencies in which the principal, premium, if any, and interest, if any, with respect to such Note are to be paid, along with any other terms relating to the non-U.S. dollar denomination, including exchange rates for the Specified Currency as against the U.S. dollar at selected times during the last five years, and any exchange controls or other foreign currency risks relating to such Specified Currency. See "Foreign Currency Risks."

GENERAL

The Notes offered by this Prospectus Supplement will be limited to U.S. $2,000,000,000 aggregate initial offering price, or the equivalent thereof in one or more Specified Currencies, less an amount equal to the aggregate initial offering price of any other Debt Securities or Debt Warrants to purchase Debt Securities covered by the Registration Statement of which this Prospectus Supplement is a part and sold by the Corporation. The Notes will be issued under an Indenture dated as of December ____, 1995 between the Corporation and Citibank, N.A., as Trustee, as supplemented from time to time (the "Indenture"), which Indenture is further described under "Description of Debt Securities" in the accompanying Prospectus. The Indenture does not limit the amount of additional unsecured indebtedness ranking equally and ratably with the Notes that the Corporation may incur and the Corporation may, from time to time, without the consent of the holders of the Notes, provide for the issuance of Notes under the Indenture in addition to the U.S.$2,000,000,000, aggregate initial offering price of the Notes offered hereby. The U.S. dollar equivalent of Notes denominated in a Specified Currency other than U.S. dollars will be determined on the Business Day (as defined below) prior to the date of acceptance by the Corporation for a purchase of Notes on the basis of the Market Exchange Rate (as defined below) for such Specified Currency. The statements herein concerning the Notes and the Indenture do not purport to be complete and are subject to, and are qualified in their entirety by reference to, all the provisions of the Indenture, including the definitions therein of certain terms. Whenever particular provisions of the Indenture or defined terms contained in the Indenture are referred to, such provisions and defined terms are incorporated herein by reference as a part of the statements made, and the statements are qualified in their entirety by such reference.

The Notes, of which the Notes offered by this Prospectus Supplement will form a part, constitute one series of Securities (as defined in the Indenture), unlimited as to principal amount, established by the Corporation pursuant to the Indenture.

The Notes will constitute unsecured and unsubordinated indebtedness of the Corporation and will rank equally and ratably with all other unsecured and unsubordinated indebtedness of the Corporation. See "Description of Debt Securities---General" in the accompanying Prospectus.

Notes will be offered on a continuing basis and will mature on any day nine months or more from the Issue Date, as selected by the purchaser and agreed to by the Corporation, and may be subject to redemption at the option of the Corporation or repayment at the option of the holder prior to their Maturity Date. Each Note will bear interest from the Issue Date (as defined below) at either (a) a fixed rate ("Fixed Rate Notes"), which may be zero in the case of a Note issued at an Issue Price (as defined below) representing a substantial discount from the principal amount payable upon the Maturity Date (a "Zero-Coupon Note"), or (b) a floating rate or rates determined by reference to one or more Base Rates (as defined herein), which may be adjusted by a Spread and/or Spread Multiplier (each as defined below) ("Floating Rate Notes").

Each Note will be issued in fully registered form without coupons and will be represented by either a Certificated Note or by a single master security (the "Master Security") representing Book-Entry Notes. The Master Security will be registered in the name of a nominee of the Depositary. Except as set forth herein, Book-Entry Notes will be issuable only in global form. No Book-Entry

Note shall represent any Certificated Note and Certificated Notes will not be exchangeable for Book-Entry Notes, except as described below under "Description of Notes---Book-Entry Notes---Delivery and Form" and the accompanying Prospectus under "Description of Debt Securities---Book-Entry Notes---Delivery and Form." All Notes issued on the same day and having the same terms (including, but not limited to, the same designation, the same currency, Interest Payment Dates (as defined below), rate of interest, Maturity Date and redemption or repayment provisions) may be represented by a single Book-Entry Note. A beneficial interest in a Book-Entry Note will be shown on, and transfers thereof will be effected only through, records maintained by the Depositary or its participants. Payments of principal of, premium, if any, and interest, if any, on Notes represented by a Book-Entry Note will be made by the Corporation or its paying agent to the Depositary or its nominee. Unless otherwise specified in the applicable Pricing Supplement, DTC will be the Depositary. See "Description of Notes---Book-Entry Notes---Delivery and Form" and "Description of Debt Securities---Book-Entry Notes---Delivery and Form" in the accompanying Prospectus.

Unless otherwise specified in the applicable Pricing Supplement, the authorized denominations of Notes denominated in U.S. dollars will be U.S.$100,000 and any amount in excess thereof that is an integral multiple of U.S.$1,000. The authorized denominations of Notes denominated in a Specified Currency other than U.S. dollars will be as set forth in the applicable Pricing Supplement.

Interest rates offered by the Corporation with respect to the Notes may differ depending upon, among other things, the aggregate principal amount of the Notes purchased in any single transaction.

The principal amount of the Notes will be payable at the Maturity Date at the Corporate Trust Office of Citibank, N.A., Corporate Trust Services, 111 Wall Street, 5th Floor, New York, New York 10043, or at such other place as the Corporation may designate.

Certificated Notes will be transferable by the registered holders thereof or by their attorneys duly authorized in writing at the Corporate Trust Office of Citibank, N.A., Corporate Trust Services, 111 Wall Street, 5th Floor, New York, New York 10043, or at such other place as the Corporation may designate, without charge except for any tax or other governmental charge imposed in connection therewith, and in the manner and subject to the limitations provided in the Indenture, and upon surrender of the Certificated Notes. Upon any such transfer, a new Certificated Note or Notes in authorized denominations for an equal aggregate principal amount having identical terms will be issued to the transferee in exchange therefor.

Unless otherwise specified in the applicable Pricing Supplement, the Notes may not be redeemed by the Corporation, or repaid at the option of the holder, or both, prior to their Maturity Date. Unless otherwise specified in the applicable Pricing Supplement, the Notes will not be subject to any sinking fund. See "Description of Notes---Redemption and Repayment."

Unless otherwise specified in the applicable Pricing Supplement, the amount of any Original Issue Discount Note (as such term is defined in "Description of Notes---Original Issue Discount Notes") payable in the event of redemption by the Corporation, repayment at the option of the holder or acceleration of Maturity, in lieu of the stated principal amount due at the Maturity Date, will be the Amortized Face Amount of such Original Issue Discount Note as of the date of such redemption, repayment or acceleration. For the purposes of determining whether holders of the requisite amount of Notes outstanding under the Indenture have made a demand or given a notice of waiver or taken any other action, the outstanding principal amount of any Original Issue Discount Note shall be deemed to be the Amortized Face Amount. The "Amortized Face Amount" of an Original Issue Discount Note shall be the amount equal to (a) the Issue Price of such Original Issue Discount Note set forth in the applicable Pricing Supplement plus (b) the portion of the difference between the Issue Price and the principal amount of such Original Issue Discount Note that has accrued at the yield to maturity set forth in the Pricing Supplement (computed in accordance with generally accepted United States bond yield computation principles) at the date as of which the Amortized Face Amount is calculated, but in no event shall the Amortized Face Amount of such Original Issue Discount Note exceed its stated principal amount. See also "United States Federal Taxation Consequences to U.S. Holders---Original Issue Discount Notes."

Unless otherwise specified herein, the Pricing Supplement relating to each Note or Notes will describe the following terms, as applicable: (1) the Specified Currency with respect to such Note (and, if such Specified Currency is other than U.S. dollars, certain other terms relating to such Note); (2) whether such Note is a Fixed Rate Note, a Floating Rate Note, an Amortizing Note or a Zero-Coupon Note or other Original Issue Discount Note; (3) whether such Note is a Currency Indexed Note or other Indexed Note, and if so the terms thereof; (4) the price (which may be expressed as a percentage of the aggregate initial public offering price thereof) at which such Note will be issued to the public (the "Issue Price"); (5) the date on which such Note will be issued to the public (the "Issue Date"); (6) the Maturity Date of such Note; (7) if such Note is a Fixed Rate Note, the rate per annum at which such Note will bear interest, if any (the "Interest Rate"); (8) if such Note is a Floating Rate Note, the Base Rate or Rates, the Initial Interest Rate or formula for determining such, the Interest Reset Period, the Interest Reset Dates, the Interest Payment Period, the Interest Payment Dates, the Index Maturity, the Maximum Interest Rate and

the Minimum Interest Rate, if any, and the Spread and/or Spread Multiplier, if any (all as defined herein), and any other terms relating to the particular method of calculating the Interest Rate for such Note; (9) if such Note is an Amortizing Note, whether payments of principal thereof and interest thereon will be made quarterly or semiannually, and the redemption or repayment information in respect thereof; (10) whether the interest rate on such Note may be reset upon the occurrence of certain events or at the option of the Corporation; (11) whether such Note may be redeemed at the option of the Corporation, and/or repaid at the option of the holder, prior to its Maturity Date, and if so, the provisions relating to such redemption or repayment; (12) whether such Note will be issued initially as a Book-Entry Note or as a Certificated Note; (13) certain special United States Federal income tax consequences of the purchase, ownership and disposition of certain Notes, if any, and (14) any other terms of such Note not inconsistent with the provisions of the Indenture.

GLOSSARY

Reference is made to the Indenture, the Prospectus and the forms of Notes filed as exhibits to the Registration Statement to which this Prospectus Supplement relates for the full definition of certain terms used in this Prospectus Supplement, as well as any capitalized terms used in this Prospectus Supplement, for which no definition is provided. Set forth below are definitions of certain terms used in this Prospectus Supplement with respect to the Notes.

"Business Day" with respect to any Note means, unless otherwise specified in the applicable Pricing Supplement, any day, other than a Saturday or Sunday, that meets each of the following applicable requirements: such day is (a) not a day on which banking institutions are authorized or required by law, regulation or executive order to be closed in The City of New York, (b) if the Note is denominated in a Specified Currency other than U.S. dollars or ECU, (x) not a day on which banking institutions are authorized or required by law, regulation or executive order to close in the Principal Financial Center of the country issuing the Specified Currency and (y) a day on which banking institutions in such Principal Financial Center are carrying out transactions in such Specified Currency, (c) if the Note is denominated in ECU, an ECU clearing day, as determined by the ECU Banking Association in Paris, (d) if the Note is denominated in a composite currency other than ECU, as specified in the applicable Pricing Supplement and (e) with respect to London Inter Bank Offer Rate Notes ("LIBOR Notes") is also a London Banking Day. "London Banking Day" means any day on which dealings in deposits in the Indexed Currency are transacted in the London interbank market. "Principal Financial Center" will generally be the capital city of the country of the Specified Currency, except that with respect to U.S. dollars and ECUs, the Principal Financial Center shall be The City of New York and Luxembourg, respectively;

"Interest Payment Date" with respect to any Note means a date (other than at Maturity) on which, under the terms of such Note, regularly scheduled interest shall be payable;

"Maturity Date" with respect to any Note means the date on which such Note will mature, as specified thereon, and "Maturity" means the date on which the principal of a Note or an installment of principal becomes due and payable in full in accordance with its terms and the terms of the Indenture, whether at its Maturity Date or by declaration of acceleration, call for redemption at the option of the Corporation, repayment at the option of the holder, or otherwise; and

"Regular Record Date" with respect to any Interest Payment Date for Fixed Rate Notes means, unless otherwise specified in the applicable Pricing Supplement, the date (whether or not a Business Day) which is the fifteenth calendar day of the calendar month preceding such Interest Payment Date. "Regular Record Date" with respect to any Interest Payment Date for Notes other than Fixed Rate Notes means, unless otherwise specified in the applicable Pricing Supplement, the date (whether or not a Business Day) 15 calendar days prior to such Interest Payment Date.

References herein to "U.S. dollars" or "U.S.$" or "$" are to the currency of the United States of America.

BOOK-ENTRY NOTES---DELIVERY AND FORM

Upon issue, all Book-Entry Notes will be represented by the Master Security. See "Description of Debt Securities---Book-Entry Notes---Delivery and Form" in the accompanying Prospectus.

PAYMENT CURRENCY

Unless otherwise specified in the applicable Pricing Supplement, and except as otherwise described herein with respect to Currency Indexed Notes, principal, and premium, if any, and interest, if any, will be paid by the Corporation in U.S. dollars in the manner described in the following paragraphs, even if a Note is denominated in a Specified Currency other than U.S. dollars; provided, however, that the holder of such Note may (unless the Pricing Supplement and the Note so indicate otherwise) elect to receive all such payments in such Specified Currency (subject to certain conditions described at "Foreign Currency Risks---Payment Currency") by delivery of a written request to the Corporation's paying agent (the "Paying Agent") in The City of New York. Any such election must be received by the Paying Agent on or prior to the applicable Regular Record Date or at least 15 calendar days prior to Maturity, as the case

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

may be, and no such election or change of election may be made with respect to payments on any Note with respect to which (i) an Event of Default has occurred, (ii) the Corporation has exercised any of its discharge or defeasance options, or (iii) the Corporation has given a notice of redemption. Such election shall remain in effect unless and until changed by written notice to the Paying Agent, but the Paying Agent must receive written notice of any such change on or prior to the applicable Regular Record Date or at least 15 calendar days prior to Maturity, as the case may be. Until the Notes are paid or payment thereof is provided for, the Corporation will, at all times, maintain a Paying Agent in The City of New York capable of performing the duties described herein to be performed by the Paying Agent. The Corporation has initially appointed Citibank, N.A., New York, New York as Paying Agent under the Indenture. The Corporation will notify the holders of the Notes in accordance with the Indenture of any change in the Paying Agent or its address. Except as may otherwise be provided in a Pricing Supplement with respect to Foreign Currency Notes, all currency exchange costs will be borne by the Corporation unless any holder of a Note has made the election referred to in the proviso in the first sentence in this paragraph. In the case of such election, each electing holder of a Note shall bear the currency exchange costs related to such Note, if any, by deductions from the payments otherwise due such holder.

Unless otherwise specified in the applicable Pricing Supplement, in the case of a Note denominated in a Specified Currency other than U.S. dollars, the amount of U.S. dollar payments in respect of such Note will be determined by the Corporation or an agent for the Corporation as specified in the applicable Pricing Supplement (the "Exchange Rate Agent"), based on the indicative quotation in The City of New York selected by such Exchange Rate Agent at approximately 11:00 a.m., New York City time, on the second Business Day preceding the applicable payment date, that yields the largest number of U.S. dollars upon conversion of the Specified Currency. Unless otherwise specified in the applicable Pricing Supplement, such selection shall be made from among the quotations appearing on the bank composite or multi-contributor pages of the Reuters Monitor Foreign Exchange Service, or if not available, the Telerate Monitor Foreign Exchange Service. If such quotations are unavailable from either such foreign exchange service, such election shall (unless otherwise specified in the applicable Pricing Supplement) be made from three recognized foreign exchange dealers in The City of New York selected by the Exchange Rate Agent and approved by the Corporation (one of which may be the Exchange Rate Agent) (the "Exchange Rate") for the purchase by the quoting dealer, for settlement on such payment date, of the Specified Currency for U.S. dollars. If no such bid quotations are available, payments will be made in the Specified Currency unless such Specified Currency is unavailable due to the imposition of exchange controls or to other circumstances beyond the Corporation's control or is no longer used by the government of the country issuing such Specified Currency or for the settlement of transactions by public institutions of or within the international banking community, in which case the Corporation will be entitled to make payments in U.S. dollars on the basis of the noon buying rate in The City of New York for cable transfers in the Specified Currency as certified for customs purposes by the Federal Reserve Bank of New York (the "Market Exchange Rate") for such Specified Currency on the second Business Day prior to such payment date, or on such other basis as shall be specified in the applicable Pricing Supplement. In the event such Market Exchange Rate is not then available, the Corporation will be entitled to make payments in U.S. dollars (i) if such Specified Currency is not a composite currency, on the basis of the most recently available Market Exchange Rate for such Specified Currency or (ii) if such Specified Currency is a composite currency, including, without limitation, ECU, in an amount determined by the Exchange Rate Agent to be the sum of the results obtained by multiplying the number of units of each component currency of such composite currency, as of the most recent date on which such composite currency was used, by the Market Exchange Rate for such component currency on the second Business Day prior to such payment date (or if such Market Exchange Rate is not then available, by the most recently available Market Exchange Rate for such component currency, or as otherwise specified in the applicable Pricing Supplement). Any payment made under such circumstances in U.S. dollars where the required payment is in Specified Currency other than U.S. dollars will not constitute an Event of Default.

Unless otherwise specified in the applicable Pricing Supplement, if a holder of a Note denominated in a foreign currency other than ECU shall have elected to receive payments of principal of, and premium, if any, and interest, if any, on such Note in such foreign currency as described above, and such foreign currency is unavailable as of the due date for any such payments because of the imposition of exchange controls or other circumstances beyond the Corporation's control, or is no longer used by the government of the country issuing such foreign currency or for the settlement of transactions by public institutions of or within the international banking community, then all payments due on that due date with respect to such Note shall be made in U.S. dollars until such foreign currency is available or is so sold. The amount so payable on any date in such foreign currency shall be converted into U.S. dollars at a rate determined by the Exchange Rate Agent on the basis of the most recently available Market Exchange Rate or as otherwise specified in the applicable Pricing Supplement.

Unless otherwise specified in the applicable Pricing Supplement, if a holder of a Note denominated in ECU shall have elected to receive payments of principal of and premium, if any, and interest, if any, on such Note in ECU as described above, and ECU are unavailable as of the due date for any such payments because of the imposition of exchange controls or other circumstances beyond the Corporation's control, or is no longer used in the European Monetary

System, then all payments due on that due date with respect to such Note shall be made in U.S. dollars until the ECU is available or is so used. The amount so payable on any date in ECU shall be converted into U.S. dollars at a rate determined by the Exchange Rate Agent as of the second Business Day prior to the date on which such payment is due on the following basis: The component currencies of the ECU for this purpose shall be the currency amounts that were components of the ECU as of the last date on which ECU were used in the European Monetary System. The equivalent of ECU in U.S. dollars shall be calculated by aggregating the U.S. dollar equivalents of such component currencies. The U.S. dollar equivalent of each of such component currencies shall be determined by the Exchange Rate Agent on the basis of the most recently available Market Exchange Rate for each such component currency, or as otherwise indicated in the applicable Pricing Supplement.

If the official unit of any component currency is altered by way of combination or subdivision, the number of units of that currency as a component shall be divided or multiplied in the same proportion. If two or more component currencies are consolidated into a single currency, the amounts of those currencies as components shall be replaced by an amount in such single currency equal to the sum of the amounts of the consolidated component currencies expressed in such single currency. If any component currency is divided into two or more currencies, the amount of that currency as a component shall be replaced by the amounts of such two or more currencies having an aggregate value on the date of division equal to the amount of the former component currency immediately before such division.

All determinations referred to above made by the Exchange Rate Agent shall be at its sole discretion (except to the extent expressly provided herein that any determination made by an Exchange Rate Agent that is not the Corporation is subject to approval by the Corporation) and, in the absence of manifest error, shall be conclusive for all purposes and binding on holders of the Notes.

Each Note will provide that, in the event of an official redenomination of a Specified Currency (including, without limitation, an official redenomination of a Specified Currency that is a composite currency) the obligations of the Corporation with respect to payments on Notes denominated in such Specified Currency shall, in all cases, be deemed immediately following such redenomination to provide for the payment of that amount of redenominated currency representing the amount of such obligations immediately before such redenomination. Except to the extent Currency Indexed Notes provide for the adjustment of the principal amount payable at maturity thereof pursuant to application of the formulae described under "Description of Notes---Currency Indexed Notes---Payment of Principal and Interest," or any other formulae provided for in the applicable Pricing Supplement, Notes will not provide for any adjustment to any amount payable under the Notes as a result of (a) any change in the value of a Specified Currency relative to any other currency due solely to fluctuations in exchange rates or (b) any redenomination of any component currency of any composite currency (unless such composite currency is itself officially redenominated).

Currently, there are limited facilities in the United States for conversion of U.S. dollars into foreign currencies, and vice versa. In addition, banks do not generally offer non-U.S. dollar denominated checking or savings account facilities in the United States. Accordingly, payments on Notes made in a Specified Currency other than U.S. dollars will be made from an account with a bank located outside the United States, unless otherwise specified in the applicable Pricing Supplement.

INTEREST AND PRINCIPAL PAYMENTS

Unless otherwise specified in the applicable Pricing Supplement, interest on the Notes and principal of Amortizing Notes (in each case other than interest or, in the case of Amortizing Notes, principal paid at Maturity), will be paid by mailing a check (unless otherwise specified in the applicable Pricing Supplement) from an account at a bank located outside the United States if such check is payable in a currency other than U.S. dollars) to the holder at the address of such holder appearing on the security register of the Corporation on the applicable Regular Record Date; provided, however, that unless otherwise specified in the applicable Pricing Supplement, in the case of a Note issued between a Regular Record Date and the Interest Payment Date relating to such Regular Record Date, interest (and, in the case of an Amortizing Note, principal) on such Note for the period beginning on the Issue Date and ending on such Interest Payment Date shall be paid on the Interest Payment Date following the succeeding Regular Record Date to the registered holder on such next succeeding Regular Record Date.

Notwithstanding the foregoing, a holder of U.S.$10,000,000 or more in aggregate principal amount of Notes of like tenor and term (or a holder of the equivalent thereof in a Specified Currency other than U.S. dollars) shall be entitled to receive such interest (and, in the case of Amortizing Notes, principal payments) in immediately available funds, but only if complete and appropriate instructions have been received in writing by the Paying Agent on or prior to the applicable Regular Record Date. Owners of beneficial interests in a Book-Entry Note will be paid in accordance with the Depositary's and the participant's procedures in effect from time to time as described under "Description of Notes---Book-Entry Notes---Delivery and Form" herein and "Description of Debt Securities---Book-Entry Notes---Delivery and Form" in the accompanying Prospectus. Simultaneously with the election by any holder of a Note to receive payments in a Specified Currency other than U.S. dollars (as

provided above), such holder may, if so entitled as described above, elect to receive such payments in immediately available funds by providing complete and appropriate instructions to the Paying Agent, and all payments in respect of principal of, and premium, if any, and interest, if any, on such Note will be made in immediately available funds to an account maintained by the payee with a bank located outside the United States, or as otherwise provided in the applicable Pricing Supplement.

Unless otherwise specified in the applicable Pricing Supplement, payments of principal, and premium, if any, and interest, if any, at Maturity will be made in immediately available funds unless otherwise specified in the applicable Pricing Supplement, payable to an account maintained by the payee with a bank located outside the United States if payable in a Specified Currency other than U.S. dollars) upon surrender of the Note at the office of the Paying Agent, provided that the Note is presented to the Paying Agent in time for the Paying Agent to make such payments in such funds in accordance with its normal procedures. See "Important Currency Exchange Information." Unless otherwise specified in the applicable Pricing Supplement, principal and, premium, if any, and interest, if any, payable at Maturity of a Book-Entry Note will be paid by the Paying Agent by wire transfer in immediately available funds to an account specified by the Depositary. Unless otherwise specified in the applicable Pricing Supplement, payments of interest on a Book-Entry Note, and principal of Amortizing Notes in global form in each case, other than at Maturity) will be made in same-day funds in accordance with existing arrangements between the Paying Agent and the Depositary. The Corporation will pay any administrative costs imposed by banks in connection with making payments in immediately available funds, but any tax, assessment or governmental charge imposed upon payments, including, without limitation, any withholding tax, will be borne by the holders of the Notes in respect of which such payments are made.

Certain Notes, including Original Issue Discount Notes, may be considered to be issued with original issue discount which must be included in income for United States Federal income tax purposes at a constant rate, prior to the receipt of the cash attributable to that income. See "Tax Consequences to U.S. Holders---Original Issue Discount Notes." Unless otherwise specified in the applicable Pricing Supplement, if the principal of any Original Issue Discount Note is declared to be due and payable immediately as described under "Description of Debt Securities---Event of Default" in the accompanying Prospectus, the amount of principal due and payable with respect to such Note shall be limited to the aggregate principal amount of such Note multiplied by the sum of its Issue Price (expressed as a percentage of the aggregate principal amount) plus the original issue discount amortized from the Issue Date to the date of declaration which amortization shall be calculated using the "interest method" (computed in accordance with generally accepted accounting principles in effect on the date of declaration). Special considerations applicable to any such Notes will be set forth in the applicable Pricing Supplement.

The Interest Payment Dates for Fixed Rate Notes shall be as described below under "Fixed Rate Notes," and the Interest Payment Dates for Floating Rate Notes shall be as indicated in the applicable Pricing Supplement.

FIXED RATE NOTES

Each Fixed Rate Note will bear interest from and including its Issue Date at the rate per annum set forth thereon and in the applicable Pricing Supplement until the principal amount thereof is paid, or made available for payment, in full, except as described below under "Description of Notes---Subsequent Interest Periods" and "Description of Notes---Extension of Maturity." Unless otherwise specified in the applicable Pricing Supplement, interest on each Fixed Rate Note (other than a Zero-Coupon Note or an Amortizing Note) will be payable, as selected by the purchaser, either semiannually each May 15 and November 15, or annually on each May 15, and at Maturity. Unless otherwise specified in the applicable Pricing Supplement, principal of and interest on each Amortizing Note will be payable, as selected by the purchaser, either quarterly each February 15, May 15, August 15, and November 15, or semiannually on each May 15 and November 15, as set forth in the applicable Pricing Supplement, and, in either case, at Maturity. Payments with respect to Amortizing Notes will be applied first to interest due and payable thereon and then to the reduction of the unpaid principal amount thereof. A table setting forth repayment information in respect of each Amortizing Note will be set forth in the applicable Pricing Supplement. Each payment of interest on a Fixed Rate Note shall include accrued interest from and including the Issue Date or from and including the last day in respect of which interest has been paid (or duly provided for, as the case may be), to but excluding, the Interest Payment Date or date of Maturity, as the case may be.

Any payment of principal, and premium, if any, or interest required to be made on a Fixed Rate Note on a day which is not a Business Day need not be made on such day, but may be made on the next succeeding Business Day with the same force and effect as if made on such day, and no additional interest shall accrue as a result of such delayed payment. Unless otherwise specified in the Pricing Supplement, any interest on Fixed Rate Notes will be computed on the basis of a 360-day year of twelve 30-day months. The interest rates the Corporation will agree to pay on newly-issued Fixed Rate Notes are subject to change without notice by the Corporation from time to time, but no such change will affect any Fixed Rate Notes already issued or as to which an offer to purchase has been accepted by the Corporation.

FLOATING RATE NOTES

Except for the period from the Issue Date to the first Interest Reset Date (as defined below) set forth in the applicable Pricing Supplement, each Floating Rate Note will bear interest at a rate determined by reference to either (i) an interest rate base (the "Base Rate"), which may be adjusted by a Spread and/or Spread Multiplier (each as defined below) or (ii) an interest rate which may be by reference to two or more Base Rates, as adjusted by the corresponding Spread and/or Spread Multiplier for such related Base Rate or Rates (as will be specified in the applicable Pricing Supplement). The "Spread" is the number of basis points (one basis point equals one hundredth of a percentage point) to be added to or subtracted from the related Base Rate applicable to the interest rate for such Floating Rate Note, and the "Spread Multiplier" is the percentage of the related Base Rate applicable to such Base Rate Note by which said Base Rate is to be multiplied to determine the applicable interest rate on such Floating Rate Note. Each Floating Rate Note and the applicable Pricing Supplement will specify the Index Maturity and the Spread and/or Spread Multiplier, if any, applicable to each such Floating Rate Note. The "Index Maturity" for any Floating Rate Note is the period of maturity of the instrument or obligation from which the Base Rate is calculated and will be specified in the applicable Pricing Supplement. The Spread, Spread Multiplier, Index Maturity and other variable terms of the Floating Rate Notes are subject to change by the Corporation from time to time, but no such change will affect any Note already issued or as to which an offer to purchase has been accepted by the Corporation.

The applicable Pricing Supplement will designate one of the following Base Rates as applicable to a Floating Rate Note: (a) the Certificate of Deposit Rate (a "CD Rate Note"), (b) the Commercial Paper Rate (a "Commercial Paper Rate Note"), (c) the Federal Funds Rate (a "Federal Funds Rate Note"), (d) LIBOR (a "LIBOR Note"), (e) the Prime Rate (a "Prime Rate Note"), (f) the Treasury Rate (a "Treasury Rate Note"), (g) the CMT Rate (a "CMT Rate Note") or (h) such other Base Rate or interest rate formula as is set forth in such Pricing Supplement and in such Floating Rate Note.

As specified in the applicable Pricing Supplement, a Floating Rate Note may also have either or both of the following: (i) a maximum numerical limitation, or ceiling, on the rate at which interest may accrue during any interest period ("Maximum Interest Rate") and/or (ii) a minimum numerical limitation, or floor, on the rate at which interest may accrue during any interest period ("Minimum Interest Rate"). In addition to any Maximum Interest Rate that may be applicable to any Floating Rate Note pursuant to the above provisions, the interest rate on a Floating Rate Note will in no event be higher than the maximum rate permitted by applicable law (including, without limitation, New York law, which is stated to govern the Notes and the Indenture), as the same may be modified by United States law of general application. Under present New York law, the maximum rate of interest, with certain exceptions, for any loan in an amount less than U.S.$250,000 is 16% and for any loan in the amount of U.S.$250,000 or more but less than U.S.$2,500,000 is 25% per annum on a simple interest basis. These limits do not apply to loans of U.S.$2,500,000 or more.

Each Floating Rate Note and the applicable Pricing Supplement will specify whether the rate of interest on such Floating Rate Note will be reset daily, weekly, monthly, quarterly, semiannually or annually (each an "Interest Reset Period") and the date on which such interest rate will reset (each, an "Interest Reset Date"). Unless otherwise specified in the applicable Pricing Supplement, the Interest Reset Date will be, in the case of Floating Rate Notes that reset daily, each Business Day; in the case of Floating Rate Notes (other than Treasury Rate Notes) that reset weekly, the Wednesday of each week; in the case of Treasury Rate Notes that reset weekly, the Tuesday of each week (except as provided below); in the case of Floating Rate Notes that reset monthly, the third Wednesday of each month; in the case of Floating Rate Notes that reset quarterly, the third Wednesday of February, May, August and November; in the case of Floating Rate Notes that reset semiannually, the third Wednesday of the two months of each year specified in the applicable Pricing Supplement; and in the case of Floating Rate Notes that reset annually, the third Wednesday of the month specified in the applicable Pricing Supplement; provided, however, that the interest rate in effect from the Issue Date to the first Interest Reset Date will be the Initial Interest Rate (as defined below). If any Interest Reset Date for any Floating Rate Note would otherwise be a day that is not a Business Day, such Interest Reset Date shall be postponed to the next succeeding Business Day, except that, in the case of a LIBOR Note, if such Business Day would fall in the next succeeding calendar month, such Interest Reset Date shall be the immediately preceding Business Day. The interest rate or the formula for establishing the interest rate in effect with respect to a Floating Rate Note from the Issue Date to the first Interest Reset Date (the "Initial Interest Rate") will be specified in the applicable Pricing Supplement.

Except as provided below, and unless otherwise specified in the applicable Pricing Supplement, interest on Floating Rate Notes will be payable, in the case of Floating Rate Notes with a daily, weekly or monthly Interest Reset Date, on the third Wednesday of each month or on the third Wednesday of February, May, August and November, as specified in the applicable Pricing Supplement; in the case of Floating Rate Notes with a quarterly Interest Reset Date, on the third Wednesday of February, May, August and November; in the case of Floating Rate Notes with a semiannual Interest Reset Date, on the third Wednesday of the two months of each year specified in the applicable Pricing Supplement; and in the case of Floating Rate Notes with an annual Reset Date, on the third Wednesday of the month specified in the applicable Pricing Supplement, and, in each case, at Maturity. Subject to the next succeeding sentence, unless otherwise specified in

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

the applicable Pricing Supplement, if an Interest Payment Date (other than at Maturity) with respect to any Floating Rate Note would fall on a day that is not a Business Day, such Interest Payment Date shall be postponed to the next succeeding Business Day, except that, in the case of LIBOR Notes, if such Business Day would fall in the next succeeding calendar month, such Interest Payment Date will be the immediately preceding Business Day. Any payment of principal and premium, if any, and interest required to be made on a Floating Rate Note on a Maturity Date that is not a Business Day will be made on the next succeeding Business Day, with the same force and effect as if made on such Maturity Date and no additional interest shall accrue as a result of any such delayed payment.

Unless otherwise specified in the applicable Pricing Supplement, the interest payable on each Interest Payment Date or at Maturity for Floating Rate Notes will be the amount of interest accrued from and including the Issue Date or from and including the last Interest Payment Date to which interest has been paid to, but excluding, such Interest Payment Date or date of Maturity, as the case may be (an "Interest Period").

Unless otherwise specified in the applicable Pricing Supplement, with respect to a Floating Rate Note accrued interest will be calculated by multiplying the principal amount of such Floating Rate Note by an accrued interest factor. Unless otherwise specified in the applicable Pricing Supplement, such accrued interest factor will be computed by adding the interest factors calculated for each day in the Interest Period for which accrued interest is being calculated. Unless otherwise specified in the applicable Pricing Supplement, the interest factor for each such day is computed by dividing the interest rate applicable on such day by 360, in the cases of CD Rate Notes, Commercial Paper Rate Notes, Federal Funds Rate Notes, Prime Rate Notes and LIBOR Notes, or by the actual number of days in the year, in the case of Treasury Rate Notes or CMT Rate Notes. The interest rate applicable to any day that is an Interest Reset Date is the interest rate as determined, in accordance with the procedures hereinafter set forth, with respect to the Interest Determination Date (as defined below) pertaining to such Interest Reset Date. The interest rate applicable to any other day is the interest rate in effect on the immediately preceding Interest Reset Date (or, if none, the Initial Interest Rate).

Unless otherwise specified in the applicable Pricing Supplement, all percentages resulting from any calculation of the rate of interest on a Floating Rate Note will be rounded, if necessary, to the nearest one hundred-thousandth of a percent (.0000001), with five one-millionths of a percentage point rounded upward (e.g., 9.876545% (or .09876545) would be rounded to 9.87655% (or .0987655)), and all U.S. dollar amounts used in or resulting from such calculation on Floating Rate Notes will be rounded to the nearest cent or, in the case of Notes denominated other than in U.S. dollars, the nearest unit (with one-half cent or unit being rounded upwards).

Unless otherwise specified in the applicable Pricing Supplement, the "Interest Determination Date" pertaining to an Interest Reset Date for CD Rate Notes, CMT Rate Notes, Commercial Paper Rate Notes, Prime Rate Notes and Federal Funds Rate Notes will be the second Business Day preceding such Interest Reset Date; the Interest Determination Date pertaining to an Interest Reset Date for a LIBOR Note will be the second London Banking Day preceding such Interest Reset Date; and the Interest Determination Date pertaining to an Interest Reset Date for a Treasury Rate Note will be the day of the week in which such Interest Reset Date falls on which direct obligations of the United States ("Treasury Bills") of the applicable Index Maturity (as specified on the face of such Treasury Rate Note) are auctioned. Treasury Bills are normally sold at auction on Monday of each week, unless that day is a legal holiday, in which case the auction is normally held on the following Tuesday, except that such auction may be held on the preceding Friday. If, as the result of a legal holiday, an auction is so held on the preceding Friday, such Friday will be the Interest Determination Date pertaining to the Interest Reset Date occurring in the next succeeding week. If an auction falls on a day that is an Interest Reset Date, such Interest Reset Date will be the next following Business Day. Unless otherwise specified in the applicable Pricing Supplement, the Interest Determination Date pertaining to a Note, the interest rate of which is determined with reference to two or more Base Rates, will be the first Business Day which is at least two Business Days prior to such Interest Reset Date for such Note on which each Base Rate shall be determinable.

Unless otherwise specified in the applicable Pricing Supplement, the "Calculation Date," where applicable, pertaining to an Interest Determination Date will the earlier of (i) the tenth calendar day after such Interest Determination Date, or, if any such day is not a Business Day, the next succeeding Business Day or (ii) the Business Day preceding the applicable Interest Payment Date or Maturity, as the case may be.

The applicable Pricing Supplement shall specify a calculation agent (the "Calculation Agent"), which may be the Corporation, with respect to any issue of Floating Rate Notes. Upon the request of the holder of any Floating Rate Note, the Calculation Agent will provide the interest rate then in effect and, if determined, the interest rate that will become effective on the next Interest Reset Date with respect to such Floating Rate Note. If at any time the Trustee is not the Calculation Agent, the Corporation will notify the Trustee of each determination of the interest rate applicable to any such Floating Rate Note.

The interest rate in effect with respect to a Floating Rate Note from the

Issue Date to the first Interest Reset Date will be the Initial Interest Rate. The interest rate for each subsequent Interest Rate Date will be determined by the Calculation Agent as follows:

CD RATE NOTES

CD Rate Notes will bear interest at the interest rates (calculated with reference to the CD Rate and the Spread and/or Spread Multiplier, if any and subject to the Minimum Interest Rate and the Maximum Interest Rate, if any) specified in the CD Rate Notes and in the applicable Pricing Supplement.

Unless otherwise specified in the applicable Pricing Supplement, the "CD Rate" means, with respect to any Interest Determination Date, the rate on such date for negotiable certificates of deposit having the Index Maturity designated in the applicable Pricing Supplement as published by the Board of Governors of the Federal Reserve System in "Statistical Release H.15(519), Selected Interest Rates," or any successor publication of the Board of Governors of the Federal Reserve System ("H.15(519)") under the heading "CDs (Secondary Market)" or, if not so published by 9:00 a.m., New York City time, on the Calculation Date pertaining to such Interest Determination Date for negotiable certificates of deposit on such Interest Determination Date, the CD Rate will be the rate on such Interest Determination Date for negotiable certificates of deposit of the applicable Index Maturity as published by the Federal Reserve Bank of New York in its daily statistical release, "Composite 3:30 p.m. Quotations for U.S. Government Securities," or any successor publication of the Federal Reserve Bank of New York (the "Composite Quotations") under the heading "Certificates of Deposit." If such rate is not yet published in either Release H.15(519) or the Composite Quotations by 3:00 p.m., New York City time, on the Calculation Date pertaining to such Interest Determination Date, the CD Rate on such Interest Determination Date will be calculated by the Calculation Agent and will be the arithmetic mean of the secondary market offered rates as of 10:00 a.m., New York City time, on such Interest Determination Date, of three leading nonbank dealers in negotiable U.S. dollar certificates of deposit in The City of New York selected by the Calculation Agent, after consultation with the Corporation, for negotiable certificates of deposit of major United States money center banks (in the market for negotiable certificates of deposit) with a remaining maturity closest to the applicable Index Maturity in a denomination of U.S. $5,000,000; provided, however, that if the dealers selected as aforesaid by the Calculation Agent are not quoting as mentioned in this sentence, the rate of interest in effect for the applicable period will be the rate of interest in effect on such Interest Determination Date. All references in this Prospectus Supplement or any applicable Pricing Supplement to "Release H.15(519)" shall also be references to any successor publication to Release H.15(519).

CD Rate Notes, like other Notes, are not deposit obligations of a bank and are not insured by the Federal Deposit Insurance Corporation.

COMMERCIAL PAPER RATE NOTES

Commercial Paper Rate Notes will bear interest at the interest rates (calculated with reference to the Commercial Paper Rate and the Spread and/or Spread Multiplier, if any, and subject to the Minimum Interest Rate and the Maximum Interest Rate, if any) specified in the Commercial Paper Rate Notes and in the applicable Pricing Supplement.

Unless otherwise specified in the applicable Pricing Supplement, the "Commercial Paper Rate" means, with respect to any Interest Determination Date, the Money Market Yield (as defined below) on such date of the rate for commercial paper having the applicable Index Maturity specified in the applicable Pricing Supplement, as such rate shall be published in H.15(519) under the heading "Commercial Paper." In the event that such rate is not published prior to 9:00 a.m., New York City time, on the Calculation Date pertaining to such Interest Determination Date, then the Commercial Paper Rate shall be the Money Market Yield on such Interest Determination Date of the rate for commercial paper of the applicable Index Maturity as published in the Composite Quotations under the heading "Commercial Paper." If such rate is not yet published in either H.15(519) or the Composite Quotations by 3:00 p.m., New York City time, on the Calculation Date pertaining to such Interest Determination Date, then the Commercial Paper Rate shall be the Money Market Yield of the arithmetic mean of the offered rates as of 11:00 a.m., New York City time, on such Interest Determination Date of three leading dealers of commercial paper in The City of New York selected by the Calculation Agent, after consultation with the Corporation, for commercial paper of the applicable Index Maturity, placed for industrial issuers whose bond rating is "AA," or the equivalent, from a nationally recognized statistical rating agency; provided, however, that if the dealers selected as aforesaid by the Calculation Agent are not quoting offered rates as mentioned in this sentence, the rate of interest in effect for the applicable period will be the rate of interest in effect on such Interest Determination Date.

"Money Market Yield" shall be a yield calculated in accordance with the following formula:

$$\text{Money Market Yield} = \frac{D \times 360}{360 - (D \times M)} \times 100$$

where "D" refers to the applicable per annum rate for commercial paper quoted on a bank discount basis and expressed as a decimal, and "M" refers to the actual number of days in the Interest Period for which interest is being calculated.

FEDERAL FUNDS RATE NOTES

Federal Funds Rate Notes will bear interest at the interest rates (calculated with reference to the Federal Funds Rate and the Spread and/or Spread Multiplier, if any, and subject to the Minimum Interest Rate and the Maximum Interest Rate, if any) specified in the Federal Funds Rate Notes and in the applicable Pricing Supplement.

Unless otherwise specified in the applicable Pricing Supplement, the "Federal Funds Rate" means, with respect to any Interest Determination Date, the rate on such date for Federal Funds as published in H.15(519) under the heading "Federal Funds (Effective)" or, if not so published by 9:00 a.m., New York City time, on the Calculation Date pertaining to such Interest Determination Date, the Federal Funds Rate will be the rate on such Interest Determination Date as published in the Composite Quotations under the heading "Federal Funds/Effective Rate." If such rate is not yet published in either H.15(519) or the Composite Quotations by 3:00 p.m., New York City time, on the Calculation Date pertaining to such Interest Determination Date, then the Federal Funds Rate for such Interest Determination Date will be calculated by the Calculation Agent and will be the arithmetic mean of the rates for the last transaction in overnight Federal Funds arranged by three leading brokers of Federal Funds transactions in The City of New York selected by the Calculation Agent, after consultation with the Corporation, as of 9:00 a.m., New York City time, on such Interest Determination Date; provided, however, that if the brokers selected as aforesaid by the Calculation Agent are not quoting as mentioned in this sentence, the rate of interest in effect for the applicable period will be the rate of interest in effect on such Interest Determination Date.

LIBOR NOTES

LIBOR Notes will bear interest at the interest rate (calculated with reference to LIBOR and the Spread and/or Spread Multiplier, if any, and subject to the Minimum Interest Rate and the Maximum Interest Rate, if any) specified in the LIBOR Notes and in the applicable Pricing Supplement.

Unless otherwise specified in the applicable Pricing Supplement, "LIBOR" means the rate determined by the Calculation Agent in accordance with the following provisions:

(i) With respect to an Interest Determination Date relating to a LIBOR Note or any Floating Rate Note for which the interest rate is determined with reference to LIBOR, LIBOR will be either (a) if "LIBOR Reuters" is specified in the applicable Pricing Supplement, the arithmetic mean of the offered rates (unless the specified Designated LIBOR Page by its terms provides only for a single rate, in which case such single rate shall be used) for deposits in the Index Currency having the Index Maturity designated in the applicable Pricing Supplement, commencing on the second London Banking Day immediately following that Interest Determination Date, that appear on the Designated LIBOR Page specified in the applicable Pricing Supplement as of 11:00 a.m. London time, on that Interest Determination Date, if at least two such offered rates appear (unless, as aforesaid, only a single rate is required) on such Designated LIBOR Page or (b) if "LIBOR Telerate" is specified in the applicable Pricing Supplement, the rate for deposits in the Index Currency having the Index Maturity designated in the applicable Pricing Supplement commencing on the second London Banking Day immediately following that Interest Determination Date that appears on the Designated LIBOR Page specified in the applicable Pricing Supplement as of 11:00 a.m. London time, on that Interest Determination Date. If fewer than two offered rates appear, or no rate appears, as applicable, LIBOR in respect of the related Interest Determination Date will be determined as if the parties had specified the rate described in clause (ii) below.

(ii) With respect to any Interest Determination Date on which fewer than two offered rates appear, or no rate appears, as the case may be, on the applicable Designated LIBOR Page as specified in clause (i) above, the Calculation Agent will request the principal London offices of each of four major reference ranks in the London interbank market, as selected by the Calculation Agent, after consultation with the Corporation, to provide the Calculation Agent with its offered quotation for deposits in the Index Currency for the period of the Index Maturity designated in the applicable Pricing Supplement, commencing on the second London Banking Day immediately following such Interest Determination Date, to prime banks in the London interbank market at approximately 11:00 a.m. London time, on such Interest Determination Date and in a principal amount that is representative for a single transaction in such Index Currency in such market at such time. If at least two such quotations are provided, LIBOR determined on such Interest Determination Date will be the arithmetic mean of such quotations. If fewer than two quotations are provided,

LIBOR determined on such Interest Determination Date will be the arithmetic mean of the rates quoted at approximately 11:00 a.m. in the applicable Principal Financial Center, on such Interest Determination date by three major banks in such Principal Financial Center selected by the Calculation Agent, after consultation with the Corporation, for loans in the Index Currency to leading European banks, having the Index Maturity designated in the applicable Pricing Supplement, commencing on the second London Banking Day immediately following the Interest Determination Date, and in a principal amount that is representative for a single transaction in such Index Currency in such market at such time; provided, however, that if the banks so selected by the Calculation Agent are not quoting as mentioned in this sentence, LIBOR determined on such Interest Determination Date will be LIBOR in effect on such Interest Determination Date.

"Index Currency" means the currency (including composite currencies) specified in the applicable Pricing Supplement as the currency for which LIBOR shall be calculated. If no such currency is specified in the applicable Pricing Supplement, the Index Currency shall be U.S. dollars.

"Designated LIBOR Page" means either (a) if "LIBOR Reuters" is designated in the applicable Pricing Supplement, the display on the Reuters Monitor Money Rates Service for the purpose of displaying the London interbank rates of major banks for the applicable Index Currency or (b) if "LIBOR Telerate" is designated in the applicable Pricing Supplement, the display on the Dow Jones Telerate Service for the purpose of displaying the London interbank rates of major banks for the applicable Index Currency. If neither LIBOR Reuters nor LIBOR Telerate is specified in the applicable Pricing Supplement, LIBOR for the applicable Index Currency will be determined as if LIBOR Telerate (and, if the U.S. dollar is the Index Currency, page 3750) had been specified.

PRIME RATE NOTES

Prime Rate Notes will bear interest at the interest rate (calculated with reference to the Prime Rate and the Spread and/or Spread Multiplier, if any, and subject to the Minimum Interest Rate and the Maximum Interest Rate, if any) specified in the Prime Rate Notes and in the applicable Pricing Supplement.

Unless otherwise specified in the applicable Pricing Supplement, the "Prime Rate" means, with respect to any Interest Determination Date, the rate on such date as published in H.15(519) under the heading "Bank Prime Loan." If such rate is not published by 9:00 a.m., New York City time, on the Calculation Date pertaining to such Interest Determination Date, the Prime Rate will be determined by the Calculation Agent and will be the arithmetic mean of the rates of interest publicly announced by each bank named on the "Reuters Screen NYMF Page" (as defined below) as such bank's prime rate or base lending rate as in effect for such Interest Determination Date. "Reuters Screen NYMF Page" means the display designated as page "NYMF" on the Reuters Monitor Money Rates Service (or such other page as may replace the NYMF page on that service for the purpose of displaying prime rates or base lending rates of major United States banks). If fewer than four such rates but more than one such rate appear on the Reuters Screen NYMF Page for such Interest Determination Date, the Prime Rate will be determined by the Calculation Agent and will be the arithmetic mean of the prime rates quoted on the basis of the actual number of days in the year divided by 360 as of the close of business on such Interest Determination Date by four major money center banks in The City of New York selected by the Calculation Agent, after consultation with the Corporation. If fewer than two such rates appear on the Reuters Screen NYMF Page, the Prime Rate will be calculated by the Calculation Agent and will be determined as the arithmetic mean of the prime rates furnished in The City of New York by the appropriate number of substitute banks or trust companies organized and doing business under the laws of the United States, or any State thereof, in each case having total equity capital of at least U.S.$500,000,000 and being subject to supervision or examination by federal or state authority, selected by the Calculation Agent, after consultation with the Corporation, to provide such rate or rates; provided that if the banks or trust companies selected as aforesaid by the Calculation Agent are not quoting as mentioned in this sentence, the rate of interest in effect for the applicable period will be the rate of interest in effect on such Interest Determination Date.

TREASURY RATE NOTES

Treasury Rate Notes will bear interest at the interest rates (calculated with reference to the Treasury Rate and the Spread and/or Spread Multiplier, if any, and subject to the Minimum Interest Rate and the Maximum Interest Rate, if any) specified in the Treasury Rate Notes and in the applicable Pricing Supplement.

Unless otherwise specified in the applicable Pricing Supplement, the "Treasury Rate" means, with respect to any Interest Determination Date, the rate for the auction held on such Interest Determination Date of direct obligations of the United States ("Treasury Bills") having the Index Maturity designated in the applicable Pricing Supplement, as published in H.15(519) under the heading "Treasury Bills---auction average (investment)" or, if not so published by 9:00 a.m., New York City time, on the Calculation Date pertaining to such Interest Determination Date, the auction average rate (expressed as a bond equivalent, on the basis of a year of 365 or 366 days, as applicable, and applied on a daily basis) as otherwise announced by the United States Department of the Treasury. In the event that the results of the auction of Treasury Bills having the applicable Index Maturity designated in the applicable Pricing Supplement are

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

not published or reported as provided above by 3:00 p.m., New York City time, on such Calculation Date or if no such auction is held on such Interest Determination Date, then the Treasury Rate shall be calculated by the Calculation Agent and shall be a yield to maturity (expressed as a bond equivalent, on the basis of a year of 365 or 366 days, as applicable, and applied on a daily basis) of the arithmetic mean of the secondary market bid rates, as of approximately 3:30 p.m., New York City time, on such Interest Determination Date, of three leading primary United States government securities dealers selected by the Calculation Agent, after consultation with the Corporation, for the issue of Treasury Bills with a remaining maturity closest to the applicable Index Maturity; provided, however; that if the dealers selected as aforesaid by the Calculation Agent are not quoting bid rates as mentioned in this sentence, the interest rate for the applicable period will be the interest rate in effect on such Interest Determination Date.

CMT RATE NOTES

Unless otherwise specified in the applicable Pricing Supplement, "CMT Rate" means, with respect to any Interest Determination Date relating to a Floating Rate Note for which the interest rate is determined with reference to the CMT Rate (a "CMT Rate Interest Determination Date"), the rate displayed on the Designated CMT Telerate Page under the caption "...Treasury Constant Maturities...Federal Reserve Board Release H.15...Mondays Approximately 3:45 P.M.," under the column for the Designated CMT Maturity Index for (i) if the Designated CMT Telerate Page is 7055, the rate on such CMT Rate Interest Determination Date and (ii) if the Designated CMT Telerate Page is 7052, the week, or the month, as applicable, ended immediately preceding the week in which the related CMT Rate Interest Determination Date occurs. If such rate is no longer displayed on the relevant page or is not displayed by 3:00 P.M., New York City time, on the related Calculation Date, then the CMT Rate for such CMT Rate Interest Determination Date will be such treasury constant maturity rate for the Designated CMT Maturity Index as published in the relevant H.15(519). If such rate is no longer published or is not published by 3:00 P.M., New York City time, on the related Calculation Date, then the CMT Rate on such CMT Rate Interest Determination Date will be such treasury constant maturity rate for the Designated CMT Maturity Index (or other United States Treasury rate for the Designated CMT Maturity Index) for the CMT Rate Interest Determination Date with respect to such Interest Reset Date as may then be published by either the Board of Governors of the Federal Reserve System or the United States Department of the Treasury that the Calculation Agent determines to be comparable to the rate formerly displayed on the Designated CMT Telerate Page and published in the relevant H.15(519). If such information is not provided by 3:00 P.M., New York City time, on the related Calculation Date, then the CMT Rate on the CMT Rate Interest Determination Date will be calculated by the Calculation Agent and will be a yield to maturity, based on the arithmetic mean of the secondary market closing offer side prices as of approximately 3:30 P.M., New York City time, on such CMT Rate Interest Determination Date reported, according to their written records, by three leading primary United States government securities dealers (each, a "Reference Dealer") in the City of New York (which may include the Agent or its affiliates) selected by the Calculation Agent (from five such Reference Dealers selected by the Calculation Agent, after consultation with the Corporation, and eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest)), for the most recently issued direct noncallable fixed rate obligations of the United States ("Treasury Notes") with an original maturity of approximately the Designated CMT Maturity Index and a remaining term to maturity of not less than such Designated CMT Maturity Index minus one year. If the Calculation Agent is unable to obtain three such Treasury Note quotations, the CMT Rate on such CMT Rate Interest Determination Date will be calculated by the Calculation Agent and will be a yield to maturity based on the arithmetic mean of the secondary market offer side prices as of approximately 3:30 P.M., New York City time, on such CMT Rate Interest Determination Date of three Reference Dealers in the City of New York (from five such Reference Dealers selected by the Calculation Agent, after consultation with the Corporation, and eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest)), for Treasury Notes with an original maturity of the number of years that is the next highest to the Designated CMT Maturity Index and a remaining term to maturity closest to the designated CMT Maturity Index and in an amount of at least $100 million. If three or four (and not five) of such Reference Dealers are quoting as described above, then the CMT Rate will be based on the arithmetic mean of the offer prices obtained and neither the highest nor the lowest of such quotes will be eliminated; provided, however, that if fewer than three Reference Dealers so selected by the Calculation Agent are quoting as mentioned herein, the CMT Rate determined as of such CMT Rate Interest Determination Date will be the CMT Rate in effect on such CMT Rate Interest Determination Date. If two Treasury Notes with an original maturity as described in the second preceding sentence have remaining terms to maturity equally close to the Designated CMT Maturity Index, the Calculation Agent will obtain from five Reference Dealers quotations for the Treasury Note with the shorter remaining term to maturity.

"Designated CMT Telerate Page" means the display on the Dow Jones Telerate Service on the page specified in the applicable Pricing Supplement (or any other page as may replace such page on that service for the purpose of displaying Treasury Constant Maturities as reported in H.15(519)) for the purpose of displaying Treasury Constant Maturities as reported in H.15(519). If no such page is specified in the applicable Pricing Supplement, the designated CMT Telerate Page shall be 7052 for the most recent week.

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

"Designated CMT Maturity Index" means the original period to maturity of the U.S. Treasury securities (either 1, 2, 3, 5, 7, 10, 20 or 30 years) specified in the applicable Pricing Supplement with respect to which the CMT Rate will be calculated. If no such maturity is specified in the applicable Pricing Supplement, the Designated CMT Maturity Index shall be 2 years.

ORIGINAL ISSUE DISCOUNT NOTES

Notes may be issued at a price less than their stated redemption price at maturity, other than by an amount which is less than a DE MINIMIS amount (0.25% of the stated redemption price at maturity multiplied by the number of complete years to maturity) resulting in such Notes being treated as if they were issued with original issue discount for United Sates Federal income tax purposes ("Original Issue Discount Notes"). Such Original Issue Discount Notes may currently pay no interest or interest at a rate which at the time of issuance is below market rates. See "United States Federal Taxation---Tax Consequences to U.S. Holders---Original Issue Discount Notes." Certain additional considerations relating to any Original Issue Discount Notes will be described in the Pricing Supplement relating thereto.

CURRENCY INDEXED NOTES

The Corporation may from time to time offer Notes as to which the principal amount payable at Maturity and/or the rate of interest thereon is determined by reference to the rate of exchange between the currency or composite currency in which such Notes ("Currency Indexed Notes") are denominated (the "Denominated Currency") and the other currency or currencies or composite currency or composite currencies specified as the Indexed Currency (the "Indexed Currency") in the applicable Pricing Supplement, or as determined in such other manner as may be specified in the applicable Pricing Supplement.

Unless otherwise specified in the applicable Pricing Supplement, (a) holders of Currency Indexed Notes will be entitled to receive a principal amount in respect of such Currency Indexed Notes exceeding the amount designated as the face amount of such Currency Indexed Notes in the applicable Pricing Supplement (the "Face Amount") if, at Maturity, the rate at which the Denominated Currency can be exchanged for the Indexed Currency is greater than the rate of such exchange designated as the Base Exchange Rate, expressed in units of the Indexed Currency per one unit of the Denominated Currency, in the applicable Pricing Supplement (the "Base Exchange Rate") and (b) holders of Currency Indexed Notes will be entitled to receive a principal amount in respect of such Currency Indexed Notes less than the Face Amount of such Currency Indexed Notes if, at Maturity, the rate at which the Denominated Currency can be exchanged for the Indexed Currency is less than such Base Exchange Rate, in each case determined as described below under "Currency Indexed Notes---Payment of Principal and Interest." Information as to the relative historical value (which information is not necessarily indicative of relative future value) of the applicable Denominated Currency against the applicable Indexed Currency, any exchange controls applicable to such Denominated Currency or Indexed Currency and certain tax consequences to holders will be set forth in the applicable Pricing Supplement. See "Foreign Currency Risks" and "Indexed Notes Risks."

PAYMENT OF PRINCIPAL AND INTEREST

Unless otherwise specified in the applicable Pricing Supplement, interest will be payable by the Corporation in the Denominated Currency based on the Face Amount of the Currency Indexed Notes and at the rate and times and in the manner set forth herein and in the applicable Pricing Supplement.

Unless otherwise specified in the applicable Pricing Supplement, principal of a Currency Indexed Note will be payable by the Corporation in the Denominated Currency at Maturity. The amount of such principal shall equal the Face Amount of the Currency Indexed Note, plus or minus an amount of the Denominated Currency determined by the Exchange Rate Agent specified in the applicable Pricing Supplement, which may be the Corporation, by reference to the difference between the Base Exchange Rate and the rate at which the Denominated Currency can be exchanged for the Indexed Currency as determined on the second Exchange Rate day (the "Determination Date") prior to Maturity of such Currency Indexed Note by the Exchange Rate Agent. Such rate of exchange shall be based upon the arithmetic mean of the open market spot offer quotations for the Denominated Currency (spot bid quotations for the Denominated Currency) obtained by the Exchange Rate Agent from the Reference Dealers (as defined below) in The City of New York at 11:00 a.m., New York City time, on the Determination Date, for an amount of Indexed Currency equal to the aggregate Face Amount of such Currency Indexed Note multiplied by the Base Exchange Rate, with settlement at Maturity to be in the Denominated Currency (such rate of exchange, as so determined and expressed in units of the Indexed Currency per one unit of the Denominated Currency, is hereafter referred to as the "Spot Rate"). If such quotations from the Reference Dealers are not available on the Determination Date due to circumstances beyond the control of the Exchange Rate Agent or the Corporation, the Spot Rate will be determined on the basis of the most recently available quotations from the Reference Dealers. As used herein, the term "Reference Dealers" shall mean the three banks or firms specified as such in the applicable Pricing Supplement or, if any of them shall be unwilling or unable to provide the requested quotations, such other major money center bank or banks in The City of New York selected by the Exchange Rate Agent, in consultation with the Corporation, to act as Reference Dealer or Dealers in replacement therefor. In the absence of manifest error, the determination by the Exchange Rate Agent of

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

the Spot Rate and the principal amount of Currency Indexed Notes payable at Maturity thereof shall be final and binding on the Corporation and the holders of such Currency Indexed Notes.

See "Description of Notes---Payment Currency" for a discussion of the procedures followed by the Exchange Rate Agent if the Denominated Currency of a Currency Indexed Note is unavailable as of the due date for any payment thereof because of the imposition of exchange controls or other circumstances beyond the Corporation's control or such Denominated Currency is no longer used as discussed therein.

The formula to be used by the Exchange Rate Agent to determine the principal amount of a Currency Indexed Note payable at Maturity will be specified in the applicable Pricing Supplement.

OTHER INDEXED NOTES AND CERTAIN TERMS APPLICABLE TO ALL INDEXED NOTES

The Notes may be issued as Indexed Notes, other than Currency Indexed Notes, the principal amount of which payable at Maturity and/or the interest thereon, or both, may be determined by reference to the price of one or more specified securities or commodities, to one or more securities or commodities exchange indices or other indices or by other similar methods or formulae. Holders of Indexed Notes may receive a principal amount at Maturity that is greater than or less than the face amount of such Notes depending upon the fluctuation of the relative value, rate or price of the specified index. The Pricing Supplement relating to such an Indexed Note will describe, as applicable, the method by which the amount of interest payable and the amount of principal payable at the Maturity Date in respect of such Indexed Note will be determined, certain special tax consequences of the purchase, ownership or disposition to holders of such Notes, certain risks associated with an investment in such Notes and other information relating to such Notes. See "Risks Factors."

PROSPECTIVE INVESTORS SHOULD CONSULT WITH THEIR OWN FINANCIAL AND LEGAL ADVISORS AS TO THE RISKS ENTAILED BY AN INVESTMENT IN CURRENCY INDEXED OR OTHER INDEXED NOTES. SUCH AN INVESTMENT ENTAILS SIGNIFICANT RISKS THAT ARE NOT ASSOCIATED WITH A SIMILAR INVESTMENT IN A SECURITY THE PRINCIPAL AMOUNT OF WHICH PAYABLE AT MATURITY IS NOT DETERMINED BY CURRENCY EXCHANGE RATES OR SECURITIES OR COMMODITIES EXCHANGE INDICES OR OTHER INDICES AND IS NOT AN APPROPRIATE INVESTMENT FOR INVESTORS WHO ARE UNSOPHISTICATED WITH RESPECT TO SUCH TRANSACTIONS.

Unless otherwise specified in the applicable Pricing Supplement, (a) for the purpose of determining whether holders of the requisite principal amount of Debt Securities outstanding under the Indenture have made a demand or given a notice or waiver or taken any other action, the outstanding principal amount of Indexed Notes (including Currency Indexed Notes) will be deemed to be the face amount thereof and (b) in the event of an acceleration of the Maturity Date of an Indexed Note, the principal amount payable to the holder of such Note upon acceleration will be the principal amount determined by reference to the formula by which the principal amount of such Note would be determined on the Maturity Date thereof, as if the date of acceleration were the Maturity Date.

SUBSEQUENT INTEREST PERIODS

The Pricing Supplement relating to each Note will indicate whether the Corporation has the option with respect to reset the interest rate, in the case of a Fixed Rate Note, or to reset the Spread and/or Spread Multiplier, in the case of a Floating Rate Note, and, if so, the date or dates on which such interest rate or such Spread and/or Spread Multiplier, as the case may be, may be reset (each an "Optional Reset Date"). If the Corporation has such option with respect to any Note, the following procedures shall apply, unless modified as set forth in the applicable Pricing Supplement.

The Corporation may exercise such option with respect to a Note by notifying the Trustee of such exercise at least 50 but not more than 60 days prior to an Optional Reset Date for such Note. Not later than 40 days prior to such Optional Reset Date, the Trustee will mail to the holder of such Note a notice (the "Reset Notice") setting forth (i) the election of the Corporation to reset the interest rate, in the case of a Fixed Rate Note, or the Spread and/or Spread Multiplier, in the case of a Floating Rate Note, (ii) such new interest rate or such new Spread and/or Spread Multiplier, as the case may be, and (iii) the provisions, if any, for redemption or repayment during the period from such Optional Reset Date to the next Optional Reset Date or, if there is no such next Optional Reset Date, to the Maturity Date of such Note (each such period a "Subsequent Interest Period"), including the date or dates on which or the period or periods during which and the price or prices at which such redemption may occur during such Subsequent Interest Period. Upon the transmittal by the Trustee of a Reset Notice to the holder of a Note, such new interest rate or such new Spread and/or Spread Multiplier, as the case may be, shall take effect automatically, and, except as modified by the Reset Notice and as described in the next paragraph, such Note will have the same terms as prior to the transmittal of such Reset Notice.

Notwithstanding the foregoing, not later than 20 days prior to an Optional Reset Date for a Note, the Corporation may, at its option, revoke the interest rate, in the case of a Fixed Rate Note, or the Spread and/or Spread Multiplier, in the case of a Floating Rate Note, provided for in the Reset Notice and establish an interest rate, in the case of a Fixed Rate Note, or a Spread and/or

Spread Multiplier, in the case of a Floating Rate Note, that is higher than the interest rate, Spread and/or Spread Multiplier, as the case may be, provided for in the Reset Notice, for the Subsequent Interest Period commencing on such Optional Reset Date by causing the Trustee to transmit notice of such higher interest rate or higher Spread and/or Spread Multiplier, as the case may be, to the holder of such Note. Such notice shall be irrevocable. All Notes with respect to which the interest rate or Spread or Spread Multiplier is reset on an Optional Reset Date and with respect to which the holders of such Notes have not tendered such Notes for repayment (or have validly revoked any such tender) pursuant to the next succeeding paragraph will bear such higher interest rate, in the case of a Fixed Rate Note, or higher Spread and/or Spread Multiplier, in the case of a Floating Rate Note, for the Subsequent Interest Period.

If the Corporation elects to reset the interest rate or the Spread and/or Spread Multiplier of a Note as described above, the holder of such Note will have the option to elect repayment of such Note by the Corporation on any Optional Reset Date at a price equal to the aggregate principal amount thereof outstanding on, plus any accrued interest to, such Optional Reset Date. In order for a Note to be so repaid on an Optional Reset Date, the holder thereof must follow the procedures set forth below under "Redemption and Repayment" for optional repayment, except that the period for delivery of such Note or notification to the Trustee shall be at least 25 but not more than 35 days prior to such Optional Reset Date and except that a holder who has tendered a Note for repayment pursuant to a Reset Notice may, by written notice to the Trustee, revoke any such tender for repayment until the close of business on the tenth day prior to such Optional Reset Date.

EXTENSION OF MATURITY

The Pricing Supplement relating to each Note (other than an Amortizing Note) will indicate whether the Corporation has the option to extend the maturity of such Note for one or more whole years (each an "Extension Period") up to but not beyond the date (the "Final Maturity Date") set forth in such Pricing Supplement. If the Corporation has such option with respect to any Note (other than an Amortizing Note), the following procedures shall apply, unless modified as set forth in the applicable Pricing Supplement (which will contain complete details concerning such option by the Corporation to extend the maturity of a Note (other than an Amortizing Note)).

The Corporation may exercise such option with respect to a Note by notifying the Trustee of such exercise at least 45 but not more than 60 days prior to the Maturity Date of such Note originally in effect prior to the exercise of such option (the "Original Maturity Date") or, if the Maturity Date of such Note has already been extended prior to the Maturity Date then in effect (an "Extended Maturity Date"). No later than 40 days prior to the Original Maturity Date or an Extended Maturity Date, as the case may be (each, a "Maturity Date"), the Trustee will mail to the holder of such Note a notice (the "Extension Notice") relating to such Extension Period, setting forth (i) the election of the Corporation to extend the Original Maturity Date, (ii) the new Maturity Date, (iii) in the case of a Fixed Rate Note, the interest rate applicable to the Extension Period or, in the case of a Floating Rate Note, the Spread and/or Spread Multiplier applicable to the Extension Period, and (iv) the provisions, if any, for redemption during the Extension Period, including the date or dates on which or the period or periods during which and the price or prices at which such redemption may occur during the Extension Period. Upon the mailing by the Trustee of an Extension Notice to the holder of a Note, the Original Maturity Date shall be extended automatically as set forth in the Extension Notice, and, except as modified by the Extension Notice and as described in the next paragraph, . such Note will have the same terms as prior to the mailing of such Extension Notice.

Notwithstanding the foregoing, not later than 20 days prior to the Original Maturity Date for a Note, the Corporation may, at its option, revoke the interest rate, in the case of a Fixed Rate Note, or the Spread and/or Spread Multiplier, in the case of a Floating Rate Note, provided for in the Extension Notice and establish an interest rate, in the case of a Fixed Rate Note, or a Spread and/or Spread Multiplier, in the case of a Floating Rate Note, that is higher than the interest rate, Spread and/or Spread Multiplier, as the case may be, provided for in the Extension Notice for the Extension Period, by mailing or causing the Trustee to transmit notice of such higher interest rate or higher Spread and/or Spread Multiplier, as the case may be, to the holder of such Note. Such notice shall be irrevocable. All Notes with respect to which the Maturity Date is extended and with respect to which the holders of such Notes have not tendered such Notes for repayment (or have validly revoked any such tender) pursuant to the next succeeding paragraph will bear such higher interest rate, in the case of a Fixed Rate Note, or higher Spread and/or Spread Multiplier, in the case of a Floating Rate Note, for the Extension Period.

If the Corporation elects to extend the Maturity Date of a Note, the holder of such Note will have the option to elect repayment of such Note by the Corporation on the Original Maturity Date at a price equal to the principal amount thereof plus any accrued interest to such date. In order for a Note to be so repaid on the Original Maturity Date, the holder thereof must follow the procedures set forth below under "Redemption and Repayment" for optional repayment, except that the period for delivery of such Note or notification to the Trustee shall be at least 30 but not more than 35 days prior to the Original Maturity Date and except that a holder who has tendered a Note for repayment pursuant to an Extension Notice may, by written notice to the Trustee, revoke any such tender for repayment until the close of business on the tenth day prior

to the Original Maturity Date.

REDEMPTION AND REPAYMENT

Unless otherwise provided in the applicable Pricing Supplement, the Notes will not be redeemable prior to the Maturity Date at the option of the Corporation or repayable prior to the Maturity Date at the option of the holder. Unless otherwise specified in the applicable Pricing Supplement, the Notes, except for Amortizing Notes, will not be subject to any sinking fund.

If applicable, the Pricing Supplement relating to each Note will indicate that the Note will be redeemable at the option of the Corporation or repayable at the option of the holder on a date or dates specified prior to its Maturity Date and, unless otherwise specified in such Pricing Supplement, at a price equal to 100% of the principal amount thereof, together with accrued interest to the date of redemption or repayment, unless such Note was issued with original issue discount, in which case the Pricing Supplement will specify the amount payable upon such redemption or repayment.

The Corporation may redeem any of the Notes that are redeemable and remain outstanding either in whole or from time to time in part, upon not less than 30 nor more than 60 days' notice. Unless otherwise specified in the applicable Pricing Supplement, if less than all of the Notes with like tenor and terms are to be redeemed, the Notes to be redeemed shall be selected by the Trustee by such method as the Trustee shall deem fair and appropriate.

Unless otherwise specified in the applicable Pricing Supplement, in order for a Note to be repaid at the option of the holder thereof, the Corporation must receive at least 30 days but not more than 45 days prior to the repayment date, the Note with the form entitled "Option to Elect Repayment" on the reverse of the Note duly completed. Exercise of the repayment option by the holder of a Note shall be irrevocable, except as otherwise provided under "Description of Notes---Subsequent Interest Periods" and "Description of Notes---Extensions of Maturity." The repayment option may be exercised by the holder of a Note for less than the aggregate principal amount of the Note then outstanding provided that the principal amount of the Note remaining outstanding after repayment is an authorized denomination.

With respect to a Book-Entry Note, the Depositary's nominee will be the holder of such Book-Entry Note and therefore will be the only entity that can exercise a right to repayment. See "Description of Notes---Book-Entry Notes." In order to ensure that the Depositary's nominee will timely exercise a right to repayment with respect to a particular beneficial interest in a Book-Entry Note, the beneficial owner of such interest must instruct the broker or other direct or indirect participant through which it holds a beneficial interest in such Book-Entry Note to notify the Depositary of its desire to exercise a right to repayment. Different firms have different cut-off times for accepting instructions from their customers and, accordingly, each beneficial owner should consult the broker or other direct or indirect participant through which it holds an interest in a Book-Entry Note in order to ascertain the cut-off time by which such an instruction must be given in order for timely notice to be delivered to the Depositary. Conveyance of notices and other communications by the Depositary to participants, by participants to indirect participants and by participants and indirect participants to beneficial owners of the Book-Entry Notes will be governed by agreements among them, subject to any statutory or regulated requirements as may be in effect from time to time.

If applicable, the Corporation will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws or regulations in connection with any such purchase.

The Corporation may at any time purchase Notes at any price or prices in the open market or otherwise. Notes so purchased by the Corporation may, at the discretion of the Corporation, be held or resold or surrendered to the Trustee for cancellation.

IMPORTANT CURRENCY EXCHANGE INFORMATION

Unless otherwise set forth in the applicable Pricing Supplement, each Purchaser of a Note is required to pay for such Notes in the Specified Currency thereof in immediately available funds, and payments of principal of, premium, if any, and interest, if any, on, such Note will be made in the Specified Currency. Currently, there are limited facilities in the United States for conversion of U.S. dollars into foreign currencies or currency units and vice versa and few banks offer non-U.S. dollar checking or savings account facilities in the United States. Accordingly, unless otherwise specified in a Pricing Supplement or unless alternative arrangements are made, payment of principal of, premium, if any, and interest, if any, on, Notes in a Specified Currency other than U.S. dollars will be made to an account at a bank outside the United States. See "Foreign Currency Risks." However, if requested by a prospective purchaser of Notes denominated in a Specified Currency other than U.S. dollars, the Agent soliciting the offer to purchase will use reasonable efforts to arrange for the conversion of U.S. dollars into such Specified Currency to enable the purchaser to pay for such Notes. Such request must be made on or before the third Business Day preceding the date of delivery of the Notes, or by such other date as is determined by such Agent. Each such conversion will be made by the relevant Agent on such terms and subject to such conditions, limitations and charges as such Agent may from time to time establish in accordance with its regular foreign exchange practice. All costs of any such

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

exchange will be borne by the purchasers of the Notes.

OTHER/ADDITIONAL PROVISIONS; ADDENDUM

Any provision with respect to the Notes, including the specification and determination of one or more Interest Rate Bases, the calculation of the interest rate applicable to a Floating Rate Note, the Interest Payment Dates, the Maturity Date or any other term relating thereto, may be modified and/or supplemented as specified under "Other/Additional Provisions" on the face thereof or in an Addendum relating thereto, if so specified on the face thereof. Such provisions will be described in the applicable Pricing Supplement.

### UNITED STATES FEDERAL TAXATION

GENERAL

In the opinion of the Corporation's tax counsel, the following general summary describes all material United States Federal income tax consequences of the ownership and disposition of the Notes. This summary provides general information only and is directed solely to original holders purchasing Notes at the "issue price" (as defined below) and who hold the Notes as capital assets within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "Code"), and does not purport to discuss all United States Federal income tax consequences that may be applicable to particular categories of investors that may be subject to special rules, such as banks, insurance companies, dealers in securities, persons holding Notes as a hedge against, or which are hedged against, a currency exchange or interest rate risk, or United States holders whose functional currency (as defined in Section 985 of the Code) is other than the U.S. dollar. In addition, the United States Federal income tax consequences of holding a particular Note will depend, in part, on the particular terms of such Note as set forth in the applicable Pricing Supplement. Finally, this summary does not discuss Original Issue Discount Notes which qualify as "applicable high-yield discount obligations" under Section 163(i) of the Code. Holders of Original Issue Discount Notes which are "applicable high-yield discount obligations" may be subject to special rules which will be set forth in an applicable Pricing Supplement. Holders are advised to consult their own tax advisors with regard to the application of the United States Federal income tax laws to their particular situations as well as any tax consequences arising under the laws of any state, local or foreign tax jurisdiction.

This summary is based on the Code, United States Treasury Regulations (including proposed regulations and temporary regulations) promulgated thereunder, rulings, official pronouncements and judicial decisions as of the date of this Prospectus Supplement. The authorities on which this summary is based are subject to change or differing interpretations, which could apply retroactively, so as to result in United States Federal income tax consequences different from those discussed below.

For purposes of the following discussion, "U.S. Holder" means a beneficial owner of a Note that is for United States Federal income tax purposes (i) a citizen or resident of the United States, (ii) a corporation, partnership or other entity created or organized in, or under the laws of, the United States or any political subdivision thereof or (iii) an estate or trust whose income from sources without the United States is includable in gross income for United States Federal income tax purposes regardless of its source. The term also includes certain former citizens of the United States whose income and gain on the Notes will be taxable.

TAX CONSEQUENCES TO U.S. HOLDERS

PAYMENTS OF INTEREST

Interest on a Note (whether denominated in U.S. dollars or in other than U.S. dollars) that is not an Original Issue Discount Note will generally be taxable to a U.S. Holder as ordinary interest income at the time it is accrued or is received in accordance with the U.S. Holder's method of accounting for tax purposes.

All payments of interest on a Note that matures one year or less from its date of issuance will be included in the stated redemption price at the maturity of the Note and will be taxed in the manner described below under "Original Issue Discount Notes".

Special rules governing the treatment of interest paid with respect to Original Issue Discount Notes, including certain Floating Rate Notes, Foreign Currency Notes, Currency Indexed Notes and other Indexed Notes are described under "Original Issue Discount Notes", "Foreign Currency Notes" and "Currency Indexed Notes and Other Indexed Notes" below.

ORIGINAL ISSUE DISCOUNT NOTES

The following summary is generally based upon the Treasury Regulations concerning the treatment of debt instruments issued with original issue discount (the "OID Regulations"). Under the OID Regulations, a Note that is issued for an amount less than its stated redemption price at maturity will generally be considered to have been issued at an original issue discount. The issue price of a Note is equal to the first price at which a substantial amount of such Notes is sold (excluding bond houses, brokers or similar persons or organizations

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

acting in the capacity of underwriters or wholesalers). The stated redemption price at maturity of a Note is generally equal to the sum of all payments to be made on such Note other than "qualified stated interest" payments. "Qualified stated interest" is defined as stated interest unconditionally payable (or that will be constructively received under Section 451 of the Code) in cash or property (other than debt instruments of the issuer) at least annually at a single fixed rate, a single qualified floating rate, or a single "objective rate," provided that the single rate appropriately takes into account the length of interval between payments.

Under the OID Regulations, Variable Rate Notes are subject to special rules. Subject to certain exceptions, a variable rate of interest is a "qualified floating rate" if variations in the value of the rate can reasonably be expected to measure contemporaneous fluctuations in the cost of newly borrowed funds in the currency in which the Note is denominated. A variable rate will be considered a qualified floating rate if the variable rate equals (i) the product of an otherwise qualified floating rate and a fixed multiple (i.e., a Spread Multiplier) that is greater than zero but not more than 1.35 or (ii) an otherwise qualified floating rate (or the product described in clause (i)) plus or minus a fixed rate (i.e., a Spread). If the variable rate equals the product of an otherwise qualified floating rate and a single fixed multiplier greater than 1.35, however, such rate generally constitutes an "objective rate," described more fully below. A variable rate will not be considered a qualified floating rate if the variable rate is subject to a cap, floor, governor (i.e., a restriction on the amount of increase or decrease in the stated interest rate) or similar restriction that is reasonably expected as of the issue date to cause the yield on the Note to be significantly more or less than the expected yield determined without the restriction (other than a cap, floor or governor that is fixed throughout the term of the Note).

Subject to certain exceptions, an "objective rate" is defined as a rate (other than a qualified floating rate) that is determined using a single fixed formula and that is based on (i) one or more qualified floating rates, (ii) one or more rates where each rate would be a qualified floating rate for a Note denominated in a currency other than the currency in which the Note is denominated, (iii) the yield or changes in the price of one or more items of personal property (other than stock or debt of the Corporation or a related party) that is "actively traded," or (iv) a combination of the rates described in clauses (i), (ii) and (iii) of this sentence. A variable rate of interest on a Note will not be considered an objective rate if it is reasonably expected that the average value of the rate during the first half of the Note's term will be either significantly less than or significantly greater than the average value of the rate during the final half of the Note's term.

If interest on a Note is stated at a fixed rate for an initial period of less than one year (e.g., an Initial Interest Rate) followed by a variable rate that is either a qualified floating rate or an objective rate for a subsequent period, and the value of the variable rate on the issue date is intended to approximate the fixed rate, the fixed rate and the variable rate together constitute a single qualified floating rate or objective rate. If a Floating Rate Note provides for two or more qualified floating rates that can reasonably be expected to have approximately the same values throughout the term of the Note, the qualified floating rates together constitute a single qualified floating rate. Two or more rates will be conclusively presumed to meet the requirements of the preceding sentences if the values of the applicable rates on the issue date are within 1/4 of 1 percent of each other. In addition, in order to be treated as qualified stated interest (rather than contingent payments, as discussed below), the qualified floating rate or objective rate in effect at a given time for a Note must be set at a value of that rate on any day that is no earlier than three months prior to the first day on which that value is in effect and no later than one year following that first day.

Special tax considerations (including possible original issue discount) may arise with respect to Notes which provide for interest at (i) more than one qualified floating rate, (ii) a single fixed rate and one or more qualified floating rates, or (iii) in certain cases a single fixed rate and a single objective rate. In the event Notes of this type are issued, the United States Federal income tax consequences to purchasers and holders thereof will be discussed in the applicable Pricing Supplement. Purchasers of such Notes should carefully examine the Pricing Supplement and should consult their tax advisors regarding the purchase, ownership and disposition of such Notes.

Notwithstanding the general definition of original issue discount above, a Note will not be considered to have been issued with an original issue discount if the amount of such original issue discount is less than a DE MINIMIS amount equal to 0.25% of the stated redemption price at maturity multiplied by the number of complete years to maturity (or, in the case of a Note providing for payments prior to maturity of amounts included in its stated redemption price at maturity, the weighted average maturity). Holders of Notes with a DE MINIMIS amount of original issue discount will include such original issue discount in income, as capital gain, on a pro rata basis as principal payments are made on the Note.

A U.S. Holder of an Original Issue Discount Note (other than certain U.S. Holders of Short-Term Original Issue Discount Notes, as defined below) will be required to include qualified stated interest in income at the time it is received or accrued in accordance with such U.S. Holder's method of accounting.

A U.S. Holder of an Original Issue Discount Note that matures more than

one year from its date of issuance will be required to include original issue discount in income as it accrues, in accordance with a constant yield method based on a compounding of interest, before the receipt of cash payments attributable to such income. The amount of original issue discount includable in income is equal to the sum of the "daily portions" of the original issue discount for each day during the taxable year on which the U.S. Holder held such Note. The "daily portion" is the original issue discount for the "accrual period" that is allocated ratably to each day in the accrual period. The original issue discount for an accrual period is equal to the excess, if any, of (a) the product of the "adjusted issue price" of an Original Issue Discount Note at the beginning of such accrual period and its "yield to maturity" over (b) the amount of any qualified stated interest allocable to the accrual period. The "accrual period" is the interval (not to exceed one year) that ends no later than the date of any scheduled payment of principal or interest. The Corporation will specify the accrual period it intends to use in the applicable Pricing Supplement but a U.S. Holder is not required to use the same accrual period for purposes of determining the amount of original issue discount includable in its income for a taxable year. The adjusted issue price of a Note at the beginning of an accrual period is equal to the issue price of such Note, increased by the aggregate amount of original issue discount accrued with respect to such Note that accrued in prior accrual periods, and reduced by the amount of any payment on the Note in prior accrual periods of amounts other than a payment of qualified stated interest. Under these rules, U.S. Holder's generally will have to include in income increasingly greater amounts of original issue discount in successive accrual periods.

Under the OID Regulations, a U.S. Holder may make an election (the "Constant Yield Election") to include in gross income its entire return on a Note (i.e., the excess of all remaining payments to be received on the Note over the amount paid for the Note by such Holder) in accordance with a constant yield method based on the compounding of interest. Special rules apply to elections made with respect to Notes with amortizable bond premium or market discount and U.S. Holders considering such an election should consult their own tax advisor.

In general, a cash method U.S. Holder of an Original Issue Discount Note that matures one year or less from its date of issuance (a "Short-Term Original Issue Discount Note") is not required to accrue original issue discount on such Note for United States Federal income tax purposes unless it elects to do so. U.S. Holders who make such an election, U.S. Holders who report income for United States Federal income tax purposes on the accrual method and certain other U.S. Holders, including banks and dealers in securities, are required to include original issue discount in income on such Short-Term Original Issue Discount Notes as it accrues on a straight-line basis, unless an election is made to use the constant yield method (based on a daily compounding). In the case of a U.S. Holder who is not required and does not elect to include original issue discount in income currently, any gain realized on the sale, exchange or redemption of the Short-Term Original Issue Discount Note will be ordinary income to the extent of the original issue discount accrued. In addition, such U.S. Holder will be required to defer deductions for any interest paid on indebtedness incurred to purchase or carry Short-Term Original Issue Discount Notes in an amount not exceeding the deferred interest income, until such deferred interest income is recognized.

Certain Notes may be redeemable at the option of the Corporation prior to the Maturity Date, or repayable at the option of the U.S. Holder prior to the Maturity Date. Notes containing such features may be subject to rules that differ from the general rules discussed above. U.S. Holders intending to purchase Notes with any such features should carefully examine the applicable Pricing Supplement and should consult with their own tax advisors with respect to such features, since the tax consequences with respect to original issue discount will depend, in part, on the particular terms and the particular features of the purchased Note.

MARKET DISCOUNT AND PREMIUM

If a U.S. Holder purchases a Note for an amount less than its stated redemption price at maturity, or in the case of an Original Issue Discount Note, its adjusted issue price, the amount of the difference will be treated as "market discount," unless such excess is less than a specified DE MINIMIS amount.

In general, market discount will be considered to accrue ratably during the period from the date of acquisition to the maturity date of the Note, unless the Holder elects (on a Note by Note basis) to accrue on the basis of a constant interest rate. Any gain recognized on the retirement or disposition of a Market Discount Note will be treated as ordinary income to the extent that such gain does not exceed the accrued market discount on such Note. Alternatively, a Holder may elect to include market discount in income currently as it accrued (on either a ratable or constant interest rate basis). Such election shall apply to all debt instruments with market discount acquired by the electing Holder during that taxable year and all subsequent years. Absent such an election, a Holder may be required to defer the deduction of all or a portion of the interest paid or accrued on any indebtedness incurred or maintained to purchase or carry such Note until the maturity or disposition of such Note.

If a U.S. Holder purchases a Note for an amount that is greater than the stated redemption price at maturity, such Holder will be considered to have purchased such Note with "amortizable bond premium" equal in amount to such excess, and generally will not be required to include any original issue

discount in income. A U.S. Holder may elect (in accordance with applicable Code provisions) to amortize such premium, using a constant yield method, over the remaining term of the Note (where such Note is not callable prior to its maturity date). If such Note may be called prior to maturity after the U.S. Holder has acquired it, the amount of amortizable bond premium is determined with reference to either the amount payable on maturity or, if it results in a smaller premium, attributable to the period through the earlier call date with reference to the amount payable on the earlier call date. A U.S. Holder who elects to amortize bond premium must reduce his tax basis in the Note by the amount of the premium amortized in any year. An election to amortize bond premium applies to all taxable debt obligations then owned and thereafter acquired by the U.S. Holder and may be revoked only with the consent of the Internal Revenue Service.

An Original Issue Discount Note purchased for an amount that is greater than its adjusted issue price, but less than or equal to the sum of all amounts payable on the Note (other than qualified stated interest), will be considered to have been purchased at an "acquisition premium." A U.S. Holder will reduce the amount of original issue discount which such Holder includes in income for any taxable year by the fraction, the numerator of which is the excess of the cost of the Note over its adjusted issue price and denominator of which is the excess of the sum of all amounts payable on the Note after the purchase date (other than qualified stated interest) over the adjusted issue price.

SALE, EXCHANGE OR REDEMPTION OF THE NOTES

Upon the sale, exchange or redemption of a Note, a U.S. Holder will recognize taxable gain or loss equal to the difference between the amount realized on the sale, exchange or redemption (except to the extent such amount is attributable to accrued and unpaid interest) and the U.S. Holder's adjusted tax basis in the Note. A U.S. Holder's adjusted tax basis in a Note will generally be the U.S. dollar cost of the Note to such U.S. Holder, increased by the amount of any original issue discount previously included in income by the U.S. Holder with respect to such Note and reduced by any amortized premium and any principal payments received by the U.S. Holder and, in the case of an Original Issue Discount Note, by the amounts of any other payments that do not constitute qualified stated interest.

In general, gain or loss realized on the sale, exchange or redemption of a Note will be capital gain or loss (except in the case of a Short-Term Original Issue Discount Note, to the extent of any original issue discount not previously included in such U.S. Holder's taxable income), and will be long-term capital gain or loss if at the time of sale, exchange or redemption, the Note has been held for more than one year. Under current law, the excess of net long-term net capital gains over net short-term capital losses is taxed at a lower rate than ordinary income for certain non-corporate taxpayers. The distinction between capital gain or loss is also relevant for purposes of, among other things, limitations on the deductibility of capital losses.

SUBSEQUENT INTEREST PERIODS AND EXTENSIONS OF MATURITY

If so specified in the applicable Pricing Supplement relating to a Note, the Company may have the option (a) to reset the interest rate, in the case of a Fixed Rate Note, or to reset the Spread and/or the Spread Multiplier, in the case of a Floating Rate Note and/or (b) to extend the Maturity of such Note. See "Description of Notes---Subsequent Interest Periods" and "Description of Notes--- Extension of Maturity." These type of Notes may be subject to special rules for determining interest income or gain or loss. A description of the United States Federal income tax consequences to a U.S. Holder of these Notes will be contained in the applicable Pricing Supplement.

FOREIGN CURRENCY NOTES

The United States Federal income tax consequences to a U.S. Holder of the ownership and disposition of Notes that are denominated in, or provide for payments determined by reference to, a currency or currency unit other than the United States dollar ("Foreign Currency Notes") will be summarized in the applicable Pricing Supplement.

NOTES LINKED TO COMMODITIES, SECURITIES, INDEXES OR OTHER FACTORS

The United States Federal income tax consequences to a U.S. Holder of the ownership and disposition of Notes that have principal or interest determined by reference to one or more specified commodity prices, securities, equity or commodity indices or other factors will vary depending on the exact terms of the Notes and related factors. Notes containing any of such features may be subject to rules that differ from the general rules discussed above. U.S. Holders intending to purchase such Notes should refer to the discussion relating to taxation in the applicable Pricing Supplement.

NOTES SUBJECT TO CONTINGENCIES

The Treasury has proposed new regulations concerning the proper treatment of contingent payment debt instruments. The proposed effective date of the regulations is 60 days after the date the regulations are finalized. Notes containing contingent payments may be subject to rules that differ from those described above, or presently proposed in the proposed regulations. A description of the proposed treatment of contingent Notes will be summarized in the applicable Pricing Supplement.

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

BACKUP WITHHOLDING AND INFORMATION REPORTING

Backup withholding and information reporting requirements may apply to certain payments of principal, premium and interest (including original issue discount) on a Note, and to payments of proceeds of the sale or redemption of a Note, to certain non-corporate U.S. Holders. The Corporation, its agent, a broker, the relevant Trustee or any paying agent, as the case may be, will be required to withhold from any payment a tax equal to 31 percent of such payment if the U.S. Holder fails to furnish or certify his correct taxpayer identification number (social security number or employer identification number) to the payor in the manner required, fails to certify that such U.S. Holder is not subject to backup withholding, or otherwise fails to comply with the applicable requirements of the backup withholding rules. Certain holders (including, among others, U.S. corporations and persons who are not U.S. persons) are not subject to the backup withholding and reporting requirements. Any amounts withheld under the backup withholding rules from a payment to a holder may be credited against such holder's United States Federal income tax and may entitle such holder to a refund, provided that the required information is furnished to the United States Internal Revenue Service.

THE UNITED STATES FEDERAL INCOME TAX DISCUSSION SET FORTH ABOVE IS INCLUDED FOR GENERAL INFORMATION ONLY AND MAY NOT BE APPLICABLE DEPENDING UPON A HOLDER'S PARTICULAR SITUATION. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES TO THEM OF THE OWNERSHIP AND DISPOSITION OF THE NOTES, INCLUDING THE TAX CONSEQUENCES UNDER STATE, LOCAL, FOREIGN AND OTHER TAX LAWS AND THE POSSIBLE EFFECTS OF CHANGES IN FEDERAL OR OTHER TAX LAWS.

PLAN OF DISTRIBUTION

Under the terms of Selling Agent Agreements, each dated as of December , 1995, the Notes are offered on a continuing basis by the Corporation through Bear, Stearns & Co. Inc., Lehman Brothers, Lehman Brothers Inc., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, J. P. Morgan Securities Inc., and Salomon Brothers Inc, who have agreed to use their reasonable best efforts to solicit purchases of the Notes. The Corporation may appoint additional Agents to solicit sales of the Notes; provided, however, that any such solicitation and sale of the Notes shall be on the same terms and conditions to which the Agents have agreed. In addition, the Corporation may arrange for the Notes to be sold through other agents, dealers or underwriters. The Corporation may sell Notes directly to investors on its own behalf. Unless otherwise specified in the applicable Pricing Supplement, the Corporation will pay each Agent a commission in the form of a discount ranging from .05% to .60% of the initial offering price of each Note sold through such Agent, depending upon the Maturity Date thereof. No commission will be payable to the Agents on Notes sold directly to purchasers by the Corporation. The Corporation will have the sole right to accept offers to purchase Notes and may reject any proposed purchase of Notes in whole or in part. Each Agent will have the right, in its discretion reasonably exercised, to reject any proposed purchase of Notes in whole or in part. The Corporation reserves the right to withdraw, cancel or modify the offer without notice.

The Corporation may also sell Notes to an Agent as principal for its own account at a discount equal to the commission applicable to any agency sale of a Note of identical maturity, unless otherwise specified in the applicable Pricing Supplement. Such Notes may be resold to one or more investors and other purchasers at varying prices relating to prevailing market prices at the time of resale as determined by the Agent or, if so specified in an applicable Pricing Supplement, for resale at a fixed public offering price. In addition, the Agents may offer the Notes they have purchased as principal to other dealers. The Agents may sell Notes to any dealer at a discount and, unless otherwise specified in the applicable Pricing Supplement, such discount allowed to any dealer will not, during the distribution of the Notes, be in excess of the discount to be received by such Agent from the Corporation. After the initial public offering of Notes to be resold by an Agent to investors and other purchasers, the public offering price (in the case of Notes to be resold at a fixed public offering price), concession and discount may be changed.

Each Agent may be deemed to be an "underwriter" within the meaning of the Securities Act of 1933, as amended. The Corporation has agreed to indemnify the Agents against certain liabilities, including liabilities under the Securities Act of 1933, as amended.

No Note will have an established trading market when issued. The Corporation does not intend to apply for the listing of the Notes on any securities exchange, but has been advised by the Agents that the Agents intend to make a market in the Notes as permitted by applicable laws and regulations. The Agents are not obligated to do so, however, and the Agents may discontinue making a market at any time without notice. No assurance can be given as to the liquidity of any trading market for any Notes.

--------------------

GENERAL MOTORS CORPORATION

and

CITIBANK, N.A.,

Trustee

INDENTURE

Dated as of December    ,  1995

Debt Securities

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

TABLE OF CONTENTS*

                                                          PAGE

Parties.............................. ..........................................1
Recitals................................................................1

                          ARTICLE ONE.
                          DEFINITIONS.

Section 1.01.   Definitions............................................1
                Additional Amounts....................................2
                Authorized Newspaper..................................2
                Board of Directors....................................2
                Board Resolution......................................2
                Business Day..........................................2
                Corporate Trust Office................................2
                Corporation...........................................3
                Corporation Order.....................................3
                Coupon................................................3
                Coupon Security.......................................3
                Depository............................................3
                Event of Default......................................3
                Global Security.......................................4
                Holder................................................4
                Indenture.............................................4
                Interest Payment Date.................................4
                Issue Date............................................4
                Maturity Date.........................................4
                Officers' Certificate.................................4
                Opinion of Counsel....................................5
                Original Issue Discount Securities....................5
                outstanding...........................................5
                Paying Agent..........................................5
                person................................................6

*The Table of Contents is not part of the Indenture.

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

Place of Payment....................................6
Registered Security.................................6
Regular Record Date.................................6
responsible officer.................................6
Security Register and Security Registrar............6
Trust Indenture Act of 1939.........................6
United States.......................................6
United States person................................7
Unregistered Security...............................7
U.S. Dollar.........................................7
Section 1.02    Notice Securityholders..............................7

ARTICLE TWO.
ISSUE, EXECUTION, REGISTRATION AND EXCHANGE OF SECURITIES.

Section 2.01. Amount Unlimited; Issuable in Series....................7
Section 2.02. Form of Trustee's Certificate of Authentication........10
Section 2.03. Form, Execution, Authentication, Delivery and Dating of
Securities..........................................................10
Section 2.04. Denominations; Record Date.............................12
Section 2.05. Exchange and Registration of Transfer of Securities....13
Section 2.06. Temporary Securities...................................14
Section 2.07. Mutilated, Destroyed, Lost or Stolen Securities........15
Section 2.08. Cancellation...........................................16
Section 2.09. Computation of Interest................................16
Section 2.10.  Securities in Global Form.............................16
Section 2.11.  Medium-Term Securities................................16

ARTICLE THREE.
REDEMPTION OF SECURITIES.

Section 3.01. Redemption of Securities; Applicability of Article.....18
Section 3.02. Notice of Redemption; Selection of Securities..........18
Section 3.03. Payment of Securities Called for Redemption............19

ARTICLE FOUR.
PARTICULAR COVENANTS OF THE CORPORATION.

Section 4.01. Payment of Principal, Premium, Interest
and Additional Amounts..................................20
Section 4.02. Offices for Notices and Payments, etc..................20
Section 4.03. Provisions as to Paying Agent..........................21
Section 4.04. Luxembourg Publications................................22
Section 4.05. Statement by Officers as to Default....................22
Section 4.06. Limitation on Liens....................................22
Section 4.07. Limitation on Sale and Lease-Back......................24
Section 4.08. Definitions Applicable to Sections 4.06 and 4.07.......24

ARTICLE FIVE.
SECURITYHOLDER LISTS AND REPORTS BY
THE CORPORATION AND THE TRUSTEE.

Section 5.01. Securityholder Lists...................................26
Section 5.02. Preservation and Disclosure of Lists.................. 26
Section 5.03. Reports by the Corporation.............................27
Section 5.04. Reports by the Trustee.................................28

ARTICLE SIX.
REMEDIES ON DEFAULT.

Section 6.01. Events of Default......................................28
Section 6.02. Payment of Securities on Default; Suit Therefor........30
Section 6.03. Application of Moneys Collected by Trustee.............32
Section 6.04. Proceedings by Securityholders.........................33
Section 6.05. Remedies Cumulative and Continuing.....................34
Section 6.06. Direction of Proceedings...............................34
Section 6.07. Notice of Defaults.....................................35
Section 6.08. Undertaking to Pay Costs...............................35

ARTICLE SEVEN.
CONCERNING THE TRUSTEE.

Section 7.01. Duties and Responsibilities of Trustee.................36
Section 7.02. Reliance on Documents, Opinions, etc...................37
Section 7.03. No Responsibility for Recitals, etc....................38
Section 7.04. Ownership of Securities or Coupons.....................38
Section 7.05. Moneys to be Held in Trust.............................38
Section 7.06. Compensation and Expenses of Trustee...................38
Section 7.07. Officers' Certificate as Evidence......................39
Section 7.08. Conflicting Interest of Trustee........................39
Section 7.09. Eligibility of Trustee.................................39
Section 7.10. Resignation or Removal of Trustee......................40
Section 7.11. Acceptance by Successor Trustee........................41
Section 7.12. Successor by Merger, etc...............................42
Section 7.13. Limitations on Rights of Trustee as Creditor..........42

ARTICLE EIGHT.
CONCERNING THE SECURITYHOLDERS.

Section 8.01. Action by Securityholders..................................42
Section 8.02. Proof of Execution by Securityholders.....................43
Section 8.03. Who Are Deemed Absolute Owners............................44
Section 8.04. Corporation-Owned Securities Disregarded..................44
Section 8.05. Revocation of Consents; Future Securityholders Bound......44
Section 8.06. Securities in a Foreign Currency..........................45

ARTICLE NINE.
SECURITYHOLDERS' MEETINGS.

Section 9.01. Purposes of Meetings......................................45
Section 9.02. Call of Meetings by Trustee...............................46
Section 9.03. Call of Meetings by Corporation or Securityholders........46
Section 9.04. Qualification for Voting..................................47
Section 9.05. Regulations...............................................47
Section 9.06. Voting....................................................47

ARTICLE TEN.
SUPPLEMENTAL INDENTURES.

Section 10.01. Supplemental Indentures without Consent of Securityholders
48
Section 10.02. Supplemental Indentures with Consent of Securityholders..49
Section 10.03. Compliance with Trust Indenture Act: Effect of
               Supplemental Indentures..................................50
Section 10.04. Notation on Securities...................................51

ARTICLE ELEVEN.
CONSOLIDATION, MERGER, SALE OR CONVEYANCE.

Section 11.01. Corporation May Consolidate, etc., on Certain Terms......51
Section 11.02. Successor Corporation Substituted........................51
Section 11.03. Opinion of Counsel to be Given Trustee...................52
Section 11.04  Certificate to Trustee...................................52

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

ARTICLE TWELVE.
SATISFACTION AND DISCHARGE OF INDENTURE;
UNCLAIMED MONEYS.

Section 12.01. Discharge of Indenture....................................52
Section 12.02. Satisfaction, Discharge and Defeasance
               of Securities of any Series.............................53
Section 12.03. Deposited Moneys to be Held in Trust by Trustee..........54
Section 12.04. Paying Agent to Repay Moneys Held........................55
Section 12.05. Return of Unclaimed Moneys...............................55

ARTICLE THIRTEEN.
IMMUNITY OF INCORPORATORS, STOCKHOLDERS,
OFFICERS AND DIRECTORS.

Section 13.01. Indenture and Securities Solely Corporate Obligations....55

ARTICLE FOURTEEN.
MISCELLANEOUS PROVISIONS.

Section 14.01. Benefits of Indenture Restricted to Parties and Securityholder
56
Section 14.02. Provisions Binding on Corporation's Successors...........56
Section 14.03. Addresses for Notices, etc..............................56
Section 14.04. Evidence of Compliance with Conditions Precedent........56
Section 14.05. Legal Holidays..........................................57
Section 14.06. Trust Indenture Act to Control..........................57
Section 14.07. Execution in Counterparts...............................57
Section 14.08. New York Contract.......................................57
Section 14.09. Judgment Currency.......................................57
Section 14.10. Severability of Provisions..............................58
Section 14.11. Corporation Released From Indenture Requirements Under
               Certain Circumstances..................................58
Acceptance of Trust by Trustee.........................................58
Testimonium............................................................58
Signatures and Seals...................................................59
Acknowledgments........................................................59

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

......THIS INDENTURE, dated as of the day of December, 1995 between GENERAL MOTORS CORPORATION, a corporation duly organized and existing under the laws of the State of Delaware (hereinafter sometimes called the "Corporation"), party of the first part, and Citibank, N.A., a banking association duly incorporated and existing under the laws of the United States of America, as trustee hereunder (hereinafter sometimes called the "Trustee," which term shall include any successor trustee appointed pursuant to Article Seven).

WITNESSETH:

WHEREAS, the Corporation deems it necessary to issue from time to time for its lawful purposes securities (hereinafter called the "Securities" or, in the singular, "Security") evidencing its unsecured indebtedness and has duly authorized the execution and delivery of this Indenture to provide for the issuance of the Securities in one or more series, unlimited as to principal amount, to bear such rates of interest, to mature at such time or times and to have such other provisions as shall be fixed as hereinafter provided; and

WHEREAS, the Corporation represents that all acts and things necessary to constitute these presents a valid indenture and agreement according to its terms, have been done and performed, and the execution of this Indenture has in all respects been duly authorized, and the Corporation, in the exercise of legal rights and power in it vested, is executing this Indenture;

NOW, THEREFORE:

In order to declare the terms and conditions upon which the Securities are authenticated, issued and received, and in consideration of the premises, of the purchase and acceptance of the Securities by the Holders thereof and of the sum of one dollar to it duly paid by the Trustee at the execution of these presents, the receipt whereof is hereby acknowledged, the Corporation covenants and agrees with the Trustee, for the equal and proportionate benefit of the respective Holders from time to time of the Securities, as follows:

ARTICLE ONE.<br>DEFINITIONS.

SECTION 1.01 DEFINITIONS. The terms defined in this Section (except as herein otherwise expressly provided or unless the context otherwise requires) for all purposes of this Indenture and of any indenture supplemental hereto shall have the respective meanings specified in this Section. All other terms used in this Indenture which are defined in the Trust Indenture Act of 1939 or which are by reference therein defined in the Securities Act of 1933, as amended, shall have the meanings (except as herein otherwise expressly provided or unless the context otherwise clearly requires) assigned to such terms in said Trust Indenture Act and in said Securities Act as in force at the date of this Indenture as originally executed. The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole, including the Exhibits to this instrument, and not to any particular article, Section or other subdivision. Certain terms used wholly or principally within an Article of this Indenture may be defined in that Article.

ADDITIONAL AMOUNTS:

The term "Additional Amounts" shall mean any additional amounts which are required by a Security or by or pursuant to a Board Resolution under circumstances specified therein, to be paid by the Corporation in respect of certain taxes, assessments or governmental charges imposed on certain Holders of Securities and which are owing to such Holders of Securities.

AUTHORIZED NEWSPAPER:

The term "Authorized Newspaper" shall mean a newspaper in an official language of the country of publication of general circulation in the place in connection with which the term is used. If it shall be impractical in the opinion of the Trustee to make any publication of any notice required hereby in an Authorized Newspaper, any publication or other notice in lieu thereof which is made or given with the approval of the Trustee shall constitute a sufficient publication of such notice.

BOARD OF DIRECTORS:

The term "Board of Directors" shall mean the Board of Directors of the Corporation or the Finance Committee of the Corporation or any committee established by the Board of Directors or Finance Committee.

BOARD RESOLUTION:

The term "Board Resolution" shall mean a resolution certified by the Secretary or Assistant Secretary of the Corporation to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Trustee.

BUSINESS DAY:

The term "Business Day" shall mean, with respect to any Security, a day

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

(other than a Saturday or Sunday) that in the city (or in any of the cities, if more than one) in which amounts are payable as specified on the face of the form of such Security, is neither a legal holiday nor a day on which banking institutions are authorized or required by law, regulation or executive order to close.

CORPORATE TRUST OFFICE:

The term "Corporate Trust Office" means the office of the Trustee in New York, New York, at which at any particular time its corporate trust business shall be principally administered, which office at the date hereof is located at 120 Wall Street, New York, NY 10043, except that, with respect to presentation of Securities for payment or registration of transfers and exchanges and the location of the Security Registrar, such term means the office or agency of the Trustee in said city at which at any particular time its corporate agency business shall be conducted, which at the date hereof is located at 111 Wall Street, New York, NY 10043.

CORPORATION:

The term "Corporation" shall mean the person named as the "Corporation" in the first paragraph of this instrument until a successor corporation shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "Corporation" shall mean such successor corporation.

CORPORATION ORDER:

The term "Corporation Order" shall mean any request, order or confirmation signed by a person designated pursuant to Section 2.03 to the Trustee, which may be transmitted by telex, by telecopy or in writing.

COUPON:

The term "Coupon" shall mean any interest coupon appertaining to a Security.

COUPON SECURITY:

The term "Coupon Security" shall mean any Security authenticated and delivered with one or more Coupons appertaining thereto.

DEPOSITORY:

The term "Depository" shall mean, with respect to the Securities of any series issuable or issued in whole or in part in the form of one or more Global Securities, the Person designated as Depository by the Corporation pursuant to Section 2.01 until a successor Depository shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "Depository" shall mean or include each Person who is then a Depository hereunder, and if at any time there is more than one such Person, "Depository" as used with respect to the Securities of any such series shall mean the Depository with respect to the Securities of that series.

EVENT OF DEFAULT:

The term "Event of Default" shall mean any event specified as such in Section 6.01.

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

GLOBAL SECURITY:

The term "Global Security" shall mean a Registered Security or an Unregistered Security evidencing all or part of a series of Securities issued to the Depository for such series in accordance with Section 2.03.

HOLDER:

The terms "Holder," "Holder of Securities," "Securityholder" or other similar terms, shall mean (a) in the case of any Registered Security, the person in whose name at the time such Security is registered on the registration books kept for that purpose in accordance with the terms hereof, and (b) in the case of any Unregistered Security, the bearer of such Security.

INDENTURE:

The term "Indenture" shall mean this instrument as originally executed or as it may from time to time be supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof.

INTEREST PAYMENT DATE:

The term "Interest Payment Date" when used with respect to any Security, means the Stated Maturity of an installment of interest on such Security.

ISSUE DATE:

The term "Issue Date" shall mean, with respect to Securities of any tranche, whether evidenced by a Registered Security or an Unregistered Security, the date such Securities are authenticated pursuant to Section 2.03.

MATURITY DATE:

The term "Maturity Date" when used with respect to any Security, shall mean the stated maturity of the Security.

OFFICERS' CERTIFICATE:

The term "Officers' Certificate" shall mean a certificate signed by the Chairman of the Board of Directors or the President or any Executive Vice President or any Senior Vice President or any Vice President or the Treasurer and by the Secretary or any Assistant Secretary or, if the other signatory is other than the Treasurer, any Assistant Treasurer of the Corporation.

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

OPINION OF COUNSEL:

The term "Opinion of Counsel" shall mean an opinion in writing signed by legal counsel, who may be an employee of or counsel to the Corporation, or who may be other counsel acceptable to the Trustee.

ORIGINAL ISSUE DISCOUNT SECURITIES:

The term "Original Issue Discount Securities" shall mean any Securities which are initially sold at a discount from the principal amount thereof and which provide upon Event of Default for declaration of an amount less than the principal amount thereof to be due and payable upon acceleration thereof.

OUTSTANDING:

The term "outstanding" when used with reference to Securities, shall, subject to the provisions of Section 7.08 and Section 8.04, mean, as of any particular time, all Securities authenticated and delivered by the Trustee under this Indenture, except

(a) Securities theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(b) Securities, or portions thereof, for the payment or redemption of which moneys in the necessary amount shall have been deposited in trust with the Trustee or with any paying agent (other than the Corporation) or shall have been set aside and segregated in trust by the Corporation (if the Corporation shall act as its own Paying Agent), provided, that if such Securities are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given as in Article Three provided, or provisions satisfactory to the Trustee shall have been made for giving such notice; and

(c) Securities in lieu of and in substitution for which other Securities shall have been authenticated and delivered pursuant to the terms of Article Two, unless proof satisfactory to the Trustee is presented that any such Securities are held by bona fide Holders in due course.

PAYING AGENT:

The term "Paying Agent" shall mean initially Citibank, N.A., and subsequently, any other paying agent appointed by the Corporation from time to time in respect of the Securities.

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

PERSON:

The term "person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

PLACE OF PAYMENT:

The term "Place of Payment," when used with respect to the Securities of any series, means the place or places where the principal of (and premium, if any) and interest, if any, (and Additional Amounts, if any) on the Securities of that series are payable.

REGISTERED SECURITY:

The term "Registered Security" shall mean any Security registered on the Security registration books of the Corporation.

REGULAR RECORD DATE:

The term "Regular Record Date" for the interest payable on any Interest Payment Date on the Securities of any series means the date specified for that purpose as contemplated by Sections 2.01 and 2.04.

RESPONSIBLE OFFICER:

The term "responsible officer" when used with respect to the Trustee shall mean any officer assigned by the Trustee to administer its corporate trust matters.

SECURITY REGISTER AND SECURITY REGISTRAR:

The term "Security Register" and "Security Registrar" shall have the respective meanings specified in Section 2.05.

TRUST INDENTURE ACT OF 1939:

The term "Trust Indenture Act of 1939" shall mean the Trust Indenture Act of 1939, as amended.

UNITED STATES:

The term "United States" shall mean the United States of America (including the States and the District of Columbia) and its possessions (including the Commonwealth of Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, Wake Island and the Northern Mariana Islands).

UNITED STATES PERSON:

The term "United States person" has the meaning given to it by the Internal Revenue Code of 1986, as amended, and regulations thereunder, including U.S. Treasury Regulations Section 1.163-5(c)(2)(i)(D).

UNREGISTERED SECURITY:

The term "Unregistered Security" shall mean any Security other than a Registered Security.

U.S. DOLLAR:

The term "U.S. Dollar" or "$" means a dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for the payment of public and private debts.

SECTION 1.02. NOTICE TO SECURITYHOLDERS. Except as otherwise expressly provided herein, where this Indenture provides for notice to Holders of Securities of any event, such notice shall be sufficiently given if in writing and mailed, first class, postage prepaid, to each Holder at such Holder's address as it appears in the Securities Register, not later than the latest date, and not earlier than the earliest date prescribed for such notice.

Neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder of a Security shall affect the sufficiency of such notice with respect to other Holders of Securities.

In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by the person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders of Securities shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

ARTICLE TWO.

ISSUE, EXECUTION, REGISTRATION AND
EXCHANGE OF SECURITIES.

SECTION 2.01. AMOUNT UNLIMITED; ISSUABLE IN SERIES. The aggregate principal amount of Securities which may be authenticated and delivered under this Indenture is unlimited.

The Securities may be issued in one or more series. There shall be established in or pursuant to a Board Resolution, and set forth in an Officers' Certificate, or established in one or more indentures supplemental hereto, prior to the issuance of Securities of any series:

(1) the designation of the Securities of the series (which shall distinguish the Securities of the series from all other Securities);

(2) any limit upon the aggregate principal amount of the Securities of the series which may be authenticated and delivered under this Indenture (except for Securities authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Securities of the series pursuant to Section 2.05, 2.06, 2.07, 3.02 or 10.04);

(3) the date or dates on which the principal of the Securities of the series is payable;

(4) the rate or rates, which may be fixed or variable, at which the Securities of the series shall bear interest, if any, and if the rate or rates are variable, the manner of calculation thereof, the date or dates from which such interest shall accrue, the Interest Payment Dates on which such interest shall be payable and, in the case of Registered Securities, the Regular Record Date for the determination of Holders of such Securities to whom interest is payable on any Interest Payment Date;

(5) the place or places (in addition to such place or places specified in this Indenture) where the principal of (and premium, if any), interest, if any, and Additional Amounts, if any, on Securities of the series shall be payable;

(6) the right, if any, of the Corporation to redeem Securities, in whole or in part, at its option and the period or periods within which, the price or prices at which and the terms and conditions upon which Securities of the series may be redeemed pursuant to any sinking fund or otherwise;

(7) the obligation, if any, of the Corporation to redeem, purchase or repay Securities of the series pursuant to any mandatory redemption, sinking fund or analogous provisions or at the option of a Holder thereof and the period or periods within which, the price or prices at which and the terms and conditions upon which Securities of the series shall be redeemed, purchased or repaid, in whole or in part, pursuant to such obligation;

(8) if other than U.S. Dollars, the currency or currencies, or units based on or related to foreign currencies, including European Currency Units ("ECUs"), in which the Securities of the series shall be denominated and in which payments of principal of (premium, if any), interest, if any, on and any other amounts payable with respect to such Securities shall or may be payable; or in the manner in which such currency, currencies or composite currencies will be determined; and if the principal of (and premium, if any) and interest, if any, on the Securities of such series are to be payable, at the election of the Corporation or a holder thereof, in a currency or currencies, including composite currencies, other than that or those in which the Securities are stated to be payable, the currency or currencies in which payment of the principal of (and premium, if any) and interest, if any, on Securities of such series as to which such election is made shall be payable, and the periods within which and the terms and conditions upon which such election is to be made;

(9) if the amount of principal of and interest on the Securities of the series may be determined with reference to an index based on a currency or currencies other than that in which the Securities of the series are denominated, the manner in which such amounts shall be determined;

(10) the denominations in which Securities of the series shall be issuable, if other than U.S.$1,000 or integral multiples thereof with respect to Registered Securities and denominations of U.S.$1,000 and U.S.$5,000 for Unregistered Securities;

(11) if other than the principal amount thereof, the portion of the principal amount of Securities of the series which shall be payable upon declaration of acceleration of the maturity thereof or which the Trustee shall be entitled to claim pursuant to Section 6.02;

(12) whether the Securities of the series will be issuable as Registered Securities or Unregistered Securities (with or without Coupons), or both, any restrictions applicable to the offer, sale or delivery of Unregistered Securities and, if other than as provided for in Section 2.05, the terms upon which Unregistered Securities of the series may be exchanged for Registered Securities of such series and vice versa; and whether the Securities of the series shall be issued in whole or in part in the form of one or more Global Securities and, in such case, the Depository for such Global Security or Securities and whether any Global Securities of the series are to be issuable initially in temporary form and whether any Global Securities of the series are

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

to be issuable in definitive form with or without Coupons and, if so, whether beneficial owners of interests in any such definitive Global Security may exchange such interests for Securities of such series and of like tenor of any authorized form and denomination and the circumstances under which and the place or places where any such exchanges may occur, if other than in the manner provided in Section 2.05;

(13) whether and under what circumstances the Corporation will pay Additional Amounts on the Securities of the series held by a person who is not a U.S. person in respect of any tax, assessment or governmental charge withheld or deducted and, if so, whether the Corporation will have the option to redeem such Securities rather than pay such Additional Amounts;

(14) the provisions, if any, for the defeasance of the Securities of the series;

(15) if the Securities of such series are to be issuable in definitive form (whether upon original issue or upon exchange of a temporary Security of such series) only upon receipt of certain certificates or other documents or satisfaction of other conditions, the form and terms of such certificates, documents or conditions;

(16) any trustees, depositaries, authenticating or paying agents, transfer agents, registrars or any other agents with respect to the Security of such series; and

(17) any other terms of the series (which terms shall not be inconsistent with the provisions of this Indenture);

All Securities of any one series shall be substantially identical except (i) as to denomination, (ii) that Securities of any series may be issuable as either Registered Securities or Unregistered Securities and (iii) as may otherwise be provided in or pursuant to such Board Resolution and set forth in such Officers' Certificate or in any such indenture supplemental hereto.

If any of the terms of the series are established by action taken pursuant to a Board Resolution, a copy of an appropriate record of such action shall be certified by the Secretary or any Assistant Secretary of the Corporation and delivered to the Trustee at the same time as or prior to the delivery of the Officers' Certificate setting forth the terms of the series.

SECTION 2.02. FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION. The Trustee's certificate of authentication shall be in the following form:

[FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION]

This is one of the Securities of the series designated therein referred to in the within-mentioned Indenture.

CITIBANK, N.A.,
as Trustee,

By: _____
Authorized Signatory

SECTION 2.03. FORM, EXECUTION, AUTHENTICATION, DELIVERY AND DATING OF SECURITIES. The Securities of each series and the Coupons, if any, to be attached thereto, shall be in the forms approved from time to time by or pursuant to a Board Resolution, or established in one or more indentures supplemental hereto, and may have such letters, numbers or other marks of identification or designation and such legends or endorsements printed, lithographed or engraved thereon as the Corporation may deem appropriate and as are not inconsistent with the provisions of this Indenture, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any stock exchange on which the Securities may be listed, or to conform to usage.

Each Security and Coupon shall be executed on behalf of the Corporation by its Chairman of the Board of Directors or any Vice Chairman of the Board of Directors or its President or any Executive Vice President or any Senior Vice President or any Vice President and by its Treasurer or any Assistant Treasurer or its Secretary or any Assistant Secretary, under its Corporate seal. Such signatures may be the manual or facsimile signatures of the present or any future such officers. The seal of the Corporation may be in the form of a facsimile thereof and may be impressed, affixed, imprinted or otherwise reproduced on the Securities.

Each Security and Coupon bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Corporation shall bind the Corporation, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Security, or the Security to which such Coupon appertains. At any time and from time to time after the execution and delivery of this Indenture, the Corporation may deliver Securities of any series executed by the Corporation and, in the case of Coupon Securities, having attached thereto appropriate Coupons, to the Trustee for authentication, together with a Corporation Order for the authentication and delivery of such Securities, and the Trustee in accordance with such Corporation Order shall authenticate and deliver such Securities. If

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

the form or terms of the Securities or Coupons of the series have been established in or pursuant to one or more Board Resolutions as permitted by this Section and Section 2.01, in authenticating such Securities, and accepting the additional responsibilities under this Indenture in relation to such Securities, the Trustee shall be entitled to receive, and (subject to Section 7.01) shall be fully protected in relying upon, an Opinion of Counsel stating:

(a) if the form of such Securities or Coupons has been established by or pursuant to Board Resolution as permitted by Section 2.01, that such form has been established in conformity with the provisions of this Indenture;

(b) if the terms of such Securities have been established by or pursuant to Board Resolution as permitted by Section 2.01, that such terms have been established in conformity with the provisions of this Indenture; and

(c) that each such Security and Coupon, when authenticated and delivered by the Trustee and issued by the Corporation in the manner and subject to any conditions specified in such Opinion of Counsel, will constitute valid and legally binding obligations of the Corporation, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium and other laws of general applicability relating to or affecting the enforcement of creditors' rights and to general equity principles. If such form or terms has been so established, the Trustee shall not be required to authenticate such Securities if the issue of such Securities pursuant to this Indenture will affect the Trustee's own rights, duties or immunities under the Securities and the Indenture or otherwise in a manner which is not reasonably acceptable to the Trustee.

Every Registered Security shall be dated the date of its authentication. Each Unregistered Security shall be dated as provided in or pursuant to the Board Resolution or supplemental indenture referred to in Section 2.01 or, if no such terms are specified, the date of its original issuance.

No Security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Security a certificate of authentication substantially in the form provided for herein executed by the Trustee by manual signature, and such certificate upon any Security shall be conclusive evidence, and the only evidence, that such Security has been duly authenticated and delivered hereunder and is entitled to the benefits of this Indenture. Notwithstanding the foregoing, if any Security shall have been duly authenticated and delivered hereunder but never issued and sold by the Corporation, and the Corporation shall deliver such Security to the Trustee for cancellation as provided in Section 2.08 together with a written statement (which need not comply with Section 14.04 and need not be accompanied by an Opinion of Counsel) stating that such Security has never been issued and sold by the Corporation, for all purposes of this Indenture such Security shall be deemed never to have been authenticated and delivered hereunder and shall never be entitled to the benefits of this Indenture.

If the Corporation shall establish pursuant to Section 2.01 that the Securities of a series are to be issued in whole or in part in the form of a Global Security, then the Corporation shall execute and the Trustee shall in accordance with this Section and the Corporation Order with respect to such series authenticate and deliver the Global Security that (i) shall represent and shall be denominated in an aggregate amount equal to the aggregate principal amount of outstanding Securities of such series to be represented by the Global Security, (ii) shall be registered, if in registered form, in the name of the Depository for such Global Security or the nominee of such Depository, and (iii) shall be delivered by the Trustee to such Depository or pursuant to such Depository's instructions.

Each Depository designated pursuant to Section 2.01 for a Global Security in registered form must, at the time of its designation and at all times while it serves as Depository, be a clearing agency registered under the Securities Exchange Act of 1934 and any other applicable statute or regulation.

SECTION 2.04. DENOMINATIONS; RECORD DATE. The Securities shall be issuable as Registered Securities or Unregistered Securities in such denominations as may be specified as contemplated in Section 2.01. In the absence of any such specification with respect to any series, such Securities shall be issuable in the denominations contemplated by Section 2.01.

The term "record date" as used with respect to an Interest Payment Date (except a date for payment of defaulted interest) shall mean such day or days as shall be specified in the terms of the Registered Securities of any particular series as contemplated by Section 2.01; provided, however, that in the absence of any such provisions with respect to any series, such term shall mean (1) the last day of the calendar month next preceding such Interest Payment Date if such Interest Payment Date is the fifteenth day of a calendar month; or (2) the fifteenth day of a calendar month next preceding such Interest Payment Date if such Interest Payment Date is the first day of the calendar month.

The person in whose name any Registered Security is registered at the close of business on the Regular Record Date with respect to an Interest Payment Date shall be entitled to receive the interest payable and Additional Amounts, if any, payable on such Interest Payment Date notwithstanding the cancellation of such Registered Security upon any transfer or exchange thereof subsequent to such Regular Record Date and prior to such Interest Payment Date; provided, however, that if and to the extent the Corporation shall default in the payment

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

of the interest and Additional Amounts, if any, due on such Interest Payment Date, such defaulted interest and Additional Amounts, if any, shall be paid to the persons in whose names outstanding Registered Securities are registered on a subsequent record date established by notice given by mail by or on behalf of the Corporation to the Holders of Securities of the series in default not less than fifteen days preceding such subsequent record date, such record date to be not less than five days preceding the date of payment of such defaulted interest.

SECTION 2.05. EXCHANGE AND REGISTRATION OF TRANSFER OF SECURITIES. Registered Securities of any series may be exchanged for a like aggregate principal amount of Registered Securities of other authorized denominations of such series. Registered Securities to be exchanged shall be surrendered at the office or agency to be designated and maintained by the Corporation for such purpose in the Borough of Manhattan, The City of New York, in accordance with the provisions of Section 4.02, and the Corporation shall execute and register and the Trustee shall authenticate and deliver in exchange therefor the Registered Security or Registered Securities which the Holder making the exchange shall be entitled to receive.

If the Securities of any series are issued in both registered and unregistered form, except as otherwise specified pursuant to Section 2.01, at the option of the Holder thereof, Unregistered Securities of any series may be exchanged for Registered Securities of such series of any authorized denominations and of a like aggregate principal amount, upon surrender of such Unregistered Securities to be exchanged at the agency of the Corporation that shall be maintained for such purpose in accordance with Section 4.02, with, in the case of Unregistered Securities that are Coupon Securities, all unmatured Coupons and all matured Coupons in default thereto appertaining. At the option of the Holder thereof, if Unregistered Securities of any series are issued in more than one authorized denomination, except as otherwise specified pursuant to Section 2.01, such Unregistered Securities may be exchanged for Unregistered Securities of such series of other authorized denominations and of a like aggregate principal amount, upon surrender of such Unregistered Securities to be exchanged at the agency of the Corporation that shall be maintained for such purpose in accordance with Section 4.02 or as specified pursuant to Section 2.01, with, in the case of Unregistered Securities that are Coupon Securities, all unmatured Coupons and all matured Coupons in default thereto appertaining. Unless otherwise specified pursuant to Section 2.01, Registered Securities of any series may not be exchanged for Unregistered Securities of such series. Whenever any Securities are so surrendered for exchange, the Corporation shall execute, and the Trustee shall authenticate and deliver, the Securities which the Holder making the exchange is entitled to receive.

The Corporation (or its designated agent (the "Security Registrar")) shall keep, at such office or agency, a Security Register (the "Security Register") in which, subject to such reasonable regulations as it may prescribe, the Corporation shall register Securities and shall register the transfer of Registered Securities as in this Article Two provided. The Security Register shall be in written form or in any other form capable of being converted into written form within a reasonable time. At all reasonable times the Security Register shall be open for inspection by the Trustee. Upon due presentment for registration of transfer of any Registered Security of a particular series at such office or agency, the Corporation shall execute and the Trustee shall authenticate and deliver in the name of the transferee or transferees a new Registered Security or Registered Securities of such series for an equal aggregate principal amount.

Unregistered Securities (except for any temporary bearer Securities) and Coupons shall be transferable by delivery.

All Securities presented for registration of transfer or for exchange, redemption or payment, as the case may be, shall (if so required by the Corporation or the Trustee) be duly endorsed by, or be accompanied by a written instrument or instruments of transfer in form satisfactory to the Corporation and the Trustee duly executed by, the Holder or his attorney duly authorized in writing.

No service charge shall be made for any exchange or registration of transfer of Registered Securities, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection therewith.

The Corporation shall not be required to exchange or register a transfer of (a) any Registered Securities of any series for a period of fifteen days next preceding any selection of such Registered Securities of such series to be redeemed, or (b) any Security of any such series selected for redemption except in the case of any such series to be redeemed in part, the portion thereof not to be so redeemed.

Notwithstanding anything herein or in the terms of any series of Securities to the contrary, neither the Corporation nor the Trustee (which shall rely on an Officers' Certificate and an Opinion of Counsel) shall be required to exchange any Unregistered Security for a Registered Security if such exchange would result in adverse Federal income tax consequences to the Corporation (including the inability of the Corporation to deduct from its income, as computed for Federal income tax purposes, the interest payable on any Securities) under then applicable United States Federal income tax laws.

SECTION 2.06. TEMPORARY SECURITIES. Pending the preparation of definitive

Securities of any series, the Corporation may execute and upon receipt of a Corporation Order the Trustee shall authenticate and deliver temporary Securities of such series (printed or lithographed). Temporary Securities of any series shall be issuable in any authorized denominations, and in the form approved from time to time by or pursuant to a Board Resolution but with such omissions, insertions and variations as may be appropriate for temporary Securities, all as may be determined by the Corporation. Every temporary Security shall be executed by the Corporation and be authenticated by the Trustee upon the same conditions and in substantially the same manner, and with like effect, as the definitive Securities. Without unnecessary delay the Corporation shall execute and shall furnish definitive Securities of such series and thereupon any or all temporary Registered Securities of such series may be surrendered in exchange therefor without charge at the office or agency to be designated and maintained by the Corporation for such purpose in the Borough of Manhattan, The City of New York, in accordance with the provisions of Section 4.02 and in the case of Unregistered Securities at any agency maintained by the Corporation for such purpose as specified pursuant to Section 2.01, and the Trustee shall authenticate and deliver in exchange for such temporary Securities an equal aggregate principal amount of definitive Securities of the same series of authorized denominations and in the case of such Securities that are Coupon Securities, having attached thereto the appropriate Coupons. Until so exchanged the temporary Securities of any series shall be entitled to the same benefits under this Indenture as definitive Securities of such series. The provisions of this Section 2.06 are subject to any restrictions or limitations on the issue and delivery of temporary Unregistered Securities of any series that may be established pursuant to Section 2.01 (including any provision that Unregistered Securities of such series initially be issued in the form of a single global Unregistered Security to be delivered to a depositary or agency of the Corporation located outside the United States and the procedures pursuant to which definitive Unregistered Securities of such series would be issued in exchange for such temporary global Unregistered Security).

SECTION 2.07. MUTILATED, DESTROYED, LOST OR STOLEN SECURITIES. In case any temporary or definitive Security of any series or, in the case of a Coupon Security, any Coupon appertaining thereto, shall become mutilated or be destroyed, lost or stolen, the Corporation in the case of a mutilated Security or Coupon shall, and in the case of a lost, stolen or destroyed Security or Coupon may, in its discretion, execute, and upon receipt of a Corporation Order the Trustee shall authenticate and deliver, a new Security of the same series as the mutilated, destroyed, lost or stolen Security or, in the case of a Coupon Security, a new Coupon Security of the same series as the mutilated, destroyed, lost or stolen Coupon Security or, in the case of a Coupon, a new Coupon Security of the same series as the Coupon Security to which such mutilated, destroyed, lost or stolen Coupon appertains, bearing a number not contemporaneously outstanding, in exchange and substitution for the mutilated Security, or in lieu of and in substitution for the Security so destroyed, lost or stolen or in exchange for the Coupon Security to which such mutilated, destroyed, lost or stolen Coupon appertains, with all appurtenant Coupons not destroyed, lost or stolen. In every case the applicant for a substituted Security or Coupon shall furnish to the Corporation and to the Trustee such security or indemnity as may be required by them to save each of them harmless, and, in every case of destruction, loss or theft, the applicant shall also furnish to the Corporation and to the Trustee evidence to their satisfaction of the destruction, loss or theft of such Security or Coupon, as the case may be, and of the ownership thereof. The Trustee may authenticate any such substituted Security and deliver the same upon the written request or authorization of any officer of the Corporation. Upon the issuance of any substituted Security or Coupon, the Corporation may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith and in addition a further sum not exceeding ten dollars for each Security so issued in substitution. In case any Security or Coupon which has matured or is about to mature shall become mutilated or be destroyed, lost or stolen, the Corporation may, instead of issuing a substituted Security, pay or authorize the payment of the same (without surrender thereof except in the case of a mutilated Security or Coupon) if the applicant for such payment shall furnish the Corporation and the Trustee with such security or indemnity as they may require to save them harmless and, in case of destruction, loss or theft, evidence to the satisfaction of the Corporation and the Trustee of the destruction, loss or theft of such Security or Coupon and of the ownership thereof.

Every substituted Security with, in the case of any such Security that is a Coupon Security, its Coupons, issued pursuant to the provisions of this Section by virtue of the fact that any Security or Coupon is destroyed, lost or stolen shall, with respect to such Security or Coupon, constitute an additional contractual obligation of the Corporation, whether or not the destroyed, lost or stolen Security or Coupon shall be found at any time, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Securities, and the Coupons appertaining thereto, duly issued hereunder.

All Securities and any Coupons appertaining thereto shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities and Coupons appertaining thereto and shall, to the extent permitted by law, preclude any and all other rights or remedies, notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the replacement or payment of negotiable instruments or other securities without their surrender.

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

SECTION 2.08. CANCELLATION. All Securities surrendered for payment, redemption, exchange or registration of transfer, and all Coupons surrendered for payment as the case may be, shall, if surrendered to the Corporation or any agent of the Corporation or of the Trustee, be delivered to the Trustee and promptly cancelled by it or, if surrendered to the Trustee, be cancelled by it, and no Securities or Coupons shall be issued in lieu thereof except as expressly permitted by any of the provisions of this Indenture. The Trustee shall destroy cancelled Securities and Coupons and deliver a certificate of destruction to the Corporation.

SECTION 2.09. COMPUTATION OF INTEREST. Except as otherwise specified as contemplated by Section 2.01 for Securities of any series, interest on the Securities of each series shall be computed on the basis of a 360-day year of twelve 30-day months.

SECTION 2.10. SECURITIES IN GLOBAL FORM. If Securities of a series are issuable in global form, as specified as contemplated by Section 2.01, then, notwithstanding clause (9) of Section 2.01 and the provisions of Section 2.04, such Security shall represent such of the outstanding Securities of such series as shall be specified therein and may provide that it shall represent the aggregate amount of outstanding Securities from time to time endorsed thereon and that the aggregate amount of outstanding Securities represented thereby may from time to time be reduced to reflect exchanges. Any endorsement of a Security in global form to reflect the amount, or any increase or decrease in the amount, of outstanding Securities represented thereby shall be made by the Trustee in such manner and upon instructions given by such Person or Persons as shall be specified therein or in the Corporation Order to be delivered to the Trustee pursuant to Section 2.03 or Section 2.06. Subject to the provisions of Section 2.03 and, if applicable, Section 2.06, the Trustee shall deliver and redeliver any Security in definitive global bearer form in the manner and upon written instructions given by the Person or Persons specified therein or in the applicable Corporation Order. If a Corporation Order pursuant to Section 2.03 or 2.06 has been, or simultaneously is, delivered, any instructions by the Corporation with respect to endorsement or delivery or redelivery of a Security in global form shall be in writing but need not comply with Section 14.04 and need not be accompanied by an Opinion of Counsel. The beneficial owner of a Security represented by a definitive Global Security in bearer form may, upon no less than 30 days written notice to the Trustee, given by the beneficial owner through a Depository, exchange its interest in such definitive Global Security for a definitive Bearer Security or Securities, or a definitive Registered Security or Securities, of any authorized denomination, subject to the rules and regulations of such Depository and its members. No individual definitive Bearer Security will be delivered in or to the United States.

The provisions of the last sentence of the third to the last paragraph of Section 2.03 shall apply to any Security represented by a Security in global form if such Security was never issued and sold by the Corporation and the Corporation delivers to the Trustee the Security in global form together with written instructions (which need not comply with Section 14.04 and need not be accompanied by an Opinion of Counsel) with regard to the reduction in the principal amount of Securities represented thereby, together with the written statement contemplated by the last sentence of the third to the last paragraph of Section 2.03.

Unless otherwise specified as contemplated by Section 2.01, payment of principal of and any premium and any interest on any Security in definitive global form shall be made to the Person or Persons specified therein.

SECTION 2.11. MEDIUM-TERM SECURITIES. Notwithstanding any contrary provision herein, if all Securities of a series are not to be originally issued at one time, it shall not be necessary to deliver the Corporation Order, Officers' Certificate, supplemental indenture or Opinion of Counsel otherwise required pursuant to Sections 14.04, 2.01 2.03 and 2.06 at or prior to the time of authentication of each Security of such series if such documents are delivered at or prior to the authentication upon original issuance of the first Security of such series to be issued.

An Officers' Certificate or supplemental indenture, delivered pursuant to this Section 2.11 in the circumstances set forth in the preceding paragraph may provide that Securities which are the subject thereof will be authenticated and delivered by the Trustee on original issue from time to time upon the written order of persons designated in such Officers' Certificate or supplemental indenture and that such persons are authorized to determine, consistent with such Officers' Certificate or any applicable supplemental indenture such terms and conditions of said Securities as are specified in such Officers' Certificate or supplemental indenture, provided that the foregoing procedure is acceptable to the Trustee.

ARTICLE THREE.
REDEMPTION OF SECURITIES.

SECTION 3.01. REDEMPTION OF SECURITIES; APPLICABILITY OF ARTICLE. Redemption of Securities of any series as permitted or required by the terms thereof shall be made in accordance with such terms and this Article; provided, however, that if any provision of any series of Securities shall conflict with any provision of this Article, the provision of such series of Securities shall govern.

The notice date for a redemption of Securities shall mean the date on

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

which notice of such redemption is given in accordance with the provisions of Section 3.02 hereof.

SECTION 3.02. NOTICE OF REDEMPTION; SELECTION OF SECURITIES. The election of the Corporation to redeem any Securities shall be evidenced by an Officers' Certificate. In case the Corporation shall desire to exercise the right to redeem all, or, as the case may be, any part of a series of Securities pursuant to the terms and provisions applicable to such series, it shall fix a date for redemption and shall mail a notice of such redemption at least thirty and not more than sixty days prior to the date fixed for redemption to the Holders of the Securities of such series which are Registered Securities to be redeemed as a whole or in part at their last addresses as the same appear on the Security Register. Such mailing shall be by prepaid first class mail. Any notice which is mailed in the manner herein provided shall be conclusively presumed to have been duly given, whether or not the Holder shall have received such notice. In any case, failure to give notice by mail, or any defect in the notice to the Holder of any Security of a series designated for redemption as a whole or in part shall not affect the validity of the proceedings for the redemption of any other Security of such series.

Notice of redemption to the Holders of Unregistered Securities to be redeemed as a whole or in part, who have filed their names and addresses with the Trustee as described in Section 5.04, shall be given by mailing notice of such redemption, by first class mail, postage prepaid, at least thirty days and not more than sixty days prior to the date fixed for redemption, to such Holders at such addresses as were so furnished to the Trustee (and, in the case of any such notice given by the Corporation, the Trustee shall make such information available to the Corporation for such purpose). Notice of redemption to any other Holder of an Unregistered Security of such series shall be published in an Authorized Newspaper in the Borough of Manhattan, The City of New York and in an Authorized Newspaper in London (and, if required by Section 4.04, in an Authorized Newspaper in Luxembourg), in each case, once in each of two successive calendar weeks, the first publication to be not less than thirty nor more than sixty days prior to the date fixed for redemption. Any notice which is mailed in the manner herein provided shall be conclusively presumed to have been duly given, whether or not the Holder shall have received such notice. In any case, failure to give notice by mail, or any defect in the notice to the Holder of any Security of a series designated for redemption as a whole or in part shall not affect the validity of the proceedings for the redemption of any other Security of such series.

Each such notice of redemption shall specify the provisions of such Securities under which such redemption is made, that the conditions precedent, if any, to such redemption have occurred, shall describe the same and the date fixed for redemption, the redemption price at which such Securities are to be redeemed, the Place of Payment, that payment will be made upon presentation and surrender of such Securities and, in the case of Coupon Securities, of all Coupons appertaining thereto maturing after the date fixed for redemption, that interest and Additional Amounts, if any, accrued to the date fixed for redemption will be paid as specified in said notice, and that on and after said date interest, if any, thereon or on the portions thereof to be redeemed will cease to accrue. If less than all of the Securities of a series are to be redeemed any notice of redemption published in an Authorized Newspaper shall specify the numbers of the Securities to be redeemed. In case any Security is to be redeemed in part only, the notice of redemption shall state the portion of the principal amount thereof to be redeemed and shall state that upon surrender of such Security, a new Security or Securities in principal amount equal to the unredeemed portion thereof will be issued of the same series.

At least one Business Day prior to the redemption date specified in the notice of redemption given for Unregistered Securities as provided in this Section and on or prior to the redemption date specified in the notice of redemption given for all Securities other than Unregistered Securities, the Corporation will deposit in trust with the Trustee or with one or more paying agents an amount of money sufficient to redeem on the redemption date all the Securities or portions of Securities so called for redemption at the appropriate redemption price, together with accrued interest, if any, to the date fixed for redemption. The Corporation will give the Trustee notice of each redemption at least forty-five days prior to the date fixed for redemption (unless a shorter notice is acceptable to the Trustee) as to the aggregate principal amount of Securities to be redeemed.

If less than all of the Securities of a series are to be redeemed, the Trustee shall select, pro rata or by lot or in such other manner as it shall deem reasonable and fair, the numbers of the Securities to be redeemed in whole or in part.

SECTION 3.03. PAYMENT OF SECURITIES CALLED FOR REDEMPTION. If notice of redemption has been given as above provided, the Securities or portions of Securities with respect to which such notice has been given shall become due and payable on the date and at the Place of Payment stated in such notice at the applicable redemption price, together with interest, if any (and Additional Amounts, if any), accrued to the date fixed for redemption, and on and after said date (unless the Corporation shall default in the payment of such Securities at the redemption price, together with interest, if any, and Additional Amounts, if any, accrued to said date) interest on the Securities or portions of Securities so called for redemption shall cease to accrue. On presentation and surrender of such Securities subject to redemption at said Place of Payment in said notice specified, the said Securities or the specified

portions thereof shall be paid and redeemed by the Corporation at the applicable redemption price, together with interest, if any, and Additional Amounts, if any, accrued thereon to the date fixed for redemption. Interest, if any (and Additional Amounts, if any), maturing on or prior to the date fixed for redemption shall continue to be payable (but without interest thereon unless the Corporation shall default in payment thereof) in the case of Coupon Securities to the bearers of the Coupons for such interest upon surrender thereof, and in the case of Registered Securities to the Holders thereof registered as such on the Security Register on the relevant record date subject to the terms and provisions of Section 2.04. At the option of the Corporation payment may be made by check to (or to the order of) the Holders of the Securities or other persons entitled thereto against presentation and surrender of such Securities.

If any Coupon Security surrendered for redemption shall not be accompanied by all appurtenant Coupons maturing after the date fixed for redemption, the surrender of such missing Coupon or Coupons may be waived by the Corporation and the Trustee, if there be furnished to each of them such security or indemnity as they may require to save each of them harmless.

Upon presentation of any Security redeemed in part only, the Corporation shall execute and the Trustee shall authenticate and deliver to the Holder thereof, at the expense of the Corporation, a new Security or Securities, of authorized denominations, in aggregate principal amount equal to the unredeemed portion of the Security so presented of the same series.

ARTICLE FOUR.
PARTICULAR COVENANTS OF THE CORPORATION.

SECTION 4.01. PAYMENT OF PRINCIPAL, PREMIUM, INTEREST AND ADDITIONAL AMOUNTS. The Corporation will duly and punctually pay or cause to be paid the principal of (and premium, if any), interest, if any, and Additional Amounts, if any, on each of the Securities at the place, at the respective times and in the manner provided in the terms of the Securities and in this Indenture. The interest on Coupon Securities (together with any Additional Amounts) shall be payable only upon presentation and surrender of the several Coupons for such interest installments as are evidenced thereby as they severally mature. The interest, if any, on any temporary bearer Securities (together with any Additional Amounts) shall be paid, as to the installments of interest evidenced by Coupons attached thereto, if any, only upon presentation and surrender thereof, and, as to the other installments of interest, if any, only upon presentation of such Securities for notation thereon of the payment of such interest. The interest on Registered Securities (together with any Additional Amounts) shall be payable only to the Holders thereof and at the option of the Corporation may be paid by mailing checks for such interest payable to or upon the order of such Holders at their last addresses as they appear on the Security Register for such Securities.

SECTION 4.02. OFFICES FOR NOTICES AND PAYMENTS, ETC. As long as any of the Securities of a series remain outstanding, the Corporation will designate and maintain, in the Borough of Manhattan, The City of New York, an office or agency where the Registered Securities of such series may be presented for registration of transfer and for exchange as in this Indenture provided, an office or agency where notices and demands to or upon the Corporation in respect of the Securities of such series or of this Indenture may be served, and an office or agency where the Securities of such series may be presented for payment. The Corporation will give to the Trustee notice of the location of each such office or agency and of any change in the location thereof. In case the Corporation shall fail to maintain any such office or agency in the Borough of Manhattan, The City of New York, or shall fail to give such notice of the location or of any change in the location thereof, presentations may be made and notices and demands may be served at the corporate trust office of the Trustee in the Borough of Manhattan, The City of New York, and the Corporation hereby appoints the Trustee as its agent to receive all such presentations, notices and demands.

If Unregistered Securities of any series are outstanding, the Corporation will maintain or cause the Trustee to maintain one or more agencies in a city or cities located outside the United States (including any city in which such an agency is required to be maintained under the rules of any stock exchange on which the Securities of such series are listed) where such Unregistered Securities, and Coupons, if any, appertaining thereto may be presented for payment. No payment on any Unregistered Security or Coupon will be made upon presentation of such Unregistered Security or Coupon at an agency of the Corporation within the United States nor will any payment be made by transfer to an account in, or by mail to an address in, the United States, except, at the option of the Corporation, if the Corporation shall have determined that, pursuant to applicable United States laws and regulations then in effect such payment can be made without adverse tax consequences to the Corporation. Notwithstanding the foregoing, payments in U.S. Dollars with respect to Unregistered Securities of any series and Coupons appertaining thereto which are payable in U.S. Dollars may be made at an agency of the Corporation maintained in the Borough of Manhattan, The City of New York if such payment in U.S. Dollars at each agency maintained by the Corporation outside the United States for payment on such Unregistered Securities is illegal or effectively precluded by exchange controls or other similar restrictions.

The Corporation hereby initially designates Citibank, N.A., located at its Corporate Trust Office as the Security Registrar and as the office or agency of the Corporation in the Borough of Manhattan, The City of New York, where the Securities may be presented for payment and, in the case of Registered

Securities, for registration of transfer and for exchange as in this Indenture provided and where notices and demands to or upon the Corporation in respect of the Securities of any series or of this Indenture may be served.

SECTION 4.03.  PROVISIONS AS TO PAYING AGENT. (a) Whenever the Corporation shall appoint a paying agent other than the Trustee with respect to the Securities of any series, it will cause such paying agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this Section:

(1) that it will hold sums held by it as such agent for the payment of the principal of (and premium, if any), interest, if any, or Additional Amounts, if any, on the Securities of such series or the Coupons appertaining thereto, as the case may be, entitled thereto and will notify the Trustee of the receipt of sums to be so held,

(2) that it will give the Trustee notice of any failure by the Corporation (or by any other obligor on the Securities of such series) to make any payment of the principal of (or premium, if any), interest, if any, or Additional Amounts, if any, on the Securities of such series when the same shall be due and payable, and

(3) at any time during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such paying agent.

(b) If the Corporation shall act as its own paying agent, it will, on or before each due date of the principal of (and premium, if any), interest, if any, or Additional Amounts, if any, on the Securities of any series set aside, segregate and hold in trust for the benefit of the Holders of the Securities of such series entitled thereto a sum sufficient to pay such principal (and premium if any), interest, if any, or Additional Amounts, if any, so becoming due. The Corporation will promptly notify the Trustee of any failure to take such action.

(c) Anything in this Section to the contrary notwithstanding, the Corporation may, at any time, for the purpose of obtaining a satisfaction and discharge with respect to one or more or all series of Securities hereunder, or for any other reason, pay or cause to be paid to the Trustee all sums held in trust for such series by it or any paying agent hereunder as required by this Section, such sums to be held by the Trustee upon the trusts herein contained.

(d) Anything in this Section to the contrary notwithstanding, the agreement to hold sums in trust as provided in this Section is subject to the provisions of Sections 12.03 and 12.04.

SECTION 4.04.  LUXEMBOURG PUBLICATIONS.  In the event of the publication of any notice pursuant to Section 3.02, 6.07, 7.10, 7.11, 9.02, 10.02 or 12.05, the party making such publication shall also, to the extent that notice is required so to be given to Holders of Securities of any series by applicable Luxembourg law or stock exchange regulation, make a similar publication the same number of times in Luxembourg.

SECTION 4.05.  STATEMENT BY OFFICERS AS TO DEFAULT.  The Corporation will deliver to the Trustee, on or before a date not more than four months after the end of each fiscal year of the Corporation (which, on the date of execution hereof, ends on December 31) ending after the date hereof, commencing with the fiscal year ended in 1995, an Officers' Certificate, stating whether or not to the best knowledge of the signers thereof the Corporation is in default in the performance or observance of any of the terms, provisions and conditions of this Indenture to be performed or observed by it and, if the Corporation shall be in default, specifying all such defaults and the nature thereof of which they may have knowledge.

SECTION 4.06.  LIMITATIONS ON LIENS. For the benefit of the Securities, the Corporation will not, nor will it permit any Manufacturing Subsidiary to, issue or assume any Debt secured by a Mortgage upon any Principal Domestic Manufacturing Property of the Corporation or any Manufacturing Subsidiary or upon any shares of stock or indebtedness of any Manufacturing Subsidiary (whether such Principal Domestic Manufacturing Property, shares of stock or indebtedness are now owned or hereafter acquired) without in any such case effectively providing concurrently with the issuance or assumption of any such Debt that the Securities (together with, if the Corporation shall so determine, any other indebtedness of the Corporation or such Manufacturing Subsidiary ranking equally with the Securities and then existing or thereafter created) shall be secured equally and ratably with such Debt, unless the aggregate amount of Debt issued or assumed and so secured by Mortgages, together with all other Debt of the Corporation and its Manufacturing Subsidiaries which (if originally issued or assumed at such time) would otherwise be subject to the foregoing restrictions, but not including Debt permitted to be secured under clauses (i) through (vi) of the immediately following paragraph, does not at the time exceed 20% of the stockholders' equity of the Corporation and its consolidated subsidiaries, as determined in accordance with generally accepted accounting principles and shown on the audited consolidated balance sheet contained in the latest published annual report to the stockholders of the Corporation.

The above restrictions shall not apply to Debt secured by (i) Mortgages on property, shares of stock or indebtedness of any corporation existing at the time such corporation becomes a Manufacturing Subsidiary; (ii) Mortgages on

property existing at the time of acquisition of such property by the Corporation or a Manufacturing Subsidiary, or Mortgages to secure the payment of all or any part of the purchase price of such property upon the acquisition of such property by the Corporation or a Manufacturing Subsidiary or to secure any Debt incurred prior to, at the time of, or within 180 days after, the later of the date of acquisition of such property and the date such property is placed in service, for the purpose of financing all or any part of the purchase price thereof, or Mortgages to secure any Debt incurred for the purpose of financing the cost to the Corporation or a Manufacturing Subsidiary of improvements to such acquired property; (iii) Mortgages securing Debt of a Manufacturing Subsidiary owing to the Corporation or to another Subsidiary; (iv) Mortgages on property of a corporation existing at the time such corporation is merged or consolidated with the Corporation or a Manufacturing Subsidiary or at the time of a sale, lease or other disposition of the properties of a corporation as an entirety or substantially as an entirety to the Corporation or a Manufacturing Subsidiary; (v) Mortgages on property of the Corporation or a Manufacturing Subsidiary in favor of the United States of America or any State thereof, or any department, agency or instrumentality or political subdivision of the United States of America or any State thereof, or in favor of any other country, or any political subdivision thereof, to secure partial, progress, advance or other payments pursuant to any contract or statute or to secure any indebtedness incurred for the purpose of financing all or any part of the purchase price or the cost of construction of the property subject to such Mortgages; or (vi) any extension, renewal or replacement (or successive extensions, renewals or replacements) in whole or in part of any Mortgage referred to in the foregoing clauses (i) to (v), inclusively; PROVIDED, HOWEVER, that the principal amount of Debt secured thereby shall not exceed by more than 115% the principal amount of Debt so secured at the time of such extension, renewal or replacement and that such extension, renewal or replacement shall be limited to all or a part of the property which secured the Mortgage so extended, renewed or replaced (plus improvements on such property).

SECTION 4.07. LIMITATION ON SALE AND LEASE-BACK. For the benefit of the Securities, the Corporation will not, nor will it permit any Manufacturing Subsidiary to, enter into any arrangement with any person providing for the leasing by the Corporation or any Manufacturing Subsidiary of any Principal Domestic Manufacturing Property owned by the Corporation or any Manufacturing Subsidiary on the date that the Securities are originally issued (except for temporary leases for a term of not more than five years and except for leases between the Corporation and a Manufacturing Subsidiary or between Manufacturing Subsidiaries), which property has been or is to be sold or transferred by the Corporation or such Manufacturing Subsidiary to such person, unless either (i) the Corporation or such Manufacturing Subsidiary would be entitled, pursuant to the provisions of the covenant on limitation on liens described above, to issue, assume, extend, renew or replace Debt secured by a Mortgage upon such property equal in amount to the Attributable Debt in respect of such arrangement without equally and ratably securing the Securities; provided, however, that from and after the date on which such arrangement becomes effective the Attributable Debt in respect of such arrangement shall be deemed for all purposes under the covenant on limitation on liens described in Section 4.06 and this covenant on limitation on sale and lease-back to be Debt subject to the provisions of the covenant on limitation on liens described above (which provisions include the exceptions set forth in clauses (i) through (vi) of such covenant), or (ii) the Corporation shall apply an amount in cash equal to the Attributable Debt in respect of such arrangement to the retirement (other than any mandatory retirement or by way of payment at maturity), within 180 days of the effective date of any such arrangement, of Debt of the Corporation or any Manufacturing Subsidiary (other than Debt owned by the Corporation or any Manufacturing Subsidiary) which by its terms matures at or is extendible or renewable at the option of the obligor to a date more than twelve months after the date of the creation of such Debt.

SECTION 4.08. DEFINITIONS APPLICABLE TO SECTIONS 4.06 AND 4.07. The following definitions shall be applicable to the covenants contained in Sections 4.06 and 4.07 hereof:

(a)    "Attributable Debt" means, at the time of determination as to any lease, the present value (discounted at the actual rate, if stated, or, if no rate is stated, the implicit rate of interest of such lease transaction as determined by the chairman, president, any vice chairman, any vice president, the treasurer or any assistant treasurer of the Corporation), calculated using the interval of scheduled rental payments under such lease, of the obligation of the lessee for net rental payments during the remaining term of such lease (excluding any subsequent renewal or other extension options held by the lessee). The term "net rental payments" means, with respect to any lease for any period, the sum of the rental and other payments required to be paid in such period by the lessee thereunder, but not including, however, any amounts required to be paid by such lessee (whether or not designated as rental or additional rental) on account of maintenance and repairs, insurance, taxes, assessments, water rates, indemnities or similar charges required to be paid by such lessee thereunder or any amounts required to be paid by such lessee thereunder contingent upon the amount of sales, earnings or profits or of maintenance and repairs, insurance, taxes, assessments, water rates, indemnities or similar charges; provided, however, that, in the case of any lease which is terminable by the lessee upon the payment of a penalty in an

amount which is less than the total discounted net rental payments required to be paid from the later of the first date upon which such lease may be so terminated and the date of the determination of net rental payments, "net rental payments" shall include the then current amount of such penalty from the later of such two dates, and shall exclude the rental payments relating to the remaining period of the lease commencing with the later of such two dates.

(b)   "Debt" means notes, bonds, debentures or other similar evidences of indebtedness for money borrowed.

(c)   "Manufacturing Subsidiary" means any Subsidiary (A) substantially all the property of which is located within the continental United States of America, (B) which owns a Principal Domestic Manufacturing Property and (C) in which the Corporation's investment, direct or indirect and whether in the form of equity, debt, advances or otherwise, is in excess of U.S.$2,500,000,000 as shown on the books of the Corporation as of the end of the fiscal year immediately preceding the date of determination; PROVIDED, HOWEVER, that "Manufacturing Subsidiary" shall not
--------  -------
include Electronic Data Systems Corporation and its Subsidiaries, Hughes Electronics Corporation and its Subsidiaries, General Motors Acceptance Corporation and its Subsidiaries (or any corporate successor of any of them) or any other Subsidiary which is principally engaged in leasing or in financing installment receivables or otherwise providing financial or insurance services to the Corporation or others or which is principally engaged in financing the Corporation's operations outside the continental United States of America.

(d)   "Mortgage" means any mortgage, pledge, lien, security interest, conditional sale or other title retention agreement or other similar encumbrance.

(e)   "Principal Domestic Manufacturing Property" means any manufacturing plant or facility owned by the Corporation or any Manufacturing Subsidiary which is located within the continental United States of America and, in the opinion of the Board of Directors, is of material importance to the total business conducted by the Corporation and its consolidated affiliates as an entity.

(f)   "Subsidiary" means any corporation of which at least a majority of the outstanding stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by the Corporation, or by one or more Subsidiaries, or by the Corporation and one or more Subsidiaries.

ARTICLE FIVE.
SECURITYHOLDER LISTS AND REPORTS BY THE
CORPORATION AND THE TRUSTEE.

SECTION 5.01. SECURITYHOLDER LISTS. The Corporation covenants and agrees that it will furnish or cause to be furnished to the Trustee with respect to the Securities of each series:

(a) semiannually, not later than each Interest Payment Date (in the case of any series having semiannual Interest Payment Dates) or not later than the dates determined pursuant to Section 2.01 (in the case of any series not having semiannual Interest Payment Dates) a list, in such form as the Trustee may reasonably require, of the names and addresses of the Holders of Securities of such series as of the Regular Record Date (or as of such other date as may be determined pursuant to Section 2.01 for such series) therefor, and

(b) at such other times as the Trustee may request in writing, within thirty days after receipt by the Corporation of any such request, a list in such form as the Trustee may reasonably require of the names and addresses of the Holders of Securities of a particular series specified by the Trustee as of a date not more than fifteen days prior to the time such information is furnished; provided, however, that if and so long as the Trustee shall be the Security Registrar any such list shall exclude names and addresses received by the Trustee in its capacity as Security Registrar, and if and so long as all of the Securities of any series are Registered Securities, such list shall not be required to be furnished.

SECTION 5.02. PRESERVATION AND DISCLOSURE OF LISTS. (a) The Trustee shall preserve, in as current a form as is reasonably practicable, all information as to the names and addresses of the Holders of each series of Securities (i) contained in the most recent list furnished to it as provided in Section 5.01, (ii) received by the Trustee in its capacity as Security Registrar or a Paying Agent, or (iii) filed with it within the preceding two years pursuant to Section 5.04(c). The Trustee may destroy any list furnished to it as provided in Section 5.01 upon receipt of a new list so furnished.

(b) In case three or more Holders of Securities (hereinafter referred to as "applicants") apply in writing to the Trustee and furnish to the Trustee reasonable proof that each such applicant has owned a Security of such series for a period of at least six months preceding the date of such application, and such application states that the applicants' desire to communicate with other Holders of Securities of a particular series (in which case the applicants must hold Securities of such series) or with Holders of all Securities with respect to their rights under this Indenture or under such Securities and it is accompanied by a copy of the form of proxy or other communication which such applicants propose to transmit, then the Trustee shall, within five business days after the receipt of such application, at its election, either:

(1) afford to such applicants access to the information preserved at the time by the Trustee in accordance with the provisions of subsection (a) of this Section, or

(2) inform such applicants as to the approximate number of Holders of Securities of such series or all Securities, as the case may be, whose names and addresses appear in the information preserved at the time by the Trustee, in accordance with the provisions of subsection (a) of this Section, and as to the approximate cost of mailing to such Securityholders the form of proxy or other communication, if any, specified in such application.

If the Trustee shall elect not to afford to such applicants access to such information, the Trustee shall, upon the written request of such applicants, mail to each Holder of such series or all Securities, as the case may be, whose name and address appear in the information preserved at the time by the Trustee in accordance with the provisions of subsection (a) of this Section a copy of the form of proxy or other communication which is specified in such request, with reasonable promptness after a tender to the Trustee of the material to be mailed and of payment, or provision for the payment, of the reasonable expenses of mailing, unless within five days after such tender, the Trustee shall mail to such applicants and file with the Securities and Exchange Commission, together with a copy of the material to be mailed, a written statement to the effect that, in the opinion of the Trustee, such mailing would be contrary to the best interests of the Holders of Securities of such series or all Securities, as the case may be, or would be in violation of applicable law. Such written statement shall specify the basis of such opinion. If said Commission, after opportunity for a hearing upon the objections specified in the written statement so filed, shall enter an order refusing to sustain any of such objections or if, after the entry of an order sustaining one or more of such objections, said Commission shall find, after notice and opportunity for hearing, that all the objections so sustained have been met, and shall enter an order so declaring, the Trustee shall mail copies of such material to all such Holders with reasonable promptness after the entry of such order and the renewal of such tender; otherwise the Trustee shall be relieved of any obligation or duty to such applicants respecting their application.

(c) Each and every Holder of Securities, by receiving and holding the same, agrees with the Corporation and the Trustee that neither the Corporation nor the Trustee nor any agent of the Corporation or of the Trustee shall be held accountable by reason of the disclosure of any such information as to the names and addresses of the Holders of Securities in accordance with the provisions of subsection (b) of this Section, regardless of the source from which such information was derived, and that the Trustee shall not be held accountable by reason of mailing any material pursuant to a request made under said subsection (b).

SECTION 5.03.   REPORTS BY THE CORPORATION.   The Corporation covenants:

(a) to file with the Trustee within fifteen days after the Corporation is required to file the same with the Securities and Exchange Commission, copies of the annual reports and of the information, documents and other reports (or copies of such portions of any of the foregoing as said Commission may from time to time by rules and regulations prescribe) which the Corporation may be required to file with said Commission pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934; or, if the Corporation is not required to file information, documents or reports pursuant to either of such sections, then to file with the Trustee and said Commission, in accordance with rules and regulations prescribed from time to time by said Commission, such of the supplementary and periodic information, documents and reports which may be required pursuant to Section 13 of the Securities Exchange Act of 1934 in respect of a security listed and registered on a national securities exchange as may be prescribed from time to time in such rules and regulations.

(b) to file with the Trustee and the Securities and Exchange Commission, in accordance with the rules and regulations prescribed from time to time by said Commission, such additional information, documents, and reports with respect to compliance by the Corporation with the conditions and covenants provided for in this Indenture as may be required from time to time by such rules and regulations;

(c) to transmit by mail to all the Holders of Securities of each series, as the names and addresses of such Holders appear on the Security Register, within thirty days after the filing thereof with the Trustee, such summaries of any information, documents and reports required to be filed by the Corporation with respect to each such series pursuant to subsections (a) and (b) of this Section as may be required by rules and regulations prescribed from time to time by the Securities and Exchange Commission; and

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

(d) If Unregistered Securities of any series are outstanding, to file with the listing agent of the Corporation with respect to such series such documents and reports of the Corporation as may be required from time to time by the rules and regulations of any stock exchange on which such Unregistered Securities are listed.

SECTION 5.04. REPORTS BY THE TRUSTEE. (a) On or before April 1, 1996 and on or before April 1 of each year thereafter, so long as any Securities of any series are outstanding hereunder, the Trustee shall transmit to the Holders of Securities of such series, in the manner provided by Section 311(c) of the Trust Indenture Act of 1939, a brief report dated as of the preceding February 15, as may be required by Sections 311(a) and (b) of the Trust Indenture Act of 1939.

(b) A copy of each such report shall, at the time of such transmission to Holder of Securities of a particular series, be filed by the Trustee with each stock exchange upon which the Securities of such series are listed and also with the Securities and Exchange Commission. The Corporation agrees to notify the Trustee when and as the Securities of any series become listed on any stock exchange.

ARTICLE SIX.
REMEDIES ON DEFAULT.

SECTION 6.01. EVENTS OF DEFAULT. In case one or more of the following Events of Default with respect to a particular series of Securities shall have occurred and be continuing, that is to say:

(a) default in the payment of the principal of (or premium, if any, on) any of the Securities of such series as and when the same shall become due and payable either at maturity, upon redemption, by declaration or otherwise; or

(b) default in the payment of any installment of interest, if any, or in the payment of any Additional Amounts upon any of the Securities of such series as and when the same shall become due and payable, and continuance of such default for a period of thirty days; or

(c) failure on the part of the Corporation duly to observe or perform any other of the covenants or agreements on the part of the Corporation applicable to such series of the Securities or contained in this Indenture for a period of ninety days after the date on which written notice of such failure, requiring the Corporation to remedy the same, shall have been given to the Corporation by the Trustee, or to the Corporation and the Trustee by the Holders of at least twenty-five percent in aggregate principal amount of the Securities of such series at the time outstanding; or

(d) a court having jurisdiction in the premises shall enter a decree or order for relief in respect of the Corporation in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Corporation or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs and such decree or order shall remain unstayed and in effect for a period of ninety days; or

(e) the Corporation shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of the Corporation or for any substantial part of its property, or shall make any general assignment for the benefit of creditors;

then if an Event of Default described in clause (a), (b) or (c) shall have occurred and be continuing, and in each and every such case, unless the principal amount of all the Securities of such series shall have already become due and payable, either the Trustee or the Holders of not less than twenty-five percent in aggregate principal amount of the Securities of all series affected thereby then outstanding hereunder, by notice in writing to the Corporation (and to the Trustee if given by Holders of such Securities) may declare the principal amount of all the Securities (or, with respect to Original Issue Discount Securities, such lesser amount as may be specified in the terms of such Securities) of the series affected thereby to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, any provision of this Indenture or the Securities of such series contained to the contrary notwithstanding, or, if an Event of Default described in clause (d) or (e) shall have occurred and be continuing, and in each and every such case, either the Trustee or the Holders of not less than twenty-five per cent in aggregate principal amount of all the Securities then outstanding hereunder (voting as one class), by notice in writing to the Corporation (and to the Trustee if given by Holders of Securities), may declare the principal of all the Securities not already due and payable (or, with respect to Original Issue Discount Securities, such lesser amount as may be specified in the terms of such Securities) to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, any provision in this Indenture or in the Securities to the contrary notwithstanding. The foregoing provisions, however, are subject to the conditions that if, at any time after the principal of the Securities of any one or more or all series, as the case may be, shall have been so declared due and payable, and before any

judgment or decree for the payment of the moneys due shall have been obtained or entered as hereinafter provided, the Corporation shall pay or shall deposit with the Trustee a sum sufficient to pay all matured installments of interest, if any, and all Additional Amounts, if any, due upon all the Securities of such series or of all the Securities, as the case may be, and the principal of (and premium, if any, on) all Securities of such series or of all the Securities, as the case may be (or, with respect to Original Issue Discount Securities, such lesser amount as may be specified in the terms of such Securities), which shall have become due otherwise than by acceleration (with interest, if any, upon such principal and premium, if any, and, to the extent that payment of such interest is enforceable under applicable law, on overdue installments of interest and Additional Amounts, if any, at the same rate as the rate of interest specified in the Securities of such series, as the case may be (or, with respect to Original Issue Discount Securities at the rate specified in the terms of such Securities for interest on overdue principal thereof upon maturity, redemption or acceleration of such series, as the case may be), to the date of such payment or deposit), and such amount as shall be payable to the Trustee pursuant to Section 7.06, and any and all defaults under the Indenture shall have been remedied, then and in every such case the Holders of a majority in aggregate principal amount of the Securities of such series (or of all the Securities, as the case may be) then outstanding, by written notice to the Corporation and to the Trustee, may waive all defaults with respect to that series or with respect to all Securities, as the case may be and rescind and annul such declaration and its consequences; but no such waiver or rescission and annulment shall extend to or shall affect any subsequent default or shall impair any right consequent thereon. If the principal of all Securities shall have been declared to be payable pursuant to this Section 6.01, in determining whether the Holders of a majority in aggregate principal amount thereof have waived all defaults and rescinded and annulled such declaration, all series of Securities shall be treated as a single class and the principal amount of Original Issue Discount Securities shall be deemed to be the amount declared payable under the terms applicable to such Original Issue Discount Securities.

In case the Trustee shall have proceeded to enforce any right under this Indenture and such proceedings shall have been discontinued or abandoned because of such recession and annulment or for any other reason or shall have been determined adversely to the Trustee, then and in every such case the Corporation, Trustee and the Holders of Securities, as the case may be, shall be restored respectively to their former positions and rights hereunder, and all rights, remedies and powers of the Corporation, the Trustee and the Holders of Securities, as the case may be, shall continue as though no such proceedings had been taken.

SECTION 6.02. PAYMENT OF SECURITIES ON DEFAULT; SUIT THEREFOR. The Corporation covenants that (1) in case default shall be made in the payment of any installment of interest, if any, on any of the Securities of any series or any Additional Amounts in payable respect of any of the Securities of any series, as and when the same shall become due and payable, and such default shall have continued for a period of thirty days or (2) in case default shall be made in the payment of the principal of (or premium, if any, on) any of the Securities of any series, as and when the same shall have become due and payable, whether upon maturity of such series or upon redemption or upon declaration or otherwise, then upon demand of the Trustee, the Corporation will pay to the Trustee, for the benefit of the Holders of the Securities of such series, and the Coupons, if any, appertaining to such Securities, the whole amount that then shall have become due and payable on all such Securities of such series and such Coupons, for principal (and premium, if any) or interest, if any, or Additional Amounts, if any, as the case may be, with interest upon the overdue principal (and premium, if any) and (to the extent that payment of such interest is enforceable under applicable law) upon overdue installments of interest, if any, and Additional Amounts, if any, at the same rate as the rate of interest specified in the Securities of such series (or, with respect to Original Issue Discount Securities, at the rate specified in the terms of such Securities for interest on overdue principal thereof upon maturity, redemption or acceleration); and, in addition thereto, such further amounts as shall be payable pursuant to Section 7.06.

In case the Corporation shall fail forthwith to pay such amounts upon such demand, the Trustee, in its own name and as trustee of an express trust, shall be entitled and empowered to institute any action or proceedings at law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceedings to judgment or final decree, and may enforce any such judgment or final decree against the Corporation or other obligor upon such Securities and collect in the manner provided by law out of the property of the Corporation or other obligor upon such Securities wherever situated the moneys adjudged or decreed to be payable.

In case there shall be pending proceedings for the bankruptcy or for the reorganization of the Corporation or any other obligor upon Securities of such series under Title 11 of the United States Code or any other applicable law, or in case a receiver or trustee shall have been appointed for the property of the Corporation or such other obligor, or in case of any other judicial proceedings relative to the Corporation or such other obligor, or to the creditors or property of the Corporation or such other obligor, the Trustee, irrespective of whether the principal of the Securities of such series shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand pursuant to the provisions of this Section, shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

amount of principal (or, with respect to Original Issue Discount Securities, such portion of the principal amount as may be specified in the terms of that series), and premium, if any, interest, if any, and Additional Amounts, if any, owing and unpaid in respect of the Securities of such series, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee under Section 7.06 and of the Holders of the Securities and Coupons of such series allowed in any such judicial proceedings relative to the Corporation or other obligor upon the Securities of such series, or to the creditors or property of the Corporation or such other obligor, and to collect and receive any moneys or other property payable or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Securityholders of such series and of the Trustee on their behalf; and any receiver, assignee or trustee in bankruptcy or reorganization is hereby authorized by each of the Holders of the Securities and Coupons of such series to make payments to the Trustee and, in the event that the Trustee shall consent to the making of payments directly to the Securityholders of such series, to pay to the Trustee such amount as shall be sufficient to cover reasonable compensation to the Trustee, its agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee except as a result of its negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Securities or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

All rights of action and of asserting claims under this Indenture, or under any of the Securities, may be enforced by the Trustee without the possession of any of the Securities or Coupons appertaining to such Securities, or the production thereof on any trial or other proceedings relative thereto, and any such action or proceedings instituted by the Trustee shall be brought in its own name and as trustee of an express trust, and any recovery of judgment shall be for the ratable benefit of the Holders of the Securities or Coupons appertaining thereto.

In case of a default hereunder the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights, either at law or in equity or in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law.

SECTION 6.03.  APPLICATION OF MONEYS COLLECTED BY TRUSTEE.  Any moneys collected by the Trustee pursuant to Section 6.02 shall be applied in the order following, at the date or dates fixed by the Trustee and, in case of the distribution of such moneys on account of principal (or premium, if any) or interest, if any, upon presentation of the several Securities and Coupons in respect of which moneys have been collected, and stamping thereon the payment, if only partially paid, and upon surrender thereof, if fully paid:

FIRST: To the payment of the amounts payable to the Trustee pursuant to Section 7.06;

SECOND: In case the principal of the Securities in respect of which moneys have been collected shall not have become due, to the payment of interest, if any, and Additional Amounts, if any, on the Securities of such series in the order of the maturity of the installments of such interest, with interest (to the extent that such interest has been collected by the Trustee) upon the overdue installments of interest at the same rate as the rate of interest, if any, and Additional Amounts, if any, specified in the Securities of such series (or, with respect to Original Issue Discount Securities, at the rate specified in the terms of such Securities for interest on overdue principal thereof upon maturity, redemption or acceleration), such payments to be made ratably to the persons entitled thereto, without discrimination or preference; and

THIRD: In case the principal of the Securities in respect of which moneys have been collected shall have become due, by declaration or otherwise, to the payment of the whole amount then owing and unpaid upon the Securities of such series for principal (and premium, if any), interest, if any, and Additional Amounts, if any, and (to the extent that such interest has been collected by the Trustee) upon overdue installments of interest, if any, and Additional Amounts, if any, at the same rate as the rate of interest specified in the Securities of such series (or, with respect to Original Issue Discount Securities, at the rate specified in the terms of such Securities for interest on overdue principal thereof upon maturity, redemption or acceleration); and in case such moneys shall be insufficient to pay in full the whole amount so due and unpaid upon the Securities of such series, then to the payment of such principal (and premium, if any), interest, if any, and Additional Amounts, if any, without preference or priority of principal (and premium, if any), over interest, if any, and Additional Amounts, if any, or of interest, if any, and Additional Amounts, if any, over principal (and premium, if any), or of any installment of interest, if any, or Additional Amounts, if any, over any other installment of interest, if any, or Additional Amounts, if any, or of any Security of such series over any other Security of such series, ratably to the aggregate of such principal (and premium, if any), and accrued and unpaid interest, if any, and Additional Amounts, if any.

SECTION 6.04. PROCEEDINGS BY SECURITYHOLDERS. No Holder of any Security of any series or of any Coupon appertaining thereto shall have any right by virtue or by availing of any provision of this Indenture to institute any action or proceedings at law or in equity or in bankruptcy or otherwise, upon or under or with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless such Holder previously shall have given to the Trustee written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of not less than twenty-five percent in aggregate principal amount of the Securities of such series then outstanding or, in the case of any Event of Default described in clause (d) or (e) of Section 6.01, twenty-five per cent in aggregate principal amount of all the Securities at the time outstanding (voting as one class) shall have made written request upon the Trustee to institute such action or proceedings in its own name as trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee for sixty days after its receipt of such notice, request and offer of indemnity shall have failed to institute any such action or proceedings and no direction inconsistent with such written request shall have been given to the Trustee pursuant to Section 6.06; it being understood and intended, and being expressly covenanted by the taker and Holder of every Security with every other taker and Holder and the Trustee, that no one or more Holders of Securities or Coupons appertaining to such Securities shall have any right in any manner whatever by virtue of or by availing himself of any provision of this Indenture to affect, disturb or prejudice the rights of any other Holder of Securities or Coupons appertaining to such Securities, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all Holders of Securities and Coupons. For the protection and enforcement of the provisions of this Section, each and every Securityholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Notwithstanding any other provisions in this Indenture, however, the right of any Holder of any Security to receive payment of the principal of (and premium, if any) and interest, if any, and Additional Amounts, if any, on such Security or Coupon, on or after the respective due dates expressed in such Security or Coupon, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder. With respect to Original Issue Discount Securities, principal shall mean such amount as shall be due and payable be specified in the terms of such Securities.

SECTION 6.05. REMEDIES CUMULATIVE AND CONTINUING. All powers and remedies given by this Article Six to the Trustee or to the Holders of Securities or Coupons shall, to the extent permitted by law, be deemed cumulative and not exclusive of any thereof or of any other powers and remedies available to the Trustee or the Holders of Securities or Coupons, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in this Indenture, and no delay or omission of the Trustee or of any Holder of any of the Securities or Coupons to exercise any right or power accruing upon any default occurring and continuing as aforesaid shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein; and, subject to the provisions of Section 6.04, every power and remedy given by this Article Six or by law to the Trustee or to the Holders of Securities or Coupons may be exercised from time to time, and as often as shall be deemed expedient, by the Trustee or by the Holders of Securities or Coupons, as the case may be.

SECTION 6.06. DIRECTION OF PROCEEDINGS. The Holders of a majority in aggregate principal amount of the Securities of any or all series affected (voting as one class) at the time outstanding shall have the right to direct the time, method, and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee; provided, however, that (i) such direction shall not be in conflict with any rule of law or with this Indenture, (ii) the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction and (iii) the Trustee shall have the right to decline to follow any such direction if the Trustee, being advised by counsel, determines that the action or proceedings so directed would be prejudicial to the Holders not joining in such direction or may not lawfully be taken or if the Trustee in good faith by its board of directors or executive committee or a trust committee of directors or trustees and/or responsible officers shall determine that the action or proceedings so directed would involve the Trustee in personal liability.

Prior to any declaration accelerating the maturity of the Securities of any series, the holders of a majority in aggregate principal amount of the Securities of such series at the time outstanding may on behalf of the Holders of all of the Securities of such series waive any past default or Event of Default hereunder and its consequences except a default in the payment of principal of (premium, if any) or interest, if any, or Additional Amounts, if any, on any Securities of such series or in respect of a covenant or provision hereof which may not be modified or amended without the consent of the Holders of each outstanding Security of such series affected. Upon any such waiver the Corporation, the Trustee and the Holders of the Securities of such series shall be restored to their former positions and rights hereunder, respectively; but no such waiver shall extend to any subsequent or other default or Event of Default or impair any right consequent thereon. Whenever any default or Event of Default hereunder shall have been waived as permitted by this Section 6.06, said default

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

or Event of Default shall for all purposes of the Securities of such series and this Indenture be deemed to have been cured and to be not continuing.

SECTION 6.07. NOTICE OF DEFAULTS. The Trustee shall, within ninety days after the occurrence of a default with respect to the Securities of any series, give notice of all defaults with respect to that series known to the Trustee (i) if any Unregistered Securities of that series are then outstanding, to the Holders thereof, by publication at least once in an Authorized Newspaper in the Borough of Manhattan, The City of New York and at least once in an Authorized Newspaper in London (and, if required by Section 4.04, at least once in an Authorized Newspaper in Luxembourg), (ii) if any Unregistered Securities of that series are then outstanding, to all Holders thereof who have filed their names and addresses with the Trustee as described in Section 5.04, by mailing such notice to such Holders at such addresses and (iii) to all Holders of then outstanding Registered Securities of that series, by mailing such notice to such Holders at their addresses as they shall appear on the Security Register, unless in each case such defaults shall have been cured before the mailing or publication of such notice (the term "defaults" for the purpose of this Section being hereby defined to be the events specified in Sections 6.01(a), (b), (c), (d) and (e) and any additional events specified in the terms of any series of Securities pursuant to Section 2.01, not including periods of grace, if any, provided for therein, and irrespective of the giving of written notice specified in Section 6.01 (c) or in the terms of any Securities established pursuant to Section 2.01); and provided that, except in the case of default in the payment of the principal of (premium, if any), interest, if any, or Additional Amounts, if any, on any of the Securities of such series, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interests of the Holders of the Securities of such series.

SECTION 6.08. UNDERTAKING TO PAY COSTS. All parties to this Indenture agree, and each Holder of any Security by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section shall not apply to any suit instituted by the Trustee, to any suit instituted by any Securityholders of any series, or group of such Securityholders, holding in the aggregate more than ten percent in aggregate principal amount of all Securities (voting as one class), or to any suit instituted by any Securityholders for the enforcement of the payment of the principal of (or premium, if any), interest, if any, or Additional Amounts, if any on any Security on or after the due date expressed in such Security.

ARTICLE SEVEN.
CONCERNING THE TRUSTEE.

SECTION 7.01. DUTIES AND RESPONSIBILITIES OF TRUSTEE. The Trustee, prior to the occurrence of an Event of Default of a particular series and after the curing of all Events of Default of such series which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture. In case an Event of Default with respect to a particular series has occurred (which has not been cured) the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(a) prior to the occurrence of an Event of Default with respect to a particular series and after the curing of all Events of Default with respect to such series which may have occurred:

(1) the duties and obligations of the Trustees with respect to such series shall be determined solely by the express provisions of this Indenture, and the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2) in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture;

(b) the Trustee shall not be liable for any error of judgment made in good faith by a responsible officer or officers, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts; and

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

(c) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of Securities pursuant to Section 6.06 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

No provision of this Indenture shall be construed as requiring the Trustee to expend or risk its own funds or otherwise to incur any personal financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if there shall be reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

SECTION 7.02. RELIANCE ON DOCUMENTS, OPINIONS, ETC. Subject to the provisions of Section 7.01:

(a) the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, note, Coupon or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b) any request, direction, order or demand of the Corporation mentioned herein shall be sufficiently evidenced by an instrument signed in the name of the Corporation by the Chairman of the Board of Directors or any Vice Chairman of the Board of Directors or the President or any Executive Vice President or any Senior Vice President or any Vice President or the Treasurer and by the Secretary or any Assistant Secretary or, if the other signatory is other than the Treasurer, any Assistant Treasurer (unless other evidence in respect thereof be herein specifically prescribed); and a Board Resolution may be evidenced to the Trustee by a copy thereof certified by the Secretary or any Assistant Secretary of the Corporation;

(c) the Trustee may consult with counsel and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in good faith and in accordance with such Opinion of Counsel;

(d) the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Securityholders, pursuant to the provisions of this Indenture, unless such Securityholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses, and liabilities which might be incurred therein or thereby;

(e) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, coupon or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Corporation, personally or by agent or attorney;

(f) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys, provided, however, that the Trustee shall be responsible for any misconduct or negligence on the part of any agent or attorney appointed by it hereunder; and

(g) the Trustee shall not be liable for any action taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture.

SECTION 7.03. NO RESPONSIBILITY FOR RECITALS, ETC. The recitals contained herein and in the Securities, other than the Trustee's certificate of authentication, shall be taken as the statements of the Corporation, and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of this Indenture or of the Securities, provided that the Trustee shall not be relieved of its duty to authenticate Securities only as authorized by this Indenture. The Trustee shall not be accountable for the use or application by the Corporation of Securities or the proceeds thereof.

SECTION 7.04. OWNERSHIP OF SECURITIES OR COUPONS. The Trustee or any agent of the Corporation or of the Trustee, in its individual or any other capacity, may become the owner or pledgee of Securities or Coupons with the same rights it would have if it were not Trustee, or an agent of the Corporation or of the Trustee.

SECTION 7.05. MONEYS TO BE HELD IN TRUST. Subject to the provisions of Section 12.04 hereof, all moneys received by the Trustee or any paying agent shall, until used or applied as herein provided, be held in trust for the purposes for which they were received but need not be segregated from other funds except to the extent required by law. Neither the Trustee nor any paying agent shall be under any liability for interest on any moneys received by it hereunder except such as it may agree with the Corporation to pay thereon. So long as no Event of Default shall have occurred and be continuing, all interest

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

allowed on any such moneys shall be paid from time to time upon the written order of the Corporation, signed by its Chairman of the Board of Directors or any Vice Chairman of the Board of Directors or its President or any Executive Vice President or any Senior Vice President or any Vice President or its Treasurer or any Assistant Treasurer.

SECTION 7.06. COMPENSATION AND EXPENSES OF TRUSTEE. The Corporation covenants and agrees to pay to the Trustee from time to time, and the Trustee shall be entitled to, reasonable compensation, and, except as otherwise expressly provided the Corporation will pay or reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any of the provisions of this Indenture (including the reasonable compensation, expenses and disbursements of its counsel and of all persons not regularly in its employ) except any such expense, disbursement or advance as may arise from its negligence or bad faith. If any property other than cash shall at any time be subject to the lien of this Indenture, the Trustee, if and to the extent authorized by a receivership or bankruptcy court of competent jurisdiction or by the supplemental instrument subjecting such property to such lien, shall be entitled to make advances for the purpose of preserving such property or of discharging tax liens or other prior liens or encumbrances hereon. The Corporation also covenants to indemnify the Trustee for, and to hold it harmless against, any loss, liability or reasonable expense incurred without negligence or bad faith on the part of the Trustee, arising out of or in connection with the acceptance or administration of this trust, including the reasonable costs and expenses of defending itself against any claim of liability in the premises. The obligations of the Corporation under this Section to compensate the Trustee and to pay or reimburse the Trustee for reasonable expenses, disbursements and advances shall constitute additional indebtedness hereunder. Such additional indebtedness shall be secured by a lien prior to that of the Securities upon all property and funds held or collected by the Trustee as such, except funds held in trust for the benefit of the Holders of particular Securities or Coupons.

SECTION 7.07. OFFICERS' CERTIFICATE AS EVIDENCE. Subject to the provisions of Section 7.01, whenever in the administration of the provisions of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action to be taken hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of negligence or bad faith on the part of the Trustee, be deemed to be conclusively proved and established by an Officers' Certificate delivered to the Trustee, and such Certificate, in the absence of negligence or bad faith on the part of the Trustee, shall be full warrant to the Trustee for any action taken, suffered or omitted by it under the provisions of this Indenture upon the faith thereof.

SECTION 7.08. CONFLICTING INTEREST OF TRUSTEE. (a) The Trustee shall comply with Section 310(b) of the Trust Indenture Act of 1939.

(b) The Indentures dated as of April 1, 1986 and November 15, 1990, respectively, between the Corporation and Citibank, N.A. shall be deemed to be specifically described herein for purposes of clause (i) of the first proviso contained in Section 310(b) of the Trust Indenture Act of 1939.

SECTION 7.09. ELIGIBILITY OF TRUSTEE. There shall at all times be a trustee hereunder which shall be a corporation organized and doing business under the laws of the United States or of any State or Territory thereof or of the District of Columbia, which (a) is authorized under such laws to exercise corporate trust powers and (b) is subject to supervision or examination by Federal, State, Territorial or District of Columbia authority and (c) shall have at all times a combined capital and surplus of not less than twenty-five million dollars. If such corporation publishes reports of condition at least annually, pursuant to law, or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation at any time shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. In case at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, the Trustee shall resign immediately in the manner and with the effect specified in Section 7.10.

SECTION 7.10. RESIGNATION OR REMOVAL OF TRUSTEE. (a) The Trustee, or any trustee or trustees hereafter appointed, may, upon sixty days written notice to the Corporation, at any time resign with respect to one or more or all series by giving written notice of resignation to the Corporation (i) if any Unregistered Securities of a series affected are then outstanding, by giving notice of such resignation to the Holders thereof, by publication at least once in an Authorized Newspaper in London (and, if required by Section 4.04, at least once in an Authorized Newspaper in Luxembourg), (ii) if any Unregistered Securities of a series affected are then outstanding, by mailing notice of such resignation to the Holders thereof who have filed their names and addresses with the Trustee as described in Section 5.04 at such addresses as were so furnished to the Trustee and (iii) by mailing notice of such resignation to the Holders of then outstanding Registered Securities of each series affected at their addresses as they shall appear on the Security Register. Upon receiving such notice of resignation the Corporation shall promptly appoint a successor trustee with respect to the applicable series by written instrument, in duplicate, executed by order of the Board of Directors of the Corporation, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within thirty days after the mailing of such notice of

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

resignation to the Securityholders, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee, or any Securityholder who has been a bona fide Holder of a Security or Securities of the applicable series for at least six months may, subject to the provisions of Section 6.08, on behalf of himself and all others similarly situated, petition any such court for the appointment of a successor trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, appoint a successor trustee.

(b) In case at any time any of the following shall occur: (i) the Trustee shall fail to comply with the provisions of subsection (a) of Section 7.08 with respect to any series of Securities after written request therefor by the Corporation or by any Securityholder who has been a bona fide Holder of a Security or Securities of such series for at least six months, or

(ii) the Trustee shall cease to be eligible in accordance with the provision of Section 7.09 with respect to any series of Securities and shall fail to resign after written request therefor by the Corporation or by any such Securityholder, or

(iii) the Trustee shall become incapable of acting with respect to any series of Securities, or shall be adjudged a bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, the Corporation may remove the Trustee with respect to the applicable series of Securities and appoint a successor trustee with respect to such series by written instrument, in duplicate, executed by order of the Board of Directors of the Corporation, one copy of which instrument shall be delivered to the Trustee so removed and one copy to the successor trustee, or, subject to the provisions of Section 6.08, any Securityholder of such series who has been a bona fide Holder of a Security or Securities of the applicable series for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor trustee with respect to such series. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, remove the Trustee and appoint a successor trustee.

(c) The Holders of a majority in aggregate principal amount of the Securities of all series (voting as one class) at the time outstanding may at any time remove the Trustee with respect to Securities of all series and appoint a successor trustee with respect to the Securities of all series.

(d) Any resignation or removal of the Trustee and any appointment of a successor trustee pursuant to any of the provisions of this Section shall become effective upon acceptance of appointment by the successor trustee as provided in Section 7.11.

SECTION 7.11. ACCEPTANCE BY SUCCESSOR TRUSTEE. Any successor trustee appointed as provided in Section 7.10 shall execute, acknowledge and deliver to the Corporation and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee with respect to all or any applicable series shall become effective and such successor trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations with respect to such series of its predecessor hereunder, with like effect as if originally named as trustee herein; but, nevertheless, on the written request of the Corporation or of the successor trustee, the trustee ceasing to act shall, upon payment of any amounts then due it pursuant to the provisions of Section 7.06, execute and deliver an instrument transferring to such successor trustee all the rights and powers of the trustee so ceasing to act. Upon request of any such successor trustee, the Corporation shall execute any and all instruments in writing in order more fully and certainly to vest in and confirm to such successor trustee all such rights and powers. Any trustee ceasing to act shall, nevertheless, retain a lien upon all property or funds held or collected by such trustee to secure any amounts then due it pursuant to the provisions of Section 7.06.

In case of the appointment hereunder of a successor trustee with respect to the Securities of one or more (but not all) series, the Corporation, the predecessor Trustee and each successor trustee with respect to the Securities of any applicable series shall execute and deliver an indenture supplemental hereto which shall contain such provisions as shall be deemed necessary or desirable to confirm that all the rights, powers, trusts and duties of the predecessor Trustee with respect to the Securities of any series as to which the predecessor Trustee is not retiring shall continue to be vested in the predecessor Trustee, and shall add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one trustee, it being understood that nothing herein or in such supplemental indenture shall constitute such trustees co-trustees of the same trust and that each such trustee shall be trustee of a trust or trusts hereunder separate and apart from any trust or trusts hereunder administered by any other such trustee.

No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be qualified under the provisions of Section 7.08 and eligible under the provisions of Section 7.09.

Upon acceptance of appointment by a successor trustee as provided in this Section, the Corporation shall give notice of the succession of such trustee hereunder (a) if any Unregistered Securities of a series affected are then outstanding, to the Holders thereof, by publication of such notice at least once in an Authorized Newspaper in the Borough of Manhattan, The City of New York and at least once in an Authorized Newspaper in London (and, if required by Section 4.04, at least once in an Authorized Newspaper in Luxembourg), (b) if any Unregistered Securities of a series affected are then outstanding, to the Holders thereof who have filed their names and addresses with the Trustee pursuant to Section 5.04, by mailing such notice to such Holders at such addresses as were so furnished to the Trustee (and the Trustee shall make such information available to the Corporation for such purpose) and (c) to the Holders of Registered Securities of each series affected, by mailing such notice to such Holders at their addresses as they shall appear on the Security Register. If the Corporation fails to mail such notice in the prescribed manner within ten days after the acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be so given at the expense of the Corporation.

SECTION 7.12. SUCCESSOR BY MERGER, ETC. Any corporation into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such corporation shall be qualified under the provisions of Section 7.08 and eligible under the provisions of Section 7.09, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

SECTION 7.13. LIMITATIONS ON RIGHTS OF TRUSTEE AS CREDITOR. The Trustee shall comply with Section 311(a) of the Trust Indenture Act of 1939.

ARTICLE EIGHT.
CONCERNING THE SECURITYHOLDERS.

SECTION 8.01. ACTION BY SECURITYHOLDERS. Whenever in this Indenture it is provided that the Holders of a specified percentage in aggregate principal amount of the Securities of any or all series may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action the Holders of such specified percentage have joined therein may be evidenced (a) by any instrument or any number of instruments of similar tenor executed by Securityholders in person or by agent or proxy appointed in writing, or (b) by the record of the Holders of Securities voting in favor thereof at any meeting of Securityholders duly called and held in accordance with the provisions of Article Nine, or (c) by a combination of such instrument or instruments and any such record of such a meeting of Securityholders.

In determining whether the Holders of a specified percentage in aggregate principal amount of the Securities have taken any action (including the making of any demand or request, the waiving of any notice, consent or waiver or the taking of any other action), the principal amount of any Original Issue Discount Security that may be counted in making such determination and that shall be deemed to be outstanding for such purposes shall be equal to the amount of the principal thereof that could be declared to be due and payable upon an Event of Default pursuant to the terms of such Original Issue Discount Security at the time the taking of such action is evidenced to the Trustee.

SECTION 8.02. PROOF OF EXECUTION BY SECURITYHOLDERS. Subject to the provisions of Sections 7.01, 7.02 and 9.05, proof of the execution of any instrument by a Securityholder or its agent or proxy shall be sufficient if made in the following manner:

(a) In the case of Holders of Unregistered Securities, the fact and date of the execution by any such person of any instrument may be proved by the certificate of any notary public or other officer of any jurisdiction authorized to take acknowledgments of deeds or administer oaths that the person executing such instruments acknowledged to him the execution thereof or by an affidavit of a witness to such execution sworn to before any such notary or other such officer. Where such execution is by or on behalf of any legal entity other than an individual, such certificate or affidavit shall also constitute sufficient proof of the authority of the person executing the same. The fact of the holding by any Holder of a Security of any series, and the identifying number of such Security and the date of his holding the same, may be proved by the production of such Security or by a certificate executed by any trust company, bank, banker or recognized securities dealer wherever situated satisfactory to the Trustee, if such certificate shall be deemed by the Trustee to be satisfactory. Each such certificate shall be dated and shall state that on the date thereof a Security of such series bearing a specified identifying number was deposited with or exhibited to such trust company, bank, banker or recognized securities dealer by the person named in such certificate. Any such certificate may be issued in respect of one or more Securities of one or more series specified therein. The holding by the person named in any such certificate of any Securities of any series specified therein shall be presumed to continue for a period of one year from the date of such certificate unless at the time of any determination of such holding (1) another certificate bearing a later date issued in respect of the same Securities shall be produced, or (2) the Security of such series specified in such certificate shall be produced by some other person, or (3) the

Security of such series specified in such certificates shall have ceased to be outstanding. Subject to Sections 7.01, 7.02 and 9.05, the fact and date of the execution of any such instrument and the amount and numbers of Securities of any series held by the person so executing such instrument and the amount and numbers of any Security or Securities for such series may also be proven in accordance with such reasonable rules and regulations as may be prescribed by the Trustee for such series or in any other manner which the Trustee for such series may deem sufficient.

(b) In the case of Registered Securities, the ownership of such Securities shall be proved by the Security Register or by a certificate of the Security Registrar.

SECTION 8.03. WHO ARE DEEMED ABSOLUTE OWNERS. The Corporation, the Trustee, any paying agent, any transfer agent and any Security Registrar may treat the Holder of any Unregistered Security and the Holder of any Coupon as the absolute owner of such Unregistered Security or Coupon (whether or not such Unregistered Security or Coupon shall be overdue) for the purpose of receiving payment thereof or on account thereof and for all other purposes and neither the Corporation, the Trustee, any paying agent, any transfer agent nor any Security Registrar shall be affected by any notice to the contrary. The Corporation, the Trustee, any paying agent, any transfer agent and any Security Registrar may, subject to Section 2.04 hereof, treat the person in whose name a Registered Security shall be registered upon the Security Register as the absolute owner of such Registered Security (whether or not such Registered Security shall be overdue) for the purpose of receiving payment thereof or on account thereof and for all other purposes and neither the Corporation, the Trustee, any paying agent, any transfer agent nor any Security Registrar shall be affected by any notice to the contrary.

SECTION 8.04. CORPORATION-OWNED SECURITIES DISREGARDED. In determining whether the Holders of the required aggregate principal amount of Securities have concurred in any direction, consent or waiver under this Indenture, Securities which are owned by the Corporation or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with the Corporation, shall be disregarded and deemed not to be outstanding for the purpose of any such determination, except that for the purpose of determining whether the Trustee shall be protected in relying on any such direction, consent or waiver only Securities which the Trustee knows are so owned shall be disregarded. Securities so owned which have been pledged in good faith may be regarded as outstanding for the purposes of this Section if the pledgee shall establish to the satisfaction of the Trustee the pledgee's right to vote such Securities and that the pledgee is not a person directly or indirectly controlling or controlled by or under direct or indirect common control with the Corporation. In the case of a dispute as to such right, any decision by the Trustee taken upon the advice of counsel shall be full protection to the Trustee.

SECTION 8.05. REVOCATION OF CONSENTS; FUTURE SECURITYHOLDERS BOUND. At any time prior to the taking of any action by the Holders of the percentage in aggregate principal amount of the Securities specified in this Indenture in connection with such action, any Holder of a Security the identifying number of which is shown by the evidence to be included in the Securities the Holders of which have consented to such action may, by filing written notice with the Trustee at its office and upon proof of holding as provided in Section 8.02, revoke such action so far as concerns such Security. Except as aforesaid any such action taken by the Holder of any Security shall be conclusive and binding upon such Holder and upon all future Holders and owners of such Security and of any Security issued in exchange or substitution therefor irrespective of whether or not any notation in regard thereto is made upon such Security. Any action taken by the Holders of the percentage in aggregate principal amount of the Securities specified in this Indenture in connection with such action shall be conclusively binding upon the Corporation, the Trustee and the Holders of all the Securities of each series intended to be affected thereby.

SECTION 8.06. SECURITIES IN A FOREIGN CURRENCY. Unless otherwise specified in an Officers' Certificate delivered pursuant to Section 2.01 of this Indenture with respect to a particular series of Securities, on any day when for purposes of this Indenture any action may be taken by the Holders of a specified percentage in aggregate principal amount of two or more series of outstanding Securities and, at such time, there are outstanding Securities of at least one such series which are denominated in a coin or currency other than that of at least one other such series, then the principal amount of Securities of each such series (other than any such series denominated in U.S. Dollars) which shall be deemed to be outstanding for the purpose of taking such action shall be that amount of U.S. Dollars that could be obtained for such amount at the Market Exchange Rate. For purposes of this Section 8.06, Market Exchange Rate shall mean the noon U.S. Dollar buying rate for that currency for cable transfers quoted in The City of New York on such day as certified for customs purposes by the Federal Reserve Bank of New York; provided, however, in the case of ECUs, Market Exchange Rate shall mean the rate of exchange determined by the Commission of the European Communities (or any successor thereto) as published in the Official Journal of the European Communities, such publication or any successor publication, the "Journal"). If such Market Exchange Rate is not available for any reason with respect to such currency, the Corporation shall use, in its sole discretion and without liability on its part, such quotation of the Federal Reserve Bank of New York, or in the case of ECUs, the rate of exchange as published in the Journal, as of the most recent available date, or in the case of ECUs, rates of exchange from one or more major banks in The City

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

of New York or in the country of issue of the currency in question, which for purposes of the ECU shall be Brussels, Belgium, or such other quotations or, in the case of ECUs, a rate of exchange as the Corporation shall deem appropriate. The provisions of this paragraph shall apply in determining the equivalent number of votes which each Securityholder or proxy shall be entitled to pursuant to Section 9.05 in respect of Securities of a series denominated in a currency other than U.S. Dollars.

All decisions and determinations of the Corporation regarding the Market Exchange Rate shall be in its sole discretion and shall, in the absence of manifest error, be conclusive for all purposes and irrevocably binding upon the Corporation and all Holders.

ARTICLE NINE.
SECURITYHOLDERS' MEETINGS.

SECTION 9.01. PURPOSES OF MEETINGS. A meeting of Securityholders of any or all series may be called at any time and from time to time pursuant to the provisions of this Article for any of the following purposes:

(1) to give any notice to the Corporation or to the Trustee, or to give any directions to the Trustee, or to waive any default hereunder and its consequences, or to take any other action authorized to be taken by Securityholders pursuant to any of the provisions of Article Six;

(2) to remove the Trustee and appoint a successor trustee pursuant to the provisions of Article Seven;

(3) to consent to the execution of an indenture or indentures supplemental hereto pursuant to the provisions of Section 10.02; or

(4) to take any other action authorized to be taken by or on behalf of the Holders of any specified aggregate principal amount of the Securities of any or all series, as the case may be, under any other provision of this Indenture or under applicable law.

SECTION 9.02. CALL OF MEETINGS BY TRUSTEE. The Trustee may at any time call a meeting of Holders of Securities of any or all series to take any action specified in Section 9.01, to be held at such time and at such place in the Borough of Manhattan, The City of New York, or in London, as the Trustee shall determine. Notice of every meeting of the Holders of Securities of any or all series, setting forth the time and place of such meeting, shall be given (i) if any Unregistered Securities of a series that may be affected by the action proposed to be taken at such meeting are then outstanding, to all Holders thereof, by publication at least twice in an Authorized Newspaper in the Borough of Manhattan, The City of New York and at least twice in an Authorized Newspaper in London (and, if required by Section 4.04, at least twice in an Authorized Newspaper in Luxembourg) prior to the date fixed for the meeting, the first publication, in each case, to be not less than twenty nor more than one hundred eighty days prior to the date fixed for the meeting and the last publication to be not more than five days prior to the date fixed for the meeting, (ii) if any Unregistered Securities of a series that may be affected by the action proposed to be taken at such meeting are then outstanding, to all Holders thereof who have filed their names and addresses with the Trustee as described in Section 5.04, by mailing such notice to such Holders at such addresses, not less than twenty nor more than one hundred eighty days prior to the date fixed for the meeting and (iii) to all Holders of then outstanding Registered Securities of each series that may be affected by the action proposed to be taken at such meeting, by mailing such notice to such Holders at their addresses as they shall appear on the Security Register, not less than twenty nor more than one hundred eighty days prior to the date fixed for the meeting. Failure of any Holder or Holders to receive such notice or any defect therein shall in no case affect the validity of any action taken at such meeting. Any meeting of Holders of Securities of all or any series shall be valid without notice if the Holders of all such Securities outstanding, the Corporation and the Trustee are present in person or by proxy or shall have waived notice thereof before or after the meeting. The Trustee may fix, in advance, a date as the record date for determining the holders entitled to notice of or to vote at any such meeting at not less than twenty or more than one hundred eighty days prior to the date fixed for such meeting.

SECTION 9.03. CALL OF MEETINGS BY CORPORATION OR SECURITYHOLDERS. In case at any time the Corporation, pursuant to a Board Resolution, or the Holders of at least ten percent in aggregate principal amount of the Securities of any or all series, as the case may be, then outstanding, shall have requested the Trustee to call a meeting of Securityholders of any or all series to take any action authorized in Section 9.01, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Trustee shall not have mailed or published as provided in Section 9.02, the notice of such meeting within thirty days after receipt of such request, then the Corporation or the Holders of such Securities in the amount above specified may determine the time and the place in said Borough of Manhattan or London for such meeting and may call such meeting to take any action authorized in Section 9.01, by mailing notice thereof as provided in Section 9.02.

SECTION 9.04. QUALIFICATION FOR VOTING. To be entitled to vote at any meeting of Securityholders a person shall be a Holder of one or more Securities of a series with respect to which a meeting is being held or a person appointed

by an instrument in writing as proxy by such a Holder. The only persons who shall be entitled to be present or to speak at any meeting of the Securityholders shall be the persons entitled to vote at such meeting and their counsel and any representatives of the Trustee and its counsel and any representatives of the Corporation and its counsel.

SECTION 9.05. REGULATIONS. Notwithstanding any other provisions of this Indenture, the Trustee may make such reasonable regulations as it may deem advisable for any meeting of Securityholders, in regard to proof of the holding of Securities and of the appointment of proxies, and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall think fit.

The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Corporation or by Securityholders as provided in Section 9.03, in which case the Corporation or the Securityholder calling the meeting, as the case may be, shall in like manner appoint a temporary chairman. A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the Holders of a majority in principal amount of the Securities represented at the meeting and entitled to vote.

Subject to the provisions of Sections 8.01 and 8.04, at any meeting each Securityholder or proxy shall be entitled to one vote for each U.S.$1,000 principal amount of Securities held or represented by him; provided, however, that no vote shall be cast or counted at any meeting in respect of any Security challenged as not outstanding and ruled by the chairman of the meeting not to be outstanding. The chairman of the meeting shall have no right to vote except as a Securityholder or proxy. Any meeting of Securityholders duly called pursuant to the provisions of Section 9.02 or 9.03 may be adjourned from time to time, and the meeting may be held as so adjourned without further notice.

SECTION 9.06. VOTING. The vote upon any resolution submitted to any meeting of Securityholders shall be by written ballot on which shall be subscribed the signatures of the Securityholders or proxies and on which shall be inscribed the identifying number or numbers or to which shall be attached a list of identifying numbers of the Securities held or represented by them. The permanent chairman of the meeting shall appoint two inspectors of votes who shall count all votes cast at the meeting for or against any resolution and who shall make and file with the secretary of the meeting their verified reports in duplicate of all votes cast at the meeting. A record in duplicate of the proceedings of each meeting of Securityholders shall be prepared by the secretary of the meeting and there shall be attached to said record the original reports of the inspectors of votes on any vote by ballot taken thereat and affidavit by one or more persons having knowledge of the facts setting forth a copy of the notice of the meeting and showing that said notice was mailed as provided in Section 9.02. The record shall be signed and verified by the permanent chairman and secretary of the meeting and one of the duplicates shall be delivered to the Corporation and the other to the Trustee to be preserved by the Trustee, the latter to have attached thereto the ballots voted at the meeting.

Any record so signed and verified shall be conclusive evidence of the matters therein stated.

ARTICLE TEN.

SUPPLEMENTAL INDENTURES.

SECTION 10.01. SUPPLEMENTAL INDENTURES WITHOUT CONSENT OF SECURITYHOLDERS. The Corporation, when authorized by Board Resolution, and the Trustee may from time to time and at any time enter into an indenture or indentures supplemental hereto (which shall conform to the provisions of the Trust Indenture Act of 1939) for one or more of the following purposes:

(a) to evidence the succession of another corporation to the Corporation, or successive successions, and the assumption by any successor corporation of the covenants, agreements and obligations of the Corporation pursuant to Article Eleven hereof;

(b) to add to the covenants of the Corporation such further covenants, restrictions, conditions or provisions as its Board of Directors and the Trustee shall consider to be for the protection of the Holders of Securities of any or all series, or the Coupons appertaining to such Securities, and to make the occurrence, or the occurrence and continuance, of a default in any of such additional covenants, restrictions, conditions or provisions a default or an Event of Default with respect to any or all series permitting the enforcement of all or any of the several remedies provided in this Indenture as herein set forth, with such period of grace, if any, and subject to such conditions as such supplemental indenture may provide;

(c) to add or change any of the provisions of this Indenture to such extent as shall be necessary to permit or facilitate the issuance of Securities of any series in bearer form, registrable or not registrable as to principal, and with or without interest Coupons, and to provide for exchangeability of such Securities with Securities issued hereunder in fully registered form and to make all appropriate changes for such purpose, and to add or change any of the provisions of this Indenture to such extent as shall be necessary to permit or

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

facilitate the issuance of uncertificated Securities of any series;

(d) to cure any ambiguity or to correct or supplement any provision contained herein or in any supplemental indenture which may be defective or inconsistent with any other provision contained herein or in any supplemental indenture; to convey, transfer, assign, mortgage or pledge any property to or with the Trustee; or to make such other provisions in regard to matters or questions arising under this Indenture as shall not adversely affect the interests of the Holders of any series of Securities or any Coupons appertaining to such Securities;

(e) to evidence and provide for the acceptance and appointment hereunder by a successor trustee with respect to the Securities of one or more series and to add or change any provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one trustee, pursuant to Section 7.11;

(f) to establish the form or terms of Securities of any series as permitted by Sections 2.01 and 2.03; and

(g) to change or eliminate any provision of this Indenture, provided that any such change or elimination (i) shall become effective only when there is no Security outstanding of any series created prior to the execution of such supplemental indenture which is entitled to the benefit of such provision or (ii) shall not apply to any Security outstanding.

The Trustee is hereby authorized to join with the Corporation in the execution of any such supplemental indenture, to make any further appropriate agreements and stipulations which may be therein contained and to accept the conveyance, transfer, assignment, mortgage or pledge of any property thereunder, but the Trustee shall not be obligated to enter into any such supplemental indenture which adversely affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Any supplemental indenture authorized by the provisions of this Section may be executed by the Corporation and the Trustee without the consent of the Holders of any of the Securities at the time outstanding, notwithstanding any of the provisions of Section 10.02.

SECTION 10.02. SUPPLEMENTAL INDENTURES WITH CONSENT OF Securityholders. With the consent (evidenced as provided in Section 8.01) of the Holders of not less than a majority in the aggregate principal amount of the Securities of all series at the time outstanding affected by such supplemental indenture (voting as one class), the Corporation, when authorized by a Board Resolution, and the Trustee may from time to time and at any time enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of any supplemental indentures or modifying in any manner the rights of the Holders of the Securities of each such series or any Coupons appertaining to such Securities; provided, however, that no such supplemental indenture shall (i) change the fixed maturity of any Securities, or reduce the principal amount thereof (or premium, if any), or reduce the rate or extend the time of payment of any interest or Additional Amounts thereon or reduce the amount due and payable upon acceleration of the maturity thereof or the amount provable in bankruptcy, or make the principal of (premium, if any) or interest, if any, or Additional Amounts, if any, on any Security payable in any coin or currency other than that provided in such Security, (ii) impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof (or, in the case of redemption, on or after the redemption date therefor) or (iii) reduce the aforesaid percentage of Securities, the consent of the Holders of which is required for any such supplemental indenture, or the percentage required for the consent of the Holders pursuant to Section 6.01 to waive defaults, without the consent of the Holder of each Security so affected.

Upon the request of the Corporation, accompanied by a copy of a Board Resolution certified by the Secretary or an Assistant Secretary of the Corporation authorizing the execution of any such supplemental indenture, and upon the filing with the Trustee of evidence of the consent of Securityholders as aforesaid, the Trustee shall join with the Corporation in the execution of such supplemental indenture unless such supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such supplemental indenture.

It shall not be necessary for the consent of the Securityholders under this Section to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

Promptly after the execution and delivery by the Corporation and the Trustee of any supplemental indenture pursuant to the provisions of this Section, the Trustee shall give notice of such supplemental indenture (i) to the Holders of then outstanding Registered Securities of each series affected thereby, by mailing a notice thereof by first-class mail to such Holders at their addresses as they shall appear on the Security Register, (ii) if any Unregistered Securities of a series affected thereby are then outstanding, to the Holders thereof who have filed their names and addresses with the Trustee as described in Section 5.04, by mailing a notice thereof by first-class mail to such Holders at such addresses as were so furnished to the Trustee and (iii) if

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

any Unregistered Securities of a series affected thereby are then outstanding, to all Holders thereof, if by publication of a notice thereof at least once in an Authorized Newspaper in London (and, if required by Section 4.04, at least once in an Authorized Newspaper in Luxembourg), and in each case such notice shall set forth in general terms the substance of such supplemental indenture. Any failure of the Corporation to mail or publish such notice, or any defect therein, shall not, however in any way impair or affect the validity of any such supplemental indenture.

SECTION 10.03. COMPLIANCE WITH TRUST INDENTURE ACT; EFFECT OF SUPPLEMENTAL INDENTURES. Any supplemental indenture executed pursuant to the provisions of this Article Ten shall comply with the Trust Indenture Act of 1939. Upon the execution of any supplemental indenture pursuant to the provisions of this Article Ten, this Indenture shall be and be deemed to be modified and amended in accordance therewith and the respective rights, limitations of rights, obligations, duties and immunities under this Indenture of the Trustee, the Corporation and the Holders of Securities shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments, and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

The Trustee, subject to the provisions of Sections 7.01 and 7.02, may receive an Opinion of Counsel as conclusive evidence that any such supplemental indenture complies with the provisions of this Article Ten.

SECTION 10.04. NOTATION ON SECURITIES. Securities of any series authenticated and delivered after the execution of any supplemental indenture pursuant to the provision of this Article Ten may bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. New Securities of any series so modified as to conform, in the opinion of the Trustee and the Board of Directors of the Corporation, to any modification of this Indenture contained in any such supplemental indenture may be prepared by the Corporation, authenticated by the Trustee and delivered, without charge to the Securityholders, in exchange for the Securities of such series then outstanding.

ARTICLE ELEVEN.

CONSOLIDATION, MERGER, SALE OR CONVEYANCE.

SECTION 11.01. CORPORATION MAY CONSOLIDATE, ETC., ON CERTAIN TERMS. The Corporation covenants that it will not merge or consolidate with any other corporation or sell or convey all or substantially all of its assets to any person, firm or corporation, unless (i) either the Corporation shall be the continuing corporation, or the successor corporation (if other than the Corporation) shall be a corporation organized and existing under the laws of the United States of America or a state thereof and such corporation shall expressly assume the due and punctual payment of the principal of (and premium, if any), interest, if any, and Additional Amounts, if any, on all the Securities and any Coupons, according to their tenor, and the due and punctual performance and observance of all of the covenants and conditions of this Indenture to be performed by the Corporation by supplemental indenture satisfactory to the Trustee, executed and delivered to the Trustee by such corporation and (ii) the Corporation or such successor corporation, as the case may be, shall not, immediately after such merger or consolidation, or such sale or conveyance, be in default in the performance of any such covenant or condition.

SECTION 11.02. SUCCESSOR CORPORATION SUBSTITUTED. In case of any such consolidation, merger, sale or conveyance and upon any such assumption by the successor corporation, such successor corporation shall succeed to and be substituted for the Corporation, with the same effect as if it had been named herein as the party of the first part. Such successor corporation thereupon may cause to be signed, and may issue either in its own name or in the name of General Motors Corporation, any or all of the Securities, and any Coupons appertaining thereto, issuable hereunder which theretofore shall not have been signed by the Corporation and delivered to the Trustee; and, upon the order of such successor corporation, instead of the Corporation, and subject to all the terms, conditions and limitations in this Indenture prescribed, the Trustee shall authenticate and shall deliver any Securities or Coupons which previously shall have been signed and delivered by the officers of the Corporation to the Trustee for authentication, and any Securities or Coupons which such successor corporation thereafter shall cause to be signed and delivered to the Trustee for that purpose. All of the Securities, and any Coupons appertaining thereto, so issued shall in all respects have the same legal rank and benefit under this Indenture as the Securities or Coupons theretofore or thereafter issued in accordance with the terms of this Indenture as though all of such Securities, and any Coupons appertaining thereto, had been issued at the date of the execution hereof.

In case of any such consolidation, merger, sale or conveyance such changes in phraseology and form (but not in substance) may be made in the Securities and Coupons thereafter to be issued as may be appropriate.

SECTION 11.03. OPINION OF COUNSEL TO BE GIVEN TRUSTEE. The Trustee, subject to the provisions of Sections 7.01 and 7.02, may receive an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale or conveyance, and any such assumption, complies with the provisions of this Article Eleven.

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

SECTION 11.04. CERTIFICATE TO TRUSTEE. On or before April 1, 1996, and on or before April 1 in each year thereafter, the Corporation will deliver to the Trustee a brief certificate of the Corporation's principal executive officer, principal financial officer or principal accounting officer as to such officer's knowledge of the Corporation's compliance with all conditions and covenants under this Indenture (such compliance to be determined without regard to any period of grace or requirement of notice provided under this Indenture).

ARTICLE TWELVE.

SATISFACTION AND DISCHARGE OF INDENTURE;
UNCLAIMED MONEYS.

SECTION 12.01. DISCHARGE OF INDENTURE. If at any time (a) the Corporation shall have delivered to the Trustee for cancellation all Securities of any series theretofore authenticated (other than any Securities of such series and Coupons appertaining thereto which shall have been destroyed, lost or stolen and which shall have been replaced or paid as provided in Section 2.06) or (b) all such Securities of such series and any Coupons appertaining to such Securities not theretofore delivered to the Trustee for cancellation shall have become due and payable, or are by their terms to become due and payable within one year or are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption, and the Corporation shall deposit or cause to be deposited with the Trustee as trust funds the entire amount (other than moneys repaid by the Trustee or any paying agent to the Corporation in accordance with Section 12.04) sufficient to pay at maturity or upon redemption all Securities of such series and all Coupons appertaining to such Securities not theretofore delivered to the Trustee for cancellation, including principal (and premium, if any), interest, if any, and Additional Amounts, if any, due or to become due to such date of maturity or date fixed for redemption, as the case may be, and if in either case the Corporation shall also pay or cause to be paid all other sums payable hereunder by the Corporation with respect to such series, then this Indenture shall cease to be of further effect with respect to the Securities of such series or any Coupons appertaining to such Securities, and the Trustee, on demand of and at the cost and expense of the Corporation and subject to Section 14.04, shall execute proper instruments acknowledging satisfaction of and discharging this Indenture with respect to the Securities of such series and all Coupons appertaining to such Securities. The Corporation agrees to reimburse the Trustee for any costs or expenses thereafter reasonably and properly incurred by the Trustee in connection with this Indenture or the Securities of such series or any Coupons appertaining to such Securities.

SECTION 12.02. SATISFACTION, DISCHARGE AND DEFEASANCE OF SECURITIES OF ANY SERIES. If pursuant to Section 2.01 provision is made for the defeasance of Securities of a series, then the provisions of this Section 12.02 shall be applicable except as otherwise specified as contemplated by Section 2.01 for Securities of such series. At the Corporation's option, either (a) the Corporation shall be deemed to have paid and discharged the entire indebtedness on all the outstanding Securities of any such series and the Trustee, at the expense of the Corporation, shall execute proper instruments acknowledging satisfaction and discharge of such indebtedness or (b) the Corporation shall cease to be under any obligation to comply with any term, provision, condition or covenant specified as contemplated by Section 2.01, when

(1)   either

(A) with respect to all outstanding Securities of such series,

(i) the Corporation has deposited or caused to be deposited with the Trustee as trust funds in trust for the purpose an amount (in such currency in which such outstanding Securities and any related Coupons are then specified as payable at stated maturity) sufficient to pay and discharge the entire indebtedness of all outstanding Securities of such series for principal (and premium, if any), interest, if any, and Additional Amounts, if any, to the stated maturity or any redemption date as contemplated by the last paragraph of this Section 12.02, as the case may be; or

(ii) the Corporation has deposited or caused to be deposited with the Trustee as obligations in trust for the purpose such amount of direct noncallable obligations of, or noncallable obligations the payment of principal of and interest on which is fully guaranteed by, the United States of America, or to the payment of which obligations or guarantees the full faith and credit of the United States of America is pledged, maturing as to principal and interest in such amounts and at such times as will, together with the income to accrue thereon (but without reinvesting any proceeds thereof), be sufficient to pay and discharge the entire indebtedness on all outstanding Securities of such series for principal (and premium, if any), interest, if any, and Additional Amounts, if any, to the stated maturity or any redemption date as contemplated by the last paragraph of this Section 12.02, as the case may be; or

(B) the Corporation has properly fulfilled such other terms and conditions to the satisfaction and discharge as is specified, as contemplated by Section 2.01, as applicable to the Securities of such series, and

(2) the Corporation has paid or caused to be paid all other sums payable with respect to the outstanding Securities of such series, and

(3) The Corporation has delivered to the Trustee an Opinion of Counsel stating that (i) the Corporation has received from, or there has been published by, the Internal Revenue Service a ruling or (ii) since the date of execution of this Indenture, there has been a change in the applicable Federal income tax law, in either case to the effect that, and based thereon such opinion shall confirm that, the holders of the outstanding Securities and any related Coupons will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit, defeasance and discharge and will be subject to Federal income tax on the same amounts and in the same manner and at the same times, as would have been the case if such deposit, defeasance and discharge had not occurred.

(4) the Corporation has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of the entire indebtedness on all outstanding Securities of any such series have been complied with.

Any deposits with the Trustee referred to in Section 12.02(1)(A) above shall be irrevocable and shall be made under the terms of an escrow trust agreement in form and substance satisfactory to the Trustee. If any outstanding Securities of such series are to be redeemed prior to their stated maturity, whether pursuant to any optional redemption provisions or in accordance with any mandatory sinking fund requirement or otherwise, the applicable escrow trust agreement shall provide therefor and the Corporation shall make such arrangements as are satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Corporation.

SECTION 12.03. DEPOSITED MONEYS TO BE HELD IN TRUST BY TRUSTEE. All moneys deposited with the Trustee pursuant to Section 12.01 or 12.02 shall be held in trust and applied by it to the payment, either directly or through any paying agent (including the Corporation acting as its own paying agent), to the Holders of the particular Securities and of any Coupons appertaining to such Securities for the payment or redemption of which such moneys have been deposited with the Trustee, of all sums due and to become due thereon for principal (and premium, if any), interest, if any, and Additional Amounts, if any.

SECTION 12.04. PAYING AGENT TO REPAY MONEYS HELD. In connection with the satisfaction and discharge of this Indenture with respect to Securities of any series all moneys with respect to such Securities then held by any paying agent under the provisions of this Indenture shall, upon demand of the Corporation, be repaid to it or paid to the Trustee and thereupon such paying agent shall be released from all further liability with respect to such moneys.

SECTION 12.05. RETURN OF UNCLAIMED MONEYS. Any moneys deposited with or paid to the Trustee or any paying agent for the payment of the principal of (and premium, if any), interest, if any, and Additional Amounts, if any, on any Security and not applied but remaining unclaimed for two years after the date upon which such principal (and premium, if any), interest, if any, and Additional Amounts, if any, shall have become due and payable, shall, unless otherwise required by mandatory provisions of applicable escheat or abandoned or unclaimed property law, be repaid to the Corporation by the Trustee or such paying agent on demand, and the Holder of such Security or any Coupon appertaining to such Security shall, unless otherwise required by mandatory provisions of applicable escheat or abandoned or unclaimed property law, thereafter look only to the Corporation for any payment which such Holder may be entitled to collect and all liability of the Trustee or any paying agent with respect to such moneys shall thereupon cease; provided, however, that the Trustee or such paying agent, before being required to make any such repayment with respect to moneys deposited with it for any payment in respect of Unregistered Securities of any series, may at the expense of the Corporation cause to be published once, in an Authorized Newspaper in the Borough of Manhattan, The City of New York and once in an Authorized Newspaper in London (and, if required by Section 4.04, once in an Authorized Newspaper in Luxembourg), notice that such moneys remain and that, after a date specified therein, which shall not be less than thirty days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Corporation.

ARTICLE THIRTEEN.

IMMUNITY OF INCORPORATORS, STOCKHOLDERS,
OFFICERS AND DIRECTORS.

SECTION 13.01. INDENTURE AND SECURITIES SOLELY CORPORATE OBLIGATIONS. No recourse under or upon any obligation, covenant or agreement contained in this Indenture, or in any covenant or agreement contained in this Indenture, or in any Security, or because of any indebtedness evidenced thereby, shall be had against any past, present or future incorporator, stockholder, officer or director, as such, of the Corporation or of any successor corporation, either directly or through the Corporation or any successor corporation, under any rule of law, statute or constitutional provision or by the enforcement of any assessment or by any legal or equitable proceeding or otherwise, all such liability being expressly waived and released by the acceptance of the Securities by the Holders thereof and as part of the consideration for the issue

of the Securities and Coupons.

## ARTICLE FOURTEEN.

### MISCELLANEOUS PROVISIONS.

SECTION 14.01. BENEFITS OF INDENTURE RESTRICTED TO PARTIES AND SECURITYHOLDERS. Nothing in this Indenture or in the Securities or Coupons, expressed or implied, shall give or be construed to give to any person, firm or corporation, other than the parties hereto and their successors and the Holders of the Securities or Coupons, any legal or equitable right, remedy or claim under this Indenture or under any covenant or provision herein contained, all such covenants and provisions being for the sole benefit of the parties hereto and their successors and of the Holders of the Securities or Coupons.

SECTION 14.02. PROVISIONS BINDING ON CORPORATION'S SUCCESSORS. All the covenants, stipulations, promises and agreements in this Indenture contained by or on behalf of the Corporation shall bind its successors and assigns, whether so expressed or not.

SECTION 14.03. ADDRESSES FOR NOTICES, ETC. Any notice or demand which by any provision of this Indenture is required or permitted to be given or served by the Trustee or by the Holders of Securities to or on the Corporation may be given or served by being deposited postage prepaid first class mail in a post office letter box addressed (until another address is filed by the Corporation with the Trustee), as follows: General Motors Corporation, 767 Fifth Avenue, New York, New York 10153. Any notice, direction, request or demand by any Securityholder to or upon the Trustee shall be deemed to have been sufficiently given or made, for all purposes, if given or made in writing at its Corporate Trust Office, which is at the date of this Indenture, 120 Wall Street, 13th Floor, New York, New York 10043, except that for purposes of presentation of Securities for payment or registration of transfer or exchange, such term means the office or agency which at any particular time its corporate agency business shall be conducted, which at the date of this Indenture is 111 Wall Street, New York, New York 10043.

SECTION 14.04. EVIDENCE OF COMPLIANCE WITH CONDITIONS PRECEDENT. Upon any application or demand by the Corporation to the Trustee to take any action under any of the provisions of this Indenture, the Corporation shall furnish to the Trustee an Officers' Certificate stating that all conditions precedent provided for in this Indenture relating to the proposed action have been complied with and an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent have been complied with, except that in the case of any such application or demand as to which the furnishing of such documents is specifically required by any provision of this Indenture relating to such particular application or demand, no additional certificate or opinion need be furnished.

Each certificate or opinion provided for in this Indenture and delivered to the Trustee with respect to compliance with a condition or covenant provided for in this Indenture shall include (1) a statement that the person making such certificate or opinion has read such covenant or condition; (2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based; (3) a statement that, in the opinion of such person, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and (4) a statement as to whether or not, in the opinion of such person, such condition or covenant has been complied with.

SECTION 14.05. LEGAL HOLIDAYS. In any case where the date of maturity of any interest, premium or Additional Amounts on or principal of the Securities or the date fixed for redemption of any Securities shall not be a Business Day in a city where payment thereof is to be made, then payment of any interest, premium or Additional Amounts on, or principal of such Securities need not be made on such date in such city but may be made on the next succeeding Business Day with the same force and effect as if made on the date of maturity or the date fixed for redemption, and no interest shall accrue for the period after such date.

SECTION 14.06. TRUST INDENTURE ACT TO CONTROL. If and to the extent that any provision of this Indenture limits, qualifies or conflicts with another provision included in this Indenture by operation of Sections 310 to 317, inclusive, of the Trust Indenture Act of 1939 (an "incorporated provision"), such incorporated provision shall control.

SECTION 14.07. EXECUTION IN COUNTERPARTS. This Indenture may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same instrument.

SECTION 14.08. NEW YORK CONTRACT. This Indenture and each Security shall be deemed to be a contract made under the laws of the State of New York, and for all purposes shall be governed by and construed in accordance with the laws of said State, regardless of the laws that might otherwise govern under applicable New York principles of conflicts of law and except as may otherwise be required by mandatory provisions of law. Any claims or proceedings in respect of this Indenture shall be heard in a federal or state court located in the State of New York.

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

SECTION 14.09. JUDGMENT CURRENCY. The Corporation agrees, to the fullest extent that it may effectively do so under applicable law, that (a) if for the purposes of obtaining judgment in any court it is necessary to convert the sum due in respect of the principal of or interest on the Securities of any series (the "Required Currency") into a currency in which a judgment will be rendered (the "Judgment Currency"), the rate of exchange used shall be the rate at which in accordance with normal banking procedures the Trustee could purchase in The City of New York the Required Currency with the Judgment Currency on the date on which final unappealable judgment is entered, unless such day is not a New York Banking Day, then, to the extent permitted by applicable law, the rate of exchange used shall be the rate at which in accordance with normal banking procedures the Trustee could purchase in The City of New York the Required Currency with the Judgment Currency on the New York Banking Day preceding the day on which final unappealable judgment is entered and (b) its obligations under this Indenture to make payments in the Required Currency (i) shall not be discharged or satisfied by any tender, or any recovery pursuant to any judgment (whether or not entered in accordance with subsection (a)), in any currency other than the Required Currency, except to the extent that such tender or recovery shall result in the actual receipt, by the payee, of the full amount of the Required Currency expressed to be payable in respect of such payments, (ii) shall be enforceable as an alternative or additional cause of action for the purpose of recovering in the Required Currency the amount, if any, by which such actual receipt shall fall short of the full amount of the Required Currency so expressed to be payable and (iii) shall not be affected by judgment being obtained for any other sum due under this Indenture. For purposes of the foregoing, "New York Banking Day" means any day except a Saturday, Sunday or a legal holiday in The City of New York or a day on which banking institutions in The City of New York are authorized or required by law or executive order to close.

SECTION 14.10 SEVERABILITY OF PROVISIONS. Any prohibition, invalidity or unenforceability of any provision of this Indenture in any jurisdiction shall not invalidate or render unenforceable the remaining provisions hereto in such jurisdiction and shall not invalidate or render unenforceable such provisions in any other jurisdiction.

SECTION 14.11 CORPORATION RELEASED FROM INDENTURE REQUIREMENTS UNDER CERTAIN CIRCUMSTANCES. Whenever in this Indenture the Corporation shall be required to do or not to do anything, so long as any of the Securities of any series shall be Outstanding, the Corporation shall, notwithstanding any such provision, not be required to comply with such provisions if it shall be entitled to have this Indenture satisfied and discharged pursuant to the provisions hereof, even though in either case the Holders of any of the Securities of that series shall have failed to present and surrender them for payment pursuant to the terms of this Indenture.

Citibank, N.A., the party of the second part, hereby accepts the trusts in this Indenture declared and provided, upon the terms and conditions hereinabove set forth.

IN WITNESS WHEREOF, GENERAL MOTORS CORPORATION, the party of the first part, has caused this Indenture to be signed and acknowledged by its Chairman of the Board or one of its Vice Chairmen of the Board or its President or one of its Executive Vice Presidents or one of its Senior Vice Presidents or one of its Vice Presidents or its Treasurer, and its Corporate seal to be affixed hereunto, and the same to be attested by its Secretary or an Assistant Secretary; and CITIBANK, N.A., the party of the second part, has caused this Indenture to be signed, and its

corporate seal to be affixed  hereunto,  and the same to be attested by its duly
authorized officers, all as of the day and year first above written.


[Corporate Seal]                    GENERAL MOTORS CORPORATION


Attest:                             By:_____ _____ _____ ____



[Corporate Seal]                    CITIBANK, N.A.

Attest:                             By:_____ _____ _____ __


STATE OF NEW YORK           )
                            ) ss.:
COUNTY OF NEW YORK          )


        On  the  ____day of December,  1995  before  me  personally  came
_____ _____, to me known, who, being by me duly sworn, did depose and say
that                    he/she              resides                     at
_____, that
he/she is the _____ of General Motors Corporation,  one of the
corporations  described in and which  executed the  foregoing  instrument;  that
he/she  knows  the  seal of said  Corporation;  that the  seal  affixed  to said
instrument is such Corporate seal; that it was so

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

affixed by authority of the Board of Directors of said Corporation, and that he/she signed his/her name thereto by like authority.

[SEAL]

Notary Public

STATE OF NEW YORK          )
                           ) ss.
COUNTY OF NEW YORK         )

On the day of    December,   1995   before me    personally   came
_____, to me known,  who, being by me duly sworn,  did depose and say
that          he/she                         resides           at
he/she is a _____ of Citibank,  N.A., one of the  corporations
described in and which executed the foregoing instrument;  that he/she knows the
seal of said corporation,  that the seal  affixed  to said  instrument  is such
corporate seal; that it was so affixed by authority of the Board of Directors of
said corporation, and that he/she signed his/her name thereto by like authority.

[SEAL]

Notary Public

EXHIBIT 5
GENERAL MOTORS CORPORATION
3031 WEST GRAND BOULEVARD
DETROIT, MICHIGAN  48202

November 14, 1995

GENERAL MOTORS CORPORATION
3044 West Grand Boulevard
Detroit, Michigan 48202

Dear Sirs:

As Attorney for General Motors Corporation (the "Corporation") in
connection with the registration of your Debt Securities and Debt Warrants
(the "Securities") which will be offered by the Corporation at an aggregate
price of up to $2,000,000,000, for issuance from time to time pursuant to
Rule 415 of the Securities Act of 1933, as amended, I advise that in my
opinion you have full power and authority under the laws of Delaware, the
State of your incorporation, and under your Certificate of Incorporation, as
amended, to borrow the money and to contract the indebtedness to be
evidenced by the said Securities.

It is my further opinion that the Indenture dated as of December ___,
1995, with Citibank, N.A., as Trustee (the "Indenture"), has been duly
authorized, executed and delivered and that the Debt Securities, as provided
in the Indenture, and the Debt Warrants, as provided in the Debt Warrant
Agreement, when duly authorized, executed and authenticated, issued and paid
for, will be valid and legally binding obligations of the Corporation in
accordance with and subject to the terms thereof and of the Indenture and
the Debt Warrant Agreement, as the case may be.

I hereby consent to the use of the foregoing opinion as Exhibit 5 of
your Registration Statement filed with the United States Securities and
Exchange Commission under the Securities Act of 1933, as amended, with
respect to the above mentioned Securities and to the use of my name in such
Registration Statement and in the related Prospectus under the heading
"Legal Opinions".

Very truly yours,

/s/ Martin I Darvick
--------------------
Martin I. Darvick
Attorney

Exhibit 8

GENERAL MOTORS CORPORATION
3044 WEST GRAND BOULEVARD
DETROIT, MICHIGAN 48202

November 14, 1995

General Motors Corporation
3044 West Grand Boulevard
Detroit, Michigan 48202

Dear Sirs:

In connection with the General Motors Corporation (the "Corporation") registration of the Medium-Term Notes Due from Nine Months or More from Date of Issue (the "Notes") which will be offered by the Corporation at an aggregate price of up to $2,000,000,000, I have acted as tax counsel to the Corporation, and in that capacity have furnished certain opinions to it. I hereby confirm to you the opinion as set forth under the heading "United States Federal Taxation" in the Prospectus Supplement covering such notes which is part of the registration statement to which this letter is attached as an exhibit. As indicated in the opinion, the discussion sets forth a general summary of all material United States Federal income tax consequences of the ownership and disposition of the Notes as applied to original holders purchasing Notes at the issue price. Holders are advised to consult their own tax advisors with regard to the application of the income tax laws to their particular situations as well as any tax consequences arising under the laws of any state, local or foreign tax jurisdiction.

I hereby consent to the filing with the Securities and Exchange Commission of this opinion as an exhibit to the Registration Statement, as amended, and the reference to tax counsel under the heading "United States Federal Taxation" in the Prospectus Supplement. By providing the foregoing consent, I do not admit that tax counsel falls within the category of persons whose consent is required under section 7 of the Securities Act of 1933, as amended.

Very truly yours,

s/ Robert N. Dietz
--------------------
Robert N. Dietz
Tax Attorney

EXHIBIT 23(a)

CONSENT OF INDEPENDENT AUDITORS

GENERAL MOTORS CORPORATION:

We consent to the incorporation by reference in this Registration
Statement on Form S-3 of General Motors Corporation of our reports dated
January 30, 1995 appearing in the Annual Report on Form 10-K of General
Motors Corporation for the year ended December 31, 1994 and to the
reference to us under the heading "Experts" in the Prospectus, which is
part of this Registration Statement.

/s/ DELOITTE & TOUCHE LLP
- --------------------------
DELOITTE & TOUCHE LLP

Detroit, Michigan
November 13, 1995

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

EXHIBIT 23(b)

CONSENT OF INDEPENDENT AUDITORS

THE BOARDS OF DIRECTORS
ELECTRONIC DATA SYSTEMS CORPORATION
GENERAL MOTORS CORPORATION

We hereby consent to the use of our report incorporated herein by
reference and to the reference to our firm under the heading "Experts" in
the Prospectus.

/s/ KPMG PEAT MARWICK LLP
- -------------------------
KPMG PEAT MARWICK LLP
Dallas, Texas
November 13, 1995

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
----------------------------

FORM T-1

STATEMENT OF ELIGIBILITY
UNDER THE TRUST INDENTURE ACT OF 1939 OF A
CORPORATION DESIGNATED TO ACT AS TRUSTEE

Check if an application to determine eligibility of a Trustee
pursuant to Section 305 (b)(2) ___
------------------------

CITIBANK, N.A.
(Exact name of trustee as specified in its charter)

13-5266470
----------------------
(I.R.S. employer
identification no.)

399 Park Avenue, New York, New York          10043
- -------------------------------------------  ----------
(Address of principal executive office)      (Zip Code)
------------------------

GENERAL MOTORS CORPORATION
(Exact name of obligor as specified in its charter)

Delaware                                     38-0572515
- -------------------------------------       --------------------
(State or other jurisdiction of              (I.R.S. employer
incorporation or organization)               identification no.)

767 FIFTH AVENUE                             10153
NEW YORK, NEW YORK                           (Zip Code)

3044 WEST GRAND BOULEVARD                    48202
DETROIT, MICHIGAN                            (Zip Code)
- --------------------------------------------------
(Address of principal executive offices)

------------------------

DEBT SECURITIES
(Title of the indenture securities)

Item 1.     General Information.

        Furnish the following information as to the trustee:

    (a)   Name and address of each examining or supervising authority to which
    it is subject.

              NAME                              ADDRESS
              Comptroller of the Currency       Washington, D.C.
              Federal Reserve Bank of New York  New York, NY
              Federal Deposit Insurance Corporation  Washington, D.C.

    (b)   Whether it is authorized to exercise corporate trust powers.

          Yes.

Item 2.     AFFILIATIONS WITH OBLIGOR.
            If the obligor is an affiliate of the trustee, describe each such
affiliation.

            None.

Item 16.    LIST OF EXHIBITS.

            Exhibit 1 - Copy of Articles of Association of the Trustee, as now
            in effect. (Exhibit 1 to T-1 to Registration Statement No. 2-79983)

            Exhibit 2 - Copy of certificate of authority of the Trustee to
            commence business. (Exhibit 2 to T-1 to Registration Statement No.
            2-29577).

            Exhibit 3 - Copy of authorization of the Trustee to exercise
            corporate trust powers. (Exhibit 3 to T-1 to Registration Statement
            No. 2-55519)

            Exhibit 4 - Copy of existing By-Laws of the Trustee. (Exhibit 4 to
            T-1 to Registration Statement No. 33-34988)

            Exhibit 5 - Not applicable.

Exhibit 6 - The consent of the Trustee required by Section 321(b) of the Trust Indenture Act of 1939. (Exhibit 6 to T-1 toRegistration Statement No. 33-19227.)

Exhibit 7 - Copy of the latest Report of Condition of Citibank, N.A.(as of June 30, 1995 - attached)

Exhibit 8 - Not applicable.

Exhibit 9 - Not applicable.


SIGNATURE

Pursuant to the requirements of the Trust Indenture Act of 1939, the Trustee, Citibank, N.A., a national banking association organized and existing under the laws of the United States of America, has duly caused this statement of eligibility to be signed on its behalf by the undersigned, thereunto duly authorized, all in The City of New York and State of New York, on the 6th day of November, 1995.


                    CITIBANK, N.A.


                         /S/CAROL NG
                    By:  Carol Ng
                         Assistant Vice President

Source: GENERAL MOTORS CORP, S-3, November 14, 1995

Charter No. 1461

Comptroller of the Currency
Northeastern District
REPORT OF CONDITION
CONSOLIDATING
DOMESTIC AND FOREIGN
SUBSIDIARIES OF

Citibank, N. A.

of New York in the State of New York,  at the close of business on June 30, 1995
published in response to call made by Comptroller  of the Currency,  under Title
12, United States Code, Section 161,  Charter Number 1461  Comptroller of the
Currency Northeastern District.

ASSETS

|  |  | Thousands of dollars |
|---|---|---|
| Cash and balances due from depository institutions: |  |  |
| Noninterest-bearing balances and currency and coin |  | $ 7,397,000 |
| Interest-bearing balances: |  | 9,242,000 |
| Securities: |  |  |
| Held-to-maturity securities |  | 4,013,000 |
| Available-for-sale securities |  | 12,199,000 |
| Federal funds sold and securities purchased under agreements to resell in domestic offices of the bank and of its Edge and Agreement subsidiaries, and in IBFs: Federal funds sold |  | 3,468,000 |
| Securities purchased under agreements to resell |  | 519,000 |
| Loans and lease financing receivables: |  |  |
| Loans and leases, net of unearned income | $136,294,000 |  |
| LESS: Allowance for loan and lease losses | 4,401,000 |  |
|  | ------------- |  |
| Loans and leases, net of unearned income and allowance |  | 131,893,000 |
| Assets held in trading accounts |  | 33,328,000 |
| Premises and fixed assets (including capitalized leases) |  | 3,463,000 |
| Other real estate owned |  | 1,299,000 |
| Investments in unconsolidated subsidiaries and associated companies |  | 1,039,000 |
| Customers' liability to this bank on acceptances outstanding |  | 1,408,000 |
| Intangible assets |  | 14,000 |
| Other assets |  | 7,825,000 |
|  |  | ------------- |
| TOTAL ASSETS |  | $217,107,000 |
|  |  | ============ |

LIABILITIES

| Deposits: |  |  |
|---|---|---|
| In domestic offices |  | $ 33,302,000 |
| Noninterest-bearing | $ 11,799,000 |  |
| Interest-bearing | 21,503,000 |  |
|  | - ------------ |  |
| In foreign offices, Edge and Agreement subsidiaries, and IBFs |  | 116,776,000 |
| Noninterest-bearing | 8,429,000 |  |
| Interest-bearing | 108,347,000 |  |
|  | ------------ |  |
| Federal funds  purchased and securities  sold under  agreements to repurchase in domestic offices of the bank and of its Edge and Agreement  subsidiaries,  and in IBFs: |  |  |
| Federal funds purchased |  | 1,756,000 |
| Securities sold under agreements to repurchase |  | 675,000 |
| Trading liabilities |  | 22,079,000 |
| Other borrowed money: |  |  |
| With original maturity of one year or less |  | 8,224,000 |
| With original maturity of more than one year |  | 4,321,000 |
| Mortgage indebtedness and obligations under capitalized leases |  | 107,000 |

| | |
|---|---:|
| Bank's liability on acceptances executed and outstanding | 1,418,000 |
| Notes and debentures subordinated to deposits | 5,700,000 |
| Other liabilities | 7,752,000 |
| | ------------- |
| TOTAL LIABILITIES | $202,110,000 |
| | ============= |

### EQUITY CAPITAL

| | |
|---|---:|
| Common stock | $    751,000 |
| Surplus | 6,686,000 |
| Undivided profits and capital reserves | 7,855,000 |
| Net unrealized holding gains (losses) on available-for-sale securities | 246,000 |
| Cumulative foreign currency translation adjustments | (541,000) |
| | ------------- |
| TOTAL EQUITY CAPITAL | $ 14,997,000 |
| | ------------- |
| TOTAL LIABILITIES AND EQUITY CAPITAL | $217,107,000 |
| | ============= |

I, Roger W. Trupin,  Controller of the above-named  bank do hereby declare
that this Report of  Condition  is true and correct to the best of my  knowledge
and belief.

ROGER W. TRUPIN

We, the undersigned directors, attest to the correctness of this Report of
Condition.  We declare  that it has been  examined by us, and to the best of our
knowledge and belief has been prepared in conformance  with the instructions and
is true and correct.

CHRISTOPHER J. STEFFEN
WILLIAM R. RHODES
PAUL J. COLLINS                                    Directors

Created by 10KWizard    www.10KWizard.com

FORM 8-A

(Amendment No.1)

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FOR REGISTRATION OF CERTAIN CLASSES OF SECURITIES PURSUANT TO SECTION 12(b)
OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934

GENERAL MOTORS CORPORATION
---------------------------
(Exact name of registrant as specified in its charter)

| Delaware | TIN# 38-0572515 |
|----------|-----------------|
| (State of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 300 Renaissance Center | |
| Detroit, Michigan | 48265-3000 |
| (Address of principal executive offices) | (Zip Code) |

If this form relates to the registration of a class of securities pursuant to
Section 12(b) of the Exchange Act and is effective pursuant to General
Instruction A.(c), check the following box. [X]

If this form relates to the registration of a class of securities pursuant to
Section 12(g) of the Exchange Act and is effective pursuant to General
Instruction A.(d), check the following box. [ ]

Securities Act registration statement file number to which this form relates:
333-75534 and 333-83514.

Securities to be registered pursuant to Section 12(b) of the Act:

| Title of each class to be registered | Name of each exchange on which each class is to be registered |
|--------------------------------------|----------------------------------------------------------------|
| 5.25% Series B Convertible Senior Debentures  due 2032 | New York Stock Exchange, Inc. |

Securities to be registered pursuant to Section 12(g) of the Act: None

Information Required in Registration Statement

Item 1 and Item 2 are hereby amended and restated as follows:

Item 1.    Description of Registrant's Securities to be Registered.

A description of the 5.25% Series B Convertible Senior Debentures due 2032 of
the Registrant is contained in the "Description of Debt Securities" set forth in
the Prospectus dated January 2, 2002 (filed as part of the Registration
Statement on Form S-3 (Registration No. 333-75534) of the Registrant under the
Securities Act of 1993, as amended) and in the "Description of Series B
Debentures" set forth in the related Prospectus Supplement of the Registrant
dated February 28, 2002, which descriptions are incorporated herein by
reference.

Item 2.       Exhibits.

| Number | Description |
|--------|-------------|
| 1. | Restated Certificate of Incorporation of the Registrant, as amended and supplemented to date. See Exhibit 3(a) to the most recent Form 10-K or Form 10-Q as appropriate. |
| 2. | By-Laws of the Registrant, as amended and supplemented to date.  See Exhibit 3(b) to the most recent Form 10-K or 10-Q as appropriate. |

3.    Senior Debt Indenture, dated as of December 7, 1995,
      by and between the Registrant and Citibank, N.A. as
      trustee, incorporated herein by reference to Exhibit 4(a)
      of the Registration Statement on Form S-3 (No. 33-64229)
      of the Registrant filed on November 14, 1995.

4.    First Supplemental Indenture, dated as of March 4, 2002
      by and between the Registrant and Citibank, N.A. as
      trustee.

5.    Form of 5.25% Series B Convertible Senior Debentures
      due 2032.


Signature


Pursuant to the requirements of Section 12 of the Securities and Exchange Act of
1934, as amended, the Registrant has duly caused this registration statement to
be signed on its behalf by the undersigned, thereto duly authorized.


                        General Motors Corporation
                        --------------------------
                              (Registrant)


Date: March 6, 2002        By:        /s/ Sanjiv Khattri
                           ------------------------------------
                           Sanjiv Khattri, Assistant Treasurer

Source: GENERAL MOTORS CORP, 8-A12B/A, March 06, 2002

EXHIBIT 4

GENERAL MOTORS CORPORATION

and

CITIBANK, N.A.,

Trustee

FIRST SUPPLEMENTAL INDENTURE

Dated as of March 4, 2002

## SUPPLEMENTAL INDENTURE

FIRST SUPPLEMENTAL INDENTURE, dated as of March 4, 2002, between GENERAL MOTORS CORPORATION, a corporation duly organized and existing under the laws of the State of Delaware (the "Corporation"), and CITIBANK, N.A., a national banking association duly organized and existing under the laws of the United States of America (the "Trustee", which term shall include any successor trustee appointed pursuant to Article Seven of the Indenture (as defined below)).

### WITNESSETH:

WHEREAS, the Corporation and the Trustee have heretofore executed and delivered the Indenture, dated as of December 7, 1995 (the "Indenture"), providing for the issuance from time to time of one or more series of debt securities evidencing unsecured indebtedness of the Corporation (the "Securities"). Terms used in this First Supplemental Indenture which are defined in the Indenture shall have the meanings assigned to them in the Indenture.

WHEREAS, this First Supplemental Indenture amends the Indenture, pursuant to Section 10.01 thereof, in order to permit the issuance of Securities that may be converted into any securities of any person.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree for the equal and proportionate benefit of the respective Holders from time to time hereafter of the Securities as follows:

### ARTICLE ONE

Section 1. Section 1.01 of the Indenture shall be amended by adding the following paragraph immediately prior to the definition of "Additional Amounts":

When used with respect to any Security, the words "convert", "converted" and "conversion" are intended to refer to the right of the Holder or the Corporation to convert or exchange such Security into or for securities or other property in accordance with such terms, if any, as may hereafter be specified for such Security as contemplated by Section 2.01, and these words are not intended to refer to any right of the Holder or the Corporation to exchange such Security for other Securities of the same series and like tenor pursuant to Section 2.05, 2.06, 2.07, or 10.04 or another similar provision of this Indenture, unless the context otherwise requires; and references herein to the terms of any Security that may be converted mean such terms as may be specified for such Security as contemplated in Section 2.01.

Section 2. Section 1.01 of the Indenture shall be amended by adding the following paragraph immediately prior to the definition of "Corporate Trust Office":

The term "Conversion Agent" shall mean initially Citibank, N.A. and subsequently, any other conversion agent appointed by the Corporation from time to time in respect of the Securities.

Section 3. Section 2.01 of the Indenture shall be amended by deleting paragraphs (16) and (17) thereof and replacing them with the following paragraphs:

(16) any trustees, depositaries, authenticating and paying agents, transfer agents, registrars or any other agents with respect to the

Security of such series;

(17) the terms, if any, on which Holders of Securities may convert or exchange Securities of the series into any securities of any person; and

(18) any other terms of the series (which terms shall not be inconsistent with the provisions of this Indenture).

Section 4. Section 3.02 of the Indenture shall be amended by deleting Section 3.02 in its entirety and adding a new Section 3.02 to read as follows:

Section 3.02 Notice of Redemption; Selection of Securities. The election of the Corporation to redeem any Securities shall be evidenced by an Officers' Certificate. In case the Corporation shall desire to exercise the right to redeem all, or, as the case may be, any part of a series of Securities pursuant to the terms and provisions applicable to such series, it shall fix a date for redemption and shall mail a notice of such redemption at least thirty and not more than sixty days prior to the date fixed for redemption to the Holders of the Securities of such series which are Registered Securities to be redeemed as a whole or in part at their last addresses as the same appear on the Security Register. Such mailing shall be by prepaid first class mail. Any notice which is mailed in the manner herein provided shall be conclusively presumed to have been duly given, whether or not the Holder shall have received such notice. In any case, failure to give notice by mail, or any defect in the notice to the Holder of any Security of a series designated for redemption as a whole or in part shall not affect the validity of the proceedings for the redemption of any other Security of such series.

Notice of redemption to the Holders of Unregistered Securities to be redeemed as a whole or in part, who have filed their names and addresses with the Trustee as described in Section 5.04, shall be given by mailing notice of such redemption, by first class mail, postage prepaid, at least thirty days and not more than sixty days prior to the date fixed for redemption, to such Holders at such addresses as were so furnished to the Trustee (and, in the case of any such notice given by the Corporation, the Trustee shall make such information available to the Corporation for such purpose). Notice of redemption to any other Holder of an Unregistered Security of such series shall be published in an Authorized Newspaper in the Borough of Manhattan, The City of New York and in an Authorized Newspaper in London (and, if required by Section 4.04, in an Authorized Newspaper in Luxembourg), in each case, once in each of two successive calendar weeks, the first publication to be not less than thirty nor more than sixty days prior to the date fixed for redemption. Any notice which is mailed in the manner herein provided shall be conclusively presumed to have been duly given, whether or not the Holder shall have received such notice. In any case, failure to give notice by mail, or any defect in the notice to the Holder of any Security of a series designated for redemption as a whole or in part shall not affect the validity of the proceedings for the redemption of any other Security of such series.

Each such notice of redemption shall specify the provisions of such Securities under which such redemption is made, that the conditions precedent, if any, to such redemption have occurred, shall describe the same and the date fixed for redemption, the redemption price at which such Securities are to be redeemed, the Place of Payment, that payment will be made upon presentation and surrender of such Securities and, in the case of Coupon Securities, of all Coupons appertaining thereto maturing after the date fixed for redemption, that interest and Additional Amounts, if any, accrued to the date fixed for redemption will be paid as specified in said notice, and that on and after said date interest, if any, thereon or on the portions thereof to be redeemed will cease to accrue. If less than all of the Securities of a series are to be redeemed any notice of redemption published in an Authorized Newspaper shall specify the numbers of the Securities to be redeemed. In case any Security is to be redeemed in part only, the notice of redemption shall state the portion of the principal amount thereof to be redeemed and shall state that upon surrender of such Security, a new Security or Securities in principal amount equal to the unredeemed portion thereof will be issued of the same series. In case any Security is convertible, the notice of redemption shall state the terms of conversion, the date on which the right to convert the Security to be redeemed will terminate and the place or places where such Security may be surrendered for conversion.

At least one Business Day prior to the redemption date specified in the notice of redemption given for Unregistered Securities as provided in this Section and on or prior to the redemption date specified in the notice of redemption given for all Securities other than Unregistered Securities, the Corporation will deposit in trust with the Trustee or with one or more paying agents an amount of money sufficient to redeem on the redemption date all the Securities or portions of Securities so called for redemption, other than any Securities called for redemption on the redemption date which have been converted prior to the date of such deposit, at the appropriate redemption price, together with accrued interest, if any, to the date fixed for redemption. The Corporation will give the Trustee notice of each redemption at least forty-five days prior to the date fixed for redemption (unless a shorter notice is acceptable to the Trustee) as to the aggregate principal amount of Securities to be

redeemed. In case of redemption of less than all Securities, the Issuer will give the Trustee sixty days prior notice.

If less than all of the Securities of a series are to be redeemed, the Trustee shall select, pro rata or by lot or in such other manner as it shall deem reasonable and fair, the numbers of the Securities to be redeemed in whole or in part.

If any Security selected for partial redemption is converted in part before termination of the conversion right with respect to the portion of the Security so selected, the converted portion of such Security shall be deemed (so far as may be) to be the portion selected for redemption. Securities which have been converted during a selection of Securities to be redeemed shall be treated by the Trustee as outstanding for the purpose of such selection.

If any Security called for redemption is converted, any money deposited with the Trustee or with any paying agent or so segregated and held in trust for the redemption of such Security shall (subject to any right of the Holder of such Security or any predecessor Security to receive interest as provided in the last paragraph of Section 4.01 or in the terms of such Security) be paid to the Corporation upon its request or, if then held by the Corporation, shall be discharged from such trust.

Section 5. The last paragraph of Section 3.03 shall be replaced with the following new Section 3.04:

Section 3.04. Securities Redeemed in Part. Upon presentation of any Security redeemed in part only, the Corporation shall execute and the Trustee shall authenticate and deliver to the Holder thereof, at the expense of the Corporation, a new Security or Securities, of authorized denominations, in aggregate principal amount equal to the unredeemed portion of the Security so presented of the same series.

Section 6. The first sentence of Section 4.02 shall be deleted, and a new first sentence shall be added, to read in its entirety as follows:

As long as any of the Securities of a series remain outstanding, the Corporation will designate and maintain, in the Borough of Manhattan, The City of New York, an office or agency where the Registered Securities of such series may be presented for registration of transfer or exchange or for conversion as in this Indenture provided, an office or agency where notices and demands to or upon the Corporation in respect of the Securities of such series or of this Indenture may be served, and an office or agency where the Securities of such series may be presented for payment.

Section 7. Section 6.08 shall be amended by adding the following at the end of the paragraph after the phrase "expressed in such Security":

(or, in the case of redemption, on or after the redemption date) or for the enforcement of the right to convert any Security in accordance with its terms.

Section 8. Section 10.01 shall be amended by deleting the word "and" at the end of paragraph (f) thereof, deleting the period and adding the word "; and" at the end of paragraph (g) thereof, and adding the following paragraph (h):

(h) to add to or change any of the provisions of this Indenture with respect to any Securities that by their terms may be converted into any securities of any person, in order to permit or facilitate the issuance, payment or conversion of such Securities.

Section 9. Section 10.02 shall be amended by making provisions (ii) and (iii) in the first paragraph thereof into new provisions (iii) and (iv), respectively, and by adding a new (ii) as follows:

(ii) in the case of Securities that are convertible, change in any manner adverse to the Holders (A) the amounts payable upon the redemption of the Securities, (B) the dates, if any, on which the Holders have the right to require the Corporation to repurchase the Securities, or the transactions or events, if any, upon which the Holders have the right to require the Corporation to repurchase the Securities or the amounts payable upon the repurchase thereof or (C) the circumstances, if any, under which the Holders have the right to convert the Securities or the amounts receivable upon conversion thereof (but excluding from operation of this clause (ii) any adjustment to the conversion rate) or

Section 10. Section 14.05 of the Indenture shall be amended by deleting Section 14.05 in its entirety and adding a new Section 14.05 to read as follows:

Section 14.05. Legal Holidays. In any case where the date of maturity of any interest, premium or Additional Amounts on or principal of the Securities, the date fixed for redemption of any Securities or any date on which a holder has the right to convert his Security shall not be a Business Day in a city where payment thereof is to be made, then payment of any interest, premium or Additional Amounts on, or principal of such Securities need not be made on such date in such city but may be made on

the next succeeding Business Day with the same force and effect as if made
on the date of maturity or the date fixed for redemption, and no interest
shall accrue for the period after such date.

ARTICLE TWO

Section 1. Recitals. The recitals contained herein shall be taken on the
statements of the Corporation and the Trustee assumes no responsibility for
their correctness. The Trustee makes no representation as to the validity or
sufficiency of this First Supplemental Indenture.

Section 2. Counterparts. This First Supplemental Indenture may be executed
in any number of counterparts, each of which shall be an original; but such
counterparts shall together constitute but one and the same instrument.

Section 3. New York Contract. This Indenture and each Security shall be
deemed to be a contract made under the law of the State of New York, and for all
purposes shall be governed by and construed in accordance with the laws of the
said State, regardless of the laws that might otherwise govern under applicable
New York principles of conflicts of law and except as may otherwise be required
by mandatory provisions of law. Any claims or proceedings in respect of this
First Supplemental Indenture shall be heard in a federal or state court located
in the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this First Supplemental Indenture to be duly executed.

GENERAL MOTORS CORPORATION

By: _____
    Name: Antoinette Skeete
    Title: Assistant Secretary

CITIBANK, N.A., as Trustee

By: _____
    Name:
    Title

EXHIBIT 5
R-

Unless this certificate is presented by an authorized representative of The
Depository Trust Company, a New York corporation ("DTC"), to the Company or its
agent for registration of transfer, exchange or payment, and any certificate
issued is registered in the name of Cede & Co. or such other name as requested
by an authorized representative of DTC (and any payment is made to Cede & Co. or
to such other entity as is requested by an authorized representative of DTC),
ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY
PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an
interest herein.

## GENERAL MOTORS CORPORATION

5.25% Series B Convertible Senior Debentures Due March 6, 2032 (the "Series B
Debentures")

### CUSIP 370442733

GENERAL MOTORS CORPORATION, a Delaware corporation (hereinafter called the
"Company"), for value received, hereby promises to pay to Cede & Co., or
registered assigns, the principal sum of _____DOLLARS ($_____) at
the office or agency of the Company for such purpose in the Borough of
Manhattan, The City of New York, on March 6, 2032, in such coin or currency of
the United States of America as at the time of payment shall be legal tender for
the payment of public and private debts, and to pay interest on said principal
sum at the rate of 5.25% per annum at the office or agency of the Company in the
Borough of Manhattan, The City of New York, in like coin or currency from the
first day of March or September as the case may be, to which interest on the
Global Debentures has been paid preceding the date hereof (unless the date
hereof is March 1 or September 1, to which interest has been paid, in which case
from the date hereof, or unless no interest has been paid on the Global
Debentures since the original issuance of this Global Debenture, in which case
from March 6, 2002), semi-annually on March 1 and September 1 (each, an
"Interest Payment Date"), until payment of said principal sum has been made or
duly provided for. The first payment to be made on September 1, 2002 is in
respect of the period from March 6, 2002 to September 1, 2002. Notwithstanding
the foregoing, if the date hereof is after February 15 or August 15, as the case
may be, and before the following March 1 or September 1, this Global Debenture
shall bear interest from such March 1 or September 1; provided, however, that if
the Company shall default in the payment of interest due on such March 1 or
September 1, then this Global Debenture shall bear interest from the next
preceding March 1 or September 1 to which interest has been paid or, if no
interest has been paid on the Global Debentures since the original issuance of
the Global Debentures, from March 6, 2002. The interest so payable on any March
1 or September 1 will, subject to certain exceptions provided in the Indenture
referred to below, be paid to the person in whose name this Global Debenture is
registered at the close of business on the fifteenth day of the calendar month
preceding such March 1 or September 1 (each, a "Record Date"), except that if
the Series B Debentures are to be redeemed by the Company or purchased by the
Company at the option of the Holder on a date that falls on or after a Record
Date and prior to the corresponding Interest Payment Date, the interest so
payable will be paid to the Holder that tenders the Series B Debentures for
redemption or purchase, as the case may be. At the option of the Company,
interest may be paid by check to the registered Holder hereof entitled thereto
at his last address as it appears on the registry books, and principal may be
paid by check to the registered Holder hereof or other person entitled thereto
against surrender of this Global Debenture. If any March 1 or September 1 falls
on a day that is not a Business Day (as defined below), payment of interest
shall be made on the next succeeding Business Day with the same force and effect
as if made on that date, but no additional interest shall accrue as a result of
such delay in payment. Interest payable on the final maturity date of the Series
B Debentures, or on any redemption date or any repayment date that is not an
Interest Payment Date, will be paid to the person entitled to payment of
principal on the Series B Debentures.

This Global Debenture is one of a duly authorized issue of debentures, notes,
bonds or other evidences of indebtedness of the Company (hereinafter called the
"Series B Debentures") of the series herein specified, all issued or to be
issued under and pursuant to an indenture dated as of December 7, 1995, as
supplemented by the First Supplemental Indenture, dated as of March 4, 2002
(herein called the "Indenture"), duly executed and delivered by the Company to
Citibank, N.A. (herein called the "Trustee"), to which Indenture and all
indentures supplemental thereto reference is hereby made for a description of
the rights, limitations of rights, obligations, duties and immunities thereunder
of the Trustee, the Company and the Holders of the Series B Debentures. This
Global Debenture represents $_____ of the Series B Debentures, limited
in aggregate principal amount to $2,600,000,000. The Global Debentures will bear
interest, calculated on the basis of a 360-day year consisting of twelve 30-day
months.

In case an Event of Default, as defined in the Indenture, with respect to the
Series B Debentures shall have occurred and be continuing, the principal hereof
may be declared, and upon such declaration shall become, due and payable in the
manner, with the effect and subject to the conditions provided in the Indenture.

The Indenture contains provisions permitting the Company and the Trustee, with
the consent of the Holders of not less than a majority in aggregate principal

amount of the Securities at the time Outstanding of all series to be affected (voting as one class), evidenced as in the Indenture provided, to execute supplemental indentures adding any provisions to or changing in any manner or eliminating any of the provisions of the Indenture or of any supplemental indenture or modifying in any manner the rights of the Holders of the Securities of each such series; provided, that no such supplemental indenture shall (i) extend the final maturity of any Security, or reduce the principal amount thereof or any premium thereon, or reduce the rate or extend the time of payment of any interest thereon, or impair or affect the rights of any Holder to institute suit for the payment thereof, without the consent of the Holder of each Security so affected, (ii) change in any manner adverse to the Holders (A) the amount payable upon redemption of the Securities under Section 4 below, (B) the dates on which the Holders have the right under Section 5 below to require the Company to repurchase the Securities, or the transactions or events upon which the Holders have the right under Section 6 below to require the Company to repurchase the Securities or the amounts payable upon the repurchase thereof or (C) the circumstances under which the Holders have the right under Section 1 below to convert the Securities or the amounts receivable upon conversion thereof (but excluding from the operation of this clause (ii) any adjustment to the conversion rate), in each case without the consent of the Holder of each Security so affected, or (iii) reduce the aforesaid percentage of Securities, the Holders of which are required to consent to any such supplemental indenture, without the consent of the Holder of each Security affected. Any such consent or waiver by the Holder of this Global Debenture shall be conclusive and binding upon such Holder and upon all future Holders of this Global Debenture and of any Global Debenture issued upon the registration of transfer hereof or in lieu hereof, whether or not notation for such consent or waiver is made upon this Global Debenture.

No reference herein to the Indenture and no provision of this Global Debenture or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and interest on this Global Debenture at the place, at the respective times, at the rate, and in the coin or currency, herein prescribed.

The Company may from time to time, without notice to or the consent of the registered Holders of the Global Debentures, create and issue further debentures ranking pari passu (the "further Series B Debentures") with the Global Debentures in all respects (or in all respects except for the payment of interest accruing prior to the issue date of such further Series B Debentures or except for the first payment of interest following the issue date of such further Series B Debentures) and so that such further Series B Debentures may be consolidated and form a single series with the Global Debentures and have the same terms as to status, redemption or otherwise as the Global Debentures.

    Section 1.  Conversion Privilege

    Subject to and upon compliance with the provisions set forth below and in the Indenture, upon the occurrence of one of the events set forth below, a Holder of the Series B Debentures shall have the right, at its option, at any time after the original issuance of the Series B Debentures hereunder through 5:00 p.m., New York City time, on the final maturity date of the Series B Debentures (except that, with respect to any Series B Debenture or portion of a Series B Debenture that shall be called for redemption, such right shall terminate at the close of business on the Business Day next preceding the date fixed for redemption of such Series B Debenture or portion of a Series B Debenture unless the Company shall default in payment due upon redemption thereof) to convert the principal amount of this Series B Debenture, or any portion of such principal amount that is an integral multiple of $25.00, into fully paid and nonassessable shares of the Company's $12/3 par value common stock (the "Common Stock") at the conversion rate (the "Conversion Rate") in effect at such time, by surrender of the Series B Debenture so to be converted, together with any required funds, in the manner provided in Section 2 below. The Conversion Rate is 0.3852 shares per $25.00 principal amount, subject to adjustment from time to time as set forth in Section 3 below.

    Other than in the case of a Principal Value Conversion (as defined below), if the Company elects, it may, in lieu of delivering shares of Common Stock, pay to Holders tendering Series B Debentures for conversion an amount in cash per Series B Debenture (for all or any portion of such converted Series B Debentures) equal to: (1) the average Closing Sale Price of the Common Stock for the five consecutive Trading Days immediately following the date of the Company's notice of its election to deliver cash, multiplied by (2) the number of shares of Common Stock that the Holder would otherwise be entitled to receive upon conversion. On a selective basis, the Company may also pay cash in lieu of shares of Common Stock in the event that the issuance of shares of Common Stock is prohibited by law. The Company will inform Holders through the Trustee no later than two Business Days following the Conversion Date of its election to pay cash in lieu of delivering shares of Common Stock. The Company may not change its election with respect to the consideration to be delivered upon conversion of a Series B Debenture once it has provided such notice to the Holders. Cash will be delivered to Holders on the second Business Day after the fifth Trading Day following the date of the Company's notice of its election to deliver cash. "Conversion Date" means, with respect to any Holder, the date that the Conversion Agent is notified by the Depository of the due completion of the procedures of the Depository with respect to conversion, or the due surrender of such Holder's Series B Debentures for conversion as provided below.

    (a) The Series B Debentures shall be convertible only upon the occurrence

of one of the following events:

(1)    during any fiscal quarter commencing after March 31, 2002 if the Closing
       Sale Price of the Common Stock exceeds 120% of the Conversion Price for at
       least 20 Trading Days in the 30 consecutive Trading Days ending on the
       last Trading Day of the immediately preceding fiscal quarter (it being
       understood for purposes of this paragraph that the Conversion Price in
       effect on the close of each of the 30 consecutive Trading Days shall be
       used);

(2)    during the five Business Day period after any nine consecutive Trading Day
       period in which the Trading Price of the Series B Debentures for each day
       of such period was less than 95% of the product of the Closing Sale Price
       of the Common Stock multiplied by the number of shares of Common Stock
       issuable upon conversion of each $25.00 principal amount of the Series B
       Debentures; provided, that if on the date of any conversion pursuant to
       this paragraph the Closing Sale Price of the Common Stock is greater than
       the Conversion Price, a Holder shall receive, in lieu of Common Stock
       based on the Conversion Price, cash or Common Stock or a combination of
       both, at the Company's option, with a value equal to the principal amount
       of the Holder's Series B Debentures plus accrued interest as of the
       conversion date (a "Principal Value Conversion");

(3)    if the Series B Debentures have been called for redemption, at any time on
       or after the date the notice of redemption has been given until the close
       of business on the Business Day immediately preceding the redemption date;
       or

(4)    as provided in paragraph (b) below.

       The Conversion Agent shall, on behalf of the Company, determine on a
       daily basis whether the Series B Debentures shall be convertible as a
       result of the occurrence of an event specified in clause (a)
       above; provided, that the Company and not the Conversion Agent shall
       be responsible for determining, on a daily basis, the Closing Sale
       Price of the Common Stock. If the Series B Debentures shall be so
       convertible, the Company shall promptly deliver to the Conversion
       Agent and the Trustee written notice thereof. Whenever the Series B
       Debentures shall become convertible, the Company or, at the
       Company's request, the Trustee in the name and at the expense of the
       Company, shall notify Holders of the event triggering such
       convertibility in the manner set forth in Section 1.02 of the
       Indenture, at the Holder's address as it appears on the registration
       books of the Company, and the Company shall also publicly announce
       such information and publish it on the Company's Web site or such
       other public medium as the Company may use at the time. Any notice
       so given shall be conclusively presumed to have been duly given,
       whether or not a Holder receives such notice.

       (b)    In the event that:

(1)    (A) the Company distributes to all Holders of its shares of Common Stock
       rights or warrants entitling them (for a period expiring within 45 days of
       the record date for the determination of the stockholders entitled to
       receive such distribution) to subscribe for or purchase shares of Common
       Stock, at a price per share less than the average of the Closing Sale
       Prices of the Common Stock for the ten Trading Days immediately preceding,
       but not including, the date such distribution is first publicly announced
       by the Company, or (B) the Company distributes to all Holders of its
       shares of Common Stock, cash or other assets, debt securities or rights or
       warrants to purchase its securities, where the Fair Market Value of such
       distribution per share of Common Stock exceeds 15% of the Closing Sale
       Price of a share of Common Stock on the Trading Day immediately preceding,
       but not including, the date such distribution is first publicly announced
       by the Company, then, in either case, the Series B Debentures may be
       surrendered for conversion at any time on and after the date that the
       Company gives notice to the Holders of such right, which shall be not less
       than 10 days prior to the Ex-Dividend Time for such distribution, until
       the earlier of the close of business on the Business Day immediately
       preceding, but not including, the Ex-Dividend Time or the date the Company
       publicly announces that such distribution will not take place; provided
       that, no adjustment to the Conversion Price or the ability of a Holder of
       a Series B Debenture to convert will be made if the Holder will otherwise
       participate in such distribution without conversion; or

(2)    (A) the Company consolidates with or merges with or into another person or
       conveys, transfers, sells, leases or otherwise disposes of all or
       substantially all of its properties and assets, (B) the Company is not the
       resulting or surviving entity, (C) such transaction is not with an
       Affiliate of the Company and (D) after the completion or consummation of
       such transaction either (i) more than 50% of the surviving or resulting
       entity's Voting Stock is not held by the Company's pre-transaction
       shareholders or (ii) more than 50% of the surviving or resulting entity's
       directors were not directors of the Company or directors approved by the
       Board of Directors immediately prior to the transaction, then the Series B
       Debentures may be surrendered for conversion at any time from and after
       the date 15 days prior to the anticipated effective date of the
       transaction and ending on and including the date 15 days after the
       consummation of the transaction. The Board of Directors shall determine

Source: GENERAL MOTORS CORP, 8-A12B/A, March 06, 2002

the anticipated effective date of the transaction, and such determination shall be conclusive and binding on the Holders and shall be publicly announced by the Company and posted on its Web site or such other public medium as the Company may use at the time not later than two Business Days prior to the 30 day period described in the preceding sentence.

"Affiliate" of any specified person means any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. For the purposes of this definition, "control" when used with respect to any specified person means the power to direct or cause the direction of the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Business Day" means each day of the year other than a Saturday or Sunday on which banking institutions in The City of New York are not authorized or obligated to close.

"Capital Stock" for any corporation means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) stock issued by that corporation.

"Closing Sale Price" on any date means the closing per share price of the Common Stock (or, if no closing sale price is reported, the average of the closing bid and ask prices) on such date as reported on the New York Stock Exchange, or if the Common Stock is not listed on the New York Stock Exchange, as reported on a national securities exchange, or if not reported on a national securities exchange, as reported by the NASDAQ National Market, in each case calculated without reference to extended or after-hours trading. In the absence of such a quotation, the Company shall determine the Closing Sale Price on the basis of such quotations as it considers appropriate.

"Conversion Price" per share of Common Stock means, on any date, $25.00 principal amount of the Series B Debentures divided by the Conversion Rate as of that date.

"Ex-Dividend Time" means, with respect to any issuance or distribution on shares of Common Stock, the first date on which the shares of Common Stock trade regular way on the principal securities market on which the shares of Common Stock are then traded without the right to receive such issuance or distribution.

"Trading Day" means a day during which trading in the Common Stock occurs regular way on the New York Stock Exchange, or if the Common Stock is not listed on the New York Stock Exchange, on the principal other national or regional securities exchange on which the Common Stock is then listed, or, if the Common Stock is not listed on a national or regional securities exchange, as reported by NASDAQ National Market, or, if the Common Stock is not so reported, as reported on the principal other market on which the Common Stock is then traded.

"Trading Price" means, on any date, the average of the secondary market bid quotations per Series B Debenture obtained by the Conversion Agent for $10,000,000 principal amount of Series B Debentures at approximately 3:30 p.m., New York City time, on such date from three independent nationally recognized securities dealers selected by the Company; provided, that if at least three such bids cannot reasonably be obtained by the Conversion Agent, but two bids are obtained, then the average of the two bids shall be used, and if only one such bid can reasonably be obtained by the Conversion Agent, this one bid shall be used; and provided further, that if the Conversion Agent cannot reasonably obtain at least one bid for $10,000,000 principal amount of Series B Debentures from a nationally recognized securities dealer or in the Company's reasonable judgment, the bid quotations are not indicative of the secondary market value of the Series B Debentures, then the Trading Price of the Series B Debentures shall be deemed to be less than 95% of the product of the Closing Sale Price of the Common Stock multiplied by the number of shares of Common Stock issuable upon conversion of $25.00 principal amount of the Series B Debentures. The Conversion Agent shall have no obligation to determine the Trading Price of the Series B Debentures unless the Company has requested such a determination; and the Company shall have no obligation to make such request unless a Holder provides it with reasonable evidence that the trading price of the Series B Debentures would be less than 95% of the product of the Closing Sale Price of the Common Stock and the number of shares issuable upon conversion of $25.00 principal amount of Series B Debentures. If such evidence is provided, the Company shall instruct the Conversion Agent to determine the Trading Price of the Series B Debentures beginning on the next Trading Day and on each successive Trading Day until the Trading Price is greater than or equal to 95% of the product of the Closing Sale Price of the Common Stock and the number of shares issuable upon conversion of $25.00 principal amount of the Series B Debentures.

"Voting Stock" of a person means Capital Stock of such person of the class or classes pursuant to which the Holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors, managers or trustees of such person (irrespective of whether or not at the time Capital Stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

A Series B Debenture in respect of which a Holder is exercising its option to require redemption pursuant to Section 5 hereof or redemption upon a

Source: GENERAL MOTORS CORP, 8-A12B/A, March 06, 2002

Fundamental Change pursuant to Section 6 hereof may be converted only if such
Holder withdraws its election in accordance with Section 5 hereof or Section 6
hereof, as the case may be. A Holder of Series B Debentures is not entitled to
any rights of a Holder of Common Stock until such Holder has converted its
Series B Debentures to Common Stock, and only to the extent such Series B
Debentures are deemed to have been converted to Common Stock in accordance with
the terms of this Global Debenture.

Section 2.   Conversion Procedures

Each Series B Debenture shall be convertible at the office of the
Conversion Agent into fully paid and nonassessable shares (calculated to the
nearest 1/100th of a share) of Common Stock. Unless the Company elects
otherwise, or unless it is a Principal Value Conversion, the Series B Debenture
will be converted into shares of Common Stock at the Conversion Price therefor.
No payment or adjustment shall be made in respect of dividends on the Common
Stock or accrued interest on a converted Series B Debenture.

In the case of a Principal Value Conversion, a Holder will receive, in
lieu of Common Stock, cash, Common Stock, or a combination of cash and Common
Stock, at the Company's option, with a value equal to the principal amount of
the Series B Debenture converted plus accrued interest as of the conversion
date. If a Holder surrenders its debentures for conversion and it is a Principal
Value Conversion, the Company will notify the Holder by the second Trading Day
following the Conversion Date whether it will pay the principal amount plus
accrued interest in cash, Common Stock, or a combination of cash and Common
Stock, and in what percentage. Any Common Stock delivered upon a Principal Value
Conversion will be valued at the greater of (x) the Conversion Price on the
Conversion Date and (y) the Closing Sale Price on the third Trading Day after
the Conversion Date. The Company will pay any portion of the principal amount
plus accrued interest to be paid in cash on the third Trading Day after the
Conversion Date. If the Company elects to deliver Common Stock to pay any
portion of such principal amount plus accrued interest, it will deliver Common
Stock on the fourth Trading Day following the Conversion Date.

The Company shall not issue any fraction of a share of Common Stock in
connection with any conversion of Series B Debentures, but instead shall make a
cash payment (calculated to the nearest cent) equal to such fraction multiplied
by the Closing Sale Price of the Common Stock on the last Trading Day prior to
the date of conversion. Holders will not receive any payment (whether in cash or
Common Stock) on conversion of a Series B Debenture representing accrued
interest. Instead, accrued interest will be deemed to be cancelled, extinguished
and forfeited upon conversion.

Before any Holder of a Series B Debenture shall be entitled to convert the
same into Common Stock, such Holder shall, in the case of Series B Debentures
issued in global form, comply with the procedures of the Depository in effect at
that time, and in the case of certificated Series B Debentures, surrender such
Series B Debentures, duly endorsed to the Company or in blank, at the office of
the Conversion Agent, and shall give written notice to the Company at said
office or place that such Holder elects to convert the same and shall state in
writing therein the principal amount of Series B Debentures to be converted and
the name or names (with addresses) in which such Holder wishes the certificate '
or certificates for Common Stock to be issued, and, if required, pay funds equal
to interest payable on the next Interest Payment Date.

If a Series B Debenture is tendered for conversion during the period after
a Record Date for an Interest Payment Date to but excluding the corresponding
Interest Payment Date, then unless the Series B Debenture has been called for
redemption on a redemption date that occurs during such period, the Series B
Debentures must be accompanied by funds equal to the interest payable on that
Interest Payment Date on the principal amount so converted; provided, that no
such payment need be made if there shall exist at the time of conversion a
default in the payment of interest on the Series B Debentures.

The issue of stock certificates on conversion of Series B Debentures shall
be made without charge to the converting Holder for any documentary, stamp or
similar issue or transfer taxes in respect of the issue thereof, and the Company
shall pay any and all documentary, stamp or similar issue or transfer taxes that
may be payable in respect of the issue or delivery of shares of Common Stock on
conversion of Series B Debentures pursuant hereto. The Company shall not,
however, be required to pay any such tax which may be payable in respect of any
transfer involved in the issue or delivery of shares of Common Stock or the
portion, if any, of the Series B Debentures which are not so converted in a name
other than that in which the Series B Debentures so converted were registered,
and no such issue or delivery shall be made unless and until the person
requesting such issue has paid to the Company the amount of such tax or has
established to the satisfaction of the Company that such tax has been paid.

If more than one Series B Debenture shall be surrendered for conversion at
one time by the same Holder, the number of full shares of Common Stock which
shall be deliverable upon conversion shall be computed on the basis of the
aggregate principal amount of the Series B Debentures (or specified portions
thereof to the extent permitted thereby) so surrendered. Subject to the next
succeeding sentence, the Company will, as soon as practicable thereafter, issue
and deliver at said office or place to such Holder of a Series B Debenture, or
to such Holder's nominee or nominees, certificates for the number of full shares
of Common Stock to which such Holder shall be entitled as aforesaid, together
with cash in lieu of any fraction of a share to which such Holder would

Source: GENERAL MOTORS CORP, 8-A12B/A, March 06, 2002

otherwise be entitled. The Company shall not be required to deliver certificates for shares of Common Stock while the stock transfer books for such stock or the security register are duly closed for any purpose, but certificates for shares of Common Stock shall be issued and delivered as soon as practicable after the opening of such books or security register.

A Series B Debenture shall be deemed to have been converted as of the close of business on the date of the notification to the Conversion Agent by the Depository of the due completion of the procedures of the Depository with respect to conversion or the due surrender of such Debentures for conversion as provided above. The person or persons entitled to receive the Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such Common Stock as of the close of business on the Conversion Date.

In case any Series B Debenture shall be surrendered for partial conversion, the Company shall execute and the Trustee shall authenticate and deliver to or upon the written order of the Holder of the Series B Debenture so surrendered, without charge to such Holder unless the new Series B Debenture or Series B Debentures are to be registered in a name other than that in which the Series B Debentures were originally registered, a new Series B Debenture or Series B Debentures in authorized denominations in an aggregate principal amount equal to the unconverted portion of the surrendered Series B Debentures.

Section 3.  Conversion Rate Adjustments

The Conversion Rate shall be subject to adjustment from time to time by the Company as follows:

(a) In case the Company shall hereafter pay a dividend or make a distribution to all Holders of the outstanding Common Stock in shares of Common Stock, the Conversion Rate shall be increased so that the same shall equal the rate determined by multiplying the Conversion Rate in effect at the opening of business on the date following the date fixed for the determination of stockholders entitled to receive such dividend or other distribution by a fraction,

(i)   the numerator of which shall be the sum of the number of shares of Common Stock outstanding at the close of business on the date fixed for the determination of stockholders entitled to receive such dividend or other distribution plus the total number of shares of Common Stock constituting such dividend or other distribution; and

(ii)  the denominator of which shall be the number of shares of Common Stock outstanding at the close of business on the date fixed for such determination,

such increase to become effective immediately after the opening of business on the day following the date fixed for such determination. For the purpose of this paragraph (a), the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of the Company. If any dividend or distribution of the type described in this paragraph (a) is declared but not so paid or made, the Conversion Rate shall again be adjusted to the Conversion Rate that would then be in effect if such dividend or distribution had not been declared.

(b) In case the Company shall  issue  rights or warrants to all Holders of its  outstanding  shares of Common Stock  entitling them (for a period expiring within  forty-five  (45)  days after  the  date  fixed  for  determination of stockholders  entitled to receive such rights or  warrants) to subscribe  for or purchase  shares of Common  Stock at a price  per  share less than the  Current Market Price (as defined below)  on the date fixed  for  determination  of stockholders  entitled to receive such rights or warrants,  the Conversion  Rate shall  be  increased  so that the  same  shall  equal  the  rate  determined  by multiplying  the Conversion Rate in effect  immediately  prior to the date fixed for determination of stockholders entitled to receive such rights or warrants by a fraction,

(i)   the numerator of which shall be the sum of the number of shares of Common Stock outstanding on the date fixed for determination of stockholders entitled to receive such rights or warrants plus the total number of additional shares of Common Stock offered for subscription o purchase, and

(ii)  the denominator of which shall be the sum of the number of shares of Common Stock outstanding at the close of business on the date fixed for determination of stockholders entitled to receive such rights or warrants plus the number of shares that the aggregate offering price of the total number of shares so offered would purchase at such Current Market Price.

Such adjustment shall be successively made whenever any such rights or warrants are issued, and shall become effective immediately after the opening of business on the day following the date fixed for determination of stockholders entitled to receive such rights or warrants. To the extent that shares of Common Stock are not delivered after the expiration of such rights or warrants, the Conversion Rate shall be readjusted to the Conversion Rate that would then be in effect had the adjustments made upon the issuance of such rights or warrants

been made on the basis of delivery of only the number of shares of
Common Stock actually delivered. If such rights or warrants are not so
issued, the Conversion Rate shall again be adjusted to be the Conversion
Rate that would then be in effect if such date fixed for the
determination of stockholders entitled to receive such rights or
warrants had not been fixed. In determining whether any rights or
warrants entitle the Holders to subscribe for or purchase shares of
Common Stock at less than such Current Market Price, and in determining
the aggregate offering price of such shares of Common Stock, there shall
be taken into account any consideration received by the Company for such
rights or warrants and any amount payable on exercise or conversion
thereof, the value of such consideration, if other than cash, to be
determined by the Board of Directors (whose determination shall be
conclusive, and described in a resolution of the Board of Directors).

(c) In case outstanding shares of Common Stock shall be subdivided into a
greater number of shares of Common Stock, the Conversion Rate in effect at the
opening of business on the day following the day upon which such subdivision
becomes effective shall be proportionately increased, and conversely, in case
outstanding shares of Common Stock shall be combined into a smaller number of
shares of Common Stock, the Conversion Rate in effect at the opening of business
on the day following the day upon which such combination becomes effective shall
be proportionately reduced, such increase or reduction, as the case may be, to
become effective immediately after the opening of business on the day following
the day upon which such subdivision or combination becomes effective.

(d) In case the Company shall, by dividend or otherwise, distribute to all
Holders of its Common Stock shares of any class of capital stock of the Company
or evidences of its indebtedness or assets (including securities, but excluding
any rights or warrants referred to in paragraph (b) above, and excluding any
dividend or distribution (x) paid exclusively in cash or (y) referred to in
paragraph (a) above (any of the foregoing included in this paragraph (d)
hereinafter in this paragraph (d) called the "securities")), then, in each such
case (unless the Company elects to reserve such securities for distribution to
the Holders upon the conversion of the Series B Debentures so that any such
Holder converting Series B Debentures will receive upon such conversion, in
addition to the shares of Common Stock to which such Holder is entitled, the
amount and kind of such securities which such Holder would have received if such
Holder had converted its Series B Debentures into Common Stock immediately prior
to the record date (as defined in paragraph (f) below for such distribution of
the securities), the Conversion Rate shall be increased so that the same shall
be equal to the rate determined by multiplying the Conversion Rate in effect on
the record date with respect to such distribution by a fraction,

(i)   the numerator of which shall be the Current Market Price on such
      record date; and

(ii)  the denominator of which shall be the Current Market Price on such record
      date less the fair market value (as determined by the Board of Directors,
      whose determination shall be conclusive, and described in a resolution of
      the Board of Directors) on the record date of the portion of the
      securities so distributed applicable to one share of Common Stock,

such adjustment to become effective immediately prior to the opening of business
on the day following such record date; provided, that if the then fair market
value (as so determined) of the portion of the securities so distributed
applicable to one share of Common Stock is equal to or greater than the Current
Market Price on the record date, in lieu of the foregoing adjustment, adequate
provision shall be made so that each Holder shall have the right to receive upon
conversion the amount of securities such Holder would have received had such
Holder converted each Series B Debenture on the record date. If such dividend or
distribution is not so paid or made, the Conversion Rate shall again be adjusted
to be the Conversion Rate that would then be in effect if such dividend or
distribution had not been declared. If the Board of Directors determines the
fair market value of any distribution for purposes of this paragraph (d) by
reference to the actual or when issued trading market for any securities, it
must in doing so consider the prices in such market over the same period used in
computing the Current Market Price on the applicable record date.

Rights or warrants distributed by the Company to all Holders of Common
Stock entitling the Holders thereof to subscribe for or purchase shares of the
Company's capital stock (either initially or under certain circumstances), which
rights or warrants, until the occurrence of a specified event or events
("Trigger Event"): (i) are deemed to be transferred with such shares of Common
Stock; (ii) are not exercisable; and (iii) are also issued in respect of future
issuances of Common Stock, shall be deemed not to have been distributed for
purposes hereof (and no adjustment to the Conversion Rate will be required)
until the occurrence of the earliest Trigger Event, whereupon such rights and
warrants shall be deemed to have been distributed and an appropriate adjustment
(if any is required) to the Conversion Rate shall be made under this paragraph
(d). If any such right or warrant, including any such existing rights or
warrants distributed prior to the date hereof, are subject to events, upon the
occurrence of which such rights or warrants become exercisable to purchase
different securities, evidences of indebtedness or other assets, then the date
of the occurrence of any and each such event shall be deemed to be the date of
distribution and record date with respect to new rights or warrants with such
rights (and a termination or expiration of the existing rights or warrants
without exercise by any of the Holders thereof). In addition, in the event of
any distribution (or deemed distribution) of rights or warrants, or any Trigger

Event or other event (of the type described in the preceding sentence) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Conversion Rate was made, (1) in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by any Holders thereof, the Conversion Rate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per share redemption or repurchase price received by a Holder (or Holders of Common Stock with respect to such rights or warrants (assuming such Holder had retained such rights or warrants), made to all Holders of Common Stock as of the date of such redemption or repurchase, and (2) in the case of such rights or warrants that shall have expired or been terminated without exercise by any Holders thereof, the Conversion Rate shall be readjusted as if such rights and warrants had not been issued. No adjustment of the Conversion Rate shall be made pursuant to this paragraph (d) in respect of rights or warrants distributed or deemed distributed on any Trigger Event to the extent that such rights or warrants are actually distributed, or reserved by the Company for distribution to Holders of Series B Debentures upon conversion by such Holders of Series B Debentures to Common Stock.

For purposes of paragraphs (a), (b) and (d), any dividend or distribution to which paragraph (d) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock (or both), shall be deemed instead to be: (1) a dividend or distribution of the evidences of indebtedness, assets or shares of capital stock other than such shares of Common Stock or rights or warrants (and any Conversion Rate adjustment required by paragraph (d) with respect to such dividend or distribution shall then be made), immediately followed by (2) a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Conversion Rate adjustment required by paragraphs (a) and (b) with respect to such dividend or distribution shall then be made), except (A) the record date of such dividend or distribution shall be substituted as "the date fixed for the determination of stockholders entitled to receive such dividend or other distribution," "the date fixed for the determination of stockholders entitled to receive such rights or warrants" and "the date fixed for such determination" within the meaning of paragraphs (a) and (b), and (B) any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding at the close of business on the date fixed for such determination" within the meaning of paragraph (a).

(e) In case the Company shall, by dividend or otherwise, distribute to all Holders of its Common Stock cash (excluding (x) any quarterly cash dividend on the Common Stock to the extent the aggregate cash dividend per share of Common Stock in any fiscal quarter does not exceed the greater of (A) the amount per share of Common Stock of the next preceding quarterly cash dividend on the Common Stock to the extent that such preceding quarterly dividend did not require any adjustment of the Conversion Rate pursuant to this paragraph (e) (as adjusted to reflect subdivisions or combinations of the Common Stock), and (B) 3.75% of the arithmetic average of the Closing Sale Price during the ten Trading Days immediately prior to the date of declaration of such dividend, and (y) any dividend or distribution in connection with the liquidation, dissolution or winding up of the Company, whether voluntary or involuntary), then, in such case, the Conversion Rate shall be increased so that the same shall equal the rate determined by multiplying the Conversion Rate in effect immediately prior to the close of business on such record date by a fraction,

(i)    the numerator of which shall be the Current Market Price on such record date; and

(ii)   the denominator of which shall be the Current Market Price on such record date less the amount of cash so distributed (and not excluded as provided above) applicable to one share of Common Stock,

such adjustment to be effective immediately prior to the opening of business on the day following the record date; provided that if the portion of the cash so distributed applicable to one share of Common Stock is equal to or greater than the Current Market Price on the record date, in lieu of the foregoing adjustment, adequate provision shall be made so that each Holder shall have the right to receive upon conversion the amount of cash such Holder would have received had such Holder converted each Series B Debenture on the record date. If such dividend or distribution is not so paid or made, the Conversion Rate shall again be adjusted to be the Conversion Rate that would then be in effect if such dividend or distribution had not been declared. If any adjustment is required to be made as set forth in this paragraph (e) as a result of a distribution that is a quarterly dividend, such adjustment shall be based upon the amount by which such distribution exceeds the amount of the quarterly cash dividend permitted to be excluded pursuant hereto. If an adjustment is required to be made as set forth in this paragraph (e) above as a result of a distribution that is not a quarterly dividend, such adjustment shall be based upon the full amount of the distribution.

(f) In case a tender or exchange offer made by the Company or any subsidiary for all or any portion of the Common Stock shall expire and such tender or exchange offer (as amended upon the expiration thereof) shall require the payment to stockholders of consideration per share of Common Stock having a fair market value (as determined by the Board of Directors, whose determination shall be conclusive and described in a resolution of the Board of Directors) that as of the last time (the "Expiration Time") tenders or exchanges may be made pursuant to such tender or exchange offer (as it may be amended) exceeds

the Closing Sale Price of a share of Common Stock on the Trading Day next succeeding the Expiration Time, the Conversion Rate shall be increased so that the same shall equal the rate determined by multiplying the Conversion Rate in effect immediately prior to the Expiration Time by a fraction

(i)   the numerator of which shall be the sum of (x) the fair market value (determined as aforesaid) of the aggregate consideration payable to stockholders based on the acceptance (up to any maximum specified in the terms of the tender or exchange offer) of all shares validly tendered or exchanged and not withdrawn as of the Expiration Time (the shares deemed so accepted up to any such maximum, being referred to as the "Purchased Shares") and (y) the product of the number of shares of Common Stock outstanding (less any Purchased Shares) at the Expiration Time and the Closing Sale Price of a share of Common Stock on the Trading Day next succeeding the Expiration Time, and

(ii)  the denominator of which shall be the number of shares of Common Stock outstanding (including any tendered or exchanged shares) at the Expiration Time multiplied by the Closing Sale Price of a share of Common Stock on the Trading Day next succeeding the Expiration Time,

such adjustment to become effective immediately prior to the opening of business on the day following the Expiration Time. If the Company is obligated to purchase shares pursuant to any such tender or exchange offer, but the Company is permanently prevented by applicable law from effecting any such purchases or all such purchases are rescinded, the Conversion Rate shall again be adjusted to be the Conversion Rate that would then be in effect if such tender or exchange offer had not been made.

"Current Market Price" shall mean the average of the daily Closing Sale Prices per share of Common Stock for the ten consecutive Trading Days selected by the Company commencing no more than 30 Trading Days before and ending not later than the earlier of such date of determination and the day before the "ex" date with respect to the issuance, distribution, subdivision or combination requiring such computation immediately prior to the date in question. For purpose of this paragraph, the term "ex" date, (1) when used with respect to any issuance or distribution, means the first date on which the Common Stock trades, regular way, on the relevant exchange or in the relevant market from which the Closing Sale Price was obtained without the right to receive such issuance or distribution, and (2) when used with respect to any subdivision or combination of shares of Common Stock, means the first date on which the Common Stock trades, regular way, on such exchange or in such market after the time at which such subdivision or combination becomes effective. If another issuance, distribution, subdivision or combination to which the paragraphs above apply during the period applicable for calculating "Current Market Price" pursuant to the definition in the preceding paragraph, "Current Market Price" shall be calculated for such period in a manner determined by the Board of Directors to reflect the impact of such issuance, distribution, subdivision or combination on the Closing Sale Price of the Common Stock during such period.

"Fair Market Value" shall mean the amount which a willing buyer would pay a willing seller in an arm's-length transaction.

"record date" shall mean, with respect to any dividend, distribution or other transaction or event in which the Holders of Common Stock have the right to receive any cash, securities or other property or in which the Common Stock (or other applicable security) is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of stockholders entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

(g)The Company may make such increases in the Conversion Rate, in addition to those required by Sections 15.05(a), (b), (c), (d), (e), or (f) as the Board of Directors considers to be advisable to avoid or diminish any income tax to Holders of Common Stock or rights to purchase Common Stock resulting from any dividend or distribution of Common Stock (or rights to acquire stock) or from any event treated as such for income tax purposes. To the extent permitted by applicable law, the Company from time to time may increase the Conversion Rate by any amount for any period of time if the period is at least twenty (20) days, the increase is irrevocable during the period and the Board of Directors shall have made a determination that such increase would be in the best interests of the Company, which determination shall be conclusive. Whenever the Conversion Rate is increased pursuant to the preceding sentence, the Company shall mail, or cause the Trustee or Conversion Agent to mail, to Holders of record of the Series B Debentures a notice of the increase at least five (5) Business Days prior to the date the increased Conversion Rate takes effect, and such notice shall state the increased Conversion Rate and the period during which it will be in effect.

(h) No adjustment in the Conversion Rate shall be required unless such adjustment would require an increase or decrease of at least one percent (1%) in such rate; provided, that any adjustments that by reason of this paragraph (h) are not required to be made shall be carried forward and taken into account in any subsequent adjustment. All calculations shall be made by the Company and shall be made to the nearest cent or to the nearest one-ten thousandth (1/10,000) of a share, as the case may be. No adjustment need be made for rights to purchase Common Stock pursuant to a Company plan for reinvestment of dividends or interest. To the extent the Series B Debentures become convertible

into cash, assets, property or securities (other than capital stock of the Company or Successor Company Stock listed on any national securities exchange or quoted in an inter-dealer quotation system), no adjustment need be made thereafter as to the cash, assets, property or such securities. Interest will not accrue on any cash into which the Series B Debentures are convertible.

(i) Whenever the Conversion Rate is adjusted as herein provided, the Company shall promptly file with the Trustee and any Conversion Agent other than the Trustee an Officers' Certificate setting forth the Conversion Rate after such adjustment and setting forth a brief statement of the facts requiring such adjustment. Unless and until a responsible officer of the Trustee shall have received such Officers' Certificate, the Trustee shall not be deemed to have knowledge of any adjustment of the Conversion Rate and may assume that the last Conversion Rate of which it has knowledge is still in effect. Promptly after delivery of such certificate, the Company shall prepare a notice of such adjustment of the Conversion Rate setting forth the adjusted Conversion Rate and the date on which each adjustment becomes effective and shall mail such notice of such adjustment of the Conversion Rate to the Holder of each Series B Debenture at his last address appearing on the Series B Debenture register provided for in the Indenture, within twenty (20) days after execution thereof. Failure to deliver such notice shall not affect the legality or validity of any such adjustment.

(j) In any case in which an adjustment shall become effective immediately after (1) a record date for an event, (2) the date fixed for the determination of stockholders entitled to receive a dividend or distribution pursuant to paragraph (a), (3) a date fixed for the determination of stockholders entitled to receive rights or warrants pursuant to paragraph (b), or (4) the Expiration Time for any tender or exchange offer pursuant to paragraph (f), (each a "Determination Date"), the Company may elect to defer until the occurrence of the applicable Adjustment Event (as hereinafter defined) (x) issuing to the Holder of any Series B Debenture converted after such Determination Date and before the occurrence of such Adjustment Event, the additional shares of Common Stock or other securities issuable upon such conversion by reason of the adjustment required by such Adjustment Event over and above the Common Stock issuable upon such conversion before giving effect to such adjustment and (y) paying to such Holder any amount in cash in lieu of any fractional shares. For purposes of this paragraph (j), the term "Adjustment Event" shall mean:

(i)    in any case referred to in clause (1) hereof, the occurrence of such event,

(ii)   in any case referred to in clause (2) hereof, the date any such dividend or distribution is paid or made,

(iii)  in any case referred to in clause (3) hereof, the date of expiration of such rights or warrants, and

(iv)   in any case referred to in clause (4) hereof, the date a sale or exchange of Common Stock pursuant to such tender or exchange offer is consummated and becomes irrevocable.

If any of the following events occur, namely (i) any reclassification of the outstanding shares of Common Stock (other than a subdivision or combination to which paragraph (c) applies), (ii) any consolidation, merger or combination of the Company with another person as a result of which Holders of Common Stock shall be entitled to receive stock, other securities or other property or assets (including cash) with respect to or in exchange for such Common Stock, or (iii) any sale, lease or conveyance of all or substantially all of the properties and assets of the Company to any other person as a result of which Holders of Common Stock shall be entitled to receive stock, other securities or other property or assets (including cash) with respect to or in exchange for such Common Stock, then the Company or the successor or purchasing person, as the case may be, shall execute with the Trustee a supplemental indenture (which shall comply with the Trust Indenture Act as in force at the date of execution of such supplemental indenture). Such supplemental indenture shall provide that each Series B Debenture shall be convertible into the kind and amount of shares of stock, other securities or other property or assets (including cash) receivable upon such reclassification, consolidation, merger, combination, sale or conveyance by a Holder of a number of shares of Common Stock issuable upon conversion of such Series B Debentures (assuming, for such purposes, a sufficient number of authorized shares of Common Stock are available to convert all such Series B Debentures) immediately prior to such reclassification, consolidation, merger, combination, sale or conveyance assuming such Holder of Common Stock did not exercise his rights of election, if any, as to the kind or amount of stock, other securities or other property or assets (including cash) receivable upon such reclassification, consolidation, merger, combination, sale or conveyance (provided, that if the kind or amount of stock, other securities or other property or assets (including cash) receivable upon such reclassification, consolidation, merger, combination, sale or conveyance is not the same for each share of Common Stock in respect of which such rights of election shall not have been exercised ("nonelecting share"), then for the purposes of this paragraph the kind and amount of stock, other securities or other property or assets (including cash) receivable upon such reclassification, consolidation, merger, combination, sale or conveyance for each non-electing share shall be deemed to be the kind and amount so receivable per share by a plurality of the non-electing shares), and that such successor or purchasing person shall satisfy the obligations of the Company under Section 6 hereof. Such supplemental indenture shall further provide for adjustments which shall be as

Source: GENERAL MOTORS CORP, 8-A12B/A, March 06, 2002

nearly equivalent as may be practicable to the adjustments provided for herein.

The Company shall cause notice of the execution of such supplemental indenture to be mailed to each Holder of Series B Debentures, at its address appearing on the Series B Debenture register provided for in the Indenture, within twenty (20) days after execution thereof. Failure to deliver such notice shall not affect the legality or validity of such supplemental indenture. The above provisions shall similarly apply to successive reclassifications, changes, consolidations, mergers, combinations, sales and conveyances.

The Company shall provide, free from preemptive rights, out of its authorized but unissued shares or shares held in treasury, sufficient shares of Common Stock to provide for the conversion of the Series B Debentures from time to time as such Series B Debentures are presented for conversion. Before taking any action which would cause an adjustment increasing the Conversion Rate to an amount that would cause the Conversion Price to be reduced below the then par value, if any, of the shares of Common Stock issuable upon conversion of the Series B Debentures, the Company will take all corporate action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue shares of such Common Stock at such adjusted Conversion Rate. The Company covenants that all shares of Common Stock which may be issued upon conversion of Series B Debentures will upon issue be fully paid and non-assessable by the Company and free from all taxes, liens and charges with respect to the issue thereof. The Company covenants that, if any shares of Common Stock to be provided for the purpose of conversion of Series B Debentures hereunder require registration with or approval of any governmental authority under any federal or state law before such shares may be validly issued upon conversion, the Company will in good faith and as expeditiously as possible, to the extent then permitted by the rules and interpretations of the Securities and Exchange Commission (or any successor thereto), endeavor to secure such registration or approval, as the case may be.

The Company further covenants that, if at any time the Common Stock shall be listed on the New York Stock Exchange or any other national securities exchange or automated quotation system, the Company will, if permitted by the rules of such exchange or automated quotation system, list and keep listed, so long as the Common Stock shall be so listed on such exchange or automated quotation system, all Common Stock issuable upon conversion of the Series B Debenture; provided, that if the rules of such exchange or automated quotation system permit the Company to defer the listing of such Common Stock until the first conversion of the Series B Debentures into Common Stock in accordance with the provisions hereof, the Company covenants to list such Common Stock issuable upon conversion of the Series B Debentures in accordance with the requirements of such exchange or automated quotation system at such time.

(k) If (i) the Company shall declare a dividend (or any other distribution) on its Common Stock that would require an adjustment in the Conversion Rate, (ii) the Company shall authorize the granting to the Holders of all or substantially all of its Common Stock of rights or warrants to subscribe for or purchase any share of any class or any other rights or warrants; (iii) there shall be any reclassification or reorganization of the Common Stock of the Company (other than a subdivision or combination of its outstanding Common Stock, or a change in par value, or from par value to no par value, or from no par value to par value), or of any consolidation or merger to which the Company is a party and for which approval of any stockholders of the Company is required, or of the sale or transfer of all or substantially all of the assets of the Company; or (iv) there shall be the voluntary or involuntary dissolution, liquidation or winding up of the Company; the Company shall cause to be filed with the Trustee and to be mailed to each Holder of Series B Debentures at his address appearing on the Series B Debenture register provided for in the Indenture, as promptly as possible but in any event at least ten (10) days prior to the applicable date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution or rights or warrants, or, if a record is not to be taken, the date as of which the Holders of Common Stock of record to be entitled to such dividend, distribution or rights are to be determined, or (y) the date on which such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding up is expected to become effective or occur, and the date as of which it is expected that Holders of Common Stock of record shall be entitled to exchange their Common Stock for securities or other property deliverable upon such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding up. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such dividend, distribution, reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding up.

Section 4.  Redemption.
-----------

Prior to March 6, 2009, the Series B Debentures will not be redeemable at the Company's option. On or after March 6, 2009, the Company may redeem the Series B Debentures, in whole or in part, in cash at the redemption prices set forth below, plus accrued and unpaid interest to and including the date of redemption. The redemption prices (expressed as a percentage of the principal amount of the Series B Debentures) are as follows for Series B Debentures redeemed during the twelve month period commencing March 6 in each of the following years indicated:

| Year | Redemption Price |
| ---- | ---------- |
| 2009.......................................... | 102.188% |
| 2010.......................................... | 101.750% |
| 2011.......................................... | 101.313% |
| 2012.......................................... | 100.875% |
| 2013.......................................... | 100.438% |
| 2014 and thereafter........................... | 100.000% |

......In the case of any partial redemption, selection of the Series B
Debentures for redemption will be made by the Trustee in compliance with the
requirements of the principal national securities exchange, if any, on which the
Series B Debentures are listed or, if the Series B Debentures are not listed on
a national securities exchange, by lot or by such other method as directed by
the Company. The Trustee will make that selection not more than forty-five days
before the redemption date. If a portion of a Holder's Series B Debentures is
selected for partial redemption and a Holder converts a portion of its Series B
Debentures, the converted portion will be deemed to be part of the portion
selected for redemption. The Company shall not redeem Series B Debentures in
part if it has failed to pay interest on the Series B Debentures and such
failure to pay is continuing. Series B Debentures and portions of Series B
Debentures that the Trustee selects shall be in principal amounts of $25.00 or
integral multiples of $25.00.

        Section 5.  Repurchase of Series B Debentures at Holder's Option
        -------------------------------------------------------------

        On March 6, 2014, 2019, 2024, and 2029, or if any such March 6 is not a
Business Day, then on the next succeeding Business Day (each, a "Purchase
Date"), Holders of Series B Debentures may require the Company to repurchase the
Series B Debentures at a purchase price ("Purchase Price") equal to the
principal amount of the Series B Debentures to be repurchased plus accrued and
unpaid interest to but excluding the Purchase Date.

        The Series B Debentures to be purchased on any Purchase Date may be paid
for, in whole or in part, at the election of the Company, in cash or shares of
Common Stock, or in any combination of cash and shares of Common Stock, subject
to the conditions set forth herein. The Company shall designate in the Company
Notice (as defined below) whether the Company will repurchase the Series B
Debentures for cash or shares of Common Stock, or, if a combination thereof, the
percentages of the Purchase Price of Series B Debentures in respect of which it
will pay in cash or shares of Common Stock; provided, that the Company will pay
cash, based on the Closing Sale Price on the Trading Day immediately preceding
the Purchase Date, for fractional interests in shares of Common Stock. For
purposes of determining the existence of potential fractional interests, all
Series B Debentures subject to repurchase by the Company held by a Holder shall
be considered together (no matter how many separate certificates are to be
presented). Each Holder whose Series B Debentures are repurchased shall receive
the same percentage of cash or shares of Common Stock in payment of the Purchase
Price for such Series B Debentures, except with regard to the payment of cash in
lieu of fractional shares of Common Stock. On a selective basis, the Company may
also pay cash in lieu of shares of Common Stock in the event that the issuance
of such Common Stock is prohibited by law. The Company may not change its
election with respect to the consideration (or components or percentages of
components thereof) to be paid once the Company has given its Company Notice to
Holders except in the event of a failure to satisfy, prior to the close of
business on the Business Day immediately preceding the Purchase Date, any
condition to the payment of the Purchase Price, in whole or in part, in shares
of Common Stock. If the Company elects to pay the Purchase Price, in whole or in
part, in shares of Common Stock, the number of shares of Common Stock that the
Company will deliver shall be equal to the portion of the Purchase Price to be
paid in Common Stock divided by the average of the Closing Sale Prices of the
Common Stock during the five-Trading Day period ending on, but not including,
the third Business Day prior to the Purchase Date, appropriately adjusted to
take into account the occurrence, during the period commencing on the first
Trading Day during the five-Trading Day period and ending on the Purchase Date,
of any event that would require an adjustment to the Conversion Rate (the
"Market Price").

        In connection with any repurchase of Series B Debentures, the Company
shall, no less than 24 Business Days prior to each Purchase Date (the "Company
Notice Date"), give notice to Holders setting forth information specified below
(the "Company Notice"). In the event the Company has elected to pay the Purchase
Price (or a specified percentage thereof), with shares of Common Stock, the
Company Notice shall: (i) state that each Holder will receive a number of shares
of Common Stock with a value equal to 100% of the Market Price equal to such
specified percentage of the Purchase Price of the Series B Debentures to be paid
in Common Stock (except any cash amount to be paid in lieu of fractional
shares); (ii) set forth the method of calculating the Market Price of the shares
of Common Stock; and (iii) state that because the Market Price of shares of
Common Stock will be determined prior to the Purchase Date Holders of the Series
B Debentures will bear the market risk with respect to the value of the shares
of Common Stock to be received from the date such Market Price is determined to
the Purchase Date.

        At least three Business Days before each Company Notice Date, the Company

Source: GENERAL MOTORS CORP, 8-A12B/A, March 06, 2002

shall deliver an Officers' Certificate to the Trustee specifying: (i) the manner of payment selected by the Company, (ii) the information required in the Company Notice, (iii) if the Company elects to pay the Purchase Price, or a specified percentage thereof, in shares of Common Stock, that the conditions to such manner of payment set forth herein have been or will be complied with, and (iv) whether the Company desires the Trustee to give the required Company Notice.

In any case, each Company Notice shall include a form of Purchase Notice to be completed by a Holder and shall state:

(i)    the Purchase Price;

(ii)   whether the Purchase Price will be paid in cash or shares of Common Stock, or any combination thereof, specifying the percentages of each;

(iii)  the name and address of the Paying Agent and the Conversion Agent;

(iv)   if the Series B Debentures are then convertible, that Series B Debentures as to which a Purchase Notice has been given may be converted only if the Purchase Notice is withdrawn in accordance with the terms of the Series B Debentures;

(v)    that Series B  Debentures  must be  surrendered  to the Paying  Agent to collect the Purchase Price;

(vi)   that the Purchase Price for any Series B Debenture as to which a Purchase Notice has been given and not withdrawn will be paid promptly following the later of the Purchase Date and the time of surrender of such Series B Debenture;

(vii)  that, unless the Company defaults in making payment on Series B Debentures for which a Purchase Notice has been submitted, interest on such Series B Debentures will cease to accrue on and after the Purchase Date; and

(viii) the CUSIP number of the Series B Debentures.

Company Notices may be given by the Company or, at the Company's request, the Trustee shall give such Company Notice in the Company's name and at the Company's expense.

Repurchases of Series B Debentures shall be made upon: (a) delivery to the Paying Agent by the Holder of a written notice of purchase (a "Purchase Notice") during the period beginning at any time from the opening of business on the Company Notice Date prior to the relevant Purchase Date until the close of business on the fourth Business Day prior to such Purchase Date stating:

(1) the certificate number of the Series B Debenture which the Holder will deliver to be repurchased or the appropriate Depository procedures if certificated Series B Debentures have not been issued;

(2) the portion of the principal amount of the Series B Debenture that the Holder will deliver to be repurchased, which portion must be in principal amounts of $25.00 or a integral multiple of $25.00;

(3) that such Series B Debenture shall be repurchased by the Company as of the Purchase Date pursuant to the terms and conditions specified herein, and

(4) that such Series B Debenture shall be repurchased by the Company as of the Purchase Date pursuant to the terms and conditions specified in this Series B Debenture; and, in the event the Company elects to pay the Purchase Price, in whole or in part, in shares of Common Stock but such portion of the Purchase Price shall ultimately be paid to such Holder entirely in cash because any of the conditions to payment of the Purchase Price in shares of Common Stock is not satisfied prior to the close of business on the relevant Purchase Date, whether such Holder elects (i) to withdraw such Purchase Notice as to some or all of the Series B Debentures to which such Purchase Notice relates (stating the principal amount and certificate numbers, if any, of the Series B Debentures as to which such withdrawal shall relate), or (ii) to receive cash in respect of the entire Purchase Price for all Series B Debentures (or portions thereof) to which such Purchase Notice relates; and

(b) book-entry transfer or delivery of such Series B Debenture to the Paying Agent at any time after delivery of the Purchase Notice (together with all necessary endorsements) at the offices of the Paying Agent, such delivery being a condition to receipt by the Holder of the Purchase Price therefor; provided, however, that such Purchase Price shall be so paid pursuant to this paragraph if the Series B Debenture so delivered to the Paying Agent shall conform in all respects to the description thereof in the related Purchase Notice.

If a Holder, in such Holder's Purchase Notice and in any written notice of withdrawal delivered by such Holder, fails to indicate such Holder's choice with respect to the election set forth in clause (4) above, such Holder shall be deemed to have elected to receive cash in respect of the entire Purchase Price for all Series B Debentures subject to such Purchase Notice in the circumstances set forth in such clause (4).

The Company shall repurchase from the Holder thereof a portion of a Series B Debenture, if the principal amount of such portion is $25.00 or a integral

multiple of $25.00. Any repurchase by the Company contemplated pursuant to the foregoing provisions shall be consummated by the delivery of the consideration to be received by the Holder promptly following the later of the Purchase Date and the time of the book-entry transfer or delivery of the Series B Debenture or the relevant portion thereof.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Purchase Notice shall have the right to withdraw such Purchase Notice at any time up to the close of business on the fourth Business Day prior to the Purchase Date by delivery of a written notice of withdrawal (a "Withdrawal Notice") to the Paying Agent. The Paying Agent shall promptly notify the Company of the receipt by it of any Purchase Notice or Withdrawal Notice. The Withdrawal Notice shall state: (i) the principal amount of Series B Debentures withdrawn (which must be in an amount of $25.00 or a integral multiple thereof); (ii) the certificate numbers of the withdrawn Series B Debentures or evidence compliance with the appropriate Depository procedures if certificated Series B Debentures have not been issued; and (iii) the principal amount, if any, of Series B Debentures that remains subject to the Purchase Notice.

The Company may, in its sole and complete discretion, accept a Withdrawal Notice on or after the third Business Day prior to a Purchase Date. The decision of the Company to accept or reject such a Withdrawal Notice shall be conclusive and binding on the Holder proposing to make the withdrawal. The Paying Agent will promptly return to the respective Holders thereof any Series B Debentures with respect to which a Purchase Notice has been withdrawn in compliance with this Series B Debenture.

The Company's right to exercise its election to repurchase Series B Debentures through the issuance of shares of Common Stock shall be conditioned upon: (i) the Company's not having given its Company Notice of an election to pay entirely in cash and its giving of timely Company Notice of an election to purchase all or a specified percentage of the Series B Debentures with shares of Common Stock as provided herein; (ii) the registration of such shares of Common Stock under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"), in each case, if required; (iii) the listing of such shares of Common Stock on a United States national securities exchange or the quotation of such shares of Common Stock in an inter-dealer quotation system of any registered United States national securities association, in each case, if the Common Stock is then listed on a national securities exchange or quoted in an inter-dealer quotation system; (iv) any necessary qualification or registration of such shares of Common Stock under applicable state securities laws or the availability of an exemption from such qualification and registration; and (v) the receipt by the Trustee of an (A) Officers' Certificate stating that the terms of the issuance of the shares of Common Stock are in conformity with the Indenture, (B) an Opinion of Counsel to the effect that the shares of Common Stock to be issued by the Company in payment of the Purchase Price in respect of the Series B Debentures have been duly authorized and, when issued and delivered pursuant to the terms of this Indenture in payment of the Purchase Price in respect of the Series B Debentures, will be validly issued, fully paid and non-assessable and (C) an Officer's Certificate, stating that the conditions to the issuance of the shares of Common Stock have been satisfied. Such Officers' Certificate shall also set forth the number of shares of Common Stock to be issued for each $25.00 principal amount of Series B Debentures and the Closing Sale Price of a share of Common Stock on each Trading Day during the period commencing on the first Trading Day of the period during which the Market Price is calculated and ending on but excluding the third Business Day prior to the applicable Purchase Date. If the foregoing conditions are not satisfied prior to the close of business on the Purchase Date and the Company has elected to purchase the Series B Debentures through the issuance of shares of Common Stock, the Company shall pay the entire Purchase Price of the Series B Debentures in cash.

Upon determination of the actual number of shares of Common Stock to be issued upon repurchase of Series B Debentures, the Company shall be required to disseminate a press release through Dow Jones & Company, Inc. or Bloomberg Business News containing this information or publish the information on the Company's web site or through such other public medium as the Company may use at that time.

All shares of Common Stock delivered upon repurchase of the Series B Debentures shall be duly authorized, validly issued, fully paid and nonassessable. If a Holder of a repurchased Series B Debenture is paid in shares of Common Stock, the Company shall pay any documentary, stamp or similar issue or transfer tax due on such issue of Common Stock. However, the Holder shall pay any such tax which is due because the Holder requests the Common Stock to be issued in a name other than the Holder's name. The Paying Agent may refuse to deliver the certificates representing the shares of Common Stock being issued in a name other than the Holder's name until the Paying Agent receives a sum sufficient to pay any tax which will be due because the shares of Common Stock are to be issued in a name other than the Holder's name.

Prior to 10:00 a.m. (New York City Time) on the Business Day following the Purchase Date, the Company shall deposit with the Trustee or with the Paying Agent an amount of cash (in immediately available funds if deposited on such Business Day) or Common Stock, if permitted hereunder, sufficient to pay the aggregate Purchase Price of all the Series B Debentures or portions thereof that are to be purchased as of the Purchase Date. If prior to 10:00 a.m. (New York City Time) on the Business Day following the Purchase Date the Trustee or Paying

Agent holds an amount of cash or Common Stock sufficient to pay the aggregate Purchase Price of the Series B Debentures that are to be so purchased, then, on and after the Purchase Date (i) the Series B Debentures to be purchased will cease to be Outstanding; (ii) stated interest on such Series B Debentures will cease to accrue, and (iii) all other rights of the Holders with respect to such Series B Debentures will terminate, other than the right to receive the Purchase Price upon delivery of the Series B Debentures. This will be the case whether or not book-entry transfer of the Series B Debentures has been made or the Series B Debentures have been delivered to the Paying Agent. As soon as practicable after the Purchase Date the Company shall deliver to each Holder entitled to receive shares of Common Stock through the Paying Agent, a certificate for the number of full shares of Common Stock issuable in payment of the Purchase Price and cash in lieu of any fractional interests. The person in whose name the certificate for the shares of Common Stock is registered shall be treated as a Holder of record of Common Stock on the Business Day following the Purchase Date. No payment or adjustment will be made for dividends on the shares of Common Stock the record date for which occurred on or prior to the Purchase Date.

Any certificated Series B Debenture that is to be repurchased only in part shall be surrendered at the office of the Paying Agent (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or such Holder's attorney duly authorized in writing) and the Company shall execute and the Trustee shall authenticate and deliver to the Holder of such Series B Debenture; without service charge, a new Series B Debenture or Series B Debentures, of any authorized denomination as requested by such Holder in aggregate principal amount equal to, and in exchange for, the portion of the principal amount of the Series B Debenture so surrendered which is not repurchased.

The Company will comply with any tender offer rules under the Exchange Act that may be applicable at the time of its offer to repurchase the Series B Debentures.

The Trustee and the Paying Agent shall return to the Company any cash or shares of Common Stock that remain unclaimed, together with interest or dividends, if any, thereon, held by them for the payment of the Purchase Price; provided, however, that to the extent that the aggregate amount of cash or shares of Common Stock deposited by the Company exceeds the aggregate Purchase Price of the Series B Debentures or portions thereof which the Company is obligated to purchase as of the Purchase Date then, unless otherwise agreed in writing with the Company, promptly after the Business Day following the Purchase Date, the Trustee shall return any such excess to the Company together with interest or dividends, if any, thereon.

Section 6.   Repurchase of Series B Debentures Upon Fundamental Change.
            ----------------------------------------------------------

If there shall occur a Fundamental Change at any time prior to maturity of the Series B Debentures, then each Holder shall have the right, at such Holder's option, to require the Company to redeem all of such Holder's Series B Debentures, or any portion thereof that is an integral multiple of $25.00 principal amount, on the date (the "Repurchase Date") that is thirty (30) days after the date the Company provides notice of such Fundamental Change (or, if such 30th day is not a Business Day, the next succeeding Business Day) at a redemption price (the "Repurchase Price") equal to 100% of the principal amount thereof, together with accrued interest to, but excluding, the Repurchase Date; provided that, if such Repurchase Date is an Interest Payment Date, then the interest payable on such Interest Payment Date shall be paid to the Holders of record of the Series B Debentures on the applicable Record Date instead of the Holders surrendering the Series B Debentures for redemption on such date.

A "Fundamental Change" means the occurrence of any transaction or event (whether by means of an exchange offer, liquidation, tender offer, consolidation, merger, combination, reclassification, recapitalization or otherwise) in connection with which 90% or more of the Common Stock shall be exchanged for, converted into, acquired for or constitute solely the right to receive, consideration 10% or more of which (measured by the fair market value of such consideration and its components as determined by the Board of Directors, whose determination shall be conclusive and described in a resolution of the Board of Directors) is not common stock that is (or, upon consummation of or immediately following such transaction or event, which will be) listed on a United States national securities exchange or approved (or, upon consummation of or immediately following such transaction or event, which will be approved) for quotation on the Nasdaq National Market or any similar United States system of automated dissemination of quotations of securities prices, but only if such transaction or event also includes one of the following: (i) the filing by any person, including the Company's affiliates and associates, other than the Company and its employee benefit plans, of a Schedule 13D or Schedule TO, or any successor schedule, form or report, under the Exchange Act, disclosing that such person has become the beneficial owner of 50% or more of the voting power of the Common Stock or other Capital Stock into which the Common Stock is reclassified or exchanged; or (ii) the consummation of any share exchange, consolidation or merger pursuant to which the Common Stock is converted into cash, securities or other property, in each case other than any share exchange, consolidation or merger of the Company in which the Holders of Common Stock immediately prior to the share exchange, consolidation or merger have, directly or indirectly, at least a majority of the total voting power in the aggregate of all classes of Capital Stock of the continuing or surviving corporation immediately after the

Source: GENERAL MOTORS CORP, 8-A12B/A, March 06, 2002

share exchange, consolidation or merger.

The Series B Debentures to be purchased on any Repurchase Date may be paid for, in whole or in part, at the election of the Company or its successor, in cash or shares of common stock of the Company's successor, which may include the Company as appropriate ("Successor Company Stock"), or in any combination of cash and shares of Successor Company Stock, subject to the conditions set forth herein. The Company, or its successor, shall inform Holders through the Trustee not later than the ninth Business Day prior to the Repurchase Date of its election to pay the Repurchase Price, in whole or in part, in Successor Company Stock, specifying the portion to be paid in Successor Company Stock, provided, that the Company or its successor will pay cash, based on the Closing Sale Price on the Trading Day immediately preceding the Repurchase Date, for fractional interests in shares of Successor Company Stock. For purposes of determining the existence of potential fractional interests, all Series B Debentures subject to repurchase held by a Holder shall be considered together (no matter how many separate certificates are to be presented). Each Holder whose Series B Debentures are repurchased shall receive the same percentage of cash or shares of Successor Company Stock in payment of the Repurchase Price for such Series B Debentures, except with regard to the payment of cash in lieu of fractional shares of Successor Company Stock. On a selective basis, the Company or its successor may also pay cash in lieu of shares of Successor Company Stock in the event that the issuance of such Successor Company Stock is prohibited by law. The Company and its successor may not change the election with respect to the consideration (or components or percentages of components thereof) to be paid once the Company or its successor has given its notice to the Trustee except in the event of a failure to satisfy, prior to the close of business on the Business Day immediately preceding the Repurchase Date, any condition to the payment of the Repurchase Price, in whole or in part, in shares of Successor Company Stock. If the Company or its successor elects to pay the Repurchase Price, in whole or in part, in shares of Successor Company Stock, the number of shares of Successor Company Stock that will be delivered shall be equal to the portion of the Repurchase Price to be paid in Successor Company Stock divided by the average of Closing Sale Prices of Successor Company Stock for the five consecutive Trading Days following the date the Company, or its successor, notifies the Trustee of its election to pay all or a portion of the Repurchase Price in shares of Successor Company Stock, appropriately adjusted to take into account the occurrence, during the period commencing on the first Trading Day during the five-Trading Day period and ending on the Repurchase Date, of any event that would require an adjustment to the Conversion Rate (the "Fundamental Change Market Price").

The right to exercise its election to purchase Series B Debentures through the issuance of shares of Successor Company Stock shall be conditioned upon: (i) no notice of an election to purchase the Series B Debentures entirely in cash having been given and timely notice of an election to purchase all or a specified percentage of the Series B Debentures with shares of Successor Company Stock having been given as provided herein; (ii) the registration of such shares of Successor Company Stock under the Securities Act and the Exchange Act, in each case, if required; (iii) the listing of such shares of Successor Company Stock on a United States national securities exchange or the quotation of such shares of Successor Company Stock in an inter-dealer quotation system of any registered United States national securities association, in each case, if the Successor Company Stock is then listed on a national securities exchange or quoted in an inter-dealer quotation system; (iv) any necessary qualification or registration of such shares of Successor Company Stock under applicable state securities laws or the availability of an exemption from such qualification and registration; and (v) the receipt by the Trustee of an (A) Officers' Certificate stating that the terms of the issuance of the shares of Successor Company Stock are in conformity with the Indenture, (B) an Opinion of Counsel to the effect that the shares of Successor Company Stock to be issued by the Company in payment of the Purchase Price in respect of the Series B Debentures have been duly authorized and, when issued and delivered pursuant to the terms of this Indenture in payment of the Purchase Price in respect of the Series B Debentures, will be validly issued, fully paid and non-assessable and (C) an Officer's Certificate, stating that the conditions to the issuance of the shares of Successor Company Stock have been satisfied. Such Officers' Certificate shall also set forth the number of shares of Successor Company Stock to be issued for each $25.00 principal amount of Series B Debentures and the Closing Sale Price of a share of Common Stock on each Trading Day during the period commencing on the first Trading Day of the period during which the Market Price is calculated and ending on but excluding the third Business Day prior to the applicable Repurchase Date. If the foregoing conditions are not satisfied prior to the close of business on the Repurchase Date and the Company or its successor has elected to purchase the Series B Debentures through the issuance of shares of Successor Company Stock, the entire Repurchase Price of the Series B Debentures shall be paid in cash.

Upon determination of the actual number of shares of Successor Company Stock to be issued upon repurchase of Series B Debentures, the Company or its successor shall be required to disseminate a press release through Dow Jones & Company, Inc. or Bloomberg Business News containing this information or publish the information on the Company's or such successor's web site or through such other public medium as the Company or its successor may use at that time.

On or before the tenth day after the occurrence of a Fundamental Change, the Company or at its written request (which must be received by the Trustee at least five (5) Business Days prior to the date the Trustee is requested to give notice as described below, unless the Trustee shall agree in writing to a

Source: GENERAL MOTORS CORP, 8-A12B/A, March 06, 2002

shorter period), the Trustee, in the name of and at the expense of the Company, shall mail or cause to be mailed to all Holders of record on the date of the Fundamental Change a notice (the "Fundamental Change Notice") of the occurrence of such Fundamental Change and of the redemption right at the option of the Holders arising as a result thereof. If the Company shall give such notice, the Company shall also deliver a copy of the Fundamental Change Notice to the Trustee at such time as it is mailed to Holders. Concurrently with the mailing of any Fundamental Change Notice, the Company shall issue a press release announcing such Fundamental Change referred to in the Notice, the form and content of which press release shall be determined by the Company in its sole discretion. The failure to issue any such press release or any defect therein shall not affect the validity of the Fundamental Change Notice or any proceedings for the redemption of any Series B Debenture which any Holder may elect to have the Company redeem as provided in this Section 6.

Each Fundamental Change Notice shall include a form of Option to Elect Repayment Upon A Fundamental Change and shall specify the circumstances constituting the Fundamental Change, the Repurchase Date, the Repurchase Price, whether the Repurchase Price will be paid in cash or shares of Successor Company Stock, or any combination thereof, specifying the percentages of each, that the Holder must exercise the redemption right on or prior to the close of business on the Repurchase Date (the "Fundamental Change Expiration Time"), that the Holder shall have the right to withdraw any Series B Debentures surrendered in accordance with the terms of the Series B Debentures, if the Series B Debentures are then convertible, that Series B Debentures as to which a Fundamental Change Notice has been given may be converted only if the Fundamental Change Notice is withdrawn in accordance with the terms of the Series B Debentures, a description of the procedure which a Holder must follow to exercise such redemption right and to withdraw any surrendered Series B Debentures, the place or places where the Holder is to surrender such Holder's Series B Debentures, the amount of interest accrued on each $25.00 principal amount of the Series B Debentures to the Repurchase Date and the "CUSIP" number or numbers of the Series B Debentures (if then generally in use). In the event the Company or its successor elects to pay the Repurchase Price (or a specified percentage thereof), with shares of Successor Company Stock, the Fundamental Change Notice shall also (i) state that each Holder will receive a number of shares of Successor Company Stock with a value equal to 100% of the Fundamental Change Market Price equal to such specified percentage of the Repurchase Price of the Series B Debentures to be paid in Successor Company Stock (except any cash amount to be paid in lieu of fractional shares), (ii) set forth the method of calculating the Fundamental Change Market Price of the shares of Successor Company Stock, and (iii) state that because the Fundamental Change Market Price of shares of Successor Company Stock will be determined prior to the Repurchase Date, Holders of the Series B Debentures will bear the market risk with respect to the value of the shares of Successor Company Stock to be received from the date such Fundamental Change Market Price is determined to the Repurchase Date. No failure of the Company or its successor to give the foregoing notices and no defect therein shall limit the Holders' redemption rights or affect the validity of the proceedings for the redemption of the Series B Debentures pursuant to this Section 6.

For a Series B Debenture to be so redeemed at the option of the Holder, the Paying Agent must receive such Series B Debenture with the form entitled "Option to Elect Repayment Upon A Fundamental Change" on the reverse thereof duly completed, together with such Series B Debentures duly endorsed for transfer, on or before the Fundamental Change Expiration Time. All questions as to the validity, eligibility (including time of receipt) and acceptance of any Series B Debenture for repayment shall be determined by the Company, whose determination shall be final and binding absent manifest error.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Option to Elect Repayment Upon A Fundamental Change shall have the right to withdraw such Option at any time up to the close of business on the fourth Business Day prior to the Repurchase Date by delivery of a Withdrawal Notice to the Paying Agent. The Paying Agent shall promptly notify the Company of the receipt by it of any Option to Elect Repayment Upon A Fundamental Change or Withdrawal Notice. Any Withdrawal Notice shall state: (i) the principal amount of Series B Debentures withdrawn (which must be in an amount of $25.00 or a integral multiple thereof); (ii) the certificate numbers of the withdrawn Series B Debentures or evidence compliance with the appropriate Depository procedures if certificated Series B Debentures have not been issued; and (iii) the principal amount, if any, of Series B Debentures that remains subject to the Option to Elect Repayment Upon A Fundamental Change.

The Company may, in its sole and complete discretion, accept a Withdrawal Notice on or after the third Business Day prior to a Repurchase Date. The decision of the Company to accept or reject such a withdrawal notice shall be conclusive and binding on the Holder proposing to make the withdrawal. The Paying Agent will promptly return to the respective Holders thereof any Series B Debentures with respect to which an Option to Elect Repayment Upon A Fundamental Change has been withdrawn in compliance with this Series B Debenture.

The Company and its successor will comply with any tender offer rules under the Exchange Act that may be applicable in connection with the redemption rights of the Holders of Series B Debentures in the event of a Fundamental Change.

All shares of Successor Common Stock delivered upon repurchase of the Series B Debentures shall be duly authorized, validly issued, fully paid and nonassessable. If a Holder of a purchased Series B Debenture is paid in shares

Source: GENERAL MOTORS CORP, 8-A12B/A, March 06, 2002

of Successor Company Stock, the Company or its successor shall pay any
documentary, stamp or similar issue or transfer tax due on such issue of
Successor Company Stock. However, the Holder shall pay any such tax which is due
because the Holder requests the Successor Company Stock to be issued in a name
other than the Holder's name. The Paying Agent may refuse to deliver the
certificates representing the shares of Successor Company Stock being issued in
a name other than the Holder's name until the Paying Agent receives a sum
sufficient to pay any tax which will be due because the shares of Successor
Company Stock are to be issued in a name other than the Holder's name.

Prior to 10:00 a.m. (New York City Time) on the Business Day following the
Repurchase Date, the Company or its successor shall deposit with the Trustee or
with the Paying Agent an amount of cash (in immediately available funds if
deposited on such Business Day) or Successor Company Stock, if permitted
hereunder, sufficient to pay the aggregate Repurchase Price of all the Series B
Debentures or portions thereof that are to be purchased as of the Repurchase
Date. If prior to 10:00 a.m. (New York City Time) on the Business Day following
the Repurchase Date the Trustee or Paying Agent holds an amount of cash or
Common Stock sufficient to pay the aggregate Repurchase Price of the Series B
Debentures that are to be so repurchased, then, on and after the Repurchase Date
(i) the Series B Debentures to be repurchased will cease to be Outstanding; (ii)
stated interest on such Series B Debentures will cease to accrue, and (iii) all
other rights of the Holders with respect to such Series B Debentures will
terminate, other than the right to receive the Repurchase Price upon delivery of
the Series B Debentures. This will be the case whether or not book-entry
transfer of the Series B Debentures has been made or the Series B Debentures
have been delivered to the Paying Agent. As soon as practicable after the
Repurchase Date the Company or its successor shall deliver to each Holder
entitled to receive shares of Successor Company Stock through the Paying Agent,
a certificate for the number of full shares of Successor Company Stock issuable
in payment of the Repurchase Price and cash in lieu of any fractional interests.
The person in whose name the certificate for the shares of Successor Company
Stock is registered shall be treated as a Holder of record of Successor Company
Stock on the Business Day following the Repurchase Date. No payment or
adjustment will be made for dividends on the shares of Successor Company Stock
the record date for which occurred on or prior to the Repurchase Date.

Any certificated Series B Debenture that is to be repurchased only in part
shall be surrendered at the office of the Paying Agent (with, if the Company,
its successor or the Trustee so requires, due endorsement by, or a written
instrument of transfer in form satisfactory to the Company and the Trustee duly
executed by, the Holder thereof or such Holder's attorney duly authorized in
writing) and the Company or its successor shall execute and the Trustee shall
authenticate and deliver to the Holder of such Series B Debenture; without
service charge, a new Series B Debenture or Series B Debentures, of any
authorized denomination as requested by such Holder in aggregate principal
amount equal to, and in exchange for, the portion of the principal amount of the
Series B Debenture so surrendered which is not purchased.

The Trustee and the Paying Agent shall return to the Company or its
successor any cash or shares of Successor Company Stock that remain unclaimed,
together with interest or dividends, if any, thereon, held by them for the
payment of the Repurchase Price; provided, however, that to the extent that the
aggregate amount of cash or shares of Successor Company Stock deposited by the
Company or its successor exceeds the aggregate Repurchase Price of the Series B
Debentures or portions thereof which the Company or its successor is obligated
to purchase as of the Repurchase Date then, unless otherwise agreed in writing
with the Company or its successor, promptly after the Business Day following the
Purchase Date the Trustee shall return any such excess to the Company together
with interest or dividends, if any, thereon.

Section 7.   Registration; Transfer; Governing Law
             --------------------------------------

Upon due presentment for registration of transfer of this Global Debenture
at the office or agency designated and maintained by the Company for such
purpose in the Borough of Manhattan, The City of New York, pursuant to the
provisions of the Indenture, a new Global Debenture for an equal aggregate
principal amount will be issued to the transferee in exchange therefor, subject
to the limitations provided in the Indenture, without charge except for any tax
or other governmental charge imposed in connection therewith.

The Company, the Trustee and any authorized agent of the Company or the
Trustee may deem and treat the Holder in whose name this Global Debenture is
registered as the absolute owner of this Global Debenture (whether or not this
Global Debenture shall be overdue and notwithstanding any notation of ownership
or other writing hereon), for the purpose of receiving payment of, or on account
of, the principal hereof and premium, if any, and subject to the provisions
contained herein, interest hereon, and for all other purposes, and neither the
Company nor the Trustee nor any authorized agent of the Company or the Trustee
shall be affected by any notice to the contrary.

No recourse under or upon any obligation, covenant or agreement of the
Company in the Indenture or any indenture supplemental thereto or in any Series
B Debenture, or because of the creation of any indebtedness represented thereby,
shall be had against any incorporator, stockholder, officer or director, as
such, of the Company or of any successor corporation, either directly or through
the Company or any successor corporation, under any rule of law, statute or
constitutional provision or by the enforcement of any assessment or by any legal

or equitable proceeding or otherwise, all such liability being expressly waived and released by the acceptance hereof and as part of the consideration for the issue hereof.

This Global Debenture is governed by the laws of the State of New York.

Terms used herein without definition which are defined in the Indenture shall have the meanings assigned to them in the Indenture.

This Global Debenture shall not be valid or become obligatory for any purpose until the certificate of authentication hereon shall have been signed by the Trustee under the Indenture.

Source: GENERAL MOTORS CORP, 8-A12B/A, March 06, 2002

WITNESS THE SEAL OF THE COMPANY AND THE SIGNATURES OF ITS DULY AUTHORIZED
OFFICERS.

Dated: March 6, 2002                          GENERAL MOTORS CORPORATION

                              By: _____
                                  Name:  Sanjiv Khattri
                                  Title:  Assistant Treasurer

[SEAL]

                              By: _____
                                  Name:  Antoinette Skeete
                                  Title:  Assistant Secretary

Source: GENERAL MOTORS CORP, 8-A12B/A, March 06, 2002

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

THIS IS ONE OF THE SECURITIES OF THE
SERIES DESIGNATED THEREIN REFERRED TO
IN THE WITHIN-MENTIONED INDENTURE.

CITIBANK, N.A.
  AS TRUSTEE,

By:_____
        Wafaa Orfy
        Authorized Agent

Source: GENERAL MOTORS CORP, 8-A12B/A, March 06, 2002

FOR VALUE RECEIVED the undersigned hereby sells,
assigns and transfers unto

PLEASE INSERT SOCIAL SECURITY OR OTHER
  IDENTIFYING NUMBER OF ASSIGNEE

------------------------------------

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------
Please print or typewrite name and address including postal zip code of
assignee

--------------------------------------------------------------------------------
the within Global Debenture of GENERAL MOTORS   CORPORATION and hereby
irrevocably constitutes and appoints

_____attorney to
transfer said Global Debenture on the books of the within-named Company, with
full power of substitution in the premises.

Dated:_____

                                    SIGN HERE  _____
                                               NOTICE:   THE   SIGNATURE   OF
                                               THIS        ASSIGNMENT      MUST
                                               CORRESPOND  WITH  THE  NAME AS
                                               WRITTEN  UPON  THE FACE OF THE
                                               WITHIN   INSTRUMENT  IN  EVERY
                                               PARTICULAR  WITHOUT ALTERATION
                                               OR  ENLARGEMENT  OR ANY CHANGE
                                               WHATEVER.

                                               SIGNATURE GUARANTEED

--------------------------------

CONVERSION NOTICE
--------------------------------

To convert this Security into
Common Stock of the Company,
check the box [    ]
--------------------------------

To convert only part of this
Security, state the principal
amount to be converted (which
must be $25.00 or an integral
multiple of $25.00):

If you want the stock certificate
made out in another person's name
fill in the form below:

----------------------------

----------------------------
(Insert the other person's
 soc. sec. tax ID no.)

----------------------------

----------------------------

----------------------------

----------------------------
(Print or type other person's
 name, address and zip code)
--------------------------------

Date:          Your Signature:
    ----------          ----------------------------

-------------------------------------------------------------
 (Sign exactly as your name appears on the other side of this Security)
Signature Guaranteed

--------------------------------
Participant in a Recognized Signature
Guarantee Medallion Program

By:
    ----------------------------
          Authorized Signatory

PURCHASE NOTICE

TO:   GENERAL MOTORS CORPORATION

      CITIBANK, N.A.

The undersigned registered owner of this Series B Debenture hereby irrevocably acknowledges receipt of a notice from General Motors Corporation (the "Company") regarding the right of Holders to elect to require the Company to repurchase the Series B Debentures and requests and instructs the Company to repay the entire principal amount of this Series B Debenture, or the portion thereof (which is $25.00 or an integral multiple thereof) below designated, in accordance with the terms of this Series B Debenture at the price of 100% of such entire principal amount or portion thereof, together with accrued interest to, but excluding, the Repurchase Date, to the registered Holder hereof. Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Series B Debenture. The Series B Debentures shall be purchased by the Company as of the Purchase Date pursuant to the terms and conditions specified in the Series B Debenture. In the event the Company elects to pay the Purchase Price, in whole or in part, in shares of Common Stock but such portion of the Purchase Price shall ultimately be paid to such Holder entirely in cash because any of the conditions to payment of the Purchase Price in shares of Common Stock is not satisfied prior to the close of business on the relevant Purchase Date, the undersigned registered owner elects:

[ ] to withdraw this Purchase Notice as to $[] principal amount of the Series B Debentures to which this Purchase Notice relates (Certificate Numbers:                    ), or

[ ] to receive cash in respect of $[] principal amount of the Series B Debentures to which this Purchase Notice relates.

      Dated:

      Signature(s)

      NOTICE: The above signatures of the Holder(s) hereof must correspond with the name as written upon the face of the Series B Debenture in every particular without alteration or enlargement or any change whatever.

      Certificate Number (if applicable):

      Principal amount to be repaid (if less than all):

      Social Security or Other Taxpayer Identification Number

Source: GENERAL MOTORS CORP, 8-A12B/A, March 06, 2002

OPTION TO ELECT REPAYMENT UPON A FUNDAMENTAL CHANGE

TO:    GENERAL MOTORS CORPORATION

       CITIBANK, N.A.

The undersigned registered owner of this Series B Debenture hereby irrevocably acknowledges receipt of a notice from General Motors Corporation (the "Company") as to the occurrence of a Fundamental Change with respect to the Company and requests and instructs the Company to repay the entire principal amount of this Series B Debenture, or the portion thereof (which is $25.00 or an integral multiple thereof) below designated, in accordance with the terms of this Series B Debenture at the price of 100% of such entire principal amount or portion thereof, together with accrued interest to, but excluding, the Repurchase Date, to the registered Holder hereof. Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Series B Debenture. The Series B Debentures shall be purchased by the Company as of the Repurchase Date pursuant to the terms and conditions specified in the Series B Debenture. In the event the Company elects to pay the Repurchase Price, in whole or in part, in shares of Successor Company Stock but such portion of the Repurchase Price shall ultimately be paid to such Holder entirely in cash because any of the conditions to payment of the Repurchase Price in shares of Successor Company Stock is not satisfied prior to the close of business on the relevant Repurchase Date, the undersigned registered owner elects:

[   ] to withdraw this Option to Elect Repayment Upon A Fundamental  Change as to $[]  principal  amount of the Series B Debentures  to which this  Repurchase Notice relates (Certificate Numbers:                       ), or

[ ] to receive cash in respect of $[] principal amount of the Series B Debentures to which this Option to Elect Repayment Upon A Fundamental Change relates.

       Dated:

       Signature(s)

       NOTICE: The above signatures of the Holder(s) hereof must correspond with the name as written upon the face of the Series B Debenture in every particular without alteration or enlargement or any change whatever.

       Certificate Number (if applicable):

       Principal amount to be repaid (if less than all):

       Social Security or Other Taxpayer Identification Number

---

Created by 10KWizard    www.10KWizard.com

... ... ... .... ... ... ..... .......

## GENERAL MOTORS CORPORATION

and

## CITIBANK, N.A. as

Trustee

## SECOND SUPPLEMENTAL INDENTURE

Dated as of November 5, 2004

## SUPPLEMENTAL INDENTURE

SECOND SUPPLEMENTAL INDENTURE, dated as of November 5, 2004, between GENERAL MOTORS CORPORATION, a corporation duly organized and existing under the laws of the State of Delaware (the "Company"), and CITIBANK, N.A., a national banking association duly organized and existing under the laws of the United States of America (the "Trustee," which term shall include any successor trustee appointed pursuant to Article Seven of the Indenture (as defined below)).

### WITNESSETH:

WHEREAS, the Company and the Trustee have heretofore executed and delivered the Indenture, dated as of December 7, 1995 (the "Indenture"), providing for the issuance from time to time of one or more series of debt securities evidencing unsecured indebtedness of the Company, and the First Supplemental Indenture, dated as of March 4, 2002. Terms used in this Second Supplemental Indenture which are defined in the Indenture shall have the meanings assigned to them in the Indenture.

WHEREAS, in March 2002, pursuant to the Indenture, the Company issued $1.15 billion of 4.50 percent Series A Convertible Senior Debentures due March 6, 2032 (the "Series A Debentures").

WHEREAS, the provisions of the Series A Debentures are set forth in the Global Note evidencing the Series A Debentures.

WHEREAS, the terms of the Series A Debentures permit the Company to elect (in its sole discretion) to deliver cash or Company common stock, or a combination of cash and Company common stock, upon certain conversion events and repurchase events specified in the Series A Debentures.

WHEREAS, the Company desires to limit in certain respects its rights to elect to deliver Company common stock in connection with any such future conversion and repurchase events with respect to the Series A Debentures.

WHEREAS, the Trustee, pursuant to Section 10.01 of the Indenture, is authorized to join with the Company in the execution of any supplemental indenture made pursuant thereto and to make any further appropriate agreements and stipulations which may be contained therein.

NOW, THEREFORE, in furtherance of the premises herein, the Company and the Trustee hereby stipulate as follows:

Section 1. Section 1 of each outstanding Series A Debenture and all Series A Debentures hereafter issued (as a result of transfer, further issuances or otherwise) shall hereby be irrevocably amended as provided in this Section, without any further action on the part of the Company, the Trustee or any holder of Series A Debentures. The following two sentences shall be added at the end of the second paragraph of Section 1 of the Series A Debentures as follows:

"Notwithstanding any other provision herein to the contrary, in connection with all such conversions of Series A Debentures, the Company shall make the election referenced above to pay cash, in lieu of the issuance of shares of Common Stock, with respect to a number of Series A Debentures being converted as of any Conversion Date that is at least equal to the quotient determined by dividing (i) the aggregate principal amount of all Series A Debentures being converted as of such Conversion Date by (ii) the product of (A) the Conversion Rate multiplied by (B) the Closing Sale Price of the Common Stock on such Conversion Date, rounded up to the nearest whole number. For the avoidance of doubt, the Company retains the right to pay cash in lieu of shares of Common Stock, or to deliver shares of Common Stock with respect to any other Series A Debentures being converted as of any such Conversion Date."

Section 2. Section 2 of each outstanding Series A Debenture and all Series A Debentures hereafter issued (as a result of transfer, further issuances or otherwise) shall hereby be irrevocably amended as provided in this Section, without any further action on the part of the Company, the Trustee or any holder of Series A Debentures. A new third sentence to the second paragraph of Section 2 shall be added as follows:

"Notwithstanding any other provision herein to the contrary, in connection with all Principal Value Conversions of Series A Debentures, the Company shall opt to pay only cash, in lieu of the issuance of shares of Common Stock."

Section 3. Section 5 of each outstanding Series A Debenture and all Series A Debentures hereafter issued (as a result of transfer, further issuances or otherwise) shall hereby be irrevocably amended as provided in this Section, without any further action on the part of the Company, the Trustee or any holder of Series A Debentures. A new second sentence to the second paragraph of Section 5 shall be added as follows:

"Notwithstanding any other provision herein to the contrary, in connection with all purchases of Series A Debentures pursuant to this Section 5, the Company shall elect to pay for such Series A Debentures only in cash, subject to the conditions set forth herein. "

Section 4. Section 6 of each outstanding Series A Debenture and all Series A Debentures hereafter issued (as a result of transfer, further issuances or otherwise) shall hereby be irrevocably amended as provided in this Section, without any further action on the part of the Company, the Trustee or any holder of Series A Debentures. A new second sentence to the third paragraph of Section 6 shall be added as follows:

"Notwithstanding any other provision herein to the contrary, in connection with all purchases of Series A Debentures pursuant to this Section 6, the Company shall elect to pay for such Series A Debentures only in cash, subject to the conditions set forth herein. "

Section 5. Recitals. The recitals contained herein shall be taken on the statements of the Company and the Trustee assumes no responsibility for their correctness. The Trustee makes no representation as to the validity or sufficiency of this Second Supplemental Indenture.

Section 6. Counterparts. This Second Supplemental Indenture may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same instrument.

Section 7. New York Contract. This Second Supplemental Indenture shall be deemed to be a contract made under the law of the State of New York, and for all purposes shall be governed by and construed in accordance with the laws of the said State, regardless of the laws that might otherwise govern under applicable New York principles of conflicts of law and except as may otherwise be required by mandatory provisions of law. Any claims or proceedings in respect of this Second Supplemental Indenture shall be heard in a federal or state court located in the State of New York.

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have caused this Second Supplemental Indenture to be duly executed.

GENERAL MOTORS CORPORATION

By:_____
Name: Walter G. Borst
Title: Treasurer


**CITIBANK, N.A., as Trustee**

By:_____
Name: Wafaa Orfy
Title: Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Second Supplemental Indenture to be duly executed.

**GENERAL MOTORS CORPORATION**

By:_____
Name: Walter G. Borst
Title: Treasurer

**CITIBANK, N.A., as Trustee**

By:_____
Name: Wafaa Orfy
Title: Vice President

GENERAL MOTORS CORPORATION

and

CITIBANK, N.A. as

Trustee

THIRD SUPPLEMENTAL INDENTURE

Dated as of November 5, 2004

SUPPLEMENTAL INDENTURE

THIRD SUPPLEMENTAL INDENTURE, dated as of November 5, 2004, between GENERAL MOTORS CORPORATION, a corporation duly organized and existing under the laws of the State of Delaware (the "Company"), and CITIBANK, N.A., a national banking association duly organized and existing under the laws of the United States of America (the "Trustee," which term shall include any successor trustee appointed pursuant to Article Seven of the Indenture (as defined below)).

WITNESSETH:

WHEREAS, the Company and the Trustee have heretofore executed and delivered the Indenture, dated as of December 7, 1995 (the "Indenture"), providing for the issuance from time to time of one or more series of debt securities evidencing unsecured indebtedness of the Company, the First Supplemental Indenture, dated as of March 4, 2002, and the Second Supplemental Indenture, dated as of the date hereof. Terms used in this Third Supplemental Indenture which are defined in the Indenture shall have the meanings assigned to them in the Indenture.

WHEREAS, in March 2002, pursuant to the Indenture, the Company issued $2.6 billion of 5.25 percent Series B Convertible Senior Debentures due March 6, 2032 (the "Series B Debentures").

WHEREAS, the provisions of the Series B Debentures are set forth in the Global Note evidencing the Series B Debentures.

WHEREAS, the terms of the Series B Debentures permit the Company to elect (in its sole discretion) to deliver cash or Company common stock, or a combination of cash and Company common stock, upon certain conversion events and repurchase events specified in the Series B Debentures.

WHEREAS, the Company desires to limit in certain respects its rights to elect to deliver Company common stock in connection with any such future conversion and repurchase events with respect to the Series B Debentures.

WHEREAS, the Trustee, pursuant to Section 10.01 of the Indenture, is authorized to join with the Company in the execution of any supplemental indenture made pursuant thereto and to make any further appropriate agreements and stipulations which may be contained therein.

NOW, THEREFORE, in furtherance of the premises herein, the Company and the Trustee hereby stipulate as follows:

Section 1. Section 1 of each outstanding Series B Debenture and all Series B Debentures hereafter issued (as a result of transfer, further issuances or otherwise) shall hereby be irrevocably amended as provided in this Section, without any further action on the part of the Company, the Trustee or any holder of Series B Debentures. The following two sentences shall be added at the end of the second paragraph of Section 1 of the Series B Debentures as follows:

-1-

"Notwithstanding any other provision herein to the contrary, in connection with all such conversions of Series B Debentures, the Company shall make the election referenced above to pay cash, in lieu of the issuance of shares of Common Stock, with respect to a number of Series B Debentures being converted as of any Conversion Date that is at least equal to the quotient determined by dividing (i) the aggregate principal amount of all Series B Debentures being converted as of such Conversion Date by (ii) the product of (A) the Conversion Rate multiplied by (B) the Closing Sale Price of the Common Stock on such Conversion Date, rounded up to the nearest whole number. For the avoidance of doubt, the Company retains the right to pay cash in lieu of shares of Common Stock, or to deliver shares of Common Stock with respect to any other Series B Debentures being converted as of any such Conversion Date."

Section 2. Section 2 of each outstanding Series B Debenture and all Series B Debentures hereafter issued (as a result of transfer, further issuances or otherwise) shall hereby be irrevocably amended as provided in this Section, without any further action on the part of the Company, the Trustee or any holder of Series B Debentures. A new third sentence to the second paragraph of Section 2 shall be added as follows:

"Notwithstanding any other provision herein to the contrary, in connection with all Principal Value Conversions of Series B Debentures, the Company shall opt to pay only cash, in lieu of the issuance of shares of Common Stock."

Section 3. Section 5 of each outstanding Series B Debenture and all Series B Debentures hereafter issued (as a result of transfer, further issuances or otherwise) shall hereby be irrevocably amended as provided in this Section, without any further action on the part of the Company, the Trustee or any holder of Series B Debentures. A new second sentence to the second paragraph of Section 5 shall be added as follows:

"Notwithstanding any other provision herein to the contrary, in connection with all purchases of Series B Debentures pursuant to this Section 5, the Company shall elect to pay for such Series B Debentures only in cash, subject to the conditions set forth herein."

Section 4. Section 6 of each outstanding Series B Debenture and all Series B Debentures hereafter issued (as a result of transfer, further issuances or otherwise) shall hereby be irrevocably amended as provided in this Section, without any further action on the part of the Company, the Trustee or any holder of Series B Debentures. A new second sentence to the third paragraph of Section 6 shall be added as follows:

"Notwithstanding any other provision herein to the contrary, in connection with all purchases of Series B Debentures pursuant to this Section 6, the Company shall elect to pay for such Series B Debentures only in cash, subject to the conditions set forth herein."

Section 5. Recitals. The recitals contained herein shall be taken on the statements of the Company and the Trustee assumes no responsibility for their correctness. The Trustee makes no representation as to the validity or sufficiency of this Third Supplemental Indenture.

Section 6. Counterparts. This Third Supplemental Indenture may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same instrument.

Section 7. New York Contract. This Third Supplemental Indenture shall be deemed to be a contract made under the law of the State of New York, and for all purposes shall be governed by and construed in accordance with the laws of the said State, regardless of the laws that might otherwise govern under applicable New York principles of conflicts of law and except as may otherwise be required by mandatory provisions of law. Any claims or proceedings in respect of this Third Supplemental Indenture shall be heard in a federal or state court located in the State of New York.

*   *   *   *   *

IN WITNESS WHEREOF, the parties hereto have caused this Third Supplemental Indenture to be duly executed.

**GENERAL MOTORS CORPORATION**

By:_____

Name: Walter G. Borst

Title: Treasurer

**CITIBANK, N.A., as Trustee**

By:_____

Name: Wafaa Orfy

Title: Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Third Supplemental Indenture to be duly executed.

GENERAL MOTORS CORPORATION

By:_____
Name: Walter G. Borst
Title: Treasurer

CITIBANK, N.A., as Trustee

By:_____
Name: Wafaa Orfy
Title: Vice President

GENERAL MOTORS CORPORATION

and

CITIBANK, N.A. as

Trustee

FOURTH SUPPLEMENTAL INDENTURE

Dated as of November 5, 2004

SUPPLEMENTAL INDENTURE

FOURTH SUPPLEMENTAL INDENTURE, dated as of November 5, 2004, between GENERAL MOTORS CORPORATION, a corporation duly organized and existing under the laws of the State of Delaware (the "Company"), and CITIBANK, N.A., a national banking association duly organized and existing under the laws of the United States of America (the "Trustee," which term shall include any successor trustee appointed pursuant to Article Seven of the Indenture (as defined below)).

WITNESSETH:

WHEREAS, the Company and the Trustee have heretofore executed and delivered the Indenture, dated as of December 7, 1995 (the "Indenture"), providing for the issuance from time to time of one or more series of debt securities evidencing unsecured indebtedness of the Company, the First Supplemental Indenture, dated as of March 4, 2002, the Second Supplemental Indenture, dated as of the date hereof, and the Third Supplemental Indenture, dated as of the date hereof. Terms used in this Fourth Supplemental Indenture which are defined in the Indenture shall have the meanings assigned to them in the Indenture.

WHEREAS, in July 2003, pursuant to the Indenture, the Company issued $4.3 billion of 6.25 percent Series C Convertible Senior Debentures due July 15, 2033 (the "Series C Debentures").

WHEREAS, the provisions of the Series C Debentures are set forth in the Global Note evidencing the Series C Debentures.

WHEREAS, the terms of the Series C Debentures permit the Company to elect (in its sole discretion) to deliver cash or Company common stock, or a combination of cash and Company common stock, upon certain conversion events and repurchase events specified in the Series C Debentures.

WHEREAS, the Company desires to limit in certain respects its rights to elect to deliver Company common stock in connection with any such future conversion and repurchase events with respect to the Series C Debentures.

WHEREAS, the Trustee, pursuant to Section 10.01 of the Indenture, is authorized to join with the Company in the execution of any supplemental indenture made pursuant thereto and to make any further appropriate agreements and stipulations which may be contained therein.

NOW, THEREFORE, in furtherance of the premises herein, the Company and the Trustee hereby stipulate as follows:

Section 1. Section 1 of each outstanding Series C Debenture and all Series C Debentures hereafter issued (as a result of transfer, further issuances or otherwise) shall hereby be irrevocably amended as provided in this Section, without any further action on the part of the Company, the Trustee or any holder of Series C Debentures. The following two sentences shall be added at the end of the second paragraph of Section 1 of the Series C Debentures as follows:

CHICAGO_1165250_1

"Notwithstanding any other provision herein to the contrary, in connection with all such conversions of Series C Debentures, the Company shall make the election referenced above to pay cash, in lieu of the issuance of shares of Common Stock, with respect to a number of Series C Debentures being converted as of any Conversion Date that is at least equal to the quotient determined by dividing (i) the aggregate principal amount of all Series C Debentures being converted as of such Conversion Date by (ii) the product of (A) the Conversion Rate multiplied by (B) the Closing Sale Price of the Common Stock on such Conversion Date, rounded up to the nearest whole number. For the avoidance of doubt, the Company retains the right to pay cash in lieu of shares of Common Stock, or to deliver shares of Common Stock with respect to any other Series C Debentures being converted as of any such Conversion Date."

Section 2.  Section 2 of each outstanding Series C Debenture and all Series C Debentures hereafter issued (as a result of transfer, further issuances or otherwise) shall hereby be irrevocably amended as provided in this Section, without any further action on the part of the Company, the Trustee or any holder of Series C Debentures. A new third sentence to the second paragraph of Section 2 shall be added as follows:

"Notwithstanding any other provision herein to the contrary, in connection with all Principal Value Conversions of Series C Debentures, the Company shall opt to pay only cash, in lieu of the issuance of shares of Common Stock."

Section 3.  Section 5 of each outstanding Series C Debenture and all Series C Debentures hereafter issued (as a result of transfer, further issuances or otherwise) shall hereby be irrevocably amended as provided in this Section, without any further action on the part of the Company, the Trustee or any holder of Series C Debentures. A new second sentence to the second paragraph of Section 5 shall be added as follows:

"Notwithstanding any other provision herein to the contrary, in connection with all purchases of Series C Debentures pursuant to this Section 5, the Company shall elect to pay for such Series C Debentures only in cash, subject to the conditions set forth herein. "

Section 4.  Section 6 of each outstanding Series C Debenture and all Series C Debentures hereafter issued (as a result of transfer, further issuances or otherwise) shall hereby be irrevocably amended as provided in this Section, without any further action on the part of the Company, the Trustee or any holder of Series C Debentures. A new second sentence to the third paragraph of Section 6 shall be added as follows:

"Notwithstanding any other provision herein to the contrary, in connection with all purchases of Series C Debentures pursuant to this Section 6, the Company shall elect to pay for such Series C Debentures only in cash, subject to the conditions set forth herein. "

Section 5.    Recitals. The recitals contained herein shall be taken on the statements of the Company and the Trustee assumes no responsibility for their correctness. The Trustee makes no representation as to the validity or sufficiency of this Fourth Supplemental Indenture.

Section 6.    Counterparts. This Fourth Supplemental Indenture may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same instrument.

Section 7.  New York Contract. This Fourth Supplemental Indenture shall be deemed to be a contract made under the law of the State of New York, and for all purposes shall be governed by and construed in accordance with the laws of the said State, regardless of the laws that might otherwise govern under applicable New York principles of conflicts of law and except as may otherwise be required by mandatory provisions of law. Any claims or proceedings in respect of this Fourth Supplemental Indenture shall be heard in a federal or state court located in the State of New York.

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have caused this Fourth Supplemental Indenture to be duly executed.

GENERAL MOTORS CORPORATION

By:_____
Name: Walter G. Borst
Title: Treasurer

CITIBANK, N.A., as Trustee

By:_____
Name: Wafaa Orfy
Title: Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Fourth Supplemental Indenture to be duly executed.

**GENERAL MOTORS CORPORATION**

By:_____
Name: Walter G. Borst
Title: Treasurer


CITIBANK, N.A., as Trustee

By:_____
Name: Wafaa Orfy
Title: Vice President

GENERAL MOTORS CORPORATION

and

WILMINGTON TRUST COMPANY as

Trustee

SUPPLEMENTAL INDENTURE

Dated as of August 13, 2007

SUPPLEMENTAL INDENTURE, dated as of August 13, 2007, between GENERAL MOTORS CORPORATION, a corporation duly organized and existing under the laws of the State of Delaware (the "Company"), and WILMINGTON TRUST COMPANY, a banking corporation duly organized and existing under the laws of the State of Delaware (the "Trustee"). The term "Trustee" shall include any successor trustee appointed pursuant to Article Seven of the Indenture (as defined below).

### WITNESSETH:

WHEREAS, the Company and the Citibank, N.A., as predecessor to the Trustee, have heretofore executed and delivered the Indenture, dated as of December 7, 1995 (the "Indenture"), providing for the issuance from time to time of one or more series of debt securities evidencing unsecured indebtedness of the Company, the First Supplemental Indenture, dated as of March 4, 2002, the Second Supplemental Indenture, dated as of November 5, 2004, the Third Supplemental Indenture, dated as of November 5, 2004 and the Fourth Supplemental Indenture, dated as November 5, 2004. Terms used in this Supplemental Indenture that are defined in the Indenture shall have the meanings assigned to them in the Indenture.

WHEREAS, Appendix A hereto identifies approximately $12.46 billion in U.S. dollar denominated non-convertible debt Securities, represented by 13 series of Securities, issued and outstanding under the Indenture.

WHEREAS, each series of Securities identified on Appendix A hereto was issued in the form of Global Securities (collectively, the "Global Notes").

WHEREAS, each of the Global Notes is subject to the Indenture and all indentures supplemental thereto, each Global Note containing a paragraph as follows:

"This Global Bond is one of a duly authorized issue of debentures, notes, bonds or other evidences of indebtedness of the Company (hereinafter called the "Securities") of the series hereinafter specified, all issued or to be issued under and pursuant to an indenture dated as of December 7, 1995 (herein called the "Indenture"), duly executed and delivered by the Company to Citibank, N.A. (herein called the "Trustee") to which Indenture and all indentures supplemental thereto reference is hereby made for a description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Trustee, the Company and the holders of the Securities;"

WHEREAS, certain provisions of the Indenture are described in each of the Global Notes.

WHEREAS, the first sentence of the fourth paragraph of each of the Global Notes contains a description of the vote of Holders required by Section 10.02 of the Indenture to enter into certain supplemental indentures, the text of which, up to the first semi-colon, is as follows:

"The Indenture contains provisions permitting the Company and the Trustee, with the consent of the Holders of not less than 66 2/3% in aggregate principal amount of the Securities at the time Outstanding (as defined in the Indenture) of all series to be affected (voting as one class), evidenced as in the Indenture provided, to execute supplemental indentures adding any provisions to or

changing in any manner or eliminating any of the provisions of the Indenture or of any supplemental indenture or modifying in any manner the rights of the Holders of the Securities of each such series;"

WHEREAS, the Global Notes incorrectly summarize Section 10.02 of the Indenture with respect to the percentage in aggregate principal amount of Securities outstanding required to execute such supplemental indentures, the Indenture expressly providing for approval by a majority rather than 66 2/3% in aggregate principal amount of Securities outstanding, the text of the first paragraph of Section 10.02, up to the first semi-colon, being as follows:

"With the consent (evidenced as provided in Section 8.01) of the Holders of not less than a majority in the aggregate principal amount of the Securities of all series at the time outstanding affected by such supplemental indenture (voting as one class), the Corporation, when authorized by a Board Resolution, and the Trustee may from time to time and at any time enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of any supplemental indentures or modifying in any manner the rights of the Holders of the Securities of each such series or any Coupons appertaining to such Securities;"

WHEREAS, the Company desires to correct this description of the Indenture in the Global Notes.

WHEREAS, the Trustee, pursuant to Section 10.01 of the Indenture, is authorized to join with the Company in the execution of any supplemental indenture made pursuant thereto and to make any further appropriate agreements and stipulations which may be contained therein, which section provides that the Company may enter into a supplemental indenture:

"to cure any ambiguity or to correct or supplement any provision contained herein or in any supplemental indenture which may be defective or inconsistent with any other provision contained herein or in any supplemental indenture; to convey, transfer, assign, mortgage or pledge any property to or with the Trustee; or to make such other provisions in regard to matters or questions arising under this Indenture as shall not adversely affect the interests of the Holders of any series of Securities or any Coupons appertaining to such Securities;"

NOW, THEREFORE, in furtherance of the premises herein, the Company and the Trustee hereby stipulate as follows:

Section 1.  The first sentence of the fourth paragraph of each of the Global Notes (or other applicable portion) shall be and hereby is amended, without any further action on the part of the Company, the Trustee or the Holder of any Global Note, by deleting the phrase "66 2/3%" contained therein and replacing it with the phrase "a majority," so that the paragraph, up to the first semi-colon, shall read as follows:

"The Indenture contains provisions permitting the Company and the Trustee, with the consent of the Holders of not less than a majority in aggregate principal amount of the Securities at the time Outstanding (as defined in the Indenture) of all series to be affected (voting as one class), evidenced as in the Indenture provided, to execute supplemental indentures adding any provisions to or changing in any manner or eliminating any of the provisions of the Indenture or of any supplemental indenture or modifying in any manner the rights of the Holders of the Securities of each such series;"

Section 2.  Recitals. The recitals contained herein shall be taken as the statements of the Company and the Trustee assumes no responsibility for their correctness. The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.

Section 3.  Counterparts. This Supplemental Indenture may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same instrument.

Section 4.  New York Contract. This Supplemental Indenture shall be deemed to be a contract made under the law of the State of New York, and for all purposes shall be governed by and construed in accordance with the laws of the said State, regardless of the laws that might otherwise govern under applicable New York principles of conflicts of law and except as may otherwise be required by mandatory provisions of law. Any claims or proceedings in respect of this Supplemental Indenture shall be heard in a federal or state court located in the State of New York.

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed.

GENERAL MOTORS CORPORATION

By:_____
Name:
Title:


WILMINGTON TRUST COMPANY,
not in its individual capacity but solely as
Trustee

By:_____
Name:
Title:

Section 4.  New York Contract. This Supplemental Indenture shall be deemed to be a contract made under the law of the State of New York, and for all purposes shall be governed by and construed in accordance with the laws of the said State, regardless of the laws that might otherwise govern under applicable New York principles of conflicts of law and except as may otherwise be required by mandatory provisions of law. Any claims or proceedings in respect of this Supplemental Indenture shall be heard in a federal or state court located in the State of New York.

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed.

GENERAL MOTORS CORPORATION

By:_____
Name:
Title:

WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Trustee

By:_____
Name:
Title:

Geoffrey J. Lewis
Financial Services Officer

## Appendix A

6 3/8% Notes due May 1, 2008
7.20% Notes due January 15, 2011
7.125% Senior Notes due July 15, 2013
7.70% Debentures due April 15, 2016
8.250% Debentures due July 15, 2023
8.10% Debentures due June 15, 2024
6 3/4% Debentures due May 1, 2028
8.375% Debentures due July 15, 2033
7.375% Senior Notes due May 15, 2048
7.25% Quarterly Interest Bonds due April 15, 2041
7.50% Senior Notes due July 1, 2044
7.375% Senior Notes due May 23, 2048
7.25% Senior Notes due February 15, 2052