# Texas AG 7



General Motors Corporation

June 1, 2009

Via Federal Express

[DEALER ENTITY CORPORATE NAME]
[DEALER ADDRESS]

       Re:    *GM Dealer Sales and Service Agreement/Participation Agreement*

Attention: _____

      [DEALER ENTITY CORPORATE NAME] ("Dealer") and General Motors Corporation ("GM") are parties to a Dealer Sales and Service Agreement (the "Dealer Agreement") for [BRAND RETAINED] motor vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this letter agreement have the definitions set forth for such terms in the Dealer Agreement.

      GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). No trustee has been appointed and GM is operating its business as debtor-in-possession.

      GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets"), to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court. GM's restructuring in the Bankruptcy Case involves, among other things, the restructuring of its current dealer network. Part of that restructuring includes focus on and retention of those dealers who, based on a number of factors, GM believes have an opportunity to be successful dealers selling and servicing GM's products.

      Dealer recognizes that as part of GM's restructuring efforts, a significant number of dealers of the same line make as Dealer will be consolidated. Because this consolidation will result in fewer dealers representing the Existing Model Line, the retained dealers, including Dealer, will have the opportunity to increase sales significantly. It is therefore vital to Dealer and GM that Dealer agree to implement additional sales and inventory requirements necessary for Dealer to be retained in the 363 Acquirer's dealer network and for Dealer's performance to be in line with such increased opportunity.

      In consideration for Dealer's execution and delivery of, and performance under, this letter agreement and subject to Bankruptcy Court approval, GM (i) shall not move to reject the Dealer Agreement in the Bankruptcy Case, and (ii) shall assign the Dealer Agreement to the 363 Acquirer as part of the 363 Sale, provided such sale closes.



OR THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

EXHIBIT 7

As a condition of its participation in the 363 Acquirer's dealer network and in consideration of GM's agreements set forth herein, Dealer shall execute and deliver this letter agreement to GM. This letter agreement contains terms that supplement the Dealer Agreement[s] and incorporates requirements that GM believes will enhance Dealer's and the 363 Acquirer's opportunities for success. In addition, GM expects that GM or the 363 Acquirer will from time to time, subject to modification in its sole discretion, publish essential brand element guidelines for dealership operations, including Dealer's operations. The essential brand elements are GM's and the 363 Acquirer's minimum standards for dealership operations and include, among other things, facility image requirements and/or relocation requirements, dedicated sales and service requirements for the Existing Model Line, and participation in customer information programs.

This letter agreement will become effective upon the date of Dealer's due execution and delivery of this letter agreement to GM (the "Effective Date"). If Dealer executes and delivers this letter agreement to GM on or before **June 12, 2009**, subject to Bankruptcy Court approval, the 363 Assets will include, without limitation, the Dealer Agreement, as supplemented by this letter agreement. If Dealer does not sign and deliver to GM this letter agreement on or before **June 12, 2009**, GM may, in its sole discretion, move to reject the Dealer Agreement[s] in the Bankruptcy Case. If the 363 Sale does not occur on or before August 31, 2009 (or such later date as GM or the 363 Acquirer may select in their sole discretion), GM or the 363 Acquirer may, at their sole option and at any time thereafter, terminate this letter agreement by written notice to Dealer.

## SUPPLEMENTAL TERMS

1. <u>Defined Terms</u>. All initially capitalized terms used and not otherwise expressly defined herein shall have the meanings set forth for such terms in the Dealer Agreement[s].

2. <u>Sales Performance</u>. Dealer recognizes that, as a result of the consolidation of GM dealers undertaken by GM to strengthen the dealer network and increase dealer through-put, Dealer has substantially more sales opportunities and Dealer must substantially increase its sales of new Motor Vehicles. The 363 Acquirer will provide to Dealer an annual number of new Motor Vehicles that Dealer must sell to meet the 363 Acquirer's increased sales expectations and will update such annual sales number on a periodic basis throughout each year. Dealer's requirements to meet the 363 Acquirer's sales targets are in addition to the sales effectiveness requirements of the current Dealer Agreement. Dealer acknowledges and agrees that compliance with the sales effectiveness requirements of the Dealer Agreement alone will not be sufficient to meet the requirements of this Section 2 and Dealer must meet the sales effectiveness requirements of the Dealer Agreement, as supplemented by this letter agreement.

3. <u>New Vehicle Inventory</u>. Dealer recognizes that, due to the consolidation of GM dealers representing the Existing Model Line and the expected sales increases contemplated in Section 2 above, Dealer will need to stock additional Motor Vehicles. Dealer shall use its best efforts to stock sufficient additional new Motor Vehicles to meet the increased sales expectations. To facilitate its expected increased sales, Dealer shall, upon the written request from the 363 Acquirer, order and accept from the 363 Acquirer additional new Motor Vehicles of the Existing Model Line to meet or exceed the sales guidelines provided by the 363 Acquirer relating to Dealer's increased sales expectations contemplated in Section 2 above. In addition, upon Dealer's written request, the 363 Acquirer shall coordinate with, and provide to, GMAC (or such other floor plan provider designated by Dealer), updated sales expectations and other information necessary for GMAC (or such other floor plan provider designated by Dealer) to act upon Dealer's request for additional floor plan funding.

