|  |  |  | (Hourly) |
|---|---|---|---|
|  |  | Pay |  |
| Thailand | GM Thailand | Local Variable Pay | GM Thailand Local Variable Pay Plan (Hourly) |
| Chile | GM Chile | Profit Sharing | GM Chile Profit Sharing Plan (Hourly) |
| Ecuador | GM Ecuador | Profit Sharing | GM Ecuador Profit Sharing (Hourly) |
| France | GM France - NSC | Profit Sharing | GM France - NSC Profit Sharing (Hourly) |
| France | GM PT France | Profit Sharing | GM PT France - NSC Profit Sharing (Hourly) |

## Section 4.10(h)

### Non-Standard Individual Agreements

1.  Consulting Agreement with Raymond Wexler
2.  Consulting Agreement with R. William Happel
3.  Consulting Agreement with Darwin Allen
4.  Consulting Agreement with Esam Alnasery
5.  Consulting Agreement with James Farmer
6.  Consulting Agreement with Robert Lange
7.  Consulting Agreement with J. Brian McVeigh
8.  Consulting Agreement with Choon Rhee
9.  Consulting Agreement with Dennis Walsh
10. Employment Agreement with Kirk Gutmann
11. Employment Agreement with Adriana Karaboutis
12. Employment Agreement with Virender Sandhu
13. Employment Agreement with Linda Channell
14. Employment Agreement with Terry Kline
15. Employment Agreement with Diane Jurgens
16. Employment Agreement with Chester Huber, Jr.
17. Employment Agreement with Walter Dorfstatter
18. Employment Agreement with J. Donald Butler
19. Employment Agreement with Timothy Cox
20. Employment Agreement with Anthony DiSalle
21. Employment Agreement with Terry Inch
22. Employment Agreement with Scott Kubicki
23. Employment Agreement with Timothy Nixon
24. Employment Agreement with James Piwowarski
25. Employment Agreement with Steve Schwinkle
26. Employment Agreement with Christopher Steele
27. Employment Agreement with James Taylor
28. Employment Agreements with Kathleen Barents
29. Employment Agreements with Nicholas Cyprus
30. Employment Agreement with Carl-Peter Forster
31. Employment Agreements with Steven Harris
32. Employment Agreement with Nancy Everett
33. Employment Agreements with Kenneth Cole
34. Employment Agreements with Ralph Szygenda
35. Employment Agreement with Robert Lutz
36. Employment Agreement with Mark LaNeve
37. Employment Agreement with Johnathan Browning
38. Employment Agreements with Robert Osborne
39. Employment Agreement with James Jordan
40. Employment Agreement with Jeffrey Jaworski
41. Employment Agreement with Donna Cheesbrough
42. Employment Agreement with Thomas Sheeran
43. Employment Agreement with Kenneth Chih

44. Employment Agreement with Hans Demant
45. Termination Agreement with Robert Sheipe
46. Split Dollar Life Insurance Agreement with G. Richard Wagoner, Jr. Irrevocable Trust
47. Split Dollar Life Insurance Agreement with J. Michael Losh Irrevocable Trust
48. Split Dollar Life Insurance Agreement with John F. Smith Irrevocable Trust.
49. Split Dollar Life Insurance Agreement with Louis R. Hughes, Jr. Irrevocable Trust
50. Split Dollar Life Insurance Agreement with Harry Pearce
51. Agreement with Andrew Pope (05/01/09)
52. Agreement with Michael Younes (04/01/09)
53. Agreement with Jane Newcomb (11/01/07)
54. Agreement with Florentin Blejdea (05/07/09)
55. Consulting Agreement with Roger Martin
56. Consulting Agreement with Michael Guzik
57. Employment agreement with Bo Andersson

## Section 4.11

### Labor Matters

Eighty-four retirees and 1102 current employees of GM Daewoo Auto & Technology Company filed claims in January and March of 2007, respectively, claiming that amounts such as research allowance and annual bonus had been wrongfully excluded from the calculation of ordinary wage. A verdict for the retirees' case was rendered in November 2008 (partially in favor of plaintiffs and partially in favor of defendant) and both plaintiffs and defendant appealed in December 2008.

## **Section 4.12**

### **Investigation; Litigation**

None.

## Section 4.13

### Tax Matters

U.S. Income Tax Matters

The United States federal statute of limitations is closed through the 2003 federal income Tax year except for an open-ended, restricted waiver that is limited to a United States-Canada transfer pricing dispute and related foreign tax credits. The transfer pricing dispute is currently pending with competent authority. The statute of limitations for the 2004 through 2006 federal income Tax years has been extended to June 30, 2010. Based upon IRS proposed adjustments for the 2004 through 2006 years, neither the proposed audit adjustments nor the extension of the statute of limitations are expected to give rise to a Material Adverse Effect. The IRS has commenced the audit of the 2007 and 2008 federal income Tax years and is in the information gathering stage.

State and Local Tax Matters

Parent and its Subsidiaries file various income, gross income, sales, use, ad valorem, gross receipts, value added, franchise, profits, license, transfer, recording, withholding, payroll, employment, excise and other types of state and local Tax Returns. Many of these Tax Returns are routinely examined by Taxing Authorities, and waivers are routinely requested by and granted to state and local Taxing Authorities. None of these audits or waivers, alone or together, is reasonably expected to give rise to a Material Adverse Effect. Parent and its Subsidiaries have established aggregate reserves for United States state and local Taxes on its March 31, 2009 financial statements of approximately $116 million.

Non-US Tax Matters

Parent and its Subsidiaries file income and other Tax Returns in multiple jurisdictions and are subject to examination by Taxing Authorities throughout the world. Parent and its Subsidiaries' previously filed Tax Returns are currently under review or are subject to open Tax years from 1999 to 2008 with various significant taxing jurisdictions, including, Argentina, Australia, Belgium, Brazil, Canada, Ecuador, France, Germany, Hungary, India, Indonesia, Italy, Mexico, New Zealand, Poland, Russia, South Korea, Spain, Thailand, Turkey, the United Kingdom and Venezuela. These open years contain matters that could be subject to differing interpretations of applicable Tax Laws and regulations as they relate to the amount, timing or inclusion of revenue and expenses or the sustainability of income Tax credits for a given audit cycle. We have recorded a Tax benefit only for those positions that meet the more likely than not standard. Parent and its Subsidiaries have established a total FIN 48 reserve on its March 31, 2009 financial statements for non-United States cash Tax liabilities of approximately $496 million.

## Section 4.14

### Intellectual Property and IT Systems

<u>IP Litigation</u>

| | Case Title | Court | Case No. |
|---|---|---|---|
| | <u>U.S. Lawsuits</u> | | |
| 1. | Automotive Technologies International v. American Honda Motor Company et al. (including Parent) | D. DW | Civil Action No. 06-178-GMS |
| 2. | Automotive Technologies International v. General Motors et al. | E.D. TX | 2:08-CV-57 (JTW) |
| 3. | Chamberlain Group v. Lear (Parent intervened) | N.D. IL | 05 C 3449 |
| 4. | Dura Global Technologies v. Magna Donnelly (indemnity claim against Parent) | E.D. MI | 07-10945 |
| 5. | Dura Global Technologies v. Magna Donnelly II (indemnity claim against Parent) | E.D. TX | 6:08-CV-455 |
| 6. | Parent v. Urban Gorilla | U.S. District UT | 2:06 CV 133 |
| 7. | Kuhl Wheels LLC et al. v. General Motors | E.D. MI / CAFC | 06-CV-15204-DT / 2008-1158 |
| 8. | MHL TEK v. General Motors et al. | E.D. TX | 2:08-cv-00125-TJW-CE |
| 9. | MHL TEK LLC v. Nissan Motor Co. et al. (indemnity claim against Parent) | E.D. TX | 2:07-cv-289-TJW |
| 10. | Mitchell Corporation of Owosso v. General Motors | E.D. TX | 2:08-cv-178 |
| 11. | OnStar v. Micral et al. | N.D. OH | 3:08-cv-2047 |
| 12. | Ronald A. Katz Technology LP v. General Motors & In re Katz Interactive Call Processing Patent Litigation (including Parent) | E.D. Tex / C.D. CA | 9:06cv198 / 07-ML-01816-B-RGK (FFMx) |
| 13. | Parent v. Costar Inc. | C.D. CA | CV 08-7760 CAS (PLAx) |
| 14. | Pisani v. General Motors | US District RI | 1:09 CV 125 |
| 15. | Acadia University v. GM | Nova Scotia | |
| | <u>Non-U.S. Lawsuits</u> | | |
| 16. | Mohamed Samir Abdel Salam, in his capacity as legal representative of the Egyptian Company for Automobiles vs. GM Egypt | Giza First Instance Court, Egypt | |
| 17. | Rogerio Napolitano and Vladan Prokic v. General Motors do Brasil Ltda. | Brazil | 000.04.055200-4 |

| 18. | Nullity Actions against Ford Global Technolgies, regarding DE 9809865 / EP0953758B1 | Munich Patent Court | 10 Ni 21/07 (EU) |
| 19. | Ford Global Technologies v. Adam Opel | District Court, Duesseldorf | 4a O 409/06 |

Certain Unresolved IP Allegations

| | Alleger | Nature of Allegation | Products/Systems |
|---|---|---|---|
| 1. | AFT Adaptive Force Technology | License USPN 6,384,518 | Piezoelectric coupler |
| 2. | Alliacense | Infringement of MMP patent portfolio | OnStar Nav Unit; ABS, engine, chassis, climate control units; audio amplifier |
| 3. | American Outfitters | Infringe USPN D502,433 | H2 and H3 bumpers |
| 4. | Applied Interact LLC | License USPN 5,508,731; 5,249,044 | unspecified online sweepstakes |
| 5. | Armatron Int. | Infringement of USPN 5,160,927; 5,235,315; 5,432,516; 6,040,765 | Rendezvous, STS obstacle detection system (Bosch) |
| 6. | Avery Dennison | Infringement of USPN 6,228,486; 6,461,722; 6,756,095 | visor heat seal label Saturn Vue |
| 7. | BG Products | Infringement of USPN 6,478,036 | EGR cleaner |
| 8. | Clarke, Dennis | Infringement of USPN 6,794,438; 6,841,602 | thermoset polymers |
| 9. | Cooper Standard | Infringement of USPN 5,875,670 | weatherstripping crimping tool |
| 10. | Daimler AG | Infringement of USPN 6,328,358; 6,184,842; 6,433,753 | radome cover (Kaumagraph Flint Corp.) |
| 11. | De Villeroche, Gerard | Infringement of USPN 4,951,211 | vehicle guide and information system |
| 12. | Directed Electronics | Infringement of USPN 5,146,215; 5,650,774 | Subaru RKE/security systems |
| 13. | DTN/Meteorlogix | License USPN 6,753,784 | Weather alerting service |
| 14. | Duramax Marine | Infringement of TM "DURAMAX" | diesel marine engines |
| 15. | DVD6C | License of patents on DVD technology | Digital Works Inc. past supplier |

| | Alleger | Nature of Allegation | Products/Systems |
|---|---|---|---|
| 16. | Ford Global Tech. | Infringement of 4,930,836; 5,029,364; 5,364,157; 5,297,841; 5,782,523; 5,752,737; 5,803,516; 6,059,352; 6,581,955; 6,769,729; 7,144,064 | Various body patents |
| 17. | Ford Global Tech. | Infringement of USPN 6,044,318 | H2 throttle control |
| 18. | Ford Global Tech. | Infringement of USPN 6,173,693; EP0953758 | L850 direct injection head (Opel) |
| 19. | Ford Global Tech. | License USPN 7,157,026; 7,029,138; D501,784 | emergency trunk release handles |
| 20. | Gebre, Adamasu | Infringement of USPN 5,297,049; 5,504,683 | navigation systems (suit dismissed w/o prejudice) |
| 21. | General Patent Corp. | Infringement of USPN 5,864,604 | GM Card |
| 22. | Giri, Joseph | Infringement of copyright of mural "The Eagle Band" | Cadillac ad in April 2009 Motor Trend |
| 23. | Honeywell, Transense | Inventorship dispute | vehicle torque SAW sensor |
| 24. | Hoppenstein, Joel | License to USPN 7,246,089 | liability management method |
| 25. | IDT | License USPN 5,999,965 | unspecified VOIP call center systems |
| 26. | Isuzu | Indemnification | Agreement to indemnify in MHL v Nissan for sale of vehicles |
| 27. | Johnson Controls | Chamberlain trade secret | in-vehicle garage door opener |
| 28. | Katulka, Michael | Infringement of USPN 6,607,232 | tailgate support |
| 30. | Kiekert | Infringement of USPN 5,634,677 | Magna door latch on Enclave, Outlook, Acadia, and Traverse |
| 31. | Leemann, Karl and Ruchti, Heinz | Infringement of USPN 5,602,524 | Tire pressure monitoring |
| 32. | Little League Baseball | Infringement of TM "Little League Baseball" | TV commercial (image removed) |

| | Alleger | Nature of Allegation | Products/Systems |
|---|---|---|---|
| 33. | Lonzame, Pete | Infringement of USPN 5,349,328 (expired 10/23/02) | Tire pressure monitoring |
| 34. | Magna International | Indemnification | Reverse indemnification for rear power sliding windows in Dura v Magna I |
| 35. | Magna International | Indemnification | Reverse indemnification for rear power sliding windows in Dura v Magna II |
| 36. | Martin, P Jeff | unspecified design | design of Acadia |
| 37. | Meridian Enterprises | License to USPN 5,025,372 | reloadable or personalized cards |
| 38. | NGK Spark Plugs | Infringement of USPN 4,733,056 (exp 3/22/05) | planar oxygen sensor |
| 39. | Nissan | Infringement of USPN 5,135,444 | 5L40 and 5L50 transmissions |
| 40. | Philips | Infirngement of Philips/Sony disc patents | promotional disc w GQ magazine |
| 41. | Pisani, Carol | Fraud related to New Devices submission | seat belt warning |
| 42. | Resqnet.com | Infringement of USPN 5,530,961; 5,831,608; 5,792,659; 5,812,127 | terminal emulator software |
| 43. | Ripley Entertainment | Infringement of TM "Believe it or Not" | Internet-based ads |
| 44. | Scate Technologies | Infringement of unspecified IP | Vision software screen prints |
| 45. | Shelby Enterprises | Infringement of USPN 7,048,019; 7,059,365 | fuel filler pipe assemblies |
| 46. | Sorensen R&D | Infringement of USPN 4,935,184 | AC Delco cordless impact wrench |
| 47. | Suzuki | Indemnification | Agreement to indemnify in Wacoh v Chrysler for design of CAMI vehicles |
| 48. | Suzuki | Indemnification | Agreement to indemnify in MHL v GM for design of CAMI vehicles |

| Alleger | Nature of Allegation | Products/Systems |
|---|---|---|
| 49. The Welding Institute | Infringement of USPN 5,460,317; 5,813,592 | robotic welders designed for friction stir welding |
| 50. Timken | Infringement of USPN 7,285,949 | 4L60E speed sensor |
| 51. Toyota | Licence USPN 6,530,594; 6,279,941; 6,561,540; 6,089,594; 6,347,268; 6,170,864; 6,371,515 | supplemental restraint system technology |
| 52. Uth Patents | License USPN 6,494,458; 6,494,460 | Dry Gas Seal Technology |
| 53. Washington Research Foundation | Infringement of patents | Bluetooth chipsets |
| 54. Wayne, Andrew, Teresa Barger | Wrongful prosecution of Andrew Barger | |
| 55. William Reid and NetP&L, Inc. | Lawsuit dismissed w/o prejudice USPN 6,131,120 | GM Identity Management |
| 56. ZF | Infringement of USPN RE39,960; 7,140,997; 7,217,218; 7,255,661; 7,335,127 | Six-speed FWD automatic transmissions |
| 57. VW | Infringement of DE19802077C2 | On at least two levels installable luggage compartment panel |
| 58. VW | Infringement of DE19523358C2 | Locking mechanism for a head restraint |
| 59. VW | Infringement of DE 196 50 921 B4 | Support rod for headrest in road vehicle |
| 60. VW | Infringement of EP 1 141 657 B1 | Method and device for reading navigation data |
| 61. VW | Infringement of EP 0 70 1926 B2 | Multifunction Control Device |
| 62. Daimler AG | Infringement of DE 44 45 580 C1 | Hard-top vehicle |
| 63. PSA | | Third stop light with water nozzle |
| 64. InteressenGemeinschaft für Rundfunk-schutzrechte KG | Infringement of EP 0 347 686 B1 | Rotating transmitter for digital pulses and method of using it |
| 65. PSA | Infringement of EP 1 314 875 B1, EP 1 704 | Systems for the regeneration of |

| **Alleger** | **Nature of Allegation** | **Products/Systems** |
|---|---|---|
| | 702 B1, EP 1 203 876 B1, EP 1 086 304 B1, FR 2 774 427, & FR 2 774 428 | diesel particle filters involving post fuel injections during the expansion stroke |
| 66.   Daimler AG | Infringement of DE10254695 B3 | Press-hardened part and method for the production thereof |
| 67.   H. Finke | Infringement of EP1334224B1 | Lining material for Roof Trim |
| 68.   Mittelhäuser | Infringement of EP 1 129 882 B1 | Fuel Filler Flap |
| 69.   Hörauf & Kohler Verwaltungs KG | Infringement of EP0906523 B1 | Glove Box /damping element |
| 70.   BOS GmbH & Co. KG | Infringement of EP 1 296 854 B1 | Flex-Rail-System |
| 71.   VW | Infringement of EP107442 9 | Light Switch Unit |
| 72.   Lindmayer | Infringement of DE195000999 | Door Latch |
| 73.   Kiekert | Infringement of DE4447687 C2 | Power-locking motor-vehicle door latch |

## **Section 4.15**

### **Real Property**

None.

