Date: _____

_____
Name of Transferee

By: _____
        Name:
        Title:

(Sign exactly as your name appears on the other side of this Certificate)

NOTICE: The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

D - 10

1766891

**EXHIBIT E**

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ Warrants by
_____ unto _____
(Please insert social security or other Taxpayer Identification Number of assignee) prior to
the expiration of the holding period applicable to sales thereof under Rule 144 under the
Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the
undersigned confirms that such Warrants are being transferred:

> To **[NGMCO, Inc.]** (the "**Issuer**") or any subsidiaries thereof; or
>
> Pursuant to a registration statement that has become effective under the
> Securities Act; or
>
> Pursuant to an exemption from registration provided by Rule 144 under the
> Securities Act or any other available exemption from the registration
> requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the
Issuer and the Warrant Agent reserve the right to require the delivery of such legal opinion,
certifications or other evidence as may reasonably be required in order to determine that
the proposed transfer is being made in compliance with the Securities Act and applicable
state securities laws.

*Unless one of the boxes is checked, the Warrant Agent will refuse to register any of
the Warrants evidenced by this certificate in the name of any person other than the
registered holder thereof.*

Date:   [_____]

                              [Insert name of transferee]

                              By:   _____
                                    Name:
                                    Title:

E - 1

**EXHIBIT F**

## FORM OF COMMON STOCK REQUISITION ORDER

*[Date]*

Via Facsimile [_____]

**[NGMCO, Inc.]**
[_____]
[_____]
Attention:  Treasurer

Re:     DWAC Issuance
        Control No. _____

Ladies and Gentlemen:

You are hereby authorized to issue and deliver the shares of Common Stock as indicated below via DWAC.  The shares are being issued to cover the exercise of Warrants under the Warrant Agreement, dated as of [_____], 2009, between **[NGMCO, Inc.]** and [•], as Warrant Agent (the "**Warrant Agreement**"). Defined terms used but not defined herein have the meaning assigned to them in the Warrant Agreement.

Number of Shares:          _____

                           _____ Original Issue or

                           _____ Transfer from Treasury Account

Broker Name:               _____

Broker's DTC Number:       _____

Contact and Phone:         _____

F - 1

1766891

The Broker will initiate the DWAC transaction on (date).

Sincerely,

[•.],
as Warrant Agent


By: _____
Name:
Title:


cc:    [*Insert name*] via facsimile [*insert fax number*]
       Broker

F - 2

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit B**

Form of Parent Warrant B

B

**EXHIBIT B**

## FORM OF PARENT WARRANT B

.

**WARRANT AGREEMENT**

**dated as of *[_____]*, 2009**

**between**

**[NGMCO, Inc.]**

**and**

**[•]**
**as Warrant Agent**

1766891

## ARTICLE 1
### DEFINITIONS

Section 1.01.    Certain Definitions.............................................................................. 1

## ARTICLE 2
### ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.    Issuance of Warrants........................................................... 9

Section 2.02.    Execution and Authentication of Warrants........................... 9

Section 2.03.    Form of Warrant Certificates .............................................. 9

Section 2.04.    Transfer Restrictions and Legends...................................... 10

Section 2.05.    Transfer, Exchange and Substitution ................................... 11

Section 2.06.    Global Warrants .................................................................. 12

Section 2.07.    Surrender of Warrant Certificates ....................................... 14

## ARTICLE 3
### EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.    Exercise of Warrants........................................................... 14

Section 3.02.    Procedure for Exercise ....................................................... 14

Section 3.03.    Settlement of Warrants ....................................................... 14

Section 3.04.    Delivery of Common Stock ................................................. 15

Section 3.05.    No Fractional Shares to Be Issued...................................... 16

Section 3.06.    Acquisition of Warrants by Company .................................. 16

Section 3.07.    Direction of Warrant Agent ................................................ 16

## ARTICLE 4
### [RESERVED]

## ARTICLE 5
### ADJUSTMENTS

Section 5.01.    Adjustments to Exercise Price ........................................... 17

Section 5.02.    Adjustments to Number of Warrants ................................... 21

Section 5.03.    Certain Distributions of Rights and Warrants; Shareholder
                 Rights Plan......................................................................... 21

Section 5.04.    No Impairment.................................................................... 22

Section 5.05.    Other Adjustments if Net Share Settlement Applies .......... 23

ii

Section 5.06.    Discretionary Adjustments .................................................................. 23

Section 5.07.    Restrictions on Adjustments ............................................................... 23

Section 5.08.    Deferral of Adjustments ..................................................................... 24

Section 5.09.    Recapitalizations, Reclassifications and Other Changes .................. 24

Section 5.10.    Consolidation, Merger and Sale of Assets ......................................... 29

Section 5.11.    Common Stock Outstanding ............................................................... 29

Section 5.12.    Covenant to Reserve Shares for Issuance on Exercise ..................... 30

Section 5.13.    Calculations Final .............................................................................. 30

Section 5.14.    Notice of Adjustments ....................................................................... 30

Section 5.15.    Warrant Agent Not Responsible for Adjustments or Validity ........... 31

Section 5.16.    Statements on Warrants ..................................................................... 31

## ARTICLE 6
### OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.    No Rights as Stockholders ................................................................. 31

Section 6.02.    Mutilated or Missing Warrant Certificates ........................................ 32

Section 6.03.    Modification, Waiver and Meetings ................................................... 32

## ARTICLE 7
### CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    Payment of Certain Taxes .................................................................. 33

Section 7.02.    Change of Warrant Agent ................................................................... 33

Section 7.03.    Compensation; Further Assurances .................................................... 35

Section 7.04.    Reliance on Counsel ........................................................................... 35

Section 7.05.    Proof of Actions Taken ...................................................................... 35

Section 7.06.    Correctness of Statements .................................................................. 35

Section 7.07.    Validity of Agreement ........................................................................ 36

Section 7.08.    Use of Agents ..................................................................................... 36

Section 7.09.    Liability of Warrant Agent ................................................................. 36

Section 7.10.    Legal Proceedings .............................................................................. 36

Section 7.11.    Other Transactions in Securities of the Company .............................. 36

Section 7.12.    Actions as Agent ................................................................................ 36

Section 7.13.    Appointment and Acceptance of Agency ........................................... 37

Section 7.14.    Successors and Assigns ...................................................................... 37

Section 7.15.    Notices ....................................................................... 37

Section 7.16.    Applicable Law............................................................. 38

Section 7.17.    Benefit of this Warrant Agreement.................................. 38

Section 7.18.    Registered Warrantholders............................................. 38

Section 7.19.    Inspection of this Warrant Agreement.............................. 38

Section 7.20.    Headings ..................................................................... 38

Section 7.21.    Counterparts ................................................................ 39


EXHIBIT A    FORM OF RESTRICTIVE LEGEND FOR WARRANTS ........  A-1

EXHIBIT B    FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK..B-1

EXHIBIT C    FORM OF GLOBAL WARRANT LEGEND...............................C-1

EXHIBIT D    FORM OF WARRANT CERTIFICATE ...................................... D-1

EXHIBIT E    FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER
             RESTRICTIONS ...........................................................E-1

EXHIBIT F    FORM OF COMMON STOCK REQUISITION ORDER.............F-1

iv

## WARRANT AGREEMENT

This Warrant Agreement ("**Warrant Agreement**") dated as of [_____], 2009 is between **[NGMCO, Inc.]**, a corporation organized under the laws of Delaware (the "**Company**"), and [●] (the "**Warrant Agent**").

## WITNESSETH THAT:

WHEREAS, pursuant to the Master Sale and Purchase Agreement (as may be amended, modified or supplemented in accordance with its terms, the "**Master Sale and Purchase Agreement**") dated as of June 1, 2009 by and among General Motors Corporation (the "**Initial Warrantholder**"), Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and the Company, the Company has agreed to issue to the Initial Warrantholder an aggregate initial Number of Warrants issued hereunder equal to 45,454,545, each of which is exercisable for one share of Common Stock (as defined below);

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants;

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

### ARTICLE 1

#### DEFINITIONS

Section 1.01. *Certain Definitions.* As used in this Warrant Agreement, the following terms shall have their respective meanings set forth below:

"**$**" refers to such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Adjustment Event**" has the meaning set forth in Section 5.08.

"**Agent Members**" has the meaning set forth in Section 2.06(c).

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Black Scholes Proportion**" has the meaning given to it in the definition of "Change of Control Payment Amount."

"**Black Scholes Warrant Value**" as of any date, shall mean the value of a Warrant to purchase one share of Common Stock (as determined in good faith by the Board of Directors based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent) and

1

shall be determined by customary investment banking practices using the Black Scholes model. For purposes of calculating such amount, (1) the term of the Warrants will be the period from the date of determination until the Expiration Date, (2) the price of each share of Common Stock will be the Current Market Price as of the date of determination, (3) the assumed volatility will be determined by such independent investment banking firm as of the date of determination, (4) the assumed risk-free rate will equal the yield on the ten year U.S. Treasury securities and (5) any other assumptions shall be made by the Board of Directors in good faith based upon the advice of such independent investment bank at the time of determination.

"**Board of Directors**" means the board of directors of the Company or any committee of such board of directors duly authorized to exercise the power of such board of directors with respect to the matters provided for in this Warrant Agreement as to which the board of directors is authorized or required to act.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Warrant Agent.

"**Business Day**" means any day other than a Saturday or Sunday or other than a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company and all warrants or options to acquire such capital stock.

"**Carryover Warrants**" shall mean, for each Warrant, that portion of such Warrant equal to one minus the Black Scholes Proportion.

"**Cash**" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Certificated Warrant**" means a Warrant represented by a Warrant Certificate, in definitive, fully registered form.

"**Change of Control Date**" shall mean the date on which a Change of Control Event is consummated.

"**Change of Control Estimated Payment Amount**" shall mean, in respect of any Change of Control Event, an estimate of the Change of Control Payment Amount payable on the applicable Change of Control Payment Date, as determined in good faith by the Board of Directors, based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent, as of a date no more than 20 Business Days and no less than 15 Business Days prior to the Change of Control Date, in a manner consistent with the terms of this Warrant

2

Agreement and the Warrants, including the definitions of Black Scholes Warrant Value and Change of Control Payment Amount.

"**Change of Control Event**" shall mean (i) the acquisition by a Person (other than the Company or a subsidiary of the Company) in a tender offer or a series of related tender offers of 80% or more of the outstanding Common Stock (determined on a fully-diluted basis), (ii) the consolidation or merger of the Company with or into another Person (other than a subsidiary of the Company), or (iii) a sale of all or substantially all of the Company's assets, in each of clauses (i) through (iii) in which all or any portion of the consideration paid or exchanged for Common Stock, or into which Common Stock is converted, consists of Other Property.

"**Change of Control Payment Amount**" shall mean an amount in Cash equal to the product of (1) the Black Scholes Warrant Value of a Warrant on a Change of Control Date immediately prior to the consummation of such Change of Control Event multiplied by (2) a fraction, (x) the numerator of which is the fair market value of the Other Property received in exchange for a share of Common Stock in a Change of Control Event as of the Change of Control Date (as determined by an independent investment bank of national standing selected by the Company and determined by customary investment banking practices) and (y) the denominator of which is the sum of (a) the Closing Sale Price of the Registered and Listed Shares received in exchange for a share of Common Stock in a Change of Control Event as of the Change of Control Date (if any), and (b) the fair market value (determined as above) of the Other Property as of the Change of Control Date received in exchange for a share of Common Stock in a Change of Control Event (such fraction referred to herein as the "**Black Scholes Proportion**").

For purposes of determining the Change of Control Payment Amount, if holders of Common Stock are entitled to receive differing forms or types of consideration in any transaction or series of transactions contemplated by the definition of "Change of Control Event," each holder shall be deemed to have received the same proportion of Other Property and Registered and Listed Shares that all holders of Common Stock in the aggregate elected or were required to receive in such transaction or transactions.

"**Change of Control Payment Date**" has the meaning set forth in Section 5.09(e).

"**Close of Business**" means 5:00 p.m. New York City time.

"**Closing Date**" has the meaning given thereto in the Master Sale and Purchase Agreement.

"**Closing Sale Price**" means, as of any date, the last reported per share sales price of a share of Common Stock or any other security on such date (or, if no last reported sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices on such date) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other

3

security is then listed or quoted; *provided, however*, that in the absence of such quotations, the Board of Directors will make a good faith determination of the Closing Sale Price.

If during a period applicable for calculating Closing Sale Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, Closing Sale Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Common Stock**" means the common stock, par value $0.01 per share, of the Company authorized at the date of this Warrant Agreement or as such stock may be constituted from time to time. Subject to the provisions of Section 5.09 and Section 5.10, shares issuable upon exercise of Warrants shall include only shares of the class designated as Common Stock of the Company as of the date of this Warrant Agreement or shares of any class or classes resulting from any reclassification or reclassifications or change or changes thereof and that have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion that the total number of shares of such class resulting from all such reclassifications or changes bears to the total number of shares of all such classes resulting from such reclassifications or changes.

"**Company Order**" means a written order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller, and delivered to the Warrant Agent.

"**Current Market Price**" means, (i) in connection with a dividend, issuance or distribution, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the earlier of the date in question and the Trading Day immediately preceding the Ex-Date for such dividend, issuance or distribution and (ii) in connection with a determination of Black Scholes Warrant Value, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the date of determination, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[    ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank

4

or other qualified financial institution selected by the Board of Directors and reasonably acceptable to the Warrant Agent. If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional securities exchange or quotation system, the Current Market Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such price shall be reasonably determined in good faith by the Company's Board of Directors.

"**Cut-Off Time**" has the meaning set forth in Section 5.09(e).

"**Depositary**" means The Depository Trust Company, its nominees, and their respective successors.

"**Determination Date**" has the meaning set forth in Section 5.08.

"**Distribution Date**" has the meaning set forth in Section 2.04.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Ex-Date**" means, in connection with any dividend, issuance or distribution, the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such dividend, issuance or distribution.

"**Exercise Date**" has the meaning set forth in Section 3.02(b).

"**Exercise Notice**" means, for any Warrant, the exercise notice set forth on the reverse of the Warrant Certificate, substantially in the form set forth in Exhibit D hereto.

"**Exercise Price**" means initially $55.00 per Warrant, subject to adjustment pursuant to Article 5.

"**Expiration Date**" means, for any Warrant, the date that is the ten (10) year anniversary of the date hereof.

"**Full Physical Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Full Physical Share Amount in exchange for payment by the Warrantholder of the Exercise Price.

"**Full Physical Share Amount**" has the meaning set forth in Section 3.03(b).

"**Global Warrant**" means a Warrant in the form of a permanent global Warrant Certificate, in definitive, fully registered form.

"**Global Warrant Legend**" means the legend set forth in Section 2.06(b).

"**Initial Warrantholder**" has the meaning set forth in the Recitals.

5

"**Master Sale and Purchase Agreement**" has the meaning set forth in the Recitals.

"**Net Share Amount**" has the meaning set forth in Section 3.03(c).

"**Net Share Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Net Share Amount without any payment therefor.

"**Net Share Settlement Price**" means, as of any date, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days prior to the date of determination of the Net Share Settlement Price for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[ ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank or other qualified financial institution reasonably acceptable to the Warrant Agent. If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional Securities exchange or quotation system, the Net Share Settlement Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such prices shall be reasonably determined in good faith by the Company's Board of Directors.

If during a period applicable for calculating Net Share Settlement Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, the Net Share Settlement Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**New Warrant Exercise Price**" shall be equal to the product of (i) the Exercise Price then in effect and (ii) one minus the Black Scholes Proportion.

"**New Warrants**" has the meaning set forth in Section 5.09(e).

"**Number of Warrants**" means, for a Warrant Certificate, the "Number of Warrants" specified on the face of such Warrant Certificate (or, in the case of a Global Warrant, on Schedule A to such Warrant Certificate), subject to adjustment pursuant to Article 5.

6

1766891

"**Officer's Certificate**" means a certificate signed by any two officers of the Company, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller.

"**Other Property**" means any cash, property or other securities other than Registered and Listed Shares.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any Cash, securities or other property or in which Common Stock (or other applicable security) is exchanged for or converted into any combination of Cash, securities or other property, the date fixed for determination of holders of Common Stock entitled to receive such Cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

"**Redemption**" has the meaning set forth in Section 5.09(e).

"**Redemption Notice**" has the meaning set forth in Section 5.09(e).

"**Reference Property**" has the meaning set forth in Section 5.09(a).

"**Registered and Listed Shares**" shall mean shares of the common stock of the surviving entity in a consolidation, merger, or combination or the acquiring entity in a tender offer, except that if the surviving entity or acquiring entity has a parent corporation, it shall be the shares of the common stock of the parent corporation, provided, that, in each case, such shares (i) have been registered (or will be registered within 30 calendar days following the Change of Control Date) under Section 12 of the Exchange Act with the Securities and Exchange Commission, and (ii) are listed for trading on the New York Stock Exchange or any other national securities exchange (or will be so listed or admitted within 30 calendar days following the Change of Control Date).

"**Reorganization Event**" has the meaning set forth in Section 5.09(a).

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, the third Trading Day immediately following the Exercise Date for such Warrant.

"**Trading Day**" means (i) if the applicable security is listed on the New York Stock Exchange, a day on which trades may be made thereon or (ii) if the applicable security is

7

listed or admitted for trading on the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or other national securities exchange or market, a day on which the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or such other national securities exchange or market is open for business or (iii) if the applicable security is not so listed, admitted for trading or quoted, any Business Day.

"**Trigger Event**" has the meaning set forth in Section 5.03.

"**Unit of Reference Property**" has the meaning set forth in Section 5.09(a).

"**Unit Value**" has the meaning set forth in Section 5.09(c).

"**VEBA Exercise Price**" means the 'Exercise Price' as such term is defined in the VEBA Warrant Agreement.

"**VEBA Warrant Agreement**" means the warrant agreement dated as of [     ], 2009 between **[NGMCO, Inc.]** and [ ] as Warrant Agent pursuant to which UAW Retiree Medical Benefits Trust was the 'Initial Warrantholder' as defined therein.

"**VEBA Warrants**" means the warrants issued pursuant to the VEBA Warrant Agreement.

"**Vice President**" means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president" of the Company.

"**Voting Stock**" means Capital Stock having the right to vote for the election of directors under ordinary circumstances.

"**Warrant**" means a warrant of the Company exercisable for one share of Common Stock as provided herein, and issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth in this Warrant Agreement.

"**Warrant Agent**" means [●], in its capacity as warrant agent hereunder.

"**Warrant Certificate**" means any certificate representing Warrants satisfying the requirements set forth in Section 2.03.

"**Warrant Register**" has the meaning set forth in Section 2.05.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

## ARTICLE 2

ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

8

Section 2.01.  *Issuance of Warrants.*  (a) The Company shall execute and deliver to the Warrant Agent, for authentication and delivery to the Initial Warrantholder on the Closing Date, a single Certificated Warrant in the name of the Initial Warrantholder, together with an Authentication Order with respect thereto, evidencing an initial aggregate Number of Warrants equal to 45,454,545 (such Number of Warrants subject to adjustment from time to time as described herein).  The Warrant Agent shall, upon receipt of such Certificated Warrant and Authentication Order, authenticate and deliver such Certificated Warrant to the Initial Warrantholder in accordance with Section 2.02 and register the Initial Warrantholder as the Warrantholder of such Warrants in accordance with Section 2.05.  All such Warrants shall be dated as of the Closing Date.

