32.    **Other Provisions**

A.    References in this Settlement Agreement to "Sections," "Paragraphs" and "Exhibits" refer to the Sections, Paragraphs, and Exhibits of this Settlement Agreement unless otherwise specified.

B.    The Bankruptcy Court (or in the event the bankruptcy proceeding has been closed or dismissed, the Court) will, subject to Section 26 of this Settlement Agreement, resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation of this Settlement Agreement.    Each of the parties hereto expressly and irrevocably submits to the jurisdiction of the Bankruptcy Court or the Court, as applicable, and expressly waives any argument it may have with respect to venue or forum non conveniens.

C.    This Settlement Agreement constitutes the entire agreement between the parties regarding the matters set forth herein, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement, other than representations, warranties and covenants contained and memorialized in this Settlement Agreement.    This Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth in this Settlement Agreement.

D.    The captions used in this Settlement Agreement are for convenience of reference only and do not constitute a part of this Settlement Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Settlement Agreement, and all provisions of this Settlement Agreement will be enforced and construed as if no captions had been used in this Settlement Agreement.

E.    This Settlement Agreement may be executed in two or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument, provided that counsel for the parties to this Settlement Agreement shall exchange among themselves original signed counterparts.

F.    No party to this Settlement Agreement may assign any of its rights hereunder without the prior written consent of the other parties, and any purported assignment in violation of this sentence shall be void. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.    For purposes of clarification and without limitation as to other beneficiaries, GM is intended to be a third party beneficiary of this Settlement Agreement.

G.    Each of [New Co], the UAW, the Committee, the Class and the Covered Group shall do any and all acts and things, and shall execute and deliver any and all documents, as may be necessary or appropriate to effect the purposes of this Settlement Agreement.

H.    This Settlement Agreement shall be construed in accordance with applicable federal laws of the United States of America.

I.    Any provision of this Settlement Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any

such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent any provision of this Settlement Agreement is invalid or unenforceable as provided for in Section 32.J of this Settlement Agreement, it shall be replaced by a valid and enforceable provision agreed to by [New Co] and the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group (which agreement shall not be unreasonably withheld) that preserves the same economic effect for the parties under this Settlement Agreement; provided however, that to the extent that such prohibited or unenforceable provision cannot be replaced as contemplated and the consequences of such prohibited or unenforceable provision causes this Settlement Agreement to fail of its essential purpose then this Settlement Agreement may be voided at the sole discretion of the party seeking the benefit of the prohibited or unenforceable provision. Class Counsel is expressly authorized to take all appropriate action to implement this provision.

J.   In the event that any payment referenced in this Settlement Agreement is due to be made on a weekend or a holiday, the payment shall be made on the first business day following such weekend or holiday.

K.   In the event that any legal or regulatory approvals are required to effectuate the provisions of this Settlement Agreement, [New Co], the UAW, the Class, and the Committee will fully cooperate in securing any such legal or regulatory approvals.

L.   Any notice, request, information or other document to be given under this Settlement Agreement to any of the parties by any other party shall be in writing and delivered personally, or sent by Federal Express or other carrier which guarantees next-day delivery, transmitted by facsimile, transmitted by email if in an Adobe Acrobat PDF file, or sent by registered or certified mail, postage prepaid, at the following addresses. All such notices and communication shall be effective when delivered by hand, or, in the case of registered or certified mail, Federal Express or other carrier, upon receipt, or, in the case of facsimile or email transmission, when transmitted (provided, however, that any notice or communication transmitted by facsimile or email shall be immediately confirmed by a telephone call to the recipient.):

If to [New Co], addressed to:

> Diana Tremblay
> GMNA Vice President of Labor Relations
> [New Co]
> 2000 Centerpoint Parkway
> Pontiac, MI 48341
> Tel: (248) 753-2243

in each case with copies to:

> Francis S. Jaworski
> Office of the General Counsel
> [New Co]
> Mail Code 482-C25-B21
> 300 Renaissance Center
> P.O. Box 300
> Detroit, MI 48265-3000
> Tel: (313) 665-4914

> Cadawalder, Wickersham & Taft LLP
> One World Financial Center
> New York, NY 10281
> Attention: R. Ronald Hopkinson/Lisa J. Pauquette/John J. Rapisardi
> Tel: (212) 504-6000

If to UAW, addressed to:

> Daniel W. Sherrick
> General Counsel
> International Union, United Automobile, Aerospace and
> Agricultural Implement Workers of America
> 8000 East Jefferson Avenue
> Detroit, MI 48214
> Tel: (313) 926-5216

with a copy to:

> Cleary Gottlieb Steen & Hamilton LLP
> One Liberty Plaza
> New York, New York 10006
> Attention: A. Richard Susko/Richard S. Lincer/David I. Gottlieb
> Tel: (212) 225-2000

Each party may substitute a designated recipient upon written notice to the other parties.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS THEREOF, the parties hereto have caused this Settlement Agreement to be executed by themselves or their duly authorized attorneys.

**AGREED:**

By: _____      Date:

      Francis S. Jaworski
      [New Co]
      Mail Code 482-C25-B21
      300 Renaissance Center
      P.O. Box 300
      Detroit, MI 48265-3000
      Tel: (313) 665-4914
      francis.s.jaworski@gm.com

      COUNSEL FOR [New Co]


By: _____      Date:

      Daniel W. Sherrick  (P37171)
      8000 East Jefferson Avenue
      Detroit, MI  48214
      Tel: (313) 926-5216

      COUNSEL FOR
      INTERNATIONAL UNION, UNITED AUTOMOBILE,
      AEROSPACE AND AGRICULTURAL IMPLEMENT
      WORKERS OF AMERICA


**ACKNOWLEDGED AND CONFIRMED:**

By: _____      Date:

      William T. Payne
      Stember Feinstein Doyle & Payne, LLC
      Pittsburgh North Office
      1007 Mt. Royal Boulevard
      Pittsburgh, PA  15222
      Tel: (412) 492-8797
      wpayne@stargate.net

      CLASS COUNSEL

# EXHIBITS

| | |
|---|---|
| Exhibit A: | Trust Agreement |
| Exhibit B: | [Reserved] |
| Exhibit C: | [Reserved] |
| Exhibit D: | Form of Equity Registration Rights Agreement |
| Exhibit E: | Form of Trust Agreement Amendment |
| Exhibit F: | 2009 Benefits Changes |
| Exhibit G: | National Institute for Health Care Reform Term Sheet |
| Exhibit H: | [Reserved] |
| Exhibit I: | Form of [New Co] Note* |
| Exhibit J: | Form of Preferred Stock Certificate of Designation |
| Exhibit K: | Form of Stockholders Agreement** |
| Exhibit L: | Form of Warrant |

*Final form to be agreed between [New Co] and the VEBA in conformity with the VEBA Note Term Sheet attached as Exhibit Y to the Master Sale and Purchase Agreement, dated June 1, 2009, by and among [New Co], GM and the other parties thereto (the "MSPA"). The VEBA Note Term Sheet is attached hereto as Exhibit I pending agreement on the final form.

**Final form to be agreed among [New Co], the New VEBA, and the other stockholders to be parties thereto, in conformity with the Governance Term Sheet previously furnished to the UAW, with such changes thereto as may be required by the United States Treasury and agreed to by the UAW.

# EXHIBIT A

# TRUST AGREEMENT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The form of trust agreement attached hereto includes references to Ford Motor Company, Inc. and Chrysler, LLC and to separate class action cases brought against each of those companies by the UAW and a class of each company's retirees. The form of trust agreement in the attached Exhibit E is designed to accommodate the possibility that settlement agreements are entered into in those cases pursuant to which those companies would also deposit agreed-upon amounts into the trust described in the attached Exhibit E. But there is currently no settlement agreement in either of those cases, and there is no guarantee that there will be such a settlement agreement, or that any potential settlement of those cases would include an agreement to pay any amount into the trust described in the attached Exhibit E.

In the event that there is no settlement agreement in either or both of those cases, or that any settlement of either or both of those cases does not include a form of trust agreement identical in all respects to the attached Exhibit E, the references to such company and the corresponding case and settlement agreement shall be removed from the form of trust agreement, and the trust agreement shall be conformed to relate solely to the remaining settlement agreements or to this Settlement Agreement as the case may be.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

2

## UAW RETIREE MEDICAL BENEFITS TRUST

THIS TRUST AGREEMENT, entered into and effective as of _____, by and among _____, _____, _____, _____, _____, _____, _____, _____, _____, _____, _____ (the "Committee") and _____ (the "Trustee").

### W I T N E S S E T H:

WHEREAS, General Motors Corporation ("GM"), International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), along with respective Class Representatives of plaintiff class members in the case of *UAW v. General Motors Corp.,* Civ. Act. No. 2:07-cv-14074 (E.D. Mich. complaint filed September 9, 2007), have entered into a settlement agreement dated February __, 2008 ("GM Retiree Settlement"), that, subject to Court approvals and other stated conditions, provides for GM to make certain deposits and remittances to a trust established as a voluntary employees' beneficiary association (the "Trust"), and credited to the GM Separate Retiree Account in the Trust.

WHEREAS, Chrysler, LLC ("Chrysler"), UAW, along with respective class representatives of plaintiff class members in the case of *UAW v. Chrysler, LLC,* Civ. Act. No. _:07-cv-14310 (E.D. Mich. complaint filed _____, 2007), have entered into a settlement agreement dated _____, 2008 ("Chrysler Retiree Settlement"), that, subject to Court approvals and other stated conditions, provides for Chrysler to make certain deposits and remittances to the Trust, and credited to the Chrysler Separate Retiree Account in the Trust.

WHEREAS, Ford Motor Company, Inc. ("Ford"), UAW, along with respective class representatives of plaintiff class members in the case of *UAW v. Ford Motor Co.,* Civ. Act. No. _____ (E.D. Mich. complaint filed _____, 2007). have entered into a settlement agreement dated _____, 2008 ("Ford Retiree Settlement"), that, subject to Court approvals and other stated conditions, provides for Ford to make certain deposits and remittances to the Trust, and credited to the Ford Separate Retiree Account in the Trust.

WHEREAS, the Settlements contemplate a Committee, as more fully defined herein, (the "Committee") to act on behalf of employees' beneficiary associations (the "EBAs"), which are incorporated in the Trust;

WHEREAS, by an order dated _____, the Court approved the Chrysler Settlement, and by an order dated _____, the Court approved the Ford Settlement, and by an order dated _____, the Court approved the GM Settlement (collectively, the "Court Order");

WHEREAS, through operation of each Court Order the Committee was formed;

WHEREAS, the Trust consists of three separate employees' beneficiary associations (collectively, the "EBAs"), and the membership of each EBA includes the applicable Eligible Group;

WHEREAS, each EBA, acting through the Committee, will establish and maintain a separate employee welfare benefit plan (collectively the "Plans") on behalf of the members of the respective Eligible Groups;

WHEREAS, the Committee, on behalf of the EBAs, has entered into this Trust Agreement to implement the Trust, to be known as the "UAW Retiree Medical Benefits Trust," which shall include the GM Separate Retiree Account, the Ford Separate Retiree Account and the Chrysler Separate Retiree Account (collectively the "Separate Retiree Accounts"), to accept the deposits, contributions, transfers and remittances of, or attributable to, each Company in the respective Separate Retiree Account;

WHEREAS, the purpose of each Separate Retiree Account is to serve as a separate, dedicated account to be used for the sole purpose of funding Benefits provided under the related Plan to the Eligible Group under that Plan and defraying the reasonable expenses of such Plan, as set forth in the GM Retiree Settlement, Ford Retiree Settlement and the Chrysler Retiree Settlement respectively;

WHEREAS, the purpose of this Trust is to allow for the pooled investment of assets credited to each of the Separate Retiree Accounts and to provide the economy of scale to the Committee in providing services for each of the Plans, but not to allow for the assets attributable to any one Separate Retiree Account to offset liabilities or defray the expenses attributable to any other Separate Retiree Account;

WHEREAS, the Committee is willing to serve as the named fiduciary of each Plan and the Trustee desires to serve in such capacity with respect to the Trust;

WHEREAS, the Committee is willing to exercise the authority granted to it herein;

WHEREAS, the Trustee is willing to receive, hold, and invest the assets of the Trust in accordance with the terms of this Trust Agreement;

WHEREAS, the Trust is intended to comply with the requirements of sections 419A(f)(5)(A) and 501(c)(9) of the Internal Revenue Code of 1986, as amended (the "Code"), the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and deposits to the Trust are described in section 302(c)(2) of the Labor Management Relations Act, 1947, as amended ("LMRA");

NOW THEREFORE, in consideration of the premises and the covenants contained herein, the Committee and the Trustee agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1  <u>Authorized Investments</u>.  Subject to any investment guidelines established by the Committee and communicated to the Trustee pursuant to Section 10.4, "Authorized Investments" shall not be limited to investments that are defined as legal investments for trust funds under the laws of any jurisdiction.  Authorized Investments shall include, but shall not be limited to (i) cash held in interest bearing accounts or cash equivalents that are credited with earnings; (ii) bonds, debentures, notes, or other evidences of indebtedness; (iii) stocks (regardless of class) or other evidences of ownership in any corporation, partnership, mutual investment fund (including funds for which the Trustee or an affiliate thereof serves as investment manager), investment company, association, joint venture or business trust; (iv) derivative securities, including without limitation future contracts and option contracts; (v) investment contracts issued by legal reserve insurance companies; (vi) collective investment funds; and (vii) any other investment or transaction permitted by applicable law.

Section 1.2  <u>Beneficiary</u>.  A person designated as a beneficiary of a Participant by the Participant, who is in an Eligible Group and who is or may become entitled to Benefits under one of the Plans through his or her relationship with an Eligible Retiree or with a deceased retiree or employee of a Company.

Section 1.3  <u>Benefits</u>.  During the Initial Accounting Period with respect to each Plan, Benefits under each such Plan shall have the same meaning as "Retiree Medical Benefits" (as that term is defined under each Company Settlement), that is, post retirement medical benefits, including but not limited to hospital surgical medical, prescription drug, vision, dental, hearing aid and the $76.20 Special Benefit related to Medicare.  After the Initial Accounting Period ends with respect to a Plan, Benefits, pursuant to an amendment to such Plan, may include any benefit permissible under section 501(c)(9) of the Code and section 3(1) of ERISA.

Section 1.4  <u>Chair</u>.  The Member selected pursuant to Section 9.5 to perform the functions described in Article IX.

Section 1.5  <u>Chrysler</u>.  Chrysler LLC, a Delaware corporation with its principal offices in Auburn Hills, Michigan, and its successors and assigns.

Section 1.6  <u>Chrysler Eligible Group</u>.  The Class or Class Members and the Covered Group as set forth in the Chrysler Settlement and repeated verbatim in Exhibit A.

Section 1.7  <u>Chrysler Health Care Program</u>.  The employee welfare benefit plan maintained by Chrysler as in effect as of October 12, 2007, which provided retiree medical benefits to Chrysler employees who retired from UAW-represented bargaining units.

Section 1.8  <u>Chrysler Retiree EBA</u>.  The UAW Chrysler Retirees Employees' Beneficiary Association, an employee organization within the meaning of Section 3(4) of ERISA.

Section 1.9  <u>Chrysler Retiree Plan</u>.  The UAW Chrysler Retirees Medical Benefits Plan, as established and maintained by the Chrysler Retiree EBA, as may be amended from time to

3

time by the Committee, as specified herein, to make available Benefits to Participants and Beneficiaries included in the Chrysler Eligible Group.

Section 1.10  Chrysler Retiree Settlement.  Settlement of the claims in *UAW v. Chrysler, LLC*, Civ. Act. No. _:07-cv-14310 (E.D. Mich. complaint filed _____, 2007).

Section 1.11  Chrysler Separate Retiree Account.  The separate account in the Trust, including any Employer Security Sub-Account attributable to any Chrysler Employer Security, maintained to account for (a) the assets attributable to the deposits, contributions, remittances, subsidies, investment income, and any other income held in the Trust Fund exclusively to fund the Chrysler Retiree Plan; and (b) the Benefits provided pursuant to the Chrysler Retiree Plan, other liabilities, administrative expenses attributable to such Benefits, and the Chrysler Separate Retiree Account's share of investment expenses incurred.

Section 1.12  Code.  The Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Section 1.13  Committee.  The group of Independent Members and UAW Members formed pursuant to the Settlements to implement the Trust, to administer each Plan, and to serve as a "named fiduciary" of each Plan within the meaning of section 402(a)(2) of ERISA, including the exercise of authority or control over Plan assets.

Section 1.14  Company.  The term Company shall mean Chrysler, Ford, or GM, as the case may be (collectively the "Companies").

Section 1.15  Company Health Care Plan.  The Chrysler Health Care Program for Hourly Employees, the Ford Retiree Health Program, and the General Motors Health Care Program for Hourly Employees, as the case may be (collectively "Company Health Care Plans").

Section 1.16  EBA.  The Chrysler Retiree EBA, the Ford Retiree EBA, or the GM Retiree EBA, as the case may be (collectively "EBAs").

Section 1.17  Eligible Group.  All individuals who satisfy the requirements to be included in either the Chrysler Eligible Group, the Ford Eligible Group, or the GM Eligible Group, as the case may be (collectively "Eligible Groups").

Section 1.18  Eligible Retiree.  A former employee retired from a Company who satisfies the requirements to be included in an Eligible Group.

Section 1.19  Employer Security.  Any obligation, note, warrant, bond, debenture, stock or other security within the meaning of section 407(d)(1) of ERISA that is acquired or held by the Trust (or arising from any such security through conversion) pursuant a deposit or transfer under one of the Settlements the acquisition or holding of which (i) is not prohibited by sections 406(a)(1)(E) or 406(a)(2) of ERISA, or (ii) is the subject of a prohibited transaction exemption provided under section 408 of ERISA.

Section 1.20  Employer Security Sub-Account.  The sub-account maintained by the Trustee within each Separate Retiree Account to hold separately any Employer Security and any

proceeds from the disposition of any Employer Security, at the direction of the Committee or the Independent Fiduciary pursuant to Article XI.

Section 1.21  ERISA.  The Employee Retirement Income Security Act of 1974, as amended through any date relevant under this Trust Agreement, and any successor statute thereto.

Section 1.22 Ford.  Ford Motor Company, a Delaware corporation with its principal office in Dearborn, Michigan, and its successors and assigns.

Section 1.23 Ford Eligible Group.  The Class or Class Members and the Covered Group as set forth in the Ford Settlement and repeated verbatim in Exhibit B.

Section 1.24  Ford Retiree Health Program.  The portion of the Hospital-Surgical-Medical-Drug-Dental-Vision Program maintained by Ford as in effect on and after the effective date of the 2007 UAW-Ford National Collective Bargaining Agreement, which provided retiree medical benefits to Ford hourly employees who retire from UAW-represented bargaining units.

Section 1.25 Ford Retiree EBA.  The UAW Ford Retirees Employees' Beneficiary Association, an employee organization within the meaning of Section 3(4) of ERISA.

Section 1.26 Ford Retiree Plan.  The UAW Ford Retirees Medical Benefits Plan, as established and maintained by the Ford Retiree EBA, as may be amended from time to time by the Committee, as specified herein, to make available Benefits to Participants and Beneficiaries included in the Ford Eligible Group.

Section 1.27 Ford Retiree Settlement.  Settlement of the claims in *UAW v. Ford Motor Co.,* Civ. Act. No. _____ (E.D. Mich. complaint filed _____, 2007).

Section 1.28 Ford Separate Retiree Account.  The separate account in the Trust, including any Employer Security Sub-Account attributable to any Ford Employer Security, maintained to account for (a) the assets attributable to the deposits, contributions, remittances, subsidies, investment income, and any other income held in the Trust Fund exclusively to fund the Ford Retiree Plan; and (b) the Benefits provided pursuant to the Ford Retiree Plan, other liabilities, administrative expenses attributable to such Benefits, and the Ford Separate Retiree Account's share of investment expenses incurred.

Section 1.29 GM.  The General Motors Corporation, a Delaware corporation with its principal offices in Detroit, Michigan, and its successors and assigns.

Section 1.30 GM Eligible Group.  The Class or Class Members and the Covered Group as set forth in the GM Settlement and repeated verbatim in Exhibit C.

Section 1.31 General Motors Health Care Program for Hourly Employees.  The collectively bargained General Motors Health Care Program for Hourly Employees as set forth in Exhibit C-1 of the 2007 and prior GM-UAW National Agreements, as applicable to those GM-UAW Represented Employees who had attained seniority prior to September 14, 2007.

Section 1.32 <u>GM Retiree EBA</u>. The UAW GM Retirees Employees' Beneficiary Association, an employee organization within the meaning of Section 3(4) of ERISA.

Section 1.33 <u>GM Retiree Plan</u>. The UAW GM Retirees Medical Benefits Plan, as adopted by the GM Retiree EBA, as may be amended from time to time by the Committee, as specified herein, to make available Benefits to Participants and Beneficiaries included in the GM Eligible Group.

Section 1.34 <u>GM Retiree Settlement</u>. Settlement of the claims in *UAW v. General Motors Corp.,* Civ. Act. No. 2:07-cv-14074 (E.D. Mich. complaint filed September 9, 2007).

