7(c)(iii) below, any amendment, alteration or repeal by means of a merger, consolidation or otherwise) so as to adversely affect the rights, preferences, privileges or voting powers of the Series A Preferred Stock; provided, however, that notwithstanding anything to the contrary herein, the vote of 100% of the shares of the Series A Preferred Stock at the time outstanding shall be necessary to (A) reduce the Liquidation Amount, (B) reduce the Applicable Dividend Rate, (C) provide for the payment of dividends on the Series A Preferred Stock to be made in other than U.S. dollars, (D) change any Dividend Payment Date or the First Optional Redemption Date or (E) make dividends on the Series A Preferred Stock non-cumulative; or

(iii)    Share Exchanges, Reclassifications, Mergers and Consolidations. Any consummation of a binding share exchange or reclassification involving the Series A Preferred Stock, or of a merger or consolidation of the Corporation with or into another corporation or other entity, unless in each case (x) the shares of the Series A Preferred Stock remain outstanding and are not amended in any respect or, in the case of any such merger or consolidation with respect to which the Corporation is not the surviving or resulting entity, are converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent, and (y) such shares remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, and limitations and restrictions thereof, taken as a whole, as are not materially less favorable to the holders thereof than the rights, preferences, privileges and voting powers, and limitations and restrictions thereof, of the Series A Preferred Stock immediately prior to such consummation, taken as a whole;

provided, however, that for all purposes of this Section 7(c), any increase in the amount of the authorized Preferred Stock, or the creation and issuance, or an increase in the authorized or issued amount, whether pursuant to preemptive or similar rights or otherwise, of any other series of the Preferred Stock, or any securities convertible into or exchangeable or exercisable for any other series of the Preferred Stock, ranking junior to the Series A Preferred Stock with respect to the payment of dividends (whether such dividends are cumulative or non-cumulative) and the distribution of assets upon liquidation, dissolution or winding up of the Corporation will not be deemed to adversely affect the rights, preferences, privileges or voting powers, and shall not require the affirmative vote or consent of, the holders of outstanding shares of the Series A Preferred Stock.

(d)    **Changes after Provision for Redemption.** No vote or consent of the holders of the Series A Preferred Stock shall be required pursuant to Section 7(c) above if, at or prior to the time when any such vote or consent would otherwise be required pursuant to such Section, all outstanding shares of the Series A Preferred Stock shall have been redeemed, or shall have been called for redemption upon proper notice and sufficient funds shall have been deposited in trust for such redemption, in each case pursuant to Section 5 above.

(e)    **Procedures for Voting and Consents.** The rules and procedures for calling and conducting any meeting of the holders of the Series A Preferred Stock (including, without limitation, the fixing of a record date in connection therewith), the solicitation and use of proxies at such a meeting, the obtaining of written consents and any other aspect or matter with regard to such a meeting or such consents shall be governed by any rules that the Board of Directors or any duly authorized committee of the Board of Directors, in its discretion, may adopt from time

11

to time, which rules and procedures shall conform to the requirements of the Charter, the Bylaws, and applicable law and the rules of any national securities exchange or other trading facility on which the Series A Preferred Stock is listed or traded at the time.

Section 8. *Record Holders*. To the fullest extent permitted by applicable law, the Corporation and any transfer agent for the Series A Preferred Stock may deem and treat the record holder of any share of the Series A Preferred Stock as the true and lawful owner thereof for all purposes, and neither the Corporation nor any such transfer agent shall be affected by any notice to the contrary.

Section 9. *Notices*. All notices or communications in respect of the Series A Preferred Stock shall be sufficiently given if given in writing and delivered in person or by first class mail, postage prepaid, or if given in such other manner as may be permitted in this Certificate of Designations, in the Charter or Bylaws or by applicable law. Notwithstanding the foregoing, if shares of the Series A Preferred Stock are issued in book-entry form through The Depository Trust Corporation ("DTC") or any similar facility, such notices may be given to the holders of the Series A Preferred Stock in any manner permitted by such facility.

Section 10. *No Preemptive Rights*. No holder of the Series A Preferred Stock shall be entitled as a matter of right to subscribe for or purchase, or have any preemptive right or any other right to remediate dilution with respect to, any part of any new or additional issue of stock of any class whatsoever, or of securities convertible into any stock of any class whatsoever, whether now or hereafter authorized and whether issued for cash or other consideration or by way of dividend.

Section 11. *Replacement Certificates*. The Corporation shall replace any mutilated certificate at the holder's expense upon surrender of that certificate to the Corporation. The Corporation shall replace certificates that become destroyed, stolen or lost at the holder's expense upon delivery to the Corporation of reasonably satisfactory evidence that the certificate has been destroyed, stolen or lost, together with any indemnity that may be reasonably required by the Corporation.

Section 12. *Other Rights*. The shares of the Series A Preferred Stock shall not have any rights, preferences, privileges or voting powers or relative, participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other than as set forth herein or in the Charter or as provided by applicable law.

Section 13. *Form*.

(a)    The Series A Preferred Stock shall be initially issued in substantially the form set forth in Exhibit A ("Series A Preferred Share Certificate") and shall have such insertions as are appropriate or required or permitted by this Certificate of Designations and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Corporation may deem appropriate and as are not inconsistent with the provisions of this Certificate of Designations, such as may be required to comply with this Certificate of Designations, any law or any rule of any securities exchange

12

on which the Series A Preferred Stock may be listed, and such as may be necessary to conform to customary usage.

(b)    If the Series A Preferred Stock is sold pursuant to an effective registration statement filed with the Securities and Exchange Commission, or if the Corporation so elects at any time, any Series A Preferred Share Certificates may be presented to the Transfer Agent by holders in exchange for one or more Global Shares up to the aggregate number of shares of Series A Preferred Stock then outstanding, to be registered in the name of DTC, or its nominee, and delivered by the Transfer Agent to DTC, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of DTC. Upon such presentation, the Corporation shall execute a Global Share representing such aggregate number of shares of Series A Preferred Stock and deliver the same to the Transfer Agent for authentication and delivery.

(c)    Any Global Share shall bear the legend substantially in the form set forth in Exhibit C hereto (the "Global Share Legend").

(d)    So long as a Global Share is registered in the name of DTC or its nominee, members of, or participants in, DTC ("Agent Members") shall have no rights under this Certificate of Designation with respect to the Global Share held on their behalf by DTC or the Transfer Agent as its custodian, and DTC may be treated by the Corporation, the Transfer Agent and any agent of the Corporation or the Transfer Agent as the absolute owner of such Global Share for all purposes. Accordingly, any such owner's beneficial interest in such Global Share will be shown only on, and the transfer of such interest shall be effected only through, records maintained by DTC or its nominee or its Agent Members, and neither the Corporation nor the Transfer Agent shall have any responsibility with respect to such records maintained by DTC or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Corporation, the Transfer Agent or any agent of the Corporation or the Transfer Agent from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder.

(e)    Any holder of a Global Share registered in the name of DTC or its nominee shall, by acceptance of such Global Share, agree that transfers of beneficial interests in such Global Share may be effected only through a book-entry system maintained by the holder of such Global Share (or its agent), and that ownership of a beneficial interest in the Series A Preferred Stock represented thereby shall be required to be reflected in book-entry form.

(f)    Transfers of a Global Share registered in the name of DTC or its nominee shall be limited to transfers in whole, and not in part, to the Corporation, DTC, their successors, and their respective nominees. Interests of beneficial owners in a Global Share registered in the name of DTC or its nominee shall be transferred in accordance with the rules and procedures of DTC.

(g)    A Global Share registered in the name of DTC or its nominee shall be exchanged for certificated shares of Series A Preferred Stock only if DTC (A) has notified the Corporation that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act, and (B) a successor to DTC registered as a clearing agency

13

under Section 17A of the Exchange Act is not able to be appointed by the Corporation within 90 days or DTC is at any time unwilling or unable to continue as a depositary and a successor to DTC is not able to be appointed by the Corporation within 90 days. In any such event, a Global Share registered in the name of DTC or its nominee shall be surrendered to the Transfer Agent for cancellation, and the Corporation shall execute, and the Transfer Agent shall countersign and deliver, to each beneficial owner identified by DTC, in exchange for such beneficial owner's beneficial interest in such Global Share, certificated shares of the Series A Preferred Stock representing, in the aggregate, the number of shares theretofore represented by such Global Share with respect to such beneficial owner's respective beneficial interest. Any certificated share of Series A Preferred Stock delivered in exchange for an interest in a Global Share pursuant to this Section shall not bear the Global Share Legend. Interests in the Global Shares may not be exchanged for certificated shares of Series A Preferred Stock other than as provided in this Section 13(g).

(h)    The holder of a Global Share registered in the name of DTC or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Certificate of Designations.

Section 14.    *Transfer Restrictions and Legends.* (a) Each Series A Preferred Share Certificate issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)    Shares of Series A Preferred Stock may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a holder except pursuant to (A) a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any shares of Series A Preferred Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Series A Preferred Share Certificate representing such shares for exchange in accordance with the procedures of the Transfer Agent (as defined in Section 17 below) (together with any legal opinions, certifications or other evidence as may reasonably be required by the Corporation or the Transfer Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Series A Preferred Share Certificate for a like number of shares, which shall not bear such legend.

(b)    Any shares of Series A Preferred Stock that are purchased or owned by the Corporation or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Corporation or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such shares no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

14

Section 15.   *Transfer, Exchange and Substitution.*   (a) Series A Preferred Share Certificates shall be issued in registered form only. The Corporation shall cause to be kept at the office of the Transfer Agent, and the Transfer Agent shall maintain, a register (the "Preferred Share Register") in which, subject to such reasonable regulations as the Corporation may prescribe, the Corporation shall provide for the registration of shares and transfers, exchanges or substitutions of Series A Preferred Share Certificates as herein provided. All Series A Preferred Share Certificates issued upon any registration of transfer or exchange of or substitution for shares shall be valid obligations of the Corporation, evidencing the same obligations, and entitled to the same benefits under this Certificate of Designations, as Series A Preferred Share Certificates surrendered for such registration of transfer, exchange or substitution.

(b)   A holder may transfer a Series A Preferred Share Certificate only upon surrender of such Series A Preferred Share Certificate for registration of transfer. Series A Preferred Share Certificates may be presented for registration of transfer and exchange at the offices of the Transfer Agent with a written instruction of transfer in form satisfactory to the Transfer Agent, duly executed by such holder or by such holder's attorney, duly authorized in writing. Such holder will also provide a written certificate (substantially in the form of Exhibit B hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Series A Preferred Share Certificates. The Transfer Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Series A Preferred Share Certificate hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act. No such transfer shall be effected until, and the transferee shall succeed to the rights of a holder only upon, final acceptance and registration of the transfer in the Preferred Share Register by the Transfer Agent. Prior to the registration of any transfer of a Series A Preferred Share Certificate by a holder as provided herein, the Corporation, the Transfer Agent, and any agent of the Corporation or the Transfer Agent may treat the person in whose name Series A Preferred Share Certificates are registered as the owner thereof for all purposes and as the person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)   Every Series A Preferred Share Certificate presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Corporation or the Transfer Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Corporation and the Transfer Agent, by the holder thereof or such holder's attorney duly authorized in writing.

(d)   When Series A Preferred Share Certificates are presented to the Transfer Agent with a request to register the transfer of, or to exchange or substitute, such Series A Preferred Share Certificates, the Transfer Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied. To permit registrations of transfers, exchanges and substitutions, the Corporation shall execute Series A Preferred Share Certificates at the Transfer Agent's request and the Transfer Agent shall countersign and deliver such Series A Preferred Share Certificates. No service charge shall be made for any registration of transfer or exchange of or substitution for Series A Preferred Share Certificates, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Series A Preferred Share Certificates.

15

1766819

(e)    If less than all shares represented by a Series A Preferred Share Certificate are transferred, exchanged or substituted in accordance with this Certificate of Designations, the Series A Preferred Share Certificate shall be surrendered to the Transfer Agent and a new Series A Preferred Share Certificates for a number of shares equal to the shares represented by such Series A Preferred Share Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering holder, shall be executed by the Corporation and delivered to the Transfer Agent and the Transfer Agent shall countersign such new Series A Preferred Share Certificate and shall deliver such new Series A Preferred Share Certificate to the person or persons entitled to receive the same.

Section 16. *Surrender of Series A Preferred Share Certificates*. Any Series A Preferred Share Certificate surrendered for registration of transfer, exchange, or substitution of shares represented thereby shall, if surrendered to the Corporation, be delivered to the Transfer Agent, and all Series A Preferred Share Certificates surrendered or so delivered to the Transfer Agent shall be promptly cancelled by the Transfer Agent and shall not be reissued by the Corporation and no Series A Preferred Share Certificate shall be issued hereunder in lieu thereof. The Transfer Agent shall deliver to the Corporation from time to time or otherwise dispose of such cancelled shares as the Corporation may direct.

Section 17. *Transfer Agent And Registrar*. The duly appointed Transfer Agent and Registrar for the Series A Preferred Stock shall be [_____] (the "Transfer Agent"). The Corporation may, in its sole discretion, remove the Transfer Agent in accordance with the agreement between the Corporation and the Transfer Agent; provided that the Corporation shall appoint a successor transfer agent who shall accept such appointment prior to the effectiveness of such removal; provided further that such successor transfer agent shall be the Transfer Agent for purposes of this Certificate of Designations.

16

## EXHIBIT A

FORM OF SERIES A FIXED RATE CUMULATIVE
PERPETUAL PREFERRED STOCK
($25 LIQUIDATION PREFERENCE)

NUMBER

*[_____]*

SHARES

*[_____]*

CUSIP *[_____]*

### *[NGMCO, INC.]*
### INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE
### THIS CERTIFICATE IS TRANSFERABLE

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN
REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE
SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR
OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT
RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH
APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM
REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE
RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A STOCKHOLDERS
AGREEMENT, DATED [●], 2009, AMONG THE ISSUER OF THESE SECURITIES AND
THE INVESTORS REFERRED TO THEREIN, AND AN EQUITY REGISTRATION RIGHTS
AGREEMENT, DATED [●], 2009, AMONG THE ISSUER AND THE HOLDERS
REFERRED TO THEREIN, COPIES OF WHICH ARE ON FILE WITH THE ISSUER. THE
SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR
OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT.
ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT
WILL BE VOID.]

1766819

This is to certify that _____, is the owner of *[__]* fully paid and non-assessable shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, $0.01 par value, liquidation preference $25.00 per share (the "Stock"), of *[NGMCO, Inc.]* (the "Corporation"), transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this certificate properly endorsed.

This certificate is not valid or obligatory for any purpose unless countersigned and registered by the Transfer Agent and Registrar.

Witness the facsimile signatures of its duly authorized officers.

Dated: [____], 2009

_____

Name:
Title:

Name:
Title:

Countersigned and Registered

_____ ,

as Transfer Agent and Registrar

By: _____
Authorized Signature

18

1766819

*[NGMCO, INC.]*

*[NGMCO, Inc.]* (the "Corporation") will furnish, without charge to each stockholder who so requests, a copy of the certificate of designations establishing the powers, preferences and relative, participating, optional or other special rights of each class of stock of the Corporation or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights applicable to each class of stock of the Corporation or series thereof. Such information may be obtained by a request in writing to the Secretary of the Corporation at its principal place of business.

This certificate and the share or shares represented hereby are issued and shall be held subject to all of the provisions of the Corporation's Amended and Restated Certificate of Incorporation and the Certificate of Designations of the Series A Fixed Rate Cumulative Perpetual Preferred Stock (Liquidation Preference $25.00 per share) (copies of which are on file with the Transfer Agent), to all of which the holder, by acceptance hereof, assents.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full to applicable laws or regulations:

| | | |
|---|---|---|
| TEN COM | - as tenants in common | UNIF GIFT MIN ACT- _____Custodian _____ |
| TEN ENT | - as tenants by the entireties | (Minor)          (Cust) |
| JT TEN | - as joint tenants with right of | under Uniform Gifts to Minors Act |
| | survivorship and not as | _____ |
| | tenants in common | (State) |

Additional abbreviations may also be used though not in the above list.

For value received, _____ hereby sell(s), assign(s) and transfer(s) unto

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

_____

_____

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OF ASSIGNEE

_____

_____shares
of the capital stock represented by the within certificate, and do(es) hereby irrevocably constitute and appoint _____, Attorney to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.

19

1766819

Dated_____

_____
Signature

NOTICE: The signature to this assignment must correspond
with the name as written upon the face of this
certificate in every particular, without alteration or
enlargement or any change whatever.

SIGNATURE GUARANTEED

_____

NOTICE: The signature(s) should be guaranteed by
an eligible guarantor institution (banks,
stockbrokers, savings and loan associations, and
credit unions with membership in an approved
signature guarantee medallion program), pursuant
to Rule 17Ad-15 under the Securities Exchange Act
of 1934.

20

1766819

**EXHIBIT B**

**FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS**

In connection with the sale, assignment and transfer of _____ shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such shares are being transferred:

To *[NGMCO, Inc.]* (the "**Issuer**") or any subsidiaries thereof; or

Pursuant to a registration statement that has become effective under the Securities Act; or

Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Transfer Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Transfer Agent will refuse to register any of the* shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock *evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:  [_____]

[Insert name of transferee]

By: _____
       Name:
       Title:

21

1766819

## EXHIBIT C

### GLOBAL SHARE LEGEND

UNLESS THIS GLOBAL SHARE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO *[NGMCO, INC.]* (THE "ISSUER") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL SHARE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE ISSUER, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

22

# EXHIBIT K

# FORM OF STOCKHOLDERS AGREEMENT

Final form to be agreed among [New Co], the New VEBA, and the other stockholders to be parties thereto, in conformity with the Governance Term Sheet previously furnished to the UAW, with such changes thereto as may be required by the United States Treasury and agreed to by the UAW.

**PRIVILEGED & CONFIDENTIAL**
**CW&T DRAFT**
**6/21/09**

STOCKHOLDERS AGREEMENT

by and among

*[New GM Name]*,

*[_____]*
("UST Vehicle"),

7176384 Canada Inc.,

and

UAW Retiree Medical Benefits Trust

Dated *[_____]*, 2009

## TABLE OF CONTENTS

Page

### ARTICLE I
### DEFINITIONS

Section 1.1    Certain Defined Terms...........................................................................................1
Section 1.2    Terms Generally...................................................................................................6

### ARTICLE II
### BOARD OF DIRECTORS

Section 2.1    Size of Initial Board. ...........................................................................................6
Section 2.2    Composition of Board...........................................................................................6
Section 2.3    Agreement to Nominate VEBA Nominee. ...........................................................7
Section 2.4    Agreement to Nominate Canada Nominee. ..........................................................8

### ARTICLE III
### CERTAIN COVENANTS AND RESTRICTIONS

Section 3.1    Initial Public Offering..........................................................................................8
Section 3.2    Government Holders Sale of Shares. ....................................................................8
Section 3.3    Transfer Restrictions.............................................................................................9
Section 3.4    Restrictions on Certain Corporate Actions. .......................................................10
Section 3.5    Certificate Legends. ...........................................................................................10

### ARTICLE IV
### VOTING AGREEMENT

Section 4.1    Government Holder Participation to Establish Quorum.....................................10
Section 4.2    Government Holder Agreement to Vote..............................................................11
Section 4.3    VEBA Agreement to Vote. .................................................................................12
Section 4.4    Irrevocable Proxy...............................................................................................12
Section 4.5    Inconsistent Voting Agreements.........................................................................13

### ARTICLE V
### OTHER AGREEMENTS

Section 5.1    Tag-Along Rights................................................................................................13
Section 5.2    Drag-Along Rights..............................................................................................14
Section 5.3    Preemptive Rights...............................................................................................16
Section 5.4    Information Rights...............................................................................................17

## ARTICLE VI
## MISCELLANEOUS

| | | |
|---|---|---|
| Section 6.1 | Notices. | 17 |
| Section 6.2 | Termination. | 19 |
| Section 6.3 | Authority. | 19 |
| Section 6.4 | No Third Party Beneficiaries. | 19 |
| Section 6.5 | No Personal Liability by the VEBA Signatory | 20 |
| Section 6.6 | Cooperation. | 20 |
| Section 6.7 | Governing Law; Forum Selection. | 20 |
| Section 6.8 | WAIVER OF JURY TRIAL. | 20 |
| Section 6.9 | Assignment; Successors and Assigns. | 20 |
| Section 6.10 | After Acquired Securities. | 20 |
| Section 6.11 | Entire Agreement. | 20 |
| Section 6.12 | Severability. | 21 |
| Section 6.13 | Enforcement of this Agreement. | 21 |
| Section 6.14 | Amendment. | 21 |
| Section 6.15 | Headings. | 21 |
| Section 6.16 | Counterparts; Facsimiles. | 21 |
| Section 6.17 | US Treasury. | 22 |
| Section 6.18 | Canada. | 22 |
| Section 6.19 | Time Periods. | 22 |

## STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT (this "Agreement") is entered into as of *[_____]*, 2009 by and among *[New GM Name]*, a Delaware corporation (the "Corporation"), *[_____]*, a limited liability company whose membership interests are held by the United States Department of the Treasury (together with its Permitted Transferees, the "UST Vehicle"), 7176384 Canada Inc., a corporation organized under the laws of Canada (together with its Permitted Transferees, "Canada"), and the UAW Retiree Medical Benefits Trust, a voluntary employees' beneficiary association (together with its Permitted Transferees, the "VEBA").

WHEREAS, each of the Government Holders and the VEBA owns, as of the date hereof, that number of shares of common stock, par value $0.01 per share, of the Corporation (the "Common Stock") and that number of shares of Series [__] preferred stock, par value $0.01 per share, of the Corporation, set forth opposite such Holder's name on **Annex I** hereto;

WHEREAS, the VEBA will also be issued, as of the date hereof, a warrant to acquire *[_____]* shares of Common Stock (the "Warrant"); and

WHEREAS, the parties hereto wish to enter into this Agreement to govern the rights and obligations of the parties with respect to certain matters relating to the Corporation and the Holders' ownership and voting of the Common Stock.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained in this Agreement and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    *Certain Defined Terms.*  As used in this Agreement, the following terms have the following meanings set forth below or in the Sections set forth below:

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly Controls or is Controlled by or is under common Control with such Person. For the avoidance of doubt, for purposes of this Agreement, the UAW and its Affiliates shall be deemed to be Affiliates of the VEBA. For the avoidance of doubt, for purposes of this Agreement, the UST and each other department or instrumentality of the United States government shall not be deemed to be Affiliates of the UST Vehicle and each other department or instrumentality of the Canadian government shall not be deemed to be Affiliates of Canada.

"Agreement" shall have the meaning set forth in the Preamble.

"Beneficial Ownership" or "Beneficially Owned" have the meanings given to such terms in Rule 13d-3 of the Exchange Act.

"Board" means the board of directors of the Corporation.

"Business Day" means any day that is not a Saturday, Sunday or any other day on which banks are required or authorized by Law to be closed in New York City, New York.

"Canada" shall have the meaning set forth in the Preamble.

"Canada Nominee" shall have the meaning set forth in **Section 2.4**.

"Canada Owned Shares" means the shares of Common Stock Beneficially Owned by Canada as of the relevant time.

"Change of Control" means (A) any acquisition or purchase of capital stock of the Corporation, or of all or substantially all of the assets of the Corporation or (B) any merger, consolidation, business combination, recapitalization, reorganization or other extraordinary business transaction involving or otherwise relating to the Corporation, in each case, which would require the vote of the stockholders of the Corporation pursuant to the DGCL or the Certificate of Incorporation of the Corporation.

"Chief Executive Officer" means the duly appointed Chief Executive Officer of the Corporation.

"Common Stock" shall have the meaning set forth in the Recitals.

"Compelled Sale" shall have the meaning set forth in **Section 5.2**.

"Compelled Sale Notice" shall have the meaning set forth in **Section 5.2**.

"Consent" means any consent, approval, authorization, waiver, grant, franchise, concession, agreement, license, exemption or other permit or order of, registration, declaration or filing with, or report or notice to, any Person.

"Control" means the direct or indirect power to direct or cause the direction of management or policies of a Person, whether through the ownership of voting securities, general partnership interests or management member interests, by contract or trust agreement, pursuant to a voting trust or otherwise. "Controlling" and "Controlled" have the correlative meanings.

"Corporation" shall have the meaning set forth in the Preamble.

"Co-Sale Holders" shall have the meaning set forth in **Section 5.1**.

"Co-Sale Notice" shall have the meaning set forth in **Section 5.1**.

"DGCL" means the Delaware General Corporation Law, as amended from time to time.

"Drag-Along Buyer" shall have the meaning set forth in **Section 5.2**.

"Electing Holder" shall have the meaning set forth in **Section 5.2**.

"Equity Registration Rights Agreement" means the Equity Registration Rights Agreement, dated as of the date hereof, by and among the Corporation, the VEBA, the UST Vehicle, Canada and General Motors Corporation.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Executive Officer" means any officer who (i) is subject to Section 16(a) of the Exchange Act or (ii) would be subject to Section 16(a) of the Exchange Act if the Common Stock was registered under Section 12 of the Exchange Act.

"Fiscal Year" means the fiscal year of the Corporation.    Each Fiscal Year shall commence on the day immediately following the last day of the immediately preceding Fiscal Year.

"GAAP" means accounting principles generally accepted in the United States of America as in effect from time to time, consistently applied and maintained throughout the applicable periods both as to classification of items and amounts.

"Government Holder" means the UST Vehicle or Canada.

"Governmental Approval" means any Consent of, with or to any Governmental Authority, and includes any applicable waiting periods associated with any Governmental Approvals.

"Governmental Authority" means any United States or non-United States federal, provincial, state or local government or other political subdivision thereof, any entity, authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"Governmental Order" means any Order, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority and binding on a Person.

"Group" has the meaning given to such term in Section 13(d)(3) of the Exchange Act.

"Holder" or "Holders" means, individually or collectively as the context may require, the UST Vehicle, Canada, and the VEBA.

"Independent" shall have the meaning set forth in **Section 2.2(b)**.

"Initial Shares" means, with respect to any Holder, that number of shares of Common Stock, set forth opposite such Holder's name on **Annex I** hereto.

