| | |
|---|---|
| | • $20 Generic<br>• $50 Brand |
| Catastrophic Plan for retirees and surviving spouses who fail to pay required monthly contributions | No longer offered.   Retirees and surviving spouses currently in Catastrophic Plan will be given opportunity to join regular plan. |
| Coverage for Erectile Dysfunction (ED) medications (e.g. Viagra, Cialis, Levitra) | No longer offered, except in prior authorized cases of Pulmonary Arterial Hypertension |
| Coverage for the Proton Pump Inhibitor drug class (e.g. omeprazole, Prilosec, Zegerid, Nexium, Achiphex, Prevacid, Protonix) | No longer offered, except in prior authorized cases of Barrett's Esophagitis and Zoellinger-Ellison Syndrome |
| Vision Program | No longer offered |
| Dental Program | No longer offered |
| Emergency Room Co-Pay | $100 (waived if admitted) |
| Medicare Part B Special Benefit ($76.20 per month for retirees enrolled in Medicare) | No longer offered by health plan.<br><br>This modification is not applicable to approximately 24,800 retirees and surviving spouses who retired or began receiving surviving spouse benefits before October 1979, and whose benefit is provided through the pension trust.  The payments will continue for these pre-1979 retirees and surviving spouses. |
| "Low Income Retirees" (less than $8,000 annual pension and monthly basic benefit rate of less than $33.33) | Monthly contribution requirement of $11 (flat rate regardless of family status)<br><br>In all other respects, these retirees and surviving spouses will be included in same plan as other retirees and surviving spouses. |
| Monthly Contribution Requirements (General Retirees) | No Change (currently $11/single and $23/ family) |
| Deductible and Co-Pay Requirements (General Retirees) | No Change (currently $164 annual deductible and $273 annual (single) out-of-pocket maximum) |
| Sponsored Dependents and Principally Supported Children | Consistent with changes made to the active medical program, the retiree medical program will not allow the designation of new "sponsored dependents" or "principally supported children."  The provisions allowing new dependents to be added as a result of adoption or legal guardianship will continue in effect. |

## The Future Outlook

In the early years of the VEBA's existence, it is unlikely that the VEBA will be able to sell the stock in the new company. The new VEBA will therefore be required to use the $10 billion in immediate contributions from the Internal VEBA at GM, along with the assets of the Mitigation VEBA and the $585 million annual cash dividend payment on the Preferred Stock, to provide retiree medical benefits during 2010 and 2011. Because of the uncertainty regarding the long-term value of the stock, the Committee will likely be required to make further adjustments in the benefit levels for 2010 and 2011. The extent of those future adjustments will depend on many factors, including investment returns in the Internal and Mitigation VEBA's during the remaining months of 2009, and whether the dividends on the new $6.5 billion in Preferred Stock are delayed.

If the stock can be sold in 2012 or thereafter for significant value, the Committee will be able to take that new value into account and restore some or all of the benefits that are being reduced under these arrangements. In other words, if the current restructuring efforts are successful and the company returns to viability, the UAW retirees stand to reap the benefit of that recovery through the VEBA's significant stock ownership.

We urge your support for these proposed agreements. In these difficult circumstances, we believe they provide the best possible protection for your retiree benefits.

In solidarity,

Ron Gettelfinger          Cal Rapson, *Vice President*          Bill Payne
*UAW President*     *and Director, UAW GM Department*     *Counsel to the Class*

---

**Important Notes**

For further information about the proposed agreement and the process for court review of the proposed agreements and the proposed sale, please refer to the enclosed legal notice. Full and complete copies of the proposed retiree health agreement can be found on the website referred to in that notice.

**If you support the proposed agreement, you do not need to take any action at this time. Information about the modified medical plan will be sent to you following court approval. If you wish to object to the proposed agreements, you must file a written objection as described in the enclosed legal notice.**

Counsel to the Class Representatives participated in negotiation of the 2007 retiree medical agreements which were approved by the District Court for the Eastern District of Michigan on July 31, 2008. Although the Class Representatives are not formal parties to the new agreements described above, Counsel to the Class Representatives has reviewed the proposed agreements and is in full support of the efforts to obtain Bankruptcy Court approval of the new agreements. Counsel for the Class has entered an appearance in the Bankruptcy case and will be supporting approval of the proposed agreements.

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
                                   :

**In re**                                 :       **Chapter 11 Case No.**
                                    :

**GENERAL MOTORS CORP.,** *et al.,*   :       **09-50026 (REG)**
                                    :

                   **Debtors.**     :       **(Jointly Administered)**
                                    :
-----------------------------------------------------------x

**NOTICE TO DEBTORS' RETIREES REPRESENTED BY
THE INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA OF SALE OF DEBTORS'
ASSETS AND APPROVAL OF UAW RETIREE SETTLEMENT AGREEMENT**

PLEASE TAKE NOTICE THAT:

       1.    By motion dated June 1, 2009 (the "Motion"), General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"),[1] have sought, among other things, authorization and approval of (a) the sale of substantially all the Debtors' assets pursuant to that certain Master Sale and Purchase Agreement and related agreements (the "MPA") among the Debtors (the "Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury") (the "363 Transaction"), free and clear of liens, claims, encumbrances, and other interests, (b) certain proposed procedures to govern the sale process and provide for the submission of any competing bids for substantially all the Debtors' assets (the "Sale Procedures"), (c) the assumption and assignment of certain executory contracts and unexpired leases of personal property and of nonresidential real property (collectively, the "Leases") in connection with the 363 Transaction, (d) that certain settlement agreement between the Purchaser and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") consented to by representatives of members of the "Class" of the Debtors' retirees and surviving spouses represented by the UAW such representatives, the "Class Representatives") to be executed at the closing of the 363 Transaction (the "UAW Retiree Settlement Agreement"), and (e) scheduling a hearing for approval of the 363 Transaction and the UAW Retiree Settlement Agreement (the "Sale Hearing").[2]

---

[1] The Debtors and their respective Tax ID numbers are as follows: General Motors Corporation, Tax ID No. 38-0572515; Saturn, LLC, Tax ID No. 38-2577506; Saturn Distribution Corporation, Tax ID No. 38-2755764; and Chevrolet-Saturn of Harlem, Inc., Tax ID No. 20-1426707.

[2] Copies of the Motion and the MPA (without certain commercially sensitive attachments) may be obtained by accessing the website established by the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com.

2.      The Sale Hearing is scheduled to be conducted on June 30, 2009 at 9:45 a.m. (Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, Room 621, New York, New York 10004 (the "Bankruptcy Court"), before the Honorable Robert E. Gerber, United States Bankruptcy Judge, to consider the approval of the MPA or any higher or better offer by a Successful Bidder (as defined in the Sale Procedures) and approval of the UAW Retiree Settlement Agreement. If the Purchaser is the Successful Bidder, the Debtors anticipate seeking entry of an order approving the 363 Transaction substantially in the form of the order attached to the Motion as Exhibit "B" (the "Sale Order"). The Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing.

3.      Coverage of Retiree Medical Benefits (as defined in the UAW Retiree Settlement Agreement) will continue to be provided to UAW-Represented Retirees (as defined in the Sale Procedures Order) and their eligible dependents without interruption by either GM or the Purchaser up until December 31, 2009, in accordance with the terms of agreements negotiated and agreed to by the UAW, which include certain benefit reductions to take effect on July 1, 2009 (or, if later, Bankruptcy Court approval, if needed).

4.      Contingent upon the Bankruptcy Court's approval of the 363 Transaction, and concurrently with the sale of the Debtors' assets pursuant to the 363 Transaction, the Debtors will assume and assign to the Purchaser any collective bargaining agreements entered into by and between the Debtors and the UAW (the "UAW CBA Assignment"), with the exception of (a) the agreement to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between the Company and the UAW ("MOU"); and (b) the Settlement Agreement, dated February 21, 2008, between the Company and the UAW (the "2008 Settlement Agreement"), which was approved by the United States District Court for the Eastern District of Michigan in the class action styled *Int'l Union, UAW, et al. v. General Motors Corporation*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 9, 2007) (final order entered July 31, 2008).

5.      The Purchaser has agreed, among other things, to enter into the proposed UAW Retiree Settlement Agreement, pursuant to which the Purchaser will make contributions to a voluntary employee beneficiary association trust (the "New VEBA") in respect of non-pension retiree benefits to the UAW-Represented Retirees on terms that differ from the terms of the MOU and the 2008 Settlement Agreement. Among other things, the UAW Retiree Settlement Agreement provides for the funding of the New VEBA with a combination of (i) shares of the Purchaser's common stock representing 17.5% of the aggregate common equity interest in the Purchaser; (ii) a promissory note of the Purchaser in the principal amount of $2.5 billion, payable in three equal cash installments on July 15 of 2013, 2015, and 2017; (iii) shares of the Purchaser's cumulative perpetual preferred stock in the amount of $6.5 billion, with a 9% dividend per annum, payable quarterly in cash; (iv) warrants to acquire newly issued shares of the Purchaser representing 2.5% of the Purchaser's common equity outstanding at December 31, 2009, issuable at any time prior to December 31, 2015; and (v) the assets held in the existing voluntary employee beneficiary association trust sponsored by the Sellers and to be transferred to the Purchaser, which at March 31, 2009 had a value of approximately $9.4 billion.

6.      In addition, GM, the UAW, and the Class Representatives have entered into an agreement, dated May 29, 2009 (the "UAW Claims Agreement"), pursuant to which the UAW and Class Representatives agreed, subject to the consummation of the 363 Transaction and the UAW Retiree Settlement Agreement becoming effective following approval of the Bankruptcy Court, to take further actions to release claims against GM and its subsidiaries, and their employees, officers, directors, and agents, relating to retiree medical benefits pursuant to the MOU, Settlement Agreement, and UAW collective bargaining agreements, *provided* that such claims may be reinstated if the rights or benefits of the UAW-Represented Retirees under the UAW Retiree Settlement Agreement are adversely impacted by reason of any reversal or modification of the Bankruptcy Court's approval of the 363 Transaction or UAW Retiree Settlement Agreement.

7.      The UAW is the authorized representative of the UAW-Represented Retirees for purposes of approval of the UAW Retiree Settlement Agreement pursuant to section 1114 of the United States Bankruptcy Code. At the Sale Hearing, the Debtors will request approval by the Bankruptcy Court of the UAW Retiree Settlement Agreement as an agreement with the UAW, as the authorized representative of the UAW-Represented Retirees.

8.      A copy of the MPA (without certain commercially sensitive attachments) and the Motion (including the proposed Sale Order), the Sale Procedures Order as entered by the Bankruptcy Court (with the Sale Procedures attached), the UAW Retiree Notice, and the UAW Retiree Settlement Agreement, including all exhibits thereto, may be obtained (i) by accessing (a) the website of the Bankruptcy Court at http://www.nysb.uscourts.gov, or (b) the website of the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com/ or (ii) by visiting the Office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408. Copies also may be obtained by faxing a written request to the attorneys for the Debtors, Weil, Gotshal & Manges LLP (Attn: Russell Brooks, Esq.) at 212-310-8007.

9.      **Responses or objections, if any, to the relief sought in the Motion, including the approval of the UAW Retiree Settlement Agreement, must be made in writing and filed with the Clerk of the Bankruptcy Court (at the address shown in paragraph 2 above), and served upon (a) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (b) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (c) the attorneys for the Creditors Committee; (d) Cleary Gottlieb Steen & Hamilton LLP, the attorneys for the UAW, One Liberty Plaza, New York, New York 10006 (Attn: James L. Bromley, Esq.); (e) Cohen, Weiss and Simon LLP, the attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036 (Attn: Babette Ceccotti, Esq.); (f) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); and (g) the Office of the United States Trustee for the Southern District of New York (Attn: Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004., so as to be received no later than June 19, 2009, at 5:00 p.m. (Eastern Time) (the "Objection Deadline").**

10.     The failure of any person or entity to file a response or objection on or before the Objection Deadline shall be deemed a consent to the 363 Transaction and the other relief requested in the Motion, including approval of the UAW Retiree Settlement Agreement, and shall bar the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Procedures, the Motion, the 363 Transaction, and the UAW Retiree Settlement Agreement, and the Debtors' consummation of the 363 Transaction.

11.     This Notice is subject to the full terms and conditions of the Motion, the Sale Procedures Order, the MPA, and the UAW Retiree Settlement Agreement, which shall control in the event of any conflict. The Debtors encourage parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

12.     If you have questions about the 363 Transaction or the UAW Retiree Settlement Agreement, you may call 1-800-489-4646 (the "Call Center").

Dated:  New York, New York
        June 2, 2009


                                        _____
                                        Harvey R. Miller
                                        Stephen Karotkin
                                        Joseph H. Smolinsky

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Debtors
                                        and Debtors in Possession

I

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit I**

Form of Sale Approval Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                         :

In re                         :       **Chapter 11 Case No.**
                         :

**GENERAL MOTORS CORP.,** *et al.*,  :       **09-_____ (__)**
                         :

              **Debtors.**     :       **(Jointly Administered)**
                         :
---------------------------------------------------------------x

## ORDER (I) AUTHORIZING SALE OF ASSETS PURSUANT TO MASTER SALE AND PURCHASE AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED PURCHASER; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE; AND (III) GRANTING RELATED RELIEF

Upon the motion, dated June 1, 2009 (the "Motion"), of General Motors

Corporation ("GM") and certain of its subsidiaries, as debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105, 363, and 365

of title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for, among other things, entry

of an order authorizing and approving (A) that certain Master Sale and Purchase Agreement,

dated as of June 1, 2009, by and among GM and its Debtor subsidiaries (collectively, the

"Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by

the United States Department of the Treasury (the "U.S. Treasury"), together with all related

documents and agreements as well as all exhibits, schedules, and addenda thereto (the "MPA"), a

copy of which is annexed hereto as Exhibit "A"; (B) the sale of the Purchased Assets[1] to the

Purchaser free and clear of liens, claims, encumbrances, and interests, including rights or claims

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Motion or the MPA.

based on any successor or transferee liability; (C) the assumption and assignment of the

Assumable Executory Contracts; (D) the establishment of certain Cure Amounts; and (E) the

UAW Retiree Settlement Agreement; and the Court having jurisdiction to consider the Motion

and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing

Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of Any and

All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of

the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. §

157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the Motion having been provided in accordance with this Court's Order,

dated June __, 2009 (the "Sale Procedures Order"), and it appearing that no other or further

notice need be provided; and a hearing having been held on June 30, 2009, to consider the relief

requested in the Motion (the "Sale Hearing"); and upon the Affidavit of Frederick A. Henderson

Pursuant to Local Bankruptcy Rule 1007-2 (the "Henderson Affidavit"), the record of the

Hearing, and all of the proceedings had before the Court; and the Court having reviewed the

Motion and any objections thereto (the "Objections") and found and determined that the relief

sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and

their estates, as contemplated by Bankruptcy Rule 6003 and is in the best interests of the

Debtors, their estates and creditors, and other parties in interest and that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

   FOUND AND DETERMINED THAT:

     A.  The findings and conclusions set forth herein constitute the Court's

findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to

this proceeding pursuant to Fed. R. Bankr. P. 9014.

B.      To the extent any of the following findings of fact constitute conclusions

of law, they are adopted as such. To the extent any of the following conclusions of law

constitute findings of fact, they are adopted as such.

C.      This Court has jurisdiction over the Motion, the MPA, and the 363

Transaction pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant

to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of these cases and the Motion in this District is

proper under 28 U.S.C. §§ 1408 and 1409.

D.      The statutory predicates for the relief sought in the Motion are sections

105(a), 363, and 365 of the Bankruptcy Code as supplemented by Bankruptcy Rules 2002, 6004,

and 6006.

E.      As evidenced by the affidavits and certificates of service and Publication

Notice previously filed with the Court, in light of the exigent circumstances of these chapter 11

cases and the wasting nature of the Purchased Assets and based on the representations of counsel

at the Sale Procedures Hearing and the Sale Hearing, (i) proper, timely, adequate, and sufficient

notice of the Motion, the Sale Procedures, the 363 Transaction, the Assumption and Assignment

Procedures, the UAW Retiree Settlement Agreement, and the Sale Hearing have been provided

in accordance with Bankruptcy Rules 2002(a), 6004(a), and 6006(c) and in compliance with the

Sale Procedures Order; (ii) such notice was good and sufficient, reasonable, and appropriate

under the particular circumstances in these chapter 11 cases, and reasonably calculated to reach

and apprise all holders of liens, claims, encumbrances, and other interests, including rights or

claims based on any successor or transferee liability, about the Sale Procedures, the sale of the

Purchased Assets, the 363 Transaction, and the assumption and assignment of the Assumable

Executory Contracts, and to reach all UAW-Represented Retirees about the UAW Retiree

Settlement Agreement and the assumption by GM of that certain Letter Agreement, dated May

29, 2009, between GM, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") and Stember, Feinstein, Doyle & Payne, LLC (the "UAW Claims Agreement") relating thereto; and (iii) no other or further notice of the Motion, the 363 Transaction, the Sale Procedures, the Assumption and Assignment Procedures, the UAW Retiree Settlement Agreement, the UAW Claims Agreement, and the Sale Hearing or any matters in connection therewith is or shall be required. With respect to parties who may have claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors (including, but not limited to, potential contingent warranty claims against the Debtors), the Publication Notice was sufficient and reasonably calculated under the circumstances to reach such parties.

        F.      As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, in light of the exigent circumstances presented, (a) the Debtors have adequately marketed the Purchased Assets and conducted the sale process in compliance with the Sale Procedures Order; (b) a reasonable opportunity has been given to any interested party to make a higher or better offer for the Purchased Assets; (c) the consideration provided for in the MPA constitutes the highest or otherwise best offer for the Purchased Assets and provides fair and reasonable consideration for the Purchased Assets; (d) the 363 Transaction will provide a greater recover for the Debtors' creditors than would be provided by any other practical available alternative, including liquidation under chapters 7 or 11 of the Bankruptcy Code; (e) no other entity has offered to purchase the Purchased Assets for greater economic value to the Debtors or their estates; (f) the consideration to be paid by the Purchaser under the MPA exceeds the liquidation value of the Purchased Assets; and (g) the Debtors' determination that the MPA

constitutes the highest or best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

G.    The actions represented to be taken by the Sellers and the Purchaser are appropriate under the circumstances of these chapter 11 cases and are in the best interests of the Debtors, their estates and creditors, and other parties in interest.

H.    Approval of the MPA and consummation of the 363 Transaction at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

I.    The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Purchased Assets pursuant to the 363 Transaction prior to, and outside of, a plan of reorganization and for the immediate approval of the MPA and the 363 Transaction because, among other things, the Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Motion is not granted on an expedited basis. In light of the exigent circumstances of these chapter 11 cases and the risk of deterioration in the going concern value of the Purchased Assets pending the 363 Transaction, time is of the essence in (i) consummating the 363 Transaction, (ii) preserving the viability of the Debtors' businesses as going concerns, and (iii) minimizing the widespread and adverse economic consequences for the Debtors, their estates, their creditors, employees, the automotive industry, and the national economy that would be threatened by protracted proceedings in these chapter 11 cases.

J.    The consideration provided by the Purchaser pursuant to the MPA (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery to the Debtors' estates than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

K.    The 363 Transaction must be approved and consummated as promptly as practicable in order to preserve the viability of the business to which the Purchased Assets relate as a going concern.

L.    In light of the extensive prepetition negotiations culminating in the MPA, the Purchaser's commitment to consummate the 363 Transaction is clear without the need to provide a good faith deposit.

M.    Each Debtor (i) has full corporate power and authority to execute the MPA and all other documents contemplated thereby, and the sale of the Purchased Assets has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the MPA, (iii) has taken all corporate action necessary to authorize and approve the MPA and the consummation by the Debtors of the transactions contemplated thereby, and (iv) needs no consents or approvals, other than those expressly provided for in the MPA which may be waived by the Purchaser, to consummate such transactions.

N.    The consummation of the 363 Transaction outside of a plan of reorganization pursuant to the MPA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors. The 363 Transaction does not constitute a sub rosa plan of reorganization.

O.    The MPA and the 363 Transaction were negotiated, proposed, and entered into by the Sellers and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions. Neither the Sellers nor the Purchaser has engaged in any conduct that would cause or permit the MPA to be avoided under 11 U.S.C. § 363(n).

P.    The Purchaser is a good faith purchaser under section 363(m) of the

Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

Q.    The Purchaser is not an "insider" of any of the Debtors, as that term is

defined in section 101(31) of the Bankruptcy Code.

