# MASTER LEASE AGREEMENT

THIS LEASE is made and entered into as the date set forth on the Lease Schedule to which this Lease is attached (the "Lease Schedule") by and between Landlord and Tenant.

WHEREAS, Landlord owns the Land and the Improvements and the appurtenances thereto, which together comprise the Leased Premises; and

WHEREAS, Tenant desires to lease the Leased Premises on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration for the mutual covenants herein contained, and other valuable consideration, the parties agree as follows:

**1.** **LEASE SCHEDULE AND EXHIBITS**. The Lease Schedule and all Exhibits attached hereto are hereby incorporated herein by this reference. All capitalized terms used herein that are not specifically defined herein shall have the meanings set forth on the Lease Schedule. The Tenant and the Landlord are collectively referred to herein as the "Parties".

**2.** **AGREEMENT TO LEASE.** Upon the terms and conditions set forth herein, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Leased Premises and any and all fixtures, machinery, equipment and personal property (collectively, the "Landlord Fixtures and Personal Property") owned or leased by Landlord and located on the Leased Premises.

**3.** **LEASE TERM.** Unless sooner terminated or extended pursuant to the terms hereof, the term of this Lease (the "Term") shall commence as of the Commencement Date and shall end on the earlier of (i) the date on which the stock of Landlord or title to the Leased Premises is transferred to Tenant or an affiliate of Tenant in accordance with the Amended and Restated Master Sale and Purchase Agreement (the "Purchase Agreement") dated as of June 26, 2009 between Landlord, Tenant and the other parties named therein, or (ii) October 31, 2009 (as may be extended in accordance with this Section 3, the "Termination Date"). Notwithstanding the foregoing, Tenant may extend the Term through January 31, 2010 on all of the terms and conditions of this Lease by providing Landlord prior written notice on or before October 1, 2009 of Tenant's election to extend the Term.

**4.** **RENTAL PAYMENTS**

**4.1** **Rent.** Tenant shall pay to Landlord the base rent (the "Base Rent") in the amount set forth in the Lease Schedule. In addition, Tenant shall pay Landlord as additional rent (the "Additional Rent"; together with the Base Rent, the "Rent") any reasonable costs reasonably incurred by Landlord for which Tenant is responsible in accordance with this Lease. Except as set forth in this Lease and except with respect to any matter caused by the gross negligence or willful misconduct of Landlord, Tenant shall be responsible for all costs associated with the Leased Premises that accrue or arise during the Term. Tenant shall pay any Additional Rent within thirty (30) days after receipt of a reasonably detailed invoice therefor from Landlord. Rent shall be paid to Landlord at Landlord's Address (as defined in the Lease Schedule).

1

**4.2    Services.** Except as otherwise agreed in writing by Tenant and Landlord (including, without limitation, in the Purchase Agreement (as hereinafter defined)), Landlord shall not be responsible for providing or arranging for any services for the Leased Premises or to Tenant with respect to the Leased Premises, including, without limitation, maintenance and repair, electricity, gas, water or other utility services, janitorial services, or security services. Notwithstanding the foregoing, Landlord shall cooperate with Tenant in Tenant obtaining any of the aforesaid services it requires for the Leased Premises. Notwithstanding anything to the contrary contained herein, to the extent such services are provided to the Leased Premises at Tenant's request pursuant to a Contract (as hereinafter defined) that cannot be assigned to Tenant in accordance with Section 25 without cost or without triggering a right to terminate the Contract by the other party thereto, the Contract shall not be assigned to Tenant, Landlord shall not take any adverse action with respect to such Contract, and Tenant, upon receipt of any invoices it receives from Landlord for services provided under the Contract after the Commencement Date, shall pay Landlord any amounts due thereunder on or before the due date thereof.

**4.3    Interest on Late Payments.** In the event that Tenant fails to pay Rent, and such amount is not paid within fifteen (15) business days after the date on which Rent is due as herein provided, then such sum shall bear interest thereafter, without prejudice to and in addition to any other remedy available to the Landlord under this Lease, at a rate equal to, on any date, the sum of (i) the average (rounded to the nearest 1/16th of one percent) of the London Interbank Offered Rates for three-month United States dollar-denominated deposits, as published in the Wall Street Journal on such date and (ii) 500 basis points, but in no event greater than the maximum rate then permitted under applicable law (the "Default Rate").

**5.    USE.** Tenant may use the Leased Premises in a manner substantially similar to the manner in which the Leased Premises were used by General Motors Corporation prior to the Commencement Date and for any other use permitted or allowed by or under applicable laws. Tenant shall comply in all material respects with all laws, regulations and other governmental requirements relating to Tenant's use and occupancy of the Leased Premises. Tenant may contest any alleged violation of laws, regulations and other government regulations so long as the Tenant, in good faith and with due diligence, contests the same or the validity thereof by appropriate or allowable legal proceeding or process and provided that upon final adjudication, determination or settlement of such proceeding or process Tenant shall immediately pay any amounts due and/or comply therewith.

**6.    TAXES.** All real property taxes or special improvement taxes payable during the Term with respect to the Leased Premises, all property taxes levied or assessed against the Landlord Fixtures and Personal Property, and all property taxes levied or assessed against the Tenant Trade Fixtures and Personal Property (as hereinafter defined) (including all penalties and interest thereon), which may be assessed, levied, imposed upon the same, or any use or occupancy of the Leased Premises, for any period within the Term, shall be paid by Tenant, before they become delinquent. Landlord shall deliver copies of all tax bills it receives to Tenant within ten (10) business days after receipt thereof. Tenant shall deliver to Landlord duplicate receipts and canceled checks or photocopies thereof showing the payments of all such taxes and assessments, within thirty (30) days after respective payments evidenced thereby, but in no event after any such payment is required to be made hereunder. Provided no Event of Default shall have occurred and be continuing hereunder, Tenant may contest any tax or assessment upon or

2

against the Leased Premises, or any part thereof, or the improvements at any time situated thereon, so long as the Tenant shall, in good faith and with due diligence, contest the same or the validity thereof by appropriate legal proceeding which shall have the effect of preventing the collection of the tax or assessment so contested, and provided that upon final adjudication of such proceeding Tenant shall immediately pay any amounts due. The obligations of Tenant under this provision shall survive the expiration or termination of the Lease.

7. **CONDITION OF LEASED PREMISES.** Tenant acknowledges that it accepts the Leased Premises in their "As-Is" condition on the Commencement Date. Except as expressly set forth herein, Tenant enters into this Lease without any representations or warranties on the part of Landlord, express or implied, as to the condition of the Leased Premises, including, but not limited to, the cost of operations and the condition of its fixtures, improvements and systems.

8. **MAINTENANCE.** Landlord shall have no responsibility for any maintenance and repair of and replacements to the Leased Premises of any nature whatsoever (except maintenance, repair and replacements necessitated by the gross negligence or willful misconduct of Landlord), including, without limitation, any capital, extraordinary and normal repairs and replacements to the Leased Premises, normal maintenance, the maintenance of the roof, footings, foundations, walls, structural elements, HVAC, mechanical, plumbing and electrical serving the Leased Premises exclusively. Notwithstanding anything to the contrary contained herein, Tenant may elect to perform or elect not to perform the same in its sole discretion, provided that Tenant shall indemnify Landlord from any penalties or fines imposed on Landlord by any applicable governmental authority if Tenant elects not to perform any maintenance or repair of or make any replacements to the Leased Premises (except maintenance, repair and replacements necessitated by the gross negligence or willful misconduct of Landlord).

9. **ASSIGNMENT AND SUBLETTING.** Tenant may assign its interest in this Lease (as to the entire Leased Premises or as to any portion thereof) and sublease all or any portion of the Leased Premises without obtaining the consent of Landlord.

10. **LANDLORD'S TITLE AND QUIET ENJOYMENT.** Landlord represents and warrants that Landlord owns fee simple title to the Leased Premises and has full right and authority to make this Lease. Landlord covenants that so long as an Event of Default does not then exist, Tenant shall have quiet and peaceful possession and enjoyment of the Leased Premises and shall not be interfered with by Landlord, or any party claiming by, through or under Landlord or any party claiming title superior to Landlord, subject to the rights of space tenants under existing leases.

11. **ALTERATIONS AND IMPROVEMENTS; LIENS**.

11.1 **Alterations, Additions and Improvements.** Tenant may, at its own expense and without Landlord's consent, make any alterations, additions or improvements to the Leased Premises which Tenant deems desirable. All such alterations, additions and improvements shall be made in accordance with all applicable laws and ordinances. Tenant shall not be required to restore the Leased Premises to the condition existing prior to the making of such alterations, additions and improvements at the commencement of the Term.

3

**11.2    Tenant Liens.** Tenant shall not permit the Leased Premises to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished in connection with work of any character performed or claimed to have been performed on the Leased Premises by, or at the direction or sufferance of Tenant; provided, however, that Tenant shall have the right to contest, in good faith and with reasonable diligence, the validity of any such lien or claimed lien, and Tenant shall not be deemed in default hereunder as a result of such lien so long as Tenant is so contesting such lien. Subject to Tenant's right of contest, in the event that such lien is not released, removed, or bonded over when required in this Section 11.2, Landlord, at its option, may take all action Landlord deems reasonable or necessary to release and remove such lien (without any duty to investigate the validity thereof) and Tenant shall, within ten (10) days following demand, either before or after such release and removal, pay or reimburse Landlord for all reasonable sums, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by Landlord in connection with removal of such lien together with interest thereon from the date incurred until the date paid at the Default Rate. The obligations of Tenant under the provisions of this Section 11.2 shall survive the expiration or termination of this Lease.

**11.3    Landlord Liens.** Landlord shall not permit the Leased Premises to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished in connection with work of any character performed or claimed to have been performed on the Leased Premises by, or at the direction or sufferance of Landlord; provided, however, that Landlord shall have the right to contest, in good faith and with reasonable diligence, the validity of any such lien or claimed lien, and Landlord shall not be deemed in default hereunder as a result of such lien so long as Landlord is so contesting such lien; provided, in case of any such lien attaching, or notice or claim thereof being asserted during any period of time in which Tenant desires to assign or sublease its interest in this Lease, as a condition precedent to the right to contest, Landlord shall bond over or otherwise provide security (as permitted by applicable law in such proceeding), the effect of which is to prevent such lien from attaching to Tenant's or Landlord's interest in the Leased Premises and any proceeds accruing from the assignment thereof. Subject to Landlord's right of contest, in the event that such lien is not released, removed, or bonded over when required in this Section 11.3, Tenant, at its option, may take all action Tenant deems reasonable or necessary to release and remove such lien (without any duty to investigate the validity thereof) and Landlord shall, within ten (10) days following demand, either before or after such release and removal, pay or reimburse Tenant for all reasonable sums, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by Tenant in connection with removal of such lien together with interest thereon from the date incurred until the date paid at the Default Rate. The obligations of Landlord under the provisions of this Section 11.3 shall survive the expiration or termination of this Lease.

**12.    TENANT TRADE FIXTURES AND PERSONAL PROPERTY.** Tenant currently owns certain trade fixtures, machinery, equipment, and other personal property located on the Leased Premises and Tenant may during the Term install in or on the Leased Premises other trade fixtures, machinery, equipment and personal property (collectively, the "Tenant Trade Fixtures and Personal Property") as Tenant deems desirable, and all of the Tenant Trade Fixtures and Personal Property shall remain Tenant's property whether or not affixed or attached

4

to the Leased Premises. Tenant may, but shall not be required to, remove the Tenant Trade Fixtures and Personal Property from the Leased Premises at any time during the Term.

13. **INSURANCE**.

13.1 **Tenant's Insurance.**    Throughout the Term, Tenant shall maintain insurance insuring:

(a)    The Building and any other Improvements at any time situated upon the Leased Premises against loss or damage by fire, lightning, wind storm, hail storm, aircraft, vehicles, smoke, explosion, riot or civil commotion as provided by the Standard Fire and Extended Coverage Policy and all other risks of direct physical loss as insured against under Special Form ("all risk" coverage). The insurance coverage shall be for not less than 100% of the full replacement cost of the Building and other Improvements and building ordinance coverage.

(b)    Tenant, Landlord (as an "additional insured"), and any permitted mortgagee of Landlord, from all claims, demands or actions made by or on behalf of any person or persons, firm or corporation and arising from, related to or connected with the Leased Premises, for bodily injury to or personal injury to or death of any person, or more than one person, or for damage to property in an amount of not less than $2,000,000.00 combined single limit per occurrence/aggregate, and Tenant shall carry excess liability insurance coverage in an amount not less than $8,000,000.00.

(c)    All contents and trade fixtures, furniture and furnishings in the Leased Premises to the extent of at least ninety percent (90%) of their replacement cost under Standard Fire and Extended Coverage Policy and all other risks of direct physical loss as insured against under Special Form ("all risk") coverage.

13.2 **Form of Insurance.** All of said insurance required by this Section 13 shall be in form and with companies licensed in the state in which the respective Leased Premises is located, and shall be AM Best's rated A- and class VII or better, and shall provide that the same shall not be subject to cancellation or termination except after at least ten (10) days prior written notice to Landlord. Certificates of the insurance policies required to be carried hereunder shall be deposited with the Landlord at the Commencement Date and from time to time, together with copies of the policies, upon request of the Landlord. Any insurance required of Tenant under this Lease may be furnished under a blanket policy carried by Tenant. Notwithstanding anything in this Lease to the contrary, Tenant may self-insure any or all of its insurance obligations under this Lease.

14. **DAMAGE AND CONDEMNATION.** In the event of any casualty, taking or condemnation for a public or quasi public use or purpose by a competent authority affecting the Leased Premises, (a) neither party may terminate this Lease; (b) Tenant shall be entitled to all insurance proceeds or awards in connection with such casualty or condemnation; and (c) Tenant may elect, in its sole discretion and at its sole cost (except with respect to any insurance proceeds), to restore the Leased Premises.

15. **[INTENTIONALLY DELETED].**

1774192

16.    [INTENTIONALLY DELETED].

17.    **EVENTS OF DEFAULT; REMEDIES**.

        **17.1    Events of Default.**    Each of the following events shall constitute an "Event of Default":

                (a)    If Tenant shall fail to pay any Rent to Landlord when due in accordance with the terms of this Lease and such default shall continue for a period of fifteen (15) days after the date on which Tenant receives written notice of such failure to pay Rent from Landlord;

                (b)    If Tenant shall fail to keep or perform or abide by any other requirement, term, condition, covenant or agreement of this Lease and such default shall continue for a period of thirty (30) days after written notice to Tenant of such default, and, if more than thirty (30) days shall reasonably be required to correct the breach complained of in such notice, then if Tenant shall fail to commence promptly to correct such breach and prosecute the same to completion with reasonable diligence;

                (c)    If Tenant shall be adjudged an involuntary bankrupt, or a decree or order approving, as properly filed, a petition or answer filed against Tenant asking reorganization of Tenant under the federal bankruptcy laws as now or hereafter amended, or under the laws of any state, shall be entered, and any such decree or judgment or order shall not have been vacated or set aside within one hundred twenty (120) days from the date of the entry or granting thereof;

                (d)    If Tenant shall file or admit the jurisdiction of the court and the material allegations contained in any petition in bankruptcy or any petition pursuant or purporting to be pursuant to the federal bankruptcy laws as now or hereafter amended;

                (e)    If Tenant shall institute any proceeding or shall give its consent to the institution of any proceedings for any relief of Tenant under any bankruptcy or insolvency laws or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, arrangements, composition or extension; or

                (f)    If Tenant shall make any assignment for the benefit of creditors or shall apply for or consent to the appointment of a receiver for Tenant; or a decree or order appointing a receiver of the property of Tenant shall be made and such decree or order shall not have been vacated or set aside within one hundred twenty (120) days from the date of entry or granting thereof.

        **17.2    Remedies.**    Upon the occurrence of any one or more Events of Default, Landlord may at its election pursue any and all remedies available at law or in equity (other than termination of this Lease), including without limitation, the right to sue Tenant for any and all damages, losses and liabilities, and reasonable costs and expenses (including reasonable attorneys' fees and court costs) incurred by or caused to Landlord arising out of or resulting from any act or omission of Tenant or any Event of Default by Tenant hereunder, and the right to sue

6

1774192

for specific performance, and for injunctive relief but excluding for any Rent due following the date on which Tenant vacates the Leased Premises.

**17.3   Landlord Defaults.** If Landlord defaults in the performance of any of its obligations, covenants and warranties hereunder and such default continues for a period of thirty (30) days after written notice thereof to Landlord (or in an emergency, Landlord shall fail to cure such default immediately), and if more than thirty (30) days shall reasonably be required to correct the breach complained of in such notice, then if Landlord shall fail to commence promptly to correct such breach and prosecute the same to completion with reasonable diligence not to exceed sixty (60) days, Tenant may, at its option and in addition to all other rights and remedies available to Tenant, cure the same on behalf of Landlord, in which event Tenant may deduct the cost of such cure from Rent next due hereunder, provided that if such Rent is insufficient to fully reimburse Tenant for such costs, any such deficiency (together with interest thereon at the Default Rate) shall be immediately due and payable by Landlord to Tenant upon written demand from Tenant, which demand shall be accompanied by invoices or receipts evidencing such costs.

**17.4   Limitation on Liability.**

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL TENANT OR LANDLORD BE LIABLE FOR ANY INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND ARISING UNDER OR IN CONNECTION WITH THIS LEASE (INCLUDING PURSUANT TO SECTION 16 HEREOF), REGARDLESS OF LEGAL THEORY, INCLUDING ANY SUCH DAMAGES OR LOSSES RESULTING FROM BUSINESS INTERRUPTION OR LOST PROFITS.

**18.   ENVIRONMENTAL.** Any Liabilities arising under any Environmental Law relating to (A) conditions present on the Leased Premises, (B) Landlord's ownership of the Leased Premises, (C) Tenant's occupancy of the Leased Premises or (D) Landlord's or Tenant's failure to comply with Environmental Laws (as all such terms are defined in the Purchase Agreement) with respect to the Leased Premises shall be governed by Sections 2.3(a)(viii) and 2.3(b)(iv) of the Purchase Agreement, with the Leased Premises treated as a Purchased Asset (as such term is defined in the Purchase Agreement) for such purpose and the provisions thereof shall be deemed incorporated by reference herein for that purpose. Notwithstanding anything to the contrary contained in the Purchase Agreement, however, in no event shall Landlord be entitled to terminate this Lease in connection with this Section 18.

**19.   NOTICE.** All notices or demands required or permitted to be given or served pursuant to this Lease shall be in writing and shall be deemed to have been given or served one (1) business day subsequent to transmittal by nationally recognized prepaid overnight courier, and addressed to Landlord at Landlord's Address or to Tenant at Tenant's Address (as set forth in the Lease Schedule). Such addresses may be changed from time to time by either party by serving notice as above provided. In no event shall personal delivery at the Leased Premises be deemed an effective means of notice.

1774192

**20.    ENTRY UPON LEASED PREMISES.** Neither Landlord nor Landlord's representatives shall be permitted to enter the Leased Premises during the Term without Tenant's prior written consent, which may be withheld in Tenant's sole discretion. If Tenant consents to any such entry, a representative of Tenant shall accompany Landlord and/or Landlord's representatives through the Leased Premises at all times.

**21.    GENERAL PROVISIONS.**

**21.1    Brokerage.** Landlord and Tenant each represents and warrants to the other that it has not engaged or dealt with any broker in this transaction. Landlord and Tenant each agree to indemnify and hold the other harmless from and against all liability, claims, demands, damages, or costs of any kind arising from or connected with any broker's commission, finder's fee, consulting fee or other charge claimed to be due any person or entity arising from the indemnifying party's conduct with respect to this Lease.

**21.2    Amendments.** No amendment or modification of this Lease shall be effective unless in writing and executed by Landlord and Tenant.

**21.3    Severability.** If any term or provision of this Lease shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Lease shall not be affected thereby, but each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**21.4    Attorney's Fees.** In the event Landlord or Tenant is required to use the services of any attorney for the enforcement of any of the terms, covenants or provisions hereof or in the event of any other dispute between Landlord and Tenant concerning this Lease, the prevailing party shall be entitled to recover reasonable attorney's fees and expenses from the non-prevailing party.

**21.5    Time of Essence.** Subject to Section 21.12 below, time is of the essence of this Lease, and all provisions herein relating thereto shall be strictly construed.

**21.6    Waiver.** No waiver of any provision of this Lease shall be deemed to be a waiver of any other provision hereof or of any subsequent or continuing breach of the same or any other provision. Landlord's consent to or approval of any act by Tenant shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act.

**21.7    Successors and Assigns.** All of the covenants, conditions, and provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, when permitted hereunder.

**21.8    Governing Law.** This Lease shall be construed in accordance with the laws of the state of Michigan.

**21.9    Estoppel Agreements.** Each of Tenant and Landlord agrees that from time to time within ten (10) business days after written request by the other party hereto, it will execute, acknowledge and deliver to the requesting party or to such other party as may be designated by the requesting party, a certificate stating that this Lease is then in full force and

8

1774192

effect and has not been modified, supplemented or amended in any way, except as indicated in such certificate; that all conditions and agreements under this Lease to be performed by Landlord or Tenant, as applicable, have been satisfied or performed, except as set forth in such certificate; that, to such party's knowledge, there are no existing defenses or offsets of Tenant, except as indicated in such certificate; that Tenant has not paid any rental more than one month in advance, except as indicated in such certificate; and that, to such party's knowledge, the other party is not in default under any provisions of this Lease.

**21.10   Subordination, Non-Disturbance Agreement.** Prior to entering into any financing encumbering the Leased Premises in accordance with this Lease (including Section 23 hereof), at Tenant's request, Landlord agrees to deliver to Tenant a subordination, non-disturbance and attornment agreement with respect to the applicable Separate Leased Premises executed by Landlord's lender in a form reasonably acceptable to such lender and Tenant.

