circumstance, is held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefore in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

Section 7.8    Counterparts.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement. All signatures of the Parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a PDF signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

Section 7.9    Headings.    The descriptive headings of the Articles, Sections and paragraphs of, and Schedules to, this Agreement are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof

Section 7.10    Third Parties.    Except for the Subsidiaries of Sellers and Purchaser pursuant to **Article 5**, this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns, and nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than the Receiving Parties, the Parties, their Affiliates and their respective permitted successors or assigns, any legal or equitable Claims, benefits, rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 7.11    Governing Law.    The construction, interpretation and other matters arising out of or in connection with this Agreement (whether arising in contract, tort, equity or otherwise) shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, and (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws.

Section 7.12    Venue and Retention of Jurisdiction.    Except as provided in **Section 2.9**, each Party irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or in connection with this Agreement and the Transition Services (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein); provided, however, that this **Section 7.12** shall not be applicable in the event the Bankruptcy Cases have closed, in which case the Parties irrevocably and unconditionally submit to the exclusive jurisdiction of the federal courts in the Southern District of New York and state courts of the State of New York located in the Borough of Manhattan in the City of New York for any litigation arising out of or in connection with this Agreement and the Transition Services (and agree not to commence any

15

litigation relating thereto except in the federal courts in the Southern District of New York and state courts of the State of New York located in the Borough of Manhattan in the City of New York, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein).

Section 7.13   *Waiver of Jury Trial.* EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

Section 7.14   *Entire Agreement.* This Agreement (together with the Purchase Agreement, the Ancillary Agreements and the Schedules) contains the final, exclusive and entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the Parties with respect to the subject matter hereof and thereof. Neither this Agreement nor any other agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 7.15   *Disclaimer.* EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF SELLERS, PURCHASER, THE OTHER SERVICE PROVIDERS OR THEIR RESPECTIVE AFFILIATES OR ANY PERSON ACTING ON BEHALF OF ANY SUCH PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AT   LAW OR IN EQUITY WITH RESPECT TO THE TRANSITION SERVICES OR THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT, OR THE ACCURACY, AVAILABILITY, TIMELINESS OR COMPLETENESS OF, OR THE RESULTS TO BE OBTAINED FROM, SUCH TRANSITION SERVICES, AND SELLERS, PURCHASER, THE OTHER SERVICE PROVIDERS AND THEIR RESPECTIVE AFFILIATES HEREBY DISCLAIM THE SAME.

Section 7.16   *Allocation of Obligations of Sellers.* Sellers shall cooperate to appropriately allocate among themselves the obligations and rights of Sellers under this Agreement, including any obligation to make or right to receive payments.

Section 7.17   *Interpretation of Schedules.* Within the Schedules, references to Purchaser or Sellers shall be deemed to include the Subsidiaries of such Party or Parties, as appropriate.

*[SIGNATURE PAGE FOLLOWS]*

16

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____

        Name: [_____]

        Title: [_____]

SATURN LLC

By: _____

        Name: [_____]

        Title: [_____]

SATURN DISTRIBUTION CORPORATION

By: _____

        Name: [_____]

        Title: [_____]

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

        Name: _____]

        Title: [_____]

*[NGMCO, INC.]*

By: _____

        Name: [_____]

        Title: [_____]

## SCHEDULE A

### TRANSITION SERVICES PROVIDED BY OR ON BEHALF OF PURCHASER

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| ***PROPERTY MANAGEMENT*** | | | |
| **Asset Management Oversight for Idle Manufacturing Facilities**<br>• Administer contracts and manage day-to-day operations of ongoing concerns | • Includes facilities idle at Closing, facilities in the process of being idled at Closing and facilities leased to Purchaser that become idle after Closing<br>• Includes real estate, facility, *etc.* | September 1, 2011 | $8, 250 / month |
| **Asset Management Oversight for Non-Manufacturing Facilities**<br>• Administer leases (including negotiation of amendments to Limited Facility Leases, as necessary) and contracts and manage day-to-day operations of ongoing concerns | | March 1, 2010 | $8, 250 / month |
| **Coordination of Rejected Real Estate Leases**<br>• Perform consulting services related to rejection of leases and landlord liaison and document management<br>• Administer leases and coordinate notices to landlord | • Both immediate and delayed rejections | March 1, 2010 | No cost |
| **Coordination of Rejected Personal Property Leases and Contracts**<br>• Perform consulting services related to rejection of personal property leases and contracts.<br>• Coordinate personal property lease rejection timing, notices to lessors and return of personal property | • Both immediate and delayed rejections<br>• Equipment may be located in facilities owned by Sellers or owned by Purchaser | March 1, 2010 | No cost |
| **Asset Management Oversight for RHI** | | December 31, 2010 | No cost |

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| **Controlled Properties**<br>• Administer contracts and manage day-to-day operations of all properties owned, leased or controlled by Riverfront Holdings, Inc., except for the premises leased pursuant to the Ren Cen Lease. | | | |
| ***FACILITY IDLING PROCESS*** | | | |
| **Facility Idling**<br>• Provide the idling services set forth on Schedule A-2 with respect to the facilities of the Sellers and their Subsidiaries set forth on Schedule A-3 | | December 31, 2013 | No cost |
| ***ACCESS RIGHTS AND STORAGE SERVICES*** | | | |
| **Access Right to Personal Property Owned by or Leased to Sellers and Located in Facilities Owned by or Leased to Purchaser**<br>• Provide Sellers the right to enter Purchaser facilities for purposes of preparing for removal and removing any fixtures, machinery, equipment and personal property that is owned by or leased to Sellers and located at such facility | • Sellers acknowledge that Purchaser may require certain personal property to be removed during plant shut down periods<br>• Sellers shall (i) notify Purchaser not less than three (3) business days prior to entry for removal, (ii) not unreasonably interfere with Purchaser's operations, (iii) be accompanied by a representative of Purchaser and (iv) provide Purchaser a list of items (or categories of items) Sellers intend to remove from the facility | December 31, 2013 | No cost |
| **Storage of Personal Property of Sellers**<br>• Store personal property owned by Sellers (or leased to Sellers) that, as of the Closing, is located in facilities owned by or leased to Purchaser, in order to allow Sellers to prepare for removal and remove the personal property | • Purchaser has the right to remove and store such personal property at alternate locations<br>• Sellers shall not unreasonably interfere with or cause a material | December 31, 2013 | No cost |

Schedule A
2

1761813

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| as contemplated by this Agreement | disruption of Purchaser's business or operations in connection with any storage services provided pursuant to this Agreement<br><br>• Any personal property owned by Sellers not removed from a facility on or before the Service Termination Date shall thereafter be deemed to be abandoned, and Purchaser may, at its election, (i) accept the same or (ii) remove and dispose of the same at Sellers' cost; provided that Sellers shall receive a credit against such costs for any amount Purchaser receives in connection with the sale or other disposition of such personal property<br><br>• Sellers agree to execute a bill of sale with respect to each such Seller owned item of personal property that is not removed from any facility, upon request of Purchaser | | |
| **SECURITY** | | | |
| **Manage and Provide Security**<br>• Manage and provide security and fire monitoring related to active and idled facilities<br>• Consultation regarding ongoing security requirements for Seller | • Use of third party contractors for on-site security to be paid directly by Sellers | December 31, 2013 | $16,500 / month |
| **ACCOUNTING** | | | |
| **Accounts Payable Processing and Paying Agent Services**<br>• Set up, vouch, approve and reconcile payments | • Use of third party services | January 1, 2013 | $66,000 / month (for Purchaser employees) and $20,000 / month |

Schedule A

3

176183

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| • Pay invoices on behalf of Sellers; if unable to pay out of Seller accounts, reimbursement will be settled at month end | | | (for third parties) |
| **Accounts Receivable Processing**<br>• Accrue for rental income and other miscellaneous income | | January 1, 2013 | $16,500 / month |
| **General Ledger**<br>• Book entries and perform account reconciliations<br>• Book closing entries<br>• Perform purchase accounting / consideration accounting | | January 1, 2013 | $33,000 / month |
| **Fixed Asset Accounting**<br>• Maintain fixed asset records to reflect asset dispositions and perform related accounting activities | | January 1, 2013 | $49,500 / month |
| **Lease Accounting**<br>• Maintain record entries for lease transaction (e.g. rejection activity)<br>• Perform accounting activities for property and real estate leases | | January 1, 2013 | $16,500 / month |
| **Motors Holding Accounting**<br>• Perform and manage accounting for Motors Holding related transactions | | January 1, 2013 | $16,500 / month |
| **Budget and Forecast**<br>• Provide inputs as necessary to develop budgets and forecasts | | January 1, 2013 | No cost |
| **Court Required Financial Reporting**<br>• Perform all associated activities related to filings as required by the bankruptcy court | | January 1, 2011 | $5,500 / month |
| ***TREASURY*** | | | |
| **Wind-down of MEI and Elmo II & III** | | October 1, 2009 | $4,125 / month |

Schedule A

4

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| • Provide general support based on knowledge of previous transactions | | | |
| **Cash Management & Operations**<br>• Manage bank account funding<br>• Perform administration and banking services<br>• Facilitate automated accounting of cash flows<br>• Set up and manage new bank accounts | | August 1, 2010 | $16,500 / month |
| **TAX** | | | |
| **Tax Compliance**<br>• Prepare and file federal, state, local and foreign income and other taxes | | January 1, 2013 | $49,500 / month plus $2,000 / month for third party services |
| **Tax Accounting**<br>• Perform accounting services associated with tax obligations stemming from operations of or the winding down and liquidation of Sellers | | January 1, 2013 | $16,500 / month |
| **Customs**<br>• Provide support for filing of customs duties and reconciliation process as well as post entry compliance<br>• Assist with value reconciliation compliance<br>• Assist with NAFTA reconciliation compliance<br>• Assist with trade program review opportunity and follow up | • Requires additional support from third party administrator engaged by Sellers to reconcile customs duties | June 1, 2011 | $33,000 / month |
| **Property Tax**<br>• Prepare and file real and personal property taxes | | January 1, 2013 | $16,500 / month |
| ***PURCHASING*** | | | |
| **Negotiate, Source, and Contract Indirect Goods and Services on Behalf of Sellers as Required (Purchasing Services)**<br>• Manage facilities, security, equipment rentals, MRO supplies, and other similar activities | | January 1, 2013 | $16,500 / month |
| ***IS&S*** | | | |

Schedule A
5

1761813

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| **Manage Assets** <br> • Allow use of eFast system for asset tracking and depreciation | | January 1, 2013 | See Summarized Application Use below |
| **Finance and Accounting** <br> • Allow use of core accounting systems for general ledger activities and associated transaction processing (e.g., eLedger, eTBR) <br> • Allow use of consolidation and reporting tools (e.g., Hyperion) <br> • Allow use of treasury systems for cash management and cash transactions (e.g., Quantum) <br> • Extract capability to extract financial data required for reporting purposes | | January 1, 2013 | See Summarized Application Use below |
| **Operations** <br> • Allow use of DACOR and eDACOR for creation of POs, payables and cash disbursements | | January 1, 2013 | See Summarized Application Use below |
| **IT Infrastructure Support** <br> • Allow and support network connection for up to 100 non-Purchaser badged personnel <br> • Provide up to 100 laptops and/or desktops computers configured to the GMOL image <br> • Maintain contractor IDs for up to 100 resources <br> • Allow access to printers | • Est. potentially up to 100 contractors | January 1, 2013 | $170 / month / GMOL configured PC |
| **Summarized Application Use** | See descriptions IS&S sections above | January 1, 2013 | $16,500 / month |
| ***COMMUNICATIONS*** <br> **Coordination of Outside / Stakeholder Messages Assistance** <br> • Reasonably cooperate with Sellers to coordinate press releases and other public statements | | January 1, 2013 | No cost |
| ***RETAINED SPLINTER UNION SERVICES*** | | | |
| **Payroll Processing** | | | |

Schedule A

6

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| • Upon request from Sellers before or at Closing and subject to agreement on scope, price and terms for providing such services, the Purchaser shall process Sellers' payroll for IUE-represented Moraine Assembly Plant employees. If such service is requested, the Parties shall expeditiously negotiate in good faith to reach agreement on the scope, price, and terms for providing such service. | • Sellers have been advised of and are aware of Purchaser's payroll processes and systems and acknowledges that there is very limited flexibility to deviate in any way from the Purchaser's payroll process.<br>• Both Parties acknowledge that the provision of payroll services does not include the financial obligation or responsibility for actual wages or benefits | | |
| **Benefits Administration**<br>• Upon request from the Sellers before or at Closing and subject to agreement on scope, price and terms for providing such services, the Purchaser shall administer the benefit plans set forth on Schedule A-4 for current and former employees whose participation in the scheduled plans is deemed required by Sellers under the plans or the collective bargaining agreements set forth on Schedule A-4. If such service is requested, the Parties shall expeditiously negotiate in good faith to reach agreement on the scope, price, and terms for providing services | • Sellers have been advised and are aware that Purchaser's arrangements with vendors and limited resources, processes and systems provide very limited flexibility to provide benefit administration services that deviate in any way from Purchaser's<br>• Both Parties acknowledge that the provision of benefit administration services does not include the financial obligation or responsibility for actual wages or benefits | | |
| ***OTHER*** | | | |
| **Insurance Management**<br>• Provide information about insurance in existence immediately prior to Closing | | January 1, 2013 | No cost |

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| **Background Information on Legal Matters** <br> • Assist Sellers by providing background/factual information regarding legal matters, as reasonably requested by Sellers, subject to Schedule B | | January 1, 2013 | No cost |
| **Books and Records** <br> • Afford Sellers and their authorized representatives reasonable access to and allow them to obtain copies of books and records of Purchaser to confirm Transition Services have been provided as contemplated by this Agreement <br> • Afford Sellers and their authorized representatives reasonable access to and allow them to obtain copies of books and records of Purchaser if and to the extent related to the real property owned by Sellers | • Subject to the provisions of **Article 3**; provided that such access shall also be subject to such additional confidentiality provisions as Purchaser may reasonably deem necessary <br> • Any such access to information shall be conducted during normal business hours and in such a manner as not to materially interfere with the normal operations of the business of a Purchaser | January 1, 2013 | No cost |

Schedule A

8

1761813

## SCHEDULE A-2

## FACILITY IDLING PROCESS

The Purchaser Service Providers shall provide to the Receiving Parties at each facility listed on Schedule A-3 only the following Transition Services for which the Purchaser Service Providers are identified below as the Responsible Party. With respect to facilities leased to Purchaser pursuant to the Master Lease Agreement, Purchaser shall begin to perform such Transition Services at such time as provided in the Master Lease Agreement or otherwise as mutually agreeable. Each type of Transition Service listed below shall be understood by reference to and performed in accordance with the applicable portions of the "Facilities Idling Playbook" developed by Sellers prior to the date of the Purchase Agreement, as such document has been interpreted in the historical practice of Sellers. Each Party acknowledges that it has received copy of the "Facilities Idling Playbook."

| Description of Service | Responsible Party |
|---|---|
| **Conveyor Systems** | |
| Review Support/Service Contracts | Purchaser Service Providers |
| Retain Documentation | Purchaser Service Providers |
| Review OEM Service Manuals | Purchaser Service Providers |
| Lubrication | Purchaser Service Providers |
| Backup Programmable Devices | Purchaser Service Providers |
| Shutdown Control Panels | Purchaser Service Providers |
| Electricity | Purchaser Service Providers |
| Temperature | Purchaser Service Providers |
| Hydraulics | Purchaser Service Providers |
| Compressed Air | Purchaser Service Providers |
| Cleaning | Purchaser Service Providers |
| Perform Preservation of Equipment Tasks for Idled Equipment | Sellers |
| Perform Periodic Maintenance Tasks for Idled Equipment | Sellers |
| Shutdown Conveyor Equipment | Purchaser Service Providers |
| Spare Parts | Purchaser Service Providers |
| **Body** | |
| Support Contracts | Purchaser Service Providers |
| Consumables | Purchaser Service Providers |
| SPO | Purchaser Service Providers |
| Weld Water | Purchaser Service Providers |
| Backup Programmable Devices | Purchaser Service Providers |
| Shutdown Control Panels | Purchaser Service Providers |
| Weld Equipment | Purchaser Service Providers |
| Tooling | Purchaser Service Providers |

| Description of Service | Responsible Party |
|---|---|
| Robots | Purchaser Service Providers |
| Hemmers | Purchaser Service Providers |
| Shutdown Dispense Equipment | Purchaser Service Providers |
| Hydraulics | Purchaser Service Providers |
| Compressed Air | Purchaser Service Providers |
| Power Tools | Purchaser Service Providers |
| Electricity | Purchaser Service Providers |
| Temperature | Purchaser Service Providers |
| Lubrication | Purchaser Service Providers |
| Retain Documentation | Purchaser Service Providers |
| Cleaning | Purchaser Service Providers |
| Perform Preservation of Equipment Tasks for Idled Equipment | Sellers |
| Perform Periodic Maintenance Tasks for Idled Equipment | Sellers |
| Communication Equipment | Purchaser Service Providers |
| Boundary Samples | Purchaser Service Providers |
| Parts | Purchaser Service Providers |
| Perceptron | Purchaser Service Providers |
| CMM | Purchaser Service Providers |
| **GA** | |
| GA Technical Support contracts | Purchaser Service Providers |
| Consumables | Purchaser Service Providers |
| Backup Programmable Devices & Processors | Purchaser Service Providers |
| Shutdown Control Panels | Purchaser Service Providers |
| Shutdown M & E Equipment | Purchaser Service Providers |
| Fixtured Tooling | Purchaser Service Providers |
| Shutdown Robots | Purchaser Service Providers |
| Shutdown Dispense Equipment | Purchaser Service Providers |
| Hydraulics | Purchaser Service Providers |
| Compressed Air | Purchaser Service Providers |
| All Power Tools | Purchaser Service Providers |
| Electricity | Purchaser Service Providers |
| Temperature | Purchaser Service Providers |
| Lubrication - shut off all automatic lubrication equipment as appropriate | Purchaser Service Providers |
| Documentation -all documentation should be accounted for in single depository within the General Assembly Area | Purchaser Service Providers |
| Cleaning | Purchaser Service Providers |
| Perform Preservation of Equipment Tasks for Idled | Sellers |

Schedule A-2

2

| Description of Service | Responsible Party |
|---|---|
| Equipment | |
| Perform Periodic Maintenance Tasks for Idled Equipment | Sellers |
| Communication equipment | Purchaser Service Providers |
| Boundary samples | Purchaser Service Providers |
| Parts | Purchaser Service Providers |
| Reclaim any GM property out of plant (loan, repair, *etc.*) | Purchaser Service Providers |
| Drain fluids from all point of use cribs as appropriate | Purchaser Service Providers |
| Drain Processing FF systems below the main headers. If idling is longer than 180 days, anti-rust flush should be loaded into systems below header | Purchaser Service Providers |
| If length of idling is 180 days or longer, drain systems below the main headers and fill with anti-rust flush | Purchaser Service Providers |
| Purge all systems. Cap and/or grease exposed termination points. Remove and dispose of all bulk containers, barrels, and pails | Purchaser Service Providers |
| Water Test Booth - drain water from system | Purchaser Service Providers |
| V.I.N. Room - Tag ID Inventory and Move to Secure Location | Purchaser Service Providers |
| **Paint** | |
| Pre-Shutdown | Purchaser Service Providers |
| Support Contracts | Purchaser Service Providers |
| General Paint Shop and Conveyors | Purchaser Service Providers |
| Phosphate Shutdown | Purchaser Service Providers |
| ELPO Shutdown | Purchaser Service Providers |
| Sealer, Antichip and Underbody PVC Shutdown | Purchaser Service Providers |
| Deadner and LASD Shutdown | Purchaser Service Providers |
| Prime and Topcoat Spray Equipment Shutdown | Purchaser Service Providers |
| Powder Prime Spray Equipment Shutdown | Purchaser Service Providers |
| Powder Distribution Systems Shutdown | Purchaser Service Providers |
| Powder Spray Booths and ASH Shutdown | Purchaser Service Providers |
| Wet Spray Booths and ASH Shutdown | Purchaser Service Providers |
| Ovens Shutdown | Purchaser Service Providers |
| Final Repair Shutdown | Purchaser Service Providers |
| Paint Circulation Systems Shutdown | Purchaser Service Providers |
| Misc Enclosure & Decks | Purchaser Service Providers |
| Cavity Wax | Purchaser Service Providers |
| Lighting Shutdown | Purchaser Service Providers |
| Building Air supply Shutdown | Purchaser Service Providers |
| Abatement Shutdown | Purchaser Service Providers |

