HEARING DATE AND TIME:  August 3, 2009 at 9:45 a.m. (Eastern Time)
OBJECTION DEADLINE:  July 28, 2009 at 4:00 p.m. (Eastern Time)

Joshua D. Rievman (JR 0539)
HOGUET NEWMAN REGAL & KENNEY, LLP
10 East 40th Street
New York, NY  10016-0301
Ph:   212-689-8808
Fax: 212-689-5101
Jrievman @hnrklaw.com
Attorneys for Everett Chevrolet, Inc.

James S. Fitzgerald, WSBA #8426
(Of Counsel - pro hac vice application pending)
LIVENGOOD FITZGERALD & ALSKOG, PLLC
121 Third Avenue
P.O. Box 908
Kirkland, WA  98083-0908
Ph:   425-822-9281
Fax: 425-828-0908
fitzgerald@lfa-law.com
livengoodfitzgeraldalskog@gmail.com
Attorneys for Everett Chevrolet, Inc.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                  :
**In re**                                         :   **Chapter 11 Case No.**
                                                  :
**GENERAL MOTORS CORP.**, *et al.*,               :   **09-50026 (REG)**
                                                  :
                    **Debtors.**                  :   **(Jointly Administered)**
                                                  :
-----------------------------------------------------------------x

**OBJECTION OF EVERETT CHEVROLET, INC. TO DEBTORS' OMIBUS
MOTION PURSUANT TO 11 U.S.C. § 365 AUTHORIZING (A) THE
REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
WITH CERTAIN DOMESTIC DEALERS AND (B) GRANTING CERTAIN
RELATED RELIEF**

TO:   THE HONORABLE ROBERT E. GERBER
      UNITED STATES BANKRUPTCY JUDGE

EVERETT CHEVROLET, INC. (hereinafter "ECI" or "Everett Chevrolet"[1]), by and through its undersigned counsel, files this objection to the Omnibus Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. §§ 105 and 365 Authorizing (A) the Rejection of Executory Contracts and Unexpired Leases with Certain Domestic Dealers and (B) Granting Certain Related Relief, dated July 6, 2009 ("Rejection Motion").

ECI requests that the Court deny the Debtors' motion and require assumption by the Debtors and New GM so that the ECI dealership franchise can continue as an ongoing business under a Participation Agreement with modifications agreed on by the Debtors and the Washington State Attorney General's Office. In the alternative, ECI requests these issues be treated as a contested matter that requires an adversary proceeding with due notice and opportunity for discovery and an evidentiary hearing. This objection is supported by the Declaration of John B. Reggans III in Opposition to Debtors' Motion for Rejection of Executory Contract and Unexpired Leases with Dealer Everett Chevrolet, Inc., with annexed exhibits, filed with this objection.

**Bases for Objection**

1.   The test for determining whether to reject or assume an executory contract is the business judgment rule. COR Route 5 Co., LLC v. Penn Traffic Co., 524 F.3d 373 (2d Cir. 2008). In determining whether the business judgment standard is met, this Court must "examine the contract and circumstances and apply its best judgment to determine if the assumption or rejection would be beneficial or burdensome to the estate." Westbury Real Estate Ventures, Inc. v. Bradlees, Inc., 194 B.R. 555, 558 n. 1 (Bankr. S.D.N.Y.

---

[1] ECI is erroneously listed in the Debtors' motion as "Everett Chevrolet-Geo, Inc." Ex. A to Debtors' Motion, Dealer No. 20. ECI dropped the word "Geo" from its dealership name when GM discontinued the line years ago.

1996).

2.  Here, Debtors do not establish that rejection of the ECI contract will benefit the estate. Through its franchise agreement with GM, ECI pays for the total costs of operation, including but not limited to: inventory, parts, tools, salaries, and plant costs. ECI costs GM nothing. Moreover, Debtor's Rejection Motion fails to identify the nature and extent of its alleged evaluation of the ECI business in the "Dealership Evaluation Process."

