HEARING DATE AND TIME: August 3, 2009 at 9:45 a.m. (Eastern Time)
OBJECTION DEADLINE: July 28, 2009 at 4:00 p.m. (Eastern Time)

Joshua D. Rievman, Esquire
HOGUET NEWMAN REGAL & KENNEY, LLP
10 East 40th Street
New York, NY  10016-0301
Ph:  212-689-8808
Fax: 212-689-5101
Jrievman @hnrklaw.com
Attorneys for Everett Chevrolet, Inc.

James S. Fitzgerald, WSBA #8426
(pro hac vice application pending)
LIVENGOOD FITZGERALD & ALSKOG, PLLC
121 Third Avenue
P.O. Box 908
Kirkland, WA  98083-0908
Ph:  425-822-9281
Fax: 425-828-0908
fitzgerald@lfa-law.com
livengoodfitzgeraldalskog@gmail.com
Attorneys for Everett Chevrolet, Inc.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                  :

**In re**                             :         **Chapter 11 Case No.**

                                  :

**GENERAL MOTORS CORP.,** *et al.,*    :         **09-50026 (REG)**

                                  :

               **Debtors.**       :         **(Jointly Administered)**

                                  :

------------------------------------------------------------x

**DECLARATION OF JOHN B. REGGANS III IN OPPOSITION TO DEBTORS'
MOTION FOR REJECTION OF EXECUTORY
CONTRACT AND UNEXPIRED LEASES WITH DEALER EVERETT
CHEVROLET, INC.**

JOHN B. REGGANS III declares:

1

1.    I am the President of Everett Chevrolet, Inc. (hereinafter "ECI" or "Everett Chevrolet"), a Chevrolet dealer located at 7300 Evergreen Way, Everett, Washington, dealer No. 20 on the list of dealer contracts (Exhibit A to the Debtors' motion) General Motors Corporation ("GM") and its affiliated debtors have moved to reject pursuant to 11 U.S.C. § 365. The dealership stopped using the name "Everett Chevrolet-Geo" when GM dropped the Geo. This declaration is made in opposition to the Debtors' motion to reject. I have firsthand knowledge of all matters stated herein and am competent to testify about them.

2.    I graduated from Western Michigan University with a degree in Business Administration. I have been a GM dealer for 14 years. Since 1996 I have been a successful Dealer Principal of ECI. Originally I acquired the dealership through a capital investment by Motors Holding, a division of General Motors, which I paid off in full in 2 years 10 months, several years sooner than the 7.5 year pro-forma upon which Motors Holding made the investment. Dealership performance has earned us four Profit Enhancement Program (PEP) Awards from GM in 1997, 1999, 2004, and 2006. This award is based on the highest percent of net profit of sales group for the year.

3.    The exceptional sales performance of ECI was recognized in other ways by other business groups. In April 2008 I was elected to serve on the Board of Directors for the Seattle Chevrolet Local Market Association (LMA). Black Enterprise Magazine named me one of the Top 100 Auto Dealers 12 consecutive years from 1997 – 2008. Since 2001 I have been a member of the Board of Directors of the General Motors Minority Dealers Association (GMMDA) and chairman of the GMMDA Scholarship Committee. I was also a member of the Board of Directors of the National Association of Minority Automobile Dealers (NAMAD) for 2006-07. I am a member of the National Automobile Dealer Association (NADA) and state and local dealer associations.

2

4.    Despite the rapid downturn of the economy in general and GM in particular, in 2007 ECI was No. 2 in retail car sales for Chevrolet in the Seattle Zone, which includes 35 dealers (186 cars sold). The dealership is located in Everett, a city of 101,800 residents, and only 25 miles north of Seattle with a population of 602,000. ECI has ranked near the top in 2008 in all important categories of PDS (Purchase and Delivery Score) and SSS (Service Satisfaction Score). In December 2008 ECI ranked above the GM goals in PDS and SSS.

