# EXHIBIT A

04-10-09 GMAC_1

1

1           IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

2              IN AND FOR THE COUNTY OF SNOHOMISH

3      ─────────────────────────────────────────

GMAC, A DELAWARE                )
4   CORPORATION,                    )
                                    )     Cause No. 08-2-10683-5
5               Plaintiff,          )
                                    )
6        vs.                        )
                                    )
7   EVERETT CHEVROLET, INC., A      )
    DELAWARE CORPORATION,           )
8   Et al.                          )
                                    )
9               Defendants.         )

10     ─────────────────────────────────────────

11              VERBATIM REPORT OF PROCEEDINGS

12     ─────────────────────────────────────────

13

14         BE IT REMEMBERED that on 11th day of April, 2009,

15     the above-entitled and numbered cause came on for

16     Hearing before JUDGE ERIC Z. LUCAS, Snohomish County

17     Superior Court, Everett, Washington.

18                    A P P E A R A N C E S

19
    For the Plaintiff          JOHN GLOWNEY

    For the Defendant          WILLIAM WHEELER and
                               KARL HAUSMANN


    REPORTED BY:
    DIANA NISHIMOTO, OFFICIAL COURT REPORTER
    SNOHOMISH COUNTY COURTHOUSE
    3000 EVERETT, WA  98201
    PHONE (425)388-3281
    CSR. 3222

                        Page 1

04-10-09 GMAC_1

2

1          THE COURT:   All right.   We are back on the record
2      in the matter of GMAC versus Everett Chevrolet.  And
3      this morning's hearing was scheduled to talk about the
4      motion to amend the complaint.  I've sort of changed
5      this agenda.   I'm going to give you my ruling.  So
6      here we go.
7          This matter has come before the Court for hearing
8      from March 17th, 2009 to April 10th, 2009.  The Court
9      has heard and reviewed trial testimony, all exhibits,
10     the memorandum of counsel, the records and the files
11     herein.   It is therefore ordered, adjudged and
12     decreed as follows:
13         And these are my Findings of Fact.
14         Owner, John Reggans, has been operating Everett
15     Chevrolet Inc. (Henceforth ECI) successfully in the
16     City of Everett since 1996.  He started in this
17     business with an 80 percent investment from Motor's
18     Holding, a division of General Motors Company and a
19     twenty percent match of his own.
20         The program he engaged in with Motor's Holding
21     enabled the junior investor to buy out the larger
22     company interest in a certain amount of time.
23         The pro forma plan for Mr. Reggans was to
24     accomplish this task in 3.5 years.  His actual
25     performance was better.  He acquired one hundred

04-10-09 GMAC_1

3

1    percent ownership in 1999, after only two years and

2    nine months.  This acquisition was achieved solely

3    through dealer profits.

4        ECI, under Mr. Reggans, has been profitable every

5    year from 1996 to 2006.  The Dunn and Bradstreet

6    report filed as exhibit number 92 indicates that his

7    high year sales were approximately 40 million dollars.

8        During the late 90's Mr. Reggans testified that he

9    averaged new car sales of 70 a month from 1996 to

10   1999.    In 1999, a new Chevy dealership, Speedway

11   Chevrolet, opened up as a direct competitor.  After

12   this, his new car sales dropped, but he still managed

13   to average about 40 to 60 new cars sold a month.

14       In 1999, he received a working capital loan from

15   GMAC in the amount of $500,000, and repaid it in full

16   in five years.  He has had revolving line of credit

17   with GMAC since 1999, with payment terms of interest

18   only.  This continued until July 2008, when GMAC

19   unilaterally demanded principal reduction payments of

20   $10,000 a month in addition to interest.

21       Mr. Reggans testified that in 2006 ECI earned

22   $700,000 in net profit.  However, after 2006, the car

23   industry began to decline.  His 2007 net profit was

24   only about $28,000.

25       In September of 2007, Mr. Jerry Vick became GMAC

3

04-10-09 GMAC_1

4

1    branch manager for the Pacific Northwest.   When Mr.
2    Vick was asked on direct examination if there were any
3    credit issues in 2007, he indicated, yes, that ECI
4    needed to expand its revolving line of credit from
5    $500,000 to $800,000.

