Cheryl Tama Oblander (ARDC 6199464)
Neal L. Wolf (ARDC 6186361)
Gerald F. Munitz (ARDC 1990470)
**BUTLER RUBIN SALTARELLI & BOYD LLP**
70 West Madison Street, Suite 1800
Chicago, IL 60602
Tel.: (312) 444-9660
Fax: (312) 276-4830
Email: ctama@butlerrubin.com

Elaine S Vorberg (ARDC 6230465)
**Law Offices of Elaine S Vorberg, P.C.**
1821 Walden Office Square
Schaumburg, IL 60173, Suite 400
Tel: (847) 397-9793
Fax: (847) 220-9211
Email: Elaine@vorberglaw.com

Attorneys for D'Andrea Buick, Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| General Motors Corp., *et al.*, | Case No. 09-50026 (REG) |
| Debtors. | (Jointly Administered) |

**OBJECTION BY D'ANDREA BUICK, INC. TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §365 AUTHORIZING (A) THE REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF**

D'Andrea Buick, Inc. ("D'Andrea Buick"), by and through its undersigned counsel, respectfully submits this Objection to the Motion Pursuant To 11 U.S.C. §365 Authorizing (A) The Rejection Of Executory Contracts And Unexpired Leases Of Certain Domestic Dealers And (B) Granting Certain Related Relief (Doc. 2995) (the "Rejection Motion") filed by the Debtor

General Motors Corporation and the above captioned Debtors and Debtors in Possession (herinafter, "GM" or "Debtors").

## PRELIMINARY STATEMENT

1. On July 6, 2009, Debtors filed their Rejection Motion seeking authority to among other things, reject 70 Affected Dealer Agreements, representing 38 dealerships.[1] The Rejection Motion applies to the Dealer Franchise Agreements and Ancillary Agreements of the Affected Dealers that did not accept the onerous terms of the Wind-Down Agreements or Participation Agreements. Notably, and consistent with the Debtors' rush to judgment on this matter, Debtors seek a retroactive rejection, to July 10, 2009, only 4 days after the filing of the Rejection Motion, 14 days prior to the date for filing objections and 24 days prior to the hearing. This retroactive rejection request effectively eviscerates any notion of notice and due process for the Affected Dealers and could result in the loss of administrative expense rights that may be available.

2. D'Andrea Buick is an Affected Dealer that chose not to accept the unreasonable and onerous terms of the Wind-Down Agreement. As a result of that decision, Debtors seek to reject its Franchise Agreements and Ancillary Agreements.

3. Whether through the Wind-Down Agreement or the Rejection Motion, D'Andrea Buick's fate is the same, and apparently without recourse in these bankruptcy proceedings. It will be out of business and left on the line for millions of dollars of debt loaded on to it by GM. Its employees are without work, its property sits vacant and its owners are arguably personally liable on debt to GMAC that GM wrongfully induced to incur by at a time when GM well knew of its own inevitable fate. The state franchise and dealership laws D'Andrea Buick relied upon as its protection against wrongful automaker conduct will be eviscerated and because Congress did not have the forethought to legislate bankruptcy safe havens for auto dealerships in the event

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Rejection Motion.

of the wholesale bankruptcy of the automakers, D'Andrea Buick and the thousands of "rejected" dealerships in this and the Chrysler bankruptcy case pending in this same court, will be simply out of luck.

4. D'Andrea Buick respectfully submits that while this Court's decision on the Rejection Motion may well be a foregone conclusion (it is duly mindful of the decision in In re Old Carco LLC, f/k/a Chrysler, 406 B.R. 180 (Bankr. S.D.N.Y. June 19, 2009) (rejecting any balancing of the equities, or any other possible argument against rejection)), it is imperative that the record is made in this case that D'Andrea Buick's Franchise Agreements and Ancillary Agreements are not being rejected in good faith, that the Wind-Down Agreement is unconscionable, illusory and certainly not the "soft landing" the Debtors claim it is, and that the Rejection Motion is overreaching and not supported by the evidence.

