# EXHIBIT "F"

# *D'Andrea* BUICK, Inc.

7051 S. WESTERN AVENUE   CHICAGO, IL 60636   (773) 776-0500   FAX (773) 776-1294

May 18, 2009

**Via Facsimile, Electronic Mail and U.S. Mail**
Mr. Chuck MacGregor
Zone Manager – Chicago
General Motors Corporation
North Central Region
387 Shuman Boulevard
Suite 240
Naperville, IL  60563-1217

Re:    **D'Andrea Buick, Inc., d/b/a D'Andrea Buick – Pontiac - GMC**

Dear Chuck:

I am in receipt of General Motors Corporation's correspondence of May 14, 2009.  I am gravely disappointed in the correspondence.  Please accept the following to provide you with details concerning the circumstances, as well as our submission (by carbon copy) to General Motors Corporation ("GM") for its consideration in the "dealer network plans" revealed in the correspondence.

We acknowledge that GM has not finalized its "planning" with regard to your dealer network; however, we would submit that the analysis and communication has been woefully inadequate, disrespectful of the requirements of the Dealer Sales and Service Agreement ("Agreement") and Illinois law, arbitrary and capricious and constituting unfair and deceptive practices, considering the facts and circumstances.

First and foremost, other than GM's challenges in the current "unprecedented" economic conditions (we could argue whether the conditions are "unprecedented" considering that I have been doing business at this location, with success, for over 30 years and through multiple economic crises and recessions), there has been no reason offered for the planned termination of the agreement.  GM has failed to provide me with a provision in the Agreement, under which it plans to terminate; and has no valid basis for doing so, absent my agreement.  There has been no breach by D'Andrea Buick, Inc., nor does any just cause exist for termination.



B U I C K

Although GM cites "historical performance" and other market factors as supportive of its position and plan, the analysis has apparently failed to recognize key facts:

1. In the past five years, D'Andrea Buick, Inc. has met, and in some cases, surpassed retail sales goals for its Buick sales. D'Andrea Buick, Inc. during those five years has consistently been among the top performing dealers in the zone. CSI performance has been within the top of the zone. D'Andrea Buick – Pontiac – GMC is 95% effective in selling General Motors Protection Plan products.

2. Inasmuch as D'Andrea Buick, Inc. has been a Pontiac and GMC dealer for less than one year; and further considering that GM has injured the Pontiac franchise by its own act of communicating to the public that it intends to discontinue the Pontiac line, the Pontiac and GMC sales may not necessarily be illustrative of the sales success of D'Andrea Buick, Inc. Nevertheless, during the channeling process, culminating in D'Andrea Buick, Inc.'s buy-sell agreement with Greater Chicago Auto Sales, Inc. (August 2008), GM representatives repeatedly assured me that my purchase of Greater Chicago Auto Sales, Inc.'s Pontiac dealership would be of financial benefit to GM and D'Andrea Buick, Inc. Notably, the historical performance and market factors were apparently very favorable when considered by GM in awarding D'Andrea Buick, Inc. the Pontiac and GMC dealerships just months ago.

3. In addition to the initial investments made by D'Andrea Buick, Inc. with respect to the Buick dealership (which exceed $1.5 Million), D'Andrea Buick, Inc. incurred obligations and made additional investments in conjunction with GM's channeling process (which exceeded $2 Million) to acquire the Pontiac and GMC dealerships, not including the cost of vehicles, signage, and lease of property, to perform its obligations. Again, during the channeling process, GM representatives were supportive of the investment. The investments were made in reliance upon GM's long-term planning, communicated to me just months ago – to consolidate single-point dealerships (including, but not limited to Ray Buick) into D'Andrea Buick –Pontiac – GMC. Not only was D'Andrea Buick, Inc. induced by GM to increase its investment, but was coerced by GM, and in fact, threatened with termination of its existing Agreement (without remuneration) if it failed to make the additional investment.

4. D'Andrea Buick, Inc. employs 32 people and maintains a monthly payroll in excess of $30,000 per month (not including officer's compensation). The Buick – Pontiac – GMC dealership is an anchor in the economically-disadvantaged Englewood neighborhood of Chicago; and provides the community with a stable retail presence. D'Andrea Buick, Inc. makes charitable contributions in the community it serves. Furthermore, the award-winning service provided by D'Andrea Buick –Pontiac – GMC in the community is irreplaceable.

5. Inventory of vehicles and parts is adequate to meet the demands of the customers, but well-controlled, so as not to negatively impact the profitability of D'Andrea Buick – Pontiac – GMC.

Chuck MacGregor, Zone Manager – Chicago
May 18, 2009
Page 3 of 3

6. D'Andrea Buick – Pontiac – GMC has met all warranty obligations on behalf of GM, as required of it.

As demonstrated above, D'Andrea Buick, Inc. met all of its obligations under the Agreement. GM, on the other hand, has not demonstrated good cause for termination of the Agreement, whether as set forth in the Agreement or by the Illinois Motor Vehicle Franchise Act. Furthermore, GM has acted arbitrarily and capriciously, and has committed unfair and deceptive acts in the channeling process and in its current plan to terminate D'Andrea Buick – Pontiac – GMC's Agreements, as evidenced by its letter.

Consequently, to the extent GM intends to finalize its plan to terminate our Agreement, D'Andrea Buick, Inc. is fully prepared to pursue any and all remedies available to it under the Agreement and the Illinois Motor Vehicle Franchise Act. In the event I am not assured, within a reasonable time frame, that GM has amended its plan, D'Andrea Buick, Inc. is prepared to pursue damages (including treble damages and attorneys' fees) and/or equitable relief, in the Circuit Court of Cook County, pursuant to Sections 12 and/or 13 of the Illinois Motor Vehicle Franchise Act.

Nevertheless, we will agree to a termination, provided that the termination is fair and equitable in light of the foregoing, and includes Termination Assistance and any other fair and reasonable compensation as required by Section 9 of the Illinois Motor Vehicle Franchise Act. We look forward to your response and continuation of this open and candid communication. In the meantime, please feel free to contact me should you have any further questions.

Very truly yours,

Nicholas J. D'Andrea

NJD/ev

cc:    GMDealerNetworkquestions@gm.com (*Via Electronic Mail*)
       Peter O. Kulcsar, General Motors Corporation (Via *Facsimile, Electronic Mail and U.S. Mail*)
       Chris L. Stefanos, Attorney at Law
       Elaine S Vorberg, Law Offices of Elaine S Vorberg, P.C.

