Jeffrey S. Davis
Attorney at Law
1422 Berry Drive
Cleburne, Texas 76033
817/602-7999
FAX # 817/641-8829
jsdesqtx@yahoo.com
Motion for Admission to Practice *Pro Hac Vice* has been filed

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **IN RE:** | **General Motors Corporation,** *et al* § | **Chapter 11** |
| | § | **Case No. 1-09-50026 (REG)** |
| | **Debtors.** § | **(Jointly Administered)** |

## LIMITED OBJECTION OF FORREST CHEVROLET-CADILLAC, INC., AND FORREST PONTIAC-BUICK-GMC TRUCK, INC., TO OMNIBUS MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 365 AUTHORIZING (A) THE REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF

**TO THE HONORABLE ROBERT E. GERBER**
**UNITED STATES BANKRUPTCY JUDGE**

NOW COME FORREST CHEVROLET-CADILLAC, INC., and FORREST PONTIAC-BUICK-GMC TRUCK, INC., hereinafter "FORREST", who file this their Limited Objection to Omnibus Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. §§ 105 and 365 Authorizing (A) the Rejection of Executory Contracts and Unexpired Leases with Certain Domestic Dealers and (B) Granting Certain Related Relief, and in support would show as follows:.

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    Debtors to FORREST: Waive Texas Law and Close
        Your Dealership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    Debtors to this Court: Approve our Rejection Motion
        and Preempt Texas Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.    Debtor Did Not Exercise Sound Business Judgment . . . . . . . . . . . . . . . . . . . 13

    B.    Federal Law Prohibits Debtors From Circumventing Texas Law . . . . . . . . . . . 16

    C.    Debtor Seeks To Evade Jurisdiction in Texas . . . . . . . . . . . . . . . . . . . . . . 18

    D.    Debtors Seek to Free Themselves from Texas Law
        Governing Franchise Modification and Termination . . . . . . . . . . . . . . . . . . 19

    E.    Debtors Seek To Deny FORREST The Right To Operate its Business . . . . . . 20

    F.    Debtors Seek to Evade Texas Law Regarding Dealer Locations . . . . . . . . . . . 21

    G.    Debtors Seeks to Limit FORRESTS' Warranty Claims . . . . . . . . . . . . . . . . . 21

    H.    Debtors Demand That FORREST Waive Their Texas Rights . . . . . . . . . . . . . 22

    I.    Debtors Seek to Evade Texas Law Regarding Payments to
        FORREST Upon Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    J.    Debtors' Concept of "Dealership Evaluation Process" and
        Dealer Performance Score" Conflict With Texas Law . . . . . . . . . . . . . . . . . 22

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Memorandum of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Briardiffv. Briarcliff Tenants Ass'n (In re Briarcliff)*, 15 B.R. 864 (D.N.J. 1981) . . . . . . . . . . . . .

. . . 18

*Concerto Software, Inc.* v. *VitaquestInt'l, Inc.*, 290 B.R. 448 (D. Me. 2003) . . . . . . . . . . . . . . .

. . 18,19

*Control Data Corporation v. Zelman*, 602 F.2d 38 (2nd Cir, 1979) . . . . . . . . . . . . . . . . . . . . . . . .

. 14

*City of New Yorkv. Quanta Res. Corp. (In re Quanta Res. Corp.)*, 739 F.2d 912 (3d Cir. 1984) . . .

. . 18

*FDIC v. Castetter*, 184 F.3d 1040 (9th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gillis v. California*, 293 U.S. 62 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

18

*H&L Developers, Inc. v. Arvida/JMB Partners (In re H&L Developers, Inc.)*,
       178 B.R. 71 (Bankr. E.D. Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581 (9th Cir. 1993) . . . . . . . . . . . . .

. 17

*In re Chi-Feng Huang*, 23 B.R. 798 (9th Cir. BAP 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . .

14

*In re Minges*, 602 F.2d 38 (2d Cir.1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

15

*In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . .

.. 14

*In re Quanta Resources Corp.*, 739 F.2d 912 (3d Cir.1984), <u>aff'd sub nom.</u>,
   *Midlantic National Bank v. New Jersey Department of Environmental Protection*,
   474 U.S. 494 (1986) ................................................... 17

*In re Synergy Dev. Corp.*, 140 B.R. 958 (Bankr. S.D.N.Y. 1992) .....................

18

*In re White Crane Trading Co., Inc.*, 170 B.R. 694 (Bankr. E.D. Cal. 1994) .............

. 17

*Lubrizol Enter. v. Richmond Metal Finishers* 756 F.2d 1043 (4th Cir.1985) .............

. 14,15

*Midlantic National Bank v. New Jersey Department of Environmental Protection*,
   474 U.S. 494 (1986) .................................................. 17,18

*Navellier v. Sletten*, 262 F.3d 923 (9th Cir. 2001) ...............................

14

*New Motor Vehicle Board of California* v. *Orrin W. Fox, Co.*, 439 U.S. 96,107(1978) ........

... 6

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984) ...........................

14

*Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303 (5th Cir. 1985) .................

. 14

*Robinson v. Michigan Consol. Gas* Co., 918 F.2d 579 (6th Cir. 1990) ................

