E
X
H
I
B
I
T

A-1

**EXHIBIT A-1**

**EXCLUSIVE USE AGREEMENT**

THIS EXCLUSIVE USE AGREEMENT (this "Agreement") is made and entered into as of the 4 day of ~~November~~ October, ~~2005~~ 2005, by and between FORREST ~~CHEVROLET-OLDSMOBILE-CADILLAC,~~ Pontiac-Buick-GMC Truck INC. ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

CMJ

**RECITALS**

A. Dealer currently operates a ~~Chevrolet and Cadillac~~ Buick, Pontiac GMC sales and service facility at 2400 N. Main Street, Cleburne, Texas, pursuant to the Dealer Agreements (as defined herein).

B. Dealer and GM are parties to a Supplemental Settlement Agreement and Release of even date herewith (the "Settlement Agreement").

C. Pursuant to the Settlement Agreement, Dealer (i) terminated its Dealer Sales and Service Agreement with respect to Oldsmobile products, and (ii) agreed to conduct GM-exclusive motor vehicle dealership operations at the Dealership Premises (as defined herein) on the terms and conditions contained herein, intending to be bound by the terms hereof.

**COVENANTS**

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Definitions. For purposes of this Agreement, the following capitalized terms shall have the meanings set forth in this Section 1:

(a) "Dealer Agreements." The Dealer Sales and Service Agreements entered into by and between Dealer and GM for the Existing Model Lines, and any amendments, modifications, or replacements of such agreements.

(b) "Dealership Operations." As defined in the Dealer Agreements.

(c) "Dealership Premises." The location(s) approved from time to time for the conduct of Dealership Operations for the Existing Model Lines pursuant to the terms of the Dealer Agreements.

(d) "Effective Date." The date set forth in the introductory paragraph of this Agreement.

(e) "Exclusivity Period." The period commencing on the Effective Date and continuing for a period of ~~twenty-five (25)~~ fifteen years thereafter.

(f) "Existing Model Lines." The ~~Chevrolet and Cadillac~~ Buick-Pontiac-GMC Truck products sold at the Dealership Premises in accordance with the Dealer Agreements.

CMJ CMJ

2. Exclusive Use. Dealer hereby agrees that, at all times during the Exclusivity Period, it shall actively and continuously conduct Dealership Operations for the Existing Model Lines at the Dealership Premises in accordance with the terms of the Dealer Agreements. The Dealership Premises

shall not be used for any purpose other than Dealership Operations for the Existing Model Lines (which prohibited uses include, but are not limited to, the sale, display, storage, and/or service of motor vehicles not covered by the Dealer Agreements other than as specifically contemplated by the term "Dealership Operations" in the Dealer Agreements), during the Exclusivity Period without the prior written consent of GM, which consent may be granted or withheld in GM's sole discretion.

3. Consideration. Dealer hereby acknowledges and agrees that payments and other covenants and agreements by GM set forth in the Settlement Agreement are fair and adequate consideration for Dealer's execution of and performance under this Agreement, the Settlement Agreement and any other documents executed by either party in connection with the Settlement Agreement (the "Related Agreements").

4. Default and Breach. Each of the following shall constitute a breach of this Agreement:

(a) Dealer's failure to actively and continuously conduct Dealership Operations for the Existing Model Lines at the Dealership Premises at all times during the Exclusivity Period;

(b) use of the Dealership Premises, or any part thereof, at any time during the Exclusivity Period, for any purpose other than Dealership Operations for the Existing Model Lines;

(c) subject to Section 5(d) below, the termination at any time during the Exclusivity Period of any of the Dealer Agreements, for any reason whatsoever (including, but not limited to, the termination in connection with the sale by Dealer of any of its assets or operations relating to Dealership Operations);

(d) subject to Section 5(d) below, any action or inaction by Dealer which results in the discontinuation of Dealership Operations for any of the Existing Model Lines at the Dealership Premises (by, for example, but not by way of limitation, the sale by Dealer of its assets or operations relating to any of the Dealer Agreements or the relocation by Dealer of its operations under any of the Dealer Agreements) at any time during the Exclusivity Period; and

(e) Dealer's failure at any time during the Exclusivity Period to perform any other of its obligations as set forth herein, in the Settlement Agreement, or any Related Agreement.

5. Remedies.

(a) In the event of a breach hereunder, GM shall have any or all of the following remedies, at GM's election:

(i) Dealer shall, within three (3) ~~days after receipt of a written notice from GM advising of such breach, pay liquidated damages for the Brand-Related Losses (defined below) to GM, as follows: (A) for a breach occurring during the time period commencing on the Effective Date and ending on the tenth (10th) anniversary of the Effective Date, Dealer shall pay GM the sum of One Million Four Hundred Twenty Five Thousand and No/100 Dollars ($1,425,000); (B) for a breach occurring during the time period commencing the day after the tenth (10th) anniversary of the Effective Date and ending on the twentieth (20th) anniversary of the Effective Date, Dealer shall pay GM the sum of Nine Hundred Fifty Thousand and No/100 Dollars ($950,000); and (C) for a breach occurring during the time period commencing the day after the twentieth (20th) anniversary of the Effective Date and ending on the expiration of the Exclusivity Period,~~

[Handwritten:] OF ARBITRATOR'S AWARD HOWEVER, IF ANY, PAY THE FOLLOWING based on the following terms: IF THE DATE OF BREACH IS WITHIN ONE YEAR OF EXECUTION OF THIS AGREEMENT, 200% OF THE AMOUNT PAID (OR $500,000). THIS AMOUNT WILL BE REDUCED BY 1/15TH EACH YEAR FOR THE BALANCE OF THE AGREEMENT. FOR EXAMPLE, IF A BREACH OCCURS IN YEAR 15 AFTER EXECUTION THE AMOUNT WILL BE $33,333.

