Hearing: August 3, 2009 at 9:45 a.m.
Objections Due: July 28, 2009 at 4:00 p.m.

BOARDMAN, SUHR, CURRY & FIELD, LLP
1 S. Pinckney St., 4th Floor
P. O. Box 927
Madison, WI 53701-0927
Telephone: (608) 283-1759
Facsimile: (608) 283-1709
Gary L. Antoniewicz (pro hac vice motion pending)
Attorneys for Quinlan's Equipment, Inc.

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x

In re
General Motors Corp., *et al.*,
Debtors.

Chapter 11
Case No. 09-50026 (REG)
(Jointly Administered)

--------------------------------------------------------- x

**OBJECTIONS OF QUINLAN'S EQUIPMENT, INC.**
**TO DEBTORS' MOTION PURSUANT TO 11 U.S.C.**
**§ 365 AUTHORIZING (A) THE REJECTION OF**
**EXECUTORY CONTRACTS AND UNEXPIRED**
**LEASES WITH CERTAIN DOMESTIC DEALERS**
**AND (B) GRANTING CERTAIN RELATED RELIEF**

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

This objection is filed on behalf of Quinlan's Equipment, Inc. ("Quinlan's"), 1030 S. Superior Street, Antigo, WI 54409. Quinlan's is a Wisconsin-based franchised dealer of General Motors Corp. ("GM") under a written dealer agreement for the sale and service of GMC vehicles. Quinlan's hereby objects to the rejection of its agreement with GM and to the granting of the related relief requested in the Debtor's motion dated July 6, 2009.

## BACKGROUND

1.  Quinlan's is an "Affected Dealer" identified in paragraph 1(i) of the Debtor's motion and listed on Exhibit A attached thereto.

2.  Quinlan's is a party to a sales and service agreement ("Dealer Agreement") with GM for the sale and service of GMC vehicles which is an "Affected Dealer Agreement" as set forth in paragraph 1(i) of Debtor's motion. Quinlan's has been a GMC dealer under sales and service agreements with GM for over 35 years and operates at a single location.[1]

3.  The Dealer Agreement with GM required Quinlan's to make substantial investments in order to sell and service GMC vehicles including investments in dealership facilities, tools and equipment, personnel, training and advertising. The Dealer Agreement also required Quinlan's to invest in and maintain brand signage and other identifying marks and to purchase and maintain inventories of vehicle parts and accessories.

4.  Most of the investments by Quinlan's have no purpose other than the sale and service of GMC vehicles and will be lost should Quinlan's Dealer Agreement be rejected. But for Quinlan's investments, GM would have been required to make the investment itself in Quinlan's local market.

5.  Because of the nature of Quinlan's investments under its Dealer Agreement with GM, Quinlan's would not have made the investments without adequate assurances that its Dealer Agreement would continue as long as it fulfilled its obligations

---

[1] Quinlan's principal owner, John J. Quinlan has provided an Affidavit in support of these objections and to provide a factual record for the background facts.

2

under the Dealer Agreement. These assurances were provided by GM under the terms of the Dealer Agreement itself and by the Wisconsin legislature. Neither the Dealer Agreement nor Wisconsin law permit termination or rejection by GM simply for its own convenience.

6. In addition to the assurances against termination without cause provided by the Dealer Agreement itself, Quinlan's is protected against such termination by provisions of the Wisconsin Motor Vehicle Dealer Law ("WMVDL") (Wis. Stat. §§ 218.0101-218.0163). Among other things, the WMVDL provides that a motor vehicle manufacturer or distributor may not "unfairly, without due regard to the equities or without just provocation, directly or indirectly cancel[] or fail[] to renew the franchise of any motor vehicle dealer . . .." Wis. Stat. § 218.0116(1)(i). 7. The Debtors have entered into a Transaction Agreement with "New GM" (Debtors' Motion, ¶ 4) and the Debtors have sold GM's assets on a going concern basis to New GM which will then become the distributor of GM vehicles including GMC to the Dealer Network. The Debtors' Rejection Motion is aimed at allowing GM to eliminate Quinlan's from the Dealer Network without having to comply with the Dealer Agreements or the WMVDL.

