UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:　　Chapter 11 Case No.
MOTORS LIQUIDATION COMPANY, *et al.*,　　:
　　f/k/a General Motors Corp., *et al.*　　　　:
　　　　　　　　　　　　　　　　　　　　　:　　09-50026 (REG)
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Debtors.　　　　　　　　　:　　(Jointly Administered)
　　　　　　　　　　　　　　　　　　　　　:
------------------------------------------------------------X

## CERTIFICATE OF PUBLICATION

I, Angela Ferrante, certify as follows:

　　1.　　I am a Director with the Business Reorganization Department of the Melville office of The Garden City Group, Inc., the claims and noticing agent for the debtors and debtors-in-possession (the "Debtors") in the above-captioned proceeding. The business address for the Melville office is 105 Maxess Road, Melville, New York 11747

　　2.　　On July 6, 2009, at the direction of Weil, Gotshal & Manges LLP, counsel for the Debtors, I caused publication of the **Notice of Final Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates (Docket No. 2539)** in the following publications:

Publication Name

*The New York Times*, National

*The Wall Street Journal*, National

　　3.　　I certify under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated:　Melville, New York
　　　　July 29, 2009

　　　　　　　　　　　　　　　　　　　　　　　　　　/s/  Angela Ferrante
　　　　　　　　　　　　　　　　　　　　　　　　　　　Angela Ferrante

09-50026-mg    Doc 3522    Filed 07/29/09    Entered 07/29/09 19:07:14    Main Document
Pg 2 of 4

# LEGAL NOTICES

**GLOBAL, NATIONAL, REGIONAL**
TO ADVERTISE CALL 1.800.366.3975
FAX: 214.640.7900
ADVERTISING.WSJ.COM
EE MW SW WE

## MEDIA & MARKETING

### ADVERTISING



Quantcast CEO Konrad Feldman, left, and Chief Revenue Officer Todd Teresi

# Quantcast Shakes Up Ad-Targeting Model

BY JESSICA E. VASCELLARO

In a test of the viability of small online-ad companies, **Quantcast** has launched a new online ad-targeting service that is being closely watched by advertisers and investors.

Quantcast, a high-profile San Francisco start-up, is one of dozens of young companies helping broker targeted display ads—which typically contain both text and images, and are aimed at audiences selected for such characteristics as age, income or even probable personality traits.

Some of these start-ups sell targeted ads directly on behalf of media companies and other Web publishers. Others—like Quantcast—provide data to help companies, such as **General Electric**'s NBC Universal and **Time-Warner**'s Time Inc., sell targeted ads on their own.

Investors have poured millions of dollars into the fledgling businesses, hoping to discover the next Google or Yahoo that could change the way ads are sold online.

So far, few of the ad-targeting and data-brokering companies—which also include **Audience-Science** and **BlueKai**—have become big, or even profitable. And lawmakers and regulators have stepped up inquiries into whether the ways they collect and crunch data on Web users' online behavior ought to be more tightly regulated to protect consumer privacy.

Quantcast, which has 65 employees, is attracting attention because it entered the ad-targeting business by the backdoor. In 2006, it started out by offering a free service that allowed Web publishers to track the types of people visiting their sites through software code it placed on the sites. The service put Quantcast in competition with Nielsen and comScore, which track audiences based on the Web-surfing behaviors of panels of Internet users, among other methods.

Now Quantcast plans to translate the technology it has installed on more than 10 million Web sites into revenue. Its new media-buying service, known as Quantcast Media Program, begins by allowing advertisers to create a detailed profile of the types of people they want to reach. Then Quantcast finds Web sites using its measurement technology that are attracting those types of people. It takes a cut of the revenue from the resulting ads sold by the Web sites.

Independent online-media analyst Barry Parr says Quantcast's model of giving away audience data, and charging only when an advertiser buys ads, is likely to appeal to advertisers more than other services that charge publishers upfront for their data.

Some Web sites question whether Quantcast sees enough online activity for its data to be valuable, noting that it still doesn't measure some of the largest sites on the Web. But Quantcast Chief Executive Konrad Feldman says roughly all U.S. Internet users hit a site it tracks every month, and that the real strength of the service is that it allows advertisers to build a custom target audience on the fly.

So far, few advertisers have purchased ads through the new service, which was announced last week. **Home Depot** has bought some on weather-tracking service Weather Underground, according to Richard Lowden, vice president of sales at the weather Web site. However, companies including **Kia Motors** and Virgin America are using Quantcast data to define the types of consumers they want to target online.

Quantcast faces keen competition in the display-ad market, ranging from smaller companies such as **Specific Media** Inc. to larger players like **Yahoo** and Time Warner's AOL.

David Zinman, Yahoo's vice president and general manager for display advertising, says his company recently launched a new ad-targeting service that allows advertisers to show display ads to visitors who searched for certain search terms. "We have data that is only available to Yahoo, and are using it in a very specific and customized way" for advertisers, he says.

Still, some ad professionals are enthusiastic about Quantcast's new service. "Yahoo can do many of the things that Quantcast can do, but they only see behavior on their own networks," says Jacki Kelley, president of North America for Universal McCann, a media agency owned by **Interpublic Group**. She says one of her clients is testing the Quantcast media-buying program.

Peter Naylor, senior vice president of digital media sales for NBC Universal, says he is more confident of Quantcast's data than that of other ad-targeting companies because it has helped NBC run a "fine-tooth comb" through its own audience. NBC used Quantcast to track its Olympics Web sites last year, for instance, and found significant differences between visitors to the site's gymnastics areas, compared with the equestrian ones.

As a result, NBC plans to roll out Quantcast's media-buying program across its online properties. "It helps us find more of an advertiser's target audience," Mr. Naylor says.

### Ice Age, Transformers Tie

*Associated Press*

Prehistoric creatures and robots were in a photo finish for the Fourth of July box-office crown Sunday, with "Transformers: Revenge of the Fallen" and "Ice Age: Dawn of the Dinosaurs" tied with $42.5 million each.

Final numbers Monday will sort out which movie actually came in first.

"I've seen squeakers before in my time, but never one like this,"

---

### THE JOURNAL CROSSWORD

Solution to the puzzle of Friday, July 3



---

## BANKRUPTCIES

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re: GENERAL MOTORS CORP., et al., Debtors.
Chapter 11 Case No. 09-50026 (REG)
(Jointly Administered)

**NOTICE OF FINAL ORDER ESTABLISHING NOTIFICATION PROCEDURES AND APPROVING RESTRICTIONS ON CERTAIN TRANSFERS OF INTERESTS IN THE DEBTORS' ESTATES**

TO ALL PERSONS OR ENTITIES WITH EQUITY INTERESTS IN THE DEBTORS:

PLEASE TAKE NOTICE that on June 1, 2009 (the "Commencement Date"), General Motors Corporation ("GM") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors") commenced a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Section 362(a) of the Bankruptcy Code operates as a stay of any act to obtain possession of property of the Debtors' estates or of property from the Debtors' estates or to exercise control over property of the Debtors' estates.

