Mathew S. Barr
Tyson M. Lomazow
MILBANK, TWEED, HADLEY & McCLOY LLP
One Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219

    - and -

David S. Cohen (admission pro hac vice pending)
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006-2236
Telephone:    (202) 835-7500
Facsimile:    (202) 835-7586

Counsel for Wells Fargo Bank Northwest,
National Association, as Indenture Trustee

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case No. |
| **MOTORS LIQUIDATION COMPANY (f/k/a General Motors Corp.)**, *et al.*, | 09-50026 (REG) (Jointly Administered) |
| Debtors. | |

**OBJECTION OF WELLS FARGO BANK NORTHWEST, N.A., TO MOTION
BY DEBTORS FOR ENTRY OF ORDER AUTHORIZING REJECTION
OF CERTAIN PERSONAL PROPERTY AGREEMENTS AND/OR
<u>ABANDONMENT OF COLLATERAL TO SECURED CREDITORS</u>**

Wells Fargo Bank Northwest, National Association, not individually, but solely in its capacity as indenture trustee under the leveraged lease transaction commonly known as "GM 2001A" (the "**Indenture Trustee**"), by and through its undersigned counsel, hereby files this Objection to the Motion by Debtors for Entry of Order Authorizing Rejection of Certain Personal

Property Agreements and/or Abandonment of Collateral to Secured Creditors, dated July 17, 2009 (Docket No. 3212) (the "**Rejection Motion**"). In support of its Objection, the Indenture Trustee respectfully states as follows:

## PRELIMINARY STATEMENT

1. In December 2001, Motors Liquidation Company (f/k/a General Motors Corporation) ("**Old GM,**" and collectively with its debtor affiliates in the above-captioned cases, the "**Debtors**") entered into a single integrated leveraged lease transaction commonly known as the "GM 2001A transaction" (the "**Leveraged Lease Transaction**") Pursuant to the Leveraged Lease Transaction, Old GM leased certain automotive manufacturing equipment with an estimated fair market value of approximately $479 million for use at Old GM's facilities located in Michigan, New York, Ohio, and Louisiana.

2. To raise sufficient capital to fund the Leveraged Lease Transaction, Old GM retained the services of Banc of America Securities, LLC ("BAS") as its debt placement agent. Through its syndication efforts, BAS raised $360 million from institutional investors through the sale of "General Motors Corporation $360,000,000 GM 2001-A Equipment Notes" (the "**Equipment Notes**").

3. Notably, the marketing materials circulated by BAS to induce institutions to invest in the Leveraged Lease Transaction (through the purchase of the Equipment Notes) made clear that GM 2001A was a single "transaction," the purpose of which was to fund the acquisition of five (5) stamping press systems, an engine line, an engine assembly line, and other engine assets (collectively, the "**2001A Equipment**"). Although the marketing materials did indicate that multiple series of the Equipment Notes would be secured by 2001A Equipment owned by the corresponding Owner Trust, prospective investors were never afforded an

2

opportunity to pick and choose the specific components of the 2001A Equipment in which they wanted to invest. To the contrary, the marketing materials indicated that "investors will be purchasing a pro rata interest in each of the series of [Equipment] Notes."[1] It is clear that Old GM intended to sell, and the institutional investors intended to purchase, participations in a single, integrated transaction known as "GM 2001A."

