# **Exhibit A**

Mathew S. Barr
Tyson M. Lomazow
MILBANK, TWEED, HADLEY & McCLOY LLP
One Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219

            - and -

David S. Cohen (admission pro hac vice pending)
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006-2236
Telephone:    (202) 835-7500
Facsimile:    (202) 835-7586

Counsel for Wells Fargo Bank Northwest,
National Association, as Indenture Trustee

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
                                                           :
**In re**                                                  :        **Chapter 11 Case No.**
                                                           :
**MOTORS LIQUIDATION COMPANY (f/k/a**                      :        **09-50026 (REG)**
**General Motors Corp.),** *et al.*,                       :        **(Jointly Administered)**
                                                           :
                              **Debtors.**                 :
                                                           :
-----------------------------------------------------------x

**DECLARATION OF TYSON M. LOMAZOW IN SUPPORT OF**
**OBJECTION OF WELLS FARGO BANK NORTHWEST, N.A., TO**
**MOTION BY DEBTORS FOR ENTRY OF ORDER AUTHORIZING**
**REJECTION OF CERTAIN PERSONAL PROPERTY AGREEMENTS**
**AND/OR ABANDONMENT OF COLLATERAL TO SECURED CREDITORS**

       I, Tyson M. Lomazow, declare as follows:

       1.       I am duly licensed to practice law in the State of New York.  I am an associate

with the law firm Milbank, Tweed, Hadley & McCloy LLP, counsel for Wells Fargo Bank

Northwest, National Association, not individually, but solely in its capacity as indenture trustee

under the leveraged lease transaction commonly known as "GM 2001A" (the "**Indenture Trustee**").  I submit this declaration in support of the Objection of Wells Fargo Bank Northwest, N.A., to Motion by Debtors for Entry of Order Authorizing Rejection of Certain Personal Property Agreements and/or Abandonment of Collateral to Secured Creditors (the "**Objection**").  I have personal knowledge of the facts stated in this Declaration and, if called upon to do so, would testify competently thereto at hearing.

     2.      Attached to this Declaration as Schedule 1 is a copy of a document that purports to be a General Motors Corporation ("**Old GM**") "Private Placement Memorandum" that Old GM's exclusive debt placement agent, Banc of America Securities LLC, circulated to "sophisticated institutional accredited investors interested in the purchase of the GM 2001-A Equipment Notes" in November 2001 (the "**Memorandum**").  The Memorandum was provided to the Indenture Trustee by one of the noteholders, on whose behalf the Indenture Trustee acts, that purchased an interest in the GM 2001-A Equipment Notes.  The noteholder kept the Memorandum in its files in the ordinary course of business.  The Indenture Trustee redacted certain marginalia from the Memorandum that is irrelevant to the issues raised in (i) the Motion by Debtors for Entry of Order Authorizing Rejection of Certain Personal Property Agreements and/or Abandonment of Collateral to Secured Creditors and (ii) the Objection.

     3.      Attached to this Declaration as Schedule 2 is a true and correct copy of the Lease Agreement (GM 2001A-2), dated as of December 18, 2001, between State Street Bank and Trust Company of Connecticut, National Association, a national banking association, not in its individual capacity, but solely as Owner Trustee, as Lessor, and General Motors Corporation, as Lessee (the "**GM 2001-A-2 Lease**").  As the indenture trustee in the underlying leveraged lease transaction, the Indenture Trustee kept the GM 2001-A-2 Lease in its files in the ordinary course

of business.

4.      Attached to this Declaration as Schedule 3 is a true and correct copy of the Lease Agreement (GM 2001A-8), dated as of December 18, 2001, between State Street Bank and Trust Company of Connecticut, National Association, a national banking association, not in its individual capacity, but solely as Owner Trustee, as Lessor, and General Motors Corporation, as Lessee (the "**GM 2001-A-8 Lease**").  As the indenture trustee in the underlying leveraged lease transaction, the Indenture Trustee kept the GM 2001-A-8 Lease in its files in the ordinary course of business.

5.      Attached to this Declaration as Schedule 4 is a true and correct copy of the Trust Indenture and Security Agreement (GM 2001A-8), dated as of December 18, 2001, between State Street Bank and Trust Company of Connecticut, National Association, a national banking association, not in its individual capacity, but solely as Owner Trustee under the Trust Agreement dated as of December 18, 2001 with the Owner Participant, and Wells Fargo Bank Northwest, National Association, as Indenture Trustee (the "**GM 2001-A-8 Indenture**").  As the indenture trustee in the underlying leveraged lease transaction, the Indenture Trustee kept the GM 2001-A-8 Indenture in its files in the ordinary course of business.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED this 30th day of July 2009, at New York, New York.

/s/ Tyson M. Lomazow
Tyson M. Lomazow

# Schedule 1

**Private Placement Memorandum**

*Confidential*



## General Motors Corporation

### $360,000,000 GM 2001-A Equipment Notes

November 2001



**Banc of America Securities**

# OnBase Fixed Income

Document Type

Document Type:

Action on Paper Copy:

Return To:

FI - Private Placements

OFFERING MEMORANDUM

Destroy

| | |
|---|---|
| FI - Borrower Name | 2001 EQUIPMENT NOTE GM 2001A- |
| FI - Bond Number | 64355 |
| FI - CUSIP | 85746*DD9 |
| FI - Guarantor | GENERAL MOTORS CORP |
| FI - Description | Offering Memorandum Nov 2001 |

RECEIVED

NOV 2 3 2004

IMAGING



**General Motors Corporation** *Confidential*

# $360,000,000 GM 2001-A Equipment Notes

This Memorandum has been prepared solely for the benefit of sophisticated institutional accredited investors interested in the purchase of the GM 2001-A Equipment Notes (the "Notes" or the "Proposed Notes") described herein. The information contained herein has been supplied by General Motors Corporation ("GM" or the "Company") and is highly confidential. NEITHER BANC OF AMERICA SECURITIES LLC ("BAS") NOR ANY OF ITS EMPLOYEES OR AGENTS HAVE VERIFIED SUCH INFORMATION AND NEITHER BAS NOR ANY OF THEM MAKE ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. The Company has reviewed and approved the information contained herein. This Memorandum is submitted for the recipient's confidential use in connection with the private placement of such Notes and may not be used, reproduced or distributed, in whole or in part, for any other purpose. By accepting delivery of this Memorandum, the investor receiving this Memorandum agrees to maintain the confidentiality of the information contained herein, and if such investor does not ultimately purchase any portion of the Notes offered, to return this Memorandum and all related documents to Chris Oberholtzer at the address below. Any question relating to this Memorandum should be directed to:

| Scott Dolgoff | Chris Oberholtzer | Stephanie Acheson |
|---|---|---|
| (312) 828-8040 | (312) 828-8916 | (312) 828-6003 |
| scott.dolgoff@bankofamerica.com | chris.oberholtzer@bankofamerica.com | stephanie.a.acheson@bankofamerica.com |
| | Banc of America Securities LLC<br>Private Placement Group – IL1-231-20-15<br>231 South LaSalle Street<br>Chicago, IL 60697<br><br>Facsimile: (312) 828-5919<br>(312) 828-3819 | |

The Notes offered in this Memorandum are being sold without registration under the Securities Act of 1933, as amended (the "Securities Act"), pursuant to the private placement exemption contained in Section 4(2) of the Securities Act. Such Notes and this Memorandum have not been approved or disapproved as to form, content, accuracy or adequacy by the Securities and Exchange Commission ("SEC") or any state regulatory authority or commission. This Memorandum does not constitute an offer or solicitation in any state in which such offer or solicitation is not authorized. Any representation to the contrary is void. No resale of the Notes may be made unless the Notes are subsequently registered under the Securities Act or an exemption from the registration requirements of the Securities Act is available, including without limitation the exemption provided by Rule 144A of the Securities Act relating to resales of the Notes to "qualified institutional buyers" (as such term is defined therein). Each prospective investor should proceed on the assumption that it must bear the economic risk of an investment in the Notes for an indefinite period of time.

This Memorandum may contain financial projections which are based on the Company's estimates of future financial performance. Many of the factors affecting such future financial performance are impossible to predict with certainty, and as such are outside the Company's ability to control. The Company and BAS make no representation or warranty as to the accuracy of such projections.

BAS is serving as placement agent for the Company in connection with the private placement of the Notes. BAS is a wholly-owned direct subsidiary of Bank of America Corporation, the parent of Bank of America, N.A. ("Bank of America"). BAS is a broker-dealer registered with the SEC and is a member of the National Association of Securities Dealers, Inc., and the Securities Investor Protection Corporation.

*Banc of America Securities LLC*

General Motors Corporation                                                    *Confidential*

BAS is <u>not</u> a bank.  The securities and financial instruments sold, offered, or recommended by BAS are not bank deposits, are not guaranteed by, and are not otherwise obligations of, any bank, thrift, or other subsidiary of Bank of America Corporation, and are not insured by the Federal Deposit Insurance Corporation or any other governmental agency.

From time to time, Bank of America and its affiliates may lend to one or more issuers whose securities are underwritten, dealt in, or placed by BAS.  You are referred to the relevant prospectus, offering statement, or other disclosure document for material information relating to any such lending relationship and whether the proceeds of an issue will be used to repay any such loans.  Furthermore, the obligations of BAS are not those of any affiliated bank or thrift, and no such affiliated bank or thrift is responsible for securities underwritten, dealt in, or placed by BAS.

BAS also may participate from time to time in a primary or secondary distribution of securities offered or sold to you by it.  Further, BAS may act as an investment advisor to issuers whose securities may be offered or sold to you by it.

Regulation FD promulgated by the Securities and Exchange Commission prohibits the Company from disclosing material, nonpublic information to selected persons unless the Company discloses such information publicly or discloses such information on a confidential basis. Your acceptance of this Memorandum shall constitute an agreement by you and your representatives that to the extent that the Company discloses material, nonpublic information to you or your representatives, such disclosure is made with the understanding that you and your representatives agree to maintain such material, nonpublic information in confidence and that the Company does not, at this time, intend to disclose any such material nonpublic information publicly.

*Banc of America Securities LLC*

General Motors Corporation                                                                    *Confidential*

# $360,000,000 GM 2001-A Equipment Notes

## TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY
     A.  Company Overview................................................................. 1
     B.  Transaction and Equipment Overview ...........................................2
     C.  Financial Summary ...............................................................5

II.  SUMMARY OF PROPOSED TERMS .............................................. 6

ENCLOSED:

General Motors Corporation Annual Financial Reports for the fiscal years ended December 31, 1997 through 2000.

General Motors Corporation Quarterly Report on Form 10-Q for the nine months ended September 30, 2001.

*Banc of America Securities LLC*

General Motors Corporation                                              *Confidential*

# I. EXECUTIVE SUMMARY

## A. Company Overview

General Motors Corporation ("GM" or the "Company") - the world's largest vehicle manufacturer - designs, builds, and markets a wide variety of cars and trucks worldwide. Founded in 1908, GM today sells its vehicles in 190 countries with manufacturing operations in more than 50 countries. GM employs more than 385,000 people globally and partners with over 30,000 suppliers worldwide. In 2000, GM earned $4.5 billion on sales of approximately $185 billion and had a global market share of 15.1%. The Company's U.S. market share is significantly higher (estimated at 27.7% in 2000). The Company carries senior unsecured debt ratings of BBB+ from Standard & Poor's Credit Ratings and A3 from Moody's Investors Services.

Along with manufacturing and marketing automobiles, the Company has substantial interests in financial and insurance services, telecommunications and space, locomotive manufacturing, and heavy-duty automobile parts and accessories. GM has more than 260 major subsidiaries, joint ventures and affiliates around the world. GM's worldwide automotive operations are combined into a single global unit known as GM Automotive Operations which operate in four different regions: North America, Europe, Asia Pacific, and Latin America/Africa/Mid-East. These divisions are briefly described below.

*GM North America ("GMNA")* is responsible for designing, manufacturing and marketing vehicles under the Chevrolet, Pontiac, Oldsmobile, Buick, Cadillac, GMC, Hummer, Saab and Saturn brands in the U.S., Canada, Mexico, Central America, Puerto Rico and the Caribbean. GMNA employs approximately 212,000 people and was the market share leader in 2000; delivering 5,660,000 vehicles (27.7% of all cars and light trucks in North America).

*GM Europe ("GME")* designs, manufactures, and markets vehicles across Europe, with manufacturing facilities in 11 countries. Automobile products and services are marketed under the Opel, Vauxhall, Saab, Chevrolet, Cadillac and Isuzu brands. GME employs approximately 89,000 people and delivered 1,855,000 vehicles in 2000 (9.3% market share of all cars and light trucks in Europe).

*GM Asia Pacific ("GMAP")* manufactures and markets vehicles throughout Asia, Australasia and the Pacific Rim. GMAP's brands include Cadillac, Chevrolet, Isuzu, Opel, Holden, Buick, Suzuki, Saturn, Subaru and Saab. GMAP employs approximately 11,000 people and delivered 473,000 vehicles in 2000 (3.7% market share of all cars and light trucks in the region).

*GM Latin America, Africa, Mid-East ("GMLAAM")* manufactures and markets GM products under the Chevrolet, Opel, Isuzu, and GMC brands, and also distributes Cadillac, Suzuki and Saab brands. GMLAAM employs approximately 24,000 people and delivered 603,000 vehicles in 2000 (16.3% market share of all cars and light trucks in this region).

1                                              *Banc of America Securities LLC*

General Motors Corporation                                      *Confidential*

## B. Transaction and Equipment Overview

GM has engaged Banc of America Securities LLC ("BAS") as exclusive debt placement agent for a leveraged lease financing of five (5) stamping press systems, an engine line, an engine assembly line and other engine assets (collectively the "Equipment"). The fair market value of the Equipment is approximately $479 million. The Equipment is located at various manufacturing facilities in Michigan, New York, Louisiana, and Ohio. All of the Equipment has been placed in service in 2000 and 2001.

Metal stamping presses are used to stamp designs into sheet metal to form the metal into usable shapes. Stamping presses are used by automobile manufacturers to produce components such as sheet metal doors, hoods and fenders. The presses involved in this transaction include two (2) AA size 6,500-ton stamping press systems, and three (3) Progressive stamping press systems. Dies will not be included as part of the Equipment. IHI, Inc. of Japan manufactures the AA size presses and Mueller-Weingarten of Germany and Automatic Feed of the United States manufacture the Progressive presses.

In addition to the five (5) stamping presses, this transaction will include engine lines located in the Flint South Engine Plant located in Flint, MI, and the Tonawanda Engine Plant located in Tonawanda, NY. The Flint South Engine Line is a brand new, state-of-the-art facility that produces the new In-line Six engine used in the Chevy Trailblazer, GMC Envoy, and Oldsmobile Bravada. This line is critical to the success of GM's Mid-Size Utility program. The Tonawanda Engine Plant produces principally four-cylinder engines for use in GM's small/medium cars such as the Cavalier, Sunfire, Alero, Malibu, Saturn L-Series, and the new Saturn Vue SUV. It is still being determined if equipment at Bay City, MI will also be included in this transaction.

### General Motors Corporation
### Equipment Summary

|    | Equipment | Location | In-Service Date | Lessor's Cost (apprx) |
|----|-----------|----------|-----------------|-----------------------|
| 1  | AA-9 Press | Shreveport, LA | 2001 | $35,500,000 |
| 2  | AA-10 Press | Pontiac, MI | 2001 | 38,000,000 |
| 3  | Progressive A-39 Press | Parma, OH | 2001 | 6,800,000 |
| 4  | Progressive B-39 Press | Parma, OH | 2001 | 8,000,000 |
| 5  | Progressive B-46 Press | Parma, OH | 2001 | 7,600,000 |
| 6  | L-6 Flint South Engine Line | Flint, MI | 2001 | 271,000,000 |
| 7a | L-850 Tonawanda Engine Line | Tonawanda, NY | 2000 | 42,800,000 |
| 7b | L-18 Tonawanda Assembly Line | Tonawanda, NY | 2000 | 21,600,000 |
| 8* | Bay City Engine Assets | Bay City, MI | 2001 | 48,000,000 |
|    | Total |  |  | $479,300,000* |

* Bay City assets may or may not be included in the final transaction.

*Banc of America Securities LLC*

REDACTED

**General Motors Corporation**                                      *Confidential*

In the Transaction, a number of trusts (the "Owner Trusts") will purchase Equipment from GM and lease the Equipment back to GM. The beneficial owners of the Owner Trusts will be General Electric Capital Corporation and Philip Morris Capital Corporation or their affiliates. Approximately 25% of the equipment cost will be funded by an equity investment. The remainder, representing approximately 75% (but in no case more than 80%) of the equipment cost, will be funded through fixed rate private placement notes (the "Notes") provided by one or more institutional investors arranged by BAS. The Notes will be issued in series under a separate indenture for each Owner Trust. It is currently estimated that there will be six Owner Trusts and consequently six series of Notes, although the final number may be higher or lower. Each series of Notes will be secured by (i) a first priority perfected security interest in the Equipment owned by the corresponding Owner Trust, and (ii) an assignment of the applicable lease rentals. Closing and funding is anticipated on December 14, 2001.

**Leveraged Lease Cash Flows at Closing**



The Notes will pay interest on a semi-annual basis, and will also be subject to mandatory scheduled principal amortization payments. An estimation of each amortization schedule is shown as an annex to the *Summary of Proposed Terms* section of this memorandum. Lease rental payments will be sufficient to service principal and interest obligations under the Notes.

**Leveraged Lease On-Going Cash Flows**



General Motors Corporation                                    *Confidential*

The final determination of the inclusion/exclusion of the Bay City equipment will dictate the actual amount of debt required in this transaction. The face value of the proposed offering stated in this memorandum ($360mm) assumes the full equipment valuation of approximately $479mm. If Bay City is not included, then the overall equipment value of $431mm would dictate an approximate debt amount of $324mm. The outcome of this contingency will be known prior to the acceptance of circle indications from prospective investors.

Amortization schedules for Flint, Tonawanda, and the stamping presses are provided as an annex to the *Summary of Proposed Terms*. The Bay City amortization schedule, if applicable, will be determined prior to circling the Notes. Please note that there will likely be multiple Owner Trusts for each equipment category. For example, GE Capital and Philip Morris Capital will each take an undivided interest in the Flint assets, therefore, there will actually be two Owner Trusts and two series of Notes corresponding to the Flint assets. These two series of Notes may have slightly different amortization schedules. Similarly, it is anticipated that the stamping presses and Tonawanda assets will be split between different Owner Trusts affiliated with both GE Capital and Philip Morris Capital. The information below provides an estimate of the amount, final maturity and average life of the Notes which will correspond to the various equipment types. Further detail regarding the actual number of Owner Trusts and their respective amortization schedules will be provided prior to circling the Notes.

### Proposed Notes Summary

| Equipment | Estimated Debt Amount | Approximate Final Maturity | Approximate Average Life |
|---|---|---|---|
| Flint Engine Line | $204,000,000 | 11 years | 8.2 years |
| Stamping Presses | $71,000,000 | 20 years | 10.2 years |
| Tonawanda Engine | $49,000,000 | 10 years | 7.1 years |
| Bay City Engine | $36,000,000 | TBD | TBD |
| | $360,000,000 | | |

*Please note that investors will be purchasing a pro rata interest in each of the series of Notes, and that all amounts are estimates and subject to adjustment post-circle based upon the appraised value of the equipment and customary re-optimization provisions.*

4                                    *Banc of America Securities LLC*

REDACTED

General Motors Corporation                                                    *Confidential*

## C.  Financial Summary

**General Motors Corporation**
**Selected Financial and Operating Information**
($ in millions)

| | Nine Months Ended Sept. 30, | | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2001 | 2000 | 2000 | 1999 | 1998 | 1997 | 1996 |
| **Income Statement** | | | | | | | |
| Revenue | $ 131,310 | $ 138,291 | $ 184,632 | $ 176,558 | $ 155,445 | $ 178,252 | $ 163,885 |
| EBITDA | 17,077 | 23,082 | 29,808 | 28,762 | 22,461 | 30,496 | 24,211 |
| EBIT | 7,372 | 13,577 | 16,397 | 16,444 | 11,314 | 13,880 | 12,371 |
| Interest expense | 6,438 | 7,066 | 9,552 | 7,750 | 6,629 | 6,113 | 5,695 |
| Net income | 346 | 4,363 | 4,452 | 6,002 | 2,956 | 6,698 | 4,963 |
| **Balance Sheet** | | | | | | | |
| Total assets | 314,844 | 297,245 | 303,100 | 274,730 | 257,389 | 231,752 | 222,142 |
| Total debt | 155,910 | 140,891 | 144,655 | 131,688 | 114,152 | 93,022 | 85,300 |
| Stockholders' equity | 28,824 | 31,515 | 30,175 | 20,644 | 15,052 | 17,506 | 23,418 |
| Total capitalization | 184,734 | 172,406 | 174,830 | 152,332 | 129,136 | 110,533 | 108,718 |
| Property Plant & Equipment - net | 34,555 | 34,036 | 33,977 | 32,779 | 37,187 | 33,914 | 37,504 |
| **Cash Flows** | | | | | | | |
| Cash from Operations | 4,858 | 13,812 | 19,750 | 26,945 | 14,343 | 16,910 | 18,819 |
| Depreciation & Amortization | 9,705 | 9,505 | 13,411 | 12,318 | 11,147 | 16,616 | 11,840 |
| **Margin Analysis [1]** | | | | | | | |
| Gross margin | 19.3% | 24.8% | 21.1% | 21.1% | 20.3% | 17.8% | 16.9% |
| EBITDA margin | 13.4% | 18.1% | 16.1% | 16.3% | 14.4% | 17.1% | 14.8% |
| EBIT margin | 5.7% | 12.2% | 8.9% | 9.3% | 7.3% | 7.8% | 7.5% |

[1] Calculated on a trailing twelve month basis for the periods ended Sept. 30, 2000 and 2001.

General Motors Corporation                                          *Confidential*

## II. Summary of Proposed Terms

**Overview:**

The transactions are leveraged sales and leasebacks. On the closing date, General Motors Corporation will sell Equipment to a number of owner trusts. Each owner trust will subsequently lease its Equipment back to General Motors Corporation pursuant to a Lease. Each owner trust, as Issuer, will issue one series of Equipment Notes to finance up to 80% of the purchase price of its Equipment.

Each Issuer will secure the series of Equipment Notes it issues with a pledge of its ownership interests in the Equipment. The Equipment Notes issued by an Issuer will not be cross-defaulted or cross-collateralized with the Equipment Notes issued by any other Issuer.

Investors will purchase ratable amounts of each series of Equipment Notes on the closing date, but investors will not be required to maintain ratable ownership of Equipment Notes thereafter.

**Parties to the Transaction:**

**Lessee:**

General Motors Corporation ("GM").

**Private Placement Agent:**

Banc of America Securities ("BAS").

**Lessee's Counsel:**

Kirkland & Ellis.

**Issuers / Lessors:**

Each of the several common law trusts established by the Owner Participants. It is presently anticipated that there will be approximately six distinct Issuers, but the number could be higher or lower.

**Indenture Trustee:**

A U.S. bank or trust company acting as indenture trustee, selected by Noteholders and acceptable to Lessee.

**Noteholders:**

Accredited institutional investors who will purchase Equipment Notes of either series.

**Noteholders' Counsel:**

Willkie Farr & Gallagher.

**Indentures:**

Equipment Notes will be issued by each Issuer under an indenture between such Issuer and Indenture Trustee. Each Indenture will be substantially identical to the other Indentures, except for the principal amount, interest rate, amortization schedule and final maturity of the Equipment Notes issued

REDACTED

*Banc of America Securities LLC*

**General Motors Corporation**                                    *Confidential*

thereunder.

**Owner Trustee:**          A Delaware-based U.S. bank or trust company selected by the Owner Participants and acceptable to Lessee will serve as Owner Trustee of each Issuer.

**Owner Participants:**     The Owner Participants will be General Electric Capital Corporation and Phillip Morris Capital Corporation or their affiliates. Each Owner Participant will be required to satisfy a minimum net worth requirement of $75 million.

**Owner Participants' Counsel:**  Winston & Strawn.

**Closing Date:**           Expected to be December 14, 2001, but in any event prior to December 31, 2001.

**Terms of the Equipment Notes**
**Principal Amount:**       Each series of Equipment Notes will be issued in approximately the principal amount specified above in the Proposed Notes Summary set forth in Part I.B. of this Confidential Offering Memorandum (the "Proposed Notes Summary").

                           The aggregate principal amount of each series will not exceed 80% of the cost of the Equipment to be acquired by each Issuer (the "Issuer's Cost" of such Equipment).

**Equipment:**              The Equipment that will secure the Equipment Notes is described in Part I. B. of this Confidential Offering Memorandum.

                           As indicated in the Proposed Notes Summary, two separate Issuers will hold undivided interests in the Flint engine line (aggregating, between the acquiring Issuers, to 100% of the undivided percentage interests in the Flint engine line). It is possible that other Equipment will also be financed through the use of undivided interests. As used in this Term Sheet, the term "Unit" means each of the five stamping presses, each Tonawanda line and the Flint engine line, or, as appropriate, an Issuer's undivided interest in any such item, and the term "Equipment" means any or all of the foregoing tangible property or undivided interest.

**Interest Rate:**          Each series will accrue interest at a fixed rate.

**Final Maturity Dates:**   The final maturity date of each series of Equipment Notes is specified in the Proposed Notes Summary.

REDACTED

7                    *Banc of America Securities LLC*

**General Motors Corporation** *Confidential*

| | |
|---|---|
| **Principal Payments:** | Principal payments on the Equipment Notes will be made as set forth in the Preliminary Amortization Schedules for the Equipment Notes of each Series, attached as Exhibits to this Term Sheet, in each case subject to final adjustments. |
| **Average Life:** | The anticipated average life of each series of Equipment Notes is specified in the Proposed Notes Summary. |
| **Rating:** | The Equipment Notes will not be rated by Moody's Investors Service or Standard & Poor's Ratings Services. Neither Lessee nor the Private Placement Agent will apply for any ratings. Any ratings request is the sole responsibility of the Noteholders. Ratings will not be a condition of closing. |
| **Amortization:** | Each Series of Equipment Notes will be fully amortizing until final maturity. Please refer to the Exhibits to this Term Sheet for indicative amortization schedules. The final amortization of each series of Equipment Notes will be established in connection with the optimization of scheduled rental payments ("Rentals") under each Lease immediately prior to the Closing Date to achieve the most favorable economics for each Issuer and Lessee and to reflect the actual conditions at the Closing Date, such as benchmark interest rates, Issuer's Cost, transaction expenses and the like as of such date. |
| **Interest Payments:** | Interest will begin accruing on the Closing Date. Interest payments on the Equipment Notes will be made on March 14, 2002, and thereafter, semi-annually on each July 2 and January 2, beginning on July 2, 2002. Interest will be paid in arrears and will be computed on the basis of a 360-day year consisting of twelve 30-day months. |
| **Non-Recourse Liability:** | The Equipment Notes issued by each Issuer will be non-recourse and will be secured by (i) an assignment of such Issuer's rights, title and interest under the related Lease and the Rentals thereunder and (ii) a first priority perfected security interest in favor of Indenture Trustee in the related Equipment. None of such Issuer, the Owner Trustee nor the related Owner Participant shall have any personal liability for payment of indebtedness or performance of any other provisions of the Indenture, the Equipment Notes, or any other related loan documents under the Indenture. |
| | **The Equipment Notes are neither obligations of, nor guaranteed by, Lessee.** |
| **Make-Whole Premium:** | The Make-Whole Premium shall equal the excess, if any, of (i) the discounted present value of future scheduled mandatory |

REDACTED

8

*Banc of America Securities LLC*

**General Motors Corporation**                                            *Confidential*

payments of principal and interest on the Equipment Notes under an Indenture, over (ii) the outstanding principal balance of the Equipment Notes under such Indenture, plus accrued but unpaid interest thereon. The discount rate shall be the bond equivalent yield for actively traded U.S. Treasury securities, as displayed on Bloomberg Financial Markets News screen PX1, having a maturity which most nearly approximates the remaining Average Life to maturity of the Equipment Notes being prepaid plus 0.50%.

