# **<u>Schedule 3</u>**

GM 2001A-8
DOCUMENT 2

# LEASE AGREEMENT

(GM 2001A-8)
dated as of December 18, 2001

between

## STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT NATIONAL ASSOCIATION,
a national banking association,
not in its individual capacity
except as expressly stated herein,
but solely as Owner Trustee,

as Lessor

and

## GENERAL MOTORS CORPORATION,

as Lessee

## GENERAL MOTORS CORPORATION
Leveraged Lease of Automobile Manufacturing Equipment

CERTAIN RIGHTS OF THE LESSOR UNDER THIS LEASE AGREEMENT HAVE BEEN ASSIGNED TO, AND ARE SUBJECT TO A SECURITY INTEREST IN FAVOR OF, WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION AS INDENTURE TRUSTEE, UNDER THE TRUST INDENTURE AND SECURITY AGREEMENT, DATED AS OF DECEMBER 18, 2001, BETWEEN THE LESSOR AND THE INDENTURE TRUSTEE, AS SUCH INDENTURE MAY BE AMENDED, MODIFIED OR SUPPLEMENTED FROM TIME TO TIME IN ACCORDANCE WITH THE PROVISIONS THEREOF  THIS LEASE AGREEMENT HAS BEEN EXECUTED IN SEVERAL COUNTERPARTS  TO THE EXTENT THAT THIS LEASE AGREEMENT CONSTITUTES CHATTEL PAPER (AS SUCH TERM IS DEFINED IN THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN ANY APPLICABLE JURISDICTION), NO SECURITY INTEREST IN THIS LEASE AGREEMENT MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART HEREOF OTHER THAN THE "ORIGINAL EXECUTED COUNTERPART," WHICH SHALL BE IDENTIFIED AS THE COUNTERPART CONTAINING THE RECEIPT THEREFOR EXECUTED BY THE INDENTURE TRUSTEE ON OR FOLLOWING THE SIGNATURE PAGE THEREOF  SEE <u>SECTION 19</u> FOR FURTHER INFORMATION CONCERNING THE RESPECTIVE RIGHTS OF THE SEVERAL HOLDERS OF COUNTERPARTS HEREOF

THIS COUNTERPART IS [NOT] THE ORIGINAL EXECUTED COUNTERPART



# TABLE OF CONTENTS TO LEASE AGREEMENT

Page

SECTION 1    Definitions                                                                    1

SECTION 2    Lease                                                                          2

SECTION 3    Term and Rent                                              .                   4
     (a)    Interim Term and Base Term                                  . 4
     (b)    Base Rent                                        .          . 4
     (c)    Supplemental Rent                                          . 5
     (d)    Minimum Rent    .                                .            5
     (e)    Adjustments                              . .              . 5
     (f)    Late Payment    . .                                          6
     (g)    Payments in General                                         6

SECTION 4    Lessor's Disclaimer of Representations and Warranties, Lessor's Covenants    6
     (a)    Representations and Warranties                               6
     (b)    Covenants                                                    7

SECTION 5    Return of the Equipment                                                       7
     (a)    Condition Upon Return                                        7
     (b)    Storage                                                      8
     (c)    Failure to Meet Return Conditions                            8
     (d)    Cooperation                                                  8
     (e)    Records                                         .            9

SECTION 6    Liens    .                                                              .     9

SECTION 7    Maintenance and Operation; Possession and Subleases, Identification         11
     (a)    Maintenance and Operation                        .          11
     (b)    Contest of Requirements of Law    .              .          11
     (c)    Payment of Taxes and Other Impositions                      12
     (d)    Possession and Subleases                                 .  12
     (e)    Identification                                              13
     (f)    Records                                                      14
     (g)    Acknowledgment                          .              .    14

SECTION 8    Replacement of Parts, Modifications                                          14
     (a)    Replacement of Parts                             .          14
     (b)    Alterations and Modifications                    .          15

SECTION 9    Voluntary Termination For Obsolete Equipment    .                          . 15

GM 2001A-8
DOCUMENT 2

Page

|   |   |   |
|---|---|---|
| (a) | General | 15 |
| (b) | Notice of Termination | 16 |
| (c) | Sale of Equipment, Termination Payment | 16 |
| (d) | Retention of Equipment by Lessor | 18 |

SECTION 10    Loss, Destruction, Requisition, etc    18
| (a) | Event of Loss | 18 |
| (b) | Repair | 20 |
| (c) | Condemnation Other Than Requisition of Use | 20 |
| (d) | Application of Payments on an Event of Loss | 20 |
| (e) | Application of Payments Not Relating to an Event of Loss | 21 |
| (f) | Application of Payments During an Event of Default or Lease Default | 21 |

SECTION 11    Insurance    21
| (a) | Coverage | 21 |
| (b) | Policy Provisions | 22 |
| (c) | Reports, etc | 24 |
| (d) | Additional Insurance by Lessor and Lessee | 24 |

SECTION 12    Inspection    24

SECTION 13    Performance of Operative Documents    25

SECTION 14    Assignment    25

SECTION 15    Events of Default    26

SECTION 16    Effect of Event of Default    28
| (a) | Remedies | 28 |
| (b) | Continuing Obligations | 32 |
| (c) | Remedies Cumulative | 32 |

SECTION 17    Notices    32

SECTION 18    Renewal Option, Purchase Options, Valuation    33
| (a) | Fixed Rate Renewal Option | 33 |
| (b) | Fair Market Value Renewal Option | 33 |
| (c) | Purchase Options | 35 |
| (d) | Binding Election | 38 |

SECTION 19    Security for Lessor's Obligation to Holders of Equipment Notes    38

GM 2001A-8
DOCUMENT 2

Page

SECTION 20    Lessor's Right to Perform for Lessee                                .    38

SECTION 21    Miscellaneous                                                        .    39

SECTION 22    Successor Trustee                                                         39

SECTION 23    Lessee Indemnity                                                         39

SECTION 24    Equipment to Remain Personal Property    .         .        .    . .    . 39

SECTION 25    Survival                                                 .    .    .    . 40

SECTION 26    Further Assurances                                         .              40

SECTION 27    Successors and Assigns .         .         .                            40

SECTION 28    Assignment by the Lessee                                  .              41

EXHIBIT A - Form of Lease Supplement (GM 2001A-8)

EXHIBIT B - Form of Assignment by Lessee

EXHIBIT C - Form of Guaranty of Assignment of Lease Agreement
(GM 2001A-8)

INSPECTION SCHEDULE

GM 2001A-8
DOCUMENT 2

This LEASE AGREEMENT (GM 2001A-8), dated as of December 18, 2001 (this "Lease"), between State Street Bank and Trust Company of Connecticut, National Association, a national banking association, not in its individual capacity, except as expressly provided in the Trust Agreement, but solely as Owner Trustee under the Trust Agreement (GM 2001A-8) dated as of December 18, 2001 (in such capacity together with its successors and assigns, the "Lessor"), and GENERAL MOTORS CORPORATION, a corporation organized and existing pursuant to the laws of the State of Delaware (together with its successors and assigns, the "Lessee")

WHEREAS, the Lessee and the Lessor have entered into a Participation Agreement (GM 2001A-8) dated as of December 18, 2001 (the "Participation Agreement") with the other parties named therein with respect to the transactions of which this Lease is a part,

WHEREAS, subject to the terms and conditions of the Participation Agreement, on the Delivery Date the Lessee desires to enter into a lease of the Undivided Interest in the Equipment and thereby lease such Undivided Interest in the Equipment from the Lessor, and the Lessor desires to lease such Undivided Interest in the Equipment to the Lessee at the rentals and upon the terms hereinafter provided and as provided in one or more Lease Supplements substantially in the form attached hereto as Exhibit A and subject to the conditions subjecting such Undivided Interest in the Equipment to this Lease,

WHEREAS, the parties hereto contemplate that the Lessor will, simultaneously with the execution and delivery hereof, assign for security purposes certain of its rights in this Lease to the Indenture Trustee, pursuant to the Indenture,

WHEREAS, the property subject to this Agreement is the Undivided Interest in the Equipment and the parties hereto acknowledge that there is one, and only one, Unit, notwithstanding any references herein to "any Unit," "each Unit," "all Units" or "Units," and the parties hereto hereby adopt the following rules of construction set forth in Section 1 of this Lease

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein and other good and valuable consideration, receipt of which is hereby acknowledged, the Lessor and the Lessee hereby agree as follows

SECTION 1    Definitions    For purposes of this Lease, capitalized terms used but not defined herein shall have the meanings assigned to them in Appendix A (such definitions to be equally applicable to both the singular and plural forms of the terms defined, unless the context otherwise requires) to the Participation Agreement   Any term defined by reference to an agreement, instrument or other document shall have the meaning so assigned to it whether or not such document is in effect   Unless otherwise indicated, references in this Lease to sections, paragraphs, clauses, appendices, schedules and exhibits are to the same contained in or attached to this Lease   For the

GM 2001A-8
DOCUMENT 2

avoidance of doubt, the following rules of construction shall be applied wherever the following phrases are used  Any references to the "the Undivided Interest in the Equipment," "such Undivided Interest in the Equipment," "the Undivided Interest in such Equipment," "the Undivided Interest in the Unit," "the Undivided Interest in any Unit," "such Undivided Interest in the Unit" or "the Undivided Interest in such Unit" shall each have the same meaning, namely the Undivided Interest in the one Unit that is the subject of the applicable agreement  Any references to "all Units," "any Unit," "such Unit" or "each Unit" shall mean "the Unit "

SECTION 2.    Lease

(a)    Upon the terms and subject to the conditions hereof, the Lessor hereby agrees to lease for the Term to the Lessee hereunder, and the Lessee hereby agrees to lease for the Term from the Lessor hereunder, the Undivided Interest in the Equipment described in one or more Lease Supplements leasing such Undivided Interest in the Equipment hereunder on the Delivery Date therefor, unless otherwise earlier terminated pursuant to the terms hereof

(b)    Immediately upon execution and delivery of all of the Operative Documents without necessity of further act or evidence by either party hereto, the Undivided Interest in the Equipment shall be deemed examined and accepted by the Lessee for all purposes and shall be deemed delivered and leased by the Lessor to the Lessee for the Base Term as provided in the applicable Lease Supplement and herein

(c)    This Lease is intended by the parties to be an absolute net lease (and the expenses associated with the lease, servicing, return, maintenance, operation and insurance of the Equipment or the Undivided Interest therein shall be for the account of the Lessee, unless expressly stated that such expenses are for the account of some other Person or unless expressly excluded from the obligations of the Lessee in the Operative Documents), and, notwithstanding any provision of this Lease or of any other Operative Document to the contrary, the Lessee's obligation to make all payments of Rent as and when the same shall become due and payable in accordance with the terms of this Lease and any other Operative Document shall be absolute, irrevocable and unconditional and shall not be affected by any circumstance or subject to any abatement or diminution by set-off, deduction, counterclaim, recoupment, agreement, defense, suspension, deferment, interruption or otherwise, and until such time as all Rent required to be paid under this Lease or any other Operative Document has been paid, the Lessee shall have no right to terminate this Lease or to be released, relieved, or discharged from its obligation to make, and shall not suspend or discontinue, any payment of Rent for any reason whatsoever, including, without limitation   (i) any default, misrepresentation, gross negligence, misconduct, wilful misconduct or other action or inaction of any kind by the Lessor, in its individual capacity or as Owner Trustee under the Trust Agreement, the Owner Participant or any other Person, whether under or in connection with this Lease, any other Operative Document or any other agreement relating to this Lease or in connection with any

GM 2001A-8
DOCUMENT 2

unrelated transaction, (ii) the insolvency, bankruptcy, reorganization or other similar proceeding or cessation of existence, or discharge or forgiveness of indebtedness of, any entity or Person referred to in clause (i) above or any other Person, (iii) the invalidity, unenforceability, impossibility, disaffirmance or illegality of performance of this Lease or any other Operative Document, or any instrument referred to herein or therein or any other infirmity herein or therein or any lack of right, power or authority of the Lessor, the Lessee, the Owner Participant, the Indenture Trustee, a Noteholder or any other Person to perform the obligations hereunder or thereunder or consummate the transactions contemplated hereby or thereby or any doctrine of force majeure, impossibility, frustration or failure of consideration for any other reason, whether similar or dissimilar, (iv) any defect in the title, condition, design, merchantability, operation or fitness for use of, or any Lien or other restriction of any kind upon, any Unit or any Part or the Undivided Interest therein, any loss or destruction of, or damage to, any Unit or any Part or the Undivided Interest therein, or any interruption in or cessation of the ownership, possession, operation or use of any Unit or any Part or the Undivided Interest therein for any reason whatsoever, including without limitation, failure of title under or resulting from the Operative Documents, (v) any restriction, prevention or curtailment of or interference with any Unit or any Part or the Undivided Interest therein for any reason whatsoever, including, without limitation, by any Governmental Authority, (vi) any Applicable Law now or hereafter in force, (vii) any failure to obtain any required Governmental Action, or the consent or approval of any other Person, for a transfer of rights or title to the Lessor, the Lessee or any other Person, (viii) any amendment or other change of, or any assignment of any rights under, any Operative Document or any waiver or other action or inaction under or in respect of any Operative Document or any exercise or nonexercise of any right or remedy under the Indenture or this Lease or the sale of any Unit or any Part thereof or the Undivided Interest therein or other interest therein, (ix) the breach or failure of any warranty or representation made in this Lease or any other Operative Document by Lessee, Lessor, Owner Participant, the Indenture Trustee or any other Person, or (x) any other cause or circumstance, foreseen or unforeseen, whether similar or dissimilar to any of the foregoing

(d)    If for any reason whatsoever this Lease shall be terminated in whole or in part by operation of law or otherwise except as specifically provided herein, the Lessee nonetheless agrees without limitation of the other rights or remedies of the Lessor hereunder, to pay to the Lessor, to the maximum extent permitted by Applicable Law, an amount equal to each Rent payment at the time such payment would have become due and payable in accordance with the terms hereof had this Lease not been terminated in whole or in part   The Lessee hereby waives, to the extent permitted by Applicable Law, any and all rights which it may now have or which at any time hereafter may be conferred upon it, by statute or otherwise, to modify, terminate, cancel, quit or surrender this Lease except in accordance with the express terms hereof   Each Rent payment made pursuant to this Lease by Lessee shall be final and the Lessee will not seek or have the right to recover all or any part of such payment from the Lessor or any Person for any reason whatsoever

(c)    It is the intention of the Lessee and the Lessor that the transactions contemplated by this Lease shall constitute a lease  Notwithstanding the foregoing, in the event a court of competent jurisdiction determines that this Lease does not constitute a lease, then Lessee shall be deemed to have granted to Lessor a perfected security interest in all of Lessee's right, title and interest in, to and under the Undivided Interest in the Equipment pursuant to this <u>Section 2(e),</u> and Lessee hereby grants such security interest  For purposes of such grant, this Lease shall constitute a security agreement under the UCC

SECTION 3    <u>Term and Rent</u>

(a)    <u>Interim Term and Base Term</u>    The Interim Term for the Undivided Interest in each Unit shall commence on the Delivery Date and end on, but not include, the Base Term Commencement Date or such earlier date as this Lease with respect to the Undivided Interest in such Unit shall be terminated in accordance with the terms hereof  The Base Term for the Undivided Interest in each Unit shall commence on the Base Term Commencement Date and terminate on

(i)    the Last Day of the Base Term, or

(ii)    such earlier date as this Lease, with respect to the Undivided Interest in such Unit, may be terminated in accordance with the provisions hereof

(b)    <u>Base Rent</u>    The Lessee hereby agrees to pay to the Lessor Base Rent for the Undivided Interest in the Equipment in the following amounts

(i)    on each Lease Period Date occurring during the Base Term, an amount equal to the product of (A) the Lessor's Cost and (B) the Relevant Percentage of Lessor's Cost set forth opposite such Lease Period Date under the caption "Percentage of Lessor's Cost" on <u>Schedule II</u> to the Lease Supplement,

(ii)    on the applicable Lease Period Date occurring during the Fixed-Rate Renewal Term, if any, an amount determined as provided in <u>Section 18(a)</u>, and

(iii)    on the applicable Lease Period Date occurring during a Fair Market Value Renewal Term, if any, an amount determined as provided in <u>Section 18(b)</u>

Base Rent shall be allocated to each Lease Period as specified on <u>Schedule II-A</u> to the Lease Supplement  Base Rent allocated to any Lease Period shall be further allocated ratably to each day within such Lease Period  For the avoidance of doubt, and notwithstanding anything to the contrary herein, the parties hereto agree that, irrespective of Lessee's payment obligation on the Lease Period Dates shown on <u>Schedule II-A</u> to the Lease Supplement, the allocation of Lessee's liability on

GM 2001A-8
DOCUMENT 2

account of the use of the property shall be that stated on Schedule II-A to the Lease Supplement
It is the intention of the Lessor and the Lessee that the allocations of Base Rent for the Undivided
Interest in the Equipment to each Lease Period on Schedule II-A to the Lease Supplement constitute
specific allocations of fixed rent within the meaning of Treasury Regulation Section 1 467-
1(c)(2)(ii)  Each Applicable Schedule shall be subject to adjustments pursuant to Section 3(e)

(c)    Supplemental Rent  Lessee shall pay (or cause to be paid) promptly to the
Lessor or to whomever shall be entitled thereto under the terms of any Operative Document any and
all Supplemental Rent as and when the same shall become due and owing on or before the due date
specified for such payment in the applicable Operative Document and if no due date therefor is so
specified, within five Business Days after written demand therefor  The Lessee shall also pay as
Supplemental Rent an amount equal to the Make-Whole Premium payable by the Lessor at the time
such amount is due and payable, provided, that if the Lessee has paid a Make-Whole Premium
pursuant to the Participation Agreement under the circumstances specified in Section 8 3(e)(iii) or
8 3(e)(iv) of the Indenture, under no circumstances shall the Lessee thereafter be liable for any
further Make-Whole Premium  In the event of any failure on the part of the Lessee to pay any
Supplemental Rent, the Lessor shall have all rights, powers and remedies provided for herein or in
any other Operative Document or by law or equity or otherwise as in the case of non-payment of
Base Rent

(d)    Minimum Rent  Notwithstanding anything contained herein (including any
adjustments pursuant to Sections 9(c)(ii), 10(a)(i) or 18(c)(v)) or in any other Operative Document
to the contrary, (i) each installment of Base Rent (whether or not Base Rent is adjusted pursuant to
Section 3(e) hereof) shall be in an amount which is at least equal to the principal and interest on the
Equipment Notes scheduled to be paid by Lessor pursuant to the Indenture on the Lease Period Date,
(ii) the last installment of Base Rent scheduled to be paid hereunder shall be in an amount which is
at least equal to the aggregate unpaid principal amount plus accrued and unpaid interest on the
Equipment Notes, whether or not then due and (iii) each payment of Stipulated Loss Value,
Termination Value or Early Fixed Price Purchase Amount, when combined with all other payments
due under this Lease in connection therewith, shall be at least equal to the unpaid principal, accrued
and unpaid interest and Make-Whole Premium, if any, payable with respect to the Equipment Notes
on the date such payment becomes due

(e)    Adjustments  Upon the occurrence of an Adjustment Event, the Base Rent
payments and allocations, the Stipulated Loss Values, the Termination Values and the Early Fixed
Price Purchase Amount shall be recalculated as set forth in Section 16 of the Participation
Agreement, provided, however, that all adjustments shall be (i) made in a manner which preserves
the characterization of the Lease as one that does not require constant or proportionate rent accrual
under Section 467 of the Code and/or regulations thereunder (or any successor or relevant Code
provision or regulations), (ii) in compliance with Treasury Regulation Section 1 467-3(c)(4) (or any

GM 2001A-8
DOCUMENT 2

successor regulation) and (iii) in compliance with the requirements of Sections 4 02(5) and 4 07 of Revenue Procedure 2001-29 (or any successor or relevant procedure)

(f)    Late Payment    If any Rent shall not be paid when due, the Lessee shall pay to the Lessor (or, in the case of Supplemental Rent not paid when due, to the Lessor for its own account or to the Person entitled thereto as provided herein or in any other Operative Document), as Supplemental Rent for the Undivided Interest in any Unit, interest (to the extent permitted by Applicable Law) on such overdue amount from and including the due date thereof to but excluding the date of payment thereof (unless payment is made after 11 00 a m , local time at the place of receipt, in which event such date of payment shall be included) at the Overdue Rate

(g)    Payments in General    All payments of Rent owed to Lessor or any other Person shall be made directly by Lessee by wire transfer of immediately available funds prior to 11 00 a m , New York time, on the due date thereof    Such payment shall be due to (i) Lessor at its address as may be specified by the Lessor or such other office of Lessor in the continental United States or such other account as Lessor shall direct in a notice to Lessee at least ten Business Days prior to the date such payment of Rent is due or (ii) such other Person at its address as may be specified by such Person, provided, however, that so long as the Indenture shall not have been fully discharged in accordance with its terms, Lessor hereby directs and Lessee agrees, that, unless the Indenture Trustee shall otherwise direct in writing, all Rent payable to Lessor (excluding Excepted Property) shall be paid prior to 11 00 a m , New York time, on the due date thereof directly to the Indenture Trustee at the office of the Indenture Trustee listed on Schedule 8 to the Participation Agreement, or such other address as shall be furnished by notice to the parties hereto    All payments of Supplemental Rent payable to the Owner Participant, to the extent that such amounts constitute Excepted Property, shall be made in Dollars in immediately available funds prior to 11 00 a m , New York time, on the due date thereof to the account of the Owner Participant specified on Schedule 8 to the Participation Agreement

Notwithstanding anything to the contrary contained herein, if any date on which a payment of Rent becomes due and payable is not a Business Day, then such payment shall not be made on such scheduled date but shall be made on the next succeeding Business Day with the same force and effect as if made on such scheduled date

SECTION 4    Lessor's Disclaimer of Representations and Warranties, Lessor's Covenants

(a)    Representations and Warranties    THE UNDIVIDED INTEREST IN THE EQUIPMENT IS BEING DELIVERED BY LESSOR TO LESSEE "AS IS, WHERE IS". AS BETWEEN (i) THE LESSOR, THE OWNER PARTICIPANT AND THE INDENTURE TRUSTEE, AND (ii) THE LESSEE, DELIVERY OF THE UNDIVIDED INTEREST IN EACH UNIT PURSUANT TO SECTION 2 SHALL BE CONCLUSIVE PROOF OF ACCEPTANCE BY THE

GM 2001A 8
DOCUMENT 2

LESSEE OF THE UNDIVIDED INTEREST IN SUCH UNIT AS BEING IN COMPLIANCE WITH ALL REQUIREMENTS OF THIS LEASE  NEITHER LESSOR (IN EITHER ITS INDIVIDUAL OR TRUST CAPACITY) NOR OWNER PARTICIPANT MAKES, HAS MADE OR SHALL BE DEEMED TO MAKE OR HAVE MADE, AND EACH HEREBY EXPRESSLY DISCLAIMS, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE TITLE, VALUE, COMPLIANCE WITH SPECIFICATIONS, CONDITION, DESIGN, QUALITY, DURABILITY, OPERATION, MERCHANTABILITY OR FITNESS OR SUITABILITY FOR USE OR PURPOSE OF ANY UNIT OR ANY PART THEREOF OR THE UNDIVIDED INTEREST THEREIN, AS TO THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, AS TO THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT, AS TO THE ABSENCE OF OBLIGATIONS BASED ON STRICT LIABILITY IN TORT, OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY UNIT OR ANY PART THEREOF OR THE UNDIVIDED INTEREST THEREIN, IT BEING AGREED THAT ALL RISKS INCIDENT THERETO ARE TO BE BORNE, AS BETWEEN (i) THE LESSOR, THE OWNER PARTICIPANT AND THE INDENTURE TRUSTEE, AND (ii) THE LESSEE, BY THE LESSEE IN THE EVENT OF ANY DEFECT OR DEFICIENCY IN ANY UNIT OR ANY PART THEREOF OR THE UNDIVIDED INTEREST THEREIN, OF ANY NATURE WHETHER PATENT OR LATENT, AND THAT NEITHER THE LESSOR NOR ANY PARTICIPANT OR THE INDENTURE TRUSTEE SHALL HAVE ANY RESPONSIBILITY WITH RESPECT THERETO, and neither the Lessor nor the Owner Participant shall be liable, except as specifically set forth in the Operative Documents, for business losses, loss of profits or other damages or losses resulting from the loss of use of any Unit, any Modification or any Part thereof or the Undivided Interest therein, including, but not limited to, damages to the Lessee or any other Person who or which derive their rights to any Unit, any Modification or any Part thereof or the Undivided Interest therein from the Lessee, it being agreed that, except as expressly stated in the Operative Documents, all such risks, as between the Lessor, the Lessee and the Owner Participant, are to be borne by Lessee to the fullest extent permitted by Applicable Law  The provisions of this Section 4 have been negotiated and are intended to be a complete exclusion and negation of any other warranties with respect to any Unit or any Part thereof or the Undivided Interest therein by the Lessor, the Indenture Trustee or any Participant, whether express or implied

(b)     Covenants  The Lessor covenants that during the Term (except as expressly permitted hereby) the Lessor will not, through its own actions or inactions, interfere with the quiet enjoyment of any Unit or Part thereof or the Undivided Interest therein by the Lessee  Lessor, solely in its individual capacity, agrees that it will not directly or indirectly create, incur, assume or suffer to exist any Lessor Lien attributable to it on or with respect to the Undivided Interest in the Equipment or any Part thereof  The foregoing is not intended to limit the rights granted to the Lessee hereunder to return the Undivided Interest in any Unit

SECTION 5    Return of the Equipment

(a)    Condition Upon Return    Unless purchased by Lessee pursuant to Section 18(c) hereof, upon the termination of this Lease at the end of the Base Term or any Renewal Term or pursuant to Section 9 or Section 16 hereof in respect of any Unit or any interest therein, the Lessee, at its own expense, will deliver the Undivided Interest in such Unit to the Lessor, or applicable party, the Unit disassembled and crated for shipment to the nearest railhead (or at another location specified by the Lessor and, so long as the Lien of the Indenture has not been released, the Indenture Trustee, so long as delivery to such other location shall be at no additional cost to the Lessee)    At the time of such return, each Unit shall be (i) free and clear of all Liens (other than Lessor Liens and Owner Participant Liens), (ii) free and clear of all rights of third parties, (iii) in the condition required by this Lease and in as good operating condition, with all Parts fully functional, as when delivered to Lessee hereunder, ordinary wear and tear excepted and (iv) free of all Lessee advertising or insignia placed thereon    The Lessee shall return to the Lessor with the Undivided Interest in each Unit subject to return any and all Assigned Proprietary Rights

(b)    Storage    If, at such time, the Lessor, upon 180 days' notice to the Lessee, requests and the Lessee in its reasonable judgment has available suitable storage space, the Lessee shall defer such return and will store such Unit without charge at premises of the Lessee used for storage by the Lessee, for a period not to exceed 90 days    During any such storage period, the Lessor shall bear its portion (based on its Undivided Interest in the Unit) of all reasonable costs of maintenance, insurance and additional handling for any Unit being stored

(c)    Failure to Meet Return Conditions    In the event the Lessee does not meet the return conditions specified in Section 5(a) on the date required by the provisions of this Lease, the Lessee will be in default of its obligations hereunder, but the obligations of the Lessee under this Lease shall continue with respect to the Undivided Interest in each Unit until the Lessee has complied with the requirements of Section 5(a) with respect to the Undivided Interest in such Unit (and the Base Rent, Stipulated Loss Value and Termination Value during any such period occurring after the end of the Term with respect to any such Unit or any interest therein shall be established in the manner set forth in Section 18(b))

(d)    Cooperation    During the last nine months of the Term in respect of the Undivided Interest in any Unit (unless the Lessee shall have elected to purchase the Undivided Interest in such Unit or renew this Lease with respect to the Undivided Interest in such Unit in accordance with the terms of this Lease), with reasonable notice, the Lessee will cooperate in all reasonable respects with the efforts of the Lessor to sell or lease such Undivided Interest in the Unit or any other interest therein, including, without limitation, permitting prospective purchasers or lessees to fully inspect such Unit and the logs, drawings, manuals, specifications, data and the maintenance records relating thereto (subject to the Lessee's ordinary document retention policies),

GM 2001A-8
DOCUMENT 2

provided, however, that such cooperation shall not unreasonably interfere with the normal operation of such Unit by the Lessee or cause Lessee to incur any additional expense other than as specifically provided in the Operative Documents  All information obtained in connection with such inspection shall be subject to confidentiality agreements reasonably prescribed by the Lessee and similar to those provided in Section 23 of the Participation Agreement

(e)    Records  Upon the return of the Undivided Interest in any Unit to the Lessor as provided in this Section 5, the Lessee shall deliver or cause to be delivered to the Lessor copies of all title documents, logs, drawings, manuals, specifications and data and inspection, modification and maintenance records which are required to be maintained with respect thereto pursuant to Section 7(f) and which are necessary to determine the condition of the Unit or for the continued maintenance, repair or general operation of the Unit and are in the possession of Lessee at that time (subject to the Lessee's ordinary document retention policies)

(f)    Environmental Report  Not later than 30 days prior to relinquishment of possession of any Unit at the end of the Base Lease Term, the Lessee shall provide to the Lessor, the Owner Participant, the Indenture Trustee and the Noteholders an inspection report by a reputable environmental consulting firm selected by Lessee and reasonably satisfactory to Owner Participant and the Indenture Trustee verifying that such Unit is in a condition suitable for transportation under applicable Environmental Laws (including the Hazardous Materials Transportation Act)  If the Lessee fails to provide such a report when required, Lessee shall use reasonable best efforts to provide such report on or before the date which is 30 days after the last day of the Base Lease Term and if Lessee does not deliver such report by such date, at the Lessor's option the Lessee shall not deliver possession of the Undivided Interest in such Unit to the Owner Participant and instead shall pay on such 30th day, as liquidated damages, the Fair Market Sales Value (established by the Appraisal Procedure) for the Undivided Interest in such Unit (as if such Unit were in a condition suitable for transportation under applicable Environmental Laws) to the Lessor, in which case the Lessor shall convey and the Lessee shall accept title to the Undivided Interest in such Unit  Lessee agrees to initiate an Appraisal Procedure in order to comply with the terms of this Section 5(f) even if Lessee is not required to obtain an appraisal to satisfy the other provisions of this Lease  In any event, if the report is not delivered and the Undivided Interest in the Unit is not returned on the last day of the Base Lease Term, Base Rent shall accrue as provided in Section 5(c) until such report is delivered or such Fair Market Sales Value is paid  Upon payment of such Fair Market Sales Value, this Lease shall terminate with respect to the Undivided Interest in such Unit

SECTION 6   Liens  The Lessee will not directly or indirectly create, incur, assume or suffer to exist any Lien on or with respect to any Unit or Part thereof or the Undivided Interest therein, title thereto or any interest therein or in this Lease, except for Permitted Liens, which shall constitute the following

GM 2001A-8
DOCUMENT 2

(i)    Scheduled Liens,

(ii)    the respective rights of the Lessor and the Lessee as herein provided, the Lien of the Indenture, and any other rights of any Person existing pursuant to the Operative Documents,

(iii)    Trustee Liens and Owner Participant Liens,

(iv)    Liens for Taxes that are not yet due and payable or, so long as adequate reserves have been established, are being contested in good faith and by appropriate proceedings diligently conducted, in each case, so long as such proceedings do not (A) subject any Unit or the Undivided Interest therein or other interest therein to any significant risk of foreclosure, forfeiture or loss or result in the sale of any Unit or any Part thereof or the Undivided Interest therein or other interest therein, (B) interfere with the use, possession or disposition of any Unit or Part thereof or the Undivided Interest therein or other interest therein, (C) interfere with the payment of Rent or (D) involve any risk of loss of the priority of the Lien of the Indenture on the Indenture Estate,

(v)    materialmen's, mechanics', workmen's, repairmen's, employees', carriers', warehousemen's and other like Liens relating to any Unit or the Undivided Interest therein or any other interest therein or in connection with any Modification or arising in the ordinary course of business for amounts that either are not more than 30 days past due or are being contested in good faith by appropriate proceedings, so long as such proceedings satisfy the conditions for the continuation of proceedings to contest Taxes set forth in clause (iv) above,

(vi)    Liens arising out of any judgment or award against Lessee up to $3,000,000, unless the judgment secured shall not, within 60 days after the entry thereof, have been discharged, vacated, reversed or execution thereof stayed pending appeal, and

(vii)    any Lien with respect to which the Lessee shall have provided, to the reasonable satisfaction of the Lessor (and, if the Indenture shall not have been discharged in accordance with its terms, the Indenture Trustee), an adequate indemnity bond, provided that such indemnity bond shall provide full indemnification for the amount of any such Lien and shall be adequate to ensure that (a) the Lien poses no material risk of the sale, forfeiture or loss of any Unit or any Part thereof or the Undivided Interest therein or other interest therein and does not impair in any way the Lien of the Indenture or the priority thereof and (b) the existence of such Lien does

GM 2001A-8
DOCUMENT 2

not interfere with the quiet enjoyment of any Unit or the Undivided Interest therein or any other interest therein

The Lessee will promptly, at its own expense, take (or cause to be taken) such actions as may be necessary to duly discharge any such Lien not excepted above if the same shall arise at any time

SECTION 7    Maintenance and Operation, Possession and Subleases, Identification

(a)    Maintenance and Operation    The Lessee, at its own cost and expense, shall maintain, operate, repair and make all Modifications to the Equipment or any Part thereof in a non-discriminatory manner consistent with GM's general practice and in accordance with prudent industry practice, manufacturers' warranty requirements (during any applicable warranty period) and the Lessee's established operating procedures and maintenance, rebuild and repair programs so as to keep the Equipment in good working order, ordinary wear and tear from proper use excepted, and in such condition as shall comply in all material respects with all Applicable Laws or applicable Governmental Actions, subject to Section 7(b)    The Lessee will not operate the Equipment or any Part thereof in any manner excluded from coverage by any insurance in effect as required by the terms of Section 11    The Lessee or any sublessee or assignee that is an Affiliate of GM may use the Equipment or any Part thereof only in any production facility owned or operated by GM or an Affiliate of GM located in the continental United States, and sublessees or assignees that are not Affiliates of GM may use the Equipment or any Part thereof only in the continental United States, provided, however, that prior to relocating any Equipment or any Part thereof in accordance with the foregoing, the Relocation Conditions shall be met    Any Hazardous Materials used in, or resulting or emitted from, the operation of any Unit will be used, contained and disposed of in accordance with applicable Environmental Laws    The Lessor shall not be obligated in any way to maintain, alter, repair, rebuild or replace any Unit or Part thereof

(b)    Contest of Requirements of Law.    If, with respect to any requirement of Applicable Law or any Governmental Action relating to the use, operation or maintenance of any Unit or the Undivided Interest therein, (i) the Lessee is contesting diligently and in good faith by appropriate proceedings such requirement or Governmental Action, or (ii) compliance with such requirement or Governmental Action shall have been excused or a waiver, extension or forbearance exempting the Lessee from such requirement or Governmental Action shall have been obtained, or (iii) the Lessee shall be making a good faith effort and shall be diligently taking appropriate steps to comply with such requirement or Governmental Action, then the failure by the Lessee to comply with such requirement or Governmental Action prior to the last day of the Term with respect to the Undivided Interest in such Unit shall not constitute an Event of Default hereunder, provided, however, that such contest or noncompliance does not involve (A) any risk of (1) foreclosure, forfeiture or loss of any Unit or the Undivided Interest therein or any other interest therein or (2) criminal liability being imposed on the Lessor, the Owner Participant, the Indenture Trustee or any

GM 2001A-8
DOCUMENT 2

Noteholder or (B) any substantial likelihood of (1) the sale of, or the creation of any Lien (other than a Permitted Lien) on, any Unit or the Undivided Interest therein or any other interest therein, (2) material civil liability being imposed on the Lessor, the Owner Participant, the Indenture Trustee or any Noteholder or (3) the extension of the ultimate imposition of such Applicable Law beyond the last day of the Term  The Lessee shall provide the Lessor and the Indenture Trustee with notice of any contest or noncompliance of the type described in clauses (i) and (iii) above in detail sufficient to enable the Lessor and the Indenture Trustee to ascertain whether such contest or noncompliance may have any effect of the type described in the above proviso

(c)    Payment of Taxes and Other Impositions    The Lessee shall pay all Taxes and other impositions related to any Unit or Part thereof or the Undivided Interest therein or other interest therein on a timely basis  Upon the written request by the Lessor, the Lessee shall provide the Lessor with evidence of the payment of any Taxes, or other impositions, the failure of which to be paid would cause the imposition of a Lien upon any Unit or Part thereof or the Undivided Interest therein or other interest therein  The Lessor will cooperate with the Lessee in the Lessee's preparation and filing of state and local property tax returns with respect to the Equipment during the Lease Term, in the manner required to preserve or obtain any existing or future tax abatements or exemptions applicable to the Equipment  The Lessee shall assume full responsibility for preparing and furnishing to the Lessor for execution all filings with any Governmental Authority of or in the state and/or locality in which the Equipment is located in respect of any and all property taxes, except that, where required or permitted by applicable law, the Lessee shall make such filings on behalf of the Lessor in the name of the Lessor or in the Lessee's own name  In each case in which the Lessee furnishes a tax return or any other form to be executed by the Lessor for filing with or delivery to any taxing authority, the Lessee shall certify to the Lessor that such document is in the proper form, is required to be filed under Applicable Law and does not impose any tax or other liability on the Lessor or any of its affiliates which is not indemnified by the Lessee

(d)    Possession and Subleases    So long as no Event of Default or Lease Default shall have occurred and be continuing, the Lessee shall have the right, upon not less than 30 days' prior written notice to the Lessor (which notice shall include the proposed form of sublease) and, if the Indenture has not been discharged in accordance with its terms, the Indenture Trustee, to enter into a sublease of the Undivided Interest in any Unit, provided, however, that (i) the sublease is and remains expressly subject and subordinate in all respects to the terms of this Lease and, if the Indenture has not been discharged in accordance with its terms, the Indenture, (ii) the Lessee remains primarily liable under this Lease and the Lessee shall not be released from its obligations under this Lease or any other Operative Document, (iii) such Unit remains and is used solely within the continental United States and the Lessor and, if the Indenture has not been discharged in accordance with its terms, the Indenture Trustee and the Noteholders, are notified as to its location, (iv) prior to entering into the sublease, the Relocation Conditions shall be met, (v) at the time Lessee enters into such sublease, the sublessee is not subject to any proceeding of the type described in Section 15(h),

GM 2001A-8
DOCUMENT 2

(vi) no such sublease shall permit any further subleasing of the Undivided Interest in the Unit, (vii) the term of the sublease does not extend beyond 30 days prior to the last day of the Term of the Lease, (viii) the Lessee shall have provided to the Lessor and, if the Indenture has not been discharged in accordance with its terms, the Indenture Trustee, before entering into any sublease, evidence that the insurance required to be maintained in accordance with Section 11 is in full force and effect, and (ix) the Lessee shall provide the Lessor and the Indenture Trustee, before entering into the sublease, an opinion of counsel selected by the Lessee and reasonably satisfactory to the Lessor and the Indenture Trustee, such opinion to be in form and substance reasonably satisfactory to the Lessor and to the Indenture Trustee, as to the nonimpairment of the Lien of the Indenture and the continued perfection of the Indenture Trustee's security interest therein and as to any other such matter incident to the proposed sublease as the Lessor or the Indenture Trustee may reasonably request  As a condition to the foregoing, the Lessee shall deliver to the Owner Participant an opinion of the Lessee's Tax Counsel, which opinion shall be reasonably acceptable to the Owner Participant, to the effect that such sublease will have no unindemnified adverse U S federal income tax consequences to the Owner Participant other than those to which Owner Participant would have been subject had there been no such sublease (taking into account any additional indemnification provided by the Lessee in connection with such sublease)  So long as no Event of Default or Material Default shall have occurred and be continuing and so long as the Lessee shall comply with the provisions of Section 11, the Lessee may, without the prior written consent of the Lessor, deliver possession of any Unit or Part thereof to the Manufacturer thereof or to any Person for testing, service, repair, maintenance or overhaul work on such Unit or any Part thereof or for Modifications or additions to such Unit or Part thereof to the extent required or permitted by the terms of Section 8(b), provided, however, that such Unit or Part shall remain in the continental United States at all times during such testing, service, repair, maintenance, overhaul work, Modifications or additions  Notwithstanding the foregoing, the Lessee may not, without the consent of the Lessor, enter into a sublease to a lessee incorporated or organized outside of the United States, or that would otherwise in any manner cause the Unit or any interest therein subject to such sublease to be "tax-exempt use property" as that term is defined in section 168(h) of the Code or any successor provision  Any assignment, sublease or other transfer of any Unit or Part or the Undivided Interest therein or other interest therein in violation of the provisions of this Section shall be void.

      (e)    Identification  Within 60 days following the Delivery Date, the Lessee agrees to affix and maintain (or cause to be affixed and maintained) in a conspicuous place on each Unit delivered on the Delivery Date a nameplate bearing the inscription.

GM 2001A-8
DOCUMENT 2

Undivided Interests Leased From

State Street Bank and Trust Company of Connecticut,
as Owner Trustees, Lessors

and, for so long as such Unit or the Undivided Interest therein or any other interest therein shall be subject to the Lien of the Indenture, bearing the following additional inscription

> Subject to the rights of Wells Fargo Bank Northwest, National Association, as Indenture Trustee

(each such nameplate to be replaced, if necessary, with a nameplate reflecting the name of any successor Lessor or successor Indenture Trustee in each case as permitted under the Operative Documents) Except as provided above, the Lessee will not allow the name of any person, association or corporation to be placed on any Unit as a designation that might be interpreted as a claim of ownership of such Unit or the Undivided Interest therein or of a security interest therein

(f)   Records   The Lessee shall maintain or cause to be maintained all logs, drawings, manuals, specifications and data and inspection, modification and maintenance records and other materials required to be maintained in respect of the Equipment or the Undivided Interest therein by Applicable Law or by prudent business practice with respect to similar equipment owned or leased by the Lessee and as promptly as reasonably practicable furnish or cause to be furnished to the Lessor and the Indenture Trustee, upon notice from the Lessor or the Indenture Trustee, such information as may be required to enable the Lessor and the Indenture Trustee to file any reports required to be filed by the Lessor or the Indenture Trustee with any Governmental Authority because of the Lessor's ownership interest in, or the Indenture Trustee's security interest in, the Undivided Interest in the Equipment

(g)   Acknowledgment   The parties acknowledge that (i) a default by the Lessee or any successor or assignee of the Lessee under any lease, mortgage or other agreement or instrument affecting another interest in the Unit may result in the loss of use by the Lessee of the Undivided Interest in the Unit and (ii) conflicting claims to possession may require resolution under Applicable Law

SECTION 8    Replacement of Parts, Modifications

(a)   Replacement of Parts   The Lessee may, at its own cost and expense, remove in the ordinary course of operations, maintenance, service, repair, overhaul or testing, any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, or damaged, _provided, however,_ that the Lessee, except as otherwise provided in Section 8(b), will, at its own cost and expense,

replace such Parts promptly and in no event later than the end of the Term   All replacement Parts shall be free and clear of all Liens (except for Permitted Liens and except in the case of replacement property temporarily installed on an emergency basis), and shall be in as good operating condition as the Parts replaced, assuming such replaced Parts were in good working order and in the condition and repair required to be maintained by the terms hereof, shall not decrease (except to an insignificant extent) the value of the Undivided Interest in the Unit as a whole, and shall be in good working order and have a utility, remaining useful life and estimated residual value at least equal to those of the Parts replaced (assuming that such replaced Parts have been maintained in accordance with the requirements of Section 7(a))   The Undivided Interest in all Parts at any time removed from any Unit shall remain the property of the Lessor, no matter where located, until such time as such Parts shall be replaced by Parts which have been incorporated or installed in or attached to such Unit and which meet the requirements for replacement Parts specified above   Immediately upon any replacement Part becoming incorporated or installed in or attached to any Unit as above provided, without further act (subject only to Permitted Liens and except in the case of replacement property temporarily installed on an emergency basis), all right, title and interest to the Undivided Interest in such replacement Part shall thereupon vest in the Lessor to the same extent as the Lessor's interest in the replaced Part (assuming the Lessee was in compliance with this Lease with respect to such Part), the Undivided Interest in such replacement Part shall become subject to this Lease and be deemed part of the Unit for all purposes hereof to the same extent as the Parts originally incorporated or installed in or attached to such Unit, and the Lessor shall no longer have any right, title or interest to the replaced Part and such replaced Part shall no longer be subject to this Lease

(b)    Alterations and Modifications   Lessee shall make (or cause to be made) at its own expense Modifications to each Unit required by Applicable Law or applicable Governmental Action and may, so long as no Material Default or Event of Default has occurred and is continuing, at its own expense make any other Modifications that it deems necessary or appropriate, provided, however, that such Modifications (other than Modifications required by Applicable Law or applicable Governmental Action) do not  decrease (except to an insignificant extent) the utility, value or estimated residual value of the Undivided Interest in such Unit, reduce (except to an insignificant extent) the remaining useful life of the Undivided Interest in such Unit or cause the Undivided Interest in such Unit to become limited use property within the meaning of Revenue Procedure 2001-28   With respect to Modifications which (i) are required by Applicable Law or applicable Governmental Action, (ii) cannot be removed from the Unit without materially diminishing or impairing the utility, value, remaining useful life or estimated residual value of the Unit or the Undivided Interest therein or (iii) the financing of which was arranged or provided by the Lessor, title to the Undivided Interest in such Modifications shall vest in the Lessor without further act to the same extent as the Lessor's interest in the Part or Parts subject to the Modification (assuming the Lessee was in compliance with this Lease with respect to such Part)   The Lessor shall have no right, title or interest in any Modification not specified in the preceding sentence   The Undivided Interest in modifications referred to in the preceding sentence (as in which the Lessor has no right, title or

GM 2001A-8
DOCUMENT 2

interest) may be purchased by the Lessor at the Fair Market Sales Value thereof (established by the Appraisal Procedure) at the end of the Term, if (i) such Modifications have not been removed from the Unit and (ii) Lessee has not exercised its rights to purchase the Undivided Interest in such Unit pursuant to the terms of this Lease  Subject to compliance with Applicable Law, the Lessee may remove, at its expense, any Modification referred to in the preceding sentence, <u>provided</u>, <u>however</u>, that unless the Lessee shall have given notice of its election to purchase the Undivided Interest in such Unit pursuant to <u>Section 18(c)</u>, the Lessee, at its expense and prior to the end of the Term, shall repair any damage to such Unit caused by such removal such that the Undivided Interest in such Unit is returned to the condition required hereunder

SECTION 9    <u>Voluntary Termination For Obsolete Equipment</u>

(a)    <u>General</u>  If at any time on or after the fifth anniversary of the Base Term Commencement Date with respect to any Unit, such Unit is determined by the Lessee to be obsolete, uneconomic or surplus to the needs of the Lessee for any reason, or at any time, any Unit or the continued operation thereof is determined by the Lessee to have been rendered uneconomic by reason of the cost of compliance with new or amended Applicable Law or new or amended applicable Governmental Action (each Unit as to which such a determination has been made being an "<u>Obsolete Unit</u>"), the Lessee may elect to terminate the Lease on any Lease Period Date with respect to such Obsolete Unit upon satisfaction of all of the requirements of this <u>Section 9</u>  Upon the satisfaction of the requirements of this <u>Section 9</u> for a termination of this Lease with respect to an Obsolete Unit, the Base Rent for the Undivided Interest in such Obsolete Unit shall cease to accrue and the Term for the Undivided Interest in such Obsolete Unit shall terminate

(b)    <u>Notice of Termination</u>  To exercise its right to terminate this Lease with respect to any Obsolete Unit as provided in this <u>Section 9</u>, the Lessee shall provide the Lessor (and, if the Indenture with respect to such Obsolete Unit shall not theretofore have been discharged, the Indenture Trustee and the Noteholders) with (i) notice in writing at least 90 days prior to the Lease Period Date on which the Lessee elects to terminate this Lease with respect to such Obsolete Unit (the "<u>Termination Date</u>") (which Termination Date shall not be later than the last day of the Term), such notice to specify the Termination Date and (ii) an Officer's Certificate of the Lessee as to the determinations referred to in <u>Section 9(a)</u>  It shall be a condition to the right to terminate the Lease as described in <u>Section 9(a)</u> that, on the date of the notice described in the preceding section, no Material Default or Event of Default shall have occurred and be continuing  The Lessee may, at its option by written notice to the Lessor, the Indenture Trustee and the Noteholders not less than ten days prior to the Termination Date, revoke any such notice of termination, in which event this Lease shall not terminate and the Lessee shall bear the reasonable out-of-pocket expenses incurred by the Lessee, the Owner Participant, the Indenture Trustee and the Noteholders (<u>provided</u>, <u>however</u>, that the Lessee shall bear the reasonable legal fees and expenses of Counsel for the Noteholders but not of any other counsel representing the Noteholders) in connection therewith, <u>provided</u>, that Lessee

GM 2001A-8
DOCUMENT 2

may not give such notice of revocation if any Person shall have submitted a bid in accordance with Section 9(c) in an amount at least equal to Termination Value for the Undivided Interest in the Obsolete Unit as of the Termination Date and the sale described in Section 9(c) shall be consummated with such Person  The number of such revocations and elections to continue this Lease during the Base Term for the Undivided Interest in each Unit (for which purpose a failed sale pursuant to Section 9(c)(iii) shall be deemed a revocation) shall not exceed two

      (c)    Sale of Equipment; Termination Payment

      (i)    Following the notice of termination referred to in Section 9(b), the Lessee shall, as agent for the Lessor and at the Lessee's expense, solicit bids for the cash purchase of the Obsolete Unit on the Termination Date on the basis that the Obsolete Unit will be returned in compliance with Section 5(a)  The Lessor may also solicit bids for the cash purchase of the Obsolete Unit on the Termination Date independent of the Lessee, but shall be under no duty to solicit bids or to inquire into the efforts of the Lessee to obtain bids  The Lessee and the Lessor, as the case may be, shall certify in an Officer's Certificate to the other the amount and terms of each bid received by it and the name and address of the Person submitting such bid  Subject to Section 9(d), in the event that the Lessee or the Lessor shall have obtained any such bids from any Person other than an Affiliate of the Lessee, the Lessor shall sell the Undivided Interest in the Obsolete Unit on the Termination Date to such Person which shall have submitted the highest such bid (who shall not be the Lessee or any Affiliate or Tax Affiliate of the Lessee or any Person purchasing the Obsolete Unit pursuant to any agreement for the use in the future of such Obsolete Unit by the Lessee or any Affiliate of the Lessee)  Upon payment to the Lessor of the purchase price in immediately available funds (and all other amounts due pursuant to this Section 9(c) on the Termination Date) the Lessor shall sell all right, title and interest of the Lessor in and to the Obsolete Unit to such Person free and clear of Lessor Liens, Owner Participant Liens and the Lien of the Indenture, and this Lease and the obligations (other than those that survive pursuant to Section 25) of the Lessee with respect to such Obsolete Unit hereunder shall terminate concurrently with such sale  On the Termination Date, the Lessor shall execute and deliver to such Person a bill of sale and such other instruments, documents and opinions as such Person or the Lessee may reasonably request to evidence the valid consummation of such transfer  In connection with such sale, the Lessee shall ensure that the Obsolete Unit meets the requirements of Section 5(a) on the Termination Date

      (ii)    The Undivided Interest in the total selling price realized at any sale of an Obsolete Unit shall be retained by the Lessor and, as a condition to the sale of any Obsolete Unit hereunder, the Lessee shall pay on the Termination Date to the Lessor

GM 2001A-8
DOCUMENT 2

or the Persons entitled thereto under the Operative Documents, in immediately available funds, (A) an amount equal to the excess, if any, of (x) the Termination Value for such Obsolete Unit as of the Termination Date over (y) the Undivided Interest in the proceeds of such sale net of the reasonable out-of-pocket expenses incurred by the Lessor and the Owner Participant in connection with such sale, and net of any sales, transfer or similar taxes incurred in connection with the sale, (B) all Base Rent due and owing prior to the Termination Date, (C) all Supplemental Rent due and owing on or prior to the Termination Date (including an amount equal to the Make-Whole Premium, if any), and (D) an amount equal to the reasonable out-of-pocket expenses of the Owner Participant (including the reasonable legal fees and expenses of the Owner Participant), the Owner Trustee, the Indenture Trustee and the Noteholders (provided, however, that Lessee shall bear the reasonable legal fees and expenses of Counsel for the Noteholders but not of any other counsel representing the Noteholders) incurred in connection with such sale except to the extent covered in clause (A)(y) of this Section 9(c)(ii)   The amount payable hereunder shall be increased by any positive amount set forth on Schedule IV to the Lease Supplement opposite the relevant Termination Date under the caption "Base Rent Amount as of the Termination Date" or decreased by the absolute value of any negative amount set forth on Schedule IV to the Lease Supplement opposite the relevant Termination Date under the caption "Base Rent Amount as of the Termination Date "

(iii)    If an Obsolete Unit shall not have been sold on the Termination Date (unless the Lessor shall have retained the Undivided Interest in the Obsolete Unit pursuant to Section 9(d)), this Lease shall continue in full force and effect

(d)    Retention of Equipment by Lessor   If the Lessee shall elect to terminate this Lease with respect to the Undivided Interest in any Obsolete Unit pursuant to this Section 9, the Lessor may elect to retain the Undivided Interest in such Obsolete Unit by giving irrevocable notice to the Lessee and, so long as the Indenture shall not have been discharged, the Indenture Trustee and the Noteholders, no later than 30 days prior to the Termination Date  If the Lessor so elects to retain the Undivided Interest in such Obsolete Unit, on the Termination Date, (i) the Lessee shall pay to Lessor or the Person entitled thereto as provided in the Operative Documents the payments referred to in Section 9(c)(ii)(B)-(D) (increased by the absolute value of the applicable amount, if any, set forth on Schedule IV to the Lease Supplement opposite the relevant Termination Date under the caption "Base Rent Allocations in Excess of Base Rent Payments" or decreased by the absolute value of the applicable amount, if any, set forth on Schedule IV to the Lease Supplement opposite the relevant Termination Date under the caption "Excess of Base Rent Payments over Base Rent Allocations") and (ii) the Lessor shall pay to the Indenture Trustee an amount equal to the unpaid principal amount, interest and premium, if any (after taking into account any payments required by clause (i)), on the Termination Date, of the Equipment Notes with respect to the Undivided Interest

GM 2001A-8
DOCUMENT 2

in such Obsolete Unit (as determined pursuant to Section 6 1(b)(3) of the Indenture) Upon payment of the amounts due pursuant to the preceding sentence, this Lease and the obligations of the Lessee hereunder (other than those that survive pursuant to Section 25) shall terminate with respect to the Undivided Interest in such Obsolete Unit, and the Lessor shall execute and deliver to the Lessee on the Termination Date such instruments as the Lessee shall reasonably request to evidence the termination of this Lease with respect to the Undivided Interest in such Obsolete Unit  In the event the Lessee fails to pay the amounts specified in clause (i) of the second sentence of this Section 9(d) or the Lessor fails to pay the amounts specified in clause (ii) of such sentence, the Lessee shall be deemed to have revoked its notice of termination (but a deemed revocation due to such a failure by the Lessor shall not be considered a revocation for purposes of the last sentence of Section 9(b)).  In connection with the retention of the Undivided Interest in the Obsolete Unit by the Lessor, the Lessee shall ensure that the Undivided Interest in such Obsolete Unit meets the requirements of Section 5(a) on the Termination Date

SECTION 10    Loss, Destruction, Requisition, etc

(a)    Event of Loss    Upon the occurrence of an Event of Loss in respect of the Undivided Interest in any Unit, the Lessee shall forthwith give the Lessor and, if the Indenture with respect to the Undivided Interest in such Unit has not been discharged, the Indenture Trustee and the Noteholders, written notice of such Event of Loss and on the earlier of (A) the first Stipulated Loss Value Date occurring after the 10th day following the receipt by Lessee of insurance proceeds related to the occurrence of such Event of Loss or (B) any Stipulated Loss Value Date, chosen by the Lessee in its sole discretion, but in no event later than the 180th day following the occurrence of such Event of Loss (the "Event of Loss Payment Date"), Lessee shall pay to the Lessor or the Persons entitled to such payments pursuant to the Operative Documents (A) the Stipulated Loss Value determined as of the Event of Loss Payment Date, (B) all Base Rent that has accrued prior to the Event of Loss Payment Date, (C) all Supplemental Rent due and owing on or prior to the Event of Loss Payment Date, and (D) an amount equal to the reasonable out-of-pocket expenses of the Owner Participant, the Owner Trustee, the Indenture Trustee, and the Noteholders (provided, however, that Lessee shall bear the reasonable legal fees and expenses of Counsel for the Noteholders) incurred in connection with the actions under this Section 10, provided, that the amount payable hereunder shall be increased by any positive amount set forth on Schedule III to the Lease Supplement opposite the relevant Stipulated Loss Value Date under the caption "Base Rent Amount as of Stipulated Loss Date" or decreased by the absolute value of the negative amount set forth on Schedule III to the Lease Supplement opposite the relevant Stipulated Loss Value Date under the caption "Base Rent Amount as of Stipulated Loss Date".

At such time as the Lessor and the other Persons entitled thereto under the Operative Documents shall have received the payments specified in clause (i) above, together with all other amounts that then may be due hereunder, (1) the obligation of the Lessee to pay Base Rent hereunder

GM 2001A-8
DOCUMENT 2

with respect to the Undivided Interest in such Unit for any period commencing after the Event of Loss Payment Date shall terminate, (2) this Lease as regards the Undivided Interest in such Unit shall terminate (other than the obligations of the Lessee which survive pursuant to Section 25) and (3) provided that no Event of Default or Lease Default exists on the Event of Loss Payment Date, payments and amounts received hereunder (other than Excepted Property) shall be applied in accordance with Section 3 3 of the Indenture and the Lessor will transfer to or at the direction of the Lessee, without recourse or warranty (except as to the absence of Lessor Liens), all the Lessor's right, title and interest in and to the Undivided Interest in such Unit and any insurance proceeds relating thereto (other than with respect to insurance maintained by the Lessor pursuant to Section 11), and the Lessee will be subrogated to all claims of the Lessor, if any, against third parties (other than with respect to insurance maintained by the Lessor pursuant to Section 11), for damage to or loss of such Unit or the Undivided Interest therein  Notwithstanding anything to the contrary contained in this Section 10(a), and without relieving Lessee in any way from its obligation to pay Base Rent as and when due, in the event that the Event of Loss occurs within the 90 day period prior to the last day of the Term for the Unit subject to the Event of Loss, the Event of Loss Payment Date shall be the later of the last Lease Period Date of the Term or the date thereafter that the payments referred to in the next sentence shall be paid to the Lessor and the other Persons entitled thereto, provided, that such Event of Loss Payment Date shall in no event be later than the earlier of the date the Lessee receives all insurance proceeds to which it is entitled with respect to the Undivided Interest in such Unit that is the subject of the Event of Loss or the date that is 180 days after the last Lease Period Date in the Term  If the Event of Loss Payment Date referred to in the preceding sentence occurs on (x) the last Lease Period Date of the Term, the Lessee shall make the payments for such date referred to in Section 10(a)(i) or (y) any other date, the Lessee shall pay to the Lessor and all other Persons entitled thereto the amount referred to in Section 10(a)(i)(D), all Supplemental Rent due and owing on such date, together with an amount equal to the sum of (A) the Stipulated Loss Value on the last day of the Term and (B) the product of (w) the Stipulated Loss Value on the last day of the Term multiplied by the Postponement Rate and (x) a fraction equal to (y) the number of days elapsed from (but excluding) the last day of the Term to (and including) the Event of Loss Payment Date divided by (z) 365  In the event that the payments referred to in the preceding sentence are not made prior to the last day of the Term, the Term with respect to the Undivided Interest in the Unit subject to the Event of Loss shall be extended until such payments are made

        (b)   Repair  In the event of any damage or loss to a Unit not constituting an Event of Loss, the Lessee shall promptly repair such Unit at its own expense to the standards required by Section 7(a) hereof and such repairs shall be sufficient to ensure that the utility, value, remaining useful life and estimated residual value of the Undivided Interest in the repaired Unit be at least equal to those of the Undivided Interest in such Unit prior to such damage or loss (assuming that such Unit has been maintained in accordance with Section 7(a))

GM 2001A 8
DOCUMENT 2

(c)    Condemnation Other Than Requisition of Use  In the case of a taking or condemnation not constituting a Requisition of Use, this Lease shall continue, and each and every obligation of the Lessee hereunder and under each Operative Document shall remain in full force and effect  The Lessee shall be entitled to the Undivided Interest in all sums received by reason of any such taking or condemnation for the period ending on the Termination Date or last date of the Term with respect to the applicable Unit, and the Lessor shall be entitled to the Undivided Interest in all sums received by reason of any such taking or condemnation for the period after the Termination Date or last date of the Term with respect to the applicable Unit

(d)    Application of Payments on an Event of Loss  Payments received by the Lessor or the Lessee from any Governmental Authority, insurer (other than proceeds of insurance carried by or on behalf of the Lessor or the Owner Participant pursuant to Section 11(d)) or other Person as a result of an Event of Loss with respect to the Undivided Interest in any Unit shall be applied as follows

(i)    all such payments to the ratable extent allocable to the Undivided Interest shall be promptly paid to the Lessor or, so long as the Indenture shall be in effect, the Indenture Trustee for application pursuant to the following provisions of this Section 10(d), except that the Lessee may retain any amounts that at the time would be payable to the Lessee under the provisions of clauses (ii) or (iii) below,

(ii)    so much of such payments (applying any payments from insurers before any payments from other Persons (including Governmental Authorities)) as shall not exceed the amount of Stipulated Loss Value and other amounts required to be paid by this Section 10 as a result of the Lessee's election to make the payments specified in Section 10(a)(i) shall be applied in reduction of the Lessee's obligation to pay such amount if the same has not already been paid by the Lessee or, if the same has already been fully paid by the Lessee, shall be applied to reimburse the Lessee for its payment of such amount, and

(iii)    the balance, if any, of such payments representing proceeds of insurance carried by the Lessee to the ratable extent allocable to the Undivided Interest shall be paid over to, or retained by, the Lessee or, if payments representing proceeds from any other Person or source to the ratable extent allocable to the Undivided Interest, shall be divided between the Lessor and the Lessee as their respective interests may appear

(e)    Application of Payments Not Relating to an Event of Loss  Payments received by the Lessor (other than proceeds of insurance carried by or on behalf of the Lessor or the Owner Participant pursuant to Section 11(d)) or by the Lessee (other than proceeds of insurance carried by

GM 2001A-8
DOCUMENT 2

or on behalf of the Lessee pursuant to <u>Section 11(d)</u>) from any Governmental Authority, insurer or other Person, plus the amount of any payments which would have been due from an insurer (but for the Lessee's self-insurance or policy deductibles) or with respect to any destruction, damage, loss, condemnation, confiscation, theft, seizure of or requisition of title to any Unit or the Undivided Interest therein, in each case not constituting an Event of Loss, shall be applied ,to the ratable extent allocable to the Undivided Interest, as provided in <u>Sections 3 2 or 3 4</u> of the Indenture

(f)    <u>Application of Payments During an Event of Default or Lease Default</u> Notwithstanding the foregoing provisions of this <u>Section 10</u> or the provisions of <u>Section 11</u>, if an Event of Default or a Lease Default shall have occurred and be continuing, any amount that would otherwise be payable to or for the account of, or that would otherwise be retained by, the Lessee in connection with this Lease or any Unit or Part thereof or the Undivided Interest therein or any other interest therein shall be paid to or retained by the Lessor or, so long as the Indenture shall be in effect, to the Indenture Trustee for application pursuant to the Indenture and, at such time thereafter as no Event of Default or Lease Default shall be continuing then such amount shall be paid promptly to the Lessee (or Lessor as otherwise required pursuant to this <u>Section 10</u>) unless such amount shall have been otherwise applied by the Indenture Trustee pursuant to <u>Article III</u> of the Indenture

SECTION 11    <u>Insurance</u>

(a)    <u>Coverage</u>    The Lessee shall at its expense, maintain with respect to the Equipment, insurance in such amounts as is generally carried by the Lessee from time to time with respect to owned or leased equipment used in similar locations  To the extent generally maintained with respect to other such equipment, the Lessee shall maintain with respect to the Equipment on a non-discriminatory basis the following policies (with such self-insurance or deductibles as the Lessee generally maintains with respect to similar equipment, <u>provided</u> that such self-insurance or deductibles shall (x) apply ratably to all insured property at each production facility and (y) shall not exceed industry standards on a "per occurrence" basis)

(i)    Commercial general liability insurance in amounts not less than $25,000,000 covering liability arising from premises, operations, independent contractors, products-completed operations, personal and advertising injury, and blanket contractual liability,

(ii)    Commercial property insurance covering the full replacement cost value of Lessee's personal property including contents, fixtures, equipment (including the Equipment), improvements and betterments for "all-risk" perils included in the standard special causes of loss form and flood and earthquake,

GM 2001A-8
DOCUMENT 2

(iii)    Boiler and machinery insurance covering the full replacement cost value of Lessee's personal property including contents, fixtures, equipment (including the Equipment), improvements and betterments against loss or damage from explosion of boilers or pressure vessels and mechanical and electrical breakdown, and

(iv)    Workers' compensation/employer's liability insurance in accordance with statutory provisions covering accidental injury, illness or death of an employee of the Lessee while at work or in the scope of his employment with the Lessee and employer's liability in an amount not less than $25,000,000

Any loss, whether actually covered in whole or in part by any such policies, shall be the responsibility of Lessee  With respect to any such policies maintained with outside insurers, such insurers shall be rated at least B-plus or better by A M  Best & Company or any successor rating agency of comparable stature

(b)    Policy Provisions  Any insurance policy maintained by the Lessee with respect to the Equipment shall

(i)    in the case of commercial general liability insurance, specify the Lessee, Owner Participant, Lessor (in both its individual and trust capacities), the Indenture Trustee (in both its individual and trust capacities) and the Noteholders as additional insureds, as their respective interests may appear (the "Additional Insureds"),

(ii)    in the case of commercial property insurance and boiler and machinery insurance, specify the Lessee, Owner Participant, Lessor (in both its individual and trust capacities), the Indenture Trustee (in both its individual and trust capacities) and the Noteholders as additional insureds and loss payees, as their respective interests may appear (together with the Additional Insureds, the "Additional Insureds and Loss Payees"),

(iii)    provide that proceeds in respect of any loss or occurrence (as the proceeds relate to the Undivided Interest in the Equipment) shall be adjusted with the Lessee, unless an Event of Default or a Material Default shall have occurred and be continuing, or an Event of Loss with respect to the Undivided Interest in a Unit shall have occurred, in which case such loss shall be adjusted by the Indenture Trustee, so long as the Indenture shall not have been discharged in accordance with its terms, and thereafter by the Lessor, and payable (as the proceeds relate to the Undivided Interest in the Equipment) (x) to the Lessee in respect of payments not exceeding $5,000,000, provided no Event of Default or Lease Default shall have occurred and be continuing,

and no Event of Loss with respect to the Undivided Interest in such Unit shall have occurred, and (y) in all other circumstances to the Lessor (or, so long as the Indenture shall not have been discharged, the Indenture Trustee),

(iv)    include effective waivers by the insurer of all claims for insurance premiums or commissions or (if such policies provide for the payment thereof) additional premiums or assessments against the Owner Participant, the Lessor (in both its individual and trust capacities), the Indenture Trustee (in both its individual and trust capacities) and the Noteholders,

(v)    provide that the whole or any part of the right, title and interest of the Lessor or the Lessee therein may be assigned to the Indenture Trustee as primary loss payee, and

(vi)    provided that such endorsements are available in the commercial insurance market, the Lessee shall obtain endorsements to the insurance policies carried pursuant to <u>Sections 11(a)(i), (a)(ii)</u> and <u>(a)(iii)</u> providing that (A) the insurers waive any right of subrogation, set-off or counterclaim or any other deduction, whether by attachment or otherwise, in respect of any liability of the Lessee or any Additional Insured and Loss Payee, (B) the respective interests of the Additional Insureds and Loss Payees shall not be invalidated by any act or neglect by the Lessee or any other Person, including breach of any warranty contained in such policies, (C) no lapse, cancellation or material change with respect to such policies (or, in the alternative, no lapse, cancellation or material adverse change that would affect the interests of the Additional Insureds and Loss Payees with respect to any Unit) shall be effective as to an Additional Insured and Loss Payee until at least 30 days after receipt by such Additional Insured and Loss Payee of written notice thereof, (D) the coverage afforded by such policies shall not be affected by the performance of any work in or about any Modification and (E) the insurance shall be primary regardless of any other insurance of the Additional Insured and Loss Payee which would otherwise contribute at the time of loss to the personal property insured under such insurance policies

(c)    <u>Reports, etc</u>  On the Delivery Date, and at each policy renewal, but not less than annually, Lessee shall provide to the Lessor and the Indenture Trustee certificates of insurance from each insurer or by an authorized representative of each insurer.  Such certificates shall identify the underwriters, the type of insurance, the limits, deductibles, and term thereof and shall specifically list the special provisions delineated in <u>Section 11(b)</u> for such insurance required by this <u>Section 11</u>  Concurrently with the furnishing of all certificates referred to in this <u>Section 11</u>, Lessee shall furnish the Lessor and the Indenture Trustee with an opinion from an independent insurance broker,

GM 2001A 8
DOCUMENT 2

acceptable to the Lessor, stating that all policies are in effect and that, in the opinion of such broker, the insurance then maintained by the Lessee is in accordance with this <u>Section 11</u> and that the self-insurance and deductibles maintained by the Lessee are consistent with industry standards

(d)    <u>Additional Insurance by Lessor and Lessee</u>    The Lessee may at its own expense and for its own account carry insurance with respect to its interest in the Equipment in amounts in excess of that required to be maintained by this <u>Section 11</u>    The Lessor and the Owner Participant may each carry for its own account at its sole cost and expense insurance with respect to its interest in the Equipment, <u>provided</u>, <u>however</u>, that (i) the Owner Participant has provided the Lessee with notice that it intends to carry such insurance and (ii) such insurance does not prevent the Lessee from carrying the insurance required or permitted by this <u>Section 11</u> or adversely affect such insurance or the cost thereof

SECTION 12    <u>Inspection</u>    Upon two weeks prior written notice to the Lessee, on the days during the Term and at those locations specified in the <u>Inspection Schedule</u> to this Lease (or at other mutually agreed upon times during the Term), the Lessor, the Owner Participant and, so long as the Indenture is in effect, the Indenture Trustee and the Noteholders or their designated agents may at their own expense and risk conduct a visual inspection of the Equipment and may inspect the books and records of the Lessee relating thereto, <u>provided</u>, that so long as there is no Event of Default or no Material Default has occurred and is continuing, only one such inspection will be permitted annually, and, <u>provided</u>, <u>further</u>, that after the occurrence and during the continuance of an Event of Default or a Material Default, the number of inspections shall not be limited and all such inspections shall be at the Lessee's expense and risk, and, <u>provided</u>, <u>further</u>, that all information obtained in connection with any such inspection shall be subject to confidentiality arrangements reasonably prescribed by the Lessee and similar to those provided in <u>Section 23</u> of the Participation Agreement, and, <u>provided</u>, <u>further</u>, that the Lessee may deny access to any Person who is an Adverse Party (which shall not include the Owner Participant)    No inspection pursuant to this <u>Section 12</u> shall interfere with the use, operation or maintenance of the Equipment or the normal conduct of Lessee's business, and the Lessee shall not be required to undertake or incur any additional liabilities in connection therewith    Neither the Lessee, the Indenture Trustee nor any Participant shall at any time be required to inspect any Unit or any Part thereof, and any inspection by the Lessor, the Indenture Trustee or any Participant shall not be deemed to affect or modify the provisions of <u>Section 4</u>    In the event that any Unit is not available on the date specified in the Inspection Schedule because such day is not a Business Day or for any other reason, the Lessee will make arrangements for inspection of such Unit on another date reasonably requested by Lessor, Owner Participant, Indenture Trustee and Noteholders

SECTION 13    <u>Performance of Operative Documents</u>    Lessee agrees to perform its obligations hereunder and under the Operative Documents

GM 2001A-8
DOCUMENT 2

SECTION 14    Assignment   Subject to the penultimate sentence of Section 7(a) and except as otherwise provided herein, and provided no Event of Default or Material Default has occurred and is continuing, Lessee may assign all, but not less than all, of its rights and obligations with respect to the Undivided Interest in each Unit subject to this Lease (i) to any non-Affiliate if Lessee expects to have a continuing business relationship with such non-Affiliate or (ii) to any Affiliate, in each case, pursuant to an assignment in the form attached hereto as Exhibit B, provided, that Lessee unconditionally guarantees the obligations of such assignee pursuant to a guaranty in the form attached hereto as Exhibit C, and provided, further, that the Lessee shall provide the Lessor, the Owner Participant, and, for so long as the Indenture is outstanding, the Indenture Trustee and the Noteholders with at least 30 days' notice of such assignment identifying the proposed assignee and the address of such assignee for notification purposes, and that (a) any non-Affiliate assignee is reasonably acceptable to the Lessor and, for so long as the Indenture is outstanding, the Indenture Trustee and the Noteholders, (b) the Indenture Trustee and the Owner Participant shall have received from counsel to the Lessee such customary opinions as they may request regarding such assignment and guaranty, which opinions shall be of a scope comparable to the opinions delivered pursuant to Section 4(g)(i) of the Participation Agreement (including opinions as to the nonimpairment of the Lien of the Indenture and the continued perfection of the Indenture Trustee's security interest therein and as to any other such matter incident to the proposed assignment as the Indenture Trustee and Owner Participant may reasonably request), (c) there shall be no action, suit or proceeding pending or threatened that questions the validity or enforceability of such assignment or guaranty, (d) the assignment and guaranty shall not violate any Applicable Law binding upon the assignee or any party to the Participation Agreement, (e) all consents and approvals required to effect the assignment and the guaranty shall have been obtained, (f) the Lessee and the assignee shall have made such representations and warranties as reasonably requested by the Owner Participant and the Indenture Trustee or the Noteholders in connection with such assignment and guaranty, which representations and warranties shall be of a scope comparable to those set forth in Section 8(a) of the Participation Agreement, (g) no such assignment shall permit any further assignment of the Lease, (h) at the time that the assignment is entered into, the assignee is not insolvent or the subject of any bankruptcy proceedings, (i) the Lessor, and if the Indenture has not been discharged in accordance with its terms, the Indenture Trustee and the Noteholders, are notified as to the location of the Unit and (j) the Lessee shall have provided to the Lessor, and if the Indenture has not been discharged in accordance with its terms, the Indenture Trustee and the Noteholders, before entering into any assignment, insurance certificates evidencing that the insurance required to be maintained in accordance with Section 11 is in full force and effect   Subject to the foregoing, the terms and provisions of this Lease shall be binding upon and inure to the benefit of the Lessor and the Lessee and their respective successors and permitted assigns   The Lessee shall pay all reasonable out-of-pocket expenses, disbursements and costs (including reasonable legal and other professional fees and expenses) incurred by the Lessor, the Owner Participant, the Indenture Trustee and the Noteholders in connection with such assignment   As a condition to the foregoing, the Lessee shall provide to the Owner Participant an opinion of Lessee's Tax Counsel, which opinion shall be reasonably acceptable to the Owner Participant, to the

GM 2001A-8
DOCUMENT 2

effect that any such assignment will have no unindemnified adverse U S Federal income tax consequences to the Owner Participant (except for taxes that are not indemnified for by reason of the application of Sections 5(d)(I), 5(d)(M), or 5(e) of the Tax Indemnity Agreement)

SECTION 15    Events of Default    Each of the following events shall constitute an Event of Default (whether any such event shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) and each such Event of Default shall continue so long as, but only as long as, it shall not have been remedied·

(a)    the Lessee shall have failed to make a payment of Base Rent, Stipulated Loss Value, Termination Value, Early Fixed Price Purchase Amount, End Term Purchase Option amount or Supplemental Rent to the extent such Supplemental Rent represents Make-Whole Premium within 5 Business Days after the same shall have become due, or

(b)    the Lessee shall have failed to make a payment of Supplemental Rent other than Stipulated Loss Value, Termination Value or any Make-Whole Premium after the same shall have become due and such failure shall continue for 30 Business Days after Lessee's receipt of demand therefor by the party entitled thereto, or

(c)    the Lessee fails to comply with Section 10(d) of the Participation Agreement, or

(d)    if a guaranty is delivered pursuant to Section 14, a default in the due observance or performance of any covenant, condition or agreement contained in such guaranty (other than any covenant, condition or agreement described in clauses (a), (b), (f) and (g) of this Section 15, as to which the guarantor shall be entitled to cure Lessee's default within the applicable periods specified in such clauses), which non-observance or non-performance shall have continued for 45 days, provided, however, that if such default cannot be cured by payment of money or by diligent efforts within such 45 days (the "cure period"), if GM is diligently pursuing a cure, the cure period shall be extended for an additional period of time as may be necessary to cure (which additional period shall not exceed 180 days without the written consent of the Lessor and, if the Indenture has not been discharged, the Indenture Trustee), provided, further, that in no event shall any such cure period extend beyond the cure periods referenced in clauses (f) and (g) below with respect to any occurrence referred to therein, or

(e)    for any reason, the guaranty delivered pursuant to Section 14 is invalid or otherwise unenforceable in any respect and a valid replacement guaranty of GM reasonably satisfactory to the Owner Participant and, so long as the Indenture has not been discharged, the Indenture Trustee, has not been provided, or

GM 2001A-8
DOCUMENT 2

(f)    the Lessee shall have failed to comply in any material respect with any other covenant or agreement contained herein or any other Operative Document (other than the Tax Indemnity Agreement) and such failure shall continue for 90 days after the earlier of the date that (i) the Treasurer or any Assistant Treasurer of the Lessee obtains actual knowledge of such failure or (ii) the Lessee receives a written notice (clearly labeled a "Notice of Default") from the Lessor, the Indenture Trustee or any Notcholder advising the Lessee of such failure, provided, however, that if such failure cannot be cured by payment of money and cannot be cured by diligent efforts within such 90-day period (the "cure period") but diligent efforts shall be properly commenced within the cure period and the Lessee is diligently pursuing a remedy of such failure, the cure period shall be extended for an additional 90 days (so long as such failure can be cured within such additional 90 days) (but not later than 90 days before the end of the Term), or

(g)    any representation or warranty made by the Lessee herein or in any Operative Document (except the representations and warranties set forth in the Tax Indemnity Agreement) or in any Officer's Certificate pursuant hereto or thereto shall prove to have been inaccurate in any material respect at the time made, provided, however, that if the representation or warranty was originally given by the Lessee in good faith, an Event of Default shall not be deemed to exist unless the inaccurate representation or warranty remains material to the Owner Participant, the Lessor, the Indenture Trustee or any Noteholder at the time such inaccuracy is discovered and, if capable of being cured, remains uncured for a period of 90 days after the earlier of the date that (i) the Treasurer or any Assistant Treasurer of the Lessee obtains actual knowledge of such inaccuracy or (ii) the Lessee receives a written notice (clearly labeled a "Notice of Default") from Lessor, Indenture Trustee or any Noteholder advising Lessee of such inaccuracy, or

(h)    the Lessee shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking of possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall take any corporate action to authorize any of the foregoing, or an involuntary case or other proceeding shall be commenced against the Lessee seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed or unstayed for a period of 90 consecutive days, or

GM 2001A-8
DOCUMENT 2

(i)    Lessee shall have failed to carry and maintain such insurance in respect of the Equipment as is required pursuant to <u>Section 11</u> and such failure shall continue until the fifth day before the end of the period during which, under the terms of the applicable policy, the lapse or cancellation of such policy is not effective as to the Additional Insureds named therein

SECTION 16    <u>Effect of Event of Default</u>

(a)    <u>Remedies</u>  Upon the occurrence of any Event of Default and so long as the same shall be continuing, the Lessor, at its option, may, to the extent permitted by Applicable Law, exercise one or more of the following remedies, as the Lessor in its sole discretion shall elect

(i)    the Lessor, by notice to the Lessee, may rescind or terminate this Lease,

(ii)    the Lessor may demand that the Lessee, and upon the written demand of the Lessor the Lessee shall, surrender its possession of the Equipment promptly to the Lessor in the manner and condition required by, and otherwise in accordance with the provisions of, this Lease as if the Equipment were being returned at the end of the Term and the Lessor shall not be liable for the reimbursement of the Lessee for any costs and expenses incurred by the Lessee in connection therewith, <u>provided</u> that if within five Business Days after such demand is received by the Lessee the Lessee provides the Lessor with an Officer's Certificate to the effect that (A) at the time, a Person (other than the Lessee or an Affiliate of the Lessee) holds an interest in the Equipment under a valid instrument or agreement that was entered into on or before the date of this Lease, (B) the Lessee is unwilling or unable to surrender possession of the Equipment without the prior written consent or concurrent action of such Person and (C) such prior written consent or concurrent action has not been obtained or taken, then the Lessor may also demand that the Lessee, and upon the written demand of the Lessor the Lessee shall prior to surrender of possession of the Equipment to the Lessor (x) cease using the Equipment (whether or not the Lessee or any successor or assignee of the Lessee at the time owns or holds under a lease any other interest in the Equipment), (y) surrender the Undivided Interest in the Equipment to the Lessor and (z) store the Equipment at the Lessee's sole cost and expense at the premises of the Lessee used for storage by the Lessee, and if the Lessee fails promptly to comply with any of the foregoing demands, the Lessor may, at its option, cause public officials acting pursuant to Applicable Law or to judicial order obtained in summary proceedings or otherwise to enter upon the premises where the Equipment is located and enforce any of such demands, all without liability to the Lessor for or by any reason of such entry or taking possession, and the Lessee shall promptly execute and deliver to the Lessor such instruments or other documents as the

Lessor may deem necessary or advisable to obtain possession of the Undivided Interest in the Equipment (or, if applicable, the Equipment),

(iii)    the Lessor may (whether or not the Lessor has taken possession thereof) sell the Undivided Interest in the Equipment at public or private sale, as the Lessor may determine, free and clear of any rights of the Lessee with respect thereto and without any duty to account to the Lessee with respect to such sale or any proceeds with respect thereto (except to the extent required by clause (v) or (vi) of this Section 16(a) if the Lessor shall elect to exercise its rights thereunder), in which event the Lessee's obligation to pay Base Rent and Supplemental Rent (other than Supplemental Rent accruing prior to and in connection with such event or which otherwise survives pursuant to Section 25) with respect to the Undivided Interest in the Equipment sold accruing after the date of such sale shall be terminated (except to the extent that Base Rent is to be included in computations under clause (v) or (vi) of this Section 16(a) if the Lessor shall elect to exercise its rights thereunder),

(iv)    the Lessor may hold or lease all or a portion of the Undivided Interest in the Equipment as the Lessor in its sole discretion may determine, free and clear of any rights of the Lessee with respect to such Undivided Interest and without any duty to account to the Lessee with respect to such action or inaction or for any proceeds with respect to such action or inaction;

(v)    whether or not Lessor has exercised rights under clauses (i), (ii), (iii) or (iv) above, the Lessor may demand, by written notice to the Lessee specifying a Stipulated Loss Value Date which shall be a date not earlier than 10 days after the date of such notice, that the Lessee pay to the Lessor, and the Lessee shall pay to the Lessor, on such Stipulated Loss Value Date, as liquidated damages for loss of a bargain and not as a penalty any unpaid Base Rent due and owing prior to such Stipulated Loss Value Date and any unpaid Supplemental Rent accrued to such Stipulated Loss Value Date (including an amount equal to the Make-Whole Premium, if any), plus whichever of the following amounts the Lessor, in its sole discretion, shall specify in such notice (together with interest on such amount at the Overdue Rate from such Stipulated Loss Value Date to the date of actual payment)

(A)    an amount equal to the excess, if any, of Stipulated Loss Value of the Undivided Interest in the Equipment, computed as of such Stipulated Loss Value Date, over the Fair Market Rental Value of the Undivided Interest in the Equipment during the remaining Base Term (or any Renewal Term then in effect), after discounting such Fair Market Rental Value semiannually to present value as of such Stipulated Loss Value Date at a rate per annum equal to the Note Rate, or

GM 2001A-8
DOCUMENT 2

(B)    an amount equal to the excess, if any, of such Stipulated Loss Value over the Fair Market Sales Value of the Undivided Interest in the Equipment as of such Stipulated Loss Value Date, or

(C)    an amount equal to the excess of (I) the present value as of such Stipulated Loss Value Date of all installments of Base Rent until the end of the Term (or any Renewal Term then in effect), discounted semiannually at a rate per annum equal to the Note Rate, over (II) the present value as of such Stipulated Loss Value Date of the Fair Market Rental Value of the Undivided Interest in the Equipment until the end of the Base Term (or any Renewal Term then in effect), discounted semiannually at a rate per annum equal to the Note Rate,

provided that in the case of (A), (B) or (C), unless Lessor shall have exercised its remedies pursuant to Sections 16(a)(iii) or 16(a)(iv), Lessee shall deliver the Undivided Interest in the Equipment to the Lessor in accordance with Section 5(a) and whereupon, in each case, the Lessee's obligations to pay Base Rent or Supplemental Rent shall terminate and this Lease and all obligations of Lessee hereunder (other than the obligations of Lessee that survive termination of this Lease pursuant to Section 25) shall terminate

(vi)    the Lessor may demand, by written notice to the Lessee specifying a Stipulated Loss Value Date which shall be a date not earlier than 10 days after the date of such notice, that Lessee pay to the Lessor, and the Lessee shall pay to Lessor, on such Stipulated Loss Value Date, as liquidated damages for loss of a bargain and not as a penalty any unpaid Base Rent due and owing prior to such Stipulated Loss Value Date and any unpaid Supplemental Rent accrued to such Stipulated Loss Value Date (including an amount equal to the Make-Whole Premium, if any), plus an amount equal to the greatest of (I) Stipulated Loss Value for the Undivided Interest in the Equipment determined as of such Stipulated Loss Value Date, (II) the discounted Fair Market Rental Value determined pursuant to Section 16(a)(v)(A), and (III) the Fair Market Sales Value of the Undivided Interest in the Equipment as of such Stipulated Loss Value Date and, in this event, upon full payment by the Lessee of all sums due under this Section 16(a)(vi), the Lessor shall transfer the Undivided Interest in the Equipment to the Lessee "as-is, where-is," without recourse, representation or warranty (other than the absence of Owner Participant Liens, Lessor Liens and the Lien of the Indenture), and in each case the Lessee's obligations to pay Base Rent or Supplemental Rent (other than Supplemental Rent accruing prior to or in connection with such event or which otherwise survives pursuant to Section 25) shall terminate as of the date of payment by the Lessee under this Section 16(a)(vi) and this Lease and

GM 2001A 8
DOCUMENT 2

the Lessee's obligations hereunder (other than the obligations of the Lessee that survive termination of this Lease pursuant to Section 25) shall terminate,

(vii)    if the Lessor shall have sold all of the Undivided Interest in the Equipment pursuant to clause (iii) of this Section 16(a) or other right of sale, the Lessor, in lieu of exercising its rights under clause (v) of this Section 16(a), may, if it shall so elect, demand that the Lessee pay to the Lessor and the Lessee shall pay to the Lessor on the date of such sale, as liquidated damages for loss of a bargain and not as a penalty, any unpaid Base Rent due and owing prior to such next Lease Period Date and any Supplemental Rent accrued to such next Lease Period Date (including an amount equal to the Make-Whole Premium, if any), plus the amount of any deficiency between Stipulated Loss Value for the Undivided Interest in the Equipment, computed as of such next Lease Period Date, and the proceeds of such sale, together with interest at the Overdue Rate on the amount of such Rent, from the due date or dates thereof, and the amount of such deficiency from the date of such sale, until the date of actual payment,

(viii)    the Lessor may enter into a substitute lease of the Undivided Interest in a Unit or Units with another party, in which case the Lessee shall remain liable for all amounts due under this Lease, which liability shall be reduced by any amounts paid to Lessor under such substitute lease, or

(ix)    the Lessor may exercise any other right or remedy that may be available to it under Applicable Law or proceed by appropriate court action to enforce the terms hereof, to recover damages for the breach hereof or to rescind this Lease

Additionally, if Lessor exercises its remedies under this Section 16 the amount the Lessee must pay the Lessor hereunder shall be increased by any positive amount set forth on Schedule III to the Lease Supplement opposite the relevant Stipulated Loss Value Date under the caption "Base Rent Amount as of Stipulated Loss Value Date" or decreased by the absolute value of any negative amount set forth on Schedule III to the Lease Supplement opposite the relevant Stipulated Loss Value Date under the caption "Base Rent Amount as of Stipulated Loss Value Date", provided, however, that to the extent such increase or decrease does not precisely reflect the excess of Base Rent paid over Base Rent allocated, whichever the case may be, as of the date on which Base Rent ceases to accrue, such applicable amount shall be further increased or decreased by the amount necessary to ensure that the aggregate amount of Base Rent paid equals the aggregate amount of Base Rent allocated as of the date on which Base Rent ceases to accrue

Except as expressly provided in Section 16(a), no rescission or termination of this Lease in whole or in part, or any repossession of the Undivided Interest in any Equipment or exercise

I\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt final A-8 wpd

GM 2001A 8
DOCUMENT 2

of any remedy under <u>Section 16(a)</u> will relieve Lessee of any of its obligations under this Lease or any other Operative Documents

(b)    <u>Continuing Obligations</u>    The Lessee shall be liable, except as otherwise expressly provided herein, for any and all accrued and unpaid Rent due hereunder before, after or during the exercise of any of the foregoing remedies, including all reasonable legal fees and other reasonable out-of-pocket expenses incurred by the Lessor, the Owner Participant, the Noteholders or the Indenture Trustee by reason of the occurrence of any Event of Default or the exercise of the Lessor's remedies with respect thereto  At any sale of the Undivided Interest in the Equipment or any part thereof pursuant to <u>Section 16(a)</u>, the Noteholders or the Indenture Trustee may bid for and purchase such property

(c)    <u>Remedies Cumulative</u>    To the extent permitted by Applicable Law and except as provided therein, no remedy under this <u>Section 16</u> is intended to be exclusive, but each shall be cumulative and in addition to any other remedy provided under this <u>Section 16</u> or otherwise available to the Lessor at law or in equity  No express or implied waiver by the Lessor of any Event of Default shall in any way be, or be construed to be, a waiver of any future or subsequent Event of Default  The failure or delay of the Lessor in exercising any rights granted it hereunder upon any occurrence of any of the contingencies set forth herein shall not constitute a waiver of any such right upon the continuation or recurrence of any such contingencies or similar contingencies and any single or partial exercise of any particular right by the Lessor shall not exhaust the same or constitute a waiver of any other right provided herein  To the extent permitted by Applicable Law, the Lessee hereby waives any rights now or hereafter conferred by statute or otherwise which may require the Lessor to sell, lease or otherwise use the Undivided Interest in the Equipment in mitigation of the Lessor's damages or which may otherwise limit or modify any of the Lessor's rights and remedies provided in this <u>Section 16</u>

SECTION  17    <u>Notices</u>    All notices, demands, instructions, consents and other communications required or permitted to be given to or made upon any party hereto shall be in writing and shall be personally delivered (or offered for delivery and rejected) by Federal Express or next business day delivery by another reliable express courier or by prepaid courier service, or by telecopy (with confirmation) and shall be deemed to be given for purposes of this Lease on the day that such writing is delivered to the intended recipient thereof in accordance with the provisions of this <u>Section 17</u>  Unless otherwise specified in a notice delivered (or offered for delivery and rejected) in accordance with the foregoing provisions of this subsection, notices, demands, instructions and other communications in writing shall be given to or made upon the respective parties hereto at their respective addresses (or numbers) as set forth on <u>Schedule 8</u> to the Participation Agreement (or such other address as designated by the appropriate party in accordance with this <u>Section 17</u>)

GM 2001A-8
DOCUMENT 2

SECTION 18    Renewal Option, Purchase Options, Valuation

(a)    Fixed Rate Renewal Option    Not less than nine months before the end of the Base Term, the Lessee may deliver to Lessor a written notice irrevocably electing to renew this Lease as to the Undivided Interest in any or all of the Units then subject to this Lease at a rental amount per Unit per Lease Period equal to 50% of the average semi-annual Base Rent (as specified on the Applicable Schedule and as apportioned to the Undivided Interest in such Unit on the basis of its Fair Market Sales Value as of the Delivery Date (as set forth in the Appraised and Applicable Schedule) as a percentage of the Fair Market Sales Value for the Undivided Interest in all Equipment subject to this Lease as of the Delivery Date) for the Undivided Interest in any such Unit during the Base Term payable to the Lessor by the Lessee semi-annually in arrears on the Lease Period Date (a "Fixed Rate Renewal")    The Lessee shall specify in such notice the term of such Fixed Rate Renewal which shall be in intervals of twelve-month periods (each ending on a January 2 or July 2), provided, however, the term (the "Fixed Rate Renewal Term") of any such Fixed Rate Renewal shall not extend beyond the earlier of (i) the date on which the expected remaining useful life of any Unit covered thereunder is less than 20% of the useful life of such Unit on the Delivery Date and (ii) the date on which the expected residual Fair Market Sales Value of any Unit covered thereunder is less than 20% of aggregate Lessor's Cost of such Unit (without regard to inflation or deflation and in accordance with the first two sentences of Section 5(a) hereof)    For purposes of the preceding sentence, the "expected remaining useful life" and the "expected residual Fair Market Sales Value" of the Undivided Interest in the Equipment subject to any Fixed Rate Renewal shall be established not more than 18 months prior to the commencement of the initial Fixed Rate Renewal Term (if any) by an appraiser selected by the Lessee and reasonably acceptable to the Owner Participant, and such appraiser shall deliver an appraisal which shall be reasonably acceptable to the Owner Participant    At the end of the Base Term for any Undivided Interest in the Equipment then subject to this Lease, if the Lessee has elected to renew this Lease as aforesaid, this Lease shall continue in full force and effect during the following Fixed Rate Renewal Term, except that (x) Lessee shall pay to the Lessor the amounts set forth above and (y) the Stipulated Loss Values and Termination Values applicable during the Fixed Rate Renewal Term shall initially be the Fair Market Sales Value (determined by the appraiser specified in the preceding sentence) of the Undivided Interest in] the Unit as of the commencement of the Fixed Rate Renewal Term, and on each Lease Period Date during the Fixed Rate Renewal Term shall decline on a straight line basis by an amount per Lease Period obtained by dividing the difference between the Fair Market Sales Value of the Undivided Interest in the Unit as of the beginning of the Fixed Rate Renewal Term  and the estimated Fair Market Sales Value of the Undivided Interest in the Unit as of the end of the Fixed Rate Renewal Term by the number of Lease Periods in the Fixed Rate Renewal Term

(b)    Fair Market Value Renewal Option    Not less than nine months before the end of each Base Term or Renewal Term for the Undivided Interest in any Unit then subject to this Lease, the Lessee may deliver to the Lessor a written notice irrevocably electing to renew this Lease for the

GM 2001A-8
DOCUMENT 2

Undivided Interest in such Unit at a rental rate described below (a "Fair Market Value Renewal")
The term (the "Fair Market Value Renewal Term") of such Fair Market Value Renewal shall be in
two-year intervals (each ending on a January 2 or July 2) which shall end on the second anniversary
of the commencement of such Fair Market Value Renewal Term (the "Selected FMV Renewal
Expiration Date"), provided, that if such Fair Market Value Renewal Term would exceed 80% of any
Unit's remaining useful life as of the commencement of such Fair Market Value Renewal Term or
would not leave at the end of such Renewal Term an expected residual value of at least 20% of the
Fair Market Sales Value of the Undivided Interest in the Unit as of the commencement of such
Renewal Term, such shorter Fair Market Value Renewal Term as would satisfy such remaining useful
life and residual value standards (which standards shall be established not more than 18 months prior
to the commencement of any such Fair Market Value Renewal Term by an appraiser selected by the
Lessee and reasonably acceptable to the Owner Participant, and such appraiser shall deliver an
appraisal which shall be reasonably acceptable to the Owner Participant) The initial Fair Market
Value Renewal Term shall commence upon the expiration of the Base Term or the Fixed Rate
Renewal Term, and each subsequent Fair Market Value Renewal Term shall commence upon the
expiration of the preceding Fair Market Value Renewal Term During each Fair Market Value
Renewal Term elected by the Lessee pursuant to this Section 18(b), Base Rent for the Undivided
Interest in the Equipment shall be payable to Lessor by Lessee semi-annually in arrears on the Lease
Period Dates and shall be equal to 105% of the Fair Market Rental Value of such Undivided Interest
in the Equipment for the first two terms and 100% of the Fair Market Rental Value of such Undivided
Interest in the Equipment for each subsequent term, provided, however, that if, after the Delivery
Date, a statutory change is enacted or the Internal Revenue Service issues a final Treasury Regulation
(or any other administrative pronouncement upon which lessors and lessees can rely for Federal
income tax purposes, but only if the Lessee provides the Lessor, at the Lessee's expense, with an
unqualified opinion of independent tax counsel selected by the Owner Participant and reasonably
acceptable to the Lessee, to the effect that Fair Market Value Renewal at a rental rate equal to 100%
of then current Fair Market Rental Value will not result in any adverse tax consequences to the Lessor
or the Owner Participant under Code section 467 or any successor provision thereto) in each case that
is in effect at the commencement of the applicable Fair Market Value Renewal Term or amends or
clarifies Treasury Regulation section 1 467-1(h)(6) to provide in substance that rent for a Fair Market
Value Renewal Term may be at a rate equal to 100% of the fair market rental rate determined at the
time of such Fair Market Value Renewal Term, then Base Rent shall be equal to 100% of the Fair
Market Rental Value of such Undivided Interest in the Equipment for each such period Such Fair
Market Rental Value shall be determined by the Appraisal Procedure If no such written notice is
delivered by the Lessee to the Lessor on or before the date that is nine months prior to the end of a
Base Term or the date that is nine months prior to the end of a Fixed Rate Renewal Term or a Fair
Market Value Renewal Term, the Lessee shall be deemed to have waived any right to renew this
Lease At the end of a Base Term, a Fixed Rate Renewal Term or a Fair Market Value Renewal Term
for the Undivided Interest in any Unit, if the Lessee has elected to renew this Lease as aforesaid, this
Lease shall continue in full force and effect during the following Renewal Term, except that (x) the

GM 2001A-8
DOCUMENT 2

Lessee shall pay Lessor Base Rent in the amount set forth above and (y) the Stipulated Loss Values and Termination Values applicable during the Fair Market Value Renewal Term shall initially be the Fair Market Sales Value (determined pursuant to the Appraisal Procedure) of the Undivided Interest in the Equipment as of the commencement of the Fair Market Value Renewal Term, and on each Lease Period Date during the Fair Market Value Renewal Term shall decline on a straight line basis by an amount per Lease Period obtained by dividing the difference between the Fair Market Sales Value of such Undivided Interest in the Equipment as of the beginning of the Fair Market Value Renewal Term and the estimated Fair Market Sales Value of such Undivided Interest in the Equipment as of the end of the Fair Market Value Renewal Term by the number of Lease Periods in the Fair Market Value Renewal Term

(c)    Purchase Options

(i)    Early Purchase Option    The Lessee shall have the right, exercisable by giving written notice (the "EBO Notice") to the Lessor not less than ninety (90) days prior to the EBO Date, to purchase on the EBO Date from the Lessor all of the Lessor's right, title and interest in and to the Undivided Interest in any of the Units then subject to this Lease (the "EBO Purchase Option")  The Lessee shall purchase such Undivided Interest in the Unit or Units pursuant to the EBO Purchase Option for an amount equal to the Early Fixed Price Purchase Amount  Lessee shall also pay at such time (A) all Base Rent due and owing prior to such Lease Period Date and (B) all Supplemental Rent due and owing on or prior to such Lease Period Date (including the amount of the Make-Whole Premium, if any, payable in connection with any redemption or repurchase of Equipment Notes upon the exercise of such purchase option)  Lessee may, at its option, revoke the EBO Notice at any time at least 10 days prior to the EBO Date, and this Lease with respect to the Undivided Interest in the Unit which was the subject of such EBO Notice shall continue in full force and effect, provided, however, that if the Lessee so revokes such EBO Notice within 30 days of the EBO Date, then the Lessee shall be obligated to pay to the Owner Trustee as Supplemental Rent on the EBO Date, an amount equal to 0 75% of the Early Fixed Price Purchase Amount with respect to the Undivided Interest in the Unit  If the Early Fixed Price Purchase Amount with respect to the Undivided Interest in a Unit is payable in more than one installment then (i) on the EBO Date the Lessee shall be deemed automatically to grant, and the Lessor shall automatically obtain, a security interest in each Undivided Interest in the Unit being purchased on such EBO Date to secure the unpaid installments of the Early Fixed Price Purchase Amount, (ii) the Lessee shall execute and file such financing statements and other documents as the Lessor shall reasonably request to evidence and perfect such security interest, and (iii) such security interest shall automatically terminate upon payment in full of all unpaid installments of Early Fixed Price Purchase Amount with respect to the

GM 2001A 8
DOCUMENT 2

Undivided Interest in such Unit  The first installment of Early Fixed Price Purchase Amount shall be at least sufficient to repay principal and interest on the Equipment Notes to the extent provided in <u>Section 6 1(b)(1)</u> of the Indenture and Lessee shall also pay as Supplemental Rent on the date such first installment is payable an amount equal to the Make-Whole Premium, if any, with respect to the Equipment Notes, to the extent so repaid

(ii)    <u>End Term Purchase Option</u>  At the expiration of the Base Term or any Renewal Term, the Lessee shall have the option, exercisable by giving not more than 360 days but at least nine months' irrevocable prior written notice to the Lessor, to purchase on the last Business Day of such Base Term or Renewal Term (the "<u>End Term Date</u>") all of the Lessor's right, title and interest in and to the Undivided Interest in any or all of the Units then subject to this Lease for a purchase price equal to the Fair Market Sales Value of the Undivided Interest in any such Unit on the End Term Date established pursuant to the Appraisal Procedure after Lessee has notified Lessor of its intent to exercise its purchase option pursuant to this <u>Section 18(c)(ii)</u> (the "<u>End Term Purchase Option</u>")  The Lessee shall also pay at such time all amounts of Rent due and owing on the End Term Date and all Supplemental Rent due and owing prior to the End Term Date

(iii)    <u>Owner Participant Becomes Competitor</u>  In the event that the Owner Participant (or any subsequent transferee) or any Affiliate of the Owner Participant (or any subsequent transferee) (each of the foregoing, an "<u>OP Entity</u>"), acquires or is acquired by, merges, or otherwise consolidates with, any company (or any Associated Person of any company) engaged in automobile manufacturing, automobile distribution, automobile parts manufacturing or automobile parts distribution (collectively, the "<u>Automotive Business</u>"), irrespective of whether such company or Associated Person is a direct competitor of the Lessee or any Affiliate of the Lessee, the Lessee may, on the Lease Period Date next following the lapse of the six-month period after the merger, acquisition or consolidation referred to above, upon not less than 30 days' notice, purchase all of the Undivided Interest in the Equipment then subject to this Lease for a price equal to the Termination Value of such Undivided Interest in the Equipment on such Lease Period Date, <u>provided</u>, <u>however</u>, that the foregoing shall not apply to (i) an institutional investor which is solely a passive investor in the financing of equipment or facilities used in the Automotive Business or (ii) an acquisition by an OP Entity as part of a foreclosure or restructuring with respect to a passive investment, and not for the purpose of holding such acquired interest as part of the Owner Participant's normal course business operations  The Lessee shall also pay at such time (A) all Base Rent due and owing on such Lease Period Date (exclusive of any Base Rent designated as Base Rent payable in advance)

GM 2001A-8
DOCUMENT 2

and (B) all Supplemental Rent due and owing on or prior to such Lease Period Date (including the amount of the Make-Whole Premium, if any, payable in connection with any redemption or repurchase of Equipment Notes upon the exercise of such purchase option)

(iv)    Payment of Purchase Price    If the Lessee shall have exercised its EBO Purchase Option, End Term Purchase Option, or its option pursuant to Section 18(c)(iii), the Lessee shall pay (in cash or immediately available funds) the purchase price prescribed above and purchase on the relevant EBO Date, End Term Date or Lease Period Date, as the case may be, the Undivided Interest in the Equipment required to be purchased on such dates   Upon payment by the Lessee to Lessor of the purchase price for such Undivided Interest in the Equipment and all additional amounts specified in Section 18(c)(i), 18(c)(ii) or 18(c)(iii), as the case may be, the Lessor shall transfer to the Lessee, "as-is, where-is" without recourse or warranty but free and clear of Lessor Liens, Owner Participant Liens attributable to it and the Lien of the Indenture (if and to the extent the Indenture Trustee is required to release the same), all the Lessor's right, title and interest in, to and under the Undivided Interest in such Unit   Thereupon the obligations of the Lessee hereunder with respect to such Undivided Interest in the Equipment (other than any such obligations expressed herein as surviving termination of this Lease) shall terminate   Notwithstanding any other provision of this clause (iv), if the Lessee shall have exercised its EBO Purchase Option or its option pursuant to Section 18(c)(iii) and if the Lessee shall have elected, as provided in the Indenture, to issue Unsecured Notes in exchange for the Outstanding Equipment Notes, the Lessee may reduce the aggregate amount payable to Lessor by the principal amount of the Equipment Notes so exchanged   In addition, the Lessee shall pay all costs incurred by the Lessor to effect the transfer of its rights in the Undivided Interest in the Equipment so purchased to the Lessee

(v)    If the Lessee elects to exercise its purchase option under Section 18(c)(i), any amount payable to the Lessor on the EBO Date shall be increased by any positive amount set forth on Schedule V under the caption "Base Rent Amount as of the EBO Date" for the EBO Date or decreased by the absolute value of any negative amount set forth on Schedule V opposite the relevant date under the caption "Base Rent Amount as of the EBO Date "

(vi)    If the Lessee elects to exercise its purchase option under Section 18(c)(iii), any amount payable to the Lessor on the Lease Period Date shall be increased by any positive amount set forth on Schedule IV under the caption "Base Rent Amount as of Termination Date" for the Termination Date on Schedule IV which corresponds to the Lease Payment Date or decreased by the absolute value of any

GM 2001A-8
DOCUMENT 2

negative amount set forth on <u>Schedule IV</u> under the caption "Base Rent Amount as of the Termination Date" for the Termination Date on <u>Schedule IV</u> which corresponds to the Lease Payment Date

(d)    <u>Binding Election</u>  Any election made by the Lessee pursuant to <u>Sections 18(a)</u>, <u>18(b)</u>, <u>18(c)(i)</u>, <u>18(c)(ii)</u> or <u>18(c)(iii)</u> shall be irrevocable by the Lessee (except to the extent such election is made revocable by the corresponding aforementioned section) and such election shall be binding on the Lessor if (i) the Lessee fulfills all of the requirements relating to such election and (ii) on the commencement date of such Renewal Term or the date of purchase, as the case may be, no Event of Default, Material Default or Credit Default shall have occurred and be continuing

SECTION 19    <u>Security for Lessor's Obligation to Holders of Equipment Notes</u>  The Lessor's interest in this Lease has been assigned as security to the Indenture Trustee pursuant to the Indenture for the benefit of the holders from time to time of the Equipment Notes, and the Lessee acknowledges due notice of, and consents to, such security assignment  To the extent, if any, that this Lease and any Lease Supplement constitute chattel paper (as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction), no security interest in this Lease and any Lease Supplement may be created through the transfer or possession of any counterpart other than the original counterpart, which shall be identified as the counterpart containing the receipt therefor executed by the Indenture Trustee as secured party under the Indenture on the signature page thereof. The Lessee hereby accepts and consents to the terms of the Indenture and to the assignment of all the Lessor's right, title and interest in and to this Lease and any Lease Supplements pursuant to the terms thereof

The Lessee agrees to pay directly to the Indenture Trustee (or, after receipt by the Lessee of notice from the Indenture Trustee of the discharge of the Indenture, to the Lessor), all amounts of Rent due or to become due hereunder and assigned to the Indenture Trustee and, in the event the Indenture has not been discharged, to deliver to Indenture Trustee and the Noteholders copies of all notices, opinions, certificates, reports and financial information which the Lessee delivers to the Lessor under any Operative Document  Notwithstanding the foregoing assignment of this Lease, the obligations of the Lessor to the Lessee to perform the terms and conditions of this Lease shall remain in full force and effect and the Lessee agrees to look solely to the Lessor for the performance of such obligations

SECTION 20    <u>Lessor's Right to Perform for Lessee</u>  If the Lessee fails to make any payment of Rent required to be made by it hereunder or fails to perform or comply with any of its agreements contained herein, then the Lessor (subject to <u>Section 8 3(c)(i)(C)</u> of the Indenture) or the Indenture Trustee may, after giving written notice to the Lessee (which notice need not be given to the extent any notice with respect to such failure has previously been given pursuant to <u>Section 15</u>), itself make such payment or perform or comply with such agreement but shall not be obligated here-

GM 2001A-8
DOCUMENT 2

under to do so, and the amount of such payment and the amount of the reasonable expenses of the Lessor or the Indenture Trustee incurred in connection with such payment or the performance of or compliance with such agreement, as the case may be, together with interest thereon at the Overdue Rate, shall be deemed Supplemental Rent, payable by the Lessee upon demand

SECTION 21    Miscellaneous    Any provision of this Lease which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction    No term or provision of this Lease may be changed or waived orally, but only by an instrument in writing signed by the Lessee, the Lessor and any assignee of the Lessor's rights hereunder and the Indenture Trustee, to the extent required by the terms of the Indenture    This Lease shall constitute an agreement of lease, and nothing contained herein shall be construed as conveying to the Lessee any right, title or interest in any Unit except as a lessee only    The Section and paragraph headings in this Lease and the table of contents are for convenience of reference only and shall not modify, define, expand or limit any of the terms or provisions hereof and all references herein to numbered sections, unless otherwise indicated, are to sections of this Lease    This Lease shall in all respects be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York    This Lease may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall (subject to the second sentence of Section 19) be an original, but all such counterparts shall together constitute but one and the same instrument    This Lease is being delivered in the State of New York

SECTION 22    Successor Trustee    The Lessee agrees that in the case of the appointment of any successor Owner Trustee pursuant to the terms of the Trust Agreement and in compliance with Section 11(c) of the Participation Agreement, such successor Owner Trustee shall, upon written notice to the Lessee by such successor Owner Trustee, succeed to all the rights, powers and title of the Lessor hereunder and shall be deemed to be the Lessor and the owner of the Undivided Interest in the Equipment for all purposes hereof without the necessity of any consent or approval by the Lessee (subject to Section 11(c) of the Participation Agreement) and without in any way altering the terms of this Lease or the Lessee's obligations hereunder    One such appointment and designation of a successor Owner Trustee shall not exhaust the right to appoint and designate further successor Owner Trustees pursuant to the Trust Agreement, but such right may be exercised repeatedly as long as this Lease shall be in effect

SECTION 23    Lessee Indemnity.    As provided in Section 8 of the Participation Agreement, the Lessee shall indemnify and hold harmless the Lessor and each other Person entitled to

GM 2001A-8
DOCUMENT 2

indemnification thereunder in the same manner and with the effect as if such Section were set fully forth herein

SECTION 24    Equipment to Remain Personal Property    The Lessee and the Lessor agree that the Equipment, each Unit and every Part thereof and the Undivided Interest therein are severed from, and shall be remain severed from, any real property and are readily moveable, and, even if physically attached to such property, it is the intention of the Lessee and the Lessor that the Equipment, each Unit and every Part thereof and the Undivided Interest therein (i) shall retain the character of personal property, (ii) shall be removable without causing material damage to the real property, (iii) shall be treated as personal property with respect to the rights of all Persons whomsoever, (iv) shall not become part of any real property, and (v) by virtue of its nature as personal property, shall not be affected in any way by any instrument dealing with any real property    The Lessee shall not, without the prior written consent of the Lessor and, until the Lien of the Indenture shall have been discharged in accordance with its terms, the Indenture Trustee, and subject to such conditions as the Lessor and, until the Lien of the Indenture shall have been discharged in accordance with its terms, the Indenture Trustee may impose for their protection, affix or install any Unit to or in any real property in such a manner as to cause or permit such Unit or the Undivided Interest therein to become a fixture or subject to the rights of any Person having an interest in such real property

SECTION 25    Survival

(a)    All indemnities, representations and warranties contained or incorporated by reference in this Lease shall survive, and shall continue in effect following, the execution and delivery of this Lease and the expiration or termination of this Lease

(b)    The obligations of the Lessee to be performed under this Lease prior to the date this Lease is terminated and the obligations of Lessee pursuant to Sections 2(c), 2(d), 3(c), 3(e), 3(f), 5, 6, 9(c), 9(d), 10, 13, 14, 16, 18, 22, 23, 24 and 25 shall survive the expiration or termination of this lease    The extension of any applicable statute of limitations by the Lessor, the Indenture Trustee, the Lessee, the Owner Participant or any Indemnitee shall not affect such survival

SECTION 26    Further Assurances    The Lessee agrees, at its own expense, to promptly and duly execute and deliver to the Lessor and, so long as the Indenture shall remain in effect, the Indenture Trustee, such further documents and assurances and take such further action as the Lessor and, so long as the Indenture shall remain in effect, the Indenture Trustee, may from time to time reasonably request in order to more effectively carry out the intent and purpose of this Lease    The Lessee agrees to establish and protect the rights and remedies created or intended to be created in favor of the Lessor hereunder, and of the Indenture Trustee's interest in this Lease as assigned under the Indenture, including, without limitation, if requested by the Lessor or, so long as the Indenture shall remain in effect, the Indenture Trustee, the execution and delivery or supplements or

GM 2001A-8
DOCUMENT 2

amendments hereto, in recordable form, subjecting any replacement or substituted Undivided Interest in the Equipment to this Lease and the security interest of the Indenture and the recording or filing of counterparts hereof, or of financing statements with respect hereto

SECTION 27    <u>Successors and Assigns</u>    This Lease, including all agreements, covenants, indemnities, representations and warranties contained herein, shall be binding upon and inure to the benefit of the Lessor and the Lessee and their respective successors and permitted assigns

SECTION 28    <u>Assignment by the Lessee</u>    The Lessee may not, without the prior written consent of the Lessor, assign any of its rights hereunder except as otherwise expressly provided herein

\* \* \* \* \* \*

GM2001A-_
DOCUMENT 2

[SIGNATURE PAGE TO THE LEASE AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Lease Agreement to be duly executed as of the date first written above

**GENERAL MOTORS CORPORATION,**
as Lessee

By

Name
Title

**STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION,** not in its individual capacity, except as expressly provided herein, but solely as Owner Trustee, as Lessor

By·

Name.
Title

ELIZABETH C. HAMMER
VICE PRESIDENT

Inspection Schedule Tonawanda Engine

March
Tuesdays          9 00 AM

| Year | Date |
|------|------|
| 1 | 19-Mar-02 |
| 2 | 18-Mar-03 |
| 3 | 23-Mar-04 |
| 4 | 22-Mar-05 |
| 5 | 21-Mar-06 |
| 6 | 20-Mar-07 |
| 7 | 25-Mar-08 |
| 8 | 24-Mar-09 |
| 9 | 23-Mar-10 |
| 10 | 22-Mar-11 |
| 11 | 20-Mar-12 |
| 12 | 26-Mar-13 |
| 13 | 25-Mar-14 |
| 14 | 24-Mar-15 |
| 15 | 22-Mar-16 |

GM 2001A-8
DOCUMENT 2

EXHIBIT A TO
LEASE AGREEMENT

## LEASE SUPPLEMENT (GM 2001A-8)

dated as of December 18, 2001

between

## STATE STREET BANK AND TRUST COMPANY
## OF CONNECTICUT, NATIONAL ASSOCIATION,

not in its individual capacity
except as expressly stated herein,
but solely as Owner Trustee,

as Lessor

and

## GENERAL MOTORS CORPORATION,

as Lessee

CERTAIN RIGHTS OF LESSOR UNDER THIS LEASE SUPPLEMENT HAVE BEEN ASSIGNED TO, AND ARE SUBJECT TO A SECURITY INTEREST IN FAVOR OF, WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE, UNDER THE TRUST INDENTURE AND SECURITY AGREEMENT DATED AS OF DECEMBER 18, 2001, BETWEEN LESSOR AND INDENTURE TRUSTEE, AS SUCH INDENTURE MAY BE AMENDED, MODIFIED OR SUPPLEMENTED FROM TIME TO TIME IN ACCORDANCE WITH THE PROVISIONS THEREOF  THIS LEASE SUPPLEMENT HAS BEEN EXECUTED IN SEVERAL COUNTERPARTS  TO THE EXTENT, IF ANY, THAT THIS LEASE SUPPLEMENT CONSTITUTES CHATTEL PAPER (AS SUCH TERM IS DEFINED IN THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN ANY APPLICABLE JURISDICTION), NO SECURITY INTEREST IN THIS LEASE SUPPLEMENT MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART HEREOF OTHER THAN THE "ORIGINAL EXECUTED COUNTERPART", WHICH SHALL BE IDENTIFIED AS THE COUNTERPART CONTAINING THE RECEIPT THEREFOR EXECUTED BY INDENTURE TRUSTEE ON OR FOLLOWING THE SIGNATURE PAGE THEREOF

THIS COUNTERPART IS [NOT] THE ORIGINAL EXECUTED COUNTERPART

GM 2001A-8
DOCUMENT 2

EXHIBIT A TO
LEASE AGREEMENT

### LEASE SUPPLEMENT (GM 2001A-8)

LEASE SUPPLEMENT (GM 2001A-8), dated as of December 18, 2001, between GENERAL MOTORS CORPORATION ("Lessee") and STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION, not in its individual capacity, but solely as Owner Trustee under the Trust Agreement (such Owner Trustee, in its capacity as such Owner Trustee, being herein called "Lessor")

WHEREAS, Lessor and Lessee have heretofore entered into that certain Lease Agreement (GM 2001A-8), dated as of December 18, 2001, relating to the lease of the Undivided Interest in certain automotive manufacturing equipment (herein called the "Lease", and the defined terms therein being hereinafter used with the same meanings) The Lease provides for the execution and delivery from time to time of Lease Supplements for the purpose of leasing the Undivided Interest in the Equipment under the Lease as and when delivered by Lessor and Lessee and the replacement of existing Lease Supplements, all in accordance with the terms thereof

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, Lessor and Lessee hereby agree as follows

1   Lessor hereby delivers and leases to Lessee under the Lease and Lessee hereby accepts and leases from Lessor under the Lease the Undivided Interest in certain Equipment located in Lessee's production facility at _____ and specified in Schedule I hereto each with the Lessor's Cost, Base Rent, Stipulated Loss Value, Termination Value and EBO Date set forth in Schedules I through V hereto

2   The Last Day of the Base Term, EBO Date and Early Fixed Price Purchase Amount Percentage for the Undivided Interest in the Equipment subject to this Lease Supplement shall be as set forth below

Last Day of the Base Term ___ __ _  _____
EBO Date _____ ___ ___ _____
Early Fixed Price Purchase Amount Percentage _____ _____

3   All of the terms and provisions of the Lease are hereby incorporated by reference in this Lease Supplement to the same extent as if fully set forth herein

4   This Lease Supplement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall

1

GM 2001A-8
DOCUMENT 2

together constitute but one and the same instrument  To the extent, if any, that this Lease Supplement constitutes chattel paper (as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction), no security interest in this Lease Supplement may be created through the transfer or possession of any counterpart other than the original counterpart, which shall be identified as the counterpart containing the receipt therefor executed by Indenture Trustee as secured party under the Indenture on the signature page thereof

5  Lessee confirms that it has accepted delivery of the Undivided Interest in the Equipment for all purposes hereof and of the Lease in good working order and repair and without defect

6  **This Lease Supplement is being delivered in the State of New York and shall in all respects be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.**

[Signature Page Follows]

2

GM 2001A-8
DOCUMENT 2

IN WITNESS WHEREOF, Lessor and Lessee have caused this Lease Supplement to be duly executed on the day and year first above written

**GENERAL MOTORS CORPORATION,**
as Lessee

By    _____
Name  _____
Title   _____

**STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION,** not in its individual capacity, except as expressly provided herein, but solely as Owner Trustee, as Lessor

By    _____
Name  _____
Title   _____

I:\GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt final A 8 wpd

GM 2001A-8
DOCUMENT 2

**EXHIBIT B**
**TO LEASE**
**AGREEMENT**

## FORM OF LEASE ASSIGNMENT

This LEASE ASSIGNMENT is entered into as of _____ 20__, by and between General Motors Corporation, a corporation organized and existing pursuant to the laws of the State of Delaware, as assignor (together with its successors and assigns, the "Lessee") and [_____], a corporation organized and existing pursuant to the laws of the State of _____ (together with its successors and assigns, the "Assignee")

WHEREAS, the Lessee has heretofore entered into a Lease Agreement (GM 2001A-8) (the "Lease") with State Street Bank and Trust Company of Connecticut, National Association, not in its individual capacity except as expressly provided therein, but solely as Owner Trustee (the "Owner Trustee"), dated as of December 18, 2001, in respect of, among other things, the Undivided Interest in the Equipment listed on Schedule 1 hereto (the "Transferred Equipment")

WHEREAS, the Lessee has agreed to assign all of its interest in the Transferred Equipment to the Assignee and the Assignee has agreed to accept all of Lessee's obligations under the Lease and the other Operative Documents

WHEREAS, the Lessee, the Owner Trustee, General Electric Capital Corporation, as Owner Participant and the other parties named therein have entered into a Participation Agreement (GM 2001A-8) dated as of December 18, 2001 (the "Participation Agreement") pursuant to which, among other things, the Lessee sold to the Owner Trustee and the Owner Trustee purchased from the Lessee all of Lessee's right, title and interest in respect of the Transferred Equipment

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein and for other good and valuable consideration, the parties hereto agree as follows

1 Definitions  For purposes of this Lease Assignment, capitalized terms used but not defined herein shall have the meanings assigned to them in Appendix A (such definitions to be equally applicable to both the singular and plural forms of the terms defined) to the Participation Agreement Any term defined by reference to an agreement, instrument or other document shall have the meaning so assigned to it whether or not such document is in effect  Unless otherwise indicated, references in this Lease Assignment to sections, paragraphs, clauses, appendices, schedules and exhibits are to the same contained in or attached to this Lease Assignment

1

GM 2001A-8
DOCUMENT 2

2    Assignment    The Lessee has assigned, transferred and set over and does hereby assign, transfer, and set over unto the Assignee, all of the Lessee's right, title and interest in and to the Lease and the other Operative Documents

3    Assumption    The Assignee hereby assumes, and covenants and agrees to pay, perform and discharge, all of the obligations of the Lessee arising or accruing from and after the effective date of this Agreement under the Operative Documents to which the Lessee is a party and each other contract, agreement, document or instrument hereby assigned to the Assignee, and all of the obligations of the Lessee arising or accruing from and after the effective date of this Agreement  The Assignee hereby confirms that it shall be deemed a party to the Operative Documents to which the Lessee is a party and each such other contract, agreement, document and instrument, and that it shall be bound by all the terms thereof as if therein named as the Lessee  The assignment and assumption effected by this Agreement shall not release the Lessee from its obligations under the Operative Documents to which the Lessee is a party or any such other contract, agreement, document or other instrument, except to the extent such obligations are expressly assumed by the Assignee pursuant to this Section 3

4    Appointment as Attorney-in-Fact    In furtherance of the assignment effected by this Agreement, the Lessee hereby constitutes and appoints the Assignee the true and lawful attorney of the Lessee, with full power of substitution, in the name of the Assignee or in the name of the Lessee but on behalf of and for the benefit of and at the expense of the Assignee, to collect for the account of the Assignee all Undivided Interest in the Equipment sold, transferred or assigned to the Assignee pursuant to this Agreement, to institute and prosecute, in the name of the Lessee or otherwise, but at the expense of the Assignee, all  proceedings that the Assignee may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to the Undivided Interest in the Equipment so sold, transferred or assigned; to defend and compromise at the expense of the Assignee any and all actions, suits or proceedings as to the title to or interest in any of the property so acquired by the Assignee, and to do all such acts and things in relation thereto at the expense of the Assignee as the Assignee shall reasonably deem advisable  The Lessee hereby acknowledges that this appointment is coupled with an interest and is irrevocable by the Lessee in any manner or for any reason or by virtue of any dissolution of the Lessee

5    Payments    The Lessee hereby covenants and agrees to pay over to the Assignee any amounts (including any sums payable as interest in respect thereof) received by it that, under Section 3, belong to the Assignee, and the Assignee hereby covenants and agrees to pay over to the Lessee any amounts (including any sums payable as interest in respect thereof) received by it that, under Section 3, belong to the Lessee

6    Further Assurances    The Lessee shall, at all times and from time to time, upon the request of the Assignee, promptly and duly execute and deliver any and all such further instruments and

2

GM 2001A-8
DOCUMENT 2

documents and take such further action as the Assignee may reasonably request to obtain the full benefits of this Agreement and of the rights and powers herein granted

    7  <u>Representations and Warranties</u>  The Assignee represents and warrants that

        (a)  it has all requisite power and authority and legal right to enter into and carry out the transaction contemplated by this Agreement and to carry out and perform the obligations of the Lessee under the Operative Documents, and, upon giving effect to the transfer being effected hereby, it will not be in breach of any covenant, agreement or condition required to be performed or observed by the Lessee in the Operative Documents,

        (b)  the execution and performance of this Agreement have been duly authorized by all necessary action by the Assignee,

        (c)  on and as of the date hereof, the representations and warranties of the Lessee set forth in <u>Section 8</u> to the Participation Agreement are true and correct as to the Assignee,

        (d)  the transfer to it of all of the Lessee's right, title and interest as Lessee will not violate any provision of, or create a relationship that would be in violation of, any Applicable Law,

        (e)  the transfer to it of all of the Lessee's right, title and interest as Lessee will not involve, either directly or indirectly, the assets of any plan that would cause a violation of any provision of ERISA or the imposition of an excise tax under the Code, and

        (f)  this Agreement constitutes the legal, valid and binding obligation of the Assignee and is enforceable in accordance with its terms

    8  <u>Governing Law</u>  This Agreement shall in all respects be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York

    9  <u>Counterparts</u>  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument

    10  <u>Notices</u>  All notices and other communications provided for hereunder shall be in writing and delivered to each party at the addresses for notices set forth in the Participation Agreement

[Signature Page Follows]

3

GM 2001A 8
DOCUMENT 2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above

[LESSEE], as Lessee

By    _____

Name  _____

Title  _____

[ASSIGNEE], as Assignee

By    _____

Name  _____

Title  _____

4

GM 2001A 8
DOCUMENT 2

EXHIBIT C
TO LEASE
AGREEMENT

FORM OF GUARANTY
OF LEASE ASSIGNMENT

This GUARANTY OF LEASE ASSIGNMENT (this "Guaranty") is entered into as of _____, 20__, by General Motors Corporation, a corporation organized and existing pursuant to the laws of the State of Delaware, as guarantor (together with its successors and assigns, the "Guarantor"), in favor and for the benefit of General Electric Capital Corporation (together with its successors and assigns, the "Owner Participant"), State Street Bank and Trust Company of Connecticut, National Association, not in its individual capacity but solely as owner trustee (together with its successors and assigns, the "Owner Trustee") and Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as indenture trustee (together with its successors and assigns, the "Indenture Trustee"), (the Owner Participant, the Owner Trustee and the Indenture Trustee each being referred to as a "Beneficiary" and collectively as the "Beneficiaries")

WHEREAS, Guarantor, as lessee in such capacity, "Lessee", has heretofore entered into a Lease Agreement (GM 2001A-8) and a Lease Supplement (collectively, the "Lease") with the Owner Trustee dated as of December 18, 2001 in respect of, among other things, the lease of the Transferred Equipment (as defined below) from the Owner Trustee to the Lessee

WHEREAS, the Lessee has concurrently herewith entered into a Lease Assignment (the "Lease Assignment") dated as of _____ 20__, with _____, a corporation organized and existing pursuant to the laws of the State of _____ (the "Assignee"), whereby Lessee assigned all of its right, title and interest under the Lease in and to the Undivided Interest in certain Equipment listed on Schedule 1 to the Lease Assignment (the "Transferred Equipment") to Assignee

WHEREAS, the Guarantor, the Lessee, the Owner Trustee, the Owner Participant and the other parties named therein have entered into a Participation Agreement (GM 2001A-8) dated as of December 18, 2001 (the "Participation Agreement") pursuant to which, among other things, the Lessee agreed to sell to the Owner Trustee and the Owner Trustee agreed to purchase from the Guarantor all of Guarantor's right, title and interest in respect of the Transferred Equipment

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Guarantor hereby agrees with and for each of the Beneficiaries as follows

1

GM 2001A-8
DOCUMENT 2

1    <u>Definitions</u>   For purposes of this Guaranty, capitalized terms used but not defined herein shall have the meanings assigned to them in <u>Appendix A</u> (such definitions to be equally applicable to both the singular and plural forms of the terms defined) to the Participation Agreement   Any term defined by reference to an agreement, instrument or other document shall have the meaning so assigned to it whether or not such document is in effect   Unless otherwise indicated, references in this Guaranty to sections, paragraphs, clauses, appendices, schedules and exhibits are to the same contained in or attached to this Guaranty

2    <u>Guarantee of Obligations under Lessee Operative Documents</u>   The Guarantor (i) irrevocably and unconditionally guarantees to each of the Beneficiaries, and to its successors, transferees and assigns, the due (whether at the stated maturity, by acceleration or otherwise), complete and punctual performance and observance of all payment obligations of Assignee under the Operative Documents to which it is a party (the "<u>Lessee Operative Documents</u>") and the faithful and timely performance of, and compliance with, all other covenants and agreements of Assignee under the Lessee Operative Documents strictly in accordance with the terms thereof (without regard to the effect on such obligations, covenants or agreements of the matters referred to in <u>Sections 2 through 8</u> hereof or any other circumstance) and (ii) agrees to pay any and all costs and expenses (including attorneys' fees and disbursements) which may be paid or incurred by any Beneficiary in enforcing any rights with respect to, or collecting, any or all payments due pursuant to the terms of any of the Lessee Operative Documents and/or enforcing any rights with respect to, or collecting against, the Guarantor under this Guaranty (all such payment obligations and other covenants and agreements being referred to herein as the "<u>Obligations</u>")   In case Assignee shall fail to perform or observe any Obligation referred to in clause (i) or (ii) of the preceding sentence, the Guarantor will forthwith perform and observe such Obligation, or cause the same forthwith to be performed or observed, and, in case Assignee shall fail to pay or perform duly, completely and punctually any Obligation referred to in clause (i) or (ii) of the preceding sentence when and as the same shall be due (whether at the stated maturity, by acceleration or otherwise) and payable, or required to be performed, as the case may be, in accordance with the terms of the respective Lessee Operative Document, the Guarantor will immediately pay or perform as the case may be, the same to the Beneficiary entitled thereto pursuant to such Lessee Operative Document, regardless of whether or not any of the Noteholders, the Indenture Trustee, the Owner Trustee, the Owner Participant or anyone on behalf of any of them shall have instituted any suit, action or proceeding or exhausted its remedies or taken any steps to enforce any rights against the Assignee or any other Person or entity to compel any such performance or to collect all or any part of such amount pursuant to the provisions of the Lessee Operative Documents or at law or in equity, or otherwise, and regardless of any other condition or contingency

3    <u>Payments of Obligations</u>   The Guarantor hereby guarantees that the Obligations will be paid for the benefit of the applicable Beneficiary without set-off or counterclaim in lawful currency of the United States of America at the office of the applicable Beneficiary as set forth in <u>Schedule 8</u> to the Participation Agreement   The Guarantor shall make any payments required hereunder upon receipt of written notice thereof from the applicable Beneficiary, <u>provided, however,</u> that the failure

2

of the applicable Beneficiary to give such notice shall not affect the Guarantor's obligations hereunder

4    Waiver by Guarantor    The Guarantor hereby waives absolutely and irrevocably any claim which it may have against the Assignee, any Beneficiary or any of their respective Affiliates by reason of any payment to any other Person pursuant to or in respect of this Guaranty, including any claims by way of subrogation, contribution, reimbursement, indemnity or otherwise

5    Amendments etc with Respect to the Obligations    The Guarantor shall remain fully obligated hereunder notwithstanding that, without any reservation of rights against the Guarantor and without notice to or further assent by the Guarantor, at any time and from time to time, in whole or in part (a) any demand for payment or performance of any of the Obligations made by any Beneficiary may be rescinded by such party and any of the Obligations continue, (b) the Obligations, or the liability of any other party upon or for any part thereof, and any collateral security or guarantee therefor or right of offset with respect thereto, may be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by any Beneficiary, (c) any Lessee Operative Document, and any collateral security document or other guarantee or document related thereto, may be amended, modified, supplemented or terminated, as the parties thereto may deem advisable, (d) any collateral security, guarantee or right of offset held by any Beneficiary for the payment or performance of the Obligations may be sold, exchanged, waived, surrendered or released, and (e) any increase in the amount of the Obligations    No Beneficiary shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations or for this Guaranty or any property subject thereto    For the purposes hereof, "demand" shall include the commencement and continuance of any legal proceedings

6    Waiver by the Guarantor, No Waiver by Beneficiaries    The Guarantor unconditionally waives, to the fullest extent permitted by law, any and all (a) notices of the creation, renewal, extension or accrual of any Obligation or any notice of or proof of reliance by any of the Beneficiaries upon this Guaranty or acceptance of this Guaranty (the Obligations, and any of them, shall conclusively be deemed to have been created, contracted, incurred or renewed, extended, amended or waived in reliance upon this Guaranty, and all dealings between Lessee or the Guarantor and each Beneficiary shall be conclusively presumed to have been had or consummated in reliance upon this Guaranty), (b) notices which may be required by statute, rule of law or otherwise, now or hereafter in effect, to preserve intact any rights of any of the Beneficiaries against the Guarantor, including, without limitation, any demand, presentment and protest, proof of notice of non-payment under any Lessee Operative Document and notice of default or any failure on the part of Assignee to perform and comply with any Obligation, (c) rights to the enforcement, assertion or exercise by any of the Beneficiaries of any right, power, privilege or remedy conferred herein or in any Lessee Operative Document or otherwise, (d) requirements of promptness or diligence on the part of any of the Beneficiaries, (e) requirements on the part of any of the Beneficiaries to mitigate the damages resulting from any default hereunder or under any Lessee Operative Document, (f) notices of the sale,

3

GM 2001A-8
DOCUMENT 2

transfer or other disposition of any right, title to or interest in any Lessee Operative Document or (g) other circumstances whatsoever which might otherwise constitute a legal or equitable discharge, release or defense of a guarantor or surety, or which might otherwise limit recourse against the Guarantor  No failure to exercise and no delay in exercising, on the part of any Beneficiary, any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof, or the exercise of any other power or right  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law

7    Guaranty of Payment and Performance    This Guaranty is a primary obligation of the Guarantor and not one of surety and is an unconditional, absolute, present and continuing obligation and guaranty of payment and performance (and not merely of collection), and the validity and enforceability of this Guaranty shall be absolute and unconditional irrespective of, and shall not be impaired, affected or in any way conditioned or contingent upon, (a) the making of demand, the institution of suit or the taking of any other action to enforce performance or observance of the Obligations, (b) the validity, regularity or enforceability of any Lessee Operative Document or any of the Obligations or any collateral security, other guarantee, if any, or credit support therefor or right of offset with respect thereto at any time or from time to time held by any Beneficiary, (c) any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to or be asserted by Assignee or the Guarantor against any Beneficiary, or (d) any attempt to collect from Assignee or any other entity or to perfect or enforce any security or upon any other condition or contingency

8    Guarantor's Obligations Not Affected    The duties and obligations of the Guarantor under this Guaranty shall remain in full force and effect, without the necessity of any reservation of rights against the Guarantor and without notice to or further assent by, the Guarantor, at any time and from time to time, in whole or in part, and without regard to, and shall not be impaired or affected by any of the following  (a) any extension, modification or renewal of, termination, addition or supplement to, or deletion from any of the terms of or indulgence with respect to, or substitutions for, the Obligations or any part thereof or any agreement relating thereto at any time, (b) any failure or omission to enforce any right, power or remedy with respect to the Obligations or any part thereof or any agreement relating thereto, (c) any waiver of any right, power or remedy or of any default with respect to the Obligations or any part thereof or any agreement relating thereto, (d) any release, surrender, compromise, settlement, waiver, subordination or modification, with or without consideration, of any other guarantees with respect to the Obligations or any part thereof, or any other obligation of any Person with respect to the Obligations or any part thereof, (e) the enforceability or validity of the Obligations or any part thereof or the genuineness, enforceability or validity of any agreement relating thereto, (f) any change in the ownership of the Assignee or the insolvency, bankruptcy or any other change in the legal status of the Assignee or any rejection or modification of the obligations of the Lessee or those of any person under the Lessee Operative Documents as a result of any bankruptcy, reorganization, insolvency or similar proceeding, (g) the change in or the

4

GM 2001A 8
DOCUMENT 2

imposition of any law, decree, regulation or other governmental act which does or might impair, delay or in any way affect the validity, enforceability or the payment when due of the Obligations, (h) the failure of the Assignee or the Guarantor to maintain in full force, validity or effect or to obtain or renew when required all governmental and other approvals, licenses or consents required in connection with the Obligations or this Guaranty, or to take any other action required in connection with the performance of all obligations pursuant to the Obligations or this Guaranty, (i) the existence of any claim, set-off or other rights which the Guarantor may have at any time against the Assignee or any other Person in connection herewith or with an unrelated transaction, (j) any limitation of the remedies of any Beneficiary under any of the Lessee Operative Documents or any limitation of the liability of Assignee under the terms of any Lessee Operative Document, which may now or hereafter be imposed by any statute, regulation or Applicable Law, (k) any merger or consolidation of Assignee or the Guarantor into or with any other Person, or any sale, lease or transfer of any or all of the assets of Assignee or the Guarantor to any other Person, (1) any indebtedness of Assignee to any Person, including the Guarantor, or (m) any other action, occurrence or circumstance, whatsoever.

9    Substituted Lessee.    If the Lease or the Lease Assignment is rejected or deemed rejected in any bankruptcy, reorganization or other similar proceeding filed against the Lessee or the Assignee, as the case may be, the Guarantor shall, without further act, succeed to and be bound by, all of the rights and obligations of the Lessee or the Assignee under the Lease or this Lease Assignment as of the date immediately preceding the date of the filing of the petition for relief in such proceeding, including any obligation to cure any default or Event of Default by the Lessee under the Lease or the Assignee under this Lease Assignment, as the case may be, or under any other Lessee Operative Document   It is the intention of the parties hereto that any such rejection of the Lease, this Lease Assignment or any other Lessee Operative Document shall not terminate such document but shall without further act, effect a substitution of the Guarantor for the Lessee or the Assignee under the Lease, this Lease Assignment and the other Lessee Operative Documents so that the Lessee, the Assignee or either party's trustee shall immediately upon such rejection surrender possession of the Undivided Interest in the Equipment to the Guarantor

10    No Subrogation, Reinstatement   The Guarantor shall be subrogated to the rights of any Beneficiary in respect of any payment made by the Guarantor hereunder for the benefit of, or any set-off or application or appropriation of funds by the Guarantor by, such Beneficiary, provided that the Guarantor shall not be entitled to take any action, or exercise any right, with respect to any such right of subrogation or otherwise exercise any of the rights of any Beneficiary against Assignee or any collateral security or guarantee or other credit support or right of offset held by any Beneficiary for the payment of the Obligations, nor shall the Guarantor seek or be entitled to seek any reimbursement from Assignee in respect of payments made by the Guarantor hereunder, until all amounts and all performance owing to each and every Beneficiary by Assignee on account of the Obligations are paid and performed in full   This Guaranty shall continue to be effective, or be reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Obligations is rescinded or must otherwise be restored or returned by any Beneficiary upon the bankruptcy, insolvency, reorganization,

5

GM 2001A-8
DOCUMENT 2

arrangement, adjustment, composition, dissolution, liquidation, or the like, of Assignee or the Guarantor, or as a result of the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to Assignee or the Guarantor or any substantial part of such Person's respective property, or otherwise, all as though such payment had not been made notwithstanding any termination of this Guaranty or any Operative Document

11    Term of Agreement    This Guaranty and all guarantees, covenants and agreements of the Guarantor contained herein shall continue in full force and effect and shall not be discharged until such time as all of the Obligations shall be paid in full and all of the agreements of the Assignee and the Guarantor hereunder and under the Lessee Operative Documents shall be duly performed

12    Survival    All warranties, representations and covenants made by the Guarantor herein or in any certificate or other instrument delivered by it or on its behalf under this Guaranty or any other Operative Document shall be considered to have been relied upon by the Beneficiaries and shall survive the execution and delivery of this Guaranty, regardless of any investigation made by the Beneficiaries on behalf of any of them    All statements in any such certificate or other instrument shall constitute warranties and representations by the Guarantor hereunder

13    Severability    Any provision of this Guaranty which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction    To the extent permitted by Applicable Law, the Guarantor hereby waives any provision of law which renders any provision hereof prohibited or unenforceable in any respect

14    Legal Actions and Consent to Jurisdiction

(a)    Any suit, action or proceeding, whether at law or in equity, including any declaratory judgment or similar suit or action, arising out of or relating to this Guaranty may be instituted by or against the Guarantor in any state or Federal court of competent jurisdiction in the County of New York, State of New York    The Guarantor waives any option or objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding, and irrevocably submits to the jurisdiction of any such court in any such suit, action or proceeding.

(b)    The parties agree that a remedy at law for a violation of this Section 14 may not be adequate and therefore agree that the remedies of specific performance and injunctive relief shall be available in the event of any violation in addition to any other right or remedy at law or in equity to which the parties hereto may be entitled

I \GEN\MOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt final A 8 wpd

GM 2001A-8
DOCUMENT 2

15    Notices    All notices, demands, instructions or other communications required or permitted to be given to or made upon any party hereto shall be given in accordance with the provisions of the Lease and at the address either set forth therein or as provided on the signature page hereof

16    Amendments, Waivers, etc    No provision of this Guaranty shall be waived, amended, terminated or supplemented except by a written instrument executed by the Guarantor and each Beneficiary  The Guarantor hereby acknowledges and consents to the assignment of all of the Owner Trustee's rights hereunder subject to the terms and conditions of the Indenture

17    GOVERNING LAW    THIS GUARANTY SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE DOMESTIC LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK

18    Counterparts.    This Guaranty and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument

7

GM 2001A-8
DOCUMENT 2

IN WITNESS WHEREOF, the undersigned have caused this Guaranty to be duly executed as of the date first written above

GENERAL MOTORS CORPORATION

By     _____

       Name

       Title

AGREED TO AND ACCEPTED BY

[_____],

as Owner Trustee

By     _____

       Name.

       Title

**[OWNER PARTICIPANT]**

By     _____

       Name

       Title

[_____],

as Indenture Trustee

By     _____

       Name·

       Title·

I \GENMOT\GM\2001 Leaseback\Equity Docs\Lease Docs\Finals\2001A Lease Agmt final A 8 wpd

# TAB - 3

GM 2001A-8
DOCUMENT 3

# LEASE SUPPLEMENT (GM 2001A-8)

dated as of December 18, 2001

between

## STATE STREET BANK AND TRUST COMPANY
## OF CONNECTICUT, NATIONAL ASSOCIATION,

not in its individual capacity
except as expressly stated herein,
but solely as Owner Trustee,

as Lessor

and

## GENERAL MOTORS CORPORATION,

as Lessee

CERTAIN RIGHTS OF LESSOR UNDER THIS LEASE SUPPLEMENT HAVE BEEN ASSIGNED TO, AND ARE SUBJECT TO A SECURITY INTEREST IN FAVOR OF, WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE, UNDER THE TRUST INDENTURE AND SECURITY AGREEMENT DATED AS OF DECEMBER 18, 2001, BETWEEN LESSOR AND INDENTURE TRUSTEE, AS SUCH INDENTURE MAY BE AMENDED, MODIFIED OR SUPPLEMENTED FROM TIME TO TIME IN ACCORDANCE WITH THE PROVISIONS THEREOF. THIS LEASE SUPPLEMENT HAS BEEN EXECUTED IN SEVERAL COUNTERPARTS. TO THE EXTENT, IF ANY, THAT THIS LEASE SUPPLEMENT CONSTITUTES CHATTEL PAPER (AS SUCH TERM IS DEFINED IN THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN ANY APPLICABLE JURISDICTION), NO SECURITY INTEREST IN THIS LEASE SUPPLEMENT MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART HEREOF OTHER THAN THE "ORIGINAL EXECUTED COUNTERPART", WHICH SHALL BE IDENTIFIED AS THE COUNTERPART CONTAINING THE RECEIPT THEREFOR EXECUTED BY INDENTURE TRUSTEE ON OR FOLLOWING THE SIGNATURE PAGE THEREOF

THIS COUNTERPART IS [NOT] THE ORIGINAL EXECUTED COUNTERPART

GM 2001A-8
DOCUMENT 3

## LEASE SUPPLEMENT (GM 2001A-8)

LEASE SUPPLEMENT (GM 2001A-8), dated as of December 18, 2001, between GENERAL MOTORS CORPORATION ("Lessee") and STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION, not in its individual capacity, but solely as Owner Trustee under the Trust Agreement (such Owner Trustee, in its capacity as such Owner Trustee, being herein called "Lessor")

WHEREAS, Lessor and Lessee have heretofore entered into that certain Lease Agreement (GM 2001A-8), dated as of December 18, 2001, relating to the lease of the Undivided Interest in certain automotive manufacturing equipment (herein called the "Lease", and the defined terms therein being hereinafter used with the same meanings) The Lease provides for the execution and delivery from time to time of Lease Supplements for the purpose of leasing the Undivided Interest in the Equipment under the Lease as and when delivered by Lessor and Lessee and the replacement of existing Lease Supplements, all in accordance with the terms thereof

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, Lessor and Lessee hereby agree as follows

1   Lessor hereby delivers and leases to Lessee under the Lease and Lessee hereby accepts and leases from Lessor under the Lease the Undivided Interest in certain Equipment located in Lessee's production facility at Tonawanda, New York and specified in Schedule I hereto each with the Lessor's Cost, Base Rent, Stipulated Loss Value, Termination Value and EBO Date set forth in Schedules I through V hereto

2   The Last Day of the Base Term, EBO Date and Early Fixed Price Purchase Amount Percentage for the Undivided Interest in the Equipment subject to this Lease Supplement shall be as set forth below

Last Day of the Base Term  March 18, 2016
EBO Date  July 2, 2009
Early Fixed Price Purchase Amount Percentage  as set forth in Schedule V

3   All of the terms and provisions of the Lease are hereby incorporated by reference in this Lease Supplement to the same extent as if fully set forth herein

4   This Lease Supplement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument   To the extent, if any, that this Lease

- 2 -

GM 2001A-8
DOCUMENT 3

Supplement constitutes chattel paper (as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction), no security interest in this Lease Supplement may be created through the transfer or possession of any counterpart other than the original counterpart, which shall be identified as the counterpart containing the receipt therefor executed by Indenture Trustee as secured party under the Indenture on the signature page thereof

5  Lessee confirms that it has accepted delivery of the Undivided Interest in the Equipment for all purposes hereof and of the Lease in good working order and repair and without defect

**6  This Lease Supplement is being delivered in the State of New York and shall in all respects be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.**

[Signature Page Follows]

- 3 -

GM2001A-_
DOCUMENT 3

## [SIGNATURE PAGE TO THE LEASE SUPPLEMENT]

IN WITNESS WHEREOF, Lessor and Lessee have caused this Lease Supplement to be duly executed on the day and year first above written

**GENERAL MOTORS CORPORATION,**
as Lessee

By _____
Name
Title

**STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION**, not in its individual capacity, except as expressly provided herein, but solely as Owner Trustee, as Lessor

By _____
Name
Title        ELIZABETH C HAMMER
             VICE PRESIDENT

SCHEDULE I
TO
LEASE SUPPLEMENT (2001A-8)

"Engine Line" means an engine line and the related equipment described below delivered pursuant to the Lease so long as title thereto or beneficial ownership thereof shall remain vested in Lessor (or its permitted successors or assigns) in accordance with the terms of the Lease (b) any and all Parts (i) so long as the same shall be incorporated or installed in such engine line (except Parts temporarily installed on an emergency basis as described in Section 8(a) of the Lease) or (ii) so long as title thereto or beneficial ownership thereof shall remain vested in Lessor (or its permitted successors or assigns) in accordance with the terms of Section 8 of the Lease after removal from such engine line (c) the Assigned Proprietary Rights and (d) any equipment substituted for or in replacement of such engine line and any Modification to such engine line so long as title thereto or beneficial ownership thereof shall remain vested in Lessor (or its permitted successors or assigns) in accordance with the terms of the Lease. The term "Engine Line" does not include proprietary tooling. Capitalized terms not defined herein have the meanings given to them in Appendix A to the Participation Agreement. As of the Delivery Date, the Engine Line consists of, without limitation, the following.

| Tag Number | Description |
|---|---|
| NAMM27897 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAM7271 | L-18 ENGINE ASM LINE |
| NAMM27895 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAMM26916TSD | L 18 VALVETRAIN IGNITION COLD TEST |
| NAMM27896 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAM7271INST | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM27851 | MARK ASM MANIFOLD MANIPLLATOR |
| NAM7271F | L 18 ENGINE LINE FOUNDATION |
| NAMM27856 | MARK ASSY UTICOR MESSAGE DISPLAY |
| NAM7271ELECT | L 18 ENGINE ASM LINF(ELFCTRICAL) |
| NAMM27943 | MARK ASM ENGINE STAND |
| NAM7271INS1 | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM28025 | MARK ASM KBK BRIDGE SYSTEM |
| NAM7271FC | L 18 ENGINE LINE POA 5--7 |
| NAMM28027 | MARK ASM KBK BRIDGE SYSTEM |
| NAM7271J | L 18 ASM LINE I UBF EQUIP ETC |
| NAMM28028 | MARK ASM KBK BRIDGE SYSTEM |
| NAM7271PMC | L-18 ASM LINE P M & C SYSTEM |
| NAMM27838 | MARK ASM 54X54 LIFT TABLE |
| NAM7271P | L-18 ASM LINE LEAK TEST EQUIPMENT |
| NAMM27862 | MARK V ASM ERRORPROFFING-LIGHTING |
| NAM7271FA | L 18 FNGINE ASM POA 1 |
| NAMM27918 | MARK ASM ENGINE STAND |
| NAM7271A | L 18 ASM LINE IMPROVEMENTS |
| NAMM27861 | MARK V ASM LIGHTING TRANSFORMER |
| NAM7271SWARE | L-18 ENGINE ASM LINE CONTROLS |
| NAMM27898 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMBG5728 | L 18 ASM LINE KBK TRUSS REINFORCEMENT |
| NAMM27899 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271FB | L 18 ENGINE LINE POA4 |
| NAMM27900 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271PFOR | L -18 ASM ELEVATED PLATFORM |
| NAMM27901 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271KBK | L18 ASM LINE KBK BRIDGE COMPONENTS |
| NAMM27902 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7273 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27904 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7274 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27905 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7275 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27906 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7276 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27907 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271ANSYS | L 18 ASM LINE ANDON SYSTEM-FOR BOARDS |
| NAMM27908 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMBG5728A | REINFORCE TRUSSES-L 18 ASM LINE |
| NAMM27909 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271N | L 18 ASM LINE WIREWAY |
| NAMM27903 | MARL ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271L | L 18 ASM LINE BUS PLUGS |
| NAM7271QCA | L-18 ASM LINE Q C & A SYSTEM |
| NAM7271I | L18 ASM LINE CPU UPGRADE NEMATRON COMPUTERS |
| NAMM26916TS1 | L -18 TEST STANDS |
| NAM7271ANDON | L 18 ASM LINE ANDON EQUIPMENT |
| NAM7271PTASM | L-18 ASM LINE POWERTRAIN ASM SYSTEM |
| NAM7271ELEC3 | L-18 ASM LINE ELECTRICALS |
| NAM7271LOAD | L-18 ASM LINE UPLOAD/DOWNLOAD SYSTEM |
| NAMM28286 | L18 ASM LINE 48X45 FLOW THRU X OVER PIPES |
| NAMM28289 | L18 ASM LINE 54X48 FLOW THRU EXH MANIFOLDS |
| NAMM28278 | L18 ASM LINE 54X48 OIL PAN FLOW THRU |
| NAMM28285 | L18 ASM LINE 54X48 FLOW THRU FUEL RAILS |

tonowanda L18 assembly--UCC(A7&8) 01 xls xls

| | |
|---|---|
| NAMM28287 | 1 18 ASM LINE 48X45 FLOW THRU WATER PUMPS |
| NAMM28290 | L18 ASM LINE 54X48 FLOW THRU EXH MANIFOLDS |
| NAM7271PCTWR | L-18 ASM LINE PC TOWER |
| NAM7271C | L  18 ASSEMBLY LINE EXTRAS |
| NAM7271R | L-18 ASM LINE GUARD RAILS |
| NAMM28347 | L18 OIL FILL(COOLANT/HEATER) TEMP CONTROL |
| NAMM28288 | L18 ASM LINE 36X32/54X48 FLOW THRU FLYWHEELS |
| NAMM28279 | L 18 ASM 1 INE 36X32 FLOW THRU BALANCERS |
| NAMM28258 | L-18 ASM DATA COLLECTION SYSTEM |
| NAMM28112 | L 18 ASSY LINE SINK UNIT |
| NAMM28113 | 1 18 ASSY LINE SINK UNIT |
| NAMM28114 | L 18 ASSY LINE SINK UNIT |
| NAMM28116 | L 18 ASSY LINE SINK UNIT |
| NAMM28115 | L 18 ASSY LINE SINK UNIT |
| NAMM28117 | L 18 ASSY LINE SINK UNIT |
| NAM7271ELEC2 | L  18 ENG ASM ELECTRICAL |
| NAMM28280 | L18 ASM LINE 48X40 FLOW THRU CYL HEADS |
| NAMM28277 | 1 18 ASM LINE 45X40 FLOW THRU CASES |
| NAMM28281 | L18 ASM LINE 48X40 FLOW THRU CYL HEADS |
| NAM7271O | L-18 ASM LINE WIREWAY-STATIONS |
| NAM7271I1 | 1  -18 ASSEMBLY LINE EXTRAS |
| NAMM28283 | 1 18 ASM LINE 54X48 FLOW THRU RKR COVERS |
| NAMM28284 | L18 ASM 1 INE 54X48 FLOW THRU RKR COVERS |
| NAM7271G | L  18 ASSEMBLY LINE EXTRAS |
| NAM7271K | L-18 ASM LINE SQUARE D POWER |
| NAM7271D | L -18 ASSEMBLY LINE EXTRAS |
| NAMM28234 | L -18 ASSY TEAM ROOM |
| NAMM28346 | L18 OIL FILL DYE INJECTION SYSTEM |
| NAM7271ELEC1 | L  18 ENG ASM ELECTRICAL |
| NAMM28023 | L 18 ACCESSORY DRIVE BRACKET MANIPULATOR |
| NAMM28018 | L 18 BALANCER==--- MANIPULATOR |
| NAMM28024 | L 18 BELL HOUSING MANIPULATOR |
| NAMM28017 | L 18 CRANK ASSY— MANIPULATOR |
| NAML18ENGRAC | L 18 ENGINE RACKS(970) GM32076 |
| NAMM28022 | L-18 FLYWHEEL-—-— MANIPULATOR |
| NAM7271FD | L 18 ENGINE LINE FOUNDATION |
| NAMM28016 | L 18 INLET MAN ASSY MANIPULATOR |
| NAMM28020 | L 18 L H HEAD-==-— MANIPULATOR |
| NAMM26916TS2 | L  18 TEST STANDS |
| NAMM28019 | L-18 OIL  PAN-—-— MANIPULATOR |
| NAM7271INS1B | L 18 ENGINE ASM LINE(INSTALL ) |
| NAMM28021 | L-18 R H HEAD-—-— MANIPULATOR |
| NAM7271INS2 | L 18 ENGINE ASM LINE(INSTALL ) |
| NAM7271M | L-18 ASM LINE ENG SVS WIRE WAY |
| NAMM28468 | OCE 9600 DIGITAL ENG  PRINT  SYSTEM |
| NAMM28323 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28324 | 3/4 TON AIR HOIST(BUCKETS) 1 18 REPAIR LOOP |
| NAMM28325 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAM7271INS1A | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM28326 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAM7271Q | L 18 ASM LINE BALANCERS |
| NAM7271S | L-18 ASM LINE EMPTY PALLET STORAGE SYSTEM |
| NAM7271E | L -18 ASSEMBLY LINE EXTRAS |
| NAMM28234A | L -18 ASSY TEAM ROOM |
| NAMM28128 | MARK ASM/PIST AREA LIFT&TILT TABLE |
| NAMM28248 | L -18 ASSY TEAM ROOM |
| NAMM28129 | MARK ASM/PIST AREA LIFT&TILT TABLE |
| NAMM28246 | L -18 ASSY TEAM ROOM |
| NAMM28300 | L 18 ASM HOHL CART 22960 |
| NAMM28244 | L -18 ASSY TEAM ROOM |
| NAMM28302 | L 18 ASM HOHL CART 22960 |
| NAMM28249 | L  18 ASSY TEAM ROOM |
| NAMM28295 | L 18 ASM HOHL CART 22960 |
| NAMM28247 | L  18 ASSY TEAM ROOM |
| NAMM28296 | L 18 ASM HOHL CART 22960 |
| NAMM28245 | L -18 ASSY TEAM ROOM |
| NAMM28297 | L 18 ASM HOHL CART 22960 |
| NAMM28243 | L -18 ASSY TEAM ROOM |
| NAMM28298 | L 18 ASM HOHL CART 22960 |
| NAMM28242 | L -18 ASSY TEAM ROOM |
| NAMM28299 | L 18 ASM HOHL CART 22960 |

| | |
|---|---|
| NAMM28241 | L -18 ASSY TEAM ROOM |
| NAMM28301 | L 18 ASM HOHL CART 22960 |
| NAMM28234B | L -18 ASSY TEAM ROOM |
| NAMM28303 | L 18 ASM HOHL CART 22960 |
| NAMM28270 | L 18 ANDON BOARD |
| NAM7271B | L -18 ASSEMBLY LINE EXTRAS |
| NAMM28269 | L 18 ANDON BOARD |
| NAM7271PMCSW | L-18 ASM LINE P M & C SOFTWARE |
| NAMM28188A | I 18 NAPP ELECTRONIC PULL SYSTEM |
| NAMM28321 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28328 | 3/4 TON AIR HOIST(BUCKFTS) L18 REPAIR LOOP |
| NAMM28268F | L 18 HEAD LIFT TABLE FOUNDATION |
| NAMM28475 | L-18 CRANK OP70/80 9000CFM OIL MIST COLLECTOR |
| NAM7308 | PLI TOOL ROOM EZ TRAK CNC MACHINE |
| NAM7272A | L 18 OP120 CRANKSHAFT MACHINE |
| NAMM28381 | OKAMOTO ACC-6 18 DX3 SURFACE GRINDER |
| NAM7307 | PLI TOOL ROOM EZ TRAK CNC MACHINE |
| NAM7210A | PARLEC MODEL 260-TOOL SETTER |
| NAM7272INST | L 18 OP 120 CRANK MACHINE INSTALLATION |
| NAMM28276 | L 18 ANDON BOARD |
| NAMM28275 | L 18 ANDON BOARD |
| NAMS403FOUND | L 18 HEAD BROACH FOUNDATION |
| NAM7284A | L 18 CYL HEAD ASM MACHINE |
| NAMM28033B | MARC HEAD OP180 HELI FLOW MIST COLLECTOR |
| NAMM28033A | MARC HEAD OP180 HELI FLOW MIST COLLECTOR |
| NAMM28274 | L 18 ANDON BOARD |
| NAMM28273 | L 18 ANDON BOARD |
| NAM7301 | L 18 AUDIT CMM MACHINE |
| NAM7267INSTA | I 18 BLOCK INSTALLATION(TONA) |
| NAMM28272 | L 18 ANDON BOARD |
| NAMM28271 | L 18 ANDON BOARD |
| NAML18ENGRAC | L 18 ENGINE RACKS(970) GM32076 |
| NAM7271FD | L 18 ENGINE LINE FOUNDATION |
| NAMM26916TS2 | L 18 TEST STANDS |
| NAM7271INS1B | L 18 ENGINE ASM LINE(INSTALL) |
| NAM7271INS2 | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM28468 | OCE 9600 DIGITAL ENG PRINT SYSTEM |
| NAM7271INS1A | L 18 ENGINE ASM LINE(INSTALL) |
| NAM7271S | L 18 ASM LINE EMPTY PALLET STORAGE SYSTEM |
| NAMM28234A | L -18 ASSY TEAM ROOM |
| NAMM28248 | L 18 ASSY TEAM ROOM |
| NAMM28246 | L 18 ASSY TEAM ROOM |
| NAMM28244 | L 18 ASSY TEAM ROOM |
| NAMM28249 | L 18 ASSY TEAM ROOM |
| NAMM28247 | L 18 ASSY TEAM ROOM |
| NAMM28245 | L 18 ASSY TEAM ROOM |
| NAMM28243 | L 18 ASSY TEAM ROOM |
| NAMM28242 | L -18 ASSY TEAM ROOM |
| NAM28241 | L 18 ASSY TEAM ROOM |
| NAMM28234B | L -18 ASSY TEAM ROOM |
| NAM28270 | L 18 ANDON BOARD |
| NAMM28269 | L 18 ANDON BOARD |
| NAMM28188A | L18 NAPP ELECTRONIC PULL SYSTEM |
| NAMM28268F | L 18 HEAD LIFT TABLE FOUNDATION |
| NAM7264 | L 18 CRANK BALANCER MACHINE |
| NAM7266 | L-18 CRANK OP 110 MACHINE |
| NAM7505A | |
| NAMM27976 | MARK OP 170 CRANK MIST COLLECTOR |
| NAM7584A | L 850 CRANK GAGING MACHINE |
| NAMM27938 | 4 CRANK OP30 AIR CLEANER |
| NAMM29003A | L 850 CRANK LINE 1 GANTRY ROBOT |
| NAMM29039A | L 850 CRANK LINE 2 LOAD CONVEYOR |
| NAMM27836A | MARK CRK OP 50 ELECTRIC BRIDGE |
| NAMBG5680A | L 850 CRANK COOLANT BUILDING |
| NAMM27879 | MARK CRANK OP 60 MONORAIL |
| NAMM29267 | L 850 CRANK ANDON BOARD |
| NAMM29268 | L 850 CRANK ANDON BOARD |
| NAMM29269 | L 850 CRANK ANDON BOARD |
| NAMM29270 | L 850 CRANK ANDON BOARD |
| NAM7577A | L 850 CRANK ZEISS PRISMO |
| NAMM29221 | L 850 CRANK LOAD ASSIST |
| NAMM28041 | MARK CRANK OP90 MANIPULATOR |
| NAMM27971 | MARK CRK OP 110 MANIPULATOR |
| NAMM28029 | MARK CRANK OP80 MANIPUILATOR |

| | |
|---|---|
| NAMM27919 | MARK CRANK 44 X 54 PENTALIFT TABLE |
| NAMM28045 | MARK CRANK OP 90 44X54 TABLE |
| NAMM27509A | MARK CRANK COOL REFRIG HEAT UNIT |
| NAMM27920 | MARK CRANK 44 X 54 PENTALIFT TABLE |
| NAMM27810 | MARK CASE OP 170 MIST ENCLOSURE |
| NAMM27807 | MARK CASE CM POSITECH MANIPULATOR |
| NAMM27897 | MARK ASM HOT TEST KDK BRIDGE SYSTEM |
| NAMM27895 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAMM27896 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAMM27851 | MARK ASM MANIFOLD MANIPULATOR |
| NAMM27856 | MARK ASSY UTICOR MESSAGE DISPLAY |
| NAMM27943 | MARK ASM ENGINE STAND |
| NAMM28025 | MARK ASM KBK BRIDGE SYSTEM |
| NAMM28027 | MARK ASM KBK BRIDGE SYSTEM |
| NAMM28028 | MARK ASM KBK BRIDGE SYSTEM |
| NAMM27838 | MARK ASM 54X54 LIFT TABLE |
| NAMM27862 | MARK V ASM ERRORPROFFING-LIGHTING |
| NAMM27918 | MARK ASM ENGINE STAND |
| NAMM27861 | MARK V ASM LIGHTING TRANSFORMER |
| NAMM27898 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27899 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27900 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27901 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27902 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27904 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27905 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27906 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27907 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27908 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27909 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27903 | MARL ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7270 | L 18 CRANK IN LINE TRSF MACHINE OP 45 |
| NAM7272 | L 18 OP120 CRANKSHAFT MACHINE |
| NAM7263 | L 18 OP 65 CRANK ROLLING MACHINE |
| NAM7262 | L 18 OP65 CRANK ROLLING MACHINE |
| NAM7265 | L 18 OP 110(B) CRANK BAL MACHINE |
| NAM7266A | L 18 OP 110(B) CRANK BAL MACHINE |
| NAMM28015 | L18 OP120 CRANK 4ARM LOADER GANTRY |
| NAM7262INST | L 18 CRANK INSTALLATION(TONA) |
| NAM7263INST | L 18 CRANK INSTALLATION(TONA) |
| NAM7265INST | L 18 CRANK INSTALLATION(TONA) |
| NAM7270INST | L 18 CRANK INSTALLATION(TONA) |
| NAM7282 | L 18 CRANK SPIN DRY MACHINE |
| NAMM27945 | L 18 CRANK AUTOMATION |
| NAMM27946 | L 18 CRANK AUTOMATION |
| NAMM27947 | L 18 CRANK AUTOMATION |
| NAMM27948 | L 18 CRANK AUTOMATION |
| NAMM28235 | L-18 CRANK TEAM ROOM |
| NAMM28014 | L 18 OP120 CRANK COOLANT FILTRATION UNIT |
| NAMM28013 | L 18 OP120 CRANK MIST CONTROL SYSTEM |
| NAM7262F | L-18 CRANK OP 65 FOUNDATION |
| NAMM27878A | L18 CRANK HI PRESSURE COOLANT SYSTEM |
| NAM7264INST | INSTALL L 18 CRANK BALANCER |
| NAM7272F | L 18 OP 120 CRANK MACHINE FOUNDATION |
| NAMM27878 | L18 CRANK HI PRESSURE COOLANT SYSTEM |
| NAM7262ELEC | L 18 OP65 CRANK ROLLING MACHINE |
| NAM7270F | L -18 OP 45 CRANK FOUNDATION |
| NAMM28096 | L18 CRANK BALANCER MIST COLLECTOR |
| NAMM28366 | L18 OP45 CRANK MONORAIL RADIO CONTROLLED |
| NAMM28229 | L 18 CRANK OP110 MANIPULATOR |
| NAM027971A | L18 CRANK OP110 MANIPULATOR |
| NAMM28121 | L18 CRANK OP70 GRIND WHEEL CART |
| NAMTA9225 | L18 CRANK OP50 ERROR PROOFING TITAN SYSTEM |
| NAM7268 | L 18 CYL HEAD OP30 TRANSFER MACHINE |
| NAM7269 | L 18 CYL HEAD OP50 TRANSFER MACHINE |
| NAM7284 | L 18 CYL HEAD ASM MACHINE |
| NAMM28064 | L18 CYL HEAD COOLANT FILTRATION |
| NAM7117RV | L 18 CYL HEAD WASHER |
| NAMM28208 | L 18 CYL HEAD OP30 TO OP 50 |
| NAM7268A | L 18 CYL HEAD OP30 TRANSFER MACHINE |
| NAMM28210 | L 18 CYL HEAD OP50 TO OP 70 AUTOMATION |
| NAMM28212 | L 18 CYL HEAD OP50 TO OP 70 AUTOMATION |
| NAMM28209 | L 18 CYL HEAD OP50 TO OP 70 AUTOMATION |
| NAMM28211 | L 18 CYL HEAD OP50 TO OP 70 AUTOMATION |
| NAM7268INST | L 18 CYL HEAD EQUIPMENT INSTALLATION(TONA) |

| | |
|---|---|
| NAM7269INST | L 18 CYL HEAD EQUIPMENT INSTALLATION(TONA) |
| NAMM28206 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28207 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28064A | L 18 CYL HEAD COOLANT FILTRATION SYSTEM |
| NAMM28200 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28202 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28204 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28198 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28199 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28201 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28203 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28205 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28064C | L18 CYL HEAD COOLANT FILTRATION |
| NAMM28233 | L-18 CYL HEAD TEAM ROOM |
| NAMM28375 | L 18 COMBO SINK UNIT-CYL HEAD |
| NAMM28376 | L-18 COMBO SINK UNIT-CYL HEAD |
| NAMM28254 | L18 HEAD FINAL44 X 54 LIFT&ROTATE TABLE |
| NAMM28253 | L18 HEAD OP70 44 X 54 LIFT&ROTATE TABLE |
| NAMM28064B | L18 CYL HEAD COOLANT FILTRATION |
| NAMM28252 | L 18 HEAD OP 30 MANIPULATOR |
| NAMM28213 | L 18 CYL HEAD OP50 TO OP 70 AUTOMATION |
| NAMM28003A | L- CYL HEAD OP50 AUTOMATION |
| NAM7267 | L-18 BLOCK TRANSFER MACHINE |
| NAM7267INST | L 18 BLOCK INSTALLATION(TONA) |
| NAM7098C | L-18 INTERMEDIATE BLOCK WASHER |
| NAM7099C | L-18 FINAL BLOCK WASHER |
| NAM7101A | L18 BLOCK VISITROL CAM BRG PRESS |
| NAMM27950 | L-18 BLOCK CONVEYOR OP 105 TO 110 |
| NAM7074D | L 18 BLOCK MACHINE WING BASE |
| NAM7075D | L 18 BLOCK MACHINE WING BASE |
| NAMM27949 | L-18 BLOCK CONVEYOR OP 100 TO 105 |
| NAMM27877A | L18 BLOCK HI PRESSURE COOLANT SYSTEM |
| NAMM27876A | L18 BLOCK HI PRESSURE COOLANT SYSTEM |
| NAMM27877 | L18 BLOCK HI PRESSURE COOLANT SYSTEM |
| NAMM27876 | L18 BLOCK HI PRESSURE COOLANT SYSTEM |
| NAMM28377 | L 18 COMBO SINK UNIT BLOCK JOB |
| NAMTA9263 | L 18 BLOCK TITAN GALLERY HOLE PROBE |
| NAM7271 | L 18 ENGINE ASM LINE |
| NAM426916TSD | L-18 VALVETRAIN IGNITION COLD TEST |
| NAM7271INST | L 18 ENGINE ASM LINE(INSTALL) |
| NAM7271F | L 18 ENGINE LINE FOUNDATION |
| NAM7271ELECT | L 18 ENGINE ASM LINE(ELECTRICAL) |
| NAM7271INS1 | L 18 ENGINE ASM LINE(INSTALL) |
| NAM7271FC | L 18 ENGINE LINE POA 5--7 |
| NAM7271J | L -18 ASM LINE LUBE EQUIP  ETC |
| NAM7271PMC | L 18 ASM LINE P M & C SYSTEM |
| NAM7271P | L 18 ASM LINE LEAK TEST EQUIPMENT |
| NAM7271FA | L 18 ENGINE ASM POA 1 |
| NAM7271A | L 18 ASM LINE IMPROVEMENTS |
| NAM7271SWARE | L-18 ENGINE ASM LINE CONTROLS |
| NAMBG5728 | L-18 ASM LINE KBK TRUSS REINFORCEMENT |
| NAM7271FB | L 18 ENGINE LINE POA4 |
| NAM7271PFOR | L  18 ASM ELEVATED PLATFORM |
| NAM7271KBK | L18 ASM LINE KBK BRIDGE COMPONENTS |
| NAM7273 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAM7274 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAM7275 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAM7276 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAM7271ANSYS | L 18 ASM LINE ANDON SYSTEM FOR BOARDS |
| NAMBG5728A | REINFORCE TRUSSES L 18 ASM LINE |
| NAM7271N | L-18 ASM LINE WIREWAY |
| NAM7271L | L-18 ASM LINE BUS PLUGS |
| NAM7271QCA | L 18 ASM LINE Q C & A SYSTEM |
| NAM7271I | L18 ASM LINE CPU UPGRADE NEMATRON COMPUTERS |
| NAMM26916TS1 | L -18 TEST STANDS |
| NAM7271ANDON | L 18 ASM LINE ANDON EQUIPMENT |
| NAM7271PTASM | L-18 ASM LINE POWERTRAIN ASM SYSTEM |
| NAM7271ELEC3 | L-18 ASM LINE ELECTRICALS |
| NAM7271LOAD | L-18 ASM LINE UPLOAD/DOWNLOAD SYSTEM |
| NAMM28286 | L18 ASM LINE 48X45 FLOW THRU  X-OVER PIPES |
| NAMM28289 | L18 ASM LINE 54X48 FLOW THRU EXH MANIFOLDS |
| NAMM28278 | L18 ASM LINE 54X48 OIL PAN FLOW THRU |
| NAMM28285 | L18 ASM LINE 54X48 FLOW THRU FUEL RAILS |
| NAMM28287 | L18 ASM LINE 48X45 FLOW THRU WATER PUMPS |
| NAMM28290 | L18 ASM LINE 54X48 FLOW THRU EXH MANIFOLDS |

| | |
|---|---|
| NAM7271PCTWR | L 18 ASM LINE PC TOWER |
| NAM7271C | L 18 ASSEMBLY LINE EXTRAS |
| NAM7271R | L-18 ASM LINE GUARD RAILS |
| NAMM28347 | L18 OIL FILL(COOLANT/HEATER) TEMP CONTROL |
| NAMM28288 | L18 ASM LINE 36X52/54X48 FLOW THRU FLYWHEELS |
| NAMM28279 | L 18 ASM LINE 36X32 FLOW THRU BALANCERS |
| NAMM28258 | L-18 ASM DATA COLLECTION SYSTEM |
| NAMM28112 | L 18 ASSY LINE SINK UNIT |
| NAMM28113 | L 18 ASSY LINE SINK UNIT |
| NAMM28114 | L 18 ASSY LINE SINK UNIT |
| NAMM28116 | L 18 ASSY LINE SINK UNIT |
| NAMM28115 | L 18 ASSY LINE SINK UNIT |
| NAMM28117 | L 18 ASSY LINE SINK UNIT |
| NAM7271ELEC2 | L 18 ENG ASM ELECTRICAL |
| NAMM28280 | L18 ASM LINE 48X40 FLOW THRU CYL HEADS |
| NAMM28277 | L18 ASM LINE 45X40 FLOW THRU CASES |
| NAMM28281 | L18 ASM LINE 48X40 FLOW THRU CYL HEADS |
| NAM7271O | L-18 ASM LINE WIREWAY STATIONS |
| NAM7271H | L 18 ASSEMBLY LINE EXTRAS |
| NAMM28283 | L18 ASM LINE 54X48 FLOW THRU RKR COVERS |
| NAMM28284 | L18 ASM LINE 54X48 FLOW THRU RKR COVERS |
| NAM7271G | L-18 ASSEMBLY LINE EXTRAS |
| NAM7271K | L 18 ASM LINE SQUARE D POWER |
| NAM7271D | L 18 ASSEMBLY LINE EXTRAS |
| NAMM28234 | L 18 ASSY TEAM ROOM |
| NAMM28346 | L18 OIL FILL DYE INJECTION SYSTEM |
| NAM7271ELEC1 | L 18 ENG ASM ELECTRICAL |
| NAMM28023 | L 18 ACCESSORY DRIVE BRACKET MANIPULATOR |
| NAMM28018 | L 18 BALANCER——— MANIPULATOR |
| NAMM28024 | L 18 BELL HOUSING MANIPULATOR |
| NAMM28017 | L 18 CRANK  ASSY— MANIPULATOR |
| NAMM28022 | L-18 FLYWHEEL——— MANIPULATOR |
| NAMM28016 | L-18 INLET MAN ASSY MANIPULATOR |
| NAMM28020 | L 18 L H HEAD——— MANIPULATOR |
| NAMM28019 | L-18 OIL  PAN —— MANIPULATOR |
| NAMM28021 | L 18 R H HEAD——— MANIPULATOR |
| NAM7271M | L 18 ASM LINE ENG SVS WIRE WAY |
| NAMM28323 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28324 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28325 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28326 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAM7271Q | L-18 ASM LINE BALANCERS |
| NAM7271E | L 18 ASSEMBLY LINE EXTRAS |
| NAMM28128 | MARK ASM/PIST AREA LIFT&TILT TABLE |
| NAMM28129 | MARK ASM/PIST AREA LIFT&TILT TABLE |
| NAMM28300 | L 18 ASM HOHL CART 22960 |
| NAMM28302 | L 18 ASM HOHL CART 22960 |
| NAMM28295 | L 18 ASM HOHL CART 22960 |
| NAMM28296 | L 18 ASM HOHL CART 22960 |
| NAMM28297 | L 18 ASM HOHL CART 22960 |
| NAMM28298 | L 18 ASM HOHL CART 22960 |
| NAMM28299 | L 18 ASM HOHL CART 22960 |
| NAMM28301 | L 18 ASM HOHL CART 22960 |
| NAMM28303 | L 18 ASM HOHL CART 22960 |
| NAM7271B | L -18 ASSEMBLY LINE EXTRAS |
| NAM7271PMCSW | L-18 ASM LINE P M & C SOFTWARE |
| NAMM28321 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28328 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28064F | L 18 COOLANT FILTRATION FOUNDATION |
| NAMM28190 | L 18 MODULAR OFFICE—MISKINES |
| NAMM28188 | L18 NAPP ELECTRONIC PULL SYSTEM |
| NAMM28304 | HOPPER ELEV—L18 CONVERSION |
| NAMM28305 | HOPPER ELEV—L18 CONVERSION |
| NAMM28132 | L-18 CHIP CONVEYOR |
| NAMTA9206 | L18 PROD INFO SYSTEM |
| NAM7644ELECT | L 850 CRANK ELECT/INSTALL MACHINE |
| NAM7644ELECT | L 850 CRANK ELECT/INSTALL MACHINE |
| NAM7646A | L 850 OP 10 CRANKSHAFT MACHINE |
| NAM7509A | L 850 CRK PIN GRINDER GANTRY COMMISSIONING |
| NAM7506B | L 850 CRK OIL HOLE GANTRY COMMISSIONING |
| NAM7500B | L 850 CRANK OP10  GANTRY COMMISSIONING |
| NAM7230A | L 850 CRANK BROACH GANTRY COMMISSIONING |
| NAM7583D | L 850 CYL HEAD OP 150 ASM MACHINE |
| NAM7659 | L 850 CELL 3 CAM LOBE GRINDER |
| NAM7658 | L 850 CELL 3 CAM LOBE GRINDER |

| | |
|---|---|
| NAM7660 | L 850 CELL 3 CAM LOBE GRINDER |
| NAML850CAMIP | L850 CAMSHAFT INSTALL COSTS |
| NAM7665B | L850 CAM MOD III 355 MACHINE CTR |
| NAM7664 | L850 CAM MOD III 355 MACHINE CTR |
| NAMM29419 | L 850 CELL 3 CAM OBERLIN FILTER |
| NAML850CAMIO | L850 CAMSHAFT INSTALL COSTS |
| NAM7663 | L 850 T65L CAM HORIZONTAL LATHE |
| NAM7662 | L 850 T65L CAM HORIZONTAL LATHE |
| NAM7661 | L 850 T65L CAM HORIZONTAL LATHE |
| NAML850CAMIQ | L850 CAMSHAFT INSTALL COSTS |
| NAM7661FOUN | L 850 CAM MO 3 OP 40 LATHE FOUNDATION |
| NAM7662FOUN | L 850 CAM MO 3 OP 40 LATHE FOUNDATION |
| NAMM29407 | L850 CAM MTL HANDLING EQUIPMENT |
| NAMM29406 | L850 CAM MTL HANDLING EQUIPMENT |
| NAMM29405 | L850 CAM MTL HANDLING EQUIPMENT |
| NAML850CAM3L | L 850 CAMSHAFT MODULE 3 IN LABOR |
| NAM7671A | L850 CAM WASHER MODEL AQUAMASTER FC 1600 |
| NAM7670 | Q190 MICRO POLISHER REPAIR LATHE |
| NAM7637A | L 850 CAM LOBE GRINDER INST SUPPORT |
| NAM7636A | L 850 CAM LOBE GRINDER INST SUPPORT |
| NAMM29404 | L850 CAM MTL HANDLING EQUIPMENT |
| NAMM29403 | L850 CAM SIDE BY SIDE MTL HANDLING |
| NAMM29402 | L850 CAM MTL HANDLING EQUIP |
| NAMM29433 | L850 CAM CRACK--MAGNAFLUX MD-10305 |
| NAMM28494 | L 859 PFX MODEL 454 CMM/DCC SYSTEM |
| NAM7671 | L 850 CAM CELL 3 AQUAMASTER CAM WASHER |
| NAM7612INST | L850 CAM MOD 3 OP80 GRINDER INST |
| NAM7612E | L850 CAM RELAY/HOUSINGS |
| NAMBG5706CA | L 850 CAM TRUSS REINFORCEMENT |
| NAM7612INSA | L850 CAM MOD 3 OP80 GRINDER INST |
| NAM7612AA | L 850 CAM LOBE HOIST |
| NAM7585PAL | L 850 ENGINE ASM LINE PALLETS |
| NAM7585G | L 850 ENGINE ASM LINE |
| NAM7585GA | L 850 ENHINE ASM LINE |
| NAM7585PALL | L 850 ENGINE ASM LINE PALLETS |
| NAM7570A | L850 OP 120 CYL HEAD CAM BOLT FEEDER |
| NAM7520 | L 850 CRANK OIL HOLE DRILLING MACHINE |
| NAM7541 | L 850 CRANK OIL HOLE DRILLING MACHINE |
| NAM7540A | L 850 CRANK WASHER |
| NAMM27757 | 4 CRANK OP120 MTL HANDLING |
| NAMM27758 | 4 CRANK MTL HANDLING |
| NAMM27890 | 4 CRANK PENTALIFT LOADING TABLE |
| NAMM27888 | 4 CRANK PENTALIFT LOADING TABLE |
| NAMM27889 | 4 CRANK PENTALIFT LOADING TABLE |
| NAMM29146 | L 850 CRANK LINE 1 OP 230 DALMAC MANIPULATOR |
| NAMM29147 | L 850 CRANK LINE 1 OP 230 DALMAC MANIPULATOR |
| NAMM29148 | L 850 LINE 2 OP 250 DALMAC MANIPULATOR |
| NAMM29149 | L 850 CRANK LINE 2 OP 250 DALMAC MANIPULETOR |
| NAMM27835 | 4 CRANK REPAIR 44X52 LIFT TABLE |
| NAMM27937 | 4 CRANK OP 30 AIR CLEANER |
| NAMM27935 | 4 CRANK OP30 AIR CLEANER |
| NAMM27936 | 4 CRANK OP30 AIR CLEANER |
| NAM7506A | L 850 CRANK OIL HOLE OP 80 |
| NAMM29314A | L 850 CYL HEAD DELIVERY SYSTEM TO ASM LINE |
| NAMM29106 | L 850 CYL HEAD LOADER |
| NAM7583A | L 850 CYL HEAD OP 150 ASM MACHINE |
| NAMM28003 | 4 CYL HEAD OP50 AUTOMATION |
| NAMM29100 | L 850 CYL HEAD ASM ROBOT |
| NAMM29099 | L 850 CYL HEAD ASM AUTOMATION |
| NAM6712B | 4 CYL HEAD TRANSFER MACHINE |
| NAMM29107A | L 850 OP 5 CYL HEAF AUTOMATION |
| NAMM29122 | L 850 CYL HEAD AUTOMATION |
| NAMM27849A | 4 CYL HEAD OP 130 ROBOT |
| NAMM27850A | 4 CYL HEAD OP 130 ROBOT |
| NAMM29328 | L 850 HEAD DOUBLE WASH STAND |
| NAMM29251 | L 850 CYL HD 2ND LIFT DEVICE |
| NAMM29250 | L 850 CYL HD 2ND LIFTING DEVICE |
| NAMM29385 | L 850 CYL HEAD INK JET SYSTEM |
| NAMM29384 | L 850 CYL HEAD INK JET SYSTEM |
| NAMM29260 | L 850 CYL HEAD ANDON BOARD |
| NAMM29261 | L 850 CYL HEAD ANDON BOARD |
| NAMM29262 | L 850 CYL HD ASM ANDON BOARD |
| NAM7572A | L 850 CYL HEAD TRANSFER PTS WASHER |
| NAMM29248 | L 850 HEAD SECONDARY LIFT DEVICE |
| NAMM29314 | L 850 CYL HEAD DELIVERY SYSTEM TO ASM LINE |

| | |
|---|---|
| NAMM29315 | 1 850 BLOCK DELIVERY SYSTEM TO ASM LINE |
| NAMM29315A | L 850 BLOCK DELIVERY SYSTEM TO ASM LINE |
| NAMM29123 | L 850 BLOCK AUTOMATION |
| NAM7556A | L 850 OP 150 BLOCK TRANSFER MACHINE |
| NAMM29126A | L 850 BLOCK OP 25 AUTOMATION |
| NAM7555A | L 850 BLOCK OP 140 HONING MACHINE |
| NAMM27649A | 4 CASE BRG CAP OP 140 AUTOMATION |
| NAM6700 | 4 CASE CROSS TRF INLAND DRIVES |
| NAMM29142A | L 850 BLOCK UNLOADER LOWER CASE |
| NAM7058C | MARK CASE OP10 PANEL BOX |
| NAM6576E | 4 CASE OP 160 MAIN BRG CONTROLS |
| NAMM29326 | L 850 BLOCK OP 20 DOUBLE WASH STAND |
| NAM7543A | L 850 BLOCK OP 20 TRANSFER MACHINE |
| NAMM29258 | L 850 BLOCK ANDON BOARD |
| NAMM29259 | L 850 BLOCK ANDON BOARD |
| NAMM29327 | L 850 BLOCK SINGLE WASH STAND |
| NAM7546A | L 850 BLOCK OP 50 LEAK TEST |
| NAMM27928 | 4 CASE OP 160 LIFT TABLE |
| NAMM27929 | 4 CASE OP 160 LIFT TABLE |
| NAMM29178 | L 850 CONN ROD LINE UNLOADER |
| NAMM29174 | L 850 CONN ROD LOADER |
| NAMM29175A | L 850 ROD BEAM CONVEYOR |
| NAM7631A | L 850 ROD OP 45 DEBURR OIL HOLE |
| NAM7626A | L 850 ROD LANDIS GRINDER |
| NAMM29307A | L 850 ROD TEAM ROOM |
| NAMM27753 | 4 ROD OP60 FINISH-DIVERTER MACHINE |
| NAMM29331 | L 850 ROD DOUBLE WASH STAND |
| NAMM29266 | L 850 ROD ANDON BOARD |
| NAM7615 | L 850 CAM OP 80 LINE 2 LOBE GRINDER |
| NAM7616 | L 850 CAM OP 80 LINE 2 LOBE GRINDER |
| NAM7617 | L 850 CAM OP 80 LINE 2 LOBE GRINDER |
| NAMTA9500 | L 850 NAO COMMON P M & C SYSTEM |
| NAM7597 | L 850 CAM LINE 2 OP 20 GRINDER |
| NAM7599 | L 850 CAM OP 70 LINE 2 GRINDER |
| NAM7603 | 1 850 CAM OP 60 LINE 2 HORIZONTAL MACH CTR |
| NAM7601 | L 850 CAM OP 30 LINE 2 HORIZONTAL MACH CTR |
| NAM7621 | L 850 CAM OP 90 LINE 2 POLISHER |
| NAM7623 | L 850 CAM OP 110 LINE 2 LOBE GAGE |
| NAM7619 | L 850 CAM OP 85 LINE 2 POLISHER |
| NAM7606 | L 850 CAM OP 40 LINE 2 HORIZONTAL MACH CTR |
| NAM7607 | L 850 CAM OP 40 LINE 2 CNC LATHE |
| NAM7609 | L 850 CAM OP 50 LINE 2 CNC LATHE |
| NAM7593 | L 850 CAM LINE 2 OP 10 INDUCTION HARDENER |
| NAM7594 | L 850 CAM OP 10 LINE 2 INDUCTION HARDENER |
| NAM7595 | L 850 CAM OP 10 LINE 2 INDUCTION HARDENER |
| NAM7589 | L 850 LINE 2 CAM WASHER |
| NAM7602A | L 850 CAM OP 60 HORIZONTAL MACH CTR |
| NAM7620A | L 850 CAM JOURNAL POLISHER LINE 1 |
| NAMM29329 | L 850 CAM DOUBLE WASH STAND |
| NAMM29330 | L 850 CAM DOUBLE WASH STAND |
| NAMM29263 | L 850 CAM ANDON BOARD |
| NAMM29265 | L 850 CAM ANDON BOARD |
| NAMM29264 | L 850 CAMSHAFT ANDON BOARD |
| NAM7600A | L 850 CAM HORIZONTAL MACHINING CTR |
| NAM7618A | L 850 CAM LOBE POLISHER LINE 1 |
| NAMM29091 | L 850 CAMSHAFT MIST COLLECOR |
| NAMM29092 | L 850 CAMSHAFT MIST COLLECTOR |
| NAM7605A | L 850 CAM HORIZONTAL CNC LATHE |
| NAM7604A | L 850 OP 40 CAM HORIZONTAL CNC LATHE |
| NAM7585A | L 850 ENGINE ASSY LINE |
| NAMTA9504 | L 850 POWERTRAIN ASM SYSTEM |
| NAMM29308A | L 850 ENG ASM TEAM ROOM |
| NAMM29309A | L 850 ENG ASM TEAM ROOM |
| NAMM29312A | L 850 ENG ASM TEAM ROOM |
| NAM7234B | L 850 PISTO/ROD ASM MACHINE |
| NAM7234A | L 850 PISTON/ROD ASM MACHINE |
| NAMM29318 | L 850 ASM LINE SINGLE WAH STAND |
| NAMM29319 | L 850 ASM LINE SINGLE WASH STAND |
| NAMM29399 | L 850 ENG ASM FLEX LINK TABLE |
| NAMM29400 | L 850 ENG ASM FLEX LINK TABLE |
| NAMM29255 | L 850 ENG ASM ANDON BOARD |
| NAMM29256 | L 850 ENG ASM ANDON BOARD |
| NAMM29257 | L 850 ENG ASM ANDON BOARD |
| NAM7586B | L 850 ENGINE COLD TEST |
| NAMM29233 | L 850 ENG/HD ASM TABLE 50 X 59 |

| | |
|---|---|
| NAMM29226 | L 850 ENG ASM 48X37 ROTATE TABLE |
| NAMM29227 | L 850 ENG ASM 48X37 ROTATE TABLE |
| NAMM29228 | L 850 ENG ASM 48X37 ROTATE TABLE |
| NAMM29229 | L 850 ENG ASM 48X37 ROTATE TABLE |
| NAMM29230 | L 850 ENG/HD ASM TABLE 48 X 37 |
| NAMM29231 | L 850 ENG/HD ASM TABLE 48 X 37 |
| NAMM29232 | L 850 ENG/HD ASM TABLE 48 X 37 |
| NAMLS5443 | L 850 TURNSTII E TRK STAGING AREA |
| NAMTA9503 | L 850 Q C & A ACCOUNTABILITY SYSTEM |
| NAM7611 | L 850 OP 65 LINE 2 HEX BUSHING |
| NAMTA9502 | L 850 ELECTRONIC PULL SYSTEM |
| NAMTA9153 | L 850 PRIMS (RAID ARRAY) |
| NAMTA9501 | L 850 ANDON SYSTEM NETWORKING |
| NAMM29084A | L 850 COOLANT BLDG CHIP PROCESSING EQUIP |
| NAM7573A | L 850 ZEISS PRISMO VAST CMM |
| NAM7574A | L 850 ZEISS PRISMO VAST CMM |
| NAMM29417 | L 850 UTILITY OILY WASTE TANK SYSTEM |
| NAMM29288 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29287 | L 850 BULK MTL HANDLING SYSTEM |
| NAMTA9500S | L 850 FLO PRO SOFTWARE FOR P M & C |
| NAMM29278 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29279 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29280 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29281 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29277 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29292 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29282 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29283 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29284 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29285 | L 850 BULK MTL HANDLING DEVILE |
| NAMM29386 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29286 | L 850 BULK MTL HANDLING DEVICW |
| NAM7638 | L 850 PARTS JET ASHER |
| NAMM29381 | L 850 43682 EMONITOR ODYSSEY |
| NAMM29316 | L 850 PART IDENTIFICATION & TRACKING |
| NAMM29317 | L 850 PART IDENTIFICATION & TRACKING |
| NAMM29352 | L 850 MAINT  SINGLE WASH STAND |
| NAMM29353 | L 850 TOOL MAINT SINGLE WASH STAND |
| NAMM29289 | L 850 LUBE FILLED CART |
| NAMM29290 | L 850 LUBE FILLED CART |
| NAMM29291 | L 850 LUBE FILLED CART |
| NAM7639 | L 850 TURN BROACH CRANK MACHINE |
| NAM7640 | L 850 TURN BROACH CRANK MACHINE |
| NAM7656 | L 850 OIL HOLE DRILLING MACHINE |
| NAM7657 | L 850 OIL HOLE DRILLING MACHINE |
| NAM7656A | L 850 OP 80 CRANKSHAFT MACHINE |
| NAM7507A | L850 CRANK INSTALLATION |
| NAMM29280A | L 850 CRANK LINE AIR HOIST |
| NAM7656C | L850 CRANK OP80 COOLANT PUMPOVER UNIT |
| NAM7656B | L 850 OIL HOLE DRILLING MACHINE |
| NAM7500A | L 850 OP 10 CRANK INSTALL |
| NAM7501A | L 850 OP 10 CRANK INSTALL |
| NAM7639A | L 850 TURN BROACH CRANK MACHINE |
| NAM7640A | L 850 TURN BROACH CRANK MACHINE |
| NAMM29021A | L850 CRANK STAMPING UNIT |
| NAMM29023A | L850 CRANK STAMPING UNIT |
| NAMM29042A | L850 CRANK STAMPING UNIT |
| NAMM29059A | L850 CRANK STAMPING UNIT |
| NAMM29061A | L850 CRANK STAMPING UNIT |
| NAM7656D | L850 CRANK OP80 PUMPOVER PITS |
| NAM7612B | L 850 OP80 ELEC MOD 2 CRANK GRINDER |
| NAM7667 | L850 HEAD  LEAK TEST MACHINE |
| NAMM29245 | L850 CYL HEAD AUTOMATION(LIFT) |
| NAMM29246 | L850 CYL HEAD AUTOMATION(LIFT) |
| NAMM29247 | L850 CYL HEAD AUTOMATION(LIFT) |
| NAMM29249 | L850 CYL HEAD AUTOMATION UNLOAD |
| NAMM29250A | L850 CYL HEAD AUTOMATION CAP UP LIFTING |
| NAMM29248A | L850 CYL HEAD AUTOMATION(PICK UP) |
| NAMM29251A | L850 CYL HEAD AUTOMATION(LOAD) |
| NAMM27098 | MARK HEAD DUNK TANK |
| NAMM28033 | MARC HEAD OP180 HELI FLOW MIST COLLECTOR |
| NAMM28034 | MARC HEAD OP190 HELI FLOW MIST COLLECTOR |
| NAMM28031 | MARC HEAD OP 30 HELI FLOW MIST COLLECTOR |
| NAMM28032 | MARC HEAD OP 30 HELI-FLOW MIST COLLECTOR |
| NAMM29314B | L 850 CYL HEAD DELIVERY SYSTEM PALLET STOPS |

| | |
|---|---|
| NAMM29451 | L 850 HEAD LABELING SYSTEM |
| NAMM29090A | L850 DOCKING STATION-CYL HEAD ASM |
| NAMM29250D | L850 CYL HEAD AUTOMATION CAP UP LIFTING |
| NAMM29248D | L850 CYL HEAD AUTOMATION(PICK UP) |
| NAMM29251D | L850 CYL HEAD AUTOMATION(LOAD) |
| NAMM29250B | L850 CYL HEAD AUTOMATION CAP UP LIFTING |
| NAMM29248B | L850 CYL HEAD AUTOMATION(PICK UP) |
| NAMM29251B | L850 CYL HEAD AUTOMATION(LOAD) |
| NAMM29250C | L850 CYL HEAD AUTOMATION CAP UP LIFTING |
| NAMM29248C | L850 CYL HEAD AUTOMATION(PICK UP) |
| NAMM29251C | L850 CYL HEAD AUTOMATION(LOAD) |
| NAM7666 | L850 BLOCK LEAK TEST MACHINE |
| NAM7546B | L 850 BLOCK OP50 |
| NAMM27930 | MARK CASE OP100 MIST COLLECTOR |
| NAMM29236A | L850 BLOCK AUTOMATION |
| NAMM29238A | L850 BLOCK AUTOMATION |
| NAMM29240A | L850 BLOCK AUTOMATION |
| NAMM29242A | L850 BLOCK AUTOMATION |
| NAMM29220A | L850 BLOCK AUTOMATION |
| NAMM29221A | L850 BLOCK AUTOMATION |
| NAMM29222A | L850 BLOCK AUTOMATION |
| NAMM29237A | L850 BLOCK AUTOMATION |
| NAMM29239A | L850 BLOCK AUTOMATION |
| NAMM29241A | L850 BLOCK AUTOMATION |
| NAMM29243A | L850 BLOCK AUTOMATION |
| NAMM27810A | DUCTWORK OP180/190 MARK CASE |
| NAMTA9217 | INDUSTRIAL WORK STATION L850 BLOCK |
| NAMM29220B | L850 BLOCK AUTOMATION |
| NAMM29221B | L850 BLOCK AUTOMATION |
| NAMM29222B | L850 BLOCK AUTOMATION |
| NAMM29236B | L850 BLOCK AUTOMATION |
| NAMM29237B | L850 BLOCK AUTOMATION |
| NAMM29238B | L850 BLOCK AUTOMATION |
| NAMM29239B | L850 BLOCK AUTOMATION |
| NAMM29240B | L850 BLOCK AUTOMATION |
| NAMM29241B | L850 BLOCK AUTOMATION |
| NAMM29242B | L850 BLOCK AUTOMATION |
| NAMM29243B | L850 BLOCK AUTOMATION |
| NAM7542A | L 850 BLOCK DUNKER TANK |
| NAM7542B | L 850 BLOCKROBOT POA 18 19 |
| NAMM28314 | INK JET SYSTEM MARK CASE |
| NAM7558B | L850 BOCK CURTAINS |
| NAMM29452 | L850 BLOCK MODEL ANALYSIS PACKAGE |
| NAMM27511A | 04 CASE AUTOMATION |
| NAM7558A | L 850 BLOCK LINE INSTALL |
| NAMM29130A | L 850 OP 60 CASE LOADER INSTALL |
| NAM7624A | L 850 ROD FRACT ASM MACHINE |
| NAM7627A | L 850 ROD FRACT ASM MACHINE |
| NAMM29421 | L850 ROD OMNI LIFT&ROTATE TABLE |
| NAM7630A | L850 ROD STATISICAL PACKAGE |
| NAML850CAMIN | L850 CAMSHAFT INSTALL COSTS |
| NAM7636 | L 850 CAM LOBE GRINDER |
| NAM7637 | L 850 CAM LOBE GRINDER |
| NAM7651 | L850 CAM CELL 3 ADCOLE GAGE |
| NAM7649 | L850 CAM CELLPRO INDUCTION HARDENER |
| NAM7648 | L850 CAM CELLPRO INDUCTION HARDENER |
| NAM7650 | L850 CAM CELLPRO INDUCTION HARDENER |
| NAMBG5706D | L 850 CAM TRUSS REINFORCEMENT |
| NAM7609INST | L 850 CAM GRINDER |
| NAMM29274 | L 850 OIL COOLANT SYSTEM(CAMSHAFT) |
| NAMM29273 | L850 OIL COOLANT SYSTEM(CAMSHAFT) |
| NAMM29412 | L850 CAM MOD 3 12000CFM MIST COLLECTOR |
| NAMBG5706E | L 850 CAM TRUSS REINFORCEMENT |
| NAM7604C | L 850 CAM OP40 HORIZONTAL |
| NAM7612A | L 850 CAM LOBE HOIST |
| NAM7665A | L 850 OP60 CAM MAKINO HORIZONTAL MACHINING |
| NAM7656ELECT | L850 CAM MACHINE ELECTRICALS |
| NAM7612R | L850 CAM INSTALL COSTS |
| NAMBG5706B | L 850 CAM TRUSS REINFORCEMENT |
| NAMM29271 | L850 SMOG HOG MIST COLLECTOR(CAMSHAFT) |
| NAMM29272 | L850 SMOG HOG MIST COLLFCTOR(CAMSHAFT) |
| NAM7604B | L 850 CAM OP40 OVERHEAD WORK |
| NAM7612D | L850 CAM ELECTRICALS |
| NAM7585B | L 850 ENGINE ASM LINE |
| NAM7586C | L 850 ENG ASM OIL TEMP CONTROL UNIT |

| | |
|---|---|
| NAM7585E | L 850 ENG ASM LINE SIDE BY SIDE MTL |
| NAM7585F | L 850 ENG ASM LINE ZONE 3 LIFT DEVICES |
| NAMM28097 | L850 COLD TEST SERVER CARD ACCESS |
| NAM7585C | L 850 ENGINE ASM INSTALL LEAK TEST |
| NAM7585D | L850 ASM LINE X-OVER STAIRS |
| NAMM29277A | L850 ASM BULK MTL HANDLING |
| NAM7586 | L 850 ENGINE TEST |
| NAMTA9171 | L850 ASM LINE STA M1016 NEMATRON |
| NAMBG5706F | L850 CAM TRUSS REINFORCEMENT |
| NAMBG5706C | L 850 CAM TRUSS REINFORCEMENT |
| NAMBG5716A | L 850 TURNSTII E BLDG |
| NAMM29082A | L 850 BACK UP SUMP SYSTEM |
| NAMBG5700A | L850 ROOF FIBERGLASS PANELS |
| NAMLS5443A | L 850 PARK LOT LIGHTS TURNSTILE AREA |
| NAMBG5700B | L850 ROOF FIBERGLASS PANELS |
| NAMM29420 | L 850 ABOVE GROUND 10 000 GAL STORAGE TANK |
| NAMBG5700C | L850 ROOF SLIDING WINDOWS |
| NAMM29394 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAM7561DWG | L 850 TAS 32280 PRIMS DWG |
| NAMM29301 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29395 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAM7612C | L 850 OP80 INST HOIST SYSTEM |
| NAMM29298 | L 850 BULK HANDLING DEVICE |
| NAMM29296 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29297 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29391 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29390 | L 850 BULK MATERIAL HANDLING SYSTEM |
| NAMM28232 | L 18 OSCAR TEAM ROOM |
| NAMM29302 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29392 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29393 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29294 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29293 | L 850 BULK MATERIAL HANDLINGDEVICE |
| NAMM29387 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29388 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29389 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMBG5700D | L850 ROOF SLIDING WINDOWS |
| NAMBG5716 | L 850 TURNSTILE BLDG |
| NAMM28217 | L 850 INKJET SYSTEM |
| NAMBG5680B | L850 COOLANT BLDG ADDITIONAL DRAINS |
| NAMM28191 | 20 MARKING SYSTEMS V8 PSTN |
| NAMBG5706A | L 850 TRUSS REINFORCING INSPECTION SVCS |
| NAMM29145B | L850 MAINTENANCE CAMERA SYSTEM |
| NAMTA9224 | L 850 TEAM ROOM P C |
| NAMBG5687A | L 850 LIGHTING |
| NAM7642 | L 850 P20-2020 PARLEC TOOL SET UP |
| NAMM27808A | 4 HEAD ROOF VENTILATOR |
| NAMM27809 | 4 HEAD ROOF VENTILATOR |
| NAMM29121A | L 850 OP 145 AUTOMATION |
| NAMTA9172 | L 850 HP LASERJET 55 1 PRINTER |
| NAMBG5690A | L 850 UTILITY BLDG PIPING |
| NAMTA9150 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9151 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9122 | L 850 BUS TEAM COMPAQ 4000 |
| NAMTA9152 | L 850 COMPAQ MAXIMO COMPUTER |
| NAMTA9162 | L 850 PM GATEWAY PORTABLE COMPUTER |
| NAMTA9163 | L 850 PM GATEWAY PORTABLE COMPUTER |
| NAMTA9164 | L 850 PM GATEWAY PORTABLE COMPUTER |
| NAMTA9165 | L 850 PM GATEWAY PORTABLE COMPUTER |
| NAMTA9137 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9138 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9139 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9140 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9141 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9142 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9143 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9144 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9145 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9146 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9147 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9148 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9149 | L 850 COMPAQ DESKPRO 4000 |
| NAMM27956 | 1/2 TON AIR OVERHEAD PRODUCTIVE HOIST |
| NAMM27957 | 1/2 TON AIR PRODUCTIVE HOIST |
| NAMTA9134 | L 850 COMPAQ DESK PRO 4000 |

| | |
|---|---|
| NAMTA9135 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9136 | L 850 COMPAQ DESKPRO 4000 |
| NAMM28180 | L 4 ASM CLARK MIST COLLECTOR |
| NAMM28043A | L4 ASM PENTALIFT LIFT & ROTATE TABLE |
| NAMBG5724 | PL1 AIR SUPPLY HOUSE DRIP PAN |
| NAMBG5717 | TRUASS REINFORCE HEAT TREAT AREA |
| NAMBG5704A | PL1 NORTH DOCK A HVAC SYSTEM |
| NAMM28221 | GAS FIRED HEATING SYSTEM |
| NAMBG5722 | PL1 CUTTER GRIND DUST COLLECTION DUCTWORK |
| NAMBG5723 | PL4 CUTTER GRIND DUST COLLECTION DUCTWORK |
| NAMM28131 | NORTH DOCK 2-TON BRIDGE SYSTYEM PLT1 |
| NAMBG5717A | NEW HEAT TREAT AREA |
| NAMBG5727B | PL4 COMAU MAKE UP AIR UNIT #16(PIPING) |
| NAM6701F | L4 CROSS TRANSFER MACHINE |
| NAMM28039A | 0ASTIC 4000 COOLANT SYSTEM 59 |
| NAMM28040A | 0ASTIC 4000 COOLANT SYSTEM 59 |
| NAM6701E | L 4 CROSS TRANSFER DRIVE UNIT STRAPS |
| NAM6701C | L 4 CROSS TRANSFER COLOR MONITOR DRIVER |
| NAM6701D | L 4 CROSS TRANSFER BUSHING FIXTURES |
| NAMM28120A | L4 PENTA LIFT TABLE |
| NAMM27897 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAM7271 | L-18 ENGINE ASM LINE |
| NAMM27895 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAMM26916TSD | L 18 VALVETRAIN IGNITION COLD TEST |
| NAMM27896 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAM7271INST | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM27851 | MARK ASM MANIFOLD MANIPULATOR |
| NAM7271F | L 18 ENGINE LINE FOUNDATION |
| NAMM27856 | MARK ASSY UTICOR MESSAGE DISPLAY |
| NAM7271ELECT | L 18 ENGINE ASM LINE(ELECTRICAL) |
| NAMM27943 | MARK ASM ENGINE STAND |
| NAM7271INS1 | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM28025 | MARK ASM KBK BRIDGE SYSTEM |
| NAM7271FC | L 18 ENGINE LINE POA 5- 7 |
| NAMM28027 | MARK ASM KBK BRIDGE SYSTEM |
| NAM7271J | L  18 ASM LINE LUBE EQUIP  ETC |
| NAMM28028 | MARK ASM KBK BRIDGE SYSTEM |
| NAM7271PMC | L-18 ASM LINE P M & C SYSTEM |
| NAMM27838 | MARK ASM 54X54 LIFT TABLE |
| NAM7271P | L-18 ASM LINE LEAK TEST EQUIPMENT |
| NAMM27862 | MARK V ASM ERRORPROFFING-LIGHTING |
| NAM7271FA | L 18 ENGINE ASM POA 1 |
| NAMM27918 | MARK ASM ENGINE STAND |
| NAM7271A | L 18 ASM LINE IMPROVEMENTS |
| NAMM27861 | MARK V ASM LIGHTING TRANSFORMER |
| NAM7271ISWARE | L-18 ENGINE ASM LINE CONTROLS |
| NAMM27898 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMBG5728 | L-18 ASM LINE KBK TRUSS REINFORCEMENT |
| NAMM27899 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271FB | L 18 ENGINE LINE POA4 |
| NAMM27900 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271PFOR | L  18 ASM ELEVATED PLATFORM |
| NAMM27901 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271KBK | L18 ASM LINE KBK BRIDGE COMPONENTS |
| NAMM27902 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7273 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27904 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7274 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27905 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7275 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27906 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7276 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27907 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271ANSYS | L 18 ASM LINE ANDON SYSTEM FOR BOARDS |
| NAMM27908 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMBG5728A | REINFORCE TRUSSES-L 18 ASM LINE |
| NAMM27909 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271N | L-18 ASM LINE WIREWAY |
| NAMM27903 | MARL ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271L | L-18 ASM LINE BUS PLUGS |
| NAM7271QCA | L-18 ASM LINE Q C & A SYSTEM |
| NAM7271I | L18 ASM LINE CPU UPGRADE NEMATRON COMPUTERS |
| NAMM26916TS1 | L  18 TEST STANDS |
| NAM7271ANDON | L 18 ASM LINE ANDON EQUIPMENT |
| NAM7271PTASM | L-18 ASM LINE POWERTRAIN ASM SYSTEM |

| | |
|---|---|
| NAM7271ELEC3 | L 18 ASM LINE ELECTRICALS |
| NAM7271LOAD | L-18 ASM LINE UPLOAD/DOWNLOAD SYSTEM |
| NAMM28286 | L18 ASM LINE 48X45 FLOW THRU X-OVER PIPES |
| NAMM28289 | L18 ASM LINE 54X48 FLOW THRU EXH MANIFOLDS |
| NAMM28278 | L18 ASM LINE 54X48 OIL PAN FLOW THRU |
| NAMM28285 | L18 ASM LINE 54X48 FLOW THRU FUEL RAILS |
| NAMM28287 | L18 ASM LINE 48X45 FLOW THRU WATER PUMPS |
| NAMM28290 | I 18 ASM LINE 54X48 FLOW THRU EXH MANIFOLDS |
| NAM7271PCTWR | L-18 ASM I INE PC TOWER |
| NAM7271C | L -18 ASSEMBLY LINE EXTRAS |
| NAM7271R | L-18 ASM LINE GUARD RAILS |
| NAMM28347 | L18 OIL FILL(COOLANT/HEATER) TEMP CONTROL |
| NAMM28288 | L18 ASM LINE 36X32/54X48 FLOW THRU FLYWHEELS |
| NAMM28279 | L 18 ASM LINE 36X32 FLOW THRU BALANCERS |
| NAMM28258 | L 18 ASM DATA COLLECTION SYSTEM |
| NAMM28112 | L 18 ASSY LINE SINK UNIT |
| NAMM28113 | L 18 ASSY LINE SINK UNIT |
| NAMM28114 | L 18 ASSY LINE SINK UNIT |
| NAMM28116 | L 18 ASSY LINE SINK UNIT |
| NAMM28115 | L 18 ASSY LINE SINK UNIT |
| NAMM28117 | L 18 ASSY LINE SINK UNIT |
| NAM7271ELEC2 | L  18 ENG ASM ELECTRICAL |
| NAMM28280 | L18 ASM LINE 48X40 FLOW THRU CYL HEADS |
| NAMM28277 | L18 ASM LINE 45X40 FLOW THRU CASES |
| NAMM28281 | L18 ASM LINE 48X40 FLOW THRU CYL HEADS |
| NAM72710 | L-18 ASM LINE WIREWAY-STATIONS |
| NAM7271H | L  18 ASSEMBLY LINE EXTRAS |
| NAMM28283 | L18 ASM LINE 54X48 FLOW THRU RKR COVERS |
| NAMM28284 | L18 ASM LINE 54X48 FLOW THRU RKR COVERS |
| NAM7271G | L -18 ASSEMBLY LINE EXTRAS |
| NAM7271K | L-18 ASM LINE SQUARE D POWER |
| NAM7271D | L  18 ASSEMBLY LINE EXTRAS |
| NAMM28234 | L -18 ASSY TEAM ROOM |
| NAMM28346 | L18 OIL FILL DYE INJECTION SYSTEM |
| NAM7271ELEC1 | L  18 ENG ASM ELECTRICAL |
| NAMM28023 | L 18 ACCESSORY DRIVE BRACKET MANIPULATOR |
| NAMM28018 | L-18 BALANCER——— MANIPULATOR |
| NAMM28024 | L 18 BELL HOUSING MANIPULATOR |
| NAMM28017 | L-18 CRANK ASSY— MANIPULATOR |
| NAML18ENGRAC | L 18 ENGINE RACKS(970) GM32076 |
| NAMM28022 | L-18 FLYWHEEL——— MANIPULATOR |
| NAM7271FD | L 18 ENGINE LINE FOUNDATION |
| NAMM28016 | L-18 INLET MAN ASSY MANIPULATOR |
| NAMM28070 | L-18 L H HEAD——— MANIPULATOR |
| NAMM26916TS2 | L  18 TEST STANDS |
| NAMM28019 | L 18 OIL  PAN ——- MANIPULATOR |
| NAM7271INS1B | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM28021 | L-18 R H HEAD——— MANIPULATOR |
| NAM7271INS2 | L 18 ENGINE ASM LINE(INSTALL) |
| NAM7271M | L 18 ASM LINE ENG SVS WIRE WAY |
| NAMM28468 | OCE 9600 DIGITAL ENG PRINT SYSTEM |
| NAMM28323 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28324 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28325 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAM7271INS1A | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM28326 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAM7271Q | L-18 ASM LINE BALANCERS |
| NAM7271S | L-18 ASM LINE EMPTY PALLET STORAGE SYSTEM |
| NAM7271E | L  18 ASSEMBLY LINE EXTRAS |
| NAMM28234A | L  18 ASSY TEAM ROOM |
| NAMM28128 | MARK ASM/PIST AREA LIFT&TILT TABLE |
| NAMM28248 | L -18 ASSY TEAM ROOM |
| NAMM28129 | MARK ASM/PIST AREA LIFT&TILT TABLE |
| NAMM28246 | L -18 ASSY TEAM ROOM |
| NAMM28300 | L 18 ASM HOHL CART 22960 |
| NAMM28244 | L -18 ASSY TEAM ROOM |
| NAMM28302 | L 18 ASM HOHL CART 22960 |
| NAMM28249 | L  18 ASSY TEAM ROOM |
| NAMM28295 | L 18 ASM HOHL CART 22960 |
| NAMM28247 | L -18 ASSY TEAM ROOM |
| NAMM28296 | L 18 ASM HOHL CART 22960 |
| NAMM28245 | L -18 ASSY TEAM ROOM |
| NAMM28297 | L 18 ASM HOHL CART 22960 |
| NAMM28243 | L  18 ASSY TEAM ROOM |
| NAMM28298 | L 18 ASM HOHL CART 22960 |

| | |
|---|---|
| NAMM28242 | L 18 ASSY TEAM ROOM |
| NAMM28299 | L 18 ASM HOHL CART 22960 |
| NAMM28241 | L 18 ASSY TEAM ROOM |
| NAMM28301 | L 18 ASM HOHL CART 22960 |
| NAMM28234B | L 18 ASSY TEAM ROOM |
| NAMM28303 | L 18 ASM HOHL CART 22960 |
| NAMM28270 | L 18 ANDON BOARD |
| NAM7771B | L 18 ASSEMBLY LINE EXTRAS |
| NAMM28269 | L 18 ANDON BOARD |
| NAM7771PMCSW | L-18 ASM LINE P M & C SOFTWARE |
| NAMM28188A | L18 NAPP ELECTRONIC PULL SYSTEM |
| NAMM28321 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28328 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28268F | L 18 HEAD LIFT TABLE FOUNDATION |

SCHEDULE II

to

Lease Supplement (GM2001A-8)
Delivery Date  December 18, 2001

BASE RENT

| Lease Period Date | Percentage of Lessor's Cost [1] |
|---|---|
| 18-Mar-02 | 1 86349345 |
| 2-Jul-02 | 1 57559243 |
| 2-Jan-03 | 2 72698690 |
| 2-Jul-03 | 2 72698690 |
| 2-Jan-04 | 2 72698690 |
| 2-Jul-04 | 5 45125570 |
| 2-Jan-05 | 2 62891323 |
| 2-Jul-05 | 6 89352867 |
| 2-Jan-06 | 2 47538707 |
| 2-Jul-06 | 7 04705483 |
| 2-Jan-07 | 2 31080703 |
| 2-Jul-07 | 7 21163487 |
| 2-Jan-08 | 2 13437723 |
| 2-Jul-08 | 7 38806467 |
| 2-Jan-09 | 27 70000000 |
| 2-Jul-09 | 2 56323790 |
| 2-Jan-10 | 2 78708269 |
| 2-Jul-10 | 2 82179605 |
| 2-Jan-11 | 1 01822896 |
| 2-Jul-11 | 1 01822896 |
| 2-Jan-12 | 29 30236681 |
| 2-Jul-12 | 0 00000000 |
| 2-Jan-13 | 10 35428358 |
| 2-Jul-13 | 0 00000000 |
| 2-Jan-14 | 0 21160602 |
| 2-Jul-14 | 0 00000000 |
| 2-Jan-15 | 0 00000000 |
| 2-Jul-15 | 4 83468954 |
| 2-Jan-16 | 0 00000000 |
| 18-Mar-16 | 10 35428358 |

[1] Base Rent will be allocated to the Lease Periods as set forth in Schedule II-A

SCHEDULE II-A

to

Lease Supplement (GM2001A-8)
Delivery Date  December 18, 2001

BASE RENT ALLOCATION

| From (and including) | To (and including) | Base Rent Allocated to Each Lease Period (Percentage of Lessor's Cost) | Base Rent Payment per Schedule II (Percentage of Lessor's Cost) | Lease Period Date |
|---|---|---|---|---|
| 18-Dec-01 | 17-Mar-02 | | 0 00000000 | 18-Mar-02 |
| 18-Mar-02 | 30-Jun-02 | 2 74746509 | 1 86349345 | 18-Mar-02 |
| | | | 0 88397164 | 2-Jul-02 |
| 1-Jul-02 | 31-Dec-02 | 4 80139531 | 0 69162079 | 2-Jul-02 |
| | | | 2 72698690 | 2-Jan-03 |
| | | | 1 38278761 | 2-Jul-03 |
| 1-Jan-03 | 30-Jun-03 | 4 76122095 | 1 34419929 | 2-Jul-03 |
| | | | 2 72698690 | 2-Jan-04 |
| | | | 0 69003475 | 2-Jul-04 |
| 1-Jul-03 | 31-Dec-03 | 4 76122095 | 4 76122095 | 2-Jul-04 |
| 1-Jan-04 | 30-Jun-04 | 4 76122095 | 2 62891323 | 2-Jan-05 |
| | | | 2 13230772 | 2-Jul-05 |
| 1-Jul-04 | 31-Dec-04 | 4 76122095 | 4 76122095 | 2-Jul-05 |
| 1-Jan-05 | 30-Jun-05 | 4 76122095 | 2 47538707 | 2-Jan-06 |
| | | | 2 28583388 | 2-Jul-06 |
| 1-Jul-05 | 31-Dec-05 | 4 76122095 | 4 76122095 | 2-Jul-06 |
| 1-Jan-06 | 30-Jun-06 | 4 76122095 | 2 31080703 | 2-Jan-07 |
| | | | 2 45041392 | 2-Jul-07 |
| 1-Jul-06 | 31-Dec-06 | 4 76122095 | 4 76122095 | 2-Jul-07 |
| 1-Jan-07 | 30-Jun-07 | 4 76122095 | 2 13437723 | 2-Jan-08 |
| | | | 2 62684372 | 2-Jul-08 |
| 1-Jul-07 | 31-Dec-07 | 4 76122095 | 4 76122095 | 2-Jul-08 |
| 1-Jan-08 | 30-Jun-08 | 4 91220308 | 4 91220308 | 2-Jan-09 |
| 1-Jul-08 | 31-Dec-08 | 4 91220308 | 4 91220308 | 2-Jan-09 |
| 1-Jan-09 | 30-Jun-09 | 5 42664132 | 5 42664132 | 2-Jan-09 |
| 1-Jul-09 | 31-Dec-09 | 5 42664132 | 5 42664132 | 2-Jan-09 |
| 1-Jan-10 | 30-Jun-10 | 5 81665657 | 5 81665657 | 2-Jan-09 |
| 1-Jul-10 | 31-Dec-10 | 5 81665657 | 1 20565462 | 2-Jan-09 |
| | | | 2 56323790 | 2-Jul-09 |
| | | | 2 04776405 | 2-Jan-10 |
| 1-Jan-11 | 30-Jun-11 | 5 81665657 | 0 73931864 | 2-Jan-10 |
| | | | 2 82179605 | 2-Jul-10 |
| | | | 1 01822896 | 2-Jan-11 |



SCHEDULE II-A
to
Lease Supplement (GM2001A-8)
Delivery Date  December 18, 2001

BASE RENT ALLOCATION

| From (and including) | To (and including) | Base Rent Allocated to Each Lease Period (Percentage of Lessor's Cost) | Base Rent Payment per Schedule II (Percentage of Lessor's Cost) | Lease Period Date |
|---|---|---|---|---|
| | | | 1 01822896 | 2-Jul-11 |
| | | | 0 21908395 | 2-Jan-12 |
| 1-Jul-11 | 31-Dec-11 | 5 81665657 | 5 81665657 | 2-Jan-12 |
| 1-Jan-12 | 30-Jun-12 | 5 81665657 | 5 81665657 | 2-Jan-12 |
| 1-Jul-12 | 31-Dec-12 | 5 81665657 | 5 81665657 | 2-Jan-12 |
| 1-Jan-13 | 30-Jun-13 | 5 81665657 | 5 81665657 | 2-Jan-12 |
| 1-Jul-13 | 31-Dec-13 | 5 81665657 | 5 81665657 | 2-Jan-12 |
| 1-Jan-14 | 30-Jun-14 | 5 81665657 | 5 81665657 | 2-Jan-13 |
| 1-Jul-14 | 31-Dec-14 | 5 81665657 | 4 53762701 | 2-Jan-13 |
| | | | 0 21160602 | 2-Jan-14 |
| | | | 1 06742355 | 2-Jul-15 |
| 1-Jan-15 | 30-Jun-15 | 5 81665657 | 3 76726599 | 2-Jul-15 |
| | | | 2 04939058 | 18-Mar-16 |
| 1-Jul-15 | 31-Dec-15 | 5 81665657 | 5 81665657 | 18-Mar-16 |
| 1-Jan-16 | 17-Mar-16 | 2 48823642 | 2 48823642 | 18-Mar-16 |
| Total | | 148 12687397 | 148 12687397 | |

SCHEDULE III
to
Lease Supplement (GM2001A-8)
Delivery Date December 18, 2001

STIPULATED LOSS VALUE

| Stipulated Loss Value Date | Stipulated Loss Value (Percentage of Lessor's Cost) | Base Rent Amount as of Stipulated Loss Value Date (Percentage of Lessor's Cost)[2] | Net Amount Payable (Percentage of Lessor's Cost)[3] |
|---|---|---|---|
| 2-Jan-02 | 101 68682941 | 0 00000000 | 101 68682941 |
| 2-Feb-02 | 102 49050105 | 0 00000000 | 102 49050105 |
| 2-Mar-02 | 103 29793389 | 0 00000000 | 103 29793389 |
| 2-Apr-02 | 103 70899783 | -1 49005159 | 102 21894624 |
| 2-May-02 | 103 59610363 | -0 68981904 | 102 90628459 |
| 2-Jun-02 | 103 56474508 | 0 11041351 | 103 67515859 |
| 2-Jul-02 | 103 41823155 | 0 91064606 | 104 32887761 |
| 2-Aug-02 | 103 35289153 | 0 13528618 | 103 48817770 |
| 2-Sep-02 | 103 29057183 | 0 93551873 | 104 22609056 |
| 2-Oct-02 | 103 11276364 | 1 73575128 | 104 84851492 |
| 2-Nov-02 | 103 01579186 | 2 53598383 | 105 55177570 |
| 2-Dec-02 | 102 92149969 | 3 33621638 | 106 25771607 |
| 2-Jan-03 | 102 71159781 | 4 13622574 | 106 84782355 |
| 2-Feb-03 | 102 58865678 | 2 20277566 | 104 79143245 |
| 2-Mar-03 | 102 46804349 | 2 99631249 | 105 46435598 |
| 2-Apr-03 | 102 34978301 | 3 78984931 | 106 13963232 |
| 2-May-03 | 102 16277477 | 4 58338614 | 106 74616091 |
| 2-Jun-03 | 102 02482144 | 5 37692296 | 107 40174440 |
| 2-Jul-03 | 101 81790821 | 6 17045979 | 107 98836800 |
| 2-Aug-03 | 101 65983549 | 4 23700971 | 105 89684520 |
| 2-Sep-03 | 101 50371207 | 5 03054653 | 106 53425861 |
| 2-Oct-03 | 101 27843305 | 5 82408336 | 107 10251641 |
| 2-Nov-03 | 101 10179669 | 6 61762018 | 107 71941688 |
| 2-Dec-03 | 100 92690968 | 7 41115701 | 108 33806669 |
| 2-Jan-04 | 100 68266495 | 8 20469383 | 108 88735878 |
| 2-Feb-04 | 100 48685859 | 6 27124376 | 106 75810234 |
| 2-Mar-04 | 100 29259508 | 7 06478058 | 107 35737566 |
| 2-Apr-04 | 100 09989105 | 7 85831740 | 107 95820846 |
| 2-May-04 | 99 86456992 | 8 65185423 | 108 51642415 |
| 2-Jun-04 | 99 65982825 | 9 44539105 | 109 10521930 |
| 2-Jul-04 | 99 41233981 | 10 23892788 | 109 65126769 |
| 2-Aug-04 | 99 17895416 | 5 58120900 | 104 76016316 |
| 2-Sep-04 | 98 94688265 | 6 37474583 | 105 32162848 |
| 2-Oct-04 | 98 67194605 | 7 16828265 | 105 84022870 |
| 2-Nov-04 | 98 42733826 | 7 96181948 | 106 38915773 |
| 2-Dec-04 | 98 18392372 | 8 75535630 | 106 93928002 |
| 2-Jan-05 | 97 89752191 | 9 54889313 | 107 44641504 |
| 2-Feb-05 | 97 64132541 | 7 71351672 | 105 35484214 |
| 2-Mar-05 | 97 38619734 | 8 50705355 | 105 89325089 |



SCHEDULE III

to

Lease Supplement (GM2001A-8)
Delivery Date  December 18, 2001

## STIPULATED LOSS VALUE

| Stipulated Loss Value Date | Stipulated Loss Value (Percentage of Lessor's Cost) | Base Rent Amount as of Stipulated Loss Value Date (Percentage of Lessor's Cost)[2] | Net Amount Payable (Percentage of Lessor's Cost)[3] |
|---|---|---|---|
| 2-Apr-05 | 97 13214920 | 9 30059037 | 106 43273957 |
| 2-May-05 | 96 85519678 | 10 09412720 | 106 94932398 |
| 2-Jun-05 | 96 59508643 | 10 88766402 | 107 48275046 |
| 2-Jul-05 | 96 31200651 | 11 68120085 | 107 99320736 |
| 2-Aug-05 | 96 02011497 | 5 58120900 | 101 60132397 |
| 2-Sep-05 | 95 72918297 | 6 37474583 | 102 10392880 |
| 2-Oct-05 | 95 41522502 | 7 16828265 | 102 58350768 |
| 2-Nov-05 | 95 11798616 | 7 96181948 | 103 07980564 |
| 2-Dec-05 | 94 82164925 | 8 75535630 | 103 57700555 |
| 2-Jan-06 | 94 50222815 | 9 54889313 | 104 05112128 |
| 2-Feb-06 | 94 19946730 | 7 86704288 | 102 06651018 |
| 2-Mar-06 | 93 89754892 | 8 66057970 | 102 55812862 |
| 2-Apr-06 | 93 59648208 | 9 45411653 | 103 05059861 |
| 2-May-06 | 93 27396117 | 10 24765335 | 103 52161453 |
| 2-Jun-06 | 92 96694641 | 11 04119018 | 104 00813659 |
| 2-Jul-06 | 92 63841351 | 11 83472700 | 104 47314051 |
| 2-Aug-06 | 92 29789199 | 5 58120900 | 97 87910099 |
| 2-Sep-06 | 91 95810165 | 6 37474583 | 98 33284748 |
| 2-Oct-06 | 91 59673560 | 7 16828265 | 98 76501825 |
| 2-Nov-06 | 91 25075274 | 7 96181948 | 99 21257221 |
| 2-Dec-06 | 90 90544223 | 8 75535630 | 99 66079853 |
| 2-Jan-07 | 90 53849655 | 9 54889313 | 100 08738968 |
| 2-Feb-07 | 90 18687395 | 8 03162292 | 98 21849687 |
| 2-Mar-07 | 89 83586296 | 8 82515974 | 98 66102270 |
| 2-Apr-07 | 89 48547017 | 9 61869657 | 99 10416674 |
| 2-May-07 | 89 11518956 | 10 41223339 | 99 52742295 |
| 2-Jun-07 | 88 75899470 | 11 20577022 | 99 96476492 |
| 2-Jul-07 | 88 38284952 | 11 99930704 | 100 38215657 |
| 2-Aug-07 | 87 99132196 | 5 58120900 | 93 57253097 |
| 2-Sep-07 | 87 60029292 | 6 37474583 | 93 97503874 |
| 2-Oct-07 | 87 18925506 | 7 16828265 | 94 35753772 |
| 2-Nov-07 | 86 79218069 | 7 96181948 | 94 75400016 |
| 2-Dec-07 | 86 39554507 | 8 75535630 | 95 15090137 |
| 2-Jan-08 | 85 97800147 | 9 54973192 | 95 52773339 |
| 2-Feb-08 | 85 55003540 | 8 23405520 | 93 78409060 |
| 2-Mar-08 | 85 12244639 | 9 05275571 | 94 17520211 |
| 2-Apr-08 | 84 69523851 | 9 87145623 | 94 56669474 |
| 2-May-08 | 84 27501772 | 10 69015674 | 94 96517446 |
| 2-Jun-08 | 83 85085618 | 11 50885725 | 95 35971344 |

SCHEDULE III
to
Lease Supplement (GM2001A-8)
Delivery Date  December 18, 2001

## STIPULATED LOSS VALUE

| Stipulated Loss Value Date | Stipulated Loss Value (Percentage of Lessor's Cost) | Base Rent Amount as of Stipulated Loss Value Date (Percentage of Lessor's Cost)[2] | Net Amount Payable (Percentage of Lessor's Cost)[3] |
|---|---|---|---|
| 2-Jul-08 | 83 43371455 | 12 32755777 | 95 76127232 |
| 2-Aug-08 | 82 98114321 | 5 75819361 | 88 73933682 |
| 2-Sep-08 | 82 52902343 | 6 57689413 | 89 10591756 |
| 2-Oct-08 | 82 08396196 | 7 39559464 | 89 47955660 |
| 2-Nov-08 | 81 63503170 | 8 21429515 | 89 84932685 |
| 2-Dec-08 | 81 18659223 | 9 03299567 | 90 21958790 |
| 2-Jan-09 | 80 74239271 | 9 85455417 | 90 59694688 |
| 2-Feb-09 | 80 05674900 | -16 94100561 | 63 11574340 |
| 2-Mar-09 | 79 37178821 | -16 03656539 | 63 33522282 |
| 2-Apr-09 | 78 68736357 | -15 13212517 | 63 55523841 |
| 2-May-09 | 78 04988531 | -14 22768495 | 63 82220036 |
| 2-Jun-09 | 77 38251837 | -13 32324472 | 64 05927365 |
| 2-Jul-09 | 72 26547056 | -12 41880450 | 59 84666606 |
| 2-Aug-09 | 76 02974949 | -14 07760218 | 61 95214730 |
| 2-Sep-09 | 75 35230269 | -13 17316196 | 62 17914072 |
| 2-Oct-09 | 74 72187742 | -12 26872174 | 62 45315567 |
| 2-Nov-09 | 74 06163945 | -11 36428152 | 62 69735793 |
| 2-Dec-09 | 73 40220395 | -10 45984130 | 62 94236264 |
| 2-Jan-10 | 72 78781724 | -9 55323433 | 63 23458291 |
| 2-Feb-10 | 71 98641967 | -11 37087426 | 60 61554541 |
| 2-Mar-10 | 71 24804321 | -10 40143150 | 60 84661171 |
| 2-Apr-10 | 70 51032772 | -9 43198874 | 61 07833898 |
| 2-May-10 | 69 82383491 | -8 46254598 | 61 36128893 |
| 2-Jun-10 | 69 10485887 | -7 49310321 | 61 61175566 |
| 2-Jul-10 | 68 43730737 | -6 52366045 | 61 91364692 |
| 2-Aug-10 | 67 64106253 | -8 37601374 | 59 26504879 |
| 2-Sep-10 | 66 90913141 | -7 40657098 | 59 50256043 |
| 2-Oct-10 | 66 22848528 | -6 43712822 | 59 79135707 |
| 2-Nov-10 | 65 51541891 | -5 46768546 | 60 04773346 |
| 2-Dec-10 | 64 80328614 | -4 49824269 | 60 30504344 |
| 2-Jan-11 | 64 14265162 | -3 52879993 | 60 61385168 |
| 2-Feb-11 | 63 44981241 | -3 57758613 | 59 87222628 |
| 2-Mar-11 | 62 75812468 | -2 60814337 | 60 14998131 |
| 2-Apr-11 | 62 06760083 | -1 63870061 | 60 42890022 |
| 2-May-11 | 61 42880800 | -0 66925785 | 60 75955015 |
| 2-Jun-11 | 60 75804576 | 0 30018491 | 61 05823067 |
| 2-Jul-11 | 60 13922739 | 1 26962768 | 61 40885507 |
| 2-Aug-11 | 59 48865477 | 1 22084148 | 60 70949625 |
| 2-Sep-11 | 58 83968891 | 2 19028424 | 61 02997315 |

SCHEDULE III

to

Lease Supplement (GM2001A-8)
Delivery Date  December 18, 2001

## STIPULATED LOSS VALUE

| Stipulated Loss Value Date | Stipulated Loss Value (Percentage of Lessor's Cost) | Base Rent Amount as of Stipulated Loss Value Date (Percentage of Lessor's Cost)[2] | Net Amount Payable (Percentage of Lessor's Cost)[3] |
|---|---|---|---|
| 2-Oct-11 | 58 24290172 | 3 15972700 | 61 40262872 |
| 2-Nov-11 | 57 61459759 | 4 12916976 | 61 74376735 |
| 2-Dec-11 | 56 98814008 | 5 09861252 | 62 08675260 |
| 2-Jan-12 | 56 41410369 | 6 06805528 | 62 48215898 |
| 2-Feb-12 | 55 63909060 | -22 26486876 | 33 37422184 |
| 2-Mar-12 | 54 86617184 | -21 29542600 | 33 57074584 |
| 2-Apr-12 | 54 09536998 | -20 32598324 | 33 76938674 |
| 2-May-12 | 53 38799642 | -19 35654048 | 34 03145595 |
| 2-Jun-12 | 52 64258672 | -18 38709771 | 34 25548901 |
| 2-Jul-12 | 51 96087885 | -17 41765495 | 34 54322389 |
| 2-Aug-12 | 51 24141128 | -16 44821219 | 34 79319909 |
| 2-Sep-12 | 50 52463638 | -15 47876943 | 35 04586695 |
| 2-Oct-12 | 49 87187174 | -14 50932667 | 35 36254507 |
| 2-Nov-12 | 49 18165919 | -13 53988391 | 35 64177528 |
| 2-Dec-12 | 48 49445441 | -12 57044114 | 35 92401326 |
| 2-Jan-13 | 47 87157843 | -11 60099838 | 36 27058004 |
| 2-Feb-13 | 46 65806255 | -20 98583920 | 25 67222335 |
| 2-Mar-13 | 45 81092687 | -20 01639643 | 25 79453044 |
| 2-Apr-13 | 44 96510865 | -19 04695367 | 25 91815498 |
| 2-May-13 | 44 18194059 | -18 07751091 | 26 10442968 |
| 2-Jun-13 | 43 35990002 | -17 10806815 | 26 25183187 |
| 2-Jul-13 | 42 60076572 | -16 13862539 | 26 46214033 |
| 2-Aug-13 | 41 80301780 | -15 16918263 | 26 63383517 |
| 2-Sep-13 | 41 00711931 | -14 19973986 | 26 80737945 |
| 2-Oct-13 | 40 27440870 | -13 23029710 | 27 04411160 |
| 2-Nov-13 | 39 50336909 | -12 26085434 | 27 24251475 |
| 2-Dec-13 | 38 73446662 | -11 29141158 | 27 44305504 |
| 2-Jan-14 | 38 02904281 | -10 32196882 | 27 70707399 |
| 2-Feb-14 | 37 27427200 | -9 56413207 | 27 71013993 |
| 2-Mar-14 | 36 52935485 | -8 59468931 | 27 93466554 |
| 2-Apr-14 | 35 78685622 | -7 62524655 | 28 16160967 |
| 2-May-14 | 35 10812067 | -6 65580379 | 28 45231689 |
| 2-Jun-14 | 34 39163752 | -5 68636102 | 28 70527650 |
| 2-Jul-14 | 33 73919769 | -4 71691826 | 29 02227943 |
| 2-Aug-14 | 33 04929350 | -3 74747550 | 29 30181800 |
| 2-Sep-14 | 32 36240041 | -2 77803274 | 29 58436767 |
| 2-Oct-14 | 31 73986938 | -1 80858998 | 29 93127940 |
| 2-Nov-14 | 31 08019615 | -0 83914722 | 30 24104893 |
| 2-Dec-14 | 30 42385966 | 0 13029555 | 30 55415521 |



SCHEDULE III

to

Lease Supplement (GM2001A-8)
Delivery Date  December 18, 2001

## STIPULATED LOSS VALUE

| Stipulated Loss Value Date | Stipulated Loss Value (Percentage of Lessor's Cost) | Base Rent Amount as of Stipulated Loss Value Date (Percentage of Lessor's Cost)[2] | Net Amount Payable (Percentage of Lessor's Cost)[3] |
|---|---|---|---|
| 2-Jan-15 | 29 83221438 | 1 09973831 | 30 93195268 |
| 2-Feb-15 | 29 20375959 | 2 06918107 | 31 27294066 |
| 2-Mar-15 | 28 57897782 | 3 03862383 | 31 61760165 |
| 2-Apr-15 | 27 95790863 | 4 00806659 | 31 96597522 |
| 2-May-15 | 27 40191053 | 4 97750936 | 32 37941988 |
| 2-Jun-15 | 26 80948690 | 5 94695212 | 32 75643902 |
| 2-Jul-15 | 26 28244293 | 6 91639488 | 33 19883781 |
| 2-Aug-15 | 25 46083499 | 3 05114810 | 28 51198310 |
| 2-Sep-15 | 24 81311971 | 4 02059087 | 28 83371057 |
| 2-Oct-15 | 24 23018848 | 4 99003363 | 29 22022211 |
| 2-Nov-15 | 23 61054163 | 5 95947639 | 29 57001802 |
| 2-Dec-15 | 22 99466266 | 6 92891915 | 29 92358181 |
| 2-Jan-16 | 22 44391069 | 7 89836191 | 30 34227260 |
| 2-Feb-16 | 21 85678971 | 8 86780467 | 30 72459439 |
| 2-Mar-16 | 21 27378698 | 9 83724744 | 31 11103442 |
| 18-Mar-16 | 20 00000000 | 10 35428358 | 30 35428358 |

[2] This amount reflects the excess of Base Rent allocated over Base Rent paid (if shown as a positive number) or the excess of Base Rent paid over Base Rent allocated (if shown as a negative number)

[3] The "Net Amount Payable" in this column is the amount payable on termination which is the sum of, and represents (i) a payment (or reduction) of "Base Rent Amount" and (ii) a payment of the "Stipulated Loss Value"

SCHEDULE IV

to

Lease Supplement (GM2001A-8)

Delivery Date  December 18, 2001

## TERMINATION VALUE

| Termination Date | Termination Value (Percentage of Lessor's Cost) | Base Rent Amount as of Termination Date (Percentage of Lessor's Cost)[4] | Net Amount Payable (Percentage of Lessor's Cost)[5] |
|---|---|---|---|
| 2-Jan-02 | 101 68682941 | 0 00000000 | 101 68682941 |
| 2-Feb-02 | 102 49050105 | 0 00000000 | 102 49050105 |
| 2-Mar-02 | 103 29793389 | 0 00000000 | 103 29793389 |
| 2-Apr-02 | 103 70899783 | -1 49005159 | 102 21894624 |
| 2-May-02 | 103 59610363 | -0 68981904 | 102 90628459 |
| 2-Jun-02 | 103 56474508 | 0 11041351 | 103 67515859 |
| 2-Jul-02 | 103 41823155 | 0 91046606 | 104 32887761 |
| 2-Aug-02 | 103 35289153 | 0 13528618 | 103 48817770 |
| 2-Sep-02 | 103 29057183 | 0 93551873 | 104 22609056 |
| 2-Oct-02 | 103 11276364 | 1 73575128 | 104 84851492 |
| 2-Nov-02 | 103 01579186 | 2 53598383 | 105 55177570 |
| 2-Dec-02 | 102 92149969 | 3 33621638 | 106 25771607 |
| 2-Jan-03 | 102 71159781 | 4 13622574 | 106 84782355 |
| 2-Feb-03 | 102 58865678 | 2 20277566 | 104 79143245 |
| 2-Mar-03 | 102 46804349 | 2 99631249 | 105 46435598 |
| 2-Apr-03 | 102 34978301 | 3 78984931 | 106 13963232 |
| 2-May-03 | 102 16277477 | 4 58338614 | 106 74616091 |
| 2-Jun-03 | 102 02482144 | 5 37692296 | 107 40174440 |
| 2-Jul-03 | 101 81790821 | 6 17045979 | 107 98836800 |
| 2-Aug-03 | 101 65983549 | 4 23700971 | 105 89684520 |
| 2-Sep-03 | 101 50371207 | 5 03054653 | 106 53425861 |
| 2-Oct-03 | 101 27843305 | 5 82408336 | 107 10251641 |
| 2-Nov-03 | 101 10179669 | 6 61762018 | 107 71941688 |
| 2-Dec-03 | 100 92690968 | 7 41115701 | 108 33806669 |
| 2-Jan-04 | 100 68266495 | 8 20469383 | 108 88735878 |
| 2-Feb-04 | 100 48685859 | 6 27124376 | 106 75810234 |
| 2-Mar-04 | 100 29259508 | 7 06478058 | 107 35737566 |
| 2-Apr-04 | 100 09989105 | 7 85831740 | 107 95820846 |
| 2-May-04 | 99 86456992 | 8 65185423 | 108 51642415 |
| 2-Jun-04 | 99 65982825 | 9 44539105 | 109 10521930 |
| 2-Jul-04 | 99 41233981 | 10 23892788 | 109 65126769 |
| 2-Aug-04 | 99 17895416 | 5 58120900 | 104 76016316 |
| 2-Sep-04 | 98 94688265 | 6 37474583 | 105 32162848 |
| 2-Oct-04 | 98 67194605 | 7 16828265 | 105 84022870 |
| 2-Nov-04 | 98 42733826 | 7 96181948 | 106 38915773 |
| 2-Dec-04 | 98 18392372 | 8 75535630 | 106 93928002 |
| 2-Jan-05 | 97 89752191 | 9 54889313 | 107 44641504 |
| 2-Feb-05 | 97 64132541 | 7 71351672 | 105 35484214 |
| 2-Mar-05 | 97 38619734 | 8 50705355 | 105 89325089 |



SCHEDULE IV
to
Lease Supplement (GM2001A-8)
Delivery Date  December 18, 2001

## TERMINATION VALUE

| Termination Date | Termination Value (Percentage of Lessor's Cost) | Base Rent Amount as of Termination Date (Percentage of Lessor's Cost)[4] | Net Amount Payable (Percentage of Lessor's Cost)[5] |
|---|---|---|---|
| 2-Apr-05 | 97 13214920 | 9 30059037 | 106 43273957 |
| 2-May-05 | 96 85519678 | 10 09412720 | 106 94932398 |
| 2-Jun-05 | 96 59508643 | 10 88766402 | 107 48275046 |
| 2-Jul-05 | 96 31200651 | 11 68120085 | 107 99320736 |
| 2-Aug-05 | 96 02011497 | 5 58120900 | 101 60132397 |
| 2-Sep-05 | 95 72918297 | 6 37474583 | 102 10392880 |
| 2-Oct-05 | 95 41522502 | 7 16828265 | 102 58350768 |
| 2-Nov-05 | 95 11798616 | 7 96181948 | 103 07980564 |
| 2-Dec-05 | 94 82164925 | 8 75535630 | 103 57700555 |
| 2-Jan-06 | 94 50222815 | 9 54889313 | 104 05112128 |
| 2-Feb-06 | 94 19946730 | 7 86704288 | 102 06651018 |
| 2-Mar-06 | 93 89754892 | 8 66057970 | 102 55812862 |
| 2-Apr-06 | 93 59648208 | 9 45411653 | 103 05059861 |
| 2-May-06 | 93 27396117 | 10 24765335 | 103 52161453 |
| 2-Jun-06 | 92 96694641 | 11 04119018 | 104 00813659 |
| 2-Jul-06 | 92 63841351 | 11 83472700 | 104 47314051 |
| 2-Aug-06 | 92 29789199 | 5 58120900 | 97 87910099 |
| 2-Sep-06 | 91 95810165 | 6 37474583 | 98 33284748 |
| 2-Oct-06 | 91 59673560 | 7 16828265 | 98 76501825 |
| 2-Nov-06 | 91 25075274 | 7 96181948 | 99 21257221 |
| 2-Dec-06 | 90 90544223 | 8 75535630 | 99 66079853 |
| 2-Jan-07 | 90 53849655 | 9 54889313 | 100 08738968 |
| 2-Feb-07 | 90 18687395 | 8 03162292 | 98 21849687 |
| 2-Mar-07 | 89 83586296 | 8 82515974 | 98 66102270 |
| 2-Apr-07 | 89 48547017 | 9 61869657 | 99 10416674 |
| 2-May-07 | 89 11518956 | 10 41223339 | 99 52742295 |
| 2-Jun-07 | 88 75899470 | 11 20577022 | 99 96476492 |
| 2-Jul-07 | 88 38284952 | 11 99930704 | 100 38215657 |
| 2-Aug-07 | 87 99132196 | 5 58120900 | 93 57253097 |
| 2-Sep-07 | 87 60029292 | 6 37474583 | 93 97503874 |
| 2-Oct-07 | 87 18925506 | 7 16828265 | 94 35753772 |
| 2-Nov-07 | 86 79218069 | 7 96181948 | 94 75400016 |
| 2-Dec-07 | 86 39554507 | 8 75535630 | 95 15090137 |
| 2-Jan-08 | 85 97800147 | 9 54973192 | 95 52773339 |
| 2-Feb-08 | 85 55003540 | 8 23405520 | 93 78409060 |
| 2-Mar-08 | 85 12244639 | 9 05275571 | 94 17520211 |
| 2-Apr-08 | 84 69523851 | 9 87145623 | 94 56669474 |
| 2-May-08 | 84 27501772 | 10 69015674 | 94 96517446 |
| 2-Jun-08 | 83 85085618 | 11 50885725 | 95 35971344 |

SCHEDULE IV

to

Lease Supplement (GM2001A-8)
Delivery Date  December 18, 2001

## TERMINATION VALUE

| Termination Date | Termination Value (Percentage of Lessor's Cost) | Base Rent Amount as of Termination Date (Percentage of Lessor's Cost)[4] | Net Amount Payable (Percentage of Lessor's Cost)[5] |
|---|---|---|---|
| 2-Jul-08 | 83 43371455 | 12 32755777 | 95 76127232 |
| 2-Aug-08 | 82 98114321 | 5 75819361 | 88 73933682 |
| 2-Sep-08 | 82 52902343 | 6 57689413 | 89 10591756 |
| 2-Oct-08 | 82 08396196 | 7 39559464 | 89 47955660 |
| 2-Nov-08 | 81 63503170 | 8 21429515 | 89 84932685 |
| 2-Dec-08 | 81 18659223 | 9 03299567 | 90 21958790 |
| 2-Jan-09 | 80 74239271 | 9 85455417 | 90 59694688 |
| 2-Feb-09 | 80 05674900 | -16`94100561 | 63 11574340 |
| 2-Mar-09 | 79 37178821 | -16 03656539 | 63 33522282 |
| 2-Apr-09 | 78 68736357 | -15 13212517 | 63 55523841 |
| 2-May-09 | 78 04988531 | -14 22768495 | 63 82220036 |
| 2-Jun-09 | 77 38251837 | -13 32324472 | 64 05927365 |
| 2-Jul-09 | 72 26547056 | -12 41880450 | 59 84666606 |
| 2-Aug-09 | 76 02974949 | -14 07760218 | 61 95214730 |
| 2-Sep-09 | 75 35230269 | -13 17316196 | 62 17914072 |
| 2-Oct-09 | 74 72187742 | -12 26872174 | 62 45315567 |
| 2-Nov-09 | 74 06163945 | -11 36428152 | 62 69735793 |
| 2-Dec-09 | 73 40220395 | -10 45984130 | 62 94236264 |
| 2-Jan-10 | 72 78781724 | -9 55323433 | 63 23458291 |
| 2-Feb-10 | 71 98641967 | -11 37087426 | 60 61554541 |
| 2-Mar-10 | 71 24804321 | -10 40143150 | 60 84661171 |
| 2-Apr-10 | 70 51032772 | -9 43198874 | 61 07833898 |
| 2-May-10 | 69 82383491 | -8 46254598 | 61 36128893 |
| 2-Jun-10 | 69 10485887 | -7 49310321 | 61 61175566 |
| 2-Jul-10 | 68 43730737 | -6 52366045 | 61 91364692 |
| 2-Aug-10 | 67 64106253 | -8 37601374 | 59 26504879 |
| 2-Sep-10 | 66 90913141 | -7 40657098 | 59 50256043 |
| 2-Oct-10 | 66 22848528 | -6 43712822 | 59 79135707 |
| 2-Nov-10 | 65 51541891 | -5 46768546 | 60 04773346 |
| 2-Dec-10 | 64 80328614 | -4 49824269 | 60 30504344 |
| 2-Jan-11 | 64 14265162 | -3 52879993 | 60 61385168 |
| 2-Feb-11 | 63 44981241 | -3 57758613 | 59 87222628 |
| 2-Mar-11 | 62 75812468 | -2 60814337 | 60 14998131 |
| 2-Apr-11 | 62 06760083 | -1 63870061 | 60 42890022 |
| 2-May-11 | 61 42880800 | -0 66925785 | 60 75955015 |
| 2-Jun-11 | 60 75804576 | 0 30018491 | 61 05823067 |
| 2-Jul-11 | 60 13922739 | 1 26962768 | 61 40885507 |
| 2-Aug-11 | 59 48865477 | 1 22084148 | 60 70949625 |
| 2-Sep-11 | 58 83968891 | 2 19028424 | 61 02997315 |



SCHEDULE IV

to

Lease Supplement (GM2001A-8)
Delivery Date  December 18, 2001

## TERMINATION VALUE

| Termination Date | Termination Value (Percentage of Lessor's Cost) | Base Rent Amount as of Termination Date (Percentage of Lessor's Cost)[4] | Net Amount Payable (Percentage of Lessor's Cost)[5] |
|---|---|---|---|
| 2-Oct-11 | 58 24290172 | 3 15972700 | 61 40262872 |
| 2-Nov-11 | 57 61459759 | 4 12916976 | 61 74376735 |
| 2-Dec-11 | 56 98814008 | 5 09861252 | 62 08675260 |
| 2-Jan-12 | 56 41410369 | 6 06805528 | 62 48215898 |
| 2-Feb-12 | 55 63909060 | -22 26486876 | 33 37422184 |
| 2-Mar-12 | 54 86617184 | -21 29542600 | 33 57074584 |
| 2-Apr-12 | 54 09536998 | -20 32598324 | 33 76938674 |
| 2-May-12 | 53 38799642 | -19 35654048 | 34 03145595 |
| 2-Jun-12 | 52 64258672 | -18 38709771 | 34 25548901 |
| 2-Jul-12 | 51 96087885 | -17 41765495 | 34 54322389 |
| 2-Aug-12 | 51 24141128 | -16 44821219 | 34 79319909 |
| 2-Sep-12 | 50 52463638 | -15 47876943 | 35 04586695 |
| 2-Oct-12 | 49 87187174 | -14 50932667 | 35 36254507 |
| 2-Nov-12 | 49 18165919 | -13 53988391 | 35 64177528 |
| 2-Dec-12 | 48 49445441 | -12 57044114 | 35 92401326 |
| 2-Jan-13 | 47 87157843 | -11 60099838 | 36 27058004 |
| 2-Feb-13 | 46 65806255 | -20 98583920 | 25 67222335 |
| 2-Mar-13 | 45 81092687 | -20 01639643 | 25 79453044 |
| 2-Apr-13 | 44 96510865 | -19 04695367 | 25 91815498 |
| 2-May-13 | 44 18194059 | -18 07751091 | 26 10442968 |
| 2-Jun-13 | 43 35990002 | -17 10806815 | 26 25183187 |
| 2-Jul-13 | 42 60076572 | -16 13862539 | 26 46214033 |
| 2-Aug-13 | 41 80301780 | -15 16918263 | 26 63383517 |
| 2-Sep-13 | 41 00711931 | -14 19973986 | 26 80737945 |
| 2-Oct-13 | 40 27440870 | -13 23029710 | 27 04411160 |
| 2-Nov-13 | 39 50336909 | -12 26085434 | 27 24251475 |
| 2-Dec-13 | 38 73446662 | -11 29141158 | 27 44305504 |
| 2-Jan-14 | 38 02904281 | -10 32196882 | 27 70707399 |
| 2-Feb-14 | 37 27427200 | -9 56413207 | 27 71013993 |
| 2-Mar-14 | 36 52935485 | -8 59468931 | 27 93466554 |
| 2-Apr-14 | 35 78685622 | -7 62524655 | 28 16160967 |
| 2-May-14 | 35 10812067 | -6 65580379 | 28 45231689 |
| 2-Jun-14 | 34 39163752 | -5 68636102 | 28 70527650 |
| 2-Jul-14 | 33 73919769 | -4 71691826 | 29 02227943 |
| 2-Aug-14 | 33 04929350 | -3 74747550 | 29 30181800 |
| 2-Sep-14 | 32 36240041 | -2 77803274 | 29 58436767 |
| 2-Oct-14 | 31 73986938 | -1 80858998 | 29 93127940 |
| 2-Nov-14 | 31 08019615 | -0 83914722 | 30 24104893 |
| 2-Dec-14 | 30 42385966 | 0 13029555 | 30 55415521 |



SCHEDULE IV
to
Lease Supplement (GM2001A-8)
Delivery Date  December 18, 2001

## TERMINATION VALUE

| Termination Date | Termination Value (Percentage of Lessor's Cost) | Base Rent Amount as of Termination Date (Percentage of Lessor's Cost)[4] | Net Amount Payable (Percentage of Lessor's Cost)[5] |
|---|---|---|---|
| 2-Jan-15 | 29 83221438 | 1 09973831 | 30 93195268 |
| 2-Feb-15 | 29 20375959 | 2 06918107 | 31 27294066 |
| 2-Mar-15 | 28 57897782 | 3 03862383 | 31 61760165 |
| 2-Apr-15 | 27 95790863 | 4 00806659 | 31 96597522 |
| 2-May-15 | 27 40191053 | 4 97750936 | 32 37941988 |
| 2-Jun-15 | 26 80948690 | 5 94695212 | 32 75643902 |
| 2-Jul-15 | 26 28244293 | 6 91639488 | 33 19883781 |
| 2-Aug-15 | 25 46083499 | 3 05114810 | 28 51198310 |
| 2-Sep-15 | 24 81311971 | 4 02059087 | 28 83371057 |
| 2-Oct-15 | 24 23018848 | 4 99003363 | 29 22022211 |
| 2-Nov-15 | 23 61054163 | 5 95947639 | 29 57001802 |
| 2-Dec-15 | 22 99466266 | 6 92891915 | 29 92358181 |
| 2-Jan-16 | 22 44391069 | 7 89836191 | 30 34227260 |
| 2-Feb-16 | 21 85678971 | 8 86780467 | 30 72459439 |
| 2-Mar-16 | 21 27378698 | 9 83724744 | 31 11103442 |
| 18-Mar-16 | 20 00000000 | 10 35428358 | 30 35428358 |

[4]  This amount reflects the excess of Base Rent allocated over Base Rent paid (if shown as a positive number) or the excess of Base Rent paid over Base Rent allocated (if shown as a negative number)

[5]  The "Net Amount Payable" in this column is the amount payable on termination which is the sum of, and represents (i) a payment (or reduction) of "Base Rent Amount" and (ii) a payment of the "Termination Value"

SCHEDULE V

to

Lease Supplement (GM2001A-8)
Delivery Date  December 18, 2001

## EBO AMOUNT

| EBO Date | Early Fixed Price Purchase Amount (Percentage of Lessor's Cost) | Base Rent Amount as of the EBO Date (Percentage of Lessor's Cost)[6] | Net Amount Payable (Percentage of Lessor's Cost)[7] |
|---|---|---|---|
| 2-Jul-09 | 43 76152546 | -12 41880450 | 31 34272096 |
| 15-Sep-09 | 14 25197255 | 0 00000000 | 14 25197255 |
| 15-Dec-09 | 14 25197255 | 0 00000000 | 14 25197255 |

[6] This amount reflects the excess of Base Rent allocated over Base Rent paid (if shown as a positive number) or the excess of Base Rent paid over Base Rent allocated (if shown as a negative number)

[7] The "Net Amount Payable" in this column is the amount payable which is the sum of, and represents (i) a payment (or reduction) of "Base Rent Amount" and (ii) a payment of the "Early Fixed Price Purchase Amount"

# **Schedule 4**

**EXECUTION COPY**

PARTICIPATION AGREEMENT

(GM 2001A-8 )

dated as of December 18, 2001

among

GENERAL MOTORS CORPORATION, as Lessee

GENERAL ELECTRIC CAPITAL CORPORATION, as Owner Participant

STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT,
NATIONAL ASSOCIATION,
not in its individual capacity,
except as expressly stated
herein, but solely as Owner Trustee

WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION,
not in its individual capacity,
except as expressly stated
herein, but solely as Indenture Trustee

and

THE PERSONS NAMED ON SCHEDULE 2 HERETO,
as Note Purchasers

# TABLE OF CONTENTS
## TO PARTICIPATION AGREEMENT

Page

SECTION 1.  PARTICIPATION IN THE PURCHASE OF THE UNDIVIDED INTEREST IN THE EQUIPMENT    . . ..    3

SECTION 2.  LESSEE'S NOTICES OF DELIVERY DATE; CLOSING ON DELIVERY DATE    .    . . .    . . . ..    .    4

SECTION 3. INSTRUCTIONS TO THE OWNER TRUSTEE . . . .    5

SECTION 4.  CONDITIONS PRECEDENT TO THE PARTICIPANTS' OBLIGATIONS ON THE DELIVERY DATE    .    .    . 5

SECTION 5. CONDITIONS PRECEDENT TO THE LESSEE'S OBLIGATIONS ON . THE DELIVERY DATE    .    .    11

SECTION 6.  CHANGE OF SITUS AND IDENTITY OF OWNER TRUST    .    13

SECTION 7.  EXTENT OF INTEREST OF NOTEHOLDERS    14

SECTION 8.  LESSEE REPRESENTATIONS, WARRANTIES AND INDEMNITIES14    .    .    .

SECTION 9.  REPRESENTATIONS AND WARRANTIES OF PARTIES OTHER THAN THE LESSEE . . . .    . .    38

SECTION 10.  CERTAIN COVENANTS OF THE LESSEE    .    44

SECTION 11.  COVENANTS OF PARTIES OTHER THAN THE LESSEE    .    . 48

SECTION 12.  CERTAIN COVENANTS OF THE OWNER TRUSTEE AND THE OWNER PARTICIPANT    .    .    .    . 51

SECTION 13.  EXCHANGE OF EQUIPMENT NOTES    .    . 52

SECTION 14.  OWNER FOR TAX PURPOSES .    .    . . 53

SECTION 15.  NOTICES; CONSENT TO JURISDICTION . .    . . ..    53

## TABLE OF CONTENTS
(continued)

Page

**SECTION 16.    CALCULATION OF ADJUSTMENTS TO BASE RENT, STIPULATED LOSS VALUE, TERMINATION VALUE, ETC.; CONFIRMATION AND VERIFICATION** . . .    .    . . 54

**SECTION 17. REFUNDING**    . . . . .    . . . .    . . 56

**SECTION 18. TRANSFER OF OWNER PARTICIPANT'S INTEREST**    .    . 60

**SECTION 19. LIABILITY OF THE OWNER TRUSTEE**    . . . .    . 62

**SECTION 20. LIABILITY OF OWNER PARTICIPANT**    .    . . . . 63

**SECTION 21. LIABILITY OF THE INDENTURE TRUSTEE**    . .    . . . . . 63

**SECTION 22. COSTS**    . . . . . .    .    . . .    . . . 64

**SECTION 23. PUBLICITY; CONFIDENTIAL DOCUMENTS**    .    . . .    . . . 65

**SECTION 24. MISCELLANEOUS**    . . .    . . . .    . .    . . . . 66

## INDEX TO APPENDIX, EXHIBITS AND SCHEDULES

Appendix A    Definitions

Exhibit A     Trust Agreement
Exhibit B     Bill of Sale
Exhibit C     Lease and Lease Supplement
Exhibit D     Trust Indenture and Security Agreement
Exhibit E     [Reserved]
Exhibit F     Form of UCC–Indenture
Exhibit G     Form of UCC–Lease
Exhibit H     [Reserved]
Exhibit I     Form of Consent to Assignment of non-GM Software
Exhibit J     [Reserved]
Exhibit K     Form of Owner Participant Transfer Guaranty
Exhibit L     Form of Owner Participant Assignment
Exhibit M     [Reserved]
Exhibit N     [Reserved]
Exhibit O     List of Counsel
Exhibit P     Opinion of Kirkland & Ellis as counsel to Lessee
Exhibit Q     Opinion of General Motors General Counsel
Exhibit R     Opinion of Kirkland & Ellis
Exhibit S     Opinion of Shipman & Goodwin LLP, as counsel to Owner Trustee
Exhibit T 1   Opinion of Winston & Strawn, as counsel to Owner Participant
Exhibit T 2   Opinion of internal counsel to Owner Participant
Exhibit U     [Reserved]
Exhibit V     Opinion of Ray, Quinney & Nebeker, as counsel to the Indenture Trustee
Exhibit W     Form of Lessee Officer Certificate
Exhibit X     Form of Certificate of BALC re equity investment
Exhibit Y     Form of Certificate of BAS re Equipment Notes
Exhibit Z     Appendix Z to Appraisal

Schedule 1     Equipment
Schedule 2     Note Purchasers' Commitments
Schedule 3     Owner Participant Commitment
Schedule 4     UCC Filing Jurisdictions
Schedule 5     Scheduled Liens
Schedule 6     Required Consents
Schedule 7     Environmental Matters
Schedule 8     Addresses
Schedule 9     Owner Participant Pricing Assumption

## PARTICIPATION AGREEMENT

THIS PARTICIPATION AGREEMENT (GM2001 A-8), dated as of December 18, 2001 is among (i) GENERAL MOTORS CORPORATION, a Delaware corporation (herein, together with its successors and assigns, the "Lessee"), (ii) GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation (herein, together with its successors and permitted assigns, the "Owner Participant"), (iii) STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION, a national banking association, not in its individual capacity, except as expressly stated herein, but solely as owner trustee under the Trust Agreement (herein in such capacity, together with its successors and permitted assigns, the "Owner Trustee"), (iv)WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, a national banking association, not in its individual capacity, except as expressly stated herein, but solely as indenture trustee under the Indenture (herein in such capacity, together with its successors and permitted assigns, the "Indenture Trustee") and (v) the Persons named on Schedule 2 hereto, as Note Purchasers

Certain terms used but not otherwise defined herein shall have the respective meanings given them in Appendix A attached hereto (each definition to be equally applicable to both the singular and plural forms of the terms defined)    References in this Agreement to Sections, subsections, paragraphs, Schedules, Appendices and Exhibits are to Sections, subsections and paragraphs in, and Schedules, Appendices and Exhibits to, this Agreement unless otherwise indicated    For the avoidance of doubt, the following rules of construction shall be applied wherever the following phrases are used  Any references to the "the Undivided Interest in the Equipment," "such Undivided Interest in the Equipment," "the Undivided Interest in such Equipment," "the Undivided Interest in the Unit," "the Undivided Interest in any Unit," "such Undivided Interest in the Unit" or "the Undivided Interest in such Unit" shall each have the same meaning, namely the Undivided Interest in the one Unit that is the subject of the applicable agreement    Any references to "all Units," "any Unit," "such Unit" or "each Unit" shall mean "the Unit "

## RECITALS

WHEREAS,

A       On or prior to the Delivery Date, subject to the terms and conditions hereof, the Owner Participant and the Owner Trustee will enter into the Trust Agreement, in the form attached hereto as Exhibit A, whereby the Owner Trust will be created.

B       On or prior to the Delivery Date, the Lessee will sell the Undivided Interest in the Equipment to the Owner Trustee and, in furtherance thereof, the Lessee will execute and deliver to the Owner Trustee the Bill of Sale, in the form attached hereto as Exhibit B, pursuant to which the Owner Trustee will become the owner of the Lessee's rights with respect to the Undivided Interest in the Equipment

C       The Owner Trustee will agree to pay to the Lessee on the Delivery Date an amount equal to the Lessor's Cost of the Undivided Interest in the Equipment

D       On or prior to the Delivery Date, subject to the terms and conditions hereof, the Owner Participant shall deliver funds to the Owner Trustee in order to participate in the purchase of the Undivided Interest in the Equipment on such date as contemplated herein

E       Pursuant to the Trust Agreement, and subject to the terms and conditions hereof, the Owner Trustee is authorized and directed to enter into the Lease and Lease Supplement, in the form attached hereto as Exhibit C, on the Delivery Date, whereby, subject to the terms and conditions set forth therein, the Owner Trustee will lease to the Lessee, and the Lessee will lease from the Owner Trustee, the Undivided Interest in the Equipment

F       On the Delivery Date, subject to the terms and conditions hereof, the Indenture Trustee and the Owner Trustee will enter into the Indenture and Indenture Supplement, in the form attached hereto as Exhibit D, pursuant to which Indenture and Indenture Supplement the Owner Trustee will mortgage and pledge unto the Indenture Trustee, for the benefit of the Noteholders, as part of the Indenture Estate under the Indenture, all of the Owner Trustee's estate, right, title and interest in, to and under the properties held in trust by the Owner Trustee under the Trust Agreement (other than Excepted Property) including, without limitation, all of the Owner Trustee's right, title and interest in and to the Lease and the Undivided Interest in the Equipment and the Owner Trustee will authorize the issuance and delivery of Equipment Notes

G       On the Delivery Date, subject to the terms and conditions hereof, pursuant to the Indenture and the Indenture Supplement, the Owner Trustee will issue to the several Note Purchasers, and the several Note Purchasers will purchase from the Owner Trustee, Equipment Notes

H    On the Delivery Date, subject to the terms and conditions hereof, the Owner Trustee shall use the proceeds from the sale of the Equipment Notes issued by the Owner Trustee pursuant to the Indenture in order to pay the aggregate percentage set forth on <u>Schedule 2</u> of Lessor's Cost of the Undivided Interest in the Equipment

I    On the Delivery Date, the Owner Trustee will pay to the Lessee the Lessor's Cost of the Undivided Interest in the Equipment

J    On the Delivery Date, subject to the terms and conditions hereof, the Lessee and the Owner Participant will enter into the Tax Indemnity Agreement.

K.    The parties hereto desire to enter into the transactions contemplated by this Agreement and desire to be bound by the mutual covenants herein

L    The property subject to this Agreement is the Undivided Interest in the Equipment and the parties hereto acknowledge that there is one, and only one, Unit; notwithstanding any references herein to "any Unit," "each Unit," "all Units" or "Units," and the parties hereto hereby adopt the rules of construction set forth in the Preamble

NOW, THEREFORE, in consideration of the premises and other mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the parties hereto agree as follows

## SECTION 1. <u>PARTICIPATION IN THE PURCHASE OF THE UNDIVIDED INTEREST IN THE EQUIPMENT</u>

(a)    <u>Participation by Note Purchasers</u>    Subject to the terms and conditions of this Agreement, on the Delivery Date the Note Purchasers severally agree to purchase from the Owner Trustee, and the Owner Trustee shall issue and sell to the Note Purchasers, the Equipment Notes having the maturity and bearing the interest rate set forth on <u>Schedule 2</u> hereto    Each Note Purchaser shall purchase one or more Equipment Notes, each in a principal amount and for a purchase price equal to (i) the percentage set forth opposite such Note Purchaser's name as the percentage of Lessor's Cost on <u>Schedule 2</u> hereto for the Delivery Date multiplied by (ii) Lessor's Cost for the Undivided Interest in the Equipment (rounded to the nearest $1), <u>provided</u>, <u>however</u>, that the aggregate principal amount of the Equipment Notes issued with respect to the Undivided Interest in the Equipment shall not in any event exceed the amount set forth on <u>Schedule 2</u> hereto as the "Aggregate Principal Amount" with respect to the Note Purchasers    The proceeds from the sale of the Equipment Notes shall be used by the Owner Trustee to pay a portion of Lessor's Cost of the Undivided Interest in the Equipment as contemplated by <u>Section 2</u>

(b)    <u>Participation by Owner Participant</u>.    Subject to the terms and conditions of this Agreement, on the Delivery Date, the Owner Participant shall participate in the

payment of Lessor's Cost for the Undivided Interest in the Equipment by making an equity investment in the beneficial ownership of the Undivided Interest in such Equipment (the "Trust Equity Contribution") equal to (A) the percentage set forth on Schedule 3 hereto for the Delivery Date multiplied by (B) Lessor's Cost for the Undivided Interest in the Equipment (rounded to the nearest $1), provided, however, that the Trust Equity Contribution shall not in any event exceed the amount set forth on Schedule 3 hereto as the "Aggregate Equity Amount " Subject to the terms and conditions of this Agreement, on the Delivery Date the Owner Participant shall pay the amount of the Trust Equity Contribution to the Owner Trustee The Trust Equity Contribution shall be used by the Owner Trustee to pay the aggregate percentage set forth on Schedule 2 of Lessor's Cost of the Undivided Interest in the Equipment as contemplated by Section 2.

(c)    Definition of Commitment    The aggregate principal amount of Equipment Notes to be purchased by each Note Purchaser on the Delivery Date as determined by Section 1(a) and the amount of the Owner Participant's participation on the Delivery Date as determined by Section 1(b) are referred to herein as each Participant's "Commitment" for the Delivery Date

(d)    Equipment Subject to the Delivery Date, Lease Terms    The Equipment and the Last Day of the Base Term, EBO Date and Early Fixed Price Purchase Amount for the lease of the Undivided Interest in the Equipment are described on Schedule 1 hereto

## SECTION 2.  LESSEE'S NOTICES OF DELIVERY DATE; CLOSING ON DELIVERY DATE

(a)    Delivery Date    The Delivery Date shall be December 18, 2001 and no further notice shall be required hereunder

(b)    Delivery Date Funding to the Owner Trustee    Subject to the satisfaction or waiver of the conditions set forth in Section 4, each Participant shall, on the Delivery Date, deliver (by wire transfer of immediately available funds) its Commitment for Lessor's Cost of the Undivided Interest in the Equipment to the Owner Trustee (ABA 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, Attention Corporate Trust Administration, for credit to account no 9903-991-9, for further credit to GM 2001A-8 and telephone notice to Elizabeth C Hammer at (860) 244-1817) to be held in trust by the Owner Trustee for the benefit of the Participant delivering such Commitment (and not as a part of the Trust Estate)

(c)    Delivery Date Funding to the Lessee    Upon receipt by the Owner Trustee of each Participant's full Commitment for Lessor's Cost of the Undivided Interest in the Equipment, the Owner Trustee shall, on the Delivery Date, pay to the Lessee (by wire transfer of immediately available funds), at the Lessee's account at Citibank NY (ABA# 021000089, Attention General Motors Corporation Account 0003-1878), for credit to General Motors Corporation, an aggregate amount equal to Lessor's Cost for the Undivided Interest in the Equipment

(d)    <u>Time and Place of Closing</u>    The closing of the transactions contemplated on the Delivery Date shall commence at 9 00 a m , New York time, and shall take place at the offices of Kirkland & Ellis, Citigroup Center, 153 East 53rd Street, New York, New York

(c)    <u>Purchase of Equipment Notes</u>    Subject to the satisfaction of the conditions applicable to the Delivery Date, each Note Purchaser severally agrees to purchase Equipment Notes on the Delivery Date as contemplated hereby and by the Indenture

**SECTION 3. <u>INSTRUCTIONS TO THE OWNER TRUSTEE</u>**    The Owner Participant agrees that the payment by the Owner Participant of the amount of its Commitment for the Undivided Interest in the Equipment, to be delivered on the Delivery Date, in accordance with the terms of <u>Section 2</u>, shall constitute, without further act, the authorization and direction by the Owner Participant to the Owner Trustee to take the actions specified in <u>Section 2(a)</u> of the Trust Agreement, upon the terms and conditions set forth in the Trust Agreement

**SECTION 4.    <u>CONDITIONS PRECEDENT TO THE PARTICIPANTS' OBLIGATIONS ON THE DELIVERY DATE</u>**    The obligations of each of the Participants to participate in the payment of Lessor's Cost for the Undivided Interest in the Equipment are subject to each other Participant having made its respective Commitment available pursuant to <u>Section 2</u> and the fulfillment to the satisfaction of, or waiver by such Participant prior to or on the Delivery Date of, the following conditions precedent (except that (x) the obligations of a Participant shall not be subject to such Participant's own performance or, if such Participant shall have the power to cause another Person to perform, such Participant's failure to cause such performance, to the extent that such performance is reasonably within the control of such Person and (y) the obligations of a Participant shall not be subject to the breach of the representations and warranties applicable to such Participant or, if such Participant shall have the power to cause another Person to perform, the breach of the representations and warranties applicable to such Person)

(a)    <u>Sale of Undivided Interest in Equipment from the Lessee to the Owner Trustee</u>    The Owner Participant and the Owner Trustee shall have duly executed and delivered the Trust Agreement and the Lessee and the Owner Trustee shall have duly executed and delivered the Bill of Sale, each shall be in full force and effect, and photocopies of executed originals thereof shall have been delivered to each Participant

(b)    <u>Basic Documents</u>    The following documents shall have been duly authorized, executed and delivered by the respective party or parties thereto, and shall be in full force and effect and executed counterparts shall have been delivered to each Participant and their respective special counsel and the Indenture Trustee and its special counsel, each in form and substance satisfactory to each Participant; <u>provided</u> that only the Indenture Trustee shall receive original counterparts of the Lease and Lease Supplement with an original of the Indenture Trustee's

receipt attached, only the Note Purchasers shall receive executed Equipment Notes and only the Owner Participant and the Lessee will receive originals or copies of the Tax Indemnity Agreement

(i)    this Participation Agreement,

(ii)    the Lease, dated the Delivery Date, covering the Undivided Interest in the Equipment,

(iii)    the Lease Supplement, dated the Delivery Date and covering the Undivided Interest in the Equipment,

(iv)    the Indenture,

(v)    the Indenture Supplement, dated the Delivery Date and covering the Undivided Interest in the Equipment;

(vi)    the Tax Indemnity Agreement,

(vii)    the Bill of Sale, and

(viii)    the Equipment Notes, in each case registered in the name of the applicable Note Purchaser or its nominee and in the principal amount (or aggregate principal amount) equal to the applicable Note Purchaser's Commitment on the Delivery Date

(c)    Uniform Commercial Code Statements

(i)    A financing statement or statements covering the security interests created by or pursuant to the Indenture shall have been prepared naming the Owner Trustee as debtor and the Indenture Trustee as secured party and shall have been duly filed in the jurisdictions set forth in Schedule 4 and all Taxes with respect to such filings shall have been paid and satisfactory evidence thereof shall have been delivered to the Participants and the Indenture Trustee  The collateral description to be included in such Uniform Commercial Code financing statements is attached as Exhibit F

(ii)    A Uniform Commercial Code protective financing statement or statements describing the Lease as a lease and providing for the assignment thereof by the Owner Trustee to the Indenture Trustee shall have been duly filed in the jurisdictions set forth in Schedule 4 and all Taxes with respect to such filings shall have been paid and satisfactory evidence thereof shall have been delivered to the Participants and the Indenture Trustee  The description of the interest to be included in such Uniform Commercial Code financing statements is attached as Exhibit G

(d)    Evidence of Authority. Each Participant shall have received the following, in each case in form and substance satisfactory to it

(i)    A copy of the Certificate of Incorporation of the Lessee certified by the Secretary of State of the State of Delaware and copies of the By-Laws of the Lessee and of (A) resolutions of the Lessee's board of directors or appropriate committee of the board, certified by the Secretary or an Assistant Secretary of the Lessee, granting a Delegation of Authority to the Chief Financial Officer of the Lessee to approve capital lease or operating lease structures in an amount in excess of $100 million and (B) a Certificate of Approval executed by the Lessee's Chief Financial Officer duly authorizing (x) the execution, delivery and performance by the Lessee of this Agreement, the other Operative Documents and each other document or instrument required to be executed and delivered by the Lessee in connection herewith, (y) the transactions contemplated herein and by the other Operative Documents (including the sale of the Undivided Interest in the Equipment to the Owner Trustee and the lease by the Lessee of the Undivided Interest in the Equipment under the Lease) and (z) compliance by the Lessee with the conditions set forth herein

(ii)    Such other documents and evidence with respect to the Lessee, the Owner Trustee, the Indenture Trustee, or the Owner Participant as the Participants or their special counsel may reasonably request in order to establish the authority of such parties to consummate the transactions contemplated by this Agreement and the other Operative Documents to which each such respective Person is a party and the taking of all corporate proceedings in connection herewith or therewith

(e)    Acceptance by Owner Trustee of Equipment  Each of the Participants shall have received evidence satisfactory to it to the effect that an authorized representative of the Owner Trustee shall have accepted the Undivided Interest in the Equipment on the Delivery Date, and that the Owner Trustee will have good and valid title to the Undivided Interest in the Equipment and free and clear of Liens other than those Liens set forth on Schedule 5 ("Scheduled Liens").

(f)    No Event of Default or Event of Loss  No event or condition shall have occurred and be continuing or would result from the purchase, sale, lease or assignment of the Undivided Interest in the Equipment on or before the Delivery Date as contemplated herein, or the taking of any other act as contemplated hereby, which constitutes or would constitute a Lease Default, Lease Event of Default, Indenture Default or an Indenture Event of Default  The Undivided Interest in the Equipment shall not have been subject to an Event of Loss or any Prospective Loss  No material adverse change in the condition of Lessee and its subsidiaries, taken as a whole (other than in the ordinary course of business) shall have occurred since December 31, 2000, except as may have been disclosed by the Lessee in its public filings with the Securities and Exchange Commission

(g)   Opinions

(i)   Each Participant shall have received (x) an opinion from Kirkland & Ellis, special counsel to the Lessee, (y) an opinion from an attorney in the Office of General Counsel of the Lessee, and (z) one or more opinions from local counsel to the Lessee in each State in which any Equipment is located, substantially in the forms of Exhibits P, Q, and R, in each case dated the Delivery Date

(ii)   Each Participant shall have received an opinion from Shipman & Goodwin LLP, special counsel for the Owner Trustee, substantially in the form of Exhibit S, dated the Delivery Date

(iii)   Each Note Purchaser shall have received an opinion from Winston & Strawn, special counsel to the Owner Participant substantially in the form of Exhibit T 1 and an opinion from internal counsel to the Owner Participant substantially in the form of Exhibit T 2, in each case, dated the Delivery Date

(iv)   Each Note Purchaser shall have received a favorable opinion from Willkie Farr & Gallagher, special counsel to the Note Purchasers, dated the Delivery Date, covering such matters relating to the transactions contemplated hereby as such Note Purchaser shall have requested and otherwise in form and substance satisfactory to the Note Purchasers

(v)   Each Participant shall have received an opinion substantially in the form of Exhibit V from Ray, Quinney & Nebeker, counsel for the Indenture Trustee, dated the Delivery Date

(vi)   The Owner Participant shall have received an opinion from Winston & Strawn in form and substance reasonably satisfactory to it with respect to certain United States federal tax matters related to the transactions occurring on or prior to the Delivery Date as contemplated by this Agreement and the other Operative Documents

(h)   Appraisal Opinion   The Owner Participant shall have received from the Appraiser an appraisal opinion addressed to it, dated the Delivery Date, in form and substance reasonably satisfactory to the Owner Participant and its special counsel   Each Note Purchaser shall have received a letter from the Appraiser addressed to the Note Purchasers in form and substance satisfactory to each Note Purchaser as to the Fair Market Sales Value of the Undivided Interest in the Equipment as of the Delivery Date and a summary of the methodology employed by the Appraiser in arriving at such Fair Market Sales Value

(i)   Payment of Taxes   All Taxes, if any, due and payable on or prior to the Delivery Date in connection with the execution, delivery, recording, performance on or prior to

the Delivery Date and filing of the Operative Documents and the documents and instruments enumerated and described in Section 4(b), or in connection with the issuance and sale of the Equipment Notes and the purchase by the Owner Trustee of the Undivided Interest in the Equipment, shall have been paid in full by the Lessee

(j)    Lessee Representations and Warranties    The representations and warranties of the Lessee contained herein and in the other Operative Documents shall be true and accurate in all material respects on and as of the Delivery Date with the same effect as though made on and as of the Delivery Date except to the extent that such representations and warranties specifically relate solely to an earlier date (in which event such representations and warranties shall have been true and accurate in all material respects on and as of such earlier date)

(k)    Certificates

(i)    Each Participant shall have received an Officer's Certificate of the Lessee, in the form of Exhibit W, dated the Delivery Date, addressed to each Participant and certifying as to the matters stated in Sections 4(f) and 4(j) and that the Lessee has performed in all material respects the covenants required to be performed by the Lessee on or prior to the Delivery Date under this Agreement and the other Operative Documents

(ii)    The Owner Participant, each Note Purchaser (or special counsel for the Note Purchasers) and the Indenture Trustee shall have received a certificate in the form of Exhibit X hereto from BALC dated the Delivery Date, with respect to offerees of the equity investment of the Owner Participant and the manner of offering thereof

(iii)    The Owner Participant, each Note Purchaser (or special counsel for the Note Purchasers) and the Indenture Trustee shall have received a certificate in the form of Exhibit Y hereto from BAS dated the Delivery Date, with respect to offerees of Equipment Notes and the manner of offering thereof

(l)    No Litigation or Governmental Action    No action or proceeding shall have been instituted, nor shall any action, proceeding or Governmental Action be threatened before any Governmental Authority, nor shall any order, judgment or decree have been issued or proposed to be issued, at the time of the Delivery Date, to set aside, restrain, enjoin or prevent the completion and consummation of the transactions contemplated by this Agreement or the other Operative Documents

(m)    Other Representations and Warranties    The representations and warranties of the Owner Participant, the Owner Trustee and the Indenture Trustee contained herein or in the other Operative Documents shall be true and accurate in all material respects as of and on the Delivery Date with the same effect as though made on and as of the Delivery Date except to the extent that such representations and warranties specifically relate solely to an earlier date (in which

event such representations and warranties shall have been true and accurate in all material respects on and as of such earlier date) and each Participant shall have received certificates signed by the President, any Vice President or any Assistant Vice President or other authorized representative of the Owner Participant, the Owner Trustee and the Indenture Trustee, addressed to each Participant and certifying as to the foregoing matters with respect to the Owner Participant, the Owner Trustee and the Indenture Trustee, respectively

(n)    Equipment Notes, Investment   The Equipment Notes shall have been issued by the Owner Trustee, duly authenticated by the Indenture Trustee and sold to the Note Purchasers in an aggregate principal amount equal to (i) the total percentage set forth on Schedule 2 hereto multiplied by (ii) Lessor's Cost for the Undivided Interest in all Equipment, rounded to the nearest $1   The sum of (i) the Owner Participant's Commitment with respect to the Undivided Interest in the Equipment and (ii) the proceeds from the sale of Equipment Notes on the Delivery Date shall equal (disregarding rounding errors) Lessor's Cost for the Undivided Interest in the Equipment, and the proceeds from the sale of Equipment Notes shall have been made available to the Owner Trustee pursuant to Section 2(b)

(o)    Authentication Request   The Owner Trustee shall have delivered to the Indenture Trustee (i) an Owner Trustee Request, dated as of the Delivery Date, authorizing and requesting the Indenture Trustee to authenticate and, upon further instructions of the Owner Trustee (which may be oral instructions), to deliver the Equipment Note in the principal amount equal to (A) the percentage set forth in Schedule 2 hereto multiplied by (B) Lessor's Cost for the Undivided Interest in all Equipment, rounded to the nearest $1, and (ii) the original of the Lease and each Lease Supplement pertaining to the Undivided Interest in the Equipment (against a receipt therefor)

(p)    No Violation of Applicable Law   The transactions contemplated by the Operative Documents to take place on or prior to the Delivery Date by any party hereto or any Note Purchaser shall not involve any such party or Note Purchaser in any violation of any Applicable Law

(q)    Consents, Approvals, Licenses   All Governmental Actions and other approvals and consents set forth on Schedule 6 hereto or any other additional approvals relating to the Lessee or the Equipment or the Undivided Interest therein required for the consummation of the transactions contemplated by this Agreement and the other Operative Documents to take place on the Delivery Date shall have been obtained and shall be in form and substance satisfactory to the Participants   The Lessee shall have received consents to the assignment of material third-party software in form and substance reasonably satisfactory to the Participants

(r)    Insurance   The Lessee shall be in compliance with the provisions of Section 11 of the Lease with respect to the Undivided Interest in the Equipment, and the Owner Participant, the Indenture Trustee and each Note Purchaser shall have received the certificates and opinions set forth in Section 11(c) of the Lease

(s)    No Adverse Accounting Treatment    The transaction to be effected pursuant to the Lease shall be classifiable on the financial statements of the Owner Participant as a leveraged lease under FASB 13, as in effect on the Delivery Date

(t)    Delivery Date    The Delivery Date shall be on or before December 31, 2001

(u)    Private Placement Number    A Private Placement Number issued by Standard & Poor's CUSIP Service Bureau (in cooperation with the Securities Valuation Office of the National Association of Insurance Commissioners) shall have been obtained for the Equipment Notes.

(v)    Acquisition Permitted    Each Note Purchaser's acquisition of Equipment Notes shall be permitted by the laws and regulations of each jurisdiction to which such Note Purchaser is subject, without recourse to provisions (such as Section 1408(a)(8) of the New York Insurance Law) permitting limited investments by insurance companies without restriction as to the character of the particular investment

All certificates, opinions and other documents to be delivered on the Delivery Date by any person other than such Participant, and all other matters to be accomplished prior to or on the Delivery Date, shall be satisfactory in the judgment of such Participant and its special counsel    In the event (i) the conditions precedent specified in this Section 4 shall not have been fulfilled (or waived by the applicable Participant) on or prior to the Delivery Date or (ii) any of the other Participants shall not have delivered its Commitment to the Owner Trustee on the Delivery Date, if a Participant so elects, such Participant may terminate this Agreement and the other Operative Documents, in which case such agreements will be of no further force and effect (other than to the extent provided in Section 22(a) and Section 24(b))    Notwithstanding the foregoing, the Lessee shall not be released from any liability resulting from any default hereunder

**SECTION 5.    CONDITIONS PRECEDENT TO THE LESSEE'S OBLIGATIONS ON THE DELIVERY DATE**    The obligations of the Lessee to carry out its obligations under the Operative Documents with respect to the Delivery Date and the Undivided Interest in the Equipment is subject to the fulfillment to the satisfaction of or waiver by the Lessee prior to or on the Delivery Date of the following conditions precedent

(a)    Basic Documents    Each of the documents specified in Section 4(b) shall have been duly authorized, executed and delivered by the respective party or parties thereto (other than the Lessee) in the manner specified in Section 4(b), shall be in full force and effect on the Delivery Date and an executed original counterpart of each of such documents (or, in the case of the Equipment Notes, the Lease and the Lease Supplements, copies of such documents) shall have been delivered to the Lessee or its special counsel

(b)    Evidence of Authority    The Lessee shall have received the following, in each case in form and substance reasonably satisfactory to it.

(i)    A copy of the general authorizing resolutions of the Indenture Trustee, the Owner Trustee and the Owner Participant, certified as of the Delivery Date by the Secretary, an Assistant Secretary or other authorized representative of the Indenture Trustee, the Owner Trustee or the Owner Participant (as the case may be), which authorize the execution, delivery and performance by the Indenture Trustee, the Owner Trustee and the Owner Participant of all of the Operative Documents to which the Indenture Trustee, the Owner Trustee or the Owner Participant are a party, together with such other documents and evidence with respect to Indenture Trustee, the Owner Trustee or the Owner Participant as the Lessee or its special counsel may reasonably request in order to establish the authority of such parties to consummate the transactions contemplated by this Agreement and the other Operative Documents, the taking of all corporate proceedings in connection therewith and compliance with the conditions set forth herein and therein, and

(ii)    A copy of the Certificate of Incorporation of the Owner Participant certified by the Secretary of State of the State of Delaware and copies of the By-Laws of the Owner Participant and certified by the Secretary, an Assistant Secretary or other authorized representative of the Owner Participant.

(c)    Representations and Warranties    The representations and warranties of the Owner Participant, the Owner Trustee, and the Indenture Trustee contained in this Agreement or any other Operative Document shall be true and accurate in all material respects on and as of the Delivery Date with the same effect as though made on and as of the Delivery Date except to the extent that such representations and warranties specifically relate solely to an earlier date (in which event such representations and warranties should have been true and accurate in all material respects on and as of such earlier date) and the Lessee shall have received certificates signed by the President, any Vice President or any Assistant Vice President or other authorized representative of the Owner Participant, the Indenture Trustee and the Owner Trustee addressed to the Lessee and certifying as to the foregoing matters with respect to the Owner Participant, the Indenture Trustee and the Owner Trustee, respectively

(d)    Opinions    The Lessee shall have received originals, addressed to it, of the opinions set forth in Sections 4(g)(ii), 4(g)(iii), 4(g)(iv) and 4(g)(v) hereof and a summary of the Appraisal (such summary shall be limited to a description of the qualifications of the Appraiser, the Appraisal's conclusion regarding (1) the Fair Market Sales Value of the Undivided Interest in the Equipment on the Delivery Date, (2) the remaining economic useful life of the Undivided Interest in the Equipment and (3) a summary of the Appraiser's methodology used to reach that conclusion) in each case addressed to the Lessee and dated the Delivery Date and in form and substance reasonably satisfactory to the Lessee and its special counsel    The Lessee shall treat the Appraisal summary in accordance with the confidentiality provisions set forth in Section 23

(e)    No Litigation or Governmental Action  No action or proceeding shall have been instituted nor shall any Governmental Action be threatened before any Governmental Authority, nor shall any order, judgment or decree have been issued or proposed to be issued by any Governmental Authority at the time of Delivery Date, to set aside, restrain, enjoin or prevent the completion and consummation of the transactions contemplated by this Agreement, or the other Operative Documents

(f)    BALC Equity Certificate  The Lessee shall have received a certificate in the form of Exhibit X hereto from BALC, dated the Delivery Date, with respect to offerees of the equity investment of the Owner Participant and the manner of offering thereof

(g)    BAS Debt Certificate.  The Lessee shall have received a certificate in the form of Exhibit Y hereto from BAS, dated the Delivery Date, with respect to the offerees of Equipment Notes and the manner of offering thereof.

All certificates, opinions and other documents to be delivered on the Delivery Date by any Person other than the Lessee, and all other matters to be accomplished prior to or on the Delivery Date, shall be satisfactory in the reasonable judgment of the Lessee and its counsel  In the event (i) the conditions precedent specified in this Section 5 shall not have been fulfilled (or waived by the Lessee) on or prior to the Delivery Date or (ii) any Participant shall not have delivered its required Commitment amount to the Owner Trustee on the Delivery Date, if the Lessee so elects the Lessee may terminate this Agreement and the other Operative Documents in which case this Agreement and the other Operative Documents will be of no further force and effect (other than to the extent provided in Section 22(a) and Section 24(b))  Notwithstanding the foregoing, no defaulting party shall be released from any liability resulting from any default hereunder

**SECTION 6. CHANGE OF SITUS AND IDENTITY OF OWNER TRUST**.  The Owner Participant and the Indenture Trustee agree that if, at any time, (a) the Trust Estate or the Owner Trustee becomes subject to any Taxes for which it is indemnified pursuant to Section 8(c), (b) the tangible net worth of the institution acting as Owner Trustee or guaranteeing the obligations of the Owner Trustee decreases below $75,000,000, or (c) the long-term credit rating of the institution acting as the Owner Trustee as rated by either Moody's Investors Service, Inc  or Standard & Poor's Ratings Services should fall below investment grade and if, as a consequence thereof, the Lessee should request, in the case of (a), that the situs of the trust be moved to another state in the United States from the state in which it is then located, or, in the case of (b), the Lessee or Indenture Trustee should request that the Owner Trustee be replaced or, in the case of (c), the Lessee or the Indenture Trustee should request that the Owner Trustee be replaced, the situs of the trust will be moved or the old Owner Trustee replaced by an owner trustee designated by the Owner Participant and reasonably acceptable to the Lessee and the Indenture Trustee, as the case may be, and the Owner Participant and the Indenture Trustee will take whatever action may be reasonably necessary to accomplish such removal or replacement, provided that (i) the rights and obligations under the Operative Documents of the Owner Participant, the Noteholders and Indenture Trustee shall not be

altered in a manner adverse to the Owner Participant, the Noteholders or the Indenture Trustee, respectively, as a result of the taking of such action, (ii) the first priority perfected lien of the Indenture on the Indenture Estate shall not be adversely affected by such action, (iii) with respect to (a), there is no Material Default or Lease Event of Default which has occurred and is continuing, (iv) the Owner Participant, the Noteholders and Indenture Trustee shall have received an opinion or opinions of counsel (reasonably satisfactory to the Owner Participant and Indenture Trustee), in scope, form and substance satisfactory to the Owner Participant and Indenture Trustee to the effect that (A) the trust, as thus removed or with the trustee replaced, shall remain a validly established trust, (B) any amendments to the Trust Agreement necessitated by such removal or replacement shall have been duly authorized, executed and delivered by the parties thereto and shall constitute the valid and binding obligations of such parties, enforceable in accordance with their terms, (C) such removal or replacement will not cause any adverse tax consequence to the Owner Participant with respect to which the Lessee is not required to indemnify fully the Owner Participant pursuant to the Tax Indemnity Agreement or Section 8(c) (taking into account any additional indemnification provided by the Lessee in connection with such removal or replacement), (D) such removal or replacement has not adversely affected the lien of the Indenture or the Indenture Estate and the priority of such lien thereon and (E) covering such other matters as the Owner Participant, the Noteholders and the Indenture Trustee may reasonably request, (v) Lessee shall reimburse the Participants and the Indenture Trustee for any and all reasonable costs and expenses including reasonable counsel fees and disbursements (which in the case of the Noteholders shall include only legal fees and expenses of Counsel for the Noteholders), registration fees, recording or filing fees and taxes incurred by the Owner Trustee, the Indenture Trustee and the Participants in connection with such change of situs, (vi) it is reasonably expected that such change in situs or replacement of the Owner Trustee would not materially increase the amount of all indemnities which the Lessee would be required to pay, in the aggregate, to either of the Owner Trustee or the Owner Participant pursuant to Section 8(c) and the Tax Indemnity Agreement, and (vii) with respect to (b) and (c), if the Owner Participant has not appointed a new owner trustee within 60 days after receipt of written notice thereof from the Indenture Trustee under this Section 6, the Indenture Trustee may replace the Owner Trustee with an owner trustee reasonably satisfactory to the Owner Participant and the Lessee

**SECTION 7. EXTENT OF INTEREST OF NOTEHOLDERS** No Noteholder shall have any further interest in, or other right with respect to, the security interests created by the Indenture when and if the principal of, premium, if any, and interest on all Equipment Notes held by such Noteholder and all other sums then payable to such Noteholder under the Indenture, the Equipment Notes and hereunder shall have been indefeasibly paid in full Each Noteholder agrees that it will look solely to the income and proceeds from the Indenture Estate to the extent available for distribution to such Noteholders as provided in the Indenture and that none of the Owner Participant, the Owner Trustee or the Lessee shall be personally liable to any Noteholders for any amounts payable under the Equipment Notes or the Indenture, except as expressly provided in the Operative Documents

## SECTION 8.  LESSEE REPRESENTATIONS, WARRANTIES AND INDEMNITIES

(a)    Lessee Representations and Warranties    The Lessee represents and warrants to each Participant that

(i)    Organization and Power    The Lessee is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, has the corporate power and authority to enter into and perform its obligations under each of the Operative Documents to which it is or will be a party and is duly qualified to do business as a foreign corporation in good standing in each state in which the Equipment or any Part thereof is located    The Lessee has not failed to qualify or to be in good standing in any other jurisdiction where the failure to qualify or to be in good standing would have a material adverse effect on the business or financial condition of the Lessee or impair the ability of the Lessee to perform its obligations under the Operative Documents

(ii)    Authorization    The execution, delivery and performance by the Lessee of the Operative Documents and the other agreements or documents referred to herein or in any other Operative Document, in each case to which it is or will be a party, have been or will be duly authorized by all necessary corporate action on the part of the Lessee, do not require any approval or consent of the Lessee, or any trustee or holder of any indebtedness or obligations of Lessee except such consents listed on Schedule 6, which consents have been duly obtained or, by the Delivery Date, will have been duly obtained and remain in full force and effect, and the execution, delivery and performance by the Lessee of each of such agreements do not contravene the Certificate of Incorporation or By-Laws of Lessee or any Applicable Law, or contravene any provision of, or constitute a default under any indenture, mortgage, contract or other agreement to which the Lessee is a party or by which it or its properties may be bound or affected, except such of the foregoing as would not have a material adverse effect on the Lessee or the transactions contemplated by this Agreement

(iii)    Enforceability    Each of the Operative Documents and the other agreements or documents referred to herein or in any other Operative Document, in each case to which the Lessee is or will be a party, when executed and delivered, will constitute legal, valid and binding obligations of the Lessee, enforceable against the Lessee in accordance with the respective terms thereof, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and by general principles of equity and except, in the case of the Lease, as limited by Applicable Laws which may affect the remedies provided in the Lease, which laws, however, do not make the remedies provided in the Lease inadequate for the practical realization of the rights and benefits provided thereby

(iv)    Litigation   There are no suits or proceedings pending or, to the knowledge of the Lessee, threatened against or affecting the Lessee or the Equipment or the Undivided Interest therein before any Governmental Authority which question the legality, validity or enforceability of this Agreement or any other Operative Document or any other agreements or documents referred to herein or therein, in each case to which the Lessee is or will be a party, or any litigation that would materially and adversely affect the Lessee's ability to perform its obligations under the Operative Documents

(v)    Security Interest   The Indenture will, on the Delivery Date, create the security interest in the Indenture Estate it purports to create, which security interest constitutes a first priority perfected security interest under the Uniform Commercial Code (subject to Scheduled Liens), and, except for (A) the filing of continuation statements at periodic intervals with respect to the security and other interests created by the Operative Documents under the Uniform Commercial Code of the applicable jurisdictions, and (B) the taking of possession by the Indenture Trustee of the original counterpart of the Lease and the Lease Supplement covering the Undivided Interest in the Equipment, no further action, including any filing or recording of any document (including any financing statement in respect thereof under Article 9 of the Uniform Commercial Code of any applicable jurisdiction), is necessary in order to establish the Owner Trustee's rights under and to perfect the Indenture Trustee's security interest in the Undivided Interest in the Equipment as against the Lessee and any third parties in any applicable jurisdiction within the United States

(vi)    No Default or Event of Loss   There has not occurred any Lease Default or Lease Event of Default which is presently continuing and, on the Delivery Date, no Event of Loss exists with respect to the Undivided Interest in any Unit to be sold on the Delivery Date

(vii)    Chief Executive Office   The chief executive office (as such term is used in Article 9 of the Uniform Commercial Code) of the Lessee is located in Detroit, Michigan

(viii)    Governmental Actions   All Governmental Actions required for the execution, delivery and performance by the Lessee of the Operative Documents and the other agreements or documents referred to herein or in any other Operative Document, in each case to which Lessee is or will be a party, have been obtained or made or, by the Delivery Date will be, obtained or made, and are or, by the Delivery Date will be, in full force and effect and no such Governmental Actions are subject to any pending or threatened suit, action, inquiry, investigation, proceeding or appeal (administrative, judicial or otherwise)

(ix)    Personal Property   The Equipment is personal property (and the Lessee intended that the Equipment be personal property at the time such Equipment was

installed) and are not, and will not be, attached to or related to real estate in such a manner that any Unit constitutes, or will constitute, a fixture under the law of the state in which such Unit is located and no part of any Unit contains underground storage tanks. Removal of the Equipment will not cause substantial injury or damage to the related real estate and the Equipment can be removed and used elsewhere.

        (x)   <u>Identification of Equipment</u>  The Equipment is the same Equipment identified on <u>Exhibit Z</u>, that is indicated as being the Equipment delivered on the Delivery Date.

        (xi)   <u>Investment Company Act, Trust Indenture Act</u>  The Lessee is not an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended. The Indenture does not require qualification under the Trust Indenture Act.

        (xii)   <u>Brokerage</u>  Except for the fees and expenses of BALC and BAS, there are no fees or expenses for any broker, finder or financial advisor retained by the Lessee or its Affiliates in connection with the transactions contemplated by the Operative Documents that will be included in Transaction Costs and there are no such fees or expenses (including fees and expenses of BALC and BAS) known to the Lessee or for which the Owner Participant, the Owner Trustee, the Indenture Trustee or any Note Purchaser will be liable.

        (xiii)   <u>No Offer or Solicitation</u>  The Lessee has not offered (and, on the Delivery Date, will not have offered) any interest in the Undivided Interest in the Equipment, the Equipment, Equipment Notes, the Trust Estate, the Indenture Estate or the Lease, or any similar securities of the Lessee or the Owner Trustee, to, or solicited any offer to acquire any of the same from, any Person in violation of Section 5 of the Securities Act or any state securities laws, nor has it authorized any Person to take any such action, and the Lessee has not taken any action which would subject any interest in the Undivided Interest in the Equipment, the Equipment, Equipment Notes, the Trust Estate, the Indenture Estate or the Lease to the registration requirements of Section 5 of the Securities Act or any state securities laws.

        (xiv)   <u>Condition of Equipment</u>  The Equipment will be, on the Delivery Date, properly installed in a workmanlike manner in accordance with Applicable Law in all material respects and in substantial accordance with the plans and specifications therefor, will contain no material structural or systemic defects and will be in good operating condition.

(xv)    Location of Equipment  On the Delivery Date, the Equipment will be located at the site so specified for each Unit on Schedule I to the Lease Supplement and the Lessee shall have fee title or vested rights of access to each such site

(xvi)    Title  Lessee shall have on the Delivery Date good and valid title to the Undivided Interest in the Equipment being conveyed to the Owner Trustee on the Delivery Date, free and clear of all Liens except Scheduled Liens

(xvii)    Taxes  All Taxes, if any, due and payable in connection with the execution, delivery, performance on or prior to the Delivery Date, recording and filing of the Operative Documents and the documents and instruments enumerated and described in Section 4(c) in connection with the issuance and sale of Equipment Notes and the purchase by the Owner Trustee of the Undivided Interest in the Equipment, shall have been paid in full by the Lessee on the Delivery Date

(xviii)    ERISA. Assuming that the Owner Participant is not acquiring its beneficial interest in its investment pursuant to Section 1(b) with assets of any "employee benefit plan" (as defined in Section 3(3) of ERISA) or of any "plan" (as defined in Section 4975(a)(1) of the Code) and assuming the accuracy of the representations of the Note Purchasers in Section 9(b) and assuming compliance with provisions of this Agreement concerning restrictions on transferability of Equipment Notes, the execution and delivery by the Lessee of this Agreement and the other Operative Documents to which the Lessee is or is to become a party will not involve any transaction which is prohibited by Section 406 of ERISA or Section 4975 of the Code

(xix)    Financial Information  The Lessee's Annual Report on Form 10-K for the fiscal year ended December 31, 2000 and Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2001 fairly presented the consolidated financial condition of the Lessee and its subsidiaries as at such dates in accordance with generally accepted accounting principles and did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the context in which they were made, not misleading

(xx)    Compliance with Environmental Laws  Except as set forth in Schedule 7, to the Lessee's knowledge after inquiry among its environmental personnel who are primarily responsible for matters of compliance with Environmental Laws and Governmental Actions, as such Environmental Laws and Governmental Actions relate to any Unit, there are no circumstances that would reasonably be expected to prevent or interfere with the Lessee's ability to maintain each Unit as contemplated by the Operative Documents and in compliance in all material respects with all applicable Environmental Laws and Governmental Actions  To the Lessee's knowledge, after inquiry among its environmental personnel who are primarily responsible for matters of compliance with Environmental Laws

and Governmental Actions, as such Environmental Laws and Governmental Actions relate to any Unit, there are no past or pending Environmental Claims against the Lessee with respect to any Unit, except for such Environmental Claims which did not, or would not reasonably be expected to, have a material adverse effect on the value or the physical or operating condition of any Unit or impair the Owner Trustee's title thereto

        (b)    General Indemnity.

        (i)    Claims Defined   For the purposes of this Section 8(b), "Claims" shall mean any and all liabilities, obligations, losses (including losses or reductions in value of the Equipment or the Undivided Interest therein as a result of the events described in Section 8(b)(iii)(E)), costs, expenses, damages, penalties, liabilities, claims (including Environmental Claims), judgments, actions or suits of whatsoever kind and nature, founded or unfounded and whether or not subject to litigation, including, without limitation, (x) claims or penalties arising from any products liability, negligence, statutory liability or violation of any Applicable Law or in tort (strict, absolute or otherwise) and (y) loss of or damage to any property or the environment (including, without limitation, clean-up costs, remediation costs, removal costs, response costs, costs of corrective action, costs of financial assurance, natural resource damages and any costs in connection with the protection of wildlife, aquatic species and vegetation, and any relevant mitigative action required under applicable Environmental Laws or Governmental Actions) and, except as otherwise expressly provided in this Section 8(b), all reasonable out-of-pocket costs, disbursements and expenses (including reasonable legal fees and expenses, reasonable consultants' fees and expenses and reasonable costs of investigation) imposed on, incurred by or asserted against an Indemnitee in connection therewith

        (ii)    Indemnitee Defined   For the purposes of this Section 8(b), "Indemnitee" means the Owner Trustee (in both its individual capacity and as Owner Trustee), the Owner Participant, the Indenture Trustee (in both its individual capacity and as Indenture Trustee), each Noteholder (and the successors and permitted assigns of each of the foregoing) and the agents, officers, directors, employees and Affiliates of each such Indemnitee (each such agent, officer, director, employee and Affiliate of an Indemnitee is referred to herein collectively as the "Related Indemnitee Group" of such Indemnitee)  With respect to any amount that the Lessee is requested by an Indemnitee to pay by reason of this Section 8(b), such Indemnitee shall, if so requested by the Lessee and prior to any payment, submit such additional information in such Indemnitee's possession (or readily available to it) to the Lessee as the Lessee may reasonably request to substantiate the requested payment.

        (iii)    Indemnification Obligation.  Except as provided in Section 8(b)(iv), the Lessee hereby agrees to indemnify and defend each Indemnitee on an After-Tax Basis against, and agrees to protect, save and keep harmless each Indemnitee, its successors and permitted assigns on an After-Tax Basis from any Claims relating to or arising out of

(A) any of the Operative Documents (or any other agreements and documents delivered pursuant thereto or referred to herein or therein), the performance, enforcement or invalidity of any of the terms thereof, or the enforceability of any thereof, or any of the transactions or agreements contemplated therein, (B) the Equipment, the Undivided Interest therein or any other interest therein, including, but not limited to, the design, manufacture, purchase, acceptance, installation, rejection, ownership, transfer of title by the Lessee, maintenance, repair, storage, delivery, nondelivery, lease, sublease, substitution, imposition of any Lien thereon by the Lessee or its Affiliates, possession, use, operation, condition, reassembly, sale, repossession, return or other application or disposition of any Unit, the Undivided Interest therein or any part thereof, any liabilities imposed by or under Environmental Laws, whether or not in compliance with the Operative Documents, (C) the offer, sale, purchase, holding or delivery of the Equipment Notes or any other securities issued in connection with Section 13 or 17 and the offer and sale to and transfer by the Owner Participant of its interest in the Trust Estate, (D) the application of Part 4 or 5 of Subpart B of Title I of ERISA or Section 4975 of the Code to the execution and delivery by the Lessee, the Owner Participant or any Noteholder of this Agreement or any other Operative Document to which the Lessee, the Owner Participant or such Noteholder is a party or the consummation of the transactions contemplated thereby on the Delivery Date, including, without limitation, the sale, re-sale or transfer of the Equipment Notes on or after the Delivery Date in a manner permitted by and consistent with provisions of this Agreement and the other Operative Documents, provided, however, that in the case of the Owner Participant only, the provisions of this subsection shall not apply to the application of Part 4 or 5 of Subpart B of Title I of ERISA or Section 4975 of the Code in respect of any sale, re-sale or transfer of the Equipment Notes for reasons other than the participation of the Indemnitees as Owner Participants in the transactions contemplated by the Operative Documents, (E) the inability for any reason of full right, title and interest to the Undivided Interest in the Equipment to vest in the Owner Trustee at the times and in the manner contemplated by the Operative Documents or (F) any Make-Whole Premium which shall become due at any time under the Lease or the Indenture in respect of a Lease Event of Default (which amount shall be payable as Supplemental Rent to the Owner Trustee in all circumstances other than in the case of a purchase or prepayment of the Equipment Notes by the Owner Trustee or the Owner Participant following a Lease Event of Default pursuant to Section 8 3(e)(iii) or Section 8 3(e)(iv) of the Indenture, in which case such amount shall be payable directly to the Noteholders)

(iv)    Claims Excluded.    The following are excluded from the Lessee's agreement to indemnify any Indemnitee under this Section 8(b)

(A) Any Claim to the extent attributable to acts or events (other than acts or events attributable to the Lessee or its Affiliates) occurring after the earlier of (x) the return of the Undivided Interest in the Unit under the Lease in accordance with the requirements of Section 5(a) thereto and (y) except in connection with the exercise of remedies pursuant to Section 16 of the Lease or until all

payments have been made as required under <u>Section 10</u> of the Lease with respect to an Event of Loss, the expiration or earlier termination of the Lease under circumstances not requiring return of the Undivided Interest in the Unit,

(B) Any Claim which is (x) a Tax (except to the extent that an indemnity under this Section is required to be paid on an After-Tax Basis and to the extent of any indemnity for Taxes pursuant to <u>Section 8(b)(iii)(D))</u>, (y) a Loss or (z) a Foreign Tax Credit Loss (in each case of (x), (y) and (z), including any cost or expense of contesting such Tax, Loss or Foreign Tax Credit Loss), whether or not, in the case of (x), (y) or (z), Lessee is required to indemnify therefor under the Tax Indemnity Agreement or <u>Section 8(c)</u> of this Agreement, it being agreed that the Lessee's liability with respect to Taxes, Losses and Foreign Tax Credit Losses (and the contest thereof) is set forth in its entirety in <u>Section 8(c)</u> of this Agreement and the Tax Indemnity Agreement,

(C) Any Claim to the extent attributable to the gross negligence or willful misconduct of such Indemnitee or any of such Indemnitee's Related Indemnitee Group, except to the extent such gross negligence or willful misconduct is imputed as a matter of law to the Indemnitee or the Indemnitee's Related Group as a result of the Indemnitee's (1) ownership interest in the Equipment or the Undivided Interest therein or (2) participation in the transactions contemplated in the Operative Documents,

(D) Any Claim to the extent attributable to the noncompliance by such Indemnitee or any of such Indemnitee's Related Indemnitee Group with any of the terms of, or any misrepresentation or breach of warranty by such Indemnitee or any member of such Indemnitee's Related Indemnitee Group contained in this Agreement, any other Operative Document to which such Indemnitee or any such member of the Related Indemnitee Group is a party or any document or certificate delivered pursuant thereto, except to the extent such noncompliance, misrepresentation or breach of warranty was caused by a noncompliance, misrepresentation or breach of warranty by Lessee in the Operative Documents,

(E) Any Claim to the extent attributable to (x) a disposition in connection with an Indenture Event of Default and such Indenture Event of Default is the result of the action, inaction, bankruptcy or insolvency of such Indemnitee or (y) a voluntary disposition by (A) the Owner Trustee or the Owner Participant of all or any part of its interest in the Trust Estate or the Undivided Interest in the Equipment, the Lease or any of the other properties, rights and interests constituting the Trust Estate, other than any transfer required by the Operative Documents or following the occurrence and during the continuance of a Lease Event of Default or (B) by any other Indemnitee of all or any part of such

Indemnitee's interest in the Equipment or the Undivided Interest therein, the Lease or any of the other properties, rights and interests constituting the Trust Estate or the Indenture Estate, or the Equipment Notes, except in the case of the Indenture Trustee, any transfer required by the Operative Documents or in connection with the exercise of its rights upon the occurrence and continuance of a Lease Event of Default,

(F) Any Claim to the extent attributable to a negligent failure on the part of the Indenture Trustee or the Owner Trustee, as the case may be, to distribute in accordance with the Indenture or the Trust Agreement, as the case may be, any amounts received and distributable by it thereunder,

(G) Any Claim to the extent attributable to the authorization or giving or withholding of any future amendments, supplements, waivers or consents with respect to any of the Operative Documents by such Indemnitee, other than (x) such action that is requested by or consented to by the Lessee or is required to be executed by the Lessee under any Operative Document, (y) such action that occurs as a result of a Lease Event of Default that has occurred and is continuing or (z) such action that is required or contemplated by (and, if contemplated by, in compliance with) the provisions of the Operative Documents or by Applicable Law,

(H) Any Claim to the extent attributable to an Indenture Event of Default that is the result of the action, inaction, bankruptcy or insolvency of such Indemnitee,

(I) As to the Owner Participant only, any Claim to the extent that it would not have arisen but for the appointment of a successor Owner Trustee without the consent of the Lessee, except in connection with the appointment of a successor Owner Trustee pursuant to <u>Section 6</u>,

(J) Any Claim to the extent that it relates to a cost, fee or expense payable by a Person other than the Lessee pursuant to any provision of this Agreement (other than any thereof to the extent the Lessee is specifically liable therefor under this Agreement in the event such Person fails to pay the same, in which case the Lessee shall be entitled to reimbursement on an After-Tax Basis from such Person),

(K) Any Claim to the extent that it is a usual operating or overhead expense internal to such Indemnitee unless incurred in connection with a Lease Default or Lease Event of Default or otherwise in connection with extraordinary or unusual circumstances,

(L)  Any Claim by the Lessor or Owner Participant resulting from the imposition of any Lessor Lien or Owner Participant Lien, and

(M)  Any Claim to the extent attributable to the waiver by the Indenture Trustee of any condition precedent specified in <u>Section 18(b)</u> (unless Lessee also waived such condition precedent)

(v)    <u>Insured Claims</u>  In the case of any Claim indemnified by the Lessee hereunder which is or may be covered by a policy of insurance maintained by or for the benefit of the Lessee, each Indemnitee agrees to cooperate in a reasonable manner and at the Lessee's expense with the insurers in the exercise of their rights to investigate, defend or compromise such Claim as may be required to retain the benefits of such insurance with respect to such Claim

(vi)    <u>Claims Procedure</u>  In case any action, suit or proceeding shall be brought against any Indemnitee for which such Indemnitee is entitled to indemnification, such Indemnitee shall notify the Lessee of the commencement thereof (but the failure to do so shall not relieve the Lessee of its obligation to indemnify such Indemnitee except to the extent that the Lessee or its insurer is materially prejudiced as a result of such failure) Subject to the rights of insurers under policies of insurance maintained by or for the benefit of Lessee, the Lessee and its insurers shall have the right to investigate, and, if the Lessee states that, based on the facts and circumstances as then known, it intends to so indemnify (with Lessee reserving its right to take a contrary position based on factual circumstances as subsequently learned by the Lessee, which position Lessee will promptly disclose to such Indemnitee), the right in its sole discretion to defend or compromise (using its reasonable best efforts), any Claim for which indemnification is sought under this <u>Section 8(b)</u>, and, at the Lessee's expense, the Indemnitee shall cooperate with all reasonable requests of the Lessee in connection therewith, <u>provided, however,</u> that the Lessee shall not be entitled to assume and control the defense of any such action, suit or proceeding if (i) such action, suit or proceeding involves the potential imposition of criminal liability on such Indemnitee, (ii) such action, suit or proceeding seeks, as all or part of the relief sought, the sale, forfeiture or loss of any Unit or the Undivided Interest therein or the creation of any Lien (other than a Permitted Lien) on any Unit or the Undivided Interest therein, the Indenture Estate or the Trust Estate or any part thereof and there is more than a de minimis risk that such relief will be granted, (iii) a Lease Event of Default shall have occurred and be continuing, (iv) such Claim is joined with one or more Claims for which Lessee is not obligated to indemnify hereunder and such other Claims are not severable from the indemnifiable Claim or (v) the amounts involved, in the reasonable opinion of such Indemnitee, are likely to have a materially adverse effect on the business of such Indemnitee other than the ownership, leasing and financing of the Undivided Interest in the Equipment, and <u>provided further,</u> in the event of an action, suit or proceeding contemplated by the preceding proviso, the Lessee may nevertheless participate at its own expense in such action, suit or proceeding  If in the

reasonable opinion of such Indemnitee, there exists an actual or potential material conflict of interest between the Lessee and the Indemnitee such that such Indemnitee and the Lessee have differing defenses, then such Indemnitee and the Lessee shall each be entitled to defend such Claim  Where the Lessee or its insurers undertake the defense of an Indemnitee with respect to a Claim, no additional legal fees or expenses (beyond those accrued prior to the Lessee's assumption of the defense) of such Indemnitee in connection with the defense of such Claim shall be indemnified hereunder unless such fees or expenses were incurred at the request of the Lessee or such insurers  Subject to the provisions of <u>Section 8(b)(iv)</u>, in any action, suit or proceeding relating to (i) Claims under this <u>Section 8(b)</u>, conducted by an Indemnitee and not controlled by the Lessee or (ii) which are described in the second preceding sentence, the Lessee shall pay the reasonable out-of-pocket costs, disbursements and expenses (including reasonable legal fees and expenses) of the Indemnitee in connection with such action, suit or proceeding  Subject to the requirements of any policy of insurance, an Indemnitee may participate at its own expense in any judicial proceeding controlled by the Lessee pursuant to the preceding provisions; <u>provided</u> that such party's participation does not, in the opinion of the independent counsel to the Lessee or its insurers, interfere with such control, and such participation shall not constitute a waiver of the indemnification provided in this <u>Section 8(b)</u>  Notwithstanding anything to the contrary contained herein, the Lessee shall not under any circumstances be liable for the fees and expenses of more than one counsel for (a) each of (i) the Owner Participant (and its respective successors and assigns), (ii) the Owner Trustee (and its respective successors and permitted assigns, agents and servants) and (iii) the Indenture Trustee and (b) all of the Noteholders, taken together (and for each such Person identified in clauses (a) and (b), their respective successors and permitted assigns, agents and servants)  Notwithstanding anything in this <u>Section 8(b)</u> to the contrary, in any action, suit or proceeding to which any Indemnitee is a party, the Lessee shall not enter into any settlement or other compromise with respect to any Claim without the prior written consent of the Indemnitee (which consent will not be unreasonably withheld) unless the Lessee acknowledges in a writing satisfactory to such Indemnitee such Indemnitee's right to full indemnification under this <u>Section 8(b)</u> with respect to such Claim

(vii)    <u>Subrogation</u>  To the extent that a Claim indemnified by the Lessee under this <u>Section 8(b)</u> is in fact paid in full by the Lessee and/or an insurer under a policy of insurance, the Lessee and/or such insurer, as the case may be, shall be subrogated to the rights and remedies of the Indemnitee on whose behalf such Claim was paid with respect to the transaction or event giving rise to such Claim (other than claims in respect of insurance policies maintained by such Indemnitee at its own expense)  So long as no Lease Event of Default has occurred and is continuing, should an Indemnitee receive any amount to which the Lessee or its insurer is entitled pursuant to the preceding sentence, such Indemnitee shall promptly pay the amount received to the Lessee

(viii)    <u>No Guaranty</u>  Nothing set forth in this Agreement or any other Operative Document shall constitute a guarantee by the Lessee or any Person related to the

Lessee that the Equipment shall have any particular useful life or residual value or a guarantee to the Indenture Trustee, the Owner Participant or any Noteholder that the principal and interest with respect to the Equipment Notes will be paid

      (ix)    <u>Fees and Expenses</u>  Notwithstanding anything to the contrary in this Agreement (whether or not any of the transactions contemplated hereby are consummated), except to the extent that any of the items hereinafter described are Transaction Costs that are the responsibility of the Owner Participant pursuant to <u>Section 22</u>, the Lessee shall pay (A) the fees (whether ordinary or extraordinary), expenses and disbursements of, and all other amounts payable to, the Indenture Trustee (and any co-trustee), as trustee under the Indenture, with respect to the administration of the Indenture Estate, including the reasonable fees and expenses of its counsel; (B) the fees (whether ordinary or extraordinary), expenses and disbursements of the Owner Trustee (and any co-trustee or separate trustee), as trustee under the Trust Agreement, with respect to the administration of the Trust Estate, including the reasonable fees and expenses of counsel, and (C) all reasonable out-of-pocket costs and expenses incurred by each of the Owner Participant, the Owner Trustee, the Indenture Trustee and the Note Purchasers (excluding, in the case of the Note Purchasers legal fees and expenses other than the reasonable fees and expenses of Counsel for the Note Purchasers) in connection with (i) the entering into or giving or withholding of any proposed amendment, modification, supplement, waiver, termination, approval or consent requested by the Lessee, (ii) any Event of Loss or (iii) any action in connection with the exercise by the Lessee of any of its rights under this Agreement or the Lease or any redemption, prepayment, refinancing or assumption of the Equipment Notes undertaken at the request of the Lessee

      (x)    <u>Primary Obligor</u>  The Lessee's obligations under the indemnities provided for in this Agreement shall be those of a primary obligor whether or not the Person indemnified shall also be indemnified with respect to the same matter under the terms of any other document or instrument, and the Person seeking indemnification from the Lessee pursuant to any provision of this Agreement may proceed directly against Lessee without first seeking to enforce any other right of indemnification

    (c)    <u>General Tax Indemnity</u>

      (i)    <u>Taxes Indemnified</u>  Except as provided in paragraph (ii), the Lessee agrees to pay, protect, defend and to indemnify each Tax Indemnitee on an After-Tax Basis for, and to hold each Tax Indemnitee harmless on an After-Tax Basis from and against the actual amount of all Taxes that are imposed (or asserted against any Tax Indemnitee or the Equipment, the Undivided Interest therein or any other interest therein (whether or not indemnified against by any other person)) on or with respect to, or are measured by or withheld from any payments or arise out of or in any way relate to

                (A)    this Participation Agreement or any other Operative Document or the transactions contemplated thereby,

                (B)    any future amendment, supplement, waiver or consent with respect to any Operative Document with respect to which Lessee has consented in writing,

                (C)    the issuance and sale of the Equipment Notes,

                (D)    the payment or receipt of the principal of or interest or premium on, or other amounts with respect to, the Equipment Notes,

                (E)    the payment or receipt of Base Rent or Supplemental Rent or the receipts or earnings arising from or received with respect to the Undivided Interest in the Equipment or any part thereof or any interest therein or any application or disposition thereof,

                (F)    any other amount paid or payable (whether actual or deemed), pursuant to the Operative Documents or the transactions contemplated thereby,

                (G)    the construction, installation, inspection, financing, refinancing, condition, sublease, possession, abandonment, nondelivery, acceptance, rejection, storage, transfer of title, redelivery, modification, transportation, retirement, purchase, ownership, delivery, lease, use, operation, maintenance, repair, servicing, movement and return or other disposition of the Equipment or the Undivided Interest therein, and

                (H)    otherwise with respect to the transactions contemplated by the Operative Documents

        (ii)    Excluded Taxes  The indemnity provided for in paragraph (i) above shall not extend to any of the following Taxes (the "Excluded Taxes")

                (A) Taxes imposed by Subtitle A of the Code, and any other Taxes (other than any sales, use, transfer, ad valorem, stamp, license, property or rental Taxes or any Taxes in the nature of sales, use, transfer, ad valorem, stamp, license, property or rental Taxes) imposed by any state, local or foreign government or political subdivision thereof, which are imposed on or measured by net income (including any minimum taxes or taxes on items of tax preference), including, without limitation, the New York State Franchise Tax on Business Corporations to the extent such tax is computed pursuant to §210 of the applicable statute (the "New

York Net Income Tax") or any other or any successor net income tax provision, provided, however, that the Michigan State Single Business Tax shall not be an Excluded Tax

(B) Taxes (other than any sales, use, transfer, ad valorem, stamp, license, property or rental Taxes or any Taxes in the nature of sales, use, transfer, ad valorem, stamp, license, property or rental Taxes) imposed by the United States, or any state or local governmental or taxing authority thereof or therein, or local or foreign government or political subdivision thereof, which are (i) value added Taxes, (ii) imposed because of the holder of an Undivided Interest being treated as a partner in a partnership with the holder of another interest in the Equipment, (iii) Taxes on doing business, and (iv) Taxes imposed on or measured by gross income, gross or net receipts, capital, net worth and similar items of such Tax Indemnitee, in each case whether collected by withholding or otherwise; provided, however, in each case, such Taxes described in (i), (ii), (iii) or (iv) to the extent such Tax Indemnitee would not have been subject to Taxes of such type by such jurisdiction but for (I) the location, presence, registration, use or operation of the Equipment by the Lessee within the jurisdiction of the taxing authority imposing such Tax, (II) the presence, incorporation or activities of the Lessee in such jurisdiction, including, but not limited to, use of any other equipment by the Lessee in such jurisdiction, (III) the status of the Lessee as a foreign entity or as an entity owned in whole or in part by foreign persons, (IV) the Lessee having made (or having been deemed to have made) payments to such Tax Indemnitee from the relevant jurisdiction or (V) the Lessee being incorporated, organized, maintaining a place of business or conducting activities in such jurisdiction shall not be Excluded Taxes,

(C) Taxes that result from any transfer, assignment, sale, exchange or other disposition of the Undivided Interest in the Unit, or any interest therein or rights or obligations arising under the Operative Documents which is voluntary or the result of the bankruptcy or insolvency of the relevant Indemnitee, other than a disposition or transfer (x) following the occurrence and during the continuation of a Lease Event of Default, (y) on the Delivery Date pursuant to the terms of the Operative Documents or a transfer pursuant to Sections 5, 7, 8, 9, 10 or 18 of the Lease or (z) resulting from an Event of Loss, an early termination of the applicable Lease pursuant to Section 9 of such Lease or the purchase of such Undivided Interest in the Unit pursuant to Section 18(c)(i) of the Lease, provided that in the case of an early termination pursuant to Section 9 of the Lease, state and local sales Taxes will be Excluded Taxes to the extent net resale proceeds to the Lessor exceed Termination Value with respect to such Undivided Interest in the Unit and such Termination Value actually is paid in full to the Lessor,

(D) environmental Taxes imposed under section 59A of the Code or any successor environmental tax provision,

(E) Taxes imposed on the Owner Trust with respect to any fees or other compensation received by the Owner Trustee in its capacity as such or as a result of the Owner Trust not being treated as a disregarded, conduit or pass-through entity, or as an agent of Owner Participant for tax purposes,

(F) otherwise indemnifiable Taxes imposed against a transferee or assignee of any Tax Indemnitee to the extent of the excess of such Taxes over the amount of otherwise indemnifiable Taxes that would have been imposed against such transferee or assignee had there not been such a transfer or assignment by such transferee's or assignee's predecessor in interest or a related person (other than a transfer following the occurrence and during the continuation of a Lease Event of Default),

(G) Taxes that result from the inaccuracy of any representation by a Tax Indemnitee or any related Person (provided that for this purpose the Owner Trustee shall not be considered to be related to the Owner Participant) in any Operative Document or the breach by such Tax Indemnitee or any related Tax Indemnitee (if such related Tax Indemnitee was acting under the direction of the relevant Tax Indemnitee) of any of its warranties or covenants in any of the Operative Documents (including without limitation a breach by the Lessor or Owner Participant of its obligations under Section 11(g) of this Agreement) or the gross negligence or willful misconduct of a Tax Indemnitee or related person,

(H) so long as no Lease Event of Default shall have occurred and be continuing, Taxes imposed with respect to the Undivided Interest in the Unit after the earliest of (i) either the return of the Undivided Interest in such Unit to the Lessor pursuant to Section 5 of the Lease, (ii) the termination of the Lease Term with respect to such Undivided Interest in the Unit pursuant to Section 18(c) of the Lease or (iii) a termination pursuant to Section 9 of the Lease or an Event of Loss or (iv) the discharge in full of Lessee's obligation to pay the Stipulated Loss Value, Termination Value or Early Fixed Price Purchase Amounts with respect to such Undivided Interest in the Unit, provided, however, that the exclusion set forth in this clause (H) shall not apply to that portion of Taxes imposed after such date as a result of payments by the Lessee under the Operative Documents or Taxes relating to events occurring or matters arising prior to or simultaneous with the earliest of such times,

(I)  the failure of the Tax Indemnitee to timely comply with the contest provisions of paragraph (vii) below, if such failure effectively precludes the initiation or continuation of such contest,

(J)  any Taxes in direct and clear substitution for any of the foregoing Excluded Taxes,

(K)  except in the case of any Noteholder, penalties, interest or additions to Tax attributable to the gross negligence of a Tax Indemnitee or the deliberate disregard of rules or regulations by a Tax Indemnitee,

(L)  in the case of a Noteholder, penalties, interest or additions to Tax that would not have resulted but for the failure of such Tax Indemnitee to timely and accurately file a return required to be filed under Section 8(c)(viii) hereof unless such failure is caused by the Lessee,

(M)  Taxes incurred by the Indenture Trustee with respect to which such Indenture Trustee would not be entitled to indemnity or reimbursement from any Person pursuant to Section 9 5 (a)(iii)(A) or (B) of the Indenture,

(N)  Taxes resulting from an amendment or modification to any of the Operative Documents which amendment or modification was effected without the written consent of the Lessee,

(O)  Taxes that are paid and included in the computation of Lessor's Cost, and

(P)  Taxes that result from Lessor Liens or Trustee Liens, unless such lien arises from a Lease Event of Default and continues while such Event of Default is continuing

Notwithstanding any other provisions of Section 8(c) to the contrary, if any Taxes subject to indemnification under Section 8(c) shall be required by law to be deducted or withheld from any payment to a Noteholder under the Operative Documents, the Lessee shall increase the amount paid so that such Noteholder receives, after deduction or withholding on account of such Taxes, the full amount such Noteholder would have received if no such deduction or withholding had been made

Notwithstanding any other provisions of this Section 8(c) to the contrary, the Lessee will indemnify each Noteholder from and against, any present or future claim or liability for any notary fees or registration, stamp, excise, recording, transaction and documentary Taxes or other similar Taxes, fees or charges and any penalties or interest with respect thereto (unless such penalties and interest are imposed as a result of circumstances described in Section 8(c)(ii)(L) hereof which would preclude indemnification hereunder) which may be payable to or assessed, levied, collected or demanded by any Person, on or in connection with the execution, delivery, filing, registration, validity, legality, enforceability, priority or admissibility in evidence (in proceedings against the

Lessee, Owner Participant or Owner Trustee) of this Agreement or any other Operative Document and any other transactions or documents contemplated by the foregoing

Notwithstanding any other provision of this <u>Section 8(c)</u> to the contrary, the Lessee will indemnify the Owner Trustee and the Owner Participant (and any Affiliate, successor or permitted assign of either thereof) on an After-Tax Basis for any obligation with respect to United States federal withholding taxes imposed on the Owner Trustee or the Owner Participant (or any Affiliate of either thereof) with respect to the Equipment Notes under the terms of the Indenture or as a result of a claim by the IRS asserted against the Owner Trust or the Owner Participant (or any Affiliate of either), <u>provided</u>, <u>however</u>, that the Lessee shall be subrogated to the rights and defenses of the Lessor and the Owner Participant (and any Affiliate of either thereof) in respect of such withholding taxes, including the rights and defenses in <u>Section 9 5</u> of the Indenture

Notwithstanding the provisions of <u>Section 8(c)(ii)(A)</u> hereof to the contrary, if U S federal income withholding taxes are required by law to be deducted from or in respect of any sum payable under the Operative Documents to or for the benefit of any Noteholder who is not a "United States Person" within the meaning of Section 7701(a)(30) of the Code (a "Foreign Noteholder"), or to any Indenture Trustee on account of payments to any Foreign Noteholder, the Lessee shall pay such additional amount as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this paragraph), such Foreign Noteholder receives on an After-Tax Basis an amount equal to the sum it would have received had no such deductions been made, <u>provided</u> that no additional amount shall be payable by Lessee in respect of U S federal income withholding taxes to or for the benefit of any Foreign Noteholder if such Foreign Noteholder shall have failed to provide the forms or documents referred to in this paragraph or has notified the Indenture Trustee that such forms are withdrawn or inaccurate. On or prior to the date of the Operative Documents in the case of each Foreign Note Purchaser listed on the signature pages hereto, and on the date it becomes a Noteholder in the case of each other Foreign Noteholder, each Foreign Noteholder shall provide the Lessee with a certificate to the effect that such Foreign Noteholder is not subject to withholding on payments under the Operative Documents, and the Indenture Trustee with two accurate and complete original signed copies of Form W-8ECI or W-8BEN (or any successor or substitute form or forms) of the IRS to the effect that such Foreign Noteholder is eligible under Section 1441(c)(1) or 1442(b) of the Code to receive payments without deduction or withholding of United States federal income tax    Each Foreign Noteholder further agrees to deliver to the Indenture Trustee from time to time, as reasonably requested by the Indenture Trustee or as may be required by Applicable Law and in any case before or promptly upon the occurrence of any event requiring a change in the most recent Form W-8ECI or W-8BEN previously delivered pursuant to the preceding sentence, two accurate and complete original signed copies of Form W-8ECI or W-8BEN to the effect that such Foreign Noteholder continues to be eligible under Section 1441(c)(1) or 1442(b) of the Code to receive payments under the Operative Documents without deduction or withholding of United States Federal income tax, and each Foreign Noteholder who becomes a Noteholder subsequent to the date of the Operative Documents to the effect that such Foreign Noteholder is not subject to withholding on payments under the Operative Documents

In the event a Foreign Noteholder who had been exempt from withholding by reason of Sections 864, 871, 881, 882, 1441(c)(1) or 1442(b) of the Code, and regulations thereunder, determines that it is legally unable to comply with the filing requirements to qualify for such exemption because such Code Sections have been amended or repealed from their form in effect on the date hereof, such Foreign Noteholder shall promptly notify the Lessee in writing of its inability to meet such filing requirements and certify that it is unable to recover the full amount of such deduction or withholding from a source other than the Lessee or Owner Trustee (hereinafter a "Withholding Notice") Any Foreign Noteholder claiming any additional amounts payable pursuant to this paragraph shall use reasonable best efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its lending office or use reasonable best efforts to make, fund or maintain its Note through another lending office of such Foreign Noteholder if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts which may thereafter accrue and would not, in the reasonable judgment of such Foreign Noteholder be otherwise materially disadvantageous to such Foreign Noteholder

If any Withholding Notice is delivered by a Foreign Noteholder as described above, and such Foreign Noteholder claims any additional amounts in respect of withholding tax, then, unless such Foreign Noteholder has theretofore taken steps to remove or cure, and has removed or cured, the conditions creating the cause for the delivery of such a Withholding Notice and has complied with the applicable requirements to qualify for exemption from withholding, the Lessee may designate a Person to purchase for cash, in accordance with the terms of the Operative Documents, all, but not less than all, of the Equipment Notes outstanding to such Noteholder and such Noteholder's rights and obligations hereunder related to such Equipment Notes without recourse to or warranty, or expense to, such Noteholder for a purchase price equal to the outstanding principal amount plus accrued interest outstanding and all other amounts owed to such Noteholder under the Operative Documents and such Equipment Notes. A purchase of any Equipment Note pursuant to Section 8(c) shall not relieve the Lessee of the obligation to pay any amounts arising under Section 8(c) with respect to any period ending on or prior to the date of such purchase

Notwithstanding any other provision of this Section 8(c) to the contrary, the Owner Participant and Owner Trustee will use best efforts to minimize Taxes indemnifiable by the Lessee under this Section 8(c), including by complying with reasonable requests by the Lessee to do or to refrain from doing any act if such compliance has no material adverse or unindemnified adverse impact on the Owner Participant or Owner Trustee or any Affiliate of either thereof or on the business or operations of any of the foregoing

The indemnity for the Michigan State Single Business Tax will be computed on a hypothetical basis assuming that (a) the activities in Michigan under the Lease are the Owner Participant's only activities in Michigan and (b) the Michigan State Single Business Tax is computed by the Owner Participant to reflect the lowest applicable Michigan State Single Business Tax liability utilizing all appropriate reductions for tax base, including, but not limited to, the capital acquisitions and the gross receipts reduction to the adjusted tax base, and utilizing all applicable

credits and deductions offsetting or reducing such Tax liability  Furthermore, any such indemnity shall be reduced by the value of any Tax savings in the State of Michigan in previous years

        (iii)    <u>Payment</u>  Each payment required to be made by the Lessee to a Tax Indemnitee pursuant to paragraph (i) shall be paid in immediately available funds by the later of  (A) 30 days following Lessee's receipt of the Tax Indemnitee's written demand for the payment (which demand shall be accompanied by an Officer's Certificate of the Tax Indemnitee describing in reasonable detail the Taxes for which the Tax Indemnitee is demanding indemnity and the computation of such Taxes, (B) the date on which such Taxes are required to be paid to the applicable taxing authority, (C) other than with respect to any withholding Taxes subject to indemnification, subject to paragraph (vii) below, in the case of amounts which are being contested pursuant to such paragraph (vii), at the time and in accordance with a Final Determination of such contest (including all appeals), or (D) other than with respect to any withholding Taxes subject to indemnification, in the case of any indemnity demand for which the Lessee has requested review and determination pursuant to paragraph (iv) below, at the earlier of (x) the completion of such review and determination or (y) 180 days following Lessee's receipt of the Tax Indemnitee's written demand for the payment  Any amount payable to the Lessee pursuant to paragraph (v) or (vi) below shall be paid promptly after the Tax Indemnitee realizes a Tax Benefit giving rise to a payment under paragraph (v) or receives a refund or credit giving rise to a payment under paragraph (vi), as the case may be, and shall be accompanied by an Officer's Certificate of the Tax Indemnitee computing in reasonable detail the amount of such payment  Upon the Final Determination of any contest pursuant to paragraph (vii) below in respect of any Taxes for which the Lessee made a Tax Advance, the amount of the Lessee's obligation under paragraph (i) above shall be determined as if such Tax Advance had not been made  Any obligation of the Lessee under this <u>Section 8(c)</u> and the Tax Indemnitee's obligation to repay the Tax Advance will be satisfied first by set off against each other, and any difference owing by either party will be paid within 10 days of such final determination

        (iv)    <u>Independent Examination</u>.  Within 15 days after the Lessee receives any computation from the Tax Indemnitee, the Lessee may request that an independent public accounting firm selected by the Tax Indemnitee and reasonably acceptable to the Lessee shall review and determine on a confidential basis the amount of any indemnity payment by the Lessee to any Tax Indemnitee pursuant to paragraph (i) above or any payment by a Tax Indemnitee to Lessee pursuant to paragraph (v) or (vi) below  The Tax Indemnitee shall cooperate with such accounting firm and supply it with all documentation and records necessary for the accounting firm to conduct such review and determination, <u>provided that</u> such accounting firm shall agree in writing satisfactory to the Tax Indemnitee to maintain the confidentiality of such information  The parties hereto agree that the independent public accounting firm's sole responsibility shall be to verify the computation of any payment pursuant to this <u>Section 8(c)</u> (setting forth fully the assumptions on which such verification is based) and that matters of interpretation of this Participation

Agreement are not within the scope of the independent accountant's responsibility  The fees and disbursements of such accounting firm will be paid by the Lessee, provided, however, that such fees and disbursements will be paid by the Tax Indemnitee if the verification results in an adjustment in the Lessee's favor of 5 0 percent or more of the net present value (using a discount rate equal to the Note Rate and calculating such value as of the date such payment becomes due and payable under this Agreement) of the indemnity payment or payments computed by the Tax Indemnitee  None of the Owner Participant, the Lessee or any Noteholder shall be required to disclose their income tax returns to any Person, and no other Tax Indemnitee shall be required to disclose its income tax returns to any Person other than the accounting firm retained pursuant to this paragraph

    (v) <u>Tax Benefit</u>  If, as a result of any Taxes paid or indemnified against by the Lessee under this <u>Section 8(c)</u>, the aggregate Taxes paid or accrued by the Tax Indemnitee for any taxable year and not indemnified by the Lessee pursuant to this <u>Section 8(c)</u> are less (whether by reason of a deduction, credit, allocation or apportionment or otherwise) than the amount of such Taxes that otherwise would have been payable by such Tax Indemnitee (a "<u>Tax Benefit</u>"), then to the extent such Tax Benefit was not taken into account in determining the amount of indemnification payable by the Lessee under paragraph (i) above, such Tax Indemnitee shall pay the Lessee the amount of such Tax Benefit on a After-Tax Basis, provided, however, that (A) if at the time such payment is due to the Lessee a Lease Event of Default shall have occurred and be continuing, such amount shall not be payable until such Lease Event of Default has been cured, and (B) the amount payable to the Lessee pursuant to this paragraph (net of any amount necessary to make such payment on an After-Tax Basis) shall not exceed the excess of all corresponding indemnity payments that were made by the Lessee to the Tax Indemnitee (net of any amount that was necessary to make such payment on an After-Tax Basis) over all amounts previously paid by the Tax Indemnitee to the Lessee pursuant to this <u>Section 8(c)(v)</u> with respect to such indemnity payments (net of any amount necessary to make payment of such amounts on an After-Tax Basis)  If it is later determined that the Tax Indemnitee was not entitled to such Tax Benefit, the portion of such Tax Benefit that is repaid or recaptured will be treated as Taxes for which the Lessee must indemnify the Tax Indemnitee pursuant to this <u>Section 8(c)</u>.  The Tax Indemnitee shall in good faith use reasonable efforts (in a manner consistent with its overall financial and public relations interests) to seek and claim any such Tax Benefit, and, in the case of the Owner Participant and the Owner Trustee, to minimize the Taxes indemnifiable by the Lessee under paragraph (i)  In the event that the amount of the Lessee's indemnification liability to any Tax Indemnitee other than the Owner Participant and the Owner Trustee could be reduced by commercially reasonable steps readily available to any such Tax Indemnitee, such Tax Indemnitee shall take such steps, provided that such Tax Indemnitee shall be under no obligation to take any step that, in its reasonable opinion, would (a) result in its incurring any additional costs in performing its obligations hereunder (unless the Lessee has agreed to reimburse it for the same) or (b) be otherwise materially adverse to such Tax Indemnitee

(vi)    Refund    If a Tax Indemnitee obtains a refund or actually utilizes a credit of all or part of any Taxes paid, reimbursed or advanced by the Lessee pursuant to this Section 8(c) or would have received such refund or credit but for a counterclaim or offsetting claim or other claim not indemnified hereunder (to the extent not previously taken into account in calculating the amount paid under this Section 8(c) with respect to such Taxes), the Tax Indemnitee within fifteen days shall pay to the Lessee the amount of such refund or credit plus or minus any net tax benefit or detriment realized by such Tax Indemnitee as a result of any payment by such Tax Indemnitee made pursuant to this sentence (taking into account any Taxes incurred by such Tax Indemnitee by reason of the receipt of such refund or credit as well as any Tax benefits or credits by reason of such payment to the Lessee); provided, however, that (A) if at the time such payment is due to the Lessee a Lease Event of Default shall have occurred and be continuing, such amount shall not be payable until such Lease Event of Default has been cured, and (B) the amount payable to the Lessee pursuant to this sentence (net of any amount necessary to make such payment on an After-Tax Basis) shall not exceed the amount of the indemnity payment in respect of such refunded or credited Taxes that was made by the Lessee (net of any amount that was necessary to make such payment on an After-Tax Basis)    If, in connection with a refund or credit of all or part of any Taxes paid, reimbursed or advanced by the Lessee pursuant to this Section 8(c), a Tax Indemnitee receives an amount representing interest on such refund or credit, the Tax Indemnitee shall within fifteen days pay to the Lessee the amount of such interest that shall be fairly attributable to such Taxes paid, reimbursed or advanced by the Lessee prior to the receipt of such refund or credit    If it is later determined that the Tax Indemnitee was not entitled to such refund or credit, the portion of such refund or credit that is repaid or recaptured will be treated as Taxes for which the Lessee must indemnify the Tax Indemnitee pursuant to this Section 8(c)    The Tax Indemnitee shall in good faith use reasonable best efforts (in a manner consistent with its overall financial and public relations interests) to seek and claim any such Tax refund or credit and, in the case of the Owner Participant and the Owner Trustee, to minimize the Taxes indemnifiable by the Lessee under paragraphs (i) and (ii)    In the event that the amount of the Lessee's indemnification liability to any Tax Indemnitee other than the Owner Participant and the Owner Trustee could be reduced by commercially reasonable steps readily available to any such Tax Indemnitee, such Tax Indemnitee shall take such steps, provided that such Tax Indemnitee shall be under no obligation to take any step that, in its reasonable opinion, would (a) result in its incurring any additional costs in performing its obligations hereunder (unless the Lessee has agreed to reimburse it for the same) or (b) be otherwise materially adverse to such Tax Indemnitee.

(vii)    Contest

(A) Notice of Contest    If any proceeding (including without limitation a written claim or written threat of such proceeding) or demand for payment is commenced or made by any taxing authority against a Tax Indemnitee for any Taxes with respect to which the Lessee may be liable for indemnity

hereunder (a "Tax Claim"), such Tax Indemnitee shall give the Lessee written notice of such Tax Claim as soon as practicable, and in no event more than 30 days after its receipt, and shall furnish the Lessee (provided the Lessee shall have agreed to keep such information confidential other than as required to contest the claim) with copies of such Tax Claim and all other writings received from the taxing authority relating to such claim, provided, however, that failure to notify Lessee within such 30-day period shall not relieve the Lessee of any obligation to indemnify the Tax Indemnitee hereunder unless such failure precludes the Lessee from initiating or continuing the contest of such Tax Claim  The Tax Indemnitee shall not pay such Tax Claim until at least 30 days after providing the Lessee with such written notice, unless required to do so by law or regulation or unless deferral of payment would cause adverse consequences to the Tax Indemnitee.

(B) Control of Contest. Subject to the conditions set forth in paragraph (vii)(C) below, the Lessee will be entitled to control the contest of any Tax Claim unless such Tax Claim cannot be segregated procedurally from tax claims for which the Lessee is not obligated to indemnify the Tax Indemnitee (in which case Lessee may, subject to the conditions set forth in paragraph (vii)(C), require such Tax Indemnitee to contest such Tax Claim on its behalf) If permitted by applicable law and consistent with Lessee's choice of manner of conducting such contest and forum for such contest, the Lessee shall use reasonable best efforts to contest such Tax Claim in its own name  In the case of a Tax Claim that the Lessee is not entitled to contest, or that the Lessee and the Tax Indemnitee otherwise agree that the Tax Indemnitee shall contest

(1)    the Tax Indemnitee will contest and control such Tax Claim in good faith and with due diligence,

(2)    at the Lessee's request, if payment is made to the taxing authority, the Tax Indemnitee shall use reasonable efforts to obtain a refund thereof in appropriate administrative and judicial proceedings,

(3)    the Tax Indemnitee shall consult with and keep reasonably informed the Lessee and its designated counsel with respect to such Tax Claim, shall timely provide the Lessee with copies of the relevant portions of all documents relating to such Tax Claim (provided the Lessee shall have agreed to keep such information confidential), and shall consider and consult with the Lessee concerning any request by the Lessee to (a) resist payment of Taxes demanded by the taxing authority in connection with such Tax Claim if practical and (b) not pay such Taxes except under protest if protest is necessary and proper,

(4)    the Tax Indemnitee will not, without the Lessee's prior written consent, forego any administrative appeal, proceeding, hearing or conference if doing so would preclude initiating or contesting further such Tax Claim, provided, however, that the Tax Indemnitee shall not be required to pursue any appeal to the United States Supreme Court,

(5)    the Tax Indemnitee shall not otherwise settle, compromise or abandon such contest without the Lessee's prior written consent except as provided in paragraph (vii)(D) below,

(6)    the Tax Indemnitee shall contest such Tax Claim at the administrative level if (a) the Lessee so requests and (b) the Tax Indemnitee is contesting at that time other issues for the same tax year at the administrative level, and

(7)    the Tax Indemnitee shall take such other reasonable action as is reasonably requested by the Lessee from time to time.

(C)    Conditions of Contest  Notwithstanding the foregoing, no contest with respect to a Tax Claim will be required pursuant to this Section 8(c)(vii), and the Lessee shall be required to pay any such Taxes without contest, unless

(1)    within 30 days after notice by the Tax Indemnitee to the Lessee of such Tax Claim the Lessee shall request in writing that such Tax Claim be contested, provided that if a shorter period is required for taking action with respect to such Tax Claim pursuant to the last sentence of paragraph (vii)(A) above, the Lessee shall use reasonable best efforts to request such contest within such shorter period,

(2)    the Lessee acknowledges its obligation to indemnify the Tax Indemnitee with respect to such Tax Claim or states why it believes it would not be obligated to so indemnify,

(3)    no Lease Event of Default has occurred and is continuing,

(4)    there is no immediate or material threat of sale, forfeiture or loss of, or the creation of a lien on the Equipment, the Undivided Interest therein or any other part thereof or interest therein by the applicable taxing authority as a result of such Tax Claim,

(5)    if such contest involves payment of such Tax, the Lessee will either (x) lend to the Tax Indemnitee on an interest-free basis (without reduction for any Tax savings that the Tax Indemnitee may realize as a result of the payment of such Tax), which loan will be repaid in full by the Tax Indemnitee upon the conclusion of the contest ("Tax Advance") (together with any interest received thereon from a taxing authority) or (y) pay such Tax Indemnitee, in either case, the amount payable by the Lessee pursuant to paragraph (i) above with respect to such Tax,

(6)    the Lessee agrees to pay (and pays on demand) to the Tax Indemnitee all reasonable costs and expenses incurred by the Tax Indemnitee in connection with the contest of such claim (including, without limitation, reasonable fees and disbursements of counsel), and

(7)    the Tax Indemnitee has been provided with an opinion, reasonably acceptable to such Tax Indemnitee, of Lessee's Tax Counsel or Lessee's internal tax counsel to the effect that there is a Reasonable Basis for contesting such Tax Claim (and in the case of an appeal of an adverse decision, the Tax Indemnitee has been provided with an opinion from Lessee's Tax Counsel or internal tax counsel that there is substantial authority for such appeal)

Notwithstanding anything contained in this paragraph (vii) to the contrary, no Tax Indemnitee shall be required to contest any Tax Claim if the subject matter thereof shall be of a continuing nature and there shall have been a final determination with respect thereto, unless there shall have been a change in facts or the law (including, without limitation, amendments to statutes or regulations, administrative rulings and court decisions), and such Tax Indemnitee shall have received an opinion of Lessee's Tax Counsel, which opinion shall be furnished at the Lessee's sole expense and shall be reasonably satisfactory to the Tax Indemnitee, setting forth the facts and legal analysis on which it is based, to the effect that as a result of such change in facts or the law it is more likely than not that the Tax Indemnitee will prevail in the contest of such claim

(D)    Waiver of Indemnification  Notwithstanding anything to the contrary contained in this Section 8(c)(vii), the Tax Indemnitee at any time may elect to decline to take any action or any further action with respect to a Tax Claim or may in its sole discretion settle or compromise any contest with respect to such Tax Claim without the Lessee's consent if the Tax Indemnitee

(1)    waives its right to any indemnity payment by the Lessee pursuant to this Section 8(c) in respect of such Tax (including Taxes imposed in future years from directly related claims and claims based on the outcome of such Tax Claim), and

(2)        promptly repays to the Lessee any Tax Advance and any amount paid to such Tax Indemnitee pursuant to this <u>Section 8(c)</u> in respect of such Taxes, plus interest on such Tax Advance or other amounts at the Internal Revenue Service rate for refunds (or other applicable state or local interest rate for refunds), payable from the date of payment of such amounts by the Lessee to the Tax Indemnitee to (but excluding) the date of repayment of such amounts by the Tax Indemnitee to the Lessee

If the Tax Indemnitee settles a Tax Claim without the written consent of the Lessee either (x) without expressly reserving the right to contest the same or related issues in any relevant proceedings or (y) such that the Lessee is effectively precluded from initiating or continuing a contest hereunder of any Tax Claim for any other taxable period, the Tax Indemnitee shall be deemed to have waived the payment by the Lessee under this <u>Section 8(c)</u> of any indemnity amounts in respect of such Tax Claim

(viii)    <u>Reports</u>

(A) If any report, statement or return is required to be filed by a Tax Indemnitee with respect to any Tax that is subject to indemnification under this <u>Section 8(c)</u>, the Lessee will (1) notify the Tax Indemnitee of such requirement not later than 30 days prior to the date such report or return is required to be filed (determined without regard to extensions) and (2) either (x) if permitted by applicable law, prepare such report, statement or return for filing by the Lessee in such manner as will show the ownership of the Undivided Interest in the Equipment by the Lessor for United States federal, state or local income tax purposes (if applicable), send a copy of such report, statement or return to the Tax Indemnitee and timely file such report, statement or return with the appropriate taxing authority, or (y) if practicable and if the return to be filed reflects only information in respect of the transactions contemplated by the Operative Documents, prepare and furnish to such Tax Indemnitee not later than 10 days prior to the date such report, statement or return is required to be filed (determined without regard to extensions) a proposed form of such report or return for filing by the Tax Indemnitee If no report, statement or return is required to be filed with respect to a Tax subject to indemnification under this <u>Section 8(c)</u>, the Lessee will promptly notify the Tax Indemnitee of such Tax not later than 30 days prior to the due date for payment of such Tax.

(B) Subject to paragraph (iii) above, not later than the date any Tax described in the preceding clause (A) is required to be paid by the Tax Indemnitee, the Lessee will either (1) if permitted by applicable law, pay such Tax directly to the appropriate taxing authority or (2) pay the Tax Indemnitee the amount of such Tax in immediately available funds

(C) Each of the Tax Indemnitee or the Lessee, as the case may be, will timely provide the other, at the Lessee's expense, with all information in its possession that the other party may reasonably require and request to satisfy its obligations under this paragraph (viii), provided, however, and subject to the provisions of Section 8(c)(iv) hereof, that no Tax Indemnitee or the Lessee shall be required to provide or to disclose any of its tax returns or other information or documents which it shall in good faith (exercising reasonable discretion) deem to be of a confidential nature  The Lessee shall hold each Tax Indemnitee harmless from and against all liabilities arising out of any insufficiency or inaccuracy of any report, return or statement if such insufficiency or inaccuracy results from the insufficiency or inaccuracy of any information required to be supplied by the Lessee pursuant to this paragraph (viii) in preparing and filing such report, statement or return

(ix)    Scope  Notwithstanding any other provision in the Operative Documents, all of the Lessee's obligations with respect to Taxes (except to the extent that an indemnity or other payment is expressly required to be reimbursed on an After-Tax Basis or any indemnity for Taxes pursuant to Section 8(b)(iii)(D)) are contained in this Section 8(c) and in the Tax Indemnity Agreement

(x)    Survival of Obligations  All of the obligations of the Lessee and any Tax Indemnitee under this Section 8(c) with respect to the Undivided Interest in any Unit shall survive and continue notwithstanding the termination of the Lease or any other Operative Document

## SECTION 9. REPRESENTATIONS AND WARRANTIES OF PARTIES OTHER THAN THE LESSEE

(a)    Owner Trustee Representations and Warranties  The Owner Trustee in its individual capacity represents and warrants to other parties hereto that

(i)    Organization and Power  The Owner Trustee in its individual capacity is a national banking association duly organized and validly existing in good standing under the laws of the United States of America and has full corporate power, authority and legal right to execute, deliver and perform its obligations under the Trust Agreement and act as trustee thereunder, to enter into and perform its obligations under each other Operative Document to which it is a party.

(ii)    Authorization  The Trust Agreement and each other Operative Document to which it is a party in its individual or trust capacity have been or will be duly authorized, executed and delivered by the Owner Trustee, in its individual capacity or trust capacity, as the case may be, and constitute or will constitute the legal, valid and binding obligation of the Owner Trustee, in its individual capacity or trust capacity, as the case may

be, enforceable against it in such capacity in accordance with the terms thereof, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and by general principles of equity

(iii)    No Violation of Law    The execution, delivery and performance by the Owner Trustee in its individual capacity of the Trust Agreement and by the Owner Trustee in its individual or trust capacity of the Operative Documents to which the Owner Trustee in either capacity is a party do not violate any Applicable Law of the State of Connecticut or the United States relating to its banking or trust powers.

(iv)    No Breach    The execution, delivery and performance by the Owner Trustee in its individual capacity of the Trust Agreement and by the Owner Trustee in its individual or trust capacity of each other Operative Document to which it is a party in either capacity does not (A) require the consent or approval of, the giving of notice to, or the registration with, or the taking of any other action with respect to, any Governmental Authority of the United States or the State of Connecticut relating to or governing its banking or trust powers (except such as shall have been duly obtained or given and are in full force and effect), or (B) contravene nor will contravene any provision of, nor constitute nor will constitute a default under its Articles of Association, by-laws or any indenture, mortgage, contract or other agreement to which the Owner Trustee in its individual or trust capacity is a party or by which it is bound, or any judgment or order binding on it

(v)    Litigation    There are no pending or, to the knowledge of the Owner Trustee, in its individual capacity, threatened actions or proceedings against the Owner Trustee in its trust or individual capacity before any court or administrative agency which purport to affect the legality, validity or enforceability of any Operative Document or would affect the ability of the Owner Trustee to perform its obligations under the Operative Documents

(vi)    No Lessor's Liens    There are no Lessor's Liens on the Trust Estate or the Indenture Estate, or on any part of either thereof attributable to the Owner Trustee in its individual capacity and the execution, delivery and performance by the Owner Trustee (in its individual or trust capacity) of the Operative Documents to which the Owner Trustee (in its individual or trust capacity) is or will be a party will not subject the Trust Estate or Indenture Estate to any Lessor's Liens

(vii)    No Offer or Solicitation    The Owner Trustee in its individual capacity has not offered any interest in any Equipment Notes or any similar securities for sale to, or solicited any offer to acquire the same from, anyone other than the Note Purchasers, and no responsible officer in the Corporate Trust Administration Department of the Owner Trustee has actual knowledge of any offer or solicitation of the equity investment of the

Owner Participant except as described in the certificate to be delivered pursuant to Section 4(k)(ii)

(viii)    Chief Executive Office    (a) The location (as such term is defined in the Uniform Commercial Code) of the Owner Trustee is Goodwin Square, 225 Asylum Street, Hartford, CT 06103 Attention Corporate Trust Administration, (b) the Owner Trustee's true legal name (as registered with the United States Comptroller of the Currency in the United States, the jurisdiction of its incorporation) is State Street Bank and Trust Company of Connecticut, National Association, (c) the Owner Trustee's federal tax identification number is 06-1304336

(ix)    No Other Transactions    Since the date of the Trust Agreement, the Owner Trustee has not entered into any transaction on behalf of the Owner Trust other than as specifically contemplated by the Operative Documents

(b)    Representations and Warranties of the Note Purchasers    Each of the Note Purchasers, severally and not jointly, represents and warrants to other parties hereto as follows

(i)    such Note Purchaser is acquiring the Equipment Notes to be acquired by it for its own account and not with a view to any distribution of the Equipment Notes in violation of the Securities Act, provided that the disposition of such Note Purchaser's property shall at all times be within its control,

(ii)    such Note Purchaser acknowledges that the Equipment Notes have not been registered under the Securities Act, in reliance upon an exemption from such registration, and agrees that it will not sell, offer for sale, transfer, pledge or hypothecate its Equipment Notes in the absence of an effective registration statement covering such Equipment Notes under the Securities Act, unless such sale, offer of sale, transfer, pledge or hypothecation is exempt and is permitted under this Agreement and the Indenture,

(iii)    such Note Purchaser's knowledge, sophistication and experience in financial and business matters are such that it is capable of evaluating, and has evaluated, the merits and risks of its prospective investment in the Equipment Notes, and such Note Purchaser is able to bear the economic risk of such investment and is able to afford a complete loss of such investment,

(iv)    either (i) no assets of any Employee Benefit Plan will be used by such Note Purchaser to acquire Equipment Notes, or (ii) if assets of an Employee Benefit Plan are used by such Note Purchaser to acquire Equipment Notes, (x) the assets of any Employee Benefit Plan being utilized to acquire Equipment Notes consist solely of assets of an insurance company general account and the acquisition of Equipment Notes and holding of Equipment Notes by such Note Purchaser is entitled to the exemption granted by

Department of Labor Prohibited Transaction Class Exemption ("PTE") 95-60 with respect to the assets of any such Employee Benefit Plan, (y) the assets of any Employee Benefit Plan being utilized to acquire Equipment Notes consist solely of assets of a "bank collective investment fund" and the transfer of Equipment Notes to and holding of Equipment Notes by such Note Purchaser is entitled to the exemption granted by PTE 91-38 with respect to the assets of any such Employee Benefit Plan, or (z) the assets utilized to acquire Equipment Notes consist of assets of an "investment fund" within the meaning of PTE 84-14 (issued March 13, 1984) and the conditions of PTE 84-14 will be satisfied with respect to the purchase of the Equipment Notes, and

(v)    such Note Purchaser is not subject to withholding or backup withholding for Taxes with respect to any payments received in connection with the Equipment Notes, or otherwise has or will provide evidence of an appropriate exemption from such withholding or backup withholding

(c)    Owner Participant Representations and Warranties    The Owner Participant represents and warrants to other parties hereto as follows

(i)    No Offer or Solicitation    The Owner Participant is acquiring its interest in the Trust Estate for investment and not with a present intent as to any resale or distribution thereof in violation of Section 5 of the Securities Act (subject nonetheless to the understanding that the disposition of its properties shall at all times be and remain within its control)    Neither the Owner Participant nor anyone acting on its behalf has directly or indirectly offered any interest in the Equipment, the Trust Estate, any Equipment Note, any equipment or trust estates relating to an agreement similar to this Agreement, dated as of the Delivery Date, and under which General Motors Corporation is the lessee or any similar securities for sale to, or solicited any offer to acquire any of the same from, anyone in a manner which would result in a violation of the Securities Act or any state securities laws

(ii)    Organization and Power    The Owner Participant is a corporation duly organized and validly existing in good standing under the laws of the state of its incorporation, is duly qualified to transact business in all states where the failure to so qualify would have a materially adverse effect on its business, and has the corporate power and authority to enter into and perform its obligations under this Agreement and the other Operative Documents to which it is a party

(iii)    Authorization    This Agreement and the other Operative Documents to which it is a party have been duly authorized by all necessary corporate action on the part of the Owner Participant, do not require any approval or consent of any trustee or holders of any indebtedness or obligations of the Owner Participant, and have been or will be duly executed and delivered by such Owner Participant, and neither the execution and delivery thereof, nor the consummation of the transactions contemplated thereby, nor

compliance by the Owner Participant with any of the terms and provisions hereof or thereof will contravene any Applicable Law, its Articles of Incorporation or by-laws, or result in any breach of or constitute any default under any indenture, mortgage, contract, or other material agreement to which the Owner Participant is a party or by which it or its properties may be bound or affected, except such of the foregoing as would not have a material adverse effect on the Owner Participant or the transactions contemplated by this Agreement, except that no representation or warranty is made as to any Applicable Law to which the Owner Participant may be subject because of the activities of the Lessee or the nature of the Equipment

(iv)    Enforceability    Each of this Agreement and the other Operative Documents to which it is a party constitutes or will constitute a legal, valid and binding obligation of the Owner Participant enforceable against the Owner Participant in accordance with the terms thereof, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and by general principles of equity, provided, that no such representation or warranty is made by the Owner Participant with respect to Section 12(f).

(v)    No Owner Participant Liens    There are no Owner Participant Liens on the Trust Estate or the Indenture Estate, or on any part of either thereof, and the execution, delivery and performance by the Owner Participant of the Operative Documents to which the Owner Participant is or will be a party will not subject the Trust Estate or Indenture Estate to any Owner Participant Liens

(vi)    No Governmental Authority Approval    No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery or performance by the Owner Participant of this Agreement or any other Operative Document.

(vii)    Litigation    There are no suits or proceedings pending or, to the knowledge of the Owner Participant, threatened against or affecting the Owner Participant before any Governmental Authority which question the legality, validity or enforceability of this Agreement or any other Operative Documents to which it is a party or would affect the ability of the Owner Participant to perform its obligations under the Operative Documents

(viii)    ERISA    No part of the funds to be used by the Owner Participant to make its investment pursuant to Section 1(b) constitutes assets of any "employee benefit plan" (as defined in Section 3(3) of ERISA) or of any "plan" (as defined in Section 4975(e)(1) of the Code)

(d)    Indenture Trustee Representations and Warranties    The Indenture Trustee in its individual capacity represents and warrants to other parties hereto that

(i)    Organization and Power    The Indenture Trustee is a national banking association, duly organized and validly existing in good standing under the laws of the United States of America and has full corporate power, authority and legal right to execute, deliver and perform its obligations under the Indenture and act as trustee thereunder, to enter into and perform its obligations under each other Operative Document to which it is a party

(ii)    Authorization    The Indenture and each other Operative Document to which it is a party have been or will be duly authorized, executed and delivered by the Indenture Trustee and constitute or will constitute the legal, valid and binding obligation of the Indenture Trustee, enforceable against it in accordance with the terms thereof, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and by general principles of equity

(iii)    No Violation of Law.    The execution, delivery and performance by the Indenture Trustee of the Indenture, the Operative Documents to which the Indenture Trustee is a party do not violate any Applicable Law of the State of Utah or federal law, government rule or regulation applicable to the banking and trust powers of the Indenture Trustee in its trust or individual capacity

(iv)    No Breach    The execution, delivery and performance by the Indenture Trustee in its individual capacity of the Indenture and each other Operative Document to which it is a party in its individual or trust capacity does not (A) require the consent or approval of, the giving of notice to, or the registration with, or the taking of any other action with respect to, any Governmental Authority in respect of or under any federal or Delaware law governing the trust powers of the Indenture Trustee in its trust or individual capacity (except such as shall have been duly obtained or given and are in full force and effect), or (B) contravene nor will contravene any provision of, nor constitute nor will constitute a default under its Articles of Association or by-laws or any indenture, mortgage, contract or other agreement to which the Indenture Trustee in its individual capacity is a party or by which it is bound, or any judgment or order binding on it

(v)    Litigation    There are no pending or, to the knowledge of the Indenture Trustee, in its individual capacity, threatened actions or proceedings against the Indenture Trustee in its trust or individual capacity before any court or administrative agency which purport to affect the legality, validity or enforceability of this Agreement, or any other Operative Document

(vi)    No Trustee Liens    There are no Trustee Liens attributable to the Indenture Trustee on the Trust Estate or Indenture Estate, or on any part of either thereof and the execution, delivery and performance by the Indenture Trustee (in its individual or

trust capacity) of the Operative Documents to which the Indenture Trustee (in its individual or trust capacity) is or will be a party will not subject the Trust Estate or Indenture Estate to any Trustee Liens attributable to the Indenture Trustee

(vii)    <u>No Offer or Solicitation</u>    The Indenture Trustee has not offered any interest in the Indenture Estate or any Equipment Notes or any similar securities for sale to, or solicited any offer to acquire the same from, anyone, and no responsible officer in the Corporate Trust Department of the Indenture Trustee has actual knowledge of any such offer or solicitation except as described in the certificate to be delivered pursuant to Section 4(k)(iii)

(viii)    <u>Chief Executive Office</u>    The chief executive office and principal place of business of the Indenture Trustee is Salt Lake City, Utah

**SECTION 10.    CERTAIN COVENANTS OF THE LESSEE**    The Lessee covenants and agrees with and for the benefit of the parties to this Agreement that

(a)    <u>Additional Actions</u>    The Lessee will cause to be done, executed, acknowledged and delivered all and every such further acts, conveyances and assurances as the Owner Trustee, Indenture Trustee or any Participant shall reasonably require to document and evidence the assignment of its rights, title and interest in the Undivided Interest in the Equipment or the other transactions contemplated by this Agreement or the other Operative Documents

(b)    <u>Change of Chief Executive Office, Jurisdiction of Incorporation or Name</u>    The Lessee shall notify the Owner Trustee and the Indenture Trustee at least 30 days prior to changing its chief executive office, jurisdiction of incorporation or name

(c)    <u>Consent to Delivery of Indenture Supplement</u>    The Lessee consents in all respects to the execution and delivery of the Indenture and each Indenture Supplement and to the issuance and delivery of the Equipment Notes on the Delivery Date

(d)    <u>Merger, Consolidation</u>    The Lessee will not merge or consolidate with any other corporation or sell or convey all or substantially all of its assets to any person, firm or corporation, unless (i) either the Lessee shall be the continuing corporation, or the successor corporation (if other than the Lessee) shall be a corporation organized and existing under the laws of the United States of America or a state thereof and such corporation shall expressly assume the obligations of the Lessee under this Agreement and the other Operative Documents and (ii) the Lessee, or such successor corporation, as the case may be, shall not, immediately after and as a result of such merger or consolidation, or such sale or conveyance, be in default in the performance of any covenant or condition in this Agreement or any other Operative Document    In the event of any such consolidation, merger, sale or conveyance and upon any such assumption by the successor corporation, such successor corporation shall succeed to and be substituted for the Lessee in this

Agreement and the other Operative Documents, with the same effect as if it had been originally named herein and therein

(c)   Information   The Lessee shall deliver to the Owner Participant, the Owner Trustee, the Indenture Trustee and each Noteholder

(i)   within ten days after the date the Lessee is required to file the following with the SEC, copies of the quarterly and annual reports and of the information, documents and other reports (or copies of such portions of any of the foregoing as the SEC may from time to time by rules and regulations prescribe) which the Lessee may be required to file with the SEC pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 (or if the Lessee is no longer subject to such reporting requirements, quarterly and annual financial statements substantially equivalent to the financial statements required by such reporting requirements), and

(ii)   within 120 days after the end of each fiscal year of the Lessee, an Officer's Certificate of the Lessee, (A) to the effect that the signatory has reviewed, or caused to be reviewed by individuals under his or her supervision, this Agreement and the other Operative Documents to which the Lessee is a party and has made, or caused to be made under his or her supervision, a review of the transactions contemplated hereby and thereby and the condition of the Lessee during such preceding fiscal year, and such review has not disclosed the existence during such fiscal year, nor does such signatory have knowledge of the existence as at the date of such certificate, of any condition or event that constitutes a Lease Default, Lease Event of Default, or Event of Loss, or, if any such condition or event existed or exists, specifying the nature and period of existence thereof and any action the Lessee has taken, is taking or proposes to take with respect thereto and (B) so long as any Equipment Notes are outstanding, (I) to the effect that, as of the date of such Officer's Certificate, the security interest in the Indenture Estate continues to constitute a first priority perfected security interest under the Uniform Commercial Code (subject to Scheduled Liens), and (II) to the effect that, to the signatory's knowledge after consultation with counsel, no continuation statements or other documents are required to be recorded or filed during the following fiscal year in order to preserve such first priority perfected security interest in the Indenture Estate, or if continuation statements or other documents are required to be recorded or filed during the following fiscal year in order to preserve such first priority perfected security interest, specifying which documents must be recorded or filed and where and when such documents must be recorded or filed and that Lessee agrees to make, or cause to be made, such specified recordings or filings, and shall take, or shall cause to be taken, all such other action as may be necessary or reasonably requested by the Indenture Trustee in order to preserve the lien and security interest of the Indenture Trustee in the properties, rights and interests constituting the Indenture Estate

(f)    Notice of Certain Events  The Lessee shall deliver to the Owner Trustee, the Indenture Trustee, the Owner Participant and each Noteholder promptly and in any event within five days after the Lessee becomes aware of the existence thereof, notice specifying any condition that constitutes a Lease Default, Lease Event of Default, Indenture Default, Indenture Event of Default, an Event of Loss or Prospective Loss with respect to the Undivided Interest in any Unit and further specifying any action the Lessee proposes to take in connection therewith.

(g)    Further Actions  The Lessee shall cause the financing statements (and continuation statements with respect thereto) and the documents enumerated and described in Sections 4(c), and all other documents necessary or reasonably requested in that connection, to be recorded or filed at such places and times, and in such manner, and shall take, or shall cause to be taken, all such other action as may be necessary or reasonably requested by the Owner Participant, the Owner Trustee or the Indenture Trustee in order to establish, preserve and perfect the interest of the Owner Trustee in the Undivided Interest in the Equipment, and, so long as the Lien of the Indenture shall not have been discharged, the lien and security interest of the Indenture Trustee in the properties, rights and interests constituting the Indenture Estate  Without limiting the foregoing, the Lessee shall file or cause to be filed financing statements consistent with those described in Section 4(c) with respect to any Unit or the Undivided Interest therein which is substituted (whether as a replacement Part or upon an Event of Loss) in accordance with the Lease for the Undivided Interest in the Equipment listed in the financing statements described in Section 4(c)

(h)    Maintenance of Corporate Existence  Subject to the provisions of Section 10(d), the Lessee shall at all times maintain its corporate existence and preserve and keep in full force and effect its rights and franchises material to its business and, in the case of the Lessee, shall remain qualified to do business in each jurisdiction where a Unit is located

(i)    Certain Payments  The Lessee agrees to pay to the Owner Participant, as Supplemental Rent under the Lease, an amount equal to interest at the Postponement Rate on any amounts held by the Indenture Trustee pursuant to Section 3 4 of the Indenture and not distributed to the Owner Trustee or the Owner Participant upon the occurrence and continuance of a Lease Event of Default, such interest to be calculated from the date such amounts would otherwise have been distributed until the earlier of the date such amounts are actually received by the Owner Trustee or the Owner Participant or the date such Lease Event of Default is no longer continuing

(j)    Indenture  The Lessee shall perform the obligations contemplated for it in Section 9 3 of the Indenture  In addition, the Lessee shall fully perform its obligations under any Operative Document to which it is a party

(k)    Environmental Matters

(i)    The Lessee shall comply in all material respects with all Environmental Laws and Governmental Actions now or hereafter applicable to the use,

operation and maintenance of any Unit (including any Modification thereto), including those Environmental Laws relating to release reporting (as defined in Environmental Laws) and any response activities (as defined in Environmental Laws) taken to address any such release, except for those instances of non-compliance which would not have a material adverse effect upon the value of any Unit or the Undivided Interest therein or the physical or operating condition of any Unit or impair the Owner Trustee's title thereto

(ii)     Promptly upon the Lessee becoming aware of the following, the Lessee shall provide the Owner Participant, the Noteholders and the Indenture Trustee with written notice of (A) any condition or occurrence arising from the use, operation or maintenance of any Unit (including any Modification thereto) that results in the noncompliance with any Environmental Law or Governmental Action and which noncompliance is reasonably expected to have a material adverse effect on the value of the Unit or the Undivided Interest therein or operating condition of such Unit or the Owner Trustee's title thereto or (B) any Environmental Claim against the Lessee with respect to any Unit which is reasonably expected to have a material adverse effect on the value of the Unit or the Undivided Interest therein or operating condition of such Unit or the Owner Trustee's title thereto   Any such notification shall describe in reasonable detail the nature of the condition, occurrence or Environmental Claim and the Lessee's response, if any, thereto. Upon the written request of the Owner Participant or the Indenture Trustee, the Lessee shall make available to the Owner Participant or the Indenture Trustee employees of the Lessee familiar with such condition, occurrence or Environmental Claim to discuss such condition, occurrence or Environmental Claim.

(l)     Purchase of Equipment Notes   Neither the Lessee nor any of its Affiliates shall at any time during the Term purchase or own, directly or indirectly, any Equipment Notes, or any other equipment notes issued in connection with a lease dated as of the Delivery Date under which General Motors Corporation is the lessee

(m)     Supplemental Rent   Supplemental Rent payable by the Lessee shall include amounts which are owing under the Indenture in respect of the Equipment Notes (in addition to amounts payable in respect to Make Whole Premium) in excess of principal and interest (including, without limitation, any amount due in connection with the revocation of the EBO Notice) together with any amounts in excess of principal and interest that the Owner Trustee is required to pay to any Person under the Operative Documents (other than amounts with respect to any breach by the Owner Trustee of its obligations solely in its individual capacity under such Operative Documents), provided that to the extent such amounts arise due to the action, inaction or bankruptcy of the Owner Participant or Owner Trustee, such amounts shall first be payable out of the Trust Estate

(n)     Calculation of Certain Amounts

(i)    <u>Make Whole Premium</u>   Two Business Days prior to any Prepayment Date, the Lessee shall provide the Indenture Trustee with a calculation, in reasonable detail, of the Make-Whole Premium, if any, due on such Prepayment Date   If a Majority in Interest of Noteholders notify the Lessee that they believe such calculation of the Make-Whole Premium is clearly erroneous (specifying the reason why) and propose an alternative calculation, the amount of the Make-Whole Premium calculated by such Notcholders and specified in such notice shall be presumptively correct

(ii)    <u>Amortization Schedule</u>   Upon any partial prepayment by the Owner Trustee pursuant to <u>Section 6 1</u> of the Indenture, the Lessee shall revise the Schedule to the Equipment Notes to reflect the actual principal payments to be made on the remaining Installment Payment Dates and provide the Indenture Trustee with a copy of such revised schedule   Partial prepayments made under the Equipment Notes pursuant to <u>Section 6 1</u> of the Indenture shall be applied pro rata against the remaining installments of principal due on the remaining Installment Payment Dates (after giving effect to any principal payment, if any, scheduled to be made on the relevant Prepayment Date)

(o) <u>Partition Right</u>   Without limiting the right of partition under Applicable Law of the Lessor or any transferee of the Lessor, the Lessee agrees that, if at any time the Lessee acquires an undivided interest in any Unit, it will waive any right of partition with respect to the Unit or the undivided interest in the Unit so long as an Undivided Interest in the Unit is owned by the Lessor or any transferee of the Lessor (other than the Lessee or any Affiliate of the Lessee)

## SECTION 11.  <u>COVENANTS OF PARTIES OTHER THAN THE LESSEE</u>

(a)    <u>Owner Trustee Liens</u>   The Owner Trustee, in its individual capacity, hereby unconditionally agrees with and for the benefit of the parties to this Agreement that the Owner Trustee in its individual capacity will not directly or indirectly create, incur, assume or suffer to exist any Lessor Liens on or against any part of the Trust Estate, the Indenture Estate or the Undivided Interest in Equipment, and the Owner Trustee in its individual capacity agrees that it will at its own cost and expense promptly take such action as may be necessary to duly discharge and satisfy in full all such Lessor Liens (by bonding or otherwise, so long as Lessee's operation and use of, and the Indenture Trustee's Lien on, the Equipment is not impaired), <u>provided</u>, <u>however</u>, that any Lessor Lien which is attributable solely to the Lessor shall be permitted so long as (i) the existence of such Lessor Lien poses no material risk of the sale, forfeiture or loss of any Unit, the Undivided Interest therein or any other Part thereof or interest therein, and does not impair in any way the Lien of the Indenture or the priority thereof, (ii) the existence of such Lessor Lien does not interfere in any way with the quiet enjoyment of any Unit or any Part thereof by Lessee or Lessee's right, title and interest in or with respect to any Modification and (iii) the Lessor or the Owner Trustee, in its individual capacity, is diligently contesting such Lessor Lien by appropriate proceedings and has established adequate reserves sufficient to discharge such Lessor Lien in full; <u>provided, further,</u> that

once the Indenture has been discharged in accordance with its terms, the Owner Trustee shall be permitted to permit Lessor Liens to exist on the Trust Estate or the Undivided Interest in the Equipment so long as such Liens do not impose any additional burdens on the Lessee or interfere with the Lessee's rights under the Lease (including, without limitation, the Lessee's right to quiet enjoyment and right to purchase title to such Undivided Interest in the Equipment free and clear of such Lessor Liens as provided in Section 18(c) thereof) The Owner Trustee will reimburse the Lessee, the Owner Participant, the Indenture Trustee and the Noteholders for any reasonable legal fees and expenses incurred in an action against the Owner Trustee for a breach by the Owner Trustee of its obligations under this Section 11(a)

(b)    Compliance with Trust Agreement  Each of the Owner Participant and the Owner Trustee (in its individual and trust capacity) hereby agrees with the Lessee, the Indenture Trustee and the Noteholders (i) to comply with all of the terms of the Trust Agreement (as the same may hereafter be amended or supplemented from time to time in accordance with the terms thereof) applicable to it in its respective capacity, the noncompliance with which would materially adversely affect any such party, (ii) not to amend, supplement, or otherwise modify any provision of the Trust Agreement in such manner as to adversely affect the rights of any such party (other than to an insignificant extent) without the prior written consent of such party and (iii) notwithstanding anything to the contrary contained in the Trust Agreement, not to terminate or revoke the trust created by the Trust Agreement without the prior written consent of each such party  Nothing in this Section 11(b) shall impair any right of the Owner Trustee, in its individual capacity, to resign as the Owner Trustee under Section 9(a)(i) of the Trust Agreement

(c)    Replacement of Owner Trustee  The institution acting as the Owner Trustee or any successor may resign or be removed by the Owner Participant, a successor Owner Trustee may be appointed, and a corporation may become the Owner Trustee under the Trust Agreement, only in accordance with the provisions of Section 9 of the Trust Agreement  The Owner Participant further agrees not to remove the institution acting as Owner Trustee, and not to replace the institution acting as Owner Trustee in the event that such institution resigns as Owner Trustee, without in either case having obtained the prior written consent of (so long as the Owner Trustee or Indenture Trustee is not exercising remedies under the Lease) the Lessee  (such consent not to be unreasonably withheld)  Any replacement institution acting as the Owner Trustee shall (i) have a combined capital and surplus of at least $75,000,000 (or have a combined capital and surplus in excess of $5,000,000 the obligations of which, whether now in existence or hereafter incurred, are fully and unconditionally guaranteed by a corporation organized and doing business under the laws of the United States, any State or territory thereof or of the District of Columbia and have combined capital and surplus of at least $75,000,000), and (ii) have a long-term credit rating by either Moody's Investors Service, Inc  or Standard & Poor's Ratings Services of investment grade   If such corporation publishes reports of conditions at least annually, pursuant to law or to the requirements of Federal, State, Territorial or District of Columbia supervising or examining authority, then for the purposes of this Section 11(c), the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published

So long as no Lease Event of Default shall occur and be continuing, the Owner Trustee and the Owner Participant agree that no co-trustee or separate trustee shall be appointed pursuant to Section 9(b) of the Trust Agreement unless (x) the Lessee and the Indenture Trustee shall have consented to such appointment, each such consent not to be unreasonably withheld or (y) the Owner Trustee or the Owner Participant has received a written opinion that such appointment is prudent or necessary in order to conform to any Applicable Law

(d)    Indebtedness by Owner Trustee  The Owner Trustee (until such time as the Indenture has been discharged in accordance with its terms) will not incur any indebtedness for money borrowed, or enter into any business or other activity, except as contemplated hereby and by the other Operative Documents  If the Owner Trustee undertakes such actions, such actions shall not impose any additional burdens on the Lessee or interfere with the Lessee's rights under the Lease (including, without limitation, the Lessee's right to quiet enjoyment and right to purchase title to the Undivided Interest in the Equipment free and clear of such Lessor Liens).

(e)    Indenture Trustee Liens.  The Indenture Trustee, in its individual capacity, hereby unconditionally agrees with and for the benefit of the parties to this Agreement that in such capacity it will not directly or indirectly create, incur, assume or suffer to exist any Trustee Liens attributable to it on or against any part of the Trust Estate, the Indenture Estate or the Undivided Interest in the Equipment, and in such individual capacity it agrees that it will at its own cost and expense promptly take such action as may be necessary to duly discharge and satisfy in full any Trustee Liens (by bonding or otherwise, so long as Lessee's operations and use of, and the Indenture Trustee's Lien on the Equipment is not impaired) provided, however, that any Trustee Lien which is attributable solely to the Indenture Trustee shall be permitted so long as (i) the existence of such Trustee Lien poses no material risk of the sale, forfeiture of or loss of any Unit, the Undivided Interest therein or any other Part thereof or interest therein and does not impair in any way the Lien of the Indenture or the priority thereof, (ii) the existence of such Trustee Lien does not interfere in any way with the quiet enjoyment of any Unit or any Part thereof by Lessee or Lessee's right, title and interest in or with respect to any Modification and (iii) the Indenture Trustee is diligently contesting such Trustee Lien by appropriate proceedings and has established adequate reserves sufficient to discharge such Trustee Lien in full  The Indenture Trustee will reimburse the Lessee, each such other Person and the Noteholders for any reasonable legal fees and expenses incurred in an action against the Indenture Trustee for a breach by the Indenture Trustee of its obligations under this Section 11(e)

(f)    Change of Location  The Owner Trustee, in its individual capacity, agrees that it will give 30 days' prior written notice to the other parties to this Agreement prior to any change in its (i) location (as such term is defined in the Uniform Commercial Code), (ii) true legal name (as registered in its jurisdiction of incorporation), (iii) its jurisdiction of incorporation or chief executive office or (iv) its federal tax identification number.

(g)    Further Assurances  In the event the Undivided Interest in any Unit or Part ceases to become subject to the Lease (in accordance with the terms thereof), the Owner Trustee and the Indenture Trustee shall, at the Lessee's cost and expense, cause to be done, executed, acknowledged and delivered all and every such further act within their reasonable control as Lessee shall reasonably request to document and evidence such event (including, without limitation, the execution of a Bill of Sale and UCC termination statements)  The Owner Trustee and the Indenture Trustee further agree to execute such UCC financing statements or other similar documents as are reasonably necessary to permit the Lessee to fulfill its obligations under Section 10(g) and as contemplated in the Relocation Conditions

(h)    Purchase of Equipment Notes  Other than as contemplated in Section 1(a), none of the Indenture Trustee, the Owner Trustee or the Owner Participant shall at any time during the Term purchase or own, directly or indirectly any Equipment Notes

## SECTION 12. CERTAIN COVENANTS OF THE OWNER TRUSTEE AND THE OWNER PARTICIPANT

(a)    Owner Participant Liens    The Owner Participant hereby unconditionally agrees with and for the benefit of the other parties to this Agreement that the Owner Participant will not directly or indirectly create, incur, assume or suffer to exist any Owner Participant Liens on or against any part of the Trust Estate, the Indenture Estate or the Undivided Interest in the Equipment, and the Owner Participant agrees that it will, at its own cost and expense, take such action as may be necessary to duly discharge and satisfy in full any such Owner Participant Lien (by bonding or otherwise, so long as Lessee's operation and use of, and the Indenture Trustee's Lien on, the Equipment is not impaired), provided, however, that any Owner Participant Lien which is attributable solely to the Owner Participant shall be permitted so long as (i) the existence of such Owner Participant Lien poses no material risk of the sale, forfeiture of or loss of any Unit or any Part thereof or interest therein and does not impair in any way the Lien of the Indenture or the priority thereof, (ii) the existence of such Owner Participant Lien does not interfere in any way with the quiet enjoyment of any Unit or any Part thereof by Lessee or Lessee's right, title and interest in or with respect to any Modification and (iii) the Owner Participant is diligently contesting such Owner Participant Lien by appropriate proceedings and has established adequate reserves sufficient to discharge such Owner Participant Lien in full, provided, further, that once the Indenture has been discharged the Owner Participant may permit Owner Participant Liens to exist on the Trust Estate or the Undivided Interest in the Equipment so long as such Liens do not impose any additional burdens on the Lessee or interfere with the Lessee's rights under the Lease (including, without limitation, the Lessee's right to quiet enjoyment and right to purchase title to the Undivided Interest in such Equipment free and clear of such Owner Participant Liens as provided in Section 16(c) thereof)

(b)    Instructions to Owner Trustee  The Owner Participant will, subject to the fulfillment of the conditions set forth in Section 11(g) or 17, as applicable, give the Owner

Trustee such instructions or consents as are necessary to allow the Owner Trustee to perform its obligations under Sections 11(g) and 17

(c)    Reimbursement of Legal Fees  The Owner Participant will reimburse each of the Lessee, the Owner Trustee, Indenture Trustee and each Noteholder for any reasonable legal fees and expenses incurred as a result of a successful action against the Owner Participant for a breach by the Owner Participant of its obligations under Section 12(b)

(d)    Information to Lessee   Upon written notice by the Lessee that the Lessee is considering taking or requesting any action described in clause (i), (ii) or (iii) of Section 5(d)(E) of the Tax Indemnity Agreement, the Owner Participant promptly shall provide to the Lessee its best estimate, setting forth fully the facts and assumptions on which such estimate is based and computing such estimate in reasonable detail, of the maximum amount of Taxes, if any, for which the Lessee could be obligated to indemnify the Owner Participant pursuant to the Tax Indemnity Agreement

(e)    Voluntary Bankruptcy of Owner Trustee   The Owner Participant agrees, to the extent permitted by Applicable Law, that it will not cause the Owner Trustee to seek any voluntary relief under any bankruptcy or insolvency or other similar law with respect to the Owner Trustee and will not commence any bankruptcy, insolvency or other similar proceeding against the Owner Trustee

(f)    Termination of Option of Owner Participant  The Owner Participant agrees for the express benefit of the Indenture Trustee and the Noteholders that, after the Delivery Date and the creation of the lien under the Indenture, without the consent of the Indenture Trustee, no election under Section 8(b) of the Trust Agreement shall be effective until the lien and security interest on the Indenture Estate shall have been released and until full payment of the principal of, the premium, if any, and interest on the Equipment Notes and all other sums due the Noteholders shall have been made

SECTION 13. **EXCHANGE OF EQUIPMENT NOTES**  Each of the Participants, the Owner Trustee and the Indenture Trustee agrees that if, pursuant to Sections 18(c)(i) and (iii) of the Lease, the Lessee elects to purchase any or all of the Undivided Interest in the Equipment subject to the Lease, (a) the Lessee or its Affiliates may elect to exchange new notes for the Equipment Notes secured by the Undivided Interest in such Equipment by giving notice of such exchange to the Participants, the Owner Trustee and the Indenture Trustee (provided that the Indenture Trustee and the Noteholders shall have received, on or prior to the Exchange Date, an Opinion of Counsel to the effect that there are no adverse tax consequences of such exchange to the Noteholders and the Indenture Trustee) and (b) as more fully provided in Section 7.2 of the Indenture, concurrently with the issuance of such new notes each of such parties will execute and deliver appropriate documentation (i) releasing the Owner Trustee and the Owner Participant from all obligations with respect to such Equipment Notes, new notes, the Undivided Interest in the Equipment or obligations

under such Equipment Notes and the Indenture Supplement, (ii) to the extent provided in the Indenture, releasing the security interest in the Undivided Interest in the Equipment purchased by the Lessee, (iii) releasing the Owner Trustee and the Owner Participant from any obligations with respect to such Equipment Notes or the Undivided Interest in the Equipment, and (iv) taking all such other actions as are reasonably necessary to permit such exchange by the Lessee and which do not adversely affect the Owner Trustee, the Owner Participant or the Noteholders (other than to an insignificant extent)

**SECTION 14. <u>OWNER FOR TAX PURPOSES</u>** It is hereby acknowledged (by the parties hereto and by the Lessee on its own behalf and on behalf of its affiliates) that it is the intent of the parties hereto that for U S Federal, state and local income tax purposes, the Owner Participant is and will be the owner of the Undivided Interest in the Equipment to be delivered under the Lease and the Lessee will be the lessee thereof Neither the Lessee, any affiliate of the Lessee, the Owner Participant, the Indenture Trustee, the Noteholders nor the Owner Trustee shall take any position to the contrary Without limiting the foregoing, the Lessee hereby covenants (on its behalf and on behalf of its affiliates) that the Lessee and each of its affiliates will file any and all U.S federal, state and local income tax returns on a basis that is consistent with the Owner Participant's ownership of the Undivided Interest in the Equipment for such U S. federal, state and local income tax purposes Nothing contained in this Section shall be construed to limit the Lessee's use and operation of the Undivided Interest in the Equipment under the Lease or constitute a representation or warranty by the Lessee as to tax consequences

**SECTION 15. <u>NOTICES; CONSENT TO JURISDICTION</u>**

(a)    <u>Notices</u>  All notices, demands, instructions, consents and other communications required or permitted to be given to or made upon any party hereto shall be in writing and shall be personally delivered or sent by Federal Express or next business day delivery by another reliable express courier or by telecopy (with confirmation), or by prepaid courier service and shall be deemed to be given for purposes of this Agreement on the day that such writing is delivered (or offered for delivery and rejected) to the intended recipient thereof in accordance with the provisions of this subsection Unless otherwise specified in a notice delivered in accordance with the foregoing provisions of this subsection, notices, demands, instructions and other communications in writing shall be given to or made upon the respective parties hereto at their respective addresses (or numbers) as follows  (A) if to Lessee, the Owner Trustee, the Participants or the Indenture Trustee, to the respective addresses set forth on <u>Schedule 8</u> or <u>Schedule 2</u> hereto or (B) if to a subsequent Participant, addressed to such address as the subsequent Participant shall have furnished by notice to the parties hereto. All payments to be made to the Noteholders shall be made in accordance with the provisions of <u>Schedule 2</u>

(b)    <u>Jurisdiction</u>. Each of the parties hereto

(i)    hereby irrevocably and unconditionally submits for itself and its property, to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York and to the non-exclusive jurisdiction of the Supreme Court of the State of New York, New York County, for the purposes of any suit, action or other proceeding arising out of or relating to this Agreement, the Lease, the Tax Indemnity Agreement, any other Operative Document, the subject matter of any thereof or any of the transactions contemplated hereby or thereby brought by any party or parties thereto, or their successors or assigns, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court  The consent of the parties to the jurisdiction of a New York State court shall not preclude the right of any party to remove such action to the United States District Court for the Southern District of New York should such removal be permitted under Applicable Law  Each of the parties hereto agrees that a final judgment rendered by a court of competent jurisdiction in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law  Nothing in this Agreement shall affect any right that any party hereto otherwise may have to bring any action or proceeding relating to this Agreement or the other Operative Documents against any other party hereto or its properties in, or to remove any such action or proceeding to, the courts of any jurisdiction,

(ii)    hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (A) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Operative Documents in any New York State or federal court, and (B) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court, and

(iii)    irrevocably agrees that lawful service of process in the State of New York for any action or proceeding (whether in Federal or state court in and for the State of New York) arising out of or in connection with this Agreement or any of the other Operative Documents may be made by mailing by certified mail, return receipt requested, such papers as may be necessary for such service of process to such party at its notice address designated in or pursuant to Section 15(a) hereof.

## SECTION 16.  CALCULATION OF ADJUSTMENTS TO BASE RENT, STIPULATED LOSS VALUE, TERMINATION VALUE, ETC.; CONFIRMATION AND VERIFICATION

(a)    Calculation of Adjustments  In the event of the issuance of Replacement Notes pursuant to Section 17(a)(iii) (an "Adjustment Event"), then the Owner Participant shall recalculate the payments of Base Rent, Stipulated Loss Values, Termination Values

and Early Fixed Price Purchase Amounts (x) to preserve the Owner Participant's Economics, and (y) to minimize to the greatest extent possible, consistent with the foregoing clause (x), the present value (discounted semiannually at an interest rate per annum to be supplied by the Lessee) of the payments of Base Rent In performing any such recalculations, the Owner Participant shall utilize the same methods and assumptions (including the Tax Assumptions) originally used to calculate the payments of Base Rent, Stipulated Loss Values, Termination Values and Early Fixed Price Purchase Amount (other than those assumptions changed as a result of the events described in the preceding sentence necessitating such recalculation, it being agreed that such recalculation shall reflect solely any changes of assumptions or facts resulting directly from the event or events necessitating such recalculation) Any calculation of adjustment pursuant to this Section shall be subject to the constraints of Revenue Procedure 2001-28, Revenue Procedure 2001-29 and Section 467 of the Code, only to the extent and in the manner such constraints were actually applied by the Owner Participant in performing the original calculations except in the case of clause (v) where the adjustments shall be calculated in accordance with applicable tax law as it may exist at such time

(b)    Confirmation and Verification  Upon completion of any recalculation described in Section 16(a) (which shall occur promptly upon the Owner Participant's receipt of knowledge of the occurrence of an Adjustment Event), a duly authorized officer of the Owner Participant shall provide a certificate to the Lessee either (x) stating that the Interim Lease Payments and the payments of Base Rent, Stipulated Loss Values, Termination Values and Early Fixed Price Purchase Amount with respect to the Term as then set forth in the applicable Lease Supplement do not require change, or (y) setting forth such adjustments to the Interim Lease Payment, the payments of Base Rent, Stipulated Loss Values, Termination Values and Early Fixed Price Purchase Amount as have been calculated by the Owner Participant in accordance with Section 16(a)  Such certificate shall describe in reasonable detail the nature of the Adjustment Event  If the Lessee shall so request, the recalculation of any such adjustments described in this Section shall be verified by an independent auditing firm mutually acceptable to the Lessee and the Owner Participant (the "Verification Firm")  One or more representatives of the Verification Firm shall be shown, on a confidential basis, the original assumptions used by the Owner Participant and the methods used by the Owner Participant in the original calculation of any any recalculation of the Interim Lease Payment, Base Rent, Stipulated Loss Values, Termination Values and Early Fixed Price Purchase Amount  The reasonable costs of such verification shall be borne by the Lessee, unless as a result of such verification process the payments of Base Rent are adjusted and such adjustment causes the present value of the payments of Base Rent, discounted semi-annually at the Note Rate, to decline by 10 basis points or more from the present value of the payments of Base Rent, discounted semi-annually at the Note Rate, certified by the Owner Participant pursuant to this Section, in which case the Owner Participant shall be responsible for, and shall reimburse the Lessee for, the reasonable costs of such verification  The parties hereto agree that the Verification Firm's sole responsibility shall be to verify the recalculation described in Section 16(a) pursuant to this Section (setting forth fully the assumptions on which such verification is based) and that matters of interpretation of this Agreement are not within the scope of the Verification Firm's responsibility

(c)    Limitation on Adjustment.  No adjustment may be made to the Interim Lease Payment, the payments of Base Rent or to Stipulated Loss Values, Termination Values or Early Fixed Price Purchase Amount, unless (i) the Interim Lease Payment, as so adjusted, under any circumstances and in any event, will be in an amount at least sufficient for the Owner Trustee to pay in full as of the due date of such payment the scheduled principal, if any, and interest on the Equipment Notes due in or accrued during the Interim Lease Payment Period, (ii) each installment of Base Rent, as so adjusted, under any circumstances and in any event, will be in an amount at least sufficient for the Owner Trustee to pay in full as of the due date of such installment any scheduled payment of principal and interest on the Equipment Notes required to be paid except such Equipment Notes as are, from time to time, surrendered to the Indenture Trustee for cancellation pursuant to the Indenture on the due date of such installment of Base Rent, (iii) such Stipulated Loss Values, Termination Values and Early Fixed Price Purchase Amounts, as so adjusted, under any circumstances and in any event, will be, together with any other amounts required to be paid by the Lessee under the Lease in connection with an Event of Loss or a termination of the Lease, as the case may be, at least sufficient to pay in full, as of the date of payment thereof, the aggregate unpaid principal, premium, if any, and unpaid interest on the Equipment Notes (except such Equipment Notes as are, from time to time, surrendered to the Indenture Trustee for cancellation pursuant to the Indenture) accrued to the date on which Stipulated Loss Value, Termination Value or Early Fixed Price Purchase Amount, as the case may be, is paid in accordance with the terms of the Lease, and (iv) any adjustment of the Early Fixed Price Purchase Amount shall be reasonably satisfactory to Owner Participant's Tax Counsel, which counsel shall use the same methodology such counsel used to analyze the Early Fixed Price Purchase Amount as in effect on the Delivery Date

## SECTION 17.  **REFUNDING**

(a)    Refunding Events  Subject to the terms of the Indenture, on or after the date which is five years after the Delivery Date, the Lessee shall have the right at any time to request the Owner Trustee and the Indenture Trustee to effect a prepayment of such Equipment Notes as will result in the payment in full of all Equipment Notes pursuant to Section 6 1(c) the Indenture as part of a refunding or refinancing thereof subject to the satisfaction of the conditions set forth in Sections 17(b) and 17(c)  The Lessee shall give notice of such prepayment to the Owner Trustee, the Indenture Trustee and the Notcholders not less than 30 nor more than 60 days prior to the applicable Prepayment Date, provided, that such notice of prepayment shall be revocable until the 30th day prior to the applicable Prepayment Date and thereafter shall be irrevocable  On or prior to the applicable Prepayment Date·

(i)    the Owner Trustee, the Indenture Trustee, the Lessee and any other appropriate party shall enter into a financing or loan agreement (which financing or loan agreement may involve an underwriting agreement in connection with a public offering of equipment notes or other securities) reasonably satisfactory to the Owner Trustee,

(ii)    the Lessee and the Owner Trustee will, after such prepayment has been made, amend the Lease such that (x) Base Rent payable in respect of the period from and after the Refunding Date is recalculated in accordance with <u>Section 16</u>, upwards or downwards, to preserve the Owner Participant's Economics and (y) amounts payable in respect of Stipulated Loss Value, Termination Value and the Early Fixed Price Purchase Amount from and after the Refunding Date are recalculated in accordance with <u>Section 16</u>,

(iii)    the Owner Trustee and the Indenture Trustee will enter into an agreement to provide for the securing of the replacement equipment notes or other securities (all such replacement notes and other securities issued in connection therewith being referred to as the "<u>Replacement Notes</u>") issued by the Owner Trustee pursuant to this <u>Section 17(a)</u> in like manner as the Equipment Notes issuable under the Indenture and will enter into such amendments and supplements to the Indenture as may be necessary to effect such refunding or refinancing, and

(iv)    unless otherwise agreed by the Owner Participant, the Lessee shall pay as Supplemental Rent under the Lease all reasonable fees, costs and expenses of such refunding or refinancing

(b)    <u>Refunding Date, Refunding Proceeds</u>  On any Base Lease Period Date designated by the Lessee (the "Refunding Date"), if the provisions of this <u>Section 17</u> have been satisfied or waived by the party for whose benefit such provisions are included, then, subject to the terms and conditions of the Indenture, the Replacement Notes shall be issued in one or more series by the Owner Trustee and authenticated by the Indenture Trustee under and pursuant to the Indenture, shall be in an aggregate principal amount equal to the current principal amount of Equipment Notes to be refunded as of the date of such refunding, shall bear interest at a fixed or variable rate or fixed or variable rates per annum, and shall be payable as set forth in or determined under the Indenture and the related Indenture Supplements and shall be sold to the purchaser(s) thereof  The proceeds of the sale of such Replacement Notes shall be paid directly to the Indenture Trustee at the Indenture Trustee's office in immediately available funds for application in accordance with Section 6 1 of the Indenture

(c)    <u>Conditions</u>  In addition to the limitations set forth in <u>Sections 17(a) and (b)</u>, the obligations of the Indenture Trustee and the Owner Trustee to participate in a refunding of any Equipment Notes shall be subject to the fulfillment of the following conditions precedent (with each instrument, document, evidence, certificate, opinion or other writing to be in form and substance reasonably satisfactory to the Indenture Trustee, the Owner Trustee and the Owner Participant)

(i)    The transaction shall not adversely affect any of the Owner Participant's rights under the Operative Documents or result in any augmentation of its

obligations thereunder (other than, in each case, to an insignificant extent) and the documents effecting such transaction shall be reasonably satisfactory to the Owner Participant

(ii)    The final maturity of the Replacement Notes shall not be a date which is later than the date of the final maturity of the then outstanding Equipment Notes being refinanced and the average life to maturity of the Replacement Notes shall not be more than six months greater than the remaining average life of the then outstanding Equipment Notes being refinanced

(iii)    A third party or parties, which are not Affiliates of the Lessee or Owner Participant, shall have committed to (and shall) provide the financing needed to consummate the proposed refunding or refinancing transaction

(iv)    Refundings under this <u>Section 17</u> shall not have been previously effected more than two times

(v)    The Owner Participant shall have received a written opinion of the Owner Participant's Tax Counsel that (A) such refunding or refinancing does not adversely affect the determination that the Owner Participant is the owner of the Undivided Interest in the Equipment for Federal income tax purposes and (B) such refunding or refinancing does not have other unindemnified tax consequences (taking into account any additional indemnification provided by the Lessee in connection with such refunding or refinancing) to the Owner Trustee or the Owner Participant, <u>provided</u> that the Owner Participant shall use its reasonable best efforts to cause the Owner Participant's Tax Counsel to promptly issue such opinion

(vi)    The Lessee shall, prior to the making of the prepayment notice pursuant to <u>Section 17(a)</u> to holders of the outstanding Equipment Notes to be refunded, have given the Owner Trustee, the Noteholders, the Indenture Trustee and the Owner Participant reasonable assurances of its ability to complete the refunding

(vii)    The Owner Trustee shall have delivered to the Indenture Trustee an Owner Trustee Request authorizing and requesting the Indenture Trustee to authenticate and deliver any Replacement Notes to be issued on such date pursuant to <u>Section 2 2</u> of the Indenture

(viii)    There shall not be a Lease Event of Default, Material Default, Indenture Default or Indenture Event of Default (unless, in the case of an Indenture Default or Indenture Event of Default, the refunding or refinancing will result in the cure or waiver of such Indenture Default or Indenture Event of Default) which has occurred and is continuing

(ix)    The Lessee shall have obtained or caused to have been obtained and shall have delivered to the Owner Participant and the Owner Trustee copies of documents or other evidence of all Governmental Actions required in connection with the issuance, authentication and sale of any Replacement Notes

(x)    The Indenture Trustee and the Owner Participant shall have received such customary opinions as they may reasonably request regarding the issuance of the Replacement Notes, which opinions shall be of a scope comparable to the applicable opinions delivered pursuant to Section 4(h)

(xi)    The issuance of the Replacement Notes shall not cause the transaction effected pursuant to the Lease to be re-classified on the financial statements of the Owner Participant as other than a leveraged lease under GAAP as then in effect for leveraged leases

(xii)    There shall be no action, suit or proceeding pending or threatened that questions the validity or enforceability of any Replacement Notes, or of any obligation of the Lessee, the Owner Trustee or the Indenture Trustee under any of the agreements to be executed and delivered or to be amended in connection with the issuance of any Replacement Notes

(xiii)    The transactions to be consummated in connection with the refunding shall not violate any Applicable Law binding upon the Lessee, the Owner Participant, the Owner Trustee, the Indenture Trustee or any Noteholder relevant to the Equipment or any interest therein

(xiv)    All consents and approvals related to the Lessee and the Equipment or any interest therein required to effect the issuance of the Replacement Notes shall have been obtained

(xv)    The Lessee shall make such representations and warranties as reasonably requested by the Owner Participant and the Indenture Trustee in connection with the issuance of the Replacement Notes, which representations and warranties shall be of a scope comparable to those set forth in Section 8(a) and 9(d).

(d)    Transfer and Reset  If the Lessee so requests, the Owner Trustee, the Indenture Trustee and the Noteholders shall effect any prepayment contemplated above by (i) transferring ownership of the Equipment Notes to a transferee designated by the Lessee as provided by the provisions of the Indenture, provided, however, that prior to any such transfer there will have been deposited with the Indenture Trustee an amount equal to the Prepayment Price determined in accordance with Section 6 1(c) of the Indenture; provided, further, that the Lessee shall be obligated to pay any portion of such Prepayment Price not received by the Indenture Trustee from such

designated transferee, and (ii) amending such Equipment Notes to be repaid to reset the interest rate of such Equipment Notes to a rate designated by the Lessee

## SECTION 18. <u>TRANSFER OF OWNER PARTICIPANT'S INTEREST</u>

(a)    <u>Restrictions on Transfer</u>    Without the prior written consent of the Lessee (unless a Lease Event of Default shall have occurred and be continuing) and, so long as the Lien of the Indenture shall be in effect, the Indenture Trustee, the Owner Participant shall not, directly or indirectly, assign, convey or otherwise transfer (whether by consolidation, merger, sale of assets or otherwise) any of its right, title or interest in and to the Trust Estate, this Agreement, the Trust Agreement or any other Operative Document except as and to the extent permitted by, and in accordance with the terms and conditions of, this <u>Section 18</u>

(b)    <u>Permitted Transfers</u>    Subject to <u>Section 18(d)</u>, the Owner Participant may transfer all or, subject to <u>Section 18(e)</u>, any portion of its right, title and interest in and to the Trust Estate (whether or not the same shall then have been pledged or mortgaged under the Indenture, but subject to the Lien of the Indenture if then in effect) and in and to this Agreement and the other Operative Documents to any Person (a "Transferee") only in compliance with and upon satisfaction of the following conditions

(i)    The Transferee shall be (A) a financial institution, corporation, leasing company or other institutional investor whose net worth (calculated in accordance with GAAP) at the time is at least $75,000,000 (or the obligations of which are guaranteed by a financial institution, corporation, leasing company or other institutional investor whose net worth (calculated in accordance with GAAP) at the time is at least $75,000,000 pursuant to a guaranty in form attached hereto as <u>Exhibit K</u>), or (B) (1) an Affiliate of the Owner Participant, which Affiliate shall be a corporation and (2) either (x) the Owner Participant shall guarantee the obligations of such Affiliate as Owner Participant under the Operative Documents pursuant to a guarantee in form and substance reasonably satisfactory to the Lessee and the Indenture Trustee or (y) such Affiliate shall have a net worth (calculated in accordance with GAAP) at the time of such transfer of at least $75,000,000

(ii)    No such transfer shall violate any provision of, or create a relationship which would be in violation of, any Applicable Law, including, without limitation, applicable securities laws, any agreement to which the Owner Participant or the Transferee is a party or by which it or any or its property is bound

(iii)    The Transferee shall enter into an agreement or agreements, in form attached hereto as <u>Exhibit L</u>

(iv)    The transferring Owner Participant shall have provided 30 days (or ten days with respect to a transfer to an Affiliate as contemplated by <u>Section 18(b)(i)(B)</u>)

prior written notice of such transfer to the Indenture Trustee and the Noteholders, which notice shall specify (A) such information and evidence as shall be reasonably necessary to establish compliance with this <u>Section 18</u> and <u>Section 11(a)</u> of the Trust Agreement, (B) the extent of the interest to be transferred, and (C) the address (for the purpose of giving notice as contemplated by the Operative Documents) and the name of the Transferee and any guarantor of the Transferee hereunder

(v)     The transferring Owner Participant shall pay all reasonable fees, expenses, disbursements and costs (including legal and other professional fees and expenses), incurred by the Owner Trustee, the Indenture Trustee, the Noteholders and the Lessee, in connection with any transfer pursuant to this <u>Section 18</u>

(vi)     The transferring Owner Participant or the Transferee shall have delivered to the Lessee and, if the Lien of the Indenture shall then be in effect, the Indenture Trustee, an opinion of counsel opining as to such matters of a scope substantially similar to the opinions furnished by or in respect of the Owner Participant on the Delivery Date.

(vii)     No part of the funds used by the Transferee to acquire the transferring Owner Participant's interest in the Trust Estate shall constitute assets of any "employee benefit plan" (as defined in Section 3(3) of ERISA) or of any "plan" (as defined in Section 4975(e)(1) of the Code) and the Transferee shall provide the Lessee, the Indenture Trustee and the Noteholders with representations and warranties to such effect

(c)     <u>Effect of Transfer</u>

(i)     From and after any transfer effected in accordance with this <u>Section 18</u>, the Owner Participant making such transfer shall be released, to the extent of the obligations assumed by the Transferee, from its liability hereunder and under the other Operative Documents to which it is or will be a party in respect of obligations to be performed on or after the date of such transfer  Upon any transfer by the Owner Participant in accordance with this <u>Section 18</u>, the Transferee shall be deemed an "Owner Participant" for all purposes of the Operative Documents, shall have all rights and obligations under such Operative Documents, from the date of the transfer and, in the case of a transfer of all of the Owner Participant's interest in the Trust Estate each reference herein to the Owner Participant making such transfer shall thereafter be deemed a reference to such Transferee for all purposes, except as provided in the preceding sentence, <u>provided</u> that in no event shall the obligations of the Lessee be increased or the Lessee's rights decreased

(ii)     Notwithstanding any such transfer, unless otherwise agreed to by the Lessee and the Transferee, the Owner Participant's Economics shall be determined solely by reference to those assumptions and methods of calculation employed in the original

calculation thereof, as adjusted prior to such transfer, as such assumptions and methods relate to the original Owner Participant

(d)    Special Additional Restrictions on Transfer   Without the prior written consent of the Lessee (unless a Lease Event of Default shall have occurred and be continuing), neither the Owner Trustee nor the Owner Participant shall at any time directly or indirectly, sell, assign or otherwise transfer its interest in the Lease or Trust Estate to any Person (or Associated Person thereof) engaged in automobile manufacturing, automobile distribution, automobile parts manufacturing or automobile parts distribution irrespective of whether such Person or Associated Person is a direct competitor of the Lessee (a "Competitor")   This Section 18(d) shall not restrict (A) any sale of the Undivided Interest in a Unit in accordance with the terms of the Operative Documents, or (B) following termination of the Lease, any sale of the Undivided Interest in a Unit or any assignment of any claim relating to such termination   For purposes of this Section 18(d), an institutional investor which is a passive investor in the financing of equipment or facilities used in automobile manufacturing, automobile distribution, automobile parts manufacturing or automobile parts distribution shall not, solely by reason of such investment, be deemed to be engaged in such businesses.

(e)    Partial Transfer   Any transfer of less than all of an Owner Participant's interest in the Trust Estate shall be subject to the following conditions

(i)    No transfer of such interest shall be made which represents less than $50,000,000 of the Undivided Interest in the Equipment, based upon the Lessor's Cost thereof

(ii)    After any such transfer there shall be no more than two interests in the Trust Estate

(iii)    The Owner Participant, the Lessee and, to the extent necessary, the Indenture Trustee, shall have amended the Operative Documents to reflect such transferee as an additional Owner Participant, which amendments shall be reasonably satisfactory to the Lessee and the Indenture Trustee and shall not increase the obligations of the Lessee nor diminish the rights of the Lessee.

**SECTION 19. LIABILITY OF THE OWNER TRUSTEE**   The Lessee, the Owner Participant, the Indenture Trustee, and the Noteholders each agree that the Owner Trustee in its individual capacity shall have no personal liability whatsoever to the Lessee, the Owner Participant, the Indenture Trustee, the Noteholders, or any of their respective successors and assigns for any claim based on or in respect of this Agreement or any of the other Operative Documents or arising in any way from the transactions contemplated hereby or thereby, provided, however, that the Owner Trustee shall be liable in its individual capacity (a) for its own willful misconduct or gross negligence (or simple negligence in the handling of funds) and to the Owner Participant for the

breach of its obligations to the Owner Participant in respect of the Trust Agreement and the Owner Trust, (b) for liabilities that may result from the incorrectness of any representation or warranty expressly made by it in its individual capacity in the Operative Documents or from the failure of the Owner Trustee to perform the covenants and agreements expressly made in its individual capacity set forth in the Operative Documents, or (c) for any Tax based on or measured by any fees, commission or compensation received by it for acting as trustee in connection with any of the transactions contemplated by the Operative Documents. It is understood and agreed that, except as provided in the preceding proviso (i) the Owner Trustee, in its individual capacity, shall have no personal liability under any of the Operative Documents as a result of acting pursuant to and consistent with one or another of the Operative Documents, (ii) all obligations of the Owner Trustee, in its individual capacity, to the Lessee, the Owner Participant and the Indenture Trustee are solely nonrecourse obligations except to the extent that it has received payment from others and except as expressly provided in the Operative Documents, and (iii) all such other personal liability of the Owner Trustee, in its individual capacity, is expressly waived and released as a condition of, and as consideration for, the execution and delivery of the Operative Documents by the Owner Trustee, in its individual capacity. It is further understood and agreed that the Owner Participant except as provided in the proviso to the first sentence of this Section 19 shall not be personally liable for, or for any loss in respect of, any action taken or omitted to be taken by, or any representation, warranty, undertaking or agreement of, the Owner Trustee, in its individual capacity, under this Agreement or any other Operative Document other than those taken or omitted at the express direction of the Owner Participant and which do not violate the express terms of the Operative Documents to which the Owner Trustee, in its individual capacity, is a party. Notwithstanding the foregoing provisions of this Section, nothing herein shall be deemed to prevent any party hereto (other than the Owner Participant) from having recourse to and seeking enforcement against the Trust Estate for performance and observance of covenants, agreements and conditions required to be performed or observed by the Owner Trustee, in its capacity as Owner Trustee, in this Agreement and the other Operative Documents.

SECTION 20.    **LIABILITY OF OWNER PARTICIPANT**    The Owner Participant shall not have any obligation to the Lessee, the Owner Trustee, the Indenture Trustee or the Notcholders or any of their successors or assigns with respect to the transactions contemplated by the Operative Documents except those obligations of the Owner Participant expressly set forth in the Operative Documents to which it is a party or except as expressly set forth in the instruments delivered in connection therewith to which it is a party, and the Owner Participant shall not be liable for performance by any other party hereto of such other party's obligations under the Operative Documents except as set forth in the Operative Documents to which it is a party. This Section 20 shall not raise any inference as to the obligations of any other party to this Agreement.

SECTION 21. **LIABILITY OF THE INDENTURE TRUSTEE**    The Lessee, the Owner Participant and the Owner Trustee each agree that the Indenture Trustee, in its individual capacity, shall have no personal liability whatsoever to the Lessee, the Owner Participant, the Owner Trustee or any of their respective successors and assigns for any claim based on or in respect of this

Agreement or any of the other Operative Documents or arising in any way from the transactions contemplated hereby or thereby, provided, however, that the Indenture Trustee shall be liable in its individual capacity (a) for its own willful misconduct or gross negligence (or simple negligence in the handling of funds) in respect of its obligations under the Indenture, (b) for liabilities that may result from the incorrectness of any representation or warranty expressly made by it in its individual capacity in Section 9 hereof, or from the failure of the Indenture Trustee to perform the covenants and agreements expressly made in its individual capacity and set forth in this Agreement or the Indenture and the other Operative Documents to which it is a party or (c) for any Tax based on or measured by any fees, commission or compensation received by it for acting as trustee in connection with any of the transactions contemplated by the Operative Documents  It is understood and agreed that, except as provided in the preceding proviso (i) the Indenture Trustee, in its individual capacity, shall have no personal liability under any of the Operative Documents as a result of acting pursuant to and consistent with one or another of the Operative Documents, and (ii) all such personal liability of the Indenture Trustee, in its individual capacity, is expressly waived and released as a condition of, and as consideration for, the execution and delivery of the Operative Documents by the Indenture Trustee

## SECTION 22. COSTS

(a)    Transaction Costs  The following expenses are herein defined as "Transaction Costs"  (i) the reasonable fees, out-of-pocket expenses and disbursements of the counsel set forth in Exhibit Q which fees with respect to counsel for the Lessee shall consist only of those fees representing costs of documentation of the transactions contemplated by the Operative Documents, (ii) all fees, taxes and other charges payable in connection with the recording or filing of instruments and financing statements, (iii) the initial fee and reasonable and actual disbursements of the Owner Trustee under the Trust Agreement, (iv) the initial fee and reasonable and actual disbursements of the Indenture Trustee under the Indenture, (v) the fee of American Appraisal Associates, Inc  with respect to the Appraisal, (vi) the initial fee and reasonable and actual disbursements of BAS in its role as debt placement agent, (vii) the reasonable out-of-pocket expenses and disbursements of the Owner Participant, (x) the reasonable fees of Capstar Partners in its role as adviser to the Owner Participant and (xi) without duplication, reasonable fees and expenses incurred in connection with the preparation of the Operative Documents and other documents delivered on the Delivery Date  If the transactions contemplated hereby and by the other Operative Documents are consummated, the Owner Participant agrees to pay 4 48% of all Transaction Costs submitted to the Owner Participant within three months of the Delivery Date as provided in Section 22(b) below; provided, however, that if the Transaction Costs are in excess of the Assumed Transaction Cost Amount, the Lessee shall pay all of its own Transaction Expenses to the extent of such excess  In the event the transactions in respect of the Delivery Date are not consummated, the Lessee shall pay all Transaction Costs of the Owner Participant, the Indenture Trustee, the Owner Trustee and the Note Purchasers in respect of the  Delivery Date, provided that if such transactions are not consummated due to a Participant's breach of its obligations under this

Agreement, the Lessee shall not be obligated to pay the Transaction Costs incurred by such Participant, except for fees and expenses of their counsel set forth in Exhibit O

(b)    Invoices and Payment    Each of the Owner Trustee, the Indenture Trustee, the Owner Participant and the Lessee shall promptly (but in any event within three months of the Delivery Date) submit to the Owner Participant, with copies to the Lessee for its review, appropriately detailed invoices setting forth the Transaction Costs.

## SECTION 23. **PUBLICITY; CONFIDENTIAL DOCUMENTS**.

(a)    Publicity    Except as otherwise expressly permitted in the Operative Documents, each party hereto agrees that it will not, and that it will use its best efforts to cause its agents and advisors not to, issue or release for external publication any article or advertising or publicity matter relating to the transactions contemplated hereby and mentioning or implying the identity of the Participants or the Lessee without the relevant Participant's or the Lessee's, as the case may be, prior written consent

(b)    Confidential Information    For the purposes of this Section 23, "Confidential Information" means information delivered by or on behalf of the Lessee or any of its Affiliates in connection with the transactions contemplated by or otherwise pursuant to this Agreement that is proprietary in nature and that was clearly marked or labeled or otherwise adequately identified when received as being confidential information of the Lessee or such Affiliate, provided that such term does not include information that (1) was publicly known or otherwise known prior to the time of such disclosure, (2) subsequently becomes publicly known through no act or omission by the Owner Participant, the Owner Trustee, the Indenture Trustee or any Noteholder or any person acting on their behalf, (3) otherwise become known other than through disclosure by the Lessee or any of its Affiliates or (4) constitutes financial statements delivered under Section 10(e) that are otherwise publicly available    The Owner Participant, the Owner Trustee, the Indenture Trustee and each Noteholder will maintain the confidentiality of such Confidential Information in accordance with procedures adopted by the Owner Participant, the Owner Trustee, the Indenture Trustee and each Noteholder, as the case may be, in good faith to protect confidential information of third parties delivered to such Person, provided that the Owner Participant, the Owner Trustee, the Indenture Trustee and each Noteholder may deliver or disclose Confidential Information to (i) its respective directors, officers, employees, agents, attorneys and affiliates (to the extent such disclosure reasonably relates to the administration of the investment represented by the Equipment Notes), (ii) its respective financial advisors and other professional advisors who agree to hold confidential the Confidential Information substantially in accordance with the terms of this Section 23, (iii) any other holder of any Equipment Note, (iv) (A) any institutional investor to which any Noteholder sells or offers to sell such Equipment Note or any part thereof or any participation therein (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 23) or (B) any prospective purchaser or lessee of the Undivided Interest in any Unit or the Owner Participant's interest therein (if such Person has agreed in writing

prior to its receipt of such Confidential Information to be bound by the provisions of this <u>Section 23</u>), (v) any Person from which any Noteholder offers to purchase any security of the Lessee (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this <u>Section 23</u>), (vi) (A) upon the order of any Governmental Authority having jurisdiction and authority to issue such order or (B) upon the request or demand (if such request or demand shall have the force of law) of, or in connection with any investigation or audit by, or pursuant to any routine disclosure made to, any Governmental Authority, or by any Governmental Authority regulating such Person's business, (vii) the National Association of Insurance Commissioners or any similar organization, or any nationally recognized rating agency that requires access to information about any Noteholder's investment portfolio, or (viii) any other Person to which such delivery or disclosure may be necessary or appropriate (w) to effect compliance with any law, rule, regulation or order applicable to the Owner Participant, the Owner Trustee, the Indenture Trustee or any Noteholder, (x) in response to any subpoena or other legal process, (y) in connection with any litigation to which the Owner Participant, the Owner Trustee, the Indenture Trustee or any Noteholder is a party or (z) if an Event of Default has occurred and is continuing, to the extent the Owner Participant, the Owner Trustee, the Indenture Trustee or any Noteholder, as the case may be, may reasonably determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under this Agreement or any other Operative Document

(c)    <u>Noteholders Bound</u>    Each Noteholder, by its acceptance of an Equipment Note, will be deemed to have agreed to be bound by and to be entitled to the benefits of this <u>Section 23</u> as though it were a party to this Agreement    On reasonable request by the Lessee in connection with the delivery to any Noteholder of information required to be delivered to such Noteholder under this Agreement or requested by such Noteholder (other than a Note Purchaser or its nominee), such Noteholder will enter into an agreement with the Lessee embodying the provisions of this <u>Section 23</u>

(d)    <u>Notice of Disclosure</u>    In the case of disclosure under clause (vi) or (viii) of <u>Section 23(b)</u>, if permitted by such Governmental Authority, the Owner Participant, the Owner Trustee, the Noteholders or the Indenture Trustee, as the case may be, shall notify the Lessee at least two Business Days before making any such disclosure (unless two Business Days is commercially impracticable, in which case such party will notify the Lessee as soon as is commercially practicable)

(e)    <u>Appraisals</u>    The Lessee agrees that it shall keep the Appraisals confidential; <u>provided, however</u>, that nothing herein shall prevent or be construed to prevent the Lessee from disclosing such Appraisals (x) in connection with any litigation involving the transactions contemplated by the Operative Documents and (y) under the circumstances described in the second sentence of <u>Section 23(b)</u>

## SECTION 24. <u>MISCELLANEOUS</u>

(a)    Consent  The Owner Participant covenants and agrees that it shall not unreasonably withhold its consent to any consent requested of the Owner Trustee, as Lessor, under the terms of the Lease which by its terms is not to be unreasonably withheld by the Owner Trustee, as Lessor

(b)    Survival of Representations, Warranties, Covenants and Agreements The representations, warranties, indemnities and agreements of Lessee, the Owner Trustee, the Indenture Trustee and the Owner Participant provided for in this Agreement, and the Lessee's, the Indenture Trustee's, the Owner Trustee's and the Owner Participant's obligations under any and all thereof, shall survive the making available of the respective Commitments by the Participants, the delivery of the Undivided Interest in the Equipment and the expiration or other termination of this Agreement

(c)    Counterparts, Amendment, Successors and Assigns  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument  Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified, except by an instrument in writing signed by the party against which the enforcement of the termination, amendment, supplement, waiver or modification is sought  The terms of this Agreement shall be binding upon, and inure to the benefit of, Lessee, the Owner Participant and their respective successors and assigns, the Indenture Trustee and its successors as Indenture Trustee under the Indenture, the Owner Trustee and its successors as Owner Trustee under the Trust Agreement and shall inure to the benefit of the Notcholders

(d)    Governing Law. **This Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance (without reference to choice of law doctrines). This Agreement is being delivered in the State of New York.**

(e)    Headings, etc  The Table of Contents and headings of the various Sections of this Agreement are for convenience of reference only and shall not modify, define, expand or limit any of the provisions hereof

(f)    Severability  Any provision of this Agreement that may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction

(g)    Method of Payment  Except as otherwise provided in any Operative Document, all amounts required to be paid by any party to any other party hereunder or under any of the other Operative Documents shall be paid in immediately available funds in such freely

transferable coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts

(h)   <u>Reproduction of Documents</u>   This Agreement and all related documents, including (i) the Operative Documents, (ii) amendments, consents, waivers and modifications that may subsequently be executed, (iii) documents received by any party in connection with the consummation of the transactions contemplated hereby on the Delivery Date (except the Equipment Notes themselves), and (iv) financial statements, certificates and other information previously or subsequently furnished to any Participant, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic, digitalization or other similar process, and any party hereto may destroy any original document so reproduced, <u>provided, however</u> that such reproductions shall be subject to the confidentiality requirements of <u>Section 23</u> The parties hereto agree and stipulate that any such reproduction shall, to the extent permitted by Applicable Law and to the extent accurate, be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence), and that any enlargement, facsimile or further reproduction of the reproduction shall likewise be admissible in evidence

(i)   <u>No Waiver, Remedies Cumulative</u>   No failure to exercise and no delay in exercising on the part of any party to this Agreement of any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof, or the exercise of any other right, power or privilege   The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law

\*   \*   \*   \*   \*   \*   \*   \*   \*

GM2001A-_
DOCUMENT 1

[SIGNATURE PAGE FOR PARTICIPATION AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

**STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION**, as Owner Trustee

By _____
Its _____
    ELIZABETH C. HAMMER
    VICE PRESIDENT

**GENERAL MOTORS CORPORATION**, as Lessee

By _____
Its _____

**GENERAL ELECTRIC CAPITAL CORPORATION**, as Owner Participant

By _____
Its _____

**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION**, as Indenture Trustee

By _____
Its _____
    Eric Morgan
    Assistant Trust Officer

GM2001A _
DOCUMENT 1

[SIGNATURE PAGE FOR PARTICIPATION AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Participation
Agreement to be duly executed by an authorized representative

STATE STREET BANK AND TRUST
COMPANY OF CONNECTICUT, NATIONAL
ASSOCIATION, as Owner Trustee

By _____
Its _____

GENERAL MOTORS CORPORATION,
as Lessee

By _____
Its _____

GENERAL ELECTRIC CAPITAL
CORPORATION,
as Owner Participant

By _Rodney G. Simmons_
Its _RODNEY SIRMONS, MANAGER - OPERATIONS_

WELLS FARGO BANK NORTHWEST,
NATIONAL ASSOCIATION, as Indenture
Trustee

By _____
Its _____

[PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

ALLSTATE LIFE INSURANCE COMPANY

By

Name    JEFFREY A. MASCH
Title    Authorized Signatory

By

Name    DAVID WALSH
Title    Authorized Signatory
Authorized Signatories

GM 2001A-_
DOCUMENT 1

## [PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative.

AMERICAN GENERAL ANNUITY INSURANCE
COMPANY
AMERICAN GENERAL LIFE INSURANCE COMPANY
ALL AMERICAN LIFE INSURANCE COMPANY
AMERICAN GENERAL LIFE INSURANCE COMPANY
OF NEW YORK

BY:  AMERICAN GENERAL INVESTMENT MANAGEMENT, L.P.

By:  American General Investment Management
Corporation, its general partner

By:  _____
Name:  Gregg Hammer
Title: Senior Vice President

GM 2001A-_
DOCUMENT 1

[PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

AMERICAN REPUBLIC INSURANCE COMPANY

By  Advantus Capital Management, Inc

By _____

Name _____

Title _____

GM 2001A-_
DOCUMENT 1

## [PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

THE CANADA LIFE ASSURANCE COMPANY

By _____

Name _____ **G. PAUL ENGLISH** _____

Title _____ **ASSOCIATE TREASURER** _____

GM 2001A-_
DOCUMENT 1

## [PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

C M LIFE INSURANCE COMPANY

By David L Babson & Company Inc as Investment Sub-Adviser

By _____

Name    Richard C. Morrison

Title    Managing Director

GM 2001A-_
DOCUMENT 1

## [PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

FARM BUREAU MUTUAL INSURANCE COMPANY
OF MICHIGAN

By  Advantus Capital Management, Inc

By _____

Name _____

Title _____David R  Hackney, Vice President_____

GM 2001A
DOCUMENT I

## [PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

IDS LIFE INSURANCE COMPANY (909)

By _____

Name _David M. Kuplic_

Title _Assistant Vice President, Investments_

GM 2001A _
DOCUMENT I

## [PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

JACKSON NATIONAL LIFE INSURANCE COMPANY

By  PPM AMERICA, INC , as attorney in fact, on behalf of Jackson National Life Insurance Company

By _____

Name _____ Chris Raub _____

Title _____ Senior Managing Director _____

GM 2001 A
DOCUMENT 1

[PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation
Agreement to be duly executed by an authorized representative

JOHN HANCOCK LIFE INSURANCE COMPANY

By _____

Name  Stacey P. Agretelis

Title  Director

GM 2001A
DOCUMENT 1

## [PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

JOHN HANCOCK VARIABLE LIFE INSURANCE COMPANY

By _____

Name    Stacey P. Agretelis

Title    Authorized Signatory

GM 2001 A _
DOCUMENT 1

## [PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

LUTHERAN BROTHERHOOD

By _____

Name ___Keri L. Reich_____

Title ___Portfolio Manager_____

GM 2001A-_
DOCUMENT 1

[PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation
Agreement to be duly executed by an authorized representative

MASSACHUSETTS MUTUAL LIFE INSURANCE
COMPANY

By David L Babson & Company Inc ,
   Its Investment Adviser

By _____

Name _____ Richard C. Morrison _____

Title _____ Managing Director _____

GM 2001A-_
DOCUMENT 1

[PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

MELLON BANK, N A , solely in its capacity as Trustee for the Bell Atlantic Master Trust as directed by John Hancock Life Insurance Company, and not in its individual capacity

By _____

Name _____

Title _____

BERNADETTE RIST
AUTHORIZED SIGNATORY

The decision to participate in the investment, any representations made herein by the participant, and any actions taken hereunder by the participant has / have been made solely at the direction of the investment fiduciary who has sole investment discretion with respect to this investment

GM 2001A-_
DOCUMENT 1

[PARTICIPATION AGREEMENT SIGNATURE PAGE]


IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative


MTL INSURANCE COMPANY

By  Advantus Capital Management, Inc

By _____

Name _____

Title _____ Allen Steinkopf  Vice President

GM 2001A-_
DOCUMENT 1

## [PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

NATIONWIDE LIFE INSURANCE COMPANY

By

Name    Mark W. Poeppelman

Title    Associate Vice President

GM 2001A-_
DOCUMENT 1

[PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation
Agreement to be duly executed by an authorized representative

NATIONWIDE MUTUAL INSURANCE COMPANY

By _____

Name    Mark W. Poeppelman

Title    Associate Vice President

GM 2001 V-_
DOCUMENT I

## [PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

PRINCIPAL LIFE INSURANCE COMPANY,
an Iowa corporation

By  Principal Capital Management, LLC, a Delaware
     limited liability company, its authorized signatory

By _____

Name _____ DOUGLAS A. DREES, Counsel

Title _____

By _____

Name _____ JON Q. HEINY, Sr. _____

Title _____

GM 2001A-_
DOCUMENT I

## [PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

PROTECTED HOME MUTUAL LIFE INSURANCE COMPANY

By. Advantus Capital Management, Inc.

By _____

Name _____ Joseph Gogola _____

Title _____ Vice President _____

GM 2001A-
DOCUMENT 1

## [PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative.

SUNAMERICA LIFE INSURANCE COMPANY

By _____

Name _____Gregg Hammer_____

Title _____Authorized Agent_____

GM 2001A-_
DOCUMENT 1

## [PARTICIPATION AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative

TEACHERS INSURANCE AND ANNUITY
ASSOCIATION OF AMERICA

By _____

Name _____ DAVID G PERSKY _____

Title _____ DIRECTOR _____

GM 2001A-_
DOCUMENT 1

[PARTICIPATION AGREEMENT SIGNATURE PAGE]


IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by an authorized representative


TRUSTMARK INSURANCE COMPANY

By  Advantus Capital Management, Inc

By  _____
Name _____ James F. Geiger _____
Title _____ Vice President _____







GM 2001A-8

**EXECUTION COPY**

APPENDIX A
TO
PARTICIPATION AGREEMENT

**DOCUMENT 2**

DEFINITIONS

---

"Additional Insureds" has the meaning given to such term in <u>Section 11(b)(i)</u> of the Lease

"Adjustment Event" has the meaning given to such term in <u>Section 16(a)</u> of the Participation Agreement

"Adverse Party" means, as determined in the sole discretion of the Lessee in its good faith judgment, any Person (i) that intends to harm, or is reasonably likely to harm, the Lessee or its Affiliates (other than any "qualified institutional buyer" as defined in Rule 144A under the Securities Act) or (ii) that is a Competitor of the Lessee or any of its direct or indirect subsidiaries or an Affiliate of any such Competitor

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"After-Tax Basis" means (a) with respect to any payment to be received by an Indemnitee (which, for purposes of this definition, shall include any Tax Indemnitee and, for purposes of the Tax Indemnity Agreement, the Owner Participant (as defined therein)), the amount of such payment supplemented by a further payment or payments so that, after deducting from such payments the amount of all Taxes (net of any current credits, deductions or other Tax Benefits or the present value of any future credits, deductions, or other Tax Benefits (determined using an appropriate discount rate) arising from the payment by the Indemnitee of any amount, including Taxes, for which the payment to be received is made) actually imposed currently on the Indemnitee by any Governmental Authority or taxing authority with respect to such payments, the balance of

such payments shall be equal to the original payment to be received and (b) with respect to any payment to be made by any Indemnitee, the amount of such payment supplemented by a further payment or payments so that, after increasing such payment by the amount of any current credits or other Tax benefits or the present value of future credits or other Tax benefits (determined using an appropriate discount rate) realized by the Indemnitee under the laws of any Governmental Authority or taxing authority resulting from the making of such payments, the sum of such payments (net of such credits or benefits) shall be equal to the original payment to be made, provided, however, for the purposes of this definition, it shall be assumed that (i) for an Indemnitee other than the Owner Participant, federal income taxes are payable by such Indemnitee at the highest marginal statutory rate applicable to corporations from time to time, (ii) for the Owner Participant as the Indemnitee, federal, state and local income taxes are payable at the Highest Rate and (iii) such Indemnitee has sufficient income to utilize any deductions, credits (other than foreign tax credits, the use of which shall be determined on an actual basis) and other Tax benefits arising from any payments described in clause (b) of this definition

"Aggregate Equity Amount" has the meaning given to such term in Section 1(b) of the Participation Agreement (by reference to Schedule 3 thereto)

"Aggregate Principal Amount" has the meaning given to such term in Section 1(a) of the Participation Agreement (by reference to Schedule 2 thereto)

"Amortization Deductions" has the meaning given to such term in Section 2(f) of the Tax Indemnity Agreement

"Anticipated Book Earnings," with respect to the Owner Participant, means (a) during the five year period following the date of the Adjustment Event, (i) 100% of total book earnings anticipated by the Owner Participant as a result of its ownership and leasing of the Undivided Interest in the Equipment over such five year period and (ii) not less than 95% nor more than 105% of such anticipated book earnings in each of such five years and (b) during the remaining Base Term, (i) 100% of total book earnings anticipated by the Owner Participant as a result of its ownership and leasing of the Undivided Interest in the Equipment over such remaining Base Term and (ii) not less than 90% nor more than 110% of such anticipated book earnings in each year of such remaining Base Term

"Applicable Law" means all applicable laws, Environmental Laws, statutes, treaties, rules, codes, ordinances, regulations, certificates, orders, interpretations, licenses and permits of any Governmental Authority and judgments, decrees, injunctions, writs, orders or like action of any court, arbitrator or other administrative, judicial or quasi-judicial tribunal or agency of competent jurisdiction (including, without limitation, those pertaining to health, safety or the environment)

"Applicable Schedule," with respect to Lessor's Cost, payments of Base Rent, allocation of Base Rent, Termination Value or Stipulated Loss Value applicable to the Undivided

Interest in a Unit on a Lease Period Date, means the schedule as originally executed or as amended, as appropriate, that specifies the percentage of Lessor's Cost to be used to calculate the payments of Base Rent, allocation of Base Rent, Termination Value or Stipulated Loss Value, respectively, for such Undivided Interest in such Unit on such Lease Period Date

"Appraisal" means, with respect to the Equipment and the Undivided Interest therein, the appraisal opinion delivered to the Owner Participant pursuant to <u>Section 4(h)</u> of the Participation Agreement

"Appraisal Procedure" means a procedure whereby a value, period, amount or determination to be determined under the Lease or any other Operative Document (each a "fact") shall be established. The Lessor and the Lessee shall first attempt to agree upon such fact. If either the Lessor or the Lessee shall determine that such a fact cannot timely be established by agreement, such party shall appoint an appraiser and give notice thereof to the other party, which shall appoint an appraiser within 30 days thereafter. If such other party does not appoint an appraiser within such thirty-day period, the determination of the first appraiser made within 60 days thereafter shall be conclusive and binding on the Lessor and the Lessee. If within 60 days after appointment of the second of the two appraisers, such appraisers are unable to agree upon the fact in question, they jointly shall appoint a third appraiser within 10 days thereafter, or, if they do not do so, either the Lessor or the Lessee may request the American Arbitration Association, or any organization successor thereto, to appoint the third appraiser from a panel of appraisers with at least five years' experience in the valuation of machinery used in the manufacture of automobiles. The decision of the third appraiser shall be given within 60 days after its appointment. If three appraisers shall be so appointed, the average of all three determinations shall be conclusive and binding on the Lessor and the Lessee unless the determination of one appraiser is disparate from the middle determination by more than twice the amount by which the third determination is disparate from the middle determination, in which case the determination of the most disparate appraiser shall be excluded and the average of the remaining two determinations shall be conclusive and binding on the Lessor and the Lessee. The obligation to pay the fees and expenses of appraisers incurred in connection with any Appraisal Procedure relating to any transaction contemplated by any provision of the Lease or any other Operative Document shall be divided equally between the Lessor and the Lessee (except the obligation to pay such fees and expenses in connection with the Appraisal Procedure pursuant to <u>Sections 5(a), 10, 16, 18(a)</u> and <u>18(e)</u> of the Lease, which shall be solely that of the Lessee)

"Appraiser" means American Appraisal Associates, Inc

"Assigned Proprietary Rights" means the Undivided Interest in (i) the third-party software assigned to the Lessor as set forth in <u>Schedule II</u> to the Bill of Sale, (ii) the Lessee Proprietary Software, (iii) all of the Lessee's right, title and interest in and to any and all warranty rights, claims or interests, express or implied, related to the Equipment and (iv) other intangible property which are necessary for the normal operation of the relevant Equipment, <u>provided</u>,

however, that "Assigned Proprietary Rights" shall not include the Lessee Proprietary Intellectual Property

"Confidential Information" means any information regarding the Lessee's present or future business practices, product specifications, customers or other matters, whether or not such information is designated or marked as confidential, excluding any information that is publicly available when provided or thereafter becomes publicly available

"Lessee Proprietary Intellectual Property" means all of the following in any jurisdiction throughout the world, which is owned by the Lessee and is specific to Lessee's present or future business practices, product specifications, customers or other matters   (i) patents, patent applications, inventions and invention disclosures, together with any foreign counterparts and any continuations, continuations-in-part, divisions, substitute or improvement patents or patent applications, re-issues and patents of additions with respect thereto, (ii) copyrights and copyrightable works; (iii) registrations and applications for any of the foregoing, (iv) transaction data, know-how and any other Confidential Information, (v) programs (including source code), program summaries, program listings, program logic, programming tools, specifications, flow charts, screen designs, file formats, drawings, manuals, reports, user guides, operation guides, installation guides, and other documentation or programming materials prepared, and (vi) all other intellectual property rights, as such rights may be subsequently defined

"Associated Person" means, with respect to any Person, any other Person (a) who owns directly or indirectly 10% or more of such Person's equity or (b) has 10% or more of its equity owned directly or indirectly by such Person or such Person's Affiliate

"Assumed Transaction Cost Amount" shall be the amount set forth on Schedule 9 to the Participation Agreement

"Authorized Officer" means, (a) with respect to the Indenture Trustee, any officer in the Corporate Trust Administration Department of the Indenture Trustee who shall be duly authorized by appropriate corporate action to authenticate a bond or to execute any Operative Document, and (b) with respect to the Owner Trustee, any officer of the Owner Trustee in its Corporate Trust Administration Department who shall be duly authorized by appropriate corporate action to execute any Operative Document

"BALC" means Banc of America Leasing & Capital, LLC

"Bankruptcy Code" means the United States Bankruptcy Code of 1978, as amended

"BAS" means Banc of America Securities, LLC

"Base Lease Period" means, for the Undivided Interest in any Unit, each of the consecutive periods throughout the Base Term, the first such period commencing on and including March 18, 2002 and ending on July 1, 2002, and each of the remaining semi-annual periods commencing on and including the next following Base Lease Period Date (or such shorter period with respect to the final Base Lease Term)

"Base Lease Period Date" means (a) for the first Base Lease Period, March 18, 2002, and (b) thereafter, each succeeding July 2 and January 2 (or such other date set forth on the Applicable Schedule to the Lease Supplement) (or if any such day is not a Business Day, the next succeeding Business Day) up to and including the Last Day of the Base Term

"Base Rent" means, with respect to the Base Term, the rent payable by the Lessee pursuant to Section 3(b) of the Lease, as the same may be adjusted as provided in Section 3(e) of the Lease and Section 16 of the Participation Agreement and, for any Renewal Term, rent payable by the Lessee determined pursuant to Section 18 of the Lease

"Base Term" means, in respect of any Unit, the term described in Section 3(a) of the Lease

"Base Term Commencement Date" means March 18, 2002

"Bill of Sale" means, with respect to the Undivided Interest in a Unit, the Bill of Sale in the form attached as Exhibit B to the Participation Agreement and delivered pursuant to Section 4(b) of the Participation Agreement

"Business Day" means any day other than a Saturday or Sunday or a day on which commercial banks are required or authorized to close in New York, New York, Detroit, Michigan or the city and state in which the principal corporate trust office of the Indenture Trustee is located

"Claims" has the meaning given to such term in Section 8(b)(i) of the Participation Agreement

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any successor Federal statute

"Commitment" has the meaning given to such term in Section 1(c) of the Participation Agreement

"Company" means GM and, subject to the provisions of the Indenture and Participation Agreement, its permitted successors and assigns

"Company Request" means a written request of the Company executed on its behalf by a Responsible Officer

"Competitor" has the meaning given to such term in <u>Section 18(d)</u> of the Participation Agreement

"Cost Recovery Deductions" has the meaning given to such term in <u>Section 2(c)</u> of the Tax Indemnity Agreement

"Counsel for the Noteholders" means Willkie Farr & Gallagher or, after the Delivery Date, such other counsel as may be specified by a Majority in Interest of the Noteholders

"Credit Default" means a Lease Default (other than a Material Default) which can be cured by the payment of money or by diligent efforts within the allotted period of time and as to which, if the payment of money is required, there is material uncertainty as to the Lessee's ability to make such payment in a timely fashion

"Current Principal Amount" means, with respect to an Equipment Note as of any relevant date, the original principal amount of such Equipment Note reduced by the amount of principal paid with respect to such Equipment Note prior to such date

"Debt" means any liability for borrowed money, or any liability for the payment of money in connection with any letter of credit transaction, or other liabilities evidenced or to be evidenced by bonds, debentures, notes or other similar instruments

"Delivery Date" means the date set forth in Section 2(a) of the Participation Agreement

"Dollars" and "$" each means the lawful currency of the United States of America

"Early Fixed Price Purchase Amount" in respect of the Undivided Interest in a Unit means the product of (a) the percentage set forth on <u>Schedule V</u> to the Lease Supplement opposite the EBO Date under the caption "Early Fixed Price Purchase Amount" and (b) the Fair Market Sales Value for the Undivided Interest in such Unit determined as of the Delivery Date, as set forth in the Appraisal and Applicable Schedule

"EBO Date," with respect to the Undivided Interest in a Unit, means the date set forth with respect thereto in the Lease Supplement relating to the Undivided Interest in such Unit

"EBO Notice" has the meaning given to such term in <u>Section 18(c)(i)</u> of the Lease

"EBO Purchase Option" has the meaning given to such term in <u>Section 18(c)(i)</u> of the Lease

"Effective Rate" has the meaning given to such term in <u>Section 2(h)</u> of the Tax Indemnity Agreement

"Employee Benefit Plan" has the meaning specified in <u>Section 3(3)</u> of ERISA but excluding governmental plans (as defined at <u>Section 3(32)</u> of ERISA or <u>Section 414(d)</u> of the Code)

"End Term Date" has the meaning given to such term in <u>Section 18(c)(ii)</u> of the Lease

"End Term Purchase Option" has the meaning given to such term in <u>Section 18(c)(ii)</u> of the Lease

"Engine Line" means (a) an engine line and the related equipment described in the Schedule to the Lease Supplement delivered pursuant to the Lease so long as title to or beneficial ownership of an Undivided Interest therein shall remain vested in the Lessor (or its permitted successors or assigns) in accordance with the terms of the Lease, (b) any and all Parts (i) so long as the same shall be incorporated or installed in such engine line (except Parts temporarily installed on an emergency basis as described in <u>Section 8(a)</u> of the Lease), or (ii) so long as title or beneficial ownership of an Undivided Interest therein shall remain vested in the Lessor (or its permitted successors or assigns) in accordance with the terms of <u>Section 8</u> of the Lease after removal from such engine line, (c) the Assigned Proprietary Rights and (d) any equipment substituted for or in replacement of such engine line and any Modification to such engine line so long as title to or beneficial ownership of an Undivided Interest therein shall remain vested in the Lessor (or its permitted successors or assigns) in accordance with the terms of the Lease  The term "Engine Line" does not include proprietary tooling

"Environmental Claims" means any and all administrative, regulatory or judicial actions or causes of action, suits, obligations, liabilities, losses, proceedings, executory decrees, judgments, penalties, fees, demands, demand letters, orders, directives, claims (including without limitation any claims involving liability in tort, strict, absolute or otherwise), liens, notices of noncompliance or violation, or legal fees, costs of investigations or proceedings, relating in any way to any Environmental Law or any Governmental Action issued under any such Environmental Law, or arising from the presence, release or threatened release (or alleged presence or release) into the environment of any Hazardous Materials (hereinafter "Actions") including, without limitation, and regardless of the merit of such Action, any and all Actions by any Governmental Authority or by any third party for enforcement, cleanup, removal, response, remedial or other actions for damages,

contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law or any alleged injury or threat of injury to health, safety or the environment

"Environmental Laws" means all permits, laws, regulations, ordinances, and judicial and administrative decrees, rulings, judgments and orders of Federal, state and local governmental bodies having jurisdiction thereof, guidelines and rules of common law now or hereafter in effect, and in each case as amended, and any judicial or administrative interpretation thereof, which relate to the regulation and protection of human health, safety, the environment and natural resources (including without limitation ambient air, surface water, groundwater, wetlands, land, surface or subsurface strata, wildlife, aquatic species and vegetation), including without limitation all such laws and regulations relating to emissions, discharges, releases or threatened releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, discharge, release, transport or handling of Hazardous Materials. "Environmental Laws" includes, but is not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U S C § 9601 et seq., Resource Conservation and Recovery Act (RCRA), 42 U S C § 6901, et seq., Toxic Substances Control Act (TSCA), 15 U S C § 2601 et seq., Clean Air Act, 42 U S C § 7401 et seq., Clean Water Act, 33 U S C § 1251, et seq., Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U S C § 136 et seq., Oil Pollution Act of 1990 (OPA), 33 U S C 2701, et seq., Occupational Safety and Health Act (OSHA), 29 U S C § 651 et seq., the Hazardous Materials Transportation Act, 42 U S C § 1801 et seq. and Safe Drinking Water Act (SDWA), 42 U S C § 300f et seq., as the same may be amended, modified or supplemented, and the regulations promulgated pursuant thereto and any state or local laws and regulations concerning the regulation and protection of the environment, human health, safety and natural resources

"Equipment" means the equipment listed in Schedule 1 to the Participation Agreement the Undivided Interest in which will be delivered on the Delivery Date

"Equipment Note" means any Equipment Note issued under the Indenture substantially in the form of Exhibit A thereto as such form may be varied pursuant to the terms thereof and includes any such Equipment Note issued under the Indenture on the Delivery Date as well as any Equipment Note issued in exchange for or replacement of any thereof (including Replacement Notes), but shall not include any Unsecured Notes issued by the Company pursuant to Section 7 2 of the Indenture in exchange for any Equipment Notes

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any successor federal statute

"Event of Default," with respect to the Lease, has the meaning given to such term in Section 15 of the Lease

"Event of Loss," with respect to the Undivided Interest in any Unit, means any of the following events with respect to such property (a) the loss of a substantial portion of all of such Unit or the use thereof due to the destruction of or damage to such Unit which renders repair of such Unit uneconomic, (b) any damage or destruction to such Unit which results in an insurance settlement with respect to such Unit, on the basis of a total loss, or a constructive or compromised total loss, (c) the theft, disappearance, confiscation or seizure of, or taking of title to, such Unit (other than a Requisition of Use) which shall have resulted in the loss of possession or use of such Unit by the Lessee for a period of three months or more or, if shorter, a period that extends beyond the Term for the Undivided Interest in such Unit, and (d) the Requisition of Use of such Unit

"Event of Loss Payment Date" has the meaning given to such term in Section 10(a) of the Lease

"Excepted Property" means (a) any right, title or interest of the Owner Participant or Owner Trustee, in its individual capacity, or any Affiliate of either of them, to any payment which by the terms of Sections 8(b), 8(c) and 10(i) of the Participation Agreement, Section 5(d) or 7(a) of the Trust Agreement, or any section of the Tax Indemnity Agreement or any corresponding payment under Sections 3(c) or 23 of the Lease relating to any of the aforementioned provisions shall be payable to the Owner Participant or Owner Trustee, in its individual capacity, or any Affiliate of any of them, or any member of such Person's Related Indemnitee Group, as the case may be, (b) any insurance proceeds payable under insurance maintained by the Owner Participant or Owner Trustee, in its individual or trust capacity, or any Affiliate of either, pursuant to Section 11(d) of the Lease which is in addition to the insurance required by Section 11 of the Lease to be maintained by the Lessee, (c) any insurance proceeds (or proceeds of governmental indemnities in lieu thereof) payable to the Owner Participant or Owner Trustee, in its individual capacity, or any Affiliate of either, under any liability insurance maintained by the Company pursuant to Section 11 of the Lease or by any other Person (or governmental indemnities in lieu thereof) and (d) the respective rights of the Owner Participant or Owner Trustee, in its individual capacity, or any Affiliate of any of them, to the proceeds of the foregoing or amounts payable under the Lease Assignment Guaranty in respect of any of the foregoing

"Excepted Rights" means the rights of the Owner Trustee under Article XIV of the Indenture

"Exchange Date" has the meaning given to such term in Section 7 2 of the Indenture

"Excluded Taxes" has the meaning given to such term in Section 8(c)(ii) of the Participation Agreement

"Fair Market Rental Value" means with respect to the Undivided Interest in any Unit, the amount, which shall not in any event be less than zero, that would be paid in cash in an arm's-length transaction between an informed and willing lessee and an informed and willing lessor,

GM 2001A-8

neither of whom is under any compulsion to lease, for the use of the Undivided Interest in such Unit for a given period    Except pursuant to <u>Section 16</u> of the Lease, Fair Market Rental Value of the Undivided Interest in any Unit shall be determined on the assumption that    (a) the Undivided Interest in such Unit is in the condition and state of repair required under <u>Section 5(a)</u> of the Lease, (b) the Lessee is in compliance with the requirements of the Operative Documents, (c) during such lease period, Base Rent will be payable in equal semiannual installments in arrears and (d) the Lessee has no EBO Purchase Option    The Fair Market Rental Value shall be determined pursuant to the Appraisal Procedure

"Fair Market Sales Value" means, with respect to the Undivided Interest in any Unit, the amount, which in any event shall not be less than zero, that would be paid in cash in an arm's-length transaction between an informed and willing purchaser and an informed and willing seller, neither of whom is under any compulsion to purchase or sell, respectively, for the ownership of the Undivided Interest in such Unit   Fair Market Sales Value of the Undivided Interest in any Unit shall be determined on the assumptions that    (a) except for purposes of <u>Section 16</u> of the Lease, the Undivided Interest in such Unit is in the condition and state of repair required under <u>Section 5(a)</u> of the Lease and the Lessee is in compliance with the requirements of the Operative Documents, (b) except for purposes of the Appraisal conclusions, the Undivided Interest in such Unit has been delivered to the Lessor at the location and otherwise as required by the first sentence of <u>Section 5(a)</u> of the Lease, and (c) is determined without regard to the Lessee's renewal options or leasehold interest   Fair Market Sales Value of the Undivided Interest in any Unit shall be determined pursuant to the Appraisal Procedure except for purposes of determining Lessor's Cost, in which case the Fair Market Sales Value shall be determined pursuant to the Appraisal, or except as otherwise expressly provided herein

"Fair Market Value Renewal" has the meaning given to such term in <u>Section 18(b)</u> of the Lease

"Fair Market Value Renewal Term" means the term of any renewal of the Lease by the Lessee pursuant to <u>Section 18(b)</u> of the Lease at the end of the Base Term or any Renewal Term, as the case may be

"FASB 13" means the Statement of Financial Accounting Standards No. 13 as promulgated by the Financial Accounting Standards Board, as in effect on the Delivery Date

"Final Determination" means (a) a decision, judgment, decree or other order by any court of competent jurisdiction, which decision, judgment, decree or other order has become final (i e , when all allowable appeals have been exhausted by either party to the action) or, in any case where judicial review shall at the time be unavailable by reason of the proposed adjustment involving a decrease in a net operating loss carryforward or a business credit carryforward, a decision, judgment, decree or other order of an administrative official or agency of competent jurisdiction, which decision, judgment, decree or other order has become final (i e , all administrative

appeals have been exhausted by either party), (b) a closing agreement entered into under Section 7121 of the Code or any other settlement agreement entered into in connection with an administrative or judicial proceeding (including any settlement of a proposed adjustment entered into by the Owner Participant in accordance with the terms of the Tax Indemnity Agreement) or (c) the expiration of the time for instituting a claim for refund, or if such a claim was filed, the expiration of the time for instituting a suit with respect thereto

"Fixed Rate Renewal" has the meaning given to such term in Section 18(a) of the Lease

"Fixed Rate Renewal Term" means the term of any renewal of the Lease by the Lessee pursuant to Section 18(a) of the Lease at the end of the Base Term

"Foreign Tax Credit Loss" has the meaning given to such term in Section 9 of the Tax Indemnity Agreement

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time

"GM" or "General Motors" means General Motors Corporation, a Delaware corporation, its successors and assigns

"Governmental Action" means all permits, authorizations, registrations, consents, approvals, waivers, exceptions, variances, orders, judgments, written interpretations, decrees, licenses, exemptions, publications, filings, notices to and declarations of or with, or required by, any Governmental Authority, or required by any Applicable Law, and shall include, without limitation, all environmental and operating permits and licenses that are required for the full use, occupancy, zoning and operation of any Unit or the Undivided Interest therein

"Governmental Authority" means, in the case of the United States, any Federal, state, county, municipal or other governmental authority or judicial or regulatory agency, board, body, commission, instrumentality, court or quasi-governmental authority from time to time, and, in the case of any foreign governmental authority, all similar entities to the foregoing having jurisdiction over any Unit or the Undivided Interest therein or any Person that is a party to any Operative Document, any property of any of them or any of the transactions contemplated by any Operative Document

"Granting Clause Documents" means the Lease and the Bill of Sale

"Hazardous Materials" means (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, polychlorinated biphenyls ("PCBs"), transformers or other equipment that contain dielectric fluid

containing PCBs, and radon gas, (b) those materials, substances, chemicals or wastes which are now or hereafter become defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous substances," "special wastes," "toxic substances," "toxic pollutants," or words of similar import under any applicable Environmental Law, and (c) any other chemical, material, substance, or waste, exposure to which is now or hereafter prohibited, limited or regulated by any Governmental Authority under Applicable Law

"Highest Rate" has the meaning given to such term in Section 17 of the Tax Indemnity Agreement

"Income Inclusion" has the meaning given to such term in Section 5(a)(ii) of the Tax Indemnity Agreement

"Indemnitee" has the meaning given to such term in Section 8(b)(ii) of the Participation Agreement

"Indenture" or "Trust Indenture and Security Agreement" means the Trust Indenture and Security Agreement (GM 2001A-8), dated as of the Delivery Date, between the Owner Trustee and the Indenture Trustee, as originally executed or as modified, amended or supplemented in accordance with the provisions thereof  The terms "Indenture" or "Trust Indenture and Security Agreement" shall also include the Indenture Supplement entered into pursuant to the terms of the Indenture in substantially the form set forth in Exhibit D to the Participation Agreement

"Indenture Default" means any event that is, or after notice or passage of time, or both, would be, an Indenture Event of Default

"Indenture Documents" means any Operative Document as to which the interest of the Owner Trustee therein is subject to the Granting Clause of the Indenture

"Indenture Estate" has the meaning given to such term in the Granting Clause of the Indenture

"Indenture Event of Default" has the meaning given to such term in Section 8 1 of the Indenture

"Indenture Supplement" means any supplement to the Indenture together with all schedules thereto, if any, (a) in respect of the issuance of Equipment Notes on the Delivery Date, in the form of Exhibit B to the Indenture and, (b) in respect of Replacement Notes issued pursuant to Section 2 10 of the Indenture and any other supplement thereto entered into pursuant to the terms of the Indenture, which supplement need not be in the form of Exhibit B

"Indenture Trustee" means Wells Fargo Bank Northwest, National Association, a national banking association, as trustee under the Indenture, and any other Person which may from time to time be acting as Indenture Trustee in accordance with the provisions of the Indenture

"Independent," when used with respect to an engineer, appraiser or other expert, means an engineer, appraiser or other expert who (a) is in fact independent, (b) does not have any direct financial interest or any material indirect financial interest in the Company or any Affiliate of the Company, and (c) is not connected with the Company or any Affiliate of the Company as an officer, employee, promoter, underwriter, trustee, partner, director or Person performing similar functions

"Installment Payment Amount" means, with respect to each Equipment Note, the amount of the installment payment of principal due and payable on each Installment Payment Date up to and including the Maturity Date thereof, which amount shall be as set forth in such Equipment Note or Exhibit B-1 to the Indenture Supplement under which such Equipment Note was issued, as applicable

"Installment Payment Date" means each date on which an installment payment of principal is due and payable on each Equipment Note, as set forth in such Equipment Note or Exhibit B-1 to the Indenture Supplement under which such Equipment Note was issued, as applicable

"Installment Payment Percentage" means, with respect to each Installment Payment Date, the percentage set forth opposite such Installment Payment Date in such Equipment Note or Exhibit B-1 to the Indenture Supplement under which such Equipment Note was issued, as applicable

"Interest Deductions" has the meaning given to such term in Section 2(e) of the Tax Indemnity Agreement

"Interest Payment Date" means March 18, 2002 and each January 2 and July 2, commencing July 2, 2002

"Interim Term" or "Interim Lease Payment Period" means the period commencing on the Delivery Date and terminating on, but not including, Base Term Commencement Date

"Interim Term Commencement Date" means the Delivery Date of such Unit

"IRS" means the Internal Revenue Service and any entity succeeding to any or all of its functions under the Code

"Last Day of the Base Term," with respect to the Undivided Interest in a Unit, means the date specified in the Lease Supplement for the Undivided Interest in such Unit as the Last Day of the Base Term for the Undivided Interest in all Equipment subject to such Lease Supplement

"Lease" or "Lease Agreement" means the Lease Agreement (GM 2001A-8), dated as of the Delivery Date, in substantially the form set forth in Exhibit C to the Participation Agreement, between the Owner Trustee, as lessor, and the Lessee, as such Lease Agreement may from time to time be supplemented, amended or modified in accordance with the terms thereof, of the Indenture and of the Participation Agreement  The terms "Lease" and "Lease Agreement" shall also include the Lease Supplement entered into pursuant to the terms of the Lease

"Lease Assignment Guaranty" means the Guaranty of Lease Assignment substantially in the form of Exhibit C to the Lease among GM, the Owner Participant, the Owner Trustee and the Indenture Trustee

"Lease Default" means an event which upon the passage of time or the giving of notice, or both, would constitute a Lease Event of Default

"Lease Event of Default" has the meaning given to the term "Event of Default" in the Lease

"Lease Period" means, (a) with respect to the Base Term, a Base Lease Period and (b) with respect to any Renewal Term, a Renewal Lease Period

"Lease Period Date" means, (a) with respect to the Base Term, a Base Lease Period Date and (b) with respect to any Renewal Term, a Renewal Lease Period Date

"Lease Supplement" means the lease supplement, substantially in the form attached as Exhibit A to the Lease together with all Schedules thereto, to be entered into between the Lessor and the Lessee as of the date specified therein, as amended from time to time as provided in the Lease

"Lessee" has the meaning given to such term in the introduction to the Lease

"Lessee Proprietary Software" means the software, together with associated source code an Undivided Interest in which is owned by the Lessee and that was developed by the manufacturer of the Equipment to operate the Equipment, together with any programs (including source code), program summaries, program listings, program logic, programming tools, specifications, flow charts, screen designs, file formats, drawings, manuals, reports, user guides, operation guides, installation guides, and other documentation or programming materials prepared, provided, however, that each of the foregoing items constitute "Lessee Proprietary Software" only if and to the extent that such items are necessary for the normal operation of the relevant Equipment

"Lessee Request" means a written request signed in the name of the Lessee by a Responsible Officer thereof

"Lessee's Tax Counsel" means Kirkland & Ellis or such other tax counsel as is selected by the Lessee and reasonably acceptable to the Owner Participant

"Lessor" has the meaning given to such term in the introduction to the Lease

"Lessor Lien" or "Owner Trustee Lien" means any Lien, true lease or sublease of or disposition of title with respect to the Undivided Interest in the Unit or any Part thereof arising as a result of (a) any claim against the Lessor or the Owner Trustee, in its individual capacity, or any Affiliate thereof, not resulting from the transactions contemplated by the Operative Documents, (b) any act or omission of the Lessor or the Owner Trustee, in its individual capacity, or any Affiliate thereof, which is not required by the Operative Documents or is in violation of any of the terms of the Operative Documents, (c) any claim against the Lessor or the Owner Trustee, in its individual capacity, or any Affiliate thereof, with respect to Taxes or Transaction Expenses against which the Lessee is not required to indemnify the Lessor or the Owner Trustee, in its individual capacity, pursuant to Section 8(b) or 8(c) of the Participation Agreement or (d) any claim against the Lessor arising out of any transfer by the Lessor of all or any portion of the interest of the Lessor in the Undivided Interest in any Unit or Part thereof, the Trust Estate or the Operative Documents other than the transfer of title to or possession of any Equipment by the Lessor pursuant to and in accordance with the Indenture or pursuant to the exercise of the remedies set forth in Section 16 of the Lease

"Lessor's Cost" for any given date means the Fair Market Sales Value of the Undivided Interest in the Equipment which remains subject to the Lease, determined as of the Delivery Date, as set forth in the Appraisal and Applicable Schedule

"Lien" means any mortgage, deed of trust, pledge, security interest, encumbrance, lien, easement, servitude or charge of any kind, including, without limitation, any irrevocable license, conditional sale or other title retention agreement, any lease in the nature thereof, or any other right of or arrangement with any creditor to have its claim satisfied out of any specified property or asset with the proceeds therefrom prior to the satisfaction of the claims of the general creditors of the owner thereof, whether or not filed or recorded, or the filing of, or agreement to execute as "debtor," any financing or continuation statement under the Uniform Commercial Code of any jurisdiction or any foreign, federal, state or local lien imposed pursuant to any Applicable Law

"Loss" has the meaning given to such term in Section 5 of the Tax Indemnity Agreement

"Loss of Deductions" has the meaning given to such term in Section 5(a)(i) of the Tax Indemnity Agreement

"Majority in Interest of Noteholders" as of a particular date of determination means a Noteholder or Noteholders holding at least a majority of the aggregate principal amount of all Outstanding Equipment Notes

"Make-Whole Premium" means, with respect to any Equipment Note, an amount equal to the excess, if any, of the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal of such Equipment Note over the amount of such Called Principal, provided that the Make-Whole Premium may in no event be less than zero  For the purposes of determining the Make-Whole Premium, the following terms have the following meanings

"Applicable Percentage" shall mean 0 50% (50 basis points)

"Called Principal" shall mean, with respect to any Equipment Note, the principal of such Equipment Note that is to be prepaid on any Prepayment Date pursuant to Section 6 1 or 8 2 of the Indenture or is to be purchased or prepaid pursuant to Section 8 3(e)(iii) or Section 8 3(e)(iv) thereof, taking into account the provisions of Section 8(b)(iii)(F) of the Participation Agreement

"Discounted Value" shall mean, with respect to the Called Principal of any Equipment Note, the amount obtained (calculated to at least six decimal places) by discounting all Remaining Scheduled Payments with respect to such Called Principal from their respective scheduled Installment Payment Dates to the Settlement Date with respect to such Called Principal, in accordance with accepted financial practice and at a discount factor (applied on a semiannual basis) equal to the Reinvestment Yield with respect to such Called Principal

"Reinvestment Yield" shall mean the sum of (i) the Applicable Percentage plus (ii) the yield to maturity implied by (x) the yields reported, as of 10 00 A M (New York City time) on the second Business Day preceding the Settlement Date on (1) the Bloomberg Financial Markets News screen PX1 or the equivalent screen provided by Bloomberg Financial Markets News, or (2) if such on-line market data is not at the time provided by Bloomberg Financial Markets News, on the display designated as "Page 500" on the Telerate service (or such other display as may replace Page 500 on the Telerate service), in any case for actively traded U S Treasury securities having a maturity equal to the Remaining Average Life of such Called Principal as of such Settlement Date, or (y) if such yields are not

reported as of such time or the yields reported as of such time are not ascertainable (including by way of interpolation), the Treasury Constant Maturity Series Yields reported, for the latest day for which such yields have been so reported as of the second Business Day preceding the Settlement Date, in Federal Reserve Statistical Release H 15 (519) (or any comparable successor publication) for actively traded U S Treasury securities having a constant maturity equal to the Remaining Average Life of such Called Principal as of such Settlement Date  Such implied yield will be determined, if necessary, by (a) converting U S Treasury bill quotations to bond-equivalent yields in accordance with accepted financial practice and (b) interpolating linearly between (1) the actively traded U S Treasury security with a maturity closest to and greater than the Remaining Average Life and (2) the actively traded U S Treasury security with a maturity closest to and less than the Remaining Average Life

"Remaining Average Life" shall mean, with respect to any Called Principal, the number of years (calculated to the nearest one-twelfth year) obtained by dividing (i) such Called Principal into (ii) the sum of the products obtained by multiplying (a) the principal component of each Remaining Scheduled Payment with respect to such Called Principal by (b) the number of years (calculated to the nearest one-twelfth year) that will elapse between the Settlement Date with respect to such Called Principal and the scheduled due date of such Remaining Scheduled Payment

"Remaining Scheduled Payments" shall mean, with respect to any Called Principal, all payments of such Called Principal and interest thereon that would be due after the Settlement Date with respect to such Called Principal if no payment of such Called Principal were made prior to its scheduled due date, provided that if such Settlement Date is not an Installment Payment Date, then the amount of the next succeeding scheduled interest payment will be reduced by the amount of interest accrued to such Settlement Date and required to be paid on such Settlement Date pursuant to Section 6 1, Section 8 2, Section 8 3(e)(iii) or Section 8 3(e)(iv) of the Indenture or Section 8(b)(iii)(F) of the Participation Agreement

"Settlement Date" shall mean, with respect to any Called Principal, the date on which such Called Principal is to be prepaid pursuant to Section 6 1 or 8 2 of the Indenture or is to be purchased or prepaid pursuant to Section 8 3(e)(iii) or Section 8 3(e)(iv) thereof, taking into account Section 8(b)(iii)(F) of the Participation Agreement

"Material Default" means any event of the type specified in paragraphs (a), (b), (c) and (e) of Section 15 of the Lease which, with the passage of time or the giving of notice, or both, would become a Lease Event of Default

"Material Event of Default" means any Lease Event of Default of the type specified in paragraphs (a), (b), (c) and (e) of Section 15 of the Lease

"Maturity" means, with respect to the Equipment Notes of any series, all of the Equipment Notes maturing on a particular Maturity Date

"Maturity Date" means, with respect to any Equipment Note, the date specified in Exhibit B-1 to the Indenture Supplement under which such Equipment Note is issued as the final maturity date of such Equipment Note

"Modification" means any addition, alteration, improvement or modification to any Unit, other than original, substitute or replacement Parts of such Unit

"Note Purchaser" means each of the Persons named on Schedule 2 to the Participation Agreement

"Note Rate" means 7 20% per annum, which is the interest rate borne by the Equipment Notes

"Noteholder" means a holder of an Outstanding Equipment Note

"Obsolete Unit" has the meaning given to such term in Section 9(a) of the Lease

"Officer's Certificate" means a certificate signed, (a) in the case of the Lessee, by (i) the Treasurer, any Assistant Treasurer, the Controller or any Assistant Controller of the Company, signing alone, or (ii) any Vice President signing together with the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer of the Company , (b) in the case of a Tax Indemnitee or the Owner Participant (as defined in the Tax Indemnity Agreement), by the President, any Vice President, the Treasurer, any Assistant Treasurer, the Controller or any Assistant Controller of such Tax Indemnitee or Owner Participant and (c) in the case of the Owner Trustee, a Responsible Officer of the Owner Trustee

"Operative Documents" means the Participation Agreement, Lease, Lease Supplement, Indenture, Indenture Supplement, Trust Agreement, Equipment Notes, Tax Indemnity Agreement and Bill of Sale

"Opinion of Counsel" means a written opinion of legal counsel, who, (a) in the case of counsel for the Company may be (i) a lawyer employed by the Company, (ii) Kirkland & Ellis

or (iii) other counsel designated by the Company and who shall be satisfactory to the Indenture Trustee and, (b) in the case of legal counsel for the Owner Trustee, may be (i) Shipman & Goodwin LLP or (ii) other counsel designated by the Owner Trustee and who shall be satisfactory to the Indenture Trustee

"Outstanding," when used with respect to the Equipment Notes, means, as of any date of determination, all Equipment Notes theretofore executed and delivered under the Indenture other than

(a)    Equipment Notes theretofore canceled by the Indenture Trustee or delivered to the Indenture Trustee for cancellation pursuant to Section 2 6 of the Indenture or otherwise,

(b)    Equipment Notes for payment (but only to the extent of such payment) or prepayment of which money in the necessary amount has been theretofore deposited with the Indenture Trustee in trust for the Noteholders with respect to such Equipment Notes, provided that if such Equipment Notes are to be prepaid, notice of such prepayment has been duly given pursuant to the Indenture or provision therefor satisfactory to the Indenture Trustee has been made, and

(c)    Equipment Notes in lieu of which other equipment notes have been executed, delivered and authenticated pursuant to the Indenture,

provided, however, that in determining whether the Noteholders of the requisite aggregate principal amount of Equipment Notes Outstanding have given any request, demand, authorization, declaration, direction, notice, consent or waiver under the Indenture, Equipment Notes owned by or pledged to the Owner Participant or any Affiliate thereof or the Lessee or any Affiliate thereof shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Indenture Trustee shall be protected in relying upon any such request, demand, authorization, declaration, direction, notice, consent or waiver, only Equipment Notes which the Indenture Trustee knows to be so owned or so pledged shall be disregarded, and except if all Equipment Notes are so owned or pledged  Equipment Notes owned by the Owner Participant or any Affiliate thereof which have been pledged in good faith may be regarded as Outstanding if the Owner Participant establishes to the satisfaction of the Indenture Trustee the pledgee's right to act with respect to such Equipment Notes and that the pledgee is not the Owner Participant or any Affiliate thereof

"Overdue Rate" means, with respect to a payment previously due but unpaid, (a) to the extent such payment consists of (or when paid would be distributable under the terms of the Indenture as) principal, premium, if any, or interest on any Equipment Note, the sum of the rate at which interest normally accrues on such Equipment Note plus 1% or (b) otherwise, the Postponement Rate, in each case calculated on the basis of a 360-day year consisting of twelve 30-day months

"Owner Participant" has the meaning given to such term in the recitals to the Participation Agreement and its successors and permitted assigns as allowed under the provisions of the Operative Documents

"Owner Participant Lien" means any Lien, true lease or sublease of or disposition of title with respect to any Unit, the Undivided Interest in any Unit or any Part thereof arising as a result of (a) any claim against the Owner Participant or any Affiliate thereof not resulting from the transactions contemplated by the Operative Documents, (b) any act or omission of the Owner Participant or any Affiliate thereof which is not required by the Operative Documents or is in violation of the terms of the Operative Documents, (c) any claim against the Owner Participant or any Affiliate thereof with respect to Taxes (including federal income taxes imposed on the Owner Trustee as a result of its classification as an entity taxable as an association for federal income tax purposes) or Transaction Expenses against which the Lessee is not required to indemnify the Owner Participant or such Affiliate or (d) any claim against the Owner Participant or any Affiliate thereof arising out of the transfer by the Owner Participant of all or any portion of its interest in the Undivided Interest in the Equipment, the Trust Estate or the Operative Documents

"Owner Participant Transferee Parent Guaranty" means the Owner Participant Transferee Parent Guaranty in the form attached as Exhibit K to the Participation Agreement

"Owner Participant's Economics" means the Owner Participant's anticipated (a) nominal after-tax economic yield, (b) periodic and total aggregate after-tax cash flow and (c) Anticipated Book Earnings over the Term with respect to the Undivided Interest in any Unit (using the multiple investment sinking fund method of analysis), and based upon the same assumptions as used by such Owner Participant (including the Tax Assumptions as defined in the Tax Indemnity Agreement) as of the Delivery Date in determining the Interim Lease Payment, Base Rent, Stipulated Loss Values, Termination Value and Early Fixed Price Purchase Amount and in making the original computations upon which its evaluation of its investment in the Undivided Interest in any Unit was based through the EBO Date and through the end of the Base Term   The Owner Participant's after-tax economic yield shall mean its return on its investment in the Undivided Interest in any Unit and shall be computed on the assumption that none of the portion of Lessor's Cost paid by the Owner Participant consisted of borrowed funds

"Owner Participant Transferee Assignment Agreement" means the Owner Participant Transferee Assignment Agreement in the form attached as Exhibit L to the Participation Agreement

"Owner Participant's Tax Counsel" means Winston & Strawn, or other tax counsel selected by the Owner Participant and reasonably acceptable to the Lessee

"Owner Trust" means the trust created pursuant to the Trust Agreement

"Owner Trustee" means State Street Bank and Trust Company of Connecticut, National Association, a national banking association, not in its individual capacity but solely as trustee under the Trust Agreement unless otherwise expressly stated, and each other Person which may from time to time be acting as Owner Trustee in accordance with the provisions of the Operative Documents

"Owner Trustee Request" means a written request signed in the name of the Owner Trustee by an Authorized Officer thereof

"Participant" means, individually, the Owner Participant and each Note Purchaser

"Participation Agreement" means the Participation Agreement (GM 2001A-8), dated as of December 18, 2001 among the Lessee, Indenture Trustee, Owner Participant, the Note Purchasers and Owner Trustee as such Participation Agreement may be amended or supplemented from time to time pursuant to the applicable provisions thereof

"Parts" means all appliances, parts, instruments, appurtenances, accessories, furnishings, spare parts, subsystems and other equipment or property of whatever nature which may from time to time be furnished with, incorporated into or installed on, the Equipment or part thereof from time to time (excluding severable Modifications) "Parts" shall not include dies or proprietary tooling

"Percentages" has the meaning given to such term in Recital One of the Tax Indemnity Agreement

"Permitted Investment" means (i) direct obligations of the United States of America and agencies thereof for which the full faith and credit of the United States of America is pledged, (ii) obligations fully guaranteed by the United States of America, (iii) certificates of deposit issued by, or bankers' acceptances of, or time deposits (including overnight deposits) with, any bank, trust company or national banking association incorporated or doing business under the laws of the United States of America or one of the States thereof having combined capital and surplus and retained earnings of at least $500,000,000 (including any Indenture Trustee or Owner Trustee if such conditions are met), having general obligations rated at least Aa by Moody's Investors Service or AA by Standard & Poor's Ratings Services (but excluding any investment as to which there is a public announcement by the rating agency providing a rating thereon that such rating is under consideration for a possible downgrade below Aa3 or AA-, as the case may be), (iv) commercial paper of companies, banks, trust companies or national banking associations incorporated or doing business under the laws of the United States of America or one of the States thereof and in each case having a rating of A-1/P-1 or better assigned to such commercial paper by Standard & Poor's Ratings Services or Moody's Investors Service (or, if neither such organization shall rate such commercial paper at any time, by any nationally recognized rating organization in the United States of America), (v) shares of U S Treasury money market funds which by their charters are permitted to invest

solely in obligations of the type described in clauses (i) and (ii) that have a rating of A-1/P-1 or better as assigned by Standard & Poor's Ratings Services or Moody's Investors Service and (vi) repurchase agreements with any financial institution described in clause (iii) above having a combined capital and surplus of at least $750,000,000 fully collateralized by obligations of the type described in clauses (i) through (iv) above, provided that if all of the above investments are unavailable, the entire amounts to be invested may be used to purchase Federal Funds from an entity described in clause (iii) above, and provided further that no investment shall be eligible as a "Permitted Investment" unless the final maturity or date of return of such investment is 91 days or less from the date of purchase thereof

"Permitted Lien" means any Lien referred to in clauses (i) through (vii) of Section 6 of the Lease

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Authority or any other entity

"Postponement Rate" means the Prime Rate plus one percent

"Prepayment Date" means the date on which the Equipment Notes are to be prepaid (or purchased in lieu of prepayment, as applicable) pursuant to Section 6 1, Section 8 2 or Section 8 3(e) of the Indenture, which date, unless otherwise stated in the Indenture, shall be an Interest Payment Date

"Prepayment Price" means the price at which the Equipment Notes are to be prepaid (or purchased in lieu of prepayment, where applicable), determined as of the applicable Prepayment Date, pursuant to Section 6 1, Section 8 2 or Section 8 3(e) of the Indenture, as the case may be

"Prime Rate" means the rate of interest publicly announced by Citibank, N A , in New York City from time to time as its "prime rate" for Dollar loans

"Prospective Loss" means any event which upon the passage of time or giving of notice or both would result in an Event of Loss

"Reasonable Basis" for a position shall exist if tax counsel may properly advise reporting such position on a tax return in accordance with Section 6662 of the Code and Section 1 6662-3(b)(3) of the regulations thereunder

"Records" has the meaning given to such term in Section 3 of the Tax Indemnity Agreement.

"Refunding Date" has the meaning given to such term in Section 17(b) of the Participation Agreement

"Register" has the meaning given to such term in Section 2 4 of the Indenture

"Regulations" means the federal income tax regulations including regulations in proposed, temporary or final form

"Related Indemnitee Group" has the meaning given to such term in Section 8(b)(ii) of the Participation Agreement

"Relevant Percentage of Lessor's Cost" means, for the purpose of determining the Base Rent, Termination Value or Stipulated Loss Value for the Undivided Interest in a Unit on a Lease Period Date, the percentage associated with such Lease Period Date on the Applicable Schedule

"Relocation Conditions," with respect to the relocation of any Unit as provided in Section 7(a) of the Lease, shall be met if (a) the Lessee has provided written notice of such relocation to the Lessor not less than ten Business Days prior to such relocation, (b) the Lessee has filed prior to such relocation such financing statements, executed by the Lessee, sublessee or assignee, where applicable, as are necessary to continue the Lessor's and Indenture Trustee's security interests in the Undivided Interest in such Unit of equivalent validity, enforceability and priority, subject to Permitted Liens, and has furnished to the Owner Trustee, the Indenture Trustee and the Noteholders an Opinion of Counsel to the effect that such security interests will be continued and the lien of the Indenture shall remain unimpaired, (c) the Lessor's and the Indenture Trustee's reasonable rights of access to such real property for the purpose of exercising remedies under the Lease with respect to the Undivided Interest in such Unit are unimpaired, (d) the Lessee shall have provided to the Lessor an Officer's Certificate of the Lessee certifying that the Lessee shall have complied with all of these Relocation Conditions and the other conditions of Section 7(a) of the Lease in connection with such relocation of such Unit and that the financing statements referred to in clause (b) hereof have been duly filed and recorded, specifying the requisite recording information, (e) no Material Default or Lease Event of Default shall have occurred and be continuing at the time of such notice and relocation, (f) the Lessee shall have provided to the Lessor an Officer's Certificate specifying the number of production facilities neither owned nor operated by GM or an Affiliate of GM at which the Equipment subject to the Lease is then located, and (g) if the Indenture has not been discharged, each notice delivered to the Lessor under the Lease shall be delivered to the Indenture Trustee and the Noteholders

"Renewal Lease Period" means, for the Undivided Interest in any Unit during a Renewal Term, each of the consecutive semi-annual periods commencing on the first day of such Renewal Term and ending on the January 2 or July 2 next succeeding such first day and each of the renewing periods ending on or before the last day of such Renewal Term

"Renewal Lease Period Date" means each January 2 and July 2 during a Renewal Term, including the last day of the Renewal Term

"Renewal Term," with respect to the Undivided Interest in each Unit, means any Fixed Rate Renewal Term or Fair Market Value Renewal Term

"Rent" means the Base Rent and Supplemental Rent, collectively

"Replacement Notes" has the meaning given to such term in Section 17(a)(iii) of the Participation Agreement

"Requisition of Use" means any circumstance or event in consequence of which the use of any Unit or the Undivided Interest therein shall be requisitioned or taken by any Governmental Authority or other Person under power of eminent domain or otherwise which extends beyond a period exceeding the lesser of 180 days or the period ending 30 days prior to the last day of the Term

"Responsible Officer" means, with respect to the Owner Trustee or the Indenture Trustee, any officer in its corporate trust department, as the case may be, or any officer of the Owner Trustee, the Indenture Trustee, as the case may be, customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of his knowledge of and familiarity with a particular subject, and with respect to a Tax Indemnitee, the Owner Participant or the Lessee, or any person who is permitted to execute an Officer's Certificate with respect to such party

"Scheduled Liens" has the meaning given to such term in Section 4(e) of and Schedule 5 to the Participation Agreement

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended

"Site" means the production facility at which a Unit is located on the Delivery Date

"Specified Representation or Covenant" has the meaning given to such term in Section 17 of the Tax Indemnity Agreement

"Specified Required or Permitted Act" has the meaning given to such term in Section 17 of the Tax Indemnity Agreement

"State Deductions" has the meaning given to such term in Section 2(g) of the Tax Indemnity Agreement

"Stipulated Loss Value," in respect of the Undivided Interest in a Unit as of any Stipulated Loss Value Date, means the product of (a) the percentage set forth on Schedule III to the

Lease Supplement opposite such date under the caption "Stipulated Loss Value" as the Relevant Percentage of Lessor's Cost and (b) the Fair Market Sales Value for the Undivided Interest in such Unit determined as of the Delivery Date, as set forth in the Appraisal and Applicable Schedule, provided that Stipulated Loss Value as of any date shall be determined after giving effect to any adjustment thereof contemplated by Section 3(e) of the Lease and Section 16 of the Participation Agreement for which the event specified therein permitting such adjustment has occurred During any Renewal Term, "Stipulated Loss Value" shall have the meaning given to such term in Sections 18(a) or 18(b) of the Lease, as applicable

"Stipulated Loss Value Date" means each date as of which an obligation arises to pay Stipulated Loss Value

"Substitution Date" has the meaning given to such term in Section 10(a) of the Lease

"Substitute Unit" has the meaning given such term in Section 10(a)(ii) of the Lease

"Supplemental Rent" means all amounts, liabilities and obligations (other than Base Rent) which the Lessee assumes or agrees to pay to the Lessor or the Owner Participant or any other Person under the Lease, under the Participation Agreement or under the Tax Indemnity Agreement or under any of the other Operative Documents including, without limitation, payments of Stipulated Loss Value, Termination Value and amounts calculated with reference thereto and such other amounts referred to in Section 3(e) of the Lease and Section 10(m) of the Participation Agreement

"Tax" or "Taxes" mean any and all fees (including, without limitation, documentation, recording, license and registration fees), taxes (including, without limitation, net income, franchise, value added, ad valorem, gross income, gross receipts, sales, use, property (personal and real, tangible and intangible), stamp taxes, levies, imposts, duties, charges, assessments or withholdings of any nature whatsoever, together with any and all penalties, fines, additions to tax and interest imposed by any federal, state, local or foreign government or political subdivision thereof, provided, however, that Taxes shall not include any excise taxes, charges or penalties under Section 4975 of the Code or Section 502(i) or (l) of ERISA or any Regulations promulgated thereunder (collectively, "ERISA Taxes"), except to the extent such ERISA Taxes are indemnified pursuant to Section 8(b)(iii)(D) of the Participation Agreement

"Tax Advance" has the meaning given to such term in Section 8(c)(vii)(C)(5) of the Participation Agreement

"Tax Affiliate" shall mean any Person related to another Person within the meaning of Section 267 of the Code

"Tax Assumptions" means the assumptions set forth in <u>Section 2</u> of the Tax Indemnity Agreement

"Tax Benefit" has the meaning given to such term in <u>Section 8(c)(v)</u> of the Participation Agreement

"Tax Claim" has the meaning given to such term in <u>Section 8(c)(vii)</u> of the Participation Agreement

"Tax Indemnitee" means the Owner Trustee (both in its individual capacity and as Owner Trustee), the Owner Participant, each Noteholder, the Indenture Trustee (both in its individual capacity and as Indenture Trustee), and any Affiliate, successor or permitted assign of any of the foregoing

"Tax Indemnity Agreement" means the Tax Indemnity Agreement (GM 2001A-8) dated as of the Delivery Date between the Lessee and the Owner Participant, as the same may be amended, modified or supplemented from time to time in accordance with the provisions thereof.

"Term" means, with respect to the Undivided Interest in any Unit, the Interim Term, the Base Term and, if actually entered into, any Renewal Term together with any extension thereof

"Termination Date," in respect of the Undivided Interest in any Obsolete Unit, shall have the meaning it is given in <u>Section 9(b)</u> of the Lease

"Termination Value," in respect of the Undivided Interest in a Unit as of any Termination Date or any Lease Period Date specified in <u>Section 18(c)(iii)</u> of the Lease, means the product of (a) the percentage set forth on <u>Schedule IV</u> to the Lease Supplement opposite such date under the caption "Termination Value" as the Relevant Percentage of Lessor's Cost and (b) the Fair Market Sales Value for the Undivided Interest in such Unit determined as of the Delivery Date, as set forth in the Appraisal and the Applicable Schedule, <u>provided</u> that the Termination Value as of any date shall be determined after giving effect to any adjustment thereof contemplated by <u>Section 3(e)</u> of the Lease and <u>Section 16</u> of the Participation Agreement for which the event specified therein permitting such adjustment has occurred. During any Renewal Term, "Termination Value" shall have the meaning given to such term in <u>Sections 18(a)</u> and <u>(b)</u> of the Lease, as applicable

"Transaction Costs" has the meaning given to such term in <u>Section 22</u> of the Participation Agreement

"Transaction Expense" means "Transaction Costs "

"Transferee" has the meaning given to such term in Section 18(b) of the Participation Agreement

"Trust Agreement" means the Trust Agreement (GM 2001A-8), dated as of the Delivery Date between the Owner Participant and State Street Bank and Trust Company of Connecticut, National Association, in its individual capacity, as originally executed or as modified, amended or supplemented pursuant to the applicable provisions thereof and substantially in the form attached as Exhibit A to the Participation Agreement

"Trust Estate" means all estate, right, title and interest of the Owner Trustee in and to the Undivided Interest in the Equipment, the Lease, any Lease Supplement and the Bill of Sale including, without limitation, all amounts of Base Rent and Supplemental Rent, insurance proceeds and requisition, indemnity or other payments of any kind  Notwithstanding the foregoing, "Trust Estate" shall not include any Excepted Property or Excepted Rights

"Trust Indenture Act" means the Trust Indenture Act of 1939, as amended and as the same may be further amended, or any comparable successor law

"Trust Office" means the principal corporate trust office of the Owner Trustee at the address specified in Schedule 8 to the Participation Agreement or the principal corporate trust office of any successor Owner Trustee

"Trustee Liens" means any Lien, true lease or sublease of or disposition of title with respect to the Undivided Interest in the Unit or Part thereof arising as a result of (a) any claim against the Indenture Trustee, in its individual or trust capacity, or any Affiliate thereof, respectively, not resulting from the transactions contemplated by the Operative Documents, (b) any grossly negligent act or omission of the Indenture Trustee, in its individual or trust capacity, or any Affiliate thereof, respectively, which is in violation of any of the terms of the Operative Documents (or failure to use ordinary care in the handling of funds), (c) any claim against Indenture Trustee, in its individual or trust capacity, or any Affiliate thereof, respectively, with respect to Taxes or Transaction Expenses against which the Lessee is not required to indemnify the Indenture Trustee, in its individual or trust capacity, pursuant to Section 8(b) or 8(c) of the Participation Agreement or (d) any claim against the Indenture Trustee, arising out of any transfer by the Indenture Trustee of all or any portion of its interest in the Undivided Interest in the Equipment, the Trust Estate or the Operative Documents other than (A) the transfer of title to the Undivided Interest in, or possession of, the Equipment by the Indenture Trustee, pursuant to and in accordance with the Lease, pursuant to and in accordance with the Indenture or pursuant to the exercise of the remedies set forth in Section 16 of the Lease or (B) otherwise permitted in by the Operative Documents

"Undivided Interest" means a 50% undivided interest

"Unit" means the Engine Line

"Unsecured Notes" has the meaning given to such term in Section 7 2 of the Indenture

"U S  Government Obligations" means securities that are direct obligations of the United States of America for the payment of which its full faith and credit is pledged which are not callable or redeemable, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such U S  Government Obligation or a specific payment of interest on or principal of any such U S  Government Obligation held by such custodian for the account of the holder of a depository receipt so long as such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U S  Government Obligation or the specific payment of interest on or principal of the U S  Government Obligation evidenced by such depository receipt

"Verification Firm" has the meaning given to such term in Section 16(b) of the Participation Agreement

"Withholding Notice" has the meaning given to such term in Section 8(c)(ii) of the Participation Agreement

GM2001A-8

## EXHIBIT K
## TO PARTICIPATION AGREEMENT

### FORM OF OWNER PARTICIPANT TRANSFER GUARANTY

### (GM 2001A-8)

This OWNER PARTICIPANT TRANSFER GUARANTY (GM 2001A-8) ("Guaranty") is entered into as of _____, 20__, by [NAME OF PARENT GUARANTOR], a corporation organized under the laws of _____ (the "Guarantor"), for the benefit of the Lessee, the Owner Participant Parent, the Owner Trustee, the Indenture Trustee and the Noteholders, all as more fully described in the second recital below (together with their respective successors and assigns, the "Beneficiaries")

WHEREAS, _____ ___ _____, a _____ corporation ("Owner Participant") has heretofore entered into a Participation Agreement (GM 2001A-8), dated as of December 18, 2001, (as at any time amended, the "Participation Agreement"), with General Motors Corporation, _____ __, as Owner Participant Parent, State Street Bank and Trust Company of Connecticut, a national banking corporation, not in its individual capacity, except as expressly stated in the Participation Agreement, but solely as Owner Trustee and Wells Fargo Bank Northwest, National Association, a national banking association, not in its individual capacity, except as expressly stated in the Participation Agreement, but solely in its capacity as Indenture Trustee,

WHEREAS, the Participation Agreement contemplates the transfer of the Owner Participant's interest in and to the Trust Estate in whole or in part on the terms and conditions therein provided,

WHEREAS, Owner Participant and [_____ ] (together with its successors and assigns, the "Assignee") are parties to that certain Owner Participant Assignment Agreement dated _____ 20__ (the "Assignment") and whereby Owner Participant has assigned [%] of its right, title and interest to the Assigned Beneficial Interest (the "Assigned Beneficial Interest"),

WHEREAS it is a condition of the Participation Agreement that the Guarantor enter into this Guaranty concurrently with the execution of the Assignment,

NOW, THEREFORE, for value received, the Guarantor hereby agrees with and for the benefit of each of the Beneficiaries as follows

# ARTICLE I

## Defined Terms

SECTION 1 01    Definitions   For purposes of this Guaranty, capitalized terms used but not defined herein shall have the meanings assigned to them in Appendix A (such definitions to be equally applicable to both the singular and plural forms of the terms defined) to the Participation Agreement  Any term defined by reference to an agreement, instrument or other document shall have the meaning so assigned to it whether or not such document is in effect

# ARTICLE II

## Guaranty

SECTION 2 01    Guaranty of Obligations under Operative Documents   The Guarantor irrevocably and unconditionally guarantees to each of the Beneficiaries the due (whether at the stated maturity, by acceleration or otherwise), complete and punctual performance and observance of all payment obligations of Assignee with respect to the Assigned Beneficial Interest under the Operative Documents to which it is or becomes a party (the "OP Operative Documents") and the faithful and timely performance of, and compliance with, all other covenants and agreements of Assignee with respect to the Assigned Beneficial Interest under the OP Operative Documents, strictly in accordance with the terms thereof (all such payment obligations and other covenants and agreements being referred to herein as the "Obligations")  In case Assignee shall fail to perform or observe any Obligation, the Guarantor will forthwith perform and observe such Obligation or cause the same forthwith to be performed or observed, and, in case Assignee shall fail to pay or perform duly, completely and punctually any Obligation when and as the same shall be due (whether at the stated maturity, by acceleration or otherwise) and payable, or required to be performed, as the case may be, in accordance with the terms of the requisite OP Operative Document, the Guarantor will immediately pay or perform, as the case may be, the same to the Beneficiary entitled thereto pursuant to such OP Operative Document

SECTION 2 02    Unconditional Obligations   This Guaranty is a primary obligation of the Guarantor and is an unconditional, absolute, present and continuing obligation and guaranty of payment and performance (and not merely of collection) and is in no way conditioned or contingent upon (a) the making of demand, the institution of suit or the taking of any other action to enforce performance or observance of the Obligations, (b) the validity, regularity or enforceability of any OP Operative Document or any of the Obligations or any collateral security, other guaranty, if any, or credit support therefor or right of offset with respect thereto at any time or from time to time held by any Beneficiary, (c) any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to or be asserted by Assignee or the Guarantor against any Beneficiary, (d) any attempt to collect from Assignee or any other entity or to perfect or enforce any security or upon any other condition or contingency or (e) upon any other action, occurrence or circumstance whatsoever

SECTION 2 03    The Guarantor's Obligations Not Affected  The duties and obligations of the Guarantor under this Guaranty shall remain in full force and effect, without the necessity of any reservation of rights against the Guarantor or further assent by the Guarantor, and without regard to, and shall not be impaired or affected by

(a)    any extension, indulgence or renewal in respect of the payment of any amount payable, or the performance of any Obligation,

(b)    any termination of, or amendment or modification of, or addition or supplement to, or deletion from any of the terms of, any Operative Document, or any other agreement (including, without limitation, any collateral security, other guaranty, if any, or other credit support or right of offset with respect thereto) which may be made,

(c)    any compromise, waiver, release or consent or other action or inaction in respect of any of the terms of any Operative Document, or any other agreement (including, without limitation, any collateral security, right of offset, other guaranty, if any, or other credit support or right of offset with respect thereto) which may be made,

(d)    any exercise or nonexercise by any of the Beneficiaries of any right, power, privilege or remedy under or in respect of this Guaranty or any Operative Document, or any waiver of any such right, power, privilege or remedy or of any default in respect of this Guaranty or any Operative Document or any guaranty or other agreement executed pursuant hereto or thereto, or any receipt of any security or any release of any security,

(e)    any bankruptcy, insolvency, reorganization, arrangement, adjustment, composition, dissolution, liquidation, or the like, of Assignee, the Guarantor or any other Person,

(f)    any limitation of the remedies of any Beneficiary under any of the Operative Documents or any limitation of the liability of Assignee under the terms of any Operative Document, which may now or hereafter be imposed by any statute, regulation or Applicable Law,

(g)    any merger or consolidation of Assignee or the Guarantor into or with any other Person, or any sale, lease or transfer of any or all of the assets of Assignee or the Guarantor to any other Person,

(h)    any indebtedness of Assignee to any Person, including the Guarantor,

(i)    any claim, set-off, deduction or defense the Guarantor may have against any of the Beneficiaries, whether hereunder or under any Operative Document or independent of or unrelated to the transactions contemplated by the Operative Documents,

(j)    absence of any notice to, or knowledge by, the Guarantor of the existence or

occurrence of any of the matters or events set forth in the foregoing subdivisions (a) through (i), or

(k)    any other circumstance whatsoever, except as provided in Article VIII hereof

SECTION 2 04    Waiver by the Guarantor  The Guarantor unconditionally waives, to the fullest extent permitted by law, any and all (a) notices of the creation, renewal, extension or accrual of any Obligation or any of the matters referred to in Section 2 03 hereof or any notice of or proof of reliance by any of the Beneficiaries upon this Guaranty or acceptance of this Guaranty (the Obligations, and any of them, shall conclusively be deemed to have been created, contracted, incurred or renewed, extended, amended or waived in reliance upon this Guaranty and all dealings between Assignee or the Guarantor and each Beneficiary shall be conclusively presumed to have been had or consummated in reliance upon this Guaranty), (b) notices which may be required by statute, rule of law or otherwise, now or hereafter in effect, to preserve intact any rights of any of the Beneficiaries against the Guarantor, including, without limitation, any demand, presentment and protest, proof of notice of non-payment under any Operative Document and notice of default or any failure on the part of Assignee to perform and comply with any Obligation, (c) rights to the enforcement, assertion or exercise by any of the Beneficiaries of any right, power, privilege or remedy conferred herein or in any Operative Document or otherwise, (d) requirements of promptness or diligence on the part of any of the Beneficiaries, (e) requirements on the part of any of the Beneficiaries to mitigate the damages resulting from any default hereunder or under any Operative Document, (f) notices of the sale, transfer or other disposition of any right, title to or interest in any Operative Document or (g) other circumstances whatsoever which might otherwise constitute a legal or equitable discharge, release or defense of a guarantor or surety, or which might otherwise limit recourse against the Guarantor

SECTION 2 05    Payments  The Guarantor hereby guarantees that all payments hereunder shall be made in Dollars and shall be paid without regard to any set-off, counterclaim, deduction or defense that the Guarantor may have or assert

SECTION 2 06    No Subrogation, Reinstatement  The Guarantor shall be subrogated to the rights of any Beneficiary in respect of any payment made by the Guarantor hereunder for the benefit of, or any set-off or application or appropriation of funds by the Guarantor by, such Beneficiary, provided that the Guarantor shall not be entitled to take any action, or exercise any right, with respect to any such right of subrogation or otherwise exercise any of the rights of any Beneficiary against Assignee or any collateral security or guaranty or other credit support or right of offset held by any Beneficiary for the payment of the Obligations, nor shall the Guarantor seek or be entitled to seek any reimbursement from Assignee in respect of payments made by the Guarantor hereunder, until all amounts and all performance owing to the Beneficiaries by Assignee on account of the Obligations are paid and performed in full  This Guaranty shall continue to be effective, or be reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Obligations is rescinded or must otherwise be restored or returned by any Beneficiary upon the bankruptcy, insolvency, reorganization, arrangement, adjustment, composition, dissolution, liquidation, or the like, of Assignee or the Guarantor, or as a result of, the appointment of a

custodian, receiver, trustee or other officer with similar powers with respect to Assignee or the Guarantor or any substantial part of such Person's respective property, or otherwise, all as though such payment had not been made notwithstanding any termination of this Guaranty or any Operative Document

## ARTICLE III

### Representations and Warranties of the Guarantor

SECTION 3 01      The Guarantor hereby represents and warrants to each of the Beneficiaries that

(a)      it is a corporation duly organized and validly existing in good standing under the laws of the State of _____ and has the corporate power and authority to carry on its present business and operations, to own or lease its properties and to enter into and perform its obligations under this Guaranty and this Guaranty has been duly authorized by all necessary corporate action, has been duly executed and delivered and constitutes a legal, valid and binding obligation enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights of creditors generally and by general principles of equity,

(b)      the execution, delivery and performance by the Guarantor of this Guaranty and compliance by it with all of the provisions hereof do not contravene any Applicable Law or any order of any court or governmental authority or agency applicable to or binding on it or contravene the provisions of, or constitute a default under, its certificate of incorporation or by-laws or any indenture, mortgage, loan agreement, lease or other material agreement or instrument to which it is a party or by which it or any of its property may be bound or affected,

(c)      no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery or performance by it of this Guaranty,

(d)      there is no action, suit or proceeding pending or threatened against it that questions the validity or enforceability of this Guaranty or which would have a material adverse effect on its financial condition or its ability to perform its obligations under this Guaranty, and

(e)      [Assignee is a direct wholly-owned subsidiary of the Guarantor]; and

(f)      the representations and warranties of Assignee set forth in the Participation Agreement were true and correct in all material respects when made

## ARTICLE IV

### No Waiver, Cumulative Remedies

SECTION 4 01    The failure or delay of any Beneficiary in exercising any right or remedy granted it hereunder shall not operate as a waiver of such right or remedy or be construed to be a waiver of any breach of any of the terms and conditions hereof or to be an acquiescence therein  Each and every right, power and remedy herein specifically given to each Beneficiary shall be cumulative and shall be in addition to every other right, power and remedy herein specifically given or now or hereafter existing at law, in equity or by statute and the exercise or the beginning of the exercise of any right, power or remedy shall not be construed as a waiver of the right to exercise at the same time or thereafter any other right, power or remedy  A waiver by a Beneficiary of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy that such Beneficiary or any other Beneficiary would otherwise have

## ARTICLE V

### Amendments and Waivers, Successors and Assigns

SECTION 5 01    All notices, demands, declarations, consents, directions, approvals, instructions, requests and other communications required or permitted by the terms hereof shall be in writing and shall be given in accordance with Section 17 of the Participation Agreement

## ARTICLE VI

### Amendments and Waivers, Successors and Assigns

SECTION 6 01    Neither this Guaranty nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing signed by the Guarantor and each Beneficiary  This Guaranty shall be binding upon the Guarantor and its successors and assigns and shall inure to the benefit of the Beneficiaries and their respective successors and assigns

## ARTICLE VII

### Severability of this Guaranty

SECTION 7 01    Any provision of this Guaranty which is determined by competent authority to be prohibited and unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction

## ARTICLE VIII

### Termination

SECTION 8 01    Subject to the provisions of Section 2 06 hereof, this Guaranty and the Guarantor's duties and obligations hereunder shall remain in full force and effect and be binding in accordance with its terms, until the date on which all Obligations and the obligations of the Guarantor hereunder shall have been satisfied by payment and performance in full

## ARTICLE IX

### Miscellaneous

SECTION 9 01    This Guaranty constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral between or among the Guarantor, Assignee and each Beneficiary with respect to the subject matter hereof  The headings of the various Articles and Sections of this Guaranty are for convenience of reference only and shall not modify, define, expand or limit any of the terms or provisions hereof  The obligations of the Guarantor hereunder may not be assigned without the written consent of each Beneficiary  THIS GUARANTY SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO THE CHOICE OF LAW DOCTRINE OF SUCH STATE

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be duly executed by its duly authorized representative as of the day and year first above written

[GUARANTOR]

By _____

      Name

      Title

EXHIBIT L
## TO PARTICIPATION AGREEMENT

## FORM OF OWNER PARTICIPANT ASSIGNMENT

### (GM 2001A-8)


This OWNER PARTICIPANT ASSIGNMENT AGREEMENT (GM 2001A-8) is entered into as of _____, 20__, by and between _____ ___ _, a corporation organized and existing pursuant to the laws of the State of _____, as assignor (together with its successors and assigns, the "Transferor") and _____, a corporation organized and existing pursuant to the law of the State of _____ _ _ (together with its successors and assigns, the "Assignee")

WHEREAS, pursuant to that certain Participation Agreement (GM 2001A-8) among the Transferor, General Motors Corporation, as Lessee, State Street Bank & Trust Company of Connecticut, a national banking association, not in its individual capacity, except as expressly stated in the Participation Agreement, but solely as Owner Trustee, Wells Fargo Bank Northwest, National Association, not in is individual capacity, except as expressly stated in the Participation Agreement, but solely in its capacity as Indenture Trustee and the Note Purchasers party thereto, the said parties entered into a leveraged lease transaction with respect to the Undivided Interest in the Equipment,

WHEREAS, the Owner Participant has agreed to assign [__%] of its right, title and interest in and to the Undivided Interest in the Equipment through a transfer of [__%] of its right, title and interest in and to the Trust Estate (the "Assigned Beneficial Interest") to the Assignee and the Assignee has agreed to accept such Assigned Beneficial Interest,

[WHEREAS, Assignee's obligations under the Operative Documents with respect to the Assigned Beneficial Interest shall be guaranteed by _____ _ _ __, a _____ corporation ("Assignee Parent")]

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein and for other good and valuable consideration, the parties hereto agree as follows

1    <u>Definitions</u>  For purposes of this Assignment, capitalized terms used but not defined herein shall have the meanings assigned to them in <u>Appendix A</u> (such definitions to be equally applicable to both the singular and plural forms of the terms defined) to the Participation Agreement  Any term defined by reference to an agreement, instrument or other document shall have the meaning so assigned to it whether or not such document is in effect.

2       <u>Assignment</u>  The Transferor has assigned, transferred and set over and does hereby absolutely assign, transfer, and set over unto the Assignee, all of the Transferor's right, title and interest in and to the Assigned Beneficial Interest  THE TRANSFEROR MAKES NO WARRANTIES OR REPRESENTATIONS OF ANY KIND, EXPRESS OR IMPLIED, AS TO THE TITLE, MERCHANTABILITY, COMPLIANCE WITH SPECIFICATIONS, CONDITION, DESIGN, OPERATION, FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT, ABSENCE OF LATENT DEFECTS OR FITNESS FOR A PARTICULAR PURPOSE OR FOR USE OF THE UNDIVIDED INTEREST IN THE EQUIPMENT, OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE UNDIVIDED INTEREST IN THE EQUIPMENT (OR ANY PART THEREOF), EXCEPT THAT TRANSFEROR CONFIRMS THAT THE OPERATIVE DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED THEREBY DO NOT IN ANY WAY DIMINISH OR OTHERWISE ADVERSELY AFFECT ANY RIGHT THAT ASSIGNEE, AS SUCCESSOR TO THE INTERESTS OF TRANSFEROR, MAY HAVE WITH RESPECT TO THE UNDIVIDED INTEREST IN THE EQUIPMENT AGAINST THE MANUFACTURER OR ANY OTHER SUPPLIER OR ANY SUBCONTRACTOR OR SUPPLIER

3       <u>Assumption</u>  Assignee hereby accepts the Assigned Beneficial Interest from Transferor and agrees that, from and after the execution and delivery hereof, it shall be bound by all the terms of, and shall have assumed and undertaken, to perform all of the obligations of the Transferor with respect to the Assigned Beneficial Interest (on a several basis) under each of the Operative Documents to which the Transferor is a party  Assignee expressly assumes hereunder all and any liability and obligations of Transferor with respect to the Assigned Beneficial Interest (on a several basis) accruing or arising under any of the Operative Documents prior to, on and after the execution and delivery of this Agreement  Upon the execution and delivery of this Agreement, Assignee shall be deemed an "Owner Participant" with respect to the Assigned Beneficial Interest for all purposes of the Operative Documents and shall be deemed to have made all payments previously made by Transferor with respect to the Assigned Beneficial Interest, and each reference in any Operative Agreement to or encompassing the "Owner Participant" with respect to the Assigned Beneficial Interest shall thereafter be deemed to mean Assignee.

4       <u>Assignee's Representations, Warranties and Covenants</u>   The Assignee represents, warrants and covenants that

(a)     It is a financial institution, corporation, leasing company or other institutional investor the net worth of which (calculated in accordance with GAAP) is at least $75,000,000 (or the obligations of which are guaranteed by an institutional investor the net worth of which (calculated in accordance with GAAP) is at least $75,000,000,

(b)     Assignee is a corporation duly organized, validly existing and in good standing under the laws of the State of _____ and has the corporate power and authority to execute and deliver and to perform its obligations hereunder with respect to the Assigned Beneficial Interest and under each of the Operative Documents to which it is to be a party, and such performance under each of such agreements has been duly authorized and will constitute a legal,

valid and binding obligation of Assignee enforceable in accordance with its terms subject, as to enforcement, to bankruptcy, insolvency, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and to general equity principles,

(c)    Neither the execution and delivery by Assignee of any Operative Document to which it is to be party will, to its knowledge, contravene any federal or state law, governmental rule or regulation, or any judgment or order applicable to or binding on it, or contravene, result in any breach of or constitute any default under, its Articles of Incorporation or By-laws or any agreement or instrument to which it is a party or by which any of its properties may be bound,

(d)    Neither the execution and delivery by Assignee of any Operative Document to which it is to be a party requires the consent or approval of, the giving of notice to, the registration with, the recording or filing of any document with, or the taking of any other action in respect of, any federal or other governmental authority or agency,

(e)    There are no proceedings pending, or to Assignee's best knowledge threatened, and to its knowledge there is no existing basis for any such proceedings, against or affecting Assignee in any court or before any governmental authority or arbitration board or tribunal that, if adversely determined, individually or in the aggregate would materially and adversely affect any of the Trust Estate or would question the right, power and authority of Assignee to perform its obligations under the Operative Documents to which it is to be a party,

(f)    Assignee is acquiring the Assigned Beneficial Interest for its own account for investment and not with a view to, or for sale in connection with, any distribution, provided, however, that the disposition of its property shall at all times be and remain within its control,

(g)    No part of the Assigned Beneficial Interest is being acquired through the investment of the assets of any Plan within the meaning of ERISA, and

(h)    Neither Assignee nor any Associated Person thereof is engaged in the automobile manufacturing business, the automotive parts manufacturing business, the automobile distribution business or the automotive parts distribution business.

(i)    Assignee has delivered the documents required by Section 5(b) of the Participation Agreement

5    Governing Law  This Assignment shall in all respect be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York

6      Counterparts   This Assignment may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument

7      Notices   All notices and other communications provided for hereunder shall be in writing (including telex or telegraphic communication) and mailed, telexed, telegraphed or delivered to each party at the addresses for notices set forth in the Participation Agreement

8      Successors and Assigns   This Assignment shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns

*      *      *      *

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed as of the date first written above

By    _____
      Name
      Title


[ASSIGNEE]


By    _____
      Name
      Title

GM2001A-8

## EXHIBIT O

Ray, Quinney & Nebeker

Winston & Strawn

Willkie Farr & Gallagher

Shipman & Goodwin

Kirkland & Ellis (local counsel to Lessee in
New York)

GM2001-A8

## SCHEDULE 1
## TO PARTICIPATION AGREEMENT

"Engine 1 ine" means an engine line and the related equipment described below delivered pursuant to the Lease so long as title thereto or beneficial ownership thereof shall remain vested in Lessor (or its permitted successors or assigns) in accordance with the terms of the Lease (b) any and all Parts (s) so long as the same shall be incorporated or installed in such engine line (except Parts temporarily installed on an emergency basis as described in Section 8(a) of the I ease) or (ii) so long as title thereto or beneficial ownership thereof shall remain vested in Lessor (or its permitted successors or assigns) in accordance with the terms of Section 8 of the Lease after removal from such engine line (c) the Assigned Proprietary Rights and (d) any equipment substituted for or in replacement of such engine line and any Modification to such engine line so long as title thereto or beneficial ownership thereof shall remain vested in Lessor (or its permitted successors or assigns) in accordance with the terms of the Lease The term "Engine Line" does not include proprietary tooling Capitalized terms not defined herein have the meanings given to them in Appendix A to the Participation Agreement As of the Delivery Date the I ngine Line consists of without limitation the following

| Tag Number | Description |
|---|---|
| NAMM27897 | MARK ASM HOT TEST KBK BRIDGE SYSTI M |
| NAM7271 | 1 18 ENGINE ASM LINE |
| NAMM27895 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAMM26916TSD | L 18 VALVETRAIN IGNITION COLD TEST |
| NAMM27896 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAM7271INST | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM27851 | MARK ASM MANIFOLD MANIPULATOR |
| NAM7271F | 1 18 ENGINE I INF FOUNDATION |
| NAMM27856 | MARK ASSY UTILOR MESSAGE DISPLAY |
| NAM7271EI ECT | L 18 ENGINE ASM LINE(ELECTRICAI ) |
| NAMM27943 | MARK ASM ENGINE STAND |
| NAM7271INS1 | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM28025 | MARK ASM KBK BRIDGE SYSTEM |
| NAM7271FC | L 18 ENGINE LINE POA 5 7 |
| NAMM28027 | MARK ASM KDK BRIDGE SYSTEM |
| NAM7271J | 1 -18 ASM LINE LUBE EQUIP ETC |
| NAMM28028 | MARK ASM KDK BRIDGE SYSTEM |
| NAM7271PMC | L 18 ASM I INF P M & C SYSTEM |
| NAMM27838 | MARK ASM 54X54 LIFT TABLE |
| NAM7271P | L 18 ASM LINE I FAK TEST EQUIPMENT |
| NAMM27862 | MARK V ASM ERRORPROFING I IGHTING |
| NAM7271FA | L 18 ENGINE ASM POA 1 |
| NAMM27918 | MARK ASM ENGINF STAND |
| NAM7271A | L 18 ASM LINE IMPROVEMENTS |
| NAMM27861 | MARK V ASM LIGHTING TRANSFORMER |
| NAM7271SWARF | L 18 ENGINE ASM LINE CONTROI S |
| NAMM27898 | MARK ASY 1/2 TON MODEI 7750 AIR HOIST |
| NAMBG5728 | L 18 ASM LINE KBK TRUSS REINFORCEMENT |
| NAMM27899 | MARK ASY 1/2 TON MODEI 7750 AIR HOIST |
| NAM7271FB | L 18 ENGINE LINE POA4 |
| NAMM27900 | MARK ASY 1/2 TON MODEI 7750 AIR HOIST |
| NAM7271PFOR | L 18 ASM ELEVATED PLATFORM |
| NAMM27901 | MARK ASY 1/2 TON MODEI 7750 AIR HOIST |
| NAM7271KBK | L18 ASM LINE KBK BRIDGE COMPONENTS |
| NAMM27902 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7273 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27904 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7274 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27905 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7275 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27906 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7276 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27907 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271ANSYS | L 18 ASM LINE ANDON SYSTEM FOR BOARDS |
| NAMM27908 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMBG5728A | REINFORCE TRUSSES-L 18 ASM LINE |
| NAMM27909 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271N | L 18 ASM LINE WIREWAY |
| NAMM27903 | MARL ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271L | L 18 ASM LINE BUS PI UGS |
| NAM7271QCA | L-18 ASM LINE Q C & A SYSTEM |
| NAM7271I | L18 ASM LINE CPU UPGRADF NEMATRON COMPUTERS |
| NAMM26916TSI | L 18 TEST STANDS |
| NAM7271ANDON | L 18 ASM LINE ANDON EQUIPMENT |
| NAM7271PTASM | L 18 ASM LINE POWERTRAIN ASM SYSTEM |
| NAM7271ELFC3 | L-18 ASM LINE ELECTRICALS |
| NAM7271ILOAD | L 18 ASM LINE UPLOAD/DOWNLOAD SYSTEM |
| NAMM28286 | L18 ASM LINE 48X45 FI OW THRU X-OVER PIPES |
| NAMM28289 | 1 18 ASM I INE 54X48 FLOW THRU EXH MANIFOI DS |
| NAMM28278 | L18 ASM LINE 54X48 OIL PAN FLOW THRU |
| NAMM28285 | L18 ASM LINE 54X48 FLOW THRU FUH RAILS |

| | |
|---|---|
| NAMM28287 | L18 ASM LINE 48X45 FLOW THRU WATER PUMPS |
| NAMM28290 | L18 ASM LINE 54X48 FLOW THRU EXH MANIFOLDS |
| NAM7271PCTWR | L 18 ASM LINE PC TOWER |
| NAM7271C | L 18 ASSEMBLY LINE EXTRAS |
| NAM7271R | L 18 ASM LINE GUARD RAILS |
| NAMM28347 | J 18 OIL FILL (COOL ANT9FATFR) TEMP CONTROL |
| NAMM28288 | L18 ASM LINE 36X12/54X48 FLOW THRU FLYWHEELS |
| NAMM28279 | L 18 ASM LINE 36X32 FLOW THRU BALANCERS |
| NAMM28258 | L 18 ASM DATA COLLECTION SYSTEM |
| NAMM28112 | L 18 ASSY LINE SINK UNIT |
| NAMM28113 | L 18 ASSY LINE SINK UNIT |
| NAMM28114 | L 18 ASSY LINE SINK UNIT |
| NAMM28116 | L 18 ASSY LINE SINK UNIT |
| NAMM28115 | L 18 ASSY LINE SINK UNIT |
| NAMM28117 | L 18 ASSY LINE SINK UNIT |
| NAM7271ELEC2 | L 18 ENG ASM ELECTRICAL |
| NAMM28280 | L18 ASM LINE 48X40 FLOW THRU CYL HEADS |
| NAMM28277 | L18 ASM LINE 45X40 FLOW THRU CASES |
| NAMM28281 | L18 ASM LINE 48X40 FLOW THRU CYL HEADS |
| NAM7271O | L-18 ASM LINE WIREWAY-STATIONS |
| NAM7271H | L 18 ASSEMBLY LINE EXTRAS |
| NAMM28283 | L18 ASM LINE 54X48 FLOW THRU RKR COVERS |
| NAMM28284 | L18 ASM LINE 54X48 FLOW THRU RKR COVERS |
| NAM7271G | L -18 ASSEMBLY LINE EXTRAS |
| NAM7271K | L 18 ASM LINE SQUARE D POWER |
| NAM7271D | L 18 ASSEMBLY LINE EXTRAS |
| NAMM28234 | L 18 ASSY TEAM ROOM |
| NAMM28346 | L18 OIL FILL DYE INJECTION SYSTEM |
| NAM7271ELEC1 | L 18 ENG ASM ELECTRICAL |
| NAMM28023 | L 18 ACCESSORY DRIVE BRACKET MANIPULATOR |
| NAMM28018 | L-18 BALANCER—•—-— MANIPULATOR |
| NAMM28024 | L-18 BELL HOUSING MANIPULATOR |
| NAMM28017 | L-18 CRANK ASSY— MANIPULATOR |
| NAML18ENGRAC | L-18 ENGINE RACKS(970) GMJ22076 |
| NAMM28022 | L-18 FLYWHEEL -•-— MANIPULATOR |
| NAM7271FD | L 18 ENGINE LINE FOUNDATION |
| NAMM28016 | L-18 INLET MAN ASSY MANIPULATOR |
| NAMM28020 | L-18 L H HEAD- •— MANIPULATOR |
| NAMM26916TS2 | L 18 TEST STANDS |
| NAMM28019 | L-18 OIL PAN-•-— MANIPULATOR |
| NAM7271INS1B | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM28021 | L-18 R H HEAD- •— MANIPULATOR |
| NAM7271INS2 | L 18 ENGINE ASM LINE(INSTALL) |
| NAM7271M | L-18 ASM LINE ENG SVS WIRE WAY |
| NAMM28468 | OCE 9600 DIGITAL ENG PRINT SYSTEM |
| NAMM28323 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28324 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28325 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAM7271INS1A | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM28326 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAM7271Q | L 18 ASM LINE BALANCERS |
| NAM7271S | L 18 ASM LINE EMPTY PALLET STORAGE SYSTEM |
| NAM7271F | L -18 ASSEMBLY LINE EXTRAS |
| NAMM28234A | L -18 ASSY TEAM ROOM |
| NAMM28128 | MARK ASM/PIST AREA LIFT&TILT TABLE |
| NAMM28248 | L 18 ASSY TEAM ROOM |
| NAMM28129 | MARK ASM/PIST AREA LIFT&TILT TABLE |
| NAMM28246 | L -18 ASSY TEAM ROOM |
| NAMM28300 | L 18 ASM HOHL CART 22960 |
| NAMM28244 | L 18 ASSY TEAM ROOM |
| NAMM28302 | L 18 ASM HOHL CART 22960 |
| NAMM28249 | L 18 ASSY TEAM ROOM |
| NAMM28295 | L 18 ASM HOHL CART 22960 |
| NAMM28247 | L -18 ASSY TEAM ROOM |
| NAMM28296 | L 18 ASM HOHL CART 22960 |
| NAMM28245 | L 18 ASSY TEAM ROOM |
| NAMM28297 | L 18 ASM HOHL CART 22960 |
| NAMM28243 | L 18 ASSY TEAM ROOM |
| NAMM28298 | L 18 ASM HOHL CART 22960 |
| NAMM28242 | L -18 ASSY TEAM ROOM |
| NAMM28299 | L 18 ASM HOHL CART 22960 |

| NAMM28241 | L-18 ASSY TEAM ROOM |
|---|---|
| NAMM28301 | L 18 ASM HOHL CART 22960 |
| NAMM28234B | L-18 ASSY TEAM ROOM |
| NAMM28303 | L 18 ASM HOHL CART 22960 |
| NAMM28270 | L 18 ANDON BOARD |
| NAM7271B | L-18 ASSEMBLY LINE EXTRAS |
| NAMM28269 | L 18 ANDON BOARD |
| NAM7271PMCSW | L 18 ASM LINE P M & C SOFTWARE |
| NAMM28188A | L 18 NAPP ELECTRONIC PULL SYSTEM |
| NAMM28321 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28328 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28268F | L 18 HEAD LIFT TABLE FOUNDATION |
| NAMM28475 | L 18 CRANK OP70/80 9000CFM OIL MIST COLLECTOR |
| NAM7308 | PLI TOOL ROOM EZ TRAK CNC MACHINE |
| NAM7272A | L 18 OP120 CRANKSHAFT MACHINE |
| NAMM28381 | OKAMOTO ACC-6 18 DX3 SURFACE GRINDER |
| NAM7307 | PLI TOOL ROOM EZ TRAK CNC MACHINE |
| NAM7210A | PARLEC MODEL 260-TOOL SETTER |
| NAM7272INST | L 18 OP 120 CRANK MACHINE INSTALLATION |
| NAMM28276 | L 18 ANDON BOARD |
| NAMM28275 | L 18 ANDON BOARD |
| NAM5401FOUND | L 18 HEAD BROACH FOUNDATION |
| NAM7284A | L 18 CYL HEAD ASM MACHINE |
| NAMM28031B | MARC HEAD OP180 HELI FLOW MIST COLLECTOR |
| NAMM28033A | MARC HEAD OP180 HELI FLOW MIST COLLECTOR |
| NAMM28274 | L 18 ANDON BOARD |
| NAMM28273 | L 18 ANDON BOARD |
| NAM7101 | L 18 AUDIT CMM MACHINE |
| NAM7267INSTA | L 18 BLOCK INSTALLATION(TONA) |
| NAMM28272 | L 18 ANDON BOARD |
| NAMM28271 | L 18 ANDON BOARD |
| NAM118ENGRAC | L 18 ENGINE RACKS(970) GM32076 |
| NAM7271FD | L 18 ENGINE LINE FOUNDATION |
| NAMM26916TS2 | L 18 TEST STANDS |
| NAM7271INS1B | L 18 ENGINE ASM LINE(INSTALL) |
| NAM7271INS2 | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM28468 | OCF 9600 DIGITAL ENG PRINT SYSTEM |
| NAM7271INS1A | L 18 ENGINE ASM LINE(INSTALL) |
| NAM7271S | L 18 ASM LINE EMPTY PALLET STORAGE SYSTEM |
| NAMM28234A | L 18 ASSY TEAM ROOM |
| NAMM28248 | L 18 ASSY TEAM ROOM |
| NAMM28246 | L 18 ASSY TEAM ROOM |
| NAMM28244 | L 18 ASSY TEAM ROOM |
| NAMM28249 | L 18 ASSY TEAM ROOM |
| NAMM28247 | L 18 ASSY TEAM ROOM |
| NAMM28245 | L 18 ASSY TEAM ROOM |
| NAMM28243 | L 18 ASSY TEAM ROOM |
| NAMM28242 | L-18 ASSY TEAM ROOM |
| NAMM28241 | L 18 ASSY TEAM ROOM |
| NAMM28234B | L 18 ASSY TEAM ROOM |
| NAMM28270 | L 18 ANDON BOARD |
| NAMM28269 | L 18 ANDON BOARD |
| NAMM28188A | L 18 NAPP FLECTRONIC PULL SYSTEM |
| NAMM28268F | L 18 HEAD LIFT TABLE FOUNDATION |
| NAM7264 | L 18 CRANK BALANCER MACHINE |
| NAM7266 | L 18 CRANK OP 110 MACHINE |
| NAM7505A | |
| NAMM27976 | MARK OP 170 CRANK MIST COLLECTOR |
| NAM7584A | L 850 CRANK GAGING MACHINE |
| NAMM27938 | 4 CRANK OP30 AIR CLEANER |
| NAMM29003A | L 850 CRANK LINE 1 GANTRY ROBOT |
| NAMM29039A | L 850 CRANK LINE 2 LOAD CONVEYOR |
| NAMM27836A | MARK CRK OP 50 ELECTRIC BRIDGE |
| NAMBG5680A | L 850 CRANK COOLANT BUILDING |
| NAMM27879 | MARK CRANK OP 60 MONORAIL |
| NAMM29267 | L 850 CRANK ANDON BOARD |
| NAMM29268 | L 850 CRANK ANDON BOARD |
| NAMM29269 | L 850 CRANK ANDON BOARD |
| NAMM29270 | L 850 CRANK ANDON BOARD |
| NAM7577A | L 850 CRANK ZEISS PRISMO |
| NAMM29221 | L 850 CRANK LOAD ASSIST |
| NAMM28041 | MARK CRANK OP90 MANIPULATOR |
| NAMM27971 | MARK CRK OP 110 MANIPULATOR |
| NAMM28029 | MARK CRANK OP80 MANIPULATOR |

tonowanda L18 assembly–UCC(A7&8) 01 xls xls

| | |
|---|---|
| NAMM27919 | MARK CRANK 44 X 54 PENTALIFT TABLE |
| NAMM28045 | MARK CRANK OP 90 44X54 TABLE |
| NAMM27509A | MARK CRANK COOL REFRIG HEAT UNIT |
| NAMM27920 | MARK CRANK 44 X 54 PENTALIFT TABLE |
| NAMM27810 | MARK CASE OP 170 MIST ENCLOSURE |
| NAMM27807 | MARK CASE CM POSITECH MANIPULATOR |
| NAMM27897 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAMM27895 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAMM27896 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAMM27851 | MARK ASM MANIFOLD MANIPULATOR |
| NAMM27856 | MARK ASSY UTILOR MESSAGE DISPLAY |
| NAMM27943 | MARK ASM 1 NGINE STAND |
| NAMM28025 | MARK ASM KBK BRIDGE SYSTEM |
| NAMM28027 | MARK ASM KBK BRIDGE SYSTEM |
| NAMM28028 | MARK ASM KBK BRIDGE SYSTEM |
| NAMM27838 | MARK ASM 54X54 LIFT TABLE |
| NAMM27862 | MARK V ASM ERRORPROFFING LIGHTING |
| NAMM27918 | MARK ASM ENGINE STAND |
| NAMM27861 | MARK V ASM LIGHTING TRANSFORMER |
| NAMM27898 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27899 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27900 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27901 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27902 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27904 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27905 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27906 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27907 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27908 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27909 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMM27903 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7270 | L 18 CRANK IN LINE TRSF MACHINE OP 45 |
| NAM7272 | L 18 OP120 CRANKSHAFT MACHINE |
| NAM7263 | L 18 OP 65 CRANK ROLLING MACHINE |
| NAM7262 | L 18 OP65 CRANK ROLLING MACHINE |
| NAM7265 | L 18 OP 110(B) CRANK BAL MACHINE |
| NAM7266A | L 18 OP 110(B) CRANK BAL MACHINE |
| NAMM28015 | L18 OP120 CRANK 4ARM LOADER GANTRY |
| NAM7262INST | L 18 CRANK INSTALLATION(TONA) |
| NAM7263INST | L 18 CRANK INSTALLATION(TONA) |
| NAM7265INST | L 18 CRANK INSTALLATION(TONA) |
| NAM7270INST | L 18 CRANK INSTALLATION(TONA) |
| NAM7282 | L 18 CRANK SPIN DRY MACHINE |
| NAMM27945 | L 18 CRANK AUTOMATION |
| NAMM27946 | L 18 CRANK AUTOMATION |
| NAMM27947 | L 18 CRANK AUTOMATION |
| NAMM27948 | L 18 CRANK AUTOMATION |
| NAMM28235 | L 18 CRANK TEAM ROOM |
| NAMM28014 | L 18 OP120 CRANK COOLANT FILTRATION UNIT |
| NAMM28013 | L 18 OP120 CRANK MIST CONTROL SYSTEM |
| NAM7262F | L 18 CRANK OP 65 FOUNDATION |
| NAMM27878A | L18 CRANK HI PRESSURE COOLANT SYSTEM |
| NAM7264INST | INSTALL L 18 CRANK BALANCER |
| NAM7272F | L 18 OP 120 CRANK MACHINE FOUNDATION |
| NAMM27878 | L18 CRANK HI PRESSURE COOLANT SYSTEM |
| NAM7262ELEC | L 18 OP65 CRANK ROLLING MACHINE |
| NAM7270F | L -18 OP 45 CRANK FOUNDATION |
| NAMM28096 | L18 CRANK BALANCER MIST COLLECTOR |
| NAMM28366 | L18 OP45 CRANK MONORAIL RADIO CONTROLLED |
| NAMM28229 | L 18 CRANK OP110 MANIPLLATOR |
| NAMM27971A | L18 CRANK OP110 MANIPULATOR |
| NAMM28121 | L18 CRANK OP70 GRIND WHEEL CART |
| NAMTAV225 | L18 CRANK OP50 ERROR PROOFING TITAN SYSTEM |
| NAM7268 | L 18 CYL HEAD OP30 TRASFER MACHINE |
| NAM7269 | L 18 CYL HEAD OP50 TRANSFER MACHINE |
| NAM7284 | L 18 CYL HEAD ASM MACHINE |
| NAMM28064 | L18 CYL HEAD COOLANT FILTRATION |
| NAM7117RV | L 18 CYL HEAD WASHER |
| NAMM28208 | L 18 CYL HEAD OP30 TO OP 50 |
| NAM7268A | L 18 CYL HEAD OP30 TRANSFER MACHINE |
| NAMM28210 | L 18 CYL HEAD OP50 TO OP 70 AUTOMATION |
| NAMM28212 | L 18 CYL HEAD OP50 TO OP 70 AUTOMATION |
| NAMM28209 | L 18 CYL HEAD OP50 TO OP 70 AUTOMATION |
| NAMM28211 | L 18 CYL HEAD OP50 TO OP 70 AUTOMATION |
| NAM7268INST | L 18 CYL HEAD EQUIPMENT INSTALLATION(TONA) |

| | |
|---|---|
| NAM7269INST | L 18 CYL HEAD EQUIPMENT INSTALLATION(TONA) |
| NAMM28206 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28207 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28064A | L 18 CYL HEAD COOLANT FILTRATION SYSTEM |
| NAMM28200 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28202 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28204 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28198 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28199 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28201 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28203 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28205 | L 18 CYL HEAD AUTOMATION OP10 TO OP30 |
| NAMM28064C | L18 CYL HEAD COOLANT FILTRATION |
| NAMM28233 | L 18 CYL HEAD TEAM ROOM |
| NAMM28375 | L 18 COMBO SINK UNIT CYL HEAD |
| NAMM28376 | L 18 COMBO SINK UNIT CYL HEAD |
| NAMM28254 | L18 HEAD FINAL44 X 54 LIFT&ROTATE TABLE |
| NAMM28253 | L18 HEAD OP70 44 X 54 LIFT&ROTATE TABLE |
| NAMM28064B | L18 CYL HEAD COOLANT FILTRATION |
| NAMM28252 | L 18 HEAD OP 40 MANIPULATOR |
| NAMM28213 | L 18 CYL HEAD OP50 TO OP 70 AUTOMATION |
| NAMM28003A | L  CYL HEAD OP50 AUTOMATION |
| NAM7267 | L 18 BLOCK TRANSFER MACHINE |
| NAM7267INST | L 18 BLOCK INSTALLATION(TONA) |
| NAM7098C | L 18 INTERMEDIATE BLOCK WASHER |
| NAM7099C | L 18 FINAL BLOCK WASHER |
| NAM7101A | L18 BLOCK CONTROL CAM BRG PRESS |
| NAMM27950 | L 18 BLOCK CONVEYOR OP 105 TO 110 |
| NAM7074D | L 18 BLOCK MACHINE WING BASE |
| NAM7075D | L 18 BLOCK MACHINE WING BASE |
| NAMM27949 | L 18 BLOCK CONVEYOR OP 100 TO 105 |
| NAMM27877A | L18 BLOCK HI PRESSURE COOLANT SYSTEM |
| NAMM27876A | L18 BLOCK HI PRESSURE COOLANT SYSTEM |
| NAMM27877 | L18 BLOCK HI PRESSURE COOLANT SYSTEM |
| NAMM27876 | L18 BLOCK HI PRESSURE COOLANT SYSTEM |
| NAMM28377 | L 18 COMBO SINK UNIT BLOCK JOB |
| NAMTA9263 | L 18 BLOCK TITAN GALLERY HOLE PROBE |
| NAM7271 | L 18 ENGINE ASM LINE |
| NAMM26916TSD | L 18 VALVETRAIN IGNITION COLD TEST |
| NAM7271INST | L 18 ENGINE ASM LINE(INSTALL) |
| NAM7271F | L 18 ENGINE LINE FOUNDATION |
| NAM7271ELECT | L 18 ENGINE ASM LINE(ELECTRICAL) |
| NAM7271INS1 | L 18 ENGINE ASM LINE(INSTALL) |
| NAM7271FC | L 18 ENGINE LINE POA 5–7 |
| NAM7271J | L  18 ASM LINE LUBE EQUIP ETC |
| NAM7271PMC | L 18 ASM LINE P M & C SYSTEM |
| NAM7271P | L 18 ASM LINE LEAK TEST EQUIPMENT |
| NAM7271FA | L 18 ENGINE ASM POA 1 |
| NAM7271A | L 18 ASM LINE IMPROVEMENTS |
| NAM7271SWARE | L 18 ENGINE ASM LINE CONTROLS |
| NAMBG5728 | L 18 ASM LINE KBK TRUSS REINFORCEMENT |
| NAM7271FB | L 18 ENGINE LINE POA4 |
| NAM7271PFOR | 1  18 ASM ELEVATED PLATFORM |
| NAM7271KBK | L18 ASM LINE KBK BRIDGE COMPONENTS |
| NAM7273 | L 18 ASM NUT REMOVER CAP BREAKER MACHINE |
| NAM7274 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAM7275 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAM7276 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAM7271ANSYS | L 18 ASM LINE ANDON SYSTEM FOR BOARDS |
| NAMRG5728A | REINFORCE TRUSSES L 18 ASM LINE |
| NAM7271N | L 18 ASM LINE WIREWAY |
| NAM7271L | L 18 ASM LINE BUS PLUGS |
| NAM7271QCA | 1  18 ASM LINE Q C & A SYSTEM |
| NAM7271I | 1 18 ASM LINE CPU UPGRADE NEMATRON COMPUTERS |
| NAMM26916TS1 | L  18 TEST STANDS |
| NAM7271ANDON | 1  18 ASM LINE ANDON EQUIPMENT |
| NAM7271PTASM | L 18 ASM LINE POWER TRAIN ASM SYSTEM |
| NAM7271ELEC3 | L 18 ASM LINE ELECTRICALS |
| NAM7271LOAD | L  18 ASM LINE UPLOAD-DOWNLOAD SYSTEM |
| NAMM28286 | L18 ASM LINE 48X45 FLOW THRU X OVER PIPES |
| NAMM28289 | L18 ASM LINE 54X48 FLOW THRU EXH MANIFOLDS |
| NAMM28278 | L18 ASM LINE 54X48 OIL PAN FLOW THRU |
| NAMM28285 | L18 ASM LINE 54X48 FLOW THRU FUEL RAILS |
| NAMM28287 | L18 ASM LINE 48X45 FLOW THRU WATER PUMPS |
| NAMM28290 | L18 ASM LINE 54X48 FLOW THRU EXH MANIFOLDS |

| | |
|---|---|
| NAM7271PCTWR | L 18 ASM LINE PC TOWER |
| NAM7271C | L 18 ASSEMBLY LINE EXTRAS |
| NAM7271R | L 18 ASM LINE GUARD RAILS |
| NAMM28347 | L18 OIL FILL (COOLANT/AIR ATTR) TEMP CONTROL |
| NAMM28288 | L18 ASM LINE 36X32/54X48 FLOW THRU FLYWHEELS |
| NAMM28279 | L 18 ASM LINE 36X32 FLOW THRU BALANCERS |
| NAMM28258 | L 18 ASM DATA COLLECTION SYSTEM |
| NAMM28112 | L 18 ASSY LINE SINK UNIT |
| NAMM28111 | L 18 ASSY LINE SINK UNIT |
| NAMM28114 | L 18 ASSY LINE SINK UNIT |
| NAMM28116 | L 18 ASSY LINE SINK UNIT |
| NAMM28115 | L 18 ASSY LINE SINK UNIT |
| NAMM28117 | L 18 ASSY LINE SINK UNIT |
| NAM7271ELEC2 | L 18 ENG ASM ELECTRICAL |
| NAMM28280 | L18 ASM LINE 48X40 FLOW THRU CYL HEADS |
| NAMM28277 | L18 ASM LINE 45X40 FLOW THRU CASES |
| NAMM28281 | L18 ASM LINE 48X40 FLOW THRU CYL HEADS |
| NAM7271O | L 18 ASM LINE WIREWAY STATIONS |
| NAM7271H | L 18 ASSEMBLY LINE EXTRAS |
| NAMM28283 | L18 ASM LINE 54X48 FLOW THRU RKR COVERS |
| NAMM28284 | L18 ASM LINE 54X48 FLOW THRU RKR COVERS |
| NAM7271G | L 18 ASSEMBLY LINE EXTRAS |
| NAM7271K | L 18 ASM LINE SQUARE D POWER |
| NAM7271D | L 18 ASSEMBLY LINE EXTRAS |
| NAMM28234 | L 18 ASSY TEAM ROOM |
| NAMM28346 | L18 OIL FILL DYE INJECTION SYSTEM |
| NAM7271ELEC1 | L 18 ENG ASM ELECTRICAL |
| NAMM28023 | L 18 ACCESSORY DRIVE BRACKET MANIPULATOR |
| NAMM28018 | L 18 BALANCER——— MANIPULATOR |
| NAMM28024 | L 18 BELL HOUSING MANIPULATOR |
| NAMM28017 | L 18 CRANK ASSY – MANIPULATOR |
| NAMM28022 | L 18 FLYWHEEL –=– MANIPULATOR |
| NAMM28016 | L 18 INLET MAN ASSY MANIPULATOR |
| NAMM28020 | L 18 L H HEAD–=– MANIPULATOR |
| NAMM28019 | L 18 OIL PAN =–– MANIPULATOR |
| NAMM28021 | L 18 R H HEAD=–= MANIPULATOR |
| NAM7271M | L-18 ASM LINE ENG SYS WIRE WAY |
| NAMM28323 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM29324 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28425 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28326 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAM7271Q | L 18 ASM LINE BALANCERS |
| NAM7271E | L 18 ASSEMBLY LINE EXTRAS |
| NAMM28128 | MARK ASM/PIST AREA LIFT&TILT TABLE |
| NAMM28129 | MARK ASM/PIST AREA LIFT&TILT TABLE |
| NAMM28300 | L 18 ASM HOHL CART 22960 |
| NAMM28302 | L 18 ASM HOHL CART 22960 |
| NAMM28295 | L 18 ASM HOHL CART 22960 |
| NAMM28296 | L 18 ASM HOHL CART 22960 |
| NAMM28297 | L 18 ASM HOHL CART 22960 |
| NAMM28298 | L 18 ASM HOHL CART 22960 |
| NAMM28299 | L 18 ASM HOHL CART 22960 |
| NAMM28301 | L 18 ASM HOHL CART 22960 |
| NAMM28303 | L 18 ASM HOHL CART 22960 |
| NAM7271B | L 18 ASSEMBLY LINE EXTRAS |
| NAM7271PMC SW | L 18 ASM LINE P M & C SOFTWARE |
| NAMM28121 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28328 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28064F | L 18 COOLANT FILTRATION FOUNDATION |
| NAMM28190 | L 18 MODULAR OFFICE- MISKNES |
| NAMM28188 | L18 NAPP ELECTRONIC PULL SYSTEM |
| NAMM28304 | HOPPER ELEV L18 CONVERSION |
| NAMM28305 | HOPPER ELEV L18 CONVERSION |
| NAMM28132 | L 18 CHIP CONVEYOR |
| NAMTA9206 | L18 PROD INFO SYSTEM |
| NAM7644ELECT | L 850 CRANK ELECT/INSTALL MACHINE |
| NAM7644ELECT | L 850 CRANK ELECT/INSTALL MACHINE |
| NAM7646A | L 850 OP 10 CRANKSHAFT MACHINE |
| NAM7509A | L 850 CRK PIN GRINDER GANTRY COMMISSIONING |
| NAM7506B | L 850 CRK OIL HOLE GANTRY COMMISSIONING |
| NAM7500B | L 850 CRANK OP10 GANTRY COMMISSIONING |
| NAM7230A | L 850 CRANK BROACH GANTRY COMMISSIONING |
| NAM7583D | L 850 CYL HEAD OP 150 ASM MACHINE |
| NAM7659 | L 850 CELL 3 CAM LOBE GRINDER |
| NAM7658 | L 850 CELL 3 CAM LOBE GRINDER |

| | |
|---|---|
| NAM7660 | L 850 CELL 3 CAM LOBE GRINDER |
| NAML850CAMIP | L850 CAMSHAFT INSTALL COSTS |
| NAM7665B | L850 CAM MOD III 155 MACHINE CTR |
| NAM7664 | L850 CAM MOD III 155 MACHINE CTR |
| NAMM29419 | L 850 CELL 3 CAM OBERLIN FILTER |
| NAML850CAMJO | L850 CAMSHAFT INSTALL COSTS |
| NAM7663 | L 850 T651 CAM HORIZONTAL LATHE |
| NAM7662 | L 850 T65L CAM HORIZONTAL LATHE |
| NAM7661 | L 850 T65L CAM HORIZONTAL LATHE |
| NAML850CAMIQ | L850 CAMSHAFT INSTALL COSTS |
| NAM7661FOUN | L 850 CAM MO 3 OP 40 LATHE FOUNDATION |
| NAM7662FOUN | L 850 CAM MO 3 OP 40 LATHE FOUNDATION |
| NAMM29407 | L 850 CAM MTL HANDLING EQUIPMENT |
| NAMM29406 | L850 CAM MTL HANDLING EQUIPMENT |
| NAMM29405 | L 850 CAM MTL HANDLING EQUIPMENT |
| NAML850CAM3L | L 850 CAMSHAFT MODULE 3 IN LABOR |
| NAM7671A | L850 CAM WASHER MODEL AQUAMASTER FC 1600 |
| NAM7670 | Q190 MICRO POLISHER REPAIR LATHE |
| NAM7637A | L 850 CAM LOBE GRINDER INST SUPPORT |
| NAM7636A | L 850 CAM LOBE GRINDER INST SUPPORT |
| NAMM29404 | L850 CAM MTL HANDLING EQUIPMENT |
| NAMM29403 | L850 CAM SIDE BY SIDE MTL HANDLING |
| NAMM29402 | L850 CAM MTL HANDLING EQUIP |
| NAMM29413 | L850 CAM CRACK MAGNAFLUX MD-10305 |
| NAMM28494 | L 850 PFX MODEL 454 CMM/DCC SYSTEM |
| NAM7671 | L 850 CAM CELL 3 AQUAMASTER CAM WASHER |
| NAM7612INST | L850 CAM MOD 3 OP80 GRINDER INST |
| NAM7612E | L850 CAM RELAY/HOUSINGS |
| NAMBG5706CA | L 850 CAM TRUSS REINFORCEMENT |
| NAM7612INSA | L850 CAM MOD 3 OP80 GRINDER INST |
| NAM7612AA | L 850 CAM LOBT HOIST |
| NAM7585PAL | L 850 ENGINE ASM LINE PALLETS |
| NAM7585G | L 850 ENGINE ASM LINE |
| NAM7585GA | L 850 ENHINE ASM LINE |
| NAM7585PALL | L 850 ENGINE ASM LINE PALLETS |
| NAM7570A | L850 OP 120 CYL HEAD BOLT FEEDER |
| NAM7520 | L 850 CRANK OIL HOLE DRILLING MACHINE |
| NAM7541 | L 850 CRANK OIL HOLE DRILLING MACHINE |
| NAM7540A | L 850 CRANK WASHER |
| NAMM27757 | 4 CRANK OP120 MTL HANDLING |
| NAMM27758 | 4 CRANK MTL HANDLING |
| NAMM27890 | 4 CRANK PENTALIFT LOADING TABLE |
| NAMM27888 | 4 CRANK PENTALIFT LOADING TABLE |
| NAMM27889 | 4 CRANK PENTALIFT LOADING TABLE |
| NAMM29146 | L 850 CRANK LINE 1 OP 230 DALMAC MANIPULATOR |
| NAMM29147 | L 850 CRANK LINE 1 OP 230 DALMAC MANIPULATOR |
| NAMM29148 | L 850 LINE 2 OP 250 DALMAC MANIPULATOR |
| NAMM29149 | L 850 CRANK LINE 2 OP 250 DALMAC MANIPULETOR |
| NAMM27835 | 4 CRANK REPAIR 44X52 LIFT TABLE |
| NAMM27917 | 4 CRANK OP 30 AIR CLEANER |
| NAMM27935 | 4 CRANK OP30 AIR CLEANER |
| NAMM27936 | 4 CRANK OP30 AIR CLEANER |
| NAM7506A | L 850 CRANK OIL HOLE OP 80 |
| NAMM29314A | L 850 CYL HEAD DELIVERY SYSTEM TO ASM LINE |
| NAMM29106 | L 850 CYL HEAD LOADER |
| NAM7583A | L 850 CYL HEAD OP 150 ASM MACHINE |
| NAM28003 | 4 CYL HEAD OP50 AUTOMATION |
| NAMM29100 | L 850 CYL HEAD ASM ROBOT |
| NAMM29099 | L 850 CYL HEAD ASM AUTOMATION |
| NAM6712B | 4 CYL HEAD TRANSFER MACHINE |
| NAMM29107A | L 850 OP 5 CYL HEAD AUTOMATION |
| NAMM29122 | L 850 CYL HEAD AUTOMATION |
| NAMM27849A | 4 CYL HEAD OP 130 ROBOT |
| NAMM27850A | 4 CYL HEAD OP 130 ROBOT |
| NAMM29328 | L 850 HEAD DOUBLE WASH STAND |
| NAMM29251 | L 850 CYL HD 2ND LIFT DEVICE |
| NAMM29250 | L 850 CYL HD 2ND LIFTING DEVICE |
| NAMM29385 | L 850 CYL HEAD INK JET SYSTEM |
| NAMM29384 | L 850 CYL HEAD INK JET SYSTEM |
| NAMM29260 | L 850 CYL HEAD ANDON BOARD |
| NAMM29261 | L 850 CYL HEAD ANDON BOARD |
| NAMM29262 | L 850 CYL HD ASM ANDON BOARD |
| NAM7572A | L 850 CYL HEAD TRANSFER PTS WASHER |
| NAMM29248 | L 850 HEAD SECONDARY LIFT DEVICE |
| NAMM29314 | L 850 CYL HEAD DELIVERY SYSTEM TO ASM LINE |

| | |
|---|---|
| NAMM29915 | L 850 BLOCK DELIVERY SYSTEM TO ASM LINE |
| NAMM29915A | L 850 BLOCK DELIVERY SYSTEM TO ASM LINE |
| NAMM29123 | L 850 BLOCK AUTOMATION |
| NAM7556A | L 850 OP 150 BLOCK TRANSFER MACHINE |
| NAMM29126A | L 850 BLOCK OP 25 AUTOMATION |
| NAM7555A | L 850 BLOCK OP 140 HONING MACHINE |
| NAMM27649A | 4 CASE BRG CAP OP 140 AUTOMATION |
| NAM6700 | 4 CASE CROSS TRF INLAND DRIVES |
| NAMM29142A | L 850 BLOCK UNLOADER LOWER CASE |
| NAM7058C | MARK CASE OP10 PANEL BOX |
| NAM6576E | 4 CASE OP 160 MAIN BRG CONTROLS |
| NAMM29126 | L 850 BLOCK DOUBLE WASH STAND |
| NAM7543A | L 850 BLOCK OP 20 TRANSFER MACHINE |
| NAMM29258 | L 850 BLOCK ANDON BOARD |
| NAMM29259 | L 850 BLOCK ANDON BOARD |
| NAMM29327 | L 850 BLOCK SINGLE WASH STAND |
| NAM7546A | L 850 BLOCK OP 50 LEAK TEST |
| NAMM27928 | 4 CASE OP 160 LIFT TABLE |
| NAMM27929 | 4 CASE OP 160 LIFT TABLE |
| NAMM29178 | L 850 CONN ROD LINE UNLOADER |
| NAMM29174 | L 850 CONN ROD LOADER |
| NAMM29175A | L 850 ROD BEAM CONVEYOR |
| NAM7631A | L 850 ROD OP 45 DEBURR OIL HOLE |
| NAM7626A | L 850 ROD LANDIS GRINDER |
| NAMM29307A | L 850 ROD TEAM ROOM |
| NAMM27753 | 4 ROD OP60 FINISH DIVERTER MACHINE |
| NAMM29331 | L 850 ROD DOUBLE WASH STAND |
| NAMM29266 | L 850 ROD ANDON BOARD |
| NAM7615 | L 850 CAM OP 80 LINE 2 LOBE GRINDER |
| NAM7616 | L 850 CAM OP 80 LINE 2 LOBE GRINDER |
| NAM7617 | L 850 CAM OP 80 LINE 2 LOBE GRINDER |
| NAMTA9500 | L 850 NAO COMMON P M & C SYSTEM |
| NAM7597 | L 850 CAM LINE 2 OP 20 GRINDER |
| NAM7590 | L 850 CAM OP 70 LINE 2 GRINDER |
| NAM7603 | L 850 CAM OP 60 LINE 2 HORIZONTAL MACH CTR |
| NAM7601 | L 850 CAM OP 30 LINE 2 HORIZONTAL MACH CTR |
| NAM7621 | L 850 CAM OP 90 LINE 2 POLISHER |
| NAM7623 | L 850 CAM OP 110 LINE 2 LOBE GAGE |
| NAM7619 | L 850 CAM OP 85 LINE 2 POLISHER |
| NAM7606 | L 850 CAM OP 40 LINE 2 HORIZONTAL MACH CTR |
| NAM7607 | L 850 CAM OP 40 LINE 2 CNC LATHE |
| NAM7609 | L 850 CAM OP 50 LINE 2 CNC LATHE |
| NAM7593 | L 850 CAM LINE 2 OP 10 INDUCTION HARDENER |
| NAM7594 | L 850 CAM OP 10 LINE 2 INDUCTION HARDENER |
| NAM7595 | L 850 CAM OP 10 LINE 2 INDUCTION HARDENER |
| NAM7589 | L 850 LINE 2 CAM WASHER |
| NAM7602A | L 850 CAM OP 60 HORIZONTAL MACHING CTR |
| NAM7620A | L 850 CAM JOURNAL POLISHER LINE 1 |
| NAMM29129 | L 850 CAM DOUBLE WASH STAND |
| NAMM29330 | L 850 CAM DOUBLE WASH STAND |
| NAMM29263 | L 850 CAM ANDON BOARD |
| NAMM29265 | L 850 CAM ANDON BOARD |
| NAMM29264 | L 850 CAMSHAFT ANDON BOARD |
| NAM7600A | L 850 CAM HORIZONTAL MACHINING CTR |
| NAM7618A | L 850 CAM LOBE POLISHER LINE 1 |
| NAMM29091 | L 850 CAMSHAFT MIST COLLECOR |
| NAMM29092 | L 850 CAMSHAFT MIST COLLECTOR |
| NAM7605A | L 850 CAM HORIZONTAL CNC LATHE |
| NAM7604A | L 850 OP 40 CAM HORIZONTAL CNC LATHE |
| NAM7585A | L 850 ENGINE ASSY LINE |
| NAMTA9504 | L 850 POWERTRAIN ASM SYSTEM |
| NAMM29308A | L 850 ENG ASM TEAM ROOM |
| NAMM29309A | L 850 ENG ASM TEAM ROOM |
| NAMM29312A | L 850 ENG ASM TEAM ROOM |
| NAM7234B | L 850 PISTO-ROD ASM MACHINE |
| NAM7234A | L 850 PISTON-ROD ASM MACHINE |
| NAMM29318 | L 850 ASM LINE SINGLE WAH STAND |
| NAMM29319 | L 850 ASM LINE SINGLE WASH STAND |
| NAMM29399 | L 850 ENG ASM FLEX LINK TABLE |
| NAMM29400 | L 850 ENG ASM FLEX LINK TABLE |
| NAMM29255 | L 850 ENG ASM ANDON BOARD |
| NAMM29256 | L 850 ENG ASM ANDON BOARD |
| NAMM29257 | L 850 ENG ASM ANDON BOARD |
| NAM7586B | L 850 ENGINE COLD TEST |
| NAMM29233 | L 850 ENG-HD ASM TABLE 50 X 59 |

| | |
|---|---|
| NAMM29226 | L 850 ENG ASM 48X37 ROTATE TABLE |
| NAMM29227 | L 850 ENG ASM 48X37 ROTATE TABLE |
| NAMM29228 | L 850 ENG ASM 48X37 ROTATE TABLE |
| NAMM29229 | I 850 ENG ASM 48X37 ROTATE TABLE |
| NAMM29230 | L 850 ENG/IID ASM TABLE 48 X 37 |
| NAMM29231 | L 850 ENG/IID ASM TABLE 48 X 37 |
| NAMM29232 | L 850 ENG/IID ASM TABLE 48 X 37 |
| NAM13.5443 | L 850 TURNSTILE-TRK STAGING AREA |
| NAMTA9503 | L 850 Q C & A ACCOUNTABILITY SYSTEM |
| NAM7611 | L 850 OP 65 LINE 2 HEX BUSHING |
| NAMTA9502 | L 850 ELECTRONIC PULL SYSTEM |
| NAMTA9151 | L 850 PRIMS (RAID ARRAY) |
| NAMTA9501 | L 850 ANDON SYSTEM NETWORKING |
| NAMM29084A | L 850 COOLANT BLDG CHIP PROCESSING EQUIP |
| NAM7573A | L 850 ZEISS PRISMO VAST CMM |
| NAM7574A | L 850 ZEISS PRISMO VAST CMM |
| NAMM29417 | L 850 UTILITY OILY WASTE TANK SYSTEM |
| NAMM29288 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29287 | L 850 BULK MTL HANDLING SYSTEM |
| NAMTA95005 | L 850 FLO PRO SOFTWARE FOR P M & C |
| NAMM29278 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29279 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29280 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29281 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29277 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29292 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29282 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29283 | I 850 BULK MTL HANDLING DEVICE |
| NAMM29284 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29285 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29386 | L 850 BULK MTL HANDLING DEVICE |
| NAMM29286 | L 850 BULK MTL HANDLING DEVICW |
| NAM7638 | L 850 PARTS JET ASHER |
| NAMM29381 | L 850 43682 EMONITOR ODYSSEY |
| NAMM29316 | L 850 PART IDENTIFICATION & TRACKING |
| NAMM29317 | L 850 PART IDENTIFICATION & TRACKING |
| NAMM29332 | L 850 MAINT SINGLE WASH STAND |
| NAMM29333 | L 850 TOOL MAINT SINGLE WASH STAND |
| NAMM29289 | I 850 LUBE FILLED CART |
| NAMM29290 | L 850 LUBE FILLLD CART |
| NAMM29291 | L 850 LUBE FILLED CART |
| NAM7639 | L 850 TURN BROACH CRANK MACHINE |
| NAM7640 | L 850 TURN BROACH CRANK MACHINE |
| NAM7656 | L 850 OIL HOLE DRILLING MACHINE |
| NAM7657 | L 850 OIL HOLE DRILLING MACHINE |
| NAM7656A | L 850 OP 80 CRANKSHAFT MACHINE |
| NAM7507A | L850 CRANK INSTALLATION |
| NAMM29280A | L 850 CRANK LINE AIR HOIST |
| NAM7656C | L850 CRANK OP80 COOLANT PUMPOVER UNIT |
| NAM7656B | L 850 OIL HOLE DRILLING MACHINE |
| NAM7500A | L 850 OP 10 CRANK INSTALL |
| NAM7501A | L 850 OP 10 CRANK INSTALL |
| NAM7639A | L 850 TURN BROACH CRANK MACHINE |
| NAM7640A | L 850 TURN BROACH CRANK MACHINE |
| NAMM29021A | L850 CRANK STAMPING UNIT |
| NAMM29023A | L850 CRANK STAMPING UNIT |
| NAMM29042A | L850 CRANK STAMPING UNIT |
| NAMM29059A | L850 CRANK STAMPING UNIT |
| NAMM29061A | L850 CRANK STAMPING UNIT |
| NAM7656D | L 850 CRANK OP80 PUMPOVER PITS |
| NAM7612B | L 850 OP80 ELLC MOD 2 CRANK GRINDER |
| NAM7667 | L850 HEAD LEAK TEST MACHINE |
| NAMM29245 | L850 CYL HEAD AUTOMATION(LIFT) |
| NAMM29246 | L850 CYL HEAD AUTOMATION(LIFT) |
| NAMM29247 | L850 CYL HEAD AUTOMATION(LIFT) |
| NAMM29249 | L850 CYL HEAD AUTOMATION UNLOAD |
| NAMM29250A | L850 CYL HEAD AUTOMATION CAP UP LIFTING |
| NAMM29248A | L850 CYL HEAD AUTOMATION(PICK UP) |
| NAMM29251A | L850 CYL HEAD AUTOMATION(LOAD) |
| NAMM27998 | MARK HEAD DUNK TANK |
| NAMM28033 | MARC HEAD OP180 HELI FLOW MIST COLLECTOR |
| NAMM28034 | MARC HEAD OP190 HELI FLOW MIST COLLECTOR |
| NAMM28031 | MARC HEAD OP 10 HELI FLOW MIST COLLECTOR |
| NAMM28032 | MARC HEAD OP 30 HELI FLOW MIST COLLECTOR |
| NAMM29314B | L 850 CYL HEAD DELIVERY SYSTEM PALLET STOPS |

| | |
|---|---|
| NAMM29431 | L 850 HEAD LABELING SYSTEM |
| NAMM29090A | L850 DOCKING STATION-CYL HEAD ASM |
| NAMM29250D | L850 CYL HEAD AUTOMATION CAP UP LIFTING |
| NAMM29248D | L850 CYL HEAD AUTOMATION(PICK UP) |
| NAMM29251D | L850 CYL HEAD AUTOMATION(LOAD) |
| NAMM29250B | L850 CYL HEAD AUTOMATION CAP UP LIFTING |
| NAMM29248B | L850 CYL HEAD AUTOMATION(PICK UP) |
| NAMM29251B | L850 CYL HEAD AUTOMATION(LOAD) |
| NAMM29250C | L850 CYL HEAD AUTOMATION CAP UP LIFTING |
| NAMM29248C | L850 CYL HEAD AUTOMATION(PICK UP) |
| NAMM29251C | L850 CYL HEAD AUTOMATION(LOAD) |
| NAM7666 | L850 BLOCK LEAK TEST MACHINE |
| NAM7544B | L 850 BLOCK OP50 |
| NAMM27930 | MARK CASE OP100 MIST COLLECTOR |
| NAMM29936A | L850 BLOCK AUTOMATION |
| NAMM29938A | L850 BLOCK AUTOMATION |
| NAMM29940A | L850 BLOCK AUTOMATION |
| NAMM29942A | L850 BLOCK AUTOMATION |
| NAMM29920A | L850 BLOCK AUTOMATION |
| NAMM29921A | L850 BLOCK AUTOMATION |
| NAMM29922A | L850 BLOCK AUTOMATION |
| NAMM29937A | L850 BLOCK AUTOMATION |
| NAMM29939A | L850 BLOCK AUTOMATION |
| NAMM29941A | L850 BLOCK AUTOMATION |
| NAMM29943A | L850 BLOCK AUTOMATION |
| NAMM27810A | DUCTWORK OP180/190 MARK CASE |
| NAMTA9217 | INDUSTRIAL WORK STATION L850 BLOCK |
| NAMM29920B | L850 BLOCK AUTOMATION |
| NAMM29921B | L850 BLOCK AUTOMATION |
| NAMM29922B | L850 BLOCK AUTOMATION |
| NAMM29936B | L850 BLOCK AUTOMATION |
| NAMM29937B | L850 BLOCK AUTOMATION |
| NAMM29938B | L850 BLOCK AUTOMATION |
| NAMM29939B | L850 BLOCK AUTOMATION |
| NAMM29940B | L850 BLOCK AUTOMATION |
| NAMM29941B | L850 BLOCK AUTOMATION |
| NAMM29942B | L850 BLOCK AUTOMATION |
| NAMM29943B | L850 BLOCK AUTOMATION |
| NAM7542A | L 850 BLOCK DUNKER TANK |
| NAM7542B | L 850 BLOCK-ROBOT POA 18 19 |
| NAMM28314 | INK JET SYSTEM MARK CASE |
| NAM7558B | L850 BOCK CURTAINS |
| NAMM29432 | L850 BLOCK MODEL ANALYSIS PACKAGE |
| NAMM27511A | 04 CASE AUTOMATION |
| NAM7558A | L 850 BLOCK LINE INSTALL |
| NAMM29130A | L 850 OP 60 CASE LOADER INSTALL |
| NAM7624A | L 850 ROD FRACT ASM MACHINE |
| NAM7627A | L 850 ROD FRACT ASM MACHINE |
| NAMM29421 | L850 ROD OMNI LIFT&ROTATE TABLE |
| NAM7630A | L850 ROD STATISICAL PACKAGE |
| NAMI 850CAMIN | L850 CAMSHAFT INSTALL COSTS |
| NAM7636 | L 850 CAM LOBE GRINDER |
| NAM7637 | L 850 CAM LOBE GRINDER |
| NAM7651 | L850 CAM CELL VADCOLE GAGE |
| NAM7649 | L850 CAM CELL PRO INDUCTION HARDENER |
| NAM7648 | L850 CAM CELLPRO INDUCTION HARDENER |
| NAM7650 | L850 CAM CELLPRO INDUCTION HARDENER |
| NAMBG5706D | L 850 CAM TRUSS REINFORCEMENT |
| NAM7609INST | L 850 CAM GRINDER |
| NAMM29274 | L 850 OIL COOLANT SYSTEM(CAMSHAFT) |
| NAMM29273 | L850 OIL COOLANT SYSTEM(CAMSHAFT) |
| NAMM29412 | L850 CAM MOD 3 12000CFM MIST COLLECTOR |
| NAMBG5706E | L 850 CAM TRUSS REINFORCEMENT |
| NAM7604C | L 850 CAM OP40 HORIZONTAL |
| NAM7612A | L 850 CAM LOBE HOIST |
| NAM7665A | L 850 OP60 CAM MAX/NO HORIZONTAL MACHINING |
| NAM7656I-LECT | L850 CAM MACHINE ELECTRICALS |
| NAM7612R | L850 CAM INSTALL COSTS |
| NAMBG5706B | L 850 CAM TRUSS REINFORCEMENT |
| NAMM29271 | L850 SMOG HOG MIST COLLECTOR(CAMSHAFT) |
| NAMM29272 | L850 SMOG HOG MIST COLLECTOR(CAMSHAFT) |
| NAM7604B | L 850 CAM OP40 OVERHEAD WORK |
| NAM7612D | L850 CAM ELECTRICALS |
| NAM7585B | L 850 ENGINE ASM LINE |
| NAM7586C | L 850 ENG ASM OIL TEMP CONTROL UNIT |

| | |
|---|---|
| NAM7585T | L 850 ENG ASM LINE SIDE BY SIDE MTL |
| NAM7585F | I 850 ENG ASM I INE ZONE 3 LIFT DEVICES |
| NAMM28097 | L850 COLD TEST STRVER CARD ACCESS |
| NAM7585C | L 850 ENGINE ASM INSTALL LEAK TEST |
| NAM7585D | L850 ASM LINE X OVER STAIRS |
| NAMM29277A | L850 ASM BULK MTL HANDLING |
| NAM7586 | L 850 ENGINE TEST |
| NAMTA9171 | L850 ASM LINE STA M1016 NEMATRON |
| NAMBG5706F | L850 CAM TRUSS REINFORCEMENT |
| NAMBG5706C | L 850 CAM TRUSS REINFORCEMENT |
| NAMBG5716A | L 850 TURNSTILF BLDG |
| NAMM29082A | L 850 BACK UP SUMP SYSTEM |
| NAMBG5700A | L850 ROOF FIBERGLASS PANELS |
| NAMLS5443A | L 850 PARK LOT LIGHTS-TURNSTILF AREA |
| NAMBG5700B | L850 ROOF FIBERGLASS PANELS |
| NAMM29420 | L 850 ABOVE GROUND 10 000 GAL STORAGE TANK |
| NAMBG5700C | L850 ROOF SLIDING WINDOWS |
| NAMM29394 | L 850 BULK MATERIAL HANDI NG DEVICE |
| NAM7561DWG | L 850 TAS 32280 PRIMS DWG |
| NAMM29301 | L 850 BULK MATTRIAL HANDLING DEVICE |
| NAMM29195 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAM7612C | L 850 OP80 INST HOIST SYSTEM |
| NAMM29298 | L 850 BULK HANDLING DEVICE |
| NAMM29296 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29297 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29391 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29390 | L 850 BULK MATERIAL HANDLING SYSTEM |
| NAMM28232 | L 18 OSCAR TEAM ROOM |
| NAMM29302 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29392 | I 850 BULK MATTRIAL HANDI ING DEVICE |
| NAMM29393 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29294 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMM29293 | L 850 BULK MATERIAL HANDLINGDEVICE |
| NAMM29387 | L 850 BULK MATERIAL HANDLING DEVICF |
| NAMM29388 | L 850 BULK MATLRIAL HANDLING DI VICE |
| NAMM29389 | L 850 BULK MATERIAL HANDLING DEVICE |
| NAMBG5700D | L850 ROOF SLIDING WINDOWS |
| NAMBG5716 | L 850 TURNSTILF BLDG |
| NAMM28217 | L 850 INKJET SYSTEM |
| NAMBG5680B | L850 COOLANT BLDG ADDITIONAL DRAINS |
| NAMM28191 | 20 MARKING SYSTEMS V8 PSTN |
| NAMBG5706A | L 850 TRUSS REINFORCING INSPECTION SVCS |
| NAMM29145B | L850 MAINTENANCE CAMERA SYSTEM |
| NAMTA9224 | L 850 TEAM ROOM P C |
| NAMBG5687A | L 850 LIGHTING |
| NAM7642 | L 850 P20-2020 PARLEC TOOL SET UP |
| NAMM27808A | 4 HEAD ROOF VENTILATOR |
| NAMM27809 | 4 HEAD ROOF VENTILATOR |
| NAMM29121A | L 850 OP 145 AUTOMATION |
| NAMTA9172 | L 850 HP LASERJET 55 I PRINTER |
| NAMBG5690A | L 850 UTILITY BLDG PIPING |
| NAMTA9150 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9151 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9122 | I 850 BLS TEAM COMPAQ 4000 |
| NAMTA9152 | I 850 COMPAQ MAXIMO COMPUTER |
| NAMTA9162 | L 850 PM GATEWAY PORTABLE COMPUTER |
| NAMTA9163 | L 850 PM GATEWAY PORTABLE COMPUTER |
| NAMTA9164 | L 850 PM GATEWAY PORTABLE COMPUTER |
| NAMTA9165 | L 850 PM GATEWAY PORTABLE COMPUTER |
| NAMTA9137 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9138 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9139 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9140 | I 850 COMPAQ DESKPRO 4000 |
| NAMTA9141 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9142 | I 850 COMPAQ DESKPRO 4000 |
| NAMTA9143 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9144 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9145 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9146 | I 850 COMPAQ DESKPRO 4000 |
| NAMTA9147 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9148 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9149 | L 850 COMPAQ DESKPRO 4000 |
| NAMM27956 | 1/2 TON AIR OVERHEAD PRODUCTIVE HOIST |
| NAMM27957 | 1/2 TON AIR PRODUCTIVE HOIST |
| NAMTA9134 | L 850 COMPAQ DESK PRO 4000 |

| | |
|---|---|
| NAMTA9135 | L 850 COMPAQ DESKPRO 4000 |
| NAMTA9136 | I 850 COMPAQ DESKPRO 4000 |
| NAMM28180 | L 4 ASM CLARK MIST COLLECTOR |
| NAMM28043A | L4 ASM PENTALIFT LIFT & ROTATE TABLE |
| NAMBG5724 | PL1 AIR SUPPLY HOUSE DRIP PAN |
| NAMBG5717 | TRUASS REINFORCE HEAT TREAT AREA |
| NAMBG5704A | PL1 NORTH DOCK A HVAC SYSTEM |
| NAMM28221 | GAS FIRED HEATING SYSTEM |
| NAMBG5722 | PL1 CUTTER GRIND DUST COLLECTION DUCTWORK |
| NAMBG5723 | PL4 CUTTER GRIND DUST COLLECTION DUCTWORK |
| NAMM28131 | NORTH DOK K 2 TON BRIDGE SYSTYCM PI T1 |
| NAMBG5717A | NEW HEAT TREAT AREA |
| NAMBG5727B | PL4 COMAU MAKE UP AIR UNIT #16(PIPING) |
| NAM6701F | I 4 CROSS TRANSFER MACHINE |
| NAMM28039A | 0ASTIC 4000 COOLANT SYSTEM 59 |
| NAMM28040A | 0ASTIC 4000 COOLANT SYSTEM 59 |
| NAM6701E | L 4 CROSS TRANSFER DRIVE UNIT STRAPS |
| NAM6701C | L 4 CROSS TRANSFER COLOR MONITOR DRIVER |
| NAM6701D | L 4 CROSS TRANSFER BUSHING FIXTURES |
| NAMM28120A | L4 PENTA LIFT TABLE |
| NAMM27897 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAM7271 | L 18 ENGINE ASM LINE |
| NAMM27895 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAMM26916TSD | I 18 VALVETRAIN IGNITION COLD TEST |
| NAMM27896 | MARK ASM HOT TEST KBK BRIDGE SYSTEM |
| NAM7271INST | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM27851 | MARK ASM MANIFOLD MANIPULATOR |
| NAM7271F | L 18 ENGINE LINE FOUNDATION |
| NAMM27856 | MARK ASSY UTICOR MESSAGE DISPLAY |
| NAM7271ELECT | L 18 ENGINE ASM LINE(ELECTRICAL) |
| NAMM27943 | MARK ASM ENGINE STAND |
| NAM7271INS1 | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM28025 | MARK ASM KBK BRIDGE SYSTEM |
| NAM7271HC | L 18 ENGINE LINE POA 5-7 |
| NAMM28027 | MARK ASM KBK BRIDGE SYSTEM |
| NAM7271J | L 18 ASM LINE LUBE FQUIP FTC |
| NAMM28028 | MARK ASM KBK BRIDGE SYSTEM |
| NAM7271PMC | L 18 ASM LINE P M & C SYSTEM |
| NAMM27838 | MARK ASM 54X54 LIFT TABLE |
| NAM7271P | L 18 ASM LINE LEAK TEST EQUIPMENT |
| NAMM27862 | MARK V ASM ERRORPROFING LIGHTING |
| NAM7271FA | L 18 ENGINE ASM POA 1 |
| NAMM27918 | MARK ASM ENGINE STAND |
| NAM7271A | L 18 ASM LINE IMPROVEMENTS |
| NAMM27861 | MARK V ASM LIGHTING TRANSFORMER |
| NAM7271SWARE | L 18 ENGINE ASM LINE CONTROLS |
| NAMM27898 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMBG5728 | L 18 ASM LINT KBK TRUSS REINFORCEMENT |
| NAMM27899 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271FB | L 18 ENGINE LINE POA4 |
| NAMM27900 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271PFOR | L -18 ASM ELEVATED PLATFORM |
| NAMM27901 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271KBK | L18 ASM LINE KBK BRIDGE COMPONENTS |
| NAMM27902 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7273 | L 18 ASM NUT REMOVER/CAP BREAKTR MACHINE |
| NAMM27904 | MARK ASY 1/2 TON MODFI 7750 AIR HOIST |
| NAM7274 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27905 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7275 | L 18 ASM NUT REMOVER/CAP BREAKER MACHINE |
| NAMM27906 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7276 | L 18 ASM NUT RI MOVER/CAP BREAKER MACHINE |
| NAMM27907 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271ANSYS | I 18 ASM LINE ANDON SYSTEM FOR BOARDS |
| NAMM27908 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAMBG5728A | REINFORCE TRUSSES L 18 ASM LINE |
| NAMM27909 | MARK ASY 1/2 TON MODEL 7750 AIR HOIST |
| NAM7271N | L 18 ASM LINE WIREWAY |
| NAMM27903 | MARI ASY 1/2 TON MODFI 7750 AIR HOIST |
| NAM7271L | L 18 ASM I INE BUS PLUGS |
| NAM7271QCA | L 18 ASM LINT Q C & A SYSTEM |
| NAM7271I | L18 ASM LINE CPU UPGRADE NEMATRON COMPUTERS |
| NAMM26916TS1 | L 18 TEST STANDS |
| NAM7271ANDON | I 18 ASM LINE ANDON EQUIPMENT |
| NAM7271PTASM | L-18 ASM LINE POWERTRAIN ASM SYSTEM |

| | |
|---|---|
| NAM7271ELEC3 | L 18 ASM LINE ELECTRICALS |
| NAM7271LOAD | L 18 ASM LINE UPLOAD/DOWNLOAD SYSTEM |
| NAMM28286 | L18 ASM LINE 48X45 FLOW THRU EX OVER PIPES |
| NAMM28289 | L18 ASM LINE 54X48 FLOW THRU EXH MANIFOLDS |
| NAMM28278 | L18 ASM LINE 54X48 OIL PAN FLOW THRU |
| NAMM28285 | L18 ASM LINE 54X48 FLOW THRU FUEL RAILS |
| NAMM28287 | L18 ASM LINE 48X45 FLOW THRU WATER PUMPS |
| NAMM28290 | L18 ASM LINE 54X48 FLOW THRU EXH MANIFOLDS |
| NAM7271PCTWR | L 18 ASM LINE PC TOWER |
| NAM7271C | L 18 ASSEMBLY LINE EXTRAS |
| NAM7271R | L 18 ASM LINE GUARD RAILS |
| NAMM28347 | L18 OIL FILL(COOLANT/HEATER) TEMP CONTROL |
| NAMM28288 | L18 ASM LINE 36X12 54X48 FLOW THRU FLYWHEELS |
| NAMM28279 | L 18 ASM LINE 36X12 FLOW THRU BALANCERS |
| NAMM28258 | L 18 ASM DATA COLLECTION SYSTEM |
| NAMM28112 | L 18 ASSY LINE SINK UNIT |
| NAMM28113 | L 18 ASSY LINE SINK UNIT |
| NAMM28114 | L 18 ASSY LINE SINK UNIT |
| NAMM28116 | L 18 ASSY LINE SINK UNIT |
| NAMM28115 | L 18 ASSY LINE SINK UNIT |
| NAMM28117 | L 18 ASSY LINE SINK UNIT |
| NAM7271ELEC2 | L 18 ENG ASM ELECTRICAL |
| NAMM28280 | L18 ASM LINE 48X40 FLOW THRU CYL HEADS |
| NAMM28277 | L18 ASM LINE 45X40 FLOW THRU CASES |
| NAMM28281 | L18 ASM LINE 48X40 FLOW THRU CYL HEADS |
| NAM7271O | L 18 ASM LINE WIREWAY STATIONS |
| NAM7271H | L 18 ASSEMBLY LINE EXTRAS |
| NAMM28283 | L18 ASM LINE 54X48 FLOW THRU RKR COVERS |
| NAMM28284 | L18 ASM LINE 54X48 FLOW THRU RKR COVERS |
| NAM7271G | L 18 ASSEMBLY LINE EXTRAS |
| NAM7271K | L 18 ASM LINE SQUARE D POWER |
| NAM7271D | L 18 ASSEMBLY LINE EXTRAS |
| NAMM28234 | L 18 ASSY TEAM ROOM |
| NAMM28346 | L18 OIL FILL DYE INJECTION SYSTEM |
| NAM7271ELEC1 | L 18 ENG ASM ELECTRICAL |
| NAMM28023 | L 18 ACCESSORY DRIVE BRACKET MANIPULATOR |
| NAMM28018 | L 18 BALANCER — — MANIPULATOR |
| NAMM28024 | L 18 BELL HOUSING MANIPULATOR |
| NAMM28017 | L 18 CRANK ASSY — MANIPULATOR |
| NAM118ENGRAC | L 18 ENGINE RACKS(970) GM32076 |
| NAMM28022 | L 18 FLYWHEEL — MANIPULATOR |
| NAM7271FD | L 18 ENGINE LINE FOUNDATION |
| NAMM28016 | L 18 INLET MAN ASSY MANIPULATOR |
| NAMM28020 | L 18 L H HEAD— MANIPULATOR |
| NAMM26916TS2 | L 18 TEST STANDS |
| NAMM28019 | L 18 OIL PAN — MANIPULATOR |
| NAM7271INS1B | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM28021 | L 18 R H HEAD — MANIPULATOR |
| NAM7271INS2 | L 18 ENGINE ASM LINE(INSTALL) |
| NAM7271M | L 18 ASM LINE ENG SYS WIRE WAY |
| NAMM28468 | OCF 9600 DIGITAL ENG PRINT SYSTEM |
| NAMM28323 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28324 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28325 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAM7271INS1A | L 18 ENGINE ASM LINE(INSTALL) |
| NAMM28326 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAM7271Q | L-18 ASM LINE BALANCERS |
| NAM7271S | L 18 ASM LINE EMPTY PALLET STORAGE SYSTEM |
| NAM7271F | L 18 ASSEMBLY LINE EXTRAS |
| NAMM28234A | L 18 ASSY TEAM ROOM |
| NAMM28128 | MARK ASM/PIST AREA LIFT&TILT TABLE |
| NAMM28248 | L 18 ASSY TEAM ROOM |
| NAMM28129 | MARK ASM/PIST AREA LIFT&TILT TABLE |
| NAMM28246 | L 18 ASSY TEAM ROOM |
| NAMM28300 | L 18 ASM HOHL CART 22960 |
| NAMM28244 | L 18 ASSY TEAM ROOM |
| NAMM28302 | L 18 ASM HOHL CART 22960 |
| NAMM28249 | L 18 ASSY TEAM ROOM |
| NAMM28295 | L 18 ASM HOHL CART 22960 |
| NAMM28247 | L 18 ASSY TEAM ROOM |
| NAMM28296 | L 18 ASM HOHL CART 22960 |
| NAMM28245 | L -18 ASSY TEAM ROOM |
| NAMM28297 | L 18 ASM HOHL CART 22960 |
| NAMM28243 | L -18 ASSY TEAM ROOM |
| NAMM28298 | L 18 ASM HOHL CART 22960 |

| | |
|---|---|
| NAMM28242 | L 18 ASSY TEAM ROOM |
| NAMM28299 | L 18 ASM HOHL CART 22960 |
| NAMM28241 | L 18 ASSY TEAM ROOM |
| NAMM28301 | L 18 ASM HOHL CART 22960 |
| NAMM28234B | L 18 ASSY TEAM ROOM |
| NAMM28303 | L 18 ASM HOHL CART 22960 |
| NAMM28270 | L 18 ANDON BOARD |
| NAM7271B | L 18 ASSEMBLY LINE EXTRAS |
| NAMM28269 | L 18 ANDON BOARD |
| NAM7271PMCSW | L 18 ASM LINE P M & C SOFTWARE |
| NAMM28188A | L 18 NAPP ELECTRONIC PULL SYSTEM |
| NAMM28321 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28328 | 3/4 TON AIR HOIST(BUCKETS) L18 REPAIR LOOP |
| NAMM28268F | L 18 HEAD LIFT TABLE FOUNDATION |

**SCHEDULE 2 - GM Trust 2001 A-8
TO PARTICIPATION AGREEMENT**

## NOTE PURCHASERS' COMMITMENT

| **Lessor's Cost** | **Interest Rate** |
|---|---|
| $10 785 000 | 7 20% |

| | COMMITMENT | % OF LESSOR S COST |
|---|---|---|
| John Hancock Life Insurance Company 1 | 860 110 00 | 7 98% |
| John Hancock Life Insurance Company 2 | 0 00 | |
| John Hancock Variable Life Insurance Company | 850 000 00 | 7 88% |
| Mellon Bank N A   Trustee for Bell Atlantic Master Trust | 0 00 | |
| **Hancock Total** | **1 710,110 00** | 15 86% |
| | | |
| Teachers Insurance and Annuity Association of America | 1 094 470 00 | 10 15% |
| **Teachers Total** | **1 094 470 00** | 10 15% |
| | | |
| American General Annuity Insurance Company | 0 00 | |
| American General Life Insurance Company | 575 736 50 | 5 34% |
| All American Life Insurance Company | 0 00 | |
| American General Life Insurance Company of New York | 0 00 | |
| **AIG Total** | | |
| SunAmerica Life Insurance Company | 575 736 50 | 5 34% |
| **Sun Total** | | |
| **AIG/Sun Total** | **1 151,473 00** | 10 68% |
| | | |
| Allstate Life Insurance Company | 942 840 00 | 8 74% |
| **Allstate Total** | **942 840 00** | 8 74% |
| | | |
| Jackson National Life Insurance Company | | |
| (ELI Account) | 0 00 | |
| (41 Account) | 645 281 00 | 5 98% |
| (MVA Account) | 0 00 | |
| **Jackson/PPM Total** | **645,281 00** | 5 98% |
| | | |
| IDS Life Insurance Company (909) | 578 307 00 | 5 34% |
| **Amex Total** | **578 307 00** | 5 34% |
| | | |
| Principal Life Insurance Company 1 | 357 310 00 | 3 31% |
| Principal Life Insurance Company 2 | 34 578 00 | 0 32% |
| Principal Life Insurance Company 3 | 23 052 00 | 0 21% |
| Principal Life Insurance Company 4 | 46 105 00 | 0 43% |
| Principal Life Insurance Company 5 | 46 105 00 | 0 43% |
| Principal Life Insurance Company 6 | 69 157 00 | 0 64% |
| **Principal Total** | **578 307 00** | 5 34% |
| | | |
| The Canada Life Assurance Company | | |
| (Account G52724) | 0 00 | |
| (Account G53708) | 0 00 | |
| (Account G06798) | 433 228 00 | 4 02% |
| (Account G08808) | 0 00 | |
| **Canada Total** | **433,228 00** | 4 02% |
| | | |
| Nationwide Mutual Insurance Company | 141 939 00 | 1 32% |
| Nationwide Life Insurance Company | 205 213 00 | 1 90% |
| **Nation Total** | **347 152 00** | 3 22% |
| | | |
| Lutheran Brotherhood | 232 295 26 | 2 15% |
| **Lutheran Total** | **232,295.26** | 2 15% |
| | | 0 00% |
| Trustmark Insurance Company | 51 303 29 | 0 48% |
| Farm Bureau Mutual Insurance Company of Michigan | 62 704 02 | 0 58% |
| MTL Insurance Company | 49 707 19 | 0 46% |
| American Republic Insurance Company | 45 602 93 | 0 42% |
| Protected Home Mutual Life Insurance Company | 22 801 46 | 0 21% |
| **Advantus Total** | **232 119 00**    232 118 89 | 2 15% |
| | | 0 00% |
| | | 0 00% |
| Massachusetts Mutual Life Insurance Company | | 0 00% |
| (Account LTP) | 77 525 44 | 0 72% |
| (Account PM-GIA) | 91,206 40 | 0 85% |
| (Account GIC SPAC) | 13 680 96 | 0 13% |

| (Account Str Settle) | 22 801 60 | 0 21% |
| C M Life Insurance Company | 22 801 60 | 0 21% |
| **Mass Total** | **228 016 00** | **2 11%** |

| **NOTE PURCHASERS' AGGREGATE** | **8,169,598.26** | **75 75%** |

**SCHEDULE 3   Trust GM 2001 A-7**
**TO PARTICIPATION AGREEMENT**

**OWNER PARTICIPANT COMMITMENT**

| Aggregate Equity Amount | % OF LESSOR'S COST |
|---|---|
| $2,506,852 08 | 23 24387650 |

General Foods Credit Investors No2 Corporation
c/o Phillip Morris Capital Corporation

225 High Ridge Road
Suite 300 West
Stamford, CT 06905



# UCC FILING MATRIX

| LEASE | LOCATION OF EQUIPMENT | SECRETARY OF STATE STEP 1 UCC FILINGS GM AS LESSEE | STEP 1 COUNTY LEVEL FIXTURE FILINGS & MEMORANDUM OF LEASE | SECRETARY OF STATE STEP 2 UCC FILINGS STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, OWNER TRUSTEE AS DEBTOR | STEP 2 COUNTY LEVEL FIXTURE FILINGS |
|---|---|---|---|---|---|
| GM 2001-A-X | Tonawanda, NY | Delaware | Erie County, NY | Connecticut | Erie County, NY |

I \\server\GM_2001 Lease\GXI guns\bxs Part Agt & Defn\Scnedules Schedule 4 Schedule _ UCC filing matrix\4 S) wpd

GM2001A-8

## SCHEDULE 5
## TO PARTICIPATION AGREEMENT

### SCHEDULED LIENS

Liens for Taxes that are not yet due and payable

## SCHEDULE 6
## TO PARTICIPATION AGREEMENT

## CONSENTS

None

## SCHEDULE 7
## TO PARTICIPATION AGREEMENT

### ENVIRONMENTAL MATTERS

None

## SCHEDULE 8
## TO PARTICIPATION AGREEMENT

### ADDRESSES

General Motors Corporation
New York Treasurer's Office
767 Fifth Avenue, 14th Floor
New York, NY 10153
Attn  Director, Capital Planning
Facsimile  (212) 418-3639
Telephone  (212) 418-6271

State Street Bank and Trust Company of
Connecticut, National Association
225 Asylum Street, 23rd Floor
Hartford, CT 06103

Wells Fargo Bank Northwest, National
Association
79 South Main Street
3rd Floor
Salt Lake City, UT 84111
Attn


General Electric Capital Corporation
120 Long Ridge Road 3rd Floor
Stamford, CT 06927-4900

## SCHEDULE 9   Trust GM 2001 A-8
## TO PARTICIPATION AGREEMENT

### OWNER PARTICIPANTS PRICING ASSUMPTIONS

| | |
|---|---|
| Transaction Costs | 0 46% of Lessor's Cost |
| Interest Rate on Equipment Note | 7 20% |
| Principal Amount of Equipment Note | $8,169,598 26 |
| Owner Participant's Commitment | $2,615,401 74 |
| Amortization of Equipment Note | See Attached Schedule |

.

**Reserved**