Appendix 1

Debtors' Ex. 6 in Evidence

Loan and Security Agreement by and between
Borrower and U.S. Dept. of Treasury as Lender,
dated as of December 31, 2008 (Execution Version),
and all Appendices, Schedules and Exhibits Thereto

Pursuant to the provisions of Local Bankruptcy Rule 8007-1(b),
because of its unusual bulk, only the relevant portions of Debtors' Ex. 6
are included in Appendix 1. If requested by the Court or by any party,
other relevant portions of the document (or if needed, the entire document)
will be made available.

EX-10.1

EX-10.1 2 k47265exv10w1.htm EX-10.1

**Exhibit 10.1**

**EXECUTION VERSION**

---

## LOAN AND SECURITY AGREEMENT

### By and Between

### The Borrower Listed on Appendix A

### as Borrower

### and

### THE UNITED STATES DEPARTMENT OF THE TREASURY

### as Lender

### Dated as of December 31, 2008

---

\*\*\* Portions of this exhibit have been omitted under a request for confidential treatment pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934 and filed separately with the United States Securities and Exchange Commission.

---

GM EX 6

GMPR-HD 3228

EX-10.1

## TABLE OF CONTENTS

| | Page |
|---|---|
| SECTION 1. DEFINITIONS AND ACCOUNTING MATTERS | 1 |
| 1.01 Certain Defined Terms | 1 |
| 1.02 Interpretation | 21 |
| 1.03 Accounting Terms and Determinations | 22 |
| | |
| SECTION 2. ADVANCES, NOTE AND PAYMENTS | 22 |
| 2.01 Advances | 22 |
| 2.02 The Note | 22 |
| 2.03 Procedure for Borrowing | 22 |
| 2.04 Limitation on Types of Advances; Illegality | 23 |
| 2.05 Repayment of the Advances; Interest | 23 |
| 2.06 Optional Prepayments | 24 |
| 2.07 Mandatory Prepayments | 24 |
| 2.08 Requirements of Law | 25 |
| 2.09 Use of Proceeds | 25 |
| | |
| SECTION 3. PAYMENTS; COMPUTATIONS; TAXES | 26 |
| 3.01 Payments | 26 |
| 3.02 Computations | 26 |
| 3.03 US Taxes | 26 |
| | |
| SECTION 4. COLLATERAL SECURITY | 29 |
| 4.01 Collateral; Security Interest | 29 |
| 4.02 UCC Matters; Further Assurances | 30 |
| 4.03 Changes in Locations, Name, etc | 30 |
| 4.04 Lender's Appointment as Attorney-in-Fact | 31 |
| 4.05 Performance by the Lender of the Borrower's Obligations | 32 |
| 4.06 Proceeds | 32 |
| 4.07 Remedies | 32 |
| 4.08 Continuing Liability of the Borrower | 33 |
| 4.09 Limitation on Duties Regarding Preservation of Facility Collateral | 33 |
| 4.10 Powers Coupled with an Interest | 34 |
| 4.11 Release of Security Interest Upon Satisfaction of all Obligations | 34 |
| 4.12 Partial Release of Facility Collateral | 34 |
| | |
| SECTION 5. CONDITIONS PRECEDENT | 35 |
| 5.01 Initial Advance | 35 |
| 5.02 Initial and Subsequent Advances | 38 |
| | |
| SECTION 6. REPRESENTATIONS AND WARRANTIES | 39 |
| 6.01 Existence | 39 |
| 6.02 Financial Condition | 39 |
| 6.03 Litigation | 40 |
| 6.04 No Breach | 40 |
| 6.05 Action, Binding Obligations | 40 |
| 6.06 Approvals | 40 |
| 6.07 Taxes | 40 |

- i -

GMPR-HD 3229

|  | Page |
|---|---|
| 6.08 Investment Company Act | 41 |
| 6.09 No Default | 41 |
| 6.10 Chief Executive Office; Chief Operating Office | 41 |
| 6.11 Location of Books and Records | 41 |
| 6.12 True and Complete Disclosure | 41 |
| 6.13 Material Agreements | 41 |
| 6.14 ERISA | 41 |
| 6.15 Expense Policy | 41 |
| 6.16 Subsidiaries | 41 |
| 6.17 Capitalization | 42 |
| 6.18 Fraudulent Conveyance | 42 |
| 6.19 USA PATRIOT Act | 42 |
| 6.20 Embargoed Person | 42 |
| 6.21 Borrowing for Own Benefit | 43 |
| 6.22 Indebtedness | 43 |
| 6.23 Labor Matters | 43 |
| 6.24 Survival of Representations and Warranties | 43 |
| 6.25 Representations Concerning the Facility Collateral | 44 |
| 6.26 Intellectual Property | 44 |
| 6.27 JV Agreements | 45 |
| 6.28 Senior Lien Assets | 45 |
| 6.29 Excluded Collateral | 45 |
| 6.30 Mortgaged Real Property | 45 |
| 6.31 Additional Representations and Warranties | 46 |
| | |
| SECTION 7. AFFIRMATIVE AND FINANCIAL COVENANTS OF THE LOAN PARTIES | 46 |
| 7.01 Financial Statements | 46 |
| 7.02 Reporting Requirements | 48 |
| 7.03 Financial Covenants | 49 |
| 7.04 Existence, Etc | 49 |
| 7.05 Use of Proceeds | 50 |
| 7.06 Maintenance of Property; Insurance | 50 |
| 7.07 Further Identification of Facility Collateral | 50 |
| 7.08 Defense of Title | 51 |
| 7.09 Preservation of Facility Collateral | 51 |
| 7.10 Maintenance of Papers, Records and Files | 51 |
| 7.11 Maintenance of Licenses | 51 |
| 7.12 Payment of Obligations | 51 |
| 7.13 OFAC | 52 |
| 7.14 Investment Company | 52 |
| 7.15 Due Diligence | 52 |
| 7.16 Further Assurances | 52 |
| 7.17 Executive Privileges and Compensation | 53 |
| 7.18 Asset Divestiture | 54 |
| 7.19 Restrictions on Expenses | 54 |
| 7.20 Restructuring Plan; Restructuring Targets | 54 |
| 7.21 Term Sheet Requirements | 55 |
| 7.22 Restructuring Plan Report | 55 |
| 7.23 President's Designee Review/Certification | 55 |
| 7.24 Required Distributions | 56 |
| 7.25 Provide Additional Information | 56 |

- ii -

GMPR-HD 3230

|                                                                   | Page |
|-------------------------------------------------------------------|------|
| 7.26 Material Transaction                                         | 56   |
| **SECTION 8. NEGATIVE COVENANTS OF THE LOAN PARTIES**            | 56   |
| 8.01 Prohibition of Fundamental Changes                          | 56   |
| 8.02 Lines of Business                                           | 56   |
| 8.03 Transactions with Affiliates                                | 56   |
| 8.04 Limitation on Liens                                         | 57   |
| 8.05 Limitation on Distributions                                 | 57   |
| 8.06 No Amendment or Waiver                                      | 57   |
| 8.07 Prohibition of Certain Prepayments                          | 57   |
| 8.08 Change of Fiscal Year                                       | 57   |
| 8.09 Limitation on Negative Pledge Clauses                       | 57   |
| 8.10 Limitations on Indebtedness                                 | 57   |
| 8.11 Limitations on Investments                                  | 58   |
| 8.12 ERISA                                                        | 58   |
| 8.13 Action Adverse to the Facility Collateral                   | 58   |
| 8.14 Limitation on Sale of Assets                                | 58   |
| 8.15 Restrictions on Pension Plans                               | 58   |
| 8.16 JV Agreements                                               | 59   |
| **SECTION 9. EVENTS OF DEFAULT; TERMINATION EVENTS**            | 59   |
| 9.01 Events of Default                                           | 59   |
| **SECTION 10. REMEDIES**                                         | 61   |
| **SECTION 11. MISCELLANEOUS**                                   | 63   |
| 11.01 Waiver                                                     | 63   |
| 11.02 Notices                                                    | 63   |
| 11.03 Indemnification and Expenses                               | 63   |
| 11.04 Amendments                                                 | 64   |
| 11.05 Successors and Assigns                                     | 64   |
| 11.06 Survival                                                   | 64   |
| 11.07 Captions                                                   | 65   |
| 11.08 Counterparts and Facsimile                                 | 65   |
| 11.09 Loan Agreement Constitutes Security Agreement              | 65   |
| 11.10 Governing Law                                              | 65   |
| 11.11 SUBMISSION TO JURISDICTION; WAIVERS                        | 65   |
| 11.12 WAIVER OF JURY TRIAL                                       | 66   |
| 11.13 Acknowledgments                                            | 66   |
| 11.14 Hypothecation or Pledge of Facility Collateral             | 66   |
| 11.15 Assignments; Participations                                | 66   |
| 11.16 Periodic Due Diligence Review                              | 67   |
| 11.17 Set-Off                                                    | 68   |
| 11.18 Reliance                                                   | 68   |
| 11.19 Reimbursement                                              | 68   |
| 11.20 Waiver Of Redemption And Deficiency Rights                 | 69   |
| 11.21 Single Agreement                                           | 69   |
| 11.22 Severability                                               | 69   |
| 11.23 Entire Agreement                                           | 69   |
| 11.24 Appendix A                                                 | 69   |

- iii -

GMPR-HD 3231

SCHEDULES

SCHEDULE 1.1    List of Pledgors

SCHEDULE 1.2    List of Guarantors

SCHEDULE 6.03    Litigation

SCHEDULE 6.10    Chief Executive Office, Chief Operating Office

SCHEDULE 6.13    Existing Agreements

SCHEDULE 6.16    Subsidiaries

SCHEDULE 6.17    Ownership of Loan Parties

SCHEDULE 6.22    Existing Indebtedness

SCHEDULE 6.25    Filing Jurisdictions and Offices

SCHEDULE 6.26    Intellectual Property

SCHEDULE 6.27    JV Agreements

SCHEDULE 6.28    Facility Collateral Subject to a Senior Lien

SCHEDULE 6.29    Excluded Collateral

SCHEDULE 6.30    Excluded Real Property

EXHIBITS

EXHIBIT A    Form of Note

EXHIBIT B    Acknowledgment and Consent

EXHIBIT C    Form of Notice of Borrowing

EXHIBIT D    Form of Confidentiality Agreement

EXHIBIT E    Form of Compliance Certificate

EXHIBIT F    Form of Exemption Certificate

EXHIBIT G-1    Form of Waiver for the Loan Parties

EXHIBIT G-2    Form of Waiver from SEOs to Lender

EXHIBIT G-3    Form of Consent and Waiver of SEOs to Loan Parties

EXHIBIT G-4    Form of Waiver of Senior Employees to Lender

EXHIBIT G-5    Form of Consent and Waiver of Senior Employees to Loan Parties

APPENDICES

APPENDIX A    Supplement to Loan and Security Agreement

GMPR-HD 3232

EX-10.1

- iv -

GMPR-HD 3233

## LOAN AND SECURITY AGREEMENT

LOAN AND SECURITY AGREEMENT, dated as of December 31, 2008, between the Borrower set forth on Appendix A (the "Borrower") and THE UNITED STATES DEPARTMENT OF THE TREASURY (the "Lender").

### RECITALS

The Borrower wishes to obtain financing from time to time to restore liquidity to its business, and to restore stability to the domestic automobile industry in the United States, and the Lender has agreed, subject to the terms and conditions of this Loan Agreement, to provide such financing to the Borrower.

The financing provided hereunder will be used in a manner that (A) enables the Borrower and its Subsidiaries to develop a viable and competitive business that minimizes adverse effects on the environment; (B) enhances the ability and the capacity of the Borrower and its Subsidiaries to pursue the timely and aggressive production of energy-efficient advanced technology vehicles; (C) preserves and promotes the jobs of American workers employed directly by the Borrower and its Subsidiaries and in related industries; (D) safeguards the ability of the Borrower and its Subsidiaries to provide retirement and health care benefits for their retirees and their dependents; and (E) stimulates manufacturing and sales of automobiles produced by the Borrower and its Subsidiaries.

Accordingly, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### SECTION 1. DEFINITIONS AND ACCOUNTING MATTERS.

**1.01 Certain Defined Terms.** Subject to the amendments, restatements, supplements or other modifications in Section 1.01 of Appendix A, as used herein, the following terms shall have the following meanings (all terms defined in this Section 1.01 or in other provisions of this Loan Agreement in the singular to have the same meanings when used in the plural and vice versa):

"Account Control Agreement" shall mean one or more account control agreements among the Lender, the applicable Loan Parties and each bank party thereto, in form and substance acceptable to the Lender, to be entered into with respect to each Facility Account, as amended, restated, supplemented or otherwise modified from time to time.

"Acknowledgement and Consent" shall have the meaning specified in Section 5.01(r) hereof.

"Advance" shall have the meaning specified in Section 2.01(a).

"Affiliate" shall mean, with respect to any Person, any other Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person. For purposes of this Loan Agreement, "control" (together with the correlative meanings of "controlled by" and "under common control with") means possession, directly or indirectly, to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract, or otherwise.

"After Acquired Real Property" shall have the meaning set forth in Section 7.16(b) hereof.

GMPR-HD 3234

the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Equity Interests" shall mean any and all equity interests, including any shares of stock, membership or partnership interests, participations or other equivalents whether certificated or uncertificated (however designated) of a corporation, limited liability company, partnership or any other entity, and any and all similar ownership interests in a Person and any and all warrants or options to purchase any of the foregoing.

"Equity Pledge Agreement" shall mean that certain pledge agreement, dated as of the date hereof, by each Pledgor in favor of the Lender.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" shall mean any corporation or trade or business or other entity, whether or not incorporated, that is a member of any group of organizations (i) described in Section 414(b), (c), (m) or (o) of the Code of which any Loan Party is a member or (ii) which is under common control with any Loan Party within the meaning of section 4001 of ERISA.

"ERISA Event" shall mean (i) any Reportable Event or a determination that a Plan is "at risk" (within the meaning of Section 302 of ERISA); (ii) the incurrence by the Borrower or any ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan or the withdrawal or partial withdrawal of the Borrower or any of its respective ERISA Affiliates from any Plan or Multiemployer Plan; (iii) the receipt by the Borrower or any ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (iv) the receipt by the Borrower or any ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; or (v) the occurrence of a nonexempt "prohibited transaction" with respect to which the Borrower, the other Loan Parties or their ERISA Affiliates is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which the Borrower or any ERISA Affiliate could otherwise be liable.

"Event of Default" shall have the meaning provided in Section 9.01.

"Excluded Collateral" shall mean any Property to the extent that a grant of a security interest therein (a) is prohibited by any Applicable Law, or requires a consent pursuant to Applicable Law that has not been obtained from any Governmental Authority, or (b) is contractually prohibited, or constitutes a breach or default under or results in the termination of any contract (except to the extent that such contract or the related prohibitive provisions therein are ineffective under the New York Uniform Commercial Code or other Applicable Law) or requires a consent from any other Person (other than the Borrower or any of its Affiliates) that has not been obtained, (c) in the case of any investment property (as such term is defined in the Uniform Commercial Code), is prohibited under any applicable organizational, constitutive, shareholder or similar agreement (except to the extent that such agreement or the related prohibitive provisions therein are ineffective under the Uniform Commercial Code or other Applicable Law), or (d) is Property of any of the following types:

(i) motor vehicles situated in a jurisdiction in which the perfection of a security interest is excluded from the Uniform Commercial Code;

- 5 -

GMPR-HD 3238

(ii) voting Equity Interests in any Controlled Foreign Subsidiary, to the extent (but only to the extent) required to prevent the Collateral from including more than 65% of all voting Equity Interests in such Controlled Foreign Subsidiary;

(iii) any Equity Interests owned by the Borrower or other Loan Party in any Excluded Subsidiary;

(iv) assets that give rise to tax-exempt interest income within the meaning of Section 265(a)(2) of the Internal Revenue Code of 1986, as amended from time to time;

(v) any Property, including any debt or Equity Interest and any manufacturing plant or facility which is located within the continental United States, to the extent that the grant of a security interest therein to secure the Obligations will result in a lien, or an obligation to grant a lien, in such Property to secure any other obligation;

(vi) any "intent to use" United States trademark application for which a statement of use has not been filed;

(vii) any Property that is subject to a purchase option granted to any dealer of the Borrower's or any Loan Parties' products with respect to the related dealership Properties;

(viii) any Property (including any tangible embodiments of Intellectual Property that may be affixed to or embodied in any Property), including any Equity Interest, to the extent that the Borrower or any other Loan Party has assigned, pledged, or otherwise granted a security interest in or with respect to such Property to secure any indebtedness or any other obligations, including any Senior Lien Loan, prior to the Effective Date, to the extent that a grant of a security interest therein is contractually prohibited, or constitutes a breach or default under or results in the termination of any contract, or requires a consent from any other Person (other than the Borrower or any of its Affiliates) that has not been obtained;

(ix) any Property of the Borrower or any Loan Party acquired with (a) funds obtained from the Government of the United States, including proceeds of any loan obtained under Section 136 of the EISA or (b) under any other government programs or using other government funds, including proceeds of government loans, contracts, grants, cooperative agreements, or Cooperative Research and Development Agreements, to the extent that a grant of a security interest therein is contractually prohibited, or constitutes a breach or default under or results in the termination of any contract or precludes eligibility for funding described in clauses (a) or (b) above or requires a consent from any other Person (other than the Borrower or any of its Affiliates) that has not been obtained;

(x) any Property, including cash and cash equivalents, (x) pledged or deposited in connection with insurance, including worker's compensation, unemployment insurance or other types of social security or pension benefits, (y) pledged or deposited to secure the performance of bids, tenders, statutory obligations, and surety, appeal, customs or performance bonds and similar obligations, or (z) pledged or deposited to secure reimbursement obligations in respect of letters of credit issued to support any obligations or liabilities described in clauses (x) or (y) above; and

(xi) to the extent not otherwise included, all proceeds, including cash proceeds (as each such term is defined in the Uniform Commercial Code), and products of Excluded Collateral, in whatever form, including cash or cash equivalents.

- 6 -

GMPR-HD 3239

"Excluded Subsidiary" shall have the meaning set forth in Appendix A.

"Excluded Taxes" shall have the meaning provided in Section 3.03(a).

"Executive Order" shall have the meaning provided in Section 6.20.

"Existing Agreements" shall mean the agreements of the Loan Parties and their Subsidiaries in effect on the Effective Date and any extensions, renewals and replacements thereof so long as any such extension, renewal and replacement could not reasonably be expected to have a material adverse effect on the rights and remedies of the Lender under any of the Loan Documents.

"Expense Policy" shall mean the Borrower's comprehensive written policy on corporate expenses maintained and implemented in accordance with Section 7.19.

"Expiration Date" shall have the meaning set forth in Appendix A.

"Facility Account" shall have the meaning set forth in Appendix A.

"Facility Collateral" shall mean collectively, (i) the Collateral pledged hereunder, (ii) the Collateral (as defined in the Equity Pledge Agreement) pledged to the Lender under the Equity Pledge Agreement, (iii) the Collateral (as defined in the Intellectual Property Pledge Agreement), pledged to the Lender under the Intellectual Property Agreement, (iv) the Guaranty Collateral (as defined in the Guaranty), pledged to the Lender under the Guaranty, and (v) any other collateral security pledged to Lender under any other Loan Document, including without limitation each Mortgage; provided that Facility Collateral shall exclude any Property constituting Excluded Collateral.

"Foreign Subsidiary" shall mean any Subsidiary that is not a Domestic Subsidiary.

"Funding Date" shall have the meaning set forth in Appendix A.

"GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States.

"Governmental Authority" shall mean, with respect to any Person, any nation or government, any state or other political subdivision, agency or instrumentality thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any court or arbitrator having jurisdiction over such Person, any of its Subsidiaries or any of its properties.

"Guarantee" shall mean, as to any Person, any obligation of such Person directly or indirectly guaranteeing any Indebtedness of any other Person or in any manner providing for the payment of any Indebtedness of any other Person or otherwise protecting the holder of such Indebtedness against loss (whether by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, or to take-or-pay or otherwise), provided that the term "Guarantee" shall not include (i) endorsements for collection or deposit in the ordinary course of business, or (ii) obligations to make servicing advances for delinquent taxes and insurance, or other obligations in respect of a mortgaged property, to the extent required by the Lender. The amount of any Guarantee of a Person shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. The terms "Guarantee" and "Guaranteed" used as verbs shall have correlative meanings.

- 7 -

GMPR-HD 3240

"Guarantors" shall mean those Persons listed on Schedule 1.2.

"Guaranty" shall mean that certain Guaranty and Security Agreement, dated as of the date hereof, by each Guarantor in favor of the Lender guarantying the Obligations of the Borrower.

"Hedging Agreement" means any (i) interest rate swap agreement, interest rate cap agreement or other agreement designed to protect against fluctuations in interest rates or (ii) foreign exchange forward contract, currency swap agreement or other agreement designed to protect against fluctuations in foreign exchange rates or (iii) commodity or raw material futures contract or other agreement designed to protect against fluctuations in raw material prices.

"Indebtedness" shall mean, for any Person: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services; (c) indebtedness of others of the type referred to in clauses (a), (b), (d), (e), (f) and (g) of this definition secured by a Lien on the Property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (e) Capital Lease Obligations of such Person; (f) obligations of such Person under repurchase agreements or like arrangements; (g) indebtedness of others of the type referred to in clauses (a), (b), (d), (e), (f) and (g) of this definition Guaranteed by such Person; (h) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; (i) indebtedness of general partnerships of which such Person is a general partner unless the terms of such indebtedness expressly provide that such Person is not liable therefor; and (j) any other indebtedness of such Person evidenced by a note, bond, debenture or similar instrument.

"Individual Property" shall mean each parcel of real property, the improvements thereon and all personal property owned by the applicable Loan Party and encumbered by a Mortgage, together with all rights pertaining to such real property, improvements and personal property, as more particularly described in Article 1 of each Mortgage and referred to therein as the "Property".

"Intellectual Property" shall mean all Patents, Trademarks and Copyrights owned by any Loan Party, and all rights under any Licenses to which a Loan Party is a party.

"Intellectual Property Pledge Agreement" shall mean that certain Intellectual Property Pledge Agreement, dated as of the date hereof, by and among each Loan Party and the Lender.

"Interest Payment Date" shall have the meaning set forth in Appendix A.

"Interest Period" shall mean, with respect to any Advance, (i) initially, the period commencing on the Funding Date with respect to such Advance and ending on the calendar day prior to the next succeeding Interest Payment Date; and (ii) thereafter, each period commencing on an Interest Payment Date and ending on the calendar day prior to the next succeeding Interest Payment Date. Notwithstanding the foregoing, no Interest Period may end after the Maturity Date.

"Investment" shall mean any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase of any Equity Interests, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or any other similar investment in, any Person.

- 8 -

GMPR-HD 3241

"Investment Company Act" shall mean the Investment Company Act of 1940, as amended from time to time, including all rules and regulations promulgated thereunder.

"Joint Venture" shall mean any joint venture, partnership or similar arrangement between any Loan Party or one of its Subsidiaries and independent third parties which are not Subsidiaries of a Loan Party.

"JV Agreement" shall mean each partnership or limited liability company agreement (or similar agreement) between a Loan Party or one of its Subsidiaries and the relevant JV Partner as the same may be amended, restated, supplemented or otherwise modified from time to time, in accordance with the terms hereof.

"JV Partner" shall mean each Person party to a JV Agreement that is not a Loan Party or one of its Subsidiaries.

