HEARING DATE AND TIME: August 3, 2009 at 9:45 a.m. (Eastern Time)
OBJECTION DEADLINE: July 28, 2009 at 4:00 p.m. (Eastern Time)

Jeffrey S. Davis
Attorney at Law
1422 Berry Drive
Cleburne, Texas 76033
817/602-7999
FAX # 817/641-8829
jsdesqtx@yahoo.com
Motion for Admission to Practice *Pro Hac Vice* has been filed

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: General Motors Corporation, *et al* § <br> § <br> Debtors. § | | Chapter 11 <br> Case No. 1-09-50026 (REG) <br> (Jointly Administered) |

**AFFIDAVIT OF CHARLES MICHAEL FORREST IN SUPPORT OF
LIMITED OBJECTION OF FORREST CHEVROLET-CADILLAC, INC., AND
FORREST PONTIAC-BUICK-GMC TRUCK, INC., TO
OMNIBUS MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO
11 U.S.C. §§ 105 AND 365 AUTHORIZING (A) THE REJECTION OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN
DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF**

STATE OF TEXAS           §
                                       §
COUNTY OF JOHNSON  §

BEFORE ME, the undersigned notary public, personally appeared Charles Michael Forrest, who stated that he is over the age of 18, is of sound mind, and that the matters stated herein are within his personal knowledge and are true and correct.

"My name is Charles Michael Forrest. I am the Vice-President of both Forrest Pontiac-Buick-GMC Truck, Inc., and Forrest Chevrolet-Cadillac, Inc. I have been actively involved in the all aspects of the operations of both dealerships, including management, for several decades. As such, I am very familiar with the operations of both dealerships, as well as their relationship and dealings with General Motors Corporation ('GM') and General Motors Acceptance Company ("GMAC'). I am also the business records custodian for both of said corporations. The attached documents reflect business records of Forrest Pontiac-Buick-GMC Truck, Inc., and Forrest Chevrolet-Cadillac, Inc., and it was in the regular course of business of both Forrest Pontiac-Buick-GMC Truck, Inc., and Forrest Chevrolet-Cadillac, Inc., for an employee or representative of Forrest Pontiac-Buick-GMC Truck, Inc., and/or Forrest Chevrolet-Cadillac, Inc., with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

"I am presenting the information herein in support of the Limited Objection of Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc., to the Omnibus Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. §§ 105 and 365 Authorizing (A) the Rejection of Executory Contracts and Unexpired Leases with Certain Domestic Dealers and (B) Granting Certain Related Relief.

"I am the second generation son of a legendary car dealer in Cleburne, Texas. My father, the late O.C. Forrest, Jr. began selling cars and trucks in our community in 1949. Through much hard work and sacrifice of my parents, my dad was able to purchase our Chevrolet-Cadillac franchise in 1961. As young children in the fifties, my older brother Clint and I grew up around the automobile business. Then, after graduation from the University of Texas, Clint in 1971, and I in 1974, both elected to join

the family business. In 1978, a strike year as I recall, I was visiting with my father about the current business climate and the gravity of our own circumstances. We surveyed our car lot, and counted only five pickups in stock. As my mom and dad would often get out on Sunday afternoons, driving the country side, they discovered that Durant Chevrolet in Granbury, Texas had about 60 pickups on their lot. My dad was furious. He called the Chevrolet zone manager about the disparity. Within ten minutes of the phone conversation, virtually all the employees at the Dallas zone knew my dad had registered a complaint, along with most of the employees at that dealership. He approached me right outside the showroom with a look of fear in his eyes proclaiming, 'Son, they're all in it together what are we going to do?'

"My dad had been a director of the Texas Automobile Dealer Association in the sixties and had gained a reputation as a very successful car dealer, businessman, and community leader and he commanded some attention to his grievance. The manufacturer, caught with its hand in the cookie jar, was compelled to divert some of the fleet-ordered vehicles to our normal stock. The Durant family stopped speaking to our family for several years afterward. Basically, we were made a victim of the power-broker games of inventory acquisition. In those days, the formula that applied was: who do you know? ...and... what have you done for them lately? In this instance, there was a separate distribution system for the fleet-related aspect of new vehicle sales versus the retail system, the supposed 'normal' way that vehicles were acquired and sold. Within the context of how the retail side of the automobile business functioned, an aggressive, cannibalistic protocol developed as to of how new car dealers were uniquely taught to do business. It became known as 'TURN-and-EARN.'

