an unprecedented purchasing opportunity on new GM vehicles.

"GM filed suit in a federal court in Dallas, Texas, in March, 2005, seeking to enforce a term sheet discussed by attorneys as a legal contract with respect to the negotiations for settlement on the termination of the Oldsmobile franchise. The suit was styled Case No. 3-05-CV-0528-K; General Motors Corporation v. Forrest Chevrolet-Oldsmobile-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc.; In the United States District Court for the Northern District of Texas, Dallas Division. Said suit concerned the phase-out of Debtor's Oldsmobile line of vehicles. In said Case No. 3-05-CV-0528-K, a Transition and Release Agreement, two (2) Exclusive Use Agreements, and a Supplemental Settlement Agreement and Release. Attached hereto as Exhibits 'B' and 'C', respectively, are true and correct copies of the Exclusive Use Agreements. The Agreement, attached as Exhibit 'B' provides, in paragraphs 1.(e) and (f) for an exclusivity period of fifteen (15) years for Forrest Pontiac-Buick-GMC Truck, Inc, to sell Buick and Pontiac vehicles, and GMC Trucks at our place of business; while the Exclusive Use Agreement, attached as Exhibit 'C', provides, in paragraphs 1.(e) and (f) for an exclusivity period of fifteen (15) years for Forrest Chevrolet-Cadillac, Inc., to sell Chevrolet and Cadillac vehicles at our place of business. Specifically, paragraph 2 of both Exclusive Use Agreements state as follows:

> "Dealer hereby agrees that, at all times during the Exclusive Period it shall actively and continuously conduct Dealership Operations for the Existing Model Lines at the Dealership Premises in accordance with the terms of the Dealer Agreements. The Dealership Premises shall not be used for any purpose other than Dealership Operations for the Existing Model Lines (which prohibited use includes, but are not limited to, the sale, display, storage, and/or service of motor vehicles not covered by the Dealer Agreements other than as specifically contemplated by the term 'Dealership Operations' in the Dealer Agreements), during the Exclusivity Period without the prior written consent of GM, which consent may be granted or withheld in GM's sole discretion."

There is no provision in either Exclusive Use Agreements that exempts us from this provision in the event they are no longer operating their dealerships under a franchise agreement with GM.

"In August 2005, two months before the Oldsmobile mediation, we were confronted with a GMAC audit of 'car deal' payoffs, resulting in an immediate payment demand of $1.2 million dollars. (At that time GMAC was wholly owned by GM.) This assessment was based on three (3) day payoff requirements by their internal definitions, which I had never heard of, nor have I, to this day, ever seen in writing. Consequently, I have had to engage GMAC through legal representation for the past four (4) years. From early January 2006, through in or around July 2008, GMAC imposed five (5) punitive actions that are identified in a client alert sent to me by the Myers and Fuller law firm of Tallahassee, Florida, in November, 2008. Attached hereto as Exhibit 'D' is a true and correct copy of the document which is incorporated by reference herein as of set forth at length. Aside from two (2) prior demands by GMAC that we choose a new floor plan source, a third notice from their operations supervisor in March 2008 advised us that our line of credit would be suspended in late May 2008. As I had previously characterized their behavior as attempting to force the sale of our franchises, I was both shocked and enraged that they followed through on their threat. Thusly, our two (2) General Motors franchises, Forrest Chevrolet-Cadillac Inc., and Forrest Pontiac-Buick-GMC Inc, survived over a year with no ability to order new vehicles from the manufacturer. Predictably, the manufacturer has sent letters outlining violations of our obligation to furnish new product to their customer base.

"The hostile action of GMAC in confronting dealership personnel and emphasizing its presence in dealer's facility caused the departure of four key employees in the first ten (10) days of its presence a said facility

"During the past fourteen (14) years, since 1994, our family has been exposed to a myriad of methods of General Motors Corporation to destabilize our franchises and force us out of business. The initial strategy was to alter the sales outcome in our primary area of responsibility by allowing the relocation of our closest Chevrolet competitor, Lynn Smith Chevrolet in Burleson, Texas, in 1994. In

or around 1998-1999, General Motors attempted to starve our stores of new product allocations. Lastly, in December 2005, following a significant influx of new product resulting from the 'price-fixing' madness, *visa vi* GM Employee Pricing. of June 2005, GM attempted to flood my dealerships with new product. GMAC, the other side of the two-headed dragon, acted aggressively against our stores when we had accumulated approximately $16.0 million of new vehicle inventory. Steve Evans, who inherited his father's 30 year old franchise, R.O. Evans Pontiac-Buick-GMC in Dallas, Texas, in 1988, is a former victim of this multifaceted strategy of General Motors. Mr. Evans contacted me in 2005, warning me of such a diabolical possibility. He was very concerned at the time that the same thing that happened to him and his family would happen to me and my family. And it did. GMAC issued a notice in March, 2008, that the floor plan lines of Forrest Chevrolet-Cadillac and Forrest Pontiac-Buick-GMC would be suspended on May 22, 2008. This was actually the third notice of this kind since the end of 2005, leading to the current death spiral of our family's fifty (50) year journey as a General Motor's dealer. On July 7, 2008, Debtors sent to FORREST a letter which outlined purported breaches of the franchise agreements, namely, arising from the loss of the floor plan. Attached hereto as Exhibits 'E' and 'F', respectively, are a true and correct copies of the letters. Of interest, the letter references that Debtor can terminate the franchise agreements if FORREST fails the remedy the breach. However, DEBTOR never chose to terminate the franchise agreements, until this Motion was filed, over one (1) year later.

"On May 14, 2009, Gem sent to both dealerships a letter which stated, in part, that GM did not anticipate its contractual relationship to continue with either dealership past October 2010, being the date the current franchise agreements between both dealerships and GM terminate. However, GM provided us the opportunity to submit any information to it concerning the matters addressed in the letter. I did just that as, on May 31, 2009, I sent to GM, via facsimile, a Business Plan outlining why we should continue to be franchised dealers of GM. Attached hereto as Exhibit 'G' is a true and correct