EXHIBIT D

EXHIBIT D

# Myers&Fuller, P.A.
ATTORNEYS AT LAW

Robert A. Bass**
Robert C. Byerts
Joshua J. Logan
Shawn D. Mercer*
W. Douglas Moody, Jr.
Richard N. Sox, Jr.
Frank X. Trainor, III*

*Founding Partners:*
*Daniel E. Myers*
*Loula M. Fuller*

**Also admitted in Washington D.C.
*Only admitted in North Carolina

Respond to: Tallahassee Office

# CLIENT ALERT

## ANSWERS FOR DEALERS IN THIS VOLITALE FLOORPLAN FINANCING ENVIRONMENT
### October 28, 2008

### The Stakes

Our firm has received numerous client inquiries from across the country concerning the trending conduct of traditional floorplan lenders. We have been working with dealers on an increasing basis over the last several months to define the scope of this problem and provide answers.

If access to wholesale financing credit is suspended or conditioned with new dealer related economic burdens, the remaining life span of the average dealership can be measured in weeks. Most dealers have never been in a position where the availability of wholesale credit is threatened and this Alert is intended to serve as a quick-study primer to enable dealers to identify serious floorplan issues as they arise.

This Alert was prompted by the increasingly negative conduct being exhibited by floorplan lenders. Chief among the recent actions which we have addressed or have been reported to us is canceling floorplan lines, imposing high-risk interest rates unrelated to the agreed interest rate formula; imposing unreasonable inventory retirement guidelines when such inventory was originally purchased without repayment restrictions; demanding substantial additions to dealer working capital which contradict the original available capital formula; and, demanding that additional dealership and shareholder assets and accounts be designated as lender collateral and that cash collateral accounts be established.

The floorplan modifications discussed in this Alert did not originate because such lenders have experienced an unusually high default rate on dealership floorplan lines. The likely cause is internal to the lender's balance sheets which show small amounts of cash on hand in relation to asset portfolios littered with illiquid derivative financial instruments. Although the Treasury is in the initial stages of a plan to immediately infuse the banking system with 250 billion dollars to jump start the credit markets it will take several weeks to see any tangible results. However, non-bank floorplan lenders must still seek private funding from secondary sources and presently there is little interest to lend in these secondary markets. Finally, the loss or conversion (to holding companies) of the world's leading investment banks bodes ill for private companies seeking funding in amounts which no single bank can handle.

2822 Remington Green Circle * Tallahassee, Florida * 32308
Telephone (850) 878-6404 * Facsimile (850) 942-4869

9104 Falls of Neuse Road, Suite 200 * Raleigh, North Carolina * 27615
Telephone (919) 847-8632 * Facsimile (919) 847-8633
*www.dealerlawyer.com*

October 28, 2008
Page 2

### Responding to New Floorplan Demands

Floorplan lenders are engaging in more aggressive auditing practices as justification for adversely modifying the wholesale lending arrangements of many dealers. As noted, lenders are now routinely increasing floorplan interest rates and buy rates on retail paper, demanding immediate contributions to working capital, and enhancing the asset array subject to collateral demands including required establishment of cash collateral accounts, and demanding the systematic retirement of debt associated with moderately aged inventory.

Based on our experience, it can be assumed that every floorplan lender will claim the right to amend its wholesale financing arrangement at will. Every lender will describe a dealer's obligation to pay as due on demand rather than after a "sale." Finally, every lender will claim the right to employ self-help remedies if for any reason the lender feels insecure about its loans or collateral.

We have in the past, and continue today to vigorously oppose this construction of a lender's authority. Generally, floorplan lenders do not possess unfettered authority and unbridled discretion in dealing with borrowers. However, since the standards which govern a specific lending relationship are often determined by course of conduct, there is no single all encompassing rule that can be applied robotically to define a dealer's rights or a lender's authority.

Regardless of the observation above, by no means should a dealer assume that a lender is authorized to unilaterally modify a floorplan lending relationship subject to a written wholesale security agreement. Any such attempted modification or demand must be evaluated with respect to the written agreement and the course of conduct between the floorplan lender and affected dealer.

