October 28, 2008
Page 4

dealership cash deposits such as the GMAC Credit Balance Account. These are difficult questions because the answer depends on the type of bankruptcy protection sought and whether or not the debtor's (bankrupt lender) internal management will be left to run the company or some third party Corporate Restructuring Officer is appointed by a bankruptcy judge to oversee the on-going affairs of the debtor.

Depending on the circumstances, floorplan operations could technically continue if this activity is profitable and the debtor can locate a person(s) who will extend credit to the debtor. As noted, floorplan lenders achieve their profits by utilizing the interest spread between money it borrows and the money loaned to the floorplan customer. Accordingly, access to ready credit is the most essential asset a floorplan lender requires to operate. In reality, given that certain existing floorplan lenders are experiencing substantial problems in accessing ready credit, it is unlikely such operations would continue after a bankruptcy filing.

Many lenders, under a variety of labels, are holding dealership funds in what amounts to a cash collateral account. Whatever the name of such accounts (i.e., Credit Balance Account or Cash Management Account) these funds are generally not F.D.I.C. insured and may be designated as part of the Debtor's estate in a bankruptcy. The dealer-owner of the funds will be entitled to make a claim for the same as an unsecured creditor, but this offers little or no real protection.

Every dealer-principal, shareholder, or dealership who has funds on deposit with a floorplan lender regardless of what the fund account is called should review the agreement(s) or terms under which such funds are deposited with a lender. These collateral or offset accounts may provide for repayment of the deposit upon written demand. Moreover, even if such accounts become subject to a bankruptcy proceeding, there may be practical self-help strategies for obtaining some equivalent of repayment. Again, this all depends on the agreement and the related facts and circumstances.

A number of dealers have opted to remove all funds possible from these offset accounts. The removal of these funds is generally subject to certain minimum balance and notice requirements. The agreement governing the offset account should be carefully reviewed before taking any action in this regard.

### Out-of-Trust on Floorplan Line

It is important to understand what the phrase "out-of-trust" means when used by a floorplan lender. The phrase can mean that a dealer has "sold" a vehicle and the consumer financing entity has yet to make payment to the dealer on so-called "contracts in transit." It may mean that the lender considers any vehicle not in physical inventory on the dealership premises is deemed "sold" and the lender demands immediate payment. This can occur with dealers who make many sales through spot deliveries and lender changes the definition of "sale" in mid-stream. Finally, there is the real out-of-trust situation which occurs when a dealer receives payment for the vehicle sale and then commits the payment proceeds to pay other dealership obligations such as salaries. All of the above are serious situations which can result in drastic, but avoidable, economic consequences.

Dealers accused of being out-of-trust should never concede the issue, fold their tents, and await the shocking bill that will inevitably follow such an approach. Consenting to an out-of-trust accusation means absolute default and allows the lender to either manage the dealer's sales operations going forward or seize and sell the dealer's new and used vehicle inventory.

Such a seizure will automatically destroy the un-liquidated equity the dealer has in used car inventory. Operationally, the floorplan lender will collect the vehicles, assign them to an auction house, and collect 50 cents on the dollar or worse. The dealer and the guarantor(s) are then charged for the

October 28, 2008
Page 5

payment deficiency and all fees and costs associated with the collection, storage, transport, and sale of the seized inventory. As noted, the fees and costs alone are sufficient to destroy even the well-heeled guarantor.

At a minimum, the dealer should consider objecting to a seizure if a valid defense may exist. As noted above, in most instances, objecting to a voluntary seizure forces the lender to seek a judicial seizure order, which ensures that the dealer will receive a hearing on the issue of the seizure. The law also generally provides for an award of damages if the seizure ultimately proves to be unlawful.

In contrast, if a dealer voluntarily submits to a seizure it is likely that the issue of whether the seizure is lawful and dealership damages are irrevocably waived. In such an event, claiming the dealer's consent to seizure was made under duress will offer little chance of success.

