EXHIBIT B

**EXHIBIT B**

## EXCLUSIVE USE AGREEMENT

THIS EXCLUSIVE USE AGREEMENT (this "Agreement") is made and entered into as of the ~~4~~ [OCTOBER] day of ~~November~~, 200~~5~~ [4] by and between FORREST CHEVROLET-~~OLDSMOBILE~~-CADILLAC, INC. ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

### RECITALS

A.    Dealer currently operates a Chevrolet and Cadillac sales and service facility at 2400 N. Main Street, Cleburne, Texas, pursuant to the Dealer Agreements (as defined herein).

B.    Dealer and GM are parties to a Supplemental Settlement Agreement and Release of even date herewith (the "Settlement Agreement").

C.    Pursuant to the Settlement Agreement, Dealer (i) terminated its Dealer Sales and Service Agreement with respect to Oldsmobile products, and (ii) agreed to conduct GM-exclusive motor vehicle dealership operations at the Dealership Premises (as defined herein) on the terms and conditions contained herein, intending to be bound by the terms hereof.

### COVENANTS

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    **Definitions.** For purposes of this Agreement, the following capitalized terms shall have the meanings set forth in this Section 1:

    (a)   "Dealer Agreements." The Dealer Sales and Service Agreements entered into by and between Dealer and GM for the Existing Model Lines, and any amendments, modifications or replacements of such agreements.

    (b)   "Dealership Operations." As defined in the Dealer Agreements.

    (c)   "Dealership Premises." The location(s) approved from time to time for the conduct of Dealership Operations for the Existing Model Lines pursuant to the terms of the Dealer Agreements.

    (d)   "Effective Date." The date set forth in the introductory paragraph of this Agreement.

    (e)   "Exclusivity Period." The period commencing on the Effective Date and continuing for a period of ~~twenty-five (25)~~ [FIFTEEN (15)] years thereafter.

    (f)   "Existing Model Lines." The Chevrolet and Cadillac products sold at the Dealership Premises in accordance with the Dealer Agreements.

2.    **Exclusive Use.** Dealer hereby agrees that, at all times during the Exclusivity Period, it shall actively and continuously conduct Dealership Operations for the Existing Model Lines at the Dealership Premises in accordance with the terms of the Dealer Agreements. The Dealership Premises

{#00713806.1 07146-9999 11/18/2004 11:41 AM}

shall not be used for any purpose other than Dealership Operations for the Existing Model Lines (which prohibited uses include, but are not limited to, the sale, display, storage, and/or service of motor vehicles not covered by the Dealer Agreements other than as specifically contemplated by the term "Dealership Operations" in the Dealer Agreements), during the Exclusivity Period without the prior written consent of GM, which consent may be granted or withheld in GM's sole discretion.

3.  <u>Consideration</u>. Dealer hereby acknowledges and agrees that payments and other covenants and agreements by GM set forth in the Settlement Agreement are fair and adequate consideration for Dealer's execution of and performance under this Agreement, the Settlement Agreement and any other documents executed by either party in connection with the Settlement Agreement (the "<u>Related Agreements</u>").

4.  <u>Default and Breach</u>. Each of the following shall constitute a breach of this Agreement:

    (a) Dealer's failure to actively and continuously conduct Dealership Operations for the Existing Model Lines at the Dealership Premises at all times during the Exclusivity Period;

    (b) use of the Dealership Premises, or any part thereof, at any time during the Exclusivity Period, for any purpose other than Dealership Operations for the Existing Model Lines;

    (c) subject to Section 5(d) below, the termination at any time during the Exclusivity Period of any of the Dealer Agreements, for any reason whatsoever (including, but not limited to, the termination in connection with the sale by Dealer of any of its assets or operations relating to Dealership Operations);

    (d) subject to Section 5(d) below, any action or inaction by Dealer which results in the discontinuation of Dealership Operations for any of the Existing Model Lines at the Dealership Premises (by, for example, but not by way of limitation, the sale by Dealer of its assets or operations relating to any of the Dealer Agreements or the relocation by Dealer of its operations under any of the Dealer Agreements) at any time during the Exclusivity Period; and

    (e) Dealer's failure at any time during the Exclusivity Period to perform any other of its obligations as set forth herein, in the Settlement Agreement, or any Related Agreement.

5.  <u>Remedies</u>.

