**Hearing Date and Time:  August 3, 2009 at 9:00 a.m. (Eastern Time)**

Robert B. Weiss
Donald F. Baty, Jr.
HONIGMAN MILLER SCHWARTZ AND COHN LLP
660 Woodward Avenue
2290 First National Building
Detroit, MI  48226
Telephone: (313) 465-7314
Facsimile: (313) 465-7315

*Special Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
:
**In Re**                                          :         Chapter 11
:
**MOTORS LIQUIDATION COMPANY** (f/k/a  :         Case No. 09-50026 (REG)
General Motors Corp.), et al.,                     :         (Jointly Administered)
:
Debtors.                                    :         Hon. Robert E. Gerber
:
-------------------------------------------------------------x

**REPLY TO OBJECTION OF WELLS FARGO BANK NORTHWEST, N.A.,
TO MOTION BY DEBTORS FOR ENTRY OF ORDER AUTHORIZING
REJECTION OF CERTAIN PERSONAL PROPERTY AGREEMENTS
AND/OR ABANDONMENT OF COLLATERAL TO SECURED CREDITORS**

Motors Liquidation Company (f/k/a General Motors Corporation) ("**Old GM**") and its affiliated debtors, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), in support of their motion pursuant to sections 365 and 554 of title 11 of the United States Code (the "**Bankruptcy Code**") authorizing the Debtors to reject certain personal property "lease"[1] agreements and related agreements (the "**Agreements**") and/or to abandon the personal property subject to the Agreements (the "**Motion**"), respectfully represent:

---

[1] The Debtors take no position regarding whether the Agreements are true leases or disguised financing arrangements, and the Debtors reserve all rights regarding the proper characterization of the Agreements.

### Introduction

1.  The Debtors are responding to the objection (the "**Objection**") of Wells Fargo Bank Northwest, National Association, ("**Wells Fargo**")—the only objecting party. It is undisputed that rejection of the Agreements will benefit the Debtors' estate and that the Debtors reached their decision in the sound exercise of their business judgment. It is also undisputed that the Agreements, if they are true "leases," are executory and otherwise subject to rejection under section 365 of the Bankruptcy Code. The essence of Wells Fargo's Objection is that the Court should:

    (i)   Ignore the unambiguous language of the Agreements, which provide that each lease arrangement is a separate agreement which is not dependent upon or linked to any other lease arrangement, and

    (ii)  Conclude that the leasing arrangements are somehow a single integrated, indivisible "transaction" that must either all be rejected or all be assumed, even though not only the documents themselves but also the single piece of evidence cited by Wells Fargo clearly conveys exactly the opposite.

In particular, Wells Fargo fails to note that the eight separate lease agreements Old GM entered into involve eight separate and distinct lessors. The only support presented by Wells Fargo for its position are:

    (i)   An unauthenticated Private Placement Memorandum (the "**Offering Memorandum**") prepared by Banc of America Securities LLC ("**BAS**") before the execution of the Agreements,

    (ii)  The Offering Memorandum's inconsistent use of the singular and plural forms of the word "transaction," and

    (iii) The fact that the debt financing between the debtholders and the lessors (to which Debtors were not parties) was "purportedly" done on a consolidated basis.

The parties to the Agreements and the other 2001 leasing arrangements were highly sophisticated commercial actors, whose intent is best determined by the four corners of the Agreements themselves. These Agreements, and the documents executed in connection with the other

2

leasing arrangements, contain no language suggesting that it was the intent of the parties that all of the leases be treated as an integrated, indivisible transaction.  Moreover, the Offering Memorandum, although largely irrelevant to the inquiry, is also inconsistent with Well Fargo's position.

## Background

2.  On December 18, 2001, Old GM entered into eight separate lease arrangements, each with a different party, to "lease" certain manufacturing equipment.

