HEARING DATE AND TIME: August 3, 2009 at 9:00 a.m. (Eastern Time)
OBJECTION DEADLINE: July 28, 2009 at 4:00 p.m. (Eastern Time)

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                              :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.,* | : | **09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x

**REPLY OF DEBTORS TO OBJECTION**
**BY KARMANN U.S.A., INC. TO SECOND**
**NOTICE OF (I) DEBTORS' INTENT TO ASSUME**
**AND ASSIGN CERTAIN EXECUTORY CONTRACTS,**
**UNEXPIRED LEASES OF PERSONAL PROPERTY**
**AND UNEXPIRED LEASES OF NONRESIDENTIAL**
**REAL PROPERTY AND (II) CURE COSTS  RELATED THERETO**

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation ("**GM**")) and its

affiliated debtors, as debtors in possession in the above-captioned chapter 11 cases (collectively,

the "**Debtors**"), respectfully represent:

ERROR! NO PROPERTY NAME SUPPLIED.

## Background

1.      On July 1, 2009, the Debtors filed a motion (the "**Sale Motion**"),

requesting, *inter alia*, an order (the "**Sale Order**"), pursuant to 11 U.S.C. §§ 105, 363(b), (f), and

(m), and 365, authorizing and approving (i) the sale of substantially all of the Debtors' assets

pursuant to a proposed Master Sale and Purchase Agreement and related agreements (the

"**MPA**") among the Debtors and Vehicle Acquisition Holdings LLC ( "**New GM**"), a purchaser

sponsored by the United States Department of the Treasury (the "**U.S. Treasury**"), free and clear

of liens, claims, encumbrances, and other interests, including any successor liabilities (the "**363**

**Transaction**"), (ii) the assumption and assignment of certain executory contracts and unexpired

leases of personal property and of nonresidential real property, and (iii) the approval of the UAW

Retiree Settlement Agreement, subject to higher or better offers.

2.      On July 5, 2009, the Court approved the 363 Transaction, and on July 10,

2009, the 363 Transaction closed.  Accordingly, the Debtors no longer operate as manufacturers

of Motor Vehicles.

3.      Pursuant to the Sale Order, a hearing to consider limited contract

objections related to the assumption and assignment of executory contracts has been scheduled

for August 3, 2009.

## Karmann's Assumption Objection

4.      On July 1, 2009, Karmann U.S.A., Inc. ("**Karmann**") filed an objection

(the "**Assumption Objection**") to the Notice of the Debtors' Intent to Assume and Assign

Certain Executory Contracts, Unexpired Leases of Personal Property, and Unexpired Leases of

Nonresidential Real Property and (ii) Cure Amounts Related Thereto pursuant to the 363

Transaction (the "**Notice**").   The Notice seeks to assume and assign two types of executory

ERROR! NO PROPERTY NAME SUPPLIED.

contracts between the Debtors and Karmann.  The contracts include purchase orders for tooling (the "**Tooling Contracts**") and purchase orders for service parts (the "**Service Contracts**").  In addition to the Tooling Contracts and Service Contracts, the Debtors and Karmann are also party to a third type of contract that provides for the manufacturing of parts for the assembly of convertible tops for Pontiac brand vehicles under the GMX381 Program  (the "**Production Contracts**").  Pursuant to the Debtors' Fourth Omnibus Motion to Reject Certain Executory Contracts (the "**Motion to Reject**")[1] [Docket No. 3107], the Debtors have sought to reject the Production Contracts.

5.      The Assumption Objection sets forth two arguments.  Karmann argues, as it did in its objection to the Motion to Reject, that the Service Contracts and Production Contracts form a single, integrated agreement and therefore these contracts must be assumed or rejected together.  Second, Karmann argues that the Tooling Contracts are not executory and thus cannot be assumed and assigned.

### The Production Contracts and Service Contracts Are Not Integrated

6.      As also set forth in the Debtors' Reply to the Objection by Karmann U.S.A., Inc. to the Debtors' Fourth Omnibus Motion to Reject Certain Executory Contracts (the "**Rejection Reply**"), filed contemporaneously herewith, the Production Contracts and Service Contracts are not integrated agreements.  The Debtors hereby incorporate by reference the arguments presented in the Rejection Reply.

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

ERROR! NO PROPERTY NAME SUPPLIED.

### The Tooling Contracts are Executory Contracts

7.       The Tooling Contracts are executory contracts and may be assumed and assigned to New GM pursuant to section 365 of the Bankruptcy Code.  Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a). The term "executory contract" is not defined in the Bankruptcy Code, but generally courts have adopted the "Countryman Definition" which finds that a contract is executory if there are *material* unperformed obligations on both sides, such that default by one party excuses performance by the other.  Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 MINN. L. REV. 439 (1973);  *See Also Regen Capital I, Inc. v. Halperin (In re U. S. Wireless Data, Inc.)*, 547 F.3d 484, 488 (2d Cir. N.Y. 2008).

8.       Karmann's Assumption Objection asserts that the Tooling Contracts are not executory contracts because Karmann has completed its performance and has no outstanding obligations to perform thereunder.  Karmann, however, provides no factual basis for this assertion.  In fact, upon review of the outstanding Tooling Contracts, attached hereto as Exhibit A, the terms of the various contracts and the period during which the Debtors or New GM can request performance have not yet expired.[2]  As a result, there is a remaining obligation for Karmann to perform under the outstanding Tooling Contracts upon receipt of orders from the Debtors until expiration of such contracts.  Therefore, the outstanding Tooling Contracts continue as executory contracts that may be assumed and assigned to New GM.

---

[2] The duration of the Tooling Contracts vary.

ERROR! NO PROPERTY NAME SUPPLIED.

## Karmann's Failure to Perform Under the
## Service Contract is in Violation of the Automatic Stay

9.      It should also be noted that Karmann is currently in breach of its

performance obligations as it has refused to ship parts pursuant to its obligations under the

Service Contracts pending the outcome of this hearing.  Under section 362(a) of the Bankruptcy

Code, the commencement of the Debtors' chapter 11 cases operates as a stay from, among other

things, "any act to obtain possession of property of the estate or of property from the estate or to

exercise control of property of the estate."  11 U.S.C. § 362(a).  Section 541 of the Bankruptcy

Code makes clear that property of the estate includes the Debtors' rights under their various

executory contracts with non-debtor counterparties, such as Karmann.  *See* 11 U.S.C. § 541.

10.     Accordingly, section 362(a) of the Bankruptcy Code unequivocally

prohibits the unilateral termination or modification of the Service Contracts, Tooling Contracts,

or Production Contracts by Karmann.  *See, e.g.*, *Computer Commc'ns, Inc. v. Codex Corp. (In re

Computer Commc'ns, Inc.)*, 824 F.2d 725, 730-31 (9th Cir. 1987) (holding that termination of an

executory contract violates the automatic stay); *In re Wegner Farms Co.*, 49 B.R. 440, 444-45

(Bankr. N.D. Iowa 1985) (holding that termination of a prepetition executory contract

postpetition violates the automatic stay); *In re Bd. of Dirs. of Compañía General De

Combustibles, S.A.*, 269 B.R. 104, 113 (Bankr. S.D.N.Y. 2001) (noting generally that an

executory contract may not be terminated without seeking relief from the automatic stay); *In re

Redpath Computer Servs., Inc.*, 181 B.R. 975, 981 (Bankr. D. Ariz. 1995) (finding that non-

debtor party violated the automatic stay by attempting to terminate, based on agreement terms,

an executory contract postpetition); *In re Tudor Motor Lodge Assocs., Ltd. P'ship*, 102 B.R. 936,

5

951 (Bankr. D.N.J. 1989) (finding that postpetition efforts to terminate executory contract that had not been properly terminated prepetition were subject to the automatic stay).

11.     Moreover, under the Bankruptcy Code and applicable case law, Karmann must continue to perform postpetition on the terms and conditions of its prepetition contracts with the Debtors.  *See, e.g.*, *United States Postal Serv. v. Dewey Freight Sys., Inc.*, 31 F.3d 620, 624 (8th Cir. 1994) ("After a debtor commences a Chapter 11 proceeding, but before executory contracts are assumed or rejected under § 365(a), those contracts remain in existence, enforceable by the debtor but not against the debtor." (citing *NLRB v.* Bildisco *& Bildisco*, 465 U.S. 513, 532 (1984))); *In re Nat'l Steel Corp.*, 316 B.R. 287, 305 (Bankr. N.D. Ill. 2004) ("The non-debtor party must continue to perform under the cont[r]act prior to assumption or rejection . . . ."); *McLean Indus., Inc. v. Med. Lab. Automation, Inc. (In re McLean Indus., Inc.)*, 96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989) ("A debtor-in-possession's ability to continue to perform and to compel performance with respect to assumable executory contracts is usually the life blood of its reorganization." (quoting Honorable Howard C. Buschman III, *Benefits and Burdens:  Post-Petition Performance of Unassumed Contracts*, 5 Bankr. Dev. J. 341, 346 (1988))); *see also In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004) (explaining that critical vendors must continue to do business with the debtor because they "have long term contracts, and the automatic stay prevents these vendors from walking away.").

12.     Therefore, any refusal by Karmann to continue performing under the Service Contracts or Tooling Contracts, including its failure to ship parts as required under those contracts, is tantamount to unilateral termination and constitutes a knowing violation of the automatic stay. Section 362(k) of the Bankruptcy Code provides that parties that knowingly violate the automatic stay may be subject to civil contempt for defying a federal court injunction

ERROR! NO PROPERTY NAME SUPPLIED.

and may be liable for compensatory damages, including, among other things, attorneys' fees, court costs, and punitive damages. *See, e.g.*, *Cuffee v. Atlantic Bus. and Comty Dev. Corp. (In re Atlantic Bus. and Comty. Dev. Corp.)*, 901 F.2d 325, 329 (3d Cir. 1990); *Budget Serv. Co. v. Better Homes of Va.*, 804 F.2d 289 (4th Cir. 1986); *In re Carter*, 691 F.2d 390 (8th Cir. 1982); *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976), *cert. denied*, 429 U.S. 1093 (1977). As part of any resolution of the Assumption Objection, Karmann should be directed to immediately resume performance under the Tooling and Service Contracts.

13.    Significantly, due to Karmann's Assumption Objection, the Debtors have been unable to expeditiously assume and assign the Tooling Contracts and Service Contracts. Until the Debtors assume and assign the Tooling Contracts and Service Contracts to New GM, the Debtors' estates stand the risk of incurring administrative expense claims relating to those contracts. In the context of overruling the Assumption Objection for the reasons set forth above, this Court should direct that Karmann comply with the terms of the Tooling Contracts and Service Contracts, and the Debtors should be permitted to assume and assign such contracts to New GM.

<u>**Notice**</u>

Notice of this Reply has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the United States Department of the Treasury, (iii) the attorneys for Export Development Canada, (iv) the attorneys for the statutory committee of unsecured creditors appointed in these chapter 11 cases, (v) the attorneys for the ad hoc bondholders committee, (vi) the U.S. Attorney's Office, S.D.N.Y., (vii) the attorneys for Karmann, and (viii) all entities that requested notice in these

ERROR! NO PROPERTY NAME SUPPLIED.

chapter 11 cases under Fed. R. Bankr. P. 2002.  The Debtors submit that, in view of the facts and

circumstances, such notice is sufficient and no other or further notice need be provided.

WHEREFORE, the Debtors respectfully request that the Court enter an order

granting the relief requested herein and in the Motion, directing Karmann to perform its

obligations under the Tooling Contracts and Service Contracts, and providing such other and

further relief as is just and proper.

Dated:  New York, New York
        July 31, 2009

                                        /s/ Joseph H. Smolinsky
                                        Harvey R. Miller
                                        Stephen Karotkin
                                        Joseph H. Smolinsky

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Debtors
                                        and Debtors in Possession

ERROR! NO PROPERTY NAME SUPPLIED.

**<u>Exhibit A</u>**

Contract Header Page:       1  of  1

# CONTRACT HEADER



### *General Motors Corporation*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**       00150781099
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Mailing Address Information:**
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

| Contract Header Number: | 1F5T0 |
|---|---|

This contract sets forth the exclusive terms and conditions under which seller shall sell and buyer shall purchase the goods or services described in the line item detail of this contract for the period(s) specified therein. Terms and conditions proposed by seller which are different from or in addition to the provisions of this contract are unacceptable to buyer, are expressly rejected by buyer, and shall not become a part of this contract. Any modification of this contract shall be made only in accordance with the provisions of paragraph 31 of the contract terms and conditions.

Contract Line Item Page:            1  of  2                                    Issue Date:    11-Aug-2006

**Standard Spot Buy Contract Number:**        1F5T0070        **Amendment Number:**    000
                                                              **Part Number:**        000000015928802



# LINE ITEM DETAIL for TOOLING CONTRACT

### *General Motors Corporation*

| This Line Item is effective from | **11-Aug-2006** | through | **11-Aug-2009** |
|---|---|---|---|

**Part Description:**        TOP ASM-FLDG
**Amendment Reason:**        Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Buyer Name:**
Rice, Camilla
Buyer Code:        L30

**Tooling Capacity:**            214
**Tooling Capacity Hours:**        20
**Tooling Sample Date:**        15-Jan-006
**Hazardous Material Indicator:**    N

**Line Item Notes:**
================================================================
Purchase order issued to cover the cost of special permanent tools, dies,
patterns,
 and/or molds necessary to produce part number, part description, as
follows:

EWO #: 615076-CKGLM
EWO Description:
CONTRACT CHANGE TO IMPROVE THE WATER MANAGEMENT
BETWEEN THE RHT AND BODY AND TO ELIMINATE LEAKS INTO THE TRUNK COMPARTMENT.
 ZERO PIECE IMPACT WITH $17,805 TOOLING IMPACT CONSISTING
OF A MOLD INSERT NYLON (2 CAVITY) FOR $17,805.00.
Affected P/N(s): 15928802
Model Year: 2006
Program: X381
Capacity (pcs/hr): 214/20
Price Type:Returnable
PPAP Date: 1/15/2006
Supplier Contact:TIM TUCKER
Supplier Quote Dated:8/3/2006
Physical Location of Tooling (city & state):   KARMANN USA INC
Total Tooling Cost/Currency: $17,805.00.USD

| Contract Line Item Page: | 2 of 2 | Issue Date: | 11-Aug-2006 |
|---|---|---|---|

**Standard Spot Buy Contract Number:** 1F5T0070    **Amendment Number:** 000
**Part Number:** 000000015928802

Supplier is Required to Mark all General Motors Tools with the GM
Identification Tags.

Vaughen Vishwanathan for Camilla A. Rice
08/11/2006
==================================================================

**Terms and Conditions:**
**********

| **Freight Terms:** | Collect |
|---|---|
| **Payment Terms:** | (88) MNS-2, On average, payment shall be made on the second day of the second month following Buyers receipt date of goods or services. |
| **Delivery Terms:** | Free on Board (FOB) |
| **Delivery DUNS:** | 00150781099 |
| **Ship From DUNS:** | 00150781099 |
| **Price Type** | Returnable |

**Price Composition:**
**The Total Price is composed of Base Price plus any applicable taxes.**

All Prices are expressed in   *USD*

**Quantity:**                                                    1
**Base Price:**                                          17,805.000000

| **Total Price:** | | 17,805.000000 |
|---|---|---|
| **UOM:** | LOT | |

**Terms & Conditions:**
**********

Contract Attachment Page:    1  of  6

# CONTRACT ATTACHMENT



## *General Motors Corporation*

**Contract Header Number:**    1F5T0

The attachments in this section apply to the standard terms and conditions
associated with the GM legal business entity and the terms and conditions
associated with the line item details for contract number.

## Contract Terms & Conditions:
### Short Description
### Detailed Description

**Invoices - GM Corporation**

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS. Invoices for production part shipments are not required for payment processing.
INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS. Invoices for CONTRACTS FOR SERVICES must reference the contract
number and be accompanied by a copy of the contract. INVOICES FOR TOOLING must include a detailed description of the production tooling
involved and may only be submitted after full production sample approval has been given. A copy of the tooling contract must be attached to
the invoice as well as a copy of the approved sample part inspection report. To ensure proper payment processing, your invoice for contracts
for tooling and services must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

**Language --English**

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native
language.  When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed.
Examples of documents which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier
Warrants, Shipping Labels, Capability Studies and Data.

**Right to Audit**

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts,
correspondence and other documents for the purpose of auditing seller's charges under this contract.  Seller will preserve these documents
for a period of 1 year after the final payment under this contract.  In addition, all work, materials, inventories and other items provided
under this contract must be accessible to Buyer, including, but not limited to, parts, tools, fixtures, gages and models.  Seller will
segregated its records and otherwise cooperate with Buyer so as to facilitate the audit.

**GM Right To Material Resale**

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained
through the Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material
Resale Programs, including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of
Seller's obligations under this contract

**Insurance-US Coverage**

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as
follows:  (a)  Workers' Compensation:  statutory limits for the state(s) in which this contract is to be performed (or evidence of authority
to self insure)  (b)  Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily
injury by disease  (c)  Commercial General Liability covering liability arising from premises, operations, independent contractors,
products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each
occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

Contract Attachment Page:    2  of  6

**Special Term (US) - Government**

Special Term  (US) - Government Contracts

Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, 41 CFR 60-741.5, 41 CFR 60-250.5) (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and 52.219-9)  (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned business concerns (Executive Order 12138).

**Special Term (Us)-C-Tpat**

Special Term (U.S) - C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ('C-TPAT') initiative (for information go to http://www.cbp.gov/ and find the link to the C-TPAT section).  At Buyer's or the Bureau of Customs and Border Protection's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**Supplier Quality & Development**

Special Term - Supplier Quality and Development Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

**Terms & Conditions Global 1**

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1. ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2. SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination  (b) to route shipments in accordance with Buyer's instructions  (c) to make no charge for handling, packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract  (d) to provide with each shipment packing slips with Buyer's contract and/or release number and date of shipment marked thereon  (e) to properly mark each package with a label/tag according to Buyer's instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyer's instructions.  Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyer's instructions and the carrier's requirements.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased.  Seller further agrees:  (a) to accept payment based upon Buyer's Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer. The payment date is set forth in the Line Item Detail of this contract, or if not stated, shall be the date established by Buyer's Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyer's North American facilities, Seller's shipment date of goods or date of services, and, for all of Buyer's other locations, Buyer's receipt date of the goods or date of services.  Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3. DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyer's schedules.  Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyer's schedules.  Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4. PREMIUM SHIPMENTS:
If Seller's acts or omissions result in Seller's failure to meet Buyer's delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously

as possible at Seller's sole expense.

