Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
|  | : |  |
| **MOTORS LIQUIDATION COMPANY**, *et al.*, | : | **09-50026 (REG)** |
| **f/k/a General Motors Corp.**, *et al.* | : |  |
|  | : |  |
| Debtors. | : | **(Jointly Administered)** |
|  | : |  |

-------------------------------------------------------------x

## REPLY OF DEBTORS TO OBJECTION BY
## KARMANN U.S.A., INC. TO FOURTH OMNIBUS
## MOTION OF DEBTORS TO REJECT CERTAIN  EXECUTORY CONTRACTS

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation ("**GM**")) and its

affiliated debtors, as debtors in possession in the above-captioned chapter 11 cases (collectively,

the "**Debtors**"), respectfully represent:

### Background

1.       On June 1, 2009, the Debtors filed a motion (the "**Sale Motion**"),

requesting, *inter alia*, an order (the "**Sale Order**"), pursuant to 11 U.S.C. §§ 105, 363(b), (f), and

(m), and 365, authorizing and approving (i) the sale of substantially all of the Debtors' assets

pursuant to a proposed Master Sale and Purchase Agreement and related agreements (the

"**MPA**") among the Debtors and Vehicle Acquisition Holdings LLC ( "**New GM**"), a purchaser

sponsored by the United States Department of the Treasury (the "**U.S. Treasury**"), free and clear

of liens, claims, encumbrances, and other interests, including any successor liabilities (the "**363**

**Transaction**"), (ii) the assumption and assignment of certain executory contracts and unexpired

leases of personal property and of nonresidential real property, and (iii) the approval of the UAW

Retiree Settlement Agreement, subject to higher or better offers.

2.      On July 5, 2009, the Court approved the 363 Transaction, and on July 10,

2009, the 363 Transaction closed.  Accordingly, the Debtors no longer operate as manufacturers

of Motor Vehicles.

## The Debtors' Fourth Omnibus Rejection Motion and Karmann's Objection

3.      On July 10, 2009, the Debtors filed their Fourth Omnibus Motion to

Reject Certain Executory Contracts (the "**Motion**")[1] [Docket No. 3107].  On July 28, 2009,

Karmann U.S.A., Inc. ("**Karmann**") filed an objection (the "**Objection**") to the Motion, and

specifically to the Debtors' proposed rejection of parts supply agreements between the Debtors

and Karmann (the "**Production Contracts**").

4.      The Production Contracts provide for the manufacturing of parts for the

assembly of convertible tops for Pontiac brand vehicles under the GMX381 Program.  The

Debtors seek to reject the Production Contracts because the Pontiac brand was sold to New GM

pursuant to the 363 Transaction and New GM has no need or desire to assume the Production

Contracts in light of the contemplated cancellation of the Pontiac brand.  Since the Debtors are

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

ERROR! NO PROPERTY NAME SUPPLIED.

no longer in the business of manufacturing vehicles and, therefore, no longer participate in the production of Pontiac vehicles, they have sought to reject the Production Contracts.

5.      In addition to the Production Contracts, the Debtors are party to two other types of agreements with Karmann.  Namely, these contracts include purchase orders for tooling (the "**Tooling Contracts**") and purchase orders for service parts (the "**Service Contracts**", and, together with the Production Contracts and the Tooling Contracts, the "**Karmann Contracts**"). Unlike the Production Contracts, New GM requires the Tooling Contracts and Service Contracts going forward because they allow for the maintenance and replacement of existing convertible tops manufactured under the GMX381 Program.  As such, the Debtors have sought to assume and assign the Tooling Contracts and Service Contracts to New GM.  Notably, Karmann does not object to the business judgment of the Debtors in seeking to reject the Production Contracts, but instead objects to the Motion on the sole basis that the Debtors may not simultaneously reject the Production Contracts while assuming and assigning the Tooling Contracts and Service Contracts.

### The Karmann Contracts Are Not Integrated

6.      The Karmann Contracts are not integrated agreements.  Karmann's Objection is completely void of any legal or factual support whatsoever for its contention that these separate agreements are integrated other than cite to one bankruptcy court case in another district that stands for the general proposition that integrated contracts must be assumed or rejected in whole.

7.      Upon review of the relevant agreements, it is clear that the Karmann Contracts are separate agreements that can be rejected or assumed and assigned on an individual

3

basis.[2]  Whether a contract is integrated or severable "is a question of the parties' intent, to be

determined from the language employed by the parties, viewed in light of the circumstances

surrounding them at the time they contracted." *In re Am. Home Mtge. Inc.*, 379 B.R. 503, 520-

521 (Bankr. D. Del. 2008) (*citing Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l (In re Balfour

MacLaine Int'l)*, 85 F.3d 68, 81 (2d Cir. 1996)).   Absent ambiguity in the terms of the contract,

the parties' intent is gleaned from the four corners of the instrument.  *In re Am. Home Mtge.

Holdings, Inc.*, Case No. 07-11047, 2009 Bankr. LEXIS 439, at *17 (Bankr. D. Del. Mar. 13,

2009) (applying New York law); *In re Royster Co.*, 137 B.R. 530 (Bankr M. D. Fla. 1992).  Only

if there is an ambiguity in the terms of the contract may the court look to extrinsic evidence to

discern the intent of the parties.  *See Instead, Inc. v. Reprotect, Inc.*, 08 Civ. 5236 (DLC), 2009

U.S. Dist. LEXIS, at *12 (S.D.N.Y. Feb. 5, 2009).  Here, based on even a cursory examination of

the Karmann Contracts, it is clear that they are not integrated.

       8.     Courts have relied on a number of non-exclusive factors for evidence of

the parties' intent with respect to the integration or severability of contracts.  These include: (i)

whether the nature and purpose of each agreement (subsumed in the single contract or document)

is different; (ii) whether the consideration for each agreement is separate and distinct;  (iii)

whether the obligations of the parties to each agreement are interrelated – i.e., whether

performance under one agreement is dependent on or related to performance under the terms of

the other agreement; (iv) whether there is an integration clause stating the contract is to be

considered one agreement; (v) whether a default under one agreement causes or requires a

default under the other agreements; (vi) whether the agreements are for the same term, including

---

[2] Attached hereto as Exhibit A is a copy of each a Production Contract, a Tooling Contract, and a Service Contract. Although there are numerous contracts that fall under each of these categories, the terms and conditions of the contracts are substantially the same.

4

whether extensions are permitted on a whole or partial basis; and (vii) whether the agreements are separately negotiated. *See generally Byrd v. Gardinier, Inc. (In re Gardinier, Inc.)*, 831 F.2d 974 (11th Cir. 1987) (holding that debtor was permitted to assume purchase and sale contract, but could also reject a broker commission agreement that was stated in the same sale contract); *In re Am. Home Mtge. Inc.*, 379 B.R. 503 (Bankr. D. Del. 2008) (holding that mortgage servicing rights in a repurchase agreement were severable); *In re Adelphia Bus. Solutions, Inc.* 322 B.R. 51, 55 n. 10 (Bankr. S.D.N.Y. 2005) (holding that two separate, but closely related, lease agreements were severable); *In re Royster Co.*, 137 B.R. at 531 (Bankr M. D. Fla. 1992) (holding that 11 agreements documented on separate riders to master agreement, which were executed on different dates, separately negotiated, involved different consideration and were of varying duration constituted separate agreements).

9.      After review of the Karmann Contracts, it is clear that not a single one of the above factors weighs in favor of a finding that the contracts are integrated. Significantly, there is no master contract, integration clause, or cross-default provision included in any of the contracts. Also, because each contract is a purchase order contract, the consideration for each agreement is completely separate and distinct. Each Karmann Contract contains a "Termination for Convenience" provision allowing the Debtors to immediately terminate all or part of the respective agreement upon written notice to Karmann without regard to the effect on other agreements. Finally, the purpose of the Production Contracts, Tooling Contracts, and Service Contracts are separate and distinct as evidenced by New GM's desire to assume only two out of the three categories of Karmann Contracts. The four corners of the Karmann Contracts unambiguously contemplate standalone contracts and there is no provision indicating otherwise.

ERROR! NO PROPERTY NAME SUPPLIED.

10.    Upon further inquiry of Karmann as to the basis of its assertions, Karmann has indicated that it believes a nomination letter from the Debtors, dated February 28, 2002 (the "**Nomination Letter**"),[3] notifying Karmann that it had been selected as the supplier for the Production Contracts, Service Contracts, and Tooling Contracts resulted in integration of the Karmann Contracts.  The Debtors do not believe the Nomination Letter has any bearing on the Debtors' argument set forth above as the Nomination Letter is clearly not a master contract and is not in any way incorporated or integrated into the Karmann Contracts.  Further, the Court should only look to extrinsic evidence when there is ambiguity within the terms of the contract at issue.  The terms of the Karmann Contracts are unambiguous and therefore the Court should not look to the Nomination Letter for indication of the parties' intent with respect to integration of the Karmann Contracts.  *See Instead, Inc. v. Reprotect, Inc.*, 2009 U.S. Dist. LEXIS, at *12 (S.D.N.Y. Feb. 5, 2009).  As such, Karmann has provided absolutely no factual or legal basis supporting its contention that the Karmann Contracts are integrated.  Therefore, the Objection should be overruled.

11.    The Debtors do not believe there are any payments outstanding or accruing under the Production Contracts and accordingly, the Debtors have not sought *nunc pro tunc* relief.  However, Karmann has also filed an objection (the "**Assumption Objection**") relating to the Debtors' proposed assumption and assignment of the Tooling Contracts and Service Contracts.[4]   A hearing on the Assumption Objection is scheduled for August 3, 2009.

---

[3] A copy of the Nomination Letter is attached hereto as Exhibit B.

[4] *See* Karmann U.S.A., Inc.'s Objection to Second Notice of (i) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property and Unexpired Leases of Non-Residential Real Property and (ii) Cure Costs Related Thereto [Docket No. 2903]. A copy of the Assumption Objection is attached hereto as Exhibit C.

ERROR! NO PROPERTY NAME SUPPLIED.

The Assumption Objection also substantially relies on the argument that the Karmann Contracts are integrated agreements and must be assumed or rejected in their entirety.  Consequently, the Debtors have been unable to assume and assign the Tooling Contracts and Service Contracts to date and will not be in a position to do so until the integration issue is resolved.  In the interim, Karmann has refused to perform under the Tooling Contracts and Service Contracts.  The Debtors believe that a ruling by this Court on both matters simultaneously, determining that the Karmann Contracts are not integrated agreements, will expedite the assumption and assignment of the Tooling Contracts and Service Contracts and facilitate performance by Karmann.  This will reduce the risk that (a) the Debtors' estates will incur administrative expense claims relating to those contracts and (b) the Debtors would be required to engage in expensive litigation to compel performance under the contracts.

### Notice

12.     Notice of this Reply has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the United States Department of the Treasury, (iii) the attorneys for Export Development Canada, (iv) the attorneys for the statutory committee of unsecured creditors appointed in these chapter 11 cases, (v) the attorneys for the ad hoc bondholders committee, (vi) the U.S. Attorney's Office, S.D.N.Y., (vii) the attorneys for Karmann, and (viii) all entities that requested notice in these chapter 11 cases under Fed. R. Bankr. P. 2002.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

ERROR! NO PROPERTY NAME SUPPLIED.

WHEREFORE, the Debtors respectfully request that the Court enter an order

granting the relief requested herein and in the Motion and such other and further relief as is just

and proper.

Dated: New York, New York
           July 31, 2009

                                                    /s/ Joseph H. Smolinsky
                                                    Harvey R. Miller
                                                    Stephen Karotkin
                                                    Joseph H. Smolinsky

                                                    WEIL, GOTSHAL & MANGES LLP
                                                    767 Fifth Avenue
                                                    New York, New York 10153
                                                    Telephone: (212) 310-8000
                                                    Facsimile: (212) 310-8007

                                                    Attorneys for Debtors
                                                    and Debtors in Possession

ERROR! NO PROPERTY NAME SUPPLIED.

**<u>Exhibit A</u>**

Contract Header Page:        1   of   1

# CONTRACT HEADER



*General Motors Corporation*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**             00150781099

KARMANN MANUFACTURING LLC

14988 PILOT DR

PLYMOUTH,MI 48170

UNITED STATES

**Mailing Address Information:**

14988 PILOT DR

PLYMOUTH,MI 48170

UNITED STATES

## BUYER NAME AND ADDRESS INFORMATION:

**General Motors Corporation**

300 Renaissance Center

Detroit, MI 48265

UNITED STATES

| **Contract Header Number:** | 1F5T0 |
| --- | --- |

This contract sets forth the exclusive terms and conditions under which seller shall sell and buyer shall purchase the goods or services described in the line item detail of this contract for the period(s) specified therein. Terms and conditions proposed by seller which are different from or in addition to the provisions of this contract are unacceptable to buyer, are expressly rejected by buyer, and shall not become a part of this contract. Any modification of this contract shall be made only in accordance with the provisions of paragraph 31 of the contract terms and conditions.

Contract Line Item Page:          1   of   13                    Issue Date:   16-Jan-2009

**Standard Blanket Contract Number:**   1F5T00C6

**Amendment Number:**  000                          **Part Number:**   000000020831762



# LINE ITEM DETAIL
*General Motors Corporation*

| | This Line Item is effective from | **31-Jan-2009** | through | **24-Jan-2011** | |
|---|---|---|---|---|---|

**Part Description:**                              TOP ASM-FLDG

**Amendment Reason:**                              Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMANN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Purchasing Contact:**
Castro, Carolina
Buyer Code:                         L30

**Less Finish Part Number:**                        000000020831755
**Sample Date:**                                    31-Jan-2009
**Drawing Number (as revised):**                    NODWG
**Hazardous Material Indicator:**                   N

**Line Item Notes:**
==================================================
EWO #: 613846-CJWAB
EWO Description:
CONTRACT CHANGE TO STIFFEN THE SIDE RAIL SEALS AGAINST
THE SIDE GLASS.  ISSUE: WINDOW REGULATORS AND GLASS
TRAVEL CHANNEL ARE NOT STIFF ENOUGH TO HOLD THE GLASS
IN POSITION.  THEREFORE, A BLOW-OUT CLIP IS ADDED TO THE
SIDE RAIL SEAL RETAINERS TO PREVENT WATER LEAKS.
PIECE IMPACT OF $3.99 WITH $94,020 TOOLING IMPACT CONSISTING OF:
A. 3428/9 ASM FIXTURE AT $6600
B. 3480/1 5 AXIS MILLING/MACHINE FIXTURE AT $29880
C. G054 PROGRESSIVE DIE AT $45540
D. RACK DENSITY CHANGE AT $12000

Old L/F P/N: 15901080
New L/F P/N: 15928802
Colored Parts:-
15925458, 15928790, 15928791, 15928792, 15928793,
15928794, 15928795, 15928796, 15928797, 15928799,
15928800, 15928801,

Contract Line Item Page:            2  of  13                          Issue Date:  16-Jan-2009

**Standard Blanket Contract Number:**  1F5T00C6

**Amendment Number:**  000                          **Part Number:**  000000020831762

Piece Price Impact/Currency: (+)$3.99 USD 01/18/2006
Part Description: TOP ASM-FLDG
Model Year: 2006
Program: X381
Capacity (pcs/hr): 170/15
Price Type : Returnable
PPAP Date : 5/19/2006
Supplier Contact: TIM TUCKER
Supplier Memo Dated: 3/24/2006
Contract Duration : LG+SPO
Reductions/Effective Date:
3% Effective 24-JAN-2007
2% Effective 25-JAN-2008
2% Effective 26-JAN-2009

Spencer Venkatappa for  Camilla A. Rice
03/30/2006
=======================================================

==================================================================
CONTRACT CHANGE TO REVISE ALL X381 PARTS' SOP LTA'S BASED ON 2/11/06
REGARDING THE X381 CONVERTIBLE TOP. PER THE GM-KARMANN AGREEMENT,
THE LTA'S WILL BECOME 0, 0, 2, 2, 1.5% FOR 2006-2010.  THE CHANGE IN
TERMS WILL REVERT BACK TO THE ORIGINAL CONTRACT TERMS IF THE COST
TO PAINT THE TOPS RETURNS TO THE $125 LEVEL.  IF THE PAINT PRICE LEVEL
HAPPENS MID 2007 THE REDUCTION SCHEDULE WILL READ 1.5% FOR THE
REMAINDER OF THE YEAR.

