Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x
                                              :
**In re**                                     :        **Chapter 11 Case No.**
                                              :
**MOTORS LIQUIDATION COMPANY**, *et al.*,     :        **09-50026 (REG)**
         **f/k/a General Motors Corp.**, *et al.*  :
                                              :
                      **Debtors.**            :        **(Jointly Administered)**
                                              :
--------------------------------------------------------------x

**CONSOLIDATED REPLY OF DEBTORS TO**
**OBJECTIONS TO OMNIBUS MOTION OF DEBTORS FOR**
**ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105**
**AND 365 AUTHORIZING (A) THE REJECTION OF EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC**
**DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF**

# TABLE OF CONTENTS

**Page**

Background ................................................................................................................... 1

The Debtors' Omnibus Rejection Motion and the Objecting Dealers' Responses........................ 2

The Rejection of the Affected Dealer Agreements is a Sound Exercise of the Debtors'
Business Judgment.......................................................................................................... 5

The Impact of Rejection on the Objecting Dealers Does Not Alter the Court's
Application of the Business Judgment Standard ...................................................... 10

Section 365 of the Bankruptcy Code Preempts Any State Dealer Laws .................................... 13

The Objecting Dealers Remaining Arguments .......................................................... 14

     A.      The Wind-Down Agreement is a Valid and Legally Binding Agreement........... 14

     B.      Any Allegations of Bad Faith Are Red Herrings and Irrelevant ......................... 15

Notice ....................................................................................................................... 16

# TABLE OF AUTHORITIES

## CASES

*In re Amber's Stores, Inc.,*
    193 B.R. 819 (Bankr. N.D. Tex. 1996).......................................................................16

*BP Energy Co. v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp., et al.),*
    No. 02 Civ. 6419 (NRB), 2002 WL. 31548723 (S.D.N.Y. Nov. 15, 2002) ...............16

*In re City of Vallejo,*
    403 B.R. 72 (Bankr. E.D. Cal. 2009)........................................................................14

*In re Jamesway Corp.,*
    179 B.R. 33 (S.D.N.Y. 1995)...................................................................................16

*In re Old Carco LLC,*
    No. 09-50002, 2009 Bankr. LEXIS 1382 (Bankr. S.D.N.Y. June 19, 2009),
    *aff'd,* 2009 U.S. App. LEXIS 12351 (2d Cir. June 5, 2009)................10, 11, 12, 13, 14

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),*
    4 F.3d 1095 (2d Cir. 1993), *cert. dismissed,* 511 U.S. 1026 (1994).............................9

*Phar Mor, Inc. v. Strouss Building Associates,*
    204 B.R. 948 (Bankr. N.D. Ohio 1997).......................................................................9

*In re Pilgrim's Pride Corp.,*
    403 B.R. 413 (Bankr. N.D. Tex. 2009).....................................................................12

*In re Riodizio, Inc.,*
    204 B.R. 417 (Bankr. S.D.N.Y. 1997).........................................................................9

*In re Thinking Machine Corp. v. Mellon Finance Services,*
    67 F.3d 1021 (1st Cir. 1995).....................................................................................16

*In re Tom Stimus Chrysler-Plymouth, Inc.,*
    134 B.R. 676 (Bankr. M.D. Fla. 1991).......................................................................14

*Volkswagen of America, Inc. v. Dan Hixson Chevrolet Co. (In re Dan Hixson
    Chevrolet Co.),*
    12 B.R. 917 (Bankr. N.D. Texas 1981).....................................................................14

## STATUTES

11 U.S.C. § 105 ................................................................................................................ 1, 2

11 U.S.C. § 363 .................................................................................................................... 1

11 U.S.C. § 365 ...................................................................................................... 1, 2, 5, 11

11 U.S.C. § 1113 ................................................................................................................. 11

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation ("**GM**")) and its

affiliated debtors, as debtors in possession in the above-captioned chapter 11 cases (collectively,

the "**Debtors**"), respectfully represent:

### Background

1.      On June 1, 2009, the Debtors filed a motion (the "**Sale Motion**"),

requesting, *inter alia*, an order (the "**Sale Order**"), pursuant to 11 U.S.C. §§ 105, 363(b), (f), and

(m), and 365, authorizing and approving (i) the sale of substantially all of the Debtors' assets

pursuant to a proposed Master Sale and Purchase Agreement and related agreements (the

"**MPA**") among the Debtors and Vehicle Acquisition Holdings LLC ("**New GM**"), a purchaser

sponsored by the United States Department of the Treasury (the "**U.S. Treasury**"), free and clear

of liens, claims, encumbrances, and other interests, including any successor liabilities (the "**363**

**Transaction**"), (ii) the assumption and assignment of certain executory contracts and unexpired

leases of personal property and of nonresidential real property, and (iii) the approval of the UAW

Retiree Settlement Agreement, subject to higher or better offers.

