Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                    :
**In re**                                           :        **Chapter 11 Case No.**
                                                    :
**MOTORS LIQUIDATION COMPANY,** *et al.,*           :        **09-50026 (REG)**
    **f/k/a General Motors Corp.,** *et al.*        :
                                                    :
                        **Debtors.**                :        **(Jointly Administered)**
                                                    :
-------------------------------------------------------------x

**CONSOLIDATED REPLY OF DEBTORS TO**
**OBJECTIONS TO OMNIBUS MOTION OF DEBTORS FOR**
**ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105**
**AND 365 AUTHORIZING (A) THE REJECTION OF EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC**
**DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF**

# TABLE OF CONTENTS

**Page**

Background ............................................................................................................... 1

The Debtors' Omnibus Rejection Motion and the Objecting Dealers' Responses........................ 2

The Rejection of the Affected Dealer Agreements is a Sound Exercise of the Debtors'
Business Judgment ....................................................................................................... 5

The Impact of Rejection on the Objecting Dealers Does Not Alter the Court's
Application of the Business Judgment Standard ...................................................... 10

Section 365 of the Bankruptcy Code Preempts Any State Dealer Laws .................................... 13

The Objecting Dealers Remaining Arguments ........................................................................... 14

     A.     The Wind-Down Agreement is a Valid and Legally Binding Agreement........... 14

     B.     Any Allegations of Bad Faith Are Red Herrings and Irrelevant ......................... 15

Notice ......................................................................................................................... 16

# TABLE OF AUTHORITIES

## CASES

*In re Amber's Stores, Inc.*,
   193 B.R. 819 (Bankr. N.D. Tex. 1996)..........................................................................16

*BP Energy Co. v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp., et al.)*,
   No. 02 Civ. 6419 (NRB), 2002 WL. 31548723 (S.D.N.Y. Nov. 15, 2002) ...............16

*In re City of Vallejo*,
   403 B.R. 72 (Bankr. E.D. Cal. 2009)............................................................................14

*In re Jamesway Corp.*,
   179 B.R. 33 (S.D.N.Y. 1995)........................................................................................16

*In re Old Carco LLC*,
   No. 09-50002, 2009 Bankr. LEXIS 1382 (Bankr. S.D.N.Y. June 19, 2009),
   *aff'd*, 2009 U.S. App. LEXIS 12351 (2d Cir. June 5, 2009)................10, 11, 12, 13, 14

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
   4 F.3d 1095 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994).............................9

*Phar Mor, Inc. v. Strouss Building Associates*,
   204 B.R. 948 (Bankr. N.D. Ohio 1997).........................................................................9

*In re Pilgrim's Pride Corp.*,
   403 B.R. 413 (Bankr. N.D. Tex. 2009).........................................................................12

*In re Riodizio, Inc.*,
   204 B.R. 417 (Bankr. S.D.N.Y. 1997)...........................................................................9

*In re Thinking Machine Corp. v. Mellon Finance Services*,
   67 F.3d 1021 (1st Cir. 1995).........................................................................................16

*In re Tom Stimus Chrysler-Plymouth, Inc.*,
   134 B.R. 676 (Bankr. M.D. Fla. 1991).........................................................................14

*Volkswagen of America, Inc. v. Dan Hixson Chevrolet Co. (In re Dan Hixson
   Chevrolet Co.)*,
   12 B.R. 917 (Bankr. N.D. Texas 1981).........................................................................14

**STATUTES**

11 U.S.C. § 105 ........................................................................................................1, 2

11 U.S.C. § 363 ...........................................................................................................1

11 U.S.C. § 365 ................................................................................................1, 2, 5, 11

11 U.S.C. § 1113 ..........................................................................................................11

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation ("**GM**")) and its

affiliated debtors, as debtors in possession in the above-captioned chapter 11 cases (collectively,

the "**Debtors**"), respectfully represent:

**Background**

1.      On June 1, 2009, the Debtors filed a motion (the "**Sale Motion**"),

requesting, *inter alia*, an order (the "**Sale Order**"), pursuant to 11 U.S.C. §§ 105, 363(b), (f), and

(m), and 365, authorizing and approving (i) the sale of substantially all of the Debtors' assets

pursuant to a proposed Master Sale and Purchase Agreement and related agreements (the

"**MPA**") among the Debtors and Vehicle Acquisition Holdings LLC ("**New GM**"), a purchaser

sponsored by the United States Department of the Treasury (the "**U.S. Treasury**"), free and clear

of liens, claims, encumbrances, and other interests, including any successor liabilities (the "**363**

**Transaction**"), (ii) the assumption and assignment of certain executory contracts and unexpired

leases of personal property and of nonresidential real property, and (iii) the approval of the UAW

Retiree Settlement Agreement, subject to higher or better offers.

2.      On July 5, 2009, the Court approved the 363 Transaction and entered the

Sale Order (as modified by the Court), and on July 10, 2009, the 363 Transaction closed.

Accordingly, the Debtors no longer operate as manufacturers of any GM branded motor vehicles,

nor do they retain the rights to use GM trademarks in the wind-down of their business.  All such

manufacturing operations and trademark rights have been sold to New GM pursuant to the 363

Transaction.  (*See* Sale Order, Findings of Fact and Conclusions of Law, ¶ R) ("Upon the closing

of the 363 Transaction, the Debtors will transfer to [New GM] substantially all of its assets").

**The Debtors' Omnibus Rejection Motion and the Objecting Dealers' Responses**

3.      On July 7, 2009, promptly after entry of the Sale Order, the Debtors filed

an Omnibus Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 365 Authorizing (A)

The Rejection of Executory Contracts and Unexpires Leases with Certain Domestic Dealers and

(B) Granting Certain Related Relief (the "**Motion**").[1]  As of the date hereof, 6 Affected Dealers

out of the 37 Affected Dealers subject to the Motion have filed and still maintain an objection

(the "**Objections**") to the Motion.[2]

4.      As extensively discussed in the Motion, in testimony and other evidence

proffered or adduced at the Sale Hearing and in numerous other pleadings and affidavits filed in

these chapter 11 cases, all parts of GM, including its Dealer Network, had to become smaller and

more efficient to enable New GM to continue forward as a viable company capable of effectively

competing against foreign OEMs and operating during cyclical downturns.

5.      A reduction in the number of GM Dealerships was a necessary, albeit

painful, component of GM's overall rationalization effort.  In conducting the necessary

rationalization of its Dealer Network, the Debtors undertook a thorough analysis of every

Dealership in every market throughout the United States to assess individual market

requirements and Dealership performance.  The key Dealership performance factors evaluated by

the Debtors included, among others: minimum sales thresholds, customer satisfaction indices,

working capital needs, profitability, whether a Dealership sold competing non-GM brands,

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

[2] The objections to the Motion that remain unresolved include: (1) Objection of Cardenas Autoplex, Inc. ("**Cardenas**") [Docket No. 3174]; (2) Objection of Everett Chevrolet, Inc. ("**Everett**") [Docket No. 3531]; (3) Limited Objection of Forrest Chevrolet- Cadillac, Inc., and Forrest Pontiac- Buick-GMC Truck, Inc. ("**Forrest**") [Docket No. 3458]; (4) Objections of Quinlan's Equipment, Inc [Docket No. 3459] ("**Quinlan**"); (5) Response of Terry Gage Chevrolet-Oldsmobile, Inc. ("**Terry Gage**") [Docket No. 3094]; and (6) Objection of Norman-Blackmon Motor Company, Inc. ("**Norman-Blackmon**") [No. 3516] (collectively the "**Objecting Dealers**").

Dealership location and the current physical condition of each Dealership.  (*See* Motion ¶¶ 12-22.)  In addition, the Debtors also considered Dealer Network coverage in rural areas and small towns versus urban/suburban markets.  As described in more detail below, the Dealer performance of each of the Objecting Dealers was extremely poor when applying the objective factors considered by the Debtors in their evaluation process.

6.    Even though the performance of the Objecting Dealers was far below average, GM did not seek to abruptly reject and terminate their Dealer Franchise Agreement and Ancillary Agreements (collectively, the "**Objecting Dealer Agreements**") (as was the case in Chrysler, for example).  Rather, GM offered them the opportunity to accept Wind-Down Agreements that would have allowed the Objecting Dealers to remain in business until October 2010, sell down their inventories in an orderly fashion, and continue to provide warranty and other services to their customers with the continued support of New GM.

7.    In addition, GM offered all Dealers who accepted a Wind-Down Agreement a substantial cash payment, which, for most Dealers, provided for $1,000 for each vehicle remaining in their inventory and reimbursement for eight months of their remaining rent.  Thus, for example, a Dealer who signed a Wind-Down Agreement with 500 cars left on their lot and who paid $20,000 a month in rent would have received a cash payment of $660,000.[3]  GM elected to offer the Affected Dealers the benefits of the Wind-Down Agreement to help minimize the financial and other hardships that would have been associated with an immediate rejection and Dealership shut down.  Indeed, this was the express finding of the Court in the Sale Order:

> The Deferred Termination Agreements *were offered as an alternative to rejection of the existing Dealer Sales and Service Agreements* of these dealers pursuant to section 365 of the

---

[3] These payments were paid in two installments: 25% upon signing the Wind-Down Agreement and the remaining 75% after the Dealer completed liquidating its remaining inventory.

> Bankruptcy Code and *provide substantial additional benefits to dealers which enter into such agreements*. Approximately 99% of the dealers offered Deferred Termination Agreements accepted and executed those agreements and did so for good and sufficient consideration.  (emphasis added)

(Sale Order, Findings of Fact and Conclusions of Law, ¶ JJ.)  While the Debtors recognize that the closing of a business is always difficult, it made a concerted effort to address these situations in a fair and supportive manner and to provide each of the Objecting Dealers a soft landing and an alternative to rejection.

8.       Unfortunately, despite the Debtors best efforts, the Objecting Dealers elected not to execute a Wind-Down Agreement.  Accordingly, New GM determined it would not accept assignment of the Objecting Dealers' Franchise Agreements, which were instead left as retained assets of the Debtors' liquidating estates.  The Objecting Dealers now are parties to a Dealer Franchise Agreement with a bankrupt company that no longer manufactures or distributes any motor vehicles.  Accordingly, the Debtors cannot perform under the terms of the Dealer Franchise Agreements and therefore have absolutely no justifiable business reason to continue the Objecting Dealer Agreements.  As described in the Motion and in more detail below, if the Debtors are required by the Court to assume the Objecting Dealer Agreements, it would cost their estates substantial sums of money without providing any corresponding benefit.

9.       After sifting through the hyperbole and alleged facts, which do not bear on the legal standard implicated by the Motion, the crux of the 6 Objecting Dealers' legal arguments boils down to the following:  (i) the Debtors are not properly exercising and did not justify their business judgment in seeking to reject the Objecting Dealer Agreements[4]; (ii) rejection of the

---

[4] *See e.g.*, Objection of Cardenas Autoplex, Inc. [Docket No. 3174] at ¶2; Objection of Everett Chevrolet, Inc. [Docket No. 3531] at ¶¶1-3; Limited Objection of Forrest Chevrolet- Cadillac, Inc., and Forrest Pontiac- Buick- GMC Truck, Inc. [Docket No. 3458] at ¶¶19-23; and Objection of Quinlan's Equipment, Inc [Docket No. 3459] at ¶¶ 9-18.

