EXHIBIT A

I'm ruling that determining whether or not the Tools Contract is executory

requires an evidentiary hearing, but that no evidentiary hearing is required to rule on

whether the Production Contract and the Service Contract are a single integrated contract.

And I'm ruling, with respect to the latter matter, that the two contracts are two

contracts--not a single integrated contract—and that if Motors Liquidation wants to reject

the Production Contract without also rejecting the Service Contract, Motors Liquidation

may do so.  The following are my Findings of Fact, Conclusions of Law, and bases for

the exercise of my discretion in connection with this determination.

<u>Tools Contract</u>

On the Tools Contract, I came very close to interrupting each of you to say

"you're testifying."  Each of you lawyers was making representations to me as to your

view of the facts, about your knowledge of the industry, your belief as to the purposes of

the various provisions, and even your belief as to what abbreviations stand for, and what

ambiguous words and expressions (such as "this line item is effective from [x date" to [y

date]" signify.  That's obviously unsatisfactory, as one or both of you recognized in oral

argument.  While I well understand the Smolinsky point that it likely doesn't take three

years to provide a piece of tooling, and that references to effective dates refer to

something else, that's still not the kind of thing where I can find the intent of the

document—much less the meaning of covenants that are described in shorthand, and that

might rely on custom and practice in the industry—without an evidentiary hearing.

Likewise, I'm not in a position to make a finding as to what expressions do mean.

So I'm not in a position to make Findings of Fact, or to issue Conclusions of Law,

with respect to the Tools Contract, until the necessary evidentiary hearing has been

completed.

So we'll need to have one.

<u>Production Contract and Service Contract</u>

However, I can make Findings of Fact with respect to the Production Contract and

Service Contract, and now do so.

*1. Production Contract*

First I turn to the Content of the Production Contract.

Various Production Contract documents were entered into, but one attached to

Motors Liquidation's reply on its rejection motion can be viewed as a prototype from

which the others don't differ.  It starts with a "Contract Header," of one page, which lists

name and address information for each of the Supplier (Karmann Mfg. LLC) and Buyer

(GM).  The Contract Header goes on to say, in relevant part, that:

> This contract sets forth the exclusive terms and
> conditions under which seller shall sell and buyer
> shall purchase the goods or services described in the
> line item detail of this contract for the period(s)
> specified therein.

The "Line Item Detail" follows the Contract Header, and goes on for 13 pages.

After some preliminary tabular data, including an "Issue Date" of 16-Jan-2009, it

provides that

> This Line Item is effective from 31-Jan-2009
> through 24-Jan 2011.

(Contract Line Item Page 1 of 13).  When you put those two together, plugging in the dates following "This Line Item is effective" where it says, after the mention of "the line item detail of this contract," "for the periods set forth therein," one gets, effectively:

> This contract sets forth the exclusive terms and conditions under which seller shall sell and buyer shall purchase the goods or services described in the line item detail of this contract for the period [31-Jan 2009 through 24-Jan 2011].

(Contract Header Page 1 of 1, with Cross reference substitution made).

The "Line Item Detail" portion also addresses the matter of quantity.  It provides, in relevant part:

> The quantity of goods to be purchased under this contract is based on Buyer's requirements.  Any forecasted quantity that may be given to seller is an estimate, for planning purposes only.  Actual quantities to be purchased will vary and will be set forth in delivery schedules.

(Contract Line Item Page 12 of 13.)

There follows 6 pages of "Contract Attachment" pages.  The first of these provides, in relevant part, in an unnumbered paragraph captioned "Special Term:  Long Term Contract":

> The term of this contract is for the period(s) of purchase indicated in the Line Item Notes on the face of this contract.
>
> The price(s) for the goods are set forth in the Line Item Notes of this contract.  No adjustments will be made for increases in Seller's costs, including, but not limited to, increases in the costs for labor, material or overhead.
>
> Seller shall assure that the goods remain competitive in terms of price, technology, design and quality with similar goods available to Buyer. If, in the reasonable opinion of Buyer, the goods do

not remain competitive, Buyer, to the extent it is
free to do so, will advise Seller in writing of the
area(s) in which another product is more
competitive with respect to price, technology,
design or quality.  If, within 30 days, Seller does not
agree to immediately sell the goods at a competitive
price, or, if applicable, with comparable technology,
design or quality, Buyer may terminate this contact
and purchase from another supplier without liability
to Seller.  In consideration for this, during the term
of this contract, Buyer will not exercise its rights
under Paragraph 13 ('Termination for
Convenience'), except for terminations due to
program cancellations or modifications.

