Judge approved General Motors' bankruptcy sale

# LeaseTrader.com

**Auto Blog**

Select a Make: [Select] ⊡ Select a Model: [Select ⊡] Zipcode: [ ]   Continue

Jul
07
Judge approved General Motors' bankruptcy sale

**Subscribe to RSS Feed**

FEATURED Auto News | By **David Walker, LeaseTrader.com** |   **Add Comment** |



Judge approved General Motors' bankruptcy sale

THE GM BANKRUPTCY

NEW YORK (Reuters) -- A judge approved General Motors' bankruptcy sale late Sunday in a move that will allow the company's most profitable assets to exit court protection under government ownership.

Judge Robert Gerber of the U.S. bankruptcy court in Manhattan said the sale would "prevent the death of the patient on the operating table."

Gerber issued a four-day stay of the order approving the sale, which should allow it to close as early as Thursday.



The stay allows for appeals, and a group calling itself the "individual accident litigants" gave notice today in a Bankruptcy Court filing that it will appeal the suit to U.S. District Court in New York City. Attorneys Steve Jakubowski and Elizabeth Richert of The Coleman Law Firm in Chicago are representing the group in the appeal.

Under the deal, 'New GM' will operate the best parts of the old company, including its Chevrolet and Cadillac brands, with a less expensive workforce, smaller dealer network, and much less debt. The rest of the company will be liquidated.

The sale marks the second big victory for the Obama administration's auto task force. It helped broker the disposal of Chrysler LLC to a group led by Italy's Fiat S.p.A last month. That decision was also appealed, ultimately to the Supreme Court, which briefly delayed the sale but then declined to hear the case. GM, which filed for bankruptcy protection on June 1, had argued that it would be forced to liquidate if the sale was not approved, and the U.S. government said it could walk away from funding the automaker if a

Select a Make: [Select a Make ▼]
Zipcode: [ ]
Go

Categories

**FEATURED** (rss)

**Featured Vehicles** (rss)

**Vehicle Road Test** (rss)

**Auto News** (rss)

Archives

**July, 2009 (27)**

**June, 2009 (33)**

**May, 2009 (21)**

**April, 2009 (22)**

Show all archives

## Dealer Center

Maximum Exposure For Your Dealership
Dealer Resources



Partner With Us   Register Now!

deal was not approved by July 10.

Objectors' claims rejected

"GM cannot survive with its continuing losses ... and without the governmental funding that will expire in a matter of days," Gerber wrote in the 95-page opinion.
The judge rejected claims from a group of bondholders that GM could have restructured itself under a more traditional Chapter 11 reorganization plan, in which creditors would have been able to vote.

"As nobody can seriously dispute, the only alternative to an immediate sale is liquidation - a disastrous result for GM's creditors, its employees, the suppliers who depend on GM for their own existence, and the communities in which GM operates," Gerber wrote.
"In the event of a liquidation, creditors now trying to increase their incremental recoveries would get nothing."
Gerber also shot down objections to GM's sale from dealers whose contracts are being terminated, groups of consumer and asbestos claimants that argued they will now be unable to sue GM for their injuries, as well as a group that calls itself the "Unofficial Committee of Family & Dissident GM Bondholders."

He rejected arguments that the U.S. government, which has loaned GM billions of dollars before and during the bankruptcy, had been overbearing in its negotiations to restructure the automaker.

"The U.S. Treasury, in making hard decisions about where to spend its money and make New GM as viable as possible, made business decisions that it was entitled to make," Gerber wrote.

The 'old GM', which includes unpopular brands and unneeded factories and liabilities, will remain behind in bankruptcy court to be liquidated.

IPO possible in 2010

The U.S. Treasury has agreed to provide $60 billion in financing to the new company, including a proposed $50 billion giving it a 60 percent stake in the company.
The UAW would gain a 17.5 percent stake, the Canadian government about 12 percent and GM bondholders about 10 percent of the new company.
At a three-day sale hearing that concluded July 2, some small bondholders had objected to the deal, but no bidders presented an alternative, and the 100-year-old automaker warned of "catastrophic" consequences to the auto industry if the sale was blocked.
An auto task force official said earlier this month that the government could conduct an initial public offering for the "New GM" as soon as 2010.
*Chrissie Thompson contributed to this report*

GM PRESS RELEASE: GM 363 Asset Sale Approved by U.S. Bankruptcy Court Approval marks another step toward the launch of an independent new GM

NEW YORK – General Motors achieved another milestone in its reinvention last night when Judge Robert E. Gerber of the U.S. Bankruptcy Court for the Southern District of New York approved the sale of substantially all of General Motors Corporation's assets to NGMCO, Inc., an entity funded by the U.S. Department of the Treasury. In connection with the closing of the sale transaction, NGMCO, Inc. will change its name to General Motors Company and continue to operate under GM's historic corporate and sub brands. The approval marks another step toward the launch of an independent new GM.

The new company will acquire GM's strongest operations and will have a competitive operating cost structure, partly as a result of recent agreements with the United Auto Workers (UAW) and Canadian Auto Workers (CAW).
The new GM will have lower leverage and a stronger balance sheet, which when combined with a lower break-even point, will allow it to reduce its risk, operate profitably at much lower volume levels, and to reinvest in the business in the key areas of advanced technology and product development. GM's subsidiaries outside the United States will be acquired by the new company and are expected to continue to operate without interruption.

The new GM will be headquartered in Detroit and will be led by Fritz Henderson as president and chief executive officer and Edward E. Whitacre, Jr. as chairman of the board of directors.

"A healthy domestic auto industry remains vital to the global economy and we deeply appreciate the support the U.S., Canadian and Ontario governments and taxpayers have given GM, and the sacrifices that have been made by so many. This has been an especially challenging period, and we've had to make very difficult decisions to address some of the issues that have plagued our business for decades. Now it's our responsibility to fix this business and place the company on a clear path to success without delay," said Henderson.
The new GM's common stock will be owned by:
• U.S. Department of the Treasury: 60.8 percent
• UAW Retiree Medical Benefits Trust: 17.5 percent
• Canada and Ontario governments: 11.7 percent
• The old GM: 10 percent

Additionally, the old GM and the UAW Retiree Medical Benefits Trust will hold warrants that are exercisable for 15 percent and 2.5 percent of the interests in the new GM, respectively.

The UAW Retiree Medical Benefits Trust and the Canadian government each may nominate one member to serve on the board of the new GM. The retiree benefits trust has selected seasoned auto industry analyst Stephen Girsky. Also selected to serve on the board of directors of the new GM are six current members of the General Motors Corporation board, including Erroll Davis, Neville Isdell, Kent Kresa, Philip Laskawy, Kathryn Marinello and Fritz Henderson. The Canadian government representative and four additional board members to be identified by the U.S. Treasury will be announced at a later date.

Judge Gerber's order includes a four-day stay before closing of the sale can occur. However, GM expects the sale to close in the near future. The new GM's business is expected to be immediately operational and fully competitive, with an exciting line of new products, a smaller, more focused brand portfolio and the rationalization of its dealer network well underway. Current GM employees will be offered positions by the new company.

In connection with the closing, the current General Motors Corporation will change its name to Motors

**GM: Buy, Sell, or Hold?**
Don't trade GM until you see this special
BestNewsletters report.
www.TheBestNewsletters.com

∨ ∨                              Ads by Google

Cuomo breaks out AIG bonus list - WIVB.com
09-50026-mg    Doc 3679-1    Filed 07/29/09    Entered 08/05/09 15:39:11    Page 2 of 4
Pg 3 of 35

*Exhibit Z2*

Healthy Living
Pediatrics
Cancer
Heart Health
Living
Television
Movies
Music
Celebrity News
Family Fun
Dogs
Cats
Online Family
Your Baby
Lottery
Horoscopes
TV Schedule
Participate
Photos
Calendar
Contests
Video
News 4 at Noon
Live Streams
CBS Video
Notebooks
**Home** : **News** :



Andrew Cuomo (AG)

**Cuomo breaks out AIG
bonus list**
**Top recipient checked out with $6.4
million**
Updated: Tuesday, 17 Mar 2009, 3:00 PM EDT
Published : Tuesday, 17 Mar 2009, 3:00 PM EDT
ALBANY, N.Y. - New York State Attorney General Andrew
Cuomo on Tuesday broke down the numbers in the
controversial AIG bonus plan.
Cuomo made public a letter he sent to Congressman
Barney Frank, Chairman of the House Financial Services
Committee, regarding bonuses paid at AIG.
The breakout for the so-called retention bonuses includes
these examples:
- The top recipient received more than $6.4 million
- The top seven bonus recipients received more than $4
  million each
- The top ten bonus recipients received a combined $42
  million;
- 22 individuals received bonuses of $2 million or more, and
  combined they received more than $72 million
- 73 individuals received bonuses of $1 million or more; and
- Eleven of the individuals who received "retention" bonuses
  of $1 million or more are no longer working at AIG,
  including one who received $4.6 million
You can see the entire letter here .

Copyright WIVB.com

P
R
P
R

si
re



classifieds: 🚗 **autos** 🏠 **homes** 🧳 **jobs** 🐾 **pets** ✏ **ads**

The fastest fast is here.
Introducing the new
Comcast High-Speed Internet.

