**DAY PITNEY** LLP
Amish R. Doshi (AD5996)
7 Times Square
New York, New York 10036
Telephone:    (212) 297-5800
Facsimile:    (212) 916-2940
E-Mail:       adoshi@daypitney.com

*Attorneys for IDB Leasing, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| **MOTORS LIQUIDATION COMPANY, et al.,** (f/k/a/ General Motors Corporation, *et al.,)* | **Case No. 09-50026 (REG)** |
| Debtors. | **(Jointly Administered** |

Hearing Date:    **August 18, 2009**
Hearing Time:    **9:45 a.m.**
Objection Date:  **August 13, 2009**

### IDB LEASING INC.'S LIMITED OBJECTION TO MOTION OF DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 363(A) ESTABLISHING PROCEDURES FOR THE DISPOSITION OF *DE MINIMIS ASSETS*, AND (B) AUTHORIZING THE DEBTORS TO (i) PAY RELATED FEES, AND (ii) ASSUME, ASSUME AND ASSIGN, OR REJECT RELATED EXECUTORY CONTRACTS OR UNEXPIRED LEASES ("*DE MINIMIS* MOTION")

IDB Leasing, Inc. ("**IDB**"), submits its Limited Objection to the *De Minimis* Motion

("**Limited Objection**") filed by the above-captioned debtors and debtors-in-possession

(collectively, the "**Debtors**") and in support of its Limited Objection respectfully states as

follows:

## I.    RELEVANT BACKGROUND FACTS

1.    Pre-Petition, General Motors Corporation ("**GM**") and Pacific Rim Capital, Inc.

("**Pacific**") entered into a Master Lease Agreement dated October 19, 2001 ("**MLA**"), pursuant

to which GM agreed to lease certain equipment, more particularly described in various

Equipment Schedules to the MLA, from Pacific.  A copy of the MLA is attached hereto as Exhibit "A" and is incorporated by reference herein.

2.        Pre-petition, GM and Pacific entered into that certain Equipment Schedule, Schedule No. 140 ("**Schedule 140**"), pursuant to which GM leased from Pacific the equipment more particularly described therein, and upon the terms and conditions set forth therein.  A copy of Schedule 140 is attached hereto as Exhibit "B" and is incorporated by reference herein.

3.        Pre-petition, GM and Pacific entered into that certain Equipment Schedule, Schedule No. 156 ("**Schedule 156**" and together with Schedule 140 and the MLA, the "**Lease**") pursuant to which GM leased from Pacific the equipment more particularly described therein, and upon the terms and conditions set forth therein.  A copy of Schedule 156 is attached hereto as Exhibit "C" and is incorporated by reference herein.

4.        On or about October 20, 2004, Pacific collaterally assigned Schedule 140 and Schedule 156, along with all the equipment subject to each of those schedules, to IDB.  Copies of Notices and Acknowledgments of Assignment are attached hereto as Exhibit "D" and are incorporated by reference herein.

5.        The Debtor filed the *De Minimis* Motion, seeking, among other things, authority to sell certain assets with a relative d*e minimis* value pursuant to the *De Minimis* Sale Procedures.[1]

6.        The *De Minimis* Motion, at ¶ 7A, provides, in relevant part, as follows:

> Sale Price Less Than Or Equal to $2 Million.  The Debtors hereby seek approval to sell any asset for total consideration of a value that is less than or equal to $2 million (a "Non-Noticed *De Minimis*

---

[1]        Capitalized terms used, but not otherwise defined herein, shall have the same meanings ascribed to them in the *De Minimis* Motion.

Sale") without further court approval, and <u>without providing notice</u> of the Non-Noticed *De Minimis* Sale <u>to any party</u> …

If the Debtors seeks to assume, assume and assign, or reject executory contracts or unexpired leases relating to and in connection with an asset sale that would otherwise qualify as a Non-Noticed *De Minimis* Sale, the Debtors will seek to sell those assets pursuant to the Noticed *De Minimis* Sale procedures …

(emphasis added.)

7.     The *De Minimis* Motion, at ¶ 7B, provides, in relevant part, as follows:

<u>Sale Price Greater than $2 Million But Less Than or Equal to $15 Million</u>.  If the Debtors propose a Noticed *De Minimis* Sale, the Debtors will serve a notice of such proposed sale (a "Sale Notice") by facsimile, e-mail, overnight delivery, hand delivery or first class mail on the following parties: … (v) all known parties holding or asserting liens or encumbrances on the assets … (vi) the counterparties to all executory contracts and unexpired leases…

## II.   <u>LIMITED OPPOSITION</u>

8.     Although the *De Minimis* Motion provides that the Debtors will follow the same procedures as the Noticed *De Minimis* Sale with respect to any assumption or assumption and assignment or rejection of executory contracts or unexpired leases, in connection with sale of assets with an aggregate value less than $2 million, IDB objects to the *De Minimis* Motion to the extent that the Debtors seek authority to "sell" any or all of the equipment subject to Schedule 140 or Schedule 156 (collectively, the "IDB Equipment"), without notice to IDB, as proposed in Non-Noticed *De Minimis* Sale.  It should be noted that the Debtors cannot sell the IDB Equipment as set forth below, but rather must comply with 11 U.S.C. § 365 with respect to the Lease and/or the IDB Equipment.

9.     As set forth above, the IDB Equipment was leased to the Debtors.  IDB is the owner of the IDB Equipment.  The Debtors merely hold a leasehold interest and are only lessees with respect to the Lease and the IDB Equipment.  As such, the Debtors cannot sell the IDB

Equipment, irrespective of its alleged value, but rather must comply with the applicable provision of the Bankruptcy Code, including but not limited to 11 U.S.C. § 365. Thus, to the extent that the Lease or the IDB Equipment is involved in connection with any sale of assets, irrespective of the alleged aggregate value, then IDB request that the Debtors follow the same procedures as set forth with respect to the Noticed *De Minimis* Sale.

10.    Further, IDB objects to the *De Minimis* Motion to the extent that any notices with respect to the IDB Equipment or the Lease should be (i) given its undersigned attorneys (not just IDB) and (ii) given upon either e-mail, fax, overnight delivery or hand delivery, but <u>not by first-class mail</u>. Given the short time period of ten (10) calendar days to object to any proposed sale, first class mail may not allow sufficient time to timely respond to any such notices.

11.    IDB further reserves its rights with respect to any notices that may be sent pursuant to the *De Minimis* Motion.

### III.    <u>CONCLUSION</u>

12.    **WHEREFORE**, IDB requests the relief set forth herein and for such other further relief that this Court deems just and proper.

Dated:  August 13, 2009
       New York, New York

**DAY PITNEY** LLP

/s/ Amish R. Doshi
Amish R. Doshi (AD5996)
7 Times Square
New York, New York 10036
Telephone:    (212) 297-5800
Facsimile:    (212) 916-2940
E-mail:    adoshi@daypitney.com

***Attorneys for IDB Leasing, Inc.***

# EXHIBIT A

81492601A01081309

MASTER LEASE AGREEMENT

THIS MASTER LEASE AGREEMENT, dated as of October 19, 2001 ("Agreement"), is between General Motors Corporation, a corporation organized and existing under the laws of the State of Delaware, with as office at 902 East Hamilton Avenue, Flint, MI 48550 (hereinafter called, together with its successors and assigns, if any, "Lessee"), and Pacific Rim Capital, Inc., a corporation organized and existing under the laws of the State of California, with an office at 1 Jenner, Suite 170, Irvine, CA 92618 (hereinafter called, together with its successors and assigns, if any, "Lessor").

WITNESSETH:

I.    LEASING:

(a)    Subject to the terms and conditions set forth below, Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the equipment ("Equipment") described in Annex A to any schedule attached hereto or made a part hereof ("Schedule"). Terms defined in a Schedule and not defined herein shall have the meanings contained in such Schedule.

(b)    The obligation of Lessor to purchase Equipment from the manufacturer or supplier thereof ("Supplier") and to lease the same to Lessee under any Schedule shall be subject to receipt by Lessor, prior to the Lease Commencement Due (with respect to such Equipment), of each of the following documents in form and substance satisfactory to Lessor: (i) a Schedule relating to the Equipment, (ii) a Purchase Order Assignment and Consent in the form of Annex B to the applicable Schedule, unless Lessor shall have delivered its purchase order for such Equipment, (iii) evidence of insurance which complies with the requirements of Section IX, and (iv) such other documents as Lessor may reasonably request. As a further condition to such obligations of Lessor, Lessee shall, upon delivery of such Equipment (but not later than the Last Delivery Date specified in the applicable Schedule) execute and deliver or have delivered to Lessor a Certificate (in the form of Annex C to the applicable Schedule) covering such Equipment, and deliver or have delivered to Lessor a bill of sale therefor (in form and substance satisfactory to Lessor). Lessor hereby appoints Lessee as its agent for inspection and acceptance of the Equipment from the Supplier. Upon execution by Lessee of such Certificate, the Equipment described thereon shall be deemed to have been delivered to, and received and irrevocably accepted by, Lessee, as between Lessee and Lessor only, for lease hereunder. It is understood that such Certificate does not limit any rights Lessee may have against the Supplier.

II.    TERM, RENT, AND PAYMENT:

(a)    The rent payable hereunder and Lessee's right to use the Equipment shall commence on the date of execution by Lessee of the Certificate (in the form of Annex C to the applicable Schedule) for such Equipment ("Lease Commencement Date"). The term of this Agreement shall be the period specified in the applicable Schedule. If any term is extended, the word "term" shall be deemed to refer to all extended terms, and all provisions of this Agreement shall apply during any extended terms, except as otherwise agreed to in writing.

(b)    Rent shall be paid to Lessor at its address stated above, except as otherwise directed by Lessor. Payments of rent shall be in accordance with the provisions of the applicable Schedule. If Advance Rentals are payable, such Advance Rental shall be (i) set forth on the applicable Schedule, (ii) due upon acceptance by Lessor of such Schedule, and (iii) when received by Lessor, applied to the first rent payment and the balance, if any, to the final rental payment(s) under such Schedule. In no event shall any Advance Rental or any other rent payments be refunded to Lessee. If rent is not paid within ten (10) days of its due date, Lessee agrees to pay a late charge of one cent ($.01) per dollar on, and in addition to, the amount of such rent but not exceeding the lawful maximum, if any.

III.    TAXES:

Lessee shall have no liability for taxes imposed by the United States of America or any state or political subdivision thereof which are on or measured by the total gross income, net income, total gross receipts, capital, capital stock, or net worth of Lessor. Lessee shall report (to the extent that it is legally permissible) and pay promptly all other taxes, fees, and assessments due, imposed, assessed, or levied against the Equipment, or the purchase, ownership, delivery, leasing, possession, the use or operation thereof, or upon the rentals or receipts with respect to this Agreement or any Schedule hereunder, including all license and registration fees and all sales, use, personal property, excise, gross receipts, stamp, or other similar taxes, imposts, duties, and charges, together with any penalties, fines, or interest thereon, imposed against this Agreement or any Schedules or Supplemental Documents, or against Lessor, Lessee, or the Equipment by any federal, state, or local government or taxing authority during or relating to the term of this Agreement (all hereinafter called "Taxes"). Lessee shall not be liable, however, for any penalties, fines, or interest resulting from any acts or omissions of the Lessor, but only to the extent such penalties, fines, or interests have not arisen from Lessor's acts or omissions which are predicated on a request from Lessee or reliance on Lessee's representations or duties pursuant to this Agreement. Lessee shall (i) reimburse Lessor upon receipt of written request for reimbursement for any Taxes charged to or assessed against Lessor, provided such Taxes have not previously been paid by, or simultaneously billed to Lessee (in this regard Lessor and Lessee agree to mutually cooperate in the resolution of such matters with the appropriate taxing authorities), (ii) on written request of Lessor, submit to Lessor written evidence of Lessee's payment of Taxes, (iii) on all reports and returns show ownership of the Equipment by Lessor, and (iv) upon receipt of written request, send a copy thereof to Lessor.

