1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


MOTORS LIQUIDATION COMPANY, et al.

      f/k/a General Motors Corporation, et al.,


      Debtors.


- - - - - - - - - - - - - - - - - - - - -x


      United States Bankruptcy Court

      One Bowling Green

      New York, New York


      August 3, 2009

      9:05 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

```
 1

 2    HEARING re Hearing to Consider Limited Contract Objections

 3    Relating to Debtors' Motion Pursuant to 11 U.S.C. §§ 105,

 4    363(b), (f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002,

 5    6004, and 6006, to (I) Approve (A) the Sale Pursuant to the

 6    Master Sale and Purchase Agreement with Vehicle Acquisitions

 7    Holdings LLC (n/k/a NGMCO, Inc.), a U.S. Treasury-Sponsored

 8    Purchaser, Free and Clear Of Liens, Claims, Encumbrances, and

 9    Other Interests; (B) the Assumption and Assignment of Certain

10    Executory Contracts and Unexpired Leases; and (C) Other Relief;

11    and (II) Schedule Sale Approval Hearing

12

13    HEARING re Debtors' Fourth Omnibus Motion Pursuant to 11 U.S.C

14    § 365 to Reject Certain Executory Contracts

15

16    HEARING re Motion by Debtors for Entry of Order Authorizing

17    Rejection of Certain Personal Property Agreements and/or

18    Abandonment of Collateral to Secured Creditors

19

20    HEARING re Omnibus Motion of Debtors for Entry of Order

21    Pursuant to 11 U.S.C. Sections 105 and 365 Authorizing (A) the

22    Rejection of Executory Contracts and Unexpired Leases with

23    Certain Domestic Dealers and (B) Granting Certain Related

24    Relief

25
```

3

1

2   HEARING re Motion of Debtors for Entry of Order Pursuant to 11

3   U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim

4   Compensation and Reimbursement of Expenses of Professionals

5

6   HEARING re Application of the Official Committee of Unsecured

7   Creditors of Motors Liquidation Company for Entry of an Order

8   Authorizing the Employment and Retention of Epiq Bankruptcy

9   Solutions, LLC as the Committee's Information Agent Nunc Pro

10  Tunc to June 3, 2009

11

12  HEARING re Motion of Debtors for Entry of Order Pursuant to 11

13  U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007

14  Establishing Notice and Case Management Procedures

15

16  HEARING re Motion of the Official Committee of Unsecured

17  Creditors for an Order Establishing Procedures for Compliance

18  with 11 U.S.C. §§ 1102(b)(3) and 1103(c) filed by Robert T.

19  Schmidt on behalf of Official Committee of Unsecured Creditors

20  of General Motors Corporation

21

22

23

24

25

4

1

2  HEARING re Application of the Debtors for Entry of Order

3  Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr.

4  P. 2014 Authorizing the Retention and Employment of LFR, Inc.

5  as Environmental Consultants to the Debtors Nunc Pro Tunc to

6  the Commencement Date

7

8  HEARING re Application of the Debtors for Entry of Order

9  Pursuant to 11 U.S.C §§ 327(a) and 328(a) and Fed. R. Bankr. P.

10  2014 Authorizing the Retention and Employment of Brownfield

11  Partners, LLC as Environmental Consultants to the Debtors Nunc

12  Pro Tunc to the Commencement Date

13

14  HEARING re Application of the Debtors for Entry of Order

15  Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr.

16  P. 2014 Authorizing the Retention and Employment of The Claro

17  Group, LLC as Environmental Consultants to the Debtors Nunc Pro

18  Tunc to the Commencement Date

19

20  HEARING re Application under 11 U.S.C §327(e) Authorizing

21  Debtors to Employ and Retain Jones Day as Special Counsel for

22  the Debtors, Nunc Pro Tunc to the Petition Date

23

24

25

5

1

2    HEARING re Application of Debtors for Entry of Order Pursuant

3    to 11 U.S.C. §§ 327 (e) and Fed. R. Bankr. P. 2014 Authorizing

4    Retention and Employment of Baker & McKenzie as Special

5    Counsel, Nunc Pro Tunc to the Commencement Date

6

7    HEARING re Application of Debtors for Entry of Order Pursuant

8    to 11 U.S.C. § 327(e) and Fed. R. Bankr. P. 2014 Authorizing

9    Retention and Employment of Lowe, Fell & Skogg, LLC as Legal

10   Counsel Nunc Pro Tunc to the Commencement Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

6

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Debtors and Debtors-in-Possession

5        767 Fifth Avenue

6        New York, NY 10153

7

8    BY:  JOSEPH H. SMOLINSKY, ESQ.

9        STEPHEN KAROTKIN, ESQ.

10       EVAN LEDERMAN, ESQ.

11       LACEY B. LAKEN, ESQ.

12

13   HONIGMAN MILLER SCHWARTZ & COHN LLP

14       Special Counsel for Motors Liquidation Company

15       2290 First National Building

16       660 Woodward Avenue

17       Detroit, MI 48226

18

19   BY:  ROBERT B. WEISS, ESQ.

20

21

22

23

24

25

7

1

2   JENNER & BLOCK LLP

3        General Corporate and Conflicts Counsel for Motors

4        Liquidation Company

5        919 Third Avenue

6        37th Floor

7        New York, NY 10022

8

9   BY:  PATRICK J. TROSTLE, ESQ.

10

11  KRAMER LEVIN NAFTALIS & FRANKEL LLP

12       Attorneys for Official Committee of Unsecured Creditors

13       1177 Avenue of the Americas

14       New York, NY 10036

15

16  BY:  AMY CATON, ESQ.

17       JENNIFER R. SHARRET, ESQ.

18

19  UNITED STATES DEPARTMENT OF JUSTICE

20       Office of the United States Trustee

21       33 Whitehall Street

22       21st Floor

23       New York, NY 10004

24

25  BY:  ANDREW D. VELEZ-RIVERA, ESQ.

8

```
 1
 2    DAY PITNEY LLP
 3          Attorneys for Oracle USA
 4          7 Times Square
 5          New York, NY 10036
 6
 7    BY:  AMISH R. DOSHI, ESQ.
 8
 9    HOGUET NEWMAN REGAL & KENNEY LLP
10          Attorneys for Everett Chevrolet
11          10 East 40th Street
12          New York, NY 10016
13
14    BY:  JUAN A. SKIRROW, ESQ.
15
16    JEFFREY S. DAVIS, ATTORNEY AT LAW
17          Attorneys for Forrest Buick-Pontiac-GMC, Inc. and Forrest
18           Chevrolet-Cadillac, Inc.
19          1422 Berry Drive
20          Cleburne, TX 76033
21
22    BY:  JEFFREY S. DAVIS, ESQ.
23
24
25
```

9

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3         Attorneys for Wells Fargo as Indenture Trustee

4         One Chase Manhattan Plaza

5         New York, NY 10005

6

7    BY:  TYSON M. LOMAZOW, ESQ.

8

9    CARSON FISCHER, P.L.C.

10        Attorneys for Karmann U.S.A., Inc.

11        4111 Andover Road, West

12        2nd Floor

13        Bloomfield Hills, MI 48302

14

15   BY:  PATRICK J. KUKLA, ESQ.

16        (TELEPPHONICALLY)

17

18   MCNAMEE, LOCHNER, TITUS & WILLIAMS, P.C.

19        ATTORNEYS for the STATES OF ST. REGIS MOHAWK TRIBE

20        677 Broadway

21        Albany, New York 12207

22

23   BY:  JACOB F. LAMME, ESQ.

24        (TELEPHONICALLY)

25

10

1

2   NEW YORK STATE DEPARTMENT OF LAW

3          Environmental Protection Bureau

4          The Capitol

5          Albany, NY 12224

6

7   BY:   MAUREEN F. LEARY, AAG

8          (TELEPHONICALLY)

9

10  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

11         Attorneys for Ad Hoc Bondholders Group

12         1285 Avenue of the Americas

13         New York, NY 10019

14

15  BY:   MATTHEW SCHECK, ESQ.

16         (TELEPHONICALLY)

17

18

19

20

21

22

23

24

25

11

P R O C E E D I N G S

1

THE COURT:  All right.  We're going to deal with the

9:00 calendar on GM at this point.  We're going to start with

those matters that are wholly unopposed.  Then we're going to

deal with Karmann -- the Karmann matters.  I want to get

appearances and then I'll want people to sit down.  All right.

Who's going to take the lead?  Mr. Smolinsky?

MR. SMOLINSKY:  Good morning, Your Honor.  Joe

Smolinsky of Weil Gotshal & Manges for the debtors.  I have

with me here today my colleague, Stephen Karotkin, as well as

our co-counsel from Honigman Miller Schwartz and Cohen.  Bob

Weiss is here.

THE COURT:  Right.  Mr. Weiss?

MS. CATON:  Good morning, Your Honor.  Amy Caton from

Kramer Levin Naftalis & Frankel on behalf of the official

committee of unsecured creditors.

THE COURT:  Good morning, Ms. Caton.

MS. CATON:  Good morning.  I also have with me my

colleague, Jennifer Sharret.

THE COURT:  Your colleague's name again, please?

MS. CATON:  Jennifer Sharret.

THE COURT:  Sharret?

MS. CATON:  Yes, Your Honor.

THE COURT:  Thank you.

MR. LOMAZOW:  Good morning, Your Honor.  Tyson

12

1    Lomazow of Milbank, Tweed, Hadley & McCloy on behalf of Wells

2    Fargo as indenture trustee under the 2001(a) leverage lease

3    transaction.

4         THE COURT:  You were speaking very, very quickly.

5    May I get your name again?

6         MR. LOMAZOW:  Tyson Lomazow of Milbank Tweed --

7         THE COURT:  No.  I know Milbank Tweed.  Your name,

8    though.  Lomenzo?

9         MR. LOMAZOW:  Lomazow.

10        THE COURT:  Lomazow.  All right.  Thank you.  All

11   right.  I don't want appearances from everybody.  I want --

12   until people come up to deal with their particular matters.

13   What I would like is on these omnibus motions, to the extent

14   that they're unopposed, let's get them behind us.  And then

15   let's take care Karmann which, unless you've resolved it, is

16   going to be time consuming.  Let's go.  Mr. Smolinsky?

17        MR. SMOLINSKY:  Your Honor, if I may suggest --

18   again, Joe Smolinsky.  What I'd like to do is provide a short

19   status conference with respect to the various cure objections

20   which remain on the calendar.  And then to dispose of the

21   rejection motion other than Karmann, which, as you stated, will

22   be left over.  And then Mr. Weiss has one motion that I believe

23   is unopposed as well.

24        THE COURT:  Okay.

25        MR. SMOLINSKY:  If I may approach, Your Honor?

13

1        THE COURT:  Yes.

2        MR. SMOLINSKY:  Your Honor, I provide this summary

3   just to assist us in walking through the status.  If Your Honor

4   may recall, as part of the sale motion, there were a large

5   number of objections to cure an assumption and assignment that

6   were filed.  We continue to notice a small number of remaining

7   contracts.  And under the procedures, parties have ten days in

8   which to object.  We also, as I think we noted for Your Honor,

9   we are not holding contract counterparties to the strict ten-

10  day deadline as a result of various arguments that notices were

11  sent to the wrong address and people need more time.  So we've

12  been fairly accommodating in that regard.

13        I just want to walk through where we are.  And other

14  than Karmann, we are going to seek to adjourn the remaining

15  objections to a date approximately a month from now in early

16  September.  And we very much hope and expect that we will be

17  able to dispose of all the remaining objections without needing

18  court intervention.

19        When we were before Your Honor on June 30th at the

20  sale hearing, there were 627 objections that were filed with

21  respect to contract assumption and assignment.  At that

22  hearing, we reported that approximately 315 of those objections

23  were withdrawn for a variety of reasons.  Either they resolved

24  their dispute and they formally withdrew their objection; they

25  signed a stipulation of which we presented to Your Honor at the

14

1    hearing in which they agreed to continue to reconcile outside

2    of the judicial process; and then certain of the stipulations

3    provided that they would, if an agreement wasn't reached, go

4    into an ADR program; and a few provided that they can come back

5    to the Court if their issues were not resolved.

6            Finally, Your Honor, in connection with the essential

7    vendor motion, a number of creditors filed agreements, trade

8    agreements, that, among the various terms, provided that they

9    would deal with any cure objections in an alternative dispute

10   resolution process.  So those are also off calendar.  And we're

11   making tremendous progress in resolving all of those remaining

12   objections.

13           That left 312 objections as of June 30th.  We

14   received thirty-five new objections since that hearing which

15   we've added to the group.  And we've separately noticed those

16   parties that today would be the hearing on those objections.

17   Since then, we have formally resolved 106 objections which have

18   been withdrawn formally.  As a result -- also, there were

19   sixty-two objections that were deemed to be superseded or

20   amended to former objections which leaves 179 objections on the

21   calendar today.  And if you look at the second block, the

22   status of the remaining cure objections today, of the 179, we

23   have signed agreements resolving the cure amounts with respect

24   to twenty-nine of those objections.  The agreements require

25   that the counterparty file with this court a withdrawal of the

15

1    objection and, to date, they haven't done that.  We're

2    following up with them to make sure that the docket is clean.

3         There are seventy-two additional objections in which

4    we've reached agreements in principle.  And subject to the

5    procedure order, we are documenting those agreements which

6    don't need to come before the Court but once we have those

7    agreements fully documented then the counterparties will

8    withdraw their objection.

9         Your Honor, that leaves seventy-eight objections

10   which are still in the evaluation and negotiation bucket.  And

11   we're making headway but we haven't reached agreement yet.  And

12   those seventy-eight are the objections that we would hope that

13   we would resolve between now and the adjourned hearing.  One of

14   those is Karmann and while we're seeking to adjourn the matter

15   to the next hearing date, Karmann -- we'd like to move forward

16   today with respect to their objection.

17        THE COURT:  All right.

18        MR. SMOLINSKY:  So, Your Honor, should we check with

19   chambers for an appropriate date?

20        THE COURT:  Yes.

21        MR. SMOLINSKY:  Thank you, Your Honor.  We also have

22   on the calendar today the fourth omnibus rejection motion.

23   There are a variety of different types of contracts that we are

24   seeking to resolve and reject through this motion.  We've only

25   received one objection and that is the objection of Karmann

16

1    which we can deal with as part of the other Karmann matters.

2    We have sought to reject these contracts effective as of today.

3    There was no unique circumstances that would cause us to seek

4    nunc pro tunc relief with respect to that motion.  So assuming

5    that Your Honor is inclined to approve the contract rejections

6    that are not disputed, we seek an order today rejecting it

7    effective as of today.

8            THE COURT:  Yes.  All undisputed ones are motion

9    granted on.

10            MR. SMOLINSKY:  Thank you, Your Honor.  Now I'd like

11    to cede the podium to Mr. Weiss.

12            THE COURT:  Okay.  Mr. Weiss?

13            MR. WEISS:  Good morning, Your Honor.  Robert Weiss

14    of Honigman Miller Schwartz and Cohn, special counsel to the

15    debtors.  We are before the Court this morning with regard --

16            THE COURT:  Want to pull the microphone closer to

17    you, please, Mr. Weiss?

18            MR. WEISS:  We are before the Court this morning with

19    regard to the debtors' motion for entry of an order authorizing

20    rejection of certain personal property agreements and/or

21    abandonment of collateral to secured creditors.  These

22    agreements are equipment leases and ancillary agreements and

23    they are identified in Exhibit A to the motion.  In particular,

24    they're lease numbers 2001 A-1 and A-2 and 2001 A-6.

25            Only one objection was filed and that's by Wells

17

1    Fargo Bank in its capacity as indenture trustee.  We are

2    pleased to confirm the advice that we gave to chambers on

3    Friday afternoon that the objection has been resolved in the

4    form of a consensual form of order.  If I may just very briefly

5    summarize the changes from the original form of order submitted

6    to the Court.  The relief requested with regard to leases 2000

7    (sic) A-1 and 2 is consented to.  The hearing is adjourned

8    regarding  A-6 for the purpose primarily of continuing

9    discussions among the parties to attempt to resolve that issue.

10   The proposed date subsequent to the Court's calendar would be

11   August 18th, 2009.

12        Wells Fargo's arguments are preserved regarding A-6

13   and the Court is asked not to draw any inferences from the

14   objector's stipulation to the relief sought with regard to A-1

15   and A-2.  I believe that is the summary of the material changes

16   from the original form of order.  Counsel for Wells Fargo and,

17   I believe, would like to address the Court briefly.

18        THE COURT:  All right.  Mr. Lomazow, you have any

19   problems with what Mr. Weiss told me?

20        MR. LOMAZOW:  Your Honor, just to clarify for the

21   record, I believe the reference was to the 2001 A-1 and A-2

22   leases not the 2000 A-1 or A-2 leases.  And I also wanted to

23   note that Mr. Weiss' recitation was accurate and, in addition,

24   there is language in the proposed order, Your Honor, whereby

25   Wells Fargo reserves its right to be able to assert claims for

18

1    administrative rent, rejection damages as well as any potential

2    damages relating to the debtor or New GM's use of the

3    equipment.  And we reserve the right to be able to assert these

4    claims including on an administrative expense priority basis.

5        THE COURT:  Okay.  And Mr. Weiss, you have any

6    problems with what Mr. Lomazow just told me?

7        MR. WEISS:  Your Honor, that is all outlined in the

8    form of order that'll be presented to the Court.  Obviously,

9    the form of order will control to the extent there's any

10   inconsistency with anything that's been stated to the Court

11   today.  The form of order has been reviewed by counsel for

12   Wells Fargo and they are in agreement with regard to its

13   content.

14       THE COURT:  Okay.  All right then.  I'll approve

15   everything you were able to accomplish so far, kicked the

16   remainder.  You're going to have to confirm with my courtroom

17   deputy that the date that you want to adjourn to is one that's

18   available.  There are a lot of things going on in this court.

19   Subject only to that, everything is fine.

20       MR. WEISS:  Thank you, Your Honor.

21       THE COURT:  And you can submit the order and floppy

22   to Ms. Blum across the hall --

23       MR. WEISS:  Will do.

24       THE COURT:  -- and consult with her about the

25   adjourned date.

19

1      MR. WEISS:  Thank you, Your Honor.

2      THE COURT:  Okay.  What do we have next?  Mr.

3  Smolinsky?

4      MR. SMOLINSKY:  Again, Joe Smolinsky.  I think

5  that -- what we have on the 9:00 calendar are the two Karmann

6  objections, one with respect to the assumption and assignment

7  and, second, with respect to the rejection.  Your Honor --

8      THE COURT:  Pause, please.  Are you going to be

9  arguing for GM?

