1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


MOTORS LIQUIDATION COMPANY, et al.,

f/k/a General Motors Corp., et al.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


            U.S. Bankruptcy Court

            One Bowling Green

            New York, New York


            August 4, 2009

            9:03 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2    Hearing re:  Limited Contract Objections - Cure Amount.

3    Decision to be read.

4

5    Hearing re:  Omnibus Motion of Debtors for Entry of Order

6    Authorizing (A) the Rejection of Executory Contracts and

7    Unexpired Leases with Certain Domestic Dealers and (B) Granting

8    Certain Related Relief.  Decision to be read.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed By:  Hana Copperman

25

3

1

2   A P P E A R A N C E S :

3   WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Debtors

5        767 Fifth Avenue

6        New York, NY 10153

7

8   BY:   JOSEPH H. SMOLINSKY, ESQ.

9        (TELEPHONICALLY)

10

11   CARSON FISCHER, P.L.C.

12        Attorneys for Karmann U.S.A., Inc.

13        4111 Andover Road, West - Second Floor

14        Bloomfield Hills, MI 48302

15

16   BY:   PATRICK J. KUKLA, ESQ.

17        (TELEPHONICALLY)

18

19

20

21

22

23

24

25

4

                    P R O C E E D I N G S

1

2        THE COURT:  Good morning.  This is Judge Gerber.  May

3    I found out who's on the phone, please?

4        OPERATOR:  Yes, Your Honor.  We have Patrick Kukla and

5    Joseph Smolinsky.

6        THE COURT:  All right.  Mr. Smolinsky, can you hear me

7    okay?

8        MR. SMOLINSKY:  Yes, Judge, I can.

9        THE COURT:  Mr. Kukla?

10        MR. KUKLA:  Yes, Your Honor.

11        THE COURT:  Thank you.  All right.  Gentlemen, I'm

12    ruling that determining whether or not the Tools Contract is

13    executory requires an evidentiary hearing, but that no

14    evidentiary hearing is required to rule on whether the

15    Production Contract and the Service Contract are a single

16    integrated contract.  And I'm ruling, with respect to the

17    latter matter, that the two contracts are two contracts -- not

18    a single integrated contract -— and that if Motors Liquidation

19    wants to reject the Production Contract without also rejecting

20    the Service Contract, Motors Liquidation may do so.  The

21    following are my Findings of Fact, Conclusions of Law, and

22    bases for the exercise of my discretion in connection with this

23    determination.

24        On the Tools Contract, first, I came very close to

25    interrupting each of you to say "you're testifying".  Each of

5

1    you lawyers was making representations to me as to your view of

2    the facts, about your knowledge of the automotive industry,

3    your belief as to the purposes of the various provisions in the

4    tools contract, and even your belief as to what abbreviations

5    stand for, and what ambiguous words and expressions signify.

6    That's obviously unsatisfactory, as one or both of you

7    recognized in oral argument.  While I well understand the point

8    you, Mr. Smolinsky, made, that it likely doesn't take three

9    years to provide a piece of tooling, and that references to

10   effective dates in the agreement refer to something else,

11   that's still not the kind of thing where I can find the intent

12   of the document, much less the meaning of covenants that are

13   described in shorthand, and that might rely on custom and

14   practice in the industry, without an evidentiary hearing.

15   Likewise, I'm not in a position to make a finding as to what

16   expressions do mean.

17       So I'm not in a position to make Findings of Fact, or

18   to issue Conclusions of Law, with respect to the Tools

19   Contract, until the necessary evidentiary hearing has been

20   completed.

21       So we'll need to have one.

22       Now, turning to the Production Contract and the

23   Service Contract.

24       I'm going to pause for a minute.  Gentlemen, I'm not

25   going to exclude you from the courtroom, but I need you to sit

6

1    down quietly and quickly.

2        However, I can make Findings of Fact with respect to

3    the Production Contract and Service Contract, and now do so.

4        Turning first to the Production Contract and its

5    contents.  Various Production Contract documents were entered

6    into, but one attached to Motors Liquidation's reply on its

7    rejection motion can be viewed as a prototype from which the

8    others don't differ.  It starts with a "Contract Header," of

9    one page, which lists name and address information for each of

10   the Supplier, that being Karmann Manufacturing LLC, and the

11   Buyer, GM.  The Contract Header goes on to say, in relevant

12   part, that "This contract sets forth the exclusive terms and

13   conditions under which seller shall sell and buyer shall

14   purchase the goods or services described in the line item

15   detail of this contract for the period specified therein".

