LeClairRyan, a Professional Corporation
830 Third Avenue, Fifth Floor
New York, New York 10022
(212) 430-8032
(212) 430-8062 Fax
Michael T. Conway, Esq.

*Counsel for Detroit Diesel Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, et al., f/k/a General Motors Corp., et al. | Case No. 09-50026 (REG) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF SHAWN JACQUE IN SUPPORT OF MOTION OF DETROIT DIESEL CORPORATION FOR ORDER EXTENDING AND ENFORCING THE STAY IMPOSED UNDER 11 U.S.C. § 362(a) TO COVER CERTAIN LITIGATION RELATING TO DETROIT DIESEL CORPORATION, OR ALTERNATIVELY, ENJOINING SUCH LITIGATION PURSUANT TO 11 U.S.C. § 105**

I, **SHAWN JACQUE**, hereby declare pursuant to section 1746 of title 28 of the United States Code:

1.      I am above the age of 21. I am not a party to this action, and I am competent to give sworn testimony and have personal knowledge of the facts stated herein, which are true and correct. I am sufficiently familiar with the facts set forth herein to testify competently if required.

2.      I am employed as Corporate Counsel for Detroit Diesel Corporation. I have held this job since 2007. I have been employed by Detroit Diesel Corporation since 2003.

3.      I am an attorney licensed to practice in the State of Michigan.

4.      In my previous capacity as Senior Counsel and my present capacity as Corporate Counsel I am familiar with the history of Detroit Diesel Corporation and its formation.

5.      Detroit Diesel Corporation was formed on January 1, 1988 when it acquired certain assets of the Detroit Diesel Allison Division of General Motors.

6.      Penske Corporation owned 60% of Detroit Diesel Corporation and General Motors owned 40%.

7.      As part of the sale of the Detroit Diesel Allison Division to Detroit Diesel Corporation, General Motors agreed to assume all liabilities for all products manufactured by General Motors' Detroit Diesel Allison Division prior to January 1, 1988.

8.      A true and correct copy of the Sales Agreement between Detroit Diesel Corporation and General Motors Corporation is attached as Exhibit "A" to this declaration.

9.      At paragraph 3.1 of the Sales Agreement, General Motors agreed to assume all liabilities for, among other things, product liability claims and litigation for any products manufactured, distributed or sold by General Motors prior to the closing of the sale.  In that same paragraph, General Motors agreed to indemnify and hold Detroit Diesel Corporation harmless for any product liability claims and/or litigation relating to any products manufactured, distributed or sold by General Motors prior to the closing.

10.      As part of the sale of its assets to Detroit Diesel, General Motors entered into a specific Indemnification Agreement with Detroit Diesel which became effective on 31 December 1987.  A true and correct copy of the Indemnification Agreement, which is incorporated into the Sales Agreement by reference at section 8.1.5 (D), is attached as Exhibit "B" to this declaration.

11.      At paragraph 1.1 of the Indemnification Agreement, General Motors agreed to indemnify, defend and hold harmless Detroit Diesel Corporation *or its successors or assigns*

(emphasis added) from and against all costs and expenses including, without limitation, among others, attorneys fees, damages, losses, disbursements, etc., arising out of any claims or litigation against Detroit Diesel arising out of or relating to products manufactured, distributed or sold by General Motors prior to the date of the closing.

12.     The sale included an additional document entitled Product Responsibility Agreement.  A true and correct copy of that agreement, which is incorporated into the Sales Agreement by reference at section 8.1.5 (H), is attached as Exhibit "C" to this declaration.

13.     At paragraph 3.2 of the Product Responsibility Agreement, General Motors agreed to maintain, at its expense, adequate Product Liability insurance covering GM products manufactured, distributed or sold by GM prior to the closing.

14.     In 1989, Penske acquired another 20% of the Detroit Diesel Corporation from General Motors making Penske an 80% owner of Detroit Diesel Corporation.

15.     In 1993, Detroit Diesel Corporation became a publicly held company and Daimler-Benz acquired the 20% share of Detroit Diesel owned by General Motors.

16.     In 1998, Daimler-Benz became known as DaimlerChrysler.  In 2000 DaimlerChrysler acquired 100% of the stock of Detroit Diesel.

17.     In 2007, Daimler and Chrysler separated and Daimler became Daimler North America Corporation ("Daimler NA").  Daimler NA kept the shares of Detroit Diesel Corporation.  Detroit Diesel Corporation is currently a wholly owned subsidiary of Daimler NA and has no legal relationship to General Motors.

18.     Up until July 16, 2009, General Motors continued to honor its obligations to Detroit Diesel to indemnify, defend and hold harmless Detroit Diesel for any product liability

claims or litigation arising from any products manufactured, distributed or sold by General Motors prior to January 1, 1988.

19.    On July 16, 2009, I received an e-mail from Maynard L. Timm, Esq. of the GM Legal Staff advising me that GM would no longer assume any responsibility to Detroit Diesel under the Indemnification Agreement or the Product Responsibility Agreement for any asbestos product liability litigation against Detroit Diesel.

20.    A true and correct copy of Mr. Timm's e-mail is attached as Exhibit "D" to this declaration.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of August, 2009.

/s/ Shawn Jacque_____
Shawn Jacque

**Exhibit A**

SALES AGREEMENT

By and Between

GENERAL MOTORS CORPORATION

And

DETROIT DIESEL CORPORATION

SALES AGREEMENT
By and Between
GENERAL MOTORS CORPORATION
And
DETROIT DIESEL CORPORATION

TABLE OF CONTENTS

| Article | | Page |
|---|---|---|
| I. | Sale and Purchase of the Assets | 1 |
| II. | Purchase Price | 10 |
| III. | Assumption of Liabilities | 15 |
| IV | Representations and Warranties | 15 |
| V. | Personnel Matters | 26 |
| VI. | Particular Covenants of GM and DD | 37 |
| VII. | Certain Additional Covenants | 39 |
| VIII. | Conditions to Closing | 43 |
| IX. | Closing | 48 |
| X. | Indemnification | 50 |
| XI. | Miscellaneous | 51 |

SALES AGREEMENT

Agreement made as of the end of the 31st day of December, 1987, by and
between General Motors Corporation, a Delaware corporation, with its
principal place of business at 3044 West Grand Boulevard, Detroit,
Michigan, and Detroit Diesel Corporation, a Delaware corporation, with
its principal place of business at Redford, Michigan.

Purpose:

The purpose of this Agreement is to set forth the conditions of
transfer of the business and assets currently carried on by General
Motors Corporation (hereinafter referred to as "GM") through its
Detroit Diesel Allison Division (hereinafter referred to as "DDA") at
its manufacturing facilities at Redford Township and adjoining Det-
roit, Michigan (hereinafter referred to as "Redford Operations") to
Detroit Diesel Corporation or its successors or assigns (collectively,
"DD"), including, but not limited to, the business of development,
manufacture, assembly and sale of diesel engines.

NOW, THEREFORE, in consideration of that purpose and for good and
valuable consideration had and received, GM and DD agree as follows:

I.    SALE AND PURCHASE OF THE ASSETS.

    1.1. Assets.    Upon the terms and conditions of this Agreement
and in reliance on the representations and warranties contained
herein, GM shall (or, to the extent any of the following properties or
assets are owned by any corporation controlled, directly or indir-
ectly, by GM or any partnership or joint venture in which GM or any
such corporation is a partner or venturer, excluding Electronic Data
Systems Corporation (collectively, the "Affiliates") GM shall cause
each Affiliate to) sell, transfer, assign, convey and deliver to DD,

and DD shall purchase, accept and acquire from GM or any Affiliate as
hereinafter provided all the assets and properties (collectively, the
"Assets") relating to the Redford Operations (except for the excluded
assets referred to in Section 1.2), including, without limitation, the
following:

      1.1.1    Real Property. All real property and interests in
such real property of GM or of its Affiliates located in the Township
of Redford and adjoining Detroit in the County of Wayne and State of
Michigan, including without limitation all right, title and interest
of GM and its affiliates in the bed of any streets, open or proposed,
adjoining the land all easements and licenses appurtenant to the land,
as described in the Commitment for Title Insurance issued by Safeco
Title Insurance Company, attached hereto as  Exhibit 1.1.1., together
with all buildings, fixtures and improvements situated thereon (col-
lectively, the "Real Property"). A current land Survey showing all
improvements and easements will be provided at least 10 days prior to
Closing.

GM hereby informs DD that the Redford Operations contain transformers
and capacitors that contain polychlorinated biphenyl (PCB) dielectric
fluid.  The use, disposal, and distribution in commerce of these PCB
Transformers and Capacitors must meet specific requirements under
federal regulations, 40 CFR 761, pursuant to the federal Toxic Sub-
stance Control Act (TSCA).  Some states and local governments may have
additional regulatory requirements on PCB- Contaminated Transformers
and Capacitors.

Once title to the above-described building and PCB Transformers and
Capacitors is transferred to DD from GM, DD agrees to use, store,
mark, handle, transport and/or dispose of properly the PCB Trans-
formers and Capacitors in an environmentally safe manner and in
compliance with the applicable federal, state and local laws, regu-
lations, ordinances, etc., including but not limited to, the federal
Toxic Substances Control Act.

- 2 -

Once title to the Redford Operations and PCB Transformers and Capa-
citors is transferred to DD from GM, GM shall be relieved from any
further obligation with regard to the handling, transportation,
storage, use or disposal of the PCB Transformers and Capacitors
including the PCB fluid contained therein.

### 1.1.2.    Personal Property.

A.    All production machinery, equipment, tools, dies,
jigs, molds, patterns, gauges and production fixtures and material
handling equipment used in the current manufacture of products at or
for the Redford Operations, business machines, office furniture,
in-factory vehicles, trucks, expense materials, model shop equipment,
dies, and laboratory test fixtures, and other tangible personal
property (including replacement, spare and maintenance parts) owned by
GM or any of its Affiliates at the time of the Closing, used primarily
in, or essential to, the Redford Operations, whether located in
Redford Township, Michigan, or at the place of business of a vendor
primarily for the business of the Redford Operations (all of the
foregoing being listed in Exhibit 1.1.2 (A)), and the equipment used
in the warehousing of parts located at the Parts Distribution Center
in Romulus, Michigan which are identified on Exhibit 1.1.2(A).

B.    All service, parts, warranty, export and licensing
records located at and/or related to the Redford Operations as of the
date of Closing.

C.    Subject to Article III, all rights and interests
of GM or any of its Affiliates in all purchase orders, sales agree-
ments, service contracts, distribution agreements, product warranty
and service agreements, leases and other commitments, agreements, and
undertakings entered into in the ordinary course of business of the
Redford Operations being assumed by DD pursuant to Article III, extant
as of the date of Closing and listed in Exhibit 1.1.2 (B).

- 3 -

        D.    All quantities of inventory, including raw ma-
terials, work-in-process and finished products, stores and supplies
and spare parts owned by GM or any of its Affiliates as of the date of
Closing relating to the Redford Operations and reflected as assets on
the books of DDA's Redford Operations, including all 8 2 liter engine
spare parts at the GM facilities in Romulus (whether or not on said
books), wherever such inventories may be located in the United States
(hereinafter collectively referred to as "Inventories").

        1.1 3.    <u>Patents and Technical Information</u>.    For purposes
of this section, "Licensed Engines" shall mean two-cycle diesel engine
products and components therefor, other than injectors, designed by
DDA or manufactured by DDA at the Redford Operations; "Technical
Information" shall have the meaning given in Section 4.1.7 of this
agreement, and "Patent Rights" shall mean patents, patent applica-
tions, inventions and discoveries.

        A.    All GM Patent Rights which relate primarily to
Licensed Engines and their manufacture; provided, however, that GM
shall retain a non-exclusive, royalty-free and irrevocable license
under such assigned Patent Rights for all purposes other than to
license others to, or to itself, make, have made, use, lease and sell
Licensed Engines.

