**Exhibit B**

INDEMNIFICATION AGREEMENT

By and Between

GENERAL MOTORS CORPORATION

And

DETROIT DIESEL CORPORATION

INDEMNIFICATION AGREEMENT

By and Between

GENERAL MOTORS CORPORATION

And

DETROIT DIESEL CORPORATION

## TABLE OF CONTENTS

Article                                        Page

I.  General Indemnification                     1

II.  Environmental Matters                      3

III.  Conditions of Indemnification             4

IV.  Miscellaneous                              5

INDEMNIFICATION AGREEMENT

Agreement made as of the end of the 31st day of December, 1987, by and
between General Motors Corporation, a Delaware corporation, with its
principal place of business at 3044 West Grand Boulevard, Detroit,
Michigan, and Detroit Diesel Corporation, a Delaware corporation, with
it principal place of business at Redford, Michigan.

Purpose:

The purpose of this Agreement is to set forth the terms and conditions
of, and procedures for, indemnification by and of the parties pursuant
to the Sales Agreement and the Assignment Agreement, each dated the
date hereof by and between General Motors Corporation (hereinafter
referred to as "GM") and Detroit Diesel Corporation, (hereinafter
referred to as "DD") for the transfer of the business and assets of GM
relating to its manufacturing facilities at Redford, Township and
adjoining Detroit.  Except as otherwise defined, the terms used in
this Agreement shall have the same meaning as such terms have in the
Sales Agreement.

NOW, THEREFORE, in consideration of that purpose and for good and
valuable consideration had and received, GM and DD agree as follows:

I.    GENERAL INDEMNIFICATION

    1.1.  Indemnification by GM.  Subject to the terms and conditions
of the Sales Agreement, GM shall indemnify, defend and hold harmless
DD and its successors and assigns, after the Closing, from and against
all demands, claims, actions or causes of actions, assessments,
losses, damages, liabilities, costs and expenses, including, without
limitation, interest, penalties and attorneys' fees, disbursements and
expenses (collectively, "Damages"), asserted against, resulting to,
imposed upon or incurred by DD or its successors or assigns, directly

or indirectly, by reason of, resulting from or in connection with (A)
liabilities or obligations of, or claims against, GM (whether
absolute, accrued, contingent or otherwise) existing as of the Closing
or arising out of facts or circumstances existing at or prior thereto
(excluding the liabilities and obligations expressly assumed by DD
pursuant to the Sales Agreement), whether or not such liabilities or
obligations were known at the time of the Closing; (B) liabilities
arising out of or relating to product liability claims relating to
products manufactured or sold by GM, or services rendered by GM, prior
to the date of the Closing; (C) a breach of any representation,
warranty or agreement of GM contained in or made pursuant to the Sales
Agreement or any facts or circumstances constituting such a breach;
(D) any tax claim or assessment asserted against DD with respect to
any franchise or income taxes relating to the Redford Operations for
all periods up to and including the date of the Closing; (E) any real
estate transfer taxes, deed taxes, recording fees, sales and use
taxes, documentary taxes and all similar fees, taxes and costs
relating to the consumption of the transactions contemplated by the
Sales Agreement; (F) liabilities arising as a result of the failure to
comply with the bulk sales laws which related to the liabilities of GM
which are not being assumed by DD pursuant to the Sales Agreement; (G)
any litigation identified on Exhibit 4.1.6 (A) to the Sales Agreement;
(H) any liabilities or obligations arising out of or relating to
claims relating to the contemplated, proposed or pending sale of all
or a portion of the Assets other than in the ordinary course of
business to any person other than DD or any of its successors or
assigns; or (I) any other matter as to which DD is entitled to
indemnification under the Sales Agreement (collectively with the
claims set forth herein in Sections 1.2, 2.1 and 2.2, the "Claims").

1.2. Indemnification by DD.  Subject to the terms and conditions
of the Sales Agreement, DD shall indemnify, defend and hold harmless
GM and its successors and assigns, after the Closing, from and against
all Damages asserted against, resulting to, imposed upon or incurred

by GM or its successors and assigns, directly or indirectly, by reason
of, resulting from or in connection with (A) liabilities or obliga-
tions of, or claims against, GM (whether absolute, accrued, contingent
or otherwise) arising out of the Redford Operations after the Closing
(except as provided herein in Section 1.1, 2.1 or 2.2);  (B) a breach
of any representation, warranty or agreement of DD contained in or
made pursuant to the Sales Agreement or any facts or circumstances
constituting such a breach; or (C) liabilities and obligations under-
taken by DD pursuant to the Sales Agreement.

