1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


MOTORS LIQUIDATION COMPANY ET AL.,

     f/k/a GENERAL MOTORS CORP., ET AL.

      Debtors.


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        September 14, 2009

        9:02 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Continuing Objections to the Order Authorizing the

3   Sale of Assets Pursuant to the Amended and Restated Master Sale

4   and Purchase Agreement with NGMCO, Inc.

5

6   Motion of ACE American Insurance Company and Affiliated

7   Companies to Compel Debtors to Assume or Reject Insurance

8   Policies and Related Agreements.

9

10  HEARING re Debtors' Motion for Order Pursuant to Section

11  502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3)

12  Establishing the Deadline for Filing Proofs of Claim Including

13  Claims Under Section 503(b)(9) of the Bankruptcy Code and

14  Procedures Relating Thereto and Approving the Form and Manner

15  of Notice Thereof.

16

17  HEARING re Motion of Debtors for Entry of Order Pursuant to 11

18  U.S.C Sections 327 (a) and 330 Authorizing the Debtors to Amend

19  the Terms of Their Engagement with Brownfield Partners, LLC.

20

21  HEARING re Debtors' Sixth Omnibus Motion Pursuant to 11 U.S.C.

22  Section 365 to Reject Certain Executory Contracts and Unexpired

23  Leases of Nonresidential Real Property.

24

25

3

1

2    HEARING re Motion of Debtors for Order Pursuant to Section

3    365(d)(4) of the Bankruptcy Code Extending Time to Assume or

4    Reject Unexpired Leases of Nonresidential Real Property.

5

6    HEARING re Motion of Debtors for Entry of Order Pursuant to 11

7    U.S.C. Section 1121(d) Extending Exclusive Periods in Which

8    Debtors May File Chapter 11 Plan and Solicit Acceptances

9    Thereof.

10

11   HEARING re Verified Motion of Environmental Testing Corporation

12   (ETC) for Payment of Administrative Expenses - Stip to be

13   Submitted.

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Penina Wolicki

4

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   JOSEPH H. SMOLINSKY, ESQ.

9          STEPHEN KAROTKIN, ESQ.

10

11   KRAMER LEVIN NAFTALIS & FRANKEL LLP

12        Attorneys for Creditors' Committee

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16   BY:   ADAM C. ROGOFF, ESQ.

17

18

19   STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

20        Attorneys for Committee of Asbestos Claimants

21        2323 Bryan Street

22        Suite 2200

23        Dallas, TX 75201

24

25   BY:   PETER C. D'APICE, ESQ.

5

1

2     ROPERS, MAJESKI, KOHN & BENTLEY

3           Attorneys for Remy International

4           17 State Street

5           Suite 2400

6           New York, NY 10004

7

8     BY:   GEOFFREY W. HEINEMAN, ESQ.

9

10

11     UNITED STATES DEPARTMENT OF JUSTICE

12           U.S. Attorney's Office, SDNY

13           86 Chambers Street

14           Third Floor

15           New York, NY 10007

16

17     BY:   DAVID S. JONES, AUSA

18

19     WHITE AND WILLIAMS LLP

20           Attorneys for Sun Microsystems, Yahoo, et al.

21           One Penn Plaza

22           250 West 34th Street

23           New York, NY 10119

24

25     BY:   KAREL S. KARPE, ESQ.

6

P R O C E E D I N G S

1

2      THE COURT:  Okay, GM.  Good morning, Mr. Smolinsky,

3  Mr. Karotkin.

4      MR. SMOLINSKY:  Good morning, sir.  Good morning, Your

5  Honor.  Joe Smolinsky of Weil, Gotshal & Manges for the

6  debtors.  I think we have a fairly short calendar today.  I

7  think things will move quickly.

8          I'll just jump into the first matter we have on the

9  agenda this morning, which is a status conference on cure

10  objections with respect to the sale that closed on July 10th.

11  If I may, Your Honor, I'd like to hand up a one-page chart.

12      THE COURT:  Thank you.  Mr. Smolinsky, I want to

13  interrupt you for a second.  I meant to deal with this at the

14  very outset.  I have an attorney intern with me who is going to

15  be working in my chambers until she begins with the Weil firm

16  in approximately January.  We're going to be entering a formal

17  order in this case and in other cases in which Weil is

18  involved.  She's going to be recusing herself from all matters

19  involving this GM case and in the other Weil-related cases.  So

20  I just wanted to note that on the record.  Her name is Candace

21  Arthur.  You'll see her on your left.

22      MR. SMOLINSKY:  Thank you, Your Honor.  This chart

23  shows a comparison of where we stood on August 2nd, which is

24  the last time we were before you on a cure status conference,

25  and as of September 12th.  And you'll see that with respect to

7

1    remaining cure objections before this Court, on August 2nd we

2    had 179 pending counterparties that had pending objections.

3    Today we have 46.  At the bottom, if we pull out those that we

4    have agreements with that are simply awaiting formal

5    documentation, we're down to 27 counterparties.

6         Your Honor, we'd like to fix another date for a status

7    conference in the second half of October.  By that time, I

8    think we'll have a very good understanding of what, if any,

9    cure objections we would have to start thinking about

10   scheduling for Court intervention.  But I don't believe that

11   we're going to have many at all.

12        THE COURT:  Sure.  That makes total sense.  Just work

13   out a mutually satisfactory date with Ms. Blum and make it

14   happen.

15        MR. SMOLINSKY:  Thank you.  Your Honor, there's a

16   matter with ACE Insurance.  I don't know if it's on your

17   calendar.  There was a withdrawal that was filed, I think

18   Thursday or Friday of last week.  It's a motion to compel

19   assumption and assignment or rejection.  I don't know if you

20   have it on your calendar --

21        THE COURT:  I do have it on my calendar, but it's been

22   withdrawn?

23        MR. SMOLINSKY:  Well, Your Honor, I wanted to give,

24   just as a housekeeping matter, an update.  We had noticed ACE

25   Insurance contracts, which are insurance policies, for

8

1    assumption and assignment in connection with the regular

2    procedures.  ACE filed an objection to that notice.  We had

3    been in the process of working things out.  They ultimately

4    filed a motion to compel assumption or rejection.

