

EXHIBIT "A"

tabbies®

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER 07-15083    DIVISION G    SECTION 11

FILED _____    DEPUTY CLERK

JEANETTE GARNETT PICHON, ROLAND L. PICHON, MARK P. PICHON, PATRICE
PICHON ROBINSON, TRACY PICHON BAHAM, VERONICA PICHON JOSEPH, and
CADE PICHON HAGGER

VERSUS

ASBESTOS DEFENDANTS, ET. AL.: BAYER CROPSCIENCE, INC. (AS SUCCESSOR OF
LIABILITY TO RHONE-POULENC AG COMPANY F/K/A AMCHEM PRODUCTS, INC.
F/K/A BENJAMIN FOSTER COMPANY), SEVILLE, INC. (formerly, BRANTON
INSULATIONS, INC.); CONTINENTAL INSURANCE COMPANY; DETROIT DIESEL
CORPORATION; EAGLE, INC.; FOSTER-WHEELER, LLC; GARLOCK SEALING
TECHNOLOGIES, LLC; GENERAL MOTORS CORPORATION; GEORGE ENGINE
COMPANY, INC.; MARYLAND CASUALTY COMPANY; THE MCCARTY
CORPORATION (successor to MCCARTY INSULATION, INC., and predecessor and successor to
MCCARTY INSULATION SALES, INC.); 3M COMPANY (formerly, MINNESOTA MINING
AND MANUFACTURING COMPANY); OWENS-ILLINOIS, INC.; REILLY-BENTON
COMPANY, INC.; TAYLOR-SEIDENBACH, INC.; ONEBEACON AMERICA INSURANCE
COMPANY (as successor to COMMERCIAL UNION INSURANCE COMPANY and
EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY); AMERICAN
EMPLOYERS INSURANCE COMPANY; TRAVELERS CASUALTY AND SURETY
COMPANY (f/k/a THE AETNA CASUALTY & SURETY COMPANY); JAMES A.
DUBUISSON, JR.; ROBERT A. GARDEBLED, SR.

---

**PETITION FOR DAMAGES**

---

The Petition of Jeanette Garnett Pichon (surviving spouse of Leon Roland Pichon) and,
Roland L. Pichon, Mark P. Pichon, Patrice Pichon Robinson, Tracy Pichon Baham, Veronica
Pichon Joseph, and Cade Pichon Hagger (children of Leon Roland Pichon), all persons of the full
age of majority, with respect represent:

1.

Leon Roland Pichon was exposed to the toxic substances that caused his injuries on the
premises of Halter Marine, Inc. in Orleans Parish. Additionally, defendants, Eagle, Inc. and
Taylor-Seidenbach, Inc., are domestic corporations with their registered offices in the Parish of
Orleans, State of Louisiana. In addition, the tortious conduct of all defendants occurred in the
Parish of Orleans. Accordingly, venue is proper in Orleans Parish against all defendants pursuant
to Louisiana Code of Civil Procedure Articles 42 and 73.

2.

BAYER CROPSCIENCE, INC. (successor to Benjamin Foster Division of Amchem
Products, Inc.), SEVILLE, INC. (formerly, BRANTON INSULATIONS, INC.), DETROIT
DIESEL CORPORATION; EAGLE, INC., FOSTER-WHEELER, LLC, GARLOCK SEALING
TECHNOLOGIES, LLC (formerly, GARLOCK, INC.); GENERAL MOTORS
CORPORATION; GEORGE ENGINE COMPANY, MARQUETTE INSULATIONS, INC.;,

THE MCCARTY CORPORATION (successor to MCCARTY BRANTON, INC., and predecessor and successor to MCCARTY INSULATION SALES, INC.), MINNESOTA MINING AND MANUFACTURING COMPANY (3M), OWENS-ILLINOIS, INC., REILLY-BENTON COMPANY, INC., and TAYLOR-SEIDENBACH, INC. *(hereinafter collectively referred to as "asbestos defendants")*, are all corporations incorporated under the laws of the various states of the United States. Asbestos defendants all have their principal place of business in various states of the United States. All of them may be served under and by virtue of the Long Arm Statute of the State of Louisiana, either through their authorized agents, servants, and/or employees, or through the Secretary of State, State of Louisiana.

3.

At all times material herein, Maryland Casualty Company was the insurance carrier covering Marquette Insulations, Inc. and its executive officers, including Claude Marquette, for the liability asserted herein. Marquette Insulations, Inc. is dissolved. Accordingly, plaintiffs herein assert a direct action against this insurance company.

4.

ONEBEACON AMERICA INSURANCE COMPANY (as successor to COMMERCIAL UNION INSURANCE COMPANY and EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY) and AMERICAN EMPLOYERS INSURANCE COMPANY were at all times material herein, insurers of Eagle, Inc. (formerly Eagle Asbestos & Packing, Inc.) and plaintiffs assert a direct action against these insurance companies for the liability of Eagle, Inc.

5.

At all times material herein, Continental Insurance Company was the insurance carrier covering George Engine Company for the liability asserted herein. George Engine Company is no longer in business. Accordingly, plaintiffs herein assert a direct action against this insurance company.

6.

In addition to manufacturing, distributing, and selling asbestos-containing products to which Mr. Pichon was exposed and which resulted in his injuries and death, George Engine Company provided maintenance services for various vessels, including the yacht September Song. During such maintenance, Leon Roland Pichon was exposed to asbestos as a result of the activities of George Engine Company. George Engine Company personnel supervised and performed such maintenance, which occurred on the premises of Halter Marine and George Engine Company, as well as various other locations. George Engine Company failed and/or refused to provide adequate protections to Mr. Pichon, failed and/or refused to take adequate

precautions and failed and/or refused to warn Mr. Pichon of the unreasonably dangerous nature of asbestos.

7.

Defendant, General Motors Corporation, *hereinafter sometimes referred to as "GM"*, has been a member of the Industrial Hygiene Foundation since 1942, an industry organization that apprised its members of the hazards of asbestos as early as the 1930's and whose knowledge is discussed in detail, *supra.* GM has also been a member of the National Safety Council since 1923. In 1961, George A. Jacoby, H.S. McFarland and J.M. Roche, all executive officers of GM, served on the Board of Directors of the National Safety Counsel and John F. Gordon, another GM executive, served as Trustee. The same year, Dr. Herbert K. Abrams, M.D., presented a paper to the National Safety Council entitled "Occupational Health Hazards--Medical Aspects," discussing the fact that asbestos causes "serious lung disease" in workers and outlined seven (7) specific steps that could be taken to prevent such disease. In addition, GM has held membership in the American Industrial Hygienists Association, which also disseminated information regarding the hazards of asbestos, since 1943.

8.

Travelers Casualty and Surety Company (f/k/a: The Aetna Casualty & Surety Company) is a foreign corporation licensed to do business in the State of Louisiana, who, at all times material herein, was the insurance carrier covering Halter Marine, Inc. and the executive officers of Halter Marine, Inc. for the liability asserted herein.

9.

