UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                              :
In re                                         :        Chapter 11 Case No.
                                              :
MOTORS LIQUIDATION COMPANY, *et al.*,         :        09-50026 (REG)
    f/k/a General Motors Corp., *et al.*      :
                                              :
                          Debtors.            :        (Jointly Administered)
                                              :
------------------------------------------------------------x

### AFFIDAVIT OF MAYNARDS INDUSTRIES (1991) INC.
### PURSUANT TO BANKRUPTCY RULE 2014 AND LOCAL RULE 2014-1

STATE OF MICHIGAN            )
                             ) ss:
COUNTY OF OAKLAND            )

Taso Sofikitis, being duly sworn, hereby deposes and says:

1.    I am a President of Maynards Industries (1991) Inc.. ("**Maynards**" or the
"**Company**"), which maintains an office at 21700 Northwestern Highway, Suite 1180,
Southfield, MI 48075.

2.    Motors Liquidation Company (f/k/a General Motors Corporation) and
certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11
cases (collectively, the "**Debtors**"), have requested that the Company provide services in
connection with the proposed sale(the "**Noticed *De Minimis* Sale**") of certain assets of the
Debtors pursuant to the Order Pursuant to Sections 105 and 363 of the Bankruptcy Code (A)
Establishing Procedures for the Disposition of *De Minimis* Assets and (B) (i) Authorizing the
Debtors to Pay Related Fees. and (ii) Assume. Assume and Assign, or Reject Related Executory
Contracts or Unexpired Leases entered by the United States Bankruptcy Court for the Southern
District of New York (the "**Bankruptcy Court**") in the Debtors' chapter 11 cases on August 18,

2009 [Docket No. 3830] (the "**Sale Order**"). The Company has consented to provide such services.

3. I make this declaration on behalf of the Company in connection with the Noticed *De Minimis* Sale in accordance with the Sale Order, Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2014-1 of the Local Rules of the Bankruptcy Court.

4. To review potential conflicts of interest, as well as to determine all "connections" (as such term is used in Bankruptcy Rule 2014) to the Debtors, their creditors, other parties in interest, their respective attorneys and accountants, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") or any person employed in the office of the U.S. Trustee, the Debtors provided the Company with a comprehensive list of the types of entities who may have contacts with the Debtors. Except as set forth on **Exhibit A**, to the best of my knowledge, the Company does not have any connection with or any interest adverse to the Debtors, their creditors, or any other party in interest or their respective attorneys and accountants.

5. The Company is duly licensed and is authorized to conduct auctions in accordance with the Asset Marketing Agreement, attached hereto as **Exhibit B** (the "**AMA**"). The Company has the relevant experience and expertise to assist the Debtors in connection with the *De Minimis* Sale. The Company is a leading international industrial auctioneer and liquidator specializing in valuing and converting idle capital equipment into cash through a multitude of creative sales methodologies and disposition channels including auction, liquidation, private treaty and sealed bid sales. Headquartered in Vancouver, British Columbia, Canada the

Company operates offices in Southfield, Michigan. Toronto, Ontario, Munich, Germany and Tokyo, Japan.

6.    The Debtors and the Company have agreed that in exchange for services rendered by the Company in connection with the sale of the assets as set forth in the AMA, the Debtors will compensate the Company in accordance with the AMA.

Executed on: 10/2/09

_____

Taso Sofikitis

President, Maynards Industries (1991) Inc.

Subscribed and sworn to before me
this 2nd day of October, 2009

_____
Notary Public

> GAIL GILCHRIST
> NOTARY PUBLIC, STATE OF MI
> COUNTY OF OAKLAND
> MY COMMISSION EXPIRES Jul 8, 2014
> ACTING IN COUNTY OF

### EXHIBIT A

a)  In matters unrelated to the Debtors, affiliates of Maynards have previously performed appraisal services for (or related to) the following entities:

ABN Amro
Adam Opel GmbH
Alix Partners
Arthur Andersen
Bank of America
Bank of Montreal
Bank of Nova Scotia
Borg Warner
Catalyst, Inc.
CIBC
Citibank
Citigroup
Deloitte & Touche
Delphi
Deutsche Bank
Ernst & Young LLP
Fifth Third Bank
GE Capital
GM Saturn Corporation
GMAC
HSBC
JP Morgan
Key Bank
KPMG
Lear Corporation
Magna Inc.
Merrill Lynch Canada Finance Company
Morgan Stanley
RBS
Saturn Corporation
Saturn Motor Car Corporation
Standard Chartered Bank
US Bank
Wachovia Corporation


Maynards does not believe that these connections create a conflict of interest regarding the Debtors of theses chapter 11 cases

b) Because of the magnitude of the entire creditor list in these cases, it is possible that Maynards may represent or may have represented other creditors of the Debtors but does not represent any such creditors in connection with these cases.  Maynards presently or in the past has served as a professional person in other matters, wholly unrelated to the Debtors or these cases, in which other attorneys, accountants and other professionals of the Debtors, creditors, or other parties in interest may have served or serve as professional persons.

**EXHIBIT B**

09/20/2009  01:25     2485699793                    MAYNARDS                              PAGE  02/15

BILL- 313-665-0977
NOWICKE
MLCo

# ASSET MARKETING AGREEMENT

This agreement (the "Agreement") is made as of the 18th day of September, 2009, by and between Hilco Industrial, LLC ("Hilco"), Maynards Industries (1991) Inc. ("Maynards", and together with Hilco, "Hilco-Maynards"), and Motors Liquidation Company (f/k/a General Motors Corporation) ("MLC").

