Hearing Date: November 6, 1990
Hearing Time: 9:45 a.m. ( prevailing Eastern Time)
Hearing Place: New York, N.Y.
Objection Deadline: October 30, 2009,
at 4:00 p.m. ( prevailing Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

**MOTORS LIQUIDATION COMPANY**, *et al.*,
f/k/a General Motors Corp., *et al.*

**Debtors.**

CHAPTER 11
CASE NO. 09-50026(REG)
(Jointly Administered)

RECEIVED
OCT - 5 2009
U.S. BANKRUPTCY COURT, SDNY

## MOTION OF MOVANT  IN THE ACTION ENTITLED *WALTER J. LAWRENCE V. GENERAL MOTORS HOURLY RATE EMPLOYEE PENSION, AND GENERAL MOTORS CORPORATION*, 5:O7-CV-408 OC, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF FLORIDA FOR ENTRY OF AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C.  § 362(d)(1).

Walter J. Lawrence ("Movant")and the defendants in the action entitled *WALTER J. LAWRENCE V. GENERAL MOTORS HOURLY RATE EMPLOYEE PENSION, AND GENERAL MOTORS CORPORATION*, 5:O7-CV-408 OC, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF FLORIDA, (the "Litigation") as and for its motion (this "Motion") under L.R. 9013-1 seeking entry of an order, substantially in the form annexed hereto as Exhibit "A", modifying the automatic stay pursuant to Section 362(a) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to enable Movant's Motion for Summary Judgment and other pending motions to be heard by the United States District Court in the Middle District of Florida., case number 5:O7

Hearing Date: November 6, 1990
Hearing Time: 9:45 a.m. ( prevailing Eastern Time)
Hearing Place: New York, N.Y.
Objection Deadline: October 30, 2009,
at 4:00 p.m. ( prevailing Eastern Time)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

**CHAPTER 11**

**CASE NO. 09-50026(REG)**

**MOTORS LIQUIDATION COMPANY,** *et al.,*
**f/k/a General Motors Corp.,** *et al.*

**(Jointly Administered)**

**Debtors.**

---

**MOTION OF MOVANT IN THE ACTION ENTITLED** *WALTER J. LAWRENCE V.*
*GENERAL MOTORS HOURLY RATE EMPLOYEE PENSION, AND GENERAL MOTORS*
*CORPORATION,* **5:O7-CV-408 OC, UNITED STATES DISTRICT COURT, MIDDLE**
**DISTRICT OF FLORIDA FOR ENTRY OF AN ORDER GRANTING RELIEF FROM**
**THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)(1).**

Walter J. Lawrence ("Movant")and the defendants in the action entitled *WALTER J.*

*LAWRENCE V. GENERAL MOTORS HOURLY RATE EMPLOYEE PENSION, AND*

*GENERAL MOTORS CORPORATION,* **5:O7-CV-408 OC, UNITED STATES DISTRICT**

**COURT, MIDDLE DISTRICT OF FLORIDA, (the "Litigation")** as and for its motion (this

"Motion") under L.R. 9013-1 seeking entry of an order, substantially in the form annexed hereto as

Exhibit "A", modifying the automatic stay pursuant to Section 362(a) of Title 11 of the United States

Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") to enable Movant's Motion for Summary Judgment and other pending motions

to be heard by the United States District Court in the Middle District of Florida., case number **5:O7**

**CV-408 OC** Movant respectfully alleges as follows;

## JURISDICTION

This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

## THE BANKRUPTCY PROCEEDINGS

On June 1, 2009, the Debtor and certain affiliates filed voluntary petitions (the "Petition Date") for relief under Chapter 11 of the Code in the United States Bankruptcy Court for the Southern District of New York (the "Court"). As a result the Litigation ( as defined herein) as well as the attendant action then and now pending in the United States District Court in the Middle District of Florida., case number **5:O7-CV-408 OC**, was stayed.

The District Court is now immediately poised d\to rule on Debtor's and Movant's pending motions for summary judgment. Based on the arguments set forth below there exists a real and viable likelihood that Movant will prevail on the merits.

According to the Order of this Court, Debtor has until September 29, 1999, to file and serve it's schedules of liabilities.

## BACKGROUND

### The Dispute Between Movant and the Debtor(s)

Movant is a former employee of Debtor having been employed with Debtor for nearly 31 years, retired on March1, 1993, from General Motors Corporation. Since that time, and as a former employee of debtor, Debtor has been under a legal obligation to Movant to pay to Movant monthly

pension payments as provided for in the GM/UAW Pension Plan agreement. In the interest of brevity and the limited judicial and administrative resources of this Court, Movant includes with this motion and under separate cover copies of Movant's Amended Complaint, Motion for Summary Judgment.

The GM/UAW ERISA and IRC qualified pension plan payments has been in pay-out status since March 1, 1993, at which time Movant ceased being an employee of Debtor and became a retiree of Debtor. Starting with the pay-out on March 1, 2007, GM/UAW ERISA and IRC qualified pension plan payment, Debtor gained access to the GM/UAW ERISA and IRC qualified pension plan payment that was property of the estate. Up until the GM/UAW ERISA and IRC qualified pension plan payments was in pay-out status debtor could not gain access to these funds because they were locked up in the GM/UAW ERISA and IRC qualified pension plan. However, starting with May, 2007, Debtor starting executing on the funds that were in pay-out status, those funds were alienated by Debtor, funds that ceased being property of the estate in order to satisfy the debt referred to by Debtor in their letters to Movant of May 14, 2007, (Exhibit "B") and September 5, 2007 (Exhibit "C").

However, in the case *McVay v. Otero*, 371 B.R. 190 ( W.D. Texas, 2007), that just as is the case here, if the alienation of Debtor's payments by Movant can be a "debt" "...only if the retirement plan administrator has a 'claim' for repayment." The Court held, inciting 11 U.S.C. § 101(5), that:

> In the Bankruptcy Code, '[t]her term 'debt' means liability on a claim.' 11 U.S.C. § 10112. A 'claim' is in turn defined, in relevant part, as a 'right to payment.' Id.. § 101(5),. The meanings of 'debt' and 'claim' are considered to be 'coextensive.' Jonhson v.Home State Bank, 501 U.S. 78, 84-85 n. 5, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991); Penn. Dept. Of Public Welfare v. Davenport, 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). In re Rifkin, 124 B.R. 626, 628 (Bankr. E.D.N.y. 1991). ('Debt and claim are flip sides of the same coin.'). S.Rep. No. 989, 95[th] Cong. 2d Sess, 23 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5809 ('The terms 'debt' and 'claim' are coextensive; a creditor has a 'claim' against the debtor; the debtor owes a 'debt' to the creditor.').

Here, the Debtor owes a "debt" to the Movant, the creditor and Movant has a "claim" against the Debtor. . The debt is the alienation of the pay out provisions of Movant's interest in the GM/UAW Pension plan payments as is more fully developed herein by "applicable nonbankruptcy law" and applicable bankruptcy law and the "claim" of Movant is for the pay- out portions all in violation of 29 U.S.C. § 1144(d), 1.401(a)-13(b)(I), 26 U.S.C. § 6331(d)(4) and 26 C.F.R. § 301.6331-2(a)(1), 26 C.F.R. § 1.401(a)-13(e), 29 U.S.C. §1056(d)(1), 26 U.S.C.§ 401(a)(13(A), 26 C.F.R. §1.401(a)-13(1) ( i ), (ii), 26 U.S.C. § 6065, 6061, Treasury Reg. § 1.6061-1 and well-established applicable case law as is more fully set forth herein.

Consider the case of *United States v. Snyder,* 343 F.3d 1171, (CA9, 2003)

Pursuant to 11 U.S.C. § 541(a)(1), the property of a bankruptcy estate includes "all legal or equitable interest of the debtor in property as of the commencement of the case," "[e]xcept as provided in subsections (b) and (c)(2)." 11 U.S.C. § 541(a)(1). Subsection (c)(2) provides that a "restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable non-bankruptcy law is enforceable in a case under this title." Id. § 541(c)(2). In Patterson v. Shumate, 504 U.S. 753 (1992), the Supreme Court was asked to decide whether "applicable non-bankruptcy law" includes federal as well as state law. The Court held that federal law, including ERISA, was included, and therefore that the anti-alienation clause required for ERISA qualification constitutes a restriction on transfer enforceable under "applicable non-bankruptcy law" within the meaning of § 541(c)(2). Id. at 75960; see 29 U.S.C. § 1056(d)(1) ("Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated."). Accordingly, the Court held that a debtor's interest in an ERISA-qualified plan is excluded from the property of the bankruptcy estate. 504 U.S. at 765.

Like Snyder, id, the Debtor's alleged interest in the "ERISA-qualified plan is excluded from the property of the bankruptcy estate. 504 U.S. at 765," id because the GM/UAW "ERISA-qualified plan" contains the anti-alienation provision as mandated by law. However, "applicable nonbankruptcy law" applies here. For example, "ERISA expressly provides that it "shall [not] be construed to alter, amend, modify, invalidate, impair, or supercede any law of the United States," 29

U.S.C. § 1144(d), including federal tax law." Id.  The provisions of 1.401(a)-13(b)(I), 26 U.S.C. § 6331(d)(4) and 26 C.F.R. § 301.6331-2(a)(1), 26 C.F.R. § 1.401(a)-13-(e) are federal laws and they are each "applicable nonbankruptcy law," for purposes of the alienation of Movant's pension plan payments where, as is the case and as admitted by Debtor (See attached exhibit "D", Debtor's Answer to Movant's Amended Complaint) in the pending District Court action, there have never been any document signed by any authorized agent of Debtor, any authorized agent of Fidelity Investment or Movant that would be in accordance with the Article VII, Section 3 of the GM/UAW Pension Plan Agreement, and "applicable nonbankruptcy law", i.e. 29 U.S.C. §1056(d)(1), 26 U.S.C.§ 401(a)(13(A), 26 C.F.R. §1.401(a)-13(1) (  i ), (ii), 26 U.S.C. § 6065, 6061,  Treasury Reg. § 1.6061-1. Each of these "applicable nonbankruptcy law[s]," will be developed in full below.

On May 19, 1999, the IRS served on debtor a Notice of Levy. (Exhibit "E"). This levy, in the amount of "267928.91", in part, stated to debtor that: "THIS LEVY WON'T ATTACH FUNDS IN IRAs, SELF-EMPLOYED INDIVIDUALS' RETIREMENT PLAN, *OR ANY OTHER RETIREMENT PLANS IN YOUR POSSESSION OR CONTROL*, UNLESS THIS IS SIGNED IN THE BLOCK TO THE RIGHT. (Emp. Added). The May 19, 1999, Notice of Levy which denied to debtor the execution of the Notice of Levy on Movant's interest in the GM/UAW pension plan payments for the reason that the  instructions to IRS was that this Notice of Levy was not signed by the IRS. Thus, the complete dominion and control vis-a-vis  execution of the IRS  Notice of Levy dated May 19, 1999, is cause for the lifting of the stay since the execution of the  Notice of Levy form instructions and Debtor refusal to comply with those form instructions strips Movant of any and all adequate protection.

26 U.S.C. 6061 provides that "any ... document required to be made under any provision of

Page 5 of 64

the internal revenue laws or regulations shall be signed in accordance with forms or regulations prescribed by the Secretary." Treasury Reg. § 1.6061-1, in turn, provides that "documents required under the provisions of subtitle A or F of the Code or of the regulations thereunder to be made by any person with respect to any tax imposed by subtitle A of the Code shall be signed in accordance with any regulations contained in this chapter, or any instructions, issued with respect to such returns, statements, or other documents." Section 6065 requires that "any...document required to made under any provision of th internal revenue laws or regulations shall contain or be verified by a written declaration that is made under penalties." 26 U.S.C. § 6065. The one signature that is on the bogus continuing claim Notice of Levy is not signed by the alleged authorized agent under the penalty of perjury. The other signature that is provided for on the Notice of Levy form instructions is not signed and since it is not signed, it is not signed under the penalty of perjury.

The alleged income tax was imposed under the provisions of subtitle A, section and the Notice of Levy was allegedly issued under subtitle F, Section 6331. Thus, as provided for in 26 C.F.R. 1.6061-1, the Notice of Levy form instructions prescribes that that document had to "...be signed in accordance with any regulations contained in this chapter, or any instructions, issued with respect to such returns, statements, or other documents. "  26 C.F.R. 1.6061-1 prescribes that the Notice of Levy had to be signed "...in accordance with.." the "...instructions issued with respect to the Notice of Levy document, it is, therefore, a bogus document having not been signed by an authorized agent of the IRS as prescribed by the Notice of Levy form instructions, 26 U.S.C. 6061, and  26 C.F.R. 1.6061-1, the regulation prescribed by the secretary. Kelly v. United States, 209 F.Supp. 2d 981 fn#2 ("Section 6331(d)(4) sets forth the information which must be included with the notice."). Thus, a Notice of Levy, like a return, that does not comply with the form instructions

and signature instructions does not constitute a valid Notice of Levy. McGee v. Commissioner, T.C. Memo, 2000-308 (2000) ( Where "returns were not signed by....an authorized agent pursuant to sec. 1.6061-1(a), Income Taxa Regs, they do not constitute returns of petitioner."). It would be anomalous to excuse Debtor from compliance with Notice of Levy signature form instructions where an IRS authorised agent has determined vis-a-vis the absence of that authorized agent's signature box in the Notice of Levy form as provided for in 26 U.S.C. § 6061(a), 26 C.F.R. § 1.6061-1(a) but not to excuse a taxpayer's failure to sign a return when both 26 U.S.C. § 6061(a), 26 C.F.R. § 1.6061-1(a) apply equally to a return and a Notice of Levy.

Treasury Regulation section 1.401(a)-13(b) provides that:

> (b) No assignment or alienation--(1) General rule. Under section 401(a)(13), a trust will not be qualified unless the plan of which the trust is a part provides that benefits provided under the plan may not be anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process. (2) Federal tax levies and judgments. A plan provision satisfying the requirements of subparagraph (1) of this paragraph shall not preclude the following: (i) The enforcement of a *Federal tax levy made pursuant to section 6331.*

While the GM/UAW Pension Plan does contain this anti alienation provision the Notice of Levy has to be "....*made pursuant to section 6331.*" The application of this regulation, Treasury Regulation section 1.401(a)-13(b)(I) to the facts of this case is clear: the Notice if Levy here has to be made pursuant to 26 U.S.C. § 6331(d)(4) and 26 C.F.R. § 301.6331-2(a)(1). Thus, since a levy will not "preclude ...

