Jeffrey S. Davis
Attorney at Law
1422 Berry Drive
Cleburne, Texas 76033
817/602-7999
FAX # 817/423-7348
jsdesqtx@yahoo.com

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | | |
|---|---|---|---|
| **IN RE:** | **General Motors Corporation,** *et al* | § | **Chapter 11** |
| | | § | **Case No. 1-09-50026 (REG)** |
| | **Debtors.** | § | **(Jointly Administered)** |

## SECOND SUPPLEMENTAL RESPONSE TO LIMITED OBJECTION OF FORREST CHEVROLET-CADILLAC, INC., AND FORREST PONTIAC-BUICK-GMC TRUCK, INC., TO OMNIBUS MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 365 AUTHORIZING (A) THE REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF

*TO THE HONORABLE ROBERT E. GERBER*
*UNITED STATES BANKRUPTCY JUDGE*

 **NOW COME** FORREST CHEVROLET-CADILLAC, INC., and FORREST PONTIAC-BUICK-GMC TRUCK, INC., hereinafter "FORREST", who file this their Second Supplement to Limited Objection to Omnibus Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. §§ 105 and 365 Authorizing (A) the Rejection of Executory Contracts and Unexpired Leases with Certain Domestic Dealers and (B) Granting Certain Related Relief, and in support would show as follows:

### TABLE OF CONTENTS

Preliminary Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Court's Order to Produce Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Documents Provided to Forrest by Debtor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Debtor's Areas of Inquiry for Franchised Dealers . . . . . . . . . . . . . . . . . . . . . . . . . 5

A.  Debtor's Improper Grouping of Both FORREST Franchised Dealerships . . 5

B.  Debtor's Analysis of the FORREST Franchised Dealerships'
    Working Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    1.  Assets Overlooked by Debtor in its Calculation of
        Working Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    2.  Debtor's 2006 Working Capital Analysis . . . . . . . . . . . . . . . . . . . 8

        a.  Forrest Chevrolet-Cadillac 2006 . . . . . . . . . . . . . . . . . . . . 8

        b.  Forrest Pontiac-Buick0GMC Truck 2006 . . . . . . . . . . . . . . 9

    3.  Debtor's 2007 Working Capital Analysis . . . . . . . . . . . . . . . . . . . 9

        a.  Forrest Chevrolet-Cadillac 2007 . . . . . . . . . . . . . . . . . . . . 9

        b.  Forrest Pontiac-Buick0GMC Truck 2007 . . . . . . . . . . . . . . 10

    4.  Debtor's 2008 Working Capital Analysis . . . . . . . . . . . . . . . . . . . 10

        a.  Forrest Chevrolet-Cadillac 2008. . . . . . . . . . . . . . . . . . . . . 10

        b.  Forrest Pontiac-Buick0GMC Truck 2008 . . . . . . . . . . . . . . 10

C.  Debtor's Analysis of the FORREST Franchised Dealerships'
    Net Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D.  Additional Relevant Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    1.  Prior Offers to Purchase the FORREST Dealerships . . . . . . . . . . . . 11

    2.  Current Plan for a GM Dealership by Third-Party a
        Forrest-Pontiac-Buick-GM Truck Location . . . . . . . . . . . . . . . . . . 12

C.  Other Factors Stated in Debtor's Dealer Network Analysis . . . . . . . . . . . . . 13

Matters Affecting the Forrest Dealerships' Profitability as a Result of
Debtor's Actions And/or Inactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A.  Debtor's Use of Turn-and-Earn Sales Strategy . . . . . . . . . . . . . . . . . . . . . 14

B.  Debtor's Continued Refusal to Consolidate both FORREST Franchises . . . . 15

C.  Debtor's Use of Employee Pricing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

D.     Other then FORREST, No GM Dealer in the
       Cleburne, Texas, Market Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

E.     Debtor's Actions in the Oldsmobile Phase-Out . . . . . . . . . . . . . . . . . . . . . 17

F.     1995 Meeting With Debtor Chairman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

G.     Re-Cap of Debtor's Improper Actions Which Significantly and
       Negatively Impacted FORREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Third-party Matter Affecting the Forrest  Dealerships' Profitability . . . . . . . . . . . . . . . . . . . . . 23

Debtor Did Not Exercise Sound Business Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Control Data Corporation v. Zelman*, 602 F.2d 38 (2nd Cir, 1979) . . . . . . . . . . . . . . . . . . . . . . . . 24

*FDIC v. Castetter*, 184 F.3d 1040 (9th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Chi-Feng Huang*, 23 B.R. 798 (9th Cir. BAP 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Minges*, 602 F.2d 38 (2d Cir.1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . 24,25

*Lubrizol Enter. v. Richmond Metal Finishers* 756 F.2d 1043 (4th Cir.1985) . . . . . . . . . . . . . . . . . . 24,25

*Navellier v. Sletten*, 262 F.3d 923 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . 25

### TREATISE CITED

1 Collier on Bankruptcy p 3.03(8)(b) (L. King 15th ed. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## PRELIMINARY MATTERS

1.      On July 28, 2009, FORREST filed their Limited Objection to Omnibus Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. §§ 105 and 365 Authorizing (A) the Rejection of Executory Contracts and Unexpired Leases with Certain Domestic Dealers and (B) Granting Certain Related Relief.

2.      At the hearing on the Omnibus Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. §§ 105 and 365 Authorizing (A) the Rejection of Executory Contracts and Unexpired Leases with Certain Domestic Dealers and (B) Granting Certain Related Relief, the Court ordered Debtor to provide additional information to FORREST so as to allow FORREST to properly respond to the above-referenced motion.

3.      FORREST incorporates by reference herein their Response to Consolidated Reply of Debtors to Omnibus Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. §§ 105 and 365 Authorizing (A) the Rejection of Executory Contracts and Unexpired Leases with Certain Domestic Dealers and (B) Granting Certain Related Relief, being Court Document Number 3458.

