Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                        :
In re                                   :    Chapter 11 Case No.
                                        :
MOTORS LIQUIDATION COMPANY, et al.,     :    09-50026 (REG)
    f/k/a General Motors Corp., et al.  :
                                        :
                      Debtors.          :    (Jointly Administered)
                                        :
-------------------------------------------------------------x
```

## NOTICE OF HEARING ON DEBTORS' MOTION
## PURSUANT TO SECTIONS 363(b) AND 105 OF THE
## BANKRUPTCY CODE AND BANKRUPTCY RULE 9010(a) FOR
## APPROVAL OF SETTLEMENT AGREEMENT WITH CERTAIN LABOR UNIONS

PLEASE TAKE NOTICE that upon the annexed Motion, dated October 14, 2009

(the "**Motion**"), of Motors Liquidation Company (f/k/a General Motors Corporation) and its

affiliated debtors, as debtors (the "**Debtors**"), for an order, pursuant to sections 363(b) and 105

of title 11, United States Code and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure,

approving that certain Settlement Agreement Between and Among GMCo/MLC-IUE-CWA and

USW Regarding Retiree Health Care, Life Insurance, Pension Top-Up, and Modification and

GMCO Assumption of MLC-IUE-CWA CBA, a copy of which is annexed to the Motion as

Exhibit A (the "**Settlement Agreement**"), and authorizing the Debtors to perform all of their

obligations thereunder, all as more fully set forth in the Motion, a hearing will be held before the

Honorable Robert E. Gerber, United States Bankruptcy Judge, in Room 621 of the United States

Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New

York 10004, on **November 12**, **2009 at 2:00 p.m. (Eastern Time),** or as soon thereafter as

counsel may be heard.

                PLEASE TAKE FURTHER NOTICE that any responses or objections to the

Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the

Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a)

electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with a hard copy delivered

directly to Chambers), in accordance with General Order M-182 (which can be found at

www.nysb.uscourts.gov), and served in accordance with General Order M-242, and on (i) Weil,

Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York

10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.);

(ii) the Debtors, c/o Motors Liquidation Company, 300 Renaissance Center, Detroit, Michigan

48265 (Attn: Ted Stenger); (iii) General Motors Company, 300 Renaissance Center, Detroit,

Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham & Taft

LLP, attorneys for the United States Department of the Treasury, One World Financial Center,

New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United States Department of

the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn:

Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export Development Canada, 1633

Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and

Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory

committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036

(Attn: Thomas Moers Mayer, Esq., Amy Caton, Esq., Adam C. Rogoff, Esq., and Gregory G.

Plotko, Esq.); (viii) the Office of the United States Trustee for the Southern District of New

York, 33 Whitehall Street, 21st Floor, New York, New York 10004, (Attn: Diana G. Adams,

Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York,

New York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz, Esq.); (x) the United

Steelworkers c/o David R. Jury, Associate General Counsel, Five Gateway Center, Room 807,

Pittsburgh, Pennsylvania 15222; and (xi) Kennedy, Jennick & Murray, P.C., attorneys for the

IUE-CWA, 113 University Place, 7th Floor, New York, New York 10003 (Attn: Thomas M.

Kennedy), so as to be received no later than **November 6, 2009, at 4:00 p.m. (Eastern Time)**

(the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if no objections are timely filed and

served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to

the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Motion, which order may be entered with no further notice or opportunity to be heard offered to

any party.

Dated: New York, New York
        October 14, 2009

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**HEARING DATE AND TIME: November 12, 2009 at 2:00 p.m. (Eastern Time)**
**OBJECTION DEADLINE: November 6, 2009 at 4:00 p.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                      :
In re                                 :      Chapter 11 Case No.
                                      :
MOTORS LIQUIDATION COMPANY, et al.,   :      09-50026 (REG)
      f/k/a General Motors Corp., et al.  :
                                      :
                 Debtors.             :      (Jointly Administered)
                                      :
------------------------------------------------------------x
```

### DEBTORS' MOTION PURSUANT TO SECTIONS 363(b) AND 105 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019(a) FOR APPROVAL OF SETTLEMENT AGREEMENT WITH CERTAIN LABOR UNIONS

## Table of Contents

Page

Relief Requested ................................................................................................................. 1

Jurisdiction ......................................................................................................................... 1

Background .......................................................................................................................... 1

The Settlement Negotiations............................................................................................... 2

The Settlement Agreement ................................................................................................. 3

The Settlement Agreement Meets the Legal Standard  Established Under Rule 9019 and
    is in the Bests Interests of MLC's Estate .................................................................7

The Settlement Agreement Should be Approved Under Sections 363(b) and 105(a) of the
    Bankruptcy Code ............................................................................................... 10

Notice ................................................................................................................................ 12

i

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992)....................................................10

*In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009), *aff'd Ind. State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108 (2d Cir. 2009).............................10

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983) ....................................................................................................................10

*In re Dow Corning*, 198 B.R. 214 (Bankr. E.D. Mich. 1996) ........................................8

*Sec. Exch. Comm'n v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285 (2d Cir. 1992) ....................................................7

*In re Gen. Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009)..................................10

*Air Line Pilots Assoc. Int'l v. Am. Nat'l Bank & Trust Co. of Chicago (In re Ionosphere, Inc.)*, 156 B.R. 414 (S.D.N.Y. 1993) ..................................................................7

*Mach. Terminals, Inc. v. Woodward (In re Albert-Harris, Inc.)*, 313 F.2d 447 (6th Cir. 1963) ......................................................................................................................8

*Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1990)............................................................................11

*In re Pilgrim's Pride Corp.*, 401 B.R. 229 (Bankr. N.D. Tex. 2009) ...........................11

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968)............................................................................................................7

*In re Purofied Down Prods. Corp.*, 150 B.R. 519 (S.D.N.Y. 1993)..........................7-8

*Official Comm. of Unsecured Creditors of Tower Auto. v. Tower Auto., Inc. (In re Tower Auto., Inc.)*, 241 F.R.D. 162 (S.D.N.Y. 2006) ........................................................9

*Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499 (Bankr. S.D.N.Y. 1991) ...........................................................7

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL STATUTES AND FEDERAL RULES

11 U.S.C. § 105 ................................................................................................................... 1

11 U.S.C. § 105(a) .................................................................................................... 10 & n.4, 12

11 U.S.C. § 363 ................................................................................................................... 10

11 U.S.C. § 363(b) ............................................................................................................... 1, 10

11 U.S.C. § 363(b)(1) ........................................................................................................... 10

11 U.S.C. § 1107(a) ................................................................................................................ 1

11 U.S.C. § 1108 ..................................................................................................................... 1

11 U.S.C. § 1113 ..................................................................................................................... 4

11 U.S.C. § 1114 ............................................................................................... 2, 3 n.1, 4, 8, 9

28 U.S.C. § 157 ...................................................................................................................... 1

28 U.S.C. § 157(b) ................................................................................................................. 1

28 U.S.C. § 1334 .................................................................................................................... 1

Fed. R. Bankr. P. 9019 .......................................................................................................... 7

Fed. R. Bankr. P. 9019(a) ................................................................................................ 1, 7, 11

## TREATISES

10 *Collier on Bankruptcy* ¶ 9019.02 (15th ed. rev. 2009) ................................................... 7

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company, (formerly, General Motors Corporation (**"MLC"**))

and its affiliated debtors, as debtors and debtors in possession in the above-captioned chapter 11

cases (collectively, the **"Debtors"**), respectfully represent:

### Relief Requested

1.      By this Motion, the Debtors request, pursuant to sections 105 and 363(b)

of chapter 11 of title 11 of the United States Code (the **"Bankruptcy Code"**) and Rule 9019(a)

of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), approval of that

certain Settlement Agreement Between and Among GMCo/MLC-IUE-CWA and USW

Regarding Retiree Health Care, Life Insurance, Pension Top-Up, and Modification and GMCO

Assumption of MLC-IUE-CWA CBA, a copy of which is annexed hereto as Exhibit A (the

**"Settlement Agreement"**).

### Jurisdiction

2.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Background

3.      On June 1, 2009, the Debtors each commenced with this Court a case

under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

4.      Prior to the commencement of the Debtors' cases under chapter 11 of the

Bankruptcy Code, MLC agreed to provide certain retiree medical and life insurance benefits (the

**"Retiree Benefit Obligations"**) in various collectively bargained agreements with The

International Union of Electrical Workers, the Industrial Division of the Communications

Workers of America, AFL-CIO, CLC (the **"IUE-CWA"**) and the United Steel, Paper and

Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International

Union, AFL-CIO, CLC (the **"USW"**).  The IUE-CWA and the USW are hereinafter referred to

collectively as the **"Unions."**

      5.      By Order dated July 5, 2009 (the **"Sale Order"**), the Court approved the

sale (the **"363 Transaction"**) of substantially all of the Debtors' assets to a United States

Treasury sponsored entity now named General Motors Company (**"GMCo"**).

      6.      The Unions objected to the 363 Transaction on several bases.  Such

objections, however, were overruled by the Court.  Thereafter, the IUE-CWA filed a Notice of

Appeal of the Sale Order (the **"Appeal"**) which currently is pending in the United States District

Court for the Southern District of New York.

      7.      Pursuant to the provisions of section 1114 of the Bankruptcy Code, MLC

is continuing to pay the Retiree Benefit Obligations, subject to its rights to modify or terminate

such obligations in accordance with the provisions and procedures set forth in section 1114.  The

monthly payments attributable to the Retiree Benefit Obligations aggregate approximately $23

million.  In connection with the payment of such benefits, MLC also has reserved all of its rights

under the settlement agreement in the class action entitled *IUE-CWA et. al. v. General Motors

Corp.*, No. 2.06-CV-12151 (E.D. Mich) (the **"Combs Settlement"**), including its position that

the Retiree Benefit Obligations are vested only through September 14, 2011, and thereafter could

be terminated unilaterally by MLC, without regard to the provisions of section 1114 of the

Bankruptcy Code.

### The Settlement Negotiations

      8.      Subsequent to the entry of the Sale Order, MLC, GMCo and the Unions,

serving as the authorized representatives for purposes of section 1114 of the Bankruptcy Code of

those persons receiving retiree benefits pursuant to collective bargaining agreements between

MLC and each of the Unions, entered into negotiations with respect to the continued payment of

Retiree Benefit Obligations, the Appeal and any claims which could be asserted in the Debtors'

chapter 11 cases with respect to the Retiree Benefit Obligations.  These negotiations were

protracted and in good faith and, after due consideration of the factual and legal arguments

regarding the various issues involved, as well as the costs, risks, and delay associated with

litigating these issues, the parties have agreed to resolve all claims with respect to the foregoing

matters on the terms set forth in the Settlement Agreement.

