# LIMITED OBJECTION OF

# LINDEN DEVELOPMENT, LLC

# EXHIBIT E

## Sixth Amendment to Purchase and Sale Agreement

This Sixth Amendment to Purchase and Sale Agreement (the "Amendment") is dated December 16, 2008 and is made between

GENERAL MOTORS CORPORATION, a Delaware corporation, referred to in this Agreement as "Seller", with offices c/o Worldwide Real Estate, 200 Renaissance Center, Mail Code 482-B38-C96, P.O. Box 200, Detroit, Michigan 48265-2000,

-and-

LINDEN DEVELOPMENT, LLC, a New Jersey limited liability company, referred to in this Agreement as "Purchaser" with offices at c/o Duke Realty Corporation, 5600 Blazer Parkway, Suite 100, Dublin, Ohio 43017.

### Background

A.    Seller and Purchaser executed a Purchase and Sale Agreement dated as of July 1, 2008, as amended by a First Amendment to Purchase and Sale Agreement dated July 31, 2008, a Second Amendment to Purchase and Sale Agreement dated August 14, 2008, a Third Amendment to Purchase and Sale Agreement dated August 29, 2008, a Fourth Amendment to Purchase and Sale Agreement dated September 29, 2008, and a Fifth Amendment to Purchase and Sale Agreement dated December 5, 2008; as assigned by Duke Realty Limited Partnership to Purchaser by that certain Assignment of Purchase and Sale Agreement dated December 10, 2008 (collectively, the "Agreement"), relating to the purchase and sale of the Property.

B.    Purchaser and Seller desire to amend the Agreement to provide for an extension of the Closing Date and temporary access to the Property, subject to the terms and conditions of this Amendment.

Now, therefore, in consideration of the premises and the mutual covenants contained in this Amendment, it is agreed as follows:

1.    The background section of this Amendment is incorporated herein by reference as if set forth at length.

2.    Closing. Section 7.1 of the Agreement shall be deleted in its entirety and shall be replaced with the following:

"7.1.    Closing. The Closing shall take place at the offices of the Title Company at 12:00 p.m. on **December 19, 2008** (the "Closing Date"). If the Closing does not occur, the Deposit shall be returned to Purchaser, retained by Seller, or otherwise dealt with, all as provided elsewhere in this Agreement."

4.    Any terms not defined in this Amendment shall have the meaning ascribed to such terms as set forth in the Agreement.

I

5.    Except as expressly set forth in this Amendment all terms, conditions and covenants set forth in the Agreement shall remain in full force and effect. In the event of any conflict between the provisions of this Amendment and the provisions of the Agreement, the provisions of this Amendment shall control.

6.    Each of the individuals signing this Amendment by signing this Amendment individually represent and warrant that such party has the authority to sign this Amendment and to bind the party on behalf of whom such individual is signing.

7.    This Amendment may be executed in counterparts, which when taken together shall constitute one and the same instrument.

SELLER:

GENERAL MOTORS CORPORATION, a Delaware corporation

By: _____

Name: _FRED ZEHNDER_____

Title: _SENIOR Project MANAGER_

PURCHASER:

LINDEN DEVELOPMENT, LLC, a New Jersey limited liability company

By:    DUKE CONSTRUCTION LIMITED PARTNERSHIP, an Indiana limited partnership, Member

By:    DUKE BUSINESS CENTERS CORPORATION, an Indiana corporation, sole General Partner

By: _____
William J. DeBoer
Executive Vice President

2

The undersigned hereby executes this Amendment as a guarantor of all of the obligations of Purchaser under the Agreement, as amended by this Amendment.

LINDEN DEVELOPMENT, LLC, a New Jersey limited liability company

By:    DUKE CONSTRUCTION LIMITED PARTNERSHIP, an Indiana limited partnership, Member

By:    DUKE BUSINESS CENTERS CORPORATION, an Indiana corporation, sole General Partner

By: _____
       William J. DeBoer
       Executive Vice President

F:\New Jersey\GM\CoGen Site\Contract Docs\Amend #6.docx

3

## Fifth Amendment to Purchase and Sale Agreement

This Fifth Amendment to Purchase and Sale Agreement (the "Amendment") is dated December 5, 2008 and is made between

General Motors Corporation, a Delaware Corporation, referred to in this Agreement as "Seller", with offices c/o Worldwide Real Estate, 200 Renaissance Center, Mail Code 482-B38-C96, P.O. Box 200, Detroit, Michigan 48265-2000,

-and-

Duke Realty Limited Partnership, an Indiana Limited Partnership, referred to in this Agreement as "Purchaser" with offices at 5600 Blazer Parkway, Suite 100, Dublin, Ohio 43017.

### Background

A.    Seller and Purchaser executed a Purchase and Sale Agreement dated as of July 1, 2008, as amended by a First Amendment to Purchase and Sale Agreement dated July 31, 2008, a Second Amendment to Purchase and Sale Agreement dated August 14, 2008, a Third Amendment to Purchase and Sale Agreement dated August 29, 2008, and a Fourth Amendment to Purchase and Sale Agreement dated September 29, 2008 (collectively, the "Agreement"), relating to the purchase and sale of the Property.

B.    Purchaser and Seller desire to amend the Agreement to provide for an extension of the Closing Date and temporary access to the Property, subject to the terms and conditions of this Amendment.

Now, therefore, in consideration of the premises and the mutual covenants contained in this Amendment, it is agreed as follows:

1.    The background section of this Amendment is incorporated herein by reference as if set forth at length.

2.    <u>Closing</u>. Section 7.1 of the Agreement shall be deleted in its entirety and shall be replaced with the following:

"7. 1.    <u>Closing</u>. The Closing shall take place at the offices of the Title Company at 10:00 a.m. on **December 17, 2008** (the "<u>Closing Date</u>"). If the Closing does not occur, the Deposit shall be returned to Purchaser, retained by Seller, or otherwise dealt with, all as provided elsewhere in this Agreement."

4.    Any terms not defined in this Amendment shall have the meaning ascribed to such terms as set forth in the Agreement.

5.    Except as expressly set forth in this Amendment all terms, conditions and covenants set forth in the Agreement shall remain in full force and effect. In the event of any conflict between the provisions of this Amendment and the provisions of the Agreement, the provisions of this Amendment shall control.

1

6.    Each of the individuals signing this Amendment by signing this Amendment individually represent and warrant that such party has the authority to sign this Amendment and to bind the party on behalf of whom such individual is signing.

7.    This Amendment may be executed in counterparts, which when taken together shall constitute one and the same instrument.

EXECUTION RECOMMENDED
WORLDWIDE REAL ESTATE
BY: _____
Date: December 5, 2008

SELLER:

General Motors Corporation, a Delaware Corporation

By:    _____
Name:  Debra Homio Hoge
Title:   Director, Worldwide Real Estate

PURCHASER:

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:    Duke Realty Corporation, its General Partner

Date: December ___, 2008

By:    *attached*
Name: _____
Title: _____

The undersigned hereby executes this Amendment as a guarantor of all of the obligations of Purchaser under the Agreement, as amended by this Amendment.

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:    Duke Realty Corporation, its General Partner

By:    *attached*
Name: _____
Title: _____

F:\New Jersey\GM\CoGen Site\Contract Docs\Amend #5.docx

2

6.    Each of the individuals signing this Amendment by signing this Amendment individually represent and warrant that such party has the authority to sign this Amendment and to bind the party on behalf of whom such individual is signing.

7.    This Amendment may be executed in counterparts, which when taken together shall constitute one and the same instrument.

SELLER:

General Motors Corporation, a Delaware Corporation

Date: December __, 2008

By:     _____
Name:  _____
Title:    _____


PURCHASER:

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:     Duke Realty Corporation, its General Partner

Date: December _5_, 2008

By:     _William J DeBoer_
Name:  _WILLIAM J DEBOER_
Title:    _EVP_


The undersigned hereby executes this Amendment as a guarantor of all of the obligations of Purchaser under the Agreement, as amended by this Amendment.

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:     Duke Realty Corporation, its General Partner

By:     _William J DeBoer_
Name:  _WILLIAM J DEBOER_
Title:    _EVP_

### Fourth Amendment to Purchase and Sale Agreement

This Fourth Amendment to Purchase and Sale Agreement (the "Amendment") is dated September 26, 2008 and is made between

General Motors Corporation, a Delaware Corporation, referred to in this Agreement as "Seller", with offices c/o Worldwide Real Estate, 200 Renaissance Center, Mail Code 482-B38-C96, P.O. Box 200, Detroit, Michigan 48265-2000,

-and-

Duke Realty Limited Partnership, an Indiana Limited Partnership, referred to in this Agreement as "Purchaser" with offices at 5600 Blazer Parkway, Suite 100, Dublin, Ohio 43017.

### Background

A.    Seller and Purchaser executed a Purchase and Sale Agreement dated as of July 1, 2008, as amended by a First Amendment to Purchase and Sale Agreement dated July 31, 2008, a Second Amendment to Purchase and Sale Agreement dated August 14, 2008 and a Third Amendment to Purchase and Sale Agreement dated August 29, 2008 (collectively, the "Agreement"), relating to the purchase and sale of the Property.

B.    Purchaser and Seller desire to amend the Agreement to provide for an extension of the Closing Date and temporary access to the Property, subject to the terms and conditions of this Amendment.

Now, therefore, in consideration of the premises and the mutual covenants contained in this Amendment, it is agreed as follows:

1.    The background section of this Amendment is incorporated herein by reference as if set forth at length.

2.    Purchaser has elected not to purchase the Equipment on the Property. The first sentence of Section 2.10 of the Agreement shall be deleted and replaced with the following sentence:

"Seller hereby reserves unto itself, its representatives, contractors, and assigns, for a period commencing as of the date Purchaser elected not to purchase the Equipment and continuing for a period of sixty (60) days after the Closing Date, the right of access to, and the license to use, the Property for the purpose of removing the Equipment.

3.    Closing. Section 7.1 of the Agreement shall be deleted in its entirety and shall be replaced with the following:

"7. 1.    Closing. The Closing shall take place at the offices of the Title Company at 10:00 a.m. on December 15, 2008 (the "Closing Date"). If the Closing does not occur, the Deposit shall be returned to Purchaser, retained by Seller, or otherwise dealt with, all as provided elsewhere in this Agreement."

{#00816886.1 07138-0425 9/19/2008 07:48 AM}

4.  Any terms not defined in this Amendment shall have the meaning ascribed to such terms as set forth in the Agreement.

5.  Except as expressly set forth in this Amendment all terms, conditions and covenants set forth in the Agreement shall remain in full force and effect. In the event of any conflict between the provisions of this Amendment and the provisions of the Agreement, the provisions of this Amendment shall control.

6.  Each of the individuals signing this Amendment by signing this Amendment individually represent and warrant that such party has the authority to sign this Amendment and to bind the party on behalf of whom such individual is signing.

7.  This Amendment may be executed in counterparts, which when taken together shall constitute one and the same instrument.

EXECUTION RECOMMENDED
WORLDWIDE REAL ESTATE
BY _____

Date: September _26_, 2008

SELLER:

General Motors Corporation, a Delaware Corporation

By: _____
Name: _____
Title: _____
DEBRA HOMIC HOGE
DIRECTOR
WORLDWIDE REAL ESTATE

PURCHASER:

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:   Duke Realty Corporation, its General Partner

Date: September __, 2008

By: _Attached_
Name: _____
Title: _____

The undersigned hereby executes this Amendment as a guarantor of all of the obligations of Purchaser under the Agreement, as amended by this Amendment.

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:   Duke Realty Corporation, its General Partner

By: _Attached_
Name: _____
Title: _____

{#00816886.1 07138-0425 9/19/2008 07:48 AM}

4.    Any terms not defined in this Amendment shall have the meaning ascribed to such terms as set forth in the Agreement.

5.    Except as expressly set forth in this Amendment all terms, conditions and covenants set forth in the Agreement shall remain in full force and effect.  In the event of any conflict between the provisions of this Amendment and the provisions of the Agreement, the provisions of this Amendment shall control.

6.    Each of the individuals signing this Amendment by signing this Amendment individually represent and warrant that such party has the authority to sign this Amendment and to bind the party on behalf of whom such individual is signing.

7.    This Amendment may be executed in counterparts, which when taken together shall constitute one and the same instrument.

SELLER:

General Motors Corporation, a Delaware Corporation

Date: September __, 2008

By: _____
Name: _____
Title: _____

PURCHASER:

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:    Duke Realty Corporation, its General Partner

Date: September 29, 2008

By: _William J DeBoer_____
Name: _WILLIAM J. DEBOER_
Title: _EVP_

The undersigned hereby executes this Amendment as a guarantor of all of the obligations of Purchaser under the Agreement, as amended by this Amendment.

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:    Duke Realty Corporation, its General Partner

By: _William J DeBoer_____
Name: _WILLIAM J DEBOER_
Title: _EVP_

{#00816886.1 07138-0425 9/19/2008 07:48 AM}

## Third Amendment to Purchase and Sale Agreement

This Third Amendment to Purchase and Sale Agreement (the "Amendment") is dated August 29, 2008 and is made between

General Motors Corporation, a Delaware Corporation, referred to in this Agreement as "Seller", with offices c/o Worldwide Real Estate, 200 Renaissance Center, Mail Code 482-B38-C96, P.O. Box 200, Detroit, Michigan 48265-2000,

-and-

Duke Realty Limited Partnership, an Indiana Limited Partnership, referred to in this Agreement as "Purchaser" with offices at 5600 Blazer Parkway, Suite 100, Dublin, Ohio 43017.

### Background

A.    Seller and Purchaser executed a Purchase and Sale Agreement dated as of July 1, 2008, as amended by a First Amendment to Purchase and Sale Agreement dated July 31, 2008 and a Second Amendment to Purchase and Sale Agreement dated August 14, 2008 (collectively, the "Agreement"), relating to the purchase and sale of the Property.

B.    Purchaser and Seller desire to amend the Agreement to provide for an extension of the Property Inspection Period, subject to the terms and conditions of this Amendment.

Now, therefore, in consideration of the premises and the mutual covenants contained in this Amendment, it is agreed as follows:

1.    The background section of this Amendment is incorporated herein by reference as if set forth at length.

2.    The Property Inspection Period set forth in Section 2.8 of the Agreement is extended until 5:00 p.m., local Detroit time on September 16, 2008.

3.    Subject to Section 12.10 of the Agreement, this Amendment shall be binding upon and inure to the benefit of the parties and their respective heirs, personal representatives, successors and assigns.

4.    Any terms not defined in this Amendment shall have the meaning ascribed to such terms as set forth in the Agreement.

5.    Except as expressly set forth in this Amendment all terms, conditions and covenants set forth in the Agreement shall remain in full force and effect.  In the event of any conflict between the provisions of this Amendment and the provisions of the Agreement, the provisions of this Amendment shall control.

6.    Each of the individuals signing this Amendment by signing this Amendment individually represent and warrant that such party has the authority to sign this Amendment and to bind the party on behalf of whom such individual is signing.

{#00814160.1 07138-0425 8/28/2008 09:07 AM}

7.    This Amendment may be executed in counterparts, which when taken together shall constitute one and the same instrument.

EXECUTION RECOMMENDED
WORLDWIDE REAL ESTATE

BY: _____

Date: August 29, 2008

SELLER:

General Motors Corporation, a Delaware Corporation

By:    _____

Name:  John K. Blanchard
Title:    Executive Director

PURCHASER:

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:    Duke Realty Corporation, its General Partner

Date: August __, 2008

By:    _____
Name:  _____
Title:    _____

The undersigned hereby executes this Amendment as a guarantor of all of the obligations of Purchaser under the Agreement, as amended by this Amendment.

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:    Duke Realty Corporation, its General Partner

By:    _____
Name:  _____
Title:    _____

{#00814160.1 07138-0425 8/28/2008 09:07 AM}

7.    This Amendment may be executed in counterparts, which when taken together shall constitute one and the same instrument.

SELLER:

General Motors Corporation, a Delaware Corporation

Date: August __, 2008

By:      _____
Name:   _____
Title:   _____

PURCHASER:

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:    Duke Realty Corporation, its General Partner

Date: August __, 2008

By:     _____
Name:   WILLIAM J DEBOER
Title:   EVP

The undersigned hereby executes this Amendment as a guarantor of all of the obligations of Purchaser under the Agreement, as amended by this Amendment.

