**Hearing Date and Time: November 20, 2009, at 9:45 a.m. E.T.**
**Objection Deadline: November 17, 2009, at 4:00 p.m. E.T.  (Extended)**

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-3275
Facsimile: (212) 715-8000
Thomas Moers Mayer
Adam C. Rogoff
Amy Caton

*Counsel for the Official Committee*
*of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ------------------------------------------------------- X | | |
| | : | |
| In re: | : | Chapter 11 Case No.: |
| | : | |
| MOTORS LIQUIDATION COMPANY, et al., | : | 09-50026 (REG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| ------------------------------------------------------- X | | |

OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE MOTION OF CERTAIN NOTEHOLDERS FOR AN
ORDER TO PROVIDE THAT NO PROOFS OF CLAIM NEED BE FILED
RELATED TO CERTAIN GUARANTEE CLAIMS AGAINST MOTORS
LIQUIDATION COMPANY OR, IN THE ALTERNATIVE, DEEMING THE
<u>MOTION A PROOF OF CLAIM AS TO SUCH CLAIM</u>

## <u>TABLE OF CONTENTS</u>

BACKGROUND ..................................................................................................1

ARGUMENT .......................................................................................................4

KL2 2627397.6

# TABLE OF AUTHORITIES

## CASES

In re Dietz, 136 B.R. 459 (Bankr. E.D. Mich. 1992) ........................................................6

In re Fink, 366 B.R. 870 (Bankr. N.D. In. 2007) ...........................................................7

In re Outboard Marine Corp., 386 F.3d 824 (7th Cir. 2004) ..........................................7

In re WPRV-TV, Inc., 102 B.R. 234 (Bankr. E.D. Okla. 1989) ......................................6

## STATUTES AND RULES

Fed. R. Bankr. P. 3003(c) ...........................................................................................7

11 U.S.C. § 502(d) ......................................................................................................5

KL2 2627397.6

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession (the "**Debtors**" or "**MLC**"), by and through its undersigned proposed counsel, hereby submits this limited objection (the "**Objection**") to certain noteholders'[1] (the "**Holders**") Motion (the "**Motion**") for an Order Modifying the Bar Date Order (defined below) to Provide that no Proofs of Claim Need be Filed Related to Certain Guarantee Claims (as such term is defined in the Motion) against MLC or, in the Alternative, Deeming the Motion a Proof of Claim as to Such Claim, and for Related Relief [Docket No. 4412].  In support of its Objection, the Committee represents as follows:

## BACKGROUND

1.      The Holders allegedly hold notes (the "**Notes**") issued by General Motors Nova Scotia Finance Company ("**NS Finance**"), a Canadian company organized under the laws of the province of Nova Scotia.  NS Finance is a wholly-owned subsidiary of MLC.  In sum, the principal amount due under the Notes is approximately £600,000,000.

2.      Upon information and belief, it appears that NS Finance is not an operating company and has no assets.   The primary creditors of NS Finance appear to be holders of the Notes.

3.      On March 2, 2009, the Holders filed a Notice of Action and Statement of Complaint (the "**Complaint**", attached hereto as Exhibit A) in the Supreme Court of Nova Scotia, Canada against General Motors Corporation, NS Finance, General Motors Nova Scotia Investments Ltd. ("**NS Investments**"), General Motors of Canada Ltd. ("**GM Canada**") and the directors of NS Finance.  Among other things, the Complaint alleged that GM Canada, NS

---

[1] The Holders include: Aurelius Capital Management, LP; Drawbridge Special Opportunities Advisors, LLC; Fortress Credit Opportunities Advisors LLC; Appaloosa Management L.P.; Elliot Associates, LP; Perry Partners, L.P.; and Perry Partners International, Inc.

Investments, General Motors Corporation and the directors of NS Finance had allowed NS Finance to become insolvent and unable to pay the Notes through certain alleged intercompany transfers out of GM Canada and NS Investments.  The Complaint asserts that GM Canada and NS Investments were indebted to NS Finance through transactions that appear to have occurred several years prior to the bankruptcy filings.

4.      For reasons that remain unclear to the Committee, mere hours before the filing of these cases, General Motors Corporation, GM Canada, NS Investments and NS Limited entered into a Lock-Up Agreement (the "**Lock-Up Agreement**", attached hereto as Exhibit B) with the Holders dated June 1, 2009.

5.      The Lock-Up Agreement settled the Complaint, and provided a release for GM Canada, NS Investments and the directors referenced in the Complaint.  In exchange, holders of the Notes received a so-called "consent fee"[2] of £366.46 for every £1,000 of principal amount of the 2015 Notes outstanding and £380.17 for every £1,000 of principal amount of the 2023 Notes outstanding – a payment of approximately $350 million.

6.      It is the Committee's understanding that, following the Petition Date, the $350 million "consent fee" was then transferred to an escrow account by the Debtors or their non-debtor subsidiaries into an escrow account for the benefit of the holders of the Notes.  Upon information and belief, such monies have since been paid to holders of the Notes.  In other words, it appears that the Holders have already been paid approximately $350 million, or 37 to 38 cents on the dollar, in cash for their claims against NS Investments and MLC.  However, inexplicably, the Lock-Up Agreement provided that this "consent fee" – without doubt a material

---

[2] Pursuant to the Lock-Up Agreement, the Consent Fee was paid out of an escrow account, which was established three business days after the execution of the Lock-Up Agreement and pursuant to the terms of the Escrow Term Sheet (attached as Exhibit B to the Lock-Up Agreement).  At this time, the original source of the funds is not apparent to the Committee and requires further investigation, including whether any such transfer is avoidable.

reduction of alleged debt – did not reduce the face amount of the Holders' claims.  It is not clear where the cash for this payment came from or what consideration the Debtors received for the cash payment (and therefore, the extent to which this transfer and payment is subject to avoidance).

7.      Moreover, the Holders allege that the Lock-Up Agreement provides that holders of the Notes would <u>also</u> receive an allowed general unsecured claim under their alleged contractual guarantee claim against MLC, again without reduction for the cash payment already received.  The Holders allege that the amount of this claim is $1,061,569,251.72, which includes all principal and unpaid interest due through October 8, 2009 (the bankruptcy filing date for NS Investments).   The Motion further alleges that the Lock-Up Agreement effectively entitles holders of the Notes to a <u>second claim</u> for the principal and interest due under the Notes (i.e., another approximately $1.06 billion), the basis for which appears to be a "deficiency claim" under Nova Scotia law that NS Investments may have against MLC for the same obligations owing under the Notes – effectively, a second statutory "guarantee" claim that duplicates the contractual guarantee arrangement.[3]

8.      No motion to approve the Lock-Up Agreement was filed by the Debtors, nor was any notice of the settlement given to the Court, the Committee or other parties other than the 8-K filing by the Debtors on June 1, 2009, of which the Committee was unaware.

9.      The Committee's advisors first learned of the Lock-Up Agreement on October 7, 2009, the day before the pre-arranged bankruptcy of NS Investments.

---

[3] The Lock-Up Agreement also appears to have granted the Holders other benefits, such as reimbursement of over $2 million in legal fees and the payment of fees and expenses for the NS Investment bankruptcy trustee and its counsel.

**ARGUMENT**

10.     Over the past several weeks, the Committee's advisors have been reviewing the facts and circumstances surrounding the Complaint and Lock-Up Agreement.  Given the $350 million prepetition cash payment already made to the Holders without the knowledge or consent of the Committee (or any notice to or opportunity for review by the Court), as well as the attempt to deem that the Holders have an allowed claim for over $2 billion that was allegedly awarded through the Lock-Up Agreement, the Committee has been anticipating the Holders' proof of claim, and are eager to see what assertions it contains.  There is no doubt that a $2 billion claim that (i) fails to account for a material debt payment (the so-called $350 million "consent fee") and (ii) raises issues of double-dipping requires a thorough investigation as to whether any element of the transaction is avoidable or otherwise subject to objection.  All of the Committee's rights and remedies are reserved as to the merits of the claim, defenses and any related avoidance actions.

11.     However, despite the myriad of issues arising from this eve of bankruptcy transaction, through the Motion, the Holders ask the Court to exclude the Holders from their obligation under the Bar Date Order[4] and the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") to file a proof of claim, arguing that the Lock-Up Agreement automatically grants them an allowed claim and precludes them from having to make any showing as to the validity of their claims to this Court.  However, the Holders fail to cite any reasonable justification for their extraordinary request.  There is simply no basis to rule that the

---

[4] On September 16, 2009, the Court entered an Order establishing November 30, 2009 (the "**Bar Date**") as the General Bar Date and the Governmental Bar Date (the "**Bar Date Order**").

Holders, as any other creditor, simply need not comply with the basic requirements of the claims process and, in fact, may ignore the very purpose of the Bar Date Order.

12.    The request is more startling considering that the Holders have retained competent counsel who was capable of drafting the Motion and indisputably have knowledge of the Bar Date.  There would have been no reason to waste the estates' resources had the same effort undertaken to prepare and file a Motion simply been applied to complying with the Bar Date Order in the first instance.  Furthermore, upon information and belief, at least several of the Holders have been actively following the Debtors' cases, and surely have been aware of the Bar Date for the past several weeks.  There is no doubt that the Holders, through their retained counsel, could have and, far more importantly for purposes of the Motion, _still can timely assert whatever claims they may allege through a formal proof of claim_.

13.    It is unclear from the Motion whether the Holders are seeking a determination that the Guarantee Claim be deemed allowed as to its merits or are simply seeking to avoid complying with the same procedural requirements as all other creditors with notice of the Bar Date Order.  The Motion states that the Holders are seeking an Order providing "that no proof of claim need be filed by any Holders pursuant to the Bar Date Order in order to assert <u>and recover</u> on the Guarantee Claim related to each of the two series of Notes." (Emphasis added).  As already stated, due to the highly unusual circumstances surrounding the eve of bankruptcy Lock-Up Agreement and the fact that holders of the Notes have already received a (potentially avoidable) cash payment that almost <u>doubles</u> eventual projected recoveries for other unsecured creditors in these cases, the Committee has serious reservations as to whether the Guarantee Claim is allowable.  In addition, the Debtors' estates may have claims against holders of the Notes for recovery of payments made to them or on their behalf, including the $350 million

"consent fee." In such event, the Holders' claims against the estate may be disallowed through Section 502(d) of the United States Bankruptcy Code (the "**Bankruptcy Code**"). Simply, no basis exists to suggest that the Holders' claims should be deemed "allowed" without compliance with the basic protections afforded by the Bankruptcy Code and Bankruptcy Rules to the Debtors' estates and creditors (including the Committee) by requiring the filing a proof of claim to be analyzed and reconciled in due course during the claims process.

