

July 30, 2009


Insert Name of Supplier and all Supplier's related entities (subsidiaries and affiliates) doing business with the Company:

| | |
|---|---|
| Flextronics International USA | |
| Flextronics Automotive Inc. | |
| Flextronics MFG (Shanghai) Co. Ltd. | |
| Flextronics Technology Co. Ltd. | |

Insert ultimate DUNS number: 595240953 - Shanghai  & 250955580 - Canada


Dear Valued Supplier:

As you are no doubt aware, General Motors Corporation, and certain of its direct and indirect subsidiaries (collectively, the "Company"), filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Case" and the "Bankruptcy Court," respectively) on June 1, 2009 (the "Commencement Date"). On the Commencement Date, the Company requested the Bankruptcy Court's authority to pay certain of its suppliers in recognition of the importance of its relationship with such suppliers to its ongoing operations. On June 1, 2009, the Bankruptcy Court entered an order (the "Order") authorizing the Company to pay the prepetition claims of certain suppliers, subject to such suppliers agreeing to the terms set forth below in this agreement (the "Trade Agreement"). A copy of the Order is enclosed.

In order to receive payment on prepetition claims, each selected supplier must agree to enter into a Trade Agreement, the provisions of which are outlined below, including agreeing to continue supplying goods to the Company based on "Customary Trade Terms." In the Order, Customary Trade Terms are defined as (a) MNS-2 payment terms or such other more favorable payment terms as may be customary between a supplier and the Company,[1] (b) the terms and conditions embodied in the Company's general terms and conditions or such other more

---

[1] "MNS-2" refers to the most common payment terms in the Company's industry, whereby payment for goods supplied is generally due on the second business day of the second month following the receipt of such goods. For example, under these terms, payment for goods received by the Company during the month of May 2009 is due on July 2, 2009.

favorable trade terms, practices and programs in effect between a supplier and the Company in the twelve months prior to the Commencement Date and (c) those other terms that ensure the continued flow of goods and services, the expeditious resolution of claim disputes, and the transfer of suppliers' relationships to the Purchaser of the Company's business.

For purposes of administration of the essential supplier program, as authorized by the Bankruptcy Court, and payment of your prepetition claim, the Company and you agree as follows:

1.  The Company will make payment of $[$33,472.22 USD for Shanghai & $75,388.04 CAN for Canada] validly due and owing for shipments received by the Company prior to the Commencement Date (a "Trade Claim") within 10 business days after the execution of this Trade Agreement (without modification) by a duly authorized representative of your company.

2.  You will continue to supply goods or provide services, as applicable, to any non-Debtor affiliate of the Company with which you do business, on the terms set forth in the applicable contracts or purchase orders between you and such non-Debtor affiliates, including the purchase price for such goods and services, pursuant to the terms of the applicable contracts or purchase orders. Further, you will cause your affiliates and/or subsidiaries who are doing business with any non-Debtor affiliate of the Company to continue to supply goods or provide services, as applicable, to such non-Debtor affiliate, on the terms set forth in the applicable contracts or purchase orders between such parties, including the purchase price for such goods and services, during the Term.

3.  Except as provided in this Trade Agreement, the Company's general terms and conditions will apply to all the Company's purchases from you; and all terms and conditions of the applicable contracts or purchase orders between you and the Company will remain in full force and effect except as specifically modified by this Trade Agreement.

4.  You acknowledge that other than "Unpaid Tooling"[2] all "Tooling"[3] being utilized by you to manufacture parts for the Company, whether under direct agreements between you and the Company or agreements between you and third parties, is owned by the Company and is being held by you

---

[2] The term "Unpaid Tooling" means Tooling for which Company has not paid the purchase price set forth in the applicable purchase order for such Tooling to a supplier or any of its predecessor(s) in interest.

[3] The term "Tooling" means collectively all tooling (including primary tooling and secondary tooling), dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, and any documentation including engineering specifications, PPAP books and test reports, together with any accessions, accessories, attachments, parts, substitutions, replacements and appurtenances thereto, used by a supplier in connection with its manufacture of parts for the Company, but limited to only such items which are covered by purchase orders previously issued by the Company.

and, to the extent that you have transferred such Tooling to third parties, by such third parties, as bailees-at-will. Upon payment in full of the applicable purchase order price for any item of Unpaid Tooling, less any amounts necessary to satisfy outstanding liens of third-parties on such Tooling, if any, such item shall thereafter be included in the definition of Tooling and be acknowledged to be owned by the Company;

In the event of a dispute between you and the Company as to whether any Tooling is Unpaid Tooling, pending resolution of the dispute the Tooling subject to the dispute will be presumed to be owned by the Company, the Company will have the right to take immediate possession of such Tooling and you will not withhold delivery of possession of such Tooling; provided, however, such Tooling will remain subject to any claim or right to payment you may have for the disputed amounts (despite your relinquishment of possession).