08 **THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

4. <u>Exclusivity</u>. During the remaining term of the Dealer Agreement[s] (the "<u>Exclusivity Period</u>"), Dealer shall actively and continuously conduct Dealership Operations only for the Existing Model Line[s] at the premises authorized for the conduct of Dealership Operations under the Dealer Agreement (the "<u>Dealership Premises</u>"). During the Exclusivity Period, the Dealership Premises may not be used for any purpose other than Dealership Operations for the Existing Model Line[s] (including, but not limited to, the sale, display, storage and/or service of vehicles not approved by the Dealer Agreement[s], other than as specifically contemplated by the term "Dealership Operations") without the express prior written consent of GM or the 363 Acquirer, which consent may be granted or withheld in GM's or the 363 Acquirer's sole discretion. In the event that Dealer currently operates any non-GM dealership on the Dealership Premises, Dealer shall cease all non-GM Dealership Operations at the Dealership Premises on or before December 31, 2009. Notwithstanding anything to the contrary in the Dealer Agreement, state law or otherwise, if Dealer fails to cure any default under this Section 4 within thirty (30) days after written notice of default from GM or the 363 Acquirer, GM or the 363 Acquirer shall be entitled to all of their remedies as set forth in Section 8 below, including without limitation, the right to terminate the Dealer Agreement.

5. <u>No Protest.</u> In connection with GM's restructuring plan and consolidation of the dealer network, GM intends that GM and the 363 Acquirer have a dealer network consisting of fewer, stronger and more properly located dealers allowing for higher through-put and enhanced business potential.

(a)     GM or the 363 Acquirer may desire to relocate or establish representation for the sale and service of motor vehicles for the Existing Model Line at a site located in the vicinity of the Dealership Premises (the "<u>Proposed Site</u>"). In consideration of GM's and the 363 Acquirer's covenants and obligations herein, and provided that (i) GM or the 363 Acquirer notifies Dealer of any such relocation or establishment within two (2) years after the later of (x) the date of the 363 Sale or (y) the Effective Date (the "<u>No Protest Commencement Date</u>"), (ii) such relocation or establishment is substantially completed on or before the date which is four (4) years after the No Protest Commencement Date, and (iii) the Proposed Site is, measured by straight line distance, at least six (6) miles from the then current location of the Dealership Premises, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or tribunal or in any dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, establishment or relocation of a motor vehicle dealership for the Existing Model Line at or in the vicinity of the Proposed Site.

(b)     Dealer, for itself, its Affiliates (as defined below) and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "<u>Dealer Parties</u>"), hereby releases and forever discharges GM, the 363 Acquirer, their Affiliates and their respective members, partners, venturers, stockholders, directors, officers, employees, agents, spouses, legal representatives, successors and assigns (collectively, the "<u>GM Parties</u>"), from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of the Existing Model Line described in Section 5(a) above.

(c)     Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 5. Dealer

08 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 5. Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(d)   Dealer acknowledges that, upon a breach of this Section 5 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer to the same position they would occupy in the absence of breach. As a result of the foregoing, any such breach shall absolutely entitle GM and the 363 Acquirer to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 5. In addition, GM and the 363 Acquirer shall have all other equitable rights in connection with a breach of this Section 5 by Dealer, including, without limitation, the right to specific performance.

6.   **Release; Covenant Not to Sue; Indemnity**. In consideration for GM's covenants and agreements set forth herein, including, without limitation, the assignment of the Dealer Agreement in the 363 Sale:

(a) Dealer, for itself, the other Dealer Parties, hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this letter agreement against the GM Parties, arising out of or relating to (i) the Dealer Agreement or this letter agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM or the 363 Acquirer shall pay any SFE funds due the Dealer for the second (2nd) quarter of 2009), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreements, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this letter agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior to the date of this letter agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Article 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer of any amounts due or to become due to either or any of their Affiliates.

(b) As set forth above, GM reaffirms the indemnification provisions of Article 17.4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding,

08  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4

or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above, or (ii) any Claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement by GM to the 363 Acquirer in the 363 Sale or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. Any breach of the foregoing shall absolutely entitle GM and the 363 Acquirer to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 6. In addition, GM and the 363 Acquirer shall have all other equitable rights in connection with a breach of this Section 6 by Dealer, including, without limitation, the right to specific performance.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this letter agreement or Dealer's execution or delivery of or performance under this letter agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e) The terms of this Section 6 shall survive the termination of this letter agreement.