## Section 4.16

### Material Contracts

(a)    Contracts

(i)    None.

(ii)    The following Contracts contain non-compete or exclusivity provisions:

1.    Asset Purchase Agreement, dated June 28, 2007, by and between Parent and Allison Transmission, Inc. (f/k/a Clutch Operating Company, Inc.), as amended.

2.    Epsilon/Delta Platform Technology License Contract, dated April 5, 2009, by and among Shanghai General Motors Corporation Ltd., Parent, and Pan Asia Technical Automotive Center Company Limited and GM Global Technology Operating Inc.

3.    Intellectual Property Agreement (Small Diesel Engines), dated September 10, 2007, by and among VM Motori S.p.A., Parent, and GM Global Technology Operations, Inc.

4.    Non-Competition Agreement, dated February 28, 2003, by and among General Dynamics Corporation, Parent and General Motors Overseas Corporation.

5.    Purchase and Sale Agreement, dated as of April 2, 2006, by and between GMAC L.L.C., GM Finance Co. Holdings, Inc. and Fim Holdings LLC and the related agreements executed in connection with the closing on November 30, 2006.

6.    W-Car Technology License Agreement, dated March 25, 1997, by and between Parent and Shanghai General Motors Corporation Ltd.

7.    GTO Technology License Agreement, dated March 31, 2007, by and among Parent, GM Global Technology Operations, Inc. and Shanghai General Motors Corporation Ltd.

8.    Y4M Transmission Technology License Agreement, dated April 2008, by and among Parent, GM Global Technology Operations, Inc., Shanghai General Motors Corporation Ltd. and Pan Asia Technical Automotive Co., Ltd.

9.    GF6 Technology License Agreement, dated January 2005, by and between Parent and Shanghai General Motors Corporation Ltd.

10.    BAS Technology License Agreement, dated November 2007, by and among Parent, GM Global Technology Operations, Inc., Shanghai General Motors Corporation Ltd. and Pan Asia Technical Automotive Co., Ltd.

11.    General Framework Agreement relating to Closed Joint Stock Company GM-Avtovaz, dated June 27, 2001, by and among, Parent, GM Auslandsprojekte GmbH, AO Avtovaz and European Bank for Reconstruction and Development.

12.    Distribution Agreement, dated September 1, 1998, by and among Diesel Engine Manufacturing of America, Ltd. (n/k/a DMAX, Ltd.), Isuzu Motors America, Inc. and Parent.

13.    Amended and Restated Supply and Purchase Agreement, dated April 30, 2003, by and between Parent and DMAX, Ltd.

14.    Isuzu Truck South Africa (Proprietary) Limited Subscription and Shareholders Agreement, dated as of November 29, 2006, by and between General Motors South Africa Limited and Isuzu Motors Limited.

15. Joint Venture Agreement for the Formation of LCV Platform Engineering Corporation, dated June 9, 2006, by and between General Motors Asia Pacific Holdings, LLC and Isuzu Motors Limited.

16. Partners' Agreement - GM Isuzu Joint Venture for the Commercial Vehicles Business in Colombia, dated February 18, 2008, by and between Parent and Isuzu Motors Limited.

17. Partners' Agreement - GM Isuzu Joint Venture for the Commercial Vehicles Business in Ecuador, dated July 9, 2008, by and between Parent and Isuzu Motors Limited.

18. Joint Development Agreement, dated November 7, 2000, by and between Adam Opel GmbH and Shanghai General Motors Corporation Ltd., as amended.

19. GMDAT Master Technology License Agreement, dated November 11, 2005, by and between GM Daewoo Auto & Technology Company and Shanghai General Motors Corporation Ltd.

20. B Engine Technology License Agreement, by and between GM Daewoo Auto & Technology Company and SAIC GM Wuling Automobile Company Limited.

21. Right to Use Technology Agreement, dated December 14, 2007, by and between GM Daewoo Auto & Technology Company and Shanghai General Motors Corporation Ltd.

22. Technology License Agreement for S4200 Fact-Lift Program, dated June 1, 2008, by and between Shanghai General Motors Corporation Ltd. and GM Global Technology Operations, Inc.

23. Holden Card Agreement, dated December 20, 2006 (effective October 1, 2005), by and between General Motors Holden Ltd. and Westpac Banking Corporation.

24. Distribution Agreement, dated April 1, 1992, by and between SAAB Automobile AB and SAAB Automobile Australia (now General Motors Holden Ltd. trading as SAAB).

25. Vehicle Distributorship Agreement, dated September 1, 2008, by and between Holden New Zealand Limited and Isuzu Motors Limited.

26. Hicom-Chevrolet Joint Venture and Shareholders Agreement, dated August 28, 2007, by and between General Motors Asia Pacific Holdings LLC and DRB-Hicom Berhad (DRB).

27. J200 Technology License Agreement, dated January 1, 2008, by and between General Motors (Thailand) Limited and GM Daewoo Auto & Technology Company.

28. T250 Technology License Agreement, dated January 1, 2006, by and between General Motors (Thailand) Limited and GM Daewoo Auto & Technology Company.

29. C100 Technology License Agreement, dated January 1, 2007, by and between General Motors (Thailand) Limited and GM Daewoo Auto & Technology Company.

30. J200 Technology License Agreement, dated December 23, 2002, by and between General Motors India Private Limited and GM Daewoo Auto & Technology Company.

31. M200 Technology License Agreement, dated December 14, 2006, by and between General Motors India Private Limited and GM Daewoo Auto & Technology Company.

32. T200/T250 Technology License Agreement, dated 2007, by and between General Motors India Private Limited and GM Daewoo Auto & Technology Company.

33. Joint Venture Contract, dated October 27, 2007, by and among OnStar Corporation Shanghai Automotive Industry Sales Co. Ltd., Shanghai General Motors Corporation Limited.

34. Trademark License Agreement, initialed February 2008, by and between OnStar LLC and Shanghai OnStar Telematics Company Limited.

35. IT License Agreement, initialed February 2008, by and between OnStar Global Services Corporation and Shanghai OnStar Telematics Company Limited.

36. FAW-GM Light Duty Commercial Vehicle Company Limited CVJV Project: Supplementary Agreement, dated December 18, 2008, by and between General Motors (China) Investment Co. Ltd. and China FAW Group Corp.

37. Amended and Restated Joint Venture Contract, dated May 30, 2008, by and among GMAC LLC, (f/k/a General Motors Acceptance Corporation), Shanghai Automotive Group Finance Company Ltd. and Shanghai General Motors Corporation Limited.

38. Exclusive Distribution Agreement, dated July 5, 2006, by and between Shanghai General Motors Corporation Limited and SAAB Automobile AB.

39. Automotive Technology Cost Share Agreement dated Jan 1, 2007, by and between GM Daewoo Auto & Technology Company and GM Global Technology Operations, Inc.

(iii) Contracts entered into within the past six years governing the acquisiton or disposition of assets or other property where the consideration paid exceeded $500,000,000:

1. Asset Purchase Agreement, dated June 28, 2007, by and between Parent and Allison Transmission, Inc. (f/k/a Clutch Operating Company, Inc.), as amended.

2. Purchase and Sale Agreement, dated as of April 2, 2006, by and among GMAC L.L.C., GM Finance Co. Holdings, Inc. and Fim Holdings LLC and the related agreements executed in connection with the closing on November 30, 2006.

3. Agreement to Liquidate Joint Venture and Terminate Master Agreement, dated February 13, 2005, by and among Parent, Fiat Spa, Fiat Auto Holdings B.V., and Fiat Auto SpA.

4. Amendment Agreement to the Second Agreement of Strategic Collaboration and Mutual Advocacy, dated March 6, 2006, by and between Parent and Suzuki Motor Corporation and related agreements.

5. Stock Purchase Agreement, dated October 5, 2005, by and among Parent, 4309642 Canada Inc. and Toyota Motor Corporation.

6. Amendment to the Canadian Asset Purchase Agreement, dated as of February 27, 2003, by and between GMCL and Canadian Defense Land Systems Corp.

7. Amendment to the Master Purchase Agreement, dated as of February 28, 2003, by and among Parent, General Motors Overseas Corporation, Canadian Defense Land Systems Corp., General Dynamics Corporation, General Dynamics Land Systems Inc., GD Canada Acquisition Corporation and General Dynamics Worldwide Holdings, Inc.

8. U.S. Asset Conveyance Agreement, dated as of February 28, 2003, by and among Parent, General Dynamics Land Systems Inc. and General Dynamics Corporation.

9. Series 2003-2 Note Purchase Agreement (variable funding rental car asset backed notes, Series 2003-2), dated as of October 14, 2003 (Not Signed), by and among

Vanguard SPE I, Inc., Vanguard Car Rental USA, Inc. and General Motors Acceptance Corporation, as Series 2003-2 Note Purchaser.

10.    Asset Purchase Agreement, dated June 14, 2003, by and among ANC Rental Corporation, and its affiliates, national Car rental System, Inc. and Alamo Rent-A-Car, Inc. and Car Acquisition Company and the related agreements.

(iv)    Contracts with the following suppliers of Sellers who directly support the production of vehicles, which, provide collectively for payments by Sellers to such suppliers in excess of $250,000,000 during the 12-month period ending December 31, 2008:

1.    Delphi Corp.
2.    Magna International, Inc.
3.    Lear Corp.
4.    American Axle & Manufacturing Holdings, Inc.
5.    Johnson Controls, Inc.
6.    Bosch, Robert Stiftung GmbH
7.    TRW Automotive Holdings Corp.
8.    The Renco Group, Inc.
9.    Tenneco Inc.
10.    International Automotive Components
11.    Peugeot S.A.
12.    Alpha S.A. de C.V.
13.    Denso Corp.
14.    Martinrea International Corp.
15.    Continental AG
16.    Emcon Technologies, LLC
17.    Dana Holding Corp.
18.    The Goodyear Tire & Rubber Co.
19.    Cooper-Standard Holdings, Inc.
20.    Flex-N-Gate Corp.
21.    Android Industries - Delta Township
22.    Superior Industries International
23.    Bridgestone Corp.
24.    Yazaki Corp.
25.    Autoliv Inc.
26.    ArecelorMittal
27.    Unites States Steel Corporation
28.    AK Steel Corporation

(v)    Contracts with the following suppliers of Sellers who do not directly support the production of vehicles, which, provide collectively for payments by Sellers to such suppliers in excess of $100,000,000 during the 12-month period ending April 30, 2009:

1.    Starcom Media Vest Group
2.    Electronic Data Systems
3.    Fidelity Investments
4.    Metropolitan Life Insurance

5. IBM Corporation
6. Healthplus Michigan, Inc.
7. Blue Care Network
8. AT&T Solutions
9. Hewlett Packard Company
10. Health Alliance Plan EFT
11. Maritz Research Inc
12. Campbell Ewald
13. Blue Cross Blue Shield
14. Digitas, LLC
15. Kaleidoscope Sports & Entertainment, LLC
16. Capgemini America, Inc.
17. MPT Lansing LLC

(vi) <u>Contracts relating to the lease or purchase of an aircraft:</u>

1. Aircraft Lease Agreement (N5101), dated September 27, 2001, by and between Suntrust Corporation and Parent.
2. Aircraft Lease Agreement (N5102), dated September 27, 2001, by and between Sun Trust Corporation and Parent.
3. Aircrafte lease Agreement (S/N 4013), dated September 1, 2005, by and between AVN Air, LLC and Parent.
4. Aircrafte Lease Agreement (S/N 4019), dated November 16, 2005, amended December 15, 2005, by and between AVN Air, LLC and Parent.
5. Aircrafte Lease Agreement (S/N 4016), dated September 20, 2005, amedned December 15, 2005, by and between AVN Air, LLC and Parent.
6. Aircrafte Lease Agreement (S/N 4023), dated December 19, 2005, by and between AVN Air, LLC and Parent.
7. Aircrafte Lease Agreement (S/N 4026), dated September 29, 2005, by and between AVN Air, LLC and Parent.
8. Aircrafte Lease Agreement (S/N 4026), dated February 2, 2006, by and between AVN Air, LLC and Parent.
9. Trust Agreement for GM-GE Capital Deposit Trust, dated December 14, 2005, by and among Parent, General Electric Capital Corporation and U.S. Bank and Trust National Association.
10. Deposit Agreement, dated December 14, 2005, by and among Parent, AVN Air, LLC and General Electric Capital Corporation.

(vii) <u>Settlement agreement where a Seller has paid or may be required to pay an amount in excess of $100,000,000 to settle the Claims covered by such settlement agreement:</u>

1. General Motors Consolidated Securities Litigation Settlement

On April 17, 2006, the Judicial Panel on Multidistrict Litigation entered an order transferring *In re General Motors Corporation Securities Litigation* to the U.S. District Court for the Eastern District of Michigan for coordinated or consolidated pretrial proceedings with *Stein v. Bowles, et al.; Rosen, et al. v. General Motors*

*Corp., et al.; Gluckstern v. Wagoner, et al.* and *Orr v. Wagoner, et al.* The parties reached an agreement to settle on July 21, 2008, which required Parent to pay $277 million. The district court granted final approval to the settlement in January 2009, and an objector filed a notice of appeal to that approval order on January 30, 2009.

(viii)   None.

(ix)   Contracts establishing the following joint ventures or referred to in the documents establishing these joint ventures or ancillary thereto:

   1.   Pan Asia Technical Automotive Center Company Limited
   2.   Shanghai General Motors Corporation Limited
   3.   Closed Joint Stock Company GM-AVTOVAZ
   4.   Fiat – GM Powertrain Polska Sp. z.o.o.
   5.   General Motors Powertrain – Uzbekistan CJSC
   6.   General Motors Uzebkistan
   7.   General Motors East Africa Limited
   8.   General Motors Egypt, S.A.E.
   9.   Omnibus BB Transportes S.A.
  10.   DMAX, Ltd.
  11.   New United Motor Manufacturing, Inc.
  12.   Isuzu Camiones Andinos de Colombia Limitada
  13.   Isuzu Camiones Andinos Ecuador GMICA Ecuador CIA, Ltda.

(b)   Disclosure Related to Seller Material Contracts

Section 4.18(c) of this Sellers' Disclosure Schedule is incorporated by reference herein and hereby made a part of this Section 4.16 of this Sellers' Disclosure Schedule with respect to any suppliers that appear on this Section 4.16 of this Sellers' Disclosure Schedule.

## Section 4.17

**Dealer Sales and Service Agreements for Continuing Brands**

None.

## Section 4.18

### Sellers' Products

(a)    Recalls and Field Actions.

| Field Action Document Number | Field Action Classification | Field Action Description | Vehicle Model Years | Vehicle Make | Vehicle Model |
|---|---|---|---|---|---|
| A - 070047 | Product Safety Recall | Throttle | 2004 - 2005 | Chevrolet/Pontiac/ Suzuki | Aveo/Wave/Swift+ |
| N - 060074 | Product Safety Recall Product Emissions Defect Reports and Product Emissions Recall - GMNA | Timing Chain | 2001 | Saturn | L Series |
| N - 070027 | Use Only Product Safety | Catalytic Converter | 2004 | Cadillac | SRX |
| N - 070035 | Recall Special | Engine valve cover / spark plug retainer | 1997 - 2003 | Buick/Pontiac | Regal GS/Gr Prix |
| N - 070123 | Coverage Non-Compliance | Intake Valve Seat | 2004 - 2005 | Chevrolet/GMC | Colorado/Canyon |
| N - 070154 | Recall Special | Windshield Position | 2007 | Chevrolet/Pontiac | Equinox/Torrent |
| N - 070187 | Coverage Product Safety | Instrument Panel Gauges | 2003 - 2004 | Cadillac/Chevrolet/GMC | Escalade/Avalanche/Silverado/ Suburban/Tahoe/Trailblazer/ Denali/Envoy/Sierra |
| N - 070204 | Recall Special | Rear Differential | 2005 - 2007 | Cadillac/Pontiac/Saturn /Opel/Daewoo | CTS/CTS-V/SRX/STS/STS-V/ Solstice/Sky/GT/G2X |
| N - 070252 | Coverage | Fuel Injector | 2004 | Chevrolet/GMC | Silverado/Kodiak/Sierra/Topkick |

97

| Field Action Document Number | Field Action Classification | Field Action Description | Vehicle Model Years | Vehicle Make | Vehicle Model |
|---|---|---|---|---|---|
| N - 070318 | Product Emission Recall | Battery | 2007 | Saturn | VUE/Aura |
| N - 080048 | Product Safety Recall | Heated Washer Module | 2006,  2007 - 2008 | Cadillac/Chevrolet/GMC /Buick/Saturn/Hummer | Escalade/Escalade EXT/ Escalade ESV/Avalanche/Silverado/ Suburban/Tahoe/ Sierra Yukon/ Yukon XL/Acadia/Outlook/ Lucerne/ DTS/H2/ Enclave |
| N - 080207 | Customer Satisfaction Program | Sunroof | 2007 - 2008 | GMC/Saturn/Buick | Acadia/Outlook/Enclave |
| N - 080272 | Special Coverage | Engine Valve Seat Valve Cover / | 2006 | Chevrolet/GMC/Isuzu Pontiac/Buick/ | Colorado/Canyon Gr Prix/Regal/Lumina/ Monte |
| N - 090047 | Product Safety Recall | Spark plug retainer | 1997 - 2003 | Chevrolet/Oldsmobile | Carlo/Impala/Intrigue |

(b)    None.