(b)    Except as set forth in Section 2.05 and Section 6.02, the Warrants issued to the Initial Warrantholder on the Closing Date shall be the only Warrants issued or outstanding under this Warrant Agreement.

(c)    All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to the benefits hereof, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.

Section 2.02.  *Execution and Authentication of Warrants.*  (a) Warrants shall be executed on behalf of the Company by any Executive Vice President, any Senior Vice President, and any Vice President of the Company and attested by its Secretary or any one of its Assistant Secretaries. The signature of any of these officers on Warrants may be manual or facsimile. Typographical and other minor errors or defects in any such signature shall not affect the validity or enforceability of any Warrant that has been duly authenticated and delivered by the Warrant Agent.

(b)    Warrants bearing the manual or facsimile signatures of individuals, each of whom was, at the time he or she signed such Warrant or his or her facsimile signature was affixed to such Warrant, as the case may be, a proper officer of the Company, shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Warrants or did not hold such offices at the date of such Warrants.

(c)    No Warrant shall be entitled to any benefit under this Warrant Agreement or be valid or obligatory for any purpose unless there appears on such Warrant a certificate of authentication substantially in the form provided for herein executed by the Warrant Agent by manual or facsimile signature, and such certificate upon any Warrant shall be conclusive evidence, and the only evidence, that such Warrant has been duly authenticated and delivered hereunder.

Section 2.03.  *Form of Warrant Certificates.*  Each Warrant Certificate shall be in substantially the form set forth in Exhibit D hereto and shall have such insertions as are appropriate or required by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not

9

inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any law or any rule of any securities exchange on which Warrants may be listed, and such as may be necessary to conform to customary usage.

Section 2.04. *Transfer Restrictions and Legends.* This Section 2.04 shall not apply to Warrants and/or Common Stock which have been issued, distributed or sold pursuant to an effective registration statement or are otherwise exempt from registration under the Securities Act pursuant to Section 1145 of the Bankruptcy Code (the date as of which this Section 2.04 does not apply to such Warrants and/or Common Stock, the "**Distribution Date**").

(a)     Each Warrant issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)     Warrants may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a Warrantholder except (A) pursuant to a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)     Any Warrants as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Warrant Certificates representing such Warrants for exchange pursuant to Section 2.05 in accordance with the procedures of the Warrant Agent (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the Warrant Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Warrant Certificate for a like Number of Warrants, which shall not bear such legend.

(b)     All shares of Common Stock issued to a Warrantholder upon exercise of a Warrant shall bear the legend set forth in Exhibit B hereto.

(i)     Shares of Common Stock issued to a Warrantholder upon exercise of a Warrant may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by such Warrantholder except (A) pursuant to a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)     Any such shares of Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that the shares of Common Stock can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of

10

the transfer agent for the Common Stock (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the transfer agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new certificate or certificates for a like number of shares of Common Stock, which shall not bear such legend.

(c)     Any Warrant that is purchased or owned by the Company or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Company or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Warrants no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

Section 2.05.    *Transfer, Exchange and Substitution.*    (a) Warrants shall be issued in registered form only.  The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the "**Warrant Register**") in which, subject to such reasonable regulations as the Company may prescribe, the Company shall provide for the registration of Warrants and transfers, exchanges or substitutions of Warrants as herein provided.  All Warrants issued upon any registration of transfer or exchange of or substitution for Warrants shall be valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as Warrants surrendered for such registration of transfer, exchange or substitution.

(b)     A Warrantholder may transfer a Warrant only upon surrender of such Warrant for registration of transfer.  Warrants may be presented for registration of transfer and exchange at the offices of the Warrant Agent with a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by such Warrantholder or by such Warrantholder's attorney, duly authorized in writing.  Such Warrantholder will also provide a written certificate (substantially in the form of Exhibit E hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Warrants.  The Warrant Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Warrant hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act.  No such transfer shall be effected until, and the transferee shall succeed to the rights of a Warrantholder only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.  Prior to the registration of any transfer of a Warrant by a Warrantholder as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name Warrants are registered as the owner thereof for all purposes and as the Person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)     Every Warrant presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form

11

satisfactory to the Company and the Warrant Agent, by the holder thereof or such Warrantholder's attorney duly authorized in writing.

(d)    When Warrants are presented to the Warrant Agent with a request to register the transfer of, or to exchange or substitute, such Warrants, the Warrant Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied. To permit registrations of transfers, exchanges and substitutions, the Company shall execute Warrant Certificates at the Warrant Agent's request and the Warrant Agent shall countersign and deliver such Warrant Certificates. No service charge shall be made for any registration of transfer or exchange of or substitution for Warrants, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Warrants.

(e)    A Certified Warrant may be exchanged at the option of the holder or holders thereof, when presented or surrendered in accordance with this Warrant Agreement, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like Number of Warrants. If less than all Warrants represented by a Certificated Warrant are transferred, exchanged or substituted in accordance with this Warrant Agreement, the Warrant Certificate shall be surrendered to the Warrant Agent and a new Warrant Certificate for a Number of Warrants equal to the Warrants represented by such Warrant Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Warrantholder, shall be executed by the Company and delivered to the Warrant Agent and the Warrant Agent shall countersign such new Warrant Certificate and shall deliver such new Warrant Certificate to the Person or Persons entitled to receive the same.

Section 2.06.    *Global Warrants.*    (a) The Warrants shall initially be issued in the form of Certificated Warrants. However, if the Warrants are sold pursuant to an effective registration statement filed with the SEC, or if the Company so elects at any time, any Certificated Warrants may be presented to the Warrant Agent by Warrantholders in exchange for one or more Global Warrants up to the aggregate Number of Warrants then outstanding, to be registered in the name of the Depositary, or its nominee, and delivered by the Warrant Agent to the Depositary, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of the Depositary. Upon such presentation, the Company shall execute a Global Warrant representing such aggregate Number of Warrants and deliver the same to the Warrant Agent for authentication and delivery in accordance with Section 2.02.

(b)    Any Global Warrant shall bear the legend substantially in the form set forth in Exhibit C hereto (the "**Global Warrant Legend**").

(c)    So long as a Global Warrant is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Warrant Agreement with respect to the Global Warrant held on their behalf by the Depositary or the Warrant Agent as its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant

12

Agent as the absolute owner of such Global Warrant for all purposes. Accordingly, any such owner's beneficial interest in such Global Warrant will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility with respect to such records maintained by the Depositary or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Warrantholder.

(d)     Any holder of a Global Warrant registered in the name of the Depositary or its nominee shall, by acceptance of such Global Warrant, agree that transfers of beneficial interests in such Global Warrant may be effected only through a book-entry system maintained by the holder of such Global Warrant (or its agent), and that ownership of a beneficial interest in Warrants represented thereby shall be required to be reflected in book-entry form.

(e)     Transfers of a Global Warrant registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Company, the Depositary, their successors, and their respective nominees. Interests of beneficial owners in a Global Warrant registered in the name of the Depositary or its nominee shall be transferred in accordance with the rules and procedures of the Depositary.

(f)     A Global Warrant registered in the name of the Depositary or its nominee shall be exchanged for Certificated Warrants only if the Depositary (A) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (B) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days. In any such event, a Global Warrant registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant, Certificated Warrants representing, in the aggregate, the Number of Warrants theretofore represented by such Global Warrant with respect to such beneficial owner's respective beneficial interest. Any Certificated Warrant delivered in exchange for an interest in a Global Warrant pursuant to this Section 2.06(f) shall not bear the Global Warrant Legend. Interests in the Global Warrant may not be exchanged for Certificated Warrants other than as provided in this Section 2.06(f).

(g)     The holder of a Global Warrant registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent

13

Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder is entitled to take under this Warrant Agreement or the Warrant.

Section 2.07. *Surrender of Warrant Certificates.*  Any Warrant Certificate surrendered for registration of transfer, exchange, substitution or exercise of Warrants represented thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company and, except as provided in this Article 2 in case of an exchange, transfer or substitution, or Article 3 in case of the exercise of less than all Warrants represented thereby, or Section 6.02 in case of mutilation, no Warrant Certificate shall be issued hereunder in lieu thereof. The Warrant Agent shall deliver to the Company from time to time or otherwise dispose of such cancelled Warrant Certificates as the Company may direct.

## ARTICLE 3

### EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01. *Exercise of Warrants.* At any time prior to 5:00 p.m., New York City time, on the Expiration Date, a Warrantholder shall be entitled to exercise, in accordance with this Article 3, the full Number of Warrants represented by any Warrant Certificate then registered in such Warrantholder's name (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants). Any Warrants not exercised prior to such time shall expire unexercised.

Section 3.02. *Procedure for Exercise.* (a) To exercise a Warrant (i) in the case of a Certificated Warrant, the Warrantholder must surrender the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes as set forth in Section 7.01(b), or (ii) in the case of a Global Warrant, the Warrantholder must comply with the procedures established by the Depositary for the exercise of Warrants.

(b)    The date on which a Warrantholder complies with the requirements for exercise set forth in this Section 3.02 in respect of a Warrant is the **"Exercise Date"** for such Warrant. However, if such date is not a Trading Day or the Warrantholder satisfies such requirements after the Close of Business on a Trading Day, then the Exercise Date shall be the immediately succeeding Trading Day, unless that Trading Day falls after the Expiration Date, in which case the Exercise Date shall be the immediately preceding Trading Day.

Section 3.03. *Settlement of Warrants.* (a) Full Physical Settlement shall apply to each Warrant unless the Warrantholder elects for Net Share Settlement to apply upon exercise of such Warrant. Such election shall be made (i) in the case of a Certificated Warrant, in the Exercise Notice for such Warrant, or (ii) in the case of a Global Warrant, in accordance with the procedures established by the Depositary for the exercise of Warrants.

14

1766891

(b)    If Full Physical Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, prior to 11:00 a.m., New York City time, on the Settlement Date for such Warrant, the Warrantholder shall pay the Exercise Price (determined as of such Exercise Date) by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Warrantholder in accordance with Section 7.15, and on the Settlement Date, following receipt by the Warrant Agent of such Exercise Price, the Company shall cause to be delivered to the Warrantholder one share of Common Stock (the "**Full Physical Share Amount**"), together with Cash in respect of any fractional Warrant as provided in Section 3.05. All funds received by the Warrant Agent upon exercise of such Warrant shall be deposited by the Warrant Agent for the account of the Company at *[specify bank]*, unless the Company has previously instructed otherwise in writing.

(c)    If Net Share Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, on the Settlement Date for such Warrant, the Company shall cause to be delivered to the Warrantholder a number of shares of Common Stock (which in no event will be less than zero) (the "**Net Share Amount**") equal to (i) the Net Share Settlement Price as of the relevant Exercise Date, *minus* the Exercise Price (determined as of such Exercise Date), *divided by* (ii) such Net Share Settlement Price, together with Cash in respect of any factional shares or fractional Warrants as provided in Section 3.05.

Section 3.04.  *Delivery of Common Stock.*  (a) In connection with the delivery of shares of Common Stock to an exercising Warrantholder pursuant to Section 3.03(b) or Section 3.03(c), as the case may be, the Warrant Agent shall:

(i)    (A) if such shares of Common Stock are in book-entry form at the Depositary, deliver Common Stock by electronic transfer (with the assistance of the Company and the transfer agent of Common Stock, if necessary) to such Warrantholder's account, or any other account as such Warrantholder may designate, at the Depositary or at an Agent Member, or (B) if such shares of Common Stock are not in book-entry form at the Depositary, requisition from the transfer agent of the Common Stock and deliver to or upon the order of such Warrantholder a certificate or certificates, in each case with legends thereon as appropriate (as determined by the Company) and for the number of full shares of Common Stock to which such Warrantholder is entitled, registered in such name or names as may be directed by such Warrantholder;

(ii)    deliver Cash to such Warrantholder in respect of any fractional shares or fractional Warrants, as provided in Section 3.05; and

(iii)    if the Number of Warrants represented by a Warrant Certificate shall not have been exercised in full, deliver a new Warrant Certificate, countersigned by the Warrant Agent, for the balance of the number of Warrants represented by the surrendered Warrant Certificate.

15

(b)    Each Person in whose name any shares of Common Stock are issued shall for all purposes be deemed to have become the holder of record of such shares as of the Exercise Date or, in the case of a Warrant subject to Full Physical Settlement only, the date of payment by the Warrantholder of the Exercise Price in accordance with Section 3.03(b), if later. However, if any such date is a date when the stock transfer books of the Company are closed, such Person shall be deemed to have become the holder of such shares at the Close of Business on the next succeeding date on which the stock transfer books are open.

(c)    Promptly after the Warrant Agent shall have taken the action required above (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to any Warrants exercised (including, without limitation, with respect to any Exercise Price paid to the Warrant Agent). The Company shall reimburse the Warrant Agent for any amounts paid by the Warrant Agent in respect of a fractional share or fractional Warrant upon such exercise in accordance with Section 3.05 hereof.

Section 3.05.    *No Fractional Shares to Be Issued.* (a) Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a share of Common Stock upon exercise of any Warrants.

(b)    If any fraction of a Warrant shall be exercised hereunder, the Company shall pay the relevant Warrantholder Cash in lieu of the corresponding fraction of a share of Common Stock valued at the Net Share Settlement Price as of the Exercise Date. However, if more than one Warrant shall be exercised hereunder at one time by the same Warrantholder, the number of full shares which shall be issuable upon exercise thereof shall be computed on the basis of all Warrants (including any fractional Warrants) so exercised. If any fraction of a share of Common Stock would, except for the provisions of this Section 3.05, be issuable on the exercise of any Warrant or Warrants (including any fractional Warrants), the Company shall pay the Warrantholder Cash in lieu of such fractional shares valued at the Net Share Settlement Price as of the Exercise Date.

(c)    Each Warrantholder, by its acceptance of a Warrant Certificate, expressly waives its right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock.

Section 3.06.    *Acquisition of Warrants by Company.*  The Company shall have the right, except as limited by law, to purchase or otherwise to acquire Warrants at such times, in such manner and for such consideration as it may deem appropriate and shall have agreed with the holder of such Warrants.

Section 3.07.    *Direction of Warrant Agent.* (a) The Company shall be responsible for performing all calculations required in connection with the exercise and settlement of the Warrants and the payment or delivery, as the case may be, of Cash and/or Common Stock as described in this Article 3. In connection therewith, the Company shall provide prompt written notice to the Warrant Agent of the amount of Cash and the number of shares of Common Stock payable or deliverable, as the case may be, upon exercise and

16

settlement of the Warrants, including, without limitation, the Net Share Amount and the Full Physical Share Amount.

(b)    Any Cash to be paid, or Common Stock to be delivered, to the Warrantholders hereunder shall be delivered to the Warrant Agent no later than the Business Day immediately preceding the date such consideration is required to be delivered to the Warrantholders.

(c)    The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations or items to the Warrant Agent. The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or Units of Reference Property that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or Units of Reference Property, or to comply with any of the covenants of the Company contained in this Article 3.

ARTICLE 4

[RESERVED]

ARTICLE 5

ADJUSTMENTS

Section 5.01. *Adjustments to Exercise Price.* The Exercise Price for the Warrants shall be subject to adjustment (without duplication) upon the occurrence of any of the following events:

(a)    The issuance of Common Stock as a dividend or distribution to all holders of Common Stock, or a subdivision or combination of Common Stock, in which event the Exercise Price shall be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0}{OS_1}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution, or

17

immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be; and

$OS_1$ = the number of shares of Common Stock that would be outstanding immediately after, and solely as a result of, such dividend, distribution, subdivision or combination.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be. If any dividend or distribution or subdivision or combination of the type described in this Section 5.01(a) is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to the Exercise Price that would then be in effect if such dividend or distribution or subdivision or combination had not been declared or announced, as the case may be.

(b)    The issuance to all holders of Common Stock of rights or warrants entitling them for a period expiring 60 days or less from the date of issuance of such rights or warrants to purchase shares of Common Stock (or securities convertible into Common Stock) at less than (or having a conversion price per share less than) the Current Market Price of Common Stock, in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0 + Y}{OS_0 + X}$$

where:

$EP_0$ = the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such issuance;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such issuance;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such issuance;

X = the total number of shares of Common Stock issuable pursuant to such rights, warrants or convertible securities; and

Y = the aggregate price payable to exercise such rights, warrants or convertible securities *divided by* the Current Market Price.

18

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such issuance. In the event that the issuance of such rights, warrants or convertible securities is announced but such rights, warrants or convertible securities are not so issued, the Exercise Price shall again be adjusted to be the Exercise Price that would then be in effect if the Record Date for such issuance had not occurred. To the extent that such rights or warrants are not exercised prior to their expiration or shares of Common Stock are otherwise not delivered pursuant to such rights, warrants or convertible securities, upon the expiration, termination or maturity of such rights, warrants or convertible securities, the Exercise Price shall be readjusted to the Exercise Price that would then be in effect had the adjustments made upon the issuance of such rights, warrants or convertible securities been made on the basis of the delivery of only the number of shares of Common Stock actually delivered. In determining the aggregate price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, as well as any consideration received in connection with the conversion of any convertible securities issued upon exercise of such rights or warrants, and the value of such consideration, if other than Cash, shall be determined in good faith by the Board of Directors.

(c)    The dividend or distribution to all holders of Common Stock of (i) shares of the Company's Capital Stock (other than Common Stock), (ii) evidences of the Company's indebtedness, (iii) rights or warrants to purchase the Company's securities or the Company's assets or (iv) property or Cash (excluding any ordinary cash dividends declared by the Board of Directors and excluding any dividend, distribution or issuance covered by clauses (a) or (b) above), in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{SP_0 - FMV}{SP_0}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$SP_0$    =    the Current Market Price; and

FMV    =    the fair market value (as determined in good faith by the Board of Directors), on the Record Date for such dividend or distribution, of the shares of Capital Stock, evidences of indebtedness or property, rights or warrants so distributed or the amount of Cash (other than in the case of ordinary cash dividends declared by the Board of Directors) expressed as an amount per share of outstanding Common Stock.

19

In the event of a reduction of the VEBA Exercise Price under the VEBA Warrant Agreement (other than pursuant to Article 5 of the VEBA Warrant Agreement) below 125% of the Exercise Price as adjusted to such date pursuant to this Article 5, such reduction shall be treated as a distribution of property where the FMV of such property for purposes of this adjustment shall be equal to the absolute value of the difference between (i) the Black Scholes Warrant Value of the outstanding VEBA Warrants with a VEBA Exercise Price equal to 125% of the Exercise Price as adjusted to such date pursuant to this Article 5 and (ii) the Black Scholes Warrant Value of the outstanding VEBA Warrants immediately following such reduction in VEBA Exercise Price, expressed as an amount per share of outstanding Common Stock.

Such decrease shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

However, if the transaction that gives rise to an adjustment pursuant to this clause (c) is one pursuant to which the payment of a dividend or other distribution on Common Stock consists of shares of capital stock of, or similar equity interests in, a subsidiary of the Company or other business unit of the Company (i.e., a spin-off) that are, or, when issued, will be, traded or quoted on the New York Stock Exchange or any other national or regional securities exchange or market, then the Exercise Price will instead be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{MP_0}{MP_0 + FMV_0}$$

where:

$EP_0$ = the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$FMV_0$ = the average of the Closing Sale Prices of the Capital Stock or similar equity interests distributed to holders of Common Stock applicable to one share of Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution; and

$MP_0$ = the average of the Closing Sale Prices of the Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution.