Section 1.35 <u>GM Separate Retiree Account</u>. The separate account in the Trust, including any Employer Security Sub-Account attributable to any GM Employer Security, maintained to account for (a) the assets attributable to the deposits, contributions, remittances, subsidies, investment income and any other income and other income held in the Trust Fund exclusively to fund the GM Retiree Plan; and (b) the Benefits provided pursuant to the GM Retiree Plan, other liabilities, administrative expenses attributable to such Benefits, and the GM Separate Retiree Account's share of investment expenses incurred.

Section 1.36 <u>Implementation Date</u>. The later of (i) January 1, 2010 or (ii) the "Final Effective Date," as defined in the GM Retiree Settlement or the Chrysler Retiree Settlement, as applicable, or with respect to the Ford Retiree Settlement, the later of the "Effective Date" or the "Appeal Completion Date" (as defined in the Ford-UAW Memorandum of Understanding Post-Retirement Medical Care dated November 3, 2007) or as otherwise provided in the Ford Settlement Agreement.

Section 1.37 <u>Independent Fiduciary</u>. The entity that may be appointed from time to time by the Committee to serve pursuant to Article XI.

Section 1.38 <u>Independent Member</u>. An individual person who serves as a member of the Committee and is not appointed by UAW, who satisfies the requirements of section 9.1, and whose experience in such fields, without limitation, as health care, employee benefits, asset management, human resources, labor relations, economics, law, accounting or actuarial science indicates a capacity to fulfill the powers and duties of Article X in the manner described in Section 10.11, and wherever practicable, helps to provide a range of relevant experiences to the Committee.

Section 1.39 <u>Initial Accounting Period</u>. With respect to each Plan, the period before the later of the date that (a) the respective Company determines that its obligations, if any, with respect to the Plan made available to the Participants and Beneficiaries included in that Company's Eligible Group are subject to settlement accounting as contemplated by paragraphs 90-95 of FASB Statement No. 106, as amended, or its functional equivalent; or (b) the Company is no longer obligated to make any further payments or deposits to the Trust, including, but not limited to, any Shortfall Amounts.

Section 1.40 <u>Investment Manager</u>. An investment manager within the meaning of section 3(38) of ERISA appointed by the Committee in accordance with the provisions of Section 10.5.

Section 1.41 <u>Liaison</u>. An individual appointed to perform the functions described in Section 9.11.

Section 1.42 <u>LMRA</u>. The Labor Management Relations Act, 1947, as amended, and any successor statute thereto.

Section 1.43 <u>Member</u>. A member of the Committee or his or her successor.

Section 1.44 <u>Participant</u>. An Eligible Retiree who has fulfilled all requirements for participation as determined pursuant to Sections 2.1 and 2.2, who pays any contribution that is required as a condition of coverage, and who receives coverage pursuant to the terms of a Plan.

Section 1.45 <u>Plan</u>. The Chrysler Retiree Plan, the Ford Retiree Plan, or the GM Retiree Plan, as the case may be (collectively the "Plans").

Section 1.46 <u>Separate Retiree Account</u>. The Chrysler Separate Retiree Account, the Ford Separate Retiree Account or the GM Separate Retiree Account, as the case may be (collectively the "Separate Retiree Accounts").

Section 1.47 <u>Settlements</u>. The GM Retiree Settlement, the Chrysler Retiree Settlement and the Ford Retiree Settlement (as referred to in the preamble to this Trust Agreement).

Section 1.48 <u>Trust Agreement</u>. This agreement and all of its exhibits, as now in effect and as it may be amended hereafter from time to time by the Committee, acting on behalf of the EBAs.

Section 1.49 <u>Trust or Trust Fund</u>. The UAW Retiree Medical Benefits Trust established by this Trust Agreement, incorporating each EBA, and comprising all property or interests in property held by the Trustee from time to time under this Trust Agreement

Section 1.50 <u>Trustee</u>. The entity referred to in the Preamble to this Trust Agreement named to perform the duties set forth in this Trust Agreement, or any successor thereto appointed by the Committee in accordance with Section 8.3. Any corporation continuing as the result of any merger or consolidation to which the Trustee is a party, or any corporation to which substantially all the business and assets of the Trustee may be transferred, will be deemed automatically to be continuing as the Trustee.

Section 1.51 <u>UAW</u>. The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, CLC, and any successor thereof.

Section 1.52 <u>UAW Member</u>. An individual person who serves as a member of the Committee and is appointed by UAW, pursuant to the terms of the Settlements and Article IX of this Trust Agreement.

      Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the GM Retiree Settlement when relating to GM and/or the GM Eligible Group, the GM EBA, the GM Retiree Plan and the GM Separate Retiree Account. Any capitalized term used in this Trust Agreement, if not defined in this Trust

Agreement, shall have the meaning it has in the Chrysler Retiree Settlement when relating to Chrysler and/or the Chrysler Eligible Group, the Chrysler EBA, the Chrysler Retiree Plan and the Chrysler Separate Retiree Account. Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the Ford Retiree Settlement when relating to Ford and/or the Ford Eligible Group, the Ford EBA, the Ford Retiree Plan and the Ford Separate Retiree Account. If any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, is also used in more than one of the Settlements, such term shall have the meaning it has in the Settlement applicable to the relevant Plan, Eligible Group, or Separate Retiree Account.

## ARTICLE II
## PARTICIPATION

Section 2.1    <u>Eligibility for Participation</u>.  Any Eligible Retiree or Beneficiary may receive Benefits funded, in whole or in part, by the Trust pursuant solely to the Plan adopted by the Committee in its discretion exercising the powers provided to it under Article X from time to time, on behalf of the EBA to which such Eligible Retiree or Beneficiary belongs.  In exercising its authority under Article X, the Committee may design each Plan to provide for separate bases of participation in the Plan for classes of Participants and Beneficiaries as set forth from time to time in the Plan so long as such design is reasonably related to the purposes for which the Trust was established and, provided further, that any such design only permits participation in the Plan by the Eligible Retirees or Beneficiaries who belong to the EBA on behalf of which the Committee adopted such Plan.   Participation in the Plan is contingent on the Eligible Retiree or Beneficiary satisfying any conditions set forth therein from time to time. Under no circumstances may individuals other than Eligible Retirees or Beneficiaries be allowed to benefit from the Trust or participate in a Plan.

Section 2.2    <u>Determination by Committee</u>.  Any determination regarding the status of any individual as a Participant or Beneficiary under each Plan shall be solely and exclusively the responsibility of the Committee.

## ARTICLE III
## ESTABLISHMENT OF TRUST

Section 3.1  <u>Purpose</u>. The Trust is established for the purpose of providing Benefits to the Participants and Beneficiaries in accordance with each Plan and as are permissible under section 501(c)(9) of the Code as set forth herein; and upon termination of the Trust, to provide such Benefits to such persons as are permissible under section 501(c)(9) of the Code as set forth herein.  The EBAs are incorporated within the Trust, each of which is intended to constitute a separate "employee organization" under section 3(4) of ERISA.  The Trust, together with each Plan, is intended to constitute a "voluntary employees' beneficiary association" under section 501(c)(9) of the Code.  Each Plan is intended to constitute an "employee welfare benefit plan" within the meaning of section 3(1) of ERISA.  The Trust is established to allow for the pooled investment of assets credited to each Separate Retiree Account and to provide the economy of scale to the Committee in purchasing services for each of the Plans.  Under no circumstances may the assets credited to one Separate Retiree Account offset the liabilities or defray the expenses attributable to another Separate Retiree Account.  Further, each Separate Retiree Account shall be maintained for so long as there remains assets credited thereto.

Section 3.2  <u>Receipt of Funds</u>. The Trust Fund shall accept all sums of money and other property deposited, contributed, remitted, or transferred to the Trust with respect to a Plan and credited to the Separate Retiree Account attributable to such Plan as described in Article IV, provided that any Employer Security issued to the Trust by any Company shall be accepted only upon the direction of the Independent Fiduciary.  The Trustee shall hold, manage and administer the Trust Fund without distinction between principal and income.  The Trustee shall be accountable for the money or other property it receives, but shall not be responsible for the collection of any deposits, contributions, remittances, or transfers due to the Trust.

Section 3.3  <u>No Diversion</u>. Except as otherwise provided herein, at no time shall any part of the corpus or income of the Trust Fund be used for or diverted to purposes other than funding Benefits for the exclusive benefit of the Participants and Beneficiaries, including payment of reasonable costs of establishment, amendment and administration of the Trust and each Plan, and at no time shall any part of the net earnings of the Trust Fund improperly inure to the benefit of any private individual as provided in section 501(c)(9) of the Code and section 1.501(c)(9)-4 of the Treasury Regulations promulgated thereunder.

Section 3.4  <u>Fiduciary Duties</u>.

(a) Except as otherwise provided either herein or by applicable law, the responsibilities of each fiduciary acting in such capacity shall be limited to the performance of those duties specifically assigned to it hereunder.  No fiduciary shall have any responsibility for the performance of any duty not specifically so assigned, except to the extent such responsibility is imposed by applicable law.  The Committee shall be the named fiduciary (as defined in section 402(a)(2) and as described in section 402(c)(3) of ERISA) hereunder with authority to control and manage the operation of the Trust, to the extent set forth herein, and with respect to each Plan independently, except that if an Independent Fiduciary is appointed by the Committee, the Independent Fiduciary, and not the Committee, shall be the named fiduciary with respect to all

discretionary actions regarding the valuation, acceptance, management, disposition and voting of Employer Securities. Each fiduciary's responsibilities and duties with respect to each Plan shall be limited to the interests of that Plan's Participants and Beneficiaries.

(b) No Company is a fiduciary with respect to the Plans or the Trust. In addition, (i) neither the Trustee, the Committee nor any person or entity related to the Plans or the Trust has any authority to bind any Company, either directly or indirectly, through any interpretations, findings of fact or conclusions regarding the Plans, the Trust and this Trust Agreement, (ii) no Company exercises any discretionary authority or discretionary control with respect to the management of any Plan or the Trust or exercises any authority or control with respect to the management or disposition of assets governed by this Trust Agreement, (iii) no Company renders investment advice for a fee or other compensation, direct or indirect, with respect to any assets governed by any Plan or by this Trust Agreement, and none has the authority or responsibility to do so, and (iv) no Company has discretionary authority or discretionary responsibility in the administration of any Plan or of the Trust.

Section 3.5    No Guarantee. Nothing contained in the Trust or the Plans shall constitute a guarantee that the assets of the Trust Fund will be sufficient to pay Benefits to any person or make any other payment. The obligation of a Plan to pay Benefits provided under such Plan is expressly conditioned on the availability of assets attributed to the Separate Retiree Account associated with that Plan to pay Benefits. This Trust Agreement creates no obligation for any Company to deposit or remit any amount to the Trust Fund. Except for payments of Benefits under a Plan, no Participant or Beneficiary shall receive any distribution of cash or other thing of current or exchangeable value, either from the Committee or the Trustee, on account of or as a result of the Trust Fund created hereunder.

Section 3.6    No Interest. Except as provided in Section 12.2 with respect to Participants and Beneficiaries, none of the following persons or entities shall have any right, title or interest, whether legal or equitable, in the assets of the Trust Fund at any time, including following the termination of the Trust: the Companies, the UAW, the Committee, any Eligible Retiree, any Participant, or any Beneficiary. At no time shall any account or separate fund be considered a savings account or investment or asset of any Eligible Retiree, Participant, Beneficiary, or class of Participants and Beneficiaries.

Section 3.7    Relationship to Settlements. Notwithstanding anything in this Trust Agreement or the Plans to the contrary, neither the Committee, the Trustee, or any person acting under the authority of the Committee, the Trustee, the EBAs or the Trust shall construe, interpret or apply this Trust Agreement or the Plans in a manner that would impair any right, would frustrate any purpose, or would be inconsistent with any provision in each applicable Settlement. No construction, interpretation or application of the Trust or the Plans by the Committee, the Trustee, or any person acting under the authority of the Committee, the Trustee, the EBAs or the Trust shall bind any Company with regard to any dispute or conflict involving the Company. In the event of a conflict between the Trust Agreement or a Plan and the corresponding Settlement, such Settlement shall control.

11

## ARTICLE IV
## DEPOSITS TO THE TRUST FUND

Section 4.1   Deposits from the Companies.  The Trust Fund shall accept from the Companies deposits to the Trust Fund, as specified in each Company's Settlement.  All deposits from a Company shall be credited to that Company's respective Separate Retiree Account.

Section 4.2   Remittances of Active Employee Contributions.  The Trust Fund shall accept remittances of active employee contributions, if any.  All such remittances shall be credited to the respective Separate Retiree Account attributable to the Participants and Beneficiaries on whose behalf the employee contributions are made.

Section 4.3   Medicare Subsidies.  The Trust Fund shall accept Medicare Part D subsidies and any other governmental payments relating to the benefits provided to Participants and Beneficiaries pursuant to the Plans and Trust.  All Medicare subsidies and other governmental payments shall be credited to each Separate Retiree Account attributable to the Participants and Beneficiaries on whose behalf the subsidies or payments are made.

Section 4.4   Participant Contributions.  The Trust Fund shall accept contributions from Participants as permitted or required by the Committee.  Such Participant contributions may be remitted to the Trust Fund from each Company's pension plan pursuant to voluntary, authorized deductions from monthly pension payments from each Company's pension plan. All Participant contributions shall be credited to the Separate Retiree Account attributable to the Participant making the contribution.

Section 4.5   Deposits and Remittances from Subsequent Employers of Future Eligible Retirees.  In the event of a sale, disposition, joint venture, merger or other corporate transaction that results in the displacement of a Company's Active Employee who is a member of the Covered Group (as those terms are defined in the Company's Settlement), the Trust may, but need not, accept deposits and remittances from a subsequent employer of such displaced employee, provided that such deposits and remittances are pursuant to a collective bargaining agreement between such subsequent employer and UAW.  All deposits and remittances from a subsequent employer shall be credited to the appropriate Separate Retiree Account relating to the displaced employee.

Section 4.6 Other Legal Sources.  The Trust may accept money or property from sources other than those described in Sections 4.1, 4.2, 4.4 and 4.5, provided that acceptance from any such other source is permitted by law and that such money or property is credited to the appropriate Separate Retiree Account(s) to which such money or property relates.

12

# ARTICLE V
## PAYMENTS FROM THE TRUST FUND

Section 5.1  Payments from the Trust Fund.

(a) Subject to the direction of the Independent Fiduciary with respect to any Employer Security, and except as provided in paragraph (b) below, the Trustee shall make payments from the Trust Fund to pay Benefits under the Plans as directed by the Committee or its designee. Any payment of Benefits under the Plans must be charged to the Separate Retiree Account attributable to the Participant or Beneficiary receiving the benefits.

(b) To the extent permitted by law, the Trustee shall be fully protected in making payments out of the Trust Fund, and shall have no responsibility to see to the application of such payments or to ascertain whether such payments comply with the terms of any Plan, and shall not be liable for any payment made by it in good faith and in the exercise of reasonable care without actual notice or knowledge of the impropriety of such payments hereunder. The Trustee may withhold all or any part of any payment as the Trustee in the exercise of its reasonable discretion may deem necessary to protect the Trustee and the Trust against any liability or claim on account of any income tax or other tax; and with all or any part of such payment so withheld, may discharge any such tax liability. Any part of any such payment so withheld by the Trustee that may be determined by the Trustee to be in excess of any such tax liability will upon such determination by the Trustee be paid to the person or entity from whom or which it was withheld.

Section 5.2  Method of Payments. The Trustee may make any payment required to be made by it hereunder, unless directed otherwise by the Committee, by direct electronic deposit of the amount thereof to the financial institution where the person or entity to whom or to which such payment is to be made maintains an account, or by mailing a check in the amount thereof by first class mail in a sealed envelope addressed to such person or entity to whom or to which such payment is to be made, according to the direction of the Committee. If any dispute arises as to the identity or rights of persons who may be entitled to benefits hereunder, the Trustee may withhold payment until such dispute is resolved by a court of competent jurisdiction or, at the discretion of the Committee, is settled by written stipulation of the parties concerned.

Section 5.3  Excessive Payments. If the Trustee or the Committee determines that any payment under the Trust or any Plan is excessive or improper, the recipient shall make repayment thereof immediately following receipt of written notice from the Trustee or the Trustee's agent. If the recipient fails to make repayment to the Trustee or Trustee's agent of such excessive or improper payment by the date requested by the Trustee or the Trustee's agent, the Trustee may deduct the amount of such excessive or improper payment from any other amounts thereafter payable to such person or may pursue repayment in accordance with the provisions of Section 6.1(p). Until repaid to the Trustee or Trustee's agent, the amount of said excessive or improper payment shall not be included in the Trust Fund.

## ARTICLE VI
## TRUSTEE POWERS AND DUTIES

Section 6.1  <u>Powers of the Trustee</u>.  The Trustee shall have the following powers in addition to the powers customarily vested in trustees by law, provided however, that the Trustee's powers with respect to the investment of assets held in the Trust Fund shall be subject to (i) the funding policy established by the Committee and communicated to the Trustee under Section 10.3, (ii) any investment guidelines established by the Committee and communicated to the Trustee under Section 10.4, (iii) the instructions of an Independent Fiduciary appointed pursuant to Section 11.3, solely with respect to any Employer Security, and (iv) the instructions of the Committee or any Investment Manager appointed pursuant to Section 10.5:

(a)     With any cash at any time held by it, to purchase or subscribe for any Authorized Investment, and to retain such Authorized Investment in the Trust Fund, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(b)     To sell for cash or, with the consent of the Committee, on credit, to convert, to redeem, to exchange for another Authorized Investment, or otherwise to dispose of, any property at any time held by it, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(c)     To retain uninvested all or any part of the Trust Fund, provided that any uninvested assets shall be deposited in an interest-bearing account in any banking or savings institution, including an account established in the name of the Trustee if the Trustee is a depository institution;

(d)     To exercise any option appurtenant to any investment in which the Trust Fund is invested for conversion thereof into another Authorized Investment, or to exercise any rights to subscribe for additional Authorized Investments, and to make all necessary payments therefor, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(e)     To join in, consent to, dissent from or oppose the reorganization, recapitalization, consolidation, sale, merger, foreclosure, or readjustment of the finances of any corporations, entities or properties in which the Trust Fund may be invested, or the sale, mortgage, pledge, or lease of any such property or the property of any such corporation or entity on such terms and conditions as the Trustee may deem wise; to do any act (including the exercise of options, making of agreements or subscriptions, and payment of expenses, assessments, or subscriptions) which may be deemed necessary or advisable in connection therewith; and to accept any Authorized Investment which may be issued in or as a result of any such proceeding, and thereafter to hold the same, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(f)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or

14

by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(g)     To purchase any Authorized Investment at a premium or a discount;

(h)     Upon instruction from the Committee, to employ for the benefit of the Trust Fund suitable agents, actuaries, accountants, investment counselors, legal counsel and consultants, and to pay their reasonable expenses and compensation;

(i)     To purchase, to sell, to exercise, to allow to expire without exercise, and to honor the exercise of, options or contracts to purchase or sell stock, commodities, or other assets subject to such options or contracts, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(j)     With the consent of the Committee, to borrow, raise or lend moneys, for the purposes of the Trust in such amounts and upon such terms and conditions as the Committee, in its absolute discretion, may deem advisable, and for any such moneys so borrowed, to issue its promissory note as Trustee and to secure the repayment thereof by pledging or mortgaging all or any part of the Trust Fund, provided that no person lending money to the Trustee shall be bound to see to the application of the money lent or to inquire into the validity, expediency or propriety of any such borrowing;

(k)     To cause any Authorized Investment in the Trust Fund to be registered in, or transferred into, its name as Trustee or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust Fund, and the Trustee shall be fully responsible for any misappropriation in respect to any investment held by its nominee or held in unregistered form and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States, except as may otherwise be permitted under regulations promulgated by the Secretary of Labor;

(l)     To do all acts which it may deem necessary or proper and to exercise any and all powers of the Trustee under this Trust Agreement upon such terms and conditions as it may deem to be in the best interests of the Trust;

(m)     To apply for, purchase, hold, transfer, pay premiums on, surrender, and exercise all incidents of ownership of any insurance contract, any guaranteed income, guaranteed investment, and similar contracts;

(n)     To invest in any collective investment fund, including a short-term collective investment fund maintained by the Trustee or an affiliate of the Trustee;

(o)     To collect income and distributions payable to the Fund;

(p)     Upon instruction from the Committee or, with respect to any Employer Security, only at the direction of the Independent Fiduciary, to begin, maintain or defend any

litigation necessary in connection with the administration of the Plans or the Trust, except that the Trustee shall not be obligated or required to do so unless it has been indemnified to its satisfaction against all expenses and liabilities sustained by it by reason thereof;

(q)    To pay any income tax or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on unrelated business income of the Trust, if any, out of the Trust Fund;

(r)    To retain any funds or property subject to any dispute without liability for payment of interest, or decline to make payment or delivery thereof until final and unappealed adjudication is made by a court of competent jurisdiction;

(s)    Upon instruction from the Committee, to grant consents, take actions and otherwise implement the rights of the Trustee;

(t)    With the consent of the Committee, to act in any jurisdiction where permitted by law to do so or to designate one or more persons, or a bank or trust company, to be ancillary trustee in any jurisdiction in which ancillary administration may be necessary; to negotiate and determine the compensation to be paid to any such ancillary trustee; and to pay such compensation out of principal or income or both; and such ancillary trustee shall be granted with respect to any and all property subject to administration by it all of the powers, authorities and discretion granted in this Trust Agreement to the Trustee; provided, however, that such action as may require the investment of additional funds or the assumption of additional obligations shall not be undertaken without the written consent of the Trustee; and

(u) To cooperate with any of the Companies and/or the UAW in obtaining any judicial or regulatory approvals or relief in accordance with each Company's respective Settlement.