"IPO" means the earlier to occur of (i) the initial public offering of the Common Stock, (whether such offering is primary or secondary) that is underwritten by a nationally recognized investment bank, pursuant to a registration statement filed under the Securities Act and declared effective by the SEC (other than a registration effected solely to implement an employee benefit

plan or a transaction to which Rule 145 under the Securities Act is applicable, or a registration statement on Form S-4, Form S-8 or a successor to one of those forms) or (ii) the date on which a Corporation registration statement filed under Section 12(b) or 12(g) of the Exchange Act shall have been declared effective by the SEC following the distribution of the shares of Common Stock Beneficially Owned by General Motors Corporation pursuant to General Motors Corporation's plan of reorganization.

"IPO Date" means the effective date of the registration statement relating to the IPO.

"Joint Slate Procedure" shall mean the following process by which the Government Holders select nominees for directors:  In the event that the UST Vehicle intends to propose a slate of candidates for election (whether at an annual meeting of the Corporation's stockholders, a special meeting the Corporation's stockholders called for the purpose of electing directors of the Corporation or at any adjourned or postponed meeting), the UST Vehicle shall provide Canada with written notice of its intent to propose a competing slate of candidates not less than 140 days prior to the meeting, in the case of an annual meeting, and not more than 5 days after notice of the meeting was first mailed to the Government Holders, in the case of a special meeting; provided that in either case the UST Vehicle shall use commercially reasonable efforts to give Canada as much advance notice of its intent to propose a competing slate of candidates as reasonably possible. Within 10 days, in the case of an annual meeting, and 5 days, in the case of a special meeting, of receiving the UST Vehicle's written notice, Canada shall indicate in writing to the UST Vehicle whether or not Canada intends to participate in the slate. If Canada provides written notice of its intent to participate, such notice must include a list of Canada's nominees. The number of nominees that Canada may select shall be determined based on Canada's proportional ownership interest in shares of Common Stock Beneficially Owned by the Government Holders in the aggregate at the time of such nominee selection. If Canada provides timely written notice of its intent to participate (including a list of its nominees), each Government Holder agrees to vote "for" the joint slate of candidates nominated by the Government Holders. If Canada does not provide timely written notice of its intent to participate (including a list of its nominees) or notifies the UST Vehicle that it does not wish to participate, the UST Vehicle may propose a slate of candidates for election composed entirely of its own nominees, but Canada is under no obligation to vote "for" the candidates nominated by the UST Vehicle. Neither Government Holder shall propose a slate of candidates for election other than in compliance with this Joint Slate Procedure.

"Law" means any and all applicable United States or non-United States federal, provincial, state or local laws, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of common law) of any Governmental Authority, as well as any applicable Governmental Order.

"Material Adverse Event" shall mean (i) trading in securities generally on the New York Stock Exchange shall have been suspended or materially limited or any setting of minimum prices for trading on such exchange shall have been instituted, (ii) a general moratorium on commercial banking activities in the State of New York shall have been declared by either U.S. federal or New York State authorities or there shall have occurred a material disruption in securities settlement or clearance services in the United States, (iii) there shall have occurred any material outbreak or escalation of hostilities or other national or international calamity or crisis

the effect of which on the financial markets of the United States or Canada is such as to make it impracticable or inadvisable to sell the Common Stock or (iv) **[other potential events to be discussed]**.

"Nominee" shall have the meaning set forth in **Section 4.4**.

"Non-Electing Holders" shall have the meaning set forth in **Section 5.2**.

"Order" means any writ, judgment, decree, injunction or similar order of any Governmental Authority, whether temporary, preliminary or permanent.

"Owned Shares" means the UST Vehicle Owned Shares, the Canada Owned Shares, and the VEBA Owned Shares, as applicable.

"Permitted Transferees" shall mean for each Holder, any Affiliate (solely for the purposes of this definition, without taking into account the last sentence of the definition of Affiliate) of such Holder.

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"Preemptive Rights Period" shall have the meaning set forth in **Section 5.3**.

"Preemptive Rights Shares" shall have the meaning set forth in **Section 5.3**.

"Proxy" or "Proxies" has the meaning given to such term in Rule 14a-1 of the Exchange Act.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Selling Holder" shall have the meaning set forth in **Section 5.1**

"Sold Shares" shall have the meaning set forth in **Section 5.1**.

"Transfer" means, directly or indirectly, to sell, transfer, distribute, assign, pledge, hedge, encumber, hypothecate or similarly dispose of, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, distribution, assignment, pledge, hedge, encumbrance, hypothecation or similar disposition with or without consideration, voluntarily or by operation of Law.

"UAW" means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America.

"UST" means the United States Department of the Treasury.

"UST Vehicle" shall have the meaning set forth in the Preamble.

"UST Vehicle Owned Shares" means the shares of Common Stock Beneficially Owned by the UST Vehicle as of the relevant time.

"VEBA" shall have the meaning set forth in the Preamble.

"VEBA Nominee" shall have the meaning set forth in **Section 2.3**.

"VEBA Owned Shares" shall have the meaning set forth in **Section 4.3**.

"Voting Securities" means securities of the Corporation, including the Common Stock, with the power to vote with respect to the election of directors of the Corporation generally and all securities convertible into or exchangeable for securities of the Corporation with the power to vote with respect to the election of directors of the Corporation generally.

"Warrant" shall have the meaning set forth in the Recitals.

*Section 1.2    Terms Generally.*  The definitions in **Section 1.1** shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," unless the context expressly provides otherwise.  All references herein to Articles, Sections, paragraphs, subparagraphs or clauses shall be deemed references to Articles, Sections, paragraphs, subparagraphs or clauses of this Agreement, unless the context requires otherwise. Unless otherwise specified, the words "this Agreement," "herein," "hereof," "hereto" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."  Unless expressly stated otherwise, any Law defined or referred to herein means such Law as from time to time amended, modified or supplemented, including by succession of comparable successor Laws and references to all attachments thereto and instruments incorporated therein.

## ARTICLE II
## BOARD OF DIRECTORS

*Section 2.1    Size of Initial Board.*  The Board shall initially consist of thirteen (13) directors.  The number of directors may be changed only by vote of the Board in accordance with the bylaws of the Corporation.

*Section 2.2    Composition of Board.*  (a) The initial members of the Board shall be appointed as follows:

(i)    the Board agrees to nominate and the Holders agree to appoint ten (10) directors designated by UST Vehicle, no more than five of whom shall

have been directors of General Motors Corporation immediately prior to the date of this Agreement;

    (ii) the Board agrees to nominate and the Holders agree to appoint one director designated by Canada (which director shall be Independent (as defined below));

    (iii) the Board agrees to nominate and the Holders agree to appoint one director designated by the VEBA (which director shall be Independent (as defined below) or, if not Independent, approved by UST Vehicle, which approval shall not be unreasonably withheld); and

    (iv) the Board agrees to nominate and the Holders agree to appoint the Chief Executive Officer as a director of the Corporation.

  (b) The Holders agree that at all times prior to termination of this Agreement, at least two-thirds of the directors of the Corporation shall be required to be determined by the Board to be independent of the Corporation within the meaning of Rule 303A.02 of New York Stock Exchange Listed Company Manual (or any successor provision) ("Independent"), whether or not any of the shares of Common Stock are then listed on the New York Stock Exchange.

  (c) The nominees to stand for election at any time at which the Corporation's stockholders shall have the right to, or shall, vote for or consent in writing to the election of directors of the Corporation (whether at an annual meeting of the Corporation's stockholders, a special meeting of the Corporation's stockholders called for the purpose of electing directors of the Corporation or at each adjourned or postponed meeting) shall be nominated by the Board in accordance with the bylaws of the Corporation and **Sections 2.3** and **2.4** hereof.

  *Section 2.3 Agreement to Nominate VEBA Nominee.* So long as the VEBA holds at least 50% of its Initial Shares, at any time at which the Corporation's stockholders shall have the right to, or shall, vote for or consent in writing to the election of directors of the Corporation (whether at an annual meeting of the Corporation's stockholders, a special meeting of the Corporation's stockholders called for the purpose of electing directors of the Corporation or at any adjourned or postponed meeting), then, and in each such event, the VEBA shall have the right to designate one nominee, which nominee shall be subject to the prior written consent of the UAW and shall be Independent or, if not Independent, approved by UST Vehicle, which approval shall not be unreasonably withheld (the "VEBA Nominee"), to serve as a director.

  (a) From and after the date hereof to and including the IPO Date, the Board agrees to nominate and the Holders agree to appoint such director.

  (b) From and after the IPO Date to and including the date of termination of this Agreement with respect to such Holder in accordance with **Section 6.2**, if the Board shall approve such nominee (such approval not to be unreasonably withheld) the Board shall (i) nominate, and cause the nomination of, the VEBA Nominee, to be a member of the Board and (ii) include the VEBA Nominee in any proxy statement and related materials used by the Corporation in respect of the election to which such nomination pertains. In the event that the Board does not approve such nominee (or any subsequent nominee), the VEBA shall have the

right to designate a replacement VEBA Nominee, who shall be subject to approval of the Board in accordance with this **Section 2.3**.

Notwithstanding the foregoing, the right of the VEBA to designate a VEBA Nominee at any election pursuant to this **Section 2.3** shall only apply in the event that if the VEBA were not to designate a VEBA Nominee at such election, no member of the Board after such election would have been a continuing VEBA Nominee still designated by the VEBA at such time. In the event that the Board nominates a former VEBA Nominee for re-election not pursuant to a designation by the VEBA with respect to such election, such former VEBA Nominee shall not be considered a VEBA Nominee for the purpose of determining the VEBA's right to designate a nominee at such election.

Section 2.4    *Agreement to Nominate Canada Nominee.*  So long as Canada holds at least 50% of its Initial Shares, at any time at which the Corporation's stockholders shall have the right to, or shall, vote for or consent in writing to the election of directors of the Corporation (whether at an annual meeting of the Corporation's stockholders, a special meeting of the Corporation's stockholders called for the purpose of electing directors of the Corporation or at each adjourned or postponed meeting), then, and in each such event, from and after the date hereof to and including the IPO Date, Canada shall have the right to designate one nominee, which nominee shall be Independent (the "Canada Nominee"), to serve as a director and the Board agrees to nominate and the Holders agree to appoint such director; provided, however, that the right of Canada to designate a Canada Nominee at any election pursuant to this **Section 2.4** shall only apply in the event that if Canada were not to designate a Canada Nominee at such election, no member of the Board after such election would have been a Canada Nominee. In the event that the Board nominates a former Canada Nominee for re-election not pursuant to a designation by Canada with respect to such election, such former Canada Nominee shall not be considered a Canada Nominee for the purpose of determining Canada's right to designate a nominee at such election.

## ARTICLE III
## CERTAIN COVENANTS AND RESTRICTIONS

Section 3.1    *Initial Public Offering.*  The Government Holders shall use their reasonable best efforts to exercise their demand registration rights under the Equity Registration Rights Agreement and cause an IPO to occur within one year of the date of this Agreement.

Section 3.2    *Government Holders Sale of Shares.*  UST Vehicle and Canada shall use commercially reasonable efforts, in consultation with one another and their respective underwriters, to conduct the sell down of their respective Initial Shares in an orderly and efficient manner in accordance with the following timeline:

(a)    Each Government Holder shall sell at least [ ]% of its Initial Shares during each year following the IPO.

(b)    Each Government Holder shall have sold at least [ ]% of its Initial Shares prior to the third anniversary of the IPO.

(c)     Each Government Holder shall have sold at least [   ]% of its Initial Shares prior to the sixth anniversary of the IPO.

(d)     Each Government Holder shall have sold [   ]% of its Initial Shares prior to the [   ] anniversary of the IPO.

The timeline set forth in this **Section 3.2** shall be adjusted for any period that the Corporation is not in compliance with its obligations set forth in the Equity Registration Rights Agreement, such that the completion date for any obligations of each Government Holder not required to be completed prior to the date of such non-compliance shall be extended in an amount of time equal to the period of non-compliance. In addition, the completion date for any obligations of Canada [and the UST Vehicle] set forth in this **Section 3.2** shall be extended in an amount of time equal to (i) the duration of any Material Adverse Event, but only to the extent that such obligation was not required to be completed prior to the date of such Material Adverse Event [and (ii) any period during which a Government Holder is subject to a lockup required by an agreement or an underwriter, but only to the extent that such obligation(s) was not required to be completed prior to the date of such lockup].

*Section 3.3     Transfer Restrictions.*     Subject to the restrictions set forth in this **Section 3.3** (which restrictions shall not apply with respect to sales made in an underwritten offering pursuant to a registration statement of the Corporation), the Holders shall have the right to Transfer all or any portion of their respective Owned Shares, subject to compliance with applicable law.

(a)     Without the prior written consent of the Board, no Holder shall Transfer any shares of Common Stock or any options or warrants to acquire Common Stock, or any interest therein, to any one Person or Group if such Person or Group Beneficially Owns or would as a result of such Transfer Beneficially Own (to the knowledge of the Holder after reasonable inquiry) in excess of 10% of the Common Stock. Notwithstanding the foregoing, any Holder may Transfer any or all of its shares of Common Stock or any options or warrants to acquire Common Stock to any Permitted Transferee or pursuant to an exchange offer, a tender offer (or a request for invitation for tenders to the extent not prohibited pursuant to **Section 3.3(b)**), merger or consolidation.

(b)     Without the prior written consent of the Board, no Holder shall Transfer any shares of Common Stock or any options or warrants to acquire Common Stock to any automotive vehicle manufacturer or any Affiliate thereof; provided, however, that VEBA and its Permitted Transferees (which shall not include Chrysler Group LLC or any affiliate thereof) shall not be regarded as affiliates of Chrysler for purposes of this provision.

(c)     No Transfer of any shares of Common Stock or any options or warrants to acquire Common Stock in violation of this Agreement or in violation of any restrictive legend on the Common Stock certificates of any Holder shall be made or recorded on the books of the Corporation and any such Transfer shall be void and of no effect.

(d)    Upon the Corporation's request, any Holder shall promptly notify the Corporation in writing of the number of shares of Common Stock then Beneficially Owned by such Holder.

Section 3.4    *Restrictions on Certain Corporate Actions.*    From and after the date hereof to the IPO Date, the Corporation agrees that, so long as Canada Beneficially Owns at least 5% of the aggregate number of shares of Common Stock then issued and outstanding, without the prior written consent of Canada, the Corporation will not take any action to effectuate any of the following:

(a)    a sale of all or substantially all of the assets of the Corporation (by merger or otherwise);

(b)    any voluntary liquidation, dissolution or winding up of the Corporation; or

(c)    an issuance of Common Stock at a price per share less than fair market value, as determined in good faith by the Board of Directors (other than pursuant to an employee benefits plan).

Section 3.5    *Certificate Legends.*    Each Holder covenants and agrees that it will cooperate with the Corporation and take all action necessary to ensure that each certificate representing such Holder's shares of Common Stock and the Warrant shall conspicuously bear a legend in substantially the following form in addition to any other legend that may be required by the Corporation:

THE SALE, TRANSFER, DISTRIBUTION, ASSIGNMENT, HEDGE, PLEDGE, ENCUMBRANCE, HYPOTHECATION OR DISPOSAL OF SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE RESTRICTIONS, TERMS AND CONDITIONS OF THAT CERTAIN STOCKHOLDERS AGREEMENT, DATED AS OF *[_____]*, 2009 BY AND AMONG *[NEW GM NAME]*, *[UST VEHICLE]*, 7176384 CANADA INC., AND THE UAW RETIREE MEDICAL BENEFITS TRUST, A VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION.

## ARTICLE IV
## VOTING AGREEMENT

Section 4.1    *Government Holder Participation to Establish Quorum.*    From and after the date hereof to and including the date of termination of this Agreement with respect to such Government Holder in accordance with **Section 6.2**, at any meeting (whether annual or special and each adjourned or postponed meeting) of the Corporation's stockholders, however called, to the extent required to establish a quorum at such meeting, such Government Holder will appear at such meeting or otherwise cause all shares of Common Stock Beneficially Owned by such Government Holder as of the relevant time to be counted as present thereat for purposes of calculating a quorum.

*Section 4.2    Government Holder Agreement to Vote.* Each Government Holder hereby irrevocably and unconditionally agrees that:

(a)    from and after the date hereof to and including the earlier to occur of (i) the IPO Date or (ii) the date of termination of this Agreement with respect to such Government Holder in accordance with **Section 6.2**, at any meeting (whether annual or special and each adjourned or postponed meeting) of the Corporation's stockholders, however called, or in connection with any proposed action by written consent of the Corporation's stockholders, such Government Holder may vote or cause to be voted (including by written consent, if applicable) its Owned Shares on each matter presented to the stockholders of the Corporation, including the election of directors, in such manner as such Government Holder determines (i.e., "for," "against," "withheld" or otherwise), provided that each Government Holder agrees to vote "for" any VEBA Nominee or Canada Nominee standing for election in accordance with **Section 2.3** and **Section 2.4**, respectively;

(b)    from and after the IPO Date to and including the date of termination of this Agreement with respect to such Government Holder in accordance with **Section 6.2**, at any meeting (whether annual or special and each adjourned or postponed meeting) of the Corporation's stockholders, however called, such Government Holder shall not vote or cause its Owned Shares to vote, provided, however, that such Government Holder shall be permitted to vote or cause to be voted its Owned Shares:

(i)    in a vote with respect to any removal of directors only "for," "against" or "withhold" with respect to such removal;

(ii)    in a vote with respect to any election of directors of the Corporation (whether at an annual meeting of the Corporation's stockholders, a special meeting of the Corporation's stockholders called for the purpose of electing directors of the Corporation or at any adjourned or postponed meeting) only "for," "against" or "withhold" with respect to the election of any candidates or directors, as the case may be, that are (A) nominated by the Board, (B) nominated by third parties, or (C) nominated by either Government Holder pursuant to the Joint Slate Procedure, provided that each Government Holder agrees to vote "for" the nominees jointly nominated pursuant to the Joint Slate Procedure, and provided further, that each Government Holder agrees to vote "for" any VEBA Nominee standing for election in accordance with **Section 2.3**;

(iii)    in a vote with respect to any Change of Control to be voted on by the Corporation's stockholders, "for" or "against" such Change of Control transaction;

(iv)    in a vote with respect to any amendment or modification to the Certificate of Incorporation or bylaws of the Corporation which would or may effect any of the matters set forth in **Section 4.2(b)(i), (ii)** or **(iii)**, "for" or "against" such amendment or modification; and

(v)    on each other matter presented to the stockholders of the Corporation, solely to the extent that the vote of the Government Holder is required for

the stockholders to take action at a meeting at which a quorum is present, in the same proportionate manner (either "for," "against," "withheld" or otherwise) as the holders of Common Stock (other than the UST Vehicle, Canada, the VEBA and its Affiliates and the directors and Executive Officers of the Corporation) that were present and entitled to vote on such matter voted in connection with each such matter.

   *Section 4.3    VEBA Agreement to Vote.*   The VEBA hereby irrevocably and unconditionally agrees that from and after the date hereof and to and including the date of termination of this Agreement with respect to the VEBA in accordance with **Section 6.2**, at any meeting (whether annual or special and each adjourned or postponed meeting) of the Corporation's stockholders, however called, or in connection with any proposed action by written consent of the Corporation's stockholders, the VEBA will (i) appear at such meeting or otherwise cause all shares of Common Stock Beneficially Owned by the VEBA as of the relevant time ("VEBA Owned Shares") to be counted as present thereat for purposes of calculating a quorum and (ii) vote or cause to be voted (including by written consent, if applicable) such VEBA Owned Shares on each matter presented to the stockholders of the Corporation in the same proportionate manner (either "for," "against," "withheld" or otherwise) as (x) in the case of any proposed stockholder action at a meeting of the Corporation's stockholders, the holders of Common Stock (other than the VEBA and its Affiliates, and the directors and Executive Officers of the Corporation) that were present and entitled to vote on such matter voted in connection with each such matter and (y) in the case of any proposed stockholder action by written consent taken prior to an IPO, all the holders of Common Stock (other than the VEBA and its Affiliates, and the directors and Executive Officers of the Corporation) consented or did not consent in connection with each such matter; provided that, from and after the date hereof to and including the IPO Date, the VEBA agrees to vote "for" any Canada Nominee standing for election in accordance with **Section 2.4**.

   *Section 4.4    Irrevocable Proxy.*   This **Section 4.4** is effective from and after the IPO Date to and including the date of termination of this Agreement. Each of the UST Vehicle, Canada and the VEBA hereby revokes any and all previous Proxies or similar rights granted with respect to its Owned Shares. Subject to the last two sentences of this **Section 4.4**, upon the request of the Corporation and subject to applicable Law, each of the UST Vehicle, Canada and the VEBA shall, or shall use its reasonable best efforts to cause any Person serving as the nominee (each, a "Nominee") of such Holder with respect to its Owned Shares to, irrevocably appoint the Corporation or its designee as its proxy to vote (or cause to be voted) its Owned Shares in accordance with **Section 4.2(b)(v)** or **Section 4.3** hereof (as applicable). Such Proxy shall be irrevocable and coupled with an interest. In the event that any such Nominee for any reason fails to irrevocably appoint the Corporation or its designee as the UST Vehicle's, Canada's or the VEBA's Proxy in accordance with this **Section 4.4**, such Holder shall cause such Nominee to vote its Owned Shares in accordance with **Section 4.2(b)(v)** or **Section 4.3** hereof (as applicable). In the event that the UST Vehicle, Canada, the VEBA or any of their respective Nominees fails for any reason to vote its Owned Shares in accordance with the applicable requirements of **Section 4.2(b)(v)** or **Section 4.3** hereof (as applicable), then the Corporation or its designee shall have the right to vote such Holder's Owned Shares (and withdraw any previous vote) in accordance with **Section 4.2(b)(v)** or **Section 4.3** hereof (as applicable). Subject to applicable Law, the vote of the Corporation or its designee shall control in the event of any conflict between the vote by the Corporation or its designee of the UST

Vehicle's, Canada's or the VEBA's Owned Shares and a vote by such Holder (or any Nominee on behalf of such Holder) of its Owned Shares. Notwithstanding the foregoing, the proxy granted by the UST Vehicle, Canada, the VEBA or any of their respective Nominees shall be automatically revoked upon termination of this Agreement with respect to such Holder in accordance with its terms.

     *Section 4.5    Inconsistent Voting Agreements.* Each of the UST Vehicle, Canada and the VEBA hereby agrees that such Holder shall not enter into any agreement, contract or understanding with any Person (prior to the termination of this Agreement with respect to such Holder) directly or indirectly to vote, grant a Proxy or power of attorney or give instructions with respect to the voting of such Holder's Owned Shares in any manner which is inconsistent with this Agreement.

## ARTICLE V
## OTHER AGREEMENTS

     *Section 5.1    Tag-Along Rights.* (a) If at any time prior to the IPO, the UST Vehicle (for purposes of this **Section 5.1**, the "Selling Holder") desires to sell any or all of its Owned Shares (other than a Transfer to a Permitted Transferee), each of VEBA and Canada (for purposes of this **Section 5.1**, the "Co-Sale Holders") who is not then in breach of this Agreement shall have the right to include a number of such Co-Sale Holder's Owned Shares in such contemplated sale, at the same price per share and upon the same terms and conditions to be paid and given to the Selling Holder, equal to the product (rounded up to the nearest whole number) obtained by multiplying (i) the maximum number of shares of Common Stock that can be included in the contemplated sale and (ii) a fraction (A) the numerator of which is equal to the number of shares of Common Stock held by such Co-Sale Holder and (B) the denominator of which is equal to the number of shares of Common Stock held, in the aggregate, by the Selling Holder and all Co-Sale Holders who elect to include their shares of Common Stock in such sale, in each case exclusive of any shares of Common Stock that are subject to a previously executed binding sale agreement.

     (b)    The Selling Holder shall give notice to each of the Co-Sale Holders of each proposed sale giving rise to the rights of the Co-Sale Holders set forth in **Section 5.1(a)** at least 10 Business Days prior to the proposed consummation of any such sale, setting forth the number of shares of Common Stock proposed to be so sold (the "Sold Shares"), the name and address of the proposed transferee or transferees, the proposed amount and form of consideration and the terms and conditions of payment offered by such proposed transferee or transferees, and a representation that the proposed transferee or transferees have been informed of the rights of co-sale provided for in this **Section 5.1** (the "Co-Sale Notice"). The rights of co-sale provided pursuant to this **Section 5.1** must be exercised by any Co-Sale Holder within five business days following receipt of the notice required by the preceding sentence, by delivery of a written notice to the Selling Holder indicating such Co-Sale Holder's desire to exercise its rights and specifying the number of shares of Common Stock (up to the maximum number of shares of Common Stock as provided in **Section 5.1(a)**). If the proposed transferee or transferees fail to purchase shares of Common Stock from any Co-Sale Holder that has properly exercised its rights of co-sale under **Section 5.1(a)** on the terms specified above, then the Selling Holder shall not be permitted to make the proposed sale. If none of the Co-Sale Holders gives such notice prior to

the expiration of the five business day period for giving such notice, then the Selling Holder may sell the Sold Shares to any Person on terms and conditions that are no more favorable to the Selling Holder than those set forth in the Co-Sale Notice at any time within a period ending on the later to occur of (x) 120 days following the expiration of such period for giving notice or (y) if a definitive agreement to sell the Sold Shares is entered into by the Selling Holder within such 120-day period, the date on which all applicable approvals and consents of Governmental Authorities with respect to such proposed sale have been obtained and any applicable waiting period under Law have expired or been terminated. If the Selling Holder has not consummated the proposed sale within the time period set forth in the immediately preceding sentence, then the Selling Holder shall not sell any such shares of Common Stock without again complying with this **Section 5.1**.

(c)     If any of the Co-Sale Holders exercise their rights under **Section 5.1(a)**, the closing of the purchase of the shares of Common Stock with respect to which such rights have been exercised shall take place concurrently with the closing of the sale of the Selling Holder's interests.

(d)     The provisions of this **Section 5.1** shall not apply to any proposed sale by any Holder effected pursuant to the demand registration or piggyback provisions of the Equity Registration Rights Agreement.