R.    The Debtors, the Purchaser, and the UAW, as the exclusive collective

bargaining representative of the Debtors' employees and the authorized representative of the

UAW-Represented Retirees under section 1114(c) of the Bankruptcy Code, engaged in good

faith negotiations in conjunction with the 363 Transaction regarding the funding of "retiree

benefits" within the meaning of section 1114(a) of the Bankruptcy Code and related matters.

Conditioned upon the consummation of the 363 Transaction and approval of the Bankruptcy

Court, the Purchaser and the UAW have entered into that certain Retiree Settlement Agreement,

dated _____, 2009 (the "UAW Retiree Settlement Agreement"), which resolves the ongoing

provision of certain retiree benefits.  Under the UAW Retiree Settlement Agreement, the

Purchaser has agreed to make contributions of cash, stock, and warrants of New GM, as well as

to transfer the assets of an existing voluntary employees' beneficiary association sponsored by

GM and to be acquired by the Purchaser in the 363 Transaction, to a new voluntary employees'

beneficiary association sponsored by the UAW (the "New VEBA"), which will have the

obligation to fund certain health and welfare benefits for the Debtors' retirees and surviving

spouses represented by the UAW (the "UAW-Represented Retirees").  GM and the UAW, as the

authorized representative of the UAW-Represented Retirees, as well as the representatives for

the class of plaintiffs in a certain class action against GM (the "Class Representatives"), through

class counsel, Stemper, Feinstein, Doyle and Payne LLC ("Class Counsel"), negotiated in good

faith the UAW Claims Agreement, which requires the UAW and the Class Representatives to

take further actions to effectuate the extinguishment of certain claims against the Debtors, among

others, relating to retiree benefits in the event the 363 Transaction is consummated and the

Bankruptcy Court approves, and the Purchaser becomes fully bound by, the UAW Retiree

Settlement Agreement, subject to reinstatement of such claims to the extent of any adverse

impact to the rights or benefits of UAW-Represented Retirees under the UAW Retiree

Settlement Agreement resulting from any reversal or modification of the 363 Transaction, the

UAW Retiree Settlement Agreement, or the approval of the Bankruptcy Court thereof.

        S.      Concomitantly with the 363 Transaction, the Debtors will assume and

assign to the Purchaser modified and duly ratified collective bargaining agreements entered into

by and between the Debtors and the UAW (the "UAW CBA Assignment").  The Debtors, the

Purchaser, the UAW and Class Representatives intend that their actions in connection with the

UAW Retiree Settlement Agreement and related undertakings incorporate the compromise of

certain claims and rights and shall be deemed to satisfy the requirements of 29 U.S.C. §

186(c)(2).

        T.      The transfer of the Purchased Assets to the Purchaser will be a legal, valid,

and effective transfer of the Purchased Assets and, except for the Assumed Liabilities, will vest

the Purchaser with all right, title, and interest of the Sellers to the Purchased Assets free and clear

of liens, claims, encumbrances, and other interests, including rights or claims based on any

successor or transferee liability, including, but not limited to (i) those that purport to give to any

party a right or option to effect any forfeiture, modification, right of first refusal, or termination

of the Sellers' or the Purchaser's interest in the Purchased Assets, or any similar rights, (ii) those

relating to taxes arising under or out of, in connection with, or in any way relating to the

operation of the Purchased Assets prior to the consummation of the Sale (the "Closing"), and (iii)

(a) those arising under all mortgages, deeds of trust, security interests, conditional sale or other

title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first

refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on

the use, voting, transfer, receipt of income, or other exercise of any attributes of ownership and

(b) all debts arising in any way in connection with any agreements, acts, or failures to act, of any

of the Sellers or any of the Sellers' predecessors or affiliates, claims (as that term is defined in

the Bankruptcy Code), obligations, liabilities, demands, guaranties, options, rights, contractual or

other commitments, restrictions, interests and matters of any kind and nature, whether known or

unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement

of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or

otherwise, including, but not limited to, Claims otherwise arising under doctrines of successor or

transferee liability to the extent permitted by law.

      U.    The Purchaser would not have entered into the MPA and would not

consummate the 363 Transaction contemplated thereby, thus adversely affecting the Debtors,

their estates, and their creditors, if the sale of the Purchased Assets to the Purchaser, the

assignment of the Assumable Executory Contracts to the Purchaser, and the assumption of the

Assumed Liabilities by the Purchaser were not, except as otherwise provided in the MPA, free

and clear of all liens, claims, encumbrances, and interests of any kind or nature whatsoever, or if

the Purchaser would, or in the future could, be liable for any of such liens, claims,

encumbrances, or other interests, including rights or claims based on any successor or transferee

liability.

      V.    The Sellers may sell the Purchased Assets free and clear of all liens,

claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or

claims based on any successor or transferee liability, because, in each case, one or more of the

standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those (i)

holders of liens, claims, encumbrances, and other interests, including rights or claims based on

any successor or transferee liability, and (ii) non-Debtor parties to the Assumable Executory

Contracts who did not object, or who withdrew their Objections, to the 363 Transaction or the

Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

Those (i) holders of liens, claims, encumbrances, or other interests, including rights or claims

based on any successor or transferee liability, and (ii) non-Debtor parties to the Assumable

Executory Contracts who did object fall within one or more of the other subsections of section

363(f) of the Bankruptcy Code and are adequately protected by having their liens, claims,

encumbrances, and other interests, if any, including rights or claims based on any successor or

transferee liability, attach to the cash proceeds of the 363 Transaction ultimately attributable to

the property against or in which they claim a lien, claim, encumbrance, or other interest,

including rights or claims based on any successor or transferee liability.

        W.     Under the MPA, GM is transferring all title and interest in Memphis, TN

SPO Warehouse and White Marsh, MD Allison Transmission Plant (the "TPC Property") to the

Purchaser pursuant to section 363(f) of the Bankruptcy Code free and clear of all liens, claims,

encumbrances, and interests, including any liens on the TPC Property under the Tennessee

Master Lease and Open End Leasehold Deeds of Trust, dated as of November 18, 1999, between

General Motors Corporation and Wilmington Trust Company, not in its individual capacity but

solely as Owner Trustee under the Trust Agreement dated as of May 28, 1999 ("Wilmington

Trust Company") and the related agreements and the Maryland Master Lease and Mortgages,

dated as of September 8, 1999, between General Motors Corporation and Wilmington Trust

Company and the related agreements (the "TPC North Agreement"). The TPC North Agreement

is a secured financing, and Wilmington Trust Company shall be entitled to a lien equal to the

value of the TPC Property in the proceeds received by the Sellers under the 363 Transaction as

adequate protection under section 363(e) of the Bankruptcy Code. If the Debtors and

Wilmington Trust Company are unable to agree to the value of the TPC Property for the purpose

of determining the amount of Wilmington Trust Company's secured claim, the Debtors or

Wilmington Trust Company shall file a motion with this Court seeking a determination of the

amount of Wilmington Trust Company's secured claim.

      X.    The Purchaser would not have entered into the MPA and would not

consummate the 363 Transaction if the sale of the Purchased Assets was not free and clear of all

liens, claims, encumbrances, and other interests, including rights or claims based on any

successor or transferee liability other than Assumed Liabilities, or if the Purchaser would, or in

the future could, be liable for any such liens, claims, encumbrances, and other interests,

including rights or claims based on any successor or transferee liability (collectively, the

"Retained Liabilities") that expressly are not assumed by the Purchaser, as set forth in the MPA.

The Purchaser will not consummate the 363 Transaction unless this Court expressly orders that

none of the Purchaser, its affiliates, their present or contemplated members or shareholders

(other than the Debtors as the holder of equity in the Purchaser), or the Purchased Assets will

have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at

law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens, claims,

encumbrances, and other interests, including rights or claims based on any successor or

transferee liability or Retained Liabilities.

      Y.    The Debtors have demonstrated that it is an exercise of their sound

business judgment to assume and assign the Assumable Executory Contracts to the Purchaser in

connection with the consummation of the 363 Transaction, and the assumption and assignment

of the Assumable Executory Contracts is in the best interests of the Debtors, their estates and

creditors, and other parties in interest. The Assumable Executory Contracts being assigned to,

and the liabilities being assumed by, the Purchaser are an integral part of the Purchased Assets

being purchased by the Purchaser, and, accordingly, such assumption and assignment of the

Assumable Executory Contracts and liabilities are reasonable, enhance the value of the Debtors'

estates, and do not constitute unfair discrimination

    Z.  For the avoidance of doubt, and notwithstanding anything else in this

Order to the contrary:

- The Debtors are neither assuming nor assigning to the Purchaser the agreement to provide certain retiree medical benefits specified in (i) the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between the Company and the UAW, and (ii) the Settlement Agreement, dated February 21, 2008, between the Company and the UAW;

- the Agreement between the UAW and General Motors Corporation, dated September 26, 2007 (effective October 15, 2007) (the "UAW CBA") shall be assumed by the Debtors and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code. Assumption and assignment of the UAW CBA is integral to the 363 Transaction and the MPA, are in the best interests of the Debtors and their estates, creditors, employees, and retirees, and represent the exercise of the Debtors' sound business judgment;

- the UAW, as the exclusive collective bargaining representative of employees of the Purchaser and the "authorized representative" of the UAW-Represented Retirees under section 1114(c) of the Bankruptcy Code, GM, and the Purchaser engaged in good faith negotiations in conjunction with the 363 Transaction regarding the funding of retiree health benefits within the meaning of section 1114(a) of the Bankruptcy Code. Conditioned upon the consummation of the 363 Transaction, the UAW and the Purchaser have entered into the UAW Retiree Settlement Agreement, which, among other things, provides for the financing by the Purchaser of modified retiree health care obligations for the Class and Covered Group (as defined in the UAW Retiree Settlement Agreement) through contributions by the Purchaser to the New VEBA (as defined in the UAW Retiree Settlement Agreement). The Debtors, the Purchaser, and the UAW specifically intend that their actions in connection with the UAW Retiree Settlement Agreement and related undertakings incorporate the compromise of certain claims and rights and shall be deemed to satisfy the requirements of 29 U.S.C. § 186(c)(2);

- the Debtors' sponsorship of the Existing Internal VEBA (as defined in the UAW Retiree Settlement Agreement) shall be transferred to the Purchaser under the MPA.

AA.    The Debtors have (i) cured and/or provided adequate assurance of cure (through the Purchaser) of any default existing prior to the date hereof under any of the Assumable Executory Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumable Executory Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser has provided adequate assurance of future performance under the Assumable Executory Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code. The Assumption and Assignment Procedures are fair, appropriate, and effective and, upon the payment by the Purchaser of all Cure Amounts and approval of the assumption and assignment for a particular Assumable Executory Contract thereunder, the Debtors shall be forever released from any and all liability under the Assumable Executory Contract.

BB.    The Debtors are the sole and lawful owners of the Purchased Assets, and no other person has any ownership right, title, or interest therein. The Debtors' non-Debtor Affiliates have acknowledged and agreed to the 363 Transaction and, as required by, and in accordance with, the MPA and the Transition Services Agreement, transferred any legal, equitable, or beneficial right, title, or interest they may have in or to the Purchased Assets to the Purchaser.

CC.    The Debtors currently maintain certain privacy policies that govern the use of "personally identifiable information" (as defined in section 101(41A) of the Bankruptcy Code) in conducting their business operations. The 363 Transaction may contemplate the transfer of certain personally identifiable information to the Purchaser in a manner that may not be consistent with certain aspects of their existing privacy policies. Accordingly, on June __, 2009,

the Court directed the U.S. Trustee to promptly appoint a consumer privacy ombudsman in accordance with section 332 of the Bankruptcy Code, and such ombudsman was appointed on June __, 2009. The Court has given due consideration to the facts, including the exigent circumstances surrounding the conditions of the sale of personally identifiable information in connection with the 363 Transaction. No showing has been made that the sale of personally identifiable information in connection with the 363 Transaction violates applicable nonbankruptcy law.

DD.    This Order constitutes approval, pursuant to Bankruptcy Rule 9019, of the compromise and settlement embodied in the UAW Retiree Settlement Agreement, and such compromise and settlement meets all of the requirements set forth in Bankruptcy Rule 9019.

EE.    This Order constitutes a final order within the meaning of 28 U.S.C. §.158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

### General Provisions

1.    The Motion is granted in its entirety, and entry into and performance under, and in respect of, the MPA and the 363 Transaction is approved, as further described herein.

2.    All Objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservation of rights included in such Objections are overruled on the merits.

### Approval of the MPA

3.      The MPA, and all the terms and conditions thereof, is approved.

4.      Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the
Debtors are authorized to perform their obligations under, and comply with the terms of, the
MPA and consummate the 363 Transaction pursuant to, and in accordance with, the terms and
conditions of the MPA and this Order.

5.      The Debtors are authorized and directed to execute and deliver, and
empowered to perform under, consummate, and implement, the MPA, together with all
additional instruments and documents that the Sellers or the Purchaser deem necessary or
appropriate to implement the MPA and effectuate the 363 Transaction, and to take all further
actions as may reasonably be required by the Purchaser for the purpose of assigning, transferring,
granting, conveying, and conferring to the Purchaser or reducing to possession the Purchased
Assets or as may be necessary or appropriate to the performance of the obligations as
contemplated by the MPA.

6.      This Order and the MPA shall be binding in all respects upon all known
and unknown creditors of, and equity security interests in, any Debtor, including any holders of
liens, claims, encumbrances, or other interests, including rights or claims based on any successor
or transferee liability, all non-Debtor parties to the Assumable Executory Contracts, all
successors and assigns of the Purchaser, each Seller and their Affiliates and subsidiaries, the
Purchased Assets, and any trustees appointed in the Debtors' chapter 11 cases or upon a
conversion to cases under chapter 7 of the Bankruptcy Code and shall not be subject to rejection.
Nothing contained in any chapter 11 plan confirmed in the Debtors' chapter 11 cases or the order
confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the
MPA or this Order.

## Transfer of Purchased Assets Free and Clear

7.    Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance with the MPA, and, upon the Closing, shall be, free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, and all such liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, shall attach to the net proceeds of the 363 Transaction in the order of their priority, with the same validity, force, and effect that they now have as against the Purchased Assets, subject to any claims and defenses a Seller may possess with respect thereto.

8.    Except as expressly permitted or otherwise specifically provided by the MPA or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against or in a Seller or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the Closing, or the 363 Transaction are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

9.     The transfer of the Purchased Assets to the Purchaser pursuant to the MPA constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title, and interest of the Sellers in and to the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, other than the Assumed Liabilities.

10.     On the Closing of the 363 Transaction, each of the Sellers' creditors and any other holder of a lien, claim, encumbrance, or other interest, including rights or claims based on any successor or transferee liability, is authorized and directed to execute such documents and take all other actions as may be necessary to release its lien, claim, encumbrance, or other interest in the Purchased Assets, if any, as such lien, claim, encumbrance, or other interest may have been recorded or may otherwise exist.

11.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing a lien, claim, encumbrance, or other interest in the Sellers or the Purchased Assets shall not have delivered to the Sellers prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all liens, claims, encumbrances, or other interests, which the person or entity has with respect to the Sellers or the Purchased Assets or otherwise, then (a) the Sellers are authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Sellers or the Purchased Assets, and (b) the Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever in the Sellers or the Purchased Assets.

12.     All persons or entities in possession of any of the Purchased Assets are directed to surrender possession of such Purchased Assets to the Purchaser or its respective designees at the time of Closing of the 363 Transaction.

13.     Following the Closing of the 363 Transaction, no holder of any lien, claim, encumbrance, or other interest shall interfere with the Purchaser's title to, or use and enjoyment of, the Purchased Assets based on, or related to, any such lien, claim, encumbrance, or other interest, or based on any actions the Debtors may take in their chapter 11 cases.

14.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the MPA and this Order.

15.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the 363 Transaction contemplated by the MPA.

## Approval of the UAW Retiree Settlement Agreement

16.     The UAW Retiree Settlement Agreement, the transactions contemplated therein, and the terms and conditions thereof, are approved. The Debtors, the Purchaser, and the UAW are authorized to perform their obligations under, or in connection with, the implementation of the UAW Retiree Settlement Agreement and comply with the terms of the UAW Retiree Settlement Agreement pursuant to, and in accordance with, the terms and conditions of the UAW Retiree Settlement Agreement and this Order, including the obligation of the Purchaser to reimburse the UAW for certain expenses relating to the 363 Transaction and the transition to the New VEBA arrangements. The Trust Amendments are approved and the VEBA

Trust Agreement is reformed accordingly (as such terms are defined in the UAW Retiree

Settlement Agreement)

   17. In accordance with the terms of the UAW Retiree Settlement Agreement,

(a) as of the Closing, the requirement of Section 15 of the Settlement Agreement, dated July 31,

2008, in the class action styled *Int'l Union, UAW, et al. v. General Motors Corp.*, Civil Action

No. 07-14074 (E.D. Mich. filed Sept. 9, 2007) to amend the General Motors Hourly-Rate

Employees Pension Plan shall be terminated and void, and (b) on the later of December 31,

2009, or the Closing of the 363 Transaction, (i) the committee and the trustees of the Existing

External VEBA (as hereinafter defined) are directed to transfer to the New VEBA all assets and

liabilities of the voluntary employees' beneficiary association established pursuant to the

settlement agreement in the class action styled *UAW et al. v. General Motors Corp.*, No. 05-CV-

73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006), *aff'd*, *Int'l Union, UAW v. General Motors

Corp.*, 497 F.3d 615 (6th Cir. 2007) (the "Existing External VEBA") within fifteen (15) days

thereafter, and coverage under the Existing External VEBA as to the Class and Covered Group

(each as defined in the UAW Retiree Settlement Agreement) shall terminate upon the completion

of such transfer, and (ii) all obligations and liabilities of the Purchaser relating to retiree medical

benefits for the Class and Covered Group shall terminate, and the Purchaser shall not thereafter

have any such obligations and liabilities, in each case as provided in and in accordance with

Section 5(D) of the UAW Retiree Settlement Agreement.

### Approval of GM's Assumption of the UAW Claims Agreement

   18. Pursuant to section 365 of the Bankruptcy Code, GM's assumption of the

UAW Claims Agreement is approved, and GM, the UAW, and the Class Representatives are

authorized to perform their obligations under, or in connection with, the implementation of the

UAW Claims Agreement and comply with the terms of the UAW Claims Agreement pursuant

to, and in accordance with, the terms and conditions of the UAW Claims Agreement and this
Order.

### Assumption and Assignment to the Purchaser of Assumable Executory Contracts

19.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and
subject to and conditioned upon the Closing of the 363 Transaction, the Debtors' assumption and
assignment to the Purchaser of the Assumable Executory Contracts is approved, and the
requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed
satisfied.

20.     The Debtors are authorized and directed in accordance with sections
105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Purchaser, effective as of
the Assumption Effective Date, as provided by, and in accordance with, the Sale Procedures
Order and the MPA, the Assumable Executory Contracts free and clear of all liens, claims,
encumbrances, or other interests of any kind or nature whatsoever, including rights or claims
based on any successor or transferee liability, other than the Assumed Liabilities, and (ii) execute
and deliver to the Purchaser such documents or other instruments as the Purchaser reasonably
deems may be necessary to assign and transfer the Assumable Executory Contracts and Assumed
Liabilities to the Purchaser.

21.     The Assumable Executory Contracts shall be transferred and assigned to,
pursuant to the Sale Procedures Order and the MPA, and thereafter remain in full force and
effect for the benefit of, the Purchaser, notwithstanding any provision in any such Assumable
Executory Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of
the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and,
pursuant to section 365(k) of the Bankruptcy Code. The Sellers shall be relieved from any
further liability with respect to the Assumable Executory Contracts after such assumption and

assignment to the Purchaser. Each Assumable Executory Contract is an executory contract or

unexpired lease under section 365 of the Bankruptcy Code. The Debtors may assume each of

their respective Assumable Executory Contracts in accordance with section 365 of the

Bankruptcy Code. The Debtors may assign each Assumable Executory Contract in accordance

with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumable

Executory Contract that prohibits or conditions the assignment of such Assumable Executory

Contract or terminate, recapture, impose any penalty, condition renewal or extension, or modify

any term or condition upon the assignment of such Assumable Executory Contract, constitute

unenforceable antiassignment provisions which are void and of no force and effect. All other

requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the

assumption by the Debtors and assignment to the Purchaser of each Assumable Executory

Contract have been satisfied. At such time as provided in the Sale Procedures Order and the

MPA, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be

fully and irrevocably vested in all right, title, and interest of each Purchased Contract. Any

portion of any of the Debtors' unexpired leases of nonresidential real property that purport to

permit the respective landlords thereunder to cancel the remaining term of any such leases if the

Sellers discontinue their use or operation of the Leased Real Property are void and of no force

and effect and shall not be enforceable against the Purchaser, its assignees and sublessees, and

the landlords under such leases shall not have the right to cancel or otherwise modify such leases

or increase the rent, assert any Claim, or impose any penalty by reason of such discontinuation,

the Sellers' cessation of operations, the assignment of such leases to the Purchaser, or the

interruption of business activities at any of the leased premises.