**21.11   Intentionally Omitted.**

**21.12   Force Majeure.** Neither Landlord nor Tenant shall be deemed in default with respect to any of the terms, covenants and conditions of this Lease to be performed on Landlord's or Tenant's part (other than the failure to make any payment due hereunder), if such party's failure to timely perform same is due in whole or in part to any strike, lockout, labor trouble, civil disorder, failure of power, restrictive governmental laws and regulations, riots, insurrections, war, shortages, accidents, casualties, acts of God, acts caused directly by the other party hereto or such party's agents, employees and invitees, or any other cause beyond the reasonable control of Landlord or Tenant, as applicable (collectively, "Force Majeure Events"). In the event of a Force Majeure Event, the period of performance shall be delayed one day for each day of delay caused by the applicable Force Majeure Event. The foregoing definition of Force Majeure Events shall apply only during the Term.

**21.13   Consent.** Any time the consent of Landlord or Tenant is required, such consent shall not be unreasonably withheld, conditioned or delayed unless expressly stated otherwise herein. Whenever this Lease grants Landlord or Tenant the right to take action, exercise discretion, establish rules and regulations or make allocations or other determinations (other than decisions to exercise expansion, contraction, cancellation, termination or extension options, or decisions which are specified herein to be in the sole discretion of the applicable party), Landlord and Tenant shall act reasonably and in good faith, and shall take no action that might result in the frustration of the reasonable expectations of a sophisticated tenant or landlord concerning the benefits to be enjoyed thereby.

**21.14   Time Period for Payment.** Any time this Lease requires a payment from Landlord to Tenant or from Tenant to Landlord, and no specific time period is set forth herein, such payment shall be deemed due within thirty (30) days after receipt by the paying party of a reasonably detailed, written invoice therefor.

**21.15   Execution of Lease.** The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Leased Premises and this document shall become effective and binding only upon the execution and

9

delivery hereof by Tenant and by Landlord. All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein.

**21.16  Counterparts.** This Lease may be executed in one or more counterparts, and each such counterpart shall constitute an original.

**21.17  Confidentiality.** Except as may be required by filings with or orders by the Bankruptcy Court (defined below), each party acknowledges that it will have access to certain financial information of the other party ("Confidential Information"). Such Confidential Information shall not be released to the public and will be provided, subject to this paragraph, only to those parties who have a legitimate need for such Confidential Information, including accountants, lawyers, lenders, potential buyers, mortgagees and similar parties. Neither Landlord nor Tenant shall prepare or provide any materials with respect to this Lease for media distribution, whether it be: print, television, radio, internet or any other commercial distribution, without the approval of the other party. Landlord and Tenant may prepare any necessary documentation or agenda necessary to secure internal or public approval (if necessary) without said approval being required by the other party.

The following information shall not constitute Confidential Information for purposes of this Section 21.17:

(a)  any information that is available, or becomes available, to the general public without fault of the non-disclosing party;

(b)  any information that can be shown was in the possession of the non-disclosing party prior to receipt of the same from the disclosing party;

(c)  any information that is obtained by the non-disclosing party without an obligation of confidence from a third party who is rightfully in possession of such information and is under no obligation of confidentiality to the disclosing party;

(d)  any information that the non-disclosing party is legally required to disclose; or

(e)  any information that is independently developed by the non-disclosing party without reference or access to the Confidential Information.

**21.18  Intentionally Deleted. Gender.** All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity entity of the person or entity may require.

**21.20  Memorandum of Lease.** At Tenant's request, the parties shall execute a Memorandum of Lease in the form attached hereto as Exhibit B with respect to the Leased Premises, and Tenant, at its cost, may record such Memorandum of Lease in the applicable county recorder's office.

1774192

**22.**   **WAIVER OF LANDLORD LIEN.**  Landlord hereby waives and releases all liens, right of distraint or security interests (whether arising by statute or at common law) in all property, chattels or merchandise which may be placed in the Leased Premises and also upon all proceeds of insurance which may accrue to Tenant by reason of damage to or destruction of any such property, chattels or merchandise.

**23.**   **LANDLORD COVENANTS.**  During the Term, Landlord covenants that Landlord shall not take any action that might adversely affect the Leased Premises without Tenant's prior written consent, which consent may be withheld in Tenant's sole and absolute discretion, including, without limitation, incurring any Encumbrance (as such term is defined in the Purchase Agreement), consenting to any Encumbrance or failing to contest or notify Tenant of any Encumbrance affecting the Leased Premises after the Commencement Date.

**24.**   **SIGNAGE**.  During the Term, Tenant shall have the exclusive right to maintain and install, at Tenant's sole cost and expense, its building signage on any portion of the Leased Premises, subject to the rights of existing tenants.  Exterior signage installed by Tenant after the date hereof shall comply with applicable law.

**25.**   **ASSIGNMENT AND ASSUMPTION OF CONTRACTS.**

**25.1**   **Assignment and Assumption.**  During the Term, Landlord hereby sells, assigns, transfers, conveys and delivers unto Tenant, its successors and assigns, all of its right, title and interest in, to and under any and all leases, service contracts, property and hotel management agreements and other similar such agreements (collectively, the "Contracts") affecting or related to the Leased Premises and/or the ownership, operation, maintenance and repair thereof, together with all rights, options, interests and benefits thereunder (including, without limitation, any guaranties and security deposits (together with all accrued interest thereon) held by Landlord thereunder (collectively, the "Additional Rights"), subject to the rights of space tenants and other third parties in and to the Contracts.  Tenant hereby accepts such assignment of the Contracts, together with the Additional Rights, and hereby assumes, and agrees to be bound by, and to keep, observe and perform, all of the terms, covenants, conditions, duties and obligations of and under the Contracts that arise from and after the Commencement Date.  All advance rental payments, real estate taxes and other payments made or received by Assignor under the Contracts shall be prorated between Landlord and Tenant as of the Commencement Date in accordance with the terms of the Purchase Agreement.  On or before the Termination Date, Tenant shall sell, assign, transfer, convey and deliver the Contracts to Landlord.

**25.2**   **Revenue from Contracts.**  During the Term, Landlord shall continue to receive any and all revenue and/or rents due under the Contracts and shall, promptly upon receipt thereof, turn over such revenue or rents to Tenant unless directed otherwise by Tenant.

**[Signature Pages to Follow]**

11

**IN WITNESS WHEREOF,** the parties hereto have executed this Lease by and through their corporate officers thereunto duly authorized, the day and year first above written.

**TENANT:**

[_____], a Delaware [_____]

By: _____
Name: _____
Title: _____

**LANDLORD:**

RIVERFRONT HOLDINGS, INC., a
Delaware corporation

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO MASTER LEASE AGREEMENT (RENAISSANCE CENTER)

1774192

## Exhibit A

### Leased Premises



1774192

## Exhibit B

### Form of Memorandum of Lease

**Prepared by and after recording
return to:**

_____

_____

_____

_____

### MEMORANDUM OF LEASE

This Memorandum of Lease ("Memorandum") is made as of this _____ day of _____, 2009, by and between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant").

WHEREAS, Landlord and Tenant are parties to that certain Master Lease Agreement (Renaissance Center) dated _____, 2009 (the "Lease"), pursuant to which Tenant leases the real property located in Detroit, Michigan and more particularly described on Exhibit A attached hereto and by this reference made a part hereof (the "Leased Premises") from Landlord; and

WHEREAS, Landlord and Tenant desire to place of record this Memorandum of Lease;

NOW, THEREFORE, Landlord and Tenant hereby agree as follows:

1.   Lease.  Landlord has leased to Tenant the Leased Premises under the terms, conditions and provisions contained in the Lease, such Lease being expressly incorporated herein by reference.

2.   Term.  The Lease is for a term beginning on _____, 2009 and terminating with respect to the Leased Premises on the earlier of (a) the date on which the stock of Landlord is transferred to Tenant in accordance with the Amended and Restated Master Sale and Purchase Agreement (the "Purchase Agreement") dated as of June 26, 2009 between Landlord, Tenant and the other parties named therein, or (ii) September 30, 2009 (either, the "Termination Date").

3.   Certain Landlord Covenants.  During the Term, Landlord covenants that Landlord shall not take any action that might adversely affect the Leased Premises without Tenant's prior written consent, which consent may be withheld in Tenant's sole and absolute discretion, including, without limitation, incurring any Encumbrance (as such term is defined in the Purchase Agreement), consenting to any Encumbrance or failing to contest or notify Tenant of any Encumbrance affecting the Leased Premises after the Commencement Date.

4.    <u>Other Provisions</u>.  This Memorandum is not a complete summary of the unrecorded Lease.  Reference should be made to the unrecorded Lease for the full terms, conditions and provisions thereof.

5.    <u>Conflicts</u>.  This Memorandum is prepared solely for the purpose of recordation to give notice of the Lease and shall not constitute an amendment or modification of the Lease.  In the event of any conflict or inconsistency between the terms and provisions of this Memorandum and the terms and provisions of the unrecorded Lease, the terms and provisions of the Lease shall govern and control in all respects.

6.    <u>Successors and Assigns</u>.  This Memorandum shall run with the land described on <u>Exhibit A</u> hereto and shall be binding upon and inure to the benefit of the Landlord and the Tenant and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Memorandum as of the date first set forth above.

**TENANT:**

*/_____/*, a Delaware */_____/*

By:    _____
Name:    _____
Title:    _____


**LANDLORD:**

RIVERSIDE HOLDINGS, INC., a Delaware corporation


By:    _____
Name:    _____
Title:    _____

**[To be inserted prior to recording:  legal description, proper recording, notary, witnessing requirements for state in which the Leased Premises is located]**

O

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit O**

Form of Equity Registration Rights Agreement

## EXHIBIT O

## FORM OF EQUITY REGISTRATION RIGHTS AGREEMENT

This EQUITY REGISTRATION RIGHTS AGREEMENT (this "Agreement") is entered into as of *[_____]*, 2009 by and among *[_____]*, a Delaware corporation (the "Corporation"), THE UNITED STATES DEPARTMENT OF THE TREASURY (the "UST"), 7176384 CANADA INC., a corporation organized under the laws of Canada ("Canada"), the UAW RETIREE MEDICAL BENEFITS TRUST, a voluntary employees' beneficiary association (the "VEBA"), and *[_____]*, a Delaware corporation (the "Debtor").[1]

WHEREAS, each Holder owns, as of the date hereof, that number of shares of common stock, par value $0.01 per share, of the Corporation (the "Common Stock") set forth opposite such Holder's name on Annex I hereto;

WHEREAS, the VEBA and the Debtor each own, as of the date hereof, one or more warrants initially exercisable for that number of shares of Common Stock set forth opposite such Holder's name on Annex I hereto (collectively, the "Warrants");

WHEREAS, as of the date hereof, the Government Holders and the VEBA each own that number of shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, par value $0.01 per share (the "Preferred Stock"), set forth opposite such Holder's name on Annex I hereto;

WHEREAS, concurrently with the execution of this Agreement, the Corporation, the UST, Canada and the VEBA have executed that certain Stockholders Agreement, dated as of the date hereof;

WHEREAS, the Corporation has agreed to provide the UST, Canada, the VEBA and the Debtor with registration rights with respect to such shares of Common Stock, Warrants and Preferred Stock held by such Holders and their permitted assigns, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

*Section 1.1    Certain Defined Terms.*  As used in this Agreement, the following terms have the following meanings set forth below or in the sections set forth below:

"Adverse Disclosure" means public disclosure of material non-public information that, in the Corporation's good faith judgment, after consultation with independent outside counsel to the Corporation, (a) would be required to be made in any registration statement or report filed with

---

[1] In the event that any of the other Sellers under the Amended and Restated Master Sale and Purchase Agreement, dated June 26, 2009, by and among the Corporation, the Debtor and the other seller parties thereto, receive equity securities of the Corporation in connection with the closing of the transactions contemplated thereby, such Sellers shall be added as parties hereto and included as Holders hereunder.

the SEC by the Corporation so that such registration statement or report would not be materially misleading; (b) would not be required to be made at such time but for the filing of such registration statement; and (c) the Corporation has a *bona fide* business purpose for not disclosing publicly.

"Adverse Effect" shall have the meaning set forth in **Section 2.1.6**.

"Advice" shall have the meaning set forth in **Section 2.7**.

"Affiliate" means, with respect to any Person, any other Person who Controls, is Controlled by or is under common Control with, such Person.

"Agreement" shall have the meaning set forth in the Preamble.

"Canada" shall have the meaning set forth in the Preamble.

"Co-Managers" shall have the meaning set forth in Section **2.1.4(a)**.

"Common Stock" shall have the meaning set forth in the Recitals.

"Control" means the direct or indirect power to direct or cause the direction of management or policies of a Person, whether through the ownership of voting securities, general partnership interests or management member interests, by contract or trust agreement, pursuant to a voting trust or otherwise. "Controlling" and "Controlled" have the correlative meanings.

"Corporation" shall have the meaning set forth in the Preamble.

"Corporation Shelf Registration" shall have the meaning set forth in **Section 2.2.1**.

"Debtor" shall have the meaning set forth in the Preamble.

"Demand Registration" shall have the meaning set forth in **Section 2.1.1(a)**.

"Demand Request" shall have the meaning set forth in **Section 2.1.1(a)**.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Excluded Registration" means a registration under the Securities Act of (a) securities pursuant to one or more Demand Registrations pursuant to **Article 2** hereof, (b) securities registered on Form S-4 or S-8 or any similar successor forms, (c) securities convertible into or exercisable or exchangeable for Common Stock and (d) securities registered on Form S-3 or any successor form covering solely securities issued under a dividend reinvestment program.

"FINRA" shall have the meaning set forth in **Section 2.5(a)(xvii)**.

"Government Holder" means the UST or Canada.

"Governmental Authority" means any United States or non-United States federal, provincial, state or local government or other political subdivision thereof, any entity, authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"Holder" means each of (a) the UST, Canada, the VEBA and the Debtor and (b) any direct or indirect transferee of any such Holder who shall become a party to this Agreement in accordance with **Section 2.10**.

"Indemnitee" shall have the meaning set forth in **Section 2.9.1**.

"Indemnitor" shall have the meaning set forth in Section 2.9.3(a) but shall, for the avoidance of doubt, exclude the Government Holders and the VEBA for purposes of providing indemnification hereunder.

"Initial Sale Time" shall have the meaning set forth in **Section 2.9.1**.

"Inspectors" shall have the meaning set forth in **Section 2.5(a)(xiii)**.

"IPO" means the Corporation's first public offering of Common Stock (whether such offering is primary or secondary) that is underwritten by a nationally recognized investment bank, pursuant to a registration statement filed under the Securities Act and declared effective by the SEC (other than a registration effected solely to implement an employee benefit plan or a transaction to which Rule 145 under the Securities Act is applicable, or a registration statement on Form S-4, Form S-8 or a successor to one of those forms).

"Issuer Free Writing Prospectus" shall have the meaning set forth in **Section 2.6**.

"Lead Underwriters" shall have the meaning set forth in **Section 2.1.4(a)**.

"Losses" shall have the meaning set forth in **Section 2.9.1**.

"Market Value" shall mean with respect to any particular class or type of Registrable Securities (a) at any time securities of the same class or type as the applicable Registrable Securities are listed on a national securities exchange, the closing price of such class or type of securities on the trading day immediately preceding the date of the Demand Request or Transfer Notice, (b) at any time that the Warrants are not listed on a national securities exchange but the Common Stock is listed on a national securities exchange, for each Warrant, the closing price of one share of Common Stock multiplied by the number of shares of Common Stock for which such Warrant is then exercisable (assuming cashless exercise), or (c) other than in the case of clause (a) or clause (b), the estimated market value determined in good faith by the Corporation based upon the advice of a nationally recognized independent investment banking firm retained by the Corporation (at the sole expense of the Corporation) for this purpose (which investment banking firm shall be reasonably acceptable to the UST or if the UST is not the Requesting Holder, the Holders of a majority of the Registrable Securities covered by the Demand Request or Transfer Notice).

"Master Sale and Purchase Agreement" means the Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 and as amended from time to time, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and NGMCO, Inc.

"Material Adverse Change" means (a) any general suspension of trading in, or limitation on prices for, securities on any national securities exchange or over-the-counter market in the United States of America; (b) the declaration of a banking moratorium or any suspension of payments in respect of banks in the United States of America; (c) a material outbreak or escalation of armed hostilities or other international or national calamity (including an act of terrorism) involving the United States of America or the declaration by the United States of a national emergency or war or a change in national or international financial, political or economic conditions; or (d) any material adverse change in the business, assets or condition (financial or otherwise) of the Corporation and its subsidiaries, taken as a whole.

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"Piggyback Offering" shall have the meaning set forth in **Section 2.2.1**.

"Preferred Stock" shall have the meaning set forth in the Recitals.

"Records" shall have the meaning set forth in **Section 2.5(a)(xiii)**.

"register," "registered" and "registration" refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act, and the declaration or ordering of the effectiveness (or automatic effectiveness) of such registration statement.

"Registrable Securities" means (a) Warrants and the shares of Common Stock and/or Preferred Stock owned from time to time by the UST, Canada, the VEBA and the Debtor as of the date hereof and set forth on Annex I hereto, (b) the shares of Common Stock issued or issuable to any Holder upon exercise of a Warrant, (c) any additional securities of the Corporation issued to the Debtor pursuant to Section 3.2 of the Master Sale and Purchase Agreement and (d) any equity security issued in exchange for or with respect to any shares of Common Stock referred to in clauses (a), (b) or (c) above by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization or similar transaction, or otherwise. As to any particular Registrable Securities, such securities shall cease to be Registrable Securities on the earliest of the date on which such securities: (i) have been registered under the Securities Act and disposed of in accordance with a registration statement; (ii) have been sold pursuant to Rule 144 under the Securities Act (or any successor provision); (iii) are held by a Holder that may sell all such Registrable Securities held by it in a single day pursuant to, and in accordance with, Rule 144 under the Securities Act (or any successor provision); (iv) cease to be outstanding (whether as a result of exercise, redemption, repurchase, conversion or otherwise); or (v) are held by any Person who is not a Holder. For purposes hereof, "a majority of the Registrable Securities" and

"on the basis of the number of Registrable Securities" shall be determined assuming the exercise of the Warrants in full.

"Representatives" means, with respect to any Person, any of such Person's officers, directors, employees, agents, attorneys, accountants, actuaries, consultants or financial advisors or any other Person acting on behalf of such Person.

"Requesting Holders" shall have the meaning set forth in **Section 2.1.1(a)**.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Shelf Registration" shall have the meaning set forth in **Section 2.1.2(a)**.

"Suspension Notice" shall have the meaning set forth in **Section 2.7**.

"Take-Down" shall have the meaning set forth in **Section 2.1.2(b)**.

"Transfer Notice" shall have the meaning set forth in **Section 2.1.2(b)**.

"UST" shall have the meaning set forth in the Preamble.

"VEBA" shall have the meaning set forth in the Preamble.

"VEBA Designee" shall mean the person(s) authorized by the Committee (as defined in the UAW Retiree Medical Benefits Trust Agreement dated *[_____]* between *[_____]* and *[_____]*) to execute this Agreement and/or carry out the transactions contemplated hereby.

"Warrants" shall have the meaning set forth in the Recitals.

*Section 1.2    Terms Generally.*  The definitions in **Section 1.1** shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," unless the context expressly provides otherwise. All references herein to Articles, Sections, paragraphs, subparagraphs or clauses shall be deemed references to Articles, Sections, paragraphs, subparagraphs or clauses of this Agreement, unless the context requires otherwise. Unless otherwise specified, the words "this Agreement," "herein," "hereof," "hereto" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if." Unless expressly stated otherwise, any law defined or referred to herein means such law as from time to time amended, modified or supplemented, including by succession of comparable successor laws and references to all attachments thereto and instruments incorporated therein.

## ARTICLE 2
## REGISTRATION RIGHTS

*Section 2.1      Demand Registration.*

*Section 2.1.1   Request for Registration.*

(a)      Subject to **Section 2.1.3**, any Holder or Holders of Registrable Securities shall have the right to require the Corporation to file a registration statement under the Securities Act for a public offering of all or part of its or their Registrable Securities (a "Demand Registration"), by delivering to the Corporation written notice stating that such right is being exercised, naming, if applicable and to the extent known by such Holder or Holders, any other Holders whose Registrable Securities are to be included in such registration (collectively, the "Requesting Holders"), specifying the number and type of each such Holder's Registrable Securities to be included in such registration, specifying whether the Registrable Securities to be included by the Requesting Holder are all of the Registrable Securities then held by such Requesting Holder and, subject to **Section 2.1.4** hereof, describing the intended method of distribution thereof (a "Demand Request").  Subject to **Section 2.1.3**, after receipt of any Demand Request, the Corporation shall comply with the applicable notice requirements set forth in **Section 2.1.5**.

(b)      Subject to **Section 2.1.3** and **Section 2.1.7**, the Corporation shall file the registration statement in respect of a Demand Registration as promptly as practicable and, in any event, (i) with respect to the filing of a Form S-3, within forty-five (45) days and (ii) with respect to the filing of any other type of registration statement, within ninety (90) days after receiving a Demand Request, and shall use reasonable best efforts to cause the same to be declared effective by the SEC as promptly as practicable after such filing.

*Section 2.1.2   Shelf Registration; Take-Downs.*

(a)      Subject to **Section 2.1.3**, with respect to any Demand Registration, at any time that the Corporation is eligible to use Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3 (or any successor forms) with respect to the Registrable Securities, the Requesting Holders may request that the Corporation (i) file a registration statement pursuant to Rule 415 under the Securities Act (or any successor rule) to effect such Demand Registration, or (ii) at any time that a registration statement pursuant to Rule 415 covering Registrable Securities is effective, register additional Registrable Securities of the Requesting Holders pursuant to such shelf registration statement to effect such Demand Registration (in either case, a "Shelf Registration").  For the avoidance of doubt, a Shelf Registration shall be deemed a "Demand Registration" for all purposes under this Agreement except as otherwise provided in **Section 2.1.3**.