Schedule A-2

3

| Description of Service | Responsible Party |
|---|---|
| Compressed Air | Purchaser Service Providers |
| Programs | Purchaser Service Providers |
| Power Tools | Purchaser Service Providers |
| Electricity | Purchaser Service Providers |
| Temperature | Purchaser Service Providers |
| Lubrication | Purchaser Service Providers |
| Documentation | Purchaser Service Providers |
| Cleaning | Purchaser Service Providers |
| Perform Preservation of Equipment Tasks for Idled Equipment | Sellers |
| Perform Periodic Maintenance Tasks for Idled Equipment | Sellers |
| Communication Equipment | Purchaser Service Providers |
| Boundary Samples | Purchaser Service Providers |
| Miscellaneous | Purchaser Service Providers |
| Housekeeping | Purchaser Service Providers |
| **Powertrain Manufacturing Engineering** | |
| Perform Equipment Idling Prework Tasks | Purchaser Service Providers |
| Perform Equipment Idling Tasks | Purchaser Service Providers |
| Perform Process System Idling Tasks | Purchaser Service Providers |
| Perform Equipment Cleaning Tasks of idled equipment | Sellers |
| Perform Preservation of Equipment Tasks for Idled Equipment | Sellers |
| Perform Periodic Maintenance Tasks for Idled Equipment | Sellers |
| **Stamping** | |
| Support contracts | Purchaser Service Providers |
| Consumables | Purchaser Service Providers |
| SPO | Purchaser Service Providers |
| Reallocate parts as necessary | Purchaser Service Providers |
| Review Utility Plan | Purchaser Service Providers |
| Cooling System (H2O) | Purchaser Service Providers |
| Compressed Air | Purchaser Service Providers |
| Electricity | Purchaser Service Providers |
| Temperature | Purchaser Service Providers |
| Backup Programmable Devices | Purchaser Service Providers |
| Shutdown Control Panels | Purchaser Service Providers |
| Shutdown Processors | Purchaser Service Providers |
| Shutdown Press Equipment (mechanical) | Purchaser Service Providers |
| TDO Machine Tools | Purchaser Service Providers |

Schedule A-2

4

| Description of Service | Responsible Party |
|---|---|
| Shutdown Robots | Purchaser Service Providers |
| Shutdown blank lube / wash systems | Purchaser Service Providers |
| Hydraulics | Purchaser Service Providers |
| Lubrication | Purchaser Service Providers |
| Documentation | Purchaser Service Providers |
| Cleaning | Purchaser Service Providers |
| Perform Preservation of Equipment Tasks for Idled Equipment | Sellers |
| Perform Periodic Maintenance Tasks for Idled Equipment | Sellers |
| **WFG Energy and Utilities** | |
| Develop and Implement Utilities Management Plan | Purchaser Service Providers |
| Review Existing Operating and Utilities Contracts | Purchaser Service Providers |
| Identify and Implement Equipment Management Needs | Purchaser Service Providers |
| Develop Staffing Plan | Purchaser Service Providers |
| Management Tasks in EUSG Areas During Plant Idle | Purchaser Service Providers |
| Identify and Implement Start-up Procedure | Purchaser Service Providers |
| Provide knowledge support/consultation on continuation / transfer of utility services | Purchaser Service Providers |
| Interface with Plant Closing/Idling team | Purchaser Service Providers |
| **Environmental Services** | |
| Review/Update Site Environmental Calendar Activities | Sellers |
| Manage Waste Issues | Sellers |
| Manage Chemical Issues | Sellers |
| Manage RM contract Ramp-down | Sellers |
| Manage CM contract Ramp-down | Sellers |
| Response Plan Updates | Sellers |
| Ancillary Activities/Facilities (preventive measures) | Sellers |
| Maintain All Required Permitted Monitoring Recordkeeping and Reporting (MRRP) | Sellers |
| Determine Need to operate & maintain Refrigeration Equipment | Sellers |
| Determine if Air Permits should be maintained or terminated | Sellers |
| Determine Abatement Equipment preservation requirements | Sellers |
| Evaluate Water and Waste Permit Changes | Sellers |
| Water Sampling Requirements | Sellers |
| Waste and Water Reports | Sellers |
| UST/AST Issues | Sellers |
| PCB Related Concerns (Understanding Liability, Current/Future, Reporting Activity) | Sellers |

Schedule A-2

1761813

| Description of Service | Responsible Party |
|---|---|
| Determine Emission Reduction Credits (ERCs) | Sellers |
| Manage Industrial Hygiene Issues | Sellers |

1761813

## SCHEDULE A-3

### SELLER MANUFACTURING FACILITIES TO BE IDLED[1]

**Facilities Owned by Sellers and Leased to Purchaser:**

| | Site Name | Property Address | City | State | Zip |
|---|---|---|---|---|---|
| 1. | Stamping - Indianapolis | 340 White River Parkway West Drive South 50 | Indianapolis | IN | 46206 |
| 2. | GMPT - Flint North #5/#10/#81 | 902 E Hamilton Avenue | Flint | MI | 48550 |
| 3. | GMPT - Livonia | 12200 Middlebelt | Livonia | MI | 48150 |
| 4. | GMVM - Pontiac Assembly | 2100 S Opdyke Road | Pontiac | MI | 48341 |
| 5. | Stamping - Pontiac North Campus[2] | 220 East Columbia | Pontiac | MI | 48340 |
| 6. | Stamping - Mansfield | 2525 West Fourth Street PO Box 2567 - 44906 | Mansfield | OH | 44906-1269 |
| 7. | GMPT - Parma Complex[3] | 5400 Chevrolet Boulevard PO Box 30098 | Parma | OH | 44130 |
| 8. | GMPT - Fredericksburg | 11032 Tidewater Trail | Fredericksburg | VA | 22408 |
| 9. | GMPT - Willow Run | 2930 Ecorse Road | Ypsilanti | MI | 48197-0935 |
| 10. | Stamping - Grand Rapids | 300 36th Street SW | Wyoming | MI | 49548-2107 |
| 11. | GMVM - Shreveport Assembly and Stamping Shreveport | 7600 General Motors Boulevard | Shreveport | LA | 71129 |
| 12. | GMVM -Wilmington Assembly | 801 Boxwood Road PO Box 1512 – 19899 | Wilmington | DE | 19804-2041 |

**Facilities Owned by Sellers and not Leased to Purchaser:**

| | Site Name | Property Address | City | State | Zip |
|---|---|---|---|---|---|
| 13. | GMPT - Massena | Route 37 East | Massena | NY | 13662-0460 |
| 14. | GMVM - Moraine Assembly[4] | 2601 West Stroop Road | Moraine | OH | 45439 |
| 15. | Stamping - Pittsburgh | 1451 Lebanon School Road | West Mifflin | PA | 15122 |

---

[1] To the extent that the idling process is complete at any of these facilities prior to Closing, the facility should be removed from the chart.
[2] Does not include Plant #14 and the real property underlying Plant #14 or the associated utilities for stamping and PT facilities.
[3] Does not include the GMPT - Parma Stamping improvements and associated real property.
[4] Does not include the GMPT - Moraine (DMAX) improvements and associated real property.

## SCHEDULE A-4

### SELLER PLANS AND COLLECTIVE BARGAINING AGREEMENTS

1. Agreement Regarding Closure of the General Motors Moraine Assembly Plant between General Motors and the IUE-CWA, the Industrial Division of the Communications Workers of America, AFL-CIO, CLC and its Local Union 798

2. Supplemental Agreements Between IUE and GM:

   a. General Motors Life and Disability Benefits Program for Hourly Employees
   b. General Motors Health Care Program for Hourly Employees
   c. General Motors Supplemental Unemployment Benefit Plan
   d. General Motors Profit Sharing Plan for Hourly-Rate Employees in the United States
   e. General Motors Dependent Care Reimbursement Plan Hourly-Rate Employees in the United States
   f. Guaranteed Income Stream Benefit Program (IUE)
   g. Dependent Scholarship Program for Hourly Employees in the United States
   h. Tuition Assistance Program for Hourly Employees in the United States

3. Supplemental Agreements Between GM and Various Splinter Unions (Teamsters, United Steel Workers, International Union Operating Engineers (IUOE), Caterers- United Catering, Restaurant, Bar and Hotel Workers (now United Commercial Food Workers), and International Brotherhood of Boilermakers—formerly Metal Polishers, Buffers, Platers Unions):

   a. General Motors Life and Disability Benefits Program for Hourly Employees
   b. General Motors Health Care Program for Hourly Employees
   c. General Motors Profit Sharing Plan for Hourly-Rate Employees in the United States
   d. General Motors Income Security Plan for Hourly-Rate Employees
   e. Dependent Scholarship Program for Hourly Employees in the United States
   f. Tuition Assistance Program for Hourly Employees in the United States

## SCHEDULE B

### PURCHASER EXCLUDED SERVICES

1. Notwithstanding anything set forth in this Agreement, neither Purchaser nor any of its Affiliates shall provide any services relating to:

   - automotive or product engineering;

   - automotive or product manufacturing;

   - automotive or product distribution;

   - legal advice and services (excluding assisting Sellers by providing background/factual information in response to Seller inquiries); and

   - services to be provided pursuant to the Master Lease Agreement or the SPO Lease.

2. Notwithstanding anything set forth in this Agreement, neither the Purchaser nor any of its Affiliates shall have any obligation to respond to or otherwise address any Hazardous Material Release in surface water, groundwater, ambient air, or surface or subsurface soil under, at, on, in or emanating from or onto any facility or real property owned, operated, leased, used or held for use by Sellers or any of their Affiliates.

3. Notwithstanding anything set forth in this Agreement, nothing in this Agreement shall be interpreted to create a fiduciary relationship between Sellers and any corporate risk management personnel employed by the Purchaser Service Providers. Further, no Purchaser Service Provider shall be obligated to provide any insurance advisory services (by personnel employed by the Purchaser Service Providers) that could reasonably be expected in the Purchaser Service Provider's professional judgment to expose any such personnel to any breach of fiduciary or other duty, or to any conflict of interest.

## SCHEDULE C

**TRANSITION SERVICES PROVIDED BY OR ON BEHALF OF SELLERS**

1. **Storage of and Access to Purchaser Personal Property.**

Description of Service:

- Store personal property of Purchaser that, as of the Closing, is located in a facility listed on Schedule C-2 (the "Seller Listed Facilities").
- Provide Purchaser the right to enter Seller Listed Facilities for purposes of maintaining, preparing for removal and removing any fixtures, machinery, equipment or other personal property that is owned by or leased to Purchaser and located at such facility.

Specifications and Limitations:

- Purchaser shall
  - notify Sellers not less than three (3) business days prior to entry for removal and
  - provide Sellers a list of items (or categories of items) Purchaser intends to remove from the facility.
- In the event of any disposition of a Seller Listed Facility prior to the removal of all Purchaser personal property (excluding any personal property to be abandoned by Purchaser) from such Seller Listed Facility (the date of the completion of such removal, the "Removal Date"), Sellers will include a provision in the written agreement relating to the disposition of such Seller Listed Facility that such transferee (and its successors) will grant to Purchaser the right to maintain, prepare for removal and remove the Purchaser personal property as contemplated by this Agreement.
- Purchaser shall make repairs necessitated by the removal of its personal property from a Seller Listed Facility to the extent such repairs would be required pursuant to the idling process set forth on Schedule A-2.
- Any personal property of the Purchaser not removed from a Seller Listed Facility on or before the Service Termination Date shall thereafter be deemed to be abandoned, and Sellers may, at their election, (i) accept the same or (ii) remove and dispose of the same at Purchaser's cost; provided that Purchaser shall receive a credit against such costs for any amount Sellers receive in connection with the sale or other disposition of such personal property.
- Upon request of Sellers, Purchaser shall execute a bill of sale with respect to each item of Purchaser owned personal property that is not removed from any Seller Listed Facility by the Termination Date.
- Sellers shall deliver copies of all tax bills (for the Seller Listed Facilities) they receive to Purchaser within ten (10) business days after receipt thereof. Purchaser shall deliver to Sellers duplicate receipts and cancelled checks or photocopies thereof showing the payments of all such taxes and assessments, within thirty (30) days after respective payments evidenced thereby, but in no event after any such payment is required to be made hereunder.
- Purchaser may contest any tax or assessment upon or against the Seller Listed Facility, or any part thereof, or the improvements at any time situated thereon, so long as the Purchaser shall, in good faith and with due diligence, contest the same or the validity thereof by appropriate

legal proceeding which shall have the effect of preventing the collection of the tax or assessment so contested, and provided that upon final adjudication of such proceeding Purchaser shall immediately pay any amounts due.

Service Termination Date:

- December 31, 2013.

Service Fee:

- With respect to the period from and after the Closing Date and until the earlier of (i) the one year anniversary of the Closing Date and (ii) the applicable Removal Date, Purchaser shall timely pay, with respect to each Seller Listed Facility, each of the following (the "Operating Expenses"):
    - all utilities and other services (including, but not limited to, site coordination, management and oversight, security, water, sewage service charges, garbage or trash removal, fuels, including natural gas, and electricity, including electricity for any heating, ventilating and air conditioning) furnished to and or used in or at the Seller Listed Facility for any purpose; and
    - all real property taxes or special improvement taxes payable against the Seller Listed Facility, all property taxes levied or assessed against the Purchaser's Personal Property located in the Seller Listed Facility (including all penalties and interest thereon), which may be assessed, levied, imposed upon the same, or any use or occupancy of the Seller Listed Facility.
- If the Sellers use a Seller Listed Facility other than for (i) the storage and removal of Seller and Purchaser personal property located in such Seller Listed Facility as of the Closing Date or (ii) activities related to the marketing and sale of such Seller Listed Facility, the Parties will in good faith negotiate a fair allocation of the Operating Expenses between the Parties such that Sellers pay a portion of the Operating Expenses proportionate to their use of the Seller Listed Facility.
- If the Removal Date for any Seller Listed Facility has not occurred by the one year anniversary of the Closing Date, then with respect to the period following the one year anniversary of the Closing Date and until the earlier of (i) the Service Termination Date and (ii) the Removal Date with respect to such Seller Listed Facility, the Purchaser shall pay the Sellers the Operating Expenses plus $0.50 per usable square foot (as set forth with respect to each Seller Listed Facility on Schedule C-2), per annum, payable in equal monthly instalments.

## 2. **Limited Use of Facilities Leased to Sellers.**

Description of Service

- Provide Purchaser with a right to use and occupy the facilities listed on Schedule C-3 (the "Limited Use Facilities").

1761813

- Maintain all insurance required under each lease to which a Seller is a party with respect to a Limited Use Facility (each, a "Limited Facility Lease").

Specifications and Limitations

- Purchaser shall have the right to use the Limited Use Facilities only for (i) the purposes for which the Limited Use Facilities are being used on the Closing Date and (ii) subject to the terms and conditions of the applicable Limited Facility Lease, maintaining, preparing for removal and removing any fixtures, machinery, equipment or other personal property that is owned by or leased to Purchaser and located at the Limited Use Facility subject to such Limited Facility Lease.
- Purchaser's license to use and occupy each Limited Use Facility shall be subject in all respects to the terms and conditions of the applicable Limited Facility Lease.
- During the period Purchaser occupies any portion of a Limited Use Facility, Purchaser shall perform any and all obligations of Sellers under the terms and conditions of the applicable Limited Facility Lease.
- Notwithstanding anything herein to the contrary, Purchaser shall accept this right to use the Seller Listed Facilities in their "as is" condition on the Closing Date.
- Purchaser shall, if practicable, provide Sellers with written notice of its intent to vacate a Limited Use Facility five days before the date upon which Purchaser ceases to occupy a Limited Use Facility; provided that failure to provide such a notice shall not be a breach of this Agreement.
- The rights granted to Purchaser with respect to the Limited Use Facilities shall not constitute an interest in real property.
- Purchaser shall promptly notify Sellers in writing when Purchaser no longer occupies a Limited Use Facility and Sellers shall not reject any Limited Facility Lease until it receives such notice with respect to the applicable Limited Use Facility.
- Sellers shall have the right to bring an action to retake possession of a Limited Use Facility if (i) a Seller has been evicted or eviction proceedings have been commenced against a Seller with respect to such Limited Use Facility or (ii) Purchaser continues to occupy such Limited Use Facility after the Service Termination Date. The foregoing rights shall be in addition to, and not in limitation of, any other remedy available to Sellers under the Agreement or at law.
- With respect to the SPO Jacksonville facility and the SPO Boston facility, (i) on December 28, 2009, the applicable Seller will assume the Limited Facility Lease for each facility unless the Purchaser otherwise notifies the Sellers in writing at least three Business Days prior to such date and (ii) after the assumption of such Limited Facility Lease, the applicable Seller will reject the Limited Facility Lease when instructed to do so by Purchaser.

Service Termination Date

- December 28, 2009; provided, however, that with respect to the SPO Jacksonville and SPO Boston facilities, the Service Termination Date shall be the Business Day immediately prior to the date of the confirmation hearing for Sellers' plan of liquidation or reorganization.

Service Fee

1761813

- During the period Purchaser occupies any portion of a Limited Use Facility, Purchaser shall pay Sellers the following fees: (a) the amount of the recurring monthly rentals payable by Sellers under the Limited Facility Lease for such Limited Use Facility, (b) the amount paid by Sellers for insurance with respect to such Limited Use Facility and (c) all other amounts payable by Sellers under the Limited Facility Lease for such Limited Use Facility, whether such amounts are payable to the landlord under the Limited Facility Lease for such Limited Use Facility or to third party utility providers including, but not limited to, gas, electric, telephone, data and other utility providers.
- Purchaser also shall pay to Sellers all amounts payable by Sellers pursuant to the Limited Facility Leases for the SPO Jacksonville facility and the SPO Boston facility for all periods from and after December 29, 2009, whether or not Purchaser is in occupancy of the SPO Jacksonville facility or the SPO Boston facility, as applicable.

### 3. **Permits and Consents**.

Description of Service

- Assist Purchaser, as reasonably requested by Purchaser, in obtaining (i) consents from Governmental Authorities, (ii) Permits, (iii) consents from non-Governmental Authorities and (iv) financial assurance as required under Environmental Laws, including the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et. seq.), Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. § 6901 et. seq) and similar state laws, in each case, with respect to the ownership and operation of the Purchased Assets and payment of the Assumed Liabilities by Purchaser, sufficient in the aggregate to permit the Purchaser to own and operate the Purchased Assets from and after the Closing in substantially the same manner as owned and operated by Sellers immediately prior to the Closing.
- Sellers shall maintain and extend to Purchaser the use and benefit of all state licenses and approvals related to the manufacture and distribution of motor vehicles, to the extent permitted by applicable law

Specifications and Limitations

- None

Service Termination Date

- December 31, 2009

Service Fee

- No cost

### 4. **Limited Use of Personal Property Subject to Sellers' Equipment Financing**.

Description of Service

- Sellers shall provide Purchaser with the right to use and possess any personal property ("Limited Use Personal Property") that is subject to a contract listed on Schedule C-4 (each, a "Personal Property Contract") during the period beginning on the Closing Date and ending, with respect to each item of Limited Use Personal Property, on the earlier to occur of (i) the date the applicable Personal Property Contract has been rejected pursuant Section 365 of the Bankruptcy Code (if applicable) by the respective Seller, (ii) the date the respective Seller is otherwise no longer a party bound by the Personal Property Contract or otherwise ceases to have the right to use and possession of the Limited Use Personal Property, (iii) the date on which Purchaser obtains its own right (not under this Agreement) to use and possess the item of Limited Use Personal Property, whether by assumption, purchase or otherwise, and (iv) the date Purchaser notifies the Sellers that Purchaser no longer desires to use or possess all items of Limited Use Personal Property under the applicable Personal Property Contract (the "End Date").
- Sellers shall provide reasonable assistance to Purchaser in connection with the renegotiation, rejection, and/or recharacterization of the Personal Property Contracts.

Specifications and Limitations

- Purchaser shall have the right to use the Limited Use Personal Property only for the purposes for which the Limited Use Personal Property is being used, planned to be used, or capable of being used on the Closing Date.
- Notwithstanding anything herein to the contrary, Purchaser shall accept this right to use the Limited Use Personal Property in an "as is" condition on the Closing Date.
- Purchaser shall control all (i) negotiations and communications with the other parties to each Personal Property Contract regarding the substance, renewal, amendment or reformation of such Personal Property Contract and (ii) litigation or other disputes regarding each Personal Property Contact, including any rejection, partial rejection or action to recharacterize any such contract.  In addition, upon the direction of Purchaser, the Sellers shall execute and deliver any such renewal or amendment of any Personal Property Contract, where such Personal Property Contract (as amended) will thereafter be assumed by a Seller and assigned to Purchaser.
- Purchaser's insurance, care and maintenance of the Limited Use Personal Property shall be subject in all respects to the terms and conditions of the Personal Property Contract.
- Until the End Date applicable to any Limited Use Personal Property, Purchaser shall perform the obligations of Sellers under the Personal Property Contract, as and to the extent Sellers are required to perform such obligations under applicable law, including the Bankruptcy Code.

Service Termination Date

- December 31, 2013

Service Fee

1761813

- In addition to any amounts due pursuant to Section 6.6(e) of the Purchase Agreement, with respect to the period after the Closing Date and until the End Date for each Personal Property Contract, Purchaser shall pay Sellers all out-of-pocket costs and expenses incurred by Sellers, including attorney's and expert fees, in connection with any negotiation or dispute with respect to such Personal Property Contract.
- If Section 6.6(e) does not apply to a Personal Property Contract, with respect to the period after the Closing Date and until the End Date for each Personal Property Contract, Purchaser shall pay Sellers all amounts payable by Sellers under such Personal Property Contract, and any contracts or agreements entered into in connection therewith, whether such amounts are payable to the counterparty to the Personal Property Contract or to any third party.
- If the End Date occurs in accordance with clause (iv) of the definition of "End Date" by notice to the Seller, then, until such time as the applicable Personal Property Contract has been rejected pursuant Section 365 of the Bankruptcy Code by the respective Seller, Purchaser shall pay Sellers all amounts payable by Sellers under such Personal Property Contract, and any contracts or agreements entered into in connection therewith, whether such amounts are payable to the counterparty to the Personal Property Contract or to any third party; provided that Sellers shall promptly act to reject such Personal Property Contract.