3.  Elimination of ECI will be a detriment to the Debtors' estates because they would lose the second highest-volume Chevy car dealer in the Seattle-Everett market in 2007, among 35 dealers in the area. ECI has a proven track record of profitability and success. John Reggans is the dealer principal and he has 14 years experience as a GM dealer. Mr. Reggans and the dealership have an excellent reputation and the highest goodwill in the community. ECI currently employs 14 people, and has employed as many as 80 prior to the issues caused by GM and GMAC described herein. If the Rejection Motion is granted, ECI's Chevrolet business will be destroyed, its customer goodwill will be lost, and employees let go. GM sales will be harmed when ECI customers buy cars from other manufacturers. At a time when GM is struggling to regain market share, terminating a successful Chevrolet dealer which has the closest relationship with buyers in this important geographical area is self-defeating and the antithesis of sound business judgment. In fact, it suggests bad faith, as is more fully discussed below.

### Bad Faith

4.  GM admits that if its decision to reject is based on "bad faith, or whim or caprice," it cannot be sustained by the Court. Debtors' Motion at 16. A decision to reject based on bad faith, racial discrimination, or retaliatory animus is "irrational" and an abuse of the debtors' discretion under the business judgment rule. E.g., In re Old Carco

3

\_\_\_\_, No. 09-50002, 2009 Bankr. LEXIS 1382, at *22, *32, *38-41, aff'd, 2009 U.S. App. LEXIS 12351 (2d Cir. June 5, 2009).[2] Debtors have not acted in good faith in dealings with ECI. There is substantial evidence of irrational bases in the Debtors' decision to reject ECI as a dealer.

5. ECI recently completed a three and a half week replevin hearing against GMAC, the financing arm of GM, which, with the knowledge of GM, falsely alleged a default by the ECI dealership and demanded repayment of $6.3 million, as well as the immediate closure of the ECI dealership and repossession of all cars by GMAC. On December 31, 2008, GMAC filed a replevin action in Snohomish County Superior Court to obtain possession of all vehicle inventory, accounts, equipment, receivables and other personal property covered by its security agreement with ECI. The action was styled GMAC v. Everett Chevrolet, Inc., et al., Snohomish County Superior Court Cause No. 08-2-10683-5.

6. Falsely claiming that ECI was "out of trust" for failing to pay GMAC an "estimated" $206,806.18 for vehicles sold or leased, GMAC obtained an ex parte temporary restraining order ("TRO") which prevented ECI from selling any cars, and basically shutting ECI down for two weeks until the order was modified at a hearing on January 14, 2009 to allow ECI to sell cars and remit proceeds to GMAC. The TRO was finally dissolved on April 10, 2009 but only after a lengthy evidentiary replevin hearing conducted March 17 – April 10, 2009.

7. On April 10, 2009, Judge Eric Z. Lucas of the Snohomish County Superior Court ruled against GMAC on all claims, making several express findings of

---

[2] Unlike dealers in the Carco case involving Chrysler, ECI presents substantial evidence of bad faith by GM and GMAC within months of the bankruptcy filing. GM's sudden shift from supporter and backer of ECI to an opponent by aligning itself squarely with GMAC to close ECI down and provide no support in late 2008 and early 2009, is in sharp contrast with Chrysler's actions, which involved evaluations of dealers that predated Chrysler's bankruptcy cases "by many years" and ongoing efforts to reduce the dealership network by over 1100 dealers since 2001. 2009 Bankr. LEXIS 1382 at *26

"bad faith" by GMAC. The Court found no breach of the Wholesale Security Agreement or any other wrongdoing by ECI. The Superior Court is allowing ECI to pursue tort and contract damages from GMAC for its wrongful termination of the floorplan line of credit and interference with the dealership.

Among Judge Lucas's findings, he ruled that GMAC:

a. Unreasonably delayed responding to dealer requests for funding for the purchase of the dealership land. GMAC's reasons for refusing to fund were unreasonable and lacked credibility. "From a business standpoint, GMAC's position is not reasonable." Verbatim Report of Proceedings, Exhibit A to Reggans Decl. (hereinafter "RP") at 5: 8-9. This unreasonableness was not an "isolated occurrence," but indicative of a "pattern of behavior" by GMAC. RP at 5:13-15.

b. In demanding new and additional securitization measures on July 31, 2008, GMAC attempted to mask GMAC's ulterior motive of termination "by justifying GMAC's actions based on credit trends and performance." RP at 7:14-15. These, the Court found, were false justifications intended to mislead the dealership by "manipulating and withholding information." RP at 7:25 - 8:1.

c. Failing to share with the dealership GMAC's "very sophisticated financial analysis" of Everett Chevrolet; setting targets without justification; setting deadlines without notice or justification; demanding a personal guaranty without justification. RP at 8:5-15.