5.    Based on our proven track record of sales performance for over 12 years, GM's decision to reject ECI as a dealer is not a rational exercise of business judgment. Although the Debtors claim that rejection is based on a quantitative "Dealership Performance Score" calculated as part of its "Dealership Evaluation Process," they admit the factors considered were both "subjective" and "objective." Motion at 8. GM has not provided its dealer evaluation analysis of ECI to the dealership so that we could participate and have a fair opportunity to be heard and challenge any erroneous data or conclusions in the analysis. The rejection process utilized by GM violates the terms of its dealership contract with ECI and violates the dealer termination laws of the State of Washington codified at R.C.W. 46.96.010 *et. seq.* As explained below, there is an issue of fact regarding the credibility of the Debtors' self-serving assertions of good faith exercise of business judgment in rejecting ECI as a dealer.

6.    GM admits that if its decision to reject ECI is based on "bad faith, or whim or caprice," it cannot be sustained by the Court. Motion at 16. There is substantial evidence of bad faith and irrationality in the Debtors' decision to reject ECI as a dealer.

//

//

//

3

## Bad Faith

7.      ECI recently completed a three and a half week replevin hearing against General Motors Acceptance Corporation ("GMAC"), the financing arm of GM that was claiming a default by the ECI dealership and demanding repayment of $6.3 million, as well as the immediate closure of the dealership and repossession of all vehicle inventory collateral by GMAC.

8.      On April 10, 2009, Judge Eric Z. Lucas of the Snohomish County Superior Court ruled against GMAC on all claims, making several express findings of "bad faith" by GMAC.   A true and correct copy of Judge Lucas's oral decision ("Verbatim Report of Proceedings") in GMAC v. Everett Chevrolet, Inc., et al. Snohomish County Superior Court Cause No. 08-2-10683-5 is attached hereto as Exhibit A (hereinafter referred to as "RP").   A true and correct copy of Judge Lucas's order dated April 10, 2009 is attached hereto as Exhibit B.   The Court found no breach of the Wholesale Security Agreement by ECI, or any other wrongdoing by ECI.   The Superior Court is allowing ECI to pursue tort and contract damages from GMAC for its wrongful termination of the floorplan line of credit and interference with the dealership.

9.      The swiftness of GMAC's efforts to close down ECI is demonstrated by the following timetable:

- On July 31, 2008, GMAC demanded a $800,000 capital injection to the dealership by no later than October 31, 2008, along with a personal guaranty by me as additional security.   See Exhibit C attached hereto. Even though ECI was not in breach of the flooring agreement, GMAC threatened that failure to provide either of these would result in suspension or termination of ECI's credit line.

4

- On October 16, 2008, GMAC advised that "due to current market conditions" it unilaterally suspended its obligation to make credit line advances to ECI and raised the interest rate on outstanding advances. See letter attached as Exhibit D. If I did not agree to the change, GMAC threatened to terminate my credit line and demand full payment of the credit line by November 30, which amounted to approximately $778,000.

- On November 25, 2008, GMAC threatened that unless I provided a personal guaranty and arranged a capital injection of $300,000 to the dealership by November 30, it would suspend or terminate the credit lines. See letter attached as Exhibit E.

- On December 8, 2008, although ECI was not in default or past due on any obligations, GMAC suspended our flooring plan. See letter attached as Exhibit F. GMAC notified GM "to remit to GMAC all accounts owed to the Dealership." See attached Ex. F., page 1.

- On or around December 15, 2008, GMAC terminated ECI's flooring plan and gave me 3 months to find a new lender to pay back the $6.3 million GMAC credit line in full. See letter attached as Exhibit G.

- On December 19, 2008, GMAC declared ECI in default and demanded full payment of the flooring plan, a sum amounting to $6,367,294.89, and threatened to take possession of all Dealership property and vehicles subject to its security agreement. See letter attached as Exhibit H.