6        The request was made directly between Mr. Reggans
7    and Mr. Vick.   There was no problem granting this
8    request at that time.   At the end of 2007, Mr.
9    Reggans also requested of Mr. Vick that GMAC help
10   finance the purchase of real estate the firm was
11   leasing.   Mr. Reggans saw this as critical to the
12   profitability of his business because he was facing a
13   dramatic increase in lease payments and this was a
14   proactive action on his part.

15       The purchase of the property would avoid an
16   escalation in lease payments of nearly fifty percent.
17   Mr. Reggans made clear that this deal had to close by
18   December 31st, 2007.   GMAC did not respond until May
19   of 2008.   The response was a decline and was verbally
20   delivered by Mr. Vick.   GMAC did not respond to this
21   request in writing.

22       On direct examination, Mr. Vick indicated that the
23   reason for the decline was no positive cash flow.
24   However, the April financial statement loss was the
25   first quarter loss of the year.   Plus GMAC had just

5

4

04-10-09 GMAC_1

1       increased the revolving line of credit.

2           Lastly, the collateral is extremely valuable real

3       estate on Highway 99, Evergreen Way in Everett.  The

4       property was appraised.  The unrebutted testimony is

5       that the sales price was one million dollars under the

6       appraisal, as such, the Court does not find Mr. Vick's

7       answer at trial to be credible.

8           From a business standpoint, GMAC's position is not

9       reasonable.  From the facts presented, GMAC appears

10      to have been dragging its feet.  This delay, rather

11      than swift rejection, denies the dealer the

12      opportunity to pursue other options in a timely

13      manner.  As an isolated occurrence, this fact is not

14      important.  But it is important if it is a pattern of

15      behavior.

16          The April ECI financial statement showed a year to

17      date loss of $163,042.  This led to a meeting between

18      Mr. Vick and Mr. Reggans on June 10th.  Mr. Vick

19      testified that the meeting basically covered all the

20      items later memorialized in his letter of July 31st,

21      2008, which is exhibit number 1.  Mr. Reggans disputed

22      this vehemently in his testimony, indicating that the

23      meeting was dominated by a request for his personal

24      guarantee and that virtually none of the other topics

25      in Mr. Vick's subsequent letter were communicated in

6

04-10-09 GMAC_1

1    this meeting.  This raises a very serious issue of
2    credibility.
3        In his court testimony, Mr. Vick indicated that he
4    could not recall Mr. Reggans' response to raising
5    these very serious issues, particularly to the request
6    for the $800,000 cash injection.  The Court finds that
7    Mr. Vick's testimony is simply not credible.
8        In the letter, Mr. Vick indicates that because of
9    the losses, ECI will need a cash injection of
10   $800,000, Mr. Reggans's personal guarantee and
11   continue to pay promptly and faithfully.   A deadline
12   was set at October 31st, 2008 to achieve these goals
13   and if that they were not achieved, GMAC promised to
14   "suspend or terminate" the dealer's wholesale credit
15   lines.  After these conditions were set, a few more
16   were added.
17       One was a charge of $500 per audit.
18       And number two was the change in the revolving line
19   of credit setting a principal reduction payment of
20   $10,000 a month.
21       This letter is copied to Michelle Smith and her
22   only.  The Court also finds it incredible that a
23   letter of this magnitude would be sent almost fifty
24   days after the meeting.
25       In the world of finance, sixty days is a lifetime.