5. On June 8, 2009, Rep. Daniel Maffei introduced H.R. 2743, the Automobile Dealer Economic Rights Restoration Act of 2009 in the House. The bill would restore the franchise and other economic rights of GM dealers, including the rights to recourse under state law, as they existed prior to GM's bankruptcy. The bill has strong bipartisan support, with 264 Co-Sponsors, as of July, 24, 2009. On June 18, 2009, companion litigation was introduced in the Senate by Sen. Charles Grassley. It has 31 Co-Sponsors, as of July 24, 2009. H.R. 3170, the Financial Services and General Government Appropriations Act, 2010, which passed the House on July 16, 2009, contains an amendment which would, likewise, restore the rights of GM dealers. See Group Exhibit A hereto, H.R. 2743 and S. 1304.

6. On July 23, 2009, a Co-Sponsor of S. 1304 and Chairman of the U.S. Senate Committee of Commerce, Science &Transportation, Sen. Jay Rockefeller, requested the Special Inspector General of the Troubled Assets Relief Program (TARP) review the methodology of the

GM decisions to terminate dealership franchises across the country. "There is substantial confusion, even among dealers themselves, as to how GM and Chrysler selected dealerships to terminate and what benefits, if any, they might gain by doing so," Rockefeller said. "In light of the impact these closures have on communities across the country, as well as the fact that both companies have received billions in taxpayer supported funding, I believe the American people deserve to understand what led to these decisions." See Exhibit B hereto, July 23, 2009, letter to Mr. Neil Barofsky, Special Inspector General, from Senator Jay D. Rockefeller IV.

7. At the very least, in light of the pending legislation, the Rejection Motion should be stayed until such time as Congress and the public are fully informed and Congress has had an opportunity to consider enacting the protections that render the Rejection Motion moot and to allow D'Andrea Buick sufficient time to conduct discovery relevant to the rejection of its agreements.

8. The filing of this objection by D'Andrea Buick and its appearance in these cases is not intended as a submission by it to the claims resolution process in this case, the waiver by D'Andrea Buick of its right under 28 U.S.C. § 1411 to a jury trial in any other proceeding between it and the estate of GM, the Debtors or their affiliates, or the right of D'Andrea Buick to request a change of venue of any proceeding involving it pursuant to 28 U.S.C. § 1412.

## THE FACTS OF D'ANDREA BUICK

9. Nicholas D'Andrea, 61, is the owner and President of what was formerly D'Andrea Buick, Inc., d/b/a D'Andrea Buick–Pontiac-GMC, located at 7051 South Western Avenue, Chicago, in the economically-depressed area of Englewood.

10. Nick's career at this dealership location began in 1979, when he was hired as a salesman by Van Male Buick. With the helping hand of his mentors in the car business, he

4

steadily worked himself up to sales manager, and finally, in 1984 to general manager. By then, the Buick dealership had been purchased by Fran and Jerry Napleton.

11. Some 20 years after Nick first became involved in the car business, he purchased the dealership from the Napletons, becoming the sole owner of the dealership and the Buick franchise in 1997. Despite sacrifices and challenges along the way, he had achieved the hard-fought goal of owning his own business – and a strong, healthy, and profitable business.

12. Since 1983, Nick was actively involved in the local Knights of Columbus organization, devoting time to service work on Chicago's South Side. He and his family gave generously to local causes, including contributing to special projects at a Chicago Public School in the economically-depressed Englewood neighborhood where his dealership is located. Nick and his wife live in the Southwest Chicago suburbs, where they both grew-up. They are modest spenders and aggressive savers.

13. Nick ran his business like a business – not a personal or family piggybank. He took a salary for his six-days-a-week work schedule; his wife did not work at the dealership and did not draw a salary. Profits generated by the business were, in large measure, left in the business to keep capitalization high and to act as a cushion in lean times.