# EXHIBIT "G"

# General Motors Corporation

June 1, 2009

VIA Federal Express

D'Andrea Buick, Inc.
7051 S Western Ave
Chicago, IL 60636

Attention: Nicholas J D'Andrea

This letter is to advise you that the Pontiac, Buick, GMC Truck Dealer Agreements between GM and your dealer company will not be continued by GM on a long-term basis. This is a difficult step, but one that is part of GM's court supervised restructuring efforts. Subject to bankruptcy court approval, we are willing to assist you in winding down your Pontiac, Buick, GMC Truck dealership operations to allow for the sale of new vehicle and other inventories in an orderly fashion. In order for us to provide you with this assistance, you must execute, and GM must receive, the enclosed agreement on or before <u>June 12, 2009</u>.

In summary and subject to bankruptcy court approval, the enclosed agreement, which you should carefully read, provides:

- For the termination of the Dealer Agreements no earlier than January 1, 2010 and no later than October 31, 2010

- For the assignment and assumption of the Dealer Agreements, as supplemented by the enclosed agreement, by a purchaser of certain assets of GM in the bankruptcy (the "<u>363 Acquirer</u>")

- For the payment of financial assistance in installments in connection with the orderly winding down of your Pontiac, Buick, GMC Truck operations

- For the waiver of any other termination assistance of any kind

- For a release of claims against GM, the 363 Acquirer and their related parties

- For dealership operations to continue pursuant to the Dealer Agreements, as supplemented by the enclosed agreement, through the effective date of termination of the Dealer Agreements, except that you shall not be entitled to order any new vehicles from GM or the 363 Acquirer

Given that the enclosed agreement provides your dealership with the ability to wind-down the Pontiac, Buick, GMC Truck dealership operations on an orderly basis, we recommend you carefully consider executing the agreement. We have enclosed a return Federal Express envelope, addressed to GM, for your convenience. Due to extremely short court deadlines in the bankruptcy process, we must receive the enclosed agreement on or before <u>June 12, 2009</u>. If we receive the executed agreement by that date, we will not move to reject your Dealer Agreements in the bankruptcy and plan to assign your Dealer Agreements (as supplemented by the enclosed agreement) to the 363 Acquirer as part of the court supervised restructuring of our dealer network. If we do not receive the enclosed agreement executed by you on or before <u>June 12, 2009</u>, GM will apply to the bankruptcy court to reject your Dealer Agreements. If we reject the Dealer Agreements, we cannot offer any wind-down or termination assistance in connection with such Dealer Agreements.

While these are challenging and unprecedented economic circumstances in the industry, we are pleased that we are able to offer you the enclosed agreement to allow you to wind down your Pontiac, Buick, GMC Truck dealership business and to sell your Pontiac, Buick, GMC Truck new Motor Vehicle inventory in an orderly fashion.

If you have any questions, please direct them to the Dealer Call Center at 877.868.8071.

Sincerely,

GENERAL MOTORS CORPORATION

General Motors Corporation

167893    8875
D'Andrea Buick, Inc.
7051 S Western Ave
Chicago, IL  60636

# Dear GM Dealer-Operator:

- **This package contains detailed information regarding all of the GM brands operated at your dealership.**

- **Please review this material carefully and promptly as a timely response is required.**

# General Motors Corporation



## WIND-DOWN AGREEMENT

THIS WIND-DOWN AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between D'Andrea Buick, Inc. ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

### RECITALS

A.    Dealer and GM are the parties to Dealer Sales and Service Agreements (the "Dealer Agreements") for Pontiac, Buick, GMC Truck motor vehicles (the "Existing Model Lines"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreements.

B.    GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").    No trustee has been appointed and GM is operating its business as debtor-in-possession.

C.    GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.    GM has considered moving and may, at its option, move to reject the Dealer Agreements in the Bankruptcy Case, as permitted under the Bankruptcy Code, unless Dealer executes and delivers this Agreement to GM on or before June 12, 2009.

E.    In return for the payments set forth herein and GM's willingness not to pursue the immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this Agreement (i) to allow Dealer, among other things, to wind down its Dealership Operations in an orderly fashion (specifically including the sale of all of Dealer's new Motor Vehicles), (ii) to provide for Dealer's voluntary termination of the Dealer Agreements, GM's payment of certain monetary consideration to Dealer, and Dealer's covenants regarding its continuing Dealership Operations under the Dealer Agreements, as supplemented by the terms of this Agreement (the "Subject Dealership Operations"), and (iii) to provide for Dealer's release of GM, the 363 Acquirer and their related parties from any and all liability arising out of or connected with the Dealer Agreements, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreements, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals) as follows:

1.    Assignment-363 Sale.  Dealer acknowledges and agrees that GM has the right, but not the obligation, to seek to assign the Dealer Agreements and this Agreement in the Bankruptcy Case to the 363 Acquirer.  As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the Dealer Agreements and this Agreement to the 363 Acquirer.  If GM elects to exercise its option to assign the Dealer Agreements and this Agreement, Dealer specifically agrees to such assignment and agrees not to object to or protest any such assignment.

**14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

8875_14_167893


2.  Termination of Dealer Agreement.  Subject to the terms of Section 1 above:

(a)  Dealer hereby covenants and agrees to conduct the Subject Dealership Operations until the effective date of termination of the Dealer Agreements, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreements, as supplemented by the terms of this Agreement.  Accordingly, Dealer hereby terminates the Dealer Agreements by written agreement in accordance with Section 14.2 thereof, such termination to be effective on October 31, 2010.  Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreements to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party.  In addition, and notwithstanding the foregoing, if Dealer has sold of all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Dealer Agreements prior to January 1, 2010, Dealer may request that GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b)  Concurrently with its termination of the Dealer Agreements, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealership Operations, and within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records.  Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3.  Payment to Dealer.

(a)  Subject to Sections 1 and 2 above, in consideration of (i) Dealer's execution and delivery to GM of this Agreement, (ii) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (iii) the termination of the Dealer Agreements by written agreement in accordance with Section 14.2 thereof (as set forth in Section 2 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of $591,982 (the "Wind-Down Payment Amount"), subject to the terms herein.  This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use the customer lists and service records.