. 18

*Saravia v. 1736 18th St., N. W., LP*, 844 F.2d 823 (D.C. Cir. 1988) ................... 18

*Wengert Transp., Inc.* v. *Grouse Cartage Co. (In re Wengert Transp. Co.),*

59 B.R. 226 (Bankr. N.D. Iowa 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## FEDERAL STATUTES

11 U.S.C. §§ 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

11 U.S.C. §365(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

11 U.S.C. §365(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,19

28 U.S.C. §959(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,17

## STATE STATUTES

TEX. OCC. CODE § 2301.001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. OCC. CODE § 2301.003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

TEX. OCC. CODE § 2301.003(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

TEX. OCC. CODE § 2301.151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

TEX. OCC. CODE § 2301.151(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

TEX. OCC. CODE § 2301.404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

TEX. OCC. CODE §§ 2301.451-478 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

TEX. OCC. CODE § 2301.453 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

TEX. OCC. CODE § 2301.453(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

TEX. OCC. CODE § 2301.453(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

TEX. OCC. CODE § 2301.454 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

TEX. OCC. CODE § 2301.454(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

TEX. OCC. CODE § 2301.455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

TEX. OCC. CODE § 2301.465 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

TEX. OCC. CODE § 2301.465(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

TEX. OCC. CODE § 2301.468 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

TEX. OCC. CODE § 2301.472 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

TEX. OCC. CODE § 2301.478 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

TEX. OCC. CODE § 2301.652 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

TEX. OCC. CODE § 2301.652(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## CONGRESSIONAL RECORD, TREASTISES, AND OTHER AUTHORITY

1 Collier on Bankruptcy p 3.03(8)(b) (L. King 15th ed. 1984) . . . . . . . . . . . . . . . . . . . . . . . 15

S.Rep. No. 2073, 84th Cong., 2d Sess., 2 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

# I.
## PRELIMINARY STATEMENT

1.      Debtors have abused their bankruptcy-enhanced bargaining power, and have sought to force FORREST to waive various laws of the sovereign State of Texas which are designed to protect them from these oppressive type of acts. As the United States Congress acknowledges, the "Vast disparity in economic power and bargaining strength [between car dealers and car manufacturers] has enabled the factory to determine arbitrarily the rules by which the two parties conduct their business affairs [and makes] the dealer an easy prey for domination by the factory." S.Rep. No. 2073, 84th Cong., 2d Sess., 2 (1956). Coupled with the undeniable fact that "[t]he distribution and sale of motor vehicles in [Texas] vitally affects the general economy of the state and the public interest and welfare of its citizens," TEX. OCC. CODE § 2301.001, the United States Supreme Court has recognized that States are "empowered to subordinate the franchise rights of automobile manufacturers to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices." *New Motor Vehicle Board of California* v. *Orrin W. Fox, Co.,* 439 U.S. 96,107(1978).   In fact, "[t]he disparity in bargaining power between automobile manufacturers and their dealers prompted Congress and some 25 States to enact legislation to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers." *Id.* at 100-01 (footnote omitted).  Texas is one of those States. *See* TEX. OCC. CODE §§ 2301.001 *et seq.*

### A.      Debtors to FORREST: Waive Texas Law and Close Your Dealership

2.      Before Debtors will agree to assume FORRESTS' franchise agreements, Debtor insisted that FORREST must first "agree" to waive numerous protections Afforded to them under Texas law. This demand is directly contrary to federal law that requires a debtor to operate

according to state law, 28 U.S.C. § 959(b), and contrary to Texas law which expressly forbids the waiver of these protections (TEX. OCC. CODE § 2301.003(b)). Debtor further conditioned the assumption of FORRESTS' Franchise agreements upon the FORRESTS' consent to jurisdiction in this court regarding their franchise amendments - even though federal law relieves Debtor from liability under the franchise amendment upon discharge, 11 U.S.C. § 365(k), and despite Texas law which vests exclusive jurisdiction over such disputes in the Texas Department of Motor Vehicles. TEX. OCC. CODE §2301.151

### B.    Debtors to this Court: Approve our Rejection Motion and Preempt Texas Law

3.    By its Sale Motion, Debtors seek this Court's seal of approval for its abusive and oppressive conduct.  This Court should not, however, condone Debtors' strong arm tactics. Instead, this Court should affirm that the relationship between Debtor and FORREST is governed by Texas law; order that Debtor provide FORREST with Participation Agreements which are to be transferred to the "New GM"; and order that any provision of an amended franchise agreement that is contrary to Texas law is invalid and unenforceable.[1] In the alternative, the Court should provide for a timely and orderly period of time for FORREST to cease its relationship with Debtor with payments to FORREST in accordance with the unexecuted Wind-Down Agreements, with said agreements to be assigned to "New GM." Finally, should this Court approve Debtors' Motion, the Court should clarify that it is not validating Debtors' attempt to evade Texas law by amending its dealer franchise agreements with FORREST.

## II.
## RELEVANT FACTS

4.    The FORREST entities are, respectively, duly franchised dealers of Chevrolet, Cadillac, Pontiac, Buick, and GMC vehicles manufactured by Debtor, as well as authorized repair

facilities for said vehicles. FORREST CHEVROLET-CADILLAC, INC., was begun in 1964 and has been a franchised dealer and authorized service provider of Debtor since on or about October 29, 1964. FORREST PONTIAC-BUICK-GMC TRUCK, INC., was begun in 1990, and has been a franchised dealer and authorized service provider of Debtor since on or about August 20, 1990. Prior to the decision of Debtor to discontinue its Oldsmobile line of vehicles in 2000, a related entity of FORREST, being, Forrest-Geo-Oldsmobile-Cadillac, Inc., was formed in 1990. All of said entities were franchised dealers and authorized service provider of Debtor.