[Handwritten initials:] BB CMJ

[Handwritten initials:] BB CMJ

~~Dealer shall pay GM the sum of Four Hundred Seventy Five and No/100 Dollars ($475,000) (each, respectively, the "Damages")~~. Dealer acknowledges that, if Dealer breaches this Agreement, GM shall suffer substantial damages, including, without limitation, loss of reputation, diminution of brand value, loss of opportunities, and loss of market channeling (collectively, the "Brand-Related Losses"). Dealer acknowledges that the determination of the exact amount of such damages would be difficult or impossible. Dealer and GM acknowledge and agree that the Damages are a reasonable estimate of the liquidated damage amount for the Brand-Related Losses in light of all relevant facts now available to the parties hereto and are not a penalty.

CMJ

~~(ii) To the maximum extent permitted by law, GM shall be entitled to all of its remedies at law, including payment for actual damages beyond the Brand-Related Losses such as, without limitation, lost profits, attorney fees, and relocation costs, and all of its remedies in equity, including, but not limited to, the right to specific performance.~~

Deleted

In the alternative to Section 5(a)

CMJ

Following the arbitration award

(b) In lieu of having Dealer pay any damages pursuant to Section 5(a) above, GM may elect to apply such amount towards payment of any amount due Dealer in the event GM exercises its right of first refusal pursuant to Article 12.3 of the Dealer Agreements.

(c) In the event Dealer fails to pay any damages as required by Section 5(a) above, Dealer authorizes GM to charge the full amount thereof against Dealer's account maintained on the GM Dealer Payment System.

(d) Notwithstanding anything to the contrary in this Agreement, it shall not be a breach of this Agreement, and Dealer will have no obligation to pay any damages to GM described in Section 5(a) above, if the termination of all of the Dealer Agreements occurs as a result of all of the following:

(i) Dealer proposes to sell or otherwise transfer its assets related to Dealership Operations for all of the Existing Model Lines to a third party, which proposal (A) provides for the continuation of exclusive Dealership Operations for all of the Existing Model Lines at the Dealership Premises, or (B) provides for the relocation of Dealership Operations for all of the Existing Model Lines to a new location to be used exclusively for such Dealership Operations, and GM expressly advises Dealer in writing that such location is satisfactory to satisfy the requirements of this Section 5(d);

(ii) the transferee assumes, pursuant to a written agreement acceptable to GM, Dealer's remaining obligations under this Agreement, including, without limitation, those with respect to the unexpired portion of the Exclusivity Period;

(iii) the transferee demonstrates to GM's satisfaction the financial ability to assume Dealer's financial obligations herein;

(iv) the change of ownership or transfer proposal is otherwise approved by GM; and

(v) the transferee and GM enter into Dealer Sales and Service Agreements in the then-current form for Dealership Operations for all of the Existing Model Lines at the location identified in Section 5(d) above.

(e) No failure on the part of GM to exercise, and no delay in exercising, any right under this Agreement, the Settlement Agreement, or any Related Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any further or other exercise thereof or the exercise of any other right. The remedies provided under this Agreement, the Settlement Agreement, or any Related Agreement are cumulative, are not exclusive of any remedies provided by law, and may be exercised singly, collectively, or successively.

6. Indemnity. Dealer shall indemnify, defend and hold GM, its Affiliates and their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors and assigns (the "Indemnified Parties") harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) that may be imposed upon or incurred by the Indemnified Parties, or any of them, arising from, relating to, or caused by Dealer's breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

7. Due Authority. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

8. Confidentiality. Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

9. Informed and Voluntary Acts. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any mental, physical, or economic duress. Nothing set forth in this Agreement shall be construed as amending, modifying, or superseding any of the Dealer Agreements or GM's rights or remedies therein.

10. Effectiveness. This Agreement, and any offers made by GM to Dealer with respect to the implementation of GM's marketing channel strategy in Dealer's metropolitan area, shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is returned to GM on or before 10/4, 2005. This Agreement shall be deemed executed on the date on which it has been fully and properly executed by both parties, which date shall be entered in the introductory paragraph of this Agreement.

11. Disputes - Arbitration.

(a) Subject to the following provisions of this Section 11, GM and Dealer agree to submit to final and binding arbitration, upon either party's written notice, any and all claims, disputes, and controversies between them arising under or relating to this Agreement and its negotiation, execution, administration, modification, extension or enforcement (collectively, "Claims"). Such arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") at an AAA regional office nearest the Dealership Premises.

(b) GM and Dealer agree that the dispute resolution process outlined in this section shall be the exclusive mechanism for resolving any Claims. All arbitration awards are binding and non-appealable except as otherwise provided in the United States Arbitration Act (9 U.S.C. § 1, *et seq.*). Any court with jurisdiction may enter judgment upon the award rendered by the arbitrator, and the parties agree to be bound by such award.