8. Quinlan's received a "Wind-Down Agreement" from GM as set forth in Debtor's Motion (¶ 9). Quinlan's refused to sign such agreement as it believes that the agreement is unconscionable and sought to force Quinlan's to waive all legal rights under its Dealer Agreement and the WMVDL. Further, the wind-down agreement gave no consideration to Quinlan's individual circumstances, its investment, and that it operated at little or no cost to GM. GM refused to discuss the agreement's terms with Quinlan's and

3

failed to consider the substantial investment of Quinlan's which would be lost under the terms of the agreement.

## ARGUMENT

I. **THE DEBTORS' PROPOSED REJECTION OF QUINLAN'S DEALER AGREEMENT SHOULD NOT BE APPROVED.**

9.     There must be a showing that the debtor's decision to reject an executory contract will benefit the debtor's estate and is an exercise of sound business judgment before the rejection can be approved by the Court. *In re Orion Pictures Corp.*, 4 F.3d 1095 (2nd Cir. 1993), *cert. denied* 114 S. Ct. 1418; *In re Anglo Energy*, 41 B.R. 337 (Bankr. S.D. N.Y. 1984). Because the Debtors have failed to show that the rejection of Quinlan's Dealer Agreement will benefit the bankruptcy estate in this instance, the Debtors' Rejection Motion should be denied.

10.    The rejection of Quinlan's Dealer Agreements will result in Quinlan's having a claim against the bankruptcy estate for breach of the Dealer Agreement. 11 U.S.C. § 365(g); *In re O.P.M. Leasing Services*, 79 B.R. 161 (S.D.N.Y. 1987); *In re Aslan*, 65 B.R. 826 (Bankr. C. D. Cal. 1986). This claim will be substantial. The amount of the claim will be determined in accordance with the state law of Wisconsin. *In re Western Real Estate Fund*, 992 F.2d 592 (10th Cir. 1990); *In re Yasin*, 179 B.R. 43 (Bankr. S.D.N.Y. 1995). Under Wisconsin law, dealers whose dealer agreements are illegally terminated are entitled to damages for lost future profits. *Kealey Pharmacy v. Walgreen Co*, 761 F.2d 345, 352 (7th Cir. 1985). In *Kealey*, lost future profit damages were upheld based on the plaintiff dealers' damage expert calculation that used the "present value of lost sales" by the plaintiffs over a twenty year period multiplied by their "variable profit rate" to determine lost future profits. *Id.* at 352-353 & n.10.

11. This claim against the bankruptcy estate will exist only if Quinlan's Affected Dealer Agreement is rejected. If this agreement is assumed by the Debtors, the claims against the bankruptcy estate will be reduced by the approximate amount of Quinlan's rejection claims. Therefore, the bankruptcy estate cannot be found to be benefited by the rejection of Quinlan's Dealer Agreement unless the Debtors show that there are offsetting cost savings or other benefits resulting from the rejections. *See, In re Southern California Sound Systems,* 69 B.R. 893 (Bankr. S.D. Cal. 1987) (a factor favoring disallowing a motion for rejection is the size of the claim flowing from the breach of contract that results from the rejection); *In re Midwest Polychem,* 61 B.R. 559 (Bankr. N.D. Ill. 1986) (where rejection could result in the other party having a claim for substantial damages for breach of the contract that would not benefit the general creditors, rejection will be denied).

12. The Debtors make several assertions of why a reduction in the Dealer Network will benefit the estate. These assertions can be summarized as follows: (1) a reduction in the Dealer Network will make more GM dealers profitable; (2) the reduction will result in a more optimal size for the Dealer Network; (3) the reduction will reduce the Debtors' expenses for "Dealer Support Programs"; and (4) the reduction can be achieved only through rejection in bankruptcy of certain of Dealer Network dealer agreements.

13. Regarding the first reason, the Debtors have not demonstrated that the Dealer Network is not making adequate profits to satisfactorily compete with other brands. The Debtors are blaming GM's declining market share on overdealering, when the real causes of the decline are GM's excessive production costs due, in part, to higher

5

wage, healthcare and benefit costs compared to its foreign manufacturer competitors and its insufficient investment in smaller, more fuel-efficient vehicles. GM's alleged "overdealering" is a benefit, not a detriment, to its goal of increasing market share because it provides greater convenience for GM sales and service customers compared to competitors with a lower dealer count, especially in smaller markets where the foreign manufacturers generally have no dealer representation.