PLEASE TAKE FURTHER NOTICE that on June 25, 2009 the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having jurisdiction over this chapter 11 case, upon motion of the Debtors (the "Motion"), entered a final order (docket number 2539) (i) finding that the Debtors' net operating loss carryforwards ("NOLs") and certain other tax attributes, including their foreign tax credit and other excess credit carryforwards (together with the NOLs, the "Tax Attributes") are property of the Debtors' estates and are protected by section 362(a) of the Bankruptcy Code, (ii) finding that trading in GM common stock (the "GM Stock") could severely limit the Debtors' ability to use the Tax Attributes for purposes of the Internal Revenue Code of 1986, as amended (the "Tax Code"), and (iii) approving the procedures set forth below to preserve the Tax Attributes pursuant to sections 105(a) and 362(a) of the Bankruptcy Code retroactively effective as of the Commencement Date (the "Final Order"). ANY ACQUISITION IN VIOLATION OF THE RESTRICTIONS SET FORTH BELOW SHALL BE NULL AND VOID AB INITIO AS AN ACT IN VIOLATION OF THE AUTOMATIC STAY UNDER SECTIONS 105(A) AND 362 OF THE BANKRUPTCY CODE.

PLEASE TAKE FURTHER NOTICE that the following procedures and restrictions have been approved by the Bankruptcy Court and shall apply to holding and trading in GM Stock

(1) Notice of Substantial GM Stock Ownership. Any person or Entity (as such term is defined in section 382 of the Code, including persons acting pursuant to a formal or informal understanding among themselves to make a coordinated acquisition) that beneficially owns, at any time on or after the Commencement Date, GM Stock in an amount sufficient to qualify such person or Entity as a Substantial Equityholder (as hereinafter defined) shall file with the Court, and serve upon the Debtors, the attorneys for the Debtors, and the attorneys for any statutory committee of unsecured creditors appointed in these cases (the "Creditors' Committee"), a Notice of Substantial Stock Ownership (a "Substantial Ownership Notice") (visit www.nysb.uscourts.gov or www.gmcourtdocs.com), which describes specifically and in detail the GM Stock ownership of such person or Entity, on or before the date that is the later of: (a) ten (10) days after the entry of the Interim Order or Final Order, as applicable, and (b) ten (10) days after that person or Entity qualifies as a Substantial Equityholder. At the holder's election, the Substantial Ownership Notice to be filed with the Court (but not such notice served upon the Debtors, the attorneys for the Debtors and the attorneys for the Creditors' Committee) may be redacted to exclude such holder's taxpayer identification number and the number of shares of GM Stock that such holder beneficially owns

(2) Acquisition of GM Stock or Options. At least fifteen (15) business days prior to the proposed date of any transfer of equity securities (including Options, as hereinafter defined, to acquire such securities) that would result in an increase in the amount of GM Stock beneficially owned by any person or Entity that currently is or subsequently becomes a Substantial Equityholder or that would result in a person or Entity becoming a Substantial Equityholder (a "Proposed Equity Acquisition Transaction"), such person, Entity or Substantial Equityholder (a "Proposed Equity Transferee") shall file with the Court, and serve upon the Debtors, the attorneys for the Debtors, and the attorneys for the Creditors' Committee, a Notice of Intent to Purchase, Acquire, or Otherwise Accumulate GM Stock (an "Equity Acquisition Notice") (visit www.nysb.uscourts.gov or www.gmcourtdocs.com), which describes specifically and in detail the proposed transaction in which GM Stock is to be acquired. At the holder's election, the Equity Acquisition Notice that is filed with the Court (but not such notice served upon the Debtors, the attorneys for the Debtors and the attorneys for the Creditors' Committee) may be redacted to exclude such holder's taxpayer identification number and the number of shares of GM Stock that such holder beneficially owns and proposes to purchase or otherwise acquire

(3) Disposition of GM Stock or Options. At least fifteen (15) business days prior to the proposed date of any transfer or other disposition of equity securities (including Options to acquire such securities) that would result in a decrease in the amount of GM Stock beneficially owned by a Substantial Equityholder or that would result in a person or Entity ceasing to be a Substantial Equityholder (a "Proposed Equity Disposition Transaction," and together with a Proposed Equity Acquisition Transaction, a "Proposed Equity Transaction"), such person, Entity or Substantial Equityholder (a "Proposed Equity Transferor") shall file with the Court, and serve upon the Debtors, the attorneys for the Debtors, and the attorneys for the Creditors' Committee, a Notice of Intent to Sell, Trade, or Otherwise Transfer GM Stock (an "Equity Disposition Notice," and together with an Equity Acquisition Notice, an "Equity Trading Notice") (visit www.nysb.uscourts.gov or www.gmcourtdocs.com), which describes specifically and in detail the proposed transaction in which GM Stock would be transferred. At the holder's election, the Equity Disposition Notice that is filed with the Court (but not such notice served upon the Debtors, the attorneys for the Debtors and the attorneys for the Creditors' Committee) may be redacted to exclude such holder's taxpayer identification number and the number of shares of GM Stock that such holder beneficially owns and proposes to sell or otherwise transfer

(4) Objection Procedures. The Debtors and the Creditors' Committee shall have ten (10) business days after the filing of an Equity Trading Notice (the "Equity Objection Deadline") to file with the Court and serve on a Proposed Equity Transferee or a Proposed Equity transferor, as the case may be, an objection to any proposed transfer of equity securities (including Options to acquire such securities) described in such Equity Trading Notice on the grounds that such transfer may adversely affect the Debtors' ability to utilize the Tax Attributes (an "Equity Objection") as a result of an ownership change under section 382 or section 383 of the Tax Code

(i) If the Debtors or the Creditors' Committee file an Equity Objection by the Equity Objection Deadline, the Proposed Equity Transaction shall not be effective unless approved by a final and nonappealable order of this Court

(ii) If the Debtors or the Creditors' Committee do not file an Equity Objection by the Equity Objection Deadline, or if the Debtors and the Creditors' Committee provide written authorization to the Proposed Equity Transferee or the Proposed Equity Transferor, as the case may be, approving the Proposed Equity Transaction, prior to the Equity Objection Deadline, then such Proposed Equity Transaction may proceed solely as specifically described in the Equity Trading Notice. Any further Proposed Equity Transaction must be the subject of additional notices as set forth herein with an additional fifteen (15) business day waiting period

(5) Unauthorized Transactions in GM Stock or Options. Effective as of the Commencement Date and until further order of the Court to the contrary, any acquisition, disposition or other transfer of equity securities (including Options to acquire such securities) of the Debtors in violation of the procedures set forth herein shall be null and void ab initio as an act in violation of the automatic stay under sections 105(a) and 362 of the Bankruptcy Code

(6) Definitions. For purposes of the Final Order, the following terms have the following meanings

(i) Substantial Equityholder. A "Substantial Equityholder" is any person or Entity that beneficially owns at least 27,000,000 shares of GM's common stock ("GM Common Stock") (representing approximately 4.5% of all issued and outstanding shares of GM's common stock).