4.  The Debtors are abundantly aware of the various benefits and burdens of the Bankruptcy Code—particularly as they impact the transfer of valuable assets from "Old GM" to "New GM." Indeed, Old GM's substantial deliberations prior to commencing these chapter 11 cases are well documented, both in the national media and in the record before this Court. Hence, the Debtors are undoubtedly familiar with the well-established rule that a debtor in possession must assume or reject executory contracts or unexpired leases **in their entirety**, In re Atlantic Computer Sys., Inc., 173 B.R. 844 (S.D.N.Y. 1994) ("Under Section 365 of the [Bankruptcy] Code, a debtor may not 'cherry pick' pieces of contracts it wishes to assume."), and, likewise, must assume both the benefits and the burdens of the contract. See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531 (1984); In re Bridgeport Jai Alai, 215 B.R. 651, 657 (Bankr. D. Conn. 1997) ("Under §365(a), the debtor must assume such an executory contract **in its entirety, including any attendant burdens**.") (emphasis added). These fundamental principals apply not only to a single agreement, but also to multiple, related transactions that the parties intend to be intertwined or merged into a single agreement. See In re Braniff, 118 B.R. 819, 844 (Bankr. M.D. Fla. 1989) (finding that multiple contracts may form a single, uniform

---

[1] See Schedule 1 to the Declaration of Tyson M. Lomazow in Support of Objection of Wells Fargo Bank Northwest, N.A. to Motion by Debtors for an Entry of Order Authorizing Rejection of Certain Personal Property Agreements and/or Abandonment of Collateral to Secured Creditors, dated July 29, 2009 (the "**Lomazow Declaration**") attached hereto as Exhibit "A," at 4. The Indenture Trustee redacted certain marginalia from Schedule 1 that is irrelevant to the issues raised in the Rejection Motion and the present Objection.

3

agreement). Simply put, a debtor is not permitted to assume or reject only one of multiple, related agreements where the parties intended for the agreements to constitute a single contract. See, e.g., In re Karfakis, 162 B.R. 719, 725 (Bankr. E.D. Pa. 1993) (holding that debtor was not permitted to assume real property lease without assuming its related franchise agreement).

5. Despite these bedrock principles of contract and bankruptcy law, the Rejection Motion seeks the Court's permission to allow New GM, through Old GM, to improperly pick and choose among the most valuable of related and intertwined assets from a single leveraged lease transaction, while discarding the remainder of such assets to the detriment of the noteholders. The law is clear that a debtor does not maintain such an option. Because the Rejection Motion impermissibly seeks to tear apart a fully integrated contract and to assume or reject in a piecemeal fashion the individual components of the contract, it must be denied.[2]

## OBJECTION

**I.    Three Leases Described in Rejection Motion are Part of a Larger, Single, Integrated Leveraged Lease Transaction**

    **A.    Underlying Transaction**

6. In November 2001, Old GM's debt placement agent, BAS, described the proposed transaction underlying the Rejection Motion as including the "leveraged lease financing of five (5) stamping press systems, an engine line, an engine assembly line and other engine assets" with a "fair market value" of approximately $479 million.[3] BAS's Private Placement Memorandum (the "**Offering Memorandum**") accompanying the solicitation also

---

[2]    For the purposes of the Rejection Motion, the Indenture Trustee agrees with the Debtors that "it is not necessary for the [parties] to take a position regarding whether the Agreements are true leases or disguised financing arrangements. . . ." See Rejection Motion, at ¶ 13. Should the Debtors later attempt to re-characterize the leases at issue as disguised financing arrangements, the Indenture Trustee reserves the right to challenge any such characterization.

[3]    See Lomazow Declaration, Schedule 1, at 2.

4

indicates that "[t]he presses involved in **this transaction** include two (2) AA size 6,500-ton stamping press systems, and three (3) Progressive stamping press systems[4] . . . . In addition to the five (5) stamping presses, **this transaction** [] include[s] engine lines located in the Flint South Engine Plant located in Flint, MI, and the Tonawanda Engine Plant located in Tonawanda, NY."[5] At the time of the Offering Memorandum, "it [was] still being determined if equipment at Bay City, MI [would] also be included in **this transaction**."[6] Throughout, the Offering Memorandum repeatedly refers to the GM 2001-A Leases (as defined below) as a single "Transaction" by which the Owner Trusts would purchase all of the Equipment from Old GM, and the secured noteholders would assist in financing such purchase.[7] In its Rejection Motion, however, Old GM seeks authority to reject the one (1) AA size stamping press system in Shreveport, Louisiana, two (2) of the Progressive stamping press systems in Parma, Ohio, an engine assembly line in the Flint South Engine Plaint, and the engine line assets in Bay City, Michigan, while presumably retaining the one (1) AA-size stamping press system in Pontiac, Michigan, one (1) of the Progressive stamping press systems (B-39) in Parma, Ohio, and the engine and assembly lines located at the Tonawanda Engine Plant.[8] Such "cherry-picking" must not be allowed.