The Make-Whole Premium will be payable in the event of an optional prepayment (as described below) in the event of: (i) exercise of Lessee's Early Buyout Option ("EBO") (as described below in "The Lease - Buyout Options"), (ii) Lessee's exercise of its right to terminate a Lease or (iii) in certain circumstances in which there is a prepayment following a Lease Event of Default arising from an Indenture Event of Default, as those terms are discussed below. No Make-Whole Premium will be payable in the event of a prepayment following an Event of Loss, as that term is defined below.

**Prepayment of Equipment Notes:**

The Equipment Notes may be prepaid under the following circumstances:

(i)     If an Event of Loss shall occur with respect to any Unit and like kind equipment of equivalent value is not substituted for such Unit under the terms set forth in the Lease, Lessee shall pay the Stipulated Loss Value of such Unit. Such payment will be used to prepay a portion of the Equipment Notes under an Indenture on the earlier to occur of (A) the next succeeding Interest Payment Date or (B) 90 days after the date on which amounts payable by Lessee in respect such Event of Loss are due pursuant to the relevant Lease (each, a "Prepayment Date"). The amount prepaid will be equal to the sum of (i) as to principal, an amount equal to the product obtained by multiplying the aggregate unpaid principal amount of the Equipment Notes as of the Prepayment Date (after deducting therefrom the scheduled principal installment, if any, due on the Prepayment Date) by a fraction, the numerator of which shall be the Issuer's Cost of such Unit and the denominator of which shall be the aggregate Issuer's Cost subject to the lien under the relevant Indenture immediately prior to the Prepayment Date, and (ii) as to interest, the aggregate amount of interest accrued and unpaid in respect of the principal amount to be prepaid pursuant to clause (i) above to but not including the Prepayment Date after giving effect to the application of any Base Rent paid on or prior to the date of such

REDACTED

General Motors Corporation                                    *Confidential*

prepayment plus all amounts then due and payable to holders of the Equipment Notes, the Indenture Trustee and the Noteholders. No Make-Whole Premium will be payable in the event of a prepayment under such circumstances.

(ii)    In the event Lessee elects to exercise its EBO (as described under "The Lease - Buyout Options" below) or Early Termination Option (see "The Lease - Obsolescence" below) under a Lease, unless the Equipment Notes are exchanged for new notes in accordance with the terms of the Indenture upon exercise of the EBO, the applicable portion of the proceeds from Lessee's payment of the amount specified under the Lease as the Termination Value or EBO Price, as the case may be, will be used to prepay the Equipment Notes. The amount prepaid will be equal to the principal and accrued interest thereon, computed as provided in paragraph (i) above, plus a Make-Whole Premium.

(iii)    On and after the fifth anniversary of the issuance of the Equipment Notes, an Issuer may prepay all, but not less than all, of the Equipment Notes under an Indenture at a price equal to the aggregate unpaid principal amount thereof, together with accrued interest thereon, plus a Make-Whole Premium, in connection with a refinancing of the Equipment Notes requested by Lessee.

(iv)    If at any time an Indenture Event of Default not arising from a Lease Event of Default (as defined below) shall have occurred and be continuing and the Indenture Trustee has given notice of its intent to accelerate the Equipment Notes under the affected Indenture or to exercise other substantial remedies, an Issuer may elect to prepay or purchase all of its then outstanding Equipment Notes. In the event of such election, any Make-Whole Premium which has previously become due in respect of any event other than a Lease Event of Default giving rise to an Indenture Event of Default shall become due and payable. No other Make-Whole Premium will be payable in the event of a prepayment or purchase under such circumstances.

(v)    If at any time there is an uncured Indenture Event of Default under an Indenture that is caused solely by a Lease Event of Default, whether or not the Indenture Trustee has taken action to accelerate the Equipment Notes, if the Indenture Trustee has not at the time attempted to exercise

General Motors Corporation                                              *Confidential*

any remedies, an Issuer may elect to prepay or purchase all of its then outstanding Equipment Notes at a price equal to the aggregate unpaid principal amount thereof, together with accrued and unpaid interest thereon, plus a Make-Whole Premium. However, if an Issuer elects to prepay or purchase all of its then outstanding Equipment Notes after the expiration of the 180 day period following such Lease Event of Default, and the Indenture Trustee has still not attempted to exercise any remedies, no Make-Whole Premium shall be due and payable (without limiting the obligations of Lessee under the Lease to pay such Make-Whole Premium as Supplemental Rent in respect of such Lease of Event of Default and to indemnify the Loan Participants and the Noteholders under the Participation Agreement for such Make-Whole Premium).

**Collateral Securing Equipment Notes:**

The Equipment Notes issued by an Issuer will be secured by an assignment to the Indenture Trustee of all of such Issuer's rights under its Lease, including the right to receive Rentals thereunder (with certain exceptions) from the Lessee, and a duly perfected, first priority security interest in the Equipment. The amounts payable by the Lessee under each Lease shall be at least sufficient to pay in full when due all payments of principal, of Make Whole Premium, if any, and interest on the Equipment Notes under the corresponding Indenture.

**Exchange of Equipment Notes Under Certain Circumstances:**

Under certain circumstances, Lessee or an affiliate has the right, subject to certain conditions, to cause the Indenture Trustee to exchange all (but not less than all) of the Equipment Notes issued under the corresponding Indenture for full recourse, senior unsecured notes of GM or any of its affiliates. Such new notes will be issued in the full outstanding principal amount, bear the same interest rate, be payable in installments in the same manner, have the same final maturity and otherwise have substantially the same terms as the Equipment Notes being exchanged, with appropriate modifications to reflect the unsecured character of such new notes. If the Equipment Notes are exchanged for notes of an affiliate of GM, such affiliate's obligations under the notes will be irrevocably and unconditionally guaranteed by GM.

**Indenture Events of Default; Remedies:**

Defaults under each Indenture ("Indenture Events of Default") shall include the following:

(i)    Failure to pay principal, interest or a Make-Whole Premium within five (5) business days after they become due;

11                                                      *Banc of America Securities LLC*

**General Motors Corporation**                                        *Confidential*

(ii)    The failure of the relevant Issuer to comply in any material respect with any other covenant or other obligation, which failure is not remedied within a period of 30 days after written notice thereof; provided, however, that if such breach cannot be cured by payment of money and cannot be cured by diligent efforts within such period but such efforts shall be properly commenced within such period, the cure period, as long as such Issuer is diligently pursuing a cure, shall be extended for an additional period of time (not to exceed 90 additional days) as may be necessary to cure so long as there is no material risk to the Indenture estate or the validity or perfection of the Indenture Trustee's security interest therein;

(iii)   Any representation or warranty of the relevant Issuer or the Owner Participant party to the relevant Indenture proving to be inaccurate in any material respect when made, unless such inaccuracy is no longer material or any material adverse impact thereof is cured within 30 days after notice to such Issuer or Owner Participant, as applicable;

(iv)    Commencement of voluntary bankruptcy or insolvency proceedings by the relevant Issuer or Owner Participant;

(v)     Involuntary bankruptcy petition filing against the relevant Issuer or Owner Participant, or appointment of receiver of such Issuer or Owner Participant or its assets, which filing or appointment shall not be dismissed, discharged or stayed within 90 days;

(vi)    A Lease Event of Default (other than the failure to perform or to make a payment relating to the relevant Owner Trustee's or Owner Participant's right with respect to excepted property, such as tax and general indemnities and the proceeds of public liability insurance) has occurred and is continuing and has not been waived or cured thereunder; or

(vii)   The relevant Owner Participant or the Owner Trustee causes or suffers to exist any Issuer lien or Owner Participant lien on the Indenture estate (other than liens permitted under the Participation Agreement).

Noteholders will agree not to exercise remedies for an Indenture Event of Default which may result from a Lease Event of Default unless they are simultaneously exercising material remedies under the Lease; provided, however, that in the event

General Motors Corporation                                              *Confidential*

the Indenture Trustee is stayed or otherwise prohibited from exercising such material remedies under the Lease by the operation of any law affecting creditors' rights for a period of 180 days, the Indenture Trustee may at the expiration of any such 180-day period exercise such Indenture remedies.

In the event of a Lease Event of Default under a Lease of undivided interests in an item of Equipment, but not under the other Lease of the remaining undivided interest in such item of Equipment, the Noteholders' remedies with respect to such item of Equipment will be limited to remedies which may be effected with respect to the undivided interest in such item of Equipment represented by such defaulted Lease.

**Lessors' Rights:** Each Lessor, with respect to its Lease, will be entitled to written notice of Lease Events of Default and will have rights to cure Indenture Events of Default that arise from Lease Events of Default except that its right to cure an Indenture Event of Default (i) resulting from the failure by Lessee to pay Rentals will be limited to the right to cure an aggregate of six defaults, or three consecutive defaults and (ii) resulting from any other failure by Lessee will be limited to an amount equal to 1.5% of Lessor's Cost during the 12-month period immediately preceding the relevant default. Additionally, a Lessor will not be entitled to cure any failure by Lessee to make any payments under a Lease with respect to the excepted property.

**Retention of Amounts by Indenture Trustee:** If at the time of receipt by the Indenture Trustee of an installment of Rentals under a Lease, there has occurred and is continuing an Indenture Event of Default under the affected Indenture, the Indenture Trustee shall retain and not distribute any amount otherwise required to be distributed to the Issuer pursuant to such Indenture until the earliest of (i) the cure of such Indenture Event of Default; (ii) the Indenture Trustee's receipt of instructions to exercise material remedies in respect of such Indenture Event of Default or the acceleration of the related Equipment Notes, in which case payments will be distributed to the relevant Issuer only after the holders of the Equipment Notes and the Noteholders have been made whole (including repayment of the outstanding principal balance of the Equipment Notes, together with all accrued interest and Make-Whole Premium due, if any); and (iii) the expiration of the 180 day period following such Indenture Event of Default. The retention by the Indenture Trustee of amounts with respect to an initial Indenture Event of Default does not preclude the Indenture Trustee from withholding from time to time subsequent installments of Rentals based on any other Indenture Event of

General Motors Corporation                                    *Confidential*

Default.

| | |
|---|---|
| **Certain rights of the Owner Trustee and Indenture Trustee:** | The Owner Trustee (or the Owner Participant, as appropriate) and the Indenture Trustee, on a non-exclusive basis, shall be entitled (i) to exercise its rights to make a payment of Rent or perform or comply instead of Lessee pursuant to the relevant Lease; (ii) to receive from Lessee, all notices, certificates, reports, filings, opinions of counsel and other documents and all information which Lessee is permitted or required to give or furnish to the Owner Trustee pursuant to any operative document; (iii) to exercise rights of inspection pursuant to the relevant Lease; (iv) to exercise any election or option or make any decision or determination or to give or receive any notice, consent, waiver or approval in respect of any excepted property; (v) to approve appraisers, lawyers and other professionals and receive notices, certificates, reports, filings, opinions and other documents with respect to the relevant Owner Participant's tax position; (vi) to retain the non-exclusive right to be named as an insured in policies of insurance and to seek specific performance of the covenants of Lessee under a Lease; (vii) to cause Lessee to take any action and execute and deliver such documents and assurances as a Lessor may reasonably request from time to time to more effectively carry out the intent and purpose of the relevant lease; and (viii) to seek as Lessor specific performance of the covenants of Lessee under the relevant Lease relating to the insurance, operation, maintenance, repair, use and return of the Equipment or any part thereof, provided that the Indenture Trustee is not exercising material remedies in respect of a Lease Event of Default resulting from Lessee's failure to comply with such covenants. |

The Owner Trustee acting together with the Indenture Trustee shall have the right to (i) supplement, amend, modify, waive, grant consents under or take action as requested under the Indenture Documents; (ii) approve as satisfactory any other accountants, engineers or counsel to render services for or issue opinions to the Owner Trustees pursuant to express provisions of the operative Documents; and (iii) to exercise all other rights, powers and privileges of a Lessor under or with respect to the Indenture Documents.

The Owner Trustee (or an Owner Participant, as appropriate) shall at all times have the right, to the exclusion of the Indenture Trustee (A) to demand, collect, sue for, or otherwise receive and enforce the payment of excepted property due and payable to it (including the right to declare a Lease in default in respect of nonpayment of excepted property but not the right to exercise any remedy under the corresponding Lease in respect thereof

REDACTED

*Banc of America Securities LLC*

General Motors Corporation                                    *Confidential*

other than a suit for specific performance or for money damages); (B) to adjust interim lease payments, base rents and stipulated loss values, termination values and early fixed price purchase amounts pursuant to the relevant Lease or other operative documents (and make the appropriate supplements to the relevant lease for effecting such adjustments); and (C) maintain separate insurance pursuant to the relevant Lease.

So long as no Indenture Event of Default shall have occurred and be continuing under the relevant Indenture, the Owner Trustee shall have the right, to the exclusion of the Indenture Trustee, to exercise all rights of the relevant Lessor to make any decision or determination, and to give any notice, consent, waiver and approval with respect to solicitation of bids under the relevant Lease.

Whether or not an Indenture Event of Default has occurred and is continuing under the corresponding Indenture, the Indenture Trustee shall have the right, to the exclusion of the Owner Trustee to the extent provided in such Indenture, to receive money payable to the Lessor pursuant to the corresponding Lease (other than excepted property) for application as provided in such Indenture and to exercise the rights of the Lessor under the corresponding Lease, including the right to declare such Lease in default other than with respect to the payment of excepted property, and to exercise the remedies set forth therein.

If an Indenture Event of Default which is a Lease Event of Default under the relevant Lease, and such event has occurred and is continuing, and no other Indenture Event of Default which is not a Lease Event of Default has occurred and is continuing, the Indenture Trustee will not, without the Owner Trustee's consent (such consent not to be unreasonably withheld), amend, modify or supplement such Lease or any document delivered pursuant to it.

Except with respect to excepted property to which the Owner Trustee or an Owner Participant are entitled, the Owner Trustee will not, without the prior written consent of the Indenture Trustee, agree to any amendment, modification, waiver, discharge, supplement or termination, or grant any consent under, any term or provision of any bill of sale, which amendment, modification, waiver, discharge, supplement or termination, or grant of consent would have a material adverse effect on the rights of the Owner Trustee or Indenture Trustee thereunder.

**REDACTED**

15                                    *Banc of America Securities LLC*

General Motors Corporation                                      *Confidential*

Lessee for any reason.

**Buyout Options:**        So long as no Event of Default shall have occurred and be
                          continuing, Lessee will have the following purchase options with
                          respect to the Equipment on a Unit by Unit basis:

(i)     at the end of the applicable Base Lease Term at the then
        fair market value (determined based on their in-exchange
        value as deemed by an appraiser) plus all other amounts
        due under the applicable Lease;

(ii)    on the EBO date set forth in such Lease (the "EBO
        Date") for a cash price equal to the EBO price for the Unit
        (the "EBO Price"). The EBO Price will be sufficient to
        repay the outstanding principal plus accrued and unpaid
        interest on the corresponding portion of the Equipment
        Notes.

Lessee's exercise of any purchase option with respect to
Equipment leased by one Lessor will not result in any obligation
to exercise (or refrain from exercising) its corresponding
purchase option with respect to any other Lessor, including with
respect to Equipment as to which undivided interests have been
established.

**Lease Events of Default:**   Each of the following events, and only the following events,
                               shall constitute an "Event of Default" under each Lease:

(i)     Lessee shall fail to make any payment of Base Rent,
        Stipulated Loss Value, Termination Value, purchase
        price payable on exercise of a purchase option or any
        payment relating solely to the Make-Whole Premium
        when due and such failure shall continue for 5 business
        days; or

(ii)    Lessee shall fail to make any other payment required
        under the terms of the Lease other than those covered in
        clause (i) above, and such failure shall continue for 30
        business days after written demand from an Issuer, the
        Indenture Trustee or any Noteholder; or

(iii)   Lessee merges, consolidates or sells all or substantially
        all of its assets to any person or entity unless Lessee is
        the continuing corporation or the successor corporation is
        a corporation organized under the laws of the United
        States or a state thereof and such corporation expressly
        assumes the obligations of Lessee; or

**REDACTED**

17                          *Banc of America Securities LLC*

General Motors Corporation                                        *Confidential*

REDACTED

(iv)    the failure of Lessee to comply in any material respect with any other material Lease obligation for 90 days after written notice thereof; provided, however, that if such breach cannot be cured by payment of money and cannot be cured by diligent efforts within such 90-day period, but shall be properly commenced within such 90 days, the cure period, as long as Lessee is diligently pursuing the cure, shall be extended for an additional 90 days (but not later than 90 days before the end of the applicable Lease term); or

(v)     any representation or warranty made by Lessee (other than tax representations or warranties), in any transaction document (other than the Tax Indemnity Agreement) or in any report, certificate, financial or other written statement delivered in connection with any transaction document shall fail at any time to be correct as of the date made in any material respect, unless such inaccuracy is no longer material or any material adverse impact thereof is cured within 90 days after (a) actual knowledge thereof by Lessee or (b) written notice to Lessee; or

(vi)    commencement of voluntary bankruptcy or insolvency proceedings by Lessee; or

(vii)   any involuntary bankruptcy petition filing against Lessee, or appointment of receiver of Lessee or its assets, which filing or appointment shall not be dismissed, discharged or stayed within 90 days; or

(viii)  Lessee shall fail to carry and maintain the required insurance with respect to the Equipment and such failure shall continue until the fifth day before the end of the period during which, under the terms of the applicable policy, the lapse or cancellation of such policy is not effective as to the additional insureds named therein; or

(ix)    if a guaranty is delivered in connection with the exchange of the Equipment Notes for full recourse, senior unsecured notes of an affiliate of GM, (A) a default under such guaranty which default shall have continued for 45 days; provided that is such default cannot be cured within such 45-day period, but shall be properly commence within such 45 days, and if GM is diligently pursuing the cure, the cure period shall be extended for an additional 180 days, or (B) such guaranty is invalid or otherwise unenforceable in any respect.

*Banc of America Securities LLC*

General Motors Corporation                                            *Confidential*

No cross-default provisions or cross-acceleration will be provided as between a Lease entered into with one Lessor and any other agreement to which Lessee is a party (including the Lease entered into with the another Lessor).

**Maintenance; Use:**   Lessee (or any sublessee or assignee) will be entitled to use the Equipment anywhere in the continental United States. Lessee will maintain the Equipment in a non-discriminatory manner consistent with GM's general practice and in accordance with prudent industry practice, manufacturers' warranty requirements (during the warranty period) and Lessee's established maintenance and repair programs so as to keep the Equipment (i) in good working order, ordinary wear and tear from proper use excepted, and (ii) in such condition as shall meet in all material respects all applicable federal, state or local laws or regulations other than those being contested in good faith without substantial risk of forfeiture.

**Net Lease:**   Each Lease will be a triple net lease. Lessee shall be responsible for the cost of maintenance, insurance, ongoing trustee fees and taxes. Each Issuer will agree to cooperate with Lessee in preparing and filing state and local property tax returns with respect to the Equipment during the Lease Term, in the manner required to preserve any existing tax abatements or exemptions applicable to the Equipment; provided, however, that Lessee will prepare and file such state and local property returns solely and in its own discretion without any interference by the part of an Issuer. Neither Issuer will be entitled to prepare or file any state and local property tax returns with respect to the Equipment. Lessee shall not be responsible for any withholding taxes imposed on amounts payable under the Lease or the Equipment Notes as long as Lessee is resident of the United States.

**General Indemnity:**   Lessee will, subject to contest rights and rights of subrogation in favor of Lessee, indemnify and hold harmless the Owner Participants, the Noteholders, the Issuers, the Owner Trustees and the Indenture Trustees and their respective officers and employees (each, an "Indemnitee"), on an after-tax basis, from certain liabilities, claims and expenses relating to (i) each Lease and related documentation; (ii) the ownership of the Equipment during the Lease Term; (iii) the use, operation, condition or possession of any Unit during the Lease Term; (iv) the offer, sale, purchase, holding or delivery of the Equipment Notes; (v) the application of certain provisions of ERISA and the Internal Revenue Code to the transactions contemplated hereby; (vi) the inability of full right, title and interest to the Equipment to vest in the Owner Trustees; and (vii) any Make-Whole Premium due in respect of an Event of Default under the Lease, excluding

General Motors Corporation

*Confidential*

customary items including:

(i)    Any claim arising from acts or events occurring after the earlier of (x) the return of the Equipment in accordance with the applicable Lease and (y) the expiration of a Lease under circumstances not requiring the return of the Equipment, other than in connection with the exercise of remedies upon a default under the Lease or until all payments have been made with respect to an Event of Loss;

(ii)    any claim against any such Indemnitee resulting from the willful misconduct or gross negligence of such Indemnitee, or any misrepresentation or the breach of any warranty or covenant given or made by such person in the Lease or any related document, except to the extent such willful misconduct or gross negligence is imputed as a matter of law to the Indemnitee or the Indemnitee's related group as a result of Indemnitee's ownership interest in the Equipment or participation in the transactions contemplated in the operative documents;

(iii)    any claim to the extent attributable to a disposition in connection with an Indenture Event of Default if such Event of Default is the result of the action, inaction, bankruptcy or insolvency of such Indemnitee, and any voluntary transfer by an Issuer of the Equipment or any portion thereof or by an Owner Participant of all or any portion of its interest in the trust estate or by Noteholders other than any transfer required by the operative documents or made during the continuance of a Lease Event of Default;

(iv)    with respect to Issuers and Owner Participants only, any claim resulting from the imposition of any Issuer lien or Owner Participants lien;

(v)    any claim that is a usual operating or overhead expense unless incurred in connection with a Lease Event of Default;

(vi)    any tax liability (which will be addressed by a separate indemnity);

(vii)    any claim to the extent attributable to a negligent failure on the part of the Indenture Trustee or an Owner Trustee to distribute in accordance with the Indenture or the Trust Agreement, as the case may be, any amounts received and distributable by it thereunder;

*Banc of America Securities LLC*

General Motors Corporation                                          *Confidential*

(viii) any claim to the extent attributable to the authorization or giving or withholding of any future amendments, supplements, waivers or consents with respect to any of the operative documents by such Indemnitee, other than if such action (A) is requested or consented by the Lessee or is required by the Lessee under any operative documents; (B) occurs as a result of a Lease Event of Default that has occurred and is continuing; or (C) if such action is required or contemplated by (and in compliance with) the provisions of the operative documents or by applicable law;

(ix) as to the Owner Participant only, any claim to the extent that it would not have arisen but for the appointment of a successor Owner Trustee without the consent of the Lessee, except in connection with the appointment of a successor Owner Trustee as a result of (A) the Owner Trustee becoming subject to certain taxes for which it is indemnified pursuant to the relevant Lease, or (B) the Owner Trustee's tangible net worth being less than $75,000,000, or (C) the long-term credit rating of the institution acting as Owner Trustee falling below investment grade and as result thereof, the Lessee or the Indenture Trustee should request that the situs of the trust be moved or the Owner Trustee be replaced;

(x) any claim to the extent attributable to the waiver by the Indenture Trustee of any condition precedent set forth in the operative documents for the transfer by an Owner Participant of its interest in the estate of any Issuer (unless Lessee has also waived such condition precedent); and

(xi) any claim for Transaction Expenses which Owner Participants have agreed to pay, or that relates to a cost, fee or expense payable by a person other than Lessee pursuant to any provision of certain operative documents (other than those provisions pursuant to which Lessee is specifically liable in case such person fails to pay the same, in which case the Lessee shall be entitled to reimbursement on an after-tax basis from such person).

**Event of Loss:**

If any Unit is destroyed, taken in condemnation, damaged by casualty to the extent that it cannot economically be repaired, or if such Unit is requisitioned for use by a governmental entity for a period extending beyond the end of the Lease Term (each a "Event of Loss"), Lessee shall be obligated to either (i) substitute such Unit with the same or improved model or series of equipment of the same value, utility and remaining useful life

REDACTED

**General Motors Corporation**                                    *Confidential*

and estimated residual value or (ii) pay Stipulated Loss Value with respect to such Unit as set forth in the Lease.

**Insurance:**

Lessee will maintain, or cause to be maintained, insurance with respect to the Equipment against public liability and casualty in such amounts and with such deductibles or self-insurance as is generally carried by Lessee with respect to similar equipment (subject to a $50 million per occurrence limit on deductibles and self-insurance).

**Lessee Assumption of Debt:**

If (i) any Owner Participant or any affiliate (broadly defined) thereof is or acquires, is acquired by, merges or otherwise consolidates with any company or affiliate thereof engaged in automobile manufacturing, automobile distribution, automobile parts manufacturing or automobile parts distribution business, whether or not a direct competitor to Lessee or any affiliate thereof or (ii) Lessee exercises its EBO under the applicable Lease to purchase all, but not less than all, of the Equipment owned by each Owner Participant, on a certain date which will be provided for in the Lease, Lessee may purchase such Owner Participant's interest in the Equipment for a price equal to the Termination Value (for purchases authorized under (i) above) and at the EBO Price (for purchases authorized under (ii) above). An institutional investor which is a passive investor in the financing of equipment or facilities used in automobile manufacturing, automobile distribution, automobile parts manufacturing or automobile parts distribution business shall not, solely by reason of such investment, be deemed to be engaged in a business which is competitive with Lessee's automotive business.

If Lessee or an affiliate exercises its EBO described above, Lessee or an affiliate may elect to assume the relevant Issuer's obligations under all of the Equipment Notes issued under the corresponding Indenture by issuing, in exchange for such Equipment Notes, full recourse, unsecured notes of GM or any of its affiliates. In the event of such an exchange, the new notes will become direct obligations of GM or, if assumed by an affiliate of GM, the new notes will be irrevocably and unconditionally guaranteed by GM. Such new notes will be issued in the then-full outstanding principal amount, bear the same interest rate, be payable in installments in the same manner, have the same final maturity and otherwise have substantially the same terms as the Equipment Notes being exchanged, with appropriate modifications to reflect the unsecured character of such new notes.