"Labor Modifications" shall mean, collectively, the Compensation Reductions, the Severance Rationalization and the Work Rule Modifications.

"Lender" shall have the meaning assigned thereto in the preamble hereof.

"LIBOR" shall mean with respect to each Advance, the greater of (a) the LIBOR Floor and (b) the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to three months appearing on Reuters Screen LIBOR01 Page or if such rate ceases to appear on Reuters Screen LIBOR01 Page, on any other service providing comparable rate quotations at approximately 11:00 a.m., London time. LIBOR shall be determined on the Effective Date and reset on each Interest Payment Date.

"LIBOR Floor" shall have the meaning set forth in Appendix A.

"Licenses" shall mean the Copyright Licenses, the Trademark Licenses and the Patent Licenses.

"Lien" shall mean any mortgage, pledge, security interest, lien or other charge or encumbrance (in the nature of a security interest and other than licenses of Intellectual Property), including the lien or retained security title of a conditional vendor, upon or with respect to any property or assets.

"Loan Agreement" shall mean this Loan and Security Agreement, as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Loan Documents" shall mean the documents set forth on Appendix A, together with all other such documentation entered into in connection with the transactions contemplated under such documents and to fully evidence and secure the Borrower's Obligations hereunder.

"Loan Parties" shall mean the Borrower, the Guarantors, and the Pledgors, and "Loan Party" shall mean each of them.

"Mandatory Prepayment" shall have the meaning ascribed thereto in Section 2.07.

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, operations, property, condition (financial or otherwise) or prospects of the Loan Parties and their

- 9 -

GMPR-HD 3242

Subsidiaries (taken as a whole), (b) the ability of the Loan Parties (taken as a whole) to perform any of their obligations under any of the Loan Documents to which they are a party, (c) the validity or enforceability in any material respect of any of the Loan Documents to which they are a party, (d) the rights and remedies of the Lender under any of the Loan Documents, or (e) the Facility Collateral (taken as a whole).

"Maturity Date" shall mean the earlier of (i) the Expiration Date, (ii) the date specified in Section 2.05(a)(ii), or (iii) the occurrence of an Event of Default, at the option of the Lender.

"Maximum Loan Amount" shall have the meaning set forth in Appendix A.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgage" shall mean, with respect to each Individual Property, that certain Mortgage (or Deed of Trust or Deed to Secure Debt, as applicable), Assignment of Leases and Rents, and Security Agreement or similar agreement, executed and delivered by a Loan Party as security for the Advances and encumbering such Individual Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Multiemployer Plan" shall mean a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions are required to be made by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate may have any direct or indirect liability or obligation contingent or otherwise.

"Net Proceeds" shall mean, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a Disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than the Advances) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable, including under any tax sharing arrangements) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case that are directly attributable to such event (as determined reasonably and in good faith by a Responsible Person).

"Non-Excluded Taxes" shall have the meaning provided in Section 3.03(a).

"Note" shall mean the promissory note provided for by Section 2.02(a) for the Advances and any promissory note delivered in substitution or exchange therefor, in each case as the same shall be modified and supplemented and in effect from time to time.

"Obligations" shall mean (a) all of the Borrower's obligations to repay the Advances on the Maturity Date, to pay interest on an Interest Payment Date and all other obligations and liabilities of the Borrower to the Lender, or any other Person arising under, or in connection with, the Loan Documents, whether now existing or hereafter arising; (b) any and all sums paid by the Lender pursuant to the Loan Documents in order to preserve any Facility Collateral or the interest of the Lender therein;

- 10 -

GMPR-HD 3243

(xiv) purchase money security interests in real property, improvements thereto or equipment hereafter acquired (or, in the case of improvements, constructed) by a Loan Party, including pursuant to Capital Lease Obligations; provided that (w) such security interests secure Indebtedness permitted by Section 8.10, (x) such security interests are incurred, and the Indebtedness secured thereby is created, within 90 days after such acquisition (or construction), (y) the Indebtedness secured thereby does not exceed the lesser of the cost or the fair market value of such real property, improvements or equipment at the time of such acquisition (or construction) and (z) such security interests do not apply to any other property or assets of the Borrower or any Subsidiary;

(xv) judgment Liens securing judgments not constituting an Event of Default under Section 9.01(g);

(xvi) any Lien consisting of rights reserved to or vested in any Governmental Authority by statutory provision;

(xvii) Liens securing Indebtedness described in clause (vi) or clause (vii) of the definition of Permitted Indebtedness;

(xviii) pledges or deposits made to secure reimbursement obligations in respect of letters of credit issued to support any obligations or liabilities described in clauses (xi) or (xii) of this definition;

(xix) other Liens created or assumed in the ordinary course of business of a Loan Party; provided that the obligations secured by all such Liens shall not exceed the principal amount of $50,000,000 in the aggregate at any one time outstanding; and

(xx) any other Permitted Lien set forth on Appendix A.

"Person" shall mean any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or government (or any agency, instrumentality or political subdivision thereof).

"Plan" shall mean an employee benefit or other plan covered by Title IV of ERISA, other than a Multiemployer Plan which is sponsored, established, contributed to or maintained by any Loan Party or any ERISA Affiliate, or for which any of the Loan Parties or any of their respective ERISA Affiliates could have any liability, whether actual or contingent (whether pursuant to section 4069 of ERISA or otherwise) or to which any of the Loan Parties or any of their respective ERISA Affiliates previously maintained or contributed to during the six years prior to the Effective Date.

"Plan Completion Certification" shall mean the certification of the President's Designee delivered in accordance with Section 7.23.

"Pledged Entity" shall mean a Subsidiary of a Loan Party whose Equity Interests are Pledged Equity pursuant to the Equity Pledge Agreement.

"Pledged Equity" shall mean all of the Equity Interests of a Pledged Entity (or such lesser amount as may be required pursuant to the Pledge Limitation (as defined in the Equity Pledge Agreement)), together with all ownership certificates, options or rights of any nature whatsoever which may be issued, granted or pledged by the owners of such interests to the Lender while this Loan Agreement is in effect.

- 16 -

GMPR-HD 3249

EX-10.1

"Pledgors" shall mean the Persons set forth on Schedule 1.1 hereof.

"Post-Closing Letter Agreement" shall mean that certain Post-Closing Letter Agreement, dated as of the date hereof, by and between the Borrower and the Lender.

"Post-Default Rate" shall mean, in respect of any principal of any Advance or any other amount under this Loan Agreement, the Note or any other Loan Document that is not paid when due to the Lender (whether at stated maturity, by acceleration or mandatory prepayment or otherwise), a rate per annum during the period from and including the due date to but excluding the date on which such amount is paid in full equal to 5.00% per annum, plus (x) the interest rate otherwise applicable to such Advance or other amount, or (y) if no interest rate is otherwise applicable, the sum of (i) LIBOR plus (ii) the Spread Amount.

"Prepayment Event" shall mean the occurrence of any of the following events:

(i) the Disposition of any Facility Collateral to any Person other than to any Loan Party or Pledged Entity;

(ii) the incurrence by any Loan Party of any Indebtedness (other than the incurrence of Indebtedness that constitutes Permitted Indebtedness) or any equity or other capital raises (other than (x) contributions of indemnity payments received by the Borrower and required to be applied to satisfy (or reimburse a payment made in respect of) obligations and liabilities of the Borrower or any of its Subsidiaries or (y) the proceeds of the Advances), either public or private, whether in connection with a primary securities offering, a business combination of any kind, or otherwise; or

(iii) the Disposition of unencumbered assets of the Borrower other than in the ordinary course of business (including aircraft divestments).

"President's Designee" shall mean (i) one or more officers from the Executive Branch appointed by the President to monitor and oversee the restructuring of the U.S. domestic automobile industry and (ii) if no such officer has been appointed, the Secretary of the Treasury.

"proceeds" shall have the meaning assigned to such term under the Uniform Commercial Code.

"Prohibited Jurisdiction" shall mean, any country or jurisdiction, from time to time, that is the subject of a prohibition order (or any similar order or directive), sanctions or restrictions promulgated or administered by any Governmental Authority of the United States.

"Prohibited Person" shall mean any Person:

(i) listed in the Annex to (the "Annex"), or otherwise subject to the provisions of the Executive Order;

(ii) that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order;

- 17 -

GMPR-HD 3250

EX-10.1

## SECTION 4. COLLATERAL SECURITY.

### 4.01 Collateral; Security Interest.

(a) Subject to any amendments, restatements, supplements or other modifications in Section 4.01 of Appendix A, as security for the prompt and complete payment when due of the Obligations and the performance by the Borrower of all the covenants and obligations to be performed by it pursuant to this Loan Agreement and the other Loan Documents, the Borrower hereby mortgages, pledges and grants to the Lender a Lien on and security interest in all of its rights, title and interest in and to all personal property and real property wherever located and whether now or hereafter existing and whether now owned or hereafter acquired, of every kind and description, tangible or intangible, including without limitation, the following, whether now or hereafter existing and wherever located:

(i) all Intellectual Property as well as royalties therefrom;

(ii) each Individual Property;

(iii) all cash and Cash Equivalents, and all other property from time to time deposited in any account or deposit account and the monies and property in the possession or under the control of Lender or any affiliate, representative, agent or correspondent of Lender related to the foregoing;

(iv) all other tangible and intangible personal property of the Borrower (whether or not subject to the Uniform Commercial Code), including, without limitation, all bank and other accounts and all cash and all investments therein, all rights to receive cash and investments, including without limitation, state, Federal or local tax refunds, intercompany debt, all proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of the Borrower described in the preceding clauses of this Section 4.01(a) (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by the Borrower in respect of any of the items listed above), and all books, correspondence, files and other Records in the possession or under the control of the Borrower or any other Person from time to time acting for the Borrower that at any time evidence or contain information relating to any of the property described in the preceding clauses of this Section 4.01(a) or are otherwise necessary or helpful in the collection or realization thereof;

(v) all rights, title and interest of the Borrower (but not any of the obligations, liabilities or indemnifications of the Borrower) in, to and under the Loan Documents;

(vi) all "accounts," "chattel paper," "commercial tort claims," "deposit accounts," "documents," "equipment," "general intangibles" (including without limitation, uncertificated Equity Interests), "goods," "instruments," "inventory," "investment property," "letter of credit rights," and "securities' accounts," as each of those terms is defined in the Uniform Commercial Code;

(vii) all products and proceeds relating to or constituting any or all of the foregoing (clauses (i) through (vii) collectively, the "Collateral");

- 29 -

GMPR-HD 3262

in each case howsoever the Borrower's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise), provided that, notwithstanding anything to the contrary contained herein or in any other Loan Document, the term "Collateral" and each other term used in the definition thereof shall not include, and the Borrower is not pledging or granting a security interest in, any Property to the extent that such Property constitutes Excluded Collateral; provided further that if and when, and to the extent that, any Property ceases to be Excluded Collateral, the Borrower hereby grants to the Lender, and at all times from and after such date, the Lender shall have, a first priority or junior priority, as applicable, Lien in and on such Property (subject to Permitted Liens) and the Borrower shall cooperate in all respects to ensure the prompt perfection of the Lender's security interest therein.

The Liens granted to Lender hereinabove shall be first priority Liens on all of the Collateral (subject to Permitted Liens and to the extent legally and contractually permissible); provided that, with respect to the Collateral which is subject to a Senior Lien, as set forth on Schedule 6.28, the Lien shall be of junior priority (subject to Permitted Liens and to the extent legally and contractually permissible).

The Obligations of the Borrower under the Loan Documents constitute recourse obligations of the Borrower, and therefore, their satisfaction is not limited to payments from the Facility Collateral.

(b) With respect to each right to payment or performance included in the Collateral from time to time, the Lien granted therein includes a continuing security interest in (i) any supporting obligation that supports such payment or performance and (ii) any Lien that (A) secures such right to payment or performance or (B) secures any such supporting obligation.

4.02 UCC Matters: Further Assurances. The Borrower, shall, at all times on and after the date hereof, and at its expense, cause Uniform Commercial Code financing statements and continuation statements to be filed in all applicable jurisdictions as required to continue the perfection of the security interests created by this Loan Agreement. The Borrower shall, from time to time, at its expense and in such manner and form as the Lender may reasonably require, execute, deliver, file and record any other statement, continuation statement, specific assignment or other instrument or document and take any other action that may be necessary, or that the Lender, may reasonably request, to create, evidence, preserve, perfect or validate the security interests created hereunder or to enable the Lender to exercise and enforce its rights hereunder with respect to any of the Facility Collateral. To the extent contemplated in the Post-Closing Letter Agreement, the Borrower agrees that, if the grant of a security interest in any Property to Lender requires a consent to such grant from any other Person (other than the Borrower or any of its Affiliates), the Borrower shall use its best efforts to procure such consent. Further, the Borrower agrees that if any Excluded Collateral should, at any time following the Effective Date, become Collateral on which the Lender is permitted to take a Lien, the Borrower shall so notify the Lender and cooperate with and shall take all steps as may be reasonably required by the Lender to enable and continue the perfection of the Lender's security interests therein and shall comply with the provisions of Section 7.16 hereof in connection therewith, to the extent applicable. Without limiting the generality of the foregoing, the Borrower shall, upon the request of the Lender, execute and file such Uniform Commercial Code financing or continuation statements, or amendments thereto or assignments thereof, Mortgages, and such other instruments or notices, as may be necessary or appropriate or as the Lender may request. The Borrower hereby authorizes the Lender to file one or more Uniform Commercial Code financing or continuation statements, and amendments thereto and assignments thereof, relative to all or any of the Collateral now existing or hereafter arising without the signature of the Borrower where permitted by law. A carbon, photographic or other reproduction of this Loan Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement.

4.03 Changes in Locations, Name, etc. If the Borrower shall (i) change the location of its chief executive office/chief place of business from that specified in Section 6.10 hereof, (ii) change

- 30 -

GMPR-HD 3263

    (g) the Borrower shall have paid to the Lender all fees and expenses owed to the Lender, including without limitation, reasonable attorney's fees, in accordance with this Loan Agreement and any other Loan Document;

    (h) the Lender or its designee shall have received any other documents reasonably requested by the Lender and the Borrower shall have provided such documents within a reasonable period of time after such request; and

    (i) each Loan Party shall have performed (to the satisfaction of the Lender) all other conditions to the making of an Advance requested by the Lender, including, without limitation, compliance in all respects with the terms and conditions of the Post-Closing Letter Agreement.

    (j) in the event that the Loan Parties were unable to obtain the necessary waivers, amendments, approvals and consents described in Section 5.01(l), each Monday (or if such day is not a Business Day, the next succeeding Business Day), the Borrower shall deliver to the Lender a weekly status report, commencing with the week of January 5, 2009, identifying each holder of a Senior Lien and each Senior Lien Lender, and the actions taken by the Loan Parties to obtain such necessary waivers, amendments, approvals, and consents.

Each request for a borrowing by the Borrower hereunder shall constitute a certification by the Borrower to the effect set forth in this Section (both as of the date of such notice, request or confirmation and as of the date of such borrowing).

    SECTION 6. **REPRESENTATIONS AND WARRANTIES.** Each Loan Party, as applicable, represents and warrants to the Lender that as of the Effective Date and as of each Funding Date:

    6.01 **Existence.** Each Loan Party (a) is a corporation, limited partnership or limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite corporate or other power, and has all governmental licenses, authorizations, consents and approvals, necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a Material Adverse Effect, (c) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify would not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect, and (d) is in compliance in all material respects with all Requirements of Law.

    6.02 **Financial Condition.** The Borrower has heretofore furnished to the Lender a copy of its audited Consolidated balance sheets and the audited Consolidated balance sheets of its Consolidated Subsidiaries (including each Loan Party), each as at December 31, 2007, with the opinion thereon of an independent auditor, a copy of which has been provided to the Lender, together with copies of the Borrower's unaudited pro forma Consolidated balance sheet and the unaudited pro forma Consolidated balance sheets of its Consolidated Subsidiaries (including each Loan Party), each as of the Effective Date. The Borrower has also heretofore furnished to the Lender the related Consolidated statements of income and retained earnings and of cash flows for the Borrower and its Consolidated Subsidiaries (including each Loan Party) for its most recent fiscal year, setting forth in comparative form the same information for the previous year. All such financial statements are materially complete and correct and fairly present the Consolidated financial condition of the Borrower and its Consolidated Subsidiaries (including each Loan Party) and the Consolidated results of their operations for the fiscal year ended on said date, all in accordance with GAAP applied on a consistent basis. There are no

- 39 -

GMPR-HD 3272

• • • • • • • • • •

Documents by each Loan Party shall be deemed to have been relied upon by the Lender notwithstanding any investigation heretofore or hereafter made by the Lender or on their behalf.

6.25 **Representations Concerning the Facility Collateral.** Each Loan Party represents and warrants to the Lender that as of each day that an Advance is outstanding pursuant to this Loan Agreement:

(a) No Loan Party has assigned, pledged, conveyed, or encumbered any Facility Collateral to any other Person (other than Permitted Liens) and immediately prior to the pledge of any such Facility Collateral, a Loan Party was the sole owner of such Facility Collateral and had good and marketable title thereto, free and clear of all Liens (other than Permitted Liens), and no Person, other than the Lender has any Lien (other than Permitted Liens) on any Facility Collateral. No security agreement, financing statement, equivalent security or lien instrument or continuation statement covering all or any part of the Facility Collateral which has been signed by any Loan Party or which any Loan Party has authorized any other Person to sign or file or record, is on file or of record with any public office, except such as may have been filed by or on behalf of a Loan Party in favor of the Lender pursuant to the Loan Documents or in respect of applicable Permitted Liens.

(b) The provisions of the Loan Documents are effective to create in favor of the Lender a valid security interest in all right, title, and interest of each Loan Party in, to and under the Facility Collateral, subject only to applicable Permitted Liens.

(c) Upon the filing of financing statements on Form UCC-1 naming the Lender as "Secured Party" and each Loan Party as "Debtor", and describing the Facility Collateral, in the jurisdictions and recording offices listed on Schedule 6.25 attached hereto, the security interests granted hereunder in the Facility Collateral will constitute perfected first priority security interests under the Uniform Commercial Code in all right, title and interest of the applicable Loan Party in, to and under such Facility Collateral, which can be perfected by filing under the Uniform Commercial Code except with respect to any Facility Collateral in which a Senior Lien Lender has been granted a security interest, in which case, the security interests granted hereunder in the Facility Collateral will constitute a junior Lien on such Facility Collateral, in each case, subject to applicable Permitted Liens.

(d) Each Loan Party has and will continue to have the full right, power and authority, to pledge the Facility Collateral, and the pledge of the Facility Collateral may be further assigned without any requirement.

6.26 **Intellectual Property.**

(a) Each of the Loan Parties owns and controls, or otherwise possesses adequate rights to use, all Intellectual Property material to the conduct of its business in substantially the same manner as conducted as of the date hereof. Schedule 6.26 hereto sets forth a true and complete list as of the date hereof of all Intellectual Property owned by each Loan Party that is material to the conduct of the business of such Loan Party. All such Intellectual Property, other than Licenses, that is material to the conduct of the business of such Loan Party is subsisting and in full force and effect, has not been adjudged invalid or unenforceable, is valid and enforceable and has not been abandoned in whole or in part, except for such instances which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Except as set forth in Schedule 6.26, no such Intellectual Property that is material to the conduct of the business of such Loan Party is the subject of any licensing or franchising agreement that prohibits or restricts any Loan Party's conduct of business as presently conducted. No Loan Party has any knowledge of any conflict with the rights of others to any Intellectual Property and, to the best knowledge of each Loan Party, no Loan Party is now infringing or in conflict

- 44 -

GMPR-HD 3277

with any such rights of others in any material respect, and to the best knowledge of each Loan Party, no other Person is now infringing or in conflict in any material respect with any such properties, assets and rights owned or used by or licensed to any Loan Party, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 6.26 hereto, no Loan Party has received any notice that it is violating or has violated the trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity or other intellectual property rights of any third party, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(b) Each material License now existing is, and each other material License will be, the legal, valid and binding obligation of the parties thereto, enforceable against such parties in accordance with its terms, except any unenforceability which could not reasonably be expected to have a Material Adverse Effect. To the knowledge of each Loan Party, no default thereunder by any such party has occurred, nor does any defense, offset, deduction, or counterclaim exist thereunder in favor of any such party which could reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 6.26, each material License either (a) permits by its terms (1) the pledge of the License, (2) the foreclosure on any such License by the Lender, and (3) any potential change of control of the relevant Loan Party without material impairment of the License, or (b) is subject to a waiver or consent secured by the relevant Loan Party.

(c) The Borrower will use its best efforts to ensure that the Lender is obtaining through the Loan Documents sufficient rights and assets to enable a subsequent purchaser of the Facility Collateral in a sale pursuant to Section 4.07 to manufacture vehicles of substantially the same quality and nature as those sold by Borrower as of the date hereof, provided that such purchaser has access to reasonably common motor vehicle technologies and manufacturing capabilities appropriate for vehicles of such nature, and market such vehicles through substantially similar channels as those employed by Borrower.

**6.27 JV Agreements.**

(a) Set forth on Schedule 6.27 is a complete and accurate list as of the date hereof of all JV Agreements, showing the parties and the dates of amendments and modifications thereto.

(b) Each JV Agreement (i) is in full force and effect and is binding upon and enforceable against each party thereto, (ii) has not been otherwise amended or modified, except as set forth on Schedule 6.27, and (iii) is not in default and no event has occurred that, with the passage of time and/or the giving of notice, or both, would constitute a default thereunder, except to the extent any such default would not reasonably be expected to have a Material Adverse Effect.

**6.28 Senior Lien Assets.** Set forth on Schedule 6.28 is a complete and accurate list of all assets of each Loan Party subject to a Senior Lien.

**6.29 Excluded Collateral.** Set forth on Schedule 6.29 is a complete and accurate list of all Excluded Collateral of each Loan Party.

**6.30 Mortgaged Real Property.** Except for those certain properties described on Schedule 6.30, after giving effect to the recording of the Mortgages, all real property that is either owned in fee simple or leased pursuant to a ground lease having a term of at least fifteen (15) years by the Loan Parties (whether individually or collectively) and located in the United States shall be subject to a recorded first lien mortgage, deed of trust or similar security instrument (subject to Permitted Liens),

- 45 -

**GMPR-HD 3278**

except where the grant of such a lien (a) is legally impermissible, (b) is contractually prohibited (and waiver of such prohibition has not been obtained), or (c) would give rise to the obligation to create a Lien in favor of any other Person as set forth in Schedule 6.30 hereto.

6.31 **Additional Representations and Warranties.** Additional representations and warranties, and amendments, restatements, supplements or other modifications to those in this Section 6 are set forth in Section 6 of Appendix A.