"As circumstances would dictate, in 1990, our family was afforded the unique opportunity to purchase the other two (2) General Motors franchises in our community, the Pontiac-Buick franchise and the Oldsmobile-GMC franchise. Without the 'benefit of General Motor's advice or wise counsel',

we were blessed with enough common sense to consolidate three franchises in our size community into two dealerships, which lead to the logical configuration of Forrest Chevrolet-Oldsmobile-Cadillac and Forrest Pontiac-Buick-GMC. Approximately four (4) years later, General Motors adopted those particular brand alignments for communities of similar size to ours, being Cleburne, Texas.

"During the early 1990's, I respectfully wrote and spoke to various members of our state legislature, numerous car dealers, dealer council representatives, and wholesale factory representatives about any number of important, relevant issues. Much of my commentary and analysis focused on two (2) of my family's worst experiences of franchise ownership…the manufacturer's new vehicle allocation process…and the architecture of the relationship between the franchise holder and the manufacturer. In 1994, on behalf of my family, I invested six (6) months of time and energy in preparing a business proposal to relocate the Pontiac-Buick-GMC dealership (that was occupying rental property adjacent to a cemetery), to our long held family real estate site location at Forrest Chevrolet-Oldsmobile-Cadillac. At a meeting at our Chevrolet store later that year, a Pontiac zone manager named Jeff Fernandez took only twenty (20) minutes to obfuscate our plan. During the next two (2) years we amended our original proposal twice only to be greeted by more roadblocks. Disturbingly, none of my family realized at the time that Mr. Fernandez was 'employed on the inside track', waiting for an opportunity to 'get his hands on a dealership' under the minority plank of dealer development. It was not until 2001 that I became aware that Mr. Fernandez was even a car dealer in our market or, for that matter, that a Fernandez Pontiac-Buick-GMC (near the intersection of Highway 67 and Interstate 20 in Dallas)…even existed! Several years later, on a routine visit to my franchise, a General Motors representative, with no inducement on my part, volunteered information to me that Mr. Fernandez' motive had indeed been to become a General Motors dealer.

"By 1995, at the tender age of 43, I had already seen enough evil propagated by 'our corporate

partner' to cause grave concern about how good people with noble intentions would ever succeed in such an environment. I became motivated to develop a platform from which to volunteer my name for election to the National Dealer Council. In the final hours leading up to the election, I received a letter from the corporation notifying me that I was ineligible to serve. Even though I had contributed greatly to the value of our family's franchises over my lifetime, my name had supposedly been listed in paragraph three (3) of our franchise agreement for only two (2) of a required three years. Since General Motors had already delivered to me approximately 225 self-addressed envelopes for all the Chevrolet dealers in North Texas, I thought it foolish to let all my observations go to waste and enthusiastically forwarded my platform issues to the dealer body. Attached hereto as Exhibit 'A' is a true and correct copy of my platform which is incorporated by reference herein as if set forth at length. As a result, a number of Chevrolet dealers whose passion and plight was 'to play games to get ahead in the system' and whose behavior was being in advertently characterized by my comments, forwarded my platform concerns and ideas to all the higher-ups in Detroit. Apparently all hell broke loose in General Motor's inner circle where raw nerves had obviously been touched. The then Chairman of Chevrolet, our dear friend Jim Perkins, summoned my father and me to appear on 'the Fourteenth Floor' in Detroit to explain my position paper. During our two hour meeting that followed, I began to enthusiastically do so, but on platform issue number thirteen, it became obvious that Jim could not listen to any more truth or consequence. Eventually, I was invited to take a one (1) year absence due to perceived anger and animosity toward whomever or whatever. Within my rights as a franchise owner, I refused to do so, but I humbly offered to apologize at the next regional meeting...mind you, for the 'flavor' of my remarks, but not for the content. My offer was tabled and our two (2) hour meeting abruptly adjourned with no obvious outcome. Approximately, six (6) weeks later Jim Perkins either resigned or was forced out of his job. It is, perhaps, beyond coincidence that a lifelong journey such as mine, first, defined by