In the event a dealer is subject to such a modification, the decision to seek the advice of counsel should be tempered with a determination as to whether your dealership can practically comply with a proposed modification. If compliance does not entail the loss of a right, assumption of an increased financial burden, or contribution of unimpaired assets as collateral, your business judgment should first be applied to the issue and any professional advice sought should be short, sweet, and inexpensive.

Conversely, if the proposed modification cannot be practically satisfied, is costly now or over time, or grants the lender access to new sources of collateral or guaranty, before you give your consent you may wish to seek a formal evaluation of the proposed demand or modification.

### Demands for Immediate Payment of All Monies Loaned

Our experience thus far indicates that there is little uniformity in the risk assessment methods being employed by floorplan lenders. This has resulted in the immediate demand for full payment of all sums outstanding on the floorplan line by some lenders.

Lately, we have regularly been asked what rights a dealer has if a wholesale lender demands that a dealer's outstanding floorplan balance be paid immediately or within a small number of days. Subject to the specifics of a particular wholesale lending agreement, we have consistently taken the position that unless a dealer is in actual default of the repayment there is no valid basis to demand immediate full payment.

Unless the dealer has converted sales proceeds to other obligations and is truly out-of-trust or has committed some other material act of default, there are a number of strong arguments that payment of the balance cannot be demanded simply because the floorplan lender has changed its mind.

October 28, 2008
Page 3

If a dealer either cannot practically satisfy or rejects a lender's demand for immediate full payment, the lender's options are to (1) use a self-help remedy by seizing all vehicles in which the lender has a security interest *so long as* the dealer has no objection; (2) petition a court for an order directing the local sheriff to seize all vehicles, parts, equipment and the like in which the lender has a security interest (in this instance, the dealer is at a minimum, entitled to a post-seizure hearing wherein the lender generally is required to prove the amount due and the dealer's default); and (3) depending on what other collateral rights a dealer has granted a lender by agreement, lender's may sweep cash from dealer's open accounts and related bank accounts. The dealer must then sue to retrieve such funds.

It is important to understand that lenders have been demanding that dealers agree to sign documents which give the lender the right to sweep funds, credits, hold-back money, and the like from dealership accounts. These agreements generally authorize the lender to sign any documents in the dealership's name which are needed to access such accounts.

Now, more than ever, dealers must review every new or modified agreement or document which a lender demands a dealer to accept. If any questions arise as to the meaning of such agreements or documents, professional advice should be promptly sought as the dealer may be granting authority or access to assets which would otherwise be protected from the lender's reach.

## Guarantors

In recent months, our firm has been involved with numerous dealer principals and shareholders of dealerships being harassed or sued by a lender to make payment under the terms of Guaranty of a dealership's debts. In certain instances, lenders are demanding that every officer, shareholder and spouses of such officers and shareholders in closely-held dealership corporations sign a Guaranty in favor of the lender. If either you or your spouse have not yet signed any such Guaranty - we strongly recommend that you refuse such a request.

Lenders will often pursue the personal Guarantors of a dealership's unpaid obligations. As important as the debt repayment, the lender will also demand that the Guarantor pay for all related losses to the debt and for all attorney's fees and costs involved in the collection process. The collection of a small debt will often result in fees and costs which far exceed the actual debt.

Although we have been successful at blocking such guaranty-related legal actions, it is a difficult and expensive process to undergo. Instead, avoid such an experience by simply refusing to execute such documents.

For those individuals who have already signed some form of a Guaranty – we recommend that you locate such documents and review them immediately. If any uncertainty exists as to the terms of the Guaranty seek professional guidance and remember that in most situations, a Guaranty can be cancelled with proper notice to the lender which will at least remove responsibility for debt going forward.

## Floorplan Lender Bankruptcy

Our firm has been directly involved in several of the largest motor vehicle related bankruptcies ever filed. In advising dealer-principals, shareholders, or dealership-creditors as the case may be, we have seen little of any good come of a bankruptcy filing. Pre-bankruptcy planning is the best defense to bankruptcy.

Rumors are rampant that certain wholesale lenders may at some point in the near future seek bankruptcy protection. Dealers have asked what happens if such lender holds their floorplan account or