Moreover, objecting to a voluntary seizure offers the opportunity to negotiate a forbearance agreement. A forbearance agreement can take many forms, but in the end it can act as a resolution of the out-of-trust dispute. If the appropriate economic and legal issues are presented to the lender, then such forbearance agreements can provide for continued lender-financing of dealership operations. However, great care should be taken in the drafting of any such forbearance agreement. In many cases, the initial terms a lender will offer are worse than simply suffering the vehicle seizure and auction sale.

## Conclusion

We hope that this Alert proves valuable. Since the automotive credit market has been subject to sudden change we determined that this was our only means of proactively providing our clients with information to at least pause and consider the next move in dealing with a floorplan lender. The foregoing information is provided for informational purposes only and is not to be construed as legal advice. Questions related to the issues addressed herein should be directed to your dealer lawyer.

Comments or questions: floorplan@dealerlawyer.com



### ATTORNEYS AT LAW

Robert A. Bass**
Robert C. Byerts
Joshua J. Logan
Shawn D. Mercer*
W. Douglas Moody, Jr.
Richard N. Sox, Jr.
Frank X. Trainor, III*

*Founding Partners:*
*Daniel E. Myers*
*Loula M. Fuller*

**Also admitted in Washington D.C.
*Only admitted in North Carolina

Respond to: Tallahassee Office

# DEALER ALERT
# BANKRUPTCY CONSIDERATIONS
November 20, 2008

As a follow up to our last Dealer Alert concerning floorplan financing issues, we have received a number of calls regarding the possibility of a Chapter 11 bankruptcy as protection for dealers in these very difficult times in our industry. Myers & Fuller, P.A. attorneys have advised dealers in a number of bankruptcy matters. A Chapter 11 filing is the mechanism which would likely be used by a dealership corporation to seek bankruptcy protection where its debts exceed its assets.

Whether a bankruptcy filing is right for your dealership must be determined on a case-by-case basis. With that said, our experience in working with dealers in bankruptcy proceedings is that bankruptcy may be beneficial in certain instances where dealers are 1) having their floorplan financing summarily terminated; or 2) being terminated by the manufacturer as a result of the loss of floorplan financing or some other default such as inadequate working capital.

A bankruptcy filing may be of assistance to a dealership which is having its floorplan line shutoff with a demand to pay the balance within a short period of time. If the dealership cannot find a replacement floorplan lender, the existing lender may attempt to come in and take possession of the vehicle inventory as its loan collateral. The lender will sell the vehicle inventory at auction for something much less than the dealer owes on each unit. As in most cases, if the dealer has a personal guaranty in place on the floorplan loan then the dealer is personally liable for the deficit created by the "fire sale" of those vehicles. A bankruptcy proceeding in some cases can serve the purpose of a more controlled sale of the dealership's vehicle inventory (or perhaps the business as a whole) in order to maximize sale proceeds and minimize any deficit on existing financial obligations.

We have also advised dealers in bankruptcy proceedings where the franchise was being summarily terminated by the manufacturer as a result of a lack of adequate working capital and, in many cases, in conjunction with the loss of floorplan financing. In these cases, bankruptcy proceedings may permit the dealer to stay the termination in order to allow the dealer to find a buyer for the franchise. Although in these difficult times obtaining historic prices for franchises, in particular domestic franchises, may not be possible. However, it is better to receive *some* value for the franchise than to simply turn it back in to the manufacturer.

In addition to having legal counsel who understands floorplanning and franchise issues advising you in bankruptcy, it is important to have experienced legal counsel involved *immediately* upon receipt of a notice from your floorplan lender of a change in the relationship as well as receipt of any similar notice from your manufacturer. In many cases, involving experienced counsel from the beginning will allow for an orderly workout of the situation which will, in some cases, obviate the need for a bankruptcy proceeding.

The foregoing information is provided for educational purposes only and is not to be construed or interpreted as legal advice.

2822 Remington Green Circle  *  Tallahassee, Florida  *  32308
Telephone (850) 878-6404  *  Facsimile (850) 942-4869

---

9104 Falls of Neuse Road, Suite 200 * Raleigh, North Carolina * 27615
Telephone (919) 847-8632 * Facsimile (919) 847-8633
*www.dealerlawyer.com*