    (a) In the event of a breach hereunder, GM shall have any or all of the following remedies, at GM's election:

        (i) Dealer shall, within three (3) days ~~after receipt of a written notice from~~ OF ARBITRATORS AWARD HEREUNDER, IF ANY, PAY THE FOLLOWING ~~GM advising of such breach,~~ pay liquidated damages ~~for the Brand-Related Losses (defined below)~~ to GM, ~~as follows: (A) for a breach occurring during the time period commencing on the Effective Date and ending on the tenth (10th) anniversary of the Effective Date, Dealer shall pay GM the sum of One Million Four Hundred Twenty Five Thousand and No/100 Dollars ($1,425,000); (B) for a breach occurring during the time period commencing the day after the tenth (10th) anniversary of the Effective Date and ending on the twentieth (20th) anniversary of the Effective Date, Dealer shall pay GM the sum of Nine Hundred Fifty Thousand and No/100 Dollars ($950,000); and (C) for a breach occurring during the time period commencing the day after the twentieth (20th) anniversary of the Effective Date and ending on the expiration of the Exclusivity Period.~~

BASED ON THE FOLLOWING TERMS:

CMJ / JCM (signatures/initials in margin)

IF THE DATE OF BREACH IS WITHIN ONE YEAR (OF) EXECUTION OF THIS AGREEMENT, 200% OF THE AMOUNT PAID (OR 500,000). THIS AMOUNT WILL BE REDUCED BY 1/15th EACH YEAR FOR THE BALANCE OF THE AGREEMENT. FOR EXAMPLE, IF A BREACH OCCURS IN YEAR 15 AFTER EXECUTION THE AMOUNT WILL BE @ ??

~~Dealer shall pay GM the sum of Four Hundred Seventy-Five and No/100 Dollars ($475,000) (each, respectively, the "Damages").~~ Dealer acknowledges that, if Dealer breaches this Agreement, GM shall suffer substantial damages, including, without limitation, loss of reputation, diminution of brand value, loss of opportunities, and loss of market channeling (collectively, the "Brand-Related Losses"). Dealer acknowledges that the determination of the exact amount of such damages would be difficult or impossible. Dealer and GM acknowledge and agree that the Damages are a reasonable estimate of the liquidated damage amount for the Brand-Related Losses in light of all relevant facts now available to the parties hereto and are not a penalty.

*[handwritten margin: MJ CMJ]*

~~(ii) To the maximum extent permitted by law, GM shall be entitled to all of its remedies at law, including payment for actual damages beyond the Brand-Related Losses such as, without limitation, lost profits, attorney fees, and relocation costs, and all of its remedies in equity, including, but not limited to, the right to specific performance.~~

*[handwritten margin: delete all CMJ]*  *[handwritten margin: MJ CMJ]*  *[handwritten margin: Following the Arbitrator's Award]*

(b)     In lieu of having Dealer pay any damages pursuant to Section 5(a) above, GM may elect to apply such amount towards payment of any amount due Dealer in the event GM exercises its right of first refusal pursuant to Article 12.3 of the Dealer Agreements.

(c)     In the event Dealer fails to pay any damages as required by Section 5(a) above, Dealer authorizes GM to charge the full amount thereof against Dealer's account maintained in the GM Dealer Payment System.

(d)     Notwithstanding anything to the contrary in this Agreement, it shall not be a breach of this Agreement, and Dealer will have no obligation to pay any damages to GM described in Section 5(a) above, if the termination of all of the Dealer Agreements occurs as a result of all of the following:

(i)     Dealer proposes to sell or otherwise transfer its assets related to Dealership Operations for all of the Existing Model Lines to a third party, which proposal (A) provides for the continuation of exclusive Dealership Operations for all of the Existing Model Lines at the Dealership Premises, or (B) provides for the relocation of Dealership Operations for all of the Existing Model Lines to a new location to be used exclusively for such Dealership Operations, and GM expressly advises Dealer in writing that such location is satisfactory to satisfy the requirements of this Section 5(d);

(ii)    the transferee assumes, pursuant to a written agreement acceptable to GM, Dealer's remaining obligations under this Agreement, including, without limitation, those with respect to the unexpired portion of the Exclusivity Period;

(iii)   the transferee demonstrates to GM's satisfaction the financial ability to assume Dealer's financial obligations herein;

(iv)    the change of ownership or transfer proposal is otherwise approved by GM; and

(v)     the transferee and GM enter into Dealer Sales and Service Agreements in the then-current form for Dealership Operations for all of the Existing Model Lines at the location identified in Section 5(d) above.