3.  Wells Fargo is not a party to any of the lease agreements.  It is, however, a party to the debt documents—to which Old GM is not a party and which Old GM is not rejecting—used to finance the lessors' acquisition of the equipment to be leased to Old GM.  Of note, while the Offering Memorandum was circulated to raise debt for the leasing arrangements in the aggregate, Wells Fargo and the corresponding debtholders all ultimately entered into eight separate sets of leverage documents with respect to the individual leasing arrangements.  All of the Agreements are governed by New York law.

## Legal Standard

4.  In "determining whether a contract is severable or entire . . . the primary factor to consider is the intent of the parties as determined by a fair construction of the terms and provisions of the contract itself, by the subject matter to which it has reference, and by the circumstances existing at the time of contracting."  Mun. Capital Appreciation Ptnrs. I, L.P. v. Page, 181 F. Supp. 2d 379, 394 (S.D.N.Y. 2002) (applying New York law).  "A contract is generally considered to be entire when, by its terms and purposes, it contemplates that **all of its parts are interdependent and common** to one another . . . ."  Id. (emphasis added).  "While the Court considers facts concerning the parties' intentions and actions prior to the execution of

3

the Leases, **the Court gives predominant weight to the intentions of the parties at the time the Leases were executed as manifest within the four corners of the Lease**." In re Adelphia Business Solutions, Inc., 322 B.R. 51, 59 (Bankr. S.D.N.Y. 2005), *aff'd* 482 F.3d 602 (2d Cir. 2007) (internal footnotes omitted; emphasis added; applying Missouri law[2]). Form is not conclusive, but whether parties enter "into separate written agreements with 'separate assents' rather than a 'single assent' is influential." Rudman v. Cowles Communications, Inc., 30 N.Y.2d 1, 13 (N.Y. 1972).

### The Four-Corners of the Documents
### Within Each of the Leasing Arrangements Illustrate Separateness

5.      In its Objection, Wells Fargo substantially focuses on the Offering Memorandum—an extrinsic document—rather then the four-corners of the operative documents. Specifically, the leasing arrangements were entered into by Old GM to lease certain groups of manufacturing equipment and, instead of utilizing a single, integrated leasing transaction structure—as would have been simple to do, if it had been intended—the leasing arrangements were consummated with eight different lessors through eight separate lease agreements, as illustrated in the table below.

| Lease  | 2001A-1 | 2001A-2 | 2001A-3 | 2001A-4 | 2001A-5 | 2001A-6 | 2001A-7 | 2001A-8 |
|--------|---------|---------|---------|---------|---------|---------|---------|---------|
| Lessee | OldGM   | OldGM   | OldGM   | OldGM   | OldGM   | OldGM   | OldGM   | OldGM   |
| Lessor | GM 2001A-1 Trust | GM 2001A-2 Trust | GM 2001A-3 Trust | GM 2001A-4 Trust | GM 2001A-5 Trust | GM 2001A-6 Trust | GM 2001A-7 Trust | GM 2001A-8 Trust |

6.      Importantly, and as noted even in the Offering Memorandum, none of the Agreements are cross-collateralized or cross-defaulted. Under their express terms, a rejection or other breach of one lease Agreement is not a breach of other leases, does **not** give rise to any remedies under other leases, and has **no** effect on the equipment or collateral subject to other

---

[2] Missouri law is substantially similar to New York law with respect to this issue.

lease Agreements. Each of the eight separate lease arrangements stands completely on its own, under the very terms of the operative documents. The documents related to each lease arrangement do not even identify documents from another separate lease arrangement executed at the same time. See In re Adelphia, 322 B.R. at 59 (noting that whether multiple leases stated they were intended to be part of the same agreement was a significant factor when determining whether they were separate leases). In short, the leasing arrangements are not in any way interdependent.

7. Numerous other provisions evidence that the lease arrangements were intended to be separate. For example:

- All of the options afforded to the lessee (Old GM) in the lease arrangements with respect to (i) Fixed Rate Renewal Option, (ii) Fair Market Value Renewal Option, (iii) and Purchase Options were exercisable by the lessee on a lease-by-lease basis and were not tied to concurrent exercise of such options under any other lease.