5.  CHANGES:

Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.  Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct.  Any changes to this contract shall be made in accordance with Paragraph 31.

6.  SUPPLIER QUALITY AND DEVELOPMENT  INSPECTION:

Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000.  In addition, Buyer shall have the right to enter Seller's facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract.  Buyer's inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

7.  NONCONFORMING GOODS:

Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections.  To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically  be reduced unless Buyer otherwise notifies Seller.  Seller will not replace quantities so reduced without a new contract or schedule from Buyer.  Nonconforming goods will be held by Buyer in accordance with Seller's instructions at Seller's risk.  Seller's failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyer's option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller.  Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyer's right to assert any legal or equitable remedy, or relieve Seller's responsibility for latent defects.

8.  FORCE MAJEURE:

Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order  provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter).  During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract.  In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Seller's labor contract(s).  If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days.  If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

9.  WARRANTY:

Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect.  In addition, Seller acknowledges that Seller knows of Buyer's intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

10. INGREDIENTS DISCLOSURE  SPECIAL WARNINGS AND INSTRUCTIONS:

If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct:  (a) a list of all ingredients in the goods  (b) the amount of all ingredients  and (c) information concerning any changes in or additions to such ingredients.  Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

11. INSOLVENCY:

Buyer may immediately terminate this contract without liability to Seller in any  of the following or any other comparable events:  (a) insolvency of Seller (b) filing of a voluntary petition in bankruptcy by Seller  (c) filing of any involuntary petition in bankruptcy against Seller  (d) appointment of a receiver or trustee for Seller  or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event.  Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorney's or other professional fees.

12. TERMINATION FOR BREACH OR NONPERFORMANCE  SALE OF ASSETS  OR CHANGE IN CONTROL:

Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller:  (a) repudiates or breaches any of the terms of this contract, including Seller's warranties  (b) fails to perform services or deliver goods as specified by Buyer  (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods  and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice

from Buyer specifying such failure or breach.  In addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock that effects a change in the control of Seller.

13.  TERMINATION FOR CONVENIENCE:

In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller.  Upon such termination, Buyer shall pay to Seller the following amounts without duplication:  (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for  and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract  less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material.  Buyer will make no payments for finished goods, services, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable.  Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods or services that would be produced or performed by Seller under delivery  or release schedules outstanding at the date of termination.  Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract.  Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:

Seller agrees:  (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services  Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification  (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller  (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization  and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:

Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:

If Seller performs any work on Buyer's premises or utilizes the property of Buyer, whether on or off Buyer's premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Seller's performance of work or use of Buyer's property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:

Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyer's written request.  The certificate will provide that Buyer will receive 30 days' prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Seller's furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLER'S PROPERTY:

Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Seller's Property') necessary for the production of the goods.  The cost of changes to Seller's Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer.  Seller shall insure Seller's Property with full fire and extended coverage insurance for its replacement value.  Seller grants Buyer an irrevocable option to take possession of and title to Seller's Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items provided, however, that this option shall not apply if Seller's Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYER'S PROPERTY:

All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis ("Buyer's Property").  Seller shall bear the risk of loss of and damage to Buyer's Property.  Buyer's Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose

other than the performance of this contract  shall be deemed to be personalty  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person  and shall not be moved from Seller's premises without Buyer's prior written approval.  Buyer shall have the right to enter Seller's premises at all  reasonable times to inspect such property and Seller's records with respect thereto.  Upon the request of Buyer, Buyer's Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Seller's plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyer's Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:
Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs.  During the 15 year period after Buyer completes current model purchases, Seller will sell goods to fulfill Buyer's past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties. When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyer's service part sales activities.

21.  REMEDIES:
The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods  (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

22.  CUSTOMS  EXPORT CONTROLS:
Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer.  Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any.  Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s).  Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

23.  SETOFF/RECOUPMENT:
In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries  and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

24.  NO ADVERTISING:
Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials.

25.  COMPLIANCE WITH LAWS  EMPLOYMENT/BUSINESS PRACTICES:
Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract.  At Buyer's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

26.  NO IMPLIED WAIVER:
The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

27.  NON-ASSIGNMENT:
Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations  under this contract without Buyer's prior written consent.

28.  RELATIONSHIP OF PARTIES:
Seller and Buyer are independent contracting parties and nothing in this contract shall make either party  the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

Contract Attachment Page:    6   of   6

29.  GOVERNING LAW  JURISDICTION:

This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law.  Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures.  Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

30.  SEVERABILITY:

If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

31.  ENTIRE AGREEMENT:

This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements.  This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated with tool construction.  Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any claim of Seller for tooling.

Contract Header Page:       1  of  1

# CONTRACT HEADER



### *General Motors Corporation*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**        00150781099
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Mailing Address Information:**
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

| **Contract Header Number:** | 1F5T0 |
|---|---|

This contract sets forth the exclusive terms and conditions under which
seller shall sell and buyer shall purchase the goods or services described
in the line item detail of this contract for the period(s) specified
therein. Terms and conditions proposed by seller which are different from
or in addition to the provisions of this contract are unacceptable to
buyer, are expressly rejected by buyer, and shall not become a part of this
contract. Any modification of this contract shall be made only in
accordance with the provisions of paragraph 31 of the contract terms and
conditions.

Contract Line Item Page:        1  of  2

Issue Date:    16-Aug-2006

**Standard Spot Buy Contract Number:**        1F5T0073

**Amendment Number:**    000
**Part Number:**    000000015942126



# LINE ITEM DETAIL for TOOLING CONTRACT

### *General Motors Corporation*

| This Line Item is effective from | **11-Aug-2006** | through | **11-Aug-2009** |
|---|---|---|---|

**Part Description:**    MODULE ASM-RF RETRACTABLE CONT
**Amendment Reason:**    Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Buyer Name:**
Rice, Camilla
Buyer Code:        L30

**Tooling Capacity:**            214
**Tooling Capacity Hours:**        16
**Tooling Sample Date:**        03-Aug-006
**Hazardous Material Indicator:**    N

**Line Item Notes:**
===============================================================
Purchase order issued to cover the cost of special permanent tools, dies,
patterns,
and/or molds necessary to produce part number, part description, as
follows:

EWO #: 620340-CKDRA
EWO Description: CONTRACT CHANGE TO APPROVE A FIXTURE TO ENSURE
THE 4-BAR BUMPERS ARE PRE-ADJUSTED TO CONSTRAIN THE RHT ASSY
WHEN IN THE DOWN POSITION.  ZERO PIECE WITH $23,625.00
New P/N : 15942126
Model Year: 2007
Program:X381
Capacity (pcs/hr): 214/16
Price Type:Returnable
PPAP Date: 8/3/2006
Supplier Contact:TIM TUCKER
Supplier Memo  Dated:7/24/2006
Physical Location of Tooling (city & state):  KARMANN USA INC
Detailed Tooling Breakdown:
-----------------------------------------------------------------------
Tool Cost----------------------------Tool Description

Contract Line Item Page:         2  of  2                                          Issue Date:    16-Aug-2006

**Standard Spot Buy Contract Number:**      1F5T0073      **Amendment Number:**    000
                                                          **Part Number:**        000000015942126

--------------------------------------------------------------
$13,592.25 ------------------------ (A) 7754 DRIVE GUN SYSTEM, NEW SYTEM
$7,670.25 -------------------------(B) 7754 SENSOR SYSTEM, NEW UNIT
$2,362.50--------------------------(C) 7754 ASM MACHINE, MODIFICATIONS
--------------------------------------------------------------
$ 23,625.00---------------------Total Cost
--------------------------------------------------------------
Total Tooling Cost/Currency: $ 23,625.00  USD
Supplier is Required to Mark all General Motors Tools with the GM
Identification Tags.

Requested by Camilla A. Rice
Processed by Joanna Sudha
8/11/2006
==============================================================

**Terms and Conditions:**
**********

**Freight Terms:**          Collect
**Payment Terms:**          (88) MNS-2, On average, payment shall be made on
                            the second day of the second month following
                            Buyers receipt date of goods or services.
**Delivery Terms:**         Free Carrier (FCA)
**Delivery DUNS:**          00150781099
**Ship From DUNS:**         00150781099
**Price Type**              Returnable

**Price Composition:**

**The Total Price is composed of Base Price plus any applicable taxes.**

All Prices are expressed in          *USD*

**Quantity:**                                                                    1
**Base Price:**                                                          23,625.000000

| | |
|---|---|
| **Total Price:** | 23,625.000000 |
| **UOM:**        LOT | |

**Terms & Conditions:**
**********

Contract Attachment Page:    1  of  6

# CONTRACT ATTACHMENT



### *General Motors Corporation*

**Contract Header Number:**    1F5T0

The attachments in this section apply to the standard terms and conditions associated with the GM legal business entity and the terms and conditions associated with the line item details for contract number.

## Contract Terms & Conditions:
### Short Description

### Detailed Description

**Invoices - GM Corporation**

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS. Invoices for production part shipments are not required for payment processing. INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS. Invoices for CONTRACTS FOR SERVICES must reference the contract number and be accompanied by a copy of the contract. INVOICES FOR TOOLING must include a detailed description of the production tooling involved and may only be submitted after full production sample approval has been given. A copy of the tooling contract must be attached to the invoice as well as a copy of the approved sample part inspection report. To ensure proper payment processing, your invoice for contracts for tooling and services must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

**Language –English**

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native language.  When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed. Examples of documents which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier Warrants, Shipping Labels, Capability Studies and Data.

**Right to Audit**

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other documents for the purpose of auditing Seller's charges under this contract.  Seller will preserve these documents for a period of 1 year after the final payment under this contract.  In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer, including, but not limited to, parts, tools, fixtures, gages and models.  Seller will segregated its records and otherwise cooperate with Buyer so as to facilitate the audit.

**GM Right To Material Resale**

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained through the Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material Resale Programs, including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of Seller's obligations under this contract

**Insurance-US Coverage**

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as follows:  (a)  Workers' Compensation:  statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure)  (b)  Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease  (c)  Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

Contract Attachment Page:    2  of  6

**Special Term (US) - Government**

Special Term (US) - Government Contracts

Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all
federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without
limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as
amended, 41 CFR 60-741.5, 41 CFR 60-250.5)  (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and
52.219-9)  (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned
business concerns (Executive Order 12138).

**Special Term (Us)-C-Tpat**

Special Term (U.S) - C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the
United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ('C-TPAT') initiative (for information
go to http://www.cbp.gov/ and find the link to the C-TPAT section).  At Buyer's or the Bureau of Customs and Border Protection's request,
Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any
liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's
noncompliance.

**Supplier Quality & Development**

Special Term - Supplier Quality and Development  Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and
development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

**Terms & Conditions Global 1**

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph
25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1.  ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this
contract shall constitute Seller's acceptance of these terms and conditions only.

2.  SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if
applicable, the country of destination  (b) to route shipments in accordance with Buyer's instructions  (c) to make no charge for handling,
packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract  (d) to provide with each shipment
packing slips with Buyer's contract and/or release number and date of shipment marked thereon  (e) to properly mark each package with a
label/tag according to Buyer's instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment
in accordance with Buyer's instructions.  Seller will include on bills of lading or other shipping receipts correct classification
identification of the goods shipped in accordance with Buyer's instructions and the carrier's requirements.  The marks on each package and
identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily
identify the goods purchased.  Seller further agrees:  (a) to accept payment based upon Buyer's Evaluated Receipt Record/Self Billed
Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer. The payment date is set forth in
the Line Item Detail of this contract, or if not stated, shall  be the date established by Buyer's Multilateral Netting System (MNS-2), which
provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyer's North American
facilities, Seller's shipment date of goods or date of services, and, for all of Buyer's other locations, Buyer's receipt date of the goods
or date of services.  Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of
any liens, encumbrances and claims on the goods or services under this contract.

3.  DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyer's schedules.  Buyer shall not be
required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyer's schedules.  Buyer may
change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a
modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified,
Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4.  PREMIUM SHIPMENTS:
If Seller's acts or omissions result in Seller's failure to meet Buyer's delivery requirements and Buyer requires a more expeditious method
of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously

Contract Attachment Page:    3  of  6

as possible at Seller's sole expense.

5.  CHANGES:

Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.  Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct.  Any changes to this contract shall be made in accordance with Paragraph 31.

6.  SUPPLIER QUALITY AND DEVELOPMENT  INSPECTION:

Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000.  In addition, Buyer shall have the right to enter Seller's facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract.  Buyer's inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

7.  NONCONFORMING GOODS:

Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections.  To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically  be reduced unless Buyer otherwise notifies Seller.  Seller will not replace quantities so reduced without a new contract or schedule from Buyer. Nonconforming goods will be held by Buyer in accordance with Seller's instructions at Seller's risk.  Seller's failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyer's option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller. Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyer's right to assert any legal or equitable remedy, or relieve Seller's responsibility for latent defects.

8.  FORCE MAJEURE:

Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order  provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter).  During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract.  In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Seller's labor contract(s).  If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days.  If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

9.  WARRANTY:

Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect.  In addition, Seller acknowledges that Seller knows of Buyer's intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

10.  INGREDIENTS DISCLOSURE  SPECIAL WARNINGS AND INSTRUCTIONS:

If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct: (a) a list of all ingredients in the goods  (b) the amount of all ingredients  and (c) information concerning any changes in or additions to such ingredients.  Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

11.  INSOLVENCY:

Buyer may immediately terminate this contract without liability to Seller in any  of the following or any other comparable events:  (a) insolvency of Seller  (b) filing of a voluntary petition in bankruptcy by Seller  (c) filing of any involuntary petition in bankruptcy against Seller  (d) appointment of a receiver or trustee for Seller  or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event.  Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorney's or other professional fees.

12. TERMINATION FOR BREACH OR NONPERFORMANCE  SALE OF ASSETS  OR CHANGE IN CONTROL:

Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller:  (a) repudiates or breaches any of the terms of this contract, including Seller's warranties  (b) fails to perform services or deliver goods as specified by Buyer  (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods  and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice

from Buyer specifying such failure or breach.  In addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock that effects a change in the control of Seller.

13.  TERMINATION FOR CONVENIENCE:

In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller.  Upon such termination, Buyer shall pay to Seller the following amounts without duplication:  (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for  and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract  less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material.  Buyer will make no payments for finished goods, services, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable.  Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods or services that would be produced or performed by Seller under delivery  or release schedules outstanding at the date of termination. Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract.  Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:

Seller agrees:   (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services  Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification  (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller  (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization  and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:

Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:

If Seller performs any work on Buyer's premises or utilizes the property of Buyer, whether on or off Buyer's premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Seller's performance of work or use of Buyer's property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:

Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyer's written request.  The certificate will provide that Buyer will receive 30 days' prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Seller's furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLER'S PROPERTY:

Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Seller's Property') necessary for the production of the goods. The cost of changes to Seller's Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer.  Seller shall insure Seller's Property with full fire and extended coverage insurance for its replacement value. Seller grants Buyer an irrevocable option to take possession of and title to Seller's Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items provided, however, that this option shall not apply if Seller's Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYER'S PROPERTY:

All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis ("Buyer's Property").  Seller shall bear the risk of loss of and damage to Buyer's Property. Buyer's Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose

other than the performance of this contract  shall be deemed to be personalty  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person  and shall not be moved from Seller's premises without Buyer's prior written approval.  Buyer shall have the right to enter Seller's premises at all  reasonable times to inspect such property and Seller's records with respect thereto.  Upon the request of Buyer, Buyer's Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Seller's plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyer's Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:
Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs.  During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyer's past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties.  When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyer's service part sales activities.

21.  REMEDIES:
The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods  (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

22.  CUSTOMS  EXPORT CONTROLS:
Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer.  Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any.  Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s).  Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

23.  SETOFF/RECOUPMENT:
In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries  and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

24.  NO ADVERTISING:
Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials.

25.  COMPLIANCE WITH LAWS  EMPLOYMENT/BUSINESS PRACTICES:
Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract.  At Buyer's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

26.  NO IMPLIED WAIVER:
The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

27.  NON-ASSIGNMENT:
Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations  under this contract without Buyer's prior written consent.

28.  RELATIONSHIP OF PARTIES:
Seller and Buyer are independent contracting parties and nothing in this contract shall make either party  the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

29. GOVERNING LAW JURISDICTION:

This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law.  Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures.  Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

30. SEVERABILITY:

If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

31. ENTIRE AGREEMENT:

This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements.  This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated with tool construction.  Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any claim of Seller for tooling.

Contract Header Page:    1  of  1

# CONTRACT HEADER



### *General Motors Corporation*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**    00150781099
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Mailing Address Information:**
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

| Contract Header Number: | 1F5T0 |
|---|---|

This contract sets forth the exclusive terms and conditions under which seller shall sell and buyer shall purchase the goods or services described in the line item detail of this contract for the period(s) specified therein. Terms and conditions proposed by seller which are different from or in addition to the provisions of this contract are unacceptable to buyer, are expressly rejected by buyer, and shall not become a part of this contract. Any modification of this contract shall be made only in accordance with the provisions of paragraph 31 of the contract terms and conditions.

Contract Line Item Page:                1  of  2                                                      Issue Date:    09-Nov-2006

**Standard Spot Buy Contract Number:**        1F5T0079        **Amendment Number:**        000
                                                              **Part Number:**            000000015942126



# LINE ITEM DETAIL for TOOLING CONTRACT

### *General Motors Corporation*

| This Line Item is effective from | **09-Nov-2006** | through | **09-Nov-2009** |
|---|---|---|---|

**Part Description:**        MODULE ASM-RF RETRACTABLE CONT
**Amendment Reason:**        Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Buyer Name:**
Blanco, Jaime
Buyer Code:        L30

**Hazardous Material Indicator:**        N

**Line Item Notes:**
EWO CMGKG 649042

Prevent customer complications by eliminating below freezing RHT
operation.