Affected P/N(s) : 15928802,15868295,15894511,15912034,15912035,15894512,
15894513,15864046,15894507,15894508,15894514,15894515,15855327,15855328.

Model Year: 2006
Program: X381
Price Type : Returnable
Supplier Contact: TIM TUCKER
Supplier Memo Dated: 4/10/2006
Contract Duration : LG+SPO
Reductions/Effective Date:
0-----------1/24/2006
0-----------1/24/2007
2%--------1/24/2008
2%--------1/24/2009
1.5%-----1/24/2010

Richard Gopinath for Camilla A. Rice
4/20/2006
==================================================================

==================================================================
Contract has been amended to change the supplier capacity from FROM 170/15
TO 214/20

Joanna Sudha for Camilla A. Rice
8/11/2006
==================================================================

Contract Line Item Page:          3  of  13                    Issue Date:  16-Jan-2009

**Standard Blanket Contract Number:**  1F5T00C6

**Amendment Number:**  000                        **Part Number:**  000000020831762

================================================================
EWO #: 632274-CJZSP
EWO Description: CONTRACT CHANGE TO INCREASE THE TONNEAU FLIPPER
DOOR ROBUSTNESS DUE TO THE FLIPPER DOOR DOWNSTOP BREAKING
DURING NORMAL VEHICLE USAGE IN ADDITION TO THE FLIPPER DOOR
FALLING OFF THE DOWNSTOP DURING ACTUATION.  THEREFORE, THE
PIN IS CHANGED FROM PLASTIC TO STEEL IN COMBINATION WITH ADDING
MOLD IN 'RAMPS' TO PREVENT THE DOOR FROM SLIDING OFF THE
DOWNSTOP.  PIECE IMPACT OF $0.175 WHICH REPRESENTS A 50/50
NEGOTIATED SPLIT WITH ZERO TOOLING IMPACT.
Affected P/N(s): 15928802
Color Parts: 15925458, 15928790, 15928791, 15928800,
15928794, 15928795, 15928796, 15928797,
15928801, 15928792, 15928793, 15928799.
Piece Price Impact/Currency: + $0.175 as on 19-Jun-2006
Part Description: TOP ASM-FLDG
Model Year: 2006
Program: X381
Price Type: Returnable
PPAP Date: 6/15/2006
Supplier Contact: Tim Tucker
Supplier Memo Dated: 6/7/2006
Contract Duration: LG+SPO
Reductions/Effective Date:
   2% Effective from 28-Jan-2008
   2% Effective from 28-Jan-2009
1.5% Effective from 28-Jan-2010


Sherry Vasanthegowda for Camilla A. Rice
08/15/2006
================================================================

EWO CPTBK 683838


Description:


PRTS#202862 Issue: Pnl/Pnl joint binds during acuation causing latching system to fail.
Solution:  Lubricate Pnl/Pnl Latch (Karmann ECR 4257)

OLD PART #----------------NEW PART
15925458---------------------25813781
15928790---------------------25813782
15928791---------------------25813783
15928792---------------------25813784
15928793--------------------25813785
15928795--------------------25813786
15928796---------------------25813787
15928797---------------------25813788
15928809---------------------25813789
15928800---------------------25813790
15928801---------------------25813791
15943313---------------------25813792
15943316---------------------25813793
15943315--------------------25813794
15928802--------------------25813780


NO PIECE PRICE IMPACT

Contract Line Item Page:        4   of  13                    Issue Date:  16-Jan-2009
**Standard Blanket Contract Number:**  1F5T00C6
**Amendment Number:**  000                          **Part Number:**  000000020831762

NO TOOLING

E Blanco 14/Nov/06

Program: GMX 381
Model Year: 2006

Contract created per EWO #: CDFLVE 746693 & CHAJPC 746708

EWO Description:  Add Premium Colors

| Part # | Delta | Old price | New Price |
|--------|-------|-----------|-----------|
| 25813781 | 6.68 USD | $1,331.93 | $ 1,338.61 |
| 25813790 | 6.97 USD | $1,331.93 | $ 1,338.90 |
| 25813791 | 12.2292 USD | $1,331.93 | $ 1,344.159 |
| 25813788 | 22.445 USD | $1,331.93 | $ 1,354.38 |

Note: E&D = $50,352.73 will be amortize over 19,686 units (this quantity will be revised with Karmann,
GM purchasing does not agree with it). Once E&D is amortized, prices should be as follow.

| Part # | Delta (E&D) | Old price | New Price |
|--------|-------------|-----------|-----------|
| 25813781 | (4.1017 USD) | $ 1,338.61 | $1,334.508 |
| 25813790 | (4.8614 USD) | $ 1,338.90 | $1,334.038 |
| 25813791 | (6.065 USD) | $ 1,344.159 | $1,338.094 |
| 25813788 | (6.40736 USD) | $ 1,354.38 | $1,347.972 |

PPAP Date: 03/01/07
Capacity: 214/ 20 hrs
Supplier:  Karmann
Supplier Contact: Tim Tucker
Supplier Memo Dated: 02/02/07

Carolina Castro per Jaime Blanco L30. 02/08/07
************************************************************************************************

Program: GMX381 Convertible Top
Model Year: 2007 / 2008 / 2009

Contract created to reflect all below changes:

EWO #: CVJRW / WO 752593.

1) Eliminating stuffer for tonneau seal end cut manufacturing process.  ($-0.12) (Karmann ECR 10324)
2) Revise backlite carrier length a.  Reduce length b. Add holes for improved adhesive retention c.
remove felt tape due to rattle being eliminated when channel was shortened. ($-0.49) (Karmann ECR
8026)

Savings $-0.603272 USD

EWO #: CLJMG / WO 651430.

Adding lead in to the main pivot bracket hole aids in the installation of the top assembly at Lake Orion

Increase $0.03 USD

Contract Line Item Page:          5  of  13                                    Issue Date:   16-Jan-2009

**Standard Blanket Contract Number:**   1F5T00C6

**Amendment Number:**   000                                    **Part Number:**   000000020831762

EWO #: CLKFB/ WO 651749.

Tonneau Front Seal detached due to interference with retractor cover trim.

Increase $1.5 USD

EWO #: CLLAB/ WO 648989

Change glass blow out clip material to GMP.POM.018

Increase $0.41 USD

EWO #: CFYTBC/ WO 654105.

Change coating from 67 G (high particulate) to 73 A (no particulate).

Savings $0.35 USD

EWO #: CSAYL/ WO 678598.

Misc revisons to improve manufacturabilty and function. Also cost change to add spacer to front inside lip
of scalp molding for water leaks.

Increase $0.96 DLS

| Old Part | New Part | Old Price (USD) | New Price (USD) | Delta (Increase) |
|---|---|---|---|---|
| 25813780 | 25855302 | 1,331.9252 | 1,334.3619 | (Less Finish) 2.43 |
| 25813781 | 25855211 | 1,338.6100 | 1,341.0419 | 2.43 |
| 25813782 | 25855212 | 1,331.9252 | 1,334.3619 | 2.43 |
| 25813790 | 25855213 | 1,338.9000 | 1,341.3319 | 2.43 |
| 25813787 | 25855214 | 1,331.9252 | 1,334,3619 | 2.43 |
| 25813783 | 25855215 | 1,331.9252 | 1,334.3619 | 2.43 |
| 25813791 | 25855216 | 1,344.1592 | 1,346.5911 | 2.43 |
| 25813784 | 25855217 | 1,331.9252 | 1,334,3619 | 2.43 |
| 25813788 | 25855221 | 1,354.3800 | 1,356.8119 | 2.43 |
| 25813785 | 25855218 | 1,331.9252 | 1,334.3619 | 2.43 |
| 25813786 | 25855219 | 1,331.9252 | 1,334,3619 | 2.43 |
| 25844849 | 25855220 | 1,331.9252 | 1,334,3619 | 2.43 |

PPAP Date:  June 19, 2007
Capacity: 214 pcs / 20 hrs
Supplier:  Karmann
Supplier Contact: Tim Tucker
Supplier Memo Dated: 04/13/07

Carolina Castro for Jaime Blanco L30, on April 24th 2007.

*****************************************************************************************************
Program: GMX 381 Retractable Hard Top
Model Year: 2007 / 2008 / 2009

Supplier:  Karmann

Contract created to change Supplier Daily Capacity

Description:  Karmann submited the revised production planning activity to re-balance the current
manufacturing processing for the GMX381 G6 Convertible program to meet the lower overall planning

| Contract Line Item Page: | 6 of 13 | Issue Date: 16-Jan-2009 |
|---|---|---|

**Standard Blanket Contract Number:** 1F5T00C6

**Amendment Number:** 000                    **Part Number:** 000000020831762

volumes.
Poduction planning was reviewed by Orion Plant and agreed on modify MCR.

New MCR
132 /10 hrs

New LCR
115/10 hrs

Part #s do not change.

Supplier Contact: Tim Tucker
Supplier Memo Dated: 04/12/07

Carolina Castro, Buyer 3CC on June 19, 2007.

************************************************************************************************

Program: GMX381 Retractable Hard Top
Model Year: 2007 / 2008 / 2009

Contract created per EWO #: CYLLL 795596

EWO Description: CHANGE WEATHERSTRIP COATING TO STAHL WT91-023, IN ORDER TO
ELIMINATE AN 'ITCH' NOISE THAT CAN OCCUR WHILE DRIVING ON AN UNEVEN ROAD, AND IS
BELIEVED TO BE SHOWING UP AS CUSTOMER DISSATISFACTION AND WARRANTY.

Less Finish  #25855302

| Part # | Old price  (USD) | New price  (USD) | Delta  (USD) |
|---|---|---|---|
| 25855211 | $ 1,341.0419 | $ 1,340.8630 | (.178920) |
| 25855212 | $ 1,334.3619 | $ 1,334.1830 | (.178920) |
| 25855213 | $ 1,341.3319 | $ 1,341.1530 | (.178920) |
| 25855214 | $ 1,334.3619 | $ 1,334.1830 | (.178920) |
| 25855215 | $ 1,334.3619 | $ 1,334.1830 | (.178920) |
| 25855216 | $ 1,346.5911 | $ 1,346.4122 | (.178920) |
| 25855217 | $ 1,334.3619 | $ 1,334.1830 | (.178920) |
| 25855218 | $ 1,334.3619 | $ 1,334.1830 | (.178920) |
| 25855219 | $ 1,334.3619 | $ 1,334.1830 | (.178920) |
| 25855220 | $ 1,334.3619 | $ 1,334.1830 | (.178920) |
| 25855221 | $ 1,356.8119 | $ 1,356.6330 | (.178920) |

PPAP Date:  Sep. 12, 2007
Capacity: 115 pcs / 10 hrs
Supplier:  Karmann
Supplier Contact: Tim Tucker
Supplier Memo Dated: 06/08/07

Carolina Castro, Buyer 3CC on June 20th, 2007

************************************************************************************************

Amendment issued to add missing notes that should had been added to the contracts issued
on April 24, 2007 referring to:

EWO CVJWRA 793041

| Contract Line Item Page: | 7  of  13 | | Issue Date:  16-Jan-2009 |
|---|---|---|---|

**Standard Blanket Contract Number:**  1F5T00C6

**Amendment Number:**  000                          **Part Number:**  000000020831762

Due to validation delays that would cause the headliner change to be timed in during the blackout period at Orion, the headliner carrier change will be removed from current EWO CVJWR and re-timed in after the blackout.

Savings removed (-0.49) USD per vehicle.

No piece price change in this amendment due to the changed was done on the contract issued on April 24 but the notes were not added.

Carolina Castro, L30, August 06, 2007
*******************************************************************************************************


*****************************************************************************************

Program: GMX381 Retractable Hard Top
Model Year: 2007 / 2008 / 2009

Contract created per following EWOs

CZVYX 803438

EWO Description:
VAVE:
' Eliminate front headliner rear-center  $-0.31 pc, $2,500 tooling
' Shorten length of headliner seal $-0.42 pc, $6,250 tooling
' Reduce staples in tonneau dust seal $-0.01 piece, $0 tooling
' Change coating on PNL/PNL Pin Asm $-0.28 piece $0 tooling
' Chg material for B276 rivet  $-0.19 piece, $0 tooling

No cost changes:
' Redesign Tonneau Blocker rod into a solid rod instead of weldment asm
' Eliminate rear most foam from header latch hydraulics line
' Reduce length of Header latch hydraulic hose, 140mm was 260mm.
' Delete UHMW tape between inner roof panel and Header latch brkts
' Material revision AISI 1022 cold drawn steel was AISI 1117.
' Remove tab front headliner rear RH corner to eliminate hydraulic hose popping during actuation of RHT

CZVYXA 836685

EWO Description:
The below changes must be backed out due to cancellation or retiming
VAVE:
* Shorten length of headliner seal, $-0.42 pc, $6,250 tooling  will be reintroduced when tier three supplier (Oji) is capable
* Chg material for B276 rivet $-0.19 piece, $0 tooling  will be introduced when tier three supplier (CPS) is capable
* Reduce staples in tonneau dust seal $-0.01 piece, $0 tooling  change canceled due to supplier not being able to meet savings initially quoted

Old Less Finish  #25855302    New Less Finish  #25899335

| Old Part # | New Part # | Old price (USD) | New price (USD) | Delta (USD) |
|---|---|---|---|---|
| 25855302 | 25899335 | $ 1,334.1830 | $1,333.5930 | (0.59) |
| 25855211 | 25899336 | $ 1,340.8630 | $1,340.2730 | (0.59) |
| 25855213 | 25899337 | $ 1,341.1530 | $1,340.5630 | (0.59) |
| 25855214 | 25899338 | $ 1,334.1830 | $1,333.5930 | (0.59) |

Contract Line Item Page:                    8   of   13                              Issue Date:   16-Jan-2009

**Standard Blanket Contract Number:**   1F5T00C6

**Amendment Number:**  000                                              **Part Number:**   000000020831762

| | | | | |
|---|---|---|---|---|
| 25855215 | 25899339 | $ 1,334.1830 | $1,333.5930 | (0.59) |
| 25855216 | 25899340 | $ 1,346.4122 | $1,345.8222 | (0.59) |
| 25855218 | 25899341 | $ 1,334.1830 | $1,333.5930 | (0.59) |
| 25855221 | 25899342 | $ 1,356.6330 | $1,356.0430 | (0.59) |

PPAP Date:  08/17/07
Capacity: 115 pcs / 10 hrs
Supplier:  Karmann
Supplier Contact: Tim Tucker
Supplier Memo Dated: 08/04/07

Carolina Castro, Buyer 3CC on August 20, 2007

*********************************************************************************************************

**********************************************************

Program: GMX381 Retractable Hard Top
Model Year: 2007 / 2008 / 2009

Contracts created to update steel resale price based on 1804`s, PASU Parts and documentation audited
by Douglas Henderson (GM Steel Resale Auditor).

Breakdown per PASU form

| | Weight Kg | New Steel R. Price/kg | Old Steel R. Price/kg | New Price | Old Price | Delta |
|---|---|---|---|---|---|---|
| Panel Roof Frt Outer | 10.4620 | $0.9945 | $0.8401 | $10.4044 | $8.7891 | $1.6153 |
| Panel Roof Frt Inner | 10.8720 | $0.9365 | $0.6933 | $10.1816 | $7.5375 | $2.6441 |
| Panel Roof Rr Outer | 11.8020 | $0.9365 | $0.6933 | $11.0525 | $8.1823 | $2.8702 |
| Panel Roof Rr Inner | 12.1180 | $0.9945 | $0.8401 | $12.0513 | $10.1803 | $1.871 |
| | | | | | Total: | $9.00 |

Breakdown per 1804

| | Old Price | ew Price | Delta |
|---|---|---|---|
| Panel Roof Front Price | $45.85 | $50.11 | $4.26 |
| Panel Roof Rear Price | $47.11 | $51.85 | $4.74 |
| | | Total: | $9.00 Delta |

Tier 1: Karmann
Tier 2: Ogihara
Effective date : 09/15/2007
Supplier Contact: Tim Tucker
Supplier Memo date: 08/22/07

Carolina Castro, Buyer L30 on Sep. 28th, 2007
***********************************************************************************************

Program: GMX381 Retractable Hard Top
Model Year:  2008 / 2009

Effective January 1, 2008.

GM agrees to increase the piece price by $681.00 to cover ED&D, Burden & SG&A and share of the
Powerpacker price issue.