2.      On July 5, 2009, the Court approved the 363 Transaction and entered the

Sale Order (as modified by the Court), and on July 10, 2009, the 363 Transaction closed.

Accordingly, the Debtors no longer operate as manufacturers of any GM branded motor vehicles,

nor do they retain the rights to use GM trademarks in the wind-down of their business.  All such

manufacturing operations and trademark rights have been sold to New GM pursuant to the 363

Transaction.  (*See* Sale Order, Findings of Fact and Conclusions of Law, ¶ R) ("Upon the closing

of the 363 Transaction, the Debtors will transfer to [New GM] substantially all of its assets").

## The Debtors' Omnibus Rejection Motion and the Objecting Dealers' Responses

3.      On July 7, 2009, promptly after entry of the Sale Order, the Debtors filed
an Omnibus Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 365 Authorizing (A)
The Rejection of Executory Contracts and Unexpires Leases with Certain Domestic Dealers and
(B) Granting Certain Related Relief (the "**Motion**").[1]  As of the date hereof, 6 Affected Dealers
out of the 37 Affected Dealers subject to the Motion have filed and still maintain an objection
(the "**Objections**") to the Motion.[2]

4.      As extensively discussed in the Motion, in testimony and other evidence
proffered or adduced at the Sale Hearing and in numerous other pleadings and affidavits filed in
these chapter 11 cases, all parts of GM, including its Dealer Network, had to become smaller and
more efficient to enable New GM to continue forward as a viable company capable of effectively
competing against foreign OEMs and operating during cyclical downturns.

5.      A reduction in the number of GM Dealerships was a necessary, albeit
painful, component of GM's overall rationalization effort.  In conducting the necessary
rationalization of its Dealer Network, the Debtors undertook a thorough analysis of every
Dealership in every market throughout the United States to assess individual market
requirements and Dealership performance.  The key Dealership performance factors evaluated by
the Debtors included, among others: minimum sales thresholds, customer satisfaction indices,
working capital needs, profitability, whether a Dealership sold competing non-GM brands,

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

[2] The objections to the Motion that remain unresolved include: (1) Objection of Cardenas Autoplex, Inc. ("**Cardenas**") [Docket No. 3174]; (2) Objection of Everett Chevrolet, Inc. ("**Everett**") [Docket No. 3531]; (3) Limited Objection of Forrest Chevrolet- Cadillac, Inc., and Forrest Pontiac- Buick-GMC Truck, Inc. ("**Forrest**") [Docket No. 3458]; (4) Objections of Quinlan's Equipment, Inc [Docket No. 3459] ("**Quinlan**"); (5) Response of Terry Gage Chevrolet-Oldsmobile, Inc. ("**Terry Gage**") [Docket No. 3094]; and (6) Objection of Norman-Blackmon Motor Company, Inc. ("**Norman-Blackmon**") [No. 3516] (collectively the "**Objecting Dealers**").

Dealership location and the current physical condition of each Dealership.  (*See* Motion ¶¶ 12-22.)  In addition, the Debtors also considered Dealer Network coverage in rural areas and small towns versus urban/suburban markets.  As described in more detail below, the Dealer performance of each of the Objecting Dealers was extremely poor when applying the objective factors considered by the Debtors in their evaluation process.

6.       Even though the performance of the Objecting Dealers was far below average, GM did not seek to abruptly reject and terminate their Dealer Franchise Agreement and Ancillary Agreements (collectively, the "**Objecting Dealer Agreements**") (as was the case in Chrysler, for example).  Rather, GM offered them the opportunity to accept Wind-Down Agreements that would have allowed the Objecting Dealers to remain in business until October 2010, sell down their inventories in an orderly fashion, and continue to provide warranty and other services to their customers with the continued support of New GM.