Objecting Dealer Agreements will cause substantial harm to the Objecting Dealers[5]; and (iii)

state Dealer Laws do not allow for the rejection of the Objecting Dealer Agreements.[6]  The

Objecting Dealers' arguments are without merit under the facts and applicable case law and their

Objections should be denied.[7]

**The Rejection of the Affected Dealer Agreements
is a Sound Exercise of the Debtors' Business Judgment**

10.     The business purpose of the Debtors, appropriately renamed Motors

Liquidation Company, at this point in their chapter 11 cases is abundantly clear and extremely

simple:  liquidate whatever assets remain following the 363 Transaction as efficiently and cost-

effectively as possible to maximize the value of the recovery for its creditors.  As repeatedly

mentioned in the Motion and above, following the close of the 363 Transaction, the Debtors no

longer manufacture any GM branded vehicles.  Therefore, the Debtors are simply not capable of

performing under the Dealer Franchise Agreements, which require, among other things, the

Debtors to manufacture and deliver to the Objecting Dealers GM branded vehicles.

11.     In addition to the requirement to deliver GM branded vehicles, the

Objecting Dealer Agreements also require various other burdensome performance requirements

which the Debtors are unable to perform and should not be required to undertake at a huge

monetary loss to their estates.  These burdensome obligations include, among others, repurchase

---

[5] *See e.g.*, Objection of Cardenas Autoplex, Inc. [Docket No. 3174] at ¶¶5, 7; Objection of Everett Chevrolet, Inc. [Docket No. 3531] at ¶¶19-23; Limited Objection of Forrest Chevrolet- Cadillac, Inc., and Forrest Pontiac- Buick-GMC Truck, Inc. [Docket No. 3458] at ¶¶ 9-18; Objection of Quinlan's Equipment, Inc [Docket No. 3459] at ¶¶17-18, and Objection of Norman-Blackmon Motor Company, Inc. [No. 3516] at ¶ 6.

[6] *See e.g.*, Objection of Cardenas Autoplex, Inc. [Docket No. 3174] at ¶ 6; Objection of Everett Chevrolet, Inc. [Docket No. 3531] at ¶24; Limited Objection of Forrest Chevrolet- Cadillac, Inc., and Forrest Pontiac- Buick-GMC Truck, Inc. [Docket No. 3458] at ¶¶26-37; and Objection of Quinlan's Equipment, Inc [Docket No. 3459] at ¶¶19-23, 28-38.

[7] The Debtors believe that the facts and circumstances stated herein and as found and determined by this Court in other proceedings in these chapter 11 cases clearly justify rejection under section 365 of the Bankruptcy Code without the need for a costly, time-consuming, and unnecessary evidentiary hearing that would only serve to further drain the scarce resources of the Debtors' estates.

obligations for GM vehicles, parts and tools; warranty obligations; insurance obligations; fuel fill

obligations; direct Dealer incentive obligations; wholesale floorplan support; local advertising

assistance, and funding for Dealer websites and other IT services.  (*See* Motion ¶¶ 15-18.)

Collectively, if the Court forced the Debtors to assume these obligations it would cost their

estates millions of dollars a year in administrative expenses.  In return, the Debtors and their

creditors would receive absolutely no benefit since the Debtors can no longer generate any

revenue by selling cars or trucks.

　　　　　12.　　In an analogous situation in this case, the Court recently upheld the

Debtors' rejection of an over-market commodities supply agreement, without the need for an

evidentiary hearing, based largely on the indisputable fact that after the close of the 363

Transaction, "Motors Liquidation no longer makes cars and trucks; it doesn't need any product".

(Debtors' Motion to Reject Executory Contract with Stillwater Mining Company Hr'g Tr. 34:

19-20) (hereinafter, "***Stillwater***")[8].  In *Stillwater*, the Court went on to add that "ultimately the

decision as to whether to take an assumption of [the agreements], and thus to take the agreement

itself, was New GM's, not the decision of Motors Liquidation Company.  And when this contract

wasn't assumed by New GM, *Motors Liquidation Company, at the risk of stating the obvious,*

*didn't need the [product] itself.*"  (*Id.* at 33: 2-7.) (emphasis added)  Here, just as in the Stillwater

situation, the determination of whether to take assignment of certain Dealer Franchise

Agreements was ultimately New GM's and not the Debtors.  After New GM decided not to

purchase these agreements, the Debtors made a sound business decision to reject any remaining

Dealer Franchise Agreements for the same obvious reason as in Stillwater:  they don't need any

---

[8] The Debtors have attached a copy of the Stillwater Decision hereto as **<u>Exhibit A</u>**.

Dealers and cannot perform under any remaining Dealer Franchise Agreements following the close of the 363 Transaction.

13.       Further, even if the Debtors could perform under the Objecting Dealer Agreements, which they obviously cannot, the Objecting Dealers are all underperforming Dealers who were not selected to be retained by New GM based on a thorough evaluation of objective Dealership performance criteria. The Debtors determined that a purely subjective Dealership Evaluation Process would not be equitable or consistent with the Debtors' past business practices.  Therefore, the Debtors relied heavily on objective performance criteria in conducting the Dealership Evaluation Process.  In particular, the Debtors reviewed, analyzed and weighed numerous performance and planning metrics for each Dealership, including among other factors:

- Dealership Sales, which were measured against other Dealerships of a similar size and in a similar size market in the same state;

- Customer Satisfaction Index, which was measured against the average for the region in which the Dealership was located;

- Capitalization, which was measured based on the working capital needs of each Dealership; and

- Profitability, which was determined for each Dealership based on net profits before taxes.

14.       Based on a calculation of the above factors, each Dealership was assigned a Dealership Performance Score ("**DPS**"), with a score of 100 considered average for a particular Dealership.[9]  The Debtors determined that Dealerships receiving a DPS of less than 70 were significantly underperforming and would not be retained long-term in New GM.

---

[9] The DPS is calculated by weighing the above factors in the following manner: Dealership Sales at 50%, Customer Satisfaction Index at 30%; Capitalization at 10% and Profitability at 10%.

15.     The DPS score, however, was not the only factor considered by the Debtors in determining which Dealerships would be retained in New GM.  The Debtors also considered other important factors in determining which Dealers would receive Wind-Down Agreements.  In addition to Dealerships with a DPS score of below 70, Dealerships who sold Non-GM brands under the same roof and also experienced poor overall performance, Dealerships that sold discontinued GM brands, Dealerships with sales of less than 50 cars per year, Dealerships with inadequate or uncompetitive facilities or locations, and Dealerships unprofitable for three years in a row with inadequate working capital also were not retained by New GM.

16.     Each of the Objecting Dealers had a DPS score well below the threshold level of 70 and/or sold less than 50 cars *in total* during calendar year 2008, among various other performance factors that were extremely poor.  For example, with respect to each Objecting Dealer:

- Cardenas sold only 3 vehicles in 2008 and had a DPS score of 23;
- Terry Gage sold only 39 vehicles in 2008 and had a DPS score of 55.66;
- Quinlan's sold only 21 cars in 2008 and had a DPS of 80.11;
- Everett had a DPS score of 49.96 and sold 117 fewer cars than expected in 2008 based upon its dealerships size and market location;
- Forrest had a DPS score of 21.65 and sold 603 fewer cars than expected in 2008 based upon its dealerships size and market location

The Objecting Dealers were not retained by New GM because the above objective financial and performance criteria clearly demonstrated that their performance was extremely poor as compared to other Dealers who were retained in the Dealer Network.

17.     At bottom, when the Court strips away all of the legally irrelevant allegations in the Objections, the following undisputed facts remain: the Debtors' simply cannot perform under any remaining Dealer Franchise Agreements following this Court's approval of

the 363 Transaction (which alone is dispositive); forcing the Debtors to perform would cost their estates millions of dollars in administrative expense claims without providing any corresponding benefit; and the Objecting Dealers are all underperforming Dealers who refused to sign a Wind-Down Agreement (which would have allowed for the assignment of their Dealer Franchise Agreement to New GM and substantial economic support). Thus, the Debtors' decision to reject the Objecting Dealer Agreements is clearly a sound exercise of its business judgment and was not retaliatory and punitive as alleged in some of the Objections.

18.    Courts generally will not second-guess a debtor's business judgment concerning the assumption or rejection of an executory contract or unexpired lease. *See In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) ("[A] court will ordinarily defer to the business judgment of the debtor's management."); *accord Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 951-52 (Bankr. N.D. Ohio 1997) ("Whether an executory contract is 'favorable' or 'unfavorable' is left to the sound business judgment of the debtor. . . . Courts should generally defer to a debtor's decision whether to reject an executory contract."). Indeed, "the purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1098 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994).

19.    In recently approving Chrysler's rejection of hundreds of dealership agreements, Judge Gonzalez held that the traditional business judgment standard applies to an OEM-debtor's rejection of dealership agreements under section 365: "the scope of [the Court's] inquiry regarding the business judgment standard for purposes of rejection does not include an evaluation of whether the Debtors made the *best or even a good* business decision but merely

that the decision was made in an exercise of the Debtors' business judgment." *In re Old Carco LLC*, No. 09-50002, 2009 Bankr. LEXIS 1382, at *33 (Bankr. S.D.N.Y. June 19, 2009) ("**Chrysler**"), *aff'd*, 2009 U.S. App. LEXIS 12351 (2d Cir. June 5, 2009).

20.    The Debtors have articulated a clear business purpose for rejecting the Affected Dealer Agreements, which, if continued would be extremely burdensome to the Debtors' estates without providing any corresponding benefit.  Accordingly, just as was ordered by Judge Gonzales in *Chrysler* under far more draconian circumstances, the Court should approve the rejection of the Affected Dealer Agreements as a sound exercise of the Debtors' business judgment.

**The Impact of Rejection on the Objecting Dealers Does Not Alter
the Court's Application of the Business Judgment Standard**

21.    As stated by Fritz Henderson in his testimony before Congress regarding GM's Dealer reduction process: "Our dealer restructuring is [] an effort that is quite painful – for us, for our customers, and especially for our dealers.  Many of our dealers operate businesses that have been in their family for generations.  Our actions affect them personally as well as financially.  They also affect the communities and states where our dealers live and work." *United States House of Representatives Subcommittee for Oversight and Investigations, Committee on Energy and Commerce*, 111th Cong., June 12, 2009 (statement of Frederick A. Henderson, President and Chief Executive Officer, General Motors Corporation)  ("**Henderson Congressional Testimony**").[10]  The Debtors are extremely sympathetic to the significant impact rejection has on the Objecting Dealers, their families, employees and the local community. Indeed, it is for that exact reason that the Debtors hoped not to have to reject any Dealer Franchise Agreements, and instead developed a generous Wind-Down process, which the Court

---

[10] A copy of the Henderson Congressional Testimony is attached hereto as **Exhibit B**.

recognized was considerably more beneficial to its Dealers than rejection.  (*See* Sale Order,

Findings of Fact and Conclusions of Law, ¶ JJ.)  Nevertheless, the Objecting Dealers made the

choice not to accept the Wind-Down Agreements, leaving the Debtors with no other business

choice than to seek rejection.

22.    As noted above, forcing the Debtors to assume Objecting Dealer

Agreements under which they are incapable of performing would cost their estates substantial

sums of money without a single corresponding benefit.  Therefore, by filing the Motion, the

Debtors are attempting to use section 365 as it was expressly intended— to maximize the

recovery for its estate and creditors by eliminating burdensome contracts.  *See Chrysler,* 2009

LEXIS 1382 at *5 ("[T]he authority to reject an executory contract is vital to the basic purpose to

a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome

obligations that can impede a successful reorganization.") (citations omitted).