Paragraph 13, "Termination for Convenience," provides, in relevant part:

In addition to any other rights of Buyer to terminate
this contract, Buyer may, at its option, immediately
terminate all or any part of this contract, at any time
and for any reason, by giving written notice to
Seller.  Upon such termination, Buyer shall pay to
Seller [various contractually prescribed amounts].

Paragraph 20, "Service and Replacement Parts," provides (in full):

Seller will sell to Buyer goods necessary for it to
fulfill its current model service *and replacement
parts requirements* at the price(s) set forth in this
contract.  If the goods are systems or modules,
*Seller will sell the components or parts that
comprise the system or module* at price(s) that shall
not, in the aggregate, exceed the price of the system
or module less assembly costs.  During the 15 year
period after Buyer completes current model
purchases, *Seller will sell goods to Buyer to fulfill
Buyer's past model service and replacement parts
requirements.*  Unless otherwise agreed to by
Buyer, the price(s) during the first 3 years of this
period shall be those in effect at the conclusion of
current model purchases.  For the immediate
remainder of this period, the price(s) for goods shall
be as agreed to by the parties.  When requested by
Buyer, Seller shall make service literature and other
materials available at no additional charge to
support Buyer's service part sales activities.

(Emphasis added).

Paragraph 31, captioned "Entire Agreement," provides (in full):

> This contract, together with the attachments, exhibits, supplements or other terms of Buyer *specifically referenced* in this contract, constitutes the *entire agreement* between Seller and Buyer with respect to the matters contained in this contract and *supersedes all prior oral or written representations and agreements*.  This contract may only be modified by a contract amendment issued by Buyer.

(Emphasis added).

The Production Contract makes no reference to any other contract, including, most significantly, the Service Contract.  It has no cross-default provision with respect to any other contract, including, most significantly, the Service Contract.  As noted, the Production Contract includes only that contract itself, and "the attachments exhibits, supplements or other terms of Buyer *specifically referenced* in this contract."  (Emphasis added).

*2.  Service Contract*

The Service Contract is in a somewhat different form.  The Service Contract, which oddly is "dated" July 28, 2009, just a few days ago (and after the filing date of Motors Liquidation's motion, and, indeed, after the filing date of Karmann's objection), starts with a cover sheet, with a notation "Consolidated Contract;" is followed by a page of "General Terms and Conditions"; is then followed by 13 pages of additional contractual terms, and then follows with a 1 page "Agreement Exhibit" on which the parts to be sold are listed, with their respective costs.

The Service Contract's Cover Sheet provides that:

> The Seller agrees to sell and the Buyer agrees to purchase, at the place and upon and subject to the

> terms and conditions on the face and reverse side
> hereof approximately the percentage shown on the
> attached exhibit the Buyer's requirements, between
> the dates of:
>
> Effective Date June 23, 2007 Through Expiration
> Date December 31, 2010.

The Service Contract has two separate provisions which are in substance

integration clauses.  The first, which appears on the cover sheet, provides:

> This order including the terms and conditions
> contains the complete and final agreement between
> Buyer and Seller and no other agreement in any
> way modifying any of said terms and conditions
> will be binding upon the Buyer unless made in
> writing and signed by Buyer's authorized
> representative.

The second, which appears as Paragraph 31 of the "General Terms and

Conditions" immediately following the cover sheet, is captioned "Entire Agreement."  It

provides (in full):

> This contract, together with the attachments,
> exhibits, supplements or other terms of Buyer
> *specifically referenced* in this contract, constitutes
> the *entire agreement* between Seller and Buyer with
> respect to the matters contained in this contract and
> *supersedes all prior oral or written representations
> and agreements*.  This contract may only be
> modified by a contract amendment issued by Buyer.

(Emphasis added).

The Service Contract also has its own Paragraphs 13 and 20, identical to those in

the Production Contract.  Paragraph 13, "Termination for Convenience," provides, in

relevant part:

> In addition to any other rights of Buyer to terminate
> this contract, Buyer may, at its option, immediately
> terminate all or any part of this contract, at any time
> and for any reason, by giving written notice to

Seller.  Upon such termination, Buyer shall pay to
Seller [various contractually prescribed amounts].

Paragraph 20, "Service and Replacement Parts," provides (in full):

Seller will sell to Buyer goods necessary for it to
fulfill its current model service *and replacement
parts requirements* at the price(s) set forth in this
contract.  If the goods are systems or modules,
*Seller will sell the components or parts that
comprise the system or module* at price(s) that shall
not, in the aggregate, exceed the price of the system
or module less assembly costs.  During the 15 year
period after Buyer completes current model
purchases, *Seller will sell goods to Buyer to fulfill
Buyer's past model service and replacement parts
requirements.*  Unless otherwise agreed to by
Buyer, the price(s) during the first 3 years of this
period shall be those in effect at the conclusion of
current model purchases.  For the immediate
remainder of this period, the price(s) for goods shall
be as agreed to by the parties.  When requested by
Buyer, Seller shall make service literature and other
materials available at no additional charge to
support Buyer's service part sales activities.