  

# CHICAGO SUN-TIMES

suntimes.com    **Member of the Sun-Times News Group**

69°F
Partly Sunny

Traffic • Weather:

Home | News | Commentary | Sports | Business | Entertainment | Classifieds | Columnists | Lifestyles

# Lynn Sweet
The scoop from Washington

## In case of AIG bonus payments, some contracts made to be broken

**By Lynn Sweet on March 16, 2009 6:38 AM** | Permalink | Comments (27)

WASHINGTON – Obama administration officials are fuming with the rest of us real people over $165 million in bonus payments Sunday to key employees of the bailed-out American International Group. Taxpayers own about 80 percent of AIG's outstanding shares, bought when the New York-based insurer received about $170 billion in bailout funds last year.

Larry Summers, director of the White House National Economic Council, said the bonuses were "outrageous" on ABC's "This Week" and CBS' "Face the Nation."

The backstory here is remarkable.

The Obama White House's ability to intercede in a company (too big to fail) dependent on taxpayer cash is limited, apparently. Treasury Secretary Timothy Geithner read the riot act to AIG Chairman and CEO Edward Liddy on Wednesday over the bonuses and got some important concessions over future payments and salaries. Liddy politely called the exchange an "open and frank conversation" in a letter he sent Saturday to Geithner about how AIG's "hands are tied."

WASHINGTON – Obama administration officials are fuming with the rest of us real people over $165 million in bonus payments Sunday to key employees of the bailed-out American International Group. Taxpayers own about 80 percent of AIG's outstanding shares, bought when the New York-based insurer received about $170 billion in bailout funds last year.

Larry Summers, director of the White House National Economic Council, said the bonuses were "outrageous" on ABC's "This Week" and CBS' "Face the Nation."

The backstory here is remarkable.

The Obama White House's ability to intercede in a company (too big to fail) dependent on taxpayer cash is limited, apparently. Treasury Secretary Timothy Geithner read the riot act to AIG Chairman and CEO Edward Liddy on Wednesday over the bonuses and got some important concessions over future payments and salaries. Liddy politely called the

SEARCH

Search

MOST POPULAR

1. President
   schedule a
   July 23, 2(
   visit
2. Obama Ju
   press cont
   Transcript
3. Obama sa
   stupidly" ir
4. Obama or
   or frumpy
5. House De
   health care
   here.
6. Obama tel
   police acte
   arresting (
7. Obama in
   pitch Ame
   Associatio
   reform. AN
   governme
8. Obama ma
   for health
   press cont
9. Michelle C
   hair style
10. Obama's N
    New York,
    Transcript

exchange an "open and frank conversation" in a letter he sent Saturday to Geithner about how AIG's "hands are tied."

GET THE SWEE



Lynn Swee

President Ob
Lady Michell
Congress

The Obama administration believes – as does Liddy, brought in by the Bush White House to run the multinational insurance giant – that legally they had no choice because the 400 employees of AIG Financial Products had contracts that mandated the bonus checks be paid. Those deals were made with these workers – considered key – last May, before the bailout.

The way Liddy explained it, many of these folks at AIG Financial Products had to be enticed to stay with the company because they were the only ones who could understand the exotic financial instruments on AIG's books.

Think of a casino that has to woo croupiers to stay at the tables because they are the only ones who know how to play the games. In the case of AIG, some of these key workers were traders who, AIG maintains, oversaw "transactions that are difficult to understand and manage." These traders, AIG says, had the keys to the kingdom. They knew how to "hedge the book."

Recent Post

The story
my Obam.
conferenc
question

Obama sa
"acted stu
Gates cas

Obama m.
argument
health cai
overhaul
conferenc

As one of many angry commenters on my blog put it, "Why are the contracts with AIG execs more valid than the contracts between the automakers and autoworkers? Congress INSISTED that the autoworkers take pay cuts – and MODIFY THE CONTRACTS they had negotiated – before the automakers got federal money? . . . If the federal government owns 80% of AIG, what control do we have over the actions of management?"

I see the point. With the mortgage foreclosure crisis, the Obama administration has moved aggressively to pressure lenders to renegotiate the terms of mortgages. Some contracts, as the saying goes, are made to be broken.

Categories: Barack Obama



MORE WIDGET:

## 27 Comments

**By Evan Sherr on March 16, 2009 7:23 AM**

Any of the AIG employees who receives this bonus money is, by definition, admitting to defrauding investors. Rather than giving these crooks a carrot because they know how to "play the game"... TAKE OUT THE STICK! Offer the following to AIG employees: Stay and untangle this mess, or rot in prison. Hasn't anyone learned anything about responsibility?

PolitiFa
The Truth-O-

The health care
reform bill "wou
make it
mandatory –
absolutely
require – that
every five year:
Medicare have
counseling ses:
tell them how to
sooner." — Bel
McCaughey

**By K Barnes on March 16, 2009 7:33 AM**

Are the lawyers deliberately overlooking something in the AIG case? Our experience in the corporate world of bonuses has been quite different. While an executive compensation package is a contractual promise, it is always directly tied to the attainment of performance goals and company success. When an executive fails to achieve outstanding performance at the end of the contract year, i.e. "improves company performance", then the "promise" of a bonus is null and void. How it it that these compensation packages are being treated as "immutable contracts". This is unheard of.

And where is that AIG "talent" going to go? Other failed banks???

Health insuranc
companies are
"making record
profits, right
now." — Barac
Obama

There were mo
job losses per
month in the la:
three months
under Presiden

**By Mke Heap on March 16, 2009 8:23 AM**

How about the obvious, In lmost every case bonuses are based on performance right? How is losing over $60 billion a good performance? And I am sure that there is a clause somewhere in the contract that would allow for at least a reduced bonus amount. And does Fox News (Politics)

Fox News (Blogs)

GM Pension Plans Remain Ongoing During Company Bankruptcy 08/05/09 15:39:11    Page 1 of 1
Case 00028-ans Doc 3670-2 Filed 07/29/09 Entered

Pg 6 of 35

Exhibit Z4

This is a printer friendly version.



Pension Benefit Guaranty Corporation
Protecting America's Pensions

## FOR IMMEDIATE RELEASE

## June 01, 2009

## PBGC Public Affairs
## 202-326-4343

### GM Pension Plans Remain Ongoing During Company Bankruptcy

The Pension Benefit Guaranty Corporation today issued the following statement:

Although General Motors Corp. has entered Chapter 11 bankruptcy protection, its two defined benefit pension plans remain ongoing under GM's sponsorship. Both plans, one for hourly workers and one for salaried employees, continue to be insured by the PBGC, which guarantees benefits up to limits set by law.

Stakeholders in the bankruptcy, including GM, the United Auto Workers and the U.S. government, have stated their intent to maintain the plans under the sponsorship of a new corporate entity to be formed from the sale of GM's productive assets. The PBGC will work with all parties to achieve that outcome, which would be in the best interests of GM's more than 670,000 pension plan participants and the pension insurance program.

Individuals with questions about the PBGC and its benefit guarantees should consult the agency's auto-sector Web page at PBGC.gov. GM workers and retirees with specific questions about their GM pension benefit should call the GM Benefits & Services Center at 1-800-489-4646.

The PBGC is a federal corporation created under the Employee Retirement Income Security Act of 1974. It currently guarantees payment of basic pension benefits earned by 44 million American workers and retirees participating in over 29,000 private-sector defined benefit pension plans. The agency receives no funds from general tax revenues. Operations are financed largely by insurance premiums paid by companies that sponsor pension plans and by investment returns.
— ### —
PBGC No. 09-33

This is a printer friendly version.



Pension Benefit Guaranty Corporation
Protecting America's Pensions

## Auto Sector Pension Plans: Information for Workers and Retirees

*This information page is offered as a service to workers and retirees who have questions about their PBGC-insured benefits. The PBGC is not commenting on the future of U.S automotive companies or suggesting their pension plans will be assumed by the PBGC.*

The current financial difficulties of U.S. car makers and auto parts companies have led to increased concern among their workers and retirees.

Each day, the PBGC hears from worried callers who ask, "Will my pension be safe?

The answer is, "Yes, up to certain limits."

The qualified defined benefit pension plans of the Big Three automakers and most of their principal suppliers remain ongoing and insured by the PBGC. If a company cannot maintain its underfunded pension plan, the PBGC will step in and take responsibility for the plan. The PBGC will pay all the plan's benefit promises, up to certain limits set by Congress. These limits mean that some individuals, typically younger retirees, will see reduced benefits.

Unless and until the PBGC takes responsibility for your plan, we cannot answer specific questions about individual benefit amounts or possible reductions. For information on the status of your benefit, contact your plan administrator.

If you have questions on the PBGC, including the legal limits on benefits, please see the links below.

- PBGC To Assume Delphi Pension Plans
- Chrysler Pension Plans Continue Under New Company Sponsorship
- GM Pension Plans Remain Ongoing During Company Bankruptcy
- PBGC, Daimler Agree on $600 Million Cash Infusion into Chrysler Pensions
- Of special interest to auto workers is this radio interview with PBGC Acting Director Vince Snowbarger.
- Acting Director Snowbarger Detroit Television Interview
- For general information about the PBGC, its benefit guarantees and legal limits on those benefits, see these frequently asked questions.
- "Introduction to the PBGC," a video and interactive frequently asked questions designed for individuals whose pension plan has been assumed by the PBGC.

TTY/TDD users, call the federal relay service toll-free at 1-800-877-8339 and ask for 800-400-7242.

Until the PBGC becomes trustee, the pension plans will remain ongoing under company sponsorship. The agency will send notification letters to all plan participants when it becomes trustee. Retirees and beneficiaries will continue to receive their monthly benefit checks without interruption, and other workers will receive their pensions when they are eligible to retire.

Delphi retirees who draw a benefit from the PBGC may be eligible for the federal Health Coverage Tax Credit. Further information may be found on the PBGC Web site at http://www.pbgc.gov/workers-retirees/benefits-information/content/page13692.html.