IV.    REPORTS:

(a)    Lessee will notify Lessor in writing, within ten (10) days after any tax or other lien shall attach to any Equipment, of the full particulars thereof and of the location of such Equipment on the date of such notification unless the same shall have been removed or fully discharged by the Lessee.

(b)    Lessee will permit Lessor to inspect any Equipment during normal business hours, provided that no exercise of such inspection right shall materially interfere with the normal operation of the Equipment or the business of Lessee.

(c)    Lessee will keep the Equipment at the Equipment Location (specified in the applicable Schedule) and will promptly notify Lessor of any relocation of Equipment. Upon written request of Lessor, Lessee will notify Lessor forthwith in writing of the location of any Equipment as of the date of such notification.

(d)    Lessee will promptly and fully report to Lessor in writing if any Equipment is lost or damaged (where the estimated repair costs would exceed ten percent (10%) of its then fair market value), or is otherwise involved in an accident causing personal injury or property damage.

V.    DELIVERY, USE, AND OPERATION:

(a)    All Equipment shall be shipped directly from the Supplier to Lessee.

(b)    Lessee agrees that the Equipment will be used by Lessee solely in the conduct of its business and in a manner complying with all applicable federal, state, and local laws and regulations.

(c)    LESSEE SHALL NOT ASSIGN, MORTGAGE, SUBLET, OR HYPOTHECATE ANY EQUIPMENT, OR THE INTEREST OF LESSEE HEREUNDER, NOR SHALL LESSEE REMOVE ANY EQUIPMENT FROM THE CONTINENTAL UNITED STATES, WITHOUT THE PRIOR WRITIEN CONSENT OF THE LESSOR. SUCH CONSENT SHALL NOT UNREASONABLY BE WITHHELD.

(d)    Lessee will keep the Equipment free and clear of all liens and encumbrances other than the following: (1) liens arising from claims attributable to Lessor, (2) liens for taxes of Lessee either not yet due or being contested in good faith by appropriate proceedings, so long as such proceedings do not involve any material danger of the sale, forfeiture, or loss of

Rev. 5/14/92                                    2

the Equipment or any interest therein, and (3) materialmen's, mechanics', workmen's, repairmen's, or other like liens arising in the ordinary course of Lessee's business ('including those arising under maintenance agreements entered into in the ordinary course of business) securing obligations that are not overdue or are being contested in good faith by appropriate proceedings, so long as such proceedings do not involve any material danger of the sale, forfeiture, or loss of the Equipment or any interest therein.

## VI.    SERVICE:

(a)    Lessee will, at its sole expense, maintain or cause to be maintained each unit of Equipment in good operating order, repair, condition, and appearance in accordance with normal industry standards, normal wear and tear excepted. Lessee shall, if at any time requested by Lessor, affix in a prominent position on each unit of Equipment plates, tags, or other identifying labels showing ownership thereof by Lessor. So long as no event of default shall have occurred and be continuing, and so long as Lessee shall comply with Section VI(b) hereof, Lessee may, without the prior written approval of Lessor, deliver possession of Equipment to the Supplier or to any other provider for testing, service, repair, maintenance, or overhaul work on such Equipment.

(b)    Lessee will not, without the prior consent of Lessor, affix or install any accessory, equipment, or device on any Equipment if such addition will impair the originally intended function or use of such Equipment. All additions, repairs, parts, supplies, accessories, equipment, and devices furnished, attached, or affixed to any Equipment which are not readily removable shall be made only in compliance with applicable law, including Internal Revenue Service guidelines, and shall become the property of Lessor and subject to the terms of this Agreement. Lessee will not, without the prior written consent of Lessor and subject to such conditions as Lessor may impose for its protection, affix or install any Equipment to or in any other personal or real property.

(c)    Any alterations or modifications to the Equipment that may, at any time during the term of this Agreement, be required to comply with any applicable law, rule, or regulation shall be made at the expense of Lessee.

## VII.    STIPULATED LOSS VALUE:

"Event of Loss" with respect to the Equipment means any of the following: (1) the loss of such Equipment or use thereof due to the destruction of or damage to such Equipment which renders repair uneconomic or which renders such Equipment permanently unfit for normal use by Lessee for any reason whatsoever; (2) the theft, disappearance, confiscation, condemnation, or seizure of title to such Equipment which shall have resulted in the loss of possession or use of such Equipment by Lessee for a period in excess of sixty (60) consecutive days; or (3) imposition of environmental or other legal restrictions that make continued use of the Equipment uneconomic or illegal. Lessee shall promptly and fully notify Lessor in writing upon the occurrence of any Event of Loss. On the rental payment date next succeeding an Event of Loss (the "Payment Date"), Lessee shall pay Lessor without duplication the sum of (x) the Stipulated Loss Value of such unit calculated as of the rental period immediately preceding such Event of Loss ("Calculation Date"); and (y) all rental and other amounts which are due hereunder as of the Payment Date. Upon payment of all sums due hereunder, the term of this lease as to such unit shall terminate, and (except in the case of the loss, theft, or complete destruction of such unit) Lessor shall be entitled to recover possession of such unit.

## VIII.    RISK OF LOSS:

Lessee hereby assumes and shall bear, the entire risk of any loss, theft, damage to, or destruction of, any unit of Equipment from any cause whatsoever from the time the Equipment is shipped to Lessee.

## IX.    INSURANCE:

Lessee agrees, at its own expense, to keep all Equipment insured with "ALL-RISKS" property insurance to a limit of the Stipulated Loss Value, including, but not limited to, insurance for damage to or loss of such Equipment and liability coverage for personal injuries, death or property damage that may result from the use or operation of the Equipment, with Lessor

named as additional insured and with a loss payable clause in favor of Lessor, as its interest may appear, irrespective of any breach of warranty or other act or omission of Lessee. All such policies shall be with reputable companies and on terms reasonably satisfactory to Lessor. Lessee agrees to deliver to Lessor, upon written request by Lessor, certificate(s) of insurance. Said certificate(s) shall state that the insurance is primary to any other insurance that may be available to Lessor and provide at least thirty (30) days' written notice to Lessor of cancellation, modification, or material change to any policy. Lessee will not make adjustments with insurers except (i) with respect to claims for damage to any unit of Equipment where the repair costs do not exceed ten percent (10%) of such unit's fair market value, or (ii) with Lessor's written consent. Lessee may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Equipment or any portion thereof, or (ii) satisfy any obligation of Lessee to Lessor hereunder.

X.    RETURN OF EQUIPMENT:

(a)    Upon any expiration or termination of this Agreement or any Schedule, Lessee shall promptly, at its own cost and expense: (i) perform any testing and repairs required to place the affected units of Equipment in the good condition and repair, reasonable wear and tear excepted, and in good working order for their originally intended purpose; (ii) if deinstallation, disassembly, or crating is required, cause such units to be properly deinstalled, disassembled, and crated in accordance with normal industry standards; and (iii) tender such units to Lessor at the Equipment Location specified in the applicable Schedule or, at the option of Lessor, at any location designated by Lessor within two hundred fifty (250) miles of said Equipment Location. Upon and after tender of delivery to Lessor, Lessee shall have no new responsibilities for the Equipment. This shall not affect any obligations hereunder predating said tender.

(b)    Until Lessee has complied with the requirements of Section X(a) above, Lessee's rent payment obligation and all other obligations under this Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term. Lessor may terminate such continued leasehold interest upon ten (10) days' notice to Lessee.

XI.    EVENTS OF DEFAULT:

Lessor may in writing declare this Agreement in default upon the occurrence of any one of the following events ("Events of Default"):

(a)    Lessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within ten (10) days after written notice thereof;

(b)    Lessee breaches any of its insurance obligations under Section IX and fails to cure the breach within ten (10) days after written notice thereof;

(c)    Lessee breaches any of its other obligations, representations, or warranties and fails to cure that breach within thirty (30) days after written notice thereof;

(d)    Lessee becomes insolvent or ceases to do business as a going concern; or

(e)    any Equipment is illegally used and Lessee fails to cease such use as soon as possible, not to exceed five (5) working days, after written notice thereof.

Such declaration of default shall apply to all Schedules except as specifically excepted by Lessor.

XII.    REMEDIES:

(a) Upon the declaration of default and at any time thereafter so long as an Event of Default shall be continuing, Lessor may at its option do one or more of the following with respect to all or any part of the Equipment, to the extent permitted by, and subject to compliance with any mandatory requirements of, applicable law then in effect:

(1)    upon the written demand of Lessor and at Lessee's expense cause Lessee to return promptly, and Lessee shall return promptly, all or any part of the Equipment as the Lessor may demand in the manner and condition required by, and otherwise is accordance with Section X(a) hereof, as if the Equipment were being returned at the end of the Term; and/or

(2)    enter the premises, with or without legal process, where all or any part of the Equipment is located and take immediate possession; and/or

(3)    sell the Equipment, upon fifteen (15) days' written notice to Lessee, at public or private sale, as Lessor may determine, or otherwise dispose of, hold, use, operate, lease to others, or keep idle the Equipment as Lessor, in its sole discretion, may determine, all free and clear of any rights of Lessee, except as hereinafter set forth is this Section XII. Lessor may sell the Equipment without having the Equipment present at place of sale, and Lessor may make reasonable use of Lessee's premises for the purpose of displaying and selling the equipment at no expense to Lessor; and/or

(4)    whether or not Lessor shall have exercised, or shall thereafter at any time exercise, any of its rights under subparagraphs (1), (2), and (3) of this Section XII with respect to any of the Equipment, Lessor, by written notice to Lessee specifying a payment date of such notice, may demand that the Lessee pay to Lessor, as damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rental period immediately preceding the declaration of default), all rent due for Equipment prior to the payment date so specified, any late charges provided for in Section II hereof, any interest provided for is Section XXI(e) hereof, any accrued and then-due taxes, and all reasonable costs and expenses, including reasonable legal fees incurred by the Lessor in connection with the enforcement of, but not the administration of, the Agreement; and/or

(5)    in the event Lessor, pursuant to subparagraph (3) of this Section XII, shall have sold, released, or otherwise disposed of the Equipment, the proceeds of sale, lease, or other disposition, if any, shall be applied in the following order of priorities: (i) to pay all Lessor's reasonable costs, charges, and expenses incurred in taking, removing, holding, repairing, selling, leasing, or otherwise disposing of Equipment; then (ii) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee hereunder; then (iii) to reimburse to Lessee any sums previously paid by Lessee as liquidated damages; and then (iv) any surplus shall be retained by Lessor (Lessee shall remain responsible for any deficiency in (i) and (ii) forthwith).

(b)    The foregoing remedies are cumulative and not exclusive of other remedies, and any or all thereof may be exercised in lieu of or in addition to each other or any remedies at law, in equity, or under statute. Waiver of any default shall not be a waiver of any other or subsequent default.

XIII. ASSIGNMENT:

(a).    LESSEE WILL NOT, WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR, ASSIGN, CONVEY, OR SUBLEASE ITS RIGHTS OR INTEREST IN THIS AGREEMENT.