10     MR. SMOLINSKY:  Yes, Your Honor.

11     THE COURT:  Okay.  Who's arguing for Karmann.

12     MR. KUKLA (TELEPHONICALLY):  Good morning, Your

13  Honor.  This is Patrick Kukla of the office of Carson Fischer

14  here in Michigan --

15     THE COURT:  Right.

16     MR. KUKLA:  -- appearing telephonically.  And we

17  thank the Court for allowing us to appear telephonically.

18     THE COURT:  All right.  Well, telephonically is not a

19  problem.  Have I gotten everybody who's going to be appearing

20  on this motion?  Mr. Smolinsky, you can have a seat for a

21  couple of minutes because I need to address with both of you

22  how we're going to deal with this argument.

23     Gentlemen, I've read all of your stuff including,

24  until I went blind, these contracts that you submitted.  One of

25  the things that I'm going to want each of you to address is why

20

1    neither party quoted the language in the contracts upon which

2    it was basing its positions and instead look to me to read all

3    of this stuff by myself.

4           I'm also going to need both sides to address before

5    we get on to the specific questions why there was an inability

6    or unwillingness on the part of either side to comply with the

7    requirements of the case management order which required the

8    opening paragraphs of the submission to tell me what your

9    position is and why you should win as compared and contrasted

10   to giving me paragraph after paragraph of the history of the

11   case.  For instance, Mr. Kukla, your assumption motion tells me

12   in paragraph 1 that GM filed a Chapter 11 case on June 1 of

13   this year.  Did it occur to you that by this time I might know

14   that?  By paragraph 15, on page 5 of your motion, you tell me

15   that your position is that the tooling purchase orders aren't

16   executory contracts.  And on paragraph 17, you finally get

17   around to telling me why you believe that.

18          Mr. Smolinsky, the Weil papers aren't much better.

19   Now, neither side, to my considerable frustration, quoted the

20   language upon which its position is based.  And when it's your

21   turns to do so, Mr. Kukla, I want you to address the language

22   in the agreements upon which you premise your contention that

23   they're interrelated and interdependent because I got to tell

24   you that despite the fact that I tried to do your work for you

25   and to see the basis upon which you might be making that

21

1    contention, I couldn't find it.  And, Mr. Smolinsky, when I

2    went through all of this stuff, I had analogous problems with

3    your contention that the tooling contract is an executory

4    contract.  And I'm going to need help from you as to what are

5    the provisions that create mutuality of obligation.  In

6    paragraph 8 of your brief, you say "the period during which the

7    debtors can request performance has not expired".  I need help

8    from you as to -- to do what?  With what rights and obligations

9    associated with that?  Whether you're referring to lines that

10   say this line item is effective from 11 August through -- 11

11   August 2006 to 2009 or what.  There are assertions that it's a

12   requirements contract but the language upon which the assertion

13   that it's a requirements contract -- well, I think you're

14   saying it's a requirements contract but I didn't see the

15   language upon which that's premised.  I don't see where is the

16   provision obligating GM to buy anything.  And on the tooling

17   contract, I need your help as to why this isn't just a pile of

18   purchase orders.

19         So, gentlemen, I'll hear your arguments but you're

20   both going to have to be a lot more specific in terms of the

21   language upon which your respective contentions are premised.

22   Because my tentative, subject to your rights to be heard, is

23   that these three agreements are not in any way, shape or form

24   interdependent or a single contract and that the tooling

25   contract either isn't executory or you haven't shown me what

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

22

1    obligations there are on the part of GM going forward.

2          One of the most troublesome parts that I've had

3    understanding is that none of the jargon or abbreviations or

4    code language that's used in these documents has been explained

5    to me.  And the promise -- the contractual provisions of a

6    promissory nature have not been pointed out to me.  And,

7    indeed, whether the tooling agreement is a one-time -- one-off

8    transaction or series of them or is a framework for repeating

9    purchases and the nature and extent of the repeating purchases

10   was not explained to me.

11         Likewise, I have problems understanding what a line

12   item detail is; what a contract attachment is supposed to

13   signify; what the standard terms and conditions referred to

14   under the contract header number on the third page of the

15   tooling agreement is; what the expression associated with the

16   GM legal business entity and the terms and conditions

17   associated with the line item details for contract number is

18   supposed to mean.  On this state of the briefing, gentlemen,

19   I -- despite the fact that I went to law school, despite the

20   fact that I have a degree in industrial engineering and I know

21   something about what tooling is and what gigs and dyes are, I

22   still can't understand what the contractual obligations under

23   the contracts are claimed to be.

24         Now, Mr. Kukla, I need to hear from you first because

25   a lot of this revolves around the extent, if any, to which

23

1    these agreements are integrated.  And I want you first to tell

2    me where in your brief you told me why they are integrated;

3    second, the contractual provisions upon which you base that

4    contention; and then anything else you want to tell me.  I know

5    the law in this area.  I don't need help in the law.  I need

6    help on the facts.

7             MR. KUKLA:  Okay.  Thank you, Your Honor.  With

8    respect to your first inquiry to where in the brief, I

9    believe -- and I apologize if -- I hear the Court's concern as

10   to how it was set forth and the fact that there's no specific

11   language cited in the brief and I apologize for not giving the

12   Court that clarification.

13            Our position, Your Honor, which I hope I set out in

14   the brief, and if I didn't, again, I apologize, is that what

15   Karmann was awarded was a program to do work on the GMX 381.

16   And in connection with that award, there's an obligation to

17   produce production parts and an obligation to produce service

18   parts.  And it's our position, again, that in the automotive

19   industry, those two go hand in hand.  It's essentially a

20   package deal.  Meaning, Karmann would not have been awarded the

21   service parts business had it not been awarded the production

22   parts business.  And so, essentially, even the fact, I think --

23   the pricing itself for the service parts which stem from the

24   pricing on its production parts.

25            With respect to specific language, I would refer the

24

1    Court to the nomination letter, which I know that General

2    Motors' counsel attached to one of their replies and which I

3    forwarded to General Motors' counsel last week when we were

4    having discussions concerning the motions.  I believe in there,

5    again, it says that Karmann had been awarded or selected for

6    the retractable car job for the GMX 381 program.  And in that

7    document, it sets out that in connection with that, Karmann

8    would be producing both production parts and service parts.

9            THE COURT:  Pause, please.  Was there a reason why

10    you didn't give me the nomination letter when that is the

11    document upon which you're basing your argument?

12            MR. KUKLA:  Quite candidly, Your Honor, at the time

13    that we had to file the objection, I did not have physical

14    possession of it.  And not to make any excuses, however, as I

15    think Mr. Smolinsky had stated when he was giving his recital

16    as to the status update on the other objections, there was some

17    confusion in terms of when this notice to assume by the debtors

18    was actually sent to Karmann and, I'm sure the Court is aware,

19    that was stated in the notice there's a ten-day period upon

20    which the objections were to be filed.  And there was some

21    confusion as to whether, in fact -- whether we had received.

22    So out of an abundance of caution, we wanted to get our

23    objection on file so there could be no argument that we had

24    somehow, by failing to object timely, had consented to the

25    proposed assumption.

25

1          THE COURT:  All right.  Now, Mr. Kukla, you have a

2     copy of the nomination letter in front of you and the

3     underlying contractual documents in front of you?

4          MR. KUKLA:  Yes, I do, Your Honor.

5          THE COURT:  To what extent do any of the underlying

6     contractual documents mention the nomination letter?

7          MR. KUKLA:  I don't believe that they do, Your Honor.

8          THE COURT:  All right.  Now to what extent -- and

9     again, my problem is that this nomination letter refers to a

10    lot of seemingly jargon in the industry some of which I can

11    guess as to its meaning, some of which I have more difficulty.

12    To what extent had the documents upon which this controversy

13    revolves, the production purchase orders, the service parts

14    purchase orders and the tooling parts service orders, been

15    executed before or after the nomination letter?

16         MR. KUKLA:  I believe the purchase orders were all

17    issued subsequent to promptly receiving the nomination letter,

18    Your Honor.

19         THE COURT:  All right.  Now to what extent, when the

20    nomination letter was drafted, had the purchase orders and the

21    other documents come into being?

22         MR. KUKLA:  That much I'm not sure, Your Honor.  But

23    I would point out also that we're not strictly relying on the

24    nomination letter itself but, as I'm sure -- I know that Your

25    Honor indicated you had gone through the contracts that had

26

1    been attached to the debtors' reply.  And what the Court will

2    find in reviewing General Motors' standard or bold terms and

3    conditions, which I believe the debtors maintain govern the

4    contractual obligations between the parties, in the production

5    purchase order, which incorporates General Motors' servicing

6    conditions, under Section 20, there is an express obligation on

7    behalf of suppliers, in this case, Karmann, to produce service

8    parts up to fifteen years later.  So I think, again, Your

9    Honor --

10        THE COURT:  Can you help me find that, please?

11        MR. KUKLA:  Sure.  That is Section 20, Your Honor.

12        THE COURT:  Of what?

13        MR. KUKLA:  I believe their terms are standard for

14   all Pos so I don't think it matters particularly which purchase

15   order Your Honor looks at.

16       (Pause)

17        THE COURT:  You're not in my courtroom.  The pause is

18   because I'm reading it now.

19       (Pause)

20        THE COURT:  I don't understand, Mr. Kukla.  I assume

21   you're referring to the -- are you referring to the first

22   sentence or the second sentence of paragraph 20?  The one I'm

23   looking at is on page 5 of 6.

24        MR. KUKLA:  Yes, Your Honor.  I have that in front of

25   me.

27

1          THE COURT:  Unfortunately, this is all in just a huge

2    bundle.  There's no other way I can refer to it.

3          MR. KUKLA:  No.  I'm reading the provision I believe

4    Your Honor is reading.  I think I would be relying on the first

5    section and also the third -- actually, the remainder of that

6    paragraph.  The second sentence, I agree, isn't really

7    appropriate and applicable.  But it does say that the seller

8    will sell the buyer goods necessary to forge and fulfill its

9    current miles for every replacement parts required.  And there

10   is also a reference during the next fifteen years of

11   obligations to continue to supply service parts.  And so, I

12   think, Your Honor, Karmann's position is while we think this is

13   a material issue of fact -- and I'm not quite sure that based

14   on the documents in front of Your Honor that the Court can

15   appropriately decide this matter, a main fact needs an

16   evidentiary hearing.  But I think at a minimum, both the

17   nominations letter coupled with the general terms which that's

18   GM own document that they prepared, indicates that the intent

19   of the parties here were that these two are -- this is a

20   package deal, that the fire doesn't get to production parts

21   without being obligated to its service parts.  And while for

22   administrative purposes, GM may have felt the need to issue a

23   PO for their need for service parts, I don't believe that that

24   carries the day for them in terms of establishing a separate

25   contractual obligation.

28

1        We believe they're interrelated and I think that's

2   made clear by Section 20 of their own General Terms.

3        THE COURT:   Continue.

4        MR. KUKLA:   So our thought, Your Honor, or our

5   position respectfully is that under the main POs, these are --

6   and again, I think the debtors cited in their reply that's the

7   intent of the parties.   And I think that's says things for the

8   debtors, Your Honor, is that there's an ambiguity here as to

9   what the parties intended.

10       THE COURT:   Well, one thing as to which there at

11  least seemingly isn't an ambiguity is that there's an

12  integration clause in each of these agreements, isn't there?

13       MR. KUKLA:   I'm not sure if there is, Your Honor.

14  I'm not disputing that.   There probably is.   I can't say with

15  certainty that I've seen that provision.

16       THE COURT:   Well, I'm reading from one that's number

17  31.   It says "Entire Agreement.   This contract together with

18  the attachments, exhibits, supplements or other terms of buyers

19  specifically referenced in this contract constitutes the entire

20  agreement between seller and buyer with respect to the matters

21  contained in this contract and supersedes all prior oral or

22  written representations and agreements."

23       This contract comes, as I heard you say, after the

24  nomination letter.   And I have some difficulty seeing why

25  paragraph 31 doesn't supersede that.   And --

29

1        MR. KUKLA:  Well, Your Honor, respectfully, if

2   that -- if it were the case, I still think that the obligation

3   under paragraph 20 shows that the supply of production parts

4   and the supply of service parts are, in fact, interrelated.

5   And I know that in the debtors' reply they cited a number of

6   different factors which, of course, I've looked at.  And quite

7   candidly, Your Honor, I think we need that number if not all of

8   those factors.  The consideration for these agreements was

9   interrelated as evidenced by the nomination letter.  The

10  contract was not separately negotiated.  They all stem from one

11  bid that Karmann made, request for quote, that the debtors

12  would have issued.  Karmann bid on it, was awarded the program

13  in its entirety which included the production parts and the

14  service parts.

15        And quite candidly, separate and apart from whether

16  the debtors have issued a separate PO for service parts, under

17  this paragraph 20, Karmann would have been obligated under the

18  terms of the production order to supply the service parts at

19  the prices indicated in the production PO lest the failure to

20  perform on behalf of Karmann, failure to actually provide the

21  service parts would essentially be a cross-default because they

22  would have had a breach of the production purchase order.

23        So again, Your Honor, I think this is -- and I think

24  Your Honor pointed out that it isn't really a legal issue at

25  this point, it's a factual issue.  And I think the facts

30

1    mitigate that, best case for the debtors, there is an ambiguity

2    here to what the parties intended.  The debtors haven't

3    provided any supporting affidavit indicating what the intent of

4    the parties were.  And I don't believe that the Court can

5    determine the intent of the parties based on the limited record

6    presented at the present time.

7        THE COURT:  Well, isn't it something which is equally

8    applicable to both sides?  Haven't both sides been dreadfully

9    deficient in giving me any affidavit as to the intent or, for

10   that matter, to even put in the briefs the language that's been

11   relied upon?

12       MR. KUKLA:  I agree with that statement, Your Honor.

13   We equally -- neither party has submitted corresponding or

14   supporting affidavits.  But again, I think, Your Honor, based

15   on their own documentation which is the nomination letter that

16   they sent to us plus the purchase orders are simply, Your

17   Honor -- their position is that because there's a separate

18   purchase order for service parts and a separate purchase order

19   for production parts, each is its own individual contract.  And

20   again, Your Honor, I think in the automotive industry, it's

21   understood that a supplier is awarded a program which would

22   require that they produce both production parts and service

23   parts.  And I think that at an evidentiary hearing, Karmann and

24   its top designee could elicit testimony to support that

25   position.  But the intent here was that they were being awarded

31

1    a program to supply production and service parts.  And that's

2    the reason why they bid on the award.  That's the reason they

3    were awarded the work.  And it seems now that what the debtors

4    are doing, and I understand their motive -- but I don't think

5    the Bankruptcy Code allows them to essentially release

6    themselves from the burdens of the contract and leave those

7    with Karmann while accepting the benefit and continuing to

8    compel performance by Karmann under this only limited aspect of

9    the contract.

10             THE COURT:  Anything else, Mr. Kukla?

11             MR. KUKLA:  No, Your Honor.  I appreciate -- again, I

12   thank the Court for allowing me to participate telephonically.

13   And I think I've -- I guess I'd rest on what I've presented to

14   the Court.

15             THE COURT:  Okay.  Mr. Smolinsky?  Main lectern,

16   please.

17             MR. SMOLINSKY:  Thank you, Your Honor.  Joe Smolinsky

18   for the debtors.  Let me start by responding to the integrated

19   argument and then switch to the tooling.  Your Honor, I think

20   that there are a few critical elements of these contracts that

21   I think Your Honor should focus on when looking at the three

22   categories of contracts, the production contracts, the tooling

23   and the service parts.  Your Honor noted the integration

24   provision and I think that that's the most important provision.

25   Each of the contracts contain integration causes that provided

32

1    clearly that the agreements are set forth in the contract and

2    there are no other oral or written understandings besides

3    what's in the contract and the schedules.

4         Second, there are no cross-default provisions which I

5    think speaks clearly to the fact that if the parties intended

6    that one is tied to the other, they would have drafted the

7    contracts in such a way that would have made clear.

8         The third is that all the contracts have different

9    terms.  They're not coterminous.  So there was always a

10   contemplation that one of the contracts could terminate and the

11   others would stay in place.  There are terminations for

12   convenience provisions which allow the party to terminate the

13   contract if the program is to be scuttled.  But General Motors,

14   for example, if they were to no longer manufacture this car as

15   they are, they could terminate the contract for convenience.

16   They would terminate the production contracts for convenience.

17   The tooling contracts and service parts contracts would

18   continue.  They have their own termination for convenience

19   provisions that would not be exercised.

20        And there's a good reason for that.  Even if an OEM,

21   an original equipment manufacturer decided to no longer build a

22   car, they would still have the need to service warranties and

23   other services that they would have to provide to their

24   customers.  You may be asking why we didn't terminate for

25   convenience and there are certain payment obligations that

33

1    would be triggered by termination for convenience that could

2    rise to the level of an administrative expense claim.  So

3    that's why we're seeking to reject the production contracts --

4           THE COURT:  Now presumably those would still be

5    elements of a damage claim but you would prefer to be defending

6    or have a pre-petition claim.

7           MR. SMOLINSKY:  That's correct, Your Honor.  So when

8    you look at those three factors, the no-cross default, the

9    integration clauses and the fact that all the agreements have

10   different terms -- and let me speak about paragraph 20 for a

11   minute.  My read of paragraph 20 is simply a statement that if

12   Karmann is to get the production of original equipment then

13   they're obligated to continue to provide replacement parts for

14   a period of fifteen years.  It does infer that under that

15   provision that the parties will reach agreement as to the

16   salient terms of any future parts provisions beyond the third

17   year.  And the fact that we're rejecting the production --

18          THE COURT:  What did you mean by the third year?

19          MR. SMOLINSKY:  I believe there's a reference in

20   paragraph 20 that the pricing for the third year -- let me

21   just -- it says "Unless otherwise agreed to by the buyer, the

22   price during the first three years shall be those in effect at

23   the conclusion of the current model purchases.  For the

24   remainder of the period, the price for goods shall be as agreed

25   to by the parties."

34

1              But we're rejecting the production contracts which

2     means that we can no longer require them to perform beyond the

3     term of the tooling contracts and the service parts contracts.

4     And the debtors and New GM were aware of that provision and

5     stands here today knowing that if and when the production

6     contracts are rejected that they're not entitled to purchase

7     any of these tooling or service parts beyond the term of their

8     current agreements.

9              THE COURT:  Help me understand a few things.  And my

10    curiosity, obviously, isn't evidence but it triggers questions.

11    I would have thought that products sold under the production

12    contract would be full assemblies and that stuff sold under the

13    parts service agreement would be individual subcomponents of

14    the larger modules or assemblies.  To what extent is my

15    curiosity accurate or inaccurate?