16       The "Line Item Detail" follows the Contract Header,

17   and goes on for 13 pages.

18       After some preliminary tabular data, including an

19   "Issue Date" of 16 January, 2009, it provides that "This Line

20   Item is effective from 31 January, 2009 through 24 January,

21   2011".

22       Contract Line Item Page 1 of 13.  When you put those

23   two together, plugging in the dates following "This Line Item

24   is effective" where it says, after the mention of "the line

25

7

1    item detail of this contract," "for the periods set forth

2    therein," one gets, effectively:

3           "This contract sets forth the exclusive terms and

4    conditions under which seller shall sell and buyer shall

5    purchase the goods or services described in the line item

6    detail of this contract for the period 31 January, 2009 through

7    24 January, 2011."

8           Contract Header Page 1 of 1, with cross-reference

9    substitution made.

10          The "Line Item Detail" portion also addresses the

11   matter of quantity.  It provides, in relevant part:

12          "The quantity of goods to be purchased under this

13   contract is based on Buyer's requirements.  Any forecasted

14   quantity that may be given to seller is an estimate, for

15   planning purposes only.  Actual quantities to be purchased will

16   vary and will be set forth in delivery schedules."

17          Contract Line Item Page 12 of 13.

18          There follows six pages of "Contract Attachment"

19   pages.  The first of these provides, in relevant part, in an

20   unnumbered paragraph captioned "Special Term: Long Term

21   Contract":

22          "The term of this contract is for the periods of

23   purchase indicated in the Line Item Notes on the face of this

24   contract.

25          "The prices for the goods are set forth in the Line

8

1    Item Notes of this contract.  No adjustments will be made for

2    increases in Seller's costs, including, but not limited to,

3    increases in the costs for labor, material or overhead.

4         "Seller shall assure that the goods remain competitive

5    in terms of price, technology, design and quality with similar

6    goods available to Buyer.  If, in the reasonable opinion of

7    Buyer, the goods do not remain competitive, Buyer, to the

8    extent it is free to do so, will advise Seller in writing of

9    the areas in which another product is more competitive with

10   respect to price, technology, design or quality.  If, within

11   thirty days, Seller does not agree to immediately sell the

12   goods at a competitive price, or, if applicable, with

13   comparable technology, design or quality, Buyer may terminate

14   this contact and purchase from another supplier without

15   liability to Seller.  In consideration for this, during the

16   term of this contract Buyer will not exercise its rights under

17   Paragraph 13, 'Termination for Convenience', except for

18   terminations due to program cancellations or modifications."

19        Paragraph 13, "Termination for Convenience," provides,

20   in relevant part:

21        "In addition to any other rights of Buyer to terminate

22   this contract Buyer may, at its option, immediately terminate

23   all or any part of this contract, at any time and for any

24   reason, by giving written notice to Seller.  Upon such

25   termination, Buyer shall pay to Seller various contractually

9

1    prescribed amounts."

2        Paragraph 20, "Service and Replacement Parts,"

3    provides in full:

4        "Seller will sell to Buyer goods necessary for it to

5    fulfill its current model service and replacement parts

6    requirements at the prices set forth in this contract.  If the

7    goods are systems or modules, Seller will sell the components

8    or parts that comprise the system or module at prices that

9    shall not, in the aggregate, exceed the price of the system or

10   module less assembly costs.  During the fifteen year period

11   after Buyer completes current model purchases, Seller will sell

12   goods to Buyer to fulfill Buyer's past model service and

13   replacement parts requirements.  Unless otherwise agreed to by

14   Buyer, the prices during the first three years of this period

15   shall be those in effect at the conclusion of current model

16   purchases.  For the immediate remainder of this period, the

17   prices for goods shall be as agreed to by the parties.  When

18   requested by Buyer, Seller shall make service literature and

19   other materials available at no additional charge to support

20   Buyer's service part sales activities."

21       Emphasis added.

22       Gentlemen, I think what I'm going to do is attach the

23   document from which I'm reading to the order, so that you can

24   see which words I've emphasized and so that the provisions in

25   the agreement that I quoted are more easily readable for you.