        B.    A non-exclusive royalty-free and irrevocable
license under all GM Patent Rights which relate, but not primarily, to
Licensed Engines and their manufacture to make, have made, use, lease
and sell Licensed Engines and any other diesel engines developed or
otherwise acquired by DD.  Unless otherwise agreed to by GM in writ-
ing, the license granted by this clause shall be sublicensable only as
part of a license to make, have made, use lease and/or sell diesel
engines or components thereof manufactured by or for DD prior to or at
the time such sublicense is granted.

        C.    All GM Technical Information currently in the
files of or available to DDA and which relates primarily to Licensed

- 4 -

Engines and their manufacture; provided, however, that GM may retain
copies of such Technical Information and shall retain a non-exclusive,
royalty-free and irrevocable license to use such Technical Information
in any way for all purposes other than to license others to, or to
itself, make, have made, use, lease and sell Licensed Engines.

D.    A non-exclusive, royalty-free and irrevocable
license under all GM Technical Information currently in the files of
or available to DDA and which relates, but not primarily, to Li-
censed Engines and their manufacture to use such licensed Technical
Information to make, have made, use, lease and sell Licensed Engines
and any other diesel engines developed or otherwise acquired by DD.
Unless otherwise agreed to by GM in writing, the license granted by
this clause shall be sublicensable only as part of a license to make,
have made, use lease and/or sell diesel engines or components thereof
manufactured by or for DD prior to or at the time such sublicense is
granted.

E.    GM agrees that for a period of 5 years after the
execution of this agreement, GM will not compete with DD or its
successors in the manufacture, leasing or sale of Licensed Engines and
will not license others to make, have made, use, lease or sell two-
cycle diesel engines of similar cylinder displacement to the Licensed
Engines.

1.1.4.    Government Licenses, Permits and Approvals    All
licenses, permits and approvals issued to GM or any of its Affiliates
and that are currently used for the purpose of carrying on the Redford
Operations or that relate to the Assets, including, without limita-
tion, those listed and identified in Exhibit 1.1.4, to the extent that
GM or any of its Affiliates has the power, authority or right to
transfer or assign such licenses, permits or approvals.

1.1.5.    Administrative Assets.    All of the books and records
and other assets of GM or any of its affiliates relating to the

Redford Operations or the Assets, including, without limitation,
advertising and promotional materials (including, without limitation,
original artwork), catalogues, price lists, correspondence, mailing
lists, customer lists (including credit information relating thereto),
vendor lists, photographs, production data, sales materials and
records (regardless of the media on which they are stored), purchasing
materials and records, personnel records of employees (subject to
Section 1.2.2), manufacturing and quality control records and proce-
dures, research and development files extant at the Redford Opera-
tions, records, data and laboratory books, billing records, accounting
records, sale order files, tool routings, labor routings, inspection
processes and equipment lists, picture process sheets, process proce-
dures, equipment prints and specifications, facility blueprints,
service blueprints and plant layout.  GM shall make such information
available to DD in machine readable form to the extent it is in GM's
files in such form.

      1.1.6   _Trademarks_   The trademarks, trade names and service
marks, and registrations and applications for such trademarks, trade
names and service marks owned by GM or its Affiliates and used in the
Redford Operations, that are listed on Exhibit 1.1.6, as well as
common law rights to trademarks, trade names and service marks used
exclusively in connection with the Redford Operations, and the good-
will associated with the aforesaid; and copyrights and registrations
and applications for such copyrights, owned by GM or its Affiliates
and used in the Redford Operations that are listed on Exhibit 1.1.6.

      1.1.7.   _General_.  The Assets will include (A) all assets
(except for the excluded assets referred to in Section 1.2) of GM or
any of its Affiliates reflected on the Statement of Net Assets to Be
Transferred of the Redford Operations as of August 31, 1987 which
statement has been presented in accordance with General Motors Cor-
poration Accounting Practices and Procedures which are in accordance
with generally accepted accounting principles applied on a basis
consistent with that of the August 31, 1987 balance sheet information

- 6 -

provided to DD (the "August 31, 1987 Statement of Net Assets"),
subject to acquisitions and dispositions in the ordinary course of
business to the extent permitted by this Agreement prior to the
Closing, and (B) all assets reflected on the Closing Statement of Net
Assets (as hereinafter defined). The August 31, 1987 Statement of Net
Assets has been accompanied by a detailed list of all assets and their
respective book values at August 31, 1987.

1.2. Excluded Assets. Notwithstanding anything to the contrary
in Section 1 1 of this Agreement, the following rights, properties and
assets shall not be included in the sale of Assets.

1.2.1. Bailed Assets. All machinery, equipment, special
tools or tooling, dies, molds, patterns, jigs, gauges and production
fixtures and special material handling equipment that are identified
on Exhibit 1.2 1 (A) shall be provided to DD on a bailment basis,
subject to the conditions set forth on Exhibit 1.2 1 (B) attached
hereto, for the purpose of furnishing to GM, its subsidiaries, and
others all or part of their respective requirements for products,
subject to the provisions of this Agreement.

1.2.2. Personnel and Medical Records. All personnel and
medical records of employees and retired former employees of GM who
worked at any time for any reason at the Redford Operations and for
whom a record exists there at the time of Closing; provided, however,
with the knowledge of those employees who are accepted for employment
by DD, GM shall provide DD with copies of the personnel and medical
records of such employees.

1.2.3. Dispositions All of the inventories, products,
rights, properties, assets and businesses of the Redford Operations
which shall have been transferred or disposed of by GM prior to
Closing in the ordinary course of business or not otherwise in breach
of this Agreement.

- 7 -

1.2.4.    Trademarks.  All other GM trademarks, trade names and service marks not listed on Exhibit 1 1.6; provided, however, DD may sell or dispose of existing inventory of products, bearing any GM trademark or related corporate name or trade name.

1.2.5.    Third Party Assets.  All assets located at the Redford Operations owned by third parties, including Electronic Data Systems Corporation ("EDS Corporation") and EDS Division of General Motors Corporation and listed in Exhibit 1.2.5.  Data processing hardware, software and know-how owned by EDS Corporation will be handled under a separate agreement.

1.2.6.    Current Assets.  All cash, bank accounts and accounts receivable of DDA as of Closing; provided, however, DD will collect and disburse pre-Closing accounts receivable and payable, respectively, on behalf of GM.  In handling said accounts receivable and payable, to the extent possible DD will offset receivables against payables, with net settlement after three months.

1.2 7    Assigned or Leased Assets.  All assets located at the Redford Operations irrevocably assigned by GM to DD in an assignment document of even date herewith or leased by GM to DD in any lease agreement of even date herewith.

1.3.    Exhibits.  While the various Exhibits to this Agreement are intended to be complete, to the extent that any Assets are intended to be transferred to DD pursuant to Section 1.1 but do not appear on the applicable Exhibits, this Section 1.3 shall govern and the Assets shall nonetheless be transferred to DD.  Should it be determined after the Closing that books, records or other materials constituting Assets that were intended to be transferred to DD are still in the possession of GM or any of its Affiliates, GM shall or shall cause such Affiliates to promptly deliver them to DD at no cost to DD.

- 8 -

1.4. Nonassignable Permits, Licenses, Leases and Contracts.

1.4.1.   Nonassignability.  In reliance on the accuracy of
the representations and warranties set forth in Section 4.1.10, to the
extent that any contract or other agreement listed on Exhibit 1.1.2
(B) or any license, permit or approval or any other contract, agree-
ment or commitment included in the Assets is not capable of being
assigned, transferred or subleased by the Closing or without the
consent or waiver of the issuer thereof or the other party thereto or
any third party (including a government or governmental unit), or if
such assignment, transfer or sublease or attempted assignment, trans-
fer or sublease would constitute a breach thereof, or a violation of
any law, decree, order, regulation or other governmental edict, this
Agreement shall not constitute an assignment, transfer or sublease
thereof, or an attempted assignment, transfer or sublease thereof,
unless any such consent or waiver is obtained.

1.4.2.   GM to Use All Reasonable Efforts.  Subject to
Sections 8.1.8 and 8.1.9, GM shall, at its expense, use all reasonable
efforts, and DD shall cooperate with GM, to obtain the consents and
waivers and to resolve the impracticalities of assignment referred to
in Section 1.4.1 and to obtain any other consents and waivers neces-
sary to convey to DD any other of the Assets; provided, however, that
neither GM nor DD shall be obligated to pay any consideration therefor
to the party from whom the consent or waiver is requested, and GM
shall not be required to transfer title to any Asset for which a
consent is required and not waived by DD, but such matter shall be
resolved pursuant to the procedures set forth in Section 1.4.3 hereof

1.4.3.   If Waivers or Consents Cannot be Obtained.
Subject to Section 8.1., to the extent that the consents and waivers
referred to in Section 1.4.1 are not obtained by GM, or until the
impracticalities of transfer referred to therein are resolved, GM
shall, during the one (1) year period commencing with the Closing, use
all reasonable efforts, at its expense, to (i) provide to DD the

- 9 -

benefits of any permit or approval and of any contract, license or
other agreement, all as referred to in Section 1.4.1, to the extent
involving the Redford Operations, (ii) cooperate in any reasonable and
lawful arrangement designed to provide such benefits to DD, without
incurring any financial obligation to DD other than to provide such
benefits and (iii) enforce for the account of DD any rights of GM
arising from the licenses, permits and approvals and the contracts or
other agreements referred to in Section 1.4.1 against such issuer
thereof or other party or parties thereto (including the right to
elect to terminate in accordance with the terms thereof on the advice
of DD). At the end of such one (1) year period, GM shall have no
further obligations hereunder with respect to such licenses, permits
and approvals and such contracts, and other agreements and, subject to
Section 8.1.9, the failure to obtain any necessary consent or waiver
with respect thereto shall not be a breach of this Agreement.

    1.4.4.   <u>Obligation of DD to Perform</u>. To the extent that
DD is provided the benefits pursuant to Section 1.4.3 of any license,
permit or approval or any contract or other agreement, DD shall
perform, on behalf of GM, for the benefit of the issuer thereof or the
other party or parties thereto the obligations of GM thereunder or in
connection therewith, but only to the extent that (i) such action by
DD would not result in any material default thereunder or in con-
nection therewith and (ii) such obligation would have been a liability
assumed by DD pursuant to Article III but for the nonassignability or
nontransferability thereof, and if DD shall fail to perform to the
extent required herein, GM, without waiving any rights or remedies
that it may have under this Agreement or applicable law, may suspend
its performance under Section 1.4.3 in respect of the instrument which
is the subject of such failure to perform unless and until such
situation is remedied.

## II.  <u>PURCHASE PRICE</u>.

    2.1 The purchase price (the "Purchase Price") for the Assets
shall be the Book Value (as hereinafter defined) of Inventories,

Property, Plant and Equipment, Special Tools and Prepaid Expenses as shown on the August 31, 1987 Statement of Net Assets, less $3.4 million (the "Discount Amount"). The Purchase Price is subject to adjustment as provided in Sections 2.1.1 and 2.1.2, and shall be payable as provided in Sections 2.2. and 2.3.

2.1.1. Preparation of Closing Statement of Net Assets.

A.    Commencing at or immediately after Closing, GM, at its expense, shall prepare a Statement of Net Assets to be transferred and related footnotes of the Redford Operations as of the close of business on the date of the Closing, which statement shall be prepared in accordance with generally accepted accounting principles applied on a basis consistent with that of the August 31, 1987 Statement of Net Assets, and shall be accompanied by an audit report of the firm of Deloitte Haskins & Sells (the "Closing Statement of Net Assets").    GM shall pay the expenses of Deloitte Haskins & Sells in connection with such audit report.  The Property, Plant and Equipment at Closing shall be valued in the Closing Statement of Net Assets based upon the original cost thereof net of accumulated depreciation.  For purposes of this Agreement, the term "Book Value" shall mean the recorded amount of any or all the GM assets to be transferred as shown on the books of the Redford Operations determined in accordance with generally accepted accounting principles, without taking into account any changes in depreciation policy since August 31, 1987.