II.  ENVIRONMENTAL MATTERS.

2.1. Indemnification by GM.   GM shall indemnify, defend and hold
harmless DD, one of its wholly-owned subsidiaries, and their
controlling shareholder, from and against all governmental or private
Damages asserted against, resulting to, imposed on, or incurred by DD,
one of its wholly-owned subsidiaries, or their controlling shareholder
by reason of, resulting from, or in connection with releases of
hazardous substances, including any releases within the property,
that:  (i) are the result of GM's or any previous owner's or
operator's ownership or operation of the Assets, and (ii) occurred,
existed, was caused or arises from acts, omissions or events on or
before the date of Closing; provided, however that in no event shall
GM be obligated to indemnify any individual or entity for any omission
or act of malfeasance which gives rise to any environmental liability.

2.2. Indemnification by DD.  DD or any DD wholly-owned subsidiary
that has acquired substantially all of its assets, shall indemnify,
defend, and hold harmless GM from and against all governmental or
private Damages asserted against, imposed on, or incurred by GM
resulting from or in connection with any releases of hazardous sub-
stances, including any releases within the property, to the extent
they result from or are caused by DD, one of its wholly-owned
subsidiaries, or their controlling shareholder's use or operation of
the facility.

- 3 -

2.3. <u>Remedial Action</u>.  GM, at its sole expense, shall have the right to remedy any release or threatened release to the environment referenced in Section 2 1, and DD shall provide GM access to the Assets at reasonable times for the purpose of completing such remedial action; <u>provided</u>, however, that DD may prohibit GM from performing any remedial action that may unreasonably interfere with the conduct of DD's business unless there is a threat to the environment or the circumstances, timing or nature of such remedial action is required by a state, federal, or local environmental agency.  GM shall indemnify, defend and hold harmless DD one of its wholly-owned subsidiaries, or their controlling shareholder from and against all Damages asserted against, resulting from, imposed on or incurred by DD by reason of, resulting from or in connection with the conduct of GM or its agents, contractors or representatives in performing remedial action under this Section 2.3.

## III. <u>CONDIIIONS OF INDEMNIFICATION</u>.

The obligations and liabilities of either party to indemnify the other hereunder with respect to Claims relating to third parties shall be subject to the following terms and conditions:

3.1. The Party to be indemnified (the "Indemnified Party") shall give the other party (the "Indemnifying Party") prompt notice of any such Claim, and the Indemnifying Party will undertake the defense thereof by representatives chosen by it, or, if the Claim is not made by a third party, The Indemnifying Party will promptly pay the amount of the Claim, unless there is a dispute as to the Claim, in which case The Parties shall cooperate in the prompt resolution of the dispute. The failure to promptly notify the Indemnifying Party shall not relieve such party of its obligations hereunder provided that the failure to so notify does not adversely prejudice the Indemnifying Party's ability to defend such Claim.

- 4 -

3.2. If the Indemnifying Party, within a reasonable time after
notice of any such Claim, fails to defend such Claim, the Indemnified
Party will have the right to undertake the defense, compromise or
settlement of such Claim on behalf of and for the account and risk of
the Indemnifying Party, subject to the right of the Indemnifying
Party to assume the defense of such Claim at any time prior to settle-
ment, compromise or final determination thereof.

3.3.  Anything in this Article III to the contrary notwith-
standing, (A) if there is a reasonable probability that a Claim may
materially and adversely affect the Indemnified Party other than as a
result of money damages or other money payments, the Indemnified Party
shall have the right, at its own cost and expense, to defend, compro-
mise or settle such Claim, and (B) neither the Indemnifying Party nor
the Indemnified Party shall, without the written consent of the other
party, settle or compromise any Claim or consent to the entry of any
judgment which does not include as an unconditional term thereof the
giving by the claimant or the plaintiff to the Indemnified Party a
release from all liability in respect of such Claim.

3.4.  The right of the parties hereto to demand and receive
indemnification payments pursuant to this Agreement shall be cumula-
tive of any other rights or remedies exercisable by such party with
respect to any breach of any representation or warranty set forth in
the Sales Agreement or the Assignment Agreement, in the Exhibits or in
any certificate delivered pursuant thereto, including but not limited
to specific performance or other action for equitable relief.