5         THE COURT:  Wait.  I lost you.  I thought I heard you

6    say half a second ago that you had volunteered to assume and

7    assign it, and they still wanted you to --

8         MR. SMOLINSKY:  Yes, Your Honor.

9         THE COURT:  -- assume and assign it?

10        MR. SMOLINSKY:  Yes, Your Honor.

11        THE COURT:  Or make a decision?

12        MR. SMOLINSKY:  They --

13        THE COURT:  What am I missing?

14        MR. SMOLINSKY:  -- they weren't happy with the level

15   of information that we provided them with this notice.  These

16   are insurance policies.  There are hundreds of policies.  There

17   are very complicated issues with respect to how those contracts

18   would be assumed and assigned.  And ultimately, they wanted us

19   to enter into an assumption and assignment agreement that would

20   set out the respective responsibilities of the parties in

21   greater detail than simply the sale order.

22        Your Honor, the debtors are selling insurance

23   policies, but at the same time, they're reserving their rights

24   to assert claims that they would have under the policies, as an

25   additional insured.  And as the debtors, we wanted to make sure

1    that we continued to have the ability to assert claims under

2    the policy, even though ownership of the policy had been

3    transferred to the purchaser.  And in fact, the purchaser was

4    intending ACE to continue to provide coverage for their

5    operations on a post-sale basis.  So it was a complicated

6    transaction.

7         THE COURT:  Right.  But I assume that you and the

8    purchaser want to reserve the right to do whatever you want,

9    and you're willing to give ACE an opportunity to be heard if it

10   thinks that either you or the new purchaser are acting

11   inappropriately.

12        MR. SMOLINSKY:  That's right, Your Honor.  And ACE

13   wanted to make sure that if there are obligations on the part

14   of the debtors for asserting claims, that we would be

15   responsible for our obligations under the policy with respect

16   to those claims.

17        THE COURT:  Um-hum.

18        MR. SMOLINSKY:  So we did ultimately reach agreement

19   on an assumption and assignment agreement.  That is why the

20   matter was withdrawn and taken off calendar.  In discussions

21   with the committee on Friday, they asked for additional time to

22   understand the interrelationships between the purchaser and the

23   debtors on these policies.  We've agreed to adjourn the ACE

24   matters to -- basically restore it to the calendar.

25        It wasn't fair on ACE's part.  They withdrew the

10

1     motion based on the expectation that the agreement would be

2     handed up to Your Honor today.  And since it's not, we are

3     willing to restore it to the calendar.  I think we put on our

4     agenda an October 6 date.  But this is an important matter for

5     the purchaser.  They are currently operating, perhaps, without

6     full insurance benefits.  So what I propose, Your Honor, is

7     that we put it on -- restore it back on the calendar for

8     September 30th, and in the meantime we are preparing a

9     presentation for the committee.  And to the extent that we get

10    the committee's consent, we would just submit it to Your Honor

11    for signature.  That would resolve the cure objection and would

12    also result, again, in the withdrawal of the motion to compel.

13        THE COURT:  Sure.  Either counsel for ACE or the

14    committee, Mr. Rogoff, want to be heard on this?

15        MR. ROGOFF:  Good morning, Your Honor.  Adam Rogoff,

16    Kramer Levin, on behalf of the creditors' committee.  We're

17    going to work with the debtor to try to get an understanding of

18    the different contracts that are being assumed and assigned.

19    As counsel for the debtors indicated, this is not simply a

20    matter of assuming and assigning an agreement over to a

21    purchaser outright, relieving the estate of potential

22    liability, but that there could be claims that the agreement

23    contemplated would be asserted against the estate on an

24    administrative basis --

25        THE COURT:  And you don't want to give up the right to

11

1    get the benefits of that if there are rights to be had?

2         MR. ROGOFF:  Well, we just simply want to make sure we

3    understand, first, that the estate remains protected under

4    insurance policies as a matter of the agreement or applicable

5    law, but also, more importantly, that we just have an

6    understanding of what the potential costs could be to the

7    estate on a go-forward basis.

8         We will work with the debtors diligently to understand

9    the agreements, and we do hope that the agreements will allow

10   for handing up a consensual order.

11        THE COURT:  Fair enough.  Okay.  Makes total sense,

12   Mr. Smolinsky.  So just make it happen.

13        MR. SMOLINSKY:  Thank you, Your Honor.  At this point,

14   there's one more contested matter, the bar date, and I would

15   like to cede the podium to Mr. Karotkin.

16        THE COURT:  Sure.  Okay.  Is somebody here from Mr.

17   Esserman's firm?

18        MR. D'APICE:  Good morning, Your Honor.  Peter D'Apice

19   from Mr. Esserman's firm.

20        THE COURT:  Okay.  Mr. Karotkin, I'll let you speak in

21   a moment.  But I read the papers here.  Unless you, Mr.

22   D'Apice, can get me -- bring me something to my attention that

23   isn't in your papers, I'm not of a mind to provide for any

24   special noticing for asbestos claims.  I think that would be

25   wholly inappropriate.  So it seems to me, the principal issue

12

1    that I need to deal with is, is a forty-five days right or

2    would I be better served providing for maybe sixty days on the

3    amount of time.  But I also need to know whether that would

4    have a material adverse effect upon the debtors or the

5    creditors who are involved.

6          I agreed with the point that the notice was kind of

7    verbose and legalese.  But since so many claims were scheduled,

8    I don't know if that's a big deal.  I noticed a lack of an

9    objection by the creditors' committee.  Let me hear if there is

10   any reason why treating asbestos claimants any differently than

11   other creditors in this case, most obviously tort claimants, is

12   warranted.  This is not an asbestos-driven case.

13         Mr. Karotkin, I'll hear from you first.

14         MR. KAROTKIN:  Your Honor, I really don't have much to

15   add to what is in our papers.  Obviously, we certainly agree

16   with what you just said.  This is not -- as you have noticed

17   before at the sale hearing, this is not an asbestos case.  With

18   respect to the amount of time for the proposed notice, I would

19   note, as we noted in our papers, that the asbestos bar is

20   probably among the most well organized bar in the country, and

21   for them to suggest that they can't get claims filed within

22   that period doesn't make any sense to me at all.