Harold P. Halter, James A. Dubuisson, Jr., Robert A. Gardebled, Sr., Richard Neyland, Daniel Strahan, Joseph Norra, Cal Luc, Don Barrios, Earl Robert, and Cliff Oliver were all of the full age of majority and residents of the State of Louisiana at the time plaintiff was exposed to the harmful substances which have resulted in his mesothelioma and other ill health effects related thereto, and at all times material herein, were executive officers of Halter Marine, Inc. (hereinafter sometimes referred to as "Halter" or "Halter Marine") with specific responsibilities for the health and safety of Mr. Pichon and his fellow employees at the time Mr. Pichon was exposed to the substances which resulted in his mesothelioma and other related ill health effects. Harold P. Halter, Richard Neyland, Daniel Strahan, Joseph Norra, Cal Luc, Don Barrios, Earl Robert, and Cliff Oliver are either dead or cannot be located. Likewise, Halter Marine is no longer in business. Pursuant to the Louisiana Revised Statute 22:655, plaintiffs herein assert a direct action against Travelers Casualty and Surety Company (f/k/a: The Aetna Casualty & Surety Company) who, at all times material herein, was the insurance carrier covering Halter

Marine and the executive officers of Halter Marine for the liability asserted herein. As stated above, Harold P. Halter, James A. Dubuisson, Jr., Robert A. Gardebled, Sr., Richard Neyland, Daniel Strahan, Joseph Norra, Cal Luc, Don Barrios, Ealr Robert, and Cliff Oliver were also the executive officers of Halter Marine with specific responsibilities for the health and safety of Mr. Pichon and his fellow employees. They, too, were covered for the liability asserted herein by Travelers Casualty and Surety Company (f/k/a: The Aetna Casualty & Surety Company) and plaintiffs assert a direct action against this insurance company for the liability of these individuals.

10.

Leon Roland Pichon was employed in various positions by or on the premises of Halter Marine, Inc. from approximately 1955 through 2004. On a daily basis during this employment, Mr. Pichon was exposed to dangerously high levels of toxic substances, including asbestos, in the normal routine course of his work. At all times during Mr. Pichon's foregoing employment, he was exposed to asbestos and asbestos-containing products manufactured, distributed, and sold by "asbestos defendants."

11.

Prior to September of 1975, Leon Roland Pichon, was exposed to asbestos on a daily basis, and he contracted cancer, lung cancer, and mesothelioma as a result thereof, although it did not manifest itself until September 2006. The exposures to Mr. Pichon prior to September of 1975 caused and/or contributed to Mr. Pichon's development of cancer, lung cancer, and mesothelioma, although the disease did not manifest itself at that time. Mr. Pichon's diagnosis of asbestos-related cancer is directly attributable to his exposure to asbestos fibers prior to September of 1975. The medical evidence shows that Mr. Pichon began to sustain tissue damage shortly after the inhalation of asbestos fibers and that he sustained distinct bodily injury in each year of his occupational exposure to asbestos.

12.

As a result of his exposure to asbestos fibers, Leon Roland Pichon, contracted cancer, lung cancer, and mesothelioma, which was first diagnosed on or around September 6, 2006. Mr. Pichon died on November 25, 2006, as a result of cancer, lung cancer, and mesothelioma, complications therefrom and/or complications from treatment therefrom, and other ill health effects which resulted from exposure to asbestos.

13.

At the time of his death, Leon Roland Pichon, was survived by his wife, Jeanette Garnett Pichon and his children, Roland L. Pichon, Mark P. Pichon, Patrice Pichon Robinson, Tracy

- 4 -

Pichon Baham, Veronica Pichon Joseph, and Cade Pichon Hagger, who herein assert all survival and wrongful death claims and rights to which they are entitled as a result of the injury and death of Leon Roland Pichon.

14.

Halter Marine and the executive officers of Halter Marine were aware or should have been aware of the dangerous condition presented by exposure to asbestos and other toxic substances, and that Mr. Pichon would suffer from asbestos-related disease, including cancer, lung cancer, mesothelioma and other related ill health effects, as a result of this exposure, but they failed and/or willfully withheld from Mr. Pichon knowledge of the dangers to his health from exposure to asbestos fiber and other toxic substances.

15.

Halter Marine and the executive officers of Halter Marine had the responsibility of providing Mr. Pichon with a safe place to work and safety equipment with which to conduct his work; however, they negligently and/or intentionally failed to carry out these duties and failed to protect Mr. Pichon from the dangers of toxic fiber and dust exposure knowing full well or being substantially certain that certain workers, including Leon Roland Pichon, would develop disease as a result thereof.

16.

In addition to the foregoing acts of negligence and intentional concealment, Halter Marine and the executive officers of Halter Marine were and are guilty of the following:

a)  Failing to reveal and knowingly concealing critical medical information to Mr. Pichon;

b)  Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos, and other harmful substances in their manufacturing process and/or in connection with the work which exposed Mr. Pichon,

c)  Failing to provide necessary protection to Mr. Pichon;

d)  Failing to provide clean, respirable air and proper ventilation;

e)  Failing to provide necessary showers and special clothing;

f)  Failing to segregate work areas so that workers would not be exposed to deadly asbestos fiber;

g)  Failing to provide necessary respiratory protection;

h)  Failing to warn employees of the dangers associated with exposure to asbestos; and

I)  Failing to use non-asbestos containing products including on jobs where non-asbestos containing products were specified.

j)  Wanton and reckless disregard in the storage, handling, and transportation of asbestos;

k)   Requiring employees to dispose of asbestos in dumpsters instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

l)   Requiring employees to dispose of asbestos under buildings instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

m)   Failing to warn of the dangers of exposure to asbestos;

n)   Failing to warn employees that exposure to asbestos could cause deadly diseases including mesothelioma, asbestosis, pleural thickening, and pleural plaques;

o)   Failing to warn employees of the invisible nature of harmful asbestos, that it could be carried home on clothing and other objects by a worker, and that it could cause diseases such as asbestosis, pleural plaques, pleural thickening, and mesothelioma; and

p)   other acts which may be revealed at the trial of this matter.

These defendants committed these intentional acts knowing full well that Mr. Pichon's injuries would follow or were substantially certain to follow.

17.

Defendants, Halter Marine and the executive officers of Halter Marine , had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Mr. Pichon and for which these defendants are strictly liable under Louisiana law.

18.

Defendants, Halter Marine and the executive officers of Halter Marine, were the owners of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Mr. Pichon, and for which defendants are strictly liable under Louisiana law.

19.

In addition to the acts of negligence, strict liability, and fault identified throughout this petition, Halter Marine is strictly liable under a theory of premises liability. Halter Marine was aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that Mr. Pichon would suffer from asbestos-related diseases and other ill health effects associated therewith as a result of this exposure, but they failed and/or willfully withheld from Mr. Pichon knowledge of the dangers to their health from exposure to asbestos fiber.

20.

Defendants, Halter Marine and the executive officers of Halter Marine , are answerable for the conduct of those handling asbestos products on their premises, which asbestos was

defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury to Mr. Pichon, and for which defendants are strictly liable under Louisiana law.

21.

Defendants, Halter Marine and the executive officers of Halter Marine , are responsible for the conduct of those individuals and companies working on their premises with asbestos products which resulted in exposure to asbestos to Mr. Pichon, which asbestos was defective and which presented an unreasonable risk of harm, and which asbestos resulted in the injury to Mr. Pichon, and for which defendants are strictly liable under Louisiana law.

22.