WHEREAS, Hilco is a leading international industrial auctioneer and liquidator specializing in valuing and converting idle capital equipment into cash through a multitude of creative sales methodologies and disposition channels including auction, liquidation, private treaty and sealed bid sales. Headquartered in Farmington Hills, Michigan, Hilco operates offices in Chicago, Illinois; Grand Rapids, Michigan; Birmingham, Alabama; London, Birmingham, Leeds and Southampton, England; Mexico City, Monterrey, Guadalajara, Villahermosa and Bajio, Mexico; and Toronto, Canada;

WHEREAS, Maynards is one of the preeminent liquidation, auction and equipment appraisal companies in North America. Maynards' expertise covers all aspects of sale transactions, including consignment, transportation logistics, sale management, asset tracking, financial reporting, payment and final reconciliation. Maynards operates from four locations in North America – Vancouver, Detroit, Toronto and Montreal, as well as in Japan and Europe;

WHEREAS, on June 1, 2009, MLC filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, on July 10, 2009, MLC consummated the sale of substantially all of its assets to General Motors Company, a separate independent company, pursuant to the provisions of section 363 of the Bankruptcy Code and an order of the Court (Docket Number 2968);

WHEREAS, following the Sale Transaction, MLC remains the owner and possessor of certain machinery, equipment and other assets currently located at the Sterling Heights Tooling Center located at 33500 Mound Road, Sterling Heights Michigan (the "Facility"), including, but not limited to, the items listed on Exhibit A attached hereto (collectively, the "Facility Assets").

WHEREAS, MLC seeks to sell certain of the Facility Assets that MLC has identified or will identify to Hilco-Maynards (collectively, the "Assets").

WHEREAS, on August 18, 2009, the Court entered an order (Docket Number 3830) (the "De Minimis Asset Sale Order") authorizing procedures (the "De Minimis Sale Procedures") for MLC to sell certain assets without further court approval and authorizing MLC to pay reasonable brokers' commissions and auctioneer fees for brokers and auctioneers utilized in connection with any sales pursuant to the De Minimis Sale Procedures, a copy of which is attached as Exhibit B hereto.

US_ACTIVE:\43164384\03\43164384_3.DOC\72240.0639

This fax was received by Hilco's fax server. http://www.hilcotrading.com

**I.    Engagement and Agreement to Market Assets**

A.    MLC hereby engages Hilco-Maynards as its exclusive marketing and sales agent for the Term of this Agreement, and Hilco-Maynards hereby accepts such engagement, in each case, with respect to all Assets located in the Facility.

B.    Hilco-Maynards will implement an on-line auction sale strategy to sell the assets and will market these assets on a best efforts basis given the limited time to market the assets.

**II.    Exclusivity**

In order to permit successful marketing of the Assets, MLC grants to Hilco-Maynards the exclusive right to sell the Assets during the Term (as defined below) of this Agreement. MLC acknowledges that Hilco-Maynards or its affiliated entities may be engaged to sell or market similar assets by other persons or entities, and that any such engagement shall not constitute or be deemed to be a violation of this Agreement. During the Term of this Agreement, all inquiries regarding the Assets made to MLC, its representatives or related parties to MLC shall be redirected to Hilco-Maynards.

**III.    Method of Sale and Certain Covenants**

A.    In connection with the services to be provided by Hilco-Maynards hereunder, Hilco-Maynards will:

(i)    develop an advertising and marketing plan for all of the Assets on a best efforts basis given the limited time allotted;

(ii)    implement the advertising and marketing plan;

(iii)    provide adequate information to prospective out-of-town buyers regarding travel time and travel information (including hotel, motel, car rental and airline information);

(iv)    with respect to auctions, assign a sale site coordinator from Hilco-Maynards to oversee auction sale routing, sorting and grouping of all sale items into suitable sized lots, the creation of a buyer's lot catalog, public inspection, and supervising the delivery of all sold items for an agreed upon period after completion of the auction;

(v)    prepare for the sale of the Assets, including gathering specifications and photographs for pictorial brochures and arranging the Assets in a manner, which in Hilco-Maynards' judgment, would be designed to enhance the value of the Assets;

(vi)    with respect to auctions, provide an online bidding system and will auction the lots for cash to the highest bidder "as is," "where is," pursuant to a form Bill of Sale, which shall have been approved in writing by MLC (the "Bill of Sale"), in accordance

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

From: The Hilco Organization    Page: 4/15    Date: 9/21/2009 9:35:25 AM

09/20/2009   01:25   2485699793               MAYNARDS                      PAGE   04/15

with the *De Minimis* Asset Sale Order, and otherwise in accordance with the terms of this Agreement.

(vii)    contact local riggers to be available to assist buyers in the orderly removal of Assets from the Facility;

(viii)    charge and collect from all purchasers any purchase price together with all applicable taxes in connection therewith;

(ix)    provide a complete auction crew to handle computerized accounting functions necessary to provide auction buyers with invoices and MLC with a complete accounting of all items sold at the auction;

(x)    no later than two weeks after the sale of any Asset, account for, and pay over to MLC in immediately available funds, proceeds from such sale, less the applicable Buyer's Premium (as defined below) and the expenses to be reimbursed by MLC pursuant to this Agreement;

(xi)    subject to clause (xii) above, deposit all proceeds into a separate client trust account; and

(xii)    submit an auction report to MLC within two weeks after the earlier of the completion of the auction or the completion of the Term of this Agreement, and remit a statement of sales less expenses for this auction.

B.    In connection with the services to be provided by Hilco-Maynards hereunder, MLC hereby grants to Hilco-Maynards the following rights and authority and covenants as follows:

(i)    Hilco-Maynards shall be entitled to use the name "Motors Liquidation Company (f/k/a General Motors Corporation)" and similar derivations in all of its advertising and promotional activities related to this Agreement. Hilco-Maynards' license to use such name shall continue until the earliest of the sale of all of the Assets or the end of the Term of this Agreement. Any use of the GM brand, logo, or trademarks shall be consistent with the Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009, as amended, between MLC and General Motors Company (including any ancillary agreements).