(i) The enforcement of a *Federal tax levy made pursuant to section 6331,*" it necessarily follows from this that the Notice of Levy of May 19, 1999, does not contain the mandatory signature and verification requirements as set forth in the above and does not contain the signature pursuant to the

Notice of levy form instructions, that Notice of Levy cannot serve as a legal vehicle to alienate Movant's GM/UAW Pension Plan payments.

The U.S. Tax court and the Bankruptcy Courts have all uniformly held that one of the documents that is provided for in 26 U.S.C. § 6061(a), 26 C.F.R. § 1.6061-1(a) - a return - that is not signed under the penalty perjury is no return at all. In re Lee, 186 B.R. 539 (S.D.Fla. Sep. 05, 1995), and cases cited. Thus, since 26 U.S.C. § 6061(a), 26 C.F.R. § 1.6061-1(a) provides for "any ... document required to be made under any provision of the internal revenue laws or regulations shall be signed in accordance with forms or regulations prescribed by the Secretary," and IRS form Notice of Levy meets the test of "any ... document required to be made under any provision of the internal revenue laws or regulations shall be signed in accordance with forms or regulations prescribed by the Secretary," that IRS Notice of Levy has to not only be signed as provided for in the Form instructions, it also has to be signed under the penalty of perjury as provided for in 26 U.S.C. § 6061, 6065. The IRS continuing claim Notice of Levy fails to comply with these statutory, regulatory and well-established provisions. Therefore. The Debtor and its employees who are responsible for execution of this bogus Notice of Levy are engaging in criminal facilitation.

In "DEFENDANTS' MOTION AND BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT." U.S. District Court, Docket entry 51, Movant's attached exhibit "F". Debtor goes to great lengths in their arguments that they know that they have a legal duty to comply with the IRS May 19, 1999, Notice of Levy and its form instructions. For example, Debtor states that starting with page #8 that "[D]efendants were obligated to comply with the IRS levy," citing 26 U.S.C. § 6332(a). Debtor goes

on to state at page #9 of exhibit "F" that "...unless Defendants can show 'reasonable cause' why the

levy was not honored, it must pay the government penalty equal to 50% amount stated above."

Clearly, the "reasonable cause" that Debtor waived was that the Notice of Levy form instructions

was a complete affirmative defense as to why Debtor had to comply with the Notice of Levy by not

levying on Movant's property interest in the GM/UAW ERISA and IRC qualified pension plan

payments. The GM/UAW Pension Plan  is a plan that is qualified under 26 U.S.C. § 401(a) are

exempt from tax pursuant to 26 U.S.C. § 501(a) with certain exceptions not applicable. However,

since Debtor consciously chose to ignore the provisions of Article VII, Section 3 of the GM/UAW

Pension Plan Agreement, and  in violation of  29 U.S.C. §1056(d)(1), 26 U.S.C.§ 401(a)(13(A), 26

C.F.R. §1.401(a)-13(1) ( i ),(ii), 26 U.S.C. § 6065, 6061,  Treasury Reg. § 1.6061-1 Debtor should

be divested of that tax exempt status

Notice  of Levy form instructions and levy on Movant's property interest in the GM/UAW

ERISA and IRC qualified pension plan payments contract Debtor has now become liable to Movant,

as a secured party with a secured claim, to recoup and recover those illegal extractions of Debtor.

If, as Debtor has alleged, Debtor  fully complied with the Notice of Levy and the form instructions

then Debtor would have to have complied with 26 U.S.C. § 6061(a) and 26 C.F.R. § 1.6061-1(a) by

refusing to honor the IRS Notice of Levy that does not meet the statutory and regulatory provisions

of  the signing provisions of 26 U.S.C. § 6061(a) and 26 C.F.R. § 1.6061-1(a)

The fact that the IRS instructed the Debtor vis-a-vis the Notice of Levy form instructions that

the Notice of Levy does not apply to the  Movant's property interest in the GM/UAW ERISA and

IRC qualified pension plan payments contract thereby resulting in those Plan Payments being under

the complete dominion and control of Debtor and concurrently divesting Movant of complete

dominion and control; over those payments since Debtor commenced execution of the Notice of levy in the year 1999, result in a complete divestiture of any legal effect of the Notice of Levy on Movant's property interest in the GM/UAW ERISA and IRC qualified pension plan payments contract. The key to determining whether a taxpayer enjoys 'complete dominion' over a given sum is whether the taxpayer 'has some guarantee that he will be allowed to keep the money.' *Indianapolis Power & Light Co.*, 493 U.S. at 210. Here, Debtor has denied Movant complete dominion and control over Movant's property interest in the GM/UAW ERISA and IRC qualified pension plan payments. Whether that divestiture was legal or not does change the legal fact that Movant has had no dominion or control of his property interest in the GM/UAW ERISA and IRC qualified pension plan payments since the year 1999. Therefore, based on Debtor having denied to Movant ".. some guarantee that he will be allowed to keep the money." *Indianapolis Power, Id,* money that is not property of the estate, and money that is under the complete dominion and control of Debtor in violation of Article VII, Section 3 of the GM/UAW Pension Plan Agreement, in violation of 29 U.S.C. §1056(d)(1), 26 U.S.C. § 401(a)(13(A), 26 C.F.R. §1.401(a)-13(1) ( i ), (ii); Movant has been denied adequate protection. The Automatic stay should be lifted in order that the Court that does have subject matter jurisdiction over the non-property of the estate, Movant's interest in the GM/UAW Pension Plan contract that Court being the District Court in the Middle District of Florida. Thus, the 7th prong of *Sonnax,* "(7) whether litigation in another forum would prejudice the interests of other creditors;" has been met.

Movant argues that the estate will not be burdened of the court permits the District Court litigation to proceed because the imposition of a constructive trust, here the GM/UAW ERISA and IRC qualified pension plan agreement is not property of the estate of debtor and thus, would not

interfere with the Debtor's Chapter 11 case at any time. However, while the stay must be lifted to enable the District Court to determine the pending facts and issues in that action, this Court will determine whether a constructive trust is involved here, it is for this Court, in the first instance, what is property of the estate. *See In re Continental Airlines,* 138 B.R. 442, 445 (the determination of what constitutes property of the debtor's estate is one of the core proceedings arising under title 11 and is inherently an issue to be determined by the Bankruptcy court. As explained in *In re Flanigan,* 503 F.3d 171, 180-11 (CA2, 2007):

> The effect of a constructive trust in bankruptcy is profound. While the bankrupt estate is defined very broadly under § 541(a)(1) of the Bankruptcy Code to [*18] include all legal or equitable interests of the debtor, any property that the debtor holds in constructive trust for another is excluded from the estate pursuant to § 541(d), which states
>
> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold. 11 U.S.C. § 541(a)(1), (d); see also Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.), 874 F.2d 88, 93 (2d Cir. 1989). A constructive trust thus places its beneficiary ahead of other creditors with respect to the trust *res.*

11 U.S.C. §541(a)(1), (d); see also Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.), 874 F.2d 88, 93 (2d Cir. 1989). A constructive trust thus places its beneficiary ahead of other creditors with respect to the trust *res.*

Granting Movant stay relief will not result in the imposition of a constructive trust and, therefore, neither Debtor nor the estate will be prejudiced.

After determining whether relief from the stay will result in any harm to the Debtor or the estate, this Court must balance that hardship with any hardship that the movant will suffer as a result of the stay being enforced. Here, Movant believes that the equities favor Movant. Hardship will result to Movant denying relief, whereas there will be no prejudice to Debtor, For example, Debtor

and Movant have already prepared extensively for entry of summary judgment in the District Court. Both Debtor and Movant will be burdened by further delay and the fact that it will have to prepare again in this Court that which they and District Court have already spent significant time and resources preparing for the resolution in the District Court action. In addition, it makes no sense for this Court to prepare for that which the District court , Debtor and Movant have already prepared for. That is unnecessary expenditure of the limited resource of this Court, the District court , Debtor and Movant. Further, without a ruling on the District Court issues and facts, Debtor's and Movant's rights in this bankruptcy case remains undetermined and the value of Movant's claim will remain a troubling issue for this Court, the District Court, and Debtor.

The Debtor simply cannot file a confirmable plan of reorganization until they know what liability they have to Movant. The resolution of the issues and facts remaining in the District Court litigation will assist this Court, the Debtor and Movant and not burden this Court.  In addition, this Court must consider whether movant has some probability os success on the merits of the pending District Court litigation. Even a slight probability of success on the merits may be sufficient to support lifting an automatic stay in an appropriate case. Int'l *Business Machines v. Fernstrom Storage & Van co. (In re Fernstrom Storage & Van Co.)*, 938 F.2d 731, 737 (CA7, 1991; *Izzarelli v. Rexene (In re Rexene Prods. Co.)* 141 B.R. 574 578.(Bankr. D.Del. 1992). That probability of success is found in Debtor's admitted violations of 29 U.S.C. § 1056(d)(2), 26 C.F.R. § 1.401(a)-13(d)(1)( i ), (ii) bars any and all alienation over the 10% limits. Here, defendants' violate the provisions of 26 C.F.R. § 1.401(a)-13(d)(1)( i ), (ii), 26 C.F.R. § 1.401(a)-13(e) 29 U.S.C. § 1056(d)(2), and Article VII, Section 3(e) (Administrative Record, Volume I, pages #47-48)  of the GM/UAW Pension Plan Agreement. Thus, it is these admitted violations of Debtor that has already solidified into actual success on the merits and the issues remaining are merely damage calculations.

Antialienation provision required for ERISA qualification and contained in the GM/UAW Pension Plan Supplemental Agreement ( attached to Movant's Proof of Claim and incorporated herein by reference as though fully stated) constitutes enforceable transfer restrictions for purposes of 11 U.S.C. § 541( c )(2)'s exclusion of property from bankruptcy estate. Patterson v. Shumate, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519. Thus, because the GM/UAW ERISA and IRC qualified Pension Plan Agreement is not "property of the estate" this Bankruptcy Court lacks subject matter jurisdiction over these ERISA-qualified pension plan funds. 11 U.S.C. § 541( c )(2). In re Rains, 428 F.3d 893 (CA9, 2005); In re McClellan, 45 F.3d 432 (CA7, 1995). See *Kickman Hanley P.C. v. Kodak Restaurant*, , 558 F.3d 204 (CA2, 2009).

The terms of the GM/UAW pension plan bars the recovery of overpayments from *"...the General Motors Hourly-Rate Employees Pension Plan."* In the plan, Defendants' and the UAW have agreed in Section 10 Recovery of Benefit Overpayments. of the GM/UAW Pension Plan provides that:

> If it is determined that any benefit(s) paid to an employee under a General Motors benefit plan incorporated under the GM-UAW National Agreement or any Exhibits thereto, should not have been paid or should have been paid a lesser amount, written notice thereof shall be given to such employee and the employee shall repay the amount of the overpayment.
>
> If the employee fails to repay such amount of overpayment promptly, the Corporation, on behalf of the applicable benefit plan, shall arrange to recover the amount of such overpayments from any monies then payable, or which may become payable, to the employee in the form of wages or benefits payable under a General Motors benefit plan *(excluding the General Motors Hourly-Rate Employees Pension Plan)* incorporated under the GM-UAW National Agreement or any Exhibits thereto. (Emphasis added by Plaintiff).

There is one limited exception of the exercise of discretionary authority under the terms of the GM/UAW pension plan: Article VII, Section 3 of the GM/UAW Pension Plan Agreement which

provides that:

> (e) may have amounts of not less than $80.00, but in no event more than 10% of the retired employee's monthly pension, withheld to repay any outstanding overpayment owing to any benefit plan of the Corporation, *pursuant to written authorization and direction acceptable to the corporation.*

*Ellis National Bank of Jacksonville v. irving Trust Co.*, 786 F.2d 466 (CA2, 1986) fn#1 provides that:

> Treas.Reg. Sec. 1.401(a)-13(e) expressly permits a participant in a pension plan to direct the plan to pay all or part of plan benefits to a third party if (1) such arrangement is revocable at any time by the participant and (2) *the third party files a written acknowledgment of such revocability with the plan administrator.* The parties do not contend on appeal, and no party (including Irving Trust) has argued to the district court, that Kalil's revocable assignment to Ellis failed to satisfy these requirements

This Treasury Regulation,  Sec. 1.401(a)-13(e), expressly provides that:

> (e) Special rule for certain arrangements--(1) In general. For purposes of this section and notwithstanding paragraph (c)(1) of this section, an arrangement whereby a participant or beneficiary directs the plan to pay all, or any portion, of a plan benefit payment to a third party (which includes the participant's employer) will not constitute an ``assignment or alienation'' if-- (i) It is revocable at any time by the participant or beneficiary; and (ii) The third party files a written acknowledgement with the plan administrator pursuant to subparagraph (2) of this paragraph. (2) Acknowledgement requirement for third party arrangements. In accordance with paragraph (e)(1)(ii) of this section, the third party is required to file a written acknowledgement with the plan administrator. This acknowledgement must state that the third party has no enforceable right in, or to, any plan benefit payment or portion thereof (except to the extent of payments actually received pursuant to the terms of the arrangement). A blanket written acknowledgement for all participants and beneficiaries who are covered under the arrangement with the third party is sufficient.

Here, there is no genuine issue of material fact or dispute that the third party, Fidelity Investment, Debtor, Movant has never signed or filed with the plan administrator any Treasury Regulation,  Sec. 1.401(a)-13(e) document that would authorize the legal alienation that Fidelity

Page 14 of 64

Investment and Debtor have been executing on Movant's interest in the GM/UAW ERISA and

IRC qualified pension plan agreement.

Moreover, 29 U.S.C. § 1056(d)(2) provides that "[F]or the purposes of paragraph [29

U.S.C. § 1056(d)(1)] of this subsection, *there shall not be taken into account any voluntary and*

*revocable assignment of not to exceed 10 percent of any benefit payment.*" In addition, 26 C.F.R.