## COURT'S ORDER TO PRODUCE DOCUMENTS

4.      At the hearing on the Dedtor's motion, the Court states that: "The debtors are to settle an order in accordance with the foregoing. You're to work out with the debtor -- excuse me, with the two objectors' delivery to them of the information concerning their scores and their decision files." Transcript - Page 104, lines 14-17. However, as of the date FORREST filed this their Second Supplemental Response, they had not yet been provided with the formula by which the Dealer Performance Scores were calculated, nor were they provided with the documentation of the Customer Satisfaction Index, or the documents by which Debtor calculated the working capital of each Forrest franchise. Even so, FORREST has specifically requested that they be provided with such documents,

however, Debtor has refused to provide to FORREST the back-up documentation regarding the Customer Satisfaction Index, as well as the formula utilized in determining the various components of the Dealer Performance Score. As such, FORREST is still unable to fully respond to the Debtor's motion. FORREST reserves the right to further respond to the Debtor's calculation of their Dealer Performance Score in the event debtor produces such information.

## DOCUMENTS PROVIDED TO FORREST BY DEBTOR

5.    Debtor has provided to FORREST the following documents:

A.    GM Conducted Dealer Analysis to Establish the Size of a Viable Dealer Network, a true and correct copy of which is attached hereto as Exhibit "A";

B.    Overall Summary - Dealer Performance Summary a true and correct copy of which is attached hereto as Exhibit "B"; and

C.    Operating Reports for 2006, 2007, and 2008 for both Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc., true and correct copies of which are attached hereto, respectively, as Exhibits "C", "D", "E", "F", "G", and "H".

## DEBTOR'S AREAS OF INQUIRY FOR FRANCHISED DEALERS

6.    The Dealer Network Analysis outlined four (4) areas of inquiry by Debtor when it made its determination as to which franchise dealers to keep and which to terminate. Those areas of inquiry are: (a) Sales; (b) Customer Satisfaction Index; ( c) Capitalization; and (d) Profitability.

### A.    Debtor's Improper Grouping of Both FORREST Franchised Dealerships

7.    Both Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc., are separate entities, hold separate franchise agreements with Debtor, and operate at two (2)

separate addresses, 2400 North Main Street, Clerburne, Texas, and 2408 North Main Street, Cleburne, Texas, respectively, and both dealerships have their own separate building, lot, and service area. However, Debtor, in calculating the Dealer Performance Score it utilized in its determination to terminate both franchises, grouped both Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc., together, as if they were one (1) franchise, in its determination of the Dealer Performance Score. Such is clear from looking at the Overall Summary - Dealer Performance Summary, a copy of which is attached hereto as Exhibit B. Debtor made the same calculation, grouping together both individual franchises, for its calculations in 2006, 2007, and 2008. Such calculation was improper and Debtor has shown no justification for grouping both FORREST franchises and treating them as one entity.

**B.     Debtor's Analysis of the FORREST Franchised Dealerships' Working Capital**

8.     Also, a closer look at the Overall Summary - Dealer Performance Summary shows that the capitalization (actual) for both Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc., in significantly incorrect and under-stated. Such is first evident from a review of the Operating Reports for 2006, 2007, and 2008. The first page of each Operating Report has a year-end balance sheet which lists the assets and liabilities of the respective FORREST dealership.

9.     The first inquiry into whether Debtor has the proper number listed for capital of each dealership is to define "capital", which Debtor refers to as "working capital" in the Overall Summary - Dealer Performance Summary. Wikipedia defines "working capital" as "also known as net working capital or NWC, [which] is a financial metric which represents operating liquidity available to a business. Along with fixed assets such as plant and equipment, working capital is considered a part of operating capital. It is calculated as current assets minus current liabilities."

**1.**    **Assets Overlooked by Debtor in its Calculation of Working Capital**

10.    In looking at the capitalization of both Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc., Debtor did not take into consideration the value of the facilities at which the franchises operated.  While neither Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc., own the real property upon which their respective dealerships are located, the real property upon which Forrest Chevrolet-Cadillac, Inc., is located is owned by a related entity, being Forrest Cleburne, Properties, L.P., being a limited partnership majority owned and controlled by the owners of Forrest Chevrolet-Cadillac, Inc.; and Forrest Pontiac-Buick-GMC Truck, Inc., until August 2008, was located upon real property owned by Forrest Cleburne Properties, L.P. Presently, Forrest Cleburne Properties, L.P., is in litigation seeking recovery of the real property upon which Forrest Pontiac-Buick-GMC Truck, Inc., was operated, alleging fraud in the procurement of the real property by Eddie McGinnis.

11.    Of further significance, regarding the real property upon which their respective dealerships are located, Forrest Chevrolet-Cadillac, Inc., has an equitable interest, by virtue of a Deed of Trust, in real property valued at approximately $10 million, including the real property upon which its dealership is situated, due to a sale of real property to Forrest Cleburne Properties, L.P., with a current balance due on the note of approximately $2.3 million, which note is in default. Also, Forrest Chevrolet-Cadillac, Inc., is owed an additional approximate $900,000, unsecured, from Forrest Cleburne Properties, L.P.,which sum is the balance owed from monies used by said entity to build a new dealership building for Forrest Pontiac-Buick-GMC Truck, Inc.  The new facility, including the land, was appraised at approximately $4.6 million in August 2008. The facility was completed in 2004. The dealership facility, itself, cost $3.2 million to build.  Therefore, the above-referenced note and obligation from Forrest Cleburne Properties, L.P., to Forrest Chevrolet-Cadillac, Inc., must be included in the

capital (actual) of Forrest Chevrolet-Cadillac, Inc., prior to calculating the score. Likewise, the value of the land and dealership facility which Forrest Pontiac-Buick-GMC Truck, Inc., operated at must be used in the capital (actual) calculation as, although the same is not owned by Forrest Pontiac-Buick-GMC Truck, Inc., the land and facility were owned by a related entity, a majority of which was owned by and which was wholly run by, individuals who own Forrest Pontiac-Buick-GMC Truck, Inc.