### The Settlement Agreement

9.    The essence of the Settlement Agreement is as follows:  MLC and GMCo

have agreed to provide certain ongoing medical benefits at a reduced level to those IUE-CWA

and USW retirees and surviving spouses who are not eligible for Medicare benefits.  They also

have agreed to provide certain life insurance benefits to IUE-CWA and USW retirees (regardless

of Medicare eligibility), at a reduced level.  With respect to those retirees who are eligible for

Medicare, MLC is granting the IUE-CWA, the USW and any additional listed union that agrees

to the applicable terms of and agrees to participate in the Settlement Agreement,[1] an allowed

prepetition, general unsecured claim in MLC's chapter 11 case in an amount equal such union's

respective **"Percentage Share"** of the aggregate amount of one billion dollars (the **"Allowed**

---

[1] The additional listed unions (collectively, the "**Splinter Unions**," and those who agree to participate in the Settlement Agreement, the "**Participating Splinter Unions**") that are being offered the opportunity to agree to the terms of and participate in the settlement are International Association of Machinists and Aerospace Workers; International Brotherhood of Electrical Workers; Michigan Regional Council of Carpenters, Local 687 and Interior Systems, Local 1045; International Brotherhood of Painters and Allied Trades of the United States and Canada, Sign & Display Union Local 59; International Brotherhood of Teamsters; The International Brotherhood of Boilermakers; United Catering Restaurant Bar & Hotel Workers; International Union of Operating Engineers; and with respect to any of the aforementioned union retirees where the union has failed or refused to accept appointment as the authorized representative pursuant to 11 USC § 1114, any committee appointed by the Bankruptcy Court as the authorized representative of such union retirees.

US_ACTIVE:\43161453\10\43161453_10.DOC\.

Claim"). The Allowed Claim is in full settlement, satisfaction and discharge of all claims that

the Union's (and Participating Splinter Unions), as authorized section 1114 and 1113

representatives, have or may have against the Debtors and their affiliates arising out of collective

bargaining agreements relating to retiree healthcare benefits, life insurance benefits and all other

benefits and claims. The Settlement Agreement also provides for the withdrawal of the Appeal.

For purposes of the Settlement Agreement, the **"Percentage Share"** of each of the Unions and

the Splinter Unions is set forth on Exhibit B annexed hereto.[2]

> 10.    The Settlement Agreement contains a number of other material provisions.

For example, GMCo is agreeing to provide additional pension benefits to certain IUE-CWA and

USW retirees whose pensions were affected by the termination of the Delphi hourly pension

plans. GMCo is also agreeing to assume the last remaining unexpired IUE-CWA collective

bargaining agreement with MLC (the **"Moraine Closure Agreement"**), subject to certain

modifications. The salient terms of the Settlement Agreement are as follows:[3]

| **Pension Top-Up** | In the event that pension benefits received by a retired **"Covered Employee"** (as such term is defined in the Settlement Agreement) from the Pension Benefit Guaranty Corporation (**"PBGC"**), or a combination of the PBGC, Delphi or another entity, as a consequence of termination of the Delphi Hourly Retirement Plan (**"Delphi HRP"**), referred to herein as **"Insured Pension Payments,"** are less than what otherwise would have been received by the retired Covered Employee from the Delphi HRP according to plan terms as of July 22, 2009, GMCo will provide supplemental payments to such retired Covered Employee so that when combined with the Insured Pension Payments, such retired Covered Employee will receive pension benefits equal to what otherwise would have been paid by the Delphi HRP according to plan terms. |
|---|---|

---

[2] The Percentage Share was calculated based upon the approximate number of retirees and surviving spouses in each of the unions set forth on Exhibit B who will be over age 65 as of January 1, 2010.

[3] The table below is intended as a summary and is qualified in its entirety by the terms of the executed Settlement Agreement.

4

| | |
|---|---|
| **Up-To-7 Years Accrual** | GMCo agrees to amend the GMCo General Motors Hourly-Rate Employees Pension Plan (**"GMCo HRP"**) to provide that Covered Employees, who were Delphi employees as of November 30, 2008, the date that Delphi froze the Delphi HRP (the **"Freeze Date"**), or Covered Employees who were employed as of the Freeze Date at a Delphi operation divested after October 8, 2005 and prior to the Freeze Date (**"Delphi Divested Operation"**) will be eligible to accrue credited service under the GMCo HRP for all purposes, including but not limited to eligibility, vesting, and future benefit accruals for the seven (7) year period commencing on the Freeze Date. |
| **Retiree Health Care Benefits - On and After July 10, 2009 and Through December 31, 2009** | For claims incurred on and after July 10, 2009 and through December 31, 2009, retiree health care for eligible IUE-CWA or USW retirees will be provided in accordance with the terms of the MLC Health Care Program for Hourly Employees (the **"MLC Plan"**) as applicable to retiree members of the Covered Group as it existed on July 10, 2009.  Up to $100 million of this coverage will be paid for by MLC (with the balance payable by GMCo) and was taken into account in formulating and sizing the $1,175,000,000 Amended and Restated Secured Superpriority Debtor in Possession Credit Agreement approved by Order of the Court dated July 5, 2009 (the **"Amended DIP Facility"**).  As of January 1, 2010, all obligations by either GMCo or MLC to provide retiree health care in accordance with the GM Hourly Plan shall cease and be forever terminated. |
| **Retiree Health Care Benefits - On and After January 1, 2010** | For claims incurred on or after January 1, 2010, GMCo will provide retiree health care to eligible IUE-CWA or USW retirees in accordance with the terms contained in the Settlement Agreement and MLC shall have no liability or responsibility therefor. |
| **Reservation Of Rights With Respect To Unilateral Termination Of Retiree Health Benefits** | With respect to contributions toward health care and life insurance in retirement pursuant to collective bargaining agreements between MLC and the IUE-CWA or the USW, MLC maintains that it had reserved the right to unilaterally amend, modify or terminate the respective plans or the benefits provided by those plans.  The IUE-CWA and the USW maintain, however, that MLC did not effectively reserve such rights and that it was prohibited from unilaterally altering health care or life insurance for retirees.  For purposes of the Settlement Agreement, the parties agree that GMCo's right to amend, modify or terminate the retiree health care or life insurance benefits set forth therein shall be to the same extent as existed under the applicable collective bargaining agreements between MLC and the IUE-CWA or the USW, respectively. |
| **Waiver Of Right To Seek Future Modification To Health Care Benefits** | The IUE-CWA, USW, and Participating Splinter Unions and all retirees/members within the scope of the Settlement Agreement will not in the future seek to negotiate any modifications or changes to the health care benefits to be provided by GMCo. |

US_ACTIVE:\43161453\10\43161453_10.DOC\.

| **Termination of Health Care in Retirement** | All obligations of MLC, the MLC Plan and any other MLC entity or benefit plan for health care in retirement for members of the Covered Group (as defined in the Settlement Agreement) or any other person claiming entitlement to health care in retirement pursuant to an IUE-CWA or USW collective bargaining agreement other than as set forth in the Settlement Agreement shall be forever terminated. |
|---|---|
| **Basic Life Insurance** | GMCo will provide Basic Life Insurance in retirement to eligible IUE-CWA and USW retirees in the maximum fixed amount of $10,000 as provided for in the Moraine Closure Agreement and as modified according to Attachment B to the Settlement Agreement.  MLC shall have no responsibility for such life insurance.  All obligations of MLC, the MLC Plan and any other MLC entity or benefit plan for basic life insurance for the included members/retirees arising from any GM-IUE-CWA or GM-USW collective bargaining agreement shall be forever terminated. |
| **Assumption of the Moraine Closure Agreement** | GMCo will assume the terms and conditions of the Moraine Closure Agreement, but only as modified as set forth on Attachment C to the Settlement Agreement. |
| **Claim in MLC's Chapter 11 Case** | The IUE-CWA, USW and all Participating Splinter Unions shall be granted an allowed prepetition general unsecured claim in MLC's chapter 11 case equal to such union's respective **Percentage Share** of the aggregate amount of one billion dollars with respect to retiree health and life insurance benefits for the post-age-65 retirees, post-age-65 surviving spouses and under-age-65 retirees or surviving spouses disqualified for Retiree Health Care Benefits due to Medicare eligibility who are represented by the IUE-CWA, USW and the Participating Splinter Unions (the **"Allowed Claim"**).  The Allowed Claim shall be in full settlement, satisfaction and discharge of all claims against MLC and its affiliates, and their present and former officers and directors by the IUE-CWA, USW and the Participating Splinter Unions or any employees, retirees or other persons or beneficiaries represented by or subject to agreements entered by such unions with MLC. |
| **Waiver And Release** | With the exception of the Allowed Claim, the IUE-CWA and USW, as authorized Bankruptcy Code section 1114 and 1113 representatives, will withdraw with prejudice all claims filed or otherwise made against GMCo or MLC and their subsidiaries, and their employees, officers, directors and agents, relating to retiree health care benefits and basic life insurance and pursuant to any GM-IUE-CWA and GM-USW collective bargaining agreements or otherwise, and agree not to bring any such claims in the future; and on their own behalf and on behalf of all represented members/retirees, release and forever discharge MLC, and its current or former officers, directors, employees, agents, subsidiaries, affiliates and any and all of its welfare and pension benefit plans and their fiduciaries, with respect to any and all rights, claims or causes of action that any of them have or hereafter may have arising out of their employment with MLC. |
| **Appeal of Sale Order** | The IUE-CWA shall withdraw the Appeal. |

US_ACTIVE:\43161453\10\43161453_10.DOC\.

### The Settlement Agreement Meets the Legal Standard
### Established Under Rule 9019 and is in the Bests Interests of MLC's Estate

11.     The Debtors submit that the proposed Settlement Agreement is in the best interests of MLC and its estate and creditors, and should be approved under Bankruptcy Rule 9019.  Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  This Rule empowers Bankruptcy Courts to approve settlements "if they are in the best interests of the estate." *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  A decision to accept or reject a compromise or settlement is within the sound discretion of the Court.  *Id.; see also* 10 *Collier on Bankruptcy* ¶ 9019.02 (15th ed. rev. 2009).  The settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness." *Drexel Burnham Lambert Group*, 134 B.R. at 505 (citing *In re W.T. Grant & Co.,* 699 F.2d 599, 608 (2d Cir. 1983)).

12.     Relying on the guiding language of *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968), Courts in this Circuit have set forth the following factors regarding the reasonableness of settlements:

(1)  the probability of success in the litigation;

(2)  the difficulties associated with collection;

(3)  the complexity of the litigation, and the attendant expense, inconvenience, and delay; and

(4)  the paramount interests of the creditors.