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:    Duke Realty Corporation, its General Partner

By:     _____
Name:   WILLIAM J DEBOER
Title:   EVP

{#00814160.1 07138-0425 8/28/2008 09:07 AM}

### Second Amendment to Purchase and Sale Agreement

This Second Amendment to Purchase and Sale Agreement (the "Amendment") is dated August *14*, 2008 and is made between

General Motors Corporation, a Delaware Corporation, referred to in this Agreement as "Seller", with offices c/o Worldwide Real Estate, 200 Renaissance Center, Mail Code 482-B38-C96, P.O. Box 200, Detroit, Michigan 48265-2000,

-and-

Duke Realty Limited Partnership, an Indiana Limited Partnership, referred to in this Agreement as "Purchaser" with offices at 5600 Blazer Parkway, Suite 100, Dublin, Ohio 43017.

### Background

A.    Seller and Purchaser executed a Purchase and Sale Agreement dated as of July 1, 2008, as amended by the First Amendment to Purchase and Sale Agreement dated July 31, 2008 (collectively, the "Agreement"), relating to the purchase and sale of the Property.

B.    Purchaser and Seller desire to amend the Agreement to provide for an extension of the Property Inspection Period and the Equipment Inspection Period, subject to the terms and conditions of this Amendment.

Now, therefore, in consideration of the premises and the mutual covenants contained in this Amendment, it is agreed as follows:

1.    The background section of this Amendment is incorporated herein by reference as if set forth at length.

2.    The Property Inspection Period set forth in Section 2.8 of the Agreement is extended until 5:00 p.m., local Detroit time on August 29, 2008.

3.    The Equipment Inspection Period set forth in Section 2.8 of the Agreement is extended until 5:00 p.m., local Detroit time on September 16, 2008.

4.    Subject to Section 12.10 of the Agreement, this Amendment shall be binding upon and inure to the benefit of the parties and their respective heirs, personal representatives, successors and assigns.

5.    Any terms not defined in this Amendment shall have the meaning ascribed to such terms as set forth in the Agreement.

6.    Except as expressly set forth in this Amendment all terms, conditions and covenants set forth in the Agreement shall remain in full force and effect. In the event of any conflict between the provisions of this Amendment and the provisions of the Agreement, the provisions of this Amendment shall control.

{00812182.1 77777-0102 8/13/2008 12:15 PM}

7.    Each of the individuals signing this Amendment by signing this Amendment individually represent and warrant that such party has the authority to sign this Amendment and to bind the party on behalf of whom such individual is signing.

8.    This Amendment may be executed in counterparts, which when taken together shall constitute one and the same instrument.

Signed and sealed by the parties

EXECUTION RECOMMENDED
WORLDWIDE REAL ESTATE

BY _____

Date: August 14, 2008

SELLER:

General Motors Corporation, a Delaware Corporation

By:    _____
Name:  DEBRA HOMG HOGE
Title: DIRECTOR
       WORLDWIDE REAL ESTATE

PURCHASER:

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:    Duke Realty Corporation, its General
       Partner

Date: August ___, 2008

By:    _____
Name:  _____
Title: _____

The undersigned hereby executes this Amendment as a guarantor of all of the obligations of Purchaser under the Agreement, as amended by this Amendment.

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:    Duke Realty Corporation, its General
       Partner

By:    _____
Name:  _____
Title: _____

{ 00812182.1 77777-0102 8/13/2008 12:15 PM}

7.    Each of the individuals signing this Amendment by signing this Amendment individually represent and warrant that such party has the authority to sign this Amendment and to bind the party on behalf of whom such individual is signing.

8.    This Amendment may be executed in counterparts, which when taken together shall constitute one and the same instrument.

Signed and sealed by the parties

SELLER:

General Motors Corporation, a Delaware Corporation

Date: August ___, 2008

By:    _____
Name:  _____
Title: _____

PURCHASER:

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:    Duke Realty Corporation, its General Partner

Date: August ___, 2008

By:    _William J DeBoer_ (signature)
Name:  WILLIAM J DE BOER
Title: EVP

The undersigned hereby executes this Amendment as a guarantor of all of the obligations of Purchaser under the Agreement, as amended by this Amendment.

Duke Realty Limited Partnership, an Indiana Limited Partnership

By:    Duke Realty Corporation, its General Partner

By:    _William J DeBoer_ (signature)
Name:  WILLIAM J DE BOER
Title: EVP

{ 00812182.1 77777-0102 8/13/2008 12:15 PM}

## First Amendment to Purchase and Sale Agreement

This First Amendment to Purchase and Sale Agreement (the "Amendment") is dated July 31, 2008 and is made between

General Motors Corporation, a Delaware Corporation, referred to in this Agreement as "Seller", with offices c/o Worldwide Real Estate, 200 Renaissance Center, Mail Code 482-B38-C96, P.O. Box 200, Detroit, Michigan 48265-2000,

-and-

Duke Realty Limited Partnership, an Indiana Limited Partnership, referred to in this Agreement as "Purchaser" with offices at 5600 Blazer Parkway, Suite 100, Dublin, Ohio 43017.

### Background

A.    Seller and Purchaser executed a Purchase and Sale Agreement dated as of July 1, 2008 (the "Agreement"), relating to the purchase and sale of the Property.

B.    Purchaser and Seller desire to amend the Agreement to provide for an extension of the Property Inspection Period, the Equipment Inspection Period and the Closing Date, subject to the terms and conditions of this Amendment.

Now, therefore, in consideration of the premises and the mutual covenants contained in this Amendment, it is agreed as follows:

1.    The background section of this Amendment is incorporated herein by reference as if set forth at length.

2.    The Property Inspection Period set forth in Section 2.8 of the Agreement is extended until 5:00 p.m., local Detroit time on August 14, 2008.

3.    The Equipment Inspection Period set forth in Section 2.8 of the Agreement is extended until 5:00 p.m., local Detroit time on that day which is thirty (30) days after the expiration of the Property Inspection Period (as extended pursuant to paragraph 2 above).

4.    The Closing Date set forth in Section 7.1 of the Agreement shall be that date which is thirty (30) days after the expiration of the Equipment Inspection Period (as extended pursuant to paragraph 3 above), but in no event later than September 30, 2008.

5.    Subject to Section 12.10, this Amendment shall be binding upon and inure to the benefit of the parties and their respective heirs, personal representatives, successors and assigns.

6.    Any terms not defined in this Amendment shall have the meaning ascribed to such terms as set forth in the Agreement.

7. Except as expressly set forth in this Amendment all terms, conditions and covenants set forth in the Agreement shall remain in full force and effect. In the event of any conflict between the provisions of this Amendment and the provisions of the Agreement, the provisions of this Amendment shall control.

8. Each of the individuals signing this Amendment by signing this Amendment individually represent and warrant that such party has the authority to sign this Amendment and to bind the party on behalf of whom such individual is signing.

9. This Amendment may be executed in counterparts, which when taken together shall constitute one and the same instrument.

Signed and sealed by the parties

SELLER:

General Motors Corporation, a Delaware Corporation

Date: _____7·31_____, 2008

By: _____
Name: _____
Title: _____

EXECUTION RECOMMENDED
WORLDWIDE REAL ESTATE

BY _____

PURCHASER:

Duke Realty Limited Partnership, an Indiana Limited Partnership

By: Duke Realty Corporation, its General Partner

Date: _____, 2008

By: _____
Name: _____
Title: _____

The undersigned hereby executes this Amendment as a guarantor of all of the obligations of Purchaser under the Agreement as amended by this Amendment.

Duke Realty Limited Partnership, an Indiana Limited Partnership

By: Duke Realty Corporation, its General Partner

By: _____
Name: _____
Title: _____

2

7.   Except as expressly set forth in this Amendment all terms, conditions and covenants set forth in the Agreement shall remain in full force and effect. In the event of any conflict between the provisions of this Amendment and the provisions of the Agreement, the provisions of this Amendment shall control.

8.   Each of the individuals signing this Amendment by signing this Amendment individually represent and warrant that such party has the authority to sign this Amendment and to bind the party on behalf of whom such individual is signing.

9.   This Amendment may be executed in counterparts, which when taken together shall constitute one and the same instrument.

Signed and sealed by the parties

SELLER:

General Motors Corporation, a Delaware Corporation

Date:_____, 2008          By:    _____
                                 Name:  _____
                                 Title: _____

PURCHASER:

Duke Realty Limited Partnership, an Indiana Limited Partnership

By: Duke Realty Corporation, its General Partner

Date: _July 31_, 2008            By:    _Angela Hsu_____
                                 Name:  _Angela Hsu_____
                                 Title: _Vice President, Legal_

The undersigned hereby executes this Amendment as a guarantor of all of the obligations of Purchaser under the Agreement as amended by this Amendment.

Duke Realty Limited Partnership, an Indiana Limited Partnership

By: Duke Realty Corporation, its General Partner

By:    _Angela Hsu_____
Name:  _Angela Hsu_____
Title: _Vice President, Legal_

2

---

## PURCHASE AND SALE AGREEMENT

between

GENERAL MOTORS CORPORATION, a Delaware corporation,

as Seller,

and

DUKE REALTY LIMITED PARTNERSHIP, an Indiana limited partnership,

as Purchaser

July 1, 2008

---

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is made as of the 1st day of July, 2008 (the "Effective Date"), by and between GENERAL MOTORS CORPORATION, a Delaware corporation ("Seller"), and DUKE REALTY LIMITED PARTNERSHIP, an Indiana limited partnership ("Purchaser").

## 1.  DEFINITIONS AND EXHIBITS.

**1.1 Definitions.** In this Agreement, the following defined terms have the meanings set forth for them in the Section of this Agreement indicated below:

| Term | | Term | |
|---|---|---|---|
| Access Period | Section 2.10 | Land | Section 2.1(a) |
| Additional Exceptions | Section 3.2 | Laws | Section 2.10 |
| ACM | Section 5.2(c) | LBP | Section 5.2(c) |
| Affiliate | Section 2.6 | Linden Development | Section 4.3 |
| Agreement | Opening | Agreement | |
| Assignee | Section 12.10 | NJDEP | Section 5.1(b)(iii) |
| ASTM | Section 5.1(b)(viii) | Objection Date | Section 3.1 |
| Claim Notice | Section 5.2(i) | Orders | Section 5.2(e) |
| Claims | Section 5.1(b)(vii) | PCBs | Section 5.2(k) |
| Closing | Section 2.2(b) | Permitted Exceptions | Section 3.3 |
| Closing Date | Section 7.1 | Person | Section 2.6 |
| Confidentiality Agreement | Section 2.5(c) | Prior Owner | Section 2.9 |
| Debris | Section 5.1(b)(iii) | Property | Section 2.2 |
| Defined Groundwater | Section 4.3 | Property Inspection Period | Section 2.8 |
| Condition | | Purchaser | Opening |
| Deposit | Section 2.2(a) | Purchaser Indemnified Parties | Section 2.10 |
| Duke | Section 5.2(j) | Purchase Price | Section 2.2 |
| Effective Date | Opening | Purchaser's Assessment | Section 2.7 |
| Environmental Conditions | Section 5.2(e) | Real Property | Section 2.1(b) |
| Environmental Laws | Section 5.1(b)(i) | Remediation Agreement | Section 2.9 |
| Environmental Reports | Section 2.5(c) | Response Activities | Section 5.2(f) |
| Equipment | Section 2.2 | Right of Access Agreement | Section 2.6 |
| Equipment Inspection Period | Section 2.8 | Seller | Opening |
| Exceptions | Section 3.1 | Seller's Broker | Section 12.2 |
| Exclusions | Section 5.1(c)(i) | Survey | Section 2.5(a) |
| Hazardous Material | Section 2.10 | Surviving Obligations | Section 2.8 |
| Immaterial Taking | Section 10.2 | Title Commitment | Section 2.5(b) |
| Improvements | Section 2.1(b) | Title Company | Section 2.2(a) |
| Indemnified Parties | Section 2.6 | Title Policy | Section 2.5(b) |
| Indemnity Termination Date | Section 5.2(j) | USEPA | Section 5.2(b)(ii) |
| ISRA | Section 5.2(e) | Utility Lines | Section 5.1(b)(vi) |

{#00796708.5 07138-0425 6/27/2008 01:56 PM}

**1.2 Exhibits.** The Exhibits listed below are attached to and incorporated into this Agreement. In the event of any inconsistency between such Exhibits and the terms and provisions of this Agreement, the terms and provisions of the Exhibits shall control. The Exhibits to this Agreement are:

EXHIBIT A — Legal Description of the Land
EXHIBIT B — List of Equipment
EXHIBIT C — Form of USEPA/NJDEP Letter
EXHIBIT D — Form of Deed
EXHIBIT E — Form of Bill of Sale
EXHIBIT F — Title Company Affidavit

## 2. PURCHASE AND SALE OF THE PROPERTY.

**2.1 Purchase.** For the consideration hereinafter set forth, and subject to the provisions contained herein, Seller hereby agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, all of the following:

(a) The approximately 2.5 acres of real property located at the southwest corner of Linden Avenue and Pleasant Street, Linden, New Jersey, as more particularly described in Exhibit A, together with all reversions, remainders, easements, rights-of-way, appurtenances, hereditaments and water and mineral rights appertaining to or otherwise benefiting or used in connection with such real property, together with all of Seller's right, title and interest in and to any strips of land, streets, and alleys abutting or adjoining such real property (the "Land"); and

(b) All existing buildings or other improvements, structures, and open parking facilities placed, constructed, installed or located on the Land (collectively, the "Improvements"; the Land and Improvements are sometimes hereinafter collectively referred to as the "Real Property"). Purchaser acknowledges that the Property shall not include any emission reduction credits relating to the Property and any operations on the Property through the Closing.

**2.2 Purchase Price.** The purchase price for the Property shall be One Million Five Hundred Thousand and No/100 Dollars ($1,500,000.00) (the "Purchase Price"). In the event that Purchaser elects to purchase all equipment and other tangible personal property owned by Seller and located, placed or installed on or about the Real Property or used as part of or in connection with the Real Property or for the operation thereof as set forth on Exhibit B hereto (the "Equipment") as set forth in this Agreement, (i) the term "Property" shall be deemed to thereafter include the Real Property and the Equipment for purposes of this Agreement, and (ii) the Purchase Price shall be automatically increased to Four Million Five Hundred Thousand and No/100 Dollars ($4,500,000). Seller shall identify on Exhibit B those items of Equipment that will be removed from the Property in the event that Purchaser elects not to purchase the Equipment.

(a) Deposit. Subject to the terms of Section 2.8 below, prior to the expiration of the Property Inspection Period, Purchaser shall deliver funds, by check, wire transfer or other means, in the amount of Two Hundred Fifty Thousand and No/100 Dollars ($250,000) to Lawyers Title Insurance Company (the "Title Company") to be deposited in an interest-bearing account and held as an earnest money deposit hereunder pursuant to the terms and provisions hereof (which earnest money deposit, together with all interest earned thereon, is herein called the "Deposit"). Title Company shall retain possession or control of the Deposit until delivery thereof is permitted or required under the terms of this Agreement.

(b) <u>Balance</u>. The balance of the Purchase Price, subject to adjustment in accordance with Article 8, shall be paid at the closing of the purchase contemplated hereby (the "<u>Closing</u>") in cash, by certified check, cashier's check, wire transfer, or other immediately available funds.

**2.3 Escrow Instructions.** If required by Title Company, Purchaser and Seller shall, promptly following Purchaser's delivery of the Deposit to Title Company in accordance with Section 2.2(a), execute Title Company's standard form of escrow instructions concerning the Deposit; provided, however, that such escrow instructions shall be for the purpose of implementing this Agreement; and provided further, that such instructions shall incorporate this Agreement by reference and shall specifically provide that no provision thereof shall have the effect of modifying this Agreement unless it is so expressly stated and executed by or on behalf of Purchaser and Seller. In the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions, the terms of this Agreement shall prevail.

**2.4 Authority.** Simultaneously with the execution of this Agreement, Purchaser shall deliver to Seller evidence, reasonably satisfactory to Seller, of the due authorization and execution of this Agreement by Purchaser.

**2.5 Deliveries.** Purchaser acknowledges receipt of:

(a) An ALTA survey dated September 20, 2007 for the Property (the "<u>Survey</u>"); and

(b) A current title insurance commitment or preliminary title report issued by Title Company, including copies of all recorded matters affecting title referred to therein (collectively, the "<u>Title Commitment</u>"), contemplating the issuance by Title Company of an ALTA owner's policy of title insurance (the "<u>Title Policy</u>") insuring such title to the Real Property in Purchaser in the amount of the Purchase Price, subject to the satisfaction of the requirements of the instruments to be delivered at the Closing as contemplated hereby.