14.     As stated above, the Committee is still investigating the facts and circumstances surrounding the Complaint and the Lock-Up Agreement. Whatever those facts and circumstances are, the Committee is entitled to review them during the ordinary course of the claims reconciliation process once the Holders file a proof of claim. Particularly in this situation, the Court should not excuse the Holders from the requirements of the Bar Date Order that bind all holders of claims against the Debtors' estates.

15.     Nor is the request to treat the Motion as an informal proof of claim warranted. An informal proof of claim, by its very nature, cannot be planned, i.e., a party may not set out to protect its rights as a claimant by filing an informal proof of claim. In re Dietz, 136 B.R. 459, 464 (Bankr. E.D. Mich. 1992). As stated in Collier, "informal proofs of claim are not recognized in the Bankruptcy Code or Rules, and a court presumably would not exercise its equity powers to recognize an informal proof of claim knowing that the claimant chose not to file a formal proof of claim." 8 Collier on Bankruptcy 3001.05 (15th ed. 2008). In addition, In re WPRV-TV, Inc., 102 B.R. 234, 238 (Bankr. E.D. Okla. 1989), the court stated:

> The intent of the informal Proof of Claim concept is to alleviate problems with form over substance; that is, equitably preventing the potentially devastating effect of the failure of a creditor to formally comply with the requirements of the Code in the filing of a Proof of Claim, when, in fact, pleadings filed by the party asserting the claim during the claims filing period in a bankruptcy case puts all parties on sufficient notice that a claim

is asserted by a particular creditor. This concept, however, must be tempered by what this Court believes to be one of the paramount reasons for forcing filing by a date certain of a Proof of Claim for creditors whose claims are disputed in a Chapter 11 bankruptcy, the necessity of informing the DIP and all creditors and potential Plan proponents of all claims pending against the estate so that a Plan may be formulated with definiteness and certainty and allow creditors to determine their proportionate share of the distribution. Without enforcement of the Bankruptcy Rules in this area, the debtor would forever be battling the claims of creditors without resolution and other Plan proponents would be unduly delayed, thus denying other creditors a timely distribution.

Lastly, courts have stated that it is one thing to treat filings made by pro se creditors who may not understand the bankruptcy process with a degree of latitude. In re Fink, 366 B.R. 870, 876-77 (Bankr. N.D. In. 2007). It is quite another thing, however, when those filings come from attorneys, who are held to a higher standard. Id. citing In re Outboard Marine Corp., 386 F.3d 824, 828 (7th Cir. 2004). "Attorneys, particularly experienced bankruptcy practitioners, are expected to know the difference between motions and objections and adversary proceedings and claims, and they are expected to file the appropriate thing at the appropriate time." Fink, 366 B.R. at 877. Here, the Holders are highly sophisticated and large institutions, and are represented by able counsel, and it would be highly unusual not to require them to comply with the Bar Date Order and Bankruptcy Rule 3003(c). Nor should the Court sanction a strategy that seeks to have the Motion deemed an informal proof of claim when a timely proper claim can still be filed. Neither this Court's time nor the estates' resources would have been wasted had the Holders simply chosen to file a proof of claim in lieu of the unprecedented request to be excused from the Bar Date Order or deem the Motion an informal proof of claim. This entire issue can be easily resolved by the Holders now filing a proof of claim for which they had ample notice of the Bar Date Order and, importantly, still have ample time to comply with the clear order of this Court.

For all of the reasons set forth above, the Committee believes that there is no basis

for this Motion.  Accordingly, the Committee respectfully requests that the Motion be denied.

Dated: November 17, 2009
New York, New York

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

By: _____ /s/ Adam C. Rogoff _____
Thomas Moers Mayer
Adam C. Rogoff
Amy Caton

1177 Avenue of the Americas
New York, NY  10036
(212) 715-3275

*Counsel for the Official Committee of Unsecured Creditors of Motors Liquidation Company, et al.*

# Exhibit A

Hfx No. 308066

Supreme Court of Nova Scotia

Court Administration

MAR 0 2 2009

Halifax, N.S.

Between:

Aurelius Capital Partners, LP, Aurelius Capital Master, Ltd., Drawbridge DSO Securities LLC, Drawbridge OSO Securities LLC, FCOF UB Securities LLC, Appaloosa Investment Limited Partnership I, Palomino Fund Ltd., Thoroughbred Master Ltd. and Thoroughbred Fund LP.,

Plaintiffs

- and -

General Motors Corporation, General Motors Nova Scotia Finance Company, General Motors Nova Scotia Investments Ltd., General Motors of Canada Limited, Neil J. Macdonald, Mercedes Michel and John P. Stapleton

Defendants

### Notice of Action

**To:**     General Motors Corporation
          General Motors Nova Scotia Finance Company
          General Motors Nova Scotia Investments Ltd.
          General Motors of Canada Limited
          Neil J. Macdonald
          Mercedes Michel
          John P. Stapleton

## Action has been started against you

The plaintiffs take action against you.

The plaintiffs started the action by filing this notice with the court on the date certified by the prothonotary.

The plaintiffs claim the relief described in the attached statement of claim. The claim is based on the grounds stated in the statement of claim.

## Deadline for defending the action

To defend the action, you or your counsel must file a notice of defence with the court no more than the following number of days after the day this notice of action is delivered to you:

- 15 days if delivery is made in Nova Scotia

- 30 days if delivery is made elsewhere in Canada

- 45 days if delivery is made anywhere else

## Judgment against you if you do not defend

The court may grant an order for the relief claimed without further notice, unless you file the notice of defence before the deadline.

## You may demand notice of steps in the action

If you do not have a defence to the claim or you do not choose to defend it you may, if you wish to have further notice, file a demand for notice.

If you file a demand for notice, the plaintiffs must notify you before obtaining an order for the relief claimed and, unless the court orders otherwise, you will be entitled to notice of each other step in the action.

## Rule 57 – Action for Damages Under $100,000

Civil Procedure Rule 57 limits pretrial and trial procedures in a defended action so it will be more economical. The Rule applies if the plaintiffs state the action is within the Rule. Otherwise, the Rule does not apply, except as a possible basis for costs against the plaintiffs.

This action is not within Rule 57.

## Filing and delivering documents

Any documents you file with the court must be filed at the office of the prothonotary: 1815 Upper Water Street, Halifax, Nova Scotia (telephone # 902-424-4900)

When you file a document you must immediately deliver a copy of it to each other party entitled to notice, unless the document is part of an *ex parte* motion, the parties agree delivery is not required, or a judge orders it is not required.

## Contact information

The plaintiffs designate the following address:

Cox, Palmer
Purdy's Wharf
1100-1959 Upper Water Street
Halifax, Nova Scotia  B3J 3N2

Attention:  John A. Keith

Documents delivered to this address are considered received by the plaintiffs on delivery.

Further contact information is available from the prothonotary.

## Proposed place of trial

The plaintiffs propose that, if you defend this action, the trial will be held in Halifax, Nova Scotia.

## Signature

Signed March 2, 2009

Jeff Galway
Blake, Cassels & Graydon LLP
199 Bay Street, Suite 2800
Commerce Court West
Toronto, ON  M5L 1A9

Tel: 416-863-3859
Fax: 416-863-2653
E-mail: jeff.galway@blakes.com

John A. Keith
Cox & Palmer
Purdy's Wharf, Tower 1
1100-1959 Upper Water Street
Halifax, NS  B3J 3E5

Tel: 902-491-4217
Fax: 902-421-3130
E-mail: JKeith@coxandpalmer.com

Counsel for the Plaintiffs

## Prothonotary's certificate

I certify that this notice of action, including the attached statement of claim, was filed with the court on March 2, 2009.

Deputy  Prothonotary

## STATEMENT OF CLAIM

<u>The Plaintiffs</u>

1.          Aurelius Capital Partners, LP is a limited partnership organized under the laws of the State of Delaware.

2.          Aurelius Capital Master, Ltd. is an exempted company organized under the laws of the Cayman Islands.

3.          Drawbridge DSO Securities LLC is a limited liability company organized under the laws of the State of Delaware.

4.          Drawbridge OSO Securities LLC is a limited liability company organized under the laws of the State of Delaware.

5.          FCOF UB Securities LLC, is a limited liability company organized under the laws of the State of Delaware.

6.          Appaloosa Investment Limited Partnership I is a limited partnership organized under the laws of the State of Delaware.

7.          Palomino Fund Ltd. is a corporation organized under the laws of the British Virgin Islands.

8.          Thoroughbred Master Ltd. is a corporation organized under the laws of the British Virgin Islands.

9.          Thoroughbred Fund LP is a limited partnership organized under the laws of the State of Delaware.

<u>The Defendants</u>

10.          General Motors Corporation ("GM US") is a publicly traded corporation incorporated under the laws of Delaware that manufactures and sells automobiles and trucks. GM US's head office is in Detroit, Michigan.  GM US is insolvent absent a government bailout and debt restructuring, and thus on the brink of bankruptcy.

11.        General Motors Nova Scotia Finance Company ("Finance") is an unlimited company incorporated under the Nova Scotia *Companies Act*. The sole shareholder of Finance is GM US.

12.        General Motors Nova Scotia Investments Ltd. ("Investments") is a limited company incorporated under the Nova Scotia *Companies Act*. The sole shareholder of Investments is GM US.

13.        Finance and Investments were incorporated by GM US for the purpose of making loans to related parties and issuing debt instruments.