The rights and obligations contained in this paragraph 4 are in addition to (and not in lieu of) the rights of the Company under its respective purchase orders, including its global terms and conditions of purchase, and any other agreements between you and the Company, and will continue in full force and effect notwithstanding the expiration or termination of this Trade Agreement.

5.  You will not file or otherwise assert against any of the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any prepetition amounts allegedly owed to you by the Company including, but not limited to, the Trade Claim. Furthermore, if you have taken steps to file or assert such a lien prior to entering into this Trade Agreement, you agree to immediately take any actions required to remove such lien.

6.  You will not assert any reclamation claim or similar claim, including any claim under section 503(b)(9) of the Bankruptcy Code, on account of any goods shipped to the Company prepetition and for which you have been paid pursuant to this Trade Agreement or otherwise.

7.  If you fail or refuse, at any time, to continue to supply goods or provide services, as applicable, to the Company on the terms set forth in this Trade Agreement, any payments received by you on account of your Trade Claim will be deemed to have been in payment of then outstanding postpetition obligations owed to you. Furthermore, you will immediately repay to the Company any payments made to you on account of your Trade Claim to the extent that the aggregate amount of such payments exceed the outstanding postpetition obligations owed to you, without giving effect to any rights of setoff, reclamation or otherwise.

3

8.     You acknowledge you have reviewed the terms and provisions of the Order and you consent to be bound by all such terms.

You further agree that you will keep the terms of this Trade Agreement, together with all related settlement discussions between you and the Company, strictly confidential. You may disclose the terms of this Trade Agreement only to your management personnel that need to know such information to implement the terms of this Trade Agreement, legal counsel and other advisors with whom you have a recognized legal privilege and your working capital lender, if so requested; provided that all such parties have been informed of the confidentiality restrictions contained herein and have agreed in writing to abide by such restrictions. You agree that you will be responsible and directly liable for any breach of the confidentiality provisions set forth in this Trade Agreement by your management personnel, legal counsel, other advisors and, if applicable, working capital lender. You acknowledge that failure to honor the confidentiality provisions contained herein would cause irreparable harm to the Company. Any discussions by you with any third parties, including the press or media or consultants, regarding this Trade Agreement and its terms are expressly prohibited.

The Company expressly reserves all of its rights at law and in equity, including without limitation, all of its rights as debtor-in-possession under the Bankruptcy Code. Without limiting the generality of the foregoing sentence, this Trade Agreement, and any payment made hereunder, does not constitute (a) a waiver of the Company's rights (i) to dispute any claim, (ii) to reject any agreement, contract, purchase order or other document under section 365 of the Bankruptcy Code, or (iii) to take, or refrain from taking, any other action under any applicable section of the Bankruptcy Code or any other applicable law or (b) an approval, adoption, or assumption of any agreement, contract, purchase order, or other document under section 365 of the Bankruptcy Code or any other applicable law, all of the Company's rights with respect to which are expressly reserved.

This Trade Agreement may be executed in any number of originals or counterparts, each of such duplicate originals or counterparts shall be deemed to be an original and together will constitute one and the same instrument. The parties agree that their respective signatures can be delivered by facsimile or e-mail, and that facsimile and e-mail signatures will be treated as originals for all purposes. The individual signing this Trade Agreement on behalf of each party represents and warrants that he or she has all power and authority necessary to execute this Trade Agreement on such party's behalf.

This Trade Agreement is made in the State of Michigan and will be governed by, and construed and enforced in accordance with the laws of the State of Michigan, without regard to conflicts of law principles. The parties acknowledge that the Bankruptcy Court will have exclusive jurisdiction over any case or controversy arising out of or relating to this Trade Agreement or its subject matter and that all litigation arising out of or relating to this Trade Agreement or its subject matter must be commenced in the Bankruptcy Court.

Please sign below to acknowledge your consent to the terms of this Trade Agreement and return an executed copy to the Company either by email to SupplierCallCenter@gm.com or by facsimile to 1-248-312-7191.

If you have any questions about this Trade Agreement or our financial restructuring, please do not hesitate to call Supplier Information Call Center toll free at 1-888-409-2328 or 1-586-947-3000.

Sincerely,
**GENERAL MOTORS CORPORATION**

_____/s/    Robert E. Socia_____

By:    Robert E. Socia

Title:    Group Vice President –
General Motors Corporation

Date:    July 30, 2009


**ACKNOWLEDGED AND AGREED:**

On behalf of itself and all of its affiliates and subsidiaries listed on the first page to this Trade Agreement

By:_____

Title:__Sr. Dir. Business Dev._____

Date:___August 6,_____, 2009