7. Compliance. In consideration for GM's covenants and agreements set forth herein, including, without limitation, the assignment of the Dealer Agreement in the 363 Sale, from and after the Effective Date:

(a) Dealer shall continue to comply with all of its obligations under the Dealer Agreement[s], as supplemented by the terms of this letter agreement. In the event of any conflict between the Dealer Agreement[s] and this letter agreement, the terms and conditions of this letter agreement shall control, unless otherwise set forth herein.

(b) Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer. In the event of any conflict between the terms of the Channel Agreements and this letter agreement, the terms and conditions of this letter agreement shall control. The term "Channel Agreements" shall mean agreements (other than the Dealer Agreement) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other GM dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and

08 **THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c)    Dealer shall (i) comply with the essential brand elements set forth in any subsequently published guidelines from GM or the 363 Acquirer, and (ii) increase its floor plan capability to accommodate the increased sales and inventory expectations contemplated in Sections 2 and 3 above.

8. Breach and Remedies. In return for the consideration provided by GM herein, in the event of Dealer's breach of the Dealer Agreement[s], as supplemented by this letter agreement, GM and the 363 Acquirer shall have all of its rights and remedies under the Dealer Agreement[s], as supplemented by this letter agreement, and in addition, (i) GM or the 363 Acquirer may terminate the Dealer Agreement[s], as supplemented by this letter agreement, upon written notice to Dealer of not less than thirty (30) days, and/or (ii) the 363 Acquirer shall not be obligated to offer Dealer a replacement dealer sales and service agreement[s] upon the termination by its terms of the Dealer Agreement, as supplemented by this letter agreement. In the event that either Dealer or the 363 Acquirer terminates the Dealer Agreement[s], as supplemented by this letter agreement, after the 363 Sale or the 363 Acquirer does not offer Dealer a replacement dealer sales and service agreement[s] as set forth above, then (x) GM or the 363 Acquirer shall provide Dealer with termination assistance solely as set forth in Section 15.2 of the Dealer Agreement[s] (excluding any facility assistance pursuant to Section 15.3 of the Dealer Agreement[s]), and (y) Dealer waives all other rights under the Dealer Agreement[s], as supplemented by this letter agreement, and any applicable state laws, rules or regulations regarding termination notice, termination rights, termination assistance, facility assistance or other termination rights.

9. Miscellaneous.

(a) Dealer and the individual(s) executing this letter agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this letter agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this letter agreement.

(b) This letter agreement shall supplement the Dealer Agreement[s] as of the Effective Date and shall be effective through the remainder of the term of the Dealer Agreement[s], which shall expire no later than October 31, 2010.



08  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

(c) Except as supplemented by this letter agreement (including all exhibits, schedules and addendums to this letter agreement), the Dealer Agreement[s] shall remain in full force and effect as written. Additionally, the Dealer Agreement[s], as referenced in any other document that the parties have executed, shall mean the Dealer Agreement[s] as supplemented by this letter agreement.

(d) This letter agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

(e) The Dealer Agreement, as supplemented by this letter agreement, shall benefit and be binding upon (i) to the extent permitted by this letter agreement, any replacement or successor dealer as referred to in the Dealer Agreement, as supplemented by this letter agreement, and any successors or assigns, and (ii) any of GM's or the 363 Acquirer's successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs, this letter agreement shall benefit and bind the 363 Acquirer.

(f) The parties to this letter agreement have been represented, or have had the opportunity to be represented, by counsel and have been advised, or have had the opportunity to be advised, by counsel as to their rights, duties and relinquishments hereunder and under applicable law. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

(g) The Dealer Agreement[s], as supplemented hereby, shall be governed by and construed in accordance with the laws of the state of Michigan.

(h) By executing this Agreement, Dealer herby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this letter agreement and any other matter related thereto. The terms of this Section 9(h) shall survive the termination of this letter agreement.

(i) Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this letter agreement or any facts relating hereto or to the underlying transactions.

(j) If any part, term or provision of this letter agreement is invalid, unenforceable, or illegal, such part, term or provision shall be considered severable from the rest of this letter agreement and the remaining portions of this letter agreement shall be enforceable as if the letter agreement did not contain such part, term or provision.

This letter agreement shall constitute an agreement, executed by authorized representatives of the parties, supplementing the Dealer Agreement as contemplated by Section 17.11 thereof. This letter agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this letter agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

*[Signature Page Follows]*

08 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

7

Please indicate your approval of, and agreement with respect to, the matters set forth in this letter agreement by signing where provided below and returning it to GM for execution in the enclosed, self-addressed Federal Express envelope.

**GENERAL MOTORS CORPORATION**

By:_____
   Authorized Representative

APPROVED AND AGREED TO THIS
\_\_\_ DAY OF JUNE, 2009

**[DEALER ENTITY CORPORATE NAME]**

By: _____

Name: _____
Title: _____

**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

08 **THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

8