(c)    <u>Suppliers</u>

Suppliers that represent a material threat to the supply of products or services that could materially impair future production at a major production facility:

| | | | |
|---|---|---|---|
| 1. | AB Automotive | 40. | C&B Machinery |
| 2. | American Axle | 41. | Ingersoll Production Systems |
| 3. | Allison | 42. | Nagel |
| 4. | Bosch | 43. | Enshu |
| 5. | Brembo | 44. | EFP |
| 6. | Burgess-Norton | 45. | Vantage Plastics |
| 7. | Cascade Engineering | 46. | Robinson |
| 8. | Citation | 47. | Buckhorn |
| 9. | Donaldson | 48. | Orbis |
| 10. | Emerson | 49. | Lydall Thermal Solutions |
| 11. | Flextronics | 50. | Betz Foundry |
| 12. | Hella | 51. | Schuler Incorporated |
| 13. | Henderson Trucking | 52. | Stapla Ultrasonics |
| 14. | HHI | 53. | SCA Schuker |
| 15. | Huf | 54. | Nordson Corp. |
| 16. | IEE | 55. | Kito USA Corp. |
| 17. | Ideal | 56. | Welding Technologies |
| 18. | Kautex | 57. | Comau |
| 19. | KBI | 58. | Dearborn Conveyor |
| 20. | Lear | 59. | Bleikert Inc. |
| 21. | Milliken | 60. | Overhead Conveyor Company |
| 22. | MNP | 61. | Fata Automation |
| 23. | Mubea | 62. | Genyses Ind. Corp. |
| 24. | Raybestos | 63. | SSI Systems |
| 25. | Recaro | 64. | Central Conveyor |
| 26. | Thermodisc | 65. | PO Mc Intire |
| 27. | TRW | 66. | Fagor Arrasate SC |
| 28. | Visteon | 67. | Unico Inc. |
| 29. | Wabash | 68. | Metal Tech. Systems |
| 30. | Willi Hahn | 69. | ARO Welding Tech. |
| 31. | Winkelmann | 70. | Grossel Tool Co. |
| 32. | Crane America | 71. | Global Systems Engineering |
| 33. | Anixter | 72. | Tarpon Automation |
| 34. | Hurst | 73. | Creform Corp. |
| 35. | Cooper, Inc. | 74. | Trane |
| 36. | Mark One | 75. | Phoenix Wire Cloth |
| 37. | Ahern & Soper | 76. | Exel NA |
| 38. | American Wera | 77. | Luvata Ohio |
| 39. | Star SU | 78. | Pyrotek Inc/ Metaulics |

79. Refractory Engineers
80. High Temperature Systems
81. Northern Cable Automation
82. Avdel
83. KOLB AMERICA
84. Numatic, Inc.
85. RHM Fluid Power
86. Lynair, Inc.
87. Western New York Fluid
    Systems
88. Flow International Corp.
89. Morrell, Inc.
90. Berendsen Fluid Power
91. Track Systems
92. Marling Associates
93. Keep Fill (Kimbwell Midwest)
94. Elite Clean Room
95. Curbell Plastic
96. Hammelmann Corp.
97. Montgomery Kone Elevator Co.
    Ltd.
98. AGFM
99. Med-Kas Hydraulics
100. Paragon Technologies
101. Pyrotek, Inc.
102. Kaviert Cranes
103. Stanley Security Solutions
104. Unisource Worldwide
105. Young Supply Co.
106. Butterworth Industries
107. Dee Zee
108. Global Accessories
109. H.Ternes
110. Lund
111. Powerflow
112. Bosal
113. Metaldyne

## **Section 4.19**

### **Certain Business Practices**

None.

## Section 4.20

**Brokers and Other Advisors**

1.     The Blackstone Group LP
2.     Lakeview Capital Management, Inc.
3.     Lazard Ltd.
4.     Morgan Stanley
5.     Evercore Partners
6.     AlixPartners
7.     D.F. King & Co., Inc.
8.     Deutsche Bank Group
9.     PricewaterhouseCoopers
10.    KPMG International
11.    Deloitte Development LLC
12.    Ernst & Young Global Limited
13.    Watson Wyatt Worldwide

## Section 4.21

### Investment Representations

None.

## Section 6.2

### Conduct of Business

Supplier Relations

1.  Sellers will continue to engage in a process of reviewing, renegotiating, extending and terminating, as applicable, arrangements with its suppliers in furtherance of the Viability Plans and its efforts to reorganize as part of the Bankruptcy Cases.
2.  Sellers will continue to have Supplier Program commitments in connection with that certain Credit Agreement, dated as of April 3, 2009, between GM Supplier Receivables LLC, as borrower, and the Sponsor, as the lender.

Customer Relations

1.  Sellers will continue to engage in a process of reviewing, renegotiating, extending and terminating, as applicable, arrangements with dealers and other customers in furtherance of the Viability Plans and its efforts to reorganize as part of the Bankruptcy Cases.
2.  Sellers will continue to have Customer Warranty Program commitments in connection with Amendment No. 4, dated May 27, 2009, to the Loan and Security Agreement dated as of December 31, 2008, between Parent, as borrower, and Sponsor, as the lender.

Reorganizations

With the consent of Purchaser (not to be unreasonably withheld, conditioned or delayed), Parent may, through a series of transfers, contributions, stock splits, redemptions, dividends, distributions or other transactions, effect a reorganization of a holding company structure of certain of its Subsidiaries, as a result of which:

1.  *GMGTO.* GM Global Technology Operations, Inc. ("GMGTO") may become a direct Subsidiary of Parent or the Equity Interests of GMGTO may be held by a Subsidiary (including a newly-formed Subsidiary) of Parent other than GM GEFS L.P.
2.  *India.* Assets held by Chevrolet Sales India Private Ltd and General Motors India Private Ltd. may be held by newly formed Indian entities and the Equity Interests in both existing and newly formed entities may be held by a newly formed Subsidiary of Parent. It is also possible that some assets may be contributed to a potential newly formed joint venture. The contractual arrangements associated with the joint venture may include territorial restrictions on competition.
3.  *Thailand.* The Equity Interests in GM (Thailand) Ltd., GM Powertrain (Thailand), Chevrolet Sales Thailand Limited and/or General Motors Southeast Operations Limited may be held by a newly-formed Subsidiary of Parent.

4. *Indonesia.* A currently idled plant in Indonesia may be contributed to a newly formed joint venture, and territorial restrictions on competition may be imposed by the contractual arrangements associated with the joint venture.

5. *Controladora GM.* GM Overseas Distribution Corporation or another Subsidiary of Parent may hold the Equity Interests in Controladora General Motors S.A. de C.V.

6. *LAAM.* The Equity Interests in certain Subsidiaries conducting business in the Latin America, Africa and Middle East region, including Sarmiento 1113 S.A., GM East Africa, GM Nigeria, Chevrolet S.A. and GM Colmotores S.A. may be transferred by Parent or its Subsidiaries to other direct or indirect Subsidiaries of Parent, certain equity accounts of GM Colmotores S.A. may be recapitalized, and GM Colmotores S.A. may acquire shares from certain minority shareholders of GM Colmotores S.A. and may change its ownership structure if such acquisition occurs, and GM Colmotores S.A. may amend its Organizational Documents if a reclassification of its Equity Interests occurs.

7. *Europe.* The Equity Interests that Parent or any of its Subsidiaries holds in certain European Subsidiaries, including, General Motors Europe Holdings, S.L., General Motors Espana, S.L. and GM Automotive UK may be transferred to AOG, another Subsidiary of Parent, a newly formed Subsidiary of Parent or a German law limited partnership established to hold certain Equity Interests in trust for the benefit of the Parent and the German government. GM Strasbourg S.A. may become a direct Subsidiary of Parent. GM Europe Treasury Company AB may be reorganized to split the company into separate entities and to transfer certain assets and Liabilities to AOG.

8. *Joint Ventures.* Existing joint venture and similar agreements may be amended, altered or modified to effectuate the transactions contemplated by this Section 6.2 of this Sellers' Disclosure Schedule, additional equity investments in existing joint ventures may be made, Equity Interests held by Parent or its Subsidiaries in joint ventures may be transferred or sold, Organizational Documents of existing joint venture agreements may be amended, altered or modified and contractual rights relating to joint venture and similar agreements may be assigned to Transferred Entities or otherwise amended, altered or modified. Contractual arrangements associated with additional equity investments in existing joint ventures may include territorial restrictions on competition.

9. *Other.* Parent or its Subsidiaries may transfer Equity Interests in certain Subsidiaries that are determined to be Excluded Entities prior to the Closing. Equity Interests in Excluded Entities, and other Excluded Assets, may be held by Parent or Excluded Entities.

In connection with the foregoing reorganizations, Parent and its Subsidiaries may enter into local transfer agreements and may execute such other instruments and take such other actions as Parent and its Subsidiaries may deem reasonably necessary in order to implement such reorganizations. Parent and its Subsidiaries may continue to comply with all of their commitments and obligations under joint venture and similar agreements in existence as of the date hereof and shall not be required to take any action (or refrain from taking any action) under this Section 6.2 of this Sellers' Disclosure Schedule with respect to any joint venture or similar arrangement if such action is prohibited by any such agreement or requires the

consent of the counterparty to any such agreement and such consent is denied, or if so refraining would cause Sellers or any Purchased Subsidiary to breach any such agreement (including any fiduciary duty under any such agreement).

Joint Ventures

1.  *Japan.* Parent is in the process of winding down GMI Diesel Engineering Limited, a joint venture with Isuzu Motors Limited.
2.  *Acquisition of Equity Interests in Joint Ventures.* Parent, through one or more of its Subsidiaries, is in the process of acquiring an Equity Interest in the following proposed joint ventures: (i) FAW-GM Light Duty Commercial Vehicle Company Limited and (ii) Shanghai OnStar Telematics Company Ltd.

Canadian Matters

1.  Sellers' Canadian Subsidiaries may engage in activities necessary to (i) implement the Canadian Warranty Commitment Program; (ii) comply with the terms of any Indebtedness; (iii) comply with the terms of any Collective Bargaining Agreement or other employment or benefit agreement or undertaking; (iv) comply with any business plans provided to a Governmental Authority in connection with the business or affairs of any Sellers' Canadian Subsidiaries; (v) comply with all applicable Laws including any relating to Tax matters.
2.  Sellers may do all things necessary and appropriate in furtherance of consummation of the Nova Scotia Settlement. "Nova Scotia Settlement" means the following actions and outcomes: (a) entry by General Motors Nova Scotia Finance Company, a Nova Scotia unlimited company ("GMNS"), GMCL, GM Nova Scotia Investments Ltd., a Nova Scotia company, Parent, and certain beneficial owners of notes issued by GMNS (the "GMNS Noteholders") into a Lock Up Agreement, dated as of June 1, 2009 (the "Lock Up Agreement");  (b) entry by GMNS, and GMCL into an agreement (the "GMCL Loan Settlement") with respect to the complete satisfaction and discharge of the loan agreements between GMCL and GMNS, each dated July 10, 2003, in exchange for a cash payment and the related transfer of funds (the "GMCL Settlement Amount"); (c) the calling of a meeting of the GMNS Noteholders in accordance with that certain Fiscal and Paying Agency Agreement (the "Paying Agent Agreement") dated as of July 10, 2003 by and among GMNS, Parent, Deutsche Bank Luxembourg SA and Banque Generale du Luxembourg S.A. to (among other things) approve the Extraordinary Resolution referenced in the Lock Up Agreement; (d) the payment of an amount (in the form of a consent fee or otherwise) by GMNS to all of the GMNS Noteholders as contemplated by the Lock-Up Agreement and the Extraordinary Resolution to be voted upon at the meeting referenced in the preceding clause; (e) the subordination of the obligations of GMNS to Parent, under currency swap arrangements between Parent and GMNS, to the obligations of GMNS to the GMNS Noteholders under the notes issued pursuant to the Paying Agent Agreement; (f) an agreement by Parent not to set off its rights under any amounts owed to it under the above-referenced currency swap arrangements against any amounts Parent may owe to GMNS; (g) GMNS may engage in activities as set out in any Order granted by

the Ontario Superior Court of Justice or granted by any other court or other Governmental Authority in connection with any proceeding commenced under the Bankruptcy and Insolvency Act (Canada) against GMNS; and (h) the execution of any agreements to effectuate the foregoing, including lock-up agreements with additional GMNS Noteholders, in each case with the prior written consent of Purchaser, such consent not to be unreasonably withheld, conditioned or delayed.

3.   GMCL may sell to 1908 Holdings Ltd., a wholly-owned Subsidiary of GMCL, receivables from Parent.

## Divestitures

With the consent of Purchaser (not to be unreasonably withheld, conditioned or delayed), Parent and its Subsidiaries may, through a series of sales, assignments, transfers, conveyances, deliveries, licenses, stock splits, redemptions, contributions, dividends, distributions or other transactions, divest or agree to divest themselves of certain assets and Liabilities that are not currently anticipated to be core to the operations of Purchaser following the Closing. Such non-core operations include those portions of Sellers' businesses comprising the Hummer, Saturn, Saab and medium-duty truck lines of business. In connection with such divestitures, Parent and its Subsidiaries may or may agree to (i) contract manufacture/continue to contract manufacture product for a limited period of time, (ii) distribute/continue to distribute parts for Discontinued Brands and contract manufacturing, (iii) enter into transition services agreements pursuant to which they will perform various necessary services, (iv) transfer intellectual property assets (trademarks, trade names, trade dress, product design/shape, advertising tag lines and internet domain names), whether currently owned by GMGTO or by Parent or any other Subsidiary, outside the Ordinary Course of Business, and transfer Personal Property outside the Ordinary Course of Business, (v) enter into License Agreements with respect to Intellectual Property used by Parent or its Subsidiaries, but necessary to the divested lines of business, (vi) reject or cancel certain Seller Material Contracts, (vii) effect a reorganization of the holding company structure of certain of its Subsidiaries related to such business lines, (viii) negotiate separate agreements (*e.g.*, with On-Star, XM and others), (ix) terminate/transfer certain valuable management employees associated with the divested business lines, (x) manage the AM General contract on behalf of a buyer of the Hummer business, (xi) sell the Shreveport manufacturing facility (including Personal Property) to a buyer of the Hummer business, (xii) enter into dealer Deferred Termination Agreements with respect to certain Discontinued Brands, and (xiii) retain certain accounts payable, dealer obligations, policies/warranty obligations and reserve allowances.

## Delphi Matters

GM Components Holdings, LLC ("GMCH") and Parent have entered into a definitive agreement with Delphi Corporation ("Delphi") and an Affiliate of Platinum Equity ("Platinum") pursuant to which (i) GMCH agreed to acquire certain assets and UAW sites of Delphi and to assume certain Delphi liabilities, (ii) Platinum and Parent jointly agreed to invest in a newly formed limited liability company ("New Delphi") which would acquire most of the ongoing Delphi business, and (iii) the remaining assets and liabilities would be retained by Delphi. Parent also agreed to provide certain equity and long-term debt commitments to New Delphi, and further agreed to provide interim financing to Delphi and waive certain pre-existing claims. Similarly, Platinum

agreed to certain equity and debt commitments and to pay a termination fee to Parent in the event that Platinum were to fail to consummate the proposed transactions. The transactions are expected to close in the 3rd quarter, subject to customary terms and conditions and to the approval of the bankruptcy court presiding over the chapter 11 proceedings of Delphi.

Indebtedness

1.  GM Holden Limited may obtain a loan of $140 million from a third party lender, which is intended to be secured by a first priority security interest over the substantial part of its assets. GM Holden Limited may also extend, renew or replace (with the same or different lender) its existing $315 million facility from Controladora General Motors S.A. de C.V., on a secured or unsecured basis.

2.  Parent may guarantee any financing agreement to effectuate the transactions contemplated by this Section 6.2 of this Sellers' Disclosure Schedule.

3.  General Motors Argentina S.r.l. and General Motors do Brasil Ltda. may incur Indebtedness that may exceed $100 million to fund product programs.

4.  General Motors de Mexico, S. de R.L. de C.V. and/or Controladora General Motors S.A. de C.V. may incur Indebtedness in the excess of $100 million to fund expansion of plants and working capital.

5.  General Motors South Africa (Pty) Limited may incur Indebtedness of approximately $50 million for its working capital.

6.  General Motors Venezolana, C.A. may incur Indebtedness of approximately $50 million to Sistemas de Compra Programada Chevrolet, C.A.

7.  Key Subsidiaries may incur Indebtedness from GM European Treasury Corporation.

Severance/Benefit Plans

1.  Sellers and its Subsidiaries may terminate employees and make severance or termination payments in respect thereof, in furtherance of the Viability Plans.

2.  On or before the Closing Date, Parent may terminate any Retained Plan.

Capital Expenditure

1.  Parent has initiated a total of 94 programs (58 Vehicle programs consisting of 38 cars, 7 trucks, 12 crossovers and 1 plant expansion as well as 36 Powertrain programs for engines, transmissions and advanced propulsion systems to address fuel economy and emission improvements) which could result in aggregate capital expenditures in excess of $100,000,000 in a single program or in the aggregate across several related programs.