20

Such decrease shall become effective immediately after the Ex-Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

(d)    For the purposes of Section 5.01(a), (b) and (c), any dividend or distribution to which Section 5.01(c) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock (or both), shall be deemed instead to be  a dividend or distribution of the indebtedness, assets or shares of Capital Stock other than such shares of Common Stock or rights or warrants (and any Exercise Price adjustment required by Section 5.01(c) with respect to such dividend or distribution shall be made in respect of such dividend or distribution (without regard to the parenthetical in Section 5.01(c) that begins with the word "excluding")) immediately followed by a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Exercise Price adjustment required by Section 5.01 with respect to such dividend or distribution shall then be made), except, for purposes of such adjustment, any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding immediately prior to the Close of Business on the Record Date."

Section 5.02. *Adjustments to Number of Warrants.*    Concurrently with any adjustment to the Exercise Price under Section 5.01, the Number of Warrants for each Warrant Certificate will be adjusted such that the Number of Warrants for each such Warrant Certificate in effect immediately following the effectiveness of such adjustment will be equal to the Number of Warrants for each such Warrant Certificate in effect immediately prior to such adjustment, *multiplied by* a fraction, (i) the numerator of which is the Exercise Price in effect immediately prior to such adjustment and (ii) the denominator of which is the Exercise Price in effect immediately following such adjustment.

Section 5.03. *Certain Distributions of Rights and Warrants; Shareholder Rights Plan.* (a) Rights or warrants distributed by the Company to all holders of Common Stock (including under any Shareholder Rights Plan in existence on the date hereof or hereafter put into effect) entitling the holders thereof to subscribe for or purchase shares of the Company's Capital Stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events (a "**Trigger Event**"):

(i)    are deemed to be transferred with such shares of Common Stock;

(ii)    are not exercisable; and

(iii)    are also issued in respect of future issuances of Common Stock,

shall be deemed not to have been distributed for purposes of Article 5 (and no adjustment to the Exercise Price or the Number of Warrants under this Article 5 will be made) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be

21

deemed to have been distributed and an appropriate adjustment (if any is required) to the Exercise Price and the Number of Warrants for each Warrant Certificate shall be made under this Article 5 (subject in all respects to Section 5.03(d)).

(b)    If any such right or warrant is subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights or warrants with such rights (subject in all respects to Section 5.03(d)).

(c)    In addition, except as set forth in Section 5.03(d), in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in Section 5.03(b)) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exercise Price and the Number of Warrants for each Warrant Certificate under Article 5 was made (including any adjustment contemplated in Section 5.03(d)):

(i)    in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a Cash distribution, equal to the per share redemption or repurchase price received by a holder or holders of Common Stock with respect to such rights or warrants (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase; and

(ii)    in the case of such rights or warrants that shall have expired or been terminated without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted as if such rights and warrants had not been issued.

(d)    If a Company shareholders rights plan under which any rights are issued provides that each share of Common Stock issued upon exercise of Warrants at any time prior to the distribution of separate certificates representing such rights shall be entitled to receive such rights, prior to the separation of such rights from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall not be adjusted pursuant to Section 5.01. If, however, prior to any exercise of a Warrant, such rights have separated from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be adjusted at the time of separation as if the Company dividended or distributed to all holders of Common Stock, the Company's Capital Stock, evidences of the Company's indebtedness, certain rights or warrants to purchase the Company's securities or other of the Company's assets as described in Section 5.01(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

22

Section 5.04. *No Impairment.* The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in taking of all such action as may be necessary or appropriate in order to protect the rights of the Warrantholder.

Section 5.05. *Other Adjustments if Net Share Settlement Applies.* To the extent Net Share Settlement applies to the exercise of any Warrant, the Board of Directors shall make appropriate adjustments to the amount of Cash or number of shares of Common Stock, as the case may be, due upon exercise of the Warrant, as may be necessary or appropriate to effectuate the intent of this Article 5 and to avoid unjust or inequitable results as determined in its good faith judgment, to account for any adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate that becomes effective, or any event requiring an adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate where the Record Date or effective date (in the case of a subdivision or combination of the Common Stock) of the event occurs, during the period beginning on, and including, the Exercise Date and ending on, and including, the related Settlement Date.

Section 5.06. *Discretionary Adjustments.* The Company may from time to time, to the extent permitted by law and subject to applicable rules of the New York Stock Exchange, decrease the Exercise Price and/or increase the Number of Warrants for each Warrant Certificate by any amount for any period of at least 20 days. In that case, the Company shall give the Warrantholders at least 15 days' prior notice of such increase or decrease, and such notice shall state the decreased Exercise Price and/or increased Number of Warrants for each Warrant Certificate and the period during which the decrease and/or increase will be in effect. The Company may make such decreases in the Exercise Price and/or increases in the Number of Warrants for each Warrant Certificate, in addition to those set forth in this Article 5, as the Company's Board of Directors deems advisable, including to avoid or diminish any income tax to holders of the Common Stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

Section 5.07. *Restrictions on Adjustments.* (a) Except in accordance with Section 5.01, the Exercise Price and the Number of Warrants for any Warrant Certificate will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing.

(b) Neither the Exercise Price nor the Number of Warrants for any Warrant Certificate will be adjusted:

(i) upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

23

(ii)    for a change in the par value of the Common Stock.

(c)    In no event will the Company adjust the Exercise Price or make a corresponding adjustment to the Number of Warrants for any Warrant Certificate to the extent that the adjustment would reduce the Exercise Price below the par value per share of Common Stock.

(d)    No adjustment shall be made to the Exercise Price or the Number of Warrants for any Warrant Certificate for any of the transactions described in Section 5.01 if the Company makes provisions for Warrantholders to participate in any such transaction without exercising their Warrants on the same basis as holders of Common Stock and with notice that the Board of Directors determines in good faith to be fair and appropriate.

(e)    No adjustment shall be made to the Exercise Price, nor will any corresponding adjustment be made to the Number of Warrants for any Warrant Certificate, unless the adjustment would result in a change of at least 1% of the Exercise Price; *provided* that any adjustments that are less than 1% of the Exercise Price shall be carried forward and such carried forward adjustments, regardless of whether the aggregate adjustment is less than 1% of the Exercise Price, shall be made (i) annually, on each anniversary of the Closing Date, (ii) immediately prior to the time of any exercise, and (iii) five Business Days prior to the Expiration Date, unless, in each case, such adjustment has already been made.

(f)    If the Company takes a record of the holders of Common Stock for the purpose of entitling them to receive a dividend or other distribution, and thereafter (and before the dividend or distribution has been paid or delivered to stockholders) legally abandons its plan to pay or deliver such dividend or distribution, then thereafter no adjustment to the Exercise Price or the Number of Warrants for any Warrant Certificate then in effect shall be required by reason of the taking of such record.

Section 5.08.    *Deferral of Adjustments.*    In any case in which Section 5.01 provides that an adjustment shall become effective immediately after (a) a Record Date for an event or (b) the effective date (in the case of a subdivision or combination of the Common Stock) (each a "**Determination Date**"), the Company may elect to defer, until the later of the date the adjustment to the Exercise Price and Number of Warrants for each Warrant Certificate can be definitively determined and the occurrence of the applicable Adjustment Event (as hereinafter defined), (i) issuing to the Warrantholder of any Warrant exercised after such Determination Date and before the occurrence of such Adjustment Event, the additional shares of Common Stock or other securities or assets issuable upon such exercise by reason of the adjustment required by such Adjustment Event over and above the Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount in Cash in lieu of any fractional share of Common Stock or fractional Warrant pursuant to Section 3.05. For the purposes of this Section 5.08, the term "**Adjustment Event**" shall mean in any case referred to in clause (a) or clause (b) hereof, the occurrence of such event.

24

Section 5.09. *Recapitalizations, Reclassifications and Other Changes.* (a) If any of the following events occur:

(i)  any recapitalization;

(ii)  any reclassification or change of the outstanding shares of Common Stock (other than changes resulting from a subdivision or combination to which Section 5.01(a) applies);

(iii)  any consolidation, merger or combination involving the Company;

(iv)  any sale or conveyance to a third party of all or substantially all of the Company's assets; or

(v)  any statutory share exchange,

(each such event a "**Reorganization Event**"), in each case as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (the "**Reference Property**"), then, subject to Section 5.09(e), following the effective time of the transaction, the right to receive shares of Common Stock upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of one share of Common Stock would have owned or been entitled to receive in connection with such Reorganization Event (such kind and amount of Reference Property per share of Common Stock, a "**Unit of Reference Property**"). In the event holders of Common Stock have the opportunity to elect the form of consideration to be received in a Reorganization Event, other than with respect to a Change of Control Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock in such Reorganization Event.

(b)  At any time from, and including, the effective time of a Reorganization Event:

(i)  if Full Physical Settlement applies upon exercise of a Warrant, the Full Physical Share Amount per Warrant shall be equal to a single Unit of Reference Property;

(ii)  if Net Share Settlement applies upon exercise of a Warrant, the Net Share Amount per Warrant shall be a number of Units of Reference Property calculated as set forth in Section 3.03(c), except that the Net Share Settlement Price used to determine such Net Share Amount on any Trading Day shall be the Unit Value for such Trading Day;

25

(iii)    the Company shall pay Cash in lieu of delivering any fraction of a Unit of Reference Property or any fractional Warrant in accordance with Section 3.05 based on the Unit Value as of the Exercise Date; and

(iv)    the Closing Sale Price and the Current Market Price shall be calculated with respect to a Unit of Reference Property.

(c)    The value of a Unit of Reference Property (the "**Unit Value**") shall be determined as follows:

(i)    any shares of common stock of the successor or purchasing corporation or any other corporation that are traded on a national or regional stock exchange included in such Unit of Reference Property shall be valued as if such shares were "Common Stock" using procedures set forth in the definition of "Closing Sale Price" in Section 1.01;

(ii)    any other property (other than Cash) included in such Unit of Reference Property shall be valued in good faith by the Board of Directors (in a manner not materially inconsistent with the manner the Board of Directors valued such property for purposes of the Reorganization Event, if applicable) or by a New York Stock Exchange member firm selected by the Board of Directors; and

(iii)    any Cash included in such Unit of Reference Property shall be valued at the amount thereof.

(d)    On or prior to the effective time of any Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this Section 5.09. If the Reference Property in connection with any Reorganization Event includes shares of stock or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Event, then the Company shall cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Warrantholders as the Board of Directors shall reasonably consider necessary by reason of the foregoing. Any such amendment to this Warrant Agreement shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 5. In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this Section 5.09, the Company shall promptly file with the Warrant Agent an Officers' Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or property or asset that will comprise a Unit of Reference Property after the relevant Reorganization Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with. The Company shall cause notice of the execution of amendment to be mailed to each Warrantholder, at its address appearing on the Warrant Register, within 20 Business Days after execution thereof. Failure to deliver such notice shall not affect the legality or validity of such amendment.

26

(e)     Change of Control Event:

(i)     No less than 15 Business Days prior to the scheduled closing of a Change of Control Event, the Company shall:

(A)     calculate the Change of Control Estimated Payment Amount;

(B)     deliver to the Warrant Agent a notice of redemption (a "**Redemption Notice**"), which shall be binding on the Company and on all Warrantholders, stating that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time shall be redeemed on the Change of Control Payment Date at a price equal to the Change of Control Payment Amount (the "**Redemption**");

(C)     cause a notice of the Redemption to be sent at least once to the Dow Jones News Service or similar business news service in the United States; and

(D)     cause the Warrant Agent to send by first-class mail, postage prepaid to each Warrantholder, at the address appearing in the warrant register, a notice stating:

1)     that the Redemption is being made pursuant to this Section 5.09(e) and that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time will be redeemed on the Change of Control Payment Date for payment of the Change of Control Payment Amount;

2)     a reasonably detailed explanation of the Change of Control Estimated Payment Amount, including (x) a statement of the amount of the Change of Control Estimated Payment Amount, together with a reasonably detailed explanation of the calculation of such amount, and (y) the formula for calculating the Black Scholes Warrant Value and the Change of Control Payment Amount;

3)     the date of the Redemption (which shall be a Business Day no later than five (5) Business Days following the Change of Control Date (the "**Change of Control Payment Date**"));

4)     the Net Share Amount for each Warrant as of a date not more than five (5) Business Days prior to the date of the Redemption Notice (assuming Net Share Settlement is applicable with respect to the exercise of such Warrant);

5)     that no outstanding Warrant may be exercised after the Close of Business on the day prior to the Change of Control Date (the "**Cut-Off Time**");

6)     if applicable, that New Warrants will be issued to the Warrantholders on the Change of Control Payment Date in accordance with the terms of this Warrant Agreement and the Warrants (as the same may have been

27

1766891

amended in connection with such Change of Control Event pursuant to Section 5.09);

     7)     any other reasonable procedures that a Warrantholder must follow (to the extent consistent with the terms and conditions set forth herein) in connection with such Redemption; and

     8)     the name and address of the Warrant Agent.

     (ii)     Within two (2) Business Days prior to the Change of Control Payment Date, the Company or the surviving Person (if other than the Company) shall (A) deliver to the Warrant Agent the calculation of the Change of Control Payment Amount and (B) deposit with the Warrant Agent money sufficient to pay the Change of Control Payment Amount for all outstanding Warrants (other than the Carryover Warrants, if any).

     (iii)     On the Change of Control Payment Date, (A) the Company or the surviving Person (if other than the Company) shall redeem all outstanding Warrants (other than Carryover Warrants, if any) pursuant to the Redemption, (B) the Warrant Agent shall mail to each holder of Warrants so redeemed payment in Cash in an amount equal to the aggregate Change of Control Payment Amount in respect of such redeemed Warrants, and (C) the Company or the surviving Person (if other than the Company) shall execute and issue to the Warrantholders, and the Warrant Agent shall authenticate, new Warrants (the "**New Warrants**") representing the Carryover Warrants (if any); provided that each such New Warrant shall be issued in denominations of one Warrant and integral multiples thereof and the terms thereof shall, subject to Section 5.09(e)(v), be substantially consistent with the terms of this Warrant Agreement and the Warrants (and all references herein to Warrants shall thereafter be deemed to be references to such New Warrants).

     (iv)     No Warrant (which for the avoidance of doubt does not include New Warrants) may be exercised after the Cut-Off Time.

     (v)     Following the Change of Control Payment Date, any holder of New Warrants shall have the right to exercise such New Warrant and to receive, upon such exercise, the Reference Property in accordance with Section 5.09(a), subject to Section 5.09(b) and Section 5.09(c) and the remaining terms of this Warrant Agreement and the Warrants (as the same may have been amended in connection with such Change of Control Event pursuant to Section 5.09); provided, that, for purposes of this Section 5.09(e)(v), (A) each Unit of Reference Property shall initially only consist of the Registered and Listed Shares included in such Unit of Reference Property and (B) the initial exercise price for each New Warrant shall be equal to the New Warrant Exercise Price.

     (vi)     The provisions of this Section 5.09(e) are subject, in all cases, to any applicable requirements under the Securities Act and the Exchange Act and the

respective rules and regulations promulgated thereunder. Where there is any inconsistency between the requirements of the Securities Act or the Exchange Act or the rules and regulations promulgated thereunder and the requirements of this Section 5.09(e), the requirements of the Securities Act and the Exchange Act and the respective rules and regulations promulgated thereunder, shall supersede.

(f)    The Company hereby agrees not to become a party to any Reorganization Event or Change of Control Event unless its terms are consistent in all material respects with this Section 5.09.

(g)    The above provisions of this Section 5.09 shall similarly apply to successive Reorganization Events and Change of Control Events.

(h)    If this Section 5.09 applies to any event or occurrence, no other provision of this Article 5 with respect to anti-dilution adjustments (which for the avoidance of doubt, does not include the covenant set forth in Section 5.10) shall apply to such event or occurrence.

Section 5.10. *Consolidation, Merger and Sale of Assets.* (a) The Company may, without the consent of the Warrantholders, consolidate with, merge into or sell, lease or otherwise transfer in one transaction or a series of related transactions the consolidated assets of the Company and its subsidiaries substantially as an entirety to any corporation, limited liability company, partnership or trust organized under the laws of the United States or any of its political subdivisions so long as:

(i)    the successor assumes all the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)    the Company provides written notice of such assumption to the Warrant Agent.

(b)    In case of any such consolidation, merger, sale, lease or other transfer and upon any such assumption by the successor corporation, limited liability company, partnership or trust, such successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company. Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

Section 5.11. *Common Stock Outstanding.* For the purposes of this Article 5, the number of shares of Common Stock at any time outstanding shall not include shares held,

29

directly or indirectly, by the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

Section 5.12. *Covenant to Reserve Shares for Issuance on Exercise.* (a) The Board of Directors has authorized and will reserve for issuance such number of shares of Common Stock as the Board of Directors believes will be issuable upon the exercise of all outstanding Warrants for shares of Common Stock (assuming, for purposes of this covenant, that Full Physical Settlement applies to all Warrants exercised hereunder). The Company covenants that all shares of Common Stock that shall be so issuable shall be duly and validly issued, fully paid and non-assessable.

(b)    The Company agrees to authorize and direct its current and future transfer agents for the Common Stock to reserve for issuance the number of shares of Common Stock specified in this Section 5.12.  The Company shall instruct the transfer agent to deliver to the Warrant Agent, upon written request from the Warrant Agent substantially in the form of Exhibit F (or as separately agreed between the Warrant Agent and the transfer agent), stock certificates (or beneficial interests therein) required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Warrant Agreement. The Company shall pay to the Warrant Agent, as agent for the Warrantholders, any Cash that may be payable as provided in this Article 5.  Promptly after the date of expiration of Warrants, the Warrant Agent shall certify to the Company the aggregate Number of Warrants then outstanding, and thereafter no shares shall be required to be reserved in respect of such Warrants.

(c)    If, prior to the Distribution Date, the Common Stock has been registered under Section 12(b) of the Exchange Act and listed on a national securities exchange, the Company shall use its reasonable best efforts to apply and cause to have listed on such exchange as of the Distribution Date the Warrants and, subject to notice of issuance (if any), the shares of Common Stock issued and/or issuable upon exercise of the Warrants. If, as of the Distribution Date, the Common Stock has not yet been registered under Section 12(b) of the Exchange Act and listed on a national securities exchange, the Company shall use its reasonable best efforts to apply and cause to have listed on a national securities exchange the Warrants and, subject to notice of issuance (if any), the shares of Common Stock issued and/or issuable upon exercise of the Warrants as soon as reasonably practicable following the date on which the Common Stock is registered under Section 12(b) of the Exchange Act and listed on a national securities exchange.

Section 5.13. *Calculations Final.*  The Company shall be responsible for making all calculations called for under this Warrant Agreement. These calculations include, but are not limited to, the Exercise Date, the Current Market Price, the Closing Sale Price, the Net Share Settlement Price, the Exercise Price, the Number of Warrants for each Warrant Certificate and the number of shares of Common Stock or Units of Reference Property, if any, to be issued upon exercise of any Warrants. The Company shall make the foregoing calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Warrantholders. The Company shall provide a schedule of the Company's calculations to the Warrant Agent, and the Warrant Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification.