Section 6.2    Title to Trust Fund. All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Trustee.

Section 6.3    Standard of Care. The Trustee shall discharge its duties in the interests of each Plan's Participants and Beneficiaries and for the exclusive purpose of providing benefits to Participants and Beneficiaries of each Plan and defraying reasonable expenses of administering the Trust and each Plan, and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims, consistent with the provisions of ERISA and the Code. Subject to the provisions of ERISA, the Trustee will be under no liability or obligation to anyone with respect to any failure of the Committee to perform any of its obligations under the Plans or Trust Agreement or for any error or omission of the Committee.

Section 6.4    Determination of Rights. The Trustee shall have no power, authority, or duty hereunder in respect to the determination of the eligibility of any person for coverage under the Plans, or the entitlement of any person to Benefits or payments from the Plans.

16

Section 6.5  Continuance of Plans.  The Committee, the Trustee, the Independent Fiduciary, the Companies, and UAW do not assume any contractual obligation as to the continuance of the Plans, and no such party shall be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plans.  The Trustee's obligation to make any payment shall be limited to amounts held in the Trust Fund at the time of the payment, as may be further limited by the requirements of Section 3.5.

Section 6.6  Payment of Expenses.  The Trustee shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses, including fees and expenses of the Independent Fiduciary, reasonably incurred (and where applicable previously approved) by the Trustee or the Committee in connection with establishment, amendment, administration and operation of the Trust or Plans.  The expenses shall be allocated to the Separate Retiree Account to which the expenses relate (or, if the expenses cannot reasonably be allocated to one Separate Retiree Account, they shall be allocated among the Separate Retiree Accounts on a reasonable basis as determined by the Committee in a manner that avoids subsidization of any Separate Retiree Account by another Separate Retiree Account).  The Committee shall by written certificate provided to the Trustee request payment for any expenses related to the administration of the Trust.  Upon receipt of the written certificate, the Trustee may make the payment requested by the Committee.

Section 6.7  Reimbursement.  The Trustee will apply the assets of the Trust to reimburse a Company or the respective Company Health Care Plan, as applicable, for any Benefits advanced or provided by the Company or the respective Company Health Care Plan with regard to claims incurred by a Participant on or after the Implementation Date, including, but not limited to situations where a retirement is made retroactive and the medical claims were incurred on or after such Implementation Date or where a Company is notified of an intent by a Participant to retire under circumstances where there is insufficient time to transfer responsibility for Benefits to the applicable Plan and the Company or the respective Company Health Care Plan provides interim coverage for Benefits.  The Trustee and the Committee will fully cooperate with the Company in securing any legal or regulatory approvals that are necessary to permit such reimbursement.  In addition, the Trustee will apply the assets of the Trust to reimburse a Company for any deposits it made by mistake to the Trust, as provided for in that Company's Settlement.  Further, with regard to the transfer of assets from an existing VEBA trust to a Separate Retiree Account, and assumption of any liabilities by a Plan, the Trustee shall apply the assets of the related Separate Retiree Account to satisfy all such liabilities.  In causing the Trust Fund to pay expenses pursuant to this Section 6.7, the Committee shall be acting in its fiduciary capacity with respect to a Plan and the Trust, on behalf of the respective EBA.

Section 6.8  Trustee Compensation.  The Trustee will apply the assets of the Trust Fund to pay its own fees in the amounts and on the dates set forth in Exhibit D.  All compensation paid from the Trust Fund to the Trustee or its affiliates shall be disclosed to the Committee.

Section 6.9  <u>Consultation</u>. The Trustee may engage or consult with counsel or other advisors and may take or may refrain from taking any action in accordance with or reliance upon the opinion of counsel or such advisors.

Section 6.10  <u>Reliance on Written Instruments</u>. The Trustee shall be fully protected in acting upon any instrument, certificate or paper reasonably believed by it to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 6.11  <u>Bonding</u>. The Trustee shall be bonded to the extent and in the amount required by Section 412 of ERISA. To the extent permitted by applicable law, the costs of such bonding shall be expenses paid by the Trustee out of the assets of the Trust Fund under Section 6.6.

# ARTICLE VII
## TRUSTEE ACCOUNTS

Section 7.1  <u>Separate Retiree Accounts</u>. At all times, the Trustee shall maintain each of the Separate Retiree Accounts as a separate account under the Trust for the assets deposited by each Company, or transferred at each Company's direction, to the Separate Retiree Account in accordance with the terms of each Company's Settlement. Each Separate Retiree Account may be used only to provide Benefits for the Participants and Beneficiaries in the Plan funded by such Separate Retiree Account. Under no circumstances may a Separate Retiree Account be liable or responsible for the obligations of the Trust to any Participant or Beneficiary other than a Participant or Beneficiary in the Plan that is attributable to the same Eligible Group as that Separate Retiree Account. The Trustee shall separately account for the assets and liabilities of each Separate Retiree Account; including, without limitation: (a) deposits, contributions, remittances, subsidies, investment and other income from whatever source to each Separate Retiree Account; and (b) Benefits to Participants and Beneficiaries from each respective Separate Retiree Account, and the investment, administrative, and other expenses attributable to the maintenance of each such Separate Retiree Account. In no event shall the assets of one Separate Retiree Account be used to offset the liabilities or defray the expenses attributable to another Separate Retiree Account. Notwithstanding the proscriptions in this Section 7.1, unless the Committee expressly decides to establish segregated investment vehicles for specific Separate Retiree Accounts, the assets of the Separate Retiree Accounts, other than Employer Security Sub-Accounts, shall be invested on a pooled basis within the Trust Fund; provided that the interest of each Separate Retiree Account in such pooled Trust Fund is separately accounted for at all times.

Section 7.2  <u>Records</u>. The Trustee shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to each Separate Retiree Account and the Trust as a whole, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by the Committee or such person or persons as the Committee may designate.

Section 7.3  <u>Annual Audit</u>. The Committee shall appoint an auditor to conduct an annual audit of the Trust Fund, a statement of the results of which shall be provided to the Trustee and also made available for inspection by interested persons at the principal office of the Trust.

Section 7.4  <u>Claims Limited to Amounts in Applicable Account</u>. In any legal action against the Trust Fund, the rights of any Participant or Beneficiary against the Trust Fund shall be limited to the amount of assets in the Separate Retiree Account attributable to such Participant or Beneficiary, and the rights of any other person or entity shall be limited to the amount of assets in the Separate Retiree Account attributable to the Plan to which the claim relates.

Section 7.5  <u>Furnishing Written Accounts</u>. The Trustee shall furnish the Committee a written account setting forth a description of all securities and other property purchased and sold, and all receipts, disbursements, and other transactions effected by it during each calendar quarter, and showing the securities and other properties held, and their fair market values at the end of each calendar quarter. Such written account shall be furnished to the Committee within thirty (30) days after the close of each calendar quarter.

Section 7.6  <u>Accounting and Taxable Year, Cash Basis</u>.  The accounting and taxable year of the Trust shall be the calendar year.  All accounts of the Trustee shall be kept on a cash basis.

Section 7. 7  <u>Judicial Proceedings</u>.  If the Trustee and the Committee cannot agree with respect to any act or transaction reported in any statement, the Trustee shall have the right to have its accounts settled by judicial proceedings in which only the Trustee and the Committee shall be necessary parties.  Subject to the provisions of ERISA, the Trustee shall not be required to file, and no Participant or Beneficiary shall have any right to compel, an accounting, judicial or otherwise, by the Trustee.

## ARTICLE VIII
## PROCEDURES FOR THE TRUSTEE

Section 8.1    Removal.    The Trustee may be removed by the Committee at any time upon thirty (30) days' advance written notice.    Such removal shall be effective on the date specified in such written notice, provided that notice has been given to the Trustee of the appointment of a successor Trustee in the manner set forth in Section 8.3.

Section 8.2    Resignation.    The Trustee may resign by filing with the Committee a written resignation that shall take effect sixty (60) days after the date of such filing, unless prior thereto a successor Trustee has been appointed by the Committee.    In no event may the Trustee's resignation take effect before a successor Trustee has been appointed.    If the Committee fails to appoint a successor Trustee, the resigning Trustee may seek the appointment of a successor Trustee in the manner set forth in Section 8.3.

Section 8.3    Successor Trustee.    The Committee may appoint a successor Trustee by delivering to the successor Trustee an instrument in writing, executed by an authorized representative of the Committee, appointing such successor Trustee, and by delivering to the removed or resigning Trustee an acceptance in writing, executed by the successor Trustee so appointed.    Such appointment shall take effect upon the date specified in Section 8.1 or 8.2, as applicable.    If no appointment of a successor Trustee is made by the Committee within a reasonable time after such resignation, removal or other event, any court of competent jurisdiction may, upon application by the removed or resigning Trustee, appoint a successor Trustee after such notice to the Committee and the removed or resigning Trustee, as such court may deem suitable and proper.

Section 8.4    Amendment to Trust Document for Successor Trustee.    The Committee may appoint a successor Trustee by securing from the successor Trustee an amendment to this Trust Agreement, executed by both the successor Trustee and an authorized representative of the Committee, which replaces the current Trustee with the successor Trustee, appointing such successor Trustee, and by delivering to the removed or resigning Trustee an executed copy of the amendment.    Such appointment shall take effect upon the date specified in the amendment.

Section 8.5    Effect of Removal or Resignation of Trustee.    Upon the removal or resignation of the Trustee in accordance with Section 8.1 or 8.2, the Trustee shall remain responsible for any and all actions taken by the Trustee prior to such removal or resignation, but except as required by ERISA shall not be responsible for any and all actions taken by the successor Trustee.

Section 8.6    Merger or Consolidation of the Trustee.    Any corporation continuing as the result of any merger or resulting from any consolidation, to which merger or consolidation the Trustee is a party, or any corporation to which substantially all the business and assets of the Trustee may be transferred, will be deemed to be continuing as the Trustee.

## ARTICLE IX
## PROCEDURES FOR COMMITTEE

Section 9.1  <u>Composition of Committee</u>.  The Committee shall consist of eleven individual persons, consisting of six (6) Independent Members and five (5) UAW Members.  No Member of the Committee shall be a current or former officer, director or employee of any of the Companies; provided, however, a retiree who was represented by the UAW in his or her employment with a Company, or an employee of a Company who is on leave from the Company and is represented by the UAW, may be a UAW Member.  No Member shall be authorized to act for a Company or be an agent or representative of a Company for any purpose.  Furthermore, no Company shall be a fiduciary with respect to any of the Plans or the Trust, and the Companies will have no rights or responsibilities with respect to the Plans or the Trust other than as specifically set forth in the Company Settlements.  This limitation on Company participation on the Committee and the limitation set forth in Section 3.5 of this Trust Agreement are not subject to change, amendment or alteration.  No Independent Member, or any family member, employer, or partner of an Independent Member, shall have any financial or institutional relationship with a Company or UAW if such relationship could reasonably be expected to impair such person's exercise of independent judgment.

Section 9.2  <u>Term of Office</u>.  Each Member shall continue to serve as such until his or her death, incapacity to serve hereunder, resignation, removal, or the expiration of his or her term.  Independent Member terms shall be for three (3)-year periods, except the initial terms of four (4) of the six (6) original Independent Members, two (2) of whom shall have an initial term of two (2) years, and two of whom shall have an initial term of one (1) year, as described in Exhibit E.  An Independent Member may serve more than one term.

Section 9.3  <u>Resignation</u>.  A Member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least thirty (30) days' advance written notice to the Committee (or such shorter notice as the Committee may accept as sufficient) stating a date when such resignation shall take effect.  Such resignation shall take effect on the date specified in the notice or, if a successor Member has been appointed effective as of an earlier date, on such earlier date.

Section 9.4  <u>Removal; Appointment of Successor Committee Members</u>.

(a)  An Independent Member may be removed or replaced, and a successor designated, at any time by an affirmative vote of nine (9) of the other Members of the Committee in the event that such other Members lose confidence in the capacity or willingness of the Independent Member being replaced or removed to fulfill his or her duties and responsibilities as a Member as set forth in this Trust Agreement.  In the event of a vacancy of an Independent Member position, whether by expiration of term, resignation, removal, incapacity, or death of an Independent Member, a successor Independent Member shall be elected by the affirmative vote of nine (9) Members, and when possible, such successor Independent Member shall be elected prior to the expiration of the term, resignation, removal, incapacity, or death of the Independent Member being replaced.

(b)    The UAW Members shall serve at the discretion of the UAW International President, and may be removed or replaced, and a successor designated, at any time by written notice from the UAW International President to the Committee.

(c)    Each successor Member shall signify his or her acceptance of the appointment and his or her responsibilities under this Agreement in writing.

(d)    If no appointment of a successor Independent Member is made within a reasonable time after his or her expiration of term, resignation, removal or other event, an arbitrator selected pursuant to the procedures established in Subsection 9.9(e) may be engaged upon application of any Member to appoint a successor Independent Member to the Committee. If the failure to appoint an Independent Member is the result of factors unrelated to a dispute among Members, any Member may apply to a court of competent jurisdiction to ask the court to appoint a successor Independent Member to the Committee as such court may deem suitable and proper.

Section 9.5    Chair. The Committee shall select a chair from among its Members (the "Chair"). The term of the Chair will continue until he or she ceases to be a Member, resigns as Chair or is replaced as Chair with another Member by majority vote among the remaining Members.

Section 9.6    Meetings.

(a)    The Committee shall hold meetings as frequently as is necessary to ensure the efficient administration of the Trust and Plan and shall hold a minimum of four (4) meetings during each calendar year. The Chair, or any six (6) Members, may call a special meeting of the Committee by giving at least five (5) days' advance written notice of the time and place thereof to all other Members.

(b)    The Chair, or another such individual or individuals so designated by the Chair, shall (i) preside over Committee meetings; (ii) prepare the Committee meeting agenda; (iii) oversee Trust operations between Committee meetings and report to the Committee on such operations; and (iv) perform such other functions as the Committee determines.

(c)    One Member, or another individual so designated, shall maintain minutes of all Committee meetings, but such minutes need not be verbatim. Copies of such minutes shall be provided to all Members and to such other parties as the Committee may designate.

Section 9.7    Place of Meeting; Telephonic Meetings. Meetings of the Committee shall be held in the Detroit, Michigan metropolitan area as designated in the notice of meeting. Meetings of the Committee may be held through any communications equipment or other technology if all persons participating can hear each other, and such participation in a meeting shall be considered presence at the meeting for all purposes, including Section 9.8.

Section 9.8    Quorum. A majority of the Members of the Committee then in office shall constitute a quorum for the purpose of transacting any business; provided that at least one Independent Member and one UAW Member are present.

Section 9.9   <u>Vote of the Members.</u>

(a)      Each Member of the Committee present at the meeting shall have one vote. Except as otherwise specified in this Trust Agreement, all actions of the Committee shall be by majority vote of the entire Committee, provided that at least one Independent Member and one Union Member must be a Member in the majority for any Committee action to take effect. Notwithstanding anything in this Subsection 9.9(a) to the contrary, any action by the Committee taken after the 2011 calendar year that would not be permitted under Subsection 10.2(d) before the expiration of the 2011 calendar year shall require an affirmative vote of nine (9) Members to take effect.

(b)      The vote of any absent Independent Member of the Committee may be cast in accordance with a written proxy delivered to any other Independent Member of the Committee present at the meeting, and the vote of any absent UAW Member of the Committee may be cast in accordance with a written proxy delivered to any other UAW Member of the Committee present at the meeting.

(c)      In the event that a vacancy exists in the number of Independent Members, or that an Independent Member is absent (and has not delivered a proxy), a majority of the Independent Members present shall be entitled to cast the vote otherwise exercisable by the Independent Member not present.  In the event that a vacancy exists in the number of UAW Members, or that a UAW Member is absent (and has not delivered a proxy), a majority of the UAW Members present shall be entitled to cast the vote otherwise exercisable by the UAW Member not present.

(d)      In addition to decisions made at meetings, action may be taken without a meeting pursuant to a written (including e-mail) or telephone poll by the Chair (or his designee); provided that any action taken in a telephone poll must be confirmed in writing (including e-mail) by each Member who voted for the action taken either before or as soon as practicable following the vote (but no later than thirty (30) days after the vote).

(e)      In the event that an action does not take effect – including, without limitation, an action under Subsection 9.9(a) that requires nine (9) affirmative votes to take effect – notwithstanding all Independent Members voting in favor, or alternatively all UAW Members voting in favor, any Committee Member may refer the issue to arbitration pursuant to the procedures established from time to time by the Committee.  In addition, any Committee Member may refer the failure to appoint a successor Independent Member pursuant to Subsection 9.4(d) to an arbitrator, in which case the arbitrator may select the successor Independent Member.  The determination of the arbitrator shall be final and binding on all parties to the Trust.  The costs and expenses of such arbitration (including attorneys' fees for separate counsel for Members on each side of the issue) shall be paid from the Trust unless paid by any other source, or unless otherwise ordered by the arbitrator.  The arbitrator's decision must be consistent with the terms of the Trust and, if the dispute concerns an amendment to the Trust, the arbitrator may not issue a decision contrary to the terms of Section 12.1 hereof.

Section 9.10    Fees and Expenses.  To the extent permitted by ERISA, Members of the Committee will be entitled to reasonable compensation for the performance of their duties hereunder.  Members of the Committee may be reimbursed by the Trust for reasonable expenses properly and actually incurred in the performance of their duties.  The fees and expenses of the Committee shall be deemed to be fees and expenses of the Trust and shall be reimbursed from the Trust Fund consistent with the restrictions set forth in this Section 9.10.

(a)    Independent Members shall receive an annual retainer of $30,000, payable in equal quarterly installments in arrears, and a meeting fee of $2,000 for each meeting of the Committee in which such Independent Member participates, provided, however, that the combination of retainer and meeting fees shall not exceed $46,000 per calendar year. In the event that an Independent Member's tenure on the Committee ends on a day other than the last day of the quarter for which a quarterly installment of his or her annual retainer is due, he or she shall be paid for the pro rata portion of such quarter that coincides with his or her tenure on the Committee.  For purposes of the meeting fee, participation by telephone or other simultaneous communication device shall qualify an Independent Member for a participation fee only if the meeting is scheduled and anticipated to last at least one (1) hour.  Participation in telephonic conferences to address ad hoc issues do not qualify an Independent Member for a participation fee.

(b)    UAW Members who are eligible to receive compensation for participation on the Committee shall receive the amounts described in Subsection 9.10(a) above for Independent Members.  Any Member who is an employee of the UAW or a local union affiliated therewith shall not be eligible to receive compensation for service as a Member. Notwithstanding the prohibition on compensation otherwise described in this Subsection 9.10(b), UAW Members shall be entitled to receive reimbursements for reasonable expenses properly and actually incurred in the performance of a UAW Member's duties pursuant to this Trust Agreement.

(c)    The Chair shall receive a fee of $5,000 per year, payable in quarterly installments in arrears, for service as the Chair, in addition to the compensation received as a Member pursuant to Subsection 9.10(a) or Subsection 9.10(b), whichever is applicable.

(d)    Other than UAW Members who are prohibited from receiving compensation pursuant to Subsection 9.10(b), nothing herein shall prohibit or limit any Member from receiving fees from the Trust Fund for services rendered at the request of the Committee (e.g., reasonable fees for attendance at retiree meetings to explain the operation of the programs contemplated by the Settlements and/or this Trust Agreement).

(e)    The fees and limits described in Subsection 9.10(a) and (b) above shall be increased each calendar year after 2008 by each calendar year's percentage increase, if any, to the consumer price index for urban wages (CPI-W).

Section 9.11    Liaison.

(a)    The Liaison's primary roles, as further detailed in this section, shall be:

(1)    to work, as the Liaison deems appropriate, alongside any and all Trust personnel, outside advisors, consultants, professionals, and service providers retained by the Trust, on all matters pertaining to the operation of the Trust,

(2)    to stay informed about all facets of the Trust's activities, and

(3)    to maintain open lines of communications in regard to all activities of the Trust – including, without limitation, its funding status and the administration of the Benefits provided under the Plans – among and between (i) the Trust and the Committee, (ii) the Eligible Retirees and Beneficiaries, and (iii) retiree representatives and the UAW.

(b)    The Liaison shall not be a Member and shall not be entitled to a vote on any matter coming before the Committee.