Section 5.2     *Drag-Along Rights.* (a) At any time prior to the IPO, if the UST Vehicle (for purposes of this **Section 5.2**, the "Electing Holder"), determines to sell, in a single transaction or a series of related transactions, to an independent third party or parties (the "Drag-Along Buyer"), any shares of Common Stock, the Electing Holder may require each of VEBA and Canada (the "Non-Electing Holders") to sell or cause to be sold up to a number of their Owned Shares as of such date in such transaction (by merger or otherwise), equal to the product (rounded up to the nearest whole number) obtained by multiplying (i) the maximum number of shares of Common Stock to be included in the contemplated sale and (ii) a fraction (A) the numerator of which is equal to the number of shares of Common Stock held by such Non-Electing Holder and (B) the denominator of which is equal to the number of shares of Common Stock held, in the aggregate, by the Electing Holder and all Non-Electing Holders, to the Drag-Along Buyer, for the same consideration per share of Common Stock and on the same terms and conditions as the Electing Holder, subject to the provisions of this **Section 5.2** (the "Compelled Sale") and to take such other actions with respect thereto as set forth in **Section 5.2(b)** below.

(b)     The Corporation, if instructed in writing by the Electing Holder, shall send written notice (the "Compelled Sale Notice") of the exercise of the rights pursuant to this **Section 5.2** to each of the Non-Electing Holders setting forth the consideration per share of Common Stock to be paid pursuant to the Compelled Sale and the other terms and conditions of the transaction. Each Non-Electing Holder, upon receipt of the Compelled Sale Notice, will be obligated to (i) if applicable, vote its shares of Common Stock in favor of such Compelled Sale at any meeting of stockholders of the Corporation called to vote on or approve such Compelled Sale (or any written consent solicited for such purpose), (ii) sell the requisite number of its shares of Common Stock, and participate in the Compelled Sale and (iii) otherwise take all necessary action, including, without limitation, expressly waiving any dissenter's rights or rights of appraisal or similar rights, providing access to documents and records of the Corporation,

entering into an agreement reflecting the terms of the Compelled Sale (although Non-Electing Holders shall not be required to provide representations, warranties and indemnities other than concerning each such Holder's valid ownership of its shares of Common Stock free of all liens, and each such Holder's authority, power and right to enter into and consummate the Compelled Sale without violating any other agreement), surrendering certificates or other instruments representing the shares of Common Stock, duly authorized for transfer or accompanied by a duly executed stock power, cooperating in obtaining any applicable Governmental Approval and otherwise to cause the Corporation to consummate such Compelled Sale. Any such Compelled Sale Notice may be rescinded by the Electing Holders at any time prior to the execution of any agreement with respect to a Compelled Sale by delivering written notice thereof to the Corporation and all of the Non-Electing Holders.

(c)    The obligations of the Non-Electing Holders pursuant to this **Section 5.2** are subject to the satisfaction of the following conditions:

(i)    in the event that the Non-Electing Holders are required to provide the representations, warranties and indemnities in connection with the Compelled Sale described in **Section 5.2(b)** above, then, each such Holder (A) will not be liable for more than the lesser of (x) its pro rata share of such indemnification payments (based upon the total consideration received by such Holder divided by the total consideration received by all sellers in such Compelled Sale) and (y) the total proceeds actually received by such Holder as consideration for its shares of Common Stock in such Compelled Sale, and (B) such liability shall be several and not joint with any other Person;

(ii)    in the event that the Electing Holders are required to provide representations, warranties or indemnities in connection with the Compelled Sale (other than representations, warranties or indemnities concerning valid ownership of its shares of Common Stock free of all liens, and authority, power and right to enter into and consummate the Compelled Sale without violating any other agreement) and the Electing Holder is required to indemnify the party or parties transacting with the Corporation in the Compelled Sale, then, to the extent such indemnification is not attributable to gross negligence or bad faith with respect to representations, warranties or indemnities, each Non-Electing Holder shall contribute to the extent of the lesser of (x) its pro rata share of such indemnification payments (based upon the total consideration received by such Holder divided by the total consideration received by all sellers in such Compelled Sale) and (y) the total proceeds actually received by such Holder as consideration for its shares of Common Stock in such Compelled Sale. In any such event, such liability shall be several and not joint with any other Person. Each Non-Electing Holder shall have full access to any and all evidences or documents related to any such indemnification; and

(iii)    if any Holder is given an option as to the form and amount of consideration to be received, each other Holder shall be given the same option.

(d)    Each Holder shall be obligated to pay his, her or its pro rata share of the expenses incurred in connection with a consummated Compelled Sale (based upon the total consideration received by such Holder divided by the total consideration received by all sellers in

such Compelled Sale) to the extent such costs are incurred for the benefit of all Holders and are not otherwise paid by the Corporation or the acquiring party (costs incurred by or on behalf of a Holder for his, her or its sole benefit will not be considered costs of the transaction hereunder).

(e)    If any Holder fails to sell to the Drag-Along Buyer its Owned Shares to be sold pursuant to this **Section 5.2**, each Holder agrees that the Board shall cause such Owned Shares to be sold to the Drag-Along Buyer on the Corporation's books in consideration of the purchase price, and such Drag-Along Holder's pro rata portion of the purchase price may be held in escrow, without interest, until such time as he, she or it takes such actions as the Board may request in connection with the transaction.

Section 5.3    *Preemptive Rights.*
(a)    At any time prior to the IPO (and not including the IPO itself), the Company shall not issue any shares of Common Stock unless, prior to such issuance, the Company offers such shares of Common Stock to each Holder at the same price per share and upon the same terms and conditions.

(b)    Not less than 20 Business Days prior to the closing of such offering (the "Preemptive Rights Period"), the Company shall send a written notice to each Holder stating the number of shares of Common Stock to be offered (the "Preemptive Rights Shares"), the proposed closing date and the price and terms on which it proposes to offer such shares of Common Stock.

(c)    Within 10 Business Days after the receipt of the notice pursuant to Section 5.3(b), each Holder may elect, by written notice to the Company to purchase shares of Common Stock of the Company, at the price and on the terms specified in such notice, up to an amount equal to the product obtained by multiplying (x) the total number of shares of Common Stock to be issued by (y) a fraction, (A) the numerator of which is the number of shares of Common Stock of such class held by such Holder and (B) the denominator of which is the number of total outstanding shares of Common Stock.

(d)    The closing of any such purchase of shares of Common Stock by such Holder pursuant to this **Section 5.3(d)** shall occur concurrently with the closing of the proposed issuance, as applicable, subject to adjustment to obtain any necessary Governmental Approval.

(e)    Upon the expiration of the Preemptive Rights Period, the Company shall be entitled to sell such Preemptive Rights Shares that the Holders have not elected to purchase for a period ending 120 days following the expiration of the Preemptive Rights Period on terms and conditions not materially more favorable to the purchasers thereof than those offered to the Holders. Any Preemptive Rights Shares to be sold by the Company following the expiration of such period must be reoffered to the Holders pursuant to the terms of this **Section 5.3** or if any such agreement to Transfer is terminated.

(f)    The provisions of this **Section 5.3** shall not apply to the following issuances of shares of Common Stock:

(i)    incentive shares of Common Stock issued to or for the benefit of employees, officers, directors and other service providers of or to the Company or any Company Subsidiary in accordance with the terms hereof or any applicable incentive plan of the Company;

(ii)    securities issued upon conversion of convertible or exchangeable securities (including warrants) of the Company or any of its subsidiaries that are outstanding as of the date of this Agreement or were not issued in violation of this **Section 5.3**; and

(iii)    a subdivision of shares of Common Stock (including any share distribution or split), any combination of shares of Common Stock (including any reverse share split), shares issued as a dividend or other distribution on the shares of Common Stock or any recapitalization, reorganization, reclassification or conversion of the Company or any of its subsidiaries.

*Section 5.4    Information Rights.*  Prior to the IPO, the Company shall use its reasonable efforts to publish in a press release or other form of public dissemination or deliver to each Holder (i) capsule financial information for each fiscal quarter within 45 days after the end of such quarter and (ii) capsule financial information for each fiscal year within 90 days after the end of such fiscal year.

### ARTICLE VI
### MISCELLANEOUS

*Section 6.1    Notices.*  Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the later of the scheduled delivery date or the first business day following such delivery date (if scheduled for delivery on a day that is not a business day) after having been sent by a nationally or internationally recognized overnight courier service (charges prepaid); (c) at the time received when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the time when confirmation of successful transmission is received (or the first business day following such receipt if the date of such receipt is not a business day) if sent by facsimile, in each case, to the recipient at the address or facsimile number, as applicable, indicated below:

If to the Corporation:

[_____]
[_____]
[_____]
Attention: [_____]
Telephone: [_____]
Facsimile: [_____]

with a copy to:

[_____]
[_____]
[_____]

If to the UST Vehicle:

[_____]
[_____]
[_____]
Attention: [_____]
Telephone: [_____]
Facsimile: [_____]

with a copy to:

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York  10281
Attention: John J. Rapisardi
　　　　　　R. Ronald Hopkinson
Fax: (212) 504-6666

If to Canada:

7176384 Canada Inc.
1235 Bay Street, Suite 400
Toronto, ON M5R 3K4
Attention:  Mr. Michael Carter
Facsimile:  416-934-5009

with a copy to:

Torys LLP
79 Wellington Street, West, Suite 3000
Toronto, ON M5K 1N2
Attention: Patrice S. Walch-Watson
Facsimile: (416) 865-7380
Email: PWalch-Watson@torys.com

If to the VEBA:

[_____]
[_____]
[_____]
Attention: [_____]
Telephone: [_____]
Facsimile: [_____]

with a copy to:

[_____]
[_____]
[_____]

provided, however, if any party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 6.1**, then to the last addressee as so designated.

Section 6.2    *Termination.*    All rights, restrictions and obligations hereunder shall terminate with respect to a Holder, and this Agreement shall have no further force and effect upon such Holder, when such Holder Beneficially Owns less than 2% of the aggregate number of shares of Common Stock then issued and outstanding; provided, that all rights and obligations under this **Article VI** shall continue in perpetuity.

Section 6.3    *Authority.*    Each of the parties hereto represents to the other that (a) it has the corporate or other organizational power and authority to execute, deliver and perform this Agreement, (b) the execution, delivery and performance of this Agreement by it has been duly authorized by all necessary corporate or organizational action and no such further action is required, (c) it has duly and validly executed and delivered this Agreement, and (d) this Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

Section 6.4    *No Third Party Beneficiaries.*    This Agreement shall be for the sole and exclusive benefit of (i) the Corporation and its successors and permitted assigns and (ii) each Holder (including any trustee thereof) and their respective successors and permitted assigns. Nothing in this Agreement shall be construed to give any other Person any legal or equitable right, remedy or claim under this Agreement.

*Section 6.5    No Personal Liability by the VEBA Signatory.*  It is expressly understood and agreed by the parties hereto that this Agreement is being executed and delivered by the signatory on behalf of the VEBA not individually or personally but solely in his capacity as [Chairman of the Committee of the VEBA] in the exercise of the powers and authority conferred and vested in him in such capacity and under no circumstances shall the signatory have any personal liability in an individual capacity in connection with this Agreement or any transaction contemplated hereby.

*Section 6.6    Cooperation.*  Each party hereto shall take such further action, and execute such additional documents, as may be reasonably requested by any other party hereto in order to carry out the purposes of this Agreement.

*Section 6.7    Governing Law; Forum Selection.*  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York irrespective of the choice of laws principles of the State of New York other than Section 5-1401 of the General Obligations Law of the State of New York.  Any action or proceeding against the parties relating in any way to this Agreement may be brought and enforced exclusively in the courts of the State of New York located in the Borough of Manhattan or (to the extent subject matter jurisdiction exists therefor) the U.S. District Court for the Southern District of New York, and the parties irrevocably submit to the jurisdiction of both courts in respect of any such action or proceeding.

*Section 6.8    WAIVER OF JURY TRIAL.*  EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

*Section 6.9    Assignment; Successors and Assigns.*  Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned by any party (whether by operation of law or otherwise), other than an assignment to a Permitted Transferee in connection with a Transfer made in accordance with this Agreement, without the prior written consent of the other parties, and any such assignment without such prior written consent shall be null and void.  Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and benefit the Corporation and each Holder.  Except for a Permitted Transferee, no purchaser or recipient of shares of Common Stock from a Holder shall have any rights under this Agreement.

*Section 6.10    After Acquired Securities.*  All of the provisions of this Agreement shall apply to all of the Voting Securities now Beneficially Owned or that may be issued or Transferred hereafter to any Holder hereto in consequence of any additional issuance, purchase, exchange or reclassification of any of the Voting Securities, corporate reorganization, or any other form or recapitalization, consolidation, merger, share split or share divide, or that are acquired by a Holder in any other manner.

*Section 6.11    Entire Agreement.*  This Agreement (together with the Annex) contains the final, exclusive and entire agreement and understanding of the parties with respect to the subject

matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the parties with respect to the subject matter hereof and thereof. This Agreement shall not be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 6.12  *Severability.*  Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under law. If any term or provision of this Agreement, or the application thereof to any Person or any circumstance, is held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

Section 6.13  *Enforcement of this Agreement.*  The parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the parties shall, without the posting of a bond, be entitled, subject to a determination by a court of competent jurisdiction, to an injunction or injunctions to prevent any such failure of performance under, or breaches of, this Agreement, and to enforce specifically the terms and provisions hereof and thereof, this being in addition to all other remedies available at law or in equity, and each party agrees that it will not oppose the granting of such relief on the basis that the requesting party has an adequate remedy at law.

Section 6.14  *Amendment.*  This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the parties.

Section 6.15  *Headings.*  The descriptive headings of the Articles, Sections and paragraphs of, and the Annex to, this Agreement are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof.

Section 6.16  *Counterparts; Facsimiles.*  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement. All signatures of the parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the party whose signature it reproduces and be binding upon such party.

*Section 6.17   UST Vehicle.*   Notwithstanding anything in this Agreement to the contrary, the UST Vehicle shall only be bound by this Agreement in its capacity as stockholder and nothing in this Agreement shall be binding on or create any obligation on the part of the US Treasury in any other capacity or any branch or agency of the United States Government or subdivision thereof.

*Section 6.18   Canada.*   Notwithstanding anything in this Agreement to the contrary, Canada shall only be bound by this Agreement in its capacity as stockholder and nothing in this Agreement shall be binding on or create any obligation on the part of Canada in any other capacity or any branch or agency of the Canadian Government or subdivision thereof.

*Section 6.19   Time Periods.*   Unless otherwise specified in this Agreement, an action required under this Agreement to be taken within a certain number of days shall be taken within that number of calendar days (and not business days); provided, however, that if the last day for taking such action falls on a day that is not a business day, the period during which such action may be taken shall be automatically extended to the next business day.

[Remainder of the page intentionally blank]

IN WITNESS WHEREOF, the parties hereto, being duly authorized, have executed and delivered this Stockholders Agreement on the date first above written.

[NEW GM NAME]

By: _____
Name: _____
Title: _____


[UST VEHICLE]


By: _____
Name: _____
Title: _____


7176384 CANADA INC.

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____


UAW RETIREE MEDICAL BENEFITS
TRUST, A VOLUNTARY EMPLOYEES'
BENEFICIARY ASSOCIATION


By: [TRUSTEE]


By: _____
Name: _____
Title: _____

**Annex I**

| Holder | Number of Initial Shares of Common Stock | Series and Number of Initial Shares of Preferred Stock |
|---|---|---|
| UST Vehicle | | |
| Canada | | |
| VEBA | | |
| Total: | | |

| Holder | Number of Shares of Common Stock for which Warrant is Exercisable |
|---|---|
| VEBA | |

# EXHIBIT L

# FORM OF WARRANT

**EXHIBIT E**

**FORM OF VEBA WARRANT**

**WARRANT AGREEMENT**

dated as of *[_____]*, 2009

between

**[NGMCO, Inc.]**

and

**[•]**
as Warrant Agent

1766885

E

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit E**

Form of VEBA Warrant

**EXHIBIT E**

**FORM OF VEBA WARRANT**

**WARRANT AGREEMENT**

dated as of *[_____]*, 2009

between

**[NGMCO, Inc.]**

and

**[•]**
**as Warrant Agent**

1766885

## ARTICLE 1
### DEFINITIONS

Section 1.01.    Certain Definitions ............................................................................. 1

## ARTICLE 2
### ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.    Issuance of Warrants ........................................................................ 9

Section 2.02.    Execution and Authentication of Warrants .......................................... 9

Section 2.03.    Form of Warrant Certificates .......................................................... 10

Section 2.04.    Transfer Restrictions and Legends ................................................... 10

Section 2.05.    Transfer, Exchange and Substitution ................................................ 11

Section 2.06.    Global Warrants ............................................................................ 12

Section 2.07.    Surrender of Warrant Certificates .................................................... 14

## ARTICLE 3
### EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.    Exercise of Warrants ...................................................................... 14

Section 3.02.    Procedure for Exercise ................................................................... 14

Section 3.03.    Settlement of Warrants ................................................................... 15

Section 3.04.    Delivery of Common Stock ............................................................. 15

Section 3.05.    No Fractional Shares to Be Issued ................................................... 16

Section 3.06.    Acquisition of Warrants by Company ............................................... 16

Section 3.07.    Direction of Warrant Agent ............................................................ 16

## ARTICLE 4
### [RESERVED]

## ARTICLE 5
### ADJUSTMENTS

Section 5.01.    Adjustments to Exercise Price ......................................................... 17

Section 5.02.    Adjustments to Number of Warrants ................................................ 21

Section 5.03.    Certain Distributions of Rights and Warrants; Shareholder
                 Rights Plan ................................................................................... 21

Section 5.04.    No Impairment .............................................................................. 23

Section 5.05.    Other Adjustments if Net Share Settlement Applies ........................... 23

ii

Section 5.06.   Discretionary Adjustments.................................................. 23
Section 5.07.   Restrictions on Adjustments ............................................. 23
Section 5.08.   Deferral of Adjustments..................................................... 24
Section 5.09.   Recapitalizations, Reclassifications and Other Changes ................. 25
Section 5.10.   Consolidation, Merger and Sale of Assets........................................ 29
Section 5.11.   Common Stock Outstanding................................................ 30
Section 5.12.   Covenant to Reserve Shares for Issuance on Exercise ...................... 30
Section 5.13.   Calculations Final ......................................................... 30
Section 5.14.   Notice of Adjustments ..................................................... 31
Section 5.15.   Warrant Agent Not Responsible for Adjustments or Validity........... 31
Section 5.16.   Statements on Warrants .................................................... 31

ARTICLE 6
OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.   No Rights as Stockholders................................................ 32
Section 6.02.   Mutilated or Missing Warrant Certificates ......................................... 32
Section 6.03.   Modification, Waiver and Meetings .................................................. 32

ARTICLE 7
CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.   Payment of Certain Taxes................................................. 33
Section 7.02.   Change of Warrant Agent ................................................ 33
Section 7.03.   Compensation; Further Assurances ................................... 35
Section 7.04.   Reliance on Counsel ...................................................... 35
Section 7.05.   Proof of Actions Taken.................................................... 35
Section 7.06.   Correctness of Statements................................................ 35
Section 7.07.   Validity of Agreement .................................................... 36
Section 7.08.   Use of Agents............................................................... 36
Section 7.09.   Liability of Warrant Agent............................................... 36
Section 7.10.   Legal Proceedings......................................................... 36
Section 7.11.   Other Transactions in Securities of the Company ............................ 36
Section 7.12.   Actions as Agent........................................................... 37
Section 7.13.   Appointment and Acceptance of Agency ......................................... 37
Section 7.14.   Successors and Assigns.................................................... 37

iii

Section 7.15.    Notices ............................................................................................. 37

Section 7.16.    Applicable Law ................................................................................ 38

Section 7.17.    Benefit of this Warrant Agreement .................................................. 38

Section 7.18.    Registered Warrantholders ............................................................... 38

Section 7.19.    Inspection of this Warrant Agreement .............................................. 38

Section 7.20.    Headings ........................................................................................... 39

Section 7.21.    Counterparts ..................................................................................... 39


EXHIBIT A    FORM OF RESTRICTIVE LEGEND FOR WARRANTS ........  A-1

EXHIBIT B    FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK..B-1

EXHIBIT C    FORM OF GLOBAL WARRANT LEGEND ...............................C-1

EXHIBIT D    FORM OF WARRANT CERTIFICATE ..................................... D-1

EXHIBIT E    FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER
             RESTRICTIONS .......................................................................E-1

EXHIBIT F    FORM OF COMMON STOCK REQUISITION ORDER .............F-1

iv

1766885

## WARRANT AGREEMENT

This Warrant Agreement ("Warrant Agreement") dated as of **/_____/**, 2009 is between **[NGMCO, Inc.]**, a corporation organized under the laws of Delaware (the "**Company**"), and [•] (the "**Warrant Agent**").

## WITNESSETH THAT:

WHEREAS, pursuant to the UAW Retiree Settlement Agreement dated as of **/_____/**, 2009 between the Company, by and through its attorneys, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, by and through its attorneys (the "**UAW Retiree Settlement Agreement**"), the Company has agreed to issue to the Initial Warrantholder (as defined below) an aggregate initial Number of Warrants issued hereunder equal to 15,151,515, each of which is exercisable for one share of Common Stock (as defined below);

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants;

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

## ARTICLE 1

### DEFINITIONS

Section 1.01. *Certain Definitions.* As used in this Warrant Agreement, the following terms shall have their respective meanings set forth below:

"**$**" refers to such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Adjustment Event**" has the meaning set forth in Section 5.08.

"**Agent Members**" has the meaning set forth in Section 2.06(c).

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Black Scholes Proportion**" has the meaning given to it in the definition of "Change of Control Payment Amount."

"**Black Scholes Warrant Value**" as of any date, shall mean the value of a Warrant to purchase one share of Common Stock (as determined in good faith by the Board of Directors based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent) and shall be determined by customary investment banking practices using the Black Scholes

1

model. For purposes of calculating such amount, (1) the term of the Warrants will be the period from the date of determination until the Expiration Date, (2) the price of each share of Common Stock will be the Current Market Price as of the date of determination, (3) the assumed volatility will be determined by such independent investment banking firm as of the date of determination, (4) the assumed risk-free rate will equal the yield on the seven year U.S. Treasury securities and (5) any other assumptions shall be made by the Board of Directors in good faith based upon the advice of such independent investment bank at the time of determination.

"**Board of Directors**" means the board of directors of the Company or any committee of such board of directors duly authorized to exercise the power of such board of directors with respect to the matters provided for in this Warrant Agreement as to which the board of directors is authorized or required to act.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors, and to be in full force and effect on the date of such certification, and delivered to the Warrant Agent.

"**Business Day**" means any day other than a Saturday or Sunday or other than a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company and all warrants or options to acquire such capital stock.

"**Carryover Warrants**" shall mean, for each Warrant, that portion of such Warrant equal to one minus the Black Scholes Proportion.

"**Cash**" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Certificated Warrant**" means a Warrant represented by a Warrant Certificate, in definitive, fully registered form.

"**Change of Control Date**" shall mean the date on which a Change of Control Event is consummated.

"**Change of Control Estimated Payment Amount**" shall mean, in respect of any Change of Control Event, an estimate of the Change of Control Payment Amount payable on the applicable Change of Control Payment Date, as determined in good faith by the Board of Directors, based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent, as of a date no more than 20 Business Days and no less than 15 Business Days prior to the Change of Control Date, in a manner consistent with the terms of this Warrant Agreement and the Warrants, including the definitions of Black Scholes Warrant Value and Change of Control Payment Amount.

2

"**Change of Control Event**" shall mean (i) the acquisition by a Person (other than the Company or a subsidiary of the Company) in a tender offer or a series of related tender offers of 80% or more of the outstanding Common Stock (determined on a fully-diluted basis), (ii) the consolidation or merger of the Company with or into another Person (other than a subsidiary of the Company), or (iii) a sale of all or substantially all of the Company's assets, in each of clauses (i) through (iii) in which all or any portion of the consideration paid or exchanged for Common Stock, or into which Common Stock is converted, consists of Other Property.

"**Change of Control Payment Amount**" shall mean an amount in Cash equal to the product of (1) the Black Scholes Warrant Value of a Warrant on a Change of Control Date immediately prior to the consummation of such Change of Control Event multiplied by (2) a fraction, (x) the numerator of which is the fair market value of the Other Property received in exchange for a share of Common Stock in a Change of Control Event as of the Change of Control Date (as determined by an independent investment bank of national standing selected by the Company and determined by customary investment banking practices) and (y) the denominator of which is the sum of (a) the Closing Sale Price of the Registered and Listed Shares received in exchange for a share of Common Stock in a Change of Control Event as of the Change of Control Date (if any), and (b) the fair market value (determined as above) of the Other Property as of the Change of Control Date received in exchange for a share of Common Stock in a Change of Control Event (such fraction referred to herein as the "**Black Scholes Proportion**").

For purposes of determining the Change of Control Payment Amount, if holders of Common Stock are entitled to receive differing forms or types of consideration in any transaction or series of transactions contemplated by the definition of "Change of Control Event," each holder shall be deemed to have received the same proportion of Other Property and Registered and Listed Shares that all holders of Common Stock in the aggregate elected or were required to receive in such transaction or transactions.

"**Change of Control Payment Date**" has the meaning set forth in Section 5.09(e).

"**Close of Business**" means 5:00 p.m. New York City time.

"**Closing Date**" has the meaning given thereto in the Master Sale and Purchase Agreement dated as of June 1, 2009 by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and the Company, as may be amended, modified or supplemented in accordance with its terms.

"**Closing Sale Price**" means, as of any date, the last reported per share sales price of a share of Common Stock or any other security on such date (or, if no last reported sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices on such date) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other

3

security is then listed or quoted; *provided, however*, that in the absence of such quotations, the Board of Directors will make a good faith determination of the Closing Sale Price.

If during a period applicable for calculating Closing Sale Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, Closing Sale Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Common Stock**" means the common stock, par value $0.01 per share, of the Company authorized at the date of this Warrant Agreement or as such stock may be constituted from time to time. Subject to the provisions of Section 5.09 and Section 5.10, shares issuable upon exercise of Warrants shall include only shares of the class designated as Common Stock of the Company as of the date of this Warrant Agreement or shares of any class or classes resulting from any reclassification or reclassifications or change or changes thereof and that have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion that the total number of shares of such class resulting from all such reclassifications or changes bears to the total number of shares of all such classes resulting from such reclassifications or changes.