22.    All undisputed defaults or other obligations of the Sellers under the

Purchased Contracts arising or accruing prior to the Assumption Effective Date (without giving

effect to any acceleration clauses or any default provisions of the kind specified in section

365(b)(2) of the Bankruptcy Code) shall be cured at the Assumption Effective Date or as soon

thereafter as practicable by payment of the Cure Amounts (as hereinafter defined) by the

Purchaser, and upon paying such amounts the Purchaser shall have no further liability or

obligation arising or accruing prior to the date of the Closing, except for disputed Cure Amounts

and as otherwise expressly provided in the MPA. The Database maintained by the Debtors with

respect to the Assumable Executory Contracts, which is referenced and is accessible as set forth

in the Assumption and Assignment Notice, reflects the sole amounts necessary under section

365(b) of the Bankruptcy Code to cure all monetary defaults under the Assumable Executory

Contracts (the "Cure Amounts"), and no other amounts are or shall be due to the non-Debtor

parties in connection with the assumption by the Debtors and assignment to the Purchaser of the

Assumable Executory Contracts.

      23.     Each non-Debtor party to an Assumable Executory Contract is forever

barred, estopped, and permanently enjoined from (a) asserting against the Debtors or the

Purchaser, their successors or assigns, or their respective property, any default arising prior to, or

existing as of, the Closing, or, against the Purchaser, any counterclaim, defense, setoff, or other

Claim asserted or assertable against the Sellers and (ii) imposing or charging against the

Purchaser or its Affiliates any rent accelerations, assignment fees, increases, or any other fees as

a result of the Sellers' assumption and assignment to the Purchaser of the Assumable Executory

Contracts. The validity of such assumption and assignment of the Assumable Executory

Contracts shall not be affected by any dispute between the Sellers and any non-Debtor party to

an Assumable Executory Contract.

      24.     Except as provided in the MPA or this Order, after the Closing, the

Debtors and their estates shall have no further liabilities or obligations with respect to any

Assumed Liabilities other than certain Cure Amounts as provided in the MPA, and all holders of

such Claims are forever barred and estopped from asserting such Claims against the Debtors,

their successors or assigns, and their estates.

25.    The failure of the Sellers or the Purchaser to enforce at any time one or

more terms or conditions of any Assumable Executory Contract shall not be a waiver of such

terms or conditions, or of the Sellers' and the Purchaser's rights to enforce every term and

condition of the Assumable Executory Contracts.

26.    The assignments of each of the Assumable Executory Contracts are made

in good faith under sections 363(b) and (m) of the Bankruptcy Code.

### Additional Provisions

27.    Except for the Assumed Liabilities expressly set forth in the APA, none of

the Purchaser, its successors or assigns, or any of their respective affiliates shall have any

liability for any Claim that arose prior to the Closing Date, relates to the production of vehicles

prior to the Closing Date, or otherwise is assertable against the Debtors or is related to the

Purchased Assets prior to the Closing Date.  The Purchaser shall not be deemed, as a result of

any action taken in connection with the MPA or any of the transactions or documents ancillary

thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets, to:

(i) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with

respect to any obligations arising under the Purchased Agreements from and after the Closing);

(ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a mere continuation

or substantial continuation of the Debtors or the enterprise of the Debtors.  Without limiting the

foregoing, the Purchaser shall not have any successor, transferee, derivative, or vicarious

liabilities of any kind or character for any Claims, including, but not limited to, under any theory

of successor or transferee liability, de facto merger or continuity, environmental, labor and

employment, and products or antitrust liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted, or unasserted, fixed or contingent, liquidated or unliquidated.

28.    Effective upon the Closing and except as otherwise provided by stipulation filed with or announced to the Court with respect to a specific matter, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser, its successors and assigns, or the Purchased Assets, with respect to any (i) Claim other than Assumed Liabilities, or (ii) successor or transferee liability of the Purchaser for any of the Debtors, including, without limitation, the following actions:  (a) commencing or continuing any action or other proceeding pending or threatened against the Debtors as against the Purchaser, or its successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtors as against the Purchaser, its successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (c) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance against the Debtors as against the Purchaser or its successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (d) asserting any setoff, right of subrogation, or recoupment of any kind for any obligation of any of the Debtors as against any obligation due the Purchaser or its successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (e) commencing or continuing any action, in any manner or place, that does not comply, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or

refusing to renew any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with such assets.

29.    Except for the Assumed Liabilities, or as expressly permitted or otherwise specifically provided for in the MPA or this Order, the Purchaser shall have no liability or responsibility for any liability or other obligation of the Sellers arising under or related to the Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided in this Order and the MPA, the Purchaser shall not be liable for any Claims against the Sellers or any of their predecessors or Affiliates, and the Purchaser shall have no successor, transferee, or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Sellers or any obligations of the Sellers arising prior to the Closing, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing. The Purchaser has given substantial consideration under the MPA for the benefit of the holders of liens, claims, encumbrances, or other interests. The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims of successor liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders liens, claims, encumbrances or other interests against the Sellers or their respective assets.

30.    The consideration provided by the Purchaser for the Purchased Assets under the MPA shall be deemed to constitute reasonably equivalent value and fair consideration

under the Bankruptcy Code and under the laws of the United States, any state, territory,

possession, or the District of Columbia.

31.    The consideration provided by the Purchaser for the Purchased Assets

under the MPA is fair and reasonable, and the Sale may not be avoided under section 363(n) of

the Bankruptcy Code.

32.    If there is an Agreed G Transaction (determined no later than the due date,

with extensions, of GM's tax return for the taxable year in which the 363 Transaction occurs), (i)

the MPA shall, and hereby does, constitute a "plan" of GM and the Purchaser solely for purposes

of sections 368 and 354 of the Tax Code, and (ii) the 363 Transaction, as set forth in the MPA,

and the subsequent liquidation of the Sellers, are intended to constitute a tax reorganization of

GM pursuant to section 368(a)(1)(G) of the Tax Code.

33.    This Order (a) shall be effective as a determination that, except for the

Assumed Liabilities, at Closing, all liens, claims, encumbrances, and other interests of any kind

or nature whatsoever existing as to the Sellers with respect to the Purchased Assets prior to the

Closing have been unconditionally released, discharged, and terminated, and that the

conveyances described in this Order have been effected, and (b) shall be binding upon and

govern the acts of all entities, including, without limitation, all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state, and local

officials, and all other persons and entities who may be required by operation of law, the duties

of their office, or contract, to accept, file, register, or otherwise record or release any documents

or instruments, or who may be required to report or insure any title or state of title in or to any of

the Purchased Assets.

34.    Each and every federal, state, and local governmental agency or
department is authorized to accept any and all documents and instruments necessary and
appropriate to consummate the transactions contemplated by the MPA.

35.    Any amounts that become payable by the Sellers to the Purchaser pursuant
to the MPA (and related agreements executed in connection therewith, including, but not limited
to, any obligation arising under Section 8.2(b) of the MPA) shall (a) constitute administrative
expenses of the Debtors' estates under sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code
and (b) be paid by the Debtors in the time and manner provided for in the MPA without further
Court order.

36.    The transactions contemplated by the MPA are undertaken by the
Purchaser without collusion and in good faith, as that term is used in section 363(m) of the
Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization
provided in this Order to consummate the 363 Transaction shall not affect the validity of the 363
Transaction (including the assumption and assignment of any of the Assumable Executory
Contracts), unless such authorization is duly stayed pending such appeal.  The Purchaser is a
purchaser in good faith of the Purchased Assets and is entitled to all the protections afforded by
section 363(m) of the Bankruptcy Code.

37.    Subject to further Court order and consistent with the terms of the MPA
and the Transition Services Agreement, the Debtors and the Purchaser are authorized to, and
shall, take appropriate measures to maintain and preserve, until the consummation of any chapter
11 plan for the Debtors, (a) the books, records, and any other documentation, including tapes or
other audio or digital recordings and data in, or retrievable from, computers or servers relating to
or reflecting the records held by the Debtors or their affiliates relating to the Debtors' business,
and (b) the cash management system maintained by the Debtors prior to the Closing pursuant to

the order of the Court entered on June __, 2009 (Docket No. ___), as such system may be necessary to effect the orderly administration of the Debtors' estates.

38.     Nothing in this Order or the MPA releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental statutes or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner or operator of property after the date of entry of this Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to entry of this Order. Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.

39.     No law of any state or other jurisdiction, including any bulk sales law or similar law, shall apply in any way to the transactions contemplated by the 363 Transaction, the MPA, the Motion, and this Order.

40.     The terms and provisions of the MPA and this Order shall be binding in all respects upon, and shall inure to the benefit of the Debtors, their estates, and their creditors, the Purchaser and its respective affiliates, successors, and assigns, and any affected third parties, including, but not limited to, all persons asserting a lien, claim, encumbrance, or other interest in the Purchased Assets, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

41.     The failure to specifically include any particular provisions of the MPA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the MPA be authorized and approved in its entirety.

42.     The MPA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

43.     The provisions of this Order are nonseverable and mutually dependent on each other.

44.     Pursuant to Bankruptcy Rules 6004(g) and 6006(d), this Order shall not be stayed for ten days after its entry and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the 363 Transaction immediately upon entry of this Order.

45.     This Court retains jurisdiction to enforce and implement the terms and provisions of this Order, the MPA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Purchaser, (b) compel delivery of the purchase price or performance of other obligations owed by or to the Debtors, (c) resolve any disputes arising under or related to the MPA, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect the Purchaser against any of the Retained Liabilities or the assertion of any lien, claim, encumbrance, or other interest, of any kind or nature whatsoever, against the Purchased Assets.

Dated: New York, York
       [_____], 2009


                                        _____
                                        United States Bankruptcy Judge

EXHIBIT A

**MASTER SALE AND PURCHASE AGREEMENT**

TO BE INSERTED

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit J-1**

Form of Deferred Termination Agreement for Saturn Discontinued Brand Dealer
Agreements

J

**EXHIBIT J-1**

## FORM OF DEFERRED TERMINATION AGREEMENT FOR SATURN DISCONTINUED BRAND DEALER AGREEMENTS

THIS DEFERRED TERMINATION AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between **[RETAILER ENTITY CORPORATE NAME]** ("Retailer"), and SATURN DISTRIBUTION CORPORATION ("SDC").

### RECITALS

A.    Retailer and SDC are parties to a Retailer Agreement (the "Retailer Agreement") for Saturn Motor Vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Retailer Agreement.

B.    SDC is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). No trustee has been appointed and SDC is operating its business as debtor-in-possession.

C.    SDC and Saturn, LLC (an Affiliate, as hereinafter defined, of SDC) intend to sell, convey, assign and otherwise transfer certain of their assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.    SDC has considered moving and may, at its option, move to reject the Retailer Agreement in the Bankruptcy Case, as permitted under the Bankruptcy Code, before the closing of the 363 Sale unless Retailer executes and delivers this Agreement to SDC on or before June 12, 2009.

E.    In return for the payments set forth herein and SDC's willingness not to pursue the immediate rejection of the Retailer Agreement in the Bankruptcy Case, Retailer desires to enter into this Agreement (i) to allow Retailer, among other things, to wind down its Saturn Retail Facility Operations in an orderly fashion (specifically including the sale of all Retailer's new Motor Vehicles), (ii) to provide for Retailer's voluntary termination of the Retailer Agreement, SDC's payment of certain monetary consideration to Retailer, Retailer's covenants regarding its continuing Saturn Retail Facility Operations under the Retailer Agreement, as supplemented by the terms of this Agreement (the "Subject Retailer Operations"), and (iii) Retailer's release of SDC, Saturn, LLC and their related parties from any and all liability arising out of or connected with the Retailer Agreement, any predecessor agreement(s) thereto, and the relationship between SDC and Retailer relating to the Retailer Agreement, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Retailer and SDC hereby agree (subject to any required Bankruptcy Court approvals) as follows:

1.    Assignment-363 Sale. Retailer acknowledges that SDC has the right, but not the obligation, to assign the Retailer Agreement and this Agreement in the Bankruptcy Case to the 363 Acquirer. As part of the 363 Sale, provided such sale closes, SDC may, in its sole discretion, assign the Retailer Agreement

and this Agreement to the 363 Acquirer. Retailer specifically agrees to such assignment and agrees that it will not object to or protest any such assignment.

2.  Termination of Retailer Agreement.  Subject to the terms of Section 1 above:

(a)  Retailer hereby covenants and agrees to conduct the Saturn Retail Facility Operations until the effective date of termination of the Retailer Agreement, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Retailer Agreement, as supplemented by the terms of this Agreement. Accordingly, Retailer hereby terminates the Retailer Agreement by written agreement in accordance with Article 21A(2) thereof, such termination to be effective on October 31, 2010. Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Retailer Agreement to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party. In addition, and notwithstanding the foregoing, if Retailer has sold of all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Retailer Agreement prior to January 1, 2010, Retailer may request that SDC or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, SDC or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b)  Concurrently with its termination of the Retailer Agreement, Retailer hereby conveys to SDC or the 363 Acquirer, as applicable, a non-exclusive right to use Retailer's customer lists and service records for the Subject Retailer Operations, and within ten (10) days following SDC's or the 363 Acquirer's, as applicable, written request, Retailer shall deliver to SDC or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records. Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3.  Payment to Retailer.

(a)     Subject to Sections 1 and 2 above, in consideration of (i) Retailer's execution and delivery to SDC of this Agreement, (ii) Retailer's agreement to sell its new Motor Vehicle inventory as set forth below, and (ii) the termination of the Retailer Agreement by written agreement in accordance with Article 21(A)(2) thereof (as set forth in Section 2 of this Agreement), SDC or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Retailer the sum of ($_____ ) (the "Termination Payment Amount"), subject to the terms herein. This payment is consideration solely for Retailer's covenants, releases and waivers set forth herein, and Retailer's transfer to SDC or the 363 Acquirer, as applicable, of a non-exclusive right to use its customer lists and service records.

(b)     SDC shall pay twenty-five percent (25%) of the Termination Payment Amount (the "Initial Payment Amount") to Retailer by crediting Retailer's open account maintained by SDC or the 363 Acquirer, as applicable (the "Open Account"), in accordance with its standard practices and on or before the date ten (10) business days following the later of (i) SDC's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement. SDC or the 363 Acquirer, as applicable, shall pay the balance of the Termination Payment Amount (the "Final Payment Amount") to Retailer, subject to the terms of this Agreement, by crediting Retailer's Open Account in accordance with its standard practices, within ten (10) business days after all of the following have occurred: (i) Retailer has sold all of its new Motor

Vehicle inventory for the Existing Model Line prior to the termination of the Retailer Agreement, (ii) Retailer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, (iii) Retailer's delivery to SDC or the 363 Acquirer, as applicable, of certificates of applicable taxing authorities that Retailer has paid all sales, use, and other taxes or evidence reasonably satisfactory to SDC or the 363 Acquirer, as applicable, that SDC or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Retailer Agreement in accordance with Section 2(b) above, (v) compliance with the terms of Section 4(c) below, (vi) SDC's or the 363 Acquirer's, as applicable, receipt of the fully executed Supplemental Termination Agreement in substantially the form attached hereto as <u>Exhibit A</u> (subject to inclusion of information specific to the Subject Retailer Operations), and (vii) SDC's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals. SDC or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)    In addition to any other setoff rights under the Retailer Agreement, payment of all or any part of the Termination Payment Amount may, in SDC's or the 363 Acquirer's, as applicable, reasonable discretion, be (i) reduced by any amount owed by Retailer to SDC or the 363 Acquirer, as applicable, or their Affiliates, and/or (ii) delayed in the event SDC or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Retailer relating to the Subject Retailer Operations including, but not limited to, all or any part of the Termination Payment Amount (each, a "<u>Competing Claim</u>"), in which event SDC or the 363 Acquirer, as applicable, may delay payment of all or any part of the Termination Payment Amount until SDC or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4.    <u>Complete Waiver of All Termination Assistance Rights</u>. In consideration of the agreements by SDC hereunder, upon the termination of the Retailer Agreement, as provided in Section 2 of this Agreement, and cessation of the Subject Retailer Operations, the following terms shall apply in lieu of Retailer's rights to receive termination assistance, whether under the Retailer Agreement or applicable laws, all of which rights Retailer hereby waives:

(a)    Neither SDC nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Retailer any Motor Vehicles whatsoever.

(b)    Neither SDC nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Retailer any Parts or Accessories or Special Tools whatsoever.

(c)    Retailer shall eliminate or remove from the Retailer Premises all Retailer-owned signs (freestanding or not) for the Subject Retailer Operations within thirty (30) days following the effective date of termination at no cost to SDC or the 363 Acquirer, as applicable. Retailer understands and agrees that neither SDC nor the 363 Acquirer, as applicable, will purchase any Retailer-owned signs used in connection with the Subject Retailer Operations. Retailer hereby waives any rights it may have to require either SDC or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Retailer Operations. Retailer shall provide, or shall cause the owner of the Retailer Facility Premises to provide, GMDI access to the Retail Facility Premises in order for GMDI to remove all SDC signs leased to Retailer by GMDI. Retailer understands and agrees that the Termination Payment Amount was determined by SDC in part based on Retailer's agreement that it will timely remove all signs for the Subject Retailer Operations and will not require or attempt to require SDC or the 363 Acquirer, as

16 **THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766880

applicable, to purchase any or all of such signs pursuant to the provisions of the Retailer Agreement or any applicable statutes, regulations, or other laws.

(d)     Retailer expressly agrees that the provisions of Article 22 of the Retailer Agreement do not, by their terms, apply to this termination.

(e)     Retailer expressly agrees that all termination rights of Retailer are set forth herein and expressly agrees that any termination assistance otherwise available to Retailer as set forth in the Retailer Agreement or any state statute or regulation shall not apply to Retailer's termination of the Retailer Agreement.

(f)     The terms of this Section 4 shall survive the termination of this Agreement.

5.  Release; Covenant Not to Sue; Indemnity.

(a)     Retailer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Retailer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Retailer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Retailer or anyone claiming through or under Retailer may have as of the date of the execution of this Agreement against SDC, Saturn Corporation, General Motors Corporation, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "SDC Parties"), arising out of or relating to (i) the Retailer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the Retail Facility Premises for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of Retailer's facilities, locations or requirements, Saturn Standards for Excellence ("SFE") related payments or bonuses (except that SDC shall pay any SFE payments due to Retailer for the second (2nd) quarter of 2009 and neither SDC nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Retailer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with the Subject Retailer Operations under the Retailer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Retailer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days of the date of this Agreement, (y) the payment to Retailer of any incentives currently owing to Retailer or any amounts currently owing to Retailer in its Open Account, or (z) any claims of Retailer pursuant to Article 13E of the Retailer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by SDC or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates. SDC or the 363 Acquirer, as applicable, shall not charge back to Retailer any warranty claims approved and paid by SDC or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that SDC or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

16 **THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766880

(b)   As set forth above, SDC reaffirms the indemnification provisions of Article 13E of the Retailer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Retailer.

(c)   Retailer, for itself, and the other Retailer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above, or (ii) any Claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Retailer Agreement by SDC to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. As a result of the foregoing, any such breach shall absolutely entitle SDC or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Retailer from contesting SDC's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Retailer in violation of this Section 5. In addition, SDC or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 5 by Retailer, including, without limitation, the right to specific performance.

(d)   Retailer shall indemnify, defend and hold the SDC Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the SDC Parties, or any of them, arising from, relating to, or caused by Retailer's (or any other Retailer Party's) breach of this Agreement or Retailer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e)   The terms of this Section 5 shall survive the termination of this Agreement.

6.   Subject Retailer Operations. From the effective date of this Agreement until the effective date of termination of the Retailer Agreement (which shall not occur prior to January 1, 2010, subject to Section 2(a) above):

(a)   Retailer shall not, and shall have no right to, purchase Saturn Motor Vehicles from SDC or the 363 Acquirer, as applicable, which rights Retailer hereby waives.

(b)   Retailer shall have the right to purchase service parts from SDC or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Retail Facility Premises during the term of this Agreement. Retailer shall have no obligation, however, to follow the recommendations of the Saturn service parts inventory management process, which recommendations are provided for guidance purposes only. Retailer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the future from a source other than SDC or the 363 Acquirer, as applicable), including but not limited to orders recommended by Saturn, LLC, shall not be eligible for return.