(b)      Subject to **Section 2.1.3**, any Holder or Holders with Registrable Securities registered pursuant to a Shelf Registration that intends to effect an underwritten offering with respect to such Registrable Securities shall deliver a notice to the Corporation at least fifteen (15) days prior to the commencement of such underwritten offering, stating (i) that such Holder or Holders intend to effect an underwritten offering of all or part of the Registrable Securities

included by such Holder or Holders in the Shelf Registration, (ii) if applicable and to the extent known by such Holder, any other Holders whose Registrable Securities are to be included in the underwritten offering, (iii) the number and type of each such Holder's Registrable Securities to be included in such underwritten offering, (iv) whether the Registrable Securities to be included by such Holder are all of the Registrable Securities then held by such Holder, and (v) the proposed timetable for such underwritten offering. Any Holder with Registrable Securities registered pursuant to a Shelf Registration that intends to effect any other sale or transfer of such Registrable Securities (each a "Take-Down") shall deliver a notice to the Corporation at least five (5) days prior to effecting such non-underwritten sale or transfer, stating (i) that such Holder intends to effect a non-underwritten sale or transfer of all or part of the Registrable Securities included by such Holder in the Shelf Registration, (ii) the number and type of the Registrable Securities to be included in such sale or transfer and (iii) the proposed manner and timetable for such sale or transfer. A notice provided by any Requesting Holder pursuant to the first two sentences of this **Section 2.1.2(b)** is referred to herein as a "Transfer Notice." Subject to **Section 2.1.3**, after receipt of any Transfer Notice, the Corporation shall comply with the applicable notice requirements set forth in **Section 2.1.5**. For the avoidance of doubt, a Take-Down shall not be deemed to be a Demand Registration and shall not be subject to **Section 2.1.3**.

(c)    Subject to **Section 2.1.3**, the Corporation shall use its reasonable best efforts to keep any Shelf Registration requested pursuant to **Section 2.1.2(a)** continuously effective under the Securities Act in order to permit the prospectus forming a part thereof to be usable by the Holders until the earlier of (i) the date as of which all Registrable Securities have been sold pursuant to the Shelf Registration or another registration statement filed under the Securities Act (but in no event prior to the applicable period referred to in Section 4(3) of the Securities Act and Rule 174 thereunder) and (ii) the date as of which all of such Requesting Holders are permitted to sell their Registrable Securities without registration pursuant to Rule 144 under the Securities Act without volume limitation or other restrictions on transfer thereunder.

(d)    The Corporation shall, from time to time, supplement and amend the Shelf Registration if required by the Securities Act, including the rules, regulations or instructions applicable to the registration form used by the Corporation for such Shelf Registration.

*Section 2.1.3  Limitations.*

(a)    Notwithstanding anything to the contrary herein, a Holder shall not be permitted to request a Demand Registration prior to one hundred eighty (180) days after the date of this Agreement, unless prior thereto the Corporation has a class of equity securities registered under Section 12(b) of the Exchange Act.

(b)    A Holder (other than the UST) shall not be permitted to request a Demand Registration prior to the time the Corporation has registered a class of equity securities under Section 12(b) of the Exchange Act.

(c)    A Holder shall not be permitted to request a Demand Registration, or submit a Transfer Notice with respect to an underwritten offering pursuant to a Shelf Registration, within one hundred eighty (180) days after either (i) the effective date of a previous Demand

Registration (other than a Shelf Registration) or (ii) the completion of any underwritten offering pursuant to a Shelf Registration.

(d)    A Holder shall not be permitted to submit a Demand Request, or a Transfer Notice for an underwritten offering, or effect any such Demand Registration or underwritten offering unless such Demand Request or Transfer Notice for an underwritten offering is for (i) a number of Registrable Securities having a Market Value equal to or exceeding $100 million in the aggregate, or (ii) all of the Registrable Securities then held by the Requesting Holder.

(e)    The Corporation shall not be required to effect, (i) until (but excluding) the third anniversary of the date hereof, more than two (2) Demand Registrations (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) in the aggregate during any consecutive twelve (12) month period, and (ii) from and including the third anniversary of the date hereof, more than one (1) Demand Registration (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) in the aggregate during any consecutive twelve (12) month period. Notwithstanding the foregoing, (i) the VEBA shall have the right, from and including the third anniversary of the date hereof, to request one additional Demand Registration (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) during any consecutive twelve (12) month period, and (ii) for the avoidance of doubt, the limitations set forth in this **Section 2.1.3** shall not apply to any non-underwritten Take-Down by any Holder under a Shelf Registration.

*Section 2.1.4    Demand Registrations for Underwritten Offerings.*

(a)    At the request of the UST or Canada, or if the UST or Canada is not participating in the proposed offering, the Holders of a majority of the Registrable Securities submitting a Demand Request or Transfer Notice for an underwritten offering of Registrable Securities, the Corporation shall direct the applicable underwriter to conduct such offering in the form of a "firm commitment." With respect to any such underwritten offering, (i) the UST, or if the UST is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering shall select the investment banking firm or firms to lead the underwritten offering (the "Lead Underwriters"); provided that such Lead Underwriters shall be reasonably acceptable to the Corporation, and (ii) the Corporation shall select the other investment banking firms, if any, to co-manage such underwritten offering (the "Co-Managers"), provided that such Co-Managers shall be reasonably acceptable to the UST or Canada, or if the UST or Canada is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering.

(b)    If a Demand Registration is for an underwritten offering or a transfer pursuant to a Shelf Registration involves an underwritten offering, no Holder may participate in any such underwritten offering unless such Holder (i) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Corporation; provided that such arrangements are subject to the consent of the UST, or if the UST is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering, and (ii) completes and executes all questionnaires,

powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; provided, however, that no such Holder shall be required to make any representations or warranties in connection with any such underwritten offering other than representations and warranties as to (A) such Holder's ownership of its Registrable Securities to be transferred free and clear of all liens, claims, and encumbrances, (B) such Holder's power and authority to effect such transfer, and (C) such matters pertaining to compliance with securities laws as may be reasonably requested; provided, further, however, that (i) any obligation (if agreed to) of each such Holder to indemnify the Lead Underwriters and any Co-Managers pursuant to any such underwriting arrangements shall (1) only be with respect to information it provides to the Corporation in writing for use in such underwritten offering, (2) be several, not joint and several, and (3) be limited to the net amount received by such Holder from the sale of its Registrable Securities pursuant to such offering and (ii) neither the Government Holders nor the VEBA shall be required to indemnify any Indemnitee pursuant to this Agreement.

Section 2.1.5    *Rights of Nonrequesting Holders and the Corporation.*   Subject to **Section 2.1.3**, after receipt of any Demand Request or any Transfer Notice relating to an underwritten offering pursuant to a Shelf Registration, the Corporation shall promptly (but in any event within five (5) days) give written notice of (i) such proposed Demand Registration to all other Holders or (ii) such Transfer Notice to such other Holders whose securities are covered by such Shelf Registration, who shall have the right, exercisable by written notice to the Corporation within five (5) days of their receipt of the Corporation's notice, to elect to include in such Demand Registration or underwritten offering such portion of their Registrable Securities as they may request.  All Holders requesting to have their Registrable Securities included in a Demand Registration or underwritten offering shall be deemed to be "Requesting Holders" for purposes of this **Section 2.1**.   For the avoidance of doubt, subject to **Section 2.1.6**, the Corporation may register in any Demand Registration any equity securities of the Corporation.

Section 2.1.6    *Priority on Demand Registrations.*    With respect to any underwritten offering based on a Demand Registration (including an underwritten offering pursuant to a Shelf Registration), if the Lead Underwriters (after consultation with the Co-Managers) advise that the inclusion of the securities proposed to be included in such registration would adversely affect the price, timing or distribution of the offering or otherwise adversely affect its success (an "Adverse Effect"), the Corporation shall include in such underwritten offering (a) first, the Registrable Securities, pro rata among the Requesting Holders on the basis of the number of Registrable Securities owned by each such Requesting Holder, and (b) second, any other securities requested to be included in such underwritten offering (including securities to be sold for the account of the Corporation); provided, however, that if more than 25% of the Registrable Securities of any Holder subject to a Demand Request or Transfer Notice for an underwritten offering are excluded pursuant to the terms of this **Section 2.1.6** from the applicable Demand Registration or underwritten offering pursuant to a Shelf Registration, the offering shall not be deemed to constitute a Demand Registration for the purposes of **Section 2.1.3**.

Section 2.1.7    *Deferral of Filing; Suspension of Use.*    The Corporation may defer the filing (but not the preparation) or the effectiveness, or suspend the use, of any registration statement required by or filed pursuant to **Section 2.1**, at any time if (a) the Corporation determines, in its sole discretion, that such action or use (or proposed action or use) would

require the Corporation to make an Adverse Disclosure, or (b) prior to receiving the Demand Request or Transfer Notice, as applicable, the board of directors of the Corporation had determined to effect a registered underwritten public offering of Company equity securities or Company securities convertible into or exchangeable for Company equity securities for the Corporation's account and the Corporation had taken substantial steps (such as selecting a managing underwriter for such offering) and is proceeding with reasonable diligence to effect such offering; provided, however, that the Corporation shall not exercise its rights to deferral or suspension pursuant to this **Section 2.1.7**, and shall not so effect any such deferral or suspension, for more than a total of one hundred eighty (180) days (which need not be consecutive) in any consecutive twelve (12) month period. In making any such determination to defer the filing or effectiveness, or suspend the use, of a registration statement required by **Section 2.1**, the Corporation shall not be required to consult with or obtain the consent of any Holder or any investment manager therefor, and any such determination shall be in the sole discretion of the Corporation, and neither the Holders nor any investment manager for any Holder shall be responsible or have any liability therefor. The Corporation shall promptly notify the Holders of any deferral or suspension pursuant to this **Section 2.1.7** and the Corporation agrees that it will terminate any such deferral or suspension as promptly as reasonably practicable and will promptly notify each Holder in writing of the termination of any such deferral or suspension.

Section 2.1.8 *Withdrawal from Demand Registration.*    Any Holder may withdraw its Registrable Securities from a Demand Registration or underwritten offering at any time (prior to a sale thereunder) by providing the Corporation with written notice. Upon receipt of such written notice, the Corporation shall continue all efforts to secure registration or effect the underwritten offering of the remaining Registrable Securities not requested to be withdrawn, unless the remaining Registrable Securities would not meet the requirements of **Section 2.1.3(b)** or **Section 2.1.3(d)**, in which case, the Corporation may in its sole discretion cease all efforts to proceed with registration or the underwritten offering. If the Corporation ceases all efforts to secure registration or effect the underwritten offering pursuant to this **Section 2.1.8**, then such registration or underwritten offering shall nonetheless be deemed an effective or completed Demand Registration or completed underwritten offering pursuant to a Shelf Registration for all purposes hereunder unless (i) the withdrawal is made following the occurrence of a Material Adverse Change not known to the Requesting Holders at the time of the Demand Request or Transfer Notice or (ii) the Requesting Holders pay or reimburse the Corporation for all out-of-pocket fees and expenses reasonably incurred in connection with such Demand Registration or underwritten offering; provided that if, after a Demand Registration has become effective or an underwritten offering of Registrable Securities has been commenced, it is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court, it shall be deemed not to have been effected and shall not count as a Demand Registration or underwritten offering for the purposes of **Section 2.1.3**.

Section 2.2    *Piggyback Offerings.*

Section 2.2.1    *Right to Piggyback.*   Each time the Corporation proposes to offer any of its equity securities in a registered underwritten offering (other than pursuant to an Excluded Registration) under the Securities Act (whether for the account of the Corporation or the account of any equity holder of the Corporation other than a Holder) (a "Piggyback Offering"), the Corporation shall give prompt written notice to each Holder of Registrable

Securities (which notice shall be given not less than twenty (20) days prior to (i) the offering in the case of an underwritten offering pursuant to Rule 415 under the Securities Act (or any successor rule) (a "Corporation Shelf Registration") or (ii) the anticipated filing date of the Corporation's registration statement in a registration other than a Corporation Shelf Registration), which notice shall offer each such Holder the opportunity to include any or all of its Registrable Securities in such underwritten offering, subject to the limitations contained in **Section 2.2.2** hereof. Each Holder who desires to have its Registrable Securities included in such underwritten offering shall so advise the Corporation in writing (stating the number and type of Registrable Securities desired to be registered or included) within fifteen (15) days after the date of such notice from the Corporation. Any Holder shall have the right to withdraw such Holder's request for inclusion of such Holder's Registrable Securities in any underwritten offering pursuant to this **Section 2.2.1** by giving written notice to the Corporation of such withdrawal. Subject to **Section 2.2.2** below, the Corporation shall include in such underwritten offering all such Registrable Securities so requested to be included therein. Notwithstanding the foregoing, the Corporation may at any time withdraw or cease proceeding with any such offering if it shall at the same time withdraw or cease proceeding with the offering of all other equity securities originally proposed to be included in such offering.

*Section 2.2.2    Priority on Piggyback Offerings.*

(a)    If a Piggyback Offering was initiated by the Corporation, and if the managing underwriter advises that the inclusion of the securities proposed to be included in such Piggyback Offering would cause an Adverse Effect, the Corporation shall include in such Piggyback Offering (i) first, the securities the Corporation proposes to sell, (ii) second, the Registrable Securities requested to be included in such Piggyback Offering, pro rata among the Holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such Holder, and (iii) third, any other securities requested to be included in such Piggyback Offering. If as a result of the provisions of this **Section 2.2.2(a)**, any Holder shall not be entitled to include all Registrable Securities in such Piggyback Offering that such Holder has requested to be so included, such Holder may withdraw its request to include its Registrable Securities in such Piggyback Offering.

(b)    If a Piggyback Offering was initiated by a security holder of the Corporation (other than a Holder), and if the managing underwriter advises that the inclusion of the securities proposed to be included in such Piggyback Offering would cause an Adverse Effect, the Corporation shall include in such Piggyback Offering (i) first, the securities requested to be included therein by the security holders requesting such Piggyback Offering and the Registrable Securities requested to be included in such Piggyback Offering, pro rata among the holders of such securities on the basis of the number of securities owned by each such holder, and (ii) second, any other securities requested to be included in such Piggyback Offering (including securities to be sold for the account of the Corporation). If as a result of the provisions of this **Section 2.2.2(b)** any Holder shall not be entitled to include all Registrable Securities in such Piggyback Offering that such Holder has requested to be so included, such Holder may withdraw such Holder's request to include Registrable Securities in such Piggyback Offering.

(c)    No Holder may participate in a Piggyback Offering unless such Holder (i) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting

arrangements approved by the Corporation and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents, each in customary form and reasonably satisfactory to the Holders, reasonably required under the terms of such underwriting arrangements; provided, however, that no such Holder shall be required to make any representations or warranties in connection with any such registration other than representations and warranties as to (A) such Holder's ownership of its Registrable Securities to be sold or transferred free and clear of all liens, claims, and encumbrances, (B) such Holder's power and authority to effect such transfer, and (C) such matters pertaining to compliance with securities laws as may be reasonably requested; provided, further, however, that (i) any obligation, if agreed to, of each such Holder to indemnify the underwriters pursuant to any such underwriting arrangements shall (1) only be with respect to information it provides to the Corporation in writing for use in such underwritten offering, (2) be several, not joint and several, and (3) be limited to the net amount received by such Holder from the sale of its Registrable Securities pursuant to such registration and (ii) neither the Government Holders nor the VEBA shall be required to indemnify any Indemnitee pursuant to this Agreement.

Section 2.2.3  *Selection of Underwriters*.  The Corporation shall select the investment banking firm or firms to manage the Piggyback Offering.

Section 2.2.4  No registration of Registrable Securities effected pursuant to this **Section 2.2** shall be deemed to have been effected pursuant to **Section 2.1.1** or **Section 2.1.2** or shall relieve the Corporation of its obligations under **Section 2.1.1** or **Section 2.1.2**.

Section 2.3  **SEC Form S-3**.  Notwithstanding anything to the contrary herein, the Corporation shall use its reasonable best efforts to cause Demand Registrations to be registered on Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3 (or any successor forms) once the Corporation becomes eligible to use such form, and if the Corporation is not then eligible under the Securities Act to use such form, Demand Registrations shall be registered on the form for which the Corporation then qualifies. After becoming eligible to use Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3, the Corporation shall use its reasonable best efforts to remain so eligible.

Section 2.4  *Holdback Agreements*.

(a)  The Corporation shall not effect any public sale or distribution of its equity securities or any securities convertible into or exchangeable or exercisable for its equity securities, except in each case as part of the offering pursuant to a Demand Registration, during the sixty (60) day period (or such lesser period as the Lead Underwriters or managing underwriters may permit) beginning on the effective date of any registration statement in connection with an underwritten Demand Registration (other than a Shelf Registration), except for (i) sales or distributions pursuant to registrations on Form S-4 or Form S-8 or any successor form, (ii) the issuance of shares of Common Stock upon the conversion, exercise or exchange, by the holder thereof, of options, warrants or other securities convertible into or exercisable or exchangeable for Common Stock pursuant to the terms of such options, warrants or other securities, (iii) sales or distributions pursuant to the terms of any other agreement to issue shares of Common Stock (or any securities convertible into or exchangeable or exercisable for Common

Stock) in effect on the date of the Demand Request, including any such agreement in connection with any previously disclosed acquisition, merger, consolidation or other business combination and (iv) the issuance of shares of Common Stock in connection with transfers to dividend reinvestment plans or to employee benefit plans in order to enable any such employee benefit plan to fulfill its funding obligations in the ordinary course.

(b)    If any Holders of Registrable Securities provide a Transfer Notice relating to an underwritten offering of Registrable Securities registered pursuant to a Shelf Registration, the Corporation shall not effect any public sale or distribution of its equity securities or any securities convertible into or exchangeable or exercisable for its equity securities, except in each case as part of such underwritten offering, during the sixty (60) day period (or such lesser period as the Lead Underwriters or managing underwriters may permit) beginning on the pricing date for such underwritten offering, except for (i) sales or distributions pursuant to registrations on Form S-4 or Form S-8 or any successor form, (ii) the issuance of shares of Common Stock upon the conversion, exercise or exchange, by the holder thereof, of options, warrants or other securities convertible into or exercisable or exchangeable for Common Stock pursuant to the terms of such options, warrants or other securities, (iii) sales or distributions pursuant to the terms of any other agreement to issue shares of Common Stock (or any securities convertible into or exchangeable or exercisable for Common Stock) in effect on the date of the Transfer Notice, including any such agreement in connection with any previously disclosed acquisition, merger, consolidation or other business combination and (iv) the issuance of shares of Common Stock in connection with transfers to dividend reinvestment plans or to employee benefit plans in order to enable any such employee benefit plan to fulfill its funding obligations in the ordinary course.

(c)    Each Holder agrees, in the event of an underwritten offering of equity securities by the Corporation (whether for the account of the Corporation or otherwise), not to offer, sell, contract to sell or otherwise dispose of any Preferred Stock, Warrants, Common Stock or any securities convertible into or exchangeable or exercisable for Common Stock, including any sale pursuant to Rule 144 under the Securities Act (except as part of such underwritten offering), during the sixty (60) day period (or such lesser period in each case as the Lead Underwriters or managing underwriters may permit) beginning on the effective date of the registration statement for such underwritten offering (or, in the case of an offering pursuant to an effective shelf registration statement pursuant to Rule 415, the pricing date for such underwritten offering); provided, however, that (i) any applicable period shall terminate on such earlier date as the Corporation gives notice to the Holders that the Corporation declines to proceed with any such offering and (ii) the sum of all holdback periods applicable to the Holders shall not exceed one hundred twenty (120) days (which need not be consecutive) in any given twelve (12) month period.