## 5. **Management of and Services under Seller TSA Executory Contracts**.

Description of Service

- Allow Purchaser to manage and exercise rights under, for its own account, the Seller TSA Executory Contracts (defined below).
- At the request of Purchaser (including as to amounts, quantity, timing, specifications or otherwise) and for the benefit of Purchaser, Sellers will assist Purchaser with obtaining, directly or indirectly, goods, services and other benefits (and taking other actions) under the Seller TSA Executory Contracts, in accordance with the terms and conditions of the Seller TSA Executory Contracts.
- To the extent requested by Purchaser and to the extent permitted under the applicable Seller TSA Executory Contract, the appropriate Sellers shall extend a sublicense to Purchaser with respect to such Seller TSA Executory Contract.
- "Seller TSA Executory Contracts" means each Executory Contract for which Purchaser is obligated, pursuant to Section 6.6(e) of the Purchase Agreement, to pay or cause to be paid all amounts due in respect of Sellers' performance thereunder, including any Shared Executory Contract; provided that Limited Facilities Leases and Personal Property Contracts shall not be Seller TSA Executory Contracts.

Specifications and Limitations

- Sellers shall not order any goods or services or exercise any rights pursuant to a Seller TSA Executory Contract, except at the request and on behalf of Purchaser; provided that with respect to any Shared Executory Contract, Sellers may order goods or services for their own account.

Schedule C

6

1761813

- Purchaser shall perform the obligations of Sellers under the terms and conditions of the Seller TSA Executory Contracts, as and to the extent Sellers are required to perform such obligations under applicable law, including the Bankruptcy Code.
- Such services will be provided during the period beginning on the Closing Date and ending, with respect to each Seller TSA Executory Contract, on the date the applicable Executory Contract is no longer a Seller TSA Executory Contract.

Service Termination Date

- December 31, 2013

Service Fee

- No cost, except as otherwise specified in Section 6.6(e) of the Purchase Agreement.

1761813

## SCHEDULE C-2

## SELLER LISTED FACILITIES

| | Site Name | Property Address | Usable Square Feet |
|---|---|---|---|
| 1. | GMPT – Massena | Route 37 East, Massena, NY 13662-0460 | 815,477 |
| 2. | GMVM - Moraine Assembly[5] | 2601 West Stroop Road Moraine, OH 45439 | 3,750,503 |
| 3. | Stamping – Pittsburgh | 1451 Lebanon School Road, West Mifflin, PA 15122 | 808,474 |
| 4. | Romulus Engineering Center | 37350 Ecorse Road Romulus, MI 48174-1376 | 267,338 |
| 5. | Pontiac Fiero Site | 900 Baldwin Avenue Pontiac, MI 48340 | 1,772,174 |
| 6. | Pontiac Centerpoint Campus – West | 660 South Boulevard East Pontiac, MI 48341 | 580,000 |
| 7. | Pontiac Centerpoint Campus – Central | 2000 Centerpoint Parkway Pontiac, MI 48341-3147 | 990,000 |

---

[5] Does not include the GMPT - Moraine (DMAX) improvements and associated real property.

1761813

## SCHEDULE C-3

## LIMITED USE FACILITIES

| | Facility Name | Address | City | State |
|---|---|---|---|---|
| 1. | Fuel Cell Activity | 3050 Lomita Boulevard | Torrance | California |
| 2. | RFO Design Hollywood | 5350 Biloxi Avenue | North Hollywood | California |
| 3. | SPO - Fontana | 11900 Cabernet Drive | Fontana | California |
| 4. | Republic Square 1 | 25 Massachusetts Avenue N.W. | Washington | District of Columbia |
| 5. | Huntington Centre I | 2901 SW 149th Avenue | Miramar | Florida |
| 6. | SPO - Jacksonville | 12751 Gran Bay Parkway West | Jacksonville | Florida |
| 7. | COB - Alpharetta | 11700 Great Oaks Way | Alpharetta | Georgia |
| 8. | COB - Naperville | 387 Shuman Boulevard | Naperville | Illinois |
| 9. | RFO – Training Center - Hinsdale, IL | 336 East Ogden Avenue | Hinsdale | Illinois |
| 10. | GMPT - Indianapolis Castleton | 7601 E. 88th Pl | Castleton | Indiana |
| 11. | SPO - Boston | 45 Commerce Way | Norton | Massachusetts |
| 12. | EAS Lease Assumption | TBD | Saginaw | Michigan |
| 13. | Flint Flowthrough Warehouse | 4002 James Cole Blvd | Flint | Michigan |
| 14. | GM Heritage Center | 6400 Center Drive | Sterling Heights | Michigan |
| 15. | Great Lakes Technical Center | South Saginaw Street | Flint | Michigan |
| 16. | Phoenix Center | 31 East Judson Street | Pontiac | Michigan |
| 17. | SPO - Burton | 1215 North Center Road | Burton | Michigan |
| 18. | SPO - Davison Road Processing Center | 4134 Davison Road | Burton | Michigan |
| 19. | SPO - Ypsilanti (Business Center II) | 2625 Tyler Road | Ypsilanti | Michigan |
| 20. | SPO - Ypsilanti (SPO Business Center I ) | 2625 Tyler Road | Ypsilanti | Michigan |
| 21. | SPO Process Engineering Lab | 3023 Airpark Drive N | Flint | Michigan |

| | Facility Name | Address | City | State |
|---|---|---|---|---|
| 22. | Sterling Heights Tooling Center | 33500 Mound Road | Sterling Heights | Michigan |
| 23. | Troy - OnStar Engineering | 2321 John R Road | Troy | Michigan |
| 24. | Troy Technology Park | 1870 Technology Drive | Troy | Michigan |
| 25. | Willow Run Airport Facility (associated with GMPT Willow Run, Ypsilanti, MI) | Willow Run Airport | Wayne and Washtenaw Counties | Michigan |
| 26. | SPO South West Bulk Center | 125 Fountain Lakes Industrial Drive | St. Charles | Missouri |
| 27. | COB - Somers | 1 Pepsi Way P.O. Box 8500 | Somers | New York |
| 28. | Fuel Cell Activity | 10 Carriage Street | Honeoye Falls | New York |
| 29. | RFO On-Star Charlotte NC | 10101 Claude Freeman Drive | Charlotte | North Carolina |
| 30. | SPO - Cincinnati | 8752 Jacquemin Drive | Westchester | Ohio |
| 31. | SPO - Columbus | 6000 Green Pointe Drive | Groveport | Ohio |
| 32. | SPO West Chester | 9287 Meridian Way | Westchester | Ohio |
| 33. | COB - Irving | 225 E John Carpenter Fwy | Irving | Texas |
| 34. | SPO - Fort Worth | 301 Freedom Drive | Roanoke | Texas |
| 35. | VSSM Call Center - Austin | 7401 E. Ben White Boulevard 3 | Austin | Texas |
| 36. | SPO East Coast Bulk Center | 891 Auto Parts Place | Martinsburg | West Virginia |

1761813

## SCHEDULE C-4

### PERSONAL PROPERTY CONTRACTS

1. Master Lease Agreement dated March 17, 2000, between General Motors Corporation, NAO Worldwide Purchasing Division and The LGR Group, Inc.

2. Master Lease Agreement dated October 19, 2001, between General Motors Corporation and Pacific Rim Capital, Inc.

3. Master Lease Agreement dated November 14, 1994, between Saturn Corporation and First American Capital Management Group, Inc.

4. Master Lease Agreement dated May 1, 1995, between General Motors Corporation and First American Capital Management Group, Inc.

5. Master Lease Agreement dated November 8, 1995, between Saturn Corporation and Chancellor Fleet Corporation

6. Master Lease Agreement dated January 10, 1997, between Saturn Corporation and Yale Financial Services, Inc.

7. Master Lease Agreement dated May 16, 2000, between General Motors Corporation and First American Capital Management Group, Inc.

8. Master Lease Agreement dated March 1, 1997, between General Motors of Canada Limited and CALI Leasing Canada Ltd.

9. Master Lease Agreement dated August 20, 2000, between General Motors Corporation and Fort Street Capital, L.L.C.

10. Master Lease Agreement dated December 22, 1999, between General Motors Corporation and Newcourt Technologies Corporation

11. Master Lease Agreement dated October 29, 1997, between Saturn Corporation and Connell Equipment Leasing Company

12. Master Lease Agreement dated September 5, 2000, between General Motors of Canada Limited and Heller Financial Canada, LTD

13. Lease Agreement (GM 2004A-1) dated as of September 17, 2004 between U.S. Bank Trust National Association and General Motors Corporation

14. Lease Agreement (GM 2004A-2) dated as of September 17, 2004 between U.S. Bank Trust National Association and General Motors Corporation

15. Lease Agreement (GM 2003-A) dated as of December 23, 2003 between U.S. Bank Trust National Association and General Motors Corporation

16. Lease Agreement (GM 2003B-1) dated as of September 30, 2003 between U.S. Bank Trust National Association and General Motors Corporation

17. Lease Agreement (GM 2003C-1) dated as of December 10, 2003 between U.S. Bank Trust National Association and General Motors Corporation

18. Lease Agreement (GM 2002A-1) dated as of December 20, 2002 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

19. Lease Agreement (GM 2002A-2) dated as of December 20, 2002 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

20. Lease Agreement (GM 2001A-1) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

21. Lease Agreement (GM 2001A-2) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

22. Lease Agreement (GM 2001A-3) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

23. Lease Agreement (GM 2001A-4) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

24. Lease Agreement (GM 2001A-5) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

25. Lease Agreement (GM 2001A-6) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

26. Lease Agreement (GM 2001A-7) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

27. Lease Agreement (GM 2001A-8) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

Schedule C-4

2

28. Lease Agreement (GM 2000A-1) dated as of December 15, 2000 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

29. Lease Agreement (GM 2000A-2) dated as of December 15, 2000 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

30. Lease Agreement (GM 2000A-3) dated as of December 15, 2000 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

31. Lease Agreement (GM 91A-3) dated as of September 27, 1991 between the Connecticut National Bank and Saturn Corporation

1761813

## SCHEDULE D

### SELLER EXCLUDED SERVICES

Not applicable.

1761813

## SCHEDULE E

## PAYMENT TERMS

1. *General Consideration.* Sellers and Purchaser shall pay the price, in U.S. Dollars, for each Transition Service as set forth on Schedule A and Schedule C, respectively; as well as any amounts required to paid pursuant to **Section 7.3** of the Agreement.

2. *Invoices.* Except as otherwise provided in this Agreement, within 30 days after the end of each calendar month, Purchaser or the respective Service Provider shall submit one or more reasonably detailed invoices to Parent or the respective Receiving Party for all Purchaser Transition Services provided during such calendar month pursuant to this Agreement and Sellers or the respective Service Provider shall submit one or more reasonably detailed invoices to Purchaser or the respective Receiving Party for all Seller Transition Services provided during such calendar month pursuant to this Agreement.

3. *Time of Payment.* Invoices for Transition Services shall be due and payable in accordance with the MNS-2 system, which provides, on average, for payment on the second day of the second month following the date of the invoice or if such MNS-2 system is not utilized, within 40 days after receipt.

4. *Interest Arrears.* If the Receiving Party fails to pay when due any invoiced amounts in respect of Transition Services, the Receiving Party shall pay interest on the unpaid amount at the Libor-Plus Rate from the date due until the date paid, without prejudice to and in addition to any other remedy available to the Service Provider under the Agreement or at law.

v

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit V**

Form of Assignment and Assumption of Real Property Leases

## EXHIBIT V

## FORM OF OMNIBUS ASSIGNMENT AND ASSUMPTION OF REAL PROPERTY LEASES AND GUARANTIES

THIS OMNIBUS ASSIGNMENT AND ASSUMPTION OF REAL PROPERTY LEASES AND GUARANTIES (this "Assignment"), dated as of [_____ __], 2009, is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company f/k/a Saturn Corporation, a Delaware corporation ("S LLC"), and Saturn Distribution Corporation, a Delaware corporation ("S Distribution" and together with Parent and S LLC, each an "Assignor," and collectively, "Assignors"), and *[NGMCO, Inc]*, a Delaware *[corporation]* ("Assignee"). Capitalized terms used herein and not otherwise defined have the meanings given to them in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, Assignors, Assignee and Chevrolet-Saturn of Harlem, Inc. are parties to that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement"); and

WHEREAS, the Purchase Agreement requires Assignors to convey and transfer to Assignee, and Assignee to assume, all of Assignors' right, title and interest, whether as landlord, sublandlord, tenant or subtenant, as the case may be, in, to and under (i) the leases and subleases listed on Exhibit A attached hereto (collectively, the "Leases"), together with all rights, options, interests and benefits thereunder (including, without limitation, any guaranties and security deposits (together with all accrued interest thereon) held thereunder where Assignor is a landlord or sublandlord) (collectively, the "Lease Additional Rights"), and (ii) the guaranties listed on Exhibit B attached hereto (collectively, the "Guaranties"), together with all rights and obligations thereunder (collectively, the Guaranty Additional Rights").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Assignment. As of the Closing, Assignors hereby sell, assign, transfer, convey and deliver unto Assignee, its successors and assigns, all of the right, title and interest that Assignors possess in, to and under (i) the Leases, together with all Lease Additional Rights thereunder, excluding therefrom, any Retained Liabilities associated with the Leases and the Additional Rights, if any, and (ii) the Guaranties, together with all Guaranty Additional Rights thereunder, excluding therefrom, any Retained Liabilities associated with the Guaranties and the Guaranty Additional Rights, if any.

2.    Assumption. Assignee hereby accepts such assignment of the Leases, together with the Lease Additional Rights and the Guaranties, together with the Guaranty Additional Rights, and hereby assumes, and agrees to be bound by, and to keep, observe and perform, all of the terms, covenants, conditions, duties and obligations of and under the Leases

and Guaranties that arise from and after the Closing, excluding therefrom, any Retained Liabilities associated with the Leases, Guaranties, the Lease Additional Rights and the Guaranty Additional Rights, if any.

     3.     <u>Rentals, Taxes and Deposits</u>.  All advance rental payments, real estate taxes and other payments made or received by Assignor under the Leases shall be prorated between Assignor and Assignee as of the Closing of this Assignment in accordance with the terms of the Purchase Agreement.

     4.     <u>Conflicts with Purchase Agreement</u>.  This Assignment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement (including the representations, warranties, covenants and agreements set forth in the Purchase Agreement), all of which are incorporated herein by reference.  In the event of any conflict between the terms of this Assignment and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

     5.     <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Assignment is for the sole benefit of Assignors, Assignee and their respective successors and permitted assigns, and nothing express or implied in this Assignment is intended or shall be construed to confer upon or give to any Person, other than Assignors, Assignee and their respective successors and permitted assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Assignment.

     6.     <u>Modification</u>.  This Assignment may not be amended or modified in any manner except by a written agreement executed by each of the Parties.

     7.     <u>Governing Law</u>.  The construction, interpretation and other matters arising out of or in connection with this Assignment shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws and (c) to the extent required by Law with respect to the enforcement of any Lease or Guaranty, the Law of the jurisdiction where the premises underlying the applicable Lease or Guaranty is located.

     8.     <u>Construction of Assignment</u>.  This Assignment shall not be construed more strictly against one party than against the other, merely by virtue of the fact that it may have been prepared primarily by counsel for one of the parties, it being recognized that both Assignor and Assignee have contributed substantially and materially to the preparation of this Assignment.

     9.     <u>Severability</u>.  If any provision of this Assignment is held to be invalid or unenforceable, then, to the extent that such invalidity or unenforceability shall not deprive either party of any material benefit intended to be provided by this Assignment, the remaining provisions of this Assignment shall remain in full force and effect and shall be binding upon the parties hereto.

2

1765183

10.    Captions.    The captions of this Assignment are for convenience of reference only and do not in any way limit or amplify the terms hereof.

11.    Counterparts.    This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.  All signatures of Assignors may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

[Remainder of the page left intentionally blank]

1765183

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Assignment and Assumption of Real Property Leases and Guaranties as of the day and year first above written.

GENERAL MOTORS CORPORATION

By: _____
    Name: /_____/
    Title: /_____/

SATURN LLC

By: _____
    Name: /_____/
    Title: /_____/

SATURN DISTRIBUTION CORPORATION

By: _____
    Name: /_____/
    Title: /_____/

*[NGMCO, INC.]*

By: _____
    Name: /_____/
    Title: /_____/

## EXHIBIT A

*[forthcoming]*

## EXHIBIT B

*[forthcoming]*

1765183

W

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit W**

Form of Assignment & Assumption of Harlem Lease

## EXHIBIT W

## FORM OF ASSIGNMENT AND ASSUMPTION OF HARLEM LEASE

THIS ASSIGNMENT AND ASSUMPTION OF DEALERSHIP SUB-SUB-SUBLEASE (this "Assignment"), dated as of _____ __, 2009, is made by and among CHEVROLET-SATURN OF HARLEM, INC., a Delaware corporation ("Assignor"), and [_____], a Delaware *[limited liability company]* ("Assignee"). Capitalized terms used herein and not otherwise defined have the meanings given to them in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, Assignor, Assignee and certain other parties are parties to that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement"); and

WHEREAS, Argonaut Holdings, Inc., as landlord, and Assignor, as tenant, are parties to that certain Dealership Sub-Sub-Sublease dated as of February 8, 2006 October 11, 1985, as amended by that certain Amendment to Lease of Land dated as of [_____], 2009 (the "Lease"), relating to certain premises located at 2485 Second Avenue, New York, New York (the "Premises"); and

WHEREAS, the Purchase Agreement requires Assignor to convey and transfer to Assignee, and Assignee to assume, all of Assignor' right, title and interest, as tenant, in, to and under the Lease, together with all rights, options, interests, liabilities, obligations and benefits thereunder (collectively, the "Additional Obligations").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.       Assignment.  As of the Closing, Assignor hereby sells, assigns, transfers, conveys and delivers unto Assignee, its successors and assigns, all of the right, title and interest that Assignor possesses in, to and under the Lease, together with all Additional Obligations thereunder, excluding therefrom, any Retained Liabilities associated with the Lease and the Additional Obligations, if any.

2.       Assumption.  Assignee hereby accepts such assignment of the Lease, together with the Additional Obligations, and hereby assumes, and agrees to be bound by, and to keep, observe and perform, all of the terms, covenants, conditions, duties and obligations of and under the Lease that arise from and after the Closing, excluding therefrom, any Retained Liabilities associated with the Lease and the Additional Obligations, if any.

3.       Rentals, Taxes and Deposits.  All advance rental payments, real estate taxes and other payments made or received by Assignor under the Lease shall be prorated

between Assignor and Assignee as of the Closing of this Assignment in accordance with the terms of the Purchase Agreement.

4.     Conflicts with Purchase Agreement.  This Assignment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement (including the representations, warranties, covenants and agreements set forth in the Purchase Agreement), all of which are incorporated herein by reference.  In the event of any conflict between the terms of this Assignment and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

5.     Successors and Assigns; No Third Party Beneficiaries.  This Assignment is for the sole benefit of Assignor, Assignee and their respective successors and permitted assigns, and nothing express or implied in this Assignment is intended or shall be construed to confer upon or give to any Person, other than Assignor, Assignee and their respective successors and permitted assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Assignment.

6.     Modification.  This Assignment may not be amended or modified in any manner except by a written agreement executed by each of the Parties.

7.     Governing Law.  The construction, interpretation and other matters arising out of or in connection with this Assignment shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws and (c) to the extent required by Law with respect to the enforcement of any Lease, the Law of the jurisdiction where the Premises is located.

8.     Construction of Assignment.  This Assignment shall not be construed more strictly against one party than against the other, merely by virtue of the fact that it may have been prepared primarily by counsel for one of the parties, it being recognized that both Assignor and Assignee have contributed substantially and materially to the preparation of this Assignment.

9.     Severability.  If any provision of this Assignment is held to be invalid or unenforceable, then, to the extent that such invalidity or unenforceability shall not deprive either party of any material benefit intended to be provided by this Assignment, the remaining provisions of this Assignment shall remain in full force and effect and shall be binding upon the parties hereto.

10.     Captions.  The captions of this Assignment are for convenience of reference only and do not in any way limit or amplify the terms hereof.

11.     Counterparts.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.  All signatures of Assignor and Assignee may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic

delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

[Remainder of the page left intentionally blank]

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption of Dealership Sub-Sub-Sublease as of the day and year first above written.

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

Name: /_____/
Title:  /_____/

/_____/

By: _____

Name: /_____/
Title:  /_____/

Argonaut Holdings, Inc., a Delaware corporation, hereby consents to the foregoing assignment and assumption as the landlord under the Lease.

ARGONAUT HOLDINGS, INC.