d. GMAC credit managers were "not credible" witnesses. RP at 6:7, 9:16 and 11:9 ("total lack of credibility").

e. GMAC dealt dishonestly, unreasonably, unfairly and in bad faith with

5

    f.    GMAC imposed a three-day remit requirement that was "arbitrary and not commercially reasonable." RP at 14:15-16.

    g.    In December 2008, GMAC prevented Everett Chevrolet from accessing funds to finance sales, thus preventing the dealer from reaching sales targets imposed by GMAC. RP at 16:17 - 17:8. Not only did GMAC freeze the open account with GM, shut the business down by TRO, and send demand notices to financing institutions, GMAC's actions were calculated to block Everett Chevrolet from closing a financing deal on January 9, 2009 with GM's Motors Holding. *Id.*; RP at 19:7-10.

    h.    "The actions taken by GMAC to assault the Dealer's working capital were designed to put him out of business, not merely to protect collateral." RP at 19:22-25.

    i.    "The law only requires GMAC to be honest with regard to its intentions and not attempt to manufacture defaults, put pressure on a business to fail, or block other contract opportunities. All these

j. "ECI, under Mr. Reggans, has been profitable every year from 1996 until 2007. The Dunn & Bradstreet report filed as Exhibit #92 indicates that his high year sales were approximately $40 million dollars. RP at 3:4-7.

k. "ECI sold $19 million dollars by October 2008. With these sales, that if he had cut back his sales efforts and lowered his break-even point, he could have made a profit, but GMAC was pushing him to do just the opposite in order to engineer default. This constitutes bad faith. RP at 20:14 - 21:19.

l. "Here, GMAC aligned all forces in order to make the Dealer fail." RP at 19:13 -20:14. "GMAC breached the contract by violating the Covenant of Good Faith and Fair Dealing. The request for replevin is denied." RP at 21:22-24.

8. Since Judge Lucas's ruling, GMAC has twice appealed to the Court of Appeals seeking an emergency injunction barring ECI from selling vehicles, or to reimpose the injunction lifted by the superior court. Both times the appeals court denied GMAC's motion. Through the barrage of litigation, GMAC is seeking to bury ECI with litigation and attorney's fees to divert its time, energy and resources away from running a successful dealership.

**Retaliatory Animus**

9. Since August 2007, Mr. Reggans negotiated with GM to finance a purchase of the real estate where the ECI dealership operates in Everett, Washington. However, in 2008-09 GM began to drag its feet and eventually backed out of both the

7

10. Around the time that the land sale was being finalized in May/June 2008, GMAC began making unreasonable financial demands of the ECI dealership that it knew were not feasible, as found by Judge Lucas in his April 10, 2009 ruling (RP at 6-8, 10-11). GMAC demanded that Reggans put an additional $800,000 of working capital into the dealership and that he sign a Personal Guaranty of all Dealership obligations to GMAC. After 11 profitable years in the car business, and not in default, Reggans declined to sign the personal guaranty, but offered to seek funds to provide additional working capital into the dealership. Although GMAC managers told Reggans several times that GMAC would finance the land purchase deal, GMAC announced in May, 2008 that GMAC would not finance the land purchase. Judge Lucas found that GMAC's refusal to finance the land sale was unreasonable and done in bad faith. RP at 4-5.

11. GMAC's actions to financially squeeze the dealership by placing unreasonable demands on the dealership had the effect of stopping ECI's land deal so that GM and Argonaut could proceed with a sale to a third-party and freeze Reggans and ECI

12. Because of the close connection between GM and GMAC, GMAC would not have backed away from the land purchase financing deal without the participation of GM in the decision. GM used GMAC's bad faith tactics as a way to avoid selling the property to Reggans. At the end of October 2008, after Mr. Powell resigned his position as Vice President of Dealer & Industry Affairs, ECI lost its only advocate at GM. GM abruptly stopped supporting ECI's deal and began to work with GMAC to help put ECI out of business.

13. When GMAC suspended ECI's floorplan on December 9, 2008, GM immediately and without notice froze ECI's open account containing funds belonging to ECI from dealer incentives, rebates, reimbursements, warranty, and the like. Normally, the account is $20-30,000 at any given time, but because GM froze the account at GMAC's mere request, money accumulated in the account that remained unavailable to ECI except by court order. Typically, it takes no more than 10 days to resolve a problem with GM regarding a frozen account and to have the account unfrozen. Here, however, GM refused to unfreeze the ECI open account and would not disburse funds without GMAC approval.