- On December 31, 2008, GMAC filed a replevin action in Snohomish County Superior Court to obtain possession of all vehicle inventory, accounts, equipment, receivables and other personal property covered by its security agreement with ECI. Falsely claiming that ECI was out of

trust for failing to pay GMAC an "estimated" $206,806.18 for vehicles sold or leased, GMAC obtained an ex parte temporary restraining order ("TRO")[1] preventing ECI from selling any cars, and basically shutting us down for two weeks until the order was modified at a hearing on January 14 to allow ECI to sell cars and remit proceeds to GMAC. This was extremely harmful to ECI. The TRO was finally dissolved on April 10, 2009 after a lengthy evidentiary replevin hearing conducted March 17 – April 10, 2009.

10.    Among Judge Lucas's findings in the replevin action, he ruled that GMAC:

    a.    Unreasonably delayed responding to dealer requests for funding for the purchase of the dealership land. GMAC's reasons for refusing to fund were unreasonable and lacked credibility. "From a business standpoint, GMAC's position is not reasonable." RP at 5: 8-9. This unreasonableness was not an "isolated occurrence," but indicative of a "pattern of behavior" by GMAC. RP 5 at 13-15.

    b.    In demanding new and additional securitization measures on July 31, 2008,[2] GMAC attempted to mask GMAC's ulterior motive of termination "by justifying GMAC's actions based on credit trends and performance." RP at 7:14-15. These, the Court found, were false justifications intended to mislead the dealership by "manipulating and withholding information." RP at 7:25 - 8:1.

---

[1] A true and correct copy of the December 31, 2008 TRO obtained ex parte by GMAC is attached hereto as Exhibit P.
[2] A true and correct copy of GMAC's July 31, 2008 letter, referred to by Judge Lucas, is attached hereto as Exhibit C.

6

c.   Failing to share with the dealership GMAC's "very sophisticated financial analysis" of Everett Chevrolet; setting targets without justification; setting deadlines without notice or justification; demanding a personal guaranty without justification. RP at 8:5-15.

d.   GMAC credit managers Vick and Smith were "not credible" witnesses. RP at 6:7, 9:16 and 11:9 ("total lack of credibility").

e.   GMAC dealt dishonestly, unreasonably, unfairly and in bad faith with Everett Chevrolet, keeping a "hidden agenda" and failing to disclose material facts to the dealer, including its intention to cease doing business with ECI in the future. RP at 11:12; 11:23-25; 17:6-11 & 19-22; 18:8-12; and 20:14-15. Using "false targets" that GMAC knew the dealership could not achieve, GMAC "manufactured a default" by Everett Chevrolet. RP at 19:13-15. "The goal of the team from GMAC in this case was to shut down the Dealer." RP at 18:11 - 1913. "Given the totality of GMAC's actions, this is the only conclusion this Court can come to." RP at 19:16-17.

f.   GMAC imposed a three-day remit requirement that was "arbitrary and not commercially reasonable." RP at 14:15-16.

g.   In December 2008, GMAC prevented Everett Chevrolet from accessing funds to finance sales, thus preventing the dealer from reaching sales targets imposed by GMAC. RP at 16:17 - 17:8. Not only did GMAC freeze the open account with GM, shut the business down by TRO, and send demand notices to financing institutions, GMAC's actions were calculated to prevent Everett Chevrolet from

7

closing a deal on January 9, 2009 with GM's Motors Holding to provide $2.5 million in working capital. Id.; RP at 19:7-10.

h.   "The actions taken by GMAC to assault the Dealer's working capital were designed to put him out of business, not merely to protect collateral." RP at 19:22-25.

i.   "The law only requires GMAC to be honest with regard to its intentions and not attempt to manufacture defaults, put pressure on a business to fail, or block other contract opportunities. All these things were done in this case, and all are acts of bad faith." RP at 20:1-6.

j.   "ECI, under Mr. Reggans, has been profitable every year from 1996 until 2007. The Dunn & Bradstreet report filed as Exhibit #92 indicates that his high year sales were approximately $40 million dollars." RP at 3:4-7.

k.   "ECI sold $19 million dollars by October 2008. With these sales, that if he had cut back his sales efforts and lowered his break-even point, he could have made a profit, but GMAC was pushing him to do just the opposite in order to engineer default. This constitutes bad faith." RP at 20:14 – 21:19.

l.   "Here, GMAC aligned all forces in order to make the Dealer fail." RP at 19:13 – 20:14. "GMAC breached the contract by violating the Covenant of Good Faith and Fair Dealing. The request for replevin is denied." RP at 21:22-24.