7

04-10-09 GMAC_1

1    A concerned dealer would certainly want these fifty
2    days in order to meet the conditions set.   Here, GMAC
3    deprived the Dealer of his time to adjust, another
4    indication of delay.
5      By his own testimony, Mr. Vick did not mention the
6    deadline in his meeting, only in the letter.   The
7    entire scenario, as a reported by Mr. Vick, lacks
8    credibility.
9      This letter has been construed in many different
10   ways, but in business this is known as a drop dead
11   letter.   The author is communicating to the reader
12   that the relationship is over and it is just a matter
13   of time before the end.   However, this letter
14   attempts to mask this intent by justifying GMAC's
15   actions based on credit trends and performance.   But
16   at this point in the year, there were no trends as
17   yet.   All high overhead businesses show losses at the
18   beginning of the year until they reached their break
19   even point in sales later in the year.   This is
20   common knowledge.   If this had been the subject of
21   oral conversation over lunch, there is no question, in
22   this Court's view, given Mr. Reggans' wide ranging
23   contacts, that he would have had a different posture.
24     But GMAC deprived him of the opportunity to make
25   the maximum use of his time by misleading him, by

8

1    manipulating and withholding information and resting

04-10-09 GMAC_1

2   on a reservation of its rights.    This fifty days

3   becomes a critical point later in the year.

4     What Mr. Reggans did not know is that GMAC was

5   undertaking a very sophisticated financial analysis on

6   his firm.  He did not know that a metric was being

7   applied to him.   Ms. Smith testified that he needed

8   to show a debt to equity ratio of three to one, yet

9   this was never told to him, even though GMAC knew they

10   had analyzed his April debt to equity ratio at over

11   9.73 to 1.  There was no proof by GMAC that the cash

12   injection of $800,000 was based on achieving this

13   three to one debt to equity ratio.

14     And in fact, Ms. Smith testified that she knew he

15   could not make this target in July because he had

16   continued to lose money.   When Mr. Reggans did inject

17   $500,000 into his business in October hoping this

18   would convince GMAC to lift the personal guarantee

19   condition, he still could only achieve a debt to

20   equity ratio of 18 to 1.

21     On questioning by the Court, Ms. Smith admitted

22   that the target cash injection of $800,000 was no

23   longer valid in July when it was requested in writing.

24   And they did not tell him it was no longer valid.  She

25   calculated that a total cash injection of $800,000 by

9

1   the October deadline, given the increased losses,

2   would only get him to a debt to equity ratio of 10.73

Page 8

8

04-10-09 GMAC_1

3 to 1, when the metric is 3 to 1. She knew that ECI

4 could not meet GMAC goals.

5  According to GMAC, both Mr. Vick and Ms. Smith

6 engaged in detailed financial discussions with Mr.

7 Reggans about the performance of his business, yet not

8 once did they share the financial analysis with him.

9 Targets were set without any justification.

10 Deadlines were set without any notice or

11 justification. When he inquired why he was asked for

12 his personal guarantee after 12 years of doing

13 business with GMAC, he was told vaguely that it was

14 not uncommon. That was a quote, not uncommon, and

15 that "not every dealer" had to do it.

16  Ms. Smith was also not a credible witness. By her

17 own testimony she has 25 years in the business and a

18 Masters in business administration. Yet she could

19 not derive the formulas from simply reviewing the

20 financial information on instruments she has

21 purportedly used for years. She could not glean the

22 formulas without a formula handbook or a cheat sheet

23 and she could not give the Court ECI's breakeven point

24 in total sales, only in units per month. For a high

25 level unit manager, this is simply not credible.

10

1 However, it is credible if her primary job is

2 collections and shutting down companies. This does

3 not require a high level financial analysis. And she

Page 9

9

04-10-09 GMAC_1

4   testified that she was just "promoted" to high risk

5   manager. This is a credit collection term.   In other

6   businesses it's called special credits.   This is a

7   division of a firm that a client goes to when all

8   credit is about to be cancelled and all debts called

9   due.

10     Proof of this collection attitude is her response

11   to Mr. Reggans when he asked her why he needed to have

12   a personal guarantee.   She said he has to have some

13   "skin in the game." This Court found this comment to

14   be highly insulting.   It is not only insulting to a

15   person who has earned his ownership via hard work and

16   profit over a 12 year period, it is insulting based on

17   her explanation that a "personal guarantee shows level

18   of commitment." That's a quote.   In the credit world

19   this is a false statement.   Every single business

20   person in the world knows what a personal guarantee

21   means.   It means the lowest credit rating for a

22   business.   It means the business has no value.   This

23   is why the personal guarantee is required, so that the

24   lender can take your house if the business fails to

25   pay its debts.   In this case, it is not true that the

11

1   business had no value.   Motor's Holding, after its

2   own due diligence, was prepared to invest 2.5 million

3   dollars in this business.   This casts doubt on the

4   requirement for a personal guarantee.