14. During his many years in the car business, Nick saw a transformation of GM from a responsive, exciting car manufacturer, to a complacent and smug panderer to Wall Street, focused less on the product and the consumer, and more on "financial engineering."

15. During his 10 years of ownership, Nick ran a profitable, successful Buick dealership, employing dozens of union mechanics, salespeople, office workers and managers, in an economically-disadvantaged area of Chicago in which few would be willing to make a substantial investment.

16. Nick complied with all terms of his Dealer Sales and Service Agreement, earning awards for his sales and service records. See Exhibit C hereto, Dealer Sales and Service Agreement Standard Provisions General Motors Corporation. At no time did GM ever take any action against Nick for any alleged violation, infraction or failure to comply with the Dealer Sales and Service Agreement

17. In 2007, GM executives approached Nick with suggested plans to expand his business by taking-on additional dealerships. For many months, Nick resisted GM's efforts to expand or move his dealership, add lines or take-on new locations. Rather than leverage an existing, profitable and stable dealership, for the nebulous promise of increased revenue, Nick wanted to stay at his location, run a smaller, but more efficient and profitable business, and sell Buicks to his loyal customers in the same neighborhood he'd been serving for 30 years.

18. In 2008, the pressure from GM for him to expand increased significantly. Beginning in 2008, GM executives did not merely suggest new lines, they mandated them. Nick was told that GM's "channeling" process required them to consolidate Buick and Pontiac lines. If he would not agree to buy a Pontiac franchise, GM would terminate his Buick franchise, for cause. Understanding that termination of the franchise would mean a certain loss of his business, Nick was forced to capitulate to GM's demands.

19. In August 2008, D'Andrea Buick, Inc. purchased a Pontiac franchise from an existing dealership.[2] GM repeatedly assured Nick, through August 2008, that the addition of the Pontiac line would be a boon to his business. Consolidation of another Buick location with Nick's was a stated goal of GM. Nick was assured his dealership would see an increase in sales of Buicks, as well as profits from the added Pontiac line.

---

[2] Notably that dealership, the Gilliespie Dealership, was offered a Participation Agreement for its Chevrolet franchise.

6

20. Despite GM's claimed need to consolidate the Buick, Pontiac and GMC brands and their advertised goal of consolidating Buick, Pontiac and GMC sales showrooms, the "ultimate destination" of car buying, GM resisted Nick's request to add GMC as part of his showroom. Nick negotiated with local dealers and GM in order to complete on his own what GM expressed as its goal, "Three Powerful Brands Under One Roof." See Exhibit D hereto, GM 2009 brochure excerpt.

21. On August 14, 2008, with approximately $200,000 from his existing business and $1.2 Million in additional secured financing, for which the lender, GMAC, required execution of personal guarantees, Nick closed on the purchase of the Pontiac and GMC franchises. As a part of the deal, Nick was required to acquire 140 Pontiacs, the liabilities for which overall, exceeded their value by approximately $150,000.

22. Shortly, Nick began to struggle with sales and performance, in part due to poor credit conditions for his customer base, but exacerbated by the additional debt service that he incurred as a result of the Pontiac and GMC deal. Nevertheless, he expected that his experience through other rough economies, income from warranty and other service work, a loyal customer base and the inventory of popular Pontiac and GMC brands (with models that were less expensive than a Buick) would prevail, and he would be able to survive the temporary downturn.

23. However, by November 2008, **mere weeks after the Pontiac purchase was finalized**, the automotive trade press was reporting that GM was considering terminating the Pontiac brand. To add insult to injury, any Pontiac sales activity that had been occurring at D'Andrea Buick-Pontiac-GMC was ruined by GM's haphazard public debate over the fate of the Pontiac brand. GM had strangled the life out of any Pontiac sales.

24. To no one's surprise, GM fulfilled its own prophecy on Pontiac, and on April 27, 2009, announced that its "Viability Plan" was not acceptable (to the Auto Task Force and the President, presumably), and that a discontinuation of the Pontiac brand was required to make GM viable in the eyes of the Federal government.