(b)  GM shall pay twenty-five percent (25%) of the Wind-Down Payment Amount (the "Initial Payment Amount") to Dealer by crediting Dealer's open account maintained by GM on the GM Dealer Payment System (the "Open Account"), in accordance with GM's standard practices, within ten (10) business days following the later of (i) GM's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement.  GM or the 363 Acquirer, as applicable, shall pay the balance of the Wind-Down Payment Amount (the "Final Payment Amount") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with its standard practices, within ten (10) business days after all of the following have occurred: (i) Dealer has sold all of its new Motor Vehicle inventory for the Existing Model Lines prior to the termination of the Dealer Agreements, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of

14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

8875_14_167893



certificates of applicable taxing authorities that Dealer has paid all sales, use, and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreements in accordance with Section 2(a) above, (v) Dealer's compliance with the terms of Section 4(c) below, (vi) GM's or the 363 Acquirer's, as applicable, receipt of the fully executed Supplemental Wind-Down Agreement in substantially the form attached hereto as <u>Exhibit A</u> (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals. GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)   In addition to any other setoff rights under the Dealer Agreements, payment of all or any part of the Wind-Down Payment Amount may, in GM's or the 363 Acquirer's, as applicable, reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates (as defined below), and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealership Operations including, but not limited to, all or any part of the Wind-Down Payment Amount (each, a "<u>Competing Claim</u>"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Wind-Down Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4.   <u>Complete Waiver of All Termination Assistance Rights</u>.  In consideration of the agreements by GM hereunder, upon the termination of the Dealer Agreements, as provided in this Agreement, and cessation of the Subject Dealership Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreements or applicable laws, all of which rights Dealer hereby waives:

(a)  Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever.

(b)  Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c)  Dealer shall eliminate or remove from the Dealership Premises all Dealer-owned signs (freestanding or not) for the Subject Dealership Operations within thirty (30) days following the effective date of termination at no cost to either GM or the 363 Acquirer, as applicable. Dealer understands and agrees that neither GM nor the 363 Acquirer, as applicable, will purchase any Dealer-owned signs used in connection with the Subject Dealership Operations. Dealer hereby waives any rights it may have to require either GM or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Dealership Operations. Dealer shall provide, or shall cause the owner of the Dealership Premises to provide, GMDI access to the Dealership Premises in order for GMDI to remove all GM signs leased to Dealer by GMDI. Dealer understands and agrees that the Wind-Down Payment Amount was determined by GM in part based on Dealer's agreement that it will timely remove all signs for the Subject Dealership Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreements or any applicable statutes, regulations, or other laws.

14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

8875_14_167893

(d) Dealer expressly agrees that the provisions of Article 15 of the Dealer Agreements do not, by their terms, apply to this termination.

(e) Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in the Dealer Agreements or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreements.

(f) The terms of this Section 4 shall survive the termination of this Agreement.

5.   Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreements), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreements or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Lines, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreements, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreements, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates. GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) As set forth above, GM reaffirms the indemnification provisions of Section 17.4 of the Dealer Agreements and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

4

14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

8875_14_167893

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or this Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e) The terms of this Section 5 shall survive the termination of this Agreement.

6.  Subject Dealership Operations.    From the effective date of this Agreement until the effective date of termination of the Dealer Agreements (which shall not occur prior to January 1, 2010, subject to Section 2(a) above):

(a) Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives.

(b) Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement. Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("RIM") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

(c) Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable (under Section 12.2 of the Dealer Agreements or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person; provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section

5

14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

8875_14_167893

12.1 of the Dealer Agreements upon the death or incapacity of the Dealer Operator, except that the term of any new Dealer Agreements under Subsection 12.1.5 shall expire on October 31, 2010, subject to the terms of this Agreement. Accordingly, neither GM nor the 363 Acquirer, as applicable, shall have any obligation (under Section 12.2 of the Dealer Agreements or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d) In addition to all other matters set forth herein, the following portions of the Dealer Agreements shall not apply; Sections 6.1 and 6.3.1 (concerning ordering of new Motor Vehicles), Article 8 (Training), Article 9 (Review of Dealer's Performance), Sections 12.2 and 12.3 (Changes in Management and Ownership), Article 15 (Termination Assistance), and Article 16 (Dispute Resolution).

(e) Except as expressly otherwise set forth herein, the terms of the Dealer Agreements, shall remain unmodified and in full force and effect.

7.    No Protest.

(a)    GM or the 363 Acquirer, as applicable, may desire to relocate or establish representation for the sale and service of the Existing Model Lines in the vicinity of Dealer's Dealership Premises identified in the Dealer Agreements. In consideration of GM's and the 363 Acquirer's, as applicable, covenants and obligations herein, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or other tribunal or dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, any establishment or relocation whatsoever of motor vehicle dealerships for any of the Existing Model Lines.

(b)    Dealer, for itself and for each and all of the other Dealer Parties, hereby releases and forever discharges the GM Parties, from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including, without limitation, attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of any of such Existing Model Lines.

(c)    Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 7. Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 7. Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(d)    Dealer acknowledges that, upon a breach of this Section 7 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer, as applicable, to the same position it would occupy in the absence of breach. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in

6

14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

8875_14_167893

violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

8. <u>Due Authority</u>. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

9. <u>Confidentiality</u>. Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

10. <u>Informed and Voluntary Acts</u>. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

11. <u>Binding Effect</u>. This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that GM assigns the Dealer Agreements and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

12. <u>Effectiveness</u>. This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

13. <u>Continuing Jurisdiction</u>.    By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 13 shall survive the termination of this Agreement.

14. <u>Other Agreements</u>.

(a) Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer, as applicable, and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer, as applicable. In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

(b) The term "<u>Channel Agreements</u>" shall mean any agreement (other than the Dealer Agreements) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreements, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other dealerships, to conduct exclusive Dealership Operations under the Dealer Agreements, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase."

14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

8875_14_167893

2. <u>Release; Covenant Not to Sue; Indemnity</u>.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "<u>Dealer Parties</u>"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreements), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("<u>Claims</u>"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "<u>GM Parties</u>"), arising out of or relating to (i) the Dealer Agreements or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Lines, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("<u>SFE</u>") related payments or bonuses (except that the 363 Acquirer shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and the 363 Acquirer shall not collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreements, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreements, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM of any amounts due or to become due to GM or any of its Affiliates. GM shall not charge back to Dealer any warranty claims approved and paid by GM prior to the effective date of termination, as described in Section 1 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert [(i)] any Claim that is covered by the release provision in subparagraph (a) above **[IF DEALER AGREEMENTS ASSIGNED TO THE 363 ACQUIRER][ [or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreements or the Original Wind-Down Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.]** Notwithstanding anything to the contrary, Dealer acknowledges and agrees that GM will suffer irreparable harm from the breach by any Dealer Party of this covenant not to sue and therefore agrees that GM shall be entitled to any equitable remedies available to them, including, without limitation, injunctive relief, upon the breach of such covenant not to sue by any Dealer Party.

(c) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and

14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN



costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3. Due Authority. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4. Confidentiality. Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5. Informed and Voluntary Acts. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

6. Binding Effect. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreements and any successors or assigns. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreements and any successors or assigns, and shall benefit any of GM's successors or assigns.

7. Continuing Jurisdiction. By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 7 shall survive the termination of this Agreement.

8. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

9. No Reliance. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties hereto expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

---

14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

8875_14_167893

Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c) All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Dealer Agreements, except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Dealer Agreements, Dealer and GM shall execute and deliver documents in recordable form reasonably satisfactory to GM or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Dealer or Dealer's Affiliates.

15. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

16. Counterparts. This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

17. Breach. In the event of a breach of this Agreement by Dealer, GM and the 363 Acquirer shall each have all of its remedies at law and in equity, including, without limitation, the right to specific performance.

18. Complete Agreement of the Parties. This Agreement, the Dealer Agreements, and the schedules, exhibits, and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

8875_14_167893

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written.

D'Andrea Buick, Inc.

By: _____

Name:_____
Title:_____

**GENERAL MOTORS CORPORATION**

By _____

Authorized Representative

**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

9

8875_14_167893

## EXHIBIT A

## SAMPLE SUPPLEMENTAL WIND-DOWN AGREEMENT

THIS SUPPLEMENTAL WIND-DOWN AGREEMENT (this "Agreement") is made and entered into as of the _____ day of _____, 20__, by _____, a _____ ("Dealer"), for the use and benefit of _____, a _____ ("GM") and _____, a _____ corporation ("363 Acquirer").

### RECITALS

A.    Dealer and GM are parties to Dealer Sales and Service Agreements for _____ motor vehicles (the "Dealer Agreements").

B.    Dealer and GM are parties to that certain Wind-Down Agreement dated June __, 2009 (the "Original Wind-Down Agreement"). All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Wind-Down Agreement.

C.    [IF DEALER AGREEMENTS ASSIGNED TO THE 363 ACQUIRER][GM assigned all of its right, title and interest in the Dealer Agreements and the Original Wind-Down Agreement to the 363 Acquirer.]

D.    Pursuant to the Original Wind-Down Agreement, Dealer agreed to terminate and cancel the Dealer Agreements and all rights and continuing interests therein by written agreement and to release GM and its related parties from any and all liability arising out of or connected with the Dealer Agreements, any predecessor agreement(s) thereto, and the relationship between [GM or the 363 Acquirer] and Dealer relating to the Dealer Agreements, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

E.    Dealer executes this Agreement in accordance with Section 3 of the Original Wind-Down Agreement.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer hereby agrees as follows:

1.    Termination of Dealer Agreements.

    (a)  Dealer hereby terminates the Dealer Agreements by written agreement in accordance with Section 14.2 thereof. The effective date of such termination shall be _____, 20__.

    (b)  Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer.

    (c)  Dealer shall be entitled to receive the Final Payment Amount in accordance with the terms of the Original Wind-Down Agreement.

14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

8875_14_167893



IN WITNESS WHEREOF, Dealer has executed this Agreement through its duly authorized officer as of the day and year first above written.

_____

By:_____

Name:_____

Title:_____

8875_14_167893

# EXHIBIT "H"

GM GlobalConnect

alan joseph
D'ANDREA BUICK-PONTIAC-GMC

Edit My Profile    Logout

Workbenches | My Shortcuts | Messages | Library |
Home > Leadership Messages

Help 🔊 | Print 🖨

View and read message below or select the Back link from the task bar below to return to the home page

▸Back

**IMPORTANT COMMUNICATIONS: GM Dealer Network Restructuring Wind Down Review Process (June 4, 3:45 PM ET)**

**Mark LaNeve, GM North America Vice President, Vehicle Sales, Service and Marketing**

**06/04/2009**

**Date:** June 4, 2009, 3:45 PM

**To:** All General Motors Dealers

**Subject:** GM Dealer Network Restructuring Wind-Down Review Process

GM has developed a process to provide dealers that received a wind-down agreement the opportunity to submit a request for review.

Only electronic submissions to GMDEALERNETWORKQUESTIONS@GM.COM from the Dealer Operator named in Paragraph 3 of the Dealer Sales and Service Agreement will be accepted, and must include BAC, Dealer Company Name, address, City & State and received on or before June 8th, 5:00PM ET.

Requests for Wind Down Reviews must be received on or before June 8, 2009 to facilitate an appropriate review through June 12, at which time the process closes.  We will notify you of our decision. If the decision is reversed, you will receive a new agreement with revised timing requirements.

**THE SUBMISSION DEADLINES IN YOUR CURRENT AGREEMENTS HAVE NOT CHANGED.  THE AGREEMENTS MUST BE RETURNED BY JUNE 12, 2009 OR WE WILL PETITION THE COURT TO REJECT THE SALES AND SERVICE AGREEMENT.**

Mark LaNeve

GMNA Vice President

Vehicle Sales, Service and Marketing

*(Note:  This communications regarding the GM Dealer Network Restructuring Wind-Down Review Process supercedes any*

Terms of Use | Global Consent | Feedback    © 2007 General Motors Corporation. All Rights Reserved.

# EXHIBIT "I"

Web–Based Email :: Print

**Print** | **Close Window**

Subject: **Re: D'Andrea Buick, Inc.**
From: GMDealerNetworkquestions@gm.com
Date: **Sat, Jun 06, 2009 4:41 pm**
To: elaine@vorberglaw.com

Chuck,
How are you handling this??

**elaine@vorberglaw.com**

06/06/2009 05:25 PM

To charles.h.macgregor@gm.com
cc gmdealernetworkquestions@gm.com
Subject D'Andrea Buick, Inc.

Please respond to
GM Dealer Network Questions

Mr. MacGregor:

I am an attorney for Nicholas D'Andrea and D'Andrea Buick, Inc.  I would
like to know why you are contacting my client regarding execution of the
Wind Down Agreement -- specifically, advising him that he will lose his
franchises if he does not do so (and that much money is at stake) --
when Mr. LaNeve, on June 4, 2009, announced a "process to provide
dealers that received a wind-down agreement the opportunity ... for
review."  Are we to understand from your statements on the telephone
today that the appeals process is a fiction?  Does GM have some
assurance that the Bankruptcy Court will grant its request to avoid its
agreements and state law in the event the agreement is not accepted by
my client?  Is your sudden interest in communicating with my client
(since May 14, it has been nearly impossible to speak directly with you)
a result on some pressure on you to deliver executed agreements?  My
client, at present, has until June 12 to deliver an executed document to
GM.  He is being advised by legal counsel.  We will contact you if we
need any information from you.  If you have something constructive to
offer, please feel free to contact my client or me.  In the meantime,
please refrain from the pressure tactics; they are counterproductive for
my client's and GM's interests.