5.    In 2003, FORREST PONTIAC-BUICK-GMC TRUCK, INC., sought permission from Debtor to relocate its operations from 3145 North Main, Cleburne, Texas, to 2408 North Main, Cleburne, Texas.  FORREST PONTIAC-BUICK-GMC TRUCK, INC., had been seeking approval to relocate its dealership from rental property to property owned by persons and/or entities associated with FORREST, since as early as 1994, which real property is also next to the location of FORREST CHEVROLET-CADILLAC, INC.; however, Debtors had consistently stalled and prevented such efforts, even though ample excess property was available on the real property utilized by FORREST CHEVROLET-CADILLAC, INC., including a building which was suitable as a sales office. Not until September 17, 2003, did the Debtors approve the preliminary plans for the relocation and, finally, on January 22, 2004, Debtors finally approved the relocation plan. Not until FORREST agreed to build a new show room, sales office, and service facility was the relocation approved by Debtors. The new facility at 2408 North Main, Cleburne, Texas, was built at a cost to FORREST of approximately $3.2 million.

6.    In 2000 Debtor announced the phase-out of its Oldsmobile line of vehicles. Debtor and FORREST PONTIAC-BUICK-GMC TRUCK, INC.,   and Forrest Chevrolet-

Oldsmobile-Cadillac, Inc., could not come to an agreement on the termination of the Oldsmobile franchise and, in 2005, Debtor filed suit against FORREST PONTIAC-BUICK-GMC TRUCK, INC., and Forrest Chevrolet-Oldsmobile-Cadillac, Inc., in Case No. 3-05-CV-0528-K; General Motors Corporation v. Forrest Chevrolet-Oldsmobile-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc.; In the United States District Court for the Northern District of Texas, Dallas Division. Said suit concerned the phase-out of Debtor's Oldsmobile line of vehicles. In said Case No. 3-05-CV-0528-K, a Transition and Release Agreement, two (2) Exclusive Use Agreements, and a Supplemental Settlement Agreement and Release. Attached hereto as Exhibits "A-1" and "A-2", respectively, are true and correct copies of the Exclusive Use Agreements.

7. The Exclusive Use Agreement, attached as Exhibit "A-1," provides, in paragraphs 1.(e) and (f) for an exclusivity period of fifteen (15) years for FORREST PONTIAC-BUICK-GMC TRUCK, INC., to sell Buick and Pontiac vehicles, and GMC Trucks at FORRESTS' place of business; while the Exclusive Use Agreement, attached as Exhibit "A-2," provides, in paragraphs 1.(e) and (f) for an exclusivity period of fifteen (15) years for FORREST CHEVROLET-CADILLAC, INC., to sell Chevrolet and Cadillac vehicles at FORRESTS' place of business.[1] Specifically, paragraph 2 of both Exclusive Use Agreements state as follows:

"Dealer hereby agrees that, at all times during the Exclusive Period it shall actively and continuously conduct Dealership Operations for the Existing Model Lines at the Dealership Premises in accordance with the terms of the Dealer Agreements. The Dealership Premises shall not be used for any purpose other than Dealership Operations for the Existing Model Lines (which prohibited use includes, but are not limited to, the sale, display, storage, and/or service of motor vehicles not covered by the Dealer Agreements other than as specifically contemplated by the term 'Dealership Operations' in the Dealer Agreements), during the Exclusivity Period without the prior written consent of GM, which consent may be granted or withheld

---

[1] Debtor premised its suit on a hand-written term sheet signed by counsel for the parties. Of interest, the term sheet called for a twenty-five (25) exclusive use agreement.

in GM's sole discretion."

There is no provision in either Exclusive Use Agreements that exempts FORREST from this provision in the event they are no longer operating their dealerships under a franchise agreement with Debtor.

Debtor does not seek to reject these agreements in any currently pending motion.[2]

8.    Based upon information and belief, in October and November 2002, a used car dealer in Cleburne, Texas, was operating, in part, as an unauthorized dealer of new vehicles, and more specifically, as a dealer of vehicles manufactured by Debtors, and that said used car dealer was aided and FORREST believes that such activity was aided and abetted by several franchised dealers of Debtors. Due to this activity, FORREST lost numerous sales of new and used vehicles, as well, the franchised dealers involved in this scheme benefitted in the "turn and earn" sales philosophy[3] of Debtors.

9.    FORREST utilized GMAC Financing as the lender for its floor plan. Until November 2006, GMAC was the wholly owned financial services arm of Debtors. In November 2006, Debtors sold-off fifty-one (51%) percent of its interest in GMAC to Cerberus Capital Management. Debtors still retain a forty-nine (49%) interest in GMAC.

10.    In or around June 2005, Debtors announced employee-only pricing on its vehicles. As a direct result, sales at the FORREST dealerships increased 250% in the month of June

---

[2]. While Debtor seeks to reject certain "ancillary" agreements with a number of its dealers, none of the class of "ancillary" agreements listed by Debtor in footnote 2 of its motion concern the agreements identified in Exhibits A-1 and A-2.

[3] The "turn and earn" sale philosophy of Debtors provided that a dealer only receives a new vehicle delivered to his dealership when he sells a vehicle. Competing dealers increased allocation throughput and sales volume to the detriment of lost sales opportunities at the FORREST dealerships..