(c) Arbitration hereunder shall take place before one (1) arbitrator. The arbitrator shall be neutral and an attorney actively engaged in the practice of business law for at least ten (10) years or a retired judge of a state appellate court or a federal district or appellate court. The AAA shall submit a list of persons meeting the criteria outlined above for such arbitrator, and the parties mutually shall agree upon the arbitrator in the manner established by the AAA. If the parties are unable or fail to agree upon the arbitrator, the AAA shall select the arbitrator.

(d) The arbitrator shall have the discretion to order a prehearing exchange of information by the parties, including, without limitation, production of requested documents, an exchange of summaries of proposed witness testimony, and depositions of parties, all of which shall occur within sixty (60) days after the appointment of the arbitrator.

(e) Dealer and GM will share equally in all administrative expenses, including, but not limited to, travel, lodging and meals of the arbitrator, rental of meeting and hearing rooms, any expenses for transcribing or recording the arbitration proceedings, and any other reasonable expenses relating to the arbitration process. Dealer and GM shall be responsible for their own costs and expenses including, but not limited to, attorneys' fees and expert witness fees.

12. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

*[Signature Page Follows]*

IN WITNESS WHEREOF, GM and Dealer have executed this Agreement through their duly authorized representatives as of the day and year first above written.

GENERAL MOTORS CORPORATION, a Delaware corporation, acting through its Dealer Network Development Group

By: S.M. SPRAGUE
M.L. Heisel, Finance Director, or
S.M. Sprague, Finance Manager

By: C.F. Seaburg
C.F. Seaburg, Regional Director, or
D.T. Bott, Regional Manager

FORREST ~~CHEVROLET-OLDSMOBILE-CADILLAC~~ PONTIAC-BUICK-GMC TRUCK, INC.

By: Charles Michael Forrest
Name: Charles Michael Forrest
Title: V-P

E
X
H
I
B
I
T

A-2

EXHIBIT  A-2

## EXCLUSIVE USE AGREEMENT

THIS EXCLUSIVE USE AGREEMENT (this "Agreement") is made and entered into as of the 4 day of ~~November~~ October, 200~~4~~5 by and between FORREST CHEVROLET-~~OLDSMOBILE~~-CADILLAC, INC. ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

### RECITALS

A. Dealer currently operates a Chevrolet and Cadillac sales and service facility at 2400 N. Main Street, Cleburne, Texas, pursuant to the Dealer Agreements (as defined herein).

B. Dealer and GM are parties to a Supplemental Settlement Agreement and Release of even date herewith (the "Settlement Agreement").

C. Pursuant to the Settlement Agreement, Dealer (i) terminated its Dealer Sales and Service Agreement with respect to Oldsmobile products, and (ii) agreed to conduct GM-exclusive motor vehicle dealership operations at the Dealership Premises (as defined herein) on the terms and conditions contained herein, intending to be bound by the terms hereof.

### COVENANTS

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Definitions. For purposes of this Agreement, the following capitalized terms shall have the meanings set forth in this Section 1:

(a) "Dealer Agreements." The Dealer Sales and Service Agreements entered into by and between Dealer and GM for the Existing Model Lines, and any amendments, modifications or replacements of such agreements.

(b) "Dealership Operations." As defined in the Dealer Agreements.

(c) "Dealership Premises." The location(s) approved from time to time for the conduct of Dealership Operations for the Existing Model Lines pursuant to the terms of the Dealer Agreements.

(d) "Effective Date." The date set forth in the introductory paragraph of this Agreement.

(e) "Exclusivity Period." The period commencing on the Effective Date and continuing for a period of ~~twenty-five (25)~~ FIFTEEN 15 years thereafter.

(f) "Existing Model Lines." The Chevrolet and Cadillac products sold at the Dealership Premises in accordance with the Dealer Agreements.

2. Exclusive Use. Dealer hereby agrees that, at all times during the Exclusivity Period, it shall actively and continuously conduct Dealership Operations for the Existing Model Lines at the Dealership Premises in accordance with the terms of the Dealer Agreements. The Dealership Premises

shall not be used for any purpose other than Dealership Operations for the Existing Model Lines (which prohibited uses include, but are not limited to, the sale, display, storage, and/or service of motor vehicles not covered by the Dealer Agreements other than as specifically contemplated by the term "Dealership Operations" in the Dealer Agreements), during the Exclusivity Period without the prior written consent of GM, which consent may be granted or withheld in GM's sole discretion.

3. Consideration. Dealer hereby acknowledges and agrees that payments and other covenants and agreements by GM set forth in the Settlement Agreement are fair and adequate consideration for Dealer's execution of and performance under this Agreement, the Settlement Agreement and any other documents executed by either party in connection with the Settlement Agreement (the "Related Agreements").

4. Default and Breach. Each of the following shall constitute a breach of this Agreement:

(a) Dealer's failure to actively and continuously conduct Dealership Operations for the Existing Model Lines at the Dealership Premises at all times during the Exclusivity Period;

(b) use of the Dealership Premises, or any part thereof, at any time during the Exclusivity Period, for any purpose other than Dealership Operations for the Existing Model Lines;

(c) subject to Section 5(d) below, the termination at any time during the Exclusivity Period of any of the Dealer Agreements, for any reason whatsoever (including, but not limited to, the termination in connection with the sale by Dealer of any of its assets or operations relating to Dealership Operations);

(d) subject to Section 5(d) below, any action or inaction by Dealer which results in the discontinuation of Dealership Operations for any of the Existing Model Lines at the Dealership Premises (by, for example, but not by way of limitation, the sale by Dealer of its assets or operations relating to any of the Dealer Agreements or the relocation by Dealer of its operations under any of the Dealer Agreements) at any time during the Exclusivity Period; and

(e) Dealer's failure at any time during the Exclusivity Period to perform any other of its obligations as set forth herein, in the Settlement Agreement, or any Related Agreement.