14. Regarding the second reason, the Debtors have not demonstrated what the optimal size of the Dealer Network is and how the rejection of Quinlan's would make GM more competitive or increase its market share.

15. Regarding the third reason, the Debtors have not demonstrated that rejecting Quinlan's Dealer Agreement will save GM money to any material degree. The cost to a manufacturer of maintaining an individual dealership is negligible and greatly outweighed by the benefits the manufacturer achieves through the dealer's sales of the manufacturer's products.

16. Regarding the fourth reason, the Debtors' Rejection Motion itself suggests the GM Dealer Network has contracted as GM's market share has declined. (¶ 14). To the extent Quinlan's does not have sufficient volume to be profitable going forward, market forces will cause it to exit the Dealer Network. It is not necessary to inflict the drastic consequences of rejection on Quinlan's in order to rationalize the Dealer Network.

17. The rejection of its Dealer Agreement will damage Quinlan's disproportionately to any benefit to be derived by the general creditors of the Debtors from the rejection. If the relief sought by the Debtors' Rejection Motion is fully granted, Quinlan's franchise will terminate without cause and without compliance with the terms

of the Dealer Agreements or the WMVDL. Quinlan's relied on the protections of these agreements and laws in making its substantial investments in single-purpose facilities, equipment and training in order to sell and service GMC products. The revenue streams from these investments will be immediately halted. The facilities and equipment will stand idle or be liquidated for pennies on the dollar. The dealership personnel trained at great expense will need to be laid off. In addition, Quinlan's will have no way to receive payment for its inventory of parts and accessories anywhere near its investment value.

18.    Because Quinlan's would be damaged disproportionately to any benefit to be derived by the general creditors from the granting of the Debtors' Rejection Motion, that motion should be denied. *In re Meehan,* 59 B.R. 380 (Bankr. E.D.N.Y. 1986).

## II. EVEN IF THE AGREEMENT IS REJECTED, THE RELIEF REQUESTED IN DEBTORS' REJECTION MOTION SHOULD BE DENIED.

### A.    The Relief Sought By Debtors.

19.    In addition to requesting this Court's authorization to reject Quinlan's Dealer Agreement, and approval of the rejection, the Debtors' Rejection Motion also requests this Court, *inter alia*, to order: (a) that the Rejected Dealer Agreements are completely broken and all rights are cut off other than through the assertion of Rejection Damage Claims in this Court, (Debtors' Motion, ¶ 48) and (b) Quinlan's is no longer authorized to exercise or enforce rights under state Dealer Laws with respect to its status as an authorized GMC dealer pursuant to the Rejected Dealer Agreements. *Id.* This Relief is inappropriate, beyond this Court's authority and jurisdiction to grant, and should be denied.

20.     "The automobile dealership relationship has been heavily regulated in Wisconsin as in other states for many years--in Wisconsin for more than sixty years." *Chrysler v. Kolosso Auto Sales, Inc.,* 148 F.3d 892, 895 (7th Cir. 1998). The Wisconsin Motor Vehicle Dealer Law (Wis. Stat. §§ 218.0101-218.0163) "'is a remedial statute with a purpose to furnish a motor vehicle dealer with some protection against unfair treatment by a manufacturer" and "was enacted in recognition of the long history of abuse of dealers by manufacturers.'" *Bob Willow Motors, Inc. v. General Motors Corp.,* 872 F.2d 788, 794 (7th Cir. 1989) quoting *Ford Motor Co. v. Lyons,* 137 Wis.2d 397, 405 N.W. 354, 369 (Ct. App. 1987); *see also, Racine Harley-Davidson, Inc. v. State of Wisconsin, Division of Hearings and Appeals,* 2006 WI 86 ¶92, 717 N.W.2d 184, 599-600; *Forest Home Dodge, Inc. v. Karns,* 29 Wis. 2d 78, 85, 138 N.W. 2d 214, 217-18 (1965); *New Motor Vehicle Board of California v. Orrin W. Fox,* 439 U.S. 96, 100-101, 99 S. Ct. 403, 58 L.Ed.2d 361 (1978) ("[t]he disparity in bargaining power between automobile manufacturers and their dealers prompted Congress and some 25 States to enact legislation to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers").