(ii) Beneficial Ownership "Beneficial ownership" (or any variation thereof of GM Stock and Options to acquire GM Stock) shall be determined in accordance with applicable rules under section 382 of the Tax Code, the U S Department of Treasury regulations ("Treasury Regulations") promulgated thereunder and rulings issued by the Internal Revenue Service, and, thus, to the extent provided in those rules, from time to time shall include, without limitation, (A) direct and indirect ownership (e.g., a holding company would be considered to beneficially own all stock owned or acquired by its subsidiaries), (B) ownership by a holder's family members and any group of persons acting pursuant to a formal or informal understanding to make a coordinated acquisition of stock, and (C) in certain cases to the extent set forth in Treasury Regulations Section 1.382-4, the ownership of an Option to acquire GM Stock

(iii) Option. An "Option" to acquire stock includes any contingent purchase, warrant, convertible debt, put, stock subject to risk of forfeiture, contract to acquire stock, or similar interest regardless of whether it is contingent or otherwise not currently exercisable, and

(iv) GM Stock "GM Stock" shall mean GM Common Stock. For the avoidance of doubt, by operation of the definition of beneficial ownership, an owner of an Option to acquire GM Stock may be treated as the owner of such GM Stock

**FAILURE TO FOLLOW THE PROCEDURES SET FORTH IN THIS NOTICE WILL CONSTITUTE A VIOLATION OF THE AUTOMATIC STAY PRESCRIBED BY SECTION 362 OF THE BANKRUPTCY CODE.**

**ANY PROHIBITED ACQUISITION OR OTHER TRANSFER OF GM STOCK IN VIOLATION OF THE FINAL ORDER WILL BE NULL AND VOID AB INITIO AND MAY LEAD TO CONTEMPT, COMPENSATORY DAMAGES, PUNITIVE DAMAGES, OR SANCTIONS BEING IMPOSED BY THE BANKRUPTCY COURT.**

**THE DEBTORS MAY WAIVE, IN WRITING, ANY AND ALL RESTRICTIONS, STAYS, AND NOTIFICATION PROCEDURES CONTAINED IN THE FINAL ORDER, PROVIDED THAT PENDING AND FINAL RESOLUTION OF THE 363 TRANSACTION, THE DEBTORS SHALL NOT GRANT ANY WAIVER WITHOUT THE WRITTEN CONSENT OF NEW GM, WHICH CONSENT SHALL NOT BE UNREASONABLY WITHHELD.**

PLEASE TAKE FURTHER NOTICE that a copy of the Motion (including exhibits) is available for inspection by accessing the website of the Bankruptcy Court at www.nysb.uscourts.gov, or of the Debtors' notice and claims agent, The Garden City Group, Inc., at www.gmcourtdocs.com

PLEASE TAKE FURTHER NOTICE that any person or entity desirous of acquiring an interest restricted by the Final Order may request relief for cause at any time and the Debtors may oppose such relief

PLEASE TAKE FURTHER NOTICE that the requirements set forth in this Notice are in addition to the requirements of Bankruptcy Rule 3001(e) and applicable securities, corporate, and other laws, and do not excuse compliance therewith

BY ORDER OF THE COURT

Dated: New York, New York
June 25, 2009

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone (212) 310-8000
Facsimile. (212) 310-8007
Attorneys for Debtors
and Debtors in Possession

[1] All capitalized terms not expressly defined herein shall have the meaning ascribed to them in the Motion

---

## NOTICE OF SALE

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: Nortel Networks Inc., et al., Debtors.
Chapter 11
Case No. 09-10138 (KG)
(Jointly Administered)

**NOTICE OF PUBLIC AUCTION AND SALE HEARING**

PLEASE TAKE NOTICE that on June 19, 2009, Nortel Networks Inc. ("NNI") and certain of its affiliates ("Nortel"), including debtor Nortel Networks International Inc. ("NNII") and other Nortel entities subject to creditor protection proceedings in the United States and Canada (the "Sellers"), entered into an agreement (the "Agreement") to convey certain assets in Nortel's CDMA and LTE Business (together, the "Assets") to Nokia Siemens Networks B V (the "Purchaser"), as more fully set forth in that motion for approval of the Agreement and other related relief, filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on June 19, 2009 (D.I. 931) (the "Sale Motion"). The Sellers seek to sell to the Purchaser or such other successful bidder(s) at an auction (the "Successful Bidder") the Assets covered by the Agreement free and clear of all liens, claims, encumbrances and other interests pursuant to section 363 of the Bankruptcy Code, except as set forth in the Agreement.

PLEASE TAKE FURTHER NOTICE that the terms and conditions of the proposed sale to the Purchaser are set forth in the Agreement attached to the Sale Motion. The Agreement represents the results of extensive marketing efforts conducted by the Sellers to obtain the highest and best offer for the Assets

PLEASE TAKE FURTHER NOTICE that on June 30, 2009, the Bankruptcy Court entered an order (D.I. 1012) (the "Bidding Procedures Order") approving the bidding procedures (the "Bidding Procedures"), which set the key dates and times related to the sale of the Assets under the Agreement. All interested bidders should carefully read the Bidding Procedures.

PLEASE TAKE FURTHER NOTICE that, pursuant to the terms of the Bidding Procedures Order, an auction (the "Auction") to sell the Assets will be conducted at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006 on **July 24, 2009, at 9:30 a.m. (ET)** (the "Auction Date"). Only the Sellers, the Purchaser, the Committee, the Bondholder Group, and the Monitor and the advisors to each of the foregoing, any creditor of the Sellers and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction

scheduled to be assumed by the Debtors, by counterparties to such agreements (the "Counterparties"), (iii) objections by Counterparties to the adequate assurance of future performance by the Purchaser, and (iv) Counterparties to request adequate assurance information regarding bidders other than the Purchaser that will or may participate at the Auction (the "General Objection Deadline"), (b) **July 21, 2009 at 4:00 p.m. (ET)** as the Bid Deadline (as defined in the Bidding Procedures), and (c) **July 27, 2009 at 4:00 p.m. (ET)** as the deadline for supplemental objections with respect to objections regarding adequate assurance of future performance by Qualified Bidders other than the Purchaser

PLEASE TAKE FURTHER NOTICE that all general objections to the relief requested in the Sale Motion, other than those made by Counterparties, must be (a) in writing, (b) signed by counsel or attested to by the objecting party, (c) conform to the Bankruptcy Rules and the Local Rules, (d) filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801 by no later than the General Objection Deadline, or other applicable deadline as indicated above, and (e) served in a manner to allow the Local Rules so as to be received on or before the Objection Deadline by the following, (i) counsel to the Debtors Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Fax (212) 225-3999 (Attn James L Bromley and Lisa M Schweitzer) and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax (302) 658-3989 (Attn Derek C Abbott), (b) counsel to the Purchaser Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates, Four Times Square, New York, New York 10036, Fax (212) 735-2000 (Attn N Lynn Hiestand) and Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates, One Rodney Square, PO Box 636, Wilmington, Delaware 19899, Fax (302) 651-3000 (Attn Sarah E Pierce and Gregg M Galardi), (c) counsel to the Committee. Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Fax (212) 872-1002 (Attn Fred S Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton & Finger, P A, One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn Christopher M Samis), and (d) counsel to the Bondholder Group Milbank, Tweed, Hadley & McCloy, One Chase Manhattan Plaza, New York, New York 10006, Fax (212) 822-5735 (Attn Roland Hlawaty)

PLEASE TAKE FURTHER NOTICE that this notice is subject to the full terms and conditions of the Sale Motion, the Bidding Procedures Order and the Bidding Procedures and Nortel encourages parties in interest to review such documents in their entirety. Copies of the Sale Motion, the Agreement, and the Bidding Procedures Order (including the Bidding Procedures) are annexed to the Bankruptcy

---

## PUBLIC NOTICES

**Notice to Investors in the Mortgage Asset Backed Pass-Through Certificates RALI Series 2006-Q02, 2006-Q03 and 2006-Q06 Securitizations**

Goldman, Sachs & Co. ("Goldman Sachs") wishes to inform holders of the Mortgage Asset Backed Pass-Through Certificates RALI Trust Series 2006-Q02, 2006-Q03 and 2006-Q06 securitizations ("RALI 2006-Q02," "RALI 2006-Q03" and "RALI 2006-Q06," respectively) that it has become aware of an inconsistency between the definition of "Trigger Event" in the Final Term Sheets for the respective transactions, on one hand, and the Prospectus Supplements (and Pooling and Servicing Agreements) for the respective transactions, on the other. Goldman Sachs highlights this discrepancy to inform certificateholders that the distribution payments to be made with respect to certain classes of certificates for the respective transactions may not be consistent with the structure described in the Term Sheets.