7. The Offering Memorandum informed prospective investors that the underlying transaction would be structured as follows:

> **In the Transaction**, a number of trusts (the "Owner Trusts") will purchase Equipment from GM and lease the Equipment back to GM. The beneficial owners of the Owner Trusts will be General

---

[4]  See id. (emphasis added).

[5]  See id. (emphasis added).

[6]  See id. (emphasis added).

[7]  See id., at 2-4.

[8]  See Rejection Motion, at 4.

5

> Electric Capital Corporation and Philip Morris Capital Corporation[9] or their affiliates. Approximately 25% of the equipment cost will be funded by an equity investment. The remainder, representing approximately 75% (but in no case more than 80%) of the equipment cost, will be funded through fixed rate private placement notes (the "Notes") provided by one or more institutional investors arranged by BAS. The Notes will be issued in a series under a separate indenture for each Owner Trust. It is currently estimated that there will be six Owner Trusts and consequently six series of Notes, although the final number may be higher or lower. Each series of Notes will be secured by (i) a first priority perfected security interest in the Equipment owned by the corresponding Owner Trust, and (ii) an assignment of the applicable lease rentals."[10]

In December 2001, the parties closed the transaction in accordance with the Offering Memorandum's proposal. Instead of the six (6) Owner Trusts, leases, and series of Equipment Notes contemplated in the Offering Memorandum, however, the final Leveraged Lease Transaction involved eight (8) Owner Trusts, eight (8) 2001A Equipment leases (the "**GM 2001-A Leases**") and consequently eight (8) series of Equipment Notes. The terms of this Leveraged Lease Transaction now govern the relationship between the Indenture Trustee and Old GM.

8.  There is no question as to whether the GM 2001-A Leases and the trust structures surrounding such leases are all part of a single, integrated contract - - they are. Nor is there any question as to whether the Equipment Notes comprising the secured debt interest in the GM 2001-A Leases are part of a single leveraged lease transaction governed by this integrated contract - - they are. This conclusion is clear given that the Offering Memorandum specifically limited the potential investors (who would eventually become the noteholders represented by the Indenture Trustee) to the purchase of a "pro rata interest in each of the series of Notes"[11] - -

---

[9]   Phillip Morris Capital Corporation replaced General Foods Credit Corporation. See Rejection Motion, at Exhibit A.

[10]  See id., at 3 (emphasis added).

[11]  See Lomazow Declaration, Schedule 1, at 4.

6

meaning that the investors could only invest in the entire Leveraged Lease Transaction not any of the individual GM 2001-A Leases.[12]

9. Additionally, as set forth in the Offering Memorandum's "Summary of Proposed Terms," the underlying structure of each GM 2001-A Lease, including the rights, interests, and obligations of each party, is virtually identical.[13] Each of the GM 2001-A Leases contains several operative documents governing the relationship of the parties thereto, including a Trust Indenture and Security Agreement (collectively, the "**Indentures**"), a Participation Agreement (establishing rights by and between the owner trustee and the owner participant) (collectively, the "**Participation Agreements**"), and a Lease Agreement (collectively, the "**Leases**," and together with the Indentures and Participations Agreements, the "**Operative Agreements**"). The terms of each of these Operative Agreements are virtually identical amongst the eight (8) GM 2001-A Leases.[14]

10. The parties ultimately executed each of the Operative Agreements contemporaneously with one another, on December 18, 2001. The Indenture Trustee, the Owner Trustee,[15] and the Lessee (Old GM) are the same under all of the GM 2001-A Leases. There are

---

[12] As such, the secured noteholders are the same across all of the GM 2001-A Leases in the Transaction.