**REDACTED**

22

*Banc of America Securities LLC*

General Motors Corporation                                                        *Confidential*

**Sublease and Assignment:**

Provided that no Lease Event of Default has occurred and is continuing, Lessee shall have the right, upon not less than 30 days' prior written notice to the applicable Lessor (and to the Indenture Trustee, if at such time the Indenture has not been discharged), to sublease the Equipment on a Unit by Unit basis at any time, and from time to time, so long as (i) the sublease is expressly subject and subordinated to the applicable Lease (and to the Indenture, if the Indenture has not been discharged); (ii) Lessee remains primarily liable under such Lease and under any other operative document; (iii) the Equipment remains within the continental United States and the Lessor is notified of its location (and if the Indenture has not been discharged, the Indenture Trustee and the Noteholders); (iv) other customary relocation conditions are met; (v) at the time the Lessee enters into such sublease, the sublessee is not subject to any bankruptcy, liquidation, reorganization or other similar procedure; (vi) such sublease will not permit further subleases; (vii) the term of such sublease does not extend beyond 30 days prior to the last day of the term of the corresponding Lease; (viii) evidence of insurance pursuant to the relevant Lease being in full force and effect shall have been provided to the Lessor (and to the Indenture Trustee if the Indenture has not been discharged at such time); and (ix) Lessee shall have provided an opinion of counsel as to the nonimpairment of the lien under the relevant Indenture and the continued perfection of the Indenture Trustee's security interest therein and such other matters as the Lessor or the Indenture Trustee may reasonably request (including an opinion of tax counsel to the effect that such sublease will not have any adverse U.S. federal income tax consequences to the corresponding Owner Participant).

In addition, provided no Lease Event of Default has occurred and is continuing, Lessee shall have the right to assign the Lease to any affiliate or non-affiliate (if Lessee expects to have a continuing business relationship with such entity), provided GM unconditionally guarantees the obligations of such assignee, and the Equipment remains within the boundaries of the continental United States.

**Return of Equipment:**

Lessee shall return the Equipment to the relevant Issuer in the condition required by the relevant Lease and in good working order, ordinary wear and tear from proper use excepted, disassembled and crated for shipment to the nearest railhead, free of all Lessee advertising or insignia placed thereon by Lessee. If the relevant Issuer so requests by giving 180 days' prior written notice, and Lessee in its reasonable judgment has available suitable storage space, Lessee will defer such return and will store the Equipment with no charge to such Issuer at

**General Motors Corporation**                                                                 *Confidential*

premises of Lessee used for storage by Lessee, for a period not to exceed 90 days. Costs of maintenance, insurance and additional handling during the storage period shall be borne by such Issuer. At the time of its return, the Unit shall be free and clear of all liens (except Issuer's and Owner Participants' liens). Prior to returning the Unit, Lessee shall provide an inspection report by a reputable environmental firm verifying that such Unit is in a condition suitable for transportation under applicable environmental law.

**Covenants; Mergers:**    No financial covenants shall be provided by Lessee, including, but not limited to, covenants concerning any adverse change in Lessee's financial condition. Lessee may only merge, consolidate or sell all or substantially all of its assets to any person or entity if Lessee is the continuing corporation or the successor corporation is a corporation organized under the laws of the United States or a state thereof and such corporation expressly assumes the obligations of Lessee.

**Inspection; Reports:**    Owner Participants and Noteholders will have customary rights of inspection of the Equipment on specified days (once annually, unless an Event of Default shall have occurred) upon prior written notice to Lessee, subject to confidentiality arrangements and requirements reasonably prescribed by Lessee. Lessee will furnish, upon request, to the Noteholders and the Owner Participants its quarterly and annual financial statements filed with the Securities and Exchange Commission.

**Environmental Laws:**    Lessee shall comply in all material respects with all environmental authorities and governmental actions now or hereafter applicable to the use, operation and maintenance of any Unit of the Equipment (including any modification thereto), including all environmental laws relating to release reporting (as defined in environmental laws), any response activities (as defined in environmental laws) taken to address any such release, except for those instances of non-compliance which would not have a material adverse effect upon the value or the physical operating condition of any Unit of the Equipment or impair the Owner Trustee's title thereto.

**Services:**    Neither Owner Participant will be required to provide any services in favor of Lessee with respect to the Equipment.

**Quiet Enjoyment:**    Lessee will be entitled to quiet enjoyment of the Equipment so long as there is no Lease Event of Default under the Lease.

**Additions, Modifications,**    Lessee shall be required to make changes, additions, modifications or improvements to the Equipment required by

**REDACTED**

*Banc of America Securities LLC*

General Motors Corporation                                              *Confidential*

**and Improvements:**
law ("Required Modifications") and (so long as no Material Default or Lease Event of Default has occurred and is continuing) will have the right to make changes, additions, modifications or improvements ("Voluntary Modifications") to the Equipment that it deems necessary or appropriate, provided that such Voluntary Modifications do not materially decrease the utility, value or estimated residual value of the Equipment, materially reduce its remaining useful life or cause it to become limited use property.

If Lessee's proposed Voluntary Modifications will not be readily removable from the Equipment at the end of the Lease Term, they shall be deemed part of the Equipment and shall be subject to the terms of the applicable Lease and to the lien of the corresponding Indenture.   If Lessee's proposed Voluntary Modifications are such that they can be readily removed from the Equipment without reducing the value of the Equipment assuming the Voluntary Modification had not been made, Lessee shall retain complete ownership rights to such Voluntary Modification and such Voluntary Modification shall not be subject to such Lease or the lien of such Indenture. Required Modifications which are required by law shall be deemed part of the Equipment and shall be subject to the terms of the Lease and to the lien of the Indenture.

*Miscellaneous*

**Commitments:**
The commitments of the Owner Participants, the Noteholders and Lessee to enter into the Leases, the Indentures and the transactions contemplated hereby will expire on December 31, 2001.

**Separate Transaction Documents:**
Each Lessor will enter into separate Transaction Documents. None of the Indenture, nor the Leases or the other related Transaction Documents entered into by one Lessor will contain a cross-collateralization or cross-default to the   Indenture, Leases or related Transaction Documents entered into by another Lessor.

**Document Preparation:**
Lessee's counsel, Kirkland & Ellis, will prepare all of the documentation in connection with the transaction, with the exception of the Tax Indemnity Agreement which will be prepared by Owner Participants' counsel.

**Transaction Expenses:**
The Owner Participants shall pay their ratable share of the total transaction costs and such transaction costs shall be capitalized into the Rentals. In the event that the transaction does not close, Lessee will pay the reasonable fees and out-of-pocket expenses

25                                          *Banc of America Securities LLC*

**General Motors Corporation**                                                    *Confidential*

of the Owner Trustees, the Indenture Trustee, the Owner Participants and the Noteholders, provided, that if the transaction does not close due to a party's breach of its obligations, the Lessee shall not be obligated to pay the transaction costs of such party, except for the fees and expenses of its special counsel.

**Governing Law:**      The transaction and documentation will be governed by the laws of the State of New York.

*Closing Conditions*

**Closing Conditions:**      The obligations of Lessee, Owner Participants and Noteholders to enter into the transaction contemplated hereby shall be subject to customary conditions, including the following:

(i)      execution of documentation satisfactory to the parties;

(ii)      receipt by the Owner Participants and Noteholders of their respective internal approvals;

(iii)      receipt by Lessee of its internal approvals;

(iiii)      receipt by Owner Participants of an appraisal and tax opinion in form and substance satisfactory to it; and

(iv)      accounting treatment satisfactory to the parties.

Any conditions precedent to the effectiveness of Transaction Documents entered into by one Lessor may be complied with (or waived) independent and separately from conditions precedent to the effectiveness of Transaction Documents entered into by the any other Lessor.

**Change In Tax Law:**      It will be a condition to the Lessee's obligation to close, with respect to each Unit, that there has not occurred any Change in Tax Law since November __ , 2001 and prior to the Closing Date which has caused the net present value of Rentals and EBO Price through and including the EBO Date with respect to such Unit discounted at [__]% semi-annually, to increase by 25 basis points or more.

                                                    *Banc of America Securities LLC*

General Motors Corporation                                              *Confidential*

## Exhibit A-1

### Sample Amortization Schedule

Stamping Presses
Loan 1 Amortization  Interest Rate 7.30000%
Average Life 10.226375 Years

| Date | Principal | Interest | Debt Service |
|------|-----------|----------|--------------|
| 14-Dec-01 | - | - | - |
| 14-Mar-02 | - | 1,288,515 | 1,288,515 |
| 02-Jul-02 | - | 1,546,218 | 1,546,218 |
| 02-Jan-03 | - | 2,577,030 | 2,577,030 |
| 02-Jul-03 | - | 2,577,030 | 2,577,030 |
| 02-Jan-04 | - | 2,577,030 | 2,577,030 |
| 02-Jul-04 | 189,309 | 2,577,030 | 2,766,338 |
| 02-Jan-05 | - | 2,570,120 | 2,570,120 |
| 02-Jul-05 | 2,411,364 | 2,570,120 | 4,981,484 |
| 02-Jan-06 | - | 2,482,105 | 2,482,105 |
| 02-Jul-06 | 2,587,393 | 2,482,105 | 5,069,498 |
| 02-Jan-07 | - | 2,387,665 | 2,387,665 |
| 02-Jul-07 | 2,776,273 | 2,387,665 | 5,163,938 |
| 02-Jan-08 | - | 2,286,331 | 2,286,331 |
| 02-Jul-08 | 4,445,556 | 2,286,331 | 6,731,888 |
| 02-Jan-09 | - | 2,124,068 | 2,124,068 |
| 02-Jul-09 | 4,465,069 | 2,124,068 | 6,589,137 |
| 02-Jan-10 | 24,129,426 | 1,961,093 | 26,090,519 |
| 02-Jul-10 | - | 1,080,369 | 1,080,369 |
| 02-Jan-11 | 7,336,792 | 1,080,369 | 8,417,161 |
| 02-Jul-11 | - | 812,576 | 812,576 |
| 02-Jan-12 | 6,889,187 | 812,576 | 7,701,763 |
| 02-Jul-12 | - | 561,121 | 561,121 |
| 02-Jan-13 | 1,156,542 | 561,121 | 1,717,663 |
| 02-Jul-13 | - | 518,907 | 518,907 |
| 02-Jan-14 | - | 518,907 | 518,907 |
| 02-Jul-14 | - | 518,907 | 518,907 |
| 02-Jan-15 | - | 518,907 | 518,907 |
| 02-Jul-15 | - | 518,907 | 518,907 |
| 02-Jan-16 | - | 518,907 | 518,907 |
| 02-Jul-16 | - | 518,907 | 518,907 |
| 02-Jan-17 | - | 518,907 | 518,907 |
| 02-Jul-17 | - | 518,907 | 518,907 |
| 02-Jan-18 | - | 518,907 | 518,907 |
| 02-Jul-18 | - | 518,907 | 518,907 |
| 02-Jan-19 | - | 518,907 | 518,907 |
| 02-Jul-19 | 15,376 | 518,907 | 534,283 |
| 02-Jan-20 | - | 518,346 | 518,346 |
| 02-Jul-20 | 1,753,589 | 518,346 | 2,271,935 |
| 02-Jan-21 | - | 454,340 | 454,340 |
| 02-Jul-21 | 4,685,364 | 454,340 | 5,139,704 |
| 02-Jan-22 | 7,762,310 | 283,324 | 8,045,635 |
| Total  $ | 70,603,550   $ | 52,687,149   $ | 123,290,699 |

*Banc of America Securities LLC*

General Motors Corporation                                          *Confidential*

### Exhibit A-2

Sample Amortization Schedule

Tonawanda Engine Lines
Loan 1 Amortization   Interest Rate 7.15000%
Average Life 7.13841 Years

| Date | Principal | Interest | Debt Service |
|---|---|---|---|
| 14-Dec-01 | - | - | |
| 14-Mar-02 | - | 877,656 | 877,656 |
| 02-Jul-02 | - | 1,053,187 | 1,053,187 |
| 02-Jan-03 | - | 1,755,311 | 1,755,311 |
| 02-Jul-03 | - | 1,755,311 | 1,755,311 |
| 02-Jan-04 | - | 1,755,311 | 1,755,311 |
| 02-Jul-04 | 1,759,695 | 1,755,311 | 3,515,006 |
| 02-Jan-05 | - | 1,692,402 | 1,692,402 |
| 02-Jul-05 | 2,664,966 | 1,692,402 | 4,357,369 |
| 02-Jan-06 | - | 1,597,130 | 1,597,130 |
| 02-Jul-06 | 2,855,512 | 1,597,130 | 4,452,641 |
| 02-Jan-07 | - | 1,495,045 | 1,495,045 |
| 02-Jul-07 | 3,059,681 | 1,495,045 | 4,554,726 |
| 02-Jan-08 | - | 1,385,662 | 1,385,662 |
| 02-Jul-08 | 3,278,448 | 1,385,662 | 4,664,109 |
| 02-Jan-09 | 16,116,660 | 1,268,457 | 17,385,118 |
| 02-Jul-09 | 1,921,077 | 692,287 | 2,613,364 |
| 02-Jan-10 | 5,780,099 | 623,608 | 6,403,707 |
| 02-Jul-10 | - | 416,970 | 416,970 |
| 02-Jan-11 | 6,803,449 | 416,970 | 7,220,419 |
| 02-Jul-11 | - | 173,746 | 173,746 |
| 02-Jan-12 | 4,860,035 | 173,746 | 5,033,781 |
| 02-Jul-12 | - | - | - |
| 02-Jan-13 | - | - | - |
| 02-Jul-13 | - | - | - |
| 02-Jan-14 | - | - | - |
| 02-Jul-14 | - | - | - |
| 02-Jan-15 | - | - | - |
| 02-Jul-15 | - | - | - |
| 02-Jan-16 | - | - | - |
| 14-Mar-16 | - | - | - |
| Total  $ | 49,099,621   $ | 25,058,350   $ | 74,157,972 |

28                                          *Banc of America Securities LLC*

General Motors Corporation                                              *Confidential*

## Exhibit A-3

### Sample Amortization Schedule

**Flint South Engine Line**
Loan I Amortization   Interest Rate 7.15000%
Average Life 8.19965 Years

| Date | Principal | Interest | Debt Service |
|------|-----------|----------|--------------|
| 14-Dec-01 | - | - | - |
| 14-Mar-02 | - | 3,641,992 | 3,641,992 |
| 02-Jul-02 | - | 4,370,390 | 4,370,390 |
| 02-Jan-03 | - | 7,283,984 | 7,283,984 |
| 02-Jul-03 | - | 7,283,984 | 7,283,984 |
| 02-Jan-04 | - | 7,283,984 | 7,283,984 |
| 02-Jul-04 | 7,433,511 | 7,283,984 | 14,717,495 |
| 02-Jan-05 | - | 7,018,236 | 7,018,236 |
| 02-Jul-05 | 11,146,463 | 7,018,236 | 18,164,699 |
| 02-Jan-06 | - | 6,619,750 | 6,619,750 |
| 02-Jul-06 | 11,943,435 | 6,619,750 | 18,563,185 |
| 02-Jan-07 | - | 6,192,772 | 6,192,772 |
| 02-Jul-07 | 12,797,390 | 6,192,772 | 18,990,163 |
| 02-Jan-08 | - | 5,735,266 | 5,735,266 |
| 02-Jul-08 | 13,712,404 | 5,735,266 | 19,447,669 |
| 02-Jan-09 | - | 5,245,047 | 5,245,047 |
| 02-Jul-09 | 14,692,841 | 5,245,047 | 19,937,888 |
| 02-Jan-10 | 43,905,986 | 4,719,778 | 48,625,764 |
| 02-Jul-10 | - | 3,150,139 | 3,150,139 |
| 02-Jan-11 | - | 3,150,139 | 3,150,139 |
| 02-Jul-11 | - | 3,150,139 | 3,150,139 |
| 02-Jan-12 | 39,922,611 | 3,150,139 | 43,072,750 |
| 02-Jul-12 | 2,631,261 | 1,722,906 | 4,354,167 |
| 02-Jan-13 | 45,561,906 | 1,628,838 | 47,190,745 |
| 02-Jul-13 | - | - | - |
| 02-Jan-14 | - | - | - |
| 02-Jul-14 | - | - | - |
| 02-Jan-15 | - | - | - |
| 02-Jul-15 | - | - | - |
| 02-Jan-16 | - | - | - |
| 02-Jul-16 | - | - | - |
| 02-Jan-17 | - | - | - |
| **Total** $ | 203,747,808 $ | 119,442,540 $ | 323,190,348 |

*Banc of America Securities LLC*

# <u>Schedule 2</u>

GM 2001A-2
DOCUMENT 2

# LEASE AGREEMENT

(GM 2001A-2)
dated as of December 18, 2001

between

STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT
NATIONAL ASSOCIATION,
a national banking association,
not in its individual capacity
except as expressly stated herein,
but solely as Owner Trustee,

as Lessor

and

## GENERAL MOTORS CORPORATION,

as Lessee

## GENERAL MOTORS CORPORATION
Leveraged Lease of Automobile Manufacturing Equipment

CERTAIN RIGHTS OF THE LESSOR UNDER THIS LEASE AGREEMENT HAVE BEEN ASSIGNED TO, AND ARE SUBJECT TO A SECURITY INTEREST IN FAVOR OF, WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION AS INDENTURE TRUSTEE, UNDER THE TRUST INDENTURE AND SECURITY AGREEMENT, DATED AS OF DECEMBER 18, 2001, BETWEEN THE LESSOR AND THE INDENTURE TRUSTEE, AS SUCH INDENTURE MAY BE AMENDED, MODIFIED OR SUPPLEMENTED FROM TIME TO TIME IN ACCORDANCE WITH THE PROVISIONS THEREOF. THIS LEASE AGREEMENT HAS BEEN EXECUTED IN SEVERAL COUNTERPARTS. TO THE EXTENT THAT THIS LEASE AGREEMENT CONSTITUTES CHATTEL PAPER (AS SUCH TERM IS DEFINED IN THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN ANY APPLICABLE JURISDICTION), NO SECURITY INTEREST IN THIS LEASE AGREEMENT MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART HEREOF OTHER THAN THE "ORIGINAL EXECUTED COUNTERPART," WHICH SHALL BE IDENTIFIED AS THE COUNTERPART CONTAINING THE RECEIPT THEREFOR EXECUTED BY THE INDENTURE TRUSTEE ON OR FOLLOWING THE SIGNATURE PAGE THEREOF. SEE SECTION 19 FOR FURTHER INFORMATION CONCERNING THE RESPECTIVE RIGHTS OF THE SEVERAL HOLDERS OF COUNTERPARTS HEREOF.

GM 2001A-2
DOCUMENT 2

THIS COUNTERPART IS [NOT] THE ORIGINAL EXECUTED COUNTERPART.

GM 2001A-2
DOCUMENT 2

# TABLE OF CONTENTS TO LEASE AGREEMENT

                                                                          Page

SECTION 1.    Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SECTION 2.    Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SECTION 3.    Term and Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
         (a)    Interim Term and Base Term . . . . . . . . . . . . . . . . . . . . . . . . . 4
         (b)    Base Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
         (c)    Supplemental Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
         (d)    Minimum Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
         (e)    Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
         (f)    Late Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
         (g)    Payments in General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SECTION 4.    Lessor's Disclaimer of Representations and Warranties; Lessor's Covenants . . . . . . . 6
         (a)    Representations and Warranties . . . . . . . . . . . . . . . . . . . . . . 6
         (b)    Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SECTION 5.    Return of the Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
         (a)    Condition Upon Return . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
         (b)    Storage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
         (c)    Failure to Meet Return Conditions . . . . . . . . . . . . . . . . . . . 8
         (d)    Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
         (e)    Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SECTION 6.    Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SECTION 7.    Maintenance and Operation; Possession and Subleases; Identification . . . . . . . . . . 11
         (a)    Maintenance and Operation . . . . . . . . . . . . . . . . . . . . . . . . 11
         (b)    Contest of Requirements of Law . . . . . . . . . . . . . . . . . . . . 11
         (c)    Payment of Taxes and Other Impositions . . . . . . . . . . . . . 12
         (d)    Possession and Subleases . . . . . . . . . . . . . . . . . . . . . . . . . 12
         (e)    Identification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
         (f)    Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
         (g)    Acknowledgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

SECTION 8.    Replacement of Parts; Modifications . . . . . . . . . . . . . . . . . . . . . 14
         (a)    Replacement of Parts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
         (b)    Alterations and Modifications . . . . . . . . . . . . . . . . . . . . . . 15

**Page**

SECTION 9.    Voluntary Termination For Obsolete Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    (a)    General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    (b)    Notice of Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    (c)    Sale of Equipment; Termination Payment . . . . . . . . . . . . . . . . 16
    (d)    Retention of Equipment by Lessor . . . . . . . . . . . . . . . . . . . . . . . 18

SECTION 10.    Loss, Destruction, Requisition, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    (a)    Event of Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    (b)    Repair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    (c)    Condemnation Other Than Requisition of Use . . . . . . . . . . . . . . 20
    (d)    Application of Payments on an Event of Loss . . . . . . . . . . . . . . . 20
    (e)    Application of Payments Not Relating to an Event of Loss . . . . . . . . 21
    (f)    Application of Payments During an Event of Default or Lease Default . 21

SECTION 11.    Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    (a)    Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    (b)    Policy Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    (c)    Reports, etc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    (d)    Additional Insurance by Lessor and Lessee . . . . . . . . . . . . . . . . 24

SECTION 12.    Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

SECTION 13.    Performance of Operative Documents . . . . . . . . . . . . . . . . . . . . . . . . . 25

SECTION 14.    Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

SECTION 15.    Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

SECTION 16.    Effect of Event of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    (a)    Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    (b)    Continuing Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    (c)    Remedies Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

SECTION 17.    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

SECTION 18.    Renewal Option; Purchase Options; Valuation . . . . . . . . . . . . . . . . . . . . 33
    (a)    Fixed Rate Renewal Option . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    (b)    Fair Market Value Renewal Option . . . . . . . . . . . . . . . . . . . . . . 33

GM 2001A-2
DOCUMENT 2

|  |  | Page |
|---|---|---|
| (c) | Purchase Options | 35 |
| (d) | Binding Election | 38 |

SECTION 19.   Security for Lessor's Obligation to Holders of Equipment Notes . . . . . . . . . . . . . 38

SECTION 20.   Lessor's Right to Perform for Lessee . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

SECTION 21.   Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

SECTION 22.   Successor Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

SECTION 23.   Lessee Indemnity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

SECTION 24.   Equipment to Remain Personal Property . . . . . . . . . . . . . . . . . . . . . . . . . . 39

SECTION 25.   Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

SECTION 26.   Further Assurances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

SECTION 27.   Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

SECTION 28.   Assignment by the Lessee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41


EXHIBIT A - Form of Lease Supplement (GM 2001A-2)

EXHIBIT B - Form of Assignment by Lessee

EXHIBIT C - Form of Guaranty of Assignment of Lease Agreement
                    (GM 2001A-2)

INSPECTION SCHEDULE

This LEASE AGREEMENT (GM 2001A-2), dated as of December 18, 2001 (this "Lease"), between State Street Bank and Trust Company of Connecticut, National Association, a national banking association, not in its individual capacity, except as expressly provided in the Trust Agreement, but solely as Owner Trustee under the Trust Agreement (GM 2001A-2) dated as of December 18, 2001 (in such capacity together with its successors and assigns, the "Lessor"), and GENERAL MOTORS CORPORATION, a corporation organized and existing pursuant to the laws of the State of Delaware (together with its successors and assigns, the "Lessee").

WHEREAS, the Lessee and the Lessor have entered into a Participation Agreement (GM 2001A-2) dated as of December 18, 2001 (the "Participation Agreement") with the other parties named therein with respect to the transactions of which this Lease is a part;

WHEREAS, subject to the terms and conditions of the Participation Agreement, on the Delivery Date the Lessee desires to enter into a lease of the Undivided Interest in the Equipment and thereby lease such Undivided Interest in the Equipment from the Lessor, and the Lessor desires to lease such Undivided Interest in the Equipment to the Lessee at the rentals and upon the terms hereinafter provided and as provided in one or more Lease Supplements substantially in the form attached hereto as Exhibit A and subject to the conditions subjecting such Undivided Interest in the Equipment to this Lease;

WHEREAS, the parties hereto contemplate that the Lessor will, simultaneously with the execution and delivery hereof, assign for security purposes certain of its rights in this Lease to the Indenture Trustee, pursuant to the Indenture;

WHEREAS, the property subject to this Agreement is the Undivided Interest in the Equipment and the parties hereto acknowledge that there is one, and only one, Unit; notwithstanding any references herein to "any Unit," "each Unit," "all Units" or "Units," and the parties hereto hereby adopt the following rules of construction set forth in Section 1 of this Lease.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein and other good and valuable consideration, receipt of which is hereby acknowledged, the Lessor and the Lessee hereby agree as follows:

SECTION 1.    Definitions.    For purposes of this Lease, capitalized terms used but not defined herein shall have the meanings assigned to them in Appendix A (such definitions to be equally applicable to both the singular and plural forms of the terms defined, unless the context otherwise requires) to the Participation Agreement. Any term defined by reference to an agreement, instrument or other document shall have the meaning so assigned to it whether or not such document is in effect. Unless otherwise indicated, references in this Lease to sections, paragraphs, clauses, appendices, schedules and exhibits are to the same contained in or attached to this Lease. For the avoidance of doubt, the following rules of

construction shall be applied wherever the following phrases are used: Any references to the "the Undivided Interest in the Equipment," "such Undivided Interest in the Equipment," "the Undivided Interest in such Equipment," "the Undivided Interest in the Unit," "the Undivided Interest in any Unit," "such Undivided Interest in the Unit" or "the Undivided Interest in such Unit" shall each have the same meaning, namely the Undivided Interest in the one Unit that is the subject of the applicable agreement.   Any references to "all Units," "any Unit," "such Unit" or "each Unit" shall mean "the Unit."

SECTION 2.  Lease.

(a)    Upon the terms and subject to the conditions hereof, the Lessor hereby agrees to lease for the Term to the Lessee hereunder, and the Lessee hereby agrees to lease for the Term from the Lessor hereunder, the Undivided Interest in the Equipment described in one or more Lease Supplements leasing such Undivided Interest in the Equipment hereunder on the Delivery Date therefor, unless otherwise earlier terminated pursuant to the terms hereof.

(b)    Immediately upon execution and delivery of all of the Operative Documents without necessity of further act or evidence by either party hereto, the Undivided Interest in the Equipment shall be deemed examined and accepted by the Lessee for all purposes and shall be deemed delivered and leased by the Lessor to the Lessee for the Base Term as provided in the applicable Lease Supplement and herein.