## SECTION 7. AFFIRMATIVE AND FINANCIAL COVENANTS OF THE LOAN PARTIES.

Subject to the amendments, restatements, supplements or other modifications in Section 7 of Appendix A, each Loan Party covenants and agrees with the Lender that, so long as any Advance is outstanding and until payment in full of all Obligations:

7.01 **Financial Statements.** Except as may otherwise be required pursuant to Appendix A, the Borrower shall deliver to the Lender:

(a) as soon as available and in any event within forty-five (45) days after the end of each month, the Consolidated balance sheets of the Borrower and its Consolidated Subsidiaries (including the Loan Parties) as at the end of such month and the related unaudited Consolidated statements of income and retained earnings and of cash flows for the Borrower and its Consolidated Subsidiaries (including the Loan Parties) for such month and the portion of the fiscal year through the end of such month, setting forth in each case in comparative form the figures for the previous year;

(b) as soon as available and in any event within sixty (60) days after the end of each of the first three quarterly fiscal periods of each fiscal year of the Borrower, the Consolidated balance sheets of the Borrower and its Consolidated Subsidiaries (including the Loan Parties) as at the end of such period and the related unaudited Consolidated statements of income and retained earnings and of cash flows for the Borrower and its Consolidated Subsidiaries (including the Loan Parties) for such period and the portion of the fiscal year through the end of such period, setting forth in each case in comparative form the figures for the previous year;

(c) as soon as available and in any event within ninety (90) days after the end of each fiscal year of the Borrower, the Consolidated balance sheets of the Borrower and its Consolidated Subsidiaries (including the Loan Parties) as at the end of such fiscal year and the related Consolidated statements of income and retained earnings and of cash flows for the Borrower and its Consolidated Subsidiaries for such year, setting forth in each case in comparative form the figures for the previous year, accompanied by an opinion thereon of independent certified public accountants of recognized national standing, which opinion shall state that said Consolidated financial statements fairly present the Consolidated financial condition and results of operations of the Borrower and its Consolidated Subsidiaries (including the Loan Parties) at the end of, and for, such fiscal year in accordance with GAAP;

(d) as soon as reasonably possible after receipt by the subject Loan Party, a copy of any material report that may be prepared and submitted by such Loan Party's independent certified public accountants at any time;

(e) from time to time such other information regarding the financial condition, operations, or business of any Loan Party as the Lender may reasonably request;

- 46 -

**GMPR-HD 3279**

waivers), administration and amendment of the Loan Documents (regardless of whether the Loan is entered into hereunder), the taking of any action, including legal action, required or permitted to be taken by the Lender pursuant thereto, any "due diligence" or loan agent reviews conducted by the Lender or on their behalf or by refinancing or restructuring in the nature of a "workout."

11.20 **Waiver Of Redemption And Deficiency Rights.** Each Loan Party hereby expressly waives, to the fullest extent permitted by law, every statute of limitation on a deficiency judgment, any reduction in the proceeds of any Facility Collateral as a result of restrictions upon the Lender contained in the Loan Documents or any other instrument delivered in connection therewith, and any right that they may have to direct the order in which any of the Facility Collateral shall be disposed of in the event of any Disposition pursuant hereto.

11.21 **Single Agreement.** The Borrower and the Lender acknowledge that, and have entered hereinto and will enter into each Advance hereunder in consideration of and in reliance upon the fact that, all Advances hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, the Borrower and the Lender each agree (i) to perform all of their obligations in respect of each Advance hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Advances hereunder, and (ii) that payments, deliveries and other transfers made by any of them in respect of any Advance shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Advance hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

11.22 **Severability.** Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. If any provision of any Loan Document shall be held invalid or unenforceable (in whole or in part) as against any one or more Loan Parties, then such Loan Document shall continue to be enforceable against all other Loan Parties without regard to any such invalidity or unenforceability.

11.23 **Entire Agreement.** This Loan Agreement and the other Loan Documents embody the entire agreement and understanding of the parties hereto and supersede any and all prior agreements, arrangements and understandings relating to the matters provided for herein and therein. No alteration, waiver, amendments, or change or supplement hereto shall be binding or effective unless the same is set forth in writing by a duly authorized representative of the Lender.

11.24 **Appendix A.** Each provision of this Loan Agreement is subject to the amendments, restatements, supplements or other modifications contained in Appendix A.

[SIGNATURE PAGE FOLLOWS]

- 69 -

GMPR-HD 3302

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be duly executed and delivered as of the day and year first above written.

GENERAL MOTORS CORPORATION
as Borrower

By: /x/ Ray Young
    Name: Ray G. Young
    Title: Executive Vice President and Chief
    Financial Officer

THE UNITED STATES DEPARTMENT OF THE
TREASURY
as Lender

By: /x/ Neel Kashkari
    Name: Neel Kashkari
    Title: Interim Assistant Secretary of the Treasury for
    Financial Stability

*Signature Page to Loan and Security Agreement*

GMPR-HD 3303

ANNUNCIATA CORPORATION,
ARGONAUT HOLDINGS, INC.,
GENERAL MOTORS ASIA, INC.,
GENERAL MOTORS ASIA PACIFIC HOLDINGS, LLC,
GENERAL MOTORS OVERSEAS CORPORATION,
GENERAL MOTORS OVERSEAS DISTRIBUTION CORPORATION,
GENERAL MOTORS PRODUCT SERVICES, INC.,
GENERAL MOTORS RESEARCH CORPORATION,
GM APO HOLDINGS, LLC,
GM EUROMETALS, INC.,
GM FINANCE CO. HOLDINGS LLC,
GM GEFS L.P.,
GM GLOBAL TECHNOLOGY OPERATIONS, INC.,
GM GLOBAL TOOLING COMPANY, INC.,
GM LAAM HOLDINGS, LLC,
GM PREFERRED FINANCE CO. HOLDINGS LLC,
GM TECHNOLOGIES, LLC,
GM-DI LEASING CORPORATION,
GMOC ADMINISTRATIVE SERVICES CORPORATION,
ONSTAR, LLC,
RIVERFRONT HOLDINGS, INC.,
SATURN CORPORATION, and
SATURN DISTRIBUTION CORPORATION,
   each, as a Guarantor

By:   /s/ Adil Mistry
Name  Adil Mistry
Title:  Vice President

*Signature Page to Loan and Security Agreement*

GMPR-HD 3304

GENERAL MOTORS INTERNATIONAL HOLDINGS, INC.,
as Guarantor

By:    /s/ Adil Mistry
Name. Adil Mistry
Title:   Vice President

Address for Notices:
767 Fifth Avenue, 14th Floor
New York, NY 10153

Attention: Adil Mistry
Telephone: (212) 418-3507
Facsimile: (212) 418-3695

*Signature Page to Loan and Security Agreement*

GMPR-HD 3305

● ● ● ● ● ● ● ● ●

*** Portions of this exhibit have been omitted under a request for confidential treatment pursuant to Rule 24b-2 of the Securities and Exchange Act of 1934 and filed separately with the United States Securities and Exchange Commission.

**EXECUTION VERSION**

APPENDIX A

SUPPLEMENT TO LOAN AND SECURITY AGREEMENT

This Appendix A forms a part of the Loan and Security Agreement dated as of December 31, 2008 (the "Loan Agreement") among BORROWER (as defined below) and the UNITED STATES DEPARTMENT OF THE TREASURY, as lender ("Lender"). This Appendix A sets forth certain terms and conditions governing the transactions described in the Loan Agreement. Capitalized terms used but not defined in this Appendix A shall have the meanings ascribed to them in the Loan Agreement.

## SECTION 1. DEFINITIONS AND ACCOUNTING MATTERS.

### 1.01 Certain Defined Terms.

Terms used in this Appendix A, but not herein defined shall have the meanings ascribed thereto in the Loan Agreement or the meanings set forth below:

"Borrower" shall mean General Motors Corporation, a Delaware corporation.

"Effective Date" shall mean December 31, 2008.

"Excluded Collateral" shall include the following:

(xii) any Property securing the GMAC Rights Facility.

"Excluded Subsidiary" shall mean the Subsidiaries identified on Schedule 6.29 and any of the following, to the extent they become Subsidiaries after the Effective Date, (i) any Securitization Subsidiary; (ii) any Financing Subsidiary; (iii) any Subsidiary that owns a manufacturing plant or facility which is located within the continental United States; (iv) any Insurance Subsidiary; and (v) any Subsidiary (and any parent or holding company thereof) that is primarily engaged in the investment management business or that is regulated by the Office of the Comptroller of the Currency.

"Expiration Date" shall mean December 30, 2011 at 5:00 p.m. (Washington, D.C. time).

"Facility Account" shall mean the Loan Parties' cash management accounts.

"Financing Subsidiary" shall mean any Subsidiary that is primarily engaged in financing activities (other than lease and purchase financing provided by such Subsidiary to dealers and consumers), including (a) debt issuances to, or that are guaranteed by, governmental or quasi-governmental entities (including any municipal, local, county, regional, state, provincial, national or international organization or agency), and (b) lease transactions (including synthetic lease transactions and sale and leaseback transactions).

"Funding Date" shall mean the date on which the Lender funds an Advance in accordance with the terms hereof, which shall be either the Effective Date, the Second Draw Date, or the Third Draw Date.

"GMAC" shall mean GMAC LLC and its Subsidiaries.

1

**GMPR-HD 3326**

"GMAC Reorganization" shall mean any transactions consummated for the purpose of or in connection with the Borrower or any of its Affiliates (a) not being in control of GMAC for purposes of the Bank Holding Company Act of 1956, (b) not being an affiliate of GMAC for purposes of Sections 23A or 23B of the Federal Reserve Act, or (c) otherwise complying with the commitments made by the Borrower to the Federal Reserve System with regard to GMAC, including but not limited to, in each case, (i) the Disposition of all or any portion of the Borrower's Equity Interests in GMAC to one or more trusts, and (ii) the Disposition of all or any portion of such Equity Interests by any trustee of any such trust.

"GMAC Rights Facility" shall mean that certain loan facility under which the Lender shall make available to the Borrower up to $1 billion for use by the Borrower to purchase equity interests in GMAC in connection with a rights offering by GMAC, and under which the obligations shall be secured by first-priority liens on the GMAC equity to be issued to the Borrower in such rights offering, together with certain other GMAC equity now owned by the Borrower, and such other collateral as may be requested by the Lender and provided by the Borrower from time to time.

"Insurance Subsidiary" shall mean (i) any Subsidiary that is required to be licensed as an insurer or reinsurer or that is primarily engaged in insurance or reinsurance and (ii) any Subsidiary of a Person described in clause (i) above.

"Interest Payment Date" shall mean the last Business Day of each calendar quarter, commencing with the first calendar quarter in 2009.

"Inventory Cash Collateral Account" shall mean a cash deposit account subject to an Account Control Agreement in which the Lender has a security interest.

"Inventory Facility Collateral" shall mean Facility Collateral consisting of inventory (as defined in the Uniform Commercial Code) in which the Lender has a security interest.

"Inventory Facility Collateral Reporting Date" shall mean the first Business Day following the 15th day of each calendar month.

"Inventory Target Amount" shall mean, on any Inventory Test Date, $250,000,000 (which number may be revised at any time by the President's Designee in his/her sole discretion, based on the Restructuring Plan Report and any other information that the President's Designee deems relevant), less the amount of Mandatory Prepayments made in respect of Inventory Facility Collateral pursuant to Section 2.07(b) prior to such Inventory Test Date.

"Inventory Test Date" shall mean the last day of each fiscal month in a fiscal year.

"Inventory Value" shall mean, as of any date of determination, the book value of the Inventory Facility Collateral as reflected in the Borrower's management reports and disclosed to the Lender.

"Junior Lien Facility Collateral" shall mean Facility Collateral in which the Lender has a Lien other than a first priority security interest.

2

GMPR-HD 3327

"LIBOR Floor" shall mean 2.00%.

"Loan Documents" shall include this Loan Agreement, the Note, the Equity Pledge Agreement, the Intellectual Property Pledge Agreement, the Guaranty, the Warrant Agreement, the Warrant, the Post-Closing Letter Agreement, each Account Control Agreement, each Mortgage, and the Environmental Indemnity.

"Mandatory Prepayment" shall have the meaning set forth in Section 2.07(a) of this Appendix A.

"Maximum Loan Amount" shall mean $13,400,000,000.

"New VEBA" shall mean the new trust fund to be established pursuant to the Settlement Agreement.

"Non-Inventory Current Asset Facility Collateral" shall mean Facility Collateral consisting of assets which are "current assets" (as identified on the Borrower's Consolidated balance sheets), other than Inventory Facility Collateral, in which the Lender has a security interest.

"Other Asset Facility Collateral" means Facility Collateral consisting of assets other than "current assets" (as identified on the Borrower's Consolidated balance sheets) in which the Lender has a security interest.

"Permitted Indebtedness" shall include the following:

(xvii) Settlement Agreement Debt;

(xviii) any Warrant Notes; and

(xix) the Indebtedness incurred in connection with the GMAC Rights Facility.

"Permitted Investors" shall include the New VEBA and any other trust fund established pursuant to the Settlement Agreement (and any trustee, Affiliate or Subsidiary of the New VEBA or such other trust fund).

"Permitted Investments" shall include the following:

(iv) prior to the Certification Deadline, pursuant to the schedules of such Investments that has been preliminarily approved by the President's Designee prior to the Effective Date (which shall include Investments pursuant to Existing Agreements), which are scheduled to be fulfilled prior to March 31, 2009, provided that, the President's Designee shall have the right to further review and, at any time revoke approval of, any such Investment if the President's Designee determines that it would be inconsistent with the objective of this Loan Agreement;

(v) any Investment existing on the Effective Date (including under the Settlement Agreement) or made pursuant to binding commitments in effect on the Effective Date or an investment consisting of any extension, modification or renewal of any Investment existing on the Effective Date; provided that the amount of any such Investment is not increased through such extension, modification or renewal;

3

GMPR-HD 3328

## SECTION 5. CONDITIONS PRECEDENT.

### 5.01. Conditions Precedent to Initial Advance.

(w) GMAC Consents. The Common Holders of the Class A Membership Interests of GMAC LLC and holders of the Class C Membership Interests of GMAC LLC shall have consented in writing to the pledge to Lender of the Class B Membership Interests and the Preferred Membership Interests pursuant to the Loan Documents;

(x) Warrant Agreement. As additional consideration for the Lender to enter into this Loan Agreement and the GMAC Rights Facility, the Borrower and the Lender shall enter into the Warrant Agreement and the Borrower shall issue the Warrant to the Lender in accordance with the terms of such Warrant Agreement.

**The following shall be added as a new Section 5.03 to the Loan Agreement:**

### 5.03. Conditions Precedent to Subsequent Advances.

The making of any Advance to the Borrower after the Effective Date is subject to the following further conditions precedent both immediately prior to the making of such Advance and also after giving effect thereto and to the intended use thereof:

(a) on or prior to the Second Draw Date, the applicable Loan Parties shall have used commercially reasonable efforts to obtain from the Senior Lenders all necessary waivers, amendments, approvals, and consents to the pledge of the inventory of the Loan Parties to the Lender; and

(b) on or prior to the Second Draw Date, the Loan Parties shall have provided to the Lender a schedule of all existing material Indebtedness (x) of any Subsidiary of a Loan Party that is not itself a Loan Party, or (y) that is intercompany Indebtedness.

## SECTION 6. REPRESENTATIONS AND WARRANTIES.

### 6.02. Financial Condition.

The Borrower has heretofore furnished to the Lender a copy of its audited Consolidated balance sheets as at December 31, 2007, with the opinion thereon of an independent auditor, a copy of which has been provided to the Lender. The Borrower has also heretofore furnished to the Lender the related Consolidated statements of income and retained earnings and of cash flows for the Borrower and its Consolidated Subsidiaries for its most recent fiscal year, setting forth in comparative form the same information for the previous year. All such financial statements are materially complete and correct and fairly present the Consolidated financial condition of the Borrower and its Consolidated Subsidiaries and the Consolidated results of their operations for the fiscal year ended on said date, all in accordance with GAAP applied on a consistent basis. There are no liabilities, contingent or otherwise, as of the Effective Date, known to any Loan Party and not disclosed in the most recently publicly filed financial statements or in the footnotes thereto (or as otherwise disclosed to the Lender prior to the Effective Date), that involve a material amount.

### 6.04 No Breach.

8

GMPR-HD 3333

The Loan Parties shall not be deemed to be in breach of Section 6.04, clauses (a)(iv) and (b) to the extent that any intercompany agreements that are Existing Agreements do not satisfy the criteria of clause (iv) of the definition of Permitted Investments.

### 6.13 Existing Agreements.

Set forth on Schedule 6.13 is a complete and accurate list as of the date hereof of all Existing Agreements of the Loan Parties filed by, or incorporated in, the Borrower's 2008 SEC filings.

### 6.14 ERISA.

Any Benefit Plan which is intended to be a tax-qualified plan of any Loan Party has received a favorable determination letter and such Loan Party does not know of any reason why such letter should be revoked. The Loan Parties and each of their respective ERISA Affiliates are in material compliance with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder. (a) As of December 31, 2007, no ERISA Event has occurred that could reasonably be expected to result in liability to any Loan Party or any ERISA Affiliate in excess of $2,000,000,000, (b) as of the Effective Date, no ERISA Event other than a determination that a Plan is "at risk" (within the meaning of Section 302 of ERISA) has occurred or is reasonably likely to occur that could reasonably be expected to result in liability to any Loan Party or ERISA Affiliate in excess of $2,000,000,000, (c) as of December 31, 2007, the present value of all benefit liabilities under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of December 31, 2007, exceed the fair market value of the assets of such Plan, and the present value of all benefit liabilities of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of December 31, 2007, exceed the fair market value of the assets of all such underfunded Plans, (d) as of December 31, 2007, the Loan Parties do not have post-retirement medical liability in excess of $60,000,000,000 based on the actuarial assumptions set forth in the Loan Party's financial statements under GAAP as of December 31, 2007, and (e) as of the Effective Date, there is not, and there is not reasonably expected to be, any withdrawal liability from, or any obligation or liability (direct or indirect) with respect to, any Multiemployer Plan. The representations set forth in the preceding two sentences of this section 6.14 shall continue to be true and correct on each day that an Advance is outstanding pursuant to the Loan Agreement except to the extent that any such change or failure when aggregated with all other changes or failures in the preceding two sentences of this section 6.14, would not be reasonably expected to result in a Material Adverse Effect. There are no Plans or other arrangements which would result in the payment to any employee, former employee, individual consultant or director of any amounts or benefits upon the consummation of the transactions contemplated herein or the exercise of the Lender of any right or remedy contemplated herein. Assets of the Loan Parties or any ERISA Affiliate are not "plan assets" within the meaning of the DOL Regulation Section 2510.3-101 as amended by section 3(42) of ERISA.

### 6.15 Expense Policy.

The Borrower has commenced steps necessary to ensure that (a) the Expense Policy conforms to the requirements set forth herein and (b) the Borrower and its Subsidiaries are in compliance with the Expense Policy.

### 6.26 Intellectual Property.

9

GMPR-HD 3334

**The following shall be appended to the end of Section 6.26(a):**

(a) Notwithstanding the foregoing, in lieu of the obligation to schedule all Intellectual Property owned by each Loan Party that is material to the conduct of the business of such Loan Party, Schedule 6.26 hereto sets forth a true and complete list as of the date hereof of all Copyright registrations and applications, Patent applications and issued Patents, and Trademark registrations, Trademark applications, and domain name registrations included in the Trademarks, in each case owned by each Loan Party and material to the conduct of the business of such Loan Party, and any of the following Licenses that have been identified by the Borrower as of the date hereof subject to and in accordance with the Post-Closing Letter: (i) any Licenses listed on Section II of Schedule 6.26 as of the Effective Date, (ii) any Licenses pursuant to which any Loan Party licenses in Intellectual Property in the absence of which such Loan Party could not manufacture any of its currently manufactured vehicle models and as to which there are no alternatives for such licensed Intellectual Property available on commercially reasonable terms, and (iii) any Licenses pursuant to which any Loan Party licenses Intellectual Property out to a third party where the remaining royalties due and payable to such Loan Party thereunder are in excess of one million U.S. dollars (US$1,000,000) annually.

**The last sentence of Section 6.26(b) is hereby deleted and of no force or effect.**

**6.29 Excluded Collateral.**

Notwithstanding the requirements of Section 6.29, Schedule 6.29 sets forth a complete and accurate list of all (i) domestic Joint Ventures and Domestic Subsidiaries that comprise Excluded Collateral and (ii) all "first tier" foreign Joint Ventures and Controlled Foreign Subsidiaries that are owned by the Borrower or any of its Domestic Subsidiaries that comprise Excluded Collateral.

## SECTION 7. AFFIRMATIVE AND FINANCIAL COVENANTS OF THE LOAN PARTIES.

**7.01 Financial Statements.**

(a) In lieu of delivering monthly Consolidated balance sheets and statements of income and retained earnings for the Borrower and its Consolidated Subsidiaries, the Borrower shall deliver, within fifteen (15) days following the end of each calendar month, Consolidated monthly management reports prepared by the Borrower with respect to the Borrower and its Consolidated Subsidiaries. The management reports shall be certified to in the monthly certificate delivered by the Borrower as provided in the last paragraph of Section 7.01.

**7.02 Reporting Requirements.**

(i) The 13-week rolling cash forecast for each Loan Party and its Subsidiaries referenced in Section 7.02(i) in the Loan Agreement shall be comprised of, and shall set forth separately and with specific detail, the cash forecast for each of the four regions of the Borrower's and its Subsidiaries' operations: North America, Asia-Pacific, Europe and Middle East/Latin America.

(j) Until such time as the Lender shall require otherwise, the liquidity status report referenced in Section 7.02(j) in the Loan Agreement shall set forth the required information as to the Subsidiaries on a Borrower Consolidated basis only.

10

**GMPR-HD 3335**

EX-10.1 2 dex101.htm LOAN AND SECURITY AGREEMENT, DATED AS OF DECEMBER 31, 2008

Exhibit 10.1

***CONFIDENTIAL TREATMENT REQUESTED BY GENERAL MOTORS CORPORATION PURSUANT TO THE FREEDOM OF INFORMATION ACT

Schedule 1.1

LIST OF PLEDGORS

| Name | Form of Organization | Jurisdiction of Organization | Organizational ID Number | Taxpayer ID Number |
|------|----------------------|------------------------------|--------------------------|--------------------|
| General Motors Asia Pacific Holdings, LLC | Limited Liability Company | Delaware | *** | *** |
| General Motors Asia, Inc. | Corporation | Delaware | *** | *** |
| General Motors Corporation | Corporation | Delaware | *** | *** |
| General Motors International Holdings, Inc. | Corporation | Delaware | *** | *** |
| General Motors Overseas Corporation | Corporation | Delaware | *** | *** |
| General Motors Overseas Distribution Corporation | Corporation | Delaware | *** | *** |
| GM APO Holdings, LLC | Limited Liability Company | Delaware | *** | *** |
| GM Finance Co. Holdings LLC | Limited Liability Company | Delaware | *** | *** |
| GM GEFS L.P. | Limited Partnership | Nevada | *** | *** |
| GM LAAM Holdings, LLC | Limited Liability Company | Delaware | *** | *** |
| GM Preferred Finance Co. Holdings LLC | Limited Liability Company | Delaware | *** | *** |
| GM Technologies, LLC | Limited Liability Company | Delaware | *** | *** |
| Riverfront Holdings, Inc. | Corporation | Delaware | *** | *** |
| Saturn Corporation | Corporation | Delaware | *** | *** |

1.