(c) No failure on the part of GM to exercise, and no delay in exercising, any right under this Agreement, the Settlement Agreement, or any Related Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any further or other exercise thereof or the exercise of any other right. The remedies provided under this Agreement, the Settlement Agreement, or any Related Agreement are cumulative, are not exclusive of any remedies provided by law, and may be exercised singly, collectively, or successively.

6. **Indemnity.** Dealer shall indemnify, defend and hold GM, its Affiliates and their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors and assigns (the "Indemnified Parties") harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) that may be imposed upon or incurred by the Indemnified Parties, or any of them, arising from, relating to, or caused by Dealer's breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

7. **Due Authority.** Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

8. **Confidentiality.** Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

9. **Informed and Voluntary Acts.** Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any mental, physical, or economic duress. Nothing set forth in this Agreement shall be construed as amending, modifying or superseding any of the Dealer Agreements or GM's rights or remedies therein.

10. **Effectiveness.** This Agreement, and any offers made by GM to Dealer with respect to the implementation of GM's marketing channel strategy in Dealer's metropolitan area, shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is returned to GM on or before __10/4__, 2005. This Agreement shall be deemed executed on the date on which it has been fully and properly executed by both parties, which date shall be entered in the introductory paragraph of this Agreement.

{#00713806.1 07146-9999 11/18/2004 11:41 AM}                         4

10/06/2005 16:57 FAX 469 287 3999          STRASBURGER & PRICE                           ☒029/030

11. **Disputes - Arbitration.**

(a) Subject to the following provisions of this Section 11, GM and Dealer agree to submit to final and binding arbitration, upon either party's written notice, any and all claims, disputes, and controversies between them arising under or relating to this Agreement and its negotiation, execution, administration, modification, extension or enforcement (collectively, "Claims"). Such arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") at an AAA regional office nearest the Dealership Premises.

(b) GM and Dealer agree that the dispute resolution process outlined in this section shall be the exclusive mechanism for resolving any Claims. All arbitration awards are binding and non-appealable except as otherwise provided in the United States Arbitration Act (9 U.S.C. § 1, et seq.). Any court with jurisdiction may enter judgment upon the award rendered by the arbitrator, and the parties agree to be bound by such award.

(c) Arbitration hereunder shall take place before one (1) arbitrator. The arbitrator shall be neutral and an attorney actively engaged in the practice of business law for at least ten (10) years or a retired judge of a state appellate court or a federal district or appellate court. The AAA shall submit a list of persons meeting the criteria outlined above for such arbitrator, and the parties mutually shall agree upon the arbitrator in the manner established by the AAA. If the parties are unable or fail to agree upon the arbitrator, the AAA shall select the arbitrator.

(d) The arbitrator shall have the discretion to order a prehearing exchange of information by the parties, including, without limitation, production of requested documents, an exchange of summaries of proposed witness testimony, and depositions of parties, all of which shall occur within sixty (60) days after the appointment of the arbitrator.

(e) Dealer and GM will share equally in all administrative expenses, including, but not limited to, travel, lodging and meals of the arbitrator, rental of meeting and hearing rooms, any expenses for transcribing or recording the arbitration proceedings, and any other reasonable expenses relating to the arbitration process. Dealer and GM shall be responsible for their own costs and expenses including, but not limited to, attorneys' fees and expert witness fees.

12. **Governing Law.** This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

*[Signature Page Follows]*

{#00713806.1 07146-9999 11/12/2004 11:41 AM}                    5

IN WITNESS WHEREOF, GM and Dealer have executed this Agreement through their duly authorized representatives as of the day and year first above written.

GENERAL MOTORS CORPORATION, a Delaware corporation, acting through its Dealer Network Development Group

By: *S. M. Sprague by [signature]*
M.L. Heisel, Finance Director, or
S.M. Sprague, Finance Manager

By: *C. F. Seaburg by [signature]*
C.F. Seaburg, Regional Director, or
D.T. Bott, Regional Manager

FORREST CHEVROLET-OLDSMOBILE-CADILLAC, INC.

By: *[signature]*
Name: Charles Michael Forrest
Title: V-P