- The right to exercise rights and remedies under a lease following the occurrence of a Lease Event of Default is neither tied to nor dependent upon the concurrent exercise of the same or any other rights and remedies under any other lease.

- Old GM's rights to assign or sublease the equipment under a lease is neither tied to nor dependent upon the concurrent exercise of the same or any other rights and remedies under any other lease.

This list is far from exhaustive, but these provisions further illustrate the separateness of the lease arrangements.

8. Wells Fargo cites Carvel Corp. v. Diversified Mgmt. Group, Inc., 930 F.2d 228, 233 (2d Cir. 1991) for the proposition that "instruments executed at the same time, by the same parties for the same purpose and in the course of the same transaction will be read and interpreted together." (Objection p. 9.) This may be so, but it is of questionable relevance here given that that each lease agreement was entered into with a different lessor in the course of

5

separate "transactions." Moreover, an analytical process suggesting that material should be "read together" hardly supports the proposition that agreements should be "read" to reflect an intent wholly different from their express language.

9. Each of the leasing arrangements can, and was intended to, stand on its own. Separate agreements, separate legal opinions, separate UCC filings and other related documents were executed in connection with each of the eight separate lease transactions. Where the parties' performance under leasing arrangements can be "apportioned" or broken into "agreed equivalents," that also is evidence of separate contracts. See Ginett v. Computer Task Group, Inc., 962 F.2d 1085, 1098 (2d Cir. 1992); Mun. Capital, 181 F. Supp. 2d at 394. Each lease arrangement has separate and different payment amounts and each has varied amortization and associated payment schedules with respect to stipulated loss value, early termination value, and early buyout amounts for each leasing arrangement. See In re Adelphia, 322 B.R. at 59 (noting that apportionment of rental payments was a significant factor when determining the separateness of contracts).

10. Moreover, the parties to these multi-million dollar leasing arrangements are sophisticated market participants, presumed to understand the unambiguous terms of their contractual arrangements. The parties did not choose to enter into a single leveraged-leasing arrangement. Instead, they entered into eight separate leasing arrangements, each of which is with a different lessor. The parties could easily have documented the interdependence that Wells Fargo argues for within the four corners of the relevant agreements. There is no basis to conclude their failure to do so was other than intentional. The parties' intent regarding the separateness of each lease arrangement should be respected.

6

**The Offering Memorandum Does Not Control the Contractual Relationship of Parties**

11.     The Objection relies entirely on Offering Memorandum, and on the implicit argument that the Offering Memorandum circulated to certain potential investors by BAS in November 2001 (a month before the closing of the leasing arrangements) supersedes the transaction documents actual entered into.  However, the Offering Memorandum was a collateral document issued by a third party in connection with preliminary attempts to secure debt investors for the leasing arrangements.  The Offering Memorandum was not signed by GM and it is extrinsic to the lease Agreements.  It was not intended to be a relationship-governing document, but, rather, appears to be nothing more than a starting point for discussions about possible investments in the leasing arrangements.

12.     The Offering Memorandum is not incorporated or referenced in the Agreements. Further, the Agreements are complete on their face and integrated so as to constitute the complete arrangement.  See Mun. Capital, 181 F. Supp. 2d at 392.  Each of the separate leasing arrangements rely upon a defined term "Operative Documents," which includes neither the other leasing arrangements nor the Offering Memorandum.  The Agreements are not cross-defaulted, nor are they cross-collateralized.  In short, the leasing arrangements are distinct and separate arrangements with different parties.

13.     Additionally, the Offering Memorandum was only a "proposed" structure that was subject to change and negotiation.  Notably, the Objection characterizes the Offering Memorandum simply as "marketing materials" (Objection p. 2.) sent by BAS to potential investors; it was never contemplated as providing the final terms governing the leasing arrangements.  See In re Adelphia, 322 B.R. at 59 (stating that the predominant weight is to be given to the intent of the parties at execution of the contract and holding that a previous

7

expressed intent to integrate contracts did not weigh in favor of finding integration when the contracts were separate at execution). But most important, to the extent it is relevant here at all, the Offering Memorandum is fatally inconsistent with the position taken by Well Fargo because it clearly and unambiguously warns the potential investors repeatedly that the leasing arrangements are separate and not one unified investment.