GM Program Team requests (CRDN# 315913) to change the temperature threshold
for the folding top to only function above 0 degrees C.  It is currently
set to function to -20 degrees C. (Karmann ECR 7117).

No piece price impact

Tooling: $5,750.00 USD

Eblanco 09/Nov/06

**Terms and Conditions:**
**********

**Freight Terms:**        Collect
**Payment Terms:**        (88) MNS-2, On average, payment shall be made on
                          the second day of the second month following
                          Buyers receipt date of goods or services.
**Delivery Terms:**        Free on Board (FOB)

| Contract Line Item Page: | 2  of  2 | | Issue Date:    09-Nov-2006 |
|---|---|---|---|

**Standard Spot Buy Contract Number:** 1F5T0079    **Amendment Number:** 000
**Part Number:** 000000015942126

**Delivery DUNS:**          00150781099
**Ship From DUNS:**      00150781099
**Price Type**                 Returnable

**Price Composition:**

**The Total Price is composed of Base Price plus any applicable taxes.**

All Prices are expressed in     *USD*

**Quantity:**                                                                                                        1

**Base Price:**                                                                                       5,750.000000

| **Total Price:** | | | 5,750.000000 |
|---|---|---|---|
| **UOM:** | LOT | | |

**Terms & Conditions:**
*********

Contract Attachment Page:    1  of  6

# CONTRACT ATTACHMENT



### *General Motors Corporation*

**Contract Header Number:**    1F5T0

The attachments in this section apply to the standard terms and conditions associated with the GM legal business entity and the terms and conditions associated with the line item details for contract number.

## Contract Terms & Conditions:
### Short Description

### Detailed Description

**Invoices - GM Corporation**

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS.  Invoices for production part shipments are not required for payment processing.

INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS.  Invoices for CONTRACTS FOR SERVICES must reference the contract number and be accompanied by a copy of the contract.  INVOICES FOR TOOLING may be submitted only after full production sample approval has been received and all such invoices must be accompanied by the following: copies of applicable tooling contract(s), copy of approved sample part inspection report(s), and a copy of the 'VTAM FORM1810.csv' which will be generated following Seller's input to the tool management process located in GQTS.

To ensure proper payment processing, your invoice for contracts for tooling and services must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

**Language –English**

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native language.  When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed.  Examples of documents which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier Warrants, Shipping Labels, Capability Studies and Data.

**Right to Audit**

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other documents for the purpose of auditing seller's charges under this contract.  Seller will preserve these documents for a period of 1 year after the final payment under this contract.  In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer, including, but not limited to, parts, tools, fixtures, gages and models.  Seller will segregated its records and otherwise cooperate with Buyer so as to facilitate the audit.

**GM Right To Material Resale**

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained through the Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material Resale Programs, including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of Seller's obligations under this contract

**Insurance–US Coverage**

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as follows:  (a) Workers' Compensation:  statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure)  (b) Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily

Contract Attachment Page:    2  of  6

injury by disease  (c)  Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

**Special Term (US) - Government**

Special Term  (US) - Government Contracts
Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, 41 CFR 60-741.5, 41 CFR 60-250.5)  (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and 52.219-9)  (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned business concerns (Executive Order 12138).

**Special Term (Us)-C-Tpat**

Special Term (U.S) - C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ('C-TPAT') initiative (for information go to http://www.cbp.gov/ and find the link to the C-TPAT section).  At Buyer's or the Bureau of Customs and Border Protection's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**Supplier Quality & Development**

Special Term - Supplier Quality and Development  Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

**Terms & Conditions Global 1**

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1. ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2. SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination  (b) to route shipments in accordance with Buyer's instructions  (c) to make no charge for handling, packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract (d) to provide with each shipment packing slips with Buyer's contract and/or release number and date of shipment marked thereon  (e) to properly mark each package with a label/tag according to Buyer's instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyer's instructions.  Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyer's instructions and the carrier's requirements.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased.  Seller further agrees:  (a) to accept payment based upon Buyer's Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer.  The payment date is set forth in the Line Item Detail of this contract, or if not stated, shall be the date established by Buyer's Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyer's North American facilities, Seller's shipment date of goods or date of services, and, for all of Buyer's other locations, Buyer's receipt date of the goods or date of services.  Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3. DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyer's schedules.  Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyer's delivery schedules.  Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4. PREMIUM SHIPMENTS:

If Seller's acts or omissions result in Seller's failure to meet Buyer's delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Seller's sole expense.

5. CHANGES:

Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.  Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct.  Any changes to this contract shall be made in accordance with Paragraph 31.

6. SUPPLIER QUALITY AND DEVELOPMENT  INSPECTION:

Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000.  In addition, Buyer shall have the right to enter Seller's facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract.  Buyer's inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

7. NONCONFORMING GOODS:

Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections.  To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically  be reduced unless Buyer otherwise notifies Seller.  Seller will not replace quantities so reduced without a new contract or schedule from Seller. Nonconforming goods will be held by Buyer in accordance with Seller's instructions at Seller's risk.  Seller's failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyer's option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller. Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyer's right to assert any legal or equitable remedy, or relieve Seller's responsibility for latent defects.

8. FORCE MAJEURE:

Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order  provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter).  During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract.  In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Seller's labor contract(s).  If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days.  If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

9. WARRANTY:

Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect.  In addition, Seller acknowledges that Seller knows of Buyer's intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

10. INGREDIENTS DISCLOSURE  SPECIAL WARNINGS AND INSTRUCTIONS:

If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct:  (a) a list of all ingredients in the goods  (b) the amount of all ingredients  and (c) information concerning any changes in or additions to such ingredients.  Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

11. INSOLVENCY:

Buyer may immediately terminate this contract without liability to Seller in any  of the following or any other comparable events:  (a) insolvency of Seller (b) filing of a voluntary petition in bankruptcy by Seller  (c) filing of any involuntary petition in bankruptcy against Seller (d) appointment of a receiver or trustee for Seller  or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event.  Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorney's or other professional fees.

12. TERMINATION FOR BREACH OR NONPERFORMANCE  SALE OF ASSETS  OR CHANGE IN CONTROL:

Contract Attachment Page:    4  of  6

Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller:  (a) repudiates or breaches any of the terms of this contract, including Seller's warranties  (b) fails to perform services or deliver goods as specified by Buyer  (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods  and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.  In addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock that effects a change in the control of Seller.

13.  TERMINATION FOR CONVENIENCE:
In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller.  Upon such termination, Buyer shall pay to Seller the following amounts without duplication:  (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for  and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract  less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material.  Buyer will make no payments for finished goods, services, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable.  Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods or services that would be produced or performed by Seller under delivery  or release schedules outstanding at the date of termination.   Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract.  Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:
Seller agrees:  (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services  Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification  (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller  (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization  and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:
Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:
If Seller performs any work on Buyer's premises or utilizes the property of Buyer, whether on or off Buyer's premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Seller's performance of work or use of Buyer's property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:
Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyer's written request.  The certificate will provide that Buyer will receive 30 days' prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Seller's furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLER'S PROPERTY:
Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Seller's Property') necessary for the production of the goods.  The cost of changes to Seller's Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer.  Seller shall insure Seller's Property with full fire and extended coverage insurance for its replacement value.   Seller grants Buyer an irrevocable option to take possession of and title to Seller's Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items provided, however, that this option shall not apply if Seller's Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYER'S PROPERTY:

All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis ("Buyer's Property").  Seller shall bear the risk of loss of and damage to Buyer's Property. Buyer's Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract  shall be deemed to be personally  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person  and shall not be moved from Seller's premises without Buyer's prior written approval.  Buyer shall have the right to enter Seller's premises at all  reasonable times to inspect such property and Seller's records with respect thereto.  Upon the request of Buyer, Buyer's Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Seller's plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyer's Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:

Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs.  During the 15 year period after Buyer completes current model purchases, Seller will sell goods to fulfill Buyer's past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties. When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyer's service part sales activities.

21.  REMEDIES:

The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods  (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

22.  CUSTOMS EXPORT CONTROLS:

Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer.  Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any.  Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s).  Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

23.  SETOFF/RECOUPMENT:

In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries  and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

24.  NO ADVERTISING:

Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials.

25.  COMPLIANCE WITH LAWS  EMPLOYMENT/BUSINESS PRACTICES:

Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract.  At Buyer's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

26.  NO IMPLIED WAIVER:

The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

27.  NON-ASSIGNMENT:

Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations  under this contract without Buyer's prior written consent.

28.  RELATIONSHIP OF PARTIES:

Seller and Buyer are independent contracting parties and nothing in this contract shall make either party  the agent or legal representative
of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or
in the name of the other.

29.  GOVERNING LAW  JURISDICTION:

This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued
as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods
and any conflict of law provisions that would require application of another choice of law.  Any action or proceedings by Buyer against
Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction
over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures.  Any
actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer
from which this contract is issued.

30.  SEVERABILITY:

If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law,
such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute,
regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

31.  ENTIRE AGREEMENT:

This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract,
constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior
oral or written representations and agreements.  This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials
and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated
with tool construction.  Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost.
Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items
relating to any claim of Seller for tooling.

Contract Header Page:        1  of  1

# CONTRACT HEADER



*General Motors Corporation*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**        00150781099
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Mailing Address Information:**
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

| Contract Header Number: | 1F5T0 |
| --- | --- |

This contract sets forth the exclusive terms and conditions under which seller shall
sell and buyer shall purchase the goods or services described in the line item detail
of this contract for the period(s) specified therein. Terms and conditions proposed
by seller which are different from or in addition to the provisions of this contract are
unacceptable to buyer, are expressly rejected by buyer, and shall not become a
part of this contract. Any modification of this contract shall be made only in
accordance with the provisions of paragraph 31 of the contract terms and
conditions.

Contract Line Item Page:                1  of  2                                    Issue Date:  01-Jun-2007
**Standard Spot Buy Contract Number:**  1F5T009G
**Amendment Number:**  000                                **Part Number:**  000000025812336



# LINE ITEM DETAIL for TOOLING CONTRACT

### *General Motors Corporation*

| This Line Item is effective from | **28-May-2007** | through | **28-May-2010** |
|---|---|---|---|

**Part Description:**                                          MODULE ASM-RF RETRACTABLE CONT

**Amendment Reason:**                                      Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Buyer Name:**
Blanco, Jaime
Buyer Code:                          L30

**Tooling Capacity:**                                          214
**Tooling Capacity Hours:**                              16
**Tooling Sample Date:**                                  21-Jan-2006
**Hazardous Material Indicator:**                      N

**Line Item Notes:**
Program: GMX 381
Model Year: 2007 / 2008

Purchase order issued to cover the cost of special permanent tools, dies, patterns,
and/or molds necessary to produce part number, part description, as follows:
Retractable Hard Top

EWO #: BZPHMB / WO 667071
EWO Description:  Equity agreement between GM Engineering and Karmann to pay for 25% of decklid
quality motion features (kneelink dampener)

| Contract Line Item Page: | 2 of 2 | Issue Date:  01-Jun-2007 |
|---|---|---|

**Standard Spot Buy Contract Number:**  1F5T009G

**Amendment Number:**  000                    **Part Number:**  000000025812336

PPAP Date: 01/21/06
Capacity:214/16hrs
Supplier:Karmann
Supplier Contact: Tim Tucker
Supplier Memo Dated: 5/17/07

Total Tooling:  $39,430 USD

Supplier is Required to Mark all General Motors Tools with the GM Identification Tags.

Carolina Castro 3CC, 05/23/07.

**Terms and Conditions:**
**********

| **Freight Terms:** | Collect |
|---|---|
| **Payment Terms:** | (88) MNS-2, On average, payment shall be made on the second day of the second month following Buyers receipt date of goods or services. |

| **Delivery Terms:** | Free Carrier (FCA) |
|---|---|

| **Delivery DUNS:** | 00150781099 |
|---|---|
| **Ship From DUNS:** | 00150781099 |
| **Price Type:** | Returnable |

**Price Composition:**
**The Total Price is composed of Base Price plus any applicable taxes.**

All Prices are expressed in      *USD*
Quantity:                                                                 1
Base Price:                                                    39,430.000000

| **Total Price:** | 39,430.000000 |
|---|---|
| **UOM:** | LOT |

**Terms and Conditions:**
**********

# CONTRACT ATTACHMENT



## *General Motors Corporation*

**Contract Header Number:**        1F5T0

The attachments in this section apply to the standard terms and conditions associated with the GM legal business entity and the terms and conditions associated with the line item details for contract number.

## Contract Terms & Conditions:            Detailed Description
## Short Description

#### Invoices - GM Corporation

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS.  Invoices for production part shipments are not required for payment processing.

INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS.  Invoices for CONTRACTS FOR SERVICES must reference the contract number and be accompanied by a copy of the contract.  INVOICES FOR TOOLING may be submitted only after full production sample approval has been received and all such invoices must be accompanied by the following: copies of applicable tooling contract(s), copy of approved sample part inspection report(s), and a copy of the 'VTAM FORM1810.csv' which will be generated following Seller's input to the tool management process located in GQTS.

To ensure proper payment processing, your invoice for contracts for tooling and services must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

#### Language —English

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native language.  When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed.  Examples of documents which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier Warrants, Shipping Labels, Capability Studies and Data.

#### Right to Audit

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other documents for the purpose of auditing sellers charges under this contract.  Seller will preserve these documents for a period of 1 year after the final payment under this contract.  In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer, including, but not limited to, parts, tools, fixtures, gages and models.  Seller will segregated its records and otherwise cooperate with Buyer so as to facilitate the audit.

#### GM Right To Material Resale

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained through the Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material Resale Programs, including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of Seller's obligations under this contract

#### Insurance-US Coverage

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as follows:  (a)  Workers' Compensation: statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure)  (b)  Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease  (c)

Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

## Special Term (US) - Government

Special Term  (US) - Government Contracts
Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, 41 CFR 60-741.5, 41 CFR 60-250.5) (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and 52.219-9) (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned business concerns (Executive Order 12138).

## Special Term (Us)-C-Tpat

Special Term (U.S.) - C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ('C-TPAT') initiative (for information go to http://www.cbp.gov/ and find the link to the C-TPAT section).  At Buyer's or the Bureau of Customs and Border Protection's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

## Supplier Quality & Development

Special Term - Supplier Quality and Development  Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

## Terms & Conditions Global 1

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1. ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2. SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination  (b) to route shipments in accordance with Buyers instructions  (c) to make no charge for handling, packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract  (d) to provide with each shipment packing slips with Buyers contract and/or release number and date of shipment marked thereon  (e) to properly mark each package with a label/tag according to Buyers instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyers instructions.  Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyers instructions and the carriers requirements.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased.  Seller further agrees:  (a) to accept payment based upon Buyers Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer. The payment date is set forth in  the Line Item Detail of this contract, or if not stated, shall be the date established by Buyers Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyers North American facilities, Sellers shipment date of goods or date of services, and, for all of Buyers other locations, Buyers receipt date of the goods or date of services.  Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3. DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyers schedules.  Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyers delivery schedules.  Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4. PREMIUM SHIPMENTS:
If Sellers acts or omissions result in Sellers failure to meet Buyers delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Sellers sole expense.

5. CHANGES:
Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.  Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct.  Any changes to this contract shall be made in accordance with

Paragraph 31.

### 6. SUPPLIER QUALITY AND DEVELOPMENT INSPECTION:

Seller agrees to participate in Buyers supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000. In addition, Buyer shall have the right to enter Sellers facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract. Buyers inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

### 7. NONCONFORMING GOODS:

Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections. To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically be reduced unless Buyer otherwise notifies Seller. Seller will not replace quantities so reduced without a new contract or schedule from Buyer. Nonconforming goods will be held by Buyer in accordance with Sellers instructions at Sellers risk. Sellers failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyers option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller. Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyers right to assert any legal or equitable remedy, or relieve Sellers responsibility for latent defects.

### 8. FORCE MAJEURE:

Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter). During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract. In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Sellers labor contract(s). If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days. If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

### 9. WARRANTY:

Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect. In addition, Seller acknowledges that Seller knows of Buyers intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

### 10. INGREDIENTS DISCLOSURE SPECIAL WARNINGS AND INSTRUCTIONS:

If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct: (a) a list of all ingredients in the goods (b) the amount of all ingredients and (c) information concerning any changes in or additions to such ingredients. Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

### 11. INSOLVENCY:

Buyer may immediately terminate this contract without liability to Seller in any of the following or any other comparable events: (a) insolvency of Seller (b) filing of a voluntary petition in bankruptcy by Seller (c) filing of any involuntary petition in bankruptcy against Seller (d) appointment of a receiver or trustee for Seller or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event. Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorneys or other professional fees.

### 12. TERMINATION FOR BREACH OR NONPERFORMANCE SALE OF ASSETS OR CHANGE IN CONTROL:

Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller: (a) repudiates or breaches any of the terms of this contract, including Seller's warranties (b) fails to perform services or deliver goods as specified by Buyer (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach. In addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock that effects a change in the control of Seller.

### 13. TERMINATION FOR CONVENIENCE:

In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller. Upon such termination, Buyer shall pay to Seller the following amounts without duplication: (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material. Buyer will make no payments for finished goods, services, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable. Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods or services that would be produced or performed by Seller under delivery or release schedules outstanding at the date of termination. Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and

engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract.  Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:

Seller agrees:   (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services. Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification   (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller  (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization  and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:

Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:

If Seller performs any work on Buyers premises or utilizes the property of Buyer, whether on or off Buyers premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorneys and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Sellers performance of work or use of Buyers property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:

Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyers written request.   The certificate will provide that Buyer will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Sellers furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLERS PROPERTY:

Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Sellers Property') necessary for the production of the goods.  The cost of changes to Sellers Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer.  Seller shall insure Sellers Property with full fire and extended coverage insurance for its replacement value.  Seller grants Buyer an irrevocable option to take possession of and title to Sellers Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items  provided, however, that this option shall not apply if Sellers Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYERS PROPERTY:

All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis (Buyers Property).  Seller shall bear the risk of loss of and damage to Buyers Property.  Buyers Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract  shall be deemed to be personalty  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person  and shall not be moved from Sellers premises without Buyers prior written approval.  Buyer shall have the right to enter Sellers premises at all  reasonable times to inspect such property and Sellers records with respect thereto.  Upon the request of Buyer, Buyers Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Sellers plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyers Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:

Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs. During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyers past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties.  When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyers service part sales activities.