ED&D    +$479/unit
SG&A/Burden    +$181/unit
Powerpacker issue   +$21/unit

With the total price increase, all prior and future volume guarantees/assumptions are removed from the

Contract Line Item Page:          9    of   13                      Issue Date:   16-Jan-2009
**Standard Blanket Contract Number:**  1F5T00C6
**Amendment Number:**  000                              **Part Number:**  000000020831762

contract.

With this agreement, Karmann is closing all claim including launch costs and any kind of retroactive
payments.

Price increase as follow:

TOP. ASSY.
Finish Part # Initial Price Increase New Price
25899335 $1,342.593 $660.00 $2,002.593
25899336 $1,349.273 $660.00 $2,009.273
25899337 $1,349.563 $660.00 $2,009.563
25899338 $1,342.593 $660.00 $2,002.593
25899339 $1,342.593 $660.00 $2,002.593
25899340 $1,354.822 $660.00 $2,014.822
25899341 $1,342.593 $660.00 $2,002.593
25899342 $1,365.043 $660.00 $2,025.043
25899343 $1,344.723 $660.00 $2,004.723
25899344 $1,342.593 $660.00 $2,002.593


REAR MODULE
Finish Part # Initial Price Increase New Price
25857934 $716.285  $21.00 $737.285

PPAP Date:  N/A
Capacity: 115 pcs / 10 hrs
Supplier:  Karmann
Supplier Contact: Tim Tucker
Supplier Memo Dated: 12/11/07, agreement 12/10/07.

Carolina Castro, L30, 12/19/07.

AP 1300554757

Program: GMX381 Retractable Hard Top
Model Year: 2007 / 2008 / 2009

Contract created per following EWOs

DANYL 803441

Description:
Cable
Cable - flipper door control RH (p/n A-22A-B720)     -$1.84
Cable - flipper door control LH (p/n A-22A-B721)     -$1.84
The change to the cable added an internal compensator, revised the T-end, revised the standoff, and
eliminated the adjustor.

Seal
Seal Assembly - backlite lower (p/n A-22A-6696)   +$2.31

Breakdown
The change to the seal added a butyl bead with white paper liner, added butyl three places on the lower
insert, increased pressure sensitive tape by 0.4mm, changed to high particulate coating and increase
extrusion by 20mm, is $1.59.
added two stuffers in the lower bulb (13mm x 330mm and 12mm x 245mm), increased the drain hole

Contract Line Item Page:          10  of  13                    Issue Date:  16-Jan-2009
**Standard Blanket Contract Number:**  1F5T00C6
**Amendment Number:**  000                              **Part Number:**  000000020831762

size, deleted drain hole above 3M tape,  is $0.72.

Total savings  for this EWO -$1.37

DCKHG 849806
Shorten length of headliner seal on both outboard ends.

Total savings  for this EWO -$0.42

TOTAL Savings -$1.79 USD.

| Part # | Current price | New price | Delta (Savings) |
|---|---|---|---|
| 25899335 | $1,962.5411 | $1,960.7511 | -1.79 |
| 25899336 | $1,969.0875 | $1,967.2975 | -1.79 |
| 25899337 | $1,969.3718 | $1,967.5818 | -1.79 |
| 25899338 | $1,962.5411 | $1,960.7511 | -1.79 |
| 25899339 | $1,962.5411 | $1,960.7511 | -1.79 |
| 25899340 | $1,974.5258 | $1,972.7358 | -1.79 |
| 25899341 | $1,962.5411 | $1,960.7511 | -1.79 |
| 25899342 | $1,984.5421 | $1,982.7521 | -1.79 |
| 25899343 | $1,964.6285 | $1,962.8385 | -1.79 |
| 25899344 | $1,962.5411 | $1,960.7511 | -1.79 |

Supplier:  Karmann
Supplier Contact: Jim Davenport
Supplier Memo Dated: 01/31/08

Carolina Castro, Buyer L30, Feb 15, 2007

*********************************************************************************************************
Program: GMX381 Retractable Hard Top
Model Year: 2008 / 2009

Contract created per following EWO:

DCYFH 856690

Description: Reduce costs for the G6 convertible as a result of Paint efficiency at Tier II Paint Supplier.
The Process change is to increase density from 2 panels to 3 panels per paint carrier for the front and
rear roof panels.

| Part # | Current Price | New Price | Delta USD |
|---|---|---|---|
| 25899335 | $1,960.7511 | $1,956.5271 | $4.224 |
| 25899336 | $1,967.2975 | $1,963.0735 | $4.224 |
| 25899337 | $1,967.5818 | $1,963.3578 | $4.224 |
| 25899338 | $1,960.7511 | $1,956.5271 | $4.224 |
| 25899339 | $1,960.7511 | $1,956.5271 | $4.224 |
| 25899340 | $1,972.7358 | $1,968.5118 | $4.224 |
| 25899341 | $1,960.7511 | $1,956.5271 | $4.224 |
| 25899342 | $1,982.7521 | $1,978.5281 | $4.224 |
| 25899343 | $1,962.8385 | $1,958.6145 | $4.224 |
| 25899344 | $1,960.7511 | $1,956.5271 | $4.224 |

Effective Date: 05/31/08
Supplier:  Karmann
Supplier Contact: Jim Davenport
Supplier Memo Dated: 04/24/08

Contract Line Item Page:          11  of  13                    Issue Date:  16-Jan-2009

**Standard Blanket Contract Number:**  1F5T00C6

**Amendment Number:**  000                                **Part Number:**  000000020831762

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PO issued per EW0 DNYBY/978907

Description: Change urethane material used to bond back glass to rear panel from EFTEC TO DOW.
(Karmann ECR 3102) DOW performs better during testing.

$0 price impact, $0 tooling.

Part # affected:

Old part #......................New part #
25899335......................20784602
25899336......................20784594
25899337......................20784595
25899340......................20784596
25899342......................20784597
25899343......................20784598
25899344......................20784599

Carolina Castro, L30 Buyer, 08.25.08

===========================================================================
==
Notes:
Contract issued per EWO DTXHY 1032027
Description: Reduce density in front and rear headliner. Cost Reduction $0.48 usd.

Old P/N-----------New P/N----------Current price---------------Delta-----------------New Price----------LTAs 1.5%
                                                                                                effective 07.31.09
    20784594--------20831756-------1923.812030---------(-) $ 0.48 USD----1923.332030 USD----
1894.482049
20784595--------20831757-------1924.090644---------(-) $ 0.48 USD----1923.610644 USD----1894.756484
20784596--------20831758-------1929.141564---------(-) $ 0.48 USD----1928.661564 USD----1899.731640
20784597--------20831759-------1938.957538---------(-) $ 0.48 USD----1938.477538 USD----1909.400374
20784598--------20831760-------1919.442210---------(-) $ 0.48 USD----1918.962210 USD----1890.177776
20784599--------20831761-------1917.396558---------(-) $ 0.48 USD----1916.916558 USD----1888.162810
20784600--------20831762-------1917.396558---------(-) $ 0.48 USD----1916.916558 USD----1888.162809
20784602--------20831755-------1917.396558---------(-) $ 0.48 USD----1916.916558 USD----1888.162809

Suppler: Karmann
Supplier Contact: Jim Davenport
Suppleir quote: 01.07.09 which is not incorporated but is referenced for administrative
purposes only.  Buyer's Terms and Conditions apply.
Effective Date: 01.31.09

Carolina Castro, L30 01.13.09

Lakshmi Sathyanarayana for Carolina Castro Martínez
01/14/2009
===========================================================================
==

**Terms & Conditions:**
Longterm Agreement Eff 10/03

| Contract Line Item Page: | 12 of 13 | | Issue Date: 16-Jan-2009 |
|---|---|---|---|

**Standard Blanket Contract Number:** 1F5T00C6

**Amendment Number:** 000                                    **Part Number:** 000000020831762

| This Period effective from | **31-Jan-2009** | through | **23-Jan-2010** |
|---|---|---|---|

| | |
|---|---|
| **Freight Terms:** | Collect |
| **Payment Terms:** | (88) MNS-2, On average, payment shall be made on the second day of the second month following Buyers receipt date of goods or services. |
| **Delivery Terms:** | Free Carrier (FCA) |
| **Delivery DUNS:** | 00150781099 |
| **Ship From DUNS:** | 00150781099 |
| **Daily Capacity:** | 115 |
| **Hours Per Day:** | 10 |
| **Price Type:** | Returnable |

**Price Composition:**
**The Total Price is composed of Base Price plus any Base Material costs, Price Component costs and any applicable taxes.**

All Prices are expressed in        ***USD***

Base Price:                                                            1,916.916558

| | |
|---|---|
| **Total Price:** | 1,916.916558 |
| **UOM:** | PIECES |

**Receiving Plants and Percentage of Plant Requirements:**
**The quantity of goods to be purchased under this contract is based on Buyer's requirements.  Any forecasted quantity that may be given to Seller is an estimate, for planning purposes only.  Actual quantities to be purchased will vary and will be set forth in delivery schedules.**

As scheduled                                                        100 %

**Terms & Conditions:**
Schedule

| This Period effective from | **24-Jan-2010** | through | **24-Jan-2011** |
|---|---|---|---|

| | |
|---|---|
| **Freight Terms:** | Collect |
| **Payment Terms:** | (88) MNS-2, On average, payment shall be made on the second day of the second month following Buyers receipt date of goods or services. |
| **Delivery Terms:** | Free Carrier (FCA) |

| Contract Line Item Page: | 13 of 13 | Issue Date: 16-Jan-2009 |
|---|---|---|

**Standard Blanket Contract Number:** 1F5T00C6

**Amendment Number:** 000

**Part Number:** 000000020831762

**Delivery DUNS:**        00150781099

**Ship From DUNS:**       00150781099

**Daily Capacity:**         115

**Hours Per Day:**         10

**Price Type:**          Returnable

**Price Composition:**
**The Total Price is composed of Base Price plus any Base Material costs, Price Component costs and any applicable taxes.**

All Prices are expressed in    ***USD***

**Base Price:**                                     1,888.162809

| **Total Price:** | 1,888.162809 |
|---|---|
| **UOM:** | PIECES |

**Receiving Plants and Percentage of Plant Requirements:**
**The quantity of goods to be purchased under this contract is based on Buyer's requirements. Any forecasted quantity that may be given to Seller is an estimate, for planning purposes only. Actual quantities to be purchased will vary and will be set forth in delivery schedules.**

As scheduled                            100 %

**Terms & Conditions:**
Schedule

Contract Attachment Page:        1  of  6

# CONTRACT ATTACHMENT



*General Motors Corporation*

**Contract Header Number:**        1F5T0

**Contract Terms & Conditions:**                    **Detailed Description**
**Short Description**

**Invoices - GM Corporation**

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS.  Invoices for production part shipments are not required for payment processing.  INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS.  Invoices for CONTRACT SERVICES must reference the contract number and be accompanied by a copy of the contract.  INVOICES FOR TOOLING may be submitted only after full production sample approval has been received and all such invoices must be accompanied by the following:  copy of applicable tooling contract(s), copy of approved sample part inspection report(s), and Seller's input of tooling information into the tool management module located in GQTS.  To ensure proper payment processing, your invoice for contracts for tooling must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

**Language --English**

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native language.  When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed.  Examples of documents which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier Warrants, Shipping Labels, Capability Studies and Data.

**Right to Audit**

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other documents for the purpose of auditing sellers charges under this contract.  Seller will preserve these documents for a period of 1 year after the final payment under this contract.  In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer, including, but not limited to, parts, tools, fixtures, gages and models.  Seller will segregated its records and otherwise cooperate with Buyer so as to facilitate the audit.

**Longterm Agreement Eff 10/03**

Special Term:  Long Term Contract

The term of this contract is for the period(s) of purchase indicated in the Line Item Notes on the face of this contract.

The price(s) for the goods are set forth in the Line Item Notes of this contract.  No adjustments will be made for increases in Seller's costs, including, but not limited to, increases in the costs for labor, material or overhead

Seller shall assure that the goods remain competitive in terms of price, technology, design and quality with similar goods available to Buyer.  If, in the reasonable opinion of Buyer, the goods do not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which another product is more competitive with respect to price, technology, design or quality.  If, within 30 days, Seller does not agree to immediately sell the goods at a competitive price, or, if applicable, with comparable technology, design or quality, Buyer may terminate this contract and purchase from another supplier without liability to Seller.  In consideration for this, during the term of this contract, Buyer will not exercise its rights under Paragraph 13 ("Termination for Convenience'), except for terminations due to program cancellations or modifications.

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements to reduce Seller's costs, with the understanding that the savings (after financing) will be shared as follows: (i) Savings resulting from ideas generated solely by Buyer (including savings resulting from the reduction in the content of the goods) shall be for the sole benefit of Buyer and (ii) savings resulting from ideas generated by Seller shall be shared in accordance with Buyer's policy in effect at the time the suggestion is presented to Buyer.  To see Buyer's current supplier suggestion program go to
https://www.gmsupplypower.com/apps/supplypower/NASApp/spcds/CDSRetrieval?lob=purchase&subnav=library&togglefolder=6376

Contract Attachment Page:     2   of   6

**GM Right To Material Resale**

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained through the Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material Resale Programs, including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of Seller's obligations under this contract

**Insurance-US Coverage**

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as follows:  (a)  Workers' Compensation:  statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure) (b)  Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease  (c) Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

**Schedule**

Quantities or weights required against this order will in all cases be as buyers current material delivery schedule.  This order does not give any commitment to quantities, weights or materials except as shown by buyers material delivery schedule.

**Special Term (US) - Government**

Special Term  (US) - Government Contracts
Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, 41 CFR 60-741.5, 41 CFR 60-250.5, and 41 CFR 60-300.5) (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and 52.219-9)  (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned business concerns (Executive Order 12138).

**Special Term (Us)-C-Tpat**

Special Term (U.S) - C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ('C-TPAT') initiative (for information go to http://www.cbp.gov/ and find the link to the C-TPAT section).  At Buyer's or the Bureau of Customs and Border Protection's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**Supplier Quality & Development**

Special Term - Supplier Quality and Development  Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

**Terms & Conditions Global 1**

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1.  ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2.  SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination  (b) to route shipments in accordance with Buyers instructions  (c) to make no charge for handling, packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract  (d) to provide with each shipment packing slips with Buyers contract and/or release number and date of shipment marked thereon  (e) to properly mark each package with a label/tag according to Buyers instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyers instructions.  Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyers instructions and the carriers requirements.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased.  Seller further agrees:  (a) to accept payment based upon Buyers Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer.  The payment date is set forth in  the Line Item Detail of this contract, or if not stated, shall be the date established by Buyers Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyers North American

Contract Attachment Page:        3    of    6

facilities, Sellers shipment date of goods or date of services, and, for all of Buyers other locations, Buyers receipt date of the goods or date of services. Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3. DELIVERY SCHEDULES:

Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyers schedules. Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyers delivery schedules. Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract. Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4. PREMIUM SHIPMENTS:

If Sellers acts or omissions result in Sellers failure to meet Buyers delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Sellers sole expense.

5. CHANGES:

Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes. Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct. Any changes to this contract shall be made in accordance with Paragraph 31.

6. SUPPLIER QUALITY AND DEVELOPMENT INSPECTION:

Seller agrees to participate in Buyers supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000. In addition, Buyer shall have the right to enter Sellers facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract. Buyers inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

7. NONCONFORMING GOODS:

Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections. To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically be reduced unless Buyer otherwise notifies Seller. Seller will not replace quantities so reduced without a new contract or schedule from Buyer. Nonconforming goods will be held by Buyer in accordance with Sellers instructions at Sellers risk. Sellers failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyers option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller. Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyers right to assert any legal or equitable remedy, or relieve Sellers responsibility for latent defects.

8. FORCE MAJEURE:

Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter). During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract. In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Sellers labor contract(s). If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days. If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

9. WARRANTY:

Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect. In addition, Seller acknowledges that Seller knows of Buyers intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

10. INGREDIENTS DISCLOSURE SPECIAL WARNINGS AND INSTRUCTIONS:

If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct: (a) a list of all ingredients in the goods  (b) the amount of all ingredients  and (c) information concerning any changes in or additions to such ingredients. Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

11. INSOLVENCY:

Buyer may immediately terminate this contract without liability to Seller in any of the following or any other comparable events: (a) insolvency of Seller (b) filing of a voluntary petition in bankruptcy by Seller (c) filing of any involuntary petition in bankruptcy against Seller (d) appointment of a receiver or trustee for Seller or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event. Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorneys or other professional fees.