7.       In addition, GM offered all Dealers who accepted a Wind-Down Agreement a substantial cash payment, which, for most Dealers, provided for $1,000 for each vehicle remaining in their inventory and reimbursement for eight months of their remaining rent.  Thus, for example, a Dealer who signed a Wind-Down Agreement with 500 cars left on their lot and who paid $20,000 a month in rent would have received a cash payment of $660,000.[3]  GM elected to offer the Affected Dealers the benefits of the Wind-Down Agreement to help minimize the financial and other hardships that would have been associated with an immediate rejection and Dealership shut down.  Indeed, this was the express finding of the Court in the Sale Order:

> The Deferred Termination Agreements *were offered as an alternative to rejection of the existing Dealer Sales and Service Agreements* of these dealers pursuant to section 365 of the

---

[3] These payments were paid in two installments: 25% upon signing the Wind-Down Agreement and the remaining 75% after the Dealer completed liquidating its remaining inventory.

> Bankruptcy Code and *provide substantial additional benefits to dealers which enter into such agreements*. Approximately 99% of the dealers offered Deferred Termination Agreements accepted and executed those agreements and did so for good and sufficient consideration.  (emphasis added)

(Sale Order, Findings of Fact and Conclusions of Law, ¶ JJ.)  While the Debtors recognize that the closing of a business is always difficult, it made a concerted effort to address these situations in a fair and supportive manner and to provide each of the Objecting Dealers a soft landing and an alternative to rejection.

8.    Unfortunately, despite the Debtors best efforts, the Objecting Dealers elected not to execute a Wind-Down Agreement.  Accordingly, New GM determined it would not accept assignment of the Objecting Dealers' Franchise Agreements, which were instead left as retained assets of the Debtors' liquidating estates.  The Objecting Dealers now are parties to a Dealer Franchise Agreement with a bankrupt company that no longer manufactures or distributes any motor vehicles.  Accordingly, the Debtors cannot perform under the terms of the Dealer Franchise Agreements and therefore have absolutely no justifiable business reason to continue the Objecting Dealer Agreements.  As described in the Motion and in more detail below, if the Debtors are required by the Court to assume the Objecting Dealer Agreements, it would cost their estates substantial sums of money without providing any corresponding benefit.

9.    After sifting through the hyperbole and alleged facts, which do not bear on the legal standard implicated by the Motion, the crux of the 6 Objecting Dealers' legal arguments boils down to the following:  (i) the Debtors are not properly exercising and did not justify their business judgment in seeking to reject the Objecting Dealer Agreements[4]; (ii) rejection of the

---

[4] *See e.g.*, Objection of Cardenas Autoplex, Inc. [Docket No. 3174] at ¶2; Objection of Everett Chevrolet, Inc. [Docket No. 3531] at ¶¶1-3; Limited Objection of Forrest Chevrolet- Cadillac, Inc., and Forrest Pontiac- Buick- GMC Truck, Inc. [Docket No. 3458] at ¶¶19-23; and Objection of Quinlan's Equipment, Inc [Docket No. 3459] at ¶¶ 9-18.

Objecting Dealer Agreements will cause substantial harm to the Objecting Dealers[5]; and (iii)

state Dealer Laws do not allow for the rejection of the Objecting Dealer Agreements.[6]  The

Objecting Dealers' arguments are without merit under the facts and applicable case law and their

Objections should be denied.[7]

**The Rejection of the Affected Dealer Agreements
is a Sound Exercise of the Debtors' Business Judgment**

10.     The business purpose of the Debtors, appropriately renamed Motors

Liquidation Company, at this point in their chapter 11 cases is abundantly clear and extremely

simple:  liquidate whatever assets remain following the 363 Transaction as efficiently and cost-

effectively as possible to maximize the value of the recovery for its creditors.  As repeatedly

mentioned in the Motion and above, following the close of the 363 Transaction, the Debtors no

longer manufacture any GM branded vehicles.  Therefore, the Debtors are simply not capable of

performing under the Dealer Franchise Agreements, which require, among other things, the

Debtors to manufacture and deliver to the Objecting Dealers GM branded vehicles.