23.    Further, to the extent the Objecting Dealers argue that the Court should

employ a heightened public policy standard and "balance the equities" instead of applying the

business judgment standard, their arguments also fail.  Judge Gonzales made clear recently in

*Chrysler* with respect to the rejection and attendant shut down of hundreds of dealerships that,

"absent Congressional authority, such as through a separate section of the Bankruptcy Code

(e.g., § 1113) or a specific carve-out within § 365 itself, *the court is not free to deviate from the

business judgment standard* and weigh the effect of rejection on debtor's counterparty or the

counterparty's customers." *Id.* at *21-22 (emphasis added).  Judge Gonzalez went on to add in

*Chrysler* that while the "Court is sympathetic to the impact of the rejections on the dealers and

their customers and communities,[]such sympathy does not permit the Court to deviate from

well-established law and "balance the equities" instead of applying the business judgment

standard."  *Id.* at * 20-21.

24.       Moreover, it would not be equitable or consistent with public policy to

cause the unsecured creditors of the Debtors to subsidize the Objecting Dealers or the

surrounding local interests.  Thus, while the Debtors' proposed rejections may have a significant

impact on Objecting Dealers, their families and the local economy, that is not a reason to second

guess the Debtors' clear business judgment in seeking the rejections.  (*See Stillwater* at 35:4-14.)

("I assume that losing this business in indeed a hardship to [the counterparty].  I understand and

sympathize with it.  But this is, sadly, one of the many decisions that I've been forced to make in

this case and in others . . . where I have to deal with the unfortunate consequences of corporate

financial distress.  So that others do not suffer even more, the Bankruptcy Code provides means

for debtors to shed burdensome obligations, of which this is a classic example.  . . . For purposes

of this Motion, I must consider the reasons underlying the debtors' business judgment. . . . [there

is] no basis in the law, nor has any been cited to me, for considering hardship to the counterparty

where, for example, Congress hasn't directed us to consider competing considerations . . ."  );

*see also In re Pilgrim's Pride Corp.*, 403 B.R. 413, 425 (Bankr. N.D. Tex. 2009) ("While the

impact of rejection on the [counterparties'] community may be significant, that is not an

uncommon result of the cut-backs that typically accompany a restructuring in chapter 11.

Whether through contract rejections or plant closings, contraction of a debtor's business will

often have a harmful effect for one or more local economies.  If the bankruptcy court must

second-guess every choice by a trustee or debtor in possession that may economically harm any

given locale, the business judgment rule applicable to contract rejection and many other

decisions in the chapter 11 process will be swallowed by a public policy exception.")

25.     Accordingly, the scope of the Court's inquiry should be limited to an evaluation of whether rejection of the Objecting Dealer Agreements is a proper and sound exercise of the Debtors' business judgment.  For the reasons discussed in detail above and in the Motion, the Debtors submit that rejection of the Objecting Dealer Agreements is clearly a sound business decision that will substantially benefit the Debtors' estate and its creditors.

## Section 365 of the Bankruptcy Code Preempts Any State Dealer Laws

26.     A central theme in many of the Objections is a theory that the Debtors' rejection of the Objecting Dealer Agreements under federal bankruptcy law is impermissible to the extent that it supersedes or interferes with any of the rights of the Objecting Dealers under state Dealer Laws.[11]  The Debtors' legal position on preemption, and in opposition to the Objecting Dealers' arguments, was addressed in detail in the Motion.  (*See* Motion ¶¶ 31-33; 40-45.)  The Debtors, however, wish to reiterate here that the exact preemption issue raised by certain of the Objecting Dealers was recently decided in *Chrysler* and affirmed by the Second Circuit.  Judge Gonzalez's decision in *Chrysler* on preemption was clear and unequivocal: "the Court concludes that the Dealer Statutes are preempted by § 365 with respect to rejection of the Rejected Agreements."  *Chrysler*, 2009 LEXIS 1382, at *42.

27.     As Judge Gonzalez clearly articulated in *Chrysler*, the Dealer Laws must not be seen to impair or supersede those core bankruptcy rights that the Debtors possess under section 365 of the Bankruptcy Code.  *Id.* at *62–66; *see also In re City of Vallejo*, 403 B.R. 72, 77 (Bankr. E.D. Cal. 2009) ("Congress enacted section 365 to provide debtors the authority to reject contracts . . . [t]his authority preempts state law by virtue of the Bankruptcy Clause [and]

---

[11] *See e.g.*, Objection of Cardenas Autoplex, Inc. [Docket No. 3174] at ¶ 6; Objection of Everett Chevrolet, Inc. [Docket No. 3531] at ¶24; Limited Objection of Forrest Chevrolet- Cadillac, Inc., and Forrest Pontiac- Buick-GMC Truck, Inc. [Docket No. 3458] at ¶¶26-37; and Objection of Quinlan's Equipment, Inc [Docket No. 3459] at ¶¶19-23, 28-38.

the Supremacy Clause."); *Volkswagen of Am., Inc. v. Dan Hixson Chevrolet Co.* (*In re Dan Hixson Chevrolet Co.*), 12 B.R. 917, 923 (Bankr. N.D. Texas 1981) (holding that section 365 of the Bankruptcy Code preempted a Texas law requiring a "good cause" hearing if a dealer protests a manufacturer's attempted termination of a dealer agreement, because permitting the "good cause" proceeding to continue might frustrate the purposes of federal bankruptcy law); *In re Tom Stimus Chrysler-Plymouth, Inc.*, 134 B.R. 676, 679 (Bankr. M.D. Fla. 1991) (holding that section 365 of the Bankruptcy Code governs the assumption or rejection of a contract, even if the agreement otherwise would have been terminated under Florida dealer laws).

28.     Notably, while many of the Objecting Dealers primarily rely on the argument that state Dealer Laws prevent the Court from granting the relief requested in the Motion, not a single Objecting Dealer confronts the Debtors' central argument that the decision on this legal issue by Judge Gonzalez in *Chrysler* is dispositive.  None of the Objecting Dealers address the *Chrysler* decision because it is beyond dispute that this decision is on all fours with the facts present here and therefore represents controlling authority.

**The Objecting Dealers Remaining Arguments**

**A.     The Wind-Down Agreement is a Valid and Legally Binding Agreement**

29.     Contrary to this Court's findings of facts and conclusions of law in the Sale Order, some of the Objecting Dealers argue that the Wind-Down Agreement offered by the Debtors as an alternative to rejection is "unconscionable" and may not be legally binding.[12]  As explained in detail in the Motion and again above, the Wind-Down Agreements represented an offer by the Debtors that provided "substantial additional benefits to dealers who enter into such agreements" versus a rejection.  (Sale Order, Findings of Fact and Conclusions of Law, ¶ JJ.)

---

[12] *See e.g.*, Limited Objection of Forrest Chevrolet- Cadillac, Inc., and Forrest Pontiac- Buick-GMC Truck, Inc. [Docket No. 3458] at ¶13; Objection of Quinlan's Equipment, Inc [Docket No. 3459] at ¶ 8; and Objection of Norman-Blackmon Motor Company, Inc. [No. 3516] at ¶ 6.

Moreover, with respect to the validity of the Wind-Down Agreements, the Court expressely held

that the Wind-Down Agreements "represent valid and binding contracts, enforceable in

accordance with their terms". (*Id.* at ¶ 31.)  However, since the Objecting Dealers did not elect

to sign a Wind-Down Agreement, this argument is not germane to the relief requested by the

Debtors in the Motion.

**B.    Any Allegations of Bad Faith Are Red Herrings and Irrelevant**

30.    A number of Objecting Dealers make unsubstantiated allegations of

nefarious motives in selecting them for rejection, including discrimination and retaliatory

conduct by the Debtors.[13]  The Objections that allege this or similar (or in some instances

unspecified) bad faith attempt to distinguish their situation from the objective process undertaken

by the Debtors.  Most importantly, however, none of the Objecting Dealers' "conspiracy

theories" address the undisputable fact that following the close of the 363 Transaction, the

Debtors no longer manufacture any motor vehicles.  Ultimately, while the result of a

collaborative effort, the decision of which Dealers to retain was the decision of New GM and not

the Debtors.  Thus, any and all Dealers who New GM did not retain as part of the 363

Transaction would have faced rejection equally because the Debtors simply can no longer

perform under the Dealer Franchise Agreements.

---

[13] *See e.g.*, Objection of Everett Chevrolet, Inc. [Docket No. 3531] at ¶4-23(almost the entirety of Everett's objection relies on the legally irrelevant fact that it is involved in protracted litigation against GMAC, which has been a distinct and separate company from the Debtors since 2006); Limited Objection of Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac- Buick-GMC Truck, Inc. [Docket No. 3458] at ¶23; and Objection of Norman-Blackmon Motor Company, Inc. [No. 3516] at ¶ 6.

31.     Based on the Motion and the foregoing, the Debtors' respectfully request that the Court grant the requested relief to authorize rejection of the remaining Affected Dealer Agreements, effective as of July 10, 2009.[14]

## **Notice**

Notice of this Reply has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the United States Department of the Treasury, (iii) the attorneys for Export Development Canada, (iv) the attorneys for the statutory committee of unsecured creditors appointed in these chapter 11 cases, (v) the attorneys for the ad hoc bondholders committee, (vi) the U.S. Attorney's Office, S.D.N.Y., (vii) the attorneys for the Objecting Dealers, and (viii) all entities that requested notice in these chapter 11 cases under Fed. R. Bankr. P. 2002.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

---

[14] While none of the Objecting Dealers raises the issues of retroactive rejection in their papers, many courts, including this Court, have held that bankruptcy courts may, in their discretion, authorize rejection retroactively to a date prior to entry of the order authorizing such rejection.  *See, e.g. BP Energy Co. v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp., et al.)*, No. 02 Civ. 6419 (NRB), 2002 WL 31548723, at *3 (S.D.N.Y. Nov. 15, 2002) (finding that retroactive rejection is valid when the balance of equities favor such treatment); *In re Jamesway Corp.*, 179 B.R. 33, 36 (S.D.N.Y. 1995) (stating that section 365 does not include "restrictions on the manner in which the court can approve rejection"); *In re Thinking Mach. Corp. v. Mellon Fin. Servs.*, 67 F.3d 1021, 1028 (1st Cir. 1995) (approving retroactive orders of rejection where the balance of equities favors such relief); *In re Amber's Stores, Inc.*, 193 B.R. 819, 827 (Bankr. N.D. Tex. 1996) (holding that where the debtor has taken affirmative steps to reject certain leases and executory contracts, the debtor should not be penalized for the period of lag time that occurs between filing the motion and the entry of an order by the court); *Stillwater* at 37: 1-12 (citing numerous other decisions of this Court and other courts holding the same).  Here, the Debtors could not have been more clear that rejection was the only alternative for those Dealers who did not sign Wind-Down Agreements.  Thus, the Debtors seek a rejection date of July 10, 2009, the day the 363 Transaction closed and the Debtors could no longer perform under the Affected Dealer Agreements.

WHEREFORE, the Debtors respectfully request that the Court enter an order

granting the relief requested herein and in the Motion and such other and further relief as is just

and proper.