(Emphasis added).

The Service Contract makes no reference to any other contract, including, most

significantly, the Production Contract.  It has no cross-default provision with respect to

any other contract, including, most significantly, the Production Contract.  As noted, the

Service Contract includes only that contract itself, and "the attachments exhibits,

supplements or other terms of Buyer *specifically referenced* in this contract."  (Emphasis

added).

*3.  Nomination Letter*

On February 28, 2002 (5 years before the effective date of the Service Contract,

and 7 years before the effective date of the Production Contract), GM employee Myka

Moon wrote the Director of Business Development for ASC, Incorporated, with a copy to

the Director of Sales & Marketing of Karmann.  Ms. Moon wrote that:

> On behalf of GM's North American Advanced
> Purchasing team, I am pleased to inform you that
> the Karmann/ASC joint venture, has been selected
> as the recommended source, for the Retractable
> Hardtop for the GMX 381 – 2006 model year.

She wrote that "[t]his decision was based upon, among other things, your quotation to us

as follows."  After describing provisions in that quotation, her letter went on to say:

> SPO Service Parts Agreement:  Supplier agrees to
> sell to SPO above part prices at production price
> levels for at least three (3) years beyond the last
> production year of a functional part.
>
> Provided that Karmann/ASC is able to meet or
> exceed the agreed upon terms for quality,
> technology, price, investment/tooling and timing,
> we intend to issue one or more Purchase Orders for
> approximately 100% of our production and service
> part requirements.

Her letter did not call for a counter-signature, nor did it say or imply that it was an offer

that could be accepted in any way, either by express acceptance or by performance.  It did

not purport to be a promise itself; rather, it said "we intend" to take the action it specified.

And the action it specified was issuing "one or more Purchase Orders."  Ultimately two

purchase orders were entered—the Production Contract and the Service Contract.

Karmann contends that the Production Contract and Service Contract comprise a

single integrated document.  As a fact or mixed question of fact and law, I find that they

do not.  My reasons for that conclusion appear in my Conclusions of Law, though to the

extent any of those reasons should be regarded as mixed questions of fact and law, or

even as Findings of Fact, they should be so regarded.

<u>Conclusions of Law</u>

It is of course true that a debtor party to an executory contract can't cherry pick the elements of the contract that the debtor wishes to assume or reject, and it is also true, as Karmann argues, that where several seemingly separate contracts are part of an integrated whole, they must be assumed or rejected together.  *See, e.g.*, my earlier decision in *In re Adelphia Business Solutions, Inc.*, 322 B.R. 51, 54 (Bankr. S.D.N.Y. 2005), and *In re Kopel*, 232 B.R. 57, 65 n.4 (Bankr. E.D.N.Y. 1999) (dictum), upon which Karmann relies.  But the statement of that uncontroversial principal begs the question as to whether separate contracts should be deemed to be a single contract.  For example, Judge Swain, deciding *Kopel*, wherein the enforceability of a cross default clause in a lease was at issue, noted that because the Lease included an express cross-default provision that she held to be enforceable, "the Court need not reach the issue of whether the transaction documents ought to be construed as one contract under New York law." *Id.* at 65 n.4.

While the issue is ultimately one of state law, I've been able to discern no material differences in various state's laws in determining whether one contract should be held to be severable into two or more, or (as is more commonly the issue in the bankruptcy context) whether seemingly separate contracts should be deemed to be only one.  Whether a contract is integrated or severable is a question of the parties' intent, to be determined from the language employed by the parties, viewed in light of the circumstances surrounding them at the time they contracted.  *See In re* American Home Mortgage, 379 B.R. 503, 520-521 (Bankr. D. Del. 2008).  Absent ambiguity in the terms of the contract, the parties' intent is gleaned from the four corners of the instrument.  *In re* American Home Mortgage Holdings, 2009 Bankr. LEXIS 439.

-9-

Typically the cases have relied on particular facts that parties have brought to those court's attention, but looking at the cases as a whole, certain factors have been repeatedly considered. Thus courts have relied on a number of non-exclusive factors for evidence of the parties' intent with respect to the integration or severability of contracts. These include:

1. whether the nature and purpose of each agreement is different;

2. whether the consideration for each agreement is separate and distinct;

3. whether the obligations of the parties to each agreement are interrelated— *i.e.*, whether performance under one agreement is dependent on or related to performance under the terms of the other agreement;

4. whether there is an integration clause stating the contract is to be considered one agreement;

5. whether a default under one agreement causes or requires a default under the other agreements;

6. whether the agreements are for the same term, including whether extensions are permitted on a whole or partial basis; and whether the agreements are separately negotiated.