Assumption of the plans' unfunded liabilities will increase the PBGC's claims by approximately $3.5 billion, as the claim was previously included at a lower estimated amount in the agency's fiscal year 2008 financial statements, in accordance with generally accepted accounting principles.

The PBGC is a federal corporation created under the Employee Retirement Income Security Act of 1974. It currently guarantees payment of basic pension benefits earned by 44 million American workers and retirees participating in over 29,000 private-sector defined benefit pension plans. The agency receives no funds from general tax revenues. Operations are financed largely by insurance premiums paid by companies that sponsor pension plans and by investment returns.

— ### —

PBGC No. 09-48

**PBGC**

# PBGC facing probe over lack of audits



Amid mounting deficits, the Pension Benefit Guarantee Corporation (PBGC) is facing questions over its liability assumption practices. **Rachel Alembakis** reports

**I** N THE the wake of announcing record $23bn deficits last year, the Pension Benefit Guarantee Corporation (PBGC) now faces a possible investigation into why it does not perform forensic audits before assuming the burden of a terminated pension plan.

Meanwhile, observers suggest that proposed legislative reform for the beleaguered insurer of US corporate defined benefit pension plans may only slow the long-term rate of increase to that amount due to the agency's fundamentally unsustainable structure.

Late last year, Congressman Edward Markey of Massachusetts and Congressman George Miller of California wrote to the Government Accountability Office (GAO) to demand the agency investigate whether the PBGC, the Securities and Exchange Commission and the Department of Labor were adequately regulating pension consultants and detecting and preventing fraud and conflicts of interest.

In the wake of the Securities and Exchange Commission's (SEC) report into pension consultants' conflicts of interest, the congressmen asked the GAO to find out if the PBGC has adequately investigated whether the pension plans it has taken over have been adversely affected by those conflicts of interest.

In addition, they asked why the insurer did not undertake forensic audits to find "conflicts of interest, hidden financial arrangements and unlawful activities," according to their letter to the GAO.

The congressmen's letter specifically referenced the termination of United Airline's multi-billion dollar pension plan, but more generally called for an investigation into why there was no system to assess if there were any pension consultant conflicts of interest or undisclosed financial transactions at any of the 3,600 pension plans now under the PBGC's control.

The PBGC has to date declined to perform forensic audits, despite offers from Ted Siedle, owner of the Benchmark Financial Services, to perform such investigations on a contingency basis.

"The reason I made the offer is because, based upon my knowledge of the consulting industry, I am so convinced that we will find conflicts of interest, hidden financial arrangements and wrongdoing," he said.

Siedle met with the PBGC's executive director, Bradley Belt last year to discuss his offer, but he said that his offer was declined by the PBGC.

"There are thousands of pension funds that have been taken over by the PBGC where they've had conflicted consultants and no one's ever looked at this issue," said Siedle, a former securities lawyer at the SEC who specialises in investigating pension fraud.

"Every fund that's had conflicted consultants needs an investigation to look back over the years and quantify the harm, going back 10 or 20 years."

### Recovered money

But while there might be the possibility that conflicts of interest were a factor in some pension plans now administered by the PBGC, investigations probably will not yield much in the way of recovered money, said Michael Johnston of Hewitt Associates, which was not part of the SEC's sweep investigation.

"This whole issue about investment managers or investment consultants steering clients into various types of funds is one of these things that has been boiling around," Johnston noted.

"Yes, there has been some steering. But ultimately, I don't believe there's a lot of money there. This is not a huge fraud on the American public. This is at the fringes.

"The PBGC has been doing a very good job of trying to recover what money it can. Maybe I'm naive, but I don't see how having some other type of auditing function trying to recover money is going to result in that much difference."

### Proposed legislation

While the GAO considers the letter from Markey and Miller, Congress is in the process of passing legislation that will potentially make changes to the PBGC's risk-based premium calculations.

Both the House and the Senate have proposed PBGC reform in separate pension reform bills that have passed – the two chambers must now hammer out a compromise to be sent to President Bush for his ultimate approval. There are parallels between the two versions – in each version PBGC premiums are increased, funding targets are raised, and companies are pushed to respond more quickly to developing funding shortfalls. This shifts the responsibility for terminated plans away from employees and the PBGC towards employers.

Additionally, both versions force companies to freeze their pension plans when they enter bankruptcy, which limits the amount of benefits the PBGC could potentially become responsible for if the plan is terminated.

The PBGC is not in immediate danger of running out of money to pay the pensions of retirees under terminated plans, according to Johnston of Hewitt Associates. But this does not provide much breathing room, because both the House and Senate versions of the Pension Reform Bill would stagger reforms over a number of years.

"The PBGC has been very noisy about running out of cash, but it is not an imminent problem," Johnston noted. "The problem with all of this is even if all this legislation goes through, it's not going to improve the PBGC's position for a number of years, both because the new rules are going to phase in over time, or it looks like they will, and because they aren't drastically more stringent than the current rules."

But others disagree and point to a more serious long term problem. Even if there is not serious danger of a cash crunch, the deficits are expected to be between $40bn and $50bn over the next 10 to 15 years before stabilising, according to Douglas Elliott of the Center on Federal Financial Institutions a think-tank that performs analysis of federal agencies like the PBGC. This is under the

scenario of reforms to the system as mandated by proposed legislation – if nothing is done, the amount may rise to $72bn.

Elliott also noted that the PBGC's current deficit numbers do not fully take into account potential terminations by Delta Airlines, Northwest Airlines and Delphi, which could add an additional $10bn not provisionally accounted for by the PBGC's financial statements.

"The PBGC is broke," Elliott said. "It has enough money up to 2021, but it's clear that it doesn't have enough money to pay benefits after that. It is insolvent. Every proposal has that situation as reality. That's not to say that these bills are wrong. Depending on what your priorities are, you could decide to let the deficit continue, but then eventually stabilise. The problem is, no one has made a decision to either let that happen or propose real changes."

There is the possibility some corporations will terminate or freeze their defined benefit pension plans to avoid the additional costs that will be put on employers as a result of this proposed legislation. This, of course, makes the PBGC's position more unsustainable because it pushes the burden of paying for the insurance onto an ever-diminishing pool.

The proposed legislation is an attempt to balance the need to stem the flow of the PBGC's losses and the possibility of a taxpayer bailout against the need to make the system attractive to corporations remaining in the system. The legislation could have gone further to address other factors that play into eventual pension plan terminations, Johnston said.

"There has been a lot of discussion about how unions will negotiate big pension increases in lieu of wage increases," he said. "That charge has been levied at the auto industry, it's been levied at the steel industry before that, and clearly as the airline industry. The law could be changed to make it less attractive to unions to bargain increases. But the bottom line is that we will have future bankruptcies and we will have more liability to the PBGC."

### A silver lining?

However, the elephant in the room when it comes to the PBGC, its liabilities and who will pay for them is, do any of these worries matter? Maybe not, for several reasons. The PBGC's financial situation is dire, particularly if you look at it as if it is an insurance company. But the reality may not be so bad, Johnston says.

"The PBGC likes to think of itself as a big insurance company, so it uses insurance company-like assumptions to measure its liabilities," he said. "You can also look at the PBGC as a big pension plan, that just assumes pension liabilities from other pension plans. Because that's more of an ongoing portfolio than an annuity portfolio, a lot of people question the whole notion of whether the PBGC is at badly funded as it claims it is."

Elliott disagrees with this reasoning, saying that in a corporate pension plan, the responsibility for funding is more clearly defined than at the PBGC.

But Elliott does note that the PBGC's problem is not insurmountable, mainly because the PBGC's deficits are not themselves unguaranteed. Although the PBGC does not explicitly have the full faith and backing of the US government, it is inconceivable that retirees would be allowed to lose their pension funds altogether, even if that meant the federal government stepping in. With that implicit guarantee in place, the question changes from if to who will pay.

"There's going to be a big hole," Elliott said. "It's $23bn now, we're certain of that. Somebody's going to have to pay, and you've got three possibilities – you've the taxpayer, you've the employers and you've got Santa Claus. In the end, you're going to divvy up the responsibility between taxpayers and employers. There's no right or wrong answer here."



'The PBGC is broke. It has enough money up to 2021, but it's clear that it doesn't have enough money to pay benefits after that'

**Douglas Elliott,**
**Center on Federal Financial Institutions**

**Pension Benefit Guaranty Corporation (PBGC): Broke
Economist (01/31/03) Vol. 366, No. 8308 p.68; Rosato,
Donna**

While companies struggle to infuse cash into their underfunded
pension plans, the Pension Benefit Guaranty Corporation (PBGC), a
quasi-government agency charged with providing workers with
retirement funds when their employers cannot, may be on the verge
of insolvency itself. The agency's liabilities far outweigh its assets,
but insurance premiums, assets from company acquisitions, and
investment income from its own portfolio should help the agency
meet its obligations. Some critics are concerned that the system is
faulty because its guarantees are not backed adequately by
premiums charged to companies, but since Congress determines
premiums, PBGC is at the mercy of union lobbyists. Morgan Stanley
suggests that changes be made in the pension fund industry,
restricting how much can be allocated in various sectors, such as
the equity market.

Abstracts©Information, Inc.