(b)    Lessor may, without the consent of Lessee, assign this Agreement or any Schedule. Lessee agrees that if Lessee receives written notice of an assignment from Lessor, Lessee will pay all rent and all other amounts payable under any assigned Equipment Schedule to such assignee or as instructed by Lessor. Lessee further agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee. Lessee hereby waives and agrees not to assert against any such assignee any defense, set-off, recoupment claim, or counterclaim which Lessee has or may at any time have against Lessor, Supplier, or any prior assignee for any reason whatsoever.

(c)    Subject to the foregoing, the terms and provisions of this Agreement shall be binding upon and inure to the benefit of Lessor and Lessee and their respective successors and permitted assigns.

Rev. 5/14/92                                                        5

XIV.   NET LEASE; NO SET-OFF, ETC.:

This Agreement is a net lease. Lessee's obligation to pay rent and other amounts due hereunder shall be absolute and unconditional. Lessee shall not be entitled to any abatement or reductions of, or set-offs against, said rent or other amounts including, without limitation, those arising or allegedly arising out of claims (present or future, alleged or actual, and including claims arising out of strict tort or negligence of Lessor or Supplier) of Lessee against Lessor or Supplier under this Agreement or otherwise. Nor shall this Agreement terminate or the obligations of Lessee be affected by reason of any defect in or damage to, or loss of possession, use or destruction of, any Equipment from whatsoever cause. It is the intention of the parties that rents and other amounts due hereunder shall continue to be payable in all events in the manner and at the times set forth herein unless the obligation is terminated pursuant to the express terms hereof.

XV.   INDEMNIFICATION:

(a)      Lessee and Lessor hereby agree to indemnify, save and keep harmless the other, the other's agents, employees, successors, and assigns from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including reasonable legal expenses, of whatsoever kind and nature, in contract or tort, arising during the term of this Agreement out of the breach by the Lessor or Lessee, respectively, of any part of this Agreement. However, to the extent that any losses, damages, penalties, injuries, claims, actions and suits, including reasonable legal expenses, of whatsoever kind and nature, in contract or tort, arising during the term of this Agreement out of the breach by the Lessor or Lessee, respectively, of any part of this Agreement are caused by negligence or malfeasance of the indemnified party, there shall be no indemnification under the first sentence of this subsection. Additionally, Lessee hereby agrees to indemnify and keep harmless Lessor, its agents, employees, successors, and assigns against any and all losses, damages, penalties, injuries, claims, actions, and suits, including reasonable legal expenses, of whatsoever kind and nature, in contract or tort, and including Lessor's strict liability in tort, arising during the term of this Agreement, out of selection, manufacture, acceptance, or rejection of Equipment, and the delivery, possession, maintenance, uses, condition, return, or operation of Equipment (including, without limitation, latent and other defects, whether or not discoverable by Lessor or Lessee and any claim for patent, trademark, or copyright infringement or environmental damage). Lessor or Lessee, respectively, shall, upon request, defend any actions based on, or arising out of, any such indemnification.

(b)      Lessee hereby represents, warrants, and covenants that (i) Lessor shall be the party entitled to claim accelerated cost recovery deductions ("Tax Benefits") as defined by the Internal Revenue Code of 1986, as amended, available for Lessor's purchase and ownership of the Equipment purchased and leased hereunder, (ii) on Lease Commencement Date for any unit of Equipment, such unit will qualify for all Tax Benefits specified in Section C of the applicable Schedule(all references to Lessor in this Section XV include Lessor and the consolidated taxpayer group of which Lessor is a member); and (iii) at no time during the term of this Agreement will Lessee take or omit to take, nor will it permit any sublessee or assignee to take or omit to take, any action which will result in the disqualification of any Equipment for, reduction of (which is not the result of Lessor having alternative minimum tax status), or recapture of, all or any portion of such Tax Benefits.

(c)      Notwithstanding any other provisions in this document, if as a result of a breach of any representation, warranty, and covenant of the Lessee contained in this Agreement or any Schedule (i) tax counsel of Lessor shall reasonably determine that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Equipment, or (ii) any such Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any such Tax Benefit is recomputed or recaptured (any such determination, disallowance, adjustment, recomputation, or recapture being hereinafter called a "Loss"), then to the extent of any such breach Lessee shall pay to Lessor, as additional rental payments, such amount as shall cause the Lessor's net after-tax return on investment to equal the net after-tax return on investment (assuming an effective tax rate of thirty-four percent [34%]) that would have been realized by the Lessor if such Loss had not occurred, computed in all cases using the same assumptions utilized in originally evaluating the transaction. Such amount shall be payable within thirty (30) days after the Lessor has notified the Lessee in writing that such a Loss has occurred, including a written statement describing in reasonable detail such Loss and the computation thereof.

(d)      All of Lessor's and Lessee's rights, privileges, and indemnities contained is this Section XV shall survive the expiration or other termination of this Agreement and the rights, privileges, and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by Lessor and Lessee, respectively, their successors and assigns, respectively.

XVI.    DISCLAIMER:

LESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES. LESSOR DOES NOT MAKE, HAS NOT MADE, NOR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE EQUIPMENT LEASED HEREUNDER OR ANY COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE. All such risks, as between Lessor and Lessee, are to be borne by Lessee. Without limiting the foregoing, Lessor shall have no responsibility or liability to Lessee or any other person with respect to any of the following, regardless of any negligence of Lessor (i) any liability, loss, or damage caused or alleged to be caused directly or indirectly by any Equipment, any inadequacy thereof, any deficiency or defect (latent or otherwise) therein, or any other circumstance in connection therewith; (ii) the use, operation, or performance of any Equipment or any risks relating thereto; (iii) any interruption of service, loss of business or anticipated profits, or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement, or replacement of any Equipment. If, and so long as, no default exists under this Lease, Lessee shall be, and hereby is, authorized during the term of this Lease to assert and enforce, at Lessee's sole cost and expense, from time to time, in the name of and for the account of Lessor and/or Lessee, as their interests may appear, whatever claims and rights Lessor may have against any Supplier of the Equipment.

XVII.   REPRESENTATIONS AND WARRANTIES OF LESSEE:

Lessee hereby represents and warrants to Lessor that on the date hereof and on the date of execution of each Schedule:

(a)      Lessee has adequate power and capacity to enter into, and perform under, this Agreement and all related documents (together, the "Documents") and is duly qualified to do business wherever necessary to carry on its present business operations, including the jurisdiction(s) where the Equipment is or is to be located.

(b)      The Documents have been duly authorized, executed, and delivered by Lessee and constitute valid, legal, and binding agreements, enforceable in accordance with their terms; except to the extent that the enforcement of remedies therein provided may be limited under applicable bankruptcy and insolvency laws.

(c)      No approval, consent, or withholding of objections is required from any governmental authority or instrumentality with respect to the entry into or performance by Lessee of the Documents except such as have already been obtained.

(d)      The entry into and performance by Lessee of the Documents will not: (i) violate any judgment, order, law, or regulation applicable to Lessee or any provision of Lessee's Certificate of Incorporation or By-Laws; or (ii) result in any breach of, constitute a default under, or result in the creation of any lien, charge, security interest, or other encumbrance upon any Equipment pursuant to any indenture, mortgage, deed of trust, bank loss, or credit Agreement or other instrument (other than this Agreement) to which Lessee is a party.

(e)      There are no suits or proceedings pending or threatened in court or before any commission, board, or other administrative agency against or affecting Lessee, which will have a material adverse effect on the ability of Lessee to fulfill its obligations under this Agreement.

(f)    The Equipment listed on any Certificate (in the form of Annex C to the applicable Schedule) is and will remain tangible personal property.

(g)    Lessee is and will be at all relevant times validly existing and in good standing under the laws of the State of its incorporation (specified is the first sentence of this Agreement).

(h)    The Equipment will at all times be used for commercial or business purposes.

XVIII.   REPRESENTATIONS AND WARRANTIES OF LESSOR:

(a)    Lessor covenants that it will not directly or indirectly create, incur, assume, or suffer to exist any lien attributable to it on the Equipment which has priority over the Lessee's rights under this Agreement.

(b)    Lessor covenants that it will not, through its own actions or inactions, interfere in Lessee's quiet enjoyment of the Equipment during the applicable lease term so long as this Agreement shall not have been declared in default under Section XI above.

XIX.   EARLY TERMINATION:

(a)    On or after the First Termination Date (specified in the applicable Schedule), Lessee may, so long *as* no default exists hereunder, terminate this Agreement as to all (but not less than all) of the Equipment on such Schedule as of a rent payment date ("Termination Date") upon at least ninety (90) days' prior written notice to Lessor.

(b)    Lessee shall, and Lessor may, solicit cash bids for the Equipment on an AS IS, WHERE IS BASIS without recourse to or warranty from Lessor, express or implied ("AS IS BASIS"). Prior to the Termination Date, Lessee shall (i) certify to Lessor any bids received by Lessee and (ii) pay to Lessor (A) the Termination Value (calculated as of the rental due on the Termination Date) for the Equipment, and (B) all rent and other sums due and unpaid as of the Termination Date.

(c)    Provided that all amounts due hereunder have been paid on the Termination Date, Lessor shall (i) sell the Equipment on an AS IS BASIS for cash to the highest bidder and (ii) refund the proceeds of such sale (net of any related expenses) to Lessee up to the amount of the Termination Value. If such sale is not consummated, no termination shall occur and Lessor shall refund the Termination Value (less any expenses incurred by Lessor) to Lessee.

(d)    Notwithstanding the foregoing, Lessor may elect by written notices, at any time prior to the Termination Date, not to sell the Equipment. In that event, on the Termination Date Lessee shall (i) return the Equipment (in accordance with Section X) and (ii) pay to Lessor all amounts required wader Section XIX(b) less the amount of the highest bid certified by Lessee to Lessor.

XX.   PURCHASE OPTION:

(a) So long as no default exists hereunder and the lease has not been earlier terminated, Lessee may at lease expiration, upon at least ninety (90) days' prior written notice to Lessor, purchase all (but not less than all) of the Equipment in any Schedule on an AS IS BASIS for the option price set forth is said Schedule (the "Option Price") (plus all applicable sales taxes). Lessor and Lessee agree that the Option Prices is a reasonable prediction of the Equipment's "Fair Market Value" at lease expiration.

(b) "Fair Market Value" shall mean the price which a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment is an arm's-length transaction to a willing seller under no compulsion to sell; provided, however, that in such determination: (i) the Equipment shall be assumed to be in the condition in which it is required to be maintained and returned under this Agreement; (ii) in the case of any installed Equipment, that Equipment

Rev. 5/14/92                                    8

shall be valued on as installed basis; and (iii) costs of removal from current location shall not be a deduction from such valuation.

XXI. MISCELLANEOUS:

(a)    LESSEE AND LESSOR HEREBY UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS LEASE, ANY OF THE RELATED DOCUMENTS. ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN LESSEE AND LESSOR. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT (INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS). NOTWITHSTANDING ANY STATE OR FEDERAL LAW TO THE CONTRARY, LESSEE AND LESSOR AGREE THAT THIS WAIVER IS NOT UNILATERALLY REVOCABLE. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS LEASE, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION. IN THE EVENT OF LITIGATION, THIS LEASE MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b)    Unless and until Lessee exercises its rights under Section XX above, nothing herein contained shall give or convey to Lessee any right, title, or interest in and to any Equipment except as a lessee. Any cancellation or termination by Lessor, pursuant to the provisions of this Agreement or any Schedule hereto, shall not release Lessee from any then outstanding obligations to Lessor hereunder. All Equipment shall at all times remain personal property of Lessor regardless of the degree of its annexation to any real property and shall not by reason of any installation in, or affixation to, real or personal property become a part thereof.