16             MR. SMOLINSKY:  That's my understanding, Your Honor.

17             THE COURT:  Well, then they're different parts,

18    aren't they?  And the price of a module which has been

19    assembled and delivered as a module, on the one hand, has

20    economies of scales associated with it and doesn't have the

21    individual pricing of the components.  Anybody who's bought a

22    replacement water pump for a car knows that it costs you more

23    to get an individual replacement than it would cost to buy the

24    total of all of the individual-like components that make up a

25    vehicle.  And I don't see how one can be talking about

35

1    replacement parts at the price as set forth in the contract if

2    the production contract has prices for modules and the parts

3    contract has pricing for individual subcomponents that are

4    parts of those larger modules.  I may be using the wrong word

5    because I'm not an automotive engineer.  I'm just going back to

6    my industrial engineering experience.

7             MR. SMOLINSKY:  I think, Your Honor, it was

8    contemplated in the nomination agreements that was referred to

9    is consistent with this, that the intent was that there would

10   be in place, although I don't think it's a requirement that

11   would be in place a service parts agreement that would provide

12   the terms upon which service parts would be provided.

13            My read of paragraph 20 is the requirement is beyond

14   the production of the car.  So if this is a six-year platform

15   for the production of the G-6, the Pontiac G-6, that the

16   production -- that the service part agreement would continue

17   and that Karmann was pledging that after the G-6 program, the

18   platform was terminated so that there were no new G-6s produced

19   that they would continue to supply service parts beyond that

20   date.

21            THE COURT:  What's a G-6?  A kind of Pontiac?

22            MR. SMOLINSKY:  I believe it's a Pontiac convertible.

23            THE COURT:  Aha.

24            MR. SMOLINSKY:  And this is the retractable roof that

25   sits on that car.

36

1          THE COURT:  Um-hmm.

2          MR. SMOLINSKY:  So, certainly, New GM, when they

3    evaluated these contracts to determine whether to take

4    assignment of them, they recognized the import of rejecting the

5    production contracts.

6          THE COURT:  Say that again slowly.

7          MR. SMOLINSKY:  When New GM evaluated whether or not

8    they would take assignment of these contracts in the three

9    various buckets, they did so cognizant of the fact that by

10   rejecting the production contracts because they were

11   terminating the platform, they were no longer going to produce

12   Pontiacs, that they would lose the ability to purchase service

13   parts beyond the term of their other service part agreements.

14         THE COURT:  Um-hmm.

15         MR. SMOLINSKY:  And that's why they're not

16   integrated, Your Honor.

17         THE COURT:  Now turn to tooling.  Again, my curiosity

18   isn't evidence.  But I would think that some tooling needs to

19   be replaced because it wears out and other tooling can be used

20   for much longer periods of time.  I can't tell from looking at

21   this whether the purchases of the tooling are one-off

22   transactions or are in anticipation of the fact that tooling is

23   going to be provided -- the same tooling is going to be

24   provided over and over again.

25         MR. SMOLINSKY:  Your Honor, you may be getting to the

37

1    edge of my knowledge.  I do believe that they purchase tooling

2    periodically.  They deliver schedules for how many tooling

3    pieces they need at a time.  And the contemplation is during

4    the period of the contract.  They would deliver schedules,

5    Karmann would deliver the tooling.  I don't know how long it

6    takes to produce the tooling.  But it's a periodic purchase

7    that the company makes.  Whether that tooling is needed at the

8    dealers or at the company, I don't know.

9         THE COURT:  I'm trying to figure out -- well, I'll

10   hear your presentation on the tooling portion.  But one of the

11   problems I have is trying to figure out what GM is obligated to

12   do vis-a-vis tooling as an element to determining whether or

13   not the tooling agreement is executory or not.

14        MR. SMOLINSKY:  Your Honor, let me speak to that.

15   And I was not expecting that question.  And maybe it's a

16   function of working with the company for many months and

17   understanding what's customary and how they do things and how

18   they contract for parts.

19        But, to me, the tooling contract is simply a contract

20   to provide parts pursuant to schedules when they're delivered

21   just like any other automotive part.  The company determines

22   how much they need over the course of the next month or several

23   months.  They put in schedules.  The parts are produced and

24   paid for.  And I don't think this contract is much different

25   from any other contracts the company has.  I want to just --

38

1    THE COURT:  Well, the question is, is it not much

2    more than a glorified price list coupled with a description of

3    the surrounding terms that will accompany any particular

4    purchase orders?

5    MR. SMOLINSKY:  I don't think GM would be happy to

6    hear -- New GM would be happy to hear if your conclusion today

7    is that counterparties to contracts could decide every time a

8    part is ordered whether or not there have been a supply or not.

9    THE COURT:  Well, I very well understand that.  But

10    my job in life isn't to make people happy.  My job is to

11    construe agreements.  Now, help me understand where the

12    mutuality of obligation is and where each of the two parties to

13    the contract are obligated to do what the other guy wants him

14    to do.

15    MR. SMOLINSKY:  Let me see if I can point out a few

16    provisions, Your Honor.  First of all, the term -- and I'm

17    looking to the sample tooling agreement that's attached to the

18    reply.

19    THE COURT:  That's the second or the third -- no.

20    It's the second of the three agreements?

21    MR. SMOLINSKY:  Yes.  Yes, Your Honor.  It actually

22    starts -- yeah.

23    THE COURT:  Well, give me a second because mine isn't

24    tabbed or anything like that.

25    MR. SMOLINSKY:  It says "Contract Header - 1 of 1".

39

1        THE COURT:  Well, the first one's the production

2   contract, isn't it, which also says --

3        MR. SMOLINSKY:  Yes.

4        THE COURT:  -- "Contract Header"?

5        MR. SMOLINSKY:  Yes.  But as you keep flipping pages,

6   you get to 5 of 6, 6 of 6 and then it goes to 1 of 6.  If Your

7   Honor would like, I could hand it up.

8        THE COURT:  I got it.  All right.

9        MR. SMOLINSKY:  Your Honor, if you look at the next

10  page, it says "This line item is effective from April 24th,

11  2008 through April 24th, 2011."  I can represent to you that it

12  doesn't take four years to make one part.  So the first thing

13  I'd like to point out is that the purpose of this contract was

14  to stay in place through 2011.  It wasn't a simple purchase

15  order to produce one part.

16       The second thing I'd like Your Honor to focus on, if

17  you flip to the next page, it says near the bottom of the page,

18  it says "Quantity, 1; Base Price, 22,000."  I think I can

19  represent to you that they didn't just buy one tool for 22,000

20  dollar, that this was -- the quantity per each unit of tooling,

21  the price would be 22,000 dollars which suggests that it's an

22  agreement to produce parts during the term for that price.

23       The next thing that I'd like to point Your Honor to

24  is -- if you flip to page 3 of 5.

25       THE COURT:  Of the contract attachments?

40

1          MR. SMOLINSKY:  Yes.  It says at the top 3 of 5.  And

2     paragraph 13 is "Termination for Convenience".

3          THE COURT:  Um-hmm.

4          MR. SMOLINSKY:  If this was a simple purchase order

5     to purchase one part, there would be no termination.  Once you

6     order, you order.  And it's produced and you pay and you're

7     done.  The termination of convenience gives rights to both

8     parties.  It says that GM has the right to terminate a contract

9     whenever it wants.  But it can't just not do that.  It can't

10    just go to another supplier during that period.  It needs to

11    terminate for convenience which requires GM to do certain

12    things, to pay certain amounts.

13         THE COURT:  Well, that's certainly true in part.  But

14    tooling manufacture requires design, unless it's out of a stock

15    design, fabrication, gathering up raw materials, machining or

16    otherwise creating the tooling, and so forth, so that even if

17    it were a purchase order, a seller could be stuck with work in

18    process or having incurred costs prior to the delivery or

19    acceptance of the tooling, couldn't it?

20         MR. SMOLINSKY:  That's right, Your Honor.  That's why

21    when you produce for a platform -- and I think the way GM would

22    look at it is the platform for parts is as long as they're

23    going to produce that car.  The platform for tooling and for

24    service parts are well beyond the requirement for producing the

25    cars because they have to continue to service the cars that are

41

1    on the road.  And that's why you saw paragraph 20 which, if we

2    reject the contract, the production contract we're not going to

3    be relying on and the tooling contract which sets the price for

4    tooling during this period.  And I think that that can be read

5    in conjunction with paragraph 3 which is on the immediate

6    preceding page which talks about delivery schedules and when

7    schedules are delivered.  And it says "Time is of the essence

8    and delivery shall be made both in quantities and times

9    specified in buyer schedule."

10         So for GM, they agreed to a price.  They agreed to

11   pay certain amounts if they stop purchasing and terminate for

12   convenience.  And, in exchange, Karmann agrees to accept

13   delivery schedules when they're received and time is of the

14   essence and they're required to produce the parts and deliver.

15   To me, that's a contract.  And, to me, it's executory until the

16   termination of the contract by its terms, which is 2011, under

17   at least this contract.

18         MR. KUKLA:  Your Honor.  I apologize for

19   interrupting.  Can I have an opportunity to address the tooling

20   issue?

21         THE COURT:  When it's your turn.

22         MR. KUKLA:  Okay.  Thank you, Your Honor.

23         THE COURT:  Mr. Smolinsky, if you look at the service

24   parts agreement that's further on in your package, it says on

25   what seems to be some kind of cover page, it says "Consolidated

42

1   Contract".  It says that "buyer agrees to purchase at the price

2   upon and subject to the terms and conditions on the face and

3   reverse side hereof approximately the percentage shown on the

4   attached exhibit the buyer's requirements".  It seems to walk

5   and talk and quack like a requirements contract.  Is there any

6   similar language in the tooling agreement that, in my review of

7   it, I missed?

8           MR. SMOLINSKY:  If you look at page 1 of 1, in the

9   middle --

10          THE COURT:  1 of 5 or 1 of --

11          MR. SMOLINSKY:  No.  1 of 1.  I'm sorry.  It's the

12   first page of the tooling contract.  And in the middle of the

13   page, it says "Contract Header number 1F5TO".

14          THE COURT:  Yes.

15          MR. SMOLINSKY:  Right below that, it says "This

16   contract sets forth the exclusive terms and conditions under

17   which seller shall sell and buyer shall purchase the goods or

18   services described in the line item detailed in this contract

19   for the period specified therein.  I think that's the corollary

20   provision.  And one more note.  The reason why these contracts

21   look different is that different parts of GM would enter into

22   different types of contracts.  This isn't one unified contract.

23   I'm not even sure the parties spoke to each other when they

24   entered into all of them.  There are the SPO, the service parts

25   organization group that would work on the SPO contract.

43

 1    There's the manufacturing department which would work on the

 2    tooling.  And the production group would work on the platforms.

 3    So I read that --

 4            THE COURT:  Mr. Smolinsky, with respect -- I mean,

 5    this is like a classic price list and terms list provision.  It

 6    doesn't say anything about GM being required to purchase all of

 7    its requirements, does it?  Did I miss the word "requirements"?

 8    It says these are the terms under which seller is going to sell

 9    this stuff.  That seller is going to sell this stuff during the

10    time period specified.  And it sure looks, walks and talks like

11    what you learn as a first year law student or study when people

12    are putting terms into their purchase orders and you got to

13    battle the forms.  In fact, it looks to me like this is a

14    textbook example of how to win a battle of the forms in the old

15    Article 2 UCC sense.

16            MR. SMOLINSKY:  Your Honor, I understand your

17    argument.  Are you saying --

18            THE COURT:  I'm not arguing with anybody.  I'm just

19    trying to understand what these documents say since neither you

20    nor your opponent have given me any affidavits or any

21    assistance in this or even given me a headstart on looking at

22    the provisions that I should be focusing on.

23            MR. SMOLINSKY:  I'm trying to understand whether Your

24    Honor is looking at whether or not this is an exclusive

25    agreement which is -- I think you're suggesting there's nothing

44

1    in here that says that GM would purchase all of their parts.

2         THE COURT:  I'm trying to find out what GM is

3    obligated to do.

4         MR. SMOLINSKY:  I believe that what GM is obligated

5    to do is to pay a particular price per part and to --

6         THE COURT:  Well, if you're talking about something

7    that is already ordered, of course.  But the question is to

8    what extent does GM have to buy a single additional part from

9    Karmann.

10        MR. SMOLINSKY:  I would infer that if they stopped

11   buying parts from Karmann and either go to another supplier or

12   stop in its entirety that there would be an argument that they

13   are obligated to pay the termination for convenience payments

14   because, in that case, Karmann didn't get the benefit of their

15   bargain which is to stand ready to produce parts through 2011

16   at the price of 22,000 per tool.  And if they're not getting

17   that business and they still have to stand ready and put their

18   capacity at risk then they are entitled to get paid for it.

19   And that's what the termination for convenience provision seeks

20   to do.  This is not a simple pricelist where GM could just walk

21   away and say, look, I don't really want to buy from you

22   anymore.  I don't like the way you're handling things.  There's

23   a contract.  And that contract sets out very explicitly the

24   terms and conditions upon which the schedules can be met.  Now,

25   Karmann's not happy because there's no minimum.  There's

45

1    nothing that says that we have to order ten thousand tools per

2    year or there's an upset price, there's a breakage price.  But

3    that's just the terms of the deal.  But I stand here very much

4    believing, and this is why I was not anticipating this

5    question, that there is an obligation that GM was to purchase

6    their tooling from Karmann and that Karmann would be -- stand

7    ready to do it.  And if GM chose to go a different way, there

8    would be consequences.  There would be, effectively, a

9    reimbursements of all of their costs of setting up.  I think

10    that that's the quid pro quo under a contract.

11          THE COURT:  Um-hmm.

12          MR. SMOLINSKY:  And there was offer and there was

13    acceptance.  If Your Honor's  uncomfortable, we can have an

14    evidentiary hearing.  I don't want to --

15          THE COURT:  Well, we may have to but -- by the way,

16    where is the acceptance by Karmann on these documents?  Are

17    they countersigned in a fashion that I missed?

18          MR. SMOLINSKY:  Give me one minute.

19          THE COURT:  I mean, I see there are places for

20    Karmann's signatures but I don't see any signatures.  Well, I

21    see there are places on the parts contract.  I didn't see any

22    on the tooling contract.  And I don't remember seeing one on

23    the production parts -- or production modules contract.

24          MR. SMOLINSKY:  I should know the answer to that,

25    Your Honor.  I don't.  I think it might be electronically

46

1    but --

2              THE COURT:  All right.  Okay.  What else you got, Mr.

3    Smolinsky?

4              MR. SMOLINSKY:  Nothing, Your Honor.  As I said, I

5    don't mind -- when I read these contracts, I read them with the

6    understanding of working with the company and understanding how

7    they do things.  If Your Honor feels that an evidentiary

8    hearing is necessary, we, of course, will accommodate that.  I

9    would ask that on the integration issue there were at least --

10   that Your Honor would rule on that.  I think that the items

11   that I highlighted for you which shows that there are several

12   contracts is fully supported by your Adelphia decision and

13   Second Circuit affirmants.  And, therefore, I would like to ask

14   that Your Honor find that the contracts are -- at least the

15   service contracts -- service parts contracts are in full force

16   and effect because I believe that Karmann has stopped

17   delivering parts based on the pendency -- and based on the

18   pendency of this objection, we have not assumed and assigned

19   these contracts yet.  So we would like some relief in that

20   regard.  I think if Your Honor finds that they are separate

21   agreements then we can go ahead and at least assume and assign

22   the parts contract which I don't think are in dispute except

23   for the integration provision if Your Honor is inclined to have

24   a trial on the tooling contracts.

25             THE COURT:  Okay.  Mr. Kukla?

47

1          MR. KUKLA:  Thank you, Your Honor.  I'll be very

2     brief.  With respect to the tooling, I believe if you look at

3     the tooling purchase order, it indicates at the top left-hand

4     corner the standard spot buying.  And in the automotive

5     industry, again, I think if we had an evidentiary hearing, we

6     could -- Karmann could elicit testimony in support of this that

7     there were not schedules or releases issued for tooling, that

8     tooling is a spot buying order.  So that, when Your Honor looks

9     at the tooling contract, the only tool that they've purchased

10    is a tool that's identified in that contract at the price

11    that's identified therein.

12          And with respect to the terms, it does say the

13    numbers -- often times, you know, it's a very lengthy time as,

14    I believe, Your Honor mentioned, with respect to engineering,

15    development, design costs to get a tooling up and running.

16    Once the tool has been fabricated, that's not the end of the

17    process.  Then the tool has to go through the parts production

18    approval process, PPAP, before the OEM or the cure one over

19    issued the tooling purchase order would have an obligation to

20    pay.  So it does take a number -- it could be a number of years

21    for a tool to actually be designed, built, tested, PPAP-ed,

22    given final approval and then actually use to kick off the

23    right and production parts.  And I think -- again, in an

24    evidentiary hearing that could be established.  But there are

25    not schedules or releases with respect to tooling.  There may

48

1    be schedules and releases with respect to production parts and

2    service parts.  These all are typically your requirements

3    contract or a blanket order where basically the supplier is

4    shipping to the releases needed by the OEM.

5              Here, they need a tool to kick off the production

6    parts.  And that's the first step in the process.

7              THE COURT:  Yeah.  I understand that.  But the

8    question is to what extent does the same tool have to be

9    resupplied either because of wear, breakage or something of

10   that sort and to what extent have the parties bound each other

11   to further purchases of that nature?

12             MR. KUKLA:  Respectfully, Your Honor, again, I think

13   maybe an evidentiary is needed.  But my review of these

14   purchase orders and my understanding from the automotive

15   industry and from speaking to my client is that Karmann's

16   obligation under the tooling has been completed.  And if GM

17   needed additional tools, they could issue additional purchase

18   orders for those tools.  Or issue an engineering change

19   order -- in fact, I think some of these purchase orders are, in

20   fact, in your change order where they're simply asking for a

21   modification or a revision to the tool to either correct some

22   issue that they had discovered in production, either needs to

23   be corrected, or to make a design change in the finished

24   product that's going to delivered.

25             And it's not surprising, Your Honor, for a tooling to

49

1    cost 22,000.  In fact, if anything, that's on the low end.

2    Those tools are -- the actual cost is much, much greater than

3    that.  So the fact that the number in some of these Pos may be

4    22,000 dollars, may be higher, doesn't, in our mind, evidence

5    that that is not -- that that's a schedule or release but

6    rather is a spot buy PO for one particular tool.

7         THE COURT:  Or per unit.  I mean, if you're

8    suggesting that it's for multiple tools, of course that's the

9    case.  But parties could agree that for every gig or every

10   fixture or every other kind of tooling that you're talking

11   about, you're going to pay 22,000 dollars per unit, can't they?