10

1          I'm going to continue.

2          Paragraph 31, captioned "Entire Agreement," provides

3    in full:

4          "This contract, together with the attachments,

5    exhibits, supplements or other terms of Buyer specifically

6    referenced in this contract, constitutes the entire agreement

7    between Seller and Buyer with respect to the matters contained

8    in this contract and supersedes all prior oral or written

9    representations and agreements.  This contract may only be

10   modified by a contract amendment issued by Buyer."

11         Emphasis added.

12         The Production Contract makes no reference to any

13   other contract, including, most significantly, the Service

14   Contract.  It has no cross-default provision with respect to

15   any other contract, including, most significantly, the Service

16   Contract.  As noted, the Production Contract includes only that

17   contract itself, and "the attachments exhibits, supplements or

18   other terms of Buyer specifically referenced in this contract."

19         Emphasis added.

20         Now, turning to the Service Contract.  The Service

21   Contract is in somewhat different form.  The Service Contract,

22   which oddly is "dated" July 28, 2009, just a few days ago and

23   after the filing date of Motors Liquidation's motion, and,

24   indeed, after the filing of Karmann's objection, starts with a

25   cover sheet with a notation "Consolidated Contract".  It's

11

1 followed by a page of "General Terms and Conditions", then

2 followed by thirteen pages of additional contractual terms, and

3 then follows with a one page "Agreement Exhibit" on which the

4 parts to be sold are listed, with their respective costs.

5   The Service Contract's Cover Sheet provides that:

6   "The Seller agrees to sell and the Buyer agrees to

7 purchase, at the place and upon and subject to the terms and

8 conditions on the face and reverse side hereof, approximately

9 the percentage shown on the attached exhibit, the Buyer's

10 requirements, between the dates of:

11   "Effective Date June 23, 2007 through Expiration Date

12 December 31, 2010."

13   The Service Contract has two separate provisions which

14 are in substance integration clauses.  The first, which appears

15 on the cover sheet, provides:

16   "This order, including the terms and conditions,

17 contains the complete and final agreement between Buyer and

18 Seller, and no other agreement in any way modifying any of said

19 terms and conditions will be binding upon the Buyer unless made

20 in writing and signed by Buyer's authorized representative."

21   The second, which appears as Paragraph 31 of the

22 "General Terms and Conditions" immediately following the cover

23 sheet, is captioned "Entire Agreement."  It provides in full:

24   "This contract, together with the attachments,

25 exhibits, supplements or other terms of Buyer specifically

12

1   referenced in this contract, constitutes the entire agreement

2   between Seller and Buyer with respect to the matters contained

3   in this contract and supersedes all prior oral or written

4   representations and agreements.  This contract may only be

5   modified by a contract amendment issued by Buyer."

6        Emphasis added.

7        The Service Contract also has its own Paragraphs 13

8   and 20, identical to those in the Production Contract.

9   Paragraph 13, "Termination for Convenience," provides, in

10  relevant part:

11       "In addition to any other rights of Buyer to terminate

12  this contract, Buyer may, at its option, immediately terminate

13  all or any part of this contract, at any time and for any

14  reason, by giving written notice to Seller.  Upon such

15  termination, Buyer shall pay to Seller various contractually

16  prescribed amounts."

17       Paragraph 20, "Service and Replacement Parts,"

18  provides in full:

19       "Seller will sell to Buyer goods necessary for it to

20  fulfill its current model service and replacement parts

21  requirements at the prices set forth in this contract.  If the

22  goods are systems or modules, Seller will sell the components

23  or parts that comprise the system or module at prices that

24  shall not, in the aggregate, exceed the price of the system or

25  module less assembly costs.  During the fifteen year period

13

1    after Buyer completes the current model purchases, Seller will

2    sell goods to Buyer to fulfill Buyer's past model service and

3    replacement parts requirements.  Unless otherwise agreed to by

4    Buyer, the prices during the first three years of this period

5    shall be those in effect at the conclusion of current model

6    purchases.  For the immediate remainder of this period, the

7    prices for goods shall be as agreed to by the parties.  When

8    requested by Buyer, Seller shall make service literature and

9    other materials available at no additional charge to support

10   Buyer's service part sales activities."

11           Emphasis added.

12           The Service Contract makes no reference to any other

13   contract, including, most significantly, the Production

14   Contract.  It has no cross-default provision with respect to

15   any other contract, including, most significantly, the

16   Production Contract.  As noted, the Service Contract includes

17   only that contract itself, and "the attachments exhibits,

18   supplements or other terms of Buyer specifically referenced in

19   this contract."