B.    Within sixty (60) days of the Closing date, GM shall deliver to DD the Closing Statement of Net Assets accompanied by an audit report of Deloitte Haskins & Sells stating that (a) the examination of the Closing Statement of Net Assets has been made in accordance with generally accepted auditing standards and (b) in their opinion, the Closing Statement of Net Assets has been prepared in accordance with generally accepted accounting principles applied on a basis consistent with that of the August 31, 1987 Statement of Net

Assets    Contemporaneously GM shall deliver to DD a schedule setting
forth the amount of any adjustment to the Purchase Price to be paid
and by whom pursuant to Section 2.3.

C.    DD and GM, each at its own expense, shall cooper-
ate fully and shall use their best efforts to cause their respective
independent accountants to consult in advance in determining the
proper scope of the audits, the procedures for taking inventories, the
establishment of reserves and other matters, and cooperate fully in
said preparation and audit of the Closing Statement of Net Assets and
shall make available to said accountants all working papers, data and
such other information as may be necessary.

D.    In the event that DD is in disagreement with any
information in the Closing Statement of Net Assets or adjustment to
the Purchase Price to be paid pursuant to Section 2.3, DD shall,
within ten (10) business days after receipt of the Closing Statement
of Net Assets and the accompanying audit report of Deloitte Haskins &
Sells, notify GM of such disagreements.  If DD and GM shall not have
resolved such disputes within the next twenty (20) calendar days, both
GM and DD shall immediately refer those items of disagreement to a
nationally known accounting firm to undertake the resolution of the
matters in dispute.  Resolution of the matters in dispute shall be
made by such other firm as soon as practical in accordance with the
principles set out in Section 2.1.2, and shall be binding and conclu-
sive on DD and GM.  The costs and fees of such other firm shall be
shared equally by GM and DD.

2.1.2.  Liabilities and Prepaid Expenses.

A.  Liabilities and prepaid expenses relating to the
Redford Operations shall be prorated between DD and GM as of the
Closing.  GM shall be reimbursed by DD for prepaid expenses relating
to periods extending after the Closing and DD shall be reimbursed by

- 12 -

GM for liabilities to be paid by DD for expenses relating to periods prior to the Closing.  Such prorations shall include, without limitation, the following:  (i) all payments and charges due pursuant to any contract, agreements, easements, permits, commitments or other binding arrangements to which GM is a party or is obligated and which are being assumed by DD pursuant to this Agreement; (ii) rentals and charges payable in connection with the leasehold interests comprising any part of the Real Property; (iii) general property taxes and assessments, if any, and ad valorem taxes levied and assessed against any of the Assets; (iv) sales and use taxes, if any, payable with respect to the sale of products manufactured at the Redford Operations; (v) charges for utilities; (vi) charges for services and goods furnished in connection with the Redford Operations; and (vii) any other fees, payments or charges agreed upon by the parties.

B.  Any party hereto liable for more than fifty percent (50%) of the amount apportioned or borne under this Agreement with respect to any item referred to in this Section 2 1.2, may, at its option, prosecute by litigation or administrative proceeding, at its sole expense and risk, including the obligation to pay such amount in full and penalties thereon, if any, in the name of the other party and receive any and all claims for refund, abatement or recovery without any subsequent obligation to remit or prorate any portion thereof to the other party.  The other party shall cooperate with any such prosecution of claims at the expense of the party prosecuting such claim, but shall not be required to incur any risk or expense.

2.2.  Payment of Purchase Price.  At the Closing, DD shall purchase the Assets by wire transfer to the account of GM at Citibank, New York, Account No. 0003-1878 in the amount of the Purchase Price less that amount owing for the purchase of the Inventory.  Payment for 90 percent of the purchase price of the Inventory will be made by wire transfer to said GM account no later than 90 days after Closing, and payment for 10 percent of the purchase price of the Inventory will be made no later than 15 months after Closing.  At the Closing DD will

- 13 -

deliver promissory notes payable in 90 days and bearing no interest and 15 months bearing no interest, as appropriate. The Discount Amount shall be subtracted from the cash portion of the Purchase Price paid at Closing.

2.3. Payment of Adjustments. On the fifth business day following the completion and acceptance by GM and DD of the Closing Statement of Net Assets, as to all assets other than Inventory either (A) GM shall pay DD the amount, if any, by which the Book Value of the net assets to be transferred as shown on the August 31, 1987 Statement of Net Assets exceeds the Book Value of the net assets to be transferred as shown on the Closing Statement of Net Assets, with interest from the date of Closing at the prime rate at National Bank of Detroit in effect on the date of Closing, or (B) DD shall pay GM the amount, if any, by which the Book Value of the net assets to be transferred as shown on the Closing Statement of Net Assets exceeds the Book Value of the net assets to be transferred as shown on the August 31, 1987 Statement of Net Assets, with interest from the date of Closing at the prime rate at National Bank of Detroit in effect on the date of Closing by wire transfer to an account designated by the other. As to Inventory, any adjustment shall be effected by increasing or decreasing the amount of the notes delivered in payment of the purchase price. In the event DD raises any objection to any information in the Closing Statement of Net Assets or the adjustments to be made pursuant to this Section 2.3, DD or GM, as the case may be, shall pay any undisputed amounts pursuant hereto and any additional amounts at such time as any objections are resolved in accordance with Section 2.1.1 hereof.

2.4.   Allocation of Purchase Price.

A.   In accordance with Internal Revenue Code (I.R.C.) Section 1060, GM and DD shall allocate the Purchase Price, as adjusted, to the Assets in a manner consistent with I.R.C. Section 338 (b) (5) and the Treasury Regulations issued thereunder.

- 14 -

B.  GM shall provide DD and DD shall provide GM with a copy of any information required to be furnished to the Secretary of the Treasury under I.R.C. Section 1060(b).

III.  ASSUMPTION OF LIABILITIES.

3.1.  At and as of the Closing, pursuant to the Assumption Agreement in the form of Exhibit 3.1 attached hereto, DD shall assume and agree to perform all of the obligations of GM under all contracts, leases, agreements, commitments, licenses and permits listed on Exhibit 1.1.2 (B), other than those identified by an asterisk, after the Closing.  Notwithstanding anything to the contrary in this Agreement, DD shall not assume or become liable for and GM shall indemnify and hold DD harmless against any liabilities, obligations or commitments of GM or any of its Affiliates, whether contingent or otherwise, fixed or absolute, known or unknown, present or future or otherwise, relating, directly or indirectly, to (i) the conduct of the GM Operations or the ownership of the Assets prior to the Closing, including, without limitation, wages, employee benefits, employment discrimination, product liability claims, litigation, product returns, environmental problems, taxes, license fees and utility charges, (ii) claims relating, directly or indirectly, to products manufactured, distributed or sold by GM prior to the Closing (iii) any breach by GM of any of or any inaccuracy in any of its warranties or covenants in this Agreement, or (iv) any real estate transfer taxes, deed taxes, recording fees, sales and use taxes, documentary taxes, and all similar fees, taxes and costs relating to the consummation of the transactions contemplated by this Agreement.  The foregoing specific enumeration is not to be construed as meaning that any liability, obligation or commitment not so enumerated is to be assumed.

IV.  REPRESENTATIONS AND WARRANTIES.

4.1.  Representations and Warranties of GM.  GM represents and warrants to DD as follows:

- 15 -

4.1.1. Organization; Standing. GM is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power to own the Assets and to carry on the Redford Operations as presently conducted

4.1.2. Authority; Binding Effect. GM has the corporate power and authority to execute and deliver this Agreement and any Ancillary Agreement (as defined in Section 4.1.6), and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated herein and therein. The execution, performance and consummation of this Agreement and the Ancillary Agreements have been duly authorized by all necessary action on the part of GM and its Affiliates. This Agreement is, and the Ancillary Agreements will be when executed and delivered, valid and legally binding obligations of GM, enforceable against GM in accordance with their respective terms.

4.1.3. Qualification. GM is duly qualified or licensed and in good standing as a foreign corporation duly authorized to do business in all jurisdictions where it owns or leases real property or maintains stocks of business inventories relating to the Redford Operations or where the failure so to qualify or to be so licensed might have a material adverse effect on the condition, the Assets, revenues, business, operations or affairs of the Redford Operations.

4.1.4. Title to Assets, etc.

A. GM has good and marketable title to the Assets (in fee simple in the case of the Real Property), free and clear of any lease, easement or other restriction, mortgage, pledge, lien, security interest or encumbrance, except as set forth on Exhibit 4.1.4 (the "Permitted Encumbrances"). The Assets and the excluded assets referred to in Section 1.2 constitute all of the properties and assets that GM or any of its Affiliates use or hold in connection with the Redford Operations and the conduct of the Redford Operations as a going concern, and, except for additions in the ordinary course of

- 16 -

business, the Assets include all properties and assets the use of
which are necessary for the continued conduct of the Redford Opera-
tions as now being conducted and the continued operation of the Assets
as now being operated. No part of the Real Property is the subject of
any condemnation proceeding and, to GM's knowledge, no such proceeding
is threatened.

B.   Exhibit 1.1.1 sets forth a complete and correct
description of the Real Property. Except as set forth in Exhibit
1.1.1, based on GM's inquiries of its plant managers and operations
manager, and except as set forth in the environmental assessment
referred to in Article 6.4., GM has no knowledge that the Real Pro-
perty and the use thereof violates any local zoning or similar land
use laws or environmental or other governmental laws or regulations.
GM has no knowledge and no reason to believe that the current use of
property, plant or equipment included in the Assets is dependent on
any nonconforming use or other permit, and there are no easements or
other restrictions of record, which would materially limit the use of
such property in the Redford Operations as now conducted. Except as
set forth in Exhibit 1.1.1, all structures and other improvements
located on such Real Property and all machinery and equipment of GM
which constitute Assets hereunder are located fully within the lines
of record title of the Real Property in accordance with applicable
set-back requirements.

C.   The use, disposal, and distribution in commerce of
the PCB Transformers and Capacitors referred to in Section 1.1.1. meet
specific requirements under federal regulations, 40 CFR 761, pursuant
to the federal Toxic Substance Control Act (TSCA), and state and local
government regulatory requirements on PCB-Contaminated Transformers
and Capacitors. GM is and has used, stored, marked, handled, trans-
ported and/or disposed of properly the PCB Transformers and Capacitors
in an environmentally safe manner and in compliance with the appli-

- 17 -

cable federal, state and local laws, regulations, ordinances, etc.,
including but not limited to, the federal Toxic Substances Control
Act.

### 4.1.5. Conditions of Improvements, Inventories, etc.

A.    Exhibit 1.1.2 (A) sets forth a complete and
correct list of all machinery, equipment, trucks, vehicles and tools
constituting Assets hereunder.  The Assets have been inspected by DD,
and DD is satisfied with the condition thereof.  Except for such
warranties and representations expressly set forth in this Agreement,
GM makes no warranties or representations, expressed or implied, with
respect to the Assets, and all such items are sold to DD "as is, where
is."

B.    The Inventories reflected on the August 31, 1987
Statement of Net Assets were as of August 31, 1987, and those re-
flected on the Closing Statement of Net Assets will as of the Closing
be, of good, usable and merchantable quality, except to the extent
reserved therein.  All finished goods included in the Inventories are
saleable in the ordinary course of business of the Redford Operations.
All raw materials, work in process and finished goods Inventory will
on the Closing be of such quality as to meet or exceed GM's "in house"
and any applicable governmental quality control standards, when
applying GM's normal and customary manufacturing procedures.