IV.  MISCELLANEOUS.

4.1.  Notice.  All notices, requests, consents or other communi-
cations permitted or required under this Agreement shall be in writing
and shall be deemed to have been given when addressed:

- 5 -

```
If to GM —    Treasurer
              General Motors Corporation
              767 Fifth Avenue
              New York, New York  10153

If to DD —    Detroit Diesel Corporation
              13400 W. Outer Drive
              Detroit, Michigan  48239
              Attention:  Chairman of the Board
```

provided, however, if either party shall have designated a different addressee by notice, then to the last addressee so designated.

4.2.  **Assignment.**  This Agreement shall be binding and inure to the benefit of the successors and assigns of each of the parties hereto, but no rights, obligations, duties or liabilities of either party may be assigned without the prior written consent of the other.

4.3.  **Waiver.**  Waiver by GM or DD of any breach or of a failure to comply with any provision of this Agreement shall not constitute, or be construed as, a continuing waiver, of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.

4.4.  **Amendment.**  This Agreement may only be terminated or amended in writing by duly authorized representatives or officers of the parties hereto.

4.5.  **Headings.**  The headings of the Articles and Sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a party hereof.

4.6.  **Counterparts.**  More than one counterpart of this Agreement may be executed by the parties hereto, and each fully executed counterpart shall be deemed an original.

4.7. <u>Governing Law</u>. Except as otherwise provided herein, this Agreement shall be construed and enforced in accordance with the laws of the State of Michigan.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers at Detroit, Michigan

GENERAL MOTORS CORPORATION

By: _____

Date: _____

DETROIT DIESEL CORPORATION

By: _____

Date: _____

**Exhibit C**

PRODUCT RESPONSIBILITY AGREEMENT

By and Between

GENERAL MOTORS CORPORATION

and

DETROIT DIESEL CORPORATION

PRODUCT RESPONSIBILITY AGREEMENT

By and Between

GENERAL MOTORS CORPORATION

and

DETROIT DIESEL CORPORATION

| Article | Page |
|---|---|
| 1.   Definitions | 1 |
| 2.   Warranty, Special Policy, and Campaign Administration | 3 |
| 3.   Product Liability Insurance and Claims Administration | 6 |
| 4.   Campaign and Special Policy Decisions and Costs | 6 |
| 5.   Litigation | 8 |
| 6.   Documentary Information; Retention Periods | 11 |
| 7.   Limitation of Liability; Dispute Resolution | 11 |
| 8.   Representations and Warranties of GM | 13 |
| 9.   General Provisions | 13 |

PRODUCT RESPONSIBILITY AGREEMENT
By and Between
GENERAL MOTORS CORPORATION
and
DETROIT DIESEL CORPORATION

This Agreement dated as of the end of the 31st day of December, 1987,
is entered into by and between General Motors Corporation (GM) and
Detroit Diesel Corporation (DD) coincident to the Joint Venture
Agreement between Penske Corporation (Penske) and GM for the develop-
ment, manufacture, assembly and sale of certain diesel engines.

1.   Definitions

The terms listed below shall have the following meanings, whether
used in the singular or the plural:

1.1   "Campaign" means any recall of identified Products whereby
all affected owners are contacted in accord with the Na-
tional Traffic and Motor Vehicle Safety Act, Clean Air Act,
or other laws or regulations of similar intent, and asked to
have corrections completed.  It includes any safety campaign
to correct a safety related defect, any safety noncompliance
campaign involving noncompliance with a Federal Motor
Vehicle Safety Standard, and any emission campaign to
correct an emission related defect.

1.2   "Closing" means the date and time of the closing described
in Article 13 of the Joint Venture Agreement.

1.3   "DD Products" means all diesel engines and components
thereof produced by or for DD and its subsidiaries,
excluding 6.2 and 8.2 liter diesel engines and components
and derivatives thereof.

1.4   "EPA" means the United States Environmental Protection
Agency or any successor administrative agency.

1.5   "GM Products" means all diesel engines and components
thereof produced by Detroit Diesel Allison Division of GM,
plus (i) 8.2 liter diesel engines and components and deriva-
tives thereof produced by GM after Closing, and (ii) 6.2
liter diesel engines and components and derivatives thereof
produced by GM and distributed by Detroit Diesel Allison
Division before Closing or DD after Closing.