23         I will note that counsel's papers -- Mr. Esserman's

24   and his colleagues' papers, refer to the Eagle-Picher case as a

25   basis for there not being a bar date in an asbestos-related

13

1    personal injury case.  I personally represented Eagle-Picher in

2    its first Chapter 11 case where the first 524(g) injunction was

3    obtained.  And I can represent to the Court that in that case

4    there was in fact a bar date for asbestos-related personal

5    injury claims.  That was a classic asbestos-related Chapter 11

6    case.  That was the sine qua non for the filing of a Chapter

7    11.  That is not what we have here.  And we don't think there's

8    any reason for these claims to be treated differently than a

9    host of other tort claims in these cases.

10            THE COURT:  Let me just ask you the one question that

11   did occur to me when I was reviewing the papers.  If I

12   increased it from forty-five days to sixty, would that present

13   you with problems?

14            MR. KAROTKIN:  There is a lot of pressure from the

15   creditors' committee to get distributions out as quickly as

16   possible and propose a plan as quickly as possible.  Your

17   Honor, I cannot stand up in front of you and say that fifteen

18   days is going to make a difference.

19            THE COURT:  Um-hum.

20            MR. KAROTKIN:  Mr. Rogoff is --

21            THE COURT:  Maybe I should let Mr. Rogoff comment on

22   it, because he's got to balance the concerns of fair notice to

23   his constituency with getting appropriate -- I'm sure his

24   people, and if I were in his shoes, I would too, want to get

25   their distributions as quickly as possible.  But I'm sure he

14

1   doesn't want to leave people locked out.  So I'll get his

2   comments.  Maybe I should get them now, Mr. Rogoff.

3           MR. ROGOFF:  Thank you, Your Honor.  I'm actually

4   going to make this very easy for the Court, I hope.  We're not

5   going to object to the extension by the fifteen days.  The

6   rationale, I think is, the Court has noted the tension between

7   on the one hand, wanting to get the plan process completed

8   diligently, and as everybody appreciates, the claims analysis

9   is an important part of that; on the other hand, we also need

10  to make sure that there is adequate notice of the bar date

11  given.  We do feel that the extra fifteen days of notice

12  certainly helps all creditors in getting their claims in.

13          The other aspect of it, which will tie into

14  exclusivity requests, Your Honor will note that we did file a

15  response in support.  And underlying that response, and of

16  course tying into Your Honor's concern on this motion, is that

17  we hope to be working with the debtors diligently during this

18  extension period to try to formulate and analyze the very

19  complex issues that could exist in the structure of a plan.  It

20  is a liquidating plan on the one hand, but we do have a variety

21  of issues that we need to cross with them.

22          So given the time and the cooperation that we expect

23  to have working with the debtor and its professionals on that

24  process, as long as we're moving diligently on that, which I

25  expect that we will, I don't see any global prejudice, weighing

15

1 and balancing all the considerations, to the extra fifteen

2 days.

3   THE COURT:  Well, I assume that both you and the

4 debtors want to get your arms on the universe of claims that

5 are out there, but that nobody's suggesting that they could be

6 liquidated any time soon, and you'd know exactly how much any

7 particular claimant's claim is?

8   MR. ROGOFF:  We expect -- as Your Honor notes

9 correctly, the first step is getting the claims in, seeing the

10 universe of the unliquidated claims, and then dealing with a

11 host of issues on the claims process that, in turn, tie into

12 the plan formulation.

13   THE COURT:  Right.  Okay, thank you.

14   MR. ROGOFF:  You're welcome.

15   THE COURT:  Mr. D'Apice, may I hear you, please?

16   MR. D'APICE:  Thank you.  Peter D'Apice of Stutzman --

17   THE COURT:  I'm sorry if I mispronounced your name.

18   MR. D'APICE:  -- that's all right, Your Honor.

19   THE COURT:  D'Apice?

20   MR. D'APICE:  D'Apice, of Stutzman --

21   THE COURT:  Okay.  Thank you.

22   MR. D'APICE:  -- Bromberg, Esserman & Plifka, on

23 behalf of the ad hoc committee.

24   The first thing I want to do, Your Honor, is just

25 quickly clear up the Eagle-Picher cite that we made.  And what

16

1    we actually cited Eagle-Picher for in the case was not that

2    there was no bar date set in that case.  What we cited it for

3    was two propositions.  One is that the Eagle-Picher Court

4    stated that "while such bar dates are commonly set in Chapter

5    11 cases, upon good cause shown, the Court may dispense with

6    one in a given case."  Simply for that principle.  And I'll

7    later argue why asbestos claims give the Court the cause it

8    needs to dispense with a bar date.

9         The other point that we cited Eagle-Picher for was to

10   contrast it with this case.  This case has been pending for

11   what, three months.  It is an exceptional case, there's no

12   doubt about it.  Forty-five days notice, under circumstances

13   which I'll talk about in a minute, is not going to be adequate

14   for the far-flung nationwide pool of claimants that's out

15   there.  But we cited Eagle-Picher for the other proposition,

16   that that case had been pending over three years, and more than

17   a hundred days' notice of the bar date was given.  So just to

18   compare that.  So we did not -- if we confused Mr. Karotkin, I

19   apologize.  But we were citing it simply for the propo -- those

20   two propositions.

21        Let me tell you why asbestos claims should be treated

22   differently from other tort claims, particularly in a case like

23   this.  This may not be an asbestos-driven case, and it may

24   not -- and adequately described or fairly described as an

25   asbestos case, but that's kind of a label.  What it is, it's a

17

1   case that has indisputably tens of thousands of potential

2   asbestos claimants.