Defendants, Halter Marine and the executive officers of Halter Marine, were involved in an ultra-hazardous activity in the handling of asbestos, which asbestos resulted in the injury to Mr. Pichon, and for which defendants are absolutely liable under Louisiana law.

23.

As a result of the aforementioned acts of negligence, intentional tort, fraud, strict liability, and absolute liability of all of the hereinabove named defendants, Mr. Pichon contracted asbestos-related cancer, lung cancer, and mesothelioma and other related ill health effects as a result thereof, for which all defendants are jointly, severally, and in solido liable.

24.

During Leon R. Pichon's employment, he was provided with masks manufactured by defendant, Minnesota Mining and Manufacturing Company. Although these masks were marketed, advertised, and sold by Minnesota Mining and Manufacturing Company as providing necessary and adequate respiratory protection against the ill effects of asbestos and other exposures, in fact, said masks provided little or no protection against toxic exposures. Contrary to representations made by Minnesota Mining and Manufacturing Company, the masks allowed excessive amounts of asbestos fiber and other harmful substances through the filters and around the face piece exposing Mr. Pichon to the inherent dangers involved in the inhalation of these substances. In addition to the foregoing, Minnesota Manufacturing and Mining Company is guilty of the following:

a)    Manufacturing an unreasonably dangerous per se product;

b)    Breach of warranty;

c)    Manufacturing a product defective in design;

d)    Intentional misrepresentation of its product;

e)    Failing to properly warn against the dangers inherent in the use of its product;

f)    Failing to provide proper instructions in the use of its product;

g)    Failure to properly warn and instruct regarding the limitations of its product;

- 7 -

h)   Any other acts which may be revealed at the trial of this matter.

25.

Minnesota Mining and Manufacturing Company ("3M") was the manufacturer of the 8500 and 8710 respirators, which were utilized by workers (including Leon Pichon). DOP and NaC1 testing make clear that the filter media found in the 8500 and 8710 permit substantial leakage of small respirable particles, particularly those submicron in size. 3M was well aware of these facts and fraudulently and/or intentionally withheld such information from the consumer end user and consuming public, in an effort to gain an unjust advantage over said individuals and to continue to reap profits from the sales of said respiratory products.

26.

3M has long been aware of the importance of guarding against the inhalation of submicron size particles in preventing lung disease. Further, 3M recognized that workers generally wore their respirator upon seeing visible dust. 3M was also aware that the typical particle in industry was .5 micron in size. 3M has also been aware of limitations and criticisms of the silica dust test. Despite all of this knowledge, 3M fraudulently misrepresented and/or suppressed this information from the users and/or consumers of its products in an effort to gain an unjust advantage over unsuspecting victims, and to continue making profits from the sales of said respiratory products.

27.

In its advertising materials and catalogues, 3M made various misrepresentations of fact, which were not scientifically valid, such as: From 1972 until 1983, 3M promoted the 8710 (and earlier the 8500) for all concentration levels. 3M did not include in any of its marketing literature or use instructions during this time a maximum concentration over the TLV or PEL in which the 8500 or 8710 could not be used. This fostered the belief in users of the products that the respirators could be safely used under most (if not all) conditions.

Furthermore, 3M misrepresented the safety features offered by its products and expressly or impliedly represented that the respirators specifically prevented submicron size contaminants from reaching the lung. 3M represented that the 8710 "protects nose, mouth and lungs from lung damaging dust", that "The 8710 stops pneumoconiosis and fibrosis producing dusts from ever reaching the lungs", that "The nose needs help. It's not efficient enough to filter out everything harmful to a worker's lungs. ... The 3M Brand Respirator 8710 is efficient enough", that "The 3M Respirator is so effective, it's 99% efficient against dusts with a mean particle diameter of 0.4 to 0.6 microns", and that the 8710 "stops sand and silica and certain other matter that is suspected of producing pneumoconiosis and fibrosis." These fraudulent misrepresentations and/or suppressions

- 8 -

of the truth were employed by 3M with the intent to gain an unjust advantage over unsuspecting users and/or consumers of its products, and to continue the profits of 3M from the sales of said respiratory products.

28.

3M's use and fitting instructions were also inadequate. At all relevant times herein, there was no practical and reliable test atmosphere to fit test the 8500 or 8710. Prior to the early 1980's, 3M only provided its own unique positive pressure fit check procedure. A positive pressure test is not appropriate for use in the selection and assignment of a respirator to a particular individual. Moreover, this fit check only identifies, at best, gross or large face-seal leaks.

In addition, 3M's fitting instructions were incomplete and inadequate in other respects. For example, for years 3M instructed the user to pinch the metal clip on the 8710 with one hand to ensure a good fit. Later, however, 3M changed its use instructions and indicated that using one hand to fit the metal clip was inappropriate.

3M erroneously instructed its users to exhale vigorously and to cup their hands over the respirator, both of which are flaws in 3M's positive pressure test.

The saccharin test, as developed by 3M, was a poor fit check procedure because it utilized large size particulates.

3M was also aware that the coal dust and talc powder fit tests were inadequate, and that multiple sizes of the respirators were recommended to ensure fitting the general population. Despite the foregoing, 3M fraudulently withheld this information from the users and/or consumers of its products in an effort to gain an unjust advantage over said users and/or consumers and to continue generating profits from the sale of its respiratory products.

29.

Internal quality control testing performed by 3M establishes that the 8710 routinely failed NIOSH breathing resistance requirements. The scientific literature explains that increased resistance through the filter media causes increased leakage through the face seal.

30.

3M was aware that its 8500 mask was being used by individuals working with and/or around asbestos. 3M was also aware that the mask leaked significant amounts of respirable sized particles. It was well known that shipyard facilities contained significant amounts of respirable asbestos, and that asbestosis and mesothelioma were well recognized hazards associated with work involving asbestos. Yet 3M failed to take appropriate remedial measures. 3M Documents reflect their knowledge of the defects in their product and their suppressions of this information, which include, inter alia, the following: (8500 banned at a location because "of the extreme difficulty in controlling

its use"), (in paint spray industry, "some of our published information may have been a little misleading"), ("another problem area is when the mask is accepted it rapidly spreads where it shouldn't be used"), ("The 8500 filter mask can only be used in atmospheres that are non-toxic in nature. Silica dust is classified as a toxic dust."—and so is asbestos dust). Nevertheless, this information was fraudulently suppressed by 3M from users and/or consumers of its respiratory products so as to continue the profits of 3M from the numerous sales of these products to the public.

31.

The 3M respirator's defects, including excessive filter penetration, inadequate fit, inadequate and improper instructions regarding use limitations, inadequate and improper instructions regarding the face fit or face seal check procedures, and misleading marketing literature were substantial contributing factors in causing asbestosis, silicosis, mesothelioma and other pneumoconiosis due to excessive exposures to harmful asbestos and/or silica particles by workers who used the 3M respirators in visible dust conditions and/or in areas or jobs that involve exposure to excessive respirable asbestos dust and/or silica dust. 3M was long aware of the defects in its products, but continued to fraudulently misrepresent its products and/or continued to fraudulently suppress this information from the users of its products, all in an effort to continue reaping profits from the sales of its respiratory products and to gain an unjust advantage over the unsuspecting users and/or purchasers of its products.

32.