(ii)    Hilco-Maynards shall have the right to access and use the Facility, subject to the consent of General Motors Company to the extent required, during the Term solely for the purpose of performing its obligations under this Agreement. MLC acknowledges and agrees that it will allow Hilco-Maynards access to the Facility upon execution of this Agreement for the purpose of taking photographs and preparing the marketing material for the Assets subject to coordination and approval of access to the Facility with and by General Motors Company, to the extent required.

3

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

From: The Hilco Organization    Page: 5/15    Date: 9/21/2009 9:35:25 AM
09/28/2009  01:25    2485699793    MAYNARDS    PAGE  05/15

(iii)    Hilco-Maynards shall have the right to access and use the Facility, subject to the consent of General Motors Company to the extent required, for the purpose of performing its obligations under this Agreement during the term of this Agreement, with no interference from any labor unions or any other third parties.

(iv) Hilco-Maynards will occupy the Facility as licensees and shall not be obligated to pay any rent or other charges therefore. MLC agrees to continue to provide for all utilities during the course of Hilco-Maynards' occupancy. MLC also agrees to maintain during the Term (i) all utilities historically provided at the Facility solely for the purpose of arranging, preparing, and effecting a disposition as set forth herein, (ii) two active and working telephone lines and T1 or DSL service at each Facility insofar as the Facility requires such connectivity for the disposition of the Assets, (iii) trash removal service at the Facility, and (iv) the services of any security personnel currently available at the Facility. Hilco-Maynards shall not be responsible for removing any Asset not sold by the conclusion of the Term of this Agreement.

## IV.    Commission Payable to Hilco-Maynards; Expense Reimbursement

A.    Subject to the rebate obligation below, Hilco-Maynards shall be entitled to charge and retain for its own account an industry standard buyer's premium in connection with the sale of the Assets which is sixteen percent (16%) for this on-line auction sale buyers. (the "Buyers' Premium"). For purposes of clarification, the Buyers' Premium is a fee charged in addition to the sale price and is paid for by the buyer of the Asset or Assets. Such Buyers' Premium shall be segregated by Hilco-Maynards upon collection of proceeds from the applicable buyer(s). Gross sales amounts will be credited to thresholds for Buyer's Premium rebate for any other sales conducted by Hilco-Maynards in the future for MLC. Schedule for rebates will be negotiated as part of the agreement that will encompass other MLC manufacturing sites.

B.    MLC shall be entitled to a rebate of the collected Buyers' Premiums in accordance with a schedule to be negotiated at a later date as stated above.

C.    Prior to the sale of Assets, Hilco-Maynards shall provide a budget (the "Budget") for approval by MLC. Subject to prior approval of the Budget by MLC, Hilco-Maynards shall be entitled to reimbursement in an amount not exceeding $10,000 in the aggregate (or such greater amount, if any, agreed to in writing by MLC in its discretion) for all reasonable and documented out-of-pocket expenses in connection with the performance of its services hereunder, including, but not limited to, advertising, promotion and sales costs; sale; auction set-up, labor costs (including internal labor at hourly rates ranging from $30 to $90 fully burdened), transportation, lodging and miscellaneous expenses. MLC agrees that such amounts may be withheld from the proceeds of the sale of the Assets.

## V.    Representations and Covenants of the Parties

A.    MLC represents and warrants that (i) MLC has the requisite power, authority and legal capacity to enter into this Agreement and perform its obligations hereunder subject to the terms of the *De Minimis* Asset Sale Order and (ii) MLC has the requisite power, authority and

4

This fax was received by Hilco's fax server. http://www.hilcotrading.com

legal capacity to sell the Assets subject to the terms of, and in the manner stipulated by, the *De Minimis* Asset Sale Order.

B.    Hilco-Maynards Hilco covenants that it will at all times conduct its activities in such a commercially reasonable manner as to leave the Facility undamaged, ordinary wear and tear expected.

C.

(a)    The Parties hereto agree, and MLC hereby expressly acknowledges, that Hilco-Maynards shall not be responsible for the removal or disposition of any environmentally hazardous chemicals, solvents or substances found on the Facility or in the Assets.

(b)    Hilco/Maynards will make buyers aware that the Assets may contain polychlorinated biphenyls ("PCBs") and therefore, may be a regulated PCB Item as defined under Title 40, United States Code of Federal Regulations, Part 761 (40 CFR 761). The use, disposal and distribution in commerce, including the import and export, of these PCBs Item(s) may be subject to specific requirements under Federal Regulations, 40 CFR 761, pursuant to the Federal Toxic Substances Control Act. Some states and local governments may have additional regulatory requirements on the use, disposal and distribution in commerce of PCBs.

(c)    Hilco-Maynards, as well as its representatives and agents, shall use, mark, and handle the the Assets, including all components and materials, in an environmentally safe manner and in compliance with all applicable federal, state and local laws, provided that, nothing herein shall require Hilco-Maynards to transport or dispose of any environmentally hazardous chemicals, solvents or substances found on the Facility or in the Assets.

(d)    Subject to clause (a) above, MLC hereby agrees to defend, and hold Hilco-Maynards harmless from any and all claims, losses, damages and liabilities of any kind whatsoever which arise from or are in connection with the breach of any Environmental Laws or Environmental Permits except for those that arise from Hilco-Maynards' willful misconduct or gross negligence.

(e)    As used in this Agreement, "Environmental Laws" means all federal, state and local statutes, regulations, ordinances, rules, regulations and policies, all court orders and decrees and arbitration awards, and the common law, which pertain to environmental matters or contamination of any type whatsoever; and "Environmental Permits" means licenses, permits, registrations, governmental approvals, agreements and consents which are required under or are issued pursuant to Environmental Laws.