§ 1.401(a)-13(d)(1)( i ), (ii) provides that:"....a plan may provide that once a participant or

beneficiary begins receiving benefits under the plan, the participant or beneficiary may assign or

alienate the right to future benefit payments *provided that the provision is limited to assignments*

*or alienations which– (i) Are voluntary and revocable; (ii) Do not in the aggregate exceed 10*

*percent of any benefit payment.*" Article VII, Section 3(e) (Administrative Record, Volume I,

pages #47-48) of the GM/UAW Pension Plan Agreement is the provision of 26 C.F.R. §

1.401(a)-13(d)(1)( i ), (ii) that implements the provision that defendants' can only alienate

plaintiff's pension plan payments if there is first a "written authorization" to do. That "written

authorization" is non existent in this case. Even if in the alternative that was no "written

authorization", as is the case here, the provisions of 29 U.S.C. § 1056(d)(2) and 26 C.F.R. §

1.401(a)-13(d)(1)( i ), (ii) bars any and all alienation over the 10% limits. Here, defendants'

violate the provisions of 26 C.F.R. § 1.401(a)-13(d)(1)( i ), (ii), 29 U.S.C. § 1056(d)(2), and

Article VII, Section 3(e) (Administrative Record, Volume I, pages #47-48) of the GM/UAW

Pension Plan Agreement.

Section 10 Recovery of Benefit Overpayments., of the GM/UAW Pension Plan provides
that:

If the employee fails to repay such amount of overpayment promptly, the Corporation, on
behalf of the applicable benefit plan, shall arrange to recover the amount of such
overpayments from any monies then payable, or which may become payable, to the
employee in the form of wages or benefits payable under a General Motors benefit plan
*(excluding the General Motors Hourly-Rate Employees Pension Plan)* incorporated under

the GM-UAW National Agreement or any Exhibits thereto. (Emphasis added by Plaintiff).

Consider for example the case of Ditto v. MCCurdy, 86 Hawaii 84, 86, 947 P.2d 962, 954 (1997).

> We begin with General Motors, which is directly on point. In that case, David Buha obtained a state court judgment against Walter Kinsky and his wife in a tort action. When the judgment was not paid, Buha instituted post-judgment garnishment procedures, after which a writ of garnishment was served on the National Bank of Detroit in its capacity as trustee of a General Motors (GM) Corporation pension fund. The trustee filed a disclosure indicating no liability to Kinsky, prompting Buha to demand an examination of the garnishee. The matter was set for hearing before The Honorable James B. Stone, judge of the 34th judicial district of Michigan.

Prior to the hearing, however, GM filed suit in the United States District Court for the Eastern District of Michigan, seeking to restrain enforcement of the writ of garnishment. The district court entered a temporary restraining order (TRO) pending the hearing on GM's motion for a preliminary injunction. The district court reasoned that GM, as fiduciary of the pension plan, would "be irreparably damaged and harmed" unless defendants Buha and Judge Stone were immediately restrained. Following the hearing on GM's motion for preliminary injunction, the district court entered an order permanently enjoining Buha and Judge Stone from enforcing or attempting to enforce the writ of garnishment.

On appeal, the United States Court of Appeals for the Sixth Circuit held that benefits under an ERISA-qualified pension plan are not subject to garnishment by a creditor of a plan beneficiary. The Sixth Circuit began its discussion by pointing out that

> [g]arnishment is not mentioned in ERISA. However, both ERISA and the section of the [IRC] dealing with "qualified" pension, profit-sharing and stock bonus plans contain provisions against assignment or alienation of plan benefits. Nearly identical language in 29 U.S.C. § 1056(d)(1) (ERISA) and 26 U.S.C. § 401(a)(13) (IRC) requires plans to contain a provision that "benefits provided under the plan may not be assigned or alienated." The General Motors plan which was the object of the writ of garnishment contains this provision. There is one exception in ERISA to the requirement of non-assignability which permits a "voluntary and revocable assignment of [sic] not to exceed 10 per cent of any benefit payment . . . ." 29 U.S.C. § 1056(d)(2). A similar exception is contained in 26 U.S.C. § 401(a)(13).

General Motors, 623 F.2d 455 at 460.

The Sixth Circuit then reviewed the Joint House and Senate Conference Committee Report, which refers to the requirement of non-assignability and the exception as follows:

Alienation

Page 16 of 64

Under the conference substitute, a plan must provide that benefits under the plan may not be assigned or alienated. However, the plan may provide that after a benefit is in pay status, there may be a voluntary revocable assignment (not to exceed 10 percent of any benefit payment) by an employee which is not for purposes of defraying the administrative costs of the plan. For purposes of this rule, a garnishment or levy is not to be considered a voluntary assignment. Vested benefits may be used as collateral for reasonable loans from a plan, where the fiduciary requirements of the law are not violated. H.R.Rep.No. 93-1280, 93 Cong. 2d Sess., reprinted in [1974 U.S.C.C.A.N.], pp. 4639, 5038, 5061.

Id. (emphasis added).

The court indicated that:

Both sides find support in this language. The plaintiff [[GM]] argues that "this rule" refers to the exception, and that since garnishments are not allowed within the 10 per cent exception, they are clearly not allowed above that amount. On the other hand, the defendants [(Buha and Stone)] see "this rule" as a reference to the general requirement of a provision against assignment or alienation. Under this reading a garnishment is not to be considered an assignment, and therefore is not prohibited.

Id. Nevertheless, the court concluded that neither of the parties' arguments was convincing and stated that it was "unable to decide the question on the basis of this portion of the legislative history." Id.

The court thereafter turned to defendants' argument that use of the words "assignment" and "alienation" in [section] 1056(d)(1) indicates that Congress intended to prohibit only voluntary acts by the pension plan beneficiaries. They point out that Congress has clearly prohibited garnishments and attachments when that is its intention. They list ten different statutes in which Congress has made a distinction between voluntary assignments and involuntary encroachments on benefits by way of garnishment, execution, attachment, etc. See, e. g., 5 U.S.C. § 8346 [Civil Service retirement benefits]; 10 U.S.C. § 1450 [benefits under serviceman's survivor benefits plan].

Id. (brackets in original). Although the Sixth Circuit agreed that "[t]his is a strong indication that Congress recognized the difference between voluntary and involuntary encroachments on benefit funds and has stated it specifically when both are forbidden[,]" the court stated that "Congress did use the word 'voluntary' in specifying those assignments which qualify for the 10 per cent exception in [section] 1056(d)(2)." Id. Accordingly, the court concluded that "[t]his can reasonably be read as an indication that the preceding language in [section] 1056(d)(1) included all encroachments, both voluntary and involuntary." Id.

The court then turned to an administrative interpretation of the anti-assignment provisions of ERISA, which it found highly persuasive:

> Pursuant to [its authority under ERISA,] the Secretary of the Treasury issued Internal Revenue Service Regulation § 1.401(a)-13 [hereinafter, Treasury Regulation § 1.401(a)-13 or Reg. § 1.401(a)-13], which provides in part:
>
> (b) *No assignment or alienation.* (1) General rule. Under section 401(a)(13), a trust will not be qualified unless the plan of which the trust is a part provides that benefits provided under the plan may not be anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process. 26 C.F.R. s 1.401(a)-13 (1979).
>
> As Judge Garth pointed out in Baker v. Otis Elevator Co., 609 F.2d 686, 690 (3d Cir. 1979),
>
> > Congress specifically delegated to the Secretary of the Treasury the authority to issue regulations concerning participation, vesting and funding standards. Moreover, Congress provided that regulations issued by the Treasury Department would apply to analogous employee benefit sections of Title I of the Act in the same areas. Since the regulation in question is a legislative rather than an interpretive regulation, it is required to be followed unless it was issued in excess of the statutory authority of the Secretary or was "arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law." Id. at 691, quoting Batterson v. Francis, 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977). The regulation in question clearly passes this test.

General Motors, 623 F.2d at 462-63 (some brackets in original) (emphases added). "Giving the required effect to Reg. § 1.401(a)-13," the Sixth Circuit concluded that "pension plan benefits are not subject to garnishment and that the district court properly enjoined the proceedings in the Michigan court." See id.

In Guidry, the United States Supreme Court recognized that ERISA "erects a general bar to the garnishment of pension benefits from plans covered by the Act." Guidry, 493 U.S. at 371. Therein, petitioner Curtis Guidry, a union official, pleaded guilty to embezzling more than $377,000 from respondent Sheet Metal Workers International Association, Local 9 (Union), in violation of section 501© of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 73 Stat. 536, 29 U.S.C. § 501© (1982 ed.). Guidry's employment with the Union had made him eligible to receive benefits from three union pension funds. Nevertheless, two of the pension plans determined that Guidry had forfeited his right to benefits as a result of his criminal activity. Guidry filed a complaint against the two plans in the United States District Court for the District of Colorado, alleging that the plans had wrongfully refused to pay him the benefits to which he was entitled.

The Union intervened, joined the third pension plan as a party, and stipulated to a $275,000 judgment in the Union's favor. The district court rejected the plans' claim that

Guidry had forfeited his right to benefits, relying upon section 203(a) of ERISA, 29 U.S.C. § 1053(a) (1982 ed.), which declares that "[e]ach pension plan shall provide that an employee's right to

his normal retirement benefit is nonforfeitable" so long as the employee meets the statutory age and years of service requirements. The district court concluded, however, that ERISA's anti-alienation clause did not preclude the imposition of a constructive trust in favor of the Union until the judgment was satisfied. Although the court appeared to acknowledge that the anti-alienation provision generally prohibited the garnishment of pension benefits as a means of collecting a judgment, it nevertheless stated that "ERISA must be read in pari materia with other important federal labor legislation." Guidry, 493 U.S. at 370 (quoting Guidry v. National Sheet Metal Workers' Nat'l Pension Fund, 641 F. Supp. 360, 362 (D. Colo. 1986)). Reading ERISA in pari materia with, inter alia, the LMRDA -- which seeks to combat corruption on the part of union officials and to protect the interests of the membership -- the district court concluded that a narrow exception to ERISA's prohibition on assignment or alienation of pension benefits arises where "the viability of a union and the members' pension plans was damaged by the knavery of a union official[.]" Id. The United States Court of Appeals for the Tenth Circuit affirmed, and the Supreme Court reversed.

The Guidry Court began its discussion by stating that:
Both the District Court and the Court of Appeals presumed that § 206(d)(1) of ERISA erects a general bar to the garnishment of pension benefits from plans covered by the Act. This Court, also, indicated as much, although in dictum, in Mackey v. Lanier Collection Agency & Service, Inc., 486 U.S. 825 (1988). In Mackey the Court held that ERISA does not bar the garnishment of welfare (e.g., vacation) benefits. In reaching that conclusion, it noted that § 206(d)(1) proscribes the assignment or alienation of ERISA pension plan benefits, but that no comparable provision applies to ERISA welfare benefit plans. Id. at 836. It reasoned that "when Congress was adopting ERISA, it had before it a provision to bar the alienation or garnishment of ERISA plan benefits, and chose to impose that limitation only with respect to ERISA pension benefit plans, and not ERISA welfare benefit plans." Id. at 837 (emphasis in original). The view that the statutory restrictions on assignment or alienation of pension benefits apply to garnishment is consistent with applicable administrative regulations,[6] with the relevant legislative history,[7] and with the views of other federal courts.[8] It is also consonant with other statutory provisions designed to safeguard retirement income.[9]

493 U.S. at 371 (emphases in original). Finding that it could "see no meaningful distinction between a writ of garnishment and the constructive trust remedy imposed in this case[,]" the Court held that the constructive trust remedy "is therefore prohibited by § 206(d)(1) unless some exception to the general statutory ban is applicable." Id.
The Court went on to reject the plans' position that the LMRDA would be modified, impaired, or superseded by a "refusal to allow ERISA pension plans to be used to effectuate the remedial goals of the LMRDA."[10] 493 U.S. at 375. Additionally, the Court felt it inappropriate to "approve any generalized equitable exception -- either for employee malfeasance or for criminal misconduct -- to ERISA's prohibition on the

assignment or alienation of pension benefits." Id. at 376. In refusing to recognize a general equitable exception, the Court reasoned:

Section 206(d) reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them. If exceptions to this policy are to be made, it is for Congress to undertake that task.

As a general matter, courts should be loath to announce equitable exceptions to legislative requirements or prohibitions that are unqualified by the statutory text. The creation of such exceptions, in our view, would be especially problematic in the context of an antigarnishment provision. Such a provision acts, by definition, to hinder the collection of a lawful debt. A restriction on garnishment therefore can be defended only on the view that the effectuation of certain broad social policies sometimes takes precedence over the desire to do equity between particular parties. It makes little sense to adopt such a policy and then to refuse enforcement whenever enforcement appears inequitable. A court attempting to carve out an exception that would not swallow the rule would be forced to determine whether application of the rule in particular circumstances would be "especially" inequitable. The impracticality of defining such a standard reinforces our conclusion that the identification of any exception should be left to Congress.

Understandably, there may be a natural distaste for the result we reach here. The statute, however, is clear. In addition, as has been noted above, the malefactor often is not the only beneficiary of the pension.

Id. at 376-77 (footnote omitted) (emphasis in original).