**2.**     **Debtor's 2006 Working Capital Analysis**

12.     For year 2006, Debtor lists capital for Forrest Chevrolet-Cadillac, Inc., as $804,638, with a variance from the claimed "needed working capital standard" of ($465,362), and for Forrest Pontiac-Buick-GMC Truck, Inc., as ($182,132), with a variance from the claimed "needed working capital standard" of ($699,132), leading to a combined score of 3.48.

13.     Looking at the 2006 respective Operating Reports for Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc., the working capital for Forrest Chevrolet-Cadillac, Inc., is $7,888,865, and the working capital for Forrest Pontiac-Buick-GMC Truck, Inc., is ($8,709), which are significant variances from the numbers used by Debtor.

**a.**     ***Forrest Chevrolet-Cadillac 2006***

14.     Based upon the Operating Report, for year 2006, the capital (actual) of Forrest Chevrolet-Cadillac, Inc., is $7,888,865. When (1) the value of the land and facility upon which Forrest Chevrolet-Cadillac, Inc.'s, dealership is located is added, which value is $4.8 million; and (2) the notes payable from Forrest Cleburne Properties, L.P., totaling $4,988,391[1], are added to the capital (actual), the true number for Forrest Chevrolet-Cadillac, Inc., is $17,677,256.

---

[1] As shown on the 2006 U.S. Return of Partnership Income for Forrest Cleburne Properties, L.P.

### b.    *Forrest Pontiac-Buick0GMC Truck 2006*

15.    Based upon the Operating Report, for the year 2006, the capital (actual) of Forrest Pontiac-Buick-GMC Truck, Inc., is ($8,709).    When the value of the land and facility upon which  Forrest Chevrolet-Cadillac, Inc.'s, dealership is located is added, which value is $4.6 million is added to the capital (actual), the true number for  Forrest Pontiac-Buick-GMC, Inc., is, in essence, $4.6 million.

### 3.    Debtor's 2007 Working Capital Analysis

16.    For year 2007, Debtor lists capital (actual) for Forrest Chevrolet-Cadillac, Inc., as $535,236, with a variance from the claimed "needed working capital standard" of ($533,764), and for Forrest Pontiac-Buick-GMC Truck, Inc., as ($647,903), with a variance from the claimed "needed working capital standard" of ($1,087,903), leading to a combined score of 0.75.

17.    Looking at the 2007 respective Operating Reports for Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc., the working capital for Forrest Chevrolet-Cadillac, Inc., is $7,594,156, and the working capital for Forrest Pontiac-Buick-GMC Truck, Inc., is ($444,339), which are significant variances from the numbers used by Debtor.

### a.    *Forrest Chevrolet-Cadillac 2007*

18.    Based upon the Operating Report, for year 2007, the capital (actual) of Forrest Chevrolet-Cadillac, Inc., when (1) the value of the land and facility upon which Forrest Chevrolet-Cadillac, Inc.'s, dealership is located is added, which value is $4.8 million; and (2) the notes payable from Forrest Cleburne Properties, L.P., totaling $5,510,395[2], are added to the capital (actual), the true number for Forrest Chevrolet-Cadillac, Inc., is $17,904,551.

------------------------------------------------

[2]  As shown on the 2007 U.S. Return of Partnership Income for Forrest Cleburne Properties, L.P.

**b.**     ***Forrest Pontiac-Buick-GMC Truck 2007***

19.    Based upon the Operating Report, for the year 2007, the capital (actual) of Forrest Pontiac-Buick-GMC Truck, Inc., when the value of the land and facility upon which  Forrest Chevrolet-Cadillac, Inc.'s, dealership is located is added, which value is $4.6 million is added to the capital (actual), the true number for  Forrest Pontiac-Buick-GMC, Inc., is, in essence, $4.6 million.

**4.**     **Debtor's 2007 Working Capital Analysis**

20    For year 2008, Debtor lists capital (actual) for Forrest Chevrolet-Cadillac, Inc., as $460,721, with a variance from the claimed "needed working capital standard" of ($496,729), and for Forrest Pontiac-Buick-GMC Truck, Inc., as ($1,587,812), with a variance from the claimed "needed working capital standard" of ($2,127,812), leading to a combined score of (8.78).

21.    Looking at the 2008 respective Operating Reports for Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc., the working capital for Forrest Chevrolet-Cadillac, Inc., is $6,364,549, and the working capital for Forrest Pontiac-Buick-GMC Truck, Inc., is ($1,486,145) which are significant variances from the numbers used by Debtor.

**a.**     ***Forrest Chevrolet-Cadillac 2008***

22.    Based upon the Operating Report for year 2008, the capital (actual) of Forrest Chevrolet-Cadillac, Inc., when (1) the value of the land and facility upon which  Forrest Chevrolet-Cadillac, Inc.'s, dealership is located is added, which value is $4.8 million; and (2) the notes payable from Forrest Cleburne Properties, L.P., totaling $2,696,843 are added to the capital (actual), the true number for Forrest Chevrolet-Cadillac, Inc., is $13,861,392.

**b.**     ***Forrest Pontiac-Buick-GMC Truck 2008***

23.    Based upon the Operating Report for the year 2008, the capital (actual) of Forrest Pontiac-Buick-GMC Truck, Inc., when the value of the land and facility upon which  Forrest

Chevrolet-Cadillac, Inc.'s, dealership is located is added, which value is $4.6 million is added to the capital (actual), the true number for Forrest Pontiac-Buick-GMC, Inc., is, in essence, $3.1 million.

**C.    Debtor's Analysis of the FORREST Franchised Dealerships' Net Profits**

24.    While the Sales (actual) for both Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc., comport with the sales as shown in the respective Operating Reports, Debtor's actions, as shown below, significantly impacted the sales of vehicles at both dealerships.