*Sec. Exch. Comm'n v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 292 (2d Cir. 1992); *Air Line Pilots Assoc. Int'l v. Am. Nat'l Bank & Trust Co. of Chicago (In re Ionosphere, Inc.)*, 156 B.R. 414 (S.D.N.Y. 1993); *In re Purofied*

7

*Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993).  As stated, the decision to approve a

particular settlement lies within the sound discretion of the Bankruptcy Court.  *Mach. Terminals,*

*Inc. v. Woodward (In re Albert-Harris, Inc.)*, 313 F.2d 447 (6th Cir. 1963).  It is the

responsibility of the Court to examine a settlement and determine whether it "falls below the

lowest point in the range of reasonableness."  *In re Dow Corning*, 198 B.R. 214, 222 (Bankr.

E.D. Mich. 1996).

        13.     Based on these factors, the Settlement Agreement should be approved for

several reasons.  As stated, the Settlement Agreement is the product of arm's length and

protracted negotiations among the Debtors, GMCo and the Unions and completely resolves

substantial claims that could be asserted against the Debtors' estates.  The Unions have asserted

that their aggregate claim for Retiree Benefit Obligations exceeds $3.7 billion.  Although the

Debtors believe that they have various defenses and that the claim is substantially less than the

amount asserted by the Unions, this is a highly disputed matter and the outcome of an

adjudication of any dispute as to the vested status of the benefits is not certain.  Pursuant to the

Settlement Agreement, the claim has been liquidated as a prepetition, general unsecured claim in

the amount of $1 billion, thereby avoiding the uncertainty as to the ultimate amount of the claim

that would be allowed as well as the time and expense that would be involved in litigating the

issues necessary to make such a determination.

        14.     Further, the Settlement Agreement avoids litigation under section 1114 of

the Bankruptcy Code with respect to the termination or modification of the Retiree Benefit

Obligations.  Although the Debtors believe they would prevail in such litigation and be

successful in terminating any ongoing obligation to pay Retiree Benefit Obligations, litigation

always is uncertain, costly and time consuming.  The Settlement Agreement resolves all of these

issues and completely eliminates any responsibility of the Debtors to pay Retiree Benefit

8

Obligations after January 1, 2010 with respect to the retirees (and their spouses and dependents) represented by the Unions. Although, MLC has agreed to pay Retiree Benefit Obligations to such retirees prior such date in an amount not to exceed $100 million, it nevertheless would have the obligation to do so prior to a determination of the issues under section 1114 and, more importantly, as indicated, the payment of the Retiree Benefit Obligations by MLC up to the amount of $100 million is contemplated by the funding provided in the Amended DIP Facility.

15.    The Settlement Agreement also resolves all other issues relating to the covered retirees' employment relationship with MLC, providing for full releases of all claims related thereto, thereby facilitating the orderly and expeditious administration of these chapter 11 cases and resolving a major liability that could have significantly delayed the plan process. Further, as stated, the Settlement Agreement resolves the objection of the Unions to the 363 Transaction and the Sale Order, and provides for the withdrawal of the Appeal.

16.    It also should be noted that the Settlement Agreement provides for the continuation of medical and life insurance benefits to the eligible IUE-CWA and USW retirees without any interruption. Although the benefits will be at reduced levels, in the absence of the Settlement Agreement those benefits likely would have been terminated in their entirety. As indicated, those benefits will be paid by MLC (up to the amount of $100 million) for the period through December 31, 2009, and thereafter exclusively by GMCo. This Court is permitted to take into account the circumstances of the retirees and the consideration provided to them under the Settlement Agreement in assessing whether to approve the Settlement Agreement. *See Official Comm. of Unsecured Creditors of Tower Auto. v. Tower Auto., Inc. (In re Tower Auto., Inc.)*, 241 F.R.D. 162, 170 (S.D.N.Y. 2006) (court approved Rule 9019 settlement involving retirement benefits because, *inter alia*, it "afford[ed] significant protection for the rights that Congress required be preserved for retirees."). Further, the Settlement Agreement provides

9

additional pension benefits to certain IUE-CWA and USW retirees who were scheduled to lose

such benefits in connection with the termination of the Delphi hourly pension plans.  Many of

Delphi's retirees had been participants in MLC's pension plans before MLC spun off Delphi into

a separate company.  Such benefits will not be the responsibility of MLC.

**The Settlement Agreement Should be Approved
Under Sections 363(b) and 105(a) of the Bankruptcy Code**

17.    Ample authority also exists for approval of the Settlement Agreement

under sections 363 and 105(a)[4] of the Bankruptcy Code.  Section 363 provides, in relevant part,

"[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 of the

Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court

to authorize the sale, disposition or other use of a debtor's assets, Courts in the Second Circuit

and others, in applying this section, have required that it be based upon the sound business

judgment of the debtor.  *See Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v.

LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge

reviewing a section 363(b) application must find from the evidence presented a good business

reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel

Corp.)*, 722 F.2d 1063 (2d Cir. 1983) (same); *In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y.

2009), *aff'd Ind. State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108

(2d Cir. 2009) (same); *In re Gen. Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (same).

18.    Moreover, applicable principles of law attach to a debtor's business

decision a strong presumption that it "acted on an informed basis, in good faith and in the honest

---

[4] Section 105 of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or
judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

US_ACTIVE:\43161453\10\43161453_10.DOC\.

belief that the action taken was in the best interests of the company." *Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11); *see also In re Pilgrim's Pride Corp.*, 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009) ("[I]f a valid business reason is shown for the transaction, the transaction is presumed appropriate."). The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Integrated Res., Inc.*, 147 B.R. at 656 (citations omitted). Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence. *Id.*

19.    For the reasons set forth above, MLC's decision to enter into the Settlement Agreement is in the best interests of MLC's estate and reflects the sound business judgment of the debtor. As stated, MLC is settling a potential $3.7 billion claim for an allowed, prepetition general unsecured claim in the amount of $1 billion, and is resolving all matters relating to the employment relationship of the covered retirees, including receiving complete releases. Furthermore, by entering into the Settlement Agreement, MLC is avoiding the costs and distractions of potentially protracted litigation, and also is avoiding having to continue to pay the Retiree Benefit Obligations until such litigation is concluded. In addition, pursuant to the Settlement Agreement, the IUE-CWA will withdraw the Appeal with respect to this Court's approval of the 363 Transaction, thereby avoiding the additional time and expense associated therewith.

20.    Lastly, the Debtors have been advised by the attorneys for the Unsecured Creditors' Committee that the Committee supports the relief requested herein.

11

21.     Accordingly, the Debtors submit that the Settlement Agreement should be approved under Bankruptcy Rule 9019(a), as a valid exercise of the Debtors' reasonable business judgment and as being in the best interest of the Debtors' estates and all parties in interest.

## Notice

22.     Notice of this Motion has been provided to the Unions, the Splinter Unions, GMCo, known retirees and surviving spouses covered by the Settlement Agreement, and parties in interest in accordance with the Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated August 3, 2009 [Docket No. 3629].  The Debtors submit that such notice is sufficient and no other or further notice need be provided.

23.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated:  New York, New York
         October 14, 2009

                        /s/ Stephen Karotkin
                        Harvey R. Miller
                        Stephen Karotkin
                        Joseph H. Smolinsky

                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York 10153
                        Telephone: (212) 310-8000
                        Facsimile: (212) 310-8007

                        Attorneys for Debtors
                        and Debtors in Possession

**EXHIBIT A**

**THE SETTLEMENT AGREEMENT**

## SETTLEMENT AGREEMENT BETWEEN AND AMONG
## GMCo/MLC-IUE-CWA AND USW
## REGARDING RETIREE HEALTH CARE, LIFE INSURANCE,
## PENSION TOP-UP, AND MODIFICATION
## AND GMCO ASSUMPTION OF MLC-IUE-CWA CBA

This Settlement Agreement (together with the Exhibits hereto, the "Settlement Agreement"), is between General Motors Company ("GMCo"), Motors Liquidation Company ("MLC" formerly known as General Motors Corporation), the IUE-CWA, the Industrial Division of the Communications Workers of America, AFL-CIO,CLC ("IUE-CWA") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO,CLC ("USW"). The IUE-CWA and USW also enter into this Settlement Agreement as the authorized representative, as defined in Section 1114(c)(1) of Title 11 of the United States Code (the "Bankruptcy Code"), of those persons receiving retiree benefits, as defined in Section 1114(a) of the Bankruptcy Code, pursuant to collectively bargained plans, programs and/or agreements between MLC and the IUE-CWA or the USW (or an IUE-CWA or USW predecessor) and who are members of the Covered Group, as defined herein. Collectively, the IUE-CWA, the USW, GMCo, MLC and the Covered Group are referred to as the "Parties."

MLC agreed to provide certain retiree medical benefits in various collectively bargained agreements with the IUE-CWA and the USW. MLC, the IUE-CWA and the Class entered into a settlement agreement in the class action of *IUE-CWA, et al. v. General Motors Corp.*, No. 2:06-cv-12151 (E.D. Mich) ("Combs"). Subsequent to entering those collective bargaining agreements and the class settlement agreement (the "Combs Settlement"), MLC commenced a case under Chapter 11 of the Bankruptcy Code entitled *In Re General Motors Corp., et al.,* No. 09-050026 (REG) ("MLC Chapter 11 Case") in the U.S. Bankruptcy Court (S.D. N.Y.) (the "Bankruptcy Court"). Pursuant to an Order of the Bankruptcy Court, GMCo purchased substantially all of the assets of MLC.

The IUE-CWA and the USW assert, and GMCo and MLC deny, that GMCo and/or MLC are required to continue to provide retiree medical benefits in accordance with those collective bargaining agreements and the class settlement agreement and, further, to provide certain pension benefit guarantees in accordance with collectively bargained memorandums of understanding regarding establishment or restructuring of Delphi Corporation ("Delphi"). GMCo maintains that it is not obligated to assume or to continue to abide by the MLC collective bargaining agreements with the IUE-CWA or the USW, the Combs Settlement or the Delphi restructuring memorandums of understanding. MLC maintains that it is entitled to cancel or terminate all obligations arising from collective bargaining agreements between MLC and the IUE-CWA or the USW. After due consideration of the factual and legal arguments regarding these issues, as well as the costs, risks, and delays associated with litigating these issues, GMCo, MLC and the IUE-CWA and USW have agreed to resolve all claims regarding such matters on the basis set forth in this Settlement Agreement.