(c) Subject to the terms of the Confidentiality Agreement dated June 14, 2007 (the "<u>Confidentiality Agreement</u>"), the following final environmental documents relating to the Property (collectively, the "<u>Environmental Reports</u>"):

(i) New Jersey Department of Environmental Protection, March 3, 1995, Memorandum of Agreement, General Motors Corporation, Linden, New Jersey;

(ii) Conestoga-Rovers & Associates, September 6, 2007, ACAD Drawing Showing Site Plan, General Motors Vehicle Manufacturing - Linden Assembly.

(iii) Haley & Aldrich, Inc., October 2, 2007, ACAD Drawing Showing Site Utilities, General Motors Vehicle Manufacturing - Linden Assembly.

(iv) Conestoga-Rovers & Associates, September 2007, Facility Environmental Assessment Report, GM Linden.

(v) Haley & Aldrich, Inc., November 30, 2007, draft Groundwater Migration Control System Design Drawings, GM Linden.

(vi) Haley & Aldrich, Inc., February 29, 2008, Aerial Photographic Review, Former Quixx Cogeneration Property.

{#00796708.5 07138-0425 6/27/2008 01:56 PM}    3

(vii)    ENCORE LLC, December 5, 2007, Groundwater Monitoring Results, USEPA Recommendations For Additional Study - MW-47 Area, GM Linden Assembly Plant.

(viii)    ERM, May 11, 2006, Interim Site Investigation Report for the Quixx Linden Cogeneration Plant, Linden New Jersey.

(ix)    ERM, August 31, 2006, Remedial Investigation Report, Quixx Power Services, Inc., Linden Cogeneration Plant, Linden New Jersey.

**2.6 Inspection of Property.**  Subject to the terms of the Right of Access Agreement dated as of June 30, 2007 (the "Right of Access Agreement"), at any time during the term of this Agreement, Purchaser and its employees, agents, and contractors, shall have the right to enter the Real Property and investigate the Property, the Equipment and all matters relevant to their acquisition, development, usage, operation or marketability. Such right of investigation shall include, without limitation, the right to have made, at Purchaser's expense, any studies or inspections of the Property and the Equipment as Purchaser may deem necessary or appropriate. Notwithstanding the foregoing, all environmental assessments or investigations of any kind shall be subject to the terms of Section 2.7 below. Seller shall cooperate reasonably with any such investigations, inspections, or studies made by or at Purchaser's direction so long as such cooperation is at no expense to Seller. Purchaser shall indemnify, defend and hold Seller, each Affiliate of Seller, and their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors and assigns (together, the "Indemnified Parties"), harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including, without limitation, reasonable attorneys' fees) resulting from Purchaser's investigations, including, without limitation, the environmental investigations as set forth in Section 2.7. "Affiliate" means, with respect to any Person (as hereinafter defined), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective members, partners, venturers, directors, officers, stockholders, agents, employees and spouses. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise. "Person" means an individual, partnership, limited liability company, association, corporation, or other entity. Purchaser's obligations under this Section 2.6 shall survive the Closing or any termination of this Agreement.

**2.7 Environmental Inspection.**  Subject to the terms of the Right of Access Agreement, Purchaser shall have the right during the Property Inspection Period (as defined below), at Purchaser's sole expense, to enter the Property to conduct environmental assessments of the Property, including but not limited to, the collection and analysis of soils, surface water and groundwater samples ("Purchaser's Assessment"). Purchaser shall provide a copy of Purchaser's Assessment to Seller promptly after it is received by Purchaser. Purchaser acknowledges and agrees that any and all information, whether written or oral, regarding the Property provided to Purchaser by Seller or its employees or agents under this Agreement or otherwise shall be subject to the Confidentiality Agreement.

**2.8 Termination of Agreement.**  If, on or before 5:00 p.m., local Detroit time on July 31, 2008 (the period from the Effective Date through such date being herein referred to as the "Property Inspection Period"), Purchaser gives Seller written notice setting forth Purchaser's dissatisfaction with the Land and Improvements for any reason whatsoever, including, without limitation, any matter relating to its acquisition, development, usage, operation or marketability, then this Agreement shall terminate, the Deposit shall be promptly returned to Purchaser, and both parties shall be relieved from any further liability hereunder, except for obligations that, by their terms, survive the termination of this Agreement

(the "Surviving Obligations"). If Purchaser fails to deliver a termination notice to Seller prior to the expiration of the Property Inspection Period, the Deposit shall be delivered to Seller and shall become automatically non-refundable (except in the event of Seller's default or pursuant to Sections 3.1, 3.2, 6.3, 9.3 or 10.2 below), but applicable to the Purchase Price. In addition to the foregoing, Purchaser shall have an additional thirty (30) days after the expiration of the Property Inspection Period (the "Equipment Inspection Period") to inspect the Equipment and all matters relevant to its acquisition, usage or operation and make a determination as to whether it will elect to purchase the Equipment in accordance with the terms of this Agreement. If, on or before 5:00 p.m., local Detroit time on the date of expiration of the Equipment Inspection Period, Purchaser gives Seller written notice setting forth Purchaser's election to purchase all of the Equipment in accordance with this Agreement, the Equipment shall be deemed part of the term "Property" for purposes of this Agreement and the Purchase Price shall be increased as set forth in Section 2.1 above. If Purchaser elects not to purchase the Equipment, or fails to provide Seller with a written notice electing to purchase the Equipment, on or before 5:00 p.m., local Detroit time on the date of expiration of the Equipment Inspection Period, Seller shall retain all rights to the Equipment and Seller shall have the right, following the Closing, to remove those items of the Equipment identified on Exhibit B to be removed, in accordance with the terms of Section 2.10 below.

    **2.9**    **Seller's Right to Terminate.** Purchaser acknowledges that Seller has advised Purchaser that Quixx Linden L.P. (the "Prior Owner") has an obligation to remediate the Property pursuant to that certain Remediation Agreement dated February 2, 2006 ISRA Case # E20050327 (the "Remediation Agreement"). If the Prior Owner fails to fulfill all of its obligations under the Remediation Agreement regarding the Property prior to the expiration of the Equipment Inspection Period, Seller shall have the right to terminate this Agreement by written notice to Purchaser (sent to Purchaser within ten (10) business days after the expiration of the Equipment Inspection Period). In the event that Seller terminates this Agreement as set forth in the preceding sentence, the Deposit shall be promptly returned to Purchaser and both parties shall be relieved from any further liability hereunder, except for the Surviving Obligations. Seller's termination of this Agreement pursuant to this Section 2.9 shall be rescinded in the event that Purchaser (within ten (10) business days of receipt by Purchaser of Seller's termination notice), delivers a written agreement satisfactory to Seller in its sole and absolute discretion, that Purchaser (i) shall assume full and complete responsibility for the remediation of the Property, (ii) shall waive any and all claims of any kind against Seller and its Affiliates with respect to the Property (except for any breach by Seller under this Agreement), and (iii) shall release Seller and its Affiliates from any and all obligations of any kind relating to the remediation of any environmental condition on the Property.

    **2.10**    **Temporary Access to the Property.** During the period commencing on the date Purchaser elects, or is deemed to have elected, not to purchase the Equipment, and continuing for a period of ninety (90) days (but in no event later than sixty (60) days after the Closing Date) (the "Access Period"), Seller hereby reserves unto itself, its representatives, contractors, and assigns, the right of access to, and the license to use, the Property for the purpose of removing the Equipment. Purchaser hereby acknowledges and agrees that, if Purchaser elects not to purchase, or is deemed to have elected not to purchase, the Equipment as set forth in Section 2.8 above, the Equipment shall remain the property of Seller. Further, Seller shall be entitled to maintain a trailer on the Property during the Access Period at Seller's sole cost and expense to oversee the removal of the Equipment as set forth herein. Seller's right of access pursuant to this Section 2.9 shall automatically expire at 5:00 p.m. eastern time on the last day of the Access Period. In the event that Seller fails to remove any Equipment from the Property prior to the expiration of the Access Period, such Equipment shall become the property of Purchaser.

In the event Seller exercises its access rights pursuant to this Section 2.9, Seller shall, at Seller's sole cost and expense: (a) provide Purchaser with at least 24 hours prior notice (which may be telephonic notice),

except in the case of an emergency, in which event no notice shall be required, of any intended entry on the Property to remove any Equipment or to place a trailer on the Property or remove the trailer from the Property (provided Seller shall provide Purchaser with at least three (3) days' prior notice (which may be telephonic notice and shall include a general description of Seller's reason for such entry) of Seller's intended entry on the Property with any crane or other large equipment); (b) use reasonable efforts to minimize the interference with Purchaser's operations on the Property; (c) comply with any and all applicable federal, state or local laws, ordinances, codes, guidelines or administrative orders, including without limitation, any and all applicable Environmental Laws in connection with such entry, or any activities performed in connection with such entry, including without limitation any and all permits, licenses and authorizations issued pursuant to any of the foregoing ("Laws"); (d) perform all work and cause any representative of Seller to perform all work in a good and workmanlike manner and in accordance with Laws; (e) pay for all work and cause any representative of Seller to pay for all work free and clear of all construction liens and encumbrances; (f) promptly repair any damage caused by such entry or any activities of Seller, or any representative of Seller and restore the Property to substantially the same condition the Property was in prior to such entry (other than any obligation to replace the Equipment); (g) maintain and furnish Purchaser with proof of commercial general liability insurance with policy limits of at least one million ($1,000,000) dollars (prior to any entry on the Property), and name Purchaser as an additional insured under such policy; (h) maintain and furnish Purchaser with proof of workers compensation and employer's liability insurance in the statutorily required amounts (prior to any entry on the Property); (i) as to any invasive activities on the Property or the removal of Equipment that contains Hazardous Materials (as defined below), if any, maintain or cause each representative of Seller performing work on the Property to maintain and furnish Purchaser with proof of contractor's pollution liability insurance coverage with policy limits of at least five million ($5,000,000) dollars (prior to any entry on the Property), and name Purchaser as an additional insured under such policy. Each of the policies set forth in subparagraphs (g) – (i) shall be issued by a recognized responsible insurance company licensed to do business in the State of New Jersey and shall provide that it cannot be cancelled without thirty (30) days prior written notice to Purchaser. Notwithstanding the foregoing, Purchaser acknowledges that Seller shall be entitled to self-insure any or all of the insurance requirements above.

In addition to the foregoing, Seller shall defend (with counsel reasonably acceptable to Purchaser), indemnify, protect and save harmless the Purchaser Indemnified Parties (as defined below) from and against any and all Claims that arise out of: (i) any acts or omissions of Seller or any agent, employee, contractor, subcontractor, representative, licensee or invitee of Seller during or related to entry on the Property pursuant to this Section 2.9, including, without limitation, any acts or omissions which result in a discharge, spill, or release of any Hazardous Material on the Property in violation of any Environmental Law; or (ii) any breach of Seller's obligations under this Section 2.9. The term "Purchaser Indemnified Parties" shall mean Purchaser, each Affiliate of Purchaser, and their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors and assigns.

## 3.  TITLE.

3.1  **Review.**  Purchaser shall be entitled to object to any exceptions to title disclosed in the Title Commitment ("Exceptions"), in its reasonable discretion, by a written notice of objections delivered to Seller within ten (10) days after the date Purchaser receives the Title Commitment (the "Objection Date"). If Purchaser fails to deliver to Seller a notice of objections on or before the Objection Date, Purchaser shall be deemed to have waived any objection to any Exceptions and thereafter all Exceptions shall be deemed to be Permitted Exceptions (as hereinafter defined). Seller shall have the option, but not the obligation, within thirty (30) days after Seller's receipt of Purchaser's notice of objections, to obtain the issuance of an endorsement to the Title Commitment removing such Exceptions. If Seller fails either

to provide for the removal of such Exceptions within such thirty-day period, then this Agreement, at Purchaser's option, shall be terminated by written notice delivered to Seller within five (5) days after the expiration of such thirty-day period. Upon delivery of such termination notice by Purchaser, this Agreement shall automatically terminate, the Deposit shall be promptly returned to Purchaser, and the parties shall be released from all further obligations under this Agreement other than the Surviving Obligations. If Purchaser fails to terminate this Agreement within the five-day period set forth above, all Exceptions referred to in Purchaser's notice of objections shall be deemed to be Permitted Exceptions, and this Agreement shall remain in full force and effect. If Purchaser waives in writing its objection to any matters described in the notice of objections, such matters shall be deemed to be Permitted Exceptions.

**3.2 Title Updates.** If any endorsement or update issued to the Title Commitment contains any exceptions to title (the "<u>Additional Exceptions</u>"), other than those in the Title Commitment, Purchaser shall be entitled to object to any such Additional Exceptions, in its reasonable discretion, by a written notice of objections to Seller on or before the date five (5) days following Purchaser's receipt of such endorsement or update. If Purchaser fails to deliver to Seller a notice of objections on or before such date, Purchaser shall be deemed to have waived any objection to any Additional Exceptions appearing on such endorsement or update, and thereafter all such Additional Exceptions shall be deemed to be Permitted Exceptions. Seller shall have the option, but not the obligation, to obtain, within twenty (20) days after Seller's receipt of Purchaser's notice of objection, the issuance of an endorsement to the Title Commitment removing such Additional Exceptions. If Seller fails either to provide for the removal of such Additional Exceptions within such twenty-day period, then this Agreement, at Purchaser's option, shall be terminated by written notice delivered to Seller within five (5) days after the expiration of such twenty (20)-day period. Upon delivery of such termination notice, this Agreement shall automatically terminate, the Deposit shall be promptly returned to Purchaser, and the parties shall be released from all further obligations under this Agreement other than the Surviving Obligations. If Purchaser fails to terminate this Agreement within the five-day period set forth above, all matters set forth in Purchaser's notice of objections relating to such endorsement or update shall be deemed to be Permitted Exceptions, and this Agreement shall remain in full force and effect. If Purchaser waives in writing its objection to any matters described in the notice of objections relating to such endorsement or update, such matters shall be deemed to be Permitted Exceptions.

**3.3 Permitted Exceptions.** The term "<u>Permitted Exceptions</u>" shall mean (a) any exceptions (i) to which Purchaser does not object or (ii) as to which Purchaser has waived its objections; and (b) all building, zoning, and applicable ordinances and regulations of governmental authorities having jurisdiction over the Property.

**3.4 Extension of Closing Date.** The Closing Date shall be postponed, if necessary, by the number of days required to accommodate the procedures set forth in this Article.

## 4. SELLER'S REPRESENTATIONS, WARRANTIES AND COVENANTS.

**4.1 Authority.** Seller represents and warrants to Purchaser that Seller (i) is a corporation duly organized and existing and in good standing under the laws of the State of Delaware, and (ii) is qualified to do business in the State of New Jersey. Seller has the full right and authority to enter into this Agreement and consummate the transactions contemplated by this Agreement, and all requisite corporate action has been taken by Seller in connection with the execution of this Agreement and the documents referenced herein and the consummation of the transactions contemplated hereby. Each of the Persons signing this Agreement on behalf of Seller is authorized to do so. Seller shall furnish to Purchaser such documents to evidence such authority, as Purchaser shall reasonably request.

**4.2 No Possessory Rights.**  Except for any rights of possession granted under the Permitted Exceptions, there are no parties in possession of any of the Property, and there are no other rights of possession or use with respect to the Property that have been granted by Seller to any third party or parties.

**4.3 No Actions.**  Except as set forth in (i) any of the Environmental Reports, (ii) any reports prepared by or on behalf of Purchaser relating to the Property or the condition thereof, and (iii) the Defined Groundwater Condition (the "Defined Groundwater Condition") as defined in the Purchase and Sale Agreement dated December 19, 2007 between Seller and Linden Development, LLC, an Affiliate of Purchaser (the "Linden Development Agreement"), there are no actions, suits, proceedings or claims pending or, to the best of Seller's actual knowledge (without any duty of inquiry), threatened which would have a material adverse impact on the condition of the Property (including the environmental condition thereof).

**4.4 Environmental Matters.**  Seller (i) has not, to the best of Seller's actual knowledge, withheld any significant and material documents regarding the environmental condition of the Property, and (ii) from and after the Effective Date through the Closing Date, will not materially and adversely alter the environmental condition of the Property.  For purposes of this Section 4.4, "actual knowledge" shall mean the actual knowledge of Marilyn Dedyne and Robert Hare.