14.        General Motors of Canada Limited ("GM Canada") is a corporation incorporated under the *Canada Business Corporations Act* ("CBCA") that manufactures and sells automobiles and trucks. GM Canada's head office is Oshawa, Ontario. The sole shareholder of GM Canada is GM US. GM Canada is approaching the minimum cash reserve levels required to meet its obligations.

15.        GM US, Investments and GM Canada are all affiliates of Finance for the purposes of the *Companies Act* and the CBCA.

16.        Neil J. Macdonald ("Macdonald") resides in Oshawa, Ontario and is the Vice President, General Counsel and Secretary of GM Canada. At all material times Macdonald was an officer and director of Finance, Investments and GM Canada.

17.        Mercedes Michel ("Michel") resides in New York New York, and is a Director of the Treasurer's Office of GM US. At all material times Michel was an officer and director of Finance and Investments and an executive of GM US.

18.        John P. Stapleton ("Stapleton") resides in Oshawa, Ontario and is Vice President Finance, Treasurer and Chief Financial Officer of GM Canada. At all material times, Stapleton was an officer and director of Finance, Investments and GM Canada.

<u>Finance's Indebtedness to the Plaintiffs</u>

19. In 2003, Finance issued two series of notes (the "Notes") as follows:

 (a) notes in the aggregate amount of £350,000,000 with an interest rate of 8.375% which are repayable in 2015 (the "2015 Notes"); and

 (b) notes in the aggregate amount of £250,000,000 with an interest rate of 8.875% which are repayable in 2023 (the "2023 Notes").

20. GM US guaranteed Finance's obligations under both the 2015 Notes and the 2023 Notes.

21. The Plaintiffs are the holders of £216,248,000 (approximately 62%) of the outstanding principal amount of the 2015 Notes and £160,450,000 (approximately 64%) of the outstanding principal amount of the 2023 Notes.

22. As a result of their status as holders of Notes issued by Finance, the Plaintiffs are "complainants" within the meaning of section 7 of the Third Schedule of the *Companies Act* in respect of oppression claims concerning Finance or its affiliates commenced under section 5 of the said Schedule and are "complainants" within the meaning of section 238 of the CBCA in respect of oppression claims concerning GM Canada and its affiliates commenced under section 241 of the CBCA.

<u>The Inter-Corporate Obligations</u>

23. At all material times Finance was a major creditor of both Investments and (directly or indirectly) GM Canada.

24. The ability of Finance to satisfy its obligations under the Notes has been and remains dependent upon the receipt by Finance of amounts owing to it by Investments and GM Canada.

<u>Finance Reduces Paid Up Capital - May 2008</u>

25.        In or about May 2008 Macdonald, Michel and Stapleton, as directors of Finance, purported to determine that a portion of the paid up capital of the issued and outstanding common shares of Finance in the amount of $16 million Canadian and $500,000 U.S. was "in excess of the wants" of Finance and that it would be desirable to reduce the paid up capital on the issued and outstanding common shares of Finance by the aggregate amount of $16 million Canadian and $500,000 U.S. and to pay such amounts to GM US in cash as a repayment of capital.

26.        In reliance on this purported determination by Macdonald, Michel and Stapleton, GM US as the sole shareholder of Finance resolved on May 22, 2008 that the paid up capital of Finance be reduced by $16 million Canadian and by $500,000 U.S. and that such amounts be paid to GM US. The paid up capital of Finance was subsequently so reduced and Finance paid GM US $16 million Canadian and $500,000 U.S. At this time GM US was to the knowledge of Macdonald, Michel and Stapleton either insolvent or on the brink of insolvency.

27.        At the time that Macdonald, Michel and Stapleton purported to determine that it would be desirable for Finance to reduce its paid up capital as referred to in paragraph 25 above, and at the time the payments referred to in paragraph 26 were in fact made, Macdonald, Michel, Stapleton, Finance and GM US knew that Finance was indebted to the holders of the Notes, that GM US would not be able to honour its guarantee obligations to the holders of the Notes in full and that any return of capital to GM US would prejudice Finance's ability to repay its obligations under the Notes and thus be prejudicial to the interests of Finance's creditors including the Plaintiffs.

28.        By recommending and supporting a repayment of capital by Finance to GM US, Macdonald, Michel and Stapleton breached the fiduciary duties and duties of care they, as directors, owed to Finance.

29.        By recommending and supporting a repayment of capital by Finance to GM US, Michel had an irreconcilable conflict of interest between her role as director of Finance and her role as an executive in GM US's Treasury since GM US controls Finance and was the beneficiary of the repayment of capital.

30.         The acts of Macdonald, Michel and Stapleton in recommending and supporting a payment by Finance to GM US of $16 million Canadian and $500,000 U.S. as a purported return of capital, the payment of such amounts by Finance, and the receipt of such amounts by GM US has prejudiced the ability of Finance to repay its obligations under the Notes. Such acts by Macdonald, Michel, Stapleton, Finance and GM US were oppressive, unfairly prejudicial to and unfairly disregarded the interests of Finance and its creditors including the Plaintiffs.

31.         As a result of the facts set out in paragraphs 25-30 above, GM US has been or will be unjustly enriched at the expense of Finance and its creditors, there having been an enrichment, a corresponding deprivation and the absence of any juristic reason for the enrichment.

<u>Investments Reduces Paid Up Capital - May 2008</u>

32.         In or about May 2008 Macdonald, Michel and Stapleton also purported to determine that a portion of the paid up capital of the issued and outstanding common shares of Investments in the amount of $576,672,670 Canadian was "in excess of the wants" of Investments and that it would be desirable to reduce the paid up capital on the issued and outstanding common shares of Investments by the $576,672,670 Canadian and to pay such amount to GM US in cash as a repayment of capital.

33.         In reliance on this purported determination by Macdonald, Michel and Stapleton, GM US as the sole shareholder of Investments resolved on May 22, 2008 that the paid up capital of Investments be reduced by $576,672,670 Canadian and that such amounts be paid to GM US. The paid up capital of Investments was subsequently so reduced and Investments paid GM US $576,672,670 Canadian. At this time GM US was to the knowledge of Macdonald, Michel and Stapleton either insolvent or on the brink of insolvency.

34.         Following the above payment by Investments to GM US, the paid up capital of Investments was reduced from $576,672,770 Canadian to $100 Canadian.

35.         At the time that Macdonald, Michel and Stapleton purported to determine that it would be desirable for Investments to reduce its paid up capital as referred to in paragraph 32 above, and at the time the payment referred to in paragraph 33 was in fact made, Macdonald, Michel, Stapleton, Finance, Investments and GM US knew that (i) Investments was indebted to

- 6 -

Finance, (ii) Finance was indebted to the holders of the Notes (iii) GM US would not be able to honour its guarantee obligations to the holders of the Notes in full and (iv) any return of capital by Investments to GM US would prejudice Investments' ability to repay Finance and in turn prejudice Finance's ability to repay its obligations under the Notes and thus be prejudicial to the interests of Finance's creditors including the Plaintiffs.

36.        By recommending and supporting a repayment of capital by Investments to GM US, Macdonald, Michel and Stapleton had an irreconcilable conflict of interest between the duties they owed as officers and directors to Finance and the duties they owed to Investments. Michel's role as an executive in GM US's Treasury posed an additional conflict of interest since GM US controls Finance and was the beneficiary of the repayment of capital.

37.        As directors of Finance, a creditor of Investments, Macdonald's, Michel's and Stapleton's duty was to protect the interests of Finance. Instead of causing Finance, as a creditor of Investments, to object to the proposed reduction by Investments of its paid up capital, Macdonald, Michel and Stapleton not only recommended such course of action but caused Investments to implement it. Macdonald, in fact, swore an affidavit in support of a court order pursuant to sections 59 and 60 of the *Companies Act* in which he failed to disclose the extent of Investments' obligations to Finance, failed to disclose Finance's obligation to the holders of the Notes, and swore that no creditor would be adversely affected or prejudiced by the proposed reduction in the paid up capital of Investments. The plaintiffs plead that Macdonald, Michel and Stapleton breached the fiduciary duty and duty of care they, as directors, owed to Finance.

38.        The acts of Macdonald, Michel and Stapleton in recommending, supporting and implementing a payment by Investments to GM US of $576,672,670 Canadian as a purported return of capital, the failure of Finance to object to the proposed reduction in Investments' paid up capital, the payment of such amount by Investments, and the receipt of such amount by GM US has prejudiced the ability of Investments to repay its obligations to Finance and in turn prejudiced the ability of Finance to repay its obligations under the Notes. Such acts by Macdonald, Michel, Stapleton, Finance, Investments and GM US were oppressive, unfairly prejudicial to and unfairly disregarded the interests of Finance and its creditors including the Plaintiffs.

39.         As a result of the facts set out in paragraphs 32-38 above, GM US has been or will be unjustly enriched at the expense of Finance and its creditors, there having been an enrichment, a corresponding deprivation and the absence of any juristic reason for the enrichment.

GM Canada Undermines Value of its Obligations to Finance

40.         On February 11, 2009, at a time that GM Canada was indebted (directly or indirectly) to Finance, at a time when GM US was insolvent and at a time when GM Canada was approaching the minimum cash reserve levels required to meet its obligations, GM US and GM Canada amended their July 20, 2006 Credit Agreement with a syndicate of lenders.  Among other things, the amended Credit Agreement allows GM Canada to guarantee the indebtedness of other entities and provide its assets as collateral security for indebtedness regardless of whether such indebtedness is that of GM Canada or of other entities and regardless of whether such indebtedness is new or pre-existing.  By agreeing to the amendment to the Credit Agreement, GM Canada made possible the impairment of its ability to repay the obligations it owes (directly or indirectly) to Finance.

41.         As officers and directors of GM Canada, Macdonald and Stapleton were instrumental in conceiving, approving and implementing the course of conduct referred to in paragraph 40 above.  Macdonald and Stapleton had an irreconcilable conflict of interest between the duties they owed as officers and directors of Finance and the duties they owed to GM Canada.  By supporting and failing to object to the above course of action, Macdonald and Stapleton breached the fiduciary duties and duties of care they, as directors, owed to Finance.