2.  Parent's Indian Subsidiaries have incurred, and have issued purchase orders with respect to, capital expenditures that will exceed $100,000,000 in the aggregate.

Satisfaction of Indebtedness

1.  General Motors Colmotores S.A. may repay Indebtedness of approximately $158 million.

2.    Parent or its Subsidiaries may discharge or satisfy Indebtedness in connection with the matters described under the heading "Reorganizations" in this Section 6.2 of this Sellers' Disclosure Schedule.

3.    Sellers and their Subsidiaries may continue to settle remaining outstanding derivative transactions/commitments with counterparties in the Ordinary Course of Business.

General Motors Venezolana, C.A. Matters

GMV will shut down two assembly plants for an extended period beginning in June 2009 due to lack of material to assemble vehicles. GMV is in negotiations with suppliers to resume the supply of parts and/or services to GMV, and may restart assembly operations prior to Closing if negotiations are successful.

## Section 6.6(a)(i)

### Mandatory Assumable Executory Contracts to be Assumed at Closing

1. The UAW Collective Bargaining Agreement.
2. Amended and Restated Master Services Agreement, between Parent and GMAC, LLC, dated as of May 22, 2009 and made effective as of December 29, 2008.
3. Each other Contract between any Seller and GMAC, LLC or any of its Subsidiaries, other than those Contracts mutually agreed to in writing by GMAC, LLC and the applicable Seller.
4. Lease dated June 20, 2008 by and between NS - 1500 Marquette MS, L.L.C., a Mississippi limited liability company, as landlord, and Parent, as tenant, as amended by First Amendment to Lease dated as of June 23, 2009.
5. Lease dated June 20, 2008 by and between NS - 200 Cabot PA, L.L.C., a Pennsylvania limited liability company, as landlord, and Parent, as tenant, as amended by First Amendment to Lease dated as of June 23, 2009.
6. Letter Agreement dated February 2, 2009 by and among Parent, NS - 200 Cabot PA, L.L.C., a Pennsylvania limited liability company, and SGD Investments, Inc., a Nebraska corporation, as modified by First Amendment to Lease dated as of June 23, 2009.
7. Lease dated June 20, 2008 by and between NS - 608 Caperton WV, L.L.C., a West Virginia limited liability company, as landlord, and Parent, as tenant, as amended by First Amendment to Lease dated as of June 23, 2009.
8. Lease dated June 20, 2008 by and between NS - 2200 Willis Miller WI, L.L.C., a Wisconsin limited liability company, as landlord, and Parent, as tenant, as amended by First Amendment to Lease dated as of June 23, 2009.

## Section 6.6(a)(ii)

**Mandatory Assumable Executory Contracts to be Assumed Prior to Executory Designation
Deadline**

1. All Executory Contracts identified in the Contract Website (as defined in the Sale
   Procedures Order) at 5:00 p.m., New York City time, on the date hereof as Executory
   Contracts to be assumed shall be assumed and assigned as of the effective date provided for
   in the Contract Website on the date hereof.

2. No Benefit Plan or Non-UAW Collective Bargaining Agreement shall be assumed pursuant
   to this Section 6.6(a)(ii) of this Sellers' Disclosure Schedule.

## Section 6.17(e)

### Assumed Employee Benefit Plans

1. General Motors Hourly-Rate Employees Pension Plan
2. General Motors Personal Savings Plan for Hourly-Rate Employees in the United States
3. General Motors Life and Disability Benefits Program for Hourly Employees(Supplemental Agreement between UAW and GM)
4. General Motors Health Care Program for Hourly Employees(Supplemental Agreement between UAW and GM) (as amended by the UAW Retiree Settlement Agreement)
5. General Motors Supplemental Unemployment Benefit Plan(Supplemental Agreement between UAW and GM)
6. General Motors Profit Sharing Plan for Hourly-Rate Employees in the United States(Supplemental Agreement between UAW and GM)
7. UAW-GM Legal Services Plan for UAW Represented Hourly Employees of General Motors in the United States (Supplemental Agreement between UAW and GM)
8. Dependent Care Reimbursement Plan for Hourly-Rate Employees in the United States (Supplemental Agreement between UAW and GM)
9. General Motors Health Care Spending Account Plan for Entry Level Employees (UAW)
10. Guaranteed Income Stream Benefit Program (UAW)
11. Dependent Scholarship Program for Hourly Employees in the United States (UAW)
12. Tuition Assistance Program for Hourly Employees in the United States (UAW)
13. General Motors Retirement Program for Salaried Employees in the United States
14. General Motors Executive Retirement Plan
15. General Motors Savings-Stock Purchase Program for Salaried Employees in the United States
16. General Motors Salaried Health Care Program
17. General Motors Corporation Health Care Reimbursement Plan for Salaried Employees in the United States
18. General Motors Corporation Dependent Care Reimbursement Plan for Salaried Employees in the United States
19. General Motors Flexible Compensation Program for Salaried Employees in the United States
20. General Motors Long-Term Care Program for Salaried Employees
21. Executive Supplemental Disability Income Protection Program
22. General Motors Severance Program for Salaried Employees in the United States
23. General Motors Executive Severance Program for Salaried Employees in the United States
24. International Service Personnel Program
25. Permanently International Mobile Staff (PIMS) Employees Individual Account Retirement Plan

26. Quality Network Suggestion Plan (only UAW-represented Employees and active salaried employees)
27. Work Family/Employee Assistance Program (UAW)
28. Dependent Scholarship Program for Salaried Employees in the United States
29. Tuition Assistance Program for Salaried Employees in the United States
30. Purchaser, in its sole discretion, may assume certain individual agreements set forth on Section 4.10(h) of this Sellers' Disclosure Schedule. In the event Purchaser assumes any individual agreements, such assumed individual agreements shall be set forth on Attachment A to Section 6.17(e) of Sellers' Disclosure Schedule, to be provided immediately prior to Closing.
31. General Motors Corporation Compensation Plan for Non-Employee Directors
32. General Motors Executive Split Dollar Endorsement Plan
33. Personal Umbrella Liability Insurance Program
34. Senior Executive Financial Counseling Program
35. 401(k) Savings Plan Investment Advice Tool (Financial Engines)
36. Financial Planning Option (Ayco)
37. Health Savings Account (Bank of America)
38. Utility Patent Filing Award
39. Defensive Publication Award
40. Tool/Method Award
41. Usage Award
42. "Boss Kettering" Award Program
43. Executive Employee Physicals
44. Work Life Plus Program
45. Adoption Assistance Plan for Salaried Employees
46. Salaried Policies (including, but not limited to leaves, Mutual Separation Policy (MSP), expense reimbursement, relocation, vacation, service awards)
47. Mutual Separation Policy for Executive Employees
48. Executive Company Vehicle Program
49. Product Evaluation Program
50. Work Related Travel Policy
51. New Vehicle Employee Discount Program
52. Company Owned Vehicle Discount Program
53. The General Motors Supplemental Life Benefits Program for Executive Employees
54. The General Motors Life and Disability Benefits Program for Salaried Employees
55. Benefit plans identified under Schedules 6.17(m)(i) and (ii), if any


## Trusts

56. General Motors - UAW Layoff Benefit Trust 38-6039966
57. General Motors - IUE Welfare Benefit Trust 38-6039965 (conditioned upon IUE acceptance of modified CBA and IUE's inclusion on schedules under Section 6.17(m))

58.  General Motors Savings Plans Master Trust 04-3259743
59.  First Plaza Group Trust II 26-6389533
60.  General Motors Welfare Benefit Trust 04-3400339
61.  General Motors Salaried Employees Pension Trust 13-6369844
62.  General Motors Salaried Employees Pension Trust 25-6388249
63.  GMAM Group Pension Trust I 01-0719298
64.  GMAM Group Pension Trust II 02-0615827
65.  GMAM Investment Funds Trust 13-3160892
66.  GMAM Investment Funds Trust II 01-6231432
67.  White Plaza Group Trust 11-3317084
68.  First Plaza Group Trust 25-6295264
69.  Third Plaza Trust 25-6360552
70.  Fourth Plaza Trust 25-6360553
71.  General Motors Hourly Rate Employees Pension Trust 13-6369845
72.  General Motors Hourly-Rate Employees Pension Trust 25-6013833

**Necessary Reductions under Salaried, Executive, and non-UAW Hourly Plans**

Purchaser's obligations to assume benefit plans and to maintain compensation and benefits for one year contemplate the aggregate reduction of the total benefit obligations under Assumed Plans related to Salaried Retiree Life Insurance, Salaried Retiree Health Care, Salaried Non-Qualified Pension, Executive Retiree Life Insurance and hourly (non-UAW) Life Insurance and Health Care plans by approximately two-thirds, as compared to the obligations of Parent as determined as of 12/31/08.

The changes in salaried retiree benefits being implemented for achieving this are identified as follows:

- Retiree Basic Life Insurance for salaried classified and executive retirees reduced to $10,000 effective the first of the month following the Closing Date;
- Retiree Basic Life Insurance for active salaried classified and executive upon their retirement reduced to 50% of base salary;
- Additional salaried retiree co-pays and contributions required for health care plans, effective 1/10. Retiree cost share increases to approximately 45%. No coverage at age 65;
- 10% reduction in accrued ERP benefits as of the date of the close for active employees;
- The current temporary 10% ERP reduction for existing retirees with a combined qualified and nonqualified benefit equal to or less than $100,000 shall become permanent; no additional non-qualified pension reductions shall be made for these retirees;
- A reduction of 2/3 of the ERP amount above the combined qualified and nonqualified benefit greater than $100,000 will be implemented as of the first of the month following the Closing Date; and
- Executive Life Insurance will be cancelled in retirement for all current and future retirees effective the first of the month following the Closing Date.

Health care and life insurance coverage for non-UAW hourly retirees, if provided at all, are intended to match benefit levels provided salaried retirees. Changes affecting non-UAW hourly retirees are identified in Section 6.17(m) of the Agreement or the related sections of this Sellers' Disclosure Schedule. To the extent that the foregoing changes do not achieve the aggregate reduction level specified above, Purchaser may implement such other changes as are necessary to satisfy such requirement.

## Section 6.17(h)

**Contracts Relating to the Existing Internal VEBA**

None.

## Section 6.17(m)(i)

### Non-UAW Collective Bargaining Agreements

1. 2003 National Agreement between Parent and the International Brotherhood of Electrical Workers ("IBEW"), as amended by the IBEW-Newco Settlement Agreement Regarding Retiree Health Care, Life Insurance, & Modification & Assumption of CBA (executed by IBEW on June 18, 2009), including its Exhibit A thereto, conditioned upon employees' ratification and upon the court's approval of the IBEW Settlement Agreement identified on Section 6.17(m)(ii) of this Sellers' Disclosure Schedule and the waiver and release dated June 18, 2009 (Re: Proposed Memorandum of Understanding Regarding Retiree Health Care, Retiree Basic Life Insurance and CBA Modifications) (the "IBEW CBA"). The assumption of the IBEW CBA shall not include pre-Closing Liabilities relating thereto.

2. 2003 National Agreement between Parent and the International Association of Machinists and Aerospace Workers ("IAMAW"), as amended by the IAMAW-Newco Settlement Agreement Regarding Retiree Health Care, Life Insurance, & Modification & Assumption of CBA (executed by IAMAW on June 16, 2009), including its Exhibit A thereto, conditioned upon ratification and upon the court's approval of the IAMAW Settlement Agreement identified on Section 6.17(m)(ii) of this Sellers' Disclosure Schedule and the waiver and release dated June 15, 2009 and executed by IAMAW on June 16, 2009 (Re: Proposed Memorandum of Understanding Regarding Retiree Health Care, Retiree Basic Life Insurance and CBA Modifications) (the "IAMAW CBA"). The assumption of the IAMAW CBA shall not include pre-Closing Liabilities relating thereo.

## Section 6.17(m)(ii)

### Non-UAW Settlement Agreements

1. IBEW-Newco Settlement Agreement Regarding Retiree Health Care, Life Insurance, & Modification & Assumption of CBA (executed by the International Brotherhood of Electrical Workers on June 18, 2009), conditioned upon the court's approval of the waiver and release dated June 18, 2009 (Re: Proposed Memorandum of Understanding Regarding Retiree Health Care, Retiree Basic Life Insurance and CBA Modifications).

2. IAMAW-Newco Settlement Agreement Regarding Retiree Health Care, Life Insurance, & Modification & Assumption of CBA (executed by the International Association of Machinists and Aerospace Workers on June 16, 2009), conditioned upon the court's approval of and the waiver and release dated June 15 and executed by IAMAW on June 16, 2009 (Re: Proposed Memorandum of Understanding Regarding Retiree Health Care, Retiree Basic Life Insurance and CBA Modifications).

3. Newco- Locals 687 & 1045 Settlement Agreement Regarding Retiree Health Care & Life Insurance (executed by Michigan Regional Council of Carpenters, Local 687, and Interior Systems, Local 1045, on June 17, 2009), conditioned upon the court's approval of the waiver and release dated June 16, 2009 and signed by Unions on June 17, 2009 (Re: Proposed Memorandum of Understanding Regarding Retiree Health Care & Retiree Basic Life Insurance).

4. Newco-IBPA Settlement Agreement Regarding Retiree Health Care & Life Insurance (executed by the International Brotherhood of Painters and Allied Trades of the United States and Canada, Sign & Display Union Local 591 on June 18, 2009), conditioned upon the court's approval of and the waiver and release dated June 18, 2009 (Re: Proposed Memorandum of Understanding Regarding Retiree Health Care, Retiree Basic Life Insurance and CBA Modifications).

## Section 6.27

### Subdivision Properties

| | **Purchased Asset** | **Excluded Asset** |
|---|---|---|
| 1. | Pontiac North Campus, 894 Joslyn Road, Pontiac, Michigan<br><br>Stamping - Pontiac Plant 14 200 East Columbia, Pontiac, MI 48340<br><br>Powerhouse, 900 Baldwin Ave., Pontiac, Michigan 48340 | Stamping - Pontiac North Campus (excluding plant 14), 220 East Columbia, Pontiac, Michigan 48340<br><br>Pontiac Fiero Site (excluding powerhouse), 900 Baldwin Ave, Pontiac, Michigan 48340 |
| 2. | GMPT - Romulus, 36880 Ecorse Road, Romulus, Michigan | Romulus Engineering Center, 37350 Ecorse Road, Romulus, Michigan |
| 3. | GMVM - Fairfax Assembly, 3201 Fairfax Trafficway, Fairfax, Kansas<br><br>Stamping - Fairfax, 3201 Fairfax Trafficway, Fairfax, Kansas | Fairfax Land, 100 Kindleberger Road, Fairfax, Kansas |
| 4. | Weld Tool Center - Grand Blanc, 10800 South Saginaw St., Grand Blanc, Michigan | Dort Highway land, 10800 South Saginaw St., Grand Blanc, Michigan |
| 5. | GMVM - Lordstown Assembly, 2300 Hallock Young Road, Lordstown, Ohio<br><br>Stamping - Lordstown, 2369 Ellsworth-Bailey Road , Lordstown, Ohio | RFO - Lordstown, 1829 Hallock Young Road, Lordstown, Ohio |
| 6. | GMPT - Moraine (DMAX), 2601 W. Stroop Road, Moraine, Ohio | GMVM - Moraine Assembly, 2601 W. Stroop Road, Moraine, Ohio (excluding DMAX) |
| 7. | GMPT - Parma Stamping, 5400 Chevrolet Blvd., Parma, Ohio | GMPT - Parma Complex, 5400 Chevrolet Blvd., Parma, Ohio (Powertrain) |
| 8. | Saginaw Metal Casting, 1629 N. Washington Ave., 48605-5073, Saginaw, Michigan | Saginaw Nodular Iron, 2100 Veterans Memorial Pkwy, Saginaw, Michigan |
| 9. | GMPT - Toledo, 1455 W. Alexis Rd PO Box 909, Toledo, Ohio | REALM parcel located adjacent to Purchased Asset |

A

# EXHIBIT A

## FORM OF PARENT WARRANT A

**WARRANT AGREEMENT**

**dated as of [_____], 2009**

**between**

**[NGMCO, Inc.]**

**and**

**[•]**
**as Warrant Agent**

1766891

## ARTICLE 1
## DEFINITIONS

Section 1.01.    Certain Definitions.................................................................. 1

## ARTICLE 2
## ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.    Issuance of Warrants.............................................................. 9

Section 2.02.    Execution and Authentication of Warrants........................... 9

Section 2.03.    Form of Warrant Certificates ................................................ 9

Section 2.04.    Transfer Restrictions and Legends....................................... 10

Section 2.05.    Transfer, Exchange and Substitution ................................... 11

Section 2.06.    Global Warrants .................................................................. 12

Section 2.07.    Surrender of Warrant Certificates....................................... 14

## ARTICLE 3
## EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.    Exercise of Warrants........................................................... 14

Section 3.02.    Procedure for Exercise....................................................... 14

Section 3.03.    Settlement of Warrants ....................................................... 14

Section 3.04.    Delivery of Common Stock ................................................ 15

Section 3.05.    No Fractional Shares to Be Issued ...................................... 16

Section 3.06.    Acquisition of Warrants by Company ................................. 16

Section 3.07.    Direction of Warrant Agent ............................................... 16

## ARTICLE 4
## [RESERVED]

## ARTICLE 5
## ADJUSTMENTS

Section 5.01.    Adjustments to Exercise Price ........................................... 17