30

Section 5.14. *Notice of Adjustments.* Whenever the Exercise Price or the Number of Warrants for each Warrant Certificate is adjusted, the Company shall promptly mail to Warrantholders a notice of the adjustment. The Company shall file with the Warrant Agent such notice and an Officer's Certificate briefly stating the facts requiring the adjustment and the manner of computing it. The certificate shall be conclusive evidence that the adjustment is correct, and the Warrant Agent shall not be deemed to have any knowledge of any adjustments unless and until it has received such certificate. The Warrant Agent shall not be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Warrantholder desiring inspection thereof.

Section 5.15. *Warrant Agent Not Responsible for Adjustments or Validity.* The Warrant Agent shall at no time be under any duty or responsibility to any Warrantholder to determine whether any facts exist that may require an adjustment of the Exercise Price and the Number of Warrants for each Warrant Certificate, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed, herein or in any supplemental agreement provided to be employed, in making the same. The Warrant Agent shall have no duty to verify or confirm any calculation called for hereunder. The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations to the Warrant Agent. The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to this Article 5, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or scrip upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to this Article 5, or to comply with any of the covenants of the Company contained in this Article 5.

Section 5.16. *Statements on Warrants.* The form of Warrant Certificate need not be changed because of any adjustment made pursuant to this Article 5, and Warrant Certificates issued after such adjustment may state the same information (other than the adjusted Exercise Price and the adjusted Number of Warrants for such Warrant Certificates) as are stated in the Warrant Certificates initially issued pursuant to this Warrant Agreement. However, the Company may at any time in its sole discretion (which shall be conclusive) make any change in the form of Warrant Certificate that it may deem appropriate and that does not materially adversely affect the interest of the Warrantholders; and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

## ARTICLE 6

OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

1766891

Section 6.01. *No Rights as Stockholders.* Warrantholders shall not be entitled, by virtue of holding Warrants, to vote, to consent, to receive dividends, to receive notice as stockholders with respect to any meeting of stockholders for the election of the Company's directors or any other matter, or to exercise any rights whatsoever as the Company's stockholders unless, until and only to the extent such holders become holders of record of shares of Common Stock issued upon settlement of the Warrants.

Section 6.02. *Mutilated or Missing Warrant Certificates.* If any Warrant at any time is mutilated, defaced, lost, destroyed or stolen, then on the terms set forth in this Warrant Agreement, such Warrant may be replaced at the cost of the applicant (including legal fees of the Company) at the office of the Warrant Agent. The applicant for a new Warrant shall, in the case of any mutilated or defaced Warrant, surrender such Warrant to the Warrant Agent and, in the case of any lost, destroyed or stolen Warrant, furnish evidence satisfactory to the Company of such loss, destruction or theft, and, in each case, furnish evidence satisfactory to the Company of the ownership and authenticity of the Warrant together with such indemnity as the Company may require. Any such new Warrant Certificate shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant Certificate shall be at any time enforceable by anyone. An applicant for such a substitute Warrant Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe. All Warrant Certificates shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the substitution for lost, stolen, mutilated or destroyed Warrant Certificates, and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the substitution for and replacement of negotiable instruments or other securities without their surrender.

Section 6.03. *Modification, Waiver and Meetings.* (a) This Warrant Agreement may be modified or amended by the Company and the Warrant Agent, without the consent of the holder of any Warrant, for the purposes of curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement; *provided* that such modification or amendment does not adversely affect the interests of the Warrantholders in any respect.

(b)    Modifications and amendments to this Warrant Agreement or to the terms and conditions of Warrants may also be made by the Company and the Warrant Agent, and noncompliance with any provision of the Warrant Agreement or Warrants may be waived, with the written consent of the Warrantholders of Warrants representing a majority of the aggregate Number of Warrants at the time outstanding.

(c)    However, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected:

(i)    change the Expiration Date;

(ii)    increase the Exercise Price or decrease the Number of Warrants (except as explicitly set forth in Article 5);

32

1766891

(iii)    impair the right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

(iv)    impair or adversely affect the exercise rights of Warrantholders, including any change to the calculation or payment of the Full Physical Share Amount or the Net Share Amount, as applicable;

(v)    deprive any Warrantholder of any economic rights, privileges or benefits that arise under or are provided pursuant to this Warrant Agreement and/or the Warrants;

(vi)    reduce the percentage of Warrants outstanding necessary to modify or amend this Warrant Agreement or to waive any past default; or

(vii)    reduce the percentage in Warrants outstanding required for any other waiver under this Warrant Agreement.

## ARTICLE 7

### CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.  *Payment of Certain Taxes.*  (a) The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the initial issuance of the Warrants hereunder.

(b)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the issuance of Common Stock upon the exercise of Warrants hereunder and the issuance of stock certificates in respect thereof in the respective names of, or in such names as may be directed by, the exercising Warrantholders; *provided, however*, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such stock certificate, any Warrant Certificates or other securities in a name other than that of the registered holder of the Warrant Certificate surrendered upon exercise of the Warrant, and the Company shall not be required to issue or deliver such certificates or other securities unless and until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 7.02.  *Change of Warrant Agent.*    (a)  The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of 60 days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by any holder of Warrants (who shall, with such notice, submit his Warrant Certificate for inspection by the Company), then the holder of

any Warrants may apply to any court of competent jurisdiction for the appointment of a successor warrant agent.

(b)     The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; *provided, however*, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed.

(c)     Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the laws of the United States of America or any state thereof or the District of Columbia, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by Federal or state authority and having a combined capital and surplus of not less than $50,000,000. The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; *provided* that such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority. After appointment, any successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations. Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder. As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent, the Warrantholders and each transfer agent for the shares of its Common Stock. Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(d)     Any entity into which the Warrant Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party, shall be the successor Warrant Agent under this Warrant Agreement without any further act. In case at the time such successor to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent and deliver such Warrant Certificates so countersigned, and in case at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases

34

Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

(e)    In case at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrant Certificates so countersigned; and in case at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

Section 7.03.    *Compensation; Further Assurances.*    The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent hereunder and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon demand for all reasonable expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable compensation, expenses and disbursements of its agents and counsel) except any such expense, disbursement or advance as may arise from its or any of their negligence or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 7.04.    *Reliance on Counsel.*    The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 7.05.    *Proof of Actions Taken.*    Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Warrant Agent; and such Officer's Certificate shall, in the absence of bad faith on the part of the Warrant Agent, be full warrant to the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement in reliance upon such certificate; but in its discretion the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

Section 7.06.    *Correctness of Statements.*    The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or in the Warrant Certificates (except its countersignature thereof) or be

35

1766891

required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

Section 7.07. *Validity of Agreement.* The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificates (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any shares of Common Stock will, when issued, be validly issued and fully paid and nonassessable.

Section 7.08. *Use of Agents.* The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents and the Warrant Agent shall not be responsible for the misconduct or negligence of any agent or attorney, provided due care had been exercised in the appointment and continued employment thereof.

Section 7.09. *Liability of Warrant Agent.* The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of Warrants for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties. The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's negligence or willful misconduct or bad faith.

Section 7.10. *Legal Proceedings.* The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Warrantholders shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.

Section 7.11. *Other Transactions in Securities of the Company.* The Warrant Agent in its individual or any other capacity may become the owner of Warrants or other securities of the Company, or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

36

Section 7.12. *Actions as Agent.* The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof. The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement. No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent. No provision of the Warrant Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it. The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own negligence or willful misconduct or bad faith.

Section 7.13. *Appointment and Acceptance of Agency.* The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth.

Section 7.14. *Successors and Assigns.* All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 7.15. *Notices.* Any notice or demand authorized by this Warrant Agreement to be given or made by the Warrant Agent or by any Warrantholder to or on the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

[NGMCO, Inc.]
[_____]
[_____]
Attention: Treasurer
Telephone: [_____]
Facsimile: [_____]

With a copy to:

[_____]
[_____]
[_____]
Attention: [_____]

Any notice or demand authorized by this Warrant Agreement to be given or made by any Warrantholder or by the Company to or on the Warrant Agent shall be sufficiently

37

given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

```
[_____]
[_____]
Attention: Treasurer
Telephone: [_____]
Facsimile: [_____]
```

Any notice of demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid to the last address of such Warrantholder as it shall appear on the Warrant Register.

Section 7.16. *Applicable Law.* The validity, interpretation and performance of this Warrant Agreement and of the Warrant Certificates shall be governed by the law of the State of New York without giving effect to the principles of conflicts of laws thereof.

Section 7.17. *Benefit of this Warrant Agreement.* Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Warrantholders.

Section 7.18. *Registered Warrantholders.* Prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

Section 7.19. *Inspection of this Warrant Agreement.* A copy of this Warrant Agreement shall be available at all reasonable times for inspection by any registered Warrantholder at the principal office of the Warrant Agent (or successor warrant agent). The Warrant Agent may require any such holder to submit his Warrant Certificate for inspection by it before allowing such holder to inspect a copy of this Warrant Agreement.

1766891

Section 7.20. *Headings.*    The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

Section 7.21. *Counterparts.* This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

39

1766891

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

**[NGMCO, Inc.]**

By: _____

      Name:

      Title:

[•], as Warrant Agent

By: _____

      Name:

      Title:

**EXHIBIT A**

## FORM OF RESTRICTIVE LEGEND FOR WARRANTS

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

A - 1

**EXHIBIT B**

### FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK

[THESE SHARES OF COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

1766891

**EXHIBIT C**

**FORM OF GLOBAL WARRANT LEGEND**

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

C - 1

**EXHIBIT D**

## FORM OF WARRANT CERTIFICATE

[FACE]

No. _____

CUSIP No. _____

[UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.]

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

D - 1

**[NGMCO, Inc.]**

[Designation of Warrants]

NUMBER OF WARRANTS: Initially, [_____] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [_____], 2009 between **[NGMCO, Inc.]** and [●], as Warrant Agent (the "**Warrant Agreement**"), each of which is exercisable for one share of Common Stock.

EXERCISE PRICE: Initially, $[_____] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF PAYMENT OF EXERCISE PRICE: Cash, if Full Physical Settlement is applicable, or Net Share Settlement.

FORM OF SETTLEMENT: Upon exercise of any Warrants represented hereby, the Warrantholder shall be entitled to receive, at the Warrantholder's election, either (a) upon payment to the Warrant Agent of the Exercise Price (determined as of the relevant Exercise Date), one share of Common Stock per Warrant exercised, together with Cash in lieu of any fractional Warrants, or (b) without any payment therefor, a number of shares of Common Stock equal to the Net Share Amount, together with Cash in lieu of any fractional shares or fractional Warrants, in each case, as described in the Warrant Agreement.

DATES OF EXERCISE: At any time, and from time to time, prior to 5:00 p.m., New York City time, on the Expiration Date, the Warrantholder shall be entitled to exercise all Warrants then represented hereby and outstanding (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).

PROCEDURE FOR EXERCISE: Warrants may be exercised by (a) in the case of a Certificated Warrant, surrendering the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes, or (b) in the case of a Global Warrant, complying with the procedures established by the Depositary for the exercise of Warrants.

EXPIRATION DATE: [_____], 2019.

   This Warrant Certificate certifies that _____, or its registered assigns, is the Warrantholder of the Number of Warrants (the "**Warrants**") specified above[, as modified in Schedule A hereto,] (such number subject to adjustment from time to time as described in the Warrant Agreement).

   In connection with the exercise of any Warrants, (a) the Company shall determine the Full Physical Share Amount or Net Share Amount, as applicable, for each Warrant, and (b) the Company shall, or shall cause the Warrant Agent to, deliver to the exercising Warrantholder, on the applicable Settlement Date, for each Warrant exercised, a number of Shares of Common Stock equal to the relevant Full Physical Share Amount or Net Share

D - 2

Amount, as applicable, together with Cash in lieu of any fractional shares or fractional Warrants as described in the Warrant Agreement.

Prior to the relevant Exercise Date as described more fully in the Warrant Agreement, Warrants will not entitle the Warrantholder to any of the rights of the holders of shares of Common Stock.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

D - 3

IN WITNESS WHEREOF, **[NGMCO, Inc.]** has caused this instrument to be duly executed.

Dated: _____

**[NGMCO, Inc.]**

By: _____
       Name:
       Title:

Attest

By: _____
              Secretary

Countersigned as of the date above written:

[●], as Warrant Agent

By: _____
              Authorized Officer

D - 4

[FORM OF REVERSE OF WARRANT CERTIFICATE]

**[NGMCO, Inc.]**

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to a Warrant Agreement, dated as of [_____], 2009 (the "**Warrant Agreement**"), between the Company and [•] (the "**Warrant Agent**"), and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions each Warrantholder consents by acceptance of this Warrant Certificate or a beneficial interest therein. Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement. A copy of the Warrant Agreement is on file at the Warrant Agent's Office.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of New York without regard to the conflicts of laws principles thereof.

D - 5

**[To be attached if Warrant is a Certificated Warrant]**

**Exercise Notice**

[Warrant Agent]

[_____]
[_____]

Attention:    [•]

The undersigned (the "**Registered Warrantholder**") hereby irrevocably exercises _____ Warrants (the "**Exercised Warrants**") and delivers to you herewith a Warrant Certificate or Warrant Certificates, registered in the Registered Warrantholder's name, representing a Number of Warrants at least equal to the number of Exercised Warrants.

The Registered Warrantholder hereby either:

elects for Full Physical Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement and confirms that it will, prior to 11:00 a.m., New York City time, on the Settlement Date, pay an amount equal to the Exercise Price (determined as of the relevant Exercise Date), *multiplied by* the number of Exercised Warrants, by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Registered Warrantholder as required under Section 3.03(b) of the Warrant Agreement; or

elects for Net Share Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement.

The Registered Warrantholder hereby directs the Warrant Agent to:

(a)    deliver the Full Physical Share Amount or Net Share Amount, as applicable, for each of the Exercised Warrants as follows:

_____; and

(b)    if the number of Exercised Warrants is less than the Number of Warrants represented by the enclosed Warrant Certificates, to deliver a Warrant Certificate representing the unexercised Warrants to:

_____

Dated:_____          _____
                                          (Registered Warrantholder)




                                  By: _____
                                          Authorized Signature
                                          Address:
                                          Telephone:

        **[To Be Attached if Warrant is a Global Warrant]**

D - 7

## SCHEDULE A

## SCHEDULE OF INCREASES OR DECREASES IN WARRANTS

The initial Number of Warrants represented by this Global Warrant is _____.
In accordance with the Warrant Agreement dated as of [_____], 2009 among the Company
and [•], as Warrant Agent, the following increases or decreases in the Number of Warrants
represented by this certificate have been made:

| Date | Amount of increase in Number of Warrants evidenced by this Global Warrant | Amount of decrease in Number of Warrants evidenced by this Global Warrant | Number of Warrants evidenced by this Global Warrant following such decrease or increase | Signature of authorized signatory |
|------|------|------|------|------|
|      |      |      |      |      |

D - 8

**[To Be Attached if Warrant is a Global Warrant or Certificated Warrant]**

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____
Name, Address and Zip Code of Assignee

and irrevocably appoints _____
Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

D - 9

1766891

Date: _____

_____
Name of Transferee

By: _____
       Name:
       Title:

(Sign exactly as your name appears on the other side of this Certificate)

NOTICE: The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

D - 10

**EXHIBIT E**

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ Warrants by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such Warrants are being transferred:

> To [**NGMCO, Inc.**] (the "**Issuer**") or any subsidiaries thereof; or

> Pursuant to a registration statement that has become effective under the Securities Act; or

> Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Warrant Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Warrant Agent will refuse to register any of the Warrants evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:    [_____]


[Insert name of transferee]


By:    _____
        Name:
        Title:


E - 1

**EXHIBIT F**

## FORM OF COMMON STOCK REQUISITION ORDER

[*Date*]

Via Facsimile [_____]

**[NGMCO, Inc.]**
[_____]
[_____]
Attention:  Treasurer

Re:    DWAC Issuance
        Control No. _____

Ladies and Gentlemen:

You are hereby authorized to issue and deliver the shares of Common Stock as indicated below via DWAC.  The shares are being issued to cover the exercise of Warrants under the Warrant Agreement, dated as of [_____], 2009, between **[NGMCO, Inc.]** and [•], as Warrant Agent (the "**Warrant Agreement**"). Defined terms used but not defined herein have the meaning assigned to them in the Warrant Agreement.

Number of Shares:        _____

                         _____ Original Issue or

                         _____ Transfer from Treasury Account

Broker Name:             _____

Broker's DTC Number:     _____

Contact and Phone:       _____

F - 1

The Broker will initiate the DWAC transaction on (date).

Sincerely,

[•],
as Warrant Agent


By: _____
Name:
Title:


cc:     [*Insert name*] via facsimile [*insert fax number*]
        Broker

F - 2

C

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit C**

UAW Active Labor Modifications

## AGREEMENT BETWEEN GENERAL MOTORS CORPORATION AND THE UAW

### May 17, 2009

The UAW and GM have agreed to the terms set forth in this Agreement (including its attachments).  This Agreement shall constitute an Addendum to the 2007 GM-UAW National Agreement.

With respect to the terms of the attached Memorandums of Understanding calling for suspensions of compensation or benefits, or other amendments to existing contractual provisions, the amendments and/or suspensions will last until the expiration of the 2007 UAW-GM National Agreement unless other expiration dates are specifically required by the Loan and Security Agreement between GM and the UST or, unless otherwise modified or terminated by the mutual agreement of the parties.

The provisions of this document and its attachments are subject to the terms of ratification by the membership of the UAW.

For the International Union, UAW:                For General Motors Corporation:

CSA_A01 with signature.doc

D

**Amended and Restated Master Sale & Purchase Agreement
Exhibit D**

Form of UAW Retiree Settlement Agreement

## UAW RETIREE SETTLEMENT AGREEMENT

This settlement agreement (together with the Exhibits hereto, the "Settlement Agreement"), dated [_____], 2009, is between [New Co] ("[New Co]"), by and through its attorneys, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), by and through its attorneys. The UAW also enters into this Settlement Agreement as the authorized representative, as defined in Section 1114(c)(1) of Title 11 of the United States Code (the "Bankruptcy Code"), of those persons receiving retiree benefits, as defined in Section 1114(a) of the Bankruptcy Code, pursuant to collectively bargained plans, programs and/or agreements between [New Co] and the UAW and who are members of the Class or the Covered Group, as those terms are defined herein. This Settlement Agreement shall cover and has application to:

    (i)       the Class;

    (ii)      the Covered Group;

    (iii)     the Existing External VEBA;

    (iv)     the trustee and committee that administer the Existing External VEBA;

    (v)      the Existing Internal VEBA;

    (vi)     the trustees that administer the Existing Internal VEBA;

    (vii)    the UAW;

    (viii)   the [New Co] Plan; and

    (ix)    [New Co].

General Motors Corporation ("GM") agreed to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between GM and the UAW (the "MOU"). GM, the UAW, and the Class entered into a settlement agreement in the class action of *UAW et al. v. General Motors Corp.*, No. 05-CV-73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006, *aff'd, Int'l Union, UAW v. General Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) ("Henry I"). Thereafter, GM, the UAW, and the Class entered into a settlement agreement in the class action of *Int'l Union, UAW, et. al. v. General Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 26, 2007) ("Henry II") that was approved by the Court on July 31, 2008 (the "Henry II Settlement").