(c)    The Liaison shall maintain open lines of communications regarding the activities of the Trust among and between (i) the Trust and the Committee, (ii) the Eligible Retirees and Beneficiaries, and (iii) the retiree representatives and the UAW in regard to all activities of the Trust. Specifically, the Liaison shall maintain communications with, among others, elected leaders of retiree chapter organizations, Class Representatives (and, until the Implementation Date, Class Counsel), UAW officials (in addition to UAW Members), Trust personnel, and the Independent Members and UAW Members.

(d)    The Liaison may attend all meetings of the Committee and any Sub-Committee established pursuant to Section 10.8.

(e)    The Liaison shall be permitted to consult with and work alongside any and all Trust personnel on any facet of the operations of the Trust, including but not limited to activities related to investment of Trust assets, administration of the Benefits provided under the Plans, retention of outside advisors, consultants, professionals and service providers, and the hiring of personnel needed for operation of the Trust.

(f)    The Liaison shall have access to any and all information developed or utilized by Trust personnel in connection with the operation of the Trust, including but not limited to information provided by any outside advisors, consultants, professionals or service providers retained by the Trust. In the event that the Liaison is provided information that is subject to a privilege that the Trust or Committee may assert, the Liaison shall not take any action that would cause such privilege to be violated.

(g)    The Liaison shall be permitted to work alongside Trust personnel in the development of recommendations that may be made to the Committee by Trust personnel regarding any matter to come before the Committee.

(h)    The Liaison shall be permitted to work alongside Trust personnel in connection with the work of any outside advisors, consultants, professionals or service providers retained by the Trust.

(i)    The UAW, acting through the International President, shall have the right to appoint the Liaison.

(j)    Until the first Implementation Date of any of the Company's Settlements, the Liaison may be an active employee on the UAW staff.  On and after such implementation date, the Liaison shall not be an active member of the UAW Staff (but such person shall not be prohibited from performing work for the UAW on a consulting or other part-time basis, on matters unrelated to the operation of the Trust; provided that such work does not interfere with the Liaison's ability to perform his or her duties as the Liaison).

(k)    The Trust shall provide compensation for the Liaison as provided as follows:

(1)    If the Liaison is an active member of the UAW staff, the Trust shall not provide any compensation of any kind to the UAW Liaison.  In such circumstance, the Trust shall provide reimbursement to the Liaison for reasonable expenses properly and actually incurred in the performance of the Liaison's duties pursuant to this Trust Agreement.

(2)    If the Liaison is not an active member of the UAW staff, and the UAW designates the Liaison to perform the duties of such office on a full-time basis, the Trust shall (a) pay the Liaison an annual salary of $140,000 adjusted annually on the same basis as the adjustments for Committee Members as described in Section 9.10(e), (b) pay meeting fees in the same manner as paid for Committee Members pursuant to Section 9.10(a), (c) provide the Liaison a package of employee benefits (insurance, pension, vacation, and other fringe benefits) no less favorable than that provided to Trust personnel at the senior management level, if any, and (d) reimburse the Liaison for reasonable expenses properly and actually incurred in the performance of the Liaison's duties pursuant to this Trust Agreement.

(3)    If the Liaison is not an active member of the UAW staff and the UAW designates the Liaison to perform the duties of such office on less than a full-time basis, (a) the compensation provided in sub-section 9.11(k)(2)(a) above shall be reduced proportionately, (b) the Trust shall provide additional reasonable compensation for the performance of specific duties in the same manner as permitted for Committee Members pursuant to Section 9.10(d),  and (c) all other provisions of Section 9.11(k)(2) shall continue to apply without adjustment.

27

(l)    The Liaison shall be fully bound to adhere to the Code of Ethics attached as
Exhibit I and any failure to adhere to the Code of Ethics shall be grounds for immediate
disqualification.

## ARTICLE X
## POWERS AND DUTIES OF THE COMMITTEE

Section 10.1   General.  The Committee, acting on behalf of the EBAs, shall be responsible for the implementation, amendment and overall operation of the Trust Fund and the establishment, amendment, maintenance, and administration of the Plans.  Subject to the provisions of this Trust Agreement and applicable laws, the Committee shall have sole, absolute and discretionary authority to adopt such rules and regulations and take all actions that it deems desirable for the administration of the Trust Fund, and to interpret the terms of the Plans and Trust.  Subject to Section 3.7, the decisions of the Committee will be final and binding on all Participants and Beneficiaries and all other affected parties to the maximum extent allowed by law.

Section 10.2   Benefits.

(a)     Adoption of the Plans.  The Committee, on behalf of the EBAs, shall adopt the Plans to provide Benefits to Participants and Beneficiaries and may amend the Plans from time to time. The terms of the Plans as initially adopted are set forth in subsection (d) of this section.  Thereafter, the Committee on behalf of the EBAs may amend the Plans from time to time to provide Benefits as it may determine in its sole and absolute discretion; provided, however, that the Committee shall have no authority to provide any benefits other than Retiree Medical Benefits until the end of the Initial Accounting Period.  Furthermore, the eligibility rules of each respective Plan shall be the same as those provided by the respective Company Health Care Plan and may not be expanded by the Committee.  The Plans may provide for different benefit structures for different groups of Participants or Beneficiaries, including, without limitation, different groups of Participants or Beneficiaries included in the same Eligible Group, and may provide for different contributions for such groups; provided, however, that such differences within or among Eligible Groups are reasonably related to a rational purpose and consistent with the relevant provisions of this Trust Agreement.  The rights of the Committee described in this Section 10.2 shall be exercised in a manner consistent with the Settlements.  Although the Committee shall be under no obligation to design the Plans to assure that the assets of the Trust Fund are sufficient to provide Benefits to all potential Participants and Beneficiaries of the Plans in all subsequent years, the Committee's long-term objective in designing the Plans, absent countervailing circumstances, shall be to provide meaningful health benefits to all Participants and Beneficiaries included in each Eligible Group.

(b)     Benefits Design.  The Plans shall provide Benefits designed by the Committee in its sole discretion, acting on behalf of the EBAs as a fiduciary to the Plans, subject to Sections 1.3, 10.2(a) and 10.2(d).  The Benefit design shall include rules to determine which of the Participants and Beneficiaries of the Trust will receive Benefits under the Plans, in what form and in what amount.  The Plans may include co-pays, Participant and Beneficiary contributions, and any other features that the Committee from time to time determines appropriate or desirable in its sole discretion.  In designing the Plans and the Benefits to be provided thereunder, the Committee may take into account circumstances that it determines to be relevant, including, without limitation, the degree to which

Participants and Beneficiaries have alternative resources or coverage sources, pension levels under the Company's pension plans have changed, and the resources of the Trust Fund based upon expected deposits, remittances, and other sources of funding. In exercising its authority over benefit design, the Committee shall be guided by the principle that the Plans should provide substantial health benefits for the duration of the lives of all Participants and Beneficiaries.

(c)    Method of Providing Benefits. Benefits under a Plan may be fully insured, partially insured or self-insured, as determined from time to time by the Committee in its sole discretion and in accordance with the funding policy established pursuant to Section 10.3. In all events, the expected cost of Benefits to be provided under each Plan during any calendar year shall not exceed the amount of assets expected to be available under the Separate Retiree Account related to such Plan to cover such costs during such calendar year.

(d)    Initial Benefits. Notwithstanding any other provision in this Section 10.2, until the expiration of the 2011 calendar year, the Chrysler Retiree Plan shall provide the Benefits specified in Exhibit F(1), the Ford Retiree Plan shall provide the Benefits specified in Exhibit F(2), and the GM Retiree Plan shall provide the Benefits specified in Exhibit F(3). The Benefits specified in Exhibits F(1), F(2) and F(3) shall be the Benefits provided for under the terms of each Company's respective Settlement. During the period that the Plans are providing the initial benefits described in this Section 10.2(d), the Committee may exercise administrative discretion (as permitted under the Trust Agreement) in delivering such benefits, including, without limitation, making any changes that could have been adopted by joint action of a Company and the UAW pursuant to Section 5.A.2(h) of the Settlement Agreement between GM and UAW dated December 16, 2005, Section ___ of the Settlement Agreement between Ford and UAW dated _____, and similar provisions of the Chrysler Health Care Program.

(e)    Medicare Part B Benefits. The initial Benefits provided pursuant to Subsection 10.2(d) under each Plan shall include a subsidy of the Medicare Part B premiums attributable to such Participants in an amount no lower in dollar value than $76.20 per month.

(f)    Design Principles. In exercising its authority under this Section 10.2, the Committee shall adhere to the design principles described in Exhibit G. A Plan only may provide Benefits as defined in Section 1.3.

Section 10.3  Funding Policy. Subject to the direction of the Independent Fiduciary with respect to the Employer Securities, the Committee will establish a funding policy for each Plan and communicate that funding policy to the Trustee.

Section 10.4  Investment Guidelines. Except with respect to the authority of the Independent Fiduciary with respect to the Employer Securities, the Committee shall cause investment guidelines for managing (including the power to acquire and dispose of) all or any part of the Trust Fund and communicate that policy to the Trustee to be established. In so doing, the Committee shall adhere to the investment practice standards set forth in Exhibit H.

Section 10.5  <u>Appointment of Investment Managers</u>.  The Committee may appoint one or more Investment Managers to manage, or to select one or more Investment Managers to manage, all or part of the Trust Fund and enter into an agreement with the Investment Manager(s).  If an Investment Manager is appointed, it shall have the appurtenant investment authority of the Trustee specified in Section 6.1, as limited by investment guidelines adopted by the Committee, with respect to the portion of the Trust Fund over which it has investment discretion, and the Trustee's duties with respect to that portion of the Trust Fund shall be limited to following the instructions of the Investment Manager.

Section 10.6  <u>Government Reports and Returns</u>.  The Committee shall file all reports and returns, including but not limited to, any IRS Form 5500 series and IRS Form 990 series that are required to be made with respect to the Trust and a Plan.

Section 10.7  <u>Compromise or Settle Claims</u>.  The Committee may compromise, settle and release claims or demands in favor of or against the Trust or the Committee on such terms and conditions as the Committee may deem advisable, and payment shall be made from the Separate Retiree Account to which the claim or demand relates (or, if the claim or demand relates to more than one Separate Retiree Account, on a basis commensurate with the portion of the claim relating to each Separate Retiree Account).

Section 10.8  <u>Appointment of Third Parties; Delegation of Authority</u>.  The Committee may appoint a third party to perform any functions assigned to it by the Committee to the extent permitted under applicable law.  The Committee may by adoption of a written resolution delegate to any two or more Members the authority to act on behalf of the full Committee to the extent set forth in the resolution.  In the event of such a delegation, the resulting sub-committee shall have at least one Independent Member and one UAW Member, and subcommittee action shall require the affirmative vote of at least one Independent Member and one UAW Member. Any action taken on behalf of the Committee pursuant to the delegation shall be reported to the Committee at its next regularly scheduled meeting.

Section 10.9  <u>Consultation</u>.  The Committee may engage or consult with counsel or other advisors and, in accordance with the provisions of Section 6.6, may direct the Trustee to pay reasonable compensation therefor from the Trust Fund and may take or may refrain from taking any action in accordance with or reliance upon the opinion of counsel or such expert advisors.

Section 10.10  <u>Reliance on Written Instruments</u>.  Each Member of the Committee shall be fully protected in acting upon any instrument, certificate or paper reasonably believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 10.11  <u>Standard of Care</u>.  The Committee and each Member shall discharge their duties in the interests of Participants and Beneficiaries of each Plan and for the exclusive purpose of providing Benefits to such Participants and Beneficiaries and defraying reasonable expenses of administering the Trust and each Plan and shall act with the care, skill, prudence

and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, consistent with the provisions of ERISA and the Code. In exercising their discretion with respect to providing Benefits to Participants and Beneficiaries of each Plan, the Committee and each Member shall consider exclusively the interests of the Participants and Beneficiaries in such Plan. In exercising their discretion with respect to defraying reasonable expenses of administering the Trust or Plans, the Committee and each Member shall consider exclusively the interests of the Participants and Beneficiaries in the Plans.

Section 10.12  Bonding. The Members of the Committee shall be bonded in the amount required by section 412 of ERISA and may be covered by liability insurance in accordance with section 410(b) of ERISA. To the extent permitted by applicable law, the costs of such bonding and insurance shall be expenses paid by the Trustee under Section 6.6.

Section 10.13  Discretionary Authority. Except as the Committee's powers are limited by specific provisions of this Trust Agreement, including without limitation, the provisions of Article IX, the Committee (or its designee) shall have the exclusive right, power, and authority, in its sole and absolute discretion, to administer, apply and interpret this Trust Agreement, each Plan and any other Plan documents, to make its own motions, resolutions, administrative rules and regulations, contracts, or instruments and to decide all matters arising in connection with the operation or administration of the Trust or Plans. Benefits under the Plans will be paid only if the Committee or its designee decides in its discretion that the applicant is entitled to them. Without limiting the generality of the foregoing, the Committee, on behalf of each EBA and the Trust, shall have the sole and absolute discretionary authority to:

(a)  take all actions and make all decisions with respect to the eligibility for, and the amount of, Benefits payable under a Plan;

(b)  formulate, interpret and apply rules, regulations and policies necessary to administer a Plan in accordance with its terms;

(c)  decide questions, including legal or factual questions, relating to the calculation and payment of Benefits under a Plan;

(d)  determine the standard of proof and the sufficiency of evidence as to any factual question arising under a Plan;

(e)  resolve and/or clarify any ambiguities, inconsistencies and omissions arising under this Trust Agreement, each Plan, or other Plan documents;

(f)  process, and approve or deny Benefit claims and rule on any Benefit exclusions;

(g)  settle or compromise disputed claims as provided in Section 10.7 on such terms as the Committee determines to be in the best interest of the Participants and Beneficiaries;

(h)  enforce any contribution, remittance or payment obligation set forth in Article IV; and

(i)    do all acts which it may deem necessary or proper and to exercise any and all powers of the Committee under this Trust Agreement upon such terms and conditions as it may deem to be in the best interests of the Trust or Plans.

Subject to Section 3.7 of this Trust Agreement, all determinations made by the Committee or its designee with respect to any matter arising under the Trust, each Plan, and any other Plan documents shall be final and binding on all affected parties, including without limitation Participants, Beneficiaries, and any other persons who have claims against the Trust Fund and a Plan through any of them. In the event that the terms of a Plan are inconsistent with the terms of this Trust Agreement, the Trust Agreement controls.

Section 10.14    No Individual Liability on Contracts. The Members of the Committee shall not be liable personally, either individually or jointly, for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts. Such claims and obligations shall be paid out of the Trust; provided, however, that the Members shall not be exempt from personal liability for willful misconduct, breach of fiduciary duty, or fraud, and the Trust shall not indemnify the Members for such liabilities.

Section 10.15    The Companies and UAW Not Liable for Conduct of Committee. In their capacity as Members, the Members of the Committee, individually and jointly, are not officers, agents, employees, or representatives of the Companies or UAW. In their capacity as Members, each Member is a principal acting independently of the UAW. To the extent permitted by applicable law, the UAW (and their employees, officers, and directors) shall not be liable for any act, omission, contract, obligation, or undertaking of the Committee or its officers, agents, or representatives. Under no circumstances will any Company or their employees, officers, directors or agents be responsible for or have any liability for any act, omission, contract, obligation or undertaking of the Committee or its officers, agents or representatives.

Section 10.16    Reimbursement for Defense of Claims. To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Committee, Members, employees of the Committee, persons acting on the Committee's behalf pursuant to an express written delegation, and the Liaison (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys' fees, incurred personally in defense of any claim that seeks a recovery of any loss to a Plan or Trust Fund or for any damages suffered by any party to or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Committee – or, where required by applicable law, an independent fiduciary – determines that the settling Indemnified Party was not primarily responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Committee or an independent fiduciary), provided that the Committee shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

Section 10.17    Indemnifications. To the extent permitted by law, the Trust shall indemnify and hold the Committee, the UAW, the Companies, the Chrysler Health Care Program, the Ford

Retiree Health Program, the General Motors Health Care Program for Hourly Employees, the employees, officers and agents of each of them harmless from and against any liability that they may incur in connection with the Plans and Trust, unless such liability arises from gross negligence, intentional misconduct or breach of their respective Company Settlement. All costs associated with the indemnity provided under this Section 10.17 shall be borne solely by the Separate Retiree Account to which such costs relate.

Section 10.18   Subrogation and Reimbursement.   Subject to the limitations of Section 10.2(d), the Committee shall maintain, as part of each Plan, a comprehensive subrogation and reimbursement policy, updated from time to time as appropriate.

Section 10.19   Code of Ethics.   The Committee shall maintain a code of ethics to govern the conduct of Members and staff, if any, when acting on behalf of the Trust or a Plan or otherwise in their official capacity. The initial code of ethics is attached at Exhibit I. It may be amended by the Committee in light of experience and evolving standards, consistent with principles of good governance and fiduciary principles.

Section 10.20   Presumption of Control.   The Committee shall take all such reasonable action as may be needed to rebut any presumption of control that would limit the Trust's ability to own GM's common stock, Ford's Common Stock, the 6.75% Series U Convertible Senior Debentures Issued by GM Due December 31, 2012, or the 5.75% Senior Convertible Notes due 2013 issued by Ford or as may be required to comply with all applicable laws and regulations, including, but not limited to, federal and state banking laws and regulations.

## ARTICLE XI
## INDEPENDENT FIDUCIARY

Section 11.1    General. Upon the appointment of an Independent Fiduciary by the Committee pursuant to Section 11.3, this Article XI shall be given effect.

Section 11.2    Independent Fiduciary With Respect to Employer Security. Any provision of this Trust Agreement to the contrary notwithstanding, the Trustee shall have no discretionary authority or powers with respect to any Employer Security and all such discretionary authority shall rest with the Independent Fiduciary. The Trustee shall hold any Employer Security in the respective Employer Security Sub-Account and shall be subject to direction by the Independent Fiduciary with respect to the acceptance, management, disposition, and voting of the Employer Security. The Independent Fiduciary shall be a named fiduciary (as defined in section 402(a)(2) of ERISA) and investment manager (within the meaning of section 3(38) of ERISA) with respect to all discretionary actions regarding the valuation, acceptance, management, disposition, and voting of any Employer Security. The Trustee shall be entitled to rely upon the identification by the Committee of the Independent Fiduciary until notified in writing by the Committee that an Employer Security Sub-Account's assets are no longer subject to the Independent Fiduciary's management. During any period of time in which the Independent Fiduciary manages the Employer Security Sub-Accounts, the Trustee shall act strictly in accordance with any directions of the Independent Fiduciary with respect to the Employer Security Sub-Accounts. The Trustee shall continue to receive all assets purchased against payment therefor and to deliver all assets sold against receipt of the proceeds therefrom. The Independent Fiduciary may from time to time issue orders on behalf of the Trustee for the purchase or sale of securities directly to an underwriter or broker or dealer and for such purpose the Trustee shall, upon request, execute and deliver to such Independent Fiduciary one or more trading authorizations. The Trustee shall have no responsibility or liability to anyone relating to the asset management decisions of the Independent Fiduciary except to the extent that the Trustee has failed to act strictly in accordance with any directions of the Independent Fiduciary with respect to the Employer Security Sub-Accounts. The Trustee shall be under no duty to make or review any recommendation with respect to any such decision. The Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment made or sold pursuant to the direction of the Independent Fiduciary nor by reason of the failure to take any action with respect to any investment which was acquired pursuant to any such direction in the absence of further direction of the Independent Fiduciary.

Section 11.3    Appointment of Independent Fiduciary. The Committee, in its sole discretion, shall appoint an Independent Fiduciary to manage the Employer Security Sub-Accounts, or for any other purpose as required by law, by delivering a written instrument to the Independent Fiduciary, which the Independent Fiduciary shall acknowledge in writing. The Independent Fiduciary shall be a bank, trust company or registered investment adviser under the Investment Advisers Act of 1940, as amended.

Section 11.4    Removal. The Independent Fiduciary may be removed by the Committee at any time upon thirty (30) days' advance written notice. Such removal shall be effective on the date specified in such written notice, provided that notice has been given to the Independent Fiduciary of the appointment of a successor Independent Fiduciary in the manner set forth in

Section 11.6 below, provided that no such successor Independent Fiduciary shall be appointed in the event that the Trust then holds no Employer Security.

Section 11.5  Resignation.  The Independent Fiduciary may resign by delivering to the Committee a written resignation that shall take effect sixty (60) days after the date of such filing or such earlier date that a successor Independent Fiduciary has been appointed by the Committee.

Section 11.6  Successor Independent Fiduciary.  As expeditiously as is practicable under the circumstances, the Committee shall appoint a successor Independent Fiduciary by delivering to the successor Independent Fiduciary an instrument in writing, executed by an authorized representative of the Committee, appointing such successor Independent Fiduciary, and by delivering to the removed or resigning Independent Fiduciary an acceptance in writing, executed by the successor Independent Fiduciary so appointed.  Such appointment shall take effect upon the date specified in Section 11.4 or 11.5 above, as applicable.  In the event that the Trust Fund acquires or holds an Employer Security with respect to which an Independent Fiduciary is required, and no appointment of a successor Independent Fiduciary is made by the Committee by the date specified in Section 11.4 or Section 11.5, whichever the case may be, any court of competent jurisdiction may, upon application by the retiring Independent Fiduciary, appoint a successor Independent Fiduciary after such notice to the Committee and the retiring Independent Fiduciary, as such court may deem suitable and proper.  The Committee, and a resigning and successor Independent Fiduciary shall avoid whenever possible any period during which no Independent Fiduciary has accepted an appointment to manage an Employer Security being held in a Employer Security Sub-Account.