"**Company Order**" means a written order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller, and delivered to the Warrant Agent.

"**Current Market Price**" means, (i) in connection with a dividend, issuance or distribution, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the earlier of the date in question and the Trading Day immediately preceding the Ex-Date for such dividend, issuance or distribution and (ii) in connection with a determination of Black Scholes Warrant Value, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the date of determination, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[    ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank

4

1766885

or other qualified financial institution selected by the Board of Directors and reasonably acceptable to the Warrant Agent.  If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional securities exchange or quotation system, the Current Market Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such price shall be reasonably determined in good faith by the Company's Board of Directors.

"**Cut-Off Time**" has the meaning set forth in Section 5.09(e).

"**Depositary**" means The Depository Trust Company, its nominees, and their respective successors.

"**Determination Date**" has the meaning set forth in Section 5.08.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Ex-Date**" means, in connection with any dividend, issuance or distribution, the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such dividend, issuance or distribution.

"**Exercise Date**" has the meaning set forth in Section 3.02(b).

"**Exercise Notice**" means, for any Warrant, the exercise notice set forth on the reverse of the Warrant Certificate, substantially in the form set forth in Exhibit D hereto.

"**Exercise Price**" means initially $126.92 per Warrant, subject to adjustment pursuant to Article 5.

"**Expiration Date**" means, for any Warrant, December 31, 2015, regardless of whether such date is a Trading Day.

"**Full Physical Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Full Physical Share Amount in exchange for payment by the Warrantholder of the Exercise Price.

"**Full Physical Share Amount**" has the meaning set forth in Section 3.03(b).

"**Global Warrant**" means a Warrant in the form of a permanent global Warrant Certificate, in definitive, fully registered form.

"**Global Warrant Legend**" means the legend set forth in Section 2.06(b).

"**Initial Warrantholder**" means UAW Retiree Medical Benefits Trust, a voluntary employees' beneficiary association or any "affiliate" thereof (as defined under Rule 144 under the Securities Act).

5

"**Net Share Amount**" has the meaning set forth in Section 3.03(c).

"**Net Share Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Net Share Amount without any payment therefor.

"**Net Share Settlement Price**" means, as of any date, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days prior to the date of determination of the Net Share Settlement Price for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[  ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank or other qualified financial institution reasonably acceptable to the Warrant Agent. If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional Securities exchange or quotation system, the Net Share Settlement Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such prices shall be reasonably determined in good faith by the Company's Board of Directors.

If during a period applicable for calculating Net Share Settlement Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, the Net Share Settlement Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**New Warrant Exercise Price**" shall be equal to the product of (i) the Exercise Price then in effect and (ii) one minus the Black Scholes Proportion.

"**New Warrants**" has the meaning set forth in Section 5.09(e).

"**Number of Warrants**" means, for a Warrant Certificate, the "Number of Warrants" specified on the face of such Warrant Certificate (or, in the case of a Global Warrant, on Schedule A to such Warrant Certificate), subject to adjustment pursuant to Article 5.

6

1766885

"**Officer's Certificate**" means a certificate signed by any two officers of the Company, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller.

"**Other Property**" means any cash, property or other securities other than Registered and Listed Shares.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Parent Exercise Price**" means, with respect to each Parent Warrant Agreement, the 'Exercise Price' as such term is defined in such Parent Warrant Agreement.

"**Parent Warrant Agreement**" means each warrant agreement dated as of [    ], 2009 between **[NGMCO, Inc.]** and [ ] as Warrant Agent pursuant to which General Motors Corporation was the 'Initial Warrantholder' as defined therein.

"**Parent Warrants**" means the warrants issued pursuant to the Parent Warrant Agreements.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any Cash, securities or other property or in which Common Stock (or other applicable security) is exchanged for or converted into any combination of Cash, securities or other property, the date fixed for determination of holders of Common Stock entitled to receive such Cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

"**Redemption**" has the meaning set forth in Section 5.09(e).

"**Redemption Notice**" has the meaning set forth in Section 5.09(e).

"**Reference Property**" has the meaning set forth in Section 5.09(a).

"**Registered and Listed Shares**" shall mean shares of the common stock of the surviving entity in a consolidation, merger, or combination or the acquiring entity in a tender offer, except that if the surviving entity or acquiring entity has a parent corporation, it shall be the shares of the common stock of the parent corporation, provided, that, in each case, such shares (i) have been registered (or will be registered within 30 calendar days following the Change of Control Date) under Section 12 of the Exchange Act with the Securities and Exchange Commission, and (ii) are listed for trading on the New York Stock Exchange or any other national securities exchange (or will be so listed or admitted within 30 calendar days following the Change of Control Date).

"**Reorganization Event**" has the meaning set forth in Section 5.09(a).

7

1766885

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, the third Trading Day immediately following the Exercise Date for such Warrant.

"**Shareholders Agreement**" means the Stockholders Agreement, dated as of [_____], by and among [_____], as may be amended, modified or supplemented in accordance with its terms.

"**Trading Day**" means (i) if the applicable security is listed on the New York Stock Exchange, a day on which trades may be made thereon or (ii) if the applicable security is listed or admitted for trading on the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or other national securities exchange or market, a day on which the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or such other national securities exchange or market is open for business or (iii) if the applicable security is not so listed, admitted for trading or quoted, any Business Day.

"**Trigger Event**" has the meaning set forth in Section 5.03.

"**UAW Retiree Settlement Agreement**" has the meaning set forth in the Recitals.

"**Unit of Reference Property**" has the meaning set forth in Section 5.09(a).

"**Unit Value**" has the meaning set forth in Section 5.09(c).

"**Vice President**" means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president" of the Company.

"**Voting Stock**" means Capital Stock having the right to vote for the election of directors under ordinary circumstances.

"**Warrant**" means a warrant of the Company exercisable for one share of Common Stock as provided herein, and issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth in this Warrant Agreement.

"**Warrant Agent**" means [•], in its capacity as warrant agent hereunder.

"**Warrant Certificate**" means any certificate representing Warrants satisfying the requirements set forth in Section 2.03.

"**Warrant Register**" has the meaning set forth in Section 2.05.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

1766885

## ARTICLE 2

ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01. *Issuance of Warrants.* (a) The Company shall execute and deliver to the Warrant Agent, for authentication and delivery to the Initial Warrantholder on the Closing Date, a single Certificated Warrant in the name of the Initial Warrantholder, together with an Authentication Order with respect thereto, evidencing an initial aggregate Number of Warrants equal to 15,151,515 (such Number of Warrants subject to adjustment from time to time as described herein). The Warrant Agent shall, upon receipt of such Certificated Warrant and Authentication Order, authenticate and deliver such Certificated Warrant to the Initial Warrantholder in accordance with Section 2.02 and register the Initial Warrantholder as the Warrantholder of such Warrants in accordance with Section 2.05. All such Warrants shall be dated as of the Closing Date.

(b)    Except as set forth in Section 2.05 and Section 6.02, the Warrants issued to the Initial Warrantholder on the Closing Date shall be the only Warrants issued or outstanding under this Warrant Agreement.

(c)    All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to the benefits hereof, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.

Section 2.02. *Execution and Authentication of Warrants.* (a) Warrants shall be executed on behalf of the Company by any Executive Vice President, any Senior Vice President, and any Vice President of the Company and attested by its Secretary or any one of its Assistant Secretaries. The signature of any of these officers on Warrants may be manual or facsimile. Typographical and other minor errors or defects in any such signature shall not affect the validity or enforceability of any Warrant that has been duly authenticated and delivered by the Warrant Agent.

(b)    Warrants bearing the manual or facsimile signatures of individuals, each of whom was, at the time he or she signed such Warrant or his or her facsimile signature was affixed to such Warrant, as the case may be, a proper officer of the Company, shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Warrants or did not hold such offices at the date of such Warrants.

(c)    No Warrant shall be entitled to any benefit under this Warrant Agreement or be valid or obligatory for any purpose unless there appears on such Warrant a certificate of authentication substantially in the form provided for herein executed by the Warrant Agent by manual or facsimile signature, and such certificate upon any Warrant shall be conclusive evidence, and the only evidence, that such Warrant has been duly authenticated and delivered hereunder.

Section 2.03. *Form of Warrant Certificates.* Each Warrant Certificate shall be in substantially the form set forth in Exhibit D hereto and shall have such insertions as are appropriate or required by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any law or any rule of any securities exchange on which Warrants may be listed, and such as may be necessary to conform to customary usage.

Section 2.04. *Transfer Restrictions and Legends.* This Section 2.04 shall not apply to Warrants and Common Stock which have been issued, distributed or sold pursuant to an effective registration statement.

(a)     Each Warrant issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)     Warrants may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a Warrantholder except (A) in compliance with applicable transfer restrictions set forth in the Shareholders Agreement and (B)(I) pursuant to a registration statement that has become effective under the Securities Act or (II) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)     Any Warrants as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Warrant Certificates representing such Warrants for exchange pursuant to Section 2.05 in accordance with the procedures of the Warrant Agent (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the Warrant Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Warrant Certificate for a like Number of Warrants, which shall not bear such legend.

(b)     All shares of Common Stock issued to a Warrantholder upon exercise of a Warrant shall bear the legend set forth in Exhibit B hereto.

(i)     Shares of Common Stock issued to a Warrantholder upon exercise of a Warrant may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by such Warrantholder except (A) in compliance with applicable transfer restrictions set forth in the Shareholders Agreement and (B)(I) pursuant to a registration statement that has become effective under the Securities Act or (II) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

10

(ii)    Any such shares of Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that the shares of Common Stock can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of the transfer agent for the Common Stock (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the transfer agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new certificate or certificates for a like number of shares of Common Stock, which shall not bear such legend.

(c)    Any Warrant that is purchased or owned by the Company or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Company or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Warrants no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

Section 2.05.    *Transfer, Exchange and Substitution.*    (a)    Warrants shall be issued in registered form only.  The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the "**Warrant Register**") in which, subject to such reasonable regulations as the Company may prescribe, the Company shall provide for the registration of Warrants and transfers, exchanges or substitutions of Warrants as herein provided.  All Warrants issued upon any registration of transfer or exchange of or substitution for Warrants shall be valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as Warrants surrendered for such registration of transfer, exchange or substitution.

(b)    A Warrantholder may transfer a Warrant only upon surrender of such Warrant for registration of transfer.  Warrants may be presented for registration of transfer and exchange at the offices of the Warrant Agent with a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by such Warrantholder or by such Warrantholder's attorney, duly authorized in writing.  Such Warrantholder will also provide a written certificate (substantially in the form of Exhibit E hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Warrants.  The Warrant Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Warrant hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act.  No such transfer shall be effected until, and the transferee shall succeed to the rights of a Warrantholder only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.  Prior to the registration of any transfer of a Warrant by a Warrantholder as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name Warrants are registered as the owner

11

thereof for all purposes and as the Person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)    Every Warrant presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Company and the Warrant Agent, by the holder thereof or such Warrantholder's attorney duly authorized in writing.

(d)    When Warrants are presented to the Warrant Agent with a request to register the transfer of, or to exchange or substitute, such Warrants, the Warrant Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied. To permit registrations of transfers, exchanges and substitutions, the Company shall execute Warrant Certificates at the Warrant Agent's request and the Warrant Agent shall countersign and deliver such Warrant Certificates. No service charge shall be made for any registration of transfer or exchange of or substitution for Warrants, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Warrants.

(e)    A Certified Warrant may be exchanged at the option of the holder or holders thereof, when presented or surrendered in accordance with this Warrant Agreement, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like Number of Warrants. If less than all Warrants represented by a Certificated Warrant are transferred, exchanged or substituted in accordance with this Warrant Agreement, the Warrant Certificate shall be surrendered to the Warrant Agent and a new Warrant Certificate for a Number of Warrants equal to the Warrants represented by such Warrant Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Warrantholder, shall be executed by the Company and delivered to the Warrant Agent and the Warrant Agent shall countersign such new Warrant Certificate and shall deliver such new Warrant Certificate to the Person or Persons entitled to receive the same.

Section 2.06.    *Global Warrants.*    (a) The Warrants shall initially be issued in the form of Certificated Warrants. However, if the Warrants are sold pursuant to an effective registration statement filed with the SEC, or if the Company so elects at any time, any Certificated Warrants may be presented to the Warrant Agent by Warrantholders in exchange for one or more Global Warrants up to the aggregate Number of Warrants then outstanding, to be registered in the name of the Depositary, or its nominee, and delivered by the Warrant Agent to the Depositary, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of the Depositary. Upon such presentation, the Company shall execute a Global Warrant representing such aggregate Number of Warrants and deliver the same to the Warrant Agent for authentication and delivery in accordance with Section 2.02.

(b)    Any Global Warrant shall bear the legend substantially in the form set forth in Exhibit C hereto (the "**Global Warrant Legend**").

12

(c)     So long as a Global Warrant is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Warrant Agreement with respect to the Global Warrant held on their behalf by the Depositary or the Warrant Agent as its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Global Warrant for all purposes. Accordingly, any such owner's beneficial interest in such Global Warrant will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility with respect to such records maintained by the Depositary or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Warrantholder.

(d)     Any holder of a Global Warrant registered in the name of the Depositary or its nominee shall, by acceptance of such Global Warrant, agree that transfers of beneficial interests in such Global Warrant may be effected only through a book-entry system maintained by the holder of such Global Warrant (or its agent), and that ownership of a beneficial interest in Warrants represented thereby shall be required to be reflected in book-entry form.

(e)     Transfers of a Global Warrant registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Company, the Depositary, their successors, and their respective nominees. Interests of beneficial owners in a Global Warrant registered in the name of the Depositary or its nominee shall be transferred in accordance with the rules and procedures of the Depositary.

(f)     A Global Warrant registered in the name of the Depositary or its nominee shall be exchanged for Certificated Warrants only if the Depositary (A) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (B) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days. In any such event, a Global Warrant registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant, Certificated Warrants representing, in the aggregate, the Number of Warrants theretofore represented by such Global Warrant with respect to such beneficial owner's respective beneficial interest. Any Certificated Warrant delivered in exchange for an interest in a Global Warrant pursuant to this Section 2.06(f) shall not bear the Global Warrant Legend. Interests in the Global

Warrant may not be exchanged for Certificated Warrants other than as provided in this Section 2.06(f).

(g)    The holder of a Global Warrant registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder is entitled to take under this Warrant Agreement or the Warrant.

Section 2.07.    *Surrender of Warrant Certificates.*    Any Warrant Certificate surrendered for registration of transfer, exchange, substitution or exercise of Warrants represented thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company and, except as provided in this Article 2 in case of an exchange, transfer or substitution, or Article 3 in case of the exercise of less than all Warrants represented thereby, or Section 6.02 in case of mutilation, no Warrant Certificate shall be issued hereunder in lieu thereof. The Warrant Agent shall deliver to the Company from time to time or otherwise dispose of such cancelled Warrant Certificates as the Company may direct.

## ARTICLE 3

### EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.    *Exercise of Warrants.*    At any time prior to 5:00 p.m., New York City time, on the Expiration Date, a Warrantholder shall be entitled to exercise, in accordance with this Article 3, the full Number of Warrants represented by any Warrant Certificate then registered in such Warrantholder's name (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants). Any Warrants not exercised prior to such time shall expire unexercised.

Section 3.02.    *Procedure for Exercise.*    (a) To exercise a Warrant (i) in the case of a Certificated Warrant, the Warrantholder must surrender the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes as set forth in Section 7.01(b), or (ii) in the case of a Global Warrant, the Warrantholder must comply with the procedures established by the Depositary for the exercise of Warrants.

(b)    The date on which a Warrantholder complies with the requirements for exercise set forth in this Section 3.02 in respect of a Warrant is the **"Exercise Date"** for such Warrant. However, if such date is not a Trading Day or the Warrantholder satisfies such requirements after the Close of Business on a Trading Day, then the Exercise Date shall be the immediately succeeding Trading Day, unless that Trading Day falls after the Expiration Date, in which case the Exercise Date shall be the immediately preceding Trading Day.

14

Section 3.03. *Settlement of Warrants.* (a) Full Physical Settlement shall apply to each Warrant unless the Warrantholder elects for Net Share Settlement to apply upon exercise of such Warrant. Such election shall be made (i) in the case of a Certificated Warrant, in the Exercise Notice for such Warrant, or (ii) in the case of a Global Warrant, in accordance with the procedures established by the Depositary for the exercise of Warrants.

(b)    If Full Physical Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, prior to 11:00 a.m., New York City time, on the Settlement Date for such Warrant, the Warrantholder shall pay the Exercise Price (determined as of such Exercise Date) by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Warrantholder in accordance with Section 7.15, and on the Settlement Date, following receipt by the Warrant Agent of such Exercise Price, the Company shall cause to be delivered to the Warrantholder one share of Common Stock (the "**Full Physical Share Amount**"), together with Cash in respect of any fractional Warrant as provided in Section 3.05. All funds received by the Warrant Agent upon exercise of such Warrant shall be deposited by the Warrant Agent for the account of the Company at *[specify bank]*, unless the Company has previously instructed otherwise in writing.

(c)    If Net Share Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, on the Settlement Date for such Warrant, the Company shall cause to be delivered to the Warrantholder a number of shares of Common Stock (which in no event will be less than zero) (the "**Net Share Amount**") equal to (i) the Net Share Settlement Price as of the relevant Exercise Date, *minus* the Exercise Price (determined as of such Exercise Date), *divided by* (ii) such Net Share Settlement Price, together with Cash in respect of any fractional shares or fractional Warrants as provided in Section 3.05.

Section 3.04. *Delivery of Common Stock.* (a) In connection with the delivery of shares of Common Stock to an exercising Warrantholder pursuant to Section 3.03(b) or Section 3.03(c), as the case may be, the Warrant Agent shall:

(i)    (A) if such shares of Common Stock are in book-entry form at the Depositary, deliver Common Stock by electronic transfer (with the assistance of the Company and the transfer agent of Common Stock, if necessary) to such Warrantholder's account, or any other account as such Warrantholder may designate, at the Depositary or at an Agent Member, or (B) if such shares of Common Stock are not in book-entry form at the Depositary, requisition from the transfer agent of the Common Stock and deliver to or upon the order of such Warrantholder a certificate or certificates, in each case with legends thereon as appropriate (as determined by the Company) and for the number of full shares of Common Stock to which such Warrantholder is entitled, registered in such name or names as may be directed by such Warrantholder;

(ii)    deliver Cash to such Warrantholder in respect of any fractional shares or fractional Warrants, as provided in Section 3.05; and

15

(iii)   if the Number of Warrants represented by a Warrant Certificate shall not have been exercised in full, deliver a new Warrant Certificate, countersigned by the Warrant Agent, for the balance of the number of Warrants represented by the surrendered Warrant Certificate.

(b)   Each Person in whose name any shares of Common Stock are issued shall for all purposes be deemed to have become the holder of record of such shares as of the Exercise Date or, in the case of a Warrant subject to Full Physical Settlement only, the date of payment by the Warrantholder of the Exercise Price in accordance with Section 3.03(b), if later. However, if any such date is a date when the stock transfer books of the Company are closed, such Person shall be deemed to have become the holder of such shares at the Close of Business on the next succeeding date on which the stock transfer books are open.

(c)   Promptly after the Warrant Agent shall have taken the action required above (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to any Warrants exercised (including, without limitation, with respect to any Exercise Price paid to the Warrant Agent). The Company shall reimburse the Warrant Agent for any amounts paid by the Warrant Agent in respect of a fractional share or fractional Warrant upon such exercise in accordance with Section 3.05 hereof.

Section 3.05. *No Fractional Shares to Be Issued.* (a) Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a share of Common Stock upon exercise of any Warrants.

(b)   If any fraction of a Warrant shall be exercised hereunder, the Company shall pay the relevant Warrantholder Cash in lieu of the corresponding fraction of a share of Common Stock valued at the Net Share Settlement Price as of the Exercise Date. However, if more than one Warrant shall be exercised hereunder at one time by the same Warrantholder, the number of full shares which shall be issuable upon exercise thereof shall be computed on the basis of all Warrants (including any fractional Warrants) so exercised. If any fraction of a share of Common Stock would, except for the provisions of this Section 3.05, be issuable on the exercise of any Warrant or Warrants (including any fractional Warrants), the Company shall pay the Warrantholder Cash in lieu of such fractional shares valued at the Net Share Settlement Price as of the Exercise Date.

(c)   Each Warrantholder, by its acceptance of a Warrant Certificate, expressly waives its right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock.

Section 3.06. *Acquisition of Warrants by Company.* The Company shall have the right, except as limited by law, to purchase or otherwise to acquire Warrants at such times, in such manner and for such consideration as it may deem appropriate and shall have agreed with the holder of such Warrants.

Section 3.07. *Direction of Warrant Agent.* (a) The Company shall be responsible for performing all calculations required in connection with the exercise and settlement of

16

the Warrants and the payment or delivery, as the case may be, of Cash and/or Common Stock as described in this Article 3. In connection therewith, the Company shall provide prompt written notice to the Warrant Agent of the amount of Cash and the number of shares of Common Stock payable or deliverable, as the case may be, upon exercise and settlement of the Warrants, including, without limitation, the Net Share Amount and the Full Physical Share Amount.

(b)    Any Cash to be paid, or Common Stock to be delivered, to the Warrantholders hereunder shall be delivered to the Warrant Agent no later than the Business Day immediately preceding the date such consideration is required to be delivered to the Warrantholders.

(c)    The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations or items to the Warrant Agent. The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or Units of Reference Property that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or Units of Reference Property, or to comply with any of the covenants of the Company contained in this Article 3.

## ARTICLE 4

[Reserved]

## ARTICLE 5

### Adjustments

Section 5.01. *Adjustments to Exercise Price.* The Exercise Price for the Warrants shall be subject to adjustment (without duplication) upon the occurrence of any of the following events:

(a)    The issuance of Common Stock as a dividend or distribution to all holders of Common Stock, or a subdivision or combination of Common Stock, in which event the Exercise Price shall be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0}{OS_1}$$

where:

$EP_0$   =   the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for

17

such subdivision or combination, as the case may be;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be; and

$OS_1$ = the number of shares of Common Stock that would be outstanding immediately after, and solely as a result of, such dividend, distribution, subdivision or combination.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be. If any dividend or distribution or subdivision or combination of the type described in this Section 5.01(a) is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to the Exercise Price that would then be in effect if such dividend or distribution or subdivision or combination had not been declared or announced, as the case may be.

(b)    The issuance to all holders of Common Stock of rights or warrants entitling them for a period expiring 60 days or less from the date of issuance of such rights or warrants to purchase shares of Common Stock (or securities convertible into Common Stock) at less than (or having a conversion price per share less than) the Current Market Price of Common Stock, in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0 + Y}{OS_0 + X}$$

where:

$EP_0$ = the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such issuance;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such issuance;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such issuance;

$X$ = the total number of shares of Common Stock issuable pursuant to

18

1766885

such rights, warrants or convertible securities; and

Y    =    the aggregate price payable to exercise such rights, warrants or convertible securities *divided by* the Current Market Price.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such issuance. In the event that the issuance of such rights, warrants or convertible securities is announced but such rights, warrants or convertible securities are not so issued, the Exercise Price shall again be adjusted to be the Exercise Price that would then be in effect if the Record Date for such issuance had not occurred. To the extent that such rights or warrants are not exercised prior to their expiration or shares of Common Stock are otherwise not delivered pursuant to such rights, warrants or convertible securities, upon the expiration, termination or maturity of such rights, warrants or convertible securities, the Exercise Price shall be readjusted to the Exercise Price that would then be in effect had the adjustments made upon the issuance of such rights, warrants or convertible securities been made on the basis of the delivery of only the number of shares of Common Stock actually delivered. In determining the aggregate price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, as well as any consideration received in connection with the conversion of any convertible securities issued upon exercise of such rights or warrants, and the value of such consideration, if other than Cash, shall be determined in good faith by the Board of Directors.

(c)    The dividend or distribution to all holders of Common Stock of (i) shares of the Company's Capital Stock (other than Common Stock), (ii) evidences of the Company's indebtedness, (iii) rights or warrants to purchase the Company's securities or the Company's assets or (iv) property or Cash (excluding any ordinary cash dividends declared by the Board of Directors and excluding any dividend, distribution or issuance covered by clauses (a) or (b) above), in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{SP_0 - FMV}{SP_0}$$

where:

EP$_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

EP$_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

SP$_0$    =    the Current Market Price; and

FMV  =    the fair market value (as determined in good faith by the Board of Directors), on the Record Date for such dividend or distribution, of the shares of Capital Stock, evidences of indebtedness or property,

19

rights or warrants so distributed or the amount of Cash (other than in the case of ordinary cash dividends declared by the Board of Directors) expressed as an amount per share of outstanding Common Stock.

In the event of a reduction of the Parent Exercise Price under either of the Parent Warrant Agreements (other than pursuant to Article 5 of a Parent Warrant Agreement), such reduction shall be treated, for purposes of this Warrant Agreement, as a distribution of property where the FMV of such property for purposes of this adjustment shall be equal to the absolute value of the difference between (i) the Black Scholes Warrant Value of such outstanding Parent Warrants with a Parent Exercise Price equal to the Parent Exercise Price as adjusted to such date pursuant to Article 5 of the applicable Parent Warrant Agreement and (ii) the Black Scholes Warrant Value of such outstanding Parent Warrants immediately following such reduction in Parent Exercise Price, expressed as an amount per share of outstanding Common Stock.

Such decrease shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

However, if the transaction that gives rise to an adjustment pursuant to this clause (c) is one pursuant to which the payment of a dividend or other distribution on Common Stock consists of shares of capital stock of, or similar equity interests in, a subsidiary of the Company or other business unit of the Company (i.e., a spin-off) that are, or, when issued, will be, traded or quoted on the New York Stock Exchange or any other national or regional securities exchange or market, then the Exercise Price will instead be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{MP_0}{MP_0 + FMV_0}$$

where:

$EP_0$ = the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$FMV_0$ = the average of the Closing Sale Prices of the Capital Stock or similar equity interests distributed to holders of Common Stock applicable to one share of Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution; and

20

1766885

$MP_0$ = the average of the Closing Sale Prices of the Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution.