(c) Retailer shall not, and shall have no right to, propose to SDC or the 363 Acquirer, as applicable, (under Article 20 of the Retailer Agreement or otherwise) or consummate a change in Retailer Operator, a change in ownership, or, subject to SDC's or the 363 Acquirer's, as applicable, option, a transfer of the retailer business or its principal assets to any Person; provided, however, that SDC or the 363 Acquirer, as applicable, shall honor the terms of Article 20A of the Retailer Agreement upon the death or incapacity of the Retailer Operator, except that the term of any new retailer agreement under Article 20A shall expire on October 31, 2010, subject to the terms of this Agreement. Accordingly, neither SDC nor the 363 Acquirer, as applicable, shall have any obligation (under Article 20 of the Retailer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d) In addition to all other matters set forth herein, the following portions of the Retailer Agreement shall not apply; Article 5 (Shared Responsibility), Article 6 (Dispute Resolution Process), after August 31, 2009, Article 13A and 13C(1) (concerning ordering of new Motor Vehicles), Article 15 ( Business Planning), Article 18 (Training), Article 20B (Changes in Management and Ownership), and Article 22 (Termination Assistance).

(e)     Except as expressly otherwise set forth herein, the terms of the Retailer Agreement, shall remain unmodified and in full force and effect.

7.  Due Authority.  Retailer and the individual(s) executing this Agreement on behalf of Retailer hereby jointly and severally represent and warrant to SDC that this Agreement has been duly authorized by Retailer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

8.  Confidentiality.  Retailer hereby agrees that, without the prior written consent of SDC or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Retailer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

9.  Informed and Voluntary Acts.  Retailer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Retailer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

10. Binding Effect.  This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that SDC assigns the Retailer Agreement and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

11. Effectiveness.  This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Retailer and is received by SDC on or before **June 12, 2009**.

12. Continuing Jurisdiction.  By executing this Agreement, Retailer herby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 12 shall survive the termination of this Agreement.

13. Other Agreements.

(a)    Retailer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between SDC, or one or more of its Affiliates, and Retailer, provided that SDC or the 363 Acquirer, as applicable, and Retailer shall enter into any amendment or modification to the Channel Agreements required as a result of SDC's restructuring plan, in a form reasonably satisfactory to SDC or the 363 Acquirer, as applicable. In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

(b)    The term "Channel Agreements" shall mean any agreement (other than the Retailer Agreement) between SDC, or one or more of its Affiliates, and Retailer imposing on Retailer obligations with respect to its Subject Retailer Operations under the Retailer Agreement, including, without limitation, obligations to relocate Subject Retailer Operations, to construct or renovate facilities, not to protest establishment or relocation of other Retailers, to conduct exclusive Subject Retailer Operations under the Retailer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from SDC or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Retailer Agreement between Retailer and SDC (each a "Termination Agreement"), (ii) any performance agreement of any kind between Retailer and SDC (each a "Performance Agreement"), or (iii) any agreement between Retailer (or any Affiliate of Retailer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of General Motors Corporation ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Retailer shall comply with all of the terms of such agreements with AHI). Retailer acknowledges that SDC shall be entitled to, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Retailer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to SDC's rejection of such Termination Agreements or Performance Agreements.

(c)    All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Retailer Agreement (pursuant to Section 2(b) hereof), except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Retailer Agreement, Retailer and SDC shall enter into documents in recordable form reasonably satisfactory to SDC or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Retailer or Retailer's Affiliates.

14. Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

15. Counterparts.  This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

16. <u>Complete Agreement of the Parties</u>.  This Agreement, the Retailer Agreement, and the schedules, exhibits and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement.  The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement.  No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement.  The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

---

16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766880

IN WITNESS WHEREOF, Retailer and SDC have executed this Agreement as of the day and year first above written.

**[RETAILER ENTITY CORPORATE NAME]**

By:_____

Name:_____
Title:_____

**SATURN DISTRIBUTION CORPORATION**

By:_____
    Authorized Representative

**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY RETAILER AND RECEIVED BY SDC ON OR BEFORE JUNE 12, 2009, OR IF RETAILER CHANGES ANY TERM OR PROVISION HEREIN.**

**16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766880

## EXHIBIT A

## SAMPLE SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT

THIS SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT (this "Agreement") is made and entered into as of the _____ day of _____, 20__, by _____, a _____ ("Retailer"), for the use and benefit of _____, a _____ ("SDC") and _____, a _____ corporation ("363 Acquirer").

### RECITALS

A.    Retailer and SDC are parties to a Retailer Sales and Service Agreement for Saturn motor vehicles (the "Retailer Agreement").

B.    Retailer and SDC are parties to that certain Deferred Termination Agreement dated June __, 2009 (the "Original Deferred Termination Agreement"). All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Deferred Termination Agreement.

**C.    [IF RETAILER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [SDC assigned all of its right, title and interest in the Retailer Agreement and the Original Deferred Termination Agreement to the 363 Acquirer.]**

D.    Pursuant to the Original Deferred Termination Agreement, Retailer agreed to terminate and cancel the Retailer Agreement and all rights and continuing interests therein by written agreement and to release SDC and its related parties from any and all liability arising out of or connected with the Retailer Agreement, any predecessor agreement(s) thereto, and the relationship between SDC or the 363 Acquirer, as applicable, and Retailer relating to the Retailer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

E.    Retailer executes this Agreement in accordance with Section 3 of the Original Deferred Termination Agreement.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Retailer hereby agrees as follows:

1.    Termination of Retailer Agreement.

(a) Retailer hereby terminates the Retailer Agreement by written agreement in accordance with Section 14.2 thereof.    The effective date of such termination shall be _____, 20__.

(b) Retailer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Retailer.

(c) Retailer shall be entitled to receive the Final Payment Amount in accordance with the terms of the Original Deferred Termination Agreement.

2.  Release; Covenant Not to Sue; Indemnity.

(a) Retailer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Retailer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Retailer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Retailer or anyone claiming through or under Retailer may have as of the date of the execution of this Agreement against SDC, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "SDC Parties"), arising out of or relating to (i) the Retailer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the Retail Facility Premises for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of Retailer's facilities, locations or requirements, Saturn Standards for Excellence ("SFE") related payments or bonuses (except that the 363 Acquirer shall pay any SFE payments due Retailer for the second (2nd) quarter of 2009 and the 363 Acquirer shall not collect any further SFE related payments from Retailer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Subject Retailer Operations under the Retailer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Retailer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Retailer of any incentives currently owing to Retailer or any amounts currently owing to Retailer in its Open Account, or (z) any claims of Retailer pursuant to Article 13E of the Retailer Agreement,, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by SDC of any amounts due or to become due to SDC or any of its Affiliates. SDC shall not charge back to Retailer any warranty claims approved and paid by SDC prior to the effective date of termination, as described in Section 1 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that SDC may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) Retailer, for itself, and the other Retailer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert **[(i)]** any Claim that is covered by the release provision in subparagraph (a) above **[IF RETAILER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Retailer Agreement or the Original Deferred Termination Agreement by SDC to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.]** As a result of the foregoing, any such breach shall absolutely entitle SDC to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Retailer from contesting SDC's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Retailer in violation of this Section 2. In addition, SDC shall have all other equitable rights in connection with a breach of this Section 2 by Retailer, including, without limitation, the right to specific performance.

(c) Retailer shall indemnify, defend and hold the SDC Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the SDC Parties, or any of them, arising from, relating to, or caused by Retailer's (or any other Retailer Parties') breach of this Agreement or Retailer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3.  Due Authority. Retailer and the individual(s) executing this Agreement on behalf of Retailer hereby jointly and severally represent and warrant to SDC that this Agreement has been duly authorized by Retailer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4.  Confidentiality. Retailer hereby agrees that, without the prior written consent of SDC, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Retailer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5.  Informed and Voluntary Acts. Retailer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Retailer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

6.  Binding Effect. This Agreement shall be binding upon any replacement or successor Retailer as referred to in the Retailer Agreement and any successors or assigns. This Agreement shall be binding upon any replacement or successor Retailer as referred to in the Retailer Agreement and any successors or assigns, and shall benefit any of SDC's successors or assigns.

7.  Continuing Jurisdiction. By executing this Agreement, Retailer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 7 shall survive the termination of this Agreement.

8.  Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

9.  No Reliance. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties hereto expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

IN WITNESS WHEREOF, Retailer has executed this Agreement through its duly authorized officer as of the day and year first above written.

_____

By:_____
Name:_____
Title:_____

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit J-2**

Form of Deferred Termination Agreement for Hummer Discontinued Brand Dealer
Agreements

## EXHIBIT J-2

## FORM OF DEFERRED TERMINATION AGREEMENT FOR HUMMER DISCONTINUED BRAND DEALER AGREEMENTS

THIS DEFERRED TERMINATION AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between *[DEALER ENTITY CORPORATE NAME]* ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

### RECITALS

A.    Dealer and GM are parties to a Dealer Sales and Service Agreement (the "Dealer Agreement") for HUMMER motor vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreement.

B.    GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  No trustee has been appointed and GM is operating its business as debtor-in-possession.

C.    GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.    GM has considered moving and may, at its option, move to reject the Dealer Agreement in the Bankruptcy Case, as permitted under the Bankruptcy Code, unless Dealer executes and delivers this Agreement to GM on or before June 12, 2009.

E.    In return for the payments set forth herein and GM's willingness not to pursue the immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this Agreement, (i) to allow Dealer, among other things, to wind down its Dealership Operations in an orderly fashion (specifically including the sale of all Dealer's new Motor Vehicles), (ii) to provide for Dealer's voluntary termination of the Dealer Agreement, GM's payment of certain monetary consideration to Dealer, and Dealer's covenants regarding its continuing Dealership Operations under the Dealer Agreement, as supplemented by the terms of this Agreement (the "Subject Dealership Operations"), and (iii) to provide for Dealer's release of GM, the 363 Acquirer and their related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals) as follows:

1.    Assignment-363 Sale.  Dealer acknowledges and agrees that GM has the right, but not the obligation, to seek to assign the Dealer Agreement and this Agreement in the Bankruptcy Case to the 363 Acquirer.  As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the

Dealer Agreement and this Agreement to the 363 Acquirer.  If GM elects to exercise its option to assign the Dealer Agreement and this Agreement, Dealer specifically agrees to such assignment and agrees not to object to or protest any such assignment.

2.    Termination of Dealer Agreement.  Subject to the terms of Section 1 above:

(a)  Dealer hereby covenants and agrees to conduct the Subject Dealership Operations until the effective date of termination of the Dealer Agreement, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreement, as supplemented by the terms of this Agreement.  Accordingly, Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof, such termination to be effective on October 31, 2010.  Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreement to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party.  In addition, and notwithstanding the foregoing, if Dealer has sold all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Dealer Agreement prior to January 1, 2010, Dealer may request that GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b)  Concurrently with its termination of the Dealer Agreement, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealership Operations, and within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records.  Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3.    Payment to Dealer.

(a)  Subject to Sections 1 and 2 above, in consideration of (i) Dealer's execution and delivery to GM of this Agreement, (ii) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (iii) the termination of the Dealer Agreement by written agreement in accordance with Section 14.2 thereof (as set forth in Section 2 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of $_____ (the "Termination Payment Amount"), subject to the terms herein.  This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use the customer lists and service records.

(b)  GM or the 363 Acquirer, as applicable, shall pay twenty-five percent (25%) of the Termination Payment Amount (the "Initial Payment Amount") to Dealer by crediting Dealer's open account maintained by GM or the 363 Acquirer, as applicable (the "Open Account"), in accordance with its standard practices, within ten (10) business days following the later of (i) GM's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement.  GM or the 363 Acquirer, as applicable, shall pay the balance of the Termination Payment Amount (the "Final Payment Amount") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with its standard practices, within

2

16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

ten (10) business days after all of the following have occurred: (i) Dealer has sold all of its new Motor Vehicle inventory for the Existing Model Line prior to the termination of the Dealer Agreement, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of certificates of applicable taxing authorities that Dealer has paid all sales, use, and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreement in accordance with Section 2(a) above, (v) Dealer's compliance with the terms of Section 4(c) below, (vi) GM's or the 363 Acquirer's receipt of the fully executed Supplemental Wind-Down Agreement in substantially the form attached hereto as Exhibit A (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals. GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)   In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the Termination Payment Amount may, in GM's or the 363 Acquirer's, as applicable, reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates (as defined below), and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealership Operations including, but not limited to, all or any part of the Termination Payment Amount (each, a "Competing Claim"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Termination Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4.   Complete Waiver of All Termination Assistance Rights.   In consideration of the agreements by GM hereunder, upon the termination of the Dealer Agreement, as provided in this Agreement, and cessation of the Subject Dealership Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreement or applicable laws, all of which rights Dealer hereby waives:

(a)   Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever.

(b)   Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c)   Dealer shall eliminate or remove from the Dealership Premises all Dealer-owned signs (freestanding or not) for the Subject Dealership Operations within thirty (30) days following the effective date of termination at no cost to either GM or the 363 Acquirer, as applicable. Dealer understands and agrees that neither GM nor the 363 Acquirer, as applicable, will purchase any Dealer-owned signs used in connection with the Subject Dealership Operations. Dealer hereby waives any rights it may have to require either GM or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Dealership Operations. Dealer shall provide, or shall cause the owner of the Dealership Premises to provide, GMDI access to the Dealership Premises in order for GMDI to remove all GM signs leased to Dealer by GMDI. Dealer understands and agrees that the Termination Payment Amount was determined by GM in part based on Dealer's agreement that it will timely remove all signs for the Subject Dealership

3

Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreement or any applicable statutes, regulations, or other laws.

(d) Dealer expressly agrees that the provisions of Section 15 of the Dealer Agreement do not, by their terms, apply to this termination.

(e) Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in the Dealer Agreement or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement.

(f) The terms of this Section 4 shall survive the termination of this Agreement.

5.    Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates. GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

4

16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

(b) As set forth above, GM reaffirms the indemnification provisions of Section 17.4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or this Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 5. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 5 by Dealer, including, without limitation, the right to specific performance.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e) The terms of this Section 5 shall survive the termination of this Agreement.

6. Subject Dealership Operations.    From the effective date of this Agreement until the effective date of termination of the Dealer Agreement (which shall not occur prior to January 1, 2010, subject to Section 2(a) above):

(a) Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives.

(b) Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement. Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("RIM") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN
1766881

(c) Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable, (under Section 12.2 of the Dealer Agreement or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person; provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section 12.1 of the Dealer Agreement upon the death or incapacity of the Dealer Operator, except that the term of any new dealer agreement under Subsection 12.1.5 shall expire on October 31, 2010, subject to the terms of this Agreement.  Accordingly, neither GM nor the 363 Acquirer, as applicable, shall have any obligation (under Section 12.2 of the Dealer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d) In addition to all other matters set forth herein, the following portions of the Dealer Agreement shall not apply; Sections 6.1 and 6.3.1 (concerning ordering of new Motor Vehicles), Article 8 (Training), Article 9 (Review of Dealer's Performance), Sections 12.2 and 12.3 (Changes in Management and Ownership), Article 15 (Termination Assistance), and Article 16 (Dispute Resolution).

(e) Except as expressly otherwise set forth herein, the terms of the Dealer Agreement, shall remain unmodified and in full force and effect.

7.  <u>Due Authority</u>.  Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

8.  <u>Confidentiality</u>.  Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

9.  <u>Informed and Voluntary Acts</u>.  Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives.  In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

10. <u>Binding Effect</u>.  This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns.  Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that GM assigns the Dealer Agreement and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

11. <u>Effectiveness</u>.  This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

12. <u>Continuing Jurisdiction</u>.     By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 13 shall survive the termination of this Agreement.

13. <u>Other Agreements</u>.

6

(a) Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer, as applicable, and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer, as applicable. In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

(b) The term "Channel Agreements" shall mean any agreement (other than the Dealer Agreement) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c) All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Dealer Agreement, except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Dealer Agreement, Dealer and GM shall execute and deliver documents in recordable form reasonably satisfactory to GM or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Dealer or Dealer's Affiliates.

14. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

15. Counterparts. This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

16. Breach. In the event of a breach of this Agreement by Dealer, GM and the 363 Acquirer shall each have all of its remedies at law and in equity, including, without limitation, the right to specific performance.

7

16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766881

17. <u>Complete Agreement of the Parties</u>.    This Agreement, the Dealer Agreement, and the schedules, exhibits, and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement.  The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement.  No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement.  The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

8

16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766881

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written.

*[DEALER ENTITY CORPORATE NAME]*

By:_____

Name:_____
Title:_____


**GENERAL MOTORS CORPORATION**


By:_____
    Authorized Representative


**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

9

## EXHIBIT A

## SAMPLE SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT

THIS SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT (this "Agreement") is made and entered into as of the _____ day of _____, 20__, by _____, a _____ ("Dealer"), for the use and benefit of _____, a _____ ("GM") and _____, a _____ corporation ("363 Acquirer").

## RECITALS

A.    Dealer and GM are parties to a Dealer Sales and Service Agreement for HUMMER motor vehicles (the "Dealer Agreement").

B.    Dealer and GM are parties to that certain Deferred Termination Agreement dated June __, 2009 (the "Original Deferred Termination Agreement"). All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Deferred Termination Agreement.

**C.    [IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][GM assigned all of its right, title and interest in the Dealer Agreement and the Original Deferred Termination Agreement to the 363 Acquirer.]**

D.    Pursuant to the Original Deferred Termination Agreement, Dealer agreed to terminate and cancel the Dealer Agreement and all rights and continuing interests therein by written agreement and to release GM and its related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM or the 363 Acquirer and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

E.    Dealer executes this Agreement in accordance with Section 3 of the Original Deferred Termination Agreement.

## COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer hereby agrees as follows:

1.    Termination of Dealer Agreement.

(a) Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof. The effective date of such termination shall be _____, 20__.

(b) Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer.

(c) Dealer shall be entitled to receive the Final Payment Amount in accordance with the terms of the Original Deferred Termination Agreement.

2. <u>Release; Covenant Not to Sue; Indemnity</u>.

    (a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "<u>Dealer Parties</u>"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("<u>Claims</u>"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "<u>GM Parties</u>"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("<u>SFE</u>") related payments or bonuses (except that the 363 Acquirer shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and the 363 Acquirer shall not collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement,, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM of any amounts due or to become due to GM or any of its Affiliates. GM shall not charge back to Dealer any warranty claims approved and paid by GM prior to the effective date of termination, as described in Section 1 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

    (b) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert **[(i)]** any Claim that is covered by the release provision in subparagraph (a) above **[IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or the Original Deferred Termination Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.]** As a result of the foregoing, any such breach shall absolutely entitle SDC or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Retailer from contesting SDC's application for injunctive relief and prohibiting any further act by Retailer in violation of this Section 2. In addition, SDC shall have all other equitable rights in connection with a breach of this Section 2 by Dealer, including, without limitation, the right to specific performance.

(c) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3. <u>Due Authority</u>. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4. <u>Confidentiality</u>. Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5. <u>Informed and Voluntary Acts</u>. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

6. <u>Binding Effect</u>. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns, and shall benefit any of GM's successors or assigns.

7. <u>Continuing Jurisdiction</u>. By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 7 shall survive the termination of this Agreement.

8. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

9. <u>No Reliance</u>. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties hereto expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN
1766881

IN WITNESS WHEREOF, Dealer has executed this Agreement through its duly authorized officer as of the day and year first above written.

_____

By:_____
Name:_____
Title:_____

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit J-3**

Form of Deferred Termination Agreement for non-Saturn and non-Hummer Discontinued
Brand Dealer Agreements and Excluded Continuing Brand Dealer Agreements

**EXHIBIT J-3**

## FORM OF DEFERRED TERMINATION AGREEMENT FOR NON-SATURN AND NON-HUMMER DISCONTINUED BRAND DEALER AGREEMENTS AND EXCLUDED CONTINUING BRAND DEALER AGREEMENTS

THIS DEFERRED TERMINATION AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between *[DEALER ENTITY CORPORATE NAME]* ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

### RECITALS

A.    Dealer and GM are parties to a Dealer Sales and Service Agreement (the "Dealer Agreement") for *[BRAND WINDING DOWN]* motor vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreement.

B.    GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). No trustee has been appointed and GM is operating its business as debtor-in-possession.

C.    GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.    GM has considered moving and may, at its option, move to reject the Dealer Agreement in the Bankruptcy Case, as permitted under the Bankruptcy Code, unless Dealer executes and delivers this Agreement to GM on or before June 12, 2009.