Section 2.5    *Registration Procedures.*

(a)    If and whenever the Corporation is required to effect the registration of any Registrable Securities pursuant to this Agreement, subject to the terms and conditions of this Agreement, the Corporation shall use its reasonable best efforts to effect the registration and the sale, as applicable, of such Registrable Securities in accordance with the intended method of disposition thereof, and pursuant thereto the Corporation shall as expeditiously as possible:

(i)      prepare and file with the SEC, pursuant to **Section 2.1** with respect to any Demand Registration, a registration statement on any appropriate form under the Securities Act with respect to such Registrable Securities and use its reasonable best efforts to cause such registration statement to become effective as promptly as practicable; <u>provided</u> that as far in advance as practicable before filing such registration statement or any amendment thereto, the Corporation shall furnish to the selling Holders copies of reasonably complete drafts of all such documents prepared to be filed (including exhibits), and any such selling Holder shall have the opportunity to object to any information contained therein and the Corporation shall make corrections reasonably requested by such selling Holder with respect to such information prior to filing any such registration statement or amendment; <u>provided</u>, <u>further</u>, that the Corporation shall not file any such registration statement, and any amendment thereto, to which a Holder shall reasonably object in writing on a timely basis, unless in the Corporation's judgment such filing is necessary to comply with applicable law;

(ii)     except in the case of a Shelf Registration, prepare and file with the SEC such amendments, post-effective amendments, and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective for a period of not less than one hundred eighty (180) days (or such lesser period as is necessary for the underwriters in an underwritten offering to sell unsold allotments) and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement during such period in accordance with the intended methods of disposition by the selling Holders thereof set forth in such registration statement;

(iii)    in the case of a Shelf Registration, comply with the provisions of **Section 2.1.2(c)** and **Section 2.1.2(d)**;

(iv)     furnish to each selling Holder of Registrable Securities and the underwriters of the securities being registered, without charge, such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus), any documents incorporated by reference therein and such other documents as such selling Holders or underwriters may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such selling Holders or the sale of such securities by such underwriters (it being understood that, subject to **Section 2.1.7**, **Section 2.4(c)**, **Section 2.6** and **Section 2.7** and the requirements of the Securities Act and applicable state securities laws, the Corporation consents to the use of the prospectus and any amendment or supplement thereto by each selling Holder and the underwriters in connection with the offering and sale of the Registrable Securities covered by the registration statement of which such prospectus, amendment or supplement is a part);

(v)      use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or "blue sky" laws of such jurisdictions as the Lead Underwriters or managing underwriters reasonably request (or, in the event the registration statement does not relate to an underwritten offering, as the selling Holders of a majority of such Registrable Securities being offered may reasonably request); use its reasonable best efforts to keep each such registration or qualification (or exemption therefrom) effective during the period in which such registration statement is required to be kept effective; and do any and all other acts

and things which may be reasonably necessary or advisable to enable each selling Holder to consummate the disposition of the Registrable Securities owned by such selling Holder in such jurisdictions; provided, however, that the Corporation shall not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph, (B) consent to general service of process in any such jurisdiction or (C) take any action that would subject it to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject;

(vi)    promptly notify each selling Holder and each underwriter and (if requested by any such Person) confirm such notice in writing (A) when a prospectus or any prospectus supplement or post-effective amendment has been filed and, with respect to a registration statement or any post-effective amendment, when the same has become effective, (B) of the issuance by any state securities or other regulatory authority of any order suspending the qualification or exemption from qualification of any of the Registrable Securities under state securities or "blue sky" laws or the initiation, or threatened initiation, of any proceedings for that purpose, or (C) of the happening of any event which makes any statement made in a registration statement or related prospectus untrue or which requires the making of any changes in such registration statement, prospectus or documents so that they shall not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and, as promptly as practicable thereafter, prepare and file with the SEC and furnish a supplement or amendment to such prospectus so that, as thereafter deliverable to the purchasers of such Registrable Securities, such prospectus shall not contain any untrue statement of a material fact or omit a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(vii)    permit any selling Holder that might reasonably be deemed to be an underwriter or a Controlling Person of the Corporation to participate in the preparation of such registration or comparable statement and to require the insertion therein of material, furnished to the Corporation in writing, which in the reasonable judgment of such Holder and its counsel should be included;

(viii)    make available members of the management of the Corporation or the applicable Corporation subsidiaries for reasonable assistance in the selling efforts relating to any offering of Registrable Securities covered by a registration statement filed pursuant to this Agreement, to the extent customary for such offering (including, without limitation, to the extent customary, senior management attendance at due diligence meetings with prospective investors or underwriters and their counsel and road shows); provided, however, that management need only be made available for one such offering for each of the UST, Canada and the VEBA in any twelve (12) month period;

(ix)    otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the SEC, including the Securities Act and the Exchange Act and the rules and regulations promulgated thereunder, and make generally available to the Corporation's security holders an earnings statement satisfying the provisions of Section 11(a) of the Securities Act no later than thirty (30) days after the end of the twelve (12) month period beginning with the first day of the Corporation's first fiscal quarter commencing after the effective date of a

registration statement, which earnings statement shall cover said twelve (12) month period, and which requirement shall be deemed to be satisfied if the Corporation timely files complete and accurate information on Forms 10-K, 10-Q and 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

(x)    if requested by the Lead Underwriters, managing underwriters or any selling Holder, promptly incorporate in a prospectus supplement or post-effective amendment such information as the Lead Underwriters, managing underwriters or any selling Holder reasonably requests to be included therein, including, with respect to the Registrable Securities being sold by the selling Holders, the purchase price being paid therefor by the underwriters and with respect to any other terms of the underwritten offering of the Registrable Securities to be sold in such offering, and promptly make all required filings of such prospectus supplement or post-effective amendment;

(xi)    as promptly as practicable after filing with the SEC of any document which is incorporated by reference into a registration statement (in the form in which it was incorporated), deliver a copy of each such document to each selling Holder;

(xii)    cooperate with the selling Holders and Lead Underwriters or the managing underwriters to facilitate the timely preparation and delivery of certificates (which shall not bear any restrictive legends unless required under applicable law) representing securities sold under any registration statement, and enable such securities to be in such denominations and registered in such names as the Lead Underwriters, managing underwriters or such selling Holders may request at least two (2) business days prior to any sale of the Registrable Securities and keep available and make available to the Corporation's transfer agent prior to the effectiveness of such registration statement a supply of such certificates;

(xiii)    promptly make available for inspection by any selling Holder, any underwriter participating in any disposition pursuant to any registration statement, and any attorney, accountant or other agent or Representative retained by any such selling Holder or underwriter (collectively, the "Inspectors"), all financial and other records and pertinent corporate documents (collectively, the "Records") and properties of the Corporation, as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the Corporation's officers, directors and employees to supply all information reasonably requested by any such Inspector in connection with such registration statement; provided, however, that, unless the disclosure of such Records is necessary to avoid or correct a misstatement or omission in the registration statement or the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction, the Corporation shall not be required to provide any information under this subparagraph (xiii) if (A) the Corporation believes, after consultation with counsel for the Corporation, that to do so would cause the Corporation to forfeit an attorney-client privilege that was applicable to such information or (B) if either (1) the Corporation has requested and been granted from the SEC confidential treatment of such information contained in any filing with the SEC or documents provided supplementally or otherwise or (2) the Corporation reasonably determines in good faith that such Records are confidential and so notifies the Inspectors in writing, unless prior to furnishing any such information with respect to clause (B) such selling Holder of Registrable Securities requesting such information agrees to enter into a confidentiality agreement in a form acceptable to the

Corporation; and provided, further, that each selling Holder of Registrable Securities agrees that it shall, upon learning that disclosure of such Records is sought in a court of competent jurisdiction, give notice to the Corporation and allow the Corporation, at its expense, to undertake appropriate action and to prevent disclosure of the Records deemed confidential;

(xiv)   furnish to each selling Holder and underwriter a signed counterpart of (A) an opinion or opinions of counsel to the Corporation (which may be in-house counsel) provided that such counsel is reasonably acceptable to such Holders and the underwriter, and (B) a comfort letter or comfort letters from the Corporation's independent public accountants, each in customary form and covering such matters of the type customarily covered by opinions or comfort letters, as the case may be, as the selling Holders, Lead Underwriters or managing underwriters reasonably requests;

(xv)    cause the Registrable Securities included in any registration to be (A) in the case of an IPO, listed on a securities exchange or exchanges or an inter-dealer quotation system, as determined by the Corporation, or (B) in the case of a registration other than an IPO, (1) listed on each securities exchange, if any, on which similar securities issued by the Corporation are then listed or (2) quoted on an inter-dealer quotation system if similar securities issued by the Corporation are quoted thereon, as applicable;

(xvi)   provide a transfer agent and registrar for all Registrable Securities registered hereunder and provide a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(xvii)  cooperate with each selling Holder and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the Financial Industry Regulatory Authority ("FINRA");

(xviii) during the period when the prospectus is required to be delivered under the Securities Act, promptly file all documents required to be filed with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act;

(xix)   notify each selling Holder of Registrable Securities promptly of any request by the SEC for the amending or supplementing of such registration statement or prospectus or for additional information;

(xx)    subject to **Section 2.1.4(b)** and **Section 2.2.2(c)**, enter into such agreements (including underwriting agreements) as are customary in connection with an underwritten registration; and

(xxi)   advise each selling Holder of such Registrable Securities, promptly after it receives notice or obtains knowledge thereof, of the issuance of any stop order by the SEC suspending the effectiveness of such registration statement or the initiation or threatening of any proceeding for such purpose and promptly use its reasonable best efforts to prevent the issuance of any stop order or to obtain its withdrawal at the earliest possible moment if such stop order should be issued.

(b)     The selling Holders shall reasonably cooperate with the Corporation in the preparation and filing of any registration statement under the Securities Act pursuant to this Agreement and provide the Corporation with all information reasonably necessary to complete such preparation as the Corporation may, from time to time, reasonably request in writing, and the Corporation may exclude from such registration the Registrable Securities of any selling Holder (or not proceed with such registration) if such selling Holder unreasonably fails to furnish such information within a reasonable time after receiving such request.  Promptly following any sale or other transfer of any Registrable Securities, each Holder shall notify the Corporation in writing thereof, which notice shall specify the amount and type of securities involved, the date of the sale or transfer and whether the sale or transfer was effected under a registration statement or otherwise.

(c)     Each of the parties shall treat all notices of proposed transfers and registrations, and all information relating to any blackout periods under **Section 2.1.7** received from another party with the strictest confidence (and in accordance with the terms of any applicable confidentiality agreement among the Corporation and the Holder) and shall not disseminate such information.

*Section 2.6     Issuer Free Writing Prospectuses.*  The Corporation represents and agrees that, unless it obtains the prior consent of the Holders of a majority of the Registrable Securities participating in a registration or offering or the approval of the counsel for such Holders, and each of the Holders represents and agrees that, unless it obtains the prior consent of the Corporation, it shall not make any offer relating to the Registrable Securities that would constitute an "issuer free writing prospectus," as defined in Rule 433 under the Securities Act (an "Issuer Free Writing Prospectus"), or that would otherwise constitute a "free writing prospectus," as defined in Rule 405 under the Securities Act, required to be filed with the SEC.  The Corporation represents that any Issuer Free Writing Prospectus shall not include any information that conflicts with the information contained in a registration statement or prospectus and that any Issuer Free Writing Prospectus, when taken together with the information in the registration statement and the prospectus, shall not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

*Section 2.7     Suspension of Dispositions.*  Each Holder agrees that upon receipt of any notice (a "Suspension Notice") from the Corporation of the happening of any event of the kind described in **Section 2.5(a)(vi)(B)** or **(C)** or **Section 2.5(a)(xxi)** such Holder shall forthwith discontinue disposition of Registrable Securities until such Holder's receipt of the copies of the supplemented or amended prospectus, or until it is advised in writing (the "Advice") by the Corporation that the use of the prospectus may be resumed, and has received copies of any additional or supplemental filings which are incorporated by reference in the prospectus, and, if so directed by the Corporation, such Holder shall deliver to the Corporation all copies, other than permanent file copies then in such Holder's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice.  In the event the Corporation shall give any such notice, the time period regarding the effectiveness of registration statements set forth in **Section 2.5(a)(ii)** hereof, if applicable, shall be extended by the number of days during the period from and including the date of the giving of the Suspension Notice to and including the date when each seller of Registrable Securities covered by such registration

statement shall have received the copies of the supplemented or amended prospectus or the
Advice. The Corporation shall use its reasonable best efforts and take such actions as are
reasonably necessary to render the Advice as promptly as practicable.

Section 2.8    *Registration Expenses.*    The Corporation shall pay all reasonable fees and
expenses incident to the performance of or compliance with its obligations under this **Article 2,**
including (a) all registration and filing fees, including fees and expenses (i) with respect to filings
required to be made with all applicable securities exchanges and/or FINRA and (ii) of
compliance with securities or "blue sky" laws including any fees and disbursements of counsel
for the underwriter(s) in connection with "blue sky" qualifications of the Registrable Securities
pursuant to **Section 2.5(a)(v),** (b) printing expenses, including expenses of printing certificates
for Registrable Securities in a form eligible for deposit with The Depository Trust Company and
of printing prospectuses if the printing of prospectuses is requested by the Lead Underwriters or
managing underwriter(s), if any, or by the Holder, (c) messenger, telephone and delivery
expenses of the Corporation, (d) fees and disbursements of counsel for the Corporation,
(e) expenses of the Corporation incurred in connection with any "road show" or other marketing
efforts, (f) fees and disbursements of all independent certified public accountants (including,
without limitation, the expenses of any special audit and "cold comfort" letters required by or
incident to this Agreement) and any other Persons, including special experts, retained by the
Corporation, and (g) fees up to $250,000 plus reasonable disbursements of one legal counsel for
the Requesting Holders in connection with each registration or offering of their Registrable
Securities or sale (including, for the avoidance of doubt, a Take-Down) of their Registrable
Securities under a Shelf Registration but only if such registration, offering or sale either is
effected or, pursuant to **Section 2.7,** is postponed. For the avoidance of doubt, the Corporation
shall not be required to pay any, and each Holder shall pay its own, underwriting discounts and
commissions and transfer taxes, if any, relating to the sale or disposition of Registrable Securities
pursuant to any registration statement, or any other expenses of any Holder. In addition, the
Corporation shall bear all of its internal expenses (including all salaries and expenses of its
officers and employees performing legal or accounting duties), the expense of any annual audit,
the fees and expenses incurred in connection with the listing of the securities to be registered on
any securities exchange or inter-dealer quotation system on which similar securities issued by the
Corporation are then listed and the fees and expenses of any Person, including special experts,
retained by the Corporation.

Section 2.9    *Indemnification.*

Section 2.9.1 *Indemnification by the Corporation.*    The Corporation agrees to
indemnify and hold harmless, to the fullest extent permitted by law, each Holder, the trustees of
any Holder, the investment manager or managers acting on behalf of any Holder with respect to
the Registrable Securities, Persons, if any, who Control any of them, and each of their respective
Representatives (each, an "Indemnitee"), from and against any and all losses, penalties,
judgments, suits, costs, claims, damages, liabilities and expenses, joint or several (including
reasonable costs of investigation and legal expenses) ("Losses") arising out of or caused by any
untrue statement or alleged untrue statement of a material fact contained in any registration
statement described herein or any related prospectus or Issuer Free Writing Prospectus relating to
the Registrable Securities (as amended or supplemented if the Corporation shall have furnished
any amendments or supplements thereto), or arising out of or caused by any omission or alleged

omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the case of the prospectus, in light of the circumstances in which they were made, not misleading, except insofar as such Losses arise out of or are caused by any such untrue statement or omission included or omitted in conformity with information furnished to the Corporation in writing by such Indemnitee or any Person acting on behalf of such Indemnitee expressly for use therein; provided, however, that the foregoing indemnity agreement with respect to any preliminary prospectuses or Issuer Free Writing Prospectuses shall not inure to the benefit of such Indemnitee if the Person asserting any Losses against such Indemnitee purchased Registrable Securities and (a) prior to the time of sale of the Registrable Securities to such Person (the "Initial Sale Time") the Corporation shall have notified the respective Holder that the preliminary prospectus or Issuer Free Writing Prospectus (as it existed prior to the Initial Sale Time) contains an untrue statement of material fact or omits to state therein a material fact required to be stated therein in order to make the statements therein not misleading, (b) such untrue statement or omission of a material fact was corrected in a preliminary prospectus or, where permitted by law, Issuer Free Writing Prospectus and such corrected preliminary prospectus or Issuer Free Writing Prospectus was provided to such Holder a reasonable amount of time in advance of the Initial Sale Time such that the corrected preliminary prospectus or Issuer Free Writing Prospectus could have been provided to such Person prior to the Initial Sale Time, (c) such corrected preliminary prospectus or Issuer Free Writing Prospectus (excluding any document then incorporated or deemed incorporated therein by reference) was not conveyed to such Person at or prior to the Initial Sale Time and (d) such Losses would not have occurred had the corrected preliminary prospectus or Issuer Free Writing Prospectus (excluding any document then incorporated or deemed incorporated therein by reference) been conveyed to such Person as provided for in clause (c) above. This indemnity shall be in addition to any liability the Corporation may otherwise have under this Agreement or otherwise. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of any Holder or any indemnified party and shall survive the transfer of Registrable Securities by any Holder.

Section 2.9.2 *Indemnification by the Holders*. Each Holder (other than the Government Holders, the VEBA and the Debtor) agrees, to the fullest extent permitted under applicable law severally and not jointly, to indemnify and hold harmless each of the Corporation, its directors, officers, employees and agents, and each Person, if any, who Controls the Corporation, to the same extent as the foregoing indemnity from the Corporation, but only with respect to Losses arising out of or caused by an untrue statement or omission included or omitted in conformity with information furnished in writing by or on behalf of the respective Holder expressly for use in any registration statement described herein or any related prospectus relating to the Registrable Securities (as amended or supplemented if the Corporation shall have furnished any amendments or supplements thereto). No claim against the assets of any Holder shall be created by this **Section 2.9.2**, except as and to the extent permitted by applicable law. Notwithstanding the foregoing, no Holder shall be liable to the Corporation or any such Person for any amount in excess of the net amount received by the Holder from the sale of Registrable Securities in the offering giving rise to such liability.

Section 2.9.3 *Indemnification Procedures.*

(a)   In case any claim is asserted or any proceeding (including any governmental investigation) shall be instituted where indemnity may be sought by an Indemnitee

pursuant to any of the preceding paragraphs of this **Section 2.9**, such Indemnitee shall promptly notify in writing the Person against whom such indemnity may be sought (the "Indemnitor"); provided, however, that the omission so to notify the Indemnitor shall not relieve the Indemnitor of any liability which it may have to such Indemnitee except to the extent that the Indemnitor was prejudiced by such failure to notify. The Indemnitor, upon request of the Indemnitee, shall retain counsel reasonably satisfactory to the Indemnitee to represent (subject to the following sentences of this **Section 2.9.3(a)**) the Indemnitee and any others the Indemnitor may designate in such proceeding and shall pay the fees and disbursements of such counsel related to such proceeding. In any such proceeding, any Indemnitee shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnitee unless (a) the Indemnitor and the Indemnitee shall have mutually agreed to the retention of such counsel, (b) the Indemnitor fails to take reasonable steps necessary to defend diligently any claim within ten calendar days after receiving written notice from the Indemnitee that the Indemnitee believes the Indemnitor has failed to take such steps, or (c) the named parties to any such proceeding (including any impleaded parties) include both the Indemnitor and the Indemnitee and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests or legal defenses between them and, in all such cases, the Indemnitor shall only be responsible for the reasonable fees and expenses of such counsel. It is understood that the Indemnitor shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate law firm (in addition to any local counsel) for all such Indemnitees not having actual or potential differing interests or legal defenses among them, and that all such fees and expenses shall be reimbursed as they are incurred. The Indemnitor shall not be liable for any settlement of any proceeding affected without its written consent.

(b)     If the indemnification provided for in this **Section 2.9** is unavailable to an Indemnitee in respect of any Losses referred to herein, then the Indemnitor, in lieu of indemnifying such Indemnitee hereunder, shall contribute to the amount paid or payable by such Indemnitee as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the Indemnitor and the Indemnitee and Persons acting on behalf of or Controlling the Indemnitor or the Indemnitee in connection with the statements or omissions or violations which resulted in such Losses, as well as any other relevant equitable considerations. If the indemnification described in **Section 2.9.1** or **Section 2.9.2** is unavailable to an Indemnitee, the relative fault of the Corporation, any Holder and Persons acting on behalf of or Controlling the Corporation or any such Holder shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Corporation, a Holder or by Persons acting on behalf of the Corporation or any Holder and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Indemnitor shall not be required to contribute pursuant to this **Section 2.9.3(b)** if there has been a settlement of any proceeding affected without its written consent. No claim against the assets of any Holder shall be created by this **Section 2.9.3(b)**, except as and to the extent permitted by applicable law. Notwithstanding the foregoing, no Holder shall be required to make a contribution in excess of the net amount received by such Holder from the sale of Registrable Securities in the offering giving rise to such liability. For the avoidance of doubt, none of the Government Holders, the VEBA or the Debtor shall be required to make any contribution to any Indemnitee under this Section 2.9.3(b).

Section 2.9.4 *Survival.* The indemnification contained in this **Section 2.9** shall remain operative and in full force and effect regardless of any termination of this Agreement.

Section 2.10 *Transfer of Registration Rights.* The rights and obligations of a Holder under this Agreement may be assigned to any transferee or assignee that directly acquires Registrable Securities from such Holder (including, without limitation, in connection with any such assignment by either Government Holder or the VEBA to an affiliate Controlled by such Government Holder or the VEBA, as applicable (provided that Canada may also effect such assignment to an affiliate Controlled by Canada Development Investment Corporation, a Crown corporation and the sole shareholder of Canada or to an affiliate Controlled by [the Department of Finance of Canada]), and in connection with any such assignment by the Debtor to any successor in interest, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction), but only if (a) the respective Holder agrees in writing with the transferee or assignee to assign such rights, and a copy of such agreement is furnished to the Corporation concurrent with such transfer or assignment and (b) concurrent with such transfer or assignment, such transferee or assignee furnishes the Corporation with written notice of the name and address of such transferee or assignee and the securities with respect to which such registration rights are being transferred or assigned, and the transferee or assignee agrees in writing with the Corporation to be bound by all the provisions and obligations contained herein as a Holder hereunder. Notwithstanding the foregoing, (x) any transferee or assignee who becomes bound by the provisions of this Agreement pursuant to the first sentence of this Section 2.10 shall have all rights and obligations as a "Holder" hereunder but, unless such transferee or assignee is either (1) an Affiliate of the UST, Canada, the VEBA or the Debtor or (2) a successor in interest of the Debtor, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction, such transferee or assignee shall not have any of the rights hereunder that are specific to the UST, Canada, the VEBA or the Debtor, as applicable, and (y) the rights of the Debtor under this Agreement shall not be assigned by the Debtor in connection with the distribution of any Registrable Securities from the Debtor as part of any plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction other than any distribution of any Registrable Securities that may be deemed to have been made from the Debtor to any successor in interest, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction.

Section 2.11 *Rule 144.* After such time as the Corporation has registered a class of equity securities under Section 12(b) or Section 12(g) of the Exchange Act, or otherwise is required to report under Section 15(d) of the Exchange Act, the Corporation shall file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder and shall take such further action as the Holders may reasonably request, all to the extent required from time to time to enable the Holders to sell Common Stock without registration under the Securities Act within the limitation of the exemptions provided by (a) Rule 144 under the Securities Act, as such rule may be amended from time to time, or (b) any similar rule or regulation hereafter adopted by the SEC. The Corporation shall promptly upon the request of any Holder furnish to such Holder evidence of the number of shares of Common Stock then outstanding, as of the most recent date practicable. Any sale or transfer by a Holder of Registrable Securities that could have been effected either as

a sale of securities pursuant to, and in accordance with, Rule 144 under the Securities Act (or any successor provision) or a sale covered by a Shelf Registration shall be deemed for all purposes under this Agreement to be a sale or transfer by such Holder pursuant to, and in accordance with, Rule 144 under the Securities Act.

Section 2.12    *Preservation of Rights*.

(a)    The Corporation will not (x) grant any registration rights to third parties which are inconsistent with the rights granted hereunder or (y) enter into any agreement, take any action, or permit any change to occur, with respect to its securities that violates the rights expressly granted to the Holders in this Agreement.

(b)    If the Corporation grants any registration rights to a third party that are more favorable to such party than the rights granted to any of the UST, Canada, the VEBA and the Debtor hereunder, the UST, Canada, the VEBA and the Debtor shall be entitled to have their registration rights improved to the level of the registration rights of such third party, and all of the parties hereto shall execute an amendment to this Agreement reflecting such more favorable rights.