By: _____

Name: /_____/
Title:  /_____/

**Amended and Restated Master Sale & Purchase Agreement
Exhibit X**

Form of Master Lease Agreement

X

## EXHIBIT X

## FORM OF MASTER LEASE AGREEMENT[1]

### MASTER LEASE AGREEMENT
### (Excluded Manufacturing Assets)

**between**

### GENERAL MOTORS CORPORATION,
**a Delaware corporation**
**("Landlord")**

**and**

*[LEASECO][2]*,
**a Delaware corporation**
**("Tenant")**

**Dated: _____, 2009**

---

[1] Subject to confirmation and agreement by Purchaser and Sellers that in light of the nature of this Master Lease Agreement, the terms and pricing contained herein represent Arms-Length Basis provisions.

[2] LEASECO will be a newly formed entity that is wholly-owned by Purchaser, and its only assets will be the leasehold interest in the Premises and the Tenant Trade Fixtures and Personal Property.

1765182

# TABLE OF CONTENTS

**Section**                                                                **Page**

1. LEASE SCHEDULE AND EXHIBITS ...................................................................1

2. AGREEMENT TO LEASE ....................................................................................1

3. LEASE TERM ........................................................................................................1

4. RENTAL PAYMENTS ...........................................................................................1

    4.1    Rent................................................................................................................1
    4.2    Utilities.........................................................................................................2
    4.3    Interest on Late Payments ............................................................................2

5. USE .......................................................................................................................2

6. TAXES...................................................................................................................3

7. CONDITION OF PREMISES .................................................................................3

8. MAINTENANCE ...................................................................................................3

    8.1    Capital Repairs.............................................................................................3
    8.2    Tenant's Maintenance ...................................................................................4

9. ASSIGNMENT AND SUBLETTING .....................................................................4

    9.1    By Tenant......................................................................................................4

10. LANDLORD'S TITLE AND QUIET ENJOYMENT ..............................................4

11. ALTERATIONS AND IMPROVEMENTS; LIENS .................................................5

    11.1    Alterations, Additions and Improvements ....................................................5
    11.2    Liens.............................................................................................................5

12. TENANT TRADE FIXTURES AND PERSONAL PROPERTY ...........................5

13. INSURANCE..........................................................................................................6

    13.1    Tenant's Insurance ........................................................................................6
    13.2    Form of Insurance .........................................................................................6
    13.3    Form of Insurance ........................................................**Error! Bookmark not defined.**

14. DAMAGE AND CONDEMNATION........................................................................7

    14.1    Damage or Destruction .................................................................................7
    14.2    Condemnation ...............................................................................................7

15. RETURN OF PREMISES; FACILITY IDLING PROCESS .....................................8

1765182

16. HOLDOVER.............................................................................................................9

17. EVENTS OF DEFAULT; REMEDIES....................................................................9

    17.1    Events of Default .....................................................................................9
    17.2    Remedies.................................................................................................10
    17.3    Landlord Defaults ..................................................................................10
    17.4    Limitation on Liability...........................................................................11

18. ENVIRONMENTAL..................................................................................................11

    18.1    Definitions...............................................................................................11
    18.2    Agreements regarding Environmental Matters .......................................12

19. NOTICE.....................................................................................................................13

20. ENTRY UPON PREMISES .......................................................................................13

21. GENERAL PROVISIONS .........................................................................................14

    21.1    Brokerage...............................................................................................14
    21.2    Amendments. ..........................................................................................14
    21.3    Severability ............................................................................................14
    21.4    Attorney's Fees ......................................................................................14
    21.5    Time of Essence ....................................................................................14
    21.6    Waiver.....................................................................................................14
    21.7    Successors and Assigns..........................................................................14
    21.8    Governing Law .......................................................................................14
    21.9    Estoppel Agreements .............................................................................15
    21.10  Subordination, Non-Disturbance Agreement.........................................15
    21.11  Intentionally Omitted ............................................................................15
    21.12  Force Majeure ........................................................................................15
    21.13  Consent ..................................................................................................15
    21.14  Time Period for Payment........................................................................15
    21.15  Execution of Lease.................................................................................16
    21.16  Counterparts...........................................................................................16
    21.17  Confidentiality .......................................................................................16
    21.18  Jurisdiction for Dispute Resolution. ......................................................16
    21.19  Gender....................................................................................................17

22. WAIVER OF LANDLORD LIEN ..............................................................................17

23. CONTRACTION RIGHT............................................................................................17

24. GUARANTY ..............................................................................................................18

Exhibit A - Premises
Exhibit B - Target End Dates
Exhibit C - Rent

1765182

Exhibit D - Form of Guaranty

1765182

# LEASE SCHEDULE

This Lease Schedule is made a part of that certain Master Lease Agreement (Excluded Manufacturing Assets) attached hereto, including all Exhibits (the "Lease"), between Landlord and Tenant (as such terms are defined below).

| | | |
|---|---|---|
| 1. | Landlord: | **General Motors Corporation**, Delaware corporation. |
| 2. | Tenant: | *[LEASECO]*, a Delaware corporation. |
| 3. | Date of Lease: | *[_____ ]*, 2009. |
| 4. | Premises: | The term "Premises" shall mean (a) the land owned by Landlord (the "Land") at the common addresses set forth on Exhibit A attached hereto and made a part hereof, (b) the building or buildings located on the Land (the "Buildings"), (c) any other improvements located on the Land (collectively with the Buildings, the "Improvements"), and (d) and all appurtenances belonging to or in any way pertaining to said Land and Improvements, subject to Section 23 hereof. |
| 5. | Facility: | Each separate property listed on Exhibit A, including the Land, Buildings, Improvements and appurtenances related thereto. |
| 6. | Longer Term Facility: | Collectively, the Mansfield Facility and the Grand Rapids Facility (as defined on Exhibit A). |
| 7. | Commencement Date: | *[_____ ]*, 2009. |
| 8. | Production Period: | With respect to each Facility, the date commencing on the Commencement Date and expiring on the date set forth in a written notice delivered by Tenant to Landlord with respect to one or more Facilities (each, a "Production End Notice") that a production run has ended at such Facility.  Tenant shall deliver a Production End Notice within ten (10) business days after production has ceased at the applicable Facility or Facilities. |
| 9. | Idling Period: | With respect to each Facility, the period commencing on the date set forth in the Production End Notice and expiring on the Termination Date. |
| 10. | Target End Dates: | See Exhibit B. |

1765182

1

| 11. | Termination Dates: | See <u>Section 3</u>. |
|---|---|---|
| 12. | Outside Termination Date: | See <u>Section 3</u>. |
| 13. | Term: | The term commencing on the Commencement Date and expiring on the Termination Date with respect to each Facility, but in no event later than the Outside Termination Date. |
| 14. | Contraction Right: | See <u>Section 23</u>. |
| 15. | Rent: | See <u>Section 4</u> and <u>Exhibit C</u>. |
| 16. | Use: | See <u>Section 5</u>. |

17.    Landlord's Address:

*[_____]*
*[_____]*
***Attn:** [_____]*
***Fax:** [_____]*
***E-mail:** [_____]*

With a copy to:

*[_____]*
*[_____]*
***Attn:** [_____]*
***Fax:** [_____]*
***E-mail:** [_____]*

18.    Tenant's Address:

*[_____]*
*[_____]*
***Attn:** [_____]*
***Fax:** [_____]*
***E-mail:** [_____]*

With a copy to:

*[_____]*
*[_____]*
***Attn:** [_____]*
***Fax:** [_____]*
***E-mail:** [_____]*

19.    Guarantor:

*[_____]*, a Delaware limited liability company

2

20.        Exhibits to Lease:              Exhibit A – Premises
                                           Exhibit B – Target End Dates
                                           Exhibit C – Rent
                                           Exhibit D – Form of Guaranty

3

1765182

## MASTER LEASE AGREEMENT

THIS LEASE is made and entered into as the date set forth on the Lease Schedule to which this Lease is attached (the "Lease Schedule") by and between Landlord and Tenant.

WHEREAS, Landlord owns the Land and the Improvements and the appurtenances thereto, which together comprise the Premises; and

WHEREAS, Tenant desires to lease the Premises on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration for the mutual covenants herein contained, and other valuable consideration, the parties agree as follows:

**1.**   **LEASE SCHEDULE AND EXHIBITS.** The Lease Schedule and all Exhibits attached hereto are hereby incorporated herein by this reference. All capitalized terms used herein that are not specifically defined herein shall have the meanings set forth on the Lease Schedule. The Tenant and the Landlord are collectively referred to herein as the "Parties".

**2.**   **AGREEMENT TO LEASE.** Upon the terms and conditions set forth herein, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises and any and all fixtures, machinery, equipment and personal property (collectively, the "Landlord Fixtures and Personal Property") owned or leased by Landlord, used in connection with the operation, maintenance and/or repair of the Facilities as of the Commencement Date and located on the Premises.

**3.**   **LEASE TERM.** Unless sooner terminated or extended pursuant to the terms hereof, the term of this Lease (the "Term") shall commence as of the Commencement Date and shall end on the respective Termination Date with respect to each Facility. The "Termination Date" with respect to each Facility is the date, after the Target End Date, that is thirty (30) days after Tenant notifies Landlord in writing that this Lease will terminate with respect to such Facility, provided that the Termination Date shall not be later than (a) December 31, 2013 with respect to the Longer Term Facilities or (b) the date that is twelve (12) months after the Target End Date with respect to any other Facility (each, an "Outside Termination Date").

**4.**   **RENTAL PAYMENTS**

**4.1**   **Rent.** During a Production Period with respect to each Facility, Tenant shall pay to Landlord annual base rent equal to One Dollar ($1.00) per useable square foot, as set forth in Exhibit C (the "Rent"), in monthly installments, on or before the first day of each calendar month during the Term hereof. Rent shall be paid to Landlord at Landlord's Address (as defined in the Lease Schedule) and Rent for any partial months shall be prorated based on the total number of days in that month. Landlord and Tenant hereby stipulate that the useable square footage with respect to each Facility is set forth on Exhibit A, provided that Landlord and Tenant hereby acknowledge that Tenant leases and is obligated to pay expenses associated with the entirety of each Facility during the Term, each in accordance with the terms of this Lease. All payments by Tenant shall be made in lawful money of the United States. During an Idling Period with respect to each Facility, Tenant shall have no further obligation to pay Rent allocable

1

to such Facility, but Tenant shall be obligated to pay all other amounts payable hereunder with respect to such Facility other than taxes on Landlord Fixtures and Personal Property located on such Facility through the Termination Date. Notwithstanding the foregoing, if Tenant has not surrendered a Facility within twelve (12) months after the Target End Date with respect to such Facility, Tenant shall thereafter resume paying Rent on a monthly basis from and after such date, provided that the monthly amount payable during such period shall be equal to fifty percent (50%) of the monthly Rent due in the month in which the Production Period ended, plus all other amounts due and payable hereunder with respect to such Facility through the earlier of (a) the date on which Tenant surrenders the Facility to Landlord or (b) December 31, 2013.

**4.2    Utilities and Services.** From and after the Commencement Date, Tenant shall promptly pay for all utilities and other services (including, but not limited to, water, site coordination, management and oversight, security, sewage service charges, garbage or trash removal, fuels, including natural gas, and electricity, including electricity for any heating, ventilating and air conditioning in the Premises) furnished to and or used in or at the Premises for any purpose. Notwithstanding the foregoing, to the extent such utilities or services are provided to a Facility pursuant to an agreement to which Landlord (as opposed to Tenant) is a party, Landlord shall deliver to Tenant upon receipt any invoices it receives for such services provided to such Facility after the Commencement Date and Tenant shall pay such invoice on or before the due date thereof.

**4.3    Interest on Late Payments.** In the event that Tenant fails to pay Rent or any other sum due under any provisions of this Lease when due, and such amount is not paid within fifteen (15) business days after the date on which Rent or such other sum is due as herein provided, then such sum shall bear interest thereafter, without prejudice to and in addition to any other remedy available to the Landlord under this Lease or at law, at a rate equal to, on any date, the sum of (i) the average (rounded to the nearest 1/16th of one percent) of the London Interbank Offered Rates for three-month United States dollar-denominated deposits, as published in the Wall Street Journal on such date and (ii) 500 basis points, but in no event greater than the maximum rate then permitted under applicable law (the "Default Rate").

**5.    USE.** Tenant may use the Premises in the manner in which the Premises were used by *[General Motors Corporation]* prior to the Commencement Date, for any uses associated with the winddown of production on the Premises, and for any other uses incidental thereto. Tenant may not use the Premises for any other use unless such use is consented to in writing by Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant shall comply in all material respects with all laws, regulations and other governmental requirements relating to its use and occupancy of the Premises, provided that, notwithstanding the foregoing, Tenant shall not be obligated to cure any such violations or conditions in existence on the Commencement Date, which shall remain the obligation of Landlord, and Tenant may contest any alleged violation of laws, regulations and other government regulations so long as the Tenant, in good faith and with due diligence, contests the same or the validity thereof by appropriate legal proceeding and provided that upon final adjudication of such proceeding Tenant shall immediately pay any amounts due or comply therewith. During the Term, Landlord may enter upon the Premises to remove any fixtures, machinery, equipment and personal property that are owned or leased by Landlord and not used by Tenant, provided that Landlord shall (i) notify Tenant not less than three (3) business days prior to such entry, (ii) not

2

unreasonably interfere with Tenant's operations or removal of Tenant's Trade Fixtures and Personal Property on the Premises and must be accompanied by a representative of Tenant made available by Tenant, and (iii) provide Tenant a list of items Landlord intends to remove from the Premises. Upon expiration of a Production Period with respect to any Facility, Landlord may enter upon such Facility and remove any Landlord Fixtures and Personal Property, provided that Landlord satisfies conditions (i)-(iii) in the previous sentence.

6.    **TAXES.** All real property taxes or special improvement taxes payable against the Premises, all property taxes levied or assessed against the Landlord Fixtures and Personal Property (but only during the Production Period with respect to each Facility), and all property taxes levied or assessed against the Tenant Trade Fixtures and Personal Property (including all penalties and interest thereon), which may be assessed, levied, imposed upon the same, or any use or occupancy of the Premises, for any period within the Term of this Lease, shall be paid by Tenant, before they become delinquent. Landlord shall deliver copies of all tax bills it receives to Tenant within ten (10) business days after receipt thereof. Tenant shall deliver to Landlord duplicate receipts and canceled checks or photocopies thereof showing the payments of all such taxes and assessments, within thirty (30) days after respective payments evidenced thereby, but in no event after any such payment is required to be made hereunder. Provided no Event of Default shall have occurred and be continuing hereunder, Tenant may contest any tax or assessment upon or against the Premises, or any part thereof, or the improvements at any time situated thereon, so long as the Tenant shall, in good faith and with due diligence, contest the same or the validity thereof by appropriate legal proceeding which shall have the effect of preventing the collection of the tax or assessment so contested, and provided that upon final adjudication of such proceeding Tenant shall immediately pay any amounts due. The obligations of Tenant under this provision shall survive the expiration or termination of the Lease.

7.    **CONDITION OF PREMISES.** Tenant acknowledges that it accepts the Premises and the Landlord Fixtures and Personal Property in their "As-Is" condition on the Commencement Date. Except as expressly set forth herein, Tenant enters into this Lease without any representations or warranties on the part of Landlord, express or implied, as to the condition of the Premises or the Landlord Fixtures and Personal Property, including, but not limited to, the cost of operations and the condition of its fixtures, improvements and systems.

8.    **MAINTENANCE.**

8.1    **Capital Repairs.** Neither Landlord nor Tenant shall be required to make any extraordinary or capital repairs to or replacements of the Facilities or the Landlord Fixtures and Personal Property. In the event either Landlord or Tenant elect in its sole discretion to make any extraordinary or capital repairs or replacements, such work shall be commenced and completed in accordance with applicable laws, in a workmanlike manner using materials of a good quality and, as to Landlord, in a manner which does not unreasonably disrupt or interfere with the business activities of Tenant. If Tenant elects to make any capital repairs to or replacements of any of the Facilities or any of the Landlord Fixtures and Personal Property, Tenant may remove equipment or other personal property installed or purchased by Tenant in connection therewith upon expiration of the Term with respect to any Facility, provided that any such removal shall be performed in accordance with Section 15 hereof.

3

1765182

**8.2    Tenant's Maintenance.** Subject to the limitations set forth in Section 8.1 hereof, during the Production Period, Tenant shall keep and maintain the Landlord Fixtures and Personal Property and the Facilities, including all structural components, exterior doors and windows, and all interior and exterior load-bearing walls, underground utility and sewer pipes, driveways, parking lots, fire protection sprinkler system and all interior and exterior painting, interior plumbing, heating, air conditioning, ventilation, electrical, interior walls, ceilings, floors, windows, doors, sidewalks, and landscaping (including performing snow removal), in substantially the order, repair and working condition in which the Improvements are in as of the Commencement Date, subject to reasonable wear and tear and damage from fire, any other casualty or condemnation and/or the willful acts or omissions of Landlord and its agents, employees, contractors or representatives. All such work shall be commenced and completed in accordance with applicable laws, in a workmanlike manner using materials of a good quality. During the Idling Period, Tenant's obligations with respect to the maintenance of the Landlord Fixtures and Personal Property and the Facilities shall be governed by Section 15 hereof.

**9.    ASSIGNMENT AND SUBLETTING.**

**9.1    By Tenant.** Subject to the terms of this Section 9, this Lease shall not be assigned by Tenant to any other party, and Tenant shall have no right to sublet the Premises or any part thereof or otherwise permit all or any portion of the Premises to be occupied by any party other than Tenant or Tenant's affiliates (collectively or individually, a "Transfer"), without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. In no event shall Landlord be entitled to recapture the Premises in connection with a request that Landlord consent to a Transfer. Notwithstanding the foregoing, Tenant may, without Landlord's consent, assign this Lease or sublease or permit occupancy of all or any portion of Premises to any business entities directly or indirectly, controlling, controlled by or under common control with Tenant, or to successors to Tenant by merger, consolidation, reorganization or purchase of Tenant (which shall include, without limitation, the transfer of the voting stock of Tenant or other change in control of Tenant), or to a purchaser of all or substantially all of the assets of Tenant (each a "Permitted Transfer"). In the case of any assignment of this Lease constituting a Permitted Transfer or any other assignment of this Lease to which Landlord consents, Tenant shall not be relieved from any obligations that accrue under this Lease from and after the date of such Permitted Transfer or other assignment of this Lease unless (i) Landlord is reasonably satisfied that such assignee has the financial ability to fulfill all of the Tenant's obligations hereunder, and (ii) the assignee assumes all of Tenant's obligations under this Lease from and after the date of the Permitted Transfer or other assignment and agrees to be bound by all of the terms, covenants and conditions of this Lease. Any attempted assignment or sublease contrary to the terms and provisions of this Section 9.1 shall be void and of no force and effect.

**10.    LANDLORD'S TITLE AND QUIET ENJOYMENT.** Landlord represents and warrants that Landlord owns fee simple title to the Premises and has full right and authority to make this Lease. Landlord covenants that so long as an Event of Default does not then exist, Tenant shall have quiet and peaceful possession and enjoyment of the Premises and shall not be interfered with by Landlord, or any party claiming by, through or under Landlord or any party claiming title superior to Landlord.

4

1765182

11.     **ALTERATIONS AND IMPROVEMENTS; LIENS**.

  **11.1** **Alterations, Additions and Improvements**.  Tenant shall not make any structural alterations, additions or improvements to the Premises without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Tenant may, at its own expense and without Landlord's consent, make any non-structural alterations and improvements to the Premises which Tenant deems desirable.  All such alterations, additions and improvements shall be made in a workmanlike manner in accordance with all applicable laws and ordinances.  At the expiration or sooner termination of the Lease, Landlord agrees to accept the Premises with all alterations, additions and improvements made by Tenant, which alterations, additions and improvements shall thereafter become Landlord's property, and Tenant shall not be required to restore the Premises to the condition existing prior to the making of such alterations, additions and improvements at the commencement of the Term; provided, however, at Tenant's option, Tenant may remove any such alterations or improvements made by Tenant in accordance with Section 15 hereof.

  **11.2** **Liens**.  Tenant shall not permit the Premises to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished in connection with work of any character performed or claimed to have been performed on the Premises by, or at the direction or sufferance of Tenant; provided, however, that Tenant shall have the right to contest, in good faith and with reasonable diligence, the validity of any such lien or claimed lien, and Tenant shall not be deemed in default hereunder as a result of such lien so long as Tenant is so contesting such lien; provided, in case of any such lien attaching, or notice or claim thereof being asserted during any period of time in which Landlord has entered into a contract to sell the applicable Facility, as a condition precedent to the right to contest, Tenant shall bond over or otherwise provide security (as permitted by applicable law in such proceeding), the effect of which is to prevent such lien from attaching to Landlord's title in the Premises and any proceeds accruing from the sale thereof.  Subject to Tenant's right of contest, in the event that such lien is not released, removed, or bonded over when required in this Section 11.2, Landlord, at its option, may take all action Landlord deems reasonable or necessary to release and remove such lien (without any duty to investigate the validity thereof) and Tenant shall, within ten (10) days following demand, either before or after such release and removal, pay or reimburse Landlord for all reasonable sums, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by Landlord in connection with removal of such lien together with interest thereon from the date incurred until the date paid at the Default Rate.  The obligations of Tenant under the provisions of this Section 11.2 shall survive the expiration or termination of this Lease.