14. In late January, 2009 ECI requested that GM release $80,000 from the open account to provide much needed working capital for the dealership. On February 3, 2009 the GM regional dealer support manager, Rick Sitek, informed ECI by e-mail that "I found out that GMAC has invoked their assignment on the account, so the release of funds will be in a check that will be sent to GMAC." However, GM issued the check directly to GMAC at its request and GMAC accepted the funds. In December, 2008,

9

15. Despite Judge Lucas's finding that GMAC acted in bad faith and without reasonable grounds in cutting off ECI's financing, GM immediately and without notice stopped furnishing vehicles to ECI when GMAC suspended the ECI line of credit on December 8, 2008. Orders were unilaterally cancelled by GM and ECI has been prevented from ordering any new vehicles from GM since that time.

16. In October, 2008 when GMAC was pressuring ECI and Reggans to put more capital into the dealership, GM told Mr. Reggans "to hold GMAC off." When Reggans asked GM to expedite the much needed investment money from Motors Holding, GM representatives said it did not have money and wanted more time to close.

17. On January 23, 2009, GM gave notice that it refused to proceed with the $2.5 million investment in ECI based on nondisclosure of "pending actions…as of the date of this Agreement," claimed as a breach of a October 9, 2008 pre-investment agreement. This was a pretext for GM's breach. There were only two "pending actions." One was the GMAC action, which has been extensively referenced above. The other was a very small, even routine, claim known as the "Gardner" action, filed in Snohomish County Superior Court under Case No. 08-2-07242-6 against ECI and Ford Motor Co. It involved a breach of warranty claim by a customer who purchased a used Ford truck from ECI and believed that the engine had a problem – of which problem ECI had no knowledge. Nevertheless, on its own initiative ECI, though its attorneys, reported the Gardner action to GM's auditor, Henry & Horne, PLC, by letter dated December 1, 2008.

10

18.     The only other reason cited by GM for refusing to invest in ECI was the replevin action by GMAC in December 2008, which GM determined was conclusive evidence that investment in ECI was not a "commercially reasonable business investment," although ECI passed two audits by GM's Motors Holding and independent auditors (no irregularities found).  Judge Lucas decided in April 2009 that GMAC acted dishonestly and in bad faith to close ECI down.

19.     GM's decision not to proceed with the Motors Holding investment deal was made unilaterally without discussions with or requests for information from ECI. Because GM assumed the bona fides of each and every allegation made by GMAC, and presumed every doubt against ECI without a due diligence investigation, the facts indicate that GM and GMAC were working together, conspiring in bad faith to close down ECI.  Since GM relied on GMAC's actions, GMAC's bad faith must also be imputed to GM.  Not only did GM refuse to invest further in ECI, in February 2009 GM demanded repayment of the $500,000 pre-investment GM made to ECI in October, 2009, for which GM had demanded at the last minute a personal guaranty from Mr. Reggans that he signed under duress.  Within weeks after Judge Lucas's ruling against GMAC on April 10, 2009, GM sent notice to ECI on May 14, 2009 of its intention not to renew its contractual relationship with ECI beyond October 2010.  By continually siding with GMAC against ECI, despite express findings of bad faith by a judge, GM demonstrates its steadfast and unreasoning loyalty to its financial ally, GMAC, regardless of ECI's

20. GM tried to use the GMAC dispute as a pretext to avoid its commitment to invest $2.5 million in ECI. GM's actions deprived Reggans of the opportunity to pursue other options such as sale of the dealership to interested third parties.

21. Since GM's decision to reject ECI as a dealer is tainted by bad faith (its own as well as the judicially-established bad faith of GMAC), the Court should not allow GM to reject ECI's dealer contract. The Court is requested to require the assumption of the ECI dealer contract and order the New GM to recognize ECI as a Chevrolet dealer on an ongoing basis with terms as favorable as other renewed dealers permitted to sell GM cars in Washington under a Participation Agreement approved by the Washington State Attorney General's Office. This is the only relief that fairly restores the dealership rights that ECI enjoyed before the bad faith efforts of GMAC, acting in concert with GM, to shut ECI down and put it out of business.