11.   Judge Lucas also dissolved the January 14, 2009 restraining order, finding no breach or other default by ECI that would sustain GMAC's replevin claims. Since

8

Judge Lucas's ruling, GMAC has appealed to the Court of Appeals seeking emergency injunctions barring ECI from any further vehicle sales, or to reimpose the injunction lifted by the superior court. GMAC claims it had no duty to act in good faith. Twice tthe appeals court has d enied GMAC's motions for emergency injunction. Through the barrage of litigation, GMAC is seeking to bury ECI with litigation and attorney's fees to divert my time, energy and resources away from running a successful dealership.

### Retaliation/Bad Faith

12.    Since August 2007, I negotiated with GMAC to finance a purchase of real estate where ECI operates in Everett. In a meeting with GMAC branch manager Greg Moffitt, I discussed my plan to acquire the dealership property and utilize the equity to generate working capital for the dealership. Mr. Moffitt supported the plan and requested documentation for GMAC to review.

13.    The dealership property is owned by a GM subsidiary called Argonaut Holdings, Inc. When I acquired 100% of the dealership in 1999, the option to purchase the building and land on which the dealership was located was an essential part of my deal with GM. I originally exercised the option to purchase in 1999, but the sale did not close because a large capital improvement construction project was not completed and GM was slow about providing details on "contingencies" that would affect the purchase price.

14.    After meetings with GM, I confirmed in writing my exercise of the option to purchase in November 2007 at a price of $4.9 million as provided by contract. See letter attached as Exhibit I. Based on a market appraisal, the purchase would generate $1 million in equity which I could use as additional working capital for the dealership. The sale was originally set to close by December 31, 2007.

9

15.    Two – three weeks later (in early December, 2007) however, GM repudiated the sales deal, informing me that it would not honor my option to purchase. In a letter dated December 12, 2007, Troy Freeman, Project Manager for Worldwide Real Estate Western Region at GM's Economic Development and Enterprise Services wrote that my options had expired. See attached Exhibit J. I referred the matter to my attorney to demonstrate that the option to purchase had not expired.

16.    By e-mail dated March 6, 2008, attached hereto as Exhibit K, GM's David Fredrickson informed me for the first time that "…GM Worldwide Real Estate intends to pursue the opportunity to offer the property for sale to the Tenant [ECI], however, at this time is unable to do so due to the constraints imposed by the [General Motors] Corporation's initiative for AHI [Argonaut Holdings, Inc.] to sell these properties as part of a large portfolio sale." I wrote a reply back to Mr. Frederickson to inform him that I did not agree with his account of the discussion. See attached Exhibit L.

17.    If the dealership property was sold to a third party charging market rents, ECI's monthly rent of $24,000 would increase to $62,000. Compared with a monthly purchase mortgage payment of approximately $40,000 if ECI bought the property, it would make no financial sense for ECI to stay in business on the property if it were sold to a third party. Because of the urgency of avoiding a nearly 50% increase in rents and losing the equity in the property, it was imperative that the deal close soon.

18.    Eventually, after several meetings with Mr. William Powell, an African-American Vice President of Industry and Dealer Affairs at GM in Detroit, differences were resolved with Argonaut and GM. Mr. Powell said "a deal is a deal" -- GM supports its dealers and would recognize my option to purchase the dealership property. A new Purchase and Sale Agreement was signed in May, 2008 for me to acquire the property from Argonaut Holdings at a price of $5.1 million. Earnest money of $50,000 was paid

10

to Argonaut on May 30, 2008. The purchase was to be financed by GMAC, which over the course of a few months unilaterally changed the deal to raise the interest rate from 12 to 15%, and then required $1.2 million in cash down.