Page 10

10

04-10-09 GMAC_1

5    Most small business people start with a personal

6    guarantee and struggle to escape this risk by building

7    the net worth of their business.    For her to say this

8    in court under oath shows her lack of respect for the

9    Court, and her total lack of credibility.    But it does

10    reveal her motivation.    Clearly, this explanation to

11    the Court and to Mr. Reggans is the first real proof

12    of a GMAC hidden agenda.

13    Surprisingly, Mr. Pedram Davoudpour did testify

14    credibly.    When the Court asked him why these actions

15    were taking place, he candidly indicated that there

16    were "red flags in the file."

17    When I asked him to identify what he read in the

18    file that was a red flag, he indicated that the letter

19    of July 31st, 2008 was the red flag.    Mr. Davoudpour

20    was not using the occurrences of November or December

21    or August to impose the restrictions on ECI that he

22    was responsible for implementing, he was relying on

23    the July letter.    Mr. Davoudpour's testimony affirms

24    for the Court that the requirements in the July letter

25    were false targets and were designed to create the

12

1    basis for ECI's default.

2    The hidden agenda that is taking place here is a

3    working capital assault on ECI designed to manufacture

4    a default.

5    First, a target for cash injection is set that can

Page 11

04-10-09 GMAC_1

6  either not be reached, or if it is reached, will not
7  bring ECI into compliance with the policy metric of a
8  3 to 1 debt equity ratio.
9  Next is a communication to ECI that the break even
10  is units and that he needs to sell more units to meet
11  GMAC's goals.  ECI is also told that they need to
12  reduce inventory.  When the Court asked Ms. Smith what
13  this meant, she said, "sell more cars."
14  Next is the $500 audit charge.
15  Then there is the $10,000 monthly principal
16  reduction charge.
17  Then the revolving line of credit is suspended,
18  exhibit 69, while at the same time the interest rate
19  is increased from Libor plus 300 basis points to Libor
20  plus 600, an increase of one hundred percent.
21  Ms. Smith testified that all past credit decisions
22  were purportedly based on ECI's performance, but this
23  one in her letter is thinly based "market condition",
24  without indicating what metric in the market is being
25  used, without any stated relation to a specific market

13

1  condition or contract term.  This seems to be just an
2  arbitrary action, which is not commercially
3  reasonable.
4  Next is the inventory reduction charged billed at
5  over $170,000.  This pre payment has no basis in the
6  contract.    See exhibit number 3 where it says "As

Page 12

04-10-09 GMAC_1

7    each vehicle is sold or leased, we will faithfully and

8    promptly remit."   It comes directly out of working

9    capital without being earned.  The calculation of the

10   sum has no metric and appears totally arbitrary.  It

11   appears to assume depreciation of a vehicle that is

12   not being used when all depreciation rules are based

13   on use.   It is even generally known that you value a

14   car based on mileage used, so this charge appears

15   arbitrary and as such is not commercially reasonable.

16       Then there is the November refusal to floor

17   unencumbered new and used vehicles at the Dealer's

18   request when it would have had maximum positive effect

19   on the Dealer in response to the Dealer's efforts to

20   be proactive and anticipate his problems.

21       Followed by that decision is the one in December to

22   allow flooring after audits found ECI to be Out of

23   Trust.  This action violated GMAC's own rule as

24   testified by Ms. Smith that no flooring would be done

25   once the floorplan was suspended.

14

1        But in the December case, the flooring helps GMAC

2    by obtaining more of ECI's assets, and harms the

3    Dealer because only his earlier proactive approach

4    would have enabled him to avoid the Out of Trust

5    position.

6        The three day business day remit rule in this

7    context is used to assault working capital.   When the
                            Page 13

13

04-10-09 GMAC_1

8    business most needs flexibility, the rule is strictly,

9    if not arbitrarily, enforced.    This rule is not a

10    contract term, and it is not uniform among dealers.