25. What did come as a surprise, however, was the letter Nick received from GM, dated May 14, 2009, which vaguely described a "plan" for the restructuring of the dealer network, and concluding that "[b]ased on our review and current and foreseeable market conditions and your dealership's historical performance, we do not see that GM can have a productive business relationship with D'Andrea Buick-Pontiac-GMC over the long term," and alluding to the termination of all three of Nick's franchises: Buick, the brand on which Nick dedicated his entire career and business; GMC, the brand which Nick negotiated with GM and other dealers to obtain; and Pontiac, the brand which Nick purchased just 9 months prior for more than $1 Million, at the insistence (and under the thinly veiled threats) of GM. See Exhibit E hereto, May 14, 2009, form of correspondence from General Motors Corporation.

26. In the May 14, 2009 letter, GM expressed that its "planning" was not finalized, but offered no reason for the alluded to termination of D'Andrea Buick-Pontiac-GMC franchise. Referencing only "historical performance" and other market factors, GM gave little indication to Nick why he was slated for closure. The letter stated that "[p]lease understand that our planning in this regard is not finalized, and we are prepared to give you until the end of the month to submit any information you would like to us... If you have any information you would like to submit or have questions concerning this communication, please contact us at GMDealerNetworkquestions@gm.com."

27. Nick and his legal counsel's many calls and communications to GM went unreturned; and surreptitious comments by and combative attitudes from the same executives, who so strongly urged Nick to purchase the Pontiac franchise just a few months prior, became the norm.

28. Certain that he had met his obligations under his Dealer Sales and Service Agreements; and still confident that GM executives had meant what they said when they lauded his performance before and during the Pontiac purchase, on May 18, 2009, Nick submitted his appeal letter to the nebulous "GM Dealer Network Questions" e-mail address. See Exhibit F hereto, May 18, 2009 correspondence from Nicholas D'Andrea to Charles MacGregor. That letter sets forth a summary of the historical performance of D'Andrea Buick-Pontiac-GMC that was clearly contrary to any decision to terminate.

29. Despite Nick's appeal, GM continued to avoid calls by him or on his behalf and in the few instances when someone was caught off-guard with a phone call, the buck was passed.

30. The only substantive response from GM - not any person at GM, just "GENERAL MOTORS CORPORATION" - arrived on June 2, 2009: the "Wind-Down Agreement." See Exhibit G hereto, Wind-Down Agreement. The cover letter letter notes that by accepting the agreement D'Andrea Buick, among other things, would waive "any other termination assistance of any kind" and "release [the] claims against GM, the 363 Acquirer and their related parties."

31. On each and every of the nine pages of the Wind-Down Agreement is the warning, all capital letters and bold : "**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**" This stated drop dead date was truly a drop dead date; Nick would have to review, evaluate and decide the

9

fate of his 30 year business, in a mere seven business days. At its best, the Wind-Down Agreement offered to Nick was onerous; and at its worst, unconscionable.

32. On June 4, 2009, GM announced its wind-down review process. Requests for wind-down reviews (notably no criteria for review were provided) were required by June 8, 2009. "Submission deadlines" for the Wind-Down Agreement were not changed; and the review was said to be continuing through June 12, 2009, suggesting that the review process applied only to dealerships that executed the Wind-Down Agreement (and which had already relinquished all their rights). See Exhibit H hereto, June 4, 2009, GM Communications Memo.

33. On June 6, 2009, a Saturday, despite weeks of avoiding calls and sharing no information, the GM Zone Manager, Charles MacGregor surfaced with yet another threat for Nick: "You'll be left with a lot full of cars if you don't sign the agreement." And, as if Nick had not been lying awake at night wondering how he and his wife would manage if they lost their business, their savings and possibly even their home, as a result of GM's colossal failures, MacGregor asked, "DON'T YOU KNOW HOW MUCH MONEY IS AT STAKE HERE?"