Elaine Vorberg


Elaine S Vorberg, Attorney at Law
Licensed in Illinois and Florida
Law Offices of Elaine S Vorberg, P.C.
1821 Walden Office Square
Suite 400
Schaumburg, IL  60173
(847) 397-9793
elaine@vorberglaw.com

IRS Circular 230 Disclosure: We inform you that any U.S. federal tax
advice contained in this communication (including any attachment) is not

intended or written to be used, and cannot be used, for the purpose of
(i) avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any transaction or
matter addressed therein. (The foregoing disclaimer has been affixed
pursuant to U.S. Treasury regulations governing tax practitioners.)

Confidentiality Note: This e-mail, and any attachment to it, contains
privileged and confidential information intended only for the use of the
individual(s) or entity named on the e-mail. If the reader of this
e-mail is not the intended recipient, or the employee or agent
responsible for delivering it to the intended recipient, you are hereby
notified that reading it is strictly prohibited. If you have received
this e-mail in error, please immediately return it to the sender and
delete it from your system. Thank you.

Copyright © 2003-2009. All rights reserved.

# EXHIBIT "J"

Print | Close Window

**Subject: RE: Wind-Down Agreement**
  **From:** GMDealerNetworkquestions@gm.com
  **Date:** Tue, Jun 09, 2009 10:09 am
    **To:** elaine@vorberglaw.com

---

Thank you, we will reply.

elaine@vorberglaw.com                                    To GMDealerNetworkquestions@gm.com

06/09/2009 08:45 AM                                      cc

                                                         Subject RE: Wind-Down Agreement

| Please respond to |
| GM Dealer Network Questions |

The inquiry is my client's.  You know fully well that he is a dealer of
record.  This stonewalling is utterly ridiculous, and demonstrates
nothing other than lack of respect and fear (especially considering that
no name is associated with these e-mails).  Nevertheless, prepare the
necessary responses.  My client will be forwarding his questions this
morning and will expect a prompt response.

Elaine S Vorberg, Attorney at Law
Licensed in Illinois and Florida
Law Offices of Elaine S Vorberg, P.C.
1821 Walden Office Square
Suite 400
Schaumburg, IL  60173
(847) 397-9793
elaine@vorberglaw.com

IRS Circular 230 Disclosure: We inform you that any U.S. federal tax
advice contained in this communication (including any attachment) is not
intended or written to be used, and cannot be used, for the purpose of
(i) avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any transaction or
matter addressed therein. (The foregoing disclaimer has been affixed
pursuant to U.S. Treasury regulations governing tax practitioners.)

Confidentiality Note: This e-mail, and any attachment to it, contains
privileged and confidential information intended only for the use of the
individual(s) or entity named on the e-mail. If the reader of this
e-mail is not the intended recipient, or the employee or agent
responsible for delivering it to the intended recipient, you are hereby
notified that reading it is strictly prohibited. If you have received
this e-mail in error, please immediately return it to the sender and
delete it from your system. Thank you.


> -------- Original Message --------
> Subject: Re: Wind-Down Agreement
> From: GMDealerNetworkquestions@gm.com

> Date: Tue, June 09, 2009 7:29 am
> To: elaine@vorberglaw.com
>
>
> Elaine,
>
> Thank you for the inquiry. We are only taking inquiries directly from
> Dealer Operators of record.
>
>
>
>
>                 elaine@vorberglaw
>                 .com
>                                                                     To
>                 06/08/2009 03:07        GMDealerNetworkQuestions@gm.com
>                 PM                                                  cc
>
>                                                                Subject
>                 Please respond to       Wind-Down Agreement
>                 GM Dealer Network
>                     Questions
>
>
>
>
>
>
>
> I am an attorney for Nicholas D'Andrea and D'Andrea Buick, Inc.  As you
> know from my e-mail to Charles MacGregor on Saturday, I am advising Mr.
> D'Andrea on the wind-down agreement.  I have questions as to the
> document.  Please respond so that I may advise my client appropriately,
> or in the alternative, provide me with the name and contact information
> of an attorney for GM that can answer these questions.  As you also
> know, we are facing an onerous deadline.  Your prompt response (today)
> would be appreciated.
>
> 1.  Is GMAC considered an "affiliate" for the purpose of the agreement?
>
> 2.  Under what conditions may GM or the "363 Acquirer" decide to not
> assign the wind-down and the dealer agreements to the "363 Acquirer"?
>
> 3.  Does GM or the "363 Acquirer" intend to make good on Mr. Henderson's
> promise to the Senate that dealerships will be allowed to remain open
> until October 2010, or will it insist on being allowed to terminate
> after the end of the year "at its option" with 30 days' notice?
>
> 4.  Would the dealer be allowed to use the wind-down payment to satisfy
> any "competing claims" and avoid the delay?
>
> 5.  Is D'Andrea Buick required to comply with its Performance Agreements
> or not? (Paragraph 14 is internally inconsistent on the definition of
> "Channel Agreements".)
>
> I am not seeking to negotiate the terms of the agreement; I am asking
> for clarification, from the drafters of this contract of adhesion, as to
> interpretation of these clauses.  As requested above, please respond
> promptly.
>

Print  |  Close Window

Subject:  Fw: Re: Wind-Down Agreement]

   From:  "Nick D'Andrea" <ndandreabuick@dandreabuick.com>

   Date:  Wed, Jun 10, 2009 2:50 pm

      To:  <gmdealernetworkquestions@gm.com>

      Cc:  <elaine@vorberglaw.com>

---

We have not received any response to our questions, except for Chuck
MacGregor's statement (last Saturday -- we haven't heard anything since)
that we will be left with a lot full of cars if we don't execute the
agreement. Please respond.
----- Original Message -----
From: "Nick D'Andrea" <ndandreabuick@dandreabuick.com>
To: <GMDealerNetworkQuestions@gm.com>
Sent: Tuesday, June 09, 2009 10:15 AM
Subject: Fw: Re: Wind-Down Agreement]


>
>
>
>> -------- Original Message --------
>> Subject: Re: Wind-Down Agreement
>> From: GMDealerNetworkquestions@gm.com
>> Date: Tue, June 09, 2009 7:29 am
>> To: elaine@vorberglaw.com
>>
>>
>> Elaine,
>>
>> Thank you for the inquiry. We are only taking inquiries directly from
>> Dealer Operators of record.
>>
>>
>>
>>
>> elaine@vorberglaw
>> .com
>>
>> To
>> 06/08/2009 03:07 GMDealerNetworkQuestions@gm.com
>> PM
>> cc
>>
>>
> Subject
>> Please respond to
> Wind-Down Agreement GM Dealer Network Questions
>>
>>
>>
>>
>>
>>
>>
>>
>> I am an attorney for Nicholas D'Andrea and D'Andrea Buick, Inc. As you
>> know from my e-mail to Charles MacGregor on Saturday, I am advising Mr.