2005, which precipitated an unprecedented demand from GMAC for $1.2 million in August 2005, interestingly, when the suit GM filed against FORREST was proceeding in federal court, which sum was paid by FORREST. Such demand was taking place at the same time that GMAC was making three-day pay-off demands[4], which had also been unprecedented as the custom in the industry was seven-ten day payoffs. After numerous demands, even by legal counsel for FORREST, for proof of the documentation allowing for such action, GMAC continuously and consistently refused to produce any such documents. Subsequently, on May 26, 2008, GMAC suspended FORRESTS' floor plan. As a result, Debtors ceased to provide FORREST with any new vehicles.[5]

      11.    On July 7, 2008, Debtors sent to FORREST a letter which outlined purported breaches of the franchise agreements, namely, arising from the loss of the floor plan. Attached hereto as Exhibits "B-1" and "B-2", respectively, are a true and correct copies of the letters. Of interest, the letter references that Debtor can terminate the franchise agreements if FORREST fails the remedy the breach. However, DEBTOR never chose to terminate the franchise agreements, until this Motion was filed, over one (1) year latrer.

      12.    On May 14, 2009, Debtor sent to FORREST a letter which stated, in part, that Debtor did not anticipate its contractual relationship to continue with FORREST past October 2010, being the date the current franchise agreements between FORREST and Debtor terminate. Attached hereto as Exhibits "C-1" and "C-2", respectively, are a true and correct copies of the letters. However, Debtor provided FORREST the opportunity to submit any information to it concerning the matters addressed in the letter. FORREST did just that as they, on May 31, 2009, sent to Debtor,

---

[4] There was no agreement between FORREST and GMAC that provided for three-day payoffs.

[5] Even so, FORREST has remained in business to this day, with a commitment to its employees and customers.

via facsimile, their Business Plan outlining why they should continue to be a franchised dealer of Debtors. Attached hereto as Exhibit "D" is a true and correct copy of the Business Plan. However, the Business Plan fell on deaf ears and blind eyes as, on June 1, 2009, the same Debtors day filed voluntary petitions for relief under the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code" or "Code"), Debtor sent to FORREST a letter which was accompanied by a non-negotiable Wind-Down Agreement. Attached hereto as Exhibits "E-1" and "E-2", respectively, are true and correct copies of the letter and Wind-Down Agreement. FORREST was given a deadline of June 12, 2009, to accept the Wind-Down Agreement. FORREST did not execute the Wind-Down Agreement.

13.   According to the June 1, 2009, letter from Debtor, unless FORREST accepted the terms of the Wind-Down Agreement, as dictated solely by Debtors, which agreement, in part provides that FORREST cannot order any new vehicles and that FORREST waives all legal claims it may have against DEBTORS, then Debtors will assign the agreement to the "New GM.; otherwise, Debtors will seek to reject the franchise agreements in this Court. The "take it or leave it" ultimatum presented FORREST with a classic Hobson's choice: lose the protections of Texas law, or lose your business; and irony notwithstanding, the Wind-Down Agreement contains an express provision by which FORREST "acknowledges that its decisions and actions are entirely voluntary and free from any duress." *See* Exhibit "E-1" and "E-2" para. 10. The consequence of not signing the "no-duress" clause would be that FORREST would lose its business.

14.   FORREST did not sign the Wind-Down Agreement for either of its dealerships. As a result, Debtor file the above-referenced Motion seeking this Court's approval for rejection of FORRESTS' franchise agreements.

15.    Thereafter, by letter dated July 10, 2009, Debtor advised FORREST that it had no further authority to, among other matters, utilize Debtor's trademarks, service marks, or signage. Attached hereto as Exhibits "F-1" and "F-2", respectively, are a true and correct copies of the letters. In addition, Debtor placed limits on claims for compensation for warranty repairs performed by FORRESTS' service department.

16.    By letter dated July 15, 2008, Debtors offered to purchase FORRESTs' dealership, real property to be leased, with Goodwill valued, by Debtors, at $1.25 million. Attached hereto as Exhibit "G" is a true and correct copy of the letter and term sheet. Significantly, this offer came at a time when FORRESTs' floor plan was suspended by GMAC.

17.    Other recent offers to purchase the FORREST dealerships and/or assets have been received:

December 15, 2008:    Tommy Manuel offered to purchase the dealerships' inventories and other assets, plus pay an additional $3.6 million for the land and facility located at 2406 North Main, Cleburne, Texas, being the Chevrolet-Cadillac dealership. Attached hereto as Exhibit "H" is a true and correct copy of the offer letter; and

January 2009:    Matt Johnson offered to purchase and the dealership inventories, other assets, and pay $4.0 million for the land and facility located at 2406 North Main, Cleburne, Texas, and pay an additional $800,000.00, for the Goodwill of the business with the right to use the Forrest name. Attached hereto as Exhibit "I" is a true and correct copy of the offer letter.

18.    The departure of FORREST from the Cleburne, Texas, market area will leave

that area with both a Chrysler-Dodge-Jeep dealer and a Ford dealer. There are currently no dealers offering a foreign brand vehicle in the Cleburne, Texas, market area. However, the owners of FORREST have been offered a franchise with Eurospeed, USA, a Chinese automobile manufacturer, which dealership would include the offering of two (2) electric automobiles, al well as various models of ATV's and scooters. The franchise would be located at the current location of the FORREST dealerships.