5. Remedies.

(a) In the event of a breach hereunder, GM shall have any or all of the following remedies, at GM's election:

(i) Dealer shall, within three (3) days ~~after receipt of a written notice from GM advising of such breach, pay liquidated damages for the Brand-Related Losses (defined below) to GM, as follows: (A) for a breach occurring during the time period commencing on the Effective Date and ending on the tenth (10th) anniversary of the Effective Date, Dealer shall pay GM the sum of One Million Four Hundred Twenty Five Thousand and No/100 Dollars ($1,425,000); (B) for a breach occurring during the time period commencing the day after the tenth (10th) anniversary of the Effective Date and ending on the twentieth (20th) anniversary of the Effective Date, Dealer shall pay GM the sum of Nine Hundred Fifty Thousand and No/100 Dollars ($950,000); and (C) for a breach occurring during the time period commencing the day after the twentieth (20th) anniversary of the Effective Date and ending on the expiration of the Exclusivity Period.~~

[Handwritten: OF ARBITRATOR'S AWARD HEREUNDER, IF ANY, PAY THE FOLLOWING — based on the following terms: IF THE DATE OF BREACH IS WITHIN ONE YEAR (OF) EXECUTION OF THIS AGREEMENT, 200% OF THE AMOUNT PAID (OR 500,000). THIS AMOUNT WILL BE REDUCED BY 1/15TH EACH YEAR FOR THE BALANCE OF THE AGREEMENT. FOR EXAMPLE, IF A BREACH OCCURS IN YEAR 15 AFTER EXECUTION THE AMOUNT WILL BE @ 33 ??? — initialed CMJ]

~~Dealer shall pay GM the sum of Four Hundred Seventy Five and No/100 Dollars ($475,000) (each, respectively, the "Damages")~~. Dealer acknowledges that, if Dealer breaches this Agreement, GM shall suffer substantial damages, including, without limitation, loss of reputation, diminution of brand value, loss of opportunities, and loss of market channeling (collectively, the "Brand-Related Losses"). Dealer acknowledges that the determination of the exact amount of such damages would be difficult or impossible. Dealer and GM acknowledge and agree that the Damages are a reasonable estimate of the liquidated damage amount for the Brand-Related Losses in light of all relevant facts now available to the parties hereto and are not a penalty.

CMJ

~~(ii) To the maximum extent permitted by law, GM shall be entitled to all of its remedies at law, including payment for actual damages beyond the Brand-Related Losses such as, without limitation, lost profits, attorney fees, and relocation costs, and all of its remedies in equity, including, but not limited to, the right to specific performance.~~

delete all CMJ

CMJ

Following the Arbitrator's Award

(b) In lieu of having Dealer pay any damages pursuant to Section 5(a) above, GM may elect to apply such amount towards payment of any amount due Dealer in the event GM exercises its right of first refusal pursuant to Article 12.3 of the Dealer Agreements.

(c) In the event Dealer fails to pay any damages as required by Section 5(a) above, Dealer authorizes GM to charge the full amount thereof against Dealer's account maintained on the GM Dealer Payment System.

(d) Notwithstanding anything to the contrary in this Agreement, it shall not be a breach of this Agreement, and Dealer will have no obligation to pay any damages to GM described in Section 5(a) above, if the termination of all of the Dealer Agreements occurs as a result of all of the following:

(i) Dealer proposes to sell or otherwise transfer its assets related to Dealership Operations for all of the Existing Model Lines to a third party, which proposal (A) provides for the continuation of exclusive Dealership Operations for all of the Existing Model Lines at the Dealership Premises, or (B) provides for the relocation of Dealership Operations for all of the Existing Model Lines to a new location to be used exclusively for such Dealership Operations, and GM expressly advises Dealer in writing that such location is satisfactory to satisfy the requirements of this Section 5(d);

(ii) the transferee assumes, pursuant to a written agreement acceptable to GM, Dealer's remaining obligations under this Agreement, including, without limitation, those with respect to the unexpired portion of the Exclusivity Period;

(iii) the transferee demonstrates to GM's satisfaction the financial ability to assume Dealer's financial obligations herein;

(iv) the change of ownership or transfer proposal is otherwise approved by GM; and

(v) the transferee and GM enter into Dealer Sales and Service Agreements in the then-current form for Dealership Operations for all of the Existing Model Lines at the location identified in Section 5(d) above.

(c) No failure on the part of GM to exercise, and no delay in exercising, any right under this Agreement, the Settlement Agreement, or any Related Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any further or other exercise thereof or the exercise of any other right. The remedies provided under this Agreement, the Settlement Agreement, or any Related Agreement are cumulative, are not exclusive of any remedies provided by law, and may be exercised singly, collectively, or successively.

6. Indemnity. Dealer shall indemnify, defend and hold GM, its Affiliates and their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors and assigns (the "Indemnified Parties") harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) that may be imposed upon or incurred by the Indemnified Parties, or any of them, arising from, relating to, or caused by Dealer's breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

7. Due Authority. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

8. Confidentiality. Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

9. Informed and Voluntary Acts. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any mental, physical, or economic duress. Nothing set forth in this Agreement shall be construed as amending, modifying or superseding any of the Dealer Agreements or GM's rights or remedies therein.