21.     The Wisconsin Motor Vehicle Dealer Law ("WMVDL") includes several safeguards against unfair treatment of motor vehicle dealers by manufacturers. The safeguards most relevant to this case are: (a) a prohibition against a manufacturer unfairly canceling or failing to renew a dealer's franchise without "just provocation" (defined as a material breach of a reasonable provision of the dealer agreement for reasons within the dealer's control, which breach is not cured within a reasonable time after receipt of a written notice of breach) or without "due regard to the equities" (defined as "treatment in

enforcing an agreement that is fair and equitable to a motor vehicle dealer . . . and that is not discriminatory compared to similarly situated dealers . . ."), Wis. Stat. § 218.0116(1)(i); (b) a safeguard against manufacturers circumventing the "unfair cancellation" statute, through the transfer their manufacturing and distribution rights to a new manufacturer or distributor, by providing, in the event of "a change in a manufacturer, importer or distributor, a motor vehicle dealer's franchise[2] granted by a former manufacturer, importer or distributor shall continue in full force and operation under the new manufacturer, importer or distributor," *id.*; (c) the right of "an existing enfranchised dealer" of a line make of motor vehicles to protest the establishment of another dealership of the same line make within the dealer's "relevant market area" and to prevent the other dealership from being established if the Division of Hearings and Appeals, State of Wisconsin determines there is not good cause for the establishment, Wis. Stat. § 218.0116(7); and (d) the obligation of a manufacturer to repurchase a terminated dealer's new vehicles, parts and accessories, special tools and equipment furnishings and signs, Wis. Stat. § 218.0133.

22.    These prohibitions and obligations are imposed on manufacturers and distributors by making them a condition for obtaining and maintaining a license to distribute their vehicles in Wisconsin. Wis. Stat. §§ 218.0114(2), 218.0116(1). In addition, motor vehicle dealers have the right to seek claims for damages and injunctive relief against manufacturers and distributors who do not comply with these and the other provisions of the WMVDL. Wis. Stat. § 218.0163; Wis. Stat. § 218.0116(10).

---

[2] The term "franchise" is defined by the WMVDL as "the right to buy, sell, distribute or service a line make of motor vehicles that is granted to a motor vehicle dealer or distributor by a manufacturer, importer or distributor." Wis. Stat. § 218.0101(13).

9

23. The Debtors' request for Relief is aimed squarely at preventing Quinlan's from asserting claims against New GM under these provisions of the WMVDL. In the absence of this relief, Quinlan's can claim, pursuant to the WMVDL, it is entitled to continue to act as franchised GMC dealer under the Dealer Network established by New GM.

### B. The Relief Sought By Debtors Should Not Be Granted.

#### 1. This Court Does Not Have Jurisdiction To Terminate Or Abrogate The Rejected Dealer Agreements.

24. This Court does not have jurisdiction to terminate the Rejected Dealer Agreements, as requested by the Debtors. The consequence of a rejection under section 365 is a breach of the contract, not a termination. 11 U.S.C. § 365(g); *In re Stoltz*, 315 F.3d 80, 85 n.1 (2d Cir. 2002) (citations omitted) ("Rejection . . . is not the same as termination. A rejected lease is treated as if the debtor breached it immediately prior to the petition date, and the parties are generally left with the rights and remedies available outside of bankruptcy law."); *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997) ("Rejection gives rise to a remedy for breach of contract in the non-debtor party. . . . To determine [the non-debtor's] rights we must turn to state law."); *In re Austin Dev. Co.*, 19 F.3d 1077, 1082 (5th Cir. 1994) ("[Rejection] does not mean that the executory contract or lease has been terminated."); *In re Modern Textile, Inc.*, 900 F.2d 1184, 1191 (8th Cir. 1990) ("[R]ejection operates as a breach of an existing and continuing legal obligation of the debtor, not as a discharge or extinction of the obligation itself."); *In re Yasin*, 179 B.R. at 50 ("Under section 365, rejection constitutes a statutory breach, but does not repudiate or terminate the lease."); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687, 708 (Bankr. S.D.N.Y. 1992) (internal quotation marks omitted) (*quoting* Andrew, Executory

Contracts Revisited, 62 U. Colo. L.R. 1, 16 (1991)) ("Rejection has absolutely no effect upon the contract's continued existence; the contract is not cancelled, repudiated, rescinded, or in any other fashion terminated.").