Pursuant to the Term Sheets, in the event of certain realized losses, proceeds from the mortgage loans are to be distributed such that principal collections on the mortgage loans are allocated sequentially to reduce the principal balance of the Class A-1 certificates first, the Class A-2 certificates second and the Class A-3 certificates third. Pursuant to the Prospectus Supplements (and Pooling and Servicing Agreements), however, principal collections are allocated to Classes A-1, A-2 and A-3 on a pro rata basis.

The definition of "Trigger Event" in the Prospectus Supplements (and the Pooling and Servicing Agreements) requires the occurrence of a "Stepdown Date," which in turn requires that the aggregate stated principal balance of the mortgage loans exceed the aggregate stated principal balance of the Class A and Class M certificates by certain specified amounts. Under this definition, even if certain realized losses reach the levels specified in subparagraph (ii) of the definition, a Trigger Event will not be in effect unless a "Stepdown Date" has occurred. In contrast, under the definition of "Trigger Event" in the Term Sheets, if realized losses reach the specified levels, a "Trigger Event" will occur regardless of whether a "Stepdown Date" has occurred.

We have discussed this matter with Residential Funding Company LLC (the master servicer and sponsor), and with U.S. Bank National Association and Deutsche Bank Trust Company Americas (the trustees) and to date no action has been taken to address the issue.

If you have any questions, please contact Sang Kim at (212) 902-8680.

---

## BIDS & PROPOSALS

 **GLOBAL NOTICE INVITING TENDER**  WorleyParsons

M/s. Worley Parsons Engineering Pvt. Ltd. on behalf of Hindustan Petroleum Corporation Limited (HPCL) invites tenders under Single Stage two bids system from eligible Bidders for GGSR Products Evacuation Project, as per details given in the Tender Document:

**TENDER NO.: 0435-JH0902-00-PP-RFQ-0005.**

**ITEM: Supply of Density Meters (Vibrating Tube Type)**

| | |
|---|---|
| Sale Period for Bid Document | From 01/07/2009 to 20/07/2009 |
| Bid Due Date & Time | Upto 15.00 Hrs (IST) on 21/07/2009 |
| Unpriced Bid Opening Date & Time | At 15.30 Hrs (IST) on 21/07/2009 |
| **Bid Security:** | |
| Indian Bidder | Rs. 200,000.00 |
| Foreign Bidder | US$ 4,500.00 |
| **Tender Document Fee** | |
| For Indian Bidder | Rs. 5,000.00 |
| For Foreign Bidder | US$ 100.00 |

*For further details visit HPCL's website:*
http://www.hindustanpetroleum.com or
www.worleyparsons.com/mumbaitenders

Contact Detail: Sr. Manager Procurement, Worley Parsons Engineering Pvt. Ltd,
Sanghi Oxygen Compound, 1, Mahal Industrial Estate, Mahakali Caves Road,
Andheri (E), Mumbai 400 093 Tel: 91-22-67818000 Fax: 91-22-67818080

**SAVE FUEL YAANI SAVE MONEY**

---



Be in the Legal Loop

Legal Notices in

09-50026-mg    Doc 3522    Filed 07/29/09    Entered 07/29/09 19:07:14    Main Document
Pg 3 of 4

### INDEX TO BUSINESSES

These indexes cite notable references to most parent companies and people in today's edition. Articles on regional page inserts aren't cited in these indexes.

**A**
Advanced Micro Devices .... C3
Amazon.com .... C6
American Capital Strategies .... A10
Angelo & Banta .... B1
Applied Materials .... B4
ArcelorMittal .... C3
Arctic Cat .... A3
AudienceScience .... B7
AutoNation .... B1

**B**
BAE Systems .... B4
Bain & Co. .... B6
Barclays .... C6
Beijing Automotive Industry Holding .... B4
Best Buy Co .... B4
BHP Billiton .... C2
Blackstone Group .... C2
Blank Rome .... B2
BlueKai .... B7
Boeing .... B4
BP .... B2
Brammo .... B4
British Airways .... B4

**C**
C.F Martin .... B1
Caisse de Dépôt et Placement du Québec C4
Canara Bank .... C2
Chamberlain, Hrdlicka, White, Williams & Martin .... B2
Chevron .... A9
China Investment Corp. .... C2
China Mobile .... B4
China Telecom .... B4
China Unicom (Hong Kong) .... B4
China National Petroleum .... B2
Chrysler Group .... B2
Circuit City Stores .... C6
Cisco Systems .... C1
Citigroup .... C1
Contact Energy .... C2
Crestview Partners .... C4

**D-E**
Deloitte Consulting LLP .... B6
DigitalBridge Communications .... C1
Dubai World .... B1

**F**
Fiat .... B2,B4
Flywheel Ventures .... C4
Fortescue Metals .... C2

**G**
Gap .... A10
GAZ Group .... B4
Gazprom .... C6
General Electric .... B7
General Motors .... B1,B4,C1
Georgia Pacific .... B2
Gerdau .... C3
Goodman Group .... C2

**H**
Hale-Halsell .... A10
Hedges, Quinn Emanuel Urquhart Oliver & .... B1
Hellman & Friedman .... C4
Home Depot .... B7
HSBC Holdings .... C2
Hutchinson & Steffen .... B1

**I**
ING Groep .... C2
Inpex .... C2
Intel .... C1
Interpublic Group .... B7

**J**
JDS Uniphase .... B6
JFE Holdings .... C2
J P Morgan Chase .... C1

**K**
Kia Motors .... B7

**L**
Lehman Brothers Foundation .... C6
Leighton Holdings .... B4
Levi Strauss .... A10
LG Electronics .... C2
Lloyds Banking Group .... C2
L.M Ericsson .... B4

**M**
Magna Intl .... B4
MGM Mirage .... B1
Miller UK .... C2
Miox .... C4
Morgan, Lewis & Bockius .... B2
Morgan Stanley .... B4,C2

**N**
Neuberger Berman .... C6
New Mountain Capital C4
Nippon Yusen .... C2
Novak Biddle Venture Partners .... C1

Nucor .... C3

**O**
Origin .... C2

**P**
Paris Re Holdings .... C4
PartnerRe .... C4
Punjab National Bank C2
PVM Oil Associates .... C2

**Q**
Quantcast .... B7

**R**
RockPort Capital Partners .... C4
Royal Bank of Scotland Group .... C2
Royal Dutch Shell .... A9

**S**
SAIC .... B4
Samsung Engineering .... B4,C2
Samsung Electronics .... C2
Santa Cruz Guitar .... B1
Santos .... C2
Sberbank Rossia .... B4
Segway .... B4
Severstal .... C3
Solyndra .... C4
Sonatrach .... B4,C2
Specific Media .... B7
Standard Chartered .... C2
State Bank of India .... C2
States Industries .... A10
Steel Dynamics .... C3
Stone Point Capital .... C4
SunGard Data Systems .... B2