[13] See id., at 6-29.

[14] Compare, e.g., Lomazow Declaration, Schedule 2 (the GM 2001-A-2 Lease), with Lomazow Declaration, Schedule 3 (the GM 2001-A-8 Lease). In light of the substantial similarity across all of the constituent Operative Agreements, a reference to any particular provision in any of the Indentures, Leases, or Participation Agreements will, with limited exceptions, be the same across the remaining seven Leveraged Leases.

[15] At the time of execution of the GM 2001-A Leases, State Street Bank and Trust Company of Connecticut ("**State Street Bank**") served as the Owner Trustee. U.S. Bank, National Association, as successor to State Street Bank, now serves as successor Owner Trustee under all of the GM 2001-A Leases.

7

only two (2) owner participants,[16] each an owner participant under four (4) of the GM 2001-A Leases.

### B. Parties Intended GM 2001-A Leases to Form a Single, Integrated Contract and Old GM Must Reject or Assume the Entire Contract

11. It is black letter law that the parties' intentions determine whether separately executed agreements are, in reality, one. See Philip Servs. (Del.), Inc. v. Luntz (In re Philip Servs. (Del.), Inc.), 303 B.R. 574, 576-77 (D. Del. 2003); In re Teligent, 268 B.R. 723, 728-29 (Bankr. S.D.N.Y. 2001). For purposes of applying section 365 of the Bankruptcy Code, bankruptcy courts rely on applicable state law, which governs the interpretation of contracts. Here, each of the operative documents comprising the eight (8) GM 2001-A Leases are subject to New York law.[17]

12. Under New York law, the "primary factor to consider" in determining whether the components of an otherwise unitary contract can be "severed" and separately enforced, is "the intent of the parties as determined by a fair construction of the terms and provisions of the contract itself, by the subject matter to which it has reference, and by the circumstances existing at the time of contracting." In re O'Connell v. Prakope (In re Prakope), 317 B.R. 593, 599 (Bankr. E.D.N.Y. 2004) (applying New York law); see also Rudman v. Cowles Commc'ns, Inc., 280 N.E.2d 867, 873 (N.Y. 1972) (same).

13. To determine the intent of the parties with respect to the issue of integration of multiple agreements, courts look to various factors, including whether the agreements were

---

[16] The two owner participants under the GM 2001-A Leases are currently General Electric Capital Corporation and Phillip Morris Capital Corporation. See Rejection Motion, at Exhibit A.

[17] See, e.g., Lomazow Declaration, Schedule 3, at § 21 ("This Lease shall in all respects be governed by and construed in accordance with the domestic laws of the State of New York."); Lomazow Declaration, Schedule 4 (2001A-8 Indenture), at § 12.5 ("This Indenture and the Equipment Notes shall be governed by and construed in accordance with the laws of the State of New York.").

8

executed (i) in the course of the same transaction, (ii) simultaneously or at substantially the same time, and (iii) by the same parties. See Carvel Corp. v. Diversified Mgmt. Group, Inc., 930 F.2d 228, 233 (2d Cir. 1991) ("Under New York law, instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together."); see also BWA Corp. v. Alltrans Exp. U.S.A., Inc., 793 N.Y.S.2d 1, 3 (N.Y. 1985); In re MSCP Holdings, Inc., 316 B.R. 51, 55 (Bankr. D. Del. 2004) ("[I]n the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not in terms refer to each other.") (internal citation omitted).