(c)    This Lease is intended by the parties to be an absolute net lease (and the expenses associated with the lease, servicing, return, maintenance, operation and insurance of the Equipment or the Undivided Interest therein shall be for the account of the Lessee, unless expressly stated that such expenses are for the account of some other Person or unless expressly excluded from the obligations of the Lessee in the Operative Documents), and, notwithstanding any provision of this Lease or of any other Operative Document to the contrary, the Lessee's obligation to make all payments of Rent as and when the same shall become due and payable in accordance with the terms of this Lease and any other Operative Document shall be absolute, irrevocable and unconditional and shall not be affected by any circumstance or subject to any abatement or diminution by set-off, deduction, counterclaim, recoupment, agreement, defense, suspension, deferment, interruption or otherwise, and until such time as all Rent required to be paid under this Lease or any other Operative Document has been paid, the Lessee shall have no right to terminate this Lease or to be released, relieved, or discharged from its obligation to make, and shall not suspend or discontinue, any payment of Rent for any reason whatsoever, including, without limitation:  (i) any default, misrepresentation, gross negligence, misconduct, wilful misconduct or other action or inaction of any kind by the Lessor, in its individual capacity or as Owner Trustee under the Trust Agreement, the Owner Participant or any other Person, whether under or in connection with this Lease, any other Operative Document or any other agreement relating to this Lease or in connection with any unrelated transaction; (ii) the insolvency, bankruptcy, reorganization or other similar proceeding or cessation of existence, or discharge or forgiveness of indebtedness of, any entity or Person referred to in clause (i) above or any other

GM 2001A-2
DOCUMENT 2

Person; (iii) the invalidity, unenforceability, impossibility, disaffirmance or illegality of performance of this Lease or any other Operative Document, or any instrument referred to herein or therein or any other infirmity herein or therein or any lack of right, power or authority of the Lessor, the Lessee, the Owner Participant, the Indenture Trustee, a Noteholder or any other Person to perform the obligations hereunder or thereunder or consummate the transactions contemplated hereby or thereby or any doctrine of force majeure, impossibility, frustration or failure of consideration for any other reason, whether similar or dissimilar; (iv) any defect in the title, condition, design, merchantability, operation or fitness for use of, or any Lien or other restriction of any kind upon, any Unit or any Part or the Undivided Interest therein, any loss or destruction of, or damage to, any Unit or any Part or the Undivided Interest therein, or any interruption in or cessation of the ownership, possession, operation or use of any Unit or any Part or the Undivided Interest therein for any reason whatsoever, including without limitation, failure of title under or resulting from the Operative Documents; (v) any restriction, prevention or curtailment of or interference with any Unit or any Part or the Undivided Interest therein for any reason whatsoever, including, without limitation, by any Governmental Authority; (vi) any Applicable Law now or hereafter in force; (vii) any failure to obtain any required Governmental Action, or the consent or approval of any other Person, for a transfer of rights or title to the Lessor, the Lessee or any other Person; (viii) any amendment or other change of, or any assignment of any rights under, any Operative Document or any waiver or other action or inaction under or in respect of any Operative Document or any exercise or nonexercise of any right or remedy under the Indenture or this Lease or the sale of any Unit or any Part thereof or the Undivided Interest therein or other interest therein; (ix) the breach or failure of any warranty or representation made in this Lease or any other Operative Document by Lessee, Lessor, Owner Participant, the Indenture Trustee or any other Person; or (x) any other cause or circumstance, foreseen or unforeseen, whether similar or dissimilar to any of the foregoing.

(d)    If for any reason whatsoever this Lease shall be terminated in whole or in part by operation of law or otherwise except as specifically provided herein, the Lessee nonetheless agrees without limitation of the other rights or remedies of the Lessor hereunder, to pay to the Lessor, to the maximum extent permitted by Applicable Law, an amount equal to each Rent payment at the time such payment would have become due and payable in accordance with the terms hereof had this Lease not been terminated in whole or in part. The Lessee hereby waives, to the extent permitted by Applicable Law, any and all rights which it may now have or which at any time hereafter may be conferred upon it, by statute or otherwise, to modify, terminate, cancel, quit or surrender this Lease except in accordance with the express terms hereof. Each Rent payment made pursuant to this Lease by Lessee shall be final and the Lessee will not seek or have the right to recover all or any part of such payment from the Lessor or any Person for any reason whatsoever.

(e)    It is the intention of the Lessee and the Lessor that the transactions contemplated by this Lease shall constitute a lease. Notwithstanding the foregoing, in the event a court of competent jurisdiction determines that this Lease does not constitute a lease, then Lessee shall be deemed to have

GM 2001A-2
DOCUMENT 2

granted to Lessor a perfected security interest in all of Lessee's right, title and interest in, to and under the Undivided Interest in the Equipment pursuant to this Section 2(e), and Lessee hereby grants such security interest. For purposes of such grant, this Lease shall constitute a security agreement under the UCC.

SECTION 3.    Term and Rent.

(a)    Interim Term and Base Term. The Interim Term for the Undivided Interest in each Unit shall commence on the Delivery Date and end on, but not include, the Base Term Commencement Date or such earlier date as this Lease with respect to the Undivided Interest in such Unit shall be terminated in accordance with the terms hereof. The Base Term for the Undivided Interest in each Unit shall commence on the Base Term Commencement Date and terminate on:

(i)    the Last Day of the Base Term; or

(ii)    such earlier date as this Lease, with respect the Undivided Interest in such Unit, may be terminated in accordance with the provisions hereof.

(b)    Base Rent. The Lessee hereby agrees to pay to the Lessor Base Rent for the Undivided Interest in the Equipment in the following amounts:

(i)    on each Lease Period Date occurring during the Base Term, an amount equal to the product of (A) the Lessor's Cost and (B) the Relevant Percentage of Lessor's Cost set forth opposite such Lease Period Date under the caption "Percentage of Lessor's Cost" on Schedule II to the Lease Supplement;

(ii)    on the applicable Lease Period Date occurring during the Fixed-Rate Renewal Term, if any, an amount determined as provided in Section 18(a); and

(iii)    on the applicable Lease Period Date occurring during a Fair Market Value Renewal Term, if any, an amount determined as provided in Section 18(b).

Base Rent shall be allocated to each Lease Period as specified on Schedule II-A to the Lease Supplement. Base Rent allocated to any Lease Period shall be further allocated ratably to each day within such Lease Period. For the avoidance of doubt, and notwithstanding anything to the contrary herein, the parties hereto agree that, irrespective of Lessee's payment obligation on the Lease Period Dates shown on Schedule II-A to the Lease Supplement, the allocation of Lessee's liability on account of the use of the property shall be that stated on Schedule II-A to the Lease Supplement. It is the intention of the Lessor and the Lessee that the allocations of Base Rent for the Undivided Interest in the Equipment to each Lease Period on Schedule II-A to the Lease Supplement constitute specific allocations of fixed rent within the

meaning of Treasury Regulation Section 1.467-1(c)(2)(ii).  Each Applicable Schedule shall be subject to adjustments pursuant to Section 3(e).

(c)    Supplemental Rent.  Lessee shall pay (or cause to be paid) promptly to the Lessor or to whomever shall be entitled thereto under the terms of any Operative Document any and all Supplemental Rent as and when the same shall become due and owing on or before the due date specified for such payment in the applicable Operative Document and if no due date therefor is so specified, within five Business Days after written demand therefor.  The Lessee shall also pay as Supplemental Rent an amount equal to the Make-Whole Premium payable by the Lessor at the time such amount is due and payable; provided, that if the Lessee has paid a Make-Whole Premium pursuant to the Participation Agreement under the circumstances specified in Section 8.3(e)(iii) or 8.3(e)(iv) of the Indenture, under no circumstances shall the Lessee thereafter be liable for any further Make-Whole Premium.  In the event of any failure on the part of the Lessee to pay any Supplemental Rent, the Lessor shall have all rights, powers and remedies provided for herein or in any other Operative Document or by law or equity or otherwise as in the case of non-payment of Base Rent.

(d)    Minimum Rent.  Notwithstanding anything contained herein (including any adjustments pursuant to Sections 9(c)(ii), 10(a)(i) or 18(c)(v)) or in any other Operative Document to the contrary, (i) each installment of Base Rent (whether or not Base Rent is adjusted pursuant to Section 3(e) hereof) shall be in an amount which is at least equal to the principal and interest on the Equipment Notes scheduled to be paid by Lessor pursuant to the Indenture on the Lease Period Date, (ii) the last installment of Base Rent scheduled to be paid hereunder shall be in an amount which is at least equal to the aggregate unpaid principal amount plus accrued and unpaid interest on the Equipment Notes, whether or not then due and (iii) each payment of Stipulated Loss Value, Termination Value or Early Fixed Price Purchase Amount, when combined with all other payments due under this Lease in connection therewith, shall be at least equal to the unpaid principal, accrued and unpaid interest and Make-Whole Premium, if any, payable with respect to the Equipment Notes on the date such payment becomes due.

(e)    Adjustments.  Upon the occurrence of an Adjustment Event, the Base Rent payments and allocations, the Stipulated Loss Values, the Termination Values and the Early Fixed Price Purchase Amount shall be recalculated as set forth in Section 16 of the Participation Agreement; provided, however, that all adjustments shall be (i) made in a manner which preserves the characterization of the Lease as one that does not require constant or proportionate rent accrual under Section 467 of the Code and/or regulations thereunder (or any successor or relevant Code provision or regulations), (ii) in compliance with Treasury Regulation Section 1.467-3(c)(4) (or any successor regulation) and (iii) in compliance with the requirements of Sections 4.02(5) and 4.07 of Revenue Procedure 2001-29 (or any successor or relevant procedure).

GM 2001A-2
DOCUMENT 2

(f)    Late Payment. If any Rent shall not be paid when due, the Lessee shall pay to the Lessor (or, in the case of Supplemental Rent not paid when due, to the Lessor for its own account or to the Person entitled thereto as provided herein or in any other Operative Document), as Supplemental Rent for the Undivided Interest in any Unit, interest (to the extent permitted by Applicable Law) on such overdue amount from and including the due date thereof to but excluding the date of payment thereof (unless payment is made after 11:00 a.m., local time at the place of receipt, in which event such date of payment shall be included) at the Overdue Rate.

(g)    Payments in General. All payments of Rent owed to Lessor or any other Person shall be made directly by Lessee by wire transfer of immediately available funds prior to 11:00 a.m., New York time, on the due date thereof. Such payment shall be due to (i) Lessor at its address as may be specified by the Lessor or such other office of Lessor in the continental United States or such other account as Lessor shall direct in a notice to Lessee at least ten Business Days prior to the date such payment of Rent is due or (ii) such other Person at its address as may be specified by such Person; provided, however, that so long as the Indenture shall not have been fully discharged in accordance with its terms, Lessor hereby directs and Lessee agrees, that, unless the Indenture Trustee shall otherwise direct in writing, all Rent payable to Lessor (excluding Excepted Property) shall be paid prior to 11:00 a.m., New York time, on the due date thereof directly to the Indenture Trustee at the office of the Indenture Trustee listed on Schedule 8 to the Participation Agreement, or such other address as shall be furnished by notice to the parties hereto. All payments of Supplemental Rent payable to the Owner Participant, to the extent that such amounts constitute Excepted Property, shall be made in Dollars in immediately available funds prior to 11:00 a.m., New York time, on the due date thereof to the account of the Owner Participant specified on Schedule 8 to the Participation Agreement.

Notwithstanding anything to the contrary contained herein, if any date on which a payment of Rent becomes due and payable is not a Business Day, then such payment shall not be made on such scheduled date but shall be made on the next succeeding Business Day with the same force and effect as if made on such scheduled date.

SECTION 4.    Lessor's Disclaimer of Representations and Warranties; Lessor's Covenants.

(a)    Representations and Warranties. THE UNDIVIDED INTEREST IN THE EQUIPMENT IS BEING DELIVERED BY LESSOR TO LESSEE "AS IS, WHERE IS". AS BETWEEN (i) THE LESSOR, THE OWNER PARTICIPANT AND THE INDENTURE TRUSTEE, AND (ii) THE LESSEE, DELIVERY OF THE UNDIVIDED INTEREST IN EACH UNIT PURSUANT TO SECTION 2 SHALL BE CONCLUSIVE PROOF OF ACCEPTANCE BY THE LESSEE OF THE UNDIVIDED INTEREST IN SUCH UNIT AS BEING IN COMPLIANCE WITH ALL REQUIREMENTS OF THIS LEASE. NEITHER LESSOR (IN EITHER ITS INDIVIDUAL OR TRUST CAPACITY) NOR OWNER PARTICIPANT MAKES, HAS MADE OR SHALL BE

GM 2001A-2
DOCUMENT 2

DEEMED TO MAKE OR HAVE MADE, AND EACH HEREBY EXPRESSLY DISCLAIMS, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE TITLE, VALUE, COMPLIANCE WITH SPECIFICATIONS, CONDITION, DESIGN, QUALITY, DURABILITY, OPERATION, MERCHANTABILITY OR FITNESS OR SUITABILITY FOR USE OR PURPOSE OF ANY UNIT OR ANY PART THEREOF OR THE UNDIVIDED INTEREST THEREIN, AS TO THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, AS TO THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT, AS TO THE ABSENCE OF OBLIGATIONS BASED ON STRICT LIABILITY IN TORT, OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY UNIT OR ANY PART THEREOF OR THE UNDIVIDED INTEREST THEREIN, IT BEING AGREED THAT ALL RISKS INCIDENT THERETO ARE TO BE BORNE, AS BETWEEN (i) THE LESSOR, THE OWNER PARTICIPANT AND THE INDENTURE TRUSTEE, AND (ii) THE LESSEE, BY THE LESSEE IN THE EVENT OF ANY DEFECT OR DEFICIENCY IN ANY UNIT OR ANY PART THEREOF OR THE UNDIVIDED INTEREST THEREIN, OF ANY NATURE WHETHER PATENT OR LATENT, AND THAT NEITHER THE LESSOR NOR ANY PARTICIPANT OR THE INDENTURE TRUSTEE SHALL HAVE ANY RESPONSIBILITY WITH RESPECT THERETO, and neither the Lessor nor the Owner Participant shall be liable, except as specifically set forth in the Operative Documents, for business losses, loss of profits or other damages or losses resulting from the loss of use of any Unit, any Modification or any Part thereof or the Undivided Interest therein, including, but not limited to, damages to the Lessee or any other Person who or which derive their rights to any Unit, any Modification or any Part thereof or the Undivided Interest therein from the Lessee, it being agreed that, except as expressly stated in the Operative Documents, all such risks, as between the Lessor, the Lessee and the Owner Participant, are to be borne by Lessee to the fullest extent permitted by Applicable Law. The provisions of this Section 4 have been negotiated and are intended to be a complete exclusion and negation of any other warranties with respect to any Unit or any Part thereof or the Undivided Interest therein by the Lessor, the Indenture Trustee or any Participant, whether express or implied.

(b)    Covenants.  The Lessor covenants that during the Term (except as expressly permitted hereby) the Lessor will not, through its own actions or inactions, interfere with the quiet enjoyment of any Unit or Part thereof or the Undivided Interest therein by the Lessee.  Lessor, solely in its individual capacity, agrees that it will not directly or indirectly create, incur, assume or suffer to exist any Lessor Lien attributable to it on or with respect to the Undivided Interest in the Equipment or any Part thereof.  The foregoing is not intended to limit the rights granted to the Lessee hereunder to return the Undivided Interest in any Unit.

SECTION 5.    Return of the Equipment.

     (a)    Condition Upon Return. Unless purchased by Lessee pursuant to Section 18(c) hereof, upon the termination of this Lease at the end of the Base Term or any Renewal Term or pursuant to Section 9 or Section 16 hereof in respect of any Unit or any interest therein, the Lessee, at its own expense, will deliver the Undivided Interest in such Unit to the Lessor, or applicable party, the Unit disassembled and crated for shipment to the nearest railhead (or at another location specified by the Lessor and, so long as the Lien of the Indenture has not been released, the Indenture Trustee, so long as delivery to such other location shall be at no additional cost to the Lessee). At the time of such return, each Unit shall be (i) free and clear of all Liens (other than Lessor Liens and Owner Participant Liens), (ii) free and clear of all rights of third parties, (iii) in the condition required by this Lease and in as good operating condition, with all Parts fully functional, as when delivered to Lessee hereunder, ordinary wear and tear excepted and (iv) free of all Lessee advertising or insignia placed thereon. The Lessee shall return to the Lessor with the Undivided Interest in each Unit subject to return any and all Assigned Proprietary Rights.

     (b)    Storage. If, at such time, the Lessor, upon 180 days' notice to the Lessee, requests and the Lessee in its reasonable judgment has available suitable storage space, the Lessee shall defer such return and will store such Unit without charge at premises of the Lessee used for storage by the Lessee, for a period not to exceed 90 days. During any such storage period, the Lessor shall bear its portion (based on its Undivided Interest in the Unit) of all reasonable costs of maintenance, insurance and additional handling for any Unit being stored.

     (c)    Failure to Meet Return Conditions. In the event the Lessee does not meet the return conditions specified in Section 5(a) on the date required by the provisions of this Lease, the Lessee will be in default of its obligations hereunder, but the obligations of the Lessee under this Lease shall continue with respect to the Undivided Interest in each Unit until the Lessee has complied with the requirements of Section 5(a) with respect to the Undivided Interest in such Unit (and the Base Rent, Stipulated Loss Value and Termination Value during any such period occurring after the end of the Term with respect to any such Unit or any interest therein shall be established in the manner set forth in Section 18(b)).

     (d)    Cooperation. During the last nine months of the Term in respect of the Undivided Interest in any Unit (unless the Lessee shall have elected to purchase the Undivided Interest in such Unit or renew this Lease with respect to the Undivided Interest in such Unit in accordance with the terms of this Lease), with reasonable notice, the Lessee will cooperate in all reasonable respects with the efforts of the Lessor to sell or lease such Undivided Interest in the Unit or any other interest therein, including, without limitation, permitting prospective purchasers or lessees to fully inspect such Unit and the logs, drawings, manuals, specifications, data and the maintenance records relating thereto (subject to the Lessee's ordinary document retention policies);provided, however, that such cooperation shall not unreasonably interfere with the normal operation of such Unit by the Lessee or cause Lessee to incur any additional expense other than as specifically provided in the Operative Documents. All information obtained in connection with such

inspection shall be subject to confidentiality agreements reasonably prescribed by the Lessee and similar to those provided in Section 23 of the Participation Agreement.

(e)    Records.  Upon the return of the Undivided Interest in any Unit to the Lessor as provided in this Section 5, the Lessee shall deliver or cause to be delivered to the Lessor copies of all title documents, logs, drawings, manuals, specifications and data and inspection, modification and maintenance records which are required to be maintained with respect thereto pursuant to Section 7(f) and which are necessary to determine the condition of the Unit or for the continued maintenance, repair or general operation of the Unit and are in the possession of Lessee at that time (subject to the Lessee's ordinary document retention policies).

(f)    Environmental Report.  Not later than 30 days prior to relinquishment of possession of any Unit at the end of the Base Lease Term, the Lessee shall provide to the Lessor, the Owner Participant, the Indenture Trustee and the Noteholders an inspection report by a reputable environmental consulting firm selected by Lessee and reasonably satisfactory to Owner Participant and the Indenture Trustee verifying that such Unit is in a condition suitable for transportation under applicable Environmental Laws (including the Hazardous Materials Transportation Act).  If the Lessee fails to provide such a report when required, Lessee shall use reasonable best efforts to provide such report on or before the date which is 30 days after the last day of the Base Lease Term and if Lessee does not deliver such report by such date, at the Lessor's option the Lessee shall not deliver possession of the Undivided Interest in such Unit to the Owner Participant and instead shall pay on such 30th day, as liquidated damages, the Fair Market Sales Value (established by the Appraisal Procedure) for the Undivided Interest in such Unit (as if such Unit were in a condition suitable for transportation under applicable Environmental Laws) to the Lessor, in which case the Lessor shall convey and the Lessee shall accept title to the Undivided Interest in such Unit.  Lessee agrees to initiate an Appraisal Procedure in order to comply with the terms of this Section 5(f) even if Lessee is not required to obtain an appraisal to satisfy the other provisions of this Lease.  In any event, if the report is not delivered and the Undivided Interest in the Unit is not returned on the last day of the Base Lease Term, Base Rent shall accrue as provided in Section 5(c) until such report is delivered or such Fair Market Sales Value is paid.  Upon payment of such Fair Market Sales Value, this Lease shall terminate with respect to the Undivided Interest in such Unit.

SECTION 6.    Liens.  The Lessee will not directly or indirectly create, incur, assume or suffer to exist any Lien on or with respect to any Unit or Part thereof or the Undivided Interest therein, title thereto or any interest therein or in this Lease, except for Permitted Liens, which shall constitute the following:

(i)    Scheduled Liens;

GM 2001A-2
DOCUMENT 2

(ii)       the respective rights of the Lessor and the Lessee as herein provided, the Lien of the Indenture, and any other rights of any Person existing pursuant to the Operative Documents;

(iii)      Trustee Liens and Owner Participant Liens;

(iv)      Liens for Taxes that are not yet due and payable or, so long as adequate reserves have been established, are being contested in good faith and by appropriate proceedings diligently conducted, in each case, so long as such proceedings do not (A) subject any Unit or the Undivided Interest therein or other interest therein to any significant risk of foreclosure, forfeiture or loss or result in the sale of any Unit or any Part thereof or the Undivided Interest therein or other interest therein, (B) interfere with the use, possession or disposition of any Unit or Part thereof or the Undivided Interest therein or other interest therein, (C) interfere with the payment of Rent or (D) involve any risk of loss of the priority of the Lien of the Indenture on the Indenture Estate;

(v)       materialmen's, mechanics', workmen's, repairmen's, employees', carriers', warehousemen's and other like Liens relating to any Unit or the Undivided Interest therein or any other interest therein or in connection with any Modification or arising in the ordinary course of business for amounts that either are not more than 30 days past due or are being contested in good faith by appropriate proceedings, so long as such proceedings satisfy the conditions for the continuation of proceedings to contest Taxes set forth in clause (iv) above;

(vi)      Liens arising out of any judgment or award against Lessee up to $3,000,000, unless the judgment secured shall not, within 60 days after the entry thereof, have been discharged, vacated, reversed or execution thereof stayed pending appeal; and

(vii)     any Lien with respect to which the Lessee shall have provided, to the reasonable satisfaction of the Lessor (and, if the Indenture shall not have been discharged in accordance with its terms, the Indenture Trustee), an adequate indemnity bond; provided that such indemnity bond shall provide full indemnification for the amount of any such Lien and shall be adequate to ensure that (a) the Lien poses no material risk of the sale, forfeiture or loss of any Unit or any Part thereof or the Undivided Interest therein or other interest therein and does not impair in any way the Lien of the Indenture or the priority thereof and (b) the existence of such Lien does not interfere with the quiet enjoyment of any Unit or the Undivided Interest therein or any other interest therein.

GM 2001A-2
DOCUMENT 2

The Lessee will promptly, at its own expense, take (or cause to be taken) such actions as may be necessary to duly discharge any such Lien not excepted above if the same shall arise at any time.

SECTION 7.    Maintenance and Operation: Possession and Subleases: Identification.

(a)    Maintenance and Operation.  The Lessee, at its own cost and expense, shall maintain, operate, repair and make all Modifications to the Equipment or any Part thereof in a non-discriminatory manner consistent with GM's general practice and in accordance with prudent industry practice, manufacturers' warranty requirements (during any applicable warranty period) and the Lessee's established operating procedures and maintenance, rebuild and repair programs so as to keep the Equipment in good working order, ordinary wear and tear from proper use excepted, and in such condition as shall comply in all material respects with all Applicable Laws or applicable Governmental Actions, subject to Section 7(b).  The Lessee will not operate the Equipment or any Part thereof in any manner excluded from coverage by any insurance in effect as required by the terms of Section 11.  The Lessee or any sublessee or assignee that is an Affiliate of GM may use the Equipment or any Part thereof only in any production facility owned or operated by GM or an Affiliate of GM located in the continental United States, and sublessees or assignees that are not Affiliates of GM may use the Equipment or any Part thereof only in the continental United States; provided, however, that prior to relocating any Equipment or any Part thereof in accordance with the foregoing, the Relocation Conditions shall be met.  Any Hazardous Materials used in, or resulting or emitted from, the operation of any Unit will be used, contained and disposed of in accordance with applicable Environmental Laws.  The Lessor shall not be obligated in any way to maintain, alter, repair, rebuild or replace any Unit or Part thereof.

(b)    Contest of Requirements of Law.  If, with respect to any requirement of Applicable Law or any Governmental Action relating to the use, operation or maintenance of any Unit or the Undivided Interest therein, (i) the Lessee is contesting diligently and in good faith by appropriate proceedings such requirement or Governmental Action, or (ii) compliance with such requirement or Governmental Action shall have been excused or a waiver, extension or forbearance exempting the Lessee from such requirement or Governmental Action shall have been obtained, or (iii) the Lessee shall be making a good faith effort and shall be diligently taking appropriate steps to comply with such requirement or Governmental Action, then the failure by the Lessee to comply with such requirement or Governmental Action prior to the last day of the Term with respect to the Undivided Interest in such Unit shall not constitute an Event of Default hereunder; provided, however, that such contest or noncompliance does not involve (A) any risk of (1) foreclosure, forfeiture or loss of any Unit or the Undivided Interest therein or any other interest therein or (2) criminal liability being imposed on the Lessor, the Owner Participant, the Indenture Trustee or any Noteholder or (B) any substantial likelihood of (1) the sale of, or the creation of any Lien (other than a Permitted Lien) on, any Unit or the Undivided Interest therein or any other interest therein, (2) material civil liability being imposed on the Lessor, the Owner Participant, the Indenture Trustee or any Noteholder or (3) the extension of the ultimate imposition of such Applicable Law beyond the last day of the Term.  The

Lessee shall provide the Lessor and the Indenture Trustee with notice of any contest or noncompliance of the type described in clauses (i) and (iii) above in detail sufficient to enable the Lessor and the Indenture Trustee to ascertain whether such contest or noncompliance may have any effect of the type described in the above proviso.