GMPR-HD 00003892

***CONFIDENTIAL TREATMENT REQUESTED BY GENERAL MOTORS CORPORATION PURSUANT TO THE FREEDOM OF INFORMATION ACT

Schedule 1.2

LIST OF GUARANTORS

| Name | Form of Organization | Jurisdiction of Organization | Organizational ID Number | Taxpayer ID Number |
|---|---|---|---|---|
| Annunciata Corporation | Corporation | Delaware | *** | *** |
| Argonaut Holdings, Inc. | Corporation | Delaware | *** | *** |
| General Motors Asia Pacific Holdings, LLC | Limited Liability Company | Delaware | *** | *** |
| General Motors Asia, Inc. | Corporation | Delaware | *** | *** |
| General Motors International Holdings, Inc. | Corporation | Delaware | *** | *** |
| General Motors Overseas Corporation | Corporation | Delaware | *** | *** |
| General Motors Overseas Distribution Corporation | Corporation | Delaware | *** | *** |
| General Motors Product Services, Inc. | Corporation | Delaware | *** | *** |
| General Motors Research Corporation | Corporation | Delaware | *** | *** |
| GM APO Holdings, LLC | Limited Liability Company | Delaware | *** | *** |
| GM Eurometals, Inc. | Corporation | Delaware | *** | *** |
| GM Finance Co. Holdings LLC | Limited Liability Company | Delaware | *** | *** |
| GM GEFS L.P. | Limited Partnership | Nevada | *** | *** |
| GM Global Technology Operations, Inc. | Corporation | Delaware | *** | *** |
| GM Global Tooling Company, Inc. | Corporation | Delaware | *** | *** |
| GM LAAM Holdings, LLC | Limited Liability Company | Delaware | *** | *** |
| GM Preferred Finance Co. Holdings LLC | Limited Liability Company | Delaware | *** | *** |
| GM Technologies, LLC | Limited Liability Company | Delaware | *** | *** |

2

GMPR-HD 00003893

***CONFIDENTIAL TREATMENT REQUESTED BY GENERAL MOTORS CORPORATION PURSUANT TO THE FREEDOM OF INFORMATION ACT

| Name | Form of Organization | Jurisdiction of Organization | Organizational ID Number | Taxpayer ID Number |
|------|---------------------|------------------------------|--------------------------|--------------------|
| GM-DI Leasing Corporation | Corporation | Delaware | *** | *** |
| GMOC Administrative Services Corporation | Corporation | Delaware | *** | *** |
| OnStar, LLC | Limited Liability Company | Delaware | *** | *** |
| Riverfront Holdings, Inc. | Corporation | Delaware | *** | *** |
| Saturn Corporation | Corporation | Delaware | *** | *** |
| Saturn Distribution Corporation | Corporation | Delaware | *** | *** |

3

GMPR-HD 00003894

• • • • • • • • • •

Schedule 6.17

## OWNERSHIP OF LOAN PARTIES

| Loan Party | Form of Organization | Jurisdiction of Organization | Owner | Percent Owned |
|---|---|---|---|---|
| Annunciata Corporation | Corporation | Delaware | General Motors Corporation | 100% |
| Argonaut Holdings, Inc. | Corporation | Delaware | General Motors Corporation | 100% |
| | | | General Motors Corporation | 95.76% |
| General Motors Asia Pacific Holdings, LLC | Limited Liability Company | Delaware | General Motors Asia, Inc. | 3.6% |
| | | | General Motors Overseas Corporation | 0.64% |
| General Motors Asia, Inc. | Corporation | Delaware | General Motors Corporation | 100% |
| General Motors International Holdings, Inc. | Corporation | Delaware | General Motors Corporation | 100% |
| General Motors Overseas Corporation | Corporation | Delaware | General Motors Corporation | 100% |
| General Motors Overseas Distribution Corporation | Corporation | Delaware | General Motors Corporation | 100% |
| General Motors Product Services, Inc. | Corporation | Delaware | General Motors Corporation | 100% |
| General Motors Research Corporation | Corporation | Delaware | General Motors Corporation | 100% |

GMPR-HD 00003932

| | | | | |
|---|---|---|---|---|
| GM APO Holdings, LLC | Limited Liability Company | Delaware | General Motors Asia Pacific Holdings, LLC | 100% |
| GM Eurometals, Inc. | Corporation | Delaware | General Motors Corporation | 100% |
| GM Finance Co. Holdings LLC | Limited Liability Company | Delaware | General Motors Corporation | 100% |
| GM GEFS L.P. | Limited Partnership | Nevada | General Motors Corporation | 99.99% |
| | | | GM Technologies, LLC | 0.01% |
| GM Global Technology Operations, Inc. | Corporation | Delaware | General Motors Corporation | 100% |
| GM Global Tooling Company, Inc. | Corporation | Delaware | General Motors Corporation | 100% |
| GM LAAM Holdings, LLC | Limited Liability Company | Delaware | General Motors Asia Pacific Holdings, LLC | 100% |
| GM Preferred Finance Co. Holdings LLC | Limited Liability Company | Delaware | General Motors Corporation | 100% |
| GM Technologies, LLC | Limited Liability Company | Delaware | General Motors Corporation | 100% |
| GM-DI Leasing Corporation | Corporation | Delaware | General Motors Corporation | 100% |
| GMOC Administrative Services Corporation | Corporation | Delaware | General Motors Overseas Corporation | 100% |
| OnStar, LLC | Limited Liability Company | Delaware | General Motors Corporation | 100% |
| Riverfront Holdings, Inc. | Corporation | Delaware | General Motors Corporation | 100% |
| Saturn Corporation | Corporation | Delaware | OnStar, LLC | 100% |
| Saturn Distribution Corporation | Corporation | Delaware | Saturn Corporation | 100% |

GMPR-HD 00003933

● ● ● ● ● ● ● ● ●

Schedule 6.25

FILING JURISDICTIONS AND OFFICES

A. UCC Filing Jurisdictions and Offices

| Entity | Form of Organization | Jurisdiction of Organization | Filing Jurisdiction and Filing Office |
|---|---|---|---|
| Annunciata Corporation | Corporation | Delaware | Delaware – Secretary of State |
| Argonaut Holdings, Inc. | Corporation | Delaware | Delaware – Secretary of State |
| General Motors Asia Pacific Holdings, LLC | Limited Liability Company | Delaware | Delaware – Secretary of State |
| General Motors Asia, Inc. | Corporation | Delaware | Delaware – Secretary of State |
| General Motors Corporation | Corporation | Delaware | Delaware – Secretary of State |
| General Motors International Holdings, Inc. | Corporation | Delaware | Delaware – Secretary of State |
| General Motors Overseas Corporation | Corporation | Delaware | Delaware – Secretary of State |
| General Motors Overseas Distribution Corporation | Corporation | Delaware | Delaware – Secretary of State |
| General Motors Product Services, Inc. | Corporation | Delaware | Delaware – Secretary of State |
| General Motors Research Corporation | Corporation | Delaware | Delaware – Secretary of State |
| GM APO Holdings, LLC | Limited Liability Company | Delaware | Delaware – Secretary of State |
| GM Eurometals, Inc. | Corporation | Delaware | Delaware – Secretary of State |
| GM Finance Co. Holdings LLC | Limited Liability Company | Delaware | Delaware – Secretary of State |
| GM GEFS L.P. | Limited Partnership | Nevada | Nevada – Secretary of State |
| GM Global Technology Operations, Inc. | Corporation | Delaware | Delaware – Secretary of State |
| GM Global Tooling Company, Inc. | Corporation | Delaware | Delaware – Secretary of State |
| GM LAAM Holdings, LLC | Limited Liability Company | Delaware | Delaware – Secretary of State |
| GM Preferred Finance Co. Holdings LLC | Limited Liability Company | Delaware | Delaware – Secretary of State |

GMPR-HD 00003938

| Entity | Form of Organization | Jurisdiction of Organization | Filing Jurisdiction and Filing Office |
|---|---|---|---|
| GM Technologies, LLC | Limited Liability Company | Delaware | Delaware – Secretary of State |
| GM-DI Leasing Corporation | Corporation | Delaware | Delaware – Secretary of State |
| GMOC Administrative Services Corporation | Corporation | Delaware | Delaware – Secretary of State |
| OnStar, LLC | Limited Liability Company | Delaware | Delaware – Secretary of State |
| Riverfront Holdings, Inc. | Corporation | Delaware | Delaware – Secretary of State |
| Saturn Corporation | Corporation | Delaware | Delaware – Secretary of State |
| Saturn Distribution Corporation | Corporation | Delaware | Delaware – Secretary of State |

### B. Intellectual Property Filing Offices

| | |
|---|---|
| U.S. Patent and Trademark Collateral | United States Patent and Trademark Office |
| U.S. Copyright Collateral | United States Copyright Office |

### C. Real Estate Mortgages and Fixture Filing Offices and Jurisdictions

| Debtor/Property Owner | Property | County/State | Filing Jurisdiction |
|---|---|---|---|
| Argonaut Holdings, Inc. | Cerritos Dealership | Los Angeles Co., CA | County Recorder of Los Angeles Co., CA |
| Argonaut Holdings, Inc. | Saturn of Cerritos | Los Angeles Co., CA | County Recorder of Los Angeles Co., CA |
| Argonaut Holdings, Inc. | Colma Dealership-Saturn | San Mateo Co., CA | County Recorder of San Mateo Co., CA |
| Argonaut Holdings, Inc. | Dublin BPG | Alameda Co., CA | County Recorder of Alameda Co., CA |

GMPR-HD 00003939

| Debtor/Property Owner | Property | County/State | Filing Jurisdiction |
|---|---|---|---|
| Argonaut Holdings, Inc. | Vermont Chevrolet | Los Angeles Co., CA | County Recorder of Los Angeles Co., CA |
| General Motors Corporation | Oakland C Truck Center | Alameda Co., CA | County Recorder of Alameda Co., CA |
| Argonaut Holdings, Inc. | Saturn of Capitol Expressway | Santa Clara Co., CA | County Recorder of Santa Clara Co., CA |
| Argonaut Holdings, Inc. | Penske Cadillac Hummer South Bay | Los Angeles Co., CA | County Recorder of Los Angeles Co., CA |
| Argonaut Holdings, Inc. | 2 Denver Dealerships | Denver Co., CO | County Recorder of Denver Co., CO |
| Argonaut Holdings, Inc. | 4 Lone Tree Dealerships | Douglas Co., CO | County Recorder of Douglas Co., CO |
| Argonaut Holdings, Inc. | Estero Bay Chevrolet | Lee Co., FL | County Recorder of Lee Co., FL |
| Argonaut Holdings, Inc. | Kendall Chevrolet | Dade Co., FL | County Recorder of Dade Co., FL |
| Argonaut Holdings, Inc. | Lou Sobh Automotive | Douglas Co., GA | Clerk of the Superior Court of Douglas Co., GA |
| Argonaut Holdings, Inc. | Paramus Auto Mall | Bergen Co., NJ | County Recorder of Bergen Co., NJ |
| Argonaut Holdings, Inc. | Multi-Chevrolet Saturn | Union Co., NJ | County Recorder of Union Co., NJ |
| Argonaut Holdings, Inc. | Miller Buick Pontiac BMC& McPolkowite Motors | Middlesex Co., NJ | County Recorder of Middlesex Co., NJ |

GMPR-HD 00003940

| Debtor/Property Owner | Property | County/State | Filing Jurisdiction |
|---|---|---|---|
| Argonaut Holdings, Inc. | 86th Street Chevrolet | Kings Co., NY | County Recorder of Kings Co., NY |
| Argonaut Holdings, Inc. | Cunningham Motors | Queens Co., NY | County Recorder of Queens Co., NY |
| Argonaut Holdings, Inc. | RAB Motors | Queens Co., NY | County Recorder of Queens Co., NY |
| General Motors Corporation | City Cadillac-Oldsmobile, Major Chevrolet, Regain Pontiac and Service Facility | Queens Co., NY | County Recorder of Queens Co., NY |
| General Motors Corporation | Bohemian Auto Group | Westchester Co., NY | County Recorder of Westchester Co., NY |
| Argonaut Holdings, Inc. | Gildron Cadillac | Suffolk Co., NY | County Recorder of Suffolk Co., NY |
| General Motors Corporation | Milford Proving Grounds | Oakland and Livingston Counties, MI | County Recorder of Oakland and Livingston Counties, MI |
| General Motors Corporation | Pontiac North Campus (incl Lab) | Oakland Co., MI | County Recorder of Oakland Co., MI |
| General Motors Corporation | Warren Technical Center | Macomb Co., MI | County Recorder of Macomb Co., MI |
| Riverfront Holdings, Inc. (Lessee); Fee Owner is BNP Paribas Leasing Corporation | Detroit Renaissance Center Campus | Wayne Co., MI | County Recorder of Wayne Co., MI |

GMPR-HD 00003941

| Debtor/Property Owner | Property | County/State | Filing Jurisdiction |
|---|---|---|---|
| Riverfront Holdings, Inc. | Renaissance Center River East | Wayne Co., MI | County Recorder of Wayne Co., MI |
| Riverfront Holdings, Inc. | Renaissance Center Franklin Deck | Wayne Co., MI | County Recorder of Wayne Co., MI |
| Title information unavailable | Mesa Dealership 2 | Maricopa Co., AZ | County Recorder of Maricopa Co., AZ |
| Title information unavailable | Anaheim Hills Dealership 1 | Orange Co., CA | County Recorder of Orange Co., CA |
| Title information unavailable | Elk Grove Dealership 1 | Sacramento Co., CA | County Recorder of Sacramento Co., CA |
| Title information unavailable | Fremont Dealership | Alameda Co., CA | County Recorder of Alameda Co., CA |
| Title information unavailable | Gilroy Dealership | Santa Clara Co., CA | County Recorder of Santa Clara Co., CA |
| Title information unavailable | Tyco Property | San Mateo Co., CA | County Recorder of San Mateo Co., CA |
| Title information unavailable | Newark Dealership | Alameda Co., CA | County Recorder of Alameda Co., CA |
| Title information unavailable | Novato Dealership 1 | Marin Co., CA | County Recorder of Marin Co., CA |
| Title information unavailable | Homestead Dealership | Miami-Dade Co., FL | County Recorder of Miami-Dade Co., FL |
| Title information unavailable | Pinellas Park Dealership | Pinellas Co., FL | County Recorder of Pinellas Co., FL |

GMPR-HD 00003942

| Debtor/Property Owner | Property | County/State | Filing Jurisdiction |
|---|---|---|---|
| Title information unavailable | Smyrna Dealership | Cobb Co., GA | County Recorder of Cobb Co., GA |
| Title information unavailable | Chicago Dealership 1 | Cook Co., IL | County Recorder of Cook Co., IL |
| Title information unavailable | Elgin Dealership | Kane Co., IL | County Recorder of Kane Co., IL |
| Title information unavailable | Hodgkins Dealership | Cook Co., IL | County Recorder of Cook Co, IL |
| Title information unavailable | Brazil Dealership | Clay Co., IN | County Recorder of Clay Cn., IN |
| Title information unavailable | Indianapolis Dealership | Marion Co., IN | County Recorder of Marion Co., IN |
| Title information unavailable | Westborough Dealership | Worchester Co., MA | County Recorder of Worchester Co., MA |
| Title information unavailable | Vacant | Middlesex Co., MA | County Recorder of Middlesex Co., MA |
| Title information unavailable | Michael Chevrolet | Macomb Co., MI | County Recorder of Macomb Co., MI |
| Title information unavailable | Farmington Hills Dealership | Oakland Co., MI | County Recorder of Oakland Co., MI |
| Title information unavailable | Englewood Cliffs Dealership | Bergen Co., NJ | County Recorder of Bergen Co., NJ |
| Title information unavailable | Lawrenceville Dealerships (2) | Mercer Co., NJ | County Recorder of Mercer Co., NJ |
| Title information unavailable | Vacant | Erie Co., NY | County Recorder of Erie Co., NY |

GMPR-HD 00003943

| Debtor/Property Owner | Property | County/State | Filing Jurisdiction |
|---|---|---|---|
| Title information unavailable | Cheektowaga Dealership | Erie Co., NY | County Recorder of Erie Co., NY |
| Title information unavailable | Douglaston Dealership | Queens Co., NY | County Recorder of Queens Co., NY |
| Title information unavailable | Mt. Kisco Dealership | Westchester Co., NY | County Recorder of Westchester Co., NY |
| Title information unavailable | Syracuse Dealership | Onondaga Co., NY | County Recorder of Onondaga Co., NY |
| Title information unavailable | Kings Mountain Dealership | Cleveland Co., NC | County Recorder of Cleveland Co., NC |
| Title information unavailable | Cincinnati Dealership 1 | Hamilton Co., OH | County Recorder of Hamilton Co., OH |
| Title information unavailable | Beaverton Dealership | Washington Co., OR | County Recorder of Washington Co., OR |
| Title information unavailable | Conshohocken Dealership | Montgomery Co., PA | County Recorder of Montgomery Co., PA |
| Title information unavailable | Jenkintown Dealership 2 | Montgomery Co., PA | County Recorder of Montgomery Co., PA |
| Title information unavailable | Kennett Square Dealership | Chester Co., PA | County Recorder of Chester Co., PA |
| Title information unavailable | McMurray Dealership | Washington Co., PA | County Recorder of Washington Co., PA |

GMPR-HD 00003944

| Debtor/Property Owner | Property | County/State | Filing Jurisdiction |
|---|---|---|---|
| Title information unavailable | Wilkes Barre Dealership | Luzerne Co., PA | County Recorder of Luzerne Col, PA |
| Title information unavailable | Simpsonville Dealership | Greenville Co., PA | County Recorder of Greenville Co., PA |
| Title information unavailable | Houston Dealership 4-Saturn | Harris Co., TX | County Recorder of Harris Co., TX |
| Title information unavailable | Irving Dealership | Dallas Co., TX | County Recorder of Dallas Co., TX |
| Title information unavailable | McAllen Dealership | Hildalgo Co., TX | County Recorder of Hildalgo Co., TX |
| Title information unavailable | Orem Dealership | Utah Co., UT | County Recorder of Utah, Co., UT |
| Title information unavailable | Everett Dealership | Snohomish Co., WA | County Recorder of Snohomish Co., WA |
| Title information unavailable | Vancouver Dealership | Clark Co., WA | County Recorder of Clark Co., WA |
| Title information unavailable | Menomonee Falls Dealership | Waukesha Co., WI | County Recorder of Waukesha, WI |
| Title information unavailable | Pontiac Centerpoint Campus-East | Oakland Co., MI | County Recorder of Oakland Co., MI |
| Title information unavailable | Pontiac Centerpoint Campus-Central | Oakland Co., MI | County Recorder of Oakland Co., MI |
| Title information unavailable | Pontiac Centerpoint Campus-West | Oakland Co., MI | County Recorder of Oakland Co., MI |

GMPR-HD 00003945

| Debtor/Property Owner | Property | County/State | Filing Jurisdiction |
|---|---|---|---|
| Title information unavailable | Doraville Assembly Center | DeKalb Co., GA | County Recorder of DeKalb Co., GA |
| Title information unavailable | Janesville Assembly Center | Rock Co., WI | County Recorder of Rock Co., WI |
| Title information unavailable | Moraine Assembly Center | Montgomery Co., OH | County Recorder of Montgomery Co., OH |
| Title information unavailable | Massena Castings | St. Lawrence Co., NY | County Recorder of St. Lawrence Co., NY |
| Title information unavailable | Pittsburgh Metal Stamping | Allegheny Co., PA | County Recorder of Allegheny Co., PA |
| Title information unavailable | Grand Rapids Metal Stamping | Kent Co., MI | County Recorder of Kent Co., MI |
| Title information unavailable | Thousand Oaks Consolidated Office Building | Ventura Co., CA | County Recorder of Ventura Co., CA |
| Title information unavailable | Grand Blanc SPO Headquarters | Genesee Co., MI | County Recorder of Genesee Co., MI |
| Title information unavailable | Pontiac EDC | Oakland Co., MI | County Recorder of Oakland Co., MI |
| Title information unavailable | Saginaw Administration Site | Saginaw Co., MI | County Recorder of Saginaw Co., MI |

GMPR-HD 00003946

| Debtor/Property Owner | Property | County/State | Filing Jurisdiction |
|---|---|---|---|
| Title information unavailable | Spring Hill Manufacturing Campus | Williamson Co., TN | County Recorder of Williamson Co., TN |
| Title information unavailable | Alpharetta Training Center | Forsyth Co., GA | County Recorder of Forsyth Co., GA |
| Title information unavailable | Garland Training Center | Dallas Co., TX | County Recorder of Dallas Co., TX |
| Title information unavailable | Willow Run PDC | Wayne Co., MI | County Recorder of Wayne Co., MI |
| Title information unavailable | Lansing PDC | Ingham Co., MI | County Recorder of Ingham, Co. |
| Title information unavailable | Pontiac North Pit 17 | Oakland Co., MI | County Recorder of Oakland Co., MI |
| Title information unavailable | Pontiac North PC | Oakland Co., MI | County Recorder of Oakland Co., MI |
| Title information unavailable | Ypsilanti Vehicle Center | Washtenau Co., MI | County Recorder of Washtenau Co., MI |
| Title information unavailable | Beaverton PDC | Washington Co., OR | County Recorder of Washington Co., OR |
| Title information unavailable | Former Buick City | Genesee Co., MI | County Recorder of Genesee Co., MI |
| Title information unavailable | Former Fairfax | Wyandotte Co., KS | County Recorder of Wyandotte Co., KS |
| Title information unavailable | Former Parma Metal Center | Cuyahoga Co., OH | County Recorder of Cuyahoga Co., OH |

GMPR-HD 00003947

| Debtor/Property Owner | Property | County/State | Filing Jurisdiction |
|---|---|---|---|
| Title information unavailable | Janesville Training Center | Rock Co., WI | County Recorder of Rock Co., WI |
| Title information unavailable | Grand Blanc Metal Center | Genesee Co., MI | County Recorder of Genesee Co., MI |
| Title information unavailable | Former Delphi Site | Mercer Co., NJ | County Recorder of Mercer Co., NJ |
| Title information unavailable | Former Tarrytown Assembly | Westchester Co., NY | County Recorder of Westchester Co., NY |
| Title information unavailable | Former Validation Center | Oakland Co., MI | County Recorder of Oakland Co., MI |
| Title information unavailable | Renaissance Center Excess Land | Wayne Co., MI | County Recorder of Wayne Co., MI |
| Title information unavailable | Former Lansing Plant 1, 2, 3, 6 | Ingham Co., MI | County Recorder of Ingham Co., MI |
| Title information unavailable | Fiero Parking Lot | Oakland Co., MI | County Recorder of Oakland Co., MI |
| Title information unavailable | Dealership Vacant Land | Suffolk Co., NY | County Recorder of Suffolk, NY |
| Title information unavailable | Dealership Vacant Land | Mercer Co., NJ | County Recorder of Mercer Co., NJ |
| Title information unavailable | Yuma Proving Grounds | Yuma Co., AZ | County Recorder of Yuma Co., AZ |
| Title information unavailable | Renaissance Center River East | Wayne Co., MI | County Recorder of Wayne Co., MI |

GMPR-HD 00003948

| Debtor/Property Owner | Property | County/State | Filing Jurisdiction |
|---|---|---|---|
| Title Information unavailable | Renaissance Center Franklin Deck | Wayne Co., MI | County Recorder of Wayne Co., MI |

GMPR-HD 00003949

***CONFIDENTIAL TREATMENT REQUESTED BY GENERAL MOTORS CORPORATION PURSUANT TO THE FREEDOM OF INFORMATION ACT

Schedule 6.29

***

GMPR-HD 00003959

***CONFIDENTIAL TREATMENT REQUESTED BY GENERAL MOTORS CORPORATION PURSUANT TO THE FREEDOM OF INFORMATION ACT

Schedule 6.30 (REVISED)

***

GMPR-HD 00003960

## Appendix 2

### Debtors' Ex. 7 in Evidence

### Guaranty and Security Agreement, dated as of December 31, 2008

EX-10.2

Page 1 of 16

EX-10.2 3 k47265exv10w2.htm EX-10.2

**EXHIBIT 10.2**

## GUARANTY AND SECURITY AGREEMENT

THIS GUARANTY AND SECURITY AGREEMENT, dated as of December 31, 2008 (as amended, supplemented and otherwise modified from time to time, this "<u>Guaranty</u>"), is made by the undersigned (each, a "<u>Guarantor</u>", and collectively, the "<u>Guarantors</u>", each of which are set forth on Exhibit A hereto) in favor of the United States Department of the Treasury (the "<u>Lender</u>").