### The Offering Memorandum is Inconsistent with Wells Fargo's Position

14. While Wells Fargo points out several instances where the preliminary aggregation of investors is referred to as a single "transaction," the Offering Memorandum succinctly states in its overview that the underlying transactions are separate: "The **transactions** are leveraged sale**s** and leaseback**s**." (Offering Memorandum at p. 6, emphasis added.) Thus, "[e]ach Lessor will enter into **separate** Transaction Documents . . . None of the Indenture, nor the Leases or the other related Transaction Documents entered into by one Lessor will contain a cross-collateralization or cross-default to the Indenture, Leases or related Transaction Documents entered into by another Lessor." (Offering Memorandum at p. 25, emphasis added.) In other words, potential investors were told in no uncertain terms that a breach of one lease Agreement would **not** give rise to rights or remedies under the other. The lack of cross-collateralization and cross-default provisions is summarized again in the context of the initial overview of the transactions: **"Each Issuer** will secure the series of Equipment Notes it issues with a pledge of its ownership interests in the Equipment. The Equipment Notes issued by **an Issuer** will not be cross-defaulted or cross-collateralized with the Equipment Notes **issued by any other Issuer**." (Offering Memorandum at p. 6, emphasis added.)

15. These warnings regarding the lack of interdependence among the individual lease transactions were more than adequate to alert sophisticated investors such as those represented

by Wells Fargo that the leasing arrangements were in fact intended to be separate and divisible. Coupled with express terms of the Agreements themselves, they unequivocally demonstrate that the argument set forth in the Objection is without merit.

## The Debtors Are Not "Cherry Picking"

16. In support of its position, Wells Fargo cites In re Atlantic Computer Sys., Inc., 173 B.R. 844 (Bankr. S.D.N.Y. 1994). However, not only is Atlantic distinguishable, it actually supports the Debtors' position that the subject leasing arrangements are separate, distinct agreements.

17. In Atlantic, the Court considered a series of six equipment schedules, which were entered into on different dates, and six associated flex leases entered into under a single master leasing agreement. The lessor, after filing bankruptcy, attempted to reject the flex leases, but not the schedules. The Court reasoned that the flex leases were part of the same agreement with the associated equipment schedule and master agreement, but it noted that: "it is clear to the Court that all thirteen of the lease documents -- the Master Lease, the six Equipment Schedules, and the six Flex leases -- **cannot be considered all to comprise one single agreement**. At best, from [lessee's] perspective, there are **six single agreements**, each consisting of the Master Lease and one Equipment Schedule and that Equipment Schedule's correspondingly numbered Flex lease." In re Atlantic Computer, 173 B.R. at 849 (emphasis added). Thus, the debtors could have rejected any one of the six without impacting the others, notwithstanding their common reference to the Master Lease. Here, in contrast, there is no master leasing agreement. Rather, there are eight different sets of lease documents, and no overarching umbrella agreement. Thus, Atlantic supports the proposition that the eight separate lease agreements here and associated agreements must be viewed as eight separate arrangements.

9

**Conclusion**

18.     The facts and the law support only one conclusion—all of the 2001 lease arrangements are separate, distinct, independent agreements.

          Respectfully submitted,

          HONIGMAN MILLER SCHWARTZ AND COHN LLP
          Special Counsel to the Debtors and Debtors in Possession

Dated: July 31, 2009        By: /s/ Donald F. Baty, Jr.
            Robert B. Weiss (P28249)
            Donald F. Baty, Jr. (P38087)
         2290 First National Building
         660 Woodward Avenue
         Detroit, MI  48226
         Telephone:  (313) 465-7314
         Facsimile:  (313) 465-7315
         Email:  dbaty@honigman.com