21.  REMEDIES:

The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods  (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

22. CUSTOMS  EXPORT CONTROLS:

Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer.  Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any.  Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s).  Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

23.  SETOFF/RECOUPMENT:

In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries  and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

24.  NO ADVERTISING:

Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Sellers advertising or promotional materials.

25.  COMPLIANCE WITH LAWS  EMPLOYMENT/BUSINESS PRACTICES:

Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract.  At Buyer's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

26.  NO IMPLIED WAIVER:

The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

27.  NON-ASSIGNMENT:

Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations  under this contract without Buyer's prior written consent.

28.  RELATIONSHIP OF PARTIES:

Seller and Buyer are independent contracting parties and nothing in this contract shall make either party  the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

29.  GOVERNING LAW  JURISDICTION:

This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law.  Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyers option, in the court(s) having jurisdiction over Buyers location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures.  Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

30.  SEVERABILITY:

If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

31.  ENTIRE AGREEMENT:

This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements.  This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated with tool construction.  Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any claim of Seller for tooling.

Contract Header Page:        1  of  1

# CONTRACT HEADER



*General Motors Corporation*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**          00150781099
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Mailing Address Information:**
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

| Contract Header Number: | 1F5T0 |
|---|---|

This contract sets forth the exclusive terms and conditions under which seller shall
sell and buyer shall purchase the goods or services described in the line item detail
of this contract for the period(s) specified therein. Terms and conditions proposed
by seller which are different from or in addition to the provisions of this contract are
unacceptable to buyer, are expressly rejected by buyer, and shall not become a
part of this contract. Any modification of this contract shall be made only in
accordance with the provisions of paragraph 31 of the contract terms and
conditions.

Contract Line Item Page:          1  of  3                    Issue Date:  01-Jun-2007
**Standard Spot Buy Contract Number:**  1F5T009H
**Amendment Number:**  000                              **Part Number:**  000000025812336



# LINE ITEM DETAIL for TOOLING CONTRACT
### General Motors Corporation

| | This Line Item is effective from | **24-May-2007** | through | **24-May-2010** |
|---|---|---|---|---|

**Part Description:**                          MODULE ASM-RF RETRACTABLE CONT

**Amendment Reason:**                          Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Buyer Name:**
Blanco, Jaime
Buyer Code:                    L30

**Tooling Capacity:**                          214
**Tooling Capacity Hours:**                    16
**Tooling Sample Date:**                       23-Aug-2006
**Hazardous Material Indicator:**              N

**Line Item Notes:**
Program: GMX 381
Model Year: 2007 / 2008

Purchase order issued to cover the cost of special permanent tools, dies, patterns,
and/or molds necessary to produce part number, part description, as follows:
Retractable Hard Top

EWO CKRGA / WO 610792

EWO Description:  Revise routing of Actuator Asm to prevent hoses getting pinched during RHT loading
and to improve assembly ergonomics in Orion.

Contract Line Item Page:            2  of  3                    Issue Date:  01-Jun-2007
**Standard Spot Buy Contract Number:**  1F5T009H
**Amendment Number:**  000                              **Part Number:**  000000025812336

Add:
190 mm length Convolute Tube
Tape to hold covolute tube at one end
zip tie to hole convolute tube at one end
Add 5 rose bud tie straps
Add 50 mm length to RHT drive cylinder hydraulic hose lines


PPAP Date: 08/23/06
Capacity:214/16hrs
Supplier:Karmann
Supplier Contact: Tim Tucker
Supplier Memo Dated: 5/17/07


Total Tooling:  $2,200 USD


Supplier is Required to Mark all General Motors Tools with the GM Identification Tags.


Carolina Castro 3CC, 05/23/07.


**Terms and Conditions:**
**********

**Freight Terms:**                              Collect
**Payment Terms:**                              (88) MNS-2, On average, payment shall
                                                be made on the second day of the
                                                second month following Buyers receipt
                                                date of goods or services.


**Delivery Terms:**                             Free Carrier (FCA)


**Delivery DUNS:**                              00150781099
**Ship From DUNS:**                             00150781099
**Price Type:**                                 Returnable

**Price Composition:**
**The Total Price is composed of Base Price plus any applicable taxes.**

All Prices are expressed in      *USD*
**Quantity:**                                                                    1
**Base Price:**                                                       2,200.000000

| | |
|---|---|
| **Total Price:** | 2,200.000000 |
| **UOM:** | LOT |

Contract Line Item Page:                3  of  3                    Issue Date:  01-Jun-2007

**Standard Spot Buy Contract Number:**  1F5T009H

**Amendment Number:**  000                                  **Part Number:**  000000025812336

**Terms and Conditions:**

**********

# CONTRACT ATTACHMENT



### *General Motors Corporation*

**Contract Header Number:**      1F5T0

The attachments in this section apply to the standard terms and conditions associated with the GM legal business entity and the terms and conditions associated with the line item details for contract number.

## Contract Terms & Conditions: Short Description

## Detailed Description

#### Invoices - GM Corporation

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS.  Invoices for production part shipments are not required for payment processing.

INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS. Invoices for CONTRACTS FOR SERVICES must reference the contract number and be accompanied by a copy of the contract. INVOICES FOR TOOLING may be submitted only after full production sample approval has been received and all such invoices must be accompanied by the following: copies of applicable tooling contract(s), copy of approved sample part inspection report(s), and a copy of the 'VTAM FORM1810.csv' which will be generated following Seller's input to the tool management process located in GQTS.

To ensure proper payment processing, your invoice for contracts for tooling and services must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

#### Language --English

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native language. When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed.  Examples of documents which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier Warrants, Shipping Labels, Capability Studies and Data.

#### Right to Audit

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other documents for the purpose of auditing sellers charges under this contract.  Seller will preserve these documents for a period of 1 year after the final payment under this contract.  In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer, including, but not limited to, parts, tools, fixtures, gages and models.  Seller will segregated its records and otherwise cooperate with Buyer so as to facilitate the audit.

#### GM Right To Material Resale

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained through the Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material Resale Programs, including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of Seller's obligations under this contract

#### Insurance-US Coverage

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as follows:  (a)  Workers' Compensation:  statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure)
(b)  Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease  (c)

Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

### Special Term (US) - Government

Special Term  (US) - Government Contracts
Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, 41 CFR 60-741.5, 41 CFR 60-250.5)  (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and 52.219-9)  (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned business concerns (Executive Order 12138).

### Special Term (Us)-C-Tpat

Special Term (U.S.) - C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ('C-TPAT') initiative (for information go to http://www.cbp.gov/ and find the link to the C-TPAT section).  At Buyer's or the Bureau of Customs and Border Protection's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

### Supplier Quality & Development

Special Term - Supplier Quality and Development  Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

### Terms & Conditions Global 1

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1.  ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2.  SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination  (b) to route shipments in accordance with Buyers instructions  (c) to make no charge for handling, packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract  (d) to provide with each shipment packing slips with Buyers instructions and/or release number and date of shipment marked thereon  (e) to properly mark each package with a label/tag according to Buyers instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyers instructions.  Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyers instructions and the carriers requirements.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased.  Seller further agrees:  (a) to accept payment based upon Buyers Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer. The payment date is set forth in  the Line Item Detail of this contract, or if not stated, shall be the date established by Buyers Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyers North American facilities, Sellers shipment date of goods or date of services, and, for all of Buyers other locations, Buyers receipt date of the goods or date of services.  Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3.  DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyers schedules.  Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyers delivery schedules.  Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4.  PREMIUM SHIPMENTS:
If Sellers acts or omissions result in Sellers failure to meet Buyers delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Sellers sole expense.

5.  CHANGES:
Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.  Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct.  Any changes to this contract shall be made in accordance with

Contract Attachment Page:    3    of    5

Paragraph 31.

6. SUPPLIER QUALITY AND DEVELOPMENT INSPECTION:

Seller agrees to participate in Buyers supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000. In addition, Buyer shall have the right to enter Sellers facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract. Buyers inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

7. NONCONFORMING GOODS:

Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections. To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically be reduced unless Buyer otherwise notifies Seller. Seller will not replace quantities so reduced without a new contract or schedule from Buyer. Nonconforming goods will be held by Buyer in accordance with Sellers instructions at Sellers risk. Sellers failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyers option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller. Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyers right to assert any legal or equitable remedy, or relieve Sellers responsibility for latent defects.

8. FORCE MAJEURE:

Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter). During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract. In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Sellers labor contract(s). If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days. If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

9. WARRANTY:

Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect. In addition, Seller acknowledges that Seller knows of Buyers intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

10. INGREDIENTS DISCLOSURE SPECIAL WARNINGS AND INSTRUCTIONS:

If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct: (a) a list of all ingredients in the goods (b) the amount of all ingredients and (c) information concerning any changes in or additions to such ingredients. Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

11. INSOLVENCY:

Buyer may immediately terminate this contract without liability to Seller in any of the following or any other comparable events: (a) insolvency of Seller (b) filing of a voluntary petition in bankruptcy by Seller (c) filing of any involuntary petition in bankruptcy against Seller (d) appointment of a receiver or trustee for Seller or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event. Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorneys or other professional fees.

12. TERMINATION FOR BREACH OR NONPERFORMANCE SALE OF ASSETS OR CHANGE IN CONTROL:

Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller: (a) repudiates or breaches any of the terms of this contract, including Seller's warranties (b) fails to perform services or deliver goods as specified by Buyer (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach. In addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock that effects a change in the control of Seller.

13. TERMINATION FOR CONVENIENCE:

In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller. Upon such termination, Buyer shall pay to Seller the following amounts without duplication: (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material. Buyer will make no payments for finished goods, services, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable. Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods or services that would be produced or performed by Seller under delivery or release schedules outstanding at the date of termination. Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and

engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract. Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:
Seller agrees:   (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services  Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification  (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller  (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization  and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:
Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:
If Seller performs any work on Buyers premises or utilizes the property of Buyer, whether on or off Buyers premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorneys and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Sellers performance of work or use of Buyers property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:
Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyers written request.  The certificate will provide that Buyer will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Sellers furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLERS PROPERTY:
Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Sellers Property') necessary for the production of the goods. The cost of changes to Sellers Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer.  Seller shall insure Sellers Property with full fire and extended coverage insurance for its replacement value.  Seller grants Buyer an irrevocable option to take possession of and title to Sellers Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items  provided, however, that this option shall not apply if Sellers Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYERS PROPERTY:
All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis (Buyers Property).  Seller shall bear the risk of loss of and damage to Buyers Property.  Buyers Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract  shall be deemed to be personalty  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person  and shall not be moved from Sellers premises without Buyers prior written approval.  Buyer shall have the right to enter Sellers premises at all  reasonable times to inspect such property and Sellers records with respect thereto.  Upon the request of Buyer, Buyers Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Sellers plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyers Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:
Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs. During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyers past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties.  When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyers service part sales activities.

21.  REMEDIES:
The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods  (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

22. CUSTOMS EXPORT CONTROLS:

Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer. Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any. Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s). Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

23. SETOFF/RECOUPMENT:

In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

24. NO ADVERTISING:

Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Sellers advertising or promotional materials.

25. COMPLIANCE WITH LAWS EMPLOYMENT/BUSINESS PRACTICES:

Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract. At Buyer's request, Seller shall certify in writing its compliance with the foregoing. Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

26. NO IMPLIED WAIVER:

The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

27. NON-ASSIGNMENT:

Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations under this contract without Buyer's prior written consent.

28. RELATIONSHIP OF PARTIES:

Seller and Buyer are independent contracting parties and nothing in this contract shall make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

29. GOVERNING LAW JURISDICTION:

This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law. Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyers option, in the court(s) having jurisdiction over Buyers location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

30. SEVERABILITY:

If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

31. ENTIRE AGREEMENT:

This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements. This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated with tool construction. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any claim of Seller for tooling.

Contract Header Page:         1  of  1

# CONTRACT HEADER



*General Motors Corporation*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**          00150781099
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Mailing Address Information:**
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

| Contract Header Number: | 1F5T0 |
|---|---|

This contract sets forth the exclusive terms and conditions under which seller shall
sell and buyer shall purchase the goods or services described in the line item detail
of this contract for the period(s) specified therein. Terms and conditions proposed
by seller which are different from or in addition to the provisions of this contract are
unacceptable to buyer, are expressly rejected by buyer, and shall not become a
part of this contract. Any modification of this contract shall be made only in
accordance with the provisions of paragraph 31 of the contract terms and
conditions.

Contract Line Item Page:        1  of  2                    Issue Date:  01-Jun-2007
**Standard Spot Buy Contract Number:**  1F5T009J
**Amendment Number:**  000                              **Part Number:**  000000025812336



# LINE ITEM DETAIL for TOOLING CONTRACT
### *General Motors Corporation*

| This Line Item is effective from | **25-May-2007** | through | **25-May-2010** |
| --- | --- | --- | --- |

**Part Description:**                          MODULE ASM-RF RETRACTABLE CONT

**Amendment Reason:**                          Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Buyer Name:**
Blanco, Jaime
Buyer Code:                      L30

**Tooling Capacity:**                          214
**Tooling Capacity Hours:**                     16
**Tooling Sample Date:**                        23-Aug-2006
**Hazardous Material Indicator:**               N

**Line Item Notes:**
Program: GMX 381
Model Year: 2007 / 2008

Purchase order issued to cover the cost of special permanent tools, dies, patterns,
and/or molds necessary to produce part number, part description, as follows:
Retractable Hard Top

CMTLX / WO 671082

EWO Description:   Revise shoulder length to be 7.64 +0.5/-0.0 (currently 7.55 +0.5/-0.0) of rivets used in
front decklid hinges to reduce friction.

Contract Line Item Page:          2  of  2                    Issue Date:  01-Jun-2007
**Standard Spot Buy Contract Number:**  1F5T009J
**Amendment Number:**  000                    **Part Number:**  000000025812336

PPAP Date: 08/23/06
Capacity:214/16hrs
Supplier:Karmann
Supplier Contact: Tim Tucker
Supplier Memo Dated: 5/17/07

Total Tooling:  $2,700 USD

Supplier is Required to Mark all General Motors Tools with the GM Identification Tags.

Carolina Castro 3CC, 05/23/07.

**Terms and Conditions:**
**********

**Freight Terms:**                              Collect
**Payment Terms:**                              (88) MNS-2, On average, payment shall
                                                be made on the second day of the
                                                second month following Buyers receipt
                                                date of goods or services.

**Delivery Terms:**                             Free Carrier (FCA)

**Delivery DUNS:**                              00150781099
**Ship From DUNS:**                             00150781099
**Price Type:**                                 Returnable

**Price Composition:**
**The Total Price is composed of Base Price plus any applicable taxes.**

All Prices are expressed in        *USD*
**Quantity:**                                                              1
**Base Price:**                                                 2,700.000000

| **Total Price:** | 2,700.000000 |
|---|---|
| **UOM:** | LOT |

**Terms and Conditions:**
**********

# CONTRACT ATTACHMENT



### *General Motors Corporation*

**Contract Header Number:**        1F5T0

The attachments in this section apply to the standard terms and conditions
associated with the GM legal business entity and the terms and conditions
associated with the line item details for contract number.

## Contract Terms & Conditions:        Detailed Description
## Short Description

**Invoices - GM Corporation**

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS.  Invoices for production part shipments are not required for payment processing.

INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS.  Invoices for CONTRACTS FOR SERVICES must reference the contract number and be accompanied by a copy of the contract.  INVOICES FOR TOOLING may be submitted only after full production sample approval has been received and all such invoices must be accompanied by the following: copies of applicable tooling contract(s), copy of approved sample part inspection report(s), and a copy of the 'VTAM FORM1810.csv' which will be generated following Seller's input to the tool management process located in GQTS.

To ensure proper payment processing, your invoice for contracts for tooling and services must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

**Language --English**

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native language.
When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed.  Examples of documents
which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier Warrants, Shipping Labels,
Capability Studies and Data.

**Right to Audit**

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other
documents for the purpose of auditing sellers charges under this contract.  Seller will preserve these documents for a period of 1 year after the final
payment under this contract.  In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer,
including, but not limited to, parts, tools, fixtures, gages and models.  Seller will segregated its records and otherwise cooperate with Buyer so as to
facilitate the audit.

**GM Right To Material Resale**

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained through the
Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material Resale Programs,
including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of Seller's obligations under this
contract

**Insurance-US Coverage**

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as
follows:  (a)  Workers' Compensation:  statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure)
(b)  Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease  (c)

Contract Attachment Page:    2  of  5

Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

**Special Term (US) - Government**

Special Term  (US) - Government Contracts
Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, 41 CFR 60-741.5, 41 CFR 60-250.5)  (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and 52.219-9)  (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned business concerns (Executive Order 12138).

**Special Term (Us)-C-Tpat**

Special Term (U.S.) - C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ('C-TPAT') initiative (for information go to http://www.cbp.gov/ and find the link to the C-TPAT section).  At Buyer's or the Bureau of Customs and Border Protection's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**Supplier Quality & Development**

Special Term - Supplier Quality and Development  Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

**Terms & Conditions Global 1**

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1. ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2. SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination  (b) to route shipments in accordance with Buyers instructions  (c) to make no charge for handling, packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract  (d) to provide with each shipment packing slips with Buyers contract and/or release number and date of shipment marked thereon  (e) to properly mark each package with a label/tag according to Buyers instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyers instructions.  Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyers instructions and the carriers requirements.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased.  Seller further agrees:  (a) to accept payment based upon Buyers Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer. The payment date is set forth in  the Line Item Detail of this contract, or if not stated, shall be the date established by Buyers Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyers North American facilities, Sellers shipment date of goods or date of services, and, for all of Buyers other locations, Buyers receipt date of the goods or date of services.  Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3. DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyers schedules.  Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyers delivery schedules.  Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4. PREMIUM SHIPMENTS:
If Sellers acts or omissions result in Sellers failure to meet Buyers delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Sellers sole expense.

5. CHANGES:
Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.  Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct.  Any changes to this contract shall be made in accordance with

Contract Attachment Page:        3   of   5

Paragraph 31.