12. TERMINATION FOR BREACH OR NONPERFORMANCE SALE OF ASSETS OR CHANGE IN CONTROL:

Contract Attachment Page:        4  of  6

Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller:  (a) repudiates or breaches any of the terms of this contract, including Seller's warranties  (b) fails to perform services or deliver goods as specified by Buyer  (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods  and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.  In addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock that effects a change in the control of Seller.

13.  TERMINATION FOR CONVENIENCE:

In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller.  Upon such termination, Buyer shall pay to Seller the following amounts without duplication: (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for  and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract  less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material.  Buyer will make no payments for finished goods, services, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable.  Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods or services that would be produced or performed by Seller under delivery  or release schedules outstanding at the date of termination.  Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract.  Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:

Seller agrees:  (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services  Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification  (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller  (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization  and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:

Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:

If Seller performs any work on Buyers premises or utilizes the property of Buyer, whether on or off Buyers premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorneys and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Sellers performance of work or use of Buyers property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:

Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyers written request.  The certificate will provide that Buyer will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Sellers furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLERS PROPERTY:

Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Sellers Property') necessary for the production of the goods.  The cost of changes to Sellers Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer.  Seller shall insure Sellers Property with full fire and extended coverage insurance for its replacement value.  Seller grants Buyer an irrevocable option to take possession of and title to Sellers Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items  provided, however, that this option shall not apply if Sellers Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYERS PROPERTY:

All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis (Buyers Property).  Seller shall bear the risk of loss of and damage to Buyers Property.  Buyers Property shall at all times be properly housed and maintained by Seller, shall not be used by Seller for any purpose other than the performance of this contract  shall be deemed to be personalty  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person  and shall not be moved from Sellers premises without Buyers prior written approval.  Buyer shall have the right to enter Sellers premises at all  reasonable times to inspect such property and Sellers records with respect thereto.  Upon the request of Buyer, Buyers Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Sellers plant, properly packed and marked in

accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller its reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyers Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:
Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs.  During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyers past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties.  When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyers service part sales activities.

21.  REMEDIES:
The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods  (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

22.  CUSTOMS  EXPORT CONTROLS:
Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer.  Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any.  Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s).  Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

23.  SETOFF/RECOUPMENT:
In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries  and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

24.  NO ADVERTISING:
Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Sellers advertising or promotional materials.

25.  COMPLIANCE WITH LAWS  EMPLOYMENT/BUSINESS PRACTICES:
Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract.  At Buyer's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

26.  NO IMPLIED WAIVER:
The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

27.  NON-ASSIGNMENT:
Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations  under this contract without Buyer's prior written consent.

28.  RELATIONSHIP OF PARTIES:
Seller and Buyer are independent contracting parties and nothing in this contract shall make either party  the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

29.  GOVERNING LAW  JURISDICTION:
This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law.  Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyers option, in the court(s) having jurisdiction over Buyers location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures.  Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

30.  SEVERABILITY:
If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

Contract Attachment Page:        6   of   6

**31. ENTIRE AGREEMENT:**
This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements.  This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated with tool construction. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any claim of Seller for tooling.

Contract Header Page:        1  of  1

# CONTRACT HEADER



*General Motors Corporation*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**        00150781099
KARMANN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Mailing Address Information:**
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

| **Contract Header Number:** | 1F5T0 |
|---|---|

This contract sets forth the exclusive terms and conditions under which seller shall
sell and buyer shall purchase the goods or services described in the line item detail
of this contract for the period(s) specified therein. Terms and conditions proposed
by seller which are different from or in addition to the provisions of this contract are
unacceptable to buyer, are expressly rejected by buyer, and shall not become a
part of this contract. Any modification of this contract shall be made only in
accordance with the provisions of paragraph 31 of the contract terms and
conditions.

Contract Line Item Page:        1  of  2                              Issue Date:  25-Apr-2008

**Standard Spot Buy Contract Number:**  1F5T00BF

**Amendment Number:**  000                              **Part Number:**  000000025899335



# LINE ITEM DETAIL for TOOLING CONTRACT
### *General Motors Corporation*

| | This Line Item is effective from | **24-Apr-2008** | through | **24-Apr-2011** | |

**Part Description:**                                    TOP ASM-FLDG

**Amendment Reason:**                                    Engineering changes (Low APV)

**Manufacturing DUNS Number:**
00150781099

**Supplier Name and Manufacturing Address:**
KARMANN MANUFACTURING LLC
14988 PILOT DR
PLYMOUTH,MI 48170
UNITED STATES

**Buyer Name:**
Castro, Carolina
Buyer Code:                        L30

**Hazardous Material Indicator:**                    N

**Line Item Notes:**
Program: GMX381 Retractable Hard Top
Model Year: 2008 / 2009

Contract created per following EWO:

DCYFH 856690

Description: Reduce costs for the G6 convertible as a result of Paint efficiency at Tier II Paint Supplier.
The Process change is to increase density from 2 panels to 3 panels per paint carrier for the front and
rear roof panels.

Tooling Breakdown:
Panel Asm.-Front Panel Paint Racks .......$11,000
Panel Asm.-Rear Panel Paint Racks .......$11,000

Total Tooling:  $22,000 usd.

Contract Line Item Page:          2  of  2                    Issue Date:   25-Apr-2008

**Standard Spot Buy Contract Number:**  1F5T00BF

**Amendment Number:**  000                          **Part Number:**   000000025899335


Supplier is Required to Mark all General Motors Tools with the GM Identification Tags.


Effective Date: 05/31/08

Supplier:  Karmann

Supplier Contact: Jim Davenport

Supplier Memo Dated: 04/24/08


**Terms and Conditions:**
**********

| | |
|---|---|
| **Freight Terms:** | Collect |
| **Payment Terms:** | (88) MNS-2, On average, payment shall be made on the second day of the second month following Buyers receipt date of goods or services. |
| **Delivery Terms:** | Free Carrier (FCA) |
| **Delivery DUNS:** | 00150781099 |
| **Ship From DUNS:** | 00150781099 |
| **Price Type:** | Returnable |

**Price Composition:**
**The Total Price is composed of Base Price plus any applicable taxes.**

All Prices are expressed in     *USD*

**Quantity:**                                                                                 1

**Base Price:**                                                                  22,000.000000

| | |
|---|---|
| **Total Price:** | 22,000.000000 |
| **UOM:** | LOT |

**Terms and Conditions:**
**********

Contract Attachment Page:      1  of  5

# CONTRACT ATTACHMENT



*General Motors Corporation*

**Contract Header Number:**      1F5T0

The attachments in this section apply to the standard terms and conditions associated with the GM legal business entity and the terms and conditions associated with the line item details for contract number.

| Contract Terms & Conditions:<br>Short Description | Detailed Description |
| --- | --- |

**Invoices - GM Corporation**

DO NOT SEND INVOICES FOR PRODUCTION PART SHIPMENTS.  Invoices for production part shipments are not required for payment processing.

INVOICES ARE REQUIRED FOR PAYMENT OF ALL TOOLING AND SERVICE CONTRACTS.  Invoices for CONTRACTS FOR SERVICES must reference the contract number and be accompanied by a copy of the contract.  INVOICES FOR TOOLING may be submitted only after full production sample approval has been received and all such invoices must be accompanied by the following: copies of applicable tooling contract(s), copy of approved sample part inspection report(s), and a copy of the 'VTAM FORM1810.csv' which will be generated following Seller's input to the tool management process located in GQTS.

To ensure proper payment processing, your invoice for contracts for tooling and services must be submitted to:

For Legal Business Entity 'General Motors Corporation'
General Motors Corp.
Manual PO Support Workgroup
PO Box 63070
Phoenix, AZ  85082-3070

**Language --English**

All communications with Manufacturing, Engineering, Sales or Receiving/User locations must be in the Receiving/User location's native language.  When Receiving/User locations utilize multiple languages, the communications must be in English unless otherwise directed.  Examples of documents which must be submitted in the appropriate language include, but are not limited to, PPAP Documentation, Supplier Warrants, Shipping Labels, Capability Studies and Data.

**Right to Audit**

Seller grants to Buyer access to all pertinent information, including, but not limited to, books, records, payroll data, receipts, correspondence and other documents for the purpose of auditing sellers charges under this contract.  Seller will preserve these documents for a period of 1 year after the final payment under this contract.  In addition, all work, materials, inventories and other items provided under this contract must be accessible to Buyer, including, but not limited to, parts, tools, fixtures, gages and models.  Seller will segregated its records and otherwise cooperate with Buyer so as to facilitate the audit.

**GM Right To Material Resale**

Where Buyer and Seller agree to place selected parts in Buyer's Material Resale programs, Seller shall utilize only materials obtained through the Material Resale Programs for its production of goods for Buyer.  Failure to comply with any of the requirements of the Material Resale Programs, including the right to evaluate and the option to purchase offal from the production of these goods, shall be a breach of Seller's obligations under this contract

**Insurance-US Coverage**

Special Term (U.S.) - Insurance

For purposes of this Agreement, the insurance coverages required under Paragraph 17 ('Insurance') of the General Terms and Conditions are as follows:  (a)  Workers' Compensation:  statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure)  (b)  Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease  (c)

Contract Attachment Page:        2  of  5

Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract:  $5,000,000 each occurrence  and (d)  Automobile Liability (including owned, non owned and hired vehicles):  $5,000,000 each accident.

**Special Term  (US) - Government**

Special Term  (US) - Government Contracts
Buyer serves from time to time as a contractor for the United States government.  If Seller is a U.S. entity, Seller shall comply with all federal laws, rules, and regulations that are applicable to Seller as a subcontractor of government contractors, including, without limitation, those relating to (1) equal employment opportunity (paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, 41 CFR 60-741.5, 41 CFR 60-250.5, and 41 CFR 60-300.5)  (2) utilization of small and disadvantaged business concerns  FAR subparts 52.219-8 and 52.219-9)  (3) contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805)  and (4) contracting with women-owned business concerns (Executive Order 12138).

**Special Term  (Us)-C-Tpat**

Special Term  (U.S.) - C-TPAT

For Seller's goods to be imported into the United States, Seller shall comply with all applicable recommendations or requirements of the United States Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ('C-TPAT') initiative (for information go to http://www.cbp.gov/ and find the link to the C-TPAT section).  At Buyer's or the Bureau of Customs and Border Protection's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**Supplier Quality & Development**

Special Term - Supplier Quality and Development  Inspection: (Paragraph  6 of General Terms)
The first sentence of Paragraph 6 shall be amended to read as follows:  Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time.

**Terms & Conditions Global 1**

Special Term - Supplier Certification of Compliance with
Paragraph 25 of General Terms and Conditions
(Compliance with Laws  Employment/Business Practices)

By submitting a response to this Request for Quotation, Seller certifies that it has read, understands, and is in compliance with Paragraph 25 of the General Terms and Conditions (Compliance with Laws  Employment/Business Practices).

1.  ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

2.  SHIPPING AND BILLING:
Seller agrees:  (a)  to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination  (b) to route shipments in accordance with Buyers instructions  (c) to make no charge for handling, packaging, storage or transportation  of goods, unless otherwise stated as an item on this contract  (d) to provide with each shipment packing slips with Buyers contract and/or release number and date of shipment marked thereon  (e) to properly mark each package with a label/tag according to Buyers instructions  (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyers instructions.  Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyers instructions and the carriers requirements.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased.  Seller further agrees:  (a) to accept payment based upon Buyers Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer  and (b) to accept payment by electronic funds transfer.  The payment date is set forth in  the Line Item Detail of this contract, or if not stated, shall be the date established by Buyers Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyers North American facilities, Sellers shipment date of goods or date of services, and, for all of Buyers other locations, Buyers receipt date of the goods or date of services.  Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

3.  DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyers schedules.  Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyers delivery schedules.  Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4.  PREMIUM SHIPMENTS:
If Sellers acts or omissions result in Sellers failure to meet Buyers delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Sellers sole expense.

5.  CHANGES:
Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.  Any difference in price or time for performance resulting from such changes shall be equitably adjusted by

Contract Attachment Page:        3   of   5

Buyer after receipt of documentation in such form and detail as Buyer may direct.  Any changes to this contract shall be made in accordance with
Paragraph 31.

6.  SUPPLIER QUALITY AND DEVELOPMENT  INSPECTION:

Seller agrees to participate in Buyers supplier quality and development program(s) and to comply with all quality requirements and procedures
specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000.  In
addition, Buyer shall have the right to enter Sellers facility at reasonable times to inspect the facility, goods, materials and any property of Buyer
covered by this contract.  Buyers inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall
not constitute acceptance of any work-in-process or finished goods.

7.  NONCONFORMING GOODS:

Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such
inspections.  To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically  be reduced unless Buyer
otherwise notifies Seller.  Seller will not replace quantities so reduced without a new contract or schedule from Buyer.  Nonconforming goods will be
held by Buyer in accordance with Sellers instructions at Sellers risk.  Sellers failure to provide written instructions within 10 days, or such shorter period
as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyers option, to charge Seller for
storage and handling or to dispose of the goods without liability to Seller.  Payment for nonconforming goods shall not constitute an acceptance of
them, limit or impair Buyers right to assert any legal or equitable remedy, or relieve Sellers responsibility for latent defects.

8.  FORCE MAJEURE:

Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond
the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority
(whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and
slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order  provided that written notice of such delay
(including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence
(but in no event more than 10 days thereafter).  During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase
goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other
sources in quantities and at times requested by Buyer, and at the price set forth in this contract.  In addition, Seller at its expense shall take such
actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting
from the expiration of Sellers labor contract(s).  If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall
not exceed 30 days.  If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days,
Buyer may immediately terminate this contract without liability.

9.  WARRANTY:

Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or
by Buyer, and will be merchantable, of good material and workmanship and free from defect.  In addition, Seller acknowledges that Seller knows of
Buyers intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled
by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that
provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

10.  INGREDIENTS DISCLOSURE  SPECIAL WARNINGS AND INSTRUCTIONS:

If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct:  (a) a list of all ingredients in the goods  (b)
the amount of all ingredients  and (c) information concerning any changes in or additions to such ingredients.  Prior to and with the shipment of the
goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of
any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to
advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or
property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

11.  INSOLVENCY:

Buyer may immediately terminate this contract without liability to Seller in any  of the following or any other comparable events:  (a) insolvency of Seller
 (b) filing of a voluntary petition in bankruptcy by Seller  (c) filing of any involuntary petition in bankruptcy against Seller  (d) appointment of a receiver
or trustee for Seller  or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is
not vacated or nullified within 15 days of such event.  Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the
foregoing, including, but not limited to, all attorneys or other professional fees.

12. TERMINATION FOR BREACH OR NONPERFORMANCE  SALE OF ASSETS  OR CHANGE IN CONTROL:

Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller:  (a) repudiates or breaches any of the terms of
this contract, including Seller's warranties  (b) fails to perform services or deliver goods as specified by Buyer  (c) fails to make progress so as to
endanger timely and proper completion of services or delivery of goods  and does not correct such failure or breach within 10 days (or such shorter
period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.  In
addition, Buyer may terminate this contract upon giving at least 60 days notice to Seller, without liability to Seller, if Seller (i) sells, or offers to sell, a
material portion of its assets, or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock
that effects a change in the control of Seller.