11.     In addition to the requirement to deliver GM branded vehicles, the

Objecting Dealer Agreements also require various other burdensome performance requirements

which the Debtors are unable to perform and should not be required to undertake at a huge

monetary loss to their estates.  These burdensome obligations include, among others, repurchase

---

[5] *See e.g.*, Objection of Cardenas Autoplex, Inc. [Docket No. 3174] at ¶¶5, 7; Objection of Everett Chevrolet, Inc. [Docket No. 3531] at ¶¶19-23; Limited Objection of Forrest Chevrolet- Cadillac, Inc., and Forrest Pontiac- Buick-GMC Truck, Inc. [Docket No. 3458] at ¶¶ 9-18; Objection of Quinlan's Equipment, Inc [Docket No. 3459] at ¶¶17-18, and Objection of Norman-Blackmon Motor Company, Inc. [No. 3516] at ¶ 6.

[6] *See e.g.*, Objection of Cardenas Autoplex, Inc. [Docket No. 3174] at ¶ 6; Objection of Everett Chevrolet, Inc. [Docket No. 3531] at ¶24; Limited Objection of Forrest Chevrolet- Cadillac, Inc., and Forrest Pontiac- Buick-GMC Truck, Inc. [Docket No. 3458] at ¶¶26-37; and Objection of Quinlan's Equipment, Inc [Docket No. 3459] at ¶¶19-23, 28-38.

[7] The Debtors believe that the facts and circumstances stated herein and as found and determined by this Court in other proceedings in these chapter 11 cases clearly justify rejection under section 365 of the Bankruptcy Code without the need for a costly, time-consuming, and unnecessary evidentiary hearing that would only serve to further drain the scarce resources of the Debtors' estates.

obligations for GM vehicles, parts and tools; warranty obligations; insurance obligations; fuel fill obligations; direct Dealer incentive obligations; wholesale floorplan support; local advertising assistance, and funding for Dealer websites and other IT services.  (*See* Motion ¶¶ 15-18.) Collectively, if the Court forced the Debtors to assume these obligations it would cost their estates millions of dollars a year in administrative expenses.  In return, the Debtors and their creditors would receive absolutely no benefit since the Debtors can no longer generate any revenue by selling cars or trucks.

12.    In an analogous situation in this case, the Court recently upheld the Debtors' rejection of an over-market commodities supply agreement, without the need for an evidentiary hearing, based largely on the indisputable fact that after the close of the 363 Transaction, "Motors Liquidation no longer makes cars and trucks; it doesn't need any product". (Debtors' Motion to Reject Executory Contract with Stillwater Mining Company Hr'g Tr. 34: 19-20) (hereinafter, "***Stillwater***")[8].  In *Stillwater*, the Court went on to add that "ultimately the decision as to whether to take an assumption of [the agreements], and thus to take the agreement itself, was New GM's, not the decision of Motors Liquidation Company.  And when this contract wasn't assumed by New GM, *Motors Liquidation Company, at the risk of stating the obvious, didn't need the [product] itself.*"  (*Id.* at 33: 2-7.) (emphasis added)  Here, just as in the Stillwater situation, the determination of whether to take assignment of certain Dealer Franchise Agreements was ultimately New GM's and not the Debtors.  After New GM decided not to purchase these agreements, the Debtors made a sound business decision to reject any remaining Dealer Franchise Agreements for the same obvious reason as in Stillwater:  they don't need any

---

[8] The Debtors have attached a copy of the Stillwater Decision hereto as **<u>Exhibit A</u>**.

Dealers and cannot perform under any remaining Dealer Franchise Agreements following the close of the 363 Transaction.

13. Further, even if the Debtors could perform under the Objecting Dealer Agreements, which they obviously cannot, the Objecting Dealers are all underperforming Dealers who were not selected to be retained by New GM based on a thorough evaluation of objective Dealership performance criteria. The Debtors determined that a purely subjective Dealership Evaluation Process would not be equitable or consistent with the Debtors' past business practices. Therefore, the Debtors relied heavily on objective performance criteria in conducting the Dealership Evaluation Process. In particular, the Debtors reviewed, analyzed and weighed numerous performance and planning metrics for each Dealership, including among other factors:

- Dealership Sales, which were measured against other Dealerships of a similar size and in a similar size market in the same state;

- Customer Satisfaction Index, which was measured against the average for the region in which the Dealership was located;

- Capitalization, which was measured based on the working capital needs of each Dealership; and

- Profitability, which was determined for each Dealership based on net profits before taxes.

14. Based on a calculation of the above factors, each Dealership was assigned a Dealership Performance Score ("**DPS**"), with a score of 100 considered average for a particular Dealership.[9] The Debtors determined that Dealerships receiving a DPS of less than 70 were significantly underperforming and would not be retained long-term in New GM.