Dated: New York, New York
       July 31, 2009

                                    /s/ Joseph H. Smolinsky
                                    Harvey R. Miller
                                    Stephen Karotkin
                                    Joseph H. Smolinsky

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    Attorneys for Debtors
                                    and Debtors in Possession

## Exhibit A

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


GENERAL MOTORS CORPORATION, et al.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


            U.S. Bankruptcy Court

            One Bowling Green

            New York, New York


            July 22, 2009

            9:45 AM




B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2     HEARING re Motion to Reject Lease or Executory Contract

3

4     HEARING re Motion to Reject Lease, Unexpired Leases of

5     Nonresidential Real Property

6

7     HEARING re (Doc. 2647 & 2648) Amended Debtors' Second Omnibus

8     Motion Pursuant to 11 U.S.C. Section 365 to Reject Certain

9     Executory Contracts

10

11    HEARING re Debtors' Third Omnibus Motion Pursuant to 11 U.S.C.

12    Section 365 to Reject Certain Executory Contracts

13

14    HEARIG re Motion of Debtors for Entry of Order Pursuant to 11

15    U.S.C. Section 521 and Fed. R. Bankr. P. 1007(C) Further

16    Extending Time to File Schedules of Assets and Liabilities,

17    Schedules of Executory Contracts and Unexpired Leases, and

18    Statements of Financial Affairs

19

20

21

22

23

24    Transcribed By:  Clara Rubin

25

3

```
 1

 2     A P P E A R A N C E S :

 3     WEIL, GOTSHAL & MANGES LLP

 4          Attorneys for Debtors, Motors Liquidation Company,

 5           f/k/a General Motors

 6          767 Fifth Avenue

 7          New York, NY 10153

 8

 9     BY:   EVAN S. LEDERMAN, ESQ.

10           JOSEPH H. SMOLINSKY, ESQ.

11

12

13     HODGSON RUSS LLP

14          Attorneys for Stillwater Mining Company

15          The Lincoln Building

16          60 East 42nd Street

17          37th Floor

18          New York, NY 10165

19

20     BY:   DEBORAH J. PIAZZA, ESQ.

21

22

23

24

25
```

4

1

2    JENNER & BLOCK LLP

3         Special counsel for Debtors, Motors Liquidation Company,

4          f/k/a General Motors

5         919 Third Avenue

6         37th Floor

7         New York, NY 10022

8

9    BY:   DANIEL H. TEHRANI, ESQ.

10

11   KRAMER LEVIN NAFTALIS & FRANKEL

12        Attorneys for Official Creditors' Committee

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16   BY:   GORDON Z. NOVOD, ESQ.

17        JENNIFER SHARRET, ESQ.

18

19   LANE POWELL PC

20        Attorneys for Stillwater Mining Company

21        1420 Fifth Avenue

22        Suite 4100

23        Seattle, WA 98101

24

25   BY:   MARY JO HESTON, ESQ.

5

1

2     DENNIS A. PRIETO, IN PRO PER (TELEPHONICALLY)

3          Interested Party

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

                    P R O C E E D I N G S

1

2        THE COURT:  Good morning.  Be seated, please.

3        Okay, GM.

4      (Pause)

5        THE COURT:  Let's see if we can make some room at the

6    counsel table for everybody who wants room at the counsel

7    table, please.

8        MR. LEDERMAN:  Good morning, Your Honor.  Evan

9    Lederman, Weil, Gotshal & Manges, for the debtors.

10       THE COURT:  Good morning, Mr. Lederman.

11       MR. LEDERMAN:  Good morning, Your Honor.  We have one

12   contested matter on today.

13       THE COURT:  Yes.

14       MR. LEDERMAN:  If Your Honor would like us to start

15   with that, or if you want to go through the uncontested

16   matters?

17       THE COURT:  No, normally what I would prefer,

18   Mr. Lederman, is you deal with the uncontested matters, freeing

19   me up to take the argument that's necessary or appropriate on

20   the contested one.

21       MR. LEDERMAN:  Go through the uncontested matters

22   first, Your Honor?

23       THE COURT:  Yes, sir.

24       MR. LEDERMAN:  Okay, sure.  The first uncontested

25   matter is our -- the debtors' motion to reject certain

7

1    unexpired leases of nonresidential real property; that was

2    filed by our co-counsel Jenner & Block.  I'll call up Daniel

3    Tehrani to address that motion.

4          THE COURT:  All right.

5          Mr. Tehrani is it?

6          MR. TEHRANI:  Good morning, Your Honor.  My name is

7    Daniel Tehrani, Jenner & Block, as special --

8          THE COURT:  You want to pull the microphone closer to

9    you?

10         MR. LEDERMAN:  Sure.

11         THE COURT:  And I think I heard your name but I wasn't

12    sure.  Tehrani was it?

13         MR. TEHRANI:  Yeah, Tehrani --

14         THE COURT:  Okay.

15         MR. TEHRANI:  -- from Jenner & Block, special counsel

16    to the debtors, Motors Liquidation Company, formally General

17    Motors, in support of two unopposed motions --

18         THE COURT:  Can I ask you to speak slower, louder and

19    into the microphone, please?

20         MR. TEHRANI:  I'm sorry.  In support of two unopposed

21    motions to reject certain executory contracts and unexpired

22    leases.  The motions are unopposed and draft orders have been

23    submitted to Your Honor's chambers.

24         THE COURT:  Okay, they're granted.

25         Mr. Lederman?

8

1          MR. LEDERMAN:  Your Honor, the next uncontested matter

2     is the fourth item on the agenda, the debtors' amended second

3     omnibus motion to reject certain executory contracts.  There

4     was one objection that was filed by Macquarie Equipment

5     Finance.  The debtors have been able to resolve that objection

6     and they filed a notice of withdrawal.  So that objection has

7     been resolved.

8          There are no other objections to this motion.  It is

9     seeking rejection of various contracts, including engineering

10    service contracts, human resources contracts and other related

11    purchase agreements that are not in the best interests of

12    debtors' estate to retain on an ongoing basis.

13         Seeing that there is no other objection, we ask Your

14    Honor to approve that motion.

15         THE COURT:  Yes, granted.

16         MR. LEDERMAN:  Thank you, Your Honor.  The next

17    uncontested matter is also a -- I'm sorry, the next uncontested

18    matter is the motion for the debtors to extend their time to

19    file schedules.  We are working with the U.S. Trustee's Office

20    to try and figure out the best format and way to present these

21    schedules following the 363 transaction, and when we decide on

22    a format we'll come back to Your Honor and present that.  So at

23    this time we have no further update besides to let you know

24    that we're trying to work out a good format with the United

25    States Trustee's Office.

9

1        THE COURT:  Okay.  That's fine.  How should we deal

2   with that as a matter of docketing and calendaring and so

3   forth, in your view, Mr. Lederman?

4        MR. LEDERMAN:  I think we would ask Your Honor to

5   approve the extension while we work out the format with the

6   U.S. Trustee's Office.

7        THE COURT:  Okay.  And you've got a proposed order to

8   do that?

9        MR. LEDERMAN:  We do, Your Honor.

10       THE COURT:  Okay.  Fair enough.

11       MR. LEDERMAN:  Thank you.  The third matter was an

12   adjourned matter; it's an adversary proceeding that will be

13   going forward, I believe, on September 30th at 10:30 a.m., Your

14   Honor.

15       THE COURT:  Okay.  So --

16       MR. LEDERMAN:  And that concludes the uncontested and

17   adjourned matters.

18       THE COURT:  All right, so now we're down to the third

19   omnibus rejection motion, and I assume on that you'll want me

20   to grant the unopposed ones and we'll hear argument on the one

21   that is opposed?

22       MR. LEDERMAN:  Yes, Your Honor.

23       THE COURT:  Stillwater Mining Company?

24       MR. LEDERMAN:  Yes, Your Honor.

25       THE COURT:  All right, it's granted for the non-

10

1    objectors.  And I'll hear appearances for those who are going

2    to appear on Stillwater Mining.

3            MR. NOVOD:  Good morning, Your Honor.  Gordon Novod of

4    the law firm of Kramer Levin Naftalis & Frankel.  I'm joined by

5    my colleague Jennifer Sharret on behalf of the creditors'

6    committee of Motors Liquidation Company.

7            THE COURT:  Okay, Mr. Novod.

8            MS. HESTON:  Good morning, Your Honor.  Mary Jo Heston

9    from the law firm of Lane Powell, appearing for Stillwater

10   Mining Company.

11           THE COURT:  Okay, Ms. Heston.

12           MS. PIAZZA:  Good morning, Your Honor.  Deborah

13   Piazza, Hodgson Russ, appearing for Stillwater Mining Company.

14           THE COURT:  All right, Ms. Piazza.

15           Mr. Lederman, are you going to argue Stillwater Mining

16   on behalf of the debtor?

17           MR. LEDERMAN:  I am, Your Honor.

18           THE COURT:  Okay.

19           MR. LEDERMAN:  Would you like to hear the debtors

20   first or the objector, Your Honor?

21           THE COURT:  I think on this one I'll hear the debtor

22   first.

23           MR. LEDERMAN:  Sure, Your Honor.  The debtors submit

24   that this contract, which we propose to reject, is an exercise

25   of the debtors' business judgment that is prototypical for 365

11

1   and exactly what Congress intended for a proper rejection to

2   maximize the benefit for the estate and the recovery for the

3   creditors.

4        What we have here is a metal supply contract for

5   rhodium and palladium that has a floor price on it that

6   requires the debtors to purchase palladium at 300 dollars per

7   ounce, 10,000 ounces per month.  It increases in 2010 to 20,000

8   ounces per month, again at 300 per ounce.

9        The current spot market on palladium, Your Honor, is

10  south of 250 dollars an ounce.  So the debtors right now, if

11  they're forced to continue to perform under this contract, will

12  be required to perform at a loss of approximately 500,000

13  dollars a month.

14       It is also important to note that following a 363

15  transaction the debtors no longer manufacture vehicles;

16  therefore, they have absolutely no use for this metal

17  whatsoever.  And what they'd have to do is be forced to go out

18  into the open market and resell this metal at a substantial

19  loss if they're forced to continue performance under the

20  contract.

21       General Motors, New General Motors, was not interested

22  in purchasing this contract because it had a floor price on it

23  and they would have also been having to perform under the

24  contract at a loss.  There were other supply contracts that

25  were assumed and assigned to New GM; they were contracts that

12

1    had metal pricing for palladium and rhodium based on spot

2    market prices.  So they're much more advantageous for New

3    General Motors.  Those are the ones that they decided to

4    continue forward with.

5         Contrary to what the objectors state in their papers,

6    it had absolutely nothing to do with the location of the

7    supplier; it had to do with the terms of the contract.  The

8    terms of those contracts were a spot market contract.  They

9    were much more advantageous.  Couple that with the fact, as

10   Your Honor is well aware, the New General Motors is going to be

11   a much more leaner, efficient manufacturer, they have a reduced

12   need for the metal supply.  So those two factors were decisive

13   in New General Motors not wanting to continue with the contract

14   of Stillwater.  Again, nothing to do with the location of the

15   manufacturers.

16        I also note that the objectors are majority owned by

17   one of the companies that they reference in their objection as

18   being one of the foreign suppliers that New General Motors is

19   continuing relationship with.

20        So those two factors, we think, under 365, one, that

21   it's an over-market contract in which the debtors would have to

22   continue to perform at a substantial loss for if Your Honor

23   forced continued performance, and second, that there's

24   absolutely no need for this metal in any case.  We think it's a

25   sound exercise of the business judgment of the debtor to seek

13

1   rejection of this contract.