*See*, *e.g.*, *In re* Adelphia Business Solutions, Inc., 322 B.R. at 59.

It is possible for obligations that appear in a single contract to nevertheless be held to be separate agreements. *See*, *e.g.*, *In re* Gardinier, 831 F.2d 974 (11th Cir. 1987). But here, of course, Motors Liquidation is asking to be much less aggressive. It's asking only that I regard two separate agreements as exactly what they appear to be.

Here substantially all of the indicia—taken from the four corners of the documents—evidence the intention that separate agreements be separately, and, conversely, that there was no intention to consider them to be a single contract, or that they be deemed to be such.  As a starting point, I note, as in *Adelphia Business Solutions*, that neither contract recites an intention that the two contracts be treated as a single contract, though the parties could have easily so provided, if that were their intention.

They have different terms.  The Production Contract has a term of Jan 31, 2009 through Jan. 24, 2011.  The Service Contract has a term of June 23, 2007 through December 31, 2010.

Neither cross defaults to the other.  In fact, neither contract mentions the other in any way.

Neither says that it is a master contract, or provides that it is subject to a master contract.

Each is a purchase order contract, with different consideration payable under each.  The amount due to the seller under each contract is determined by the purchases under that contract, and not the other contract.

Neither contract has any provisions in it that make obligations under that contract dependent upon obligations or performance under the other contract.

Though each has a termination for convenience clause, permitting termination upon payment of certain sums associated with that particular contract, neither conditions termination on any payment with respect to the other contract.

There is no indication that the contracts were signed at a single closing.

Each has an integration clause, without any stated exceptions, stating that it is the entire agreement between the parties, except for documents "specifically referenced" in the agreement.  In fact, the Service Contract says that twice.

The nature of each document is the same; they're purchase agreements for different things.  That reinforces the idea that they're two separate agreements.  Neither has language that complements the other, or fills in gaps in the other.  They just cover the purchase and sale of different items.  Of course it's true that there is a relationship between the purchased products, and that this relationship was always contemplated.  I assume it to be true, as Karmann argues, that the two contracts were executed with respect to a single program.  But that doesn't make two separate agreements one, or militate as a factor by which they should be so considered.

Karmann's briefs on this motion put forward no case authority, or even factual argument, supporting its position that these two agreements should be deemed to be one.  In fact, it put forth no authority beyond the uncontroversial proposition, citing *Kopel*, that where seemingly separate documents are part of an integrated whole, they must be assumed or rejected together.  And Karmann failed to address the facts I noted above, which are undisputed.

Instead, though only by oral argument, Karmann made two different points.  It urged that the Production Contract and the Service Contract were related by reason of the content of the Nomination Letter, which suggested that they were both elements of a single "program."  And it urged that Section 20 of the Production Contract and the Service Contract made it necessary and appropriate to consider the two separate contracts as a unitary whole.  In each case, I cannot agree.

-12-

First, the Nomination Letter was not itself a contract, having neither an offer nor an acceptance, and by its terms it was merely a statement of intention. The stated intention was to enter into one or more purchase orders; it does not state the intention to enter into only one, or to enter into two that should be deemed to be one. Even if it were a contract, it could not modify the terms of the contracts we have here. As I've noted, each of the Production Contract and the Service Contract had an integration clause, *superseding all prior oral or written representations and agreements*. So even if it had a promissory component, it would be superseded by the documents that were actually executed. And while it did at least seemingly make reference to what became the future Service Contract, it did not speak to whether the obligation to sell parts would be an element of the Production Contract or would be a separate agreement. If anything, the natural inference is the latter.

Possibly recognizing some or all of what I've just noted, Karmann places greater reliance on Paragraph 20 of the Production Agreement, suggesting that this supports its position that the two agreements should be deemed to be an integrated whole. But once more I cannot agree. Paragraph 20 of the Production Contract makes no reference to the Service Contract or, for that matter, any other agreement. It contains a free standing covenant, as part of the larger Production Contract, requiring the sale of parts. And lest there by any uncertainty as to that, I must note that the same Paragraph 20 also appears in the Service Contract itself. It cannot be that Paragraph 20 in the Service Contract reflects an intention to incorporate the Service Contract as an adjunct to an agreement that already contains Paragraph 20, as no one could seriously suggest that the Service Contract was incorporating itself.

-13-

In short, there is no basis for a determination that these two separate documents are in fact a single document, nor is there any basis for a ruling that the two separate contracts should be deemed to be only one.

If Motors Liquidation wishes to reject the Production Contract, it may do so, without regard to the decision it makes with respect to the separate Service Contract.