◄ Back   |   IRA.com Home   |   News Archive

# BROOKINGS

## What Happens to the GM Pensions in Bankruptcy?

Retirement, Auto Industry, Quality-of-Life Issues, Corporate Social Responsibility

Douglas J. Elliott, Fellow, Economic Studies, Initiative on Business and Public Policy

The Brookings Institution

MAY 29, 2009 — General Motors (GM) has filed for Chapter 11 bankruptcy, triggering the next stage in the ongoing fight to see who will bear the costs of making the company financially viable again. The bankruptcy process allows debts and other claims to be reduced, sometimes dramatically, in an attempt to create a reorganized firm that can actually earn enough to meet its downsized obligations. One large claim that could theoretically be cut back is the unfunded portion of GM's pension liabilities.

GM has made pension promises costing approximately $100 billion in today's dollars. Unfortunately, the investments in its pension funds are worth about $20 billion less than the obligations, according to the Pension Benefit Guaranty Corporation (PBGC). Theoretically, the pension plans could be terminated in bankruptcy to transfer the cost of that underfunding to a combination of the PBGC, which insures pension benefits within certain limits, and existing and future retirees, who would lose the uninsured portions of their pensions. Such terminations have occurred in many bankruptcies over the years, particularly at steel companies and airlines. (Please see, "Understanding the Pension Benefit Guaranty Corporation" for more on pension funding and the role of the PBGC.)



**Flags wave behind a General Motors Corp sign in downtown in Detroit**

View Larger

Reuters/Mark Blinch

However, GM's pensions appear to be safe for now, as it appears quite unlikely that the pension plans will be terminated as part of this bankruptcy principally because the United Auto Workers (UAW) and the U.S. government do not want it to happen. As explained below, these key players have the power to block any termination. Of course, the burden of funding these pensions will not vanish and could easily come back in the future to haunt the taxpayers and other owners of the restructured GM.

Underfunded pension plans can usually be terminated in bankruptcy, but this only happens if a restructuring plan is put together that includes such a termination and the bankruptcy judge approves it. In GM's case, management has been working with the unions and the government to devise a restructuring

### RELATED CONTENT

RESEARCH AND COMMENTARY

A Guide to the Pension Benefit Guaranty Corporation
Douglas J. Elliott, Center On Federal Financial Institutions, May 20, 2009

RESEARCH AND COMMENTARY

The Tripling of the PBGC's Deficit: What Does it Tell Us?
Douglas J. Elliott, The Brookings

plan that will be proposed to the bankruptcy judge. It is highly likely that the plan will be approved, although there may be some alterations. It appears that GM's management has reached an agreement with the leadership of the UAW that it will not propose terminating the pension plans. This is one of the benefits being offered to the UAW in exchange for a series of concessions on their part.

Even if the agreement not to terminate the plans were to fall apart for some reason, there is a strong chance that the bankruptcy judge would refuse permission to terminate the plans. The Employee Retirement Income Security Act (ERISA), which governs defined benefit pensions, forbids a termination in bankruptcy unless the continuation of the plan would make it too difficult to successfully reorganize the company. This would be a difficult standard to meet in GM's case, for two reasons. The most basic is that GM has a financer lined up for the great bulk of the new funding needed -- the federal government, which virtually guarantees an initially successful reorganization. Even without this, the pension underfunding will not require any cash for some time, due to an arcane, but highly important, provision of the pension funding rules, easing the task of finding other funding sources.

GM has large funding credits arising from its choice to put more money into the pension plans in the past than it was required to do. For many years, pension law encouraged such prefunding by allowing any funding in excess of the minimum required to be taken as a credit against future requirements in future years. In fact, the credit balance grew by an interest rate, to reflect the time value of money. Until the Pension Reform Act of 2006 was passed, there was no provision to have the credit grow or decline based on actual investment performance. Even that Act applies the change only prospectively, leaving GM and a few others with huge funding credits, despite their significant pension deficits. These funding credits will reduce GM's required cash contributions in future years dollar for dollar until the credits are used up. The date at which they vanish will depend on a number of factors that affect what its minimum funding requirements would otherwise be, but the best forecasts appear to be that no cash contributions will be needed until 2013 or 2014.

The absence of a cash drain for a number of years from pension funding requirements makes it hard to argue that the pension deficits make a successful reorganization impossible. In theory, the eventual funding requirement could look so large that investors would stay away from GM, but this seems unlikely in practice. Again, this argument comes into play only to the extent that the government is unwilling to supply the needed funds on acceptable terms. The two reasons taken together make a termination very unlikely this time around.

However, it is critical to remember that the pension problem does not go away just because the plans survive for now. There is a real underfunding of considerable size which will have to be covered out of the operating profits of the restructured GM. If those profits are insufficient, for whatever reason, there could be an eventual second bankruptcy in which the pension plans are then terminated. Restructured companies have certainly gone bankrupt again in the past -- think US Airways or TWA, for example -- and one cannot be sure that GM is immune.

Institution, June 04, 2009

RESEARCH AND COMMENTARY
📄 Will Government Motors do better than General Motors?
Howard Wial, The Los Angeles Times, June 05, 2009

More Related Content »

Therefore, the massive underfunding could still turn out to be a problem for the PBGC, (effectively the taxpayers), and the current and prospective retirees. It is important that all parties keep an eye on the ball to minimize the chance of such a harmful outcome. This makes it all the more critical that the GM that comes out of bankruptcy be truly viable for the long-term.

HOME | EMPLOYMENT | CONTACT US | FA



**FEDERAL RESERVE BANK OF DALLAS**

| About the Fed | Economic Research | Economic Data | Banking Info | Financial Services | Publications & Resources | Community Affairs | Econom Educati |

You are here: FRB Dallas Home > Economic Research > Publications > Economic Letter > November 2006

**Economic Research**
- Economic Research Home
- About Economic Research
- Publications
- Economists
- The Economy in Action
- Economic Data
- Events
- Globalization and Monetary Policy Institute
- Resources and Links

**Tools**
- E-mail Alerts
- E-mail This Page
- RSS Feeds
- Podcasts
- Videos
- View Printer-friendly Page

# Economic Letter—Insights from the Federal Reserve Bank of Dallas

Print-friendly Version (IE 5.5+)



**Vol. 1, No. 11**
**November 2006**
**Federal Reserve Bank of Dallas**

### Making Sense of the U.S. Housing Slowdown
by John V. Duca

A robust housing market buoyed the U.S. economy during the 2001 recession and fueled growth once recovery began. The record-setting building of single-family homes created construction jobs and spurred demand for building materials, appliances and home furnishings. Business was brisk for mortgage lenders and real estate brokers alike.

Perhaps even more significant, rapidly rising housing prices had allowed consumers to tap into their mounting home equity, providing them the financial wherewithal for a buying spree. By mid-2004, however, home prices had risen to the point where many analysts worried that markets were overheated, making homes less affordable, particularly for first-time buyers already facing the drag of rising energy prices.

Today, signs of a housing market slowdown are unmistakable. New and existing home sales have been declining since mid-2005, although they remain high by historical standards (*Chart 1A*). Building activity has begun to cool a bit, while single-family housing permits have fallen 34 percent from their peak, settling back to pre-2002 levels (*Chart 1B*). The building permits data suggest further declines in single-family construction are likely, given the usual six to eight months it takes to complete a home.

Housing prices are rising more slowly—perhaps even beginning to decline outright. In the second quarter, the Office of Federal Housing Enterprise Oversight's measure of home price appreciation registered its biggest year-over-year slowdown since recordkeeping began in 1975. Even so, home-price gains remain solidly positive at 10.1 percent by this measure, which partly controls for changes in home quality by tracking only prices from repeat sales (*Chart 1C*).

**Quick Links**
- Complete
- Economic archive
- Frequently questions

**Publications**
- Economic
- Staff Pape
- Southwest
- Working P
- Other Econ Research

**Ordering Pu**
- E-mail Sub
- Hardcopy Subscriptio
- Back Issue Copies
- Change of

**Other Reso**
- Fed in Prir of Federal economic
- Catalog of Informatior



## U.S. Home Sales Slow from High Levels

NOTE: Data are seasonally adjusted, annualized rates.
SOURCES: Census Bureau; National Association of Realtors.



## Falling Permits Point to Slowing Home Construction

NOTES: Data are seasonally adjusted, annualized rates; contract values are chained, 2000. Shaded areas denote recessions.
SOURCES: Census Bureau; Bureau of Economic Analysis.



## Home-Price Appreciation Slowing Sharply

NOTE: Shaded areas denote recessions.
SOURCES: Freddie Mac; National Association of Realtors.



More recent data, however, suggest further deceleration in prices. Median existing home prices dipped 1.2 percent in the third quarter from year-earlier levels—the first year-over-year decline since 1993 and the largest drop since the series began in 1969 (see Chart 1C). The decline contrasts with the 14.7 percent increase posted a year earlier. New-home price-

appreciation rates have also turned down, posting a year-over-year decline of 2.4 percent in the third quarter, the largest drop since the early 1990s.

For the U.S. economy, slower building activity and softer prices raise the specter of reversing—at least in part—the gains in housing starts posted between 2001 and 2005. A retrenchment in housing demand could affect growth directly by depressing construction and indirectly as flattening home prices restrain consumer spending.[1]

Although homebuilding declines are steep, the direct effect on the economy is likely to be less dramatic because residential construction, including multifamily units, accounts for just 6 percent of GDP. Even so, homebuilding can significantly affect economic growth. Residential construction added about 0.5 percentage point to GDP growth in 2004 and 2005 but subtracted 1.1 percentage points in third quarter 2006. Many forecasters project further, but smaller, negative impacts on GDP growth through most of 2007.

The indirect effects of a housing slowdown could be larger than the direct effects if the deceleration in home prices leads to slower growth in consumption, the largest component of GDP. The risk of a consumption slowdown is one reason policymakers are monitoring housing prices and home-equity withdrawals.