(c)    Time is of the essence of this Agreement. Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right thereafter to demand strict compliance therewith. Lessee agrees, upon Lessor's request, to execute any instrument reasonably necessary for filing, recording, or perfecting the interest of Lessor. All notices required to be given hereunder shall be deemed adequately given if sent by registered or certified mail to the addressee at its address stated herein, or at such other place as such addressee may have designated in writing. This Agreement and any Schedule and Annexes thereto constitute the entire agreement of the parties with respect to the subject matter hereof. NO VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY WAIVER OF ANY OF ITS PROVISIONS OR CONDITIONS SHALL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE PARTIES HERETO.

Initials: _____

(d)    In case of a failure of Lessee to comply with any provision of this Agreement, Lessor shall have the right, but shall not be obligated to, effect such compliance, in whole or in part; and all monies spent and expenses and obligations incurred or assumed by Lessor in effecting such compliance shall constitute additional rent due to Lessor within five (5) days after the date Lessor sends notice to Lessee requesting payment. Lessor's effecting such compliance shall not be a waiver of Lessee's default.

(e)    Any rent or other amount than rent not paid to Lessor when due hereunder shall bear annualized interest, both before and after any judgment or termination hereof, at *the lesser* of the Prime Rate (as shown in the "Money Rates" column of The Wall Street Journal as of the due date of the rent or other amount) or the maximum rate allowed by law. Any provisions in this Agreement and any Schedule which are in conflict with any statute, law, or applicable rule shall be deemed omitted, modified, or altered to conform thereto.

Rev. 5/14/92                                                    9

(f)    This Agreement shall be governed by and construed and enforced according to the laws of the State of Michigan, excluding any such laws which direct the application of laws of any other jurisdiction.

IN WITNESS WHEREOF, Lessee and Lessor have caused this Agreement to be executed by their *duly* authorized representatives as of the date first above written.

LESSOR:                                                                  LESSEE:
PACIFIC RIM CAPITAL, INC.                            GENERAL MOTORS CORPORATION

By _David P. Olinsky_                                       By _Donald D. Brynton_

Title _Chairman_                                              Title _Purchasing Manager's_

Rev. 5/14/92                                      10

# EXHIBIT B

81492601A01081309

**ORIGINAL**

EQUIPMENT SCHEDULE
SCHEDULE NO. 140
DATED THIS APRIL 2, 2004
TO MASTER LEASE AGREEMENT
DATED AS OF OCTOBER 19, 2001

Lessor and Mailing Address:

PACIFIC RIM CAPITAL, INC.
15 Enterprise, Suite 400
Aliso Viejo, CA 92656

Lessee and Mailing Address:

GENERAL MOTORS CORPORATION
30009 Van Dyke
Warren, MI 48090

Capitalized terms not defined herein shall have the meanings assigned to them in the Master Lease Agreement identified above ("Agreement"; said Agreement and this Schedule being collectively referred to as "Lease").

A.   **EQUIPMENT**

Pursuant to the terms of the Lease, Lessor agrees to acquire and lease to Lessee and Lessee agrees to lease from Lessor Hot/Cold Pressure Washer, Aanalyst 200, and related equipment (Equipment) listed on all Certificates of Acceptance signed by a representative of Lessee and in connection herewith.

B.   **FINANCIAL TERMS**

1.   Advance Rent (if any): $0.00

2.   Capitalized Lessor's Cost: The aggregate of Cost set forth on attached Annex A to be signed by a representative of Lessee in connection herewith.

3.   Basic Term Lease Rate Factor:   1.728%

4.   Daily Lease Rate Factor:   0.0576%

5.   Basic Term (Number of Months): 60

6.   Basic Term Commencement Date:  The first day of the calendar month following the latest Lease Commencement Date of all Equipment.

7.   Equipment Location:    As set forth on the Certificate(s) of Acceptance

8.   Lessee's Federal Tax ID Number: 380572515

9.   Supplier: As set forth on the Certificate(s) of Acceptance

10.   Last Delivery Date: June 30, 2004

11.   First Termination Date: 60 months after the Basic Term Commencement Date.

12.   Option Price: Fair Market Value

Equipment Schedule No. 140, Page 2 of 7
General Motors Corporation
Pacific Rim Capital, Inc.

**C.    TAX BENEFITS**

a.    <u>Depreciation Method:</u>    Two hundred percent (200%) declining balance method, switching to straight line method for the first (1st) taxable year for which using the straight line method with respect to the adjusted basis of the beginning of such year will yield a larger allowance.

b.    <u>Recovery Period:</u> Five (5) years MACRS.

c.    <u>Basis:</u> One Hundred percent (100%) of Capitalized Lessor's Cost.

**D.    TERM AND RENT**

1.    <u>Interim Rent:</u>  For the period from and including the Lease Commencement Date to the Basic Term Commencement Date ("Interim Period"), Lessee shall pay rent ("Interim Rent") for each unit of Equipment, the product of the Daily Lease Rate Factor times the Capitalized Lessor's cost of such unit times the number of days in the Interim Period. Interim Rent shall be due on Basic Term Commencement Date.

2.    <u>Basic Term Rent:</u> Commencing on the Basic Term Commencement Date, and on the same day of each month thereafter (each, a "Rent Payment Date") during the Basic Term, Lessee shall pay rent ("Basic Term Rent") the product of the Basic Term Lease Rate Factor times the Capitalized Lessor's Cost of all Equipment on this Schedule.

**E.    INSURANCE**

1.    Commercial (broad form comprehensive) general liability, including contractual liability coverage, in limits of not less than two million dollars ($2,000,000.00) per occurrences combined single limit for personal injury and property damage.

2.    "All Risks" property insurance for the Equipment in an amount equal to the Stipulated Loss Value, with no co-insurance requirement

**F.    SPECIAL TERMS**

1.    <u>Redelivery:</u>   In furtherance and not in limitation of, the use, maintenance and return conditions for the Equipment set forth in Section X of the Agreement, Lessee hereby agrees to return the Equipment to Lessor in accordance with all of the terms and conditions of the Agreement and in compliance with the following special return conditions. Lessor or its assignee (or their agent) shall conduct a preliminary inspection of the Equipment at the equipment location prior to the expiration of the Lease to minimize claims made after return, provided however, that Lessee shall nonetheless remain liable for the Equipment unless and until it is surrendered to Lessor as specified below. Upon receipt of the Equipment, Lessor or its assignee (or their agent) shall conduct an inspection of the Equipment and if Equipment is not in compliance with the conditions hereinafter described, determine the repairs, additions or replacements, if any, which are necessary to place the Equipment in the condition hereinafter described. Lessee shall remain liable for the Equipment unless and until it is returned to Lessor as specified below:

a.    Be in compliance with all applicable federal, state and local laws;

b.    Be complete with no missing or damaged parts and free of any hazardous material, waste or residue;

Equipment Schedule No. 140, Page 3 of 7
General Motors Corporation
Pacific Rim Capital, Inc.

     c.     Have all components and accessories provided upon delivery or replacements provided at any time during the term of the Lease including, without limitation, those necessary to enable the Equipment to perform the function for which it was designed in accordance with the manufacturer's recommended specifications;

     d.     Equipment to be deinstalled according to the manufacturer's specifications; and

     e.     Be relicensed and recertified for manufacturer maintenance at Lessee's expense.

Lessee's right to terminate this Lease upon the expiration of the term hereof and return the Equipment shall be in its entirety as to all Equipment or to the extent of any portion thereof that comprises a complete, stand alone, self-sustaining and remarketable operating system (not a component such as but not limited to a cable, battery, lift extension, etc.) as originally contemplated when the Lease commenced.

2.     <u>Renewal Option:</u>  Lessee shall have the option to renew the Basic Term of this Schedule for a period of 12 or 24 months at the Fair Market Value provided however, Lessee shall notify Lessor of its exercise of the option at least ninety (90) days prior to the expiration of the Basis Term.

3.     <u>Certificate(s) of Acceptance:</u>    Notwithstanding anything to the contrary in the Agreement or otherwise, as an accommodation to Lessee, the acceptance of each item of Equipment under this Schedule may be effected by Lessee's electronic transmission to Lessor via facsimile or other mutually acceptable medium of the Certificate(s) of Acceptance describing each such item so accepted in sufficient detail (including serial numbers), the Equipment Location and Cost and referencing the Lessor.  Each such transmission to Lessor shall be considered a Certificate of Acceptance (as contemplated hereunder and under the Agreement) and, notwithstanding (i) the authority (or lack thereof) of the person executing such Certificate of Acceptance to act on behalf of and/or bind Lessee and (ii) the fact that the Certificate of Acceptance delivered to Lessor is not an original document, shall constitute Lessee's unconditional and non-revocable acceptance of each item(s) of Equipment set-forth therein under and for all purposes of this Schedule.  Lessee acknowledges that Lessor is relying upon each such Certificate of Acceptance and agrees to indemnify, defend and hold harmless Lessor, its agents and Assignees from and against any and all claims, actions, suits, proceedings, reasonable costs and expenses, including court costs and reasonable attorney's fees, damages, penalties, and liabilities relating to or arising out of this accommodation.

4.     <u>Predicated Debt Rate:</u>    If the yield of the 5 year U.S. Treasury obligation on the first business day of the calendar quarter in which the final document package (including final Annex A, final Annex C and Notice and Acknowledgement of Assignment) is sent to GM for signature is greater than 2.75%, then the Basic Term Lease Rate Factor defined above as 1.728%, will be increased by 0.010% for every 25 basis point (0.25%) increment by which the 5 year T-Yield exceeds 2.75%. If the yield of the 5 year U.S. Treasury obligation on the first business day of the calendar quarter in which the final document package (including final Annex A, final Annex C and Notice and Acknowledgement of Assignment) is sent to GM for signature is less than 2.75%, then the Basic Term Lease Rate Factor defined above as 1.728%, will be decreased by 0.010% for every 25 basis point (0.25%) increment by which the 5 year T-Yield is less than 2.75%. The Daily Lease Rate Factor, defined above as 0.0576%, will be modified by dividing the final Basic Term Lease Rate Factor by 30, resulting in the final Daily Lease Rate Factor. The adjusted percentage and resulting monthly rent amount will be fixed on the Basic Term Commencement Date and throughout the Basic Term.

G.     **UCC FINANCING STATMENTS**

Equipment Schedule No. 140, Page 4 of 7
General Motors Corporation
Pacific Rim Capital, Inc.

Lessee hereby authorizes Lessor to file UCC financing statements or other security instruments against Lessee to establish and protect the rights and remedies of Lessor under this Lease and in the Equipment without Lessee's signature or other authentication in accordance with the provisions of the Uniform Commercial Code then in effect in the applicable jurisdictions.

Except as expressly modified hereby, all terms and provisions of the Agreement shall remain in full force and effect. In the event of a conflict between the Agreement and this Schedule, this Schedule will control. This Schedule is not binding or effective with respect to the Agreement or Equipment until executed on behalf of Lessor and Lessee by authorized representatives of Lessor and Lessee, respectively.

IN WITNESS WHEROF, Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first written above.

LESSOR:                                    LESSEE:

PACIFIC RIM CAPITAL, INC.                  GENERAL MOTORS CORPORATION

By: _____               By: _____

Name: _Marc C. Mills_____               Name: _Harold Brown_____

Title: _President_____               Title: _Purchasing Manager__

Equipment Schedule No. 140, Page 5 of 7
General Motors Corporation
Pacific Rim Capital, Inc.