12        MR. KUKLA:  Well, I would think if that was the case,

13   Your Honor, I think they would -- one, there would not be

14   anybody to spot buying.  It should be identified as a

15   requirements contract or a blanket order.  And it should be

16   evidenced in the tooling purchase order itself.  And it seems

17   to me that the only thing the debtors are relying upon is the

18   line item at the top of the purchase order which indicates that

19   in some cases, I think Mr. Smolinsky indicated, a date of 2011.

20   And I think, again, it sometimes does take a number of years

21   for a tool to be designed, fabricated and, in fact, go through

22   the parts production approval process.

23        So, again, our position, Your Honor -- and again, we

24   agree that it's an issue of fact.  And I think that goes for

25   the entire issue that we've presented argument on today and

50

1    that an evidentiary hearing may, if fact, be needed not just on

2    tooling issues.  We believe also on the issue of the

3    integration between the purchase order -- the production

4    purchase order and the service parts purchase order.  And with

5    respect to paragraph 31 of General Motors Terms and Conditions

6    which, I believe, Mr. Smolinsky cited, while that may, in fact,

7    act as an integration clause, I guess the issue still is what

8    is the contract that's being integrated.  We believe, again,

9    that we can elicit testimony that in the automotive industry,

10   you know, these are package deals.  Production parts, service

11   parts, they go hand in hand.  There's no reason -- I mean, they

12   only aren't just a source of service parts to one supplier and

13   a source of production parts to a different supplier.  So,

14   again, we believe these are integrated.  I think our position

15   is that it is a genuine issue of material fact that would

16   require evidence rather than the record that's in front of the

17   Court presently.  And I acknowledge that both sides are equally

18   at fault for the record that the Court has in front of it so

19   I'm not trying to excuse ourselves from that.  But I do believe

20   that there is a genuine issue of material fact on both issues

21   as to at least with respect to the purchase orders, production

22   and service parts POs, as to what the parties intended.  With

23   the tooling, I think, again the contract is clear that this is

24   spot buying.  However, I concede that that is also an issue of

25   fact.

51

1          THE COURT:  Now let's talk about your overall

2     position.  You agree that Old GM doesn't make cars.  So it

3     doesn't need convertible tops.  And, in fact, even soon, if not

4     already, New GM isn't going to be making Pontiacs.  So

5     basically, you're saying, what, that because these can't be

6     separated even though there is no purpose in life at all for

7     either company to take on continuing obligations on the

8     production agreement that Old GM, Motors Liquidation Company,

9     doesn't have the ability to reject this contract?

10          MR. KUKLA:  I think they have the ability to reject

11     the entire contract.  And it will -- also I apologize.  I meant

12     to mention this before as one point of clarification.  Mr.

13     Smolinsky had mentioned that Karmann was not presently

14     shipping.  There was no confusion last week as to -- because my

15     client has been contacted by New GM and our position was

16     pending the objection.  We have not had a contract with New GM.

17     We discussed this issue with GM's special counsel, the Honigman

18     firm, and we confirmed as of last Friday that, in fact,

19     beginning today, Karmann will resume shipment.

20          THE COURT:  All right.

21          MR. KUKLA:  So hopefully that addresses that issue.

22          THE COURT:  Well, that's obviously very helpful.

23     Now, let's say if you got your wish -- if I rule that they are

24     integrated -- I mean, the last thing that any sane manager at

25     either Motors Liquidation Company or New GM would want to do

52

1    was to keep buying convertible tops for Pontiacs.  So

2    presumably, the next measure in this little chess game is that

3    then if you're right then Old GM terminates for convenience and

4    pays you for your existing inventory.  Is that what you're

5    looking for?

6         MR. KUKLA:  Well, I think, Your Honor, that would be

7    the end result is that either they assume the contract --

8    really, I mean, if they assume the contract in its entirety --

9         THE COURT:  Well, that would be idiotic.  I couldn't

10   approve that -- that would not pass any business judgment test

11   and the creditors' committee would be screaming if I ever

12   allowed that to happen.  Actually, they would be screaming

13   beforehand and, therefore, I would never let that happen.

14        MR. KUKLA:  Well, then I think the option would be,

15   as Your Honor is identifying, if they reject the contract, if

16   they were to reject the contract as a whole and then New GM can

17   negotiate with Karmann with respect to a service parts that it

18   needs going forward.

19        THE COURT:  And you want to play that game of chicken

20   and you want me to give you the legal terrain upon which you

21   can do it.

22        MR. KUKLA:  Well, I -- respectfully, Your Honor, I

23   don't believe it's a game of chicken.  We've agreed we're going

24   to resume shipment.  But with such confusion as to who would be

25   purchaser, that has been clarified through our discussions with

53

1    counsel.  We are going to resume shipment.  The only issue is,

2    again, we don't believe that they can take the benefit of the

3    contract without the burden of the contract.  And if they

4    reject the contract then we would have -- they could enter a

5    few negotiations and we could enter into a new contract to

6    provide them with their need for service parts.

7              THE COURT:  All right.  Anything else, Mr. Kukla?

8              MR. KUKLA:  Nothing, Your Honor.  Thank you.

9              THE COURT:  Mr. Smolinsky?

10             MR. SMOLINSKY:  Your Honor, I just stand to add one

11   more thing to the record.  When I was reading the acceptance

12   provision, I read it quickly when I was standing up here.  The

13   acceptance provision, which is paragraph 1 of the tooling

14   contract --

15             THE COURT:  Of which contract?

16             MR. SMOLINSKY:  The tooling contract.  It's page 2 of

17   5.  It says "Seller has read and understands this contract and

18   agrees that Seller's written acceptance" -- and I didn't go any

19   further but it says "or commencement of any work or services

20   under this contract shall constitute Seller's acceptance of

21   these terms and conditions only."  So I don't think anyone

22   would dispute the fact that services have commenced.  The only

23   issue, I think, is whether or not this is one 22,000 dollar

24   part that takes four years to build or whether this is a

25   contract under which schedules are delivered from time to time

54

1    during the duration of the term.  And we've been told that it

2    is the latter.  Thank you, Your Honor.

3            THE COURT:  All right.  I will dictate something

4    today.  But in order to do what I need to do, I would need to

5    take a recess.  And I still have a full courtroom on the dealer

6    motion.  We're going to take ten minutes and then I'm going to

7    take the dealer motion.  And then after I've heard the argument

8    on the dealer motion and dealt with that in some fashion, I'll

9    be back to you on how we're going to deal with this.

10           All right.  We're in recess until a minute or two

11   after 10:30.

12       (Recess from 10:21 a.m. until 10:37 a.m.)

13           THE COURT:  Okay.  On the dealers motion.  The motion

14   will be granted with respect to those who did not object, which

15   is in the ballpark of twenty-seven dealers.  I may have the

16   numbers slightly off.  And I will take appearances for the

17   remaining objectors.  And then I'm going to ask you to sit

18   down, I'm going to have some preliminary comments.  All right,

19   who's going to be speaking for the debtors on this one?  Mr.

20   Smolinsky?

21           MR. SMOLINSKY:  Good morning, Your Honor.  Again, Joe

22   Smolinsky of Weil Gotshal & Manges for the debtors.

23           THE COURT:  Okay.  Do I have people here on behalf of

24   the dealers?

25           MR. SKIRROW:  Yes, Your Honor.

55

1          THE COURT:  Come on up to a microphone, please.

2          MR. SKIRROW:  Good morning, Your Honor.  My name is

3    Juan Skirrow of Hoguet Newman Regal & Kenney and I represent

4    Everett Chevrolet.

5          THE COURT:  All right.  That's the one in Washington

6    State?

7          MR. SKIRROW:  Yes, Your Honor.

8          THE COURT:  Okay.

9          MR. DAVIS:  Jeffrey Davis, Your Honor, on behalf of

10   Ford, Buick, GMC and Forrest Chevrolet Cadillac.

11         THE COURT:  Right.  Anybody else?  Okay.  If there

12   had been more than two people appearing on behalf of dealers I

13   would have asked that you work very hard to coordinate your

14   presentations.  I think with only two I need to simply ask you

15   to avoid duplicative argument and to focus on facts you unique

16   to your particular clients.

17         Folks, my preparation was vis-a-vis the five, or six,

18   or seven, or eight objections that I reviewed.  And I am not in

19   a position now to narrow my comments down to the two of you who

20   are here.  But when I hear from everyone I want you to address

21   the following questions and concerns that I have.

22         First of all, from the perspective of the objectors,

23   believe me I fully understand the hardship of what losing one's

24   dealership franchise can mean.  But the case law and,

25   especially, Judge Gonzalez' decision in Old CarCo and my

56

1    decision last week, which I fully recognize is not officially

2    reported, in the mining company case, all underscore the fact

3    that except in those very few areas where Congress has told us

4    differently, we bankruptcy judges aren't allowed to consider

5    individual hardship to a particular contract counterparty.

6          Likewise, the preemption arguments were likewise

7    ruled upon in Old CarCo, and Judge Gonzalez, as in TWA,

8    addressed the difference to which we bankruptcy judges must

9    give business judgment.  I need the dealers to channel their

10   arguments -- in light of that; I must say that I was struck by

11   the lack of attention to Old CarCo.  In fact, I thought Mr.

12   Munits (ph.) was the only one of all of the objectors who

13   addressed it in any substantive way, and he's not here anymore,

14   and his matter has been continued or resolved.

15         So we have a case that is on all fours with the one

16   that's on here, except for the fact that that case ultimately

17   approved a harsher regiment for the dealers than the one that's

18   been advocated here.  So when the dealers have their turn I

19   need you to focus on those things and help me understand

20   whether you're asking me to rule that Judge Gonzalez' decision

21   in Old CarCo was wrong, or what.

22         Now, several people talked about when they cited Old

23   CarCo, they said affirmed, and then they cited the Circuit

24   Court decision of a week before Old CarCo was issued.  I don't

25   know what's going on there.  I don't understand Old CarCo to

57

1    have been affirmed by the Circuit, but it is, nevertheless, a

2    decision of a fellow bankruptcy judge in this district, and you

3    know from my prior written decisions how much I focus on

4    precedent in this district.

5         Now, the dealership in Everett Washington has the

6    potential for raising distinguishable issues.  Let me pull out

7    the file on that one.

8         The language from, both CarCo and TWA, says that

9    business judgment is respected in the absence of bad faith whim

10   or caprice.  The Superior Court Judge, I think his name was

11   Lucas, in Washington State, found GMAC guilty of bad faith.

12   But to my knowledge, made no express finding or even an implied

13   finding that was brought to my attention, that GM has

14   contrasted to GMAC, had been guilty of the conduct that he

15   found so objectionable, vis-a-vis GMAC.

16        But by the same token counsel for the Everett

17   Chevrolet dealership asked me to draw the inference that GM was

18   a participant with GMAC in doing the bad things that GMAC did.

19   And I need both side's views as to what I should be doing about

20   an allegation of that type when juxtaposed against the fact

21   that it's obvious that Motors Liquidation Company isn't making

22   cars anymore, doesn't have the ability to sell cars through a

23   dealership even if it wants to, that decisions as to which

24   dealerships to take on by assignment can only be regarded as

25   those of New GM.  And I need to balance those two.

58

1          Certainly, I don't rule out the possibility that when

2     GMAC did the bad things that it did, it did so in consultation

3     with GM.  I can't make such a finding on this record, if I ever

4     could.  But I guess the question is do I need to give Everett

5     Chevrolet and evidentiary hearing even though it wouldn't

6     seemingly be appropriate for the remainder.

7          Subject to your rights to be heard, it appears that

8     the adverse findings against GMAC are established that I can't

9     sit as a Court of Appeals of those rulings, and that we have to

10    assume that GMAC acted badly.

11         The issue is the relevance of that finding to this

12    process, and whether it is necessary or appropriate for me to

13    permit discovery as to the complicity or approval of GM and the

14    GMAC acts as directed toward GMAC.  Certainly, the findings as

15    far as they were made on GMAC are very damning.  But the

16    question is whether I should simply say, you know, go after

17    GMAC and get a zillion dollar punitive damages award against

18    GMAC or whatever, or whether I should also tag the innocent

19    creditors of this estate which GMAC's conduct, assuming for the

20    sake of argument that GM was complicit in the bad things that

21    GMAC did.

22         Was it Mr. Reivman?

23         MR. SKIRROW:  No, Your Honor, Mr. Skirrow.  I'm of

24    Mr. Reivman's firm.

25         THE COURT:  But your name was Starrow?

59

1          MR. SKIRROW:  Skirrow, S-K-I-R-R-O-W.

2          THE COURT:  Okay, Mr. Skirrow.

3          MR. SKIRROW:  I am a part of --

4          THE COURT:  Well, no, that's fine.  It's just that

5    when you gave your appearance before I didn't get your name, as

6    obvious from my question.  And I'll hear from you and Mr.

7    Davis.  But I want to hear from Mr. Smolinsky first.

8          MR. SMOLINSKY:  Thank you, Your Honor.  Again, Joe

9    Smolinsky for Weil Gotshal & Manges for the debtors.

10         Your Honor, treatment of the dealers in these

11   bankruptcy cases have been discussed at length.  There are a

12   lot of data in the record already.  The dealer rationalization

13   program was discussed at length in the first-day affidavits of

14   Frederick Henderson.  Mr. Henderson gave testimony at the sale

15   hearing.  In addition to the statements in our motion to reject

16   the dealer agreements and our reply.

17         Your Honor, thank you for granting relief with

18   respect to those dealers that did not object.  Just for the

19   record, I wanted to just put on the record the agreements in

20   principle that have been reached since the motion has been

21   filed so that the record is clear.

22         If you look at the amended agenda for today, response

23   filed number M, which is the First United Inc. opposition.

24         THE COURT:  Uh-huh.  That's the dealership in

25   Elcohan, California.

60

1          MR. SMOLINSKY:  Yes, Your Honor.

2          THE COURT:  Suburban San Diego.

3          MR. SMOLINSKY:  Yes.  The reason for the rejection

4    seemed to center around the fact that they were four

5    dealerships in the immediate area, and there were performance

6    issues.  Nevertheless in discussions, we have agreed to -- or I

7    should say New GM has agreed to provide this dealership with a

8    participation agreement to allow it to go forward.  So we've

9    adjourned this matter to the August 18th calendar to allow the

10   papering of the deal between New GM and the dealer.  And that

11   should resolve the objection.

12         THE COURT:  Okay.

13         MR. SMOLINSKY:  Letter N is objection of D'Andrea

14   Buick.  This dealership agreed to sign the modified wind-down

15   agreement.  The reason why it modified is to take into account

16   events that have occurred since the motion was filed, and since

17   the notice was given that the dealership would be on the wind-

18   down list.  And, again, we would ask that that matter be

19   adjourned to August 18th to allow a papering of that settlement

20   between New GM and the dealer.

21         Lastly, Your Honor, the objection of Mt. Kisco

22   Chevrolet.  They're also signing a modified wind-down

23   agreement, and that matter will be adjourned to August 18th as

24   well.

25         So, Your Honor, I think as you properly pointed out

61

1    there are a number of key undisputed facts.  I just want to

2    highlight them.  Number 1, the treatment of the dealers was not

3    an arbitrary process.  This is the exact situation where the

4    business judgment has been fully vetted and understood and

5    implemented.  As we cite in our motion in our reply papers, the

6    first cut was a formulaic cut; where dealers were given scores

7    for their performance.  You may hear something about DPS

8    scores; which is a weighted average of various factors of

9    performance, including number of cars sold compared to what

10   would be expected of that dealer.  Whether the dealership is

11   properly capitalized, and whether it's profitable.

12          Second, the company reached out to every dealer who

13   didn't sign either a participation agreement and a wind-down

14   agreement.  There was also a business case survey where the

15   company discussed each dealer and whether or not the dealers

16   should get a participation agreement that would allow for the

17   dealer to go forward with New GM or whether it would get a

18   wind-down agreement.  The wind-down agreements were put into

19   place to provide a soft landing for dealers that would not go

20   forward.  It comprised various considerations, including a

21   payment of 1,000 dollars for every car in inventory.  It

22   provided reimbursement of rent for a period of time.  And in

23   exchange the dealers would keep their doors open and sell off

24   their inventory in the ordinary course.

25          So when wind-down agreements were not signed the

62

1  company reached out to every dealers; tried numerous, numerous

2  times to try to get them to sign the wind-down agreement, or at

3  least to understand what its terms were.  There was an appeal

4  process.  Several dealers who were on the wind-down list were

5  given an opportunity to submit materials to GM.  And in many

6  cases, GM reversed its decision and gave them participation

7  agreements.

8        And I think the company, while very sympathetic, and

9  I think there's been a lot of reports about the dealer

10  treatment, of course, these are sympathetic stories; people

11  losing their businesses.  But I think that the company has done

12  all that they possibly could, and New GM has supported that

13  endeavor to make sure that there will be a soft landing for as

14  many as possible.

15        So, Your Honor, we're left with six objections.  I

16  think I've established through our papers that it has not been

17  an arbitrary process.

18        Number 2, during the sale process, the purchaser

19  designated contracts for assignment and the purchaser agreed to

20  take on and take assignment of all participation agreements for

21  the dealers that are going forward.  But, in particular, also

22  took assignment of all wind-down agreements to give the dealer

23  certainty for those that were exiting, that they would continue

24  to get the support of New GM as they wound down their dealers.

25        The third undisputed point is that as a result of the

63

1    sale the debtors no longer have a right to sell or distribute

2    GM vehicles.  Therefore, they cannot perform any of their

3    obligations.  If they were compelled to assume the agreements

4    that are active during the Chapter 11 case prior to objection.

5    And it bears noting with respect to our timing, we filed this

6    motion on the 6th of July, which was the day after Your Honor

7    issued the opinion which approved the sale.  Prior to that

8    date, we didn't feel comfortable to filing a rejection motion

9    and identifying dealers that would no longer be going forward,

10   and didn't sign wind-down agreements.  So once Your Honor

11   approved the sale we immediately filed the motion.  We made

12   that motion effective on the 10th, which is the date that the

13   sale closed and the date after which GM, the debtors, could no

14   longer perform their obligations under the dealer franchise

15   agreements.  So we tried to give the dealers as much time as

16   possible within a very narrow band of opportunity.

17          Number 4, as I mentioned the dealers made every

18   reasonable effort to cause the dealers not going forward to

19   sign the wind-down agreements.  And as Your Honor had noted in

20   the decision approving the sale, that the alternative treatment

21   of the participation agreement certainly -- and even the wind-

22   down agreement was better than the alternative for the dealers

23   of rejection.

24          Lastly, as Your Honor noted, the prevailing law in

25   this circuit in Chrysler is on all fours.  It provides a clear

64

1    mandate that Section 365 trumps and preempts state franchise

2    laws.  We recognize that to the extent that Your Honor approves

3    the rejection that damages may be determined under state law,

4    but what we're here before is to exercise one of a debtor's

5    core and basic rights to reject burdensome contracts or

6    contracts that they could no longer perform under.