20           Emphasis added.

21           Turning now to the Nomination Letter.  On January

22   [sic] 28, 2002, five years before the effective date of the

23   Service Contract and seven years before the effective date of

24   the Production Contract, GM employee Myka Moon wrote the

25   Director of Business Development for ASC, Incorporated, with a

14

1    copy to the Director of Sales & Marketing of Karmann.  Ms. Moon

2    wrote that:

3         "On behalf of GM's North American Advanced Purchasing

4    team, I am pleased to inform you that the Karmann/ASC joint

5    venture has been selected as the recommended source for the

6    Retractable Hardtop for the GMX 381 - 2006 model year."

7         She wrote that "this decision was based upon, among

8    other things, your quotation to us as follows".  After

9    describing provisions in that quotation, her letter went on to

10   say:

11        "SPO Service Parts Agreement:  Supplier agrees to sell

12   to SPO above part prices at production price levels for at

13   least three years beyond the last production year of a

14   functional part.

15        "Provided that Karmann/ASC is able to meet or exceed

16   the agreed upon terms for quality, technology, price,

17   investment/tooling and timing, we intend to issue one or more

18   Purchase Orders for approximately 100 percent of our production

19   and service part requirements."

20        Her letter did not call for a counter-signature, nor

21   did it say or imply that it was an offer that could be accepted

22   in any way, either by express acceptance or by performance.  It

23   did not purport to be a promise itself; rather, it said "we

24   intend" to take the action it specified.  And the action it

25   specified was issuing "one or more Purchase Orders".

15

1    Ultimately two purchase orders were entered —- the Production

2    Contract and the Service Contract.

3         Karmann contends that the Production Contract and

4    Service Contract comprise a single integrated document.  As a

5    fact or mixed question of fact and law, I find that they do

6    not.  My reasons for that conclusion appear in my Conclusions

7    of Law, though to the extent any of those reasons should be

8    regarded as mixed questions of fact and law, or even as

9    Findings of Fact, they should be so regarded.

10        Now, turning to my Conclusions of Law.

11        It is of course true that a debtor party to an

12   executory contract can't cherry pick the elements of the

13   contract that the debtor wishes to assume or reject, and it is

14   also true, as Karmann argues, that where several seemingly

15   separate contracts are part of an integrated whole, they must

16   be assumed or rejected together.  See, for example, my earlier

17   decision in In re Adelphia Business Solutions, Inc., 322 B.R.

18   51, 54 (Bankr. S.D.N.Y. 2005), and In re Kopel, 232 B.R. 57, 65

19   n.4 (Bankr. E.D.N.Y. 1999) (dictum), upon which Karmann relies.

20   But the statement of that uncontroversial principal begs the

21   question as to whether separate contracts should be deemed to

22   be a single contract.  For example, Judge Swain, deciding

23   Kopel, wherein the enforceability of a cross-default clause in

24   a lease was at issue, noted that because the lease included an

25   express cross-default provision that she held to be

16

1   enforceable, "the Court need not reach the issue of whether the

2   transaction documents ought to be construed as one contract

3   under New York law".  Id. at 65 n.4.

4        While the issue is ultimately one of state law, I've

5   been able to discern no material differences in various states'

6   laws in determining whether one contract should be held to be

7   severable into two or more, or, as is more commonly the issue

8   in the bankruptcy context, whether seemingly separate contracts

9   should be deemed to be only one.  Whether a contract is

10  integrated or severable is a question of the parties' intent,

11  to be determined from the language employed by the parties,

12  viewed in light of the circumstances surrounding them at the

13  time they contracted.  See In re American Home Mortgage, 379

14  B.R. 503, 520-521 (Bankr. D. Del. 2008).  Absent ambiguity in

15  the terms of the contract, the parties' intent is gleaned from

16  the four corners of the instrument.  In re American Home

17  Mortgage Holdings, 2009 Bankr. LEXIS 439.

18       Typically the cases have relied on particular facts

19  parties have brought to their attention, but looking at the

20  cases as a whole, certain factors have been repeatedly

21  considered.  Thus Courts have relied on a number of non-

22  exclusive factors for evidence of the parties' intent with

23  respect to the integration or severability of contracts.