4.1.6.    Litigation.  Except as disclosed in Exhibit 4.1.6
(A), there is no lien, action, proceeding, investigation or inquiry
pending or, to the best of GM's knowledge, threatened affecting the
Redford Operations or the Assets or which questions this Agreement or
any other agreement referenced herein or contemplated hereby (the
"Ancillary Agreements") or any action taken or to be taken pursuant
hereto or thereto or in connection with the purchase and sale of the
Assets.  Except as set forth in Exhibit 4.1.6 (B), there are no
pending citations, notices of violation, fines or penalties heretofore
asserted against GM, nor, on the basis of inquiries of its plant

-- 18 --

managers and operations manager, does GM have any notice of any
threats of citations, fines or penalties, which affect the Redford
Operations or the Assets under any federal, state or local law relat-
ing to air or water pollution or other environmental protection
matters, or relating to occupational health or safety, which remain
unpaid or which otherwise bind the Assets.  GM has cured, or is in the
process of resolving or curing, any defect or problem which resulted
in the issuance of any such citation, fine or penalty.  With respect
to products manufactured by the Redford Operations, GM has made
available to DD copies of its non-privileged files containing all
information with respect to (i) litigation, administrative proceedings
and other pending customer complaints relating to product performance
or resulting from the manufacture, use or sale of the product, and
(ii) campaigns or other notifications concerning products.

        4.1.7  Patents, etc.  Patents, trademarks and copyrights
which are owned by GM and which cover products and components cur-
rently manufactured by DDA at the Redford Operations are collectively
referred to hereinafter as "Intellectual Property."  Patents listed on
Exhibit 4.1.7 (A) constitute all of the patents owned by GM which
relate primarily to Licensed Engines and their manufacture.  All trade
secrets, know-how, formulae, manufacturing processes, technical
documentation, product drawings, tool drawings, material specifica-
tion, engineering specifications, and other technical information used
or necessary to manufacture and market the products and components
currently manufactured or marketed by DDA at the Redford Operations
are collectively referred to herein as "Technical Information."  GM
warrants that it has the right to transfer the Intellectual Property
and Technical Information referred to in Section 1.1.3 (A) and (C),
and has the right to grant DD the licenses referred to in Section
1.1.3 (B) and (D) of this Agreement.  None of the Intellectual Pro-
perty or Technical Information has been knowingly misappropriated from
any third person.  GM has received no claim or notice that the use of
the Intellectual Property or the Technical Information infringes or
results in a product that infringes upon the rights of any other

- 19 -

person or entity and GM has no knowledge of any such infringement
Except as listed in Exhibit 4.1.7 (B), GM has no knowledge of any
infringement or improper use by any third party of the Intellectual
Property or the Technical Information, and there is no action or
proceeding instituted by or on behalf of GM in which an act con-
stituting an infringement of any of the rights to the Intellectual
Property and Technical Information was alleged to have been committed
by a third party  GM has not knowingly taken or omitted to take any
action which would have the effect of waiving any rights to the
Intellectual Property and Technical Information, the waiver of which
would adversely affect the conduct of the Redford Operations or the
use of the Assets or allow any third party to compete more effectively
with the Redford Operations than it now does.

4.1.8.  Compliance with Other Instruments and Laws.  GM is
not in violation of any term of any charter, by-law, mortgage, inden-
ture, instrument or agreement or of any judgment, decree or order
which names GM or in violation of any term of any other instrument,
contract or agreement, which violation might adversely affect the
assets or the Redford Operations. To the best of GM's knowledge,
except as provided in Section 4.1.6. above, the Redford Operations and
the Assets are in compliance in all material respects with all stat-
utes, laws, ordinances, rules, governmental regulations, permits,
concessions, grants, franchises, licenses or other governmental
authorizations and approvals applicable to the Assets or the conduct
of the Redford Operations. All permits, concessions, grants, fran-
chises, licenses and other governmental authorizations and approvals
necessary for the conduct of the Redford Operations (all of which are
listed in Exhibit 1.1.4) and the ownership and operation of the Assets
have been duly obtained and, except as indicated on Exhibit 1.1.4, are
in full force and effect, and there are no proceedings pending or, to
the best of GM's knowledge, threatened which may result in the revoca-
tion, cancellation or suspension, or any materially adverse modifica-
tion, of any such permit, concession, grant, franchise, license or
other governmental authorization or approval. The execution, delivery

- 20 -

and performance of and compliance with this Agreement and the Ancillary Agreements will not result in any such violation or be in conflict with or constitute a default under any of the foregoing (including, but not limited to, any contract, agreement, commitment, undertaking or understanding with respect to the contemplated, proposed or pending sale of all or a portion of the Assets other than in the ordinary course of business to any person other than DD or any of its successors or assigns), or result in the creation of any mortgage, pledge, lien, charge or encumbrance upon any of the Assets or the loss of any license, governmental authorization, approval or other contractual right with respect to the Assets held by GM pursuant to any of the foregoing or result in any such revocation, cancellation, suspension or modification.

4.1.9.    <u>Brokers, etc</u>    GM has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby other than Salomon Brothers Inc, whose fees and expenses will be paid by GM.

4.1.10.    <u>Consents</u>.    No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental or judicial authority or any other third party is required in connection with the valid execution, delivery and performance of this Agreement and the Ancillary Agreements by GM or the consummation by GM of the transactions contemplated hereby and thereby, except for (i) the consents set forth in Exhibit 4.1.10 and (ii) the approval required under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended (the "HSR Act").

4.1.11.    <u>Financial Statements and Information</u>.    GM has delivered to DD copies of the August 31, 1987 Statement of Net Assets and the balance sheet information, which are attached hereto as Exhibit 4.1.11. All such financial statements have been prepared in accordance with the accounting principles described in the notes

thereto consistently applied throughout the periods indicated except
as set forth in the notes thereto.  Such balance sheet information
present fairly the net asset position of the Redford Operations at the
dates and for the periods indicated, except as shown in the notes
thereto.  The assets shown on the August 31, 1987 Statement of Net
Assets and to be reflected on the Closing Statement of Net Assets do
not and will not include any of the assets referred to in Section 1.2.

    4.1.12.  <u>Absence of Certain Changes</u>  Except as shown in
Exhibit 4.1.12, since January 1, 1987, GM has not, with respect to the
Redford Operations (i) incurred any material obligations or liabil-
ities, whether absolute, accrued, contingent or otherwise (including,
without limitation, liabilities as guarantor or otherwise with respect
to obligations of others), or incurred any obligations or liabilities
other than in the ordinary course of business, (ii) mortgaged, pledged
or subjected to any lien, lease, security interest or other charge or
encumbrance any of the Assets, tangible or intangible, (iii) acquired
or disposed of material assets or properties, or entered into any
agreement or other arrangement for any such acquisition or dispo-
sition, or acquired or disposed, or entered into any agreement to
acquire or dispose of any material assets or properties, other than in
the ordinary course of business or as shown in such Exhibit, (iv)
increased the wages, salaries, compensation, pension or other benefits
payable to any salaried employee of the Redford Operations other than
in the ordinary course of business, (v) forgiven or cancelled any
debts or claims or waived any rights of a material value in the
aggregate other than in the normal operation of its credit policies,
(vi) entered into any transaction other than in the ordinary course of
business, (vii) granted any rights or licenses under any of its
patents used in the Redford Operations or entered into any licensing
or distributorship arrangements, (viii) suffered any change other than
changes in the ordinary course of its business, none of which has had,
in any case or in aggregate, a material adverse effect on the Assets
or the Redford Operations, (ix) suffered any damage, destruction or
loss, in any case or in the aggregate (whether or not covered by

- 22 -

insurance), having a material adverse effect on the Assets or the
Redford Operations, (x) suffered any strike, (xi) suffered any other
labor trouble having a material adverse effect on the Assets or the
Redford Operations or (xii) suffered any loss of employees or custom-
ers having a material adverse effect on the Assets or the Redford
Operations.

4.1 13. Contracts.

A.    Exhibit 1.1.2 (B) is a list of all material
written agreements, contracts and commitments to which GM or any of
its Affiliates is a party or by which any of them or any of their
properties is bound that relate to the Assets or the Redford Opera-
tions (including, without limitation, employment and consulting
agreements, labor agreements, non-patent license and distribution
agreements and arrangements among GM, its Affiliates and intra-
divisional DDA facilities), other than accounts receivable of GM
arising from the sale of products in the ordinary course of business
and other than agreements, contracts and commitments for the purchase
or sale of goods or services in the ordinary course of business, no
one of which (or no related set or number of which) will involve the
expenditure after the date hereof by any party thereto of more than
$100,000.  The agreements, contracts commitments listed on Exhibit
1.1.2 (B) are hereinafter collectively referred to as the "Contracts."
GM has furnished to DD access to copies of the Contracts, and afforded
them the opportunity to inspect them.

B.    Each of the Contracts is valid and in full force
and effect and there is no material default thereunder or claim of
default and there has not occurred any event which, with the passage
of time or the giving of notice (or both), would constitute a material
default thereunder, whether on the part of GM or (to the best of GM's
knowledge) on the part of any other party thereto.  There are no
material unresolved disputes under any of the Contracts other than as
disclosed in Exhibit 1.1.2 (B).

- 23 -

C   Exhibit 1.1.2 (B) lists all collective bargaining
agreements with any labor union or other representative of employees
connected with the Redford Operations (including local agreements,
amendments, supplements, letters and memoranda of understanding of any
kind).  GM is in compliance in all material respects with each collec-
tive bargaining agreement listed on Exhibit 1.1.2 (B).  Except as
listed on Exhibit 1.1.2 (C), no collective bargaining agreement is
currently being negotiated by GM with respect to the employees of the
Redford Operations.

4.1.14.   Regulatory Matters.  Except as described in
Exhibit 4.1.14, GM has filed or otherwise provided all reports, data,
other information and applications with respect to the products
manufactured at the Redford Operations required to be filed with or
otherwise provided to all federal, state or local governmental author-
ities with jurisdiction over the manufacture, use or sale of such
products, and all regulatory approvals in respect thereof are in full
force and effect on the date hereof.  The manufacture, use and sale by
GM of each of such products are in accordance with the methods stated
in applicable Regulatory Materials (as hereinafter defined) and comply
with all applicable laws and published governmental rules, regulations
and interpretations thereof as in effect on the date hereof and with
any unpublished rule, regulation or interpretation thereof of which GM
has notice, and the methods of quality control employed by GM are
sufficient to insure such compliance  For the purposes of this
Section 4.1.14, the term "Regulatory Materials" with respect to any
product shall mean all applications, notices, data and other informa-
tion filed with any such governmental authority.  A complete list of
all such products indicating all administrative approvals, regis-
trations, permits and applications therefor relating to such products
will be supplied to DD at the Closing.

4.1.15.  Taxes.  All taxes, assessments and other govern-
mental charges upon or relating to the Assets or the Redford Opera-
tions will have been paid in full prior to the Closing to the extent

such taxes, assessments and charges relate to the Assets or conduct of
the Redford Operations prior to the Closing   GM has not received
notice of any pending increase in the tax assessment for the Real
Property or any special assessments or other charges that may be
imposed against the Real Property.

4.1.16.   Undisclosed Liabilities, etc.  Except as specif-
ically set forth in this Section 4.1, GM has no liabilities or obliga-
tions, either accrued, absolute, contingent or otherwise, affecting,
directly or indirectly, the Assets or the Redford Operations.  The
representations and warranties contained in this Agreement and the
information contained in the Exhibits, written documents, statements,
lists, certificates and other instruments delivered by or on behalf of
GM in connection with the purchase and sale of the Assets are true and
correct in all material respects.  There is no fact known to GM which
materially adversely affects, or in the future may (so far as GM can
now reasonably foresee) materially adversely affect, the condition
(financial or other), of the Assets, business, operations or prospects
of the Redford Operations which has not been set forth herein or in
the Exhibits referred to herein.

4.1.17.   Termination of Representations and Warranties.
The representations and warranties of GM relating to the Redford
Operations made in this Agreement shall be unaffected by any inves-
tigation made by any party at any time and shall terminate one year
after the date of Closing, and thereafter shall be without force or
effect, other than the representations and warranties relating to
title to the Assets (including easements benefiting the Real Property)
and to environmental matters which shall survive.  Except as otherwise
defined herein, the term "material" or "materially" as used in this
Section 4.1 shall be construed by referring, inter alia, to the Assets
and the condition, revenues, business, operations and affairs of the
Redford Operations.