1.6   "Goodwill Adjustment" means a payment to or on behalf of an
individual Product owner to help alleviate owner dissatis-
faction on a case by case basis.

1.7   "Goodwill Reserve" means the financial reserve established
by GM as of Closing for Goodwill Adjustments on GM Products
excluding 6.2 and 8.2 liter diesel engines and components
and derivatives thereof, reduced thereafter by net charges
from DD for Goodwill Adjustments on GM Products included
therein.

1.8   "Joint Venture Agreement" means the agreement with that
title between Penske and GM for the development, manufac-
ture, assembly and sale of certain diesel engines which is
dated November 16, 1987.

1.9   "NHTSA" means the United States National Highway Traffic
Safety Administration of the Department of Transportation or
any successor administrative agency.

1.10  "Policy and Warranty Reserve" means the financial reserve
established by GM as of Closing for Warranty and announced
or reasonably foreseen Special Policies and Campaigns, on GM
Products excluding 6.2 and 8.2 liter engines and components

- 2 -

and derivatives thereof, reduced thereafter by net charges
from DD for Warranty, Special Policies and Campaigns on GM
Products included therein.

1.11 "Produced by" means the manufacture or assembly of a Product
and includes components manufactured by another and in-
stalled on a Product in the assembly process.

1.12 "Product Liability" means the legal liability not covered by
Warranty for property damage, bodily injury including death,
or other damages where a Product is found to have a defect
which renders it unreasonably dangerous.

1.13 "Products" means GM Products and DD Products collectively.

1.14 "Special Policy" means any recall or other notice which is
not a Campaign and concerns identified Products whereby
corrections are offered to all affected owners beyond those
covered by Warranty.

1.15 "Warranty" means the written warranty document which in-
cludes that term and accompanied a Product new, and the
Detroit Diesel Allison Division Power Protection Plan.

2.   Warranty, Special Policy, and Campaign Administration

2.1 Following Closing, DD will, through its authorized distrib-
utors and dealers, fulfill the Warranty obligations of GM
with respect to GM Products, conduct any Special Policy or
Campaign corrections ordered by GM, and provide proper and
efficient service of GM Products so that interruption of use
is minimized.

2.2 Upon invoices submitted by DD to GM with respect to GM
Products, following a format to be agreed upon by the

- 3 -

parties prior to Closing, GM shall reimburse DD for all
costs paid by DD to its authorized distributors and dealers
under the terms of (i) the applicable Warranty, or Special
Policy or Campaign included in the Policy and Warranty
Reserve, for a period of five years from Closing up to an
aggregate amount not to exceed the Policy and Warranty
Reserve, (ii) any Special Policy or Campaign not included in
the Policy and Warranty Reserve on GM Products excluding 6.2
and 8.2 liter diesel engines and components and derivatives
thereof, for a period of five years from announcement
thereof, and (iii) the applicable Warranty, or Special
Policy or Campaign on 6.2 and 8.2 liter diesel engines and
components and derivatives thereof. GM may audit such
invoices and costs. Provided, however, that subject to GM's
reasonable requirement for financial responsibility and DD's
election to receive 50 percent of GM's Goodwill Reserve as
provided in section 2.5 below, DD may, at any time during
the period of five years from Closing, elect in writing to
receive 50 percent of GM's Policy and Warranty Reserve in
lieu of future invoices for costs paid by DD to its author-
ized distributors and dealers as provided in (i) above.
Except as set forth in Section 2.5 below, no costs shall be
paid by GM for other services to be performed by DD under
this Article 2.

2.3   The costs paid by DD to authorized distributors and dealers
for Warranty, Special Policy, and Campaign parts and labor
concerning GM Products shall be the same as costs paid by DD
for similar parts and labor concerning DD Products, and the
administration of Goodwill Adjustments shall be uniform.

2.4   DD shall provide to its authorized distributors and dealers
information for them to properly and efficiently service GM
Products. Existing inventories of parts catalogs, opera-
tor's manuals, service shop manuals, and related materials

- 4 -

shall be transferred by GM to DD at Closing.  Once exhaust-
ed, reprinting of those materials shall be the responsibil-
ity of DD at its cost, except that GM shall prepare and
print for DD any notices, bulletins, and related materials
concerning any Campaign or Special Policy announced fol-
lowing Closing on GM Products.  DD may combine such infor-
mation concerning GM Products with similar materials con-
cerning DD Products.