3        In terms of getting their arms around the scope of the

4   potential exposure, General Motors has done analyses of using

5   the standard econometrician methods that are used in

6   handling -- in analyzing asbestos claims, to forecast its

7   liability, to get a grip on what it's got and to forecast its

8   liability.  And that report was used, I believe in connection

9   with the sale motion.  It was the Hamilton, Rabinowitz &

10  Associates report prepared in January of 2009.  It is a

11  confidential report.  Its existence is not confidential.  But

12  it is a confidential report.

13       But needless to say, on the basis of that report, GM

14  reserved hundreds of millions of dollars and is indisputably,

15  given its long operation and its nationwide operation,

16  international operation, is facing tens of thousands of claims.

17       What do you do with the proofs of claim when you get

18  them?  How do you handle those claims?  The debtor's going to

19  have to somehow enter that information into a database of some

20  kind.  The debtor's then going to have to adjudicate those

21  claims in some way.  Those people will have a right, for their

22  personal injury claim, to have that adjudicated according to

23  their due process rights; which means that they're entitled to

24  a jury; it's not going to get adjudicated by this Court;

25  they're entitled to -- if there's a claim objection filed, then

18

1     you start a contested matter.  How is this Court possibly going

2     to handle tens of thousands of contested matters, let alone

3     10,000 contested matters, within any reasonable period of time?

4          And the reason this is kind of -- it's not sensible --

5     respectfully, Your Honor, it's not sensible, because there's a

6     well-worn path to handling mass tort claims like this.  And it

7     involves a postconfirmation trust that is set up and has trust

8     clerks, basically, claims clerks, do what otherwise Your Honor

9     would have to do in trying to liquidate a claim.  Now --

10         THE COURT:  Well, you said that I would liquidate.  I

11    don't think anybody would suggest that I would liquidate.  I

12    might estimate the claims, but -- which is a traditional

13    bankruptcy judge function.  But if they actually have to be

14    liquidated and tried, I've got 157 problems, don't I?

15         MR. D'APICE:  Yes, Your Honor, you do.  And I would

16    submit, Your Honor, that you can estimate, and claims have been

17    estimated in other cases with mass tort liabilities.  But what

18    we have here, what I understand the debtor and the committee to

19    say, is that this is going to be a liquidating plan.  This is

20    not a plan of reorganization of a company that's going to

21    continue operating.  This is a liquidating plan.  So if any

22    estimation leads to a number that then gets allocated to the

23    asbestos claims, both present and unknown claimants, they're

24    capped at that number, effectively.

25         THE COURT:  Well, isn't that exactly why the debtors

19

1    and the creditors' committee want to get their arms around the

2    universe of claims?

3         MR. D'APICE:  I don't -- I agree that we need to get

4    our arms around the universe of claims, Your Honor.  And the

5    way to do that -- the efficient way to do that, and a way

6    that's been done in many other cases, is you have -- they had

7    an econometrician, their expert, look at the database that GM

8    already has in place, its claims history; they look at the

9    allocation of the disease levels within that claims history;

10   they look at factors -- the experts look at factors like

11   propensity to sue for purposes of forecasting future claims

12   that will come down the pipe.

13        As every day passes, some claimant who, the day before

14   didn't have a claim, manifests and has a claim.  As every day

15   passes, there are more claimants coming up.  And there are

16   claimants in the future who haven't even been really thought

17   about, or if they've been thought about, they're really getting

18   sort of left in the lurch.

19        And this is another issue which I don't want to get

20   into today, but Your Honor did suspend order or abate ruling on

21   our earlier motion to appoint an asbestos committee.  And I

22   believe you denied the motion for appointment of a futures

23   claims rep.  I don't recall if that was done without prejudice.

24        But in terms of getting our arms around the set, the

25   universe of asbestos claims against this company, proofs of

20

1    claims are kind of -- are an impractical burden.  The debtor

2    has to take those claims and enter them in.  And ultimately, in

3    order to forecast what the total liability might be, the

4    debtor's best served by looking at its own database that it

5    already has, its database of existing claims, resolved claims,

6    its claims history.  You look at the claims history and then

7    you forecast the liability from that.

8         We've done that in other cases, Your Honor.

9    Ultimately, that is where, I believe, courts want to end up,

10   because it is the most efficient way -- I'm not saying it's

11   going to happen in three months -- but it is the most efficient

12   way to resolve the tens of thousands of claims.  And it would

13   also allow the debtor to not only get its arms around its

14   liability and the creditors' committee to see what that

15   liability is, and weigh in on it in some sort of estimation

16   process that we can work out or that an asbestos committee

17   could work out with the debtor and the creditors' committee,

18   and negotiate some resolution that will give this debtor a

19   trust that will be set up postpetition to handle all asbestos

20   claims against GM.

21        The other thing I want to point out, Your Honor, is

22   the bar date order that's proposed by debtor forbids anyone who

23   fails to file a proof of claim from suing not only the debtor

24   but any successor.  And that brings us back into the whole

25   successor liability issue that was raised in connection with

21

1    the sale.  And so what we've got is a class of tort claimants

2    who've been effectively left behind in Old GM, and now --

3        THE COURT:  Isn't that an issue for the circuit or the

4    United States Supreme Court?

5        MR. D'APICE:  It may -- I think they've already spoken

6    on the issue, Your Honor.  I think the Second Circuit has --

7        THE COURT:  Well, that's right.  So my point is, I'm

8    puzzled by your apparent desire to relitigate that issue when I

9    ruled and at least seemingly properly anticipated what the

10   circuit would say about that issue.  Which means that we're now

11   up to either an en banc by the Second Circuit in saying that it

12   didn't mean it, or by the United States Supreme Court in saying

13   that the Second Circuit got it wrong.

14       MR. D'APICE:  I don't wish to relitigate the issue,

15   Your Honor.  All I'm pointing out is that if the goal here is

16   to get our arms around the universe of asbestos claims and

17   treat them fairly, there are well-worn paths and well-trod ways

18   to do that.

19       THE COURT:  No.  Forgive me, Mr. D'Apice.  Then I

20   don't understand the thrust of your point that you want to get

21   another bite at the apple on an injunction that protects the

22   purchase.

23       MR. D'APICE:  Your Honor, if a 524(g)trust were

24   established, that's a possibility.