While working at Halter Marine, Mr. Pichon was exposed to asbestos-containing products manufactured, distributed, and sold by all "asbestos defendants," including but not limited to, Bayer Cropscience, Inc.(successor to Benjamin Foster Division of Amchem Products, Inc.) -(adhesives, coatings, sealants, and mastics), General Motors Corporation, Detroit Diesel Corporation and George Engine Corporation (gaskets, packing pipe covering special fittings, blankets, adhesives, sealants and mastics), Foster-Wheeler Corporation (block and boiler insulation), Garlock, Inc. (gaskets and packing), Owens-Illinois, Inc.-(block, cloth, blankets, yarn, cement, and pipe covering), Branton Insulations, Inc., Eagle, Inc. (as successor to Eagle Asbestos & Packing Company) and The McCarty Corporation, Marquette Insulations, Inc., Reilly-Benton Company, Inc. and Taylor-Seidenbach, Inc. (pipe covering, blankets, special fittings, gaskets, blocks, valves, cements, adhesives, mastics, and jackets). In addition to manufacturing, distributing, and selling asbestos-containing products to which Mr. Pichon was exposed and which resulted in his injuries and death, Branton Insulations, Inc., George Engine Company, Eagle, Inc. (as successor to Eagle Asbestos & Packing Company) The McCarty Corporation, Marquette Insulations, Inc., Reilly-Benton Company, Inc. and Taylor-

- 10 -

Seidenbach, Inc., exposed Mr. Pichon to asbestos during their negligent and intentional conduct during contracting activities.

33.

The asbestos-containing products manufactured, distributed and/or sold by all "asbestos defendants" were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers. Further, defendants failed and refused to warn Mr. Pichon of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause diseases such as mesothelioma, asbestosis, pleural diseases, and other ill health effects.

34.

As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, and/or sold by the "asbestos defendants," Mr. Pichon inhaled asbestos fibers and other harmful substances emitted by the normal use of said products, proximately causing the mesothelioma and other related ill health effects from which he suffers and died. Plaintiffs further contend that said "asbestos defendants" are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions. Further, "asbestos defendants" are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

35.

Prior to the time Mr. Pichon was exposed to asbestos, all defendants were aware or should have been aware of the health hazards associated with exposure to asbestos, including but not limited to pleural plaques, fibrosis, asbestosis, cancer, and mesothelioma. Further, all defendants were aware or should have been aware that invisible asbestos particles could remain airborne for many hours and that exposure could occur even after actual use of the products ceased; nevertheless, defendants remained silent as to the unreasonably dangerous nature of the products which suppression of the truth was made with the intention of obtaining an unjust advantage over unsuspecting victims. Such conduct constitutes fraud under Louisiana law.

36.

All defendants made the misrepresentations cited in the foregoing paragraph despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the

dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

37.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Mr. Pichon was exposed to products manufactured, distributed, and sold by "asbestos defendants," and he contracted mesothelioma and other related ill health effects, which was first diagnosed on or about September 6, 2006, and from which he died.

38.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Pichon, and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law.

39.

The health hazards of asbestos have been recognized by those in the business for two thousand years. The Greek geographer Strabo and the Roman historian Pliny the Elder both recognized asbestosis in slaves whose task was to weave asbestos into cloth. There is conclusive evidence (more specifically outlined below) that by the end of 1930, it was widely known in the United States by those in the industry and their insurers that exposure to asbestos could cause asbestosis and cancer, that asbestosis was a fatal disease, and that the latency period of asbestosis and other asbestos-related disease was of many years duration subsequent to initial exposure, yet this knowledge was suppressed from workers like Mr. Pichon.

40.

By the time Mr. Pichon began working with and around asbestos products, virtually every state in the Unites States recognized asbestosis and silicosis as compensable claims under workers' compensation laws. In fact, the Louisiana legislature in 1952, when it enacted its first Workers' Compensation Occupational Disease Act, listed asbestosis and silicosis as a compensable occupational disease. Moreover, all suppliers (as well as independent contractors) to any company

with government contracts were bound to comply with health and safety requirements of the Walsh Healey Public Contract Act first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. They also required isolation of dusty work, ventilation, use of respirators, and medical examinations by doctors. Despite this, Mr. Pichon was never warned of any hazard associated with asbestos, was never protected by use of adequate ventilation, was required to work next to insulators using asbestos products and with and around silica, and was required to pick up asbestos containing debris and silica. He never saw a warning on any asbestos or silica product nor was he warned by any contractor using asbestos or silica products. Despite the fact that all defendants were aware of the hazards of asbestos and silica and other toxic substances to which Mr. Pichon was exposed, they failed and refused to warn of these dangers and, furthermore, concealed these hazards. Moreover, defendants suppressed and prevented the dissemination of information relating to the hazards of asbestos and silica exposure, thus constituting fraud under Louisiana law. Even after OSHA became the law in 1971, Mr. Pichon was not warned of the health hazards associated with exposure to asbestos.

41.

The acts of the defendants, as described above, constitute a fraudulent misrepresentation and/or concealment which proximately caused the injuries and death of Roland Pichon in the following manner:

1) The material published or caused to be published was false and incomplete and that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

2) The defendants intended the publication of false and misleading reports and/or the non-disclosure of documented reports of the health hazards of asbestos:

   a) To maintain a favorable atmosphere for the continued sale and distribution and use of asbestos and asbestos-related products;

   b) To assist in the continued pecuniary gain of the defendants through the sale of asbestos products to an ignorant public;

   c) To influence in the defendant's favor, legislation to regulate asbestos exposures and unlimited medical and disability claims for compensation;

   d) To provide a defense against lawsuits brought for injury and death resulting from asbestos disease;

   e) To prevent relevant medical inquiry about asbestos disease;

   f) To mislead the general public, and the Petitioner herein, about the hazards associated with asbestos products; and

   g) To induce the Petitioner to use and continue to use asbestos products.

3) The Petitioner reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the

absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products because Petitioner believed it to be safe.

4)  Defendants, intended the Petitioner to rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, and therefore to continue their exposure to those products.

5)  Defendants are in a position of superior knowledge regarding the health hazards of asbestos and therefore the Petitioner and others deciding to use the said asbestos-containing products to which Petitioner was exposed, had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

42.

Insurance premiums were set based on the risks posed by the insured. Insurance companies discussed the hazards of asbestos with insured who manufactured, used, or distributed asbestos products. Insurance field inspectors would survey the premises or operations of the insured, advise the insured of the hazard, and set the premium accordingly. This was true prior to the time that Mr. Pichon was first exposed to asbestos and continued throughout his employment. The fact that workers' compensation insurance carriers were concerned about asbestos is evidenced by the 1932 occupational disease report in "The National Underwriter" where asbestos was listed as a serious hazard receiving special attention "for some time" in insurance underwriting. When the Supreme Court of North Carolina (McNeely v. Carolina Asbestos Co., May 23, 1934) determined that asbestosis was compensable under its workers' compensation law, insurance executive F. R. Jones wrote that the McNeely case and others like it injected elements of uncertainty that rendered the hazards of asbestosis "often uninsurable at practicable rates."; he wrote that even though rates for those in the asbestos business were high, "their adequacy ... is generally doubted." To avoid losing money, insurance companies instituted a practice of servicing claims as well as providing the insurance--"sort of a right pocket to left pocket...in other words there wasn't any way (insurance companies) could lose money on it." (See deposition of Harry J. Flynn in Bradley v. Todd Shipyards, Inc., C.A. No. 85 - 05657, Div. "D", Civil District Court for the Parish of Orleans.)