D.    Hilco-Maynards represents that it has read the De Minimis Asset Sale Order and covenants that it shall conduct all sales of Assets in accordance with the terms of the De Minimis Asset Sale Order, provided that, MLC shall be responsible for obtaining the required consents required under the De Minimis Asset Sale Order and shall advise Hilco-Maynards prior to the sale of any Asset whether all consents necessary under the De Minimis Asset Sale Order have obtained. Notwithstanding the foregoing, Hilco-Maynards is not permitted to sell any Asset for a purchase price in excess of $1,000,000 without MLC's prior written consent, which may only be

3

This fax was received by Hilco's fax server. http://www.hilcotrading.com

withheld on grounds that applicable notice procedures have not been complied with or that required consents have not been obtained.

E.      Prior to the auction, Hilco-Maynards shall consult with MLC to (i) identify certain assets as major assets (the "Major Assets"), based on their estimated sale prices and (ii) fix a minimum price bid (the "Minimum Price") for each Major Asset based on the estimated purchase price of such Asset, in each case, with the prior written agreement of MLC. Hilco-Maynards shall not, without MLC's prior written consent, sell any Major Asset for a price less than the applicable Minimum Price agreed to in advance by MLC.

F.      Hilco-Maynards shall sell Assets only pursuant to the Bill of Sale. Hilco-Maynards and MLC shall enter into a power of attorney in the form set forth as Exhibit C to enable Hilco-Maynards to enter into the Bills of Sale, with purchasers of the Assets for and on behalf of MLC.

G.      Hilco-Maynards shall act in good faith in the best interests of MLC and shall use its best efforts to complete the sale of Assets during the Term of this Agreement with the objective of securing the greatest proceeds from sales of the Assets reasonably obtainable during such period.

H.      Hilco-Maynards shall at all times comply with applicable laws, rules and regulations and shall carry out its obligations under this Agreement with due care in a competent businesslike manner consistent with industry standards and practices.

## VI.    Indemnification

A.      MLC hereby agrees to indemnify and hold Hilco-Maynards harmless from any and all claims by any buyer or prospective buyer of the Assets based on any of MLC's representations or warranties or performance hereunder. MLC further agrees to indemnify and hold Hilco-Maynards harmless from any claims, causes of action, damages and liabilities of any kind arising from or in connection with the demonstration and sale of the Assets or any inaccurate statements or representations concerning the Assets made by MLC to Hilco-Maynards or any prospective buyer, excluding any claims resulting from the willful misconduct or gross negligence of Hilco-Maynards.

B.      Hilco-Maynards shall indemnify and hold MLC harmless from any and all claims, liabilities, losses, damages and expenses arising out of or based upon Hilco-Maynards' breach of any of its representations, warranties or covenants hereunder or gross negligence or willful misconduct on the part of Hilco-Maynards, or its representatives or agents.

## VII.    Insurance

A.      During Hilco-Maynards' access to and use of the Facility, Hilco-Maynards shall procure and maintain, insurance, in which the limits of public liability shall not be less than Two Million ($2,000,000.00) Dollars for each personal injury or death and not less than Five Hundred Thousand ($500,000.00) Dollars for each instance of property damage. The policy shall name MLC as an additional insured.

6

The policy shall contain a clause that the insurer will not cancel or change the policy without first giving the MLC or parties designated by MLC thirty (30) days' prior written notice. Such insurance may be furnished by Hilco-Maynards under any blanket policy carried by it or under a separate policy therefore. The insurance shall be issued by a company qualified and licensed to do business in Michigan with general policyholder's ratings of A or better as rated in the most current available "Best's" Insurance Reports and a copy of the paid up policy evidencing such insurance or a certificate or binder from the insurer certifying to the issuance of such policy shall be delivered to MLC or parties designated by MLC prior to any access to the Facility by Hilco-Maynards and upon renewals of such policy no less than thirty (30) days prior to the expiration of such coverage.

     B.    MLC agrees to maintain, during the Term of this Agreement, fire and other perils insurance in respect of all Assets until sold. MLC acknowledges that Hilco-Maynards is not an insurer of the Assets.

## VIII. General Provisions

     A.    The term of this Agreement (the "Term") shall extend until the earlier of (i) September 30, 2009 or, if later, the effective date of rejection of MLC's lease with respect to the Facility pursuant to section 365 of the Bankruptcy Code (as defined below), or (ii) the termination of this Agreement (x) by MLC, upon a material breach of this Agreement by Hilco-Maynards, or (y) by Hilco-Maynards, upon a material breach of this Agreement by MLC, in each case, if such breach remains uncured after 7 days' written notice. Upon expiration of the Term, this Agreement shall cease to have any effect and the obligations hereunder shall terminate, in each case, except for the following: (i) Hilco-Maynards' obligation to account for and pay over proceeds of sale, less any Buyers' Premium or reimbursable expenses that Hilco-Maynards is entitled to withhold pursuant to this Agreement, (ii) The provisions of Section V(C)(d), Section VI and Section VIII hereof.

     B.    All references in this Agreement to "Hilco-Maynards" shall mean Hilco and Maynards, jointly and severally.

     C.    This Agreement (including the Exhibits hereto) constitutes the entire agreement between the Parties and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

     D.    This Agreement shall be binding upon MLC or any successor or assignee, including but not limited to, a Chapter 11 or 7 trustee, examiner, liquidation trustee or liquidator.

     E.    The parties hereto agree, and MLC hereby expressly acknowledges, that Hilco-Maynards has not guaranteed MLC any return from the sale of the Assets.

     F.    MLC and Hilco-Maynards shall deal with each other fairly and in good faith so as to allow both parties to perform its duties and earn the benefits of this Agreement.