We are persuaded by the reasoning set forth in General Motors and Guidry and hold that section 206(d)(1) erects a general bar to the garnishment of pension benefits from ERISA-covered plans. Numerous federal and state courts are in accord. See, e.g., Tenneco Inc. v. First Virginia Bank of Tidewater, 698 F.2d 688, 689-90 (4th Cir. 1983) (holding that,"[b]y virtue of the statute and . . . [Treasury Regulation § 1.401(a)-13], an employee's accrued benefits under . . . a qualified plan may not be reached by judicial process in aid of a third-party creditor"); Travelers Ins. Cos. v. Fountain City Federal Credit Union, 889 F.2d 264, 266 (11th Cir. 1989) (stating that "[b]oth the ERISA statute and the applicable [Treasury] regulation are clear[] . . . that pension plan funds may not be garnished"); Commercial Mortgage Ins., Inc. v. Citizens Nat'l Bank of Dallas, 526 F. Supp. 510, 516 (N.D. Tex. 1981) (concluding that "ERISA's assignment-alienation prohibition creates a general federal exemption of pension benefits from commercial creditors' claims and preempts otherwise relevant state law"); Cody v. Riecker, 454 F. Supp. 22, 24 (E.D. N.Y. 1978) (stating that ERISA's anti-alienation provision will not be construed "as permitting a garnishment or levy by every judgment creditor"); Goddard v. Boozer, 287 S.E.2d 308, 309 (Ga. Ct. App. 1981) (holding that funds of a profit-sharing plan, which was an ERISA-qualified pension plan, were exempt from garnishment). But see National Bank of North America v. International Bhd. of Elec. Workers, Local No. 3, Pension and Vacation Funds, 69 A.D.2d 679, 688 (N.Y. App. Div. 1979) (holding that

New York statutory procedures governing the enforcement of money judgments, including the mechanisms of levy and garnishment, are neither in conflict with nor preempted by the provisions of ERISA and, therefore, the vested benefits payable to a judgment debtor from an ERISA-qualified employee pension fund are not exempt). Moreover, our holding clearly comports with ERISA's goal of protecting the interests of participants and beneficiaries of qualified employee benefit plans. See ERISA § 2, 29 U.S.C. §§ 1001(b) and ©. Indeed, the legislative history of ERISA contains the following pertinent references to ERISA's anti-alienation provision:

[(a)] *Other provisions to protect covered employees and their beneficiaries.*--In addition to the minimum participation, vesting and funding standards provided in the bill, <u>your committee has adopted a number of specific provisions **to protect the rights of employees and beneficiaries under qualified plans.** . . .</u>

Qualified plans must provide that retirement benefits may not be assigned or alienated, except for voluntary and revocable assignments of not more than 10 percent of the benefits.

H. R. Rep. No. 93-807, 93rd Cong. 2d Sess. 3, <u>reprinted in</u> 1974 U.S. Code Cong. & Admin. News 4670, 4695 (italics in original) (bold and underscored emphasis added); and

[(b)] *Alienation.*--<u>**To further ensure that the employee's accrued benefits are actually available for retirement purposes, the committee bill also contains a provision requiring the plan to provide that benefits may not be assigned or alienated.**</u> (Of course, this provision is not intended to prevent the transfer of benefit rights from one qualified plan to another.)

Nevertheless, a plan will be permitted to provide for voluntary and revocable assignments (not to exceed 10 percent of any benefit payment).

Id. at 4734 (italics in original) (bold and underscored emphasis added).

Here, there is not question that Debtor is a "fiduciary" of the GM/UAW Pension Plan as defined by the Department of Labor. 29 C.F.R. § 2510.3-101(a)(2) ( "...any person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect), is a fiduciary of the investing plan.").

Page 21 of 64

# OVERPAYMENT

Debtor's claim is for an "overpayment." The U.S. Supreme Court has provided the following definition of an "overpayment": "any payment in excess of that which is properly due."*Jones v. Liberty Glass Co.*, 332 U.S. 524, 531 (1947); Estate of Baumgardner v. Commissioner, 85 T.C. 445, 449-450, 460-461 (1985). [A] tax is overpaid when a taxpayer pays more than is owed, for whatever reason or no reason at all." United States v. Dalm, 494 U.S. 596, 609 n.6 (1990). The term "overpayment" encompasses "erroneously", "illegally", or "wrongfully" collected taxes. Id. The underlying reason why the "taxes" in this case have been "payment in excess of that which is properly due, is because the IRS has used the illegal tax tables to determine the federal income tax deficiency determination. That which results in the tax tables used in this case being illegal is that the tax tables created annually be the IRS does not comply with the notice and comment provisions of the APA and the publication requirements of the Federal Register act.

## What Constitutes an Overpayment?

The Code does not have an all-inclusive definition of an "overpayment". Section 6401 provides examples of certain types of overpayments. For instance, the term "overpayment" includes "that part of the amount of the payment of any * * * tax which is assessed or collected after the expiration of the period of limitation properly applicable thereto. "Sec. 6401(a). On the other hand, section 6401© provides that an "amount paid as tax shall not be considered not to constitute an overpayment solely by reason of the fact that there was no tax liability in respect of which such amount was paid." However, these specific provisions do not provide a general

definition of the term. The Supreme Court in *Jones v. Liberty Glass Co.*, 332 U.S. 524, 531

(1947), has defined an overpayment as follows:

> we read the word "overpayment in its usual sense, as meaning any payment in excess of
> that which is properly due. Such an excess payment may be traced to an error in
> mathematics or in judgment or in interpretation of facts or law. And the error may be
> committed by the taxpayer or by the revenue agents. Whatever the reason, the payment of
> more than is rightfully due is what characterizes an overpayment.

See also *United States v. Dalm*, 494 U.S. 596, 609 n.6 (1990) ("The commonsense interpretation

is that a tax is overpaid when a taxpayer pays more than is owed, *for whatever reason* or no

reason at all."); *Sunoco, Inc. & Subs. v. Commissioner*, 122 T.C. 88 (2004); Bachner v.

Commissioner, 109 T.C. 125 (1997), affd. without published opinion 172 F.3d 859 (3d Cir.

1998); Estate of Baumgardner v. Commissioner, 85 T.C. 445, 450 (1985). Obviously, as we

have previously observed: "In order to determine the existence of an overpayment, there must

first be a determination of the amount of tax properly due." Winn-Dixie Stores, Inc. & Subs. v.

Commissioner, 110 T.C. 291, 295 n.5 (1998) (citing Girard Trust Bank v. United States, 226 Ct.

Cl. 366, 369, 643 F.2d 725, 727 (1981)). This leads to the question of the meaning of the term

"tax" The IRS has answered that question through it's Notice of Levy and it's form instructions.

Movant receive this GM?UAW Pension Plan payments under " *the General Motors*

*Hourly-Rate Employees Pension Plan*", id. Thus, the "overpayment" provision of **Section 10**

**Recovery of Benefit Overpayments** is not appliecable to Movant since he is retired from GM

under the "*the General Motors Hourly-Rate Employees Pension Plan*.".

Defendants' have admitted that "[P]laintiff and Defendant have never entered into any

agreement or arrangement thereby authorizing Defendants to extract, alienate or reduce any

amount of the pension plan payments that Defendant is obligated to pay to Plaintiff under the

GM/UAW Pension Plan Agreement." Defendants' Answer to Plaintiff's Amended Complaint,

paragraph #18. The reason why no written authorization was needed in this case is because the

IRS has made it clear to Debtor that the Notice of Levy does not apply to Movant's property

interest in the GM/UAW ERISA and IRC qualified pension plan payments contract.

On May 14, 2007, debtor issued and sent to Movant a letter regarding a reduction of

Movant's GM/UAW ERISA and IRC qualified pension plan payments. This letter (Exhibit "B"),

in part, provides that:

> Our records indicate you have received an overpayment of retirement benefits
> from 01/01/2005 through 06/10/2007, a total of 30 month(s). The total amount of the
> overpayment is $32,985.00. Because the Plan is an ERISA qualified Plan, we are required
> to collect overpayments and return them to the Plan's Trust Fund.

This letter also states that the "Current Benefit Amount" of "$1,045.50" was being

reduced by

the "New Benefit Amount as of 07/01/2007 to "$0.00."

On September 5, 2007, Debtor sent a second letter to Movan (Exhibit "C"). This letter,

Exhibit C, in part, provides that:

> Our records indicate you have received an overpayment of retirement benefits. The total
> amount of the overpayment is $32,985.00. Because the Plan is an ERISA qualified Plan,
> we are required to collect overpayments and return them to the Plan's Trust Fund.

This letter also states that the "Current Benefit Amount" of "$1,045.50" was being

reduced from the "Current Benefit Amount" of "$0.00", to the "New Benefit Amount as of

10/01/2007" in the amount of "$837.50."

This letter of September 5, 2007, goes on to state that:

> If the payment in a lump sum os not received, beginning 10/01/2007, your
> monthly benefit will be reduced by 50% until the total amount of the overpayment has
> been recovered. This means that your gross monthly benefit will be $418.75 until

03/01/2014. On 04/01/2014 you will receive $515.00 completing the recovery of your overpayment of $32,985.00. Thereafter, your gross monthly benefit of $837.50 will be restored.

As is more fully set forth herein, at no time has Movant signed an document agreeing to and authorizing Debtor alienate any amount of Movant's interest in the GM/UAW ERISA and IRC qualified pension plan payments, as provided for in 29 U.S.C. §1056(d)(1), 26 U.S.C.§ 401(a)(13(A), 26 C.F.R. §1.401(a)-13(1) ( i ), (ii); Article III, Section 3(e) and Article VII of the GM/UAW ERISA and IRC qualified pension plan agreement. Thus, these restrictive commands from Debtor to Movant denied to Movant complete dominion and control of those funds as a result of the Notice of Levy dated May 19, 1999, and each of the two (2) letters from debtor to Movant.

Debtor has never intended that the District Court litigation was never intended to be a part of this litigation since neither the District Court nor Movant has been named as a creditor in this bankruptcy case, a case that was commenced long after the District Court litigation. Nor does the District Court litigation have any effect on any reorganization plan of Debtor that is concurrently pending before this Court.

On February 29, 2008, by order of the Court, in the above referenced litigation, Movant filed and served his Amended Complaint. (Exhibit "G") Docket entry # 47. Movant's . allegations at item #18, 19 and defendants' reply to the same (D.E. #55) (Exhibit "D") provides that:

18.    Plaintiff and Defendant have never entered into any agreement or arrangement thereby authorizing Defendants to extract, alienate or reduce any amount of the pension plan payments that Defendant is obligated to pay to Plaintiff under the GM/UAW Pension Plan Agreement.

18.    Omitted

19.    Defendant voluntarily elected to pay to the Internal Revenue Service the amount

of $32,985.00, the same amount that Defendant is now alienating under Plaintiff's rights under General Motors/United Auto Workers ("GM/UAW") Pension Plan Agreement

19    Omitted

A copy of that Amended Complaint is included in Movant's index of exhibits and exhibit "G.

Those allegations are incorporated herein as if set forth fully herein.

On March 7, 2008, Debtor filed with the District Court "DEFENDANTS' MOTION AND BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT." Docket entry 51. At pages 17-18

Debtor cites Article 7, Section 3 of the GM Pension Plan:

> The pension fund shall not in any manner be liable for or subject to the debts or liabilities of any employee, separated employer, retired employee, pensioer or surviving spouse. Neither, benefit, pension or supplement at any time under the Plan shall be subject in any manner to alienation, sale transfer, assignment, pledge or encumbrances of any kind except in accord with provisions of a Qualified Domestic Relations Order within the meaning of IRS, section 414(p). If any person shall attempt to, or shall alienate, sell transfer, assign, pledge or otherwise encumber accrued rights, benefits, pension or supplements under the Plan or any part thereof, or if by reason of bankruptcy or enjoyed by anyone else, the Corporation may teammate the interest of such employee, pensioner or surviving spouse in any such benefit and instruct the trustee to hold or apply it to or for the benefit of such employee, pensioner or surviving spouse, spouse, children, or other dependents, or any of them as the Corporation may instruct; provided, however, that any pensioner, or surviving spouse, entitled to a monthly benefits under the plan:
>     (e) may have amounts of not less than $80.00, but in no event more than 10% of the retired employee's monthly pension, withheld to repay any outstanding overpayment owing to any benefit plan of the Corporation, ***pursuant to written authorization and direction acceptable to the corporation***. (Ex.D at 68). (Underline is that of Debtor and bold is that of Movant)

In an attempt to justify Debtors' alienation of Movant's interest in the GM Pension Plan, Debtor attempts to bifurcate the GM Pension Benefit Plan into the "benefits under the plan" provided for in Article 7, Section 3 of the GM Pension Plan and as yet "...another GM benefit plan...". For example, Debtor states at page #17 of  "DEFENDANTS' MOTION AND BRIEF

IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT." Docket entry 51, that:

Plaintiff misinterprets [Article 7, Section 3 of the GM Pension Plan{ as it is applicable to situations where the [Movant] has received an overpayment from another GM benefits plan and has authorized a deduction from his monthly pension benefit to repay such overpayment (e.g. Extended Disability Benefits under the General motors Life and Disability Benefits Program.

At pages #2-3 of "DEFENDANTS' MOTION AND BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT." Docket entry 51 (Exhibit "F") , Debtor alleges that;

Plaintiff is a former General Motors hourly employee whose terms and conditions of employment were governed by GM-UAW Collective Bargaining Agreements, and its supplements. Plaintiff retired from General Motors wit benefits commencing March 1, 1993. Upon his retirement Plaintiff began receiving a monthly pension benefit of $1,045.00 per month.
In 1999 GM received a notice from the Internal Revenue Service ("IRS") that Plaintiff had failed to pay his income taxes in 11 different years. Plaintiff's failure to pay his income taxes resulted in a tax liability and penalties of over $267,000.00 (Ex A). The IRS notice included a levy against Plaintiff's pension benefits. Based on the levy, Gm remitted plaintiff's monthly pension benefits to the IRS, thereby rendering Plaintiff's monthly benefits to $0.00.
In 2005 the Plan switched claims administrators from electronic Data Systems Corporation ("EDS") to Fidelity Investments Institutional Operation Company, Inc. ("Fidelity"). In approximately January 2005, due to a mis-communication between EDS and Fidelity, Plaintiff's monthly pension benefit of $1,045.50 was restored. However, Fidelity continued to remit to the IRS $1,099.50 per month on behalf of Plaintiff to satisfy his tax liability, without currently reducing his pension. Fidelity continued to make these payments to the IRS without the concurrently reducing his pension. Fidelity continued to make these payments to the IRS without the concurrent deductions from Plaintiff's pension benefits until June 2007, when the error was discovered. In total $32,985.00 was paid to the IRS, thus resulting in an overpayment to Plaintiff in that amount.

On May 14, 2007, the Fidelity / GM Benefits & Service center advised Plaintiff of the overpayment and informed him of the steps to be taken to recover the overpayment. The

Fidelity letter, copy attached as Exhibit B (That letter of May 14, 2007, is incorporated into Movants Index of Exhibit as exhibit "B"), stated:

This is a revised statement of your Pension benefits from General Motors. The revision and reason for the Pension Benefits Recalculation is:

- Benefits were not adjusted by the Tax Levy Amount of $1,99.50
- Pension Overpayments.