**D.    Additional Relevant Information**

**1.    Prior Offers to Purchase the FORREST Dealerships**

25.    Relevant evidence on the issue of the viability of a dealership selling vehicles manufactured by General Motors in the Cleburne-Keene-Alvarado, Texas, area, are offers to purchase one or both of the dealerships, including an offer from Debtor:

A.    By letter dated July 15, 2008, Debtor offered to purchase both FORREST dealerships, with the real property to be leased by Debtor, and with Goodwill valued, by Debtor, at $1.25 million. Significantly, this offer came at a time when both FORREST dealership's floor plans had been suspended by GMAC;

B.    By letter dated July 24, 2008, Lonestar Cleburne Autoplex, Inc, offered to purchase the FORREST dealership inventories, other assets, and pay $3.0 million for the land and facility located at 2400 Noth Main, Cleburne, Texas, (being the Chevrolet facility), and at 2406 North Main, Cleburne, Texas, (which would have been changed to 2408 North Main, Cleburne, Texas, being the Pontiac dealership), and pay an additional $1.5 million for the Goodwill of the businesses. Significantly, this offer was from a competing dealer of Dodge, Chrysler, and Jeep vehicles whose dealership is located directly across the street

from the Forrest Chevrolet dealership;

C.     By letter dated August 4, 2008, Gaines Stanley offered to purchase the

FORREST dealership inventories, other assets, and pay $3.2 million for a

portion of the land and facility located at 2408 North Main, Cleburne, Texas,

(being the Pontiac dealership), and pay an additional $750,000.00, for the

Goodwill of the businesses with the right to use the Forrest name;

D.     By letter dated December 15, 2008, Tommy Manuel offered to purchase the

FORREST dealerships' inventories and other assets, plus pay an additional $3.6

million for the land and facility located at 2406 North Main, Cleburne, Texas,

(which would have been changed to 2408 North Main, Cleburne, Texas, being

the Pontiac dealership).  At that time, Mr. Manuel owns seven (7) Chrysler

dealerships in the Dallas-Fort Worth Metroplex area; and

E.     By letter dated January 2009, Matt Johnson offered to purchase the FORREST

dealership inventories, other assets, and pay $4.0 million for the land and facility

located at 2406 North Main, Cleburne, Texas, (which would have been changed

to 2408 North Main, Cleburne, Texas, being the Pontiac dealership), and pay an

additional $800,000.00, for the Goodwill of the businesses with the right to use

the Forrest name.

## 2.     Current Plan for a GM Dealership by Third-Party at Forrest-Pontiac-Buick-GM Truck Location

26.     Of interest, based upon information and belief, FORREST has recently learned

that a franchised dealer of General Motors vehicles has entered into a contract to purchase the facility

at which the Forrest Pontiac-Buick-GMC Truck, Inc., dealership was operated.  FORREST understands

that the dealer is Lynn Smith Chevrolet in Burleson, Texas. Certainly, such action would not have taken place without first obtaining clearance or approval from General Motors to expand the Lynn Smith dealership into the Cleburne, Texas, market area. However, this transaction cannot be completed until the resolution of the suit between FORREST and the owner of the real property upon which the facility is located.

27.    That a dealership of General Motors vehicles is interested in moving to the Cleburne, Texas, market area as well as the fact that five (5) individuals or entities, *including Debtor*, and including other dealerships, offered to purchase the FORREST dealerships, clearly demonstrates that such market area is desirable and viable.

C.    **Other Factors Stated in Debtor's Dealer Network Analysis**

28.    Debtor, in its Dealer Network Analysis, states that "Despite reductions GM would maintain extensive hubtown (i.e. 25-50K population) and small town footprint as strategic advantage." Cleburne, Texas, is just such a "hubtown", as it has a population, as of July 2008, of 29,889.

29.    Debtor, in its Dealer Network Analysis, reaffirmed its close-knit relationship with GMAC when it states that "GM is responsible for vehicle inventory of terminated dealers who are floored through GMAC (approximately 80% of inventory)."

30.    As discussed in their Limited Objection, FORREST asserts that the use of a "wind-down" agreement by Debtor, especially in the context of a bankruptcy proceeding, is an attempt to circumvent state motor vehicle franchise laws, which laws would require more scrutiny of the actions of Debtor, as well as the criteria Debtor utilized in its determination to terminate any given franchise.

## MATTERS AFFECTING THE FORREST DEALERSHIPS' PROFITABILITY

## AS A RESULT OF DEBTOR'S ACTIONS AND/OR INACTIONS

31.    During the past fourteen (14) years, since 1994, the Forrest family was been

exposed to a myriad of methods of Debtor which were intended to destabilize both franchises and force them out of business. The initial strategy was to alter the sales outcome in our primary area of responsibility by allowing the relocation of FORRESTs' closest Chevrolet competitor, Lynn Smith Chevrolet in Burleson, Texas, in 1994. In or around 1998-1999, General Motors attempted to starve our stores of new product allocations. Lastly, in December 2005, following a significant influx of new product resulting from the 'price-fixing' scheme of GM Employee Pricing. Then, in June 2005, Debtor attempted to flood the FORREST dealerships with new product. GMAC, in a one-two punch, acted aggressively against the FORREST dealerships, when they had accumulated approximately $16.0 million of new vehicle inventory.[3] GMAC issued a notice in March, 2008, that the floor plan lines of Forrest Chevrolet-Cadillac and Forrest Pontiac-Buick-GMC would be suspended on May 22, 2008. This was actually the third notice of this kind since the end of 2005, leading to the current death spiral of the Forrest family's fifty (50) year journey as a General Motor's dealer. On July 7, 2008, Debtor sent to FORREST a letter which outlined purported breaches of the franchise agreements, namely, arising from the loss of the floor plan. Of interest, the letter references that Debtor can terminate the franchise agreements if FORREST fails the remedy the breach. However, DEBTOR never chose to terminate the franchise agreements, until this Motion was filed, over one (1) year later.