1. Pension Top-Up: In the event that pension benefits received by a retired Covered Employee from the PBGC, or a combination of the PBGC, Delphi or another entity (including a Delphi Divested Unit), as a consequence of termination of the Delphi Hourly Retirement Plan

("Delphi HRP"), referred to herein as "Insured Pension Payments," are less than what otherwise would have been received by the retired Covered Employee from the Delphi HRP according to plan terms as of July 22, 2009, GMCo will provide supplemental payments to such retired Covered Employee so that when combined with the Insured Pension Payments such retired Covered Employee will receive pension benefits equal to what otherwise would have been paid by the Delphi HRP according to plan terms. For the avoidance of doubt, by this provision GMCo agrees to pay benefits to the retired Covered Employee equal to the difference between the amount of Insured Pension Payments and the amount of benefits that would have been paid by the Delphi HRP according to its terms had it not been terminated.

    a.  Covered Employee shall mean those IUE-CWA or USW represented Delphi employees who had unbroken seniority and were employed by GM under the terms of the 1996 GM-IUE-CWA or GM-USW National Agreement as of the spin-off of Delphi from GM on May 28, 1999 who were not employed under a competitive wage agreement as of May 28, 1999, i.e., Tier II or Tier III employees; provided however, that IUE-CWA or USW represented employees who were employed as of May 28, 1999 and were initially hired under a competitive wage agreement that provided for them to grow into full parity for all purposes, including but not limited to all benefit participation on the same basis as non-competitive hire employees and the ability to grow into full wage parity, are also Covered Employees. It is understood that employees represented by Splinter Unions as hereafter defined are not eligible for the Pension Top-Up regardless of their election to participate in the retiree health care and life insurance coverages contemplated by this Settlement Agreement.

    b.  A Covered Employee will be entitled to the Pension Top-Up only with respect to a retirement under Article II, Section 1 (Normal Retirement), Section 2 (Early Retirement) or Section 3 (Total and Permanent Disability Retirement) of the Delphi HRP. A Covered Employee receiving only a deferred vested benefit under Article VII, Section 2 (Retention of Deferred Pension if Separated) as a former employee is not entitled to the Pension Top-Up.

    c.  In consideration of the commitments described in this paragraph 1, in the Chapter 11 bankruptcy case of *In re Delphi Corporation, et al.*, Case No. 05-44481 (RDD), the IUE-CWA and USW agree to withdraw their objections (Docket No. 17793 and No. 18258) and waive any further objections to the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified) submitted by the Debtors on June 1, 2009 (as further modified)(the "Modified Plan") or Delphi's motion to approve the Modified Plan (Docket No. 16646). Further, the IUE-CWA and USW agree to waive any Seller U.S. CBA restrictions to the proposed sale of operations, including Document 63 (IUE-CWA) and Document 53 (USW), to the extent necessary to accomplish the Modified Plan.

2.    <u>Up-To-7 Years Accrual</u>: GMCo agrees to amend the GMCo General Motors Hourly-Rate Employees Pension Plan ("GMCo HRP") to provide the following:

a. Covered Employees, who were Delphi employees as of November 30, 2008, the date that Delphi froze the Delphi HRP (the "Freeze Date"), or Covered Employees who were employed as of the Freeze Date at a Delphi operation divested after October 8, 2005 and prior to the Freeze Date ("Delphi Divested Operation") will be eligible to accrue credited service under the GMCo HRP for all purposes, including but not limited to eligibility, vesting, and future benefit accruals for the seven (7) year period commencing on the Freeze Date. Any such benefits provided by the GMCo HRP shall be at the level and scope in effect at Delphi on July 22, 2009 (the "Up-to-7-Effective Date") and shall be secondary to benefits provided by Delphi, the Delphi HRP, any Delphi Divested Operation or any benefit plan of such operation, any of their subsidiaries, affiliates or successors or associated pension plans, and/or the Pension Benefit Guarantee Corporation ("PBGC"). In no event shall the GMCo HRP provide pension benefits on such credited service at a level and scope that exceeds that being provided to hourly retirees of GMCo. The amount of such credited service accrued will equal:

   i. The amount of credited service that, but solely for Delphi Freezing the Delphi HRP, would have been earned after the Freeze Date under Article III of the Delphi HRP in effect on the Up-to-7-Effective Date; and

   ii. To the extent not taken into account in Paragraph 2(a)(i), above, the amount of credited service that, but solely for the Freeze and divestiture, would have been earned while working after the Freeze Date at any Delphi Divested Operation under Article III of the Delphi HRP in effect on the Up-To-7-Effective Date.

Nothing in this Settlement Agreement shall be deemed to require GMCo to grant credited service beyond that described in this Paragraph 2(a). Employees shall be provided only the amount of credited service earned as described in this Paragraph 2(a), and shall not receive credited service otherwise. It is understood that employees represented by Splinter Unions as hereafter defined are not eligible for the Up-To-7 Years Accrual regardless of their election to participate in the retiree health care and life insurance coverages or other aspects contemplated by this Settlement Agreement.

b. In regard to the credited service accrued in the GMCo HRP under Paragraph 2(a) of this Settlement Agreement, the GMCo HRP will recognize Delphi HRP credited service accrued prior to the Freeze Date for purposes of vesting and eligibility to retire for any Covered Employee. No other Delphi HRP credited service will be recognized by the GMCo HRP.

c. The GMCo HRP benefit payable to a Covered Employee, who retires as a Normal Retirement under and as defined by Article II, section 1 of the Delphi HRP and GMCo HRP, will be a Basic Benefit (as defined according to the GMCo HRP) and based on GMCo HRP credited service accrued under Paragraph 2(a) of this Settlement Agreement and the rates in effect under the Delphi HRP as of the Up-To-7-Effective Date.

d.  The GMCo HRP benefit payable to a Covered Employee, who retires under Article
II, section 2(a)(3) of the Delphi HRP and GMCo HRP with a combined 30 or more
years of credited service prior to age 62 and one month, will be a Basic Benefit
payable beginning at age 62 and one month based on the number of years of credited
service accrued under the GMCo HRP under Paragraph 2(a) of this Settlement
Agreement and the rates in effect under the Delphi HRP as of the Up-To-7-Effective
Date.

e.  The GMCo HRP benefit payable to a Covered Employee, who retires under the
Delphi HRP and GMCo HRP  prior to age 65 with a combined 85 Points or at least
age 60 with 10 or more years of credited service, under Article II, section 2(a)(1) or
2(a)(2) of the Delphi HRP and GMCo HRP or as a Total and Permanent Disability
retirement under Article II, section 3 of the Delphi HRP approved by Delphi or the
PBGC pursuant to the procedures applicable to the Delphi HRP as of the date
immediately preceding the Up-To-7-Effective Date and approved by GMCo under the
procedures applicable to the GMCo HRP, or for IUE-CWA Covered Employees the
Kettering Ohio, Moraine Ohio and Anaheim California plants only, and for USW
Covered Employees of the Home Avenue plant only (including those who transfer in
accordance with their seniority to the Vandalia plant in conjunction with cessation of
operations at the Home Avenue plant) as a retirement under mutually satisfactory
conditions pursuant to Article II, section 2(b) of the Delphi HRP, will consist of the
following:

    i.  the Basic Benefit based on the number of years of credited service accrued
under the GMCo HRP under Paragraph 2(a) of this Settlement Agreement,
age at time of retirement, and the rates in effect under the Delphi HRP as of
the Up-To-7-Effective Date.  Such benefits from the GMCo HRP are payable
beginning upon the date of retirement and will be re-determined, if applicable,
at age 62 and one month, under the terms of the Delphi HRP in effect as of the
Up-To-7-Effective Date; and

    ii.  if applicable, an interim supplement based on the rates in effect under the
Delphi HRP as of the Up-To-7-Effective Date for the number of years of
credited service accrued under the GMCo HRP  under Paragraph 2(a) of this
Settlement Agreement and age at time of retirement.  The duration of such
interim supplement is modified as set forth in the letter in the Delphi HRP
entitled Social Security.

    iii.  if applicable, a temporary benefit based on the rates in effect under the Delphi
HRP as of the Up-To-7-Effective Date for the number of years of credited
service accrued under the GMCo HRP under Paragraph 2(a) of this Settlement
Agreement.  Provided, however, that such number of years of credited service
when added to the number of years of credited service in the Delphi HRP will
not exceed 30.  The duration of such temporary benefit is modified as set forth
in the letter in the Delphi HRP entitled Social Security.

f.  Any Covered Employee who, after considering: i) the credited service accrued in the GMCo HRP under Paragraph 2(a) of this Settlement Agreement; ii) the Delphi HRP credited service recognized in the GMCo HRP for eligibility to retire under Paragraph 2(b) of this Settlement Agreement; and iii) age at retirement or separation from service from Delphi, or any Delphi Divested Operation, is not eligible for retirement under the GMCo HRP as described in Paragraph 2(c), 2(d), or 2(e) of this Settlement Agreement, will receive only a deferred vested benefit from the GMCo HRP based on the years of credited service accrued under the GMCo HRP under Paragraph 2(a) of this Settlement Agreement. The Basic Benefit will be based on the number of years of credited service accrued under the GMCo HRP under Paragraph 2(a) of this Settlement Agreement, age at time of benefit commencement, and the rates in effect under the Delphi HRP as of the Up-To-7-Effective Date. Neither GMCo, nor the GMCo HRP, will have any obligation to supplement the deferred vested amounts set forth above.

g.  For the avoidance of doubt, for the purposes of Paragraph 2 of this Settlement Agreement for Covered Employees who have not retired or separated from service from Delphi, GMCo, or any Delphi Divested Operation, the GMCo HRP will continue to recognize the growth in age of such Covered Employees during the period they are considered an active employee with seniority in the Delphi HRP. For purposes of such recognition of growth in age in the GMCo HRP, such Covered Employees will not be considered by the GMCo HRP to have separated from service from GM on a "time for time" basis during the period they are considered an active participant in the Delphi HRP. A Covered Employee shall be deemed an active participant in the Delphi HRP, other than for purposes of future benefit accruals and subject to the other terms of the Delphi HRP in effect and to the extent permitted by law, for all periods on or after the Freeze Date and prior to retirement or separation from service from Delphi, any Delphi Divested Operation, MLC, or GMCo.

3.  <u>Claims in MLC's Chapter 11 Case</u>: The IUE-CWA, USW and all Splinter Unions (as hereafter defined) that agree to applicable terms in this Settlement Agreement shall be granted an allowed prepetition unsecured claim in MLC's Chapter 11 Case in the amount of one billion dollars with respect to retiree health and life insurance benefits for the post-age-65 retirees, post-age-65 surviving spouses and under-age-65 retirees or surviving spouses disqualified for Retiree Health Care Benefits due to Medicare eligibility who are represented by IUE-CWA, USW and the Splinter Unions (the "Allowed Claim"). Age for purposes of the preceding sentence shall be determined as of December 31, 2009. The Allowed Claim shall be in full settlement, satisfaction and discharge of all claims against MLC and its affiliates and their present and former officers and directors by the IUE-CWA, USW and the Splinter Unions or any employees, retirees or other persons or beneficiaries represented by or subject to agreements entered by such unions with MLC (the "Splinter Claims") against MLC and its affiliates and their respective officers, directors. Upon approval of this Settlement Agreement by the Bankruptcy Court, any and all Splinter Claims shall be withdrawn, released and dismissed with prejudice and the IUE-CWA, USW and the Splinter Unions shall promptly take all such action necessary or required to effectuate the foregoing, including providing releases to MLC. Any funds resulting from the Allowed Claim shall be distributed in a manner as authorized by the Bankruptcy Court. To the extent approved by

the Bankruptcy Court, MLC agrees that the IUE-CWA, USW, and the Splinter Unions have a right to sell, assign or transfer their respective Allowed Claim as they deem appropriate at any time.