**4.5 Additional Encumbrances.**  From and after the Effective Date through the Closing Date, Seller shall not, without Purchaser's consent, (i) mortgage or encumber the Property, or (ii) execute any easement, covenants, conditions, or restrictions with respect to the Property, unless required by applicable law.

**4.6 Survival.**  The representations and warranties of set forth in this Article 4 shall survive for a period of twenty-four (24) months from and after the Closing.  Notwithstanding anything herein to the contrary, Purchaser shall have no right to any action for a breach of any representation by Seller herein to the extent that Purchaser had actual knowledge of such breach prior to Closing and closed notwithstanding such breach.

## 5.  PURCHASER'S REPRESENTATIONS, WARRANTIES AND COVENANTS.

**5.1 Authority; Restrictions on Use of Property; and Temporary Access to Equipment.**

(a)  Authority.  Purchaser represents and warrants to Seller that Purchaser is a limited liability company duly organized and existing and in good standing under the laws of the State of New Jersey.  Purchaser has the full right and authority to enter into this Agreement and consummate the transactions contemplated by this Agreement.  All requisite partnership action has been taken by Purchaser in connection with the execution of this Agreement and the documents referenced herein and the consummation of the transactions contemplated hereby.  Each of the Persons signing this Agreement on behalf of Purchaser is authorized to do so.  Purchaser shall furnish to Seller any and all documents to evidence such authority, as Seller shall reasonably request.

(b)  Restrictions on Uses of or at the Property.  The following representations, warranties and covenants related to restrictions on uses of or at the Property are made by Purchaser hereunder and shall be included in: (1) the Deed (as defined below), (2) any agreement transferring complete or partial possession or ownership of the Property through sale, lease, or otherwise to any successor, assign, purchaser, or tenant, and (3) any deed of conveyance

transferring complete or partial ownership of the Property as restrictions which will be covenants of Purchaser, run with the Land and be binding upon all subsequent owners, tenants, and users, and shall be enforceable against Purchaser, its successors, and assigns and inure to the benefit of and be enforceable by Seller, its successors and assigns:

(i)    Purchaser acknowledges and agrees that Purchaser shall, at all times, comply with any and all applicable federal, state, or local environmental laws, regulations, ordinances, codes, guidelines, or administrative orders, including any and all permits, licenses, or authorizations issued thereunder, including, but not limited to, any and all due care requirements under New Jersey law and all Federal and State requirements/guidelines (collectively "Environmental Laws"), in connection with or related to the use, operations, development, excavation, (including off-site disposal of site soils and the mitigation of vapor intrusion with respect to the remediation/redevelopment of the Property) grading, construction, or demolition, at, in, on, or below the Real Property. Purchaser, its successors and assigns shall be solely responsible and liable for any and all issues related to the migration of water within the Real Property and off of the Real Property. Purchaser, its successors and assigns shall be solely responsible and liable for any and all alleged or actual violations of any applicable Environmental Laws concerning or related to the Property.

(ii)    Purchaser acknowledges and agrees that use of groundwater at, in, or under the Real Property by any person or entity for any purpose, including potable and non-potable uses, shall be strictly prohibited.

(iii)    Purchaser represents, acknowledges, and agrees that, at Closing, the Real Property may contain various discarded materials, including, but not limited to, building materials from demolition activities; domestic and industrial trash; tires; automotive parts; used containers which held materials such as paint, antifreeze, gasoline, and other chemical substances; materials painted with lead-based paints or otherwise, wood, concrete, brick, and floorblock; and building materials which may contain asbestos-containing materials, and roof shingles (these discarded materials are herein collectively referred to as "Debris"). Purchaser acknowledges and agrees that Purchaser, and not Seller, shall be solely liable and responsible for such Debris and all matters relating thereto, including the proper management and disposal of such Debris. By way of example, but not limitation, Purchaser shall comply with all guidance/policy directives of the New Jersey Department of Environmental Protection ("NJDEP") regarding the recycling/re-use of concrete waste generated by demolition of buildings located on the Real Property. Purchaser further represents, acknowledges, and agrees that any and all soil and/or Debris management and surface water and/or groundwater management required or necessary under applicable laws or regulations or because of excavation, demolition, or soil disturbance related to the use, operations, development, excavation, grading, construction, or demolition, at, in, on, or below the Real Property is the sole obligation and liability of Purchaser. Such soil and/or Debris management and surface water and/or groundwater management may include in-place management, excavation, sediment and erosion control, and disposal or other soil and Debris management options which are allowed or required under applicable Environmental Laws.

(iv)    Purchaser covenants and agrees that it shall not "treat," "store" or "dispose" of any "hazardous substances," "hazardous wastes" or "toxic substances" as those terms are defined under CERCLA, 42 U.S.C. 9601 et. seq., RCRA, 42 U.S.C. 6901

et. seq., or TSCA, 15 U.S.C. 2601 et. seq., or under similar New Jersey law, statute, or regulation, on, at, or below the Property, and shall maintain generator-only status; provided, however, that Purchaser may (A) accumulate such substances or wastes as allowed under applicable Environmental Laws for off-site treatment, off-site storage, or off-site disposal, and (B) use and/or store commercial products on-site which may contain such substances.

(v)     Purchaser acknowledges and agrees that the Real Property may only be used by Purchaser, its successors, assigns, and tenants for industrial and commercial uses except as otherwise permitted in Section 5.1 (b) (viii) below. Such prohibited uses include, but are not limited to, residential uses, day care centers, schools, hospitals, and long-term care facilities or other similar uses that would typically require cleanup to unrestricted use standards under applicable New Jersey law. Purchaser further acknowledges and agrees that any site modifications or redevelopment limitations required at, in, on, or below the Real Property or modification to building design or construction to accommodate allowable industrial and commercial uses (and residential uses if permitted by Seller) hereunder consistent with Environmental Laws, remedial systems on the Real Property of any kind, or otherwise, is the sole obligation and liability of Purchaser (or the owner of the Real Property at the time of such activities) and will be conducted at Purchaser's sole expense.

(vi)     Purchaser acknowledges and agrees that, at Closing, the Real Property may contain underground process or utility lines or piping, including, without limitation, sanitary or storm sewers and gas, water, electrical, fire protection and septic systems, and any other similar utility lines or piping which may be present at or below the Property (herein collectively referred to as "Utility Lines"). Purchaser further acknowledges and agrees that Purchaser, and not Seller, shall be solely liable and responsible for such Utility Lines and all matters relating thereto. Further, Purchaser acknowledges and agrees that any and all management, including, but not limited to, maintenance, removal, repair, or associated cleanup of the environment, of or due to any such Utility Lines that may be required or necessary: (1) under applicable Environmental Laws or other laws or regulations, (2) to properly maintain the Property, or   (3) because of excavation, demolition, or soil disturbance related to future use, development, or construction at or of the Real Property, is the sole obligation and liability of Purchaser or the owner of the Real Property at the time of such activities.

(vii)     In the event (A) Seller is notified by USEPA, NJDEP, any other local, state or federal agency or governmental entity or any other third party (that has a right or standing under applicable law to compel or seek any action) that Purchaser has failed (or Seller becomes aware of any such failure) to complete any Response Activities (as defined below) with respect to the Property in accordance with this Agreement or the Orders (as defined below), and (B) Seller is required by USEPA, NJDEP, any other local, state or federal agency or governmental entity or any other third party (that has a right or standing under the applicable law to compel or seek any action) to take any Response Activities with respect to the Property, and (C) Purchaser fails, within sixty (60) days (or such shorter time period as required by USEPA, NJDEP, any other local, state or federal agency or governmental entity or such other third party) after the date Purchaser receives a default notice from Seller or USEPA, NJDEP, or otherwise, to either complete such Response Activities in accordance with this Agreement, the Orders or any applicable law, or notify Seller and USEPA, NJDEP, or other state agency that

Purchaser is contesting such default notice, Seller shall be entitled to, but shall not be obligated to, complete such Response Activities at Purchaser's sole cost and expense. Notwithstanding the foregoing, if Purchaser elects to contest such default notice, Purchaser shall promptly provide Seller with reasonable evidence of the basis for such objection and shall indemnify, defend (with counsel reasonably acceptable to Seller) and hold each Indemnified Party, harmless from and against any and all claims, including without limitation, any and all costs, liability, damages, penalties, causes of action, judgments and expenses, including, without limitation, reasonable attorneys' fees and costs (collectively, "Claims"), arising out of or related to Purchaser's contest. Purchaser shall deliver to Seller all default notices received by Purchaser from USEPA, NJDEP, or any other local, state or federal agency or governmental entity relating to any remediation action with respect to the Property in accordance with this Agreement, the Orders or any applicable law. If, following the procedures set forth above, (i) Seller is required to take such action to cure Purchaser's failure as described above, or (ii) the USEPA, NJDEP, or any other local, state or federal agency or governmental entity requires Seller to reimburse USEPA, NJDEP, or any other local, state or federal agency or governmental entity for any amounts relating to Purchaser's operations at or remediation of the Property, Purchaser shall, within ten (10) business days after receipt of an invoice from Seller, reimburse Seller for all costs and expenses or other payments incurred by Seller, by wire transfer to an account designated by Seller. Seller hereby reserves unto itself, its representatives, contractors, and assigns, the right of access to, and an easement to and over, the Real Property to enter the Real Property with persons and such equipment as determined necessary in Seller's sole discretion and judgment to complete Purchaser's obligations under this Agreement, the Orders or any applicable law, and to implement the remediation and corrective actions required thereunder, subject to the terms of this Section 5.1(b)(vi). In the event Seller wishes to exercise its right of access to the Real Property as set forth in this Section 5.1(b)(vii), Seller shall (i) provide Purchaser with at least 24 hours prior notice (which may be telephonic notice), except in the case of an emergency, in which event no notice shall be required, (ii) shall use reasonable efforts to minimize the interference with Purchaser's operations, and (iii) obtain and maintain, at Seller's sole cost, and provide a certificate of insurance to Purchaser, of general liability insurance in the amount of One Million Dollars ($1,000,000) combined single limit for personal injury and property damage per occurrence. Notwithstanding the foregoing, Purchaser acknowledges that Seller shall be entitled to self-insure any or all of the insurance requirements above.

(viii)    Notwithstanding Section 5.1(b)(v) above, the Real Property may be used for residential uses only upon satisfaction of the following terms and conditions: Purchaser acknowledges and agrees that, prior to any such change in use, (A) Purchaser shall obtain, at its sole cost and expense, all required approvals for such use from all governmental agencies, including, without limitation, the NJDEP, and (B) Purchaser shall conduct an appropriate investigation of the Real Property acceptable to Seller to determine whether the environmental condition of the Property meets applicable regulatory cleanup criteria or standards for the proposed residential use (including investigation and mitigation of vapor intrusion) which assessment will, at a minimum, be consistent with American Standard for Testing Materials ("ASTM") standards (or other similar industry standard which is generally recognized and accepted at the time of the investigation) for a Phase I site assessment. Purchaser shall conduct a Phase II site assessment acceptable to Seller to determine whether the environmental condition of the Real Property meets applicable regulatory cleanup criteria or standards for the proposed

residential use (including investigation and mitigation of vapor intrusion). The Phase II investigation will, at a minimum, investigate (i) VOCs, SVOCs and metals in accordance with a statistically derived sampling plan for the Real Property and based on the parameters for such substances as set forth in the Quality Assurance Project Plan previously delivered to Purchaser (and which shall be part of the Environmental Reports), and (ii) any recognized environmental conditions identified in the Phase I. If such Phase I and/or Phase II environmental site assessments disclose conditions which do not meet regulatory cleanup criteria or standards for the proposed residential use, Purchaser acknowledges and agrees that Purchaser will be solely responsible and liable for conducting cleanup or remediation at or of the Real Property required or necessary to achieve such applicable cleanup criteria or standards for the proposed residential use prior to conducting such proposed residential use. Purchaser shall provide Seller with copies of the reports of any Phase I and/or Phase II site assessments conducted at the Real Property and any reports detailing cleanup or remediation conducted by Purchaser at the Real Property, if required, to meet applicable regulatory cleanup criteria or standards (including vapor mitigation) for the proposed residential use. Seller will waive the provisions of this Section 5.1(b)(viii) and will record such waiver with the deed to the Real Property if Seller is reasonably satisfied that Purchaser has met its obligations under this Section 5.1(b)(viii).

(c) <u>Clarifications to Deed Restrictions</u>.

(i)     Excluded from Purchaser's obligations as set forth in the last two sentences of Section 5.1(b)(i) above are the following: (A) any Claims by any employee, invitee, customer, vendor or contractor of GM (or their spouses, heirs, successors, and personal representatives) related to bodily injury or personal injury, including, without limitation, illness or death, sustained or alleged to be sustained by any such employee, invitee, customer, vendor or contractor while on the Property prior to the Closing Date, (B) a breach by Seller of its obligations pursuant to Section 2.10 above, and (C) any Claims relating to a breach of Seller's representations and warranties set forth in Article 4 above (collectively, the "<u>Exclusions</u>").

(ii)     The prohibitions of Section 5.1(b)(iv) above are not intended to prohibit Purchaser from utilizing engineering controls and/or in situ or other on-site remediation techniques in the course of its performance of Response Activities to address contamination at, under or migrating from the Property.

(iii)     Seller shall waive the requirement that Section 5.1(b)(iii) relating to the Debris be included in any deed, lease or other agreement as set forth above provided that Purchaser delivers to Seller evidence (which shall include photographic evidence of the Property), reasonably acceptable to Seller, that Purchaser has removed all Debris from the Property in accordance with all applicable laws, including, without limitation, all Environmental Laws. Seller shall be entitled to, but not obligated to, audit and conduct its own investigations to confirm such evidence provided by Purchaser. In the event that such audit or investigations indicate that Purchaser has not removed all such Debris from the Property, Seller shall not waive the requirement that this Section 5.1(b)(iii) be included in any deed, lease or other agreement and Purchaser shall promptly reimburse Seller for the reasonable costs and expenses incurred by Seller in conducting such audit or investigation.

(iv)     Notwithstanding anything set forth in this Agreement, the representations, warranties and covenants related to restrictions on uses of or at the Land contained in Section 5.1(b)(iii), (vi), and (vii) above need not be included in any lease agreement with individual tenants of any building constructed (or to be constructed) on the Land, unless such lease agreement contains an option to purchase or provisions allowing the tenant to structurally renovate or modify the then existing leasehold space, install equipment or take any other action which could affect the surface or subsurface of the Land, in which case such provisions must be included without modification in such agreement for any portion of the Land and all amendments thereto.

(v)     Seller acknowledges that Purchaser's Affiliate under the Linden Development Agreement (and not Purchaser) shall be responsible for the Defined Groundwater Condition. Seller's acknowledgement that Purchaser's Affiliate under the Linden Development Agreement (and not Purchaser) is responsible for the Defined Groundwater Condition on the Real Property is not intended to, nor shall it, constitute a waiver by Seller of any claims as against Purchaser's Affiliate under the Linden Development Agreement for the Defined Groundwater Condition or any other matter therein.

(d) Survival. The obligations (including, without limitation, all indemnity obligations) and use restrictions set forth in this Section 5.1 shall survive the Closing.

## 5.2 Condition of Property.

(a) Inspection of Property. Purchaser represents to Seller that, as of the Closing, Purchaser knows, has examined and has investigated to the full satisfaction of Purchaser, the physical nature and condition, including the environmental condition, of the Property and the Improvements thereon. Purchaser further represents and acknowledges that the Property may contain wetlands, woodlands, non-game and endangered species of wildlife and/or habitats that may be subject to regulation under applicable law, including Environmental Laws. Except as set forth in Article 4 hereof, neither Seller nor any agent, attorney, employee or representative of Seller has made any representation or warranty whatsoever regarding the physical nature and condition, including the environmental condition, of the Property, and that Purchaser, in executing, delivering or performing this Agreement, has not relied upon any statement or information made or given, directly or indirectly, orally or in writing, by any individual, firm or corporation.

(b) AS IS, WHERE IS, Waiver and Release.

(i)     Purchaser represents that in proceeding to Closing, it is purchasing the Property "AS IS, WHERE IS" AND WITH ALL FAULTS AND WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY NATURE WHATSOEVER (EXCEPT AS SET FORTH IN ARTICLE 4 ABOVE), EXPRESS OR IMPLIED, ORAL OR WRITTEN, AND IN PARTICULAR, WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, and, except for the Exclusions, without any right of action under contract (except as set forth in this Agreement), under any applicable Environmental Laws, or under common law or equity, against any Indemnified Party regarding (A) the physical nature or condition, including the environmental condition, of the Property, (B) any Hazardous Substance (as

defined below) migrating from or within the Property, and (C) the Defined Groundwater Condition on or migrating from the Property.