42.         The course of conduct undertaken by Macdonald, Stapleton and GM Canada and referred to in paragraphs 40-41 is oppressive, unfairly prejudicial to, and unfairly disregards the interests of Finance and its creditors including the Plaintiffs.

Claim for Relief

43.         These parties claim an order providing the following remedies:

(a)     a declaration that the conduct of Finance, Macdonald, Michel, Stapleton and GM US as set out in paragraphs 25-30 above was oppressive, unfairly prejudicial to and unfairly disregarded the interests of the creditors of Finance including the Plaintiffs;

(b)     a declaration that the conduct of Finance, Investments, Macdonald, Michel, Stapleton and GM US as set out in paragraphs 32-38 above was oppressive, unfairly prejudicial to and unfairly disregarded the interests of the creditors of Finance including the Plaintiffs;

(c)     a declaration that the conduct of GM Canada, Macdonald and Stapleton set out in paragraphs 40-42 above is oppressive, unfairly prejudicial to and unfairly disregards the interests of the creditors of Finance including the Plaintiffs;

(d)     an order pursuant to section 5(3)(h) of the Third Schedule to the *Companies Act* setting aside the transaction referred to in paragraphs 25-26 above wherein Finance purported to reduce its paid up capital and paid $16 million Canadian and $500,000 U.S. to GM US;

(e)     an order pursuant to section 5(3)(h) of the Third Schedule to the *Companies Act* setting aside the transaction referred to in paragraphs 32-33 above wherein Investments purported to reduce its paid up capital and paid $576,672,670 Canadian to GM US;

(f)     an interlocutory and permanent order pursuant to section 241(a) of the CBCA restraining GM Canada from guaranteeing the obligations of any other entity or from pledging its assets or granting security in respect of the indebtedness of any other entity.

(g)     a declaration that GM US has been unjustly enriched as a result of its receipt of the $16 million Canadian and $500,000 U.S. referred to in paragraphs 25-30 above and an order requiring GM US to disgorge such amounts to Finance;

(h)    a declaration that GM US has been unjustly enriched as a result of its receipt of the $576,672,670 Canadian referred to in paragraphs 32-38 above and an order requiring GM US to disgorge such amount to Investments;

(i)    judgment jointly and severally against all of the defendants pursuant to section 5(3)(h) and/or (j) of the Third Schedule to the *Companies Act* and /or section 241(j) of the CBCA for damages and compensation in an amount to be determined plus interest at the rates prescribed by the Notes;

(j)    costs of this action; and

(k)    such further and other relief as counsel may advise and the court permit.

**Signature**

Signed March 2, 2009

Jeff Galway
Blake, Cassels & Graydon LLP
199 Bay Street, Suite 2800
Commerce Court West
Toronto, ON  M5L 1A9

Tel: 416-863-3859
Fax: 416-863-2653
E-mail: jeff.galway@blakes.com

John A. Keith
Cox & Palmer
Purdy's Wharf, Tower 1
1100-1959 Upper Water Street
Halifax, NS  B3J 3E5

Tel: 902-491-4217
Fax: 902-421-3130
E-mail: JKeith@coxandpalmer.com

Counsel for the Plaintiffs

# Exhibit B

## LOCK UP AGREEMENT

This Lock Up Agreement (this "**Agreement**"), dated as of June 1, 2009, is entered into by and among General Motors Nova Scotia Finance Company, a Nova Scotia unlimited company (the "**Company**"), General Motors of Canada Limited, a Canadian federal corporation ("**GM Canada**" or "**GMCL**"), GM Nova Scotia Investments Ltd., a Nova Scotia company ("**GM Investments**" and, collectively with the Company and GM Canada, the "**Canadian Entities**"), General Motors Corporation, a Delaware corporation (the "**Guarantor**"), and each of the undersigned beneficial owners (each a "**Holder**" and collectively, the "**Holders**") of the Company's 8.375% Guaranteed Notes due December 7, 2015 (the "**2015 Notes**") or the Company's 8.875% Guaranteed Notes due July 10, 2023 (the "**2023 Notes**" and together with the 2015 Notes, the "**Notes**").  The Holders, the Canadian Entities, the Guarantor and any subsequent person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "**Parties**."  Each of the terms used herein not defined herein shall have the meaning given such term in the Fiscal and Paying Agency Agreement, dated as of July 10, 2003 (the "**Fiscal and Paying Agency Agreement**"), among the Company, the Guarantor, Deutsche Bank Luxembourg S.A., as fiscal agent (the "**Fiscal Agent**") and Banque Générale du Luxembourg S.A. governing each series of Notes.

## RECITALS

WHEREAS, the Guarantor and certain of its subsidiaries and affiliates who shall be debtors in the Chapter 11 Cases (as defined below) intend to commence on or about June 1, 2009 jointly administered chapter 11 cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11, title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, the Holders, the Canadian Entities and the Guarantor desire to, among other things, take certain actions and consummate certain transactions contemplated hereby to facilitate the resolution and settlement of various direct, indirect or derivative claims and causes of action of the Holders against one or more of the Canadian Entities and the Guarantor and to facilitate the business and financial restructuring of the Guarantor, the other debtors in the Chapter 11 Cases and certain of the Canadian Entities;

WHEREAS, the Company has requested and the Holders have agreed to vote to amend the Fiscal and Paying Agency Agreement and the global securities representing the Notes as contemplated by this Agreement, in exchange for certain cash payments and the preservation in the Chapter 11 Cases of certain direct, indirect or derivative claims and causes of action of the Holders and the Company against the Guarantor;

WHEREAS, in furtherance of the foregoing, the Company shall, in accordance with the terms of the Fiscal and Paying Agency Agreement, convene a meeting (the "**Meeting**") of holders of the Notes for the purpose of passing an extraordinary resolution to amend the Fiscal and Paying Agency Agreement and the global securities representing the Notes to provide for the waiver of certain rights of the holders of the Notes, the release and discharge of certain claims

and demands by such holders and the payment of certain amounts by the Company to the holders of the Notes upon the terms set forth in the form of extraordinary resolution attached hereto as Exhibit A (the "**Extraordinary Resolution**").

WHEREAS, in connection with the transactions contemplated by this Agreement and in accordance with the terms and subject to the conditions hereof, Holders beneficially owning at least two-thirds of the aggregate principal amount of the 2015 Notes and Holders beneficially owning at least two-thirds of the aggregate principal amount of the 2023 Notes intend to vote such Notes in favor of the Extraordinary Resolution;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  Support of the Extraordinary Resolution; Additional Covenants.

(a)    Each Holder agrees (i) that the Extraordinary Resolution, when duly passed at a Meeting, shall be binding on such Holder; (ii) to deliver or cause to be delivered irrevocably within three Business Days after the date of this Agreement voting instructions, in such form as specified by the Company, in favor of the Extraordinary Resolution at the Meeting at which the Extraordinary Resolution is to be submitted in respect of the principal amount of each series of Notes held by such Holder as set forth on the signature page of such Holder or over which such Holder has voting power; provided such instruction shall cease to be irrevocable and shall become void and of no further force and effect automatically upon termination of this Agreement; (iii) to the extent permitted under the terms of the Fiscal and Paying Agency Agreement, to waive compliance with all covenants contained in the Fiscal and Paying Agency Agreement (other than those applicable to the Company's or the Guarantor's obligations hereunder) and to forebear from exercising their rights thereunder resulting from any default or event of default so long as this Agreement is in effect; and (iv) to cooperate in good faith in satisfying any other conditions required for the passage of the Extraordinary Resolution and the consummation of the transactions contemplated thereby (the "**Transactions**"), including effecting the voting commitments hereunder and the negotiation of any documents or agreements to be executed or implemented in connection therewith, or otherwise contemplated thereby, each of which documents and agreements shall be consistent in all material respects with this Agreement and the Extraordinary Resolution (all such proxies, instructions, documents and agreements, collectively, the "**Transaction Documents**").

(b)    Each Holder agrees that it shall not (i) take any action that would cause the acceleration of the payment of principal of or interest on the Notes other than in connection with the liquidation referred to in section 6(b) and except as a result of the Chapter 11 Case of the Guarantor; (ii) propose, vote for, consent to, support or participate in the formulation of any plan or resolution other than Transactions, the Extraordinary Resolution and the Transaction Documents; (iii) other than as provided in Section 6(b) below, directly or indirectly seek, solicit, support or

encourage any plan or resolution, including but not limited to any decree or order for relief in respect of any of the Company, the Guarantor or GM Canada in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Company, the Guarantor or GM Canada or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs, other than the Transactions, the Extraordinary Resolution and the Transaction Documents, or any plan or resolution that reasonably could be expected to prevent, delay or impede the successful passage of the Extraordinary Resolution or implementation of the Transactions; or (iv) directly or indirectly sell, assign, pledge, hypothecate, grant an option on, or otherwise dispose of (each, a "**Transfer**") or permit to subsist any pledge or security interest (save in the normal course of prime brokerage activity) over any of the Notes held by such Holder on the date hereof; provided, however, that any Holder may Transfer any of such Notes to any entity that executes and delivers to the Company a duly executed counterpart of this Agreement.  This Agreement shall in no way be construed to preclude any Holder from acquiring additional Notes; provided, however, that any such additional Notes shall automatically be deemed to be subject to all of the terms of this Agreement.