Section 5.02.    Adjustments to Number of Warrants ................................... 21

Section 5.03.    Certain Distributions of Rights and Warrants; Shareholder
Rights Plan.......................................................................... 21

Section 5.04.    No Impairment.................................................................... 22

Section 5.05.    Other Adjustments if Net Share Settlement Applies .......... 23

Section 5.06.    Discretionary Adjustments...................................................... 23

Section 5.07.    Restrictions on Adjustments ............................................... 23

Section 5.08.    Deferral of Adjustments...................................................... 24

Section 5.09.    Recapitalizations, Reclassifications and Other Changes ................... 24

Section 5.10.    Consolidation, Merger and Sale of Assets.......................... 29

Section 5.11.    Common Stock Outstanding................................................ 29

Section 5.12.    Covenant to Reserve Shares for Issuance on Exercise ...................... 30

Section 5.13.    Calculations Final ................................................................ 30

Section 5.14.    Notice of Adjustments ........................................................ 30

Section 5.15.    Warrant Agent Not Responsible for Adjustments or Validity........... 31

Section 5.16.    Statements on Warrants ...................................................... 31

## ARTICLE 6
## OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.    No Rights as Stockholders.................................................. 31

Section 6.02.    Mutilated or Missing Warrant Certificates ........................ 32

Section 6.03.    Modification, Waiver and Meetings .................................. 32

## ARTICLE 7
## CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    Payment of Certain Taxes................................................... 33

Section 7.02.    Change of Warrant Agent ................................................... 33

Section 7.03.    Compensation; Further Assurances ................................... 35

Section 7.04.    Reliance on Counsel .......................................................... 35

Section 7.05.    Proof of Actions Taken...................................................... 35

Section 7.06.    Correctness of Statements.................................................. 35

Section 7.07.    Validity of Agreement ....................................................... 36

Section 7.08.    Use of Agents..................................................................... 36

Section 7.09.    Liability of Warrant Agent................................................. 36

Section 7.10.    Legal Proceedings.............................................................. 36

Section 7.11.    Other Transactions in Securities of the Company .............................. 36

Section 7.12.    Actions as Agent ................................................................ 36

Section 7.13.    Appointment and Acceptance of Agency .......................... 37

Section 7.14.    Successors and Assigns...................................................... 37

iii

Section 7.15.    Notices .................................................................................. 37

Section 7.16.    Applicable Law .................................................................... 38

Section 7.17.    Benefit of this Warrant Agreement ................................. 38

Section 7.18.    Registered Warrantholders................................................ 38

Section 7.19.    Inspection of this Warrant Agreement .............................. 38

Section 7.20.    Headings ............................................................................. 38

Section 7.21.    Counterparts ....................................................................... 39


EXHIBIT A    FORM OF RESTRICTIVE LEGEND FOR WARRANTS ........ A-1

EXHIBIT B    FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK..B-1

EXHIBIT C    FORM OF GLOBAL WARRANT LEGEND................................C-1

EXHIBIT D    FORM OF WARRANT CERTIFICATE ...................................... D-1

EXHIBIT E    FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER
RESTRICTIONS ...........................................................................E-1

EXHIBIT F    FORM OF COMMON STOCK REQUISITION ORDER............. F-1

1766891

# WARRANT AGREEMENT

This Warrant Agreement ("**Warrant Agreement**") dated as of *[_____]*, 2009 is between **[NGMCO, Inc.]**, a corporation organized under the laws of Delaware (the "**Company**"), and [•] (the "**Warrant Agent**").

## WITNESSETH THAT:

WHEREAS, pursuant to the Master Sale and Purchase Agreement (as may be amended, modified or supplemented in accordance with its terms, the "**Master Sale and Purchase Agreement**") dated as of June 1, 2009 by and among General Motors Corporation (the "**Initial Warrantholder**"), Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and the Company, the Company has agreed to issue to the Initial Warrantholder an aggregate initial Number of Warrants issued hereunder equal to 45,454,545, each of which is exercisable for one share of Common Stock (as defined below);

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants;

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

## ARTICLE 1

### DEFINITIONS

Section 1.01. *Certain Definitions.* As used in this Warrant Agreement, the following terms shall have their respective meanings set forth below:

"**$**" refers to such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Adjustment Event**" has the meaning set forth in Section 5.08.

"**Agent Members**" has the meaning set forth in Section 2.06(c).

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Black Scholes Proportion**" has the meaning given to it in the definition of "Change of Control Payment Amount."

"**Black Scholes Warrant Value**" as of any date, shall mean the value of a Warrant to purchase one share of Common Stock (as determined in good faith by the Board of Directors based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent) and

1

shall be determined by customary investment banking practices using the Black Scholes model. For purposes of calculating such amount, (1) the term of the Warrants will be the period from the date of determination until the Expiration Date, (2) the price of each share of Common Stock will be the Current Market Price as of the date of determination, (3) the assumed volatility will be determined by such independent investment banking firm as of the date of determination, (4) the assumed risk-free rate will equal the yield on the seven year U.S. Treasury securities and (5) any other assumptions shall be made by the Board of Directors in good faith based upon the advice of such independent investment bank at the time of determination.

"**Board of Directors**" means the board of directors of the Company or any committee of such board of directors duly authorized to exercise the power of such board of directors with respect to the matters provided for in this Warrant Agreement as to which the board of directors is authorized or required to act.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Warrant Agent.

"**Business Day**" means any day other than a Saturday or Sunday or other than a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company and all warrants or options to acquire such capital stock.

"**Carryover Warrants**" shall mean, for each Warrant, that portion of such Warrant equal to one minus the Black Scholes Proportion.

"**Cash**" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Certificated Warrant**" means a Warrant represented by a Warrant Certificate, in definitive, fully registered form.

"**Change of Control Date**" shall mean the date on which a Change of Control Event is consummated.

"**Change of Control Estimated Payment Amount**" shall mean, in respect of any Change of Control Event, an estimate of the Change of Control Payment Amount payable on the applicable Change of Control Payment Date, as determined in good faith by the Board of Directors, based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent, as of a date no more than 20 Business Days and no less than 15 Business Days prior to the Change of Control Date, in a manner consistent with the terms of this Warrant

2

Agreement and the Warrants, including the definitions of Black Scholes Warrant Value
and Change of Control Payment Amount.

"**Change of Control Event**" shall mean (i) the acquisition by a Person (other than
the Company or a subsidiary of the Company) in a tender offer or a series of related tender
offers of 80% or more of the outstanding Common Stock (determined on a fully-diluted
basis), (ii) the consolidation or merger of the Company with or into another Person (other
than a subsidiary of the Company), or (iii) a sale of all or substantially all of the Company's
assets, in each of clauses (i) through (iii) in which all or any portion of the consideration
paid or exchanged for Common Stock, or into which Common Stock is converted, consists
of Other Property.

"**Change of Control Payment Amount**" shall mean an amount in Cash equal to
the product of (1) the Black Scholes Warrant Value of a Warrant on a Change of Control
Date immediately prior to the consummation of such Change of Control Event multiplied
by (2) a fraction, (x) the numerator of which is the fair market value of the Other Property
received in exchange for a share of Common Stock in a Change of Control Event as of the
Change of Control Date (as determined by an independent investment bank of national
standing selected by the Company and determined by customary investment banking
practices) and (y) the denominator of which is the sum of (a) the Closing Sale Price of the
Registered and Listed Shares received in exchange for a share of Common Stock in a
Change of Control Event as of the Change of Control Date (if any), and (b) the fair market
value (determined as above) of the Other Property as of the Change of Control Date
received in exchange for a share of Common Stock in a Change of Control Event (such
fraction referred to herein as the "**Black Scholes Proportion**").

For purposes of determining the Change of Control Payment Amount, if holders of
Common Stock are entitled to receive differing forms or types of consideration in any
transaction or series of transactions contemplated by the definition of "Change of Control
Event," each holder shall be deemed to have received the same proportion of Other
Property and Registered and Listed Shares that all holders of Common Stock in the
aggregate elected or were required to receive in such transaction or transactions.

"**Change of Control Payment Date**" has the meaning set forth in Section 5.09(e).

"**Close of Business**" means 5:00 p.m. New York City time.

"**Closing Date**" has the meaning given thereto in the Master Sale and Purchase
Agreement.

"**Closing Sale Price**" means, as of any date, the last reported per share sales price
of a share of Common Stock or any other security on such date (or, if no last reported sale
price is reported, the average of the bid and ask prices or, if more than one in either case,
the average of the average bid and the average ask prices on such date) as reported on the
New York Stock Exchange, or if the Common Stock or such other security is not listed on
the New York Stock Exchange, as reported by the principal U.S. national or regional
securities exchange or quotation system on which the Common Stock or such other

3

security is then listed or quoted; *provided, however*, that in the absence of such quotations, the Board of Directors will make a good faith determination of the Closing Sale Price.

If during a period applicable for calculating Closing Sale Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, Closing Sale Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Common Stock**" means the common stock, par value $0.01 per share, of the Company authorized at the date of this Warrant Agreement or as such stock may be constituted from time to time. Subject to the provisions of Section 5.09 and Section 5.10, shares issuable upon exercise of Warrants shall include only shares of the class designated as Common Stock of the Company as of the date of this Warrant Agreement or shares of any class or classes resulting from any reclassification or reclassifications or change or changes thereof and that have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion that the total number of shares of such class resulting from all such reclassifications or changes bears to the total number of shares of all such classes resulting from such reclassifications or changes.

"**Company Order**" means a written order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller, and delivered to the Warrant Agent.

"**Current Market Price**" means, (i) in connection with a dividend, issuance or distribution, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the earlier of the date in question and the Trading Day immediately preceding the Ex-Date for such dividend, issuance or distribution and (ii) in connection with a determination of Black Scholes Warrant Value, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the date of determination, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[    ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank

4

or other qualified financial institution selected by the Board of Directors and reasonably acceptable to the Warrant Agent. If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional securities exchange or quotation system, the Current Market Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such price shall be reasonably determined in good faith by the Company's Board of Directors.

"**Cut-Off Time**" has the meaning set forth in Section 5.09(e).

"**Depositary**" means The Depository Trust Company, its nominees, and their respective successors.

"**Determination Date**" has the meaning set forth in Section 5.08.

"**Distribution Date**" has the meaning set forth in Section 2.04.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Ex-Date**" means, in connection with any dividend, issuance or distribution, the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such dividend, issuance or distribution.

"**Exercise Date**" has the meaning set forth in Section 3.02(b).

"**Exercise Notice**" means, for any Warrant, the exercise notice set forth on the reverse of the Warrant Certificate, substantially in the form set forth in Exhibit D hereto.

"**Exercise Price**" means initially $30.00 per Warrant, subject to adjustment pursuant to Article 5.

"**Expiration Date**" means, for any Warrant, the date that is the seven (7) year anniversary of the date hereof.

"**Full Physical Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Full Physical Share Amount in exchange for payment by the Warrantholder of the Exercise Price.

"**Full Physical Share Amount**" has the meaning set forth in Section 3.03(b).

"**Global Warrant**" means a Warrant in the form of a permanent global Warrant Certificate, in definitive, fully registered form.

"**Global Warrant Legend**" means the legend set forth in Section 2.06(b).

"**Initial Warrantholder**" has the meaning set forth in the Recitals.

5

1766891

"**Master Sale and Purchase Agreement**" has the meaning set forth in the Recitals.

"**Net Share Amount**" has the meaning set forth in Section 3.03(c).

"**Net Share Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Net Share Amount without any payment therefor.

"**Net Share Settlement Price**" means, as of any date, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days prior to the date of determination of the Net Share Settlement Price for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[ ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank or other qualified financial institution reasonably acceptable to the Warrant Agent. If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional Securities exchange or quotation system, the Net Share Settlement Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such prices shall be reasonably determined in good faith by the Company's Board of Directors.

If during a period applicable for calculating Net Share Settlement Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, the Net Share Settlement Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**New Warrant Exercise Price**" shall be equal to the product of (i) the Exercise Price then in effect and (ii) one minus the Black Scholes Proportion.

"**New Warrants**" has the meaning set forth in Section 5.09(e).

"**Number of Warrants**" means, for a Warrant Certificate, the "Number of Warrants" specified on the face of such Warrant Certificate (or, in the case of a Global Warrant, on Schedule A to such Warrant Certificate), subject to adjustment pursuant to Article 5.

6

"**Officer's Certificate**" means a certificate signed by any two officers of the Company, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller.

"**Other Property**" means any cash, property or other securities other than Registered and Listed Shares.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Record Date**", means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any Cash, securities or other property or in which Common Stock (or other applicable security) is exchanged for or converted into any combination of Cash, securities or other property, the date fixed for determination of holders of Common Stock entitled to receive such Cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

"**Redemption**" has the meaning set forth in Section 5.09(e).

"**Redemption Notice**" has the meaning set forth in Section 5.09(e).

"**Reference Property**" has the meaning set forth in Section 5.09(a).

"**Registered and Listed Shares**" shall mean shares of the common stock of the surviving entity in a consolidation, merger, or combination or the acquiring entity in a tender offer, except that if the surviving entity or acquiring entity has a parent corporation, it shall be the shares of the common stock of the parent corporation, provided, that, in each case, such shares (i) have been registered (or will be registered within 30 calendar days following the Change of Control Date) under Section 12 of the Exchange Act with the Securities and Exchange Commission, and (ii) are listed for trading on the New York Stock Exchange or any other national securities exchange (or will be so listed or admitted within 30 calendar days following the Change of Control Date).

"**Reorganization Event**" has the meaning set forth in Section 5.09(a).

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, the third Trading Day immediately following the Exercise Date for such Warrant.

"**Trading Day**" means (i) if the applicable security is listed on the New York Stock Exchange, a day on which trades may be made thereon or (ii) if the applicable security is

7

listed or admitted for trading on the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or other national securities exchange or market, a day on which the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or such other national securities exchange or market is open for business or (iii) if the applicable security is not so listed, admitted for trading or quoted, any Business Day.

"**Trigger Event**" has the meaning set forth in Section 5.03.

"**Unit of Reference Property**" has the meaning set forth in Section 5.09(a).

"**Unit Value**" has the meaning set forth in Section 5.09(c).

"**VEBA Exercise Price**" means the 'Exercise Price' as such term is defined in the VEBA Warrant Agreement.

"**VEBA Warrant Agreement**" means the warrant agreement dated as of [     ], 2009 between [**NGMCO, Inc.**] and [ ] as Warrant Agent pursuant to which UAW Retiree Medical Benefits Trust was the 'Initial Warrantholder' as defined therein.

"**VEBA Warrants**" means the warrants issued pursuant to the VEBA Warrant Agreement.

"**Vice President**" means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president" of the Company.

"**Voting Stock**" means Capital Stock having the right to vote for the election of directors under ordinary circumstances.

"**Warrant**" means a warrant of the Company exercisable for one share of Common Stock as provided herein, and issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth in this Warrant Agreement.

"**Warrant Agent**" means [●], in its capacity as warrant agent hereunder.

"**Warrant Certificate**" means any certificate representing Warrants satisfying the requirements set forth in Section 2.03.

"**Warrant Register**" has the meaning set forth in Section 2.05.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

## ARTICLE 2

ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

8

Section 2.01. *Issuance of Warrants.* (a) The Company shall execute and deliver to the Warrant Agent, for authentication and delivery to the Initial Warrantholder on the Closing Date, a single Certificated Warrant in the name of the Initial Warrantholder, together with an Authentication Order with respect thereto, evidencing an initial aggregate Number of Warrants equal to 45,454,545 (such Number of Warrants subject to adjustment from time to time as described herein). The Warrant Agent shall, upon receipt of such Certificated Warrant and Authentication Order, authenticate and deliver such Certificated Warrant to the Initial Warrantholder in accordance with Section 2.02 and register the Initial Warrantholder as the Warrantholder of such Warrants in accordance with Section 2.05. All such Warrants shall be dated as of the Closing Date.

(b)     Except as set forth in Section 2.05 and Section 6.02, the Warrants issued to the Initial Warrantholder on the Closing Date shall be the only Warrants issued or outstanding under this Warrant Agreement.

(c)     All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to the benefits hereof, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.

Section 2.02. *Execution and Authentication of Warrants.* (a) Warrants shall be executed on behalf of the Company by any Executive Vice President, any Senior Vice President, and any Vice President of the Company and attested by its Secretary or any one of its Assistant Secretaries. The signature of any of these officers on Warrants may be manual or facsimile. Typographical and other minor errors or defects in any such signature shall not affect the validity or enforceability of any Warrant that has been duly authenticated and delivered by the Warrant Agent.

(b)     Warrants bearing the manual or facsimile signatures of individuals, each of whom was, at the time he or she signed such Warrant or his or her facsimile signature was affixed to such Warrant, as the case may be, a proper officer of the Company, shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Warrants or did not hold such offices at the date of such Warrants.

(c)     No Warrant shall be entitled to any benefit under this Warrant Agreement or be valid or obligatory for any purpose unless there appears on such Warrant a certificate of authentication substantially in the form provided for herein executed by the Warrant Agent by manual or facsimile signature, and such certificate upon any Warrant shall be conclusive evidence, and the only evidence, that such Warrant has been duly authenticated and delivered hereunder.

Section 2.03. *Form of Warrant Certificates.* Each Warrant Certificate shall be in substantially the form set forth in Exhibit D hereto and shall have such insertions as are appropriate or required by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not

9

inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any law or any rule of any securities exchange on which Warrants may be listed, and such as may be necessary to conform to customary usage.