Subsequent to entering into the MOU and the Henry II Settlement, GM filed a bankruptcy action, known as *In re General Motors Corporation*, No. 09-50026 (Bankr. S.D.N.Y. filed June 1, 2009), pursuant to which [New Co] purchased certain assets of GM (such purchase, the "Sale Transaction"). The UAW asserted that, under Document Nos. 13 and 91 of the GM-UAW National Agreement, [New Co] was bound by the terms of the MOU. According to the UAW, any sale of GM's assets required UAW approval and, in the event of a sale, [New Co] was bound by the terms of the MOU. [New Co] denied that Document Nos. 13 and 91 of the GM-UAW National Agreement and the MOU applied to [New Co] and took the position that it was free to make decisions with respect to retiree health care benefits on a unilateral basis. After due consideration of the factual and legal arguments regarding this issue, as well as the costs, risks, and delays associated with litigating the issue, [New Co] and the UAW have agreed to

enter into this Settlement Agreement, which will be presented to the Bankruptcy Court for approval after notice is provided to affected parties.

This Settlement Agreement recognizes and approves on the basis set forth herein: (i) the adoption of the [New Co] Plan; (ii) the amendment of the [New Co] Plan to terminate coverage for and exclude from coverage the Class and the Covered Group; (iii) the transfer of the UAW Related Account of the Existing Internal VEBA to the New VEBA; (iv) the termination of participation by the Class and the Covered Group under the Existing Internal VEBA; (v) the termination of the Existing External VEBA in conjunction with the establishment of the New Plan, and the transfer to the New VEBA of all assets and liabilities of the Existing External VEBA; (vi) that all claims for Retiree Medical Benefits incurred after the Implementation Date by the Class and the Covered Group, including but not limited to COBRA continuation coverage where such election is or had been made on or after retirement and any coverage provided on a self-paid basis in retirement, shall be solely the responsibility and liability of the New Plan and the New VEBA; (vii) the Committee's designation under the New Plan and New VEBA as named fiduciary and administrator of the New Plan; (viii) that the New Plan shall replace the [New Co] Plan with respect to the provision of Retiree Medical Benefits to the Class and the Covered Group after the Implementation Date; (ix) that the New VEBA shall receive certain payments as described herein from the Existing Internal VEBA, the Existing External VEBA, and [New Co]; (x) that [New Co]'s obligation to pay into the New VEBA is fixed and capped as described herein; and (xi) that the New VEBA shall serve as the exclusive funding mechanism for the New Plan.

## 1.    Definitions

2009 Benefits Changes.  The term "2009 Benefits Changes" shall mean those plan design changes set forth in Exhibit F to this Settlement Agreement, which changes are effective on the later of July 1, 2009 and the Initial Effective Date.

Adjustment Event.  The term "Adjustment Event" is defined in Section 13 of this Settlement Agreement.

Admissions.  The term "Admissions" shall mean any statement, whether written or oral, any act or conduct, or any failure to act, that could be used (whether pursuant to Rules 801(d)(2) or 804(b)(3) of the Federal Rules of Evidence, a similar rule or standard under other applicable law, the doctrines of waiver or estoppel, other rule, law, doctrine or practice, or otherwise) as evidence in a proceeding of proof of agreement with another party's position or proof of adoption of, or acquiescence to, a position that is contrary to the interest of the party making such statement, taking such action, or failing to act.

Approval Order or Judgment.  The terms "Approval Order" or "Judgment" shall mean an order obtained from the Bankruptcy Court approving and incorporating this Settlement Agreement in all respects as set forth in Section 28 of this Settlement Agreement.

Bankruptcy Court.  The term "Bankruptcy Court" shall mean the United States Bankruptcy Court with respect to *In re General Motors Corporation*, No. 09-50026 (Bankr. S.D.N.Y. filed June 1, 2009).

Class or Class Members.  The term "Class" or "Class Members" shall mean all persons who are:

(i) [New Co]-UAW Represented Employees who, as of October 15, 2007, were retired from GM with eligibility for Retiree Medical Benefits under the GM Plan, and their eligible spouses, surviving spouses and dependents;

(ii) surviving spouses and dependents of any [New Co]-UAW Represented Employees who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan;

(iii) UAW retirees of Delphi Corporation ("Delphi") who as of October 15, 2007 were retired and as of that date were entitled to or thereafter become entitled to Retiree Medical Benefits from GM and/or under the GM Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008, and their eligible spouses, surviving spouses and dependents of all such retirees;

(iv) surviving spouses and dependents of any UAW-represented employee of Delphi who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008;

(v) [New Co]-UAW Represented Employees or former UAW-represented employees who, as of October 15, 2007, were retired from any previously sold, closed, divested or spun-off GM business unit (other than Delphi) with eligibility to receive Retiree Medical Benefits from GM and/or under the GM Plan by virtue of any other agreement(s) between GM and the UAW, and their eligible spouses, surviving spouses, and dependents; and

(vi) surviving spouses and dependents of any [New Co]-UAW Represented Employee or any UAW-represented employee of a previously sold, closed, divested or spun-off GM business unit (other than Delphi), who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan.

Class Counsel. The term "Class Counsel" shall mean the law firm of Stember, Feinstein, Doyle & Payne, LLC, or its successor, as well as such other counsel as may be retained thereby or work on behalf thereof.

Class Representatives. The term "Class Representatives" shall mean Earl L. Henry, Bonnie J. Lauria, Raymond B. Bailey, Theodore J. Genco, Marvin C. Marlow, Charles R. Miller, Laverne M. Soriano, and John Huber.

Closing. The term "Closing" shall have the meaning given thereto in the Master Sale and Purchase Agreement, dated June 1, 2009, by and among [New Co], GM and the other parties thereto.

Closing Date. The term "Closing Date" shall have the meaning given thereto in the Master Sale and Purchase Agreement, dated June 1, 2009, by and among [New Co], GM and the other parties thereto.

Committee. The term "Committee" shall mean the governing body set forth in Section 4.A of this Settlement Agreement that acts on behalf of the EBA and serves as the named

- 3 -

fiduciary and administrator of the New Plan, as those terms are defined in ERISA and that is so described in the Trust Agreement.

Common Stock. The term "Common Stock" shall mean the number of shares of Common Stock, par value $0.01 per share, of [New Co], required to be issued to the New VEBA pursuant to the Equity Subscription Agreement.

Court. The term "Court" shall mean the United States District Court for the Eastern District of Michigan.

Covered Group. The term "Covered Group" shall mean:

(i) all [New Co] Active Employees who had attained seniority as of September 14, 2007, and who retire after October 15, 2007 under the GM-UAW National Agreements, or any other agreement(s) between GM and the UAW or [New Co] and the UAW, and who upon retirement are eligible for Retiree Medical Benefits under the GM Plan, the [New Co] Plan or the New Plan, as applicable, and their eligible spouses, surviving spouses and dependents;

(ii) all UAW-represented active employees of Delphi or a former Delphi unit who retire from Delphi or such former Delphi unit on or after October 15, 2007, and upon retirement are entitled to or thereafter become entitled to Retiree Medical Benefits from [New Co] and/or under the GM Plan, the [New Co] Plan, or the New Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008, and the eligible spouses, surviving spouses and dependents of all such retirees;

(iii) all surviving spouses and dependents of any UAW-represented employee of Delphi or a former Delphi unit who dies after October 15, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible or thereafter become eligible for Retiree Medical Benefits from [New Co] and/or under the GM Plan, the [New Co] Plan or the New Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008;

(iv) all former [New Co]-UAW Represented Employees and all UAW-represented employees who, as of October 15, 2007, remain employed in a previously sold, closed, divested, or spun-off GM business unit, and upon retirement are eligible for Retiree Medical Benefits from GM or [New Co], as applicable, and/or under the GM Plan, the [New Co] Plan or the New Plan by virtue of any other agreement(s) between GM and the UAW or [New Co] and the UAW, and their eligible spouses, surviving spouses and dependents; and

(v) all eligible surviving spouses and dependents of a [New Co] Active Employee, former [New Co]-UAW Represented Employee or UAW-represented employee identified in (i) or (iv) above who attained seniority on or prior to September 14, 2007 and die after October 15, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible for Retiree Medical Benefits from GM or [New Co] and/or under the GM Plan, the [New Co] Plan or the New Plan, as applicable.

Debt. The term "Debt" shall mean notes, bonds, debentures or other similar evidences of indebtedness for money borrowed.

Dispute Party. The term "Dispute Party" is defined in Section 26.B of this Settlement Agreement.

DOL. The term "DOL" shall mean the United States Department of Labor.

- 4 -

Employees Beneficiary Association or EBA. The term "Employees Beneficiary Association" or "EBA" shall mean the employee organization within the meaning of section 3(4) of ERISA that is organized for the purpose of establishing and maintaining the New Plan, with a membership consisting of the individuals who are members of the Class and the Covered Group, and on behalf of which the Committee acts.

Equity Subscription Agreement. The term "Equity Subscription Agreement" shall mean the Equity Subscription Agreement, dated June 1, 2009, by and between the New VEBA and Vehicle Acquisition Holdings, LLC.

ERISA. The term "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

Existing External VEBA. The term "Existing External VEBA" shall mean the defined contribution – Voluntary Employees' Beneficiary Association trust established pursuant to the Henry I Settlement.

Existing Internal VEBA. The term "Existing Internal VEBA" shall mean the General Motors Welfare Benefit Trust that was maintained by GM and, as of the Closing Date, will be sponsored by [New Co].

General Motors Asset Management Valuation Policies and Procedures. The term "General Motors Asset Management Valuation Policies and Procedures" shall mean GMAM's valuation policies and procedures, copies of which have been provided to the UAW and Class Counsel, as the same may be amended from time to time by GMAM (who shall notify the UAW and the Committee about any such intended amendments in a timely manner).

GM. The term "GM" is defined in the third paragraph of this Settlement Agreement.

GMAM. The term "GMAM" shall mean Promark Global Advisors Inc., formerly known as General Motors Asset Management Corporation, and its subsidiaries, or, when specifically referring to the investment manager for the Existing Internal VEBA, Promark Investment Advisors, Inc., formerly known as General Motors Investment Management Corporation. GMAM is a wholly owned subsidiary of GM.

GM Plan. The term "GM Plan" shall mean the Retiree Medical Benefits as provided pursuant to the General Motors Health Care Program for Hourly Employees in effect under the Henry II Settlement for the Class and the Covered Group.

GM-UAW National Agreements. The term "GM-UAW National Agreements" shall mean the agreement(s) negotiated on a multi-facility basis and entered into between GM and the UAW covering GM employees represented by the UAW. The current GM-UAW National Agreement is dated October 15, 2007.

Henry I. The term "Henry I" is defined in the second paragraph of this Settlement Agreement.

Henry I Settlement. The term "Henry I Settlement" shall mean the settlement agreement, dated December 16, 2005, approved by the Court in Henry I.

Henry II. The term "Henry II" is defined in the second paragraph of this Settlement Agreement.

Henry II Settlement. The term "Henry II Settlement" is defined in the second paragraph of this Settlement Agreement.

Indenture. The term "Indenture" shall mean the loan agreement, credit agreement or other form of document to be entered into by [New Co] with respect to the [New Co] Note, substantially in the form set forth in Exhibit B to this Settlement Agreement.

Implementation Date. The term "Implementation Date" shall mean the later of December 31, 2009 or the Closing Date.

Indemnified Party. The term "Indemnified Party" is defined in Section 23 of this Settlement Agreement.

Indemnification Liabilities. The term "Indemnification Liabilities" is defined in Section 23 of this Settlement Agreement.

Indemnity Expenses. The term "Indemnity Expenses" is defined in Section 23 of this Settlement Agreement.

Independent Attestation. The term "Independent Attestation" shall mean an agreed-upon procedures engagement performed for [New Co], the UAW and the Committee by a nationally recognized independent registered public accounting firm selected by [New Co] and conducted in accordance with the attestation standards of the Public Company Accounting Oversight Board, the subject matter of which would be whether specified assets of the Existing Internal VEBA have been valued in accordance with the General Motors Asset Management Valuation Policies and Procedures. The agreed-upon procedures shall be mutually agreed among the accounting firm, [New Co] and the Committee in connection with any such engagement.

Initial Accounting Period. The term "Initial Accounting Period" shall mean the period before the date that [New Co] determines that its obligations, if any, with respect to the New Plan made available to the Class and Covered Group are subject to settlement accounting as contemplated by paragraphs 90-95 of FASB Statement No. 106, as amended, or its functional equivalent.

Initial Effective Date. The term "Initial Effective Date" shall mean the date on which the Bankruptcy Court enters the Approval Order.

Interest. The term "Interest" shall mean an interest rate of 9 percent (9%) per annum (computed on the basis of a 360-day year consisting of twelve 30-day months and the number of days elapsed in any partial month), credited and compounded annually, unless otherwise specified in this Settlement Agreement.

Mitigation. The term "Mitigation" shall have the same meaning as in the Henry I Settlement.

MOU. The term "MOU" is defined in the third paragraph of this Settlement Agreement.

National Institute for Health Care Reform or Institute. The term "National Institute for Health Care Reform" or "Institute" is defined in Section 31 of this Settlement Agreement.

[New Co]. The term "[New Co]" is defined in the first paragraph of this Settlement Agreement.

- 6 -

[New Co] Active Employees.  The term "[New Co] Active Employees" shall mean those hourly employees of [New Co] or, for periods prior to the Closing Date, GM who, as of September 14, 2007 or any date thereafter, are covered by the 2007 GM-UAW National Agreement or are covered by any subsequent GM-UAW National Agreement or [New Co]-UAW National Agreement.  For purposes of this definition, "active employee" shall include hourly employees on vacation, layoff, protected status, medical or other leave of absence, and any other employees who have not broken seniority as of September 14, 2007.

[New Co] Equity.  The term "[New Co] Equity" shall mean the Common Stock, the Preferred Stock and the Warrant.

[New Co] Note.  The term "[New Co] Note" shall mean the $2.5 billion Note due July 15, 2017 of [New Co] substantially in the form set forth in Exhibit I hereto.

[New Co] Plan.  The term "[New Co] Plan" shall mean the GM Plan, as amended by the 2009 Benefits Changes.

[New Co]-UAW National Agreements.    The term "[New Co]-UAW National Agreements" shall mean the agreement(s) negotiated on a multi-facility basis and entered into between [New Co] and the UAW covering [New Co] employees represented by the UAW.

[New Co]-UAW Represented Employees.    The term "[New Co]-UAW Represented Employees" shall mean those individuals represented by the UAW in their employment with GM prior to the Closing Date, or [New Co] after the Closing Date.

New Plan.  The term "New Plan" shall mean the new retiree welfare benefit plan that is established and maintained by the EBA for the purpose of providing Retiree Medical Benefits to the Class and the Covered Group, and that is funded in part by the [New Co] Separate Retiree Account of the New VEBA.

New VEBA.  The term "New VEBA" shall mean the UAW Retiree Medical Benefits Trust that was established pursuant to the Henry II Settlement and is further described in Section 4 of this Settlement Agreement.

Non-UAW Related Account.  The term "Non-UAW Related Account" is defined in Section 6.A of this Settlement Agreement.

Pension Plan.  The term "Pension Plan" shall mean the General Motors Hourly-Rate Employees Pension Plan, as assumed by [New Co].

Preferred Stock.  The term "Preferred Stock" shall mean the number of shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, par value $0.01 per share of [New Co], having terms substantially as set forth in Exhibit J hereto, required to be issued to the New VEBA pursuant to the Equity Subscription Agreement.

Relevant [New Co] Equity Agreements.    The term "Relevant [New Co] Equity Agreements" shall mean (i) the Stockholders Agreement, among [New Co], the New VEBA, and the other [New Co] stockholder parties thereto, substantially in the form set forth in Exhibit K and (ii) the Equity Registration Rights Agreement, by and among [New Co], the New VEBA and the other parties thereto, substantially in the form set forth in Exhibit D hereto.

Retiree Medical Benefits.  The term "Retiree Medical Benefits" shall mean all post-retirement medical benefits, including but not limited to hospital surgical medical, prescription drug, vision, dental, hearing aid and the $76.20 Special Benefit related to Medicare.

SAP.  The term "SAP" is defined in Section 12.B of this Settlement Agreement.

Subsidiary.  The term "Subsidiary" shall mean any corporation or other entity of which at least a majority of the outstanding stock or other beneficial interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other governing body of such corporation or other entity (irrespective of whether or not at the time stock or other beneficial interests of any other class or classes of such corporation or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time owned by [New Co], or by one or more Subsidiaries, or by [New Co] and one or more Subsidiaries.

Transition Payments.  The term "Transition Payments" is defined in Section 12.A of the Settlement Agreement.

Trust Agreement.  The term "Trust Agreement" shall mean the UAW Retiree Medical Benefits Trust Agreement, as amended as set forth in Exhibit E to this Settlement Agreement.

UAW.  The term "UAW" is defined in the first paragraph of this Settlement Agreement.

UAW Related Account.  The term "UAW Related Account" is defined in Section 6.A of this Settlement Agreement.

UAW Releasees.  The term "UAW Releasees" shall mean the UAW, the Class, the Class Representatives, Class Counsel and the Covered Group and anyone claiming on behalf of, through or under them by way of subrogation or otherwise.

Warrant.  The term "Warrant" shall mean Warrants to acquire shares of Common Stock, par value $0.01 per share, of [New Co] substantially in the form set forth in Exhibit L hereto, and required to be issued to the New VEBA pursuant to the Equity Subscription Agreement.

## 2.    Purpose of New Plan and New VEBA

The retiree benefits provided for in this Settlement Agreement have resulted from extensive negotiations and affect the rights of the Class and the Covered Group.  [New Co] Active Employees are not members of the Class.  Therefore, medical benefit coverage for [New Co] Active Employees prior to their retirement are not within the scope of this Settlement Agreement and shall continue to be provided in accordance with the terms of the applicable collective bargaining agreement and health care benefit plan.  Similarly, Retiree Medical Benefits for [New Co]-UAW Represented Employees who become seniority employees after September 14, 2007 are outside the scope of this Settlement Agreement and such benefits, if any, shall be provided in accordance with the applicable provisions of the GM-UAW National Agreements.

Nothing in this Settlement Agreement modifies the rights or obligations of [New Co] or the UAW to negotiate over health care benefits for [New Co] Active Employees who are not members of the Covered Group and future retirees who are not members of the Covered Group upon the expiration of the GM-UAW National Agreements, which have been assumed by [New Co],or at any earlier time if [New Co] and the UAW mutually agree.  Any changes resulting from subsequent negotiations shall be applied only to employees who retire after any such

- 8 -

agreement is reached and shall not otherwise affect the rights of Class Members or the Covered Group hereunder or [New Co]-UAW Represented Employees who become seniority employees after September 14, 2007 but who retire prior to the time any such agreement is reached.

With regard to participation in the [New Co] Plan, all references to retirees in this Settlement Agreement shall be deemed to include the Covered Group. For purposes of this Settlement Agreement, any reference to health care benefits to be provided hereunder to Class Members or the Covered Group shall be deemed to include such benefits provided to any of their respective spouses and dependents subject to all the terms and conditions of the applicable plan, including but not limited to eligibility requirements.