Section 11.7  Independent Fiduciary Compensation and Expenses.  The Trustee will apply the assets of the Trust Fund in accordance with Section 7.1, to pay the fees and expenses of the Independent Fiduciary in the amounts and on the dates set forth in the agreement between the Independent Fiduciary and the Committee.

Section 11.8 Confidential Information.  In exercising its duties pursuant to Section 11.2, an Independent Fiduciary may receive confidential information from a Company under an agreement to not reveal such information to the Committee or any Member, subject to any obligation to disclose such information that may be imposed by ERISA, in which case the Company will be notified, in advance.

## ARTICLE XII
## AMENDMENT, TERMINATION AND MERGER

Section 12.1   Amendment.   The Trust Agreement may be amended at any time in writing by the Committee; provided that (i) under no circumstances shall any of the Plans or the Trust Agreement be amended or modified to provide benefits or payment for benefits other than Retiree Medical Benefits for the Participants and Beneficiaries until expiration of the Initial Accounting Period; (ii) no amendment shall alter or conflict with a Company's Settlement; and (iii) no amendment shall amend or modify Articles I, IV and XII, Sections 2.1, 3.1, 3.4(b), 3.5, 3.7, 5.1(a), 6.1(u), 6.5, 6.7, 7.1, 7.4, 9.1, 9.2, 9.3, 9.4, 9.7, 9.8, 9.9, 9.10, 10.1, 10.2(a), (b), (d), (e) and the last sentence of (f), 10.7, 10.13 (last flush paragraph), 10.15, 10.16, 10.17, 10.20, Exhibits F(1), F(2) and F(3), or the definitions of Eligible Groups in Exhibits A through C; and provided further that no amendment shall adversely affect the exempt status of the Trust or Plans under section 501(c)(9) of the Code.  No amendment to the Trust Agreement shall increase the responsibilities of the Trustee hereunder unless the Trustee has first consented to such amendment.

Section 12.2   Termination.

(a)   Before the expiration of the Initial Accounting Period with respect to each Plan, the Trust shall not be terminated.  Thereafter, the Trust and this Trust Agreement may be terminated by the Committee in writing, with a copy of such written instrument to be provided to the Trustee, whenever the Committee, on behalf of the EBAs, and in its sole discretion determines that the Trust is no longer effective in serving its purposes or that the interests of the Participants and Beneficiaries could be better served through an alternative arrangement taking into account the requirements of Section 7.1.  Upon termination of this Trust Agreement, the assets of the Trust Fund shall be paid out at the direction of the Committee in the following order of priority:  (i) the payment of reasonable and necessary administrative expenses (including taxes); (ii) the payment of Benefits to Participants and Beneficiaries entitled to payments for claims arising prior to such termination; and (iii) at the discretion of the Committee, in accordance with section 501(c)(9) of the Code and ERISA, for the benefit of Participants and Beneficiaries in such fashion as the Committee determines.  The Companies, UAW or the Committee shall not have any beneficial interest in the Trust Fund. The Trust Fund shall remain in existence until all assets have been distributed.

(b)   Following termination, the Trustee and the Committee shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

Section 12.3   Transfer of Assets.   After the Initial Accounting Period has expired with respect to a Plan, and to the extent permitted by applicable law and subject to the restrictions of Section 7.1, some or all of the assets of the Trust Fund attributable to a Separate Retiree Account with respect to which the Initial Accounting Period has expired, may at the discretion of the Committee acting in a fiduciary capacity be transferred directly to another trust for the purpose of providing Benefits to some or all of the Participants and Beneficiaries in the Plan

with respect to which the Initial Accounting Period has expired on such terms and conditions as the Committee may determine.

Section 12.4  Merger of Trusts or Transfer of Assets.  In addition to the powers of the Committee pursuant to Sections 12.2 and 12.3 to transfer Trust assets to another trust, subject to the restrictions of Section 7.1, the Committee acting in a fiduciary capacity may merge or accept transfers of assets from other trusts – including, without limitation, trusts maintained by Chrysler, Ford, and GM – into the Trust, provided that the assets attributable to the each Plan are separately accounted for in the respective Separate Retiree Account.

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1  <u>Rights in Trust Fund</u>.  No Eligible Retiree, Participant, Beneficiary, or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right relating to the Trust or a Plan against the Trustee, the Committee, the Independent Fiduciary, UAW, or the Companies, except as may be otherwise expressly provided in the Plan or in this Trust Agreement.

Section 13.2  <u>Non-Alienation</u>.  Except to the extent required by applicable law, the rights or interest of any Participant or Beneficiary to any Benefits or future payments hereunder or under the provisions of a Plan shall not be subject to attachment or garnishment or other legal process by any creditor of any such Participant or Beneficiary, nor shall any such Participant or Beneficiary have any right to alienate, anticipate, commute, pledge, encumber or assign any of the Benefits or payments which he may expect to receive, contingent or otherwise, under a Plan or this Trust Agreement, provided that assignments of benefit payments to a health care provider under a Plan may be permitted pursuant to rules adopted by the Committee in its sole discretion.

Section 13.3  <u>Controlling Laws</u>.  The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

Section 13.4  <u>Counterparts</u>.  This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

Section 13.5  <u>Headings</u>.  The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

Section 13.6  <u>Usage</u>.  The plural use of a term defined in Article I in the singular shall mean all of the entities defined by such term.

Section 13.7  <u>Notices</u>.  All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (i) on the date of receipt if served personally or by confirmed facsimile or other similar communication; (ii) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (iii) on the fourth business day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

<u>If to the Trustee</u>:

**[insert name and address]**

<u>If to the Committee</u>:

**[insert name and address]**

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

COMMITTEE OF THE UAW RETIREE MEDICAL BENEFITS TRUST

INDEPENDENT MEMBERS

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

UAW MEMBERS

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

TRUSTEE

**[insert name of institution]**

By: _____

_____
Print Name

_____
Title

Dated: _____

## Exhibit A

**Chrysler Eligible Group**

**[To be copied from Settlement Agreement when it is final. This will include both the "Class" and the "Covered Group."]**

**Exhibit B**

**Ford Eligible Group**

**[To be copied from Settlement Agreement when it is final.  This will include both the
"Class" and the "Covered Group."]**

## Exhibit C

## GM Eligible Group

The term "GM Eligible Group" as used in this Trust Agreement shall mean the Class or Class Members and the Covered Group as set forth in the GM Settlement and reiterated verbatim in this Exhibit C:

Class or Class Members. The term "Class" or "Class Members" shall mean all persons who are:

(i) GM-UAW Represented Employees who, as of October 15, 2007, were retired from GM with eligibility for Retiree Medical Benefits under the GM Plan, and their eligible spouses, surviving spouses and dependents;

(ii) surviving spouses and dependents of any GM-UAW Represented Employees who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan;

(iii) UAW retirees of Delphi Corporation ("Delphi") who as of October 15, 2007 were retired and as of that date were entitled to or thereafter become entitled to Retiree Medical Benefits from GM and/or the GM Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described in Section K.2 of such Memorandum of Understanding or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999, and their eligible spouses, surviving spouses and dependents of all such retirees;

(iv) surviving spouses and dependents of any UAW-represented employee of Delphi who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or the GM Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described in Section K.2 of such Memorandum of Understanding or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999;

(v) GM-UAW Represented Employees or former UAW-represented employees who, as of October 15, 2007, were retired from any previously sold, closed, divested or spun-off GM business unit (other than Delphi) with eligibility to receive Retiree Medical Benefits from GM and/or the GM Plan by virtue of any other agreement(s) between GM and the UAW, and their eligible spouses, surviving spouses, and dependents; and

(vi) surviving spouses and dependents of any GM-UAW Represented Employee or any UAW-represented employee of a previously sold, closed, divested or spun-off GM business unit

44

(other than Delphi), who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or the GM Plan.

Covered Group. The term "Covered Group" shall mean:

(i) all GM Active Employees who have attained seniority as of September 14, 2007, and who retire after October 15, 2007 under the GM-UAW National Agreements, or any other agreement(s) between GM and the UAW, and who upon retirement are eligible for Retiree Medical Benefits under the GM Plan or the New Plan, as applicable, and their eligible spouses, surviving spouses and dependents;

(ii) all UAW-represented active employees of Delphi or a former Delphi unit who retire from Delphi or such former Delphi unit on or after October 15, 2007, and upon retirement are entitled to or thereafter become entitled to Retiree Medical Benefits from GM and/or the GM Plan or the New Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described in Section K.2 of such Memorandum of Understanding or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999, and the eligible spouses, surviving spouses and dependents of all such retirees;

(iii) all surviving spouses and dependents of any UAW-represented employee of Delphi or a former Delphi unit who dies after October 15, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible or thereafter become eligible for Retiree Medical Benefits from GM and/or the GM Plan or the New Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described in Section K.2 of such Memorandum of Understanding or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999;

(iv) all former GM-UAW Represented Employees and all UAW-represented employees who, as of October 15, 2007, remain employed in a previously sold, closed, divested, or spun-off GM business unit (other than Delphi), and upon retirement are eligible for Retiree Medical Benefits from GM and/or the GM Plan or the New Plan by virtue of any other agreement(s) between GM and the UAW, and their eligible spouses, surviving spouses and dependents; and

(v) all eligible surviving spouses and dependents of a GM Active Employee, former GM-UAW Represented Employee or UAW-represented employee identified in (i) or (iv) above who attained seniority on or prior to September 14, 2007 and die after October 15, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible for Retiree Medical Benefits from GM and/or the GM Plan or the New Plan.

**Exhibit D**

**[Trustee's fees]**

**Exhibit E**

| Name | Date of Term Expiration |
|------|------------------------|
| Robert Naftaly*** | January 1, 2012 |
| Olena Berg-Lacey | January 1, 2012 |
| David Baker Lewis | January 1, 2011 |
| Teresa Ghilarducci | January 1, 2011 |
| Marian Udow-Phillips | January 1, 2010 |
| Ed Welch | January 1, 2010 |

Committee Chair: ***

---

**Biographical Material**

**Robert Naftaly, C.P.A.,** is the retired President and CEO of PPOM, an independent operating subsidiary of Blue Cross/Blue Shield of Michigan (BCBSM), and Executive Vice President, Chief Operating Officer for the Blues. Previously, he was Senior Vice President, Chief Financial Officers and Treasurer for BCBSM. Mr. Naftaly also served as the Director of the Department of Management and Budget of the State of Michigan from 1983 to 1987. He has also served on several other Boards, including the Detroit Investment Fund, Walsh College, Meadowbrook Insurance Group, Blue Cross/Blue Shield of Maryland, and the Board of Governors of Wayne State University.

**Olena Berg-Lacey** served from 1993 to 1998 as Assistant Secretary of Labor, Employee Benefits Security Administration. In that capacity, she directed the Department of Labor's activities regarding enforcement of ERISA, including fiduciary standards governing 700,000 private pension plans with over $3.5 trillion in assets. From 1991 to 1993, she served in the State Treasurer's Office for the state of California, where she had primary responsibility for management and investment of more than $20 billion of assets on behalf of the State. In that capacity, she also represented the California Treasurer on the board of the State's pension funds (CalPERS and CalSTRS) which together invest over $100 billion of retirement money on behalf of California's public employee retirement programs. A graduate of the University of California and the Harvard Business School, Ms. Berg-Lacey has also held a variety of positions in the private sector involving asset management and institutional investments.

47

**David Baker Lewis** is a prominent attorney, with broad experience in municipal finance and municipal bond law. He is the Chairman of the Board of Directors of Lewis & Munday. He has served on the Boards of Directors of several major corporate entities, including Conrail, Comerica Bank, TRW, Henry Ford Health Systems, Harper-Grace Hospitals, the Detroit Medical Center and H & R Block. He has also been Associate Professor of Law at the Detroit College of Law, and served as the Chair of the National Association of Securities Professionals.

**Teresa Ghilarducci** is currently Professor of Economics and Schwartz Chair in Economic Policy Analysis at the New School in New York City. She previously served for 25 years as professor of Economics at Notre Dame University. She also served a fellowship in economics at the Harvard Law School. Her academic work focuses on the economics of retirement security. She served as a member of the Advisory Board to the Pension Benefit Guaranty Corporation (a Presidential appointment) from 1995 to 2002, and was appointed by the governor of Indiana to the Board of Trustees for the Indiana Public Employees' Retirement Fund for a term from 1997 to 2002. Congressional committees have called upon her to testify as an expert witness more than 12 times on a variety of subjects related to retirement security and other economic issues.

**Marianne Udow-Phillips** is currently the Director of the Center for Healthcare Quality and Transformation, a healthcare policy analysis group affiliated with the University of Michigan health care system and Blue Cross/Blue Shield. She previously served for 3 years as the Director of the Michigan Department of Human Services, the state agency responsible for delivering a wide variety of support services to Michigan residents. Prior to her appointment to the Department of Human Services, she served in a variety of executive positions, including Senior Vice President for Health Care Products and Provider Services and Senior Vice President for Corporate Strategy and Health Care Administration, at Blue Cross Blue Shield of Michigan. She has also served as the Senior Vice President and Vice President of Plans and Operations for Mercy Alternative and Care Choices.

**Ed Welch** is an attorney and currently serves as director of the Workers' Compensation Center in the School of Labor and Industrial Relations at Michigan State University. From 1991 to 1999 he was the editor of the newsletter *On Workers Compensation*. He was the Director of the Michigan Bureau of Workers' Disability Compensation from 1985 through 1990. Mr. Welch was elected a charter member for workers' compensation of the National Academy of Social Insurance and served as the Vice-President of the International Association of Industrial Accident Boards and Commissions as well as a member of the Board of Directors of the Institute for Work and Health, a research organization in Toronto, Ontario.

**Exhibit F(1)**

[Initial Benefits for Participants in the Chrysler Retiree Plan]

## Exhibit F(2)

[Initial Benefits for Participants in the Ford Retiree Plan]

## Exhibit F(3)

### Initial Benefits for Participants and Beneficiaries in the GM Retiree Plan

Beginning on the GM Implementation Date and continuing through 2011, the initial Benefits provided by the GM Retiree Plan shall include only the following:

- All Benefits for which GM, the General Motors Health Care Program for Hourly Employees, and any other GM entity or benefit plan would have been responsible before the GM Implementation Date – including, without limitation, the catastrophic plan and COBRA continuation coverage – at the levels described in the settlement agreement approved in Int'l Union, UAW v. General Motors Corp., 497 F.3d 615 (6th Cir. 2007) ("Henry I"):

- The mitigation payments funded before the GM Implementation Date by the General Motors Defined Contributions Health Benefit Trust shall offset the Participant contributions, deductibles, co-payments and co-insurance payments at the same levels as in Henry I.

- The dental benefits funded before the GM Implementation Date by the General Motors Defined Contribution Health Benefit Trust shall be provided at the same levels as provided before the GM Implementation Date.

- An additional Participant contribution of $51.67 per month shall be required from those Participants who receive after the GM Implementation Date a flat monthly special lifetime benefit from the General Motors Hourly-Rate Employees Pension Plan of $66.70 per month.

As provided in Section 10.2(d), the Committee may exercise administrative discretion (as permitted under the Trust Agreement) in delivering the initial Benefits provided under this Exhibit F(3), including, without limitation, making any changes that could have been adopted by joint action of GM and the UAW pursuant to Section 5.A.2(h) of the settlement agreement approved in Henry I.

## Exhibit G

### Design Principles

The Committee recognizes the complexity and fragmented nature of our nation's ever-changing health care system. To the extent practical, the Committee will seek to implement each Plan in a manner consistent with the guidelines set out below, subject to both the financial requirements of such Plan and its Purpose.

1. Health care includes individual patient treatment, the alleviation of pain and suffering and the development of practices and procedures to improve the health status of Participants.

2. The Committee shall promote quality health care delivered to Participants in a manner consistent with respect and dignity, and the recognition of the confidentiality of private patient information.

3. The Committee's goal is to provide health care that is effective, safe, efficient and timely, delivered in a culturally competent manner with a recognition of the physical and cognitive challenges present among aged Participants.

4. The Committee will pursue integrated health care approaches to better assess the health risks of Participants and achieve better health outcomes.

5. The Committee will operate each Plan and assess its performance in accordance with evolving best practices measured by both internal and external benchmarks.

6. The Committee shall provide health care coverage to Participants on a basis that is reasonably accessible to Participants, affordable and sustainable.

7. The Committee will develop avenues of communication to keep Participants informed with regard to access to care, the quality of care and operations of the Plan in which they participate.

8. In selecting health care plans and providers, the Committee shall favorably consider health care entities that are non-profit and act in a manner respectful of workers' rights.

9. In selecting health care plans and providers, the Committee will seek to provide both health care and health plan administration within the United States.

10. The Committee will make efforts to assure that Participants are treated with respect and dignity, with due consideration given to their physical and cognitive challenges.

## Exhibit H

## STATEMENT OF INVESTMENT PRACTICES

The following Statement of Investment Practices ("SIP") shall be adopted as "Best Practices" for the VEBA's Committee, Investment Managers and Independent Fiduciaries. It is the intent that these Best Practices evolve over time, taking into account developments in the law, changes in available investments and other changes as the Committee, from time to time, may determine relevant. To the extent that there are inconsistencies between this document and the Trust Agreement, the Trust Agreement shall control. All defined terms in this SIP shall have the same meaning as defined in the Trust Agreement for the VEBA unless otherwise defined herein. It is also intended that these Best Practices, as amended from time to time, be incorporated in an Investment Policy Statement developed by the Committee.

The Committee is the Named Fiduciary with management and control of the assets of the VEBA with the power as set forth in the Trust Agreement to: (1) appoint Investment Managers with respect to non-Employer Securities; (2) appoint Investment Managers who themselves have the power to appoint Investment Managers; and (3) appoint Independent Fiduciaries with respect to Employer Securities. The Committee shall retain such responsibility unless and until it delegates that duty pursuant to the terms of the Trust Agreement and such persons accept such responsibilities by a document in writing.

Where the Trust Agreement permits someone else to be appointed as an Investment Manager or Independent Fiduciary (the "Investment Fiduciaries"), as the case may be, and that person accepts such responsibilities by a document in writing, that person shall be an Investment Fiduciary, and the Committee shall act as the Appointing Fiduciary with responsibility for monitoring the performance of the Investment Fiduciary, except to the extent that the Investment Fiduciary is appointed by the Court pursuant to Section 11.6 of the Trust Agreement. The Committee may also appoint Investment Managers with the authority to appoint other Investment Managers, in which case any Investment Manager so appointed shall act as the Appointing Fiduciary, provided that the Committee shall retain responsibility to monitor any Investment Manager acting as an Appointing Fiduciary.

Subject to the requirements of the Trust Agreement with respect to the Employer Securities, the Committee may appoint one or more Investment Fiduciaries to manage all or part of the Trust Fund and enter into an agreement with any Investment Fiduciary so appointed. If an Investment Fiduciary is appointed, it shall have the appurtenant investment authority of the Trustee specified in Section 6.1 of the Trust Agreement, as limited by investment guidelines adopted by the Committee and communicated to such Investment Fiduciary with respect to the portion of the Trust Fund over which it has investment discretion. The Trustee's duties with respect to that portion of the Trust Fund subject to such Investment Fiduciary's discretion and control shall be limited to following the instructions of the Investment Fiduciary to the extent consistent with Employee Retirement Income Security Act of 1974 ("ERISA"). The Investment Fiduciary so appointed is a fiduciary and must acknowledge so in writing as required by Section 3(38) of ERISA. Each Investment Fiduciary shall be monitored by the relevant Appointing Fiduciary.

Each Appointing Fiduciary should conduct periodic reviews of the appointed Investment Fiduciary not less than annually (and more frequently as appropriate under the circumstances)

with a view to determining whether such Investment Fiduciary should continue to be retained by the VEBA.