Such decrease shall become effective immediately after the Ex-Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

(d)    For the purposes of Section 5.01(a), (b) and (c), any dividend or distribution to which Section 5.01(c) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock (or both), shall be deemed instead to be a dividend or distribution of the indebtedness, assets or shares of Capital Stock other than such shares of Common Stock or rights or warrants (and any Exercise Price adjustment required by Section 5.01(c) with respect to such dividend or distribution shall be made in respect of such dividend or distribution (without regard to the parenthetical in Section 5.01(c) that begins with the word "excluding")) immediately followed by a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Exercise Price adjustment required by Section 5.01 with respect to such dividend or distribution shall then be made), except, for purposes of such adjustment, any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding immediately prior to the Close of Business on the Record Date."

Section 5.02.    *Adjustments to Number of Warrants.*    Concurrently with any adjustment to the Exercise Price under Section 5.01, the Number of Warrants for each Warrant Certificate will be adjusted such that the Number of Warrants for each such Warrant Certificate in effect immediately following the effectiveness of such adjustment will be equal to the Number of Warrants for each such Warrant Certificate in effect immediately prior to such adjustment, *multiplied by* a fraction, (i) the numerator of which is the Exercise Price in effect immediately prior to such adjustment and (ii) the denominator of which is the Exercise Price in effect immediately following such adjustment.

Section 5.03.    *Certain Distributions of Rights and Warrants; Shareholder Rights Plan.*  (a)  Rights or warrants distributed by the Company to all holders of Common Stock (including under any Shareholder Rights Plan in existence on the date hereof or hereafter put into effect) entitling the holders thereof to subscribe for or purchase shares of the Company's Capital Stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events (a "**Trigger Event**"):

(i)    are deemed to be transferred with such shares of Common Stock;

(ii)    are not exercisable; and

21

(iii)    are also issued in respect of future issuances of Common Stock,

shall be deemed not to have been distributed for purposes of Article 5 (and no adjustment to the Exercise Price or the Number of Warrants under this Article 5 will be made) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Exercise Price and the Number of Warrants for each Warrant Certificate shall be made under this Article 5 (subject in all respects to Section 5.03(d)).

(b)    If any such right or warrant is subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights or warrants with such rights (subject in all respects to Section 5.03(d)).

(c)    In addition, except as set forth in Section 5.03(d), in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in Section 5.03(b)) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exercise Price and the Number of Warrants for each Warrant Certificate under Article 5 was made (including any adjustment contemplated in Section 5.03(d)):

(i)    in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a Cash distribution, equal to the per share redemption or repurchase price received by a holder or holders of Common Stock with respect to such rights or warrants (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase; and

(ii)    in the case of such rights or warrants that shall have expired or been terminated without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted as if such rights and warrants had not been issued.

(d)    If a Company shareholders rights plan under which any rights are issued provides that each share of Common Stock issued upon exercise of Warrants at any time prior to the distribution of separate certificates representing such rights shall be entitled to receive such rights, prior to the separation of such rights from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall not be adjusted pursuant to Section 5.01. If, however, prior to any exercise of a Warrant, such rights have separated from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be adjusted at the time of separation as if the Company dividended or distributed to all holders of Common Stock, the Company's Capital Stock, evidences of the Company's indebtedness, certain rights or warrants to

22

purchase the Company's securities or other of the Company's assets as described in Section 5.01(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

Section 5.04. *No Impairment.* The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in taking of all such action as may be necessary or appropriate in order to protect the rights of the Warrantholder.

Section 5.05. *Other Adjustments if Net Share Settlement Applies.* To the extent Net Share Settlement applies to the exercise of any Warrant, the Board of Directors shall make appropriate adjustments to the amount of Cash or number of shares of Common Stock, as the case may be, due upon exercise of the Warrant, as may be necessary or appropriate to effectuate the intent of this Article 5 and to avoid unjust or inequitable results as determined in its good faith judgment, to account for any adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate that becomes effective, or any event requiring an adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate where the Record Date or effective date (in the case of a subdivision or combination of the Common Stock) of the event occurs, during the period beginning on, and including, the Exercise Date and ending on, and including, the related Settlement Date.

Section 5.06. *Discretionary Adjustments.* The Company may from time to time, to the extent permitted by law and subject to applicable rules of the New York Stock Exchange, decrease the Exercise Price and/or increase the Number of Warrants for each Warrant Certificate by any amount for any period of at least 20 days. In that case, the Company shall give the Warrantholders at least 15 days' prior notice of such increase or decrease, and such notice shall state the decreased Exercise Price and/or increased Number of Warrants for each Warrant Certificate and the period during which the decrease and/or increase will be in effect. The Company may make such decreases in the Exercise Price and/or increases in the Number of Warrants for each Warrant Certificate, in addition to those set forth in this Article 5, as the Company's Board of Directors deems advisable, including to avoid or diminish any income tax to holders of the Common Stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

Section 5.07. *Restrictions on Adjustments.* (a) Except in accordance with Section 5.01, the Exercise Price and the Number of Warrants for any Warrant Certificate will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing.

23

(b)    Neither the Exercise Price nor the Number of Warrants for any Warrant Certificate will be adjusted:

(i)    upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

(ii)    for a change in the par value of the Common Stock.

(c)    In no event will the Company adjust the Exercise Price or make a corresponding adjustment to the Number of Warrants for any Warrant Certificate to the extent that the adjustment would reduce the Exercise Price below the par value per share of Common Stock.

(d)    No adjustment shall be made to the Exercise Price or the Number of Warrants for any Warrant Certificate for any of the transactions described in Section 5.01 if the Company makes provisions for Warrantholders to participate in any such transaction without exercising their Warrants on the same basis as holders of Common Stock and with notice that the Board of Directors determines in good faith to be fair and appropriate.

(e)    No adjustment shall be made to the Exercise Price, nor will any corresponding adjustment be made to the Number of Warrants for any Warrant Certificate, unless the adjustment would result in a change of at least 1% of the Exercise Price; *provided* that any adjustments that are less than 1% of the Exercise Price shall be carried forward and such carried forward adjustments, regardless of whether the aggregate adjustment is less than 1% of the Exercise Price, shall be made (i) annually, on each anniversary of the Closing Date, (ii) immediately prior to the time of any exercise, and (iii) five Business Days prior to the Expiration Date, unless, in each case, such adjustment has already been made.

(f)    If the Company takes a record of the holders of Common Stock for the purpose of entitling them to receive a dividend or other distribution, and thereafter (and before the dividend or distribution has been paid or delivered to stockholders) legally abandons its plan to pay or deliver such dividend or distribution, then thereafter no adjustment to the Exercise Price or the Number of Warrants for any Warrant Certificate then in effect shall be required by reason of the taking of such record.

Section 5.08.  *Deferral of Adjustments.*   In any case in which Section 5.01 provides that an adjustment shall become effective immediately after (a) a Record Date for an event or (b) the effective date (in the case of a subdivision or combination of the Common Stock) (each a "**Determination Date**"), the Company may elect to defer, until the later of the date the adjustment to the Exercise Price and Number of Warrants for each Warrant Certificate can be definitively determined and the occurrence of the applicable Adjustment Event (as hereinafter defined), (i) issuing to the Warrantholder of any Warrant exercised after such Determination Date and before the occurrence of such Adjustment Event, the additional shares of Common Stock or other securities or assets issuable upon

24

such exercise by reason of the adjustment required by such Adjustment Event over and above the Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount in Cash in lieu of any fractional share of Common Stock or fractional Warrant pursuant to Section 3.05. For the purposes of this Section 5.08, the term "**Adjustment Event**" shall mean in any case referred to in clause (a) or clause (b) hereof, the occurrence of such event.

Section 5.09. *Recapitalizations, Reclassifications and Other Changes.* (a) If any of the following events occur:

    (i)    any recapitalization;

    (ii)    any reclassification or change of the outstanding shares of Common Stock (other than changes resulting from a subdivision or combination to which Section 5.01(a) applies);

    (iii)    any consolidation, merger or combination involving the Company;

    (iv)    any sale or conveyance to a third party of all or substantially all of the Company's assets; or

    (v)    any statutory share exchange,

(each such event a "**Reorganization Event**"), in each case as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (the "**Reference Property**"), then, subject to Section 5.09(e), following the effective time of the transaction, the right to receive shares of Common Stock upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of one share of Common Stock would have owned or been entitled to receive in connection with such Reorganization Event (such kind and amount of Reference Property per share of Common Stock, a "**Unit of Reference Property**"). In the event holders of Common Stock have the opportunity to elect the form of consideration to be received in a Reorganization Event, other than with respect to a Change of Control Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock in such Reorganization Event.

(b)    At any time from, and including, the effective time of a Reorganization Event:

    (i)    if Full Physical Settlement applies upon exercise of a Warrant, the Full Physical Share Amount per Warrant shall be equal to a single Unit of Reference Property;

(ii)    if Net Share Settlement applies upon exercise of a Warrant, the Net Share Amount per Warrant shall be a number of Units of Reference Property calculated as set forth in Section 3.03(c), except that the Net Share Settlement Price used to determine such Net Share Amount on any Trading Day shall be the Unit Value for such Trading Day;

(iii)    the Company shall pay Cash in lieu of delivering any fraction of a Unit of Reference Property or any fractional Warrant in accordance with Section 3.05 based on the Unit Value as of the Exercise Date; and

(iv)    the Closing Sale Price and the Current Market Price shall be calculated with respect to a Unit of Reference Property.

(c)    The value of a Unit of Reference Property (the "**Unit Value**") shall be determined as follows:

(i)    any shares of common stock of the successor or purchasing corporation or any other corporation that are traded on a national or regional stock exchange included in such Unit of Reference Property shall be valued as if such shares were "Common Stock" using procedures set forth in the definition of "Closing Sale Price" in Section 1.01;

(ii)    any other property (other than Cash) included in such Unit of Reference Property shall be valued in good faith by the Board of Directors (in a manner not materially inconsistent with the manner the Board of Directors valued such property for purposes of the Reorganization Event, if applicable) or by a New York Stock Exchange member firm selected by the Board of Directors; and

(iii)    any Cash included in such Unit of Reference Property shall be valued at the amount thereof.

(d)    On or prior to the effective time of any Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this Section 5.09. If the Reference Property in connection with any Reorganization Event includes shares of stock or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Event, then the Company shall cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Warrantholders as the Board of Directors shall reasonably consider necessary by reason of the foregoing. Any such amendment to this Warrant Agreement shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 5. In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this Section 5.09, the Company shall promptly file with the Warrant Agent an Officers' Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or property or asset that will comprise a Unit of Reference Property after the relevant

26

Reorganization Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with.  The Company shall cause notice of the execution of amendment to be mailed to each Warrantholder, at its address appearing on the Warrant Register, within 20 Business Days after execution thereof.  Failure to deliver such notice shall not affect the legality or validity of such amendment.

(e)    Change of Control Event:

(i)    No less than 15 Business Days prior to the scheduled closing of a Change of Control Event, the Company shall:

(A)    calculate the Change of Control Estimated Payment Amount;

(B)    deliver to the Warrant Agent a notice of redemption (a "Redemption Notice"), which shall be binding on the Company and on all Warrantholders, stating that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time shall be redeemed on the Change of Control Payment Date at a price equal to the Change of Control Payment Amount (the "Redemption");

(C)    cause a notice of the Redemption to be sent at least once to the Dow Jones News Service or similar business news service in the United States; and

(D)    cause the Warrant Agent to send by first-class mail, postage prepaid to each Warrantholder, at the address appearing in the warrant register, a notice stating:

1)    that the Redemption is being made pursuant to this Section 5.09(e) and that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time will be redeemed on the Change of Control Payment Date for payment of the Change of Control Payment Amount;

2)    a reasonably detailed explanation of the Change of Control Estimated Payment Amount, including (x) a statement of the amount of the Change of Control Estimated Payment Amount, together with a reasonably detailed explanation of the calculation of such amount, and (y) the formula for calculating the Black Scholes Warrant Value and the Change of Control Payment Amount;

3)    the date of the Redemption (which shall be a Business Day no later than five (5) Business Days following the Change of Control Date (the "Change of Control Payment Date"));

4)    the Net Share Amount for each Warrant as of a date not more than five (5) Business Days prior to the date of the Redemption Notice (assuming Net Share Settlement is applicable with respect to the exercise of such Warrant);

27

5)    that no outstanding Warrant may be exercised after the Close of Business on the day prior to the Change of Control Date (the "**Cut-Off Time**");

6)    if applicable, that New Warrants will be issued to the Warrantholders on the Change of Control Payment Date in accordance with the terms of this Warrant Agreement and the Warrants (as the same may have been amended in connection with such Change of Control Event pursuant to Section 5.09);

7)    any other reasonable procedures that a Warrantholder must follow (to the extent consistent with the terms and conditions set forth herein) in connection with such Redemption; and

8)    the name and address of the Warrant Agent.

(ii)    Within two (2) Business Days prior to the Change of Control Payment Date, the Company or the surviving Person (if other than the Company) shall (A) deliver to the Warrant Agent the calculation of the Change of Control Payment Amount and (B) deposit with the Warrant Agent money sufficient to pay the Change of Control Payment Amount for all outstanding Warrants (other than the Carryover Warrants, if any).

(iii)    On the Change of Control Payment Date, (A) the Company or the surviving Person (if other than the Company) shall redeem all outstanding Warrants (other than Carryover Warrants, if any) pursuant to the Redemption, (B) the Warrant Agent shall mail to each holder of Warrants so redeemed payment in Cash in an amount equal to the aggregate Change of Control Payment Amount in respect of such redeemed Warrants, and (C) the Company or the surviving Person (if other than the Company) shall execute and issue to the Warrantholders, and the Warrant Agent shall authenticate, new Warrants (the "New Warrants") representing the Carryover Warrants (if any); provided that each such New Warrant shall be issued in denominations of one Warrant and integral multiples thereof and the terms thereof shall, subject to Section 5.09(e)(v), be substantially consistent with the terms of this Warrant Agreement and the Warrants (and all references herein to Warrants shall thereafter be deemed to be references to such New Warrants).

(iv)    No Warrant (which for the avoidance of doubt does not include New Warrants) may be exercised after the Cut-Off Time.

(v)    Following the Change of Control Payment Date, any holder of New Warrants shall have the right to exercise such New Warrant and to receive, upon such exercise, the Reference Property in accordance with Section 5.09(a), subject to Section 5.09(b) and Section 5.09(c) and the remaining terms of this Warrant Agreement and the Warrants (as the same may have been amended in connection with such Change of Control Event pursuant to Section 5.09); provided, that, for purposes of this Section 5.09(e)(v), (A) each Unit of Reference Property shall

28

initially only consist of the Registered and Listed Shares included in such Unit of Reference Property and (B) the initial exercise price for each New Warrant shall be equal to the New Warrant Exercise Price.

(vi)    The provisions of this Section 5.09(e) are subject, in all cases, to any applicable requirements under the Securities Act and the Exchange Act and the respective rules and regulations promulgated thereunder. Where there is any inconsistency between the requirements of the Securities Act or the Exchange Act or the rules and regulations promulgated thereunder and the requirements of this Section 5.09(e), the requirements of the Securities Act and the Exchange Act and the respective rules and regulations promulgated thereunder, shall supersede.

(f)    The Company hereby agrees not to become a party to any Reorganization Event or Change of Control Event unless its terms are consistent in all material respects with this Section 5.09.

(g)    The above provisions of this Section 5.09 shall similarly apply to successive Reorganization Events and Change of Control Events.

(h)    If this Section 5.09 applies to any event or occurrence, no other provision of this Article 5 with respect to anti-dilution adjustments (which for the avoidance of doubt, does not include the covenant set forth in Section 5.10) shall apply to such event or occurrence.

Section 5.10.  *Consolidation, Merger and Sale of Assets.*  (a) The Company may, without the consent of the Warrantholders, consolidate with, merge into or sell, lease or otherwise transfer in one transaction or a series of related transactions the consolidated assets of the Company and its subsidiaries substantially as an entirety to any corporation, limited liability company, partnership or trust organized under the laws of the United States or any of its political subdivisions so long as:

(i)    the successor assumes all the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)    the Company provides written notice of such assumption to the Warrant Agent.

(b)    In case of any such consolidation, merger, sale, lease or other transfer and upon any such assumption by the successor corporation, limited liability company, partnership or trust, such successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company. Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor

entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

Section 5.11. *Common Stock Outstanding.* For the purposes of this Article 5, the number of shares of Common Stock at any time outstanding shall not include shares held, directly or indirectly, by the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

Section 5.12. *Covenant to Reserve Shares for Issuance on Exercise.* (a) The Board of Directors has authorized and will reserve for issuance such number of shares of Common Stock as the Board of Directors believes will be issuable upon the exercise of all outstanding Warrants for shares of Common Stock (assuming, for purposes of this covenant, that Full Physical Settlement applies to all Warrants exercised hereunder). The Company covenants that all shares of Common Stock that shall be so issuable shall be duly and validly issued, fully paid and non-assessable.

(b)    The Company agrees to authorize and direct its current and future transfer agents for the Common Stock to reserve for issuance the number of shares of Common Stock specified in this Section 5.12. The Company shall instruct the transfer agent to deliver to the Warrant Agent, upon written request from the Warrant Agent substantially in the form of Exhibit F (or as separately agreed between the Warrant Agent and the transfer agent), stock certificates (or beneficial interests therein) required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Warrant Agreement. The Company shall pay to the Warrant Agent, as agent for the Warrantholders, any Cash that may be payable as provided in this Article 5. Promptly after the date of expiration of Warrants, the Warrant Agent shall certify to the Company the aggregate Number of Warrants then outstanding, and thereafter no shares shall be required to be reserved in respect of such Warrants.

(c)    The Company shall use its reasonable best efforts to apply and cause to have listed on a national securities exchange the Warrants and, subject to notice of issuance (if any), the shares of Common Stock issued and/or issuable upon exercise of the Warrants as soon as reasonably practicable following the date on which the Common Stock is registered under Section 12(b) of the Exchange Act and listed on a national securities exchange (other than shares of Common Stock bearing the restrictive legend set forth on Exhibit B hereto).

Section 5.13. *Calculations Final.* The Company shall be responsible for making all calculations called for under this Warrant Agreement. These calculations include, but are not limited to, the Exercise Date, the Current Market Price, the Closing Sale Price, the Net Share Settlement Price, the Exercise Price, the Number of Warrants for each Warrant Certificate and the number of shares of Common Stock or Units of Reference Property, if any, to be issued upon exercise of any Warrants. The Company shall make the foregoing calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Warrantholders. The Company shall provide a schedule of the Company's calculations to the Warrant Agent, and the Warrant Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification.

30

Section 5.14.  *Notice of Adjustments.*  Whenever the Exercise Price or the Number of Warrants for each Warrant Certificate is adjusted, the Company shall promptly mail to Warrantholders a notice of the adjustment. The Company shall file with the Warrant Agent such notice and an Officer's Certificate briefly stating the facts requiring the adjustment and the manner of computing it.  The certificate shall be conclusive evidence that the adjustment is correct, and the Warrant Agent shall not be deemed to have any knowledge of any adjustments unless and until it has received such certificate.  The Warrant Agent shall not be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Warrantholder desiring inspection thereof.

Section 5.15.  *Warrant Agent Not Responsible for Adjustments or Validity.*  The Warrant Agent shall at no time be under any duty or responsibility to any Warrantholder to determine whether any facts exist that may require an adjustment of the Exercise Price and the Number of Warrants for each Warrant Certificate, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed, herein or in any supplemental agreement provided to be employed, in making the same.  The Warrant Agent shall have no duty to verify or confirm any calculation called for hereunder.  The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations to the Warrant Agent.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to this Article 5, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or scrip upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to this Article 5, or to comply with any of the covenants of the Company contained in this Article 5.

Section 5.16.  *Statements on Warrants.*  The form of Warrant Certificate need not be changed because of any adjustment made pursuant to this Article 5, and Warrant Certificates issued after such adjustment may state the same information (other than the adjusted Exercise Price and the adjusted Number of Warrants for such Warrant Certificates) as are stated in the Warrant Certificates initially issued pursuant to this Warrant Agreement. However, the Company may at any time in its sole discretion (which shall be conclusive) make any change in the form of Warrant Certificate that it may deem appropriate and that does not materially adversely affect the interest of the Warrantholders; and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

# ARTICLE 6

## OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

31

Section 6.01.  *No Rights as Stockholders.*  Warrantholders shall not be entitled, by virtue of holding Warrants, to vote, to consent, to receive dividends, to receive notice as stockholders with respect to any meeting of stockholders for the election of the Company's directors or any other matter, or to exercise any rights whatsoever as the Company's stockholders unless, until and only to the extent such holders become holders of record of shares of Common Stock issued upon settlement of the Warrants.

Section 6.02.  *Mutilated or Missing Warrant Certificates.*  If any Warrant at any time is mutilated, defaced, lost, destroyed or stolen, then on the terms set forth in this Warrant Agreement, such Warrant may be replaced at the cost of the applicant (including legal fees of the Company) at the office of the Warrant Agent. The applicant for a new Warrant shall, in the case of any mutilated or defaced Warrant, surrender such Warrant to the Warrant Agent and, in the case of any lost, destroyed or stolen Warrant, furnish evidence satisfactory to the Company of such loss, destruction or theft, and, in each case, furnish evidence satisfactory to the Company of the ownership and authenticity of the Warrant together with such indemnity as the Company may require.  Any such new Warrant Certificate shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant Certificate shall be at any time enforceable by anyone. An applicant for such a substitute Warrant Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe. All Warrant Certificates shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the substitution for lost, stolen, mutilated or destroyed Warrant Certificates, and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the substitution for and replacement of negotiable instruments or other securities without their surrender.

Section 6.03.  *Modification, Waiver and Meetings.*  (a) This Warrant Agreement may be modified or amended by the Company and the Warrant Agent, without the consent of the holder of any Warrant, for the purposes of curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement; *provided* that such modification or amendment does not adversely affect the interests of the Warrantholders in any respect.

(b)    Modifications and amendments to this Warrant Agreement or to the terms and conditions of Warrants may also be made by the Company and the Warrant Agent, and noncompliance with any provision of the Warrant Agreement or Warrants may be waived, with the written consent of the Warrantholders of Warrants representing a majority of the aggregate Number of Warrants at the time outstanding.

(c)    However, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected:

(i)    change the Expiration Date;

(ii)    increase the Exercise Price or decrease the Number of Warrants (except as explicitly set forth in Article 5);

32

1766885

(iii)    impair the right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

(iv)    impair or adversely affect the exercise rights of Warrantholders, including any change to the calculation or payment of the Full Physical Share Amount or the Net Share Amount, as applicable;

(v)    deprive any Warrantholder of any economic rights, privileges or benefits that arise under or are provided pursuant to this Warrant Agreement and/or the Warrants;

(vi)    reduce the percentage of Warrants outstanding necessary to modify or amend this Warrant Agreement or to waive any past default; or

(vii)    reduce the percentage in Warrants outstanding required for any other waiver under this Warrant Agreement.

## ARTICLE 7

### CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.  *Payment of Certain Taxes.*  (a)  The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the initial issuance of the Warrants hereunder.

(b)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the issuance of Common Stock upon the exercise of Warrants hereunder and the issuance of stock certificates in respect thereof in the respective names of, or in such names as may be directed by, the exercising Warrantholders; *provided, however,* that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such stock certificate, any Warrant Certificates or other securities in a name other than that of the registered holder of the Warrant Certificate surrendered upon exercise of the Warrant, and the Company shall not be required to issue or deliver such certificates or other securities unless and until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 7.02.  *Change of Warrant Agent.*  (a)  The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient. If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent. If the Company shall fail to make such appointment within a period of 60 days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by any holder of Warrants (who shall, with such notice, submit his Warrant Certificate for inspection by the Company), then the holder of

33

any Warrants may apply to any court of competent jurisdiction for the appointment of a successor warrant agent.

(b)    The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; *provided, however*, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed.

(c)    Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the laws of the United States of America or any state thereof or the District of Columbia, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by Federal or state authority and having a combined capital and surplus of not less than $50,000,000. The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; *provided* that such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority. After appointment, any successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations. Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder. As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent, the Warrantholders and each transfer agent for the shares of its Common Stock. Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(d)    Any entity into which the Warrant Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party, shall be the successor Warrant Agent under this Warrant Agreement without any further act. In case at the time such successor to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent and deliver such Warrant Certificates so countersigned, and in case at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases

34

Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

(e)    In case at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrant Certificates so countersigned; and in case at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

Section 7.03.    *Compensation; Further Assurances.*    The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent hereunder and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon demand for all reasonable expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable compensation, expenses and disbursements of its agents and counsel) except any such expense, disbursement or advance as may arise from its or any of their negligence or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 7.04.    *Reliance on Counsel.*    The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 7.05.    *Proof of Actions Taken.*    Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Warrant Agent; and such Officer's Certificate shall, in the absence of bad faith on the part of the Warrant Agent, be full warrant to the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement in reliance upon such certificate; but in its discretion the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

Section 7.06.    *Correctness of Statements.*    The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or in the Warrant Certificates (except its countersignature thereof) or be

35

required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

Section 7.07. *Validity of Agreement.* The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificates (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any shares of Common Stock will, when issued, be validly issued and fully paid and nonassessable.

Section 7.08. *Use of Agents.* The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents and the Warrant Agent shall not be responsible for the misconduct or negligence of any agent or attorney, provided due care had been exercised in the appointment and continued employment thereof.

Section 7.09. *Liability of Warrant Agent.* The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of Warrants for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties. The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's negligence or willful misconduct or bad faith.

Section 7.10. *Legal Proceedings.* The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Warrantholders shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.

Section 7.11. *Other Transactions in Securities of the Company.* The Warrant Agent in its individual or any other capacity may become the owner of Warrants or other securities of the Company, or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

36

Section 7.12. *Actions as Agent.* The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof. The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement. No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent. No provision of the Warrant Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it. The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own negligence or willful misconduct or bad faith.

Section 7.13. *Appointment and Acceptance of Agency.* The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth.