E.    In return for the payments set forth herein and GM's willingness not to pursue the immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this Agreement, (i) to allow Dealer, among other things, to wind down its Dealership Operations in an orderly fashion (specifically including the sale of all Dealer's new Motor Vehicles), (ii) to provide for Dealer's voluntary termination of the Dealer Agreement, GM's payment of certain monetary consideration to Dealer, and Dealer's covenants regarding its continuing Dealership Operations under the Dealer Agreement, as supplemented by the terms of this Agreement (the "Subject Dealership Operations"), and (iii) to provide for Dealer's release of GM, the 363 Acquirer and their related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals) as follows:

1.  <u>Assignment-363 Sale</u>.  Dealer acknowledges and agrees that GM has the right, but not the obligation, to seek to assign the Dealer Agreement and this Agreement in the Bankruptcy Case to the 363 Acquirer.  As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the Dealer Agreement and this Agreement to the 363 Acquirer.  If GM elects to exercise its option to assign the Dealer Agreement and this Agreement, Dealer specifically agrees to such assignment and agrees not to object to or protest any such assignment.

2.  <u>Termination of Dealer Agreement.</u>  Subject to the terms of Section 1 above:

(a) Dealer hereby covenants and agrees to conduct the Subject Dealership Operations until the effective date of termination of the Dealer Agreement, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreement, as supplemented by the terms of this Agreement.  Accordingly, Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof, such termination to be effective on October 31, 2010.  Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreement to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party.  In addition, and notwithstanding the foregoing, if Dealer has sold of all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Dealer Agreement prior to January 1, 2010, Dealer may request that GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b) Concurrently with its termination of the Dealer Agreement, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealership Operations, and within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records.  Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3.  <u>Payment to Dealer</u>.

(a) Subject to Sections 1 and 2 above, in consideration of (i) Dealer's execution and delivery to GM of this Agreement, (ii) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (iii) the termination of the Dealer Agreement by written agreement in accordance with Section 14.2 thereof (as set forth in Section 2 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of $_____ (the "<u>Deferred Termination Payment Amount</u>"), subject to the terms herein.  This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use the customer lists and service records.

(b) GM shall pay twenty-five percent (25%) of the Deferred Termination Payment Amount (the "<u>Initial Payment Amount</u>") to Dealer by crediting Dealer's open account maintained by GM on the GM Dealer Payment System (the "<u>Open Account</u>"), in accordance with GM's standard practices, within ten (10) business days following the later of (i) GM's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement.  GM

2

or the 363 Acquirer, as applicable, shall pay the balance of the Deferred Termination Payment Amount (the "Final Payment Amount") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with its standard practices, within ten (10) business days after all of the following have occurred: (i) Dealer has sold all of its new Motor Vehicle inventory for the Existing Model Line prior to the termination of the Dealer Agreement, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of certificates of applicable taxing authorities that Dealer has paid all sales, use, and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreement in accordance with Section 2(a) above, (v) Dealer's compliance with the terms of Section 4(c) below, (vi) GM's or the 363 Acquirer's receipt of the fully executed Supplemental Deferred Termination Agreement in substantially the form attached hereto as Exhibit A (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals. GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)   In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the Deferred Termination Payment Amount may, in GM's or the 363 Acquirer's reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates (as defined below), and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealership Operations including, but not limited to, all or any part of the Deferred Termination Payment Amount (each, a "Competing Claim"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Deferred Termination Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4.   Complete Waiver of All Termination Assistance Rights.   In consideration of the agreements by GM hereunder, upon the termination of the Dealer Agreement, as provided in this Agreement, and cessation of the Subject Dealership Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreement or applicable laws, all of which rights Dealer hereby waives:

(a)   Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever.

(b)   Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c)   Dealer shall eliminate or remove from the Dealership Premises all Dealer-owned signs (freestanding or not) for the Subject Dealership Operations within thirty (30) days following the effective date of termination at no cost to either GM or the 363 Acquirer, as applicable. Dealer understands and agrees that neither GM nor the 363 Acquirer, as applicable, will purchase any Dealer-owned signs used in connection with the Subject Dealership Operations. Dealer hereby waives any rights it may have to require either GM or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Dealership Operations. Dealer shall provide, or shall cause the owner of the Dealership Premises to provide, GMDI access to the

3

Dealership Premises in order for GMDI to remove all GM signs leased to Dealer by GMDI. Dealer understands and agrees that the Deferred Termination Payment Amount was determined by GM in part based on Dealer's agreement that it will timely remove all signs for the Subject Dealership Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreement or any applicable statutes, regulations, or other laws.

(d)  Dealer expressly agrees that the provisions of Article 15 of the Dealer Agreement do not, by their terms, apply to this termination.

(e)  Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in the Dealer Agreement or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement.

(f)  The terms of this Section 4 shall survive the termination of this Agreement.

5.  Release; Covenant Not to Sue; Indemnity.

(a)  Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates.  GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM

4

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN
1766870

or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) As set forth above, GM reaffirms the indemnification provisions of Section 17.4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or this Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e) The terms of this Section 5 shall survive the termination of this Agreement.

6. Subject Dealership Operations.    From the effective date of this Agreement until the effective date of termination of the Dealer Agreement (which shall not occur prior to January 1, 2010, subject to Section 2(a) above):

(a) Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives.

(b) Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement. Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("RIM") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the

5

future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

(c) Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable, (under Section 12.2 of the Dealer Agreement or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person; provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section 12.1 of the Dealer Agreement upon the death or incapacity of the Dealer Operator, except that the term of any new dealer agreement under Subsection 12.1.5 shall expire on October 31, 2010, subject to the terms of this Agreement. Accordingly, neither GM nor the 363 Acquirer, as applicable, shall have any obligation (under Section 12.2 of the Dealer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d) In addition to all other matters set forth herein, the following portions of the Dealer Agreement shall not apply; Sections 6.1 and 6.3.1 (concerning ordering of new Motor Vehicles), Article 8 (Training), Article 9 (Review of Dealer's Performance), Sections 12.2 and 12.3 (Changes in Management and Ownership), Article 15 (Termination Assistance), and Article 16 (Dispute Resolution).

(e) Except as expressly otherwise set forth herein, the terms of the Dealer Agreement, shall remain unmodified and in full force and effect.

7. No Protest.

(a) GM or the 363 Acquirer, as applicable, may desire to relocate or establish representation for the sale and service of the Existing Model Line in the vicinity of Dealer's Dealership Premises identified in the Dealer Agreement. In consideration of GM's and the 363 Acquirer's, as applicable, covenants and obligations herein, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or other tribunal or dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, any establishment or relocation whatsoever of a motor vehicle dealership for the Existing Model Line.

(b) Dealer, for itself and for each and all of the other Dealer Parties, hereby releases and forever discharges the GM Parties, from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including, without limitation, attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of such Existing Model Line.

(c) Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 7. Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 7. Dealer expressly intends that it shall be forever deprived of any such claim, demand,

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN
1766870

cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(d)    Dealer acknowledges that, upon a breach of this Section 7 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer, as applicable, to the same position it would occupy in the absence of breach. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

8.    Due Authority. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

9.    Confidentiality. Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

10.    Informed and Voluntary Acts. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

11.    Binding Effect. This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that GM assigns the Dealer Agreement and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

12.    Effectiveness. This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

13.    Continuing Jurisdiction.    By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 13 shall survive the termination of this Agreement.

14.    Other Agreements.

(a) Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer, as applicable, and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer, as applicable. In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

7

(b) The term "Channel Agreements" shall mean any agreement (other than the Dealer Agreement) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c) All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Dealer Agreement, except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Dealer Agreement, Dealer and GM shall execute and deliver documents in recordable form reasonably satisfactory to GM or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Dealer or Dealer's Affiliates.

15. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

16. Counterparts. This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

17. Breach. In the event of a breach of this Agreement by Dealer, GM and the 363 Acquirer shall each have all of its remedies at law and in equity, including, without limitation, the right to specific performance.

18. Complete Agreement of the Parties. This Agreement, the Dealer Agreement, and the schedules, exhibits, and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written

8

instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

9

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written.

*[DEALER ENTITY CORPORATE NAME]*

By:_____

Name:_____

Title:_____

**GENERAL MOTORS CORPORATION**

By:_____

Authorized Representative

**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766870

## EXHIBIT A

### SAMPLE SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT

THIS SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT AGREEMENT (this "Agreement") is made and entered into as of the _____ day of _____, 20__, by _____, a _____ ("Dealer"), for the use and benefit of _____, a _____ ("GM") and _____, a _____ corporation ("363 Acquirer").

### RECITALS

A.    Dealer and GM are parties to a Dealer Sales and Service Agreement for _____ motor vehicles (the "Dealer Agreement").

B.    Dealer and GM are parties to that certain Deferred Termination Agreement dated June __, 2009 (the "Original Deferred Termination Agreement"). All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Deferred Termination Agreement.

C.    **[IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [GM assigned all of its right, title and interest in the Dealer Agreement and the Original Deferred Termination Agreement to the 363 Acquirer.]**

D.    Pursuant to the Original Deferred Termination Agreement, Dealer agreed to terminate and cancel the Dealer Agreement and all rights and continuing interests therein by written agreement and to release GM and its related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between **[GM or the 363 Acquirer]** and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

E.    Dealer executes this Agreement in accordance with Section 3 of the Original Deferred Termination Agreement.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer hereby agrees as follows:

1.    Termination of Dealer Agreement.

(a) Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof. The effective date of such termination shall be _____, 20__.

(b) Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer.

(c) Dealer shall be entitled to receive the Final Payment Amount in accordance with the terms of the Original Deferred Termination Agreement.

**12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**
1766870

2.   Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that the 363 Acquirer shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and the 363 Acquirer shall not collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement,, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM of any amounts due or to become due to GM or any of its Affiliates. GM shall not charge back to Dealer any warranty claims approved and paid by GM prior to the effective date of termination, as described in Section 1 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert [(i)] any Claim that is covered by the release provision in subparagraph (a) above **[IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or the Original Deferred Termination Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.]** Notwithstanding anything to the contrary, Dealer acknowledges and agrees that GM will suffer irreparable harm from the breach by any Dealer Party of this covenant not to sue and therefore agrees that GM shall be entitled to any equitable remedies available to them, including, without limitation, injunctive relief, upon the breach of such covenant not to sue by any Dealer Party.

(c) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3. <u>Due Authority</u>. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4. <u>Confidentiality</u>. Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5. <u>Informed and Voluntary Acts</u>. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

6. <u>Binding Effect</u>. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns, and shall benefit any of GM's successors or assigns.

7. <u>Continuing Jurisdiction</u>. By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 7 shall survive the termination of this Agreement.

8. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

9. <u>No Reliance</u>. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties hereto expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

**12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766870

*[Signature Page Follows]*

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766870

IN WITNESS WHEREOF, Dealer has executed this Agreement through its duly authorized officer as of the day and year first above written.

_____

By:_____

Name:_____

Title:_____

**12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766870

K

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit K**

Form of Participation Agreement

**EXHIBIT K**

**FORM OF PARTICIPATION AGREEMENT**



General Motors Corporation

June 1, 2009

Via Federal Express

*[DEALER ENTITY CORPORATE NAME]*
*[DEALER ADDRESS]*

           Re:    *GM Dealer Sales and Service Agreement/Participation Agreement*

Attention: _____

    *[DEALER ENTITY CORPORATE NAME]* ("Dealer") and General Motors Corporation ("GM") are parties to a Dealer Sales and Service Agreement (the "Dealer Agreement") for *[BRAND RETAINED]* motor vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this letter agreement have the definitions set forth for such terms in the Dealer Agreement.

    GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). No trustee has been appointed and GM is operating its business as debtor-in-possession.

    GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets"), to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court. GM's restructuring in the Bankruptcy Case involves, among other things, the restructuring of its current dealer network. Part of that restructuring includes focus on and retention of those dealers who, based on a number of factors, GM believes have an opportunity to be successful dealers selling and servicing GM's products.

    Dealer recognizes that as part of GM's restructuring efforts, a significant number of dealers of the same line make as Dealer will be consolidated. Because this consolidation will result in fewer dealers representing the Existing Model Line, the retained dealers, including Dealer, will have the opportunity to increase sales significantly. It is therefore vital to Dealer and GM that Dealer agree to implement additional sales and inventory requirements necessary for Dealer to be retained in the 363 Acquirer's dealer network and for Dealer's performance to be in line with such increased opportunity.

**08  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

In consideration for Dealer's execution and delivery of, and performance under, this letter agreement and subject to Bankruptcy Court approval, GM (i) shall not move to reject the Dealer Agreement in the Bankruptcy Case, and (ii) shall assign the Dealer Agreement to the 363 Acquirer as part of the 363 Sale, provided such sale closes.

As a condition of its participation in the 363 Acquirer's dealer network and in consideration of GM's agreements set forth herein, Dealer shall execute and deliver this letter agreement to GM. This letter agreement contains terms that supplement the Dealer Agreement and incorporates requirements that GM believes will enhance Dealer's and the 363 Acquirer's opportunities for success. In addition, GM expects that GM or the 363 Acquirer will from time to time, subject to modification in its sole discretion, publish essential brand element guidelines for dealership operations, including Dealer's operations. The essential brand elements are GM's and the 363 Acquirer's minimum standards for dealership operations and include, among other things, facility image requirements and/or relocation requirements, dedicated sales and service requirements for the Existing Model Line, and participation in customer information programs.

This letter agreement will become effective upon the date of Dealer's due execution and delivery of this letter agreement to GM (the "Effective Date"). If Dealer executes and delivers this letter agreement to GM on or before **June 12, 2009**, subject to Bankruptcy Court approval, the 363 Assets will include, without limitation, the Dealer Agreement, as supplemented by this letter agreement. If Dealer does not sign and deliver to GM this letter agreement on or before **June 12, 2009**, GM may, in its sole discretion, move to reject the Dealer Agreement in the Bankruptcy Case. If the 363 Sale does not occur on or before August 31, 2009 (or such later date as GM or the 363 Acquirer may select in their sole discretion), GM or the 363 Acquirer may, at their sole option and at any time thereafter, terminate this letter agreement by written notice to Dealer.

## SUPPLEMENTAL TERMS

1. <u>Defined Terms</u>. All initially capitalized terms used and not otherwise expressly defined herein shall have the meanings set forth for such terms in the Dealer Agreement.

2. <u>Sales Performance</u>. Dealer recognizes that, as a result of the consolidation of GM dealers undertaken by GM to strengthen the dealer network and increase dealer through-put, Dealer has substantially more sales opportunities and Dealer must substantially increase its sales of new Motor Vehicles. The 363 Acquirer will provide to Dealer an annual number of new Motor Vehicles that Dealer must sell to meet the 363 Acquirer's increased sales expectations and will update such annual sales number on a periodic basis throughout each year. Dealer's requirements to meet the 363 Acquirer's sales targets are in addition to the sales effectiveness requirements of the current Dealer Agreement. Dealer acknowledges and agrees that compliance with the sales effectiveness requirements of the Dealer Agreement alone will not be sufficient to meet the requirements of this Section 2 and Dealer must meet the sales effectiveness requirements of the Dealer Agreement, as supplemented by this letter agreement.

3. <u>New Vehicle Inventory</u>. Dealer recognizes that, due to the consolidation of GM dealers representing the Existing Model Line and the expected sales increases contemplated in Section 2 above, Dealer will need to stock additional Motor Vehicles. Dealer shall use its best efforts to stock sufficient additional new Motor Vehicles to meet the increased sales expectations. To facilitate its expected increased sales, Dealer shall, upon the written request from the 363 Acquirer, order and accept from the 363 Acquirer additional new Motor Vehicles of the Existing Model Line to meet or exceed the sales guidelines provided by the 363 Acquirer relating to Dealer's increased sales expectations contemplated in

08 **THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

2

1766884

Section 2 above. In addition, upon Dealer's written request, the 363 Acquirer shall coordinate with, and provide to, GMAC (or such other floor plan provider designated by Dealer), updated sales expectations and other information necessary for GMAC (or such other floor plan provider designated by Dealer) to act upon Dealer's request for additional floor plan funding.

4. <u>Exclusivity</u>. During the remaining term of the Dealer Agreement (the "<u>Exclusivity Period</u>"), Dealer shall actively and continuously conduct Dealership Operations only for the Existing Model Line at the premises authorized for the conduct of Dealership Operations under the Dealer Agreement (the "<u>Dealership Premises</u>"). During the Exclusivity Period, the Dealership Premises may not be used for any purpose other than Dealership Operations for the Existing Model Line (including, but not limited to, the sale, display, storage and/or service of vehicles not approved by the Dealer Agreement, other than as specifically contemplated by the term "Dealership Operations") without the express prior written consent of GM or the 363 Acquirer, which consent may be granted or withheld in GM's or the 363 Acquirer's sole discretion. In the event that Dealer currently operates any non-GM dealership on the Dealership Premises, Dealer shall cease all non-GM Dealership Operations at the Dealership Premises on or before December 31, 2009. Notwithstanding anything to the contrary in the Dealer Agreement, state law or otherwise, if Dealer fails to cure any default under this Section 4 within thirty (30) days after written notice of default from GM or the 363 Acquirer, GM or the 363 Acquirer shall be entitled to all of their remedies as set forth in Section 8 below, including without limitation, the right to terminate the Dealer Agreement.

5. <u>No Protest</u>. In connection with GM's restructuring plan and consolidation of the dealer network, GM intends that GM and the 363 Acquirer have a dealer network consisting of fewer, stronger and more properly located dealers allowing for higher through-put and enhanced business potential.

(a) GM or the 363 Acquirer may desire to relocate or establish representation for the sale and service of motor vehicles for the Existing Model Line at a site located in the vicinity of the Dealership Premises (the "<u>Proposed Site</u>"). In consideration of GM's and the 363 Acquirer's covenants and obligations herein, and provided that (i) GM or the 363 Acquirer notifies Dealer of any such relocation or establishment within two (2) years after the later of (x) the date of the 363 Sale or (y) the Effective Date (the "<u>No Protest Commencement Date</u>"), (ii) such relocation or establishment is substantially completed on or before the date which is four (4) years after the No Protest Commencement Date, and (iii) the Proposed Site is, measured by straight line distance, at least six (6) miles from the then current location of the Dealership Premises, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or tribunal or in any dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, establishment or relocation of a motor vehicle dealership for the Existing Model Line at or in the vicinity of the Proposed Site.

(b) Dealer, for itself, its Affiliates (as defined below) and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "<u>Dealer Parties</u>"), hereby releases and forever discharges GM, the 363 Acquirer, their Affiliates and their respective members, partners, venturers, stockholders, directors, officers, employees, agents, spouses, legal representatives, successors and assigns (collectively, the "<u>GM Parties</u>"), from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including attorneys' fees) which they or any of them have or might have or acquire,

08 **THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

3

1766884

whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of the Existing Model Line described in Section 5(a) above.

(c) Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 5. Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 5. Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(d) Dealer acknowledges that, upon a breach of this Section 5 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer to the same position they would occupy in the absence of breach. As a result of the foregoing, any such breach shall absolutely entitle GM and the 363 Acquirer to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 5. In addition, GM and the 363 Acquirer shall have all other equitable rights in connection with a breach of this Section 5 by Dealer, including, without limitation, the right to specific performance.

6.   Release; Covenant Not to Sue; Indemnity. In consideration for GM's covenants and agreements set forth herein, including, without limitation, the assignment of the Dealer Agreement in the 363 Sale:

(a) Dealer, for itself, the other Dealer Parties, hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this letter agreement against the GM Parties, arising out of or relating to (i) the Dealer Agreement or this letter agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM or the 363 Acquirer shall pay any SFE funds due the Dealer for the second (2nd) quarter of 2009), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreements, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this letter agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior to the date of this letter agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Article 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer of any amounts due or to become due to either or any of their Affiliates.

08  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4

1766884

(b) As set forth above, GM reaffirms the indemnification provisions of Article 17.4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above, or (ii) any Claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement by GM to the 363 Acquirer in the 363 Sale or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. Any breach of the foregoing shall absolutely entitle GM and the 363 Acquirer to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 6. In addition, GM and the 363 Acquirer shall have all other equitable rights in connection with a breach of this Section 6 by Dealer, including, without limitation, the right to specific performance.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this letter agreement or Dealer's execution or delivery of or performance under this letter agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e) The terms of this Section 6 shall survive the termination of this letter agreement.

7. Compliance. In consideration for GM's covenants and agreements set forth herein, including, without limitation, the assignment of the Dealer Agreement in the 363 Sale, from and after the Effective Date:

(a) Dealer shall continue to comply with all of its obligations under the Dealer Agreement, as supplemented by the terms of this letter agreement. In the event of any conflict between the Dealer Agreement and this letter agreement, the terms and conditions of this letter agreement shall control, unless otherwise set forth herein.