Section 2.13    *Registration of Common Stock under Exchange Act; Listing*. Notwithstanding anything to the contrary herein, the Corporation shall use its reasonable best efforts to (i) file with the SEC a registration statement to register its Common Stock under Section 12 of the Exchange Act and cause such registration statement to be declared effective no later than July 31, 2010 and (ii) cause its Common Stock to be approved for listing on the New York Stock Exchange or any other national securities exchange in connection with a distribution, if any, of Registrable Securities by the Debtor pursuant to a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction.

## ARTICLE 3
## TERMINATION

Section 3.1    *Termination*.    Other than **Sections 2.8** and **2.9** and **Article 4**, this Agreement and the obligations of the Corporation hereunder shall terminate upon the time when there are no Registrable Securities remaining.    With respect to each Holder, other than **Sections 2.8 and 2.9** and **Article 4**, this Agreement and the rights and obligations of such Holder hereunder shall terminate when such Holder no longer holds any Registrable Securities and, with respect to the Debtor, has no further right to receive additional securities of the Corporation pursuant to Section 3.2 of the Master Sale and Purchase Agreement.    Notwithstanding the foregoing, all liabilities or obligations under **Sections 2.8** and **2.9** and **Article 4** shall remain in effect in accordance with the terms of such provisions.

## ARTICLE 4
## MISCELLANEOUS

Section 4.1    *Notices*.    Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the delivery date after having been sent by a nationally or

internationally recognized overnight courier service (charges prepaid); (c) at the time received when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the time when confirmation of successful transmission is received (or the first business day following such receipt if the date of such receipt is not a business day) if sent by facsimile, in each case, to the recipient at the address or facsimile number, as applicable, indicated below:

If to the Corporation:

> [_____]
> [_____]
> [_____]
> Attention: [_____]
> Telephone: [_____]
> Facsimile: [_____]
>
> with a copy to:
> Cadwalader, Wickersham & Taft LLP
> One World Financial Center
> New York, New York 10281
> Attention: John J. Rapisardi
>           R. Ronald Hopkinson
> Telephone: 212-504-6000
> Facsimile: 212-504-6666

If to the UST:

> [_____]
> [_____]
> [_____]
> Attention: [_____]
> Telephone: [_____]
> Facsimile: [_____]
>
> with a copy to:
> Cadwalader, Wickersham & Taft LLP
> One World Financial Center
> New York, New York 10281
> Attention: John J. Rapisardi
>           R. Ronald Hopkinson
> Telephone: 212-504-6000
> Facsimile: 212-504-6666

If to Canada:

> 7176384 Canada Inc.
> 1235 Bay Street, Suite 400
> Toronto, ON M54 3K4
> Attention: Mr. Michael Carter

Facsimile:  416-934-5009

with a copy to:
Patrice S. Walch-Watson, Esq.
Torys LLP
79 Wellington Street West
Suite 3000
Toronto, ON M5K 1N2
Facsimile: 416-865-7380

If to the VEBA:

UAW Retiree Medical Benefits Trust
P.O. Box 14309
Detroit, Michigan 48214

with a copy to:
Daniel W. Sherrick
General Counsel
International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America
8000 East Jefferson Avenue
Detroit, Michigan 48214
Facsimile: 313-822-4844

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
Attention: Richard S. Lincer & David I. Gottlieb

If to the Debtor:

[_____]
[_____]
[_____]
Attention: [_____]
Telephone: [_____]
Facsimile: [_____]

with a copy to:
Jenner & Block LLP
330 North Wabash Avenue

Chicago, Illinois 60611-7603
Attention: Brian R. Boch
        Catherine Abbott
Telephone: 312-222-9350
Facsimile: 312-527-0484

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Harvey R. Miller
        Stephen Karotkin
        Raymond Gietz
Telephone: 212-310-8000
Facsimile: 212-310-8007

provided, however, if any party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 4.1**, then to the last addressee as so designated.

Section 4.2    Authority.  Each of the parties hereto represents to the other that (a) it has the corporate or other organizational power and authority to execute, deliver and perform this Agreement, (b) the execution, delivery and performance of this Agreement by it has been duly authorized by all necessary corporate or organizational action and no such further action is required, (c) it has duly and validly executed and delivered this Agreement, and (d) this Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

Section 4.3    No Third Party Beneficiaries.  This Agreement shall be for the sole and exclusive benefit of (a) the Corporation and its successors and permitted assigns, (b) each Holder (including any trustee thereof) and any other investment manager or managers acting on behalf of such Holder with respect to the Common Stock, Preferred Stock, or the Warrants and their respective successors and permitted assigns and (c) each of the Persons entitled to indemnification under **Section 2.9** hereof.  Nothing in this Agreement shall be construed to give any other Person any legal or equitable right, remedy or claim under this Agreement.

Section 4.4    No Personal Liability by Trustees.  It is expressly understood and agreed by the parties hereto that this Agreement is being executed and delivered by the UST managers and the VEBA Designee not individually or personally but solely in their respective capacities as managers and trustees in the exercise of the powers and authority conferred and vested in them as such trustees and under no circumstances shall any trustee or former trustee have any personal liability in the trustee's individual capacity in connection with this Agreement or any transaction contemplated hereby.

Section 4.5    *Cooperation.* Each party hereto shall take such further action, and execute such additional documents, as may be reasonably requested by any other party hereto in order to carry out the purposes of this Agreement.

Section 4.6    *Governing Law; Forum Selection.* This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York irrespective of the choice of laws principles of the State of New York other than Section 5-1401 of the General Obligations Law of the State of New York. Any action or proceeding against the parties relating in any way to this Agreement may be brought and enforced exclusively in the courts of the State of New York located in the Borough of Manhattan or (to the extent subject matter jurisdiction exists therefor) the U.S. District Court for the Southern District of New York, and the parties irrevocably submit to the jurisdiction of both courts in respect of any such action or proceeding.

Section 4.7    *WAIVER OF JURY TRIAL.* EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

Section 4.8    *Successors and Assigns.* Except as otherwise expressly provided herein, including pursuant to **Section 2.10**, neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned by any party (whether by operation of law or otherwise) without the prior written consent of the other parties, and any such assignment without such prior written consent shall be null and void. Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and benefit the Corporation, each Holder, and their respective successors and permitted assigns; provided, that, for the avoidance of doubt, any Person who receives securities of the Corporation as a distribution from the Debtor as part of any plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction (other than any such Person that is a successor in interest to the Debtor, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction) shall not be bound by or have any rights pursuant to this Agreement.

Section 4.9    *Entire Agreement.* This Agreement (together with the Annex) contains the final, exclusive and entire agreement and understanding of the parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the parties with respect to the subject matter hereof and thereof. This Agreement shall not be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 4.10    *Severability.* Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under law. If any term or provision of this Agreement, or the application thereof to any Person or any circumstance, is

held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

*Section 4.11    Enforcement of this Agreement*.  The parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that the parties shall, without the posting of a bond, be entitled, subject to a determination by a court of competent jurisdiction, to an injunction or injunctions to prevent any such failure of performance under, or breaches of, this Agreement, and to enforce specifically the terms and provisions hereof and thereof, this being in addition to all other remedies available at law or in equity, and each party agrees that it will not oppose the granting of such relief on the basis that the requesting party has an adequate remedy at law.

*Section 4.12    Amendment*.    This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the parties.

*Section 4.13    Headings*.    The descriptive headings of the Articles, Sections and paragraphs of, and the Annex to, this Agreement are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof.

*Section 4.14    Counterparts; Facsimiles*.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement. All signatures of the parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the party whose signature it reproduces and be binding upon such party.

*Section 4.15    Time Periods*.  Unless otherwise specified in this Agreement, an action required under this Agreement to be taken within a certain number of days shall be taken within that number of calendar days (and not business days); provided, however, that if the last day for taking such action falls on a day that is not a business day, the period during which such action may be taken shall be automatically extended to the next business day.

*Section 4.16    No Binding Effect on U.S. Government*. Notwithstanding anything in this Agreement to the contrary, no provision of this Agreement shall be binding on or create any obligation on the part of the United States Department of the Treasury or any other department or any agency or branch of the United States Government, or any political subdivision thereof.

*Section 4.17    Canada.*  Notwithstanding anything in this Agreement to the contrary, Canada shall be bound by this Agreement only in its capacity as a Holder and nothing in this Agreement shall be binding on or create any obligation on the part of Canada in any other capacity or any branch of the Government of Canada or subdivision thereof.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto, being duly authorized, have executed and delivered this Equity Registration Rights Agreement on the date first above written

*[CORPORATION]*

By: _____
Name: _____
Title: _____

**THE UNITED STATES DEPARTMENT OF THE TREASURY**

By: _____
Name: _____
Title: _____

**7176384 CANADA INC.**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**UAW RETIREE MEDICAL BENEFITS TRUST**

By: _____
Name: _____
Title: _____

*[DEBTOR]*

By: _____
Name: _____
Title: _____

**Annex I**

| Holder | Number of Shares of Common Stock |
|---|---|
| UST | |
| Canada | |
| VEBA | |
| Debtor | |
| Total: | |

| Holder | Number of Shares of Common Stock for Which Warrants Are Initially Exercisable |
|---|---|
| VEBA | |
| Debtor | |
| Total: | |

| Holder | Number of Shares of Series A Preferred Stock |
|---|---|
| UST | |
| Canada | |
| VEBA | |
| Total: | |

1774946

P

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit P**

Form of Bill of Sale

**EXHIBIT P**

**FORM OF OMNIBUS BILL OF SALE**

THIS OMNIBUS BILL OF SALE (this "Bill of Sale"), dated as of [_____ ___],
2009, is made by and among General Motors Corporation, a Delaware corporation ("Parent"),
Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a
Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware
corporation ("Harlem", and collectively with Parent, S LLC and S Distribution, "Transferors",
and each a "Transferor"), and *[NGMCO, Inc.]*, a Delaware *[corporation]* ("Transferee").
Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto
in the Purchase Agreement (as defined below).

RECITALS

WHEREAS, Transferors and Transferee are parties to that certain Amended and Restated
Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement");
and

WHEREAS, pursuant to the Purchase Agreement, Transferors desire to sell, transfer,
assign, convey and deliver to Transferee, and Transferee desires to purchase, accept and acquire
from Transferors, all of Transferors' right, title and interest in and to the Purchased Assets.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of
which are hereby acknowledged, the Parties agree as follows:

Section 1.    Assignment. Pursuant to the Purchase Agreement, each Transferor hereby
sells, transfers, assigns, conveys and delivers to Transferee any and all right, title and interest
that such Transferor possesses in and to all of the Purchased Assets (except for the Intellectual
Property and the Transferred Real Property, which are governed by separate conveyance
agreements), and Transferee hereby purchases, accepts and acquires from each Transferor such
Purchased Assets. Notwithstanding anything to the contrary contained herein, Transferors are
not selling, transferring, assigning, conveying or delivering to Transferee any Excluded Assets.

Section 2.    Further Assurances. Transferors shall execute any other documentation
and take such other actions, at Transferee's sole cost and expense, as may be reasonably
requested by Transferee to enable Transferee to perfect and sustain its rights in and to the
Purchased Assets (except for the Intellectual Property and the Transferred Real Property, which
are governed by separate conveyance agreements).

Section 3.    Power of Attorney. In furtherance of the foregoing, each Transferor
irrevocably constitutes and appoints Transferee the true and lawful attorney of such Transferor
with full power of substitution and give and grant unto Transferee full power and authority in the
name and stead of such Transferor, but on behalf and for the benefit of Transferee, at any time
and from time to time, to demand, sue for, recover and receive any and all Claims of every kind
and description whatsoever relating to the Purchased Assets (except for the Intellectual Property
and the Transferred Real Property, which are governed by separate conveyance agreements),

other than Bankruptcy Avoidance Actions and any of the foregoing to the extent that they relate solely to the Excluded Assets or Retained Liabilities and any of the foregoing and to do all acts and things in relation to such Purchased Assets that Transferee shall deem desirable, for the purpose of fully vesting in Transferee all right, title and interest in and to such Purchased Assets. Such power of attorney is coupled with an interest and is irrevocable by such Transferor, by reason of such Transferor's dissolution or for any reason whatsoever.

Section 4.    Disclaimer. OTHER THAN AS SET FORTH IN SECTION 4.7(B) OF THE PURCHASE AGREEMENT, TRANSFERORS MAKE NO REPRESENTATIONS OR WARRANTIES AS TO THE CONDITION OF THE PURCHASED ASSETS OR THE SUITABILITY THEREOF FOR ANY PURPOSE.  OTHER THAN AS SET FORTH IN SECTION 4.7(B) OF THE PURCHASE AGREEMENT, TRANSFERORS HEREBY EXPRESSLY DISCLAIM ANY WARRANTIES AS TO MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE AND ANY OTHER WARRANTIES OR REPRESENTATIONS AS TO THE CONDITION OF THE PURCHASED ASSETS. TRASNFERORS HAVE EXECUTED THIS BILL OF SALE TO SELL, TRANSFER, ASSIGN, CONVEY AND DELIVER TO TRANSFEREE THE PURCHASED ASSETS ON A AS-IS BASIS AND WHEREVER LOCATED, WITH ALL FAULTS.

Section 5.    Conflicts with Purchase Agreement.  This Bill of Sale is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement.  In the event of any conflict between the terms of this Bill of Sale and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

Section 6.    Miscellaneous.

(a)    Governing Law.  The construction, interpretation and other matters arising out of or in connection with this Bill of Sale shall in all respects be governed by and construed (i) to the extent applicable, in accordance with the Bankruptcy Code and (ii) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflicts of laws.

(b)    Successors and Assigns; No Third Party Beneficiaries.  This Bill of Sale is for the sole benefit of Transferors, Transferee and their respective successors and permitted assigns, and nothing express or implied in this Bill of Sale is intended or shall be construed to confer upon or give to any Person, other than Transferors, Transferee and their respective successors and assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Bill of Sale.

(c)    Counterparts.  This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.  All signatures of the Parties may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

1759866

IN WITNESS WHEREOF, the undersigned have caused this Omnibus Bill of Sale to be executed as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
       Name: [_____]
       Title: [_____]

SATURN LLC

By: _____
       Name: [_____]
       Title: [_____]

SATURN DISTRIBUTION CORPORATION

By: _____
       Name: [_____]
       Title: [_____]

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
       Name: [_____]
       Title: [_____]

*[NGMCO, INC.]*

By: _____
       Name: [_____]
       Title: [_____]

1759866

Q

**Amended and Restated Master Sale & Purchase Agreement
Exhibit Q**

Form of Assignment and Assumption Agreement

## EXHIBIT Q

## FORM OF OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of [_____ _], 2009, is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem", and collectively with Parent, S, LLC and S Distribution, "Assignors", and each a "Assignor"), and *[NGMCO, Inc.]*, a *[Delaware corporation]* ("Assignee"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, Assignors and Assignee are parties to that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement"); and

WHEREAS, pursuant to the Purchase Agreement, Assignors desire to transfer, assign and delegate to Assignee, and Assignee desires to accept and assume from Assignors, the Assumed Liabilities.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.    Assignment.  Each Assignor hereby assigns, transfers and delegates all of the Assumed Liabilities (other than the Leased Real Property Contracts and the Intellectual Property, which are governed by separate conveyance agreements) to Assignee, and Assignee hereby assumes and agrees to pay or perform as and when due, or otherwise discharge, such Assumed Liabilities.  Notwithstanding anything contained herein to the contrary, Assignors are not assigning, transferring or delegating to Assignee, and Assignee is not assuming or agreeing to pay, any Retained Liabilities.

Section 2.    Further Assurances.  Assignee shall execute any other documentation and take such other actions, at Assignors' sole cost and expense, as may be reasonably requested by Assignor to cause Assignee to accept and assume the Assumed Liabilities as contemplated by this Agreement.

Section 3.    Conflicts with Purchase Agreement.  This Agreement is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement.  In the event of any conflict between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

1760141

Section 4.    <u>Miscellaneous</u>.

(a)    <u>Governing Law</u>. The construction, interpretation and other matters arising out of or in connection with this Agreement shall in all respects be governed by and construed (i) to the extent applicable, in accordance with the Bankruptcy Code and (ii) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflicts of laws.

(b)    <u>Successors and Assigns; No Third Party Beneficiaries</u>. This Agreement is for the sole benefit of Assignors, Assignee and their respective successors and permitted assigns, and nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than Assignors, Assignee and their respective successors and assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Agreement.

(c)    <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument. All signatures of Assignors may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

[Remainder of the page left intentionally blank]

1760141

2

IN WITNESS WHEREOF, the undersigned have caused this Omnibus Assignment and Assumption Agreement to be executed as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
  Name: [_____]
  Title:  [_____]


SATURN LLC

By: _____
  Name: [_____]
  Title:  [_____]


SATURN DISTRIBUTION CORPORATION

By: _____
  Name: [_____]
  Title:  [_____]


CHEVROLET-SATURN OF HARLEM, INC.

By: _____
  Name: [_____]
  Title:  [_____]


*[NGMCO, INC.]*

By: _____
  Name: [_____]
  Title:  [_____]

1760141

R

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit R**

Form of Novation Agreement

## EXHIBIT R

## FORM OF NOVATION AGREEMENT

General Motors Corporation, a corporation organized under the laws of Delaware with its principal office at 300 Renaissance Center, Detroit, MI 48265, Saturn LLC, a limited liability company organized under the laws of Delaware with its principal office at *[_____]*, Saturn Distribution Corporation, a corporation organized under the laws of Delaware with its principal office at *[_____]*, and Chevrolet-Saturn of Harlem, Inc., a corporation organized under the laws of Delaware with its principal office at *[_____]* (each, a "Transferor," and collectively, the "Transferors"); *[NGMCO, Inc.]*, a *[corporation]* organized under the laws of Delaware with its principal office at *[_____]* (the "Transferee"); and the United States of America (the "Government") enter into this Novation Agreement (this "Agreement") as of *[_____ ___]*, 2009.

(a) The parties agree to the following facts:

(1) The Government, represented by various Contracting Officers of *[insert federal agencies]*, has entered into certain Contracts with the Transferors, as listed on Exhibit A, and incorporated in this Agreement by reference. The term "Contracts," as used in this Agreement, means the contracts listed on Exhibit A and any other contracts between any Transferor and *[insert federal agencies]* not listed on Exhibit A on which performance has been contemplated, but which are not closed out on the effective date of this Agreement, and all modifications to such contracts made between the Government and any Transferor before the effective date of this Agreement (whether or not performance and payment have been completed and releases executed if the Government or any Transferor has any remaining rights, duties or obligations under these contracts). Included in the term "Contracts" are also all modifications made on or after the effective date of this Agreement that are under the terms and conditions of those contracts listed on Exhibit A.

(2) As of *[_____ ___]*, 2009, the Transferors have transferred to the Transferree assets of the Transferors by virtue of the Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement"), as evidenced by an Omnibus Bill of Sale and an Omnibus Assignment and Assumption Agreement executed in connection therewith, copies of which are attached as Exhibit B and Exhibit C, respectively.

(3) The Transferee has acquired all the assets of the Transferors involved in performing the Contracts by virtue of the above-referenced transfer.

(4) The Transferee has assumed all obligations and liabilities of the Transferors under the Contracts by virtue of the above-referenced transfer.

(5) The Transferee is in a position to fully perform all obligations that may exist under the Contracts.

(6) It is consistent with the Government's interest to recognize the Transferee as the successor party to the Contracts novated to it.

(7) By letter, dated *[_____ ___]*, 2009, the Transferors filed evidence of the above-referenced transfer with the Government, including one copy each, as applicable, of the documents listed in Federal Acquisition Regulation 42.1204(e)(2).

1760153

(b) IN CONSIDERATION OF THESE FACTS, THE PARTIES AGREE THAT, BY THIS AGREEMENT ---

(1) The Transferors confirm the transfer to the Transferee, and waive, on behalf of the Transferors but not on behalf of the Transferree, any claims and rights against the Government that it now has or may have in the future in connection with the Contracts.

(2) The Transferee agrees to be bound by and to perform each of the Contracts in accordance with the conditions contained in such Contracts. The Transferee also assumes all obligations and liabilities of, and all claims against, the Transferors under the Contracts novated to it as if the Transferee were the original party to the Contracts.

(3) The Transferee ratifies all previous actions taken by the Transferors with respect to the Contracts novated to it, with the same force and effect as if the action had been taken by the Transferee.

(4) The Government recognizes the Transferee as the Transferors' successor in interest in and to the Contracts novated to it. The Transferee by this Agreement becomes entitled to all rights, title, and interests of the Transferors in and to the Contracts novated to it as if the Transferee were the original party to the Contracts. Following the effective date of this Agreement, the term "Contractor," as used in the Contracts, shall refer to the Transferee.

(5) The Exhibits to this Agreement are considered integral parts of this Agreement.

(6) Except as expressly provided in this Agreement, nothing in it shall be construed as a waiver of any rights of the Government against any Transferor or of any Transferor or the Transferee against the Government.

(7) All payments and reimbursements previously made by the Government to any Transferor, and all other previous actions taken by the Government under the Contracts, shall be considered to have discharged those parts of the Government's obligations under the Contracts. All payments and reimbursements under a Contract made by the Government after the date of this Agreement in the name of or to any Transferor shall have the same force and effect as if made to the Transferee, and shall constitute a complete discharge of the Government's obligations under the respective Contract, to the extent of the amounts paid or reimbursed. Nothing herein shall be construed as a waiver of the right of the Transferree to pursue and prosecute claims previously asserted by any Transferor under a Contract novated to the Transferee, or the right of the Transferee to assert any pre-transfer claim that was not waived or released by any Transferor by operation of law (including the conduct of the parties), or mutually resolved by settlement or otherwise by any Transferor and the Government as evidenced by a written instrument executed prior to the effective date of this Agreement.

(8) Each Transferor and the Transferee agree that the Government is not obligated to pay or reimburse any of them for, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising out of or resulting from the transfer or this Agreement, other than those that the Government in the absence of this transfer or Agreement would have been obligated to pay or reimburse under the terms of the Contracts.