  **12.** **TENANT TRADE FIXTURES AND PERSONAL PROPERTY**.  Tenant currently owns certain trade fixtures, machinery, equipment, all inventories of vehicles, raw materials, work-in-progress, finished goods, supplies, stock, parts, packaging materials and other accessories thereto, and other personal property located on the Premises and Tenant may during the Term install in or on the Premises other trade fixtures, machinery, equipment and personal property (collectively, the "Tenant Trade Fixtures and Personal Property") as Tenant deems desirable, and all of the Tenant Trade Fixtures and Personal Property shall remain Tenant's property whether or not affixed or attached to the Premises.  Tenant may, but shall not be required to, remove the Tenant Trade Fixtures and Personal Property from the Premises at any

time during the Term, provided that any such removal by Tenant shall be performed in accordance with Section 15 hereof.

### 13.    **INSURANCE**.

**13.1    Tenant's Insurance.**    Throughout the Term, Tenant shall maintain insurance insuring:

(a)    The Building and any other Improvements at any time situated upon the Premises against loss or damage by fire, lightning, wind storm, hail storm, aircraft, vehicles, smoke, explosion, riot or civil commotion as provided by the Standard Fire and Extended Coverage Policy and all other risks of direct physical loss as insured against under Special Form ("all risk" coverage). The insurance coverage shall be for not less than 100% of the full replacement cost of the Building and other Improvements and building ordinance coverage. Landlord shall be named as loss payee insured and all proceeds of insurance shall be payable to Landlord.

(b)    Tenant, Landlord (as an "additional insured"), and any mortgagee of Landlord of which Tenant is given written notice, from all claims, demands or actions made by or on behalf of any person or persons, firm or corporation and arising from, related to or connected with the Premises, for bodily injury to or personal injury to or death of any person, or more than one person, or for damage to property in an amount of not less than $2,000,000.00 combined single limit per occurrence/aggregate, and Tenant shall carry excess liability insurance coverage in an amount not less than $8,000,000.00.

(c)    All contents and trade fixtures, furniture and furnishings in the Premises to the extent of at least ninety percent (90%) of their replacement cost under Standard Fire and Extended Coverage Policy and all other risks of direct physical loss as insured against under Special Form ("all risk") coverage.

**13.2    Form of Insurance.**    All of said insurance required of Tenant by this Section 13 shall be in form and with companies licensed in the state in which the Premises is located, and shall be AM Best's rated A- and class VII or better, and shall provide that the same shall not be subject to cancellation or termination except after at least ten (10) days prior written notice to Landlord. Certificates of the insurance policies required to be carried hereunder shall be deposited with the Landlord at the Commencement Date and from time to time, together with copies of the policies, upon request of the Landlord. Any insurance required of Tenant under this Lease may be furnished under a blanket policy carried by Tenant. Notwithstanding anything in this Lease to the contrary, Tenant may self-insure any or all of its insurance obligations under this Lease, provided that Tenant shall pay Landlord an amount equal to the insurance proceeds to which Landlord would be entitled under Section 14 of this Lease if Tenant had not self-insured.

**13.3    Mutual Waiver.**    Landlord and Tenant hereby waive all claims and rights of recovery against the other and their respective officers, directors, employees, agents and representatives for any loss or damage to their respective properties or interests, which loss is insured against, or required to be insured against, by Landlord or Tenant (as applicable) pursuant

6

to this Section 13, regardless of fault or negligence and regardless of the amount of insurance proceeds collected or collectible under any insurance policies in effect, and Landlord and Tenant each represent and warrant to the other that all such policies permit such waiver and contain, and will contain, enforceable waiver of subrogation endorsements.

## 14.    DAMAGE AND CONDEMNATION.

**14.1    Damage or Destruction.**  In the event of damage to, or destruction of, any Building, or any of the other Improvements or access thereto (a "Casualty") with respect to a Facility, Landlord, at its sole cost and expense (except with respect to insurance proceeds), shall repair, restore or rebuild the same to the condition existing prior to the happening of such Casualty, and Tenant shall make available to Landlord for such purpose the proceeds of the insurance it maintains pursuant to Section 13.1(a), provided that Landlord shall only be required to repair, restore or rebuild any Facility under this Section 14.1 to the extent insurance proceeds are available to do so.  Notwithstanding anything to the contrary contained herein, in the event of a Casualty, either party shall have the right to terminate this Lease with respect to the Facility affected by the Casualty, effective on the date of such Casualty (each, a "Casualty Termination Date"), by giving written notice thereof to the other party within thirty (30) days after the Casualty (a "Casualty Notice").  If Landlord is the party that issues a Casualty Notice, Tenant may nullify such Casualty Notice by giving notice to Landlord of such nullification within thirty (30) days after Landlord furnishes its Casualty Notice and, in any such case, this Lease shall not terminate with respect to the affected Facility; provided, however, that, in such case, Landlord shall have no further obligations under this Lease with respect to the restoration of the affected Facility, and Tenant shall pay all costs incurred to restore the affected Facility (using the insurance proceeds received by Landlord and/or Tenant in connection with such Casualty).  On a Casualty Termination Date, the Facility identified in the applicable Casualty Notice shall be deemed to have been removed from Exhibit A and shall no longer constitute a portion of the Premises, this Lease shall terminate with respect to such Facility, and Landlord and Tenant shall have no further obligations hereunder with respect to such Facility, including, without limitation, the payment of Rent allocable to such Facility, except any obligations hereunder that expressly survive termination of this Lease.  Notwithstanding the foregoing, from and after a Casualty Termination Date, this Lease shall remain in full force and effect with respect to the then-remaining portion of the Premises.  If neither party terminates this Lease, during the period of repair by Landlord and for a period of ninety (90) days following the completion of Landlord's restoration, the Rent allocable to the applicable Facility shall be reduced to an amount which bears the same ratio as the portion of the Facility then available for use bears to the entire Facility.

**14.2    Condemnation.**

(a)    Taking of Whole.  If the whole of the Premises or of any Facility shall be taken or condemned for a public or quasi public use or purpose by a competent authority, or if such a portion of the Premises or any Facility shall be so taken that, in Tenant's sole discretion, Tenant concludes that as a result thereof the balance cannot be used for the same purpose and with substantially the same utility to Tenant as immediately prior to such taking (each, a "Taking"), then, as applicable, (i) the Lease shall terminate with respect to a Taking of the Premises or (ii) the Lease shall terminate

7

only as to the particular Facility subject to a Taking, in either such case upon delivery of possession of the Premises to the condemning authority, and any award, compensation or damages (hereinafter sometimes called the "Award") shall be paid to and be the sole property of Landlord. Tenant shall have the right to make its own claim for any separate award that may be made by the condemning authority on account of any costs or loss Tenant may sustain in the removal of Tenant Trade Fixtures and Personal Property.

(b)    Partial Taking.    If only a part of any Facility shall be subject to a Taking, but the Lease is not terminated pursuant to Section 14.2(a) hereof, Tenant shall promptly repair and restore the Facility and all applicable Improvements to a condition that enables Tenant to continue its operations at the Facility and the Rent allocable to such Facility will be adjusted accordingly on a per square foot basis. In such case, Tenant shall have the right to use the Award to make such repairs and improvements to the Facility that are necessary to enable Tenant to continue its operations at the Facility.

(c)    Partial Termination.    If the Lease is terminated with respect to less than the entire Premises in accordance with Section 14.2(a), on the termination date set forth in such Section, the applicable Facility shall be deemed to have been removed from Exhibit A and shall no longer constitute a portion of the Premises and Landlord and Tenant shall have no further obligations hereunder with respect to such Facility, including, without limitation, the payment of Rent allocable to such Facility, except any obligations hereunder that expressly survive termination of this Lease. Notwithstanding the foregoing, from and after such applicable termination date, this Lease shall remain in full force and effect with respect to the then-remaining portion of the Premises.

## 15.    RETURN OF PREMISES; FACILITY IDLING PROCESS.

(a)    Facility Idling Process.    The parties acknowledge that Landlord and *[Purchaser]* have entered into that certain Transition Services Agreement dated as of the date hereof (the "Transition Services Agreement"). The parties have agreed that, from and after the expiration of the Production Period for each Facility, such Facility shall be shut down and idled pursuant to and in accordance with the terms, conditions, specifications and limitations of the Transition Services Agreement (the "Facility Idling Process"). Accordingly, from and after the expiration of the Production Period for each Facility, the Transition Services Agreement shall govern Landlord's and Tenant's rights and obligations relating to the Facility Idling Process for such Facility (other than the payment obligations with respect to such Facility during an Idling Period as set forth in Section 4.1 hereof) and that each Facility and the Landlord Fixtures and Personal Property located in each Facility will be returned to Landlord upon the expiration of Term in the condition contemplated by the Facilities Idling Process; provided, however, that to the extent any provisions of the Transition Services Agreement are inconsistent with or conflict with the terms and conditions of Section 18 of this Lease, the terms and conditions of Section18 of this Lease shall govern and control.

(b)    Removal of Tenant's Property.    From and after the expiration of the Production Period for each Facility, Tenant shall remove any Tenant Trade Fixtures and Personal Property that were not removed from such Facility prior to the expiration of

8

the Production Period for such Facility. Tenant shall make repairs necessitated by any removal of Tenant Trade Fixtures and Personal Property to the extent such repairs would be required by the Facility Idling Process. Any Tenant Trade Fixtures and Personal Property not removed from a Facility by Tenant on or before the Termination Date with respect to such Facility shall thereafter be deemed to be abandoned, and Landlord may, at Landlord's election, (i) accept the same, or (ii) remove and dispose of the same at Tenant's cost; provided that Tenant shall receive a credit against such costs for any amount Landlord receives in connection with the sale or other disposition of such Tenant Trade Fixtures and Personal Property. If Landlord elects to accept the same, this Lease shall serve as a bill of sale for such Tenant Trade Fixtures and Personal Property that are not removed from any Facility by Tenant.

**16.    HOLDOVER.**  Should Tenant continue to occupy any Facility after December 31, 2013, Tenant shall be deemed to be a tenant at sufferance as to such Facility and Tenant shall pay to Landlord, through the date on which Tenant surrenders the Facility to Landlord, monthly rent in an amount equal to one hundred twenty-five percent (125%) of the Rent set forth on Exhibit B with respect to such Facility (the "Holdover Rent") plus all other amounts payable under this Lease with respect to the applicable Facility on the date the Term terminates with respect to the applicable Facility. The obligation to pay Holdover Rent shall be without prejudice and in addition to any other rights and remedies Landlord may have under this Lease, including, without limitation, the right to recover possession of the applicable Facility.

**17.    EVENTS OF DEFAULT; REMEDIES**.

**17.1    Events of Default.**  Each of the following events shall constitute an "Event of Default":

(a)    If Tenant shall fail to pay any Rent or any other charge or sum to be paid by Tenant to Landlord when due in accordance with the terms of this Lease and such default shall continue for a period of fifteen (15) days after the date on which Rent is due or thirty (30) days after any other charge or sum to be paid by Tenant is due;

(b)    If Tenant shall fail to keep or perform or abide by any other requirement, term, condition, covenant or agreement of this Lease and such default shall continue for a period of thirty (30) days after written notice to Tenant of such default, and, if more than thirty (30) days shall reasonably be required to correct the breach complained of in such notice, then if Tenant shall fail to commence promptly to correct such breach and prosecute the same to completion with reasonable diligence; provided, however, that in no event shall such period of cure extend beyond one hundred eighty (180) days in the aggregate;

(c)    If Tenant shall be adjudged an involuntary bankrupt, or a decree or order approving, as properly filed, a petition or answer filed against Tenant asking reorganization of Tenant under the federal bankruptcy laws as now or hereafter amended, or under the laws of any state, shall be entered, and any such decree or judgment or order shall not have been vacated or set aside within one hundred twenty (120) days from the date of the entry or granting thereof;

(d)     If Tenant shall file or admit the jurisdiction of the court and the material allegations contained in any petition in bankruptcy or any petition pursuant or purporting to be pursuant to the federal bankruptcy laws as now or hereafter amended;

(e)     If Tenant shall institute any proceeding or shall give its consent to the institution of any proceedings for any relief of Tenant under any bankruptcy or insolvency laws or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, arrangements, composition or extension;

(f)     If Tenant shall make any assignment for the benefit of creditors or shall apply for or consent to the appointment of a receiver for Tenant; or a decree or order appointing a receiver of the property of Tenant shall be made and such decree or order shall not have been vacated or set aside within one hundred twenty (120) days from the date of entry or granting thereof; or

(g)     If Tenant shall fail to obtain or maintain the insurance as required by Section 13 hereof, in the amounts required thereby, and under the conditions and terms as set forth in said Section 13.

**17.2     Remedies.**  Upon the occurrence of any one or more Events of Default, Landlord may at its election:

(a)     Terminate this Lease.  Upon termination of the Lease, Tenant shall surrender possession and vacate the Premises immediately, and deliver possession thereof to Landlord, and hereby grants to Landlord the full and free right, in compliance with all applicable laws, to enter into and upon the Premises in such event with process of law and to repossess the Premises as Landlord's former estate and to expel or remove Tenant and any others who may be occupying or within the Premises without being deemed in any manner guilty of trespass, eviction, or forcible entry or detainer, and without relinquishing Landlord's rights to Rent or any other right given to Landlord hereunder or by operation of law.  Upon termination of the Lease, Landlord shall be entitled to recover as damages all Rent and other sums due and payable by Tenant to the date of termination; and/or

(b)     Landlord may pursue any and all remedies available at law or in equity, including without limitation, the right to sue Tenant for any and all damages, losses and liabilities, and reasonable costs and expenses (including reasonable attorneys' fees and court costs) incurred by or caused to Landlord arising out of or resulting from any act or omission of Tenant or any Event of Default by Tenant hereunder, and the right to sue for specific performance, and for injunctive relief but excluding for any Rent due following the date on which Tenant vacates the Premises.

**17.3     Landlord Defaults.**  If Landlord defaults in the performance of any of its obligations, covenants and warranties hereunder and such default continues for a period of thirty (30) days after written notice thereof to Landlord (or in an emergency, Landlord shall fail to cure such default immediately), and if more than thirty (30) days shall reasonably be required to correct the breach complained of in such notice, then if Landlord shall fail to commence

10

promptly to correct such breach and prosecute the same to completion with reasonable diligence not to exceed ninety (90) days, Tenant may, at its option and in addition to all other rights and remedies available to Tenant, cure the same on behalf of Landlord, in which event Tenant may deduct the cost of such cure from Rent next due hereunder, provided that if such Rent is insufficient to fully reimburse Tenant for such costs, any such deficiency (together with interest thereon at the Default Rate) shall be immediately due and payable by Landlord to Tenant upon written demand from Tenant, which demand shall be accompanied by invoices or receipts evidencing such costs.

    **17.4    Limitation on Liability.**

    NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL TENANT OR LANDLORD BE LIABLE FOR ANY INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND ARISING UNDER OR IN CONNECTION WITH THIS LEASE (INCLUDING PURSUANT TO SECTION 16 HEREOF), REGARDLESS OF LEGAL THEORY, INCLUDING ANY SUCH DAMAGES OR LOSSES RESULTING FROM BUSINESS INTERRUPTION OR LOST PROFITS.

    **18.    ENVIRONMENTAL.**

    **18.1    Definitions.** As used in this Section 18, the following terms shall have the following meanings:

         (a)    "Contamination" means the presence at the Premises, at a quantity or level which exceeds the amount that would require an investigation, clean up, or other response action under Environmental Law, of any Hazardous Material in surface water, groundwater, ambient air, or surface or subsurface soil.

         (b)    "Environmental Law" means any law in existence at the date hereof relating to the management or Release of, or exposure of humans to, any Hazardous Materials, pollution or the protection of human health and the environment, including surface water, groundwater, ambient air, surface or subsurface soil, natural resources or wildlife habitat.

         (c)    "Environmental Permits" means any consents, licenses, permits, or other approvals required by any governmental authority under Environmental Law.

         (d)    "Hazardous Materials" means any material or substance that is regulated, or can give rise to Liabilities or Losses, under an Environmental Law or a Permit issued pursuant to any Environmental Law, including any petroleum, petroleum-based or petroleum-derived product, polychlorinated biphenyls, asbestos-containing materials, lead, and any noxious, radioactive, flammable, corrosive or caustic compound (whether solid, liquid or gaseous).

         (e)    "Liabilities" means any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute,

11

1765182

contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any law, claim, governmental order, contract or otherwise.

(f)    "Losses" means any and all Liabilities, losses, damages, fines, amounts paid in settlement, penalties, costs and expenses (including reasonable and documented attorneys', accountants', technical consultants', engineers' and experts' fees and expenses).

(g)    "Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, discarding, burying, abandoning or disposing into the environment of Hazardous Materials that is prohibited under, or reasonably likely to result in a Liability under, any applicable Environmental Law.

**18.2    Agreements regarding Environmental Matters.**  Landlord and Tenant hereby acknowledge that:

(a)    the Landlord will retain all Liabilities for (i) all Contamination, including any Releases, in, at, on, under or emanating onto or from the Premises, regardless of when such Contamination may have occurred, and (ii) any on-going consequences or responsibilities relating to this Contamination;

(b)    the Landlord will be responsible for managing and funding the liabilities referenced in Section 18.2(a); and

(c)    the Tenant will only be responsible, as a short-term tenant, for compliance with applicable Environmental Laws and Environmental Permits directly related to its operations at the Premises.

(d)    Landlord retains or shall assume any Liability, including responsibility for the investigation, clean up, or other response action required under Environmental Law, related to any Contamination, including the Release of Hazardous Materials, in, at, on, under or emanating onto or from the Premises which occurred prior to, on or after the Commencement Date.  Except as provided by Section 18.2(e), (i) Landlord will take all actions required by or under any Environmental Law to address any Contamination in, at, on, under or emanating onto or from the Premises or other environmental conditions, matters, or issues, which, in each case may affect the Premises, and (ii), Landlord hereby forever waives, discharges and releases any claims or causes of action it has or may have against Tenant related to the existence or Release of Hazardous Materials in, at, on, under or emanating onto or from the Premises or other violation of Environmental Law prior to the Commencement Date, or on or after the Commencement Date.

(e)    Tenant shall conduct its operations at the Premises in compliance with applicable Environmental Laws and any Environmental Permits required at the Premises.  Tenant shall be responsible for (i) any fines or penalties resulting directly and exclusively from Tenant's noncompliance with Environmental Laws or Environmental

1765182

Permits at the Premises; and (ii) for site specific environmental clean up or other costs incurred by Landlord that Landlord establishes, pursuant to a non-appealable administrative or judicial determination, arose directly and exclusively from Tenant's gross negligence or willful misconduct in connection with the operation, maintenance or repair of any Facility ("Additional Costs") and not from the acts of any third party. Further, Tenant will indemnify, defend and hold Landlord harmless from and against any and all fines or penalties to the extent exclusively and directly caused by Tenant's noncompliance with Environmental Laws or Environmental Permits at the Premises and from all Additional Costs incurred by Landlord at the Facilities.

(f)     Landlord will promptly notify Tenant (and, if in writing, provide copies) of any governmental or third-party filings, notices, or communications concerning the Premises, any adjacent parcel, or other nearby real property of which Landlord has knowledge related in any way to any Contamination, environmental conditions, matters, or issues. Landlord will also notify the Tenant of any Release or threatened Release of any Hazardous Materials of which Landlord has knowledge that occurs in, at, on, under or emanates from the Premises or any adjacent parcel to the Premises after the Commencement Date and which is not caused exclusively and directly by the Tenant's activity on the Premises

(g)     Tenant will promptly notify the Landlord (and, if in writing, provide copies) of any governmental or third-party filings, notices, or communications concerning the Premises which relate in any way to any Contamination, environmental conditions, matters, or issues in connection with the Premises of which Tenant has knowledge. Tenant will also promptly notify Landlord of any Release or threatened Release of any Hazardous Materials which occurs in, at, on, under or emanates from the Premises, and which are caused exclusively and directly by the Tenant's current activities on the Premises. Other than providing Landlord with the notices provided for in this Section 18.2(g), Tenant will have no obligation to address, clean up, investigate, or otherwise respond to any Contamination on, at, in, under or emanating from the Premises, regardless of when such Contamination may have occurred.

(h)     The obligations in this Section 18 shall survive the expiration or termination of this Lease and the occurrence and discharge of any other obligation in this Lease.

19.     **NOTICE.** All notices or demands required or permitted to be given or served pursuant to this Lease shall be in writing and shall be deemed to have been given or served one (1) business day subsequent to transmittal by nationally recognized prepaid overnight courier, and addressed to Landlord at Landlord's Address or to Tenant at Tenant's Address (as set forth in the Lease Schedule). Such addresses may be changed from time to time by either party by serving notice as above provided. In no event shall personal delivery at the Premises be deemed an effective means of notice.