22. Here, there is substantial evidence that GM is rejecting ECI's contract as retaliation for standing up to GMAC's bad faith tactics and defeating GMAC's dishonest collection methods in litigation. Further discovery by deposition and requests for production is likely to show that GMAC and GM acted in concert to close down ECI and take away Mr. Reggans' dealership by improper means. A reasonable inference here is that GMAC would not have taken such aggressive action to shut down ECI, a loyal and successful Chevrolet dealer for over 12 years, without the advance knowledge and consent, if not active participation, of GM.

### Racial Discrimination

23. Mr. Reggans is an African-American member of NAMAD (the National Association of Minority Automobile Dealers), and was on the NAMAD Board of Directors from 2006-07. In that capacity, he has advocated for minority dealers' rights.

12

It is interesting to note that William Powell, the GM executive in Detroit to whom Mr. Reggans appealed to persuade GM to follow through on its commitments, is also African-American. With Mr. Powell's assistance, GM agreed to do as it had agreed. After Mr. Powell retired at the end of October, 2008, however, Mr. Reggans was told there was no longer support for the agreed-upon plan and that there was resentment that Mr. Powell had interceded on Mr. Reggans' behalf.

### Relief Sought

24.  ECI opposes the rejection of its Chevrolet dealership contracts and reserves its rights to assert any an all additional defenses, applicable claims, and all damages arising from rejection, if granted. The rejection process utilized by GM violates the terms of its dealership contract with Everett Chevrolet and violates the dealer termination laws of the State of Washington codified at R.C.W. 46.96.010 *et. seq.*[3] The state enacted these laws in the exercise of its police power to promote the public interest and public welfare, recognizing the need to protect not only dealers, but also the consuming public. RCW 46.96.010. Washington law requires notice and an opportunity for an evidentiary hearing before an administrative law judge according to APA procedures (including opportunity for pre-hearing discovery). See RCW 46.96.040-.070. After reviewing the evidence, the ALJ makes an individualized adjudication "as to the existence of good cause and good faith for the termination, cancellation, or nonrenewal of

---

[3] A debtor in possession must "manage and operate the property in his possession…according to the requirements of the valid laws of the State in which such property is situated…" 11 U.S.C. § 959(b). This section prohibits the use of bankruptcy as a ruse to circumvent applicable state laws by those who continue to operate in the marketplace. See In re White Crane Trading Co., 170 B.R. 694, 698 (Bankr. E.D. Cal. 1994). A debtor in possession must carry out its duties in conformity with state law. Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n, 997 F.2d 581, 593 (9th Cir. 1993).

13

a franchise." RCW 46.96.040. GM's motion to reject ECI's dealer contracts unfairly seeks to circumvent these laws and denies due process to ECI.

25.     Alternatively, ECI requests that these issues be treated as a contested matter and require an adversary proceeding with due notice and opportunity for discovery and an evidentiary hearing.  At a minimum, given the recent history of GMAC and GM's harsh and irrational actions against ECI, the Debtors' assertion of "good faith business judgment" in rejecting ECI's dealership contract involves issues of credibility that cannot fairly be decided on the pleadings.  ECI must be afforded a fair opportunity to seek discovery, present live testimony and have the opportunity to cross-examine the Debtors' witnesses. Moreover, since the Debtors seek relief under Bankruptcy Code Section 105 beyond Section 365 relief, an adversarial proceeding is especially appropriate.

WHEREFORE, based on the foregoing, Everett Chevrolet, Inc. respectfully requests entry of an order by the court: (i) denying the Debtors' Rejection Motion; and (ii) granting the relief requested by ECI in this objection.

DATED this 28th day of July, 2009.

HOGUET NEWMAN REGAL & KENNEY, LLP

By: /s/ Joshua D. Rievman_____
Joshua D. Rievman (JR-0539)
10 East 40th Street
New York, NY  10016-0301
Ph:   212-689-8808
Fax:  212-689-5101
Jrievman @hnrklaw.com
Attorneys for Everett Chevrolet, Inc.

(Of Counsel - pro hac vice application to be filed)
James S. Fitzgerald, WSBA #8426
LIVENGOOD, FITZGERALD & ALSKOG, PLLC
121 Third Avenue
P.O. Box 908
Kirkland, WA  98083-0908
Ph:     425-822-9281
Fax:    425-828-0908
E-mail:  fitzgerald@lfa-law.com
E-mail:  livengoodfitzgeraldalskog@gmail.com
Attorneys for Everett Chevrolet, Inc.

15