19.     With Mr. Powell's assistance, the deal came together with GM, through its affiliate Motors Holding, a GM dealer development program that also provides assistance to minority dealers, to provide up to $3 million to ECI, with $1.2 million of the money to be applied to cash required to buy the dealership property.

20.     Around the time that the land sale was being finalized in May - June 2008, GMAC began making unreasonable financial demands that it knew were not feasible, as found by Judge Lucas in his April 10, 2009 oral ruling (Ex. A, RP at 6-8, 10-11). GMAC demanded that I put in an additional $800,000 of working capital into the dealership by October 31, 2009 and that I provide a Personal Guaranty of all obligations of the ECI dealership to GMAC. See July 31, 2008 letter of M. Jerry Vick (Exhibit C hereto). After 11 profitable years in the car business, and not in default with GMAC or GM, I declined to sign the personal guaranty. However, I did offer to seek funds to provide additional working capital into the dealership, and that was being arranged through the Motors Holding investment.

21.     Although GMAC managers told me several times that GMAC would finance the land purchase deal, Mr. Vick of GMAC announced in May, 2008 that GMAC would not finance the land purchase. Judge Lucas found that GMAC's refusal to finance the land sale was unreasonable and done in bad faith. Ex. A, RP at 4-5. GMAC's actions to impede the land purchase and place unreasonable demands on the dealership had the effect of stopping ECI's land deal so that GM and Argonaut could proceed with a sale to a third-party, implementing the same strategy of refusal to sell that Mr. Frederickson of GM revealed in his March 6, 2008 email to me (Exhibit K hereto). The people at GM's

11

Worldwide Real Estate department and Argonaut who had initially opposed the sale were unhappy that the deal was going forward and they appeared to have manufactured a way to block the sale by using GMAC to close us down. Because of the close connection between GM and GMAC, GMAC would not have backed away from the land purchase financing deal without GM's participation in the decision. GM used GMAC's bad faith tactics as a way to avoid selling the dealership property to me.

22.    At a meeting with William Powell and Joe Chrzanowski, head of GM's Motors Holding division, on August 28, 2008, Mr. Powell confirmed that GM would invest to recapitalize the ECI dealership. I provided them a copy of GMAC's July 31, 2009 demand letter for $800,000 (Exhibit C hereto). We discussed the need for GM to provide ECI with sufficient funds to satisfy GMAC's demand before the October 31 deadline. After passing a pre-investment audit by GM, GM advanced ECI only $500,000 on October 5, 2008 under a pre-investment agreement, of which $270,825 was paid to GMAC, and the rest went towards paying other critical ECI obligations.

23.    The $500,000 was $300,000 less than the $800,000 capital injection demanded by GMAC, and less than what GM indicated would be available in our August 28 meeting. In addition, when the closing papers were presented for my review on October 3, two days before closing, GM demanded a personal guaranty which had not been previously offered or discussed. I was under duress and felt I had no choice but to sign it to make sure the $500,000 and the additional investment would be funded.

24.    Shortly after the $500,000 was provided by GM, I spoke to Jim Madaras, Portfolio Manager for Motors Holding at GM, about why the pre-investment amount was less than the $800,000 previously discussed and agreed upon. At that time in October, 2008 GMAC was pressuring me to put more capital into the dealership, or else it would shut the business down. When I spoke to Jim Madaras about GMAC's demand, he said

12

"hold GMAC off." Mr. Madaras told me if we needed additional funding, "just make a request." Mr. Madaras retired from GM's Motors Holding division on October 31, 2008 and was replaced by Ruby Henderson.