11    Some have a five business day remit rule.  And there

12    was no testimony in the record concerning how it was

13    applied or who got three and who got five.

14        If it's not based on contract or a clearly

15    articulated policy, it is arbitrary and not

16    commercially reasonable.

17        The sales date determined by GMAC is arbitrary.

18    Pedram Davoudpour testified that when there was a

19    dispute about sales dates then they would negotiate it

20    with the Dealer.    However, it was clear from the

21    testimony that there would be no negotiating with Mr.

22    Vick or Mr. Ted Modrzejwski.  The date is applied in

23    an arbitrary manner because cars are considered sold

24    before the deal closes and is funded.  Even known

25    unwinds are included in the audits as due and payable.

15

1    This is a working capital assault, because it then

2    requires the Dealer to fund the GMAC floorplan payment

3    out of his working capital rather than out of the

4    sale.  A Dealer with a five day remit will have a

5    distinct advantage here over one who has a three day

6    remit.  And this is not commercially reasonable

7    because it's not based in any contract term and not on

8    any clearly articulated policy.

14

04-10-09 GMAC_1

9   Audits taking place on a daily basis also assault
10  working capital.   All the employees who testified
11  indicated that the daily audits interfered with their
12  performance.   They testified that it reduced sales.
13  Inefficient performance diminishes working capital
14  because employees must be paid who are not achieving
15  peak performance.  Mr. Jaffee testified that GMAC was
16  on site interfering with the business operation from
17  November 14th, 2008 until he left on January 28th,
18  2009.  He testified that during this time, "there was
19  not one day when they were not physically on the
20  premises."  This is not commercially reasonable
21  behavior.  He testified that customers overheard their
22  conversations when they would come into his office and
23  demand information.   This testimony is contrary to
24  GMAC witnesses who said they were polite and asked
25  employees to step out.   This creates a credibility

16

1   question that this Court resolves against GMAC.
2   On December 4th, exhibit 56, demand on the open
3   account was made severely impacting not only working
4   capital, but the Dealer's cash position by diverting
5   and freezing these critical funds.
6   On December 15th GMAC demanded payment on all
7   credit lines with a deadline of March 13th.
8   And then surprisingly, on December 19th, just four
9   days later, GMAC demanded immediate payment of all

Page 15

04-10-09 GMAC_1

10    credit lines referenced in the letter December 15th,

11    2008.  These two actions coming within days of each

12    other do not make sense unless they are intended to

13    stop his investment from Motor's Holding.

14        On December 30th GMAC acquired a Temporary

15    Restraining Order that shut the business down for two

16    weeks.

17        Demand notices went to financing institutions and

18    this assault stopped all financing of sales until

19    relief was granted by the Court January 15, 2009.

20        It is unrebutted that Mr. Reggans had a

21    pre-investment contract, exhibit number 109, in place

22    that would have provided an equity cash injection into

23    his business by Motor's Holding in the amount of 2.5

24    million dollars and which was due to close on January

25    9th, 2009.  It is unrebutted that Mr. Vick and Ms.

17

1    Smith of GMAC, and others, knew this contract was

2    pending.  With this deal, Mr. Reggans would again be a

3    junior investor in his business.  However, it is also

4    undisputed that an equity investment of 2.5 million

5    dollars, just days away, would have solved all of

6    ECI's credit problems with GMAC.  Motor's Holding, in

7    its refusal to close, cited this lawsuit as a basis

8    for denial.

9        Okay.  So here is my analysis, and this is a

10    quote.

Page 16

04-10-09 GMAC_1

11     "The law has not yet acknowledged a general

12     requirement of full disclosure of all relevant facts

13     in all business relationships but the duty to disclose

14     relevant information to contractual party can arise as

15     a result of transaction itself within the partie's

16     general obligation to deal in good faith."

17         This is from Liebergesell vs. Evans 93 Wash.2d 881.

18     And the quote is from 893.  It's a 1980 case.

19         By failing to disclose the debt to equity ratio and

20     other aspects of GMAC's sophisticated financial

21     analysis, GMAC was able to create a false target for

22     the Dealer and mislead ECI about its future actions.