34. MacGregor failed to respond to counsel for D'Andrea Buick-Pontiac-GMC when asked why he would threaten closure of the dealership when a review process was supposedly continuing. See Exhibit I hereto, June 6, 2009, e-mail from Elaine S Vorberg to Charles MacGregor.

35. For days, Nick and his attorneys attempted to get clarification of various terms of the Wind-Down Agreement. These efforts were met with stonewalling and marked contempt – "Thank you for the inquiry. We are only taking inquiries directly from Dealer Operators of record." See Group Exhibit J hereto, June 9, 2009 and June 10, 2009, e-mail exchanges.

10

36. Finally, on June 10, 2009, GM's attorneys responded, providing no further clarification, and non-responsive answers to basic questions. For example, counsel for D'Andrea Buick asked "Does GM or the '363 Acquirer' intend to make good on Mr. Henderson's promise to the Senate that dealerships will be allowed to remain open until 2010, or will it insist on being allowed to terminate after the end of the year 'at its option' with 30 days' Notice?" The response "THE TERMS OF THE DOCUMENTS SPEAK FOR THEMSELVES." See Exhibit K hereto, June 10, 2009, e-mail from Henry (Sandy) I. Lowe (capitalization in original).

37. Nick received a copy of GM's Rejection Motion, followed on July 13, 2009, by "New GM's" declaration that GM "can no longer perform" under the dealer agreements, its notice to D'Andrea Buick that it has "no further rights ... to act as an Authorized Dealer." GM further stated that "mindful of the impact the Rejection Motion will have on you, we wish to offer you the following accommodations" and "offering" to pay amounts it already owed under the dealer agreements for work performed through July 9, 2009. Notably, this "offer" and "accommodation" was conditioned on the dealer complying with due dates and very short deadlines for the submission of Warranty Claims and Incentive Payments. See Exhibit L hereto, July 10, 2009, correspondence from GM. So ended Nick's 30-year relationship with GM. In light of the onerous terms and relinquishment of rights in the Wind-Down Agreement, D'Andrea Buick did not sign.

38. Understanding the likely result of not executing the Wind-Down Agreement, Nick undertook activities necessary to close his dealership in an orderly and responsible manner. He contacted his lender to advise it of the circumstances. He notified the unions of the necessity of laying-off mechanics. He and his wife personally purchased two used cars to make a cash infusion to the company necessary to pay bills to vendors and make the last payroll to the

11

company employees. Nick negotiated to trade-off some of his new car inventory with other dealers -- friends in the business for many years -- until GM's Zone Manager, Chuck MacGregor, interfered with and halted a trade of 11 vehicles.

39.     Even while GM has no use for D'Andrea Buick, Nick's relationship with his lender, GMAC, is continuing. Nick owes GMAC approximately $2 Million, with over $1.3 Million of the total having been borrowed within the last year in connection with the purchase of the Pontiac franchise. The loans are ostensibly backed by personal guarantees signed by Nick and his wife, evidencing the adage about no good deed goes unpunished.

### THE WIND-DOWN AGREEMENT IS ILLUSORY AND UNCONSCIONABLE

40.     As an initial matter, the Wind-Down Agreement did not provide assurances to the dealers that they would have any right as against the "good assets" of "New GM". The agreement specifically provided that GM "has the right, but not the obligation, to seek to assign" the agreement to "New GM". According to the Agreement, the dealer had no choice in the matter; GM had sole discretion, without limitation, to assign the agreement or not. See Exhibit G, Wind-Down Agreement Para. 1. This is contrary to basic bankruptcy law under §365(f)(2) and Bankruptcy Rule 6006.

41.     Fritz Henderson, CEO of General Motors, boasted to the U.S. Senate Commerce, Science and Transportation Committee on June 3, 2009, that GM would give dealers 15 months to wind-down operations ("When executed, these agreements allow them to stay in business until October 2010 – the expiration date of their current dealer agreement -- so they can sell down their vehicle inventories and provide warranty service to customers, thus winding down their business in an orderly fashion." See Exhibit M hereto, United States Senate Commerce, Science and Transportation Committee Opening Remarks, p.4.