>> D'Andrea on the wind-down agreement. I have questions as to the
>> document. Please respond so that I may advise my client appropriately,
>> or in the alternative, provide me with the name and contact information
>> of an attorney for GM that can answer these questions. As you also
>> know, we are facing an onerous deadline. Your prompt response (today)
>> would be appreciated.
>>
>> 1. Is GMAC considered an "affiliate" for the purpose of the agreement?
>>
>> 2. Under what conditions may GM or the "363 Acquirer" decide to not
>> assign the wind-down and the dealer agreements to the "363 Acquirer"?
>>
>> 3. Does GM or the "363 Acquirer" intend to make good on Mr. Henderson's
>> promise to the Senate that dealerships will be allowed to remain open
>> until October 2010, or will it insist on being allowed to terminate
>> after the end of the year "at its option" with 30 days' notice?
>>
>> 4. Would the dealer be allowed to use the wind-down payment to satisfy
>> any "competing claims" and avoid the delay?
>>
>> 5. Is D'Andrea Buick required to comply with its Performance Agreements
>> or not? (Paragraph 14 is internally inconsistent on the definition of
>> "Channel Agreements".)
>>
>> I am not seeking to negotiate the terms of the agreement; I am asking
>> for clarification, from the drafters of this contract of adhesion, as to
>> interpretation of these clauses. As requested above, please respond
>> promptly.
>>
>> Elaine S Vorberg, Attorney at Law
>> Licensed in Illinois and Florida
>> Law Offices of Elaine S Vorberg, P.C.
>> 1821 Walden Office Square
>> Suite 400
>> Schaumburg, IL 60173
>> (847) 397-9793
>> elaine@vorberglaw.com
>>
>> IRS Circular 230 Disclosure: We inform you that any U.S. federal tax
>> advice contained in this communication (including any attachment) is not
>> intended or written to be used, and cannot be used, for the purpose of
>> (i) avoiding penalties under the Internal Revenue Code or (ii)
>> promoting, marketing or recommending to another party any transaction or
>> matter addressed therein. (The foregoing disclaimer has been affixed
>> pursuant to U.S. Treasury regulations governing tax practitioners.)
>>
>> Confidentiality Note: This e-mail, and any attachment to it, contains
>> privileged and confidential information intended only for the use of the
>> individual(s) or entity named on the e-mail. If the reader of this
>> e-mail is not the intended recipient, or the employee or agent
>> responsible for delivering it to the intended recipient, you are hereby
>> notified that reading it is strictly prohibited. If you have received
>> this e-mail in error, please immediately return it to the sender and
>> delete it from your system. Thank you.
>
>
>

Copyright © 2003-2009. All rights reserved.

# EXHIBIT "K"

Print | Close Window

**Subject:** D'Andrea Buick

**From:** "Sandy Lowe" <slowe@lfslaw.com>

**Date:** Wed, Jun 10, 2009 3:34 pm

**To:** <elaine@vorberglaw.com>

**Cc:** <marvin.e.beaupre@gm.com>, <brian.lee@gm.com>, <charles.h.macgregor@GM.COM>

See responses to questions you sent to GM below:

HENRY (SANDY) I. LOWE
ATTORNEY
DIRECT DIAL 720.932.2615
DIRECT FAX 720-932-2614

EMAIL SLOWE@LFSLAW.COM



LOWE, FELL & SKOGG, LLC
370 SEVENTEENTH STREET, SUITE 4900
DENVER, COLORADO 80202
PHONE 720.359.8200
FAX 720.359.8201
WWW.LFSLAW.COM

NOTICE: Unless expressly stated otherwise, in writing, this correspondence, including any attachments hereto, is not intended to and shall not be used or construed as constituting "legal advice" or "tax advice" and may not be relied upon by any person for the purpose of avoiding penalties asserted by the internal revenue service or sanctions proposed by the director of the office of professional responsibility under the united states tax laws (the foregoing statement is made in accordance with Circular 230, 31 C.F.R. Part 10). This electronic mail transmission may contain an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail or by calling 720-359-8200, so that our address record can be corrected.

```
I am an attorney for Nicholas D'Andrea and D'Andrea Buick, Inc.  As you
> know from my e-mail to Charles MacGregor on Saturday, I am advising Mr.
> D'Andrea on the wind-down agreement.  I have questions as to the
> document.  Please respond so that I may advise my client appropriately,
> or in the alternative, provide me with the name and contact information
> of an attorney for GM that can answer these questions.  As you also
> know, we are facing an onerous deadline.  Your prompt response (today)
> would be appreciated.
>

1.  Is GMAC considered an "affiliate" for the purpose of the agreement? NO
>
> 2.  Under what conditions may GM or the "363 Acquirer" decide to not
> assign the wind-down and the dealer agreements to the "363 Acquirer"? SOLE
DISCRETION
>
> 3.  Does GM or the "363 Acquirer" intend to make good on Mr. Henderson's
> promise to the Senate that dealerships will be allowed to remain open
```

# EXHIBIT "L"



General Motors Company
Dealer Business Planning Group
Mail Code 482-A06-C66
100 GM Renaissance Center
Detroit, MI 48265-1000

DELIVERY VIA FEDERAL EXPRESS  7967 6478 1307

PERSONAL & CONFIDENTIAL

July 10, 2009

D'Andrea Buick, Inc.
7051 S Western Ave
Chicago, IL 60636

Attention: Mr. Nicholas D'Andrea

We ("New GM") are writing you as the purchaser of substantially all of the assets of General Motors Corporation ("Old GM"). You should have received recently a motion (the "Rejection Motion") filed with the United States Bankruptcy Court by Old GM earlier this week which seeks the Bankruptcy Court's approval to reject the Buick, Pontiac, GMC Truck Dealer Sales and Service Agreement(s) and Ancillary Agreements (collectively, the "Dealer Agreement") in effect between D'Andrea Buick, Inc. and Old GM, now known as Motors Liquidation Holdings.

The Rejection Motion was necessary because Old GM can no longer perform under your Dealer Agreement as a result of the sale transaction. For example, Old GM no longer owns the GM trademarks. Accordingly, D'Andrea Buick, Inc. is no longer authorized to use any of GM's trademarks or service marks as outlined in Article 17.5 of the Dealer Agreement and all use of GM/Divisional signage must be discontinued effective immediately. Additionally, you must discontinue the use of all advertising, Internet web sites, stationary, or other printed material that contains or relates to the trade names or trademarks of GM or any of its divisions. D'Andrea Buick, Inc. will be contacted within the next 30 days regarding the removal of any signage it leases from GMDI.