### III. ARGUMENT

#### A.   Debtor Did Not Exercise Sound Business Judgment

19.   FORREST recognizes this Court's power, pursuant to §365(a) of the Bankruptcy Code, to allow for the Debtor to reject an executory contract. As pointed to by Debtors, such action by the debtor is not allowed *carte blanche*, but, must be exercised by a debtor's sound business judgment.[6] See *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984)   However, the Supreme Court did not provide guidance for the parameters of the rule. However, in *In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665 (9th Cir. 2007), the court stated, concerning the contours of the business judgment rule that: "in evaluating the rejection decision, the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *In re Pomona Valley Medical Group, Inc.*, 476 F.3d at 670, citing *Navellier v. Sletten*, 262 F.3d 923, 946 n. 12 (9th Cir. 2001); *FDIC v. Castetter*, 184 F.3d 1040, 1043 (9th Cir.1999); and *In re Chi-Feng Huang*, 23 B.R. 798, 801 (9th Cir. BAP 1982) ("The primary issue is whether rejection would

---

[6]  "[I]n bankruptcy proceedings, the trustee, and ultimately the court, must exercise their discretion fairly in the interest of all who have had the misfortune of dealing with the debtor." *Control Data Corporation v. Zelman*, 602 F.2d 38, 43 (2nd Cir, 1979)

benefit the general unsecured creditors."). The court further stated that "[i]t should approve the rejection of an executory contract under § 365(a) unless it finds that the debtor-in-possession's conclusion that rejection would be 'advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.' *Id.*, quoting *Lubrizol Enter. v. Richmond Metal Finishers* 756 F.2d 1043, 1047 (4th Cir.1985) The court went on to state that "[t]here may be cases where the disproportionate damage to the party whose contract is to be rejected demonstrates that the debtor-in-possession's decision could not be based on sound business judgment. *Id.*, at 671, citing *In re Chi-Feng Huang*, 23 B.R. at 801. The court further, stated that "[s]uch determinations, clearly, involve questions of fact.." *Id.*, at 670 citing *Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1307-08 (5th Cir. 1985); *Lubrizol*, 756 F.2d at 1047. As stated by another court, "The issue before this Court "is whether the decision of the debtor that rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice. That issue is one of fact to be decided as such by the bankruptcy court by the normal processes of fact adjudication." *Lubrizol*, 756 F.2d at 1047, citing *In re Minges*, 602 F.2d 38, 43 (2d Cir.1979) see generally 1 Collier on Bankruptcy p 3.03(8)(b) (L. King 15th ed. 1984).

20.     Debtors represent that, in their "Rationalization Process," they reviewed factors such as Dealer throughput, Dealer return on investment, consumer convenience, drive-time metrics, and shifting market demographics. Debtors represent that such factors call for a reduction of Dealers from approximately 6,000 to between 3,600 and 3,800 by the end of 2010. Subsequently, Debtors represent that they underwent a "Dealership Evaluation Process" in which they looked at, "among other factors," Dealership Sales, Customer Satisfaction Index, Capitalization, and

Profitability. Then, based upon a calculation of these four (4) factors and an unknown number of other factors, Debtors created a Dealership Performance Score and assigned such a score to each dealer, including FORREST. According to Debtors, those dealerships with a score below 70 were determined to by "significantly underperforming."

21.    Based upon their analysis of Dealer, including FORREST, approximately 4,100 were offered Participation Agreements, and all but a very few accepted the agreements, even though, Debtors stated in paragraph 19 that the "ideal size of the Dealer Network for New GM was approximately 3,600 Dealerships." Thus, the question must be raised, "How can debtors justify a dealership network that is more than 500 dealers larger than its pre-determined 'ideal size', being 3,600 dealers?

22.    FORREST cannot either properly, fully or adequately respond to the Debtors' Motion as they do not know, regarding the Dealership Evaluation Process of Debtors, all of the factors and criteria that were used, what information was used, what time frame the information was gathered from, what factors and criteria were subjective, what methodology was utilized, what mitigating factors (if any) were looked at and applied in the evaluation process, and what FORRESTS' Dealership Performance Score was.[7]  Without this information, FORREST cannot counter the blanket and broad allegation that it did not meet the Dealership Performance Score of 70; more over, Debtors have not provided this Court with any information for it to use to analyze its evaluation method, methodology, and the outcome thereof. At best, all this Court has is the wholly subjective representations of Debtors, which representations are presented without any

---

[7]  This information has also been secreted from this Court without any explanation.

factual support.[8]

23.    From all appearances, Debtors seek to keep this Court in the dark as to their evaluation process. Such action should not be condoned, should be considered to be an act of bad faith on the part of Debtors, and this Court should order, at a minimum, a full disclosure of all factors utilized, what factors and criteria were subjective and what were objective, what methodology was utilized, the time frame the information utilized was gathered from, and what mitigating factors (if any) were looked at and applied in the evaluation process so that the evaluation process is transparent. Thus, until such information is provided to this Court, the only conclusion that can be reached is that Debtors acted with either bad faith, whim, caprice, or an abuse of discretion. To summarily approve the unfounded, undocumented, and unproven representations of debtors would not serve the ends of justice or the purposes of the Bankruptcy Code.

**B.    Federal Law Prohibits Debtors From Circumventing Texas Law**

24.    Acting in its capacity as debtor-in-possession, Debtors have conditioned their assumption and assignment of FORRESTS' franchise agreements upon FORRESTS' waiver of its rights under Texas law. Federal law is clear, however, that debtors-in-possession must comply with all applicable state laws. *See* 28 U.S.C. § 959(b). Section 959(b) provides, in pertinent part, that "a debtor in possession shall manage and operate the property in his possession... according to the requirements of the valid laws of the State in which such property is situated.. ."[2] As one bankruptcy court has stated, "the mandate of section 959(b) . . . prohibits the use of bankruptcy as a ruse to circumvent applicable state consumer protection laws by those who continue to operate in the

---

[8] FORREST reserves the right to supplement this Objection both with a written Supplemental Objection as well as through presentation of testimony and documentary evidence so as to be able to adequately and properly respond to a disclosure of the factors utilized, information utilized, and the methodology of the Dealer Evaluation Process, as they pertain to FORREST.

marketplace." *In re White Crane Trading Co., Inc.,* 170 B.R. 694, 698 (Bankr. E.D. Cal. 1994). Another court has explained: "Implicit in Section 959(b) is the notion that the goals of the federal bankruptcy laws, including rehabilitation of the debtor, do not authorize transgression of state laws setting requirements for the operation of the business...." *In re Quanta Resources Corp.,* 739 F.2d 912, 919 (3d Cir.1984), aff'd sub nom., *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494 (1986).