10. Effectiveness. This Agreement, and any offers made by GM to Dealer with respect to the implementation of GM's marketing channel strategy in Dealer's metropolitan area, shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is returned to GM on or before 10/4, 2005. This Agreement shall be deemed executed on the date on which it has been fully and properly executed by both parties, which date shall be entered in the introductory paragraph of this Agreement.

11. Disputes - Arbitration.

(a) Subject to the following provisions of this Section 11, GM and Dealer agree to submit to final and binding arbitration, upon either party's written notice, any and all claims, disputes, and controversies between them arising under or relating to this Agreement and its negotiation, execution, administration, modification, extension or enforcement (collectively, "Claims"). Such arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") at an AAA regional office nearest the Dealership Premises.

(b) GM and Dealer agree that the dispute resolution process outlined in this section shall be the exclusive mechanism for resolving any Claims. All arbitration awards are binding and non-appealable except as otherwise provided in the United States Arbitration Act (9 U.S.C. § 1, *et seq.*). Any court with jurisdiction may enter judgment upon the award rendered by the arbitrator, and the parties agree to be bound by such award.

(c) Arbitration hereunder shall take place before one (1) arbitrator. The arbitrator shall be neutral and an attorney actively engaged in the practice of business law for at least ten (10) years or a retired judge of a state appellate court or a federal district or appellate court. The AAA shall submit a list of persons meeting the criteria outlined above for such arbitrator, and the parties mutually shall agree upon the arbitrator in the manner established by the AAA. If the parties are unable or fail to agree upon the arbitrator, the AAA shall select the arbitrator.

(d) The arbitrator shall have the discretion to order a prehearing exchange of information by the parties, including, without limitation, production of requested documents, an exchange of summaries of proposed witness testimony, and depositions of parties, all of which shall occur within sixty (60) days after the appointment of the arbitrator.

(e) Dealer and GM will share equally in all administrative expenses, including, but not limited to, travel, lodging and meals of the arbitrator, rental of meeting and hearing rooms, any expenses for transcribing or recording the arbitration proceedings, and any other reasonable expenses relating to the arbitration process. Dealer and GM shall be responsible for their own costs and expenses including, but not limited to, attorneys' fees and expert witness fees.

12. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

*[Signature Page Follows]*

IN WITNESS WHEREOF, GM and Dealer have executed this Agreement through their duly authorized representatives as of the day and year first above written.

GENERAL MOTORS CORPORATION, a
Delaware corporation, acting through its Dealer
Network Development Group

By: S. M. Sprague by [signature]
M.L. Heisel, Finance Director, or
S.M. Sprague, Finance Manager

By: C. F. Seabury by [signature]
C.F. Seaburg, Regional Director, or
D.T. Bott, Regional Manager

FORREST CHEVROLET-OLDSMOBILE-
CADILLAC, INC.

By: Charles Michael Forrest
Name: Charles Michael Forrest
Title: V-P

(#00711806.1 07146-9999 11/18/2004 11:41 AM)

E
X
H
I
B
I
T

B-1

**EXHIBIT B-1**



CERTIFIED MAIL – 7001 2510 0000 2547 5399
RETURN RECEIPT REQUESTED

PERSONAL & CONFIDENTIAL

General Motors Corporation
Dealer Contractual Group
Mail Code 482-A06-C66
100 GM Renaissance Center
Detroit, MI 48265-1000

July 7, 2008

Forrest Pontiac-Buick-GMC Truck, Inc
PO Box 37
Cleburne, TX  76033-0037

Attention:  Mr. Charles M. Forrest, Vice President

This letter is written by General Motors Corporation ("GM") regarding the General Motors Dealer Sales and Service Agreements ("Agreements") in effect with Forrest Pontiac-Buick-GMC Truck, Inc.

It has come to the attention of GM that Forrest Pontiac-Buick-GMC Truck, Inc has lost its floor plan financing.  This loss of floor plan is a violation of Article 10 of the Dealer Agreement.

Article 10 provides in relevant part:

Article 10.2
"To avoid damage to goodwill which could result if Dealer is financially unable to fulfill its commitments Dealer agrees to have and maintain a separate line of credit from a creditworthy financial institution reasonably acceptable to General Motors and available to finance the Dealer's purchase of new vehicles in conformance with the policies and procedures established by General Motors.  The amount of the line of credit shall be sufficient for Dealer to meet it's obligations under Article 6.4."

Based on our records Forrest Pontiac-Buick-GMC Truck, Inc has not ordered a vehicle since May 22, 2008, and has sold only 18 vehicles since May 22, 2008 and currently there are 93 new Pontiacs (19), Buick (15), GMC (59) in stock.  The lack of a separate line of credit for flooring of new vehicles has impaired the dealership's ability to order and stock a selection of product for display and sale to potential customers. When customers do not find the necessary selection on hand, or do not have the ability to special order a vehicle they desire, there is unacceptable "damage to goodwill" with the consumers in Forrest Pontiac-Buick-GMC Truck, Inc's, Area of Primary Responsibility.