25.  Thus, even if the Dealer Agreement is rejected, Quinlan's will continue to have contractual and statutory rights under state law. *See In re Austin Development Co.*, 19 F.3d at 1082 ("[I]f rejection were deemed a complete, immediate termination, it is not clear what the measure of the creditor's claim would be."); *In re Haber Oil, Co.*, 12 F.3d 426, 435 (5th Cir. 1994) ("[I]n the absence of controlling federal bankruptcy law, the substantive nature of the property rights held by a bankrupt and its creditors is defined by state law."); *In re Laurait's Inc.*, 219 B.R. 648, 649 (Bankr. D. Mass. 1998) ("[T]he federal statute restricts the powers which may be exercised by federal court officers; it does not expand them beyond what is permitted by state law."). The ultimate fate of the agreement, therefore, must be determined under state law. *See In re Mitchell*, 249 B.R. 55, 58 (Bankr. S.D.N.Y. 2000) ("[T]o determine the effect of rejection, we look to state law."); *In re Walnut Assocs.*, 145 B.R. 489, 494 (Bankr. E.D. Pa. 1992) ("[I]f state law does authorize specific performance under the rejected executory contract, it means that the non-debtor should be able to enforce the contract against the Debtor, irrespective of his rejection of it."); *In re Herschell*, 43 B.R. 680, 682 (Bankr. E.D. Wis. 1984) ("[T]he post-petition contractual relationship between [the debtor and the nondebtor] . . . . is [an] issue which the state court must determine. It falls outside the scope of this court's jurisdiction."). Thus, this Court should deny the Debtors' request that it declare the Rejected Dealer Agreements terminated and abrogated.

2.  **Section 365 of the Bankruptcy Code Does Not Preempt The Rights of Quinlan's With Respect To New GM Arising Under The Rejected Dealer Agreement And State Dealer Laws.**

26. The Bankruptcy Code's "purpose is to minimize fiscal chaos and disruption, not to aggravate it." *In re Friarton Estates Corp.*, 65 B.R. 586, 594 (Bankr. S.D.N.Y. 1986) (internal quotation marks omitted) (*quoting In re Matter of Penn Central Transp. Co.*, 458 F. Supp. 1346, 1356 (E.D. Pa. 1978)). One crucial aspect of avoiding fiscal chaos is the proper application of state laws. *Id.* at 590 (internal quotation marks omitted) (*quoting In re Kennise Diversified Corp.*, 34 B.R. 237, 245 (Bankr. S.D.N.Y. 1983) ("[T]he provisions of the Bankruptcy Code do not and are not intended to provide an automatic mechanism for relieving property owners of the unpleasant effects of valid local laws embodying police and regulatory provisions."). Stated otherwise, "The purpose of bankruptcy is not to permit debtors or nondebtors to wrest competitive advantage by exempting themselves from the myriad of laws that regulate business. Bankruptcy does not grant the debtor a license to eliminate the marginal cost generated by compliance with valid state laws that constrain nonbankrupt competitors." *In re White Crane Trading Co.*, 170 B.R. 694, 702 (Bankr. E.D. Ca. 1994).

27. Both the Second Circuit and this Court have recognized that a rejection under section 365 is merely a breach of contract and that state law determines the consequences of such a breach:

> Rejection gives rise to a remedy for breach of contract in the non-debtor party. The claim is treated as a pre-petition claim .... The Bankruptcy Code treats rejection as a breach so that the non-debtor party will have a viable claim against the debtor. *However, the Code does not determine parties' rights regarding the contract and subsequent breach. To determine these rights we must turn to state law.*

12

*In re Lavigne*, 114 F.3d at 387 (emphasis added); *see, e.g., In re Mitchell*, 249 B.R. at 58 (citations omitted) ("[I]t now appears to be well-settled that rejection does not terminate an executory contract, or necessarily avoid the rights of the non-debtor party under the contract."); *In re Yasin*, 179 B.R. at 50 ("Under section 365, rejection constitutes a statutory breach, but does not repudiate or terminate the lease. The parties must, therefore, resort to state law to determine their rights as a result of the breach."); *see also In re Walnut Assocs.*, 145 B.R. at 494 ("Whether the Agreement is enforceable against the Debtor even after it has been rejected is an issue of state law."). Thus, this Court has recognized the primacy of state law:

> Consistent with bankruptcy law's general deference to state-law rights in or to specific property, rejection of a contract does not terminate such rights that arise from rejected contracts. Rejection is not itself an avoiding power.