**T**
Tata Realty & Infrastructure .... B4
Taylor Guitars .... B2
Teck Resources .... C2
Telecom Corp .... C2
Time-Warner .... B7
Total SA .... B2
Tower Records .... A10

**V**
Vestar Capital Partners .... C4
VF .... A10

**W**
Wells Fargo & Co .... C1

**Y**
Yahoo .... B7

### INDEX TO PEOPLE

**A**
Arb, Sherrie Childers .... B2
Atkins, Howard .... C1

**B**
Baker, Stephen .... B4
Banerji, Anup .... C2
Behravesh, Nariman .... A2
Benchimol, Albert .... C4
Bramscher, Craig .... B4
Branca, John .... A4
Buchholz, Carl M .... B2

**C**
Childs, John .... B2
Clarke, Troy .... B2
Connot, Mark .... B1

**D**
Danics, Neil .... C4
Davis, George .... C3
Davis, Jonathan .... B4
Dergarabedian, Paul .... B7
Dunn, Brian .... B4

**F**
Feldman, Konrad .... B7
Ferrando, Jon .... B1
Forster, Carl-Peter .... B4
Franks, Julian .... C2
Fridson, Martin .... C6

**G**
Given, Jeff .... C3
Gosbee, George F.J .... B2

**H**
Havenstein, Walt .... B4
Hoover, Richard .... B2
Horsnell, Paul .... C1

**J**
Johannpeter, Andre Gerdau .... C3

**K**
Katsenelson, Vitaliy .... C1
Korn, Michael .... C1

**L**
Lichtenstein, John .... C3
Listug, Kurt .... B2
Lou Jiwei .... C2

**M**
Martin, Chris .... B1
McClain, John .... A4
McDermott, Chuck .... C4
McMillan, L. Londell .... A4
Miller, Dave .... B4
Morrow, Tom .... B4
Murren, Jim .... B1

**N**
Nayakuti, Jyothi .... C2

**P**
Parkin, Chris .... C2
Parr, Barry .... B7
Perea, Carlos .... C4
Perkins .... C2
Perkins, Steve .... C2
Pursell, Dave .... C1

**Q**
Quinn, John .... B1

**R**
Raynor, Michael .... B6
Real, Kim Sanchez .... C4
Reddem, Vasundhara .... C2
Reddy, B Madhava .... C2

Redward, Peter .... C3
Risoli, Wayne .... B2
Robinet, Michael .... B2
Rosenberg, David .... C3
Roth, Daphne .... C2

**S**
Scholl, Tom .... C1
Schwartz, Peter .... B6
Sheng, Andrew .... C3
Silbey, Victoria .... B2
Simko, Sean .... C3
Smith, Dennis .... B1
Sohn, Sung Won .... C3
Steenland, Douglas .... B2
Stern, Nicholas .... C2
Stuart, Scott .... B2
Stumpf, John .... C1

**T**
Tew, Michael .... C4
Thomas, Bradley .... B4
Thompson, Ronald L. .... B2
Trenert, Jason DeSena .... C3

**V**
Vellequette, Dave .... B6
Verleger, Phil .... C1

**W**
Wallace, Bill .... C4
Wang, Jesse .... C2
Werbin, Stan .... B1
White, Todd .... C3
Wolf, Stephen .... B2
Wolfensohn, James .... C2

**Z**
Zinni, Anthony .... B4
Zinni, BAE's Anthony .... B4

## CORPORATE NEWS

# Five Chrysler Directors Are Named

### New Appointees Fill Out Nine-Member Board Ahead of Meeting in Late July

**By Kate Linebaugh**

DETROIT—**Chrysler Group** LLC, seeking to rebuild after its exit from bankruptcy court, said five new directors were named to its board, finalizing the composition of the nine-member panel, which will hold its first meeting at the end of the month.

The new appointees are: George F.J. Gosbee, chairman and president of Tristone Capital Inc.; Douglas Steenland, former chief executive of Northwest Airlines; Scott Stuart, a founding partner of Sageview Capital LLC; Ronald L. Thompson, chairman of the board of trustees for Teachers Insurance and Annuity Association; and Stephen Wolf, chairman of R.R. Donnelley & Sons Co.

*Scott Stuart*

"The formal creation of our board of directors is another important step toward building a viable Chrysler Group for the long term," said acting Chairman C. Robert Kidder, in a statement.

The new management at Chrysler, which owes its survival to a U.S. government-financed restructuring, needs to devise a strategy to withstand the car market's current weakness while putting together a longer-term plan to expand Chrysler's vehicle lineup to include fuel-efficient small cars provided by its new alliance partner, **Fiat SpA**.

Fiat CEO Sergio Marchionne, who holds the same title at Chrysler, is in the process of determining which vehicle models the company will continue to produce and where it will do so. Mr. Marchionne has set up a new management structure and aims to strengthen the identity of the company's three brands: Dodge, Jeep and Chrysler. Fiat plans to produce its 500 subcompact in the U.S. as part of the alliance.

But with demand for new vehicles showing continued weakness and consumers concerned about the company's future, Chrysler's sales have suffered disproportionately. In June its sales fell 42% as the overall market's slide slowed to 28%. The company is also in the process of ramping up production after an extended shutdown during bankruptcy that left some dealers with short supply.


*Douglas Steenland*

The new appointees to the board join Mr. Kidder, who was named chairman in May; Mr. Marchionne, Alfredo Altavilla, chief executive of Fiat Powertrain Technologies; and James Blanchard, the former Michigan governor who was appointed to represent the interests of a United Auto Workers union health-care trust fund.

The board reflects the new ownership of the Auburn Hills, Mich.-based auto maker, which emerged last month from 42 days in bankruptcy proceedings. The U.S. government took an 8% stake of the revamped Chrysler in exchange for $9 billion of loans. Fiat, which is providing Chrysler with small-car designs and engines it can build and sell in the U.S., has a 20% stake. The UAW health-care trust fund has a 55% stake.

The U.S. government appointed four of the directors: Messrs. Kidder, Steenland, Stuart and Thompson, according to a person familiar with the matter. Fiat appointed Messrs. Wolf, Marchionne and Altavilla, and the Canadian government appointed Mr. Gosbee, this person said.

---

# Political Criteria Factored Into GM Plant

*Continued from the prior page*

Democratic stronghold. The Orion site, 35 miles from GM's Detroit headquarters, is also close to tens of thousands of current and former United Auto Workers union employees, whose pressure previously helped persuade GM to scrap plans to build the car overseas.

The area has one of the region's highest unemployment rates, at 12.4%, though the Wisconsin site's was even higher, at 12.9%. Janesville, by contrast, offered a less-expensive labor pool, according to people briefed on the plan. In Spring Hill, GM has a new, $225 million paint shop. The Orion plant's paint shop needs to be replaced.

Set to emerge from bankruptcy within weeks, GM declined to disclose the factors it weighed in picking Orion, but said the process was free of political meddling.