14.   Here, there is no question that the parties entered into the eight (8) GM 2001-A Leases as part of a single, integrated contract. The explicit terms of the debt offering described in the Offering Memorandum required the noteholders to purchase a pro rata share of all the GM 2001-A Leases subject to the offered "Transaction."[18] See In re Teligent, Inc., 268 B.R. 723, 728-29 (Bankr. S.D.N.Y. 2001) (finding a single, integrated contract consisting of several sub-parts where the parties never would not have consummated a multi-part transaction absent the execution of all the multiple sub-parts); see also In re United Air Lines, Inc., 453 F.3d 463, 468 (7th Cir. 2006) ("Even if the parties entered a multi-part contract, that contract cannot be severed after the fact if the parties entered it 'as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.'") (internal citation omitted). Clearly, the Offering Memorandum focused on presenting the terms of the Leveraged Lease Transaction contract as a whole, and the legal structure of multiple sets of Operative

---

[18]   See Lomazow Declaration, Schedule 1, at 4.

9

Agreements that would form the single Leveraged Lease Transaction was of secondary concern to Old GM. This fact is highlighted by uncertainty in the Offering Memorandum regarding how the Leveraged Lease Transaction would be structured. For example, whether certain individual GM 2001-A Leases (i.e., the Bay City Equipment under the GM 2001-A-8 Lease) would be included in the Leveraged Lease Transaction, and the final number of Owner Trusts and related number of Equipment Note series included in the Leveraged Lease Transaction, remained tentative.[19] Additionally, as noted above, the (i) parties executed all of the Operative Agreements on the same day (December 18, 2001), (ii) terms of each of the Operative Agreements are materially identical across the eight (8) GM 2001-A Leases, and (iii) parties/investors to the eight (8) GM 2001-A Leases are almost universally the same.[20]

15. The issue is more than semantics; it goes to the heart of the Leveraged Lease Transaction. In entering into the contract - - which was structured and marketed by Old GM's agent as an indivisible, single transaction - - the noteholders relied on a single collateral pool to generate cash flow sufficient to repay the debt. This pool consisted of a number of different items of equipment, all of which the noteholders relied upon in agreeing to extend credit through the Owner Trust mechanism to Old GM. Having received the benefit its bargain, Old GM cannot be allowed to unilaterally cherry-pick the collateral pool to the detriment of the noteholders. A single collateral pool was sold to the noteholders, and Old GM must now live with the burden of its bargain, having received the benefit up front.

16. These facts conclusively establish that the parties entered into the GM 2001-A Leases as a single structured contract under applicable New York law – a contract that Old GM

---

[19] See id., at 2, 6.

[20] As discussed above, the only difference in parties to the GM 2001-A Leases are the two owner participants, each of which is an owner participant under four (4) of the GM 2001-A Leases.

10

cannot break apart, opportunistically picking which benefits to assume and which burdens to reject.  See NLRB, 465 U.S. at 531; see also In re Atlantic Computer Sys., Inc., 173 B.R. 844.  Rather, Old GM must assume the entire contract or reject the entire contract.  See In re Bridgeport Jai Alai, 215 B.R. at 657; see also In re Atlantic Computer Sys., Inc., 173 B.R. at 844.  This Court should not permit Old GM to tear apart in a piecemeal fashion what the parties' clearly intended to be a single, integrated contract.

## CONCLUSION

WHEREFORE, the Indenture Trustee respectfully requests that this Court (i) deny the Rejection Motion, and (ii) grant the Indenture Trustee such other relief as is just and proper.

Respectfully submitted,

New York, New York  
Dated: July 30, 2009

By: /s/ Tyson M. Lomazow  
Mathew S. Barr  
Tyson M. Lomazow  
MILBANK, TWEED, HADLEY & McCLOY LLP  
One Chase Manhattan Plaza  
New York, New York 10005-1413  
Telephone:   (212) 530-5000  
Facsimile:    (212) 530-5219

- and -

David S. Cohen (admission pro hac vice pending)  
MILBANK, TWEED, HADLEY & McCLOY LLP  
1850 K Street, NW, Suite 1100  
Washington, DC 20006-2236  
Telephone:   (202) 835-7500  
Facsimile:    (202) 835-7586

Counsel for Wells Fargo Bank Northwest,  
National Association, as Indenture Trustee