(c)    Payment of Taxes and Other Impositions.  The Lessee shall pay all Taxes and other impositions related to any Unit or Part thereof or the Undivided Interest therein or other interest therein on a timely basis.  Upon the written request by the Lessor, the Lessee shall provide the Lessor with evidence of the payment of any Taxes, or other impositions, the failure of which to be paid would cause the imposition of a Lien upon any Unit or Part thereof or the Undivided Interest therein or other interest therein.  The Lessor will cooperate with the Lessee in the Lessee's preparation and filing of state and local property tax returns with respect to the Equipment during the Lease Term, in the manner required to preserve or obtain any existing or future tax abatements or exemptions applicable to the Equipment.  The Lessee shall assume full responsibility for preparing and furnishing to the Lessor for execution all filings with any Governmental Authority of or in the state and/or locality in which the Equipment is located in respect of any and all property taxes; except that, where required or permitted by applicable law, the Lessee shall make such filings on behalf of the Lessor in the name of the Lessor or in the Lessee's own name.  In each case in which the Lessee furnishes a tax return or any other form to be executed by the Lessor for filing with or delivery to any taxing authority, the Lessee shall certify to the Lessor that such document is in the proper form, is required to be filed under Applicable Law and does not impose any tax or other liability on the Lessor or any of its affiliates which is not indemnified by the Lessee.

(d)    Possession and Subleases.  So long as no Event of Default or Lease Default shall have occurred and be continuing, the Lessee shall have the right, upon not less than 30 days' prior written notice to the Lessor (which notice shall include the proposed form of sublease) and, if the Indenture has not been discharged in accordance with its terms, the Indenture Trustee, to enter into a sublease of the Undivided Interest in any Unit; provided, however, that (i) the sublease is and remains expressly subject and subordinate in all respects to the terms of this Lease and, if the Indenture has not been discharged in accordance with its terms, the Indenture, (ii) the Lessee remains primarily liable under this Lease and the Lessee shall not be released from its obligations under this Lease or any other Operative Document, (iii) such Unit remains and is used solely within the continental United States and the Lessor and, if the Indenture has not been discharged in accordance with its terms, the Indenture Trustee and the Noteholders, are notified as to its location, (iv) prior to entering into the sublease, the Relocation Conditions shall be met, (v) at the time Lessee enters into such sublease, the sublessee is not subject to any proceeding of the type described in Section 15(h), (vi) no such sublease shall permit any further subleasing of the Undivided Interest in the Unit, (vii) the term of the sublease does not extend beyond 30 days prior to the last day of the Term of the Lease, (viii) the Lessee shall have provided to the Lessor and, if the Indenture has not been discharged in accordance with its terms, the Indenture Trustee, before entering into any sublease, evidence that the insurance required to be maintained in accordance with Section 11 is in full force and effect, and (ix) the

GM 2001A-2
DOCUMENT 2

Lessee shall provide the Lessor and the Indenture Trustee, before entering into the sublease, an opinion of counsel selected by the Lessee and reasonably satisfactory to the Lessor and the Indenture Trustee, such opinion to be in form and substance reasonably satisfactory to the Lessor and to the Indenture Trustee, as to the nonimpairment of the Lien of the Indenture and the continued perfection of the Indenture Trustee's security interest therein and as to any other such matter incident to the proposed sublease as the Lessor or the Indenture Trustee may reasonably request.  As a condition to the foregoing, the Lessee shall deliver to the Owner Participant an opinion of the Lessee's Tax Counsel, which opinion shall be reasonably acceptable to the Owner Participant, to the effect that such sublease will have no unindemnified adverse U.S. federal income tax consequences to the Owner Participant other than those to which Owner Participant would have been subject had there been no such sublease (taking into account any additional indemnification provided by the Lessee in connection with such sublease).  So long as no Event of Default or Material Default shall have occurred and be continuing and so long as the Lessee shall comply with the provisions of Section 11, the Lessee may, without the prior written consent of the Lessor, deliver possession of any Unit or Part thereof to the Manufacturer thereof or to any Person for testing, service, repair, maintenance or overhaul work on such Unit or any Part thereof or for Modifications or additions to such Unit or Part thereof to the extent required or permitted by the terms of Section 8(b); provided, however, that such Unit or Part shall remain in the continental United States at all times during such testing, service, repair, maintenance, overhaul work, Modifications or additions.  Notwithstanding the foregoing, the Lessee may not, without the consent of the Lessor, enter into a sublease to a lessee incorporated or organized outside of the United States, or that would otherwise in any manner cause the Unit or any interest therein subject to such sublease to be "tax-exempt use property" as that term is defined in section 168(h) of the Code or any successor provision.  Any assignment, sublease or other transfer of any Unit or Part or the Undivided Interest therein or other interest therein in violation of the provisions of this Section shall be void.

          (e)     Identification.  Within 60 days following the Delivery Date, the Lessee agrees to affix and maintain (or cause to be affixed and maintained) in a conspicuous place on each Unit delivered on the Delivery Date a nameplate bearing the inscription:

Undivided Interests Leased From

State Street Bank and Trust Company of Connecticut,
as Owner Trustees, Lessors

and, for so long as such Unit or the Undivided Interest therein or any other interest therein shall be subject to the Lien of the Indenture, bearing the following additional inscription:

Subject to the rights of Wells Fargo Bank Northwest, National Association, as Indenture Trustee

GM 2001A-2
DOCUMENT 2

(each such nameplate to be replaced, if necessary, with a nameplate reflecting the name of any successor Lessor or successor Indenture Trustee in each case as permitted under the Operative Documents). Except as provided above, the Lessee will not allow the name of any person, association or corporation to be placed on any Unit as a designation that might be interpreted as a claim of ownership of such Unit or the Undivided Interest therein or of a security interest therein.

(f)    Records. The Lessee shall maintain or cause to be maintained all logs, drawings, manuals, specifications and data and inspection, modification and maintenance records and other materials required to be maintained in respect of the Equipment or the Undivided Interest therein by Applicable Law or by prudent business practice with respect to similar equipment owned or leased by the Lessee and as promptly as reasonably practicable furnish or cause to be furnished to the Lessor and the Indenture Trustee, upon notice from the Lessor or the Indenture Trustee, such information as may be required to enable the Lessor and the Indenture Trustee to file any reports required to be filed by the Lessor or the Indenture Trustee with any Governmental Authority because of the Lessor's ownership interest in, or the Indenture Trustee's security interest in, the Undivided Interest in the Equipment.

(g)    Acknowledgment. The parties acknowledge that (i) a default by the Lessee or any successor or assignee of the Lessee under any lease, mortgage or other agreement or instrument affecting another interest in the Unit may result in the loss of use by the Lessee of the Undivided Interest in the Unit and (ii) conflicting claims to possession may require resolution under Applicable Law.

SECTION 8.    Replacement of Parts; Modifications.

(a)    Replacement of Parts. The Lessee may, at its own cost and expense, remove in the ordinary course of operations, maintenance, service, repair, overhaul or testing, any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, or damaged; provided, however, that the Lessee, except as otherwise provided in Section 8(b), will, at its own cost and expense, replace such Parts promptly and in no event later than the end of the Term. All replacement Parts shall be free and clear of all Liens (except for Permitted Liens and except in the case of replacement property temporarily installed on an emergency basis), and shall be in as good operating condition as the Parts replaced, assuming such replaced Parts were in good working order and in the condition and repair required to be maintained by the terms hereof; shall not decrease (except to an insignificant extent) the value of the Undivided Interest in the Unit as a whole; and shall be in good working order and have a utility, remaining useful life and estimated residual value at least equal to those of the Parts replaced (assuming that such replaced Parts have been maintained in accordance with the requirements of Section 7(a)). The Undivided Interest in all Parts at any time removed from any Unit shall remain the property of the Lessor, no matter where located, until such time as such Parts shall be replaced by Parts which have been incorporated or installed in or attached to such Unit and which meet the requirements for replacement Parts specified above. Immediately upon any replacement Part becoming incorporated or installed in or attached to any Unit as above provided, without further act

GM 2001A-2
DOCUMENT 2

(subject only to Permitted Liens and except in the case of replacement property temporarily installed on an emergency basis), all right, title and interest to the Undivided Interest in such replacement Part shall thereupon vest in the Lessor to the same extent as the Lessor's interest in the replaced Part (assuming the Lessee was in compliance with this Lease with respect to such Part), the Undivided Interest in such replacement Part shall become subject to this Lease and be deemed part of the Unit for all purposes hereof to the same extent as the Parts originally incorporated or installed in or attached to such Unit, and the Lessor shall no longer have any right, title or interest to the replaced Part and such replaced Part shall no longer be subject to this Lease.

(b)    Alterations and Modifications.  Lessee shall make (or cause to be made) at its own expense Modifications to each Unit required by Applicable Law or applicable Governmental Action and may, so long as no Material Default or Event of Default has occurred and is continuing, at its own expense make any other Modifications that it deems necessary or appropriate; provided, however, that such Modifications (other than Modifications required by Applicable Law or applicable Governmental Action) do not decrease (except to an insignificant extent) the utility, value or estimated residual value of the Undivided Interest in such Unit, reduce (except to an insignificant extent) the remaining useful life of the Undivided Interest in such Unit or cause the Undivided Interest in such Unit to become limited use property within the meaning of Revenue Procedure 2001-28.  With respect to Modifications which (i) are required by Applicable Law or applicable Governmental Action, (ii) cannot be removed from the Unit without materially diminishing or impairing the utility, value, remaining useful life or estimated residual value of the Unit or the Undivided Interest therein or (iii) the financing of which was arranged or provided by the Lessor, title to the Undivided Interest in such Modifications shall vest in the Lessor without further act to the same extent as the Lessor's interest in the Part or Parts subject to the Modification (assuming the Lessee was in compliance with this Lease with respect to such Part).  The Lessor shall have no right, title or interest in any Modification not specified in the preceding sentence.  The Undivided Interest in modifications referred to in the preceding sentence (as in which the Lessor has no right, title or interest) may be purchased by the Lessor at the Fair Market Sales Value thereof (established by the Appraisal Procedure) at the end of the Term, if (i) such Modifications have not been removed from the Unit and (ii) Lessee has not exercised its rights to purchase the Undivided Interest in such Unit pursuant to the terms of this Lease.  Subject to compliance with Applicable Law, the Lessee may remove, at its expense, any Modification referred to in the preceding sentence; provided, however, that unless the Lessee shall have given notice of its election to purchase the Undivided Interest in such Unit pursuant to Section 18(c), the Lessee, at its expense and prior to the end of the Term, shall repair any damage to such Unit caused by such removal such that the Undivided Interest in such Unit is returned to the condition required hereunder.

SECTION 9.    Voluntary Termination For Obsolete Equipment.

(a)    General.  If at any time on or after the fifth anniversary of the Base Term Commencement Date with respect to any Unit, such Unit is determined by the Lessee to be obsolete,

I:\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt.final A-2.wpd

15

GM 2001A-2
DOCUMENT 2

uneconomic or surplus to the needs of the Lessee for any reason, or at any time, any Unit or the continued operation thereof is determined by the Lessee to have been rendered uneconomic by reason of the cost of compliance with new or amended Applicable Law or new or amended applicable Governmental Action (each Unit as to which such a determination has been made being an "Obsolete Unit"), the Lessee may elect to terminate the Lease on any Lease Period Date with respect to such Obsolete Unit upon satisfaction of all of the requirements of this Section 9. Upon the satisfaction of the requirements of this Section 9 for a termination of this Lease with respect to an Obsolete Unit, the Base Rent for the Undivided Interest in such Obsolete Unit shall cease to accrue and the Term for the Undivided Interest in such Obsolete Unit shall terminate.

(b)    Notice of Termination. To exercise its right to terminate this Lease with respect to any Obsolete Unit as provided in this Section 9, the Lessee shall provide the Lessor (and, if the Indenture with respect to such Obsolete Unit shall not theretofore have been discharged, the Indenture Trustee and the Noteholders) with (i) notice in writing at least 90 days prior to the Lease Period Date on which the Lessee elects to terminate this Lease with respect to such Obsolete Unit (the "Termination Date") (which Termination Date shall not be later than the last day of the Term), such notice to specify the Termination Date and (ii) an Officer's Certificate of the Lessee as to the determinations referred to in Section 9(a). It shall be a condition to the right to terminate the Lease as described in Section 9(a) that, on the date of the notice described in the preceding section, no Material Default or Event of Default shall have occurred and be continuing. The Lessee may, at its option by written notice to the Lessor, the Indenture Trustee and the Noteholders not less than ten days prior to the Termination Date, revoke any such notice of termination, in which event this Lease shall not terminate and the Lessee shall bear the reasonable out-of-pocket expenses incurred by the Lessee, the Owner Participant, the Indenture Trustee and the Noteholders (provided, however, that the Lessee shall bear the reasonable legal fees and expenses of Counsel for the Noteholders but not of any other counsel representing the Noteholders) in connection therewith; provided, that Lessee may not give such notice of revocation if any Person shall have submitted a bid in accordance with Section 9(c) in an amount at least equal to Termination Value for the Undivided Interest in the Obsolete Unit as of the Termination Date and the sale described in Section 9(c) shall be consummated with such Person. The number of such revocations and elections to continue this Lease during the Base Term for the Undivided Interest in each Unit (for which purpose a failed sale pursuant to Section 9(c)(iii) shall be deemed a revocation) shall not exceed two.

(c)    Sale of Equipment; Termination Payment.

(i)    Following the notice of termination referred to in Section 9(b), the Lessee shall, as agent for the Lessor and at the Lessee's expense, solicit bids for the cash purchase of the Obsolete Unit on the Termination Date on the basis that the Obsolete Unit will be returned in compliance with Section 5(a). The Lessor may also solicit bids for the cash purchase of the Obsolete Unit on the Termination Date independent of the Lessee, but shall

be under no duty to solicit bids or to inquire into the efforts of the Lessee to obtain bids. The Lessee and the Lessor, as the case may be, shall certify in an Officer's Certificate to the other the amount and terms of each bid received by it and the name and address of the Person submitting such bid. Subject to Section 9(d), in the event that the Lessee or the Lessor shall have obtained any such bids from any Person other than an Affiliate of the Lessee, the Lessor shall sell the Undivided Interest in the Obsolete Unit on the Termination Date to such Person which shall have submitted the highest such bid (who shall not be the Lessee or any Affiliate or Tax Affiliate of the Lessee or any Person purchasing the Obsolete Unit pursuant to any agreement for the use in the future of such Obsolete Unit by the Lessee or any Affiliate of the Lessee). Upon payment to the Lessor of the purchase price in immediately available funds (and all other amounts due pursuant to this Section 9(c) on the Termination Date) the Lessor shall sell all right, title and interest of the Lessor in and to the Obsolete Unit to such Person free and clear of Lessor Liens, Owner Participant Liens and the Lien of the Indenture, and this Lease and the obligations (other than those that survive pursuant to Section 25) of the Lessee with respect to such Obsolete Unit hereunder shall terminate concurrently with such sale. On the Termination Date, the Lessor shall execute and deliver to such Person a bill of sale and such other instruments, documents and opinions as such Person or the Lessee may reasonably request to evidence the valid consummation of such transfer. In connection with such sale, the Lessee shall ensure that the Obsolete Unit meets the requirements of Section 5(a) on the Termination Date.

(ii)    The Undivided Interest in the total selling price realized at any sale of an Obsolete Unit shall be retained by the Lessor and, as a condition to the sale of any Obsolete Unit hereunder, the Lessee shall pay on the Termination Date to the Lessor or the Persons entitled thereto under the Operative Documents, in immediately available funds, (A) an amount equal to the excess, if any, of (x) the Termination Value for such Obsolete Unit as of the Termination Date over (y) the Undivided Interest in the proceeds of such sale net of the reasonable out-of-pocket expenses incurred by the Lessor and the Owner Participant in connection with such sale, and net of any sales, transfer or similar taxes incurred in connection with the sale, (B) all Base Rent due and owing prior to the Termination Date, (C) all Supplemental Rent due and owing on or prior to the Termination Date (including an amount equal to the Make-Whole Premium, if any); and (D) an amount equal to the reasonable out-of-pocket expenses of the Owner Participant (including the reasonable legal fees and expenses of the Owner Participant), the Owner Trustee, the Indenture Trustee and the Noteholders (provided, however, that Lessee shall bear the reasonable legal fees and expenses of Counsel for the Noteholders but not of any other counsel representing the Noteholders) incurred in connection with such sale to the extent covered in clause (A)(y) of this Section 9(c)(ii). The amount payable hereunder shall be increased by any positive amount set forth on Schedule IV to the Lease Supplement opposite the relevant

GM 2001A-2
DOCUMENT 2

Termination Date under the caption "Base Rent Amount as of the Termination Date" or decreased by the absolute value of any negative amount set forth on Schedule IV to the Lease Supplement opposite the relevant Termination Date under the caption "Base Rent Amount as of the Termination Date."

(iii)    If an Obsolete Unit shall not have been sold on the Termination Date (unless the Lessor shall have retained the Undivided Interest in the Obsolete Unit pursuant to Section 9(d)), this Lease shall continue in full force and effect.

(d)    Retention of Equipment by Lessor.  If the Lessee shall elect to terminate this Lease with respect to the Undivided Interest in any Obsolete Unit pursuant to this Section 9, the Lessor may elect to retain the Undivided Interest in such Obsolete Unit by giving irrevocable notice to the Lessee and, so long as the Indenture shall not have been discharged, the Indenture Trustee and the Noteholders, no later than 30 days prior to the Termination Date.  If the Lessor so elects to retain the Undivided Interest in such Obsolete Unit, on the Termination Date, (i) the Lessee shall pay to Lessor or the Person entitled thereto as provided in the Operative Documents the payments referred to in Section 9(c)(ii)(B)–(D) (increased by the absolute value of the applicable amount, if any, set forth on Schedule IV to the Lease Supplement opposite the relevant Termination Date under the caption "Base Rent Allocations in Excess of Base Rent Payments" or decreased by the absolute value of the applicable amount, if any, set forth on Schedule IV to the Lease Supplement opposite the relevant Termination Date under the caption "Excess of Base Rent Payments over Base Rent Allocations") and (ii) the Lessor shall pay to the Indenture Trustee an amount equal to the unpaid principal amount, interest and premium, if any (after taking into account any payments required by clause (i)), on the Termination Date, of the Equipment Notes with respect to the Undivided Interest in such Obsolete Unit (as determined pursuant to Section 6.1(b)(3) of the Indenture).   Upon payment of the amounts due pursuant to the preceding sentence, this Lease and the obligations of the Lessee hereunder (other than those that survive pursuant to Section 25) shall terminate with respect to the Undivided Interest in such Obsolete Unit, and the Lessor shall execute and deliver to the Lessee on the Termination Date such instruments as the Lessee shall reasonably request to evidence the termination of this Lease with respect to the Undivided Interest in such Obsolete Unit.  In the event the Lessee fails to pay the amounts specified in clause (i) of the second sentence of this Section 9(d) or the Lessor fails to pay the amounts specified in clause (ii) of such sentence, the Lessee shall be deemed to have revoked its notice of termination (but a deemed revocation due to such a failure by the Lessor shall not be considered a revocation for purposes of the last sentence of Section 9(b)).  In connection with the retention of the Undivided Interest in the Obsolete Unit by the Lessor, the Lessee shall ensure that the Undivided Interest in such Obsolete Unit meets the requirements of Section 5(a) on the Termination Date.

SECTION 10.   Loss, Destruction, Requisition, etc.

GM 2001A-2
DOCUMENT 2

(a)    <u>Event of Loss</u>. Upon the occurrence of an Event of Loss in respect of the Undivided Interest in any Unit, the Lessee shall forthwith give the Lessor and, if the Indenture with respect to the Undivided Interest in such Unit has not been discharged, the Indenture Trustee and the Noteholders, written notice of such Event of Loss and on the earlier of (A) the first Stipulated Loss Value Date occurring after the 10th day following the receipt by Lessee of insurance proceeds related to the occurrence of such Event of Loss or (B) any Stipulated Loss Value Date, chosen by the Lessee in its sole discretion, but in no event later than the 180th day following the occurrence of such Event of Loss (the "<u>Event of Loss Payment Date</u>"), Lessee shall pay to the Lessor and the Persons entitled to such payments pursuant to the Operative Documents (A) the Stipulated Loss Value determined as of the Event of Loss Payment Date; (B) all Base Rent that has accrued prior to the Event of Loss Payment Date, (C) all Supplemental Rent due and owing on or prior to the Event of Loss Payment Date, and (D) an amount equal to the reasonable out-of-pocket expenses of the Owner Participant, the Owner Trustee, the Indenture Trustee, and the Noteholders (provided, however, that Lessee shall bear the reasonable legal fees and expenses of Counsel for the Noteholders) incurred in connection with the actions under this <u>Section 10</u>, <u>provided</u>, that the amount payable hereunder shall be increased by any positive amount set forth on <u>Schedule III</u> to the Lease Supplement opposite the relevant Stipulated Loss Value Date under the caption "Base Rent Amount as of Stipulated Loss Date" or decreased by the absolute value of the negative amount set forth on <u>Schedule III</u> to the Lease Supplement opposite the relevant Stipulated Loss Value Date under the caption "Base Rent Amount as of Stipulated Loss Date".

At such time as the Lessor and the other Persons entitled thereto under the Operative Documents shall have received the payments specified in clause (i) above, together with all other amounts that then may be due hereunder, (1) the obligation of the Lessee to pay Base Rent hereunder with respect to the Undivided Interest in such Unit for any period commencing after the Event of Loss Payment Date shall terminate, (2) this Lease as regards the Undivided Interest in such Unit shall terminate (other than the obligations of the Lessee which survive pursuant to <u>Section 25</u>) and (3) provided that no Event of Default or Lease Default exists on the Event of Loss Payment Date, payments and amounts received hereunder (other than Excepted Property) shall be applied in accordance with <u>Section 3.3</u> of the Indenture and the Lessor will transfer to or at the direction of the Lessee, without recourse or warranty (except as to the absence of Lessor Liens), all the Lessor's right, title and interest in and to the Undivided Interest in such Unit and any insurance proceeds relating thereto (other than with respect to insurance maintained by the Lessor pursuant to <u>Section 11</u>), and the Lessee will be subrogated to all claims of the Lessor, if any, against third parties (other than with respect to insurance maintained by the Lessor pursuant to <u>Section 11</u>), for damage to or loss of such Unit or the Undivided Interest therein. Notwithstanding anything to the contrary contained in this <u>Section 10(a)</u>, and without relieving Lessee in any way from its obligation to pay Base Rent as and when due, in the event that the Event of Loss occurs within the 90 day period prior to the last day of the Term for the Unit subject to the Event of Loss, the Event of Loss Payment Date shall be the later of the last Lease Period Date of the Term or the date thereafter that the payments referred to in the next sentence shall be paid to the Lessor and the other Persons entitled thereto; <u>provided</u>, that such Event of Loss Payment

GM 2001A-2
DOCUMENT 2

Date shall in no event be later than the earlier of the date the Lessee receives all insurance proceeds to which it is entitled with respect to the Undivided Interest in such Unit that is the subject of the Event of Loss or the date that is 180 days after the last Lease Period Date in the Term.  If the Event of Loss Payment Date referred to in the preceding sentence occurs on (x) the last Lease Period Date of the Term, the Lessee shall make the payments for such date referred to in Section 10(a)(i) or (y) any other date, the Lessee shall pay to the Lessor and all other Persons entitled thereto the amount referred to in Section 10(a)(i)(D), all Supplemental Rent due and owing on such date, together with an amount equal to the sum of (A) the Stipulated Loss Value on the last day of the Term and (B) the product of (w) the Stipulated Loss Value on the last day of the Term multiplied by the Postponement Rate and (x) a fraction equal to (y) the number of days elapsed from (but excluding) the last day of the Term to (and including) the Event of Loss Payment Date divided by (z) 365.  In the event that the payments referred to in the preceding sentence are not made prior to the last day of the Term, the Term with respect to the Undivided Interest in the Unit subject to the Event of Loss shall be extended until such payments are made.

(b)    Repair.  In the event of any damage or loss to a Unit not constituting an Event of Loss, the Lessee shall promptly repair such Unit at its own expense to the standards required by Section 7(a) hereof and such repairs shall be sufficient to ensure that the utility, value, remaining useful life and estimated residual value of the Undivided Interest in the repaired Unit be at least equal to those of the Undivided Interest in such Unit prior to such damage or loss (assuming that such Unit has been maintained in accordance with Section 7(a)).

(c)    Condemnation Other Than Requisition of Use.  In the case of a taking or condemnation not constituting a Requisition of Use, this Lease shall continue, and each and every obligation of the Lessee hereunder and under each Operative Document shall remain in full force and effect.  The Lessee shall be entitled to the Undivided Interest in all sums received by reason of any such taking or condemnation for the period ending on the Termination Date or last date of the Term with respect to the applicable Unit, and the Lessor shall be entitled to the Undivided Interest in all sums received by reason of any such taking or condemnation for the period after the Termination Date or last date of the Term with respect to the applicable Unit.

(d)    Application of Payments on an Event of Loss.  Payments received by the Lessor or the Lessee from any Governmental Authority, insurer (other than proceeds of insurance carried by or on behalf of the Lessor or the Owner Participant pursuant to Section 11(d)) or other Person as a result of an Event of Loss with respect to the Undivided Interest in any Unit shall be applied as follows:

(i)    all such payments to the ratable extent allocable to the Undivided Interest shall be promptly paid to the Lessor or, so long as the Indenture shall be in effect, the Indenture Trustee for application pursuant to the following provisions of this Section 10(d),

GM 2001A-2
DOCUMENT 2

except that the Lessee may retain any amounts that at the time would be payable to the Lessee under the provisions of clauses (ii) or (iii) below;

(ii)    so much of such payments (applying any payments from insurers before any payments from other Persons (including Governmental Authorities)) as shall not exceed the amount of Stipulated Loss Value and other amounts required to be paid by this Section 10 as a result of the Lessee's election to make the payments specified in Section 10(a)(i) shall be applied in reduction of the Lessee's obligation to pay such amount if the same has not already been paid by the Lessee or, if the same has already been fully paid by the Lessee, shall be applied to reimburse the Lessee for its payment of such amount; and

(iii)    the balance, if any, of such payments representing proceeds of insurance carried by the Lessee to the ratable extent allocable to the Undivided Interest shall be paid over to, or retained by, the Lessee or, if payments representing proceeds from any other Person or source to the ratable extent allocable to the Undivided Interest, shall be divided between the Lessor and the Lessee as their respective interests may appear.

(e)    Application of Payments Not Relating to an Event of Loss.  Payments received by the Lessor (other than proceeds of insurance carried by or on behalf of the Lessor or the Owner Participant pursuant to Section 11(d)) or by the Lessee (other than proceeds of insurance carried by or on behalf of the Lessee pursuant to Section 11(d)) from any Governmental Authority, insurer or other Person, plus the amount of any payments which would have been due from an insurer (but for the Lessee's self-insurance or policy deductibles) or with respect to any destruction, damage, loss, condemnation, confiscation, theft, seizure of or requisition of title to any Unit or the Undivided Interest therein, in each case not constituting an Event of Loss, shall be applied ,to the ratable extent allocable to the Undivided Interest, as provided in Sections 3.2 or 3.4 of the Indenture.