## RECITALS

A. Pursuant to the Loan and Security Agreement, dated as of December 31, 2008 (as amended, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>"), among the Lender and General Motors Corporation (the "<u>Borrower</u>"), the Lender has agreed to make Advances to the Borrower upon the terms and subject to the conditions set forth therein.

B. Each of the Guarantors will derive a substantial direct and/or indirect benefit from the Lender's making of Advances to the Borrower pursuant to the Loan Agreement. To induce the Lender to make such Advances and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor has agreed to provide the guaranty set forth herein in favor of the Lender.

C. It is a condition precedent to the obligation of the Lender to make Advances to the Borrower under the Loan Agreement that each Guarantor shall have executed and delivered this Guaranty to the Lender.

NOW, THEREFORE, for good and valuable consideration, receipt of which by the parties hereto is hereby acknowledged, the parties hereto hereby agree as follows:

**1. Defined Terms.**

(a) Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

"<u>Expiration Date</u>" shall have the meaning set forth in Section 2(c) herein.

"<u>Guarantor Event of Default</u>" shall mean an Event of Default with respect to a Guarantor.

"<u>Obligations</u>" shall mean (a) all of the Borrower's obligations to repay the Advances on the Maturity Date, to pay interest on an Interest Payment Date and all other obligations and liabilities of the Borrower to the Lender or to any other Person arising under, or in connection with, the Loan Documents, whether now existing or hereafter arising; (b) any and all sums paid by the Lender pursuant to the Loan Documents in order to preserve any Facility Collateral or the interest of the Lender therein; (c) in the event of any proceeding for the collection or enforcement of any of the Borrower's obligations or liabilities referred to in clause (a), the reasonable expenses of retaking, holding, collecting, preparing for sale, selling or otherwise disposing of or realizing on any Facility Collateral, or of any exercise by the Lender of its rights under the Loan Documents, including without limitation, reasonable attorneys' fees and disbursements and court costs; and (d) all of the Borrower's indemnity obligations to the Lender pursuant to the Loan Documents.

**GMPR-HD 3339**

(b) The words "hereof", "herein" and "hereunder" and words of similar import when used in this Guaranty shall refer to this Guaranty as a whole and not to any particular provision of this Guaranty, and section and paragraph references are to this Guaranty unless otherwise specified.

(c) The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

## 2. Guaranty.

(a) Each Guarantor hereby unconditionally and irrevocably guarantees to the Lender and each of its permitted indorsees, transferees and assigns the prompt and complete payment and performance by Borrower when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations.

(b) Each Guarantor further agrees to pay any and all expenses (including, without limitation, all reasonable fees and disbursements of counsel) which may be paid or incurred by the Lender in enforcing any rights with respect to, or collecting, any or all of the Obligations and/or enforcing any rights with respect to, or collecting against, the Guarantors under this Guaranty. This Guaranty shall remain in full force and effect until the Obligations are paid in full, notwithstanding that from time to time prior thereto there may not be any outstanding Obligations.

(c) No payment or payments made by Borrower, a Guarantor, any other guarantor or any other Person or received or collected by the Lender from Borrower, a Guarantor, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of the Guarantors hereunder. Each Guarantor shall remain liable for the Obligations until (i) the Obligations are satisfied and paid in full and (ii) the date on which any payment made to the Lender in respect of the Obligations shall no longer be subject to avoidance under the Bankruptcy Code (such date, the "Expiration Date"), notwithstanding any payment or payments referred to in the foregoing sentence other than payments made by Guarantors in respect of the Obligations or payments received or collected from Guarantors in respect of the Obligations.

(d) Each Guarantor agrees that whenever, at any time, or from time to time, it shall make any payment on account of its liability hereunder, it will notify the Lender in writing that such payment is made under this Guaranty for such purpose.

## 3. Security Interest; Right of Set-off.

(a) Guaranty Collateral. As security for the prompt and complete payment when due of the Obligations and the performance by each Guarantor of all the covenants and obligations to be performed by it pursuant to this Guaranty and the other Loan Documents, each Guarantor hereby mortgages, pledges and grants to the Lender a Lien on and security interest in all of its rights, title and interest in and to all personal property and real property wherever located and whether now or hereafter existing and whether now owned or hereafter acquired, of every kind and description, tangible or intangible, including without limitation, the following, whether now or hereafter existing and wherever located:

(i) all Intellectual Property as well as royalties therefrom;

(ii) each Individual Property;

2

GMPR-HD 3340

(iii) all cash and Cash Equivalents, and all other property from time to time deposited in any account or deposit account and the monies and property in the possession or under the control of Lender or any affiliate, representative, agent or correspondent of Lender related to the foregoing;

(iv) all other tangible and intangible personal property of such Guarantor (whether or not subject to the Uniform Commercial Code), including, without limitation, all bank and other accounts and all cash and all investments therein, all rights to receive cash and investments, including without limitation, state, Federal or local tax refunds, intercompany debt, all proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of such Guarantor described in the preceding clauses (i) through (iii) of this Section 3(a) (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by such Guarantor in respect of any of the items listed above), and all books, correspondence, files and other Records in the possession or under the control of such Guarantor or any other Person from time to time acting for such Guarantor that at any time evidence or contain information relating to any of the property described in the preceding clauses (i) through (iii) of this Section 3(a) or are otherwise necessary or helpful in the collection or realization thereof;

(v) all rights, title and interest of such Guarantor (but not any of the obligations, liabilities or indemnifications of such Guarantor) in, to and under the Loan Documents;

(vi) all "accounts," "chattel paper," "commercial tort claims," "deposit accounts," "documents," "equipment," "general intangibles" (including without limitation, uncertificated Equity Interests), "goods," "instruments," "inventory," "investment property," "letter of credit rights," and "securities' accounts," as each of those terms is defined in the Uniform Commercial Code; and

(vii) all products and proceeds relating to or constituting any or all of the foregoing (clauses (i) through (vi) collectively, the "Guaranty Collateral");

in each case howsoever such Guarantor's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise), provided that, notwithstanding anything to the contrary contained herein or in any other Loan Document, the term "Guaranty Collateral" and each other term used in the definition thereof shall not include, and no Guarantor is pledging or granting a security interest in, any Property to the extent that such Property constitutes Excluded Collateral; provided further, however, that if and when, and to the extent that, any Property ceases to be Excluded Collateral, such Guarantor hereby grants to Lender, and at all times from and after such date, the Lender shall have a first priority or junior priority, as applicable, Lien in and on such Property (subject to Permitted Liens), and such Guarantor shall cooperate in all respects to ensure the prompt perfection of the Lender's security interest therein.

The Liens granted to Lender hereinabove shall be first priority Liens on all of the Guaranty Collateral (subject to Permitted Liens and to the extent legally and contractually permissible); provided that, with respect to the Guaranty Collateral which is subject to a Senior Lien, as set forth on Schedule 6.28 of the Loan Agreement, the Lien shall be of junior priority (to the extent legally and contractually permissible).

3

GMPR-HD 3341

The Obligations of each Guarantor under the Loan Documents constitute recourse obligations of such Guarantor, and therefore, their satisfaction is not limited to payments from the Guaranty Collateral.

With respect to each right to payment or performance included in the Guaranty Collateral from time to time, the Lien granted therein includes a continuing security interest in (i) any supporting obligation that supports such payment or performance and (ii) any Lien that (A) secures such right to payment or performance or (B) secures any such supporting obligation.

(b) Right of Set-off. Each Guarantor hereby irrevocably authorizes the Lender at any time and from time to time without notice to any Guarantor, any such notice being expressly waived by Guarantors, to set-off and appropriate and apply any and all deposits (general or special, time or demand, provisional or final), credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender to or for the credit or the account of Guarantors, or any part thereof in such amounts as Lender may elect, against and on account of the obligations and liabilities of Guarantors to Lender hereunder and claims of every nature and description of Lender against Guarantors, in any currency, whether arising hereunder, under the Loan Agreement, or under any other Loan Document, as Lender may elect, whether or not Lender has made any demand for payment and although such obligations, liabilities and claims may be contingent or unmatured. Lender may set-off cash, the proceeds of the liquidation of any Guaranty Collateral and all other sums or obligations owed by Lender to Borrower or Guarantors against all of each Guarantor's obligations to Lender, whether under this Guaranty or under any other agreement with any Guarantor, or otherwise, whether or not such obligations are then due, without prejudice to the Lender's right to recover any deficiency. The rights of Lender under this Section are in addition to other rights and remedies (including without limitation, other rights of set-off) which Lender may have. Upon the occurrence of any Guarantor Event of Default with respect to any Guarantor, the Lender shall have the right to cause liquidation, termination or acceleration to the extent of any assets pledged by such Guarantors to secure their Obligations hereunder or under any other agreement to which this Section 3 applies.

(c) UCC Matters, Further Assurances. Each Guarantor, shall, at all times on and after the date hereof, and at its expense, cause Uniform Commercial Code financing statements and continuation statements to be filed in all applicable jurisdictions as required to continue the perfection of the security interests created by this Guaranty. Each Guarantor shall, from time to time, at its expense and in such manner and form as the Lender may reasonably require, execute, deliver, file and record any other statement, continuation statement, specific assignment or other instrument or document and take any other action that may be necessary, or that the Lender, may reasonably request, to create, evidence, preserve, perfect or validate the security interests created hereunder or to enable the Lender to exercise and enforce its rights hereunder with respect to any of the Guaranty Collateral. Each Guarantor agrees that, if the grant of a security interest in any Property to Lender requires a consent to such grant from any other Person (other than such Guarantor or any of its Affiliates), such Guarantor shall use its best efforts to procure such consent, taking into consideration the likelihood that such consent will be given. Further, each Guarantor agrees that if any Excluded Collateral should, at any time following the Effective Date, become Guaranty Collateral on which the Lender is permitted to take a Lien, such Guarantor shall so notify the Lender and cooperate with and shall take all steps as may be reasonably required by the Lender to enable and continue the perfection of the Lender's security interests therein. Without limiting the generality of the foregoing, such Guarantor shall, upon the request of the Lender, execute and file such Uniform Commercial Code financing or continuation statements, or amendments thereto or assignments thereof, Mortgages and such other instruments or notices, as may be necessary or appropriate or as the Lender may request with respect to the Guaranty Collateral. Each Guarantor hereby authorizes the Lender to file one or more Uniform Commercial Code financing or continuation statements, and amendments thereto and assignments thereof, relative to all or any of the Guaranty Collateral now

4

GMPR-HD 3342

existing or hereafter arising without the signature of such Guarantor where permitted by law. A carbon, photographic or other reproduction of this Guaranty or any financing statement covering the Guaranty Collateral or any part thereof shall be sufficient as a financing statement.

(d) Changes in Locations, Names, etc. If any Guarantor shall (i) change the location of its chief executive office/chief place of business from that specified in Section 6.10 of the Loan Agreement, (ii) change its name, identity or corporate structure (or the equivalent) or change the location where it maintains records with respect to the Guaranty Collateral, or (iii) reincorporate or reorganize under the laws of another jurisdiction, it shall give the Lender written notice thereof not later than ten (10) days after such event occurs, and shall deliver to the Lender all Uniform Commercial Code financing statements and amendments as the Lender shall request and taken all other actions deemed reasonably necessary by the Lender to continue its perfected status in the Guaranty Collateral with the same or better priority.

(e) Lender's Appointment as Attorney-in-Fact. Each Guarantor hereby irrevocably constitutes and appoints the Lender and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Guarantor and in the name of such Guarantor or in its own name, from time to time in the Lender's discretion, for the purpose of carrying out the terms of this Guaranty to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Guaranty, which such Guarantor is required to do hereunder but has failed to do so within the time limits required, including without limitation, to protect, preserve and realize upon the Guaranty Collateral, to file such financing statements relating to the Guaranty Collateral as the Lender at its option deems appropriate, and, without limiting the generality of the foregoing, each Guarantor hereby gives the Lender the power and right, on behalf of such Guarantor, without assent by, but with notice to, such Guarantor, if a Guarantor Event of Default shall have occurred and be continuing, to do the following:

(i) in the name of such Guarantor or its own name, or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any insurance policies or with respect to any of the Guaranty Collateral and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Lender for the purpose of collecting any and all such moneys due with respect to any other Guaranty Collateral whenever payable;

(ii) to pay or discharge taxes and Liens levied or placed on or threatened against the Guaranty Collateral; and

(iii) (A) to direct any party liable for any payment under any Guaranty Collateral to make payment of any and all moneys due or to become due thereunder directly to the Lender or as the Lender shall direct; (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Guaranty Collateral; (C) to sign and endorse any invoices, assignments, verifications, notices and other documents in connection with any of the Guaranty Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Guaranty Collateral or any part thereof and to enforce any other right in respect of any Guaranty Collateral; (E) to defend any suit, action or proceeding brought against such Guarantor with respect to any Guaranty Collateral; (F) to settle, compromise or adjust any suit, action or proceeding described in clause (E) above and, in connection

5

GMPR-HD 3343

therewith, to give such discharges or releases as the Lender may deem appropriate; and (G) in connection with its exercise of its remedies hereunder pursuant to this Section 3, generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Guaranty Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes, and to do, at the Lender's option and such Guarantor's expense, at any time, or from time to time, all acts and things which the Lender deems necessary to protect, preserve or realize upon the Guaranty Collateral and the Lender's Liens thereon and to effect the intent of this Guaranty and the other Loan Documents, all as fully and effectively as such Guarantor might do.

Each Guarantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

Each Guarantor also authorizes the Lender, at any time and from time to time, to execute, in connection with any sale of Guaranty Collateral provided for in this Section 3, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Guaranty Collateral.

The powers conferred on the Lender are solely to protect the Lender's interests in the Guaranty Collateral and, except as required under Applicable Law, shall not impose any duty upon the Lender to exercise any such powers. The Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Lender nor any of its officers, directors, agents or employees shall be responsible to such Guarantor for any act or failure to act hereunder, except for its own gross negligence or willful misconduct.

(f) Proceeds. If a Guarantor Event of Default shall occur and be continuing, (a) all proceeds of Guaranty Collateral received by such Guarantor consisting of cash, checks and Cash Equivalents shall be held by such Guarantor in trust for the Lender, segregated from other funds of such Guarantor, and shall forthwith upon receipt by such Guarantor be turned over to the Lender in the exact form received by such Guarantor (duly endorsed by such Guarantor to the Lender, if required), and (b) any and all such proceeds received by such Guarantor will be applied by the Lender against the Obligations (whether matured or unmatured), such application to be in such order as the Lender shall elect. For purposes hereof, proceeds shall include, but not be limited to, all principal and interest payments, royalty payments, license fees, all prepayments and payoffs, all dividends and distributions, insurance claims, condemnation awards, sale proceeds, rents and any other income and all other amounts received with respect to the Guaranty Collateral and upon the liquidation of any Guaranty Collateral, all such proceeds received by the Lender will be distributed by the Lender in such order as the Lender shall elect. Any balance of such proceeds remaining after the Obligations shall have been paid in full and this Guaranty shall have been terminated shall be promptly paid over to such Guarantor or to whomsoever may be lawfully entitled to receive the same.

(g) Remedies. If a Guarantor Event of Default shall occur and be continuing, the Lender may exercise, in addition to all other rights and remedies granted to it in this Guaranty and in any other instrument or agreement securing, evidencing or relating to the Obligations, all rights and remedies of a secured party under the Uniform Commercial Code, at law and in equity. Without limiting the generality of the foregoing, the Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon such Guarantor or any other Person (all and each of which demands, defenses, presentments, protests, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Guaranty Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Guaranty Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels or as an

6

GMPR-HD 3344

entirety at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions and at prices that are consistent with the prevailing market for similar collateral as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. The Lender shall act in good faith to obtain the best execution possible under prevailing market conditions. The Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Guaranty Collateral so sold, free of any right or equity of redemption in the related Guarantor, which right or equity is hereby waived and released. Each Guarantor further agrees, at the Lender's request, to assemble the Guaranty Collateral and make it available to the Lender at places which the Lender shall reasonably select, whether at the related Guarantor's premises or elsewhere. The Lender shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Guaranty Collateral or in any way relating to the Guaranty Collateral or the rights of the Lender hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Obligations, in such order as the Lender may elect, and only after such application and after the payment by the Lender of any other amount required or permitted by any provision of law, including, without limitation, Section 9-504(1)(c) of the Uniform Commercial Code, need the Lender account for the surplus, if any, to the related Guarantor. To the extent permitted by Applicable Law, each Guarantor waives all claims, damages and demands it may acquire against the Lender arising out of the exercise by the Lender of any of its rights hereunder. If any notice of a proposed sale or other Disposition of Guaranty Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other Disposition. Each Guarantor shall remain liable for any deficiency (plus accrued interest thereon) if the proceeds of any sale or other disposition of the Guaranty Collateral are insufficient to pay the Obligations and the reasonable fees and disbursements incurred by the Lender, including reasonable fees and expenses of any attorneys employed by the Lender to collect such deficiency. Because each Guarantor recognizes that the Lender may not be able to purchase or sell all of the Guaranty Collateral on a particular Business Day, or in a transaction with the same purchaser, or in the same manner because the market for such Guaranty Collateral may not be liquid, each Guarantor agrees that liquidation of the Guaranty Collateral does not require a public purchase or sale and that a good faith private purchase or sale shall be deemed to have been made in a commercially reasonable manner. Accordingly, the Lender may elect, in its sole discretion, the time and manner of liquidating any Guaranty Collateral and nothing contained herein shall (i) obligate the Lender to liquidate any Guaranty Collateral on the occurrence of a Guarantor Event of Default or to liquidate all Guaranty Collateral in the same manner or on the same Business Day or (ii) constitute a waiver of any of the Lender's rights or remedies.

(h) Continuing Liability of each Guarantor. The security interests described above are granted as security only and shall not subject the Lender or any of its assigns to, or transfer or in any way affect or modify, any obligation, liability or indemnity of each Guarantor with respect to, any of the Guaranty Collateral or any transaction relating thereto. None of the Lender or its assigns shall be required or obligated in any manner to make any inquiry as to the nature or sufficiency of any payment received by it or the sufficiency of any performance by any party under any such obligation, or to make any payment or present or file any claim, or to take any action to collect or enforce any performance or the payment of any amount thereunder to which any such Person may be entitled at any time.

(i) Limitation on Duties Regarding Preservation of Guaranty Collateral. The Lender's duty with respect to the custody, safekeeping and physical preservation of the Guaranty Collateral in its possession, under Section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as the Lender deals with similar property for its own account. Neither the Lender nor any of its directors, officers or employees shall be liable for failure to demand, collect or realize upon all or any part of the Guaranty Collateral or for any delay in doing so or shall be under any

7

GMPR-HD 3345

EX-10.2

obligation to sell or otherwise dispose of any Guaranty Collateral upon the request of the related Guarantor or otherwise

(j) Powers Coupled with an Interest. All authorizations and agencies herein contained with respect to the Guaranty Collateral are irrevocable and powers coupled with an interest.

(k) Release of Security Interest Upon Satisfaction of all Obligations. Upon termination of this Guaranty and repayment to the Lender of all Obligations and the performance of all obligations under the Loan Documents, the Lender shall release its security interest in any remaining Guaranty Collateral; provided that if any payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the related Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or a trustee or similar officer for such Guarantor or any substantial part of its Property, or otherwise, this Guaranty, all rights hereunder and the Liens created hereby shall continue to be effective, or be reinstated, until such payments have been made.

(l) Partial Release of Guaranty Collateral. Provided that no Event of Default shall then exist, the Lender shall, in connection with any Disposition of Guaranty Collateral permitted under the Loan Agreement (other than dispositions of Guaranty Collateral between and among Guarantors and Pledged Entities), release from the Lien of the Loan Documents the portion of the Guaranty Collateral Disposed of, upon the related Guarantor's satisfaction of the conditions set forth in the Loan Agreement. For the avoidance of doubt, the Lien of the Lender on Guaranty Collateral shall not be released in connection with the Disposition of Guaranty Collateral between and among Guarantors and Pledged Entities.

4. No Subrogation. Notwithstanding any payment or payments made by any Guarantor hereunder or any set-off or application of funds of any Guarantors by the Lender, no Guarantor shall be entitled to be subrogated to any of the rights of the Lender against Borrower or any other guarantor or any collateral security or guarantee or right of offset held by such Lender for the payment of the Obligations or the obligations of any Guarantor, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from Borrower or any other Guarantor in respect of payments made by such Guarantor hereunder, until all amounts owing to Lender by Borrower on account of the Obligations are indefeasibly paid and satisfied in full. If any amount shall be paid to any Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid and satisfied in full, such amount shall be held by such Guarantor in trust for Lender, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to the Lender in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Lender, if required), to be applied against the Obligations, whether matured or unmatured, in such order as the Lender may determine.

5. Amendments, Etc. with Respect to the Obligations. Each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against Guarantors and without notice to or further assent by any Guarantor, any demand for payment of any of the Obligations made by Lender may be rescinded and any of the Obligations continued, and the Obligations, or the liability of any other party upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, terminated, waived, surrendered or released by Lender, and the Loan Agreement and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as Lender may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by Lender for the payment of the Obligations or the obligations of any Guarantor may be sold, exchanged, waived, surrendered or released. Lender shall not have any obligation to protect, secure, perfect or insure any lien

8

GMPR-HD 3346

at any time held by it as security for the Obligations or for this Guaranty or any property subject thereto. When making any demand hereunder against any Guarantor, the Lender may, but shall be under no obligation to, make a similar demand on the Borrower or any other Guarantor, and any failure by the Lender to make any such demand or to collect any payments from Borrower or any such other Guarantor or any release of Borrower or such other Guarantor shall not relieve any Guarantor of its obligations or liabilities hereunder, and shall not impair or affect the rights and remedies, express or implied, or as a matter of law, of the Lender against such Guarantor. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

6. **Waiver of Rights**. Except as otherwise expressly provided herein, each Guarantor waives any and all notice of any kind including, without limitation, notice of the creation, renewal, extension or accrual of any of the Obligations, and notice of or proof of reliance by the Lender upon this Guaranty or acceptance of this Guaranty. All of the Obligations shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived in reliance upon this Guaranty and all dealings between Borrower and Guarantors, on the one hand, and the Lender, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon this Guaranty. Each Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon Borrower or Guarantors with respect to the Obligations. In addition, each Guarantor waives any requirement that the Lender exhaust any right, power or remedy or proceed against Borrower or any other Guarantor.