**6.  SUPPLIER QUALITY AND DEVELOPMENT  INSPECTION:**

Seller agrees to participate in Buyers supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000.  In addition, Buyer shall have the right to enter Sellers facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract.  Buyers inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

**7.  NONCONFORMING GOODS:**

Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections.  To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically  be reduced unless Buyer otherwise notifies Seller.  Seller will not replace quantities so reduced without a new contract or schedule from Buyer.  Nonconforming goods will be held by Buyer in accordance with Sellers instructions at Sellers risk.  Sellers failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyers option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller.  Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyers right to assert any legal or equitable remedy, or relieve Sellers responsibility for latent defects.

**8.  FORCE MAJEURE:**

Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order  provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter).  During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract.  In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Sellers labor contract(s).  If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days.  If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

**9.  WARRANTY:**

Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect.   In addition, Seller acknowledges that Seller knows of Buyers intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

**10.  INGREDIENTS DISCLOSURE  SPECIAL WARNINGS AND INSTRUCTIONS:**

If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct:  (a) a list of all ingredients in the goods  (b) the amount of all ingredients  and (c) information concerning any changes in or additions to such ingredients.  Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

**11.  INSOLVENCY:**

Buyer may immediately terminate this contract without liability to Seller in any  of the following or any other comparable events:  (a) insolvency of Seller (b) filing of a voluntary petition in bankruptcy by Seller  (c) filing of any involuntary petition in bankruptcy against Seller  (d) appointment of a receiver or trustee for Seller  or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event.  Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorneys or other professional fees.

**12.  TERMINATION FOR BREACH OR NONPERFORMANCE  SALE OF ASSETS  OR CHANGE IN CONTROL:**

Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller:  (a) repudiates or breaches any of the terms of this contract, including Seller's warranties  (b) fails to perform services or deliver goods as specified by Buyer  (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods  and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.  In addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock that effects a change in the control of Seller.

**13.  TERMINATION FOR CONVENIENCE:**

In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller.  Upon such termination, Buyer shall pay to Seller the following amounts without duplication: (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for  and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract  less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material.  Buyer will make no payments for finished goods, services, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable.  Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods or services that would be produced or performed by Seller under delivery  or release schedules outstanding at the date of termination.  Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and

Contract Attachment Page:          4  of  5

engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract.  Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:
Seller agrees:    (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services  Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification   (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller  (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization  and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:
Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:
If Seller performs any work on Buyers premises or utilizes the property of Buyer, whether on or off Buyers premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorneys and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Sellers performance of work or use of Buyers property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:
Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyers written request.  The certificate will provide that Buyer will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Sellers furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLERS PROPERTY:
Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Sellers Property') necessary for the production of the goods. The cost of changes to Sellers Property necessary to make design and specification changes authorized by Buyer shall be paid for by Seller. Seller shall insure Sellers Property with full fire and extended coverage insurance for its replacement value.  Seller grants Buyer an irrevocable option to take possession of and title to Sellers Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items  provided, however, that this option shall not apply if Sellers Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYERS PROPERTY:
All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis (Buyers Property).  Seller shall bear the risk of loss of and damage to Buyers Property.  Buyers Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract  shall be deemed to be personally  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person  and shall not be moved from Sellers premises without Buyers prior written approval.  Buyer shall have the right to enter Sellers premises at all  reasonable times to inspect such property and Sellers records with respect thereto.  Upon the request of Buyer, Buyers Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Sellers plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyers Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:
Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs.  During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyers past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties.  When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyers service part sales activities.

21.  REMEDIES:
The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods  (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

Contract Attachment Page:       5   of   5

**22. CUSTOMS EXPORT CONTROLS:**

Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer. Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any. Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s). Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

**23. SETOFF/RECOUPMENT:**

In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries  and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

**24. NO ADVERTISING:**

Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Sellers advertising or promotional materials.

**25. COMPLIANCE WITH LAWS EMPLOYMENT/BUSINESS PRACTICES:**

Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract.  At Buyer's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**26. NO IMPLIED WAIVER:**

The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

**27. NON-ASSIGNMENT:**

Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations  under this contract without Buyer's prior written consent.

**28. RELATIONSHIP OF PARTIES:**

Seller and Buyer are independent contracting parties and nothing in this contract shall make either party  the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

**29. GOVERNING LAW JURISDICTION:**

This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law.  Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyers option, in the court(s) having jurisdiction over Buyers location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures.  Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

**30. SEVERABILITY:**

If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

**31. ENTIRE AGREEMENT:**

This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements.  This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated with tool construction. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any claim of Seller for tooling.

# CONTRACT HEADER



### *General Motors Corporation*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**          00150781099
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Mailing Address Information:**
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

| Contract Header Number: | 1F5T0 |
|---|---|

This contract sets forth the exclusive terms and conditions under which seller shall
sell and buyer shall purchase the goods or services described in the line item detail
of this contract for the period(s) specified therein. Terms and conditions proposed
by seller which are different from or in addition to the provisions of this contract are
unacceptable to buyer, are expressly rejected by buyer, and shall not become a
part of this contract. Any modification of this contract shall be made only in
accordance with the provisions of paragraph 31 of the contract terms and
conditions.

Contract Line Item Page:                    1 of 2                    Issue Date:  01-Jun-2007
**Standard Spot Buy Contract Number:**  1F5T009K
**Amendment Number:**  000                                  **Part Number:**  000000025857934



# LINE ITEM DETAIL for TOOLING CONTRACT
## *General Motors Corporation*

| | | |
|---|---|---|
| This Line Item is effective from | **23-May-2007** through | **23-May-2010** |

**Part Description:**                                  MODULE ASM-RF RETRACTABLE CONT

**Amendment Reason:**                                  Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMAN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Buyer Name:**
Blanco, Jaime
Buyer Code:                    L30

**Tooling Capacity:**                                  214
**Tooling Capacity Hours:**                            16
**Hazardous Material Indicator:**                      N

**Line Item Notes:**
Program: GMX 381
Model Year: 2007 / 2008

Purchase order issued to cover the cost of special permanent tools, dies, patterns,
and/or molds necessary to produce part number, part description, as follows:
Retractable Hard Top

CSNFY / WO 715729

EWO Description:   Change receiver bumper assembly to adjust with overmolded bumper only.
Eliminate threaded features.

Contract Line Item Page:          2  of  2                    Issue Date:  01-Jun-2007

**Standard Spot Buy Contract Number:**  1F5T009K

**Amendment Number:**  000                    **Part Number:**  000000025857934

PPAP Date: 04/01/07
Capacity:214/16hrs
Supplier:Karmann
Supplier Contact: Tim Tucker
Supplier Memo Dated: 5/17/07

Total Tooling:  $6,600 USD

Supplier is Required to Mark all General Motors Tools with the GM Identification Tags.

Carolina Castro 3CC, 05/23/07.

**Terms and Conditions:**
\*\*\*\*\*\*\*\*\*\*

**Freight Terms:**                          Collect
**Payment Terms:**                          (88) MNS-2, On average, payment shall
                                            be made on the second day of the
                                            second month following Buyers receipt
                                            date of goods or services.

**Delivery Terms:**                         Free Carrier (FCA)

**Delivery DUNS:**                          00150781099
**Ship From DUNS:**                         00150781099
**Price Type:**                             Returnable

**Price Composition:**
**The Total Price is composed of Base Price plus any applicable taxes.**

All Prices are expressed in    *USD*
**Quantity:**                                                              1
**Base Price:**                                                 6,600.000000

| **Total Price:** | 6,600.000000 |
|---|---|
| **UOM:** | LOT |

**Terms and Conditions:**
\*\*\*\*\*\*\*\*\*\*

# CONTRACT ATTACHMENT



### *General Motors Corporation*

**Contract Header Number:**        1F5T0

The attachments in this section apply to the standard terms and conditions
associated with the GM legal business entity and the terms and conditions
associated with the line item details for contract number.

**Contract Terms & Conditions:**                                **Detailed Description**
**Short Description**

### Invoices - GM Corporation

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS.  Invoices for production part shipments are not required for payment processing.

INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS.  Invoices for CONTRACTS FOR SERVICES must
reference the contract number and be accompanied by a copy of the contract.  INVOICES FOR TOOLING may be submitted only after full production
sample approval has been received and all such invoices must be accompanied by the following: copies of applicable tooling contract(s), copy of
approved sample part inspection report(s), and a copy of the 'VTAM FORM1810.csv' which will be generated following Seller's input to the tool
management process located in GQTS.

To ensure proper payment processing, your invoice for contracts for tooling and services must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

### Language –English

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native language.
When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed.  Examples of documents
which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier Warrants, Shipping Labels,
Capability Studies and Data.

### Right to Audit

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other
documents for the purpose of auditing sellers charges under this contract.  Seller will preserve these documents for a period of 1 year after the final
payment under this contract.  In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer,
including, but not limited to, parts, tools, fixtures, gages and models.  Seller will segregated its records and otherwise cooperate with Buyer so as to
facilitate the audit.

### GM Right To Material Resale

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained through the
Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material Resale Programs,
including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of Seller's obligations under this
contract

### Insurance-US Coverage

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as
follows:  (a)  Workers' Compensation:  statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure)
(b)  Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease  (c)

Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

**Special Term (US) - Government**

Special Term  (US) - Government Contracts
Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, 41 CFR 60-741.5, 41 CFR 60-250.5)  (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and 52.219-9)  (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned business concerns (Executive Order 12138).

**Special Term (Us)-C-Tpat**

Special Term (U.S.) - C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ('C-TPAT') initiative (for information go to http://www.cbp.gov/ and find the link to the C-TPAT section).  At Buyer's or the Bureau of Customs and Border Protection's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**Supplier Quality & Development**

Special Term - Supplier Quality and Development  Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

**Terms & Conditions Global 1**

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1.  ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2.  SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination  (b) to route shipments in accordance with Buyers instructions  (c) to make no charge for handling, packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract  (d) to provide with each shipment packing slips with Buyers contract and/or release number and date of shipment marked thereon  (e) to properly mark each package with a label/tag according to Buyers instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyers instructions.  Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyers instructions and the carriers requirements.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased.  Seller further agrees:  (a) to accept payment based upon Buyers Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer. The payment date is set forth in  the Line Item Detail of this contract, or if not stated, shall be the date established by Buyers Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyers North American facilities, Sellers shipment date of goods or date of services, and, for all of Buyers other locations, Buyers receipt date of the goods or date of services.  Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3.  DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyers schedules.  Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyers delivery schedules.  Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4.  PREMIUM SHIPMENTS:
If Sellers acts or omissions result in Sellers failure to meet Buyers delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Sellers sole expense.

5.  CHANGES:
Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.  Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct.  Any changes to this contract shall be made in accordance with

Contract Attachment Page:        3    of    5

Paragraph 31.

**6.  SUPPLIER QUALITY AND DEVELOPMENT  INSPECTION:**
Seller agrees to participate in Buyers supplier quality and development program(s) and to comply with all quality requirements and procedures
specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000.  In
addition, Buyer shall have the right to enter Sellers facility at reasonable times to inspect the facility, goods, materials and any property of Buyer
covered by this contract.  Buyers inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall
not constitute acceptance of any work-in-process or finished goods.

**7.  NONCONFORMING GOODS:**
Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such
inspections.  To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically be reduced unless Buyer
otherwise notifies Seller.  Seller will not replace quantities so reduced without a new contract or schedule from Buyer.  Nonconforming goods will be
held by Buyer in accordance with Sellers instructions at Sellers risk.  Sellers failure to provide written instructions within 10 days, or such shorter period
as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyers option, to charge Seller for
storage and handling or to dispose of the goods without liability to Seller.  Payment for nonconforming goods shall not constitute an acceptance of
them, limit or impair Buyers right to assert any legal or equitable remedy, or relieve Sellers responsibility for latent defects.

**8.  FORCE MAJEURE:**
Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond
the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority
(whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and
slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order  provided that written notice of such delay
(including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence
(but in no event more than 10 days thereafter).  During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase
goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other
sources in quantities and at times requested by Buyer, and at the price set forth in this contract.  In addition, Seller at its expense shall take such
actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting
from the expiration of Sellers labor contract(s).  If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall
not exceed 30 days.  If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days,
Buyer may immediately terminate this contract without liability.

**9.  WARRANTY:**
Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or
by Buyer, and will be merchantable, of good material and workmanship and free from defect.  In addition, Seller acknowledges that Seller knows of
Buyers intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled
by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that
provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

**10.  INGREDIENTS DISCLOSURE  SPECIAL WARNINGS AND INSTRUCTIONS:**
If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct:  (a) a list of all ingredients in the goods  (b)
the amount of all ingredients  and (c) information concerning any changes in or additions to such ingredients.  Prior to and with the shipment of the
goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of
any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to
advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or
property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

**11.  INSOLVENCY:**
Buyer may immediately terminate this contract without liability to Seller in any  of the following or any other comparable events:  (a) insolvency of Seller
(b) filing of a voluntary petition in bankruptcy by Seller (c) filing of any involuntary petition in bankruptcy against Seller  (d) appointment of a receiver
or trustee for Seller  or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is
not vacated or nullified within 15 days of such event.  Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the
foregoing, including, but not limited to, all attorneys or other professional fees.

**12.  TERMINATION FOR BREACH OR NONPERFORMANCE  SALE OF ASSETS  OR CHANGE IN CONTROL:**
Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller:  (a) repudiates or breaches any of the terms of
this contract, including Seller's warranties  (b) fails to perform services or deliver goods as specified by Buyer  (c) fails to make progress so as to
endanger timely and proper completion of services or delivery of goods  and does not correct such failure or breach within 10 days (or such shorter
period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.  In
addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a
material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock
that effects a change in the control of Seller.

**13.  TERMINATION FOR CONVENIENCE:**
In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any
time and for any reason, by giving written notice to Seller.  Upon such termination, Buyer shall pay to Seller the following amounts without duplication:
(a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for  and (b) the actual
costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are
reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this
contract  less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's
written consent, and the cost of any damaged or destroyed goods or material.  Buyer will make no payments for finished goods, services, work-in-
process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods
that are in Seller's standard stock or that are readily marketable.  Payments made under this Paragraph shall not exceed the aggregate price payable
by Buyer for finished goods or services that would be produced or performed by Seller under delivery  or release schedules outstanding at the date of
termination.  Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on
account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and

engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract.  Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:

Seller agrees:   (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services  Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification  (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller  (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization  and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:

Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:

If Seller performs any work on Buyers premises or utilizes the property of Buyer, whether on or off Buyers premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorneys and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Sellers performance of work or use of Buyers property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:

Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyers written request.  The certificate will provide that Buyer will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Sellers furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLERS PROPERTY:

Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Sellers Property') necessary for the production of the goods. The cost of changes to Sellers Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer.  Seller shall insure Sellers Property with full fire and extended coverage insurance for its replacement value.  Seller grants Buyer an irrevocable option to take possession of and title to Sellers Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items  provided, however, that this option shall not apply if Sellers Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYERS PROPERTY:

All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis (Buyers Property).  Seller shall bear the risk of loss of and damage to Buyers Property.  Buyers Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract  shall be deemed to be personalty  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person  and shall not be moved from Sellers premises without Buyers prior written approval.  Buyer shall have the right to enter Sellers premises at all  reasonable times to inspect such property and Sellers records with respect thereto.  Upon the request of Buyer, Buyers Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Sellers plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyers Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:

Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs.  During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyers past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties.  When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyers service part sales activities.

21.  REMEDIES:

The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods  (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

**22. CUSTOMS EXPORT CONTROLS:**

Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer. Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any. Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s). Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

**23. SETOFF/RECOUPMENT:**

In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

**24. NO ADVERTISING:**

Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Sellers advertising or promotional materials.

**25. COMPLIANCE WITH LAWS EMPLOYMENT/BUSINESS PRACTICES:**

Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract. At Buyer's request, Seller shall certify in writing its compliance with the foregoing. Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**26. NO IMPLIED WAIVER:**

The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

**27. NON-ASSIGNMENT:**

Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations under this contract without Buyer's prior written consent.

**28. RELATIONSHIP OF PARTIES:**

Seller and Buyer are independent contracting parties and nothing in this contract shall make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

**29. GOVERNING LAW JURISDICTION:**

This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law. Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyers option, in the court(s) having jurisdiction over Buyers location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

**30. SEVERABILITY:**

If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

**31. ENTIRE AGREEMENT:**

This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements. This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated with tool construction. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any claim of Seller for tooling.

Contract Header Page:        1  of  1

# CONTRACT HEADER



### *General Motors Corporation*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**            00150781099
KARMANN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Mailing Address Information:**
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

| Contract Header Number: | 1F5T0 |
|---|---|

This contract sets forth the exclusive terms and conditions under which seller shall sell and buyer shall purchase the goods or services described in the line item detail of this contract for the period(s) specified therein. Terms and conditions proposed by seller which are different from or in addition to the provisions of this contract are unacceptable to buyer, are expressly rejected by buyer, and shall not become a part of this contract. Any modification of this contract shall be made only in accordance with the provisions of paragraph 31 of the contract terms and conditions.