13.  TERMINATION FOR CONVENIENCE:

In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any
time and for any reason, by giving written notice to Seller.  Upon such termination, Buyer shall pay to Seller the following amounts without duplication:
(a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for  and (b) the actual
costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are
reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this
contract  less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's
written consent, and the cost of any damaged or destroyed goods or material.  Buyer will make no payments for finished goods, services, work-in-
process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods
that are in Seller's standard stock or that are readily marketable.  Payments made under this Paragraph shall not exceed the aggregate price payable
by Buyer for finished goods or services that would be produced or performed by Seller under delivery  or release schedules outstanding at the date of
termination.  Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on

account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract.  Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

14.  INTELLECTUAL PROPERTY:
Seller agrees:  (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services  Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification  (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller  (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization  and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered 'works made for hire ' to the extent that the works do not qualify as 'works made for hire,' Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

15.  TECHNICAL INFORMATION DISCLOSED TO BUYER:
Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**Terms & Conditions Global 2**

16.  INDEMNIFICATION:
If Seller performs any work on Buyers premises or utilizes the property of Buyer, whether on or off Buyers premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorneys and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Sellers performance of work or use of Buyers property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.  INSURANCE:
Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyers written request.  The certificate will provide that Buyer will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Sellers furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

18.  SELLERS PROPERTY:
Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ('Sellers Property') necessary for the production of the goods.  The cost of changes to Sellers Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer.  Seller shall insure Sellers Property with full fire and extended coverage insurance for its replacement value.  Seller grants Buyer an irrevocable option to take possession of and title to Sellers Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has  previously paid to Seller for the cost of such items  provided, however, that this option shall not apply if Sellers Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  BUYERS PROPERTY:
All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis (Buyers Property).  Seller shall bear the risk of loss of and damage to Buyers Property.  Buyers Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract  shall be deemed to be personalty  shall be conspicuously marked by Seller as the property of Buyer  shall not be commingled with the property of Seller or with that of a third person  and shall not be moved from Sellers premises without Buyers prior written approval.  Buyer shall have the right to enter Sellers premises at all  reasonable times to inspect such property and Sellers records with respect thereto.  Upon the request of Buyer, Buyers Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B.  transport equipment at Sellers plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyers Property for work performed on such property or otherwise.

20.  SERVICE AND REPLACEMENT PARTS:
Seller will sell to Buyer goods necessary for  it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module  at price(s) that shall not, in the aggregate, exceed  the price of the system or module less assembly costs.  During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyers past model service and replacement parts requirements.  Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases.  For the remainder of this period, the price(s) for goods shall be as agreed to by the parties.  When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyers service part sales activities.

21.  REMEDIES:
The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods  (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or

Contract Attachment Page:        5  of  5

processing of warranty chargebacks for nonconforming goods.

22. CUSTOMS  EXPORT CONTROLS:
Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer.  Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any.  Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s).  Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

23. SETOFF/RECOUPMENT:
In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries  and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

24. NO ADVERTISING:
Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Sellers advertising or promotional materials.

25. COMPLIANCE WITH LAWS  EMPLOYMENT/BUSINESS PRACTICES:
Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive worker treatment or corrupt business practices, in the supply of goods or provision of services under this contract.  At Buyer's request, Seller shall certify in writing its compliance with the foregoing.  Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

26. NO IMPLIED WAIVER:
The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

27. NON-ASSIGNMENT:
Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations  under this contract without Buyer's prior written consent.

28. RELATIONSHIP OF PARTIES:
Seller and Buyer are independent contracting parties and nothing in this contract shall make either party  the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

29. GOVERNING LAW  JURISDICTION:
This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law.  Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyers option, in the court(s) having jurisdiction over Buyers location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures.  Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

30. SEVERABILITY:
If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

31. ENTIRE AGREEMENT:
This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements.  This contract may only be modified by a contract amendment issued by Buyer.

**Tooling Cost Reimbursement**

Special Term - Tooling Cost Reimbursement

Buyer shall reimburse Seller the lesser of (i) the amount specified in this contract, or (ii) Seller's actual costs for purchased materials and services (including purchased tooling or portions thereof), plus Seller's actual direct cost for labor and overhead typically associated with tool construction. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's cost.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any claim of Seller for tooling.

**GM**

**Service Parts Operations**
General Motors Company
6200 Grande Pointe Dr.
Grand Blanc, Michigan 48439

\*\* CONSOLIDATED \*\*
\*\*\*\* CONTRACT \*\*\*\*

| Page | 1 | of | 15 |
|------|---|----|----|

GM-53168

This Agreement Number must appear on all Invoices, Packing Slips, Packages and Bills of Lading.

**Agreement,** dated    JULY       28, 2009

Between

KARMANN USA, INC
WILHELM KARMANN GMBH
14967 PILOT DRIVE
PLYMOUTH          MI 48170

(Mailing Address)

GMSPO S/C #          02137

FOB Point:

FOB Duns #          PLYMOUTH          MI 48170
                    150781099

Terms of Payment:    NET    MNS-2

Freight Terms:       COLLECT

hereinafter called the "Seller" and General Motors Company (GM Service Parts Operations) hereinafter referred to as  the "Buyer". The Seller agrees to sell and the Buyer agrees to purchase, at the price and upon  and subject to the terms and conditions on  the face  and  reverse side hereof  approximately the pecentage shown on  the  attached  exhibit  the Buyer's requirements, between the dates of:

**Effective Date**    JUNE       23, 2007 **Through Expiration Date**    DECEMBER  31, 2010
This order is not binding until accepted.

The terms and conditions to which Seller agrees by acceptance of this order.
This order, including the terms and conditions contains the complete and final agreement between Buyer and Seller and
no other agreement in any way modifying any of said terms and conditions will be binding upon the Buyer unless made in
in writing and signed by Buyer's authorized representative.

Parts must conform to all Part Print Specifications,  regardless of previous  deviations  from other  GM locations, unless approved deviations are
obtained from GM Service Parts Operations Engineering.
Do not manufacture  or ship the  material covered  by this  Agreement/Purchase Order  until receipt of Buyer's Material Control Department Parts
Release and Schedule from PC 141 indicating the proper lot to be shipped. Ship Via Best Way unless specified otherwise.

Show Remit to Duns Code on Invoices.  Do not declare valuation of Express shipments or insure Parcel Post.
If Government Contract number is shown hereon, additional terms and conditions attached hereto apply.

KARMANN USA, INC

_____
Seller

By _____
Authorized Official

By _____
C. PITTS                Buyer        18



# GENERAL TERMS AND CONDITIONS

## 1. ACCEPTANCE:
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or service under this contract shall constitute Seller's acceptance of these terms and conditions only.

## 2. SHIPPING AND BILLING:
Seller agrees: (a) to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination (b) to route shipments in accordance with Buyer's instructions (c) to make no charge for handling, packaging, storage or transportation of goods, unless otherwise stated as an item on this contract (d) to provide with each shipment packing slips with Buyer's contract and/or release number and date of shipment marked thereon (e) to properly mark each package with a label/tag according to Buyer's instructions (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyer's instructions. Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyer's instructions and the carrier's requirements. The marks on each package and identification of the goods on packing slips, bills lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased. Seller further agrees: (a) to accept payment based upon Buyer's Evaluated Receipt Record/Self Billed invoice, unless an invoice is requested by Buyer and (b) to accept payment by electronic funds transfer. The payment date is set forth in the Line Item Detail of this contract, or if not stated, shall be the date established by Buyer's Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyer's North American facilities, Seller's shipment date of goods or date of services, and, for all of Buyer's other locations, Buyer's receipt date of the goods or date of services. Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

## 3. DELIVERY SCHEDULES:
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyer's schedules. Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyer's delivery schedules. Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by contract. Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

## 4. PREMIUM SHIPMENTS:
If Seller's acts or omissions result in Seller's failure to meet Buyer's delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Seller's sole expense.

## 5. CHANGES:
Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work such as inspection, testing or quality control, and Seller agrees to promptly make such changes. Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct. Any changes to this contract shall be made in accordance with Paragraph 31.

## 6. SUPPLIER QUALITY AND DEVELOPMENT; INSPECTION:
Seller agrees to participate in Buyer's supplier quality and development and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000. In addition, Buyer shall have the right to enter Seller's facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract. Buyer's inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

## 7. NONCONFORMING GOODS:
Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections. To the extent Buyer inspects goods as nonconforming, the quantities under this contract will automatically be reduced unless Buyer otherwise notifies Seller. Seller will not replace quantities so reduced without a new contract or schedule from Buyer. Nonconforming goods will be held by Buyer in accordance with Seller's instructions at Seller's risk. Seller's failure to provide written instructions within 10 days, or such shorter period as may commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyer's option to charge Seller for storage and handling or to dispose of the goods without liability to Seller. Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyer's right to assert any legal or equitable remedy, or relieve Seller's responsibility for latent defects.

## 8. FORCE MAJEURE:
Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order, provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter). During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract. In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Seller's labor contract(s). If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days. If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

## 9. WARRANTY:
Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect. In addition, Seller acknowledges that Seller knows of Buyer's intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured, or assembled by Seller, based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

## 10. INGREDIENTS DISCLOSURE; SPECIAL WARNINGS/INSTRUCTIONS:
If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct: (a) a list of all ingredients in the goods (b) the amount of all ingredients and (c) information concerning any changes in or additions to such ingredients. Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

## 11. INSOLVENCY:
Buyer may immediately terminate this contract without liability to Seller in any of the following or any other comparable events: (a) insolvency of Seller (b) filing of a voluntary petition in bankruptcy by Seller (c) filing of any involuntary petition in bankruptcy against Seller (d) appointment of a receiver or trustee for Seller or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment, or assignment is not vacated or nullified within 15 days of such event. Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, an attorney's or other professional fees.

## 12. TERMINATION FOR BREACH OR NONPERFORMANCE:
Buyer reserves the right to terminate all or any part of this contract, without liability to Buyer, if Seller: (a) repudiates or breaches any of the terms of this contract, including Seller's warranties (b) fails to perform services or deliver goods as specified by Buyer (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods and does not correct such failure to breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.

## 13. TERMINATION FOR CONVENIENCE:
In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller. Upon such termination, Buyer and Seller shall agree upon the amounts without duplication: (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract, less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material. Buyer will make no payments for finished goods, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable. Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract. Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories, and other items relating to any termination claim of Seller.

### Special Term – Europe:
As from the commencement of the third stage of the European Monetary Union, Buyer reserves the right to remit contractual payments either in Euros or in the original currency specified in the contract. The introduction of the Euro will not allow either party to terminate, repudiate or request any alteration of this contract.

### Special Term – Europe
The warranty period set forth in Paragraph 9 shall in no event exceed five years.

### Special Term – Limited Duration
All goods and services supplied by Seller shall be year 2000 compliant and compatible, and shall function without error or fault in the processing (including, but not limited to calculating, managing, manipulating, comparing and sequencing) of date and date-related data, for the years 2000 and beyond. At Buyer's request, Seller shall certify in writing its compliance with the foregoing.

### Special Term – Advance Purchasing
If issued in the Request for Quote, the Provisions for Advance Purchasing are incorporated into this contract by reference.

## 14. INTELLECTUAL PROPERTY:
Seller agrees: (a) to defend, hold harmless and indemnify Buyer, its successors and customers against all claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided any part of the goods or services Seller expressly waives any claims against Buyer that such infringement arose out of compliance with Buyer's specification (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express consent and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered "works made for hire," to the extent that the works do not qualify as "works made for hire," Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

## 15. TECHNICAL INFORMATION DISCLOSED TO BUYER:
Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

## 16. INDEMNIFICATION:
If Seller performs any work at Buyer's premises or utilizes the property of Buyer, whether on or off Buyer's premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims demands or expenses (including attorney's and other professional fees) for damages to the property of or injuries (including death) to Buyer, the employees or any other person arising from or in connection with Seller's performance of work or use of Buyer's property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

## 17. INSURANCE:
Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyer's written request. The certificate will provide that Buyer will receive 30 days' prior written notice from the insurer of any termination or reduction in the amount of scope of coverage. Seller's furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

## 18. SELLER'S PROPERTY:
Unless otherwise agreed to by Buyer, Seller shall, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns, and other items ("Seller's Property") necessary for the production of the goods. The cost of changes to Seller's Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer. Seller shall insure Seller's Property with full fire and extended coverage insurance for the replacement value. Seller grants Buyer an irrevocable option to take possession of and title to Seller's Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has previously paid to Seller for the cost of such items, provided, however, that this option shall not apply if Seller's Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

## 19. BUYER'S PROPERTY:
All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis ("Buyer's Property"). Seller shall bear the risk of loss of and damage to Buyer's Property. Buyer's Property shall at all times be properly housed and maintained by Seller, at its expense , shall not be used by Seller for any purpose other than the performance of this contract shall be deemed to be personally shall be conspicuously marked by Seller as the property of Buyer, shall not be commingled with the property of Seller or with that of a third person and shall not be moved from Seller's premises without Buyer's prior written approval. Buyer shall have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto. Upon Buyer's request, Buyer's Property shall be immediately released to Buyer or delivered to Seller, either (i) F.O.B. transport equipment at Seller's plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyer's Property for work performed on such property or otherwise.

## 20. SERVICE AND REPLACEMENT PARTS:
Seller will sell to Buyer goods necessary for it to fulfill its current model service and replacement parts requirements at the prices set forth in this contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that shall not, in the aggregate, exceed the price of the system or module less assembly costs. During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer at such times and in such quantities as determined by Buyer to fulfill its past model service and replacement parts requirements. Unless otherwise agreed to by Buyer, the price(s) during the first 5 years of the period shall be those in effect at the conclusion of current model purchases. For the remainder of this period, the price(s) for goods shall be as agreed to by the parties. When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyer's service parts activities.

## 21. REMEDIES:
The rights and remedies reserved to Buyer in this contract shall be cumulative, and additional to, all other or further remedies provided in law or equity. Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such non-conforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) inspecting, sorting, repairing or replacing such nonconforming goods (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

## 22. CUSTOMS; EXPORT CONTROLS:
Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer. Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any. Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorizations(s). Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 23. SETOFF/RECOUPMENT:
In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliate/subsidiaries to Buyer and its affiliate/subsidiaries and Buyer shall have the right to setoff against or to recoup from any amounts due Seller and its affiliate/subsidiaries from Buyer and its affiliate/subsidiaries.

## 24. NO ADVERTISING:
Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials.

## 25. COMPLIANCE WITH LAWS; FORCE LABOR:
Seller, and goods or services supplied by seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Seller further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor, or engage in abusive employment or corrupt business practices, in the supply of goods or services under this contract. At Buyer's request, Seller shall certify in writing its compliance with the foregoing. Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

## 26. NO IMPLIED WAIVER:
The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

## 27. NON-ASSIGNMENT:
Seller may not assign or delegate its obligations under this contract without Buyer's prior written consent.

## 28. RELATIONSHIP OF PARTIES:
Seller and Buyer are independent contracting parties and nothing in this contract shall make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

## 29. GOVERNING LAW; JURISDICTION:
This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law. An action or proceeding by Buyer against Seller may be brought by Buyer in any court having jurisdiction over Seller or, at Buyer's option, in the court having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

## 30. SEVERABILITY:
If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

## 31. ENTIRE AGREEMENT:
This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements. This contract may only be modified by a contract amendment issued by Buyer.

**GM** **Service Parts Operations**
General Motors Company
6200 Grande Pointe Dr.
Grand Blanc, Michigan 48439

** CONSOLIDATED **
**** CONTRACT ****

| Page | 3 | of | 15 |

GM-53168

This Agreement Number must appear on all Invoices, Packing Slips, Packages and Bills of Lading.

Agreement, dated    JULY    28, 2009
Between

KARMANN USA, INC
WILHELM KARMANN GMBH
14967 PILOT DRIVE
PLYMOUTH          MI 48170

(Mailing Address)

GMSPO S/C #    02137

FOB Point:    PLYMOUTH          MI 48170

FOB Duns #    150781099

Terms of Payment:    NET    MNS-2

Freight Terms:    COLLECT

CONTRACT CREATED FOR THE PURPOSE OF SHIPPING SERVICE
PARTS TO GENERAL MOTORS.
J. KOMISAK/A. RODRIGUEZ/C. PITTS

-----COUNTRY OF ORIGIN-----
BY ACCEPTANCE OF THIS PURCHASE ORDER, SUPPLIERS PROVIDING GOODS FROM
LOCATIONS OUTSIDE THE BOUNDARIES OF THE UNITED STATES HEREBY AGREE
TO COMPLY WITH ALL UNITED STATES COUNTRY OF ORIGIN MARKING
REQUIREMENTS AS SET FORTH IN 19 U.S.C. 1304, AND THE CUSTOMS
REGULATIONS AS SET FORTH IN TITLE 19, CODE OF FEDERAL REGULATIONS.
THESE REQUIREMENTS ARE BRIEFLY SUMMARIZED AS FOLLOWS:

1. PHYSICAL MARKING OF GOODS FOR GM SERVICE PARTS OPERATIONS.

UNLESS EXCEPTED BY LAW, THE TARIFF ACT OF 1930 AS AMENDED (19 U.S.C.
1304), REQUIRES THAT EVERY ARTICLE OF FOREIGN ORIGIN (EACH PIECE
FOR GM SERVICE PARTS OPERATIONS) OR ITS CONTAINER (IF INDIVIDUALLY
PACKAGED OR LABELED FOR GM SERVICE PARTS OPERATIONS),
IMPORTED INTO THE U.S. SHALL BE MARKED IN A CONSPICUOUS
PLACE AS LEGIBLY, INDELIBLY, AND PERMANENTLY AS THE NATURE OF THE
ARTICLE OR ITS CONTAINER WILL PERMIT, IN SUCH A MANNER AS TO
INDICATE TO AN ULTIMATE PURCHASER IN THE U.S. THE ENGLISH NAME OF
THE COUNTRY OF ORIGIN OF THE ARTICLE, AT THE TIME OF IMPORTATION
INTO THE CUSTOMS TERRITORY OF THE UNITED STATES.  IF INCLUDING
MORE THAN ONE PIECE OF THE SAME PART IN A SINGLE PACKAGE FOR
GM SERVICE PARTS OPERATIONS, EACH PIECE AS WELL AS EACH PACKAGE
MUST BE MARKED.