---

[9] The DPS is calculated by weighing the above factors in the following manner: Dealership Sales at 50%, Customer Satisfaction Index at 30%; Capitalization at 10% and Profitability at 10%.

15.     The DPS score, however, was not the only factor considered by the

Debtors in determining which Dealerships would be retained in New GM.  The Debtors also

considered other important factors in determining which Dealers would receive Wind-Down

Agreements.  In addition to Dealerships with a DPS score of below 70, Dealerships who sold

Non-GM brands under the same roof and also experienced poor overall performance,

Dealerships that sold discontinued GM brands, Dealerships with sales of less than 50 cars per

year, Dealerships with inadequate or uncompetitive facilities or locations, and Dealerships

unprofitable for three years in a row with inadequate working capital also were not retained by

New GM.

16.     Each of the Objecting Dealers had a DPS score well below the threshold

level of 70 and/or sold less than 50 cars *in total* during calendar year 2008, among various other

performance factors that were extremely poor.  For example, with respect to each Objecting

Dealer:

- Cardenas sold only 3 vehicles in 2008 and had a DPS score of 23;
- Terry Gage sold only 39 vehicles in 2008 and had a DPS score of 55.66;
- Quinlan's sold only 21 cars in 2008 and had a DPS of 80.11;
- Everett had a DPS score of 49.96 and sold 117 fewer cars than expected in 2008 based upon its dealerships size and market location;
- Forrest had a DPS score of 21.65 and sold 603 fewer cars than expected in 2008 based upon its dealerships size and market location

The Objecting Dealers were not retained by New GM because the above objective financial and

performance criteria clearly demonstrated that their performance was extremely poor as

compared to other Dealers who were retained in the Dealer Network.

17.     At bottom, when the Court strips away all of the legally irrelevant

allegations in the Objections, the following undisputed facts remain: the Debtors' simply cannot

perform under any remaining Dealer Franchise Agreements following this Court's approval of

the 363 Transaction (which alone is dispositive); forcing the Debtors to perform would cost their estates millions of dollars in administrative expense claims without providing any corresponding benefit; and the Objecting Dealers are all underperforming Dealers who refused to sign a Wind-Down Agreement (which would have allowed for the assignment of their Dealer Franchise Agreement to New GM and substantial economic support).  Thus, the Debtors' decision to reject the Objecting Dealer Agreements is clearly a sound exercise of its business judgment and was not retaliatory and punitive as alleged in some of the Objections.

18.    Courts generally will not second-guess a debtor's business judgment concerning the assumption or rejection of an executory contract or unexpired lease.  *See In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) ("[A] court will ordinarily defer to the business judgment of the debtor's management."); *accord Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 951-52 (Bankr. N.D. Ohio 1997) ("Whether an executory contract is 'favorable' or 'unfavorable' is left to the sound business judgment of the debtor. . . .  Courts should generally defer to a debtor's decision whether to reject an executory contract.").  Indeed, "the purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1098 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994).

19.    In recently approving Chrysler's rejection of hundreds of dealership agreements, Judge Gonzalez held that the traditional business judgment standard applies to an OEM-debtor's rejection of dealership agreements under section 365: "the scope of [the Court's] inquiry regarding the business judgment standard for purposes of rejection does not include an evaluation of whether the Debtors made the *best or even a good* business decision but merely

that the decision was made in an exercise of the Debtors' business judgment." *In re Old Carco LLC*, No. 09-50002, 2009 Bankr. LEXIS 1382, at *33 (Bankr. S.D.N.Y. June 19, 2009) ("**Chrysler**"), *aff'd*, 2009 U.S. App. LEXIS 12351 (2d Cir. June 5, 2009).

20.     The Debtors have articulated a clear business purpose for rejecting the Affected Dealer Agreements, which, if continued would be extremely burdensome to the Debtors' estates without providing any corresponding benefit.  Accordingly, just as was ordered by Judge Gonzales in *Chrysler* under far more draconian circumstances, the Court should approve the rejection of the Affected Dealer Agreements as a sound exercise of the Debtors' business judgment.