2        I'd like to briefly address the objectors' points that

3   they raise in their motion:  The first I think we addressed was

4   that it's not a proper exercise of the debtors' business

5   judgment; the second is that the rejection would cause

6   disproportionate harm to Stillwater.  Again, as I stated, the

7   post-mitigation loss of the debtors having to continue this

8   contract would be, at a minimum, 500,000 dollars a month, and

9   that assumes that they can even sell this metal in the open

10  market.  If they're not able to sell this metal in the open

11  market, the loss could be three million dollars a month for the

12  debtors.  That is a substantial risk and a substantial harm

13  that would be caused to the debtors and their estates and would

14  certainly impact recovery for the unsecured creditors, whereas

15  in Stillwater's case we don't deny it's an important contract

16  for that company.  Unfortunately, that is the consequences of

17  having a contract with a company that goes through this

18  process.

19       As they stated in their papers, this contract

20  represents approximately ten percent of their revenue in 2008

21  and approximately eleven percent of their revenue year to date.

22  So while it's an important contract, it is not an

23  overwhelmingly substantial portion of their business.  Their

24  management has stated publicly that they will be able to

25  continue on just fine if this contract is rejected.

14

1        I think the other important issue that's raised in

2   their papers is the contract rejection date, when this

3   rejection will be effective.  The debtors propose the rejection

4   date should be July 9th.  We filed this motion on July 7th.

5   Stillwater received the notice of motion and the actual motion

6   papers via overnight mail on July 8th.  Also, there was

7   communications and negotiations of this contract that started

8   back in Q4 of 2008 and continued up through the debtors'

9   filing.

10       THE COURT:  Pause, please --

11       MR. LEDERMAN:  Sure.

12       THE COURT:  -- Mr. Lederman.

13       MR. LEDERMAN:  Sure.

14       THE COURT:  When I reviewed the papers, it appeared to

15   me that the principal issue was the appropriate rejection date.

16   Did Stillwater Mining ship after you told them that you were

17   about to reject, in other words, after the motion had actually

18   been filed?

19       MR. LEDERMAN:  Stillwater's counsel, I think, will be

20   able to address that, but I believe the answer is that they

21   attempted to ship on July 20th.  Certainly the motion was filed

22   well before then.  Also, the debtors reached out --

23       THE COURT:  Forgive me, Mr. Lederman.  You didn't

24   answer my question.

25       MR. LEDERMAN:  I believe Stillwater attempted to ship

15

1   on July 20th.  The debtors did not accept that shipment.

2          THE COURT:  All right, so you're not holding rhodium

3   and palladium that they had shipped after the motion was filed?

4          MR. LEDERMAN:  That's correct, not for the month of

5   July, Your Honor.

6          THE COURT:  Well --

7          MR. LEDERMAN:  There's --

8          THE COURT:  Well, at any time?  In other words, to

9   what extent, if any, do I have to figure out what is fair to

10  both sides in terms of paying them for stuff that was shipped

11  and accepted between the time the motion was filed and today?

12         MR. LEDERMAN:  There is nothing that's been accepted

13  by the debtors since the motion was filed, Your Honor.

14         THE COURT:  All right.  Continue, please.

15         MR. LEDERMAN:  So we contend since, again, the

16  proposed shipment date, as Stillwater put in their objection,

17  was July 20th, we wanted to make sure we got this motion on

18  file and got proper notice to Stillwater well before the

19  proposed ship date.  The debtors did that in two matters, Your

20  Honor.  First, it was communicated on July 1st to Stillwater

21  that the debtors were intending to reject that contract, they

22  should not ship metals for the month of July.  They explained

23  the rationale at that time that it was an over-market contract,

24  the debtors no longer need the supply because they don't

25  manufacture vehicles.

16

1          Secondly, we filed our motion and they received notice

2   well ahead of the --

3          THE COURT:  Pause, please --

4          MR. LEDERMAN:  Yes, Your Honor.

5          THE COURT:  -- Mr. Lederman.  In light of the answer

6   to the question you just gave me that there was no shipment

7   between the time that you first filed the motion and now, what

8   difference does the rejection date make?

9          MR. LEDERMAN:  Your Honor, I think Stillwater did

10  attempt to ship on July 20th.  The debtors did not accept that

11  shipment.  So that's why we wanted to make the rejection date

12  prior to this hearing.

13         THE COURT:  I see.  So your point is that if I didn't

14  make it retroactive, then arguably GM would have been obligated

15  to accept that shipment?

16         MR. LEDERMAN:  Arguably, Your Honor.  We again would

17  contend that this in no way provides any benefit to the estate.

18  So it would still be a pre-petition unsecured claim.  There

19  would not be an administrative expense that would accrue.  But

20  we wanted to prevent even having to go there and made sure to

21  provide ample advance notice to Stillwater not to ship on July

22  20th, and that's why we made the date July 9th.

23         THE COURT:  All right.  Continue, please.

24         MR. LEDERMAN:  I think those are the primary arguments

25  that the debtors would like to put forth regarding this issue.

17

1   And we think that it is, you know, a prototypical example of

2   365 for the debtors to reject this contract.  While the law and

3   365 itself is not clear on an effective rejection date, we

4   think there's ample support in the case law for Your Honor

5   making the rejection date retroactive to this hearing and to

6   the order.

7         We think that Bethlehem Steel, which we cite in our

8   papers, is a case that is directly on point here.  It was also

9   a supply contract; in that instance it was for gas.  The

10  debtors also were obligated to purchase the gas at a floor

11  price that was well above the current spot market price at that

12  time.  They were able to ascertain supply from another gas

13  supplier and they sought rejection of the gas supply a date

14  effective before the hearing.  They provided advance notice to

15  the gas supplier, just like the situation is here, and the

16  Court in that case allowed for the retroactive rejection.  We

17  would ask for the same relief.

18        THE COURT:  Okay.  Thank you.

19        MR. LEDERMAN:  Thank you, Your Honor.

20        THE COURT:  All right, do I properly assume that it

21  would be Ms. Heston?  Oh, forgive me, creditors' committee?

22        MR. NOVOD:  Yes.  Again, for the record, Your Honor,

23  Gordon Novod of the law firm of Kramer Levin Naftalis & Frankel

24  on behalf of the committee.  Rather than repeat all the

25  comments that the debtors made previously on the record, I just

18

1    want to reiterate for the Court that the creditors' committee

2    supports the debtors' judgment here and their election to

3    reject this contract.  There is no benefit for the old estate

4    that the assumption of this contract can have, as the old

5    estate is not in the business of manufacturing cars.  I'd also

6    note for Your Honor's benefit that obviously the accrual of

7    administrative expense costs with respect to the assumption of

8    this contract would diminish the wind-down budget, which

9    obviously, based on our prior record of this hearing and the

10   sale hearing which concluded on July 2nd, is of great matter

11   and significance to the creditors' committee.

12        That said, Old GM should not be in a position where it

13   has to bear the burden of this contract.  The debtors, in their

14   business judgment, have elected to reject this contract.  And

15   as you've heard from the debtors, they provided notice prior to

16   the attempted shipment date of this month.  And it's in the

17   best interest of the debtors and the unsecured creditors of Old

18   GM to reject this contract nunc pro tunc to the date on which

19   the motion was filed.

20        THE COURT:  All right.

21        MR. NOVOD:  Thank you.

22        Ms. Heston?

23        MS. HESTON:  Thank you.  For the record, Mary Jo

24   Heston appearing for Stillwater Mining Company, Your Honor.

25   One thing that I would like to say at the outset is, in

19

1    reviewing the papers that have been presented by this debtor,

2    there's not a single shred of evidence presented by this debtor

3    to support this decision.  There's not a single declaration --

4         THE COURT:  Do you mean as of the time the motion was

5    originally filed or even now after --

6         MS. HESTON:  Even now --

7         THE COURT:  -- their reply has been filed?

8         MS. HESTON:  -- there's not a single declaration.

9    There's not a single -- it's all ex cathedra statements by

10   counsel --

11        THE COURT:  Yes, but remember, we have a case

12   management order in this case that says that allegations and

13   motion papers are taken as true unless disputed.

14        MS. HESTON:  Well --

15        THE COURT:  Now, to what extent do you factually

16   dispute their contentions that this is a requirements contract,

17   that it has a floor of 300 bucks per ounce, that the contract

18   obligates payments -- excuse me, taking 10,000 ounces -- I'm

19   not sure if that's per month or per year -- in 2009, 20,000 in

20   2010, and the allegation that the business happened to wind up

21   with your affiliate rather than you?  Are those facts -- if I

22   gave you an evidentiary hearing on that, would you be able to

23   contest any of those facts?

24        MS. HESTON:  I would be able to contest several of

25   those facts, Your Honor.

20

1          THE COURT:  Be more specific.

2          MS. HESTON:  Okay.  First of all, all of the

3     statements concerning negotiations on this contract, all of the

4     negotiations on this contract, and there's in the record, in

5     the form of the contract that they put into the record, which

6     by the way had a confidentiality clause in it, there was

7     modifications of the contract, and all discussions related to

8     our contract prior to July 4th when we were first informed of

9     the decision to not assume and assign this contract, reduced --

10    were related to reduction of the quantity.  And there was never

11    a single discussion concerning the floor price.

12         So there are --

13         THE COURT:  Forgive me.  You're talking about

14    discussions to modify the existing contract.  To what extent,

15    Ms. Heston, do I have factual disputes concerning what the

16    contract provides?

17         MS. HESTON:  You have factual disputes concerning the

18    amount that is currently under the amendment for the contract;

19    it's 7,500.  And the parties had been in negotiations in terms

20    of a third amendment.  You have disputes in terms of what the

21    decision was and what the context of the decision was, because

22    in every contract on a commodity the parties seek to hedge.

23    And so the question in this case is why did they assume and

24    assign the other two contracts and not assume and assign our

25    particular contract?

21

1        THE COURT:  Forgive me.  That's a matter of confession

2   and avoidance.  And I will take your legal argument on those

3   matters after I ascertain the extent to which I need to give

4   you an evidentiary hearing on disputed facts --

5        MS. HESTON:  Okay.

6        THE COURT:  -- or whether on undisputed facts the

7   debtor has already established its entitlement to rely upon the

8   business judgment rule.

9        MS. HESTON:  There is --

10       THE COURT:  Is there a difference -- forgive me,

11  Ms. Heston.  Since you're having some delays, if not

12  difficulty, in answering my specific questions, I need to do

13  this just like it's a cross-examination.

14       MS. HESTON:  Sure.

15       THE COURT:  Do you disagree that the floor on this

16  contract is 300 dollars per ounce?

17       MS. HESTON:  No.

18       THE COURT:  All right.  Do you dispute the fact that

19  GM no longer makes vehicles?

20       MS. HESTON:  No.

21       THE COURT:  Do you dispute the fact that the price on

22  this is fixed as a floor as compared and contrasted to spot

23  pricing?

24       MS. HESTON:  No.

25       THE COURT:  Do you dispute the fact that one of the

22

1    two other companies that got the business for the palladium and

2    the rhodium is a corporate affiliate of yours?

3         MS. HESTON:  They are a majority owner but they are --

4    they have nothing to do with our management.  They are

5    precluded from all management decisions.  The fact that they

6    got that contract, we derive no benefit from that, Your Honor.

7    So the -- and the fact that it was -- that they happen to own

8    stock, it's a publicly traded company, Your Honor.  And they

9    have absolutely nothing to do with our mining operations which

10   are wholly U.S.-owned and U.S.-run with U.S. employees.