### The Consumption Connection

Housing's link to consumption occurs largely through changes in wealth driven by home prices. In general, higher asset prices encourage spending by increasing the lifetime resources of income and wealth households can consume. Of the types of household wealth subject to large price movements, the most important are stock investments and housing.

The Federal Reserve's flow of funds data provide a useful prism through which to view recent years' trends in wealth. At the turn of this century, the value of stocks eclipsed housing. From 2000 to 2005, U.S. households' real estate assets grew by $9.1 trillion, while a decline in equity prices reduced their stock wealth by $2.5 trillion. Today the two categories make up roughly the same percentage of households' net wealth (*Chart 2*). Studies show that historically a $100 rise in housing wealth leads to about a $6 rise in long-run consumption, one and one-half times the $4 gain that would result from the same increase in stock wealth.[2]





Why is housing's wealth effect stronger than the stock market's? The answer depends on how long-lasting asset-price changes are viewed, the distribution of particular forms of wealth and the liquidity of an asset—the ease and cost at which households can sell or borrow against its value.

First, home prices are less volatile than stock values, so consumers are more likely to consider gains in housing wealth as more permanent.

Second, there are large differences in the distribution of these asset holdings. Stock ownership is very concentrated among high-income households, whose consumption is less sensitive than moderate-income families' to changes in wealth.[3] Homeownership, meanwhile, is spread more evenly. Although stock ownership has doubled since the early 1970s to roughly 50 percent of households today, homeownership rates are still higher, at 68 percent. While many households own stock, the amounts are small relative to housing wealth for most homeowners. Even before the collapse of technology stocks in 2000 and the recent runup of housing prices, only 5 percent of households had a higher share of net wealth in stocks than in housing.[4]

Third, whereas the volatility and distributional differences between stock and housing wealth imply a larger effect of housing wealth on consumption, the differences in liquidity enhance the relative effect of stock wealth. Foremost is the smaller transaction cost of selling stocks compared with selling a home. This helps account for the nearly 100 percent turnover of New York Stock Exchange listings in a typical year, while the annual turnover of homes in stable neighborhoods is usually 3 to 5 percent. In addition, the low transactions costs of stocks have made them readily available to borrow against, whether from a brokerage account or, more commonly, a retirement plan.

Nevertheless, some facets of housing enhance its relative accessibility. When tapping financial wealth, consumers face capital gains taxes and early withdrawal penalties from retirement accounts. Housing wealth, by contrast, receives more favorable tax treatment. Furthermore, several developments have enhanced housing's liquidity and thereby boosted the impact on consumption of housing wealth relative to that of stock wealth.

These developments are likely related to the low U.S. personal saving rate of recent years. It turned negative in early 2006, when households' spending exceeded disposable income. Conventional estimates of the wealth effect cannot fully account for why Americans are consuming more and saving less. Increased liquidity of home equity may provide an answer.

### Fueling Consumption

We can think of the overall impact of home prices on consumption as the combination of two parts—the traditional wealth effect and the relatively new and growing phenomenon of mortgage equity withdrawal (MEW). In recent years, U.S. households have been extracting housing wealth through home-equity loans, cash-out mortgage refinancings or by not fully rolling over capital gains from sales into down payments on subsequent home purchases. Because home-equity loans and mortgages are collateralized, they usually carry lower interest rates than unsecured loans; thus, homeowners can borrow more cheaply. Also, by making housing wealth more accessible, financial innovations have opened new avenues for families to act more quickly on their consumption preferences.[5]

Consistent with a growing liquidity, or MEW effect, some new studies have found wealth effects are now greater than earlier research suggested. One estimates that a $100 rise in housing wealth leads to a $9 increase in spending. Another finds that increases in housing wealth generate three times the spending from stock-price gains.[6] Neither study, however, directly examines whether housing wealth has a greater impact on consumption today because of the greater ease of accessing home equity.

Together, higher home values and financial innovations have enabled homeowners to more easily tap housing wealth. Mortgage equity withdrawals have risen sharply recently relative to income, whether measured using the comprehensive approach of Greenspan and Kennedy, [7] whose data extend back to 1990, or a cruder definition based on the flow of funds accounts. The two series tend to move together, but the latter approach, which tracks the difference between increases in mortgage debt and households' home investments, covers a longer period.

By this measure, MEW as a share of labor and transfer income has become more sensitive to swings in home-price appreciation, aided by the lower cost and greater ease of cashout mortgage refinancings. In 2005, MEW jumped to a record 5 percent of income, but it slowed sharply in the second quarter, when home-price appreciation decelerated (*Chart 3*).





As homeowners took money out of their homes, consumption rose as a
share of GDP (*Chart 4*). Conventional theories of wealth and consumption,
which tend to ignore credit and liquidity constraints, treat home-equity
withdrawals merely as manifestations of a modest wealth effect. They
cannot account for the unusually high consumption levels of the first half of
this decade. This high consumption may not be sustainable if homeowners'
wealth declines or increases less rapidly. Even if home-price appreciation
slows to the low single digits, MEW is likely to fall sharply, perhaps by as
much as 5 percentage points of income.



The limited U.S. econometric evidence indicates that the strong pace of

World Trade Is Falling Off a Cliff
Let's start with some charts from my friend Simon Hunt, out of London. The following chart shows World Merchandise Export Values and World Industrial Production falling off a cliff. This is the worst such period since the end of World War II. And as the data we will examine next indicates, it is likely to get worse. Simon notes that consumer spending is about 60% of world GDP, and it is not just in the US that spending is slowing down. Consumers all over the developed world are in shock, as assets such as stocks and houses, real estate, and commodities fall in value. Unemployment is rising.

We think that almost 2,000,000 lost jobs in the last three months in the US is a catastrophe. China lost a reported 20,000,000 jobs in the last quarter, and migrant workers came back to the cities after Chinese New Year to find factories and jobs simply gone. Unemployment is rising rapidly in Europe, as the demand for goods has clearly been falling since last October.



This means that inventories are too high, not just in the US but in factories all over the world, and that production is slowing down. Look at the recent US trade deficit. Many market analysts rejoiced that it dropped to a six-year low, just below $40 billion. But the internal numbers were not as positive. Exports are dropping faster than imports, as seen below. "After growing in every quarter during the last three years, real goods exports fell 34.9% at an annual rate, the worst performance in more than three decades." (www.dismal.com) And a falling deficit means that US consumers have to save more to balance out less foreign buying of US debt. There is no free lunch.

**Accurate Consumer L**
200 Million Consumers - R
GoLeads Gives You More

DATA
360

| Home | My Data360 | Platforms | ❓ |

| Data Plots | Data Sets | Data Graphs | Graph Groups | Reports | About Data360 |

## U.S. Real Consumer Spending



Billions of Chained 2000 Dollars

— St.Louis Federal Reserve [ADF]

www.data360.org

**Data Graph Name**
**Issue Group**

**Graph Group(s):**

Consumer Spending Overview - M

Inflation and Deflation Factors Ove

| Generate CSV | Add To M |

---

Show rows: 50 ▼ per page 1 - 50 of 605 📊 📊

| Transpose | | View Data Set |

| **Name** | **Real Personal Consumption Expenditures** |
| **Units of Measure** | Billions of Chained 2000 Dollars |
| **Last Updated** | 7/24/2009 |
| **Source** | St.Louis Federal Reserve |
| **Source URL** | http://research.stlouisfed.org/fred2/data/PCEC96.txt ADF |
| **Source Document** | |
| **Updater** | (no editor) |
| **Display on Graph** | Yes |
| **Legend** | Real Consumer Spending [10701] - www.data360.org |
| **Notes** | |
| Jan-1959 | $1,509.4 |
| Feb-1959 | $1,526.5 |
| Mar-1959 | $1,541.8 |
| Apr-1959 | $1,537.0 |
| May-1959 | $1,556.0 |
| Jun-1959 | $1,562.3 |
| Jul-1959 | $1,557.4 |
| Aug-1959 | $1,567.1 |

CHART OF THE DAY: The Great Debt Mountain
09-90026-mg   Doc 30731   Filed 07/29/09   Entered 08/05/09 15:39:11   Page 1 of 3
Pg 22 of 35

Exhibit Z9 pg 3

THE BUSINESS INSIDER

# Clusterstock

# CHART OF THE DAY: The Great Debt Moun

### Joe Weisenthal and Kamelia Angelova | Jul. 15, 2009, 3:48 PM | 🗨 4

Tags: Economy, Chart Of The Day

Unless our economy goes through some major, structural changes, we'll need cor
again for GDP to grow. And while consumers might be feeling good after today's r
help the monster overhang, which -- as today's chart shows -- remains near all-tir



Clusterstock  〜〜〜  Chart of the Day

**Consumer Debt As A Percent Of GDP**

Source: BEA and Federal Reserve

Get This Delivered To Your Inbox

You can get this dropped in your inbox every afternoon as **The Chart Of The Day**

Exhibit Z 16 pg 1

 **REUTERS**

Print | Close this window

# Bush says government will help automakers avoid collapse

Fri Dec 19, 2008 1:07pm EST

By Jeremy Pelofsky and Tabassum Zakaria

WASHINGTON (Reuters) - President George W. Bush on Friday offered a $17.4 billion government lifeline to ailing automakers General Motors and Chrysler LLC to prevent a deeper economic recession but he demanded they prove by March 31 that they can survive.

With only a month before leaving office, Bush emphasized that he normally opposed intervening in the free market but that the U.S. economy was too fragile now to allow the two big automakers to go bankrupt and throw thousands out of work.