ANNEX A
TO SCHEDULE NO. 140
TO MASTER LEASE AGREEMENT
DATED AS OF OCTOBER 19, 2001

DESCRIPTION OF EQUIPMENT

Basic Term Commencement Date: 9/1/04

| MANUFACT-URER | SERIAL NUMBERS | MODEL NO. | TYPE OF EQUIPMENT | NO. OF UNITS | MONTHLY RENT | LEASE COMMENCE-MENT DATE | COST PER UNIT | EXTENDED COST |
|---|---|---|---|---|---|---|---|---|
| PERKIN ELMER | 200S4030501 | B3150070 | AANALYST 200-4 LAMP W/D2 AND 2 EDL | 1 | 292.51 | 8/30/2004 | 16,927.50 | 16,927.50 |
| PERKIN ELMER | N/A | N3050152 | NI LUMINA HCL | 1 | 2.84 | 8/30/2004 | 164.50 | 164.50 |
| PERKIN ELMER | N/A | N3050191 | ZN LUMINA HCL | 1 | 3.88 | 8/30/2004 | 224.50 | 224.50 |
| PERKIN ELMER | N/A | N3050218 | AL-CA-CU-FE-MG-SI-ZN LUMINA HCL | 1 | 4.14 | 8/30/2004 | 239.50 | 239.50 |
| PERKIN ELMER | N/A | N3050217 | CO-CR-CU-FE-MN-NI LUMINA HCL | 1 | 4.14 | 8/30/2004 | 239.50 | 239.50 |
| Installation Site: 7447 SE 74TH ST.  OKLAHOMA CITY OK 73135 | | | | | | | | |
| PERKIN ELMER | 200S4031701 | B3150070 | AANALYST 200-4 LAMP W/D2 AND 2 EDL | 1 | 292.51 | 7/1/2004 | 16,927.50 | 16,927.50 |
| PERKIN ELMER | N/A | N3050152 | NI LUMINA HCL | 1 | 2.84 | 7/1/2004 | 164.50 | 164.50 |
| PERKIN ELMER | N/A | N3050191 | ZN LUMINA HCL | 1 | 3.88 | 7/1/2004 | 224.50 | 224.50 |
| PERKIN ELMER | N/A | N3050218 | AL-CA-CU-FE-MG-SI-ZN LUMINA HCL | 1 | 4.14 | 7/1/2004 | 239.50 | 239.50 |
| PERKIN ELMER | N/A | N3050217 | CO-CR-CU-FE-MN-NI LUMINA HCL | 1 | 4.14 | 7/1/2004 | 239.50 | 239.50 |
| Installation Site: 7655 GM BLVD.  SHREVEPORT LA 71129 | | | | | | | | |
| PERKIN ELMER | 200S4031304 | B3150070 | AANALYST 200-4 LAMP W/D2 AND 2 EDL | 1 | 292.51 | 5/28/2004 | 16,927.50 | 16,927.50 |
| PERKIN ELMER | N/A | N3050152 | NI LUMINA HCL | 1 | 2.84 | 5/28/2004 | 164.50 | 164.50 |
| PERKIN ELMER | N/A | N3050191 | ZN LUMINA HCL | 1 | 3.88 | 5/28/2004 | 224.50 | 224.50 |
| PERKIN ELMER | N/A | N3050218 | AL-CA-CU-FE-MG-SI-ZN LUMINA HCL | 1 | 4.14 | 5/28/2004 | 239.50 | 239.50 |
| PERKIN ELMER | N/A | N3050217 | CO-CR-CU-FE-MN-NI LUMINA HCL | 1 | 4.14 | 5/28/2004 | 239.50 | 239.50 |
| Installation Site: 900 BALDWIN AVE.  PONTIAC MI 48340 | | | | | | | | |
| | | | | | | CAPITALIZED LESSOR'S COST: | | $53,386.50 |

Initials: Lessor _____

Initials: Lessee _____

Equipment Schedule No. 140, Page 6 of 7
General Motors Corporation
Pacific Rim Capital, Inc.

**ANNEX B**
**TO SCHEDULE NO. 140**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF OCTOBER 19, 2001**

STIPULATED LOSS AND TERMINATION VALUE TABLE [*]

| Rental Period | Stipulated Loss Value Percentage | | Termination Value Percentage | | Rental Period | Stipulated Loss Value Percentage | | Termination Value Percentage | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 110.000 | % | 110.000 | % | 31 | 92.329 | % | 92.329 | % |
| 2 | 109.501 | % | 109.501 | % | 32 | 91.632 | % | 91.632 | % |
| 3 | 108.997 | % | 108.997 | % | 33 | 90.927 | % | 90.927 | % |
| 4 | 108.486 | % | 108.486 | % | 34 | 90.215 | % | 90.215 | % |
| 5 | 107.970 | % | 107.970 | % | 35 | 89.495 | % | 89.495 | % |
| 6 | 107.449 | % | 107.449 | % | 36 | 88.766 | % | 88.766 | % |
| 7 | 106.921 | % | 106.921 | % | 37 | 88.030 | % | 88.030 | % |
| 8 | 106.388 | % | 106.388 | % | 38 | 87.285 | % | 87.285 | % |
| 9 | 105.849 | % | 105.849 | % | 39 | 86.532 | % | 86.532 | % |
| 10 | 105.303 | % | 105.303 | % | 40 | 85.770 | % | 85.770 | % |
| 11 | 104.752 | % | 104.752 | % | 41 | 85.000 | % | 85.000 | % |
| 12 | 104.194 | % | 104.194 | % | 42 | 84.221 | % | 84.221 | % |
| 13 | 103.630 | % | 103.630 | % | 43 | 83.434 | % | 83.434 | % |
| 14 | 103.060 | % | 103.060 | % | 44 | 82.638 | % | 82.638 | % |
| 15 | 102.483 | % | 102.483 | % | 45 | 81.832 | % | 81.832 | % |
| 16 | 101.900 | % | 101.900 | % | 46 | 81.018 | % | 81.018 | % |
| 17 | 101.311 | % | 101.311 | % | 47 | 80.195 | % | 80.195 | % |
| 18 | 100.714 | % | 100.714 | % | 48 | 79.362 | % | 79.362 | % |
| 19 | 100.111 | % | 100.111 | % | 49 | 78.521 | % | 78.521 | % |
| 20 | 99.502 | % | 99.502 | % | 50 | 77.669 | % | 77.669 | % |
| 21 | 98.885 | % | 98.885 | % | 51 | 76.809 | % | 76.809 | % |
| 22 | 98.262 | % | 98.262 | % | 52 | 75.938 | % | 75.938 | % |
| 23 | 97.632 | % | 97.632 | % | 53 | 75.058 | % | 75.058 | % |
| 24 | 96.994 | % | 96.994 | % | 54 | 74.168 | % | 74.168 | % |
| 25 | 96.350 | % | 96.350 | % | 55 | 73.268 | % | 73.268 | % |
| 26 | 95.698 | % | 95.698 | % | 56 | 72.358 | % | 72.358 | % |
| 27 | 95.039 | % | 95.039 | % | 57 | 71.438 | % | 71.438 | % |
| 28 | 94.373 | % | 94.373 | % | 58 | 70.507 | % | 70.507 | % |
| 29 | 93.699 | % | 93.699 | % | 59 | 69.566 | % | 69.566 | % |
| 30 | 93.018 | % | 93.018 | % | 60 | 68.615 | % | 68.615 | % |

Initials: Lessor _____

Initials: Lessee _____

---

[*] The Stipulated Loss Value or Termination Value for any unit of Equipment shall be equal to the Capitalized Lessor's Cost of such unit multiplied by the appropriate percentage derived from the above tables. In the event that the lease term is for any reason extended, the last percentage figure shown above shall control throughout any such extended term.

Equipment Schedule No. 140, Page 7 of 7
General Motors Corporation
Pacific Rim Capital, Inc.

ANNEX C
TO SCHEDULE NO 140
TO MASTER LEASE AGREEMENT
DATED AS OF OCTOBER 19, 2001

CERTIFICATE

TO GENERAL MOTORS CORPORATION ("Lessee")

Pursuant to the provisions of the above Schedule and Lease, Lessee hereby certifies and warrants that all Equipment listed below has been delivered and installed (if applicable) and Lessee has received the Equipment for all purposes of the Lease.

Lessee does further certify that as of the date hereof (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee pursuant to or under the Lease are true and correct on the dated hereof; and (iii) Lessee has reviewed and approved of the purchase documents for the Equipment, if any.

| MANUFACTURER | SERIAL NUMBERS | MODEL NO. | TYPE OF EQUIPMENT | NO. OF UNITS | MONTHLY RENT | LEASE COMMEN-CEMENT DATE | COST PER UNIT | EXTENDED COST | GM PO NO | GM PR NO |
|---|---|---|---|---|---|---|---|---|---|---|
| PERKIN ELMER | 200S4030561 | B3180070 | AANALYST 200-4 LAMP W/D2 AND 2 EDL | 1 | 292.51 | 8/30/2004 | 16,927.50 | 16,927.50 | GMS82657 | PRBK2054 002 |
| PERKIN ELMER | N/A | N3050152 | NI LUMINA HCL | 1 | 2.84 | 8/30/2004 | 164.50 | 164.50 | GMS82657 | PRBK2054 002 |
| PERKIN ELMER | N/A | N3050191 | ZN LUMINA HCL | 1 | 3.88 | 8/30/2004 | 224.50 | 224.50 | GMS82657 | PRBK2054 002 |
| PERKIN ELMER | N/A | N3050218 | AL-CA-CU-FE-MG-SI-ZN LUMINA HCL | 1 | 4.14 | 8/30/2004 | 239.50 | 239.50 | GMS82657 | PRBK2054 002 |
| PERKIN ELMER | N/A | N3050217 | CO-CR-CU-FE-MN-NI LUMINA HCL | 1 | 4.14 | 8/30/2004 | 239.50 | 239.50 | GMS82657 | PRBK2054 002 |
| Installation Site: 7447 SE 74TH ST.  OKLAHOMA CITY OK 73135 | | | | | 307.51 | | 17,795.50 | 17,795.50 | | |
| PERKIN ELMER | 200S4031701 | B3180070 | AANALYST 200-4 LAMP W/D2 AND 2 EDL | 1 | 292.51 | 7/1/2004 | 16,827.50 | 16,927.50 | GMS82657 | PRBK2054 003 |
| PERKIN ELMER | N/A | N3050152 | NI LUMINA HCL | 1 | 2.84 | 7/1/2004 | 164.50 | 164.50 | GMS82657 | PRBK2054 003 |
| PERKIN ELMER | N/A | N3050191 | ZN LUMINA HCL | 1 | 3.88 | 7/1/2004 | 224.50 | 224.50 | GMS82657 | PRBK2054 003 |
| PERKIN ELMER | N/A | N3050218 | AL-CA-CU-FE-MG-SI-ZN LUMINA HCL | 1 | 4.14 | 7/1/2004 | 239.50 | 239.50 | GMS82657 | PRBK2054 003 |
| PERKIN ELMER | N/A | N3050217 | CO-CR-CU-FE-MN-NI LUMINA HCL | 1 | 4.14 | 7/1/2004 | 239.50 | 239.50 | GMS82657 | PRBK2054 003 |
| Installation Site: 7655 GM BLVD.  SHREVEPORT LA 71129 | | | | 1 | 307.51 | | 17,795.50 | 17,795.50 | | |
| PERKIN ELMER | 200S4031304 | B3180070 | AANALYST 200-4 LAMP W/D2 AND 2 EDL | 1 | 292.51 | 5/26/2004 | 16,927.50 | 16,927.50 | GMS82657 | PRBK2054 001 |
| PERKIN ELMER | N/A | N3050152 | NI LUMINA HCL | 1 | 2.84 | 5/26/2004 | 164.50 | 164.50 | GMS82657 | PRBK2054 001 |
| PERKIN ELMER | N/A | N3050191 | ZN LUMINA HCL | 1 | 3.88 | 5/26/2004 | 224.50 | 224.50 | GMS82657 | PRBK2054 001 |
| PERKIN ELMER | N/A | N3050218 | AL-CA-CU-FE-MG-SI-ZN LUMINA HCL | 1 | 4.14 | 5/26/2004 | 239.50 | 239.50 | GMS82657 | PRBK2054 001 |
| PERKIN ELMER | N/A | N3050217 | CO-CR-CU-FE-MN-NI LUMINA HCL | 1 | 4.14 | 5/26/2004 | 239.50 | 239.50 | GMS82657 | PRBK2054 001 |
| Installation Site: 600 BALDWIN AVE.  PONTIAC MI 48340 | | | | | 307.51 | | 17,795.50 | 17,795.50 | | |
| GRAND TOTALS: | | | | | $922.53 | | $53,386.50 | $53,386.50 | | |