7         THE COURT:  Pause, please, Mr. Smolinsky.  As you

8    pointed out the ability to reject burdensome agreements is one

9    of the most fundamental rights of a debtor-in-possession.  It

10   may turn out after hearing all of the argument that I would

11   agree with you and sustain the debtors' rights to reject these

12   contracts.  Has GM given any thought as to whether if I

13   determine that yes GM has the right to reject but, of course,

14   that gives rise to claims against the estate, that the

15   objectors here might still be able to get deferred termination

16   agreements, wind-down agreements if they decide to give up any

17   rights to appeal and, in essence, see the light?

18        MR. SMOLINSKY:  Your Honor, it's an excellent

19   question.  And I think it's clear from the way that we've

20   handled at least four of the dealers, resolved their issues,

21   that New GM has not abandoned the idea that they want to see

22   the right thing done in the circumstance if they can.  I will

23   tell you with respect to the wind-down agreements, they

24   typically contemplate that the dealer will stay open for a

25   period of time, and that benefits the New GM in that the

65

1    dealership will remain open, the cars will not be surrendered

2    to GMAC or other parties that may wholesale floor plan

3    financing, that would then put the cars back to GM.  So there

4    is a -- when New GM took assumption and assignment of the GMAC

5    agreements, they have this obligation to take back cars that

6    are -- that are surrendered.

7            Certain of the dealers that we agreed to modify wind-

8    down agreements for, no longer had their cars, they already

9    surrendered them to GMAC.  And, accordingly, the amount that

10   was made available was lessened because of those factors.

11           I cannot speak for New GM here, today.  I would hope

12   that they would endeavor to -- if the counterparties were

13   amendable to make offers available for the wind-down consistent

14   with their prior practice, as modified.  That's all I can

15   really say on the subject.

16           THE COURT:  Fair enough.  Continue, please.

17           MR. SMOLINSKY:  Your Honor, I think I will focus my

18   comments on the two dealers that are here today.

19           First, Everett.  Your Honor, Everett, I think, and

20   obviously I'd like to hear their comments.  They're the ones

21   that are involved in the GMAC litigation.  They also raise the

22   fact that GM has been discriminatory in that this dealership is

23   owned by an African-American, and, therefore, there was some

24   discrimination and bad faith based on that.

25           Our counter is that this dealer has had poor

66

1    performance.  And none of the dealers that are on this list

2    have had numbers that come anywhere close to the breakpoint

3    where they would be considered to go forward as a dealer with

4    New GM.  This dealer sold 117 cars, fewer than expected.  It's

5    DPS score is 49.96.  Now, the DPS score, as I mentioned before,

6    is the weighted numbers taking into account profitability,

7    capitalization, and sales.  So for this dealer in 2008, as I

8    said, it had a DPS score of 49.  That was based on expected

9    sales of 404 vehicles during the year.  It sold 287.

10            It is undercapitalized by two million dollars based

11    on New GM's calculations.  And it was not profitable during

12    that period.

13            So we think that based on that scoring, that the

14    inference should not be that there was something untoward in

15    how the company exercised its business judgment, but rather,

16    the inference should be that there was no differentiation

17    between this dealer and others.

18            In order for a dealer to be considered going forward,

19    a DPS of a 100 is considered average.  Those dealers that made

20    the cut have scores of seventy and above.  So this dealer falls

21    significantly below that breakline.  And, therefore, the

22    inference should be that since it lost a million dollars in the

23    last year that it should -- that the decision was not based on

24    nefarious determinations.

25            With respect to the GMAC litigation, I -- we haven't

67

1    briefed this at length and we'd be happy to submit to the

2    Court, but there have been subsequent pleadings filed with

3    respect to the GMAC action.  This is not our issue.  When GMAC

4    saw the papers that were filed by Everett, they contacted us

5    and wanted us to know the facts.

6            THE COURT:  Excuse me, Mr. Smolinsky.  You mean,

7    subsequent papers in the Sonoma County Superior Court?

8            MR. SMOLINSKY:  Actually, in the Court of Appeals for

9    the State of Washington, Your Honor, Division One.

10           THE COURT:  That like being an intermediate appellate

11   court?

12           MR. SMOLINSKY:  I believe so, Your Honor, yes.  And

13   in this appeal which was a discretionary interlocutory appeal,

14   the Court found that there may have been errors at the trial

15   level.  I will not characterize the papers, I have them

16   available if Your Honor would like to read them.  But it looks

17   like the Appellate Court had concerns about errors committed at

18   the trial court, and, therefore, the grounds for appeal had

19   been satisfied and that the appeal is going to go forward.  And

20   there's a twelve-page decision on the finding of the possible

21   errors by the trial court, which I can hand up, if Your Honor

22   would like.  Or we can submit after the hearing.

23           But I think as Your Honor noted, there is no

24   correlation.  I can't sit here today and say no one at GM spoke

25   to anyone at GMAC.  But GMAC is a separate company operating

68

1   with separate management.  And we do not believe that GM was

2   involved in any way, nor were they implicated in those events.

3           With respect to the allegation of discrimination, I

4   would only note that Mr. Henderson testified before Congress

5   that there are actually more minority dealers on a percentage

6   basis after the dealer reduction process than before.  So,

7   again, I think the inference can be drawn that we did not -- or

8   that New GM did not target out or single out minorities.  But,

9   in fact, at worst, it was not a factor and resulted in a higher

10  percentage of minorities.

11          I believe the other dealer is Forrest.

12          THE COURT:  Right.

13          MR. SMOLINSKY:  Your Honor, we reached out to Forrest

14  several times about today's hearing, but didn't receive a

15  response.  Their main argument is that they're a solid

16  dealership, not -- it wasn't a sound exercise of business

17  judgment.  The debtors didn't explain the evaluation process.

18  They raised the preemption argument and believe that it should

19  be treated as an adversary proceeding.

20          Your Honor, this dealer's performance is woeful.  The

21  best based on the data we reviewed, that was put together by

22  GM.  If you look at the DPS score, this dealer sold 603 cars

23  less than what was expected.  Their target was 1044 vehicles,

24  they sold 441.

25          THE COURT:  You said was expected, in the past.

69

1    Expected by whom?

2              MR. SMOLINSKY:   By GM.   GM sets targets based on what

3    they would expect in the market, historical population

4    demographics.   And it's all part of the rating system that GM

5    goes through to evaluate dealers.   And as I said, if they score

6    100 or more they're considered an average performing dealer.

7              If you look at the capital requirements they're

8    undercapitalized by 2.6 million dollars.   And they had losses

9    last year of 1,834,000 dollars.   That results, when you add it

10   all together in the weighted averaged, a DPS score of 21.65.

11   Nowhere close to the seventy that was the break point.

12             If you look back at 2007 their DPS score was 39.62.

13   If you look back at 2006 their DPS score is 49.73.   So, Your

14   Honor, based on the evaluation process, based on the record of

15   the formulaic as well as the non-formulaic evaluation of

16   dealerships, we believe that New GM exercised their discretion

17   appropriately.   However, as we have discussed at length before

18   this Court, these decisions were not debtor decisions.   These

19   decisions were based on what New GM saw -- envisioned for the

20   company going forward.   And that Old GM, the debtors, have no

21   way to perform and have no choice but to reject this contract.

22             Unless Your Honor has any questions?

23             THE COURT:   No, you can reply if need be.   Mr. Davis,

24   I think I'd like to -- Ms. Caton, come on up here.

25             MS. CATON:   Good morning, Your Honor.   Amy Caton from

70

1    Kramer Levin on behalf of the official committee of unsecured

2    creditors.

3            Your Honor, I just have a couple of brief comments on

4    this motion.  The committee does support the debtors here.  And

5    while we sympathize with the dealers' plight, we think that the

6    debtors have no choice but to reject these contracts.

7            We of Kramer Levin have the unique position here of

8    being involved in, both Chrysler and GM, so we did review the

9    order that the debtors are requesting entry of to make sure

10   that it was at least as favorable to the rejected dealers as

11   the order was in Chrysler.  And the language that we requested

12   be added to this order is on page 3 of the so order paragraph

13   at the beginning of the page, in subparagraph (d).  And it

14   just -- it clarifies the fact that with respect to the affected

15   dealers that they're not waiving any of their rights or

16   defenses with respect to the debtors' exercise of their rights

17   under the dealer agreements.

18           And I believe that with that addition that we had

19   requested, that this order is at least as favorable to the

20   rejected dealers as the order was in Chrysler.

21           THE COURT:  Okay.

22           MS. CATON:  Thank you, Your Honor.

23           THE COURT:  Mr. Davis, may I hear from you first,

24   please.

25           MR. DAVIS:  I also would like to point out that Mike

71

1    Forrest of Forrest Dealerships is present in court as well.

2         Your Honor, I understand what you said about no

3    individual hardship should be considered by this Court.

4    However, the Ninth Circuit in In re Pomona Valley Medical Group

5    has stated, "There may be cases where the disproportionate

6    damage to the party whose contract is to be rejected,

7    demonstrates that the debtor-in-possession's decision cannot be

8    based on sound business judgment."  And it is our position that

9    there is disproportionate damage to Forrest Dealerships if

10   their contracts were to be rejected.  And that is based on a

11   separate agreement that impacts a dealership between GM and

12   Forrest that arises out of a settlement agreement in a federal

13   suit filed by GM when they closed Oldsmobile down.

14        THE COURT:  Slow down and speak a little louder

15   please.

16        Now, I got your point about the Ninth Circuit's

17   Pomona decision.  But the next thing you were saying, there is

18   a separate agreement that has the effect of particular

19   hardship.

20        MR. DAVIS:  There are actually two exclusive use

21   agreements arising out of a federal suit filed by GM when the

22   Oldsmobile line of vehicles was fazed out.  The Forrest

23   dealerships did not sign the agreements with regard to

24   termination of winding down the Oldsmobile line of dealerships,

25   so GM filed suit in Dallas -- in Federal Court in Dallas, and a

72

1    settlement was raised whereby for a fifteen-year exclusive

2    period each of the respective dealerships is to service the

3    line of vehicles with regard to those dealerships irregardless

4    of anything.  And those agreements still stand today.  And at

5    this point with the motion, GM is not seeking to dissolve those

6    contracts and do away with those.  And what the Forrest

7    dealerships is left with is continuing to service Pontiac,

8    Oldsmobile, GM, GMC, Chevrolet, Cadillac, Buick vehicles and

9    not get paid.  In fact, that's --

10            THE COURT:  When you mean service, you mean repair,

11    as contrasted to sell?

12            MR. DAVIS:  Yes, Your Honor.

13            THE COURT:  And what a dealer typically does when it

14    does a warranty repair, it does the work and then it goes to

15    the manufacturer to get reimbursed for the work?

16            MR. DAVIS:  Correct, Your Honor.  And at this point,

17    GM is refusing to pay for warranty and other work -- for

18    warranty repairs, and there's around 15,000 right now that is

19    outstanding, both pre and post-petition as my understanding.

20    Of course, that work is now being performed under the franchise

21    agreements as well as under both of these exclusive use

22    agreements.  And that will impose a hardship absolutely on the

23    Forrest dealerships.  If they're forced to maintain the

24    entirety of their acreage that -- there were actually two

25    dealerships, two different buildings, that they're on to

73

1    continue to only service these vehicles.  The exclusive use

2    agreement also provides they can't sell any other lines of

3    vehicles.  And so they can't go and arrange an agreement with

4    some other entity to sell vehicles.  So they're stuck only

5    servicing vehicles and maintain the facilities for that only.

6    And that is an extreme hardship, and that is a matter that GM

7    has not at all touched upon or responded to in their reply

8    to -- their response to our objection.

9          With regard -- the same is by Judge Gonzalez.  A

10   little hamstrung to be able to response to this.  Because it's

11   my understanding from talking to the assistant of the Texas

12   Attorney General's Office that they reached an agreement with

13   regard to their objection to the sale motion that GM made, with

14   regard to how Texas law would apply to dealerships and they

15   possibly going forward.  I'm not privy to that agreement, I

16   haven't seen it; so I don't know what those agreements are.  So

17   it's hard for me to respond, Judge, to any questions that you

18   have with regard to how Texas law may apply here and Judge

19   Gonzalez' ruling in Old CarCo.

20         With regard to the GMAC and GM matter, I want to

21   start back into the year 2005 when GM began it's employee

22   pricing program, which is also the timeframe at which --

23         THE COURT:  When GM began it's what program?

24         MR. DAVIS:  Employee pricing program.  At that time

25   the GM suit in Dallas Federal Court was also ongoing with

74

1    Forrest.  At that time there was a spike in the sales by

2    Forrest -- for the Forrest dealerships, which approximately two

3    months before the mediation took place, out of which the

4    exclusive use agreements were generated, GMAC came in and

5    said -- immediately demanded 1.2 million dollars in payment

6    based upon alleged three-day payment arrangements, of which

7    there's never been any production in writing, it never was

8    shown to any --

9         THE COURT:  Did you say GMAC, though, as contrasted

10   to GM?

11        MR. DAVIS:  Yes, Your Honor.  And at that time GMAC

12   was the wholly-owned financial subsidiary of GM.  So it appears

13   that GM and GMAC were working in concert.  Whether it was a

14   more favorable resolution in mediation or to put forth out of

15   business, it's unknown.  But the monies were paid and Forrest

16   continued to do business.

17        In addition, around that same timeframe, Forrest

18   underwent a process of trying to consolidate the Pontiac and

19   Buick dealership from one location where they were renting

20   property to another location where they owned property.  Which

21   they ultimately succeeded and built a 3.2 million dollar new

22   facility for the Pontiac, Buick and GMAC lines of automobiles.

23   It took a while but finally that relocation was approved by GM.

24   And with the debt service on that building can be a reason why

25   we have a lower profit shown in the years 2006 and 2007.

75

1          As far as the current matters are concerned in 2008,

2    the middle part of the year, GMAC pulled its financing for the

3    floor plan of the Forrest dealership.  What that did was that

4    caused GM not to send anymore vehicles to the Forrest

5    dealerships, thereby -- that's why you have 603 less than

6    expected sales by Forrest in 2008.  Because for half of the

7    year they were receiving no new vehicles from GM.

8          As far as the capital requirements.  I don't know

9    where they're getting the 2.6 million dollar under.  There are

10   no facts.  There's nothing stated in the response to our

11   objection at all, or to the motion, itself, to state what the

12   capital requirements are and what matters they looked at.  And

13   that is part of our response as -- as how we respond to these

14   factual matters which the Court needs to determine whether this

15   was a business judgment decision, is where we undercapitalized.

16   We have a new facility, we have about ten million dollars in

17   property that we're sitting on, how are we undercapitalized at

18   this point in time.

19         And the last matter I want to bring up before the

20   Court is, I believe as of Friday GM has announced it made a

21   mistake in its rationalization of what it looked at in giving

22   dealers wind-down agreements and terminating certain

23   dealerships.  The numbers that I understand are at least fifty

24   if not more.  So they've pointed out that we've made flawed

25   decisions.  However, we know that we haven't made a flawed

76

1    business judgment decision in this case because we don't know

2    the facts and we don't know the factors that they looked at

3    when they decided to close these dealerships down, including

4    the Forrest dealerships.  And of which Forrest dealership is a

5    rural dealership which is a backbone of GM.

6         As Frederick Henderson stated before Congress, we

7    also carefully considered our dealer network coverage, rural

8    areas, and small towns, of which Cleburne is a town around

9    30,000 individuals which has a market to a number of other

10   small towns, only ranging in size from a couple of thousand;

11   about five or six versus urban suburban markets.  We know that

12   our strong presence in rural areas, small towns and hub towns

13   gives us a strong competitive advantage on average of more than

14   ten points in market share.  And we would like to maintain that

15   advantage.  They're going to lose that advantage, Your Honor,

16   in Cleburne.  Because what the market area that Forrest

17   services is left with is a Ford dealership and directly across

18   the road a Dodge Chrysler Jeep dealership.

19        Business judgment we believe dictates that Forrest be

20   provided an agreement to proceed forward with the New GM, and

21   that's what we're asking the Court to do.  Especially in light

22   of the fact of the exclusive use agreement where they're bound

23   to service these vehicles for at least another ten years and to

24   maintain their property only for these types of vehicles.

25        THE COURT:  Okay.  Thank you, Mr. Davis.

77

1          MR. DAVIS:  Thank you, Your Honor.

2          THE COURT:  All right, Mr. Skirrow.

3          MR. SKIRROW:  Good morning, Your Honor.  Based on

4   Your Honor's comments, I'm going to tailor my presentation.

5          I'm going to start off by saying that Everett

6   Chevrolet does not seek to argue against the entire regime or

7   whether the entire regime is in accord with the business

8   judgment rule.

9          What's clear here is that the actions that GM took

10  against Everett Chevrolet are in bad faith.  And when you have

11  that you have an exception to the business judgment rule.

12         Your Honor asked well, how can GMAC's actions -- how

13  can they somehow be tied up with whatever actions GM would like

14  to take?  And I think there are -- I mean, the

15  interrelationships between the two entities here are extensive.

16  Probably the most important one is the fact that GM's decision

17  to reject Everett Chevrolet's dealership agreement is

18  predicated on information that GMAC gave it, it's predicated on

19  the performance -- on Everett Chevrolet's performance, which

20  was hamstrung and affected by GMAC.

21         THE COURT:  Well, pause, please, Mr. Skirrow.  If

22  you're saying that you client was adversely affected by the bad

23  things that GMAC did and that GMAC's conduct made it much

24  harder for your client to make money, I understand that.  But

25  as I understand the standard, what you need to show is bad

78

1    faith by GM, so you've got to show more than cause and effect,

2    you've got to show some complicity or approval or ratification.

3    I'm not trying to fine tune the words, but to use words in

4    contrast to simply picking up on bad performance that GMAC

5    caused.  Do you understand the distinction I'm making?

6         MR. SKIRROW:  Yes, Your Honor.  And I will get to

7    that.

8         THE COURT:  Okay.

9         MR. SKIRROW:  First, I would like to read Your Honor

10   a statement from the debtors' reply papers.  And it says on

11   page 15 the bottom of paragraph 30.  "Ultimately while the

12   result of a collaborative effort, the decision of which dealers

13   to retain was the decision of New GM and not the debtors."  It

14   was a collaborative effort.  Now, specific bad faith, we have

15   specific bad faith by GM.  The debtor -- these bad faith acts

16   began at the end of 2007.  The debtor wished to purchase a

17   property from GM at the end of 2007.

18        THE COURT:  Wait, I lost you.  The debtor is GM.

19        MR. SKIRROW:  I'm sorry.  Everett Chevrolet wished to

20   purchase the property on which the dealership stood from GM.