24  These include:

25       1.  Whether the nature and purpose of each agreement

17

1      is different;

2             2.   Whether the consideration for each agreement is

3      separate and distinct;

4             3.   Whether the obligations of the parties to each

5      agreement are interrelated —- i.e., whether performance under

6      one agreement is dependent on or related to performance under

7      the terms of the other agreement;

8             4. Whether there is an integration clause stating the

9      contract is to be considered one agreement;

10            5.   Whether a default under one agreement causes or

11     requires a default under the other agreements;

12            6.   Whether the agreements are for the same term,

13     including whether extensions are permitted on a whole or

14     partial basis; and whether the agreements are separately

15     negotiated.

16            See, for example, In re Adelphia Business Solutions,

17     322 B.R. at 59.

18            As some of these factors have been articulated in the

19     context of the particular facts before them, we sometimes have

20     to massage these factors to derive from them their underlying

21     meaning.

22            It is possible for obligations that appear in a single

23     contract to nevertheless be held to be separate agreements.

24     See, for example, In re Gardinier, 831 F.2d 974 (11th Cir.

25     1987).  But here, of course, Motors Liquidation is asking for

18

1    much simpler relief.  It's only that I regard two separate

2    agreements as exactly what they appear to be.

3         Here substantially all of the indicia -- taken from

4    the four corners of the documents -- evidence the intention

5    that separate agreements be separate, and, conversely, that

6    there was no intention to consider them to be a single

7    contract, or that they be deemed to be such.  As a starting

8    point, I note, as in Adelphia Business Solutions, that neither

9    contract recites an intention that the two contracts be treated

10   as a single contract, though the parties could have easily so

11   provided, if that were their intention.

12        They have different terms.  The Production Contract

13   has a term of January 31, 2009 through January, 24, 2011.  The

14   Service Contract has a term of January [sic] 23, 2007 through

15   December 31, 2010.

16        Neither cross-defaults to the other.  In fact, neither

17   contract mentions the other in any way.

18        Neither says that it is a master contract, or provides

19   that it is subject to a master contract.

20        Each is a purchase order contract, with different

21   consideration payable under each.  The amount due to the seller

22   under each contract is determined by the purchases under that

23   contract, and not the other contract.

24        Neither contract has any provisions in it that make

25   obligations under that contract dependent upon obligations or

19

1   performance under the other contract.

2           Though each has a termination for convenience clause,

3   permitting termination upon payment of certain sums associated

4   with that particular contract, neither conditions termination

5   on any payment with respect to the other contract.

6           There is no indication that the contracts were signed

7   at a single closing.

8           Each has an integration clause, without any stated

9   exceptions, stating that it is the entire agreement between the

10   parties, except for documents "specifically referenced" in the

11   agreement.  In fact, the Service Contract says that twice.

12           The nature of each document is the same; they're

13   purchase agreements for different things.  That reinforces the

14   idea that they're two separate agreements.  Neither has

15   language that complements the other, or fills in gaps in the

16   other.  They just cover the purchase and sale of different

17   items.  Of course it's true that there is a relationship

18   between the purchased products, and that this relationship was

19   always contemplated.  I assume it to be true, as Karmann

20   argues, that the two contracts were executed with respect to a

21   single program.  But that doesn't make two separate agreements

22   one, or militate as a factor by which they should be so

23   considered.

24           Karmann's briefs on this motion put forward no case

25   authority, or even factual argument, supporting its position

20

1   that these two agreements should be deemed to be one.  In fact,

2   it put forth no authority beyond the uncontroversial

3   proposition, citing Kopel, that where seemingly separate

4   documents are part of an integrated whole, they must be assumed

5   or rejected together.  And Karmann failed to address the facts

6   I noted above, which are undisputed.

7        Instead, though only by oral argument, Karmann made

8   two different points.  It urged that the Production Contract

9   and the Service Contract were related by reason of the content

10  of the Nomination Letter, which suggested that they were both

11  elements of a single "program".  And it urged that Section 20

12  of the Production Contract and the Service Contract made it

13  necessary and appropriate to consider the two separate

14  contracts as a unitary whole.  In each case, I cannot agree.