4.2.   Representations and Warranties of DD.  DD warrants and
represents to GM as follows:

- 25 -

4.2.1.    Corporate Data.  DD is a corporation duly or-
ganized, validly existing and in good standing under the laws of the
State of Delaware and has full corporate power and authority to own,
hold or lease the rights, properties and assets it will acquire, hold
or lease under the transactions contemplated by this Agreement and to
carry out the transactions contemplated by this Agreement

4.2.2.    Corporate Power; Due Authorization.  DD has full
corporate power under its charter documents and under the laws of its
jurisdiction of incorporation and other applicable laws to execute,
deliver and perform this Agreement and any Ancillary Agreement.  The
execution, delivery and performance of this Agreement and the Ancil-
lary Agreements have been fully authorized by all necessary corporate
action on the part of DD and no stockholder approval is necessary for
the consummation of the transactions contemplated hereby and thereby
This Agreement is, and the Ancillary Agreements will be when executed
and delivered, valid and legally binding obligations of DD.

4.2.3.    No Consent Required.  No consent, approval,
authorization or order of any governmental agency or body in the
United States is required for the consummation of the transactions
contemplated by this Agreement on the part of DD except as may be
required under the HSR Act.

4.3. Finder's Fee   DD has employed no finder, broker, agent or
other intermediary in connection with the negotiation or consummation
of this Agreement or any of the transactions contemplated hereby.

V.   PERSONNEL MATTERS.

5.1. Termination and Employee Information.  Immediately after the
Closing, DD shall promptly offer employment to:  (i) at least 1,122
("Minimum Salaried Employment Number") salaried employees (excluding
temporary employees) of the Redford Operations with compensation and
benefit programs in the aggregate comparable to those offered by GM
and (ii) at least 1600 ("Minimum Hourly Employment Number") hourly
employees of the Redford Operations. To the extent not all employees

accept the offer of employment, DD shall hire up to the Minimum
Salaried Employment Number from within GM, giving first consideration
to the remaining GM employees of the Redford Operations for jobs
within their qualifications and thereafter to other GM employees    If
DD, after having used its best efforts in accord with this Article 5.1
to hire the Minimum Salaried Employment Number, still is unable to do
so; then the below-described $60,000.00 payments for separated sala-
ried employees shall not apply respecting the difference between the
Minimum Salaried Employment Number and that number of salaried em-
ployees DD initially actually hires    GM has made available to DD a
true and complete list of the names and current hourly wage, monthly
salary and other compensation of all employees of the Redford Opera-
tions, together with a summary (containing estimates to the extent
necessary) of existing bonuses, additional compensation and other
benefits (whether current or deferred), if any, paid or payable to
each such person for services currently rendered, or to be rendered,
and the basis therefor.  Should the number of salaried or hourly
employees initially employed by DD in the Redford Operations decline
below the Minimum Salaried or Hourly Employment Numbers, respectively,
at any time within three years of the Closing in the case of said
salaried employees, or within two years of the Closing in the case of
said hourly employees, and should said decline result from other than
"Attrition" (defined as resulting from quit, resignation, death,
retirement, or release for cause), DD will pay to GM $60,000.00 for
each such separated salaried employee and $70,000.00 for each such
separated hourly employee.  Such declines in employment for which such
payments would be made could result from reductions in volume and/or
JOB-S events.  However, such DD payment to GM for hourly employees
shall be limited such that no further payments shall be due with
respect to any separated employee once DD's hourly employment level
first declines to 1,400    DD shall assume full financial responsibil-
ity and shall pay separation costs for all hourly employes separated
after the earlier of the date DD's hourly employment level first
declines below the 1,400 level or the date two years following the
Closing, and, accordingly, to the extent such employees receive bene-
fits under any GM Benefit Plan DD shall pay to GM annually an amount
equal to the total benefits paid such employees from the GM Benefit

- 27 -

Plans. In no event, however, shall DD be required to pay to GM under the preceeding sentence with respect to any hourly employee who is paid a duplicate benefit under any DD benefit plan. Except for such payments, DD shall have no financial responsibility for, and GM shall hold DD harmless from, any costs under any ERISA-covered employee benefit plan associated with the separation within the three year period of any salaried employee and within the two year period of any hourly employee separated until DD's hourly employment level first declines below the 1,400 employee level. ERISA-covered employee benefit plans maintained by DD shall preclude the payment of benefits thereunder to separated salaried and hourly employees who become entitled to receive separation benefits from GM during the two- and three-year periods respectively. Further, after the Closing, DD agrees that if, as of the date of Closing, certain salaried employees of the Redford Operations are placed on layoff by GM because they were not offered employment with DD, DD shall give due consideration to offering, for a period of two years from the date of Closing, employment to such employees for jobs within their qualifications first before offering employment to persons not previously employed at the Redford Operations. Nevertheless, no such laid-off employee shall have any right to employment with DD under this provision.

5.2. <u>Certain Employment Matters</u>. Except as set forth on Exhibit 5.2, GM has complied in all material respects with all applicable laws relating to the employment of labor at the Redford Operations. Except as disclosed in Exhibit 1.1.2 (B), GM is not a party to any contract with any labor organization, nor has GM agreed to recognize any union or other collective bargaining unit, nor has any union or other collective bargaining unit been certified as representing any of the employees of the Redford Operations. Except as set forth on Exhibit 5.2, GM has not experienced any strikes, work stoppages, grievance proceedings, claims of employment discrimination or unfair labor practices or other significant labor difficulties of any nature at the Redford Operations.

5.3. <u>GM Benefit Plans</u>. Except as set forth on Exhibit 5.3, GM does not maintain or sponsor, nor is it required to make any contribu-

tion to, and at no time since January 1, 1987, has it maintained,
sponsored or been required to make any contribution to, any pension,
profit-sharing, thrift or other retirement plan, medical, hospi-
talization, vision, dental, life, disability or other insurance or
benefit plan, deferred compensation, stock ownership, stock purchase,
stock option, performance share, bonus, fringe benefit, savings or
other incentive plan, severance plan or other similar plan, agreement,
arrangement or understanding on behalf of the employees of the Redford
Operations (collectively, "GM Benefit Plans"), whether or not such
plan is or is intended to be subject to the provisions of the Employee
Retirement Income Security Act of 1974, as amended ("ERISA"), or
qualified under Section 401(a) of the Internal Revenue Code of 1986,
including, without limitation, any "employee benefit plan" within the
meaning of Section 3(3) of ERISA, any "defined benefit plan" within
the meaning of Section 3(35) of ERISA or any "multiemployer plan"
within the meaning of Section 3(37) of ERISA

Each of the GM Benefit Plans has been maintained, funded and ad-
ministered in all material respects in compliance with ERISA and other
applicable laws. None of the GM Benefit Plans which are subject to
Title IV of ERISA have been terminated by the plan administrator
thereof or by the Pension Benefit Guaranty Corporation; no "pro-
ceedings" have been "instituted," within the meaning of Subtitle C of
said Title IV, to terminate any of the GM Benefit Plans; no "report-
able event," within the meaning of Section 4043 of said Subtitle C,
has occurred within the last two years with respect to any of the
Plans other than as set forth in Exhibit 5.3 hereto or as may be
caused by the consummation of the transactions contemplated hereby; no
"party in interest" or "disqualified person," within the meaning of
Section 3(14) of ERISA or Section 4975(e)(2) of the Code, respec-
tively, has engaged in any "prohibited transaction," within the
meaning of Section 406 of ERISA or Section 4975(c)(1) of the Code with
respect to any of the GM Benefit Plans; and GM has timely made or
accrued and timely paid all contributions required by the GM Benefit
Plans or under applicable law.

- 29 -

No GM Benefit Plan has incurred any "accumulated funding deficiency" within the meaning of Section 412 of the Code, and GM has made contributions to each GM Benefit Plan as required by each GM Benefit Plan or under applicable law.

Other than as set forth on Exhibit 5 3 hereto, GM is not subject to and does not contribute to any "multi-employer plan" or to any other plan which may be covered by or subject to the provisions of the Multi-Employer Pension Plan Amendment Act of 1980, as amended ("MPPAA") on behalf of any employe of its Redford Operations. Furthermore, to the best knowledge and belief of GM, there is no "withdrawal liability" (as defined in MPPAA), assessment or other similar charge, whether contingent or otherwise, for which GM may be liable or assessed.

### 5.4. Employee Benefit Obligations.

A.  Except as set forth herein, DD shall not assume or hereby become obligated to pay any debt, obligation or liability of GM regarding GM Benefit Plans, or any other employment arrangement. Notwithstanding any other provision of this Agreement, for the employees of the Redford Operations, coverage under the current GM Benefit Plans shall continue until the Closing and shall be the responsibility of GM until such date  Coverage under the GM Benefit Plans for any employee who is retired from the Redford Operations on or before the Closing, or who is on disability leave before the Closing, shall remain the responsibility of GM.  GM shall not be responsible for providing coverage under the GM Benefit Plans after the Closing to any employee who is employed in the Redford Operations or the DDA Romulus Parts Distribution Center on the Closing or who is on layoff or disability leave from such operations as of the Closing and is actively at work for DD on at least one day after the Closing (the "Transferred Employees"), except as provided in the GM Benefit Plans or by law, and except as provided in Section 5.5.C.  GM shall in

- 30 -

all events be responsible for the payment of benefits under the GM
Benefit Plans based on occurrences prior to the Closing.

Under the terms of a separate agreement to be entered into between GM
and DD no later than 60 days after the Closing, GM shall cause to be
transferred from the General Motors Retirement Program for Salaried
Employes (the "Retirement Program") to a plan designated by DD,
assets, or their cash equivalent, equal to the present value of all
"benefit commitments" (as defined in Section 4001(a)(16) of ERISA, 29
USCA § 1301(a)(16), including benefits described in Revenue Ruling
86-48) accrued under the Retirement Program to the date of Closing for
salaried employees who are Transferred Employees and at work at DD (or
on approved leave of absence or disability leave from DD) on the date
6 months from the Closing.   The present value of such benefits shall
be calculated by an actuary appointed by GM, using actuarial assump-
tions in effect for the Retirement Program on October 1, 1987, except
for the following two assumptions to which the parties have agreed:
(i) a 2.5 percent annual salary escalation for all salaried employees
who are Transferred Employees for the first seven years immediately
following the Closing and 4.0% until expected retirement as assumed by
the actuary for GM, and (ii) an interest assumption of 10 percent.

Likewise, pursuant to such separate agreement, GM shall cause to be
transferred from the General Motors Hourly-Rate Employes Pension Plan
(the "Pension Plan") to a plan designated by DD, assets, or their cash
equivalent, equal to the present value of all "Benefit commitments"
accrued under the Pension Plan to the date of Closing for hourly
employees who are Transferred Employees and at work at DD (or on
approved leave absence or disability leave from DD) on the date 6
months from the Closing, or who have been laid-off or placed in a
JOB-S bank by DD within such six month period at a time after DD's
hourly employment level has first declined below 1,400 employees,
whether such benefits are vested or not.   The present value of such
benefits shall be calculated by an actuary appointed by GM, using
actuarial assumptions in effect for the Pension Plan on October 1,

1987, except for the following two assumptions to which the parties
have agreed:  (i) the actual escalation under the current GM-UAW
national labor agreement and a 5 percent annual escalation for all
years subsequent to the expiration of said agreement in the benefits
payable to all hourly employees who are Transferred Employees until
expected retirement as assumed by the actuary for GM, and (ii) an
interest assumption of 10 percent.