2.5    In its provision of proper and efficient service of GM
Products, DD (i) shall make available replacement parts for
GM Products for a period consistent with the past practices
of GM for GM Products but in no event less than five years
from the date of first sale, and (ii) may, in its discre-
tion, make Goodwill Adjustments to help assure owner satis-
faction.  Upon invoices submitted by DD to GM, following a
format to be agreed upon by the parties prior to Closing, GM
shall reimburse DD for all costs paid by DD to its author-
ized distributors and dealers for identifiable Goodwill
Adjustments on GM Products excluding 6.2 and 8.2 liter
diesel engines and components and derivatives thereof, for a
period of five years from Closing up to an aggregate amount
not to exceed the Goodwill Reserve.  Subject to GM's reason-
able requirement for financial responsibility and DD's
election to receive 50 percent of GM's Policy and Warranty
Reserve as provided in Section 2.2 above, DD may, at any
time during the period of five years from Closing, elect in
writing to receive 50 percent of GM's Goodwill Reserve in
lieu of future invoices for Goodwill Adjustments made by DD
on GM Products excluding 6.2 and 8.2 liter engines and
components and derivatives thereof.  Upon invoices submitted
by DD to GM, following a format to be agreed upon by the
parties prior to Closing, GM shall reimburse DD for all
costs paid by DD to its authorized distributors and dealers
for identifiable Goodwill Adjustments on 8.2 liter diesel

- 5 -

engines and components and derivatives thereof; provided,
however, that GM may provide instructions concerning Good-
will Adjustments on 8.2 liter engines and components and
derivatives thereof.

3.   Product Liability Insurance and Claims Administration

3.1   DD shall purchase, at its expense, adequate Product Liabil-
ity insurance covering DD Products. GM agrees to reimburse
DD up to $2.5 million of the premiums paid by DD for such
insurance coverage for the 1988 Calendar year, but not more
than an amount which would reduce DD's portion of such
premiums to $1,000,000.

3.2   GM shall maintain, at its expense, adequate Product Liabil-
ity insurance covering GM Products.

3.3   DD shall initiate a procedure for review, reporting, and
retention of Product Liability claims (not in litigation)
concerning DD Products, as well as for review and reporting
of Product Liability claims concerning GM Products where
claims concerning them come to the attention of DD. Reports
concerning claims involving GM Products shall be provided to
GM, and DD shall cooperate with GM in the investigation and
resolution of any such claims as provided further in Sec-
tion 5.2 hereof.

4.   Campaign and Special Policy Decisions and Costs

4.1   Except as otherwise provided in this Agreement, following
Closing GM shall be responsible for all costs relating to
any Special Policy or Campaign on GM Products, and DD shall
be responsible for all costs relating to any Special Policy
or Campaign on DD Products.

- 6 -

4.2  In the event any party hereto receives any request for
product information in connection with an investigation
(actual or potential) by NHTSA, the EPA, or any other
federal, state, or local agency or other governmental
instrumentality (collectively Government Agency), that party
shall promptly notify the other parties thereof and not
respond to or negotiate with such Government Agency until
after any other party that produced or sold Products that
may be involved in such investigation has been consulted.

4.3  Each party hereto shall represent its own interests in
connection with any request for product information by any
Government Agency; provided, however, that the parties shall
cooperate fully with one another in the investigation and
shall insofar as possible refrain from taking any position
adverse to the interests of the other.  In the event of a
finding by a Government Agency of an actionable noncompli-
ance concerning Products, negotiations with the Government
Agency concerning (i) the nature of the corrective action,
(ii) penalties or other assessments, (iii) any Campaign
notice, or (iv) related matters, or any decision to chal-
lenge the findings of the Government Agency, shall be made
by GM in the case of GM Products, or DD in the case of DD
Products, or, where both GM Products and DD Products are
involved in the same finding, by DD in consultation with GM
unless GM notifies DD of its election to conduct such
negotiations or make such decision, in which event GM shall
conduct such negotiations or make such decision in consulta-
tion with DD; provided, however, with respect to DD Prod-
ucts, that DD shall retain the right to independently
conduct negotiations or make decisions.