25       THE COURT:  No, forgive me.  Because I don't know if

22

1  this is just aggressive advocacy or if it's out of line.  But I

2  ruled at some length on whether or not there would be

3  injunctive protections against the purchaser on claims that are

4  claims against this estate on successor liability issues.  I

5  ruled on the basis of a Second Circuit order which later was

6  followed by a Second Circuit opinion which laid it out at much

7  greater length even than I did, and I've been justifiably

8  criticized for writing an awful lot sometimes, perhaps more

9  than I need to.

10  So what are you telling me that you want to do about

11  objecting to the injunction that I previously ordered?

12  MR. D'APICE:  Your Honor, I'm not here to object to

13  the injunction that you previously ordered.  That was not my

14  intent.  My only intent was to describe the methodology that's

15  been used in other cases for handling mass torts, mass

16  asbestos -- numbers of asbestos claims.  I wasn't trying to

17  relitigate the injunction or talk about -- or challenge the

18  injunction issue.  I was just talking about how to handle

19  asbestos claims in a bankruptcy case.  And one way to do it is

20  the 524(g) trust, as Your Honor --

21  THE COURT:  One way to do it is a 524(g) trust.  And

22  parties can be heard and discuss with each other as to whether

23  that's necessary or appropriate here.  But I don't see how

24  that's an issue for today.

25  MR. D'APICE:  Well, I understand, Your Honor.  I'm

23

1    only offering that up as an option, because if such a trust

2    were established, a bar date and proofs of claims would not be

3    necessary and would be a waste of debtor assets, because they

4    wouldn't really look at the proofs of claims.

5         My only point, Your Honor, is that if you get the

6    proofs of claims and you try to estimate them here in this

7    Court, we've got a liquidating plan.  So they will

8    effectively -- and this issue may have to be briefed -- but

9    they would effectively be estimated for liquidation purposes,

10   for distribution purposes.  Unless I'm missing something, Your

11   Honor, there's no -- if a claim is estima -- if a tort

12   claimant's claim is estimated and it turns out the estimate

13   is -- it's estimated for purposes of allowance of the claim and

14   for purposes of the plan but not for distribution, if it later

15   turns out that the estimation was too low, I believe the tort

16   claimant has a right to come back and seek to have that

17   remedied.  But in this case, I don't see where there would be

18   any ability to come back, because it's a liquidating claim.

19   Unless I'm missing something, Your Honor, I don't see where

20   that's an issue.

21        So my only point was that yes, estimation is I think

22   an advisable way to go.  I think it works.  But you don't need

23   proofs of claim for estimation.  It adds a layer of bureaucracy

24   in the case that's not only trouble -- a burden on the

25   claimants, but it also ultimately will be a burden on the

24

1    debtor.  But that's their choice, and I'm not going to -- if

2    they want to do that, I'm not going to dispute that.

3         But in terms of the notice that's given, Your Honor,

4    again, I point out, this company's been operating for decades,

5    and it has far-flung operations, and there's claimants in

6    virtually all the states.  The debtor's database will reflect

7    where the bulk of those claimants are.  Many of them are not --

8    probably, I don't know this for a fact, but I would assume that

9    many of the claimants, particularly those whose claims are

10   accruing most recently, are not yet represented by counsel.

11        How are all these people going to be noticed?  Is

12   debtor planning to send notices to all of the tens of thousands

13   of claimants that it knows about already in its databases?  I

14   don't know the answer to that, Your Honor.  I think that would

15   potentially be a very expensive undertaking.  Is it planning to

16   advertise in newspapers in the locales, the regions, the states

17   where the bulk of these claimants are?  I don't see that they

18   volunteered that, Your Honor.

19        And in terms of notifying -- publishing notices in the

20   national papers, I think, Your Honor, with respect, I think the

21   bar, it may have pockets of it that are well organized, but

22   there are also many attorneys out there who are not part of any

23   well-organized network, and these things -- for this number of

24   claimants, I would respectfully submit, they need to be heavily

25   noticed and ample time given for claimants to recognize that

25

1    they have claims against Motors Liquidation and any of the

2    other entities that the debtors that survive and have been

3    renamed, and they can pursue those claims.

4         Your Honor, with all respect, the debtor is, as we all

5    know, a fiduciary to its creditors.  It holds a high duty to

6    those creditors.  And the notice that should be given under the

7    case law that we've cited and under the Mulane (ph.) Supreme

8    Court case from Judge Jackson, is the kind of notice you would

9    give if you actually wanted people to get the notice.  And in

10   order to do that, with the tens of thousands of claimants,

11   we're talking about a tremendous amount -- it seems to me, a

12   tremendous amount of time and effort spent identifying, finding

13   their addresses, if you don't have their addresses, for some

14   reason, and mailing the notice out to them.

15        THE COURT:  Are the people who assert asbestos claims

16   people who worked in factories where brake linings or other car

17   components were crafted, or are there consumers who somehow say

18   that by driving a Chevy you get asbestos exposure?

19        MR. D'APICE:  I don't know about the latter, Your

20   Honor.  I would imagine that the claimants include workers in

21   manufacturing.  I understand also that the claimant class would

22   include workers who repaired automobiles or who worked on

23   brakes or other component parts that had asbestos in them,

24   whether they were repairing them, cutting them, or whatever.

25        THE COURT:  Well, local garages would be all over the

26

1    country.  Are you suggesting that some kind of notice has to be

2    crafted that's going to capture every mechanic in every garage

3    across the United States?

4         MR. D'APICE:  No, Your Honor.  What I'm suggesting is

5    that if debtor has a database, as we've seen in their papers, a

6    database of existing claimants or known claimants, that those

7    claimants, I think, would need to receive mail notice.  And

8    whether or not debtor has all their addresses, I don't know.

9    But I think those people need to receive notice by mail.

10        The motion, I thought was a little -- you know, the

11   motion says if we've got their addresses we'll use them; if we

12   don't have them, we won't use them.  I think the burden on the

13   debtor is a little bit higher than that with respect to its

14   known creditors.  I believe it has to find the addresses for

15   those people and mail out the notices.