43.

That all defendants and the companies that insured them knew of the health hazards associated with exposure to asbestos since the 1930s (and suppressed this information) is shown by numerous documents and testimony. In fact, the knowledge was so well recognized in the asbestos industry that the insurance industry considered confessing liability; instead, they decided to make it "economically impossible" for plaintiffs to pursue their claims. The minutes of meetings in 1976 and 1977 of American Mutual Insurance Alliance (an insurance industry association) confirm that the hazards of asbestos exposure have been known for many years. These minutes specifically state

that medical research in 1900 linked asbestos with asbestosis and by 1935 it was recognized that asbestos caused cancer. In a memorandum of a meeting of a discussion group dated April 21, 1977, it was stated: The meeting closed with a unanimous rejection of a suggestion that liability in asbestos cases be admitted and the carriers agreed between themselves as to their respective losses and expenses. That insurance companies and their insureds were working together to discourage plaintiffs from pursuing valid claims is also demonstrated in earlier memos. In minutes dated May 22, 1974, discussing Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, (5th Cir. 1973), cert. denied, 419 U.S. 869 (1974), it is stated: "The appeals court decision in the Borel case of course sets a very bad precedence for our other pending asbestosis cases and (sic) this jurisdiction we will soon have to formulate a **'game plan'** for the continued defense of these asbestosis cases **with the other defendants."** In a memo dated October 22, 1974, it was decided that the asbestos defendants and their insurance companies would resist pending cases "and attempt to make this economocially (sic) impossible for the plaintiffs to pursue the other cases." These attempts to prevent and stifle valid claims by plaintiffs such as Mr. Pichon and plaintiffs herein show that the defendants, to this day, are committing fraud.

44.

Documents and testimony of defendants herein as well as associated asbestos companies is replete with the fact of knowledge and fraud. Although Johns-Manville (hereinafter sometimes referred to as "J-M") and Raybestos-Manhattan, Inc. (hereinafter sometimes referred to as "R-M") are not defendants herein, a discussion of their knowledge is necessary to show knowledge within asbestos industry associations, within the insurance industry, and among other defendants. In 1929, Johns-Manville Corporation and Raybestos-Manhattan, Inc. agreed to permit the Metropolitan Life Insurance Company to conduct a complete Industrial Hygiene survey of some of their facilities, including J-M's asbestos mines and mills in the Province of Quebec. The initial investigation began in October of 1929 and was completed in January of 1931. The study included the following: a survey of the dust conditions in the asbestos mines, mills and fabricating plants; physical examinations of asbestos workers, including X-ray films; and a study of the dust exhaust systems designed to eliminate asbestos dust. This survey was supervised by Dr. Anthony J. Lanza, Assistant Medical Director of Metropolitan; Dr. William J. McConnell, Assistant Medical Director of Metropolitan; and J. William Fehnel, a chemist with Metropolitan. Subsequent to this initial study, meetings were held among Dr. Anthony J. Lanza, W. R. Seigle (Vice President of J-M), Vandiver Brown (General Counsel for J-M), S. A. Williams (President of Johns-Manville Products Corporation), and Sumner Simpson (President of Raybestos-Manhattan, Inc.). The minutes of these

meetings which occurred in November, 1933, through January, 1934, reflect that Metropolitan Life was desirous of conducting a follow-up study of the J-M and R-M facilities, as well as expanding the scope of the study to include additional J-M facilities and facilities of other members of the asbestos industry. Dr. Lanza felt that the Metropolitan Life Insurance Company should advise the companies of the types of respirators which should be provided to the employees engaged in making a study of this problem. On December 7, 1934, Dr. Lanza forwarded to Vandiver Brown, counsel for J-M, the "galley proof" of the results of the 1929 through 1931 survey of the R-M and J-M plants, entitled "Effects of Inhalation of Asbestos Dust on the Lungs of Asbestos Workers." This "draft" was also circulated to representatives of Raybestos-Manhattan, who prepared editorial comments and recommendations for Dr. Lanza concerning the final publication of the report. Johns-Manville prepared similar comments. The Metropolitan report informed Raybestos-Manhattan and Johns-Manville of the following: that prolonged exposure to asbestos dust caused pulmonary fibrosis; that asbestosis could cause cardiac enlargement; that it was possible for uncomplicated asbestosis to have fatal results; and that the amount of dust in the air in the asbestos plants surveyed could be substantially reduced. After incorporating some of J-M's and R-M's editorial suggestions, Dr. Lanza published "Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers" in the Public Health Reports, Volume 50, No. 1, January 4, 1935.

45.

In November 1936, Vandiver Brown of Johns-Manville, together with Sumner Simpson, President of Raybestos-Manhattan, solicited other members of the Asbestos Products Industry to participate in "asbestos dust experiments" by the Saranac Laboratory of the Trudeau Institute. Dr. Leroy U. Gardner was the director of the Trudeau Foundation at the time. A report of these works was prepared by Dr. Gardner on April 18, 1938. The report was sent to Vandiver Brown, who in turn sent it to Dr. Lanza for his comments.

46.

In 1942, Charles Roemer, a New Jersey attorney, was advised by his cousin, Dr. Jacob Roemer, that in the course of reviewing chest x-rays of employees at the Union Asbestos and Rubber Company's Paterson, New Jersey plant, he had observed a significant number with lung changes which he believed were due to asbestos exposure. Dr. Roemer advised that the men be informed of his findings and that they be instructed to secure outdoor employment which did not involve any exposure to asbestos dust. Dr. Roemer said that unless this was done immediately, the men would suffer and die from asbestos-related lung disease. Vandiver Brown acknowledged that J-M's physical examination program had produced similar findings of x-ray evidence of asbestos disease among workers, but told Mr. Roemer and the UNARCO representatives that it was foolish to be

- 16 -

concerned. Mr. Brown explained that it was J-M's policy to let its employees die of asbestos poisoning rather than inform them of health consequences which would undoubtedly lead to costly lawsuits against the company. As testified to by Mr. Roemer, "I'll never forget, I turned to Mr. Brown... and I said, 'Mr. Brown, do you mean to tell me you would let them work until they dropped dead?' He said, 'Yes. We save a lot of money that way.'" (Deposition Charles H. Roemer taken April 25, 1984, <u>Johns-Manville Corp. et al. v. the United States of American</u>, U.S. Claims Court Civ. No. 465-83C.)

47.

As a result of the aforesaid Metropolitan Life study, additional health research on the effects of prolonged and excessive inhalation of asbestos fiber on human beings was undertaken at the Saranac Laboratory. A report on this research was delivered at the Seventh Saranac Lake Symposium in 1952 and was entitled "Pulmonary Function Studies in Men Exposed for Ten or More Years to Inhalation of Asbestos Fibers" by Fernand Gregorie and George W. Wright.

48.