7

This fax was received by Hilco's fax server. http://www.hilcotrading.com

F.    MLC recognizes and acknowledges that the services to be provided by Hilco-Maynards pursuant to this Agreement are, in general, transactional in nature, and Hilco-Maynards will not be billing MLC by the hour nor maintaining time records, other than for internal hourly labor costs associated with the sale of the Assets.  It is agreed that Hilco-Maynards is not requested or required to maintain such time records and that its compensation will be fixed on the percentages set forth herein.

G.    Any correspondence or required notice shall be addressed as follows:

If to Hilco or Hilco-Maynards:    Hilco Industrial, LLC
5 Revere Drive
Suite 206
Northbrook, Illinois 60062
Tel. (847) 849- 1100
Fax  (847) 897-0868
Attn:  Joseph Malfitano, VP, Assistant General Counsel

And

31555 West 14 Mile Road
Farmington Hills, MI 48334
Tel (2480 254-9999
Fax (248-254-9995
Attn:  Robert Levy, President


If to Maynards:    Maynards Industries (1991) Inc.
21700 Northwestern Highway
Southfield, MI 48075
Attn:  Taso Sofikitis, President

If to MLC:    GM Global Headquarters
Att. Mail Code 482-C37-A99
300 Renaissance Dr.
Detroit , Michigan 48265
Attn: Christian B. Cook


H.    This Agreement shall be deemed drafted by the parties hereto, and there shall be no presumption against either party in the interpretation of this Agreement.

I.    By executing or otherwise accepting this Agreement, MLC and Hilco-Maynards acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein.

8

This fax was received by Hilco's fax server. http://www.hilcotrading.com

From: The Hilco Organization    Page: 10/15    Date: 9/21/2009 9:35:25 AM

09/20/2009    01:25    2485699793    MAYNARDS    PAGE   10/15

J.    MLC shall provide Hilco-Maynards with:

* all reasonably requested Asset Information to the extent in MLC's possession;

* information on prospect interest and evidence of all Asset inquiries, to the extent that MLC has such information and evidence; and

* all titles to titled vehicles prior to the sale effort for any titled vehicle commencing.

K.    This Agreement may be executed in original counterparts, and if executed and delivered via facsimile shall be deemed the equivalent of an original.

L.    This Agreement creates no third-party beneficiaries.

M.    Any and all issues, disputes, claims or causes of action which relate or pertain to, or result or arise from this Agreement or Hilco-Maynards' services hereunder, shall be settled by the Court. The parties hereto irrevocably and unconditionally (a) agree not to commence any such action, suit or proceeding except in such Court), (b) waive any objection to the laying of venue of any such action, suit or proceeding in the Court and (c) waive and agree not to plead or claim that any such action, suit or proceeding brought in the Court has been brought in an inconvenient forum

N.    Neither MLC, nor Hilco, Maynard or Hilco-Maynards will be liable to any other person for any consequential, incidental, indirect, special or punitive damages, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof.

O.    Absent further order of the Court specifically permitting the same, Hilco, Maynard and Hilco-Maynards shall not be entitled to set-off any obligation hereunder against any claim asserted by them, except with respect to Hilco-Maynards' right to reimbursement under this Agreement.

## IX.    Miscellaneous

This Agreement shall be governed by and construed in accordance with Chapter 11 of Title 11 of the United States Code, if applicable, and otherwise, the laws of the State of New York, in each case, without giving effect to conflict of laws provisions. This Agreement may not be transferred or assigned without the express written consent of the other Parties. The Parties hereto are acting as independent contractors and nothing contained herein shall be deemed to create any other type of agency, partnership, joint venture or other relationship. This Agreement may not be modified or amended except by an instrument in writing executed by an authorized representative of each party to this Agreement. If any part or subpart of this agreement is found

9

This fax was received by Hilco's fax server. http://www.hilcotrading.com

or held to be invalid, that invalidity shall not affect the enforceability and binding nature of any other part of this agreement.

\*            \*            \*

10

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

From: The Hilco Organization    Page: 12/15    Date: 9/21/2009 9:35:26 AM
09/20/2009  01:25    2485699793              MAYNARDS                      PAGE  12/15

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of
the date written below.

MOTORS LIQUIDATION COMPANY                    HILCO INDUSTRIAL, LLC
(F/K/A GENERAL MOTORS CORPORATION)

By: _____                  Robert Levy  Digitally signed by Robert Levy
Title: VP & Treasurer                                      DN: cn=Robert Levy, o, ou,
Date: 9.18.09                                              email=rlevy@hilcoind.com, c=US
                                                           Date: 2009.09.21 09:34:36-04'00'
                                              By: _____
                                              Title:
MAYNARDS INDUSTRIES (1991) INC.               Date: _____
By: _____
Title: President
Date: 9/17/09

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

## EXHIBIT A

- (2) Eagle and Addison McKey Tube Benders
- (2) Williams & White Hydraulic Presses up to 5000 Ton (Subject to final MLC approval)
- Danly 3500 Ton Double Action Press (Subject to final MLC approval)
- Leblond Lathe
- (2) 25/10 Ton Overhead Cranes
- (2) Forklifts
- Dake Shop Press
- Quincy Air Compressors
- Substations (Subject to final MLC approval)
- Small hand tools and more

This fax was received by Hilco's fax server. http://www.hilcotrading.com

## EXHIBIT B

### *DE MINIMIS* ASSET SALE ORDER

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                            :

In re                           :                  Chapter 11 Case No.
                            :

MOTORS LIQUIDATION COMPANY, *et al.*,  :      09-50026 (REG)
     f/k/a General Motors Corp., *et al.*   :

                            :                  (Jointly Administered)

                Debtors.       :