Our records indicate you have received an overpayment of retirement benefits from 01/01/2005 through 06/10/2007, a total of 30 month(s). The total amount of the overpayment is $32,985.00. Because the Plan is an ERISA qualified Plan, we are required to collect overpayments and return them to the Plan's Trust Fund.. (Ex B, 5/14/07 Letter).

Effective July 1,2007, Plaintiff's monthly pension benefit was reduced to $0.00 to recoup the overpayments. Id. Subsequently, on September 5, 2007 Plaintiff was informed that he would receive 50% of his pension until the overpayment was recouped. (Ex. C, 9/5/07 Letter).

Debtors above statement that " The IRS notice included a levy against Plaintiff's pension benefits" is a factually incorrect statement. Debtors "Exhibit A" (Movant's exhibit "B"), the IRS Notice of Levy dated May 19, 1999, does not contain within the four corners of that document "a levy against Plaintiff's pension benefits." This May 19, 1999, Notice of Levy, in the amount of "267928.91", in part, stated to debtor that: "THIS LEVY WON'T ATTACH FUNDS IN IRAs, SELF-EMPLOYED INDIVIDUALS' RETIREMENT PLAN, *OR ANY OTHER RETIREMENT PLANS IN YOUR POSSESSION OR CONTROL*, UNLESS THIS IS SIGNED IN THE BLOCK TO THE RIGHT". (Emp. Added). This document is not ."... SIGNED IN THE BLOCK TO THE RIGHT." Thus, Debtors' assertion that "The IRS notice included a levy against Plaintiff's pension benefits" is a factually incorrect statement. Thus, based on the IRS Notice of Levy that plainly and clearly provides that the Notice of Levy does not apply to GM/UAW Pension Plan payments was violated by Debtor by the erroneous levy in violation of that Notice

Page 28 of 64

of Levy cannot constitute an "overpayment." Moreover, that levy that not only violated the Notice of Levy it also violated and continues to violate 29 U.S.C. §1104(1)(D) and the terms of the plan as is more fully developed herein.

Movant will now show by documents obtained from Fedility.com web site, that Debtor in conspiracy with Fidelity Investments have been violating the IRS May 19, 1999, Notice of Levy by exercising complete dominion and control over Movant's interest in the GM/UAW ERISA and IRS qualified pension plan agreement. Starting with Debtor's statement of Movant's "Payment History" as set forth in Fidelity Investment, ", dated 07/01/2007, evidences that Movant should have been paid is $13,460.40, in the year 2007 (Exhibit "H"); #13,460.40 for the year 2008 (Exhibit "I"); and for the year 2009, up to and including 09/01/2009, the amount of $13,460.40 (Exhibit "J"). That is a total amount of $40,381.20. Yet, in violation of the May 19, 1999, IRS Notice of Levy ( Exhibit "E"), Debtor only paid to Movant the amount of $22,044.91 representing a shortfall of payments to Movant in the amount of $18,336.29 ( $40,381.20.- $22,044.91),

If, as stated by Movant at  pages #1-3 and pages 8-10 of "DEFENDANTS' MOTION AND BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT." Docket entry 51 (Exhibit "F"), Debtor had a known legal duty to comply with the May 19, 1999, IRS Notice of Levy ( Exhibit "E"), Debtor in an attempt to find a safe harbor decided to spin the clear mandate of the Notice of Levy and statutory mandates, the regulatory mandates and along with applicable well-established case law and levies on Movant's interest in the GM/UAW ERISA and IRC Pension Plan payments in such a way so as to attempt to continue to disobey the clear provisions of 29 U.S.C. §1056(d)(1), 26 U.S.C.§ 401(a)(13(A), 26 C.F.R. §1.401(a)-13(1) (  i ), (ii); Article III, Section

Page 29 of 64

3(e) and Article VII of the GM/UAW ERISA and IRC qualified pension plan agreement, and 26 U.S.C. § 6061, 26 C.F.R. § 1.8061-1,

For example, Debtor states at page #1 of exhibit "F" that "[U[pon receipt of the [Notice of ] Levy, Defendant's *were obligated to abide by [the Notice of Levy]* and remit the Plaintiff's pension benefits to the IRS to satisfy his tax liability." Yet, rather than Debtor meeting it's obligation to abide by the IRS Notice of Levy, the clear mandate to debtor by the IRS that "THIS LEVY WON'T ATTACH FUNDS IN IRAs, SELF-EMPLOYED INDIVIDUALS' RETIREMENT PLAN, *OR ANY OTHER RETIREMENT PLANS IN YOUR POSSESSION OR CONTROL*, UNLESS THIS IS SIGNED IN THE BLOCK TO THE RIGHT" and where the Notice of Levy was not signed in the box to the right, Debtor's miserably failed to meet it's clearly known legal duty to abide by the clear mandate of the Notice of Levy. Further, debtor goes to great extraneous endeavors to attempt to show to the Court by way of non applicable statutes, regulations and case law that Debtor was in full compliance with the IRS Notice of Levy. Thus, whether Debtor want to classify the levy an "overpayment", a recoupment or otherwise, those monthly levies violate the IRS May 19, 1999 Notice of Levy.

Even if Movant has received any "overpayment" as alleged by Debtor Article 7, Section 3(e) of the GM Pension Plan provides that the predicate to any alleged "overpayment" there has to first be a "... *written authorization and direction acceptable to the corporation."* That predicate of a "...*written authorization and direction acceptable to the corporation,"* is completely absent here.. .

29 U.S.C. § 1104(1)(D) provides that:

Currently pending before the United States District Court in the Middle District of Florida. , in case number **5:O7-CV-408 OC**, the litigation, the following motions are

Page 30 of 64

currently pending:

1.      On March 1, 2008, Plaintiff filed with the District Court

**PLAINTIFF'S MOTION TO AMEND PLAINTIFF'S REPLY IN OPPOSITION TO "DEFENDANTS' MOTION AND BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT"**

(Docket entry # 65). That motion is still pending before the District Court even though

nearly one (1) year and ½ of time has passed since the filing of that motion.

2.      On April 16, 2008, Plaintiff filed with the District Court

**PLAINTIFF'S RENEWED MOTION TO STRIKE DEFENDANTS' AFFIRMATIVE DEFENSE OF FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES RE: DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED COMPLAINT**

(Docket entry # 65). That motion is still pending before the District Court even though

nearly one (1) year of time has passed since the filing of that motion

3.      On April 28, 2008, Plaintiff filed with the District Court:

**PLAINTIFF'S SECOND MOTION FOR SUMMARY JUDGMENT RE: AMENDED COMPLAINT**

(Docket entry # 68). That motion is still pending before the District Court even though

nearly eleven (11) months of time has passed since the filing of that motion.

4.      On May 9, 2008, Plaintiff filed with the District Court:

**MOTION FOR ENTRY OF ORDER FOR THE COURT TO TAKE**

**JUDICIAL NOTICE**

(Docket entry # 73). That motion is still pending before the District Court even though

nearly eleven (11) months of time has passed since the filing of that motion.

5.      On July 7 2008, Plaintiff filed with the District Court:

**PLAINTIFF'S MOTION FOR RECONSIDERATION RE: ORDER ON
MOTION TO QUASH, ORDER ON MOTION TO AMEND, ORDER ON
MOTION TO CONTINUE, ORDER ON MOTION FOR DISCOVERY,
ORDER ON MOTION TO STRIKE**

(Docket entry # 76). That motion is still pending before the District Court even though

nearly nine (9) months of time has passed since the filing of that motion.

6.    On August 20, 2008, Plaintiff filed with the District Court:

> **PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S AFFIRMATIVE**
>
> **DEFENSES**

(Docket entry # 79). That motion is still pending before the District Court even though

nearly eight (8) months of time has passed since the filing of that motion.

7.    On August 25, 2008, Plaintiff filed with the District Court:

> **PLAINTIFF'S MOTION TO DETERMINE IF THE STATUTE OF
> LIMITATIONS HAS EXPIRED RE: IRS NOTICE OF LEVY DATED
> MAY 19, 1999**

(Docket entry # 81). That motion is still pending before the District Court even though

nearly eight (8) months of time has passed since the filing of that motion.

8.    On September 26, 2008, Plaintiff filed with the District Court:

> **PLAINTIFF'S MOTION FOR SANCTIONS AGAINST DEFENDANTS**
>
> **FOR FAILURE TO COMPLY WITH F. R. CIV., RULE 26(A)(3)**

(Docket entry # 83). That motion is still pending before the District Court even though

nearly seven (7) months of time has passed since the filing of that motion.

9.    On February 20, 2009, Plaintiff filed with the U.S. District Court his Motion for Recusal.

That motion is still pending before that Court. Docket entry #90.

10.   On June 8, 2009, Plaintiff filed with the U.S. District Court his Motion for The Court to

Rule on Plaintiff's then Pending Motions . That motion is still pending before that Court. Docket entry #91.

11.   Relief from the automatic stay is imperative in order to permit the United States District in the Middle District of Florida, being case number **5:O7-CV-408 OC**, to rule on Movant's pending motions or in the alternative to allow Movant to Petition to file and Petition for Writ of Mandamus with the Eleventh Circuit Court of Appeals.

12.   Currently pending before the United States District in the Middle District of Florida, in this case, being case number **5:O7-CV-408 OC**, is an order injuncting Movant from filing any other documents with that Court until that Court rules on Movant's pending Motion for Summary Judgment.

13.   Movant filed with the Eleventh Circuit Court of Appeals a Petition for Writ of Mandamus to the United States District Court of the Middle District Court being case number 09-11975_E. The Eleventh Circuit's order  entered on May 26, 2009, ( Exhibit "L") holding, in part, that "[L]awrence has the adequate alternative remedy of moving the district court to rule," was exercised by Movant in the United States by Movant filing with that Court a motion for the Court to rule on Movant's pending motions. (Docket entry #92 filed on June 8, 2009). However, the automatic stay of this Court entered within a few days subsequent to the Eleventh Circuit's order of May 26, 2009, completely divested Movant the  "adequate alternative remedy" that the Eleventh Circuit held to be available to Movant.

13.   Finally, the automatic stay entered by this court on June 1, 1999, prohibits the United States District in the Middle District of Florida, in this case, being case number **5:O7-CV-408 OC** from ruling on Movant's now pending motions absent relief from this Court.

Page 33 of 64

Moreover, it is the now pending automatic stay that bars Movant from petitioning the

Eleventh Circuit Court of Appeals for any relief. Even if this Court were to grant relief

from the automatic stay and in the absence of the of the District Court ruling on Movant's

pending motions the order of the U.S. District Court entered on May 12, 2008, ( Docket

entry #72) (Exhibit "M") injuncts Movant from even attempting to seek and obtain any

relief from that Court . Thus, the only relief now available to Movant is from this Court.

### The Debtor's Chapter 11 Filing

14.    On June 1, 2009, (the "Petition Date") the Debtors filed with this Court a voluntary

Chapter 11 petition ( the "Petition") in this Court.

### ARGUMENT

### MOVANT IS ENTITLED TO RELIEF FROM THE AUTOMATIC STAY FOR CAUSE PURSUANT TO 11 U.S.C. § 362( D)(1) BECAUSE THE DEBTOR CANNOT PROVIDE MOVANT WITH ADEQUATE PROTECTION

15.    .Movant is entitled to relief from the automatic stay because the Debtor is unable to provide

adequate protection. Section 362(d)(1) of the Bankruptcy Code provides, in pertinent part:

> (d)    On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay;;;
>> (1)    for cause, including the lack of adequate protection of an interest in property of such party in interest.

11 U.S.C. § 362(d)(1)

16.    A court must lift the stay of the movant can demonstrate that any of the grounds set forth in

§ 362(d)(1) for stay relief are met. *See In re Elmira Litho, Inc.* 174 B.R. 892, 900 (Bankr. S.D.N.Y.

1994) (citing *In re Touloumis,* 170 B.R. 825, 827 (Bankr. S.D.N.Y. 1994); *In re de Kleinman,* 156

B.R. 131, 136 (Bankr. S.D.N.Y. 1993); *In re Diplomat Elecs. Corp.* 82 B.R. 688, 692 (Bankr.

S.D.N.Y. 1988)).

Page 34 of 64

17.     The Bankruptcy Code does not define what constitutes "cause" for relief from the stay;

rather, the bankruptcy court has discretion to decide on a case-by-case basis whether cause for relief

from the automatic stay exists.  *Sonnax Industries, Inc., v. Tri Component Products Corp. (In re*

*Sonnax Industries, Inc.*), 907 F.2d 1280, 1285-86(CA3, 1990); *In re Balco Equitites Ltd., Inc.*, 312

B.R. 734, 748 (Bankr. S.D.N.Y. 2004). Although "cause" is not defined in the statute, the

"legislative history does provide that 'a desire to permit an action to proceed to completion in

another tribunal may provide...cause." In re RCM Global Long Term Capital Appreciation industries,

INC. 200 B.R. 514, 526 (Bankr S.D.N.Y. 1996). Here, cause for relief from the stay may be found

based on Movant's desire to proceed to completion in the United States District Court, Middle

District of Florida and  on a lack of adequate protection.

18.     In the case of Mazzeo Lenhart, 167 F.3d 139 (CA2, 1999), the Second Circuit set forth the

test for determining cause;

> To the extent pertinent here, the Bankruptcy Code provides for the lifting of the
> automatic stay as follows:
>
>> On request of a party in interest and after notice and a hearing, the court
>> shall grant relief from the stay .
>>
>> (1) for cause, including the lack of adequate protection of an interest in
>> property of such party in interest.

11 U.S.C. § 362(d)(1). "Neither the statute nor the legislative history defines the term 'for
cause' and the legislative history gives only very general guidance." In re Sonnax
Industries, Inc., 907 F.2d at 1285. Thus the " 'facts of each request will determine whether
relief is appropriate under the circumstances.' " Id. at 1286 (quoting H.R.Rep. No. 95-595,
at 343-44 (1977), reprinted in 1978 U.S.C.C.A.N. 6300). The burden is on the moving
party to make an initial showing of "cause" for relief from the stay. See, e.g., In re Sonnax
Industries, Inc., 907 F.2d at 1285. Only if the movant makes such a showing does any
burden shift to the debtor; absent a showing of cause, the court should simply deny relief
from the stay. See, e.g., id.; In re Boodrow, 126 F.3d at 48.