A.    **Debtor's Use of Turn-and-Earn Sales Strategy**

32.    In the mid-nineties Debtor began embarking on a mission to reinvent the "TURN-and-EARN" process. This decades-old system had never even been able to pass the age old "smell test," as, how could a small-to-midsized car dealer be treated fairly in a system whereby, if you

---

[3] Steve Evans, who inherited his father's 30 year old franchise, R.O. Evans Pontiac-Buick-GMC in Dallas, Texas, in 1988, is a former victim of this multifaceted strategy of Debtor. Mr. Evans contacted Charles Michael Forrest in 2005, warning him of such a possibility. He was very concerned at the time that the same thing that happened to him and his family would happen to the Forrest family; which it did.

could not first get products, then, by definition, you could never earn them. As several years evolved and the new system was being introduced in 1998, which "new" system appeared to be nothing much different than an on-line version of the old 'TURN-and-EARN' system. Its on-line nature made the entire system time sensitive to use, prone to hi-tech sabotage or failure, much more difficult to get vehicles that a dealer wanted, easier to receive vehicles a dealer did not order, more difficult to continually train new employees, and so on.

33.    Many of FORREST's time sensitive, on-line attempts, to use Debtor's new vehicle ordering system in the first year were halted by frozen screen syndrome that ended up denying FORREST delivery of new vehicles. No-one at the corporate level ever explained this why the program froze or offered to reconcile FORREST's 'TURN-and-EARN' losses.

34.    In1999, Michael Forrest drafted a hand written letter to Ron Tonkin, a former head of the National Automobile Dealers Association, noting at the time that he had only five (5) Chevrolet extended cabs in the Forrest Chevrolet-Cadillac, Inc., inventory. Mr. Tonkin left Mr. Forrest a voicemail.

35.    In 1999, Michael Forrest also mailed a copy of his1995 National Dealer Council platform issues to every member of the 1999 Chevrolet National Dealer Council in order to remind those individuals of his previous efforts to expose the so called 'TURN-and-EARN' distribution system as a very manipulative and dysfunctional process that often starves dealers out of vehicles or floods them with vehicles.

**B.    Debtor's Continued Refusal to Consolidate both FORREST Franchises**

36.    The first denial of a Forrest family business plan to make a blended move was from 1994-1996. This plan was blocked, at the very least, by former Pontiac zone manager, Jeff Fernandez. The second denial of a Forrest family business plan to make a blended move was from Fall,

2001-Winter 2004. Two zone managers of Debtors business-control entities, Chevrolets' Keith Best, and Pontiacs' Rick Beets, "stonewalled" the Forrest family's emergency request to relocate Forrest Pontiac-Buick-GMC, Inc., to the real estate site of Forrest Chevrolet-Cadillac. After no formal response was received from Debtor to the emergency relocation request, the Chevrolet and Pontiac zone managers met one time at the Chevrolet dealership, however, they offered only contradictions as to the placement of a service reception area and the alteration of a sales building, (which would not have met engineering compliance standards). The Forrest family refused to succumb to the onerous language of a new lease agreement demanded by tenant trustee, Tom Pernell, Jr., thusly causing the leasehold to default to a 30-day, month-to month basis. Caught in the crossfire of arguments between the two business-control entities for more than a year, the Forrest Family finally decided to begin site excavation on an adjacent piece of property that they owned, knowing that Debtor's preference was to have a stand-alone facility on its own piece of property. The posturing of Debtor's officials from November, 2001, to an official written acknowledgment in or around February, 2004, allowing Forrest Pontiac-Buick-GMC Truck, Inc., to build a new facility was negligent as to any definition of timely and/or practical resolutions to the dealerships predicament. In fact, from April, 2003, until February, 2004, approximately $1.0 million of demolition and excavation work on the site, with verbal assurances from the Pontiac Zone Manager, Rick Reets, as to the efficacy of erecting a new facility. At the time that the Forrest family finally received an official written authority to build a new dealership, in approximately late January/early February 2004, they had already invested over $1.0 million in the preparatory phase of the development. As the dealership development, that originally was bid at about $2.0 million by Larry Sandlin of M.T. Building Corp., on a cost plus basis, approached completion, the out-of-pocket cost to Forrest Chevrolet-Cadillac Co., Inc., who funded the building of the new facility with cash, reached approximately $3.2 million.

**C.      Debtor's Use of Employee Pricing**

37.      Forrest Chevrolet-Cadillac, Inc., had begun to reclaim its profitability in the first

six (6) months of 2005, until Debtor elected to advertise an employee price scheme that contributed to

a breach in the confidentiality of dealer invoices and the right of a franchise dealer to negotiate discount

margins and/or trade in valuations.  The employee price mania of June, 2005, led to record shipments

of new vehicle inventory by the end of December, 2005, at which time GMAC claimed that the two

FORREST dealerships had risen above and beyond a ceiling that was unknown to dealer-principal

because a number of addendums were added to a core value of about $6.0 million during the eight-plus

years since the untimely death of O.C. Forrest, Jr., in May, 1997.   The two FORREST dealerships,

through the employee pricing sales, increased their relative sales by approximately 75 units in June, 2005,

due to the response to customer perception  that this was an unprecedented purchasing opportunity on

new vehicles manufactured by Debtor.

**D.      Other then FORREST, No GM Dealer in the Cleburne, Texas, Market Area**

38.      The departure of both Forrest Pontiac-Buick-GMC Truck, Inc., and Forrest

Chevrolet-Cadillac, Inc.,  from the Cleburne, Texas, market area will leave that area with both a

Chrysler-Dodge-Jeep dealer and a Ford dealer.  There are currently no dealers offering a foreign brand

vehicle in the Cleburne, Texas, market area.  However, the Forrest family has been offered a franchise

with Eurospeed, USA, a Chinese automobile manufacturer, which dealership would include the offering

of two (2) electric automobiles, al well as various models of ATV's and scooters.  The franchise would

be located at the current location of our dealerships.