4. <u>Retiree Health Care Benefits - On and After July 10, 2009 and Through December 31, 2009</u>. For claims incurred on and after July 10, 2009 and through December 31, 2009, retiree health care for eligible IUE-CWA or USW retirees will be provided in accordance with the terms of the MLC Health Care Program for Hourly Employees (the "MLC Plan") as applicable to retiree members of the Covered Group as it existed on July 10, 2009. The claims described in this Paragraph 4 shall be paid by either GMCo or MLC as may be determined between GMCo and MLC. As of January 1, 2010, all obligations by either GMCo or MLC to provide retiree health care in accordance with the GM Hourly Plan shall cease and be forever terminated. A claim is deemed incurred for purposes of this Section as of the date treatment is provided, regardless of when such treatment was scheduled and regardless of whether such treatment was part of a continuation of related treatments.

5. <u>Retiree Health Care Benefits - On and After January 1, 2010</u>. For claims incurred on or after January 1, 2010, GMCo will provide retiree health care to eligible IUE-CWA or USW retirees as follows and MLC shall have no liability or responsibility thereafter:

    a. GMCo will create a separate retiree health care plan with participation limited to eligible IUE-CWA and USW retirees and retirees affiliated with other Splinter Unions where those Splinter Unions elect, on a union-by-union basis, to participate on behalf of retirees and members who are similarly situated to the Covered Group with respect to health care in retirement and to be bound by the terms of a settlement agreement related to retiree health care and life insurance equivalent to those contained in this Settlement Agreement. It is understood that Splinter Union retirees are not eligible for the Pension Top-Up or Up-To-7 Years Accrual as contemplated by this Settlement Agreement. The term "Splinter Union" as used in this Settlement Agreement shall include the following, including any predecessor unions where applicable:

        i. International Association of Machinists and Aerospace Workers;

        ii. International Brotherhood of Electrical Workers;

        iii. Michigan Regional Council of Carpenters, Local 687 and Interior Systems, Local 1045;

        iv. International Brotherhood of Painters and Allied Trades of the United States and Canada, Sign & Display Union Local 59;

        v. International Brotherhood of Teamsters;

        vi. The International Brotherhood of Boilermakers;

        vii. International Union of Operating Engineers;

    viii.  United Catering Restaurant Bar & Hotel Workers; and

    ix.  With respect to any Splinter Union retirees where the union has failed or refused to accept appointment as the authorized representative pursuant to 11 USC § 1114, any committee appointed by the Bankruptcy Court as the authorized representative of such Splinter Union retirees.

b.  GMCo's obligation to make contributions toward retiree health care under this plan shall be fixed and capped at the specified level of expenditures on an average annual cost per contract basis for pre-Medicare Single coverage of $4,640 and for pre-Medicare family coverage of $9,030 (the "Cap"). The total value of health care benefits under this Settlement Agreement, inclusive of benefits paid under Paragraph 4 of this Settlement Agreement, is limited to an aggregate net present benefit value of $467 million ("Aggregate Net Present Value") with respect to all eligible IUE-CWA, USW and Splinter Union participants. GMCo shall deliver the Aggregate Net Present Value to participants over time reduced on a proportionate basis with respect to Splinter Unions that elect not to participate and by amounts paid in accordance with Paragraph 5(f) ("Adjusted Value"). It is understood that GMCo's total obligation for the IUE-CWA, the USW and all Splinter Unions is limited to the Aggregate Net Present Value and that once it has been exhausted GMCo shall have no further obligation to make contributions toward health care for the Covered Group or for any covered members of Splinter Unions that elect to participate. It is further understood that the Aggregate Net Present Value shall be reduced on a proportionate basis with respect to Splinter Unions that elect not to participate. Spending against the Aggregate Net Present Value shall be determined by recording the annual health care benefit expenditures pursuant to this Settlement Agreement discounted at a rate of 7.2%. Participant contributions are not counted against the Aggregate Net Present Value and are not counted as part of the Caps in any year. At the point in time where GMCo's total amount paid reaches the Adjusted Value GMCo shall cease making any contributions toward health care for the Covered Group or covered members of Splinter Unions that elect to participate regardless of whether such participants otherwise satisfy plan eligibility criteria.

c.  The Aggregate Net Present Value was determined based upon an expected 92% rate of participation, resulting in a plan design generally in accordance with the description contained on Attachment A. Both the IUE-CWA and USW believe that the actual rate of participation will be less than 92%. The IUE-CWA and USW believe that a conservative estimate of the expected rate of participation is 82%. Therefore, GMCo agrees that it initially will configure plan design generally in accordance with the description contained on Attachment A, except that GMCo will presume a participant acceptance rate of 82% for IUE-CWA, USW and Splinter Unions that elect to participate and adjust the participant monthly contribution for 2010 to account for the estimated annual savings associated with the additional anticipated 10% of eligible participants that decline participation in the plan as offset by amounts paid to participants electing to opt-out. For 2011, after accounting for anticipated increases or decreases in health care costs, GMCo will determine the actual opt-out savings and actual amount of opt-out payments that occurred during the

Page 7 of 15

2010 plan year and will adjust the 2011 plan design any differences resulting from an over or under estimation of the rate of participation or level of opt-out savings that occurred in 2010. Thereafter, GMCo will analyze and project retiree health care expenses on an annual basis, net of any additional opt-out related savings from the previous year and excluding any annual savings associated with those who previously opted-out but have since attained 65 years of age, at which time the participant would have lost eligibility for Retiree Health Care Benefits under this Settlement Agreement. GMCo will adjust the plan design as necessary to maintain benefit coverages within the Cap on an aggregate basis across both pre-Medicare single and pre-Medicare family coverage without reduction in the aggregate amount of annual Cap expenditures caused by participant's loss of eligibility to participate for reasons other than mortality or Medicare eligibility, at which time the participant would have lost eligibility for Retiree Health Care Benefits under this Settlement Agreement. For the avoidance of doubt, otherwise eligible individuals will no longer be eligible for Retiree Health Care Benefits under this Settlement Agreement upon attainment age 65 or if under age 65 upon becoming Medicare eligible, subject to rules governing end stage renal disease. For periods in which the Cap is exceeded, GMCo will make whatever plan design changes it deems necessary to recover the overpayment in the next plan year as well as to adjust for any anticipated increases in retiree health care costs in the next year. For periods in which the Cap has not been reached, GMCo will make whatever plan design changes it deems necessary to increase benefit levels to the extent of the Cap so they are distributed in the next plan year after adjusting for any anticipated increases in retiree health care costs in the next year.

d.  GMCo will bear all costs of plan administration.

e.  The IUE-CWA and USW may create an advisory committee and appoint members thereof; such advisory committee shall also include representatives of other Splinter Unions that have elected participation in accordance with this Settlement Agreement who wish to participate and who appoint their own representative members. If created, GMCo will advise the advisory committee reasonably prior to the implementation of any such adjustments of anticipated plan design adjustments deemed necessary to maintain benefit coverages within the Cap along with its rationale for any such adjustments. The advisory committee may provide advice and counsel with respect to any such adjustments, provided that GMCo may in its sole discretion accept or reject any such advice and that the process of involving the advisory committee shall not delay the ordinary and customary implementation of plan design alterations deemed necessary by GMCo to reflect the constraints of the Cap. The creation and operation of the advisory committee shall be at the expense of the unions participating in such committee and GMCo shall have no obligation to pay or to defray any cost or expense associated with creation of the committee or its operations or activities.

f.  Prior to January 1, 2010, the GMCo will initiate a one-time option for participants represented by the IUE-CWA, the USW and Splinter Unions that elect to participate to elect to voluntarily decline participation in the plan and in exchange for a monetary buyout in the amounts set forth on the Opt-Out Payment Schedule on Attachment D

hereto. Thereafter, the one-time option will be offered to eligible retirees at the inception of their participation in the plan. All elections to opt-out of the plan are final and cannot later be revoked.

g.  With respect to contributions toward health care and life insurance in retirement pursuant to collective bargaining agreements between MLC and the IUE-CWA or the USW, MLC maintains that it had reserved the right to unilaterally amend, modify or terminate the respective plans or the benefits provided by those plans. The IUE-CWA and the USW maintain, however, that MLC did not effectively reserve such rights and that it was prohibited from unilaterally altering health care or life insurance for retirees. For purposes of this Settlement Agreement, the parties agree that GMCo's right to amend, modify or terminate the retiree health care or life insurance benefits set forth herein shall be to the same extent as existed under the applicable collective bargaining agreements between MLC and the IUE-CWA or the USW, respectively. Apart from any right that GMCo may retain as a consequence of any reservation by MLC of the right to amend, modify or terminate health care in retirement, the parties agree that GMCo shall have the right to modify or amend the plan design in order to implement the Cap as set forth in this Settlement Agreement.

h.  The IUE-CWA, USW, Splinter Unions that elect to participate and all retirees/members within the scope of this agreement will not in the future seek to negotiate any modifications or changes to the health care benefits provided by GMCo.

i.  All obligations of MLC, the MLC Plan and any other MLC entity or benefit plan for health care in retirement for members of the Covered Group or any other person claiming entitlement to health care in retirement pursuant to an IUE-CWA or USW collective bargaining agreement other than as set forth herein shall be forever terminated as of the Effective Date.

6. Basic Life Insurance: Effective the first of the month following the Effective Date, GMCo will provide Basic Life Insurance in retirement to eligible IUE-CWA and USW retirees in the maximum fixed amount of $10,000 as provided for in attachment B of the Closure Agreement as modified according to Attachment B to this Settlement Agreement. Retirees whose basic life insurance coverage is below $10,000 will remain at the lower amount. Current active employee members of the IUE-CWA will have Basic Life Insurance in the fixed amount of $10,000 effective upon the date of retirement. MLC shall have no responsibility or liability for such insurance. The IUE-CWA, USW or included members/retirees will not in the future seek to negotiate any modifications or changes to the life insurance coverages provided by GMCo. All obligations of MLC, the MLC Plan and any other MLC entity or benefit plan for basic life insurance for the included members/retirees arising from any GM-IUE-CWA or GM-USW collective bargaining agreement shall be forever terminated as of the Effective Date.