(ii)    Except with respect to the Exclusions, Purchaser hereby expressly waives and releases any right of rescission and all claims for damages by reason of any statement, representation, warranty, assurance, promise or agreement, if any, relating to the Property or the Defined Groundwater Condition on or migrating from the Property. Purchaser further releases and discharges all of the Indemnified Parties from any and all claims or causes of action (other than with respect to the Exclusions) which Purchaser may now have or hereafter have against Seller relating to or arising from (A) the Property, including the physical nature or condition, and the environmental condition of (including any Hazardous Substances migrating from) the Property, and (B) the Defined Groundwater Condition on or migrating from the Property. Purchaser acknowledges and agrees that Seller shall have no liability of any kind whatsoever with respect to the condition of the Property (other than with respect to the Exclusions) or with respect to the Defined Groundwater Condition on or migrating from the Property. Except with respect to the Exclusions, Purchaser expressly assumes all liability and responsibility for the Property (as set forth in this Agreement, including undertaking the Response Activities, if any, as required under this Section 5.2) in perpetuity, including, without limitation, the physical nature and condition, and the environmental condition, of the Property and any Improvements thereon. Purchaser further acknowledges and agrees that Purchaser expressly assumes and shall be solely liable and responsible for any and all Hazardous Substances located on, under, in, or migrating from or within the Property, and damages relating thereto, including but not limited to damages to Natural Resources, as that term is defined under Federal and State law, (except as provided herein with respect to Exclusions), and for all liability (under statute, common law or otherwise) with respect to injury or death or damage to person or property and for any and all environmental remediation (including off-site areas, if any) required thereby in connection with historic, current or future uses or operation at the Property, including, but not limited to, remediation (or any associated deed notices or other filings) that may be required (A) under any applicable Environmental Law, (B) by the United States Environmental Protection Agency ("USEPA") or the NJDEP, or (C) otherwise. Notwithstanding anything herein to the contrary, the responsibility and liability for the Defined Groundwater Condition on the Property has been assumed by Purchaser's Affiliate under, and subject to, the Linden Development Agreement and Purchaser acknowledges and agrees that any claims that Purchaser may have with respect to the Defined Groundwater Condition shall be the responsibility and liability of Purchaser's Affiliate under, and subject to, the Linden Development Agreement and Purchaser shall look solely to Purchaser's Affiliate with respect to any such claims.

(iii)    Seller acknowledges and agrees that the terms of this Agreement, including, without limitation, the provisions of this Section 5.2(b), are solely for the benefit of Seller and the other Indemnified Parties, and no other third party shall be entitled to rely on the terms of this Agreement. Nothing herein waives, or is intended to be a waiver or a limitation, of any claims by Purchaser as against any party (other than Seller and the other Indemnified Parties) with respect to the assumption hereunder by Purchaser of any liability or responsibility for the condition of the Property.

(c)    Asbestos and Lead-Based Paint.    Seller has informed Purchaser that the Property may contain asbestos insulation and other asbestos-containing material ("ACM") and/or surfaces

coated with lead-based paint ("LBP"). After Closing, Purchaser acknowledges and agrees that, except as set forth in Section 2.10, Seller will have no further obligation with regard to the presence, condition, maintenance, handling, repair, removal, abatement or disposal of any ACM or LBP at the Property. Except as set forth in Section 2.10, Purchaser expressly assumes and shall be and remain solely liable and responsible for the condition and proper maintenance, handling, repair, removal, abatement, demolition, or disposal of any ACM or LBP at the Property under this or any other contract between the parties hereto, under any Environmental Laws (as defined herein), or under common law or equity. Subject to Section 2.10 above, Purchaser hereby releases the Indemnified Parties from and, subject to Section 2.10 above and Section 5.2(j) below, Purchaser shall indemnify, defend (with counsel reasonably acceptable to Seller) and hold the Indemnified Parties harmless from and against any and all Claims relating to ACM or LBP, whether such claims arise under any Environmental Laws, under any other federal, state, or local statutes, regulations, and ordinances, including, without limitation, those governing health and safety, under contract law, or under common law or equity.

(d) _Improvements_.    Purchaser acknowledges that the Property includes the Improvements and equipment and fixtures located therein which may be subject to regulation or compliance under Environmental Laws or under any other federal, state, or local statutes, regulations, and ordinances, including, without limitation, those governing health and safety. After the Closing, Purchaser acknowledges and agrees that, subject to Section 2.10 above, Seller will have no further obligation regarding the presence, use, condition, operation, modification, removal, disposal, replacement, repair of, or compliance with, Environmental Laws or any other federal, state, or local statutes, regulations, and ordinances, including, without limitation, those governing health and safety, relating to such Improvements, equipment and fixtures, including any remediation or cleanup of any environmental conditions on, under, in, or migrating from the Property in connection therewith. Except as set forth in Section 2.10 above, Purchaser expressly assumes and shall be and remain solely liable and responsible for such Improvements, equipment and fixtures. Subject to Section 2.10 above, Purchaser hereby releases the Indemnified Parties from and, subject to Section 2.10 above and Section 5.2(j) below, Purchaser shall indemnify, defend (with counsel reasonably acceptable to Seller) and hold the Indemnified Parties harmless from and against, any and all Claims relating to the Improvements, equipment and fixtures, whether such claims arise under any Environmental Laws, under any other federal, state, or local statutes, regulations, and ordinances, including, without limitation, those governing health and safety, under contract law, or under common law or equity.

(e) _Environmental Notices_. Promptly after the Closing, Seller will deliver a written notice to the USEPA and the NJDEP of the sale of the Property and Purchaser's agreement to assume all liability and responsibility for the environmental condition of the Property, and all Response Activities related thereto, in the form attached hereto as _Exhibit C_, except for the Defined Groundwater Condition (which is the responsibility and liability of Purchaser's Affiliate under the Linden Development Agreement). Purchaser shall, prior to the Closing, complete and deliver to NJDEP the Remediation Agreement application or in lieu thereof, an application for expedited review or a remediation in progress waiver, whichever is applicable, enter into an agreement(s) or order(s) with the NJDEP under applicable law, and enter into a Remediation Agreement (if the expedited review or remediation in progress waiver is not applied for or disapproved by NJDEP) with NJDEP to assume Seller's responsibility under the Industrial Site Recovery Act ("ISRA") and other applicable Environmental Laws, to complete all Response Activities (for industrial/commercial use) which will address all environmental conditions on, under, in, or migrating from the Property (the "Environmental Conditions"), in accordance with all applicable Environmental Laws (collectively, the "Orders") and in order to complete all of

Purchaser's obligations under this Agreement and the Orders. To the extent Purchaser files for expedited review or a remediation in progress waiver, Seller shall provide Purchaser with the necessary certification and shall perform the required preliminary assessment and site investigation as applicable, consistent with ISRA.

(f) <u>Response Activities</u>. Purchaser shall undertake cleanup, remediation, investigation, sampling, monitoring, inspection, evaluation, construction, installation, operation and maintenance of any remedial systems installed at, in, on, or in connection with the Property, and make all filings associated therewith (including but not limited to Deed Notices and Classification Exception Areas) and undertake periodic assessments and/or certifications regarding the continued protectiveness of the environmental remediation (herein, "<u>Response Activities</u>") required to be taken by Purchaser relating to the Environmental Conditions pursuant to and in accordance with this Agreement, all Environmental Laws, the Orders, and any other corrective action agreement entered into by Purchaser and USEPA, NJDEP or any other governmental agency, and any subsequent agreements or orders entered into with or issued by USEPA, NJDEP or other governmental agencies related to the Property, at Purchaser's sole cost and expense. If the USEPA, any state agency, or any other local, state or federal agency or governmental entity requires Seller to reimburse such party for any amounts relating to Purchaser's operations at or remediation of the Property (including, without limitation, any "Brownfield" remediation funds, credits or tax relief of any kind), and Purchaser fails, within sixty (60) days (or such shorter time period as required by USEPA, NJDEP, any other local, state or federal agency or governmental entity or such other third party) after the date Purchaser receives a reimbursement notice from USEPA, NJDEP, or otherwise, to notify Seller and USEPA, NJDEP, or other state agency that Purchaser is contesting such default notice, Purchaser shall, within ten (10) business days after receipt of an invoice from Seller, reimburse Seller for all costs and expenses or other payments incurred by Seller, by wire transfer to an account designated by Seller. Notwithstanding the foregoing, if Purchaser elects to contest such reimbursement notice, Purchaser shall promptly provide Seller with reasonable evidence of the basis for such objection and shall indemnify, defend (with counsel reasonably acceptable to Seller) and hold the Indemnified Parties, harmless from and against any and all Claims, arising out of or related to Purchaser's contest. Purchaser shall have the sole right to apply for and negotiate any and all "Brownfield" remediation funds, credits, tax relief, and any other financial incentive funding relating to the Property, including but not limited to any funding to reimburse any and all costs Purchaser actually incurs to remediate the Property. Seller shall not initiate or, where reasonably practicable under the circumstances, engage in any discussions with the USEPA, any state agency, or any other local, state or federal agency or governmental entity regarding any "Brownfield" remediation funds, credits, tax relief or other financial incentive funding relating to the Property and refer any inquiries concerning such matters to Purchaser. Seller will, as soon as reasonably practicable under the circumstances, notify Purchaser of any contact, whether written, verbal, or in person, by or with any governmental agency, or agency representative regarding any "Brownfield" remediation funds, credits, tax relief or other financial incentive relating to the Property.

(g) <u>Implementation of Response Activities</u>. Purchaser shall promptly commence and diligently implement and complete the Response Activities required, including, if required, implementing any Final Corrective Measures as set forth in the Orders, providing a Final Remedy Construction Completion Report, and requesting a "No Further Action and Covenant Not to Sue" determination or similar concurrence from the USEPA, NJDEP or other applicable state agencies, to ensure Purchaser's compliance with all Environmental Laws. Purchaser shall request that Seller be included, and shall take all reasonable steps to have Seller included, in such

"No Further Action and Covenant Not to Sue" determination or similar concurrence. Seller shall be entitled, but shall not be obligated, to enter upon the Property after the Closing to observe and monitor all Response Activities and all excavation, grading and other construction activities (including, without limitation, all demolition activities) to insure that Purchaser is fulfilling the requirements of the Orders, this Agreement, and all Environmental Laws. Prior to delivering any significant, material reports or submittals to such appropriate governmental agencies pertaining to the Property, Purchaser shall provide copies of such reports and submittals to Seller. Purchaser shall consider all reasonable comments by Seller to such reports or submittals and shall make all reasonable changes as requested by Seller, so long as such comments from Seller are timely received by Purchaser prior to any submittal dates.

(h) Indemnity.  Except as set forth in Section 5.2(j) below, Purchaser shall defend (with counsel reasonably acceptable to Seller), indemnify, protect, and save harmless the Indemnified Parties, from and against any and all Claims arising or brought under any Environmental Laws, common law, or equity that: (i) are related to, or are in any way connected with, or arise out of the current or historical physical nature or condition of the Property, including, without limitation, the environmental condition of the Property (bit excluding the Defined Groundwater Condition), (ii) are related to or arise from any and all acts or omissions by Purchaser or Purchaser's agents, employees, contractors, subcontractors, purchasers, tenants, licensees, invitees, or other third parties who are present on the Property after Closing, including, without limitation, any claims by any state for federal agency for reimbursement by any Indemnified Party of "Brownfield" remediation funds, credits, tax relief, and any other financial incentive funding relating to the Property; (iii) result from Claims of injury to person or property or loss of life sustained in or about the Property whether due to the presence of or exposure to Hazardous Materials or otherwise, filed after Closing; or (iv) without limiting the generality of the foregoing, arise from the breach by Purchaser of any of its representations, warranties, and covenants under the terms of this Agreement or the Orders. Notwithstanding anything herein to the contrary, with respect to any indemnity claim relating to an environmental matter on, under, in, or migrating from or within the Property, Purchaser shall not settle any such claim without the prior written consent of Seller, which consent may be granted or withheld in Seller's reasonable discretion.

(i) Indemnity Claims.  In the event that a Claim is made against an Indemnified Party that the Indemnified Party believes is subject to the indemnification provisions hereunder, the Indemnified Party shall notify Purchaser of the assertion of such Claim within thirty (30) days of the receipt by it of any such Claim (the "Claim Notice"); provided, however, that if such Claim Notice is given after such deadline, Purchaser's indemnification obligation hereunder shall not be affected except in the event and to the extent it can demonstrate prejudice therefrom.  If within twenty (20) days of receipt of the Claim Notice, Purchaser does not give notice to the Indemnified Party that Purchaser shall assume the defense and settlement of any such Claim in accordance with the terms hereof, the Indemnified Party may defend against such Claim, at Purchaser's cost, in such manner as it may deem appropriate, including, but not limited to, settling such Claim or litigation (after giving fifteen (15) days prior written notice of the same to Purchaser) on such terms as the Indemnified Party may deem appropriate. The election by Purchaser, pursuant to this section, to undertake the defense of any claim, shall not preclude the Indemnified Party from also participating or continuing participating in such defense, as long as such Indemnified Party bears its own legal fees and expenses for so doing. Purchaser agrees that it shall not settle or resolve any Claim against an Indemnified Party without that Party's prior written consent, such consent not to be unreasonably withheld.

(j) <u>Limitation on Indemnity</u>. Notwithstanding anything in this Agreement to the contrary, neither Purchaser nor its Assignee shall be liable or responsible for, and neither Purchaser nor its Assignee shall indemnify the Indemnified Parties with respect to the Exclusions. In addition, the obligation of Duke Realty Limited Partnership ("<u>Duke</u>") to indemnify (whether or not Duke assigns this Agreement pursuant to the terms of Section 12.10 hereof) the Indemnified Parties for Claims by third parties relating to the Environmental Condition of the Property, shall terminate on the twentieth (20th) anniversary of the Closing Date (the "<u>Indemnity Termination Date</u>"); provided that, if an Indemnified Party notifies Duke or its Assignee (as defined in Section 12.10 below) prior to the Indemnity Termination Date of any such Claim, Duke's indemnity obligation with respect to such Claim shall continue until such time as such Claim is resolved. Notwithstanding the terms of the preceding sentence, (i) Duke's indemnity obligations relating to any commitments made by Duke or its Assignee under the terms of the Order or any other agreement entered into between Duke or its Assignee and the USEPA, any state agency, or any other local, state or federal agency or governmental entity shall continue until the later of (x) the Indemnity Termination Date, or (y) such date as Duke or its Assignee has fully complied with the terms of all such commitments and agreements, and (ii) Duke's indemnity obligations relating to any act or omission by Duke, its Assignee, or their respective Affiliates, agents, employees, or contractors (including, without limitation, those matters set forth in Section 5.2(c) and 5.2(d) or any offsite disposal by Duke, its Assignee, or their respective Affiliates, agents, employees or contractors of Hazardous Materials or other materials) shall continue in perpetuity. Notwithstanding anything herein to the contrary, in the event that Duke assigns this Agreement to an Assignee, the limitations set forth in this Section 5.2(j) (other than the first sentence of this Section 5.2(j)) shall not apply to such Assignee and Assignee's indemnity obligations shall be unlimited in scope and shall continue in perpetuity. Further, Duke and Assignee shall enforce all indemnity commitments of any kind provided to Duke or its Assignee from any transferee of any interest in the Property (whether by sale, lease or otherwise) relating to the Environmental Condition or any matter that could have an adverse impact on the Environmental Condition, and Seller shall be a third party beneficiary of such indemnity commitments.

(k) "<u>Hazardous Material</u>" means any chemical or substance (i) the presence of which requires investigation or remediation under any federal, state or local statute, regulation, ordinance, orders, action, policy or common law; (ii) which is or becomes defined as a "hazardous waste" or "hazardous substance" under any federal, state or local statute, regulation or ordinance or amendments thereto including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601 *et seq.*), the Resource Conservation and Recovery act (42 U.S.C. §§ 6901 *et seq.*); the New Jersey Spill Compensation Control Act N.J.S.A. 58: 10-23.11, (iii) which is toxic, explosive, corrosive, carcinogenic, mutagenic or otherwise hazardous and is or becomes regulated by any governmental authority, agency, department, commission, board, agency or instrumentality of the United States, the State of New Jersey, or any political subdivision thereof; (iv) the presence of which on the Property causes or threatens to cause a nuisance upon the Property or to adjacent properties or poses or threatens to pose a hazard to the health or safety of persons on or about the Property; (v) the presence of which on adjacent properties could constitute a trespass; (vi) without limitation which contains gasoline, diesel fuel, fuel oil or other petroleum hydrocarbons; or (vii) without limitation which contains polychlorinated biphenyls ("<u>PCBs</u>"), or asbestos or urea formaldehyde foam insulation.