(c)      The Company agrees (i) following the giving of the notice in accordance with clause (ii) of this Section 1(c), to convene the Meeting at the earliest time practicable under the terms of the Fiscal and Paying Agency Agreement for the purpose of passing the Extraordinary Resolution in accordance with the requirements of the Fiscal and Paying Agency Agreement, including, without limitation, the requirements of Schedule 4 (Provisions for Meetings of Noteholders) to the Fiscal and Paying Agency Agreement; (ii) within three Business Days after the date of this Agreement to give a notice in respect of the Meeting to holders of the Notes for the purpose of passing the Extraordinary Resolution, which notice shall specify the place, day and hour of the Meeting in accordance with the requirements of the Fiscal and Paying Agency Agreement; (iii) to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to facilitate the compliance by the Holders with their obligations in Section 1(a) of this Agreement; (iv) to otherwise take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to satisfy all conditions required to be satisfied by the Company and the Paying Agent under the Fiscal and Paying Agency Agreement (including the schedules thereto) for the passage of the Extraordinary Resolution and the consummation of the Transactions, (v) to provide written confirmation to the Holders in the event that the Company elects not to move forward with the Transactions, and (vi) to cooperate in good faith in satisfying any other conditions required for the passage of the Extraordinary Resolution and the consummation of the Transactions, including the negotiation of the Transaction Documents, all of which shall be consistent in all material respects with this Agreement and the Extraordinary Resolution.

(d) The Company, GMCL and the Holders agree within three Business Days after the date of this Agreement to establish an escrow account and enter into an escrow agreement with an escrow agent mutually satisfactory to the Parties, which agreement shall incorporate the terms of Exhibit B hereto ("Escrow Agreement").

(e)  The Holders agree not to object to the treatment of unsecured creditors previously disclosed in the Current Report on Form 8-K filed by the Guarantor on May 28, 2009.

2.    Amounts Payable.  The Company agrees that upon approval of the Extraordinary Resolution, it shall pay the amounts specified therein in accordance therewith (the "**Consent Fee**").  The Company further agrees that within three business days after the approval of the Extraordinary Resolution, the Canadian Entities shall reimburse affiliates of Aurelius Capital Management, LP, Appaloosa Management L.P. and Fortress Investment Group LLC for legal fees and costs in the amount of  US$2,000,000.

3.    Termination of Agreement.  This Agreement shall terminate or be terminable, as follows (such date of termination, the "**Termination Date**"): (i) by any Holder upon written notice to the Company on or after July 9, 2009, unless on or prior to such date the Meeting has been convened, the Extraordinary Resolution has been approved and the Company and the Paying Agent have paid of all amounts specified in the Extraordinary Resolution to the holders of the Notes in accordance therewith; (ii) by a Party not then in material breach of this Agreement upon written notice to the other Parties, upon the material breach by any non-terminating Party of any of the representations, warranties or covenants contained in this Agreement or the taking of any action by any non-terminating Party that is otherwise materially inconsistent with this Agreement; (iii) automatically upon the commencement prior to the date on which the Extraordinary Resolution is passed of any voluntary or involuntary case commenced under the Bankruptcy Code (or any proceedings therein), under any Canadian insolvency statutes, the Companies' Creditors Arrangement Act (Canada), the Bankruptcy and Insolvency Act (Canada), or any statute, law, legislation, rule or regulation in respect of corporate reorganization or which provides for the appointment of an interim receiver, receiver, receiver and manager or liquidator, against or involving GM Canada or the Company or any of their assets or properties; or (iv) by any Holder upon written notice to the Company on or after the Transactions contemplated in this Agreement shall have been enjoined or otherwise prohibited by law and such injunction or prohibition is not vacated or otherwise terminated on or before the 10th day after the effectiveness of such injunction or prohibition. Upon termination of this Agreement, all obligations under this Agreement shall terminate and shall be of no further force and effect; provided, however, that (a) any claim for breach of this Agreement shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way; (b) all claims of the Holders with respect to the Consent Fee or any funds held in escrow under the terms of the Escrow Agreement as provided therein shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way, and (c) all rights and remedies set forth in Section 8 shall survive termination and shall not be prejudiced in any way.  (i) Upon termination of this Agreement other than as a result of a material breach by the Holders prior to the date of payment of the Consent Fee to the Holders, or (ii) if after the date on which the Extraordinary Resolution is passed the Holders are required to turnover the Consent Fee by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority requiring such amounts be returned to the Company, all direct, indirect

or derivative claims, causes of action, remedies, defenses, setoffs, rights or other benefits of the Holders against or from one or more of the Canadian Entities and the Guarantor except in the case of clause (ii) of this sentence the individual defendants in the Nova Scotia Proceeding shall be fully preserved without any estoppel, evidentiary or other effect of any kind or nature whatsoever, including, without limitation, all claims and causes of action referred to in Section 5 of this Agreement and the full amount owing under the Loan Agreements as of the date hereof shall be immediately due and payable according to their terms as they exist as of the date hereof.

4.   <u>Representations and Warranties</u>.  Each of the Parties represents and warrants to each of the other Parties that the following statements are true, correct and complete as of the date hereof:

(a) <u>Power and Authority</u>.  It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

(b) <u>Authorization</u>.  The execution and delivery of this Agreement by it and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(c) <u>Binding Obligation</u>.  Upon execution as set forth in Section 10, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(d) <u>No Conflicts</u>.  The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or its certificate of incorporation, by-laws, unlimited company agreement or other organizational document or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under, or give rise to a right of, or result in any termination, cancellation or acceleration of any obligation or to loss of a material benefit under, any material contractual obligation, covenant or condition to which it is a party or under its certificate of incorporation or by-laws (or other organizational documents).

(e) <u>Governmental Consents</u>.  The execution, delivery and performance by it of this Agreement do not and shall not require it to obtain or make any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any supranational, national, Federal, state, local, municipal, foreign or provincial government or any court of competent jurisdiction, tribunal, judicial or arbitral body, administrative or regulatory agency (including any stock exchange), public authority, commission or board or other governmental department, bureau, branch, agency, or any instrumentality of any of the foregoing, including, without limitation, the United States Treasury, the Bankruptcy Court or any other United States or Canadian court of competent jurisdiction, or any other third party, which has not already been obtained.

(f) <u>No Proceedings</u>.  There is no civil, criminal, administrative or arbitral action, suit, claim, hearing, investigation or proceeding pending or, to the knowledge of such Party, threatened, against such Party or any of its affiliates or subsidiaries that questions the validity of this Agreement or any action taken or to be taken by such Party in connection with the performance or consummation of any transactions contemplated by this Agreement.

(g) <u>Signing Holders</u>.  If the undersigned is a Holder, (i) the undersigned is either (A) a "qualified institutional buyer" as defined in Rule 144A promulgated under the Securities Act of 1933, as amended or (B) if resident in Canada, an "accredited investor" as defined in National Instrument 45-106 – *Prospectus and Registration Exemptions*; (ii) the undersigned has such knowledge and experience in financial and business affairs that the undersigned is capable of evaluating the merits and risks of the Transactions; (iii) the undersigned represents and warrants that the principal amount of each series of Notes held by such Holder as set forth on the signature page of such Holder is an accurate amount and that it is the beneficial owner of such Notes free and clear of all liens or other encumbrances, including any encumbrances on the right to vote such Notes under the Fiscal and Paying Agency Agreement; and (iv) the undersigned has the requisite power and authority to vote and grant proxies to vote the aggregate principal amount of the Notes represented as beneficially owned by it.

(h) <u>No Other Creditors of the Company</u>.  The Company represents and warrants to the Holders that other than the indebtedness evidenced by the Notes and the Swap Liability (as defined below), the Company has no outstanding direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any person or entity of any type, whether accrued, absolute, contingent, matured, unmatured or otherwise in excess of an aggregate of US$2,000,000.

5.    <u>Certain Claims</u>.

(a) <u>Nova Scotia Proceeding</u>.  Upon the execution of this agreement by the Parties all proceedings in the proceeding in the Supreme Court of Nova Scotia titled Aurelius Capital Partners, LP et al. v. General Motors Corporation et al., Court File No. HFX No. 308066 (the "**Nova Scotia Proceeding**") shall be held in abeyance pending the approval of the Extraordinary Resolution by the Holders of the Notes at the Meeting.  Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Holders in accordance therewith, each Holder hereby releases and discharges the defendants in the Nova Scotia Proceeding (and the past and/or present directors, officers, employees, partners, insurers, co-insurers, controlling shareholders, attorneys, advisers, consultants, accountants or auditors, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, joint ventures, assigns, spouses, heirs, related and/or affiliated entities of each of them) from all claims and demands that are raised in the Nova Scotia Proceeding, and agrees to discontinue the Nova Scotia Proceeding on a without costs basis.  Nothing contained in this Agreement shall preclude any Holder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the

payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid provided, that, this Agreement precludes each Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.

(b) <u>Intercompany Loan</u>.  Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Holders in accordance therewith, each Holder waives all (and shall cease to have any) rights and claims against the Company in respect of the Loan Agreements (as defined below), including with respect to any compromise or settlement of the loans thereunder, and such Holder's rights in the Loan Agreements, and each Holder hereby releases and discharges GM Canada (and its past and present officers, directors and employees), Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) from all claims and demands whatsoever, presently known or unknown, which the Holders ever had, now have or may hereafter have against them by reason of claims and demands arising from or in connection with those certain loan agreements between the Company and GM Canada each dated as of July 10, 2003 and pursuant to which GM Canada borrowed from the Company the sum of five hundred fifty-five million, eight hundred sixty thousand Canadian dollars (C$555,860,000), and the sum of seven hundred seventy-eight million, two hundred four thousand Canadian dollars (C$778,204,000), respectively (collectively, the "**Loan Agreements**"), provided that nothing contained in this Agreement shall preclude the Holders from pursuing any claim in respect of the parties and claims otherwise released in this paragraph  in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.  Furthermore, in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid, the settlement between the Company and GM Canada of the amount owing under the Loan Agreements as contemplated by this Transaction shall be null and void and the full amount owing under the Loan Agreements as of the date hereof shall be immediately due and payable according to their terms as they exist as of the date hereof.

(c) <u>Other Claims</u>.  Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Holders in accordance therewith, with respect to any other claim it may have against the Canadian Entities or the Guarantor in its capacity as a holder of the Notes, each Holder covenants and agrees not to pursue any claim it may have other than in connection with the advancement of its claim under the Guarantee, the advancement of its claim against GM Nova Scotia in respect of the Notes and the Deficiency Claim (each as defined below). Nothing contained in this Agreement shall preclude the Holder from pursuing any other claim it may have against the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.  For purposes of this Agreement, the "**Guarantee**" shall mean that certain guarantee of the

Notes by the Guarantor included in the Fiscal and Paying Agency Agreement and the Notes.