Section 2.04. *Transfer Restrictions and Legends.* This Section 2.04 shall not apply to Warrants and/or Common Stock which have been issued, distributed or sold pursuant to an effective registration statement or are otherwise exempt from registration under the Securities Act pursuant to Section 1145 of the Bankruptcy Code (the date as of which this Section 2.04 does not apply to such Warrants and/or Common Stock, the "**Distribution Date**").

(a)    Each Warrant issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)    Warrants may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a Warrantholder except (A) pursuant to a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any Warrants as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Warrant Certificates representing such Warrants for exchange pursuant to Section 2.05 in accordance with the procedures of the Warrant Agent (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the Warrant Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Warrant Certificate for a like Number of Warrants, which shall not bear such legend.

(b)    All shares of Common Stock issued to a Warrantholder upon exercise of a Warrant shall bear the legend set forth in Exhibit B hereto.

(i)    Shares of Common Stock issued to a Warrantholder upon exercise of a Warrant may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by such Warrantholder except (A) pursuant to a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any such shares of Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that the shares of Common Stock can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of

10

the transfer agent for the Common Stock (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the transfer agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new certificate or certificates for a like number of shares of Common Stock, which shall not bear such legend.

(c)    Any Warrant that is purchased or owned by the Company or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Company or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Warrants no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

Section 2.05.  *Transfer, Exchange and Substitution.*  (a) Warrants shall be issued in registered form only.  The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the **"Warrant Register"**) in which, subject to such reasonable regulations as the Company may prescribe, the Company shall provide for the registration of Warrants and transfers, exchanges or substitutions of Warrants as herein provided.  All Warrants issued upon any registration of transfer or exchange of or substitution for Warrants shall be valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as Warrants surrendered for such registration of transfer, exchange or substitution.

(b)    A Warrantholder may transfer a Warrant only upon surrender of such Warrant for registration of transfer.  Warrants may be presented for registration of transfer and exchange at the offices of the Warrant Agent with a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by such Warrantholder or by such Warrantholder's attorney, duly authorized in writing.  Such Warrantholder will also provide a written certificate (substantially in the form of Exhibit E hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Warrants.  The Warrant Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Warrant hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act.  No such transfer shall be effected until, and the transferee shall succeed to the rights of a Warrantholder only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.  Prior to the registration of any transfer of a Warrant by a Warrantholder as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name Warrants are registered as the owner thereof for all purposes and as the Person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)    Every Warrant presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form

11

satisfactory to the Company and the Warrant Agent, by the holder thereof or such Warrantholder's attorney duly authorized in writing.

(d)    When Warrants are presented to the Warrant Agent with a request to register the transfer of, or to exchange or substitute, such Warrants, the Warrant Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied. To permit registrations of transfers, exchanges and substitutions, the Company shall execute Warrant Certificates at the Warrant Agent's request and the Warrant Agent shall countersign and deliver such Warrant Certificates. No service charge shall be made for any registration of transfer or exchange of or substitution for Warrants, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Warrants.

(e)    A Certified Warrant may be exchanged at the option of the holder or holders thereof, when presented or surrendered in accordance with this Warrant Agreement, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like Number of Warrants. If less than all Warrants represented by a Certificated Warrant are transferred, exchanged or substituted in accordance with this Warrant Agreement, the Warrant Certificate shall be surrendered to the Warrant Agent and a new Warrant Certificate for a Number of Warrants equal to the Warrants represented by such Warrant Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Warrantholder, shall be executed by the Company and delivered to the Warrant Agent and the Warrant Agent shall countersign such new Warrant Certificate and shall deliver such new Warrant Certificate to the Person or Persons entitled to receive the same.

Section 2.06.    *Global Warrants.*    (a) The Warrants shall initially be issued in the form of Certificated Warrants. However, if the Warrants are sold pursuant to an effective registration statement filed with the SEC, or if the Company so elects at any time, any Certificated Warrants may be presented to the Warrant Agent by Warrantholders in exchange for one or more Global Warrants up to the aggregate Number of Warrants then outstanding, to be registered in the name of the Depositary, or its nominee, and delivered by the Warrant Agent to the Depositary, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of the Depositary. Upon such presentation, the Company shall execute a Global Warrant representing such aggregate Number of Warrants and deliver the same to the Warrant Agent for authentication and delivery in accordance with Section 2.02.

(b)    Any Global Warrant shall bear the legend substantially in the form set forth in Exhibit C hereto (the "**Global Warrant Legend**").

(c)    So long as a Global Warrant is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Warrant Agreement with respect to the Global Warrant held on their behalf by the Depositary or the Warrant Agent as its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant

12

Agent as the absolute owner of such Global Warrant for all purposes. Accordingly, any such owner's beneficial interest in such Global Warrant will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility with respect to such records maintained by the Depositary or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Warrantholder.

(d)    Any holder of a Global Warrant registered in the name of the Depositary or its nominee shall, by acceptance of such Global Warrant, agree that transfers of beneficial interests in such Global Warrant may be effected only through a book-entry system maintained by the holder of such Global Warrant (or its agent), and that ownership of a beneficial interest in Warrants represented thereby shall be required to be reflected in book-entry form.

(e)    Transfers of a Global Warrant registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Company, the Depositary, their successors, and their respective nominees. Interests of beneficial owners in a Global Warrant registered in the name of the Depositary or its nominee shall be transferred in accordance with the rules and procedures of the Depositary.

(f)    A Global Warrant registered in the name of the Depositary or its nominee shall be exchanged for Certificated Warrants only if the Depositary (A) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (B) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days. In any such event, a Global Warrant registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant, Certificated Warrants representing, in the aggregate, the Number of Warrants theretofore represented by such Global Warrant with respect to such beneficial owner's respective beneficial interest. Any Certificated Warrant delivered in exchange for an interest in a Global Warrant pursuant to this Section 2.06(f) shall not bear the Global Warrant Legend. Interests in the Global Warrant may not be exchanged for Certificated Warrants other than as provided in this Section 2.06(f).

(g)    The holder of a Global Warrant registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent

13

Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder is entitled to take under this Warrant Agreement or the Warrant.

Section 2.07. *Surrender of Warrant Certificates.* Any Warrant Certificate surrendered for registration of transfer, exchange, substitution or exercise of Warrants represented thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company and, except as provided in this Article 2 in case of an exchange, transfer or substitution, or Article 3 in case of the exercise of less than all Warrants represented thereby, or Section 6.02 in case of mutilation, no Warrant Certificate shall be issued hereunder in lieu thereof. The Warrant Agent shall deliver to the Company from time to time or otherwise dispose of such cancelled Warrant Certificates as the Company may direct.

## ARTICLE 3

### EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01. *Exercise of Warrants.* At any time prior to 5:00 p.m., New York City time, on the Expiration Date, a Warrantholder shall be entitled to exercise, in accordance with this Article 3, the full Number of Warrants represented by any Warrant Certificate then registered in such Warrantholder's name (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants). Any Warrants not exercised prior to such time shall expire unexercised.

Section 3.02. *Procedure for Exercise.* (a) To exercise a Warrant (i) in the case of a Certificated Warrant, the Warrantholder must surrender the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes as set forth in Section 7.01(b), or (ii) in the case of a Global Warrant, the Warrantholder must comply with the procedures established by the Depositary for the exercise of Warrants.

(b) The date on which a Warrantholder complies with the requirements for exercise set forth in this Section 3.02 in respect of a Warrant is the "**Exercise Date**" for such Warrant. However, if such date is not a Trading Day or the Warrantholder satisfies such requirements after the Close of Business on a Trading Day, then the Exercise Date shall be the immediately succeeding Trading Day, unless that Trading Day falls after the Expiration Date, in which case the Exercise Date shall be the immediately preceding Trading Day.

Section 3.03. *Settlement of Warrants.* (a) Full Physical Settlement shall apply to each Warrant unless the Warrantholder elects for Net Share Settlement to apply upon exercise of such Warrant. Such election shall be made (i) in the case of a Certificated Warrant, in the Exercise Notice for such Warrant, or (ii) in the case of a Global Warrant, in accordance with the procedures established by the Depositary for the exercise of Warrants.

14

(b)     If Full Physical Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, prior to 11:00 a.m., New York City time, on the Settlement Date for such Warrant, the Warrantholder shall pay the Exercise Price (determined as of such Exercise Date) by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Warrantholder in accordance with Section 7.15, and  on the Settlement Date, following receipt by the Warrant Agent of such Exercise Price, the Company shall cause to be delivered to the Warrantholder one share of Common Stock (the "**Full Physical Share Amount**"), together with Cash in respect of any fractional Warrant as provided in Section 3.05.  All funds received by the Warrant Agent upon exercise of such Warrant shall be deposited by the Warrant Agent for the account of the Company at *[specify bank]*, unless the Company has previously instructed otherwise in writing.

(c)     If Net Share Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, on the Settlement Date for such Warrant, the Company shall cause to be delivered to the Warrantholder a number of shares of Common Stock (which in no event will be less than zero) (the "**Net Share Amount**") equal to (i) the Net Share Settlement Price as of the relevant Exercise Date, *minus* the Exercise Price (determined as of such Exercise Date), *divided by* (ii) such Net Share Settlement Price, together with Cash in respect of any factional shares or fractional Warrants as provided in Section 3.05.

Section 3.04.   *Delivery of Common Stock.*  (a)  In connection with the delivery of shares of Common Stock to an exercising Warrantholder pursuant to Section 3.03(b) or Section 3.03(c), as the case may be, the Warrant Agent shall:

(i)     (A) if such shares of Common Stock are in book-entry form at the Depositary, deliver Common Stock by electronic transfer (with the assistance of the Company and the transfer agent of Common Stock, if necessary) to such Warrantholder's account, or any other account as such Warrantholder may designate, at the Depositary or at an Agent Member, or (B) if such shares of Common Stock are not in book-entry form at the Depositary, requisition from the transfer agent of the Common Stock and deliver to or upon the order of such Warrantholder a certificate or certificates, in each case with legends thereon as appropriate (as determined by the Company) and for the number of full shares of Common Stock to which such Warrantholder is entitled, registered in such name or names as may be directed by such Warrantholder;

(ii)    deliver Cash to such Warrantholder in respect of any fractional shares or fractional Warrants, as provided in Section 3.05; and

(iii)   if the Number of Warrants represented by a Warrant Certificate shall not have been exercised in full, deliver a new Warrant Certificate, countersigned by the Warrant Agent, for the balance of the number of Warrants represented by the surrendered Warrant Certificate.

15

1766891

(b)    Each Person in whose name any shares of Common Stock are issued shall for all purposes be deemed to have become the holder of record of such shares as of the Exercise Date or, in the case of a Warrant subject to Full Physical Settlement only, the date of payment by the Warrantholder of the Exercise Price in accordance with Section 3.03(b), if later.  However, if any such date is a date when the stock transfer books of the Company are closed, such Person shall be deemed to have become the holder of such shares at the Close of Business on the next succeeding date on which the stock transfer books are open.

(c)    Promptly after the Warrant Agent shall have taken the action required above (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to any Warrants exercised (including, without limitation, with respect to any Exercise Price paid to the Warrant Agent).  The Company shall reimburse the Warrant Agent for any amounts paid by the Warrant Agent in respect of a fractional share or fractional Warrant upon such exercise in accordance with Section 3.05 hereof.

Section 3.05.  *No Fractional Shares to Be Issued.*  (a) Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a share of Common Stock upon exercise of any Warrants.

(b)    If any fraction of a Warrant shall be exercised hereunder, the Company shall pay the relevant Warrantholder Cash in lieu of the corresponding fraction of a share of Common Stock valued at the Net Share Settlement Price as of the Exercise Date.  However, if more than one Warrant shall be exercised hereunder at one time by the same Warrantholder, the number of full shares which shall be issuable upon exercise thereof shall be computed on the basis of all Warrants (including any fractional Warrants) so exercised.  If any fraction of a share of Common Stock would, except for the provisions of this Section 3.05, be issuable on the exercise of any Warrant or Warrants (including any fractional Warrants), the Company shall pay the Warrantholder Cash in lieu of such fractional shares valued at the Net Share Settlement Price as of the Exercise Date.

(c)    Each Warrantholder, by its acceptance of a Warrant Certificate, expressly waives its right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock.

Section 3.06.  *Acquisition of Warrants by Company.*  The Company shall have the right, except as limited by law, to purchase or otherwise to acquire Warrants at such times, in such manner and for such consideration as it may deem appropriate and shall have agreed with the holder of such Warrants.

Section 3.07.  *Direction of Warrant Agent.*  (a) The Company shall be responsible for performing all calculations required in connection with the exercise and settlement of the Warrants and the payment or delivery, as the case may be, of Cash and/or Common Stock as described in this Article 3.  In connection therewith, the Company shall provide prompt written notice to the Warrant Agent of the amount of Cash and the number of shares of Common Stock payable or deliverable, as the case may be, upon exercise and

16

settlement of the Warrants, including, without limitation, the Net Share Amount and the Full Physical Share Amount.

(b)    Any Cash to be paid, or Common Stock to be delivered, to the Warrantholders hereunder shall be delivered to the Warrant Agent no later than the Business Day immediately preceding the date such consideration is required to be delivered to the Warrantholders.

(c)    The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations or items to the Warrant Agent. The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or Units of Reference Property that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or Units of Reference Property, or to comply with any of the covenants of the Company contained in this Article 3.

ARTICLE 4

[RESERVED]

ARTICLE 5

ADJUSTMENTS

Section 5.01.  *Adjustments to Exercise Price.* The Exercise Price for the Warrants shall be subject to adjustment (without duplication) upon the occurrence of any of the following events:

(a)    The issuance of Common Stock as a dividend or distribution to all holders of Common Stock, or a subdivision or combination of Common Stock, in which event the Exercise Price shall be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0}{OS_1}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution, or

17

immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be; and

$OS_1$ = the number of shares of Common Stock that would be outstanding immediately after, and solely as a result of, such dividend, distribution, subdivision or combination.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be. If any dividend or distribution or subdivision or combination of the type described in this Section 5.01(a) is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to the Exercise Price that would then be in effect if such dividend or distribution or subdivision or combination had not been declared or announced, as the case may be.

(b)     The issuance to all holders of Common Stock of rights or warrants entitling them for a period expiring 60 days or less from the date of issuance of such rights or warrants to purchase shares of Common Stock (or securities convertible into Common Stock) at less than (or having a conversion price per share less than) the Current Market Price of Common Stock, in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0 + Y}{OS_0 + X}$$

where:

$EP_0$ = the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such issuance;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such issuance;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such issuance;

$X$ = the total number of shares of Common Stock issuable pursuant to such rights, warrants or convertible securities; and

$Y$ = the aggregate price payable to exercise such rights, warrants or convertible securities *divided by* the Current Market Price.

18

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such issuance. In the event that the issuance of such rights, warrants or convertible securities is announced but such rights, warrants or convertible securities are not so issued, the Exercise Price shall again be adjusted to be the Exercise Price that would then be in effect if the Record Date for such issuance had not occurred. To the extent that such rights or warrants are not exercised prior to their expiration or shares of Common Stock are otherwise not delivered pursuant to such rights, warrants or convertible securities, upon the expiration, termination or maturity of such rights, warrants or convertible securities, the Exercise Price shall be readjusted to the Exercise Price that would then be in effect had the adjustments made upon the issuance of such rights, warrants or convertible securities been made on the basis of the delivery of only the number of shares of Common Stock actually delivered. In determining the aggregate price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, as well as any consideration received in connection with the conversion of any convertible securities issued upon exercise of such rights or warrants, and the value of such consideration, if other than Cash, shall be determined in good faith by the Board of Directors.

(c)    The dividend or distribution to all holders of Common Stock of (i) shares of the Company's Capital Stock (other than Common Stock), (ii) evidences of the Company's indebtedness, (iii) rights or warrants to purchase the Company's securities or the Company's assets or (iv) property or Cash (excluding any ordinary cash dividends declared by the Board of Directors and excluding any dividend, distribution or issuance covered by clauses (a) or (b) above), in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{SP_0 - FMV}{SP_0}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$SP_0$    =    the Current Market Price; and

$FMV$    =    the fair market value (as determined in good faith by the Board of Directors), on the Record Date for such dividend or distribution, of the shares of Capital Stock, evidences of indebtedness or property, rights or warrants so distributed or the amount of Cash (other than in the case of ordinary cash dividends declared by the Board of Directors) expressed as an amount per share of outstanding Common Stock.

19

In the event of a reduction of the VEBA Exercise Price under the VEBA Warrant Agreement (other than pursuant to Article 5 of the VEBA Warrant Agreement) below 125% of the Exercise Price as adjusted to such date pursuant to this Article 5, such reduction shall be treated as a distribution of property where the FMV of such property for purposes of this adjustment shall be equal to the absolute value of the difference between (i) the Black Scholes Warrant Value of the outstanding VEBA Warrants with a VEBA Exercise Price equal to 125% of the Exercise Price as adjusted to such date pursuant to this Article 5 and (ii) the Black Scholes Warrant Value of the outstanding VEBA Warrants immediately following such reduction in VEBA Exercise Price, expressed as an amount per share of outstanding Common Stock.