The New Plan and the New VEBA shall, after the Implementation Date, be the employee welfare benefit plan and trust that are exclusively responsible for all Retiree Medical Benefits for which [New Co], the [New Co] Plan and any other [New Co] entity or benefit plan formerly would have been responsible with respect to the Class and the Covered Group. All assets paid or transferred by [New Co] to the New VEBA (including any investment returns thereon) shall be credited to the [New Co] Separate Retiree Account and must be used for the exclusive purposes of (A) providing Retiree Medical Benefits to the participants of the New Plan and their eligible beneficiaries and (B) defraying the reasonable expenses of administering the New Plan, as set forth in the Trust Agreement. All obligations of [New Co], the [New Co] Plan and any other [New Co] entity or benefit plan for Retiree Medical Benefits for the Class and the Covered Group arising from any agreement(s) between [New Co] and the UAW shall be forever terminated as of the Implementation Date. [New Co]'s sole obligations to the New Plan and the New VEBA are those set forth in this Settlement Agreement. Eligibility rules for the New Plan shall be the same as those currently included in the [New Co] Plan, and may not be expanded.

## 3.    Factual Investigation and Legal Inquiry and Decision to Settle

Throughout the 2009 negotiations over the terms of this Settlement Agreement, the parties engaged in extended discussions concerning the GM bankruptcy filing, the terms of the sale pursuant to Section 363 of the Bankruptcy Code, retiree medical costs, and the obligations attendant to [New Co] being determined a successor to GM with respect to retiree health care. The UAW was provided with extensive information as to [New Co's] projected financial condition and health care expenditures. On behalf of the UAW, a team of investment bankers, actuaries, and legal experts have reviewed [New Co]'s information and provided the UAW with an assessment as to the state of [New Co]'s financial condition and analyzed the benefits of entering into this Settlement Agreement. [New Co] representatives also met with UAW representatives and its team of experts to answer questions and provide further detail, as requested.

The UAW has completed due diligence with respect to the Settlement Agreement utilizing professional financial and legal advisors and has determined that it is fair, reasonable and in the best interest of the Class and the Covered Group. Class Counsel has had access to the information provided to the UAW and has reviewed this Settlement Agreement and believes that, in consideration of all the circumstances, it is fair, reasonable, and in the best interest of all members of the Class.

4.    **New Plan and New VEBA**

A.    Committee. The New Plan and New VEBA, both subject to ERISA, shall be administered by the Committee. The Committee consists of 11 members, 5 of whom were appointed by the UAW and 6 of whom are independent members, who were appointed pursuant to the Court's July 31, 2008 Settlement approving the Henry II Settlement. In the event that any member of the Committee resigns, dies, becomes incapacitated or otherwise ceases to be a member, a replacement member shall be appointed, as described in the Trust Agreement.

B.    Establish and Maintain. The EBA, acting through the Committee, shall establish and maintain the New Plan for the purpose of providing Retiree Medical Benefits to the Class and the Covered Group as set forth in this Settlement Agreement. The Committee shall begin administering the New Plan so as to be able to provide Retiree Medical Benefits for the Class and the Covered Group with respect to claims incurred after the Implementation Date. The Committee established the New VEBA on October 16, 2008. The New Plan shall be ERISA-covered and the New VEBA shall meet the requirements of Section 501(c)(9) of the Internal Revenue Code. All payments to the New Plan and the New VEBA made or caused to be made by [New Co] under the Settlement Agreement are payments pursuant to section 302(c)(2) of the Labor Management Relations Act, 1947, as amended, 29 U.S.C. 186(c)(2).

C.    Limitation on [New Co] Role. No member of the Committee shall be a current or former officer, director or employee of GM or [New Co] or any member of the GM or [New Co] controlled group; provided however, that a retiree who was represented by the UAW in his/her employment with GM or [New Co] or an employee of [New Co] who is on leave from [New Co] and who is represented by the UAW is not precluded by this provision from serving on the Committee. No member of the Committee shall be authorized to act for [New Co] or shall be an agent or representative of [New Co] for any purpose. Furthermore, [New Co] shall not be a fiduciary with respect to the New Plan or New VEBA, and will have no rights or responsibilities with respect to the New Plan or New VEBA other than as specifically set forth in this Settlement Agreement.

5.    **Provision and Scope of Retiree Medical Benefits**

A.    On and Before the Implementation Date. With respect to claims incurred on and before the Implementation Date, without regard to whether such claims were incurred before, on or after the execution of this Settlement Agreement, Retiree Medical Benefits for the Class and the Covered Group will be provided either by GM or [New Co], as applicable, in accordance with the [New Co] Plan. Mitigation payments from the Existing External VEBA (for those entitled thereto) shall continue to apply during this period. As soon as reasonably practicable following the later of (a) July 1, 2009 or (b) receipt of necessary court approvals, the dental benefits provided by the Existing External VEBA shall terminate with respect to claims incurred after such date. The payment by [New Co] and/or the [New Co] Plan of Retiree Medical Benefits for claims incurred on and before the Implementation Date will not reduce [New Co]'s payment obligations to the New Plan and the New VEBA under this Settlement Agreement; but in no event shall [New Co] be responsible for payment of claims to the extent that such claims have been paid by GM or the GM Plan.

B.    After the Implementation Date. With respect to claims incurred after the Implementation Date, the New Plan and the New VEBA shall have sole responsibility for and be

- 10 -

the exclusive source of funds to provide Retiree Medical Benefits for the Class and the Covered Group, including but not limited to COBRA continuation coverage, where such election is made after retirement. Neither [New Co], the [New Co] Plan, the Existing Internal VEBA, nor any other [New Co] person, entity, or benefit plan shall have any responsibility or liability for Retiree Medical Benefits for individuals in the Class or in the Covered Group for claims incurred after the Implementation Date. [New Co]'s sole obligations to the New Plan and the New VEBA are those set forth in this Settlement Agreement.

C.    Amendment of the New Plan.    On and after January 1, 2010, the Committee shall have such authority to establish Benefits as described in the Trust Agreement, including raising or lowering benefits. However, in no event may the Committee amend the New Plan or New VEBA to provide benefits other than Retiree Medical Benefits until the expiration of the Initial Accounting Period. The ability of the New Plan and the New VEBA to pay for Retiree Medical Benefits will depend on numerous factors, many of which are outside of the control of UAW, the Committee, the New Plan and the New VEBA, including, without limitation, the investment returns, actuarial experience and other factors.

D.    Termination of [New Co] Plan and Reimbursement of [New Co].    The Approval Order shall provide that all obligations of [New Co] and all provisions of the [New Co] Plan in any way related to Retiree Medical Benefits for the Class and/or the Covered Group, and all provisions of applicable collective bargaining agreements, contracts, letters and understandings in any way related to Retiree Medical Benefits for the Class and the Covered Group are terminated on the Implementation Date, or otherwise amended so as to be consistent with this Settlement Agreement and the fundamental understanding that all [New Co] obligations regarding Retiree Medical Benefits for the Class and the Covered Group are terminated, as set forth in this Settlement Agreement. Summary Plan Descriptions of the [New Co] Plan shall reflect the termination of the responsibilities of [New Co] and the [New Co] Plan for Retiree Medical Benefits for the Class and the Covered Group for claims incurred after the Implementation Date, as set forth herein.

The New Plan and New VEBA shall reimburse [New Co] or the [New Co] Plan, as applicable, for any Retiree Medical Benefits advanced or provided by [New Co] or the [New Co] Plan with regard to claims incurred by members of the Class and the Covered Group after the Implementation Date, including, but not limited to situations where a retirement is made retroactive and the medical claims were incurred after the Implementation Date or where [New Co] is notified of an intent by a member of the Class and the Covered Group to retire under circumstances where there is insufficient time to transfer responsibility for Retiree Medical Benefits to the New Plan and [New Co] or the [New Co] Plan provides interim coverage for Retiree Medical Benefits. To the extent such reimbursement may not be permitted by law, the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, and the Committee will fully cooperate with [New Co] to secure any legal or regulatory approvals that are necessary to permit such reimbursement.

6.    **Division of Existing Internal VEBA**

A.    UAW Related Account.    Pursuant to the Henry II Settlement GM divided the Existing Internal VEBA into two bookkeeping accounts. One account consisted of the percentage of the Existing Internal VEBA's assets as of January 1, 2008 that was equal to the estimated percentage of GM's hourly OPEB liability covered by the Existing Internal VEBA

- 11 -

attributable to Non-UAW represented employees and retirees, their eligible spouses, surviving spouses and dependents ("Non-UAW Related Account"). The second account consisted of the remaining percentage of the assets in the Existing Internal VEBA as of January 1, 2008 ("UAW Related Account").

As of March 31, 2009, the amount in the UAW Related Account was valued at approximately $9.4 billion.

B.    Investment of Assets. GMAM shall oversee the investment of the assets in the Existing Internal VEBA with respect to the UAW Related Account until such time as the assets attributable to the UAW Related Account are transferred to the New VEBA pursuant to Section 12 of this Settlement Agreement. All such assets shall continue to be invested under the existing investment policy (as may be amended from time to time by [New Co] who shall notify the UAW and the Committee about intended amendments in a timely manner) applicable to the Existing Internal VEBA. Investment returns, net of Existing Internal VEBA trust expenses (this shall only include expenses to the extent permitted by ERISA), on all assets of the Existing Internal VEBA on and after January 1, 2008 shall be applied to these accounts proportionally in relation to the value of the assets in the UAW Related Account in relation to the total amount of assets in the Existing Internal VEBA. In other words, investment returns (i.e., the percentage return on the total Existing Internal VEBA), net of Existing Internal VEBA trust expenses (this shall only include expenses to the extent permitted by ERISA), shall be applied to the value of the UAW Related Account and separately to the value of the Non-UAW Account (as adjusted to reflect any withdrawals by GM or [New Co]). However, neither GM nor GMAM nor [New Co] guarantee or warrant the investment returns on the assets in the Existing Internal VEBA.

Until such time as the assets attributable to the UAW Related Account are transferred to the New VEBA, [New Co] agrees to cause GMAM to periodically inform and hold discussions with the UAW and the Committee about the investment results of and decisions regarding the assets in the Existing Internal VEBA. During such period, GMAM shall, with respect to the performance of its duties in managing the Existing Internal VEBA, participate in the following meetings and provide the following reports to the UAW and the Committee: (i) quarterly reports of Existing Internal VEBA asset class and benchmark performance for relevant time periods; and (ii) semi-annual or quarterly meetings with UAW and/or Committee representatives to report on Existing Internal VEBA returns and analysis of performance, and to review significant activities affecting investments. Any input from the UAW and/or the Committee shall not be a basis of GMAM's investment decisions within the meaning of the DOL regulations set forth at 29 C.F.R. § 2510-3.21(c).

C.    Disposition of Assets. No amounts shall be withdrawn by [New Co] from the UAW Related Account, including its investment returns, until transfer to the New VEBA under Section 12. GMAM and the Committee shall enter into discussions in advance of such transfer with regard to the method of transferring and/or otherwise handling any illiquid or otherwise non-transferable investments in the Existing Internal VEBA so as to preserve as much as possible the economic value of such investments and minimize any losses due to the liquidation of assets. Such discussions shall commence in a timely fashion and be completed as soon as reasonably practicable. The determinations made by GMAM as a product of these discussions with the Committee regarding the way to transfer illiquid or otherwise non-transferable investments in the Existing Internal VEBA shall be final and binding on [New Co], the UAW, the Committee, the Class and the Covered Group.

7.    [Reserved]

8.    **[New Co] Payments to New Plan and New VEBA**

[New Co]'s financial obligation and payments to the New Plan and New VEBA are fixed and capped by the terms of this Settlement Agreement. The timing of all payments to the New VEBA shall be as set forth in Section 12 of this Settlement Agreement; it being agreed and acknowledged that the New Plan, funded by the New VEBA, shall provide Retiree Medical Benefits for the Class and the Covered Group after the Implementation Date, and that all obligations of [New Co] and/or the [New Co] Plan for Retiree Medical Benefits for the Class and the Covered Group shall terminate as of the Implementation Date, as set forth in this Settlement Agreement. All assets shall be transferred or paid by [New Co] free and clear of any liens, claims or other encumbrances. Pursuant to this Settlement Agreement, [New Co] shall have the following, and only the following, obligations to the New VEBA and the New Plan, and all payments and transfers in this Section 8 of this Settlement Agreement shall be credited to the [New Co] Separate Retiree Account of the New VEBA:

A.    Special Attrition Plan. In accordance with Section 12.A of this Settlement Agreement, [New Co] shall pay to the New VEBA the contract cost for providing Retiree Medical Benefits for those [New Co] Active Employees who retire under the terms of the Special Attrition Plan agreed to by GM and the UAW and ratified on May 29, 2009 (the "SAP"), excluding those [New Co] Active Employees who accepted buyouts.

B.    UAW Related Account. In accordance with Section 12.B of this Settlement Agreement, [New Co] shall cause the transfer to the New VEBA of the assets (or, with regard to any illiquid or otherwise non-transferable investments, equivalent alternatives resulting from discussions between GMAM and the Committee pursuant to Section 6.C of this Settlement Agreement) of the UAW Related Account in the Existing Internal VEBA, net of Existing Internal VEBA trust expenses (which shall include expenses only to the extent permitted by ERISA).

C.    [New Co] Note. In accordance with Section 12.D of this Settlement Agreement, [New Co] shall execute and deliver to the financial institution that will serve as trustee under the Indenture, if applicable, or to the other counterparty to the Indenture (the "Indenture Trustee") a counterpart signature page to the Indenture (and issue the [New Co] Note to the New VEBA pursuant to the terms and conditions thereof). [New Co] shall pay any and all documentary, stamp or similar issue taxes that may be payable with respect to its execution and delivery of counterpart signature pages to the Indenture (or the issuance of the [New Co] Note to the New VEBA pursuant to the terms and conditions of the Indenture). [New Co] represents and warrants that its execution and delivery of counterpart signature pages to the Indenture (and the issuance of the [New Co] Note to the New VEBA pursuant to the terms and conditions of the Indenture) in accordance with this Settlement Agreement will not conflict with or constitute a breach or default under any law or contractual obligation by which [New Co] is bound or to which it or its property is subject; and [New Co] will not take any action prior to its execution and delivery of counterpart signature pages to the Indenture (or the issuance of the [New Co] Note to the New VEBA pursuant to the terms and conditions of the Indenture) that would render [New Co] unable to so execute and deliver such agreements (or issue the [New Co] Note to the New VEBA pursuant to the terms and conditions of the Indenture), or result in any such breach

- 13 -

or default occurring as a result of such execution and delivery of such agreements (or such issuance of the [New Co] Note to the New VEBA).

D.      [New Co] Equity.   In accordance with Section 12.D of this Settlement Agreement, [New Co] shall execute and deliver to the New VEBA counterpart signature pages to the Relevant [New Co] Equity Agreements (except the Equity Subscription Agreement, which was previously executed by the parties thereto) and issue the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement. [New Co] shall pay any and all documentary, stamp or similar issue taxes that may be payable with respect to its execution and delivery of counterpart signature pages to the Relevant [New Co] Equity Agreements (or the issuance of the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement). [New Co] represents and warrants that its execution and delivery of counterpart signature pages to the Relevant [New Co] Equity Agreements (and the issuance of the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement) in accordance with this Settlement Agreement will not conflict with or constitute a breach or default under any law or contractual obligation by which [New Co] is bound or to which it or its property is subject; and [New Co] will not take any action prior to its execution and delivery of counterpart signature pages to the Relevant [New Co] Equity Agreements (or the issuance of the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement) that would render [New Co] unable to so execute and deliver such agreements (or issue the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement), or result in any such breach or default occurring as a result of such execution and delivery of such agreements (or such issuance of the [New Co] Equity to the New VEBA).

9.      [Reserved]

10.     [Reserved]

11.     [Reserved]

12.     **Deposits to the New VEBA**

A.      Transition Payments; SAP Payments.   Until the Implementation Date, within 30 days of any request by the Committee, [New Co] shall pay to the New VEBA such amounts ("Transition Payments") as the Committee shall request, provided that there shall be no more than five such requests prior to the Implementation Date and the aggregate of all such payments shall not exceed $19,950,000. Such amounts shall represent an advance to the New VEBA to cover reasonable and necessary preparatory expenses incurred by the New Plan or New VEBA in anticipation of the transition of responsibility for Retiree Medical Benefits as of the Implementation Date as set forth in Section 5 of this Settlement Agreement. These advance payments shall not increase or add to the amounts [New Co] has agreed to pay under this Settlement Agreement.

[New Co] shall also pay to the New VEBA the contract cost for providing Retiree Medical Benefits for those [New Co] Active Employees who retire under the SAP (excluding those [New Co] Active Employees who accepted buyouts). The contract cost shall be determined by the parties after execution of this Settlement Agreement as follows:

(i) The parties' respective actuaries shall meet and confer as soon as practicable to determine the average cost per contract for four retiree categories: (1) Pre-Medicare Eligible single, (2) Pre-Medicare family, (3) Medicare single, and (4) Medicare family.

(ii) Based upon the categories set forth in (i) above, the parties will develop an average annual cost calculation for each category.

(iii) As soon as reasonably practicable after conclusion of the SAP, the parties will jointly assign the SAP participants to the appropriate category according to their respective circumstances and calculate an average annual cost per SAP participant.

On or before January 5, 2010, [New Co] shall pay to the New VEBA such aggregate contract cost, discounted by the Interest rate set forth in this Settlement Agreement, for the twenty-four month period following the later of January 1, 2010 and the date of retirement under the SAP. The foregoing payment shall be reduced, dollar-for-dollar, by any Transition Payments made pursuant to this Section 12.A, plus Interest.

B.      Deposit of the UAW Related Account. Within 10 business days after the Implementation Date, [New Co] shall direct the trustee of the Existing Internal VEBA to transfer to the New VEBA the UAW Related Account's share of assets in the Existing Internal VEBA, the amount of which shall be determined as provided in Section 6 of this Settlement Agreement. The Approval Order shall provide that, upon such transfer, the Existing Internal VEBA shall be deemed to be amended to terminate participation and coverage regarding Retiree Medical Benefits for the Class and the Covered Group, effective as of the Implementation Date. Accruals for trust expenses (this shall only include expenses to the extent permitted by ERISA) through the date of transfer shall be made and an amount equal to the UAW Related Account's share of such accruals shall be retained within the Existing Internal VEBA to pay such expenses. After payment of these trust expenses is completed, a reconciliation of the accruals and the actual expenses (this shall only include expenses to the extent permitted by ERISA) shall be performed. [New Co] agrees to cause the payment to the New VEBA by the Existing Internal VEBA of any overaccruals for the UAW Related Account's share of such expenses. Similarly, in the event of an underaccrual the New VEBA shall return to the Existing Internal VEBA the amount of the underaccrual of expenses for the UAW Related Account.

C.      Deposit of the Existing External VEBA. The Approval Order shall direct the committee and the trustees of the Existing External VEBA to transfer all assets and liabilities into the New VEBA and terminate the Existing External VEBA within 15 days after the Implementation Date. This transfer of assets and liabilities shall include, but not be limited to, the transfer of all rights and obligations granted to or imposed on the Existing External VEBA under Section 14.C(e) of the Henry I Settlement.