**S-1.1: The Committee shall develop and update from time to time an Investment Policy Statement that reflects these Investment Practices.**

The Investment Policy Statement should be a written statement developed by the Committee and updated from time to time that describes:

a. a prudent process for the Committee to select and retain Investment Fiduciaries,

b. the duties and responsibilities of the fiduciaries involved in asset management,

c. asset allocation, diversification and rebalancing guidelines,

d. appropriate investment guidelines, benchmarks and investment objectives against which the performance of the Investment Fiduciary is to be evaluated,

e. the due diligence criteria for selection of Investment Fiduciaries,

f. a general definition of the selection and monitoring criteria for Investment Fiduciaries, investments and service vendors,

g. the actions that can or will be taken as a result of the monitoring,

h. procedures for controlling and accounting for investment expenses.

i. requirements that investments be managed in accordance with applicable laws, trust documents, and written investment guidelines.

j. requirements that each fiduciary of the VEBA act in accordance with ERISA.

k. requirements that each fiduciary of the VEBA act in accordance with the "prudent man" rule as defined in Section 404(a)(1)(B) of ERISA.

l. requirements that each fiduciary of the VEBA shall discharge his, her or its duties with respect to the VEBA solely in the interest of the participants and beneficiaries of each Plan for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering each Plan as required by Section 404(a)(1)(A) of ERISA.

m. requirements that the VEBA be established and maintained pursuant to a written instrument as required by Section 402(a) of ERISA.

n. requirements that the Committee and the Investment Fiduciaries act in accordance with any applicable Plan Document, guidelines and other documents governing each Plan as required by Section 404(a)(1)(D) of ERISA.

o. requirements that copies of relevant documents governing the acts of the Investment Fiduciaries be provided to the Investment Fiduciaries.

p. procedures under the VEBA for allocation of responsibilities for its operation and administration consistent with the Trust Agreement and Sections 402, 403 and 405 of ERISA.

q. procedures requiring that any allocation or delegation permitted by the Trust Agreement or by Sections 402, 403 and 405 of ERISA be defined, documented and acknowledged at the time of such delegation of allocation.

r. requirements that any entity assuming a position which involves the exercise of fiduciary duties with respect to the management of VEBA plan assets under ERISA should sign a written acknowledgement that it acknowledges the acceptance of such duties and has read these Best Practices, as amended from time to time, and agrees to act in accordance with them.

54

**S.-1.2  Fiduciaries and parties in interest should not be involved in self-dealing as prohibited in Section 406 of ERISA.**

a.  No fiduciary shall cause a Plan to engage in a transaction, if such fiduciary knows or should know that such transaction constitutes a direct or indirect transaction between the plan and a party in interest to the extent that such transaction constitutes a non-exempt transaction prohibited by Section 406(a) of ERISA

b.  No fiduciary with respect to a Plan shall: (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan, to the extent that such transaction constitutes a non-exempt transaction prohibited by Section 406(b) of ERISA.

c.  The Committee should adopt policies and procedures with respect to conflicts of interests and the management of potential conflicts of interests.  Such policies should be disseminated to members of the Committee, Investment Fiduciaries, the Trustee and affected employees of the VEBA.  Each Investment Fiduciary and each affected employee should certify annually that he, she or it has received the applicable policies and procedures and confirm that he, she or it has complied with such policies in the previous year.  These policies initially should be based on the UAW conflict of interest policy.

d.  No fiduciary should be retained for a reason other than competence, cost, experience and other matters relevant to the fiduciary's ability to perform the functions assigned to such fiduciary in a cost effective manner.

**S.-1.3 The Committee and each Investment Fiduciary should take prudent steps to protect and safeguard the assets from theft and embezzlement.**

a.  The Committee should establish for procedures for the VEBA to maintain, or cause others to maintain, one or more fidelity bonds covering the plan fiduciaries and other persons who handle funds or other property of the plan as required by Section 412 of ERISA and Section 10.12 of the Trust Agreement.

b.  The Committee should take prudent steps to seek payment of any contributions that are past due and have not been paid in accordance with Section 10.13 of the Trust Agreement.

**S.-1.4  Except to the extent permitted by Department of Labor Regulations, no fiduciary may maintain the indicia of ownership of any assets of the VEBA outside the jurisdiction of the district courts of the United States as required by Section 404(b) of ERISA.**

a.  The Committee should establish procedures, which may consist of a covenant from its Investment Fiduciaries, to ensure that the indicia of ownership of the assets of the VEBA are not maintained outside the jurisdiction of the district courts of the United States, except as permitted by the Department of Labor Regulations.

**S.-2.1  The Committee should establish an investment strategy consistent with requirements of the Trust Agreement and  the purposes of the VEBA.**

a. The Committee should determine the expected modeled return on VEBA assets and identify an appropriate level of investment risk, taking into account expected returns over time and short-term liquidity needs. In determining the expected return the Committee should consider:
   1. Diversification requirements to reduce the VEBA's exposure to losses.
   2. Selection of asset classes consistent with the expected risk and return.
   3. The projected return of the portfolio relative to the funding objectives of the VEBA.
   4. Such other factors as the Committee may deem appropriate.
b. The Committee should develop an investment strategy based upon such expected return and expected level of risk. In no circumstances shall the Committee be responsible for guaranteeing any expected return.
c. The Committee should review the VEBA's investment strategy at minimum once a year and make any changes as appropriate.

**S.-2.2 The Committee should establish investment guidelines to be communicated to Investment Fiduciaries consistent with the investment strategy developed.**

a. The investment guidelines should be sufficiently detailed to permit each Investment Fiduciary to implement and manage the specific investment strategy for which it was appointed. In the discretion of the Committee, these investment guidelines provided to the Investment Fiduciary should:
   1. Define the duties and responsibilities of the Investment Fiduciary
   2. Define any applicable diversification and rebalancing guidelines.
   3. Include any relevant selection criteria for asset classes and investments.
   4. Set forth the appropriate benchmarks, indices, peer groups, and the investment objectives against which the performance of the Investment Fiduciary is to be evaluated.
   5. Define such due diligence criteria for selecting investments that the Committee in the exercise of prudence determines the Investment Fiduciary should incorporate as part of its investment process.
   6. Define the relevant monitoring criteria for the Investment Fiduciary.
   7. Define the relevant procedures for controlling and accounting for investment expenses.
b. The Committee should review the investment guidelines at a minimum once each year to ensure that investment objectives are analyzed and modified as prudent.

**S.-3.1 The Committee should select Investment Fiduciaries, delegate investment duties to such Investment Fiduciaries, and allocate assets to each Investment Fiduciary to manage consistent with the investment strategy and the investment guidelines applicable to it.**

a. The Committee should follow a due diligence process in selecting Investment Fiduciaries that selects among providers based on an objective assessment of their qualification, the quality of the work performed, the reasonableness of the fees, and any such other factors as the Committee deems appropriate and relevant. The Committee should maintain a written record of the process used to select such Investment Fiduciaries.

b.  The Committee should establish procedures to reasonably assure that each Investment
Fiduciary or other staff appointed by them has the necessary experience and
qualifications needed to oversee the assets allocated to their portfolio.

1.  The Committee should maintain a list of Investment Fiduciaries, including, as part
thereof, the Investment Fiduciaries' credentials and experience in carrying out the duties
assigned to them.

2.  The Committee should require periodic reporting from the Investment Fiduciaries as to
the work performed.

3.  To the extent the Committee hires staff with investment management-related
responsibilities, the Committee should develop written job descriptions for such staff,
including, as part thereof, the expected credentials and experience of all staff assigned or
exercising such authority.

4.  All fees for investment management should be "reasonable compensation" as defined in
Section 408(b)(2) of ERISA.

i.  The Appointing Fiduciary should take reasonable steps to assure that all
compensation, direct or indirect, is reasonable under Section 408(b)(2) of
ERISA.

ii.  If the compensation of the Investment Fiduciary will be performance based, the
Appointing Fiduciary should review such proposed compensation arrangement in
light of the risks associated with the manner of compensation and the potential
amount to be paid.

iii.  The Committee should review any proposed finder's fees or other forms of
compensation for asset placement in connection with selection of Investment
Fiduciaries to determine whether such compensation is reasonable.

iv.  The Committee should periodically review such fees to determine if fees remain
reasonable in light of the services performed.

5.  The Committee should establish a prudent process for periodically assessing the
effectiveness of the VEBA's fiduciary structure including the Committee and other
fiduciaries in meeting their responsibilities.

**S.-3.2 Each Investment Fiduciary should give appropriate consideration to the facts and
circumstances relevant to the particular investment or investment course of action in
accordance with the "prudent man" rule of ERISA.**

a.  Each Investment Fiduciary shall prudently investigate the merits of any potential
investment to be made for the VEBA.

b.  Appropriate consideration with respect to an investment includes a determination that
the particular investment or investment course of action is reasonably designed to
comply with the investment guidelines provided to the Investment Fiduciary, taking
into consideration the risk of loss and the opportunity for gain associated with the
investment or investment course of action.

c.  Each Investment Fiduciary should have the requisite expertise, knowledge and
information necessary to prudently implement the investment strategy and guidelines.

d.  If the Investment Fiduciary lacks sufficient knowledge or sophistication to manage a
portion of the VEBA's assets under its authority consistent with the investment
strategy or guidelines, the Investment Fiduciary should delegate the investment duties
to a knowledgeable professional.

**S.-3.3 Each Appointing Fiduciary shall periodically review the performance of the appointed
Investment Fiduciary.**

a.  The Appointing Fiduciary should review the performance of the Investment Fiduciary appointed, at least annually and more frequently as circumstances may warrant, with regards to:

1.  Compliance with these investment practice standards, any investment guidelines and with the purposes and needs of the VEBA.

2.  Comparison of the investment's performance to appropriate benchmarks, indices, peer groups, and the investment objectives against which the performance of the Investment Fiduciary is evaluated.

3.  Compliance with the conflict of interest policy, as long as doing so is reasonable under the circumstances. (The Appointing Fiduciary may rely on a certification of the Investment Fiduciary that it has complied with such conflict of interest policies.)

4.  The quality and timeliness of the Investment Fiduciary's response to requests for information.

5.  The level of service provided as compared to the costs and fees.

6.  The quality and timeliness of the Investment Fiduciary's reports to the Appointing Fiduciary and, where applicable, the Committee, Trustee or plan participants and beneficiaries.

7.  Any education and information provided to the Appointing Fiduciary, the Committee or the plan participants by the Investment Fiduciary.

8.  Qualitative and/or organizational changes of Investment Fiduciaries, such as:

    i.  Staff turnover in determining whether the quality of the service or the investment results provided in the past may be maintained in the future.

    ii. Changes in the organizational structure of the Investment Fiduciary, including mergers and/or acquisitions that could affect the quality of the service or the investment results in the future.

b.  The nature and results of the monitoring should be recorded in writing, including documentation of any actions recommended, reviewed or taken.

c.  Control procedures should be in place to periodically review policies for best execution and proxy voting.

1.  The Appointing Fiduciary should review the Investment Fiduciary to determine whether the Investment Fiduciary has reasonable procedures in place to secure best execution of the plan's brokerage transactions. The Appointing Fiduciary may consider the cost of commissions for the transaction, the quality and reliability of the execution and any other factors as the Appointing Fiduciary deems relevant.

2.  The Appointing Fiduciary should establish a procedure to review any commissions paid on such transactions at the direction of the Investment Fiduciary to determine if they are reasonable in light of the value of the brokerage and research services or are otherwise permissible under Section 28(e) of the Securities Exchange Act of 1934.

3.  The Appointing Fiduciary should monitor the procedures employed by an Investment Manager in voting proxies and actions taken in connection with the voting of proxies to ensure that the interests of plan participants and beneficiaries are protected by such actions (or inaction), and are not subordinated to other considerations. An Independent Fiduciary should retain all discretionary authority over voting proxies for the Employer Securities in accordance with Section 11.2 of the Trust Agreement.

**Exhibit I**

## Code of Ethics

In order for the Trust to continue the protection from the otherwise debilitating financial consequences that would accompany illness that has been afforded many thousands of UAW retirees of the automobile industry over the decades through the collective bargaining agreements between the UAW and Chrysler, Ford and GM – which protection has been essential to maintaining the dignity and financial security of such UAW retirees – the Committee must administer the Trust, and Trust personnel must act, in complete good faith and honesty, and with a single-minded dedication to protecting the interests of the Participants and Beneficiaries. To this end, this Code of Ethics shall govern the conduct of all those persons charged with implementation and administration of the Trust.

The following principles shall apply to members of the Committee as well as to any and all employees, professional staff and others employed in any staff capacity by the Trust. All such persons are referred to herein as "representatives and employees of the Trust." The Committee shall also inform all vendors, suppliers, outside consultants, health care providers and any other parties performing services for or on behalf of the Trust of this Code of Ethics and inform them that the Committee expects all such persons or entities to respect the provisions of this Code of Ethics. (For purposes of this Code of Ethics, references to family or families means spouses, children, grandparents, grandchildren, uncles, aunts, nieces, nephews by blood or marriage).

1.      The assets of the Fund are held in trust for the benefit of the Participants and Beneficiaries. The Participants and Beneficiaries are entitled to assurance that Trust assets are not dissipated, are invested wisely, and are spent only for proper purposes.

2.      The Participants and Beneficiaries are also entitled to assurance that representatives and employees of the Trust will be motivated solely by consideration of the best interests of the Participants and Beneficiaries, and will never allow their actions in administration of the Trust to be motivated in any respect by their own self-interest or any other factor that could result in decisions being taken that could work to the detriment of the Participants and Beneficiaries.

3.      Service as a representative or employee of the Trust is service *in the interest of the Participants and Beneficiaries.* Pursuing any other goal will injure the reputation of the individual involved as well as the Trust itself. Even more importantly, pursuing any goal other than the best interests of the Participants and Beneficiaries will undermine the Trust's ability to provide benefits to Participants and Beneficiaries.

4.      It is vital that all representatives and employees of the Trust conduct their day-to-day activities in accordance with these principles and in a manner consistent with the special responsibility they have to the Participants and Beneficiaries. Employees and representatives of the Trust must demonstrate – by their

conduct as well as their words – that they are dedicated solely to helping the Participants and Beneficiaries and are not motivated by any other goal or in any sense seeking to enrich themselves, their families, or business associates, or gain any advantage for themselves, their families, or business associates from their relationship to the Trust.

5.      The Trust shall conduct its proprietary functions, including all contracts for purchase or sale or for rendering services in accordance with the best practices of well-run institutions, including the securing of competitive bids for major contracts.

6.      The Trust shall not permit any of its funds to be invested in a manner designed to result in profit or advantage for any representative or employee of the Trust, his or her family, or business associates.

7.      There shall be no contracts of purchase or sale or for rendering services which will result in profit or advantage for any representative of the Trust, his or her family or business associates. Nor shall any representative or employee of the Trust accept profit or special advantage for himself or herself, his or her family or business associates from a business – including, without limitation, a vendor or service provider – with which the Trust has a business relationship of any kind.

8.      The Trust shall not make loans to its representatives or employees, or members of their families, for any purpose, including financing the private business of such persons.

9.      No representative or employee of the Trust shall have any compromising personal ties, direct or indirect, with outside agencies such as insurance carriers, brokers, or consultants – including with any representative, employee or agent of any such agencies, carriers, broker or consultants – doing business with the Trust.

10.     The Trust shall fully comply with all applicable legal and accounting requirements, including with respect to maintaining its books and records in accordance with accepted accounting practices and conducting periodic audits as required by law. The financial records of the Trust shall be made available to retired participants and others as required by law.

11.     Any person who represents the Trust has a duty to serve the best interests of the Participants and Beneficiaries. Therefore, every representative and employee of the Trust must avoid any outside transaction which even gives the appearance of a conflict of interest. The special fiduciary nature of these positions requires the highest loyalty to the duties of the office.

12.     No representative or employee of the Trust shall have any personal financial interest which conflicts with her/his duties on behalf of the Trust.

13.     No representative or employee of the Trust shall have any substantial financial interest (even in the publicly-traded, widely-held stock of a corporation), in any business with which the Trust has any business relationship.

14.     No representative or employee of the Trust shall accept "kickbacks," under-the-table payments, gifts or entertainment of any value or any personal payment of any kind from a business or professional enterprise with which the Trust does business, nor arrange to have any such financial payments or perquisites inure to the benefit of their family or business associates.

15.     All staffing decisions and decisions regarding use of outside vendors shall be made based solely on consideration of the best interests of the Participants and Beneficiaries. No staff shall be hired, nor any consultants or other vendors used in connection with the conduct of the Trust's affairs, as a result of personal or family ties to existing representatives or employees of the Trust, the UAW, or any of the contributing employers.

16.     The Participants and Beneficiaries are entitled to be reasonably informed as to how the Trust's assets are used and cared for. Toward this end, the Committee shall – at least annually – provide reasonable notice (by mailed notice to Participants and Beneficiaries or other suitable means) in a form understandable by Participants and Beneficiaries of the status of the Trust and the applicable Separate Retiree Account, including:

   a.   The funding status of the applicable Separate Retiree Account.

   b.   The amount spent on Benefits from the applicable Separate Retiree Account in the prior year.

   c.   The amount spent on administrative costs (including items such as rent, utilities, consulting fees, outside services, salaries, and the like) from the applicable Separate Retiree Account in the prior year.

   d.   The number of Participants and Beneficiaries drawing benefits from the applicable Separate Retiree Account in the prior year.

   e.   The Committee's current projections regarding solvency of the applicable Separate Retiree Account, and any anticipated Benefit adjustments that may be required over the following five year period.

   f.   Applicable Company contributions and remittances made during the prior year.

   g.   The outcome of the Cash Flow Projection required by the Company Settlements with respect to the applicable Separate Retiree Account.

   h.   The investment returns for the preceding year, as well as such longer periods as the Committee may determine.

# EXHIBIT B

# [RESERVED]

# EXHIBIT C

## [Reserved]

# EXHIBIT D

# FORM OF EQUITY REGISTRATION RIGHTS AGREEMENT

## EXHIBIT O

## FORM OF EQUITY REGISTRATION RIGHTS AGREEMENT

This EQUITY REGISTRATION RIGHTS AGREEMENT (this "Agreement") is entered into as of [_____], 2009 by and among [_____], a Delaware corporation (the "Corporation"), THE UNITED STATES DEPARTMENT OF THE TREASURY (the "UST"), 7176384 CANADA INC., a corporation organized under the laws of Canada ("Canada"), the UAW RETIREE MEDICAL BENEFITS TRUST, a voluntary employees' beneficiary association (the "VEBA"), and [_____], a Delaware corporation (the "Debtor").[1]

WHEREAS, each Holder owns, as of the date hereof, that number of shares of common stock, par value $0.01 per share, of the Corporation (the "Common Stock") set forth opposite such Holder's name on Annex I hereto;

WHEREAS, the VEBA and the Debtor each own, as of the date hereof, one or more warrants initially exercisable for that number of shares of Common Stock set forth opposite such Holder's name on Annex I hereto (collectively, the "Warrants");

WHEREAS, as of the date hereof, the Government Holders and the VEBA each own that number of shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, par value $0.01 per share (the "Preferred Stock"), set forth opposite such Holder's name on Annex I hereto;

WHEREAS, concurrently with the execution of this Agreement, the Corporation, the UST, Canada and the VEBA have executed that certain Stockholders Agreement, dated as of the date hereof;

WHEREAS, the Corporation has agreed to provide the UST, Canada, the VEBA and the Debtor with registration rights with respect to such shares of Common Stock, Warrants and Preferred Stock held by such Holders and their permitted assigns, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

*Section 1.1    Certain Defined Terms.*  As used in this Agreement, the following terms have the following meanings set forth below or in the sections set forth below:

"Adverse Disclosure" means public disclosure of material non-public information that, in the Corporation's good faith judgment, after consultation with independent outside counsel to the Corporation, (a) would be required to be made in any registration statement or report filed with

---

[1] In the event that any of the other Sellers under the Amended and Restated Master Sale and Purchase Agreement, dated June 26, 2009, by and among the Corporation, the Debtor and the other seller parties thereto, receive equity securities of the Corporation in connection with the closing of the transactions contemplated thereby, such Sellers shall be added as parties hereto and included as Holders hereunder.

# EXHIBIT E

# FORM OF TRUST AGREEMENT AMENDMENT

# AMENDMENT TO THE
## UAW RETIREE MEDICAL BENEFITS TRUST

WHEREAS, General Motors Corporation ("GM"), agreed to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between GM and the UAW (the "MOU").

WHEREAS, GM, the UAW, along with class representatives of the plaintiff class members in the case of *UAW et al. v. General Motors Corp.*, No. 05-CV-73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006, aff'd, Int'l Union, UAW v. General Motors Corp., 497 F.3d 615 (6th Cir. 2007) entered into a settlement agreement, and thereafter, GM, the UAW, and the class representatives entered into a settlement agreement in the class action of *Int'l Union, UAW, et. al. v. General Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 9, 2007) ("Henry II") that was approved by the Court on July 31, 2008 (the "GM Retiree Settlement"), which provides for GM to make certain deposits and remittances to the UAW Retiree Medical Benefits Trust (the "Trust") for the provision of retiree medical benefits.

WHEREAS, subsequent to entering into the MOU and the GM Retiree Settlement, GM filed a bankruptcy action known as *In re General Motors Corporation*, No. 09-50026 (Bankr. S.D.N.Y. filed June 1, 2009) (the "Bankruptcy Proceeding") pursuant to which [GM Newco] purchased certain assets of GM.

WHEREAS, the UAW asserted, and [GM Newco] denied, that [GM Newco] was bound by the terms of the MOU as a successor to GM and was therefore responsible for providing the retiree medical benefits contemplated in the MOU and the GM Retiree Settlement.