Section 7.14. *Successors and Assigns.* All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 7.15. *Notices.* Any notice or demand authorized by this Warrant Agreement to be given or made by the Warrant Agent or by any Warrantholder to or on the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

> **[NGMCO, Inc.]**
> [_____]
> [_____]
> Attention: Treasurer
> Telephone: [_____]
> Facsimile: [_____]
>
> With a copy to:
>
> [_____]
> [_____]
> [_____]
> Attention: [_____]

Any notice or demand authorized by this Warrant Agreement to be given or made by any Warrantholder or by the Company to or on the Warrant Agent shall be sufficiently

1766885

given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

> /_____/
> /_____/
> Attention: Treasurer
> Telephone: /_____/
> Facsimile: /_____/

Any notice of demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid to the last address of such Warrantholder as it shall appear on the Warrant Register.

Section 7.16. *Applicable Law.* The validity, interpretation and performance of this Warrant Agreement and of the Warrant Certificates shall be governed by the law of the State of New York without giving effect to the principles of conflicts of laws thereof.

Section 7.17. *Benefit of this Warrant Agreement.* Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Warrantholders.

Section 7.18. *Registered Warrantholders.* Prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

Section 7.19. *Inspection of this Warrant Agreement.* A copy of this Warrant Agreement shall be available at all reasonable times for inspection by any registered Warrantholder at the principal office of the Warrant Agent (or successor warrant agent). The Warrant Agent may require any such holder to submit his Warrant Certificate for inspection by it before allowing such holder to inspect a copy of this Warrant Agreement.

38

Section 7.20.  *Headings.*    The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

Section 7.21.  *Counterparts.*  This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

1766885

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

**[NGMCO, Inc.]**

By: _____
      Name:
      Title:


[•], as Warrant Agent

By: _____
      Name:
      Title:

1766885

**EXHIBIT A**

## FORM OF RESTRICTIVE LEGEND FOR WARRANTS

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

1766885

**EXHIBIT B**

### FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK

[THESE SHARES OF COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THESE SHARES OF COMMON STOCK ARE ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THESE COMMON SHARES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

B - 1

**EXHIBIT C**

### FORM OF GLOBAL WARRANT LEGEND

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

1766885

**EXHIBIT D**

## FORM OF WARRANT CERTIFICATE

[FACE]

No. _____

CUSIP No. _____

[UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.]

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

D - 1

## [NGMCO, Inc.]

### [Designation of Warrants]

NUMBER OF WARRANTS: Initially, [＿＿＿] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [＿＿＿], 2009 between **[NGMCO, Inc.]** and [•], as Warrant Agent (the "**Warrant Agreement**"), each of which is exercisable for one share of Common Stock.

EXERCISE PRICE: Initially, $[＿＿＿] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF PAYMENT OF EXERCISE PRICE: Cash, if Full Physical Settlement is applicable, or Net Share Settlement.

FORM OF SETTLEMENT: Upon exercise of any Warrants represented hereby, the Warrantholder shall be entitled to receive, at the Warrantholder's election, either (a) upon payment to the Warrant Agent of the Exercise Price (determined as of the relevant Exercise Date), one share of Common Stock per Warrant exercised, together with Cash in lieu of any fractional Warrants, or (b) without any payment therefor, a number of shares of Common Stock equal to the Net Share Amount, together with Cash in lieu of any fractional shares or fractional Warrants, in each case, as described in the Warrant Agreement.

DATES OF EXERCISE: At any time, and from time to time, prior to 5:00 p.m., New York City time, on the Expiration Date, the Warrantholder shall be entitled to exercise all Warrants then represented hereby and outstanding (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).

PROCEDURE FOR EXERCISE: Warrants may be exercised by (a) in the case of a Certificated Warrant, surrendering the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes, or (b) in the case of a Global Warrant, complying with the procedures established by the Depositary for the exercise of Warrants.

EXPIRATION DATE: December 31, 2015.

This Warrant Certificate certifies that ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿, or its registered assigns, is the Warrantholder of the Number of Warrants (the "**Warrants**") specified above[, as modified in Schedule A hereto,] (such number subject to adjustment from time to time as described in the Warrant Agreement).

In connection with the exercise of any Warrants, (a) the Company shall determine the Full Physical Share Amount or Net Share Amount, as applicable, for each Warrant, and (b) the Company shall, or shall cause the Warrant Agent to, deliver to the exercising Warrantholder, on the applicable Settlement Date, for each Warrant exercised, a number of Shares of Common Stock equal to the relevant Full Physical Share Amount or Net Share

Amount, as applicable, together with Cash in lieu of any fractional shares or fractional Warrants as described in the Warrant Agreement.

Prior to the relevant Exercise Date as described more fully in the Warrant Agreement, Warrants will not entitle the Warrantholder to any of the rights of the holders of shares of Common Stock.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

D - 3

1766885

   IN WITNESS WHEREOF, **[NGMCO, Inc.]** has caused this instrument to be duly executed.

Dated: _____

                **[NGMCO, Inc.]**

            By: _____
              Name:
              Title:

Attest

By: _____
    Secretary

Countersigned as of the date above written:

[•], as Warrant Agent

By: _____
    Authorized Officer

[FORM OF REVERSE OF WARRANT CERTIFICATE]

**[NGMCO, Inc.]**

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to a Warrant Agreement, dated as of [_____], 2009 (the "**Warrant Agreement**"), between the Company and [●] (the "**Warrant Agent**"), and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions each Warrantholder consents by acceptance of this Warrant Certificate or a beneficial interest therein. Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement. A copy of the Warrant Agreement is on file at the Warrant Agent's Office.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of New York without regard to the conflicts of laws principles thereof.

D - 5

**[To be attached if Warrant is a Certificated Warrant]**

**Exercise Notice**

[Warrant Agent]

[_____]
[_____]

Attention:      [●]

The undersigned (the "**Registered Warrantholder**") hereby irrevocably exercises _____ Warrants (the "**Exercised Warrants**") and delivers to you herewith a Warrant Certificate or Warrant Certificates, registered in the Registered Warrantholder's name, representing a Number of Warrants at least equal to the number of Exercised Warrants.

The Registered Warrantholder hereby either:

elects for Full Physical Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement and confirms that it will, prior to 11:00 a.m., New York City time, on the Settlement Date, pay an amount equal to the Exercise Price (determined as of the relevant Exercise Date), *multiplied by* the number of Exercised Warrants, by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Registered Warrantholder as required under Section 3.03(b) of the Warrant Agreement; or

elects for Net Share Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement.

The Registered Warrantholder hereby directs the Warrant Agent to:

(a)      deliver the Full Physical Share Amount or Net Share Amount, as applicable, for each of the Exercised Warrants as follows:

_____ ; and

(b)      if the number of Exercised Warrants is less than the Number of Warrants represented by the enclosed Warrant Certificates, to deliver a Warrant Certificate representing the unexercised Warrants to:

_____

D - 6

Dated:_____          _____
                                     (Registered Warrantholder)


                                     By:  _____
                                          Authorized Signature
                                          Address:
                                          Telephone:


**[To Be Attached if Warrant is a Global Warrant]**

D - 7

## SCHEDULE A

### SCHEDULE OF INCREASES OR DECREASES IN WARRANTS

The initial Number of Warrants represented by this Global Warrant is _____.
In accordance with the Warrant Agreement dated as of [_____], 2009 among the Company
and [●], as Warrant Agent, the following increases or decreases in the Number of Warrants
represented by this certificate have been made:

| Date | Amount of increase in Number of Warrants evidenced by this Global Warrant | Amount of decrease in Number of Warrants evidenced by this Global Warrant | Number of Warrants evidenced by this Global Warrant following such decrease or increase | Signature of authorized signatory |
|------|------|------|------|------|
|      |      |      |      |      |

D - 8

**[To Be Attached if Warrant is a Global Warrant or Certificated Warrant]**

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____

Name, Address and Zip Code of Assignee

and irrevocably appoints _____
                                    Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

D - 9

Date: _____

_____
Name of Transferee

By: _____
          Name:
          Title:

(Sign exactly as your name appears on the other side of this Certificate)

NOTICE: The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

1766885

**EXHIBIT E**

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ Warrants by
_____ unto _____
(Please insert social security or other Taxpayer Identification Number of assignee) prior to
the expiration of the holding period applicable to sales thereof under Rule 144 under the
Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the
undersigned confirms that such Warrants are being transferred:

To **[NGMCO, Inc.]** (the "**Issuer**") or any subsidiaries thereof; or

Pursuant to a registration statement that has become effective under the
Securities Act; or

Pursuant to an exemption from registration provided by Rule 144 under the
Securities Act or any other available exemption from the registration
requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the
Issuer and the Warrant Agent reserve the right to require the delivery of such legal opinion,
certifications or other evidence as may reasonably be required in order to determine that
the proposed transfer is being made in compliance with the Securities Act and applicable
state securities laws.

*Unless one of the boxes is checked, the Warrant Agent will refuse to register any of
the Warrants evidenced by this certificate in the name of any person other than the
registered holder thereof.*

Date:   [_____]

[Insert name of transferee]

By:   _____
      Name:
      Title:

E - 1

1766885

**EXHIBIT F**

## FORM OF COMMON STOCK REQUISITION ORDER

[*Date*]

Via Facsimile [_____]

**[NGMCO, Inc.]**
[_____]
[_____]
Attention:  Treasurer

Re:   DWAC Issuance
       Control No. _____

Ladies and Gentlemen:

You are hereby authorized to issue and deliver the shares of Common Stock as indicated below via DWAC.  The shares are being issued to cover the exercise of Warrants under the Warrant Agreement, dated as of [_____], 2009, between **NGMCO, Inc.]** and [•], as Warrant Agent (the "**Warrant Agreement**"). Defined terms used but not defined herein have the meaning assigned to them in the Warrant Agreement.

Number of Shares:     _____

                        _____ Original Issue or

                        _____ Transfer from Treasury Account

Broker Name:        _____

Broker's DTC Number:  _____

Contact and Phone:    _____

F - 1

The Broker will initiate the DWAC transaction on (date).

Sincerely,

[●.],
as Warrant Agent

By: _____
Name:
Title:

cc:    [*Insert name*] via facsimile [*insert fax number*]
       Broker

F - 2

F

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit F**

Certain Excluded Owned Real Property

## EXHIBIT F

## CERTAIN EXCLUDED OWNED REAL PROPERTY

| | Site Name | Property Address | City | State | Zip |
|---|---|---|---|---|---|
| 1. | GMVM - Wilmington Assembly | 801 Boxwood Road PO Box 1512 - 19899 | Wilmington | DE | 19804-2041 |
| 2. | Stamping - Indianapolis | 340 White River Parkway West Drive South 50 | Indianapolis | IN | 46206 |
| 3. | GMPT - Flint North #5/#10/#81 | 902 E Hamilton Avenue | Flint | MI | 48550 |
| 4. | GMPT – Livonia | 12200 Middlebelt | Livonia | MI | 48150 |
| 5. | GMVM - Pontiac Assembly | 2100 S Opdyke Road | Pontiac | MI | 48341 |
| 6. | Stamping - Pontiac North Campus[1] | 220 East Columbia | Pontiac | MI | 48340 |
| 7. | Stamping - Grand Rapids | 300 36th Street SW | Wyoming | MI | 49548-2107 |
| 8. | GMPT - Willow Run | 2930 Ecorse Road | Ypsilanti | MI | 48197-0935 |
| 9. | GMPT - Massena | Route 37 East | Massena | NY | 13662-0460 |
| 10. | Stamping - Mansfield | 2525 West Fourth Street PO Box 2567 - 44906 | Mansfield | OH | 44906-1269 |
| 11. | GMVM - Moraine Assembly[2] | 2601 West Stroop Road | Moraine | OH | 45439 |
| 12. | GMPT - Parma Complex[3] | 5400 Chevrolet Boulevard PO Box 30098 | Parma | OH | 44130 |
| 13. | Stamping - Pittsburgh | 1451 Lebanon School Road | West Mifflin | PA | 15122 |
| 14. | GMPT - Fredericksburg | 11032 Tidewater Trail | Fredericksburg | VA | 22408 |
| 15. | GMVM - Shreveport Assembly | 7600 General Motors Boulevard | Shreveport | LA | 71129 |
| 16. | Stamping- Shreveport | 7600 General Motors Boulevard | Shreveport | LA | 71129 |

---

[1] Does not include Plant #14 and the real property underlying Plant #14 and associated utilities for stamping and Powertrain facilities, which is part of the Transferred Real Property.

[2] Does not include the GMPT - Moraine (DMAX) improvements and associated real property, which is part of the Transferred Real Property.

[3] Does not include the GMVM - Parma Stamping improvements and associated real property, which is part of the Transferred Real Property.

G

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit G**

Certain Retained Workers' Compensation Claims

## EXHIBIT G

### CERTAIN RETAINED WORKERS' COMPENSATION CLAIMS

Alabama
Georgia
New Jersey
Oklahoma

H

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit H**

Form of Sale Procedures Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
                         :

**In re**                        :        **Chapter 11 Case No.**
                          :

**GENERAL MOTORS CORP.,** *et al.*,    :        **09-50026 (REG)**
                          :

               **Debtors.**      :        **(Jointly Administered)**
                          :
------------------------------------------------------x

**ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, AND 365 AND FED. R. BANKR. P. 2002,**
**6004, AND 6006 (I) APPROVING PROCEDURES FOR SALE**
**OF DEBTORS' ASSETS PURSUANT TO MASTER SALE AND PURCHASE**
**AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC,**
**A U.S. TREASURY-SPONSORED PURCHASER;**
**(II) SCHEDULING BID DEADLINE AND SALE HEARING DATE;**
**(III) ESTABLISHING ASSUMPTION AND ASSIGNMENT PROCEDURES;**
**AND (IV) FIXING NOTICE PROCEDURES AND APPROVING FORM OF NOTICE**

Upon the motion, dated June 1, 2009 (the "<u>Motion</u>"),[1] of General Motors

Corporation ("<u>GM</u>") and certain of its subsidiaries, as debtors in possession in the above-

captioned chapter 11 cases (collectively, the "<u>Debtors</u>" or the "<u>Company</u>"),[2] pursuant to sections

105, 363, and 365 of title 11, United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002,

6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") for,

among other things, entry of an order, (A) approving the proposed sale procedures annexed

hereto as Exhibit "A" (the "<u>Sale Procedures</u>"); (B) scheduling a bid deadline and sale hearing

date; (C) establishing procedures for assuming and assigning the Assumable Executory

Contracts; and (D) fixing notice procedures and approving forms of notice; and upon any

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the Sale Procedures, or the MPA, as applicable.

[2] The Debtors and their respective Tax ID numbers are as follows: General Motors Corporation, Tax ID No. 38-0572515; Saturn, LLC, Tax ID No. 38-2577506; Saturn Distribution Corporation, Tax ID No. 38-2755764; and Chevrolet-Saturn of Harlem, Inc., Tax ID No. 20-1426707.

objections to the Motion (the "Objections"); and the Court having jurisdiction to consider the

Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the

Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of

Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided to (i) the Office of the

United States Trustee for the Southern District of New York, (ii) the attorneys for the United

States Department of the Treasury (the "U.S. Treasury"), (iii) the attorneys for Export

Development Canada ("EDC"), (iv) the attorneys for the agent under GM's prepetition secured

term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and

restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims

against the Debtors (on a consolidated basis), (vii) the attorneys for the International Union,

United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"),

(viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and

Furniture Workers—Communications Workers of America, (ix) the United States Department of

Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys

for the ad hoc bondholders committee, and it appearing that no other or further notice need be

provided; and a hearing having been held on June 1, 2009, to consider the relief requested in the

Motion (the "Sale Procedures Hearing"); and upon the Affidavit of Frederick A. Henderson

Pursuant to Local Bankruptcy Rule 1007-2 (the "Henderson Affidavit"), the record of the Sale

Procedures Hearing, and all of the proceedings had before the Court; and the Court having

reviewed the Motion and any Objections and found and determined that the relief sought in the

Motion as provided herein is necessary to avoid immediate and irreparable harm to the Debtors

and their estates, as contemplated by Bankruptcy Rule 6003, and is in the best interests of the

Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases

set forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is

FOUND AND DETERMINED THAT:[3]

A.    The Debtors have articulated good and sufficient reasons for this Court to

grant the relief requested in the Motion regarding the sale process, including the Court's (i)

approval of the Sale Procedures, (ii) approval of the Assumption and Assignment Procedures,

(iii) approval of and authorization to serve the Sale Notice, the Assumption and Assignment

Notice, and the Special UAW Retiree Notice (each as hereinafter defined), and (iv) approval of

and authorization to publish the Publication Notice (the "Sale Procedures Relief").

B.    The Debtors have articulated good and sufficient reasons for, and the best

interests of their estates will be served by, this Court scheduling a subsequent hearing (the "Sale

Hearing") to consider whether to grant the remainder of the relief requested in the Motion,

including the approval of the sale of substantially all the assets (the "Purchased Assets") of the

Sellers in accordance with either the (i) proposed Master Sale and Purchase Agreement, dated as

of June 1, 2009, substantially in the form annexed to the Motion as Exhibit "A" (together with all

exhibits and agreements attached thereto, the "MPA"),[4] by and among GM and its Debtor

subsidiaries (collectively, the "Sellers") and Vehicle Acquisition Holdings LLC (the

"Purchaser"), a purchaser sponsored by the U.S. Treasury, or (ii) such other Marked Agreement

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of
fact when appropriate. *See* Fed. R. Bankr. P. 7052.

[4] Copies of the Motion and the MPA (without certain commercially sensitive attachments) may be obtained by
accessing the website established by the Debtors' proposed claims and noticing agent, The Garden City Group, Inc.,
at http://www.gmcourtdocs.com.

that may constitute the Successful Bid (the "Replacement Agreement"), free and clear of all

liens, claims, encumbrances, and interests, including rights or claims based on any successor or

transferee liability (with the same to attach to the proceeds therefrom) pursuant to section 363 of

the Bankruptcy Code (the "363 Transaction").

    C.  The Purchased Assets are "wasting assets" that will not retain going

concern value over an extended period of time. As such, the Debtors' estates will suffer

immediate and irreparable harm if the relief requested in the Motion is not granted on an

expedited basis consistent with the provisions set forth herein and in the MPA.

    D.  The notice of the Sale Hearing (the "Sale Notice"), substantially in the

form annexed hereto as Exhibit "B," is reasonably calculated to provide parties in interest with

proper notice of the proposed sale of the Purchased Assets, the Sale Procedures, the 363

Transaction, and the Sale Hearing.

    E.  Publication of the Publication Notice, substantially in the form annexed

hereto as Exhibit "C," as set forth herein is reasonably calculated to provide all unknown

creditors and parties not otherwise required to be served with a copy of the Sale Notice pursuant

to this Order with proper notice of the proposed sale of the Purchased Assets, the Sale

Procedures, the 363 Transaction, and the Sale Hearing.

    F.  The Assumption and Assignment Notice, substantially in the form

annexed hereto as Exhibit "D," is reasonably calculated to provide all counterparties to the

Assumable Executory Contracts with proper notice of the potential assumption and assignment

of their respective executory contracts or Leases, any Cure Amounts relating thereto, and the

Assumption and Assignment Procedures.

    G.  The UAW Special Retiree Notice (as defined below) including the Cover

Letter to UAW-Represented Retirees describing the 363 Transaction and the UAW Retiree

Settlement Agreement and the notice (together, the "UAW Retiree Notice") to the retirees of the

Debtors and of certain retirees of Delphi Corporation ("Delphi"), a former unit of GM, including

certain retirees of former Delphi units and former GM units, and their respective surviving

spouses, who are eligible to receive, now or in the future, Retiree Medical Benefits ( as defined

in the UAW-Retiree Settlement Agreement) (collectively, the "UAW-Represented Retirees"),

copies of which are annexed hereto as Exhibit "E," are reasonably calculated to provide the

UAW-Represented Retirees with proper notice of the 363 Transaction, the Sale Procedures, the

Sale Hearing, and the UAW Retiree Settlement Agreement.

        H.     The Motion and this Order comply with all applicable provisions of the

Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Guidelines for the

Conduct of Asset Sales established by the Bankruptcy Court on September 5, 2006 pursuant to

General Order M-331.

        I.     The 363 Transaction includes the transfer of "personally identifiable

information" (as defined in section 101(41A) of the Bankruptcy Code). As such, the transfer of

personally identifiable information shall not be effective until a Consumer Privacy Ombudsman

is appointed and issues its findings and the Court has an opportunity to review the findings and

issue any rulings that are appropriate.

        J.     Due, sufficient, and adequate notice of the relief requested in the Motion

and granted herein has been given to parties in interest.

        K.     This Order constitutes a final order within the meaning of 28 U.S.C. §

158(a).

        NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

1.      The Sale Procedures Relief requested in the Motion is granted as provided herein.

2.      The Objections are overruled except as otherwise set forth herein.

3.      The Sale Procedures, which are incorporated herein by reference, are approved and shall govern all bids and sale procedures relating to the Purchased Assets. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Sale Procedures.

4.      The deadline for submitting a Qualified Bid shall be June 22, 2009 (the "Bid Deadline"), as further described in the Sale Procedures.

5.      The deadline for objecting to approval of the 363 Transaction, including the sale of the Purchased Assets free and clear of liens, claims, encumbrances, and interests, including rights or claims based on any successor or transferee liability (or for UAW-Represented Retirees to object to the UAW Retiree Settlement Agreement), shall be June 19, 2009, at 5:00 p.m. (Eastern Time) (the "Objection Deadline"), *provided, however,* that in the event the Sale Procedures result in a Successful Bidder other than the Purchaser, the deadline for objecting to the sale of the Purchased Assets to such Successful Bidder shall be at the Sale Hearing.

6.      The Purchaser shall constitute a Qualified Bidder for all purposes and in all respects with respect to the Sale Procedures and is not required to make a Good Faith Deposit.

7.      The Court shall conduct the Sale Hearing on June 30, 2009, at 9:45 a.m. (Eastern Time), at which time the Court will consider approval of the 363 Transaction to the Successful Bidder and approval of the UAW Retiree Settlement Agreement. In the event the Successful Bidder is not the Purchaser, non-Debtor parties to the Assumable Executory Contracts may raise objections to adequate assurance of future performance at the Sale Hearing.

8.      The Debtors are authorized to conduct the 363 Transaction (or other

similar transaction if the Successful Bidder is a party other than the Purchaser) without the

necessity of complying with any state or local bulk transfer laws or requirements.

9.      The notices described in subparagraphs (a)-(d) below are approved and

shall be good and sufficient, and no other or further notice shall be required if given as follows:

(a)      The Debtors (or their agent) serve, within three (3) days after entry of this
Order (the "Mailing Deadline"), by first-class mail, postage prepaid, or
other method reasonably calculated to provide notice, a copy of this Order
upon: (i) the attorneys for the U.S. Treasury, (ii) the attorneys for Export
Development Canada, (iii) the attorneys for the agent under the Debtors'
prepetition secured term loan agreement, (iv) the attorneys for the agent
under the Debtors' prepetition amended and restated secured revolving
credit agreement (v) the attorneys for the statutory committee of unsecured
creditors appointed in the Debtors' chapter 11 cases (the "Creditors
Committee") (if no statutory committee of unsecured creditors has been
appointed, the holders of the fifty largest unsecured claims against the
Debtors on a consolidated basis), (vi) the attorneys for the UAW, (vii) the
attorneys for the International Union of Electronic, Electrical, Salaried,
Machine and Furniture Workers—Communications Workers of America;
(viii) the United States Department of Labor; (ix) the attorneys for the
National Automobile Dealers Association, (x) the attorneys for the ad hoc
bondholders committee; (xi) any party who, in the past three years,
expressed in writing to the Debtors an interest in the Purchased Assets and
who the Debtors and their representatives reasonably and in good faith
determine potentially have the financial wherewithal to effectuate the
transaction contemplated in the MPA, (xii) non-Debtor parties to the
Assumable Executory Contracts, (xiii) all parties who are known to have
asserted any lien, claim, encumbrance, or interest in or on the Purchased
Assets, (xiv) the Securities and Exchange Commission, (xv) the Internal
Revenue Service, (xvi) all applicable state attorneys general, local
environmental enforcement agencies, and local regulatory authorities,
(xvii) all applicable state and local taxing authorities, (xviii) the Federal
Trade Commission, (ixx) all applicable state attorneys general, (xx)
United States Attorney General/Antitrust Division of the Department of
Justice, (xxi) the U.S. Environmental Protection Agency and similar state
agencies, (xxii) the United States Attorney's Office, (xxiii) all dealers with
current agreements for the sale or leasing of GM brand vehicles, (xxiv) the
Office of the United States Trustee for the Southern District of New York,
and (xxv) all entities that requested notice in these chapter 11 cases under
Bankruptcy Rule 2002; and

(b)      On or before the Mailing Deadline, the Debtors (or their agent) serve by
first-class mail, postage prepaid, or other method reasonably calculated to

provide notice, the Sale Notice, substantially in the form annexed hereto
as Exhibit "B," upon (i) all other known creditors and (ii) all equity
security holders of the Debtors of record as of May 27, 2009.

(c)     On or before the Mailing Deadline, the Debtors (or their agent) serve by
first-class mail, postage prepaid, or other method reasonably calculated to
provide notice, a notice of the assumption and assignment of the
Assumable Executory Contracts and the proposed cure amounts relating to
the Assumable Executory Contracts (the "Assumption and Assignment
Notice"), substantially in the form annexed hereto as Exhibit "C," upon
the non-Debtor parties to the Assumable Executory Contracts.

(d)     On or before the Mailing Deadline, the Debtors (or their agent) serve by
first-class mail, postage prepaid, or other method reasonably calculated to
provide notice, a notice of the 363 Transaction and the UAW Retiree
Settlement, as well as a cover letter from the UAW describing the UAW
Retiree Settlement Agreement and communicating the UAW's support of
the 363 Transaction, including the UAW Retiree Settlement Agreement
(collectively, the "UAW Retiree Notice"), substantially in the form
annexed hereto as Exhibit "E," upon (i) the UAW, (ii) the attorneys for the
UAW, and (iii) all of the UAW-Represented Retirees.  On the Mailing
Deadline or as soon as practicable thereafter, the Debtors will cause the
MPA, the Motion, the Sale Procedures Order, the UAW Retiree Notice,
and the UAW Retiree Settlement Agreement, including all exhibits thereto
(other than those containing commercially sensitive information), to be
published on the website of the Debtors' proposed claims and noticing
agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com, in an
area dedicated to retiree-related information (this website disclosure and
the UAW Retiree Notice, collectively the "UAW Special Retiree
Notice").