(b) Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer. In the event of any conflict between the terms of the Channel Agreements and this letter agreement, the terms and conditions of this letter agreement shall control. The term "Channel Agreements" shall mean agreements (other than the Dealer Agreement) between GM and Dealer imposing on Dealer

08 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766884

obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other GM dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c) Dealer shall (i) comply with the essential brand elements set forth in any subsequently published guidelines from GM or the 363 Acquirer, and (ii) increase its floor plan capability to accommodate the increased sales and inventory expectations contemplated in Sections 2 and 3 above.

8. <u>Breach and Remedies</u>. In return for the consideration provided by GM herein, in the event of Dealer's breach of the Dealer Agreement, as supplemented by this letter agreement, GM and the 363 Acquirer shall have all of its rights and remedies under the Dealer Agreement, as supplemented by this letter agreement, and in addition, (i) GM or the 363 Acquirer may terminate the Dealer Agreement, as supplemented by this letter agreement, upon written notice to Dealer of not less than thirty (30) days, and/or (ii) the 363 Acquirer shall not be obligated to offer Dealer a replacement dealer sales and service agreement upon the termination by its terms of the Dealer Agreement, as supplemented by this letter agreement. In the event that either Dealer or the 363 Acquirer terminates the Dealer Agreement, as supplemented by this letter agreement, after the 363 Sale or the 363 Acquirer does not offer Dealer a replacement dealer sales and service agreement as set forth above, then (x) GM or the 363 Acquirer shall provide Dealer with termination assistance solely as set forth in Section 15.2 of the Dealer Agreement (excluding any facility assistance pursuant to Section 15.3 of the Dealer Agreement), and (y) Dealer waives all other rights under the Dealer Agreement, as supplemented by this letter agreement, and any applicable state laws, rules or regulations regarding termination notice, termination rights, termination assistance, facility assistance or other termination rights.

9. <u>Miscellaneous</u>.

(a) Dealer and the individual(s) executing this letter agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this letter agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary

08 **THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

6

1766884

corporate approvals have been obtained in connection with the execution and delivery of and performance under this letter agreement.

(b) This letter agreement shall supplement the Dealer Agreement as of the Effective Date and shall be effective through the remainder of the term of the Dealer Agreement, which shall expire no later than October 31, 2010.

(c) Except as supplemented by this letter agreement (including all exhibits, schedules and addendums to this letter agreement), the Dealer Agreement shall remain in full force and effect as written. Additionally, the Dealer Agreement, as referenced in any other document that the parties have executed, shall mean the Dealer Agreement as supplemented by this letter agreement.

(d) This letter agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

(e) The Dealer Agreement, as supplemented by this letter agreement, shall benefit and be binding upon (i) to the extent permitted by this letter agreement, any replacement or successor dealer as referred to in the Dealer Agreement, as supplemented by this letter agreement, and any successors or assigns, and (ii) any of GM's or the 363 Acquirer's successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs, this letter agreement shall benefit and bind the 363 Acquirer.

(f) The parties to this letter agreement have been represented, or have had the opportunity to be represented, by counsel and have been advised, or have had the opportunity to be advised, by counsel as to their rights, duties and relinquishments hereunder and under applicable law. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

(g) The Dealer Agreement, as supplemented hereby, shall be governed by and construed in accordance with the laws of the state of Michigan.

(h) By executing this Agreement, Dealer herby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this letter agreement and any other matter related thereto. The terms of this Section 9(h) shall survive the termination of this letter agreement.

(i) Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this letter agreement or any facts relating hereto or to the underlying transactions.

(j) If any part, term or provision of this letter agreement is invalid, unenforceable, or illegal, such part, term or provision shall be considered severable from the rest of this letter agreement and the remaining portions of this letter agreement shall be enforceable as if the letter agreement did not contain such part, term or provision.

08  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

This letter agreement shall constitute an agreement, executed by authorized representatives of the parties, supplementing the Dealer Agreement as contemplated by Section 17.11 thereof. This letter agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this letter agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

*[Signature Page Follows]*

08 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766884

Please indicate your approval of, and agreement with respect to, the matters set forth in this letter agreement by signing where provided below and returning it to GM for execution in the enclosed, self-addressed Federal Express envelope.

**GENERAL MOTORS CORPORATION**

By:_____
     Authorized Representative

APPROVED AND AGREED TO THIS
___ DAY OF JUNE, 2009

*[DEALER ENTITY CORPORATE NAME]*

By: _____

Name: _____
Title: _____

**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

08  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766884

L

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit L**

Form of Subdivision Master Lease

## EXHIBIT L

### FORM OF SUBDIVISION MASTER LEASE

**MASTER LEASE AGREEMENT**
**(Subdivision Properties)**

between

**GENERAL MOTORS CORPORATION,**
**a Delaware corporation**
**("Landlord")**

and

*[NEWCO],*
**a Delaware corporation**
**("Tenant")**

Dated: _____, 2009

# TABLE OF CONTENTS

**Section**                                                                 **Page**

1. LEASE SCHEDULE AND EXHIBITS ................................................................1

2. AGREEMENT TO LEASE .............................................................................1

3. LEASE TERM ...............................................................................................1

4. RENTAL PAYMENTS ...................................................................................1

    4.1     Rent.................................................................................................1
    4.2     Services............................................................................................1
    4.3     Interest on Late Payments ..............................................................2

5. USE ..............................................................................................................2

6. TAXES ..........................................................................................................2

7. CONDITION OF LEASED PREMISES ..........................................................3

8. MAINTENANCE ...........................................................................................3

9. ASSIGNMENT AND SUBLETTING ............................................................3

10. LANDLORD'S TITLE AND QUIET ENJOYMENT ......................................3

11. ALTERATIONS AND IMPROVEMENTS; LIENS .........................................3

    11.1    Alterations, Additions and Improvements ......................................3
    11.2    Tenant Liens....................................................................................4
    11.3    Landlord Liens ...............................................................................4

12. TENANT TRADE FIXTURES AND PERSONAL PROPERTY .........................4

13. INSURANCE.................................................................................................5

    13.1    Tenant's Insurance .........................................................................5
    13.2    Form of Insurance ..........................................................................5
    13.3    Form of Insurance ..........................................................................5

14. DAMAGE AND CONDEMNATION...............................................................6

15. [INTENTIONALLY DELETED]......................................................................6

16. [INTENTIONALLY DELETED]......................................................................6

17. EVENTS OF DEFAULT; REMEDIES ............................................................6

    17.1    Events of Default ...........................................................................6

17.2    Remedies ........................................................................................7
17.3    Landlord Defaults ...........................................................................7
17.4    Limitation on Liability.....................................................................7

18. ENVIRONMENTAL ....................................................................................8

19. NOTICE ....................................................................................................8

20. ENTRY UPON LEASED PREMISES ...........................................................8

21. GENERAL PROVISIONS ...........................................................................8

21.1    Brokerage ........................................................................................8
21.2    Amendments. ...................................................................................8
21.3    Severability .....................................................................................9
21.4    Attorney's Fees ...............................................................................9
21.5    Time of Essence ..............................................................................9
21.6    Waiver..............................................................................................9
21.7    Successors and Assigns ...................................................................9
21.8    Governing Law .................................................................................9
21.9    Estoppel Agreements .......................................................................9
21.10   Subordination, Non-Disturbance Agreement....................................9
21.11   Intentionally Omitted.......................................................................9
21.12   Force Majeure ................................................................................10
21.13   Consent .........................................................................................10
21.14   Time Period for Payment ...............................................................10
21.15   Execution of Lease.........................................................................10
21.16   Counterparts...................................................................................10
21.17   Confidentiality ...............................................................................10
21.18   Dispute Resolution.........................................................................11
21.19   Gender............................................................................................11
21.20   Memorandum of Lease ...................................................................12

22. WAIVER OF LANDLORD LIEN ................................................................12

23. LANDLORD COVENANTS .......................................................................12

24. SUBDIVISION OF PROPERTY .................................................................12

Exhibit A - Leased Premises
Exhibit B - Retained Premises
Exhibit C - Form of Memorandum of Lease

## LEASE SCHEDULE

This Lease Schedule is made a part of that certain Master Lease Agreement (Subdivision Properties) attached hereto, including all Exhibits (the "Lease"), between Landlord and Tenant (as such terms are defined below).

| | | |
|---|---|---|
| 1. | Landlord: | General Motors Corporation, Delaware corporation. |
| 2. | Tenant: | *[NEWCO]*, a Delaware corporation. |
| 3. | Date of Lease: | *[_____ ]*, 2009. |
| 4. | Leased Premises: | The term "Leased Premises" shall mean (a) the land owned by Landlord (the "Land") cross-hatched on Exhibits A-1 through A-8 attached hereto and made a part hereof, (b) the building or buildings located on the Land (the "Buildings"), (c) any other improvements and fixtures located on the Land (collectively with the Buildings, the "Improvements"), and (d) all appurtenances belonging to or in any way pertaining to said Land and Improvements, subject to Section 24 hereof.  For the avoidance of doubt, the Leased Premises does not include the Retained Premises (as hereinafter defined). |
| 5. | Separate Leased Premises: | Individually, each separate Leased Premises depicted on each of Exhibits A-1 through A-8. |
| 6. | Retained Premises: | The term "Retained Premises" shall mean (a) the land owned by Landlord and not leased to Tenant cross-hatched on Exhibits B-1 through B-8 attached hereto and made a part hereof, (b) the building or buildings located on such land, (c) any other improvements located on such land, and (d) all appurtenances belonging to or in any way pertaining to such land, buildings and improvements that, in the cases of (a) through (d) above, do not constitute Separate Leased Premises. |
| 7. | Property: | Collectively, the Leased Premises and the Retained Premises. |
| 8. | Commencement Date: | *[_____ ]*, 2009. |
| 9. | Termination Dates: | See Section 3. |
| 10. | Outside Termination Date: | July 31, 2029. |

1

| | | |
|---|---|---|
| 11. | Term: | The term commencing on the Commencement Date and expiring on the Termination Date with respect to each Separate Leased Premises, but in no event later than the Outside Termination Date. |
| 12. | Base Rent: | $1.00 per annum, payable on the Commencement Date and annually thereafter or, at Tenant's option, prepayable in full for the entire Term. |
| 13. | Use: | See Section 5. |

14.    Landlord's Address:

*[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

With a copy to:

*[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

15.    Tenant's Address:

*[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

With a copy to:

*[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

16.    Exhibits to Lease:

Exhibit A – Leased Premises
Exhibit B – Retained Premises
Exhibit C - Form of Memorandum of Lease

## MASTER LEASE AGREEMENT

THIS LEASE is made and entered into as the date set forth on the Lease Schedule to which this Lease is attached (the "Lease Schedule") by and between Landlord and Tenant.

WHEREAS, Landlord owns the Land and the Improvements and the appurtenances thereto, which together comprise the Leased Premises; and

WHEREAS, Tenant desires to lease the Leased Premises on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration for the mutual covenants herein contained, and other valuable consideration, the parties agree as follows:

**1.      LEASE SCHEDULE AND EXHIBITS.**  The Lease Schedule and all Exhibits attached hereto are hereby incorporated herein by this reference.  All capitalized terms used herein that are not specifically defined herein shall have the meanings set forth on the Lease Schedule. The Tenant and the Landlord are collectively referred to herein as the "Parties".

**2.      AGREEMENT TO LEASE.**  Upon the terms and conditions set forth herein, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Leased Premises. Landlord acknowledges that Tenant currently owns all of the Tenant Trade Fixtures and Personal Property (as hereinafter defined).

**3.      LEASE TERM.**  Unless sooner terminated or extended pursuant to the terms hereof, the term of this Lease (the "Term") shall commence as of the Commencement Date and shall end on the respective Termination Date with respect to each Separate Leased Premises. The "Termination Date" with respect to each Separate Leased Premises is the earlier of (a) the date on which Landlord conveys the Separate Leased Premises to Tenant in accordance with Section 24 hereof or (b) the Outside Termination Date.

**4.      RENTAL PAYMENTS**

**4.1      Rent.**  Tenant shall pay to Landlord the annual base rent (the "Base Rent") in the amount set forth in the Lease Schedule.  In addition, Tenant shall pay Landlord as additional rent (the "Additional Rent"; together with the Base Rent, the "Rent") any reasonable costs reasonably incurred by Landlord for which Tenant is responsible in accordance with this Lease.  Except as set forth in this Lease and except with respect to any matter caused by the gross negligence or willful misconduct of Landlord, Tenant shall be responsible for all costs associated with the Leased Premises that accrue or arise after the Commencement Date.  Tenant shall pay any Additional Rent within thirty (30) days after receipt of a reasonably detailed invoice therefor from Landlord.  Rent shall be paid to Landlord at Landlord's Address (as defined in the Lease Schedule).

**4.2      Services.**  Except as otherwise agreed in writing by Tenant and Landlord (including, without limitation, in the Purchase Agreement (as hereinafter defined)), Landlord shall not be responsible for providing or arranging for any services for the Leased Premises or to Tenant with respect to the Leased Premises, including, without limitation, maintenance and

repair, electricity, gas, water or other utility services, janitorial services, or security services. Notwithstanding the foregoing, Landlord shall cooperate with Tenant in Tenant obtaining any of the aforesaid services it requires for the Leased Premises. Notwithstanding anything to the contrary contained herein, to the extent such services are provided to any Separate Leased Premises at Tenant's request pursuant to an agreement to which Landlord (as opposed to Tenant) is a party, Landlord shall deliver to Tenant upon receipt any invoices it receives for such services provided to such Separate Leased Premises after the Commencement Date and Tenant shall pay its equitable share (based on the amount of such services used by Tenant, in Tenant's reasonable discretion) on or before the due date thereof. The parties acknowledge and agree that such services include, but are not limited to, the provision of steam and compressed air at the Separate Leased Premises located in Pontiac, Michigan pursuant to agreements currently in place.

**4.3    Interest on Late Payments.**  In the event that Tenant fails to pay Rent, and such amount is not paid within fifteen (15) business days after the date on which Rent is due as herein provided, then such sum shall bear interest thereafter, without prejudice to and in addition to any other remedy available to the Landlord under this Lease, at a rate equal to, on any date, the sum of (i) the average (rounded to the nearest 1/16th of one percent) of the London Interbank Offered Rates for three-month United States dollar-denominated deposits, as published in the Wall Street Journal on such date and (ii) 500 basis points, but in no event greater than the maximum rate then permitted under applicable law (the "Default Rate").

**5.    USE.**  Tenant may use the Leased Premises in a manner substantially similar to the manner in which the Leased Premises were used by General Motors Corporation prior to the Commencement Date and for any other use permitted or allowed by or under applicable laws. Tenant shall comply in all material respects with all laws, regulations and other governmental requirements relating to Tenant's use and occupancy of the Leased Premises. Tenant may, at its sole cost and expense, contest any alleged violation of laws, regulations and other government regulations so long as the Tenant, in good faith and with due diligence, contests the same or the validity thereof by appropriate or allowable legal proceeding or process and provided that upon final adjudication, determination or settlement of such proceeding or process Tenant shall immediately pay any amounts due and/or comply therewith.

**6.    TAXES.**  All ad valorem real property taxes or special improvement taxes allocable to the Leased Premises and all property taxes allocable to the personal property located thereon (including all penalties and interest thereon) for any period within the Term shall be paid by Tenant before they become delinquent. Notwithstanding anything to the contrary contained herein, Landlord shall be responsible for paying any taxes allocable to the Retained Premises and the personal property located thereon before they become delinquent. Within ten (10) business days after Landlord's or Tenant's receipt of any original tax bill for the Property, the recipient shall deliver copies thereof to the other party. Landlord and Tenant shall thereafter cooperate reasonably and in good faith to allocate such taxes between the Leased Premises and the Retained Premises and the personal property located thereon. Landlord and Tenant shall cooperate reasonably and in good faith to contest any tax or assessment upon or against the Property, or any part thereof, or the improvements at any time situated thereon, as applicable, by appropriate legal proceedings which shall have the effect of preventing the collection of the tax or assessment so contested, provided that upon final adjudication of such proceeding Landlord and Tenant shall immediately pay their proportionate shares of any amounts due in accordance

with this <u>Section 6</u>.  Landlord hereby grants Tenant a power-of-attorney to contest taxes in accordance with this Section 6 if Landlord fails to fulfill its obligations hereunder.  Landlord shall not settle any tax contests or waive the right to contest any taxes or other charges without Tenant's consent, which may be withheld in Tenant's sole and absolute discretion.  The obligations of Landlord and Tenant under this provision shall survive the expiration or termination of the Lease.

7.    **CONDITION OF LEASED PREMISES.**  Tenant acknowledges that it accepts the Leased Premises in their "As-Is" condition on the Commencement Date.  Except as expressly set forth herein, Tenant enters into this Lease without any representations or warranties on the part of Landlord, express or implied, as to the condition of the Leased Premises, including, but not limited to, the cost of operations and the condition of its fixtures, improvements and systems.

8.    **MAINTENANCE.**  Landlord shall have no responsibility for any maintenance and repair of and replacements to the Leased Premises of any nature whatsoever (except maintenance, repair and replacements necessitated by the gross negligence or willful misconduct of Landlord), including, without limitation, any capital, extraordinary and normal repairs and replacements to the Leased Premises, normal maintenance, the maintenance of the roof, footings, foundations, walls, structural elements, HVAC, mechanical, plumbing and electrical serving the Leased Premises exclusively.  Notwithstanding anything to the contrary contained herein, Tenant may elect to perform or elect not to perform the same in its sole discretion, provided that Tenant shall indemnify Landlord from any penalties or fines imposed on Landlord by any applicable governmental authority if Tenant elects not to perform any maintenance or repair of or make any replacements to the Leased Premises (except maintenance, repair and replacements necessitated by the gross negligence or willful misconduct of Landlord).

9.    **ASSIGNMENT AND SUBLETTING.**  Tenant may assign its interest in this Lease (as to the entire Leased Premises or as to any Separate Leased Premises) and sublease all or any portion of the Leased Premises without obtaining the consent of Landlord.

10.    **LANDLORD'S TITLE AND QUIET ENJOYMENT.**  Landlord represents and warrants that Landlord owns fee simple title to the Leased Premises and has full right and authority to make this Lease.  Landlord covenants that so long as an Event of Default does not then exist, Tenant shall have quiet and peaceful possession and enjoyment of the Leased Premises and shall not be interfered with by Landlord, or any party claiming by, through or under Landlord or any party claiming title superior to Landlord.

11.    **ALTERATIONS AND IMPROVEMENTS; LIENS.**

11.1    **Alterations, Additions and Improvements.**  Tenant may, at its own expense and without Landlord's consent, make any alterations, additions or improvements to the Leased Premises which Tenant deems desirable.   All such alterations, additions and improvements shall be made in accordance with all applicable laws and ordinances.  Tenant shall not be required to restore the Leased Premises to the condition existing prior to the making of such alterations, additions and improvements at the commencement of the Term.

**11.2    Tenant Liens.**  Tenant shall not permit the Property to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished in connection with work of any character performed or claimed to have been performed on the Leased Premises by, or at the direction or sufferance of Tenant; provided, however, that Tenant shall have the right to contest, in good faith and with reasonable diligence, the validity of any such lien or claimed lien, and Tenant shall not be deemed in default hereunder as a result of such lien so long as Tenant is so contesting such lien; provided, in case of any such lien attaching, or notice or claim thereof being asserted during any period of time in which Landlord has entered into a contract to sell the Retained Premises, as a condition precedent to the right to contest, Tenant shall bond over or otherwise provide security (as permitted by applicable law in such proceeding), the effect of which is to prevent such lien from attaching to Landlord's title in the Retained Premises and any proceeds accruing from the sale thereof.  Subject to Tenant's right of contest, in the event that such lien is not released, removed, or bonded over when required in this Section 11.2, Landlord, at its option, may take all action Landlord deems reasonable or necessary to release and remove such lien (without any duty to investigate the validity thereof) and Tenant shall, within ten (10) days following demand, either before or after such release and removal, pay or reimburse Landlord for all reasonable sums, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by Landlord in connection with removal of such lien together with interest thereon from the date incurred until the date paid at the Default Rate.  The obligations of Tenant under the provisions of this Section 11.2 shall survive the expiration or termination of this Lease.