(9) Transferors jointly and severally guarantee payment of all liabilities and the performance of all obligations that the Transferee (i) assumes pursuant to and as of the effective date of this Agreement or (ii) may undertake in the future should the Contracts be modified under their terms and conditions;

2

1760153

provided, however, that such future modifications are within the current scope of work and current periods of performance, including any existing options that provide the Government with the unilateral right to extend the term of a Contract. The Transferors waive notice of, and consent to, any such future modifications that are guaranteed by the Transferors pursuant to this paragraph (9)(ii).

(10) This Agreement, including its attachments, will be appended to each Contract through a modification to such Contract, and the provisions of this Agreement will apply to each such Contract as necessary to implement this Agreement.

(11) The Contracts shall remain in full force and effect, except as modified by this Agreement. Each party has executed this Agreement as of the day and year first written above.

3

IN WITNESS WHEREOF, the undersigned have caused this Novation Agreement to be executed as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
        Name: *[_____]*
        Title:  *[_____]*

SATURN LLC

By: _____
        Name: *[_____]*
        Title:  *[_____]*

SATURN DISTRIBUTION CORPORATION

By: _____
        Name: *[_____]*
        Title:  *[_____]*

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
        Name: *[_____]*
        Title:  *[_____]*

*[NGMCO, INC.]*

By: _____
        Name: *[_____]*
        Title:  *[_____]*

UNITED STATES OF AMERICA

By: _____

     Name: /_____/

     Title:  /_____/

1760153

### CERTIFICATE

I, _____, certify that I am the _____ of General Motors Corporation; that _____, who signed this Agreement for this corporation, was then _____ of this corporation; and that this Agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers. Witness my hand and the seal of this corporation this ___ day of _____, 2009.

By: _____

   Name: _____

   Title: _____

1760153

**CERTIFICATE**

I, _____, certify that I am the _____ of Saturn LLC; that _____, who signed this Agreement for this corporation, was then _____ of this corporation; and that this Agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers.  Witness my hand and the seal of this corporation this ___ day of _____, 2009.

By: _____

   Name: _____

   Title: _____

## CERTIFICATE

I, _____, certify that I am the _____ of Saturn Distribution Corporation; that
_____, who signed this Agreement for this corporation, was then _____ of this
corporation; and that this Agreement was duly signed for and on behalf of this corporation by
authority of its governing body and within the scope of its corporate powers. Witness my hand and
the seal of this corporation this ___ day of _____, 2009.

By: _____

   Name: _____

   Title: _____

1760153

## CERTIFICATE

I, _____, certify that I am the _____ of Chevrolet-Saturn of Harlem, Inc.; that _____, who signed this Agreement for this corporation, was then _____ of this corporation; and that this Agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers. Witness my hand and the seal of this corporation this ___ day of _____, 2009.

By: _____

   Name: _____

   Title: _____

1760153

**Exhibit A**
**Assigned Contracts**

*[forthcoming]*

1760153

**Exhibit B**
**Omnibus Bill of Sale**

[attached]

**Exhibit C**
**Omnibus Assignment and Assumption Agreement**

[attached]

EXHIBIT C TO NOVATION AGREEMENT

S

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit S**

Form of Government Related Subcontract Agreement

## EXHIBIT S

## FORM OF GOVERNMENT RELATED SUBCONTRACT AGREEMENT[1]

This SUBCONTRACT AGREEMENT (this "Subcontract"), dated *[_____ ]*, 2009, is made by and between General Motors Corporation, a Delaware corporation ("Prime Contractor"), and *[NGMCO, Inc.]*, a Delaware *[corporation]* ("Subcontractor," and together with the Prime Contractor, the "Parties").

**WHEREAS**, Prime Contractor and Subcontractor have entered into an Amended and Restated Master Sale and Purchaser Agreement, dated as of June 26, 2009 (the "Purchase Agreement"), whereby Subcontractor has purchased the Government Prime Contracts (as defined in the Purchase Agreement) and the assets used by Prime Contractor to perform the Government Prime Contracts;

**WHEREAS**, Prime Contractor has entered into certain contracts with the United States Government (the "Government") and currently has pending certain contract proposals that it has submitted to the Government;

**WHEREAS**, Subcontractor will be notifying the Government of assignment of submitting requests (the "Novation Requests") to the Government to novate the Government Prime Contracts (each such Government Prime Contract requiring a Novation Request is referred to herein as a "Novation Contract," and collectively, the "Novation Contracts");

**WHEREAS**, the Government may wish to modify or extend any of the Novation Contracts, or issue new task orders or deliver orders under any such Novation Contract, in order to add additional work to such Novation Contract ("Additional Work"); and

**WHEREAS**, the Parties desire to arrange for the continued performance of the Novation Contracts in accordance with all of their respective requirements and terms until such time as the Government consents to the Novation Request.

**NOW, THEREFORE**, in consideration of the foregoing premises and the agreements contained herein, the Parties agree as follows:

## ARTICLE I
## SCOPE OF WORK

Section 1.1    *Incorporation of Government Prime Contracts: Definitions.*    The Novation Contracts are incorporated by reference herein.  To give effect to the provisions contained in this Subcontract, with respect to the Government Prime Contracts once made a part of this Subcontract, any reference to the "Government" or the "Contracting Officer" shall mean Prime Contractor, unless such reference by its terms is applicable only to the Government.

---

[1] Subject to confirmation and agreement by Purchaser and Sellers that in light of the nature of this Office Lease, the terms and pricing contained herein represent Arms-Length Basis provisions.

Section 1.2    *Prime Contractor Responsibility.*  Prime Contractor shall retain its legal obligations as a prime contractor in accordance with the Novation Contracts.  Prime Contractor shall provide assistance as reasonably necessary (excluding legal, cost and pricing support) for Subcontractor to perform under the Novation Contracts, upon written request, and at the cost and expense, of Subcontractor.  Prime Contractor agrees to forward to Subcontractor any and all orders or requests for work issued by the Government after the Closing Date.

Section 1.3    *Subcontractor Responsibility.*  Subcontractor shall diligently perform all requirements, and furnish to the Government all services and materials necessary to complete performance of the obligations, of each Novation Contract in accordance with the terms and conditions thereof.  Without limiting the foregoing, unless Prime Contractor indicates otherwise by notice to Subcontractor or applicable law requires otherwise, Subcontractor shall be considered Prime Contractor's agent for purposes of: (a) collecting all amounts that may be due from the other party or parties to each Novation Contract and that relate to the period of subcontract performance hereunder with respect to such Novation Contract; and (b) negotiating or otherwise handling all disputes and issues that may arise in connection with each Novation Contract and that relate to the period of subcontract performance hereunder with respect to such Novation Contract.  Subcontractor shall as promptly as practicable after entering into this Agreement, engage legal counsel and consultants well versed in U.S. government contract law and regulations to supplement the personnel within the Business (as defined in the Purchase Agreement) in the performance of these Novation Contracts.

## ARTICLE II
## RELATIONSHIP OF PARTIES

Section 2.1    *Cooperation.*  Both Parties shall fully cooperate with each other to ensure that all requirements of the Novation Contracts and Additional Work, if applicable, are satisfied and that the transition of performance occurs without disruption or inconvenience to the Government.

Section 2.2    *Communications with Government.*  Subcontractor shall, in the first instance, be responsible for communications with the Government regarding the Novation Contracts.  Subcontractor shall promptly inform Prime Contractor of the substance of any such communications that are material.  Prime Contractor will include Subcontractor (or update Subcontractor) with respect to any material communications with the Government regarding the Novation Contracts.  Prime Contractor shall forward any written communications from the Government referring to or relating to the Novation Contracts to Subcontractor to be received not more than five (5) Business Days from receipt by Prime Contractor.

Section 2.3    *Disclosure.*  The Parties hereby agree that the contents of this Subcontract may be made known to the Government.

Section 2.4    *Award of Additional Work.*  While it may be necessary to seek extensions in delivery schedule or other routine modifications, it is not the intent of either party to expand the Novated Contracts to take on Additional Work beyond that which is within the scope of the subject contract.  Within this parameter, if at any time prior to the expiration, termination, assignment, or novation of a Novation Contract, Subcontractor requests Prime Contractor (a) to

seek an extension or modification of the Novation Contract and/or (b) to submit a proposal or compete for a new task order or delivery order under the Novation Contract, Prime Contractor shall make reasonable efforts (y) to request and obtain such an extension or modification, and/or (z) to obtain award of additional work, such as a task order or delivery order. Prime Contractor's obligation under the immediately preceding sentence is subject to the Parties' express understanding that Subcontractor shall, in the first instance, be responsible for the preparation of any request for extension or modification and of any task order or delivery order proposal and for the conduct of discussions or negotiations with the Government with respect to such request or proposal. Subcontractor shall reimburse Prime Contractor for all out-of-pocket expenses and pay to Prime Contractor reasonable labor and expenses incurred by Prime Contractor in connection with its efforts to request and obtain such Additional Work (including, without limitation, reasonable attorney's fees).

Section 2.5    *Authorization.*

(a)    Prime Contractor hereby appoints and authorizes Subcontractor, its employees and designees, as its exclusive agent for the purpose of submitting proper invoices in Prime Contractor's name to the Government seeking any and all payments under the Novation Contracts.

(b)    Prime Contractor specifically authorizes Subcontractor to submit proper invoices to the Government consistent with the pricing and other requirements set forth in the Novation Contracts. Prime Contractor shall pass on to Subcontractor, without any withholding or setoff, via wire transfer within five (5) Business Days any amounts paid by, and received from, the Government for performance by Subcontractor of its obligations under the Novation Contracts as incorporated herein.

(c)    In the absence of Subcontractor's failure to perform its duties or responsibilities under this **Article II**, Prime Contractor agrees to refrain from undertaking any actions which Subcontractor is authorized to undertake by this **Article II** unless requested to do so by Subcontractor. Prime Contractor also agrees to refrain from retaining another agent to perform any of the actions covered in this **Article II**, thereby making Subcontractor its exclusive agent for the purposes set forth herein.

(d)    Subcontractor shall maintain true and correct books and records pertaining to such invoiced amounts and, upon reasonable notice, shall permit an independent entity hired by Prime Contractor, at Prime Contractor's own expense, to audit sufficiently such books and records to verify the accuracy and appropriateness of all charges.

(e)    For purposes of allowing Subcontractor to fulfill its obligations under this Subcontract, Prime Contractor hereby delegates authority to *[Subcontractor appointees]*, or their immediate subordinates, to enter into, execute, process and deliver for, or in the name of or on behalf of, Prime Contractor, any proper invoices, task/delivery orders and modifications, amendments or extensions thereto that may arise in the ordinary course relating to the Novation Contracts, as well as task or delivery order proposals in connection with any of the Novation Contracts (the "Contract Documents"); provided that the foregoing authority shall not permit Subcontractor or its employees to issue

checks, drafts, or other orders on the funds of Prime Contractor. Copies of all Contract Documents executed by Subcontractor pursuant to this provision shall be provided to Prime Contractor no later than three (3) Business Days after being executed. Any Contract Documents requiring signatures of both the Government and the Prime Contractor shall be ratified by a counter-signature by Prime Contractor and returned to Subcontractor within three (3) Business Days of receipt by Prime Contractor. Notwithstanding the foregoing, prior to executing any document pursuant to this provision that has a projected monetary value exceeding **$100,000,000**, Subcontractor shall notify Prime Contractor in writing to insure that Prime Contractor is apprised of significant engagements executed by Subcontractor on behalf of Prime Contractor.

(f)     Nothing in this **Article II** is intended or shall be construed to transfer any rights to any Government Prime Contract or usurp, violate or otherwise negate the requirements of the Anti-Assignment Act, 41 U.S.C. § 15(a) or the Assignment of Claims Act, 31 U.S.C. § 3727(a)(1)(b) (the "Acts"). In the event of any claim by any agency of the United States of a violation of any of the provisions of either of the Acts as a result of this **Article II**, Prime Contractor shall assist Subcontractor as is reasonably necessary to correct such claimed violations and seek the Government's ratification of any Contract Document claimed to be an unlawful assignment under the Acts.

## ARTICLE III
## ASSIGNMENT, TERM AND TERMINATION

Section 3.1     *Assignment of Novation Contract*. Once a contract novation is obtained, (i) such Novation Contract will be deemed to have automatically transferred and assigned to Subcontractor on the terms set forth in the Purchase Agreement, (ii) the obligations arising out of the use, performance, ownership or operation of such Novation Contract after the Closing will be deemed to be Assumed Liabilities under the Purchase Agreement, and (iii) the rights pursuant to such Novation Contract will be deemed to be a Purchased Asset under the Purchase Agreement.

Section 3.2     *Term*. The term of this Subcontract shall be from the Closing Date until the earlier of (x) such time as all of the Novation Contracts, including any extensions or options thereto exercised by the Government, are novated as set forth immediately above, completed or terminated or (y) such time this Subcontract is terminated upon mutual agreement by the Parties as evidenced in writing. With respect to each Novation Contract, the responsibilities of the Parties hereunder shall begin upon the Closing Date for each Novation Contract then in effect and shall cease upon the earlier of: (i) contract novation of such Novation Contract as set forth immediately above; (ii) completion or termination of such Novation Contract, including any renewals or options thereto exercised by the Government; (iii) receipt of a written determination by the Government that the Novation Contract may not be subcontracted to the Subcontractor; or (iv) termination of this Subcontract.

Section 3.3     *Termination*. In the event that any one of the Novation Contracts is terminated in whole or in part by the Government prior to contract novation and prior to expiration of the term of this Subcontract, the rights of the Parties concerning the termination shall be governed by the provisions of the applicable termination clause (such as the termination for convenience provisions or the termination for default provisions, as applicable) set forth in

such Novation Contract, except that Subcontractor's rights under such clause shall relate only to the period of subcontract performance hereunder for such Novation Contract. Prime Contractor may terminate Subcontractor's work under any Novation Contract if, and only if, such Novation Contract is terminated by the Government.

Section 3.4    *Government Proposals.*  The terms of this Subcontract shall also apply to any Government Prime Contract awarded to Prime Contractor as a result of a pending bid or proposal that pertain exclusively to the Business and that by its terms requires novation (an "Awarded Contract"). The effective date of this Subcontract with respect to each such Awarded Contract shall be the date on which such Awarded Contract is awarded to Prime Contractor. For purposes of this Subcontract, the Parties' rights, duties and obligations with respect to each such Awarded Contract are the same as set forth in this Subcontract for Novation Contracts.

## ARTICLE IV
## INDEMNITY AND COMPLIANCE WITH APPLICABLE LAWS

Section 4.1    *Subcontractor Indemnification.*  Prime Contractor shall indemnify, defend and hold harmless Subcontractor and its Affiliates and directors, officers, managers, employees and agents (the "Prime Contractor Indemnified Parties") from, against and in respect of any and all claims, causes of action, losses, grievances, damages, penalties, fines, amounts paid in settlement, costs and expenses (including, reasonable attorney's fees and disbursements) (the "Losses") incurred by the Prime Contractor Indemnified Parties, or any of them, as a result of (i) a breach of this Subcontract by Prime Contractor or any of its Affiliates, and/or (ii) the performance by Prime Contractor under this Subcontract, except to the extent such Losses result from the gross negligence or willful misconduct of, or a breach of this Subcontract by, Subcontractor.

Section 4.2    *Prime Contractor Indemnification.*  Subcontractor shall indemnify, defend and hold harmless the Prime Contractor and its respective Affiliates and directors, officers, managers, employees and agents (the "Subcontractor Indemnified Parties") from, against and in respect of any and all Losses incurred by the Subcontractor Indemnified Parties, or any of them, as a result of (i) a breach of this Subcontract by Subcontractor or any of its Affiliates, and/or (ii) the performance by Subcontractor under this Subcontract, except to the extent such Losses result from the gross negligence or willful misconduct of, or a breach of this Subcontract by, Prime Contractor.

Section 4.3    *Compliance with Applicable Laws.*  Prime Contractor agrees to indemnify and defend Subcontractor from any allegation of violation or actual violation of any Government Prime Contract or legal requirement imposed by a Government Prime Contract caused by the actions of Prime Contractor, Prime Contractor's employees, consultants or subcontractors of any Government Prime Contract arising out of Prime Contractor's performance or failure to perform with respect to any of its obligations under this Subcontract or any of the Novation Contracts subsequent to the date of this Subcontract. Subcontractor agrees to indemnify and defend Prime Contractor from (i) any allegation of violation or actual violation of law by Subcontractor or its employees, consultants or subcontractors arising out of Subcontractor's performance or failure to perform with respect to any of its obligations under this Subcontract or any of the Novation Contracts subsequent to the date of this Subcontract; or (ii) any violation or alleged violation of

any legal requirement imposed by, or relating to, a Novation Contract. This provision shall survive the expiration or termination of this Subcontract.

    Section 4.4   *Legal Requirements.*  The Parties agree to take necessary precautions to assure compliance with all legal requirements pertaining to the Novation Contracts.

## ARTICLE V
## CONFIDENTIALITY

    Section 5.1   *Confidentiality.*  Each Party shall not, and shall cause its Affiliates, officers, directors, employees, representatives, agents and advisors, including attorneys, accountants, consultants, bankers and financial advisors ("Representatives") not to, disclose any information relating to the business of the other Party disclosed to it or its Representatives after the date of this Subcontract by reason of this Subcontract ("Confidential Information"), whenever furnished and regardless of the manner furnished, using efforts which are equivalent to those that the receiving Party uses to protect its own information of a similar nature; provided, however, that Confidential Information shall not include information that (i) is or becomes generally available to the public other than as a result of disclosure directly or indirectly by the Party receiving such information or any of its Representatives, (ii) was independently acquired or developed by the Party receiving such information without violating any of its obligations hereunder, or (iii) is or becomes available to the receiving Party on a non-confidential basis from a person (other than the disclosing Party or its Representatives) who, to the receiving Party's actual knowledge, is not and was not bound by a confidentiality agreement with the disclosing Party or otherwise prohibited from transmitting the information to the receiving Party. Notwithstanding the foregoing, a Party may make such disclosure necessary to avoid committing a violation of Law or of any rule or regulation of any domestic or foreign securities association, stock exchange or national securities quotation system on which such Party's securities are listed or traded.

    Section 5.2   *Survival.*  The provisions of this **Article V** shall survive any expiration or termination of this Subcontract. Each Party shall use commercially reasonable efforts not to, and shall cause each of their Affiliates and each of their respective Representatives, successors and permitted assigns to use commercially reasonable efforts not to, attempt at any time to access any data, information or system of the other Party except as required to provide or receive services, as the case may be.

## ARTICLE VI
## DISPUTES

    Section 6.1   *Resolution of Disputes.*  For the purposes of this Subcontract, the terms "claim," "certification" or "certify," and "dispute" shall have the meaning of the same terms as used in the Contract Disputes Act of 1978 (41 U.S.C. §§ 601-613), FAR Subpart 33.2, and FAR 52.233-1, "Disputes (DEC 1991)." All disputes arising under or relating to this Subcontract shall be resolved under this **Article VI**.

    Section 6.2   *Procedure.*  Subject to **Section 1.3**, with respect to any claim made by Subcontractor for which the Government is or may be liable, Subcontractor agrees that it will

prepare its claim and will present it to Prime Contractor for submission to the Government under the Contract Disputes Act. Prime Contractor agrees to submit any such claim to the Government, at the expense of Subcontractor and subject to Prime Contractor's determination, in its reasonable discretion, as to the merit of such claim. Prime Contractor shall promptly pay to Subcontractor any amount determined on appeal under the applicable Prime Contract, to the extent such payment relates to the period of Subcontract performance by Subcontractor; provided that such payment by the Prime Contractor is limited to the payment of amounts received from the Government in the dispute, as and when received from the Government. Subcontractor shall have the sole authority to direct the prosecution of the claim. In the event of a denial of a claim by the Contracting Officer, Prime Contractor shall, at the direction and expense of Subcontractor, either appeal or file suit pursuant to the Contract Disputes Act and implementing regulations, or permit Subcontractor to proceed in Prime Contractor's name. The Parties will be bound by the results of that process.

Section 6.3    *Procedure.* With respect to any dispute between the Parties arising from or related to the Subcontract, for which the Government is not liable, the Parties shall attempt to reach an amicable resolution of the dispute. If the Parties are unable to resolve amicably such a dispute within a reasonable time, the dispute shall be adjudicated in any state court sitting in New York City or any federal court sitting in the Southern District of New York in accordance with **Section 7.10**, applying the laws of the State of Michigan in accordance with **Section 7.9**.

Section 6.4    *Continuation of Performance.* The Parties shall proceed diligently with performance of this Subcontract, pending final resolution of any request for relief, claim, appeal, dispute or action arising under or in connection with this Subcontract.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1    *Notices.* Any notice, request, instruction or other document to be given hereunder shall be sent in writing and delivered personally, sent by reputable, overnight courier service (charges prepaid), sent by registered or certified mail, postage prepaid, or by facsimile, according to the instructions set forth below. Such notices shall be deemed given: at the time delivered by hand, if personally delivered; one Business Day after being sent, if sent by reputable, overnight courier service; at the time received, if sent by registered or certified mail; and at the time when confirmation of successful transmission is received by the sending facsimile machine, if sent by facsimile.

If to GM:

> General Motors Corporation
> 300 Renaissance Center
> Tower 300, 25th Floor, Room D55
> M/C 482-C25-D81
> Detroit, Michigan 48265-3000
> Attn: General Counsel
> Tel.: 313-667-3450
> Facsimile: 248-267-4584

With a copy (which shall not constitute notice) to:

Jenner & Block LLP
330 North Wabash Avenue
Chicago, Illinois 60611-7603
Attn: Joseph P. Gromacki
       Michael T. Wolf
Tel.: 312-222-9350
Facsimile: 312-527-0484

If to the Subcontractor:

*[NGMCO, Inc.]*
c/o The United States Department of the Treasury
1500 Pennsylvania Avenue, NW
      Washington D.C. 20220
Attn: Chief Counsel Office of Financial Stability
Facsimile: 202-927-9225

With a copy (which shall not constitute notice) to:

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attn:   John J. Rapisardi
      R. Ronald Hopkinson
Tel.: 212-504-6000
Facsimile: 212-504-6666

or to such other address or to the attention of such other Party that the recipient Party has specified by prior written notice to the sending Party in accordance with the preceding.