20.     **ENTRY UPON PREMISES.** Landlord and Landlord's representatives shall be permitted to enter the Premises at all reasonable times during usual business hours upon no less than forty-eight (48) hours' prior notice to Tenant (except in case of emergency) for purposes of

13

(i) performing such repairs, maintenance or replacements to be performed by Landlord pursuant to this Lease, (ii) exhibiting the Premises for sale or mortgage financing or, within the last six (6) months of the Term or during an Extended Term, to prospective tenants; and (iii) curing any Event of Default by Tenant under the terms of this Lease and during any such entry by Landlord or Landlord's representatives (except in case of emergency), at Tenant's option, a representative of Tenant shall accompany Landlord and/or Landlord's representatives through the Premises at all times.

## 21.    GENERAL PROVISIONS.

**21.1    Brokerage.**  Landlord and Tenant each represents and warrants to the other that it has not engaged or dealt with any broker in this transaction.  Landlord and Tenant each agree to indemnify and hold the other harmless from and against all liability, claims, demands, damages, or costs of any kind arising from or connected with any broker's commission, finder's fee, consulting fee or other charge claimed to be due any person or entity arising from the indemnifying party's conduct with respect to this Lease.

**21.2    Amendments.**  No amendment or modification of this Lease shall be effective unless in writing and executed by Landlord and Tenant.

**21.3    Severability.**  If any term or provision of this Lease shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Lease shall not be affected thereby, but each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**21.4    Attorney's Fees.**  In the event Landlord or Tenant is required to use the services of any attorney for the enforcement of any of the terms, covenants or provisions hereof or in the event of any other dispute between Landlord and Tenant concerning this Lease, the prevailing party shall be entitled to recover reasonable attorney's fees and expenses from the non-prevailing party.

**21.5    Time of Essence.**  Subject to Section 21.12 below, time is of the essence of this Lease, and all provisions herein relating thereto shall be strictly construed.

**21.6    Waiver.**  No waiver of any provision of this Lease shall be deemed to be a waiver of any other provision hereof or of any subsequent or continuing breach of the same or any other provision.  Landlord's consent to or approval of any act by Tenant shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act.

**21.7    Successors and Assigns.**  All of the covenants, conditions, and provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, when permitted hereunder.

**21.8    Governing Law.**  This Lease shall be construed in accordance with the laws of the state of Michigan, except that for purposes of enforcing or construing this Lease with respect to any Facility located outside the state of Michigan, the laws of the state in which such Facility is located shall apply in lieu of the laws of the state of Michigan.

14

1765182

**21.9    Estoppel Agreements.**  Each of Tenant and Landlord agrees that from time to time within ten (10) business days after written request by the other party hereto, it will execute, acknowledge and deliver to the requesting party or to such other party as may be designated by the requesting party, a certificate stating that this Lease is then in full force and effect and has not been modified, supplemented or amended in any way, except as indicated in such certificate; that all conditions and agreements under this Lease to be performed by Landlord or Tenant, as applicable, have been satisfied or performed, except as set forth in such certificate; that, to such party's knowledge, there are no existing defenses or offsets of Tenant, except as indicated in such certificate; that Tenant has not paid any rental more than one month in advance, except as indicated in such certificate; and that, to such party's knowledge, the other party is not in default under any provisions of this Lease.

**21.10    Subordination, Non-Disturbance Agreement.**  Prior to entering into any financing that encumbers any portion of the Premises, at Tenant's request, Landlord agrees to deliver to Tenant a subordination, non-disturbance and attornment agreement with respect to such portion of the Premises executed by Landlord's lender in a form reasonably acceptable to such lender and Tenant.

**21.11    Intentionally Omitted.**

**21.12    Force Majeure.**  Neither Landlord nor Tenant shall be deemed in default with respect to any of the terms, covenants and conditions of this Lease to be performed on Landlord's or Tenant's part (other than the failure to make any payment due hereunder), if such party's failure to timely perform same is due in whole or in part to any strike, lockout, labor trouble, civil disorder, failure of power, restrictive governmental laws and regulations, riots, insurrections, war, shortages, accidents, casualties, acts of God, acts caused directly by the other party hereto or such party's agents, employees and invitees, or any other cause beyond the reasonable control of Landlord or Tenant, as applicable (collectively, "Force Majeure Events"). In the event of a Force Majeure Event, the period of performance shall be delayed one day for each day of delay caused by the applicable Force Majeure Event.  The foregoing definition of Force Majeure Events shall apply only during the Term.

**21.13    Consent.**  Any time the consent of Landlord or Tenant is required, such consent shall not be unreasonably withheld, conditioned or delayed.  Whenever this Lease grants Landlord or Tenant the right to take action, exercise discretion, establish rules and regulations or make allocations or other determinations (other than decisions to exercise expansion, contraction, cancellation, termination or extension options, or decisions which are specified herein to be in the sole discretion of the applicable party), Landlord and Tenant shall act reasonably and in good faith, and shall take no action that might result in the frustration of the reasonable expectations of a sophisticated tenant or landlord concerning the benefits to be enjoyed thereby.

**21.14    Time Period for Payment.**  Any time this Lease requires a payment from Landlord to Tenant or from Tenant to Landlord, and no specific time period is set forth herein, such payment shall be deemed due within thirty (30) days after receipt by the paying party of a reasonably detailed, written invoice therefor.

1765182

**21.15  Execution of Lease.**  The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises and this document shall become effective and binding only upon the execution and delivery hereof by Tenant and by Landlord.  All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein.

**21.16  Counterparts.**  This Lease may be executed in one or more counterparts, and each such counterpart shall constitute an original.

**21.17  Confidentiality.**  Except as may be required by filings with or orders by the Bankruptcy Court (defined below), each party acknowledges that it will have access to certain financial information of the other party ("Confidential Information").  Such Confidential Information shall not be released to the public and will be provided, subject to this paragraph, only to those parties who have a legitimate need for such Confidential Information, including accountants, lawyers, lenders, potential buyers, mortgagees and similar parties.  Neither Landlord nor Tenant shall prepare or provide any materials with respect to this Lease for media distribution, whether it be: print, television, radio, internet or any other commercial distribution, without the approval of the other party.  Landlord and Tenant may prepare any necessary documentation or agenda necessary to secure internal or public approval (if necessary) without said approval being required by the other party.

The following information shall not constitute Confidential Information for purposes of this Section 21.17:

(a)  any information that is available, or becomes available, to the general public without fault of the non-disclosing party;

(b)  any information that can be shown was in the possession of the non-disclosing party prior to receipt of the same from the disclosing party;

(c)  any information that is obtained by the non-disclosing party without an obligation of confidence from a third party who is rightfully in possession of such information and is under no obligation of confidentiality to the disclosing party;

(d)  any information that the non-disclosing party is legally required to disclose; or

(e)  any information that is independently developed by the non-disclosing party without reference or access to the Confidential Information.

**21.18  Jurisdiction for Dispute Resolution.**  (a)  Without  limiting  any party's right to appeal any order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Lease and to decide any claims or disputes that may arise or result from, or be connected with, this Lease, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and

16

submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 19</u> hereof; <u>provided</u>, <u>however</u>, that if Landlord's voluntary petition for relief under Chapter 11 of Title 11, U.S.C. §§101 et. seq. has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the federal courts in the Southern District of New York and the State of New York located in the Borough of Manhattan in the City of New York and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)   Each of the parties hereto hereby consents to process being served by any party to this Lease in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 19</u>.

**21.19   Gender.** All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity entity of the person or entity may require.

**22.   WAIVER OF LANDLORD LIEN.** Landlord hereby waives and releases all liens, right of distraint or security interests (whether arising by statute or at common law) in all property, chattels or merchandise which may be placed in the Premises and also upon all proceeds of insurance which may accrue to Tenant by reason of damage to or destruction of any such property, chattels or merchandise.

**23.   CONTRACTION RIGHT.** Tenant shall have the continuing option (the "<u>Contraction Right</u>") during the Term to reduce the Premises at any time during the Term by providing notice to Landlord that Tenant is exercising the Contraction Right (each, a "<u>Contraction Notice</u>"), provided that Tenant may only reduce the Premises by returning an entire Facility (as hereinafter defined) to Landlord and not a portion of a Facility. The Contraction Notice shall include (a) the date on which Tenant shall return the Facility to Landlord, which date shall be not less than forty-five (45) days after delivery of such notice (each, a "<u>Contraction Date</u>") and (b) the identification of the Facility to be returned to Landlord on or before the Contraction Date. Tenant shall deliver the Facility to Landlord on or before the respective Contraction Date in accordance with <u>Section 15</u> hereof in the same condition as if the Contraction Date were the original date set forth in this Lease for expiration of the Term with respect to the applicable Facility. On a Contraction Date, the Facility identified in the applicable Contraction Notice shall be deemed to have been removed from <u>Exhibit A</u> and shall no longer constitute a portion of the Premises, this Lease shall terminate with respect to such Facility, and Landlord and Tenant shall have no further obligations hereunder with respect to such Facility, including, without limitation, the payment of Rent allocable to such Facility, except any obligations hereunder that expressly survive termination of this Lease. Notwithstanding the foregoing, following a Contraction Date, this Lease shall remain in full force and effect with respect to the then-remaining portion of the Premises.

17

1765182

**24.** **GUARANTY**. This Lease is expressly conditioned upon the Guarantor guaranteeing Tenant's payment and performance under this Lease by executing a written guaranty in the form attached hereto as Exhibit D and made a part hereof.

**25.** **PURCHASE OPTION**. At any time prior to the Target End Date with respect to the Pontiac North Facility (as such term is defined in Exhibit A), Tenant may elect to purchase the Pontiac North Facility by providing written notice to Landlord of such election. Within a reasonable time following delivery of such notice to Landlord, Landlord shall convey the Pontiac North Facility to Tenant by a quitclaim deed for One Dollar ($1.00) in stated consideration and this Lease shall terminate with respect to the Pontiac North Facility upon such conveyance, provided that this Lease shall remain in full force and effect with the remainder of Premises. For avoidance of doubt, the purchase option described in this Section 25 shall apply only to the Pontiac North Facility and shall not apply to any other Facility.

**[Signature Pages to Follow]**

**IN WITNESS WHEREOF,** the parties hereto have executed this Lease by and through their corporate officers thereunto duly authorized, the day and year first above written.

**TENANT:**

*[LEASECO]*, a Delaware corporation

By: _____
Name: _____
Title: _____

**LANDLORD:**

**GENERAL MOTORS CORPORATION,**
a Delaware corporation

By: _____
Name: _____
Title: _____

18

1765182

## Exhibit A

## Common Addresses of Premises

| FACILITY | USEABLE SQUARE FOOTAGE |
|---|---|
| 1. Stamping - Indianapolis, 340 White River Parkway West Drive South 50, Indianapolis, IN 46206 | 2,111,172 |
| 2. GMPT - Flint North #5/#10/#81, 902 E Hamilton Avenue, Flint, MI 48550 | 2,001,070 |
| 3. GMPT - Livonia, 12200 Middlebelt, Livonia, MI 48150 | 1,178,729 |
| 4. GMVM - Pontiac Assembly, 2100 S Opdyke Road, Pontiac, MI 48341 | 3,378,106 |
| 5. Stamping - Pontiac North Campus, 220 East Columbia, Pontiac, MI 48340 (excluding Plant 14) ("Pontiac North Facility") | 1,464,846 |
| 6. Stamping - Mansfield, 2525 West Fourth Street, PO Box 2567 - 44906, Mansfield, OH 44906-1269 (the "Mansfield Facility") | 2,753,195 |
| 7. GMPT - Parma Complex, 5400 Chevrolet Boulevard, PO Box 30098, Parma, OH, 44130 | 579,544 |
| 8. GMPT - Fredericksburg, 11032 Tidewater Trail, Fredericksburg, VA, 22408 | 280,043 |
| 9. GMPT - Willow Run, 2930 Ecorse Road, Ypsilanti, MI 48198 | 4,723,313 |
| 10. Stamping - Grand Rapids, 300 36th Street SW, Wyoming, MI 49548 (the "Grand Rapids Facility") | 2,324,628 |
| 11. GMVM – Shreveport Assembly (excluding Stamping), 7600 General Motors Blvd., Shreveport, LA | 2,768,105 |
| 12. Stamping – Shreveport, 7600 General Motors Blvd., Shreveport, LA | 867,040 |
| 13. GMVM - Wilmington Assembly, 801 Boxwood Road, Wilmington, DE | 2,836,064 |
| TOTAL: | 27,265,855 |

1765182

## Exhibit B

### Target End Dates

| FACILITY | TARGET END DATE |
|---|---|
| 1. Stamping - Indianapolis, 340 White River Parkway West Drive South 50, Indianapolis, IN 46206 | 12/31/2011 |
| 2. GMPT - Flint North #5/#10/#81, 902 E Hamilton Avenue, Flint, MI 48550 | 12/31/2010 |
| 3. GMPT - Livonia, 12200 Middlebelt, Livonia, MI 48150 | 6/30/2010 |
| 4. GMVM - Pontiac Assembly, 2100 S Opdyke Road, Pontiac, MI 48341 | 10/31/2009 |
| 5. Pontiac North Facility | 12/31/2010 |
| 6. Mansfield Facility | 6/30/2010 |
| 7. GMPT - Parma Complex, 5400 Chevrolet Boulevard, PO Box 30098, Parma OH, 44130 | 12/31/2010 |
| 8. GMPT - Fredericksburg, 11032 Tidewater Trail, Fredericksburg, VA 22408 | 12/31/2010 |
| 9. GMPT - Willow Run, 2930 Ecorse Road, Ypsilanti, MI | 12/31/2010 |
| 10.    Grand Rapids Facility | 12/31/2009 |
| 11.    GMVM – Shreveport Assembly (excluding Stamping), 7600 General Motors Blvd., Shreveport, LA | 6/30/2012 |
| 12.    Stamping – Shreveport, 7600 General Motors Blvd., Shreveport, LA | 6/30/2012 |
| 13.    GMVM - Wilmington Assembly, 801 Boxwood Road, Wilmington, DE | 7/31/2009 |

## Exhibit C

### Rent

| FACILITY | RENT PER ANNUM |
|---|---|
| 1. Stamping - Indianapolis, 340 White River Parkway West Drive South 50, Indianapolis, IN 46206 | $2,111,172 |
| 2. GMPT - Flint North #5/#10/#81, 902 E Hamilton Avenue, Flint, MI 48550 | $2,001,070 |
| 3. GMPT - Livonia, 12200 Middlebelt, Livonia, MI 48150 | $1,178,729 |
| 4. GMVM - Pontiac Assembly, 2100 S Opdyke Road, Pontiac, MI 48341 | $3,378,106 |
| 5. Pontiac North Facility | $1,464,846 |
| 6. Mansfield Facility | $2,753,195 |
| 7. GMPT - Parma Complex, 5400 Chevrolet Boulevard, PO Box 30098, Parma, OH, 44130 | $579,544 |
| 8. GMPT - Fredericksburg, 11032 Tidewater Trail, Fredericksburg, VA, 22408 | $280,043 |
| 9. GMPT - Willow Run, 2930 Ecorse Road, Ypsilanti, MI 48198 | $4,723,313 |
| 10. Grand Rapids Facility | $2,324,628 |
| 11. GMVM – Shreveport Assembly (excluding Stamping), 7600 General Motors Blvd., Shreveport, LA | $2,768,105 |
| 12. Stamping – Shreveport, 7600 General Motors Blvd., Shreveport, LA | $867,040 |
| 13. GMVM - Wilmington Assembly, 801 Boxwood Road, Wilmington, DE | $2,836,064 |
| **TOTAL:** | $27,265,855 |

EXHIBIT C TO MASTER LEASE AGREEMENT

1765182

### Exhibit D

### Form of Guaranty

### GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Guaranty Agreement") dated as of
_____, 2009, is executed by [_____], a Delaware limited liability company
("Guarantor").

WHEREAS, General Motors Corporation, a Delaware corporation, and *[LEASECO]*
("Tenant"), entered into that certain Master Lease Agreement (Excluded Manufacturing Assets)
dated as of the date hereof (the "Lease"), pursuant to which Landlord leases to Tenant the
Premises (as defined in the Lease). All capitalized terms used herein that are not specifically
defined herein shall have the meanings set forth in the Lease;

WHEREAS, Guarantor is an affiliate of Tenant and Guarantor will benefit by Tenant
entering into the Lease; and

WHEREAS, Guarantor has agreed to guarantee the Tenant's obligations, covenants,
agreements and liabilities under the Lease and/or with respect to the Premises to Landlord in
accordance with the terms and conditions of this Guaranty Agreement.

In consideration of the decision of Landlord to lease the Premises to Tenant, Guarantor
agrees as follows:

1. **Guaranty**. Upon the terms and subject to the conditions set forth in this Guaranty
Agreement, Guarantor unconditionally, absolutely and irrevocably guarantees the full and
prompt payment and performance when due of the obligations, covenants, agreements and
liabilities of the Tenant under the Lease and/or with respect to the Premises (collectively, the
"Obligations"). Guarantor agrees that the Landlord may pursue multiple actions against the
Guarantor as necessary to enforce the Landlord's rights under this Guaranty Agreement. The
guaranty set forth herein is one of payment and not of collection. Capitalized terms used, but not
defined, herein shall have the meaning ascribed to such terms in the Lease. Guarantor hereby
waives (a) any right to require Landlord to proceed against Tenant or any other guarantor or any
other person or entity liable to Landlord and (b) demand of payment, performance, presentation
and/or protest of any kind.

2. **Waiver**. No delay or failure on the part of the Landlord to exercise any right, power
or privilege under this Guaranty Agreement shall operate as a waiver thereof, and no single or
partial exercise of any right, power or privilege shall preclude any other or further exercise
thereof or the exercise of any other power or right, or be deemed to establish a custom or course
of dealing or performance between the parties hereto. The rights and remedies herein provided
are cumulative and not exclusive of any rights or remedies provided by law.

3. **Termination**. The obligations of Guarantor under this Guaranty Agreement shall
remain in full force and effect until such time as the Obligations have been paid and performed

in full, provided that the obligations of Guarantor under this Guaranty Agreement (a) shall expire with respect to each Facility on the second anniversary of the Termination Date with respect to such Facility and (b) notwithstanding the foregoing, shall remain in effect and enforceable against Guarantor after payment in full of the Obligations if at any time payment of the Obligations is rescinded or otherwise must be restored or returned by the Landlord upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Guarantor, the Tenant or otherwise, all as though such payment had not been made.

4. **Consent**. Guarantor consents to, authorizes and grants to the Landlord the full power, in its sole discretion, to deal in any manner with the Lease and the Obligations, including, without limitation, the right: (a) to amend, change, modify or otherwise revise the Lease (together with the Tenant), (b) to take or omit to take any action, grant any consent, and/or exercise any right under the Lease and/or with respect to the Premises, and (c) to consent to assignments, subleases and/or other transfers of the Premises. The obligations of Guarantor hereunder shall not be released, discharged, or in any way affected, nor shall Guarantor have any rights of recourse against the Landlord by reason of any action that the Landlord may take or omit to take under this Section 5.

5. **Assignment**. This Guaranty Agreement shall be binding upon and enforceable against Guarantor and its successors and assigns and shall inure to the benefit of, and be enforceable by, Landlord and their successors and assigns.

6. **No Third-Party Beneficiaries**. This Guaranty Agreement is intended for the sole and exclusive benefit of Landlord and their respective successors and assigns and shall not be enforceable by any other party. This Guaranty Agreement may not be assigned by Guarantor without the prior express written consent of Landlord which consent may be withheld in Landlord's sole discretion, provided that Landlord may not unreasonably withhold such consent in connection with a transfer by Tenant permitted under the Lease.

7. **Governing Law**. This Guaranty Agreement shall be construed in accordance with the laws of the state of Michigan.

8. **Notices**. Any notice, request or other communication hereunder to Landlord or Guarantor shall be delivered to the addresses set forth in and in accordance with the terms of the Lease, provided that notices to Guarantor shall be delivered to the attention of Guarantor at the addresses set forth for Tenant in the Lease.

9. **Jurisdiction for Dispute Resolution.**

(a)    Without limiting any party's right to appeal any order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Guarantor and Landlord (by its acceptance of this Guaranty Agreement) hereby agree that (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of the Lease and this Guaranty Agreement and to decide any claims or disputes that may arise or result from, or be connected with, the Lease and this Guaranty Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall

be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10 hereof; provided, however, that if Landlord's voluntary petition for relief under Chapter 11 of Title 11, U.S.C. §§101 et. seq. has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the federal courts in the Southern District of New York and the State of New York located in the Borough of Manhattan in the City of New York and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Lease in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 10.

10. **Modification**.    The terms of this Guaranty Agreement may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.  No amendment, modification or other change of any of the terms of this Guaranty Agreement shall be effective without the prior written consent of both the Landlord and Guarantor.

**[Remainder of page intentionally left blank]**

IN WITNESS WHEREOF, Guarantor has executed this Guaranty Agreement as of the date first written above.