25.    When I asked GM Motors Holding to expedite the investment money, Ruby Henderson said they didn't have the money and needed more time to close on the $2.5 million investment. When I told her I needed the money – an additional $300,000 right away– to satisfy GMAC and stay in business, she said there was no more money available at that time. The Pre-Investment Agreement indicated that Motors Holding would not provide me with investment funds to enable me to pay $1.2 million cash down payment required to purchase the dealership property from Argonaut Holdings. However, because GM understood this meant I couldn't exercise my option to purchase the land, GM/Motors Holding agreed to hold the rent to its current rate at $24,000 per month and not implement a rent escalation clause in the lease agreement.

26.    Nevertheless, on May 1, 2009, I received a letter from GM's attorneys demanding $674,977 in delinquent rent based on a retroactive adjustment in addition to the $24,000 monthly rent ECI had been paying going back to January 2007. See attached Exhibit M. If the deal to purchase the dealership property had gone forward, the back rent would have been forgiven as arranged by GM and agreed to by Argonaut Holdings. See attached Exhibit N. But because the sale did not close due to Motors Holding not funding the additional investment and GMAC refusing to finance the purchase, GM/Argonaut Holdings proceeded with recalculating an escalation of ECI's rent backdated to January 2007.

27.    On December 5, 2008 I made a request to Ms. Henderson for $540,537 from Motors Holding to pay current and due expenses of $358,715 as well as $175,000 in payroll and taxes due December 2008 and January 2009. She informed me a few days

13

later that they didn't have more money to loan, and my December 5 request for funds had been denied by the investment committee.

28.    At the end of October 2008, after William Powell retired as Vice-President of Dealer & Industrial Affairs, ECI lost its only advocate at GM. GM abruptly stopped supporting ECI's deal and began to work with GMAC to put me out of business. In November 2008 Clarence Oliver, GM's Director of Motors Holding Field Operations – Public Companies & Strategic Investments, told me that several people at GM resented my "going over their heads" to get support from William Powell on the land purchase deal and Motors Holding funding and that I "didn't go through the proper channels." He told me that with William Powell gone, "there is no support for this deal." In the weeks that followed, GM sought to postpone the closing date on the Motors Holding investment and would not permit an earlier closing in order to relieve heightened financial pressure exerted by GMAC.

29.    When GMAC suspended our floorplan on December 9, 2008, without notice GM unilaterally froze ECI's open account within two days, and refused to disburse funds to ECI. The open account is the way GM pays ECI for dealer rebates, incentives, warranty, and the like. Normally, the account is $20-30,000 at any given time, but because GM froze the account at GMAC's mere request within two business days, money accumulated in the account that remained unavailable to ECI. Typically, it takes no more than 10 days to resolve a problem with GM regarding a frozen account and to have the account unfrozen. In this case, however, GM wrongfully refused to unfreeze the open account and would not disburse funds to ECI without GMAC approval.

30.    In December 2008 I asked the GM regional dealer support manager, Rick Sitek, to identify the person from GMAC who told GM to freeze ECI's open account. He asked me if I was recording the phone conversation. When I answered that the call was

14

not being recorded, but that others were present in the room with me, Mr. Sitek abruptly hung up the phone and never called back. As of July 2, 2009, there is still $261,254 in the open account that GM controls and refuses to disburse to ECI.

31.    In late January, 2009 we requested that GM release $80,000 from the open account to provide much needed working capital for the dealership. On February 3, 2009 Rick Sitek informed ECI by e-mail that "I found out that GMAC has invoked their assignment on the account, so the release of funds will be in a check that will be sent to GMAC." GM provided the $80,000 check payable to ECI directly to GMAC at its request and GMAC cashed our check without ECI's participation or consent. During the replevin hearing, Judge Lucas found this action unreasonable and ordered GMAC to pay the $80,000 proceeds into the registry of the court, and later ordered the entire funds disbursed to ECI.