23         GMAC withheld information on its true targets and

24     metrics, while at the same time pushing the Dealer to

25     achieve the stated targets by trying to increase


18


1     sales, while at the same time deliberately depriving

2     the Dealer of the working capital needed to reach the

3     stated targets and/or goals set for him by GMAC.  By

4     so doing, GMAC leads the Dealer to behave in a way

5     that is beneficial to GMAC but detrimental to the

6     Dealer.   These facts were never disclosed.   These

7     facts were at all times relevant to their relationship

8     and this Court finds that GMAC had a duty to disclose

9     them.  As such, failure to disclose these facts

10     constitutes a breach of the implied covenant of good

11     faith and fair dealing.

Page 17

17

04-10-09 GMAC_1

12          In a slow market there are two ways to break-even
13     and reach a favorable debt to equity ratio.  One is to
14     increase sales but the other is to reduce overhead,
15     which will reduce the firm's ability to sell.
16     Revealing the debt to equity ratio and other parts of
17     the financial analysis could make this determination
18     to reduce possible.  To discuss break even analysis
19     only in units and only in increasing unit sales hides
20     this fact.  Lower sales in the current climate was not
21     good for GMAC.  GMAC pushed the Dealer to perform when
22     he could have reduced his efforts to obtain
23     profitability, but this would have increased his
24     inventory.  Ms. Smith testified that he needed to
25     "sell more cars" to succeed.   Clearly, in the current

19

1      market, with all of his competitors, hers is a
2      specious conclusion.
3          The U.C.C. defines good faith in RCW 62A.9A-102(43)
4      as follows:
5          "Good faith means honesty in fact and the
6      observance of a reasonable commercial standards of
7      fair dealing."
8          In the instant case, GMAC did not conduct itself
9      honestly.  There was a hidden agenda throughout the
10     time from when Mr. Vick took control until the
11     catastrophic demands in December.  The goal of the
12     team from GMAC in this case was to shut down the
                          Page 18

04-10-09 GMAC_1

13    Dealer.  The mechanism was to set a false target that
14    could not be achieved and by so doing manufacture a
15    default.
16        Given the totality of GMAC's actions, this is the
17    only conclusion this Court can come to.  This was a
18    hidden agenda.  GMAC does not have a contractual right
19    to shut down the Dealer and put him out of business.
20    GMAC may withdraw their financing, but they must do so
21    in a commercially reasonable manner.   This was not
22    done in this case.  The actions taken by GMAC to
23    assault the Dealer's working capital were designed to
24    put him out of business, not merely to protect
25    collateral.  If GMAC had disclosed that it did not

20

1    want to do business with ECI in the future openly and
2    honestly, then he would have had recourse to
3    alternatives.  But instead the Dealer was led to
4    believe his past good relationship with GMAC still
5    existed all the while secret actions were taking
6    place, which damaged his ability to perform, and these
7    actions escalated during 2008.  In fact, the actions
8    of December 15th and 19th seemed designed to block his
9    financing from Motor's Holding, which closing date was
10    less than thirty days away.
11        If he had the fifty days from June 10th to July
12    31st, he may have been able to close that deal despite
13    the efforts of GMAC.  Here, GMAC aligned all forces in

Page 19

19

04-10-09 GMAC_1

14    order to make the Dealer fail.   Such actions are not
15    commercially necessary or reasonable.   This case is
16    the perennial problem of a false target, otherwise
17    known as "hiding the ball".   If ECI had known that it
18    could never achieve the goals GMAC had set, then it
19    would have been free to pursue other options.
20        Now, GMAC quoted the case of Badgett.   I am not
21    going to give the cite.   But Badgett is not on point
22    because it deals with an affirmative expansion of a
23    duty of good faith by requiring cooperation.   Here no
24    such expansion is contemplated or required.   ECI and
25    this Court does not require GMAC to cooperate in any

21

1     venture.   The law only requires GMAC to be honest with
2     regard to its intentions and not attempt to
3     manufacture defaults, put pressure on a business to
4     fail, or block other contract opportunities.   All
5     these things were done in this case, and all are acts
6     of bad faith.
7         The Dealer in this case has a right to know how he
8     is being evaluated.   Failure to disclose this amounts
9     to having to take a test without knowing what the
10    problems are to be solved.   He was constantly given
11    partial financial information and encouraged to turn
12    his inventory when doing just the opposite would have
13    made him profitable.
14        ECI sold 19 million dollars by October of 2008.