42. The Wind-Down Agreement provided otherwise and did not comport with Mr. Henderson's testimony At "either party's option" the Dealer Agreement could be terminated as early as January 1, 2010. See Exhibit G, Wind-Down Agreement Para. 2. The idea that a dealer would elect to terminate is unrealistic. Effectively, the option only benefits GM. GM did not provide 15-months' notice, but rather, provided 6-months' notice, under the guise of a longer term.

43. The Wind-Down Payment (as defined in the Wind-Down Agreement), the only consideration to the dealer contemplated by the agreement, is subject to so many conditions and approvals that it would be nearly impossible for dealers to prudently assume that any amount would ever be paid to them, for example:

    a.    The payment could be reduced by any amount owed by the dealer to GM or any of its "affiliates", including "partners, venturers, directors, officers, stockholders [the United States?], agents, employees and spouses."

    b.    Any part of the payment could be delayed, for an unspecified amount of time, if any person claimed an interest in the assets or properties of the dealer, for example, a secured interest in the building where the dealership operated or a loan on the cars.

    c.    The payment would be made in accordance with GM's "standard practices," which were left unspecified, hence, subject to change.

    d.    The payment was contingent upon the dealer's sale of its inventory before the termination date.

    e.    The payment was contingent upon "bankruptcy court approvals." Considering the option to retain the agreement in "Old GM" and the lack of detail, one could only speculate as to the "approvals" to which the agreement referred.

    f.    The payment could be offset by amounts owed by dealers to GM under "Performance Agreements," regardless of whether the dealers' performance was made extremely difficult by GM, or even if it was a legal impossibility.

See Exhibit G, Wind-Down Agreement Para. 3.

44. The agreement leaves open the potential for GM to demand the dealer return any payments made, if the dealer fails to sell all of its inventory by the time GM decides to terminate it (any time after January 1, 2010) or for any other "breach". See Exhibit G, Wind-Down Agreement Para. 3.

45. The dealer, on its own behalf and on behalf of its employees, agents, spouses, officers, directors, stockholders and representatives was required to waive any claims "of every kind and nature whatsoever" against GM or any of its affiliates, relating to the agreement, or "any other events, transactions, claims, discussions or circumstances of any kind" arising prior to the effective date of the agreement **and to indemnify GM for any such claim**. See Exhibit G, Wind-Down Agreement Para. 5.

46. The agreement also mandated that the dealer provide GM, and any third-parties of GM's choosing, the right to use its customer lists and service records. The dealer was also required to not oppose the relocation or establishment of a new dealership in its vicinity. See Exhibit G, Wind-Down Agreement Paras. 2(b), 7.

47. Despite the claimed need to pare down its dealer network, the Wind-Down Agreement contemplates that GM will take away one dealer's franchise rights and business goodwill, and give it to another. Not only is this unfair and unreasonable in the abstract; but considering the Wind-Down Payment is contingent upon the dealer's sale of an inventory of "new" cars of past model years and doomed model lines (Pontiac), competition from another dealer with an unfair advantage (i.e., real new cars and a customer portfolio) will make the Wind-Down dealer's chance of "success" that much more difficult.

48. The agreement would force the dealer to waive any rights afforded to it by the Dealer Sales and Service Agreement and/or by the motor vehicle franchise law of any state, to

14

submit to the exclusive jurisdiction of the bankruptcy court and agree to confidentiality. See Exhibit G, Wind-Down Agreement Paras. 5, 7, 9, 13.

49. These are the terms of the "soft landing" for the dealers, a refrain oft stated by Debtors in the Rejection Motion (see Rejection Motion pages 4, 10, footnote 4 at page 11 "cushions the economic fall"). If the Wind-Down Agreement is a soft landing, one can hardly imagine what terms would prevail were GM not in such a beneficial mood.