Therefore, we wanted to inform you that as a result of the sale, D'Andrea Buick, Inc. shall have no further rights (direct, indirect, contractual or otherwise) to act as an Authorized Dealer of GM automobiles. However, being mindful of the impact the Rejection Motion will have on you, we wish to offer you the following accommodations for which New GM otherwise has no legal obligation:

- New GM will continue to administer the close-out of ordinary normal course open account activity under the Dealer Agreement. In that regard, utilizing the systems currently in place, New GM will make on Old GM's behalf payments arising in the ordinary course including warranty, sales incentives, vehicle holdback, wholesale floorplan, and marketing stimulus program payments accruing during the period of June 1, 2009 through July 9, 2009.

- In addition, at the option of New GM, New GM may make payments arising in the ordinary course including warranty, sales incentives, vehicle holdback, wholesale floorplan, and marketing stimulus program payments accruing during the period prior to June 1, 2009.

These accommodations are conditioned upon the following:

- **Warranty Claims:** Dealership submissions for warranty repairs that have a repair order date prior to July 10, 2009 must be submitted electronically to New GM for processing by no later than 5:00pm EDT July 24, 2009. New GM will not pay for any warranty repairs performed on and after July 10, 2009.

- **Incentive Payments:** Dealership submissions for vehicle incentive payments on vehicles reported delivered by Dealer to Old GM prior to July 10, 2009 must be submitted electronically to GM for processing by no later than 5:00pm EDT July 24, 2009. New GM will not honor any of Old GM's incentive payment obligations for vehicles reported delivered by Dealer on and after July 10, 2009.

- **GM Communication Equipment:** The GM Interactive Distance Learning Equipment must be disposed of by the dealership in accordance with local disposal ordinances. If you have any questions about this equipment, please contact your Dealer Network Coordinator at (888) 748-2687, (prompts Distance Learning Equipment, move/add/change, then enter your area code).

This letter shall also inform you that by no later than July 25, 2009, all GlobalConnect user IDs associated with your BAC will be DE-ACTIVATED with the EXCEPTION of your Partner Security Coordinator's (PSC) ID. Only the PSC's ID will remain active. If there are any non-PSC IDs which need to remain active for business purposes (eg. submitting warranty claims, operating reports, etc.), your PSC will need to RE-ACTIVATE those particular IDs.

Lastly, in order to be able to effectively communicate and correspond with you after July 10, 2009, you must complete the attached "Post Rejection Notification" form and fax it to the New GM Dealer Business Planning Group at the number listed on the form.

Very truly yours,

General Motors Company

Attachment

# EXHIBIT "M"

**GM and Chrysler Dealership Closures: Protecting Dealers and Consumers**
**United States Senate**
**Commerce, Science and Transportation Committee**
**Wednesday, June 3, 2009**

**Fritz Henderson**
**General Motors President and CEO**

Good afternoon, Mr. Chairman.

I'm Fritz Henderson, President and CEO of General Motors. Thank you for the opportunity to discuss an important part of GM's viability plan, our dealer network restructuring. Simply put, a strong dealer body is vital to GM's success. Indeed, for many customers, our dealers are the "face of GM," – so this effort is very, very important.

It is also an effort that -- regrettably – is quite painful – for us, for our customers, and especially for our dealers. Many of them run businesses that have been in their families for generations. The impact of what we are doing affects them personally as well as financially. It also affects the communities and states where they live.

That is why we went about this task very objectively and carefully. We decided not to terminate any dealers and developed a unique wind-down process that we believe is more equitable and fair. I will share more details about our process later in my testimony.

Our current dealer network in large part was established in the late 1940s and '50s. Back then, before the U.S. Interstate Highway system was built, America was a much more rural country. GM, Ford and Chrysler dominated the U.S. car market.

But times have changed. Today, I'm here to discuss why GM needs to have fewer, better dealers selling at higher volumes, who are able to better take care of customers; the costs associated with having under-performing dealers; and the objective process we are using to make the changes we need to make.

For decades, GM and our dealers have enjoyed periods of prosperity and have also weathered the inevitable troughs that are part of such a cyclical business. Over the last 20 years, we have seen particularly dramatic changes and pressures that have come from international trade, volatile energy markets, and increased competition in the U.S. market.

Foreign manufacturers who entered this market beginning in the '70s had the advantage of establishing their dealer networks in line with modern demographics. Today, more people live in the suburbs of major metropolitan areas, versus rural areas or small towns.

To meet these challenges, we've been designing new products, developing new technologies and restructuring our company to bring our fixed costs in line with these competitive market forces and shifting sales volumes.

But the most recent global financial crisis – which has yet to fully stabilize -- has made it clear that we no longer have the luxury of time – nor money – to continue to pursue the evolutionary approach we used in the past.  It was an approach we hoped would bring about change, while minimizing the disruption change brings to everyone involved.

Although it's been tough to hear at times, the direction we received from Congress, the Administration, the Automotive Task Force, and countless industry analysts and pundits, was clear and to the point:  we needed a dramatic restructuring, done with speed, across all parts of our business, if GM was to remain viable.  We were asked to deliver a plan to make that happen by June 1.

The President acknowledged what we all understood from the start – such a plan would require shared sacrifice from GM and all of our stakeholders. What has become clear as we execute our plan is that GM, our employees, and our dealers do matter to America. We are collectively woven throughout the economic fabric of our country.

And this has been the most difficult part of executing our plan. . .the human story of the people who are affected by the painful but necessary actions we are taking to ensure our viability.  Members of Congress, Treasury representatives, and the Automotive Task Force have seen this for themselves during their visits to our facilities and plant communities in recent months.

Reinventing GM – real change – does require shared sacrifice. Thousands of hourly and salaried employees are losing their jobs, and those who remain have had their pay and benefits cut. Plant closures impact families and the communities where they live.

These are tough times for everyone in the GM family. And, as a part of the GM family, our dealers are also being asked to bear some of the sacrifice in order to build a stronger, more viable GM.

The reality of our situation is this:  all parts of GM, including the dealer network, must become smaller and more efficient to reinvent GM as a company that is not only viable, but capable of surviving cyclical downturns.  GM's viability plan calls for fewer, stronger brands, as well as fewer, stronger dealers.

For years, we have heard the call that GM must adapt to today's global competition and market conditions or it will not survive.  We agree.

In the case of our dealer network, because of our long operating history and existing dealer locations, many dealerships now operate in outdated facilities that are also no longer in the prime locations to best serve customers.

Much of the growth in GM's dealership network occurred in the 1950s and '60s, when we held a dominant share of the U.S. auto market.  Since that time, strong new competitors have entered this market and our market share has shrunk, leaving us with too many dealerships. For example, GM today has roughly 6,000 dealerships in the U.S., compared to 1,240 for Toyota and 3,358 for Ford.