      25.    Citing Section 959(b), the United States Supreme Court has unequivocally stated that "Congress did not intend for the Bankruptcy Code to pre-empt all state laws," and that "Congress did not intend for the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of a trustee's powers." *Midlantic National Bank,* 474 U. S. at 505. Rather, Congress enacted 28 U.S.C. §959(b) to prohibit debtors in possession from violating valid state laws. *Id.* As one court explains:

> The purpose of bankruptcy is not to permit debtors, or nondebtors, to wrest a competitive advantage by exempting themselves from the myriad of laws that regulate business. Bankruptcy does not grant the debtor a license to eliminate the cost generated by compliance with valid state laws that constrain nonbankrupt competitors. Congress has, therefore, required that every debtor-in-possession and bankruptcy trustee manage and operate the debtor's property and business in compliance with state laws, whether good, bad, or indifferent, that apply outside of bankruptcy.

*White Crane,* 170 B.R. at 702.   In sum, Section 959(b) simply stands "for the uncontroversial proposition that a trustee must carry out his duties in conformity with state law." *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 593 (9th Cir. 1993).[9] Nonetheless, as set forth below,

---

[9] Indeed, Section 959(b) applies in many contexts. *See, e.g., Gillis v. California,* 293 U.S. 62 (1934) (trustee must pay state tax); *Midlantic Nat'lBank,* 474 U.S. 494 (aff'g City of New York v. *Quanta Res. Corp. (In re Quanta Res. Corp.),* 739 F.2d 912 (3d Cir. 1984)) (environmental laws); *Robinson v. Michigan Consol. Gas* Co., 918 F.2d 579 (6th Cir. 1990) (landlord's state law duties); *Saravia v. 1736 18th St., N. W., LP,* 844 F.2d 823 (D.C. Cir. 1988) (housing code); *Briardiff v. Briarcliff Tenants Ass'n (In re Briarcliff),* 15 B.R. 864 (D.N.J. 1981) (rent control); *In re Synergy Dev. Corp.,* 140 B.R. 958 (Bankr.

Debtors' Motion and its form Wind-Down Agreement together constitute an attempted end-run around important dealer-protection laws that should not be countenanced by this Court.

### C.   Debtor Seeks To Evade Jurisdiction in Texas

26.   Texas law clearly states that the Texas Department of Transportation, Motor Vehicle Division "has the exclusive original jurisdiction to regulate those aspects of the distribution, sale, or lease of motor vehicles that are governed by this chapter, including the original jurisdiction to determine its own jurisdiction." TEX. OCC. CODE § 2301.151(a). Texas law likewise provides "[notwithstanding the terms of any franchise or any other law, an action or proceeding brought by a manufacturer, representative, converter, or distributor against a dealer must be brought in an appropriate forum in this state only, and the law of this state applies to the action or proceeding." TEX. OCC. CODE § 2301.478.

27.   Contrary to the protections of Texas law, the Wind-Down Agreements improperly attempt to vest this Court with continuing jurisdiction (presumably in perpetuity) over disputes related to the agreement. *See* Wind-Down Agreement, para. 13 ("Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any matter related thereto."). In addition to violating the prohibition of Section 959(b), the Wind-Down Agreements attempt to instill jurisdiction in this Court violates the prohibition against a bankruptcy court's retention of jurisdiction, essentially *ad infinitum,* when such jurisdiction clearly does not exist. *See Concerto Software, Inc.* v. *VitaquestInt'l, Inc.,* 290 B.R. 448, 454 (D. Me. 2003) (finding that the court lacked jurisdiction over dispute regarding contract assigned in bankruptcy because "case law provides that an

---

S.D.N.Y. 1992) (consumer protection); *Wengert Transp., Inc.* v. *Grouse Cartage Co. (In re Wengert Transp. Co.),* 59 B.R. 226 (Bankr. N.D. Iowa 1986) (certificate of public convenience and necessity).

assumption and assignment of an executory contract under section 365 substitutes the assignee for the debtor" and "[pursuant to section 365(k), the debtor is then 'relieved from any liability for any breach of contract occurring after such assignment.'") (citations omitted). Moreover, "it is a fundamental proposition that parties cannot confer subject matter jurisdiction by agreement." *H&L Developers, Inc. v. Arvida/JMB Partners (In re H&L Developers, Inc.),* 178 B.R. 71,75 n.6 (Bankr. E.D. Pa. 1994). In sum, upon assignment to "New GM", the resolution of any dispute under the Wind-Down Agreements is a matter that should be resolved in accordance with state law. This is especially true when one considers that, "[t]here is nothing . . . that indicates that (a) state court will be unable to provide adequate relief in this situation." *Concerto Software,* 290 B.R. at 455.

**D.    Debtors Seek to Free Themselves from Texas Law Governing Franchise Modification and Termination**

28.    Section 2301.453 of the Texas Occupations Code concerns termination of franchised dealership, such as FORREST, by a manufacturer, such as Debtors. Section 2301.453 states that, unless ceratin enumerated procedures are followed, that "a manufacturer, distributor, or representative may not terminate or discontinue a franchise with a franchised dealer or directly or indirectly force or attempt to force a franchised dealer to relocate or discontinue a line-make." Texas law further provides that an affected dealer has a right to protest the matter and that at a "hearing, the board shall determine whether the party seeking the termination or discontinuance has established by a preponderance of the evidence that there is good cause for the proposed termination or discontinuance." TEX. OCC. CODE §2301.453(e) and (g).