This violation of Article 10.2 is addressed in Article 13 of the Dealer Agreement. Article 13 provides in relevant part:

Article 13.1
"The following acts or events, which are within the control of Dealer or originate from action taken by Dealer or its management or owners, are material breaches of this Agreement.  If General Motors learns that any of the acts or events has occurred, it may notify the Dealer in writing.  If notified, Dealer will be given the opportunity to respond in writing within 30 days of receipt of the notice, explaining or correcting the situation to General Motors satisfaction."

Article 13.1.11
"Failure of Dealer to maintain the line of credit required by Article 10."

Based on this breach of the Dealer  Agreement,GM is providing Forrest Pontiac-Buick-GMC Truck, Inc with thirty (30) days from its receipt of this letter to correct this breach, or otherwise explain this breach, to GM's satisfaction.  If Forrest Pontiac-Buick-GMC Truck, Inc fails to do so, GM may elect to terminate the Dealer Agreements and cease all business relationships with the dealership.

Please be assured that in the meantime, GM will continue to conduct business with Forrest Pontiac-Buick-GMC Truck, Inc according to the Dealer Agreements, and will expect the dealership to likewise fulfill its responsibilities and obligations under its Dealer Agreements.

Very truly yours,

Felipe Herrera

Felipe Herrera
Zone Manager
General Motors Corporation

c:   Dealer Business Planning Group
      Vanessa Demench, Dealer Accounting (vanessa.demenech@gm.com)

E
X
H
I
B
I
T

B-2

**EXHIBIT B-2**



General Motors Corporation
Dealer Contractual Group
Mail Code 482-A06-C66
100 GM Renaissance Center
Detroit, MI 48265-1000

CERTIFIED MAIL – 7001 2510 0000 2547 5382
RETURN RECEIPT REQUESTED

PERSONAL & CONFIDENTIAL

July 7, 2008

Forrest Chevrolet-Cadillac, Inc
PO Box 37
Cleburne, TX  76033-0037

Attention:  Mr. Charles M. Forrest, Vice President

This letter is written by General Motors Corporation ("GM") regarding the General Motors Dealer Sales and Service Agreements ("Agreements") in effect with Forrest Chevrolet-Cadillac, Inc.

It has come to the attention of GM that Forrest Chevrolet-Cadillac, Inc has lost its floor plan financing. This loss of floor plan is a violation of Article 10 of the Dealer Agreement.

Article 10 provides in relevant part:

Article 10.2
    "To avoid damage to goodwill which could result if Dealer is financially unable to fulfill its commitments Dealer agrees to have and maintain a separate line of credit from a creditworthy financial institution reasonably acceptable to General Motors and available to finance the Dealer's purchase of new vehicles in conformance with the policies and procedures established by General Motors.  The amount of the line of credit shall be sufficient for Dealer to meet it's obligations under Article 6.4."

Based on our records Forrest Chevrolet-Cadillac, Inc, has not ordered a vehicle since May 22, 2008, and has sold only 28 vehicles since May 22, 2008 and currently there are 143 new Chevrolet (119), Cadillac (24), vehicles in stock.  The lack of a separate line of credit for flooring of new vehicles has impaired the dealership's ability to order and stock a selection of product for display and sale to potential customers. When customers do not find the necessary selection on hand, or do not have the ability to special order a vehicle they desire, there is unacceptable "damage to goodwill" with the consumers in Forrest Chevrolet-Cadillac, Inc's Area of Primary Responsibility.

This violation of Article 10.2 is addressed in Article 13 of the Dealer Agreement.  Article 13 provides in relevant part:

Article 13.1
    "The following acts or events, which are within the control of Dealer or originate from action taken by Dealer or its management or owners, are material breaches of this Agreement.  If General Motors learns that any of the acts or events has occurred, it may notify the Dealer in writing.  If notified, Dealer will be given the opportunity to respond in writing within 30 days of receipt of the notice, explaining or correcting the situation to General Motors satisfaction."

Article 13.1.11
    "Failure of Dealer to maintain the line of credit required by Article 10."

Based on this breach of the Dealer Agreement,GM is providing Forrest Pontiac-Buick-GMC Truck, Inc with thirty (30) days from its receipt of this letter to correct this breach, or otherwise explain this breach, to GM's satisfaction. If Forrest Pontiac-Buick-GMC Truck, Inc fails to do so, GM may elect to terminate the Dealer Agreements and cease all business relationships with the dealership.

Please be assured that in the meantime, GM will continue to conduct business with Forrest Pontiac-Buick-GMC Truck, Inc according to the Dealer Agreements, and will expect the dealership to likewise fulfill its responsibilities and obligations under its Dealer Agreements.

Very truly yours,

Felipe Herrera

Felipe Herrera
Zone Manager
General Motors Corporation

c: Dealer Business Planning Group
Vanessa Demench, Dealer Accounting (vanessa.demenech@gm.com)

E
X
H
I
B
I
T

C-1

**EXHIBIT C-1**



VIA FEDERAL EXPRESS
PERSONAL & CONFIDENTIAL

May 14, 2009

116558 6357
CHARLES M FORREST
FORREST PONTIAC-BUICK-GMC TRUCK, INC.
2408 N MAIN
CLEBURNE, TX 76033

Attention: CHARLES M FORREST

This letter is being delivered to FORREST PONTIAC-BUICK-GMC TRUCK, INC. to meet the commitment we made to communicate to dealers during the week of May 11th concerning our restructuring efforts.