*In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. at 709 (internal quotation marks omitted) (*quoting* Andrew, *supra*, at 17).

28. The limited scope of the rejection process under section 365 makes preemption of the state dealership laws inappropriate. The sole function of a rejection is to cause a breach that gives rise to a claim that is dischargeable in the bankruptcy proceeding. *In re Walnut Assocs.*, 145 B.R. at 494 ("[T]he only effect of rejection is that the executory contract in issue is not assumed and the non-debtor party thereto cannot make an administrative claim against the debtor's estate if the debtor fails to fulfill the obligations of the contract."). As discussed, the rejected contract remains in existence and the applicable state law applies to the contract so that the nondebtor's claim can be resolved. It is therefore beyond the scope of the section 365 proceeding to preempt the state laws that define the nondebtor's rights in case of a rejection. *See, e.g., In re*

13

*Friarton Estates Corp.*, 65 B.R. at 593–94 (refusing to allow section 365 to interfere with the proper application of New York City rent-control laws).

29. Nevertheless, Debtors argue that section 365 preempts the state dealership laws through field and conflict preemption. This argument is without merit.

30. The Supreme Court has explained that "Congress did not intend for the Bankruptcy Code to pre-empt all state laws." *Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection*, 474 U.S. 494, 505, 106 S. Ct. 755 (1986). In particular, "Congress has repeatedly expressed its legislative determination that the trustee is not to have *carte blanche* to ignore nonbankruptcy law." *Id.* at 502. Because of this, the Supreme Court has noted that "[i]f Congress wishes to grant the trustee an extraordinary exemption from nonbankruptcy law, 'the intention would be clearly expressed, not left to be collected or inferred from disputable considerations of convenience in administering the estate of the bankrupt.'" *Id.* at 501 (*quoting Swarts v. Hammer*, 194 U.S. 441, 444, 24 S. Ct. 695 (1904)).

31. Recognizing this, courts have refused to find preemption of state law unless there is an "actual conflict" between state law and the Code. *See, e.g., In re Phillips*, 966 F.2d 926, 933 (5th Cir. 1992). And deference to state law holds even when the application of state law may negatively impact the business of the debtor:

> The goals of the federal bankruptcy laws, the rehabilitation of the debtor and the maximization of the estate for the benefit of creditors, "do not authorize transgression of state laws setting requirements for the operation of the business even if the continued operation of the business would be thwarted by applying state law."

*In re Friarton Estates Corp.*, 65 B.R. at 590 (*quoting In re Quanta Resources Corp.*, 739 F.2d 912, 919 (3d Cir. 1984)).

14

32.     Limiting federal preemption is especially important when state regulations, such as the WMVDL, are involved. *See Midlantic Nat'l Bank*, 474 U.S. at 504 (noting Congress's intention that the Bankruptcy Code not preempt actions to enforce state regulatory laws). Such deference is evidenced in various sections of the Bankruptcy Code. For example, actions to enforce a state's "regulatory powers" are exempted from the automatic-stay provision of the Code. *See* 11 U.S.C. § 362(b)(4). The Code also recognizes the authority of state laws over the sale of the debtor's property. *Id.* § 363(f)(1).

33.     Further, Congress specifically enacted 28 U.S.C. § 959 to require a debtor in possession to comply with state laws during the bankruptcy process. The purpose of this provision is to prevent a debtor from using the bankruptcy process to evade valid state laws. *See In re Synergy Dev. Corp.*, 140 B.R. 958, 959 (Bankr. S.D.N.Y. 1992) (*quoting In re Beker Indus. Corp.*, 77 B.R. 611, 624 (Bankr. S.D.N.Y. 1986) ("A chapter 11 debtor 'is not *pro tanto* excused by virtue of its bankruptcy from complying with valid and enforceable state and local regulations. By virtue of 28 U.S.C. § 959(b), it is required to obey them.'"). Consequently, this Court has flatly rejected as "without merit" the argument that the abrogation of state laws can be justified by a debtor's claim that it is "necessary to effect a successful reorganization." *In re Friarton Estates Corp.*, 65 B.R. at 590.