"It's in the best interest of all involved to not discuss the selection criteria for the small-car plant," said GM spokeswoman Sherrie Childers Arb. "All three plants have individual merits, but when all told, the Orion plant scenario provided the best business case."

The federal government's outsize role in the new GM has already raised concerns about the mixing of politics and commerce. Lawmakers, such as Rep. Barney Frank (D-Mass.), chairman of the powerful House Financial Services Committee, have squeezed GM to reject plant closures in their districts. Obama administration officials have prodded the car giant to develop smaller, more fuel-efficient cars.

The multistate tussle over the compact-car plant was itself the byproduct of political pressure. This spring, while seeking upward of $50 billion in federal assistance to shed debt and keep afloat, GM disclosed plans to import a new line of compact cars the size of a Toyota Yaris from China. That sparked an outcry from the UAW and from Congress, which put pressure on the Obama administration to persuade GM to drop the plan and build the cars in the U.S. GM, already deeply indebted to the government, agreed.

GM plans to invest more than $800 million to retool the Orion plant, with the aim of building its first U.S.-made compacts by 2011. The operation is expected to employ 1,400 workers. The UAW agreed to allow GM to employ lower-cost workers making $14 to $16.23 an hour, compared with the current base wage of $28 an hour, with less-expensive benefits than traditional assembly-line personnel.

Troy Clarke, GM's head of North American production, told reporters after the Orion announcement that GM was confident "that we have the ability to do this on a very cost-competitive basis."

Even with the labor savings, analysts question the logic of building a compact car in the U.S. Margins are so tight that even Toyota and Honda have opted to build their smallest models in countries with lower labor costs.

"Virtually nobody makes cars that size in the U.S.," said CSM Worldwide automotive analyst Michael Robinet. "There is a reason why GM at the outset was going to bring this car in from China."

Various estimates peg GM's losses on U.S.-built small cars at roughly $1,000 to $2,000 per vehicle sold in recent years. Lawmakers and congressional staffers involved in the compact-car competition said GM acknowledged the company expected to struggle to break even on the venture.

GM views small cars as central to its bid to become what Mr. Clarke called "the greenest car company in the world."

Anticipating higher gasoline prices, the cars will be "more and more toward the sweet spot of the market" when they roll off the assembly line sometime after 2012, Mr. Clarke said.

Even before the competition got under way, GM officials told the U.S. auto task force in late May they were inclined to pick the Orion facility.

Tennessee's Sen. Corker said GM made it clear the winner would have to offer a large monetary incentive, a condition that put both Tennessee and Wisconsin at a disadvantage. "Our state doesn't write big checks," Mr. Corker said.

Michigan won the bidding by offering $779 million in business tax credits over the next 20 years, along with $130 million in federal funds for worker training. Local officials threw in another $102 million in incentives.

In announcing the winner, Mr. Clarke said that the state of Michigan has put forward "a very, very, very good offer."


General Motors chose the Orion, Mich., factory over two other candidates to build its new compact car.

---

# Total, CNPC Now Plan to Bid On Two Venezuelan Oil Sites

**By Simon Hall**

BEIJING—**Total SA** of France and state oil company **China National Petroleum** Corp. now plan to bid for two large oil blocks being auctioned in Venezuela, instead of one in which they had previously shown interest, two people involved in the bidding round said.

"Total and CNPC are now bidding for two heavy-oil blocks, and their bid includes building upgraded facilities to process the oil," one of the people said.

The near failure of Iraq's licensing round this past week, nies showing interest in Venezuelan concessions when they make final adjustments to their offers.

Coincidentally CNPC, in partnership with **BP PLC**, won the contract for Iraq's Rumaila oil field—Iraq's largest oil field and one of the world's biggest.

A successful auction in Venezuela would allow Caracas, by using funds from foreign companies, to develop oil reserves it can't afford to own on its own and help it trim dependency on the U.S. as the main buyer of its oil.

A CNPC spokesman on Friday said he had no information about the matter.

---

# Guitar Maker Reprises No-Frills Act From '30s

*Continued from the prior page*

**Cruz Guitar** Co., a small California producer, recently introduced a "1929 model," which company President Richard Hoover says is "not so much about austerity. But it's simple, and most importantly, something that feels OK to indulge yourself in during difficult times." The 1929 sells for $3,500.

Kurt Listug, chief executive of **Taylor Guitars** in El Cajon, Calif., says he has no intention of developing less expensive models. He doesn't believe the current slump will make any long-term changes in the types of guitars



hand. Pieces are fitted and glued by workers hunched over workbenches. Workers tune each guitar carefully to make sure its sound is true.

The upshot is extreme flexibility, which is critical in the recession, when fortunes turned swiftly and unexpectedly. The ability to come up with a new design quickly and without tearing apart a production process allowed Martin to get a lower priced product into stores without a huge investment.

Subtle differences in construction are crucial in acoustic guitars. In the case of the new

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re                          Chapter 11 Case No.
GENERAL MOTORS              09-50026 (REG)
CORP., et al.,
                Debtors.    : (Jointly Administered)

NOTICE OF FINAL ORDER ESTABLISHING
NOTIFICATION PROCEDURES AND APPROVING
RESTRICTIONS ON CERTAIN TRANSFERS OF
INTERESTS IN THE DEBTORS' ESTATES

TO ALL PERSONS OR ENTITIES WITH EQUITY INTERESTS IN THE DEBTORS:

PLEASE TAKE NOTICE that on June 1, 2009 (the "Commencement Date"), General Motors Corporation ("GM") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors") commenced a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Section 362(a) of the Bankruptcy Code operates as a stay of any act to obtain possession of property of the Debtors' estates or of property from the Debtors' estates or to exercise control over property of the Debtors' estates.

PLEASE TAKE FURTHER NOTICE that on June 25, 2009 the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having jurisdiction over this chapter 11 case, upon motion of the Debtors (the "Motion"), entered a final order (docket number 2529) (i) finding that the Debtors' net operating loss carryforwards ("NOLs") and certain other tax attributes, including their foreign tax credit and other excess credit carryforwards (together with the NOLs, the "Tax Attributes") are property of the Debtors' estates and are protected by section 362(a) of the Bankruptcy Code; (ii) finding that trading in GM common stock (the "GM Stock") could severely limit the Debtors' ability to use the Tax Attributes for purposes of the Internal Revenue Code of 1986, as amended (the "Tax Code"), and (iii) approving the procedures set forth below to preserve the Tax Attributes pursuant to sections 105(a) and 362(a) of the Bankruptcy Code retroactively effective as of the Commencement Date (the "Final Order"). ANY ACQUISITION IN VIOLATION OF THE RESTRICTIONS SET FORTH BELOW SHALL BE NULL AND VOID AB INITIO AS AN ACT IN VIOLATION OF THE AUTOMATIC STAY UNDER SECTIONS 105(A) AND 362 OF THE BANKRUPTCY CODE.