(f)    Application of Payments During an Event of Default or Lease Default.  Notwithstanding the foregoing provisions of this Section 10 or the provisions of Section 11, if an Event of Default or a Lease Default shall have occurred and be continuing, any amount that would otherwise be payable to or for the account of, or that would otherwise be retained by, the Lessee in connection with this Lease or any Unit or Part thereof or the Undivided Interest therein or any other interest therein shall be paid to or retained by the Lessor or, so long as the Indenture shall be in effect, to the Indenture Trustee for application pursuant to the Indenture and, at such time thereafter as no Event of Default or Lease Default shall be continuing then such amount shall be paid promptly to the Lessee (or Lessor as otherwise required pursuant to this Section 10) unless such amount shall have been otherwise applied by the Indenture Trustee pursuant to Article III of the Indenture.

SECTION 11.    Insurance.

I:\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt.final A-2.wpd

(a)    Coverage. The Lessee shall at its expense, maintain with respect to the Equipment, insurance in such amounts as is generally carried by the Lessee from time to time with respect to owned or leased equipment used in similar locations. To the extent generally maintained with respect to other such equipment, the Lessee shall maintain with respect to the Equipment on a non-discriminatory basis the following policies (with such self-insurance or deductibles as the Lessee generally maintains with respect to similar equipment, provided that such self-insurance or deductibles shall (x) apply ratably to all insured property at each production facility and (y) shall not exceed industry standards on a "per occurrence" basis):

(i)    Commercial general liability insurance in amounts not less than $25,000,000 covering liability arising from premises, operations, independent contractors, products-completed operations, personal and advertising injury, and blanket contractual liability;

(ii)    Commercial property insurance covering the full replacement cost value of Lessee's personal property including contents, fixtures, equipment (including the Equipment), improvements and betterments for "all-risk" perils included in the standard special causes of loss form and flood and earthquake;

(iii)    Boiler and machinery insurance covering the full replacement cost value of Lessee's personal property including contents, fixtures, equipment (including the Equipment), improvements and betterments against loss or damage from explosion of boilers or pressure vessels and mechanical and electrical breakdown; and

(iv)    Workers' compensation/employer's liability insurance in accordance with statutory provisions covering accidental injury, illness or death of an employee of the Lessee while at work or in the scope of his employment with the Lessee and employer's liability in an amount not less than $25,000,000.

Any loss, whether actually covered in whole or in part by any such policies, shall be the responsibility of Lessee. With respect to any such policies maintained with outside insurers, such insurers shall be rated at least B-plus or better by A.M. Best & Company or any successor rating agency of comparable stature.

(b)    Policy Provisions. Any insurance policy maintained by the Lessee with respect to the Equipment shall:

(i)    in the case of commercial general liability insurance, specify the Lessee, Owner Participant, Lessor (in both its individual and trust capacities), the Indenture Trustee

(in both its individual and trust capacities) and the Noteholders as additional insureds, as their respective interests may appear (the "Additional Insureds");

(ii)    in the case of commercial property insurance and boiler and machinery insurance, specify the Lessee, Owner Participant, Lessor (in both its individual and trust capacities), the Indenture Trustee (in both its individual and trust capacities) and the Noteholders as additional insureds and loss payees, as their respective interests may appear (together with the Additional Insureds, the "Additional Insureds and Loss Payees");

(iii)    provide that proceeds in respect of any loss or occurrence (as the proceeds relate to the Undivided Interest in the Equipment) shall be adjusted with the Lessee, unless an Event of Default or a Material Default shall have occurred and be continuing, or an Event of Loss with respect to the Undivided Interest in a Unit shall have occurred, in which case such loss shall be adjusted by the Indenture Trustee, so long as the Indenture shall not have been discharged in accordance with its terms, and thereafter by the Lessor, and payable (as the proceeds relate to the Undivided Interest in the Equipment) (x) to the Lessee in respect of payments not exceeding $5,000,000, provided no Event of Default or Lease Default shall have occurred and be continuing, and no Event of Loss with respect to the Undivided Interest in such Unit shall have occurred, and (y) in all other circumstances to the Lessor (or, so long as the Indenture shall not have been discharged, the Indenture Trustee);

(iv)    include effective waivers by the insurer of all claims for insurance premiums or commissions or (if such policies provide for the payment thereof) additional premiums or assessments against the Owner Participant, the Lessor (in both its individual and trust capacities), the Indenture Trustee (in both its individual and trust capacities) and the Noteholders;

(v)    provide that the whole or any part of the right, title and interest of the Lessor or the Lessee therein may be assigned to the Indenture Trustee as primary loss payee; and

(vi)    provided that such endorsements are available in the commercial insurance market, the Lessee shall obtain endorsements to the insurance policies carried pursuant to Sections 11(a)(i), (a)(ii) and (a)(iii) providing that (A) the insurers waive any right of subrogation, set-off or counterclaim or any other deduction, whether by attachment or otherwise, in respect of any liability of the Lessee or any Additional Insured and Loss Payee, (B) the respective interests of the Additional Insureds and Loss Payees shall not be invalidated by any act or neglect by the Lessee or any other Person, including breach of any warranty contained in such policies, (C) no lapse, cancellation or material change with respect to such policies (or, in the alternative, no lapse, cancellation or material adverse

GM 2001A-2
DOCUMENT 2

change that would affect the interests of the Additional Insureds and Loss Payees with respect to any Unit) shall be effective as to an Additional Insured and Loss Payee until at least 30 days after receipt by such Additional Insured and Loss Payee of written notice thereof, (D) the coverage afforded by such policies shall not be affected by the performance of any work in or about any Modification and (E) the insurance shall be primary regardless of any other insurance of the Additional Insured and Loss Payee which would otherwise contribute at the time of loss to the personal property insured under such insurance policies.

(c)    Reports, etc. On the Delivery Date, and at each policy renewal, but not less than annually, Lessee shall provide to the Lessor and the Indenture Trustee certificates of insurance from each insurer or by an authorized representative of each insurer. Such certificates shall identify the underwriters, the type of insurance, the limits, deductibles, and term thereof and shall specifically list the special provisions delineated in Section 11(b) for such insurance required by this Section 11. Concurrently with the furnishing of all certificates referred to in this Section 11, Lessee shall furnish the Lessor and the Indenture Trustee with an opinion from an independent insurance broker, acceptable to the Lessor, stating that all policies are in effect and that, in the opinion of such broker, the insurance then maintained by the Lessee is in accordance with this Section 11 and that the self-insurance and deductibles maintained by the Lessee are consistent with industry standards.

(d)    Additional Insurance by Lessor and Lessee. The Lessee may at its own expense and for its own account carry insurance with respect to its interest in the Equipment in amounts in excess of that required to be maintained by this Section 11. The Lessor and the Owner Participant may each carry for its own account at its sole cost and expense insurance with respect to its interest in the Equipment; provided, however, that (i) the Owner Participant has provided the Lessee with notice that it intends to carry such insurance and (ii) such insurance does not prevent the Lessee from carrying the insurance required or permitted by this Section 11 or adversely affect such insurance or the cost thereof.

SECTION 12.    Inspection. Upon two weeks prior written notice to the Lessee, on the days during the Term and at those locations specified in the Inspection Schedule to this Lease (or at other mutually agreed upon times during the Term), the Lessor, the Owner Participant and, so long as the Indenture is in effect, the Indenture Trustee and the Noteholders or their designated agents may at their own expense and risk conduct a visual inspection of the Equipment and may inspect the books and records of the Lessee relating thereto; provided, that so long as there is no Event of Default or no Material Default has occurred and is continuing, only one such inspection will be permitted annually; and, provided, further, that after the occurrence and during the continuance of an Event of Default or a Material Default, the number of inspections shall not be limited and all such inspections shall be at the Lessee's expense and risk, and, provided, further, that all information obtained in connection with any such inspection shall be subject to confidentiality arrangements reasonably prescribed by the Lessee and similar to those provided in Section 23 of the Participation Agreement; and, provided, further, that the Lessee may deny access to any Person

I:\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt.final A-2.wpd

24

who is an Adverse Party (which shall not include the Owner Participant). No inspection pursuant to this Section 12 shall interfere with the use, operation or maintenance of the Equipment or the normal conduct of Lessee's business, and the Lessee shall not be required to undertake or incur any additional liabilities in connection therewith. Neither the Lessee, the Indenture Trustee nor any Participant shall at any time be required to inspect any Unit or any Part thereof, and any inspection by the Lessor, the Indenture Trustee or any Participant shall not be deemed to affect or modify the provisions of Section 4. In the event that any Unit is not available on the date specified in the Inspection Schedule because such day is not a Business Day or for any other reason, the Lessee will make arrangements for inspection of such Unit on another date reasonably requested by Lessor, Owner Participant, Indenture Trustee and Noteholders.

SECTION 13.    Performance of Operative Documents.  Lessee agrees to perform its obligations hereunder and under the Operative Documents.

SECTION 14.    Assignment.  Subject to the penultimate sentence of Section 7(a) and except as otherwise provided herein, and provided no Event of Default or Material Default has occurred and is continuing, Lessee may assign all, but not less than all, of its rights and obligations with respect to the Undivided Interest in each Unit subject to this Lease (i) to any non-Affiliate if Lessee expects to have a continuing business relationship with such non-Affiliate or (ii) to any Affiliate, in each case, pursuant to an assignment in the form attached hereto as Exhibit B; provided, that Lessee unconditionally guarantees the obligations of such assignee pursuant to a guaranty in the form attached hereto as Exhibit C; and provided, further, that the Lessee shall provide the Lessor, the Owner Participant, and, for so long as the Indenture is outstanding, the Indenture Trustee and the Noteholders with at least 30 days' notice of such assignment identifying the proposed assignee and the address of such assignee for notification purposes, and that (a) any non-Affiliate assignee is reasonably acceptable to the Lessor and, for so long as the Indenture is outstanding, the Indenture Trustee and the Noteholders, (b) the Indenture Trustee and the Owner Participant shall have received from counsel to the Lessee such customary opinions as they may request regarding such assignment and guaranty, which opinions shall be of a scope comparable to the opinions delivered pursuant to Section 4(g)(i) of the Participation Agreement (including opinions as to the nonimpairment of the Lien of the Indenture and the continued perfection of the Indenture Trustee's security interest therein and as to any other such matter incident to the proposed assignment as the Indenture Trustee and Owner Participant may reasonably request), (c) there shall be no action, suit or proceeding pending or threatened that questions the validity or enforceability of such assignment or guaranty, (d) the assignment and guaranty shall not violate any Applicable Law binding upon the assignee or any party to the Participation Agreement, (e) all consents and approvals required to effect the assignment and the guaranty shall have been obtained, (f) the Lessee and the assignee shall have made such representations and warranties as reasonably requested by the Owner Participant and the Indenture Trustee or the Noteholders in connection with such assignment and guaranty, which representations and warranties shall be of a scope comparable to those set forth in Section 8(a) of the Participation Agreement, (g) no such assignment shall permit any further assignment of the Lease, (h) at the time that the assignment is entered into, the assignee is not insolvent or the subject of any bankruptcy

GM 2001A-2
DOCUMENT 2

proceedings, (i) the Lessor, and if the Indenture has not been discharged in accordance with its terms, the Indenture Trustee and the Noteholders, are notified as to the location of the Unit and (j) the Lessee shall have provided to the Lessor, and if the Indenture has not been discharged in accordance with its terms, the Indenture Trustee and the Noteholders, before entering into any assignment, insurance certificates evidencing that the insurance required to be maintained in accordance with <u>Section 11</u> is in full force and effect. Subject to the foregoing, the terms and provisions of this Lease shall be binding upon and inure to the benefit of the Lessor and the Lessee and their respective successors and permitted assigns. The Lessee shall pay all reasonable out-of-pocket expenses, disbursements and costs (including reasonable legal and other professional fees and expenses) incurred by the Lessor, the Owner Participant, the Indenture Trustee and the Noteholders in connection with such assignment. As a condition to the foregoing, the Lessee shall provide to the Owner Participant an opinion of Lessee's Tax Counsel, which opinion shall be reasonably acceptable to the Owner Participant, to the effect that any such assignment will have no unindemnified adverse U.S. Federal income tax consequences to the Owner Participant (except for taxes that are not indemnified for by reason of the application of <u>Sections 5(d)(I)</u>, <u>5(d)(M)</u>, or <u>5(e)</u> of the Tax Indemnity Agreement).

SECTION 15.   <u>Events of Default</u>. Each of the following events shall constitute an Event of Default (whether any such event shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) and each such Event of Default shall continue so long as, but only as long as, it shall not have been remedied:

(a)   the Lessee shall have failed to make a payment of Base Rent, Stipulated Loss Value, Termination Value, Early Fixed Price Purchase Amount, End Term Purchase Option amount or Supplemental Rent to the extent such Supplemental Rent represents Make-Whole Premium within 5 Business Days after the same shall have become due; or

(b)   the Lessee shall have failed to make a payment of Supplemental Rent <u>other</u> than Stipulated Loss Value, Termination Value or any Make-Whole Premium after the same shall have become due and such failure shall continue for 30 Business Days after Lessee's receipt of demand therefor by the party entitled thereto; or

(c)   the Lessee fails to comply with <u>Section 10(d)</u> of the Participation Agreement; or

(d)   if a guaranty is delivered pursuant to <u>Section 14</u>, a default in the due observance or performance of any covenant, condition or agreement contained in such guaranty (other than any covenant, condition or agreement described in clauses (a), (b), (f) and (g) of this <u>Section 15</u>, as to which the guarantor shall be entitled to cure Lessee's default within the applicable periods specified in such clauses), which non-observance or non-performance shall have continued for 45 days, <u>provided</u>, <u>however</u>, that if such default

GM 2001A-2
DOCUMENT 2

cannot be cured by payment of money or by diligent efforts within such 45 days (the "cure period"), if GM is diligently pursuing a cure, the cure period shall be extended for an additional period of time as may be necessary to cure (which additional period shall not exceed 180 days without the written consent of the Lessor and, if the Indenture has not been discharged, the Indenture Trustee); provided, further, that in no event shall any such cure period extend beyond the cure periods referenced in clauses (f) and (g) below with respect to any occurrence referred to therein; or

(e)    for any reason, the guaranty delivered pursuant to Section 14 is invalid or otherwise unenforceable in any respect and a valid replacement guaranty of GM reasonably satisfactory to the Owner Participant and, so long as the Indenture has not been discharged, the Indenture Trustee, has not been provided; or

(f)    the Lessee shall have failed to comply in any material respect with any other covenant or agreement contained herein or any other Operative Document (other than the Tax Indemnity Agreement) and such failure shall continue for 90 days after the earlier of the date that (i) the Treasurer or any Assistant Treasurer of the Lessee obtains actual knowledge of such failure or (ii) the Lessee receives a written notice (clearly labeled a "Notice of Default") from the Lessor, the Indenture Trustee or any Noteholder advising the Lessee of such failure; provided, however, that if such failure cannot be cured by payment of money and cannot be cured by diligent efforts within such 90-day period (the "cure period") but diligent efforts shall be properly commenced within the cure period and the Lessee is diligently pursuing a remedy of such failure, the cure period shall be extended for an additional 90 days (so long as such failure can be cured within such additional 90 days) (but not later than 90 days before the end of the Term); or

(g)    any representation or warranty made by the Lessee herein or in any Operative Document (except the representations and warranties set forth in the Tax Indemnity Agreement) or in any Officer's Certificate pursuant hereto or thereto shall prove to have been inaccurate in any material respect at the time made; provided, however, that if the representation or warranty was originally given by the Lessee in good faith, an Event of Default shall not be deemed to exist unless the inaccurate representation or warranty remains material to the Owner Participant, the Lessor, the Indenture Trustee or any Noteholder at the time such inaccuracy is discovered and, if capable of being cured, remains uncured for a period of 90 days after the earlier of the date that (i) the Treasurer or any Assistant Treasurer of the Lessee obtains actual knowledge of such inaccuracy or (ii) the Lessee receives a written notice (clearly labeled a "Notice of Default") from Lessor, Indenture Trustee or any Noteholder advising Lessee of such inaccuracy; or

(h)    the Lessee shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking of possession by any such official in an involuntary case or other proceeding

GM 2001A-2
DOCUMENT 2

commenced against it, or shall make a general assignment for the benefit of creditors, or shall take any corporate action to authorize any of the foregoing; or an involuntary case or other proceeding shall be commenced against the Lessee seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed or unstayed for a period of 90 consecutive days; or

(i)    Lessee shall have failed to carry and maintain such insurance in respect of the Equipment as is required pursuant to Section 11 and such failure shall continue until the fifth day before the end of the period during which, under the terms of the applicable policy, the lapse or cancellation of such policy is not effective as to the Additional Insureds named therein.

SECTION 16.    Effect of Event of Default.

(a)    Remedies.  Upon the occurrence of any Event of Default and so long as the same shall be continuing, the Lessor, at its option, may, to the extent permitted by Applicable Law, exercise one or more of the following remedies, as the Lessor in its sole discretion shall elect:

(i)    the Lessor, by notice to the Lessee, may rescind or terminate this Lease;

(ii)    the Lessor may demand that the Lessee, and upon the written demand of the Lessor the Lessee shall, surrender its possession of the Equipment promptly to the Lessor in the manner and condition required by, and otherwise in accordance with the provisions of, this Lease as if the Equipment were being returned at the end of the Term and the Lessor shall not be liable for the reimbursement of the Lessee for any costs and expenses incurred by the Lessee in connection therewith, provided that if within five Business Days after such demand is received by the Lessee the Lessee provides the Lessor with an Officer's Certificate to the effect that (A) at the time, a Person (other than the Lessee or an Affiliate of the Lessee) holds an interest in the Equipment under a valid instrument or agreement that was entered into on or before the date of this Lease, (B) the Lessee is unwilling or unable to surrender possession of the Equipment without the prior written consent or concurrent action of such Person and (C) such prior written consent or concurrent action has not been obtained or taken, then the Lessor may also demand that the Lessee, and upon the written demand of the Lessor the Lessee shall prior to surrender of possession of the Equipment to the Lessor (x) cease using the Equipment (whether or not the Lessee or any successor or assignee of the Lessee at the time owns or holds under a lease any other interest in the Equipment), (y) surrender the Undivided Interest in the Equipment to the Lessor and (z) store the Equipment at the Lessee's sole cost and expense

GM 2001A-2
DOCUMENT 2

at the premises of the Lessee used for storage by the Lessee; and if the Lessee fails promptly to comply with any of the foregoing demands, the Lessor may, at its option, cause public officials acting pursuant to Applicable Law or to judicial order obtained in summary proceedings or otherwise to enter upon the premises where the Equipment is located and enforce any of such demands, all without liability to the Lessor for or by any reason of such entry or taking possession; and the Lessee shall promptly execute and deliver to the Lessor such instruments or other documents as the Lessor may deem necessary or advisable to obtain possession of the Undivided Interest in the Equipment (or, if applicable, the Equipment);

(iii)    the Lessor may (whether or not the Lessor has taken possession thereof) sell the Undivided Interest in the Equipment at public or private sale, as the Lessor may determine, free and clear of any rights of the Lessee with respect thereto and without any duty to account to the Lessee with respect to such sale or any proceeds with respect thereto (except to the extent required by clause (v) or (vi) of this Section 16(a) if the Lessor shall elect to exercise its rights thereunder), in which event the Lessee's obligation to pay Base Rent and Supplemental Rent (other than Supplemental Rent accruing prior to and in connection with such event or which otherwise survives pursuant to Section 25) with respect to the Undivided Interest in the Equipment sold accruing after the date of such sale shall be terminated (except to the extent that Base Rent is to be included in computations under clause (v) or (vi) of this Section 16(a) if the Lessor shall elect to exercise its rights thereunder);

(iv)    the Lessor may hold or lease all or a portion of the Undivided Interest in the Equipment as the Lessor in its sole discretion may determine, free and clear of any rights of the Lessee with respect to such Undivided Interest and without any duty to account to the Lessee with respect to such action or inaction or for any proceeds with respect to such action or inaction;

(v)    whether or not Lessor has exercised rights under clauses (i), (ii), (iii) or (iv) above, the Lessor may demand, by written notice to the Lessee specifying a Stipulated Loss Value Date which shall be a date not earlier than 10 days after the date of such notice, that the Lessee pay to the Lessor, and the Lessee shall pay to the Lessor, on such Stipulated Loss Value Date, as liquidated damages for loss of a bargain and not as a penalty any unpaid Base Rent due and owing prior to such Stipulated Loss Value Date and any unpaid Supplemental Rent accrued to such Stipulated Loss Value Date (including an amount equal to the Make-Whole Premium, if any), plus whichever of the following amounts the Lessor, in its sole discretion, shall specify in such notice (together with interest on such amount at the Overdue Rate from such Stipulated Loss Value Date to the date of actual payment):

GM 2001A-2
DOCUMENT 2

(A)      an amount equal to the excess, if any, of Stipulated Loss Value of the Undivided Interest in the Equipment, computed as of such Stipulated Loss Value Date, over the Fair Market Rental Value of the Undivided Interest in the Equipment during the remaining Base Term (or any Renewal Term then in effect), after discounting such Fair Market Rental Value semiannually to present value as of such Stipulated Loss Value Date at a rate per annum equal to the Note Rate; or

(B)      an amount equal to the excess, if any, of such Stipulated Loss Value over the Fair Market Sales Value of the Undivided Interest in the Equipment as of such Stipulated Loss Value Date; or

(C)      an amount equal to the excess of (I) the present value as of such Stipulated Loss Value Date of all installments of Base Rent until the end of the Term (or any Renewal Term then in effect), discounted semiannually at a rate per annum equal to the Note Rate, over (II) the present value as of such Stipulated Loss Value Date of the Fair Market Rental Value of the Undivided Interest in the Equipment until the end of the Base Term (or any Renewal Term then in effect), discounted semiannually at a rate per annum equal to the Note Rate;

provided that in the case of (A), (B) or (C), unless Lessor shall have exercised its remedies pursuant to Sections 16(a)(iii) or 16(a)(iv), Lessee shall deliver the Undivided Interest in the Equipment to the Lessor in accordance with Section 5(a) and whereupon, in each case, the Lessee's obligations to pay Base Rent or Supplemental Rent shall terminate and this Lease and all obligations of Lessee hereunder (other than the obligations of Lessee that survive termination of this Lease pursuant to Section 25) shall terminate.

(vi)      the Lessor may demand, by written notice to the Lessee specifying a Stipulated Loss Value Date which shall be a date not earlier than 10 days after the date of such notice, that Lessee pay to the Lessor, and the Lessee shall pay to Lessor, on such Stipulated Loss Value Date, as liquidated damages for loss of a bargain and not as a penalty any unpaid Base Rent due and owing prior to such Stipulated Loss Value Date and any unpaid Supplemental Rent accrued to such Stipulated Loss Value Date (including an amount equal to the Make-Whole Premium, if any), plus an amount equal to the greatest of (I) Stipulated Loss Value for the Undivided Interest in the Equipment determined as of such Stipulated Loss Value Date, (II) the discounted Fair Market Rental Value determined pursuant to Section 16(a)(v)(A), and (III) the Fair Market Sales Value of the Undivided Interest in the Equipment as of such Stipulated Loss Value Date and, in this event, upon full payment by the Lessee of all sums due under this Section 16(a)(vi), the Lessor shall transfer

the Undivided Interest in the Equipment to the Lessee "as-is, where-is," without recourse, representation or warranty (other than the absence of Owner Participant Liens, Lessor Liens and the Lien of the Indenture), and in each case the Lessee's obligations to pay Base Rent or Supplemental Rent (other than Supplemental Rent accruing prior to or in connection with such event or which otherwise survives pursuant to Section 25) shall terminate as of the date of payment by the Lessee under this Section 16(a)(vi) and this Lease and the Lessee's obligations hereunder (other than the obligations of the Lessee that survive termination of this Lease pursuant to Section 25) shall terminate;

(vii)    if the Lessor shall have sold all of the Undivided Interest in the Equipment pursuant to clause (iii) of this Section 16(a) or other right of sale, the Lessor, in lieu of exercising its rights under clause (v) of this Section 16(a), may, if it shall so elect, demand that the Lessee pay to the Lessor and the Lessee shall pay to the Lessor on the date of such sale, as liquidated damages for loss of a bargain and not as a penalty, any unpaid Base Rent due and owing prior to such next Lease Period Date and any Supplemental Rent accrued to such next Lease Period Date (including an amount equal to the Make-Whole Premium, if any), plus the amount of any deficiency between Stipulated Loss Value for the Undivided Interest in the Equipment, computed as of such next Lease Period Date, and the proceeds of such sale, together with interest at the Overdue Rate on the amount of such Rent, from the due date or dates thereof, and the amount of such deficiency from the date of such sale, until the date of actual payment;

(viii)    the Lessor may enter into a substitute lease of the Undivided Interest in a Unit or Units with another party, in which case the Lessee shall remain liable for all amounts due under this Lease, which liability shall be reduced by any amounts paid to Lessor under such substitute lease; or

(ix)    the Lessor may exercise any other right or remedy that may be available to it under Applicable Law or proceed by appropriate court action to enforce the terms hereof, to recover damages for the breach hereof or to rescind this Lease.

Additionally, if Lessor exercises its remedies under this Section 16 the amount the Lessee must pay the Lessor hereunder shall be increased by any positive amount set forth on Schedule III to the Lease Supplement opposite the relevant Stipulated Loss Value Date under the caption "Base Rent Amount as of Stipulated Loss Value Date" or decreased by the absolute value of any negative amount set forth on Schedule III to the Lease Supplement opposite the relevant Stipulated Loss Value Date under the caption "Base Rent Amount as of Stipulated Loss Value Date"; provided, however, that to the extent such increase or decrease does not precisely reflect the excess of Base Rent paid over Base Rent allocated, whichever the case may be, as of the date on which Base Rent ceases to accrue, such applicable amount shall be

GM 2001A-2
DOCUMENT 2

further increased or decreased by the amount necessary to ensure that the aggregate amount of Base Rent paid equals the aggregate amount of Base Rent allocated as of the date on which Base Rent ceases to accrue.

Except as expressly provided in Section 16(a), no rescission or termination of this Lease in whole or in part, or any repossession of the Undivided Interest in any Equipment or exercise of any remedy under Section 16(a) will relieve Lessee of any of its obligations under this Lease or any other Operative Documents.

(b)    Continuing Obligations.  The Lessee shall be liable, except as otherwise expressly provided herein, for any and all accrued and unpaid Rent due hereunder before, after or during the exercise of any of the foregoing remedies, including all reasonable legal fees and other reasonable out-of-pocket expenses incurred by the Lessor, the Owner Participant, the Noteholders or the Indenture Trustee by reason of the occurrence of any Event of Default or the exercise of the Lessor's remedies with respect thereto.  At any sale of the Undivided Interest in the Equipment or any part thereof pursuant to Section 16(a), the Noteholders or the Indenture Trustee may bid for and purchase such property.