7. **Guaranty Absolute and Unconditional**. Each Guarantor understands and agrees that this Guaranty shall be construed as a continuing, absolute and unconditional guarantee of the full and punctual payment and performance by Borrower of the Obligations and not of their collectibility only and is in no way conditioned upon any requirement that Lender first attempt to collect any of the Obligations from the Borrower or any other Guarantor, without regard to (a) the validity, regularity or enforceability of the Loan Agreement or any other Loan Document, any of the Obligations or the obligations of each Guarantor hereunder or any other collateral security therefor or guarantee thereof or right of offset with respect thereto at any time or from time to time held by Lender, (b) any defense, set-off, deduction, abatement, recoupment, reduction or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by Borrower against the Lender or any other Guarantor, or (c) any other circumstance whatsoever (with or without notice to or knowledge of Borrower or any Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of Borrower from the Obligations, or of any Guarantor from this Guaranty, in bankruptcy or in any other instance. When pursuing its rights and remedies hereunder against any Guarantor, Lender may, but shall be under no obligation to, pursue such rights, powers, privileges and remedies as it may have against Borrower or any other Person or against the Guaranty Collateral or any other collateral security or guarantee for the Obligations or any right of offset with respect thereto, and any failure by Lender to pursue such other rights or remedies or to collect any payments from Borrower or any such other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of Borrower or any such other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any liability hereunder, and shall not impair or affect the rights, powers, privileges and remedies, whether express, implied or available as a matter of law or equity, of the Lender against Guarantors. This Guaranty shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon Guarantors and the successors and assigns thereof, and shall inure to the benefit of Lender, and each of its successors, indorsees, transferees and assigns, until all the Obligations and the obligations of Guarantors under this Guaranty shall have been satisfied by performance and payment in full and the Loan Agreement and the other Loan Documents shall have been terminated, notwithstanding that from time to time during the term of the Loan Agreement a Borrower may be free from any Obligations.

9

**GMPR-HD 3347**

8. <u>Reinstatement</u>. This Guaranty shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

9. <u>Payments</u>. Each Guarantor hereby guarantees that payments hereunder will be paid to the Lender, in Dollars, promptly after demand therefor and in accordance with the wiring instructions of the Lender.

10. <u>Notices</u>. Except as otherwise expressly permitted by this Guaranty, all notices, requests and other communications provided for herein (including, without limitation, any modifications of, or waivers, requests or consents under, this Guaranty) shall be given or made in writing (including, without limitation, by telecopy or Electronic Transmission) delivered to the intended recipient at the "Address for Notices" specified on the signatures pages hereof, beneath each party's name or in Section 11.02 of Appendix A of the Loan Agreement; or, as to any party, at such other address as shall be designated by such party in a written notice to each other party. Except as otherwise provided in this Guaranty, all such communications shall be deemed to have been duly given when transmitted by telecopier or Electronic Transmission or personally delivered or, in the case of a mailed notice, upon receipt, in each case given or addressed as aforesaid.

11. <u>Severability</u>. If any of the provisions of this Guaranty shall be held invalid or unenforceable, this Guaranty shall be construed as if not containing such provisions, and the rights and obligations of the parties hereto shall be construed and enforced accordingly. If any of the provisions of this Guaranty shall be held invalid or unenforceable (in whole or in part) as against any one or more Guarantors, then this Guaranty shall continue to be enforceable against all other Guarantors without regard to any such invalidity or unenforceability.

12. <u>Amendments in Writing; No Waiver; Cumulative Remedies</u>.

(a) None of the terms or provisions of this Guaranty may be waived, amended, supplemented or otherwise modified except by a written instrument executed by each Guarantor and the Lender; provided that any provision of this Guaranty may be waived in a writing executed by the Lender.

(b) The Lender shall not be deemed by any act (except by a written instrument pursuant to Section 12(a)), delay, indulgence or omission to have acquiesced in any Default, Event of Default, Guarantor Event of Default or in any breach of any of the terms and conditions hereof, and, in the absence of a written instrument pursuant to Section 12(a), the Lender shall not be deemed to have waived any right, power, privilege or remedy hereunder. No failure to exercise, nor any delay in exercising, on the part of Lender, any right, power, remedy or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power, remedy or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Lender of any right, power, privilege or remedy hereunder on any one occasion shall not be construed as a bar to any right, power, privilege or remedy which Lender would otherwise have on any future occasion.

(c) The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

10

GMPR-HD 3348

13. Section Headings. The section headings used in this Guaranty are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

14. Successors and Assigns. This Guaranty shall be binding upon the successors and permitted assigns of each Guarantor and shall inure to the benefit of the Lender and each successor and assign thereof. No Guarantor may assign any of its rights, interests or obligations hereunder to any Person without the express written consent of the Lender in its sole discretion and any attempt to assign or transfer this Guaranty without such consent shall be null and void and of no effect whatsoever.

15. GOVERNING LAW. INSOFAR AS THERE MAY BE NO APPLICABLE FEDERAL LAW, THIS GUARANTY SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY RULE OF CONFLICTS OF LAW (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THAT WOULD RESULT IN THE APPLICATION OF THE SUBSTANTIVE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK. NOTHING IN THIS GUARANTY SHALL REQUIRE ANY UNLAWFUL ACTION OR INACTION BY EITHER PARTY.

16. CONSENT TO JURISDICTION AND VENUE; SERVICE OF PROCESS; WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY:

(A) SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS GUARANTY, THE NOTE AND THE OTHER LOAN DOCUMENTS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE GENERAL JURISDICTION OF ANY COURT OF THE STATE AND COUNTY OF NEW YORK, OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK;

(B) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND, TO THE EXTENT PERMITTED BY LAW, WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME;

(C) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO ITS ADDRESS SET FORTH IN SECTION 10 OR AT SUCH OTHER ADDRESS OF WHICH THE LENDER SHALL HAVE BEEN NOTIFIED; AND

(D) AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.

EACH GUARANTOR AND THE LENDER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO

11

GMPR-HD 3349

THIS GUARANTY, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

17. **Counterparts**. This Guaranty may be executed in any number of counterparts, all of which when taken together shall constitute one and the same instrument and any of the parties hereto may execute this Guaranty by signing any such counterpart.

18. **Joint and Several Liability**. Each Guarantor hereby acknowledges and agrees that the Guarantors are jointly and severally liable to the Lender for all representations, warranties, covenants, obligations and liabilities of each Guarantor hereunder and under the Loan Documents. Each Guarantor hereby further acknowledges and agrees that (a) any Guarantor Event of Default or any default, or breach of a representation, warranty or covenant by any Guarantor hereunder or under any Loan Document is hereby considered a default or breach by each Guarantor, as applicable, and (b) the Lender shall have no obligation to proceed against one Guarantor before proceeding against the other Guarantors. Each Guarantor hereby waives any defense to its obligations under this Guaranty based upon or arising out of the disability or other defense or cessation of liability of one Guarantor versus the other. A Guarantor's subrogation claim arising from payments to the Lender shall constitute a capital investment in the other Guarantor subordinated to any claims of the Lender and equal to a ratable share of the equity interests in such Guarantor.

19. **Limitation of Individual Guarantor Liability**. Notwithstanding any provision herein contained to the contrary, each Guarantor's liability for the payment of its obligations under this Guaranty shall be limited to an amount not to exceed as of any date of determination the amount which could be claimed by Lender from such Guarantor under this Guaranty without rendering such claim voidable or avoidable under Section 548 of the Bankruptcy Code (Title 11, U.S.C.) or under any applicable state fraudulent transfer or similar statute or common law after taking into account, among other things, such Guarantor's right of contribution and indemnification from each other Guarantor, if any. To the end set forth above, but only to the extent that the obligations of any Guarantor hereunder would otherwise be subject to avoidance under the avoidance provisions, if such Guarantor is not deemed to have received valuable consideration, fair value, fair consideration or reasonably equivalent value for the Obligations, or if the Obligations would render such Guarantor insolvent, or leave such Guarantor with an unreasonably small capital to conduct its business, or cause such Guarantor to have incurred debts (or to have intended to have incurred debts) beyond its ability to pay such debts as they mature, in each case as of the time any of the Obligations is deemed to have been incurred for the purposes of the avoidance provisions, the maximum Obligations for which such Guarantor shall be liable hereunder shall be reduced to that amount which, after giving effect thereto, would not cause the Obligations as so reduced, to be subject to avoidance under the avoidance provisions.

20. **Final Agreement; Severability**. Other than as referenced in the preceding sentence, this Guaranty contains the entire and exclusive agreement of the parties hereto with reference to the matters discussed herein. This Guaranty supersedes all prior drafts and communications with respect thereto. The headings of paragraphs herein are inserted only for convenience and shall in no way define, describe or limit the scope or intent of any provision of this Guaranty. If any term or provision of this Guaranty shall be deemed prohibited by or invalid under any applicable law, such provision shall be invalidated without affecting the remaining provisions of this Guaranty.

[SIGNATURE PAGE TO FOLLOW]

12

GMPR-HD 3350

IN WITNESS WHEREOF, the parties hereto have caused this Guaranty to be duly executed and delivered as of the day and year first above written.

ANNUNCIATA CORPORATION,
as a Guarantor

By:     /x/ Adil Mistry
Name:   Adil Mistry
Title:  Vice President

Address for Notices:
767 Fifth Avenue, 14th Floor
New York, NY 10153

Attention: Adil Mistry
Telephone: (212) 418-3507
Facsimile: (212) 418-3695

*Signature Page to Guaranty and Security Agreement*

**GMPR-HD 3351**

ARGONAUT HOLDINGS, INC.,
GENERAL MOTORS ASIA, INC.,
GENERAL MOTORS ASIA PACIFIC HOLDINGS, LLC,
GENERAL MOTORS OVERSEAS CORPORATION,
GENERAL MOTORS OVERSEAS DISTRIBUTION CORPORATION,
GENERAL MOTORS PRODUCT SERVICES, INC.,
GENERAL MOTORS RESEARCH CORPORATION,
GM APO HOLDINGS, LLC,
GM EUROMETALS, INC.,
GM FINANCE CO. HOLDINGS LLC,
GM GEFS L.P.,
GM GLOBAL TECHNOLOGY OPERATIONS, INC.,
GM GLOBAL TOOLING COMPANY, INC.,
GM LAAM HOLDINGS, LLC,
GM PREFERRED FINANCE CO. HOLDINGS LLC,
GM TECHNOLOGIES, LLC,
GM-DI LEASING CORPORATION,
GMOC ADMINISTRATIVE SERVICES CORPORATION,
ONSTAR, LLC,
RIVERFRONT HOLDINGS, INC.,
SATURN CORPORATION, and
SATURN DISTRIBUTION CORPORATION,
   each, as a Guarantor

By:      /x/ Adil Mistry
Name     Adil Mistry
Title:   Vice President

Address for Notices:
767 Fifth Avenue, 14th Floor
New York, NY 10153

Attention: Adil Mistry
Telephone: (212) 418-3507
Facsimile: (212) 418-3695

*Signature Page to Guaranty and Security Agreement*

GMPR-HD 3352

GENERAL MOTORS INTERNATIONAL
HOLDINGS, INC.,
as a Guarantor

By:      /s/ Adil Mistry
Name     Adil Mistry
Title:   Vice President

Address for Notices:
767 Fifth Avenue, 14th Floor
New York, NY 10153

Attention: Adil Mistry
Telephone: (212) 418-3507
Facsimile: (212) 418-3695

*Signature Page to Guaranty and Security Agreement*

GMPR-HD 3353

## EXHIBIT A
## LIST OF GUARANTORS

| Name | Form of Organization | Jurisdiction of Organization |
|---|---|---|
| Annunciata Corporation | Corporation | Delaware |
| Argonaut Holdings, Inc. | Corporation | Delaware |
| General Motors Asia Pacific Holdings, LLC | Limited Liability Company | Delaware |
| General Motors Asia, Inc. | Corporation | Delaware |
| General Motors International Holdings, Inc. | Corporation | Delaware |
| General Motors Overseas Corporation | Corporation | Delaware |
| General Motors Overseas Distribution Corporation | Corporation | Delaware |
| General Motors Product Services, Inc. | Corporation | Delaware |
| General Motors Research Corporation | Corporation | Delaware |
| GM APO Holdings, LLC | Limited Liability Company | Delaware |
| GM Eurometals, Inc. | Corporation | Delaware |
| GM Finance Co. Holdings LLC | Limited Liability Company | Delaware |
| GM GEFS L.P. | Limited Partnership | Nevada |
| GM Global Technology Operations, Inc. | Corporation | Delaware |
| GM Global Tooling Company, Inc. | Corporation | Delaware |
| GM LAAM Holdings, LLC | Limited Liability Company | Delaware |
| GM Preferred Finance Co. Holdings LLC | Limited Liability Company | Delaware |
| GM Technologies, LLC | Limited Liability Company | Delaware |
| GM-DI Leasing Corporation | Corporation | Delaware |
| GMOC Administrative Services Corporation | Corporation | Delaware |
| OnStar, LLC | Limited Liability Company | Delaware |
| Riverfront Holdings, Inc. | Corporation | Delaware |
| Saturn Corporation | Corporation | Delaware |
| Saturn Distribution Corporation | Corporation | Delaware |

GMPR-HD 3354

Appendix 3

Debtors' Ex. 8 in Evidence

Equity Pledge Agreement,
dated as of December 31, 2008

EX-10.3 4 k47265exv10w3.htm EX-10.3

**Exhibit 10.3**

**EXECUTION COPY**

### EQUITY PLEDGE AGREEMENT

This EQUITY PLEDGE AGREEMENT, dated as of December 31, 2008 (as amended, modified or supplemented from time to time, this "Agreement"), made by the undersigned, each of which is further identified on Annex A hereto (each, a "Pledgor" and together with their respective successors and assigns, collectively, the "Pledgors"), in favor of the United States Department of the Treasury in its capacity as the lender under the Loan Agreement referred to below (the "Pledgee"). Except as otherwise defined herein, terms used herein and defined in the Loan Agreement referred to below shall be used herein as therein defined.

### WITNESSETH:

WHEREAS, General Motors Corporation (the "Borrower") and the Pledgee are parties to that certain Loan and Security Agreement, dated as of the date hereof (as amended, modified or supplemented from time to time, the "Loan Agreement"), providing for the making of Advances as contemplated therein;

WHEREAS, each of the Pledgors will derive a substantial direct and/or indirect benefit from the Pledgee's making Advances to the Borrower pursuant to the Loan Agreement. To induce the Pledgee to enter into the Loan Agreement and make such Advances, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Pledgor has agreed to pledge and grant a security interest in the Collateral (as defined herein) in which such Pledgor has rights, title and interests in and to, as security for such Advances;

WHEREAS, it is a condition precedent to the obligation of the Lender to make Advances to the Borrower under the Loan Agreement that each Pledgor shall have executed and delivered this Agreement to the Lender; and

WHEREAS, each Pledgor desires to execute this Agreement to satisfy the conditions described in the preceding paragraph;

NOW, THEREFORE, in consideration of the benefits accruing to each Pledgor, the receipt and sufficiency of which are hereby acknowledged, each Pledgor hereby makes the following representations and warranties to the Pledgee and hereby covenants and agrees with the Pledgee as follows:

**1. DEFINITIONS.** All capitalized terms used but not defined herein shall have the respective meanings set forth in the Loan Agreement, including Appendix A thereto.

1.1. Equity Interests.

(a) As used herein, the term "Equity Interests" shall mean all of the equity interests in an issuing entity ("Issuing Entity"), acquired by, issued to or held by the relevant Pledgor as set forth on Annex A under the heading "Percentage Pledged". Each Pledgor represents and warrants that on the date hereof, the Equity Interests held by such Pledgor (i) consists of the number and type of Equity Interests of the related Issuing Entities as described in Annex A hereto and (ii) all options, warrants, calls or commitments of any character whatsoever relating to Equity Interests of such Issuing Entities, in each case listed in Annex A hereto. Each Pledgor represents and warrants on the date hereof: (x) such Equity Interests constitute that percentage of the issued and outstanding Equity Interests of the related Issuing Entities as set forth in Annex A hereto, and (y) such Pledgor is the owner of such Equity Interests so held by it and there exist no options or preemption rights in respect of any of such Equity Interests.

**GMPR-HD 3355**

EX-10.3

(b) All Equity Interests at any time pledged or required (and permitted) to be pledged hereunder are hereinafter called the "Pledged Equity Interests," which together with: (i) all Chattel Paper, Documents, Instruments and General Intangibles attributable solely to the Pledged Equity Interests; (ii) all rights of any Pledgor to receive moneys (including dividends) due but unpaid or to become due with respect to the Pledged Equity Interests and all property received in substitution or exchange therefor; (iii) all of Pledgors' rights and privileges with respect to the Pledged Equity Interests; (iv) all rights of Pledgors to property of the related Issuing Entities; (v) all Proceeds with respect to the foregoing clauses (i) through (iv); and (vi) to the extent not included in the foregoing, all proceeds, products, offspring, rents, revenues, issues, profits, royalties, income, benefits, accessions, additions, substitutions and replacements of and to any and all of the foregoing, are hereinafter called the "Collateral"; provided that, notwithstanding anything to the contrary contained herein or in any other Loan Document, the term Collateral and each other term used in the definition thereof shall not include, and the Pledgee shall not have a pledge or any other Lien pursuant to this Agreement on, any of the Excluded Collateral of any Pledgor.

1.2. Obligations. As used herein, the term "Obligations" shall mean the obligations and liabilities of the Borrower and each Pledgor to the Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, or out of or in connection with the Loan Agreement, any other Loan Documents and any other document made, delivered or given in connection therewith or herewith, whether on account of covenants, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all reasonable fees and disbursements of counsel to Lender that are required to be paid by Borrower pursuant to the terms of the Loan Agreement) or otherwise.

1.3. Chattel Paper, Documents, Instruments, General Intangibles and Proceeds. The terms "Chattel Paper," "Documents," "Instruments," "General Intangibles," and "Proceeds" have the meanings specified in the Uniform Commercial Code.

## 2. PLEDGE OF EQUITY INTERESTS.

2.1. Pledge. As collateral security for the prompt satisfaction and performance of the Obligations, each Pledgor hereby: (i) pledges, collaterally assigns and hypothecates to Pledgee and hereby grants to the Pledgee for the benefit of the Pledgee and its assigns a first priority security interest in all of the Collateral now or from time to time owned by such Pledgor; (ii) pledges and deposits as security with the Pledgee the Pledged Equity Interests of the related Issuing Entities owned by such Pledgor on the date hereof and delivers to the Pledgee, any certificates therefor or instruments thereof, accompanied by such other instruments of transfer as are reasonably acceptable to the Pledgee; and (iii) collaterally assigns, transfers, hypothecates, mortgages, charges and sets over to the Pledgee all of such Pledgor's right, title and interest in and to the Pledged Equity Interests of the related Issuing Entities (and in and to the certificates or instruments evidencing such Pledged Equity Interests of the related Issuing Entities) to be held by the Pledgee, upon the terms and conditions set forth in this Agreement.

2.2. Subsequently Acquired Equity Interests. If, at any time or from time to time after the date hereof, a Pledgor acquires (by purchase, stock dividend or otherwise) any additional Equity Interests (other than any such Equity Interests constituting Excluded Collateral) of the related Issuing Entities or, if any Equity Interests constituting Excluded Collateral ceases to be Excluded Collateral, such Pledgor hereby automatically pledges and shall forthwith deposit such Equity Interests of the related Issuing Entities (including any certificates or instruments representing such Equity Interests of the related Issuing Entities) as security with the Pledgee and deliver to the Pledgee certificates or instruments thereof, accompanied by such other instruments of transfer as are reasonably acceptable to the Pledgee, and will promptly thereafter deliver to the Pledgee a certificate executed by a Responsible Person of such Pledgor

2

GMPR-HD 3356

describing such Equity Interests and certifying that the same have been duly pledged to the Pledgee hereunder as Collateral.

2.3. Delivery of Share Certificates and Powers of Attorney. Except as may otherwise be set forth in the Post Closing Letter, simultaneously with the delivery of this Agreement, each Pledgor is delivering to the Pledgee, all certificated securities (including, without limitation, stock certificates) representing the Pledged Equity Interests, together with related stock powers duly executed in blank by the relevant Pledgor authorizing Pledgee to transfer ownership of such Pledged Equity Interests to a third party in accordance with the terms of this Agreement. Each Pledgor shall promptly deliver to the Pledgee, or cause the Borrower or any Issuing Entity to deliver directly to the Pledgee, (i) share certificates or other instruments representing any Pledged Equity Interests acquired or received by such Pledgor after the date of this Agreement and (ii) related stock powers duly executed in blank by such Pledgor authorizing Pledgee to transfer ownership of any Pledged Equity Interests acquired or received by such Pledgor after the date of this Agreement to a third party in accordance with the terms of this Agreement.

2.4. Uncertificated Securities. Other than as may be set forth in the Post Closing Letter, notwithstanding anything to the contrary contained in Sections 2.1 and 2.2, if any Pledged Equity Interests are uncertificated securities, the respective Pledgor hereby notifies the Pledgee thereof in such Annex A hereof, and hereby represents that it has taken all actions required to perfect the security interest of the Pledgee in such uncertificated Pledged Equity Interests under applicable law. Each Pledgor further agrees to take such actions as the Pledgee deems reasonably necessary to effect the foregoing and to permit the Pledgee to exercise any of its rights and remedies hereunder and under applicable law.

3. APPOINTMENT OF SUB-AGENTS; ENDORSEMENTS, ETC. The Pledgee shall have the right to appoint one or more sub-agents for the purpose of retaining physical possession of any certificated Pledged Equity Interests, which may be held (in the discretion of the Pledgee) in the name of the relevant Pledgor, endorsed or assigned in blank or, if an Event of Default shall have occurred and be continuing, in the name of the Pledgee or any nominee or nominees of the Pledgee or a sub-agent appointed by the Pledgee; provided that the Pledgee shall remain primarily liable for any and all actions and inactions of any such sub-agent or nominee of the Pledgee.

4. VOTING, ETC. WHILE NO EVENT OF DEFAULT. Unless and until an Event of Default shall have occurred and be continuing, each Pledgor shall be entitled to exercise all voting rights attaching to any and all Pledged Equity Interests owned by it, and to give consents, waivers or ratifications in respect thereof, provided that no vote shall be cast or any consent, waiver or ratification given or any action taken which would violate, result in a breach of any covenant contained in, or be materially inconsistent with, any of the terms of this Agreement, the Loan Agreement or any other Loan Document or which would have the effect of materially impairing the value of the Collateral or any part thereof or the position or interests of the Pledgee therein. All such rights of a Pledgor to vote and to give consents, waivers and ratifications shall cease in case an Event of Default shall occur and be continuing and Section 9 hereof shall become applicable; provided that, the Pledgee shall have the right from time to time during the continuance of an Event of Default to permit such Pledgor to exercise such rights. After all Event of Defaults have been cured or waived, the Pledgors will have the right to exercise the voting and consensual rights and powers that it would otherwise be entitled to exercise pursuant to the terms of this Section 4.

5. DIVIDENDS AND OTHER DISTRIBUTIONS. Unless and until an Event of Default shall have occurred and be continuing, all cash dividends, interest and principal or other amounts payable in respect of the Pledged Equity Interests shall be paid to the Pledgors in accordance with the related certificate of incorporation, by-laws, certificate of formation, or operating agreement (or

3

GMPR-HD 3357

EX-10.3

equivalent thereof), as the case may be. On and after the date on which an Event of Default shall have occurred and be continuing, all such amounts shall be paid to and shall be the collateral of the Pledgee under the Loan Documents. All dividends, distributions or other payments which are received by a Pledgor contrary to the provisions of this Section 5 or Section 9 shall be received in trust for the benefit of the Pledgee, shall be segregated from other property or funds of such Pledgor and shall be forthwith paid over to the Pledgee as collateral for the obligations of the Pledgor under the Loan Documents in the same form as so received (with any necessary endorsement).