Contract Line Item Page:                    1   of   3                          Issue Date:   14-Aug-2007
**Standard Spot Buy Contract Number:**  1F5T00B0
**Amendment Number:**  000                                  **Part Number:**  000000025899335



# LINE ITEM DETAIL for TOOLING CONTRACT
## *General Motors Corporation*

| | | | |
|---|---|---|---|
| This Line Item is effective from | **13-Aug-2007** | through | **13-Aug-2010** |

**Part Description:**                                        TOP ASM-FLDG

**Amendment Reason:**                                   Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMANN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Buyer Name:**
Castro, Carolina
Buyer Code:                              L30

**Tooling Capacity:**                                        115
**Tooling Capacity Hours:**                              10
**Tooling Sample Date:**                                  17-Aug-2007
**Hazardous Material Indicator:**                       N

**Line Item Notes:**
Program: GMX381 Retractable Hard Top
Model Year: 2007 / 2008 / 2009

Purchase order issued to cover the cost of special permanent tools, dies, patterns,
and/or molds necessary to produce part number, part description, as follows:

CZVYX 803438

EWO Description:
VAVE:
' Eliminate front headliner rear-center  $-0.31 pc, $2,500 tooling
' Shorten length of headliner seal $-0.42 pc, $6,250 tooling

Contract Line Item Page:          2  of  3                           Issue Date:  14-Aug-2007

**Standard Spot Buy Contract Number:**  1F5T00B0

**Amendment Number:**  000                              **Part Number:**  000000025899335

' Reduce staples in tonneau dust seal $-0.01 piece, $0 tooling
' Change coating on PNL/PNL Pin Asm $-0.28 piece $0 tooling
' Chg material for B276 rivet  $-0.19 piece, $0 tooling

No cost changes:
' Redesign Tonneau Blocker rod into a solid rod instead of weldment asm
' Eliminate rear most foam from header latch hydraulics line
' Reduce length of Header latch hydraulic hose, 140mm was 260mm.
' Delete UHMW tape between inner roof panel and Header latch brkts
' Material revision AISI 1022 cold drawn steel was AISI 1117.
' Remove tab front headliner rear RH corner to eliminate hydraulic hose popping during actuation of RHT

CZVYXA 836685

EWO Description:
The below changes must be backed out due to cancellation or retiming
VAVE:
' Shorten length of headliner seal, $-0.42 pc, $6,250 tooling  will be reintroduced when tier three supplier
(Oji) is capable
' Chg material for B276 rivet $-0.19 piece, $0 tooling  will be introduced when tier three supplier (CPS) is
capable
' Reduce staples in tonneau dust seal $-0.01 piece, $0 tooling  change canceled due to supplier not being
able to meet savings initially quoted

Tooling Breakdown:

1.- Modify Assembly Fixture for Headliner Asm RR  = $1.250.00

2.- Modify Assembly Fixture for Headliner Asm FRT = $1.250.00

Total Tooling: $2,500.00 USD

PPAP Date:  08/17/07
Capacity: 115 pcs / 10 hrs
Supplier:  Karmann
Supplier Contact: Tim Tucker
Supplier Memo Dated: 08/04/07

Supplier is Required to Mark all General Motors Tools with the GM Identification Tags.

Carolina Castro, Buyer 3CC on August 13, 2007

Contract Line Item Page:          3  of  3                    Issue Date:  14-Aug-2007
**Standard Spot Buy Contract Number:**  1F5T00B0
**Amendment Number:**  000                          **Part Number:**  000000025899335

**Terms and Conditions:**
**********

**Freight Terms:**                                      Collect
**Payment Terms:**                                      (88) MNS-2, On average, payment shall
                                                        be made on the second day of the
                                                        second month following Buyers receipt
                                                        date of goods or services.

**Delivery Terms:**                                     Free Carrier (FCA)

**Delivery DUNS:**                                      00150781099
**Ship From DUNS:**                                     00150781099
**Price Type:**                                         Returnable

**Price Composition:**
**The Total Price is composed of Base Price plus any applicable taxes.**

All Prices are expressed in      *USD*
**Quantity:**                                                                          1
**Base Price:**                                                              2,500.000000

| | |
|---|---|
| **Total Price:** | 2,500.000000 |
| **UOM:** | LOT |

**Terms and Conditions:**
**********

# CONTRACT ATTACHMENT



### *General Motors Corporation*

**Contract Header Number:**    1F5T0

The attachments in this section apply to the standard terms and conditions
associated with the GM legal business entity and the terms and conditions
associated with the line item details for contract number.

## Contract Terms & Conditions:          Detailed Description
## Short Description

### Invoices - GM Corporation

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS.  Invoices for production part shipments are not required for payment processing.

INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS.  Invoices for CONTRACTS FOR SERVICES must
reference the contract number and be accompanied by a copy of the contract.  INVOICES FOR TOOLING may be submitted only after full production
sample approval has been received and all such invoices must be accompanied by the following: copies of applicable tooling contract(s), copy of
approved sample part inspection report(s), and a copy of the 'VTAM FORM1810.csv' which will be generated following Seller's input to the tool
management process located in GQTS.

To ensure proper payment processing, your invoice for contracts for tooling and services must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

### Language –English

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native language.
When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed.  Examples of documents
which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier Warrants, Shipping Labels,
Capability Studies and Data.

### Right to Audit

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other
documents for the purpose of auditing sellers charges under this contract.  Seller will preserve these documents for a period of 1 year after the final
payment under this contract.  In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer,
including, but not limited to, parts, tools, fixtures, gages and models.  Seller will segregated its records and otherwise cooperate with Buyer so as to
facilitate the audit.

### GM Right To Material Resale

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained through the
Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material Resale Programs,
including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of Seller's obligations under this
contract

### Insurance-US Coverage

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as
follows:  (a)  Workers' Compensation:  statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure)
(b)  Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease  (c)

Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

**Special Term (US) - Government**

Special Term  (US) - Government Contracts
Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, 41 CFR 60-741.5, 41 CFR 60-250.5) (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and 52.219-9) (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned business concerns (Executive Order 12138).

**Special Term (Us)-C-Tpat**

Special Term (U.S.) - C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ('C-TPAT') initiative (for information go to http://www.cbp.gov/ and find the link to the C-TPAT section).  At Buyer's or the Bureau of Customs and Border Protection's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**Supplier Quality & Development**

Special Term - Supplier Quality and Development  Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

**Terms & Conditions Global 1**

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1. ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2. SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination  (b) to route shipments in accordance with Buyers instructions  (c) to make no charge for handling, packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract  (d) to provide with each shipment packing slips with Buyers contract and/or release number and date of shipment marked thereon  (e) to properly mark each package with a label/tag according to Buyers instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyers instructions.  Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyers instructions and the carriers requirements.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased. Seller further agrees:  (a) to accept payment based upon Buyers Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer. The payment date is set forth in  the Line Item Detail of this contract, or if not stated, shall be the date established by Buyers Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyers North American facilities, Sellers shipment date of goods or date of services, and, for all of Buyers other locations, Buyers receipt date of the goods or date of services.  Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3. DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyers schedules.  Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyers delivery schedules.  Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4. PREMIUM SHIPMENTS:
If Sellers acts or omissions result in Sellers failure to meet Buyers delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Sellers sole expense.

5. CHANGES:
Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.  Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct.  Any changes to this contract shall be made in accordance with

Paragraph 31.

6.  SUPPLIER QUALITY AND DEVELOPMENT INSPECTION:

Seller agrees to participate in Buyers supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000.  In addition, Buyer shall have the right to enter Sellers facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract.  Buyers inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

7.  NONCONFORMING GOODS:

Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections.  To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically  be reduced unless Buyer otherwise notifies Seller.  Seller will not replace quantities so reduced without a new contract or schedule from Buyer.  Nonconforming goods will be held by Buyer in accordance with Sellers instructions at Sellers risk.  Sellers failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyers option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller.  Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyers right to assert any legal or equitable remedy, or relieve Sellers responsibility for latent defects.

8.  FORCE MAJEURE:

Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order  provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter).  During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract.  In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Sellers labor contract(s).  If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days.  If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

9.  WARRANTY:

Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect.  In addition, Seller acknowledges that Seller knows of Buyers intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer.  The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

10.  INGREDIENTS DISCLOSURE  SPECIAL WARNINGS AND INSTRUCTIONS:

If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct:  (a) a list of all ingredients in the goods  (b) the amount of all ingredients  and (c) information concerning any changes in or additions to such ingredients.  Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

11.  INSOLVENCY:

Buyer may immediately terminate this contract without liability to Seller in any  of the following or any other comparable events:  (a) insolvency of Seller (b) filing of a voluntary petition in bankruptcy by Seller (c) filing of any involuntary petition in bankruptcy against Seller (d) appointment of a receiver or trustee for Seller  or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event.  Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorneys or other professional fees.

12.  TERMINATION FOR BREACH OR NONPERFORMANCE  SALE OF ASSETS  OR CHANGE IN CONTROL:

Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller:  (a) repudiates or breaches any of the terms of this contract, including Seller's warranties  (b) fails to perform services or deliver goods as specified by Buyer  (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods  and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.  In addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock that effects a change in the control of Seller.

13.  TERMINATION FOR CONVENIENCE:

In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Buyer.  Upon such termination, Buyer shall pay to Seller the following amounts without duplication:  (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for  and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract  less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material.  Buyer will make no payments for finished goods, services, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable.  Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods or services that would be produced or performed by Seller under delivery  or release schedules outstanding at the date of termination.  Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and

engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract. Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:

Seller agrees:   (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services   Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification   (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller   (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization   and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:

Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:

If Seller performs any work on Buyers premises or utilizes the property of Buyer, whether on or off Buyers premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorneys and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Sellers performance of work or use of Buyers property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:

Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyers written request.  The certificate will provide that Buyer will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Sellers furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLERS PROPERTY:

Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Sellers Property') necessary for the production of the goods.  The cost of changes to Sellers Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer.  Seller shall insure Sellers Property with full fire and extended coverage insurance for its replacement value.  Seller grants Buyer an irrevocable option to take possession of and title to Sellers Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items  provided, however, that this option shall not apply if Sellers Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYERS PROPERTY:

All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis (Buyers Property).  Seller shall bear the risk of loss of and damage to Buyers Property.  Buyers Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract  shall be deemed to be personalty  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person  and shall not be moved from Sellers premises without Buyers prior written approval.  Buyer shall have the right to enter Sellers premises at all  reasonable times to inspect such property and Sellers records with respect thereto.  Upon the request of Buyer, Buyers Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Sellers plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyers Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:

Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs.  During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyers past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties.  When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyers service part sales activities.

21.  REMEDIES:

The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods  (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

22. CUSTOMS EXPORT CONTROLS:

Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer. Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any. Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s). Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

23. SETOFF/RECOUPMENT:

In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

24. NO ADVERTISING:

Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Sellers advertising or promotional materials.

25. COMPLIANCE WITH LAWS EMPLOYMENT/BUSINESS PRACTICES:

Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract. At Buyer's request, Seller shall certify in writing its compliance with the foregoing. Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

26. NO IMPLIED WAIVER:

The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

27. NON-ASSIGNMENT:

Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations under this contract without Buyer's prior written consent.

28. RELATIONSHIP OF PARTIES:

Seller and Buyer are independent contracting parties and nothing in this contract shall make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

29. GOVERNING LAW JURISDICTION:

This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law. Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyers option, in the court(s) having jurisdiction over Buyers location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

30. SEVERABILITY:

If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

31. ENTIRE AGREEMENT:

This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements. This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated with tool construction. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any claim of Seller for tooling.

Contract Header Page:        1  of  1

# CONTRACT HEADER



### *General Motors Corporation*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**          00150781099
KARMANN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Mailing Address Information:**
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

| Contract Header Number: | 1F5T0 |
|---|---|

This contract sets forth the exclusive terms and conditions under which seller shall
sell and buyer shall purchase the goods or services described in the line item detail
of this contract for the period(s) specified therein. Terms and conditions proposed
by seller which are different from or in addition to the provisions of this contract are
unacceptable to buyer, are expressly rejected by buyer, and shall not become a
part of this contract. Any modification of this contract shall be made only in
accordance with the provisions of paragraph 31 of the contract terms and
conditions.

Contract Line Item Page:               1  of  2                    Issue Date:  15-Feb-2008

**Standard Spot Buy Contract Number:**  1F5T00B8

**Amendment Number:**  000                                **Part Number:**  000000025899335



# LINE ITEM DETAIL for TOOLING CONTRACT

## *General Motors Corporation*

| | | | |
|---|---|---|---|
| This Line Item is effective from | **14-Feb-2008** | through | **14-Feb-2011** |

**Part Description:**                                       TOP ASM-FLDG

**Amendment Reason:**                                   Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMANN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Buyer Name:**
Castro, Carolina
Buyer Code:                      L30

**Tooling Sample Date:**                              22-Feb-2008
**Hazardous Material Indicator:**                  N

**Line Item Notes:**
Program: GMX 381
Model Year: 2008

Purchase order issued to cover the cost of special permanent tools, dies, patterns,
And/or molds necessary to produce part number, part description, per following EWO

EWO #: DCKHG / 849806
EWO Description: Shorten length of headliner seal on both outboard ends.

Supplier: Karmann
Supplier Contact: Jim Davenport
Supplier Memo Dated: 01/31/08

Tooling Breakdown:

Contract Line Item Page:          2  of  2                    Issue Date:   15-Feb-2008

**Standard Spot Buy Contract Number:**  1F5T00B8

**Amendment Number:**  000                           **Part Number:**   000000025899335

Headliner Asm-Rear Die D556......................$6,250.00 usd

Property Label GMX3810041

Total Tooling:  $6,250.00 usd

Supplier is Required to Mark all General Motors Tools with the GM Identification Tags.

Carolina Castro, L30 on February 14, 2008

**Terms and Conditions:**
**********

| | |
|---|---|
| **Freight Terms:** | Collect |
| **Payment Terms:** | (88) MNS-2, On average, payment shall be made on the second day of the second month following Buyers receipt date of goods or services. |
| **Delivery Terms:** | Free Carrier (FCA) |
| **Delivery DUNS:** | 00150781099 |
| **Ship From DUNS:** | 00150781099 |
| **Price Type:** | Returnable |

**Price Composition:**
**The Total Price is composed of Base Price plus any applicable taxes.**

All Prices are expressed in      *USD*

| | |
|---|---|
| **Quantity:** | 1 |
| **Base Price:** | 6,250.000000 |
| **Total Price:** | 6,250.000000 |
| **UOM:** | LOT |

**Terms and Conditions:**
**********

# CONTRACT ATTACHMENT



### *General Motors Corporation*

**Contract Header Number:**    1F5T0

The attachments in this section apply to the standard terms and conditions associated with the GM legal business entity and the terms and conditions associated with the line item details for contract number.

## Contract Terms & Conditions:          Detailed Description
## Short Description

#### Invoices - GM Corporation

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS.  Invoices for production part shipments are not required for payment processing.

INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS.  Invoices for CONTRACTS FOR SERVICES must reference the contract number and be accompanied by a copy of the contract.  INVOICES FOR TOOLING may be submitted only after full production sample approval has been received and all such invoices must be accompanied by the following: copies of applicable tooling contract(s), copy of approved sample part inspection report(s), and a copy of the 'VTAM FORM1810.csv' which will be generated following Seller's input to the tool management process located in GQTS.

To ensure proper payment processing, your invoice for contracts for tooling and services must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

#### Language –English

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native language.  When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed.  Examples of documents which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier Warrants, Shipping Labels, Capability Studies and Data.

#### Right to Audit

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other documents for the purpose of auditing sellers charges under this contract.  Seller will preserve these documents for a period of 1 year after the final payment under this contract.  In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer, including, but not limited to, parts, tools, fixtures, gages and models.  Seller will segregated its records and otherwise cooperate with Buyer so as to facilitate the audit.

#### GM Right To Material Resale

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained through the Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material Resale Programs, including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of Seller's obligations under this contract

#### Insurance-US Coverage

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as follows: (a) Workers' Compensation: statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure)
(b)  Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease  (c)

Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

**Special Term (US) - Government**

Special Term  (US) - Government Contracts
Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, 41 CFR 60-741.5, 41 CFR 60-250.5, and 41 CFR 60-300.5)  (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and 52.219-9)  (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned business concerns (Executive Order 12138).

**Special Term (Us)-C-Tpat**

Special Term (U.S.) C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ('C-TPAT') initiative (for information go to http://www.cbp.gov/ and find the link to the C-TPAT section).  At Buyer's or the Bureau of Customs and Border Protection's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**Supplier Quality & Development**

Special Term - Supplier Quality and Development  Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

**Terms & Conditions Global 1**

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1.  ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2.  SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination  (b) to route shipments in accordance with Buyers instructions  (c) to make no charge for handling, packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract  (d) to provide with each shipment packing slips with Buyers contract and/or release number and date of shipment marked thereon  (e) to properly mark each package with a label/tag according to Buyers instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyers instructions.  Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyers instructions and the carriers requirements.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased.  Seller further agrees:  (a) to accept payment based upon Buyers Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer.  The payment date is set forth in  the Line Item Detail of this contract, or if not stated, the date established by Buyers Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyers North American facilities, Sellers shipment date of goods or date of services, and, for all of Buyers other locations, Buyers receipt date of the goods or date of services.  Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3.  DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyers schedules.  Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyers delivery schedules.  Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4.  PREMIUM SHIPMENTS:
If Sellers acts or omissions result in Sellers failure to meet Buyers delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Sellers sole expense.

5.  CHANGES:
Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.  Any difference in price or time for performance resulting from such changes shall be equitably adjusted by

Buyer after receipt of documentation in such form and detail as Buyer may direct.  Any changes to this contract shall be made in accordance with Paragraph 31.

6.  SUPPLIER QUALITY AND DEVELOPMENT  INSPECTION:

Seller agrees to participate in Buyers supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000.  In addition, Buyer shall have the right to enter Sellers facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract.  Buyers inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

7.  NONCONFORMING GOODS:

Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections.  To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically  be reduced unless Buyer otherwise notifies Seller.  Seller will not replace quantities so reduced without a new contract or schedule from Buyer.  Nonconforming goods will be held by Buyer in accordance with Sellers instructions at Sellers risk.  Sellers failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyers option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller.  Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyers right to assert any legal or equitable remedy, or relieve Sellers responsibility for latent defects.

8.  FORCE MAJEURE:

Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order  provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter).  During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract.  In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Sellers labor contract(s).  If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days.  If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

9.  WARRANTY:

Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect.  In addition, Seller acknowledges that Seller knows of Buyers intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

10.  INGREDIENTS DISCLOSURE SPECIAL WARNINGS AND INSTRUCTIONS:

If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct:  (a) a list of all ingredients in the goods  (b) the amount of all ingredients  and (c) information concerning any changes in or additions to such ingredients.  Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

11.  INSOLVENCY:

Buyer may immediately terminate this contract without liability to Seller in any  of the following or any other comparable events:  (a) insolvency of Seller (b) filing of a voluntary petition in bankruptcy by Seller  (c) filing of any involuntary petition in bankruptcy against Seller  (d) appointment of a receiver or trustee for Seller  or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event.  Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorneys or other professional fees.

12. TERMINATION FOR BREACH OR NONPERFORMANCE  SALE OF ASSETS  OR CHANGE IN CONTROL:

Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller:  (a) repudiates or breaches any of the terms of this contract, including Seller's warranties  (b) fails to perform services or deliver goods as specified by Buyer  (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods  and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.  In addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock that effects a change in the control of Seller.