"COUNTRY OF ORIGIN" MEANS THE COUNTRY OF MANUFACTURE, PRODUCTION,

CONTINUED ON NEXT PAGE

KARMANN USA, INC

_____
Seller

By _____
Authorized Official

By
C. PITTS          Buyer          18

| GM | **Service Parts Operations** | | | | Page | 4 | of | 15 |

**GM** **Service Parts Operations**
General Motors Company
6200 Grande Pointe Dr.
Grand Blanc, Michigan 48439

** CONSOLIDATED **
**** CONTRACT ****

Page        4     of     15

GM-53168

This Agreement Number must appear on all Invoices, Packing Slips, Packages and Bills of Lading.

**Agreement,** dated   JULY    28, 2009

Between

KARMANN USA, INC
WILHELM KARMANN GMBH
14967 PILOT DRIVE
PLYMOUTH             MI 48170

(Mailing Address)

GMSPO S/C #      02137

FOB Point:        PLYMOUTH       MI 48170

FOB Duns #        150781099

Terms of Payment:  NET    MNS-2

Freight Terms:     COLLECT

OR GROWTH OF ANY ARTICLE OF FOREIGN ORIGIN ENTERING THE UNITED STATES. FURTHER WORK OR MATERIAL ADDED TO AN ARTICLE IN ANOTHER COUNTRY MUST EFFECT A SUBSTANTIAL TRANSFORMATION IN ORDER TO RENDER SUCH OTHER COUNTRY THE "COUNTRY OF ORIGIN" WITHIN THIS DEFINITION.

THE "ULTIMATE PURCHASER" IS GENERALLY THE LAST PERSON IN THE UNITED STATES WHO WILL RECEIVE THE ARTICLE IN THE FORM IN WHICH IT WAS IMPORTED, I.E., A PURCHASER OF THE PART AT RETAIL.

2. COUNTRY OF ORIGIN DOCUMENTATION.

THE COMMERCIAL INVOICES ISSUED BY SELLER IN CONNECTION WITH THE SALE OF FOREIGN GOODS SHALL INDICATE THE COUNTRY OF ORIGIN FOR EACH ARTICLE. REFERENCE TITLE 19, CFR PART 141.86.

3. SPECIAL COUNTRY OF ORIGIN REQUIREMENTS.

CERTAIN ARTICLES IMPORTED INTO THE UNITED STATES REQUIRE SPECIFIC MARKING METHODS AND INVOICE INFORMATION, I.E., CERTAIN BALL OR ROLLER BEARINGS, TIRES AND TUBES FOR TIRES, STEEL AND CERTAIN ARTICLES OF STEEL.

SELLER FURTHER AGREES TO ASSUME FINANCIAL RESPONSIBILITY FOR THEIR FAILURE TO COMPLY WITH UNITED STATES COUNTRY OF ORIGIN MARKING LAWS AND REGULATIONS BY ACCEPTING A DEBIT FOR:

    1. ALL COSTS INCURRED BY BUYER IN BRINGING GOODS INTO COMPLIANCE
       WITH U.S. MARKING REQUIREMENTS, I.E., WAREHOUSING NON-
       COMPLYING GOODS IN A U.S. FOREIGN TRADE ZONE AND RELABELLING

CONTINUED ON NEXT PAGE

KARMANN USA, INC

_____
            Seller

By _____          By _____
        Authorized Official                      C. PITTS          Buyer          18

| GM | **Service Parts Operations** | | |
|---|---|---|---|

**Service Parts Operations**
General Motors Company
6200 Grande Pointe Dr.
Grand Blanc, Michigan 48439

\*\* CONSOLIDATED \*\*
\*\*\*\* CONTRACT \*\*\*\*

| Page | 5 | of | 15 |
|---|---|---|---|

GM-53168

This Agreement Number must appear on all Invoices, Packing Slips, Packages and Bills of Lading.

**Agreement,** dated    JULY    28, 2009

Between

KARMANN USA, INC
WILHELM KARMANN GMBH
14967 PILOT DRIVE
PLYMOUTH          MI 48170

(Mailing Address)

GMSPO S/C #          02137

FOB Point:          PLYMOUTH          MI 48170

FOB Duns #          150781099

Terms of Payment:          NET    MNS-2

Freight Terms:          COLLECT

GOODS, AND

2. ALL COSTS TO AIR FREIGHT ADDITIONAL MATERIALS TO COVER CUSTOMER REQUIREMENTS WHILE NONCONFORMING GOODS ARE BROUGHT INTO COMPLIANCE WITH MARKING REQUIREMENTS, AND

3. ANY FINES, PENALTIES, FORFEITURES ACTIONS TAKEN BY U.S. CUSTOMS, AS WELL AS GENERAL MOTORS COSTS TO LEGALLY DEFEND AGAINST SUCH ACTIONS, IN CONNECTION WITH THE IMPORTATION OF ANY GOODS FROM A SUPPLIER THAT DO NOT COMPLY WITH U.S. COUNTRY OF ORIGIN MARKING REQUIREMENTS.

PAYMENT IS TO BE MADE IN U.S. FUNDS UNLESS SPECIFIED OTHERWISE BY THE BUYER. THE SUPPLIERS INVOICES SHOULD BE RENDERED ACCORDINGLY.

PALLETIZATION OF INBOUND MATERIAL IS A REQUIREMENT FOR GMSPO.  THIS APPLIES TO BOTH BULK MATERIAL AND PACKAGED (SOURCE UNITIZED) MATER-IAL FOR SERVICE.
                    DESIGN PERFORMANCE REQUIREMENT
PALLET AND SHIPPING CONTAINER PERFORMANCE IS THE RESPONSIBILITY OF THE SUPPLIER.  IN ALL CASES, THE PALLET AND SHIPPING CONTAINER MUST:
1.  FOR BULK MATERIAL:  DELIVER DAMAGE-FREE PRODUCT WITH FULL CON-TAINER INTEGRITY TO THE SPO RECEIVING POINT.
2.  FOR SOURCE PACKAGED MATERIAL: DELIVER DAMAGE-FREE PRODUCT WITH FULL CONTAINER ITEGRITY TO THE SPO RECEIVING POINT AND SPO CUS-TOMER.
DETAILED REQUIREMENTS ARE SHOWN IN THE SPO PACKAGING STANDARDS AND

CONTINUED ON NEXT PAGE

KARMANN USA, INC

_____
Seller

By _____
Authorized Official

By _____
C. PITTS          Buyer          18

**GM** | **Service Parts Operations**
General Motors Company
6200 Grande Pointe Dr.
Grand Blanc, Michigan 48439

\*\* CONSOLIDATED \*\*
\*\*\*\* CONTRACT \*\*\*\*

| Page | 6 | of | 15 |

GM-53168

This Agreement Number must appear on all Invoices, Packing
Slips, Packages and Bills of Lading.

**Agreement,** dated    JULY    28, 2009
Between

KARMANN USA, INC
WILHELM KARMANN GMBH
14967 PILOT DRIVE
PLYMOUTH        MI 48170

(Mailing Address)

GMSPO S/C #        02137

FOB Point:        PLYMOUTH        MI 48170

FOB Duns #        150781099

Terms of Payment:    NET    MNS-2

Freight Terms:    COLLECT

GUIDELINES MANUAL.

"PARTS AND ACCESSORIES MUST CONFORM TO ALL DRAWINGS AND SPECIFICA-
TIONS. IF APPLICABLE, ALL PARTS AND ASSEMBLIES SUPPLIED UNDER THIS
CONTRACT MUST BE FREE OF RUST."

IF PARTS ARE TO BE UNITIZED BY THE VENDOR, THE PACKAGING SPECIFIC-
ATIONS MUST MEET THE REQUIREMENTS PUBLISHED IN THE GMSPO PACKAGING
STANDARDS AND GUIDELINES MANUAL.  ANY QUESTIONS PERTAINING TO THESE
GUIDELINES ARE TO BE DIRECTED TO THE PACKAGING ENGINEER AT GMSPO,
6200 GRAND POINTE DR, GRAND BLANC, MI  48439-2222.

SELLER AGREES TO PROVIDE ALL INFORMATION NECESSARY FOR BUYER TO COM-
PLY WITH ALL APPLICABLE LAWS, REGULATIONS AND RELATED LEGAL REPORT-
ING OBLIGATIONS IN THE COUNTRY(IES) OF DESTINATION.  SELLER AGREES
TO PROVIDE ALL DOCUMENTATION AND/OR ELECTRONIC TRANSACTION RECORDS
TO ALLOW BUYER TO MEET CUSTOMS RELATED OBLIGATIONS, ANY LOCAL CON-
TENT/ORIGIN REQUIREMENTS, AND TO OBTAIN ALL TARIFF AND TRADE PROGRAM
DUTY AVOIDANCE(S) AND/OR REFUND BENEFITS, WHERE APPLICABLE.

SELLER AGREES TO COMPLY WITH THE AUTOMOTIVE INDUSTRY ACTION GROUP'S
(AIAG) DOCUMENT AND EDI PROTOCOL AND STANDARDS IN THEIR SUPPLIER
INFORMATION KIT FOR U.S., CANADA, AND MEXICO IMPORTS.

SELLER AGREES TO ASSUME, AND TO INDEMNIFY BUYER AGAINST, ANY AND ALL
FINANCIAL RESPONSIBILITY ARISING FROM SELLER'S FAILURE TO COMPLY
WITH THESE REQUIREMENTS AND/OR TO SUPPLY BUYER WITH THE INFORMATION
REQUIRED TO MEET LEGAL REPORTING OBLIGATIONS, INCLUDING, WITHOUT

CONTINUED ON NEXT PAGE

KARMANN USA, INC
_____
            Seller

By _____        By _____
            Authorized Official                C. PITTS        Buyer        18

**GM**  **Service Parts Operations**
General Motors Company
6200 Grande Pointe Dr.
Grand Blanc, Michigan 48439

** CONSOLIDATED **
**** CONTRACT ****

| Page | 7 | of | 15 |

GM-53168

This Agreement Number must appear on all Invoices, Packing Slips, Packages and Bills of Lading.

**Agreement,** dated   JULY    28, 2009
Between

KARMANN USA, INC
WILHELM KARMANN GMBH
14967 PILOT DRIVE
PLYMOUTH             MI 48170

(Mailing Address)

GMSPO S/C #        02137

FOB Point:
                   PLYMOUTH          MI 48170
FOB Duns #         150781099

Terms of Payment:  NET    MNS-2
Freight Terms:     COLLECT

LIMITATION, ANY FINES, PENALTIES, FORFEITURES, OR COUNSEL FEES IN-
CURRED OR IMPOSED AS A RESULT OF ACTIONS TAKEN BY THE IMPORTING
COUNTRY'S GOVERNMENT.

"SUPPLIER IS REQUIRED TO OBTAIN WRITTEN AUTHORIZATION PRIOR
TO SELLING ANY GENERAL MOTORS PROPRIETARY PACKAGING MATERIALS
TO ANY SOURCE OTHER THAN A GENERAL MOTORS FACILITY."

ISSUANCE OF THIS PURCHASE ORDER DOES NOT RELIEVE SELLER OF THE
RESPONSIBILITY TO MAINTAIN MANUFACTURING CAPABILITY TO MEET
GENERAL MOTORS SERVICE PARTS OPERATIONS FUTURE REQUIREMENTS.

MANUFACTURING CAPABILITY MUST BE MAINTAINED UNLESS OTHERWISE
AUTHORIZED IN WRITING BY GENERAL MOTORS SERVICE PARTS OPERATIONS
PURCHASING DEPARTMENT.

THE COST DESIGNATED BELOW IS IN USD CURRENCY.

ALL REQUIRED SHIPMENTS OF MATERIAL DIRECT TO BUYER'S LOCATIONS
SHALL BE SHIPPED COLLECT, THIRD PARTY CONSIGNEE BILLING.


      ----- YEAR 2000 COMPLIANCE -----
SELLER, AND ANY GOODS AND SERVICES SUPPLIED BY SELLER, SHALL BE YEAR
2000 COMPLIANT AND COMPATIBLE, AND SHALL FUNCTION WITHOUT ERROR OR
FAULT IN THE PROCESSING (INCLUDING, BUT NOT LIMITED TO CALCULATING,
MANAGING, MANIPULATING, COMPARING AND SEQUENCING) OF DATE AND DATE-
RELATED DATA, FOR THE YEARS 2000 AND BEYOND.  AT BUYER'S REQUEST,

CONTINUED ON NEXT PAGE

KARMANN USA, INC

_____
              Seller

By _____        By _____
          Authorized Official                 C. PITTS         Buyer        18

**GM** **Service Parts Operations**
General Motors Company
6200 Grande Pointe Dr.
Grand Blanc, Michigan 48439

\*\* CONSOLIDATED \*\*
\*\*\*\* CONTRACT \*\*\*\*

| Page | 8 | of | 15 |
|------|---|----|----|

GM-53168

This Agreement Number must appear on all Invoices, Packing Slips, Packages and Bills of Lading.

**Agreement,** dated    JULY    28, 2009

Between

KARMANN USA, INC
WILHELM KARMANN GMBH
14967 PILOT DRIVE
PLYMOUTH        MI 48170

(Mailing Address)

GMSPO S/C #        02137

FOB Point:        PLYMOUTH        MI 48170

FOB Duns #        150781099

Terms of Payment:    NET    MNS-2

Freight Terms:    COLLECT

SELLER SHALL CERTIFY IN WRITING ITS COMPLIANCE WITH THE FOREGOING.

------ BAR CODING ------

ALL SUPPLIERS ARE REQUIRED TO SHIP THEIR UNITIZED MATERIAL ONLY TO GM SERVICE PARTS OPERATIONS WITH THE PROPER BAR CODING ON EACH INDIVIDUAL CARTON, POLYBAG, ETC., ACDELCO DISTRIBUTION (MASTER PACK) CARTON AND PALLET LOAD.  BAR CODING FOR GMSPO ENCOMPASSES THREE DIFFERENT SYMBOLOGIES.  ACDELCO PRODUCTS ARE BAR CODED WITH UPC VERSION A AND UCC-14 (I 2 OF 5).  GM PARTS PRODUCTS ARE BAR CODED WITH THE ANSI 39 (3 OF 9) BAR CODE.  ALL BAR CODES MAY BE PRINTED ON THE SAME EQUIPMENT.

AFTER A PART NUMBER IS ADDED TO CONTRACT AND PRIOR TO SHIPPING MATERIAL TO GMSPO, SEND 10 FULL PRODUCTION BAR CODE SAMPLES OF THE LABELS OR UNITIZED PACKAGES FOR EACH PART NUMBER ADDED TO CONTRACT TO:  LAB ANALYST, GMSPO PRODUCT ASSURANCE LAB, 6060 W. BRISTOL RD., FLINT, MI 48554-3621.  TELEPHONE (810) 635-1566 FACSIMILE (810) 635-6599.  A LETTER OR E-MAIL WILL BE FORWARDED TO THE SUPPLIER AFTER REVIEW ADVISING IF YOUR BAR CODE LABEL IS ACCEPTABLE OR NOT.

DO NOT SHIP ANY MATERIAL TO GMSPO PRIOR TO OBTAINING AN ACCEPTABLE BAR CODE STATUS.

MATH DATA:
ALL C4 TERMS APPEARING ON THE FACE OF THIS DOCUMENT SHALL HAVE THE MEANING PROVIDED IN THE GM SUPPLIER C4 INFORMATION BOOKLET(GM-1825).