### The Impact of Rejection on the Objecting Dealers Does Not Alter the Court's Application of the Business Judgment Standard

21.     As stated by Fritz Henderson in his testimony before Congress regarding GM's Dealer reduction process: "Our dealer restructuring is [] an effort that is quite painful – for us, for our customers, and especially for our dealers.  Many of our dealers operate businesses that have been in their family for generations.  Our actions affect them personally as well as financially.  They also affect the communities and states where our dealers live and work." *United States House of Representatives Subcommittee for Oversight and Investigations, Committee on Energy and Commerce*, 111th Cong., June 12, 2009 (statement of Frederick A. Henderson, President and Chief Executive Officer, General Motors Corporation)  ("**Henderson Congressional Testimony**").[10]  The Debtors are extremely sympathetic to the significant impact rejection has on the Objecting Dealers, their families, employees and the local community. Indeed, it is for that exact reason that the Debtors hoped not to have to reject any Dealer Franchise Agreements, and instead developed a generous Wind-Down process, which the Court

---

[10] A copy of the Henderson Congressional Testimony is attached hereto as **Exhibit B**.

recognized was considerably more beneficial to its Dealers than rejection.  (*See* Sale Order, Findings of Fact and Conclusions of Law, ¶ JJ.)  Nevertheless, the Objecting Dealers made the choice not to accept the Wind-Down Agreements, leaving the Debtors with no other business choice than to seek rejection.

22.     As noted above, forcing the Debtors to assume Objecting Dealer Agreements under which they are incapable of performing would cost their estates substantial sums of money without a single corresponding benefit.  Therefore, by filing the Motion, the Debtors are attempting to use section 365 as it was expressly intended— to maximize the recovery for its estate and creditors by eliminating burdensome contracts.  *See Chrysler,* 2009 LEXIS 1382 at *5 ("[T]he authority to reject an executory contract is vital to the basic purpose to a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization.") (citations omitted).

23.     Further, to the extent the Objecting Dealers argue that the Court should employ a heightened public policy standard and "balance the equities" instead of applying the business judgment standard, their arguments also fail.  Judge Gonzales made clear recently in *Chrysler* with respect to the rejection and attendant shut down of hundreds of dealerships that, "absent Congressional authority, such as through a separate section of the Bankruptcy Code (e.g., § 1113) or a specific carve-out within § 365 itself, *the court is not free to deviate from the business judgment standard* and weigh the effect of rejection on debtor's counterparty or the counterparty's customers." *Id.* at *21-22 (emphasis added).  Judge Gonzalez went on to add in *Chrysler* that while the "Court is sympathetic to the impact of the rejections on the dealers and their customers and communities,[]such sympathy does not permit the Court to deviate from

well-established law and "balance the equities" instead of applying the business judgment

standard." *Id.* at * 20-21.

24.    Moreover, it would not be equitable or consistent with public policy to

cause the unsecured creditors of the Debtors to subsidize the Objecting Dealers or the

surrounding local interests.  Thus, while the Debtors' proposed rejections may have a significant

impact on Objecting Dealers, their families and the local economy, that is not a reason to second

guess the Debtors' clear business judgment in seeking the rejections.  (*See Stillwater* at 35:4-14.)

("I assume that losing this business in indeed a hardship to [the counterparty].  I understand and

sympathize with it.  But this is, sadly, one of the many decisions that I've been forced to make in

this case and in others . . . where I have to deal with the unfortunate consequences of corporate

financial distress.  So that others do not suffer even more, the Bankruptcy Code provides means

for debtors to shed burdensome obligations, of which this is a classic example.  . . . For purposes

of this Motion, I must consider the reasons underlying the debtors' business judgment. . . . [there

is] no basis in the law, nor has any been cited to me, for considering hardship to the counterparty

where, for example, Congress hasn't directed us to consider competing considerations . . ."  );

*see also In re Pilgrim's Pride Corp.*, 403 B.R. 413, 425 (Bankr. N.D. Tex. 2009) ("While the

impact of rejection on the [counterparties'] community may be significant, that is not an

uncommon result of the cut-backs that typically accompany a restructuring in chapter 11.

Whether through contract rejections or plant closings, contraction of a debtor's business will

often have a harmful effect for one or more local economies.  If the bankruptcy court must

second-guess every choice by a trustee or debtor in possession that may economically harm any

given locale, the business judgment rule applicable to contract rejection and many other

decisions in the chapter 11 process will be swallowed by a public policy exception.")

25.     Accordingly, the scope of the Court's inquiry should be limited to an evaluation of whether rejection of the Objecting Dealer Agreements is a proper and sound exercise of the Debtors' business judgment.  For the reasons discussed in detail above and in the Motion, the Debtors submit that rejection of the Objecting Dealer Agreements is clearly a sound business decision that will substantially benefit the Debtors' estate and its creditors.