11        THE COURT:  If I gave you an evidentiary hearing, what

12   would you tell me about the contract that is being rejected

13   being different than what the debtor and the creditors'

14   committee say it provides?

15        MS. HESTON:  I would tell you that, first of all, this

16   concept that's set forth in the reply that there are going to

17   be all of these losses is insulting to the intelligence of

18   anybody that has an even basic rudimentary understanding of

19   commodity pricing.  Everyone -- we have a floor in our

20   contract, but if you look there is also a ceiling.  And so, for

21   example, in 2008 the pricing was extremely favorable under this

22   contract for the first nine months of 2008.  And as set forth

23   in our papers, the pricing on these metals is extremely

24   volatile.

25        So, you know, and we don't know what the other

23

1    contracts were, but everyone attempts to hedge, and in the

2    commodities market that that hedging sometimes works for you

3    and sometimes works against you.  So this whole concept that

4    we're going to project out, based on today's palladium price,

5    what the losses are, is ridiculous.

6         And I really -- I guess I apologize, but I am

7    offended.  We all throw around these concepts of business

8    judgment or adequate protection or all the words that we have

9    used in all of our careers, but those decisions have to be made

10   in -- I think in a business context.  And there's nothing in

11   this record in terms of -- and if you look -- I mean, I read

12   every word of your decision, Your Honor.  And, you know, if you

13   look at the context of this business judgment rule, I think you

14   have to look at it in the context of preserving U.S. jobs.

15        And the concept that Old GM and New GM, as set forth

16   in our papers and in the purchase and sale agreement -- this is

17   clearly a joint decision by these parties to assume and assign

18   these contracts.

19        THE COURT:  Well, I think that's a permissible

20   inference for me to draw, but wouldn't it be an equally

21   permissible inference for me to draw that, if Stillwater Mining

22   and its Russian sixty-one percent majority stockholder cared so

23   much about saving U.S. jobs, it would not have been impossible

24   for the sixty-one percent stockholder to say listen, for the

25   same price we'll fill the New GM needs with palladium and

24

1    rhodium extracted in the U.S. instead of bringing it in from

2    Russia?

3         MS. HESTON:  Your Honor, as indicated, the Russian

4    majority owner is not involved in any way in our management.

5    They do not -- the parties --

6         THE COURT:  Do you think your management could have

7    picked up the phone --

8         MS. HESTON:  No.

9         THE COURT:  -- and talked to the Russian parent if

10   they're not obligated to listen to orders from the Russian

11   parent?

12        MS. HESTON:  No.  They don't discuss and there's

13   nobody on our board from them.  They're precluded from being on

14   our board because of the Russian ownership.  And, candidly,

15   there was a discussion after the decision was made and they're

16   laughing at us all.  I mean, the thought that, you know -- do

17   you think for one second a Russian company -- if this was a

18   Russian-backed company that they would, you know, have assumed

19   the U.S. contract over the Russian contract, I mean, it's

20   absurd.

21        So the whole concept of --

22        THE COURT:  Did your company offer to give New GM

23   spot -- the same economic deal that the Russian company did?

24        MS. HESTON:  They never asked.  I talked to my

25   client -- first of all, you have to understand, Your Honor,

25

1    what was in the initial pleading was not what was in the reply,

2    which was received at 6 o'clock last night and I barely had a

3    chance to talk to my client.  But I talked to them about

4    several factual inaccuracies, including the ones that we have

5    discussed.  One of them is that this concept that there was all

6    of these discussions, Your Honor, is simply false.  What was

7    discussed was a reduction of the amount of palladium provided

8    to this debtor.  They never discussed with our client,

9    according to the parties that I talked to and my client last

10   night, they never discussed a floor price.  They never said --

11   and, in fact, as set forth in our declarations, when we

12   received the call for the first time on July 4th and talked to

13   this David -- I forget his last name, I apologize, it's in the

14   declaration -- but talked to the party that we had been dealing

15   with at GM, he was just obviously flabbergasted himself by the

16   decision.  He basically said I'm really sorry, the lawyers have

17   made this decision, it's not based on price.  That's what he

18   told our client.  And I recognize that's hearsay but that's

19   what we were told.

20        My client has told me that they were never asked --

21   they were never told that the flooring price was the problem

22   here.  And we have shown good faith in renegotiating this

23   contract, not once, not twice but there was a third amendment

24   to the contract that had been orally agreed to.  And, again, it

25   was not based on flooring price; it was based on the amount of

1    palladium to be provided to this debtor for the rest of the

2    year.  So until July 4th we were told that our contract was

3    going to be assumed and assigned as part of this process.

4         And I guess one last thing -- and so I guess I think

5    there is -- I think that, based on this record, there are

6    several factual disputes and that an evidentiary hearing should

7    be held with limited discovery rights.

8         THE COURT:  All right.  Thank you.

9         Reply?

10        Mr. Lederman.

11        MR. LEDERMAN:  Thank you, Your Honor.  At the outset,

12   the debtors would like to note that we had talked to

13   Stillwater's counsel and we had agreed that this would not be

14   an evidentiary hearing.  We explained and we thought the

15   uncontested facts were clear and if Your Honor wished for an

16   evidentiary hearing we could set that for a later date but that

17   we didn't think that that would be necessary.

18        THE COURT:  No, don't focus on what you said to them;

19   focus on what they said back to you.  They agreed that it was

20   not going to be an evidentiary hearing?

21        MR. LEDERMAN:  That's correct, Your Honor.

22        THE COURT:  And that today would not be an evidentiary

23   hearing or that there would not be an evidentiary hearing at

24   any point?

25        MR. LEDERMAN:  No, that today would not be an

27

1    evidentiary hearing.

2         THE COURT:  Yeah, but you're not focusing on the

3    distinction I'm making.  The question I'm asking is whether the

4    agreement you had with Stillwater Mining's counsel was that

5    merely that today would not be an evidentiary hearing or that

6    the entire controversy could be resolved without an evidentiary

7    hearing.

8         MR. LEDERMAN:  No, just merely that today would not be

9    an evidentiary hearing.

10        THE COURT:  You understand why that's not responsive,

11   then, to what I need to ascertain?

12        MR. LEDERMAN:  I understand, Your Honor.  I just

13   wanted to point that at the outset and I'll go into the

14   substantive arguments now.

15        As Your Honor's well aware, we think under 365 that

16   contract rejection is intended to be a summary hearing to

17   determine whether or not the debtors have made a sound business

18   judgment in seeking to reject the contract.

19        The undisputed facts here, as Your Honor elicited from

20   Stillwater's counsel, are clear.  There is a supply contract

21   for which the debtors have absolutely no use for the supply.

22   They no longer manufacture vehicles; therefore, at any price

23   they wouldn't need it.  However, more importantly, the contract

24   terms are clear.  It has a floor price of 300 dollars per

25   ounce, 10,000 ounces per month, which escalates to 20,000

28

1    ounces per month.  The debtors would be forced to go to those

2    markets --

3              THE COURT:  Pause please, Mr. Lederman.

4              MR. LEDERMAN:  Yes, Your Honor.

5              THE COURT:  Do you agree or disagree with Ms. Heston

6    when she says that you're wrong when you say it's 10,000, it

7    should only be 7,500?

8              MR. LEDERMAN:  We disagree, but even if it was 7,500

9    we don't think the outcome is any different.  So even if we

10   concede that it's 7,500, it's still 7,500 ounces at floor price

11   of 300 for metal that can't be used by the debtors and a spot

12   price that is 50 dollars above what the current market price

13   is.  So the post-mitigation loss of the debtors would still be

14   substantial, even at 7,500.  So even if we concede that, which

15   we don't think is correct, but we're fine to concede that we

16   don't think the outcome changes.

17             I also want to bring up the point that, again, the

18   debtors are cognizant and aware that this is an important

19   contract for Stillwater and that it could have an impact on

20   their business and indeed maybe even the local economy.  But we

21   think that Judge Gonzalez in Chrysler and the Pilgrims case

22   makes it pretty clear that that is not a determinative factor

23   that this Court should weigh in considering whether or not it's

24   a proper exercise of the debtors' business judgment to reject

25   the contract; it is the harm that it will cause the estate, the

29

1    harm that it will cause its creditors.

2        And we think here the undisputed facts are clear that

3    if the debtors are forced to continue to perform they would be

4    at a substantial loss; it would be a substantial drain on the

5    estate.  We think those are undisputed facts.

6        We think that having an evidentiary hearing would be a

7    cost that is unnecessary for the debtors.  It would be time-

8    consuming and expensive and a further drain on the estate.  And

9    we don't think, at all, it changes the outcome.  We think the

10   undisputed facts substantiate clearly that the debtors are

11   exercising their sound business judgment in seeking rejection

12   of this contract.

13       THE COURT:  Okay.

14       MR. LEDERMAN:  And we think, in fact, it would be a

15   breach of our fiduciary duties if we didn't seek to reject it.

16       THE COURT:  All right.

17       Mr. Novod, anything further?

18       MR. NOVOD:  Your Honor, Gordon Novod again, for the

19   record.  I just wanted to echo our support for the debtors

20   again.  This is not a contract which the debtors are going to

21   be using in their business.   No administrative expenses should

22   accrue in connection with this contract and we believe that the

23   contract should be rejected as the debtors have requested in

24   their papers.

25       THE COURT:  All right.

30

1          MR. NOVOD:   Thank you.

2          THE COURT:   Thank you.  All right.  We'll take a

3    recess.  I want everybody back by 10:30.

4          (Recess from 10:17 a.m. until 11:30 a.m.)

5          THE COURT:   I apologize for keeping you all waiting.

6    In this contested matter in the Chapter 11 cases of General

7    Motors Corporation, now known as Motors Liquidation Corporation

8    and its affiliates, the debtors move to reject a contract for

9    the purchase of rhodium and palladium with Stillwater Mining,

10   described more fully below.

11         After appropriate consideration, I've determined that

12   there are no material disputed issues of fact and that the

13   motion can and should be decided on the present record without

14   the need for a supplemental evidentiary hearing.  The motion is

15   granted.

16         The following are my findings of fact, conclusions of

17   law and bases for the exercise of my discretion in this regard.

18   As facts, I find that GM, referred to for clarity by many as

19   Old GM and now known as Motors Liquidation Corporation, entered

20   into a requirements contract dated August 8, 2007 with

21   Stillwater Mining for the purchase of palladium and rhodium

22   used in the manufacture of the catalytic converters that are in

23   modern motor vehicles.  The contract was twice amended on

24   December 9, 2008 and on March 5, 2009, respectively.  See Stark

25   (ph.) Declaration, paragraph 4.

31

1          Under the contract, Old GM was required to accept a

2     fixed amount of palladium at a floor price of 300 dollars per

3     ounce.  Old GM was obligated to buy 10,000 ounces per month of

4     palladium in 2009 and 20,000 ounces per month in 2010.  See old

5     contract section 4(a).  With that price and quantity, the

6     palladium would cost Old GM three million per month in 2009 and

7     six million per month in 2010.

8          Also, under the original contract Old GM was

9     originally obligated to accept 500 ounces of rhodium each month

10    starting in January 2008 and ending in December 2012.  See

11    contract section 4(b).  Though the quantities were later

12    changed in the first and second amendments to provide that for

13    the first quarter of calendar 2009, the rhodium quantity would

14    be reduced from 500 to 300 ounces per month and then to 200

15    ounces in April, zero ounces in May and June.  And under the

16    first and then second amendments, various mechanisms were

17    created for a kind of negotiation process to deal with rhodium

18    needs for periods thereafter.