"The automakers and unions must understand what is at stake and make hard decisions necessary to reform," Bush said. "By giving the auto companies a chance to restructure, we will shield the American people from a harsh economic blow at a vulnerable time."

The administration agreed to intervene after Republicans last week scuttled a proposal by the White House and Democrats to redirect $14 billion in energy loans to automakers.

Administration officials kept Democratic President-elect Barack Obama informed about the deal because he will assume responsibility for the loans when he takes office on January 20.

Chrysler, which is the weakest of the automakers, will get $4 billion in initial funding. The company said concessions would happen quickly and it would continue to undertake "significant cost reductions."

GM, due for $13.4 billion, said the bailout will lead to a leaner and stronger company. Ford, which says its liquidity is adequate for now, said it hoped to continue restructuring without need for a government line of credit.

Conditions imposed by the White House include requiring the automakers to reach agreements for restructuring by March 31, with an interim report in mid-February. There would also be limits on executive compensation and other perks and the government would receive warrants for non-voting stock.

### VIABILITY

"These conditions send a clear message to everyone involved in the future of American automakers: the time to make hard decisions to become viable is now or the only option will be bankruptcy," Bush said.

GM and Chrysler would also have to meet targets such as cutting wages and benefits by the end of 2009 to be more in line with non-union automakers. But the two could deviate from those targets if they can prove viability without them, the White House said.

On Capitol Hill, Democrats voiced support for Bush's action, while many of the president's fellow Republicans, who had blocked a legislative bailout, denounced his decision.

"I find it unacceptable that we would leave the American taxpayer with a tab

of tens of billions of dollars while failing to receive any serious concessions from the industry," said Sen. John McCain, an Arizona Republican who lost to Obama in the 2008 presidential contest.

Treasury Secretary Henry Paulson will serve as Bush's designee to oversee the loans until he leaves office and Obama will be able to select his own designee when he takes office, White House Deputy Chief of Staff Joel Kaplan said. (Additional reporting by John Crawley, David Alexander and Thomas Ferraro; Editing by Doina Chiacu)

© Thomson Reuters 2008  All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

# Troubled Asset Relief Program

My Copy

From Wikipedia, the free encyclopedia

The **Troubled Asset Relief Program (TARP)** is a program of the United States government to purchase assets and equity from financial institutions in order to strengthen its financial sector. It is the largest component of the government's measures in 2008 to address the subprime mortgage crisis.

## Contents

- 1 Purpose
- 2 Timeline of changes to the initial program
- 3 Administrative structure
- 4 Participation criteria
- 5 Eligible assets and asset valuation
- 6 Protection of taxpayer investment
- 7 Expenditures and commitments
- 8 Beneficiaries
- 9 Similar historical federal banking programs
- 10 Controversies
- 11 ABA's attempts to expunge the TARP warrants
- 12 References
- 13 See also
- 14 External links

## Purpose

TARP allows the United States Department of the Treasury to purchase or insure up to $700 billion of "troubled" assets. "Troubled assets" are defined as "(A) residential or commercial mortgages and any securities, obligations, or other instruments that are based on or related to such mortgages, that in each case was originated or issued on or before March 14, 2008, the purchase of which the Secretary determines promotes financial market stability; and (B) any other financial instrument that the Secretary, after consultation with the Chairman of the Board of Governors of the Federal Reserve System, determines the purchase of which is necessary to promote financial market stability, but only upon transmittal of such determination, in writing, to the appropriate committees of Congress." [1]

In short, this allows the Treasury to purchase illiquid, difficult-to-value assets from banks and other financial institutions. The targeted assets can be collateralized debt obligations, which were sold in a booming market until 2007 when they were hit by widespread foreclosures on the underlying loans. TARP is intended to improve the liquidity of these assets by purchasing them using secondary market mechanisms, thus allowing participating institutions to stabilize their balance sheets and avoid further losses.

TARP does not allow banks to recoup losses already incurred on troubled assets, but officials hope that once trading of these assets resumes, their prices will stabilize and ultimately increase in value, resulting in gains to both participating banks and the Treasury itself. The concept of future gains from troubled assets comes from the hypothesis in the financial industry that these assets are oversold, as only a small percentage of all mortgages are in default, while the relative fall in prices represents losses from a much

higher default rate.

The Act requires financial institutions selling assets to TARP to issue equity warrants (a type of security that entitles its holder to purchase shares in the company issuing the security for a specific price), or equity or senior debt securities (for non-publicly listed companies) to the Treasury. In the case of warrants, the Treasury will only receive warrants for non-voting shares, or will agree not to vote the stock. This measure is designed to protect taxpayers by giving the Treasury the possibility of profiting through its new ownership stakes in these institutions. Ideally, if the financial institutions benefit from government assistance and recover their former strength, the government will also be able to profit from their recovery.[2]

Another important goal of TARP is to encourage banks to resume lending again at levels seen before the crisis, both to each other and to consumers and businesses. If TARP can stabilize bank capital ratios, it should theoretically allow them to increase lending instead of hoarding cash to cushion against future unforeseen losses from troubled assets. Increased lending equates to "loosening" of credit, which the government hopes will restore order to the financial markets and improve investor confidence in financial institutions and the markets. As banks gain increased lending confidence, the interbank lending interest rates (the rates at which the banks lend to each other on a short term basis) should decrease, further facilitating lending.[2]

The TARP will operate as a "revolving purchase facility." The Treasury will have a set spending limit, $250 billion at the start of the program, with which it will purchase the assets and then either sell them or hold the assets and collect the 'coupons'. The money received from sales and coupons will go back into the pool, facilitating the purchase of more assets. The initial $250 billion can be increased to $350 billion upon the President's certification to Congress that such an increase is necessary.[3] The remaining $350 billion may be released to the Treasury upon a written report to Congress from the Treasury with details of its plan for the money. Congress then has 15 days to vote to disapprove the increase before the money will be automatically released.[2]. The first $350 billion was released on October 3, 2008, and Congress voted to approve the release of the second $350 billion on January 15, 2009. One way that TARP money is being spent is to support the "Making Homes Affordable" plan, which was implemented on March 4, 2009, using TARP money by the Department of Treasury. Because "at risk" mortgages are defined as "troubled assets" under TARP, the Treasury has the power to implement the plan. Generally, it provides refinancing for mortgages held by Fannie Mae or Freddie Mac. Privately held mortgages will be eligible for other incentives, including a favorable loan modification for five years.[4]

The authority of the United States Department of the Treasury to establish and manage TARP under a newly created Office of Financial Stability became law October 3, 2008, the result of an initial proposal that ultimately was passed by Congress as H.R. 1424, enacting the Emergency Economic Stabilization Act of 2008 and several other acts.[5][6]

# Timeline of changes to the initial program

On October 14, 2008, Secretary of the Treasury Paulson and President Bush separately announced revisions in the TARP program. The Treasury announced their intention to buy senior preferred stock and warrants in the nine largest American banks. The shares would qualify as Tier 1 capital and were non-voting shares. In order to qualify for this program, the Treasury required participating institutions to meet certain criteria, including: "(1) ensuring that incentive compensation for senior executives does not encourage unnecessary and excessive risks that threaten the value of the financial institution; (2)

ı᾿ required clawback of any bonus or incentive compensation paid to a senior executive based on
ᴧ statements of earnings, gains or other criteria that are later proven to be materially inaccurate; (3)
ᴈ prohibition on the financial institution from making any golden parachute payment to a senior executive
ᴴ based on the Internal Revenue Code provision; and (4) agreement not to deduct for tax purposes
ᴕ executive compensation in excess of $500,000 for each senior executive."[7] The Treasury also bought
ᵦ preferred stock and warrants from hundreds of smaller banks, using the first $250 billion dollars allotted
ᵧ to the program.[8]

ᵹ The first allocation of the TARP money was primarily used to buy preferred stock, which is similar to
ᴕ debt in that it gets paid before common equity shareholders. This has led some economists to argue that
ıₒ the plan may be ineffective in inducing banks to lend efficiently. [9][10]

ıı In the original plan presented by Secretary Paulson, the government would buy troubled (toxic) assets in
ıᴧ insolvent banks and then sell them at auction to private investor and/or companies. This plan was
ıᴈ scratched when Paulson met with England's Prime Minister Gordon Brown who came to the White
ıᴴ House for an international summit on the global credit crisis. Prime Minister Brown, in an attempt to
ıᴕ mitigate the credit squeeze in England, merely infused capital into banks via preferred stock in order to
ıᵦ clean up their balance sheets and, in some economists' view, effectively nationalizing many banks. This
ıᵧ plan seemed attractive to Secretary Paulson in that it was relatively easier and seemingly boosted
ıᵹlending more quickly. The first half of the asset purchases may not be effective in getting banks to lend
ıᴴagain because they were reluctant to risk lending as before with low lending standards. To make matters
ᴧₒworse, overnight lending to other banks came to a relative hault because banks did not trust each other to
ᴧı be prudent with their money.

ᴧᴧOn November 12, 2008, Secretary of the Treasury Henry Paulson indicated that reviving the
ᴧᴈsecuritization market for consumer credit would be a new priority in the second allotment.[11][12]

ᴧᴴOn December 19, 2008, President Bush used his executive authority to declare that TARP funds may be
ᴧᴕ spent on any program he personally deems necessary to avert the financial crisis, and declared Section
102 to be nonbinding. This has allowed President Bush to extend the use of TARP funds to support the
auto industry, a move supported by the United Auto Workers.