LESSEE:
GENERAL MOTORS CORPORATION

By: _Paul A. Riker_

Name: _PAUL A. RIKER_

Title: _Purchasing Manager_

Date: _10-21-04_

# EXHIBIT C

81492601A01081309

ORIGINAL

EQUIPMENT SCHEDULE
SCHEDULE NO. 156
DATED THIS JUNE 9, 2004
TO MASTER LEASE AGREEMENT
DATED AS OF OCTOBER 19, 2001

Lessor and Mailing Address:                              Lessee and Mailing Address:

PACIFIC RIM CAPITAL, INC.                               GENERAL MOTORS CORPORATION
15 Enterprise, Suite 400                                30009 Van Dyke
Aliso Viejo, CA 92656                                    Warren, MI 48090

Capitalized terms not defined herein shall have the meanings assigned to them in the Master Lease Agreement identified above ("Agreement"; said Agreement and this Schedule being collectively referred to as "Lease").

A.    EQUIPMENT

Pursuant to the terms of the Lease, Lessor agrees to acquire and lease to Lessee and Lessee agrees to lease from Lessor various Fork Trucks, Walkie Stackers, and related equipment (Equipment) listed on all Certificates of Acceptance signed by a representative of Lessee and in connection herewith.

B.    FINANCIAL TERMS

1.    Advance Rent (if any): $0.00

2.    Capitalized Lessor's Cost: The aggregate of Cost set forth on attached Annex A to be signed by a representative of Lessee in connection herewith.

3.    Basic Term Lease Rate Factor: 1.728%

4.    Daily Lease Rate Factor: 0.0576%

5.    Basic Term (Number of Months): 60

6.    Basic Term Commencement Date: The first day of the calendar month following the latest Lease Commencement Date of all Equipment.

7.    Equipment Location:    As set forth on the Certificate(s) of Acceptance

8.    Lessee's Federal Tax ID Number: 380572515

9.    Supplier: As set forth on the Certificate(s) of Acceptance

10.   Last Delivery Date: August 1, 2004

11.   First Termination Date: 60 months after the Basic Term Commencement Date.

12.   Option Price: Fair Market Value

Equipment Schedule No. 156, Page 2 of 7
General Motors Corporation
Pacific Rim Capital, Inc.

**C.    TAX BENEFITS**

a.    Depreciation Method:    Two hundred percent (200%) declining balance method, switching to straight line method for the first (1st) taxable year for which using the straight line method with respect to the adjusted basis of the beginning of such year will yield a larger allowance.

b.    Recovery Period: Five (5) years MACRS.

c.    Basis: One Hundred percent (100%) of Capitalized Lessor's Cost.

**D.    TERM AND RENT**

1.    Interim Rent:  For the period from and including the Lease Commencement Date to the Basic Term Commencement Date ("Interim Period"), Lessee shall pay rent ("Interim Rent") for each unit of Equipment, the product of the Daily Lease Rate Factor times the Capitalized Lessor's cost of such unit times the number of days in the Interim Period. Interim Rent shall be due on Basic Term Commencement Date.

2.    Basic Term Rent:  Commencing on the Basic Term Commencement Date, and on the same day of each month thereafter (each, a "Rent Payment Date") during the Basic Term, Lessee shall pay rent ("Basic Term Rent") the product of the Basic Term Lease Rate Factor times the Capitalized Lessor's Cost of all Equipment on this Schedule.

**E.    INSURANCE**

1.    Commercial (broad form comprehensive) general liability, including contractual liability coverage, in limits of not less than two million dollars ($2,000,000.00) per occurrences combined single limit for personal injury and property damage.

2,    "All Risks" property insurance for the Equipment in an amount equal to the Stipulated Loss Value, with no co-insurance requirement

**F.    SPECIAL TERMS**

1.    Redelivery:   In furtherance and not in limitation of, the use, maintenance and return conditions for the Equipment set forth in Section X of the Agreement, Lessee hereby agrees to return the Equipment to Lessor in accordance with all of the terms and conditions of the Agreement and in compliance with the following special return conditions.  Upon receipt of the Equipment, Lessor or its assignee (or their agent) shall conduct an inspection of the Equipment and if Equipment is not in compliance with the conditions hereinafter described, determine the repairs, additions or replacements, if any, which are necessary to place the Equipment in the condition hereinafter described. Lessee shall remain liable for the Equipment unless and until it is returned to Lessor as specified below:

a.    Be in good appearance, free from all advertising and insignia placed thereon by Lessee, in a clean condition, free of material rust and corrosion that would impede the normal operation of the units;

b.    Be complete with no missing or damaged parts and free of any hazardous material, waste or residue;

c.    Have all components and accessories provided upon delivery or replacements provided at any time during the term of the Lease including, without limitation,

Equipment Schedule No. 156, Page 3 of 7
General Motors Corporation
Pacific Rim Capital, Inc.

those necessary to enable the Equipment to perform the function for which it
was designed;

d.   Have tires and wheels of equal or greater quality than those originally supplied,
with an average per unit of not less than 50% of original tread or wear life
remaining and no damage to any individual tire that precludes normal usage;

e.   Batteries shall be capable of maintaining 80% of the rated voltage charge and
amp hours as when originally delivered and battery charger(s) shall be capable
of maintaining the originally rated charging capacity;

f.   In all respects, be in compliance with all applicable federal, state and local laws,
regulations and safety standards;

g.   When loaded to its rated capacity the Equipment will:

    i. Start under its own power and idle without water, fuel or hydraulic leaks or
      excessive exhaust fumes and/or emissions;

    ii. Move through its normal speed ranges in both forward and reverse;

    iii. Steer normally right and left in both forward and reverse;

    iv. Be able to stop with its service brakes within a safe distance in both
      forward and reverse; and

    v. Maneuver, lift, lower, tilt, penetrate, push, extend, pull and rotate normally;

At the expiration of this Lease, Lessee may return any or all of the Equipment identified
on this Schedule; provided, however, that each returned unit shall consist of a truck and,
if leased hereunder, battery(ies) and a charger so as to be remarketable as a separate and
complete operating system.

2.     <u>Renewal Option:</u>  Lessee shall have the option to renew the Basic Term of this Schedule
for a period of 12 or 24 months at the Fair Market Value provided however, Lessee shall
notify Lessor of its exercise of the option at least ninety (90) days prior to the expiration
of the Basis Term.

3.     <u>Certificate(s) of Acceptance:</u>   Notwithstanding anything to the contrary in the
Agreement or otherwise, as an accommodation to Lessee, the acceptance of each item of
Equipment under this Schedule may be effected by Lessee's electronic transmission to
Lessor via facsimile or other mutually acceptable medium of the Certificate(s) of
Acceptance describing each such item so accepted in sufficient detail (including serial
numbers), the Equipment Location and Cost and referencing the Lessor.  Each such
transmission to Lessor shall be considered a Certificate of Acceptance (as contemplated
hereunder and under the Agreement) and, notwithstanding (i) the authority (or lack
thereof) of the person executing such Certificate of Acceptance to act on behalf of and/or
bind Lessee and (ii) the fact that the Certificate of Acceptance delivered to Lessor is not
an original document, shall constitute Lessee's unconditional and non-revocable
acceptance of each item(s) of Equipment set-forth therein under and for all purposes of
this Schedule.  Lessee acknowledges that Lessor is relying upon each such Certificate of
Acceptance and agrees to indemnify, defend and hold harmless Lessor, its agents and
Assignees from and against any and all claims, actions, suits, proceedings, reasonable
costs and expenses, including court costs and reasonable attorney's fees, damages,
penalties, and liabilities relating to or arising out of this accommodation.

4.     <u>Predicated Debt Rate:</u>   If the yield of the 5 year U.S. Treasury obligation on the first
business day of the calendar quarter in which the final document package (including final
Annex A, final Annex C and Notice and Acknowledgement of Assignment) is sent to
GM for signature is greater than 2.50%, then the Basic Term Lease Rate Factor defined
above as 1.728%, will be increased by 0.010% for every 25 basis point (0.25%)
increment by which the 5 year T-Yield exceeds 2.50%. If the yield of the 5 year U.S.

Equipment Schedule No. 156, Page 4 of 7
General Motors Corporation
Pacific Rim Capital, Inc.

Treasury obligation on the first business day of the calendar quarter in which the final document package (including final Annex A, final Annex C and Notice and Acknowledgement of Assignment) is sent to GM for signature is less than 2.50%, then the Basic Term Lease Rate Factor defined above as 1.728%, will be decreased by 0.010% for every 25 basis point (0.25%) increment by which the 5 year T-Yield is less than 2.50%. The Daily Lease Rate Factor, defined above as 0.0576%, will be modified by dividing the final Basic Term Lease Rate Factor by 30, resulting in the final Daily Lease Rate Factor. The adjusted percentage and resulting monthly rent amount will be fixed on the Basic Term Commencement Date and throughout the Basic Term.

**G.    UCC FINANCING STATMENTS**

Lessee hereby authorizes Lessor to file UCC financing statements or other security instruments against Lessee to establish and protect the rights and remedies of Lessor under this Lease and in the Equipment without Lessee's signature or other authentication in accordance with the provisions of the Uniform Commercial Code then in effect in the applicable jurisdictions.

Except as expressly modified hereby, all terms and provisions of the Agreement shall remain in full force and effect. In the event of a conflict between the Agreement and this Schedule, this Schedule will control. This Schedule is not binding or effective with respect to the Agreement or Equipment until executed on behalf of Lessor and Lessee by authorized representatives of Lessor and Lessee, respectively.

IN WITNESS WHEROF, Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first written above.

LESSOR:                                          LESSEE:

PACIFIC RIM CAPITAL, INC.                         GENERAL MOTORS CORPORATION

By: _____                       By: _____

Name: _Marc C. Mills_____                          Name: _Paul A. Rikee_____

Title: _President_____                          Title: _Purchasing Mgr._____

Equipment Schedule No. 156, Page 5 of 7
General Motors Corporation
Pacific Rim Capital, Inc.