21   It approach GM in August 2007 with this plan and it sought

22   financing from GMAC for this purchase.  And in May 2008 --

23   May/June 2008 GMAC announced that it would not finance the

24   deal.  And what ended up occurring was it was more profitable

25   for GM to sell the property to a third party as part of a large

79

1    portfolio sale then it was to go ahead with the transaction

2    with Everett Chevrolet.  And it was -- so that was one of the

3    bad -- very clear bad acts by GM.

4            The Judge in the Washington trial, Judge Lucas, saw a

5    pattern of bad faith by GMAC.  GMAC until recently was owned to

6    a large extent by GM.  And the activities -- if you look at the

7    acts in the record GM's actions parallel GMAC's.  I mean, they

8    dovetail very closely.  So you've got this bad real estate

9    deal.  And then you see that GMAC decides to pool -- I'm sorry,

10   GMAC decides to pool Everett Chevrolet's financing in early

11   December '08.  The same day that GMAC terminates Everett

12   Chevrolet's credit to the very next day, GM immediately and

13   without notice freezes Everett's open account.  GM also refuses

14   to supply vehicles to Everett Chevrolet.

15           So you have GMAC and GM acting over a long period of

16   time in conjunction with each other.  And you have a decision

17   to not allow one of the top two dealerships in the

18   Everett/Seattle area to allow them to participate in the New

19   GM.

20           I was kind of surprised when debtors' counsel said

21   that Everett Chevrolet was a poor performer.  Everett Chevrolet

22   is one of the two top dealerships in the Everett/Seattle area.

23   It has been profitable every year from 1996 to 2007.  And we

24   suggest that but for these bad faith acts on the part of GMAC

25   and GM that it would have been very easy for Everett Chevrolet

80

1    to be at least in the top two-thirds.  Everett Chevrolet is one

2    of the top two dealers.  It's in the top five percent of

3    dealers in the Everett/Seattle area.  So it seems very

4    incredulous for debtors' counsel to suggest that Everett would

5    not have met that threshold performance standard.

6           And then debtors' counsel throws out this 117 cars

7    fact.  He says that Everett Chevrolet had a DPS score of 49.96

8    and sold 117 fewer cars than expected in 2008.  Well, it should

9    be no surprise that that happened given that as the judge in

10   the Seattle case said, given that GMAC was attacking constantly

11   Everett Chevrolet's working capital.  And it also shouldn't be

12   a -- I mean, that kind of performance, 117 cars for a

13   dealership that 100 -- let's see -- for a dealership that sold

14   nineteen million by October 2008.  What I'm --

15          THE COURT:  Wait, time out.  How many cars did

16   Everett Chevrolet sell in --

17          MR. SKIRROW:  I don't have a number, Your Honor.

18   What I --

19          THE COURT:  I assume it wasn't in the millions.

20          MR. SKIRROW:  Of cars, no, Your Honor.  I'm talking

21   about dollars.  Nineteen million in sales is what we've --

22          THE COURT:  No, then I lost you.

23          MR. SKIRROW:  What I'm --

24          THE COURT:  How many cars did you client sell in

25   2008?

81

1          MR. SKIRROW:  I don't have an exact number, Your

2    Honor, I can obtain that for you.

3          THE COURT:  Can you give me ballpark?

4          MR. SKIRROW:  Nineteen million divided by the average

5    sale --

6          THE COURT:  Value of a car.

7          MR. SKIRROW:  So take nineteen million divided by --

8          THE COURT:  And that was 20,000 in fair price?

9          MR. SKIRROW:  Sure.  I'll take twenty, Your Honor.

10        (Pause)

11         THE COURT:  All right, go on.

12         MR. SKIRROW:  Okay.  So I believe that number 117 is

13   less than ten percent of a years worth of performance.  And so

14   if -- even given all the hamstrings that were placed on Everett

15   Chevrolet, if the credit had not been cut off and GM had not

16   stopped sending cars, even under debtors' scenario Everett

17   Chevrolet may have sold enough cars -- may have sold more than

18   117 extra cars.  That's really not a huge number.  117 is less

19   than ten percent.  Would represent less than ten percent of

20   what Everett Chevrolet sold in 2008.

21         So I think the long and short of it is Everett

22   Chevrolet is a successful dealership, and it's very hard on

23   these papers and based on the factors that were used -- we

24   received no support.  No numbers, no documents that allow us to

25   go behind the numbers; and I really think it's implausible to

82

1   imagine that Everett, but for these bad acts would not have

2   succeeded.

3              And, so, what we request, we request two things.  The

4   main thing that Everett Chevrolet wants is it wants a

5   participation agreement.  It wants to continue its business.

6   It's a reputable dealership, longstanding ties in the

7   community.  And it's one of the successful African-American

8   businesses in this country.  That's its main goal.  And Your

9   Honor can rule now that it's entitled to a participation

10  agreement, that would be wonderful.  Otherwise, at a minimum we

11  request that it be given an evidentiary hearing so that it

12  could ask for very focused document discovery and so that it

13  can take witness testimony and cross examine witnesses.

14             Let me look at my notes and see if I have addressed

15  all Your Honor's questions.

16             Your Honor mentioned that -- posed a query as to how

17  the debtor could -- should or could be required to take on this

18  dealership agreement, assume it if it's no longer producing

19  cars.  Well, I think the debtor's already said that New GM

20  has -- with respect to some other objecting dealers has agreed

21  to provide or has agreed to modification wind-down agreements,

22  I propose that the debtor take -- assume the dealership

23  agreement and that work it out with the New GM.

24             And I also think -- I think the defense is a little

25  disingenuous.  How can the consummation of a bad act be a

83

1    defense?  I mean, the fact that the bad act has been brought to

2    completion shouldn't be a defense.  Right now we should be

3    entitled -- Everett Chevrolet should be entitled to see -- to

4    figure out what happened and to determine whether it was

5    treated inequitably and unfairly.  And that this decision-

6    making process be show the light of day.

7         I don't think I have any other comments, Your Honor.

8    I would be more than happy to answer your questions.

9         THE COURT:  No, no thank you.  I'll take reply.  Mr.

10   Smolinsky.

11        MR. SMOLINSKY:  Thank you, Your Honor.  If I can

12   speak to Everett first.  Joe Smolinsky again.

13        Your Honor, first with respect to the GMAC situation,

14   which I think counsel does a good job of making something out

15   of nothing, again, there's no implication that GM had anything

16   to do with this.  The action that has been pending in

17   Washington is a Replevin action, relating to the exercise of

18   remedies by GMAC as a secured creditor against the cars for

19   breach of a demand not.  Failure by this dealer to repay its

20   obligations to GMAC.  And the Court of Appeals for the State of

21   Washington, and the commissioner's ruling granting motion for

22   discretionary review, finds -- I'm just going to read one

23   paragraph.  "GMAC had demand notes, the trial court did not

24   otherwise.  GMAC demanded payment, which Everett did not make.

25   There's nothing in any of the financing contracts that

84

1    obligates GMAC to make other loans to consider alternative

2    business structures or to explain its reasons for asking for

3    changes to Everett's capitalization.  Whether GMAC's action

4    make business sense is irrelevant to the issue of whether it

5    may demand payment.  Everett may or may not have a cause of

6    action for interference with the business expectancy or some

7    other tort.  But such a claim is also irrelevant to the issue

8    of whether GMAC could demand payment.  It thus appears despite

9    its statements to the contrary that the trial court added a

10   good faith defense to the demand note and that it's decision,

11   therefore, conflicts with Badgett (ph.) and Allied.  GMAC has

12   shown probable error."

13          I just read that, Your Honor, for background.  We

14   know nothing about that action.  But it doesn't sound like this

15   was GMAC conspiring with GM to make loans to this dealer, have

16   the dealer default, and then have GMAC exercise remedies.

17          With respect to the collaboration of parties,

18   obviously the portion that was read from the reply is the

19   collaboration between the purchase and GM in determining which

20   dealers should go forward in the New GM, and not collaboration

21   between GM and GMAC.  As a matter of fact, I can represent that

22   we participated on numerous counts of -- telephone conferences

23   with our friend, Mr. Helfadt (ph.), representing GMAC, and GMAC

24   business people, where they were trying to find out which

25   dealers were on the various lists.  The wind-down list, the

85

1    non-wind-down list, because they were concerned about fraud and

2    vehicles disappearing.  And time and time again GM provided no

3    information to GMAC.

4         So the best that GM was prepared to do was when GM

5    filed this motion.  We provided a copy -- an e-mailed copy of

6    the motion to GMAC when it was filed so that they could take

7    the necessary steps to ensure the protection of their vehicles.

8    But that's it.  To suggest that GMAC and GM, together, decided

9    which dealers would go forward has just no basis in fact.

10        So, Your Honor, it sounds like what Everett is

11   seeking is an audience with New GM to determine whether GM

12   would provide Everett with a dealership franchise agreement.

13   And they're welcome to do that.  I understand that there was a

14   fulsome opportunity to appeal, to discuss the numbers.  And I

15   don't know whether Everett didn't take part in that, or did

16   take part in that.  And, ultimately, the decision by New GM was

17   to not go forward.

18        But, again, this is the debtor standing here today

19   seeking to reject a contract that it cannot perform under.

20        With respect to Forrest, I would just note -- and,

21   again, we tried to reach out to counsel for Forrest, but as

22   part of our motion we're seeking not only to reject dealer

23   franchise agreements, but also seeking to reject ancillary

24   agreements, which we agree and we've agreed with the committee,

25   includes exclusive use agreements.  So they're concern about us

86

1    or New GM enforcing an obligation that they can't sell other

2    brands is not founded --

3            THE COURT:  But would evaporate if your motion were

4    granted?

5            MR. SMOLINSKY:  By the rejection of the ancillary

6    agreements, yes, Your Honor.  The only issues come up if the

7    property is owned by a subsidiary of New GM, where the

8    dealership sits, where there may be limitations.  But I don't

9    believe that Forrest is one of those dealers.

10           THE COURT:  I didn't follow that part.

11           MR. SMOLINSKY:  There are lease agreements where a

12   subsidiary of GM owns dealerships and leases --

13           THE COURT:  Owns the land on which the dealership is

14   situated?

15           MR. SMOLINSKY:  Correct.  And there, there may be

16   agreements that may restrict brand usage.  And the subsidiary

17   called Argunot (ph.) would make its decisions, you know, as

18   they were brought to them.

19           THE COURT:  Well, that sounds like it has a potential

20   for a catch-22, doesn't it?

21           MR. SMOLINSKY:  Well, it's to -- these are strategic

22   sites that GM had acquired over the years.  But I don't think

23   that these issues are implicated at all in Forrest.  I think

24   that property is owned by the dealership or leased by the

25   dealership, or someone else.

87

1          So there is no exclusive  use that would restrict

2    Everett -- I'm sorry, restrict Forrest from conducting its

3    business or opening up another auto dealership.

4          With respect to the warrant claims, I think it was

5    15,000 dollars.  There was an issue as to warranty claims that

6    were submitted for work done after the effective date of the

7    rejection that we're seeking, which is the 10th.  Other than

8    that, I believe, the company -- New GM assumed all of the

9    obligations through the closing date for warranty provisions.

10   We'd be happy to look into that issue for them.  But that may

11   be the basis for that claim.

12         And unless you have any questions, Your Honor.

13         THE COURT:  Okay.  No, I don't.  All right, everybody

14   had a chance to speak their piece?

15         All right.  I'm going to take a recess.  I think

16   you'll be well served to take a long lunch.  And I want

17   everybody back at 1:00.  I can't guarantee you how much I will

18   have accomplished by then, but I think that's what I would like

19   to do.  We're in recess till then.

20      (Recess from 11:40 a.m. until 1:51 p.m.)

21         THE COURT:  I apologize for keeping you all waiting.

22   In this contested matter in the jointly administered Chapter 11

23   cases of Motors Liquidation Company and its affiliates, Motors

24   Liquidation moved to reject its franchise agreements and

25   associated agreements, such as exclusive use agreements, with

88

1    thirty-eight dealer counterparties whose franchise agreements

2    were not assumed and assigned to New GM and where the dealers

3    declined to execute the wind down agreements that Old GM

4    offered as an alternative to rejection.

5          By reason of developments since the filing of the

6    motion three dealers were carved out of the motion and Motors

7    Liquidation now seeks that relief with respect to thirty-five

8    dealers.  After review of the record and the undisputed facts,

9    I conclude that with respect to thirty-three of the thirty-five

10   the motion must be granted.  The motion is granted with respect

11   to the thirty dealers who did not object and also three of the

12   five who did.

13         With respect to one of the remaining two, Forrest

14   Chevrolet, which argues that it cannot respond to Motors

15   Liquidation's observations, that Forrest Chevrolet's

16   performance was quite substandard, I will be continuing the

17   motion without either granting it or denying it at this time.

18   I will require Motors Liquidation to provide Forrest Chevrolet

19   with the information upon which the decision was based.

20         Forrest Chevrolet will then have the opportunity to

21   submit that evidence with a brief, if it's of a mind to, to

22   show, if it can, that Motors Liquidation's decision as to

23   Forrest Chevrolet was made in bad faith.  Likewise, Motors

24   Liquidation will have the opportunity, is if it of a mind to,

25   to submit an opposing brief after which I'll decide whether

89

1    Forrest Chevrolet shall be treated any differently than the

2    others.

3            With respect to Everett Chevrolet, the motion

4    likewise will be continued, without either granting it or

5    denying it at this time.  AS Everett's Chevrolet requested,

6    Motors Liquidation will provide similar information to

7    Everett's Chevrolet so that Everett Chevrolet, too, will be

8    aware of the information upon which the decision as to it was

9    based.

10            Also, Everett Chevrolet will be able to take

11    reasonable discovery to determine the extent, if any, to which

12    GM was complicit in any bad faith conduct, engaged in by GMAC.

13    As contrasted to simply acting on a financial condition that

14    may have been affected by GMAC's conduct.  Everett Chevrolet

15    will also be entitled to reasonable discovery to inquire

16    whether Motors Liquidation acted to reject Everett Chevrolet's

17    franchise out of racial animus.

18            As before, Everett Chevrolet will have the right to

19    submit whatever supplemental evidence it has, along with a

20    supplemental brief, to show that it should be treated

21    differently than the other dealers and Motors Liquidation will

22    have the opportunity to respond, including the right to say, if

23    it is of a mind to, that any bad faith doesn't affect Motors

24    Liquidation's ability to reject.

25            The following are my findings of fact and conclusions

90

1    of law in connection with this determination.  As facts, I find

2    that GM, referred to for clarity by many as Old GM and now

3    known as Motors Liquidation Company, entered into franchise

4    agreements with about 6,000 dealers.

5         Substantially all of GM's retail sales are through

6    its network of independent retail dealers and distributors.

7    Some of those dealers marketed one GM brand, such as Chevrolet,

8    Buick, Cadillac or the like and others marketed several.  The

9    363 transaction contemplated the assumption by GM and the

10   assignment to new GM of dealer franchise agreements relating to

11   approximately 4,100 of Old GM's 6,000 dealerships modified in

12   ways to make the surviving GM more competitive.  Those modified

13   agreements were frequently referred to as participation

14   agreements.

15        But New GM was unwilling to take all of the dealers

16   on the same basis as it believed that in order to compete

17   effectively, in a more competitive and challenging market, it

18   needed to slim down or "rationalize" as it put it, its dealer

19   network.  That is, to reduce its dealer network and to proceed

20   with a lesser number of dealers.

21        Old GM and New GM determined in a collaborative

22   effort which dealers franchise agreements would be assumed and

23   assigned by a formalized process relying heavily, not

24   exclusively, on objective criteria.  Those criteria included

25   dealership sales measured against other dealerships of a

91

1    similar size and in a similar size market in the same state; a

2    customer satisfaction index measured against the average for

3    the region in which the dealership was located; capitalization

4    measured based on the working capital needs of each dealership

5    and profitability.

6          Based on a species of weighted average of those

7    factors each dealership was assigned a dealership performance

8    score, referred to as a DPS with a score of one hundred

9    considered to be average.  Dealerships with DPS scores of less

10   than seventy were considered to be significantly

11   underperforming and would not be retained long term by New GM.

12         Other factors taken into account included the sale of

13   non-GM brands under the same roof and who also experienced poor

14   overall performance, sale of discontinued GM brands,

15   dealerships with sales of less than fifty cars per year,

16   dealerships with inadequate or uncompetitive facilities or

17   locations and dealers unprofitable for three years in a row

18   with inadequate working capital.

19         Each of the objecting dealers had a DPS score well

20   below the threshold level of seventy and/or sold less than

21   fifty cars in total during calendar year 2008.  For instance,

22   Cardenas sold three vehicles in 2008 and had a DPS score of

23   twenty-three.  Terry Gage sold thirty-nine vehicles in 2008 and

24   had a DPS score of about fifty-seven.  Quinlan sold twenty-one

25   cars in 2008 and had a DPS of eighty.  Forrest had a DPS of

92

1    about twenty-two in 2008 and DPS scores of about fifty in 2006

2    and forty in 2007 and sold 441 cars, 603 fewer than expected

3    based on its dealership size and market location.

4           GM advised dealers that it would be engaging in this

5    evaluative process and advised them, for those who were not

6    selected to continue, GM would offer them agreements under

7    which their franchises could be brought to an end less abruptly

8    then otherwise would be the case if the dealer agreed as part

9    of that agreement to waive any other claims or legal remedies

10   it might have, including rights the dealer might have under

11   state law unless those rights were unenforceable in bankruptcy.

12          These alternative agreements were referred to as

13   deferred termination agreements or wind down agreements.

14   Dealers whose franchises were not continued were advised that

15   if they didn't enter into wind down agreements their franchise

16   agreements would be rejected.  The rejected waivers of rights

17   were disagreeable to the thirty-five dealers who were the

18   subject of this motion.  They declined to execute wind down

19   agreements and their franchise agreements were, accordingly,

20   rejected.

21          In one instance there are special facts.  Everett

22   Chevrolet had a dispute with GM's financing affiliate GMAC.

23   GMAC provides financing to purchasers of GM vehicles as well as

24   to GM dealers including, though not limited to, for the

25   purchase of vehicles before they are sold by the dealers to

1    consumers.

2         GM has a sixty-one percent interest in GMAC but GMAC

3    and GM are separate companies.  In connection with the dispute

4    I just mentioned, GMAC sought and obtained an ex parte TRO in

5    2008 enjoining Everett Chevrolet from selling any cars,

6    basically shutting down Everett Chevrolet's business for two

7    weeks until the order was modified to permit Everett Chevrolet

8    to sell cars and remit proceeds to GMAC.