15       First, the Nomination Letter was not itself a

16  contract, having neither an offer nor an acceptance, and by its

17  terms it was merely a statement of intention.  The stated

18  intention was to enter into one or more purchase orders.  It

19  did not state the intention to enter into only one or to enter

20  into two that should be deemed to be one.  Even if it were a

21  contract, it could not modify the terms of the contracts we

22  have here.  As I've noted, each of the Production Contract and

23  the Service Contract had an integration clause, superseding all

24  prior oral or written representations and agreements.  So even

25  if it had a promissory component, it would be superseded by the

21

1    documents that were actually executed.  And while it did at

2    least seemingly make reference to what became the future

3    Service Contract, it did not speak to whether the obligation to

4    sell parts would be an element of the Production Contract or

5    would be a separate agreement.  If anything, the natural

6    inference is the latter.

7         Possibly recognizing some or all of what I've just

8    noted, Karmann places greater reliance on Paragraph 20 of the

9    Production Agreement, suggesting that this supports its

10   position that the two agreements should be deemed to be an

11   integrated whole.  But once more I cannot agree.  Paragraph 20

12   of the Production Contract makes no reference to the Service

13   Contract or, for that matter, any other agreement.  It contains

14   a free standing covenant, as part of the larger Production

15   Contract, requiring the sale of parts.  And lest there by any

16   uncertainty as to that, I must note that the same Paragraph 20

17   also appears in the Service Agreement.  It cannot be that

18   Paragraph 20 in the Service Agreement reflects an intention to

19   incorporate the Service Agreement into itself.  It cannot be

20   that Paragraph 20 reflects an intention to incorporate the

21   Service Agreement as an adjunct to the agreement that already

22   contains Paragraph 20, as no one could seriously suggest that

23   the Service Agreement was incorporating itself.

24        In short, there is no basis for a determination that

25   these two separate documents are in fact a single document, nor

22

1    is there any basis for a ruling that the two separate contracts

2    should be deemed to be only one.

3         If Motors Liquidation wishes to reject the Production

4    Contract, it may do so, without regard to the decision it makes

5    with respect to the separate Service Contract.

6         Gentlemen, you're to confer with each other to work

7    out a method for teeing up the remaining issues vis-à-vis the

8    tools contract, for which I'm going to need to hold the

9    evidentiary hearing.  You're also to confer with each other as

10   to whether an interim order or a separate order with respect to

11   this aspect of the controversy is necessary or appropriate, and

12   if either party believes that it is such an order should be

13   settled on no less than two business days notice by fax or e-

14   mail.  Not by way of reargument, are there any open issues?

15   Mr. Smolinsky?

16        MR. SMOLINSKY:  Not from our side, Your Honor.  Thank

17   you very much.

18        THE COURT:  All right.  Mr. Kukla?

19        MR. KUKLA:  No, Your Honor.  Thank you.

20        THE COURT:  All right, gentlemen.  Thank you very

21   much.  Have a nice day.  GM folks are excused from the line.  I

22   will be returning to the bench at 9:45 for Lyondell Chemical.

23   We're in recess.

24        (Proceedings concluded at 9:36 AM)

25

23

1

2                          I N D E X

3

4                            RULINGS

5                                  Page      Line

6     An Evidentiary Hearing     4         12

7     is Required to Determine

8     if the Tools Contract

9     is Executory, but no

10    Evidentiary Hearing is

11    Required to Rule on Whether

12    the Production Contract

13    and the Service Contract

14    are a Single Integrated

15    Contract

16

17    The Production Contract    4         16

18    and the Service Contract

19    are Two Separate

20    Contracts

21

22

23

24

25

24

1

2                    C E R T I F I C A T I O N

3

4      I, Hana Copperman, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      _____

8      HANA COPPERMAN

9      AAERT Certified Electronic Transcriber (CET**D-487)

10

11     Veritext LLC

12     200 Old Country Road

13     Suite 580

14     Mineola, NY 11501

15

16     Date: August 13, 2009

17

18

19

20

21

22

23

24

25