A preliminary calculation of the assets to be transferred (other than
the IRC § 414(1) calculation referred to below) shall be made by GM
and provided to DD within three months following the Closing.  If DD
does not agree with the calculations made by GM, GM and DD shall
endeavor to resolve such disagreement between themselves.  If any such
disagreement cannot be resolved within four months following the
Closing, the disagreement shall be resolved by a panel of three
"enrolled actuaries" (as described in Section 3042 of ERISA), one of
whom shall be appointed by GM, one by DD, and the third by the two
actuaries first appointed.  The determination by the panel as to the
amount of assets to be transferred to the appropriate DD plan shall
not be less than the amount so calculated by the actuary appointed by
GM and shall not exceed the amount so calculated by the actuary
appointed by DD.  The decision of the panel shall be final and binding
on the parties.

If the amounts calculated to be transferred, as described above,
respecting salaried and hourly employees are more than the amounts to
be transferred as determined by GM's actuary pursuant to Section
414(1) of the Code, the Purchase Price shall be reduced by an amount
equal to the differential, but not exceeding $2 million; likewise, if
the amounts so calculated to be transferred are less than the amounts
to be transferred pursuant to Section 414(1) of the Code, the Purchase
Price shall be increased by an amount equal to differential, but not
exceeding $2 million.

GM shall cause the transfer of assets to the appropriate DD plan at a
date six months after Closing or as soon as practical thereafter.  The

amounts transferred, calculated as provided above, will bear interest
from the date of Closing to the date of transfer equal to a 10% annual
rate

Employees who separate for reasons of Attrition during the six-month
period immediately following Closing shall be entitled to pension or
retirement benefits under GM benefit plans and, DD will pay GM an
amount determined by the actuary retained on behalf the GM Plans for
the months of service and increase in final average pay, if any,
resulting from the period employed by DD.

For salaried employees who are separated by DD for reasons other than
attrition within three years of the Closing, DD shall cause the entire
amount transferred with respect to such employees to be returned to
the Retirement Program with interest at a 10% annual rate.  DD shall
retain whatever liability exists under the Retirement Plan to be
established by DD for its salaried employees for DD service of such
employees and shall hold GM harmless against such liability.

For hourly employees who are separated by DD for reasons other than
attrition until the earlier of two years immediately following Closing
or until such time as DD's hourly employment level first declines
below 1,400 employees, DD shall cause the entire amount transferred
with respect to such employees to be returned to the Pension Plan with
interest at a 10% annual rate.  In addition, DD shall cause to be
transferred from the Pension Plan to be established by DD for its
hourly employes to the GM Pension Plan an additional amount equal to
the present value of all benefit commitments accrued with respect to
service for such employees while employed by DD, calculated by DD's
actuary in the identical manner as described above for the transfer of
assets from the Pension Plan, but without respect to the annual
benefit escalation.

It is the intention of DD and GM to accomplish a "transfer of assets
and liabilities" as defined in United States Treasury Regulation
§1.414(1)-1 or a successor provision thereto.  DD agrees under the
retirement plan and pension plan to be established for salaried and

- 33 -

hourly employes to provide, with respect to those employees on whose behalf assets are transferred, the benefit commitments earned as of the Closing by such employees under the Retirement Program and Pension Plan under the same formula as exists at GM and to vest such benefits to the extent required by the Retirement Program and Pension Plan. With respect to such salaried employees, the employee's final average pay at DD shall be the basis of calculating the benefits with respect to the employee's years of GM service under the retirement plan to be established by DD for salaried employees. Further with respect to those employees on whose behalf assets are transferred to a DD plan, service with GM prior to the Closing shall be treated as service for vesting purposes under the retirement plan and pension plan established by DD for the benefit of such employees.

No assets shall be transferred to a DD plan prior to the receipt of an opinion of counsel, acceptable to GM, that the DD plan to which such assets are to be transferred will meet the requirements of Section 401(a) of the Code. DD agrees to apply for a determination from the Internal Revenue Service that each plan established by DD is such a qualified plan as soon as practicable and will take such action, including any retroactive action, as is or may be necessary to obtain and maintain a favorable determination from the Internal Revenue Service. DD and GM shall prepare and cause to be filed with the Internal Revenue Service a Form (or Forms) 5310, together with a supporting actuarial certificate, at least 30 days prior to the transfer of assets from the GM plans to the DD plans.

B. Notwithstanding anything to the contrary in this Agreement, GM agrees to indemnify and hold DD harmless from and against any liabilities or obligations, including attorneys' fees and disbursements, resulting from (A) any and all claims for life insurance, disability and medical benefits based on occurrences before the Closing (including claims for continuing treatment in respect of any accident or illness for which coverage was provided), (B) any and all other welfare and fringe benefits claims relating to the period prior to the Closing, (C) any and all life insurance, disability, severance (including severance claims based upon the transactions contemplated

- 34 -

hereunder), medical or other welfare and fringe benefits claims of any
individual (or his covered dependents) who retired from or otherwise
ceased employment with the Redford Operations on or before the Closing
or who died before the Closing, (D) any and all claims (including
third party claims) under or with respect to any pension or retirement
plan or any plan of deferred compensation which is one of the GM
Benefit Plans based on occurrences prior to Closing, (E) any and all
GM benefit costs (including without limitation post-retirement medical
coverage and other benefits) incurred as a result of the termination
prior to Closing (and, to the extent provided in Section 5 1, after
the Closing) of salaried or hourly personnel employed in, or on leave
from, the Redford Operations immediately prior to Closing, (F) any and
all severance pay (including severance claims based upon the trans-
actions contemplated hereunder and job bank costs) and wages, sal--
aries, commissions, vacation payments which are made in 1987 and in
prior years, bonuses, and other benefits and compensation accruing
prior to Closing (and, to the extent provided in Section 5.1, after
the Closing) due to all employees of the Redford Operations employed
in the Redford Operations immediately prior to the Closing, (G) any
and all claims for worker's compensation payable with respect to
incidents occurring prior to Closing and (H) any and all claims of a
violation of any law relating to the employment of labor at the
Redford Operations by GM based on occurrences on or before the Clos--
ing, in each case whether such claims are asserted before, on or after
the Closing.

      C.   For the purpose of coordination of benefits
provisions for health care coverages, for occurrences after the
Closing, DD insurance carrier shall in all cases where there is dupli-
cative insurance coverage (including post-retirement health care
coverages) be the primary carrier. This provision applies to occur-
rences from and after the first day that an employee is actively at
work for DD. If DD's insurance carrier refuses to honor the foregoing
agreement, DD agrees to indemnify and hold GM harmless from any
increased cost incurred by GM by reason of such refusal. All

Transferred Employes who at the time of the Closing are eligible under then current GM policies for post-retirement healthcare, will have the cost of said post-retirement healthcare paid by GM, reduced by any payments for said healthcare provided for and due under any DD benefit plan

D. Notwithstanding anything to the contrary in this Agreement (other than subsection (E) of Section 5 4 B), DD agrees to indemnify and hold GM harmless from and against any costs, liabilities or obligations, including attorneys' fees and disbursements, resulting from (A) any and all claims for life insurance, disability or medical benefits based on coverage provided to the Transferred Employees under any plan maintained or sponsored by DD after the Closing, (B) any and all other welfare and fringe benefits claims based on coverage provided to Transferred Employees under any such plan, and (C) any and all claims under or with respect to any pension or retirement plan or any plan of deferred compensation which DD sponsors, contributes to or otherwise participates in on or after the Closing.

E. Effective as of the Closing, benefits under the GM Benefit Plans shall cease accruing under the terms thereof with respect to the Transferred Employes.

F. Notwithstanding anything to the contrary in this Agreement, within thirty business days after the Closing, GM will pay to each Transferred Employee an amount equal to all wages, salaries, commissions (but excluding vacation payments to be made in 1988) accrued to such Transferred Employee through the Closing. For hourly employees, the liability for vacation payments to be made in 1988 will be apportioned between the parties based on the amount accrued on the books of DDA-Redford as of Closing. For salaried employees only, if the Closing occurs after January 1, 1988, the liability for vacation payments to be made in 1988 will be apportioned based on the actual number of vacation days taken in 1988 prior to Closing.

- 36 -

5.5  Employee Information; Cooperation in
Establishing DD Benefit Plans

A.   GM will provide DD, in a timely manner, pertinent
information with respect to an employee's employment with GM and
compensation from GM, and rights and benefits under any GM Benefit
Plan

B.   GM and DD will each provide the other, in a timely
manner, any relevant information with respect to an employee's employ-
ment with and compensation from GM or DD, or rights or benefits under
any employee benefit plan which either party may reasonably request.

C   DD will use its best efforts to establish a
medical plan for the Transferred Employees on a timely basis so that
such plan will be in effect on the date of Closing.  If, despite such
best efforts, DD is unable to arrange for the necessary insurance or
other coverages required by such plan, GM shall permit such Trans-
ferred Employees to remain covered by the appropriate GM plan for a
period not to exceed 90 days from the date of Closing, subject to DD
reimbursing GM's full cost as calculated by GM.

5.6.  Wrongful Acts.   Notwithstanding anything to the contrary in
this Agreement, GM shall not be liable for loss, cost, damage or
expense arising from a wrongful act by DD with respect to any em-
ployee.  Notwithstanding anything to the contrary in this Agreement,
DD shall not be liable for any loss, cost, damage or expense arising
from a wrongful act by GM with respect to any employee of the Redford
Operations.

VI.  PARTICULAR COVENANTS OF GM AND DD.

6.1.   Technical and Other Assistance

A.   GM and DD shall each, at their own expense, render
to the other transitional assistance to assist each other in the
transition of ownership of the Redford Operations from GM to DD.

- 37 -

B.    Representatives of GM and DD shall meet periodi-
cally to determine in good faith the appropriate method of and cost
for ongoing technical assistance to enable DD to conduct the Redford
Operations on an ongoing basis

C.    DD shall from time to time at the reasonable
request of GM, cooperate with GM in providing GM, to the extent
possible through DD employees formerly employed by GM in the Redford
Operations, with technical assistance and information in respect to
claims brought against GM involving products manufactured or assembled
at the Redford Operations, including consultation and the appearances
of such persons on a reasonable basis as expert or fact witnesses in
trials or administrative proceedings.  GM shall reimburse DD full cost
of such services.

D.    GM will make available for a period of up to one
year after the Closing, the services of up to 10 salaried employes to
be selected by DD, subject to the consent of GM not unreasonably
withheld, within 10 days of Closing, who are not expected to become
employes of DD but whose services are deemed to be essential for the
transition to new ownership.  DD shall reimburse GM for its cost in
providing such services.  In the event any of said 10 employes wish to
pursue career opportunities at GM during said year, DD will use its
best efforts to replace and release them.

E.    GM will make available for a period of up to four
years after Closing the use of up to 6 transient emissions test cells
at the Romulus Engineering Center or at an equivalent proximate
location.  The charge to DD for such use will be guided by outside
competitive bids for comparable levels of service and will take into
account the direct cost associated with the cells and the reasonable
allocable cost of the maintenance of such cells, and will be inclusive
of the necessary services of GM personnel or others to operate the
units.

- 38 -

6.2. <u>Operation of Redford Operations</u>    Except as otherwise
provided herein, until the Closing, GM will carry on the Redford
Operations in substantially the same manner as heretofore, cause the
Assets to be maintained and kept in normal condition, repair and
working order as on the date of this Agreement (wear and tear except-
ed), perform in all material respects all of its obligations under all
Contracts and not amend, alter or modify in any material respect any
provision of any such Contract, keep in full force and effect each and
every Contract and insurance comparable in amount and scope to cover-
age maintained by it on the date of this Agreement, use its best
efforts to maintain and preserve its business organization intact,
retain its present employees so that they will be available after the
Closing, maintain the goodwill of the business, promptly advise DD of
any material and adverse change in the business, condition (financial
or other), Assets or prospects of the Redford Operations, not take any
action that would render any of GM's representations and warranties
hereunder inaccurate as of the date hereof or the Closing, and without
the consent of DD, not enter into any material contract, commitment or
transaction relating to the Assets or the Redford Operations.