4.4  If either party hereto determines that there may be reason
to conduct a Campaign or Special Policy, or otherwise finds
it advisable to investigate experience with Products, that

- 7 -

party shall notify the other and they shall cooperate fully
with one another in the investigation of the facts and
circumstances and shall insofar as possible refrain from
taking any position adverse to the interests of the other.
Any decision to voluntarily Campaign a Product or announce a
Special Policy on a Product, and the nature of the correc-
tive action, shall be made by GM in the case of GM Products,
or DD in the case of DD Products, or, where both GM Products
and DD Products are involved in the same decision, by DD in
consultation with GM unless GM notifies DD of its election
to make such decision, in which event GM shall make such
decision in consultation with DD; provided, however, with
respect to DD Products, that DD shall retain the right to
conduct an independent Campaign or announce an independent
Special Policy.

4.5   All costs incurred in responding to a request for product
information by any Government Agency, or in any other
investigation of experience with Products, shall be borne by
the respective party that incurred such costs.

4.6   Engineering, production, parts shipping, and owner notifi-
cation associated with any Special Policy or Campaign, and
any penalties or other assessments, shall be the responsi-
bility of GM in the case of GM Products, or DD in the case
of DD Products, and shall be shared pro rata based on the
quantity of their respective Products involved when both
parties' Products are involved in the same Campaign.
Special Policy and Campaign bulletins, and related
distributor and dealer materials shall be handled as pro-
vided in section 2.4 above.

5.   Litigation

5.1   Except as otherwise herein provided, following Closing GM
shall be responsible for all costs relating to any litiga-

- 8 -

tion involving GM Products, and DD shall be responsible for all costs relating to any litigation involving DD Products.

5.2   With respect to any actual, potential, or threatened claim, action or proceeding (collectively Claim) allegedly based on a defect in a Product (including, without limitation, failure to warn or to adopt an alternative design), each of the parties hereto shall (i) communicate and cooperate with the other and, if necessary, the appropriate insurance carrier, to the fullest extent reasonably possible in investigation of the facts and circumstances surrounding the Claim, responding to discovery and preparing a defense to the Claim, and in litigation of the Claim, (ii) refrain from taking any position adverse to the interests of the other party to this Agreement, and (iii) not institute any Claim, whether by cross-complaint or otherwise, against the other party to this Agreement.

5.3   The right and obligation to control the defense of any Claim shall be with GM in the case of GM Products, and DD in the case of DD Products, provided, however, that where both GM Products and DD Products are involved in the same Claim, DD shall have the right and obligation to control the defense in consultation with GM unless GM notifies DD of its election to have the right and obligation to control the defense, in which event GM shall have the right and obligation to control the defense in consultation with DD.

5.4   In the event a legal process or other notice having the force of law concerning a Product of one party hereto is served upon another, the receiving party shall notify the other thereof and shall not take any action for defense or settlement without the consent of the other.

5.5  Each party hereto shall bear its respective costs incurred
in connection with cooperation in investigation and litiga-
tion, including those incurred for such things as the
production of documents, answering interrogatories, and
technical preparation; provided, however, that costs paid to
others not party hereto associated with such things as
travel and tests completed by others not party hereto shall
be borne by GM in the case of GM Products, and DD in the
case of DD Products.  Where both GM Products and DD Products
are involved in the same Claim, the costs paid to others not
party hereto associated with such things as travel and tests
completed by others not party hereto, shall be shared
pro rata based on the quantity of their respective Products
involved.

5.6  Each party shall be responsible for its own attorneys' fees
and other costs of defense, absent agreement to the contrary
on a case-by-case basis.  Unless otherwise agreed upon, any
settlement or any judgment not assigned by the court shall
be borne by GM in the case of GM Products, and DD in the
case of DD Products, and, where both GM Products and DD
Products are involved in the same Claim, shall be shared
pro rata based on the quantity of their respective Products
involved.

5.7  GM has agreed in its Distributor Agreements to assume the
defense of its distributors and to indemnify them against
judgments in certain lawsuits which allege that bodily
injury or property damage were caused solely by a defect in
design or manufacture.  GM shall be responsible for such
defense concerning GM Products, and for purposes of this
Agreement such responsibility shall be considered to be a
Claim against GM concerning a GM product.  DD shall be
responsible for such defense concerning DD Products, and for

- 10 -

purposes of this Agreement such responsibility shall be
considered to be a Claim against DD concerning a DD Product.

6.  Documentary Information; Retention Periods

6.1  Any documentary information disclosed by any party hereto to
another which the disclosing party considers proprietary to
it may be marked with an appropriate marking, legend or
stamp.  For a period of one (1) year from the date of
receipt, any documentary information marked proprietary
shall be treated by the receiving party with the same degree
of care with which the receiving party treats its own
information of a similar nature.  However, no party shall be
liable for disclosure of any documentary information marked
proprietary.