16        And then when you do publications in the national

17   papers, if you want to be sure to cover the area and give

18   adequate notice, I think we've also got to include publications

19   like Mealey's.  I mean, I'd point out to Your Honor, in

20   debtor's reply, they attached the bar date order from the

21   Quigley case.  And this was attached to debtor's reply filed

22   Friday.  And in Quigley, not only did -- the order I'm looking

23   at, I didn't see any other orders from Quigley.  But the order

24   that I'm looking at carved out asbestos-related personal injury

25   claims from the bar date.  It said, "Holders of the following

27

1    claims need not and should not file a proof of claim on or

2    before the general claims bar date."  And one of them is "an

3    asbestos-related personal injury claim, other than a claim for

4    contribution, indemnity, reimbursement or subrogation."

5         And it also included publication notice in the

6    Mealey's litigation report for silica.  So I imagine there was

7    silica claims in that case.  I'm not sure.  I haven't gone back

8    since Friday to look at the Quigley case.  But in Quigley, at

9    least, there was at least the asbestos claimants were carved

10   out from or excluded from the general bar date.  Whether they

11   had a later bar date, I don't know, they may well have.  And

12   that may make sense.

13        But it's not an unusual thing to either -- to not set

14   a bar date for asbestos claims or to set a later bar date.

15   It's not unusual, Your Honor, and in purposes of this case, for

16   trying to get these claims resolved, our recommendation would

17   be that no bar date be set and that the claims be resolved

18   using the kind of econometrician analysis that's been done in

19   other cases.

20        With that, I would respectfully recommend

21   reconsideration.  This is not the proper point for that to

22   pursue the reconsideration.  But the ad hoc committee's motion

23   for the appointment of an asbestos claimants committee is still

24   pending.  Your Honor abated that, abated ruling on that until

25   later in the case.  And this may be an appropriate point in the

28

1    case for reconsideration of that motion so that we can get a

2    committee in place that can represent the interests of this

3    body of creditors.

4            With a procedure for doing that, I don't know.  I'm

5    not prepared to argue it today, but I toss that out there as a

6    thought for Your Honor and as a way to resolve these claims in

7    a sensible way.

8            THE COURT:  What is the Nealey's (sic) to which you

9    were making reference?

10           MR. D'APICE:  I'm sorry, Your Honor.

11           THE COURT:  What is the Nealey's (sic) to which you

12   were making reference?

13           MR. D'APICE:  It's a Mealey's publication on asbestos.

14   Mealey's asbestos litigation.

15           THE COURT:  It's like a newsletter that goes to

16   asbestos lawyers?

17           MR. D'APICE:  Mealey's, it goes out to --

18           THE COURT:  Is it Mealey's with an M or Nealey's with

19   an N?

20           MR. D'APICE:  I'm sorry.  Mealey's with an M as in

21   Michael.  It's M-E-A-L-E-Y-S.  Mealey's litigation reports.

22   They do it typically for -- or they have a large publication

23   for insurance.  They've evidently got one for silica.  They

24   have one for asbestos.  And they publish, I believe it's a

25   monthly basis.  And it's read by whoever subscribes to it, Your

29

1    Honor.  But I think at least in the asbestos industry, it's a

2    good source for keeping people apprised of what's happening in

3    the asbestos world.

4         THE COURT:  All right.  Thank you.  Anybody want to be

5    heard for a first time before I give people a second chance to

6    be heard?

7         Okay.  Mr. Karotkin, do you want to reply?

8         MR. KAROTKIN:  Thank you, Your Honor.  Stephen

9    Karotkin, Weil, Gotshal & Manges, for the debtors.

10        First of all, let me assure Mr. D'Apice, I wasn't

11   confused by his citation to the Eagle-Picher case at all, but I

12   thank him for his clarification.

13        I think, Your Honor, you put your finger on it when

14   you distinguished between the claims filing process and the

15   claims adjudication process and the claims estimation process,

16   and recognized that in many cases where there are asbestos-

17   related claims, the Court certainly has the authority to

18   estimate the claims for the purposes of plan confirmation.  And

19   certainly the debtors need to know the universe of claims,

20   together with the creditors' committee, to get to the plan

21   formulation process.  And I'm sure that Mr. D'Apice will

22   recognize that in connection -- although this is not an

23   asbestos case, and I'm not suggesting that it is -- in

24   connection with the estimation of any asbestos-related

25   liability, the starting point is the universe of present

30

1    claims.  We don't have that yet.

2        We have lawsuits that have been filed.  And we will

3    certainly -- let me make it perfectly clear, notice of the bar

4    date will be given to the attorneys of record in all of those

5    lawsuits that have been commenced.  And there may be other

6    claims out there.

7        THE COURT:  I assume that the great bulk of the people

8    asserting asbestos claims do it through lawyers.  But I assume

9    if any individual contacted the company and says I think I have

10    an asbestos claim, you would be mailing notice to --

11        MR. KAROTKIN:  Absolutely.

12        THE COURT:  -- any such person?

13        MR. KAROTKIN:  Absolutely, sir.  To the extent that

14    publication is inadequate, I find it kind of funny that Mr.

15    D'Apice says we ought to publish in Mealey's.  Mealey's is for

16    asbestos lawyers, the plaintiffs' lawyers.  And if he is

17    purporting to stand up before this Court and say the asbestos

18    lawyers in the United States do not know that General Motors is

19    in Chapter 11, I would find that absolutely astonishing,

20    absolutely astonishing.  They know what's going on.  He is

21    certainly in contact with them.  He knows what's going on.

22    He's been before this Court.

23        I think that what he's trying to do is revisit a

24    number of issues, and I think you called him on that.  Look,

25    this case is no different than any other case.  This is not an

31

1    asbestos case.  There are asbestos claims out there.  They will

2    be get appropriate notice.  The notice that we're providing is

3    well-designed to reach potential claimants out there.  It is

4    being widely published.  It's being published in USA Today.