The "Air Hygiene Foundation," was established in 1935 as a fellowship within the Mellon Institute (then a part of the University of Pittsburgh). The organizations' name was changed to "Industrial Hygiene Foundation" and, in 1968, it was again changed to the "Industrial Health Foundation." J-M joined in 1936. Other IHF members included, among others, Garlock, Inc. or their predecessors or successors in interest. Garlock, Inc. is a defendant in this case. The IHF was founded to conduct occupational health research, particularly with respect to the health effects of dust in the work place. One of the functions of the IHF was to gather and disseminate information regarding occupational health to its members. Since its inception, it has published special bulletins on items of general interest under the headings of legal bulletins, medical bulletins, management bulletins and engineering bulletins. Since 1937, member companies have been kept informed on occupational health issues by the <u>Industrial Hygiene Digest</u>, a monthly publication which is sent to all members in return for their annual membership fee. The <u>Digest</u> is a compilation of abstracts, grouped by topic, of the published domestic and foreign scientific and medical literature pertaining to industrial health and hygiene. In addition to scientific abstracts, the Digest included a section on legal developments, and also provide notice of any proposed changes in threshold limit values for various substances. Correspondence between members and the IHF established that members either participated in or knew of a number of studies and surveys dating as far back as the 1930's which had linked asbestos with various lung diseases. As part of its consultative services for its members, the IHF undertook a number of studies involving evaluations of asbestos dust conditions and asbestos-related disease. In 1947, the fruits of an industry survey conducted by the IHF for the ATI and its

- 17 -

members were published in a "Report of Preliminary Dust Survey for Asbestos Textile Institute."

The report is dated June 1947. The object of the investigation was stated as: "defining the specific nature and the magnitude of the (asbestosis) problem in all its phases.... An original objective of most immediate importance was to facilitate the exchange of information between member companies on successful methods of dust control and otherwise to promote a general improvement in that field."

The preliminary survey to be divided into three parts designated as "Engineering, Medical and Physical Testing" was based on visits made to member companies' plants over a three month period."

While the actual report does not reveal the identity of the plants which were visited, deposition testimony of Dr. Braun indicates that other companies evaluated in the report included, among others, Garlock, a defendant in this case. Minutes of the Air Hygiene Committee meetings throughout the 1940's and 1950's reflect frequent discussions and presentations pertaining to appropriate medical practices and industrial hygiene approaches to the problem of asbestos dust in the work place. It was continually stressed that both pre-employment and periodic follow-up medical examinations were essential to monitor the health of employees, the necessity of x-rays and lung function studies, and the proper requisites for a diagnosis of asbestos-related disease. Some annual meetings apparently were held by the IHF. The minutes for the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., which was held on November 12 and 13 in 1940, revealed asbestos to be one of its two main topics of interest. An Interim Report of the Preventive Engineering Committee, written by Philip Drinker, discussed _inter alia_ dust particle size and dust control. A second report by Foundation Research at the Saranac Laboratory entitled "Individual Susceptibility to Toxic Dusts", authored by Dr. Leroy Gardner, dealt primarily with the problems of silica dust. Also discussed were court decisions on Workers' Compensation cases. A case involving the death of a North Carolina man was discussed, the minutes indicating that the claimant sought compensation on grounds that the defendant's pneumonia was due to asbestosis. The Supreme Court of North Carolina upheld the award finding that asbestosis was a contributing cause of death. The Air Hygiene committee also recommended that pre-employment and periodic chest x-rays be conducted by a reputable radiologist, that the use of the Greenberg-Smith Midget Impinger be adopted for testing the levels of dust in the air, and that various procedures be implemented to reduce the dust in manufacturing facilities. In December of 1946, Mr. Hemeon of the Industrial Hygiene Foundation was invited to attend a meeting of the American Textile Institute (discussed _infra_) to respond to inquiries regarding IHF's proposed Industrial Hygiene Survey of the member companies. It was agreed at the February 5, 1947, meeting of the American Textile Institute (ATI) that the IHF be permitted to conduct its proposed survey. A June 18, 1947 report by W. C. L. Hemeon, Head Engineer for IHF, stated that the medical review reflected an incidence of asbestosis ranging between

3% and 20%. In one presentation at a regular meeting (prior to 1950) of the IHF, the suggested threshold limit value was criticized as being unsafe for persons exposed to asbestos fiber. Defendants thus had direct and actual knowledge that the suggested threshold limit value for asbestos was not safe. In addition, this criticism was published in the scientific literature and all defendants were put on notice of the hazards of the suggested threshold limit value.

49.

In addition to the IHF, there were other trade associations which were formed to aid and service companies in the asbestos industry. Members of the Asbestos Textile Institute (ATI), founded on November 16, 1944, included companies which produced asbestos containing cloth and other products. Members included, among others, Garlock, Inc. who is a defendant in this action. At the June 13, 1946, meeting of the Asbestos Textile Institute, a question was posed as to whether or not a committee should be formed to deal with the question of dust control. Beginning on June 13, 1946, a subcommittee of the dust control committee of the Asbestos Textile Institute recommended that the committee contact the United States government, the state governments in which member plants were located, the Mellon Institute, and Metropolitan Life for the purpose of preparing a tentative program aimed at bringing to member companies the assistance of qualified technical and medical people. In 1946, the ATI was presented with a plan for a central medical committee which would call for individual medical programs at all facilities using asbestos as well as a central medical department which would be responsible to the association. Recommendations for initial medical examinations and periodic follow-up examinations were also made. The recommendation for periodic medical examinations was characterized by the presenting doctor as "fundamental in an industry where there was a 'known occupational health hazard'". While the ATI considered this proposal, it nonetheless elected to defer the plan. During the late 1940's and early 1950's, the ATI was presented with a number of other plans for wide ranging research on various issues dealing with asbestos-related disease in the asbestos industry. However, in some instances, the research projects and proposals were discarded.

50.

Another trade organization was the National Insulation Manufacturers Association ("NIMA"), which formed in December of 1958 as a joint venture trade association to serve as a voice for the mineral insulation industry. After 1958, personnel of Ruberoid/GAF (not defendants herein) attended most, if not all, NIMA meetings at which health hazards were frequently the topic of formal discussions. NIMA members had unequivocal knowledge of the potential health hazards posed by unprotected and prolonged exposure to excessive quantities of airborne asbestos fiber. The testimony of Harry Kaufman, who came to Ruberoid in 1958 as Assistant Director of Quality Control, admit

- 19 -

knowledge of the potential health hazards to an unprotected worker from exposure to asbestos fiber as far back as 1943 when he attended a five month course at the University of Maryland on Industrial Safety. Charles Limerick, former manager of the Ruberoid Vermont Mines, has admitted that he was aware of dangers of asbestos as far back as the 1930's and 1940's. GAF/Ruberoid was put on notice of dangers in 1935 or 1936 through correspondence with "Asbestos" magazine. Ruberoid subscribed to and advertised in "Asbestos". Moreover, Ruberoid was prodded by lawsuits brought by its employees alleging that they had developed asbestosis as early as 1934.

51.

Sumner Simpson, the first Raybestos-Manhattan Incorporated President, maintained a file or collection of documents, correspondence, and memoranda pertaining to the subjects of the health effects of asbestos, dust control, and dust levels. These documents clearly evidence knowledge, beginning in at least the 1930's, of dangers posed by exposure to asbestos and steps which could and should be taken to minimize the risk of asbestos-caused diseases. The "Sumner Simpson" documents, as a group, demonstrate the high level of awareness and early sophistication of the asbestos industry of knowledge that excessive exposure to asbestos over a prolonged period of time could and would produce asbestos-related diseases. Numerous letters in the "Sumner Simpson" document collection refer to the fact that many states were adding asbestosis as a compensable disease and that Raybestos-Manhattan Incorporated was going to have to deal with that reality.