                            :
------------------------------------------------------------x

## ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 363 (A) ESTABLISHING PROCEDURES FOR THE DISPOSITION OF *DE MINIMIS* ASSETS, AND (B) AUTHORIZING THE DEBTORS TO (i) PAY RELATED FEES, AND (ii) ASSUME, ASSUME AND ASSIGN, OR REJECT RELATED EXECUTORY CONTRACTS OR UNEXPIRED LEASES

Upon the Motion, dated July 29, 2009 (the "**Motion**"),[1] of Motors Liquidation

Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession

(collectively, the "**Debtors**"), pursuant to sections 105(a) and 363 of title 11 of the United States

Code establishing procedures for the sale of *de minimis* assets, whether by private sale or

auction, including the payment of related brokers' commissions and auctioneer fees and the

assumption, assumption and assignment, or rejection of related executory contracts or unexpired

leases, all as more fully set forth in the Motion; and due and proper notice of the Motion having

been provided, and it appearing that no other or further notice need be provided; and the Court

having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set

---

[1]     Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is

ORDERED THAT:

1.      The relief requested in the Motion is GRANTED as provided herein.

2.      The *De Minimis* Sale Procedures are approved as follows:

A.    Sale Price Less than or Equal to $1 Million

3.      The Debtors are hereby authorized to sell any asset for total consideration

of a value less than or equal to $1 million (a "**Non-Noticed *De Minimis* Sale**") without further

Court approval, and without providing notice of the Non-Noticed *De Minimis* Sale to any party,

whether by private sale or by auction; provided that (a) all assets with known existing

environmental contamination, and (b) the Debtors' interests in the Centerpoint Business Campus

in Pontiac, Michigan shall only be sold pursuant to the Noticed *De Minimis* Sale procedures (as

defined below). The Debtors are also authorized to take any actions that are reasonable and

necessary to close the Non-Noticed *De Minimis* Sale and obtain the sale proceeds.

4.      If the Debtors seek to assume, assume and assign, or reject executory

contracts or unexpired leases relating to and in connection with an asset sale that would

otherwise qualify as a Non-Noticed *De Minimis* Sale, the Debtors shall seek to sell those assets

pursuant to the Noticed De Minimis Sale procedures (as defined below). In addition, if the

Debtors seek to sell assets encumbered by liens (other than assets encumbered solely by liens

granted in favor of the DIP Lenders, as defined and described in more detail below) in

connection with an asset sale that would otherwise qualify as a Non-Noticed *De Minimis* Sale,

the Debtors shall seek to obtain the consent of the lienholder. If the Debtors are unable to obtain

the consent of the lienholder, the Debtors may sell the encumbered assets pursuant to the Noticed *De Minimis* Sale procedures.

B.    Sale Price Greater than $1 million but Less than or Equal to $15 Million

     5.    The Debtors are hereby authorized to sell any asset for total consideration of a value that is greater than $1 million but less than or equal to $15 million (a "**Noticed *De Minimis* Sale**"), without further Court approval, after providing notice of the Noticed *De Minimis* Sale to certain parties in accordance with the following procedures.

     6.    If the Debtors propose a Noticed *De Minimis* Sale, the Debtors will serve a notice of such proposed sale (a "**Sale Notice**") by facsimile, email, overnight delivery, hand delivery, or first class mail on the following parties:

(i)    the United States Trustee for the Southern District of New York (the "**U.S. Trustee**");

(ii)    counsel for the statutory committee of unsecured creditors (the "**Creditors' Committee**");

(iii)    counsel for the lenders under that certain Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of July 10, 2009, among Motors Liquidation Company (f/k/a General Motors Corporation), as Borrower, the Guarantors party thereto, and the Lenders party thereto from time to time;

(iv)    the Office of the United States Attorney for the Southern District of New York, 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz, Esq.);

(v)    the state Attorney General for the state in which any real property to be sold is located;

(vi)    the treasurer or other appropriate representative of the local taxing jurisdiction or governmental unit in which the property to be sold is located;

(vii)    all known parties holding or asserting liens or encumbrances on the assets that are the subject of the proposed Noticed *De Minimis* Sale and their respective counsel, if known; and

> (viii) the counterparties (or such counterparty's counsel) to all executory
> contracts or unexpired leases related to the property subject of the
> Sale Notice that the Debtors are seeking to assume and assign to
> the purchaser of the assets, or reject ((i)-(vi) collectively, the
> **"Interested Parties"**).

Interested Parties shall have ten (10) business days from service of the Sale Notice to file and

serve any objections to a Noticed *De Minimis* Sale (the **"Notice Period"**).

7.    The Sale Notice will specify:

> (i)    a description of the asset proposed to be sold, its location, and a
> statement whether, at the time of the notice, there is any known
> existing environmental contamination of such asset;

> (ii)   an identification of the executory contracts and unexpired leases, if
> any, to be assumed and assigned, or rejected in connection with the
> sale, the amounts required to cure any defaults pursuant to section
> 365(b) of the Bankruptcy Code, and a statement regarding the
> adequate assurance of future performance by the proposed
> assignee, consistent with section 365 of the Bankruptcy Code;

> (iii)  the identities of any parties holding or asserting liens or other
> interests or potential interests in the property and a statement
> indicating how the Debtors propose to satisfy section 363(f) with
> respect thereto;

> (iv)   an affidavit of the broker or auctioneer, if any, pursuant to Rule
> 2014 of the Federal Rules of Bankruptcy Procedure (the
> **"Bankruptcy Rules"**), that identifies the broker or auctioneer and
> the amount of the proposed commissions and contains the
> disclosures required by Bankruptcy Rule 2014; and

> (v)    instructions regarding the procedures to assert objections to the
> Noticed *De Minimis* Sale.