In In re Sonnax Industries, Inc., 907 F.2d at 1285, we listed a number of factors ("Sonnax
factors") that may be relevant in deciding whether the stay should be lifted in order to

permit litigation to continue in another forum:

(1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

In re Sonnax Industries, Inc., 907 F.2d at 1286. Not all of these factors will be relevant in every case.
*In re G.S. Distribution, Inc.,* 331 B.R. 552, 566-67 (Bankr. S.D.N.Y. 2005) ("Generally, courts have relied on only a few factors.")


In these very early days of Debtor's bankruptcy, this Court, any counsel that would have to be retained by Debtor over and above that which has already been retained in the State of Florida and the State of Michigan, , Debtor need have to devote the necessary resources to ably litigate anew the facts and issues that now stand at door steps of the District court. For example, if the stay is lifted in this case the interests of judicial economy would be advanced since the District Court judge and the Magistrate judge that is throughly informed of the facts and issues in this case. On the other hand, of the stay is not lifted this court would be burdened with motions and hearings for pro hoc vic counsel thereby further unnecessarily expended the limited judicial resources of this Court and at the same time not wasting the limited judicial resources of the District Court who stands at the door step of ruling on the pending motion but for the automatic

stay.

Debtor cannot dispute that the parties and Movant have spent a significant amount of time, effort, and resources in the District Court action and that the principle of judicial economy would favor validation of the District Court proceedings. *See e.g. In re G.S. Distribution, Inc.,* 331 B.R. 552, 566-67 (Bankr. S.D.N.Y. 2005). Accordingly, Sonnax factor 10 ("the interests of judicial economy and the expeditious and economical resolution of litigation" under the circumstances of this case strongly supports the annulment of the stay. On the other hand, to deny the annulment of the stay would result in allowing the Debtor to employ the automatic stay as a further shield to that which they have already admitted to their Answer to Movant's Amended Complaint; that is, there is no written authorization allowing the current alienation of Movant's pension plan payments.

### The General Test for Litigation Stay Relief is Satisfied

The legislative history to section 362(d)(1) emphasizes the section's applicability to proceedings in another tribunal such as is the case here. "It will be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve bankruptcy court from any duties that may be handled elsewhere." H.R. Rep. No. 595, 95th Cong., 1st Sess., 341 (1977). Most courts follow this logic and apply an equitable balancing test to determine if cause exists to lift the stay to allow pending litigation to proceed or continue in another forum.

The Bankruptcy Court has developed a three-prong balancing test to determine whether to grant relief from the stay:

1.    Whether any great prejudice to either party the bankruptcy estate or the debtor

will result from continuation of the civil suit;

2.    Whether the hardship to the non-bankrupt party by maintenance of the stat considerably outweighs the hardship to the debtor; and

3.    The probability of the creditor prevailing on the merits

*Izzarelli v. Rexene ( In re Rexene Prods. Co.*), 141 B.R. 574, 574 (Bankr. D. Del. 1992)

This Court should also consider general policies underlying the automatic stay when deciding

whether to grant a motion to lift the stay. These policies, which have been outlined by the United

States Court of Appeals for the Second Circuit, are:

(1) whether the relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditions [sic] and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceedings; and (12) impact of the stay on the parties and the balance of harms.

*Sonnax Industries, Inc., v. Tri Component Products Corp. (In re Sonnax Industries, Inc.*), 907 F.2d 1280, 1285-86(CA3, 1990).

Courts have often permitted "litigation to be concluded in another forum, particularly if

the non-bankruptcy suit involves multiple parties or is ready for trial." Lawrence P. King,

COLLIER ON BANKRUPTCY (15th ed. 2006) at 362.07[3][a]; *In re Rexene Prods. Co.*, 141

B.R. 574, 575 (Bankr. D. Del. 1992) ("...the fact that [the non-bankruptcy judge] has already

heard and decided two issues support[s] the granting of relief on the grounds of judicial

economy.") (hereinafter, "*Rexene*"); *In re Sonnax Indus., Inc. v. Tri Component Prods. Corp.*,

Page 38 of 64

907 F.2d 1280 (2d Cir. 1990) (hereinafter, "*Sonnax*"); *In re Castlerock Properties*, 781 F.2d 159

(9th Cir. 1986); *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984). In fact, the legislative history of

section 362(d)(1) emphasizes that a single factor, such as allowing a proceeding to advance

before another tribunal, can constitute the requisite "cause." "It will often be more appropriate to

permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy

estate would result, in order to leave the parties to their chosen forum and to relieve the

bankruptcy court from any duties that may be handled elsewhere." H.R. Rep. No. 595, 95th

Cong., 1st Sess., 341 (1977) (cited in *Rexene* at 576).

### Application

The Debtor and Movant are on the door-step of judicial resolution when the Debtor filed

its Petition. The U.S. District Court in the Middle District of Florida has extensive knowledge of

the facts and issues has already detailed findings. For example, if the stay is lifted the interests

of judicial economy will be advanced, Debtor's counsel in the District Court will not have to

seek and obtain Counsel in the State of New York as they have done in the state of Florida.

However, if on the other hand the stay is not lifted, Debtor will have to expend its limited

resources to pay counsel to seek and obtain counsel in the State of New York that would be able

to represent Debtor in this Bankruptcy case regarding the Middle District of Florida District

Court action. More importantly, an added burden would be placed on the limited judicial and

administrative resources of this Court and the District Court and the Second Circuit if appeals

should arise out of and from this bankruptcy case. This misallocation of the limited judicial and

administrative resources of this court, the limited resource of Debtor and Movant would be a

diversion of resources that could be avoided if the stay is granted.

As Movant pointed out herein, relief from the stay may be granted "when necessary to permit litigation to be concluded in another forum, particularly if the nonbankruptcy suit involves ...is ready for trial." Lawrence P. King, Collier on Bankruptcy, 362.07[3][a] (15th de. 2006). Moreover, as noted above, the legislative history of section 362(d)(1) emphasizes the importance of allowing a case to continue in the original tribunal so long as there is no prejudice to the estate. In applying the three-prong balancing test, considering the policies set forth in Sonnax, and finding that lifting the stay will not result in prejudice to the Debtor, it is appropriate here to allow the pending District Court action to continue before the District Court.

### 1. Application of the Three-Prong Balancing Test

The first factor this Court must consider in determining whether to grant relief from the automatic stay for "cause" using the three-prong balancing test is whether the lifting of the stay will result in harm to the debtor or the estate. On the facts of this case, it does not appear that lifting the stay will prejudice debtor.

If Debtors should argue that allowing the District Court to proceed to entry of Summary Judgment would require Debtors and their top management to focus all of their attention on the District Court action, Movant cannot agree. The District Court action will not require the attendance of debtor's primary officers and directors in order for the District Court to rule on Debtor's and Movant's pending motions for Summary judgment. Since  no attention to the pending District Court is injuncted nor  allowed by order of the District Court (Exhibit "M")and no further discovery is allowed, again by the District Court (Exhibit "M"),  there will certainly be no harm to the estate.

Debtor has separate litigation counsel, and according to the records and files in this case

the Counsel in this action and the counsel in the District Court action are not the same. Debtor's

District Court counsel has already completed its extensive trial and summary judgment

preparation prior to the petition date. Thus, there is no further trial preparation that could be

burdensome to the Debtor.  In addition, because the bankruptcy was file on the eve of a ruling on

the pending Motions for Summary Judgment both parties have already spent all of the necessary

time and resources in preparation. The longer the pending District Court action is delayed, the

more burdensome it is to both Debtor and Movant to ready themselves again.

     With respect to the District Court Action, lifting the stay for cause is merited as the action

is at a very advanced stage - summary judgment.. After two  years of intensive litigation and the

disposition of the pending summary judgment and cross summary judgment motions, and the

court ordered denial of any further discovery, ( Magistrate Court order dated May 12, 2008,

(Exhibit "M").the issues between parties will be resolved. Either way that the District court rules

or this Court rules should it decide to resolve the issues that are currently before the District

Court, there will most assuredly be  pending issues..

     Thus, the District Court has necessarily developed specialized knowledge of the

underlying ERISA and Internal Revenue laws, applicable well established case law, the facts of

the dispute, with counsel in this action that is different than counsel in the District Court action

and is fully versed in the issues between the parties. Indeed, the cross motions for summary

judgment alone involved over 1,500 pages of briefing, along with hundreds of pages of

accompanying declarations and exhibits. By the same token, the parties, their counsel Judge

Hodges and the Magistrate by now understand each other's expectations and practices. These are

precisely the kind of circumstances under which lifting the automatic stay for "cause" to conclude

litigation is appropriate. The alternatives of delay or trial by another judicial authority that is
unfamiliar with the District Court Action are inconsistent with the dictates of judicial economy
and fairness to the parties themselves, who have already determined the forum for litigation.
Moreover, given the role of the underlying ERISA and IRC issues  and already historically
marginal financial affairs of the Debtor and this pro ee litigant, resolution of the balance of the
District Court Action is paramount to the prospects of these Chapter 11 cases. Finally, that
Movant's claim  will have to be liquidated at some time in these Chapter 11 cases (and
liquidated sooner rather than later) -- counsels stay relief now.

### The "Balancing Test" Also Compels Relief  From the Stay

As just discussed, courts have widely found the kind of facts and circumstances present in this
case to constitute "cause" for modifying the automatic stay to permit parties to conclude pending
litigation. In addition, courts in the Third Circuit separately have approached the issue of stay
relief by applying a balancing test between the interests of the bankrupt estate and the movant.
For example, in deciding to lift the stay in favor of the movant, the Delaware Bankruptcy Court
in *Rexene* considered three factors in its analysis. Those factors are:

> (1) whether any great prejudice to either the bankrupt estate or the debtor will result from
> continuation of the suit;
>
> (2) whether the hardship to the non-bankrupt party by maintenance of the stay
> considerably outweighs the hardship to the debtor; and
>
> (3) the probability of the creditor prevailing on the merits.

In re Rexene Prods. Co., 141 B.R. 574 (Bankr. D. Del. 1992). The United States District Court of
Delaware applied this same test in affirming stay relief for the movant in *In re Continental
Airlines, Inc*, 152 B.R. 420 (D. Del. 1993).

.        Even more recently, the Delaware Bankruptcy Court has considered the three *Rexene*

factors along with the general "policies underlying the automatic stay," which include the twelve

factors followed by the United States Court of Appeals for the Second Circuit in *Sonnax*. *In re*

*W.R. Grace & Co., et al*, 2007 Bankr. LEXIS 1214, *12 (Bankr. D. Del. 2007); *see also In re*

*Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984).

As discussed above, lifting the stay to allow the District Court Action to conclude is

merited because the litigation is at a very advanced stage. The parties have already completed

pre-trial motion practice, pre-trial briefing, and  poised for the parties motions for summary

judgment. The  item of greatest debate -- that debtor does not have written authorization from

Debtor to alienate Movant's payment of the pay-out status of the GM/UAW Pension Plan

payments. Given the late stage of litigation, the District Court is uniquely situated to resolve the

remaining issues between the parties.

. Further, lifting the stay now, as opposed to at a later juncture in the bankruptcy cases, is useful

so that the parties, this Court and Debtors creditors will not be in limbo any longer than

unavoidable as to when and how there will be a resolution of remaining issues between Debtor

and Movant -- issues that are of importance to both to  the parties and the future of this Chapter

11 cases. See Rexene at 577 ("Judicial economy dictates a prompt resolution in a single forum

and with the same judge who was originally assigned to the case."). With stay relief now, will

give the parties the flexibility to capitalize on whatever opportunities may arise in the District

Court to resolve the remaining issues by appropriate means.

### (ii) The Interests of Judicial Economy Favor the District Court Action: and

### (iii) The Specialized Expertise of the Court

Both the interests of judicial economy and the specialized expertise the District Court has developed over the past two years of activity in the District Court Action militate in favor of lifting the automatic stay to allow the District Court action to conclude before the District Court. It would be a waste of resources to discard the time, energy and money that brought the District Court Action to the eve of summary judgment on the issues that remain. Under these circumstances, from the perspectives of judicial economy, the parties' own resources and fairness to the parties, it makes no sense to ask this Court at some time in the future to take the necessary time to acquaint itself with the extensive background of the District Court Action and then to resolve the remaining disputes to the extent it otherwise would have jurisdiction to do so. *See In re Continental Airlines, Inc., et al.*, 152 B.R. 420, 425 (D. Del. 1993) (in lifting the stay the court held that "the difference between filing briefs and preparing for oral argument in [the non-bankruptcy forum]...is negligible in terms of added litigation expenses and diverted attention."); *see also* Rexene at 577 ("This Court is of the opinion that to begin this litigation anew in this bankruptcy court...would certainly result in a waste of judicial resources.").

### (iv) The District Court Action Results in Complete Resolution of the Issues

If the automatic stay is lifted, the District Court will resolve all remaining issues. Thus, there will be a final determination and liquidation of any and all claims Movant may have against Debtor in the District Court Action. The parties have already run virtually the entire, grueling race; they should be allowed to take advantage of the only step that remains -- to cross the finish line: ruling on Motions for Summary Judgment. *See In re Patriot Contracting Corp.*, 2006 Bankr. LEXIS 4133, *10 (Bankr. D. N.J. 2006) (court found that permitting the action to proceed in the original forum was merited because it would result in "complete resolution of the

Page 44 of 64

dispute").