**E.      Debtor's Actions in the Oldsmobile Phase-Out**

39.      Through a referral by NADA in early 2001, the Myers and Fuller Law firm of

Tallahassee, Florida represented the two FORREST dealerships, from the announcement of Debtor's

termination of the Oldsmobile brand in December 2000. The complaints of FORREST against Debtor was filtered down to a single complaint; simply stated, it was that, contrary to Debtor's claim that the corporation had announced a phase-out of the Oldsmobile lines, Debtor had, instead, illegally terminated the Oldsmobile franchise. Sometime early in 2004, FORREST received news that the Texas Motor Vehicle Commission would at least <u>not dismiss</u> their claim that the Oldsmobile phase-out was really a disguised termination. This ruling lead to a preliminary meeting of Charles Michael Forrest, a Myers and Fuller lawyer, and three representatives from General Motors to discuss damages.

40.     Debtor filed suit in a federal court in Dallas, Texas, in March, 2005, seeking to enforce a term sheet discussed by attorneys as a legal contract with respect to the negotiations for settlement on the termination of the Oldsmobile franchise. The suit was styled Case No. 3-05-CV-0528-K; General Motors Corporation v. Forrest Chevrolet-Oldsmobile-Cadillac, Inc., and Forrest Pontiac-Buick-GMC Truck, Inc.; In the United States District Court for the Northern District of Texas, Dallas Division. Said suit concerned the phase-out of Debtor's Oldsmobile line of vehicles. In said Case No. 3-05-CV-0528-K, a Transition and Release Agreement, two (2) Exclusive Use Agreements, and a Supplemental Settlement Agreement and Release.

41.     In August 2005, two months before the Oldsmobile mediation, we were confronted with a GMAC audit of car deal payoffs, resulting in an immediate payment demand of $1.2 million dollars. (At that time GMAC was wholly owned by Debtor.) This assessment was based on three (3) day payoff requirements by their internal definitions, which I had never heard of, nor have I, to this day, ever seen in writing. Consequently, FORREST has engaged GMAC through legal representation for the past four (4) years. From early January 2006, through in or around July 2008, GMAC imposed five (5) punitive actions that are identified in a client alert sent to FORREST by the Myers and Fuller law firm of Tallahassee, Florida, in November, 2008. Aside from two (2) prior

demands by GMAC that FORREST choose a new floor plan source, a third notice from their operations supervisor in March 2008 advised that FORRESTs' line of credit would be suspended in late May 2008.[4] Thusly, our two (2) General Motors franchises, Forrest Chevrolet-Cadillac Inc., and Forrest Pontiac-Buick-GMC Inc, survived over a year with no ability to order new vehicles from the manufacturer. Predictably, the manufacturer has sent letters outlining violations of our obligation to furnish new product to their customer base.

42.     When employees of GMAC appeared at the Forrest Chevrolet-Cadillac, Inc., they confronted dealership personnel and emphasized their presence in said facility, which caused the departure of four (4) key employees in the first ten (10) days of their presence at said facility

### F.    1995 Meeting With Debtor Chairman

43.     In 1995, Charles Michael Forrest became motivated to develop a platform from which to volunteer his name for election to the National Dealer Council. In the final hours leading up to the election, he received a letter from Debtor notifying him that he was ineligible to serve. (Even though Mr. Forrest had contributed greatly to the value of the Forrest family's franchises over his lifetime, his name had supposedly only been listed in paragraph three (3) of the franchise agreements for only two (2) of the required three years.) Since Debtor had already delivered to him approximately 225 self-addressed envelopes for all the Chevrolet dealers in North Texas, he thought it foolish to let all his observations go to waste and enthusiastically forwarded his platform issues to the dealer body. Mr. Forrest's platform concerns and ideas made their way to all the executives at GM in Detroit. The then Chairman of Chevrolet, and a friend of the Forrest family, Jim Perkins, summoned O.C. Forrest, Jr., and Charles Michael Forrest to appear on the Fourteenth Floor in Detroit to explain Charles Michael

---

[4]    Charles Michael Forrest had previously characterized the behavior of Debtor and GMAC as attempting to force the sale of both franchises. Mr. Forrest was both shocked and enraged that they followed through on their threat.

Forrest's position paper. During the two (2) hour meeting that followed, Mr. Forrest began to enthusiastically explain his position, however, on platform issue number thirteen, it became obvious that Mr. Perkins would not listen to any more issues and concerns. Eventually, Charles Michael Forrest was invited to take a one (1) year leave-of-absence due to perceived anger and animosity. Mr. Forrest refused to do so, however, he humbly offered to apologize at the next regional meeting - for the flavor of his remarks, but not for the content. The offer to apologize was tabled and the meeting abruptly adjourned with no obvious outcome.

G.     **Re-Cap of Debtor's Improper Actions Which Significantly and Negatively Impacted FORREST**

44.     The following actions of Debtor and/or its financial arm (wholly owned until November, 2006, and a 49% owner thereafter), being GMAC, have aided and assisted to place both Forrest Pontiac-Buick-GMC and Forrest Chevrolet-Cadillac in the current position they are in, the bankruptcy proceedings notwithstanding:

A.     Suspension of Forrest Chevrolet-Cadillac, Inc.'s, dealer floor plan agreement by GMAC on May 26, 2008;

B.     Suspension of Forrest Pontiac-Buick-GMC, Inc.'s, dealer floor plan agreement by GMAC on May 26, 2008;

C.     Violations by GMAC of both Forrest Chevrolet-Cadillac, Inc., and Forrest Pontiac-Buick-GMC, Inc., floor plan agreements, from 1990-current 2009, by utilizing the following tactics:

a.     Imposing high-risk interest rates unrelated to agreed interest rate formula;

b.  Imposing unreasonable inventory retirement guidelines when such inventory was originally purchased without repayment restrictions;

c.  Demanding substantial additions to dealer working capital which contradict the original capital formula;

d.  Demand that additional dealership and shareholder assets and accounts be designated as lender collateral; and

e.  Demand that cash collateral accounts be established;