7. Covered Group: The retiree health care and life insurance commitments shall apply to the "Covered Group," which shall mean:

a.  MLC employees who were represented regarding the terms and conditions of their employment with MLC by the IUE-CWA or the USW and who retired from MLC under circumstances such that they were eligible for MLC contributions toward their health care and life insurance in retirement according to the terms of an IUE-CWA or USW collective bargaining agreement with MLC in effect at the time of their retirement, and their eligible spouses, surviving spouses and dependents;

b.  All active MLC employees (including those on a leave from which they are eligible to retire from MLC) who are represented with respect to the terms and conditions of their employment with MLC by the IUE-CWA and who transfer to GMCo pursuant to GMCo's assumption of the Moraine Closure Agreement pursuant to this Settlement Agreement and who retire from GMCo under circumstances such that considering their combined MLC and GMCo service they would have qualified for MLC contributions toward health care and life insurance in retirement as determined according to criteria for such eligibility as existed in the 2003 GM-IUE-CWA National Agreement, and their eligible spouses, surviving spouses and dependents;

c.  All Delphi employees who were represented with respect to the terms and conditions of their employment with Delphi by the IUE-CWA and who applied for employment consideration with MLC under the terms of the Special Employee Placement Opportunities ("SEPO") agreement, which is Attachment G to the August 5, 2007 GM, Delphi, IUE-CWA Memorandum of Understanding, and who were hired by MLC into a UAW Represented MLC Plant in accordance with the terms of the SEPO agreement and who retired from MLC or who transfer to GMCo and retire from GMCo, under circumstances such that considering their combined Delphi, MLC and GMCo service they would have qualified for corporate contributions toward health care and life insurance in retirement as determined according to criteria for such eligibility as existed in the 2003 GM-IUE-CWA National Agreement, and their eligible spouses, surviving spouses and dependents;

d.  All Delphi employees who were represented with respect to the terms and conditions of their employment with Delphi by the IUE-CWA and who are within the definition of "Covered Employees" as that term is used in Section 17.A. of the Attachment B to the IUE-Delphi-GM Memorandum of Understanding Delphi Restructuring dated August 5, 2007 or who were represented by the USW and who are within the definition of "Covered Employees" as that term is used in Section 17.A. of the Attachment B to the USW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated August 16, 2007, and who satisfy the criteria described therein such that upon their retirement they would have qualified for contributions toward health care and life insurance in retirement from GM/MCL, and their eligible spouses, surviving spouses and dependents;

e.  The term "surviving spouses" shall include surviving spouses of a Covered Group retiree as well as surviving spouses of Covered Group active employees who died or die prior to retirement under circumstances such that at the time of death the employee would have been eligible to retire under circumstances meeting any of the Covered Group classifications (a, b, c and d).

Page **10** of 15

8. <u>Assumption of the Moraine Closure Agreement</u>:  As of the Effective Date, GMCo will assume the terms and conditions of the Closure Agreement but only as modified during these negotiations as set forth on Attachment C.  Assumption of the terms and conditions of the Closure Agreement shall not constitute assumption of MLC's pre-Closing Liabilities under the Closure Agreement or assumption of any collective bargaining agreements outside the scope of the Closure Agreement, including, without limitation, memorandums of understanding regarding Delphi restructuring.

9. <u>Release</u>:  Except as related to claim arising from an alleged breach of obligations set forth herein, as of the Effective Date, the IUE-CWA, the USW and all Covered Employees and members of the Covered Group and all persons claiming entitlement to health care or life insurance in retirement pursuant to an IUE-CWA or USW collective bargaining agreement release and forever discharge GMCo, its predecessors and its current or former officers, directors, employees, agents, subsidiaries, affiliates, and any and all of its welfare and pension benefit plans and their fiduciaries, with respect to any and all rights, claims or causes of action that any of them have or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to any claim arising out of their employment with MLC, including, without limitation, alleged breaches of a collective bargaining agreement, the Combs Settlement, concerning any alleged entitlement to health care in retirement, any alleged entitlement to life insurance in retirement, and any claim the basis for which is predicated upon an allegation that GMCo is a successor to MLC.  The term "collective bargaining agreement" is intended to have the broadest possible interpretation, inclusive of any and all national agreements or memorandums of understanding entered between MLC and the IUE-CWA or MLC and the USW, or their predecessors, whether individually or collectively, written or oral or as a matter of custom and practice.

10. <u>Waiver and Release</u>:  Other than as set forth in paragraph 3 with respect to the Allowed Claim, the IUE-CWA and USW as authorized Bankruptcy Code section 1114 and 1113 representatives withdraw with prejudice all claims filed or otherwise made against GM or MLC and their subsidiaries, and their employees, officers, directors and agents, relating to retiree health care benefits and basic life insurance and pursuant to any GM-IUE-CWA and GM-USW collective bargaining Agreements or otherwise, and agree not to bring any such claims in the future, and furthermore, on their own behalf and on behalf of all represented members/retirees, release and forever discharge MLC, and its current or former officers, directors, employees, agents, subsidiaries, affiliates and any and all of its welfare and pension benefit plans and their fiduciaries, with respect to any and all rights, claims or causes of action that any of them have or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to any claim arising out of their employment with MLC, including, without limitation, alleged breaches of a collective bargaining agreement, the Combs Settlement, any alleged entitlement to heath care in retirement, and any alleged entitlement to life insurance in retirement.

11. The Order to be presented to the Bankruptcy Court approving this Settlement Agreement shall include a release from all liability of the Communications Workers of America, the IUE-CWA and USW and their local unions and any Splinter Union that elects to participate,

including each of their current and former officers, members, employees, advisors, attorneys, accountants, investment bankers, consultants, agents and other representatives in connection with or related to the MLC Chapter 11 Case, the formulation, preparation, negotiation, dissemination, implementation, administration, or consummation of this Settlement Agreement, or any Section 1113 or Section 1114 proceedings.

12. <u>Appeal</u>: The IUE-CWA shall withdraw all appeals with respect to bankruptcy court approval of the sale of substantially all MLC's assets to GMCo.

13. <u>Effective Date</u>:  This Settlement Agreement is expressly conditioned upon approval of the Bankruptcy Court in the MLC Chapter 11 Case.  The Effective Date of this Settlement Agreement shall be the date upon which an Order approving this Settlement Agreement in all material respects and in a form reasonably satisfactory to the parties, is entered by the Bankruptcy Court; provided, however that if such Order is overturned on appeal or otherwise such that there is or may be a material negative impact on the rights, obligations or benefits provided hereunder to the Parties hereto, the party experiencing the material negative impact may terminate this Settlement Agreement upon 30 days' written notice to the other parties and the rights and obligations of all parties shall revert to the status quo ante as if this Settlement Agreement had never been entered.

14. <u>Dispute Resolution</u>:  Any controversy or dispute arising out of or relating to, or involving the enforcement, implementation, application or interpretation of this Settlement Agreement may be asserted only by GMCo, MLC, IUE-CWA or USW.  The Order approving this Settlement Agreement will provide that the Bankruptcy Court will retain jurisdiction to resolve any disputes regarding the enforcement, implementation, application or interpretation of this Settlement Agreement.  In the event that the bankruptcy case has been closed or dismissed, the parties agree that any necessary litigation to resolve such disputes shall be brought before the U.S. District Court for the Eastern District of Michigan (the "Court").  Each of the parties hereto expressly and irrevocably submits to the jurisdiction of the Bankruptcy Court or the Court, as applicable, and expressly waives any argument it may have with respect to venue or forum <u>non conveniens</u>.  Nothing in this Settlement Agreement precludes members of the Covered Group, in connection with disputes arising out of the plan, from pursuing appropriate judicial review regarding disputes after exhaustion of administrative remedies.

15. <u>Integration</u>: This Settlement Agreement constitutes the entire agreement between the parties regarding the matters set forth herein, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement, other than representations, warranties and covenants contained and memorialized in this Settlement Agreement.  This Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth in this Settlement Agreement.

16. <u>Counterparts</u>: This Settlement Agreement may be executed in two or more counterparts.  All executed counterparts and each of them shall be deemed to be one and the same instrument, provided that counsel for the parties to this Settlement Agreement shall exchange among themselves original signed counterparts.

17. <u>Assignment</u>: Except as otherwise expressly stated herein, no party to this Settlement Agreement may assign any of its rights hereunder without the prior written consent of the other parties, and any purported assignment in violation of this sentence shall be void. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

18. <u>Cooperation</u>: Each of the parties hereto shall do any and all acts and things, and shall execute and deliver any and all documents, as may be necessary or appropriate to effectuate the purposes of this Settlement Agreement.

19. <u>IUE Actuarial Professional Fees – VEBA negotiations</u>:  GMCo will reimburse the IUE-CWA for amounts necessarily incurred and actually paid to actuarial experts for purposes of evaluating the prospect of entering a VEBA settlement agreement between General Motors Corporation and the IUE-CWA during the period April 1, 2008 through December 31, 2008 upon submission of paid invoices up to a an aggregated maximum for all such invoices of $70,000.

20. Definitions:

    a.   <u>Adjusted Value</u> - The term "Adjusted Value" shall have the meaning ascribed to it in Paragraph 5(b) of this Settlement Agreement.

    b.   <u>Aggregate Net Present Value</u> - The term "Aggregate Net Present Value" shall have the meaning ascribed to it in Paragraph 5(b) of this Settlement Agreement.

    c.   <u>Allowed Claim</u> - The term "Allowed Claims" shall have the meaning ascribed to it in Paragraph 3 of this Settlement Agreement.

    d.   <u>Bankruptcy Code</u> - The term "Bankruptcy Code" shall have the meaning ascribed to it in the first paragraph of the preamble to this Settlement Agreement.

    e.   <u>Bankruptcy Court</u> - The term "Bankruptcy Court" shall have the meaning ascribed to it in the second paragraph of the preamble to this Settlement Agreement.

    f.   <u>Cap</u> - The term "Cap" shall have the meaning ascribed to it in Paragraph 5(b) of this Settlement Agreement.

    g.   <u>Combs</u> - The term "Combs" shall have the meaning ascribed to it in the second paragraph of the preamble to this Settlement Agreement.

    h.   <u>Combs Settlement</u> - The term "Combs Settlement" shall have the meaning ascribed to it in the second paragraph of the preamble to this Settlement Agreement.

    i.   <u>Court</u> - The term "Court" shall have the meaning ascribed to it in Paragraph 14 of this Settlement Agreement.

    j.   <u>Delphi</u> - The term "Delphi" shall have the meaning ascribed to it in the third paragraph of the preamble to this Settlement Agreement.

k.  Delphi Divested Operation - The term "Delphi Divested Operation" shall have the meaning ascribed to it in Paragraph 2(a) of this Settlement Agreement.

l.  Delphi HRP - The term "Delphi HRP" shall have the meaning ascribed to it in Paragraph 1 of this Settlement Agreement.