(l) <u>Insurance</u>. Purchaser shall, at Purchaser's sole cost and expense, (i) insure that the Property is covered by environmental insurance policy obtained by Purchaser's Affiliate under

the Linden Development Agreement, (ii) name Purchaser and Seller as additional insureds under such policy, and (iii) deliver to Seller certificates of insurance evidencing all of the requirements set forth herein. All of the terms of such policy as set forth in the Linden Development Agreement shall apply to this Agreement as is such terms were set forth herein.

(m) Workplans. Purchaser acknowledges that the Prior Owner has submitted to USEPA and NJDEP a Remedial Action Workplan relating to the soils on the Property. As part of such submittal, Seller has recorded, or will record, a Deed Notice. Seller shall deliver a copy of the Deed Notice to Purchaser. The Deed Notice shall run with the Land, shall be binding upon all subsequent owners, tenants, and users, and shall be enforceable against Purchaser, its successors, and assigns and inure to the benefit of and be enforceable by Seller, its successors and assigns. Purchaser shall be entitled to such Deed Notice after the Closing in accordance with all applicable Laws. Subject to the Exclusions, Purchaser's Affiliate's obligations relating to the Defined Groundwater Condition under the Linden Development Agreement, and the terms of Section 5.2(j) hereof, Purchaser shall be solely responsible for all soil and groundwater matters on the Property following the Closing, including, without limitation, all requirements set forth in the Remediation Action Workplan described in this Section 5.2(m) and all monitoring and maintenance requirements and filings, including biennial certifications as required by Environmental Laws.

(n) Survival. Purchaser's obligations under this Section 5.2 shall survive the Closing.

## 6. PURCHASER'S OBLIGATION TO CLOSE.

**6.1 Purchaser's Conditions.** Purchaser shall not be obligated to close the transaction contemplated hereunder unless each of the following conditions shall be satisfied on the Closing Date:

(a) Performance. Seller shall have performed, in all material respects, its obligations hereunder to be performed on or before the Closing Date (including, without limitation, the execution and delivery of the Remediation Agreement set forth in Section 5.2(e) above).

(b) Accuracy of Representations. The representations and warranties of Seller in Article 4 shall be true and correct in all material respects on and as of the Closing Date.

**6.2 Seller's Conditions.** Seller shall not be obligated to close the transaction contemplated hereunder unless each of the following conditions shall be satisfied on the Closing Date:

(a) Performance. Purchaser shall have performed its obligations hereunder to be performed on or before the Closing Date (including, without limitation, the execution and delivery of the Remediation Agreement set forth in Section 5.2(e) above).

(b) Accuracy of Representations. The representations and warranties of Purchaser in Article 6 shall be true and correct in all material respects on and as of the Closing Date.

**6.3 Failure of Conditions.** If any condition specified in Section 6.1 above is not satisfied on or before the Closing, then at Purchaser's option, (a) if Seller notifies Purchaser (which Seller shall have no obligation to do) that Seller would like to attempt to cure or satisfy any such condition that is susceptible of cure, Purchaser may at its option extend the date for Closing to allow Seller a sufficient time (but not to exceed sixty (60) days) within which to cure or satisfy any such condition, in which case Seller shall immediately commence prosecution of such cure or satisfaction and diligently pursue same to completion, at which time a new Closing shall be scheduled within ten (10) days after completion of such

cure or satisfaction, (b) Purchaser may waive such condition either at the time originally established for Closing or at any time thereafter until the end of the cure period provided pursuant to clause (a) above and proceed to close the transaction described herein on the terms set forth in this Agreement, (c) Purchaser may terminate this Agreement by written notice thereof to Seller, either at the time originally established for Closing or at the end of the cure period provided pursuant to clause (a) above, if by the end of such cure period such condition has not been cured, in which case the Deposit shall be promptly returned to Purchaser and the parties shall thereupon be relieved of all further obligations hereunder other than the Surviving Obligations, or (d) if the failure of the condition is due to a breach by Seller hereunder, Purchaser may pursue any of its remedies under Section 11.1.

## 7. CLOSING.

**7.1 Time of Closing.**  The Closing shall take place at the offices of the Title Company at 10:00 a.m. on the date which is thirty (30) days after the expiration of the Equipment Inspection Period (but in no event later than September 16, 2008), or such earlier date as may be mutually acceptable to the parties (the "Closing Date").  If the Closing does not occur, the Deposit shall be returned to Purchaser, retained by Seller, or otherwise dealt with, all as provided elsewhere in this Agreement.

**7.2 Deliveries.**  At the Closing, the following shall occur:

(a) Deed.  Seller shall deliver to Purchaser a duly executed and acknowledged special warranty deed, in substantially the form and content of Exhibit D, conveying the Real Property to Purchaser, warranting title against all matters affecting title created by, through or under Seller, except for the Permitted Exceptions.

(b) Bill of Sale.  Seller shall deliver to Purchaser a duly executed and acknowledged Bill of Sale, in substantially the form and content of Exhibit E, conveying the Equipment to Purchaser.

(c) Purchase Price.  Purchaser shall pay to Seller the Purchase Price as provided in Section 2.2, subject to the adjustments described in Article 8.

(d) Possession.  Possession of the Property shall be delivered to Purchaser.

(e) Affidavits.  Seller shall execute and deliver to Purchaser and Title Company an affidavit that evidences that Seller is exempt from the withholding requirements of Section 1445 of the Internal Revenue Code, and Title Company's standard form of owner/seller affidavit in the form attached hereto as Exhibit F.

(f) Additional Documents.  Seller and Purchaser shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all conveyances, assignments and all other instruments and documents as may be reasonably necessary in order to complete the transaction herein provided and to carry out the intent and purposes of this Agreement.

## 8. PRORATIONS AND CLOSING EXPENSES.

**8.1 Closing Adjustments.**  The cash due at Closing pursuant to Section 2.2 shall be subject to adjustment as of the Closing Date in accordance with the following provisions:

(a) Taxes. Real property taxes and assessments, including any special assessments, on the Land for the year of the Closing shall be prorated to the Closing Date based on the most recent assessed valuations and mill levy available, which proration shall be deemed a final settlement between the parties.

(b) Closing Costs. Seller shall pay the cost of recording any instruments required to discharge any liens or encumbrances against the Property, the Survey, one-half of Title Company's escrow or settlement fees, one-half of all transfer, sales, mansion, and recordation and conveyance taxes, and Seller's other customary closing costs, including NJDEP oversight expenses for periods prior to the Closing Date (and, following the Closing Date, Seller will pay all invoices for such NJDEP oversight expenses that relate to periods prior to the Closing Date). Purchaser shall pay the cost of the premium and any endorsements for any title policy Purchaser wishes to obtain, the cost of recording Seller's deed, one-half of all transfer, sales, mansion, recordation and conveyance taxes, all applicable roll-back taxes, one-half of Title Company's escrow or settlement fees, and Purchaser's other customary closing costs, including NJDEP oversight expenses for periods following the Closing Date.

**8.2 Settlement Statement.** At the Closing, Seller and Purchaser shall execute a Closing settlement statement to reflect the credits, prorations, and adjustments contemplated by or specifically provided for in this Agreement.

**8.3 Post-Closing Adjustments.** Except as expressly herein provided, Seller shall be entitled to all income, and shall pay all operating expenses, relating to the operation of the Property for the period prior to the Closing Date, and Purchaser shall be entitled to all income, and shall pay all operating expenses, relating to the operation of the Property for the period commencing on the Closing Date. Purchaser and Seller shall undertake, following Closing, to adjust between themselves, as of the Closing Date, any income or expenses of the Property that are not adjusted on the settlement statement.

## 9. CASUALTY DAMAGE.

**9.1 Notice and Estimate.** In the event that the Property is damaged by any casualty prior to Closing, Seller shall promptly give Purchaser written notice of such occurrence, and as soon thereafter as practicable shall provide Purchaser with an estimate made by an architect, engineer or contractor selected by Seller of the cost and amount of time required to repair such damage. If Purchaser does not terminate this Agreement pursuant to Section 9.3, Purchaser shall be given an opportunity to review and approve any construction contract that Seller proposes to enter into to have such damage repaired, and Purchaser shall not unreasonably withhold, condition or delay such approval.

**9.2 Minor Damage.** If the estimated cost of repairing such damage is less than $250,000, Seller shall promptly contract for and commence the repairs and complete so much thereof as may be accomplished prior to the Closing Date. If such repairs are not completed on or before the Closing Date, then at Purchaser's option (which shall be exercised by notice to Seller given on or before the Closing Date), either (a) the Closing Date shall be extended by the period of time that Seller's architect, engineer or contractor then estimates it will take to complete the repairs and, upon completion thereof, the parties shall schedule a new Closing Date (not later than ten (10) days following such completion) on which the Closing shall occur in accordance with the terms hereof; or (b) the Closing shall take place as scheduled and, at Closing, Seller shall assign to Purchaser so much of the insurance proceeds resulting from such damage as have not then been expended for repairs, Seller shall credit Purchaser with the amount of any deductible under Seller's insurance policy that has not then been expended for repairs, and Seller shall

assign to Purchaser, and Purchaser shall assume, the rights (including, without limitation, all warranties) and obligations under any construction contract pursuant to which such repairs are being completed.

**9.3 Major Damage.** If the estimated cost of such repairs is $250,000 or more, Purchaser may elect to terminate this Agreement upon notice to Seller within fifteen (15) days after Purchaser's receipt of the estimate, in which event the Deposit shall be promptly returned to Purchaser and both parties shall be relieved of any further obligations hereunder except for the Surviving Obligations; provided, however, that if Purchaser does not so elect to terminate this Agreement, this Agreement shall remain in full force and effect and the parties shall proceed in accordance with Section 9.2 above.

## 10. CONDEMNATION.

**10.1   Notice.** If, prior to Closing, Seller learns of any actual or threatened taking in condemnation or by eminent domain (or a sale in lieu thereof) of any of the Real Property, Seller shall notify Purchaser promptly thereof.

**10.2   Termination.** Other than with respect to an Immaterial Taking (as hereinafter defined), any actual or threatened taking or condemnation for any public or quasi-public purpose or use by any competent authority in appropriate proceedings or by any right of eminent domain of any of the Land between the date of this Agreement and the Closing Date shall, at Purchaser's option, cause a termination of this Agreement. The election to terminate provided hereby shall be exercised by Purchaser by written notice to Seller to that effect given within thirty (30) days following Purchaser's receipt of Seller's notice pursuant to Section 10.1 above. Upon delivery of such termination notice, the Deposit shall be promptly returned to Purchaser and both parties shall be relieved of any further obligations hereunder except for the Surviving Obligations. If Purchaser shall not so elect to terminate this Agreement, or in the event of an Immaterial Taking, Seller shall be relieved of all obligations under this Agreement with respect to the portion of the Real Property so taken or condemned, but Purchaser shall be entitled to receive all proceeds of any such taking or condemnation, and Seller agrees that it shall not make any adjustment or settlement of any such taking or condemnation proceeding without Purchaser's consent and shall take at Closing all action necessary to assign its entire interest in such award to Purchaser. Any taking or condemnation for any public or quasi-public purpose or use that affects less than twenty-five percent (25%) of the square footage of the Land and that does not affect access (or, in the event Purchaser has elected to buy the Equipment, the operation of the Property as a cogeneration facility) shall be deemed an "Immaterial Taking."

## 11. REMEDIES.

**11.1   Breach by Seller.** Time is of the essence with respect to Seller's obligations hereunder. If Seller fails to comply with any of its obligations hereunder, Purchaser, at Purchaser's option, shall be entitled to either terminate this Agreement and obtain the prompt refund of the Deposit (whereupon both parties shall be discharged from all duties and performance hereunder other than the Surviving Obligations), or to seek money damages (but in no event more than Purchaser's actual, out-of-pocket costs and expenses). Except for Seller's obligations set forth in Section 2.8 above, Purchaser hereby waives the right to seek specific performance from Seller.

**11.2   Breach by Purchaser.** Time is of the essence with respect to Purchaser's obligations hereunder. If Purchaser fails to comply with any of its obligations hereunder, Seller shall be entitled (a) to terminate this Agreement and have the Deposit promptly paid to Seller as liquidated damages or (b) to damages (but in no event more than Seller's actual, out-of-pocket costs and expenses).

## 12. GENERAL PROVISIONS.

**12.1    Construction.** As used in this Agreement, the singular shall include the plural and any gender shall include all genders as the context requires and the following words and phrases shall have the following meanings: (a) "including" shall mean "including without limitation"; (b) "provisions" shall mean "provisions, terms, agreements, covenants and/or conditions"; (c) "lien" shall mean "lien, charge, encumbrance, title retention agreement, pledge, security interest, mortgage and/or deed of trust"; (d) "obligation" shall mean "obligation, duty, agreement, liability, covenant and/or condition"; (e) any of the Property" shall mean "the Property or any part thereof or interest therein"; and (f) "any of the Land" shall mean "the Land or any part thereof or interest therein."

**12.2    Brokers.** Seller and Purchaser each hereby represent and warrant to the other that their sole contact with the other or with the Property has been made without the assistance of any broker or other third party, other than CB Richard Ellis ("Seller's Broker"). Seller shall be responsible for the payment of Seller's Broker's commissions in accordance with the agreement executed by Seller and Seller's Broker. Purchaser and Seller shall each indemnify, defend and hold the other party and each Affiliate of such party harmless from and against any and all Claims resulting from the breach by the indemnifying party of the representations, warranties, and covenants set forth in this Section. Purchaser's and Seller's obligations under this Section 12.2 shall survive the Closing and termination of this Agreement.

**12.3    Further Assurances.** Each of the parties hereto undertakes and agrees to execute and deliver such documents, writings and further assurances as may be required to carry out the intent and purposes of this Agreement.

**12.4    Entire Agreement.** No change or modification of this Agreement shall be valid unless the same is in writing and signed by the parties hereto. No waiver of any of the provisions of this Agreement shall be valid unless in writing and signed by the party against whom such waiver is sought to be enforced. This Agreement contains the entire agreement between the parties relating to the purchase and sale of the Property. All prior negotiations between the parties are merged in this Agreement; and there are no promises, agreements, conditions, undertakings, warranties or representations, oral or written, express or implied, between the parties other than as herein set forth.

**12.5    Survival.** The obligations of the parties hereunder, to the extent not fully performed or discharged by or through the Closing, shall not be deemed merged into any instrument delivered at Closing, shall survive Closing, and shall remain fully enforceable thereafter (except as set forth in Section 4.6 above).

**12.6    Dates.** If any date set forth in this Agreement for the delivery of any document or the happening of any event (such as, for example, the expiration of the Property Inspection Period, the Equipment Inspection Period, or the Closing Date) should, under the terms hereof, fall on a weekend or holiday, then such date shall be automatically extended to the next succeeding weekday that is not a holiday.

**12.7    Governing Law.** This Agreement shall be construed and enforced in accordance with the laws of the state in which the Land is located.

**12.8    Notices.** All notices, demands or other communications required or permitted to be given hereunder shall be in writing, and any and all such items shall be deemed to have been duly delivered upon personal delivery; or as of the third business day after mailing by United States mail, certified, return receipt requested, postage prepaid, addressed as follows; or as of the immediately

following business day after deposit with Federal Express or a similar overnight courier service, addressed as follows; or as of the business day of by facsimile to the facsimile number set forth below:

If to Seller:

> General Motors Corporation
> c/o Worldwide Real Estate
> 200 Renaissance Center
> Mail Code: 482-B38-C96
> P. O. Box 200
> Detroit, Michigan 48265-2000
> Attention: Director of Real Estate
> Telecopy: (313) 665-6745

with a copy to:

> General Motors Corporation
> Mail Code: 483-520-190
> 2000 Centerpoint Parkway
> Pontiac, Michigan 48341
> Attention: William McFarland
> Telecopy: (248) 753-5829

and

> Lowe, Fell & Skogg, LLC
> 370 Seventeenth Street, Suite 4900
> Denver, Colorado 80202
> Attn: David W. Fell, Esq.
> Telecopy: (720) 359-8201

If to Purchaser:

> Duke Realty Corporation
> 5600 Blazer Parkway, Suite 100
> Dublin, Ohio 43017
> Attn: William J. DeBoer, Executive Vice President
> Telecopy: (614) 932-6288

with a copy to:

> Duke Realty Corporation
> 3950 Shackleford Road, Suite 300
> Duluth, Georgia 30096
> Attn: Howard Feinsand, Esq., Executive Vice President and General Counsel
> Telecopy: (770) 717-2431

Any address or telecopy number fixed pursuant to the foregoing may be changed by the addressee by notice given pursuant to this Section 12.8. Seller and Purchaser shall promptly forward to the other party any correspondence received by Seller or Purchaser that should have been delivered to the other party.