(d) For purposes of clarity, it is understood and agreed that nothing contained in this Agreement shall: (i) release in any respect whatsoever any claim against the Company on the Notes or any claim against the Guarantor on the Guarantee, or (ii) preclude a Holder from pursuing any claim it may have against the Guarantor or any of the other debtors in the Chapter 11 Cases or any other Party that is not based on such Holder's ownership of Notes.

(e) Legal Costs.  The defendants in the Nova Scotia Proceeding release and waive any claim against the Holders for fees and costs related to that proceeding.

6.      Stipulations and Acknowledgements.

(a) Acknowledgement of Deficiency Claim and Guarantee Claim.  Each of the Parties hereto hereby expressly acknowledges, agrees and confirms that nothing contained in this Agreement is in any way intended to, nor shall it in any way operate to, directly or indirectly, limit, waive, impair or restrict, any rights, interests, remedies or claims (whether at law or in equity, and whether now or hereafter existing) which any Holder may have against, or to which any Holder is due or owed from, the Company in respect of the Notes or the Guarantor in respect of the Guarantee Claim or the Deficiency Claim (as defined below). Each of the Company and the Guarantor hereby expressly acknowledges, agrees and confirms that (i) the Deficiency Claim is a valid and enforceable claim of the Company and shall be enforceable against the Guarantor as allowed pre-petition general unsecured claims (the "**Allowed Claims**") to the fullest extent permitted under applicable laws, (ii) the Notes are valid and enforceable claims of the Holders and shall be enforceable against the Company in their full amount, and (iii) the Guarantee Claim is a valid and enforceable claim of the Holders and shall be enforceable against the Guarantor in the Chapter 11 Cases as Allowed Claims to the fullest extent permitted under applicable laws.

(b) Guarantor Insolvency Claims.  The Company and Guarantor stipulate and acknowledge as follows:

(i)      forthwith after execution of this Agreement, the Company shall provide the Holders with a consent to a bankruptcy order pursuant to the Bankruptcy and Insolvency Act (Canada), which shall be executed by the duly authorized officers and directors of the Company in form satisfactory to the Holders. The Holders are hereby authorized for and on behalf of the Company to add to the executed consent the court file number for the application for the bankruptcy order once issued by the relevant court, and proceed to obtain the bankruptcy order. GMCL agrees to provide all necessary funding to the trustee in bankruptcy of the Company as may be required for it to administer the estate and to fully advance the Deficiency Claim (defined below) in the bankruptcy or insolvency proceedings of the Guarantor, including the payment of a retainer in

the amount not to exceed $100,000, on the date that the Extraordinary Resolution is passed;

(ii)     holders of the 2015 Notes and the 2023 Notes would and shall be entitled to a general unsecured claim in the bankruptcy or insolvency proceedings of the Guarantor for the full amount of the outstanding principal, interest and costs due on such Notes by virtue of the Guarantor's Guarantee (the "**Guarantee Claim**");

(iii)     the trustee in bankruptcy of the Company would and shall be entitled to a general unsecured claim for contribution for any amounts unpaid to the Company's creditors, namely the amount outstanding under the Notes, the Swap Liability (defined below) and any other liabilities (collectively, a "**Deficiency Claim**"), in the bankruptcy and insolvency proceedings of the Guarantor;

(iv)     for greater certainty, the Consent Fee payment does not reduce, limit or impair the Notes, the Guarantee Claim or the Deficiency Claim;

(v)     the Guarantor confirms that its only claim against the Company is the Swap Liability.  If for any reason  any portion of the Deficiency Claim is disallowed, the Guarantor agrees that the Swap Liability is subordinated to the prior, indefeasible payment in full of the Notes.  In any event, any and all other undisclosed indebtedness, claims, liabilities or obligations of the Company to the Guarantor other than the Swap Liability are subordinated to the prior, indefeasible payment in full of the Notes. To the extent of the subordination provided for herein, the Guarantor agrees that should it receive any payments from the Company or a trustee in bankruptcy of the Company, it will hold such payment in trust and immediately pay over such amounts to the paying agent for the Notes;

(vi)     the Guarantor shall not assert any right of set-off in respect of the Deficiency Claim; and

(vii)     the Guarantor agrees and covenants that it will not take any action or assert any position inconsistent with this Section 6 and, if called upon by the Holders, will confirm its agreement with the positions confirmed herein in writing or at a court hearing as reasonably requested by the Holders.

For purposes of this Agreement, "**Swap Liability**" shall mean the obligations of the Company to the Guarantor, under currency swap arrangements between the Guarantor and the Company.

7.     <u>Non-Public Information</u>.  The Holders hereby acknowledge that: (i) each of the Company and the Guarantor may be, and each Holder is proceeding on the assumption that the Company and the Guarantor are, in possession of material, non-public information concerning themselves and their respective direct and indirect subsidiaries (the "**Information**") which is not or may not be known to the Holders and that neither the Company nor the Guarantor has disclosed to the Holders; (ii) each Holder is voluntarily assuming all risks associated with the

Transactions and expressly warrants and represents that (x) neither the Company nor the Guarantor has made, and except as expressly provided in this Agreement, each Holder disclaims the existence of or its reliance on, any representation by the Company or the Guarantor concerning the Company, the Guarantor or the Notes and (y) except as expressly provided in this Agreement, it is not relying on any disclosure or non-disclosure made or not made, or the completeness thereof, in connection with or arising out of the Transactions, and therefore has no claims against the Company or the Guarantor with respect thereto; (iii) if any such claim may exist, each Holder, recognizing its disclaimer of reliance and reliance by the Company and the Guarantor on such disclaimer as a condition to entering into the Transactions, covenants and agrees not to assert it against the Company, the Guarantor or any of their respective officers, directors, shareholders, partners, representatives, agents or affiliates; and (iv) neither the Company nor the Guarantors shall have any liability, and each Holder waives and releases any claim that such Holder might have against the Company, the Guarantor or any of their respective officers, directors, shareholders, partners, representatives, agents and affiliates whether under applicable securities law or otherwise, based on the knowledge, possession or nondisclosure by the Company or the Guarantors to each Holder of the Information.  Each Holder further represents and acknowledges that is has received and reviewed (a) a copy of the prospectus, dated April 27, 2009, as amended and supplemented to date (or if resident in Canada, a copy of the Canadian offering memorandum dated April 27, 2009 which incorporates the prospectus, as amended and supplemented to date), relating to the offers by the Company and the Guarantor to exchange certain series of securities, including the Notes, which includes and incorporates by reference material public information concerning the Company and the Guarantors and (b) the Form 8-K filed by the Guarantor on May 28, 2009 relating to the proposed sale by the Guarantor of substantially all of its assets pursuant to Section 363(b) of the U.S. Bankruptcy Code.

8.   <u>Specific Performance</u>.  Each of the Parties hereto recognizes and acknowledges that a breach by any of the Parties hereto of any covenants or agreements contained in this Agreement will cause the other Parties to sustain damages for which such Parties would not have an adequate remedy at law for money damages, and therefore each Party hereto agrees that in the event of any such breach the other Parties shall be entitled to the remedy of specific performance of such covenants and agreements and injunctive and other equitable relief in addition to any other remedy to which such Parties may be entitled, at law or in equity.

9.   <u>Remedies Cumulative</u>.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party.

10.   <u>Effectiveness; Amendments</u>.  This Agreement shall not become effective and binding on a Party unless and until a counterpart signature page to this Agreement has been executed and delivered by such Party.  Except as otherwise provided herein, once effective, this Agreement may not be modified, amended or supplemented except in a writing signed by each of the Parties hereto.

11. <u>No Waiver</u>.  The failure of any Party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to

insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power or remedy or to demand such compliance.

12. <u>No Admission</u>.  Neither this Agreement nor the settlement contained herein, nor any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any claims released pursuant to Section 5 above, or of any wrongdoing or liability of or damage by any of the Parties hereto or their directors; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Parties hereto or their respective directors in any civil, criminal or administrative proceeding in any court, administrative proceeding in any court, administrative agency or other tribunal.  The Parties and the Released Persons may file this Agreement and Exhibits in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

13. <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of New York.  The Parties hereby irrevocably and unconditionally submit to the jurisdiction of any federal or state court located within the borough of Manhattan of the City, County and State of New York over any dispute for purposes of any action, suit or proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby.  Each party irrevocably waives any objection it may have to the venue of any action, suit or proceeding brought in such court or to the convenience of the forum.

14. <u>Notices</u>.  All notices and consents hereunder shall be in writing and shall be deemed to have been duly given upon receipt if personally delivered by courier service, messenger, facsimile, or by certified or registered mail, postage prepaid return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following parties:

>   If to any one Holder, to:

>   such Holder at the address shown for such Holder on the applicable signature page hereto, to the attention of the person who has signed this Agreement on behalf of such Holder

>   with copies to:

Greenberg Traurig, LLP
200 Park Avenue
New York, NY  10166
Facsimile No.:  (212) 801-9362
Attn:   Bruce R. Zirinsky
        Clifford E. Neimeth
        Anthony J. Marsico

And

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Facsimile No.:  (212) 859-8583
Attn: Brian D. Pfeiffer

If to the Company, to:

General Motors Nova Scotia Finance Company
1300-1969 Upper Water Street
Purdy's Wharf Tower Tower II
Halifax, Nova Scotia, Canada B3J 3R7

Facsimile No.: (905) 644-7319
Attn:   Chief Executive Offer, Chief Financial Officer and
        Principal Accounting Officer

with a copy to:
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153
Facsimile No.:  (212) 310-8007
Attn:  Todd R. Chandler

    15. <u>Representation by Counsel</u>.  Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

    16. <u>Consideration</u>.  It is hereby acknowledged by the Parties that, other than the agreements, covenants, representations and warranties of the Parties, as more particularly set forth herein, no consideration shall be due or paid to the Company for their agreement to use their commercially reasonable efforts to consummate the Transactions and the Extraordinary Resolutions in accordance with the terms and conditions of this Agreement.