Such decrease shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

However, if the transaction that gives rise to an adjustment pursuant to this clause (c) is one pursuant to which the payment of a dividend or other distribution on Common Stock consists of shares of capital stock of, or similar equity interests in, a subsidiary of the Company or other business unit of the Company (i.e., a spin-off) that are, or, when issued, will be, traded or quoted on the New York Stock Exchange or any other national or regional securities exchange or market, then the Exercise Price will instead be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{MP_0}{MP_0 + FMV_0}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$FMV_0$ =    the average of the Closing Sale Prices of the Capital Stock or similar equity interests distributed to holders of Common Stock applicable to one share of Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution; and

$MP_0$    =    the average of the Closing Sale Prices of the Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution.

20

Such decrease shall become effective immediately after the Ex-Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

(d)     For the purposes of Section 5.01(a), (b) and (c), any dividend or distribution to which Section 5.01(c) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock (or both), shall be deemed instead to be a dividend or distribution of the indebtedness, assets or shares of Capital Stock other than such shares of Common Stock or rights or warrants (and any Exercise Price adjustment required by Section 5.01(c) with respect to such dividend or distribution shall be made in respect of such dividend or distribution (without regard to the parenthetical in Section 5.01(c) that begins with the word "excluding")) immediately followed by a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Exercise Price adjustment required by Section 5.01 with respect to such dividend or distribution shall then be made), except, for purposes of such adjustment, any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding immediately prior to the Close of Business on the Record Date."

Section 5.02. *Adjustments to Number of Warrants.*     Concurrently with any adjustment to the Exercise Price under Section 5.01, the Number of Warrants for each Warrant Certificate will be adjusted such that the Number of Warrants for each such Warrant Certificate in effect immediately following the effectiveness of such adjustment will be equal to the Number of Warrants for each such Warrant Certificate in effect immediately prior to such adjustment, *multiplied by* a fraction, (i) the numerator of which is the Exercise Price in effect immediately prior to such adjustment and (ii) the denominator of which is the Exercise Price in effect immediately following such adjustment.

Section 5.03. *Certain Distributions of Rights and Warrants; Shareholder Rights Plan.* (a) Rights or warrants distributed by the Company to all holders of Common Stock (including under any Shareholder Rights Plan in existence on the date hereof or hereafter put into effect) entitling the holders thereof to subscribe for or purchase shares of the Company's Capital Stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events (a "**Trigger Event**"):

(i)     are deemed to be transferred with such shares of Common Stock;

(ii)    are not exercisable; and

(iii)   are also issued in respect of future issuances of Common Stock,

shall be deemed not to have been distributed for purposes of Article 5 (and no adjustment to the Exercise Price or the Number of Warrants under this Article 5 will be made) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be

21

deemed to have been distributed and an appropriate adjustment (if any is required) to the Exercise Price and the Number of Warrants for each Warrant Certificate shall be made under this Article 5 (subject in all respects to Section 5.03(d)).

(b)    If any such right or warrant is subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights or warrants with such rights (subject in all respects to Section 5.03(d)).

(c)    In addition, except as set forth in Section 5.03(d), in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in Section 5.03(b)) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exercise Price and the Number of Warrants for each Warrant Certificate under Article 5 was made (including any adjustment contemplated in Section 5.03(d)):

(i)    in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a Cash distribution, equal to the per share redemption or repurchase price received by a holder or holders of Common Stock with respect to such rights or warrants (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase; and

(ii)    in the case of such rights or warrants that shall have expired or been terminated without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted as if such rights and warrants had not been issued.

(d)    If a Company shareholders rights plan under which any rights are issued provides that each share of Common Stock issued upon exercise of Warrants at any time prior to the distribution of separate certificates representing such rights shall be entitled to receive such rights, prior to the separation of such rights from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall not be adjusted pursuant to Section 5.01. If, however, prior to any exercise of a Warrant, such rights have separated from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be adjusted at the time of separation as if the Company dividended or distributed to all holders of Common Stock, the Company's Capital Stock, evidences of the Company's indebtedness, certain rights or warrants to purchase the Company's securities or other of the Company's assets as described in Section 5.01(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

22

Section 5.04. *No Impairment.* The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in taking of all such action as may be necessary or appropriate in order to protect the rights of the Warrantholder.

Section 5.05. *Other Adjustments if Net Share Settlement Applies.* To the extent Net Share Settlement applies to the exercise of any Warrant, the Board of Directors shall make appropriate adjustments to the amount of Cash or number of shares of Common Stock, as the case may be, due upon exercise of the Warrant, as may be necessary or appropriate to effectuate the intent of this Article 5 and to avoid unjust or inequitable results as determined in its good faith judgment, to account for any adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate that becomes effective, or any event requiring an adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate where the Record Date or effective date (in the case of a subdivision or combination of the Common Stock) of the event occurs, during the period beginning on, and including, the Exercise Date and ending on, and including, the related Settlement Date.

Section 5.06. *Discretionary Adjustments.* The Company may from time to time, to the extent permitted by law and subject to applicable rules of the New York Stock Exchange, decrease the Exercise Price and/or increase the Number of Warrants for each Warrant Certificate by any amount for any period of at least 20 days. In that case, the Company shall give the Warrantholders at least 15 days' prior notice of such increase or decrease, and such notice shall state the decreased Exercise Price and/or increased Number of Warrants for each Warrant Certificate and the period during which the decrease and/or increase will be in effect. The Company may make such decreases in the Exercise Price and/or increases in the Number of Warrants for each Warrant Certificate, in addition to those set forth in this Article 5, as the Company's Board of Directors deems advisable, including to avoid or diminish any income tax to holders of the Common Stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

Section 5.07. *Restrictions on Adjustments.*    (a) Except in accordance with Section 5.01, the Exercise Price and the Number of Warrants for any Warrant Certificate will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing.

(b)    Neither the Exercise Price nor the Number of Warrants for any Warrant Certificate will be adjusted:

(i)    upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

23

(ii)    for a change in the par value of the Common Stock.

(c)    In no event will the Company adjust the Exercise Price or make a corresponding adjustment to the Number of Warrants for any Warrant Certificate to the extent that the adjustment would reduce the Exercise Price below the par value per share of Common Stock.

(d)    No adjustment shall be made to the Exercise Price or the Number of Warrants for any Warrant Certificate for any of the transactions described in Section 5.01 if the Company makes provisions for Warrantholders to participate in any such transaction without exercising their Warrants on the same basis as holders of Common Stock and with notice that the Board of Directors determines in good faith to be fair and appropriate.

(e)    No adjustment shall be made to the Exercise Price, nor will any corresponding adjustment be made to the Number of Warrants for any Warrant Certificate, unless the adjustment would result in a change of at least 1% of the Exercise Price; *provided* that any adjustments that are less than 1% of the Exercise Price shall be carried forward and such carried forward adjustments, regardless of whether the aggregate adjustment is less than 1% of the Exercise Price, shall be made (i) annually, on each anniversary of the Closing Date, (ii) immediately prior to the time of any exercise, and (iii) five Business Days prior to the Expiration Date, unless, in each case, such adjustment has already been made.

(f)    If the Company takes a record of the holders of Common Stock for the purpose of entitling them to receive a dividend or other distribution, and thereafter (and before the dividend or distribution has been paid or delivered to stockholders) legally abandons its plan to pay or deliver such dividend or distribution, then thereafter no adjustment to the Exercise Price or the Number of Warrants for any Warrant Certificate then in effect shall be required by reason of the taking of such record.

Section 5.08. *Deferral of Adjustments.*    In any case in which Section 5.01 provides that an adjustment shall become effective immediately after (a) a Record Date for an event or (b) the effective date (in the case of a subdivision or combination of the Common Stock) (each a "**Determination Date**"), the Company may elect to defer, until the later of the date the adjustment to the Exercise Price and Number of Warrants for each Warrant Certificate can be definitively determined and the occurrence of the applicable Adjustment Event (as hereinafter defined), (i) issuing to the Warrantholder of any Warrant exercised after such Determination Date and before the occurrence of such Adjustment Event, the additional shares of Common Stock or other securities or assets issuable upon such exercise by reason of the adjustment required by such Adjustment Event over and above the Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount in Cash in lieu of any fractional share of Common Stock or fractional Warrant pursuant to Section 3.05. For the purposes of this Section 5.08, the term "**Adjustment Event**" shall mean in any case referred to in clause (a) or clause (b) hereof, the occurrence of such event.

24

Section 5.09.  *Recapitalizations, Reclassifications and Other Changes.*  (a)  If any of the following events occur:

      (i)     any recapitalization;

      (ii)    any reclassification or change of the outstanding shares of Common Stock (other than changes resulting from a subdivision or combination to which Section 5.01(a) applies);

      (iii)   any consolidation, merger or combination involving the Company;

      (iv)   any sale or conveyance to a third party of all or substantially all of the Company's assets; or

      (v)    any statutory share exchange,

(each such event a "**Reorganization Event**"), in each case as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (the "**Reference Property**"), then, subject to Section 5.09(e), following the effective time of the transaction, the right to receive shares of Common Stock upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of one share of Common Stock would have owned or been entitled to receive in connection with such Reorganization Event (such kind and amount of Reference Property per share of Common Stock, a "**Unit of Reference Property**").  In the event holders of Common Stock have the opportunity to elect the form of consideration to be received in a Reorganization Event, other than with respect to a Change of Control Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock in such Reorganization Event.

      (b)    At any time from, and including, the effective time of a Reorganization Event:

      (i)     if Full Physical Settlement applies upon exercise of a Warrant, the Full Physical Share Amount per Warrant shall be equal to a single Unit of Reference Property;

      (ii)    if Net Share Settlement applies upon exercise of a Warrant, the Net Share Amount per Warrant shall be a number of Units of Reference Property calculated as set forth in Section 3.03(c), except that the Net Share Settlement Price used to determine such Net Share Amount on any Trading Day shall be the Unit Value for such Trading Day;

25

(iii)    the Company shall pay Cash in lieu of delivering any fraction of a Unit of Reference Property or any fractional Warrant in accordance with Section 3.05 based on the Unit Value as of the Exercise Date; and

(iv)    the Closing Sale Price and the Current Market Price shall be calculated with respect to a Unit of Reference Property.

(c)    The value of a Unit of Reference Property (the "**Unit Value**") shall be determined as follows:

(i)    any shares of common stock of the successor or purchasing corporation or any other corporation that are traded on a national or regional stock exchange included in such Unit of Reference Property shall be valued as if such shares were "Common Stock" using procedures set forth in the definition of "Closing Sale Price" in Section 1.01;

(ii)    any other property (other than Cash) included in such Unit of Reference Property shall be valued in good faith by the Board of Directors (in a manner not materially inconsistent with the manner the Board of Directors valued such property for purposes of the Reorganization Event, if applicable) or by a New York Stock Exchange member firm selected by the Board of Directors; and

(iii)    any Cash included in such Unit of Reference Property shall be valued at the amount thereof.

(d)    On or prior to the effective time of any Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this Section 5.09. If the Reference Property in connection with any Reorganization Event includes shares of stock or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Event, then the Company shall cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Warrantholders as the Board of Directors shall reasonably consider necessary by reason of the foregoing. Any such amendment to this Warrant Agreement shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 5. In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this Section 5.09, the Company shall promptly file with the Warrant Agent an Officers' Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or property or asset that will comprise a Unit of Reference Property after the relevant Reorganization Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with. The Company shall cause notice of the execution of amendment to be mailed to each Warrantholder, at its address appearing on the Warrant Register, within 20 Business Days after execution thereof. Failure to deliver such notice shall not affect the legality or validity of such amendment.

26

(e)    Change of Control Event:

(i)    No less than 15 Business Days prior to the scheduled closing of a Change of Control Event, the Company shall:

(A)    calculate the Change of Control Estimated Payment Amount;

(B)    deliver to the Warrant Agent a notice of redemption (a "**Redemption Notice**"), which shall be binding on the Company and on all Warrantholders, stating that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time shall be redeemed on the Change of Control Payment Date at a price equal to the Change of Control Payment Amount (the "**Redemption**");

(C)    cause a notice of the Redemption to be sent at least once to the Dow Jones News Service or similar business news service in the United States; and

(D)    cause the Warrant Agent to send by first-class mail, postage prepaid to each Warrantholder, at the address appearing in the warrant register, a notice stating:

1)    that the Redemption is being made pursuant to this Section 5.09(e) and that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time will be redeemed on the Change of Control Payment Date for payment of the Change of Control Payment Amount;

2)    a reasonably detailed explanation of the Change of Control Estimated Payment Amount, including (x) a statement of the amount of the Change of Control Estimated Payment Amount, together with a reasonably detailed explanation of the calculation of such amount, and (y) the formula for calculating the Black Scholes Warrant Value and the Change of Control Payment Amount;

3)    the date of the Redemption (which shall be a Business Day no later than five (5) Business Days following the Change of Control Date (the "**Change of Control Payment Date**"));

4)    the Net Share Amount for each Warrant as of a date not more than five (5) Business Days prior to the date of the Redemption Notice (assuming Net Share Settlement is applicable with respect to the exercise of such Warrant);

5)    that no outstanding Warrant may be exercised after the Close of Business on the day prior to the Change of Control Date (the "**Cut-Off Time**");

6)    if applicable, that New Warrants will be issued to the Warrantholders on the Change of Control Payment Date in accordance with the terms of this Warrant Agreement and the Warrants (as the same may have been

27

amended in connection with such Change of Control Event pursuant to Section 5.09);

7)    any other reasonable procedures that a Warrantholder must follow (to the extent consistent with the terms and conditions set forth herein) in connection with such Redemption; and

8)    the name and address of the Warrant Agent.

(ii)    Within two (2) Business Days prior to the Change of Control Payment Date, the Company or the surviving Person (if other than the Company) shall (A) deliver to the Warrant Agent the calculation of the Change of Control Payment Amount and (B) deposit with the Warrant Agent money sufficient to pay the Change of Control Payment Amount for all outstanding Warrants (other than the Carryover Warrants, if any).

(iii)    On the Change of Control Payment Date, (A) the Company or the surviving Person (if other than the Company) shall redeem all outstanding Warrants (other than Carryover Warrants, if any) pursuant to the Redemption, (B) the Warrant Agent shall mail to each holder of Warrants so redeemed payment in Cash in an amount equal to the aggregate Change of Control Payment Amount in respect of such redeemed Warrants, and (C) the Company or the surviving Person (if other than the Company) shall execute and issue to the Warrantholders, and the Warrant Agent shall authenticate, new Warrants (the "**New Warrants**") representing the Carryover Warrants (if any); provided that each such New Warrant shall be issued in denominations of one Warrant and integral multiples thereof and the terms thereof shall, subject to Section 5.09(e)(v), be substantially consistent with the terms of this Warrant Agreement and the Warrants (and all references herein to Warrants shall thereafter be deemed to be references to such New Warrants).

(iv)    No Warrant (which for the avoidance of doubt does not include New Warrants) may be exercised after the Cut-Off Time.

(v)    Following the Change of Control Payment Date, any holder of New Warrants shall have the right to exercise such New Warrant and to receive, upon such exercise, the Reference Property in accordance with Section 5.09(a), subject to Section 5.09(b) and Section 5.09(c) and the remaining terms of this Warrant Agreement and the Warrants (as the same may have been amended in connection with such Change of Control Event pursuant to Section 5.09); provided, that, for purposes of this Section 5.09(e)(v), (A) each Unit of Reference Property shall initially only consist of the Registered and Listed Shares included in such Unit of Reference Property and (B) the initial exercise price for each New Warrant shall be equal to the New Warrant Exercise Price.

(vi)    The provisions of this Section 5.09(e) are subject, in all cases, to any applicable requirements under the Securities Act and the Exchange Act and the

28

respective rules and regulations promulgated thereunder. Where there is any inconsistency between the requirements of the Securities Act or the Exchange Act or the rules and regulations promulgated thereunder and the requirements of this Section 5.09(e), the requirements of the Securities Act and the Exchange Act and the respective rules and regulations promulgated thereunder, shall supersede.

(f)     The Company hereby agrees not to become a party to any Reorganization Event or Change of Control Event unless its terms are consistent in all material respects with this Section 5.09.

(g)     The above provisions of this Section 5.09 shall similarly apply to successive Reorganization Events and Change of Control Events.

(h)     If this Section 5.09 applies to any event or occurrence, no other provision of this Article 5 with respect to anti-dilution adjustments (which for the avoidance of doubt, does not include the covenant set forth in Section 5.10) shall apply to such event or occurrence.

Section 5.10. *Consolidation, Merger and Sale of Assets.* (a) The Company may, without the consent of the Warrantholders, consolidate with, merge into or sell, lease or otherwise transfer in one transaction or a series of related transactions the consolidated assets of the Company and its subsidiaries substantially as an entirety to any corporation, limited liability company, partnership or trust organized under the laws of the United States or any of its political subdivisions so long as:

(i)     the successor assumes all the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)     the Company provides written notice of such assumption to the Warrant Agent.

(b)     In case of any such consolidation, merger, sale, lease or other transfer and upon any such assumption by the successor corporation, limited liability company, partnership or trust, such successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company. Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

Section 5.11. *Common Stock Outstanding.* For the purposes of this Article 5, the number of shares of Common Stock at any time outstanding shall not include shares held,

directly or indirectly, by the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

Section 5.12. *Covenant to Reserve Shares for Issuance on Exercise.* (a) The Board of Directors has authorized and will reserve for issuance such number of shares of Common Stock as the Board of Directors believes will be issuable upon the exercise of all outstanding Warrants for shares of Common Stock (assuming, for purposes of this covenant, that Full Physical Settlement applies to all Warrants exercised hereunder). The Company covenants that all shares of Common Stock that shall be so issuable shall be duly and validly issued, fully paid and non-assessable.