D.      Issuance of [New Co] Note. On the Closing Date, [New Co] shall execute and deliver to the Indenture Trustee a counterpart signature page to the Indenture and issue the [New Co] Note to the New VEBA under the Indenture. Such execution and delivery of the Indenture (and the issuance of the [New Co] Note to the New VEBA under the Indenture) shall only occur as permitted by law. [New Co] and/or the New Plan, as applicable, shall apply for any necessary legal or regulatory approvals, including but not limited to the prohibited transaction exemptions described in Section 22 of this Settlement Agreement. The UAW, the Class, and the Covered Group shall support and cooperate with any such requests for legal or regulatory approvals. If [New Co] and the New VEBA cannot timely obtain necessary legal or

- 15 -

regulatory approvals, the parties shall meet and discuss appropriate alternatives to the issuance of the [New Co] Note to the New VEBA that provide equivalent economic value to the New VEBA. Notwithstanding the foregoing, the obligations of [New Co] to execute and deliver to the Indenture Trustee a counterpart signature page to the Indenture (and to issue the [New Co] Notes to the New VEBA under the Indenture) pursuant to this Settlement Agreement shall be subject to the execution and delivery by the Indenture Trustee of the Indenture.

        E.      Issuance of [New Co] Equity.  On the Closing Date, [New Co] shall execute and deliver to the New VEBA counterpart signature pages to the Relevant [New Co] Equity Agreements (except the Equity Subscription Agreement, which was previously executed by the parties thereto) and issue the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement.  Such execution and delivery of the Relevant [New Co] Equity Agreements (and the issuance of the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement) shall only occur as permitted by law.  [New Co] and/or the New Plan, as applicable, shall apply for any necessary legal or regulatory approvals, including but not limited to the prohibited transaction exemptions described in Section 22 of this Settlement Agreement and any required federal or state bank regulatory approvals.  The UAW, the Class, and the Covered Group shall support and cooperate with any such requests for legal or regulatory approvals.  If [New Co] and the New VEBA cannot timely obtain necessary legal or regulatory approvals, as specified in the Equity Subscription Agreement, the parties shall meet and discuss appropriate alternatives to the issuance of the [New Co] Equity to the New VEBA that provide equivalent economic value to the New VEBA.  Notwithstanding the foregoing, the obligations of [New Co] to execute and deliver to the New VEBA the Relevant [New Co] Equity Agreements (and to issue the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement) pursuant to this Settlement Agreement shall be subject to the execution and delivery by the New VEBA of the Relevant [New Co] Equity Agreements to the relevant counterparties of each such agreement.  On the Closing Date, the New VEBA shall execute and deliver to [New Co] counterpart signature pages to the Relevant [New Co] Equity Agreements (except the Equity Subscription Agreement, which was previously executed by the parties thereto).

      If a deposit or payment or any portion thereof is made by [New Co] to the New VEBA by mistake under any provision of this Settlement Agreement, the Committee shall, upon written direction of [New Co], return such amounts as may be permitted by law to [New Co] (plus earnings thereon from the date of payment to but excluding the date of return) within 30 days of notification by [New Co] that such payment was made by mistake.  If a dispute arises with regard to such payment, the dispute will be resolved pursuant to Section 26 of this Settlement Agreement.

**13.**    **Adjustment Events**

        A.      Adjustment Event.  "Adjustment Event" shall mean the determination of the value of any assets in lieu of which [New Co] elects to transfer cash to the New VEBA pursuant to Sections 8.B and 12.B of this Settlement Agreement.

        B.      Due Diligence and Adjustment Mechanism.

      In connection with any Adjustment Event, [New Co] shall deliver, as soon as practicable, to the Committee (or the UAW prior to establishment of the Committee) information in

reasonable detail about the determinations made with regard to such Adjustment Event and the work papers, underlying calculations and other documents and materials on which such determinations are based, including non-privileged materials from [New Co]'s advisors, if any (collectively, the "Determination Materials").

The Committee shall have 30 days from receipt of the Determination Materials from [New Co] to submit to [New Co] a written request for an Independent Attestation of a determination(s) listed in Section 13.A of this Settlement Agreement. As a part of this review process, the Committee may ask for additional information regarding the calculations, and the data and information provided by [New Co]. [New Co] shall as promptly as practicable, respond to all reasonable requests from the Committee for such additional information. However, a request for additional information shall not extend the 30 day review period, unless an extension is reasonably necessary to allow the Committee to review such additional information, but in no event longer than 45 days from receipt of the Determination Materials.

All determinations made with regard to a determination(s) listed in Section 13.A of this Settlement Agreement shall be final and binding on [New Co], the UAW, the Class, the Covered Group, the Committee and the New Plan and New VEBA, unless the Committee timely submits a request for an Independent Attestation. If the Committee timely submits such a request, [New Co] shall engage a nationally recognized independent registered public accounting firm to conduct an Independent Attestation regarding a determination(s) listed in Section 13.A of this Settlement Agreement. The Independent Attestation shall be final and binding on [New Co], the UAW, the Class, the Covered Group, the Committee and the New Plan and New VEBA.

Nothing in the foregoing paragraphs shall prevent the division, deposit, withdrawal or transfer of any assets the valuation of which is not in dispute pending resolution of the disputed amounts.

C.    Confidentiality. All information and data provided by [New Co] to the UAW, Class Counsel, and/or the Committee as a part of this due diligence and adjustment process shall be considered confidential. The UAW, Class Counsel, and the Committee shall use such information and data solely for the purpose set forth in this Section 13 of the Settlement Agreement. The UAW, Class Counsel, and the Committee shall not disclose such information or data to any other person without [New Co]'s written consent, provided that the UAW, Class Counsel, and the Committee may disclose such information and data to their attorneys and professional advisors, subject to the agreement of such attorneys and advisors to the confidentiality restrictions set forth herein.

## 14.    Future Contributions

The UAW, the Class and the Covered Group may not negotiate any increase of [New Co]'s funding or payment obligations set out herein. The UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, also agrees not to seek to obligate [New Co] to: (i) provide any additional payments to the New VEBA other than those specifically required by this Settlement Agreement; (ii) make any other payments for the purpose of providing Retiree Medical Benefits to the Class or the Covered Group; or (iii) provide or assume the cost of Retiree Medical Benefits for the Class or the Covered Group through any other means. Provided that, the UAW may propose that [New Co] Active Employees be

permitted to make contributions to the New VEBA of amounts otherwise payable in profit sharing, COLA, wages and/or signing bonuses, if not prohibited by law.

### 15.    Pension Benefits

[New Co] and the UAW agree that this Settlement Agreement shall in no way obligate [New Co] to effect the amendment to the Pension Plan contemplated by Section 15 of the Henry II Settlement, but not implemented, to provide to retirees and eligible surviving spouses who are members of the Class or the Covered Group a flat monthly special lifetime benefit of $66.70, as provided for in the Henry II Settlement.

[New Co] and the UAW further agree that this Settlement Agreement shall in no way obligate the New Plan and New VEBA to assess an additional non-escalating monthly contribution payable by retirees and eligible surviving spouses of the Class and the Covered Group for Retiree Medical Benefits of $51.67 per month, as provided for in the Henry II Settlement.

The Approval Order shall provide that there will be no requirement to amend the Pension Plan as provided for in Section 15 of the Henry II Settlement.

### 16.    Administrative Costs

The New VEBA will be responsible for all costs to administer the New Plan and the New VEBA commencing on the Implementation Date and continuing thereafter. The New Plan and the New VEBA trust agreement shall be drafted consistent with this requirement.

### 17.    Trust Agreement; Segregated Account; Indemnification

Assets paid or transferred to the New VEBA by or at the direction of [New Co], including all investment returns thereon, shall be used solely to provide Retiree Medical Benefits to the Class and the Covered Group as defined in this Settlement Agreement until expiration of the Initial Accounting Period. Thereafter, Benefits will be provided to the Class and the Covered Group as described in the Trust Agreement. The Trust Agreement shall provide: (i) for the [New Co] Separate Retiree Account to be credited with the assets deposited or transferred to the New VEBA by [New Co], or at [New Co]'s direction, under this Settlement Agreement; (ii) that the assets in the [New Co] Separate Retiree Account may be used only to provide Benefits (as defined in the Trust Agreement) for such Class and such Covered Group; and (iii) that under no circumstances will [New Co] or the [New Co] Separate Retiree Account be liable or responsible for the obligations of any other employer or for the provision of Retiree Medical Benefits or any other benefits for the employees or retirees of any other employer.

Further, the Trust Agreement shall provide that the Committee, on behalf of the New VEBA, shall take all such reasonable action as may be needed to rebut any presumption of control that would limit the New VEBA's ability to own the [New Co] Note and the [New Co] Equity or as may be required to comply with all applicable laws and regulations, including but not limited to federal and state banking laws and regulations.

To the extent permitted by law, the New VEBA shall indemnify and hold the Committee, the UAW, [New Co], the [New Co] Plan, and the employees, officers and agents of each of them harmless from and against any liability that they may incur in connection with the New Plan and New VEBA, unless such liability arises from their gross negligence or intentional misconduct, or

- 18 -

breach of this Settlement Agreement. The Committee shall not be required to give any bond or any other security for the faithful performance of its duties under the Trust Agreement, except as such may be required by law.

### 18.    Subsidies

With regard to claims incurred after the Implementation Date, the New VEBA shall be entitled to receive any Medicare Part D subsidies and other health care related subsidies regarding benefits actually paid by the New VEBA which may result from future legislative changes, and [New Co] shall not be entitled to receive any such subsidies related to prescription drug benefits and other health care related benefits provided to the Class and the Covered Group by the New Plan and New VEBA.

### 19.    [Reserved]

### 20.    Cooperation

A.    Cooperation by [New Co]. [New Co] will cooperate with the UAW and the Committee and at the Committee's request undertake such reasonable actions as will assist the Committee in the transition of responsibility for administration of the Retiree Medical Benefits by the Committee for the New Plan and the New VEBA. Such cooperation will include assisting the Committee in educational efforts and communications with respect to the Class and the Covered Group so that they understand the terms of the New Plan, the New VEBA and the transition, and understand the claims submission process and any other initial administrative changes undertaken by the Committee. Before and after the Implementation Date, at the Committee's request and as permitted by law, [New Co] will furnish to the Committee such information and shall provide such cooperation as may be reasonably necessary to permit the Committee to effectively administer the New Plan and the New VEBA, including, without limitation, the retrieval of data in a form and to the extent maintained by [New Co] regarding age, amounts of pension benefits, service, pension and medical benefit eligibility, marital status, mortality, claims history, births, deaths, dependent status and enrollment information of the Class and the Covered Group. At the request of the Committee, [New Co] will continue to perform the necessary eligibility work for a reasonable period of time, not to exceed 90 days after the Implementation Date in order to allow the Committee to establish and test the eligibility database, and for which [New Co] will be entitled to reimbursement for reasonable costs. [New Co] shall also assist the Committee in transitioning benefit provider contracts to the New VEBA. [New Co] shall also cooperate with the UAW and the Committee and undertake such reasonable actions as will enable the Committee to perform its administrative functions with respect to the New Plan and the New VEBA, including insuring an orderly transition from [New Co] administration of Retiree Medical Benefits to the New Plan and the New VEBA.

To the extent permitted by law, [New Co] will also allow retiree participants to voluntarily have required contributions withheld from pension benefits and to the extent reasonably practical, credited to the [New Co] Separate Retiree Account of the New VEBA on a monthly basis. A retiree participant may elect or withdraw consent for pension withholdings at any time by providing 45 days written notice to the Pension Plan administrator or such shorter period that may be required by law.

- 19 -

To the extent permitted by law and if applicable, [New Co] will also cooperate with the Committee to make provision for the New VEBA payments of the $76.20 Special Benefit to be incorporated into monthly [New Co] pension checks for eligible retirees and surviving spouses. It will be the responsibility of the Committee and the New VEBA to advise [New Co]'s pension administrator in a timely manner of eligibility changes with regard to the Special Benefit payment. The timing of the information provided to [New Co]'s pension administrator will determine the timing for the incorporation into the monthly pension check. It will be the responsibility of the Committee and the New VEBA to establish a bank account for the funding of the Special Benefit payments, and [New Co]'s pension administrator will be provided with the approval to draw on that account for the payment of the benefit. The Committee and the New VEBA will assure that the bank account is adequately funded for any and all such payments. If adequate funds do not exist for the payments, then [New Co]'s pension administrator will not make such payments until the required funding is established in the account. It will be the responsibility of the Committee and the New VEBA to audit the eligibility for, and payment of, the Special Benefit. Additionally, the Committee and the New VEBA will be responsible for the payment of reasonable costs associated with [New Co]'s administration of the payment of this Special Benefit and the pension withholdings, including development of administrative and recordkeeping processes, monthly payment processing, audit and reconciliation functions and the like.

[New Co] will be financially responsible for reasonable costs associated with the transition of coverage for the Class and the Covered Group to the New Plan and New VEBA. This shall include the cost of educational efforts and communications with respect to retirees, the New Plan's initial creation of administrative procedures, initial development of record sharing procedures, the testing of computer systems, the Committee's initial vendor selection and contracting, and other activities incurred on or before the Implementation Date, including but not limited to costs associated with drafting the trust agreement for the New VEBA, seeking from the Internal Revenue Service a determination of the tax-exempt status of the New VEBA, plan design and actuarial and other professional work necessary for initiation of the New Plan and New VEBA and the benefits to be provided thereunder. Payments made by [New Co] described in this Section shall not reduce its payment obligations under this Settlement Agreement, and if the New VEBA is a multi-employer welfare trust, the costs described in this Section, to the extent not allocable to a specific employer, shall be pro-rated among the participating companies based on the ratio of required funding for each company. Payment of these costs shall be provided for in the Approval Order.

B.     Cooperation With [New Co].   The UAW and the Committee will cooperate and shall timely furnish [New Co] with such information related to the New Plan and New VEBA, in a form and to the extent maintained by the UAW and the Committee, as may be reasonably necessary to permit [New Co] to comply with requirements of the U.S. Securities and Exchange Commission, including, but not limited to, Generally Accepted Accounting Principles, including but not limited to SFAS 87, SFAS 106, SFAS 132R, SFAS 157, and SFAS 158 (as amended), for disclosure in [New Co]'s financial statements and any filings with the U.S. Securities and Exchange Commission.

- 20 -

### 21.    Accounting Treatment

[New Co] has maintained that a necessary element in its decision to enter into this Settlement Agreement is securing accounting treatment that is reasonably satisfactory to [New Co] regarding the transactions contemplated by this Settlement Agreement. As soon as practicable, [New Co] will discuss the accounting for the New Plan and the New VEBA with [New Co]'s independent auditors, and if either [New Co] or its independent auditors determine it necessary, may also discuss the accounting with the staff of the U.S. Securities and Exchange Commission. If, as a result of those discussions, [New Co] believes that the accounting for the transaction may not be a "settlement" as contemplated by paragraphs 90-95 of FASB Statement No. 106, as amended, the parties, at the request of [New Co] shall meet in an effort to restructure the transaction to achieve such accounting, which provides equivalent economic value to the New VEBA.

### 22.    Cooperation on Regulatory and Related Approvals

[New Co], on behalf of itself, the New VEBA and all other parties in interest, shall timely apply for, and the UAW and the New VEBA shall fully cooperate in securing, any legal or regulatory approvals necessary to enable the parties to fulfill the obligations of this Settlement Agreement, including, without limitation, any prohibited transaction exemptions necessary for transactions between any party in interest and the New VEBA. If [New Co] and the New VEBA do not timely obtain any necessary exemptions and the DOL does not otherwise assure the New VEBA and [New Co], to the reasonable satisfaction of each, that the necessary exemptions will be granted, the parties will meet and discuss an appropriate alternative which provides equivalent economic value to the New VEBA.

### 23.    Indemnification

Subject to approval by the Bankruptcy Court as part of the Judgment, [New Co] hereby agrees to indemnify and hold harmless the UAW and Class Counsel, and its officers, directors, employees and expert advisors (each, an "Indemnified Party"), to the extent permitted by law, from and against any and all losses, claims, damages, obligations, assessments, penalties, judgments, awards, and other liabilities related to any decision, recommendations or other actions taken prior to the date of this Settlement Agreement, including, without limitation, acting as the authorized representative of the Class and the Covered Group (collectively, "Indemnification Liabilities"), and shall fully reimburse any Indemnified Party for any and all reasonable and documented attorney fees and expenses (collectively, "Indemnity Expenses"), as and when incurred, of investigating, preparing or defending any claim, action, suit, proceeding or investigation, arising out of or in connection with any Indemnification Liabilities incurred as a result of an Indemnified Party's entering into, or participation in the negotiations for this Settlement Agreement and the transactions contemplated in connection herewith; provided, however, that such indemnity shall not apply to any portion of any such Liability or Expense that resulted from the gross negligence or willful misconduct by an Indemnified Party; provided, further, that such indemnity shall not apply to any Indemnification Liabilities to a [New Co] Active Employee for breach of the duty of fair representation.

Nothing in this Section 23 or any provision of this Settlement Agreement shall be construed to provide an indemnity for any member or any actions of the Committee; provided however, that an Indemnified Party who becomes a member of the Committee shall remain

entitled to any indemnity to which the Indemnified Party would otherwise be entitled pursuant to this Section 23 for actions taken, or for a failure to take actions, in any capacity other than as a member of the Committee; and provided further, that nothing in this Section 23 or any other provision of this Settlement Agreement shall be construed to provide an indemnity for any Indemnification Liabilities or Indemnity Expenses relating to (i) management of the assets of the New VEBA or (ii) for any action, amendment or omission of the Committee with respect to the provision and administration of Retiree Medical Benefits.

If an Indemnified Party receives notice of any action, proceeding or claim as to which the Indemnified Party proposes to demand indemnification hereunder, it shall provide [New Co] prompt written notice thereof. Failure by an Indemnified Party to so notify [New Co] shall relieve [New Co] from the obligation to indemnify the Indemnified Party hereunder only to the extent that [New Co] suffers actual prejudice as a result of such failure, but [New Co] shall not be obligated to provide reimbursement for any Indemnity Expenses incurred for work performed prior to its receipt of written notice of the claim. If an Indemnified Party is entitled to indemnification hereunder, [New Co] will have the right to participate in such proceeding or elect to assume the defense of such action or proceeding at its own expense and through counsel chosen by [New Co] (such counsel being reasonably satisfactory to the Indemnified Party). The Indemnified Party will cooperate in good faith in such defense. Upon the assumption by [New Co] of the defense of any such action or proceeding, the Indemnified Party shall have the right to participate in, but not control the defense of, such action and retain its own counsel but the expenses and fees shall be at its expense unless (a) [New Co] has agreed to pay such Indemnity Expenses, (b) [New Co] shall have failed to employ counsel reasonably satisfactory to an Indemnified Party in a timely manner, or (c) the Indemnified Party shall have been advised by counsel that there are actual or potential conflicting interests between [New Co] and the Indemnified Party that require separate representation, and [New Co] has agreed that such actual or potential conflict exists (such agreement not to be unreasonably withheld); provided, however, that [New Co] shall not, in connection with any such action or proceeding arising out of the same general allegations, be liable for the reasonable fees and expenses of more than one separate law firm at any time for all Indemnified Parties not having actual or potential conflicts among them, except to the extent that local counsel, in addition to its regular counsel, is required in order to effectively defend against such action or proceeding. All such fees and expenses shall be invoiced to [New Co], with such detail and supporting information as [New Co] may reasonably require, in such intervals as [New Co] shall require under its standard billing processes.