WHEREAS, [GM Newco] and the UAW entered into a settlement agreement (the "[GM Newco] UAW Retiree Settlement Agreement") that was approved by the court in the Bankruptcy Proceeding pursuant to which [GM Newco] agreed to provide retiree medical benefits to those that were entitled to retiree medical benefits from GM pursuant to the MOUs and the GM Retiree Settlement in exchange for UAW waiving its claim that [GM Newco] was a successor to GM and responsible for GM's liabilities under the MOUs and the GM Retiree Settlement.

WHEREAS, as part of the [GM Newco] UAW Retiree Settlement Agreement, [GM Newco] agreed to provide benefits under a plan adopted by [GM Newco] and subsequently amended pursuant to the terms of the [GM Newco] UAW Retiree Settlement Agreement.

WHEREAS, the [GM Newco] UAW Retiree Settlement Agreement provides for the Trust to be amended with respect to [GM Newco] to, among other things, allow the Committee to amend the [GM Newco] Retiree Plan on or after January 1, 2010 to modify benefit levels thereunder as well as to eliminate any reference in the Trust to the special pass-through benefit.

NOW THEREFORE, the Committee amends the Trust, effective *[insert date]* as follows (additions bold-underline) (deletions bold-strikethrough):

1

1.    Inserted after paragraph 16 in the preamble the following:

**WHEREAS, the Trust is amended to provide for the settlement agreement entered into between [GM Newco] and the UAW that addresses the provision of retiree medical benefits and is dated [insert date here].**

2.    The term "GM Eligible Group" is amended throughout to read "[GM Newco] Eligible Group."

3.    The term "GM Retiree EBA" is amended to read "[GM Newco] Retiree EBA."

4.    The term "GM Retiree Plan" is amended to read "[GM Newco] Retiree Plan."

5.    The term "UAW GM Retirees Medical Benefits Plan" is amended to read "[GM Newco] UAW Retirees Medical Benefits Plan."

6.    The term "GM Separate Retiree Account" is amended to read "[GM Newco] Separate Retiree Account."

7.    The term "GM Employer Security" is amended to read "[GM Newco] Employer Security."

8.    Section 1.19 is amended to read as follows:

Employer Security.    Any obligation, note, warrant, bond, debenture, stock or other security within the meaning of section 407(d)(1) of ERISA that is acquired or held by the Trust (or arising from any such security through conversion) pursuant a deposit or transfer under one of the Settlements the acquisition or holding of which (i) is not prohibited by sections 406(a)(1)(E) or 406(a)(2) of ERISA, or (b) is the subject of a prohibited transaction exemption provided under section 408 of ERISA.

9.    Section 1.32 is amended to read as follows:

GM[GM Newco] Retiree EBA.    The UAW GM[GM Newco] Retirees Employees' Beneficiary Association, an employee organization within the meaning of Section 3(4) of ERISA.

10.    Section 1.34 is amended to read as follows:

GM[GM Newco] UAW Retiree Settlement Agreement.    The settlement of the claims inagreement entered into between [GM Newco] and the UAW that addresses the provision of retiree medical benefits and is dated [insert date here] UAW v. General Motors Corp., Civ. Act. No. 2:07-cv-14074 (E.D. Mich. complaint filed September 9, 2007).

11.    Section 1.14 is amended to read as follows:

The term Company shall mean Newco, Ford, or GM[GM Newco], as the case may be (collectively the "Companies").

2

12.    Section 1.36 is amended to read as follows:

Implementation Date.  The later of (i) January 1, 2010 or (ii) the "Final Effective Date," as defined in ~~the GM Retiree Settlement or~~ the Newco UAW Retiree Settlement Agreement, **or the "Closing Date" as defined in the [GM Newco] UAW Retiree Settlement Agreement**, as applicable, and with respect to the Ford Retiree Settlement, the later of the "Effective Date" or the "Appeal Completion Date" (as defined in the Ford-UAW Memorandum of Understanding Post-Retirement Medical Care dated November 3, 2007) or as otherwise provided in the Ford Settlement Agreement.

13.    Section 1.47 is amended to read as follows:

Settlements.  The ~~GM~~**[GM Newco] UAW** Retiree Settlement **Agreement**, the Newco UAW Retiree Settlement Agreement and the Ford Retiree Settlement (as referred to in the preamble to this Trust Agreement).

14.    Insert a new Section 1.54 after Section 1.53 to read as follows:

**[GM Newco].  [                              ], its successors and assigns.**

15.    Section 3.2 is amended to read as follows:

Receipt of Funds.  The Trust Fund shall accept all sums of money and other property deposited, contributed, remitted, or transferred to the Trust with respect to a Plan and credited to the Separate Retiree Account attributable to such Plan as described in Article IV, provided that any Employer Security issued to the Trust by any Company, other than **(i)** any Newco Employer Security contributed pursuant to the Newco UAW Retiree Settlement Agreement as approved by a bankruptcy court under Section 25(A) thereof **or (ii) any [GM Newco] Employer Security contributed pursuant to the [GM Newco] UAW Retiree Settlement Agreement as approved by a bankruptcy court under Section 28(A) thereof**, shall be accepted only upon the direction of the Independent Fiduciary.  The Trustee shall hold, manage and administer the Trust Fund without distinction between principal and income.  The Trustee shall be accountable for the money or other property it receives, but shall not be responsible for the collection of any deposits, contributions, remittances, or transfers due to the Trust.

16.    Section 10.2(d) is amended to read as follows:

Notwithstanding any other provision in this Section 10.2, until the expiration of the 2011 calendar year, the Ford Retiree Plan shall provide the Benefits specified in Exhibit F(2)~~, and the GM Retiree Plan shall provide the Benefits specified in Exhibit F(3)~~.  The Benefits specified in Exhibits ~~F(1),~~ F(2) ~~and F(3)~~ shall be the Benefits provided for under the terms of **the Ford Retiree** ~~each Company's respective~~ Settlement.  During the period that the **Ford Retiree** Plan~~s~~ ~~are~~ **is** providing the initial benefits described in this Section 10.2(d), the Committee may exercise administrative discretion (as permitted under the Trust Agreement) in delivering such benefits, including, without limitation, making any changes that could have been adopted by joint action of a Company and the UAW pursuant to ~~Section 5.A.2(h) of the Settlement~~

3

~~Agreement between GM and UAW dated December 16, 2005 and~~ Section ___ of the Settlement Agreement between Ford and UAW dated _____.

17.   Section 10.20 is amended to read as follows:

Presumption of Control.  The Committee shall take all such reasonable action as may be needed to rebut any presumption of control that would limit the Trust's ability to own ~~GM's~~[GM Newco] Employer Securities under the terms of the [GM Newco] UAW Retiree Settlement Agreement ~~common stock,~~ Ford's Common Stock, ~~the 6.75% Series U Convertible Senior Debentures Issued by GM Due December 31, 2012,~~ or the 5.75% Senior Convertible Notes due 2013 issued by Ford or as may be required to comply with all applicable laws and regulations, including, but not limited to, federal and state banking laws and regulations.

18.    Section 12.4 is amended to read as follows:

In addition to the powers of the Committee pursuant to Sections 12.2 and 12.3 to transfer Trust assets to another trust, subject to the restrictions of Section 7.1, the Committee acting in a fiduciary capacity may merge or accept transfers of assets from other trusts – including, without limitation, trusts maintained by Newco, Ford, and ~~GM~~[GM Newco] – into the Trust, provided that the assets attributable to the each Plan are separately accounted for in the respective Separate Retiree Account.

19.    Exhibit F(3) is deleted.

20.    The last paragraph of Article I is amended to read as follows:

Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the ~~GM~~[GM Newco] UAW Retiree Settlement Agreement when relating to GM and/or the GM Newco Eligible Group, the GM EBA, the ~~GM~~[GM Newco]Retiree Plan and the ~~GM~~[GM Newco] Separate Retiree Account.   Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the Newco UAW Retiree Settlement Agreement when relating to Newco and/or the Newco Eligible Group, the Newco EBA, the Newco Retiree Plan and the Newco Separate Retiree Account. Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the Ford Retiree Settlement when relating to Ford and/or the Ford Eligible Group, the Ford EBA, the Ford Retiree Plan and the Ford Separate Retiree Account.  If any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, is also used in more than one of the Settlements, such term shall have the meaning it has in the Settlement applicable to the relevant Plan, Eligible Group, or Separate Retiree Account.

21.    Any defined term under the Trust Agreement that has been replaced or modified pursuant to this Amendment shall be replaced or modified throughout the Trust Agreement.

*[Remainder of Page Intentionally Left Blank]*

4

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

**COMMITTEE OF THE UAW RETIREE MEDICAL BENEFITS TRUST**

**INDEPENDENT MEMBERS**

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

**UAW MEMBERS**

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

_____          Dated: _____
[insert name]

**TRUSTEE** [insert name of institution]

By: _____          Dated: _____
      [insert name]

5

# EXHIBIT F

## 2009 BENEFITS CHANGES

## 2009 Benefits Changes

Beginning with claims incurred on the later of (a) July 1, 2009 or (b) receipt of necessary court approvals, the benefit plan provided by GM for UAW- represented retirees, surviving spouses and their eligible dependents as amended by the Settlement Agreement approved by the Court July 31, 2008, will be changed as follows:

| | |
|---|---|
| Prescription Drug Co-Pays (applicable to all retirees, surviving spouses and their eligible dependents).[a] | Retail (34 day supply)<br>• $10 Generic<br>• $25 Brand (formulary and non-formulary)<br>• $25 Specialty<br><br>Mail Order (90 day supply)<br>• $20 Generic<br>• $50 Brand (formulary and non-formulary)<br>• $50 Specialty |
| Catastrophic Plan for retirees and surviving spouses (and their eligible dependents) who elect into the Plan or fail to pay required monthly contributions. | Plan no longer offered.<br><br>Impacted retirees, surviving spouses and eligible dependents will be defaulted into the Traditional Care Network (TCN) unless "no coverage" is specifically requested. |
| Coverage for Erectile Dysfunction (ED) medications (e.g. Viagra, Cialis, Levitra).[a] | No longer offered, except in prior authorized cases of Pulmonary Arterial Hypertension. |
| Coverage for the Proton Pump Inhibitor drug class (e.g. omeprazole, Prilosec, Zegerid, Nexium, Aciphex, Prevacid, Protonix).[a] | No longer offered, except in prior authorized cases of Barrett's Esophagitis and Zoellinger-Ellison Syndrome. |
| Vision Program | No longer offered. |
| Dental Program | No longer offered. |
| Emergency Room Co-Pay [a] | $100 (waived if admitted). |
| Medicare Part B Special Benefit ($76.20 per month for Medicare-eligible retirees) enrolled in Medicare | No longer offered by health plan.<br><br>This benefit is no longer offered by the Health Care Plan. This modification is not applicable to approximately 21,500 retirees and surviving spouses who are currently receiving the benefit and who retired or began receiving surviving spouse benefits before October 1979, and whose benefit is provided through the pension trust. There will be no change in these payments from the pension trust for the retirees described in the preceding sentence. |
| "Protected Retirees" who meet the provisions of | Monthly contribution requirement of $11 (flat rate |

1

| | |
|---|---|
| the Affordability Test (less than $8,000 annual pension and monthly basic benefit rate of less than $33.33). [a] | regardless of family status).<br><br>In all other respects, the same administrative provisions and plan design requirements applicable to all other General retirees shall apply. |
| Monthly Contribution Requirements (General Retirees) [a] | No change (currently $11/single and $23/family). |
| Deductible, Co-Pay and out-of-pocket (OOP) Requirements (General Retirees) | No changes<br>• Deductible: $164 single/$328 family<br>• Co-insurance: 10% in network 30% out of network<br>• OOP Max: $273 single in network $546 family in network |
| Implementation | The parties will work together to effect a mutually-agreed transition and implementation as soon as practicable.  GM and the UAW will mutually agree upon communications. |
| Dependents Eligibility – Retirees | Effective upon receipt of necessary court approvals, no new Principally Supported Children or Sponsored Dependents will be enrolled pursuant to the provisions the Plan.<br><br>Effective the later of (a) October 1, 2009 or (b) receipt of necessary court approvals, coverage will cease for any child enrolled as a Principally Supported Child pursuant to the provisions of the Plan.<br><br>Effective the later of (a) October 1, 2009 or (b) receipt of necessary court approvals, coverage will cease for any dependent of an enrollee who is enrolled as a Sponsored Dependent. |

a. Modifications also to be comprehended in the HMO plan designs.

# EXHIBIT G

# NATIONAL INSTITUTE FOR HEALTH CARE REFORM TERM SHEET

## National Institute for Health Care Reform

Term Sheet

1. The Institute will be established as an industrywide labor management committee to conduct research and to analyze the current financing and medical delivery systems in the United States, develop targeted and broad-based reform proposals to improve the quality, affordability and accountability of the system, and educate the public, policymakers and others about how these reforms could address the deficiencies in the current system, e.g., skyrocketing costs, massive number of people left uninsured, profit driven decision-making on delivery of care, etc.

2. The Institute is intended to be a premier research and educational health care reform "think tank" dedicated to understanding, evaluating and developing thoughtful and innovative reform measures that would improve the financing and medical delivery systems in the U.S. and expand access to high quality, affordable and accountable health coverage for all Americans.

3. The Institute will be authorized to:

    a. Engage economists, analysts, academics and others who are experts on the U.S. and other health care systems as well as the public policies, physician, hospital and other provider systems that would need to be changed to improve health care quality, affordability and accountability in the U.S.

    b. Conduct studies and analyses of the current system and alternative structures, including ways to provide more effective sources of coverage for early retirees, reduce prescription drug costs, ensure drug safety and better inform patients of appropriate drug choices.

    c. Operate as a clearinghouse for select best practices that should be employed throughout the medical delivery system to ensure that error-free, high quality health care is available throughout the U.S.

    d. Develop innovative policy solutions to improve the current health care system.

    e. Host forums for discussion and debate of public policies that would improve the health care system and facilitate the interaction of ideas among experts.

    f. Formulate wide-ranging communications materials that discuss and describe reform measures.

4. The Institute shall be established as a non-profit, tax-exempt organization pursuant to section 501(c)(3) of the Internal Revenue Code (the "Code"). Neither GM nor the UAW will do anything to jeopardize the 501(c)(3) status of the Institute or disqualify the Institute from obtaining this status.

5. GM agrees to provide funding to the Institute of $3 million annually for five (5) years, provided that Ford Motor Company and Chrysler Corporation participate in the Institute and provide proportional funding.

6. GM and the UAW will be free, at a future date, to establish other organizations to support the mission of the Institute, including but not limited to an organization qualified under section

1

501(c)(4) of the Code, provided that the governance of any such additional organization(s) shall be structured in accordance with Paragraphs 7 and 9 below.

7. The Institute shall be governed by a Board of Directors consisting of an equal number of labor and management representatives and a President. The Bylaws shall provide that, in any matter considered by the Board of Directors, the labor and management representatives shall have equal voting strength. The UAW shall appoint the labor representatives and GM shall appoint its management representative(s). GM, the UAW and any other contributing Institute members having a representative(s) on the Board shall have the right to change any of their appointed members at any time and for any reason. The President shall be entitled to participate in all meetings of the Board of Directors.

8. The Board shall operate according to a set of bylaws that are agreed to by the labor and management representatives of the Board consistent with the provisions of this term sheet.

9. The Board shall at all times strive to operate by consensus. In the event consensus can not be achieved, all decisions made by the Board shall be governed by a super-majority, except as otherwise provided in this paragraph 9 of this Term Sheet. A super-majority shall be defined as a minimum of all but one vote of the labor and management members of the Board, with no single company having the right to block a decision by the Board. The approval of additional Institute members, sponsors, affiliates or Board seats, any change to the voting or consensus requirements, and/or any change to the purpose or intent of the Institute will require the unanimous approval of the labor and management members of the Board.

10. The Institute shall work to minimize its administrative expenses and waste. GM and the UAW shall have the right to audit and review Institute finances and spending.

11. Lobbying will be permitted to the extent allowed for 501(c)(3) organizations. The names, brands, or logos of the UAW, GM and any other members of the Institute may not be used in Institute publications, press releases, statements, websites, or other communications or materials and the Institute or its employees or affiliates may not state, suggest or imply that any of the parties support any proposals, conclusions, or recommendations without the prior consent of the party whose support is being stated, suggested or implied. The UAW, GM and any other members of the Institute may use or reprint Institute material, but may not suggest support from any of the other parties or use their names, brands, or logos without their prior consent.

12. GM reserves the right to reduce or withdraw its funding upon 30 days notice if: a) Ford and/or Chrysler do not participate in the Institute and provide proportional financial support; b) the Institute loses its status as, or is failed to be recognized as, a section 501(c)(3) tax-exempt organization; c) inappropriate financial activity is discovered; (d) the institute, its employees or its members or affiliates engage in lobbying activities beyond those described in paragraph 11 of this Term Sheet; or e) any of the restrictions about the use of GM's name, brand, or logos is violated.

13. GM and the UAW will work together to assure the rapid and effective start-up of the Institute.

# EXHIBIT H

# [Reserved]

# EXHIBIT I

# FORM OF [NEWCO] NOTE

Final form to be agreed between [New Co] and the VEBA in conformity with the VEBA Note
Term Sheet attached as Exhibit Y to the MSPA.  The VEBA Note Term Sheet is attached here
pending agreement on the final form.

## EXHIBIT Z

## VEBA NOTE TERM SHEET

*[NGMCO, Inc.]*

**Term Sheet for Note due 2017**

Following is a summary of the proposed principal terms for the Note to be issued to the Voluntary Employees' Beneficiary Association ("New VEBA") in connection with the transactions related to the restructuring of the obligations of General Motors Corporation to the New VEBA.

| | |
|---|---|
| Issuer: | *[NGMCO, Inc.]* (the "Company"). |
| Securities Offered: | US$2.5 billion Note (the "Note"). |
| Maturity Date: | July 15, 2017. |
| Interest/Payment: | Implied annual rate of 9% from July 15, 2009, payable in fixed payments in the following amounts in cash on July 15 of each of the following years: |

| Year | Amount |
|------|--------|
| 2013 | $1,384 million |
| 2015 | $1,384 million |
| 2017 | $1,384 million |

| | |
|---|---|
| Guarantees: | Any present and future U.S. subsidiaries of the Company that are borrowers or guarantors with respect to the UST Note will fully and unconditionally guarantee the performance of all obligations of the Company under the Indenture and the Note, which guarantees will be secured to the same extent, if any, as are the obligations of such borrower under, or guarantors of, the UST Note, and subordinated only to any Permanent Financing (as defined below). Each guarantor of the Notes is herein referred to as a "Guarantor" and its guarantee is referred to herein as a "Guarantee." |
| Ranking: | The obligations of the Company under the Notes and of the Guarantors under the Guarantees will: |

- rank equally in right of payment with (1) any debt issued to the United Stated Department of Treasury ("UST") in the restructuring (the "UST Note") and (2) any debt issued to Canada in the restructuring (the "Canada Note");

- be secured on a pari passu basis by the collateral securing the UST Note;

- rank senior in right of payment to all unsecured indebtedness and other obligations of the Company that are by their terms subordinated to the Note;

- rank junior in right of payment to any permanent financing including UST delayed draw term loan, revolver or any other third party permanent financing entered into with the consent of UST ("Permanent Financing"); and

- be effectively subordinated in right of payment to all future first lien secured indebtedness and other obligations of the Company, to the extent of the value of the assets securing such obligations, and be structurally subordinated to all obligations of each of the Company's subsidiaries that are not Guarantors.

| | |
|---|---|
| Intercreditor Agreement | New VEBA, the UST and Canada shall enter into an intercreditor agreement in form and substance satisfactory to the UST, which shall provide that the UST Note, the Canadian Note and the Note shall rank equally and be pari passu and that the UST shall have the sole and exclusive right to exercise all remedies and to grant waivers with respect to the Note and the UST Note. |
| Transferability: | The Note will be transferable at any time in whole or in part to (1) the Company or its subsidiaries, or (2) an unlimited number of institutional accredited investors or qualified institutional buyers in transactions that (a) do not require registration under the Securities Act and (b) do not trigger registration under the Exchange Act; provided that if at any time the UST Note is registered under the Securities Act or exchanged for a note that is entitled to demand, shelf or piggyback registration rights, then the Note will be entitled to demand, shelf, and piggyback registration rights no less favorable than those of the UST Note. |
| Optional Redemption: | The Company may redeem the Note in whole or in part at any time at 100% of its principal amount, together with accrued and unpaid interest, if any, to the redemption date. |
| Covenants | The Note will have the same covenants as the UST Note, including, to the extent made by the Company under the UST Note, covenants in respect of Change of Control, Limitation of Incurrence of Indebtedness, Restricted Payments, Limitations on Liens, Limitation on Sale of Assets, Restrictions on Sale/Leaseback and Limitation on Merger/Consolidation. |
| Default Interest: | 2% penalty interest upon any default under the terms of the Note. |
| Events of Default: | Events of Default will be the same as those in the UST Note, including, without limitation: |

1. Default in payment on the Note when due, subject to any grace period in the UST Note.

2. Default in the observance or performance of covenants, subject to any grace period in the UST Note.

3. Bankruptcy or insolvency events, subject to any grace period in the UST Note.

4. Invalidity of Guarantees to the extent provided in the UST Note, subject to any grace period in the UST Note.

| | |
|---|---|
| Modifications: | Unless (1) UST has transferred more than 75% of the UST Note and (2) the portion of the UST Note held by UST has an outstanding principal |

2

amount that is less than the implied then current principal amount of the VEBA Note (assuming an implied 9% interest rate), any modifications agreed to by UST with respect to the terms of the UST Note will automatically modify, and be binding on, the Note, other than any such modification that makes any change that extends the maturity date, extends the date of any fixed payment, reduces the implied interest rate, reduces the amount of principal, changes the currency of payment, modifies any prepayment right or by its express terms limits or restricts any right to bring suit for payment.