(e)     On the Mailing Deadline, or as soon as practicable thereafter, the Debtors
shall cause the Publication Notice to be published (i) once in (a) the global
edition of *The Wall Street Journal*, (b) the national edition of *The New
York Times*, (c) the global edition of *The Financial Times*, (d) the national
edition of *USA Today*, (e) *Detroit Free Press/Detroit News*, (f) *Le Journal
de Montreal*, (g) *Montreal Gazette*, (h) *The Globe and Mail*, and (i) *The
National Post*, and (ii) on the website of the Debtors' proposed claims and
noticing agent, The Garden City Group, Inc., at
http://www.gmcourtdocs.com.

10.    The following procedures (the "<u>Assumption and Assignment Procedures</u>")

shall govern the assumption and assignment of the Assumable Executory Contracts in connection

with the sale of the Purchased Assets to the Purchaser:[5]

<u>Determination of Assumable Executory Contracts</u>

- The Sellers shall maintain a schedule (the "<u>Schedule</u>") of Executory Contracts and Leases that the Purchaser has designated as Assumable Executory Contracts. From the date of the MPA until thirty (30) days after the Closing Date (or a later date if mutually agreed upon by the Sellers and the Purchaser) (the "<u>Executory Contract Designation Deadline</u>"), the Purchaser may (i) designate any additional Executory Contracts or Leases as Assumable Executory Contracts and add such Assumable Executory Contracts to the Schedule or (ii) remove any Assumable Executory Contract from the Schedule, in which case the Executory Contract or Lease shall cease to be an Assumable Executory Contract. The right of the Purchaser to add or remove Executory Contracts and Leases from the Schedule is subject to certain exceptions.[6]

- For each Assumable Executory Contract, the Purchaser must determine, prior to the Executory Contract Designation Deadline, the date on which it seeks to have the assumption and assignment become effective, which date may be the Closing or a later date (the "<u>Proposed Assumption Effective Date</u>").

- In addition to the Schedule, the Sellers shall maintain a secure website (the "<u>Contract Website</u>") that the non-Debtor counterparty to an Assumable Executory Contract can access to find current information about the status of its respective Executory Contract or Lease. The Contract Website contains, for each Assumable Executory Contract, (i) an identification of each Assumable Executory Contract that the Purchaser has designated for assumption and assignment and (ii) the Cure Amounts that must be paid to cure any prepetition defaults under such respective Assumable Executory Contract as of the Commencement Date. The information on the Contract Website shall be made available to the non-Debtor counterparty to the Assumable Executory Contract (the "<u>Non-Debtor Counterparty</u>"), but shall not otherwise be publicly available.

---

[5] If a party other than the Purchaser is the Successful Bidder, or if a transaction other than the 363 Transaction is consummated, then these Assumption and Assignment Procedures may be modified by further order of this Court.

[6] For example, if an Assumable Executory Contract has already been assumed and assigned, it cannot be removed from the Schedule.

Procedures for Providing Notice of Assumption and Assignment

- Following the designation of an Executory Contract or Lease as an Assumable Executory Contract, the Debtors shall provide notice (the "Assumption and Assignment Notice") to the Non-Debtor Counterparty to the Assumable Executory Contract, substantially in the form annexed hereto as Exhibit "D," setting forth (i) instructions for accessing the information on the Contract Website relating to such Non-Debtor Counterparty's Assumable Executory Contract and (ii) the procedures for objecting to the proposed assumption and assignment of the Assumable Executory Contract.

Procedures for Filing Objections to Assumption and Assignment and Cure Amounts

- Objections, if any, to the proposed assumption and assignment of the Assumable Executory Contracts (the "Contract Objections") must be made in writing, filed with the Court, and served on the Objection Deadline Parties (as defined below) so as to be received no later than ten (10) days after the date of the Assumption and Assignment Notice (the "Contract Objection Deadline") and must specifically identify in the objection the grounds therefor. The "Objection Deadline Parties" are (i) the Debtors, c/o General Motors Corporation, 30009 Van Dyke Avenue, Warren, Michigan 48090-9025 (Attn: Warren Command Center, Mailcode 480-206-114); (ii) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (iii) the U.S. Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn: Matthew Feldman, Esq.); (iv) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the attorneys for the Creditors Committee; (vi) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); and (vii) the Office of the United States Trustee for the Southern District of New York (Attn: Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004.

- Unless a Contract Objection is filed and served before the Contract Objection Deadline, the Non-Debtor Counterparty shall be deemed to have consented to the assumption and assignment of its respective Assumable Executory Contract and the respective Cure Amount and shall be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts against the Sellers, their estates, or the Purchaser.

Procedures for Resolving Objections

- If a timely Contract Objection is filed solely as to the Cure Amount (a "Cure Objection"), then the Assumable Executory Contract shall nevertheless be assumed and assigned to the Purchaser on the Assumption Effective Date, the Purchaser shall pay the undisputed portion of the Cure Amount on or as soon as reasonably practicable after the Assumption Effective Date, and the disputed portion of the Cure Amount shall be determined as follows and paid as soon as reasonably practicable

following resolution of such disputed Cure Amount: To resolve the Cure Objection, the Debtors, the Purchaser, and the objecting Non-Debtor Counterparty may meet and confer in good faith to attempt to resolve any such objection without Court intervention. A call center has been established by the Debtors for this purpose. If the Debtors determine that the Cure Objection cannot be resolved without judicial intervention, then the Cure Amount will be determined as follows: (a) with respect to Assumable Executory Contracts pursuant to which the non-Debtor counterparty has agreed to an alternative dispute resolution procedure, then, according to such procedure; and (b) with respect to all other Assumable Executory Contracts, by the Court at the discretion of the Debtors either at the Sale Hearing or such other date as determined by the Court.

- If a timely Contract Objection is filed that objects to the assumption and assignment on a basis other than the Cure Amount, the Debtors, the Purchaser, and the objecting Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention. If the Debtors determine that the objection cannot be resolved without judicial intervention, then, at the discretion of the Sellers and the Purchaser, the objection shall be determined by the Court at the Sale Hearing or such other date as determined by the Court. If the Court determines at such hearing that the Assumable Executory Contract should not be assumed and assigned, then such Executory Contract or Lease shall no longer be considered an Assumable Executory Contract.

- If the Debtors, the Purchaser, and the non-Debtor Counterparty resolve any Contract Objection, they shall enter into a written stipulation (the "Assumption Resolution Stipulation"), which stipulation is not required to be filed with or approved by the Court.

Effective Date of Assumption

- All Assumable Executory Contracts will be assumed and assigned to the Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the Proposed Assumption Effective Date and (ii) the Assumption Resolution Date (as defined below). The "Assumption Resolution Date" shall be, (i) if no Contract Objection has been filed on or prior to the Contract Objection Deadline or the only Contract Objection that has been filed on or prior to the Contract Objection Deadline is a Cure Objection, the business day after the Contract Objection Deadline, or (ii) if a Contract Objection other than a Cure Objection has been filed on or prior to the Contract Objection Deadline, the date of the Assumption Resolution Stipulation or the date of a Court order authorizing the assumption and assignment to the Purchaser of the Assumable Executory Contract.

- Contingent upon the approval of the 363 Transaction and concurrently with the consummation of the 363 Transaction (without prejudice to the conditions set forth in the MPA), (i) the UAW Collective Bargaining Agreement shall be deemed to be an Assumable Executory Contract as to which the Assumption and Assignment Notice need not be sent and which will not be listed on the Schedule or the Contract Website (ii) the Debtors shall assume and assign the UAW Collective Bargaining Agreement

to the Purchaser as of the Closing Date, and each non-Debtor party to the UAW
Collective Bargaining Agreement shall be deemed to have consented to such
assumption and assignment.

11.    Except as otherwise provided in paragraph 10 hereof with respect to

Assumable Executory Contracts, in order to be considered, an objection to the 363 Transaction

(or for UAW-Represented Retirees, the UAW Retiree Settlement Agreement), must be filed with

the Court and served upon the following so as to be received by the Objection Deadline: (i)

Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New

York 10153 (Attn:  Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky,

Esq.); (ii) the Debtors, c/o General Motors Corporation, 300 Renaissance Center, Detroit,

Michigan 48265 (Attn:  Lawrence S. Buonomo, Esq.); (iii) Cadwalader, Wickersham & Taft

LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281

(Attn:  John J. Rapisardi, Esq.); (iv) the U.S. Treasury, 1500 Pennsylvania Avenue NW, Room

2312, Washington, D.C. 20220 (Attn:  Matthew Feldman, Esq.); (v) Vedder Price, P.C.,

attorneys for EDC, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael J.

Edelman, Esq. and Michael L. Schein, Esq.); (vi) the attorneys for the Creditors Committee; (vii)

the UAW, 8000 East Jefferson Avenue, Detroit, Michigan 48214 (Attn:  Daniel W. Sherrick,

Esq.); (viii) Cleary Gottlieb Steen & Hamilton LLP, attorneys for the UAW, One Liberty Plaza,

New York, New York 10006 (Attn: James L. Bromley, Esq.); (xi) Cohen, Weiss and Simon

LLP, attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036 (Attn:  Babette

Ceccotti, Esq.); (xii) the Office of the United States Trustee for the Southern District of New

York (Attn:  Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York

10004; and (xiii) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New

York, New York 10007 (Attn:  David S. Jones, Esq. and Matthew L. Schwartz, Esq.).  Contract

Objections and Cure Objections must be filed and served in accordance with the procedure set forth in paragraph 10 herein.

12.     The failure of any objecting person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, to the consummation and performance of the 363 Transaction contemplated by the MPA or a Participation Agreement, if any (including the transfer free and clear of all liens, claims, encumbrances, and interests, including rights or claims based on any successor or transferee liability, of each of the Purchased Assets transferred as part of the 363 Transaction), the approval of the UAW Retiree Settlement Agreement, or the assumption and assignment of any Executory Contract or Lease.

13.     The U.S. Trustee is directed to appoint a Consumer Privacy Ombudsman pursuant to sections 332 and 363(b)(1) of the Bankruptcy Code as soon as practicable.

14.     Notwithstanding any possible applicability of Bankruptcy Rules 6004 or 6006, or otherwise, the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

15.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to this Order.

Dated: New York, York
      June [__] 2009

                                 _____

                                   United States Bankruptcy Judge

## EXHIBIT A

### SALE PROCEDURES

## SALE PROCEDURES

By motion dated June 1, 2009 (the "Motion"), General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"), sought, among other things, approval of the process and procedures through which it will determine the highest or otherwise best price for the purchase of substantially all the assets (the "Purchased Assets") of the Debtors (the "Sellers"). On June 2, 2009, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "Sale Procedures Order"), which, among other things, authorized the Debtors to determine the highest or otherwise best price for the Purchased Assets through the process and procedures set forth below (the "Sale Procedures").

On June 30, 2009, as further described below, in the Motion, and in the Sale Procedures Order, the Bankruptcy Court shall conduct a hearing (the "Sale Hearing"), at which the Debtors shall seek entry of an order (the "Sale Order") authorizing and approving the sale of the Purchased Assets (the "363 Transaction") pursuant to either (i) that certain Master Sale and Purchase Agreement (the "MPA") between the Sellers and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury"), substantially in the form annexed as Exhibit "A" to the Motion, or (ii) a different Successful Bid (as defined below).

### Participation Requirements

In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in purchasing the Purchased Assets (a "Potential Bidder") must first deliver the following materials to the Debtors (with a copy to the Purchaser):

(i) An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors; and

(ii) The most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of the 363 Transaction, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors, and (y) a written commitment acceptable to the Debtors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the 363 Transaction.

A "Qualified Bidder" is a Potential Bidder whose Financials (or the Financials of its equity holder(s), if applicable) demonstrate the financial capability to consummate the 363 Transaction, whose bid meets all of the Bid Requirements described below *and* that the Debtors, in their discretion but after consulting with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), and the statutory committee of unsecured creditors appointed in these chapter 11 cases (the "Creditors Committee") determine is likely to consummate the 363 Transaction, if selected as the Successful Bidder, after taking into account all relevant legal, regulatory, and business considerations. The Purchaser is a Qualified Bidder and is not required to make a Good Faith Deposit (as defined below).

Within two (2) business days after the Debtors and the Purchaser receive from a Potential Bidder all the materials required by subparagraphs (i) and (ii) above, the Debtors shall determine, in consultation with their advisors, the UAW, and the Creditors Committee, and shall notify the Purchaser and the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder.

## Obtaining Due Diligence Access

To obtain due diligence access or additional information regarding the Purchased Assets or the Sellers, a Qualified Bidder (other than the Purchaser) must first provide the Debtors with a written nonbinding expression of interest (the "Expression of Interest") regarding (i) the Qualified Bidder's proposed 363 Transaction, (ii) the purchase price range, (iii) the structure and financing of the 363 Transaction, (iv) any conditions to closing that it may wish to impose, and (v) the nature and extent of additional due diligence it may wish to conduct. If the Debtors, in their business judgment, determine that a Qualified Bidder that has submitted an Expression of Interest is reasonably likely to make a bona fide offer that would result in greater value being received for the benefit of the Sellers' estates than under the MPA (a "Qualifying Expression of Interest"), then the Debtors shall afford such Qualified Bidder reasonable due diligence, including the ability to access information from a confidential electronic data room concerning the Purchased Assets (the "Data Room").

Neither the Debtors nor any of their affiliates (or any of their respective representatives) are obligated to furnish any information relating to the Sellers, the Purchased Assets, and/or the 363 Transaction to any person except to the Purchaser or another Qualified Bidder who makes a Qualifying Expression of Interest. The Debtors shall give the Purchaser any confidential memoranda (the "Confidential Memoranda") containing information and financial data with respect to the Purchased Assets and access to all due diligence information provided to any other Qualified Bidder.

The Debtors shall coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. If the Debtors determine that due diligence material requested by a Qualified Bidder is reasonable and appropriate under the circumstances, but such material has not previously been provided to any other Qualified Bidder, the Debtors shall post such materials in the Data Room and provide notification of such posting by electronic transmission to the Qualified Bidders and not previously provided to the Purchaser.

Unless the Debtors determine otherwise, the availability of additional due diligence to a Qualified Bidder will cease after the Bid Deadline (as defined below).

## Bid Deadline

**The deadline for submitting bids by a Qualified Bidder shall be June 22, 2009, at 5:00 p.m. (Eastern Time) (the "Bid Deadline")**

Prior to the Bid Deadline, a Qualified Bidder that desires to make a bid shall deliver (i) one written copy of its bid and (ii) two copies of the MPA that has been marked to show amendments and modifications to the MPA, including price and terms, that are being

proposed by the Qualified Bidder (a "Marked Agreement"), to (a) the Debtors, c/o General
Motors Corporation, 300 Renaissance Center, Detroit, Michigan 48265 (Attn: Lawrence S.
Buonomo, Esq.), (b) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue,
New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph
H. Smolinsky, Esq.); (c) the U.S. Treasury, 1500 Pennsylvania Avenue NW, Room 2312,
Washington, D.C. 20220 (Attn: Matthew Feldman, Esq.); (d) Cadwalader, Wickersham & Taft
LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281
(Attn: John J. Rapisardi, Esq.); (e) the attorneys for the Creditors Committee; (f) the
International Union, United Automobile, Aerospace and Agricultural Implement Workers of
America (the "UAW"), 8000 East Jefferson Avenue, Detroit, Michigan 48214 (Attn: Daniel W.
Sherrick, Esq.); (g) Cleary Gottlieb Steen & Hamilton LLP, the attorneys for the UAW, One
Liberty Plaza, New York, New York 10006 (Attn: James L. Bromely, Esq.); (h) Cohen, Weiss
and Simon LLP, the attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036
(Attn: Babette Ceccotti, Esq.); (i) Vedder Price, P.C., attorneys for Export Development Canada,
1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and
Michael L. Schein, Esq.)

## Due Diligence from Bidders

The Debtors and their advisors shall be entitled to due diligence from a Qualified
Bidder, upon execution of a confidentiality agreement that is reasonably satisfactory to the
Debtors. Each Qualified Bidder shall comply with all reasonable requests for additional
information and due diligence access by the Debtors or their advisors. Failure of a Qualified
Bidder to fully comply with requests for additional information and due diligence access will be
a basis for the Debtors to determine that a bid made by the Qualified Bidder is not a Qualified
Bid.

## Bid Requirements

A bid must be a written irrevocable offer from a Qualified Bidder (i) stating that
the Qualified Bidder offers to consummate a 363 Transaction pursuant to the Marked
Agreement, (ii) confirming that the offer shall remain open until the closing of a 363 Transaction
to the Successful Bidder (as defined below), (iii) enclosing a copy of the Marked Agreement, and
(iv) including a certified or bank check, or wire transfer, in the amount of $500 million to be held
in escrow as a good-faith deposit (the "Good Faith Deposit").

In addition to the foregoing requirements, a bid or bids must:

(a) provide that the Qualified Bidder (i) agrees to the assumption by the Debtors
and assignment to such Qualified Bidder of any collective bargaining agreements
entered into by and between the Debtors and the UAW with the exception of (a)
the agreement to provide certain retiree medical benefits specified in the
Memorandum of Understanding Post-Retirement Medical Care, dated September
26, 2007, between the Company and the UAW; and (b) the Settlement
Agreement, dated February 21, 2008, between the Company and the UAW, and
(ii) will enter into the UAW Retiree Settlement Agreement;

(b) be on terms that are not materially more burdensome or conditional than the terms of the MPA;

(c) not be conditioned on obtaining financing or the outcome of unperformed due diligence by the bidder;

(d) not request or entitle the bidder to any breakup fee, expense reimbursement, or similar type of payment; and

(e) fully disclose the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

A timely bid received from a Qualified Bidder and that meets the requirements set forth above (the "Bid Requirements") will be considered a Qualified Bid if the Debtors, in consultation with their advisors, the UAW, and the Creditors Committee, reasonably believe that such bid would be consummated if selected as the Successful Bid (as defined below). For all purposes hereof, the Purchaser's offer to acquire the Purchased Assets pursuant to the MPA shall constitute a Qualified Bid.

### Acceptance of Qualified Bids

The Debtors shall present to the Bankruptcy Court at the Sale Hearing the Qualified Bid that the Debtors, in their business judgment, determine, in consultation with their advisors, the UAW, and the Creditors Committee, would provide the highest or best offer for the Purchased Assets and is in the best interests of the Debtors and their estates in the Debtors' chapter 11 cases (the "Successful Bid," and the bidder with respect thereto, the "Successful Bidder"). At the Sale Hearing, certain findings will be sought from the Bankruptcy Court, including that (i) the Successful Bidder was selected in accordance with these Bidding Procedures, and (ii) consummation of the 363 Transaction as contemplated by the Successful Bid will provide the highest or otherwise best value for the Purchased Assets and is in the best interests of the Sellers and their estates in these chapter 11 cases.

In the event that, for any reason, the Successful Bidder fails to close the 363 Transaction contemplated by its Successful Bid, then, without notice to any other party or further Bankruptcy Court order, the Debtors shall be authorized to close with the Qualified Bidder that submitted the bid that the Debtors in their business judgment determined, in consultation with their advisors, the UAW, and the Creditors Committee, would provide the next highest or otherwise best value for the Purchased Assets and is otherwise in the best interests of the Debtors after the Successful Bid (the "Next Highest Bidder").

### Return of Good Faith Deposit

Except as otherwise provided in this paragraph with respect to the Successful Bidder and the Next Highest Bidder, the Good Faith Deposits of all Qualified Bidders required to submit such a deposit under the Bidding Procedures shall be returned upon or within one (1) business day after entry of the Sale Order. The Good Faith Deposit of the Successful Bidder required to submit such a deposit under the Bidding Procedures shall be held until the closing of

the 363 Transaction and applied in accordance with the Successful Bid.  The Good Faith Deposit of the Next Highest Bidder shall be retained in escrow until 48 hours after the closing of the 363 Transaction.  Pending the closing of the 363 Transaction, the Good Faith Deposit of the Successful Bidder and the Next Highest Bidder shall be maintained in an interest-bearing escrow account.  If the closing does not occur, the disposition of Good Faith Deposits shall be as provided in the Successful Bid and Next Highest Bid, as applicable.

## EXHIBIT B

### FORM OF SALE NOTICE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                        :
In re                                   :    Chapter 11 Case No.
                                        :
GENERAL MOTORS CORP., *et al.*,         :    09-50026 (REG)
                                        :
                    Debtors.            :    (Jointly Administered)
                                        :
---------------------------------------------------------------x

### NOTICE OF SALE HEARING TO SELL SUBSTANTIALLY ALL OF DEBTORS' ASSETS PURSUANT TO MASTER SALE AND PURCHASE AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED PURCHASER

PLEASE TAKE NOTICE THAT upon the motion (the "Motion"), of General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"), dated June 1, 2009, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has issued an order dated June 2, 2009 (the "Sale Procedures Order"), among other things, (i) scheduling a hearing (the "Sale Hearing") to approve (a) the Master Sale and Purchase Agreement, dated as of June 1, 2009 (the "MPA"), by and among GM and its Debtor subsidiaries (collectively, the "Sellers") and Vehicle Acquisition Holdings LLC. (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury"), with respect to the sale of substantially all the Debtors' assets (the "Purchased Assets") free and clear of all liens, claims, encumbrances, and other interests, and subject to higher or better offers (the "363 Transaction"); (b) the assumption, assignment, and sale to the Purchaser pursuant to the MPA of certain executory contracts and unexpired leases of personal property and nonresidential real property (the "Assumable Executory Contracts"); and (c) the settlement agreement (the "UAW Retiree Settlement Agreement"), between the Purchaser and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"); (ii) approving certain procedures for the submission and acceptance of any competing bids (the "Sale Procedures"); (iii) approving a procedure for the assumption, assignment, and sale to the Purchaser pursuant to the MPA of the Assumable Executory Contracts; (iv) approving the form and manner of notice of the Motion and the relief requested therein and of the Sale Hearing; and (v) setting a deadline for the filing of objections, if any, to the relief requested in the Motion.

A.    THE MASTER SALE AND PURCHASE AGREEMENT

The total consideration under the MPA for the sale of the Purchased Assets is equal to the sum of (i) a credit bid in the amount of the outstanding indebtedness owed to the Purchaser as of the closing pursuant to certain secured loans extended by the U.S. Treasury and Export Development Canada, less approximately $8 billion (estimated to be approximately $48.3 billion at July 31, 2009); (ii) the surrender of a warrant to purchase GM shares previously issued to the U.S. Treasury in connection with the secured loans extended by the U.S. Treasury; (iii) the

issuance to GM of shares of common stock of the Purchaser representing approximately 10% of the common stock of the Purchaser as of the closing of the sale; (iv) the issuance to GM of warrants to purchase up to 15% of the shares of common stock of the Purchaser on a fully diluted basis, with one half exercisable at any time prior to the seventh anniversary of issuance at an initial exercise price based on a $15 billion equity value of the Purchaser and the other half exercisable at any time prior to the tenth anniversary of issuance at an initial exercise price based on a $30 billion equity value of the Purchaser (GM can elect partial and cashless exercises of the warrants); and (v) the assumption by the Purchaser of certain assumed liabilities, all as set forth more fully in the MPA, a copy of which is annexed to the Motion as Exhibit "A." In addition, if the aggregate amount of allowed general unsecured claims against the Debtors exceeds $35 billion, as estimated by an order of the Bankruptcy Court (which the Debtors may seek at any time), GM will receive an additional 2% of the common stock of the Purchaser as of the closing of the sale.

B.     THE SALE HEARING

        The Sale Hearing will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in Courtroom 621 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, on June 30, 2009, at 9:45 a.m. (Eastern Time). The Sale Hearing may be adjourned without notice by an announcement of the adjourned date at the Sale Hearing.

        **RESPONSES OR OBJECTIONS, IF ANY, TO THE RELIEF SOUGHT IN THE MOTION SHALL BE FILED** with the Clerk of the Bankruptcy Court and served upon: (a) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (b) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (c) the attorneys for the Creditors Committee; (d) Cleary Gottlieb Steen & Hamilton LLP, the attorneys for the UAW, One Liberty Plaza, New York, New York 10006 (Attn: James L. Bromley, Esq.); (e) Cohen, Weiss and Simon LLP, the attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036 (Attn: Babette Ceccotti, Esq.); (f) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (g) the Office of the United States Trustee for the Southern District of New York (Attn: Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004; and (h) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz, Esq.), **SO AS TO BE RECEIVED NO LATER THAN JUNE 19, 2009, AT 5:00 P.M. (EASTERN TIME) (the "Objection Deadline")**.

        The failure of any person or entity to file a response or objection on or before the Objection Deadline shall be deemed a consent to the 363 Transaction and the other relief requested in the Motion, and shall bar the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Procedures, the Motion, the 363 Transaction, the approval of the UAW Retiree Settlement Agreement, and the Debtors' consummation of the 363 Transaction.

C.     COPIES OF THE MOTION AND SALE PROCEDURES ORDER

This Notice provides only a partial summary of the relief sought in the Motion and the terms of the Sale Procedures Order.  Copies of the Motion, the MPA (excluding certain commercially sensitive information), and Sale Procedures Order are available for inspection (i) by accessing (a) the website of the Bankruptcy Court at http://www.nysb.uscourts.gov, or (b) the website of the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com or (ii) by visiting the Office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408.  Copies also may be obtained by faxing a written request to the attorneys for the Debtors, Weil, Gotshal & Manges LLP (Attn:  Russell Brooks, Esq.) at 212-310-8007.