**11.3    Landlord Liens.**  Landlord shall not permit the Property to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished in connection with work of any character performed or claimed to have been performed on the Property by, or at the direction or sufferance of Landlord; provided, however, that Landlord shall have the right to contest, in good faith and with reasonable diligence, the validity of any such lien or claimed lien, and Landlord shall not be deemed in default hereunder as a result of such lien so long as Landlord is so contesting such lien; provided, in case of any such lien attaching, or notice or claim thereof being asserted during any period of time in which Tenant desires to assign or sublease its interest in this Lease as to any one or more of the Separate Leased Premises, as a condition precedent to the right to contest, Landlord shall bond over or otherwise provide security (as permitted by applicable law in such proceeding), the effect of which is to prevent such lien from attaching to Tenant's or Landlord's interest in the applicable Separate Leased Premises and any proceeds accruing from the assignment thereof. Subject to Landlord's right of contest, in the event that such lien is not released, removed, or bonded over when required in this Section 11.3, Tenant, at its option, may take all action Tenant deems reasonable or necessary to release and remove such lien (without any duty to investigate the validity thereof) and Landlord shall, within ten (10) days following demand, either before or after such release and removal, pay or reimburse Tenant for all reasonable sums, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by Tenant in connection with removal of such lien together with interest thereon from the date incurred until the date paid at the Default Rate.  The obligations of Landlord under the provisions of this Section 11.3 shall survive the expiration or termination of this Lease.

**12.    TENANT TRADE FIXTURES AND PERSONAL PROPERTY.**  Tenant currently owns all of the trade fixtures, machinery, equipment, all inventories of vehicles, raw

materials, work-in-progress, finished goods, supplies, stock, parts, packaging materials and other accessories thereto, and other personal property located on the Leased Premises and Tenant may during the Term install in or on the Leased Premises other trade fixtures, machinery, equipment and personal property (collectively, the "Tenant Trade Fixtures and Personal Property") as Tenant deems desirable, and all of the Tenant Trade Fixtures and Personal Property shall remain Tenant's property whether or not affixed or attached to the Leased Premises. Tenant may, but shall not be required to, remove the Tenant Trade Fixtures and Personal Property from the Leased Premises at any time during the Term.

13.    **INSURANCE**.

      **13.1**    **Tenant's Insurance.**    Throughout the Term, Tenant shall maintain insurance insuring:

          (a)    The Building and any other Improvements at any time situated upon the Leased Premises against loss or damage by fire, lightning, wind storm, hail storm, aircraft, vehicles, smoke, explosion, riot or civil commotion as provided by the Standard Fire and Extended Coverage Policy and all other risks of direct physical loss as insured against under Special Form ("all risk" coverage). The insurance coverage shall be for not less than 100% of the full replacement cost of the Building and other Improvements and building ordinance coverage.

          (b)    Tenant, Landlord (as an "additional insured"), and any permitted mortgagee of Landlord, from all claims, demands or actions made by or on behalf of any person or persons, firm or corporation and arising from, related to or connected with the Leased Premises, for bodily injury to or personal injury to or death of any person, or more than one person, or for damage to property in an amount of not less than $2,000,000.00 combined single limit per occurrence/aggregate, and Tenant shall carry excess liability insurance coverage in an amount not less than $5,000,000.00.

          (c)    All contents and trade fixtures, furniture and furnishings in the Leased Premises to the extent of at least ninety percent (90%) of their replacement cost under Standard Fire and Extended Coverage Policy and all other risks of direct physical loss as insured against under Special Form ("all risk") coverage.

      **13.2**    **Landlord's Insurance**.    Throughout the Term, Landlord shall maintain insurance insuring Landlord, Tenant (as an "additional insured"), and any mortgagee of Tenant, from all claims, demands or actions made by or on behalf of any person or persons, firm or corporation and arising from, related to or connected with the Retained Premises, for bodily injury to or personal injury to or death of any person, or more than one person, or for damage to property in an amount of not less than $2,000,000.00 combined single limit per occurrence/aggregate, and Landlord shall carry excess liability insurance coverage in an amount not less than $8,000,000.00.

      **13.3**    **Form of Insurance.**    All of said insurance required by this Section 13 shall be in form and with companies licensed in the state in which the respective Separate Leased Premises is located, and shall be AM Best's rated A- and class VII or better, and shall provide

1770416                                        5

that the same shall not be subject to cancellation or termination except after at least ten (10) days prior written notice to Landlord. Certificates of the insurance policies required to be carried hereunder shall be deposited with the Landlord at the Commencement Date and from time to time, together with copies of the policies, upon request of the Landlord. Any insurance required of Tenant under this Lease may be furnished under a blanket policy carried by Tenant. Notwithstanding anything in this Lease to the contrary, Tenant may self-insure any or all of its insurance obligations under this Lease.

       **13.4**   **Mutual Waiver.** Landlord and Tenant hereby waive all claims and rights of recovery against the other and their respective officers, directors, employees, agents and representatives for any loss or damage to their respective properties or interests, which loss is insured against, or required to be insured against, by Landlord or Tenant (as applicable) pursuant to this <u>Section 13</u>, regardless of fault or negligence and regardless of the amount of insurance proceeds collected or collectible under any insurance policies in effect, and Landlord and Tenant each represent and warrant to the other that all such policies permit such waiver and contain, and will contain, enforceable waiver of subrogation endorsements.

       **14.**   **DAMAGE AND CONDEMNATION.** In the event of any casualty, taking or condemnation for a public or quasi public use or purpose by a competent authority affecting any Separate Leased Premises, (a) neither party may terminate this Lease, provided that this Lease shall automatically terminate with respect to a Separate Leased Premises if such entire Separate Leased Premises is taken or condemned; (b) Tenant shall be entitled to all insurance proceeds or awards in connection with such casualty or condemnation; and (c) Tenant may elect, in its sole discretion and at its sole cost (except with respect to any insurance proceeds), to restore such Separate Leased Premises.

       **15.**   **[INTENTIONALLY DELETED].**

       **16.**   **[INTENTIONALLY DELETED].**

       **17.**   **EVENTS OF DEFAULT; REMEDIES**.

       **17.1**   **Events of Default.** Each of the following events shall constitute an "Event of Default":

       (a)   If Tenant shall fail to pay any Rent to Landlord when due in accordance with the terms of this Lease and such default shall continue for a period of fifteen (15) days after the date on which Tenant receives written notice of such failure to pay Rent from Landlord;

       (b)   If Tenant shall fail to keep or perform or abide by any other requirement, term, condition, covenant or agreement of this Lease and such default shall continue for a period of thirty (30) days after written notice to Tenant of such default, and, if more than thirty (30) days shall reasonably be required to correct the breach complained of in such notice, then if Tenant shall fail to commence promptly to correct such breach and prosecute the same to completion with reasonable diligence;

       (c)   If Tenant shall be adjudged an involuntary bankrupt, or a decree or

order approving, as properly filed, a petition or answer filed against Tenant asking reorganization of Tenant under the federal bankruptcy laws as now or hereafter amended, or under the laws of any state, shall be entered, and any such decree or judgment or order shall not have been vacated or set aside within one hundred twenty (120) days from the date of the entry or granting thereof;

(d)    If Tenant shall file or admit the jurisdiction of the court and the material allegations contained in any petition in bankruptcy or any petition pursuant or purporting to be pursuant to the federal bankruptcy laws as now or hereafter amended;

(e)    If Tenant shall institute any proceeding or shall give its consent to the institution of any proceedings for any relief of Tenant under any bankruptcy or insolvency laws or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, arrangements, composition or extension; or

(f)    If Tenant shall make any assignment for the benefit of creditors or shall apply for or consent to the appointment of a receiver for Tenant; or a decree or order appointing a receiver of the property of Tenant shall be made and such decree or order shall not have been vacated or set aside within one hundred twenty (120) days from the date of entry or granting thereof.

**17.2    Remedies.**  Upon the occurrence of any one or more Events of Default, Landlord may at its election pursue any and all remedies available at law or in equity (other than termination of this Lease), including without limitation, the right to sue Tenant for any and all damages, losses and liabilities, and reasonable costs and expenses (including reasonable attorneys' fees and court costs) incurred by or caused to Landlord arising out of or resulting from any act or omission of Tenant or any Event of Default by Tenant hereunder, and the right to sue for specific performance, and for injunctive relief but excluding for any Rent due following the date on which Tenant vacates the Leased Premises.

**17.3    Landlord Defaults.**  If Landlord defaults in the performance of any of its obligations, covenants and warranties hereunder and such default continues for a period of thirty (30) days after written notice thereof to Landlord (or in an emergency, Landlord shall fail to cure such default immediately), and if more than thirty (30) days shall reasonably be required to correct the breach complained of in such notice, then if Landlord shall fail to commence promptly to correct such breach and prosecute the same to completion with reasonable diligence not to exceed ninety (90) days, Tenant may, at its option and in addition to all other rights and remedies available to Tenant, cure the same on behalf of Landlord, in which event Tenant may deduct the cost of such cure from Rent next due hereunder, provided that if such Rent is insufficient to fully reimburse Tenant for such costs, any such deficiency (together with interest thereon at the Default Rate) shall be immediately due and payable by Landlord to Tenant upon written demand from Tenant, which demand shall be accompanied by invoices or receipts evidencing such costs.

**17.4    Limitation on Liability.**

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL TENANT OR LANDLORD BE LIABLE FOR ANY INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND ARISING UNDER OR IN CONNECTION WITH THIS LEASE (INCLUDING PURSUANT TO SECTION 16 HEREOF), REGARDLESS OF LEGAL THEORY, INCLUDING ANY SUCH DAMAGES OR LOSSES RESULTING FROM BUSINESS INTERRUPTION OR LOST PROFITS.

**18.    ENVIRONMENTAL.** Any Liabilities arising under any Environmental Law relating to (A) conditions present on the Property, (B) Landlord's ownership of the Property, (C) Tenant's occupancy of the Property or (D) Landlord's or Tenant's failure to comply with Environmental Laws (as all such terms are defined in the Purchase Agreement) with respect to the Property shall be governed by Sections 2.3(a)(viii) and 2.3(b)(iv) of the Amended and Restated Master Sale and Purchase Agreement (the "Purchase Agreement") dated as of June 26, 2009 between Landlord, Tenant and the other parties named therein, with the Leased Premises treated as a Purchased Asset (as such term is defined in the Purchase Agreement) for such purpose and the provisions thereof shall be deemed incorporated by reference herein for that purpose. Notwithstanding anything to the contrary contained in the Purchase Agreement, however, in no event shall Landlord be entitled to terminate this Lease in connection with this Section 18.

**19.    NOTICE.** All notices or demands required or permitted to be given or served pursuant to this Lease shall be in writing and shall be deemed to have been given or served one (1) business day subsequent to transmittal by nationally recognized prepaid overnight courier, and addressed to Landlord at Landlord's Address or to Tenant at Tenant's Address (as set forth in the Lease Schedule). Such addresses may be changed from time to time by either party by serving notice as above provided. In no event shall personal delivery at the Leased Premises be deemed an effective means of notice.

**20.    ENTRY UPON LEASED PREMISES.** Neither Landlord nor Landlord's representatives shall be permitted to enter the Leased Premises during the Term without Tenant's prior written consent, which may be withheld in Tenant's sole discretion. If Tenant consents to any such entry, a representative of Tenant shall accompany Landlord and/or Landlord's representatives through the Leased Premises at all times.

**21.    GENERAL PROVISIONS.**

**21.1    Brokerage.** Landlord and Tenant each represents and warrants to the other that it has not engaged or dealt with any broker in this transaction. Landlord and Tenant each agree to indemnify and hold the other harmless from and against all liability, claims, demands, damages, or costs of any kind arising from or connected with any broker's commission, finder's fee, consulting fee or other charge claimed to be due any person or entity arising from the indemnifying party's conduct with respect to this Lease.

**21.2    Amendments.** No amendment or modification of this Lease shall be effective unless in writing and executed by Landlord and Tenant.

**21.3    Severability.** If any term or provision of this Lease shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Lease shall not be affected thereby, but each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**21.4    Attorney's Fees.** In the event Landlord or Tenant is required to use the services of any attorney for the enforcement of any of the terms, covenants or provisions hereof or in the event of any other dispute between Landlord and Tenant concerning this Lease, the prevailing party shall be entitled to recover reasonable attorney's fees and expenses from the non-prevailing party.

**21.5    Time of Essence.** Subject to Section 21.12 below, time is of the essence of this Lease, and all provisions herein relating thereto shall be strictly construed.

**21.6    Waiver.** No waiver of any provision of this Lease shall be deemed to be a waiver of any other provision hereof or of any subsequent or continuing breach of the same or any other provision. Landlord's consent to or approval of any act by Tenant shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act.

**21.7    Successors and Assigns.** All of the covenants, conditions, and provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, when permitted hereunder.

**21.8    Governing Law.** This Lease shall be construed in accordance with the laws of the state of Michigan, except that for purposes of enforcing or construing this Lease with respect to any Separate Leased Premises located outside the state of Michigan, the laws of the state in which such Separate Leased Premises is located shall apply in lieu of the laws of the state of Michigan.

**21.9    Estoppel Agreements.** Each of Tenant and Landlord agrees that from time to time within ten (10) business days after written request by the other party hereto, it will execute, acknowledge and deliver to the requesting party or to such other party as may be designated by the requesting party, a certificate stating that this Lease is then in full force and effect and has not been modified, supplemented or amended in any way, except as indicated in such certificate; that all conditions and agreements under this Lease to be performed by Landlord or Tenant, as applicable, have been satisfied or performed, except as set forth in such certificate; that, to such party's knowledge, there are no existing defenses or offsets of Tenant, except as indicated in such certificate; that Tenant has not paid any rental more than one month in advance, except as indicated in such certificate; and that, to such party's knowledge, the other party is not in default under any provisions of this Lease.

**21.10    Subordination, Non-Disturbance Agreement.** Prior to entering into any financing with respect to any Retained Premises in accordance with Section 23 hereof, at Tenant's request, Landlord agrees to deliver to Tenant a subordination, non-disturbance and attornment agreement with respect to the applicable Separate Leased Premises executed by Landlord's lender in a form reasonably acceptable to such lender and Tenant.

**21.11    Intentionally Omitted.**

**21.12  Force Majeure.**  Neither Landlord nor Tenant shall be deemed in default with respect to any of the terms, covenants and conditions of this Lease to be performed on Landlord's or Tenant's part (other than the failure to make any payment due hereunder), if such party's failure to timely perform same is due in whole or in part to any strike, lockout, labor trouble, civil disorder, failure of power, restrictive governmental laws and regulations, riots, insurrections, war, shortages, accidents, casualties, acts of God, acts caused directly by the other party hereto or such party's agents, employees and invitees, or any other cause beyond the reasonable control of Landlord or Tenant, as applicable (collectively, "Force Majeure Events"). In the event of a Force Majeure Event, the period of performance shall be delayed one day for each day of delay caused by the applicable Force Majeure Event.  The foregoing definition of Force Majeure Events shall apply only during the Term.

**21.13  Consent.**  Any time the consent of Landlord or Tenant is required, such consent shall not be unreasonably withheld, conditioned or delayed unless expressly stated otherwise herein.  Whenever this Lease grants Landlord or Tenant the right to take action, exercise discretion, establish rules and regulations or make allocations or other determinations (other than decisions to exercise expansion, contraction, cancellation, termination or extension options, or decisions which are specified herein to be in the sole discretion of the applicable party), Landlord and Tenant shall act reasonably and in good faith, and shall take no action that might result in the frustration of the reasonable expectations of a sophisticated tenant or landlord concerning the benefits to be enjoyed thereby.

**21.14  Time Period for Payment.**  Any time this Lease requires a payment from Landlord to Tenant or from Tenant to Landlord, and no specific time period is set forth herein, such payment shall be deemed due within thirty (30) days after receipt by the paying party of a reasonably detailed, written invoice therefor.

**21.15  Execution of Lease.**  The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Leased Premises and this document shall become effective and binding only upon the execution and delivery hereof by Tenant and by Landlord.  All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein.

**21.16  Counterparts.**  This Lease may be executed in one or more counterparts, and each such counterpart shall constitute an original.

**21.17  Confidentiality.**  Except as may be required by filings with or orders by the Bankruptcy Court (defined below), each party acknowledges that it will have access to certain financial information of the other party ("Confidential Information"). Such Confidential Information shall not be released to the public and will be provided, subject to this paragraph, only to those parties who have a legitimate need for such Confidential Information, including accountants, lawyers, lenders, potential buyers, mortgagees and similar parties.  Neither Landlord nor Tenant shall prepare or provide any materials with respect to this Lease for media distribution, whether it be: print, television, radio, internet or any other commercial distribution, without the approval of the other party.  Landlord and Tenant may prepare any necessary documentation or agenda necessary to secure internal or public approval (if necessary) without said approval being required by the other party.

The following information shall not constitute Confidential Information for purposes of this Section 21.17:

      (a)    any information that is available, or becomes available, to the general public without fault of the non-disclosing party;

      (b)    any information that can be shown was in the possession of the non-disclosing party prior to receipt of the same from the disclosing party;

      (c)    any information that is obtained by the non-disclosing party without an obligation of confidence from a third party who is rightfully in possession of such information and is under no obligation of confidentiality to the disclosing party;

      (d)    any information that the non-disclosing party is legally required to disclose; or

      (e)    any information that is independently developed by the non-disclosing party without reference or access to the Confidential Information.

      **21.18**  **Jurisdiction for Dispute Resolution.**  (a)   Without   limiting   any party's right to appeal any order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Lease and to decide any claims or disputes that may arise or result from, or be connected with, this Lease, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 19 hereof; provided, however, that if Landlord's voluntary petition for relief under Chapter 11 of Title 11, U.S.C. §§101 et. seq. has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the federal courts in the Southern District of New York and the State of New York located in the Borough of Manhattan in the City of New York and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

      (b)   Each of the parties hereto hereby consents to process being served by any party to this Lease in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 19.

      **21.19**  **Gender.**  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity entity of the person or entity may require.

**21.20  Memorandum of Lease.** On the Commencement Date, the parties shall execute a Memorandum of Lease in the form attached hereto as Exhibit C with respect to each Separate Leased Premises, and Tenant, at its cost, may record each such Memorandum of Lease in the applicable county recorder's office.

**22.  WAIVER OF LANDLORD LIEN.** Landlord hereby waives and releases all liens, right of distraint or security interests (whether arising by statute or at common law) in all property, chattels or merchandise which may be placed in the Leased Premises and Tenant Trade Fixtures and Personal Property and also upon all proceeds of insurance which may accrue to Tenant by reason of damage to or destruction of any such property, chattels or merchandise.

**23.  LANDLORD COVENANTS.** During the Term, Landlord covenants as follows: (a) Landlord shall make timely payment of taxes, water charges and other items that might give rise to liens affecting the Property (except to the extent Tenant is obligated to pay for such costs with respect to the Leased Premises) and Landlord shall indemnify, defend and hold Tenant harmless from and against any and all costs or damages incurred by Tenant in connection with such liens, (b) Landlord hereby grants to Tenant a power-of-attorney to make such payments on behalf of Landlord if Landlord fails to do so in accordance with this Lease, (c) Landlord shall not take any action that might adversely affect the Property without Tenant's prior written consent, which consent may be withheld in Tenant's sole and absolute discretion, including, without limitation, incurring any Encumbrance (as such term is defined in the Purchase Agreement), consenting to any Encumbrance or failing to contest or notify Tenant of any Encumbrance affecting the Property after the Commencement Date. Notwithstanding the foregoing, during the Term, Landlord may incur an Encumbrance in the form of a mortgage or deed of trust on the Retained Premises in connection with financing obtained by Landlord, provided that (i) such mortgage or deed of trust shall expressly exclude the Separate Leased Premises and shall state that such mortgage or deed of trust shall be subordinate in all respects to this Lease with respect to the Property, (ii) the lender of such financing shall be reasonably acceptable to Tenant, and (iii) Landlord shall indemnify, defend and hold Purchaser harmless from and against any and all costs or damages incurred by Tenant in connection with such financing.

**24.  SUBDIVISION OF PROPERTY.** From and after the Commencement Date, Landlord and Tenant shall cooperate in good faith and shall diligently prosecute the subdivision of each Separate Leased Premises from the applicable Retained Premises (each, a "Required Subdivision") at Tenant's cost. Landlord hereby grants Tenant a power-of-attorney to prosecute such application on behalf of Landlord if Landlord fails to fulfill its obligations under this Section 24 within five (5) days after receiving written notice from Tenant of such failure. Upon completion of a Required Subdivision affecting a Separate Leased Premises, such Separate Leased Premises shall be conveyed to Tenant by a quitclaim deed for One Dollar ($1.00) in stated consideration and this Lease shall terminate with respect to such Separate Leased Premises upon such conveyance, provided that this Lease shall remain in full force and effect with the remainder of Leased Premises. If Landlord and Tenant are unable to complete a Required Subdivision with respect to any Separate Leased Premises within a reasonable period of time, then, at Tenant's request, Landlord and Tenant shall cooperate in good faith and shall diligently proceed to resolve the subdivision issues by alternative means, including, but not limited to, submitting the applicable Separate Leased Premises to the condominium regime for the applicable jurisdiction.