    Section 7.2    *Expenses; No Offset.*  Except as expressly provided in this Subcontract, each of the Parties shall bear its own costs and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with this Subcontract and the transactions contemplated hereby, whether or not such transactions are consummated.  Neither Party may make any offset against amounts due to the other Party or any of the other Party's Affiliates pursuant to this Subcontract or otherwise.

    Section 7.3    *Assignment; Successors and Assigns.*  Neither this Subcontract nor any of the rights, interests or obligations provided by this Subcontract may be assigned by either Party (whether by operation of Law or otherwise) without the prior written consent of the other Party; provided, however, that either Party may assign its rights under this Subcontract to a Subsidiary. Subject to the preceding sentence and except as otherwise expressly provided herein, this Subcontract shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 7.4    *Amendment; Waiver.*  This Subcontract may be amended only by a written instrument executed and delivered by Prime Contractor and Subcontractor.  At any time prior to the termination of this Subcontract, the Parties may waive compliance with any provision of this Subcontract.  No agreement waiving any provision of this Subcontract shall be valid or binding unless it is in writing and is executed and delivered by or on behalf of the Party against which it is sought to be enforced.

Section 7.5    *Severability.*  Whenever possible, each provision of this Subcontract shall be interpreted in such manner as to be effective and valid under Law, but if any provision of this Subcontract is held to be prohibited by or invalid under Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Subcontract.

Section 7.6    *Counterparts.*  This Subcontract may be executed in two or more counterparts, each of which shall be deemed an original, but all such counterparts taken together shall constitute one and the same Subcontract.

Section 7.7    *Descriptive Headings.*  The descriptive headings of this Subcontract are inserted for convenience only and shall not constitute a part of this Subcontract.

Section 7.8    *No Third-Party Beneficiaries.*  This Subcontract does not confer any rights or remedies upon any Person or entity, other than the Parties hereto and their respective successors and permitted assigns.

Section 7.9    *Governing Law.*  THE LAWS OF THE STATE OF MICHIGAN, WITHOUT GIVING EFFECT TO ANY LAW OR RULE THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF MICHIGAN TO BE APPLIED, GOVERN ALL MATTERS ARISING OUT OF OR RELATING TO THIS SUBCONTRACT, INCLUDING ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT.

Section 7.10    *Forum Selection; Consent to Service of Process; Waiver of Jury Trial.* Each Party hereby irrevocably (i) submits to the exclusive jurisdiction of any state court sitting in New York City or any federal court sitting in the Southern District of New York in any Action arising out of or relating to this Subcontract, (ii) agrees that all claims in respect of such Action may be heard and determined only in any such court, (iii) hereby waives any claim of inconvenient forum or other challenge to venue in such court, and (iv) agrees not to bring any Action arising out of or relating to this Subcontract in any other court.  The Subcontractor irrevocably designates, appoints and empowers *[Subcontractor Designee]*, with offices on the date hereof in New York, as its agent with respect to any Action in New York, to receive on its behalf and in respect of its property, service of any and all legal process, summons, notices and documents that may be served in any such Action, and agrees that the failure of the agent to notify the Subcontractor of any such service of process shall not impair or affect the validity of service.  The Subcontractor further irrevocably consents to the service of process out of any of the courts listed in this **Section 7.10** by the mailing of copies by registered or certified mail, postage prepaid, to the Subcontractor at its address set forth in **Section 7.1**, such service to become effective thirty (30) days after such mailing.  If for any reason *[Subcontractor*

*Designee]* shall cease to be available to act as agent, the Subcontractor agrees to designate within ten (10) Business Days a new agent in New York on the same terms and for the same purposes. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES, AND SHALL CAUSE ITS INDEMNIFIED PARTIES TO IRREVOCABLY WAIVE, ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION ARISING OUT OF OR RELATING TO THIS SUBCONTRACT AND/OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 7.11    *Entire Agreement.*    This Subcontract and the Purchase Agreement collectively constitute the entire agreement among the Parties and supersede any prior and contemporaneous understandings, agreements or representations by or among the Parties, written or oral, that may have related in any way to the subject matter hereof.

Section 7.12    *Assurances and Future Cooperation.*    The Parties agree, at any time and from time to time, at the requesting Party's expense, to execute, acknowledge where appropriate, and deliver such further instruments and documents and to take such other action as either Party may reasonably request in order to carry out the intent and purpose of this Subcontract.

## [SIGNATURES ON FOLLOWING PAGE]

1766534

IN WITNESS WHEREOF, the Parties hereto have caused this Subcontract to be executed and delivered on the date set forth above

GENERAL MOTORS CORPORATION

By: _____

    Name:
    Title:

*[NGMCO, INC.]*

By: _____

    Name:
    Title:

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit T**

Form of Intellectual Property Assignment Agreement

T

**EXHIBIT T**

## FORM OF OMNIBUS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

THIS OMNIBUS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "Agreement"), dated as of [_____ _], 2009, is made by and among General Motors Corporation, a Delaware corporation ("Parent"), S LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), and Chevrolet-Saturn of Harlem, Inc. ("Harlem," and together with Parent, S LLC and S Distribution, each an "Assignor," and collectively, "Assignors"), and *[NGMCO, Inc.]*, a Delaware *[corporation]* ("Assignee"). Capitalized terms used herein and not otherwise defined have the meanings given to them in the Purchase Agreement (as defined below).

### RECITALS

WHEREAS, Assignors and Assignee are parties to that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement"); and

WHEREAS, pursuant to the Purchase Agreement, Assignors desire to sell, transfer, assign, convey and deliver to Assignee, and Assignee desires to purchase, accept and acquire from Assignors all of Assignors' right, title and interest in and to all Intellectual Property and all rights and benefits associated with the foregoing.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.    Assignment. Assignors hereby sell, transfer, assign, convey and deliver to Assignee all right, title and interest that Assignors possess in and to all (a) Intellectual Property, whether owned, licensed or otherwise held, and whether or not registrable (including any Trademarks and other Intellectual Property for the Discontinued Brands), and (b) all rights and benefits associated with the foregoing, including all rights to sue or recover for past, present and future infringement, misappropriation, dilution, unauthorized use or other impairment or violation of any of the foregoing and all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing (the "Assigned Intellectual Property"). The Assigned Intellectual Property shall include all (a) Patents set forth on Exhibit A, (b) Trademarks set forth on Exhibit B and (c) Copyrights set forth on Exhibit C.

Section 2.    Further Assurances. Assignors shall execute any other documentation and take such other actions, at Assignee's sole cost and expense, as may be reasonably requested by Assignee to enable Assignee to perfect and sustain its rights in and to the Assigned Intellectual Property.

Section 3.    Power of Attorney. Each Assignor irrevocably constitutes and appoints Assignee the true and lawful attorney of such Assignor with full power of substitution and gives and grants unto Assignee full power and authority in the name and stead of such Assignor, but on behalf and for the benefit of Assignee, at any time and from time to time, to demand, sue for,

recover and receive any and all Claims of every kind and description whatsoever incident or relating to the Assigned Intellectual Property and to do all acts and things in relation to the Assigned Intellectual Property that Assignee shall deem desirable, for the purpose of fully vesting in Assignee all right, title and interest in and to the Assigned Intellectual Property. Such power of attorney is coupled with an interest and is irrevocable by such Assignor, by reason of such Assignor's dissolution or for any reason whatsoever.

Section 4.    Disclaimer. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THE PURCHASE AGREEMENT, ASSIGNORS DO NOT MAKE ANY REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN CONNECTION WITH OR WITH RESPECT TO ANY OF THE ASSIGNED INTELLECTUAL PROPERTY OR OTHERWISE WITH RESPECT TO THIS AGREEMENT, INCLUDING ANY REPRESENTATIONS OR WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT. ALL OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY DISCLAIMED. EXCEPT AS EXPRESSLY SET FORTH IN THE PURCHASE AGREEMENT, ASSIGNORS ARE ASSIGNING THE ASSIGNED INTELLECTUAL PROPERTY TO ASSIGNEE ON AN "AS-IS, WHERE-IS" BASIS.

Section 5.    Conflicts with Purchase Agreement. This Agreement is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement (including the representations, warranties, covenants and agreements set forth in the Purchase Agreement), all of which are incorporated herein by reference. In the event of any conflict between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail. Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

Section 6.    Miscellaneous.

(a)    Governing Law. The construction, interpretation and other matters arising out of or in connection with this Agreement shall in all respects be governed by and construed (i) to the extent applicable, in accordance with the Bankruptcy Code and (ii) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflicts of laws.

(b)    Successors and Assigns; No Third Party Beneficiaries. This Agreement is for the sole benefit of Assignors, Assignee and their respective successors and permitted assigns, and nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than Assignors, Assignee and their respective successors and permitted assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Agreement.

(c)    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument. All signatures of Assignors and Assignee may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic

2

delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

[Remainder of the page left intentionally blank]

1759822

IN WITNESS WHEREOF, the undersigned have caused this Omnibus Intellectual Property Assignment Agreement to be duly executed the day and year first written above.

**ASSIGNORS:**

GENERAL MOTORS CORPORATION

By: _____
    Name: [_____]
    Title: [_____]

S LLC

By: _____
    Name: [_____]
    Title: [_____]

S DISTRIBUTION CORPORATION

By: _____
    Name: [_____]
    Title: [_____]

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name: [_____]
    Title: [_____]

**ASSIGNEE:**

*[NGMCO, INC.]*

By: _____
    Name: [_____]
    Title: [_____]

State of _____ )
                                          ) ss.
County of _____ )

    The foregoing instrument was acknowledged before me, the undersigned Notary Public, this ____ day of _____, 2009, by _____, the _____ of General Motors Corporation, a Delaware corporation.

_____
Notary Public

State of _____ )
                                          ) ss.
County of _____ )

    The foregoing instrument was acknowledged before me, the undersigned Notary Public, this ____ day of _____, 2009, by _____, the _____ of Saturn LLC, a Delaware limited liability company.

_____
Notary Public

State of _____ )
                                          ) ss.
County of _____ )

    The foregoing instrument was acknowledged before me, the undersigned Notary Public, this ____ day of _____, 2009, by _____, the _____ of Saturn Distribution Corporation, a Delaware corporation.

_____
Notary Public

1759822

**State of** _____           )
                                      ) ss.
**County of** _____          )

    The foregoing instrument was acknowledged before me, the undersigned Notary Public, this _____ day of _____, 2009, by _____, the _____ of Chevrolet-Saturn of Harlem, Inc., a Delaware corporation.

 

_____
Notary Public

1759822

**Exhibit A**

**Patents**

*[to be provided by Parent]*

**Exhibit B**

**Trademarks**

*[to be provided by Parent]*

**Exhibit C**

**<u>Copyrights</u>**

*[to be provided by Parent]*

EXHIBIT C TO OMNIBUS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

1759822

U

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit U**

Form of Transition Services Agreement

**EXHIBIT U**

**FORM OF TRANSITION SERVICES AGREEMENT**

This TRANSITION SERVICES AGREEMENT (this "Agreement"), dated as of
[_____ ], 2009 (the "Effective Date"), is made by and among General Motors Corporation,
a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company
("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"),
Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem", and collectively with
Parent, S LLC and S Distribution, "Sellers", and each a "Seller"), and *[NGMCO, Inc.]*, a
Delaware *[corporation]* ("Purchaser").

WHEREAS, pursuant to the Master Sale and Purchase Agreement, dated as of June 1,
2009 and amended and restated as of June 26, 2009 (the "Purchase Agreement"), by and among
Sellers and Purchaser, Purchaser is, among other things, acquiring the Purchased Assets and
assuming the Assumed Liabilities on the terms and subject to the conditions set forth in the
Purchase Agreement.

WHEREAS, Sellers require certain transition services from Purchaser and Purchaser is
willing to provide such transition services on the terms and subject to the conditions contained
herein.

WHEREAS, Purchaser requires certain transition services from Sellers and Sellers are
willing to provide such transition services on the terms and subject to the conditions contained
herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements
contained in this Agreement, and for other good and valuable consideration, the value, receipt
and sufficiency of which are acknowledged, the Parties hereby agree as follows:

**ARTICLE 1**
**INTERPRETATION; DEFINITIONS**

Section 1.1    Definitions.    All capitalized terms used but not defined in this
Agreement shall have the same meanings as are given to such terms in the Purchase Agreement.
As used in this Agreement, the following terms have the meanings set forth below or in the
sections set forth below:

"Additional Purchaser Services" has the meaning set forth in **Section 2.5(a)**.

"Additional Seller Services" has the meaning set forth in **Section 2.5(b)**.

"Agreement" has the meaning set forth in the Preamble to this Agreement.

"Defaulting Party" has the meaning set forth in **Section 4.3**.

"Disputed Amount" has the meaning set forth in **Section 2.9**.

1755824

"Disputing Party" has the meaning set forth in **Section 2.9**.

"Early Termination Consequences" has the meaning set forth in **Section 4.2**.

"Effective Date" has the meaning set forth in the Preamble to this Agreement.

"Force Majeure Event" has the meaning set forth in **Section 2.7**.

"Harlem" has the meaning set forth in the Preamble to this Agreement.

"Incremental Exit Costs" means the additional direct costs and expenses resulting from early termination of a Transition Service as compared to the costs and expenses that would have been incurred if the Transition Service were performed through the scheduled expiration date.

"Invoicing Party" has the meaning set forth in **Section 2.9**.

"Libor-Plus Rate" means, on any date, an interest rate equal to the sum of (i) the average (rounded to the nearest 1/16th of one-percent) of the London Interbank Offered Rates for three-month United States dollar denominated deposits, as published in the Wall Street Journal on such date and (ii) 500 basis points, but in no event greater than the maximum rate then permitted under applicable law.

"Neutral Arbitrator" has the meaning set forth in **Section 2.9**.

"Parent" has the meaning set forth in the Preamble to this Agreement.

"Parties" means Sellers and Purchaser together, and "Party" shall mean any Seller or Purchaser, individually, as the case may be.

"Purchase Agreement" has the meaning set forth in the Recitals to this Agreement.

"Purchaser" has the meaning set forth in the Preamble to this Agreement.

"Purchaser Service Providers" has the meaning set forth in **Section 2.1(a)**.

"Purchaser Transition Services" has the meaning set forth in **Section 2.1(a)**.

"Receiving Party" means the Party or its Subsidiaries receiving Transition Services.

"Regular Shut Down Periods" has the meaning set forth in **Section 2.6**.

"S Distribution" has the meaning set forth in the Preamble to this Agreement.

"S LLC" has the meaning set forth in the Preamble to this Agreement.

"Seller" and "Sellers" each have the meaning set forth in the Preamble to this Agreement.

"Seller Service Providers" has the meaning set forth in **Section 2.1(b)**.

2

"Seller Transition Services" has the meaning set forth in **Section 2.1(b)**.

"Service Provider" means the Party or its Subsidiaries responsible for providing Transition Services.

"Termination Date" has the meaning set forth in **Section 4.1**.

"Termination Notice" has the meaning set forth in **Section 4.2**.

"Third Party Service Provider" means any Unaffiliated Third Party that a Service Provider has designated as a direct or indirect provider or supporter of Transition Services.

"Transition Services" means the Seller Transition Services or Purchaser Transition Services, as the case may be.

"Unaffiliated Third Party" means, with respect to Purchaser, any Person other than Purchaser and its Subsidiaries, and with respect to Sellers, any Person other than Sellers and their Subsidiaries.

        Section 1.2    *Interpretation.* The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Schedules hereto) and not to any particular provision of this Agreement, and all Article, Section and Schedule references are to this Agreement unless otherwise specified. The words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation." The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms. Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms. Except as otherwise expressly provided herein, all references to "dollars" or "$" are deemed references to the lawful money of the United States of America. Each Party hereto has participated in the drafting of this Agreement, which each Party acknowledges is the result of extensive negotiations between the Parties, and consequently this Agreement shall be interpreted without reference to any rule or precept of law to the effect that any ambiguity in a document be construed against the drafter.

## ARTICLE 2
## TRANSITION SERVICES

        Section 2.1    *Provision of Transition Services.*

        (a)    On the terms and conditions of this Agreement, Purchaser and its Subsidiaries (the "Purchaser Service Providers") shall provide or cause a Third Party Service Provider to provide to Sellers and their Subsidiaries each of the transition services and support functions set forth on Schedule A, as reasonably required by Sellers in connection with (i) the liquidation of Sellers under the provisions of the Bankruptcy Code and (ii) the operation of Sellers in bankruptcy prior to liquidation (collectively, the "Purchaser Transition Services"). However, the Purchaser Service Providers will have no obligation to provide to any Receiving Party any type of service described on Schedule B.

(b)    On the terms and conditions of this Agreement, Sellers and their Subsidiaries (the "Seller Service Providers") shall provide or cause a Third Party Service Provider to provide to Purchaser and its Subsidiaries each of the transition services and support functions set forth on Schedule C (collectively, the "Seller Transition Services"). However, the Seller Service Providers will have no obligation to provide to any Receiving Party any type of service described on Schedule D.

(c)    Each Service Provider shall, in rendering Transition Services, use reasonable and ordinary care, skill and diligence (and, to the extent such services had been provided by the Service Provider for its own account or for any of its Subsidiaries before the Closing, in a manner consistent with such historic practice), including with respect to nature, quality and timeliness, and in accordance with any applicable specifications and limitations set forth on Schedule A or Schedule C (the foregoing performance standard, collectively, the "Performance Standard"); provided that with respect to Transition Services that a Service Provider renders for (or obtains from a third party for) its own or its Subsidiaries' operations, a Service Provider shall not be obligated to render such Transition Service in a manner more favorable to the Recipient than the manner in which such Services are performed or obtained by such Service Provider for its own account. With respect to any Transition Service provided by a Third Party Service Provider, the Service Providers shall use commercially reasonable efforts to cause such Third Party Service Provider to provide such Transition Services in accordance with the terms of this Agreement and the applicable service agreement obligating such Third Party Service Provider.

Section 2.2    *Modification of Transition Services.* A Service Provider may make changes from time to time in the manner of performing Transition Services as long as (i) the Service Provider is making similar changes in performing or receiving similar services for itself or its Subsidiaries, (ii) the Service Provider uses commercially reasonable efforts to provide the Receiving Party reasonable advance written notice and (iii) such changes do not have a materially adverse impact on the nature, quality, availability and timeliness of the applicable Transition Services.

Section 2.3    *Compliance with Law.* Notwithstanding anything herein to the contrary, the Service Providers shall not be responsible for providing any Transition Service, or part thereof, if and to the extent such Transition Service would violate applicable Law; provided that, upon the request and at the expense of the Receiving Party, the Services Providers will use commercially reasonable efforts to modify the applicable Transition Service so that such Transition Service may be provided in compliance with applicable Law. No Service Provider shall have any responsibility or liability for failure to provide any, or part of any, Transition Service unable to be provided as contemplated by this **Section 2.3**.

Section 2.4    *Third Party Consents and Providers.*

(a)    Following the Effective Date, the Service Providers may be required to obtain third-party consents and approvals to provide certain Transition Services. The Service Providers shall use commercially reasonable efforts, and the Receiving Parties shall cooperate with the Service Providers, to obtain such consents or approvals. The

Parties acknowledge and agree that commercially reasonable efforts and cooperation do not include the payment of any consent fees or other fees or expenses to any third party. The Service Providers shall not be responsible for providing any Transition Service, or part thereof, which is provided or supported by the products or services of a Third Party Service Provider as of the Effective Date, if and to the extent the provision of such Transition Service requires third-party consent or approval that has not been obtained. No Service Provider shall have any responsibility or liability for failure to provide any, or part of any, Transition Service unable to be provided pursuant to this **Section 2.4**. Prior to the time that such consents and approvals are obtained by the Service Providers, the Service Providers and the Receiving Parties shall cooperate to develop and implement reasonable and lawful arrangements designed to provide the benefits of the subject Transition Services (or portion thereof) to the Receiving Parties.

(b)     Certain Transition Services are currently provided and will continue to be provided by Third Party Service Providers. Notwithstanding anything to the contrary contained herein, a Service Provider may also subcontract with an Unaffiliated Third Party to directly or indirectly provide or support any other Transition Services to the Receiving Parties.

Section 2.5.     *Requests for Additional Services.*

(a)     Except for services of the type listed on Schedule B, within 180 days after the Effective Date, Sellers may request in writing that additional services be provided and Schedule A be amended to reference such additional services. The Purchaser Service Providers shall use commercially reasonable efforts to provide or cause to be provided the requested services but only if such requested services are reasonably required by Sellers (i) to wind down and liquidate under the provisions of the Bankruptcy Code or (ii) to operate in bankruptcy during liquidation (the "Additional Purchaser Services"). No Purchaser Service Provider shall be obligated to provide any such Additional Purchaser Services unless and until the Parties agree in writing as to the price, specifications and other terms and conditions under which the Purchaser Service Providers shall provide (or cause to be provided) such Additional Purchaser Services; provided that the Parties shall negotiate in good faith and expeditiously with respect to entry into such amendment to Schedule A. Upon such agreement of the Parties, such Additional Purchaser Services shall be deemed to be Transition Services under this Agreement.

(b)     Except for services of the type listed on Schedule D, within 180 days after the Effective Date, Purchaser may request in writing that additional services be provided and Schedule C be amended to reference such additional services. The Seller Service Providers shall use commercially reasonable efforts to provide or cause to be provided the requested services if such requested services were provided by or on behalf of any Seller Service Provider with respect to the business, assets and liabilities acquired by Purchaser pursuant to the Purchase Agreement as of immediately prior to the Closing Date (the "Additional Seller Services"). No Seller Service Provider shall be obligated to perform or cause to be performed any such Additional Seller Services unless and until the Parties agree in writing as to the price, specifications and other terms and conditions

1755824

under which the Seller Service Providers shall provide (or cause to be provided) such Additional Seller Services; provided that the Parties shall negotiate in good faith and expeditiously with respect to entry into such amendment to <u>Schedule C</u>. Upon such agreement of the Parties, such Additional Seller Services shall be deemed to be Transition Services under this Agreement.