/_____/, a Delaware limited liability company

By: _____

Name: _____

Title: _____

1765182

Y

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit Y**

Form of Certificate of Designation of Purchaser for Preferred Stock

## EXHIBIT Y

### Form Of Certificate of Designations

### Of

### Series A Fixed Rate Cumulative Perpetual Preferred Stock

### Of

### [NGMCO, INC.]

*[NGMCO, Inc.]*, a corporation organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), hereby certifies that the following resolution was adopted by the board of directors of the Corporation (the "Board of Directors") or an authorized committee of the Board of Directors in accordance with the provisions of Section 151 of the General Corporation Law of the State of Delaware on *[_____]*, 2009:

RESOLVED, that pursuant to the provisions of the certificate of incorporation and the bylaws of the Corporation and applicable law, a series of Preferred Stock, par value $0.01 per share, of the Corporation be and hereby is created, and that the designation and number of shares of such series, and the voting and other powers, preferences and relative, participating, optional or other rights, and the qualifications, limitations and restrictions, of the shares of such series be and hereby are as follows:

Part 1. *Designation and Number of Shares*. There is hereby created out of the authorized and unissued shares of Preferred Stock of the Corporation a series of preferred stock designated as the "Series A Fixed Rate Cumulative Perpetual Preferred Stock" (the "Series A Preferred Stock"). The authorized number of shares of the Series A Preferred Stock shall be 360,000,000. Such number of shares may be decreased by resolution of the Board of Directors, subject to the terms and conditions hereof; provided that no decrease shall reduce the number of shares of the Series A Preferred Stock to a number less than the number of shares then outstanding.

Part 2. *Standard Provisions*. The Standard Provisions contained in Annex A attached hereto are incorporated herein by reference in their entirety and shall be deemed to be a part of this Certificate of Designations to the same extent as if such provisions had been set forth in full herein.

Part 3. *Definitions*. The following terms are used in this Certificate of Designations (including the Standard Provisions in Annex A hereto) as defined below:

(a) "Common Stock" means the common stock, par value $0.01 per share, of the Corporation.

(b) "Dividend Payment Date" means March 15, June 15, September 15 and December 15 of each year.

1

(c) "Junior Stock" means any preferred stock other than this Series A Preferred Stock, the Common Stock and any other class or series of stock of the Corporation.

(d) "Liquidation Amount" means $25 per share of the Series A Preferred Stock.

Part. 4. *Certain Voting Matters.* For purposes of determining the voting rights of the holders of the Series A Preferred Stock under Section 7 of the Standard Provisions forming part of this Certificate of Designations, each holder will be entitled to one vote for each $25 of Liquidation Amount to which such holder's shares are entitled.

[Remainder of Page Intentionally Left Blank]

2

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Designations to be signed by [_____], its [_____], this [__] day of [_____], 2009.

*[NGMCO, INC.]*

By: _____
Name: *[_____]*
Title: *[_____]*

1766819

ANNEX A

## STANDARD PROVISIONS

Section 1.    *General Matters; Ranking.* Each share of the Series A Preferred Stock shall be identical in all respects to every other share of the Series A Preferred Stock. The Series A Preferred Stock shall be perpetual, subject to the provisions of Section 5 of these Standard Provisions that form a part of the Certificate of Designations. The Series A Preferred Stock shall rank senior to the Junior Stock in respect of the right to receive dividends and the right to receive payments or distributions out of the assets of the Corporation upon voluntary or involuntary liquidation, dissolution or winding up of the Corporation.

Section 2.    *Standard Definitions.* As used herein with respect to the Series A Preferred Stock:

(a) "Agent Members" has the meaning set forth in Section 13(d).

(b) "Applicable Dividend Rate" means 9% per annum.

(c) "Business Day" means any day except Saturday, Sunday and any day on which banking institutions in the State of New York generally are authorized or required by law or other governmental actions to close.

(d) "Bylaws" means the bylaws of the Corporation, as they may be amended from time to time.

(e) "Certificate of Designations" means the Certificate of Designations or comparable instrument relating to the Series A Preferred Stock, of which these Standard Provisions form a part, as it may be amended from time to time.

(f) "Charter" means the Corporation's Amended and Restated Certificate of Incorporation, as such may be amended or restated from time to time.

(g) "Dividend Period" has the meaning set forth in Section 3(a).

(h) "Dividend Record Date" has the meaning set forth in Section 3(a).

(i) "DTC" has the meaning set forth in Section 9.

(j) "First Optional Redemption Date" has the meaning set forth in Section 5(a).

(k) "Global Share" means a share of Series A Preferred Stock in the form of a permanent global stock certificate, in definitive, fully registered form.

(l) "Global Share Legend" has the meaning set forth in Section 13(d).

4

(m) "Original Issue Date" means the date on which shares of the Series A Preferred Stock are first issued.

(n) "Person" means any individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

(o) "Preferred Director" has the meaning set forth in Section 7(b).

(p) "Preferred Share Register" has the meaning set forth in Section 15(a).

(q) "Preferred Stock" means any and all series of preferred stock of the Corporation, including the Series A Preferred Stock.

(r) "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

(s) "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

(t) "Series A Preferred Share Certificate" has the meaning set forth in Section 13.

(u) "Share Dilution Amount" has the meaning set forth in Section 3(b).

(v) "Standard Provisions" mean these Standard Provisions that form a part of the Certificate of Designations relating to the Series A Preferred Stock.

(w) "Redemption Price" has the meaning set forth in Section 5(a).

(x) "Transfer Agent" has the meaning set forth in Section 17.

Section 3. *Dividends.*

(a)    **Rate.** Holders of the Series A Preferred Stock shall be entitled to receive, on each share of the Series A Preferred Stock, if, as and when declared by the Board of Directors or any duly authorized committee of the Board of Directors, but only out of assets legally available therefor, cumulative cash dividends with respect to each Dividend Period (as defined below) at a rate per annum equal to the Applicable Dividend Rate on (i) the Liquidation Amount per share of the Series A Preferred Stock and (ii) the amount of accrued and unpaid dividends for any prior Dividend Period on such share of Series A Preferred Stock, if any. Such dividends shall begin to accrue and be cumulative from the Original Issue Date, shall compound on each subsequent Dividend Payment Date (*i.e.*, no dividends shall accrue on other dividends unless and until the first Dividend Payment Date for such other dividends has passed without such other dividends having been paid on such date), and shall be payable quarterly in arrears on each Dividend Payment Date, commencing with the first such Dividend Payment Date to occur at least 20 calendar days after the Original Issue Date. In the event that any Dividend Payment Date would

5

otherwise fall on a day that is not a Business Day, the dividend payment due on that date will be postponed to the next day that is a Business Day and no additional dividends shall be payable nor shall interest accrue on the amount payable as a result of that postponement. The period from and including any Dividend Payment Date to, but excluding, the next Dividend Payment Date is a "Dividend Period"; provided that the initial Dividend Period shall be the period from and including the Original Issue Date to, but excluding, the Dividend Payment Date immediately following the Original Issue Date.

Dividends that are payable on Series A Preferred Stock in respect of any Dividend Period shall be computed on the basis of a 360-day year consisting of twelve 30-day months. The amount of dividends payable on the Series A Preferred Stock on any date prior to the end of a Dividend Period, and for the initial Dividend Period, shall be computed on the basis of a 360-day year consisting of twelve 30-day months and actual days elapsed over a 30-day month.

Dividends that are payable on Series A Preferred Stock on any Dividend Payment Date will be payable to holders of record of the Series A Preferred Stock as they appear on the stock register of the Corporation on the applicable record date, which shall be the 15th calendar day immediately preceding such Dividend Payment Date or such other record date fixed by the Board of Directors or any duly authorized committee of the Board of Directors that is not more than 60 nor less than 10 days prior to such Dividend Payment Date (each, a "Dividend Record Date"). Any such day that is a Dividend Record Date shall be a Dividend Record Date whether or not such day is a Business Day.

Holders of the Series A Preferred Stock shall not be entitled to any dividends, whether payable in cash, securities or other property, other than dividends (if any) declared and payable on the Series A Preferred Stock as specified in this Section 3 (subject to the other provisions of the Certificate of Designations).

(b)    **Priority of Dividends**. So long as any share of the Series A Preferred Stock remains outstanding, no dividend or distribution shall be declared or paid on the Common Stock or any other shares of Junior Stock, and no Common Stock or Junior Stock shall be, directly or indirectly, purchased, redeemed or otherwise acquired for consideration by the Corporation or any of its subsidiaries unless all accrued and unpaid dividends for all past Dividend Periods, including the latest completed Dividend Period (including, as provided in Section 3(a) above, any dividends on such amount), on all outstanding shares of the Series A Preferred Stock have been or are contemporaneously declared and paid in full in cash (or have been declared and a sum sufficient for the payment thereof has been set aside for the benefit of the holders of shares of the Series A Preferred Stock on the applicable record date). The foregoing limitation shall not apply to (i) a dividend payable on any Junior Stock in shares of any other Junior Stock, or to the acquisition of shares of any Junior Stock in exchange for, or through application of the proceeds of the sale of, shares of any other Junior Stock; (ii) redemptions, purchases or other acquisitions of shares of Common Stock or other Junior Stock in connection with the administration of any employee benefit plan in the ordinary course of business (including purchases to offset the Share Dilution Amount pursuant to a publicly announced repurchase plan); provided that any purchases to offset the Share Dilution Amount shall in no event exceed the Share Dilution Amount; (iii) any dividends or distributions of rights or Junior Stock in connection with a stockholders' rights

6

plan or any redemption or repurchase of rights pursuant to any stockholders' rights plan; (iv) the acquisition by the Corporation or any of its subsidiaries of record ownership in Junior Stock for the beneficial ownership of any other persons (other than the Corporation or any of its subsidiaries), including as trustees or custodians; and (v) the exchange or conversion of Junior Stock for or into other Junior Stock (with the same or lesser aggregate liquidation amount). "Share Dilution Amount" means the increase in the number of diluted shares outstanding (determined in accordance with generally accepted accounting principles in the United States, and as measured from the Original Issue Date) resulting from the grant, vesting or exercise of equity-based compensation to employees and equitably adjusted for any stock split, stock dividend, reverse stock split, reclassification or similar transaction.

When dividends are not paid (or declared and a sum sufficient for payment thereof set aside for the benefit of the holders thereof on the applicable record date) on any Dividend Payment Date in full on shares of the Series A Preferred Stock, all dividends declared on the Series A Preferred Stock and payable on such Dividend Payment Date shall be declared pro rata so that the respective amounts of such dividends declared shall bear the same ratio to each other as all accrued and unpaid dividends per share on the shares of the Series A Preferred Stock (including, as provided in Section 3(a) above, any dividends on such amount) (subject to their having been declared by the Board of Directors or a duly authorized committee of the Board of Directors out of legally available funds and including, all accrued but unpaid dividends) bear to each other.

Subject to the foregoing, and not otherwise, such dividends (payable in cash, securities or other property) as may be determined by the Board of Directors or any duly authorized committee of the Board of Directors may be declared and paid on any securities, including Common Stock and other Junior Stock, from time to time out of any funds legally available for such payment, and holders of the Series A Preferred Stock shall not be entitled to participate in any such dividends.

Section 4. *Liquidation, Dissolution or Winding Up*. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, then, before any distribution or payment shall be made to the holders of Junior Stock, the holders of the Series A Preferred Stock shall be entitled to be paid in full the respective amounts of the liquidation preferences thereof, which in the case of the Series A Preferred Stock shall be the Liquidation Amount, plus an amount equal to all accrued and unpaid dividends, if any (including, as provided in Section 3(a) above, any dividends on such amount), whether or not declared, prior to such distribution or payment date. If such payment shall have been made in full to the holders of the Series A Preferred Stock, the remaining assets and funds of the Corporation shall be distributed among the holders of Junior Stock, according to their respective rights and preferences and in each case according to their respective shares. If, upon any liquidation, dissolution or winding up of the affairs of the Corporation, the amounts so payable are not paid in full to the holders of all outstanding shares of the Series A Preferred Stock, the holders of the Series A Preferred Stock shall share ratably in any distribution of assets in proportion to the full amounts to which they would otherwise be respectively entitled. Neither the consolidation or merger of the Corporation, nor the sale, lease or conveyance of all or a part of its assets, shall be deemed a liquidation, dissolution or winding up of the affairs of the Corporation within the

7

meaning of the foregoing provisions of this Section 4.

Section 5. *Redemption.*

(a)     **Optional Redemption**. The Series A Preferred Stock may not be redeemed by the Corporation prior to December 31, 2014 (the "First Optional Redemption Date"). On or after that date, the Corporation, at its option, may redeem, in whole or in part, at any time and from time to time, out of funds legally available therefor, the shares of the Series A Preferred Stock at the time outstanding, upon notice given as provided in Section 5(c) below, at a redemption price per share equal to the sum of (i) the Liquidation Amount per share and (ii) except as otherwise provided below, any accrued and unpaid dividends (including, as provided in Section 3(a) above, any dividends on such amount) (regardless of whether any dividends are actually declared) to, but excluding, the date fixed for redemption (the "Redemption Price").

The Redemption Price for any shares of the Series A Preferred Stock shall be payable on the redemption date to the holder of such shares against surrender of the certificate(s) evidencing such shares to the Corporation or its agent. Any declared but unpaid dividends payable on a redemption date that occurs subsequent to the Dividend Record Date for a Dividend Period shall not be paid to the holder entitled to receive the Redemption Price on the redemption date, but rather shall be paid to the holder of record of the redeemed shares on such Dividend Record Date relating to the Dividend Payment Date as provided in Section 3 above.

(b)     **No Mandatory Redemption; No Sinking Fund**. The Series A Preferred Stock will not be subject to any mandatory redemption, mandatory repurchase, sinking fund or other similar provisions. Holders of the Series A Preferred Stock will have no right to require redemption or repurchase of any shares of the Series A Preferred Stock.

(c)     **Notice of Redemption**. Notice of every redemption of shares of the Series A Preferred Stock shall be given by first class mail, postage prepaid, addressed to the holders of record of the shares to be redeemed at their respective last addresses appearing on the books of the Corporation. Such mailing shall be at least 30 days and not more than 60 days before the date fixed for redemption. Any notice mailed as provided in this subsection (c) shall be conclusively presumed to have been duly given, whether or not the holder receives such notice, but failure duly to give such notice by mail, or any defect in such notice or in the mailing thereof, to any holder of shares of the Series A Preferred Stock designated for redemption shall not affect the validity of the proceedings for the redemption of any other shares of the Series A Preferred Stock. Notwithstanding the foregoing, if shares of the Series A Preferred Stock are issued in book-entry form through The Depository Trust Corporation or any other similar facility, notice of redemption may be given to the holders of the Series A Preferred Stock at such time and in any manner permitted by such facility. Each notice of redemption given to a holder shall state: (1) the redemption date; (2) the number of shares of the Series A Preferred Stock to be redeemed and, if less than all the shares held by such holder are to be redeemed, the number of such shares to be redeemed from such holder; (3) the Redemption Price; and (4) the place or places where certificates for such shares are to be surrendered for payment of the redemption price, but failure duly to give such notice to any holder of shares of the Series A Preferred Stock designated for redemption or any defect in such notice shall not affect the validity of the proceedings for the

8

redemption of any other shares of the Series A Preferred Stock.

(d)    **Partial Redemption**. In case of any redemption of part of the shares of the Series A Preferred Stock at the time outstanding, the shares to be redeemed shall be selected either pro rata or in such other manner as the Board of Directors or a duly authorized committee thereof may determine to be fair and equitable. Subject to the provisions hereof, the Board of Directors or a duly authorized committee thereof shall have full power and authority to prescribe the terms and conditions upon which shares of the Series A Preferred Stock shall be redeemed from time to time. If fewer than all the shares represented by any certificate are redeemed, a new certificate shall be issued representing the unredeemed shares without charge to the holder thereof.

(e)    **Effectiveness of Redemption**. If notice of redemption has been duly given and if on or before the redemption date specified in the notice all funds necessary for the redemption have been deposited by the Corporation, in trust for the pro rata benefit of the holders of the shares called for redemption, with a bank or trust company doing business in the Borough of Manhattan, The City of New York, and having a capital and surplus of at least $500 million and selected by the Board of Directors or a duly authorized committee thereof, so as to be and continue to be available solely therefor, then, notwithstanding that any certificate (if the shares of Series A Preferred Stock are not in book-entry form) for any share so called for redemption has not been surrendered for cancellation, on and after the redemption date dividends shall cease to accrue on all shares so called for redemption, all shares so called for redemption shall no longer be deemed outstanding and all rights with respect to such shares shall forthwith on such redemption date cease and terminate, except only the right of the holders thereof to receive the amount payable on such redemption from such bank or trust company, without interest. Any funds unclaimed at the end of three years from the redemption date shall, to the extent permitted by law, be released to the Corporation, after which time the holders of the shares so called for redemption shall look only to the Corporation for payment of such amounts.

(f)    **Status of Redeemed Shares**. Shares of the Series A Preferred Stock that are redeemed, repurchased or otherwise acquired by the Corporation shall revert to authorized but unissued shares of Preferred Stock (provided that any such cancelled shares of the Series A Preferred Stock may be reissued only as shares of any series of the Preferred Stock other than the Series A Preferred Stock).

Section 6. *Conversion*. Holders of the Series A Preferred Stock shares shall have no right to exchange or convert such shares into any other securities.

Section 7. *Voting Rights*.

(a)    **General**. The holders of the Series A Preferred Stock shall not have any voting rights except as set forth below or as otherwise from time to time required by law.

(b)    **Series A Preferred Stock Directors**. Whenever, at any time or times, dividends payable on the shares of the Series A Preferred Stock have not been paid for an aggregate of six quarterly Dividend Periods or more, whether or not consecutive, the authorized number of directors of the Corporation shall automatically be increased to accommodate the number of the

9

Preferred Directors specified below and the holders of the Series A Preferred Stock shall have the right, voting as a class, to elect two directors (hereinafter the "Preferred Directors" and each a "Preferred Director") to fill such newly created directorships at the Corporation's next annual meeting of stockholders (or at a special meeting called for that purpose prior to such next annual meeting) and at each subsequent annual meeting of stockholders until all accrued and unpaid dividends for all past Dividend Periods, including the latest completed Dividend Period (including, as provided in Section 3(a) above, any dividends on such amount), on all outstanding shares of the Series A Preferred Stock have been declared and paid in full, at which time such right shall terminate with respect to the Series A Preferred Stock, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent payment failure of the character above mentioned; provided that it shall be a qualification for election for any Preferred Director that the election of such Preferred Director shall not cause the Corporation to violate any corporate governance requirements of any securities exchange or other trading facility on which securities of the Corporation may then be listed or traded that listed or traded companies must have a majority of independent directors. Upon any termination of the right of the holders of shares of the Series A Preferred Stock as a class to vote for directors as provided above, the Preferred Directors shall cease to be qualified as directors, the term of office of all Preferred Directors then in office shall terminate immediately and the authorized number of directors shall be reduced by the number of the Preferred Directors elected pursuant hereto. Any Preferred Director may be removed at any time, with or without cause, and any vacancy created thereby may be filled, only by the affirmative vote of the holders of a majority of the shares of the Series A Preferred Stock at the time outstanding voting separately as a class, to the extent the voting rights of such holders described above are then exercisable. If the office of any Preferred Director becomes vacant for any reason other than removal from office as aforesaid, the remaining Preferred Director may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred.

(c)    **Class Voting Rights as to Particular Matters.**  So long as any shares of the Series A Preferred Stock are outstanding, in addition to any other vote or consent of stockholders required by law or by the Charter, the vote or consent of the holders of at least 66 2/3% of the shares of the Series A Preferred Stock at the time outstanding, voting as a separate class, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, shall be necessary for effecting or validating:

(i)    Authorization of Senior or Pari Passu Stock. Any amendment or alteration of the Certificate of Designations for the Series A Preferred Stock or the Charter (including any amendment to the Charter effectuated by a certificate of designations) to authorize or create or increase the authorized amount of, or any issuance of, any shares of, or any securities convertible into or exchangeable or exercisable for shares of, any class or series of capital stock of the Corporation ranking senior to or pari passu with the Series A Preferred Stock with respect to either or both the payment of dividends and/or the distribution of assets on any liquidation, dissolution or winding up of the Corporation;

(ii)    Amendment of the Series A Preferred Stock. Any amendment, alteration or repeal of any provision of the Certificate of Designations for the Series A Preferred Stock or the Charter (including, unless no vote on such merger or consolidation is required by Section

10

7(c)(iii) below, any amendment, alteration or repeal by means of a merger, consolidation or otherwise) so as to adversely affect the rights, preferences, privileges or voting powers of the Series A Preferred Stock; provided, however, that notwithstanding anything to the contrary herein, the vote of 100% of the shares of the Series A Preferred Stock at the time outstanding shall be necessary to (A) reduce the Liquidation Amount, (B) reduce the Applicable Dividend Rate, (C) provide for the payment of dividends on the Series A Preferred Stock to be made in other than U.S. dollars, (D) change any Dividend Payment Date or the First Optional Redemption Date or (E) make dividends on the Series A Preferred Stock non-cumulative; or

(iii)   Share Exchanges, Reclassifications, Mergers and Consolidations. Any consummation of a binding share exchange or reclassification involving the Series A Preferred Stock, or of a merger or consolidation of the Corporation with or into another corporation or other entity, unless in each case (x) the shares of the Series A Preferred Stock remain outstanding and are not amended in any respect or, in the case of any such merger or consolidation with respect to which the Corporation is not the surviving or resulting entity, are converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent, and (y) such shares remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, and limitations and restrictions thereof, taken as a whole, as are not materially less favorable to the holders thereof than the rights, preferences, privileges and voting powers, and limitations and restrictions thereof, of the Series A Preferred Stock immediately prior to such consummation, taken as a whole;

provided, however, that for all purposes of this Section 7(c), any increase in the amount of the authorized Preferred Stock, or the creation and issuance, or an increase in the authorized or issued amount, whether pursuant to preemptive or similar rights or otherwise, of any other series of the Preferred Stock, or any securities convertible into or exchangeable or exercisable for any other series of the Preferred Stock, ranking junior to the Series A Preferred Stock with respect to the payment of dividends (whether such dividends are cumulative or non-cumulative) and the distribution of assets upon liquidation, dissolution or winding up of the Corporation will not be deemed to adversely affect the rights, preferences, privileges or voting powers, and shall not require the affirmative vote or consent of, the holders of outstanding shares of the Series A Preferred Stock.