**GM Pulls Out of Investment**

32.    By letter dated January 23, 2009, attached hereto as Exhibit O, GM provided written notice that it refused to proceed with the $2.5 million investment in ECI based on nondisclosure of "pending actions...as of the date of this Agreement," claimed as a breach of the October 9, 2008 pre-investment agreement. This was a pretext for GM's breach. There were only two "pending actions." One was the GMAC action, which has been extensively referenced above. The other was a very small, even routine, claim known as the "Gardner" action, filed in Snohomish County Superior Court under Case No. 08-2-07242-6 against ECI and Ford Motor Co. It involved a breach of warranty claim by a customer who purchased a used Ford truck from ECI and believed that the engine had a problem – of which problem ECI had no knowledge. Nevertheless, on its own initiative ECI, though its attorneys, reported the Gardner action to GM's auditor, Henry & Horne, PLC, by letter dated December 1, 2008. GM never requested details

15

from ECI or its attorneys about the Gardner action. Ford Motor Co. was primarily liable because the express warranty was Ford's. ECI decided upon a nuisance-value settlement of the Gardner claim for $3,000 in mediation and was dismissed from the case. In short, the Gardner action was not a legitimate basis for GM to refuse to follow through on its investment agreement with ECI.

33.    The only other reason cited by GM for refusing to invest in ECI was the mere filing of replevin action by GMAC in December 2008, which GM determined was conclusive evidence that investment in ECI was not a "commercially reasonable business investment," although ECI passed two audits: the first pre-investment audit by Motors Holding (no irregularities found) and a second audit by an independent auditor/CPA, Henry Horne, for Motors Holding for due diligence (no irregularities found) and Judge Lucas found that GMAC acted dishonestly and in bad faith to close ECI down. GM's decision not to proceed with the deal was made unilaterally without discussions with or requests for information from ECI. Because GM assumed the good faith veracity of each and every allegation made by GMAC against ECI, and presumed every doubt against ECI without a due diligence investigation, the facts indicate that GM and GMAC were working together, conspiring in bad faith to close down ECI. Since GM relied on GMAC's actions, GMAC's bad faith must also be imputed to GM. Not only did GM refuse to invest further in ECI, in February 2009 GM demanded repayment of the $500,000 investment made to ECI in October, 2009. Within weeks after Judge Lucas's ruling against GMAC on April 10, 2009, GM sent notice to ECI on May 14, 2009 of its intention not to renew its contractual relationship with ECI beyond October 2010. By continually siding with GMAC against ECI, despite express findings of bad faith by a judge, GM has demonstrated its steadfast and unreasoning loyalty to its financial ally,

16

GMAC, regardless of ECI's proven track record of Chevrolet sales performance and trust in GM. This is wrong and devastating to ECI, its employees, me and my family.

34.    GM tried to use the GMAC dispute as a pretext to avoid its commitment to invest $2.5 million in ECI. GM's actions deprived me of the opportunity to pursue other options such as sale of the dealership to interested third parties. Although I had a valid Sales and Service Agreement at the time, no disputes and had not expressed any desire to sell the dealership, I was approached by one interested dealer who said he had discussed purchasing my dealership with GM's zone manager. This was a surprise to me since I had no interest in selling at the time.

35.    Since GM's decision to reject ECI as a dealer is tainted by bad faith (its own as well as the judicially-established bad faith of GMAC), the Court should not allow GM to reject ECI's dealer contract. The Court is requested to require the assumption of the ECI dealer contract and order the New GM to recognize ECI as a Chevrolet dealer on an ongoing basis with terms as favorable as other renewed dealers permitted to sell cars in the State of Washington under a Participation Agreement with terms and conditions approved by the Washington State Attorney General. This is the only relief that fairly restores the dealership rights that ECI enjoyed before the bad faith efforts of GMAC, acting in concert with GM, to shut ECI down and put us out of business.

36.    Even though Judge Lucas ruled in ECI's favor on all issues and found GMAC acted in bad faith, GM has furnished no vehicles to ECI since December 9, 2008, the date when GMAC suspended ECI's line of credit. Without claiming any default by ECI and without prior notice or any opportunity to be heard, GM unilaterally prevented ECI from ordering new vehicles in the computer order system and rescinded all existing orders in the system. In this manner, GM acted in concert with GMAC to close our business down by preventing us from ordering cars.