04-10-09 GMAC_1

15    with these sales, that if he had cut back his sales

16    efforts and lowered his break-even point, he could

17    have made a profit, but GMAC was pushing him to do

18    just the opposite in order to engineer default.  This

19    constitutes bad faith.

20        So the conclusions of law are that this Court has

21    jurisdiction in this matter.

22        GMAC breached the contract by violating the

23    Covenant of Good Faith and Fair Dealing.

24        The request for replevin is denied.

25        And I think consistent with that, the motion to

22

1    amend the complaint is also denied.

2        I don't think we need to talk about it.

3        Anybody have anything else they want to say?

4        MR. GLOWNEY:  What is the Court going to do with

5    the TRO?

6        THE COURT:  Well, I think that means it's over.

7        Mr. Hausmann?

8        MR. HAUSMANN:  I agree, I think it was just in

9    place between the time of the inception of the case

10    and this ruling on replevin, so I think it's

11    distinguished by definition.

12        MR. WHEELER:  Your Honor --

13        MR. GLOWNEY:  Is the Court treating this as the

14    final ruling in this case?

15        THE COURT:  The Court is treating this as the
                        Page 21

04-10-09 GMAC_1

16    final ruling in this case.

17        MR. WHEELER:  Your Honor, taking that into

18    consideration, we would request that there be a hold

19    on the bond so that we could pursue monetary damages

20    against GMAC on that bond.

21        THE COURT:   I will grant that.

22        MR. GLOWNEY:  Is that going to be in this case or

23    some different case?

24        THE COURT:   I am not sure.

25        MR. GLOWNEY:  I'm just trying to understand, if you

                                                          23

1     are saying that this case is finished, then where is

2     he pursuing this claim?

3         THE COURT:   Well, I thought about this to a

4     certain extent, because I know that this matter is

5     going to continue in some form.  I am not quite sure

6     how.  What I'm going to do is I'm going to retain

7     jurisdiction in this case for any post hearing motions

8     that relate to this replevin action.

9         And if you think that the bond relates to that, go

10    ahead and make your motion.

11        MR. HAUSMANN:  Your Honor, I think just to -- for

12    interest of full explanation we do have a counterclaim

13    pending, and it has a claim for damages.

14        And I just don't -- I am not -- I'm still

15    processing your decision, I am not sure how we should

16    approach that issue through here.

04-10-09 GMAC_1

17    THE COURT:    The rest of the trial?

18    MR. HAUSMANN:    Yes, well you just mentioned this

19    was a final decision.

20    THE COURT:    On the replevin motion.

21    MR. WHEELER:    So should we file a motion for -- as

22    for readiness to proceed against the bond for the

23    monetary damages on the counterclaim?

24    THE COURT:    I am not quite sure I understand that

25    either.

24

1    MR. WHEELER:    We have a counterclaim against GMAC

2    for monetary damages.    The bond was submitted by GMAC

3    so that in the event the replevin action was decided

4    against GMAC --

5    THE COURT:    Oh, is it a replevin bond?

6    MR. HAUSMANN:    It is a replevin bond.

7    MR. GLOWNEY:    It is.

8    MR. WHEELER:    It is.    So in the event that that

9    decision was rendered against GMAC and the Dealer

10    could prove damages, the Dealer could pursue a claim

11    against that bond.

12    THE COURT:    I'm just doing this off the top of my

13    head, I hadn't thought about this part.    I would

14    expect that would be the second step of this action,

15    the proceeding against the bond.