50. This is no soft landing, the terms offered under the take it or leave it Wind-Down Agreement were illusory and unconscionable. GM took billions in government bailout and further stripped its dealers of any and all rights they may have had under their agreements or applicable law.

51. The Wind-Down Agreement was procedurally and substantively unconscionable. See Liparoto Const., Inc. v. General Shale Brick, Inc.,--- N.W.2d ----, 2009 WL 1449055 (Mich. App. May 21, 2009). The dealers "had no realistic alternative to acceptance" and the terms were "so extreme as to shock the conscience." Id. (internal citations omitted). See also Northwest Acceptance Corp. v. Almont Gravel, Inc., 412 N.W.2d 719, 724 (Mich. App. 1987); Hubscher & Son, Inc. v. Storey, 578 N.W.2d 701 (Mich. App. 1998). This court should not condone the Wind-Down Agreement, which should not be enforceable as a matter of law, by allowing the Debtors to reject the Affected Dealer Agreements because they were unwilling to bend to the GM Wind-Down demands.

52. The Wind-Down Agreement is illusory because GM has not provided any consideration in exchange for the concessions extracted from the dealers and its performance was entirely optional. See Restatement (Second) of Contracts: Illusory and Alternative Promises § 77 cmt. a (1981); Restatement (Second) of Contracts: Conditional Promise § 76 cmt. d (1981);

Restatement (Second) of Contracts: Promise; Promisor; Promisee; Beneficiary § 77 cmt. e (1981). To the contrary, GM offered nothing in the Wind-Down Agreement to the dealers for the concessions. To the extent GM was required to do anything under the Wind-Down, it was an obligation that already existed.

### THE D'ANDREA BUICK REJECTION IS NOT IN GOOD FAITH

53.   With all due respect, the decision in In re Old Carco LLC, f/k/a Chrysler, 406 B.R. 180, 188 (Bankr. S.D.N.Y. June 19, 2009) rejecting any balancing of the equities, or any other possible argument against rejection, oversteps the boundaries of the bankruptcy laws. "The bankruptcy laws are intended as a shield, not as a sword. Their purpose is to minimize fiscal chaos and disruption, not to aggravate it." In re Penn Central Transp. Co., 458 F. Supp. 1346, 1356 (E.D. Pa. 1978). We believe that the sounder analysis of the rejection of an executory contract must consider whether rejection will cause substantial harm to the contracting party with no proportionate benefit to the estate and that inherently there must be some balancing of the equities. See In re Sundial Asphalt Co., Inc., 147 B.R. 72 (E.D.N.Y. 1992); In re Midwest Polychem, Ltd., 61 B.R. 559, 562 (Bankr. N.D. Ill. 1986); Infosystems Technology, Inc. v. Logical Software, Inc., 1987 WL 13805 (D. Mass. 1987); In re Monarch Tool & Mfg. Co., 114 B.R. 134, 137 (Bankr. S.D. Ohio 1990); In re Petur U.S.A. Instrument Co., Inc., 35 B.R. 561 (Bankr. W.D. Wash. 1983).

54.   Even under In re Old Carco LLC, f/k/a Chrysler, 406 B.R. 180, 188 (Bankr. S.D.N.Y. June 19, 2009), the debtor's decision to reject can be challenged if not made in good faith. There is no objective or subjective evidence to support the rejection of the 70 Affected Dealer Agreements and the Debtor can not meet the good faith requirement. The Rejection Motion is merely replete with vague, nebulous, conclusory statements regarding the Dealership

16

Evaluation Process. There is no evidence how that process applied to any of the 70 Affected Dealer Agreements.

55. More importantly, the facts show that any possible lack of financial performance by D'Andrea Buick was due to GM forcing it to purchase the Pontiac dealership. Therefore, D'Andrea Buick is entitled to know with specificity what parameters led to it being offered a Wind-Down Agreement and why it should be subject to the Rejection Motion.