Besides the intense pressure from competitors, GM dealers also compete against each other.  Over the years, many GM dealers could not earn enough profits to renovate their facilities and retain top-tier sales and service staffs.

Thin profit margins and state franchise laws also prevented many dealers from relocating as U.S. demographics shifted from urban to suburban settings.  The dealers that remain compete with each other for a shrinking share of GM sales. Current market conditions only make this situation worse.

Our current plan calls for GM to have between 3,800 and 3,500 U.S. dealers by the end of 2010, depending on attrition levels, with a retail market share of 17.3 percent in a retail sales market of 10.15 million.  This means that the number of units sold per dealer would nearly double, compared to today's levels.

This overall number is based on the previously announced potential sale of the Saturn, Hummer, and Saab, brands, or their phase-out if they can't be sold; dealer attrition over the next 18 months, which -- as you might expect in these difficult times -- is running at record levels; and the wind-down over time of the approximately 1,200 dealers we notified on May 15th, plus an additional 200 dealers who also received wind-down agreements this week.

The Treasury noted the problems caused by GM's current dealer network in their assessment of our Feb. 17 viability plan on March 30.  They said:

"GM has been successfully pruning unprofitable or underperforming dealers for several years.  However, its current pace will leave it with too many such dealers for a long period of time while requiring significant closure costs that its competitors will not incur.  These underperforming dealers create a drag on the overall brand equity of GM and hurt the prospects of the many stronger dealers who could help GM drive incremental sales."

Everyone agrees – even the dealers themselves – that a restructuring of GM's dealer network must take place.

A smaller dealer network reduces GM's costs, primarily related to support we provide for information technology systems, dealer and sales person incentives, field sales, service and training, service parts, and advertising.  This support costs GM roughly $1,000 per vehicle.

However, this effort we are undertaking is not really about saving money – although there will be cost savings.  A key to GM's success over the long haul – which U.S. taxpayers have a vested interest in – will be a healthy, strong, and profitable dealer network that can provide the industry's best customer service and enhance the image of our four remaining brands: Chevrolet, Cadillac, Buick and GMC.  Dealers who are too small, are unprofitable, or perform only marginally well, simply cannot provide those things to our customers.

The remaining dealerships will be better poised to keep their current GM customers, while aggressively marketing to take sales from competitors.  The long-term benefits of a stronger, more viable dealer network are clear.

We are making these hard decisions to benefit our customers. As we reinvent GM, we are putting the customer first in everything that we do. Even with these cutbacks, GM will still have the biggest, most extensive dealer network in the country – more than any of our competitors, including Toyota, Honda, Nissan, Ford and Chrysler.

Next, I'd like to talk about the objective process we are using to consolidate the dealer network. We strongly believe that <u>how</u> we are doing this is as critical to our success as <u>what</u> we are doing. GM's dealer consolidation process is unique.

First and foremost, as I stated earlier, we have not terminated any dealer agreements. Just this week, we sent wind-down agreements to dealers who we could not retain in the network long-term. When executed, these agreements allow them to stay in business until October 2010 – the expiration date of their current dealer agreement -- so they can sell down their vehicle inventories and provide warranty service to customers, thus winding down their business in an orderly fashion.

We also – subject to bankruptcy court approval – have some financial assistance in the wind-down agreements to allow the dealers to accomplish this. On May 15th, we had previously notified most of these dealers about our planning. While this is not an easy process by any means, we think it is far preferable to an abrupt termination.

Prior to taking any action, we conducted a thorough analysis of every market and every dealer throughout the U.S. to assess individual market requirements and dealer performance.

Some of the key dealer performance factors that we looked at included:
- Customer satisfaction index
- Sales performance and volume
- Working capital
- Profitability
- Dualing patterns
- Dealership location
- Facility

We also carefully considered our dealer network coverage in rural areas and small towns versus urban/suburban markets. We know that our strong presence in rural areas, small towns and "hub" towns such as gives us a leg up versus the competition, which we intend to maintain. When these dealers perform to our standards, they are a huge asset.

We also took great pains to ensure that minority dealers were considered equitably and proportionally. In fact, the percentage of minority dealers overall may actually increase slightly after the consolidation takes place.

Identifying dealerships that we want to keep in the GM dealer network and those with whom we will have to wind down our business relationships was a very difficult step. However, it is a step we had no other choice but to take for GM's viability.

By reducing the number of dealers, the remaining dealers will see increased sales throughput at more competitive levels. This will provide a greater return on their

4

investment, especially in metropolitan markets. They will be able to retain top sales and service talent, invest in their facilities, and focus on selling vehicles to people who don't currently own a GM car or truck. Most importantly, they will be able to improve the overall customer experience and retain current customers.

From GM's point of view, by winding down under-performing dealers, we will eliminate the negative impact they have on our brand image and increase the opportunity for sales and service provided by our high-performing dealers. Although we will achieve substantial cost reductions in the consolidation, our primary goal was to improve the dealer network as a whole. This will enable us to focus our resources on top performers and core brands so we can attract and retain more private capital and the best dealer operators.

Dealers who wish to provide GM with additional information with regard to their performance on the key dealer performance factors have the opportunity to provide it to our Dealer Network Planning and Investments organization. We have received a number of such requests and are continuing to receive them.

Our dealers are not a problem but an asset for General Motors. Consolidating our dealer network will make it an even stronger asset.

Before concluding, let me mention one additional opportunity to help dealers and auto manufacturers in the current environment. In several other countries around the world, vehicle sales incentive programs have been implemented. These fleet modernization – or "scrappage" – programs provide incentives for customers to trade in older, less fuel-efficient vehicles for vouchers to purchase newer, cleaner, more fuel-efficient vehicles.

These programs have been very successful in stimulating vehicle sales in other countries. We urge Congress to quickly enact legislation for such a program in the U.S. In particular, we support the proposal introduced by Senators Stabenow and Brownback. It provides the broadest and potentially most effective program of those being considered.

In conclusion, GM is grateful for the support of the Congress and Administration as we undertake this painful, yet essential reinvention of our company.

As we are experiencing first-hand, it's much easier to talk about the need to change in the pages of newspapers, or on cable television. However, dramatic change is a much more difficult and serious challenge to actually undertake, and requires sacrifice.

The wholesale reinvention of GM has not been easy. But we will not soften our determination to see this process through because it is difficult or to run from sacrifice. We hope your support remains just as strong.

We understand our responsibility to American taxpayers, and we take it very seriously. We want GM to not only survive, but thrive. And we want our employees, communities, and especially our dealers to thrive with us. This – and, of course, great cars and trucks – is the way to pay back our nation's support.

The end result will be a healthier, successful, reinvented GM that will not only benefit employees and dealers, but contribute to America's economic and competitive strength.

Thank you.  I look forward to your questions.