29.    Texas law provides that a manufacturer "may not modify or replace a franchise if the modification or replacement would adversely affect to a substantial degree the dealer's sales, investment, or obligations to provide service to the public" without proper notice and the right to protest

*Page 21 of 28*

the modification. TEX. OCC. CODE § 2301.454. Texas law further provides that "[a]fter a protest is

filed, the board shall determine whether the manufacturer . . . has established by a preponderance of the

evidence that there is good cause for the proposed modification or replacement." TEX. OCC. CODE

§ 2301.454(d).

      30.     Texas law also provides a list of factors that the Texas Motor Vehicle Division

is to utilize in its determination of whether the manufacturer has established good cause. Section

2301.455 states at follows:

> "(a)    Notwithstanding the terms of any franchise, in determining whether good cause has been established under Section 2301.453 or 2301.454, the board shall consider all existing circumstances, including:
>
> > (1)    the dealer's sales in relation to the sales in the market;
> > (2)    the dealer's investment and obligations;
> > (3)    injury or benefit to the public;
> > (4)    the adequacy of the dealer's service facilities, equipment, parts, and personnel in relation to those of other dealers of new motor vehicles of the same line-make;
> > (5)    whether warranties are being honored by the dealer;
> > (6)    the parties' compliance with the franchise, except to the extent that the franchise conflicts with this chapter; and
> > (7)    the enforceability of the franchise from a public policy standpoint, including issues of the reasonableness of the franchise's terms, oppression, adhesion, and the parties' relative bargaining power.
>
> (b)    The desire of a manufacturer, distributor, or representative for market penetration does not by itself constitute good cause."

      31.     The Wind-Down Agreement proposed by Debtor constitutes a substantial

modification to the existing franchise agreements with FORREST. Under the Wind-Down Agreement,

however, the single authority authorized to approve such a modification *(i.e.* the Texas Motor Vehicle

Division) will never be given the opportunity because the Wind-Down Agreement strips FORREST of

any protest rights. *See, e.g.,* Wind-Down Agreement at para. 5 ("Release; Covenant Not to Sue;

Indemnity").

### E.    Debtors Seek To Deny FORREST The Right To Operate its Business

32.    Texas law prohibits a manufacturer from unilaterally deciding that a dealer cannot carry more than one manufacturer's product. TEX. OCC. CODE § 2301.472. Paragraph 2 of the Exclusive Use Agreements, however, requires that "The Dealership Premises shall not be used for any purpose other than Dealership Operations for the Existing Model Lines (which prohibited use includes, but are not limited to, the sale, display, storage, and/or service of motor vehicles not covered by the Dealer Agreements." See Exclusive Use Agreement at para.2.

### F.    Debtors Seek to Evade Texas Law Regarding Dealer Locations

33.    Texas law grants existing dealerships the ability to protest the establishment or relocation of another dealer in the same line-make, if the protesting dealership is located within the same county or a 15-mile radius of the proposed dealership. TEX. OCC. CODE § 2301.652. Paragraph 7 of the Wind-Down Agreement, however, prohibits an affected dealer from protesting or challenging before a court or administrative agency the establishment or relocation of a motor vehicle dealership in the vicinity of FORRESTS' current location. This provision conflicts with TEX. OCC. CODE § 2301.652(b). In a state the size of Texas, the statutorily-determined protest area is often very different from the manufacturer-determined responsibility area.

### G.    Debtors Seeks to Limit FORRESTS' Warranty Claims

34.    Texas law provides that: "A manufacturer or distributor shall pay a dealer's claim for reimbursement for warranty work or dealer preparation and delivery work not later than the 30th day after the date of approval of the claim." TEX. OCC. CODE § 2301.404. Paragraphs 2 and 6 of the Wind-Down Agreement, however, require FORREST to continue to perform warranty

work, while there is no reciprocal provision in the agreement providing that FORREST will be paid for the warranty work performed. In addition, paragraph 2 of the Exclusive Use Agreements provide that, for a period of fifteen (15) years from November 4, 2005., that "The Dealership Premises [of FORREST] shall not be used for any purpose other than Dealership Operations for the Existing Model Lines (which prohibited use includes, but are not limited to, the sale, display, storage, and/or service of motor vehicles not covered by the Dealer Agreements." Even after rejection and/or termination of the franchise agreements, such warranty work is to be performed without any compensation to FORREST from Debtor or "New GM."

### H.    Debtors Demand That FORREST Waive Their Texas Rights

35.    The entirety of paragraph 5 of the Wind-Down Agreement is at odds with section 2301.003's provisions indicating that an agreement to waive the terms of the Texas Occupations Code is void and unenforceable, since paragraph 6 requires FORREST to waive essentially all claims against Debtor, the 363 Acquirer and others (including any claim that the assignment of the Dealer Agreements by Debtor to New GM is void, unenforceable or in violation of applicable law) and any claim that Debtor is taking action against a dealer without following the procedures required by sections 2301.451-478 of the Texas Occupations Code.

### I.    Debtors Seek to Evade Texas Law Regarding Payments to FORREST Upon Termination

36.    Texas law provides for payments to dealers upon termination of their franchise agreement. TEX. OCC. CODE. §2301.465. The Wind-Down Agreement does not allow for payment to FORREST of all categories of compensation as set forth in TEX. OCC. CODE §2301.465(b). More over, Debtors now seek to not pay FORREST any monies for termination of their franchise agreements.