We recently filed a Form S-4 with the Securities and Exchange Commission setting forth our offer to the GM bondholders to exchange debt for equity. The Form S-4 also describes our restructuring plan. The unprecedented economic conditions in the United States and in our industry have made it necessary for us to restructure our business and operations significantly. The restructuring plan also includes addressing GM's dealer network in order to maintain GM's long term viability. Part of that restructuring is a planned reduction in the number of GM dealerships. As we have communicated to all dealers, our revised restructuring plan is a result of GM being challenged to move more aggressively and faster in its restructuring efforts.

In our planning, we have identified those attributes that GM dealers must have to be a successful part of the dealer network going forward. We also reviewed historical performance factors such as sales effectiveness, sales volume, CSI performance, capitalization, profitability, location, facilities, and dualing patterns, among other market factors. We have conducted an analysis of your dealership's operations and market. We now are providing you with our current planning regarding your dealership in connection with our dealer network plans, in the spirit of open and candid communication.

Based on our review and current and foreseeable market conditions and your dealership's historical performance, we do not see that GM can have a productive business relationship with FORREST PONTIAC-BUICK-GMC TRUCK, INC. over the long term. Generally speaking, we would not expect our contractual relationship to continue past October, 2010. Please understand that our planning in this regard is not finalized, and we are prepared to give you until the end of the month to submit any information you would like to us. We know this is a difficult situation. However, we feel that it is best to openly communicate our planning to you. The need for this review and analysis was forced on us by extremely difficult economic conditions both of us face in the industry. Simply put, we must have a viable, competitive dealer network going forward and all our planning is focused on this goal.

If you have any information you would like to submit or have questions concerning this communication, please contact us at GMDealerNetworkquestions@gm.com.

Sincerely,

General Motors Corporation

E
X
H
I
B
I
T

C-2

EXHIBIT   C-2

VIA FEDERAL EXPRESS
PERSONAL & CONFIDENTIAL

May 14, 2009

112300 1364
CHARLES M FORREST
FORREST CHEVROLET-CADILLAC, INC.
2400 N MAIN
CLEBURNE, TX 76033

Attention: CHARLES M FORREST

This letter is being delivered to FORREST CHEVROLET-CADILLAC, INC. to meet the commitment we made to communicate to dealers during the week of May 11th concerning our restructuring efforts.

We recently filed a Form S-4 with the Securities and Exchange Commission setting forth our offer to the GM bondholders to exchange debt for equity. The Form S-4 also describes our restructuring plan. The unprecedented economic conditions in the United States and in our industry have made it necessary for us to restructure our business and operations significantly. The restructuring plan also includes addressing GM's dealer network in order to maintain GM's long term viability. Part of that restructuring is a planned reduction in the number of GM dealerships. As we have communicated to all dealers, our revised restructuring plan is a result of GM being challenged to move more aggressively and faster in its restructuring efforts.

In our planning, we have identified those attributes that GM dealers must have to be a successful part of the dealer network going forward. We also reviewed historical performance factors such as sales effectiveness, sales volume, CSI performance, capitalization, profitability, location, facilities, and dualing patterns, among other market factors. We have conducted an analysis of your dealership's operations and market. We now are providing you with our current planning regarding your dealership in connection with our dealer network plans, in the spirit of open and candid communication.

Based on our review and current and foreseeable market conditions and your dealership's historical performance, we do not see that GM can have a productive business relationship with FORREST CHEVROLET-CADILLAC, INC. over the long term. Generally speaking, we would not expect our contractual relationship to continue past October, 2010. Please understand that our planning in this regard is not finalized, and we are prepared to give you until the end of the month to submit any information you would like to us. We know this is a difficult situation. However, we feel that it is best to openly communicate our planning to you. The need for this review and analysis was forced on us by extremely difficult economic conditions both of us face in the industry. Simply put, we must have a viable, competitive dealer network going forward and all our planning is focused on this goal.

If you have any information you would like to submit or have questions concerning this communication, please contact us at GMDealerNetworkquestions@gm.com.

Sincerely,

General Motors Corporation

E
X
H
I
B
I
T

D

EXHIBIT D

BUSINESS PLAN

Forrest Auto Park to consolidate (and replace) the separate corporations of Forrest
Chevrolet-Cadillac, Inc. and Forrest Pontiac-Buick- GMC, Inc.

Over the past nineteen years, a plethora of prejudicial events have adversely affected our
historical performance with reference to sales effectiveness, sales volume, CSI
performance, capitalization, profitability, location, facilities, dueling patterns, etc. The
following list represents a sample of such events.....

Agenda:

ADVERSE FACTORS:

*Disallowance of our family's business consolidation plans from 1994-1996, 2001-2003,
and 2006-2009.

*The unfair competitive effect on our marketplace with the relocation of Lynn Smith
Chevrolet in approximately 1994.

*The alteration of our own area of responsibility through an expansion into the Alvarado,
Texas, area in recent years.

*The coerced building of a new Pontiac-Buick-GMC dealership (2001-present).

*The extreme effects of "Turn and Earn" product allocation methods over a lifetime of
operations; in the early years, adverse manifestations often reflected the "starvation" of
certain products. In the later years, particularly after June 2005, there was a "fatal deluge"
of products that invited the participation of the GMAC finance arm as the "other side of
the two-headed dragon".

*The illegal, immoral, and unethical suspension of out GMAC floor plan on May 26,
2008.