34.     Lower courts have thus refused to allow the Bankruptcy Code to serve as a vehicle for the convenient avoidance of state regulations. *See, e.g., Robinson v. Michigan Consolidated Gas Co.*, 918 F.2d 579 (6th Cir. 1990) (refusing to preempt a Michigan law that protects utility customers); *In re Allied Products Corp.*, 42 Bankr. Ct. Dec. 248 (N.D.

Ill. 2004) (refusing to preempt an Illinois law that protects insurance carriers); *In re Friarton Estates Corp.*, 65 B.R. at 594 (refusing to preempt New York City rent-control laws); *In re Kennise Diversified Corp.*, 34 B.R. at 245 ("The provisions of the Bankruptcy Code do not and are not intended to provide an automatic mechanism for relieving property owners of the unpleasant effects of valid local laws embodying police and regulatory provisions.").

35.    The Debtors, therefore, cannot be allowed to commandeer section 365 to circumvent state dealership laws. Doing so would betray Congress' intention that the Bankruptcy Code can not be used as a mechanism for avoiding state laws that were enacted to protect the health and welfare of state citizens. Because the WMVDL serves that purpose, it should not be preempted.

36.    Nevertheless, the Debtors argue that field preemption applies by virtue of section 365; however field preemption only applies when "Congress evidences an intent to occupy a given field." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248. Congress has made no indication that it intended for section 365 to preempt any field of law, let alone state dealership laws. To the contrary, Congress structured section 365 to function in tandem with state dealership laws: section 365 governs whether a debtor can reject an executory contract, while the state dealership laws determine the nondebtor's remedies in the case of a rejection. Field preemption, therefore, would undermine the proper functioning of section 365.

37.    The Debtors are also incorrect in asserting that the state dealership laws are preempted by conflict preemption. Conflict preemption only applies when state law "actually conflicts with federal law, that is, when it is impossible to comply with both

16

state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood*, 464 U.S. at 248 (citations omitted). In the context of section 365 and state dealership laws, there can be no conflict preemption because the state laws are necessary for the proper functioning of section 365. As discussed, when there is a rejection under section 365, the remedies of the nondebtor are determined according to state law. 11 U.S.C. 365(g); *In re Lavigne*, 114 F.3d at 387. Therefore, state dealership laws do not actually conflict with, or stand as an obstacle to, the proper application of section 365.

38.     In addition, the Debtors' primary support for conflict preemption, *In re Dan Hixson Chevrolet Co.*, does not suggest that preemption would be appropriate in this case. 12 B.R. 917 (Bankr. N.D. Tex 1981). In *Hixson*, a Volkswagen dealership filed for bankruptcy, and Volkswagen attempted to initiate a "good-cause" hearing under the Texas dealership law to allow it to terminate the dealership agreement. *Id.* at 918. The court reasoned that both section 365 and the Texas statute served the same purpose, each created "a mechanism for enforcing the dealer-debtor's right to remain a franchisee," and concluded that preemption was proper because allowing both proceedings to go forward would be "duplicative" and could create a conflict if the two tribunals reached different conclusions. *Id.* at 923-24. Thus, instead of indicating that section 365 preempts state dealership laws, *Hixson* demonstrates that courts will find conflict preemption only when there is an actual conflict with state law. And unlike the Texas law at issue in *Hixson*, the state dealership laws do not conflict with section 365 in this case because they only will affect New GM's obligations to the Affected Dealers and will not interfere with the Debtors' relief under section 365.

WHEREFORE, Quinlan's respectfully requests that the Court deny the Debtors' Rejection Motion, including the Relief sought by that motion.

July 28, 2009

Respectfully submitted,

/s/ Gary L. Antoniewicz
Gary L. Antoniewicz
(*Pro Hac Vice* Motion Pending)
BOARDMAN, SUHR, CURRY & FIELD LLP
1 S. Pinckney St., 4th Floor
P. O. Box 927
Madison, WI 53701-0927
Telephone: (608) 283-1759
Facsimile: (608) 283-1709

F:\DOCS\wd\32913\2\A0875404.DOC