PLEASE TAKE FURTHER NOTICE that the following procedures and restrictions have been approved by the Bankruptcy Court and shall apply to holding and trading in GM Stock:

(1) Notice of Substantial GM Stock Ownership. Any person or Entity (as such term is defined in section 382 of the Code, including persons acting pursuant to a formal or informal understanding among themselves to make a coordinated acquisition) that beneficially owns, at any time on or after the Commencement Date, GM Stock in an amount sufficient to qualify such person or Entity as a Substantial Equityholder (as hereinafter defined) shall file with the Court, and serve upon the Debtors, the attorneys for the Debtors, and the attorneys for any statutory committee of unsecured creditors appointed in these cases (the "Creditors' Committee"), a Notice of Substantial Stock Ownership (a "Substantial Ownership Notice") (visit www.nysb.uscourts.gov or www.gmcourtdocs.com), which describes specifically and in detail the GM Stock ownership of such person or Entity, on or before the date that is the later of, (a) ten (10) days after the entry of the Interim Order or Final Order, as applicable, and (b) ten (10) days after that person or Entity qualifies as a Substantial Equityholder. At the holder's election, the Substantial Ownership Notice to be filed with the Court (but not such notice served upon the Debtors, the attorneys for the Debtors and the attorneys for the Creditors' Committee) may be redacted to exclude such holder's taxpayer identification number and the number of shares of GM Stock that such holder beneficially owns.

(2) Acquisition of GM Stock or Options. At least fifteen (15) business days prior to the proposed date of any transfer of equity securities (including Options, as hereinafter defined, to acquire such securities) that would result in an increase in the amount of GM Stock beneficially owned by any person or Entity that currently is or subsequently becomes a Substantial Equityholder or that would result in a person or Entity becoming a Substantial Equityholder (a "Proposed Equity Acquisition Transaction"), such person, Entity, or Substantial Equityholder (a "Proposed Equity Transferee") shall file with the Court, and serve upon the Debtors, the attorneys for the Debtors, and the attorneys for the Creditors' Committee, a Notice of Intent to Purchase, Acquire, or Otherwise Accumulate GM Stock (an "Equity Acquisition Notice") (visit www.nysb.uscourts.gov or www.gmcourtdocs.com), which describes specifically and in detail the proposed transaction in which GM Stock is to be acquired. At the holder's election, the Equity Acquisition Notice that is filed with the Court (but not such notice served upon the Debtors, the attorneys for the Debtors and the attorneys for the Creditors' Committee) may be redacted to exclude such holder's taxpayer identification number and the number of shares of GM Stock that such holder beneficially owns and proposes to purchase or otherwise acquire

(3) Disposition of GM Stock or Options. At least fifteen (15) business days prior to the proposed date of any transfer or other disposition of equity securities (including Options to acquire such securities) that would result in a decrease in the amount of GM Stock beneficially owned by a Substantial Equityholder or that would result in a person or Entity ceasing to be a Substantial Equityholder (a "Proposed Equity Disposition Transaction", and together with a Proposed Equity Acquisition Transaction, a "Proposed Equity Transaction"), such person, Entity, or Substantial Equityholder (a "Proposed Equity Transferor") shall file with the Court, and serve upon the Debtors, the attorneys for the Debtors, and the attorneys for the Creditors' Committee, a Notice of Intent to Sell, Trade, or Otherwise Transfer GM Stock (an "Equity Disposition Notice," and together with an Equity Acquisition Notice, an "Equity Trading Notice") (visit www.nysb.uscourts.gov or www.gmcourtdocs.com), which describes specifically and in detail the proposed transaction in which GM Stock would be transferred. At the holder's election, the Equity Disposition Notice that is filed with the Court (but not such notice

served upon the Debtors, the attorneys for the Debtors and the attorneys for the Creditors' Committee) may be redacted to exclude such holder's taxpayer identification number and the number of shares of GM Stock that such holder beneficially owns and proposes to sell or otherwise transfer.

(4) Objection Procedures. The Debtors and the Creditors' Committee shall have ten (10) business days after the filing of an Equity Trading Notice (the "Equity Objection Deadline") to file with the Court and serve on a Proposed Equity Transferee or a Proposed Equity Transferor, as the case may be, an objection to any proposed transfer of equity securities (including Options to acquire such securities) described in such Equity Trading Notice on the grounds that such transfer may adversely affect the Debtors' ability to utilize the Tax Attributes (an "Equity Objection") as a result of an ownership change under section 382 or section 383 of the Tax Code.

(i) If the Debtors or the Creditors' Committee file an Equity Objection by the Equity Objection Deadline, then the Proposed Equity Transaction shall not be effective unless approved by a final and non-appealable order of this Court.

(ii) If the Debtors or the Creditors' Committee do not file an Equity Objection by the Equity Objection Deadline, or if the Debtors and the Creditors' Committee provide written authorization to the Proposed Equity Transferee or the Proposed Equity Transferor, as the case may be, approving the Proposed Equity Transaction, prior to the Equity Objection Deadline, then such Proposed Equity Transaction may proceed solely as specifically described in the Equity Trading Notice. Any further Proposed Equity Transaction must be the subject of additional notices as set forth herein with an additional fifteen (15) business day waiting period.

(5) Unauthorized Transactions in GM Stock or Options. Effective as of the Commencement Date and until further order of the Court to the contrary, any acquisition, disposition or other transfer of equity securities (including Options to acquire such securities) of the Debtors in violation of the procedures set forth herein shall be null and void ab initio as an act in violation of the automatic stay under sections 105(a) and 362 of the Bankruptcy Code.

(6) Definitions. For purposes of the Final Order, the following terms have the following meanings.

(i) Substantial Equityholder. A "Substantial Equityholder" is any person or Entity that beneficially owns at least 27,000,000 shares of GM's common stock ("GM Common Stock") (representing approximately 4.5% of all issued and outstanding shares of GM's common stock)

(ii) Beneficial Ownership. "Beneficial ownership" (or any variation thereof of GM Stock and Options to acquire GM Stock) shall be determined in accordance with applicable rules under section 382 of the Tax Code, the U.S. Department of Treasury regulations ("Treasury Regulations") promulgated thereunder and rulings issued by the Internal Revenue Service, and, thus, to the extent provided in those rules, from time to time shall include, without limitation, (A) direct and indirect ownership (e.g., a holding company would be considered to beneficially own all stock owned or acquired by its subsidiaries), (B) ownership by a holder's family members and any group of persons acting pursuant to a formal or informal understanding to make a coordinated acquisition of stock, and (C) in certain cases to the extent set forth in Treasury Regulations Section 1.382-4, the ownership of an Option to acquire GM Stock.

(iii) Option. An "Option" to acquire stock includes any contingent purchase, warrant, convertible debt, put, stock subject to risk of forfeiture, contract to acquire stock, or similar interest regardless of whether it is contingent or otherwise not currently exercisable, and

(iv) GM Stock. "GM Stock" shall mean GM Common Stock For the avoidance of doubt, by operation of the definition of beneficial ownership, an owner of an Option to acquire GM Stock may be treated as the owner of such GM Stock

FAILURE TO FOLLOW THE PROCEDURES SET FORTH IN THIS NOTICE WILL CONSTITUTE A VIOLATION OF THE AUTOMATIC STAY PRESCRIBED BY SECTION 362 OF THE BANKRUPTCY CODE. ANY PROHIBITED ACQUISITION OR OTHER TRANSFER OF GM STOCK IN VIOLATION OF THE FINAL ORDER WILL BE NULL AND VOID AB INITIO AND MAY LEAD TO CONTEMPT, COMPENSATORY DAMAGES, PUNITIVE DAMAGES, OR SANCTIONS BEING IMPOSED BY THE BANKRUPTCY COURT.