(c)    Remedies Cumulative.  To the extent permitted by Applicable Law and except as provided therein, no remedy under this Section 16 is intended to be exclusive, but each shall be cumulative and in addition to any other remedy provided under this Section 16 or otherwise available to the Lessor at law or in equity.  No express or implied waiver by the Lessor of any Event of Default shall in any way be, or be construed to be, a waiver of any future or subsequent Event of Default.  The failure or delay of the Lessor in exercising any rights granted it hereunder upon any occurrence of any of the contingencies set forth herein shall not constitute a waiver of any such right upon the continuation or recurrence of any such contingencies or similar contingencies and any single or partial exercise of any particular right by the Lessor shall not exhaust the same or constitute a waiver of any other right provided herein.  To the extent permitted by Applicable Law, the Lessee hereby waives any rights now or hereafter conferred by statute or otherwise which may require the Lessor to sell, lease or otherwise use the Undivided Interest in the Equipment in mitigation of the Lessor's damages or which may otherwise limit or modify any of the Lessor's rights and remedies provided in this Section 16.

SECTION 17.    Notices.  All notices, demands, instructions, consents and other communications required or permitted to be given to or made upon any party hereto shall be in writing and shall be personally delivered (or offered for delivery and rejected) by Federal Express or next business day delivery by another reliable express courier or by prepaid courier service, or by telecopy (with confirmation) and shall be deemed to be given for purposes of this Lease on the day that such writing is delivered to the intended recipient thereof in accordance with the provisions of this Section 17.  Unless otherwise specified in a notice delivered (or offered for delivery and rejected) in accordance with the foregoing provisions of this subsection, notices, demands, instructions and other communications in writing shall be given to or made

I:\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt.final A-2.wpd

32

GM 2001A-2
DOCUMENT 2

upon the respective parties hereto at their respective addresses (or numbers) as set forth on Schedule 8 to the Participation Agreement (or such other address as designated by the appropriate party in accordance with this Section 17).

SECTION 18.    Renewal Option; Purchase Options; Valuation.

(a)    Fixed Rate Renewal Option. Not less than nine months before the end of the Base Term, the Lessee may deliver to Lessor a written notice irrevocably electing to renew this Lease as to the Undivided Interest in any or all of the Units then subject to this Lease at a rental amount per Unit per Lease Period equal to 50% of the average semi-annual Base Rent (as specified on the Applicable Schedule and as apportioned to the Undivided Interest in such Unit on the basis of its Fair Market Sales Value as of the Delivery Date (as set forth in the Appraised and Applicable Schedule) as a percentage of the Fair Market Sales Value for the Undivided Interest in all Equipment subject to this Lease as of the Delivery Date) for the Undivided Interest in any such Unit during the Base Term payable to the Lessor by the Lessee semi-annually in arrears on the Lease Period Date (a "Fixed Rate Renewal"). The Lessee shall specify in such notice the term of such Fixed Rate Renewal which shall be in intervals of twelve-month periods (each ending on a January 2 or July 2); provided, however, the term (the "Fixed Rate Renewal Term") of any such Fixed Rate Renewal shall not extend beyond the earlier of (i) the date on which the expected remaining useful life of any Unit covered thereunder is less than 20% of the useful life of such Unit on the Delivery Date and (ii) the date on which the expected residual Fair Market Sales Value of any Unit covered thereunder is less than 20% of aggregate Lessor's Cost of such Unit (without regard to inflation or deflation and in accordance with the first two sentences of Section 5(a) hereof). For purposes of the preceding sentence, the "expected remaining useful life" and the "expected residual Fair Market Sales Value" of the Undivided Interest in the Equipment subject to any Fixed Rate Renewal shall be established not more than 18 months prior to the commencement of the initial Fixed Rate Renewal Term (if any) by an appraiser selected by the Lessee and reasonably acceptable to the Owner Participant, and such appraiser shall deliver an appraisal which shall be reasonably acceptable to the Owner Participant. At the end of the Base Term for any Undivided Interest in the Equipment then subject to this Lease, if the Lessee has elected to renew this Lease as aforesaid, this Lease shall continue in full force and effect during the following Fixed Rate Renewal Term, except that (x) Lessee shall pay to the Lessor the amounts set forth above and (y) the Stipulated Loss Values and Termination Values applicable during the Fixed Rate Renewal Term shall initially be the Fair Market Sales Value (determined by the appraiser specified in the preceding sentence) of the Undivided Interest in] the Unit as of the commencement of the Fixed Rate Renewal Term, and on each Lease Period Date during the Fixed Rate Renewal Term shall decline on a straight line basis by an amount per Lease Period obtained by dividing the difference between the Fair Market Sales Value of the Undivided Interest in the Unit as of the beginning of the Fixed Rate Renewal Term and the estimated Fair Market Sales Value of the Undivided Interest in the Unit as of the end of the Fixed Rate Renewal Term by the number of Lease Periods in the Fixed Rate Renewal Term.

(b)    Fair Market Value Renewal Option. Not less than nine months before the end of each Base Term or Renewal Term for the Undivided Interest in any Unit then subject to this Lease, the Lessee may deliver to the Lessor a written notice irrevocably electing to renew this Lease for the Undivided Interest in such Unit at a rental rate described below (a "Fair Market Value Renewal"). The term (the "Fair Market Value Renewal Term") of such Fair Market Value Renewal shall be in two-year intervals (each ending on a January 2 or July 2) which shall end on the second anniversary of the commencement of such Fair Market Value Renewal Term (the "Selected FMV Renewal Expiration Date"); provided, that if such Fair Market Value Renewal Term would exceed 80% of any Unit's remaining useful life as of the commencement of such Fair Market Value Renewal Term or would not leave at the end of such Renewal Term an expected residual value of at least 20% of the Fair Market Sales Value of the Undivided Interest in the Unit as of the commencement of such Renewal Term, such shorter Fair Market Value Renewal Term as would satisfy such remaining useful life and residual value standards (which standards shall be established not more than 18 months prior to the commencement of any such Fair Market Value Renewal Term by an appraiser selected by the Lessee and reasonably acceptable to the Owner Participant, and such appraiser shall deliver an appraisal which shall be reasonably acceptable to the Owner Participant). The initial Fair Market Value Renewal Term shall commence upon the expiration of the Base Term or the Fixed Rate Renewal Term, and each subsequent Fair Market Value Renewal Term shall commence upon the expiration of the preceding Fair Market Value Renewal Term. During each Fair Market Value Renewal Term elected by the Lessee pursuant to this Section 18(b), Base Rent for the Undivided Interest in the Equipment shall be payable to Lessor by Lessee semi-annually in arrears on the Lease Period Dates and shall be equal to 105% of the Fair Market Rental Value of such Undivided Interest in the Equipment for the first two terms and 100% of the Fair Market Rental Value of such Undivided Interest in the Equipment for each subsequent term; provided, however, that if, after the Delivery Date, a statutory change is enacted or the Internal Revenue Service issues a final Treasury Regulation (or any other administrative pronouncement upon which lessors and lessees can rely for Federal income tax purposes, but only if the Lessee provides the Lessor, at the Lessee's expense, with an unqualified opinion of independent tax counsel selected by the Owner Participant and reasonably acceptable to the Lessee, to the effect that Fair Market Value Renewal at a rental rate equal to 100% of then current Fair Market Rental Value will not result in any adverse tax consequences to the Lessor or the Owner Participant under Code section 467 or any successor provision thereto) in each case that is in effect at the commencement of the applicable Fair Market Value Renewal Term or amends or clarifies Treasury Regulation section 1.467-1(h)(6) to provide in substance that rent for a Fair Market Value Renewal Term may be at a rate equal to 100% of the fair market rental rate determined at the time of such Fair Market Value Renewal Term, then Base Rent shall be equal to 100% of the Fair Market Rental Value of such Undivided Interest in the Equipment for each such period. Such Fair Market Rental Value shall be determined by the Appraisal Procedure. If no such written notice is delivered by the Lessee to the Lessor on or before the date that is nine months prior to the end of a Base Term or the date that is nine months prior to the end of a Fixed Rate Renewal Term or a Fair Market Value Renewal Term, the Lessee shall be deemed to have waived any right to renew this Lease. At the end of a Base Term, a Fixed Rate Renewal Term or a Fair Market Value Renewal Term for the Undivided Interest in any Unit, if the Lessee

GM 2001A-2
DOCUMENT 2

has elected to renew this Lease as aforesaid, this Lease shall continue in full force and effect during the following Renewal Term, except that (x) the Lessee shall pay Lessor Base Rent in the amount set forth above and (y) the Stipulated Loss Values and Termination Values applicable during the Fair Market Value Renewal Term shall initially be the Fair Market Sales Value (determined pursuant to the Appraisal Procedure) of the Undivided Interest in the Equipment as of the commencement of the Fair Market Value Renewal Term, and on each Lease Period Date during the Fair Market Value Renewal Term shall decline on a straight line basis by an amount per Lease Period obtained by dividing the difference between the Fair Market Sales Value of such Undivided Interest in the Equipment as of the beginning of the Fair Market Value Renewal Term and the estimated Fair Market Sales Value of such Undivided Interest in the Equipment as of the end of the Fair Market Value Renewal Term by the number of Lease Periods in the Fair Market Value Renewal Term.

(c)    Purchase Options.

(i)    Early Purchase Option. The Lessee shall have the right, exercisable by giving written notice (the "EBO Notice") to the Lessor not less than ninety (90) days prior to the EBO Date, to purchase on the EBO Date from the Lessor all of the Lessor's right, title and interest in and to the Undivided Interest in any of the Units then subject to this Lease (the "EBO Purchase Option"). The Lessee shall purchase such Undivided Interest in the Unit or Units pursuant to the EBO Purchase Option for an amount equal to the Early Fixed Price Purchase Amount. Lessee shall also pay at such time (A) all Base Rent due and owing prior to such Lease Period Date and (B) all Supplemental Rent due and owing on or prior to such Lease Period Date (including the amount of the Make-Whole Premium, if any, payable in connection with any redemption or repurchase of Equipment Notes upon the exercise of such purchase option). Lessee may, at its option, revoke the EBO Notice at any time at least 10 days prior to the EBO Date, and this Lease with respect to the Undivided Interest in the Unit which was the subject of such EBO Notice shall continue in full force and effect; provided, however, that if the Lessee so revokes such EBO Notice within 30 days of the EBO Date, then the Lessee shall be obligated to pay to the Owner Trustee as Supplemental Rent on the EBO Date, an amount equal to 0.75% of the Early Fixed Price Purchase Amount with respect to the Undivided Interest in the Unit. If the Early Fixed Price Purchase Amount with respect to the Undivided Interest in a Unit is payable in more than one installment then (i) on the EBO Date the Lessee shall be deemed automatically to grant, and the Lessor shall automatically obtain, a security interest in each Undivided Interest in the Unit being purchased on such EBO Date to secure the unpaid installments of the Early Fixed Price Purchase Amount, (ii) the Lessee shall execute and file such financing statements and other documents as the Lessor shall reasonably request to evidence and perfect such security interest, and (iii) such security interest shall automatically terminate upon payment in full of all unpaid installments of Early Fixed Price Purchase

Amount with respect to the Undivided Interest in such Unit. The first installment of Early Fixed Price Purchase Amount shall be at least sufficient to repay principal and interest on the Equipment Notes to the extent provided in <u>Section 6.1(b)(1)</u> of the Indenture and Lessee shall also pay as Supplemental Rent on the date such first installment is payable an amount equal to the Make-Whole Premium, if any, with respect to the Equipment Notes, to the extent so repaid.

(ii)    <u>End Term Purchase Option</u>. At the expiration of the Base Term or any Renewal Term, the Lessee shall have the option, exercisable by giving not more than 360 days but at least nine months' irrevocable prior written notice to the Lessor, to purchase on the last Business Day of such Base Term or Renewal Term (the "<u>End Term Date</u>") all of the Lessor's right, title and interest in and to the Undivided Interest in any or all of the Units then subject to this Lease for a purchase price equal to the Fair Market Sales Value of the Undivided Interest in any such Unit on the End Term Date established pursuant to the Appraisal Procedure after Lessee has notified Lessor of its intent to exercise its purchase option pursuant to this <u>Section 18(c)(ii)</u> (the "<u>End Term Purchase Option</u>"). The Lessee shall also pay at such time all amounts of Rent due and owing on the End Term Date and all Supplemental Rent due and owing prior to the End Term Date.

(iii)    <u>Owner Participant Becomes Competitor</u>. In the event that the Owner Participant (or any subsequent transferee) or any Affiliate of the Owner Participant (or any subsequent transferee) (each of the foregoing, an "OP Entity"), acquires or is acquired by, merges, or otherwise consolidates with, any company (or any Associated Person of any company) engaged in automobile manufacturing, automobile distribution, automobile parts manufacturing or automobile parts distribution (collectively, the "<u>Automotive Business</u>"), irrespective of whether such company or Associated Person is a direct competitor of the Lessee or any Affiliate of the Lessee, the Lessee may, on the Lease Period Date next following the lapse of the six-month period after the merger, acquisition or consolidation referred to above, upon not less than 30 days' notice, purchase all of the Undivided Interest in the Equipment then subject to this Lease for a price equal to the Termination Value of such Undivided Interest in the Equipment on such Lease Period Date; provided, however, that the foregoing shall not apply to (i) an institutional investor which is solely a passive investor in the financing of equipment or facilities used in the Automotive Business or (ii) an acquisition by an OP Entity as part of a foreclosure or restructuring with respect to a passive investment, and not for the purpose of holding such acquired interest as part of the Owner Participant's normal course business operations. The Lessee shall also pay at such time (A) all Base Rent due and owing on such Lease Period Date (exclusive of any Base Rent designated as Base Rent payable in advance) and (B) all Supplemental Rent due and owing on or prior to such Lease Period Date (including the amount of the Make-Whole

GM 2001A-2
DOCUMENT 2

Premium, if any, payable in connection with any redemption or repurchase of Equipment Notes upon the exercise of such purchase option).

(iv)    <u>Payment of Purchase Price</u>.  If the Lessee shall have exercised its EBO Purchase Option, End Term Purchase Option, or its option pursuant to <u>Section 18(c)(iii)</u>, the Lessee shall pay (in cash or immediately available funds) the purchase price prescribed above and purchase on the relevant EBO Date, End Term Date or Lease Period Date, as the case may be, the Undivided Interest in the Equipment required to be purchased on such dates.  Upon payment by the Lessee to Lessor of the purchase price for such Undivided Interest in the Equipment and all additional amounts specified in <u>Section 18(c)(i), 18(c)(ii)</u> <u>or 18(c)(iii)</u>, as the case may be, the Lessor shall transfer to the Lessee, "as-is, where-is" without recourse or warranty but free and clear of Lessor Liens, Owner Participant Liens attributable to it and the Lien of the Indenture (if and to the extent the Indenture Trustee is required to release the same), all the Lessor's right, title and interest in, to and under the Undivided Interest in such Unit.  Thereupon the obligations of the Lessee hereunder with respect to such Undivided Interest in the Equipment (other than any such obligations expressed herein as surviving termination of this Lease) shall terminate.  Notwithstanding any other provision of this clause (iv), if the Lessee shall have exercised its EBO Purchase Option or its option pursuant to <u>Section 18(c)(iii)</u> and if the Lessee shall have elected, as provided in the Indenture, to issue Unsecured Notes in exchange for the Outstanding Equipment Notes, the Lessee may reduce the aggregate amount payable to Lessor by the principal amount of the Equipment Notes so exchanged.  In addition, the Lessee shall pay all costs incurred by the Lessor to effect the transfer of its rights in the Undivided Interest in the Equipment so purchased to the Lessee.

(v)    If the Lessee elects to exercise its purchase option under <u>Section 18(c)(i)</u>, any amount payable to the Lessor on the EBO Date shall be increased by any positive amount set forth on <u>Schedule V</u> under the caption "Base Rent Amount as of the EBO Date" for the EBO Date or decreased by the absolute value of any negative amount set forth on <u>Schedule V</u> opposite the relevant date under the caption "Base Rent Amount as of the EBO Date."

(vi)    If the Lessee elects to exercise its purchase option under <u>Section 18(c)(iii)</u>, any amount payable to the Lessor on the Lease Period Date shall be increased by any positive amount set forth on <u>Schedule IV</u> under the caption "Base Rent Amount as of Termination Date" for the Termination Date on <u>Schedule IV</u> which corresponds to the Lease Payment Date or decreased by the absolute value of any negative amount set forth on <u>Schedule IV</u> under the caption "Base Rent Amount as of the Termination Date" for the Termination Date on <u>Schedule IV</u> which corresponds to the Lease Payment Date.

GM 2001A-2
DOCUMENT 2

(d)    Binding Election. Any election made by the Lessee pursuant to Sections 18(a), 18(b), 18(c)(i), 18(c)(ii) or 18(c)(iii) shall be irrevocable by the Lessee (except to the extent such election is made revocable by the corresponding aforementioned section) and such election shall be binding on the Lessor if (i) the Lessee fulfills all of the requirements relating to such election and (ii) on the commencement date of such Renewal Term or the date of purchase, as the case may be, no Event of Default, Material Default or Credit Default shall have occurred and be continuing.

SECTION 19.    Security for Lessor's Obligation to Holders of Equipment Notes. The Lessor's interest in this Lease has been assigned as security to the Indenture Trustee pursuant to the Indenture for the benefit of the holders from time to time of the Equipment Notes, and the Lessee acknowledges due notice of, and consents to, such security assignment. To the extent, if any, that this Lease and any Lease Supplement constitute chattel paper (as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction), no security interest in this Lease and any Lease Supplement may be created through the transfer or possession of any counterpart other than the original counterpart, which shall be identified as the counterpart containing the receipt therefor executed by the Indenture Trustee as secured party under the Indenture on the signature page thereof. The Lessee hereby accepts and consents to the terms of the Indenture and to the assignment of all the Lessor's right, title and interest in and to this Lease and any Lease Supplements pursuant to the terms thereof.

The Lessee agrees to pay directly to the Indenture Trustee (or, after receipt by the Lessee of notice from the Indenture Trustee of the discharge of the Indenture, to the Lessor), all amounts of Rent due or to become due hereunder and assigned to the Indenture Trustee and, in the event the Indenture has not been discharged, to deliver to Indenture Trustee and the Noteholders copies of all notices, opinions, certificates, reports and financial information which the Lessee delivers to the Lessor under any Operative Document. Notwithstanding the foregoing assignment of this Lease, the obligations of the Lessor to the Lessee to perform the terms and conditions of this Lease shall remain in full force and effect and the Lessee agrees to look solely to the Lessor for the performance of such obligations.

SECTION 20.    Lessor's Right to Perform for Lessee. If the Lessee fails to make any payment of Rent required to be made by it hereunder or fails to perform or comply with any of its agreements contained herein, then the Lessor (subject to Section 8.3(e)(i)(C) of the Indenture) or the Indenture Trustee may, after giving written notice to the Lessee (which notice need not be given to the extent any notice with respect to such failure has previously been given pursuant to Section 15), itself make such payment or perform or comply with such agreement but shall not be obligated hereunder to do so, and the amount of such payment and the amount of the reasonable expenses of the Lessor or the Indenture Trustee incurred in connection with such payment or the performance of or compliance with such agreement, as the case may be, together with interest thereon at the Overdue Rate, shall be deemed Supplemental Rent, payable by the Lessee upon demand.

I:\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt.final A-2.wpd

GM 2001A-2
DOCUMENT 2

SECTION 21.    Miscellaneous.  Any provision of this Lease which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  No term or provision of this Lease may be changed or waived orally, but only by an instrument in writing signed by the Lessee, the Lessor and any assignee of the Lessor's rights hereunder and the Indenture Trustee, to the extent required by the terms of the Indenture.  This Lease shall constitute an agreement of lease, and nothing contained herein shall be construed as conveying to the Lessee any right, title or interest in any Unit except as a lessee only.  The Section and paragraph headings in this Lease and the table of contents are for convenience of reference only and shall not modify, define, expand or limit any of the terms or provisions hereof and all references herein to numbered sections, unless otherwise indicated, are to sections of this Lease.  This Lease shall in all respects be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.  This Lease may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall (subject to the second sentence of Section 19) be an original, but all such counterparts shall together constitute but one and the same instrument.  This Lease is being delivered in the State of New York.

SECTION 22.    Successor Trustee.  The Lessee agrees that in the case of the appointment of any successor Owner Trustee pursuant to the terms of the Trust Agreement and in compliance with Section 11(c) of the Participation Agreement, such successor Owner Trustee shall, upon written notice to the Lessee by such successor Owner Trustee, succeed to all the rights, powers and title of the Lessor hereunder and shall be deemed to be the Lessor and the owner of the Undivided Interest in the Equipment for all purposes hereof without the necessity of any consent or approval by the Lessee (subject to Section 11(c) of the Participation Agreement) and without in any way altering the terms of this Lease or the Lessee's obligations hereunder.  One such appointment and designation of a successor Owner Trustee shall not exhaust the right to appoint and designate further successor Owner Trustees pursuant to the Trust Agreement, but such right may be exercised repeatedly as long as this Lease shall be in effect.

SECTION 23.    Lessee Indemnity.  As provided in Section 8 of the Participation Agreement, the Lessee shall indemnify and hold harmless the Lessor and each other Person entitled to indemnification thereunder in the same manner and with the effect as if such Section were set fully forth herein.

SECTION 24.    Equipment to Remain Personal Property.  The Lessee and the Lessor agree that the Equipment, each Unit and every Part thereof and the Undivided Interest therein are severed from, and shall be remain severed from, any real property and are readily moveable, and, even if physically attached to such property, it is the intention of the Lessee and the Lessor that the Equipment, each Unit and every

GM 2001A-2
DOCUMENT 2

Part thereof and the Undivided Interest therein (i) shall retain the character of personal property, (ii) shall be removable without causing material damage to the real property, (iii) shall be treated as personal property with respect to the rights of all Persons whomsoever, (iv) shall not become part of any real property, and (v) by virtue of its nature as personal property, shall not be affected in any way by any instrument dealing with any real property. The Lessee shall not, without the prior written consent of the Lessor and, until the Lien of the Indenture shall have been discharged in accordance with its terms, the Indenture Trustee, and subject to such conditions as the Lessor and, until the Lien of the Indenture shall have been discharged in accordance with its terms, the Indenture Trustee may impose for their protection, affix or install any Unit to or in any real property in such a manner as to cause or permit such Unit or the Undivided Interest therein to become a fixture or subject to the rights of any Person having an interest in such real property.

SECTION 25.    Survival.

(a)    All indemnities, representations and warranties contained or incorporated by reference in this Lease shall survive, and shall continue in effect following, the execution and delivery of this Lease and the expiration or termination of this Lease.

(b)    The obligations of the Lessee to be performed under this Lease prior to the date this Lease is terminated and the obligations of Lessee pursuant to Sections 2(c), 2(d), 3(c), 3(e), 3(f), 5, 6, 9(c), 9(d), 10, 13, 14, 16, 18, 22, 23, 24 and 25 shall survive the expiration or termination of this lease. The extension of any applicable statute of limitations by the Lessor, the Indenture Trustee, the Lessee, the Owner Participant or any Indemnitee shall not affect such survival.

SECTION 26.    Further Assurances. The Lessee agrees, at its own expense, to promptly and duly execute and deliver to the Lessor and, so long as the Indenture shall remain in effect, the Indenture Trustee, such further documents and assurances and take such further action as the Lessor and, so long as the Indenture shall remain in effect, the Indenture Trustee, may from time to time reasonably request in order to more effectively carry out the intent and purpose of this Lease. The Lessee agrees to establish and protect the rights and remedies created or intended to be created in favor of the Lessor hereunder, and of the Indenture Trustee's interest in this Lease as assigned under the Indenture, including, without limitation, if requested by the Lessor or, so long as the Indenture shall remain in effect, the Indenture Trustee, the execution and delivery or supplements or amendments hereto, in recordable form, subjecting any replacement or substituted Undivided Interest in the Equipment to this Lease and the security interest of the Indenture and the recording or filing of counterparts hereof, or of financing statements with respect hereto.

SECTION 27.    Successors and Assigns. This Lease, including all agreements, covenants, indemnities, representations and warranties contained herein, shall be binding upon and inure to the benefit of the Lessor and the Lessee and their respective successors and permitted assigns.

I:\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt.final A-2.wpd

GM 2001A-2
DOCUMENT 2

SECTION 28.    <u>Assignment by the Lessee</u>.  The Lessee may not, without the prior written consent of the Lessor, assign any of its rights hereunder except as otherwise expressly provided herein.

* * * * * *

GM2001A-
DOCUMENT 2

## [SIGNATURE PAGE TO THE LEASE AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Lease Agreement to be duly executed as of the date first written above.

**GENERAL MOTORS CORPORATION,**
as Lessee

By: _____
Name:
Title:

**STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION,** not in its individual capacity, except as expressly provided herein, but solely as Owner Trustee, as Lessor

By: _____
Name:
Title:    ELIZABETH C. HAMMER
          VICE PRESIDENT

Inspection Schedule Michigan Presses

May
Wednesdays
9:00 am Pontiac
1:00 pm Bay City
3:30 pm Flint

| Year | Date |
|------|-----------|
| 1 | 08-May-02 |
| 2 | 14-May-03 |
| 3 | 12-May-04 |
| 4 | 11-May-05 |
| 5 | 10-May-06 |
| 6 | 09-May-07 |
| 7 | 14-May-08 |
| 8 | 13-May-09 |
| 9 | 12-May-10 |
| 10 | 11-May-11 |
| 11 | 09-May-12 |
| 12 | 08-May-13 |
| 13 | 14-May-14 |
| 14 | 13-May-15 |
| 15 | 11-May-16 |
| 16 | 10-May-17 |
| 17 | 09-May-18 |
| 18 | 08-May-19 |
| 19 | 13-May-20 |
| 20 | 12-May-21 |

GM 2001A-2
DOCUMENT 2

<u>EXHIBIT A TO
LEASE AGREEMENT</u>

### LEASE SUPPLEMENT (GM 2001A-2)

dated as of December 18, 2001

between

### STATE STREET BANK AND TRUST COMPANY
### OF CONNECTICUT, NATIONAL ASSOCIATION,
not in its individual capacity
except as expressly stated herein,
but solely as Owner Trustee,

as Lessor

and

### GENERAL MOTORS CORPORATION,

as Lessee

CERTAIN RIGHTS OF LESSOR UNDER THIS LEASE SUPPLEMENT HAVE BEEN ASSIGNED TO, AND ARE SUBJECT TO A SECURITY INTEREST IN FAVOR OF, WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE, UNDER THE TRUST INDENTURE AND SECURITY AGREEMENT DATED AS OF DECEMBER 18, 2001, BETWEEN LESSOR AND INDENTURE TRUSTEE, AS SUCH INDENTURE MAY BE AMENDED, MODIFIED OR SUPPLEMENTED FROM TIME TO TIME IN ACCORDANCE WITH THE PROVISIONS THEREOF. THIS LEASE SUPPLEMENT HAS BEEN EXECUTED IN SEVERAL COUNTERPARTS. TO THE EXTENT, IF ANY, THAT THIS LEASE SUPPLEMENT CONSTITUTES CHATTEL PAPER (AS SUCH TERM IS DEFINED IN THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN ANY APPLICABLE JURISDICTION), NO SECURITY INTEREST IN THIS LEASE SUPPLEMENT MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART HEREOF OTHER THAN THE "ORIGINAL EXECUTED COUNTERPART", WHICH SHALL BE IDENTIFIED AS THE COUNTERPART CONTAINING THE RECEIPT THEREFOR EXECUTED BY INDENTURE TRUSTEE ON OR FOLLOWING THE SIGNATURE PAGE THEREOF.