## 6. REPRESENTATION AND WARRANTIES OF THE PLEDGOR.

### 6.1. Representations and Warranties.

(a) Each Pledgor represents, warrants and covenants that:

(i) it is the sole owner of the Pledged Equity Interests pledged by it hereunder, free and clear of all claims, mortgages, pledges, Liens, security interests and other encumbrances of any nature whatsoever (and no right or option to acquire the same exists in favor of any other person or entity), except for the assignment, pledge and security interest in favor of the Pledgee created or provided for herein or under any other Loan Document and Permitted Liens, and (except to the Pledgee hereunder) such Pledgor agrees that, except as permitted by the Loan Agreement, it will not encumber or grant any security interest in or with respect to the Pledged Equity Interest or permit any of the foregoing;

(ii) no options, warrants or other agreements with respect to the Collateral owned by such Pledgor are outstanding;

(iii) except for Excluded Collateral, the Pledged Equity Interests pledged by such Pledgor hereunder, represent all of the shares of capital stock and equity interests of the Issuing Entities owned by such Pledgor;

(iv) to the knowledge of such Pledgor, all of the Pledged Equity Interests owned by it have been duly and validly issued, are fully paid and non-assessable; and

(v) the pledge and collateral assignment to the Pledgee of the Pledged Equity Interests by such Pledgor pursuant to this Agreement, together with the delivery in the State of New York by such Pledgor to the Pledgee of all certificated Pledged Equity Interests together with related stock powers with respect thereto in blank, and the filing of Uniform Commercial Code financing statements in the applicable filing jurisdiction set forth on Annex A, will create a valid and perfected first priority Lien in the Collateral, and the proceeds thereof, subject to no other Lien or to any agreement purporting to grant to any third party a Lien on the property or assets of such Pledgor which would include the Collateral other than a Permitted Lien allowable under the Loan Agreement.

## 7. FURTHER ASSURANCES; POWER-OF-ATTORNEY.

4

GMPR-HD 3358

7.1. Each Pledgor agrees that it will cooperate with the Pledgee in filing and refiling under the Uniform Commercial Code such financing statements, continuation statements and other documents in such filing offices in any Uniform Commercial Code jurisdiction as may reasonably be necessary or advisable and wherever required or advisable by law in order to perfect and preserve the Pledgee's first priority security interest in the Collateral hereunder and hereby authorizes the Pledgee to file financing statements and amendments thereto relative to all or any part of the Collateral, and agrees to do such further acts and things and to execute and deliver to the Pledgee such additional conveyances, assignments, agreements and instruments as the Pledgee may reasonably require or reasonably deem advisable to carry into effect the purposes of this Agreement or to further assure and confirm unto the Pledgee their rights, powers and remedies hereunder or thereunder.

7.2. Each Pledgor hereby constitutes and irrevocably appoints the Pledgee as its true and lawful attorney-in-fact, with full authority in the place and stead of such Pledgor and in the name of such Pledgor or otherwise, at any time and from time to time after an Event of Default shall have occurred and be continuing, to (i) affix to any documents representing the Collateral, the stock powers delivered with respect thereto, (ii) transfer or cause the transfer of the Collateral, or any part thereof, on the books of the Issuing Entity, to the name of the Pledgee or any nominee, (iii) exercise with respect to such Collateral, all the rights, powers and remedies of an owner, and (iv) take any action and execute any instrument which the Pledgee may deem necessary or advisable to accomplish the purposes of this Agreement, which such Pledgor is required to do hereunder but has failed to do within the required time frames hereunder. The power of attorney granted pursuant to this Section 7.2(b) and all authority hereby conferred are granted and remedies solely to protect the Pledgee's interest in the Collateral and shall not impose any duty upon the Pledgee to exercise any power. This power of attorney shall be irrevocable as one coupled with an interest until the Maturity Date.

8. **TRANSFER BY THE PLEDGOR.** No Pledgor will sell or otherwise dispose of, grant any option with respect to, or mortgage, pledge or otherwise encumber any of the Collateral except in accordance with the terms of this Agreement and the Loan Documents or as may otherwise be agreed to in writing by the Pledgee.

9. **REMEDIES; PRIVATE SALE.**

9.1. Remedies. During the period during which an Event of Default is continuing:

(a) the Pledgee shall have all of the rights and remedies with respect to the Pledged Equity Interests of a secured party under the Uniform Commercial Code and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted (including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Pledged Equity Interests as if the Pledgee was the sole and absolute owner thereof (and the Pledgors agree to take all such action as may be appropriate to give effect to such right));

(b) the Pledgee may make any reasonable compromise or settlement deemed desirable with respect to any of the Pledged Equity Interests and may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, any of the Pledged Equity Interests;

(c) the Pledgee may, in its name or in the name of related Pledgor or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or in exchange for, any of the Pledged Equity Interests, but shall be under no obligation to do so;

5

**GMPR-HD 3359**

(d) the Pledgee may, with respect to the Pledged Equity Interests or any part thereof which shall then be or shall thereafter come into the possession, custody or control of the Pledgee or any of its agents, sell, lease, assign or otherwise dispose of all or any part of such Pledged Equity Interests, at such place or places as the Pledgee deems best, and for cash or for credit or for future delivery (without thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required above or by applicable statute and cannot be waived), and any Person may be the purchaser, lessee, assignee or recipient of any or all of the Pledged Equity Interests so disposed of at any public sale (or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise), of any Pledgor, any such demand, notice and right or equity being hereby expressly waived and released. The Pledgee may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned;

(e) the Pledgee shall have the right to receive any and all cash dividends, payments or other Proceeds paid in respect of the Pledged Equity Interests and make application thereof to the Obligations in such order as the Pledgee shall elect; and

(f) any or all of the Pledged Equity Interests may be registered in the name of the Pledgee or its nominee, and the Pledgee or its nominee may thereafter exercise, (A) all voting, corporate or other organizational and other rights pertaining to such Pledged Equity Interests at any meeting of shareholders of the relevant Issuing Entities or otherwise and (B) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Pledged Equity Interests as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Pledged Equity Interests upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate or other organizational structure of any Issuing Entity, or upon the exercise by any Pledgor or the Pledgee of any right, privilege or option pertaining to such Pledged Equity Interests, and in connection therewith, the right to deposit and deliver any and all of the Pledged Equity Interests with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Lender may determine), all without liability except to account for property actually received by it, but the Lender shall have no duty to any Pledgor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

The Pledgors recognize that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "Securities Act"), and applicable state securities laws (to the extent not preempted), the Pledgee may be compelled, with respect to any sale of all or any part of the Pledged Equity Interests which constitutes a "security" under the Securities Act, to limit purchasers to those who will agree, among other things, to acquire such Pledged Equity Interests for their own account, for investment and not with a view to the distribution or resale thereof. The Pledgors acknowledge that any such private sale may be at prices and on terms less favorable to the Pledgee than those obtainable through a public sale without such restrictions, and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Pledgee shall not have any obligation to engage in public sales and no obligation to delay the sale of any such Pledged Equity Interests for the period of time necessary to permit the respective issuer thereof to register it for public sale.

9.2. Private Sale. The Pledgee shall not incur any liability as a result of the sale of the Pledged Equity Interests, or any part thereof, at any private sale pursuant to Section 9.1 of this Agreement conducted in good faith. Each Pledgor hereby waives any claims against the Pledgee by reason of the fact

6

GMPR-HD 3360

EX-10.3

that the price at which the Pledged Equity Interests may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of any obligations.

### 10. COVENANTS OF THE PLEDGOR.

(a) Each Pledgor covenants and agrees that it will take all reasonable steps to defend the right, title and interest of the Pledgee in and to the Collateral and the proceeds thereof against the claims and demands of all persons whomsoever; and each Pledgor covenants and agrees that it will have like title to and right to pledge any other property at any time hereafter pledged to the Pledgee as Collateral hereunder and will likewise take all reasonable steps to defend its rights thereto and interests therein.

(b) Each Pledgor covenants and agrees that it shall not (i) create, incur, assume or permit to exist any Lien or encumbrance on the Collateral (other than the Lien granted hereunder and Permitted Liens) and (ii) take any action which would have the effect of materially impairing the position or interests of the Pledgee hereunder except as expressly permitted by this Agreement.

(c) Except as otherwise permitted under the Loan Agreement, without the prior written consent of the Pledgee, each Pledgor covenants and agrees that it will not (i) vote to enable, or take any other action to permit, any Issuing Entity to issue any stock or other equity securities or interests of any nature or to issue any other securities convertible into or granting the right to purchase or exchange for any stock or other equity securities or interests of any Issuing Entity or (ii) sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Pledged Equity Interests.

(d) Each Pledgor covenants and agrees that it will cause its pledge hereunder to be noted conspicuously on its books and records. If any certificates or other instruments are issued to represent the Pledged Equity Interests, then the relevant Pledgor shall deliver or cause to be delivered to the Pledgee or its designee such certificates or other instruments.

(e) No Pledgor will, nor will it permit any of the related Issuing Entities (for so long as all or a portion of its related Equity Interests constitute Collateral hereunder) to, without the prior written consent of the Pledgee, (i) enter into or permit to exist any arrangement or agreement (excluding the Loan Agreement and the other Loan Documents) which directly or indirectly prohibits such Pledgor or any of the related Issuing Entities from creating, assuming or incurring any Lien upon such Pledgor's properties, revenues or assets whether now owned or hereafter acquired other than as permitted in the Loan Agreement, (ii) permit any Lien to exist on any of the Equity Interests of the related Issuing Entities (other than the Lien granted to the Pledgee hereunder and Permitted Liens), (iii) sell, transfer or otherwise dispose of any of the Equity Interests with respect to the Issuing Entities, regardless of whether such Equity Interests constitute Collateral hereunder, other than in a transaction permitted under the Loan Agreement or (iv) except as otherwise set forth in the Loan Agreement, enter into any agreement, contract or arrangement (excluding the Loan Agreement and the other Loan Documents) restricting the ability of any Issuing Entity to pay or make dividends or distributions in cash or kind to the Pledgor or the Pledgee (to the extent the Pledgee is entitled hereunder to receive the payment of same), to make loans, advances or other payments of whatsoever nature to the Pledgor, or to make transfers or distributions of all or any part of its assets to the Pledgor or any Person owning or holding the Equity Interests with respect to such Issuing Entity; in each case other than (x) customary anti-assignment provisions contained in leases, permits, licensing agreements and other contracts entered into by the Pledgor or such Issuing Entity in the ordinary course of its business, (y) restrictions and conditions imposed by any laws, rules or regulations of any governmental authority, and (z) restrictions and conditions arising under the Loan Agreement and the other Loan Documents.

7

GMPR-HD 3361

(f) Each Pledgor covenants and agrees that, throughout the term of the Loan Agreement, if and when any Equity Interests owned by such Pledgor shall cease to be Excluded Collateral, such Equity Interests shall be deemed at all times from and after the date hereof to constitute Collateral hereunder.

(g) Each Pledgor covenants and agrees that the Pledged Equity Interests are "general intangibles" under Article 9 of the Uniform Commercial Code, and are not "securities" for purposes of Article 8 of the Uniform Commercial Code or "investment property" for purposes of Article 9 of the Uniform Commercial Code, and that it will not modify any organizational, operating or other agreements to permit such equity interests to be governed by Article 8 of the Uniform Commercial Code without the prior written consent of the Pledgee.

(h) Each Pledgor covenants and agrees that it shall and shall cause each Issuing Entity to:

(i)    preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises;

(ii)   comply with the requirements of all Applicable Laws, rules, regulations and orders of Governmental Authorities if failure to comply with such requirements could be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect;

(iii)  keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied, and maintain adequate accounts and reserves for all taxes (including income taxes), all depreciation, depletion, obsolescence and amortization of its properties, all contingencies, and all other reserves;

(iv)   not move its chief executive office or chief operating office from the addresses referred to in Schedule 6.10 of the Loan Agreement other than in strict compliance with the obligations set forth in Section 4.03 of the Loan Agreement;

(v)    pay and discharge all taxes, assessments and governmental charges or levies imposed on it or its income or profits or on any of its Property prior to the date on which penalties attach thereto, except for any such tax, assessment, charge or levy the payment of which is being contested in good faith and by proper proceedings and against which adequate reserves are being maintained. Each Pledgor and its Subsidiaries shall file on a timely basis all federal, and material state and local tax and information returns, reports and any other information statements or schedules required to be filed by or in respect of it where the failure to file would reasonably be expected to have a Material Adverse Effect;

(vi)   keep in full force and effect the provisions of its charter documents, by-laws, operating agreements or similar organizational documents; and

(vii)  keep in full force and effect all agreements and instruments by which it or any of its properties may be bound and all applicable decrees, orders and judgments, in each case in such manner that a Material Adverse Effect will not result.

8

GMPR-HD 3362

11. **PLEDGOR'S OBLIGATIONS ABSOLUTE, ETC.** Subject to Section 16, the obligations of each Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstance or occurrence whatsoever, including, without limitation:

(a) any renewal, extension, amendment or modification of, or addition or supplement to or deletion from any of the Loan Documents, or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof;

(b) any waiver, consent, extension, indulgence or other action or inaction under or in respect of any such agreement or instrument or this Agreement;

(c) any furnishing of any additional security to Pledgee or its assignee or any acceptance thereof or any release of any security by Pledgee or its assignee;

(d) any limitation on any party's liability or obligations under any such instrument or agreement or any invalidity or unenforceability, in whole or in part, of any such instrument or agreement or any term thereof;

(e) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to such Pledgor or any Affiliate of such Pledgor, or any action taken with respect to this Agreement by any trustee or receiver, or by any court, in any such proceeding, whether or not such Pledgor shall have notice or knowledge of any of the foregoing; or

(f) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Pledgors in respect of its obligations hereunder or the Pledgors in respect of this Agreement or otherwise.

12. **NOTICES, ETC.** Except as otherwise expressly permitted by this Agreement, all notices, requests and other communications provided for herein and under the other Loan Documents (including, without limitation, any modifications of, or waivers, requests or consents under, this Agreement) shall be given or made in writing (including, without limitation, by telecopy or Electronic Transmission) delivered to the intended recipient at the "Address for Notices" specified (i) on the signatures pages hereof, beneath each party's name, (ii) in Section 11.02 of Appendix A of the Loan Agreement or (iii) on Annex A attached hereto; or, as to any party, at such other address as shall be designated by such party in a written notice to each other party. Except as otherwise provided in this Agreement, all such communications shall be deemed to have been duly given when transmitted by telecopier or Electronic Transmission or personally delivered or, in the case of a mailed notice, upon receipt, in each case given or addressed as aforesaid.

13. **WAIVER; AMENDMENT.** None of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever unless in writing duly signed by the Pledgee and the Pledgors.

14. **GOVERNING LAW.** INSOFAR AS THERE MAY BE NO APPLICABLE FEDERAL LAW, THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY RULE OF CONFLICTS OF LAW (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THAT WOULD RESULT IN THE APPLICATION OF THE SUBSTANTIVE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

9

GMPR-HD 3363

NOTHING IN THIS AGREEMENT SHALL REQUIRE ANY UNLAWFUL ACTION OR INACTION BY ANY PARTY.

15. WAIVER OF JURY TRIAL; CONSENT TO JURISDICTION AND VENUE; SERVICE OF PROCESS. EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY:

(A) SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE GENERAL JURISDICTION OF ANY COURT OF THE STATE AND COUNTY OF NEW YORK, OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK;

(B) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND, TO THE EXTENT PERMITTED BY LAW, WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME;

(C) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO ITS ADDRESS SET FORTH ON THE SIGNATURE PAGES HEREOF BENEATH EACH PARTY'S NAME, OR IN SECTION 11.02 OF APPENDIX A OF THE LOAN AGREEMENT OR AT SUCH OTHER ADDRESS OF WHICH THE PLEDGEE SHALL HAVE BEEN NOTIFIED; AND

(D) AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.

EACH PLEDGOR AND THE PLEDGEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16. CONTINUING SECURITY INTEREST; RELEASE.

(a) This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until the Obligations have matured and have been paid and satisfied in full, (ii) be binding upon and inure to the benefit of the Pledgors, each of the Pledgors' executors, administrators, successors and assigns, and (iii) inure to the benefit of and be binding upon the Pledgee and its successors, transferees and assigns. Upon the payment and satisfaction in full of the Obligations, each Pledgor shall be entitled to the return, upon its request and at its expense, of such of the Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof.

(b) Upon termination of the Loan Agreement and repayment to the Lender of all Obligations and the performance of all obligations under the Loan Documents, the Pledgee shall release

10

GMPR-HD 3364

its security interest in any remaining Collateral; provided that if any payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Pledgee upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or a trustee or similar officer for the Borrower or any substantial part of its Property, or otherwise, this Agreement, all rights hereunder and the Liens created hereby shall continue to be effective, or be reinstated, until such payments have been made.

(c) Provided that no Default or Event of Default shall then exist, the Lender shall, in connection with any Disposition of any Collateral permitted under the Loan Agreement (other than dispositions of Facility Collateral between and among Loan Parties and Pledged Entities), release from the Lien of the Loan Documents the portion of the Collateral Disposed of, upon the applicable Loan Parties' satisfaction of the conditions set forth in the Loan Agreement.

17. **MISCELLANEOUS.** The headings of the several sections and subsections in this Agreement are for purposes of reference only and shall not limit or define the meaning hereof. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. In the event that any provision of this Agreement shall prove to be invalid or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain binding on all parties hereto.

18. [Reserved].

19. **JOINT AND SEVERAL LIABILITY.** Each Pledgor hereby acknowledges and agrees that the Pledgors are jointly and severally liable to the Lender for all representations, warranties, covenants, obligations and liabilities of each Pledgor hereunder and under the Loan Documents. Each Pledgor hereby further acknowledges and agrees that (a) any Event of Default or any default, or breach of a representation, warranty or covenant by any Pledgor hereunder or under any Loan Document is hereby considered a default or breach by each Pledgor, as applicable, and (b) the Lender shall have no obligation to proceed against one Pledgor before proceeding against the other Pledgors. Each Pledgor hereby waives any defense to its obligations under this Agreement based upon or arising out of the disability or other defense or cessation of liability of one Pledgor versus the other. A Pledgor's subrogation claim arising from payments to the Lender shall constitute a capital investment in the other Pledgor subordinated to any claims of the Lender and equal to a ratable share of the equity interests in such Pledgor.

[remainder of page intentionally left blank; signature page follows]

11

GMPR-HD 3365

IN WITNESS WHEREOF, each Pledgor has caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

GENERAL MOTORS CORPORATION, as a Pledgor

By:      /x/ Adil Mistry
Name     Adil Mistry
Title:   Assistant Treasurer

*Signature Page to Equity Pledge Agreement*

GMPR-HD 3366

GENERAL MOTORS ASIA, INC.,
GENERAL MOTORS ASIA PACIFIC HOLDINGS, LLC,
GENERAL MOTORS OVERSEAS CORPORATION,
GENERAL MOTORS OVERSEAS DISTRIBUTION CORPORATION,
GM APO HOLDINGS, LLC,
GM FINANCE CO. HOLDINGS LLC,
GM GEFS L.P.,
GM LAAM HOLDINGS, LLC,
GM PREFERRED FINANCE CO. HOLDINGS LLC,
GM TECHNOLOGIES, LLC,
RIVERFRONT HOLDINGS, INC., and
SATURN CORPORATION,
            each, as a Pledgor

By:    /x/ Adil Mistry
Name   Adil Mistry
Title:   Vice President

*Signature Page to Equity Pledge Agreement*

GMPR-HD 3367

**GENERAL MOTORS INTERNATIONAL
HOLDINGS, INC., as a Pledgor**

By:      /s/ Adil Mistry

Name    Adil Mistry

Title:    Vice President

*Signature Page to Equity Pledge Agreement*

GMPR-HD 3368

Appendix 4

Parker's Ex. 1 in Evidence

Prospectus Dated June 19, 2003
together with Prospectus Supplement
dated June 26, 2003

Pursuant to the provisions of Local Bankruptcy Rule 8007-1(b),
because of its unusual bulk, only the relevant portions of Parker's Ex. 1
are included in Appendix 4.   If requested by the Court or by any party,
other relevant portions of the document (or if needed, the entire document)
will be made available.



# FORM 424B5

## GENERAL MOTORS CORP - GMGMQ

**Filed: June 27, 2003 (period: )**

Form of prospectus disclosing information,facts,events covered in both forms 424B2 424B3

*PARKER #1*

*EVIDENSE*

GMPR-HD 3797

# Table of Contents

424B5 - PROSPECTUS SUPPLEMENT

GMPR-HD 3798

Filed Pursuant to Rule 424(b)(5)
Registration No. 333-105949

**PROSPECTUS SUPPLEMENT**
(To Prospectus dated June 19, 2003)



# $4,000,000,000
# General Motors Corporation
### 6.250% Series C Convertible Senior Debentures Due 2033

We are offering $4,000,000,000 principal amount of 6.250% Series C Convertible Senior Debentures Due 2033.

The Series C debentures are convertible into shares of our $1 2/3 par value common stock, at your option, under any of the following circumstances: (1) the closing sale price of our $1 2/3 par value common stock exceeds specified thresholds, (2) the trading price of the Series C debentures falls below specified thresholds, (3) the Series C debentures are called for redemption or (4) upon the occurrence of other specified corporate events. The Series C debentures are convertible at a conversion price of $47.62 per share, which is equal to a conversion rate of 0.525 shares per $25.00 principal amount of Series C debentures, subject to adjustment. We may pay you an amount of cash equivalent to the shares of our $1 2/3 par value common stock otherwise required to be delivered upon conversion. We will pay interest on the Series C debentures on January 15 and July 15 of each year, beginning January 15, 2004. We may redeem the Series C debentures, in whole or in part, on or after July 20, 2010 for an amount in cash equal to the redemption prices set forth herein. You may require us to repurchase your Series C debentures on July 15 of 2018, 2023 and 2028, or, if any of those days is not a business day, on the next succeeding business day, for an amount equal to the principal amount plus accrued and unpaid interest. We may elect to pay the repurchase price in cash, shares of our $1 2/3 par value common stock or any combination thereof. We have listed the Series C debentures on the New York Stock Exchange under the symbol "GPM" and expect trading of the debentures to commence on June 27, 2003.

Our $1 2/3 par value common stock is listed on the New York Stock Exchange under the symbol "GM." On June 26, 2003, the last sale price of our $1 2/3 par value common stock as reported on the New York Stock Exchange was $35.94 per share.

Investing in the debentures involves risks. See "Risk Factors" beginning on page S-5.

| | Per Series C debenture | Total |
|---|---|---|
| Public Offering Price (1) | 100.00% | $ 4,000,000,000 |
| Underwriting Discount | 1.75% | $70,000,000 |
| Proceeds to General Motors Corporation | 98.25% | $ 3,930,000,000 |

(1)    The public offering price set forth above does not include accrued interest, if any.

We have granted the underwriters the right to purchase up to an additional $600,000,000 aggregate principal amount of Series C debentures to cover overallotments, if any.