13.  TERMINATION FOR CONVENIENCE:

In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller.  Upon such termination, Buyer shall pay to Seller the following amounts without duplication: (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for  and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract  less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material.  Buyer will make no payments for finished goods, services, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable.  Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods or services that would be produced or performed by Seller under delivery  or release schedules outstanding at the date of termination.  Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on

account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract.  Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:
Seller agrees:  (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services  Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller  (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization  and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:
Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:
If Seller performs any work on Buyers premises or utilizes the property of Buyer, whether on or off Buyers premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorneys and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Sellers performance of work or use of Buyers property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:
Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms.  Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyers written request.  The certificate will provide that Buyer will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Sellers furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLERS PROPERTY:
Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Sellers Property') necessary for the production of the goods.  The cost of changes to Sellers Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer.  Seller shall insure Sellers Property with full fire and extended coverage insurance for its replacement value.  Seller grants Buyer an irrevocable option to take possession of and title to Sellers Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items  provided, however, that this option shall not apply if Sellers Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYERS PROPERTY:
All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis (Buyers Property).  Seller shall bear the risk of loss of and damage to Buyers Property.  Buyers Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract  shall be deemed to be personalty  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person  and shall not be moved from Sellers premises without Buyers prior written approval.  Buyer shall have the right to enter Sellers premises at all  reasonable times to inspect such property and Sellers records with respect thereto.  Upon the request of Buyer, Buyers Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Sellers plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyers Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:
Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs.  During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyers past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties.  When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyers service part sales activities.

21.  REMEDIES:
The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or

processing of warranty chargebacks for nonconforming goods.

22.  CUSTOMS  EXPORT CONTROLS:
Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer.  Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any.  Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s).  Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

23.  SETOFF/RECOUPMENT:
In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries  and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

24.  NO ADVERTISING:
Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Sellers advertising or promotional materials.

25.  COMPLIANCE WITH LAWS  EMPLOYMENT/BUSINESS PRACTICES:
Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract.  At Buyer's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

26.  NO IMPLIED WAIVER:
The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

27.  NON-ASSIGNMENT:
Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations  under this contract without Buyer's prior written consent.

28.  RELATIONSHIP OF PARTIES:
Seller and Buyer are independent contracting parties and nothing in this contract shall make either party  the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

29.  GOVERNING LAW  JURISDICTION:
This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law.  Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyers option, in the court(s) having jurisdiction over Buyers location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures.  Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

30.  SEVERABILITY:
If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

31.  ENTIRE AGREEMENT:
This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements.  This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated with tool construction. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any claim of Seller for tooling.

# CONTRACT HEADER



### *General Motors Corporation*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**        00150781099
KARMANN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Mailing Address Information:**
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

| Contract Header Number: | 1F5T0 |
|---|---|

This contract sets forth the exclusive terms and conditions under which seller shall sell and buyer shall purchase the goods or services described in the line item detail of this contract for the period(s) specified therein. Terms and conditions proposed by seller which are different from or in addition to the provisions of this contract are unacceptable to buyer, are expressly rejected by buyer, and shall not become a part of this contract. Any modification of this contract shall be made only in accordance with the provisions of paragraph 31 of the contract terms and conditions.

Contract Line Item Page:                1  of  3              Issue Date:  28-Feb-2008

**Standard Spot Buy Contract Number:**  1F5T00BB

**Amendment Number:**  000                          **Part Number:**  000000025899335



# LINE ITEM DETAIL for TOOLING CONTRACT
## *General Motors Corporation*

| | This Line Item is effective from | **27-Feb-2008** | through | **27-Feb-2011** |
|---|---|---|---|---|

**Part Description:**                              TOP ASM-FLDG

**Amendment Reason:**                           Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMANN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Buyer Name:**
Castro, Carolina
Buyer Code:                        L30

**Hazardous Material Indicator:**                          N

**Line Item Notes:**
Program: GMX 381
Model Year: 2008

Purchase order issued to cover the cost of special permanent tools, dies, patterns,
And/or molds necessary to produce part number, part description, per following EWO

EWO #: DANYL 803441

Description:
Cable
Cable - flipper door control RH (p/n A-22A-B720)
Cable - flipper door control LH (p/n A-22A-B721)
The change to the cable added an internal compensator, revised the T-end, revised the standoff, and
eliminated the adjustor.

Seal

Contract Line Item Page:          2  of  3                          Issue Date:  28-Feb-2008

**Standard Spot Buy Contract Number:**  1F5T00BB

**Amendment Number:**  000                          **Part Number:**  000000025899335

Seal Assembly - backlite lower (p/n A-22A-6696)

Breakdown
The change to the seal added a butyl bead with white paper liner, added butyl three places on the lower insert, increased pressure sensitive tape by 0.4mm, changed to high particulate coating and increase extrusion by 20mm.
added two stuffers in the lower bulb (13mm x 330mm and 12mm x 245mm), increased the drain hole size, deleted drain hole above 3M tape,.

TOOLING BREAKDOWN

INJECTION MOLD TONNEAU COVER............$17,650
2 CAVITY MOLD COMPRESSOR....................$5,000
2 FORM DIES ELBOS........................................$6,000
2 FORM TOOLS COLD HEAD.........................$3,000
SPRING FORM PLATE....................................$2,000
CRIMP STATION DIE PRE CRIMP.................$30,000
2 CRIMP DIE FINAL CRIMP............................$3,000
CHECK FIXTURE...............................................$1,000


MOLD MODIFICATIONS...........................$4,389
NOTCHING FIXTURE...............................$15,000
SLIP COAT RACK MODIFICATIONS..........$1,000
CHECK FIXTURE UPDATES.....................$1,000
DIE CUT BUTYL TAPE.............................$1,000
AND TRIM TOOL......................................$14,450


TOTAL.....................................................$104,489 usd

Supplier is Required to Mark all General Motors Tools with the GM Identification Tags.


Carolina Castro, L30 on February 27, 2008



**Terms and Conditions:**
**********

**Freight Terms:**                                    Collect
**Payment Terms:**                                  (88) MNS-2, On average, payment shall
                                                             be made on the second day of the
                                                             second month following Buyers receipt
                                                             date of goods or services.


**Delivery Terms:**                                 Free Carrier (FCA)

Contract Line Item Page:            3   of   3            Issue Date:   28-Feb-2008

**Standard Spot Buy Contract Number:**  1F5T00BB

**Amendment Number:**  000                          **Part Number:**  000000025899335

**Delivery DUNS:**                                  00150781099

**Ship From DUNS:**                                 00150781099

**Price Type:**                                     Returnable

**Price Composition:**
**The Total Price is composed of Base Price plus any applicable taxes.**

All Prices are expressed in        ***USD***

**Quantity:**                                                              1

**Base Price:**                                                104,489.000000

| Total Price: | 104,489.000000 |
|---|---|
| UOM: | LOT |

**Terms and Conditions:**
**********

# CONTRACT ATTACHMENT



## *General Motors Corporation*

**Contract Header Number:**        1F5T0

The attachments in this section apply to the standard terms and conditions
associated with the GM legal business entity and the terms and conditions
associated with the line item details for contract number.

## Contract Terms & Conditions:          Detailed Description
## Short Description

### Invoices - GM Corporation

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS.  Invoices for production part shipments are not required for payment processing.

INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS.  Invoices for CONTRACTS FOR SERVICES must
reference the contract number and be accompanied by a copy of the contract.  INVOICES FOR TOOLING may be submitted only after full production
sample approval has been received and all such invoices must be accompanied by the following: copies of applicable tooling contract(s), copy of
approved sample part inspection report(s), and a copy of the 'VTAM FORM1810.csv' which will be generated following Seller's input to the tool
management process located in GQTS.

To ensure proper payment processing, your invoice for contracts for tooling and services must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

### Language –English

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native language.
When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed.  Examples of documents
which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier Warrants, Shipping Labels,
Capability Studies and Data.

### Right to Audit

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other
documents for the purpose of auditing sellers charges under this contract.  Seller will preserve these documents for a period of 1 year after the final
payment under this contract.  In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer,
including, but not limited to, parts, tools, fixtures, gages and models.  Seller will segregated its records and otherwise cooperate with Buyer so as to
facilitate the audit.

### GM Right To Material Resale

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained through the
Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material Resale Programs,
including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of Seller's obligations under this
contract

### Insurance-US Coverage

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as
follows:  (a)  Workers' Compensation:  statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure)
(b)  Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease  (c)

Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

## Special Term (US) - Government

Special Term  (US) - Government Contracts
Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, 41 CFR 60-741.5, 41 CFR 60-250.5, and 41 CFR 60-300.5) (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and 52.219-9) (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned business concerns (Executive Order 12138).

## Special Term (Us)-C-Tpat

Special Term (U.S.) - C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ("C-TPAT") initiative.  For information go to http://www.cbp.gov/ and find the link to the C-TPAT section.  At Buyer's or the Bureau of Customs and Border Protection's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

## Supplier Quality & Development

Special Term - Supplier Quality and Development  Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

## Terms & Conditions Global 1

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1. ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2. SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination  (b) to route shipments in accordance with Buyers instructions  (c) to make no charge for handling, packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract  (d) to provide with each shipment packing slips with Buyers contract and/or release number and date of shipment marked thereon  (e) to properly mark each package with a label/tag according to Buyers instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyers instructions.  Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyers instructions and the carriers requirements.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased.  Seller further agrees:  (a) to accept payment based upon Buyers Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer.  The payment date is set forth in  the  Line Item Detail of this contract, or if not stated, shall be the date established by Buyers Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyers North American facilities, Sellers shipment date of goods or date of services, and, for all of Buyers other locations, Buyers receipt date of the goods or date of services. Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3. DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyers schedules.  Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyers delivery schedules.  Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4. PREMIUM SHIPMENTS:
If Sellers acts or omissions result in Sellers failure to meet Buyers delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Sellers sole expense.

5. CHANGES:
Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.  Any difference in price or time for performance resulting from such changes shall be equitably adjusted by

Buyer after receipt of documentation in such form and detail as Buyer may direct. Any changes to this contract shall be made in accordance with Paragraph 31.

### 6. SUPPLIER QUALITY AND DEVELOPMENT INSPECTION:

Seller agrees to participate in Buyers supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000. In addition, Buyer shall have the right to enter Sellers facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract. Buyers inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

### 7. NONCONFORMING GOODS:

Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections. To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically be reduced unless Buyer otherwise notifies Seller. Seller will not replace quantities so reduced without a new contract or schedule from Buyer. Nonconforming goods will be held by Buyer in accordance with Sellers instructions at Sellers risk. Sellers failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyers option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller. Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyers right to assert any legal or equitable remedy, or relieve Sellers responsibility for latent defects.

### 8. FORCE MAJEURE:

Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter). During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract. In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Sellers labor contract(s). If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days. If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

### 9. WARRANTY:

Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect. In addition, Seller acknowledges that Seller knows of Buyers intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

### 10. INGREDIENTS DISCLOSURE SPECIAL WARNINGS AND INSTRUCTIONS:

If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct: (a) a list of all ingredients in the goods (b) the amount of all ingredients and (c) information concerning any changes in or additions to such ingredients. Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

### 11. INSOLVENCY:

Buyer may immediately terminate this contract without liability to Seller in any of the following or any other comparable events: (a) insolvency of Seller (b) filing of a voluntary petition in bankruptcy by Seller (c) filing of any involuntary petition in bankruptcy against Seller (d) appointment of a receiver or trustee for Seller or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event. Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorneys or other professional fees.

### 12. TERMINATION FOR BREACH OR NONPERFORMANCE SALE OF ASSETS OR CHANGE IN CONTROL:

Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller: (a) repudiates or breaches any of the terms of this contract, including Seller's warranties (b) fails to perform services or deliver goods as specified by Buyer (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach. In addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock that effects a change in the control of Seller.

### 13. TERMINATION FOR CONVENIENCE:

In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller. Upon such termination, Buyer shall pay to Seller the following amounts without duplication: (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material. Buyer will make no payments for finished goods, services, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable. Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods or services that would be produced or performed by Seller under delivery or release schedules outstanding at the date of termination. Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on

Contract Attachment Page:        4  of  5

account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract.  Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:

Seller agrees:   (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services  Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification  (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller  (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization  and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:

Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:

If Seller performs any work on Buyers premises or utilizes the property of Buyer, whether on or off Buyers premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorneys and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Sellers performance of work or use of Buyers property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:

Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyers written request.  The certificate will provide that Buyer will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Sellers furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLERS PROPERTY:

Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Sellers Property') necessary for the production of the goods.  The cost of changes to Sellers Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer.  Seller shall insure Sellers Property with full fire and extended coverage insurance for its replacement value. Seller grants Buyer an irrevocable option to take possession of and title to Sellers Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items  provided, however, that this option shall not apply if Sellers Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYERS PROPERTY:

All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis (Buyers Property).  Seller shall bear the risk of loss of and damage to Buyers Property.  Buyers Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract  shall be deemed to be personally  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person and shall not be moved from Sellers premises without Buyers prior written approval.  Buyer shall have the right to enter Sellers premises at all  reasonable times to inspect such property and Sellers records with respect thereto.  Upon the request of Buyer, Buyers Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Sellers plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyers Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:

Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs.  During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyers past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties.  When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyers service part sales activities.

21.  REMEDIES:

The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods  (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or

processing of warranty chargebacks for nonconforming goods.

**22. CUSTOMS EXPORT CONTROLS:**
Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer. Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any. Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s). Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

**23. SETOFF/RECOUPMENT:**
In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries  and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

**24. NO ADVERTISING:**
Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Sellers advertising or promotional materials.

**25. COMPLIANCE WITH LAWS  EMPLOYMENT/BUSINESS PRACTICES:**
Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract.  At Buyer's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**26. NO IMPLIED WAIVER:**
The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

**27. NON-ASSIGNMENT:**
Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations  under this contract without Buyer's prior written consent.

**28. RELATIONSHIP OF PARTIES:**
Seller and Buyer are independent contracting parties and nothing in this contract shall make either party  the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

**29. GOVERNING LAW  JURISDICTION:**
This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law.  Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyers option, in the court(s) having jurisdiction over Buyers location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures.  Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

**30. SEVERABILITY:**
If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

**31. ENTIRE AGREEMENT:**
This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements.  This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated with tool construction. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any claim of Seller for tooling.

Contract Header Page:      1  of  1

# CONTRACT HEADER



### *General Motors Corporation*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**          00150781099
KARMANN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Mailing Address Information:**
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

| Contract Header Number: | 1F5T0 |
|---|---|

This contract sets forth the exclusive terms and conditions under which seller shall
sell and buyer shall purchase the goods or services described in the line item detail
of this contract for the period(s) specified therein. Terms and conditions proposed
by seller which are different from or in addition to the provisions of this contract are
unacceptable to buyer, are expressly rejected by buyer, and shall not become a
part of this contract. Any modification of this contract shall be made only in
accordance with the provisions of paragraph 31 of the contract terms and
conditions.

Contract Line Item Page:               1  of  2                    Issue Date:  25-Apr-2008
**Standard Spot Buy Contract Number:**  1F5T00BF
**Amendment Number:**  000                          **Part Number:**  000000025899335



# LINE ITEM DETAIL for TOOLING CONTRACT
## *General Motors Corporation*

| | | | |
|---|---|---|---|
| This Line Item is effective from | **24-Apr-2008** | through | **24-Apr-2011** |

**Part Description:**                                    TOP ASM-FLDG
**Amendment Reason:**                                   Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMANN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Buyer Name:**
Castro, Carolina
Buyer Code:                          L30

**Hazardous Material Indicator:**                           N

**Line Item Notes:**
Program: GMX381 Retractable Hard Top
Model Year: 2008 / 2009

Contract created per following EWO:

DCYFH 856690

Description: Reduce costs for the G6 convertible as a result of Paint efficiency at Tier II Paint Supplier.
The Process change is to increase density from 2 panels to 3 panels per paint carrier for the front and
rear roof panels.

Tooling Breakdown:
Panel Asm.-Front Panel Paint Racks .......$11,000
Panel Asm.-Rear Panel Paint Racks .......$11,000

Total Tooling:  $22,000 usd.

Contract Line Item Page:          2  of  2                          Issue Date:  25-Apr-2008
**Standard Spot Buy Contract Number:**  1F5T00BF
**Amendment Number:**  000                              **Part Number:**  000000025899335

Supplier is Required to Mark all General Motors Tools with the GM Identification Tags.

Effective Date: 05/31/08
Supplier:  Karmann
Supplier Contact: Jim Davenport
Supplier Memo Dated: 04/24/08

**Terms and Conditions:**
**********

**Freight Terms:**                                       Collect
**Payment Terms:**                                       (88) MNS-2, On average, payment shall
                                                         be made on the second day of the
                                                         second month following Buyers receipt
                                                         date of goods or services.

**Delivery Terms:**                                      Free Carrier (FCA)

**Delivery DUNS:**                                       00150781099
**Ship From DUNS:**                                      00150781099
**Price Type:**                                          Returnable

**Price Composition:**
**The Total Price is composed of Base Price plus any applicable taxes.**

All Prices are expressed in      *USD*
**Quantity:**                                                                         1
**Base Price:**                                                              22,000.000000

| | |
|---|---|
| **Total Price:** | 22,000.000000 |
| **UOM:** | LOT |

**Terms and Conditions:**
**********

Contract Attachment Page:        1  of  5

# CONTRACT ATTACHMENT



## *General Motors Corporation*

**Contract Header Number:**        1F5T0

The attachments in this section apply to the standard terms and conditions
associated with the GM legal business entity and the terms and conditions
associated with the line item details for contract number.

| **Contract Terms & Conditions: Short Description** | **Detailed Description** |
|---|---|

**Invoices - GM Corporation**

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS.  Invoices for production part shipments are not required for payment processing.

INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS.  Invoices for CONTRACTS FOR SERVICES must
reference the contract number and be accompanied by a copy of the contract.  INVOICES FOR TOOLING may be submitted only after full production
sample approval has been received and all such invoices must be accompanied by the following: copies of applicable tooling contract(s), copy of
approved sample part inspection report(s), and a copy of the 'VTAM FORM1810.csv' which will be generated following Seller's input to the tool
management process located in GQTS.