IF MATH DATA IS TO BE UTILIZED FOR THIS ORDER, C4 COMPLIANCE IS REQUESTED.  THE FOLLOWING C4 GUIDELINES SHOULD BE USED IN

CONTINUED ON NEXT PAGE

KARMANN USA, INC

_____
Seller

By _____
Authorized Official

By C. PITTS        Buyer        18

**GM** **Service Parts Operations**
General Motors Company
6200 Grande Pointe Dr.
Grand Blanc, Michigan 48439

\*\* CONSOLIDATED \*\*
\*\*\*\* CONTRACT \*\*\*\*

| Page | 9 | of | 15 |
|---|---|---|---|

GM-53168

This Agreement Number must appear on all Invoices, Packing Slips, Packages and Bills of Lading.

**Agreement,** dated    JULY    28, 2009

Between

KARMANN USA, INC
WILHELM KARMANN GMBH
14967 PILOT DRIVE
PLYMOUTH        MI 48170

(Mailing Address)

GMSPO S/C #        02137

FOB Point:        PLYMOUTH        MI 48170

FOB Duns #        150781099

Terms of Payment:    NET    MNS-2

Freight Terms:    COLLECT

CONJUNCTION WITH THE GM SUPPLIER C4 INFORMATION BOOKLET, AS WELL AS
ANY RELATED STATEMENTS OF WORK, STATEMENTS OF REQUIREMENTS, OR
SPECIFICATIONS DOCUMENTS GOVERNING THE USE OF C4 AND MATH DATA
FOR THIS CONTRACT.
GM PREFERS TO PROVIDE ALL MATH DATA TRANSMISSIONS
TO SUPPLIERS IN THE NATIVE FILE FORMAT OF THE GM MATH DATA MASTER.
IF NON-STRATEGIC SOFTWARE IS USED, THE SUPPLIER ASSUMES ALL COSTS
ASSOCIATED WITH ADDITIONAL TRANSLATIONS.  IF THE SUPPLIER IS TO
RETURN MATH DATA, IT MUST BE DATA BANKED IN THE NATIVE FILE FORMAT
OF THE MATH DATA MASTER.  ANY AWARDS MADE WITHOUT C4 COMPLIANCE DO
NOT INFER THAT FUTURE C4 COMPLIANCE WILL BE WAIVED.  SUPPLIER WILL
BE RESPONSIBLE TO MEET INSPECTION AND VERIFICATION OF PARTS TO THE
GM MATH DATA MASTER. IF PORTABLE MATH DATA MEDIA (MAGNETIC TAPES,
CASSETTES, OR DISKS) IS USED, THEY BELONG EXCLUSIVELY TO GM AND MUST
BE RETURNED IN 30 DAYS.  GM PORTABLE MATH DATA MEDIA IS NOT TO BE
USED FOR SUPPLIER LIBRARIES. ALL GM DEVELOPED PROPRIETARY
PRODUCTIVITY TOOLS (SUCH AS UG-GRIPS, USER FUNCTIONS, UNIX SCRIPTS,
ETC.), PROVIDED FOR USE IN CONNECTION WITH THIS ORDER, SHALL NOT BE
UTILIZED ON ANY NON-GM CONTRACT.  ALL COPIES OF GM PROPRIETARY
PRODUCTIVITY TOOLS ARE TO BE DESTROYED OR RETURNED TO GM UPON
REQUEST OR AT COMPLETION OF THIS ORDER.

SELLER REPRESENTS THAT GOODS PURCHASED UNDER THIS ORDER WERE NOT
PRODUCED WITH FORCED LABOR (AS DEFINED IN 19 U.S.C. 1307) EITHER
BY SELLER OR SELLER'S SUPPLIERS.  SELLER SHALL INDEMNIFY BUYER
AGAINST ANY LIABILITY BUYER MAY INCUR IF THIS REPRESENTATION IS
INCORRECT.

CONTINUED ON NEXT PAGE

KARMANN USA, INC

_____
Seller

By _____
Authorized Official

By _____
C. PITTS        Buyer        18

**GM** **Service Parts Operations**
General Motors Company
6200 Grande Pointe Dr.
Grand Blanc, Michigan 48439

\*\* CONSOLIDATED \*\*
\*\*\*\* CONTRACT \*\*\*\*

| Page | 10 | of | 15 |
|---|---|---|---|

GM-53168

This Agreement Number must appear on all Invoices, Packing Slips, Packages and Bills of Lading.

**Agreement,** dated    JULY    28, 2009

Between

KARMANN USA, INC
WILHELM KARMANN GMBH
14967 PILOT DRIVE
PLYMOUTH            MI 48170

(Mailing Address)

GMSPO S/C #            02137

FOB Point:
                    PLYMOUTH            MI 48170
FOB Duns #            150781099

Terms of Payment:    NET      MNS-2
Freight Terms:       COLLECT

TOOLING AND OTHER ITEMS PROVIDED TO SELLER PURSUANT TO PARAGRAPH 19 OF THIS ORDER ("BAILED PROPERTY") SHALL BE UTILIZED BY SELLER OR ITS SUPPLIERS SOLELY FOR PRODUCTION OF GOODS FOR BUYER. ANY GOODS DETER-MINED TO BE NONCONFIRMING BY SELLER (OR ITS SUPPLIERS) OR BY BUYER SHALL BE RENDERED UNUSABLE OR UNSALEABLE PRIOR TO SALVAGE OR DISPOSAL. SELLER WARRANTS THAT IT HAS,OR WILL INSTITUTE IMMEDIATELY, APPROPRIATE INTERNAL CONTROLS, AS WELL AS AUDIT/REVIEW ARRANGEMENTS WITH ITS SUPPLIERS, TO ENSURE COMPLIANCE WITH THE REQUIREMENTS OF THIS PROVISION. ADDITIONALLY, SELLER AGREES THAT RECOVERY OR REIM-BURSEMENT OF ANY ATTORNEY'S FEES EXPENDED OR INCURRED BY BUYER IN THE ENFORCEMENT, OR RESULTING FROM A BREACH BY SELLER OR ITS SUPPLIERS OF, THIS PROVISION SHALL BE A REMEDY AVAILABLE TO BUYER PURSUANT TO PARAGRAPH 20 ("REMEDIES") OF THIS ORDER.

----- QS 9000 REQUIREMENTS -----
AS A POTENTIAL GENERAL MOTORS SUPPLIER YOU ARE REQUIRED TO COMPLY WITH ALL GENERAL MOTORS QUALITY PROCEDURES.  THIS INCLUDES CERTIFICATION TO QS-9000.  CERTIFICATION TO QS-9000 IS REQUIRED BY 12/31/97 FOR ALL SUPPLIERS TO GENERAL MOTORS.  FAILURE TO ACHIEVE CERTIFICATION TO QS-9000 WILL RESULT IN DISQUALIFICATION FROM THE QUOTING PROCESS.  THE QS-9000 AND QUALITY SYSTEM ASSESSMENT DOCUMENTS CAN BE OBTAINED FROM THE AIAG (248) 358-3003.

IN ADDITION TO QS-9000, THE FOLLOWING GENERAL MOTORS QUALITY PROCEDURES MUST BE ADHERED TO BY ALL GENERAL MOTORS SUPPLIERS EFFECTIVE IMMEDIATELY.  IT IS GENERAL MOTORS EXPECTATION THAT ALL SUPPLIERS ARE KNOWLEDGEABLE OF OUR QUALITY PROCEDURES AND HAVE THE APPROPRIATE SYSTEMS, PROCESSES AND DOCUMENTATION IN PLACE TO

CONTINUED ON NEXT PAGE

KARMANN USA, INC

_____
            Seller

By _____        By _____
        Authorized Official                   C. PITTS            Buyer        18

| GM | Service Parts Operations |
|----|--------------------------|

Service Parts Operations
General Motors Company
6200 Grande Pointe Dr.
Grand Blanc, Michigan 48439

** CONSOLIDATED **
**** CONTRACT ****

| Page | 11 | of | 15 |

GM-53168

This Agreement Number must appear on all Invoices, Packing Slips, Packages and Bills of Lading.

Agreement, dated    JULY    28, 2009

Between

KARMANN USA, INC
WILHELM KARMANN GMBH
14967 PILOT DRIVE
PLYMOUTH          MI 48170

(Mailing Address)

GMSPO S/C #    02137

FOB Point:    PLYMOUTH          MI 48170

FOB Duns #    150781099

Terms of Payment:    NET    MNS-2

Freight Terms:    COLLECT

ENSURE COMPLIANCE.
     *APQP    (ADVANCE PRODUCT QUALITY PLANNING)
     GP-4    (PILOT SHIPPING PROCEDURE)
     GP-5    (PROBLEM REPORTING AND RESOLUTION)
     GP-6    (SUPPLIER SUBMISSION OF MATCH CHECK MATERIAL)
     GP-7    (COMPONENT VERIFICATION & TRACEABILITY PROCEDURE)
     GP-8    (CONTINUOUS IMPROVEMENT PROCEDURE)
     GP-9    (RUN AT RATE)
     GP-10   (EVALUATION & ACCEDITATION OF SUPPLIER TEST FACILITIES)
     GP-11   (GENERAL PROCEDURE FOR PROTOTYPE MATERIAL)
     GP-12   (EARLY PRODUCTION CONTAINMENT PROCEDURE)
     *PPAP    (PRODUCTION PART APPROVAL PROCEDURE)

PROCEDURES WITH AN * CAN BE OBTAINED FROM THE AIAG (248) 358-3003.
ALL OTHER DOCUMENTS CAN BE OBTAINED FROM BOISE CASCADE OFFICE
PRODUCTS 1-800-421-7676 OR 1-810-758-5400.

-------------QUALITY AND DEVELOPMENT-------------------------
SELLER AGREES TO PARTICIPATE IN BUYER'S SUPPLIER QUALITY AND DEVELOP
MENT PROGRAM(S). IN ADDITION, SELLER SHALL COMPLY WITH ALL QUALITY
REQUIREMENTS AND PROCEDURES SPECIFIED BY BUYER, AS THE SAME MAY BE
REVISED FROM TIME TO TIME, INCLUDING THOSE APPLICABLE TO SELLER AS
SET FORTH IN "QUALITY SYSTEM REQUIREMENTS QS-9000"
--------------------PREMIUM FREIGHT----------------------
     IF SELLER'S ACTS OR OMISSIONS RESULT IN SELLERS FAILURE TO
MEET BUYERS REQUIREMENTS AND BUYER REQUIRES A MORE EXPEDITIOUS
METHOD OF TRANSPORTATION FOR THE GOODS THAN THE TRANSPORTATION
METHOD ORIGINALLY SPECIFIED BY BUYER, SELLER SHALL SHIP THE

CONTINUED ON NEXT PAGE

KARMANN USA, INC

_____
Seller

By _____
Authorized Official

By
C. PITTS          Buyer          18

**GM** **Service Parts Operations**
General Motors Company
6200 Grande Pointe Dr.
Grand Blanc, Michigan 48439

** CONSOLIDATED **
**** CONTRACT ****

| Page | 12 | of | 15 |

GM-53168

This Agreement Number must appear on all Invoices, Packing Slips, Packages and Bills of Lading.

Agreement, dated    JULY    28, 2009
Between

KARMANN USA, INC
WILHELM KARMANN GMBH
14967 PILOT DRIVE
PLYMOUTH          MI 48170

(Mailing Address)

GMSPO S/C #          02137

FOB Point:

FOB Duns #          PLYMOUTH          MI 48170
                    150781099

Terms of Payment:    NET    MNS-2

Freight Terms:       COLLECT

GOODS AS EXPEDITIOUSLY AS POSSIBLE AT SELLERS SOLE EXPENSE.
-------------------------------------------------------------

IT WILL BE THE RESPONSIBILITY OF THE SUPPLIER TO IDENTIFY ALL
RETURNABLE DUNNAGE AS "RETURNABLE' AND TO IDENTIFY THE DUNNAGE
WITH THE COMPANY NAME AND ADDRESS CLEARLY AFFIXED TO THE DUNNAGE.

GM SERVICE PARTS OPERATION IS TO BE INVOICED AT THE SAME PRICE AS
GM PRODUCTION PLANTS FOR ALL CURRENT MODEL PARTS PURCHASED FROM
OUR VENDORS.  COST JUSTIFICATION WILL BE REQUIRED FOR ALL

PACKAGING AND/OR PROCESSING VARIATIONS THAT RESULT IN DIFFERENT
PRICING THAN PRODUCTION.

SELLER AGREES TO PAYMENT IN ACCORD WITH ITS CURRENT EFT PAYMENT
AGREEMENT OR, WHERE EFT IS NOT IN PLACE, THAT GM MAY DEFER MAKING
PAYMENT BY PAPER CHECK DURING ANY RECOGNIZED GM HOLIDAY UNTIL THE
NEXT GM BUSINESS DAY WITHOUT BEING IN DEFAULT OR LOSING ANY CASH
DISCOUNT PRIVILEGES.

FOR SELLER'S GOODS TO BE IMPORTED INTO THE UNITED STATES, SELLER
SHALL COMPLY WITH ALL APPLICABLE RECOMMENDATIONS OR REQUIREMENTS OF
THE UNITED STATES CUSTOMS SERVICE'S CUSTOM - TRADE PARTNERSHIP
AGAINST TERRORISM ("C-TPAT") INITIATIVE (FOR INFORMATION GO TO
HTTP://WWW.CUSTOMS.USTREAS.GOV/ENFORCEM/TPAT.HTM).  AT BUYER'S OR
THE CUSTOMS SERVICE'S REQUEST, SELLER SHALL CERTIFY IN WRITING ITS
COMPLIANCE WITH THE FOREGOING.  SELLER SHALL INDEMNIFY AND HOLD

CONTINUED ON NEXT PAGE

KARMANN USA, INC
_____
             Seller

By _____          By _____
        Authorized Official                  C. PITTS          Buyer          18

| GM | **Service Parts Operations** | Page | 13 | of | 15 |
|---|---|---|---|---|---|

**Service Parts Operations**
General Motors Company
6200 Grande Pointe Dr.
Grand Blanc, Michigan 48439

\*\* CONSOLIDATED \*\*
\*\*\*\* CONTRACT \*\*\*\*

Page       13    of    15

GM-53168

This Agreement Number must appear on all Invoices, Packing Slips, Packages and Bills of Lading.

**Agreement,** dated    JULY    28, 2009

Between

KARMANN USA, INC
WILHELM KARMANN GMBH
14967 PILOT DRIVE
PLYMOUTH              MI 48170

(Mailing Address)

GMSPO S/C #        02137

FOB Point:

FOB Duns #         PLYMOUTH              MI 48170
                   150781099

Terms of Payment:   NET    MNS-2

Freight Terms:      COLLECT

BUYER HARMLESS FROM AND AGAINST ANY LIABILITY, CLAIMS, DEMANDS, OR EXPENSES (INCLUDING ATTORNEY'S OR OTHER PROFESSIONAL FEES) ARISING FROM OR RELATING TO SELLER'S NONCOMPLIANCE.

SELLER GRANTS TO BUYER ACCESS TO ALL PERTINENT INFORMATION, INCLUDING, BUT NOT LIMITED TO, BOOKS, RECORDS, PAYROLL DATA, RECEIPTS, CORRESPONDENCE AND OTHER DOCUMENTS FOR THE PURPOSE OF AUDITING SELLER'S CHARGES UNDER THIS CONTRACT.  SELLER WILL PRESERVE THESE DOCUMENTS FOR A PERIOD OF 1 YEAR AFTER THE FINAL PAYMENT UNDER THIS CONTRACT.  IN ADDITION, ALL WORK, MATERIALS, INVENTORIES AND OTHER ITEMS PROVIDED UNDER THIS CONTRACT MUST BE ACCESSIBLE TO BUYER, INCLUDING, BUT NOT LIMITED TO, PARTS, TOOLS, FIXTURES, GAGES AND MODELS.  SELLER WILL SEGREGATED ITS RECORDS AND OTHERWISE COOPERATE WITH BUYER SO AS TO FACILITATE THE AUDIT.