### Section 365 of the Bankruptcy Code Preempts Any State Dealer Laws

26.     A central theme in many of the Objections is a theory that the Debtors' rejection of the Objecting Dealer Agreements under federal bankruptcy law is impermissible to the extent that it supersedes or interferes with any of the rights of the Objecting Dealers under state Dealer Laws.[11]  The Debtors' legal position on preemption, and in opposition to the Objecting Dealers' arguments, was addressed in detail in the Motion.  (*See* Motion ¶¶ 31-33; 40-45.)  The Debtors, however, wish to reiterate here that the exact preemption issue raised by certain of the Objecting Dealers was recently decided in *Chrysler* and affirmed by the Second Circuit.  Judge Gonzalez's decision in *Chrysler* on preemption was clear and unequivocal: "the Court concludes that the Dealer Statutes are preempted by § 365 with respect to rejection of the Rejected Agreements."  *Chrysler*, 2009 LEXIS 1382, at *42.

27.     As Judge Gonzalez clearly articulated in *Chrysler*, the Dealer Laws must not be seen to impair or supersede those core bankruptcy rights that the Debtors possess under section 365 of the Bankruptcy Code.  *Id.* at *62–66; *see also In re City of Vallejo*, 403 B.R. 72, 77 (Bankr. E.D. Cal. 2009) ("Congress enacted section 365 to provide debtors the authority to reject contracts . . . [t]his authority preempts state law by virtue of the Bankruptcy Clause [and]

---

[11] *See e.g.*, Objection of Cardenas Autoplex, Inc. [Docket No. 3174] at ¶ 6; Objection of Everett Chevrolet, Inc. [Docket No. 3531] at ¶24; Limited Objection of Forrest Chevrolet- Cadillac, Inc., and Forrest Pontiac- Buick-GMC Truck, Inc. [Docket No. 3458] at ¶¶26-37; and Objection of Quinlan's Equipment, Inc [Docket No. 3459] at ¶¶19-23, 28-38.

the Supremacy Clause."); *Volkswagen of Am., Inc. v. Dan Hixson Chevrolet Co.* (*In re Dan Hixson Chevrolet Co.*), 12 B.R. 917, 923 (Bankr. N.D. Texas 1981) (holding that section 365 of the Bankruptcy Code preempted a Texas law requiring a "good cause" hearing if a dealer protests a manufacturer's attempted termination of a dealer agreement, because permitting the "good cause" proceeding to continue might frustrate the purposes of federal bankruptcy law); *In re Tom Stimus Chrysler-Plymouth, Inc.*, 134 B.R. 676, 679 (Bankr. M.D. Fla. 1991) (holding that section 365 of the Bankruptcy Code governs the assumption or rejection of a contract, even if the agreement otherwise would have been terminated under Florida dealer laws).

28.     Notably, while many of the Objecting Dealers primarily rely on the argument that state Dealer Laws prevent the Court from granting the relief requested in the Motion, not a single Objecting Dealer confronts the Debtors' central argument that the decision on this legal issue by Judge Gonzalez in *Chrysler* is dispositive.  None of the Objecting Dealers address the *Chrysler* decision because it is beyond dispute that this decision is on all fours with the facts present here and therefore represents controlling authority.

### The Objecting Dealers Remaining Arguments

**A.      The Wind-Down Agreement is a Valid and Legally Binding Agreement**

29.     Contrary to this Court's findings of facts and conclusions of law in the Sale Order, some of the Objecting Dealers argue that the Wind-Down Agreement offered by the Debtors as an alternative to rejection is "unconscionable" and may not be legally binding.[12]  As explained in detail in the Motion and again above, the Wind-Down Agreements represented an offer by the Debtors that provided "substantial additional benefits to dealers who enter into such agreements" versus a rejection.  (Sale Order, Findings of Fact and Conclusions of Law, ¶ JJ.)

---

[12] *See e.g.*, Limited Objection of Forrest Chevrolet- Cadillac, Inc., and Forrest Pontiac- Buick-GMC Truck, Inc. [Docket No. 3458] at ¶13; Objection of Quinlan's Equipment, Inc [Docket No. 3459] at ¶ 8; and Objection of Norman-Blackmon Motor Company, Inc. [No. 3516] at ¶ 6.