19          There was some oral argument with respect to different

20    numbers.  My findings of fact are based on the numbers as I

21    read them from the underlying contractual documents, although I

22    will find, in the event of any appeal, that the differences

23    would not be material under any circumstances.

24          Palladium is a commodity, and the spot price for

25    palladium rises and falls with market conditions.  At-present

32

market conditions, the 300 dollars per ounce that GM would have

to pay for the palladium, assuming that Old GM wanted it or

needed it, would be substantially above market.  As of July 10,

the date of the closing of Old GM's recent Section 363

transaction, the spot price was approximately 235 dollars per

ounce.  The average daily price for palladium during 2009 has

been 197 dollars per ounce.  See Stillwater Mining's 10-K.

While I well understand that people enter into

contract at fixed prices to address the fact that commodity

prices go up and down, the undisputed fact is that the contract

price is substantially in excess of the sport market price.

Also, of course, though this is a hugely important point and

perhaps needed to be addressed first, Old GM no longer makes

cars and trucks; it does not need the palladium or the rhodium.

And under the contract, Old GM -- remember that's Motors

Liquidation Company -- is forced to expend three million

dollars per month for the remainder of 2009, and six million

dollars per month beginning in 2010 for palladium that it does

not need or use.  I further note, assuming arguendo that it

were relevant, that even New GM would not require increased

palladium now that what is surviving is downsized, even at the

fair market price, much less than the higher-than-market price

under this contract.

It's a fair inference to draw that Old GM and New GM

conferred when New GM decided which contracts New GM wished to

33

1    assume and that this contract wasn't one of them.  But

2    ultimately the decision as to whether to take an assumption of

3    this agreement, and thus to take the agreement itself, was New

4    GM's, not the decision of Motors Liquidation Company.  And when

5    this contract wasn't assumed by New GM, Motors Liquidation

6    Company, at the risk of stating the obvious, didn't need the

7    palladium itself.

8          There is no cure due on the contract.  See Stark

9    declaration, paragraph 8.  However, it appears that Stillwater

10   Mining attempted to deliver product on or about July 20 and its

11   delivery was refused.  Thus, I do not need to deal with what

12   would have happened if GM was holding palladium that had been

13   delivered under the contract in the period in between the time

14   of its motion to reject and the time of this hearing.

15         Though these facts ultimately are not relevant, I

16   find, for the sake of completeness, that Stillwater is a U.S.

17   manufacturer employing U.S. workers, that two other entities

18   will be supplying the product that Stillwater provided to New

19   GM, one of which is a Russian entity that is the sixty-one

20   percent majority stockholder of Stillwater Mining.

21         Given Motors Liquidation Company's right to relief

22   under these undisputed facts, I don't need to find additional

23   facts such as what may have been discussed between the parties

24   vis-a-vis a consensual resolution that might have obviated the

25   motion to reject or reasons anyone at Old GM might have given

34

1    for its decision to reject.

2         Now turning to my conclusions of law and bases for the

3    exercise of my discretion on this motion, I find, as

4    conclusions of law or mixed questions of fact and law, that

5    courts generally will not second-guess a debtor's business

6    judgment concerning the rejection of an executory contract.

7    See, for example, In re Riodizio 204 B.R. 417, 424 (Bankr.

8    S.D.N.Y. 1997) and In re Farmore 204 B.R. 948, 951-952 (Bankr.

9    N.D. Ohio, 1997) and that the reasons underlying the debtor's

10   business judgment here are both apparent and obvious in fact.

11        The purpose beyond allowing debtors to reject

12   executory contracts is to allow them to abandon burdensome

13   property.  See, for example, In re Orion Pictures, 4 F.3d 1095,

14   1098, a decision of the Second Circuit, and In re Old Car Co

15   LLC, that being the liquidation name for the former Chrysler

16   Corporation, 2009 B.R. LEXIS 1382, p. 5.  Here, Motors

17   Liquidation's business purpose is easy to understand, as

18   counsel for the creditors' committee, supporting the debtors'

19   motion, made clear:  Motors Liquidation no longer makes cars

20   and trucks; it doesn't need any product.

21        Moreover, the contract requires a purchase of

22   palladium and rhodium in minimum quantities that aren't needed.

23   And the price for the palladium is way over the spot price;

24   it's way over market.  Even if Motors Liquidation needed the

25   palladium and the rhodium, which it obviously doesn't, it's a

35

1    classic example of a contract that's burdensome to the estate.

2         Stillwater Mining notes that this contract provides

3    that it was about eleven to twelve percent of its revenue.  And

4    I assume that losing this business is indeed a hardship to

5    Stillwater Mining.  I understand that and I sympathize with it.

6    But this is, sadly, one of the many decisions that I've been

7    forced to make in this case and in others, and that I may well

8    have to make in the future in this case and in others, where I

9    have to deal with the unfortunate consequences of corporate

10   financial distress.  So that others do not suffer even more,

11   the Bankruptcy Code provides means for debtors to shed

12   burdensome obligations, of which this is a classic example.

13        For purposes of this motion, I must consider the

14   reasons underlying the debtors' business judgment.  And even if

15   I were to apply the more rigorous test of what's in the best

16   interests of the estate, I'd have to reach the same conclusion

17   as comments made by creditors' committee's counsel strongly

18   suggest.  Likewise, there's, unfortunately or fortunately but

19   simply as a matter of reality, no basis in the law, nor has

20   been any cited to me, for considering hardship to the

21   counterparty on a motion of this character where, for example,

22   Congress hasn't directed us to consider competing

23   considerations, as we're required to consider for collective

24   bargaining agreements, as noted by Judge Lynn in Pilgrim's

25   Pride Corp., 403 B.R. 413, 425 (Bankr. N.D. Texas, 2009), just

36

1    a short time ago:  While the impact of rejection on the

2    counterparty's community may be significant, that is not an

3    uncommon result of the cutbacks that typically accompany a

4    restructuring in Chapter 11.  Judge Lynn went on to say, in

5    Pilgrim's Pride, whether through contract rejections or plant

6    closings, contraction of a debtor's business will often have a

7    harmful effect for one or more local economies.

8         If the Bankruptcy Court must second-guess every choice

9    by a trustee or debtor-in-possession that may economically harm

10   any given locale, the business judgment rule applicable to

11   contract rejection and many other decisions in the Chapter 11

12   process will be swallowed by a public policy exception.

13        Also, of course, I note that Stillwater Mining will

14   still have the ability to file a proof of claim and presumably

15   to recover on a claim for its resulting rejection damages, a

16   claim for the loss of the profit it would have made under this

17   contract.

18        Turning then to the matter of the appropriate

19   rejection date, I start with the fact, as I and other courts

20   have held previously, that a bankruptcy court may make its

21   rejection order retroactive under appropriate circumstances,

22   or, putting it in the terms that we more commonly put it, to

23   make its determination nunc pro tunc to the time of the filing

24   of the motion.

25        I did so for a much longer period in the Adelphia

37

1    Business Solutions case, and my decision to make it retroactive

2    there for a period of several years was ultimately affirmed by

3    the circuit in Adelphia Business Solutions, Inc. v. Abnos, 482

4    F.3d 602.  There the circuit assumed, without deciding, that

5    the power exists, when it noted the decisions of many other

6    courts that had recognized this power.  See Pacific Shores

7    Development LLC vs. At Home Corp., In re At Home Corp.,

8    392 F.3d 1064, 1071, (9th Cir. 2004); Thinking Machines Corp.

9    vs. Mellon Financial Services Corp, In re Thinking Machines

10   Corp., 67 F.3d 1021, 1028 (1st Cir. 1995); and Constant Limited

11   Partnership vs. Jamesway Corp., In Re Jamesway Corp.,

12   179 B.R. 33, 39 (S.D.N.Y. 1995).

13        Here the duration of the requested nunc pro tunc

14   period is very modest, going back only about two weeks to the

15   filing of the motion after Old GM had long before given notice

16   of its intention to reject and where Old GM declined delivery

17   of the product and thus was not unjustly enriched by its

18   contract counterparty providing it with something for which

19   appropriate payment hadn't been made.

20        In fact, if I had permitted Stillwater Mining to force

21   Motors Liquidation Corp. to accept delivery of product that

22   Motors Liquidation Corp. didn't want or need, that would have

23   been an even more unjust result, especially if Motors

24   Liquidation had then had to dispose of that unneeded product at

25   a loss.  Making the effective date of the rejection nunc pro

38

1    tunc to the date of the filing of the motion under these facts

2    is the just thing to do.

3         Accordingly, the debtors are to settle an order in

4    accordance with this ruling stating no more than that for the

5    reasons set forth on the record.  The motion is granted.  The

6    time to appeal from this decision will run from the time of the

7    entry of the ultimate order and not from the date of this

8    dictated oral decision.

9         We have no further business.  We're adjourned for

10   today.  Thank you.

11        (Proceedings concluded at 11:47 AM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

39

1                          I N D E X

2

3                        R U L I N G S

4    DESCRIPTION                            PAGE      LINE

5    Debtors' motion to reject lease or        7         24

6    executory contract granted

7    Debtors' motion to reject unexpired leases  7       24

8    of nonresidential real property granted

9    Debtors' amended second omnibus motion to   8       15

10   reject certain executory contracts granted

11   Debtors' third omnibus motion to reject     9       25

12   certain executory contracts as to

13   non-objecting parties granted

14   Debtors' third omnibus motion to reject    30       15

15   certain executory contracts as to

16   Stillwater Mining Company granted nunc pro

17   tunc to date of the filing of the motion

18

19

20

21

22

23

24

25

40

1

2                        C E R T I F I C A T I O N

3

4      I, Clara Rubin, certify that the foregoing transcript is a true

5      and accurate record of the proceedings.

6

7      _____

8      Clara Rubin

9      AAERT Certified Transcriber (CET**D-491)

10

11     Veritext LLC

12     200 Old Country Road

13     Suite 580

14     Mineola, NY 11501

15

16     Date:  July 23, 2009

17

18

19

20

21

22

23

24

25

## **Exhibit B**

**Testimony delivered to**

**United States House of Representatives**
**Subcommittee for Oversight and Investigations,**
**Committee on Energy and Commerce,**
**June 12, 2009**

**by**

**Frederick A. Henderson**
**President and Chief Executive Officer**
**General Motors Corporation**

Good morning and thank you, Chairman Stupak and Ranking Member Walden.

I'm Fritz Henderson, President and CEO of General Motors.  Thank you for the opportunity to discuss an important part of GM's viability plan, our dealer network restructuring.  Simply put, a strong dealer body is vital to GM's success.  Indeed, for many customers, our dealers are the "face of GM" – so this effort is critically important to the successful reinvention of General Motors.

Our dealer restructuring is also an effort that is quite painful – for us, for our customers, and especially for our dealers.  Many of our dealers operate businesses that have been in their families for generations.  Our actions affect them personally as well as financially.  They also affect the communities and states where our dealers live and work.

That is why we are conducting our GM dealer restructuring very objectively and carefully and in consultation with several of our dealers.  We decided not to terminate any dealers, and instead developed a unique wind-down process that we believe is considerably more equitable for our dealers.  I will share details about our process later in my testimony.