On January 15, 2009, the Treasury issued interim final rules for reporting and record keeping
requirements under the executive compensation standards of the CPP.[13]

On January 21, 2009, the Treasury announced new regulations regarding disclosure and mitigation of
conflicts of interest in its TARP contracting. [14]

On February 5, 2009, the Senate approved changes to the TARP which prohibit firms receiving TARP
funds from paying bonuses to their 25 highest-paid employees. The amendment was proposed by
Christopher Dodd of Connecticut as an amendment to the $900 billion economic stimulus act yet to be
passed. [15]

On February 10, 2009, the newly confirmed Secretary of the Treasury Timothy Geithner outlined his
plan to use the $300 billion or so dollars remaining in the TARP funds. He intended to use $50 billion
for foreclosure mitigation and use the rest to help fund private investors to buy toxic assets from banks.
Nevertheless, this highly anticipated speech coincided with a nearly 5 percent drop in the S&P 500 and
was criticized for being short on details.[16]

On March 23, 2009, U.S. Treasury Secretary Timothy Geithner announced a Public-Private Investment

# Investment News: Money Morning

Investment News Provider

- Home
- Archives
- Premium Content
- Investor Reports
- About Us
- Contributors
- Contact Us
- Categories



Sponsored Link: Peter Schiff on why this money should replace the U.S. Dollar

U.S. Banks Refuse to Detail How They're Spending Federal Bailout Money

[*This is the fifth installment of an investigative series in which* **Money Morning** *examines how U.S. banks are using federal bailout funds.*]

**By William Patalon III**
**Executive Editor**
**Money Morning/The Money Map Report**

After receiving hundreds of billions of dollars in taxpayer-funded federal bailout money, the biggest U.S. banks say they can't track how that money is being spent.

Some of the banks are outright refusing to discuss the matter, a new study has found.

"We have not disclosed that to the public. We're declining to," Thomas Kelly, a spokesman for JP Morgan Chase & Co. (JPM) told *The Associated Press*, which surveyed 21 banks that received at least $1 billion in federal bailout money, and asked how that capital was being used. JP Morgan received a $25 billion infusion as part of the U.S. Treasury Department's $700 billion Troubled Assets Relief Program (TARP).

As an ongoing *Money Morning* investigation has demonstrated, billions in U.S. bank rescue funds are financing buyouts worldwide - instead of lending at home. Some of those buyouts deals are being done in markets as far away as China. Meanwhile, credit remains tight here in the U.S. market, a situation that could be alleviated if only the banks made the bailout money available to consumers in the form of loans.

*Money Morning* was one of the first news organizations to really examine how TARP money was being misdirected, and wasn't being deployed as originally intended. More recently, *The AP* has joined the journalistic posse and published several investigative pieces, including one that looked at executive pay at financial institutions that received bailout money.

Some experts - such as investing icon Jim Rogers - say that bailouts in general are bad deals. They're even worse if they're funded by taxpayers who don't know how their money is being spent **[A related**

**story on Rogers' views about the U.S. banking-bailout initiative appeared last week in *Money Morning*. To access that story, please click here].**

The bottom line: Banks won't say how they're using the bailout money. That refusal - coupled with the almost non-existent disclosure and oversight of the TARP program - means the country may well never find out how hundreds of billions of taxpayer dollars were spent.

## Anatomy of a Survey

In its latest investigative offering, *The Associated Press* contacted 21 banks that received at least $1 billion in government money and asked four questions: How much has been spent? What was it spent on? How much is being held in savings? And what's the plan for the rest?

According to *The AP*, none of the banks provided specific answers.



**Sign up below...**
**and we'll send you a new investment report for free:**

**"Credit Crisis Report."**

**MONEY MORNING**
Get these stories delivered to you every day, for FREE
Sign Up Below
WE VALUE YOUR PRIVACY

Sign Up Now!

For instance, when Kevin Heine, a spokesman for Bank of New York Mellon Corp. (BK) - which received about $3 billion in TARP money - was asked how his institution was using the emergency infusion, he replied by stating that "we have not disclosed that to the public. We're declining to."

The words varied, but the basic message was the same from one bank to another. For instance, Barry Koling, a spokesman for SunTrust Banks Inc. (STI), the Atlanta, Ga.-based lender that received $3.5-billion in taxpayer cash, told the wire service that "we're not providing dollar-in, dollar-out tracking."

Some banks actually admitted that they simply didn't know where the money was going.

For instance, a spokesman for the Birmingham-based Regions Financial Corp. (RF) said the company is not tracking how it is spending the $3.5 billion in TARP money that it received.

"We manage our capital in its aggregate," said Regions spokesman Tim Deighton.

These answers - or lack thereof - highlight both the secrecy surrounding the TARP program, as well as the lack of oversight by Congress. Given that the entire TARP program is worth at least $700 billion - roughly the equivalent of the economy of The Netherlands - those aren't small issues.

About half of the $700 billion was earmarked for bailouts. But because the U.S. financial crisis was escalating so quickly - and because the Bush administration pushed Congress to approve the TARP plan quickly - Congress attached virtually no strings to the bailout funds. The Treasury Department has been using the money to buy stakes in key U.S. banks, allegedly hoping that the infusion of cash would enable them to heal themselves and start lending again.

As the deepening U.S. credit crisis has shown, that hasn't happened.

## No Oversight, No Accountability

There has been no accounting of how banks spend that money. Lawmakers summoned bank executives to Capitol Hill late last year and implored them to lend the money - instead of hoarding it, spending it on executive bonuses, or for buyouts to get bigger. But there's no process in place to guide this. And there are no consequences for banks that fail to comply with what U.S. lawmakers are asking.

Even worse: There's no vehicle that enables taxpayers to find out what banks are doing - at least, not yet.

"It is entirely appropriate for the American people to know how their taxpayer dollars are being spent in private industry," Elizabeth Warren, the top congressional watchdog overseeing the financial bailout, told *The AP*. Stating that it takes "a lot of nerve not to give answers."

Warren said her oversight panel will try to force the banks to say where they've spent the money. But she also noted that she was quite surprised to learn that she even has to ask for that information.

"If the appropriate restrictions were put on the money to begin with, if the appropriate transparency was in place, then we wouldn't be in a position where you're trying to call every recipient and get the basic information that should already be in public documents," Warren said.

In fact, the due diligence on the legislation that created TARP was so lax that lawmakers didn't realize until much later that the bill they passed actually managed to create a potentially illegal tax loophole that grants banks a tax-break windfall of as much as $140 billion. Lawmakers were furious - but possibly powerless, afraid that a full-scale assault on the tax change could cause already-done deals to unravel, in turn causing investor confidence to do the same.

"Those are legitimate questions that should have been asked on Day One," said U.S. Rep. Scott Garrett, R-N.J., a financial services committee member who opposed the bailout as it was being pushed through Congress. "Where is the money going to go to? How is it going to be spent? When are we going to get a record on it?"

## Buyouts Not Bailouts

Nearly every bank questioned - including Citigroup Inc. (C) and Bank of America Corp. (BAC) - recipients of some of the largest TARP infusions - responded to *AP* inquiries with generic public relations statements explaining that the money was being used to strengthen balance sheets and to continue making loans to ease the credit crisis.

As a *Money Morning* story detailed Friday, BofA just finalized its buyout of Merrill Lynch & Co. Inc. (MER), creating the largest U.S. bank - as well as the biggest challenge yet for longtime BofA Chief Executive Officer Kenneth D. Lewis. And Wells Fargo & Co. (WFC) completed its $12.7 billion purchase of Wachovia Corp. (WB) - outbidding Citigroup Inc. (C) and making a massive bet that it accurately quantified the still existing risks in Wachovia's huge portfolio of mortgage and real estate loans.

Those were just the latest in a long series of buyout deals being funded at least partly by TARP money, the ongoing *Money Morning* investigation has shown.

In response to *The AP* survey questions, a few banks detailed company-specific programs, such as a JP Morgan plan to lend $5 billion to nonprofit organizations and healthcare companies over the next year. Marshall & Ilsley Corp. (MI), said the $1.75 billion bailout infusion it received allowed the Wisconsin-based bank to temporarily stop foreclosing on homes, said Senior Vice President Richard Becker.

This "foreclosure moratorium" will run through the end of March, the bank announced in December.

## No Real Answers

But no bank provided even the most basic accounting for the federal money. Some even said that the money couldn't be tracked.

The bailout money "doesn't have its own bucket," said Bob Denham, a spokesman for North Carolina-based BB&T Corp. (BBT).

Denham said taxpayer money wasn't used in BB&T's recent purchase of a Florida insurance company. When asked how he could make such a statement - after stating that TARP money couldn't be tracked - said BB&T would have made that deal even without the infusion.

Interestingly, a spokesman for BB&T told the *Charleston (W.V.) Daily Mail* newspaper just before Christmas that the bank doesn't like the federal government's $700 billion financial rescue plan - and actually didn't want to participate - but took the $3.1 billion because competitors are participating and because the Treasury Department urged it to.

According to the newspaper, BB&T - the largest bank in West Virginia - has been asked how it justifies participating in the federal government's Troubled Asset Relief Program, or TARP, in light of BB&T Chairman John A. Allison IV's promotion of the late author Ayn Rand's philosophy of free market capitalism.

The reticence banks displayed when it came to discussing their use of TARP money bordered on the absurd. Most banks wouldn't even say why they were keeping the details secret.
"We're not sharing any other details. We're just not at this time," Wendy Walker, a spokeswoman for Dallas-based Comerica Inc. (CMA), which received $2.25-billion from the government, told *The AP*.

One didn't even want to say they wouldn't say, the wire service reported.