**ANNEX A
TO SCHEDULE NO. 156
TO MASTER LEASE AGREEMENT
DATED AS OF OCTOBER 19, 2001**

DESCRIPTION OF EQUIPMENT

Basic Term Commencement Date: 10/1/04

| MANUFACT-URER | SERIAL NUMBERS | MODEL NO. | TYPE OF EQUIPMENT | NO. OF UNITS | MONTHLY RENT | LEASE COMMENCE-MENT DATE | COST PER UNIT | EXTENDED COST |
|---|---|---|---|---|---|---|---|---|
| HYSTER | C098N02916A | E80XL3 | ELEC 8,000 LB FORK TRUCK | 1 | 550.82 | 11/10/2003 | 31,876.00 | 31,876.00 |
| HYSTER | C098N02898A | E80XL3 | ELEC 8,000 LB FORK TRUCK | 1 | 548.48 | 11/10/2003 | 31,741.00 | 31,741.00 |
| HYSTER | C098N02911A | E80XL3 | ELEC 8,000 LB FORK TRUCK | 1 | 548.48 | 10/31/2003 | 31,741.00 | 31,741.00 |
| HYSTER | F108V29645A | E65XM2 | ELEC 6,500 LB FORK TRUCK | 1 | 440.95 | 1/5/2004 | 25,518.00 | 25,518.00 |
| HYSTER | F108V29645A | E65XM2 | ELEC 6,500 LB FORK TRUCK | 1 | 440.95 | 1/20/2004 | 25,518.00 | 25,518.00 |
| HYSTER | F108V29653A | E65XM2 | ELEC 6,500 LB FORK TRUCK | 1 | 440.95 | 1/20/2004 | 25,518.00 | 25,518.00 |
| HYSTER | F108V29656A | E65XM2 | ELEC 6,500 LB FORK TRUCK | 1 | 440.95 | 1/20/2004 | 25,518.00 | 25,518.00 |
| CROWN | 15747J3 | 24-85-29 | 24 CELL 85 AH 29 PLT BATTERY | 1 | 69.59 | 9/1/2004 | 4,027.00 | 4,027.00 |
| CROWN | 15748J3 | 24-85-29 | 24 CELL 85 AH 29 PLT BATTERY | 1 | 69.59 | 11/10/2003 | 4,027.00 | 4,027.00 |
| CROWN | 12488E3 | 24-85-25 | 24 CELL 85 AH 25 PLT BATTERY | 1 | 62.28 | 1/5/2004 | 3,604.00 | 3,604.00 |
| CROWN | 19148A4 | 24-85-25 | 24 CELL 85 AH 25 PLT BATTERY | 1 | 62.28 | 1/20/2004 | 3,604.00 | 3,604.00 |
| CROWN | 19149A4 | 24-85-25 | 24 CELL 85 AH 25 PLT BATTERY | 1 | 62.28 | 1/20/2004 | 3,604.00 | 3,604.00 |
| CROWN | 19200A4 | 24-85-25 | 24 CELL 85 AH 25 PLT BATTERY | 1 | 62.28 | 1/20/2004 | 3,604.00 | 3,604.00 |
| CROWN | UM5001HPN00529 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 |
| CROWN | UM5001HPN00532 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 |
| CROWN | UM5001HPN00536 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 |
| CROWN | UM5001HPN00537 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 |
| CROWN | UM5001HPN00538 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 |
| CROWN | UM5001HPN00539 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 |
| CROWN | UM5001HPN00540 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 |
| CROWN | 15746J3 | 24-85-29 | 24 CELL 85 AH 29 PLT BATTERY | 1 | 69.59 | 9/27/2004 | 4,027.00 | 4,027.00 |
| Installation Site: 220 E. COLUMBIA AVE.  PONTIAC MI 48340 | | | | | | | | |
| HYSTER | D114N02644A | E40XMS | ELEC 4,000 LB FORK TRUCK | 1 | 380.70 | 10/3/2003 | 22,031.00 | 22,031.00 |
| HYSTER | A416A01736A | J60Z | ELEC 6,000 LB FORK TRUCK | 1 | 524.36 | 8/5/2004 | 30,345.00 | 30,345.00 |
| CROWN | 21329C4 | 40-125-13 | 40 CELL 125 AH 13 PLT BATTERY | 1 | 85.62 | 8/5/2004 | 4,955.00 | 4,955.00 |
| CROWN | 13898G3 | 24-85-15 | 24 CELL 85 AH 15 PLT BATTERY | 1 | 43.80 | 6/16/2003 | 2,535.00 | 2,535.00 |
| CROWN | UM5001N00429 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 166.75 | 6/16/2003 | 9,650.00 | 9,650.00 |
| CROWN | UM5001N00616 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 166.75 | 9/24/2003 | 9,650.00 | 9,650.00 |
| Installation Site: 4700 W. 10TH ST.  INDIANAPOLIS IN 46222 | | | | | | | | |
| | | | | | | CAPITALIZED LESSOR'S COST: | | $377,643.00 |

Initials: Lessor _[signature]_                 Initials: Lessee _[signature]_

Equipment Schedule No. 156, Page 6 of 7
General Motors Corporation
Pacific Rim Capital, Inc.

**ANNEX B**
**TO SCHEDULE NO. 156**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF OCTOBER 19, 2001**

STIPULATED LOSS AND TERMINATION VALUE TABLE *

| Rental Period | Stipulated Loss Value Percentage | | Termination Value Percentage | | Rental Period | Stipulated Loss Value Percentage | | Termination Value Percentage | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 110.000 | % | 110.000 | % | 31 | 92.329 | % | 92.329 | % |
| 2 | 109.501 | % | 109.501 | % | 32 | 91.632 | % | 91.632 | % |
| 3 | 108.997 | % | 108.997 | % | 33 | 90.927 | % | 90.927 | % |
| 4 | 108.486 | % | 108.486 | % | 34 | 90.215 | % | 90.215 | % |
| 5 | 107.970 | % | 107.970 | % | 35 | 89.495 | % | 89.495 | % |
| 6 | 107.449 | % | 107.449 | % | 36 | 88.766 | % | 88.766 | % |
| 7 | 106.921 | % | 106.921 | % | 37 | 88.030 | % | 88.030 | % |
| 8 | 106.388 | % | 106.388 | % | 38 | 87.285 | % | 87.285 | % |
| 9 | 105.849 | % | 105.849 | % | 39 | 86.532 | % | 86.532 | % |
| 10 | 105.303 | % | 105.303 | % | 40 | 85.770 | % | 85.770 | % |
| 11 | 104.752 | % | 104.752 | % | 41 | 85.000 | % | 85.000 | % |
| 12 | 104.194 | % | 104.194 | % | 42 | 84.221 | % | 84.221 | % |
| 13 | 103.630 | % | 103.630 | % | 43 | 83.434 | % | 83.434 | % |
| 14 | 103.060 | % | 103.060 | % | 44 | 82.638 | % | 82.638 | % |
| 15 | 102.483 | % | 102.483 | % | 45 | 81.832 | % | 81.832 | % |
| 16 | 101.900 | % | 101.900 | % | 46 | 81.018 | % | 81.018 | % |
| 17 | 101.311 | % | 101.311 | % | 47 | 80.195 | % | 80.195 | % |
| 18 | 100.714 | % | 100.714 | % | 48 | 79.362 | % | 79.362 | % |
| 19 | 100.111 | % | 100.111 | % | 49 | 78.521 | % | 78.521 | % |
| 20 | 99.502 | % | 99.502 | % | 50 | 77.669 | % | 77.669 | % |
| 21 | 98.885 | % | 98.885 | % | 51 | 76.809 | % | 76.809 | % |
| 22 | 98.262 | % | 98.262 | % | 52 | 75.938 | % | 75.938 | % |
| 23 | 97.632 | % | 97.632 | % | 53 | 75.058 | % | 75.058 | % |
| 24 | 96.994 | % | 96.994 | % | 54 | 74.168 | % | 74.168 | % |
| 25 | 96.350 | % | 96.350 | % | 55 | 73.268 | % | 73.268 | % |
| 26 | 95.698 | % | 95.698 | % | 56 | 72.358 | % | 72.358 | % |
| 27 | 95.039 | % | 95.039 | % | 57 | 71.438 | % | 71.438 | % |
| 28 | 94.373 | % | 94.373 | % | 58 | 70.507 | % | 70.507 | % |
| 29 | 93.699 | % | 93.699 | % | 59 | 69.566 | % | 69.566 | % |
| 30 | 93.018 | % | 93.018 | % | 60 | 68.615 | % | 68.615 | % |

Initials: Lessor _____        Initials: Lessee _____

---

* The Stipulated Loss Value or Termination Value for any unit of Equipment shall be equal to the Capitalized Lessor's Cost of such unit multiplied by the appropriate percentage derived from the above tables. In the event that the lease term is for any reason extended, the last percentage figure shown above shall control throughout any such extended term.

Equipment Schedule No. 156, Page 7 of 7
General Motors Corporation
Pacific Rim Capital, Inc.

ANNEX C
TO SCHEDULE NO 156
TO MASTER LEASE AGREEMENT
DATED AS OF OCTOBER 19, 2001

CERTIFICATE

TO GENERAL MOTORS CORPORATION ("Lessee")

above Schedule and Lease, Lessee hereby certifies and warrants that all Equipment listed below has been
alled (if applicable); and Lessee has received the Equipment for all purposes of the Lease.

hereof (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee pursuant to
the dated hereof; and (iii) Lessee has reviewed and approved of the purchase documents for the Equipment, if any.