9         The TRO was thereafter lifted and in the course of

10   further litigation in that matter the Superior Court of

11   Snohomish County, Washington issued substantial factual

12   findings including findings that there was no wrongdoing by

13   Everett Chevrolet and that GMAC acted wrongfully in numerous

14   respects and that GMAC dealt dishonestly, unreasonably,

15   unfairly and in bad faith with Everett Chevrolet.

16        Those factual findings may or may not stand up on

17   appeal or they may turn out to be true as facts but not to have

18   the legal significance to GMAC that was attached to them in the

19   Washington court proceedings.  Ultimately, I don't need to find

20   facts of that nature today.

21        So far, as the record in this court reflects, that

22   Snohomish County Superior Court made no similar findings with

23   respect to GM or conduct by GM.  However, Everett Chevrolet

24   contends that acts performed by GMAC could not have been

25   performed without the knowledge or assistance of GM.  That GM

94

1    and GMAC were working together and that GMAC's bad faith must

2    be imputed to GM.

3            I'm not in a position, on this record, to make any

4    factual findings with respect to the complicity, if any, of GM

5    and GMAC's acts.  Nor am I in a position to sit as a court of

6    appeals with respect to the factual findings of the Snohomish

7    County Superior Court.

8            At this juncture I'm not in a position to rely upon

9    those findings in any way, shape or form other than to find

10   that one judge found that GMAC acted in bad faith and that the

11   circumstances raises as an issue or create an issue without

12   establishing as a fact whether GM might have done likewise.

13           I note that apart from arguments that Everett

14   Chevrolet makes that are not materially different then those

15   raised by other objectors, Everett Chevrolet contends that its

16   facts present unique issues with respect to the debtor's

17   contention that Everett Chevrolet's franchise agreement was

18   rejected in "good faith".  And Everett Chevrolet contends that

19   its issues should be treated as a contested matter and require

20   an adversary proceeding, a different thing, with due notice,

21   opportunity for discovery and an evidentiary hearing.

22           I also note that Everett Chevrolet raises concerns as

23   to racial animus in connection with the rejection of its

24   franchise agreement, although it has produced no evidence of

25   any such racial animus or any evidence from which racial animus

95

1   can be inferred.

2        I now turn to facts applicable to all objectors; one

3   is a hugely important point.  Motors Liquidation no longer

4   makes cars and trucks.  It no longer makes GM branded vehicles

5   and it no longer has the right to GM brands.

6        Obligations under the franchise agreements include

7   repurchase obligations for GM vehicles, parts and tools,

8   warranty obligations, insurance obligations, fuel fill

9   obligations, direct dealer incentive obligations, wholesale

10  floor plan support, local advertising assistance and funding

11  for dealer websites and other IT services.  All of which are

12  meaningless, burdensome or both for a company that no longer

13  makes and sells vehicles.

14       It is a fair inference to draw that Old GM and New GM

15  conferred when New GM decided which franchise agreements it

16  wishes to assume.  And obviously the thirty-five dealers'

17  franchise agreements at issue here weren't among them.  But

18  ultimately the decision as to whether to take a franchise

19  agreement was New GM's.  And when these agreements weren't

20  assumed by New GM, Old GM, Motors Liquidation Company, at the

21  risk of stating the obvious, didn't need those franchise

22  agreements itself.

23       Here what we now have is a Motors Liquidation Company

24  that no longer is in the car and truck business, dealerships

25  are pointless and dealer franchise agreements are an

96

1    unnecessary and expensive burden.  I don't need an evidentiary

2    hearing to find any of those facts.

3         Now turning to my conclusions of law and bases for

4    the exercise of my discretion, the objectors make three basic

5    arguments.  They assert that there was a failure to invoke

6    appropriate business judgment, that the decisions resulted in

7    hardship to them that I must consider and that they are

8    entitled to rights that they have under state law under

9    statutes and case law for the protection of dealers.  I'll deal

10   with those contentions in turn.

11        Turning first to business judgment.  I find, as

12   conclusions of law or mixed questions of fact and law, the

13   courts generally will not second guess a debtor's business

14   judgment concerning the rejection of an executory contract.

15   See, for example, In re Riodizio 204 B.R. 417, 424 (Bankr.

16   S.D.N.Y. 1997); In re Farmore 204 B.R. 948, 951-952 (Bankr.

17   N.D. Ohio 1997).  The purpose behind allowing debtors to reject

18   executory contracts is to allow them to abandon burdensome

19   property, see In re Orion Pictures 4 F3d 1095, 1098 and In re

20   Old Car Co, that's the former Chrysler case, 406 B.R. 180

21   (Bankr. S.D.N.Y. 2009).

22        Accordingly, the scope of the bankruptcy court's

23   inquiry is limited.  Under the business judgment standard, the

24   Court must determine whether rejection will benefit the

25   debtors' estates.  As part of this determination the Court must

97

1    determine whether the debtors made their decisions rationally,

2    see In re Pilgrim's Pride 403 B.R. 427.   Irrational bases of

3    decision making include racial and gender discrimination and

4    retaliatory animus, see Pilgrim's Pride at p. 428.   Such bases

5    are antithetical to sound business judgment and demonstrate bad

6    faith, whim or caprice.   And I've been quoting from Old Car Co.

7         However, whether the debtor is making the best or

8    even a good business decision is not a material issue of fact

9    under the business judgment test, see Old Car Co. and Wheeling

10   Pittsburg 72 B.R. 849.

11        Here, Motors Liquidation's business purpose is easy

12   to understand.   Frankly, it's obvious as counsel for the

13   creditors' committee supporting the debtors' motion in a recent

14   matter also before me, made clear Motors Liquidation no longer

15   makes cars and trucks, it doesn't need dealers.   Motors

16   Liquidation is unable to meet many of the obligations under the

17   franchise agreements and it would be inordinately expensive

18   and/or pointless for Motors Liquidation to meet obligations for

19   the remainder.

20        When Judge Gonzalez was deciding Car Co -- Old Car

21   Co. and he found that the debtors exercised sound business

22   judgment he noted the obvious in that case, one that's no less

23   obvious here.   The debtors would no longer be in the car

24   manufacturing business, see 403 B.R. 196, therefore they reject

25   the agreements that are an integral part of conducting that

98

1   business and without which car business they cannot perform nor

2   have any reason for performing under dealer franchise

3   agreements.  In fact, because the dealers here were GM's risk

4   performers, GM would be well within its business judgment if it

5   had determined to reject these franchises even if GM were

6   continuing as a standalone company.

7           In the course of oral argument I noted how so few of

8   the objectors had addressed Judge Gonzalez' decision in Old Car

9   Co., remember that's the former Chrysler case which was renamed

10  after Chrysler, like Old GM, came to be no more than a

11  liquidating shell.  Old Car Co. is, of course, on all fours

12  with this case save only for the fact that dealers here were

13  offered better options by GM then dealers were offered in

14  Chrysler.

15          Judge Gonzalez expressly dealt with several of the

16  issues that we have here and it's unnecessary for me to discuss

17  those issues in comparable length.  It's just extraordinary how

18  similar this case is to Old Car Co., fully as much so as it was

19  when I dealt with the earlier issues on the 363 sales.

20          First, as to business judgment, I find here as a

21  mixed question of fact and law that the decision making process

22  was rational and an exercise of sound business judgment.  As in

23  Old Car Co., I should not and do not disturb the business

24  judgment decision.  I also can and do find, as Judge Gonzalez

25  found in Old Car Co. that rejection benefits the debtors'

99

1    estates so that even if we were applying that higher standard,

2    as we do by way of example when we're ruling on settlement

3    motions under Rule 9019, that I could find that to be satisfied

4    as well.  Here no evidence is presented to me showing that the

5    debtors made their individual rejection decisions irrationally

6    such that the rejections demonstrate bad faith or whim or

7    caprice.

8            Turning now to the matter of hardship.  Several of

9    the objectors have pointed out the hardship this series of

10   rejection motions causes them and I take that as true.  I fully

11   understand the hardship to the objectors and have great

12   sympathy for them.  But as with the Stillwater Mining matter

13   earlier in this case, this is another one of the many decisions

14   that I've been forced to make and may well have to make in the

15   future where I have to deal with the unfortunate consequences

16   of corporate financial distress.  So that others do not suffer

17   even more the Bankruptcy Code provides means for debtors to

18   shed burdensome obligations of which these franchise agreements

19   are classic examples.

20           For purposes of this motion, I must consider the

21   debtors' business judgment and even if I were to apply the more

22   rigorous test of what's in the best interest of the estate, as

23   I noted just a moment ago, this motion would pass muster under

24   that standard as well.  Likewise, there's no basis in the law

25   nor has any been cited to me for considering hardship to the

1    counterparty on a motion of this character where, for example,

2    Congress hasn't directed us to consider competing

3    considerations as we're required to do for collective

4    bargaining agreements.

5        As noted by Judge Lynn in Pilgrim's Pride, 403 B.R.

6    425, while the impact of rejection on a counterparties'

7    community may be significant, that is not an uncommon result of

8    the cutbacks that typically accompany a restructuring in

9    Chapter 11.  So there not only did Judge Lynn reject hardship

10    to the party but he even rejected hardship to the surrounding

11    community.

12        Now turning to the argument that the objectors have

13    rights under state law such as by state dealer protection

14    statutes.  These arguments, too, were addressed and rejected in

15    Old Car Co.  Once more, I won't repeat that discussion or

16    analysis at length.  It's sufficient for the purposes of this

17    decision to note Judge Gonzalez' overview of this aspect of his

18    decision.  Consistent with the order, the Court concludes that

19    the dealer statutes are pre-empted by Section 365 with respect

20    to rejection of the rejected agreements.  Of course, as with

21    contract rejections in general, damages are still calculated

22    according to state law, see 403 B.R. 199-207.

23        For all of these reasons, I must overrule all of the

24    objections that were filed on a general basis by the various

25    objectors whose objections were not otherwise resolved.

101

1              Now let me finally turn to the special objections of

2       the two objectors who spoke today.  Neither offered to find

3       that the general principals I described above would be

4       different in any way for them.  And until and unless they can

5       show me that their facts are different, essentially by reason

6       of bad faith decisions aimed at them by GM they will have to be

7       considered the same way.  But they rely on statements on TWA

8       and Old Car Co. that to invoke the business judgment rule on a

9       rejection motion the debtor cannot act in bad faith or based on

10      whim or caprice.  That's essentially what we're down to now.

11             Neither of the two objectors made any showing of bad

12      faith, whim or caprice on the record developed to date.  But in

13      each case they said they wanted to see the basis for the DPS

14      scores that Motors Liquidation computed and they wanted to see

15      why they weren't chosen for continuation; contending, in

16      substance, that they were having difficulty responding to the

17      motion when they didn't know the basis upon which Motors

18      Liquidation acted the way it did.

19             While I Have no reason to conclude that providing

20      them that information would change the result, I'm a little bit

21      uncomfortable with the fairness of confronting them with

22      evidence that they could not previously see.  And I think the

23      debtors must provide that to them.  I think that the two

24      remaining objectors should then have the right to submit

25      anything that flows from that evidence, once they've had a

102

1    chance to see it, to see if the bad faith, whim or caprice that

2    the law requires can be found.

3          Finally, Everett Chevrolet contends that it was the

4    victim of bad faith and/or racial animus.  So far, as I noted,

5    there has been no evidence of that.  But with the factual

6    findings of Judge Lucas I think Everett Chevrolet should be

7    entitled to some discovery, if it wants it, to investigate

8    whether GM acted in collusion with GMAC in connection with the

9    bad GMAC acts that Judge Lucas found.  And I note in that

10   connection that even if the facts that Judge Lucas found turned

11   out not to be legally significant in that Washington action,

12   the facts he found might still be the facts or they might be

13   vacated, I don't know.  But the point is that the facts that

14   are important are not the facts with respect to GMAC it's the

15   facts with respect to GM.

16         And I emphasize that this requires more than a

17   showing that GM acted on financial results that were caused by

18   acts of GMAC.  It would require giving me evidence by which I

19   should find that Old GM and not just GMAC acted in bad faith.

20         Likewise, I'll allow Everett Chevrolet reasonable

21   discovery, if it wants it, to inquire as to the possibility

22   that Everett Chevrolet's termination was the result of racial

23   animus.  Irrational bases of decision making include racial and

24   gender discrimination and retaliatory animus.  Judge Gonzalez

25   noted that in Old Car Co. quoting the earlier case law.  Such

103

1   bases are antithetical to sound business judgment and

2   demonstrate the bad faith or whim or caprice that is the basis,

3   essentially the only basis for beating back the business

4   judgment rule.  Judge Gonzalez noted that at 406 B.R. 193

5   quoting Pilgrim's Pride 403 B.R. 428.

6        While I'm fully cognizant of the points Mr. Henderson

7   made about there being more proportionately minority dealers

8   now than there were before and implicitly that there was a

9   strong direction coming from the top, that these decisions

10  should be made in a non-discriminatory way, I think that

11  Everett Chevrolet should be allowed to inquire even if or

12  especially if anyone acted contrary to Mr. Henderson's

13  directions.  I've discussed the mechanisms for that above.

14  We're not going to have an evidentiary hearing until people

15  make submissions to me that lead me to believe that there's

16  enough there to make that necessary or appropriate.

17       After getting the information or in Everett

18  Chevrolet's case the discovery, you're to provide me with

19  further submissions, if you wish, to show me why the two

20  objectors' circumstances are different from those as to whom

21  I've already ruled.  I'll then determine whether an evidentiary

22  hearing is necessary or appropriate.

23       Finally, I will encourage, though not require, Motors

24  Liquidation and New GM to see if they can still offer the

25  objectors here the wind down agreements that the objectors once

104

1    turned down.  The objectors may have turned those agreements

2    down without fully understanding how strongly the law requires

3    bankruptcy judges in my position to honor business decisions of

4    the type we have here, especially where we have a situation

5    where Motors Liquidation no longer makes cars.  And they may

6    not have fully understood the law as articulated so well in

7    Pilgrim's Pride that individual hardships to counterparties to

8    contracts with debtors in bankruptcy, while of course a matter

9    of sorrow to any bankruptcy judge, are an inevitable

10   consequence of corporate financial distress.  And those

11   hardships are the price we must pay to allow companies to

12   survive to save as many jobs as we can and to provide whatever

13   assistance we can to the creditor community as a whole.

14       The debtors are to settle an order in accordance with

15   the foregoing.  You're to work out with the debtor -- excuse

16   me, with the two objectors' delivery to them of the information

17   concerning their scores and their decision files, after which

18   they'll be allowed to make supplemental submissions if they

19   wish.  You're to work out the schedules for submission of that,

20   if they're reasonable I'll approve them.  I'll want you to

21   paper your deal in a scheduling order or stipulation.  If it's

22   reasonable I won't have a problem with it.

23       All right.  Not by way of re-argument, I think that

24   deals with us on the dealers.  Mr. Smolinsky?

25       MR. SMOLISNKSY:  Thank you, Your Honor.  Joe

105

1    Smolinsky for the debtors.  We, of course, will work with the

2    other side to make sure they have all the information they need

3    and engage in dialogue and work out scheduling.

4          The one thing I would like to clarify, it was

5    important to us to make the rejection effective as of the 10th

6    of July, that being the closing.  And I think it would be

7    appropriate to have at least an understanding that the

8    contracts are deemed suspended and that the debtors are not

9    required to perform under those contracts as we go forward with

10   possible discovery in working out these issues.

11         THE COURT:  And, presumably, if there is no change in

12   the decision with respect to these last two, that it be nunc

13   pro tunc to the same earlier date of July 10th?

14         MR. SMOLISNKSY:  Yes, Your Honor.

15         THE COURT:  I think I understand why you're asking

16   for that.  Is there any objection by the counsel for the

17   objectors?

18         MR. DAVIS:  Jeffrey Davis for the Forrest

19   dealerships.  Judge, it's our understanding from reading the

20   motion of Motors Liquidation that the exclusive use agreements

21   were not identified as ancillary agreements.  They listed those

22   types of agreements as ancillary though counsel in his reply

23   stated a group got together and they determined that the

24   exclusive use agreements were ancillary but we don't see that

25   it's listed in their motion in those types of agreements.  And

106

1    so I don't -- I think the Court has to determine whether

2    exclusive use is ancillary and is part of the motion before the

3    Court or not.

4            THE COURT:  Well I think the debtor conceded that

5    they are and that if its motion is granted you're to be off the

6    hook on those ancillary agreements.  Did I understand you

7    incorrectly, Mr. Smolinsky?

8            MR. SMOLISNKSY:  That's correct, Your Honor.

9            THE COURT:  Does that skin the cat for you or do you

10   have a separate concern?

11           MR. DAVIS:  That was it, Your Honor.

12           THE COURT:  Okay.

13           MR. DAVIS:  Your Honor, with respect to deeming the

14   franchise agreements suspended, I would propose an alternative

15   and that alternative being that Everett Chevrolet be treated

16   similarly to those individuals who signed -- those entities who

17   signed wind down agreements until a determination is made as to

18   whether Everett Chevrolet should have a participation

19   agreement.

20           THE COURT:  Well, the problem that I have is you're

21   expecting the debtors to keep performing when I cut you some

22   slack and I didn't just treat you like everybody else, even

23   after you had given me no evidence of racial animus and no

24   evidence that you had been treated in bad faith by GM as

25   contrasted to GMAC?

1        MR. DAVIS:  Your Honor, I'm just trying to make this

2  transition as smooth as possible for Everett Chevrolet.

3        THE COURT:  Well, yes, but this is a court of law.

4  Mr. Smolinsky, do you want to respond?

5        MR. SMOLISNKSY:  Your Honor, Joe Smolinsky.  I think

6  this Court is aware of the wind down budget that we're

7  currently operating under.  The only basis upon which the

8  debtors were able to enter into wind down agreements is based

9  on the presupposition that those agreements would be assumed

10  and assigned to New GM.

11        The wind down agreements provide for a host of

12  financial accommodations which the debtors are not in the

13  position to provide.  So in terms of seeking to perform under

14  it, I think that that would be an issue for New GM.

15        We're prepared to engage in a dialogue to see whether

16  New GM would offer the wind down agreement, as Your Honor had

17  suggested.  But in terms of the interim period, we can't compel

18  New GM to perform and to take an assignment of a temporary wind

19  down agreement nor are the debtors in a position to provide

20  those financial accommodations.

21        THE COURT:  I am not going to order any particular

22  compliance for Everett Chevrolet in this interim period.

23  Frankly, with no evidence having been put forward to show

24  either that there was racial animus or that GM, as contrasted

25  to GMAC, acted improperly I feel like no good deed goes

1    unpunished and that if I erred in that decision it was by not

2    shutting you down right now and allowing you to move for 60(b)

3    relief if it ever turned out that GM, as contrasted to GMAC, it

4    acted improperly.