6.3. <u>Union Agreement</u>.    DD shall assume the National Collective
Bargaining Agreement covering the hourly employees at the Redford
facility in force at the Closing.

6.4. <u>Environmental Assessment</u>.    Before the Closing, GM shall, at
its sole expense, conduct an environmental assessment of the Redford
Operations, the nature and scope of which will be determined by GM.
The results of this assessment shall be disclosed to DD as soon as
available but, in no event, later than the Closing.

VII. <u>CERTAIN ADDITIONAL COVENANTS</u>.

7.1. <u>Rights of Inspection</u>.    GM shall afford to the officers,
attorneys, accountants or other authorized representative of DD
reasonable access to all of the Assets and books and records of GM
relating to the Assets and the Redford Operations, including those

- 39 -

items listed in Exhibit 1.1 2(A), in order to afford DD full oppor-
tunity to make such review, examination and investigation of the
operations as DD shall desire to make, and DD shall be permitted to
take extracts from, or to make copies of such books and records as may
be reasonably necessary, including but not limited to employee per-
sonnel and medical records; and GM shall furnish or cause to be
furnished to DD such financial and operating data and other informa-
tion relating to the Assets and the Redford Operations as DD may
reasonably request.  DD shall keep confidential all proprietary
information to which it is given access pursuant to this Section 7.1,
as provided in Section 7.2.

7.2.  Confidentiality of Information.  All information disclosed
heretofore or hereafter by GM to DD in connection with this Agreement,
and all DDA information in the possession of DD relating to DDA
products other than those manufactured or assembled at the Redford
Operations shall be kept confidential by DD, and shall not be used
otherwise than by DD in connection with this Agreement except to the
extent it was known when received or as it is or as it becomes law-
fully obtainable from other sources, or to the extent such duty as to
confidentiality and non-use is waived, or except as may be required by
court order or any governmental agency.  Such obligation as to confi-
dentiality and non-use shall cease upon Closing.  In the event the
parties fail to close, DD shall use its best efforts to return to GM
all documents (and reproductions thereof), received from GM (and, in
the case of reproductions, all such reproductions made by DD).

7.3    Non-Solicitation of Employees.  For a period of two years
after the date of the Closing, GM will not, and will cause its Affili-
ates not to, for any reason, directly or indirectly, for themselves or
for any other person, solicit for employment any person who is em-
ployed by GM prior to the Closing and who is employed by DD commencing
on the Closing, provided that the foregoing restriction shall not
apply to any employee employed by GM commencing after the Closing
after his employment with DD has terminated (other than as a result of
a violation of this Section 7.3).

- 40 -

7.4. <u>Option to Purchase Diesel Fuel Injector Assets</u>

7.4.1.    Effective at the Closing, GM hereby grants DD the
right and option, exercisable by giving written notice at any time
within one year of the Closing, to purchase GM's business and assets
then utilized by its Rochester Products Division for the production of
unit diesel fuel injectors ("Licensed Products")    GM shall operate
the business subject to the option only in the ordinary course during
the period of the option.    Such sale shall be made pursuant to an
agreement to be negotiated on substantially the same terms and con-
ditions, as set forth in this Agreement.    The purchase price for
Licensed Products shall be at the net book value thereof, and the
Closing upon such purchase shall take place no later than 90 days
after notice of exercise is given.

7.4.2.    If said option, provided for in Article 7.4.1,
above, is exercised, DD shall, for a period of up to three years after
the Closing on the purchase under said option, supply GM with Licensed
Products under terms and conditions similar to those provided for in
the Requirements Contract between GM and DD.

7.4.3.    <u>Patents and Technical Information</u>.    For purposes
of this section, "Technical Information" shall mean all trade secrets,
know-how, formulae, manufacturing processes, technical documentation,
product drawings, tool drawings, material specifications, engineering
specifications, and other technical information used or necessary to
manufacture and market the Licensed Products, and "Patent Rights"
shall mean patents, patent applications, inventions and discoveries.

Upon the exercise of the option granted to DD herein, GM shall
assign and grant to DD:

A.    All GM Patent Rights which relate primarily to
Licensed Products and their manufacture; provided, however, that GM
shall retain a non-exclusive, royalty-free and irrevocable license

- 41 -

under such assigned Patent Rights for all purposes other than to
license others to, or to itself, make, have made, use, lease and sell
Licensed Products.

B.   A non-exclusive, royalty-free and irrevocable
license under all GM Patent Rights which relate, but not primarily, to
licensed Products and their manufacture to make, have made, use, lease
and sell Licensed Products and any other diesel fuel injectors devel-
oped or otherwise acquired by DD. Unless otherwise agreed to by GM in
writing, the license granted by this clause shall be sublicensable
only as part of a license to make, have made, use, lease and/or sell
diesel fuel injectors manufactured by or for DD prior to or at the
time such sublicense is granted.

C   All GM Technical Information currently in the
files of or available to RPD and DDA which relates primarily to
Licensed Products and their manufacture; provided, however, that GM
may retain copies of such Technical Information and shall retain a
non-exclusive, royalty-free and irrevocable license to use such
Technical Information in any way for all purposes other than to
license others to, or to itself, make, have made, use, lease and sell
Licensed Products.

D.   A non-exclusive, royalty-free and irrevocable
license under all GM Technical Information currently in the files of
or available to RPD and DDA which relates, but not primarily, to
Licensed Products and their manufacture to use such licensed Technical
Information to make, have made, use, lease and sell Licensed Products
and any other diesel fuel injectors developed or otherwise acquired by
DD. Unless otherwise agreed to by GM in writing, the license granted
by this clause shall be sublicensable only as part of a license to
make, have made, use and/or sell diesel fuel injectors manufactured by
or for DD prior to or at the time such sublicense is granted.

E.   GM agrees that for a period of 4 years after the
exercise of the option provided for in this agreement, GM will not

- 42 -

compete with DD or its successors in the manufacture, leasing or sale
of Licensed Products and will not license others to make, have made,
use, lease or sell unit diesel fuel injectors.

7.5  Further Assurances.  At the Closing and from time to time
after the Closing, for no further consideration, the parties hereto
shall perform all such other action and shall execute, acknowledge and
deliver all such assignments, transfers, consents and other documents
as the other party or its counsel may reasonably request to carry out
the intent of this Agreement.

7.6   In support of the data processing and computer-related
costs to be incurred by DD pursuant to its Agreement for Data Pro-
cessing Services with Electronic Data Systems Corporation ("EDS"), GM
will agree to pay EDS for a period of twenty-four months beginning on
January 1, 1988 the difference between the amount of DD's actual
annual data processing expense ($29.8 million) and $15 million.
During the twenty-four month period, DD will make every effort to
reduce said GM data processing payments.  Any additional services or
changes in current services will constitute a new DD initiative and
not be covered by the GM subsidy.  If during this period DD's total
actual data processing costs fall below $15 million, GM and DD will
share any of the additional cost savings on a 50/50 basis.

7.7  DD will take the necessary actions to move its engineering
staff from the Romulus Engineering Center on or before March 31, 1988.

VIII.    CONDITIONS TO CLOSING.

8.1. Conditions to Obligations of DD.  The obligation of DD to
consummate the transactions contemplated by this Agreement shall be
subject to the fulfillment at or prior to the Closing of the following
conditions (any one or more of which may be waived in whole or in part
by DD):

- 43 -

8.1.1.    <u>Legal Opinion</u>    DD shall have received from
Harry J. Pearce, General Counsel to GM, an opinion dated the date of
the Closing and in form and substance satisfactory to DD substantially
to the effect of Sections 4.1.1 , 4.1.2 and 4.1.3.

8.1.2.    <u>Accuracy of Representations and Warranties;</u>
<u>Performance of Covenants</u>.  The representations and warranties of GM
set forth in this Agreement or in any certificate or document called
for in this Agreement shall be true and correct in all material
respects as made, both on the date hereof and at and as of the Closing
(as though such representations and warranties were made anew), except
with respect to the effect of transactions permitted by the provisions
of this Agreement, and all agreements and transactions contemplated
hereby and to be performed by GM on or before the Closing shall have
been duly performed.  The survey referred to in Section 1.1.1 shall
reflect that all structures and improvements located on the Real
Property and all machinery and equipment are located fully within the
lines of record title in accordance with applicable set-back require-
ments; and Exhibit 4.1.4 shall not reflect the existence of any
easements or other restrictions of record (not removed in the Title
Policy being issued) which would materially limit the use of the Real
Property in the Redford Operations as now conducted.  DD has entered
into this Agreement expressly in reliance upon such representations
and warranties.

8.1.3.    <u>Conveyancing Documents</u>.  There shall have been
delivered to DD by GM such bills of sale, assignments, deeds with
covenants against the acts of GM only and other good and sufficient
instruments of transfer (the "Transfer Documents") conveying and
transferring to DD title as provided in this Agreement to the Assets
as DD may reasonably request.

8.1.4.    <u>Title Policy</u>.  There shall have been delivered to
DD by GM an owners policy of title insurance, with a zoning endorse-
ment, without standard exceptions in the amount of the Book Value of
the Real Property as of December 31, 1987, issued by Safeco Title

- 44 -

Insurance Company insuring DD's fee simple title to the Real Property, subject only to the Permitted Encumbrances. The amount of such Title Policy shall be increased at GM's expense to an amount equal to the allocable value of the Real Property determined pursuant to Section 2.4.

8.1.5.    <u>Execution of Ancillary Agreements</u>. Each of the following agreements (the "Ancillary Agreements") shall have been executed and delivered to DD:

A.    Lease Agreement relating to Series 60 Engines in substantially the form of Exhibit 8.1.5 (A) hereto.

B.    Lease Agreement relating to the Parts Distribution Center in substantially the form of Exhibit 8.1.5 (B) hereto.

C.    Agreement for Data Processing Services in substantially the form of Exhibit 8.1.5 (C) hereto.

D.    Indemnification Agreement in substantially the form of Exhibit 8.1.5 (D) hereto.

E.    Requirements Contract in substantially the form of Exhibit 8.1.5 (E) hereto.

F.    Distribution Agreements relating to 6.2 and 8.2 liter engines in substantially the form of Exhibits 8.1.5 (F)(i) and 8.1.5 (F)(ii), respectively, hereto.

G.    International Distribution Agreement in substantially the form of Exhibit 8.1.5 (G) hereto.

H.    Product Responsibility Agreement in substantially the form of Exhibit 8.1.5 (H) hereto.

8.1.6.    <u>Officer's Certificate</u>    There shall have been delivered to DD appropriate certificates dated the Closing and signed

- 45 -

by an authorized officer of GM which evidence the authorization of the
execution and delivery of this Agreement and the Ancillary Agreements
and as to fulfillment of the conditions specified in Section 8.1.2

8.1.7. No Suits  No suit, action or other proceeding or
investigation shall be threatened or pending before any court or
governmental agency in which it is sought to restrain or prohibit or
to obtain material damages or other material relief in connection with
this Agreement or the consummation of the transactions contemplated
hereby or which is likely to affect materially the value or utility of
the Assets or the Redford Operations.

8.1.8  Consents to Assignment of Certain Contracts
Subject to Section 1.4.1, GM shall have obtained consents to the
assignment and transfer to DD of GM's rights and obligations under all
agreements, contracts, commitments, licenses and permits on Exhibit
1.1.4 and those identified by a cross on Exhibit 1.1.2 (B).

8.1.9. HSR Act.  All filings, if any, required under the
HSR Act to be made in connection with the transactions contemplated by
this Agreement shall have been made, the waiting period under such Act
shall have expired and no conditions to the transactions contemplated
by this Agreement shall have been imposed or proposed by any federal
governmental agency.

8.1.10. Satisfactory Documents.  All proceedings in con-
nection with the transactions contemplated hereby and all documents
and instruments incident to such transactions shall be reasonably
satisfactory in substance and form to DD and its counsel, and DD and
its counsel shall have received all such counterpart originals or
certified or other copies of such documents as DD or its counsel may
reasonably request.