6.2  GM hereby designates DD, and DD agrees, to keep and maintain
records of the name and address of the first purchaser of
Products and such other information as may be required by
NHTSA, EPA, or other Governmental Agency.

6.3  DD shall initiate a procedure for retention of documents
concerning Products consistent with that of GM for GM
Products.  Upon notice from GM with respect to GM Products,
DD shall suspend its normal retention periods for documents
therein identified and maintain those documents until
notified by GM that it may return to normal retention
periods.  Costs associated with document retention, includ-
ing any suspension thereof, shall be the responsibility of
the party that incurred such costs.

7.  Limitation of Liability; Dispute Resolution

7.1  Except as expressly provided in this Agreement, in no event
shall any party hereto be (i) liable to the other party for

- 11 -

any Claim, liability, loss, damage or cost which may arise in connection with any defect in any Product, or (ii) entitled to any recovery from the other party in connection with any financial liability incurred by it under this Agreement.

7.2   GM hereby agrees to indemnify and hold harmless DD, and its directors, officers, employes and agents, against and from any and all Claims, liabilities, damages or costs, including reasonable attorney fees, whether for bodily injury including death, property damage, economic loss or other damages, which may arise out of any GM Product or the sale, use or operation thereof.

7.3   DD hereby agrees to indemnify and hold harmless GM and its subsidiaries, directors, officers, employes and agents, against and from any and all Claims, liabilities, damages or costs, including reasonable attorney fees, whether for bodily injury including death, property damage, economic loss or other damages, which may arise out of any DD Product or the sale, use or operation thereof. Additionally, should DD elect in writing to receive 50 percent of GM's Policy and Warranty Reserve and Goodwill Reserve in lieu of future invoices for certain costs paid by DD to its authorized distributors and dealers as provided in Sections 2.2 and 2.5 or should the 5 year term referred to in Sections 2.2(i) and (ii) expire, DD shall thereafter indemnify and hold harmless GM and its subsidiaries, directors, officers, employes and agents, against and from any and all Claims, liabilities, damages or costs, including reasonable attorney fees, for breach of warranty, economic loss or other damages associated with the performance of or failure to perform any Warranty, or any Special Policy or Campaign included in the Policy and Warranty Reserve or any Special Policy or Cam-

paign referred to in Section 2.2(ii) or performance of or failure to
make any Goodwill Adjustment on GM Products excluding 6.2 and 8.2
liter diesel engines and components and derivatives thereof.

    7.4   In the event of any dispute of a legal nature between the
parties to this Agreement concerning the provisions of this
Agreement, such dispute shall be submitted to a dispute
resolution panel.   On a case by case basis, the panel shall
consist of the Treasurer, or his designee, of each party in
the dispute, plus one person designated by them.   The panel
may establish procedures for submission of the dispute,
including that reasonable requests made by one party to
another for information shall be honored in order that each
of the parties may be advised of relevant facts.   A majority
decision shall control.

8.   Representations and Warranties of GM

GM represents and warrants to DD that (i) the listing of pending
formal Claims having the force of law and suits with respect to
GM Products (listing the claimant, ad damnum, and a brief de-
scription of the Product, its application, and the Claim),
supplied by GM to DD is as of the date hereof complete and
correct in all material respects; and (ii) the Policy and War-
ranty Reserve on the date hereof is $70,000,000[*] and the Goodwill
Reserve on the date hereof is $11,000,000.[*]

9.   General Provisions

    9.1   This Agreement constitutes the entire agreement of the
parties with respect to the subject matter hereof.   To the
extent that provisions in the Joint Venture Agreement or any
other agreement are inconsistent with any provision of this

*The values of the Policy and Warranty Reserve and the Goodwill
Reserve reflect balances as of August 31, 1987.  These are subject to
adjustment as of December 31, 1987 consistent with past practice.

Agreement, this Agreement supersedes all prior agreements and understandings, oral and written, among the parties with respect to the subject matter.