5    Your Honor, we think the notice is more than adequate.

6           We are not trying to bind future claimants, obviously,

7    as Your Honor alluded to, those issues have been addressed by

8    Your Honor as well as the Second Circuit.  No one is requesting

9    or requiring that future claimants file claims because they

10   can't file claims.  And they certainly are not going to be, nor

11   will we take the position that pure future claimants are barred

12   by any proposed order you enter in connection with the bar

13   date.

14          But again, we are prepared to move forward.  We think

15   there's adequate notice.  If Your Honor has suggested and would

16   like us to give an additional fifteen days notice, I think we

17   all are amenable to that.

18          I would just like to point out one or two other things

19   that are more in the nature of housekeeping, if I may.  First

20   of all, if you change the date, it really doesn't matter.  But

21   it turned out that, I believe, November 9th was a Sunday so we

22   had to change it to November 10th.  We've also added, at the

23   request of the committee, a list at the end of the proposed

24   notice that lists the bond indentures and the QSIP numbers, so

25   people who have bond claims will be able to recognize that to

32

1    the extent they purely have a claim under a bond indenture,

2    that they don't have to file claims.

3        THE COURT:  This is a standard situation where they've

4    been scheduled, and even if they hadn't been scheduled, you'd

5    have a claim by the indenture trustee?

6        MR. KAROTKIN:  Yes, sir.  It does provide that the

7    indenture trustee has the authority to file the claim, and it's

8    not necessary for individual bondholders to file claims.  It's

9    simply based on the claim under the bond indenture.  If they

10   have other claims, obviously they --

11       THE COURT:  Of course.

12       MR. KAROTKIN:  -- would be required.  But again, we

13   think we've complied with the rules.  We think notice is

14   adequate.  And I think that Mr. D'Apice is raising a lot of red

15   herrings, because simply the plaintiff lawyers don't want to be

16   bothered.  Thank you.

17       THE COURT:  All right.  Mr. Rogoff?

18       MR. ROGOFF:  Just briefly, Your Honor.  Adam Rogoff on

19   behalf of the committee.  Briefly, Your Honor, from the

20   committee's perspective, we look back at the interests of all

21   the creditor groups that are out there.  And one thing I note

22   is we spent time this morning talking about the asbestos

23   claimants.  But there are also many other types of tort

24   claimants in this case:  personal injury victims --

25       THE COURT:  Such as somebody who's in a car wreck?

33

1          MR. ROGOFF:  Exactly, Your Honor.  And I'm not

2     advocating an expansion or exclusion, to say it differently, of

3     the bar date for those tort claimants.  I'm simply pointing out

4     that there are many other tort claimants in these cases who are

5     required to comply with the bar date.  And as a result, I don't

6     believe that we should be picking and choosing among tort

7     claimants to the prejudice of others, let alone to the

8     prejudice of other unsecured creditors in these cases.

9          Your Honor did note that distinction at the beginning

10    of his questioning, and I just thought it would be helpful, as

11    we've come presumably to the conclusions of the oral arguments,

12    just to note that that is correct.  There are many other tort

13    claimants in these cases who are going to be bound by the bar

14    date.  And that does help the estate as a whole map out the

15    appropriate plan process for all creditors.

16          THE COURT:  Okay.

17          MR. ROGOFF:  Thank you.

18          THE COURT:  Everybody had a chance to be heard?  All

19    right, sit in place, everybody.

20      (Pause)

21          THE COURT:  All right.  Ladies and gentlemen, subject

22    to some adjustments in the timing of the notice period and a

23    few words in the notice, I'm approving the debtors' motion.

24    And the following are the bases for the exercise of my

25    discretion in this regard.

34

1        The asbestos litigants' objection, when one puts aside

2   its hints that I should reconsider matters that I've already

3   ruled upon, boils down to two principal points, one of which is

4   that there should be a special rule for asbestos litigants,

5   absolving them from the duty applicable to all other creditors

6   in this case, to file proofs of claim, if their claims have not

7   been previously scheduled, or where they might be represented

8   by indenture trustees or other special representatives.  And it

9   argues that there should be special notice directed to the

10  subset of the creditors' community which might be asserting

11  asbestos claims.

12       In each case, I believe that that request is

13  inappropriate.  In my view, for the reasons that Mr. Rogoff

14  mentioned and similar reasons that he could have mentioned if

15  he had spoken at greater length, there should not be a special

16  rule for asbestos litigants, especially where, as here, that

17  raises the risk if not the certainty, of prejudice to the

18  remainder of the creditor community, which, to the extent it

19  matters, and frankly I think it does, is much, much larger than

20  the subset of the creditor community that is asserting asbestos

21  claims.

22       Asbestos claims -- and remember, we're talking about

23  present claims, we're not talking about future claims -- are a

24  species of personal injury claim.  And nobody has suggested,

25  properly in my view, that there should be a special rule for

35

1   general tort litigants such as products liability litigants,

2   people who are in car wrecks.  And we have to keep our eye on

3   the ball, which is to get our arms around the universe of

4   claims.  We're not going to be able to liquidate them all that

5   quickly, of course, but we'll know what's out there, so that we

6   can get value into the pockets of the creditors as quickly as

7   possible.

8         I don't think it's either necessary or appropriate for

9   me to prejudge how the debtor and the creditors' committee are

10  going to be putting their noodles together to structure the

11  liquidating plan.  But it's at least conceivable, by way of

12  example, that they might want to create a reserve to deal with

13  claims that can't be liquidated right away and get value out to

14  those people whose claims are fixed, so that the entirety of

15  the creditor community doesn't have to be penalized for

16  uncertainty.

17        I don't know if they'll choose that approach or not,

18  but one thing that they need to do before they can work out the

19  mechanics for getting value into the pockets of creditors, is

20  to get their arms around the universe of claims.  That seems to

21  me so fundamental and so commonsense that I don't see how any

22  reasonable person could quarrel with that.

23        Now, I thought that an extra couple of weeks would be

24  in the interests of the creditor community, and that seems to

25  have elicited no significant objection.  The task, as we talked

36

1    about in colloquy, is to balance the needs and concerns of the

2    entirety of the creditors community in getting value out to

3    creditors by keeping moving the case forward, against the need

4    which we have to be careful about, which is to cut off their

5    opportunity to file claims.  And for that reason, in the

6    exercise of my discretion, I think sixty days is better than

7    forty-five.  But I think that with that adjustment, what the

8    debtors have proposed is appropriate.  And I'm going to approve

9    them.