52.

Defendant, Owens-Illinois, Inc., (O-I) began the manufacture and sale of the asbestos containing insulation product "Kaylo" in the 1940's. Defendant's knowledge of the hazards posed by the inhalation of asbestos fiber released from Kaylo can be documented as far back as the early 1940's. Much of the evidence arises out of testing done of Kaylo at the Saranac Laboratory at Saranac Lake New York. The following is a brief description of some of the evidence pertaining to O-I's knowledge of the health hazards posed by inhalation of asbestos dust released from its Kaylo product. On February 12, 1943, O-I's director of research, U. E. Bows, sent a letter to L. U. Gardner of the Saranac Laboratory stating: "(The health hazard) should be considered from the standpoint of employees working in the plant where the material is made or where it may be sawed to the desired dimensions and also considered from the standpoint of applicators or erectors at the point of use." On November 16, 1948, A. J. Vorwald of the Saranac Laboratory sent a letter to U. E. Bows regarding the effects of inhalation of Kaylo dust in animal studies. This letter provides in pertinent part:

In all animals sacrificed after more than 30 months of exposure to Kaylo dust unmistakable evidence of asbestosis has developed, showing that Kaylo on inhalation

is capable of producing asbestos and must be regarded as a potentially hazardous material.

\*\*\*

I realize that our findings regarding Kaylo are less favorable than anticipated. However, since Kaylo is capable of producing asbestosis, it is better to discover it now in animals rather then later in industrial workers. Thus, the company, being forewarned, would be in a better position to institute adequate control measures for safeguarding exposed employees and protecting its own interest.

Along with the November 16 letter of Vorwald was an interim report to the Owens-Illinois Glass Company regarding the ability of dust generated by Kaylo to cause lung disease. Pertinent portions of that report provide:

Kaylo is capable, on prolonged inhalation of producing asbestosis in the lungs of guinea pigs and it should be handled industrially as a hazardous dust.

\*\*\*

The animals were exposed to atmospheric suspensions of Kaylo dust for 8 hours daily, 5 and ½ days a week throughout the experiment. The dust concentration which varied somewhat from time to time has averaged 116 particles per cubic foot of air over the entire course of the experiment to date.

\*\*\*

While the lesions up to 30 months showed no fibrosis, certain aspects of them were compatible with a preliminary stage in the development of asbestosis. These aspects were masked by the inert type of reaction to the materials other than asbestos in the dust.

\*\*\*

All nine animals sacrificed subsequent to 30 months in the present experiment...have developed true fibrosis of a type characteristic of the response of guinea pigs to asbestos.

\*\*\*

Kaylo, because of its content of an appreciable amount of fibrous chrysotile, is capable of producing asbestosis and should be handled as a hazardous industrial dust.

The Saranac Laboratory report clearly informed O-I that the asbestos content in the air in certain parts of its plant were potentially hazardous to human health. The report further recommended that respirators be used by workers loading Kaylo material into box cars. In the same report O-I was also warned against reliance on compliance with government and industry standards in order to completely protect against the possibility of occupational disease. On February 7, 1952, Vorwald sent a letter to W. G. Hazard enclosing the final report on "The Capacity of Inhaled Kaylo Dust to Injure the Lung." A copy of the report was sent to O-I corporate medical director, Shook. The report states in pertinent part:

Kaylo dust is capable of producing peribronchiolar fibrosis typical of asbestosis. The dust also has a slightly unfavorable influence upon a tuberculosis infection. Although extrapolation from animal to human experience is difficult, nevertheless, the results of the study indicate that every precaution should be taken to protect workers against inhaling the dust.

Despite the information made know to O-I concerning the ability of dust generated form its Kaylo product to cause asbestosis and other ailments, O-I actually drafted a pamphlet stating that Kaylo

could be used without the danger of developing asbestosis.  See December 12, 1950, letter from Willis G. Hazard to A. G. Vorwald; December 9, 1952, correspondence from C. W. Howard to George White.  O-I continued to promote Kaylo as safe and "non-toxic".  See advertisement in Petroleum Engineer C-55 to C-62 April, 1952, Hydros Calcium Silicate Heat Insulation.

53.

Other evidence of knowledge include the fact that in May 1952, Willis Hazard of O-I attended the Seventh Saranac Symposium where considerable discussion of asbestosis and cancer took place.  On October 5, 1955, Hazard of O-I concerning a report of Saranac Lake contained in Arch. Indust. Health, 12:348-360, (1955) entitled "Effect of Inhaled Commercial Hydrous Calcium Silicate Dust on Animal Tissues."  The report was published by Dr. Scheepers of the Saranac Laboratory and contained some of the Saranac Laboratory's findings pertaining to Kaylo.  The report was not shown to O-I officials prior to publication.  In his October 5, 1955, Hazard stated:

We had felt (publication of the research) would be the proper procedure for the long run, even though the experiments did not show Kaylo to be lily-white.  They showed to be specific, the Kaylo dust could cause asbestosis, an incurable lung condition, and they showed the dust could reactivate tuberculosis....

* * *

The name "Kaylo" and O-I appear no where in the article.  Its completely anonymous.

The above aptly demonstrates that O-I possessed the requisite knowledge of the hazards posed by inhalation of asbestos fiber as far back as the 1940's.  Despite that knowledge, defendant chose not to warn the plaintiff or others similarly situated of the hazards posed to their health by working with or near defendant's products.  Further, defendant's suppression of known health hazards associated with exposure to their products constitute fraud under Louisiana law.  Moreover, O-I sold its design and trademark for Kaylo to Owens-Corning Fiberglass Corporation knowing that it was a defective product capable of causing disease and death.  O-I is liable for the defective Kaylo product which continued to be sold throughout the 1970s.  O-I is liable to plaintiffs both for designing a defective product as well as for plaintiff, Doris Jambon, being exposed to this product as manufactured by O-I and later by Owens-Corning Fiberglas Corp.  O-I is liable for designing a defective product and for selling the design of this defective product to Owens Corning Fiberglass Corporation.  OI is also liable for fraud as its suppressed knowledge of the defectiveness in its product.  In addition, O-I breached its continuing duty to warn under Louisiana law.  Additionally, O-I suppressed its knowledge of the health effects associated with Kaylo and, thus, committed fraud under Louisiana law.

54.

All defendants made the misrepresentations cited in the foregoing paragraphs despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the

dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

55.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Pichon and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law.

56.

Plaintiffs' injuries were caused by all defendants' wanton and reckless disregard for public safety in the storage, handling, and transportation of asbestos to which Leon Roland Pichon was exposed and which resulted in his injuries and death. These companies are liable to petitioner for punitive damages pursuant to Article 2315.3 of the Louisiana Civil Code.

57.

As a result of the aforementioned acts of negligence, intentional tort, fraud, and strict liability of all of the hereinabove named defendants, Mr. Pihon contracted cancer, lung cancer, and mesothelioma and other related ill health effects which resulted in his death.

58.

All of the hereinabove named defendants are jointly, severally, and in solido liable to petitioners for the damages sustained as a result of Mr. Pichon's contraction of cancer, lung cancer, mesothelioma and death.

59.