8.    If the transaction is to be a private sale, the Sale Notice will also specify:

> (i)    the identity of the proposed purchaser (including a statement
> indicating whether the proposed purchaser is an "insider" as
> defined in section 101(31) of the Bankruptcy Code); and

> (ii)   the major economic terms and conditions of the Noticed *De
> Minimis* Sale;[2]

---

[2]    This information may be provided by attaching the applicable contract or contracts to the Sale Notice.

9.      If the transaction is to be by auction, the Sale Notice will also specify:

     (i)      the date, time and place of the auction;

     (ii)     the minimum acceptable bid; and

     (iii)    any terms and conditions of sale to be imposed at the auction.

10.     Objections to a Noticed *De Minimis* Sale ("**Objections**") must be in writing, filed with the Court, and served on the Interested Parties and counsel to the Debtors so as to be received by all such parties prior to 4:00 p.m. (Eastern Time) on the last day of the Notice Period. Each Objection must state with specificity the grounds for the Objection.

11.     If any significant economic terms of a Noticed *De Minimis* Sale are amended after transmittal of the Sale Notice, but prior to the expiration of the Notice Period, the Debtors will serve a revised Sale Notice on all Interested Parties describing the proposed Noticed *De Minimis* Sale, as amended. If a revised Sale Notice is required, the Notice Period will expire on the later of the original Notice Period expiration date or five (5) calendar days from service of the revised Sale Notice.

12.     If an Objection to a Noticed *De Minimis* Sale is properly filed and served by an Interested Party:

     (i)      The Debtors may negotiate with the party filing the Objection and may change the terms of the sale without the requirement of further notice, as long as the revised terms are no more onerous to the Debtors than those set forth in the Sale Notice.

     (ii)     The Noticed *De Minimis* Sale may not proceed absent (a) withdrawal of the Objection; or (b) entry of an order by the Court specifically approving the Noticed *De Minimis* Sale.

     (iii)    The Debtors may schedule a hearing on the Noticed *De Minimis* Sale and, upon the scheduling of such a hearing, the Debtors will provide notice of the hearing on the party filing the Objection and the Interested Parties.

13.     If no Objection to a Noticed *De Minimis* Sale is filed and served by an Interested Party consistent with the Noticed *De Minimis* Sale Procedures, such Noticed *De Minimis* Sale will be deemed final and fully authorized by the Court under the terms of this Order, including the payment of related brokers' commissions or auctioneer fees, if applicable, and the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases, if applicable (including the payment of cure costs related thereto), and no further notice or Court approval to consummate the Noticed *De Minimis* Sale will be required or necessary.

14.     The Debtors may consummate a Noticed *De Minimis* Sale prior to expiration of the applicable Notice Period if they obtain each Interested Party's written consent to such Noticed *De Minimis* Sale.

15.     In the case of a Noticed *De Minimis* Sale to proceed by private sale, in the event the Debtors receive a competing bid the Debtors will only consummate a sale upon consultation with the Creditors' Committee.

16.     In the case of a Noticed *De Minimis* Sale to proceed by auction, the Debtors may sell the applicable asset at the auction for any price above the minimum bid, even if the sale price exceeds the applicable threshold for the *De Minimis* Sale Procedures.

C.    Effects of Sale

17.     The consent of the DIP Lenders is not required to sell estate assets, and all buyers will take title to the assets free and clear of the DIP Lenders' liens, claims, encumbrances and other interests, pursuant to section 363(f) of the Bankruptcy Code. Additionally, pursuant to section 363(f) of the Bankruptcy Code, all sales of property and interests in property pursuant to this Order shall be free and clear of all liens, claims and encumbrances, if any, and any such valid, and where applicable perfected, liens, claims, and encumbrances, including liens, claims,

and encumbrances of the DIP Lenders, will attach to the proceeds of the sale, subject to the

rights, claims, defenses and objections, if any, of the Debtors or the Creditors' Committee.

Notwithstanding the foregoing, nothing in this Order shall be construed to invalidate or

subordinate any duly perfected, non-voidable, valid liens of governmental units for personal

property taxes, real property taxes, special taxes, special assessments, and infrastructure

improvement taxes arising before or after the commencement of these chapter 11 cases to the

extent that such liens of governmental units take priority over previously granted and perfected

consensual liens or security interests in property of the Debtors under applicable non-bankruptcy

law.

        18.     All buyers will take assets sold by the Debtors pursuant to the *De Minimis*

Sale Procedures subject to the terms of the documentation executed in connection with the sale,

which may include provisions that the buyers are taking the assets "as is" and "where is,"

without any representations or warranties from the Debtors as to the quality or fitness of such

assets for either their intended purpose or any particular purpose.

        19.     All sales consummated in compliance with the *De Minimis* Sale

Procedures shall be deemed to be the result of an arm's-length transaction and the purchaser

shall be deemed a good faith purchaser and shall be entitled to the protections of section 363(m)

of the Bankruptcy Code.

        20.     Upon the closing of a private sale or auction pursuant to the *De Minimis*

Sale Procedures above, the Debtors may (a) assume any executory contract or unexpired lease to

be assigned to a proposed purchaser or other third party as a part of the proposed sale and

provide for the payment of the related cure amount and (b) reject any executory contract or

unexpired lease identified for rejection in the Sale Notice. The counterparties to any executory

contracts or unexpired leases identified in the Sale Notice pursuant to the *De Minimis* Sale

Procedures are hereby barred from asserting any further cure claims in respect of such executory

contracts or unexpired leases after the objection period for a Noticed *De Minimis* Sale has

passed.