### (v) The District Court Action Will Not Interfere With the Bankruptcy Case

Allowing the District Court Action to proceed will not interfere with Debtor's bankruptcy

cases because Debtor already has counsel for this matter, separate and apart from bankruptcy

counsel. Again, due to the timing of the bankruptcy filings, on the eve of summary judgment ,

Debtor 's litigation counsel is fully prepared to litigate the majority of the limited remaining

issues in the District Court Action. Finally, as discussed above, and as compared to the overall

action, the issues that remain to be determined are finite and there is trial on  those issues based

on the pending Motions for Summary Judgment. This level of work, when compared to the two

years of prior litigation in the District Court Action by litigation counsel that is otherwise

unaffiliated with the bankruptcy cases simply cannot be reasonably viewed as an imposition on

Debtor 's bankruptcy cases, the more so because these issues will have to be decided somewhere,

some time, for this Chapter 11 case. For those same reasons, there is no argument that the estates

would be prejudiced by having to expend additional financial resources on the District Court

Action, as lifting the stay provides the shortest and least expensive means to resolution of the

issues that remain in the District Court Action. *See In re Ware Window Co.*, 2003 Bankr. LEXIS

885, *9 (Bankr. E.D. Pa. 2003) ("In all cases addressing relief from the stay under § 362(d)(1) to

allow the commencement or continuation of non-bankruptcy litigation, the overriding

consideration is whether the debtor's estate or the debtor will be prejudiced if the litigation is

permitted in another forum. Absent a showing of prejudice, relief has generally been granted.").

### (vi) Judgment Not Subject to Equitable Subordination: and
### (vii) Resolution Will Not Result in Avoidable Judicial Lien

Given the nature of the District Court Action and the relief sought by the Pending motions for summary judgment, there is simply no argument that any judgment that would stem from the District Court Action could be subject to equitable subordination or result in an avoidable judicial lien. Therefore, these two factors, as delineated in *Sonnax*, weigh in favor of lifting the automatic stay and allowing the District Court Action to conclude before the District Court, as the results of the action would not be effectively reversed by the rights afforded to Debtor through the bankruptcy process.

### (viii) Balance of Hardships and the *Rexene* Analysis

The analysis of the *Sonnax* factors, above, demonstrates that the prevalent balancing test in *Rexene*, as favored by courts, heavily weighs in favor of lifting the automatic stay to allow Movant to proceed with the District Court Action. Most importantly (and of enough weight in and of itself to merit lifting the stay), the District Court Action was advanced literally to the eve of summary judgment when Debtor sought bankruptcy protection. Given the time, expense and developed expertise of the District Court with respect to the District Court Action, to deny its completion would simply be inefficient. When balancing, on the one hand, the hypothetical harm to the estates of allowing Debtor s separate litigation counsel to conclude the remaining issues in a two-year litigation against, on the other hand, the harm to Movant of substantial delay and/or recommencing litigation before the Bankruptcy Court, the result is clear -- the stay should be lifted. Additionally, resolution of the remaining issues in the District Court Action is actually in the best interests of the Debtors' estates. Given the weight of the apportionment and assets in dispute, the Chapter 11 cases cannot substantially advance without resolution of Movant's claims against it.

Finally, the third consideration in *Rexene*, which is the probability that Movant will prevail on the merits, provides further support for lifting the stay. The "probability" that Movant will prevail on the merits has already solidified into actual success on the merits. For example, the Eleventh Circuit's order entered on May 26, 2009, ( Exhibit "L"), holding, in part, that "[L]awrence has the adequate alternative remedy of moving the district court to rule." On the eve of the filing of the bankruptcy petition by Debtor on June 1, 2009, Movant invoked that 'adequate alternative remedy [by] moving the district court to rule," on Debtor's pending motions. However, Movant was notified of the filing of the petition thereby staying the hand of the District Court from ruling on the "adequate alternative", an alternative issuance of Writ of Mandamus by the Eleventh Circuit. The lifting of the stay would allow Movant to obtain from the District Court the "adequate alternative" that Movant's constitutional right of access to the courts entitles Movant to.

As the majority of the issues between the parties will decided on summary judgment, including, especially, the key issues of the ten percent provisions of ERISA § 206(d)(2), 29 U.S.C. § 1056(d)(2), the ten percent provisions of 26 U.S.C. § 401(a)(13(A) , the ten percent provisions of 26 C.F.R. § 1.401(a)-13(d)(1)( i ), (ii), and the ten percent written authorization provision of Article VII, Section 3 of the GM/UAW Pension Plan Agreement that is the remains of the litigation. In other words, what remains for determination in the District Court Action are, in essence, damage calculations on an already successful admission by Debtor vis-avis Answer to Movant's Amended Complaint. (Exhibit "G") Docket entry # 47. Movant's . allegations at item #18, 19 and defendants' reply to the same (D.E. #55) (Exhibit "D") provides that:

18.    Plaintiff and Defendant have never entered into any agreement or arrangement thereby authorizing Defendants to extract, alienate or reduce any amount of the

pension plan payments that Defendant is obligated to pay to Plaintiff under the GM/UAW Pension Plan Agreement.

18.     Omitted

19.     Defendant voluntarily elected to pay to the Internal Revenue Service the amount of $32,985.00, the same amount that Defendant is now alienating under Plaintiff's rights under General Motors/United Auto Workers ("GM/UAW") Pension Plan Agreement

19      Omitted

Thus, in the District Court action Debtor has admitted that "Plaintiff and Defendant have never entered into any agreement or arrangement thereby authorizing Defendants to extract, alienate or reduce any amount of the pension plan payments that Defendant is obligated to pay to Plaintiff under the GM/UAW Pension Plan Agreement" and that "Defendant voluntarily elected to pay to the Internal Revenue Service the amount of $32,985.00, the same amount that Defendant is now alienating under Plaintiff's rights under General Motors/United Auto Workers ("GM/UAW") Pension Plan Agreement." A copy of that Answer to Movant's Amended Complaint is included in Movant's index of exhibits as exhibit "D". That document is incorporated herein as if set forth fully herein.

Accordingly, a balancing test under *Rexene*, whether considered simply or in conjunction with the *Sonnax* factors, strongly favors lifting the stay to allow the District Court Action to conclude.


18.     (1) whether relief would result in a partial or complete resolution of the issues

**The Statutory and Regulatory Procedures Applicable to the IRS Notice of Levy**

The statutory and regulatory procedures applicable to the IRS notice of levy are provided for in 26 U.S.C. § 6331(d)(4) and 26 C.F.R. § 301.6331-2(a)(1).

The notice required under paragraph (1) shall include a brief statement which sets forth in simple and nontechnical terms—

Page 48 of 64

(A) the provisions of this title relating to levy and sale of property,

(B) *the procedures applicable to the levy...*

The IRS has determined within the four (4) corners of the May 19, 1999, that the procedures applicable to the notice of levy is that if that document is not signed, and that document is not signed, then that Notice of Levy cannot be executed against Movant's GM/UAW ERISA and IRC qualified pension plan provisions. In the Notice of Levy the IRS clearly set forth the procedure that "THIS LEVY WON'T ATTACH FUNDS IN IRAs, SELF-EMPLOYED INDIVIDUALS' RETIREMENT PLAN, *OR ANY OTHER RETIREMENT PLANS IN YOUR POSSESSION OR CONTROL*, UNLESS THIS IS SIGNED IN THE BLOCK TO THE RIGHT". The Notice of Levy was not signed in the box to the right. Thus, in accordance with 26 U.S.C. § 6331(d)(4) and 26 C.F.R. § 301.6331-2(a)(1) as applicable to the Notice of Levy  Debtor violated 26 U.S.C. § 6331(d)(4) and 26 C.F.R. § 301.6331-2(a)(1) and the Notice of Levy by executing on Movant's Pension Plan payments.

**The Statutory Breaches: The Provisions of the Ten Percent Alienation Provisions of ERISA, the Statutes Under the Internal Revenue Code, the Internal Revenue Code Regulations and the Terms of the GM/UAW Pension Plan**

**Debtor has departed from the essential requirements of the law.**

A.      **The Ten Percent Provisions of ERISA, 29 U.S.C. § 1056(d)(2)**

**29 U.S.C. § 1056(d)(2), in part, provides that:**

(d) Assignment or alienation of plan benefits
(1) Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.
(2) For the purposes of paragraph (1) of this subsection, there shall not be taken into account any voluntary and revocable assignment of not to exceed 10 percent of any benefit payment,

Page 49 of 64

ERISA broadly protects covered retirement benefits from dissipation through payment to third parties, even if the payments are authorized by a plan participant or would otherwise be valid by force of law. Under Section 206 of ERISA, "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1); *see also* 26 U.S.C. § 401(a)(13)(A) (mandating that trusts are entitled to favorable retirement plan tax treatment only if they contain an anti-alienation provision). Section 1056(d)(2) includes one exception, for alienation of Movant's interest in the GM/UAW ERISA and fIRC qualified pension plan payments that is applicable here: "there shall not be taken into account any voluntary and revocable assignment of not to exceed 10 percent of any benefit payment." To "give[ ] full and appropriate effect to ERISA's goal of protecting pension benefits," the Supreme Court has "declined to recognize any [other] exceptions to ERISA's antialienation provision." *Patterson v. Shumate* , 504 U.S. 753, 764 (1992). In doing so, the Court has explained:

> Section 206(d) reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them. If exceptions to this policy are to be made, it is for Congress to undertake that task.

*Guidry v. Sheet Metal Workers Nat'l Pension Fund* , 493 U.S. 365, 376 (1990); *Kickham Hanley, P.C. v. Kodak Restaurant,* 558 F.3d 204 (CA2, 2009) ("As the Supreme Court said in *Guidry,* §1056(d) "reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners . . . even if that decision prevents others from securing relief for the wrongs done them." 493 U.S. at 376."). Here, by Debtor's own admission the wrong done to them was the wrong done by Fidelity Investments by Fidelity paying to the IRS allegedly according their perception of having to obey that Notice of Levy and at the same time paying to

Movant the pension plan payments that Movant has been legally entitled to all of the time. This is a debt that was created by Fidelity Investment and a debt that is owed to Debtor. It is not the legal responsibility of Movant to pay the debt of Fidelity Investment.

Treasury Department regulations state that for tax purposes "a trust will not be qualified unless the plan of which the trust is a part provides that benefits provided under the plan may not be anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process." 26 CFR § 1.401(a)-13(b)(1) (1989). Id, (" fn11 The anti-alienation provision permits "any voluntary and revocable assignment of *not to exceed 10 percent of any benefit payment.*" ERISA § 206(d)(2), 29 U.S.C. § 1056(d)(2) (1982 ed.). The Conference Report states: "For purposes of this rule, a garnishment or levy is not to be considered a voluntary assignment." H. R. Conf. Rep. No. 93-1280, p. 280 (1974).").

Plaintiff filed an Amended Complaint in the above referred to litigation. Defendants' have answered. Plaintiff's allegations at item #18, 19 and defendants' reply to  the same (D.E. #55) ( "D") provides that:

> 18.    *Plaintiff and Defendant have never entered into any agreement or arrangement thereby authorizing Defendants to extract, alienate or reduce any amount of the pension plan payments that Defendant is obligated to pay to Plaintiff under the GM/UAW Pension Plan Agreement.*
> 18.    *Omitted*
> 19.    *Defendant voluntarily elected to pay to the Internal Revenue Service the amount of  $32,985.00, the same amount that Defendant is now alienating under Plaintiff's rights under General Motors/United Auto Workers ("GM/UAW") Pension Plan Agreement*
>    19    *Omitted*

*For purposes of Fed. R. Civ. P, Rule 8(a), these replies constitutes an admission on the part of defendants'. Defendants' have now admitted that there never was any written*

*authorization under the terms of the plan authorizing the alienation that is now and has been ongoing on.* Facts admitted in an answer are judicial admissions that bind debtor throughout this litigation. Gibbs ex rel Estate of Gibbs v. Cigna, 440 F.3f 571 (CA2, 2006), citing Bellefonte v. Argonaut, 757 F.2d 523, 528 (CA2, 1985); see also Western World v. Stack Oil 922 F.2d 118, 121-22 (CA2, 1990). Thus. In view of the fact that debtor has admitted that Movant has never signed any written authorization as provided for  of 29 U.S.C. § 1056(d)(2) , 26 U.S.C. § 401(a)(13(A) and  26 C.F.R. § 1.401(a)-13(d)(1)( i ), (ii), the anti-alienation provisions of Article VII, Section 3(e) **( Administrative Record, page #47-48)** of the GM/UAW  Pension Plan Agreement and  Section 3(a)(9) of the plan, coupled with the fact that debtor continues this unlawful taking and based on each of the two (2) dated May 14, 2007, and September 5, 2007, Movant has documented admissible evidence that Movant has made a prima facie case of cause and inadequate protection for this Court to lift the stay in order that the Judge Hodges in the litigation can rule on Debtor's and Movant's pending motions for Summary Judgment and the other pending motions. Or in the alternative if Judge Hodges continues to abdicate his judicial obligations to Debtor and  Movant a lifting of the stay will open the way for Movant to once again petition the Eleventh Circuit for a Writ of Mandamus.

The debtors' bears the burden to show that an exclusion applies to deny benefits. *Horton v. Reliance Standard Life Ins., Co.,* 141 F.3d 1038 (CA11, 1998).  For example, the debtors' here bear the burden to show that in the absence of any "written authorization" debtors' have the authority under ERISA and the terms of the plan to exercise authority to alienate defendants' pension plan payments.

**B.**     **The Ten Percent Provision of 26 U.S.C. § 401(a)(13(A).**

This statute, 26 U.S.C. § 401(a)(13(A),  provides that:

(13) Assignment and alienation.—

(A) In general.— A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated. For purposes of the preceding sentence, *there shall not be taken into account any voluntary and revocable assignment of not to exceed 10 percent of any benefit payment made by any participant who is receiving benefits under the plan* unless the assignment or alienation is made for purposes of defraying plan administration costs. For purposes of this paragraph a loan made to a participant or beneficiary shall not be treated as an assignment or alienation if such loan is secured by the participant's accrued nonforfeitable benefit and is exempt from the tax imposed by section 4975 (relating to tax on prohibited transactions) by reason of section 4975 (d)(1). This paragraph shall take effect on January 1, 1976 and shall not apply to assignments which were irrevocable on September 2, 1974.

## C.    The Ten Percent provisions of 26 C.F.R. § 1.401(a)-13(d)(1)( i ), (ii)

Buttressing, and reinforcing  29 U.S.C. § 1056(d)(2) and 26 U.S.C. § 401(a)(13(A) is

26 C.F.R. § 1.401(a)-13(d)(1)( i ), (ii), this regulation provides that:

(d) Exceptions to general rule prohibiting assignments or alienations–(1) Certain voluntary and revocable assignments or alienations. Not withstanding paragraph (b)(1) of this section, a plan may provide that once a participant or beneficiary begins receiving benefits under the plan, the participant or beneficiary may assign or alienate the right to future benefit payments *provided that the provision is limited to assignments or alienations which-- (i) Are voluntary and revocable; (ii) Do not in the aggregate exceed 10 percent of any benefit payment*

## D.    Debtors ' Have Developed a Pattern of Behavior Here That Has Denied to Plaintiff Procedural Due Process and Alienation of Plaintiff's Pension Plan Payments.

That pattern of behavior not only violates the anti-alienation  provisions of 29 U.S.C. § 1056(d)(2) , 26 U.S.C. § 401(a)(13(A) and  26 C.F.R. § 1.401(a)-13(d)(1)( i ), (ii), but also violates the anti-alienation provisions of  Article VII, Section 3(e) ( **Administrative Record, page #47-48)** of the GM/UAW  Pension Plan Agreement and  Section 3(a)(9) of the plan in the context of the "authority" of the "Board".

The lifting of the stay by this Court will result in either a partial or complete resolution of the

issues in the United States District Court, Middle District of Florida. Movant respectfully submits that staying Movant's pending action against Debtor in the United States District Court in the Middle District of Florida., case number **5:O7-CV-408 OC** will deprive Movant of his ability to pursue his meritorious claims as is more fully set forth in Movant's Amended Complaint. By order of the Court, Movant filed and served his Amended Complaint. on February 29, 2008 (Exhibit "G") Docket entry # 47. This Amended Complaint is incorporated herein by reference as though fully set forth herein. Without relief from the automatic stay, Movant stands to forfeit those claims and there is no adequate, substitute relief available to Movant. See the Eleventh Circuit's order entered on May 26, 2009, ( Exhibit "L") holding, in part, that "[L]awrence has the adequate alternative remedy of moving the district court to rule."

Movant's lacks adequate protection since the Value of Movant's interest in the GM/UAW ERISA Qualified and Internal Revenue Code Qualified Pension Plan agreement as a result of the stay. As proof of the decline in value in Movant's interest in the GM/UAW ERISA Qualified and Internal Revenue Code Qualified Pension Plan agreement , the Court, in the case of In re Elmira, 174, 892 (S.D.N.Y., 1994), a case setting forth the "...proof required to establish a prima facie case under 11 U.S.C. § 362(d)(1)...", where the burden is placed 'squarely on the debtor's shoulders the burden of proving the absence of cause...", and where "...cause includes the lack of adequate protection...", Movant must, therefore, "...demonstrate a factual and legal right to the relief that [Movant] seeks," citing In re Planned Sys. 78 B.R. 852, 859 (Bankr S.D. Ohio 1987). Thus, in movant's "...seeking relief from the automatic stay under 11 U.S.C. § 362(d)(1) [Movant carries] the initial burden of showing that [Movant] is entitled to relief before the debtor is obligated to go forward with its proof." *Elmira*, id and cases cited.

If, as is the case here, "...the basis of the stay relief is lack of adequate protection of an

interest in [the GM/UAW ERISA Qualified and Internal Revenue Code Qualified Pension Plan

agreement, the "property], the nature of movant's interest defines the need for adequate

protection, and the scope of the prima facie case." Id. The Court in *Elmiar* went on to hold that:

In *United Savings As'n v. Timbers Forest Associates, Ltd.*, 484 U.S. 365, 370, 108 S.Ct.

626, 630, 98 L.Ed.2d 740 (1988), the Supreme Court defined the nature of the secured creditor's

interest and the extent of the adequate protection that [11 U.S.C.] § 362(d)(1) addresses:

> It is common ground that the 'interest in property' referred to by [11 U.S.C.] §
> 362(d)(1) includes the right of a secured creditor to have the security applied in
> payment of the debt upon completion of the reorganization; and that that interest is
> not adequately protected if the security is depreciating during the term of the stay.

Accord, Barclay's Bank of New York, N.A. v. Saypol (In re Saypol), 31 B.R. 796, 800

(Bankr. S.D.N.Y. 1983) ("in the context of the automatic stay, Congress believed the existence

*vel non* of such a decline [in the value of the secured creditor's interest] to be almost decisive in

determining the need of adequate protection."); *In re Snyder* 285 B.R. 712, FN#2 ( D.C.N.D.

Calif., 2002) (" Secured creditors may also be entitled to relief from the automatic stay to enforce

nonbankruptcy rights against their collateral if the requirements of § 362(d) are met. And, absent

consent, a plan may not be confirmed if the special requirements of §§ 1129(b)(2)(A), 1225(a)(5)

or 1335(a)(5) applicable to secured claims are not satisfied . 11 U.S.C. §§ 1129(b)(2)(A),

1225(a)(5), 1335(a)(5).").

Here, Movant's interest in the GM/UAW pension plan payments is depreciating during the

term of the stay.. For example, according to the Payment history of Movant's GM/UAW ERISA

and IRC qualified pension plan payments (Exhibits "H", "I", " and "J") Debtor has alienated from

of Movant's GM/UAW ERISA and IRC qualified pension plan payments every month and

continues to do so every month.

Page 55 of 64

Accordingly, Movant, as a secured creditor, lacks adequate protection since the value of Movant's interest in the GM/UAW Pension Plan is declining as a result of the stay each month when debtor alienates Movant's interest in the GM/UAW ERISA Qualified and Internal Revenue Code Qualified Pension Plan agreement. Thus, Movant's interest in the GM/UAW ERISA Qualified and Internal Revenue Code Qualified Pension Plan payments is not adequately protected since the security, Movant's interest in the GM/UAW ERISA Qualified and Internal Revenue Code Qualified Pension Plan payments is depreciating during the term of stay.

The proof of this decline in Movant's interest and the value of that interest lies in the fact that Debtor is alienating Movant's monthly GM/UAW pension payments in violation of 29 U.S.C. § 1056(d)(2) and 26 C.F.R. § 1.401(a)-13(d)(1)( i ), (ii) bars any and all alienation over the 10% limits. Here, defendants' violate the provisions of 26 C.F.R. § 1.401(a)-13(d)(1)( i ), (ii), 29 U.S.C. § 1056(d)(2), and Article VII, Section 3(e), and the IRS May 19, 1999, Notice of Levy (Exhibit"E").

Under Bankruptcy Code Section 506(a), a creditor with a lien on bankruptcy estate property holds a secured claim to the extent of the value of the creditor's interest in the estate's interest in such property. Bankruptcy Code Section 541(a) provides that, on the commencement of a bankruptcy case, an estate is created that consists of all the debtor's legal and equitable interests on that date. However, according to Section 541 (c)(2), nonbankruptcy law restrictions on the transfer of a beneficial interest in a trust are enforceable in a bankruptcy case. While 541(a) of the Bankruptcy code provides that bankruptcy estate is comprised of all legal and equitable interests of the debtor section 542( c )(2) provides an exclusion from the estate as follows:

A restriction on the transfer of a beneficial interest of the debtor in a trust that enforceable under          applicable nonbankruptcy law is enforceable in a case under title 11 U.S.C. § 542(

c )(2).

In *Patterson v. Shumate*, 504 US 753 (1992), the Supreme Court obliterated the narrow definition of the exclusion and held that the "applicable nonbankruptcy law" in § 541( c )(2) "encompasses any relevant nonbankruptcy law, including federal law such as ERISA." Id. At 759, 112 S.Ct. 2242.

In *Patterson* , id,  the Supreme Court determined that an anti-alienation clause is a provision in the governing document for an arrangement such as a trust that specifies that the beneficial or equitable owner of the property held in that arrangement cannot transfer his or her interest to a third party.

The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.A. § 1001 et seq. (1974), is a federal law that sets minimum standards for most voluntarily established Pension and health plans in private industry to provide protection for individuals enrolled in these plans. of 1974 ERISA See Employee Retirement Income Security Act.

Contained in the debtor's plan, is  a restriction on transfer enforceable under "nonbankruptcy law" within the meaning of Section 541(c)(2). GM/UAW Pension Plan being an  ERISA-qualified pension plan is  excluded from the debtor's bankruptcy estate under that section. Thus, since the GM/UAW Pension Plan being an  ERISA-qualified pension plan, the provisions of Article VII, Section 3 of the GM/UAW  Pension Plan Agreement, and    29 U.S.C. §1056(d)(1), 26 U.S.C.§ 401(a)(13(A), 26 C.F.R. §1.401(a)-13(1) (  i ), (ii) only provides for a written, voluntary and revocable assignment of not to exceed 10 percent of any benefit payment, the fact that there is no "written authorization" bars the levy of the sums demanded by Debtor in their letters to Movant of May 14, 2007, (Exhibit "B") and September 5, 2007 (Exhibit "C").

### NO PRIOR REQUEST

Page 57 of  64

communicate "....by United States Mail or by an approved courier service." This is Movant's

written attempt to seek and obtain "by United States Mail" *GENERAL MOTORS HOURLY*

*RATE EMPLOYEE PENSION, AND GENERAL MOTORS CORPORATION*" concurrence on

the above request. If *GENERAL MOTORS HOURLY RATE EMPLOYEE PENSION, AND*

*GENERAL MOTORS CORPORATION* does concur, then Movant   shall expect such

concurrence to be delivered to Movant   by the above ordered means of delivery until such time

that the  Bankruptcy  Court rules on Movant's above pending motion.

By: _____

Walter J. Lawrence

Plaintiff in pro per


## Declaration of Service

Pursuant to 28 U.S.C. 1746, I, Walter J. Lawrence,  declares under the penalty of perjury

that on _____, I did place a copy of  **MOTION OF PLAINTIFF**

**IN THE ACTION ENTITLED** *WALTER J. LAWRENCE V. GENERAL MOTORS HOURLY*

*RATE EMPLOYEE PENSION, AND GENERAL MOTORS CORPORATION*, **5:O7-CV-408**

**OC, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF FLORIDA FOR**

**ENTRY OF AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY**

**PURSUANT TO 11 U.S.C.  § 362(d)(1).** in a U.S. mail receptacle with U.S. postage first being

fully prepaid  for first class U.S.  with the addresses being:

**Counsel for GM**


Weil, Gotshal & Manges, LLP

Page 58 of  63

767 Fifth avenue

New York, NY 10153

Attn:   Harvey R. Miller, Esq.

Stephen Karotkin, Esq.

Joseph H. Smolinsky, Esq.


Cynthia L. May

Greenberg Traurig, LLP*

Suite 100

625 E Twiggs St

Tampa , FL 33602-3925

813/318-5700

Fax: 813/318-5900

Email: mayc@gtlaw.com

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*



**Debtor**

General Motors Corporation
c/o Motors Liquidation Company
300 Renaissance Center
Detroit, MI 48265
Attn: Ted Stenger

General Motors Corporation

300 Renaissance Center
Detroit, MI 48265
Attn: Lawrence S. Buonomo, Esq.

**U.S. Trustee's Office**

The Office of the United States Trustee
for the Southern District of New York
33 Whitehall Street
21st Floor
New York, NY 10004
Attn: Diana G. Adams, Esq.

**Creditors' Committee**

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attn:    Kenneth H. Eckstein, Esq.
         Thomas Moers Mayer, Esq.
         Adam C. Rogogg, Esq.
         Gordon Z. Novod, Esq.

**20 Largest Unsecured Creditors**

.Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, DE 19890
Attn: Geoffrey J. Lewis

International Union, United Automobile,
Aerospace and Agricultural Implement
Workers of America (UAW)
8000 East Jefferson
Detroit, MI 48214
Attn: Ron Gettlefinger

Deutsche Bank AG,
London As Fiscal Agent
Attn: Stuart Harding
Theodor-Heuss-Allee 70
Frankfurt, 60262
Germany

International Union of Electronic, Electrical,
Salaried, Machine and Furniture Workers-
Communications
Workers of America (IUE-CWA)
3461 Office Park Drive
Kettering, OH 45439
Attn: Mr. James Clark

Bank of New York Mellon
One Wall Street
New York, NY 10286
Attn: Gregory Kinder

Starcom Mediavest Group, Inc.
35 W. Wacker drive
Chicago, IL 60601
Attn: Laura Desmond

Delphi Corp.
5725 Delphi Drive
Troy, MI 48098
Attn: Rodney O'Nea

Robert Bosch GmbH
38000 Hills Tech Drive
Farmington Hills, MI 48331
Attn: Franz Fehrenbach

Lear Corp.
21557 Telegraph Road
Southfield, MI 48033
Attn: Robert Rositer

renco Group, Inc.
1 Rockfeller Plaza
29th Floor
New York, NY 10020
Attn: Lon Offenbacher

Enterprise Rent A Car
6929 N. Lakewood Ave.
Suite 100
Tulsa, OK 74117
Attn: Greg Stubblefield

Johnson Controls, Inc.
5757 N. Green Bay Avenue
Glendale, WI 53209
Attn: Stephen A. Roell

Denso Corp.
24777 Denso Drive
Southfield, MI 48086
Attn: Haruya Maruyama

TRW Automotive
Holdings, Corp.
12025 Tech Center Dr.
Livonia, MI 48150
Attn: John Plant

Magna International, Inc.
Attn: Don Walker
337 Magna Drive
Aurora, ON L4G7K1
Canada

American Axle & Mfg Holdings, Inc.
One Dauch Drive
Detroit, IM 48211-1198
Attn: Richard Dauch

Maritz Inc.
1375 North Highway Drive
Fenton, MO 63099
Attn: Steve Maritz

Publicis Groups S.A.
Attn: Maurice Levy
133 Ave Des Champs Elysees
Paris, 75008
France

Hewlett Packard Co.
3000 Hanover Street
Palo Alto, CA 94304
Attn: Mike Nefkens

Interpublic Group of
Companies, Inc.

1114 Avenue of the Americas
New York, NY 10036
Attn: Michael Roth

**Others**:

U.S. Treasury
Attn: Matthews Feldman, Esq.
1500 Pennsylvania Avenue NW Room 2312
Washington, DC 20220

Cadwalder, Wickersham & taft, LLP
Attn: John J. Rapisardi, Esq;
One World Financial Center
New York New York 10281

Vedder Price, P.C.
Michael J. Edelman, Esq.
Michael L. Schein, Esq.
1633 Broadway, 47th Floor
New York, NY 10019

By: _____

Walter J. Lawrence

Plaintiff in pro per.