D.  Massive over shipment of new vehicle inventory from July, 2005 to December, 2005, precipitated by GM's willingness to endorse an allocation methodology known as "TURN-and-EARN";

E.  Inducement to build the new Forrest Pontiac-Buick-GMC automobile dealership by refusing multiple requests to relocate and blend Forrest Pontiac-Buick-GMC, Inc,. formally located at 2145 North Main Street, Cleburne, Texas, onto the primary, and more than adequate, historical real estate site of Forrest Chevrolet-Cadillac at 2400 N. Main, Cleburne, Texas;

F.  Discrimination by Debtor in denying FORREST appropriate and sustaining levels of new vehicle inventory in its willingness to endorse an allocation methodology known as "TURN-and-EARN" in the time frame 1994-1999;

G.  Relocation of the Lynn Smith Chevrolet franchise in Burleson, Texas in 1994, effectively altering its allocation methodology toward new vehicle shipments under the definition of metro versus non-metro status and causing preferential treatment toward that dealership that harmed FORREST. Debtor increased the number of vehicles shipped to Lynn Smith Chevrolet which, in turn, provided

customers with a greater variety of new vehicles to choose from, while, at the same time, not providing enough vehicles to FORREST, especially Truck, which were in demand at FORREST due to the rural area that FORREST serves. Even when FORREST requested shipment of additional Truck, or vehicles, Debtor either ignored the requests or only shipped a minimal number of additional Truck and/or vehicles, never enough to meet demand. The result was lost sales for FORREST;

H.    Expansion of the FORREST area of primary sales responsibility into the vicinity of Alvarado, Texas, thereby raising the standard of required sales performance, with no logical explanation, and under protest by Charles Michael Forrest as dealer-operator in the time frame of approximately 1999;

I.    Refusal of Debtor to allow FORREST to consolidate both dealerships by requests made in 1994-1996, 2001-2003, and 2006-2009. Consolidation would have significantly increased profits and lowered expenses as FORREST could offer all lines of vehicles at one location, owned by Forrest Chevrolet-Cadillac, Inc., offer service for all lines of vehicles at one location, and utilize one-half (plus or minus) of its sales staff. Instead, due to Debtor's refusal for consolidation, FORREST incurred many duplicate, and unnecessary, expenses; and

J.    Request for Charles Michael Forrest to take a one (1) year leave-of-absence because Debtor did not like his comments on the manner in which Debtor's business was being operated.

## THIRD-PARTY MATTER AFFECTING THE FORREST

## DEALERSHIPS' PROFITABILITY

45.     Several other factors combined to impact the sales of vehicles by FORREST. During the summer of the year 2000, Charles Michael Forrest received a bizarre phone call from a young man named Jeff England. Mr. England was a former employee, the used car manager, at the Forrest Chevrolet-Cadillac store. The reasoning behind his call was to suggest that he had a great many of his customers who wanted to purchase new vehicles, and that he needed a place to send them. When Mr. Forrest told Mr. England that the Forrest Chevrolet-Cadillac store certainly should be the presumed destination for what he deemed as his customers, Mr. England responded that he would send his customers to the Forrest dealership, and that he wanted the trade-ins in return as compensation. Furthermore, Mr. England said that he could send his customers to any number of new car dealers. Mr. Forrest responded that the game he was playing was blackmail, that it was also illegal, and not to ever mention such a scheme again. Over the next three (3) years, based upon information and belief, Mr. England proceeded to develop a network of new car dealers with which he could execute his brokering activities and constantly recruited our employees. Having seen and heard about many instances of vehicles that he brokered into the FORREST area of sales responsibility, and suffering both the obvious loss of key employees and the avoidance of candidates for employment, due to interference by Mr. England, George Bray, a private investigator in the Forth Worth area, was hired to set-up a sting operation on Mr. England's business. Shortly thereafter, Mr. Bray successfully recorded on both audio and video two new vehicle purchases/deliveries on Mr. England's used car lot:: one being from Lynn Smith Chevrolet in Burleson, Texas, and one from Durant Chevrolet in Granbury, Texas. Mr. England's employees also affixed Jeff England Motor Company emblems to the new vehicles as they were being delivered. With considerable unsolicited feedback from FORREST customers, employees,

Forrest family's own observations, and Mr. Bray's assistance, a dozen examples of brokered purchases were documented.

## DEBTOR DID NOT EXERCISE SOUND BUSINESS JUDGMENT

46.    It is clear that debtor's action in seeking to reject an executory contract is not allowed *carte blanche*, but, must be exercised by a debtor's sound business judgment.[5] See *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984)    However, the Supreme Court did not provide guidance for the parameters of the sound business judgment rule. In *In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665 (9th Cir. 2007), the court stated, concerning the contours of the business judgment rule that: "in evaluating the rejection decision, the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *In re Pomona Valley Medical Group, Inc.*, 476 F.3d at 670, citing *Navellier v. Sletten*, 262 F.3d 923, 946 n. 12 (9th Cir. 2001); *FDIC v. Castetter*, 184 F.3d 1040, 1043 (9th Cir.1999); and *In re Chi-Feng Huang*, 23 B.R. 798, 801 (9th Cir. BAP 1982) ("The primary issue is whether rejection would benefit the general unsecured creditors."). The court further stated that "[i]t should approve the rejection of an executory contract under § 365(a) unless it finds that the debtor-in-possession's conclusion that rejection would be 'advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.' *Id.*, quoting *Lubrizol Enter. v. Richmond Metal Finishers* 756 F.2d 1043, 1047 (4th Cir.1985) The court went on to state that "[t]here may be cases where the disproportionate damage to the party whose contract is to be rejected demonstrates that the debtor-in-possession's decision could not be based on sound business judgment. *Id.*, at 671, citing *In re Chi-Feng Huang*, 23 B.R. at 801. The court further, stated that "[s]uch

_____

[5] "[I]n bankruptcy proceedings, the trustee, and ultimately the court, must exercise their discretion fairly in the interest of all who have had the misfortune of dealing with the debtor." *Control Data Corporation v. Zelman*, 602 F.2d 38, 43 (2nd Cir, 1979)

determinations, clearly, involve questions of fact.." *In re Pomona Valley Medical Group, Inc.*, 476 F.3d at

670 <u>citing</u> *Richmond Leasing Co. v. Capital Bank,* 762 F.2d 1303, 1307-08 (5th Cir. 1985); *Lubrizol,* 756

F.2d at 1047.    As stated by another court, "The issue before this Court "is whether the decision of the

debtor that rejection will be advantageous is so manifestly unreasonable that it could not be based on

sound business judgment, but only on bad faith, or whim or caprice.  That issue is one of fact to be

decided as such by the bankruptcy court by the normal processes of fact adjudication." *Lubrizol,* 756

F.2d at 1047, <u>citing</u> *In re Minges,* 602 F.2d 38, 43 (2d Cir.1979) <u>see generally</u> 1 Collier on Bankruptcy p

3.03(8)(b) (L. King 15th ed. 1984).

       47.     Based upon the facts presented above, it is clear that Debtor acted, not upon

sound business judgment, but, rather, that debtor acted upon bad faith, whim, or caprice.  Such is clear,

especially in light of the actions and inactions directed against FORREST by debtor for the past decade,

or more, including asking Charles Michael Forrest to take a one (1) year leave-of-absence when he dared

to question the business practices of Debtor.  Simply stated, Debtor undertook a systematic course of

action which caused higher expenses and lower profits for both FORREST dealerships, as well as fewer

vehicles to be delivered to the dealerships, while, at the same time, delivering extra vehicles to a

competitor in close proximity to the FORREST dealerships.

       48.     In addition, Debtor has improperly calculated the Dealer Performance Score it

utilized in its decision to terminate the two FORREST dealerships in the following respects:

    A.     Grouped both the Forrest Chevrolet-Cadillac franchised dealership and the Forrest

           Pontiac-Buick-GMC Truck franchised dealership in making the calculations when a

           separate calculation should have been performed for each distinct dealership, especially

           since they are located at separate facilities; and

B.    Utilized a significantly reduced number for working capital for years 2006, 2007, and

2008 for both FORREST dealerships.

49.    Therefore, is appears that Debtor manipulated the calculations in order to justify

a termination of both FORREST franchised dealerships.  Such is especially clear when Debtor has

refused, despite an order from ths Court, to produce to FORREST the back-up documentation

regarding the Customer Satisfaction Index, as well as the formula utilized in determining the various

components of the Dealer Performance Score.  Such actions are truly acts of bad faith, whim, or

caprice.  Debtor was looking for a way to terminate the FORREST franchises because it knew that it

could not have done so under the dealer franchise laws of the State of Texas.  Instead, Debtor is seeking

to hide its transgressions against the FORREST dealerships by claiming it made a sound business

judgment.  Such action is clearly a showing of bad faith, whim, or caprice.

## CONCLUSION

50.    Based upon the above, the Court should DENY the requested rejection and

termination of the franchise agreements of both FORREST CHEVROLET-CADILLAC, INC., and

FORREST PONTIAC-BUICK-GMC TRUCK, INC., and order that the franchise agreements be

transferred to New GM.

**WHEREFORE,** FORREST CHEVROLET-CADILLAC, INC., and FORREST PONTIAC-

BUICK-GMC TRUCK, INC., respectfully requests that the Court sustain their Limited Objection and

for such other and further relief as they may show themselves to be entitled.

Respectfully submitted,

JEFFREY S. DAVIS
Attorney at Law
1422 Berry Drive
Cleburne, Texas 76033
817/602-7999
FAX # 817/423-7348

JEFFREY S. DAVIS
Texas Bar No. 00787334
Attorney for Forrest Chevrolet-Cadillac, Inc., and
Forrest Pontiac-Buick-GMC Truck, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the ___th day of October, 2009, a true and correct copy of the foregoing
was served on all those parties receiving notice via the Court's Electronic Case Filing System (through
ECF) and the parties below via U. S. Mail First Class, postage prepaid on the following parties:

Harvey Miller
Stephen Karotkin
Joseph H. Smolinsky
Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Debtors
c/o General Motors Corporation
Attn: Lawrence S. Buonomo
300 Renaissance Center
Detroit, Michigan 48265

James L. Bromley
Cleary, Gottlieb, Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

Michael J. Edelman
Michael L. Schein
Vedder Price, P.C.
1633 Broadway 47th FL
New York, NY 10019

John J. Rapisardi
Cadwalader Wickersham & Taft LLP
One World Financial Center
New York, NY 10281

Babette Ceccotti
Cohen Weiss and Simon LLP
330 W. 42nd Street
New York, NY 10036

Diana G. Adams
Office of U. S. Trustee
33 Whitehall Street, 21st Fl.
New York, NY 10004

David S. Jones
Matthew L. Schwartz
U. S. Attorney's Office
86 Chambers Street, 3rd Fl.
New York, NY 10007

Matthew Feldman
United States Department of the Treasury
1500 Pennsylvania Avenue NW
Room 2312
Washington, D.C. 20220

Kenneth H. Eckstein
Thomas Moers Mayer
Adam C. Rogoff
Gordon Z. Novod
Kramer, Levin, Naftalis & Frankel, L.L.P.
1177 Avenue of the Americas
New York, NY 10036

Daniel W. Sherrick
UAW
8000 East Jefferson Avenue
Detroit, Michigan 48214

JEFFREY S. DAVIS