m.  Effective Date - The term "Effective Date" shall have the meaning ascribed to it in Paragraph 13 of this Settlement Agreement.

n.  Freeze Date - The term "Freeze Date" shall have the meaning ascribed to it in Paragraph 2(a) of this Settlement Agreement.

o.  GMCo - The term "GMCo" shall have the meaning ascribed to it in the first paragraph of the preamble to this Settlement Agreement.

p.  GMCo HRP - The term "GMCo HRP" shall have the meaning ascribed to it in Paragraph 2 of this Settlement Agreement.

q.  IUE-CWA - The term "IUE-CWA" shall have the meaning ascribed to it in the first paragraph of the preamble to this Settlement Agreement.

r.  MLC - The term "MLC" shall have the meaning ascribed to it in the first paragraph of the preamble to this Settlement Agreement.

s.  MLC Chapter 11 Case - The term "MLC Chapter 11 Case" shall have the meaning ascribed to it in the second paragraph of the preamble to this Settlement Agreement.

t.  MLC Plan - The term "MLC Plan" shall have the meaning ascribed to it in Paragraph 4 of this Settlement Agreement.

u.  Modified Plan - The term "Modified Plan" shall have the meaning ascribed to it in Paragraph 1(c) of this Settlement Agreement.

v.  PBGC - The term "PBGC" shall have the meaning ascribed to it in Paragraph 2(a) of this Settlement Agreement.

w.  Splinter Claims - The term "Splinter Claims" shall have the meaning ascribed to it in Paragraph 3 of this Settlement Agreement.

x.  SEPO - The term "SEPO" shall have the meaning ascribed to it in Paragraph 7(c) of this Settlement Agreement.

y.  Splinter Union - The term "Splinter Union" shall have the meaning ascribed to it in Paragraph 5(a) of this Settlement Agreement.

z.  Up-to-7-Effective Date - The term "Up-to-7-Effective Date" shall have the meaning ascribed to it in Paragraph 2(a) of this Settlement Agreement.

aa. <u>USW</u> - The term "USW" shall have the meaning ascribed to it in the first paragraph of the preamble to this Settlement Agreement.

IN WITNESS THEREOF, the parties hereto have caused this Settlement Agreement to be executed by themselves or their duly authorized attorneys.

**AGREED**

General Motors Company

By: _D. Scott Lenhofer_                                    Date: _8 / z /_ 2009

Motors Liquidation Company

By: _____                              Date: _____ 2009

IUE-CWA, the Industrial Division of the
Communications Workers of America, AFL-CIO,
CLC                                                        Date: _____ 2009

By: _____

United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and
Service Workers International Union, AFL-
CIO,CLC                                                   Date: _____ 2009

By: _____

Page 15 of 15

aa. <u>USW</u> - The term "USW" shall have the meaning ascribed to it in the first paragraph of the preamble to this Settlement Agreement.

IN WITNESS THEREOF, the parties hereto have caused this Settlement Agreement to be executed by themselves or their duly authorized attorneys.

**AGREED**

General Motors Company

_____          Date: _____2009
By:

Motors Liquidation Company

_____          Date: _Sept. 10,_2009
By: _A.A. Koch_

IUE-CWA, the Industrial Division of the
Communications Workers of America, AFL-CIO,
CLC                                       Date: _____2009

_____
By:

United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and
Service Workers International Union, AFL-           Date: _____2009
CIO,CLC

_____
By:

aa. USW - The term "USW" shall have the meaning ascribed to it in the first paragraph of the preamble to this Settlement Agreement.

IN WITNESS THEREOF, the parties hereto have caused this Settlement Agreement to be executed by themselves or their duly authorized attorneys.

**AGREED**

General Motors Company

_____        Date: _____2009
By:

Motors Liquidation Company

_____        Date: _____2009
By:

IUE-CWA, the Industrial Division of the
Communications Workers of America, AFL-CIO,       Date: 9/3/2009
CLC

_____
By:

United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and
Service Workers International Union, AFL-          Date: _____2009
CIO,CLC

_____
By:

Page **15** of **15**

aa. <u>USW</u> - The term "USW" shall have the meaning ascribed to it in the first paragraph
of the preamble to this Settlement Agreement.

IN WITNESS THEREOF, the parties hereto have caused this Settlement Agreement to be
executed by themselves or their duly authorized attorneys.

**AGREED**

General Motors Company

_____          Date: _____2009
By:

Motors Liquidation Company

_____          Date: _____2009
By:

IUE-CWA, the Industrial Division of the
Communications Workers of America, AFL-CIO,
CLC                                        Date: _____2009


_____
By:

United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and
Service Workers International Union, AFL-          Date: _09/03_____2009
CIO,CLC

_____
By:

SETTLEMENT AGREEMENT – ATTACHMENT A
General Description of Retiree Medical Plan[1]

The following reflects a general description of the level of Retiree Medical Benefit coverage
contemplated as of January 1, 2010:

| | |
|---|---|
| Plan Offering | • Nationwide HSA-qualified PPO |
| Monthly Contributions<br>Supporting a total OPEB liability of<br>$467 million for IUE/USW/Other<br>Splinter Unions | • $95 (single)<br>• $140 (two)<br>• $180 (three or more) |
| Annual Deductible | • $2,500 (single)<br>• $5,000 (family) (single member may satisfy) |
| Medical Co-Insurance (after<br>deductible) | • 20% (in-network)<br>• 40% (out of network) |
| Out-of-Pocket Maximum | • $3,500 (single)<br>• $7,000 (family) (single member may satisfy) |
| Behavioral Health (after deductible) | • Same as medical. |
| Rx Retail (after deductible) | • 20% (in-network)<br>• 40% (out-of-network) |
| Rx Mail (after deductible) | • 20% (in-network)<br>• 40% (out-of-network) |
| Vision Program | No longer offered. |
| Dental Program | No longer offered. |
| Coverage Termination<br>(Participant level) | • Retirees, surviving spouses, and eligible dependents<br>who are age 65 or older, and<br>• Retirees, surviving spouses, and eligible dependents<br>who are under age 65 but eligible for Medicare. |

---

[1] This plan description is provided as a general description of the plan design anticipated to be
within the limits of the Caps which support a $467 million total liability to be measured from
7/10/2009 forward using an annual discount rate of 7.2%.

**ATTACHMENT B**            **IUE-CWA**
Modifications to the 2003 Supplemental Agreement  - Life and Disability Benefits
Program

The following is a list of proposed changes to the Life and Disability Benefits
Program:

**Sickness and Accident (S&A) and
Extended Disability Benefits (EDB)**

- For an employee to be deemed to be wholly and continuously disabled
  under the provisions of Article II, Section 6(a) and Article II, Section 7(a),
  the employee must provide medical evidence, satisfactory to the Carrier
  (third party administrator) that substantiates total disability, i.e., medical
  substantiation. Absent medical information that substantiates total
  disability, the employee's claim for benefits under the Program will be
  denied. This will be effective for all employees' currently on a disability
  leave or any future disability leaves. New claim forms will be created for
  this process and will be distributed to all employees on claim.

**Basic Life, Extra Accident, and
Survivor Income Benefit Insurance**

- Article II, Section 1 – eliminate Continuing Life at age 65 from schedule –
  Article II, Section 1 will only pertain to employees prior to retirement.

- Article II, Section 2 – eliminate Continuing Life at age 65.  Article II,
  Section 2 will only pertain to employees after retirement.  Basic Life
  Insurance amount will be a maximum of $10,000 for all current retirees
  and future retirees.

- Article II, Section 3 – eliminate Extra Accident Insurance for all current
  retirees and future retirees.

- Miscellaneous modifications that relate to changes for Basic Life

  Article III, Section 3(e)
  Article III, Section 4(b) and (c)
  Article IV, Section 1(c)

For the International IUE-CWA:              For General Motors Company:

_(signature)_ Clark                        _(signature)_

9/3/09                                     9/3/09

Dated:

## SETTLEMENT AGREEMENT ATTACHMENT C

## Agreement between General Motors Company and the IUE-CWA, the Industrial Division of the Communications Workers of America, AFL-CIO and its Local Union 798

This Agreement shall constitute an Addendum to the 2008 Moraine Closure Agreement.

The following paragraphs, documents, and memoranda contained in the 2008 Moraine Closure Agreement shall be amended as follows:

- Cost of Living payable, Paragraphs (65d) – (65f) is eliminated
- Performance Bonus Payments, Paragraph (65)(b)(2) is eliminated
- Individual Upward Educational Plan, Document 21 is eliminated December 31, 2009
- Retiree Individual Upward Educational Plan, Document 25 is eliminated December 31, 2009
- IUE-CWA-GM Scholarship Program For Dependent Children, Document 57 is eliminated December 31, 2009
- Section 5 of the Closure Agreement relating to Supplemental Unemployment Benefit (SUB) is modified (See Attachment A)
  - Note the provisions identified above were settled similar in scope to those settled with the UAW
- Section 16 of the Closure Agreement is eliminated
- Joint Activities, Document 73 is modified to reflect a final settlement of $450,000 to be paid with installments of $225,000 in the first quarter 2010 and $225,000 in the first quarter of 2011
- Memorandum of Understanding Moraine Assembly Closure Agreement Special Attrition Program

  Option 5 "Special Employee Hiring Opportunities GM-IUE-CWA Moraine Assembly Plant" is eliminated for General Motors Company. Those employees who elected Option 5 will be allowed to rescind their application in accordance with the Option 5 provisions during a two (2) week time period identified by Management. Employees who do not rescind their application will remain on layoff with applicable SUB.

- Life and Disability Benefits Program (See Attachment B)

The parties agree that the provisions of the 2008 Moraine Closure Agreement not amended by these negotiations, the Term Sheet or the General Motors Company- IUE-CWA Settlement Agreement shall remain in force as outlined in the Closure Agreement.

General Motors Company

IUE-CWA

Industrial Division of
The Communications Workers of
America, AFL-CIO and its Local 798

By: _D. A Hamber_

By: _James D Clark_
_9/3/09_

Dated: _9/3/09_

**SETTLEMENT AGREEMENT - Attachment C continued**

**IUE-CAW**
Modifications to the 2003 Supplemental Unemployment Benefit Plan and
Guaranteed Income Stream Programs
Attachment A

---

This document further modifies the (10/18/08) Closure Agreement and the Supplemental Unemployment Benefit Plan and Guaranteed Income Stream Program Closure Agreement 9/23/08 Closure Agreement - Attachment B.

For employees who remain on layoff as of the effective date of this Agreement (7/22/09), and who are eligible for 104 weeks of SUB benefits as provided for in the Supplemental Unemployment Benefit Plan and Guaranteed Income Stream Program Closure Agreement 9/23/08 Closure Agreement - Attachment B, the SUB benefit for weeks 53 through 104, if eligible, will be calculated as follows:

- The weekly benefit payment will be 50% of the employee's gross weekly wages, based on a 40-hour week, less any Unemployment Compensation and applicable taxes.

For the International IUE-CWA:                    For General Motors Company:

*(signature)*                                     *(signature)*

9/3/09                                            9/3/09

Dated:

**SETTLEMENT AGREEMENT – Attachment C continued**

**ATTACHMENT B**                **IUE-CWA**
Modifications to the 2003 Supplemental Agreement - Life and Disability Benefits
Program

The following is a list of proposed changes to the Life and Disability Benefits
Program:

**Sickness and Accident (S&A) and**
**Extended Disability Benefits (EDB)**

- For an employee to be deemed to be wholly and continuously disabled
  under the provisions of Article II, Section 6(a) and Article II, Section 7(a),
  the employee must provide medical evidence, satisfactory to the Carrier
  (third party administrator) that substantiates total disability, i.e., medical
  substantiation. Absent medical information that substantiates total
  disability, the employee's claim for benefits under the Program will be
  denied. This will be effective for all employees' currently on a disability
  leave or any future disability leaves. New claim forms will be created for
  this process and will be distributed to all employees on claim.

**Basic Life, Extra Accident, and**
**Survivor Income Benefit Insurance**

- Article II, Section 1 – eliminate Continuing Life at age 65 from schedule –
  Article II, Section 1 will only pertain to employees prior to retirement.

- Article II, Section 2 – eliminate Continuing Life at age 65.  Article II,
  Section 2 will only pertain to employees after retirement.  Basic Life
  Insurance amount will be a maximum of $10,000 for all current retirees
  and future retirees.

- Article II, Section 3 – eliminate Extra Accident Insurance for all current
  retirees and future retirees.

- Miscellaneous modifications that relate to changes for Basic Life

  Article III, Section 3(e)
  Article III, Section 4(b) and (c)
  Article IV, Section 1(c)

For the International IUE-CWA:                    For General Motors Company:

_Jerry Clark_                                    _D. A. Sander_

_9/3/09_                                         _9/3/09_
Dated:

## SETTLEMENT AGREEMENT - ATTACHMENT D

### Opt-Out Payment Schedule

| AGE | SINGLE | FAMILY |
|---|---|---|
| 64 | $1,120 | $2,180 |
| 63 | $2,165 | $4,214 |
| 62 | $3,140 | $6,112 |
| 61 | $4,050 | $7,882 |
| 60 | $4,898 | $9,533 |
| 59 | $5,690 | $11,073 |
| 58 | $6,428 | $12,509 |
| 57 | $7,116 | $13,850 |
| 56 | $7,759 | $15,100 |
| 55 & Below | $8,358 | $16,266 |

1) The amount payable during the initial one-time option referenced in Paragraph 5(f) of the Settlement Agreement shall be based upon retiree or surviving spouse age and coverage status (i.e. single/family) as of January 1, 2010.

2) The amount payable for those retiring after the Effective Date shall be based upon retiree or surviving spouse age and coverage status as of the date of retirement.

3) Eligibility for an opt-out election is limited to retirees and surviving spouses of the Covered Group who are under age 65 and to dependents aged 18 to 24 of a retirees or surviving spouses of the Covered Group who are age 65 or older where the dependant qualifies for continued coverage under the plan terms due to status as a full time student (Student-Dependent). The Student-Dependent opt-out payment shall be determined according to the "Single" benefit amount based upon the number of years until the Student-Dependent reaches age 24. For example, for a Student-Dependent aged 22 the "Single" benefit amount associated with age 63, above, would apply, representing two years of coverage remaining until the student-dependent reaches age 24. Although non Student-dependents will continue to qualify for coverage under the terms of this agreement they are not eligible for an opt-out payment. The amount payable for the initial one-time option for Student-Dependents as described herein shall be based on their age and status as of January 1, 2010. The amount payable to Student-Dependents of age 65 or over Covered Group members who retire after the Effective Date shall be based upon the Student-Dependant's age and status as of the date that such Covered Group member retires. In instances where there are two or more student-dependents under the same Covered Group sponsor, they each will qualify for a "Single" opt-out payment as applicable.

Page 1 of 2

4) Retirees or surviving spouses of the Covered Group who are members of the same family where each has or will have opt-out eligibility based upon retiree status each shall be entitled to a "Single" opt-out benefit only, regardless of the timing of their respective election. For example, where A and B are married and both are members of the Covered Group and A is currently retired and B is a current GMCo employee who upon retirement would be eligible to make an opt-out election, then A is entitled to a "Single" benefit payment upon exercise of the one-time voluntary election to opt-out and B is entitled to a "Single" benefit payment upon exercise of the one-time voluntary election to opt-out upon retirement, but neither is eligible to receive a "Family" benefit payment.

Page 2 of 2

**EXHIBIT B**

|     | **UNION** | **PERCENTAGE SHARE** |
| --- | --- | --- |
| 1. | IUE-CWA | 79.39% |
| 2. | USW | 14.73% |
| 3. | International Association of Machinists and Aerospace Workers | 4.32% |
| 4. | International Brotherhood of Electrical Workers | 0.42% |
| 5. | Michigan Regional Council of Carpenters, Local 687 and Interior Systems, Local 1045 | 0.29% |
| 6. | International Brotherhood of Painters & Allied Trades of the U.S. and Canada, Sign & Display Union Local 59 | 0.09% |
| 7. | International Brotherhood of Teamsters | 0.25% |
| 8. | International Brotherhood of Boilermakers | 0.10% |
| 9. | International Union of Operating Engineers | 0.18% |
| 10. | United Catering Restaurant Bar & Hotel Workers | 0.23% |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                              :
In re                                         :          **Chapter 11 Case No.**
                                              :
**MOTORS LIQUIDATION COMPANY**, *et al.*,     :          **09-50026 (REG)**
     **f/k/a General Motors Corp.,** *et al.*   :
                                              :
                  **Debtors.**   :          **(Jointly Administered)**
                                              :
-----------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 363(b) AND 105 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019(a) APPROVING <u>SETTLEMENT AGREEMENT WITH CERTAIN LABOR UNIONS</u>

Upon the Motion, dated October 14, 2009 (the "**Motion**")[1], of Motors Liquidation

Company (formerly, General Motors Corporation ("**MLC**")) and its affiliated debtors, as debtors

and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),

for an order pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule

9019(a) approving that certain Settlement Agreement Between and Among GMCo/MLC-IUE-

CWA and USW Regarding Retiree Health Care, Life Insurance, Pension Top-Up, and

Modification and GMCO Assumption of MLC-IUE-CWA CBA, a copy of which is annexed to

the Motion as Exhibit A (the **"Settlement Agreement"**), and authorizing the Debtors to perform

all of their obligations thereunder, all as more fully set forth in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334; and consideration of the Motion being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

---

1 Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

due and proper notice of the Motion having been provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is:

ORDERED that the Motion is granted; and it is further

ORDERED that the Settlement Agreement is hereby approved; and it is further

ORDERED that the Debtors are authorized and directed to implement and to perform all of their obligations under the Settlement Agreement; and it is further

ORDERED that the Unions and all Participating Splinter Unions be, and hereby are, granted an allowed, prepetition, general unsecured claim in MLC's chapter 11 case in an amount equal to such union's respective **"Percentage Share"** of the aggregate amount of $1 billion (the "**Allowed Claim**").  For purposes hereof, the **"Percentage Share"** of each of the Unions and the Splinter Unions is set forth on Exhibit A annexed hereto; and it is further

ORDERED that the Allowed Claim shall be in full settlement and satisfaction of any and all claims that the Unions, the Participating Splinter Unions, any and all employees, retirees or other persons or beneficiaries represented by or subject to agreements entered by the Unions and the Participating Splinter Unions with MLC have against MLC, the other Debtors and their respective affiliates, officers and directors; and it is further

ORDERED that, except for the Allowed Claim, the Unions and any Participating Splinter Unions, as authorized Bankruptcy Code section 1114 and 1113 representatives, shall promptly withdraw, with prejudice, all claims filed or otherwise made against MLC, the other Debtors, General Motors Corporation and their respective subsidiaries, employees, officers, directors, and agents relating to retiree health care benefits and basic life insurance and pursuant

to any collective bargaining agreements, or any other claims, and shall not bring or assert any such claims against any such entities in the future; and it is further

ORDERED that, except for the Allowed Claim, the Unions and any Participating Splinter Unions, as authorized Bankruptcy Code section 1114 and 1113 representatives, on their own behalf and on behalf of all represented members, employees, beneficiaries and/or retirees, hereby release, and are deemed to release, and forever discharge MLC, the other Debtors, General Motors Corporation and their respective current or former officers, directors, employees, agents, subsidiaries, affiliates and any and all of their welfare and pension benefit plans and their fiduciaries, with respect to any and all rights, claims or causes of action that any of them have or may have, known or unknown, arising out of, based upon or otherwise related to any claim arising out of their employment with MLC and/or General Motors Corporation, including, without limitation, any claim or cause of action with respect to alleged breaches of a collective bargaining agreement, the Combs Settlement, any alleged entitlement to health care in retirement and any alleged entitlement to life insurance in retirement; and it is further

ORDERED that within five (5) business days of the date of this Order, the IUE-CWA shall withdraw the Appeal, with prejudice; and it is further

ORDERED that, as provided in the Settlement Agreement, the Communication Workers of America, the IUE-CWA and USW and their local unions and any Participating Splinter Union, including each of their respective current and former officers, members, employees, advisors, attorneys, accountants, investment bankers, consultants, agents and other representatives in connection with or related to these chapter 11 cases, shall be released from all liability arising from or related to the formulation, preparation, negotiation, dissemination, implementation, administration, or consummation of  the Settlement Agreement, or any section 1113 or section 1114 proceedings; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation and/or enforcement of the

Settlement Agreement and/or this Order.

Dated: November __, 2009
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

|  | UNION | PERCENTAGE SHARE |
|---|---|---|
| 1. | IUE-CWA | 79.39% |
| 2. | USW | 14.73% |
| 3. | International Association of Machinists and Aerospace Workers | 4.32% |
| 4. | International Brotherhood of Electrical Workers | 0.42% |
| 5. | Michigan Regional Council of Carpenters, Local 687 and Interior Systems, Local 1045 | 0.29% |
| 6. | International Brotherhood of Painters & Allied Trades of the U.S. and Canada, Sign & Display Union Local 59 | 0.09% |
| 7. | International Brotherhood of Teamsters | 0.25% |
| 8. | International Brotherhood of Boilermakers | 0.10% |
| 9. | International Union of Operating Engineers | 0.18% |
| 10. | United Catering Restaurant Bar & Hotel Workers | 0.23% |