**12.9    Headings.** The headings of Articles and Sections of this Agreement are for purposes of convenience and reference and shall not be construed as modifying the Articles or Sections in which they appear.

**12.10    Assignment.** Except for an assignment to an Affiliate of Purchaser (an "Assignee"), Purchaser may not assign this Agreement without the prior written consent of Seller, which is within Seller's sole judgment and discretion. Any approved assignee shall assume all obligations imposed on Purchaser as if the assignee were the original purchaser in this Agreement; provided, however, that Purchaser shall not be released from its duties and obligations hereunder (including, without limitation, all indemnity obligations of Purchaser hereunder). Upon assignment to the Assignee, the Assignee shall have all of the rights and benefits of Purchaser hereunder to the extent such rights and benefits are assigned to the Assignee.

**12.11    Successors and Assigns.** Subject to Section 12.10, this Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, personal representatives, successors and assigns.

**12.12    Like-Kind Exchange.** Purchaser agrees to cooperate with Seller for purposes of effecting and structuring, in conjunction with the sale of the Property, for the benefit of Seller, a like-kind exchange of real property, whether a simultaneous or deferred exchange, pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, provided that such cooperation does not affect or extend the Closing Date to the detriment of Purchaser. Purchaser specifically agrees to execute such documents and instruments as are reasonably necessary to implement such an exchange. Seller shall be solely responsible for assuring that the structure of any proposed exchange is effective for Seller's tax purposes. Furthermore, Purchaser specifically agrees that Seller may assign this Agreement and any of its rights or obligations hereunder, in whole or in part, as necessary or appropriate in furtherance of effectuating a Section 1031 like-kind exchange for the Property, provided that such assignment shall not serve to relieve Seller of any liability for Seller's obligations hereunder.

**12.13    Attorneys' Fees.** If either party commences an action to enforce the terms of, or resolve a dispute concerning, this Agreement, the court shall award the prevailing party in such action all costs and expenses incurred by such party in connection therewith, including reasonable attorneys' fees.

**12.14    Severability.** If any provision of this Agreement is declared void or unenforceable by a final judicial or administrative orders, this Agreement shall continue in full force and effect, except that the void or unenforceable provision shall be deemed deleted and replaced with a provision as similar in terms to such void or unenforceable provision as may be possible and be valid and enforceable.

**12.15    Confidentiality.** The existence and subject matter of this Agreement and any documents entered into or contemplated by this Agreement are confidential and shall not be disclosed to or discussed with any third parties by Purchaser (except Purchaser's counsel, representatives of lending institutions considering financing the transaction, the real estate brokers referred to in Section 12.2, and engineers or other professionals employed by Purchaser for purposes relating to this Agreement) without the prior written consent of Seller. The parties hereto shall not issue any press release or otherwise make public any information with respect to this Agreement.

**12.16   No Offer.**  The submission of an unsigned copy of this Agreement to Purchaser shall not constitute an offer or option to purchase the Property.   This Agreement shall become effective and binding only upon execution and delivery by both Seller and Purchaser.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date(s) set forth below, but as of the Effective Date.

SELLER:

GENERAL MOTORS CORPORATION, a
Delaware corporation

Date: _____7-1_____, 2008

By: _Debra H Hoge_
Name: _____
Title: ___DEBRA HOMIC HOGE___
___DIRECTOR___
___WORLDWIDE REAL ESTATE___

PURCHASER:

DUKE REALTY LIMITED PARTNERSHIP, an
Indiana limited partnership

By: Duke Construction Limited Partnership, its sole member

By: Duke Realty Corporation, its general partner

Date: _____, 2008

By: _____
Name: _____
Title: _____

The undersigned hereby executes this Agreement as a guarantor of all of the obligations of the Purchaser under this Agreement.

DUKE REALTY LIMITED PARTNERSHIP, an
Indiana limited partnership

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date(s) set forth below, but as of the Effective Date.

SELLER:

GENERAL MOTORS CORPORATION, a
Delaware corporation

Date: _____, 2008

By:_____
Name:_____
Title:_____


PURCHASER:

DUKE REALTY LIMITED PARTNERSHIP, an
Indiana limited partnership

By: Duke Realty Corporation, its general partner

Date: _7-1_____, 2008

By: *William J DeBoer*
Name: _WILLIAM J DEBOER_
Title: _EVP_


The undersigned hereby executes this Agreement as a guarantor of all of the obligations of the Purchaser under this Agreement.

DUKE REALTY LIMITED PARTNERSHIP, an
Indiana limited partnership

By: *William J DeBoer*
Name: _WILLIAM J DEBOER_
Title: _EVP_

# EXHIBIT A
## LEGAL DESCRIPTION

BEGINNING at a point In the southwesterly sideline of Pleasant Street (60 feet wide), where said sideline is intersected by the common boundary line between said Lot 67.1 In block 470 and Lot 6, Block 470, said point also being South 45 degrees 35 minutes 45 seconds East, 66.00 feet along said sideline from its intersection with the northwesterly sideline of Linden Avenue (66 feet wide); thence

1. Along said common boundary line between Lot 7.1 and 6 In Block 470, South 38 degrees 08 minutes 00 seconds West, 263.39 feet to a point on the common boundary line of said Lot 62 in Block 470; thence

2. Along the common boundary line between said lots 7.1 and 62 In Block 470, along an arc curving to the left having a radius of 453.34 feet and a chord bearing of South 36 degrees 10 minutes 17 seconds East, 245.28 feet, an arc length of 238.37 feet to a point in same; thence

3. Still along the said common boundary line between Lots 7.2 and 62 In Block 470, South 51 degrees 52 minutes 00 seconds East, 109.38 feet to a point on the common boundary line of said Lots 7.1 and 62 In Block 470 and Lot 7 In Block 470; thence

4. Along the common boundary line between said Lots 7.1 and 7 in Block 470, North 38 degrees 08 minutes 00 seconds East 329.75 feet to a point in the aforementioned southwesterly sideline of Pleasant Street; thence

5. Along said southwesterly sideline of Pleasant Street, North 51 degrees 52 minutes 00 seconds West, 345.51 feet to the POINT AND PLACE OF BEGINNING.

**EXHIBIT B**
**LIST OF EQUIPMENT**

| DESCRIPTION | SERIAL NO. | EQUIPMENT TYPE | MODEL NO. | MANUFACTURER | REMOVE |
|---|---|---|---|---|---|
| Gas Chromatograph | SS 383905 | Xmtr | 2350/ PN 7-0570-234 | Daniel | |
| Combustion Turbine 1 | 0625T | CT | Taurus 60TG 98104CST#2 | Solar Turbine | X |
| Steam Turbine 1 | C702702-1 | Steam Turbine | 2DYR-PE-75 | Elliot Turbine | X |
| Heat Recovery Steam Generator # 1 | W-3810 | HRSG | MF-3-52/VC-2-2809 | ERI | X |
| Economizer # 1 | E-3815 | Economizer | | ERI | X |
| Steam Turbine Gear Box #1 | C702702-3 | Gear Box | C6R4 | Lufkin | X |
| SCR Skid 1 Blower M1 | 121297313-1 | Fan | | Dynamic Fan | X |
| SCR Skid 1 Blower M2 | 121297314-1 | Fan | | Dynamic Fan | X |
| Combustion Turbine 2 | 0626T | CT | Taurus 60TG 98104CST#2 | Solar Turbine | X |
| Steam Turbine 2 | C702702-2 | Steam Turbine | 2DYR-PE-75 | Elliot Turbine | X |
| Heat Recovery Steam Generator # 2 | W-3814 | HRSG | MF-3-52/VC-2-2809 | ERI | X |
| Economizer # 2 | E-3811 | Economizer | | ERI | X |
| Steam Turbine Gear Box #2 | C702702-2 | Gear Box | C6R4 | Lufkin | X |
| SCR Skid 2 Blower M1 | 121297315-2 | Fan | | Dynamic Fan | X |
| SCR Skid 2 Blower M2 | 121297316-2 | Fan | | Dynamic Fan | X |
| Combustion Turbine 3 | 0679T | CT | Taurus 60TG 98104CST#2 | Solar Turbine | X |
| Steam Turbine 3 | C702702-3 | Steam Turbine | 2DYR-PE-75 | Elliot Turbine | X |
| Heat Recovery Steam Generator # 3 | W-3812 | HRSG | MF-3-52/VC-2-2809 | ERI | X |
| Economizer # 3 | E-3813 | Economizer | | ERI | X |
| Steam Turbine Gear Box #3 | C702702-1 | Gear Box | C6R4 | Lufkin | X |
| SCR Skid 3 Blower M1 | 121297317-3 | Fan | | Dynamic Fan | X |
| SCR Skid 3 Blower M2 | 121297318-3 | Fan | | Dynamic Fan | X |
| Steam Condenser | 97-31696-1 | Condenser | | Graham | X |
| Instrument Air Dryer | 97L31696-1 | Tank | HRD275 | Ingersoll Rand | X |
| Air Compressor # 1 | MM97-9843 | Air Compressor | 2ACII55M3HA | Ingersoll Rand Centac | X |
| Air Compressor Motor 1 | E10541-01-1 | Motor | 5810Z Frame Type CG | Siemens | X |

| Air Compressor # 2 (Parts missing) | MM97-9846 | Air Compressor | 2ACII55M3HA | Ingersoll Rand Centac | |
|---|---|---|---|---|---|
| Air Compressor Motor 2 | E10541-01-3 | Motor | 5810Z Frame Type CG | Siemens | |
| Air Compressor # 3 | MM97-9844 | Air Compressor | 2ACII55M3HA | Ingersoll Rand Centac | X |
| Air Compressor Motor 3 | E10541-01-4 | Motor | 5810Z Frame Type CG | Siemens | X |
| Air Compressor # 4 (Parts missing) | MM97-9845 | Air Compressor | 2ACII55M3HA | Ingersoll Rand Centac | |
| Air Compressor Motor 4 | E10541-01-2 | Motor | 5810Z Frame Type CG | Siemens | |
| Generator - Emergency Diesel | 382569 | Diesel Generator | 350ROZD71 | Kohler | X |
| Cooling Tower Cell # 1 | 119058-NC9265GM-1997 | Cool Tower | NC9265GM | Marley | |
| Cooling Tower Cell # 2 | 119058-NC9265GM-1997 | Cool Tower | NC9265GM | Marley | |
| Cooling Tower Cell # 3 | 119058-NC9265GM-1997 | Cool Tower | NC9265GM | Marley | |
| Cooling Tower Cell # 4 | 119058-NC9265GM-1997 | Cool Tower | NC9265GM | Marley | |
| Cooling Tower Cell # 5 | 119058-NC9265GM-1997 | Cool Tower | NC9265GM | Marley | |
| Auxiliary Boiler | A--3816/E-3817 | Boiler | N2S-7/S-122 (MR) | Nebraska | X |
| Aux Boiler Forced Draft Fan | | Fan | 980L,39,S,3,CW 90 Deg | BF | X |
| GM Sales Water Pump 1 (North) | 97E0182203A | Pump | 11-10705-133M61 | Paco | |
| GM Sales Water Pump 2 (South) | 97E0182203B | Pump | 11-10705-133M61 | Paco | |
| Liquid Fuel Unload Pump 1 (North) | 97E0182301A | Pump | 11-25955-133M01X | Paco | |
| Liquid Fuel Unload Pump 2 (South) | 97E0182301B | Pump | 11-25955-133M01X | Paco | |
| Condensate Transfer Pump 1 (North) | 97E0182201A | Pump | 11-15705-133M61-2781 | Paco | |
| Condensate Transfer Pump 2 (South) | 97E0182201B | Pump | 11-15705-133M61-2781 | Paco | |
| Circulation Water Pump 1 | 97E0182102B | Pump | 32-16174-D1100X1-2963 | Paco | |

| | | | | | |
|---|---|---|---|---|---|
| Circulation Water Pump 2 | 97E0182102A | Pump | 32-16174-D1100X1-2963 | Paco | |
| Circulation Water Pump 3 | 97E0182101 | Pump | 32-16174-D1100X1-2963 | Paco | |
| Hot Well Condensate Pump 1 | 97JA2867A | Pump | 11DLC | Paco/John | |
| Hot Well Condensate Pump 1 | 97JA2867B | Pump | 11DLC | Paco/John | |
| Liquid Fuel Transfer Pump 1 | 3209-2\H32755-2 | Pump | USNH40ER54 | Shanly\Alwr | |
| Liquid Fuel Transfer Pump 2 | 3209-2\H32755-1 | Pump | USNH40ER54 | Shanly\Alwr | |
| Station UPS | FE10K02610 | UPS | FE10KVA | Best Power | X |
| DA Feedwater Heater | | Heater | | Cochran | |
| Transformer-Emergency Source | 98600007 | Transformer | OA/FA | Cooper | X |
| Transformer-480-6900 volt | PCL-1366 | Transformer | OA/FA | GE | X |
| Transformer-Main 6.9-26.4kv | 64095 | Transformer | OA/FA/FA | Niagara | X |
| PA Refrigerated Dryer Compressor 1 | ET97L00177S | Air Dryer | 5RS2-4000-TSN-207 | Copeland | X |
| Process Air Refrigerated Dryer 1 | 97MDXR1679 | Air Dryer | DXR8250W-RSP | Ingersoll Rand | X |
| Boiler Feedwater Pump 1 | 1197-1478 RN | Pump | A163224 | IDP | |
| Boiler Feedwater Pump 2 | 0799-5791 LINE C | Pump | A216747 | IDP | |
| Boiler Feedwater Pump 3 | 1197-1478C SC/LG | Pump | A163224 | IDP | |
| Station Air Compressor | 5032133 | Air Compressor | 3000 | Ingersoll Rand | X |
| Ammonium Hydroxide Tank | F 7411 | Tank | | Tanner | X |
| Ammonium Hydroxide Pump 1 | 146870 | Pump | M03RAPPSSEHM | Metro | |
| Ammonium Hydroxide Pump 1 | 138259 | Pump | M03RAPPSSEHM | Metro | |
| Fuel Oil Tank | 107700 | Tank | | CBI | |
| Raw Water Tank | 107701 | Tank | | CBI | |
| DI Water Tank | J8320 | Tank | | Composite Tanks | |
| Condensate Tank 1 | | Tank | | Composite Tanks | |

| Condensate Tank 2 | | Tank | | Composite Tanks | |
|---|---|---|---|---|---|
| | | | | | |

**EXHIBIT C**
**FORM OF USEPA/NJDEP LETTER**

_____, 2007

Environmental Protection Agency—Region II

_____

_____

Re: General Motors Property; Linden, New Jersey (the "Property")

Dear Sir or Madam:

Please be advised that on _____, General Motors Corporation sold the Property to _____ ("Purchaser"). Purchaser is assuming all liability and responsibility for the environmental condition of the Property, and all environmental remediation on the Property.

The contact person for Purchaser is: [list name and address]. Purchaser looks forward to working with the EPA on the remediation of the Property.

Sincerely,

_____

By: _____

**EXHIBIT D**

**FORM OF SPECIAL WARRANTY DEED**

THIS INSTRUMENT PREPARED BY:

Lowe, Fell & Skogg, LLC
370 Seventeenth Street
Suite 4900
Denver, Colorado  80202

---

**DEED**

STATE OF NEW JERSEY                )
                                   ) ss.   KNOW ALL PERSONS BY THESE PRESENTS:
COUNTY OF UNION                    )

    THIS DEED ("Deed"), is made on _____, 2008, between GENERAL MOTORS CORPORATION, a Delaware corporation, whose address is c/o Worldwide Real Estate, 200 Renaissance Center, Mail Code: 482-B38-C96, P.O. Box 200, Detroit, Michigan 48265-2000, referred to as the "Grantor", and _____, a New Jersey limited liability company, whose address is c/o Duke Realty Corporation, 5600 Blazer Parkway, Suite 100, Dublin, Ohio 43017, referred to as the "Grantee."

    **Transfer of Ownership.**  Grantor grants and conveys (transfers ownership of) the property ("Property"), described below to Grantee.  This transfer is made for the sum of _____ ($_____).  The Grantor acknowledges receipt of this money.

    **Tax Map Reference.**

    X  No property tax identification number is available on the date of this Deed.  (Check box if applicable).

    **Property.**  The Property consists of the land and all the buildings and structures on the land in the City of Linden, County of Union and State of New Jersey.  The legal description for the Property is attached hereto as Exhibit A.

    **Promises by Grantor.**  Grantor promises that Grantor has done no act to encumber the Property. This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6).  This promise means that Grantor has not allowed anyone else to obtain any legal rights that affect the Property (such as by making a mortgage or allowing a judgment to be entered against Grantor).

    **Deed Restriction.**  Notwithstanding anything to the contrary, Grantee takes the Property subject to the following restrictions, which restrictions shall run with the Property and bind Grantee, its successors and assigns:

{#00796708.5 07138-0425 6/27/2008 01:56 PM}                D-1

(i)      Grantee acknowledges and agrees that Grantee shall, at all times, comply with any and all applicable federal, state, or local environmental laws, regulations, ordinances, codes, guidelines, or administrative orders, including any and all permits, licenses, or authorizations issued thereunder, including, but not limited to, any and all due care requirements under New Jersey law and all Federal and State requirements/guidelines (collectively "Environmental Laws"), in connection with or related to the use, operations, development, excavation, (including off-site disposal of site soils and the mitigation of vapor intrusion with respect to the remediation/redevelopment of the Property) grading, construction, or demolition, at, in, on, or below the Property. Grantee, its successors and assigns shall be solely responsible and liable for any and all issues related to the migration of water within the Property and off of the Property. Grantee, its successors and assigns shall be solely responsible and liable for any and all alleged or actual violations of any applicable Environmental Laws concerning or related to the Property.

(ii)     Grantee acknowledges and agrees that use of groundwater at, in, or under the Property by any person or entity for any purpose, including potable and non-potable uses, shall be strictly prohibited.

(iii)    Grantee represents, acknowledges, and agrees that, at Closing, the Property may contain various discarded materials, including, but not limited to, building materials from demolition activities; domestic and industrial trash; tires; automotive parts; used containers which held materials such as paint, antifreeze, gasoline, and other chemical substances; materials painted with lead-based paints or otherwise, wood, concrete, brick, and floorblock; and building materials which may contain asbestos-containing materials, and roof shingles (these discarded materials are herein collectively referred to as "Debris"). Grantee acknowledges and agrees that Grantee, and not Grantor, shall be solely liable and responsible for such Debris and all matters relating thereto, including the proper management and disposal of such Debris. By way of example, but not limitation, Grantee shall comply with all guidance/policy directives of the New Jersey Department of Environmental Protection ("NJDEP") regarding the recycling/re-use of concrete waste generated by demolition of buildings located on the property. Grantee further represents, acknowledges, and agrees that any and all soil and/or Debris management and surface water and/or groundwater management required or necessary under applicable laws or regulations or because of excavation, demolition, or soil disturbance related to the use, operations, development, excavation, grading, construction, or demolition, at, in, on, or below the Property is the sole obligation and liability of Grantee. Such soil and/or Debris management and surface water and/or groundwater management may include in-place management, excavation, sediment and erosion control, and disposal or other soil and Debris management options which are allowed or required under applicable Environmental Laws.

(iv)     Grantee covenants and agrees that it shall not "treat," "store" or "dispose" of any "hazardous substances," "hazardous wastes" or "toxic substances" as those terms are defined under CERCLA, 42 U.S.C. 9601 et. seq., RCRA, 42 U.S.C. 6901 et. seq., or TSCA, 15 U.S.C. 2601 et. seq., or under similar New Jersey law, statute, or regulation, on, at, or below the Property, and shall maintain generator-only status; provided, however, that Grantee may (A) accumulate such substances or wastes as allowed under applicable Environmental Laws for off-site treatment, off-site storage, or off-site disposal, and (B) use and/or store commercial products on-site which may contain such substances.

(v)      Grantee acknowledges and agrees that the Property may only be used by Grantee, its successors, assigns, and tenants for industrial and commercial uses except as

otherwise permitted in subparagraph (viii) below. Such prohibited uses include, but are not limited to, residential uses, day care centers, schools, hospitals, and long-term care facilities or other similar uses that would typically require cleanup to unrestricted use standards under applicable New Jersey law. Grantee further acknowledges and agrees that any site modifications or redevelopment limitations required at, in, on, or below the Property or modification to building design or construction to accommodate allowable industrial and commercial uses (and residential uses if permitted by Grantor) hereunder consistent with Environmental Laws, remedial systems on the Property of any kind, or otherwise, is the sole obligation and liability of Grantee (or the owner of the Property at the time of such activities) and will be conducted at Grantee's sole expense.

(vi)      Grantee acknowledges and agrees that, at Closing, the Property may contain underground process or utility lines or piping, including, without limitation, sanitary or storm sewers and gas, water, electrical, fire protection and septic systems, and any other similar utility lines or piping which may be present at or below the Property (herein collectively referred to as "Utility Lines"). Grantee further acknowledges and agrees that Grantee, and not Grantor, shall be solely liable and responsible for such Utility Lines and all matters relating thereto. Further, Grantee acknowledges and agrees that any and all management, including, but not limited to, maintenance, removal, repair, or associated cleanup of the environment, of or due to any such Utility Lines that may be required or necessary: (a) under applicable Environmental Laws or other laws or regulations, (b) to properly maintain the Property, or (c) because of excavation, demolition, or soil disturbance related to future use, development, or construction at or of the Property, is the sole obligation and liability of Grantee or the owner of the Property at the time of such activities.

(vii)      In the event (a) Grantor is notified by United States Environmental Protection Agency (the "USEPA"), NJDEP, any other local, state or federal agency or governmental entity or any other third party (that has a right or standing under applicable law to compel or seek any action) that Grantee has failed (or Grantor becomes aware of any such failure) to complete any Response Activities (as defined below) with respect to the Property in accordance with the foregoing, the Orders (as defined below) or any applicable law, and (b) Grantor is required by USEPA, NJDEP, any other local, state or federal agency or governmental entity or any other third party (that has a right or standing under the applicable law to compel or seek any action) to take any Response Activities with respect to the Property in accordance with this Deed , and (c) Grantee fails, within sixty (60) days (or such shorter time period as required by USEPA, NJDEP, any other local, state or federal agency or governmental entity or such other third party) after the date Grantee receives a default notice from Grantor or USEPA, NJDEP, or otherwise, to either complete such Response Activities in accordance with this Deed, the Orders or any applicable law, or notify Grantor and USEPA, NJDEP, or other state agency that Grantee is contesting such default notice, Grantor shall be entitled to, but shall not be obligated to, complete such Response Activities at Grantee's sole cost and expense. Notwithstanding the foregoing, if Grantee elects to contest such default notice, Grantee shall promptly provide Grantor with reasonable evidence of the basis for such objection and shall indemnify, defend (with counsel reasonably acceptable to Grantor) and hold Grantor, each affiliate of Grantor, and their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors and assigns harmless from and against any and all claims, including without limitation, any and all costs, liability, damages, penalties, causes of action, judgments and expenses, including, without limitation, reasonable attorneys' fees and costs, arising out of or related to Grantee's contest. Grantee shall deliver to Grantor all default notices received by Grantee from USEPA, NJDEP, or any other local, state or federal agency or governmental entity

relating to any remediation action with respect to the Property in accordance with this Deed, the Orders or any applicable law. If, following the procedures set forth above, (a) Grantor is required to take such action to cure Grantee's failure as described above, or (b) the USEPA, NJDEP, or any other local, state or federal agency or governmental entity requires Grantor to reimburse USEPA, NJDEP, or any other local, state or federal agency or governmental entity for any amounts relating to Grantee's operations at or remediation of the Property, Grantee shall, within ten (10) business days after receipt of an invoice from Grantor, reimburse Grantor for all costs and expenses or other payments incurred by Grantor, by wire transfer to an account designated by Grantor. Grantor hereby reserves unto itself, its representatives, contractors, and assigns, the right of access to, and an easement to and over, the Property to enter the Property with persons and such equipment as determined necessary in Grantor's sole discretion and judgment to complete Grantee's obligations under this Deed, the Orders or any applicable law, and to implement the remediation and corrective actions required thereunder, subject to the terms of subparagraph (vi) above. In the event Grantor wishes to exercise its right of access to the Property as set forth in this subparagraph (vii), Grantor shall (a) provide Grantee with at least 24 hours prior notice (which may be telephonic notice), except in the case of an emergency, in which event no notice shall be required, (b) shall use reasonable efforts to minimize the interference with Grantee's operations, and (c) obtain and maintain, at Grantor's sole cost, and provide a certificate of insurance to Grantee, of general liability insurance in the amount of One Million Dollars ($1,000,000) combined single limit for personal injury and property damage per occurrence. Notwithstanding the foregoing, Grantee acknowledges that Grantor shall be entitled to self-insure any or all of the insurance requirements above. For purposes of this subparagraph (vii), (a) "Response Activities" shall mean Purchaser's agreement to undertake cleanup, remediation, investigation, sampling, monitoring, inspection, evaluation, construction, installation, operation and maintenance of any remedial systems installed at, in, on, or in connection with the Property, and make all filings associated therewith (including but not limited to Deed Notices and Classification Exception Areas) and undertake periodic assessments and/or certifications regarding the continued protectiveness of the environmental remediation required to be taken by Purchaser relating to the environmental conditions on, under, in, or migrating from the Property pursuant to and in accordance with all Environmental Laws, the Orders, and any other corrective action agreement entered into by Purchaser and USEPA, NJDEP or any other governmental agency, and any subsequent agreements or orders entered into with or issued by USEPA, NJDEP or other governmental agencies related to the Property, at Purchaser's sole cost and expense; and (b) "Order" shall mean any agreement to complete the Response Activities with respect to the Property.

**(Signature page follows)**

**Signatures.** This Deed is signed and attested to by the Grantor's proper corporate officers as of the date at the top of the first page.

ATTESTED BY:                                           GENERAL MOTORS COPORATION, a
                                                       Delaware corporation


By:_____                           By:  _____
Name:_____                           Name:_____
Title:_____                         Title:_____



STATE OF NEW JERSEY                )
                                   ) ss.
COUNTY OF _____            )

    I CERTIFY that on _____ 200__, _____ personally
came before me and stated to my satisfaction that this person

    (a)    was the maker of the attached Deed;

    (b)    was authorized to and did execute this deed as _____ of
           _____, the entity named in this Deed; and

    (c)    made this Deed for $_____ as the full and actual
           consideration paid or to be paid for the transfer of title (such consideration is defined in
           N.J.S.A. 46:15-5); and

    (d)    executed this instrument as the act of the entity named in this Deed.


Signed and sworn to before me on _____, 200__.


                                          _____
                                          NOTARY PUBLIC

WHEN RECORDED RETURN TO:

Elizabeth C. Belden, Esq.
Vice President, Corporate Counsel
& Assistant Secretary
Linden Development, LLC, a New Jersey limited liability company
3950 Shackleford Road, Suite 300

{#00796708.5 07138-0425 6/27/2008 01:56 PM}          D-5

Duluth, Georgia  30096

SEND SUBSEQUENT TAX BILL TO:

_____

_____

_____

_____

**EXHIBIT A TO DEED**

**LEGAL DESCRIPTION**

**EXHIBIT B TO DEED**
**Permitted Exceptions**

**EXHIBIT E**

**FORM OF BILL OF SALE**

THIS BILL OF SALE, dated as of _____, 200_, is made by GENERAL MOTORS COPORATION, a Delaware corporation ("Seller") for the benefit of _____ ("Purchaser").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Seller, Seller hereby sells, conveys, transfers and sets over unto Purchaser the following (collectively the "Transferred Property"):

1.    Those items of equipment and tangible personal property owned by Seller and located on, or used in connection with, the real property described in Schedule 1 attached hereto and made a part hereof, which equipment and personal property is more particularly described on the inventory attached as Schedule 2 hereto and made a part hereof (the "Personal Property").

Seller warrants and represents that the Transferred Property is free and clear of all liens and encumbrances whatsoever and shall defend Purchaser and its successors and assigns from and against any and all adverse claims by, through and under Seller against the Transferred Property.

EXECUTED as of the date set forth above.


GENERAL MOTORS CORPORATION


By: _____
Name: _____
Title: _____


E-1

{#00796708.5 07138-0425 6/27/2008 01:56 PM}

## SCHEDULE 1

## REAL PROPERTY

{#00796708.5 07138-0425 6/27/2008 01:56 PM}

**SCHEDULE 2**

**PERSONAL PROPERTY**

{#00796708,5 07138-0425 6/27/2008 01:56 PM}

**EXHIBIT F**

**TITLE COMPANY AFFIDAVIT**

Lawyers Title Insurance Corporation
Troy National Division

The undersigned makes this affidavit for the purpose of inducing Lawyers Title Insurance Corporation ("Lawyers Title") to issue a Title Insurance Policy in connection with Case Number _____ (the "Policy") insuring an interest in the land described in Schedule A of the Commitment (the "Land"), and acknowledges that Lawyers Title is placing material reliance upon the facts stated in this Affidavit in issuing its Policy.

The undersigned, being duly sworn, says that, to the best of his/her personal knowledge, the following statements are true and complete in every respect.

1. **OWNERSHIP**:   The undersigned is the _____ of GENERAL MOTORS CORPORATION (the "Owner"), has personal knowledge of the facts stated herein, and is authorized to make this Affidavit on behalf of the Owner.  The Owner owns the Land.

2. **CONSTRUCTION OR IMPROVEMENTS**:  No improvements or alterations have been made to the Land within the past four months and no claims of laborers or materialmen remain unpaid and no material incorporated into the Land is subject to any security interest, except: NONE.

3. **LAND CONTRACT OR TRUST**:  The Owner has not sold the Land on a Land Contract or conveyed the Land to any trust or other entity.  The Owner is not holding title to the Land for another in fulfillment of any trust or any agreement for the benefit of any other person, firm or corporation.

4. **POSSESSION**:  The Owner is the only party entitled to possession of the Land.

5. **CLAIMS OR DISPUTES**:  Except as shown in the Commitment, no claim of an interest in the Land has been asserted by any other person.  No notice of a claim of an interest in the Land has been received by the Owner.  No disputes exist concerning title to the Land, the location of any boundary line or the location of any improvements.  The Land is not encumbered by liens created by unrecorded mortgages.

6. **RIGHTS, EASEMENTS OR RESTRICTIONS**:  Except as shown in the Commitment, there are no existing water, mineral, or oil rights, and there are no agreements to convey or assign to parties other than the parties to this transaction any water, mineral, or oil rights on the Land.  There are no unrecorded easements or claims of easements and no restrictions upon the use of the Land not appearing in the public records.  There have been no violations of any applicable building and use restrictions.

7. **BANKRUPTCY:** No proceedings in bankruptcy or receivership have been instituted by or against the Owner which are now pending, nor has the Owner made any assignment as to the Land for the benefit of creditors.

8. **PROPERTY TAX AND SPECIAL ASSESSMENTS:** Except as shown in the Commitment, no real estate taxes or special assessments are due. No notices have been received by the Owner regarding any pending taxes or special assessments affecting the Land.

9. **TAX LIENS:** Except as shown in the Commitment, no Federal, State, or Local Taxes are a lien on the Land. No notices have been received by the Owner regarding any pending assessments affecting the Land.

10. **OTHER MATTERS:** The undersigned has been advised that there is a delay in the indexing of land records in the County and that LandAmerica commercial Services has been unable to search title to the property to the date of closing.

OWNER:

GENERAL MOTORS CORPORATION

By: _____
Name: _____
Title: _____

STATE OF MICHIGAN          )
                                      )ss.

COUNTY OF WAYNE          )

Subscribed and sworn to before me, a notary public, on this _____ day of _____, 20___.

_____
Notary Public
Acting in the County of Wayne, State of Michigan
My Commission Expires: _____