17. <u>Headings</u>.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

18. <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, administrators and representatives.

19. <u>Several, Not Joint, Obligations</u>.  The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint.

20. <u>Prior Negotiations</u>.  This Agreement supersedes all prior negotiations with respect to the subject matter hereof but shall not supersede the Extraordinary Resolution or the Transaction Documents.

21. <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. Delivery of an executed signature page of this Agreement by facsimile or e-mail shall be as effective as delivery of a manually executed signature page of this Agreement.

22. <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

23. <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

24. <u>Additional Parties</u>.  Without in any way limiting the provisions hereof, additional holders of the Notes may elect to become Parties by executing and delivering to the Company a counterpart hereof.  Such additional holder shall become a party to this Agreement as a Holder in accordance with the terms of this Agreement.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

**GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY**

By: _____

Name: *Neil J. Macdonald*

Title: *Secretary*

**GENERAL MOTORS CORPORATION**

By: _____

Name: _____

Title: _____

**GENERAL MOTORS OF CANADA LIMITED**

By: _____

Name: *Neil J. Macdonald*

Title: *Vice President*

**GM NOVA SCOTIA INVESTMENTS LTD.**

By: _____

Name: *Neil J. Macdonald*

Title: *Secretary*

**Signature Page to Lockup Agreement**

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY

By: _____
     Name:
     Title:

GENERAL MOTORS CORPORATION

By: _____
     Name: RAY G. YOUNG
     Title: CHIEF FINANCIAL OFFICER

GENERAL MOTORS OF CANADA LIMITED

By: _____
     Name:
     Title:

GM NOVA SCOTIA INVESTMENTS LTD.

By: _____
     Name:
     Title:

**Signature Page to Lockup Agreement**

**HOLDERS**:

AURELIUS CAPITAL PARTNERS, LP

By:    Aurelius Capital GP, LLC, its General Partner

By:_____
Dan Gropper
Managing Director
Principal amount of 2015 Notes held:  £17,822,000

Principal amount of 2023 Notes held:  £41,480,000

Date:  June 1, 2009

Address:  535 Madison Avenue
              22nd Floor
              New York, NY 10022

Attention:  Dan Gropper
Fax:  212-786-5870

**Signature Page to Lockup Agreement**

## HOLDERS:

AURELIUS CAPITAL MASTER, LTD.

By:    Aurelius Capital Management, LP,
solely as investment manager and not in its
individual capacity

By: _____
Dan Gropper
Managing Director
Principal amount of 2015 Notes held:
£17,424,000

Principal amount of 2023 Notes held:
£38,970,000

Date:  June 1, 2008

Address for Notice:    AURELIUS CAPITAL MASTER, LTD.
c/o Aurelius Capital Management, LP
535 Madison Avenue
22nd Floor
New York NY 10022

Registered Office:    AURELIUS CAPITAL MASTER, LTD.
c/o GlobeOp Financial Services (Cayman)
Limited
45 Market Street, Suite 3205
2nd Floor, Gardenia Court
Camana Bay, West Bay Road South
Grand Cayman KY1-9003

Attention: Dan Gropper
Fax:  212-786-5870

**HOLDERS:**

**Drawbridge DSO Securities LLC**

By: _____
      Constantine M. Dakolias
      President

Principal amount of 2015 Notes held:  £111,600,000.00
Date:  May 31, 2009

1345 Avenue of the Americas, 46th Floor
New York, New York 10105
Attention: Constantine M. Dakolias
Fax: (212) 798-6099

**Drawbridge OSO Securities LLC**

By: _____
      Constantine M. Dakolias
      President

Principal amount of 2015 Notes held:  £12,400,000.00
Date:  May 31, 2009

1345 Avenue of the Americas, 46th Floor
New York, New York 10105
Attention: Constantine M. Dakolias
Fax: (212) 798-6099

**FCOF UB Securities LLC**

By: _____
      Constantine M. Dakolias
      President
Principal amount of 2015 Notes held:  £9,500,000.00
Principal amount of 2023 Notes held:  £5,500,000.00
Date:  May 31, 2009

1345 Avenue of the Americas, 46th Floor
New York, New York 10105
Attention: Constantine M. Dakolias
Fax: (212) 798-6099

GM Lock Up Agreement May 31, 2009

**HOLDERS**:

Appaloosa Investment Limited Partnership I

By: _James E. Bolin_

    Name: _James E. Bolin_

    Title: _Partner_

Principal amount of 2015 Notes held: $ _$ 15,181,000_

Principal amount of 2023 Notes held: $ _$ 22,696,000_

Date: _6/1/09_

    _c/o Appaloosa Management LP_
    _51 JFK Parkway, 2nd Fl_
    _Short Hills, NJ 07078_

Attention: _James Bolin_

Fax: _(973) 701-7055_

Palomino Fund Ltd.

By: _James E. Bolin_

    Name: _James E. Bolin_

    Title: _Partner_

Principal amount of 2015 Notes held: $ _$ 22,187,000_

Principal amount of 2023 Notes held: $ _$ 33,171,000_

Date: _6/1/09_

    _c/o ~~Appal~~ Palomino Fund Ltd._
    _51 JFK Parkway, 2nd Fl_
    _Short Hills, NJ 07078_

Attention: _James Bolin_

Fax: _(973) 701-7055_

**Signature Page to Lockup Agreement**

Thoroughbred Master Ltd.

By: _James E. Bolin_____

    Name: _James E. Bolin_

    Title: _Partner_

Principal amount of 2015 Notes held: $ _£ 11,306,000_

Principal amount of 2023 Notes held: $ _£ 18,457,000_

Date: _6/1/09_

    c/o Thoroughbred Master Ltd.
    51 JFK Parkway, 2nd Fl.
    Short Hills, NJ 07078

Attention: James Bolin

Fax: (973) 701-7055


Thoroughbred Fund LP

By: _James E. Bolin_____

    Name: _James E. Bolin_

    Title: _Partner_

Principal amount of 2015 Notes held: $ _£ 10,828,000_

Principal amount of 2023 Notes held: $ _£ 17,676,000_

Date: _6/1/09_

    c/o Thoroughbred Fund LP
    51 JFK Parkway, 2nd Fl.
    Short Hills, NJ 07078

Attention: James Bolin

Fax: (973) 701-7055

**Signature Page to Lockup Agreement**

**HOLDERS:**

**Elliott International, L.P.**
**By: Elliott International Capital Advisors**
**Inc. – As attorney-in-fact**

By: _Elliot Greenberg, Vice President_
Elliot Greenberg, Vice President
Principal amount of 2015 Notes held:
$46,200,000

Principal amount of 2023 Notes held:
$2,400,000

Date:  May 31, 2009

**c/o Elliott Management Corporation**
**712 Fifth Avenue**
**New York, NY 10019**
**Attention: Didric Cederholm**
**Fax: (212) 586-9461**

**The Liverpool Limited Partnership**
**By: Liverpool Associates Ltd. – As**
**General Partner**

By: _Elliot Greenberg, Vice President_
Elliot Greenberg, Vice President
Principal amount of 2015 Notes held:
$20,800,000

Principal amount of 2023 Notes held:
$1,600,000

Date:  May 31, 2009

**c/o Elliott Management Corporation**
**712 Fifth Avenue**
**New York, NY 10019**
**Attention: Didric Cederholm**
**Fax: (212) 586-9461**

**Signature Page to Lockup Agreement**

**Exhibit A**

**Extraordinary Resolution**

Set out below in a combination form is the text of the Extraordinary Resolution. For clarity, the opening text for the Extraordinary Resolution in respect of each series has been set out separately.

*For the 2015 Notes:*

"THAT THIS MEETING (the "**2015 Meeting**") of the holders of the 2015 Notes (the "**2015 Holders**") and benefiting from the provisions of the fiscal and paying agency agreement among General Motors Nova Scotia Finance Company (the "**Company**"), General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "**Fiscal Agent**") and Banque Générale du Luxembourg S.A. (the "**Paying Agent**" and together with the Fiscal Agent, the "**Agents**") dated as of July 10, 2003 (the "**Fiscal and Paying Agency Agreement**"), by Extraordinary Resolution (the "**Extraordinary Resolution**"), HEREBY: "

*For the 2023 Notes:*

"THAT THIS MEETING (the "**2023 Meeting**") of the holders of the 2023 Notes (the "**2023 Holders**") and benefiting from the provisions of the fiscal and paying agency agreement among General Motors Nova Scotia Finance Company (the "**Company**"), General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "**Fiscal Agent**") and Banque Générale du Luxembourg S.A. (the "**Paying Agent**" and together with the Fiscal Agent, the "**Agents**") dated as of July 10, 2003 (the "**Fiscal and Paying Agency Agreement**"), by Extraordinary Resolution (the "**Extraordinary Resolution**"), HEREBY: "

*For the 2015 and 2023 Notes (each series voting separately)*

**RESOLVES** by special quorum an Extraordinary Resolution in accordance with the proviso to paragraph 5 of Schedule 4 of the Fiscal and Paying Agency Agreement to authorize and direct the addition of a new provision at the end of, and forming part of, Condition 6 of Schedule 1 of the Fiscal and Paying Agency Agreement, which also forms a part of the Global Notes representing the 2015 Notes and the 2023 Notes, as follows:

"**Certain Claims**

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, each Noteholder hereby releases and discharges the defendants in the Nova Scotia Proceeding (and the past and/or present directors, officers, employees, partners, insurers, co-insurers, controlling shareholders, attorneys, advisers, consultants, accountants or auditors, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, joint ventures, assigns, spouses, heirs, related and/or affiliated entities of each of them) from all claims and demands that are raised in

the proceeding in the Supreme Court of Nova Scotia titled Aurelius Capital Partners, LP v. General Motors Corporation et al, Court File No. HFX No. 308066 (the "**Nova Scotia Proceeding**"), and agrees to discontinue the Nova Scotia Proceeding on a without costs basis.  Nothing contained in this Extraordinary Resolution shall preclude any Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid; provided, that, this Extraordinary Resolution precludes each Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, each Noteholder waives all (and shall cease to have any) rights and claims against the Company in respect of the Loan Agreements (as defined below), including with respect to any compromise or settlement of the loans thereunder, and such Noteholder's rights in the Loan Agreements, and each Noteholder hereby releases and discharges GM Canada (and its past and present officers, directors and employees), Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) from all claims and demands whatsoever, presently known or unknown, which the Noteholders ever had, now have or may hereafter have against them by reason of claims and demands arising from or in connection with those certain loan agreements between the Company and GM Canada each dated as of July 10, 2003 and pursuant to which GM Canada borrowed from the Company the sum of five hundred fifty-five million, eight hundred sixty thousand Canadian dollars (C$555,860,000), and the sum of seven hundred seventy-eight million, two hundred four thousand Canadian dollars (C$778,204,000), respectively (collectively, the "**Loan Agreements**"), provided that nothing contained in this Extraordinary Resolution shall preclude the Noteholders from pursuing any claim in respect of the parties and claims otherwise released in this paragraph in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid.  Furthermore, in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding, and, as a result, an amount equal to the Consent Fee has been repaid, the settlement between the Company and GM Canada of the amount owing under the Loan Agreements as contemplated by this Transaction shall be null and void and the full amount owing under the Loan Agreements as of the date hereof shall be immediately due and payable according to their terms as they exist as of the date hereof.

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, with respect to any other claim it may have against

the Canadian Entities or the Guarantor in its capacity as a holder of the Notes, the Noteholder covenants and agrees not to pursue any claim it may have other than in connection with the advancement of its claim under the Guarantee, the advancement of its claim against GM Nova Scotia in respect of the Notes and the Deficiency Claim (each as defined below). Nothing contained in this Extraordinary Resolution shall preclude the Noteholder from pursuing any other claim it may have against the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.  For purposes of this Extraordinary Resolution, the "**Guarantee**" shall mean that certain guarantee of the Notes by the Guarantor included in the Fiscal and Paying Agency Agreement and the Notes.

Nothing contained in this Extraordinary Resolution is in any way intended to, nor shall it in any way operate to, directly or indirectly, limit, waive, impair or restrict, any rights, interests, remedies or claims (whether at law or in equity, and whether now or hereafter existing) which any Noteholder may have against, or to which any Noteholder is due or owed from, the Company in respect of the Notes or the Guarantor in respect of the Guarantee Claim or the Deficiency Claim (as such terms are defined in the Lock-up Agreement). It is hereby expressly acknowledged, agreed and confirmed that that (i) the Deficiency Claim is a valid and enforceable claim of the Company and shall be enforceable against the Guarantor as allowed pre-petition general unsecured claims (the "**Allowed Claims**") to the fullest extent permittedunder applicable laws, (ii) the Notes are valid and enforceable claims to the Noteholders and shall be enforceable against the Company in their full amount, and (iii) the Guarantee Claim is a valid and enforceable claim of the Noteholders and shall be enforceable against the Guarantor as Allowed Claims to the fullest extent permitted under applicable laws.

For purposes of clarity, it is understood and agreed that nothing contained in this Extraordinary Resolution shall: (i) release in any respect whatsoever any claim against the Company on the Notes or any claim against the Guarantor on the Guarantee, or (ii) preclude a Noteholder from pursuing any claim it may have against the Guarantor or any of the other debtors  in the Chapter 11 Cases or any other Party that is not based on such Holder's ownership of Notes.

The Consent Fee payment does not reduce, limit or impair the Notes, the Guarantee Claim or the Deficiency Claim.

The Guarantor confirms that its only claim against the Company is the Swap Liability.  If for any reason  any portion of the Deficiency Claim is disallowed, the Guarantor agrees that the Swap Liability is subordinated to the prior, indefeasible payment in full of the Notes.  In any event, any and all other undisclosed indebtedness, claims, liabilities or obligations of the Company to the Guarantor other than the Swap Liability are subordinated to the prior, indefeasible payment in full of the Notes. To the extent of the subordination provided for herein, the Guarantor agrees that should it receive any payments from the Company or a trustee in bankruptcy of the Company, it will hold such payment in trust and immediately pay over such amounts to the paying

agent for the Notes.  For purposes of this Extraordinary Resolution, "**Swap Liability**" shall mean the obligations of the Company to the Guarantor, under currency swap arrangements between the Guarantor and the Company.

The Guarantor shall not assert any right of set-off in respect of the Deficiency Claim.

**RESOLVES** by special quorum an Extraordinary Resolution in accordance with Schedule 4 of the Fiscal and Paying Agency Agreement to pay, subject to the approval of the foregoing Extraordinary Resolution by the requisite Noteholders, an amount equal to £366.46 per £1,000 of principal amount of the 2015 Notes outstanding and £380.17 per £1,000 of principal amount of the 2023 Notes outstanding (the "**Consent Fee**"), immediately following the approval of the foregoing Extraordinary Resolution by the requisite Noteholders.  The Consent Fee shall be paid to the common depository by wire transfer, and Euroclear and Clearstream, as applicable, will credit the relevant accounts of their participants on the payment date.  Payments in respect of Notes not evidenced by Global Notes  shall be made by wire transfer, direct deposit or check mailed to the address of the holder entitled thereto as such address shall appear on the register of the Company.

**RESOLVES** by ordinary quorum an Extraordinary Resolution in accordance with the proviso to paragraph 5 of Schedule 4 of the Fiscal and Paying Agency Agreement to authorize and direct the following:

(a)  authorizes, directs and empowers the Agents to concur in, approve, and execute, and do all such deeds, instruments, acts and things that may be necessary to carry out and give effect to these resolutions;

(b)  sanctions, assents to and approves any necessary or consequential amendment to the Fiscal and Paying Agency Agreement to effect these resolutions; and

(c)  acknowledges that capitalized terms used in these resolutions have the same meanings as those defined in the Fiscal and Paying Agency Agreement, as applicable.

## Exhibit B

## Escrow Term Sheet

| | |
|---|---|
| **Escrow Agent** | A Canadian institutional trustee mutually satisfactory to the parties, acting reasonably |
| **Deposit** | GMCL deposits the Consent Fee (the "Escrow Amount") into a segregated account maintained on behalf of GMCL and GM Nova Scotia  and the Holders with the Escrow Agent with a Canadian financial institution ("Escrow Account #1") |
| **Release upon passing of extraordinary resolution** | Upon receipt by the Escrow Agent of the scrutineer's report for the noteholder Meeting evidencing that the Extraordinary Resolution has been duly passed by the requisite majority of noteholders, the Escrow Agent shall cause the Escrow Amount to be deposited into a new segregated account opened on behalf of GM Nova Scotia and maintained by the Escrow Agent with a Canadian financial institution ("Escrow Account #2").

Upon deposit of the Escrow Amount in Account #2, GM Nova Scotia shall be deemed to have acknowledged and agreed that the loans under the Loan Agreements shall have been settled and compromised in full subject to the terms of the Lock-Up Agreement.

Immediately upon the deposit of the Escrow Amount into Account #2, the Escrow Agent shall release the Escrow Amount and cause the Escrow Amount to be deposited with the Fiscal Paying Agent into the account specified by the Fiscal Paying Agent on Schedule A to the Escrow Agreement. |
| **Release of funds to GMCL** | The Escrow Agent shall cause the Escrow Amount to be released from Escrow Account #1 to GMCL and deposited into the account specified by GMCL on Schedule B to the Escrow Agreement in the following circumstances:

(i) if GM Nova Scotia and all of the Holders notify the Escrow Agent that the Meeting called for the passage of the Extraordinary Resolution has failed to occur prior to July 9, 2009 due to circumstances which are outside GM Nova Scotia's control and the Lockup Agreement has been terminated by the Holders; or

(ii) upon receipt by the Escrow Agent of the scrutineer's report for the noteholder Meeting evidencing that after holding the Meeting, the Extraordinary Resolution failed to be passed by the requisite majority of |

noteholders.

**Release upon Bankruptcy or Failure to hold meeting**

Upon receipt of notice by the Requisite Holders of any of the following events, the Escrow Agent shall cause the Escrow Amount to be released from Escrow Account #1 to all of the Holders and deposited into such accounts as may be specified in writing by each relevant Holder:

(a)    Bankruptcy, CCAA or any similar proceeding of GM Nova Scotia initiated directly or indirectly or fomented in any way by GM Nova Scotia or one of its affiliates;

(b)    a bankruptcy, CCAA or any similar proceeding of GMCL initiated directly or indirectly or fomented in any way by GMCL or one of its affiliates; or

(c)    a failure to hold the Meeting by July 9, 2009 due to circumstances which are within GM Nova Scotia's control.

For purposes of this section, **"Requisite Holders"** means Holders representing at least 51% of the outstanding principal amount of each series of Notes.

**Release upon disputed Material Breach**

In the case of a material breach of the Lockup Agreement other than those referred to above, the Escrow Agent shall retain the Escrow Amount in Escrow Account #1 until the Escrow Agent receives a final court order determining that such Material Breach has occurred.  In such circumstances, the Escrow Agent shall pay out the Escrow Amount from Escrow Account #1 in a manner consistent  with such court order (it being understood that if a Material Breach has occurred, the Escrow Amount shall be paid to the Holders).

**Interest**

Accrues to benefit of GMCL from date of Escrow Agreement to June 30, 2009 inclusive; thereafter accrues for the benefit of the Holders.

**Currency**

British Pounds

**Fees**

All fees of the Escrow Agent shall be for the account of GMCL.  Fees and expenses of the Escrow Agent arising from court proceedings will be paid by GMCL subject to a right of reimbursement from the Escrow Amount  in  the  event  that  GMCL  is  successful  in  such  court

- 3 -

proceedings.

| | |
|---|---|
| **Indemnity** | GMCL (unless broader indemnity required by Escrow Agent). |
| **Termination** | The Escrow Agreement shall be entered into no later than Wednesday June 4, 2009. |
| **Definitions** | Defined terms shall have the meanings set out in the Lock-Up Agreement. |
| **Governing Law** | Ontario |