(b)     The Company agrees to authorize and direct its current and future transfer agents for the Common Stock to reserve for issuance the number of shares of Common Stock specified in this Section 5.12. The Company shall instruct the transfer agent to deliver to the Warrant Agent, upon written request from the Warrant Agent substantially in the form of Exhibit F (or as separately agreed between the Warrant Agent and the transfer agent), stock certificates (or beneficial interests therein) required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Warrant Agreement. The Company shall pay to the Warrant Agent, as agent for the Warrantholders, any Cash that may be payable as provided in this Article 5. Promptly after the date of expiration of Warrants, the Warrant Agent shall certify to the Company the aggregate Number of Warrants then outstanding, and thereafter no shares shall be required to be reserved in respect of such Warrants.

(c)     If, prior to the Distribution Date, the Common Stock has been registered under Section 12(b) of the Exchange Act and listed on a national securities exchange, the Company shall use its reasonable best efforts to apply and cause to have listed on such exchange as of the Distribution Date the Warrants and, subject to notice of issuance (if any), the shares of Common Stock issued and/or issuable upon exercise of the Warrants. If, as of the Distribution Date, the Common Stock has not yet been registered under Section 12(b) of the Exchange Act and listed on a national securities exchange, the Company shall use its reasonable best efforts to apply and cause to have listed on a national securities exchange the Warrants and, subject to notice of issuance (if any), the shares of Common Stock issued and/or issuable upon exercise of the Warrants as soon as reasonably practicable following the date on which the Common Stock is registered under Section 12(b) of the Exchange Act and listed on a national securities exchange.

Section 5.13. *Calculations Final.* The Company shall be responsible for making all calculations called for under this Warrant Agreement. These calculations include, but are not limited to, the Exercise Date, the Current Market Price, the Closing Sale Price, the Net Share Settlement Price, the Exercise Price, the Number of Warrants for each Warrant Certificate and the number of shares of Common Stock or Units of Reference Property, if any, to be issued upon exercise of any Warrants. The Company shall make the foregoing calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Warrantholders. The Company shall provide a schedule of the Company's calculations to the Warrant Agent, and the Warrant Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification.

30

Section 5.14. *Notice of Adjustments.* Whenever the Exercise Price or the Number of Warrants for each Warrant Certificate is adjusted, the Company shall promptly mail to Warrantholders a notice of the adjustment. The Company shall file with the Warrant Agent such notice and an Officer's Certificate briefly stating the facts requiring the adjustment and the manner of computing it. The certificate shall be conclusive evidence that the adjustment is correct, and the Warrant Agent shall not be deemed to have any knowledge of any adjustments unless and until it has received such certificate. The Warrant Agent shall not be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Warrantholder desiring inspection thereof.

Section 5.15. *Warrant Agent Not Responsible for Adjustments or Validity.* The Warrant Agent shall at no time be under any duty or responsibility to any Warrantholder to determine whether any facts exist that may require an adjustment of the Exercise Price and the Number of Warrants for each Warrant Certificate, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed, herein or in any supplemental agreement provided to be employed, in making the same. The Warrant Agent shall have no duty to verify or confirm any calculation called for hereunder. The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations to the Warrant Agent. The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to this Article 5, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or scrip upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to this Article 5, or to comply with any of the covenants of the Company contained in this Article 5.

Section 5.16. *Statements on Warrants.* The form of Warrant Certificate need not be changed because of any adjustment made pursuant to this Article 5, and Warrant Certificates issued after such adjustment may state the same information (other than the adjusted Exercise Price and the adjusted Number of Warrants for such Warrant Certificates) as are stated in the Warrant Certificates initially issued pursuant to this Warrant Agreement. However, the Company may at any time in its sole discretion (which shall be conclusive) make any change in the form of Warrant Certificate that it may deem appropriate and that does not materially adversely affect the interest of the Warrantholders; and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

## ARTICLE 6

OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

1766891

Section 6.01. *No Rights as Stockholders.* Warrantholders shall not be entitled, by virtue of holding Warrants, to vote, to consent, to receive dividends, to receive notice as stockholders with respect to any meeting of stockholders for the election of the Company's directors or any other matter, or to exercise any rights whatsoever as the Company's stockholders unless, until and only to the extent such holders become holders of record of shares of Common Stock issued upon settlement of the Warrants.

Section 6.02. *Mutilated or Missing Warrant Certificates.* If any Warrant at any time is mutilated, defaced, lost, destroyed or stolen, then on the terms set forth in this Warrant Agreement, such Warrant may be replaced at the cost of the applicant (including legal fees of the Company) at the office of the Warrant Agent. The applicant for a new Warrant shall, in the case of any mutilated or defaced Warrant, surrender such Warrant to the Warrant Agent and, in the case of any lost, destroyed or stolen Warrant, furnish evidence satisfactory to the Company of such loss, destruction or theft, and, in each case, furnish evidence satisfactory to the Company of the ownership and authenticity of the Warrant together with such indemnity as the Company may require. Any such new Warrant Certificate shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant Certificate shall be at any time enforceable by anyone. An applicant for such a substitute Warrant Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe. All Warrant Certificates shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the substitution for lost, stolen, mutilated or destroyed Warrant Certificates, and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the substitution for and replacement of negotiable instruments or other securities without their surrender.

Section 6.03. *Modification, Waiver and Meetings.* (a) This Warrant Agreement may be modified or amended by the Company and the Warrant Agent, without the consent of the holder of any Warrant, for the purposes of curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement; *provided* that such modification or amendment does not adversely affect the interests of the Warrantholders in any respect.

(b)    Modifications and amendments to this Warrant Agreement or to the terms and conditions of Warrants may also be made by the Company and the Warrant Agent, and noncompliance with any provision of the Warrant Agreement or Warrants may be waived, with the written consent of the Warrantholders of Warrants representing a majority of the aggregate Number of Warrants at the time outstanding.

(c)    However, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected:

(i)    change the Expiration Date;

(ii)    increase the Exercise Price or decrease the Number of Warrants (except as explicitly set forth in Article 5);

1766891

(iii)    impair the right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

(iv)    impair or adversely affect the exercise rights of Warrantholders, including any change to the calculation or payment of the Full Physical Share Amount or the Net Share Amount, as applicable;

(v)    deprive any Warrantholder of any economic rights, privileges or benefits that arise under or are provided pursuant to this Warrant Agreement and/or the Warrants;

(vi)    reduce the percentage of Warrants outstanding necessary to modify or amend this Warrant Agreement or to waive any past default; or

(vii)    reduce the percentage in Warrants outstanding required for any other waiver under this Warrant Agreement.

## ARTICLE 7

### CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.  *Payment of Certain Taxes.*  (a) The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the initial issuance of the Warrants hereunder.

(b)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the issuance of Common Stock upon the exercise of Warrants hereunder and the issuance of stock certificates in respect thereof in the respective names of, or in such names as may be directed by, the exercising Warrantholders; *provided, however*, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such stock certificate, any Warrant Certificates or other securities in a name other than that of the registered holder of the Warrant Certificate surrendered upon exercise of the Warrant, and the Company shall not be required to issue or deliver such certificates or other securities unless and until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 7.02.  *Change of Warrant Agent.*    (a) The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient. If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent. If the Company shall fail to make such appointment within a period of 60 days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by any holder of Warrants (who shall, with such notice, submit his Warrant Certificate for inspection by the Company), then the holder of

33

any Warrants may apply to any court of competent jurisdiction for the appointment of a successor warrant agent.

(b)     The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; *provided, however*, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed.

(c)     Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the laws of the United States of America or any state thereof or the District of Columbia, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by Federal or state authority and having a combined capital and surplus of not less than $50,000,000. The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; *provided* that such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority. After appointment, any successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations. Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder. As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent, the Warrantholders and each transfer agent for the shares of its Common Stock. Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(d)     Any entity into which the Warrant Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party, shall be the successor Warrant Agent under this Warrant Agreement without any further act. In case at the time such successor to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent and deliver such Warrant Certificates so countersigned, and in case at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases

34

Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

(e)    In case at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrant Certificates so countersigned; and in case at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

Section 7.03.    *Compensation; Further Assurances.*    The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent hereunder and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon demand for all reasonable expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable compensation, expenses and disbursements of its agents and counsel) except any such expense, disbursement or advance as may arise from its or any of their negligence or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 7.04.    *Reliance on Counsel.*    The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 7.05.    *Proof of Actions Taken.*    Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Warrant Agent; and such Officer's Certificate shall, in the absence of bad faith on the part of the Warrant Agent, be full warrant to the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement in reliance upon such certificate; but in its discretion the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

Section 7.06.    *Correctness of Statements.*    The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or in the Warrant Certificates (except its countersignature thereof) or be

35

required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

Section 7.07.  *Validity of Agreement.*  The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificates (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any shares of Common Stock will, when issued, be validly issued and fully paid and nonassessable.

Section 7.08.  *Use of Agents.*  The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents and the Warrant Agent shall not be responsible for the misconduct or negligence of any agent or attorney, provided due care had been exercised in the appointment and continued employment thereof.

Section 7.09.  *Liability of Warrant Agent.*  The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of Warrants for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties.  The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's negligence or willful misconduct or bad faith.

Section 7.10.  *Legal Proceedings.*  The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Warrantholders shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.

Section 7.11.  *Other Transactions in Securities of the Company.*  The Warrant Agent in its individual or any other capacity may become the owner of Warrants or other securities of the Company, or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

1766891

Section 7.12. *Actions as Agent.* The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof. The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement. No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent. No provision of the Warrant Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it. The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own negligence or willful misconduct or bad faith.

Section 7.13. *Appointment and Acceptance of Agency.* The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth.

Section 7.14. *Successors and Assigns.* All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 7.15. *Notices.* Any notice or demand authorized by this Warrant Agreement to be given or made by the Warrant Agent or by any Warrantholder to or on the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

[NGMCO, Inc.]
[_____]
[_____]
Attention: Treasurer
Telephone: [_____]
Facsimile: [_____]

With a copy to:

[_____]
[_____]
[_____]
Attention: [_____]

Any notice or demand authorized by this Warrant Agreement to be given or made by any Warrantholder or by the Company to or on the Warrant Agent shall be sufficiently

37

given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

/_____/
/_____/
Attention:  Treasurer
Telephone:  /_____/
Facsimile:  /_____/

Any notice of demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid to the last address of such Warrantholder as it shall appear on the Warrant Register.

Section 7.16. *Applicable Law.* The validity, interpretation and performance of this Warrant Agreement and of the Warrant Certificates shall be governed by the law of the State of New York without giving effect to the principles of conflicts of laws thereof.

Section 7.17. *Benefit of this Warrant Agreement.* Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Warrantholders.

Section 7.18. *Registered Warrantholders.* Prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

Section 7.19. *Inspection of this Warrant Agreement.* A copy of this Warrant Agreement shall be available at all reasonable times for inspection by any registered Warrantholder at the principal office of the Warrant Agent (or successor warrant agent). The Warrant Agent may require any such holder to submit his Warrant Certificate for inspection by it before allowing such holder to inspect a copy of this Warrant Agreement.

38

Section 7.20. *Headings.*    The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

Section 7.21. *Counterparts.*    This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

1766891

     IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

**[NGMCO, Inc.]**

By: _____
        Name:
        Title:


[●], as Warrant Agent

By: _____
        Name:
        Title:

SIGNATURE PAGE TO PARENT WARRANT A

**EXHIBIT A**

**FORM OF RESTRICTIVE LEGEND FOR WARRANTS**

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

A - 1

1766891

**EXHIBIT B**

### FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK

[THESE SHARES OF COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

1766891

**EXHIBIT C**

### FORM OF GLOBAL WARRANT LEGEND

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

C - 1

**EXHIBIT D**

## FORM OF WARRANT CERTIFICATE

[FACE]

No. _____

CUSIP No. _____

[UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.]

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

1766891

### [NGMCO, Inc.]

[Designation of Warrants]

NUMBER OF WARRANTS: Initially, [_____] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [_____], 2009 between **[NGMCO, Inc.]** and [•], as Warrant Agent (the "**Warrant Agreement**"), each of which is exercisable for one share of Common Stock.

EXERCISE PRICE: Initially, $[_____] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF PAYMENT OF EXERCISE PRICE: Cash, if Full Physical Settlement is applicable, or Net Share Settlement.

FORM OF SETTLEMENT: Upon exercise of any Warrants represented hereby, the Warrantholder shall be entitled to receive, at the Warrantholder's election, either (a) upon payment to the Warrant Agent of the Exercise Price (determined as of the relevant Exercise Date), one share of Common Stock per Warrant exercised, together with Cash in lieu of any fractional Warrants, or (b) without any payment therefor, a number of shares of Common Stock equal to the Net Share Amount, together with Cash in lieu of any fractional shares or fractional Warrants, in each case, as described in the Warrant Agreement.

DATES OF EXERCISE: At any time, and from time to time, prior to 5:00 p.m., New York City time, on the Expiration Date, the Warrantholder shall be entitled to exercise all Warrants then represented hereby and outstanding (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).

PROCEDURE FOR EXERCISE: Warrants may be exercised by (a) in the case of a Certificated Warrant, surrendering the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes, or (b) in the case of a Global Warrant, complying with the procedures established by the Depositary for the exercise of Warrants.

EXPIRATION DATE: [_____], 2016.

This Warrant Certificate certifies that _____, or its registered assigns, is the Warrantholder of the Number of Warrants (the "**Warrants**") specified above[, as modified in Schedule A hereto,] (such number subject to adjustment from time to time as described in the Warrant Agreement).

In connection with the exercise of any Warrants, (a) the Company shall determine the Full Physical Share Amount or Net Share Amount, as applicable, for each Warrant, and (b) the Company shall, or shall cause the Warrant Agent to, deliver to the exercising Warrantholder, on the applicable Settlement Date, for each Warrant exercised, a number of Shares of Common Stock equal to the relevant Full Physical Share Amount or Net Share

D - 2

Amount, as applicable, together with Cash in lieu of any fractional shares or fractional Warrants as described in the Warrant Agreement.

Prior to the relevant Exercise Date as described more fully in the Warrant Agreement, Warrants will not entitle the Warrantholder to any of the rights of the holders of shares of Common Stock.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

D - 3

IN WITNESS WHEREOF, **[NGMCO, Inc.]** has caused this instrument to be duly executed.

Dated: _____

**[NGMCO, Inc.]**

By: _____
           Name:
           Title:

Attest

By: _____
          Secretary

Countersigned as of the date above written:

[•], as Warrant Agent

By: _____
        Authorized Officer

D - 4

[FORM OF REVERSE OF WARRANT CERTIFICATE]

**[NGMCO, Inc.]**

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to a Warrant Agreement, dated as of [_____], 2009 (the "**Warrant Agreement**"), between the Company and [●] (the "**Warrant Agent**"), and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions each Warrantholder consents by acceptance of this Warrant Certificate or a beneficial interest therein. Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement. A copy of the Warrant Agreement is on file at the Warrant Agent's Office.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of New York without regard to the conflicts of laws principles thereof.

D - 5

**[To be attached if Warrant is a Certificated Warrant]**

**Exercise Notice**

[Warrant Agent]

[_____]
[_____]

Attention:    [•]

The undersigned (the "**Registered Warrantholder**") hereby irrevocably exercises _____ Warrants (the "**Exercised Warrants**") and delivers to you herewith a Warrant Certificate or Warrant Certificates, registered in the Registered Warrantholder's name, representing a Number of Warrants at least equal to the number of Exercised Warrants.

The Registered Warrantholder hereby either:

elects for Full Physical Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement and confirms that it will, prior to 11:00 a.m., New York City time, on the Settlement Date, pay an amount equal to the Exercise Price (determined as of the relevant Exercise Date), *multiplied by* the number of Exercised Warrants, by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Registered Warrantholder as required under Section 3.03(b) of the Warrant Agreement; or

elects for Net Share Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement.

The Registered Warrantholder hereby directs the Warrant Agent to:

(a)    deliver the Full Physical Share Amount or Net Share Amount, as applicable, for each of the Exercised Warrants as follows:

_____ ; and

(b)    if the number of Exercised Warrants is less than the Number of Warrants represented by the enclosed Warrant Certificates, to deliver a Warrant Certificate representing the unexercised Warrants to:

_____

D - 6

1766891

Dated:_____          _____

                                              (Registered Warrantholder)


                                        By:  _____
                                              Authorized Signature
                                              Address:
                                              Telephone:


               **[To Be Attached if Warrant is a Global Warrant]**


                                    D - 7

## SCHEDULE A

### SCHEDULE OF INCREASES OR DECREASES IN WARRANTS

The initial Number of Warrants represented by this Global Warrant is _____.
In accordance with the Warrant Agreement dated as of [_____], 2009 among the Company
and [●], as Warrant Agent, the following increases or decreases in the Number of Warrants
represented by this certificate have been made:

| Date | Amount of increase in Number of Warrants evidenced by this Global Warrant | Amount of decrease in Number of Warrants evidenced by this Global Warrant | Number of Warrants evidenced by this Global Warrant following such decrease or increase | Signature of authorized signatory |
|------|------|------|------|------|
|      |      |      |      |      |

D - 8

**[To Be Attached if Warrant is a Global Warrant or Certificated Warrant]**

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____

Name, Address and Zip Code of Assignee

and irrevocably appoints _____
                                          Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

D - 9