If the Indemnified Party receives notice from [New Co] that [New Co] has elected to assume the defense of the action or proceeding, [New Co] will not be liable for any attorney fees or other legal expenses subsequently incurred by the Indemnified Party in connection with the matter.

[New Co] shall not be liable for any settlement of any claim against an Indemnified Party made without [New Co]'s written consent, which consent shall not be unreasonably withheld or delayed. [New Co] shall not, without the prior written consent of an Indemnified Party, which consent shall not be unreasonably withheld or delayed, settle or compromise any claim, or permit a default or consent to the entry of any judgment, that would create any financial obligation on the part of the Indemnified Party not otherwise within the scope of the indemnified liabilities.

The termination of this Settlement Agreement shall not affect the indemnity provided hereunder, which shall remain operative and in full force and effect. Notwithstanding anything in

- 22 -

this Section 23 to the contrary, this Section 23 of the Settlement Agreement shall not be applicable with respect to any of the matters covered by Section 2.9 of the Equity Registration Rights Agreement.

### 24. Costs and Attorneys Fees

A.    Fees and Expenses. [New Co] agrees to reimburse the UAW and Class Counsel at or prior to the consummation of the transactions contemplated in Section 8 for reasonable attorney and professional fees and expenses based on hours worked and determined in accordance with the current market rates (not to include any upward adjustments such as any lodestar multipliers, risk enhancements, success fee, completion bonus or rate premiums) incurred in connection with the negotiation of the Equity Subscription Agreement, the Relevant [New Co] Equity Agreements, the Note, the Indenture, the Warrant and all related transaction agreements and the consummation of the closings thereunder, and all court proceedings, including without limitation, any litigation and discovery, related to obtaining the Approval Order and any other orders required to obtain final approval of the Sale Transaction and any related appeals and motion practice. The parties may request that the Bankruptcy Court include in its Approval Order reference to [New Co's] reimbursement of fees and expenses pursuant to this Section 24.A.

B.    Fees After the Closing Date. Each party to this Settlement Agreement agrees not to seek any other future fees or expenses from any other party in connection with either Henry II or Henry I or the bankruptcy proceeding, except that any party to this Settlement Agreement may seek such fees and costs as may be allowed by law.

### 25. Releases and Certain Related Matters

A.    In consideration of [New Co]'s entry into this Settlement Agreement, and the other obligations of [New Co] contained herein, the UAW, acting on its own behalf and as authorized representative of the Class and the Covered Group, hereby consents to the entry of the Judgment, which shall be binding upon all Class Members and the Covered Group.

B.    As of the Closing Date, each UAW Releasee releases and forever discharges each other UAW Releasee and each other Indemnified Party and shall be forever released and discharged with respect to any and all rights, claims or causes of action that such UAW Releasee had, has or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of or based upon or otherwise related to (a) any of the claims arising, or which could have been raised, in connection with either Henry I, Henry II, or the GM bankruptcy proceedings, concerning the provision of Retiree Medical Benefits and the terms of this Settlement Agreement, (b) any claims that this Settlement Agreement, any document referred to or contemplated herein is not in compliance with applicable laws and regulations, and (c) any action taken to carry out this Settlement Agreement in accordance with this Settlement Agreement and applicable law.

C.    As of the Closing Date, the UAW Releasees release and forever discharge [New Co], and its officers, directors, employees, agents, and subsidiaries, and the [New Co] Plan and its fiduciaries, with respect to any and all rights, claims or causes of action that any UAW Releasee had, has or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to (a) any of the claims

arising, or which could have been raised, in connection with Henry I, Henry II, or the GM bankruptcy proceedings, concerning the provision of Retiree Medical Benefits and the terms of this Settlement Agreement, (b) any claims that this Settlement Agreement, any document referred to or contemplated herein is not in compliance with applicable laws and regulations, and (c) any action taken to carry out this Settlement Agreement in accordance with this Settlement Agreement and applicable law.

D.      As of the Closing Date, the UAW Releasees release and forever discharge the Existing External VEBA and the fiduciaries, trustees, and committee that administer the Existing External VEBA, and the Existing Internal VEBA and the fiduciaries, trustees, and committee that administer the Existing Internal VEBA with respect to any and all rights, claims or causes of action that any UAW Releasee had, has or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to (a) any of the claims arising, or which could have been raised, in connection with Henry I, Henry II, or the GM bankruptcy proceedings, concerning the provision of Retiree Medical Benefits and the terms of this Settlement Agreement, (b) any claims that this Settlement Agreement, any document referred to or contemplated herein is not in compliance with applicable laws and regulations, and (c) any action taken by such fiduciaries, trustee and/or committees to carry out this Settlement Agreement and to transfer assets of the Existing External VEBA and Existing Internal VEBA to the New VEBA in accordance with this Settlement Agreement and applicable law.

E.      As of the Closing Date, [New Co] releases and forever discharges the Class Representatives and Class Counsel from any and all claims, demands, liabilities, causes of action or other obligations of whatever nature, including attorney fees, whether known or unknown, that arise from their participation or involvement with respect to the assertion of the claims and negotiations leading to this Settlement Agreement. This release does not extend to obligations arising from the terms of the Settlement Agreement itself.

F.      Neither the entry into this Settlement Agreement nor the consent to the Judgment is, may be construed as, or may be used as, an Admission by or against [New Co] or any UAW Releasee of any fault, wrongdoing or liability whatsoever.

## 26.    Dispute Resolution

A.      <u>Coverage</u>. Any controversy or dispute arising out of or relating to, or involving the enforcement, implementation, application or interpretation of this Settlement Agreement shall be enforceable only by [New Co], the Committee and the UAW, and the Approval Order will provide that the Bankruptcy Court will retain jurisdiction to resolve any disputes, and, in the event that the bankruptcy proceeding has been closed or dismissed, the parties agree that any necessary litigation to resolve such disputes shall be brought before the Court. Notwithstanding the foregoing, any disputes relating solely to eligibility for participation or entitlement to benefits under the New Plan shall be resolved in accordance with the applicable procedures such Plan shall establish, and nothing in this Settlement Agreement precludes Class Members from pursuing appropriate judicial review regarding such disputes; provided however, that no claims related to Retiree Medical Benefits for claims incurred after the Implementation Date may be brought against [New Co], any of its affiliates, or the [New Co] Plan.

B.    Attempt at Resolution.  Although the Bankruptcy Court retains exclusive jurisdiction to resolve disputes arising out of or relating to the enforcement, implementation, application or interpretation of this Settlement Agreement, the parties agree that prior to seeking recourse to the Bankruptcy Court, the parties shall attempt to resolve the dispute through the following process:

(i)    The aggrieved party shall provide the party alleged to have violated this Settlement Agreement ("Dispute Party") with written notice of such dispute, which shall include a description of the alleged violation and identification of the Section(s) of the Settlement Agreement allegedly violated.  Such notice shall be provided so that it is received by the Dispute Party no later than 180 calendar days from the date of the alleged violation or the date on which the aggrieved party knew or should have known of the facts that give rise to the alleged violation, whichever is later, but in no event longer than 3 years from the date of the alleged violation.

(ii)    If the Dispute Party fails to respond within 21 calendar days from its receipt of the notice, the aggrieved party may seek recourse to the Bankruptcy Court; provided however, that the aggrieved party waives all claims related to a particular dispute against the Dispute Party if the aggrieved party fails to bring the dispute before the Bankruptcy Court within 180 calendar days from the date of sending the notice.

All the time periods in Section 26 of this Settlement Agreement may be extended by agreement of the parties to the particular dispute.

C.    Alternate Means of Resolution.  Nothing in this Section shall preclude [New Co], the UAW, or the Committee from agreeing on any other form of alternative dispute resolution or from agreeing to any extensions of the time periods specified in this Section.

D.    Arbitration for Certain Disputes.  Notwithstanding anything in Section 26.A or 26.B of this Settlement Agreement to the contrary, any dispute or controversy arising under the last paragraph of Section 5.D or the last paragraph of Section 12 of this Settlement Agreement shall be resolved in the following manner:

(i)    While the parties agree that each of the disputes referenced in Section 26.D of this Settlement Agreement may be submitted to arbitration, they first shall endeavor to resolve the dispute through the following procedures:

(1)    the aggrieved party shall provide the other party with written notice of such dispute;

(2)    the written notice in Section 26.D(i)(1) of this Settlement Agreement shall include a description of the alleged violation and identify the Section(s) of the Settlement Agreement allegedly violated;

(3)    the party receiving the notice shall respond in writing within 21 calendar days of receipt of notice; and

(4)    within 21 calendar days of that response the parties shall meet in an effort to resolve the dispute.

- 25 -

All the time periods in this Section 26.D of this Settlement Agreement may be extended by agreement of the parties to the particular dispute.

(ii)     Should the parties be unable to resolve the dispute within 30 calendar days from the date of the meeting set forth in Section 26.D(i)(4) of this Settlement Agreement, either party may send written demand to the other party that the issue be resolved by arbitration. The failure to demand arbitration within 60 calendar days from the date of the meeting set forth in Section 26.D(i)(4) of this Settlement Agreement shall waive any right to such arbitration over the issue, absent mutual written agreement to the contrary by the parties. If a party fails to make a timely demand for arbitration pursuant to this Section 26.D(ii), such party may not pursue the dispute in court, and the dispute will be resolved on the basis of the position taken by the opposing or answering party.

(iii)     In the event that [New Co], the UAW, or the Committee proceed to arbitration in accordance with this Section 26.D, that dispute shall be submitted to an arbitrator (the "Arbitrator") who will not have the authority to modify or to amend this Settlement Agreement, but only to apply this Settlement Agreement, as written, to particular factual situations based on a preponderance of the evidence. The Arbitrator shall not have the authority to award punitive or exemplary damages. Interest shall be paid on any delayed payments as a result of the arbitration process. The interest will be calculated daily at a rate equal to the OPEB Discount Rate for each day that amounts remain outstanding. Such arbitration shall take place in Detroit, Michigan unless otherwise agreed upon in writing by the parties. Any award shall be in writing and issued within 30 days from the close of the hearing, unless the parties otherwise agree. The award shall be final, conclusive and binding on [New Co], the UAW, and the Committee. The award may be reduced to judgment in any appropriate court having jurisdiction in accordance with the provisions of applicable law.

(iv)     In the event that a dispute arising under this Section is taken to arbitration, the Arbitrator shall be the arbitrator/umpire used by [New Co] and the UAW for disputes arising under the then applicable [New Co]-UAW National Agreement; provided that, if within 15 days of receipt of the written arbitration demand referred to in Section 26.D(ii), the parties agree in writing that the dispute requires an arbitrator with actuarial expertise, then the Arbitrator shall be a person with actuarial expertise upon whom the parties mutually agree in writing, but failing such mutual agreement with 30 days of receipt of the written arbitration demand referred to in Section 26.D(ii), the arbitrator/umpire used by [New Co] and the UAW for disputes arising under the then applicable [New Co]-UAW National Agreement shall select a person with actuarial expertise to serve as the Arbitrator.

(v)     [New Co], the UAW, and the Committee shall cooperate in setting a hearing date for the arbitration as soon as possible following selection of the Arbitrator.

**27.    Submission of the Settlement Agreement**

The parties shall submit this Settlement Agreement to the Bankruptcy Court and jointly work diligently to have this Settlement Agreement approved by the Bankruptcy Court as soon as possible. The parties shall give notice to all affected individuals, in a manner approved by the

Bankruptcy Court. The parties shall seek from the Bankruptcy Court any order necessary to comply with the Federal Rules of Bankruptcy Procedure or any other applicable rule of procedure or statutory requirement that must be met to give this Settlement Agreement full force and effect.

## 28. Conditions

This Settlement Agreement is conditioned upon the occurrence or resolution of the conditions described in subparagraphs A and B of this Section. The failure of the conditions described in subparagraphs A and/or B shall render this Settlement Agreement void.

A. _Judgment/Approval Order_. The Bankruptcy Court shall have entered a Judgment approving and accepting this Settlement Agreement in all respects and as to all parties, including [New Co], the UAW, the Class and the Covered Group and the Closing shall have occurred in reliance on such Judgment. Such Approval Order shall be reasonably acceptable in form and substance to [New Co] and the UAW. This condition shall be deemed to have failed upon issuance of an order disapproving this Settlement Agreement, or upon the issuance of an order approving only a portion of this Settlement Agreement but disapproving other portions, unless [New Co] and the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, agree otherwise in writing.

B. _Existing Internal VEBA Sponsorship_. [New Co], or one of its Subsidiaries, shall assume from GM sponsorship of the Existing Internal VEBA. In connection therewith, [New Co] shall (i) have all of the rights, title and interest as plan sponsor, plan administrator or employer under the Existing Internal VEBA, (ii) have any responsibility, obligation or liability of plan sponsor or plan administrator relating to, the Existing Internal VEBA and each contract, agreement or arrangement established thereunder or relating thereto, and (iii) operate the Existing Internal VEBA in accordance with, and to otherwise comply with the [New Co]'s obligations under, this Settlement Agreement, effective as of the Closing Date and subject to approval by the Bankruptcy Court, including, without limitation, the obligation to direct the trustee of the Existing Internal VEBA to transfer the UAW Related Account in the Existing Internal VEBA to the New VEBA.

## 29. No Admission; No Prejudice

A. Notwithstanding anything to the contrary, whether set forth in this Settlement Agreement, the MOU, the Judgment, or any notice, any documents filed with the Court in either Henry I, Henry II, or the GM bankruptcy proceedings, any documents, whether provided in the course of or in any manner whatsoever relating to the discussions between [New Co] and UAW with respect to health care benefits or relating to this Settlement Agreement, whether distributed, otherwise made available to or obtained by any person or organization, including without limit, [New Co] Active Employees, Class Members, or their spouses, surviving spouses or dependents, or to the UAW or [New Co] in the course of the negotiations that led to entry into this Settlement Agreement, or otherwise:

(i) [New Co] has denied, and continues to deny, that it is responsible for providing medical benefits to retirees. Neither this Settlement Agreement nor any document referred to or contemplated herein may be construed as, or may be viewed or used as, an Admission by or

- 27 -

against the [New Co] of any fault, wrongdoing or liability whatsoever, or as an Admission by [New Co] of any claim or argument made by or on behalf of the UAW, [New Co] Active Employees, the Class or the Covered Group, that it is the successor in interest of GM. Without limiting in any manner whatsoever the generality of the foregoing, the performance of any settlement actions by [New Co] may not be construed, viewed or used as an Admission by or against [New Co].

(ii) The UAW, acting on its own behalf and as the authorized representative of the Class Members, has claimed, and continues to claim, that the allegations, claims and contentions made against [New Co] have merit. Neither this Settlement Agreement nor any document referred to or contemplated herein nor any settlement actions may be construed as, or may be viewed or used as, an Admission by or against any of the UAW, the Class Representatives or the Class Members of any fault, wrongdoing or liability whatsoever or of the validity of any claim or argument made by or on behalf of [New Co] that [New Co] has a unilateral right to modify or terminate retiree health care benefits, has no obligation to assume the MOU, or that [New Co] is not a successor of interest to GM. Without limiting in any manner whatsoever the generality of the foregoing, the performance of any settlement actions by any of the UAW, the Class Representatives or the Class Members, including without limitation, the acceptance of any retiree health care benefits under any of the [New Co] health care plans set forth in this Settlement Agreement, may not be construed, viewed or used as an Admission by or against any of the UAW, the Class Representatives or the Class that [New Co] has a unilateral right to modify or terminate retiree health care benefits, has no obligation to assume the MOU, or that [New Co] is not a successor to GM.

(iii) Entering into this Settlement Agreement and performance of any of the settlement actions shall not be construed as, or deemed to be evidence of, an Admission by any of the parties hereto, and shall not be offered or received in evidence in any action or proceeding against any party hereto in any court, administrative agency or other tribunal or forum for any purpose whatsoever other than to enforce the provisions of this Settlement Agreement or to obtain or seek approval of this Settlement Agreement.

For the purposes of this Section 29, [New Co] refers to [New Co] and the UAW refers to the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, as organizations, as well as any and all of their respective directors, officers, employees, and agents.

This Settlement Agreement and anything occurring in connection with reaching this Settlement Agreement are without prejudice to [New Co], the UAW and the Class. The parties may use this Settlement Agreement to assist in securing the Judgment approving the settlement. It is intended that [New Co], the UAW, the Committee, the Class Representatives, the Class, the Covered Group and Class Counsel shall not use this Settlement Agreement, or anything occurring in connection with reaching this Agreement, as evidence against [New Co], the UAW, the Class or the Covered Group in any circumstance except where the parties are operating under or enforcing this Settlement Agreement or the Judgment approving this Settlement Agreement.

## 30.    Duration and Termination of Settlement Agreement

This Settlement Agreement will remain in effect unless and until terminated in accordance with this Section and as provided for in Section 28 of this Settlement Agreement. Termination of this Settlement Agreement may occur as follows:

(i) If the Judgment is denied in whole or in material part, either [New Co] or the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, may terminate this Settlement Agreement by 30 days' written notice to the other party and the rights and obligations of all parties shall revert to the status quo ante as if this Settlement Agreement had never been entered.

(ii) If an Approval Order satisfactory to the parties, as described in Section 28.A of this Settlement Agreement or any other order authorizing the Sale Transaction, is entered by the Bankruptcy Court, but overturned on appeal or otherwise such that there is or may be a material negative impact on the rights, obligations or benefits provided hereunder to the UAW, the Class, the Covered Group or [New Co], either [New Co] or the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, may terminate this Settlement Agreement upon 30 days' written notice to the other parties and the rights and obligations of all parties shall revert to the status quo ante as if this Settlement Agreement had never been entered.

(iii) If any court, agency or other tribunal of competent jurisdiction issues a determination that any part of this Settlement Agreement is prohibited or unenforceable in any material respect, either [New Co] or the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, may terminate this Settlement Agreement by 30 days' written notice to the other party and the rights and obligations of all parties shall revert to the status quo ante as if this Settlement Agreement had never been entered.

Notwithstanding the foregoing, Sections 22, 23, 26 and 29 shall survive the termination of this Settlement Agreement.

## 31.    National Institute for Health Care Reform

In recognition of the interest of [New Co], the UAW, the Class and the Covered Group in improving the quality, affordability, and accountability of health care in the United States, the parties agree that as a part of this settlement [New Co] and the UAW shall establish a National Institute for Health Care Reform ("Institute"). The Institute shall be established and receive its first annual funding payment as soon as practicable after the Initial Effective Date on the basis set forth in the term sheet attached hereto as Exhibit G to this Settlement Agreement. The annual funding payment will be payable in four equal quarterly installments. The funding and operation of the Institute shall be separate, independent and distinct from the New Plan and the New VEBA. Any payments by [New Co] to the Institute shall be governed exclusively by the term sheet and are not in any way related to [New Co]'s payment obligations as described in Sections 8 and 12 of this Settlement Agreement.