Governing Law:                  New York.

3

1766878

# EXHIBIT J

# FORM OF PREFERRED STOCK
# CERTIFICATE OF DESIGNATIONS

## EXHIBIT Y

### Form Of Certificate of Designations

### Of

### Series A Fixed Rate Cumulative Perpetual Preferred Stock

### Of

### [NGMCO, INC.]

*[NGMCO, Inc.]*, a corporation organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), hereby certifies that the following resolution was adopted by the board of directors of the Corporation (the "Board of Directors") or an authorized committee of the Board of Directors in accordance with the provisions of Section 151 of the General Corporation Law of the State of Delaware on *[_____]*, 2009:

RESOLVED, that pursuant to the provisions of the certificate of incorporation and the bylaws of the Corporation and applicable law, a series of Preferred Stock, par value $0.01 per share, of the Corporation be and hereby is created, and that the designation and number of shares of such series, and the voting and other powers, preferences and relative, participating, optional or other rights, and the qualifications, limitations and restrictions, of the shares of such series be and hereby are as follows:

Part 1. *Designation and Number of Shares.* There is hereby created out of the authorized and unissued shares of Preferred Stock of the Corporation a series of preferred stock designated as the "Series A Fixed Rate Cumulative Perpetual Preferred Stock" (the "Series A Preferred Stock"). The authorized number of shares of the Series A Preferred Stock shall be 360,000,000. Such number of shares may be decreased by resolution of the Board of Directors, subject to the terms and conditions hereof; provided that no decrease shall reduce the number of shares of the Series A Preferred Stock to a number less than the number of shares then outstanding.

Part 2. *Standard Provisions.* The Standard Provisions contained in Annex A attached hereto are incorporated herein by reference in their entirety and shall be deemed to be a part of this Certificate of Designations to the same extent as if such provisions had been set forth in full herein.

Part 3. *Definitions.* The following terms are used in this Certificate of Designations (including the Standard Provisions in Annex A hereto) as defined below:

(a) "Common Stock" means the common stock, par value $0.01 per share, of the Corporation.

(b) "Dividend Payment Date" means March 15, June 15, September 15 and December 15 of each year.

1

1766819

(c) "Junior Stock" means any preferred stock other than this Series A Preferred Stock, the Common Stock and any other class or series of stock of the Corporation.

(d) "Liquidation Amount" means $25 per share of the Series A Preferred Stock.

Part. 4. *Certain Voting Matters*.  For purposes of determining the voting rights of the holders of the Series A Preferred Stock under Section 7 of the Standard Provisions forming part of this Certificate of Designations, each holder will be entitled to one vote for each $25 of Liquidation Amount to which such holder's shares are entitled.

[Remainder of Page Intentionally Left Blank]

2

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Designations to be signed by [_____], its [_____], this [__] day of [_____], 2009.

*[NGMCO, INC.]*

By: _____
Name: *[_____]*
Title: *[_____]*

3

ANNEX A

## STANDARD PROVISIONS

Section 1.    *General Matters; Ranking*. Each share of the Series A Preferred Stock shall be identical in all respects to every other share of the Series A Preferred Stock. The Series A Preferred Stock shall be perpetual, subject to the provisions of Section 5 of these Standard Provisions that form a part of the Certificate of Designations. The Series A Preferred Stock shall rank senior to the Junior Stock in respect of the right to receive dividends and the right to receive payments or distributions out of the assets of the Corporation upon voluntary or involuntary liquidation, dissolution or winding up of the Corporation.

Section 2.    *Standard Definitions*. As used herein with respect to the Series A Preferred Stock:

(a) "Agent Members" has the meaning set forth in Section 13(d).

(b) "Applicable Dividend Rate" means 9% per annum.

(c) "Business Day" means any day except Saturday, Sunday and any day on which banking institutions in the State of New York generally are authorized or required by law or other governmental actions to close.

(d) "Bylaws" means the bylaws of the Corporation, as they may be amended from time to time.

(e) "Certificate of Designations" means the Certificate of Designations or comparable instrument relating to the Series A Preferred Stock, of which these Standard Provisions form a part, as it may be amended from time to time.

(f) "Charter" means the Corporation's Amended and Restated Certificate of Incorporation, as such may be amended or restated from time to time.

(g) "Dividend Period" has the meaning set forth in Section 3(a).

(h) "Dividend Record Date" has the meaning set forth in Section 3(a).

(i) "DTC" has the meaning set forth in Section 9.

(j) "First Optional Redemption Date" has the meaning set forth in Section 5(a).

(k) "Global Share" means a share of Series A Preferred Stock in the form of a permanent global stock certificate, in definitive, fully registered form.

(l) "Global Share Legend" has the meaning set forth in Section 13(d).

4

(m) "Original Issue Date" means the date on which shares of the Series A Preferred Stock are first issued.

(n) "Person" means any individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

(o) "Preferred Director" has the meaning set forth in Section 7(b).

(p) "Preferred Share Register" has the meaning set forth in Section 15(a).

(q) "Preferred Stock" means any and all series of preferred stock of the Corporation, including the Series A Preferred Stock.

(r) "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

(s) "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

(t) "Series A Preferred Share Certificate" has the meaning set forth in Section 13.

(u) "Share Dilution Amount" has the meaning set forth in Section 3(b).

(v) "Standard Provisions" mean these Standard Provisions that form a part of the Certificate of Designations relating to the Series A Preferred Stock.

(w) "Redemption Price" has the meaning set forth in Section 5(a).

(x) "Transfer Agent" has the meaning set forth in Section 17.

Section 3. *Dividends.*

(a)    **Rate**. Holders of the Series A Preferred Stock shall be entitled to receive, on each share of the Series A Preferred Stock, if, as and when declared by the Board of Directors or any duly authorized committee of the Board of Directors, but only out of assets legally available therefor, cumulative cash dividends with respect to each Dividend Period (as defined below) at a rate per annum equal to the Applicable Dividend Rate on (i) the Liquidation Amount per share of the Series A Preferred Stock and (ii) the amount of accrued and unpaid dividends for any prior Dividend Period on such share of Series A Preferred Stock, if any. Such dividends shall begin to accrue and be cumulative from the Original Issue Date, shall compound on each subsequent Dividend Payment Date (*i.e.*, no dividends shall accrue on other dividends unless and until the first Dividend Payment Date for such other dividends has passed without such other dividends having been paid on such date), and shall be payable quarterly in arrears on each Dividend Payment Date, commencing with the first such Dividend Payment Date to occur at least 20 calendar days after the Original Issue Date. In the event that any Dividend Payment Date would

5

otherwise fall on a day that is not a Business Day, the dividend payment due on that date will be postponed to the next day that is a Business Day and no additional dividends shall be payable nor shall interest accrue on the amount payable as a result of that postponement. The period from and including any Dividend Payment Date to, but excluding, the next Dividend Payment Date is a "Dividend Period"; provided that the initial Dividend Period shall be the period from and including the Original Issue Date to, but excluding, the Dividend Payment Date immediately following the Original Issue Date.

Dividends that are payable on Series A Preferred Stock in respect of any Dividend Period shall be computed on the basis of a 360-day year consisting of twelve 30-day months. The amount of dividends payable on the Series A Preferred Stock on any date prior to the end of a Dividend Period, and for the initial Dividend Period, shall be computed on the basis of a 360-day year consisting of twelve 30-day months and actual days elapsed over a 30-day month.

Dividends that are payable on Series A Preferred Stock on any Dividend Payment Date will be payable to holders of record of the Series A Preferred Stock as they appear on the stock register of the Corporation on the applicable record date, which shall be the 15th calendar day immediately preceding such Dividend Payment Date or such other record date fixed by the Board of Directors or any duly authorized committee of the Board of Directors that is not more than 60 nor less than 10 days prior to such Dividend Payment Date (each, a "Dividend Record Date"). Any such day that is a Dividend Record Date shall be a Dividend Record Date whether or not such day is a Business Day.

Holders of the Series A Preferred Stock shall not be entitled to any dividends, whether payable in cash, securities or other property, other than dividends (if any) declared and payable on the Series A Preferred Stock as specified in this Section 3 (subject to the other provisions of the Certificate of Designations).

(b)    **Priority of Dividends**. So long as any share of the Series A Preferred Stock remains outstanding, no dividend or distribution shall be declared or paid on the Common Stock or any other shares of Junior Stock, and no Common Stock or Junior Stock shall be, directly or indirectly, purchased, redeemed or otherwise acquired for consideration by the Corporation or any of its subsidiaries unless all accrued and unpaid dividends for all past Dividend Periods, including the latest completed Dividend Period (including, as provided in Section 3(a) above, any dividends on such amount), on all outstanding shares of the Series A Preferred Stock have been or are contemporaneously declared and paid in full in cash (or have been declared and a sum sufficient for the payment thereof has been set aside for the benefit of the holders of shares of the Series A Preferred Stock on the applicable record date). The foregoing limitation shall not apply to (i) a dividend payable on any Junior Stock in shares of any other Junior Stock, or to the acquisition of shares of any Junior Stock in exchange for, or through application of the proceeds of the sale of, shares of any other Junior Stock; (ii) redemptions, purchases or other acquisitions of shares of Common Stock or other Junior Stock in connection with the administration of any employee benefit plan in the ordinary course of business (including purchases to offset the Share Dilution Amount pursuant to a publicly announced repurchase plan); provided that any purchases to offset the Share Dilution Amount shall in no event exceed the Share Dilution Amount; (iii) any dividends or distributions of rights or Junior Stock in connection with a stockholders' rights

6

plan or any redemption or repurchase of rights pursuant to any stockholders' rights plan; (iv) the acquisition by the Corporation or any of its subsidiaries of record ownership in Junior Stock for the beneficial ownership of any other persons (other than the Corporation or any of its subsidiaries), including as trustees or custodians; and (v) the exchange or conversion of Junior Stock for or into other Junior Stock (with the same or lesser aggregate liquidation amount). "Share Dilution Amount" means the increase in the number of diluted shares outstanding (determined in accordance with generally accepted accounting principles in the United States, and as measured from the Original Issue Date) resulting from the grant, vesting or exercise of equity-based compensation to employees and equitably adjusted for any stock split, stock dividend, reverse stock split, reclassification or similar transaction.

When dividends are not paid (or declared and a sum sufficient for payment thereof set aside for the benefit of the holders thereof on the applicable record date) on any Dividend Payment Date in full on shares of the Series A Preferred Stock, all dividends declared on the Series A Preferred Stock and payable on such Dividend Payment Date shall be declared pro rata so that the respective amounts of such dividends declared shall bear the same ratio to each other as all accrued and unpaid dividends per share on the shares of the Series A Preferred Stock (including, as provided in Section 3(a) above, any dividends on such amount) (subject to their having been declared by the Board of Directors or a duly authorized committee of the Board of Directors out of legally available funds and including, all accrued but unpaid dividends) bear to each other.

Subject to the foregoing, and not otherwise, such dividends (payable in cash, securities or other property) as may be determined by the Board of Directors or any duly authorized committee of the Board of Directors may be declared and paid on any securities, including Common Stock and other Junior Stock, from time to time out of any funds legally available for such payment, and holders of the Series A Preferred Stock shall not be entitled to participate in any such dividends.

Section 4. *Liquidation, Dissolution or Winding Up.* In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, then, before any distribution or payment shall be made to the holders of Junior Stock, the holders of the Series A Preferred Stock shall be entitled to be paid in full the respective amounts of the liquidation preferences thereof, which in the case of the Series A Preferred Stock shall be the Liquidation Amount, plus an amount equal to all accrued and unpaid dividends, if any (including, as provided in Section 3(a) above, any dividends on such amount), whether or not declared, prior to such distribution or payment date. If such payment shall have been made in full to the holders of the Series A Preferred Stock, the remaining assets and funds of the Corporation shall be distributed among the holders of Junior Stock, according to their respective rights and preferences and in each case according to their respective shares. If, upon any liquidation, dissolution or winding up of the affairs of the Corporation, the amounts so payable are not paid in full to the holders of all outstanding shares of the Series A Preferred Stock, the holders of the Series A Preferred Stock shall share ratably in any distribution of assets in proportion to the full amounts to which they would otherwise be respectively entitled. Neither the consolidation or merger of the Corporation, nor the sale, lease or conveyance of all or a part of its assets, shall be deemed a liquidation, dissolution or winding up of the affairs of the Corporation within the

7

meaning of the foregoing provisions of this Section 4.

Section 5. *Redemption*.

(a)    **Optional Redemption**. The Series A Preferred Stock may not be redeemed by the Corporation prior to December 31, 2014 (the "First Optional Redemption Date"). On or after that date, the Corporation, at its option, may redeem, in whole or in part, at any time and from time to time, out of funds legally available therefor, the shares of the Series A Preferred Stock at the time outstanding, upon notice given as provided in Section 5(c) below, at a redemption price per share equal to the sum of (i) the Liquidation Amount per share and (ii) except as otherwise provided below, any accrued and unpaid dividends (including, as provided in Section 3(a) above, any dividends on such amount) (regardless of whether any dividends are actually declared) to, but excluding, the date fixed for redemption (the "Redemption Price").

The Redemption Price for any shares of the Series A Preferred Stock shall be payable on the redemption date to the holder of such shares against surrender of the certificate(s) evidencing such shares to the Corporation or its agent. Any declared but unpaid dividends payable on a redemption date that occurs subsequent to the Dividend Record Date for a Dividend Period shall not be paid to the holder entitled to receive the Redemption Price on the redemption date, but rather shall be paid to the holder of record of the redeemed shares on such Dividend Record Date relating to the Dividend Payment Date as provided in Section 3 above.

(b)    **No Mandatory Redemption; No Sinking Fund**. The Series A Preferred Stock will not be subject to any mandatory redemption, mandatory repurchase, sinking fund or other similar provisions. Holders of the Series A Preferred Stock will have no right to require redemption or repurchase of any shares of the Series A Preferred Stock.

(c)    **Notice of Redemption**. Notice of every redemption of shares of the Series A Preferred Stock shall be given by first class mail, postage prepaid, addressed to the holders of record of the shares to be redeemed at their respective last addresses appearing on the books of the Corporation. Such mailing shall be at least 30 days and not more than 60 days before the date fixed for redemption. Any notice mailed as provided in this subsection (c) shall be conclusively presumed to have been duly given, whether or not the holder receives such notice, but failure duly to give such notice by mail, or any defect in such notice or in the mailing thereof, to any holder of shares of the Series A Preferred Stock designated for redemption shall not affect the validity of the proceedings for the redemption of any other shares of the Series A Preferred Stock. Notwithstanding the foregoing, if shares of the Series A Preferred Stock are issued in book-entry form through The Depository Trust Corporation or any other similar facility, notice of redemption may be given to the holders of the Series A Preferred Stock at such time and in any manner permitted by such facility. Each notice of redemption given to a holder shall state: (1) the redemption date; (2) the number of shares of the Series A Preferred Stock to be redeemed and, if less than all the shares held by such holder are to be redeemed, the number of such shares to be redeemed from such holder; (3) the Redemption Price; and (4) the place or places where certificates for such shares are to be surrendered for payment of the redemption price, but failure duly to give such notice to any holder of shares of the Series A Preferred Stock designated for redemption or any defect in such notice shall not affect the validity of the proceedings for the

8

redemption of any other shares of the Series A Preferred Stock.

(d)    **Partial Redemption**. In case of any redemption of part of the shares of the Series A Preferred Stock at the time outstanding, the shares to be redeemed shall be selected either pro rata or in such other manner as the Board of Directors or a duly authorized committee thereof may determine to be fair and equitable. Subject to the provisions hereof, the Board of Directors or a duly authorized committee thereof shall have full power and authority to prescribe the terms and conditions upon which shares of the Series A Preferred Stock shall be redeemed from time to time. If fewer than all the shares represented by any certificate are redeemed, a new certificate shall be issued representing the unredeemed shares without charge to the holder thereof.

(e)    **Effectiveness of Redemption**. If notice of redemption has been duly given and if on or before the redemption date specified in the notice all funds necessary for the redemption have been deposited by the Corporation, in trust for the pro rata benefit of the holders of the shares called for redemption, with a bank or trust company doing business in the Borough of Manhattan, The City of New York, and having a capital and surplus of at least $500 million and selected by the Board of Directors or a duly authorized committee thereof, so as to be and continue to be available solely therefor, then, notwithstanding that any certificate (if the shares of Series A Preferred Stock are not in book-entry form) for any share so called for redemption has not been surrendered for cancellation, on and after the redemption date dividends shall cease to accrue on all shares so called for redemption, all shares so called for redemption shall no longer be deemed outstanding and all rights with respect to such shares shall forthwith on such redemption date cease and terminate, except only the right of the holders thereof to receive the amount payable on such redemption from such bank or trust company, without interest. Any funds unclaimed at the end of three years from the redemption date shall, to the extent permitted by law, be released to the Corporation, after which time the holders of the shares so called for redemption shall look only to the Corporation for payment of such amounts.

(f)    **Status of Redeemed Shares**. Shares of the Series A Preferred Stock that are redeemed, repurchased or otherwise acquired by the Corporation shall revert to authorized but unissued shares of Preferred Stock (provided that any such cancelled shares of the Series A Preferred Stock may be reissued only as shares of any series of the Preferred Stock other than the Series A Preferred Stock).

Section 6. *Conversion*. Holders of the Series A Preferred Stock shares shall have no right to exchange or convert such shares into any other securities.

Section 7. *Voting Rights*.

(a)    **General**. The holders of the Series A Preferred Stock shall not have any voting rights except as set forth below or as otherwise from time to time required by law.

(b)    **Series A Preferred Stock Directors**. Whenever, at any time or times, dividends payable on the shares of the Series A Preferred Stock have not been paid for an aggregate of six quarterly Dividend Periods or more, whether or not consecutive, the authorized number of directors of the Corporation shall automatically be increased to accommodate the number of the

9

Preferred Directors specified below and the holders of the Series A Preferred Stock shall have the right, voting as a class, to elect two directors (hereinafter the "Preferred Directors" and each a "Preferred Director") to fill such newly created directorships at the Corporation's next annual meeting of stockholders (or at a special meeting called for that purpose prior to such next annual meeting) and at each subsequent annual meeting of stockholders until all accrued and unpaid dividends for all past Dividend Periods, including the latest completed Dividend Period (including, as provided in Section 3(a) above, any dividends on such amount), on all outstanding shares of the Series A Preferred Stock have been declared and paid in full, at which time such right shall terminate with respect to the Series A Preferred Stock, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent payment failure of the character above mentioned; provided that it shall be a qualification for election for any Preferred Director that the election of such Preferred Director shall not cause the Corporation to violate any corporate governance requirements of any securities exchange or other trading facility on which securities of the Corporation may then be listed or traded that listed or traded companies must have a majority of independent directors. Upon any termination of the right of the holders of shares of the Series A Preferred Stock as a class to vote for directors as provided above, the Preferred Directors shall cease to be qualified as directors, the term of office of all Preferred Directors then in office shall terminate immediately and the authorized number of directors shall be reduced by the number of the Preferred Directors elected pursuant hereto. Any Preferred Director may be removed at any time, with or without cause, and any vacancy created thereby may be filled, only by the affirmative vote of the holders of a majority of the shares of the Series A Preferred Stock at the time outstanding voting separately as a class, to the extent the voting rights of such holders described above are then exercisable. If the office of any Preferred Director becomes vacant for any reason other than removal from office as aforesaid, the remaining Preferred Director may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred.

(c)    **Class Voting Rights as to Particular Matters.**  So long as any shares of the Series A Preferred Stock are outstanding, in addition to any other vote or consent of stockholders required by law or by the Charter, the vote or consent of the holders of at least 66 2/3% of the shares of the Series A Preferred Stock at the time outstanding, voting as a separate class, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, shall be necessary for effecting or validating:

(i)    Authorization of Senior or Pari Passu Stock. Any amendment or alteration of the Certificate of Designations for the Series A Preferred Stock or the Charter (including any amendment to the Charter effectuated by a certificate of designations) to authorize or create or increase the authorized amount of, or any issuance of, any shares of, or any securities convertible into or exchangeable or exercisable for shares of, any class or series of capital stock of the Corporation ranking senior to or pari passu with the Series A Preferred Stock with respect to either or both the payment of dividends and/or the distribution of assets on any liquidation, dissolution or winding up of the Corporation;

(ii)    Amendment of the Series A Preferred Stock. Any amendment, alteration or repeal of any provision of the Certificate of Designations for the Series A Preferred Stock or the Charter (including, unless no vote on such merger or consolidation is required by Section

10