Dated:  New York, New York
      June 2, 2009

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone: (212) 310-8000
                    Facsimile: (212) 310-8007

                    Attorneys for Debtors
                    and Debtors in Possession

## EXHIBIT C

### FORM OF PUBLICATION NOTICE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                   :

In re                            :        Chapter 11 Case No.
                                    :

GENERAL MOTORS CORP., *et al.*,   :        09-50026 (REG)
                                    :

                 Debtors.       :        (Jointly Administered)
                                    :
---------------------------------------------------------x

## NOTICE OF SALE HEARING TO SELL SUBSTANTIALLY ALL OF DEBTORS' ASSETS PURSUANT TO MASTER SALE AND PURCHASE AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED PURCHASER

            PLEASE TAKE NOTICE THAT upon the motion (the "Motion"), of General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"), dated June 1, 2009, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has issued an order dated June 2, 2009 (the "Sale Procedures Order"), among other things, (i) scheduling a hearing (the "Sale Hearing") to approve (a) the Master Sale and Purchase Agreement, dated as of June 1, 2009 (the "MPA"), by and among GM and its Debtor subsidiaries (collectively, the "Sellers") and Vehicle Acquisition Holdings LLC. (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury"), with respect to the sale of substantially all the Debtors' assets (the "Purchased Assets") free and clear of all liens, claims, encumbrances, and other interests, and subject to higher or better offers (the "363 Transaction"); (b) the assumption, assignment, and sale to the Purchaser pursuant to the MPA of certain executory contracts and unexpired leases of personal property and nonresidential real property (the "Assumable Executory Contracts"); and (c) the settlement agreement (the "UAW Retiree Settlement Agreement"), between the Purchaser and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"); (ii) approving certain procedures for the submission and acceptance of any competing bids (the "Sale Procedures"); (iii) approving a procedure for the assumption, assignment, and sale to the Purchaser pursuant to the MPA of the Assumable Executory Contracts; (iv) approving the form and manner of notice of the Motion and the relief requested therein and of the Sale Hearing; and (v) setting a deadline for the filing of objections, if any, to the relief requested in the Motion.

## A.     THE MASTER SALE AND PURCHASE AGREEMENT

            The total consideration under the MPA for the sale of the Purchased Assets is equal to the sum of (i) a credit bid in the amount of the outstanding indebtedness owed to the Purchaser as of the closing pursuant to certain secured loans extended by the U.S. Treasury and Export Development Canada, less approximately $8 billion (estimated to be approximately $48.3 billion at July 31, 2009); (ii) the surrender of a warrant to purchase GM shares previously issued to the U.S. Treasury in connection with the secured loans extended by the U.S. Treasury; (iii) the

issuance to GM of shares of common stock of the Purchaser representing approximately 10% of the common stock of the Purchaser as of the closing of the sale; (iv) the issuance to GM of warrants to purchase up to 15% of the shares of common stock of the Purchaser on a fully diluted basis, with one half exercisable at any time prior to the seventh anniversary of issuance at an initial exercise price based on a $15 billion equity value of the Purchaser and the other half exercisable at any time prior to the tenth anniversary of issuance at an initial exercise price based on a $30 billion equity value of the Purchaser (GM can elect partial and cashless exercises of the warrants); and (v) the assumption by the Purchaser of certain assumed liabilities, all as set forth more fully in the MPA, a copy of which is annexed to the Motion as Exhibit "A." In addition, if the aggregate amount of allowed general unsecured claims against the Debtors exceeds $35 billion, as estimated by an order of the Bankruptcy Court (which the Debtors may seek at any time), GM will receive an additional 2% of the common stock of the Purchaser as of the closing of the sale.

## B.    THE SALE HEARING

The Sale Hearing will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in Courtroom 621 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, on June 30, 2009, at 9:45 a.m. (Eastern Time). The Sale Hearing may be adjourned without notice by an announcement of the adjourned date at the Sale Hearing.

**RESPONSES OR OBJECTIONS, IF ANY, TO THE RELIEF SOUGHT IN THE MOTION SHALL BE FILED** with the Clerk of the Bankruptcy Court and served upon: (a) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (b) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (c) the attorneys for the Creditors Committee; (d) Cleary Gottlieb Steen & Hamilton LLP, the attorneys for the UAW, One Liberty Plaza, New York, New York 10006 (Attn: James L. Bromley, Esq.); (e) Cohen, Weiss and Simon LLP, the attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036 (Attn: Babette Ceccotti, Esq.); (f) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (g) the Office of the United States Trustee for the Southern District of New York (Attn: Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004; and (h) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz, Esq.), **SO AS TO BE RECEIVED NO LATER THAN JUNE 19, 2009, AT 5:00 P.M. (EASTERN TIME) (the "Objection Deadline").**

The failure of any person or entity to file a response or objection on or before the Objection Deadline shall be deemed a consent to the 363 Transaction and the other relief requested in the Motion, and shall bar the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Procedures, the Motion, the 363 Transaction, the approval of the UAW Retiree Settlement Agreement, and the Debtors' consummation of the 363 Transaction.

## C.    COPIES OF THE MOTION AND SALE PROCEDURES ORDER

This Notice provides only a partial summary of the relief sought in the Motion and the terms of the Sale Procedures Order. Copies of the Motion, the MPA (excluding certain commercially sensitive information), and Sale Procedures Order are available for inspection (i) by accessing (a) the website of the Bankruptcy Court at http://www.nysb.uscourts.gov, or (b) the website of the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com or (ii) by visiting the Office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408. Copies also may be obtained by faxing a written request to the attorneys for the Debtors, Weil, Gotshal & Manges LLP (Attn: Russell Brooks, Esq.) at 212-310-8007.

BY ORDER OF THE COURT

Dated: New York, New York
     June 2, 2009

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## EXHIBIT D

### FORM OF ASSUMPTION AND ASSIGNMENT NOTICE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                :

**In re**                  :           **Chapter 11 Case No.**
                :

**GENERAL MOTORS CORP.,** *et al.,*    :          **09-50026 (REG)**
                :

             **Debtors.**    :          **(Jointly Administered)**
                :

-------------------------------------------------------x

## NOTICE OF (I) DEBTORS' INTENT TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS, UNEXPIRED LEASES OF PERSONAL PROPERTY, AND UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY AND (II) CURE AMOUNTS RELATED THERETO

PLEASE TAKE NOTICE THAT:

       1.      By motion dated June 1, 2009 (the "Motion"), General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"),[1] sought, among other things, authorization and approval of (a) the sale of substantially all the Debtors' assets pursuant to that certain Master Sale and Purchase Agreement and related agreements (the "MPA") among the Debtors (the "Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury") (the "363 Transaction"), free and clear of liens, claims, encumbrances, and interests, (b) certain proposed procedures to govern the sale process and provide for the submission of any competing bids for substantially all the Debtors' assets (the "Sale Procedures"), (c) the assumption and assignment of certain executory contracts (the "Contracts") and unexpired leases of personal property and of nonresidential real property (collectively, the "Leases") in connection with the 363 Transaction, (d) that certain settlement agreement between the Purchaser and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") to be executed at the closing of the 363 Transaction (the "UAW Retiree Settlement Agreement"), and (e) scheduling a final hearing for approval of the 363 Transaction (the "Sale Hearing").[2]

---

[1] The Debtors and their respective Tax ID numbers are as follows: General Motors Corporation, Tax ID No. 38-0572515; Saturn, LLC, Tax ID No. 38-2577506; Saturn Distribution Corporation, Tax ID No. 38-2755764; and Chevrolet-Saturn of Harlem, Inc., Tax ID No. 20-1426707.

[2] Copies of the Motion and the MPA (without certain commercially sensitive attachments) may be obtained by accessing the website established by the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com.

2.      The MPA, which, together with certain ancillary agreements,
contemplates a set of related transactions for the sale of substantially all the Debtors' assets,
defined as the "Purchased Assets" in Section 2.2(a) of the MPA, including certain Contracts and
Leases, subject to higher or better offers.

3.      The MPA contemplates, and the proposed order approving the Motion (the
"Sale Order"), if approved, shall authorize the assumption and assignment to the Purchaser of
certain Contracts and Leases pursuant to section 365 of title 11, United States Code (the
"Bankruptcy Code"). The Sellers maintain a schedule containing Contracts and Leases that the
Debtors may assume and assign to the Purchaser (collectively, the "Assumable Executory
Contracts"). You are receiving this Notice because you are a party to one or more of the
Assumable Executory Contracts.

4.      **THE SCHEDULE CONTAINS A LIST OF ASSUMABLE
EXECUTORY CONTRACTS THAT MAY BE ASSUMED. THE PURCHASER
RESERVES THE RIGHT UNDER THE MPA TO EXCLUDE ANY ASSUMABLE
EXECUTORY CONTRACT FROM THE LIST OF ASSUMABLE EXECUTORY
CONTRACTS TO BE ASSUMED AND ASSIGNED BY NO LATER THAN THE
DESIGNATION DEADLINE DISCUSSED IN PARAGRAPH 10 BELOW.**

5.      The Debtors maintain a secure website which contains information about
your Assumable Executory Contracts, including amounts that the Debtors believe must be paid
to cure all prepetition defaults under the respective contracts as of the Commencement Date in
accordance with section 365(b) of the Bankruptcy Code (the "Cure Amounts"). In order to view
the Cure Amount for the Assumable Executory Contract to which you are a party, you must log
onto http://www.contractnotices.com (the "Contract Website"). To log on, please use the user
name and password provided to you with this notice. The username and password will enable
you to access the Cure Amount for the particular Assumable Executory Contract to which you
are a party.

6.      Please review the Cure Amount for your Assumable Executory Contract.
In some instances, additional terms or conditions of assumption and assignment with respect to a
particular Assumable Executory Contract is provided on the Contract Website.

7.      Objections, if any, to the proposed assumption and assignment of the
Assumable Executory Contracts (the "Contract Objections"), including objections to the Cure
Amount, must be made in writing and filed with the United States Bankruptcy Court for the
Southern District of New York (the "Bankruptcy Court") so as to be received **no later than ten
(10) days after the date of this Notice** (the "Objection Deadline") by (i) the Debtors, c/o
General Motors Corporation, Cadillac Building, 30009 Van Dyke Avenue, Warren, Michigan
48090-9025 (Attn: Warren Command Center, Mailcode 480-206-114); (ii) Weil, Gotshal &
Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn:
Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (iii) the U.S.
Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn:
Matthew Feldman, Esq.); (iv) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser,
One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v)
the attorneys for the Creditors Committee; (vi) Vedder Price, P.C., attorneys for Export
Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael

J. Edelman, Esq. and Michael L. Schein, Esq.); and (vii) the Office of the United States Trustee
for the Southern District of New York (Attn: Diana G. Adams, Esq.), 33 Whitehall Street, 21st
Floor, New York, New York 10004.

8.    If a timely Contract Objection is filed solely as to the Cure Amount (a
"Cure Objection"), then the Assumable Executory Contract shall nevertheless be assumed and
assigned to the Purchaser on the Assumption Effective Date (as hereinafter defined), the
Purchaser shall pay the undisputed portion of the Cure Amount on or as soon as reasonably
practicable after the Assumption Effective Date, and the disputed portion of the Cure Amount
shall be determined as follows and paid as soon as reasonably practicable following resolution of
such disputed Cure Amount: To resolve the Cure Objection, the Debtors, the Purchaser, and the
objecting non-Debtor counterparty to the Assumable Executory Contract (the "Non-Debtor
Counterparty") may meet and confer in good faith to attempt to resolve any such objection
without Court intervention. The Call Center (as defined in paragraph 19) has been established by
the Debtors for this purpose. If the Debtors determine that the Cure Objection cannot be
resolved without judicial intervention, then the Cure Amount will be determined as follows: (a)
with respect to Assumable Executory Contracts pursuant to which the non-Debtor counterparty
has agreed to an alternative dispute resolution procedure, then, according to such procedure; and
(b) with respect to all other Assumable Executory Contracts, by the Court at the discretion of the
Debtors either at the Sale Hearing or such other date as determined by the Court.

9.    If a timely Contract Objection is filed that objects to the assumption and
assignment on a basis other than the Cure Amount, the Debtors, the Purchaser, and the objecting
Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such
objection without Court intervention. If the Debtors determine that the objection cannot be
resolved without judicial intervention, then, at the discretion of the Sellers and the Purchaser, the
objection shall be determined by the Court at the Sale Hearing or such other date as determined
by the Court. If the Court determines at such hearing that the Assumable Executory Contract
should not be assumed and assigned, then such Executory Contract or Lease shall no longer be
considered an Assumable Executory Contract.

10.    If the Debtors, the Purchaser, and the Non-Debtor Counterparty resolve
any Contract Objection, they shall enter into a written stipulation (the "Assumption Resolution
Stipulation"), which stipulation is not required to be filed with or approved by the Court.

11.    If you agree with the respective Cure Amount(s) listed in the Contract
Website with respect to your Assumable Executory Contract(s), and otherwise do not object to
the Debtors' assumption and assignment of your Assumable Executory Contract, you are not
required to take any further action.

12.    Unless an Objection is filed and served before the Objection Deadline, you
shall be deemed to have consented to the assumption and assignment of your Assumable
Executory Contract and the Cure Amount(s) for your Assumable Executory Contract(s), and you
shall be forever barred from objecting to the Cure Amount and from asserting any additional
cure or other amounts against the Debtors, their estates, or the Purchaser.

13.    Up to the date that is thirty (30) days following the closing of the 363
Transaction, or if such date is not a Business Day (as defined in the MPA), the next Business

Day, or such other later date as mutually agreed upon by the Purchaser and the Debtors (the "Designation Deadline"), the Purchaser may, in its sole discretion, subject to certain limitations specified in the MPA (applicable only as between the parties thereto), exclude any of the Assumable Executory Contracts by providing notice on the Contract Website. Upon such designation, the Contract or Lease referenced therein shall no longer be considered a Assumable Executory Contract, shall not be deemed to be, or to have been, assumed or assigned, and shall remain subject to assumption, rejection, or assignment by the Debtors. Until the Designation Deadline, the Purchaser also may, subject to certain limitations specified in the MPA (applicable only as between the parties thereto) designate additional Contracts or Leases as Assumable Executory Contracts to be assumed and assigned by providing notice to the affected Non-Debtor Counterparties. The Contract Website shall be updated from time to time to reflect the then current status of your contract as well as the proposed effective date (the "Proposed Assumption Effective Date"), if any, of the assumption and assignment of particular contracts.

14.    The Debtors' decision to assume and assign the Assumable Executory Contracts is subject to Bankruptcy Court approval and consummation of the 363 Transaction, and, absent such consummation, each of the Assumable Executory Contracts will not be assumed or assigned to the Purchaser and shall in all respects be subject to further administration under the Bankruptcy Code. All Assumable Executory Contracts will be assumed and assigned to the Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the Proposed Assumption Effective Date and (ii) the date following expiration of the Objection Deadline if no Contract Objection, other than to the Cure Amount, has been timely filed, or, if a Contract Objection, other than to the Cure Amount, has been filed the date of the Assumption Resolution Stipulation or the date of a Bankruptcy Court order authorizing the assumption and assignment to the Purchaser of the Assumable Executory Contract. Until the Assumption Effective Date, assumption and assignment thereof is subject to the Purchaser's rights to modify the designation of Assumable Executory Contracts as set forth in paragraph 13 above. Except as otherwise provided by the MPA, the Purchaser shall have no rights in and to a particular Assumable Executory Contract the Assumption Effective Date.

15.    The inclusion of any document on the list of Assumable Executory Contracts shall not constitute or deemed to be a determination or admission by the Debtors or the Purchaser that such document is, in fact, an executory contract or Lease within the meaning of the Bankruptcy Code, and all rights with respect thereto are expressly reserved.

16.    Any Contract Objection shall not constitute an objection to the relief generally requested in the Motion (e.g., the sale of the Purchased Assets by the Debtors to the Purchaser free and clear of liens, claims, encumbrances, and interests), and parties wishing to object to the relief generally requested in the Motion must file and serve a separate objection in accordance with the procedures approved and set forth in the order of the Bankruptcy Court approving the Sale Procedures.

17.    If a party other than the Purchaser is determined to be the highest and best bidder for the assets to be sold pursuant to the 363 Transaction, you will receive a separate notice providing additional information regarding the treatment of your contract(s) or Lease(s); *provided, however*, that if the applicable Cure Amount has been established pursuant to the procedures set forth in this Notice, it shall not be subject to further dispute if the new purchaser seeks to acquire such contract or Lease.

18.    This Notice is subject to the full terms and conditions of the Motion, the order of the Bankruptcy Court approving the Sale Procedures, and the Assumption and Assignment Procedures set forth in the order approving the Sale Procedures, which shall control in the event of any conflict.  The Debtors encourage parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

19.    If you have questions about the Assumable Executory Contracts or proposed Cure Amounts, you may call 1-888-409-2329 (in the United States) or 1-586-947-3000 (outside the United States) (the "Call Center").

Dated: New York, New York
     June 2, 2009

                _____

                Harvey R. Miller
                Stephen Karotkin
                Joseph H. Smolinsky

                WEIL, GOTSHAL & MANGES LLP
                767 Fifth Avenue
                New York, New York 10153
                Telephone: (212) 310-8000
                Facsimile: (212) 310-8007

                Attorneys for Debtors
                and Debtors in Possession

## EXHIBIT E

### FORM OF UAW RETIREE NOTICE

### A Message to UAW GM Retirees

Dear Brothers and Sisters,

As we all know, GM is engulfed in a severe crisis. GM's staggering losses during 2008 and 2009 have forced the company to file for bankruptcy. The Company has also been forced to rely on loans from the federal government in order to maintain its operations. In this environment, we are fighting every day to preserve and protect to the greatest extent possible our hard-won gains, particularly for the retirees, and surviving spouses of retirees, who helped build this industry with your years of loyal service.

Last December, after a lengthy process that included congressional hearings and petitioning the White House, the federal government granted GM a short-term emergency operating loan in order to avoid an immediate liquidation of the company at that time. As part of that loan, GM was required to submit a restructuring plan to the Treasury Department by February 17, 2009. On March 30, President Obama announced that the company's February 17 plan didn't go far enough in reducing costs and laying the groundwork for sustainability. He said GM would have to identify additional cost savings and debt reductions if GM were to receive additional financial support. The Treasury Department's auto task force also required deeper concessions from UAW members, retirees and other company stakeholders.

On May 28, GM announced that the Treasury Department would provide additional financial support in connection with a court-supervised restructuring of GM, in accordance with the terms of a broad restructuring agreement worked out between Treasury, GM, the UAW and representatives of GM's bondholders.

The agreement under which the Treasury Department will extend this new financial support includes a new schedule of contributions to the trust fund that will provide retiree medical benefits beginning in 2010. It also includes modifications to the collective bargaining agreement for active employees. The UAW active workforce ratified that agreement May 29. Based on these agreements, the United States government will provide a total of over $50 billion in financial support to allow GM to complete its restructuring.

GM's recent bankruptcy filing is part of the agreement reached with the Treasury Department. The goal of the bankruptcy filing is to allow for swift court approval of the restructuring so that the company can move forward to implement the agreements between the parties.

### Proposed Sale

To complete the restructuring, a new company will be formed which will purchase the operating assets of GM. If approved by the Bankruptcy Court, the new company will enter into the agreements with the UAW covering both active and retired workers. The initial ownership of the new corporation will be allocated as follows:

- ➢ 72.5% -- United States and Canadian Governments

- ➢ 17.5% -- UAW Retiree Benefits Trust Fund

> 10%  -- Bondholders

As part of the approval of the proposed sale, the Bankruptcy Court will also be asked to approve the new UAW Retiree Settlement Agreement, summarized below. As described more fully in Paragraph 6 of the attached document, if the court approves both the sale and the UAW Retiree Settlement Agreement, responsibility for providing retiree benefits for the duration of 2009, and for making the contributions to the VEBA, will shift to the new company (which will then own GM's operating assets).

Attached to this letter is a formal notice from the Bankruptcy Court regarding the proposed sale. As described in that notice, the Bankruptcy Court will soon hold a hearing to consider the proposed sale and the UAW Retiree Settlement Agreement.

### Pension Plan Continues Without Change

The restructuring agreements provide that the new company will take over responsibility for the GM UAW pension plan. That plan will continue operations and pension benefits will be continued at their current level.

### Retiree Medical Benefits

Retiree medical benefits were one of the most significant issues addressed in 2007 bargaining. The 2007 National UAW-GM Agreement established a new Trust Fund (called a "Voluntary Employees' Beneficiary Association" or "VEBA"), which is responsible for retiree medical benefits starting on January 1, 2010. The 2007 Agreement established a series of cash contributions by the Company to the VEBA, beginning on January 1, 2010.

In order for GM to receive the necessary government support -- which will allow the company to complete its restructuring and continue operations into the future -- we were required to support a series of changes to the retiree medical and VEBA agreements.

In this difficult situation, we were able to preserve the core medical benefits for retirees. These were hard fought issues and the changes described below are certainly painful. But if we had not agreed to support these changes, the U.S. Treasury would not have provided the additional support to GM. Without this critical government support, GM's near term future would be in serious peril and GM would face almost certain liquidation.

The following summarizes the principal features of the proposed agreement.

**Existing Internal VEBA Assets Transferred in January 2010.** Along with the new payment structure described below, in January 2010 the VEBA will receive the assets of an internal trust fund maintained at GM (called the "Internal VEBA"). The value of the assets in that fund is currently approximately $10 billion. GM had sought to use these assets to cover the cost of benefits prior to the January 1, 2010 implementation, which would have depleted these assets and diminished the cash balance in the new VEBA. We successfully resisted these efforts and

the new VEBA will therefore receive the full value of these Internal VEBA assets on January 1, 2010 as outlined in the 2007 agreement.

The assets in the Internal VEBA have been invested by GM on the VEBA's behalf since January 1, 2008. The value of these assets has been negatively impacted by conditions in the investment market during 2008 and so far in 2009. These assets will continue to be invested during the balance of 2009 and will be transferred to the new VEBA on January 1, 2010.

**New $2.5 Billion Note.** Under the new funding structure, the VEBA will receive a new Note, payable in cash, with a principal amount of $2.5 billion. Cash payments under the new Note (including accrued interest) will be $1.384 billion payable in each of 2013, 2015 and 2017.

**New $6.5 Billion in Preferred Stock.** The VEBA will also receive Preferred Stock in the new company with a face value of $6.5 billion. This Preferred Stock includes a 9% cash dividend payment structure, under which $585 million is payable annually for as long as the VEBA holds this stock. This dividend payment must be made before the new company can pay any dividends to the holders of its common stock. If the company delays payment of the dividends on the Preferred Stock, it will not be allowed to pay dividends to its common shareholders until it becomes current on the VEBA's Preferred Stock dividend obligations. While this preference over the common shareholders makes it likely the new company will consistently pay the preferred dividend, there is a risk that market conditions or other factors beyond the control of the UAW may result in the company delaying these preferred dividends for some period of time.

**VEBA to own Significant GM Common Stock.** Another requirement of the Treasury Department loans was that a portion of the value received by the VEBA be in the form of common stock. To meet that requirement, the VEBA will receive an initial allocation of 17.5% of the stock in the new company. The United States and Canadian Governments will receive 72.5% of the initial stock, and bondholders will receive 10%.

The VEBA will also have the right to designate a member of GM's Board of Directors, with UAW consent. The VEBA will be required to vote its GM shares in the same proportion as the votes of other shareholders.

The overall restructuring of GM will eliminate a tremendous portion of GM's other debt obligations. With a greatly improved balance sheet, as well as significant restructuring of business operations, there is a realistic prospect that the stock in the new company will represent significant value in the future. If and when that occurs, a significant portion of that value will be captured by the VEBA through this stock ownership.

**Warrants.** In addition to the direct ownership of the Preferred and Common Stock described above, the new VEBA will also receive a Warrant, which represents the right to an additional 2.5% of the Common Stock of the new company, with a strike price determined by an aggregate $75 billion equity value for the new company. This will allow the VEBA to realize additional value if the total value of the stock of the new company exceeds that value at any point prior to expiration of the new Warrant.

The new VEBA agreement includes mechanisms for the VEBA to sell the Common and Preferred Stock, as well as the new Warrants, to other parties under certain conditions.

**Pension Pass Through Eliminated.** One funding mechanism under the 2007 Agreement was called the "Pension Pass Through." Under that arrangement, the new VEBA was scheduled to impose an additional monthly contribution requirement, and the GM pension benefits were to increase by a corresponding amount. This mechanism has been eliminated and its value is instead reflected in the new Note and other instruments described above.

**Mitigation VEBA Assets Transferred.** Under the existing agreements, an independent VEBA is currently providing dental benefits and certain "mitigation" payments (i.e. covering a significant portion of the co-pays, deductibles and contributions that retirees would otherwise be required to pay under the 2005 agreement). Under the 2007 Agreement and the proposed new agreement, the assets in this existing independent VEBA (called the "Mitigation VEBA") will be transferred into the new VEBA on January 1, 2010. It is expected that the assets in the Mitigation VEBA will be approximately $700 million on January 1, 2010 but the actual balance will depend on investment performance and other factors during the balance of 2009. As explained below, the dental benefits currently provided by the Mitigation VEBA will be eliminated in accordance with the proposed new agreement.

**VEBA Committee can adjust benefits beginning in 2010.** As under the 2007 Agreement, the VEBA will be governed by an 11-member Committee, including 5 members appointed by the UAW and 6 Independent Members. Under the 2007 Agreement, that Committee had the authority, starting on January 1, 2012, to adjust benefits so that benefit levels can be kept consistent with the assets in the Trust. Under the proposed agreement, the Committee will be allowed to make necessary benefit adjustments beginning when the VEBA assumes responsibility on January 1, 2010.

## Immediate Changes in Benefit Levels Required

Under the 2007 Agreement, GM remained responsible for providing retiree medical benefits through the end of 2009, with the new VEBA taking over responsibility on January 1, 2010. In the discussions over the last several weeks, the company sought an "early implementation" of this transition. Had we agreed to that approach, the assets of the VEBA would have been depleted to pay benefits for the remainder of 2009.

We succeeded in avoiding this depletion of the VEBA's assets during 2009. The new company will therefore continue to provide retiree medical benefits for the balance of 2009 until the new VEBA takes over responsibility. In exchange, however, the Treasury Department insisted that the benefits be immediately reduced to reflect GM's difficult financial situation. In order to maintain the support of the Government, therefore, we were required to agree to the following changes in benefits. These changes will be effective on July 1, 2009 (or later if court approval is delayed beyond that date).

| Prescription Drug Co-Pays | Retail (34 day supply)<br>• $10 Generic<br>• $25 Brand<br><br>Mail Order (90 day supply) |
| --- | --- |