**[Signature Pages to Follow]**

**IN WITNESS WHEREOF,** the parties hereto have executed this Lease by and through their corporate officers thereunto duly authorized, the day and year first above written.

**TENANT:**

*[NEWCO],* a Delaware corporation

By: _____
Name: _____
Title: _____

**LANDLORD:**

**GENERAL MOTORS CORPORATION,**
a Delaware corporation

By: _____
Name: _____
Title: _____

1770416

## Exhibit A

**Leased Premises**

[See Exhibits A-1 through A-[_____] attached hereto]

1770416

## Exhibit A-1

**Leased Premises – Pontiac, Michigan**

[Attached Hereto]

1770416

## Exhibit A-2

**Leased Premises - Romulus, Michigan**

[Attached Hereto]

1770416

## Exhibit A-3

**Leased Premises - Fairfax, Kansas**

[Attached Hereto]

## Exhibit A-4

**Leased Premises - Grand Blanc, Michigan**

[Attached Hereto]

## Exhibit A-5

**Leased Premises - Lordstown, Ohio**

[Attached Hereto]

1770416

<u>**Exhibit A-6**</u>

**Leased Premises - Moraine, Ohio**

[Attached Hereto]

## Exhibit A-7

**Leased Premises – Saginaw, Michigan**

[Attached Hereto]

## Exhibit A-8

**Leased Premises - Toledo, Ohio**

[Attached Hereto]

1770416

## Exhibit B

**Leased Premises**

[See Exhibits B-1 through B-[_____] attached hereto]

1770416

## Exhibit B-1

**Retained Premises - Pontiac, Michigan**

[Attached Hereto]

**Exhibit B-2**

**Retained Premises - Romulus, Michigan**

[Attached Hereto]

1770416

## Exhibit B-3

**Retained Premises - Fairfax, Kansas**

[Attached Hereto]

1770416

**<u>Exhibit B-4</u>**

**Retained Premises - Grand Blanc, Michigan**

[Attached Hereto]

## Exhibit B-5

**Retained Premises - Lordstown, Ohio**

[Attached Hereto]

1770416

## Exhibit B-6

**Retained Premises - Moraine, Ohio**

[Attached Hereto]

### Exhibit B-7

**Retained Premises - Saginaw, Michigan**

[Attached Hereto]

1770416

## Exhibit B-8

**Retained Premises - Toledo, Ohio**

[Attached Hereto]

## Exhibit C

### Form of Memorandum of Lease

**Prepared by and after recording
return to:**

_____
_____
_____
_____

### MEMORANDUM OF LEASE

This Memorandum of Lease ("Memorandum") is made as of this _____ day of _____, 2009, by and between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant").

WHEREAS, Landlord and Tenant are parties to that certain Master Lease Agreement (Subdivision Properties) dated _____, 2009 (the "Lease"), pursuant to which Tenant leases a portion of the real property (the "Separate Leased Premises") located in _____, _____ and more particularly described on Exhibit A attached hereto and by this reference made a part hereof (the "Property") from Landlord; and

WHEREAS, Landlord and Tenant desire to place of record this Memorandum of Lease;

NOW, THEREFORE, Landlord and Tenant hereby agree as follows:

1.    Lease.  Landlord has leased to Tenant the Separate Leased Premises under the terms, conditions and provisions contained in the Lease, such Lease being expressly incorporated herein by reference.

2.    Term.  The Lease is for a term beginning on _____, 2009 and terminating with respect to the Separate Leased Premises on the earlier of (a) the date on which Landlord conveys the Separate Leased Premises to Tenant in accordance with the Lease or (b) _____, 2029.

3.    Certain Landlord Covenants.  Under the Lease, Landlord has agreed not take any action that might adversely affect the Property without Tenant's prior written consent, which consent may be withheld in Tenant's sole and absolute discretion, including, without limitation, incurring any Encumbrance (as such term is defined in the Lease), consenting to any Encumbrance or failing to contest or notify Tenant of any Encumbrance affecting the Property after the Commencement Date.  Notwithstanding the foregoing, during the Term, the Lease permits Landlord to incur an Encumbrance in the form of a mortgage or deed of trust on the portion of the Property not constituting the Separate Leased Premises in connection with financing obtained by Landlord, provided that (i) such mortgage or deed of trust shall expressly exclude the Separate Leased Premises and shall state that such mortgage or deed of trust shall be

1770416

subordinate in all respects to this Lease with respect to the Property, (ii) the lender of such financing shall be reasonably acceptable to Tenant, and (iii) Landlord shall indemnify, defend and hold Purchaser harmless from and against any and all costs or damages incurred by Tenant in connection with such financing.

4.    Other Provisions.  This Memorandum is not a complete summary of the unrecorded Lease.  Reference should be made to the unrecorded Lease for the full terms, conditions and provisions thereof.

5.    Conflicts.  This Memorandum is prepared solely for the purpose of recordation to give notice of the Lease and shall not constitute an amendment or modification of the Lease.  In the event of any conflict or inconsistency between the terms and provisions of this Memorandum and the terms and provisions of the unrecorded Lease, the terms and provisions of the Lease shall govern and control in all respects.

6.    Successors and Assigns.  This Memorandum shall run with the land described on Exhibit A hereto and shall be binding upon and inure to the benefit of the Landlord and the Tenant and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Memorandum as of the date first set forth above.

**TENANT:**

*[NEWCO]*, a Delaware corporation

By: _____
Name: _____
Title: _____

**LANDLORD:**

**GENERAL MOTORS CORPORATION,**
a Delaware corporation

By: _____
Name: _____
Title: _____

**[To be inserted prior to recording:  legal description, proper recording, notary, witnessing requirements for state in which Separate Leased Premises is located]**

1770416

M

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit M**

Form of Assignment and Assumption of Willow Run Lease

## EXHIBIT M

## FORM OF ASSIGNMENT AND ASSUMPTION OF WILLOW RUN LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE OF LAND (this "Assignment"), dated as of [_____ ], 2009 (the "Effective Date"), is made by and among GENERAL MOTORS CORPORATION, a Delaware corporation ("Assignor"), and *[NGMCO, Inc.]*, a Delaware *[corporation]* ("Assignee"). Capitalized terms used herein and not otherwise defined have the meanings given to them in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, Assignor, Assignee and certain other parties entered into that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (as amended from time to time, the "Purchase Agreement"); and

WHEREAS, the Wayne County Airport Authority (as successor-in-interest to the Board of County Road Commissioners of the County of Wayne, Michigan), as landlord, and Assignor, as tenant, are parties to that certain Willow Run Airport Lease of Land dated October 11, 1985, as amended by that certain Amendment to Lease of Land dated as of *[July 28]*, 2009 (as so amended, the "Lease"), relating to certain premises located at the Willow Run Airport in Wayne and Washtenaw Counties, Michigan (the "Premises"); and

WHEREAS, the Purchase Agreement requires Assignor to convey and transfer to Assignee, and Assignee to assume, all of Assignor's right, title and interest, as tenant, in, to and under the Lease, together with all rights, options, interests, liabilities, obligations and benefits thereunder (collectively, the "Additional Obligations"), but specifically excluding the Retained Liabilities associated with the Lease and the Additional Rights, if any, and all liabilities under Section 4 of this Assignment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Assignment.  As of the Effective Date, Assignor hereby sells, assigns, transfers, conveys and delivers unto Assignee, its successors and assigns, all of the right, title and interest that Assignor possesses in, to and under the Lease, together with all Additional Obligations thereunder, excluding therefrom, (i) any Retained Liabilities associated with the Lease and the Additional Rights, if any, and (ii) all liabilities under Section 4 of this Assignment.

2.    Assumption.  Assignee hereby accepts such assignment of the Leases, together with the Additional Obligations, and hereby assumes, and agrees to be bound by, and to keep, observe and perform, all of the terms, covenants, conditions, duties and obligations of and under the Leases that arise from and after the Effective Date, excluding therefrom, (i) any Retained Liabilities associated with the Lease and the Additional Obligations, if any, and (ii) all liabilities under Section 4 of this Assignment.

3.    Rentals, Taxes and Deposits.  All advance rental payments, real estate taxes and other payments made or by Assignor under the Lease shall be prorated between Assignor and Assignee as of the Effective Date of this Assignment in accordance with the terms of the Purchase Agreement.

4.    Environmental.

4.1    Definitions.  As used in this Section 4, the following terms shall have the following meanings:

(a)    "Contamination" means the presence at the Premises, at a quantity or level which exceeds the amount that would require an investigation, clean up, or other response action under Environmental Law, of any Hazardous Material in surface water, groundwater, ambient air, or surface or subsurface soil.

(b)    "Environmental Law" means any law in existence at the date hereof relating to the management or Release of, or exposure of humans to, any Hazardous Materials, pollution or the protection of human health and the environment, including surface water, groundwater, ambient air, surface or subsurface soil, natural resources or wildlife habitat.

(c)    "Environmental Permits" means any consents, licenses, permits, or other approvals required by any governmental authority under Environmental Law.

(d)    "Hazardous Materials" means any material or substance that is regulated, or can give rise to Liabilities or Losses, under an Environmental Law or a Permit issued pursuant to any Environmental Law, including any petroleum, petroleum-based or petroleum-derived product, polychlorinated biphenyls, asbestos-containing materials, lead, and any noxious, radioactive, flammable, corrosive or caustic compound (whether solid, liquid or gaseous).

(e)    "Liabilities" means any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any law, claim, governmental order, contract or otherwise.

(f)    "Losses" means any and all Liabilities, losses, damages, fines, amounts paid in settlement, penalties, costs and expenses (including reasonable and documented attorneys', accountants', technical consultants', engineers' and experts' fees and expenses).

(g)    "Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, discarding, burying, abandoning or disposing into the environment of Hazardous Materials that is prohibited under, or reasonably likely to result in a Liability under, any applicable Environmental Law.

2

4.2     Agreements Regarding Environmental Matters under the Lease.
Assignor and Assignee hereby acknowledge that:

(a)     the Assignor will retain all Liabilities for (i) all
Contamination, including any Releases, in, at, on, under or emanating onto or from the Premises,
regardless of when such Contamination may have occurred, and (ii) any on-going consequences
or responsibilities relating to this Contamination;

(b)     the Assignor will be responsible for managing and funding
the liabilities referenced in Section 4.2(a); and

(c)     the Assignee will only be responsible for compliance with
applicable Environmental Laws and Environmental Permits directly related to its operations at
the Premises.

(d)     Assignor retains or shall assume any Liability, including
responsibility for the investigation, clean up, or other response action required under
Environmental Law, related to any Contamination, including the Release of Hazardous
Materials, in, at, on, under or emanating onto or from the Premises which occurred prior to, on or
after the Effective.  Except as provided by Section 4.2(e), (i) Assignor will take all actions
required by or under any Environmental Law to address any Contamination in, at, on, under or
emanating onto or from the Premises or other environmental conditions, matters, or issues,
which, in each case may affect the Premises, and (ii), Assignor hereby forever waives, discharges
and releases any claims or causes of action it has or may have against Assignee related to the
existence or Release of Hazardous Materials in, at, on, under or emanating onto or from the
Premises or other violation of Environmental Law prior to the Effective Date, or on or after the
Effective Date.

(e)     Assignee shall conduct its operations at the Premises in
compliance with applicable Environmental Laws and any Environmental Permits required at the
Premises.  Assignee shall be responsible for (i) any fines or penalties resulting directly and
exclusively from Assignee's noncompliance with Environmental Laws or Environmental Permits
at the Premises; and (ii) for site specific environmental clean up or other costs incurred by
Assignor that Assignor establishes, pursuant to a non-appealable administrative or judicial
determination, arose directly and exclusively from Assignee's gross negligence or willful
misconduct in connection with the operation, maintenance or repair of any Facility ("Additional
Costs") and not from the acts of any third party.  Further, Assignee will indemnify, defend and
hold Assignor harmless from and against any and all fines or penalties to the extent exclusively
and directly caused by Assignee's noncompliance with Environmental Laws or Environmental
Permits at the Premises and from all Additional Costs incurred by Assignor at the Premises.

(f)     Assignor will promptly notify Assignee (and, if in writing,
provide copies) of any governmental or third-party filings, notices, or communications
concerning the Premises, any adjacent parcel, or other nearby real property of which Assignor
has knowledge related in any way to any Contamination, environmental conditions, matters, or
issues.  Assignor will also notify the Assignee of any Release or threatened Release of any
Hazardous Materials of which Assignor has knowledge that occurs in, at, on, under or emanates

3

from the Premises or any adjacent parcel to the Premises after the Effective Date and which is not caused exclusively and directly by the Assignee's activity on the Premises.

(g)    Assignee will promptly notify the Assignor (and, if in writing, provide copies) of any governmental or third-party filings, notices, or communications concerning the Premises which relate in any way to any Contamination, environmental conditions, matters, or issues in connection with the Premises of which Assignee has knowledge. Assignee will also promptly notify Assignor of any Release or threatened Release of any Hazardous Materials which occurs in, at, on, under or emanates from the Premises, and which are caused exclusively and directly by the Assignee's current activities on the Premises.  Other than providing Assignor with the notices provided for in this Section 4.2(g), Assignee will have no obligation to address, clean up, investigate, or otherwise respond to any Contamination on, at, in, under or emanating from the Premises, regardless of when such Contamination may have occurred.

(h)    The obligations in this Section 4 shall survive the expiration or termination of this Lease and the occurrence and discharge of any other obligation under this Assignment.

5.    Conflicts with Purchase Agreement.  This Assignment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement (including the representations, warranties, covenants and agreements set forth in the Purchase Agreement), all of which are incorporated herein by reference.  In the event of any conflict between the terms of this Assignment and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

6.    Successors and Assigns; No Third Party Beneficiaries.  This Assignment is for the sole benefit of Assignor, Assignee and their respective successors and permitted assigns, and nothing express or implied in this Assignment is intended or shall be construed to confer upon or give to any Person, other than Assignor, Assignee and their respective successors and permitted assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Assignment.

7.    Modification.  This Assignment may not be amended or modified in any manner except by a written agreement executed by each of the Parties.

8.    Governing Law.  The construction, interpretation and other matters arising out of or in connection with this Assignment shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws and (c) to the extent required by Law with respect to the enforcement of any Lease, the Law of the jurisdiction where the Premises are located.

9.    Construction of Assignment.  This Assignment shall not be construed more strictly against one party than against the other, merely by virtue of the fact that it may

4

have been prepared primarily by counsel for one of the parties, it being recognized that both Assignor and Assignee have contributed substantially and materially to the preparation of this Assignment.

10.     Severability.  If any provision of this Assignment is held to be invalid or unenforceable, then, to the extent that such invalidity or unenforceability shall not deprive either party of any material benefit intended to be provided by this Assignment, the remaining provisions of this Assignment shall remain in full force and effect and shall be binding upon the parties hereto.

11.     Captions.    The captions of this Assignment are for convenience of reference only and do not in any way limit or amplify the terms hereof.

12.     Counterparts.    This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.  All signatures of Assignor and Assignee may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

[Remainder of the page left intentionally blank]

1772791

N

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit N**

Form of Ren Cen Lease

**EXHIBIT N**

**FORM OF REN CEN LEASE**

**MASTER LEASE AGREEMENT**
**(Renaissance Center)**

between

**RIVERFRONT HOLDINGS, INC.,**
**a Delaware corporation**
**("Landlord")**

**and**

**_[_____],_**
**a Delaware _[_____]_**
**("Tenant")**

**Dated: _____, 2009**

# TABLE OF CONTENTS

**Section**                                                                                      **Page**

1. LEASE SCHEDULE AND EXHIBITS ...................................................................................1

2. AGREEMENT TO LEASE ..................................................................................................1

3. LEASE TERM ......................................................................................................................1

4. RENTAL PAYMENTS ..........................................................................................................1

    4.1     Rent..........................................................................................................................1
    4.2     Services...................................................................................................................2
    4.3     Interest on Late Payments ....................................................................................2

5. USE .......................................................................................................................................2

6. TAXES...................................................................................................................................2

7. CONDITION OF LEASED PREMISES ...............................................................................3

8. MAINTENANCE ..................................................................................................................3

9. ASSIGNMENT AND SUBLETTING ..................................................................................3

10. LANDLORD'S TITLE AND QUIET ENJOYMENT ...........................................................3

11. ALTERATIONS AND IMPROVEMENTS; LIENS .............................................................3

    11.1    Alterations, Additions and Improvements ...........................................................3
    11.2    Tenant Liens...........................................................................................................4
    11.3    Landlord Liens ......................................................................................................4

12. TENANT TRADE FIXTURES AND PERSONAL PROPERTY ...........................................4

13. INSURANCE.........................................................................................................................5

    13.1    Tenant's Insurance ................................................................................................5
    13.2    Form of Insurance .................................................................................................5

14. DAMAGE AND CONDEMNATION.....................................................................................5

15. [INTENTIONALLY DELETED].............................................................................................5

16. [INTENTIONALLY DELETED].............................................................................................6

17. EVENTS OF DEFAULT; REMEDIES ..................................................................................6

    17.1    Events of Default ...................................................................................................6
    17.2    Remedies................................................................................................................6

i

17.3  Landlord Defaults ........................................................................7
17.4  Limitation on Liability...............................................................7

18. ENVIRONMENTAL.................................................................................7

19. NOTICE......................................................................................................7

20. ENTRY UPON LEASED PREMISES.................................................8

21. GENERAL PROVISIONS ......................................................................8

21.1  Brokerage....................................................................................8
21.2  Amendments................................................................................8
21.3  Severability ................................................................................8
21.4  Attorney's Fees ..........................................................................8
21.5  Time of Essence .........................................................................8
21.6  Waiver.........................................................................................8
21.7  Successors and Assigns..............................................................8
21.8  Governing Law ...........................................................................8
21.9  Estoppel Agreements ..................................................................8
21.10 Subordination, Non-Disturbance Agreement..............................9
21.11 Intentionally Omitted.................................................................9
21.12 Force Majeure .............................................................................9
21.13 Consent .......................................................................................9
21.14 Time Period for Payment ............................................................9
21.15 Execution of Lease......................................................................9
21.16 Counterparts..............................................................................10
21.17 Confidentiality ..........................................................................10
21.18 Intentionally Deleted.................................................................10
21.19 Gender.......................................................................................10
21.20 Memorandum of Lease ..............................................................10

22. WAIVER OF LANDLORD LIEN ......................................................11

23. LANDLORD COVENANTS ................................................................11

24. SIGNAGE...............................................................................................11

25. ASSIGNMENT AND ASSUMPTION OF CONTRACTS....................11

25.1  Assignment and Assumption .....................................................11
25.2  Revenue from Contracts. ...........................................................11

Exhibit A - Leased Premises
Exhibit B - Form of Memorandum of Lease

1774192

## LEASE SCHEDULE

This Lease Schedule is made a part of that certain Master Lease Agreement (Renaissance Center) attached hereto, including all Exhibits (the "Lease"), between Landlord and Tenant (as such terms are defined below).

| | | |
|---|---|---|
| 1. | Landlord: | Riverfront Holdings, Inc., Delaware corporation. |
| 2. | Tenant: | [_____], a Delaware [_____]. |
| 3. | Date of Lease: | [_____], 2009. |
| 4. | Leased Premises: | The term "Leased Premises" shall mean (a) the land owned by Landlord (the "Land") that is located within the area outlined on the depiction attached hereto as Exhibit A and made a part hereof, (b) the building or buildings located on the Land (the "Buildings"), (c) any other improvements and fixtures located on the Land and owned by Landlord (collectively with the Buildings, the "Improvements"), and (d) all appurtenances belonging to or in any way pertaining to said Land and Improvements. |
| 5. | Commencement Date: | [_____], 2009. |
| 6. | Termination Date: | See Section 3. |
| 11. | Term: | The term commencing on the Commencement Date and expiring on the Termination Date. |
| 12. | Base Rent: | $1.00 per month, payable on the Commencement Date and monthly thereafter or, at Tenant's option, prepayable in full for the entire Term. |
| 13. | Use: | See Section 5. |
| 14. | Landlord's Address: | [_____]<br>[_____]<br>*Attn: [_____]*<br>*Fax: [_____]*<br>*E-mail: [_____]*<br><br>With a copy to:<br><br>[_____]<br>[_____]<br>*Attn: [_____]* |

1774192

1

*Fax: [_____]*
*E-mail: [_____]*

15.  Tenant's Address:  *[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

With a copy to:

*[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

16.  Exhibits to Lease:  Exhibit A – Leased Premises
Exhibit B - Form of Memorandum of Lease

2

1774192