(c)     At any time after the Effective Date and before the Termination Date, Sellers or Purchaser may request that <u>Schedule A</u> or <u>Schedule C</u> be amended to reference additional or modified specifications. Upon such request the Parties shall negotiate in good faith the adoption of such additional or modified specifications and any corresponding pricing modifications that may be necessary or appropriate. No Service Providers shall be obligated to perform or cause to be performed any Transition Services in accordance with such specifications unless and until mutually agreed by the Parties.

Section 2.6    *Modifications and Shutdowns.*  If a Service Provider determines that it is necessary or appropriate to temporarily suspend a Transition Service due to scheduled or emergency repairs, maintenance and/or modification, the Service Provider shall give the Receiving Party reasonable prior notice of such shutdown (including information regarding the nature of the shutdown and the projected length of such shutdown), unless it is not practical to give such prior notice because the shut down is due to an emergency. Sellers are hereby notified that the Purchaser Service Providers currently intend to shut down operations for several weeks, twice annually during the periods (i) around the end of December and the beginning of January and (ii) in the month of July (the "<u>Regular Shut Down Periods</u>"), which may result in substantially diminished availability of Transition Services during such periods. With the goal of minimizing the impact on the Receiving Parties of suspended and reduced Transition Services during the Regular Shut Down Periods, Parties shall cooperate to plan the delivery of Transition Services around such periods. Purchaser shall provide Sellers reasonable prior written notice of any change in the Regular Shut Down Periods. In addition, the Service Providers may use the same regularly scheduled information technology support and maintenance windows (during which information systems are not fully available) as were used by Sellers prior to the Closing. The Service Providers shall provide the Receiving Parties reasonable prior written notice of any change in such support and maintenance windows.

Section 2.7    *Force Majeure; Reduction of Services.*  Each Service Provider (including with respect to services performed through Third Party Service Providers) shall be excused from the performance of its obligations under this Agreement, for any period, and to the extent, that such performance is prevented, in whole or in part, as a result of delays caused by any act of God, public enemy, war or threats of same, terrorism or threats of same, epidemic, fire, flood, embargoes, severe weather, civil disturbance, act of government, court order, labor dispute or other cause beyond its reasonable control (a "<u>Force Majeure Event</u>"), and such non-performance shall not be a breach or default hereunder or grounds for termination hereof. Such affected Service Provider shall give written notice to Sellers or Purchaser, as the case may be, of any such Force Majeure Event as soon as reasonably practicable, and the respective Service Providers (including with respect to services performed through Third Party Service Providers) and Receiving Parties will use commercially reasonable efforts to mitigate the effect of any such Force Majeure Event and its consequences on performance hereunder.

1755824

Section 2.8    *Fees for Transition Services.*  The fees to be charged for each Transition Service are set forth on <u>Schedule A</u> and <u>Schedule C</u> and the billing, payment and other terms therefor are set forth on <u>Schedule E</u>.

Section 2.9    *Disputes.*  The Parties shall exercise commercially reasonable efforts to resolve disputes in good faith as promptly as practicable.  If a Party (the "<u>Disputing Party</u>") in good faith disputes the accuracy or legitimacy of any portion (the "<u>Disputed Amount</u>") of an invoice or charge, then the Disputing Party may, without being in breach of this Agreement, withhold the Disputed Amount when paying such invoice or charge pending resolution of the dispute and will provide written notice of the amount, nature and supporting detail regarding the Disputed Amount to the other Party or Parties (the "<u>Invoicing Party</u>").  Promptly following receipt of such written notice, the dispute resolution process set forth below in this **Section 2.9** shall become applicable and the Parties shall discuss the resolution of such Disputed Amount.  If a full resolution of the Disputed Amount has not occurred within 30 days of the initial discussion described in the foregoing sentence, the Parties shall cooperate to promptly submit for resolution such matter (or the portion remaining in dispute) to an arbitrator mutually agreed to by the Parties (the "<u>Neutral Arbitrator</u>").  The Parties shall execute, if requested by the Neutral Arbitrator, an engagement letter reasonably satisfactory to the Neutral Arbitrator.  The Parties shall direct the Neutral Arbitrator to render a resolution of such disputed matter within 30 days after its engagement (or such other period agreed upon by the Parties).  The resolution of the Neutral Arbitrator shall be set forth in a written statement delivered to each of the Parties and shall be final, binding, conclusive and non-appealable for all purposes hereunder.  All fees and expenses of the Neutral Arbitrator shall be paid on a 50-50 basis to the Neutral Arbitrator by Sellers on the one hand and Purchaser on the other hand.  The Neutral Arbitrator shall determine the amount of the Disputed Amount due to the Invoicing Party, which amount shall not exceed the Disputed Amount or be less than zero.  If the Neutral Arbitrator determines that the Invoicing Party was due any portion of the Disputed Amount, then the Neutral Arbitrator shall award to the Invoicing Party (i) the portion of the Disputed Amount determined by the Neutral Arbitrator to be payable to the Invoicing Party and (ii) interest, from the date of the invoice giving rise to the dispute, at the Libor-Plus Rate on the portion of the Disputed Amount to which the Invoicing Party is entitled.  Any amount awarded by the Neutral Arbitrator shall be paid by either Purchaser or Sellers, as applicable, by wire transfer of immediately available funds to the account or accounts designated in writing by the other Party or Parties within five Business Days after the date on which the resolution of the Neutral Arbitrator is delivered to the Parties.  Each Service Provider will continue performing Transition Services in accordance with this Agreement pending resolution of any dispute hereunder.

Section 2.10    *Personnel.*

(a)    *Designation of Personnel.*  Each Service Provider shall have the right, in its reasonable discretion, to designate which personnel shall be assigned to perform the Transition Services, and shall have the right, in its reasonable discretion, to remove and replace any such personnel at any time and/or designate a Third Party Service Provider.

(b)    *Financial Responsibility for Personnel.*  Each Service Provider shall be responsible for the payment of all personnel expenses, including wages, required travel and travel related expenses, of its employees performing the Transition Services.

7

Section 2.11    *Status of Service Providers.*    In all matters relating to this Agreement, each Service Provider shall be acting as an independent contractor and not as an agent, representative or joint venture partner of the Receiving Party. The Service Providers shall not be liable for any debts, obligations or liabilities of the Receiving Parties.

Section 2.12    *Protective Acknowledgements.*    Each Party acknowledges that the Service Providers are not insurers or guarantors of the Transition Services they provide, are not in the business of providing Transition Services and are providing the Transition Services only as an accommodation to the Receiving Parties. To facilitate their compliance with their financial reporting requirements, the Purchaser Service Providers may decide not to make changes to any or all of their systems during the last calendar quarter of any year and, therefore, unless otherwise set forth in a plan agreed to by all Parties, the Purchaser Service Providers are not obligated to make any such changes during the last calendar quarter of any year.

Section 2.13    *Receiving Party Obligations.*    Each Receiving Party shall fully cooperate with the Service Providers and Third Party Service Providers with respect to the provision of Transition Services. Without limiting the foregoing, as necessary to enable the provision of Transition Services by the Service Providers and the Third Party Service Providers, the Receiving Parties shall: (a) adhere in all material respects to the policies of the Service Providers with respect to the protection of proprietary information and other policies regarding the use of information technology resources, to the extent relevant to the Transition Services provided; (b) provide timely responses to any information requested by the Service Providers or the Third Party Service Providers; and (c) provide access to the facilities and assets of the Receiving Parties as requested by the Service Providers or Third Party Service Providers. The Receiving Parties shall promptly notify Sellers or Purchaser, as the case may be, of any problems or failures with respect to the Transition Services, or any breach or default by any Service Provider or Third Party Service Provider under this Agreement, which notice shall describe the foregoing in reasonable detail, and the Receiving Parties shall cooperate with the Service Providers and the Third Party Service Providers to correct the foregoing. The Service Providers and the Third Party Service Providers shall be entitled to rely on any instructions or other information provided by the Receiving Parties, and the Service Providers shall not be in breach of or in default under this Agreement as a result of any such reliance; provided that no such instructions shall expand the obligations of the Service Providers hereunder. The Service Providers shall be excused from their obligation to perform or cause to be performed a Transition Service if and to the extent that (i) such failure to perform or cause to be performed such Transition Service was due to the Receiving Party's failure to perform its responsibilities under this **Section 2.13** and (ii) the Service Providers use commercially reasonable efforts to perform or cause to be performed such Transition Service notwithstanding Receiving Party's failure, if practicable.

Section 2.14    *Transition Service Managers.*    The Seller Services Manager and the Purchaser Services Manager (each as defined below) shall liaise with each other, and seek to resolve in good faith all issues related to the scope, sufficiency and/or performance of Transition Services and any other issues arising in connection with this Agreement. The Purchaser Services Manager and the Seller Services Manager shall meet periodically (in person or by telephone), as reasonable, for purposes of requesting Transition Services, establishing procedures, reviewing performance and forecasting needs.

8

1755824

(a)    Sellers shall appoint an individual, by giving written notice thereof to Purchaser within three (3) business days following the date hereof, to act as its initial services manager (the "Seller Services Manager"), who will be directly responsible for, among other things, coordinating and managing the delivery of the Seller Transition Services. The Seller Services Manager will work with the personnel of Sellers, as well as with any Third Party Service Providers providing Seller Transition Services, to address reasonable issues and matters raised by the Purchaser Services Manager relating to this Agreement. Sellers shall promptly notify Purchaser of the appointment of a new Seller Services Manager.

(b)    Purchaser shall appoint an individual, by giving written notice thereof to Sellers within three (3) business days following the date hereof, to act as its initial services manager (the "Purchaser Services Manager"), who will be directly responsible for, among other things, coordinating and managing the delivery of the Purchaser Transition Services. The Purchaser Services Manager will work with the personnel of Purchaser, as well as with any Third Party Service Providers providing Purchaser Transition Services, to address reasonable issues and matters raised by the Seller Services Manager relating to this Agreement. Purchaser shall promptly notify Sellers of the appointment of a new Purchaser Services Manager.

## ARTICLE 3
## CONFIDENTIALITY; PRIVACY

*Section 3.1    Confidentiality.*    All information (identified by the disclosing Person as confidential or proprietary) shared in the course of providing or receiving Transition Services, including information related to employees, customers or suppliers, will be considered Confidential Information and will be subject to the confidentiality provisions set forth in Section 6.24 of the Purchase Agreement; provided that, notwithstanding the term set forth in Section 6.24 of the Purchase Agreement, the term of the confidentiality obligation with respect to the Confidential Information covered by virtue of this **Section 3.1** shall extend until the second anniversary of the Termination Date.

*Section 3.2    Privacy.*    Notwithstanding anything herein to the contrary, with respect to Personal Information owned or controlled by the Parties and shared under this Agreement, the Service Providers shall at all times comply with the Privacy Policies of the Party that owns or controls the data, including with respect to using, accessing, storing, handling, processing, transmitting and disposing of Personal Information. Furthermore, with respect to Personal Information owned or controlled by the Parties and shared under this Agreement, written notice shall be provided to the Party that owns or controls the data, as soon as reasonably practicable after any Party (other than the Party that owns or controls the data) becomes aware of (i) any breach or potential breach of the applicable Privacy Policies of the Party that owns or controls the data, or (ii) any incident where Personal Information may have been accessed by or disclosed to an unauthorized person.

*Section 3.3    Survival.*    The provisions of this **Article 3** shall survive any expiration or termination of this Agreement. Each Party shall use commercially reasonable efforts not to, and shall cause their Subsidiaries, successors and permitted assigns to use

9

commercially reasonable efforts not to, attempt at any time to access any data, information or system of the other Party or Parties except as required to provide or receive Transition Services, as the case may be.

## ARTICLE 4
## TERM AND TERMINATION

     *Section 4.1    Term and Final Termination.* This Agreement shall commence on the Effective Date and continue until the date upon which all Transition Services have (i) terminated in accordance with the termination date set forth opposite each Transition Service on Schedule A or Schedule C or (ii) been earlier terminated pursuant to **Section 4.2** (the "Termination Date").

     *Section 4.2    Early Termination.* Notwithstanding anything to the contrary contained in this Agreement, (i) a Receiving Party may terminate all or any Transition Services on not less than 30 days prior written notice to Sellers or Purchaser, as the case may be, unless another notification period is specified on Schedule A or Schedule C (each such notice a "Termination Notice"), and (ii) the Parties may terminate this Agreement or any Transition Services by mutual agreement at any time. As soon as a Transition Service is terminated, Sellers or Purchaser, as the case may be, shall no longer be obligated to pay any fees for the terminated Transition Services with respect to the period following the effective date of such termination. As soon as reasonably practicable following its receipt of a Termination Notice, Sellers or Purchaser shall provide to the other Party or Parties, a written notice as to whether the termination of any of the Transition Services that are the subject of the Termination Notice (x) will require termination or partial termination of any of the other Transition Services and/or (y) will result in any Incremental Exit Costs (together, "Early Termination Consequences") and a good faith estimate (together with reasonable supporting documentation) of the aggregate amount of any such Incremental Exit Costs. If Sellers or Purchaser delivers notification of an Early Termination Consequence, the Receiving Party may withdraw or modify its Termination Notice within 10 days of such notification. If the Receiving Party does not withdraw or modify such Termination Notice (in writing) within such period, termination of such Transition Services will be final, including with respect to the termination of any other Transition Services identified by the Service Provider as an Early Termination Consequence and Purchaser or Sellers, as the case may be, shall have the obligation to pay the actual amount of any Incremental Exit Costs identified by the other Party or Parties as an Early Termination Consequence, notwithstanding that any such actual amount may be greater or less than the estimated amount, provided that such actual amount does not exceed the good faith estimate of Incremental Exit Costs by more than 10 percent. Notwithstanding anything to the contrary, no Receiving Party shall have the right to unilaterally reinstitute any Transition Service if such Transition Service has been terminated.

     *Section 4.3    Early Termination by Non-Defaulting Party.* Purchaser on the one hand or Sellers on the other hand may terminate this Agreement (i) upon 30 days prior written notice to the other Party, if such other Party (the "Defaulting Party") is in breach of its payment obligations hereunder (it being understood that a Party will not be deemed to be in breach of such obligations with respect to an invoice or charge so long as it is disputing such invoice or charge in good faith in accordance with **Section 2.9**) or (ii) upon 30 days prior written notice to the Defaulting Party, if the Defaulting Party is in material breach of any of its non-monetary

10

obligations hereunder, and, in the case of either of clause (i) or (ii), the Defaulting Party fails to cure such breach within the applicable notice period specified above. Other than as provided in **Section 4.2** and **4.3**, this Agreement may not be terminated by either Party under any circumstances.

   *Section 4.4 Effect of Termination.* If this Agreement is terminated in its entirety pursuant to **Section 4.1**, **4.2** or **4.3**, all obligations of the Parties under this Agreement shall terminate, except for (i) **Articles 3**, **5**, **6** and **7**, the terms and conditions of which shall survive any termination or expiration of this Agreement and (ii) the obligation of any Party to pay (x) all unpaid amounts in respect of Transition Services provided under this Agreement prior to the date of termination, whether or not invoiced prior to such date, and (y) other costs and expenses expressly required by the terms of this Agreement to be borne by such Party, including Incremental Exit Costs.

**ARTICLE 5**
**REMEDIES**

   *Section 5.1 Cure.* In the event a Service Provider breaches this Agreement by failing to perform in accordance with this Agreement any Transition Service required to be performed under this Agreement, the Receiving Party shall provide notice thereof to Sellers or Purchaser, as applicable, and the applicable Service Provider shall use commercially reasonable efforts to cure such failure, including by performing or re-performing such Transition Service. If, and to the extent, the Service Provider fails to cure such failure within 30 days of receiving such notice, the Receiving Party shall be entitled to and may seek indemnification pursuant to **Section 5.2**.

   *Section 5.2 Service Provider Indemnification.* Subject to **Article 6** and the other limitations set forth in this Agreement, Sellers shall indemnify, defend and hold harmless Purchaser and its Subsidiaries from, against and in respect of any and all Losses incurred by Purchaser and its Subsidiaries, or any of them, as a result of the breach of this Agreement by any Seller Service Provider in connection with the performance of the Seller Transition Services. Subject to **Article 6** and the other limitations set forth in this Agreement, Purchaser shall indemnify, defend and hold harmless Sellers and their Subsidiaries from, against and in respect of any and all Losses incurred by Sellers and their Subsidiaries, or any of them, as a result of the breach of this Agreement by any Purchaser Service Provider in connection with the performance of the Purchaser Transition Services.

   *Section 5.3 Exclusivity of Remedy.* Notwithstanding anything to the contrary herein, the right to performance or re-performance set forth in **Section 5.1** and/or indemnification set forth in **Section 5.2** shall be the sole and exclusive remedies of the Receiving Parties with respect to any breach of this Agreement or any Losses otherwise arising out of or relating to the Transition Services. In no event shall such remedies be deemed to have failed of their essential purpose.

11

## ARTICLE 6
## LIMITATION OF LIABILITY; EXCLUSION OF CONSEQUENTIAL DAMAGES

Section 6.1    Limitation of Liability.

(a)    *PURCHASER LIABILITY.*  IN NO EVENT SHALL THE AGGREGATE LIABILITY OF PURCHASER UNDER ANY LEGAL THEORY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT EXCEED $15,000,000; PROVIDED, HOWEVER, THAT THERE SHALL BE NO LIMITATION ON LIABILITIES RESULTING FROM A WILLFUL BREACH BY THE PURCHASER SERVICE PROVIDERS.

(b)    *SELLERS LIABILITY.*  IN NO EVENT SHALL THE AGGREGATE LIABILITY OF SELLERS UNDER ANY LEGAL THEORY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT EXCEED $15,000,000; PROVIDED, HOWEVER, THAT THERE SHALL BE NO LIMITATION ON LIABILITIES RESULTING FROM A WILLFUL BREACH BY THE SELLER SERVICE PROVIDERS.

Section 6.2    *EXCLUSION OF CONSEQUENTIAL DAMAGES.*  IN NO EVENT SHALL SELLERS OR PURCHASER BE LIABLE FOR ANY INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF LEGAL THEORY, INCLUDING ANY SUCH DAMAGES OR LOSSES RESULTING FROM BUSINESS INTERRUPTION OR LOST PROFITS.

## ARTICLE 7
## MISCELLANEOUS

Section 7.1    Notices.  Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the delivery date after having been sent by a nationally or internationally recognized overnight courier service (charges prepaid); (c) at the time received when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the time when confirmation of successful transmission is received (or the first Business Day following such receipt if the date of such receipt is not a Business Day) if sent by facsimile, in each case, to the recipient at the address or facsimile number, as applicable, indicated below:

1755824

| | |
|---|---|
| If to any Seller: | General Motors Corporation<br>300 Renaissance Center<br>Tower 300, 25th Floor, Room D55<br>M/C 482-C25-D81<br>Detroit, Michigan 48265-3000<br>Attn: General Counsel<br>Tel.: (313) 667-3450<br>Facsimile: (248) 267-4584 |
| With copies to: | Jenner & Block LLP<br>330 North Wabash Avenue<br>Chicago, Illinois 60611-7603<br>Attn: Joseph P. Gromacki<br>    Michael T. Wolf<br>Tel.: 312-222-9350<br>Facsimile: 312-527-0484<br><br>and<br><br>Weil Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn: Harvey R. Miller<br>    Stephen Karotkin<br>    Raymond Gietz<br>Tel.: 212-310-8000<br>Facsimile: 212-310-8007 |
| If to Purchaser: | NGMCO, Inc.<br>c/o The United States Department of the Treasury<br>1500 Pennsylvania Avenue, NW<br>Washington D.C. 20220<br>Attn: Chief Counsel Office of Financial Stability<br>Facsimile: 202-927-9225 |
| With a copy to: | Cadwalader, Wickersham & Taft LLP<br>One World Financial Center<br>New York, New York 10281<br>Attn: John J. Rapisardi<br>    R. Ronald Hopkinson<br>Tel.: 212-504-6000<br>Facsimile: 212-504-6666 |

provided, however, if any Party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 7.1**, then to the last addressee as so designated.

13

1755824

*Section 7.2    No Right of Setoff.* Except as otherwise provided under **Section 2.9** in this Agreement, no Party nor any of its Affiliates shall have any right of holdback or setoff or assert any Claim or defense with respect to any amounts that may be owed by such Party or its Affiliates to any other Party (or Parties) hereto or its or their Affiliates as a result of and with respect to any amount that may be owing to such Party or its Affiliates under this Agreement or any other commercial arrangement entered into, between or among such Parties and/or their respective Affiliates.

*Section 7.3    Taxes.* The Receiving Party shall pay any and all sales, use, goods and services or value-added taxes due for the respective Transition Services.

*Section 7.4    Assignment.* Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned or delegated by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any such assignment or delegation without such prior written consent shall be null and void; provided, however, that, without the consent of the other Parties, (i) any Party may assign its obligations hereunder to one or more Affiliates of such Party and (ii) Sellers may assign their rights, interests and obligations hereunder to any successor in interest, including, but not limited to, a liquidating trust established under a chapter 11 plan; provided, further, that no such assignment or delegation shall relieve the assigning Party of any of its obligations under this Agreement and the assigning Party shall be liable for any failure on the part of any assignee to perform its obligations hereunder. Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

*Section 7.5    Amendment.* This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the Parties.

*Section 7.6    Waiver.* At any time prior to the Termination Date, the Parties may (a) extend the time for the performance of any of the obligations or other acts of the other Parties or (b) waive compliance with any of the agreements or conditions contained herein (to the extent permitted by Law). Any such waiver or extension by a Party (i) shall be valid only if, and to the extent, set forth in a written instrument signed by a duly authorized representative or officer of the Party to be bound and (ii) shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement. The failure in any one or more instances of a Party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said Party of any breach of any of the terms, covenants or conditions of this Agreement shall not be construed as a subsequent waiver of, or estoppel with respect to, any other terms, covenants, conditions, rights or privileges, but the same will continue and remain in full force and effect as if no such forbearance or waiver had occurred.

*Section 7.7    Severability.* Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law. If any term or provision of this Agreement, or the application thereof to any Person or any

14

1755824