(d)   **Changes after Provision for Redemption**. No vote or consent of the holders of the Series A Preferred Stock shall be required pursuant to Section 7(c) above if, at or prior to the time when any such vote or consent would otherwise be required pursuant to such Section, all outstanding shares of the Series A Preferred Stock shall have been redeemed, or shall have been called for redemption upon proper notice and sufficient funds shall have been deposited in trust for such redemption, in each case pursuant to Section 5 above.

(e)   **Procedures for Voting and Consents**. The rules and procedures for calling and conducting any meeting of the holders of the Series A Preferred Stock (including, without limitation, the fixing of a record date in connection therewith), the solicitation and use of proxies at such a meeting, the obtaining of written consents and any other aspect or matter with regard to such a meeting or such consents shall be governed by any rules that the Board of Directors or any duly authorized committee of the Board of Directors, in its discretion, may adopt from time

11

to time, which rules and procedures shall conform to the requirements of the Charter, the Bylaws, and applicable law and the rules of any national securities exchange or other trading facility on which the Series A Preferred Stock is listed or traded at the time.

Section 8. *Record Holders.* To the fullest extent permitted by applicable law, the Corporation and any transfer agent for the Series A Preferred Stock may deem and treat the record holder of any share of the Series A Preferred Stock as the true and lawful owner thereof for all purposes, and neither the Corporation nor any such transfer agent shall be affected by any notice to the contrary.

Section 9. *Notices.* All notices or communications in respect of the Series A Preferred Stock shall be sufficiently given if given in writing and delivered in person or by first class mail, postage prepaid, or if given in such other manner as may be permitted in this Certificate of Designations, in the Charter or Bylaws or by applicable law. Notwithstanding the foregoing, if shares of the Series A Preferred Stock are issued in book-entry form through The Depository Trust Corporation ("DTC") or any similar facility, such notices may be given to the holders of the Series A Preferred Stock in any manner permitted by such facility.

Section 10. *No Preemptive Rights.* No holder of the Series A Preferred Stock shall be entitled as a matter of right to subscribe for or purchase, or have any preemptive right or any other right to remediate dilution with respect to, any part of any new or additional issue of stock of any class whatsoever, or of securities convertible into any stock of any class whatsoever, whether now or hereafter authorized and whether issued for cash or other consideration or by way of dividend.

Section 11. *Replacement Certificates.* The Corporation shall replace any mutilated certificate at the holder's expense upon surrender of that certificate to the Corporation. The Corporation shall replace certificates that become destroyed, stolen or lost at the holder's expense upon delivery to the Corporation of reasonably satisfactory evidence that the certificate has been destroyed, stolen or lost, together with any indemnity that may be reasonably required by the Corporation.

Section 12. *Other Rights.* The shares of the Series A Preferred Stock shall not have any rights, preferences, privileges or voting powers or relative, participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other than as set forth herein or in the Charter or as provided by applicable law.

Section 13. *Form.*

(a)     The Series A Preferred Stock shall be initially issued in substantially the form set forth in Exhibit A ("Series A Preferred Share Certificate") and shall have such insertions as are appropriate or required or permitted by this Certificate of Designations and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Corporation may deem appropriate and as are not inconsistent with the provisions of this Certificate of Designations, such as may be required to comply with this Certificate of Designations, any law or any rule of any securities exchange

12

on which the Series A Preferred Stock may be listed, and such as may be necessary to conform to customary usage.

(b)     If the Series A Preferred Stock is sold pursuant to an effective registration statement filed with the Securities and Exchange Commission, or if the Corporation so elects at any time, any Series A Preferred Share Certificates may be presented to the Transfer Agent by holders in exchange for one or more Global Shares up to the aggregate number of shares of Series A Preferred Stock then outstanding, to be registered in the name of DTC, or its nominee, and delivered by the Transfer Agent to DTC, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of DTC. Upon such presentation, the Corporation shall execute a Global Share representing such aggregate number of shares of Series A Preferred Stock and deliver the same to the Transfer Agent for authentication and delivery.

(c)     Any Global Share shall bear the legend substantially in the form set forth in Exhibit C hereto (the "Global Share Legend").

(d)     So long as a Global Share is registered in the name of DTC or its nominee, members of, or participants in, DTC ("Agent Members") shall have no rights under this Certificate of Designation with respect to the Global Share held on their behalf by DTC or the Transfer Agent as its custodian, and DTC may be treated by the Corporation, the Transfer Agent and any agent of the Corporation or the Transfer Agent as the absolute owner of such Global Share for all purposes. Accordingly, any such owner's beneficial interest in such Global Share will be shown only on, and the transfer of such interest shall be effected only through, records maintained by DTC or its nominee or its Agent Members, and neither the Corporation nor the Transfer Agent shall have any responsibility with respect to such records maintained by DTC or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Corporation, the Transfer Agent or any agent of the Corporation or the Transfer Agent from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder.

(e)     Any holder of a Global Share registered in the name of DTC or its nominee shall, by acceptance of such Global Share, agree that transfers of beneficial interests in such Global Share may be effected only through a book-entry system maintained by the holder of such Global Share (or its agent), and that ownership of a beneficial interest in the Series A Preferred Stock represented thereby shall be required to be reflected in book-entry form.

(f)     Transfers of a Global Share registered in the name of DTC or its nominee shall be limited to transfers in whole, and not in part, to the Corporation, DTC, their successors, and their respective nominees. Interests of beneficial owners in a Global Share registered in the name of DTC or its nominee shall be transferred in accordance with the rules and procedures of DTC.

(g)     A Global Share registered in the name of DTC or its nominee shall be exchanged for certificated shares of Series A Preferred Stock only if DTC (A) has notified the Corporation that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act, and (B) a successor to DTC registered as a clearing agency

13

under Section 17A of the Exchange Act is not able to be appointed by the Corporation within 90 days or DTC is at any time unwilling or unable to continue as a depositary and a successor to DTC is not able to be appointed by the Corporation within 90 days. In any such event, a Global Share registered in the name of DTC or its nominee shall be surrendered to the Transfer Agent for cancellation, and the Corporation shall execute, and the Transfer Agent shall countersign and deliver, to each beneficial owner identified by DTC, in exchange for such beneficial owner's beneficial interest in such Global Share, certificated shares of the Series A Preferred Stock representing, in the aggregate, the number of shares theretofore represented by such Global Share with respect to such beneficial owner's respective beneficial interest. Any certificated share of Series A Preferred Stock delivered in exchange for an interest in a Global Share pursuant to this Section shall not bear the Global Share Legend. Interests in the Global Shares may not be exchanged for certificated shares of Series A Preferred Stock other than as provided in this Section 13(g).

(h)    The holder of a Global Share registered in the name of DTC or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Certificate of Designations.

Section 14.   *Transfer Restrictions and Legends.* (a) Each Series A Preferred Share Certificate issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)    Shares of Series A Preferred Stock may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a holder except pursuant to (A) a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)   Any shares of Series A Preferred Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Series A Preferred Share Certificate representing such shares for exchange in accordance with the procedures of the Transfer Agent (as defined in Section 17 below) (together with any legal opinions, certifications or other evidence as may reasonably be required by the Corporation or the Transfer Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Series A Preferred Share Certificate for a like number of shares, which shall not bear such legend.

(b)    Any shares of Series A Preferred Stock that are purchased or owned by the Corporation or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Corporation or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such shares no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

14

Section 15.    *Transfer, Exchange and Substitution.*    (a) Series A Preferred Share Certificates shall be issued in registered form only. The Corporation shall cause to be kept at the office of the Transfer Agent, and the Transfer Agent shall maintain, a register (the "Preferred Share Register") in which, subject to such reasonable regulations as the Corporation may prescribe, the Corporation shall provide for the registration of shares and transfers, exchanges or substitutions of Series A Preferred Share Certificates as herein provided. All Series A Preferred Share Certificates issued upon any registration of transfer or exchange of or substitution for shares shall be valid obligations of the Corporation, evidencing the same obligations, and entitled to the same benefits under this Certificate of Designations, as Series A Preferred Share Certificates surrendered for such registration of transfer, exchange or substitution.

(b)    A holder may transfer a Series A Preferred Share Certificate only upon surrender of such Series A Preferred Share Certificate for registration of transfer. Series A Preferred Share Certificates may be presented for registration of transfer and exchange at the offices of the Transfer Agent with a written instruction of transfer in form satisfactory to the Transfer Agent, duly executed by such holder or by such holder's attorney, duly authorized in writing. Such holder will also provide a written certificate (substantially in the form of Exhibit B hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Series A Preferred Share Certificates. The Transfer Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Series A Preferred Share Certificate hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act. No such transfer shall be effected until, and the transferee shall succeed to the rights of a holder only upon, final acceptance and registration of the transfer in the Preferred Share Register by the Transfer Agent. Prior to the registration of any transfer of a Series A Preferred Share Certificate by a holder as provided herein, the Corporation, the Transfer Agent, and any agent of the Corporation or the Transfer Agent may treat the person in whose name Series A Preferred Share Certificates are registered as the owner thereof for all purposes and as the person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)    Every Series A Preferred Share Certificate presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Corporation or the Transfer Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Corporation and the Transfer Agent, by the holder thereof or such holder's attorney duly authorized in writing.

(d)    When Series A Preferred Share Certificates are presented to the Transfer Agent with a request to register the transfer of, or to exchange or substitute, such Series A Preferred Share Certificates, the Transfer Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied. To permit registrations of transfers, exchanges and substitutions, the Corporation shall execute Series A Preferred Share Certificates at the Transfer Agent's request and the Transfer Agent shall countersign and deliver such Series A Preferred Share Certificates. No service charge shall be made for any registration of transfer or exchange of or substitution for Series A Preferred Share Certificates, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Series A Preferred Share Certificates.

15

(e)    If less than all shares represented by a Series A Preferred Share Certificate are transferred, exchanged or substituted in accordance with this Certificate of Designations, the Series A Preferred Share Certificate shall be surrendered to the Transfer Agent and a new Series A Preferred Share Certificates for a number of shares equal to the shares represented by such Series A Preferred Share Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering holder, shall be executed by the Corporation and delivered to the Transfer Agent and the Transfer Agent shall countersign such new Series A Preferred Share Certificate and shall deliver such new Series A Preferred Share Certificate to the person or persons entitled to receive the same.

Section 16.  *Surrender of Series A Preferred Share Certificates.*  Any Series A Preferred Share Certificate surrendered for registration of transfer, exchange, or substitution of shares represented thereby shall, if surrendered to the Corporation, be delivered to the Transfer Agent, and all Series A Preferred Share Certificates surrendered or so delivered to the Transfer Agent shall be promptly cancelled by the Transfer Agent and shall not be reissued by the Corporation and no Series A Preferred Share Certificate shall be issued hereunder in lieu thereof.  The Transfer Agent shall deliver to the Corporation from time to time or otherwise dispose of such cancelled shares as the Corporation may direct.

Section 17.  *Transfer Agent And Registrar.* The duly appointed Transfer Agent and Registrar for the Series A Preferred Stock shall be *[_____]* (the "Transfer Agent").  The Corporation may, in its sole discretion, remove the Transfer Agent in accordance with the agreement between the Corporation and the Transfer Agent; provided that the Corporation shall appoint a successor transfer agent who shall accept such appointment prior to the effectiveness of such removal; provided further that such successor transfer agent shall be the Transfer Agent for purposes of this Certificate of Designations.

16

## EXHIBIT A

FORM OF SERIES A FIXED RATE CUMULATIVE
PERPETUAL PREFERRED STOCK
($25 LIQUIDATION PREFERENCE)

NUMBER                                                              SHARES

/_____/                                                      /_____/

CUSIP /_____]

### *[NGMCO, INC.]*
### INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE
### THIS CERTIFICATE IS TRANSFERABLE

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN
REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE
SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR
OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT
RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH
APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM
REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE
RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A STOCKHOLDERS
AGREEMENT, DATED [●], 2009, AMONG THE ISSUER OF THESE SECURITIES AND
THE INVESTORS REFERRED TO THEREIN, AND AN EQUITY REGISTRATION RIGHTS
AGREEMENT, DATED [●], 2009, AMONG THE ISSUER AND THE HOLDERS
REFERRED TO THEREIN, COPIES OF WHICH ARE ON FILE WITH THE ISSUER. THE
SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR
OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT.
ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT
WILL BE VOID.]

17

This is to certify that _____, is the owner of *[___]* fully paid and non-assessable shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, $0.01 par value, liquidation preference $25.00 per share (the "Stock"), of *[NGMCO, Inc.]* (the "Corporation"), transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this certificate properly endorsed.

This certificate is not valid or obligatory for any purpose unless countersigned and registered by the Transfer Agent and Registrar.

Witness the facsimile signatures of its duly authorized officers.

Dated: [ ___ ], 2009

| | |
|---|---|
| Name: | Name: |
| Title: | Title: |

Countersigned and Registered

_____ ,

as Transfer Agent and Registrar

By: _____

Authorized Signature

18

## *[NGMCO, INC.]*

*[NGMCO, Inc.]* (the "Corporation") will furnish, without charge to each stockholder who so requests, a copy of the certificate of designations establishing the powers, preferences and relative, participating, optional or other special rights of each class of stock of the Corporation or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights applicable to each class of stock of the Corporation or series thereof. Such information may be obtained by a request in writing to the Secretary of the Corporation at its principal place of business.

This certificate and the share or shares represented hereby are issued and shall be held subject to all of the provisions of the Corporation's Amended and Restated Certificate of Incorporation and the Certificate of Designations of the Series A Fixed Rate Cumulative Perpetual Preferred Stock (Liquidation Preference $25.00 per share) (copies of which are on file with the Transfer Agent), to all of which the holder, by acceptance hereof, assents.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full to applicable laws or regulations:

| | | |
|---|---|---|
| TEN COM | - as tenants in common | UNIF GIFT MIN ACT- _____Custodian _____ |
| TEN ENT | - as tenants by the entireties | (Minor)          (Cust) |
| JT TEN | - as joint tenants with right of survivorship and not as tenants in common | under Uniform Gifts to Minors Act _____ (State) |

Additional abbreviations may also be used though not in the above list.

For value received, _____ hereby sell(s), assign(s) and transfer(s) unto

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

_____

_____

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OF ASSIGNEE

_____

_____ shares

of the capital stock represented by the within certificate, and do(es) hereby irrevocably constitute and appoint _____, Attorney to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.

19

Dated_____

_____
Signature

NOTICE: The signature to this assignment must correspond
with the name as written upon the face of this
certificate in every particular, without alteration or
enlargement or any change whatever.

SIGNATURE GUARANTEED

_____
NOTICE: The signature(s) should be guaranteed by
an eligible guarantor institution (banks,
stockbrokers, savings and loan associations, and
credit unions with membership in an approved
signature guarantee medallion program), pursuant
to Rule 17Ad-15 under the Securities Exchange Act
of 1934.

1766819

## EXHIBIT B

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such shares are being transferred:

> To *[NGMCO, Inc.]* (the "**Issuer**") or any subsidiaries thereof; or
>
> Pursuant to a registration statement that has become effective under the Securities Act; or
>
> Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Transfer Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Transfer Agent will refuse to register any of the* shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock *evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:   [ _____ ]

[Insert name of transferee]

By:   _____
         Name:
         Title:

21

1766819

## EXHIBIT C

### GLOBAL SHARE LEGEND

UNLESS THIS GLOBAL SHARE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO *[NGMCO, INC.]* (THE "ISSUER") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL SHARE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE ISSUER, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

22

1766819

**Amended and Restated Master Sale & Purchase Agreement
Exhibit Z**

VEBA Note Term Sheet

Z

# EXHIBIT Z

## VEBA NOTE TERM SHEET

### *[NGMCO, Inc.]*

**Term Sheet for Note due 2017**

Following is a summary of the proposed principal terms for the Note to be issued to the Voluntary Employees' Beneficiary Association ("New VEBA") in connection with the transactions related to the restructuring of the obligations of General Motors Corporation to the New VEBA.

| | |
|---|---|
| Issuer: | *[NGMCO, Inc.]* (the "Company"). |
| Securities Offered: | US$2.5 billion Note (the "Note"). |
| Maturity Date: | July 15, 2017. |
| Interest/Payment: | Implied annual rate of 9% from July 15, 2009, payable in fixed payments in the following amounts in cash on July 15 of each of the following years: |

| Year | Amount |
|------|--------------|
| 2013 | $1,384 million |
| 2015 | $1,384 million |
| 2017 | $1,384 million |

| | |
|---|---|
| Guarantees: | Any present and future U.S. subsidiaries of the Company that are borrowers or guarantors with respect to the UST Note will fully and unconditionally guarantee the performance of all obligations of the Company under the Indenture and the Note, which guarantees will be secured to the same extent, if any, as the obligations of such borrower under, or guarantors of, the UST Note, and subordinated only to any Permanent Financing (as defined below).  Each guarantor of the Notes is herein referred to as a "Guarantor" and its guarantee is referred to herein as a "Guarantee." |
| Ranking: | The obligations of the Company under the Notes and of the Guarantors under the Guarantees will: |

- rank equally in right of payment with (1) any debt issued to the United Stated Department of Treasury ("UST") in the restructuring (the "UST Note") and (2) any debt issued to Canada in the restructuring (the "Canada Note");

- be secured on a pari passu basis by the collateral securing the UST Note;

- rank senior in right of payment to all unsecured indebtedness and other obligations of the Company that are by their terms subordinated to the Note;

- rank junior in right of payment to any permanent financing including UST delayed draw term loan, revolver or any other third party permanent financing entered into with the consent of UST ("Permanent Financing"); and

- be effectively subordinated in right of payment to all future first lien secured indebtedness and other obligations of the Company, to the extent of the value of the assets securing such obligations, and be structurally subordinated to all obligations of each of the Company's subsidiaries that are not Guarantors.

| | |
|---|---|
| Intercreditor Agreement | New VEBA, the UST and Canada shall enter into an intercreditor agreement in form and substance satisfactory to the UST, which shall provide that the UST Note, the Canadian Note and the Note shall rank equally and be pari passu and that the UST shall have the sole and exclusive right to exercise all remedies and to grant waivers with respect to the Note and the UST Note. |
| Transferability: | The Note will be transferable at any time in whole or in part to (1) the Company or its subsidiaries, or (2) an unlimited number of institutional accredited investors or qualified institutional buyers in transactions that (a) do not require registration under the Securities Act and (b) do not trigger registration under the Exchange Act; provided that if at any time the UST Note is registered under the Securities Act or exchanged for a note that is entitled to demand, shelf or piggyback registration rights, then the Note will be entitled to demand, shelf, and piggyback registration rights no less favorable than those of the UST Note. |
| Optional Redemption: | The Company may redeem the Note in whole or in part at any time at 100% of its principal amount, together with accrued and unpaid interest, if any, to the redemption date. |
| Covenants | The Note will have the same covenants as the UST Note, including, to the extent made by the Company under the UST Note, covenants in respect of Change of Control, Limitation of Incurrence of Indebtedness, Restricted Payments, Limitations on Liens, Limitation on Sale of Assets, Restrictions on Sale/Leaseback and Limitation on Merger/Consolidation. |
| Default Interest: | 2% penalty interest upon any default under the terms of the Note. |
| Events of Default: | Events of Default will be the same as those in the UST Note, including, without limitation: |

1. Default in payment on the Note when due, subject to any grace period in the UST Note.

2. Default in the observance or performance of covenants, subject to any grace period in the UST Note.

3. Bankruptcy or insolvency events, subject to any grace period in the UST Note.

4. Invalidity of Guarantees to the extent provided in the UST Note, subject to any grace period in the UST Note.

| | |
|---|---|
| Modifications: | Unless (1) UST has transferred more than 75% of the UST Note and (2) the portion of the UST Note held by UST has an outstanding principal |

2

1766878

amount that is less than the implied then current principal amount of the VEBA Note (assuming an implied 9% interest rate), any modifications agreed to by UST with respect to the terms of the UST Note will automatically modify, and be binding on, the Note, other than any such modification that makes any change that extends the maturity date, extends the date of any fixed payment, reduces the implied interest rate, reduces the amount of principal, changes the currency of payment, modifies any prepayment right or by its express terms limits or restricts any right to bring suit for payment.

Governing Law:                    New York.

3

1766878

**Amended and Restated Master Sale & Purchase Agreement**

**Disclosure Schedule**