17

37.    GM is rejecting ECI's contract as retaliation for standing up to GMAC's bad faith tactics and defeating their wrongful collection actions in litigation. Further discovery by deposition and requests for production is likely to show that GMAC and GM conspired to close down ECI and take away my dealership by improper means. GMAC would not have taken such aggressive action to shut down ECI, a Chevrolet dealer for over 12 years, without the advance knowledge and consent, if not active participation, of GM.

## Sales Damaged by Bad Faith Actions of GM and GMAC

38.    ECI sold 346 new vehicles and 608 used vehicles for calendar year 2008. In 2007, 531 new vehicles and 955 used vehicles were sold at ECI. After December 2008 until the present, ECI has financially suffered as a result of the wrongful actions of GMAC in trying to shut ECI down.

39.    Even after Snohomish County Superior Court injunction was dissolved on April 10, 2009, and ECI has not breached any agreement with GMAC or GM, GMAC wrongfully refuses to return to ECI titles to vehicles that were not floorplanned by GMAC. The titles to these vehicles represent approximately $270,000 in used vehicles that are a liquid asset just like cash to ECI because the vehicles can be sold to wholesale or retail buyers at any time. Without those titles, ECI cannot sell the vehicles and GMAC further squeezes the ECI dealership financially.

40.    Among our staff of 14 employees, we have technicians who are qualified to support the Chevrolet line make. At the peak of sales, ECI employed 80 persons.

## Racial Discrimination

41.    I have continuously stood up for dealer rights in the various associations I belong to. I am a member of the National Association of Minority Automobile Dealers ("NAMAD"), and was on the NAMAD Board of Directors from 2006-07. As an

18

African-American member and director, I have been an advocate for minority dealers' rights. I participated in promoting NAMAD's 15% program, which tries to obtain commitments from major car manufacturers to increase the number of minority owned dealers to at least 15 percent of all active dealers. Rick Wagoner, the President of GM at the time, was asked by NAMAD to support the 15% program. On behalf of GM, he refused to commit to the 15% program.

### Detrimental Effect of Contract Rejection if Granted

42. Elimination of the line make – Chevrolet cars and trucks – will financially damage the dealership to the extent that it must close all operations and let all employees go. Since ECI is a single point Chevrolet dealership and sells no other lines (GM denied my requests to sell Cadillac or Mazda lines), there would be no cars to sell. I have personally committed all my resources to developing the ECI dealership at its present location. The Chevrolet dealership is my main livelihood and source of income. Without continuation of my dealership with GM, I will have no business to generate income with. ECI's dealership is located in a viable market in Everett with customers located throughout Western Washington. In all likelihood, there will continue to be a Chevrolet dealer in Everett. Since I have built up the Everett dealership for the past 12 and a half years, and know the market here and have considerable good will in the community, I am in the best position to operate the dealership going forward.

43. The dealership and I enjoy an excellent reputation and the highest goodwill in the community. If the Rejection Motion is granted, ECI's Chevrolet business will be destroyed, its customer good will lost, and employees let go.

44. ECI costs GM nothing to continue as a dealer. Through its franchise agreement with GM, ECI pays the total costs of operation, including but not limited to: inventory, parts, tools, salaries, and plant costs. There would be no benefit to the

19

Debtors' estate for GM to reject ECI's contract. In fact, rejection would produce a detriment to the debtor estates by eliminating the No. 2 leading seller of Chevrolet cars in the Seattle-Everett area (2007). GM sales will be harmed when ECI customers buy cars from other manufacturers. At a time when GM is struggling to regain market share, terminating a successful Chevrolet dealer who has the closest relationship with buyers is self-defeating.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

SIGNED AND DATED this 27th day of July, 2009 at Kirkland, Washington.

_____

John B. Reggans III