16    MR. GLOWNEY:    Wouldn't it be a trial on monetary

17    damages?    I don't quite understand what proceeding

Page 23

23

04-10-09 GMAC_1

18    against the bond is --
19         THE COURT:   Well, the bond is replevin bond and
20    the decision on the replevin has been made.
21         MR. HAUSMANN:   Just to confuse things a little bit
22    more.  The first action was an injunction.  What GMAC
23    filed was a replevin bond before Judge Allendoerfer.
24    We argued that was not the right type of bond.    Judge
25    Allendoerfer said it's a bond, it's sufficient.  I

25

1    don't want to paraphrase what he said, but arguably he
2    said that was a bond to insure from damages that
3    ·flowed from the injunction, which I think might be a
4    different species of damages or species of claim, than
5    a replevin bond and the damages related to the
6    replevin.
7         THE COURT:   Okay.  What I contemplated was that
8    there was this replevin show cause action and then
9    once the decision was made here, then the other issue
10   would proceed to trial.
11        MR. HAUSMANN:   Okay.
12        THE COURT:   That's what I contemplated.
13        MR. HAUSMANN:   Right.
14        THE COURT:   But there might be some -- what I was
15   thinking about last night, is there may be need in
16   going from that step to the trial, there may be some
17   need for other types of motions, depending on the
18   ruling of this hearing, to facilitate a smooth

04-10-09 GMAC_1

19  transition.  And off on the top of my head, I couldn't
20  think of anything, but that might have been because it
21  was 3:30 in the morning and I couldn't process all
22  that well then.
23     But I think that there are probably some things
24  that probably need to be done, so I will retain
25  jurisdiction for the post hearing motions.  I will not

26

1   retain jurisdiction for the trial, that has to go back
2   to presiding to be assigned out for trial.  And that
3   trial will be on damages.
4      MR. GLOWNEY:  So the injunction is lifted?
5      THE COURT:  The injunction is lifted.
6      MR. GLOWNEY:  So when they sell cars what do they
7   do?
8      MR. HAUSMANN:  They are still contractually bound.
9      MR. WHEELER:  We will pay the floorplan amount.
10     MR. GLOWNEY:  Then we have $700,000 in
11  delinquencies.
12     MR. WHEELER:  The delinquencies were caused as a
13  result of your action.
14     MR. GLOWNEY:  And the 130 under the TRO, we don't
15  need to debate that here, but that's a question.
16     THE COURT:  I understand that is not a neat and
17  tidy situation, okay.  But I can't resolve all the
18  problems at this point.
19     MR. GLOWNEY:  I just want to be clear, the
                    Page 25

25

04-10-09 GMAC_1

20     injunction is lifted or not.

21        THE COURT:   It is lifted.

22        MR. HAUSMANN:   Thank you, your Honor.

23        MR. WHEELER:   Thank you, your Honor.

24        THE COURT:   So I'm not quite sure what you all

25     want to do in terms of an order, but in an hour I'm

27

1      going to be heading over to juvenile court.

2         Mr. Hausmann, you know where juvenile court is.

3         MR. HAUSMANN:   Yes.

4         THE COURT:   If you need me to sign something today,

5      I will be available over there.

6         MR. WHEELER:   Yes, we do.

7         THE COURT:   You just need to go over there and

8      speak with the court coordinator.

9         MR. HAUSMANN:   That's down at Denny.

10        THE COURT:   Have you been there lately?  Just go

11     in the main front entrance, once you go through the

12     metal detector and all that, there is a little booth.

13        MR. HAUSMANN:   Kiosk.

14        THE COURT:   Yes, kiosk, and just ask them.  I will

15     either be in courtroom one after three o'clock, or I

16     will be upstairs in staffing.

17        MR. GLOWNEY:   Are you going to prepare an order or

18     do you want me to --

19        MR. HAUSMANN:   We will work together.

20        MR. GLOWNEY:   We need to get it entered today.

Page 26

26

**04-10-09 GMAC_1**

21          THE COURT:    Anything else?

22          MR. GLOWNEY:    I don't think so.

23          THE COURT:    Thank you.  Court will be in recess.

24

25

Page 27

27