56. The Rejection Motion is replete with vague, nebulous, conclusory statements in support of rejection. The mere fact that the majority of its dealers accepted the agreements offered to them, whether a Participation or Wind-Down Agreement, does not make the agreements fair and the Rejection Motion valid. As noted above, the tactics of the Debtors left dealers on either side of the equation little choice.

57. The Debtors say that as of June 1, 2009 there were approximately 6000 dealerships. Debtors also state that 99% (4100) of the dealers offered the Participation Agreement accepted and 98% (1,862) offered the Wind-Down Agreement accepted. Only 38 dealers, less than 1% of its total dealership, did not accept the Wind-Down Agreement. There is no evidence that absent rejection of these 38 dealers that the Debtors' will face a catastrophic liquidation. Rather, it is clear that the rejection of these 38 dealerships is retaliatory and punitive for not accepting the unconscionable and illusory terms of the Wind-Down Agreement.

58. There is further evidence that the dealers truly had no choice in deciding whether or not to accept a Participation or Wind-Down Agreement, each agreement was offered with the implicit threat of rejection in the bankruptcy case.

59. Debtors have offered no evidence how the Rationalization Process of their Dealer Network will return their core business to profitability. Short term cost-savings may be realized,

17

but the Debtors were not put into bankruptcy by the Dealer Benefit Programs. GM is a debtor because it failed to produce products that the market wanted, products that their loyal dealers continued to sell even under adverse circumstances.

60. Bankruptcy Rule 6006(a) provides that a proceeding to reject an executory contract, other than as part of a plan, is governed by Rule 9014. Bankruptcy Rule 9014 deems the motion for rejection to be a contested matter to which Rule 7626 and Rules 7028-7037 apply. D'Andrea Buick requests a reasonable opportunity to conduct discovery regarding the decision to reject its dealership agreement and, pursuant to Rule 9014(d), to participate in the examination and cross-examination of witnesses testifying with respect to disputed material factual issues. The request for discovery comports with the court's analysis in In re Old Carco LLC, f/k/a Chrysler, 406 B.R. 180, 208 (Bankr. S.D.N.Y. June 19, 2009) (noting that the debtors had provided discovery to all dealers who had made that request). Accordingly, D'Andrea Buick will seek such discovery as necessary regarding the rejection of its agreements.

61. The conduct of discovery and the conduct of a trial will not prejudice the interests of the Debtors' estate because the debtors are not presently performing under the agreements. To the extent that parties similarly situated to D'Andrea Buick request this same relief, the ability to coordinate discovery and consolidate the proceedings for trial pursuant to Rule 7042 is improved.

WHEREFORE, based on the foregoing, D'Andrea Buick respectfully requests that the Rejection Motion be denied or that alternatively it be stayed (a) pending resolution of the proposed legislation and related hearings before Congress and (b) for a period of time sufficient to allow it to conduct discovery on the Debtors' grounds for rejection of its agreements and for a

trial on the objection. Further, D'Andrea Buick respectfully requests that any order approving the Rejection Motion be effective as of the date of the order, and not retroactive to July 10, 2009.

DATED:  Chicago, Illinois
July 28, 2009

                                                          s/Cheryl Tama Oblander
                                       Cheryl Tama Oblander
                                       Neal L. Wolf
                                       Gerald F. Munitz
                                       Butler Rubin Saltarelli & Boyd LLP
                                       70 West Madison Street, Suite 1800
                                       Chicago, IL 60602
                                       Tel.: (312) 444-9660
                                       Fax: (312) 276-4830
                                       Email: ctama@butlerrubin.com

                                       Elaine S Vorberg (ARDC 6230465)
                                       **Law Offices of Elaine S. Vorberg, P.C.**
                                       1821 Walden Office Square, Suite 400
                                       Schaumburg, IL 60173
                                       Tel: (847) 397-9793
                                       Fax: (847) 220-9211
                                       Email: Elaine@vorberglaw.com

444473v2