**J.** **Debtors' Concept of "Dealership Evaluation Process" and Dealer Performance Score" Conflict With Texas Law**

37.    Texas law provides that" notwithstanding the terms of any franchise, [a manufacturer may not] directly or indirectly discriminate against a franchised dealer or otherwise treat franchised dealers differently as a result of a formula or other computation or process intended to gauge the perform88ance of a dealership; or discriminate unreasonably between or among franchisees in the sale of a motor vehicle owned by the manufacturer or distributor." TEX. OCC. CODE §2301.468 Through use of the Dealer Evaluation Process and the Dealer Performance Score, discrimination against FORREST is exactly what Debtors engaged themselves in. This is especially evident in that Debtors have kept secret the method and manner in which they reviewed dealers for their determination of who to keep and who to discard.

### IV.
### CONCLUSION

38.    Debtors' mandatory modifications to its franchise agreements with FORREST unquestionably violate Texas law. Equally true is that federal law prevents Debtors from extracting the aforementioned concessions from FORREST. Bankruptcy does not vest DEBTORS with the power to thwart both state and federal law, and this Court is duty-bound to ensure that the equitable remedy of bankruptcy is not used to achieve the inequitable result sought by DEBTORS.

### IV.
### MEMORANDUM OF LAW

39.    FORREST submits that the arguments and authorities set forth in this Limited Objection satisfy the requirements of Southern District of New York Bankruptcy Local Rule 9013-l(b).

WHEREFORE, FORREST CHEVROLET-CADILLAC, INC., and FORREST PONTIAC-

**J.    Debtors' Concept of "Dealership Evaluation Process" and Dealer Performance Score" Conflict With Texas Law**

37.    Texas law provides that" notwithstanding the terms of any franchise, [a manufacturer may not] directly or indirectly discriminate against a franchised dealer or otherwise treat franchised dealers differently as a result of a formula or other computation or process intended to gauge the perform88ance of a dealership; or discriminate unreasonably between or among franchisees in the sale of a motor vehicle owned by the manufacturer or distributor." TEX. OCC. CODE §2301.468 Through use of the Dealer Evaluation Process and the Dealer Performance Score, discrimination against FORREST is exactly what Debtors engaged themselves in. This is especially evident in that Debtors have kept secret the method and manner in which they reviewed dealers for their determination of who to keep and who to discard.

## IV.
## CONCLUSION

38.    Debtors' mandatory modifications to its franchise agreements with FORREST unquestionably violate Texas law. Equally true is that federal law prevents Debtors from extracting the aforementioned concessions from FORREST. Bankruptcy does not vest DEBTORS with the power to thwart both state and federal law, and this Court is duty-bound to ensure that the equitable remedy of bankruptcy is not used to achieve the inequitable result sought by DEBTORS.

## IV.
## MEMORANDUM OF LAW

39.    FORREST submits that the arguments and authorities set forth in this Limited Objection satisfy the requirements of Southern District of New York Bankruptcy Local Rule 9013-1(b).

**WHEREFORE,** FORREST CHEVROLET-CADILLAC, INC., and FORREST PONTIAC-BUICK-GMC TRUCK, INC., respectfully requests that the Court sustain their Limited Objection and for such other and further relief as it may show itself to be entitled.

Respectfully submitted,

JEFFREY S. DAVIS
Attorney at Law
1422 Berry Drive
Cleburne, Texas 76033
817/602-7999
FAX # 817/641-8829
jsdesqtx@yahoo.com

JEFFREY S. DAVIS
Texas Bar No. 00787334

Attorney for Forrest Chevrolet-Cadillac, Inc., and
Forrest Pontiac-Buick-GMC Truck, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of July, 2009, a true and correct copy of the foregoing was served on all those parties receiving notice via the Court's Electronic Case Filing System (through ECF) and the parties below via U. S. Mail First Class, postage prepaid on the following parties:

Harvey Miller
Stephen Karotkin
Joseph H. Smolinsky
Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

*Page 26 of 28*

Debtors
c/o General Motors Corporation
Attn: Lawrence S. Buonomo
300 Renaissance Center
Detroit, Michigan 48265

James L. Bromley
Cleary, Gottlieb, Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

Michael J. Edelman
Michael L. Schein
Vedder Price, P.C.
1633 Broadway 47th FL
New York, NY 10019

John J. Rapisardi
Cadwalader Wickersham & Taft LLP
One World Financial Center
New York, NY 10281

Babette Ceccotti
Cohen Weiss and Simon LLP
330 W. 42nd Street
New York, NY 10036

Diana G. Adams
Office of U. S. Trustee
33 Whitehall Street, 21st Fl.
New York, NY 10004

David S. Jones
Matthew L. Schwartz
U. S. Attorney's Office
86 Chambers Street, 3rd Fl.
New York, NY 10007

Matthew Feldman
United States Department of the Treasury
1500 Pennsylvania Avenue NW
Room 2312
Washington, D.C. 20220

*Page 27 of 28*

Kenneth H. Eckstein
Thomas Moers Mayer
Adam C. Rogoff
Gordon Z. Novod
Kramer, Levin, Naftalis & Frankel, L.L.P.
1177 Avenue of the Americas
New York, NY 10036

Daniel W. Sherrick
UAW
8000 East Jefferson Avenue
Detroit, Michigan 48214

The affected dealers as identified and listed on Exhibit "A" to Debtors' Motion.

JEFFREY S. DAVIS