*The arrogant, envious, and greedy behavior of a former used car manager of our
operations who opportunistically solicited the co-operation of many well-known new car
dealers to broker new vehicle sales into our known new car dealers to broker new vehicle
sales into our sales area of responsibility.

POSITIVE FACTORS:

*Facility – We have built and continue to operate our new Forrest Autopark facility
(2005-2009) at 2408 N. Main in Cleburne, Texas.

*Floor Plan – We will utilize the $4.8 million valuation of the original real estate site of
Forrest Chevrolet-Cadillac to secure a line of credit to execute our own floor plan.

*Capitalization – We will utilize approximately $2 million of fixed assets (comprised of furniture, fixtures, equipment, parts, inventory, special tools, wreckers, computers, etc.) as security for our working capital. (Though, to date, we have not been given the minimum amount required as a capital standard).

*Profitability – Given the mayhem that is unfolding in the marketplace with GM's bankruptcy announcement, we, Forrest Autopark, will avoid financial destabilization of our new car inventory value by #1: having paid off our GMAC balance; #2: replenishing our inventories at 50 cents on the dollar, by buying up distressed dealership inventories. This strategy will allow us to achieve gross profits on most new and used vehicle sales at 200-300% of industry norm for a three to six month period, For example, we can begin selling 50 cars and trucks a months, but make as much gross as if selling 125-150 cars and trucks per month. This "once-in-a-lifetime" opportunity will allow us instantaneous profitability, rather than having to "ramp up" for six months to regain our momentum.

*Marketplace -- obviously viable with a growing population and diversifying demographic.

*Location – Excellent! A heavily traveled 30,000 plus vehicles a day on Hwy 174, anticipating the extension of Hwy 121, direct from the heart of the metroplex to be completed in two years or less.

My attributes that GM dealers must have to be a successful part of the dealer network going forward……..

I have been in and around the automobile business since I was "knee-high to a grapefruit" and started walking….in 1955!
I swept the car lot, washed cars, stocked parts, delivered parts, filed and worked in the office, etc. 'til I graduated from Cleburne High School in 1970. While I was in high school, I was and all-around achiever, proving to be successful both as an athlete and as a scholar. The highlight of my sports career was to be named second-team all-district as a defensive back in football. I also alternated as a slot-back on offense. I performed above average on the basketball court and I participated in the 100 yard dash, the 440, the sprint relay team and finished third in the district in broad jump my senior year. In other words, I am as competitive as anyone out there. In the classroom, along with being in the National Honor Society and being a lieutenant governor in Key Club, I graduated as salutatorian of my high school class. In fact, my overzealous interest in my high girlfriend, Donna Cannon (Miss CHS), surely cost me the valedictorian spot by .05 of a point! I started selling cars in the off-season when I was preparing for my senior year in high school. I continued sell cars in the summers during my four-plus years at the University of Texas. Graduating with 160 plus hours and an Industrial Management degree, I came full time into the dealership in 1974. We also had just been informed that my dad might expect to survive about 90 days after he had just lost a kidney to cancer! The Good Lord kept him around for another 23 years! Utilizing my computer skills from many varied course studies in mechanical engineering and business management, to indulge our accounting operations, I became familiar with the entire GM Standardized

Accounting System and served as our in-house computer guru from 1977 through 1990.
During this span of time, I also spent extensive time in our parts operations, our body
shop operations, and our service operation. But realizing that nothing happens 'till
somebody sells something, I began to assimilate the knowledge to write
"WONDERMENT", my sales training manual. For approximately 18 years, from 1987
through 2005, I taught one to two-hour sales training sessions on Saturday morning.
Indeed, for an intense period for two years (1992-1994), I taught one-hour sales sessions
**everyday**! I ceased this level of activity when I wrote "WONDERMENT", MY 100
PAGE GUIDE TO SUCCESSFUL SELLING. Because of my highly diversified
educational background and the advantage of my strongest vocational aptitude in the area
of teaching, I was able and willing to complement my sales training guide with a 150
question exam. I administered my exam to approximately twenty sales people in our
organization five years ago over a two-month period of time. Even as they used the
template I created on the front-and-back side of a single sheep of paper, identifying sixty
or so individual things about a customer in a five-year evolution of time (1987-1992),
their average scores were in the thirties. This exercise required a major use of the Bell
Curve to "exonerate my professionals". As I applied the majesty of blending art with
science, I achieved the highest closing ratios in the history of the automobile
business.....at 65%!! This achievement of such a dramatic success ratio caused me to
scoff at the typical braggadocio of industry standard 15-20% closing ratios, preferring to
call them what they really are....80-85% FAILURE RATES.
The most important attributes I possess are passion and experience. Neither can be
compromised or substituted. Rather than seek the comfort zone of "20 Groups" since my
father passed away a dozen years ago, I have engaged the challenges of life, both
personally and professionally, as they have come directly at me. I am confident no dealer
has ever "walked in my shoes" and still been "standing for the EIGHT COUNT". If you
dare to doubt my will to succeed, my courage to face adversity, or the basic tenets of my
belief system, I invite you to simply examine the following profiles of my father, my
mother, my brother, and me....and the journey of our family over a lifetime! As Albert
Einstein said, "Great spirits have always encountered violent opposition from mediocre
minds."

To General Motors:

We the willing (Michael Forrest and Crew)
Led by the unknowing (General Motors)
Have done so much
With so little
For so long
That we can now
Do anything
With Nothing

Michael Forrest