THE DEBTORS MAY WAIVE, IN WRITING, ANY AND ALL RESTRICTIONS, STAYS, AND NOTIFICATION PROCEDURES CONTAINED IN THE FINAL ORDER, PROVIDED THAT PENDING AND AFTER THE 363 TRANSACTION, THE DEBTORS SHALL NOT GRANT ANY WAIVER WITHOUT THE WRITTEN CONSENT OF NEW GM, WHICH CONSENT SHALL NOT BE UNREASONABLY WITHHELD.

PLEASE TAKE FURTHER NOTICE that a copy of the Motion (including exhibits) is available for inspection by accessing the website of the Bankruptcy Court at www.nysb.uscourts.gov, or of the Debtors' notice and claims agent, The Garden City Group, Inc, at www.gmcourtdocs.com

PLEASE TAKE FURTHER NOTICE that any person or entity desirous of acquiring an interest restricted by the Final Order may request relief for cause at any time and the Debtors may oppose such relief

PLEASE TAKE FURTHER NOTICE that the requirements set forth in this Notice are in addition to the requirements of Bankruptcy Rule 3001(e) and applicable securities, corporate, and other laws, and do not excuse compliance therewith

BY ORDER OF THE COURT

Dated: New York, New York
       June 25, 2009

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone (212) 310-8000
Facsimile (212) 310-8007
Attorneys for Debtors
and Debtors in Possession

*All capitalized terms not expressly defined herein shall have the meaning ascribed to them in the Motion.

## A Father of Netscape Begins A Silicon Valley Venture Firm

**By CLAIRE CAIN MILLER**

The man who popularized the Web browser has started a venture capital fund to back the next generation of new technologies.

Marc Andreessen, who co-founded Netscape, is announcing on Monday that he and Ben Horowitz, a longtime business associate, have raised $300 million that they intend to invest in technology companies. The venture capital firm, Andreessen Horowitz, will risk small sums, as little as $50,000, on new ideas.

Then, if they work, they will put in more money, as much as $50 million, for the companies to

### Starting small to see what ideas have the most promise.

grow globally. The fund will have its offices on Sand Hill Road, the stretch in Menlo Park, Calif., that is home to top venture firms.

Andreessen Horowitz will be testing a theory of investing, one that has lost favor in recent years in Silicon Valley, that smaller funds making smaller investments in very young companies will yield higher returns.

Five-year returns in the venture capital industry, which reached 48 percent in 2000 at the height of the dot-com bubble, were just 6 percent through 2008, according to the National Venture Capital Association. Venture investors make much of their money when their start-ups go public, but only four have sold shares to the public this year.

Andreessen Horowitz plans to look for companies like Facebook, where Mr. Andreessen is a director. Facebook started with just $500,000 but has since raised $600 million to grow.

The partners, who also co-founded Opsware, a software company they sold to Hewlett-Packard, said they planned to stick with what they know. Almost all of the companies in which they invest will be in Silicon Valley, they said, that is unusual these days, when many funds set up shop in China, India and other countries.

They will also invest only in information technology companies — "anything with a chip or anything that runs software," Mr. Andreessen said — another rarity these days. "We will not be doing biotech or clean tech," he said, then added jokingly: "We probably won't even recycle."

Instead, they will focus on start-ups that do networking and storage, consumer Internet services and cloud computing. They are also excited about consumer electronics. "Silicon Valley companies are becoming a major force in consumer electronics again. It's sort of back to the future," Mr. Andreessen said, pointing to the success of the Flip video camera, whose maker, Pure Digital, was sold to Cisco in May.

Mr. Andreessen and Mr. Horowitz have already been making angel investments together for four years. They have put $4 million into 45 companies, including Twitter; Qik, a service that publishes live video from mobile phones; and Aliph, which makes the Jawbone Bluetooth headset.

Through that investing, they have a method to figure out whether to bet on a new idea. Mr. Andreessen focuses on a new technology and the potential market, while Mr. Horowitz analyzes whether an entrepreneur is capable of executing, they said.

"In the venture capital business, 15 companies a year still deliver 97 percent of returns," Mr. Horowitz said. "The key to success is still finding those 15."

## Michael Jackson Rocks the Web

As news of Michael Jackson's death began to spread June 25, the crush of people flocking to the Web for information overloaded several sites and services, causing AOL's instant messaging service, news sites, Twitter and Wikipedia to buckle under the strain.

But just how much traffic are we talking about? Compete, a Web analytics firm based in Boston, crunched some numbers and came up with a few data points to help illustrate the surge.

It found that there were 9.98 million queries for the terms "Michael" and "Jackson" across the top 25 search engines and news and social media sites in the week ended June 27. Compete said that was more than 24 times the amount of queries for information using the terms "Iran" and "election" during the week before.

Google, which said that its systems initially interpreted the spike in searches as an attack, fielded the most requests, handling 61 percent of the queries.

Yahoo Music pulled in a hefty 45 percent of Web surfers seeking the pop idol's albums, music videos and merchandise, according to Compete. YouTube ranked a distant second with 23 percent.

Compete said Yahoo's dominance was probably because of spillover from its coverage of Mr. Jackson's hospitalization. Yahoo said its coverage broke traffic records, generating 800,000 clicks in the first 10 minutes that the item was posted.

JENNA WORTHAM

## Twitter Coming [truncated]

Microsoft is d the hot new are search. The con week that Bing, gine it unveiled would begin inc output of popula its search result

"There has be sion of real-time premium on im that has been ci by Twitter," wro general manage search technolo con Valley in the feature. "W ing this phenom interest and list what consumer this space."

The change number of Twit searches. Whe example, "Al G Gore tweets" o Bing search bo will be the mos updates from th president. Micr picked a few th counts based o followers and t tweets they pr clude the actor Kara Swisher, nalist; Danny S analyst; and so that are popula will update the ery 60 seconds

The new ser volve any spec tween Microso Microsoft deve lic application terfaces that T able to anyone

Although all gines index Tw some older tw first major sea integrating wi way. This coul up the buzz it the last month

COMMERCIAL REAL ESTATE
BUSINESS OPPORTUNITIES

OFFICE SPACE (100)
Offices-Manhattan .......... 105
35 ST W, #147  B'twn Broadway & 7th
500, 1000 & 2000 sq ft, totally renovated,
New windows, 7 days/week  NO FEE
falconproperties.com    212-302-3000
38 ST W, #325        OFF 8th AVE
500, 700, 1400 sf  Totally reno ofcs
New elevs 24-hr Drmn Internet access
falconproperties.com    212-302-3000

COMMERCIAL & INDUSTRIAL PROPERTIES (300)
Queens ......................... 327
CENT QUEENS -15,000/7,000/1,000 SF
Drive-In & Interior Tailboard Loading,
Spklr, Hi Ceil Yard Avail 718-739-3550
www.DorfAssociates.com

COMMERCIAL LOTS & ACREAGE (700)
Queens ......................... 715
CENTRAL QUEENS - FOR LEASE
15,000 SF Yard Space for Rent
Dorf Management -718-739-3550
www.DorfAssociates.com

1968 A YEAR LIKE NO [truncated]
New York Times reporter Michael T. Kaufman provides a a pivotal year in our world's history. Heavily illustrated wit white photos. this eye-catching book chronicles the trage that characterized the year and shaped the baby boon

The New York Times
nytstore.com

ORDI
nyts
(80