GM 2001A-2
DOCUMENT 2

THIS COUNTERPART IS [NOT] THE ORIGINAL EXECUTED COUNTERPART.

GM 2001A-2
DOCUMENT 2

EXHIBIT A TO
LEASE AGREEMENT

## LEASE SUPPLEMENT (GM 2001A-2)

LEASE SUPPLEMENT (GM 2001A-2), dated as of December 18, 2001, between GENERAL MOTORS CORPORATION ("Lessee") and STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION, not in its individual capacity, but solely as Owner Trustee under the Trust Agreement (such Owner Trustee, in its capacity as such Owner Trustee, being herein called "Lessor").

WHEREAS, Lessor and Lessee have heretofore entered into that certain Lease Agreement (GM 2001A-2), dated as of December 18, 2001, relating to the lease of the Undivided Interest in certain automotive manufacturing equipment (herein called the "Lease", and the defined terms therein being hereinafter used with the same meanings). The Lease provides for the execution and delivery from time to time of Lease Supplements for the purpose of leasing the Undivided Interest in the Equipment under the Lease as and when delivered by Lessor and Lessee and the replacement of existing Lease Supplements, all in accordance with the terms thereof.

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, Lessor and Lessee hereby agree as follows:

1. Lessor hereby delivers and leases to Lessee under the Lease and Lessee hereby accepts and leases from Lessor under the Lease the Undivided Interest in certain Equipment located in Lessee's production facility at _____ and specified in Schedule I hereto each with the Lessor's Cost, Base Rent, Stipulated Loss Value, Termination Value and EBO Date set forth in Schedules I through V hereto.

2. The Last Day of the Base Term, EBO Date and Early Fixed Price Purchase Amount Percentage for the Undivided Interest in the Equipment subject to this Lease Supplement shall be as set forth below:

Last Day of the Base Term: _____
EBO Date: _____
Early Fixed Price Purchase Amount Percentage: _____

3. All of the terms and provisions of the Lease are hereby incorporated by reference in this Lease Supplement to the same extent as if fully set forth herein.

4. This Lease Supplement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together

1

I:\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt.final A-2.wpd

GM 2001A-2
DOCUMENT 2

constitute but one and the same instrument. To the extent, if any, that this Lease Supplement constitutes chattel paper (as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction), no security interest in this Lease Supplement may be created through the transfer or possession of any counterpart other than the original counterpart, which shall be identified as the counterpart containing the receipt therefor executed by Indenture Trustee as secured party under the Indenture on the signature page thereof.

5.  Lessee confirms that it has accepted delivery of the Undivided Interest in the Equipment for all purposes hereof and of the Lease in good working order and repair and without defect.

6.  **This Lease Supplement is being delivered in the State of New York and shall in all respects be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.**

[Signature Page Follows]

2

GM 2001A-2
DOCUMENT 2

     IN WITNESS WHEREOF, Lessor and Lessee have caused this Lease Supplement to be duly executed on the day and year first above written.

**GENERAL MOTORS CORPORATION,**
as Lessee

By:    _____
Name:  _____
Title:   _____

**STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION,**
not in its individual capacity, except as expressly provided herein, but solely as Owner Trustee, as Lessor

By:    _____
Name:  _____
Title:   _____

3

GM 2001A-2
DOCUMENT 2

**EXHIBIT B
TO LEASE
AGREEMENT**

## FORM OF LEASE ASSIGNMENT

This LEASE ASSIGNMENT is entered into as of _____ 20__, by and between General Motors Corporation, a corporation organized and existing pursuant to the laws of the State of Delaware, as assignor (together with its successors and assigns, the "Lessee") and [_____], a corporation organized and existing pursuant to the laws of the State of _____ (together with its successors and assigns, the "Assignee").

WHEREAS, the Lessee has heretofore entered into a Lease Agreement (GM 2001A-2) (the "Lease") with State Street Bank and Trust Company of Connecticut, National Association, not in its individual capacity except as expressly provided therein, but solely as Owner Trustee (the "Owner Trustee"), dated as of December 18, 2001, in respect of, among other things, the Undivided Interest in the Equipment listed on Schedule 1 hereto (the "Transferred Equipment").

WHEREAS, the Lessee has agreed to assign all of its interest in the Transferred Equipment to the Assignee and the Assignee has agreed to accept all of Lessee's obligations under the Lease and the other Operative Documents.

WHEREAS, the Lessee, the Owner Trustee, General Electric Capital Corporation, as Owner Participant and the other parties named therein have entered into a Participation Agreement (GM 2001A-2) dated as of December 18, 2001 (the "Participation Agreement") pursuant to which, among other things, the Lessee sold to the Owner Trustee and the Owner Trustee purchased from the Lessee all of Lessee's right, title and interest in respect of the Transferred Equipment.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein and for other good and valuable consideration, the parties hereto agree as follows:

1. Definitions. For purposes of this Lease Assignment, capitalized terms used but not defined herein shall have the meanings assigned to them in Appendix A (such definitions to be equally applicable to both the singular and plural forms of the terms defined) to the Participation Agreement. Any term defined by reference to an agreement, instrument or other document shall have the meaning so assigned to it whether or not such document is in effect. Unless otherwise indicated, references in this Lease Assignment to

1

sections, paragraphs, clauses, appendices, schedules and exhibits are to the same contained in or attached to this Lease Assignment.

2. <u>Assignment</u>. The Lessee has assigned, transferred and set over and does hereby assign, transfer, and set over unto the Assignee, all of the Lessee's right, title and interest in and to the Lease and the other Operative Documents.

3. <u>Assumption</u>. The Assignee hereby assumes, and covenants and agrees to pay, perform and discharge, all of the obligations of the Lessee arising or accruing from and after the effective date of this Agreement under the Operative Documents to which the Lessee is a party and each other contract, agreement, document or instrument hereby assigned to the Assignee, and all of the obligations of the Lessee arising or accruing from and after the effective date of this Agreement. The Assignee hereby confirms that it shall be deemed a party to the Operative Documents to which the Lessee is a party and each such other contract, agreement, document and instrument, and that it shall be bound by all the terms thereof as if therein named as the Lessee. The assignment and assumption effected by this Agreement shall not release the Lessee from its obligations under the Operative Documents to which the Lessee is a party or any such other contract, agreement, document or other instrument, except to the extent such obligations are expressly assumed by the Assignee pursuant to this <u>Section 3</u>.

4. <u>Appointment as Attorney-in-Fact</u>. In furtherance of the assignment effected by this Agreement, the Lessee hereby constitutes and appoints the Assignee the true and lawful attorney of the Lessee, with full power of substitution, in the name of the Assignee or in the name of the Lessee but on behalf of and for the benefit of and at the expense of the Assignee, to collect for the account of the Assignee all Undivided Interest in the Equipment sold, transferred or assigned to the Assignee pursuant to this Agreement; to institute and prosecute, in the name of the Lessee or otherwise, but at the expense of the Assignee, all proceedings that the Assignee may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to the Undivided Interest in the Equipment so sold, transferred or assigned; to defend and compromise at the expense of the Assignee any and all actions, suits or proceedings as to the title to or interest in any of the property so acquired by the Assignee; and to do all such acts and things in relation thereto at the expense of the Assignee as the Assignee shall reasonably deem advisable. The Lessee hereby acknowledges that this appointment is coupled with an interest and is irrevocable by the Lessee in any manner or for any reason or by virtue of any dissolution of the Lessee.

5. <u>Payments</u>. The Lessee hereby covenants and agrees to pay over to the Assignee any amounts (including any sums payable as interest in respect thereof) received by it that, under <u>Section 3</u>, belong to the Assignee, and the Assignee hereby covenants and agrees to pay over to the Lessee any amounts (including any sums payable as interest in respect thereof) received by it that, under <u>Section 3</u>, belong to the Lessee.

I:\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt.final A-2.wpd

GM 2001A-2
DOCUMENT 2

6. <u>Further Assurances</u>. The Lessee shall, at all times and from time to time, upon the request of the Assignee, promptly and duly execute and deliver any and all such further instruments and documents and take such further action as the Assignee may reasonably request to obtain the full benefits of this Agreement and of the rights and powers herein granted.

7. <u>Representations and Warranties</u>. The Assignee represents and warrants that:

(a)    it has all requisite power and authority and legal right to enter into and carry out the transaction contemplated by this Agreement and to carry out and perform the obligations of the Lessee under the Operative Documents, and, upon giving effect to the transfer being effected hereby, it will not be in breach of any covenant, agreement or condition required to be performed or observed by the Lessee in the Operative Documents;

(b)    the execution and performance of this Agreement have been duly authorized by all necessary action by the Assignee;

(c)    on and as of the date hereof, the representations and warranties of the Lessee set forth in <u>Section 8</u> to the Participation Agreement are true and correct as to the Assignee;

(d)    the transfer to it of all of the Lessee's right, title and interest as Lessee will not violate any provision of, or create a relationship that would be in violation of, any Applicable Law;

(e)    the transfer to it of all of the Lessee's right, title and interest as Lessee will not involve, either directly or indirectly, the assets of any plan that would cause a violation of any provision of ERISA or the imposition of an excise tax under the Code; and

(f)    this Agreement constitutes the legal, valid and binding obligation of the Assignee and is enforceable in accordance with its terms.

8. <u>Governing Law</u>. This Agreement shall in all respects be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

9. <u>Counterparts</u>. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

I:\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt.final A-2.wpd

GM 2001A-2
DOCUMENT 2

10. <u>Notices</u>.  All notices and other communications provided for hereunder shall be in writing and delivered to each party at the addresses for notices set forth in the Participation Agreement.

[Signature Page Follows]

4

GM 2001A-2
DOCUMENT 2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

[LESSEE], as Lessee


By: _____
Name: _____
Title: _____


[ASSIGNEE], as Assignee


By: _____
Name: _____
Title: _____

I:\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt.final A-2.wpd

GM 2001A-2
DOCUMENT 2

EXHIBIT C
TO LEASE
AGREEMENT

## FORM OF GUARANTY
## OF LEASE ASSIGNMENT

This GUARANTY OF LEASE ASSIGNMENT (this "Guaranty") is entered into as of _____, 20__, by General Motors Corporation, a corporation organized and existing pursuant to the laws of the State of Delaware, as guarantor (together with its successors and assigns, the "Guarantor"), in favor and for the benefit of General Electric Capital Corporation (together with its successors and assigns, the "Owner Participant"), State Street Bank and Trust Company of Connecticut, National Association, not in its individual capacity but solely as owner trustee (together with its successors and assigns, the "Owner Trustee") and Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as indenture trustee (together with its successors and assigns, the "Indenture Trustee"), (the Owner Participant, the Owner Trustee and the Indenture Trustee each being referred to as a "Beneficiary" and collectively as the "Beneficiaries").

WHEREAS, Guarantor, as lessee in such capacity, "Lessee", has heretofore entered into a Lease Agreement (GM 2001A-2) and a Lease Supplement (collectively, the "Lease") with the Owner Trustee dated as of December 18, 2001 in respect of, among other things, the lease of the Transferred Equipment (as defined below) from the Owner Trustee to the Lessee.

WHEREAS, the Lessee has concurrently herewith entered into a Lease Assignment (the "Lease Assignment") dated as of _____ 20__, with _____, a corporation organized and existing pursuant to the laws of the State of _____ (the "Assignee"), whereby Lessee assigned all of its right, title and interest under the Lease in and to the Undivided Interest in certain Equipment listed on Schedule 1 to the Lease Assignment (the "Transferred Equipment") to Assignee.

WHEREAS, the Guarantor, the Lessee, the Owner Trustee, the Owner Participant and the other parties named therein have entered into a Participation Agreement (GM 2001A-2) dated as of December 18, 2001 (the "Participation Agreement") pursuant to which, among other things, the Lessee agreed to sell to the Owner Trustee and the Owner Trustee agreed to purchase from the Guarantor all of Guarantor's right, title and interest in respect of the Transferred Equipment.

1

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Guarantor hereby agrees with and for each of the Beneficiaries as follows:

1.   Definitions.  For purposes of this Guaranty, capitalized terms used but not defined herein shall have the meanings assigned to them in Appendix A (such definitions to be equally applicable to both the singular and plural forms of the terms defined) to the Participation Agreement.  Any term defined by reference to an agreement, instrument or other document shall have the meaning so assigned to it whether or not such document is in effect.  Unless otherwise indicated, references in this Guaranty to sections, paragraphs, clauses, appendices, schedules and exhibits are to the same contained in or attached to this Guaranty.

2.   Guarantee of Obligations under Lessee Operative Documents.  The Guarantor (i) irrevocably and unconditionally guarantees to each of the Beneficiaries, and to its successors, transferees and assigns, the due (whether at the stated maturity, by acceleration or otherwise), complete and punctual performance and observance of all payment obligations of Assignee under the Operative Documents to which it is a party (the "Lessee Operative Documents") and the faithful and timely performance of, and compliance with, all other covenants and agreements of Assignee under the Lessee Operative Documents strictly in accordance with the terms thereof (without regard to the effect on such obligations, covenants or agreements of the matters referred to in Sections 2 through 8 hereof or any other circumstance) and (ii) agrees to pay any and all costs and expenses (including attorneys' fees and disbursements) which may be paid or incurred by any Beneficiary in enforcing any rights with respect to, or collecting, any or all payments due pursuant to the terms of any of the Lessee Operative Documents and/or enforcing any rights with respect to, or collecting against, the Guarantor under this Guaranty (all such payment obligations and other covenants and agreements being referred to herein as the "Obligations").  In case Assignee shall fail to perform or observe any Obligation referred to in clause (i) or (ii) of the preceding sentence, the Guarantor will forthwith perform and observe such Obligation, or cause the same forthwith to be performed or observed, and, in case Assignee shall fail to pay or perform duly, completely and punctually any Obligation referred to in clause (i) or (ii) of the preceding sentence when and as the same shall be due (whether at the stated maturity, by acceleration or otherwise) and payable, or required to be performed, as the case may be, in accordance with the terms of the respective Lessee Operative Document, the Guarantor will immediately pay or perform as the case may be, the same to the Beneficiary entitled thereto pursuant to such Lessee Operative Document, regardless of whether or not any of the Noteholders, the Indenture Trustee, the Owner Trustee, the Owner Participant or anyone on behalf of any of them shall have instituted any suit, action or proceeding or exhausted its remedies or taken any steps to enforce any rights against the Assignee or any other Person or entity to compel any such performance or to collect all or any part of such amount pursuant to the provisions of the Lessee Operative Documents or at law or in equity, or otherwise, and regardless of any other condition or contingency.

I:\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt.final A-2.wpd

GM 2001A-2
DOCUMENT 2

3. <u>Payments of Obligations</u>. The Guarantor hereby guarantees that the Obligations will be paid for the benefit of the applicable Beneficiary without set-off or counterclaim in lawful currency of the United States of America at the office of the applicable Beneficiary as set forth in <u>Schedule 8</u> to the Participation Agreement. The Guarantor shall make any payments required hereunder upon receipt of written notice thereof from the applicable Beneficiary; <u>provided, however</u>, that the failure of the applicable Beneficiary to give such notice shall not affect the Guarantor's obligations hereunder.

4. <u>Waiver by Guarantor</u>. The Guarantor hereby waives absolutely and irrevocably any claim which it may have against the Assignee, any Beneficiary or any of their respective Affiliates by reason of any payment to any other Person pursuant to or in respect of this Guaranty, including any claims by way of subrogation, contribution, reimbursement, indemnity or otherwise.

5. <u>Amendments etc. with Respect to the Obligations</u>. The Guarantor shall remain fully obligated hereunder notwithstanding that, without any reservation of rights against the Guarantor and without notice to or further assent by the Guarantor, at any time and from time to time, in whole or in part (a) any demand for payment or performance of any of the Obligations made by any Beneficiary may be rescinded by such party and any of the Obligations continue, (b) the Obligations, or the liability of any other party upon or for any part thereof, and any collateral security or guarantee therefor or right of offset with respect thereto, may be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by any Beneficiary, (c) any Lessee Operative Document, and any collateral security document or other guarantee or document related thereto, may be amended, modified, supplemented or terminated, as the parties thereto may deem advisable, (d) any collateral security, guarantee or right of offset held by any Beneficiary for the payment or performance of the Obligations may be sold, exchanged, waived, surrendered or released, and (e) any increase in the amount of the Obligations. No Beneficiary shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations or for this Guaranty or any property subject thereto. For the purposes hereof, "demand" shall include the commencement and continuance of any legal proceedings.

6. <u>Waiver by the Guarantor; No Waiver by Beneficiaries</u>. The Guarantor unconditionally waives, to the fullest extent permitted by law, any and all (a) notices of the creation, renewal, extension or accrual of any Obligation or any notice of or proof of reliance by any of the Beneficiaries upon this Guaranty or acceptance of this Guaranty (the Obligations, and any of them, shall conclusively be deemed to have been created, contracted, incurred or renewed, extended, amended or waived in reliance upon this Guaranty, and all dealings between Lessee or the Guarantor and each Beneficiary shall be conclusively presumed to have been had or consummated in reliance upon this Guaranty), (b) notices which may be required by statute, rule of law or otherwise, now or hereafter in effect, to preserve intact any rights of any of the Beneficiaries against the Guarantor, including, without limitation, any demand, presentment and protest, proof of notice of non-payment under any Lessee Operative Document and notice of default or any failure on the part of Assignee to perform and comply with any Obligation, (c) rights to the enforcement, assertion or exercise

3

by any of the Beneficiaries of any right, power, privilege or remedy conferred herein or in any Lessee Operative Document or otherwise, (d) requirements of promptness or diligence on the part of any of the Beneficiaries, (e) requirements on the part of any of the Beneficiaries to mitigate the damages resulting from any default hereunder or under any Lessee Operative Document, (f) notices of the sale, transfer or other disposition of any right, title to or interest in any Lessee Operative Document or (g) other circumstances whatsoever which might otherwise constitute a legal or equitable discharge, release or defense of a guarantor or surety, or which might otherwise limit recourse against the Guarantor. No failure to exercise and no delay in exercising, on the part of any Beneficiary, any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof, or the exercise of any other power or right. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

7.  Guaranty of Payment and Performance.  This Guaranty is a primary obligation of the Guarantor and not one of surety and is an unconditional, absolute, present and continuing obligation and guaranty of payment and performance (and not merely of collection), and the validity and enforceability of this Guaranty shall be absolute and unconditional irrespective of, and shall not be impaired, affected or in any way conditioned or contingent upon, (a) the making of demand, the institution of suit or the taking of any other action to enforce performance or observance of the Obligations, (b) the validity, regularity or enforceability of any Lessee Operative Document or any of the Obligations or any collateral security, other guarantee, if any, or credit support therefor or right of offset with respect thereto at any time or from time to time held by any Beneficiary, (c) any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to or be asserted by Assignee or the Guarantor against any Beneficiary, or (d) any attempt to collect from Assignee or any other entity or to perfect or enforce any security or upon any other condition or contingency.

8.  Guarantor's Obligations Not Affected.  The duties and obligations of the Guarantor under this Guaranty shall remain in full force and effect, without the necessity of any reservation of rights against the Guarantor and without notice to or further assent by, the Guarantor, at any time and from time to time, in whole or in part, and without regard to, and shall not be impaired or affected by any of the following: (a) any extension, modification or renewal of, termination, addition or supplement to, or deletion from any of the terms of or indulgence with respect to, or substitutions for, the Obligations or any part thereof or any agreement relating thereto at any time; (b) any failure or omission to enforce any right, power or remedy with respect to the Obligations or any part thereof or any agreement relating thereto; (c) any waiver of any right, power or remedy or of any default with respect to the Obligations or any part thereof or any agreement relating thereto; (d) any release, surrender, compromise, settlement, waiver, subordination or modification, with or without consideration, of any other guarantees with respect to the Obligations or any part thereof, or any other obligation of any Person with respect to the Obligations or any part thereof; (e) the enforceability or validity of the Obligations or any part thereof or the genuineness, enforceability or validity of any agreement relating thereto; (f) any change in the ownership of the Assignee or the insolvency,

4

bankruptcy or any other change in the legal status of the Assignee or any rejection or modification of the obligations of the Lessee or those of any person under the Lessee Operative Documents as a result of any bankruptcy, reorganization, insolvency or similar proceeding; (g) the change in or the imposition of any law, decree, regulation or other governmental act which does or might impair, delay or in any way affect the validity, enforceability or the payment when due of the Obligations; (h) the failure of the Assignee or the Guarantor to maintain in full force, validity or effect or to obtain or renew when required all governmental and other approvals, licenses or consents required in connection with the Obligations or this Guaranty, or to take any other action required in connection with the performance of all obligations pursuant to the Obligations or this Guaranty; (i) the existence of any claim, set-off or other rights which the Guarantor may have at any time against the Assignee or any other Person in connection herewith or with an unrelated transaction; (j) any limitation of the remedies of any Beneficiary under any of the Lessee Operative Documents or any limitation of the liability of Assignee under the terms of any Lessee Operative Document, which may now or hereafter be imposed by any statute, regulation or Applicable Law; (k) any merger or consolidation of Assignee or the Guarantor into or with any other Person, or any sale, lease or transfer of any or all of the assets of Assignee or the Guarantor to any other Person; (1) any indebtedness of Assignee to any Person, including the Guarantor; or (m) any other action, occurrence or circumstance, whatsoever.

9.  Substituted Lessee.  If the Lease or the Lease Assignment is rejected or deemed rejected in any bankruptcy, reorganization or other similar proceeding filed against the Lessee or the Assignee, as the case may be, the Guarantor shall, without further act, succeed to and be bound by, all of the rights and obligations of the Lessee or the Assignee under the Lease or this Lease Assignment as of the date immediately preceding the date of the filing of the petition for relief in such proceeding, including any obligation to cure any default or Event of Default by the Lessee under the Lease or the Assignee under this Lease Assignment, as the case may be, or under any other Lessee Operative Document. It is the intention of the parties hereto that any such rejection of the Lease, this Lease Assignment or any other Lessee Operative Document shall not terminate such document but shall without further act, effect a substitution of the Guarantor for the Lessee or the Assignee under the Lease, this Lease Assignment and the other Lessee Operative Documents so that the Lessee, the Assignee or either party's trustee shall immediately upon such rejection surrender possession of the Undivided Interest in the Equipment to the Guarantor.

10.  No Subrogation; Reinstatement.  The Guarantor shall be subrogated to the rights of any Beneficiary in respect of any payment made by the Guarantor hereunder for the benefit of, or any set-off or application or appropriation of funds by the Guarantor by, such Beneficiary; provided that the Guarantor shall not be entitled to take any action, or exercise any right, with respect to any such right of subrogation or otherwise exercise any of the rights of any Beneficiary against Assignee or any collateral security or guarantee or other credit support or right of offset held by any Beneficiary for the payment of the Obligations, nor shall the Guarantor seek or be entitled to seek any reimbursement from Assignee in respect of payments made by the Guarantor hereunder, until all amounts and all performance owing to each and every Beneficiary by Assignee on account of the Obligations are paid and performed in full. This Guaranty

5

shall continue to be effective, or be reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Obligations is rescinded or must otherwise be restored or returned by any Beneficiary upon the bankruptcy, insolvency, reorganization, arrangement, adjustment, composition, dissolution, liquidation, or the like, of Assignee or the Guarantor, or as a result of the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to Assignee or the Guarantor or any substantial part of such Person's respective property, or otherwise, all as though such payment had not been made notwithstanding any termination of this Guaranty or any Operative Document.

11. <u>Term of Agreement</u>. This Guaranty and all guarantees, covenants and agreements of the Guarantor contained herein shall continue in full force and effect and shall not be discharged until such time as all of the Obligations shall be paid in full and all of the agreements of the Assignee and the Guarantor hereunder and under the Lessee Operative Documents shall be duly performed.

12. <u>Survival</u>. All warranties, representations and covenants made by the Guarantor herein or in any certificate or other instrument delivered by it or on its behalf under this Guaranty or any other Operative Document shall be considered to have been relied upon by the Beneficiaries and shall survive the execution and delivery of this Guaranty, regardless of any investigation made by the Beneficiaries on behalf of any of them. All statements in any such certificate or other instrument shall constitute warranties and representations by the Guarantor hereunder.

13. <u>Severability</u>. Any provision of this Guaranty which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Applicable Law, the Guarantor hereby waives any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

14. <u>Legal Actions and Consent to Jurisdiction</u>.

(a)    Any suit, action or proceeding, whether at law or in equity, including any declaratory judgment or similar suit or action, arising out of or relating to this Guaranty may be instituted by or against the Guarantor in any state or Federal court of competent jurisdiction in the County of New York, State of New York. The Guarantor waives any option or objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding, and irrevocably submits to the jurisdiction of any such court in any such suit, action or proceeding.

(b)    The parties agree that a remedy at law for a violation of this <u>Section 14</u> may not be adequate and therefore agree that the remedies of specific performance and injunctive relief shall be available

6

I:\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt_final A-2.wpd

GM 2001A-2
DOCUMENT 2

in the event of any violation in addition to any other right or remedy at law or in equity to which the parties hereto may be entitled.

16.    15. Notices. All notices, demands, instructions or other communications required or permitted to be given to or made upon any party hereto shall be given in accordance with the provisions of the Lease and at the address either set forth therein or as provided on the signature page hereof.

16. Amendments, Waivers, etc. No provision of this Guaranty shall be waived, amended, terminated or supplemented except by a written instrument executed by the Guarantor and each Beneficiary. The Guarantor hereby acknowledges and consents to the assignment of all of the Owner Trustee's rights hereunder subject to the terms and conditions of the Indenture.

17. GOVERNING LAW. THIS GUARANTY SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE DOMESTIC LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

18. Counterparts. This Guaranty and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

7

IN WITNESS WHEREOF, the undersigned have caused this Guaranty to be duly executed as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____

Name:
Title:

AGREED TO AND ACCEPTED BY:

[_____],
as Owner Trustee

By: _____

Name:
Title:

[OWNER PARTICIPANT]

By: _____

Name:
Title:

[_____],
as Indenture Trustee

By: _____

Name:
Title:

8