The underwriters expect to deliver the debentures to purchasers on July 2, 2003.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus supplement or the related prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

Joint Book-Running Managers

## Merrill Lynch & Co.
### Morgan Stanley
#### Citigroup
### Banc of America Securities LLC
#### Goldman, Sachs & Co.
##### JPMorgan

###### UBS Investment Bank

**Banc One Capital Markets, Inc. Barclays Capital Bear, Stearns & Co. Inc.
BNP PARIBAS Deutsche Bank Securities**

ABN AMRO Rothschild LLC Credit Suisse First Boston HSBC Mizuho International plc

Source: GENERAL MOTORS CORP, 424B5, June 27, 2003

June 26, 2003

GMPR-HD 3800

## TABLE OF CONTENTS

### Prospectus Supplement

| | Page |
|---|---|
| About this Prospectus | ii |
| Summary | S-1 |
| Risk Factors | S-5 |
| Disclosure Regarding Forward-Looking Statements | S-12 |
| Recent Developments | S-14 |
| Use of Proceeds | S-17 |
| Consolidated Ratio of Earnings to Fixed Charges | S-17 |
| Price Range of Common Stock and Dividend Policy | S-18 |
| Consolidated Capitalization | S-19 |
| Selected Consolidated Financial Data | S-20 |
| Description of Series C Debentures | S-22 |
| Certain United States Federal Income Tax Consequences | S-34 |
| Underwriters | S-41 |
| Legal Matters | S-45 |
| Experts | S-45 |

### Prospectus

| | Page |
|---|---|
| About this Prospectus | 1 |
| Principal Executive Offices | 2 |
| Where You Can Find More Information | 2 |
| Incorporation of Certain Documents by Reference | 3 |
| Description of General Motors Corporation | 4 |
| Ratio of Earnings to Fixed Charges and Ratio of Earnings to Fixed Charges and Preference Stock Dividends | 5 |
| Use of Proceeds | 5 |
| Overview of Capital Stock | 6 |
| Description of $1⅔ Par Value Common Stock and Class H Common Stock | 8 |
| Description of Preferred Stock | 16 |
| Description of Preference Stock | 18 |
| Description of Debt Securities | 20 |
| Description of Purchase Contracts | 27 |
| Description of Depositary Shares | 28 |
| Description of Warrants | 31 |
| Description of Units | 34 |
| Forms of Securities | 37 |
| Plan of Distribution | 39 |
| Legal Matters | 42 |
| Experts | 42 |

i

Source: GENERAL MOTORS CORP, 424B5, June 27, 2003

GMPR-HD 3801

• • • • • • • • •

PROSPECTUS

# $10,000,000,000

# GENERAL MOTORS CORPORATION

**Debt Securities**
**Common Stock (par value $1 $^2/_3$)**
**Class H Common Stock (par value $0.10)**
**Preference Stock (par value $0.10)**
**Preferred Stock (without par value)**
**Purchase Contracts**
**Depositary Shares**
**Warrants**
**Units**

---

We may offer from time to time debt securities, $1 $^2/_3$ par value common stock, Class H common stock, preference stock, preferred stock, purchase contracts, depositary shares, warrants or units. The aggregate initial offering price of all securities sold by us under this prospectus will not exceed $10,000,000,000. We will provide specific terms of these securities in supplements to this prospectus. You should read this prospectus and any supplement carefully before you invest.

Our $1 $^2/_3$ par value common stock is listed in the United States on the New York Stock Exchange, the Chicago Stock Exchange, the Pacific Stock Exchange and the Philadelphia Stock Exchange under the symbol "GM." Our Class H common stock is listed on the New York Stock Exchange under the symbol "GMH."

---

We reserve the sole right to accept and, together with our agents from time to time, to reject in whole or in part any proposed purchase of securities to be made directly or through any agents.

---

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

June 19, 2003

Source: GENERAL MOTORS CORP, 424B5, June 27, 2003

**GMPR-HD 3848**

You should rely only on the information contained in or incorporated by reference into this prospectus or any accompanying supplemental prospectus. We have not authorized anyone to provide you with different information or make any additional representations. We are not making an offer of these securities in any state or other jurisdiction where the offer is not permitted. You should not assume that the information contained in or incorporated by reference into this prospectus or any prospectus supplement is accurate as of any date other than the date on the front of each of such documents. The terms "General Motors," "GM," "we," "us," and "our" refer to General Motors Corporation. The term "Hughes" refers to Hughes Electronics Corporation, a wholly owned subsidiary of GM.

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| About this Prospectus | 1 | Description of Preferred Stock | 16 |
| Principal Executive Offices | 2 | Description of Preference Stock | 18 |
| Where You Can Find More Information | 2 | Description of Debt Securities | 20 |
| Incorporation of Certain Documents by | | Description of Purchase Contracts | 27 |
| Reference | 3 | Description of Depositary Shares | 28 |
| Description of General Motors Corporation | 4 | Description of Warrants | 31 |
| Ratio of Earnings to Fixed Charges | | Description of Units | 34 |
| and Ratio of Earnings to Fixed Charges and Preference Stock | | Forms of Securities | 37 |
| Dividends | 5 | Plan of Distribution | 39 |
| Use of Proceeds | 5 | Legal Matters | 42 |
| Overview of Our Capital Stock | 6 | Experts | 42 |
| Description of 1 ⅓ Par Value Common | | | |
| Stock and Class H Common Stock | 8 | | |

## ABOUT THIS PROSPECTUS

This prospectus, along with a prospectus for General Motors Nova Scotia Finance Company, a wholly owned subsidiary of GM, is part of a registration statement that we filed with the Securities and Exchange Commission, referred to as the SEC in this prospectus, utilizing a "shelf" registration process. Under this shelf process, we may sell any combination of our securities and General Motors Nova Scotia Finance Company may sell its guaranteed debt securities, as described in the related prospectus, in one or more offerings. The aggregate initial offering price of all securities sold by us under this prospectus will not exceed $10,000,000,000. This prospectus provides you with a general description of the securities we may offer. Each time we sell securities, we will provide a prospectus supplement that will contain specific information about the terms of that offering. The prospectus supplement may also add, update or change information contained in this prospectus. You should read both this prospectus and any prospectus supplement together with additional information described below under "Incorporation of Certain Documents By Reference."

1

Source: GENERAL MOTORS CORP, 424B5, June 27, 2003

**GMPR-HD 3849**

● ● ● ● ● ● ● ● ●

- a default having occurred for the payment of principal, premium, if any, or interest on or other monetary amounts due and payable on any senior indebtedness or any other default having occurred concerning any senior indebtedness, which permits the holder or holders of any senior indebtedness to accelerate the maturity of any senior indebtedness with notice or lapse of time, or both. Such an event of default must have continued beyond the period of grace, if any, provided for such event of default, and such an event of default shall not have been cured or waived or shall not have ceased to exist;

- the principal of, and accrued interest on, any series of the subordinated debt securities having been declared due and payable upon an event of default pursuant to section 6 of the subordinated debt indenture; this declaration must not have been rescinded and annulled as provided in the subordinated debt indenture; or

- any different or additional events described in a prospectus supplement.

If this prospectus is being delivered in connection with a series of subordinated debt securities, the accompanying prospectus supplement or the information incorporated in this prospectus by reference will set forth the approximate amount of senior indebtedness outstanding as of the end of the most recent fiscal quarter.

If the trustee under the subordinated debt indenture or any holders of the subordinated debt securities receive any payment or distribution that is prohibited under the subordination provisions, then the trustee or the holders will have to repay that money to the holders of the senior indebtedness.

Even if the subordination provisions prevent us from making any payment when due on the subordinated debt securities of any series, we will be in default on our obligations under that series if we do not make the payment when due. This means that the trustee under the subordinated debt indenture and the holders of debt securities of that series can take action against us, but they will not receive any money until the claims of the holders of senior indebtedness have been fully satisfied.

### Certain Covenants

*Definitions Applicable to Covenants Under Our Senior Debt Indenture.*    The following definitions shall be applicable to the senior debt covenants specified below:

(i) "Attributable Debt" means, at the time of determination as to any lease, the present value (discounted at the actual rate, if stated, or, if no rate is stated, the implicit rate of interest of such lease transaction as determined by our chairman, president or any vice chairman, any vice president, our treasurer or any assistant treasurer), calculated using the interval of scheduled rental payments under such lease, of the obligation of the lessee for net rental payments during the remaining term of such lease (excluding any subsequent renewal or other extension options held by the lessee). The term "net rental payments" means, with respect to any lease for any period, the sum of the rental and other payments required to be paid in such period by the lessee thereunder, but not including, however, any amounts required to be paid by such lessee (whether or not designated as rental or additional rental) on account of maintenance and repairs, insurance, taxes, assessments, water rates, indemnities or similar charges required to be paid by such lessee thereunder or any amounts required to be paid by such lessee thereunder contingent upon the amount of sales, earnings or profits or of maintenance and repairs, insurance, taxes, assessments, water rates, indemnities or similar charges; provided, however, that, in the case of any lease which is terminable by the lessee upon the payment of a penalty in an amount which is less than the total discounted net rental payments required to be paid from the later of the first date upon which such lease may be so terminated and the date of the determination of net rental payments, "net rental payments" shall include the then current amount of such penalty from the later of such two dates, and shall exclude the rental payments relating to the remaining period of the lease commencing with the later of such two dates.

(ii) "Debt" means notes, bonds, debentures or other similar evidences of indebtedness for money borrowed.

22

Source: GENERAL MOTORS CORP, 424B5, June 27, 2003

**GMPR-HD 3870**

(iii) "Manufacturing Subsidiary" means any Subsidiary (A) substantially all the property of which is located within the continental United States of America, (B) which owns a Principal Domestic Manufacturing Property and (C) in which our investment, direct or indirect and whether in the form of equity, debt, advances or otherwise, is in excess of $2,500,000,000 as shown on our books as of the end of the fiscal year immediately preceding the date of determination; provided, however, that "Manufacturing Subsidiary" shall not include Hughes Electronics Corporation and its Subsidiaries, General Motors Acceptance Corporation and its Subsidiaries (or any corporate successor of any of them) or any other Subsidiary which is principally engaged in leasing or in financing installment receivables or otherwise providing financial or insurance services to us or others or which is principally engaged in financing our operations outside the continental United States of America.

(iv) "Mortgage" means any mortgage, pledge, lien, security interest, conditional sale or other title retention agreement or other similar encumbrance.

(v) "Principal Domestic Manufacturing Property" means any manufacturing plant or facility owned by us or any Manufacturing Subsidiary which is located within the continental United States of America and, in the opinion of our Board of Directors, is of material importance to the total business conducted by us and our consolidated affiliates as an entity.

(vi) "Subsidiary" means any corporation of which at least a majority of the outstanding stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by us, or by one or more Subsidiaries, or by us and one or more Subsidiaries.

*Limitation on Liens.*   For the benefit of the senior debt securities, we will not, nor will we permit any Manufacturing Subsidiary to, issue or assume any Debt secured by a Mortgage upon any Principal Domestic Manufacturing Property of ours or any Manufacturing Subsidiary or upon any shares of stock or indebtedness of any Manufacturing Subsidiary (whether such Principal Domestic Manufacturing Property, shares of stock or indebtedness are now owned or hereafter acquired) without in any such case effectively providing concurrently with the issuance or assumption of any such Debt that the senior debt securities (together with, if we shall so determine, any other indebtedness of us or such Manufacturing Subsidiary ranking equally with the senior debt securities and then existing or thereafter created) shall be secured equally and ratably with such Debt, unless the aggregate amount of Debt issued or assumed and so secured by Mortgages, together with all other Debt of ours and our Manufacturing Subsidiaries which (if originally issued or assumed at such time) would otherwise be subject to the foregoing restrictions, but not including Debt permitted to be secured under clauses (i) through (vi) of the immediately following paragraph, does not at the time exceed 20% of the stockholders equity of us and our consolidated subsidiaries, as determined in accordance with accounting principles generally accepted in the U.S. and shown on the audited consolidated balance sheet contained in the latest published annual report to our stockholders.

The above restrictions shall not apply to Debt secured by:

(i) Mortgages on property, shares of stock or indebtedness of any corporation existing at the time such corporation becomes a Manufacturing Subsidiary;

(ii) Mortgages on property existing at the time of acquisition of such property by us or a Manufacturing Subsidiary, or Mortgages to secure the payment of all or any part of the purchase price of such property upon the acquisition of such property by us or a Manufacturing Subsidiary or to secure any Debt incurred prior to, at the time of, or within 180 days after, the later of the date of acquisition of such property and the date such property is placed in service, for the purpose of financing all or any part of the purchase price thereof, or Mortgages to secure any Debt incurred for the purpose of financing the cost to us or a Manufacturing Subsidiary of improvements to such acquired property;

23

Source: GENERAL MOTORS CORP, 424B5, June 27, 2003

GMPR-HD 3871

(iii) Mortgages securing Debt of a Manufacturing Subsidiary owing to us or to another Subsidiary;

(iv) Mortgages on property of a corporation existing at the time such corporation is merged or consolidated with us or a Manufacturing Subsidiary or at the time of a sale, lease or other disposition of the properties of a corporation as an entirety or substantially as an entirety to us or a Manufacturing Subsidiary;

(v) Mortgages on property of ours or a Manufacturing Subsidiary in favor of the United States of America or any State thereof, or any department, agency or instrumentality or political subdivision of the United States of America or any State thereof, or in favor of any other country, or any political subdivision thereof, to secure partial, progress, advance or other payments pursuant to any contract or statute or to secure any indebtedness incurred for the purpose of financing all or any part of the purchase price or the cost of construction of the property subject to such Mortgages; or

(vi) any extension, renewal or replacement (or successive extensions, renewals or replacements) in whole or in part of any Mortgage referred to in the foregoing clauses (i) to (v); provided, however, that the principal amount of Debt secured thereby shall not exceed by more than 115% the principal amount of Debt so secured at the time of such extension, renewal or replacement and that such extension, renewal or replacement shall be limited to all or a part of the property which secured the Mortgage so extended, renewed or replaced (plus improvements on such property).

The subordinated debt indenture does not include any limitation on our ability to incur these types of liens.

*Limitation on Sales and Lease-Backs.* For the benefit of the senior debt securities, we will not, nor will we permit any Manufacturing Subsidiary to, enter into any arrangement with any person providing for the leasing by us or any Manufacturing Subsidiary of any Principal Domestic Manufacturing Property owned by us or any Manufacturing Subsidiary on the date that the senior debt securities are originally issued (except for temporary leases for a term of not more than five years and except for leases between us and a Manufacturing Subsidiary or between Manufacturing Subsidiaries), which property has been or is to be sold or transferred by us or such Manufacturing Subsidiary to such person, unless either:

(i) we or such Manufacturing Subsidiary would be entitled, pursuant to the provisions of the covenant on limitation on liens described above, to issue, assume, extend, renew or replace Debt secured by a Mortgage upon such property equal in amount to the Attributable Debt in respect of such arrangement without equally and ratably securing the senior debt securities; provided, however, that from and after the date on which such arrangement becomes effective the Attributable Debt in respect of such arrangement shall be deemed for all purposes under the covenant on limitation on liens described above and this covenant on limitation on sale and lease-back to be Debt subject to the provisions of the covenant on limitation on liens described above (which provisions include the exceptions set forth in clauses (i) through (vi) of such covenant); or

(ii) we shall apply an amount in cash equal to the Attributable Debt in respect of such arrangement to the retirement (other than any mandatory retirement or by way of payment at maturity), within 180 days of the effective date of any such arrangement, of Debt of ours or any Manufacturing Subsidiary (other than Debt owned by us or any Manufacturing Subsidiary) which by its terms matures at or is extendible or renewable at the option of the obligor to a date more than twelve months after the date of the creation of such Debt.

The subordinated debt indenture does not include any limitations on sales and lease-backs.

**Defeasance**

If the terms of a particular series of debt securities so provide, we may, at our option, (a) discharge its indebtedness and its obligations under the applicable indenture with respect to such series or (b) not comply with certain covenants contained in the applicable indenture with respect to such series, in each case by depositing

24

Source: GENERAL MOTORS CORP, 424B5, June 27, 2003

**GMPR-HD 3872**



Created by 10KWizard    www.10KWizard.com

Source: GENERAL MOTORS CORP, 424B5, June 27, 2003

GMPR-HD 3891

## Appendix 5

**Declaration of Oliver Addison Parker in support
of his claim that the speed with which the Section
363 sale of the Debtors' principal assets to the
Purchaser was approved violated due process**

Oliver Addison Parker, Pro Se
283 Codrington Drive
Lauderdale By The Sea, FL 33308
Ph: (954) 599-6468
Fax: (954) 772-6468
splitapart@prodigy.net
Florida Bar No. 235891

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

In re

GENERAL MOTORS CORP., *et al.*,

Debtors.

------------------------------------------------------------- x

Chapter 11

Case No. 09-50026 (REG)

(Jointly Administered)

### Declaration of Oliver Addison Parker
### in support of his claim that the speed with which the Section 363 sale
### of the Debtors' principal assets to the Purchaser was approved violated due process

I, Oliver Addison Parker, make this Declaration under 28 U.S.C. § 1746 and state:

1.     That I am a bondholder and creditor of the Debtor, that I am an attorney and sole practitioner living and practicing in Broward County, Florida, that my Florida Bar No. is 235891, and that I timely objected to the 363 sale of the Debtors principle assets to the Purchaser and that I personally participated pro se in the evidentiary hearing on the Debtors 363 sale motion on June 30, July 1 and July 2, 2009.

2.     That the three-day evidentiary hearing on the Debtors 363 sale motion was for all intents and purposes a bench trial.

3.     That the time allowed for trial preparation between the close of pleadings (to wit, the last day for filing objections to the 363 sale – June 19, 2009) and the commencement of the three-day evidentiary hearing on the Debtors 363 sale motion (June 30, 2009) was only eleven (11) days.

4.      That because of the shortness time between the close of pleadings and the commencement of the trial I did not receive any discovery from the Debtors until two days before trial when I received a box load of documents with approximately five thousand (5000) pages of material. That a second box load of documents was delivered to my New York hotel the evening before trial with another five thousand (5000) pages of material. A third delivery of documents was made to my hotel at the conclusion of the first day of trial consisting of a portable hard drive with approximately one hundred thousand (100,000) pages of material. Needless to say, there was insufficient time with which to review these documents for preparation prior to trial.

5.      That because of the shortness time between the close of pleadings and the commencement of the trial, the Deposition of Fritz Henderson (the Debtor's CEO) took place on a Sunday just two days before the start of the trial, starting at 12:20 P.M. and concluding at 8:23 P.M. This was the very same day that I first received discovery from the Debtors consisting of a box load of documents with approximately five thousand (5000) pages of material. Likewise, the Deposition of Harry Wilson of the Treasury Department's Auto Task Force took place on the following Monday the day before the trial began, starting at 11:00 A.M. and concluding at 7:40 P.M. This was the very same day that a second box load of documents was delivered to my New York hotel containing another five thousand (5000) pages of material. Clearly, there was insufficient time with which to review these documents for preparation prior to taking these depositions.

6.      That the transcript of Henderson's deposition was 422 pages, while the transcript of Wilson's deposition was 395 pages. The depositions were not delivered until the day of trial and for some reason were misdelivered to my office in Broward County, Florida rather than to me in New York. Thus, the deposition transcripts were not available for use by me in cross-examination. An examination of the trial transcript reveals that this lack greatly hampered my ability to effectively cross-examine. However, even if I had received the deposition transcripts in New York

2

at the start of trial, inasmuch as (1) Fritz Henderson concluded his testimony on the first day of trial, (2) the first day of trial did not conclude until almost 8:00 P.M. and (3) Wilson concluded his testimony on the second day of trial, I would not have had sufficient time to examine the deposition transcripts so as to effectively use them for cross examination.

7.      That because of the shortness time between the close of pleadings and the commencement of the trial, together with the fact that no documents were received until just two days before trial, there was insufficient time with which to hire valuation experts to testify as to either the going concern value of the Debtor or the liquidation value of the Debtor.

8.      That because of the shortness time between the close of pleadings and the commencement of the trial, together with the fact that no documents were received until just two days before trial, there was insufficient time with which to obtain copies of recorded mortgages and UCC filings for the Debtors domestic manufacturing facilities for introduction at trial.

9.      That because of the shortness time between the close of pleadings and the commencement of the trial, together with the fact that no documents were received until just two days before trial, there was insufficient time with which to obtain discovery regarding who, other than Fritz Henderson and Harry Wilson, ought to be deposed and/or compelled to testify at the trial.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of July, 2009.

By: _____

Oliver Addison Parker

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and accurate copies of the above and foregoing document have been served by United States Mail, Postage Prepaid, to the following named attorneys for each of the following named parties, this 27th day of July 2009:

3

| **Parties** | **Attorneys** |
|---|---|
| *The Debtors* | Harvey R. Miller<br>Stephen Karotkin<br>Joseph H. Smolinsky<br>Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Tel: (212) 310-8000 |
| *Office of the United States Trustee* | Diana G. Adams<br>United States Trustee<br>Office of the United States Trustee<br>33 Whitehall Street<br>21st Floor<br>New York, NY 10004<br>Tel: (212) 510-0500 |
| *Counsel to the United States Treasury and NGMCO, Inc.* | Lev L. Dassin (Acting US Atty., SDNY)<br>David S. Jones<br>Jeffrey S. Oestericher<br>Matthew L. Schwartz<br>Joseph N. Cordaro<br>86 Chambers Street, Third Floor<br>New York, New York 10007<br>Tel: (212) 637-1945/2745<br><br>-and-<br><br>John J. Rapisardi<br>Peter Friedman<br>Cadwalader, Wickersham & Taft LLP<br>One World Financial Center<br>New York, New York 10281<br>Tel: (212) 504-5585 |
| *Counsel to Export Development Canada* | Michael J. Edelman<br>Michael L. Schein<br>Vedder Price P.C.<br>1633 Broadway, 47th Floor<br>New York, NY 10019<br>Tel: (212) 407-7770 |

4

*The Official Committee of Unsecured Creditors*

Kenneth H. Eckstein
Thomas Moers Mayer
Robert Schmidt
Jeffrey S. Trachtman
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100

*Counsel for The International Union,*
*United Automobile, Aerospace & Agricultural*
*Implement Workers of America, AFL-CIO*

James L. Bromley
Avram E. Luft
Cleary Gottlieb Steen & Hamilton
One Liberty Plaza
New York, NY 10006
Tel: (212) 225-2264

-and-

Babette A. Ceccotti
Cohen, Weiss and Simon LLP
330 West 42nd Street
New York, NY 10036
Tel: (212) 563-4100

*Counsel to the United Steelworkers*

Suzanne Hepner
Levy Ratner, P.C.
80 Eighth Avenue, Eighth Floor
New York, NY 10011
Tel: (212) 627-8100

*Individual Accident Litigants*

Steve Jakubowski
Elizabeth Richert
The Coleman Law Firm
77 West Wacker Drive, Suite 4800
Chicago, IL 60601
Tel: (312) 606-8641

*Counsel to Mark Buttita, personal*
representative of Salvatore Buttita

Rita C. Tobin, Esq
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, NY 10152-3500

5

-and-

Peter Van N. Lockwood, Esq.
Ronald E. Reinsel, Esq.
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle
Washington, D.C. 20005
Tel. (202) 862-5000

*Counsel to the Ad Hoc Committee of*
*Asbestos Personal Injury Claimants*

Sander L. Esserman
Robert T. Brousseau
Peter C. D'Apice
Jo E. Hartwick
STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA, A
PROFESSIONAL CORPORATION
2323 Bryan Street, Suite 2200
Dallas Texas 75201
Tel. (214) 969-4900

*Counsel for the Unofficial Committee*
*Of Family & Dissident GM Bondholders*

Michael P. Richman
Mark A. Salzberg
James C. Chadwick
Melissa Ichan
PATTON BOGGS LLP
1185 Avenue of the Americas
New York, NY 10036
Tel. (646) 557-5100

Oliver Addison Parker, Pro Se
283 Codrington Drive
Lauderdale By The Sea, FL 33308
Ph: (954) 599-6468
Fax: (954) 772-6468
splitapart@prodigy.net
Florida Bar No. 235891

By: _____
Oliver Addison Parker, Pro Se