To ensure proper payment processing, your invoice for contracts for tooling and services must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

**Language --English**

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native language.
When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed.  Examples of documents
which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier Warrants, Shipping Labels,
Capability Studies and Data.

**Right to Audit**

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other
documents for the purpose of auditing sellers charges under this contract.  Seller will preserve these documents for a period of 1 year after the final
payment under this contract.  In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer,
including, but not limited to, parts, tools, fixtures, gages and models.  Seller will segregated its records and otherwise cooperate with Buyer so as to
facilitate the audit.

**GM Right To Material Resale**

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained through the
Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material Resale Programs,
including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of Seller's obligations under this
contract

**Insurance-US Coverage**

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as
follows:  (a)  Workers' Compensation:  statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure)
(b)  Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease  (c)

Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

## Special Term (US) - Government

Special Term  (US) - Government Contracts
Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, 41 CFR 60-741.5, 41 CFR 60-250.5, and 41 CFR 60-300.5) (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and 52.219-9) (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned business concerns (Executive Order 12138).

## Special Term (Us)-C-Tpat

Special Term (U.S) - C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ('C-TPAT') initiative (for information go to http://www.cbp.gov/ and find the link to the C-TPAT section). At Buyer's or the Bureau of Customs and Border Protection's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

## Supplier Quality & Development

Special Term - Supplier Quality and Development  Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

## Terms & Conditions Global 1

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1.  ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2.  SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination  (b) to route shipments in accordance with Buyers instructions  (c) to make no charge for handling, packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract  (d) to provide with each shipment packing slips with Buyers contract and/or release number and date of shipment marked thereon  (e) to properly mark each package with a label/tag according to Buyers instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyers instructions.  Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyers instructions and the carriers requirements.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased.  Seller further agrees:  (a) to accept payment based upon Buyers Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer. The payment date is set forth in   the Line Item Detail of this contract, or if not stated, the date established by Buyers Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyers North American facilities, Sellers shipment date of goods or date of services, and, for all of Buyers other locations, Buyers receipt date of the goods or date of services.  Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3.  DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyers schedules.  Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyers delivery schedules. Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4.  PREMIUM SHIPMENTS:
If Sellers acts or omissions result in Sellers failure to meet Buyers delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Sellers sole expense.

5.  CHANGES:
Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.  Any difference in price or time for performance resulting from such changes shall be equitably adjusted by

Buyer after receipt of documentation in such form and detail as Buyer may direct.  Any changes to this contract shall be made in accordance with Paragraph 31.

6.  SUPPLIER QUALITY AND DEVELOPMENT  INSPECTION:
Seller agrees to participate in Buyers supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000.  In addition, Buyer shall have the right to enter Sellers facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract.  Buyers inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

7.  NONCONFORMING GOODS:
Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections.  To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically  be reduced unless Buyer otherwise notifies Seller.  Seller will not replace quantities so reduced without a new contract or schedule from Buyer.  Nonconforming goods will be held by Buyer in accordance with Sellers instructions at Sellers risk.  Sellers failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyers option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller.  Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyers right to assert any legal or equitable remedy, or relieve Sellers responsibility for latent defects.

8.  FORCE MAJEURE:
Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order  provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter).  During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract.  In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Sellers labor contract(s).  If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days.  If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

9.  WARRANTY:
Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect.  In addition, Seller acknowledges that Seller knows of Buyers intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

10.  INGREDIENTS DISCLOSURE  SPECIAL WARNINGS AND INSTRUCTIONS:
If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct: (a) a list of all ingredients in the goods  (b) the amount of all ingredients  and (c) information concerning any changes in or additions to such ingredients.  Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

11.  INSOLVENCY:
Buyer may immediately terminate this contract without liability to Seller in any  of the following or any other comparable events:  (a) insolvency of Seller (b) filing of a voluntary petition in bankruptcy by Seller  (c) filing of any involuntary petition in bankruptcy against Seller  (d) appointment of a receiver or trustee for Seller  or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event.  Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorneys or other professional fees.

12. TERMINATION FOR BREACH OR NONPERFORMANCE  SALE OF ASSETS  OR CHANGE IN CONTROL:
Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller:  (a) repudiates or breaches any of the terms of this contract, including Seller's warranties  (b) fails to perform services or deliver goods as specified by Buyer  (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods  and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.  In addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock that effects a change in the control of Seller.

13.  TERMINATION FOR CONVENIENCE:
In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller.  Upon such termination, Buyer shall pay to Seller the following amounts without duplication: (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for  and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract  less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material.  Buyer will make no payments for finished goods, services, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable.  Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods or services that would be produced or performed by Seller under delivery  or release schedules outstanding at the date of termination.  Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on

Contract Attachment Page:       4   of   5

account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract.  Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:
Seller agrees:  (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services  Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification  (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller  (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization  and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:
Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:
If Seller performs any work on Buyers premises or utilizes the property of Buyer, whether on or off Buyers premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorneys and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Sellers performance of work or use of Buyers property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:
Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyers written request.  The certificate will provide that Buyer will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Sellers furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLERS PROPERTY:
Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Sellers Property') necessary for the production of the goods.  The cost of changes to Sellers Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer.  Seller shall insure Sellers Property with full fire and extended coverage insurance for its replacement value.  Seller grants Buyer an irrevocable option to take possession of and title to Sellers Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items  provided, however, that this option shall not apply if Sellers Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYERS PROPERTY:
All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis (Buyers Property).  Seller shall bear the risk of loss of and damage to Buyers Property.  Buyers Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract  shall be deemed to be personalty  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person  and shall not be moved from Sellers premises without Buyers prior written approval.  Buyer shall have the right to enter Sellers premises at all  reasonable times to inspect such property and Sellers records with respect thereto.  Upon the request of Buyer, Buyers Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Sellers plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyers Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:
Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs.  During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyers past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties.  When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyers service part sales activities.

21.  REMEDIES:
The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods  (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or

processing of warranty chargebacks for nonconforming goods.

22. CUSTOMS  EXPORT CONTROLS:

Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer. Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any.  Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s).  Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

23. SETOFF/RECOUPMENT:

In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries  and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

24. NO ADVERTISING:

Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Sellers advertising or promotional materials.

25. COMPLIANCE WITH LAWS  EMPLOYMENT/BUSINESS PRACTICES:

Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract.  At Buyer's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

26. NO IMPLIED WAIVER:

The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

27. NON-ASSIGNMENT:

Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations  under this contract without Buyer's prior written consent.

28. RELATIONSHIP OF PARTIES:

Seller and Buyer are independent contracting parties and nothing in this contract shall make either party  the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

29. GOVERNING LAW  JURISDICTION:

This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law.  Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyers option, in the court(s) having jurisdiction over Buyers location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures.  Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

30. SEVERABILITY:

If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

31. ENTIRE AGREEMENT:

This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements.  This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated with tool construction. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any claim of Seller for tooling.

Contract Header Page:        1  of  1

# CONTRACT HEADER



*General Motors Corporation*

<table>
<tr><td>

**SUPPLIER NAME AND ADDRESS INFORMATION:**

**DUNS Number:**        00150781099

KARMANN MANUFACTURING LLC

14988 PILOT DR

PLYMOUTH,MI 48170

UNITED STATES

**Mailing Address Information:**

14988 PILOT DR

PLYMOUTH,MI 48170

UNITED STATES

</td><td>

**BUYER NAME AND ADDRESS INFORMATION:**

**General Motors Corporation**

300 Renaissance Center

Detroit, MI 48265

UNITED STATES

</td></tr>
</table>

| **Contract Header Number:** | 1F5T0 |
|---|---|

This contract sets forth the exclusive terms and conditions under which seller shall sell and buyer shall purchase the goods or services described in the line item detail of this contract for the period(s) specified therein. Terms and conditions proposed by seller which are different from or in addition to the provisions of this contract are unacceptable to buyer, are expressly rejected by buyer, and shall not become a part of this contract. Any modification of this contract shall be made only in accordance with the provisions of paragraph 31 of the contract terms and conditions.

Contract Line Item Page:         1  of  3                    Issue Date:  21-May-2008
**Standard Spot Buy Contract Number:**  1F5T00BG
**Amendment Number:**  000                            **Part Number:**  000000025899335



# LINE ITEM DETAIL for TOOLING CONTRACT
## *General Motors Corporation*

| | | | | |
|---|---|---|---|---|
| This Line Item is effective from | **09-May-2008** | through | **09-May-2011** | |

**Part Description:**                               TOP ASM-FLDG
**Amendment Reason:**                               Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMANN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Purchasing Contact:**
Castro, Carolina
Buyer Code:                        L30

**Hazardous Material Indicator:**                    N

**Line Item Notes:**
Program: GMX381 Retractable Hard Top
Model Year: 2008/2009

Purchase order issued to cover the cost of special permanent tools, dies, patterns,
and/or molds necessary to produce part number, part description, as follows:

EWO DMWKM 961767

EWO Description:
PRTS 1027860: Reduce / Eliminate an itching noise that occurs between the glass guidance clip and the
door glass

Revise the interfacing surface of the glass guidance clip at the door glass.  The design change will
increase the contact surface area by creating a flat on the part edge.  The current radius is 0.5mm, and
the new flat surface will be appx 1.5 x 22.  (Karmann ECR 14156).

Contract Line Item Page:                    2  of  3                Issue Date:  21-May-2008
**Standard Spot Buy Contract Number:**  1F5T00BG
**Amendment Number:**  000                                    **Part Number:**  000000025899335

Tooling Breakdown:

RETAINER- FRONT WEATHERSTRIP RH BENDER GMX3810445..........$ 6,500.00

Total Tooling: $ 6,500.00 USD

Capacity: 115 pcs / 10 hrs
Supplier:  Karmann
Supplier Contact: Jim Davenport
Supplier Memo Dated: 05/02/08

Supplier is Required to Mark all General Motors Tools with the GM Identification Tags.

Carolina Castro, Buyer L30 on May 09, 2008

**Terms and Conditions:**
**********

**Freight Terms:**                                Collect
**Payment Terms:**                             (88) MNS-2, On average, payment shall
                                                  be made on the second day of the
                                                  second month following Buyers receipt
                                                  date of goods or services.

**Delivery Terms:**                            Free Carrier (FCA)

**Delivery DUNS:**                             00150781099
**Ship From DUNS:**                            00150781099
**Price Type:**                                 Returnable

**Price Composition:**
**The Total Price is composed of Base Price plus any applicable taxes.**

All Prices are expressed in        *USD*
**Quantity:**                                                              1
**Base Price:**                                                    6,500.000000

| **Total Price:** | 6,500.000000 |
|---|---|
| **UOM:** | LOT |

Contract Line Item Page:            3  of  3                  Issue Date:  21-May-2008

**Standard Spot Buy Contract Number:**  1F5T00BG

**Amendment Number:**  000                              **Part Number:**  000000025899335

**Terms and Conditions:**
**********

Contract Attachment Page:       1   of   5

# CONTRACT ATTACHMENT



### *General Motors Corporation*

**Contract Header Number:**        1F5T0

**Contract Terms & Conditions:**                    **Detailed Description**
**Short Description**

**Invoices - GM Corporation**

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS.  Invoices for production part shipments are not required for payment processing.

INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS.  Invoices for CONTRACTS FOR SERVICES must reference the contract number and be accompanied by a copy of the contract.  INVOICES FOR TOOLING may be submitted only after full production sample approval has been received and all such invoices must be accompanied by the following: copies of applicable tooling contract(s), copy of approved sample part inspection report(s), and a copy of the 'VTAM FORM1810.csv' which will be generated following Seller's input to the tool management process located in GQTS.

To ensure proper payment processing, your invoice for contracts for tooling and services must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

**Language –English**

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native language.  When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed.  Examples of documents which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier Warrants, Shipping Labels, Capability Studies and Data.

**Right to Audit**

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other documents for the purpose of auditing sellers charges under this contract.  Seller will preserve these documents for a period of 1 year after the final payment under this contract.  In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer, including, but not limited to, parts, tools, fixtures, gages and models.  Seller will segregated its records and otherwise cooperate with Buyer so as to facilitate the audit.

**GM Right To Material Resale**

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained through the Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material Resale Programs, including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of Seller's obligations under this contract

**Insurance-US Coverage**

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as follows:  (a)  Workers' Compensation:  statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure)  (b)  Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease  (c)  Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

**Special Term (US) - Government**

Special Term  (US) - Government Contracts
Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, 41 CFR 60-741.5, 41 CFR 60-250.5, and 41 CFR 60-300.5)  (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and 52.219-9)  (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned business concerns (Executive Order 12138).

**Special Term (Us)-C-Tpat**

Special Term (U.S) - C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ('C-TPAT') initiative (for information go to http://www.cbp.gov/ and find the link to the C-TPAT section).  At Buyer's or the Bureau of Customs and Border Protection's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**Supplier Quality & Development**

Special Term - Supplier Quality and Development Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

**Terms & Conditions Global 1**

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1.  ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2.  SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination  (b) to route shipments in accordance with Buyers instructions  (c) to make no charge for handling, packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract  (d) to provide with each shipment packing slips with Buyers contract and/or release number and date of shipment marked thereon  (e) to properly mark each package with a label/tag according to Buyers instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyers instructions.  Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyers instructions and the carriers requirements.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased.  Seller further agrees:  (a) to accept payment based upon Buyers Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer. The payment date is set forth in   the Line Item Detail of this contract, or if not stated, shall be the date established by Buyers Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of Buyers North American facilities, Sellers shipment date of goods or date of services, and, for all of Buyers other locations, Buyers receipt date of the goods or date of services.  Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3.  DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyers schedules.  Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyers delivery schedules.  Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4.  PREMIUM SHIPMENTS:
If Sellers acts or omissions result in Sellers failure to meet Buyers delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Sellers sole expense.

5.  CHANGES:
Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.  Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct.  Any changes to this contract shall be made in accordance with Paragraph 31.

6.  SUPPLIER QUALITY AND DEVELOPMENT  INSPECTION:

Seller agrees to participate in Buyers supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000.  In addition, Buyer shall have the right to enter Sellers facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract.  Buyers inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

### 7. NONCONFORMING GOODS:

Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections.  To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically  be reduced unless Buyer otherwise notifies Seller.  Seller will not replace quantities so reduced without a new contract or schedule from Buyer.  Nonconforming goods will be held by Buyer in accordance with Sellers instructions at Sellers risk.  Sellers failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyers option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller.  Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyers right to assert any legal or equitable remedy, or relieve Sellers responsibility for latent defects.

### 8. FORCE MAJEURE:

Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order  provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter).  During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract.  In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Sellers labor contract(s).  If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days.  If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

### 9. WARRANTY:

Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect.  In addition, Seller acknowledges that Seller knows of Buyers intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer.  The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

### 10. INGREDIENTS DISCLOSURE  SPECIAL WARNINGS AND INSTRUCTIONS:

If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct: (a) a list of all ingredients in the goods  (b) the amount of all ingredients  and (c) information concerning any changes in or additions to such ingredients.  Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

### 11. INSOLVENCY:

Buyer may immediately terminate this contract without liability to Seller in any  of the following or any other comparable events: (a) insolvency of Seller  (b) filing of a voluntary petition in bankruptcy by Seller  (c) filing of any involuntary petition in bankruptcy against Seller  (d) appointment of a receiver or trustee for Seller  or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event.  Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorneys or other professional fees.

### 12. TERMINATION FOR BREACH OR NONPERFORMANCE  SALE OF ASSETS  OR CHANGE IN CONTROL:

Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller: (a) repudiates or breaches any of the terms of this contract, including Seller's warranties  (b) fails to perform services or deliver goods as specified by Buyer  (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods  and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.  In addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock that effects a change in the control of Seller.

### 13. TERMINATION FOR CONVENIENCE:

In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller.  Upon such termination, Buyer shall pay to Seller the following amounts without duplication: (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for  and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract  less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material.  Buyer will make no payments for finished goods, services, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable.  Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods or services that would be produced or performed by Seller under delivery or release schedules outstanding at the date of termination.  Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract.  Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as

Buyer shall request.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:

Seller agrees:   (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services  Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification  (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller  (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization  and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:

Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:

If Seller performs any work on Buyers premises or utilizes the property of Buyer, whether on or off Buyers premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorneys and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Sellers performance of work or use of Buyers property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:

Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyers written request.  The certificate will provide that Buyer will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Sellers furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLERS PROPERTY:

Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Sellers Property') necessary for the production of the goods. The cost of changes to Sellers Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer. Seller shall insure Sellers Property with full fire and extended coverage insurance for its replacement value. Seller grants Buyer an irrevocable option to take possession of and title to Sellers Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items  provided, however, that this option shall not apply if Sellers Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYERS PROPERTY:

All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis (Buyers Property).  Seller shall bear the risk of loss of and damage to Buyers Property.  Buyers Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract  shall be deemed to be personalty  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person  and shall not be moved from Sellers premises without Buyers prior written approval.  Buyer shall have the right to enter Sellers premises at all  reasonable times to inspect such property and Sellers records with respect thereto.  Upon the request of Buyer, Buyers Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Sellers plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyers Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:

Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs.  During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyers past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties.  When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyers service part sales activities.

21.  REMEDIES:

The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods  (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

22.  CUSTOMS  EXPORT CONTROLS:

Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to

Buyer.  Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any.  Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s).  Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

23.  SETOFF/RECOUPMENT:

In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries  and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

24.  NO ADVERTISING:

Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Sellers advertising or promotional materials.

25.  COMPLIANCE WITH LAWS  EMPLOYMENT/BUSINESS PRACTICES:

Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract.  At Buyer's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

26.  NO IMPLIED WAIVER:

The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

27.  NON-ASSIGNMENT:

Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations  under this contract without Buyer's prior written consent.

28.  RELATIONSHIP OF PARTIES:

Seller and Buyer are independent contracting parties and nothing in this contract shall make either party  the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

29.  GOVERNING LAW  JURISDICTION:

This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law.  Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyers option, in the court(s) having jurisdiction over Buyers location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures.  Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

30.  SEVERABILITY:

If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

31.  ENTIRE AGREEMENT:

This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements.  This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated with tool construction. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any claim of Seller for tooling.