SPECIAL TERM (U.S.) - INSURANCE
FOR PURPOSES OF THIS AGREEMENT, THE INSURANCE COVERAGES REQUIRED UNDER PARAGRAPH 17 ("INSURANCE") OF THE GENERAL TERMS AND CONDITIONS ARE AS FOLLOWS: (A) WORKERS' COMPENSATION: STATUTORY LIMITS FOR THE STATE(S) IN WHICH THIS CONTRACT IS TO BE PERFORMED (OR EVIDENCE OF AUTHORITY TO SELF INSURE); (B) EMPLOYER'S LIABILITY: $500,000 EACH ACCIDENT FOR BODILY INJURY BY ACCIDENT AND $500,000 EACH EMPLOYEE FOR BODILY INJURY BY DISEASE; (C) COMMERCIAL GENERAL LIABILITY COVERING LIABILITY ARISING FROM PREMISES, OPERATIONS, INDEPENDENT CONTRACTORS, PRODUCTS/COMPLETED OPERATIONS, PERSONAL INJURY AND ADVERTISING INJURY, AND LIABILITY ASSUMED UNDER AN INSURED CONTRACT: $5,000,000 EACH OCCURRENCE; AND (D) AUTOMOTIVE LIABILITY (INCLUDING OWNED, NON-OWNED AND HIRED VEHICLES): $5,000,000 EACH ACCIDENT.

CONTINUED ON NEXT PAGE

KARMANN USA, INC

_____
                Seller

By _____        By _____
        Authorized Official                   C. PITTS        Buyer        18

**GM** **Service Parts Operations**
General Motors Company
6200 Grande Pointe Dr.
Grand Blanc, Michigan 48439

\*\* CONSOLIDATED \*\*
\*\*\*\* CONTRACT \*\*\*\*

| Page | 14 | of | 15 |
| --- | --- | --- | --- |

GM-53168

This Agreement Number must appear on all Invoices, Packing Slips, Packages and Bills of Lading.

**Agreement,** dated    JULY    28, 2009

Between

KARMANN USA, INC
WILHELM KARMANN GMBH
14967 PILOT DRIVE
PLYMOUTH              MI 48170

(Mailing Address)

GMSPO S/C #        02137

FOB Point:
                   PLYMOUTH           MI 48170
FOB Duns #         150781099

Terms of Payment:   NET    MNS-2
                    COLLECT
Freight Terms:

SPECIAL TERM (US) - GOVERNMENT CONTRACTS
BUYER SERVES FROM TIME TO TIME AS A CONTRACTOR FOR THE UNITED STATES
GOVERNMENT.  IF SELLER IS A U.S. ENTITY, SELLER SHALL COMPLY WITH
ALL FEDERAL LAWS, RULES, AND REGULATIONS THAT ARE APPLICABLE TO
SELLER AS A SUBCONTRACTOR OF GOVERNMENT CONTRACTORS, INCLUDING
WITHOUT LIMITATION, THOSE RELATING TO (1) EQUAL EMPLOYMENT
OPPORTUNITIES (PARAGRAPHS (1) THROUGH (7) OF SECTION 202 OF
EXECUTIVE ORDER 11246, AS AMENDED, 41 CFR 60-741.5, 41 CFR 60-250.5
); (2) UTILIZATION OF SMALL AND DISADVANTAGED BUSINESS CONCERNS; FAR
SUBPARTS 52.219-8 AND 52.219-9; (3) CONTRACTING WITH BUSINESS
CONCERNS OPERATING IN AREAS OF SURPLUS LABOR (41 CFR 1-1.805); AND
(4) CONTRACTING WITH WOMEN-OWNED BUSINESS CONCERNS (EXECUTIVE ORDER
12138).

KARMANN USA, INC

_____
Seller

By _____
Authorized Official

By
C. PITTS           Buyer        18

**GM** Service Parts Operations
General Motors Company

## Agreement Exhibit

KARMANN USA, INC
G.M.S.P.O. #  02137

| Page | of 5 | 15 |
|------|------|-----|
| Agreement No. | GM-53168 | |

| Quantity | Ser % | Ref Sym | Part Number | Part Description | Purchase Specification | Cost | Unit of Measure |
|----------|-------|---------|-------------|------------------|------------------------|------|-----------------|
| | 100 | | 15894509 | SEAL KIT-F/TOP PUM | UNITIZED | $4.56770 | EA |
| | 100 | | 15921008 | MOLDING ASM-RF DRI | UNITIZED | $7.05370 | EA |
| | 100 | | 15921009 | MOLDING ASM-RF DRI | UNITIZED | $7.05370 | EA |
| | 100 | | 15934391 | MOLDING ASM-RF DRI | UNITIZED | $8.99620 | EA |
| | 100 | | 15934392 | MOLDING ASM-RF DRI | UNITIZED | $8.99620 | EA |
| | 100 | | 22708355 | WEATHERSTRIP-R/CMP | UNITIZED | $2.04250 | EA |

PACKAGING $.3640

By _____
C. PITTS          Buyer          18

## Exhibit B

 **General Motors**
WWP-Advance Purchasing

## NOMINATION LETTER

February 28, 2002

ASC, Incorporated
One Sunroof Center
Southgate, MI 48195

Attn:  Rich Parks
       Director of Business Development (ASC)
CC:    Mark Stevens
       Director- Sales & Marketing (Karmann,USA)

Subject: **GMX 381 Retractable Hardtop**

On behalf of the North American Advanced Purchasing team, I am pleased to inform
you that the Karmann/ ASC joint venture, has been selected as the recommended
source, for the Retractable Hardtop for the GMX 381 - 2006 model year.

This decision was based upon, among other things, your quotation to us as follows:

Part Numbers: 22701432 Retractable Hardtop

With the Following Add ons to body and general assembly
22701430/31 -- Guide ASM - F/Top Frt Loc Pin RT/LT
22701433 -- Hinge Asm F/Top Stow Compt Lid
22701436 -- Strut Asm- R/Compt Lid
22701434/35 -- Actuator RR Compt Lide Lat RT/LT
22701437 -- Pin Asm R/TopLoc
22701438/39 -- Bracket Asm- F/top Pivot Bracket RT/LT
22701440/41 -- Bracket Asm- F/Top Piv RT/ LT
22701442/43 -- Hinge Asm- RR Compt Lid RT/LT

| | |
|---|---|
| Model Program: | GMX 381  Grand Am Convertible |
| Mass: | 47.76 KG |
| Module Piece Cost: | $1750 USD EACH |
| Production Tooling: | $9,366,500 |
| Pre-Production Tooling | $1,430,000 |
| Prototype | $13,200 |

One Time Mule Build          $200,000

IPTV Agreement per the Supplier Commitment form dated 1/22/02:
1st Model Year: 112, 209, 274
2nd Model Year: 105, 197, 258
3rd Model Year:  99,185, 242

*Fleet commitment will be reviewed within the coming months

| Long-Term Agreement: | Reduction | Effective Date |
|---|---|---|
| | 3 | September 2007 |
| | 2 | September 2008 |
| | 2 | September 2009 |

Karmann/ASC agrees to manage all price reductions on the full assembly and provide General Motors written documentation to support contract reductions.

SPO Service Parts Agreement: Supplier agrees to sell to SPO above part prices at production price levels for at least three (3) years beyond the last production year of a functional part.

Provided that Karmann/ASC is able to meet or exceed the agreed upon terms for quality, technology, price, investment/tooling and timing, we intend to issue one or more Purchase Orders for approximately 100% of our production and service part requirements.

We appreciate the level of commitment in which you have shown to date and look forward to your participation in this program.

Very Truly Yours,
Myka Moon

**Exhibit C**

CARSON FISCHER, P.L.C.
Counsel for Karmann U.S.A., Inc.
4111 Andover Road, West-2nd Floor
Bloomfield Hills, MI  48302
(248) 644-4840
Robert A. Weisberg (P26698)
Patrick J. Kukla (P60465)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                                        :
In re:                                                  :        Chapter 11
                                                        :        Case No.: 09-50026 (REG)
GENERAL MOTORS CORPORATION, *et al.,*  :        (Jointly Administered)
                                                        :
              Debtors.                                  :
-------------------------------------------------------------------x

### KARMANN U.S.A., INC.'S OBJECTION TO SECOND NOTICE OF (I) DEBTORS' INTENT TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS, UNEXPIRED LEASES OF PERSONAL PROPERTY AND UNEXPIRED LEASES OF NON-RESIDENTIAL REAL PROPERTY AND (II) CURE COSTS RELATED THERETO

**Karmann U.S.A., Inc.** ("**Karmann U.S.A.**"), by and through its attorneys, Carson Fischer, P.L.C., hereby states its objection to the proposed assumption and assignment of executory contracts with Karmann U.S.A.

## INTRODUCTION

1.      On June 1, 2009 (the "Petition Date"), General Motors Corporation ("GM") and its affiliated debtors (collectively, the "Debtors") each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§  157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

1

3.       On June 1, 2009, the Debtors filed a motion [Docket No. 92] (the **"Sale Motion"**) seeking, among other things, (a) authority to sell substantially all of the Debtors' assets free and clear of all liens, claims and encumbrances, (b) approval of certain procedures for the solicitation of bids with respect to the sale and (c) authority to assume and assign certain executory contracts and unexpired leases in connection with the sale transaction.

4.       On June 2, 2009 the Court entered an order approving the Debtors' proposed bidding procedures and establishing procedures for the assumption and assignment of executory contracts and unexpired leases [Docket No.  274] (the **"Sale Procedures Order"**).

5.       With respect to the assumption and assignment of executory contracts and unexpired leases, the Sale Procedures Order provides that the Debtors are to serve each non-debtor party to an executory contract or unexpired lease that the Debtors intend to assume and assign to the purchaser, a notice of assumption and assignment of executory contracts and unexpired leases (the **"Assignment Notice"**).

6.       Each Assignment Notice is to set forth instructions for accessing information from a contract website (the **"Contract Website"**) containing the contracts to be assumed and assigned as well as the proposed cure amounts.

7.       On June 9, 2009, Karmann U.S.A.'s parent entity, Wilhelm Karmann GmbH, received the *Debtors' Notice of (i) Debtors Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property, and Unexpired Leases of*

2

*Nonresidential Real Property and (II) Cure amounts Related Thereto*[1] (the **"Karmann Assignment Notice"**), which stated the Debtors intention to assume and assign Debtors' agreements with Karmann U.S.A. (the **"Karmann Contracts"**).  The Karmann Assignment Notice contained instructions and information for accessing the Contract Website.

8.      Following receipt of the Karmann Assignment Notice, Karmann U.S.A. accessed the Contract Website and reviewed the list of Karmann Contracts to be assumed.  As of the date of the Karmann Assignment Notice, the list of Karmann Contracts to be assumed, included purchase orders for tooling (the **"Tooling POs"**), production parts (the **"Production POs"**) and service parts (the **"Service POs"**).  The proposed cure amount for the Karmann Contracts was $0.00. (the **"Proposed Cure Amount"**).

9.      Although the various purchase orders were listed on the Contract Website separately, the Production POs and the Service POs, as further described herein, were one contract.  Although the Karmann Assignment Notice had not been properly served on Karmann U.S.A., Karmann U.S.A. did not oppose the assumption of such contracts and did not object to the Karmann Assignment Notice.

10.      Subsequent to receiving the Karmann Assignment Notice, Karmann U.S.A. received a second notice from the Debtors stating the Debtors intent to assume

---

[1] The Assignment Notice was dated June 5, 2009 and was sent to Karmann GmbH in Germany.  Notwithstanding that the Assignment Notice seeks to assume contracts between GM and Karmann U.S.A., no notice was sent to Karmann U.S.A.

and assign **additional** executory contracts with Karmann U.S.A. (the **"Second Karmann Assignment Notice"**).

11.    Unlike the Karmann Assignment Notice, the Second Karmann Assignment Notice was sent to Karmann U.S.A. and not to its parent entity Wilhelm Karmann GmbH.  The Second Karmann Assignment Notice was dated June 15, 2009, however, Karmann U.S.A. did not receive the Second Assignment Notice until sometime after June 22, 2009.

12.    The Second Karmann Assignment Notice, dated June 15, 2009, purports to allow recipients ten days from the date of the Second Karmann Assignment Notice in which to file objections.    Karmann U.S.A.'s objection to the Second Karmann Assignment Notice is timely-filed.

13.    Following receipt of the Second Karmann Assignment Notice, Karmann U.S.A. accessed the Contract Website and reviewed the revised list of Karmann Contracts to be assumed and assigned.  The revised list of Karmann Contracts to be assumed included the Tooling POs and Service POs but no longer included the Production POs.  Additionally, the Proposed Cure Amount was changed from $0.00 to $12,127.42 in favor of the Debtors.

## OBJECTION

14.    Karmann U.S.A. objects to the proposed assumption and assignment of the Karmann Contracts because certain of the Karmann Contracts are not executory contracts and, to the extent certain of the Karmann Contracts are executory contracts, the Debtors are obligated to assume all of the Karmann Contracts.

4

### A.    The Tooling POs Are Not Executory Contracts

15.    Section 365(a) of the Bankruptcy Code provides that a debtor, subject to court approval, "may assume or reject any executory contract or unexpired lease of the debtor."   However, before a debtor can assume a contract pursuant to Section 365, it must first be established that an executory contract existed at the time of the bankruptcy filing. *In re Kong*, 162 B.R. 86, 91 (Bankr. E.D. N.Y. 1993).

16.    The Bankruptcy Code does not define the term "executory contract." In construing the term "executory contract" the majority of courts, including the United States Court of Appeals for the Second Circuit, have adopted the "Countryman Definition" formulated by Professor Vern Countryman. See *In re U.S. Wireless Data, Inc.*, 547 F.3d 484, 488 (2d Cir. 2008).   Under the Countryman Definition an executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." See Countryman, *Executory Contracts in Bankruptcy*, 57 Minn. L. Rev. 439, 446 (1973). See also *U.S. Wireless Data at* 488 (2d Cir. 2008).

17.    The Tooling POs are not executory contracts because Karmann U.S.A. has completed its performance under the Tooling POs and Karmann U.S.A. has no obligations remaining under the Tooling POs.   "If the contract or lease has expired by its own terms or has been terminated prior to the commencement of the bankruptcy case, then there is nothing left for the [Debtor] to assume or [reject]."   *Kong* at 91; *In re Romberger*, 150 B.R. 125, 126-127 (Bankr. M.D. Pa. 1992).

18.     Since the Tooling POs were not executory contracts as of the Petition Date, the Debtors cannot assume and assign the Tooling POs.

**B.     If The Debtors Intend To Assume The Service POs, The Debtors Must Also Assume The Production POs**

19.     Prior to the Petition Date, Karmann U.S.A. supplied the Debtors with production component parts pursuant to the Production POs, and in connection therewith, Karmann U.S.A. was obligated to supply Debtors with service parts pursuant to the Service POs. The agreement to supply service parts was integral to the supply of production component parts and both the providing of production component parts and service parts were components of a single contract.

20.     Pursuant to the Second Karmann Assignment Notice, the Debtors seek to assume the Tooling POs and Service POs. At this time, upon information and belief, the Debtors do not intend to assume the Production POs.

21.     If the Debtors intend to assume the Service POs, the Debtors must also assume the Production POs because the Service POs and Production POs are part of the same integrated contract. Where several contracts are part of an integrated whole, they must be assumed or rejected together. *In re Kopel*, 232 B.R. 57, 64 (Bankr. E.D. N.Y. 1999).

22.     Accordingly, if the Debtors intend to assume the Service POs, they must assume the entire contract and thus cannot not include the Production POs in its Second Karmann Assignment Notice.

23.    Because Debtors did not include the Production POs in the Second Karmann Assignment Notice, Karmann U.S.A. preserves its rights to object to any cure amount which Debtors may subsequently designate.

24.    Karmann U.S.A. reserves the right to amend this objection and reserves the right to assert additional objections to the proposed assumption and assignment of the Karmann Contracts at any hearing on this objection.

WHEREFORE, based upon the foregoing, Karmann U.S.A. requests that the Court condition the Debtors' assumption and assignment of the Service POs upon the assumption and assignment of the Production POs and grant Karmann U.S.A. such other and further relief as the Court deems just and proper.

> CARSON FISCHER, P.L.C.
> *Attorneys for Karmann U.S.A., Inc.*
>
> By: /s/ Patrick J. Kukla
> Robert A. Weisberg (P26698)
> Patrick J. Kukla (P60465)
> 4111 Andover Road, West-2nd Flr.
> Bloomfield Hills, MI  48302
> Tele:  (248) 644-4840

Dated:  July 1, 2009

7