Moreover, with respect to the validity of the Wind-Down Agreements, the Court expressely held

that the Wind-Down Agreements "represent valid and binding contracts, enforceable in

accordance with their terms". (*Id.* at ¶ 31.)  However, since the Objecting Dealers did not elect

to sign a Wind-Down Agreement, this argument is not germane to the relief requested by the

Debtors in the Motion.

**B.    Any Allegations of Bad Faith Are Red Herrings and Irrelevant**

> 30.    A number of Objecting Dealers make unsubstantiated allegations of

nefarious motives in selecting them for rejection, including discrimination and retaliatory

conduct by the Debtors.[13]  The Objections that allege this or similar (or in some instances

unspecified) bad faith attempt to distinguish their situation from the objective process undertaken

by the Debtors.  Most importantly, however, none of the Objecting Dealers' "conspiracy

theories" address the undisputable fact that following the close of the 363 Transaction, the

Debtors no longer manufacture any motor vehicles.  Ultimately, while the result of a

collaborative effort, the decision of which Dealers to retain was the decision of New GM and not

the Debtors.  Thus, any and all Dealers who New GM did not retain as part of the 363

Transaction would have faced rejection equally because the Debtors simply can no longer

perform under the Dealer Franchise Agreements.

---

[13] *See e.g.*, Objection of Everett Chevrolet, Inc. [Docket No. 3531] at ¶4-23(almost the entirety of Everett's objection relies on the legally irrelevant fact that it is involved in protracted litigation against GMAC, which has been a distinct and separate company from the Debtors since 2006); Limited Objection of Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac- Buick-GMC Truck, Inc. [Docket No. 3458] at ¶23; and Objection of Norman-Blackmon Motor Company, Inc. [No. 3516] at ¶ 6.

31. Based on the Motion and the foregoing, the Debtors' respectfully request that the Court grant the requested relief to authorize rejection of the remaining Affected Dealer Agreements, effective as of July 10, 2009.[14]

## Notice

Notice of this Reply has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the United States Department of the Treasury, (iii) the attorneys for Export Development Canada, (iv) the attorneys for the statutory committee of unsecured creditors appointed in these chapter 11 cases, (v) the attorneys for the ad hoc bondholders committee, (vi) the U.S. Attorney's Office, S.D.N.Y., (vii) the attorneys for the Objecting Dealers, and (viii) all entities that requested notice in these chapter 11 cases under Fed. R. Bankr. P. 2002.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

---

[14] While none of the Objecting Dealers raises the issues of retroactive rejection in their papers, many courts, including this Court, have held that bankruptcy courts may, in their discretion, authorize rejection retroactively to a date prior to entry of the order authorizing such rejection.  *See, e.g. BP Energy Co. v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp., et al.)*, No. 02 Civ. 6419 (NRB), 2002 WL 31548723, at *3 (S.D.N.Y. Nov. 15, 2002) (finding that retroactive rejection is valid when the balance of equities favor such treatment); *In re Jamesway Corp.*, 179 B.R. 33, 36 (S.D.N.Y. 1995) (stating that section 365 does not include "restrictions on the manner in which the court can approve rejection"); *In re Thinking Mach. Corp. v. Mellon Fin. Servs.*, 67 F.3d 1021, 1028 (1st Cir. 1995) (approving retroactive orders of rejection where the balance of equities favors such relief); *In re Amber's Stores, Inc.*, 193 B.R. 819, 827 (Bankr. N.D. Tex. 1996) (holding that where the debtor has taken affirmative steps to reject certain leases and executory contracts, the debtor should not be penalized for the period of lag time that occurs between filing the motion and the entry of an order by the court); *Stillwater* at 37: 1-12 (citing numerous other decisions of this Court and other courts holding the same).  Here, the Debtors could not have been more clear that rejection was the only alternative for those Dealers who did not sign Wind-Down Agreements.  Thus, the Debtors seek a rejection date of July 10, 2009, the day the 363 Transaction closed and the Debtors could no longer perform under the Affected Dealer Agreements.

WHEREFORE, the Debtors respectfully request that the Court enter an order

granting the relief requested herein and in the Motion and such other and further relief as is just

and proper.

Dated: New York, New York
        July 31, 2009

                                        /s/ Joseph H. Smolinsky
                                        Harvey R. Miller
                                        Stephen Karotkin
                                        Joseph H. Smolinsky

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Debtors
                                        and Debtors in Possession