GM's current dealer network was largely established in the late 1940s and '50s, before the U.S. Interstate Highway system was built.  America at that time was a much more rural country, and GM, Ford and Chrysler dominated the U.S. car market.  But times have changed.

Today, I'm here to discuss:
- why GM needs to have fewer, more profitable dealers selling at higher volumes;
- the costs associated with having under-performing dealers; and
- the objective process we are using to make the changes we need to make.

\* \* \* \* \* \* \*

For decades, GM and our dealers have enjoyed periods of prosperity, just as we have weathered the inevitable troughs that are part of the cyclical auto business.  Over the last 20 years, we have seen particularly dramatic changes and pressures that have come from international trade, volatile energy markets and increased competition in the U.S. market.  Today, more people live in the suburbs of major metropolitan areas, versus rural areas or small towns.

1

Foreign manufacturers who entered the U.S. market in earnest beginning in the '70s had the advantage of establishing dealer networks in response to these trends and in line with modern demographics.

But the most recent global financial crisis – which has yet to stabilize – has made it clear that we no longer have the luxury of restructuring our business through the evolutionary approach we have used in recent years. It was an approach that was changing GM while minimizing the disruption that such change brings to everyone involved.

Although it's been tough to hear at times, the direction we received from Congress, the current and previous Administrations, the Automotive Task Force, and countless industry analysts and pundits, was clear and to the point: to remain viable, GM needed to enact a dramatic restructuring, with speed, across all parts of our business. We were asked to deliver a plan to make that happen by June 1.

President Obama acknowledged what we all understood from the start – such a plan would require shared sacrifice from GM and all of our stakeholders. What has become clear as we have executed our plan is that GM, our employees, and our dealers do matter to America. We are collectively woven throughout the economic fabric of our country.

And this has been the most difficult part of executing our plan: the human story of the people who are affected by the painful but necessary actions we are taking to ensure our viability. Members of Congress, the Automotive Task Force and other Administration officials have seen this for themselves during their visits to our facilities and plant communities in recent months.

Reinventing GM – real change – does require shared sacrifice. Thousands of hourly and salaried employees are losing their jobs, and those who remain have had their pay and benefits cut. Plant closures impact families and the communities where they live.

These are tough times for everyone in the GM family. And, as a part of the GM family, our dealers are also being asked to bear some of the sacrifice in order to build a stronger, more viable GM.

The reality of our situation is this: all parts of GM, including the dealer network, must become smaller and more efficient to reinvent GM as a company that is not only viable, but capable of surviving cyclical downturns. GM's viability plan calls for fewer, stronger brands, as well as fewer, stronger dealers.

For years, we have heard that GM must adapt to today's global competition and market conditions or it will not survive. We agree.

In the case of our dealer network, because of our long operating history and existing dealer locations, many dealerships now operate in outdated facilities that are no longer located where they can best serve our customers.

Much of the growth in GM's dealership network occurred in the 1950s and '60s, when we held a dominant share of the U.S. auto market. Since that time, strong new competitors have entered the U.S. market and GM's market share has shrunk, leaving

2

us with too many dealerships.  For example, GM today has roughly 6,000 dealerships in the U.S., compared to 1,240 for Toyota and 3,358 for Ford.

In addition to the intense pressure from competitors, GM dealers also compete against each other.  Over the years, many GM dealers could not earn enough profit to renovate their facilities and retain top-tier sales and service staffs.

Thin profit margins and state franchise laws also prevented many dealers from relocating as U.S. demographics shifted from urban to suburban settings.  The dealers that remain compete with each other for a shrinking share of GM sales.  Current market conditions only make this situation worse.

Dealer attrition in 2009 through a bankruptcy or other financial distress is averaging 80 GM dealers per month.  This rate would imply attrition of 1,280 dealerships through October 2010, or approximately the same number of dealers that have been offered wind-down agreements.

Our current plan calls for GM to have between 3,800 and 3,500 U.S. dealers by the end of 2010, depending on attrition levels, with a retail market share of 17.3 percent in a retail sales market of 10.15 million units per year.  This means the number of units sold per dealer would nearly double.

This overall number of dealers is based on the previously announced potential sale of the Saturn, Hummer and Saab brands, or their phase-out if they can't be sold; dealer attrition over the next 18 months, which – in these difficult times – is running at record levels; and the wind-down over time of the approximately 1,200 dealers we notified on May 15th, plus an additional 200 dealers who also received wind-down agreements last week.  And I hasten to point out that, even with these cutbacks, GM will still have the biggest, most extensive dealer network in the country – more than any of our competitors, including Toyota, Honda, Nissan, Ford or Chrysler.

On March 30, 2009, the U.S. Department of the Treasury noted the challenges posed by GM's current dealer network:

"GM has been successfully pruning unprofitable or underperforming dealers for several years.  However, its current pace will leave it with too many such dealers for a long period of time while requiring significant closure costs that its competitors will not incur.  These underperforming dealers create a drag on the overall brand equity of GM and hurt the prospects of the many stronger dealers who could help GM drive incremental sales."

Everyone agrees – even the dealers themselves – that a restructuring of GM's dealer network must take place.

Obviously, General Motors is presently in bankruptcy and this is a time when resources are extraordinarily limited.  Our company takes very seriously our responsibility to the taxpayers.  A focused dealer network will reduce costs for GM in a very meaningful way at a time when every dollar is precious.  These cost savings come in two categories.

First of all, a right-sized dealer network centered around strong dealers will allow us to drastically reduce, and in some case eliminate, many direct dealer support programs –

3

programs such as the incentives paid to the dealer, factory wholesale floorplan support, and the one percent market support for each vehicle.  The reductions in direct dealer support will result in annual savings of over $2 billion annually – or about $928,000 per closed dealer.

Second, the dealer network reductions will also save an estimated $415 million per year in structural cost savings – items like local advertising assistance, service and training, and information technology systems.  These savings amount to about $180,000-per-closed dealer.  In total, the dealer restructuring should result in approximate savings of over $2.5 billion per year, or over $1.1 million per closed dealer on an annual basis.

But cost savings are not the only reason restructuring the dealer network is so important.  GM's success over the long haul – which U.S. taxpayers are invested in – will depend in no small part on a healthy, strong and profitable dealer network that can provide the industry's best customer service and enhance the image of our four remaining brands: Chevrolet, Cadillac, Buick and GMC.  Dealers who underperform simply cannot provide these benefits to our customers.  GM's remaining dealerships will be better positioned to keep their current GM customers, while aggressively marketing to take sales from competitors.

* * * * * * *

I'd like to talk for a moment about the objective process we are using to consolidate GM's dealer network.  We strongly believe that <u>how</u> we are doing this is as critical to our success as <u>what</u> we are doing, and GM's dealer consolidation process is unique.

Prior to taking any action, we conducted a thorough analysis of every GM dealer in every market throughout the U.S. to assess individual market requirements and dealer performance.

Some of the key dealer performance factors that we looked at included:
- Customer satisfaction index
- Sales performance and volume
- Working capital
- Profitability
- Dualing patterns
- Dealership location
- And current state of each facility

We also carefully considered our dealer network coverage in rural areas and small towns versus urban/suburban markets.  We know that our strong presence in rural areas, small towns and "hub" towns gives us a strong competitive advantage on average of more than 10 points in market share, and we would like to maintain that advantage.  When our rural and small town dealers perform to our standards, they are a huge asset, and so we intend to retain an extensive rural network of 1,505 dealers nationally.

We also took great pains to ensure that minority dealers were considered equitably and proportionally in our process.  In fact, the percentage of minority dealers overall may actually increase slightly after the consolidation takes place.

4

Following our analysis, we identified those dealers that we cannot retain in the GM dealer network long-term.  It is important to note, as I stated earlier, that we have not terminated any GM dealers.  Instead, we have sent wind-down agreements to those dealers we cannot retain.  When executed, these agreements allow dealers to stay in business until October 2010 – the expiration date of their current dealer agreement – so they can sell down their vehicle inventories and provide warranty service to customers.  This allows dealers to wind down their businesses in an orderly fashion – for the benefit of GM, our dealers and our customers.

Subject to bankruptcy court approval, we also offer some financial assistance to dealers as part of the wind-down agreements to help them close their stores in an orderly fashion.  And we notified dealers about our planning as soon as possible – on May 15, in most cases.  While this process is far from painless, we think it is far preferable to an abrupt termination.

Identifying dealerships that we cannot retain has been a very difficult step, but one we had to take for GM's long-term viability.

By reducing the number of GM dealers, our remaining dealers will see increased sales throughput at more competitive levels.  This will provide a greater return on their investment, especially in metropolitan markets.  They will be able to retain top sales and service talent, invest in their facilities and focus more resources on selling vehicles to people who don't currently own a GM car or truck.  Most importantly, they will be able to improve the overall customer experience and retain current customers.

By winding down under-performing dealers, we will eliminate the negative impact they have on our brand image and increase the opportunity for sales and service by our high-performing dealers.  As a result of this effort, we will achieve substantial cost reductions.  And moving forward, these actions will enable us to focus our limited resources on strong performers and core brands, enhancing our long-term viability, spurring a return to profitability and enabling us to repay our debt to the taxpayer more quickly.

While we are operating with the highest level of urgency in these matters, we believe it is equally important that we get this process right in light of the personal and financial stakes at hand.  We recognize we won't get every call right.  That's why we are listening and working with our dealers and the National Automobile Dealers Association to give us all a better understanding of their concerns.

As a result of these consultations, we sent our dealers a letter this week clarifying various subjects in the participation agreement for remaining dealers, most notably dualing with competitive makes and performance standards.

We also have in a place an appeals process.  We have considered **856** appeal requests and are reviewing hundreds of appeal cases.  We will continue to evaluate all GM dealers against a common set of performance standards to ensure that our selection process is fair and robust.

As of today's deadline, we are encouraged by the progress we are making and the overall dealer response has been very strong.  91 percent of GM dealers have signed or verbally agreed to the participation agreements, while almost 67 percent have done so with the wind-down agreements.

5

Successful dealers are critical to the future of General Motors.  Strengthening our dealer network will make that future possible and preserve over 200,000 jobs at GM's remaining dealers, along with hundreds of thousands of jobs with GM's direct manufacturing and supplier network.

*  *  *  *  *  *  *

Before concluding, I would like to commend the House of Representatives for its swift passage earlier this week of the Consumer Assistance to Recycle and Save (CARS) Act.  This fleet modernization or "scrappage" legislation provides incentives for customers to trade in older, less fuel-efficient vehicles for vouchers to purchase newer, cleaner more fuel-efficient vehicles.  Similar programs have been very successful in stimulating vehicle sales in other countries, and we urge the full Congress to quickly enact legislation for such a program in the U.S.

*  *  *  *  *  *  *

In conclusion, we at GM are grateful for the support of Congress and the Administration as we undertake this painful, yet essential reinvention of our company.

As we are experiencing first-hand, it's much easier to talk about the need to change than to make it happen.

The wholesale reinvention of GM requires sacrifice, and will not been easy.  But we will not soften our determination to see this process through.  We hope your support remains just as strong.

We understand our responsibility to American taxpayers, and we take it very seriously.  We want GM not only to survive, but thrive.  And we want our employees, communities and our dealers to thrive with us.  This – and of course great cars and trucks – is the way to pay back our nation's support.

The end result will be a leaner, stronger "New GM" positioned for a profitable, self-sustaining and competitive future – one that will not only benefit employees and dealers, but contribute to America's economic well being.

Thank you.  I look forward to your questions.