Heine, the New York Mellon spokesman who said he wouldn't share spending specifics, added: "I just would prefer if you wouldn't say that we're not going to discuss those details."
Morgan Stanley (MS) offered to discuss the matter with reporters on condition of anonymity. When *The AP* refused, Morgan Stanley spokeswoman Carissa Ramirez sent the wire service an e-mail saying: "We are going to decline to comment on your story."

Lawmakers say they want to tighten restrictions on the second half of the TARP money, the yet-to-be-released block worth $350 billion. U.S. Treasury Secretary Henry M. "Hank" Paulson Jr. said the federal department is trying to build up its monitoring of bank spending.

"What we've been doing here is moving, I think, with lightning speed to put necessary programs in place, to develop them, implement them, and then we need to monitor them while we're doing this," Paulson said at a recent forum in New York. "So we're building this organization as we're going."

But that may all be too late, says Garrett, the New Jersey Republican congressman. Indeed, it's entirely possible that U.S. taxpayers will never get a clear answer on where hundreds of billions of dollars went.

[**Editor's Note:** The ongoing financial crisis has changed the investing game forever, making uncertainty the norm and creating a whole set of new rules that will help determine who wins and who loses.

Investors who ignore this "New Reality" will struggle, and will find their financial forays to be frustrating and unrewarding. But investors who embrace this change will not only survive - they will thrive.

*Money Morning* Investment Director Keith Fitz-Gerald has already isolated these new rules and has unlocked the key to what he refers to as "The Golden Age of Wealth Creation." But Fitz-Gerald brings more than a realization - and an understanding - to the table, here. After a decade of work, he's also developed a new computerized trading model based on a mathematical concept known as "fractals." This system allows him to predict price movements of broad indexes, or individual stocks, with a high degree of certainty. And it's particularly well suited to the kind of market we're all facing right now. Check out our latest report on these new rules, and this new market environment.]

**News and Related Story Links**:

- **Globe and Mail:**
  Banks mum on plans for bailout money.

- **Money Morning Investigative Report on the Bank Bailouts (Part IV):**
  Banks That Got $188 Billion in Bailout Money This Year Paid Out $1.6 Billion to Top Execs Last Year.

- **Money Morning Investigative Report on the Bank Bailouts (Part III):**
  Billions in U.S. Bank Rescue Funds are Fueling Buyouts Worldwide - Instead of Lending at Home.

- **Money Morning Investigative Report on the Bank Bailouts (Part II):**
  Billions in Bank Rescue Funds are Fueling Buyout Deals, and not the Increase in Loans That Would Help Ease the Financial Crisis.
- **Money Morning Investigative Report on the Bank Bailouts (Part I):**
  Foreign Bondholders - and not the U.S. Mortgage Market - Drove the Fannie/Freddie Bailout.

- **USA Today:**
  Where'd the bailout money go? Banks aren't saying.

- **USA Today:**
  Congress Presses Banks on Financial Rescue Spending.

- **Wikipedia:**
  Troubled Assets Relief Program.

- **Money Morning News Analysis:**
  Bank of America to Boost Stake in China's No. 2 Bank.

- 
  **Money Morning News Analysis:**
  Paulson Announces New Plans to Buy Equity Stakes in Banks and Revive Credit Markets.

- **Wikipedia:**
  Elizabeth Warren.

- **Money Morning News Analysis:**
  Bank of America, Wells Fargo End Year by Closing Major Buyout Deals.

*Exhibit Z 12 pg 1*

# boston.com

THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

LISTENOP | ELIZABETH WARREN

*The Boston Globe*

# Keeping tabs on the bailout

**By Elizabeth Warren | April 12, 2009**

*Until last year, Harvard Law School professor Elizabeth Warren was perhaps best known for her writing on bankruptcy and consumer finance. But last fall, she was appointed chair of a newly created Congressional Oversight Panel, which is charged with keeping tabs on the $700 billion bailout of the financial sector - an effort formally known as the Troubled Assets Relief Program. Warren was recently interviewed by Globe deputy editorial page editor Dante Ramos, who prepared the following edited excerpts.*

**Q:** You've been quite critical of the Treasury. What troubles you most about what you're getting and what you're not getting?

**A:** There's no discussion of the overall policy. Instead, there are specific programs that are announced, and from that, it's necessary to reason backwards to figure out what the goal must have been. It's like a "Jeopardy!" game. If this is the answer, what was the question? It's frustrating because without a clearly articulated goal and identified metrics to determine whether the goal is being accomplished, it's almost impossible to tell if a program is successful.

**Q:** Do you have a clear sense of what the overall TARP plan at this point is supposed to do? Are you capable of summarizing what it's supposed to be doing?

**A:** No. And neither is Treasury. Treasury has given us multiple contradictory explanations for what it's trying to accomplish.

There's a major problem and a minor problem. The minor problem is documentation. I've spent four weeks now looking for someone who can give me the details of the stress test so that we can do an independent evaluation of whether the stress test is any good.

We get: "someone will call [you] right back." Only the call doesn't come.

The major problem is that Treasury has not articulated its goals. And without that, we can't have a robust debate about whether they're headed in the right direction; instead, we're stuck with this more technical argument about the implementation of the [Term Asset-Backed Securities Loan Facility] or the details of the Capital Acquisition Program. And that misses the central question of, should we be subsidizing failing banks or liquidating them? When we acquire capital, should we exercise more control over the institutions that take the money or less control? Those are the central policy issues that the American public has a right to participate in.

**Q:** What [is] the underlying problem? Is it that there aren't the right people at Treasury? Or is the lack of transparency and the lack of resolution on the conceptual front, is that an unspoken part of the policy?

**A:** I can only look at the evidence. When the panel asked [Bush administration Treasury Secretary Henry] Paulson in December whether or not the American taxpayer was getting full value when it invested billions of dollars of the original TARP money, he sent a letter back to me that said, "Yes. These are par transactions." That means, in effect, for every $100 of taxpayer money that went into those banks, the US taxpayer was getting back $100 worth of stock and warrants.

We did an independent valuation of the transactions, crunched a lot of numbers, used a lot of different approaches for how to value the transactions. And we discovered that for every $100 of taxpayer money put into the financial institutions, the taxpayer got back about $66 in current value.

**Q:** So what accounts for the $34 difference?

**A:** Treasury specifically designed a program that had the effect of subsidizing the financial institutions, and simultaneously represented to the panel and to the American people that there was no subsidization.

**Q:** So they weren't really telling you the truth?

**A:** They said one thing and did another.

**Q:** It seems that there's a culture clash. The public-policy culture says there should be public participation, and the goal is to allocate the benefits and the pain as fairly as you can. And then there's the Wall Street culture, which is built upon self-interested institutions maximizing benefit without a lot of outside interference. Those two things clash pretty strongly in the AIG case.

**A:** I see this as an insiders/outsiders problem.

The insiders, the investment bankers and other financial services specialists, have a system that works very well for them. The problem is they're now using the outsiders' money to fund that system. Their system has collapsed. AIG is not functional without substantial taxpayer dollars. And the insiders don't seem to have appreciated the seismic shift in their world when they need money, gifts, subsidies from outsiders.

Anyone who thinks that they can take tens of billions of dollars of taxpayer money and continue to operate business as usual lives in a fantasy world that I don't understand. Culture clash? No! This is not a culture clash. This is not about taxpayers who don't get it. This is about people who think [in a] fantasy, that their world is prosperous and continues to create value that can be parsed out privately, when they are relying on huge subsidies from the taxpayer. It's just wrong!

**Q:** What's the connection between the squeeze that consumers are feeling and the financial bailout that you're now charged with trying to scrutinize?

**A:** I bring a very different perspective to the bailout than those who spent the last dozen years in the financial services industry. I believe that ultimately, the banks exist to serve the American people. Not vice versa. We cannot have a vibrant economy without a strong and reliable banking system, but it is impossible to save the banking system independently of saving the American family.

The whole Treasury program began as a top-down analysis: Large financial institutions are at risk of failing; how can we prop them up? We might have asked a different series of questions: Large financial institutions are failing; how do we make sure that there are some financial institutions to keep the economy going forward while we let the failures go? There was a real focus on saving all of the institutions rather than a focus on saving enough of a system to keep it workable for the underlying economy.

Saving everyone is a lot more expensive than saving the minimal number to keep the economy functional.

Every time I do the paperwork for the panel and note a $10 billion expenditure, I think about how many schools that might have built, how many hospitals that might have updated. Those dollars are not just ink on a page. They're real.

**Q:** If at the end of all of this you and your panel have done a good job, what does that look like?

**A:** Wow, that's a tough one. I suspect it will be a comparative measure. We will have wasted comparatively less money, and spent more on comparatively more successful programs. If as the result of our panel's work, Treasury takes a more comprehensive perspective on how to commit $3 trillion of taxpayer money, then we succeed.

**Q:** And what happens if they keep being unresponsive? What can you do?

**A:** They've already changed. Secretary Paulson asked for $700 billion announcing one program, and within weeks had changed directions entirely. The current Treasury has recognized that as a strategy that will not be tolerated.

**Q:** Is there anything else that you would want people to understand?

**A:** I don't have a badge and a gun. The power of this panel is derived entirely from the voice of the American people. If they stay out of the policy debates, then Treasury can spend at will and reshape the American economy with no one in the room but insiders. If they are involved, the policies will look different.

It's the design of the rules going forward that will tell us or that will determine whether we are moving to a cyclical economy with high wealth, high risk, and crashes every 10 to 15 years. Or whether we will emerge, as we did following the new regulatory reforms in the Great Depression, with a more stable economic system that benefits people across the economic spectrum. It's an amazing moment in history. ■

© Copyright 2009 The New York Times Company