| MANUFACTURER | SERIAL NUMBERS | MODEL NO. | TYPE OF EQUIPMENT | NO. OF UNITS | MONTHLY RENT | LEASE COMMEN-CEMENT DATE | COST PER UNIT | EXTENDED COST | GM PO NO | GM PR NO |
|---|---|---|---|---|---|---|---|---|---|---|
| HYSTER | C098N02916A | E60XL3 | ELEC 6,000 LB FORK TRUCK | 1 | 550.62 | 11/10/2003 | 31,876.00 | 31,876.00 | WFS02985 | PR0085WH 001 |
| HYSTER | C098N02939A | E60XL3 | ELEC 6,000 LB FORK TRUCK | 1 | 548.48 | 11/10/2003 | 31,741.00 | 31,741.00 | WFS02985 | PR0085WH 004 |
| HYSTER | C098N02911A | E60XL3 | ELEC 6,000 LB FORK TRUCK | 1 | 548.48 | 10/31/2003 | 31,741.00 | 31,741.00 | WFS02985 | PR0085WH 004 |
| HYSTER | F108V29545A | E65KM2 | ELEC 6,500 LB FORK TRUCK | 1 | 440.95 | 1/5/2004 | 25,518.00 | 25,518.00 | WFS02985 | PR0085WH 007 |
| HYSTER | F108V29646A | E65XM2 | ELEC 6,500 LB FORK TRUCK | 1 | 440.95 | 1/20/2004 | 25,518.00 | 25,518.00 | WFS02985 | PR0085WH 007 |
| HYSTER | F108V29653A | E65XM2 | ELEC 6,500 LB FORK TRUCK | 1 | 440.95 | 1/20/2004 | 25,518.00 | 25,518.00 | WFS02985 | PR0085WH 007 |
| HYSTER | F108V29656A | E65XM2 | ELEC 6,500 LB FORK TRUCK | 1 | 440.95 | 1/20/2004 | 25,518.00 | 25,518.00 | WFS02985 | PR0085WH 007 |
| CROWN | 15747J3 | 24-85-29 | 24 CELL 85 AH 29 PLT BATTERY | 1 | 69.59 | 9/1/2004 | 4,027.00 | 4,027.00 | WFS02985 | PR0085WH 005 |
| CROWN | 15746J3 | 24-85-29 | 24 CELL 85 AH 29 PLT BATTERY | 1 | 69.59 | 11/10/2003 | 4,027.00 | 4,027.00 | WFS02985 | PR0085WH 005 |
| CROWN | 12488E5 | 24-85-25 | 24 CELL 85 AH 25 PLT BATTERY | 1 | 62.28 | 1/5/2004 | 3,604.00 | 3,604.00 | WFS02985 | PR0085WH 008 |
| CROWN | 19148A4 | 24-85-25 | 24 CELL 85 AH 25 PLT BATTERY | 1 | 62.28 | 1/20/2004 | 3,604.00 | 3,604.00 | WFS02985 | PR0085WH 008 |
| CROWN | 19148A4 | 24-85-25 | 24 CELL 85 AH 25 PLT BATTERY | 1 | 62.28 | 1/20/2004 | 3,604.00 | 3,604.00 | WFS02985 | PR0085WH 008 |
| CROWN | 19200A4 | 24-85-25 | 24 CELL 85 AH 25 PLT BATTERY | 1 | 62.28 | 1/20/2004 | 3,604.00 | 3,604.00 | WFS02985 | PR0085WH 008 |
| CROWN | UM5001HPN00528 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 | WFS02966 | PR0085WH 003 |
| CROWN | UM5001HPN00532 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 | WFS02966 | PR0085WH 006 |
| CROWN | UM5001HPN00535 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 | WFS02966 | PR0085WH 006 |
| CROWN | UM5001HPN00537 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 | WFS02966 | PR0085WH 006 |
| CROWN | UM5001HPN00538 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 | WFS02966 | PR0085WH 009 |
| CROWN | UM5001HPN00539 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 | WFS02966 | PR0085WH 009 |
| CROWN | UM5001HPN00540 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 184.03 | 5/14/2004 | 10,650.00 | 10,650.00 | WFS02966 | PR0085WH 009 |
| CROWN | 15746J3 | 24-85-29 | 24 CELL 85 AH 25 PLT BATTERY | 1 | 69.59 | 9/27/2004 | 4,027.00 | 4,027.00 | WFS02966 | PR0085WH 002 |
| Installation Site: 220 E. COLUMBIA AVE,  PONTIAC MI 48340 | | | | | 5,157.68 | | | 298,477.00 | 298,477.00 | |
| HYSTER | D114N02844A | E40XMS | ELEC 4,000 LB FORK TRUCK | 1 | 380.70 | 10/3/2003 | 22,031.00 | 22,031.00 | WFS02399 | PR0095AL 001 |
| HYSTER | A416A01736A | J80Z | ELEC 8,000 LB FORK TRUCK | 1 | 524.36 | 8/5/2004 | 30,345.00 | 30,345.00 | WFS02399 | PR0075AL 001 |
| CROWN | 21329C4 | 40-125-13 | 40 CELL 125 AH 13 PLT BATTERY | 1 | 85.62 | 8/5/2004 | 4,955.00 | 4,955.00 | WFS02407 | PR0075AL 002 |
| CROWN | 13689G3 | 24-85-15 | 24 CELL 85 AH 15 PLT BATTERY | 1 | 43.80 | 8/18/2003 | 2,535.00 | 2,535.00 | WFS02407 | PR0095AL 003 |
| CROWN | UM5001N00423 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 166.75 | 8/18/2003 | 9,650.00 | 9,650.00 | WFS02407 | PR0095AL 002 |
| CROWN | UM5001N00816 | AKER WADE | UNIMAX 5001 CHARGER | 1 | 166.75 | 9/24/2003 | 9,650.00 | 9,650.00 | WFS02407 | PR0095AL 003 |
| Installation Site: 4700 W. 10TH ST.  INDIANAPOLIS IN 46222 | | | | | 1,367.98 | | | 79,166.00 | 79,166.00 | |
| | | | GRAND TOTALS: | | $6,525.66 | | | $377,643.00 | $377,643.00 | |

LESSEE:
GENERAL MOTORS CORPORATION

By: _____

Name: Donald O Bryant

Title: Purchasing Manager

Date: 10/13/54

# EXHIBIT D

ORIGINAL

## NOTICE AND ACKNOWLEDGMENT OF ASSIGNMENT

Reference is hereby made to Equipment Schedule No. 140 (the "Lease") by and between General Motors Corporation, as lessee (the "Lessee"), and Pacific Rim Capital, Inc., as lessor (the "Lessor"), which, by reference therein, incorporates the terms and conditions of Master Lease Agreement dated October 19, 2001 between Lessor and Lessee (the "Master Lease").

Lessor hereby gives Lessee notice and Lessee hereby acknowledges receipt of notice that Lessor intends to collaterally assign to IDB Leasing, Inc. ("Lender"), whose offices are at 511 Fifth Avenue, New York, NY 10017, all of its rights in and to the Lease and the equipment leased thereunder ("Equipment").

In recognition of Lender's reliance upon this Notice and Acknowledgment of Assignment by agreeing to accept the above described conveyance and in consideration of Lender's and Lessor's agreement not to interfere with Lessee's quiet possession and enjoyment of the Equipment subject to the terms of the Lease, Lessee hereby certifies, covenants and agrees that: (a.) commencing with the rental due December 1, 2004 ("Rent Assignment Date"), there remain outstanding fifty-seven (57) equal monthly rental payments of $922.53 each due under the Lease and that Lessee will unconditionally pay such payments and all other monies due to or to become due under the Lease without abatement, reduction, set-off, defense, counterclaim or deduction for any reason to Lender at Wells Fargo Bank Northwest, N.A., 299 S. Main, 12th Floor, MAC: U1228-120, Corporate Trust Lease Group, Salt Lake City, UT, 84111 until Lender instructs Lessee otherwise in writing; (b.) the Equipment is in Lessee's possession at each address specified in the Lease, has been inspected by duly authorized representatives of Lessee and found to be in good working order, suitable for the Lessee's purposes in all respects and fully accepted as Equipment under the Lease; (c.) the Lease is in full force and effect and, no modification, amendment or supplement to the Lease has been made; (d.) the Lease, Master Lease, related Certificate(s) of Acceptance and this Notice and Acknowledgment of Assignment constitute the entire agreement between Lessee and Lessor regarding the Equipment, its lease, and all rent and other amounts due therefor and no other written or oral agreement exists therefor; (e.) any future modification, termination, amendment or supplement to the Lease, settlement of amounts due thereunder or revocation or modification of this Notice and Acknowledgment of Assignment shall be ineffective without Lender's prior written consent; (f.) neither Lessee nor, to the Lessee's knowledge, Lessor has breached the Lease in any respect; and (g.) Lessee has received no notice of a prior sale, transfer, assignment, hypothecation or pledge of the Lease, the rents reserved thereunder or the Equipment.

Lessee acknowledges that Lender has not assumed any obligations of Lessor, other than the obligation of quiet and peaceful possession of the Equipment under the terms of the Lease and Lender shall not be responsible for the performance by Lessor or any other party of the terms and conditions of the Lease. Notwithstanding any contrary provision contained in the Master Lease, Lessor shall have no duty to indemnify Lessee against claims pursuant to Article XV thereof unless said claims arise from the gross negligence or willful misconduct of Lessor. Further, Lessor hereby notifies Lessee and Lessee acknowledges that Lender is entitled to the benefits of each and every right accorded Lessor in the Lease, including but not limited to inspection rights, indemnity rights, right to give and receive consent, notices and other documents required to be furnished under the Lease and the right to remedies and to receive payment of costs and expenses incurred in exercising rights and remedies. Rents due under the Lease prior to the Rent Assignment Date are for the account of Lessor.

ACCEPTED AND AGREED TO ON THIS 20th DAY OF October , 2004.

LESSOR: PACIFIC RIM CAPITAL, INC.

By: _Maui Cubill_

Title: _President_

LESSEE: GENERAL MOTORS CORPORATION

By: _Paul a. R_

Title: _Purchasing Manager_

ORIGINAL

## NOTICE AND ACKNOWLEDGMENT OF ASSIGNMENT

Reference is hereby made to Equipment Schedule No. 156 (the "Lease") by and between General Motors Corporation, as lessee (the "Lessee"), and Pacific Rim Capital, Inc., as lessor (the "Lessor"), which, by reference therein, incorporates the terms and conditions of Master Lease Agreement dated October 19, 2001 between Lessor and Lessee (the "Master Lease").

Lessor hereby gives Lessee notice and Lessee hereby acknowledges receipt of notice that Lessor intends to collaterally assign to IDB Leasing, Inc. ("Lender"), whose offices are at 511 Fifth Avenue, New York, NY 10017, all of its rights in and to the Lease and the equipment leased thereunder ("Equipment").

In recognition of Lender's reliance upon this Notice and Acknowledgment of Assignment by agreeing to accept the above described conveyance and in consideration of Lender's and Lessor's agreement not to interfere with Lessee's quiet possession and enjoyment of the Equipment subject to the terms of the Lease, Lessee hereby certifies, covenants and agrees that: (a.) commencing with the rental due November 1, 2004 ("Rent Assignment Date"), there remain outstanding fifty-nine (59) equal monthly rental payments of $6,525.66 each due under the Lease and that Lessee will unconditionally pay such payments and all other monies due or to become due under the Lease without abatement, reduction, set-off, defense, counterclaim or deduction for any reason to Lender at Wells Fargo Bank Northwest, N.A., 299 S. Main, 12th Floor, MAC: U1228-120, Corporate Trust Lease Group, Salt Lake City, UT, 84111 until Lender instructs Lessee otherwise in writing; (b.) the Equipment is in Lessee's possession at each address specified in the Lease, has been inspected by duly authorized representatives of Lessee and found to be in good working order, suitable for the Lessee's purposes in all respects and fully accepted as Equipment under the Lease; (c.) the Lease is in full force and effect and, no modification, amendment or supplement to the Lease has been made; (d.) the Lease, Master Lease, related Certificate(s) of Acceptance and this Notice and Acknowledgment of Assignment constitute the entire agreement between Lessee and Lessor regarding the Equipment, its lease, and all rent and other amounts due therefor and no other written or oral agreement exists therefor; (e.) any future modification, termination, amendment or supplement to the Lease, settlement of amounts due thereunder or revocation or modification of this Notice and Acknowledgment of Assignment shall be ineffective without Lender's prior written consent; (f.) neither Lessee nor, to the Lessee's knowledge, Lessor has breached the Lease in any respect; and (g.) Lessee has received no notice of a prior sale, transfer, assignment, hypothecation or pledge of the Lease, the rents reserved thereunder or the Equipment.

Lessee acknowledges that Lender has not assumed any obligations of Lessor, other than the obligation of quiet and peaceful possession of the Equipment under the terms of the Lease and Lender shall not be responsible for the performance by Lessor or any other party of the terms and conditions of the Lease. Notwithstanding any contrary provision contained in the Master Lease, Lessor shall have no duty to indemnify Lessee against claims pursuant to Article XV thereof unless said claims arise from the gross negligence or willful misconduct of Lessor. Further, Lessor hereby notifies Lessee and Lessee acknowledges that Lender is entitled to the benefits of each and every right accorded Lessor in the Lease, including but not limited to inspection rights, indemnity rights, right to give and receive consent, notices and other documents required to be furnished under the Lease and the right to remedies and to receive payment of costs and expenses incurred in exercising rights and remedies.  Rents due under the Lease prior to the Rent Assignment Date are for the account of Lessor.

ACCEPTED AND AGREED TO ON THIS 20th DAY OF October, 2004.

LESSOR: PACIFIC RIM CAPITAL, INC.

By: _Alan Abbott_

Title: _President_

LESSEE: GENERAL MOTORS CORPORATION

By: _Bryant St._

Title: _Purchasing Manager_