5              I don't know what the evidence will show.  If it

6    shows that GM acted knowingly in bad faith then, you know, that

7    at least seemingly is going to give your client some rights.

8    But I am -- when you haven't shown any basis for relief so far,

9    I'm not going to order it.  You are; of course, free to make

10   whatever deals you want with either Old GM, now called Motors

11   Liquidation Company, or New GM.  And if GM is -- if New GM is

12   receptive to the suggestion I made, to make alternative

13   arrangements you want to make with them.  But I'm not ordering

14   anything.

15             MR. DAVIS:  Understood, Your Honor.  And I do thank

16   you for your generosity.

17             THE COURT:  All right.  Anything else?  Now we have,

18   of course, the matter under the other executory contracts.  Mr.

19   Smolinsky, at one time there was other business as well,

20   dealing with your interim fees and the desire of New York State

21   and the Tribe to review them.  Are those issues still before me

22   or what?

23             MR. SMOLISNKSY:  Your Honor, we have a number of

24   uncontested matters that we can rush through very quickly.  The

25   one item, as you noted, that still was open was the interim

109

1   compensation motion.  I think you saw in our reply that we had

2   certain concerns about individual creditors having the right to

3   effectively stop funding professional fees, perhaps in an

4   attempt to gain leverage for their individual circumstances.

5   But we have been in discussions with both objectors and during

6   the break we were able to finalize language.

7         The sum and substance of the agreement would be that

8   we would provide the state and the -- is the Regis Mohawk

9   Tribe -- with copies of our monthly fee statements although

10  they would agree that they can't object until such time as the

11  interim regular quarterly fee applications come before the

12  Court.  And I have two paragraphs that I can read into the

13  record with respect to that so that they would have current

14  time information about the fees that are being incurred during

15  the case.

16        I do note that the committee, in speaking to them,

17  have raised certain issues relative to the confidential aspects

18  of what might be in those fee statements, those monthly fee

19  statements.

20        THE COURT:  Confidential stuff on the part of efforts

21  by the debtors or vis-a-vis the creditors' committee's fee

22  statements which would seemingly be subject to the same

23  problem?

24        MR. SMOLISNKSY:  I think their concern is more broad

25  based.  Environmental claims are a major aspect of what we have

110

1    left in this case.

2              THE COURT:  Sure.

3              MR. SMOLISNKSY:  And the concern, and rightfully so,

4    is that there is going to be a lot of strategy being thought

5    about and potential litigation strategies.  And those may very

6    well find their way into the monthly fee statements.  We would

7    likely have to redact.  The question is whether we redact

8    separately for the two objectors or for everybody.  But these

9    are the issues that we're talking about.  Conceptually, we

10   don't have a problem providing them with the monthly fee

11   statements if that resolves the objection.

12             THE COURT:  I think I already understand the point

13   but Ms. Caton has risen.  Why don't you come on over if you

14   want to expand on that, Ms. Caton?

15             MS. CATON:  Thank you, Your Honor.  Amy Caton from

16   Kramer Levin on behalf of the creditors' committee.  Your

17   Honor, I think our point goes a little bit farther than Mr.

18   Smolinsky stated before.  We just heard about this potential

19   resolution at the end of the recess and unfortunately we didn't

20   have time to discuss it very far with Mr. Smolinsky or the

21   State of New York and the St. Regis Mohawk tribe.

22             The quarterly fee application process for our firm,

23   and I imagine all of the firms, is a pretty lengthy process.

24   We go through our monthly bills.  We summarize them.  We look

25   further to see whether there needs to be additional time

111

1    written down and, you know, if there were unnecessary expenses.

2    And we do this on a quarterly basis, I think, for a reason and

3    that is it's a time consuming process and one that we don't

4    want to bill the estate for on a monthly basis.

5              I understand if this is only two creditors looking

6    but it's a variety of professional's monthly statements and

7    this could be time consuming for people to think about third

8    parties reviewing their monthly fee statements each month.

9              In addition, as Mr. Smolinsky stated, environmental

10   liabilities are one of the biggest issues in this case and we

11   want the opportunity to review the debtors' professionals,

12   their monthly fee statements as well and talk to them and

13   determine whether or not there need to be redactions made in

14   these cases with respect to publicly filed fee applications so

15   that the parties can, I guess, not let their adversaries on to

16   their strategy on a going forward basis.

17             We're not looking at an administratively insolvent

18   estate here.  The committee is highly concerned about

19   professional fees in this case, not because of administrative

20   insolvency but because we have unsecured creditors that are

21   looking at receiving substantial values here from the New GM

22   stock and warrants.  And we'll be carefully reviewing the fee

23   applications or the monthly fee statements as will the U.S.

24   trustee.

25             What I would propose as a solution here is rather

112

1    than submitting detailed monthly fee statements to the State of

2    New York and to the St. Regis Mohawk Tribe is to provide them

3    with a chart or something of that nature showing that the fees

4    and expenses for each of the professionals on a monthly basis

5    so that they can feel like they're keeping tabs but without

6    getting the detailed disclosure that they'll be welcome to get

7    on a quarterly basis.  And that's what we would like to propose

8    as a solution here.

9            THE COURT:  All right.  I don't think --

10           MS. LEARY:  Your Honor --

11           THE COURT:  Yes, is somebody on the phone?

12           MS. LEARY (TELEPHONICALLY):  Yes, Your Honor.  This

13   is Maureen Leary for the Attorney General's office and the New

14   York State Department of Environmental Conservation.  Thank you

15   very much for allowing me to appear by telephone.  And I

16   believe Jacob Lamme for the tribe is also on the phone.

17           MR. LAMME (TELEPHONICALLY):  I am, Your Honor.

18           MS. LEARY:  If I could just, very quickly, run down

19   the interest thing and -- so everybody's on the same page with

20   why we are involved in a pretty straightforward motion.

21           Certainly the Court's aware of the wind down facility

22   that is (indiscernible) billion dollars.  That pot of money is

23   going to be shared by a number of interests, obviously the

24   professionals.  Certainly, as counsel has pointed out, the

25   environmental (indiscernible) obligations which, as my limited

113

1    objection sets forth, are quite significant in terms of dollar

2    amounts.

3            A couple things, I'm not exactly clear why the

4    creditor committee is interested in redacting what otherwise

5    would be another party's fee application.  I'm not clear about

6    that other than their own --

7            THE COURT:  You don't?  I certainly do.  If the

8    creditors' committee is picking up the financial pieces of the

9    debtor's efforts, vis-a-vis its environmental obligations, I

10   would think that the creditors' committee would care about it

11   as much or more so than the State of New York would.

12           MS. LEARY:  Okay.  Fair enough.  But unlike the

13   creditors' committee or even the United States trustee or the

14   debtor's counsel, particularly with respect to the

15   environmental consultant's fee, there's no one indicates, other

16   than my client who has experience working with consultants and

17   reviewing their fees, and -- because it comes out of state

18   funds.  So it's something that I view as actually a cooperative

19   agreement and which certainly could result in (indiscernible)

20   all around.  So the expertise that would benefit the

21   (indiscernible) should free up those professionals.  I think

22   it's important for the Court to understand there are three

23   pending applications before this Court for retention nunc pro

24   tunc to June 3rd --

25           THE COURT:  Wait.  You're breaking up very badly, Ms.

114

1   Leary.

2           MS. LEARY:   I apologize, Your Honor.

3           THE COURT:   Are you on a speaker phone or something

4   of that sort?

5           MS. LEARY:   I am not but I am on a BlackBerry because

6   I'm not in my office.

7           THE COURT:   That may be causing the problem but I'm

8   losing words.  Go on, please.  I think I get most of what

9   you're saying.

10          MS. LEARY:   Well, yeah, (indiscernible) the

11  environmental consultant's fees (indiscernible) peer review.

12  And I think we would provide both the estate and the creditors'

13  committee with value added in our review of that.

14          But our position, which is -- there's a

15  (indiscernible) but should have (indiscernible) that the United

16  States trustee and the creditors' committee and the debtor's

17  counsel would be very vigilant in reviewing the fee apps so

18  that (indiscernible) the environmental (indiscernible) that

19  provides.  I believe that's set forth in a 363 decision.  The

20  applicants are --

21          THE COURT:   I lost that.  I'm sorry.  Obviously I'm

22  not going to order you to take calls, going forward, from your

23  office but you're going to have to either repeat what you said

24  or not appear before a court on a BlackBerry.

25          MS. LEARY:   Yeah.  I apologize Your Honor.  And what

1   I will do is simply rely on our papers.  Can you hear me now a

2   little bit better?

3        THE COURT:  Yes.  I heard you say you're going to

4   rely on your papers.

5        MS. LEARY:  Yes, I will do that as well as make any

6   additional submissions necessary.

7        THE COURT:  All right.  Ladies and gentleman, given

8   Ms. Caton's concerns, I don't think that I could ratify a deal

9   that the debtor made with the tribe or with the New York State

10  even if the debtor had a full meeting of the minds on that.

11  Does the tribe have anything to add?

12       MR. LAMME:  Your Honor, this is Jacob Lamme.  You

13  know, while the case is not administratively insolvent at this

14  time the tribe just has to make sure that it stays this way and

15  that's why we have an interest in making sure all of the fees

16  that are paid to professionals are reasonable.  And that's the

17  basis of our objection, Your Honor.

18       THE COURT:  All right.  Ladies and gentlemen, I think

19  that your efforts to try to reach a deal are not going to be a

20  good use of time and I'm simply going to rule.  And the bottom

21  line is going to be that both the State of New York and the

22  tribe, along with any other creditors for that matter who want

23  to be heard, will have the full panoply of rights they choose

24  to exercise on interim fee apps but will not have special

25  rights via the review or approval on monthly fee requests and

1       the following are the bases for the exercise of my discretion

2       in this regard.

3              First, I believe that it is inappropriate for any

4       party, and I've said this in other cases in other contexts to

5       try to achieve its will by affecting an imposing party by the

6       purse strings.  So it is a matter of concern to me, as it is to

7       most judges, for any private litigant who is not a fiduciary

8       for the estate to have the ability to deprive an opposing

9       attorney of compensation.

10             Apart from that, I would not, in a thousand years,

11      countenance the debtors or the creditors' committee, looking

12      over the shoulders of New York State or the tribe.  Nor do I

13      think it's appropriate for the New York State or the tribe to

14      be looking over the shoulders of the debtors or the creditors'

15      committee.

16             The choice of professionals' time entries with

17      respect to particular experts, time spent on various things

18      leaves footprints which only the most idiotic of examiners of

19      documents couldn't draw important inferences from.

20             And the last thing I'm going to suggest is that the

21      environmental claimants, New York State and the tribe being the

22      most obvious examples, are anywhere near in that category.

23      They've been very able advocates before and I'm sure they're

24      going to be that.  And frankly the issues that they're

25      addressing, especially the pollution in that plant that I

117

1    believe is in -- your plant is way up near the northern New

2    York/Canadian border if I'm not mistaken, am I correct?  The

3    Messina plant?

4              MR. LAMME:  Your Honor, this is Jacob Lamme for the

5    tribe again.  It's the GM Messina facility.

6              THE COURT:  Yes.  I'm well aware of the environmental

7    issues with respect to that.  It's going to raise very serious

8    issues.  I'm going to have to spend a lot of time on it unless

9    you can consensually resolve these matters.  But I'm not going

10   to let either of you peer over the other guy's shoulders as

11   part of that.

12             Now inevitably some disclosure is going to be

13   required on quarterly fee apps but we'll jump off that bridge

14   when we come to it.  At this time I am not going to be ordering

15   any disclosure of monthly fee reports, although I think I can

16   and should require, in some form, whether it be in a chart or a

17   letter or what disclosure on a monthly basis to New York State

18   and the tribe of what is being charged.  Break it down by fees

19   and expenses.  All right.  What else do we have, Mr. Smolinsky?

20             MR. SMOLISNKSY:  Thank you, Your Honor.  We have two

21   motions by the committee which I will let them speak.  We have

22   a case management order which is consistent with orders that

23   you've entered before in other cases, such as BearingPoint,

24   which allows such money-saving procedures as serving by e-mail.

25   If Your Honor has any questions, we can address it.

118

1          THE COURT:  Am I correct that they're wholly

2    unopposed?

3          MR. SMOLISNKSY:  Yes, Your Honor.

4          THE COURT:  I don't see a need for argument; they're

5    approved.

6          MR. SMOLISNKSY:  Thank you, Your Honor.  We also have

7    several applications to employ professionals.  That would be

8    LFR, Brownfield, Claro, Jones Day and Baker & McKenzie and Lowe

9    Fell & Skogg.  There have been no objections.  We've worked out

10   our issues with the U.S. trustee.  There was one supplemental

11   affidavit owned by Brownfield, I understand that that affidavit

12   has now been signed and is being submitted to the Court today.

13   So Mr. Velez-Rivera was here earlier.  He had no problem with

14   entry of those orders.

15         THE COURT:  All right.  They're approved.

16         MR. SMOLISNKSY:  And I think, Your Honor, that leaves

17   the two committee motions.

18         THE COURT:  Okay.  I'll hear presentation on them but

19   so far as I'm aware they're unopposed as well.

20         MS. SHARRET:  Your Honor.  Jennifer Sharret from

21   Kramer Levin on behalf of the creditors' committee.  The first

22   is the committee's application to retain Epiq Bankruptcy

23   Solutions as the committee's information agent and there are no

24   objections and we would respectfully request that it be

25   approved.

119

1          THE COURT:  Granted.

2          MS. SHARRET:  The second is the committee's motion to

3    clarify procedures under Section 1102 and 1103 of the

4    Bankruptcy Code, clarifying that the committee shall not

5    disclosure confidential information in setting up procedures

6    for creditors to request such information and procedures, such

7    as a website and telephone number, to solicit and receive

8    comments as required under the Bankruptcy Code.

9          THE COURT:  Of course.  That's granted also.

10         MS. SHARRET:  Thank you, Your Honor.

11         THE COURT:  All right.  So now, I think, we're down

12   to the Karmann motions.  I'm going to have to -- I will dictate

13   something but I'm not of a mind to make you or your colleagues

14   wait in the courtroom for that, Mr. Smolinsky, since dictating

15   a decision requires work that can sometimes be time consuming.

16   Is Mr. Kukla still on the phone?

17         MR. KUKLA (TELEPHONICALLY):  Yes, I am, Your Honor.

18         THE COURT:  All right.  Well, I'm not inclined to

19   keep you on the phone for another couple of hours either.  What

20   I think I'm of a mind to do is I'm going to get to work on it

21   now.  And I would suggest, Mr. Kukla -- I assume you're already

22   back in your office.  You're heading back to your office, Mr.

23   Smolinsky or can you get that way and be available to

24   participate in a conference call, an on-the-record conference

25   call?

120

1          MR. SMOLISNKSY:  Yes, Your Honor.

2          THE COURT:  All right.

3          MR. KUKLA:  Your Honor, do you have any idea when --

4   the reason is I have a prior engagement at 5 p.m.

5          THE COURT:  Are you in the east?

6          MR. KUKLA:  Yes.

7          THE COURT:  You're in a suburb of Detroit?

8          MR. KUKLA:  Yes, I am.

9          THE COURT:  Yeah.

10         MR. KUKLA:  I can have another attorney available.

11         THE COURT:  Well, all right.  That's option number

12  one.  Option number two would be that I simply have the call

13  at, say, 9:00 tomorrow morning.

14         MR. KUKLA:  That would be easier for me, Your Honor,

15  but whatever this Court would prefer.

16         THE COURT:  Mr. Smolinsky, I see you nodding yes to

17  the latter alternative?

18         MR. SMOLISNKSY:  That's fine, Your Honor.

19         THE COURT:  All right.  Then I don't know how we deal

20  with this mechanically but let's figure that I'll try to

21  dictate something at 9 tomorrow.

22         MR. KUKLA:  And, Your Honor, just -- and I apologize

23  for earlier but I just want to make one point of clarification.

24         THE COURT:  Yeah, go ahead.

25         MR. KUKLA:  And I won't go back there and try to

121

1    rehash argument but I just want to make one clarification which

2    was, with respect to the tooling issue, to the extent that Your

3    Honor determines that is a pseudo-contract, and I have to

4    clarify this with the client, but we may, in fact, believe if

5    it is assumable as an executory contract that there may, in

6    fact, be a pre-petition cure amount owed.

7           THE COURT:  Uh-huh.

8           MR. KUKLA:  I just wanted to make sure there was no

9    surprises and I feel that -- and as much as I mentioned

10   earlier, I apologize.

11          THE COURT:  All right.  Okay.  Then we're adjourned

12   for today.  Thank you.

13          MR. KUKLA:  Thank you, Your Honor.

14          MR. SMOLISNKSY:  Thank you, Your Honor.

15       (Whereupon these proceedings were concluded at 2:52 p.m.)

16

17

18

19

20

21

22

23

24

25

122

1

2                              I N D E X

3

4                            R U L I N G S

5    DESCRIPTION                                    PAGE     LINE

6    Debtors' fourth omnibus rejection motion        16        9

7    granted with respect to all undisputed contract

8    rejections

9    Debtors' motion for entry of an order           18       14

10   authorizing rejection of certain personal

11   property agreements and/or abandonment of

12   collateral to secured creditors approved

13   subject to changes in proposed order stated on

14   the record

15   Debtors' motion authorizing rejection of        54       14

16   executory contracts and unexpired leases with

17   certain domestic dealers granted with respect to

18   nonobjectors (27 dealers); granted with respect  88       10

19   to 33 of 35 dealers

20   Applications to employ LFR, Brownfield, Claro,  118       13

21   Jones Day and Baker & McKenzie and Lowe Fell

22   & Skogg approved

23

24

25

123

1

2                          I N D E X, cont'd

3

4                            R U L I N G S

5    DESCRIPTION                                PAGE    LINE

6    Creditors' committee's motion for entry of an    118     24

7    order authorizing the employment of Epiq

8    Bankruptcy Solutions, LLC as the committee's

9    information agent nunc pro tunc to June 3, 2009

10   granted

11   Creditors' committee's motion for an Order    119      7

12   establishing procedures for compliance with

13   11 U.S.C. §§ 1102(b)(3) and 1103(c)

14

15

16

17

18

19

20

21

22

23

24

25

124

1

2                              C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        LISA BAR-LEIB

9        AAERT Certified Electronic Transcriber (CET**D-486)

10

11       Also transcribed by:  Esther Accardi (CET**D-485)

12                             Pnina Eilberg (CET**D-488)

13

14       Veritext LLC

15       200 Old Country Road

16       Suite 580

17       Mineola, NY 11501

18

19       Date:  August 4, 2009

20

21

22

23

24

25