8.2. Conditions to Obligations of GM.  The obligation of GM to
consummate the transactions contemplated by this Agreement shall be

subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by GM):

8.2.1.    Legal Opinion.   GM shall have received from special counsel to DD, an opinion dated the Closing and in form and substance satisfactory to GM substantially to the effect of Sections - 4.2.1., 4.2.2 and 4.2.3.

8.2.2.    Accuracy of Representations and Warranties; Performance of Covenants.   The representations and warranties of DD contained in this Agreement or in any certificate or document called for in this Agreement shall be true and correct in all material respects as made, both on the date hereof and at and as of the Closing (as though such representations were made anew), except with respect to the effect of transactions permitted by the provisions of this Agreement, and all agreements and transactions contemplated hereby and to be performed by DD on or before the Closing shall have been duly performed.  GM entered into this Agreement expressly in reliance upon such representations and warranties.

8.2.3.    Officer's Certificate   There shall have been delivered to GM appropriate certificates dated the Closing and signed by the President or any Vice President of DD which evidence the authorization of the execution and delivery of this Agreement and the Ancillary Agreements and as to fulfillment of the conditions specified in Section 8.2.2.

8.2.4.  Execution of Agreements   Each of the following Agreements shall have been executed and delivered to GM:

A.  Lease Agreement relating to Series 60 Engines in substantially the form of Exhibit 8.1.5 (A) hereto.

B.  Lease Agreement relating to the Parts Distribution Center in substantially the form of Exhibit 8.1.5 (B) hereto.

- 47 -

C.   Assumption Agreement substantially in the form of Exhibit 3.1 hereto.

D.   Indemnification Agreement in substantially the form of Exhibit 8.1.5 (D) hereto.

E.   Requirements Contract in substantially the form of Exhibit 8.1.5 (E) hereto.

F.   Distribution Agreements relating to 6.2 and 8.2 liter engines in substantially the form of Exhibits 8.1.5 (F)(i) and 8.1.5 (F)(ii), respectively, hereto.

G.   International Distribution Agreement in substantially the form of Exhibit 8.1.5 (G) hereto.

H.   Product Responsibility Agreement in substantially the form of Exhibit 8.1.5 (H) hereto.

IX.  CLOSING.

9.1. The Closing. The closing (the "Closing") of the transactions contemplated hereby shall take place at the GM Legal Staff offices in Detroit, Michigan, at 10:00 a.m. on December 31, 1987, or on such other date or at such other time as the parties may agree (the actual date of the Closing being referred to herein as the "Closing Date"); the Closing to be effective as of the close of business on the Closing Date.

9.2. Termination. This Agreement may be terminated unilaterally by either party, without any further cause, if the Closing does not occur on or prior to March 31, 1988 for any reason other than its own failure to meet conditions or obligations imposed on it herein, or, at any time prior to the Closing:

(A)  by mutual agreement of GM and DD;

- 48 -

(B) by DD, if there has been a material violation or breach by GM of any of the agreements, representations or warranties contained in this Agreement which has not been waived in writing or if there has been a material failure of satisfaction of a condition to the obligations of DD which has not been waived in writing; and

(C) by GM, if there has been a material violation or breach by DD of any of the agreements, representations or warranties contained in this Agreement which has not been waived in writing or if there has been a material failure of satisfaction of a condition to the obligations of GM hereunder which has not been waived in writing

In the event of termination of this Agreement by either GM or DD as provided above, this Agreement shall forthwith become void. Notwithstanding the foregoing, termination of this Agreement pursuant to this Section 9.2 shall not in any way limit or restrict the rights and remedies of any party hereto against any other party hereto which has violated or breached any of the representations, warranties, agreements or other provisions of this Agreement prior to termination hereof.

9.3. GM's Obligations. At the Closing, GM shall deliver to DD the following, at the expense of GM and in proper form for recording where appropriate:

9.3.1. Conveyancing Documents. The Transfer Documents with respect to the Real Property executed and acknowledged in accordance with Section 8.1.3.

9.3.2. Assignments and Consents to Assignment. Executed assignments and consents to assignment for the permits and agreements to be acquired by DD pursuant to Article I.

9.3.3. Other Transfer Documents. All other appropriate Transfer Documents necessary to transfer to DD such title to the Assets as is warranted by GM herein.

- 49 -

9.3.4    Receipts.  Appropriate receipts

9.3.5.    Title Policy.  A "marked up" copy of the Commitment for Title Insurance issued by Safeco Title Insurance Company which shall insure the Real Property to be subject only to those matters permitted hereunder and shall expressly insure over matters arising during the "Gap" which exists between the effective date of the commitment and the date of Closing.  The title policy, as required by Section 8.1.4, with respect to the Real Property shall be delivered to DD after Closing as soon as practical after the real estate deeds described in Section 8.1.3 are recorded.

9.3.6.    Executed Ancillary Agreements.  The Ancillary Agreements as required by Section 8.1.5.

9.3.7.    Other.  All other documents and papers required by Article VIII hereof as conditions to Closing

9.4.  DD's Obligations.  At the Closing, DD shall deliver to GM, at the expense of DD:

9.4.1.    Executed Agreements  The executed Agreements as required by Section 8.2.4.

9.4.2.    Closing Payment.  The payment required by Section 2.2 at the Closing.

9.4.3.    Other.  All other documents and papers required by Article VIII hereof as conditions to Closing.

X.  INDEMNIFICATION.

10.1.    Indemnification  From and after the Closing, GM shall indemnify, defend and hold harmless DD, and DD shall indemnify, defend and hold harmless GM pursuant to the Indemnification Agreement attached hereto as Exhibit 8.1.5 (D).

- 50 -

XI  MISCELLANEOUS.

11.1    Waiver of Compliance with Bulk Sales Laws and Hold
Harmless Agreement.  DD hereby waives compliance by GM with the
provisions of the Bulk Sales Law of any state or foreign jurisdiction
and GM agrees to indemnify DD against and hold DD harmless from any
and all claims, demands, liabilities, and obligations arising out of
the failure or alleged failure of GM to comply with any such law in
respect of the sale of the Assets and the Redford Operations to DD.

11.2.    Notices.  All notices, requests, consents or other
communications permitted or required under this Agreement or the
Components Supply Agreement shall be in writing and shall be deemed to
have been given when addressed:

        If to GM -    Treasurer
                      General Motors Corporation
                      767 Fifth Avenue
                      New York, New York 10153

        If to DD -    Detroit Diesel Corporation
                      13400 West Outer Drive
                      Detroit, Michigan  48239-4001
                      Attention:  Chairman of the Board

provided, however, if either party shall have designated a different
addressee by notice, then to the last addressee so designated.

11.3.    Assignment.  This Agreement shall be binding and inure to
the benefit of the successors and assigns of each of the parties
hereto, but no rights, obligations, duties or liabilities of either
party  may be assigned without the prior written consent of the other;
provided, however, that DD shall be entitled, without the consent of
GM, to nominate one (1) or more of its wholly-owned Subsidiaries to
receive title to or hold any of the Assets, including the Real
Property, provided that any such Subsidiary shall have all the rights
and be bound by all like obligations of DD attaching to the ownership
of such Assets hereunder and that DD shall remain fully responsible

- 51 -

for fulfillment by that Subsidiary of all obligations under this
Agreement.

11.4.  Entire Agreement.  This Agreement and the other agree-
ments delivered at the Closing represent the entire agreement and
understandings between the parties with respect to the transactions
contemplated herein; provided, however, that the parties may, by
agreement, extend the time of any performance of any obligations of
the parties hereto.  This Agreement and the other agreements delivered
at the Closing supersede all prior agreements, understandings, ar-
rangements, covenants, representations or warranties, written or oral,
by any officer, employee or representative of either party.

11.5  Waiver.  Waiver by GM or DD of any breach or of a failure
to comply with any provision of this Agreement shall not constitute,
or be construed as, a continuing waiver, of such provi-
sion, or a waiver of any other breach of, or failure to comply with
any provision of this Agreement.

11.6.  Amendment.  This Agreement may only be terminated or
amended in writing by duly authorized representatives or officers of
the parties hereto.

11.7.  Expenses.  Each party shall be responsible for its own
expenses incurred in connection with the preparation of this Agree-
ment, the performance of its obligations hereunder and with the
consummation of the transactions contemplated hereby, except as
otherwise expressly provided in this Agreement.  GM shall pay all
sales or use taxes applicable to the transfer of the Assets

11.8.  Post Closing

A.  After the Closing, DD shall from time to
time, at GM's request and without further cost or expense to GM,

prepare, execute and deliver to GM such other instruments of assumption and take such other action as GM may find reasonably necessary.

B. After the Closing, GM shall from time to time, at DD's request and without further cost or expense to DD, prepare, execute and deliver to DD such documents and take such other action to effect the transfer of the Assets and the Redford Operations as DD may find reasonably necessary.

C. DD agrees that all books and records delivered to DD by GM pursuant to the provisions hereof shall be open for inspection by representatives of GM at any time during regular business hours for a period of three (3) years following the Closing and that GM may during such period at its expense make such excerpts therefrom as it may deem desirable. GM agrees that such documents and materials as shall be retained by GM and that are related to the Assets shall be open for inspection by representatives of DD at any time during regular business hours for a period of ten (10) years following the Closing and that DD may during such period at its expense make such copies thereof as it may deem desirable.

D. For a period of ten (10) years commencing at Closing, DD shall maintain all technical documentation it acquires from GM in connection with the purchase of the Assets under Section 1.1 at a location at which they shall be reasonably accessible to GM upon request. During such ten (10) year period, DD shall not destroy or give up possession of its final copy of such documentation or items without offering GM the opportunity, at GM's expense but without any payment to DD, to obtain a copy of such documentation or items.

E. GM shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of DD after Closing and DD shall take such action as may be reasonably necessary to segregate payments made or collections

- 53 -

received on behalf of GM after Closing in order to ensure that the
cost of the related liability or the benefits of the related assets
accrue to the appropriate party in accordance with the terms of this
Agreement. To the extent that any such collections are received after
Closing in the form of checks or other negotiable instruments payable
to the other party to this Agreement, GM or DD, as appropriate, shall
promptly take all necessary action to endorse such checks or instru-
ments to permit the appropriate party to collect the proceeds of such
checks and instruments.

If any party to this Agreement is requested by the other party, or on
behalf of the other party undertakes, to make payments or advance
funds on behalf of such other party to facilitate the orderly consum-
mation of the transition contemplated by this Section 11.8.F. The
party on whose behalf such payments are made shall reimburse the party
making such payments within seven days of receipt of appropriate
documentation with respect to the payments.

DD shall not be obligated to accept, or incur any expense in con-
nection with, any attempted return of any product manufactured or sold
by GM prior to the Closing.


11 9    Third Parties. Nothing contained in this Agreement is
intended to or shall be construed to confer upon or give to any
person, firm, corporation, association, labor union or trust other
than the parties hereto, and their respective permitted successors and
assigns, any claims, rights, or remedies under or by reason of this
Agreement.

11.10. Headings    The headings of the Articles and Sections of
this Agreement are inserted for convenience only and shall not be
deemed to constitute a part hereof.

- 54 -

11.11   Counterparts   More than one counterpart of this Agreement may be executed by the parties hereto, and each fully executed counterpart shall be deemed an original.

11.12   Governing Law.   Except as otherwise provided herein, this Agreement shall be construed and enforced in accordance with the laws of the State of Michigan.

11.13.   Public Announcements.   GM and DD will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby and shall not issue any press release or make any public statement without mutual consent, except as may be required by law and then only with such prior consultation.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers at Detroit, Michigan.

GENERAL MOTORS CORPORATION

By: _____

Date: __12-18-87_____

DETROIT DIESEL CORPORATION

By: _____

Date: ___12/18/87_____

- 55 -