9.2   In any case where any notice or other communication is required or permitted to be given under this Agreement such notice or other communication shall be in writing and (i) personally delivered, or (ii) sent by air express or prepaid first class mail (which communication shall be immediately confirmed by a telex), or (iii) transmitted by electronic facsimile transfer (which communication shall be immediately confirmed by a telex), as follows:

If to GM:      General Motors Corporation
               767 Fifth Avenue
               New York, NY  10153
               Attention:  Treasurer

If to DD:      Detroit Diesel Corporation
               13400 W. Outer Drive
               Detroit, Michigan  48239
               Attention:  Chairman of the Board

9.3   This Agreement shall be governed by the laws of the State of Delaware.

9.4   No modification or amendment of this Agreement, and no waiver of the terms or conditions hereof, shall be valid or binding unless made in writing and duly signed.

9.5   This Agreement does not constitute any party an agent of another for any purposes whatsoever.

- 14 -

9.6  This Agreement may not be assigned by any party or trans-
     ferred by operation of law except with the prior written
     consent of the parties hereto and except as provided in the
     Joint Venture Agreement.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to
be duly executed on their behalf as of the day and year first above
written.

                              GENERAL MOTORS CORPORATION

                              By: _____
                              Date: _____

                              DETROIT DIESEL CORPORATION

                              By: _____
                              Date: _____

ADDENDUM

To

Product Responsibility Agreement

By and Between

General Motors Corporation

And

Detroit Diesel Corporation


This Addendum is executed contemporaneously with the Product Responsibility Agreement dated as of December 31, 1987 (the "Agreement"). Its purpose is to (a) clarify accounting for the Policy and Warranty Reserve and the Goodwill Reserve, and (b) add products distributed in Canada through General Motors of Canada Limited (GM Canada) to the Agreement.

### Policy and Warranty Reserve
### and Goodwill Reserve

The amounts in Section 8 of the Agreement for the Policy and Warranty Reserve and Goodwill Reserve are amounts applicable to the worldwide distribution of GM Products, excluding 6.2 and 8.2 liter engines and components and derivatives thereof. Accordingly, reductions of those reserves following closing shall include worldwide net charges for Warranty, Special Policies, Campaigns and Goodwill Adjustments on GM Products included therein, consistent with the past practice of Detroit Diesel Allison Division. Immediately following closing these charges for the United States and Canada will pass through DDC. However, the charges from overseas distributors will not pass through DDC. The charges from overseas distributors shall, however, be included in reduction of the reserves consistent with the past practices of Detroit Diesel Allison.

Should DDC elect to receive 50 percent of GM's Policy and Warranty Reserve and Goodwill Reserve under Section 2.2 of the Agreement at a time when the charges for Warranty, Special Policies, Campaigns and Goodwill Adjustments on GM Products from overseas distributors included in those reserves are not passing through DDC, the Policy and Warranty Reserve and Goodwill Reserve shall be reduced by an amount attributable to estimated future charges for GM Products overseas, and this shall be done immediately before 50 percent of the reserves is

- 2 -

calculated.  Should DDC thereafter undertake the overseas
distribution, further negotiation of the handling of overseas charges
for GM Products will be required.

### General Motors of Canada Limited

The principles of the Agreement shall apply equally to GM Prod-
ucts in Canada and the name of GM Canada may be substituted for that
of GM with respect to GM Products in Canada.

GENERAL MOTORS CORPORATION

By: _John W. Whitbrick_

Date: _12 - 18 - 87_

DETROIT DIESEL CORPORATION

By: _____

Date: _12/18/87_

**Exhibit D**

maynard.l.timm@gm.com
07/16/2009 10:05 AM

To   shawn.jacque@daimler.com

cc   damon.l.white@gm.com

Subject   Asbestos Indemnification Requests--December 31, 1987
Indemnification Agreement and Product Responsibility
Agreement--General Motors Company

Shawn--

On July 10, 2009, General Motors Corporation emerged from Chapter 11 Bankruptcy and became
General Motors Company, a completely new entity. As part of the bankruptcy process, General Motors
Company did not assume the December 31, 1987 Indemnification Agreement and Product Responsibility
Agreement. Consequently, General Motors Company will have no involvement or assume any
responsibility for the defense of asbestos exposure litigation against Detroit Diesel Corporation. We will
be communicating this information to outside counsel shortly

*Maynard L. Timm*
**(313) 665-7375 (8/255)**
**(248) 267-4389 or (313) 665-7376 (Fax)**
**maynard.l.timm@gm.com**
GM Legal Staff, M/C: 482-026-601
400 Renaissance Center, Detroit, MI 48265-4000