10            Then we get to the quality of the notice and the

11   quality of the publication.  I think the debtors said that I

12   don't need to order it because they're doing it anyway, which

13   is actual mailed notice to all of the lawyers who have

14   represented asbestos claimants.  And I understand that to mean

15   people who either filed suit or wrote letters or made phone

16   calls or otherwise told the debtors that they intend to assert

17   those claims or that they're asserting them.  And to the extent

18   they're not represented by counsel, and frankly I think the

19   great bulk are represented by counsel, but to the extent

20   they're not, similar notice to them.

21            That's going to be the legislative history of this

22   order, Mr. Karotkin.  And I don't care whether it says that

23   you're going to do that in the order or whether you do it

24   without me ordering it, but one way or another, I expect you to

25   see that they get that notice that you said they would get.

37

1          I also considered the publication that's been proposed

2    to be satisfactory, especially since it's obvious to me that

3    the lawyers in the asbestos claim community are more than

4    capable of communicating with each other, and that they do that

5    all the time.

6          One point that was made in the papers did hit a

7    responsive chord with me.  I'm not going to direct that the

8    notice be rewritten, but I think that the objection that it was

9    wordy and lawyeresque and legalesesque was well taken.  I think

10   as a matter of best practices, the debtors' community should

11   start working on preparing its bar date notices in something

12   closer to plain English.  But I am not going to, today, order

13   that something that would be a matter of best practices will be

14   turned into a requirement, at least not in this case.

15         I will say that one of the common lawyer habits of

16   using three words to express one, I think, because it's so

17   important, needs to be fixed.  So instead of saying that if

18   they don't file claims they're going to be barred, estopped and

19   enjoined, or whatever the exact words that were used in that

20   draft notice, the notice should say that if you don't timely

21   file your proof of claim, you're going to be barred "dash"

22   forbidden "dash" from asserting the claim thereafter.

23         I don't know what estopped means in this sense.  I'm

24   not going to be sending out injunctions to a zillion people.

25   I'll see what the exact words were that troubled me.  I think I

38

1   paraphrased them reasonably close.

2       (Pause)

3       MR. KAROTKIN:  Your Honor, I believe it's in paragraph

4   6 of the notice.  Third line?

5       THE COURT:  Right you are, Mr. Karotkin.  And my

6   memory of the words that had been used was pretty accurate.  So

7   in that paragraph 6, instead of saying "barred, estopped and

8   enjoined," I want you to say "barred - that is forbidden - from

9   asserting the claim," going on.  I don't want to use three

10  words where one is sufficient, and I want it to be of a type

11  that a person of ordinary intelligence understands the

12  consequence of not doing it.

13      With those adjustments, the motion is granted and the

14  notice is approved.  And Mr. Karotkin, I'll leave it to you and

15  your folks to paper the ruling and implement it.

16      MR. KAROTKIN:  Thank you, sir.

17      THE COURT:  All right, folks.  I don't know if this is

18  you, Mr. Karotkin, or you, Mr. Smolinsky.  I think we have a

19  number of other matters that are not controversial.  Do you

20  want me to do them, or do you just want to submit orders on

21  them or how would you like me to proceed on that?

22      MR. SMOLINSKY:  Thank you, Your Honor.  Joe Smolinsky.

23  We'd be happy to submit orders.  There is one matter on the

24  10:30 calendar, the Environmental Testing, that I think I'd

25  like to just explain where we came out.

39

1        THE COURT:  Yes.  If you don't have anybody showing up

2   at 10:30, can we do it right now?

3        MR. SMOLINSKY:  We certainly can, Your Honor.

4        THE COURT:  Okay.  Let's do it.

5        MR. SMOLINSKY:  Your Honor, you'll recall that the

6   subject lease was rejected earlier in these cases.  ETC then

7   filed a motion for allowance of an administrative expense and a

8   motion for payment of an administrative expense for real estate

9   taxes, amounts due under service contracts, and approximately

10  1.8 million dollars for environmental remediation and

11  restoration of the property.  The lease, when it was rejected,

12  had about six months to run on the lease.

13       The debtors have been working with ETC to reconcile

14  the claims and to try to come to grips with the different --

15  the types of claims.  And we ultimately came to resolution

16  embodied in a stipulation.  ETC is going to receive an

17  administrative expense claim in the amount of 65,000 dollars,

18  which will be paid within seven business days of entry of a

19  final order.  Additionally, ETC will receive an unsecured

20  prepetition claim in the amount of 975,000 dollars, which is in

21  full and final satisfaction of all of their remaining rejection

22  claims and any other claims that they might have, under the

23  lease or otherwise.

24       And I think, Your Honor, that that fully resolves the

25  matter.  We have a stipulation which we can hand into chambers.

40

1       THE COURT:  Okay.  That's fine, Mr. Smolinsky.  And

2  why don't you or one of your folks just drop it off across the

3  hall when we're done?

4       MR. SMOLINSKY:  Thank you, Your Honor.

5       THE COURT:  And actually, I think we are done now,

6  aren't we?

7       MR. SMOLINSKY:  We are, Your Honor.

8       THE COURT:  Okay.  Thank you, folks.  Have a good day.

9       MR. SMOLINSKY:  Thank you, Your Honor.

10      (Proceedings concluded at 9:59 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

41

1

2                         I N D E X

3

4                         RULINGS

5                                 Page      Line

6    Debtors' Motion for Order 33       23

7    Pursuant to Section

8    502(b)(9) of the

9    Bankruptcy Code and

10   Bankruptcy Rule

11   3003(c)(3) Establishing

12   the Deadline for Filing

13   Proofs of Claim Approved

14   with Modifications

15

16

17

18

19

20

21

22

23

24

25

42

1

2                              C E R T I F I C A T I O N

3

4        I, Penina Wolicki, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        Penina Wolicki

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:  September 15, 2009

16

17

18

19

20

21

22

23

24

25