Petitioners are entitled to damages for the following: physical pain and suffering of Leon Roland Pichon; mental pain and anguish (including but not limited to fear of death) which Mr. Pichon suffered; fear of death, humiliation and emotional distress suffered by Mr. Pichon, loss of income and earning capacity of Mr. Pichon; loss of fringe benefits; disability; medical expenses; care and personal assistance provided to Mr. Pichon; loss of personal services; loss of enjoyment of life and lifestyle; loss of support to wife and children; loss of consortium and society, love, and affection; loss of services, loss of companionship; mental pain and anguish which Jeanette Garnett Pichon, widow of Leon Roland Pichon, and Roland L. Pichon, Mark P. Pichon, Patrice

Pichon Robinson, Tracy Pichon Baham, Veronica Pichon Joseph, and Cade Pichon Hagger endured from watching the suffering and death of their husband and father; grief suffered by Jeanette Garnett Pichon, widow of Leon Roland Pichon, and Roland L. Pichon, Mark P. Pichon, Patrice Pichon Robinson, Tracy Pichon Baham, Veronica Pichon Joseph, and Cade Pichon Hagger as a result of the death of Leon Roland Pichon; funeral and burial expenses; lost income and expenses related to the travel and medical treatment for the injuries and death of Leon Pichon, funds expended by each of the plaintiffs herein for the care and treatment of their husband and father as well as loss of income and benefits associated therewith, and all other damages arising out of this survival and wrongful death action which may be shown at the trial of this matter.

**WHEREFORE**, Jeanette Garnett Pichon (surviving spouse of Leon Roland Pichon) and, Roland L. Pichon, Mark P. Pichon, Patrice Pichon Robinson, Tracy Pichon Baham, Veronica Pichon Joseph, and Cade Pichon Hagger (children of Leon Roland Pichon), pray that the defendants named herein be duly cited to appear and answer, and that after all due proceedings are had, that there be judgment rendered herein in favor of petitioners and against defendants for all damages suffered by petitioners together with legal interest for the date of judicial demand, and all costs associated with the prosecution of this claim. Petitioners further pray for all general and equitable relief.

Respectfully submitted,

**ROUSSEL & CLEMENT**

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JONATHAN B. CLEMENT - 30444
LAUREN R. CLEMENT - 31106
1714 Cannes Drive
LaPlace, LA 70068
Telephone: (985) 651-6591
Facsimile: (985) 651-6592
ATTORNEYS FOR PETITIONERS

**PLEASE SERVE THE PETITION FOR DAMAGES ON THE FOLLOWING:**

1. **BAYER CROPSCIENCE, INC.**                                    **(LONG ARM SERVICE)**
   **(AS SUCCESSOR TO RHONE-POULENC AG COMPANY**
   **F/K/A AMCHEM PRODUCTS, INC.**
   **F/K/A BENJAMIN FOSTER COMPANY)**
   (Via Louisiana Long Arm Statute)
   through their agent for service of process:
   Corporation Service Company
   80 State Street
   Albany, New York 12207

2. **SEVILLE, INC. (formerly BRANTON INSULATIONS, INC.)**
   Through its agent for service of process:
   H.T. Branton
   1101 Edwards Ave.
   Harahan, LA 70123

3. **CONTINENTAL INSURANCE COMPANY**
   Through its agent for service of process
   Louisiana Secretary of State
   8549 United Plaza Blvd.
   Baton Rouge, LA 70809

4. **DETROIT DIESEL CORPORATION**                                **(LONG ARM SERVICE)**
   **(as successor to DETROIT DIESEL**
   **ALLISON DIVISION OF GENERAL**
   **MOTORS CORPORATION)**
   (Via Louisiana Long Arm Statute)
   The Corporation Trust Company
   Corporation Trust Center
   1209 Orange Street
   Wilmington, Delaware 19801

5. **EAGLE, INC. (formerly EAGLE ASBESTOS & PACKING**
   **COMPANY, INC.)**
   Through its agent for service of process:
   Susan B. Kohn
   1100 Poydras St, 30th Floor
   New Orleans, LA 70163

6. **FOSTER WHEELER LLC**                                        **(LONG ARM SERVICE)**
   **(FORMERLY FOSTER WHEELER CORPORATION)**
   (Via Louisiana Long Arm Statute)
   The Corporation Trust Company
   Corporation Trust Center
   1209 Orange Street
   Wilmington, Delaware 19801

7. **GARLOCK SEALING TECHNOLOGIES, LLC**
   **(FORMERLY GARLOCK, INC.)**
   Through its agent for service of process:
   C.T. Corporation System
   8550 United Plaza Blvd.
   Baton Rouge, LA 70809

8. **GENERAL MOTORS CORPORATION**
   through its agent for service of process:
   C. T. Corporation Systems
   8550 United Plaza Blvd.
   Baton Rouge, LA 70809

9.    **MARYLAND CASUALTY COMPANY**
through its agent for service of process
Louisiana Secretary of State
8549 United Plaza Blvd.
Baton Rouge, LA 70809

10.   **THE MCCARTY CORPORATION**
Through its agent for service of process:
Paul H. Spaht
445 North Blvd., Ste. 300
Baton Rouge, LA 70802

11.   **3M COMPANY (MINNESOTA MINING AND MANUFACTURING COMPANY)**
Through its agent for service of process:
C. T. Corporation Systems
8550 United Plaza Blvd.
Baton Rouge, LA 70809

12.   **OWENS-ILLINOIS, INC.**                                (LONG ARM SERVICE)
(Via Louisiana Long-Arm Statute)
Owens-Illinois, Inc.
One Seagate
Toledo, OH 43666

13.   **REILLY-BENTON COMPANY, INC.**
Through its agent for service of process:
Thomas L. Cougill
c/o Beason-Willingham, LLP
8550 United Plaza Blvd., Suite 702
Baton Rouge, LA 70809

13.(a).   **REILLY-BENTON COMPANY, INC.**                    (LONG ARM SERVICE)
Through its agent for service of process:
Thomas L. Cougill
c/o Beason-Willingham, LLP
808 Travis, Suite 1608
Houston, TX 77002-5607

14.   **TAYLOR-SEIDENBACH, INC.**
Through its agent for service of process:
Ralph I. Shepard
731 S. Scott Street
New Orleans, LA 70119

15.   **ONEBEACON AMERICA INSURANCE COMPANY (AS SUCCESSOR TO COMMERCIAL UNION INSURANCE COMPANY AND EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY)**
Through its agent for service of process:
Secretary of State
Legal Services Sections
8549 United Plaza Blvd.
Baton Rouge, La. 70809

16.   **AMERICAN EMPLOYERS INSURANCE COMPANY**
Through its agent for service of process:
Secretary of State
Legal Services Sections
8549 United Plaza Blvd.
Baton Rouge, La. 70809

17.    **TRAVELERS CASUALTY AND SURETY COMPANY**
**(F/k/a: THE AETNA CASUALTY & SURETY COMPANY)**
Through its agent for service of process:
Secretary of State
Legal Services Sections
8549 United Plaza Blvd.
Baton Rouge, La. 70809

18.    **JAMES A. DUBUISSON**
72356 Homestead St.
Covington, La. 70435

19.    **ROBERT A. GARDEBLED, SR.**
1200 Oaklawn Dr.
Metairie, La. 70005