21.     With respect to all Noticed *De Minimis* Sales and Non-Noticed *De Minimis* Sales consummated pursuant to this Order, this Order shall be sole and sufficient

evidence of the transfer of title to any particular purchaser, and all such sales consummated

pursuant to this Order shall be binding upon and shall govern the acts of all persons and entities

who may be required by operation of law, the duties of their office, or contract, to accept, file,

register or otherwise record or release any documents or instruments, or who may be required to

report or insure any title or state of title in or to any of the property sold pursuant to this Order,

including without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, administrative agencies, governmental departments,

secretaries of state, and federal, state, and local officials, and each of such persons and entities is

hereby directed to accept this Order as sole and sufficient evidence of such transfer of title and

shall rely upon this Order in consummating the transactions contemplated hereby.

D.    The Quarterly Report

22.     On or before the 30th day after the commencement of each fiscal quarter

commencing with the fiscal quarter beginning on October 1, 2009, the Debtors shall file and

serve on the Creditors' Committee a report summarizing (i) any Noticed *De Minimis* Sales that

were consummated pursuant to the *De Minimis* Sale Procedures during the immediately

preceding fiscal quarter and (ii) any Non-Noticed *De Minimis* Sales for consideration greater

than $250,000 that were consummated pursuant to the *De Minimis* Sale Procedures during the immediately preceding fiscal quarter (a "**Quarterly Report**"). With respect to each applicable sale, each Quarterly Report shall include:

    (i)    a description of the assets sold;

    (ii)    the identity of the purchaser and any relationship such party has with the Debtors; and

    (iii)    the total consideration received in connection with the sale.

E.    <u>Miscellaneous</u>

    23.    The Debtors are authorized to pay reasonable brokers' commissions and auctioneer fees for brokers and auctioneers utilized in connection with any sales pursuant to the *De Minimis* Sale Procedures authorized herein.

    24.    Any (a) sale to an "insider," as defined in section 101(31) of the Bankruptcy Code, (b) Non-Noticed *De Minimis* Sale of real property, and (c) Non-Noticed *De Minimis* Sale of other property for total consideration of a value in excess of $500,000 may only be consummated after consultation with the Creditors' Committee.

    25.    To the extent applicable, the ten-day stay of Federal Rule of Bankruptcy Procedure 6004(h) is hereby waived, and this Order shall be effective immediately. Furthermore, Non-Noticed *De Minimis* Sales and Noticed *De Minimis* Sales shall be deemed authorized pursuant to the terms of this Order and no further or additional waivers of the ten-day stay of Federal Rule of Bankruptcy Procedure 6004(h) shall be required for the Debtors to consummate a Non-Noticed *De Minimis* Sale or a Noticed *De Minimis* Sale, subject to compliance with the notice and other procedures set forth herein.

    26.    The Debtors are authorized, in consultation with the Creditors' Committee, to execute and deliver all instruments and documents, and take such other action as

may be necessary or appropriate to implement and effectuate the transactions contemplated by this Order.

27.    Nothing in this Order or any purchase agreement entered into under this Order releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order. Nothing in this Order shall be deemed to allow the Debtors to abandon real or personal property in violation of any applicable state or federal laws or regulations, including but not limited to environmental laws and regulations.

28.    Nothing in this Order shall be construed to prevent the Debtors, in their sole discretion, from seeking this Court's approval at any time of any proposed sale after notice and an opportunity for a hearing.

29.    No further orders of this Court are necessary to effectuate the terms set forth herein for the transactions contemplated herein.

30.    Nothing in this Order shall authorize the Debtors to sell assets they do not own, including any leased equipment.

31.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
        _August 18, 2009_

                                        _s/ Robert E. Gerber_
                                        United States Bankruptcy Judge

From: The Hilco Organization    Page: 15/15    Date: 9/21/2009 9:35:26 AM

09/20/2009    01:25    2495699793    MAYNARDS    PAGE  15/15

## EXHIBIT C

POWER OF ATTORNEY

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

LIMITED POWER OF ATTORNEY
PURSUANT AND SUBJECT TO ASSET MARKETING AGREEMENT

Know all by these presents, that Motors Liquidation Company ("MLC") hereby makes, constitutes and appoints each of Hilco Industrial, LLC ("Hilco") and Maynards Industries (1991) Inc. ("Maynards", and together with Hilco, "Hilco-Maynards"), acting together or individually, as MLC's true and lawful attorneys-in-fact, with power and authority on behalf of and in the name, place and stead of MLC to:

(1)      market, auction and sell Assets pursuant to that certain Asset Marketing Agreement by and among MLC, Hilco and Maynards, dated as of September [●], 2009 (the "Marketing Agreement");

(2)      execute, deliver and perform the obligations of MLC under Bills of Sale pursuant the Marketing Agreement; and

(3)      perform such other acts as are required to be conducted on behalf of MLC pursuant to Hilco-Maynards' obligations under the Marketing Agreement;

provided, however, that, (A) this Power of Attorney is subject, in all respects, to the Marketing Agreement, and power and authority to act on behalf or in the name of MLC is granted hereby to Hilco-Maynards only insofar as the same is exercised pursuant to, for the purpose of and consistent with the Marketing Agreement; (B) this Power of Attorney, and the power and authority granted to Hilco-Maynards hereby, is not coupled with interest and may be revoked at any time by MLC without any obligation on the part of MLC; and (C) this Power of Attorney, and the power and authority granted to Hilco-Maynards hereby, shall remain in force and effect only for the Term of the Marketing Agreement or, if earlier, until revoked by MLC in a signed writing delivered to each of Hilco and Maynards.

Capitalized terms not defined herein shall have the meanings ascribed thereto in the Marketing Agreement.  References to Hilco-Maynards, shall mean Hilco and Maynards, acting together or individually.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this ____ day of September, 2009.

Motors Liquidation Company
By: _____
Name:
Title:

STATE OF _____        )
                                )ss
COUNTY OF _____       )


On this ____ day of September, 2009, _____ personally appeared before me, and acknowledged that he executed the foregoing instrument on behalf of Motors Liquidation Company for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.


_____
Notary Public


My Commission Expires: