## FOUNTAIN LAKES II

### OFFICE/WAREHOUSE LEASE
#### COVER PAGE

Date of this Lease:    September ___, 2005

|  | LANDLORD | TENANT |
|---|---|---|
| Parties | Fountain Lakes I, L.L.C., a Maryland limited liability company | General Motors Corporation, a Delaware corporation |

**1.1 Premises**

BUILDING NAME:  Fountain Lakes II

ADDRESS: xxx Fountain Lakes
attached as Exhibit A
    Industrial Boulevard
    St. Charles, Missouri  63301

☒ Diagram of leased space

**FEET**    APPROXIMATE TOTAL SQUARE FEET IN BUILDING:    290,291  SQUARE

**FEET**    APPROXIMATE SQUARE FEET IN LEASED PREMISES:    190,932  SQUARE

TENANT'S PRO RATA SHARE:    65.77 PERCENT

**2.1 Term**

COMMENCEMENT DATE: TBD*    TERM: 10 years 5 months

TERMINATION DATE:  TBD**

*The Commencement Date shall be as set forth in Paragraph 3.1.

**The Termination Date shall be the date that is 125 months after the Commencement Date.

**2.2 Renewal**

RENEWAL TERM(S):    2 additional period(s) of 5 years each

**2.4 Termination Option**

OPTIONAL TERMINATION DATES:    At end of 65th month

**3.1 Rent**

| | Months 1 - 5 | Months 6 – 65 | Months 66 - 125 |
|---|---|---|---|
| ANNUAL BASE RENT: | $0.00 | $630,075.60 | $725,541.60 |
| PER SQUARE FOOT: | $0.00 | $3.30 | $3.80 |
| MONTHLY INSTALLMENTS: | $0.00 | $52,506.30 | $60,461.80 |

    *subject to paragraph 3.1 in the body of the Lease

MAKE CHECK PAYABLE TO:  Fountain Lakes I, L.L.C.
c/o Balke Brown Associates, Inc.
1001 Highlands Plaza Drive West, Suite 150
St. Louis, Missouri  63110

**3.2 Security Deposit**

SECURITY DEPOSIT:    [None]

**3.3 Late Charge when due**

LATE CHARGE: 5% of delinquent payment plus accrued interest if not paid within 10 days of

**4.1 Taxes Insurance**

REAL ESTATE TAXES AND INSURANCE:    Tenant to pay its pro rata share

**5.1 Expenses**

OPERATING EXPENSES:    Tenant to pay its pro rata share

**6.1 Use**

PERMITTED USE OF PREMISES:    Office/Warehouse/Distribution

**6.2 Parking**

PARKING SPACES ALLOCATED TO TENANT:    All automobile and truck parking spaces adjacent to any portion of GM leased premises, exclusively, plus other spaces on non-exclusive lot (as depicted on Exhibit E);

**7.1 Utilities**

UTILITIES AND TRASH REMOVAL:    Tenant to pay

L:\BALKE\General Motors\01r5 - Lease rtw chngs.DOC


EXHIBIT

A

INTEREST RATE:                          8%

20.1                    Notices
            ADDRESS FOR NOTICES                    ADDRESS FOR NOTICES

            Fountain Lakes I, L.L.C.               Affiliated Computer Services, Inc.
            Balke Brown Associates, Inc.           Mailstop: GM LA
            1001 Highlands Plaza Drive West, Suite 150    1100A Cobb Parkway N
            St. Louis, Missouri 63110              Marietta, GA 30062
            Fax (314) 802-0802                     Fax (678) 285-0927

                                                   With a copy to:
                                                      General Motors Worldwide Real Estate
                                                      200 Renaissance Center
                                                      MC 482-B38-C96
                                                      Detroit, MI 48265
                                                      Attention: Executive Director
                                                      Fax (313) 665-6745

23.2            BROKERS:

                                          Landlord's Broker: Grubb & Ellis/Krombach Partners
                                                             Balke Brown Associates, Inc.

                                          Commission Payable: By Landlord per separate agreement

                                          Tenant's Broker: Jones Lang LaSalle

                                          Commission Payable: Landlord pays 4% of base rental
                                                             over the initial term (exclusive of
                                                             any amortization of Tenant
                                                             Improvements)

Exhibit A – Diagram of Leased Premises
Exhibit B -Form of Confirmation of Lease Term
Exhibit C – Redevelopment Agreement
Exhibit D – Safety Standards
EXHIBIT E – TENANT EXCLUSIVE PARKING
EXHIBIT F  PARTICIPATING PLANS
SCHEDULE 1 – BASE BUILDING IMPROVEMENTS
SCHEDULE 2  TENANT IMPROVEMENTS
SCHEDULE 3  SCHEDULE (MILESTONES)
SCHEDULE 4  OUTLINE SPECIFICATION

## OFFICE/WAREHOUSE LEASE

THIS LEASE is made and entered into as of the day set forth on the Lease Cover Page by and between Landlord and Tenant.

### W I T N E S S E T H :

For and in consideration of the rents and covenants hereinafter set forth, Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the following-described Premises upon the following terms and conditions:

### ARTICLE 1
### PREMISES

**1.1    Premises.**  Landlord, for and in consideration of the rents, covenants and agreements hereinafter set forth and hereby agreed to be paid, kept and performed by Tenant, does hereby lease to Tenant, and Tenant hereby leases from Landlord, that portion of Landlord's real estate and building described on the Lease Cover Page (such building together with the land on which it is situated is hereinafter referred to collectively as the "Building"), which is more particularly delineated on the diagram attached hereto as Exhibit A and incorporated herein by this reference (hereinafter referred to as the "Premises").

### ARTICLE 2
### TERM

**2.1    Term.**  The Lease term, Lease Commencement Date and Lease Termination Date of this Lease are set forth in paragraph 2.1 of the Lease Cover Page.  If the Premises are not available and ready for occupancy by the stated Lease Commencement Date, and to the extent such unavailability or unreadiness is not occasioned or caused primarily by Tenant (such as Tenant's failure to promptly approve plans or specifications or make improvements to the Premises which are to be made by Tenant), then the Lease Commencement Date shall be the first day on which the Premises are available and ready for occupancy, and the Lease Termination Date shall be extended accordingly to provide for a full 125 month term.  The phrase "available and ready for occupancy" means substantial completion of all improvements to be made by Landlord as described in paragraph 8.1 herein and the issuance by the applicable authorities of an occupancy permit allowing Tenant's occupancy of the Premises for the purposes set forth herein; provided, however, this shall only be a condition so long as Tenant has timely taken all action required of it to apply for such occupancy permit.  If the Lease Termination Date, as so extended, is other than on the last day of a calendar month, the Lease Termination Date shall be further extended to the next occurring calendar month end.  If the Premises are not available and ready for occupancy by the stated Lease Commencement Date and to the extent such unavailability or unreadiness is occasioned or caused by Tenant (such as Tenant's failure to promptly approve plans and specifications or make improvements to the Premises which are to be made by Tenant), then, Tenant's free rent period shall commence as of the scheduled Lease Commencement Date, although the actual Lease Commencement Date shall be extended as provided above.  Upon the actual determination by Landlord and Tenant of the Lease Commencement Date and consequently the Lease Termination Date (if it is other than as stated in paragraph 2.1 on the Lease Cover Page), Landlord and Tenant shall confirm in writing the Lease Commencement Date and the Lease Termination Date by executing the form attached hereto as Exhibit B.  Subject to the availability of the Premises and so long as Tenant has secured all insurance required hereunder, Tenant shall have the right, without cost to Tenant, prior to the Lease Commencement Date of this Lease, to enter upon the Premises at reasonable times for the purpose of preparing the Premises for their intended use so long as such access does not materially interfere with Landlord's ability to complete and deliver the Premises as required herein.  Tenant's final entry into possession of the Premises shall constitute acceptance of the Premises and Tenant's acknowledgment that the Premises are in good order, condition and repair and that the Premises have been completed to Tenant's full and complete satisfaction, subject only to those punchlist type items and time to complete same which shall be agreed to in writing at the time of such occupancy and to all warranties provided by Landlord and Landlord's contractors.

**2.2    Renewal Option.**

(1)    So long as Tenant is not in default hereunder either at the time such option is exercised or at the commencement of the renewal term, Tenant is granted the right and option (the "Renewal Option") to extend the term of this Lease for the additional period or periods described in paragraph 2.2 on the Lease Cover Page, and if such renewal is effectively exercised, such renewal term (the "Renewal Term") shall commence upon the expiration of the previous term of this Lease,

provided that such option must be exercised, if at all, by written notice from Tenant to Landlord given at least nine (9) months prior to the expiration of the then current term.

(2)    In the event the foregoing option is effectively exercised, all the terms and conditions contained in this Lease shall continue to apply except that:

(i)    There shall be no further right of renewal beyond the periods referred to above;

(ii)    The Base Rent applicable to the Premises during any Renewal Term shall equal ninety-five percent (95%) of the then market rate of the Premises, but not less than the annual Base Rent paid by Tenant during the immediately preceding twelve (12) months before the Renewal Term. Upon the determination of such Base Rent, Landlord and Tenant shall enter into an amendment to the Lease to set forth the amount of initial Base Rent during such Renewal Term; and

(iii)    At least forty-five (45) days prior to the date that Tenant is required to notify Landlord of its intention to exercise its Renewal Option hereunder, Tenant shall first inform Landlord of its potential interest to renew this Lease. Landlord shall then notify Tenant, within fifteen (15) days of the date of receipt of Tenant's notice, of the Base Rent for such Renewal Term as determined by Landlord in accordance with paragraph 2.2(2)(ii) above and which will be payable for the Renewal Term if Tenant elects to renew this Lease. Tenant shall then have fifteen (15) days thereafter to advise Landlord if it does not agree to pay the Base Rent set forth in the Landlord's notice, in which event, the parties shall negotiate in good faith to determine an appropriate Base Rent that meets the criteria set forth in paragraph 2.2(2)(ii) above. If the parties cannot agree to an appropriate Base Rent that meets the criteria set forth in paragraph 2.2(2)(ii) above within thirty (30) days of Tenant advising Landlord that it does not agree to the Base Rent set forth in the Landlord's notice, the parties agree that the appropriate Base Rent shall be determined as follows:

(iv)    Within fifteen (15) days following the thirty (30) day period described in paragraph 2.2(2)(iii) above, Landlord and Tenant shall each notify the other in writing of their selection of an appraiser to determine the Market Rate. The two appraisers shall give their opinion of the Market Rate within twenty (20) days after their selection. The average of the two opinions shall be the Market Rate; provided, however, that in the event the two opinions differ by more than ten percent (10%) of the lower of the two amounts, the appraisers shall, within five (5) days thereafter, jointly select a third appraiser. This third appraiser shall, within ten (10) business days shall give its own opinion of the Market Rate and the two opinions which are closest to each other in value shall be added together and divided by two, and such average shall be final and binding on Landlord and Tenant as the Market Rate. Each party shall pay the costs and fees of the appraiser it selected. If a third appraiser is selected, the parties shall share equally the cost of the third appraiser. Upon determination of the Market Rate, Tenant shall have ten (10) days following such determination to elect to rescind its exercise of the Renewal Option. In the event of a timely rescission by Tenant of its Renewal Option, Tenant shall be responsible for paying the costs of all three appraisers. Upon determination of the Market Rate, so long as Tenant does not exercise its option to rescind the exercise of the Renewal Option, the parties shall promptly execute an amendment to this Lease setting forth the Base Rent for the Renewal Term. Each appraiser shall be a member in good standing of the appraisal institute holding a MAI designation and currently certified or licensed as a state certified general appraiser in the State of Missouri and have a minimum of five (5) years experience in the same geographical area as that in which the Premises is located and in real estate leasing and appraisal with respect to real estate which is of a similar kind to the Premises.

(3)    For the purposes of any expansion, extension, or renewal of this Lease, the Market Rate shall be the rate that is charged to renewing/extending tenants for space of comparable size, location, and conditions in comparable property within a five (5) mile radius of the Building. The Market Rate should take into consideration the following: location, quality, age, common area factors, finish allowances, rental abatement, parking charges, lease assumptions, space planning allowances, refurbishment allowances, and any other concessions or inducement. In addition, other considerations such as credit standing of the Tenant, lease term, and any other issues that would be relevant in making a market rate determination should be considered.

**2.3    Right of First Refusal.** Subject to the prior rights of Pretium Packaging, L.L.C. and Vi-Jon Laboratories, Inc., if at any time during the term of this Lease Landlord enters into a Letter of Intent with a bona fide third party to lease any space which becomes available in Building II (the "ROFR Space"), Landlord shall provide a copy of such Letter of Intent to Tenant together with information sufficient for Tenant to confirm that such additional space will not violate Section 22.18 below ("Landlord's Notice"), whereupon Tenant shall have the option, exercisable by delivery of written notice to Landlord within ten (10) days after the date of Landlord's Notice, to indicate its

-4-

agreement to lease the ROFR Space. In the event Tenant decides to lease the ROFR Space, the terms of such lease shall, at Tenant's option, either be (i) on all of the same terms and conditions as set forth herein with Tenant Improvement Allowance being prorated based upon the size of the space and the number of years remaining in the Lease term, or (ii) the terms and conditions set forth in the Letter of Intent. In the event Tenant exercises its right of first refusal under this paragraph and elects to have the terms of this Lease apply to the ROFR Space and there is less than three (3) years remaining on the then current term of this Lease, then as a further condition to Tenant's exercise of its right of first refusal under this paragraph, Tenant must simultaneously exercise its next Renewal Option pursuant to Section 2.2. In such case, the rate of rent for the ROFR Space, as set forth in the Letter of Intent, shall be deemed the market rate of rent for the ROFR Space only for purposes of the Renewal Option. If Tenant does not exercise its option hereunder, then Landlord shall be free to lease the ROFR Space to the third party on substantially the same terms set forth in the Letter of Intent.

     **2.4**   **Termination Option**. Provided that this Lease is in full force and effect and that Tenant is not in default hereunder, Tenant shall have the right and option (the "Termination Option") to terminate this Lease effective on the date set forth in paragraph 2.4 on the Lease Cover Page ("Early Termination Date"), provided that such Termination Option must be exercised, if at all, by written notice from Tenant to Landlord given not less than nine (9) months prior to the Early Termination Date and payment with such notice of five (5) months Base Rent plus the then unamortized balance of any and all leasing commissions and Tenant Improvement Allowance which Landlord pays and/or provides to Tenant in connection with the Premises, all such expenses to be amortized on a straight line basis over the Initial Term of the Lease (the "Termination Fee"). If Tenant has previously exercised any option to expand the Premises, the Termination Fee shall also include the then unamortized balance of any and all leasing commissions and Tenant improvement allowance which Landlord pays and/or provides to Tenant in connection with such option space, all such expenses to be amortized on a straight line basis over the term of the Lease for such option space.

     **2.5**   **Personal Right**. Tenant expressly acknowledges that the rights granted in paragraphs 2.2, 2.3 and 2.4 are granted solely to, and is exercisable solely by the Tenant whose name appears on the Lease Cover Page and that such rights shall automatically lapse upon Tenant's assignment of this Lease or subletting of the Leased Property, or any portion thereof, to any person or entity, provided that Landlord shall permit such rights to be assigned to Tenant's assignee for the balance of the term of the Lease if such entity is a substantial, creditworthy entity in Landlord's reasonable judgment.

### ARTICLE 3
### BASE RENT

     **3.1**   **Base Rent**. Tenant shall pay to Landlord without demand, deduction, or offset as rent for the Premises, the amounts set forth in paragraph 3.1 of the Lease Cover Page. Each monthly installment shall be payable in advance on the first day of each calendar month during the term of this Lease. In the event the term of this Lease commences or ends on a day other than the first day of the calendar month, then the rental for such partial month shall be pro rated in the proportion that the number of days that this Lease is in effect during such partial month bears to the total number of days in such month, and such rental shall be paid upon the commencement of such period. Unless and to the extent the Lease Commencement Date is delayed by Force Majeure (as defined in Section 22.16) or a material delay caused by Landlord (i.e., a delay not caused by Tenant and that prevents the Lease Commencement Date from occurring no later than 10 weeks after the date on which Landlord and Tenant agree on the plans and specifications for the improvements referenced in Paragraph 8.1 below), the Lease Commencement Date shall be, and the payment of Base Rent shall commence, on the earlier of the date of substantial completion of the Tenant Improvements and November 1, 2005.

     **3.2**   **Security Deposit**. [None]

     **3.3**   **Late Charge**. A late charge equal to five percent (5%) of the delinquent payment may be assessed, at Landlord's option, as additional rent in the event that any rental or other sum due hereunder is not paid within ten (10) days after the same shall be due and payable. In addition, any and all delinquent payments of rent, additional rent and all other sums payable hereunder shall bear interest at the rate of ten percent (10%) per annum from the date of delinquency until paid. This provision shall in no way affect the right of Landlord to declare Tenant in default of this Lease for the failure to pay rent on the day that it is due.

### ARTICLE 4
### REAL ESTATE TAXES AND INSURANCE

     **4.1**   **Real Estate Taxes**. Tenant agrees to pay, as additional rent, Tenant's "Pro Rata Share" (as that term is defined below) of any and all real estate taxes, assessments (including subdivision assessments) and levies of every kind, whether general or special, ordinary or

extraordinary and professional fees relating to appeals thereof, which may be levied or assessed on the land and Building in which the Premises are located during the Lease term (hereinafter "Taxes"). It is understood and agreed that only Landlord may protest or contest the validity, amount and enforceability of any Taxes levied or assessed on the land and Building in which the Premises are located, provided that if the Taxes are increased in any given year by more than 3% over the previous year, Landlord shall carry out such protest at Tenant's request, expense and discretion, using counsel selected by Landlord and reasonably acceptable to Tenant, and any tax savings or refunds relating to Taxes paid directly or indirectly by Tenant shall belong to Tenant.

**4.2    Insurance.** Tenant also agrees to pay, as additional rent, Tenant's "Pro Rata Share" (as that term is defined below) of Landlord's insurance costs for the Premises and the Building during the Lease term. Should Landlord's insurance rates be increased by reason of a particular use of a portion of the Building being made by a party other than Tenant, no such increase in insurance costs shall be included in the calculation of Landlord's insurance costs for purposes of determining Tenant's Pro Rata Share thereof. Should Landlord's insurance rates be increased by reason of the particular use of the Premises being made by Tenant, all such increases in insurance costs over the existing rate prior to such use or the rate which would be charged but for such use by Tenant, shall be paid entirely by Tenant to Landlord within thirty (30) days after Tenant's receipt of an invoice for same.

**4.3    Payment of Additional Rent.** Tenant shall pay Landlord all additional rent due under this Article 4 as provided in paragraph 5.4 below. Tenant's "Pro Rata Share" is hereby agreed to be equal to the percentage specified on the Cover Page, which was determined based upon the number of square feet of space contained within the Premises as compared to the total number of square feet of space contained in the Building. In the event the actual number of square feet of space contained within the Premises or within the Building should be different than that set forth on the Cover Page, then Tenant's Base Rent and Pro Rata Share shall be recalculated accordingly. Tenant's obligation to pay Tenant's Pro Rata Share of Taxes and insurance costs shall be pro rated, if necessary, to correspond with that portion of a tax year or insurance year occurring in the first and last years of the term of this Lease.

**ARTICLE 5**
**OPERATING EXPENSES**

**5.1    Tenant's Share of Operating Expenses.** Tenant shall pay, as additional rent, its Pro Rata Share (as defined in paragraph 4.3 above) of Landlord's operating expenses for the Building (for purposes of this Article 5, "Building" shall also include the tract of ground, parking lot, curbs, sidewalks and landscaping adjoining the building itself). Operating expenses for the Building for these purposes shall include all costs of management, operation, repair, maintenance and replacement, but shall not include expenses described in Section 5.2.B. below. The calculation of operating expenses for purposes of this paragraph shall be made annually on a calendar year basis. Landlord agrees to use its best efforts to minimize Operating Costs and agrees, commencing in 2007, to limit annual increases in controllable expenses contained within operating expenses to five percent (5%) or less in the aggregate. Controllable expenses for this purpose shall not include the cost of utilities, real estate taxes or any other expense over which Landlord has no reasonable control.

**5.2    Operating Expenses Defined.**

**A.** By way of illustration and not limitation, the term "operating expenses" shall include, but shall not be limited to, the following expenses of the Building:

(1) Costs and expenses incurred for the hiring and employment of all persons engaged in the on-site operation and maintenance of the Building or pursuant to a management agreement consistent with subsection (6) below;

(2) Cost of all Building maintenance and lighting replacement, as well as the cost of all service agreements on equipment and improvements, including window cleaning;

(3) Cost of repairs, general maintenance and replacements other than capital costs that are not described in subparagraph (7) below;

(4) Cost of all water and sewer and all common area electric and other utilities;

(5) Cost of maintenance, upkeep and replacement of the interior common elements and exterior of the Building, and the planting, landscaping and grounds surrounding the Building;

(6)    Cost of Building management, which cost may be payable to personnel or entities affiliated with Landlord and which may include a management fee not in excess of three percent (3%) of gross rents collected;

(7)    Cost, as reasonably amortized by Landlord of any capital improvements to the Building which reduces other operating expenses, or which is required to comply with any law, order, requirement or regulation or to replace existing equipment and machinery (the cost of any such replacement item shall be amortized over the number of years of 'useful life' of the item in accordance with GAAP, and Tenant shall reimburse Landlord as operating expenses for that portion of such amortized cost covering each remaining year of the Term of the Lease and any applicable Renewal Term from the date on which such replacement is completed);

(8)    Removal of all snow, ice, paper and debris from the parking areas and sidewalks serving the Building;

(9)    Maintaining parking lot lighting fixtures and relamping and reballasting as needed;

(10)    Repairing, maintaining, servicing and replacing all on-site utility facilities, including, but not limited to, electrical systems, water systems, storm drainage systems and sanitary sewer systems, to the extent that they are not cleaned, repaired, maintained or replaced by public utilities;

(11)    Cost of maintaining, sealing, striping and resurfacing but not replacing the parking areas, sidewalks and other common areas;

(12)    All costs associated with Landlord's fire alarm system and sprinkler system (if any) in the Building; and

(13)    All other non-capital costs incurred by Landlord in connection with the operation and maintenance of the Building other than expenses which relate exclusively to another tenant's space in the Building, it being the intention of the parties that Tenant pay as additional rent, in addition to the Base Rent, all expenses of operating and maintaining the Premises including Tenant's Pro Rata Share of all expenses of operating and maintaining the Building which benefit or are applicable to more than one tenant in the Building.

B.    Notwithstanding the foregoing, operating expenses shall not include any of the following expenses:

(1)    Mortgage principal and interest payments and other financing fees, costs and expenses;

(2)    Refinancing fees, costs and expenses;

(3)    Ground rent and related costs;

(4)    Depreciation and amortization of Building or equipment (except as provided in A(7) above;

(5)    Interest or penalties resulting from late payment by Landlord or other tenants;

(6)    Advertising costs;

(7)    Brokerage lease commissions;

(8)    Tenant Improvements or alterations, including allowances for same paid by Landlord;

(9)    Capital improvements and replacements, except as provided in Section A(7) above;

(10)    Costs reimbursed by tenants or any other third party;

(11)    Costs reimbursed by insurance;

(12)    Costs reimbursed by governmental authorities;

(13)    Special services paid for by tenants;

(14)    Landlord's legal fees;

(15)    Artwork in the Building;

(16)    Legal fees for preparation and negotiation of leases;

(17)    Repairs due to a casualty or condemnation;

(18)    Leasing and marketing expenses for the Building;

(19)    Equipment rental and related expenses if the cost would constitute a capital expenditure, excepting rentals for temporary use in the maintenance and operation of the Building;

(20)    Contributions to operating expense reserves;

(21)    Contributions to political or charitable organizations;

(22)    Costs related to environmental remediation not caused by Tenant;

(23)    Taxes other than real property taxes or taxes or charges in lieu of property taxes;

(24)    Any cost representing an amount paid for services or materials to a related person, firm, or entity to the extent such amount exceeds the amount that would be paid for such services or materials at substantially the then existing market rates for the same quality of service to an unrelated person, firm, or corporation;

(25)    The cost of work performed by Landlord which is due to negligence of Landlord or its agents, representatives or employees;

(26)    The cost of overtime or other expense to Landlord in curing its defaults or settling its disputes (except in connection with a default by Tenant); and

(27)    The cost of any audit which Landlord reimburses pursuant to Paragraph 5.3 of this Lease or similar provisions in leases with other tenants.

    **5.3    Annual Statements.**  Landlord shall provide to Tenant a statement of actual operating expenses for the preceding calendar year within one hundred fifty (150) days after the end of such calendar year.  Within ninety (90) days after Tenant receives Landlord's statement of actual operating expenses for the preceding calendar year, Tenant or its authorized agent shall have the right during normal business hours to inspect the books and records of Landlord relating to the operation of the Building at Landlord's office for the purpose of verifying the information in such statement.  Unless Tenant asserts specific errors within ninety (90) days after delivery of such statement, the statement shall be deemed to be correct.  Tenant may have Landlord's statement of operating expenses audited by an independent certified public accountant.  In the event such audit shows that Landlord has overcharged Tenant by five percent (5%) or more, Landlord shall pay the cost of such audit.  Otherwise, Tenant shall pay the cost of such audit. Landlord's failure to assess such increase for any one year shall not preclude Landlord from recovering any similar increase during the following year and shall not preclude Landlord from collecting for any similar increase with respect to any subsequent year.

    **5.4    Estimated Payments.**  In order to provide for the current payment by Tenant, on account, of Taxes, insurance premiums and operating expenses, Landlord shall, prior to the Lease Commencement Date and within approximately one hundred twenty (120) days of January 1 of each succeeding calendar year during the term of this Lease, estimate the Taxes, insurance premiums and operating expenses for the following year.  Tenant shall pay as additional rent hereunder during the ensuing twelve (12) months, on the first day of each month, one-twelfth (1/12) of Tenant's Pro Rata Share of Landlord's estimate of said Taxes, insurance premiums and operating expenses.  Should Landlord fail to provide Tenant with an estimate of the Taxes, insurance premiums and operating expenses anticipated for the following year by January 1 of any calendar year, Tenant shall continue to pay rental on the basis of the prior years' estimate until the first day of the month after such notice is given, on which date, Landlord or Tenant, as appropriate, will pay to the other the amount required to adjust Landlord's estimate of Tenant's Pro Rata Share of Taxes, insurance premiums and operating expenses allocable to the part of the calendar year which shall then have lapsed.  If, as finally determined, Tenant's Pro Rata Share of such Taxes, insurance premiums and operating expenses shall be greater or less than the aggregate of all

installments so paid by Tenant to Landlord during such twelve (12) month period, then Tenant shall pay to Landlord the amount of such underpayment within thirty (30) days of Tenant's receipt of a statement therefrom by Landlord, or Landlord shall credit (or refund if the Lease has terminated) Tenant for the amount of such overpayment, as the case may be. It is the intention hereunder to estimate the amount of Taxes, insurance premiums and operating expenses for each calendar year and then adjust such estimate after the end of each year based on the actual Taxes, insurance premiums and operating expenses incurred during such year in accordance with the timing and manner of reconciling operating expenses in Paragraph 5.3 above. If at any time it appears to Landlord that the amount payable hereunder for the current calendar year will vary from Landlord's estimate by more than five percent (5%), Landlord may, by written notice to Tenant, revise Landlord's estimate for the year, in which case, subsequent payments by Tenant for the year shall be based upon the revised estimate prorata in accordance with the months remaining in such calendar year. In no event, however, shall Landlord have the right, without Tenant's consent, to revise Landlord's estimate more than one (1) time during any calendar year. The obligations of Landlord and Tenant with respect to adjustments of additional rent shall survive the termination of this Lease. Should this Lease terminate on a day other than the last day of a calendar year, Tenant's Pro Rata Share of Landlord's Taxes, insurance premiums and operating expenses for the calendar year in which this Lease terminates shall be prorated on the basis which the number of days from the commencement of the calendar year to and including the termination date bears to 365. Tenant does hereby acknowledge that its obligation to participate in Taxes, insurance premiums and operating expenses shall be deemed additional rent and, in the event of non-payment thereof, Landlord shall have all the rights and remedies herein provided for in case of nonpayment of rent.

**5.5    Vacancy Adjustment.** In determining the amount of operating expenses for which Tenant is obligated to pay Tenant's Prorata Share for any calendar year (i) if less than 100% of the Building shall have been occupied by tenants and fully used by them at any time during the year, operating expenses shall be increased to an amount equal to the like operating expenses which would normally be expected to be incurred had such occupancy been 100% and had such full utilization been made during the entire period, or (ii) if Landlord is not furnishing any particular work or service (the cost of which, if performed by Landlord, would constitute an operating expense) to a tenant who has undertaken to perform or to pay directly for such work or service in lieu of the performance thereof or payment therefor by Landlord, operating expenses shall be deemed to be increased by an amount equal to the additional operating expense which would reasonably have been incurred during such period by Landlord, had it at its own expense furnished such work or service to such tenant.

## ARTICLE 6
## PURPOSE

**6.1    Possession and Use.** The Premises shall be occupied and used for the purpose of receiving, storing, warehousing and shipping products, materials and merchandise which is distributed by Tenant and other forms of transshipment services on a 24-hour-a-day, seven-day-a-week basis and other lawful uses incidental thereto. Tenant shall not allow any noise, smoke or odor to escape from the Premises in a manner which would be reasonably expected to materially disturb other occupants of the Building, or occupy the Premises in such manner as to disturb the peaceful and quiet occupancy of the other occupants of the Building. In no event, however, shall the Premises be used or occupied by Tenant in any manner contrary to law, zoning regulations or recorded restrictions, if any.

**6.2    Parking and Common Areas.** Tenant shall have the right to park trucks and trailers in those locations specified by Landlord as well as directly in front of Tenant's dock doors and to use spaces on the parking lot, as set forth in 6.2 of the Lease Cover Page, for automobile parking, for itself, its employees and invitees on an/unassigned, non-exclusive basis as depicted on Exhibit E. Tenant shall not park any trucks or tractor trailers on the automobile parking lot. Tenant shall be solely responsible to pay for any and all repairs, maintenance or excessive deterioration of such paved surfaces resulting from Tenant's excessive or improper use thereof. Tenant shall, at no time, block any common drive, or block access to any other tenant's premises and shall abide by such reasonable rules and regulations regarding the parking or standing of automobiles, trucks and trailers as Landlord may promulgate from time to time. Landlord shall retain exclusive control and management over the common areas serving the Premises and the Building, including but not limited to, all driveways, entrances, exits, roadways, parking areas, sidewalks and other features or facilities provided for the general use of all the tenants in the Building. Landlord shall have the right to establish, modify, change and enforce rules and regulations with respect to the use of said common areas and Tenant agrees to abide by and conform with such rules and regulations. Nothing contained in this Lease shall be construed so as to prohibit Landlord from reconfiguring the parking lot or from constructing any structures on the parking lot or in the common areas provided same does not unreasonably interfere with Tenant's operations at the Building or alter any truck routes to or through the drives accessing the Premises. Landlord reserves the right to remove abandoned or unlicensed vehicles and vehicles that are unreasonably interfering with the use of the

EXCLUSIVE
OR

-9-

parking lot by others and to charge the responsible party for Landlord's expense of removing said vehicle. Tenant shall be deemed responsible for any such vehicle belonging to or parked by any of Tenant's officers, directors, shareholders, employees, agents, contractors, licensees and concessionaires. Upon Landlord's request, Tenant shall furnish to Landlord within seven (7) days after the date of such request, the automobile license numbers of the vehicles used by Tenant and Tenant's employees, agents, contractors, licensees and concessionaires. Landlord shall have the right to cause any vehicles used by such parties to be towed at Tenant's cost for failure to park in the portion of the parking area where Tenant is authorized to park. Any amounts payable by Tenant hereunder shall be immediately due and payable upon demand by Landlord as additional rent hereunder.

## ARTICLE 7
## UTILITIES, TRASH AND PERSONAL PROPERTY TAXES

7.1    **Utilities.** Landlord shall cause the Premises to be separately metered for electricity and gas used in or upon the Premises during the term of this Lease. Tenant shall pay all electricity and gas charges relating to Tenant's use of the Premises. Landlord shall pay or cause to be paid when due, all charges for water and sewer used in or upon the Premises during the term of this Lease. Tenant shall reimburse Landlord, within thirty (30) days of Tenant's receipt of an invoice for same, for Tenant's Pro Rata Share of those water and sewer charges not separately metered to Tenant but relating to Tenant's use of the Premises as determined from time to time by Landlord. Tenant shall at all times during the term of this Lease maintain sufficient heat in the Premises so as to keep the water lines and sprinkler system in and serving the Premises from freezing during the winter months. Tenant shall be responsible for all damages incurred by Landlord for Tenant's failure to comply with the foregoing provisions and Landlord shall have the right, but not the obligation to cause the Premises to be adequately heated during the winter months at Tenant's sole cost and expense in the event Tenant shall fail to do so.

7.2    **Trash.** Tenant agrees to remove, at Tenant's sole cost and expense, all trash and rubbish of Tenant, which trash and rubbish shall be placed in Tenant's receptacles which shall be located in the areas designated by Landlord from time to time.

7.3    **Personal Property and Business Taxes.** Tenant shall pay before delinquent, all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operation, as well as upon its trade fixtures, merchandise and other personal property in or upon the Premises.

## ARTICLE 8
## TENANT IMPROVEMENTS AND ALTERATIONS

8.1    **Tenant Improvements.** Landlord agrees to construct the Base Building Improvements to the Premises at Landlord's sole cost as described on Schedule 1 attached hereto. Landlord also agrees to construct the improvements to the Premises listed on the Schedule of Tenant Improvements attached hereto as Schedule 2 (the "Tenant Improvements"). All such work shall be performed in a good and workmanlike manner, in accordance with the agreed Plans and Specifications referred to below, in compliance with all applicable laws, regulations, ordinances and codes and with the application of safety standards attached hereto as Exhibit D. Landlord shall complete the design and construction of the Base Building Improvements and the Tenant Improvements in accordance with the Milestone Schedule attached hereto as Schedule 3, subject to extension for delays to such work caused by force majeure events and the Tenant. The dates for commencement and completion of the Base Building Improvements and Tenant Improvements and access for Tenant's installation of fixtures and furnishings are of the essence.

The Tenant Improvements shall be constructed on an "open book" basis, and the Tenant shall be entitled to audit the Landlord's books and records for the improvements as required to substantiate the cost to design and construct the Tenant Improvements. Prior to commencement of construction of the Tenant Improvements, the Landlord shall submit to the Tenant, for the Tenant's reasonable approval, a proposed line item budget and maximum cost for the Tenant Improvements, indicating a not-to-exceed amount for the Excess Costs, as defined below, payable by the Tenant. Landlord agrees to obtain at least three (3) bids for each major component of the work. Landlord shall not be required to select the lowest bidder, but shall select that bid which, in Landlord's reasonable judgment, is submitted by the lowest qualified bidder. All costs and expenses of the Tenant Improvements in excess of the Tenant Improvement Allowance amount set forth in paragraph 8.1 of the Lease Cover Page ("Excess Costs") shall be paid by Tenant.

LANDLORD SHALL BE RESPONSIBLE FOR THE DESIGN AND ENGINEERING FOR THE TENANT IMPROVEMENTS AND THE PREPARATION OF THE PLANS AND SPECIFICATIONS FOR THE TENANT IMPROVEMENTS. SUCH PLANS AND SPECIFICATIONS SHALL COMPLY WITH THE OUTLINE SPECIFICATION FOR TENANT IMPROVEMENTS ATTACHED HERETO AS SCHEDULE 4. LANDLORD AND TENANT SHALL AGREE UPON A

SET OF PLANS AND SPECIFICATIONS FOR THE TENANT IMPROVEMENTS ON OR BEFORE THE PLAN APPROVAL DATE SET FORTH ON THE LEASE COVER PAGE, WHICH APPROVAL SHALL NOT BE UNREASONABLY WITHHELD OR DELAYED. IF NO SUCH AGREEMENT IS REACHED, THEN UNTIL SUCH TIME AS SUCH AGREEMENT IS REACHED, LANDLORD SHALL HAVE NO OBLIGATION TO CONSTRUCT THE TENANT IMPROVEMENTS, HOWEVER, RENT SHALL COMMENCE ON THE SCHEDULED LEASE COMMENCEMENT DATE. BY SO AGREEING TO THE PLANS AND SPECIFICATIONS, LANDLORD WARRANTS AND COVENANTS TO BUILD IN ACCORDANCE WITH SUCH PLANS AND SPECIFICATIONS, THAT THE PLANS AND SPECIFICATIONS ARE BUILDABLE AS PREPARED AND THAT LANDLORD SHALL COMPLETE CONSTRUCTION WITHIN TEN (10) WEEKS EXCEPT TO THE EXTENT OF DELAYS CAUSED BY FORCE MAJEURE OR BY TENANT.

The Tenant shall have the right to install the Tenant's fixtures and furnishings in the Premises during the construction of the Tenant Improvements. The Landlord shall provide access to areas of the Premises as reasonably required by the Tenant in accordance with the Milestone Schedule attached hereto as Schedule 3.

All improvements and work to be done on the Premises shall be performed solely by Landlord or its designated contractors or Tenant's contractors reasonably approved by Landlord (as to future improvements). If Tenant subsequently requests changes to the Plans and Specifications initially approved by Tenant and Landlord, Tenant shall be responsible for all increased costs and expenses associated with such changes, including without limitation the cost of preparing the revisions to the Plans unless such revisions are required on account of omissions or other matters for which Landlord's architect or contractor were initially responsible. No such changes shall be made without the prior written approval of Landlord after a written request has been made by Tenant.

Landlord will manage construction of the Tenant Improvements free of charge to Tenant. In the event the total construction cost of the Tenant Improvements as calculated upon substantial completion is less than the amount of the Tenant Improvement Allowance set forth in paragraph 8.1 of the Lease Cover Page, Tenant shall have the right to apply any unused portion to architectural/design fees, phones/data equipment or free rent.

Notwithstanding the foregoing, the amount set forth in paragraph 8.1 of the Lease Cover Page as the Maximum Amortization of Excess Costs, may be paid by Tenant over the initial lease term, together with interest thereon from and after such funds are advanced by Landlord at an annual rate equal to the rate per annum described in paragraph 8.1 of the Lease Cover Page in equal monthly installments payable on the first day of each month commencing on the first day Base Rent is due and payable. If Tenant elects to so amortize any such portion of the Excess Costs, Tenant must notify Landlord of its election in writing within fifteen (15) days after determination of the cost of the Tenant Improvements, but in all events, prior to Landlord's commencement of construction of the Tenant Improvements. Upon Final Completion of the construction of the Tenant Improvements (including punchlist work), Tenant shall reimburse Landlord for the portion of the Excess Costs that are not so amortized within forty-five (45) days after receipt of Landlord's invoice and sworn statements from the contractors and suppliers. Full unconditional waiver of lien from all of Landlord's contractors and suppliers covering the Base Building Improvements and the Tenant Improvements shall be due no later than ten (10) days after payment is received by Landlord.

**8.2    Tenant's Alterations.**

A.    Tenant may make nonstructural alterations costing less than Twenty Five Thousand and No/100 Dollars ($25,000.00) per calendar year or fraction thereof in the aggregate without Landlord's consent, provided Tenant gives Landlord not less than thirty (30) days prior written notice thereof. Tenant shall not make any other alterations or improvements to the Premises, or to the exterior of the Premises or the exterior of the Building, without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant agrees that all such work shall be done at Tenant's sole cost and expense, in accordance with the plans and specifications approved by Landlord and in a good and workmanlike manner, that the structural integrity of the Building shall not be impaired, and that no liens shall attach to all or any part of the Premises or the Building by reason thereof. Tenant shall, at its sole expense, obtain all permits required for such work. Landlord may condition its consent to proposed alterations and improvements upon, among other things, any one or more of the following:

(i)    Tenant's agreement to remove any alterations or improvements upon termination, and to restore the Premises to the prior condition.

(ii)    In the case of any alteration costing over $25,000.00, delivery to Landlord of a satisfactory payment and performance bond equal to one and one-half times the estimated cost of the work.

(iii)    In the case of any alteration, delivery to Landlord of evidence satisfactory to Landlord that Tenant shall cause such construction or alteration work to be performed by contractors who shall employ craft workers who are members of unions that are affiliated with the AFL-CIO Building and Construction Trades Department (the "Labor Covenant").  Tenant shall include the Labor Covenant in each of its contracts for such construction or alteration work.  Tenant shall also provide such evidence as Landlord may reasonably require, from time to time during the course of such construction or alteration work, that the Labor Covenant is being fully and faithfully observed and Tenant shall include the obligation to provide such evidence in each contract entered into by Tenant for such construction or alteration work. Tenant further agrees that it shall incorporate the foregoing requirements in any sublease of the Premises.  In the alternative, Tenant may engage Landlord to perform such alterations or improvements at Tenant's cost.

**B.**    Tenant shall promptly pay any franchise, minor privilege or other tax or assessment resulting directly or indirectly from any alterations or improvements made by Tenant to the Premises.  At Landlord's option, Landlord may engage an architect or an engineer to assist Landlord in reviewing any plans and specifications or other materials submitted by Tenant to Landlord for any proposed alterations or improvements to the Premises costing at least $25,000.00, and Tenant shall reimburse Landlord as Additional Rent for the reasonable fees and expenses of any such architect or engineer engaged by Landlord within thirty (30) days after Landlord's demand therefor.  Tenant shall repair promptly, at its sole expense, any damage to the Premises caused by bringing into the Premises any property for Tenant's use, or by the installation or removal of such property, regardless of fault or by whom the damage shall be caused unless resulting from Landlord's or Landlord's agent's, representative's or employee's negligence or breach of this Lease.

**C.**    Subject to Tenant's rights under Section 8.3 below, unless removal is required by Landlord as a condition of Landlord's approval to such alteration or if Landlord's approval is not required, then by written notice to Tenant within thirty (30) days after Tenant's notice to Landlord that it is making such alterations, all alterations or improvements shall become the property of Landlord and shall be surrendered with the Premises at the expiration or other termination of the Lease Term, without payment by Landlord therefor.  Tenant's machinery and equipment remains the property of Tenant and shall be removed by Tenant, at Tenant's sole expense, subject to the provisions of Article 19 (Surrender and Holding Over).  Any removal by Tenant of alterations, improvements, machinery and/or equipment in accordance with this Section 8.2 shall be at Tenant's sole expense and subject to the condition that Tenant, at Tenant's sole expense, repair promptly all damage to the Premises resulting from such removal so that the Premises are restored in all material respects to their condition as existing prior to the installation of such alterations, improvements, machinery and equipment.  Any such property remaining on the Premises after the expiration of this Lease shall be deemed abandoned by Tenant, but under no circumstances shall the presence of such property on the Premises after the expiration of the term of this Lease, be deemed evidence of or constitute a holding over by Tenant. Landlord shall have the right, but not the obligation, to remove any and all property abandoned or deemed abandoned by Tenant and to dispose of it as Landlord deems fit without any liability or responsibility to Tenant. If Landlord chooses to store any such abandoned property on Tenant's behalf, then Tenant shall, as a condition to recovering any such property, reimburse Landlord for any and all costs of such storage.  Any storage by Landlord of Tenant's property may be terminated at any time by Landlord without liability to Tenant whereupon Landlord may dispose of any such property as Landlord deems fit.  Any damage to the Premises caused by Tenant in installing or removing any of Tenant's property shall be repaired at the expense of Tenant.

**8.3    Tenant's Fixtures.**    Tenant may install upon the Premises such furniture, appliances, equipment, trade fixtures and other property as it deems necessary for its use, all of which items shall remain the property of Tenant and may be removed by Tenant at the termination of this Lease.  Any such property remaining on the Premises after the expiration of this Lease shall be deemed abandoned by Tenant, but under no circumstances shall the presence of such property on the Premises after the expiration of the term of this Lease, be deemed evidence of or constitute a holding over by Tenant.  Landlord shall have the right, but not the obligation, to remove any and all property abandoned or deemed abandoned by Tenant and to dispose of it as Landlord deems fit without any liability or responsibility to Tenant.  If Landlord chooses to store any such abandoned property on Tenant's behalf, then Tenant shall, as a condition to recovering any such property, reimburse Landlord for any and all costs of such storage.  Any storage by Landlord of Tenant's property may be terminated at any time by Landlord without liability to Tenant whereupon Landlord may dispose of any such property as Landlord deems fit.  Any damage to the Premises caused by Tenant in installing or removing any of Tenant's property shall be repaired at the expense of Tenant.

**8.4    Satellite Dish.**  Tenant shall have the right to install, at its sole cost and expense and at no additional rental charge, one(1) or more antennae, satellite dish or other transmission facilities, including all related wiring at a location on the rooftop of the Building which is mutually

agreeable to Landlord and Tenant. No roof penetration shall be made without Landlord's specific approval and oversight or in a manner which voids any roof warranty applicable to the Building. The operation of any such equipment shall not cause material interference with the operation of any equipment previously installed by Landlord or any other tenant on the roof. Upon expiration of the Lease, Tenant shall remove any and all such equipment and shall repair any and all damage resulting therefrom.

## ARTICLE 9
## REPAIRS AND MAINTENANCE

**9.1    Tenant's Obligation to Repair.** During the term of this Lease and any renewal term, Tenant shall, at its own cost and expense, when and if needed, or whenever requested by Landlord, and subject to all warranties provided by Landlord or Landlord's contractors and suppliers, keep and maintain all interior portions of the Premises (except to the extent Landlord is responsible to maintain the same pursuant to paragraph 9.2 below) in a good condition, promptly making all necessary repairs and replacements thereto, with materials and workmanship of the same character, kind and quality as the original. Tenant's obligation to maintain and repair the Premises shall include but shall not be limited to, all windows, glass and plate glass, doors, interior walls and finish work, floors (excluding subfloors) and floor coverings, water heaters and all plumbing work, electrical systems and fixtures, dock levelers, dock bumpers, dock doors, the heating and air conditioning systems and other fixtures located in and/or serving the Premises, all of which shall be kept and maintained by Tenant in good condition and repair, subject only to ordinary wear and tear and fire and other casualty. In addition, Tenant shall be responsible for maintaining (including, but not limited to, maintaining in full force and effect a servicing contract with a qualified HVAC service company for performing regularly scheduled preventative maintenance services) and replacing as needed the heating and air conditioning systems serving the Leased Premises during the term of this Lease (other than during the last three (3) years of the applicable term) and shall be responsible for any maintenance and repair items or replacements which would otherwise be the Landlord's obligation if, and to the extent, that such repair or maintenance or replacement responsibilities are due to the wrongful or negligent acts or activities of Tenant in or from the Leased Premises. In the event that a replacement or major repair of the HVAC system or components is required during the last three (3) years of the then applicable term of this Lease, Landlord shall perform same and Tenant shall only be responsible for reimbursing Landlord a portion thereof based upon (a) the amortized value of the cost of any such replacement item amortized over the number of years of 'useful life' of the item in accordance with GAAP; (b) pro rated for the number of years remaining in the applicable Term of the Lease; and (c) at such time, if ever, as any applicable Renewal Term is exercised, then Tenant shall pay Landlord for the remaining unamortized cost thereof. If the Building's sprinkler system or any of its appliances or systems shall be damaged or injured or not in proper working order by reason of any act or omission of Tenant or Tenant's employees, agents, contractors, licensees or invitees or if the Board of Fire Underwriters or Fire Insurance Exchange or any bureau or department or official of the state, county or city government require or recommend that any changes, modifications, alterations or additional sprinkler heads or other equipment be made or supplied by reason of the nature and/or conduct of Tenant's business or the location of partitions, trade fixtures or other contents in the Building or for any other reason not caused by Landlord or if any such changes, modifications, alterations, additional sprinkler heads or other equipment become necessary to prevent the imposition of a penalty or charge against the full allowance for a sprinkler system in the fire insurance rate as fixed by said Exchange or by any fire insurance company, Landlord shall have the right to perform any and all such work at Tenant's sole cost and expense and Tenant shall promptly reimburse Landlord as additional rent hereunder for the full cost of same upon receipt of an invoice from Landlord for such cost serving the Premises.

**9.2    Landlord's Obligation to Repair.** Landlord shall:

(i)    Perform all needed replacements to the roof, exterior walls, subfloors, foundations, all structural replacements, including columns, beams, support joists, trunk utility lines and substrata portions of the plumbing system located outside of the Premises and/or not exclusively serving the Premises;

(ii)    Perform all needed repairs to the roof, exterior walls, subfloors, foundations, all structural repairs, including columns, beams, support joists, trunk utility lines and substrata portions of the plumbing system located outside of the Premises and/or not exclusively serving the Premises and the sprinkler system of the entire Building, including portions located within the Premises;

(iii)    Maintain the driveways, parking areas and other facilities owned by Landlord for the general use of all the tenants and their invitees in the Building in which the Premises are located, including any and all necessary landscaping of the common areas;

(iv)    Remove snow and ice from the parking areas, sidewalks and driveways serving the Building in which the Premises are located; and

(v)    Perform all needed repairs and replacements to the electrical, mechanical, HVAC, lighting and plumbing systems during the first twelve (12) months of the Lease term (except to the extent that the same have been installed or modified by Tenant).

Landlord's maintenance responsibilities pursuant to this paragraph shall not apply to any damage or repairs required due to the wrongful or negligent activities or actions of Tenant in or upon the Premises.  In the event of an "emergency", and Tenant is unable to contact Landlord after reasonable efforts to do so, Tenant may perform Landlord's repair obligations as set forth herein.  As soon as Tenant is reasonably able to do so, Tenant shall notify Landlord that Tenant has made such repairs on Landlord's behalf.  Landlord shall reimburse Tenant for the reasonable costs of said repairs upon Landlord's receipt of an invoice for same.  An "emergency" shall not be deemed to exist unless there is an imminent threat of harm to any person or an imminent threat of material damage to Tenant's property located in the Premises or any material interruption of Tenant's operations.  Except for costs incurred by Landlord to perform replacements pursuant to (i) above or to perform the repairs and replacements pursuant to (v) above, or to perform roof repairs which are covered by warranties, all costs incurred by Landlord in performing its obligations under this paragraph shall be deemed to be operating expenses for purposes of Article 5 of this Lease

**9.3    Landlord's Right Upon Tenant's Refusal to Repair.**  If Tenant refuses or neglects to make repairs and/or maintain the Premises, or any part thereof, in a manner reasonably satisfactory to Landlord, Landlord shall have the right, upon giving Tenant five (5) days prior written notice of its election to do so, to make such repairs or perform such maintenance on behalf of and for the account of Tenant.  In such event, such work shall be paid for by Tenant within thirty (30) days of its receipt of a bill therefor.  Nothing herein contained shall impose any duty on the part of Landlord to do any such work under any provision of this Lease which Tenant may be required to perform, nor shall it constitute a waiver of Tenant's default in failing to do the same.  Landlord shall not be required to provide Tenant with any written notice of its election to perform work on Tenant's behalf pursuant to the provisions of this paragraph 9.3 in the event that the condition being remedied by Landlord on Tenant's behalf constitutes an emergency situation posing an imminent threat of harm or damage to Landlord's or some other tenant's property, or which poses an imminent threat of personal injury to any person.

**9.4    Landlord's Entry Upon the Premises.**  Tenant agrees to permit Landlord and its authorized representatives to enter the Premises during normal business hours for the purpose of inspecting same, making any necessary repairs to the Premises and performing any work therein necessary to comply with any laws, ordinances, rules or regulations of any public authority, fire rating bureau, or Landlord's insurer or that Landlord may deem necessary to prevent waste or deterioration to the Premises.  Landlord shall not be required to give Tenant any notice of its entry into the Premises in the event Landlord is entering the Premises in conjunction with any actual or perceived emergency situation involving any imminent threat of harm to any person or an imminent threat of material damage to the Premises, Landlord's Building or other property of Landlord or any third party.  Any such entry shall be so as to cause minimal inconvenience to Tenant and observe all of Tenant's safety rules and standards.  In addition, Landlord may, upon twenty-four (24) hours notice to Tenant, enter upon the Premises during normal business hours to show the Premises to prospective purchasers, mortgagees and insurance representatives and may at any time during the last one hundred eighty (180) days of the term of this Lease, show the Premises to prospective Tenants.

**ARTICLE 10**
**INSURANCE**

**10.1    Tenant's Public Liability and Property Insurance.**  During the term of this Lease, Tenant shall, at its sole cost and expense, obtain and maintain during the term of the Lease, Comprehensive General Liability Insurance, including Blanket Contractual Liability coverage, with limits of not less than Five Million and No/100 Dollars ($5,000,000.00) Combined Single Limit for Personal Injury and Property Damage; Comprehensive Automobile Liability Insurance covering all owned, non-owned and hired vehicles with limits of not less than Five Million and No/100 Dollars ($5,000,000.00) Combined Single Limit for Personal Injury and Property Damage; and Statutory Workers Compensation and Employers Liability coverage with limits of not less than Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00).  In such policy or policies, Landlord and Landlord's management company and/or managing agent shall be named as additional insureds, as their interests may appear and said policies shall contain a waiver of subrogation clause. Tenant shall be solely responsible for obtaining any fire or extended coverage insurance for personal property and improvements of Tenant which may be located within the Premises and for all goods, commodities and material stored by Tenant in or about the Premises.  Tenant shall provide Landlord with evidence of such insurance, satisfactory to Landlord, on or prior to the Lease Commencement Date and thereafter on or prior to the expiration of any such policy or policies.  All

-14-

such policies shall contain a provision that they may not be canceled or non-renewed except upon not less than thirty (30) days prior written notice to Landlord. Notwithstanding the aforesaid, Tenant shall be permitted to self-insure for all such coverages so long as Tenant provides Landlord with reasonably satisfactory evidence of Tenant's self insurance program.

**10.2    Landlord's Obligations.** Landlord shall, as an operating expense, obtain and maintain during the term of the Lease, All Risk Property Insurance for the Building upon a full replacement cost basis, with no co-insurance requirement; Comprehensive General Liability Insurance, including Blanket Contractual Liability coverage, with limits of not less than Five Million Dollars and No/100 Dollars ($5,000,000.00) Combined Single Limit for Personal Injury and Property Damage; Comprehensive Automobile Liability Insurance covering all owned, non-owned and hired vehicles with limits of not less than Five Million and No/100 Dollars ($5,000,000.00) Combined Single Limit for Personal Injury and Property Damage; and Statutory Workers Compensation and Employers Liability coverage with limits of not less than Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00). Landlord shall deliver to Tenant upon request a certificate evidencing such coverages.

**10.3    Mutual Waiver of Subrogation.** Landlord and Tenant hereby waive the rights each may have against the other on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, their respective property, the Premises or its contents arising from any risk insured against by Landlord or Tenant; and the parties each, on behalf of their respective insurance companies insuring the property of either Landlord or Tenant against any such loss, waive any right of subrogation that it may have against Landlord or Tenant, as the case may be. The release set forth in this paragraph shall apply only to the extent that such loss or damage is covered by insurance and only so long as the applicable insurance policies contain a clause or otherwise provide that this release shall not affect the right of the insured to recover under such policies.

**10.4    Liability.** Tenant and all those claiming by, through or under Tenant shall store their property in and shall occupy and use the Premises and any improvements therein and appurtenances thereto and any other applicable portions of the Building, solely at their own risk and Tenant and all those claiming by, through or under Tenant hereby release Landlord, to the full extent permitted by law, from any and all claims of every kind, including loss of life, personal or bodily injury, damage to merchandise, equipment, fixtures or other property, or damage to business or from business interruption, arising, directly or indirectly, out of or from or on account of such occupancy and use or resulting from any present or future condition or state of repair thereof, except those claims arising out of the negligence of Landlord or its agents, directors, officers, employees or contractors. Tenant shall defend and indemnify Landlord and save it harmless from and against any and all claims against Landlord arising from (a) Tenant's use of the Premises or the conduct of its business or from any activity, work or thing done, permitted or suffered by Tenant in or about the Building, (b) the nonperformance of any covenant or agreement on Tenant's part to be performed pursuant to the terms of this Lease, (c) any act or negligence of Tenant or of any of its agents, contractors, employees, invitees or licensees, and from and against all costs, fines, judgments, reasonable counsel fees, expenses and liabilities incurred in any such claim or in any action or proceeding brought thereon, or (d) Tenant's failure to comply with any and all governmental laws, ordinances and regulations applicable to the condition or use of the Premises or its occupancy. In case any action or proceeding be brought against Landlord by reason of any such claim, Tenant upon notice from Landlord, covenants to resist or defend at Tenant's expense such action or proceeding by counsel reasonably satisfactory to Landlord. However, the foregoing provisions shall not be construed to make Tenant responsible for loss, damage, liability or defense resulting from injuries to third parties caused by the negligence or misconduct of Landlord or its agents, directors, officers, contractors or employees. Further, Tenant shall give prompt notice to Landlord in case of fire or other casualty or accidents in the Premises or of any defects therein or in any of Landlord's machinery or equipment serving the Premises. The provisions of this Article shall survive the termination of this Lease with respect to any claims or liabilities accruing prior to such termination.

**ARTICLE 11**
**CASUALTY**

**11.1    Damage or Destruction.** If the Premises shall be partially damaged by fire or other casualty insured under Landlord's insurance policies, then upon Landlord's receipt of the insurance proceeds, Landlord shall, except as otherwise provided herein, repair and restore the same (exclusive of Tenant's trade fixtures, decorations, signs and contents) substantially to the condition thereof immediately prior to such damage or destruction; limited, however, to the extent of the insurance proceeds received by Landlord. If by reason of such occurrence, (a) the Premises is damaged in whole or in part as a result of a risk which is not covered by Landlord's insurance; or (b) the Premises is damaged in whole or in part during the last twelve (12) months of the term of this Lease; or (c) the Premises is damaged or the Building is damaged (whether or not the Premises is damaged) to an extent of 50% of more of the then replacement value thereof; or (d) the Building is damaged (whether or not the Premises is damaged) to such an extent that the Building cannot, in

the judgment of Landlord, be operated as an integral unit during and following the repair or restoration of said damaged areas, then, upon the occurrence of any of such events, Landlord may elect either to repair the damage as aforesaid, or cancel this Lease by written notice of cancellation given to Tenant within thirty (30) days after the date of such occurrence, and thereupon this Lease shall cease and terminate as though the date of Landlord's notice were the date herein fixed for the expiration of the term hereof; provided Tenant shall have the option to elect to renew this Lease in accordance with its terms if Landlord elects to terminate this Lease pursuant to clause (c) above (if Tenant so elects to renew, Landlord shall not be entitled to terminate this Lease). In addition to the foregoing, in the event the holder of any indebtedness secured by a mortgage or deed of trust covering the Premises requires that the insurance proceeds be applied to such indebtedness, then Landlord shall have the right to terminate this Lease by delivering a written notice of termination to Tenant within thirty (30) days after such requirement is made by such holder. Upon the termination of this Lease as aforesaid, Tenant's liability for the rents reserved hereunder shall cease as of the effective date of the termination of this Lease. Unless this Lease is terminated by Landlord as aforesaid, this Lease shall remain in full force and effect and Landlord shall promptly commence and diligently complete the restoration of the Premises and the Building. If the casualty renders the Premises untenantable in whole or in part, a proportionate abatement of the minimum Base Rent and additional rent shall be allowed from the date when the damage occurred until the date when the Premises are made tenantable or until the effective date of termination as herein provided, said abatement to be computed on the basis of the relation which the square foot area of the space rendered untenantable bears to the aggregate square foot area of the Premises, provided that destruction of 50% or more of the square foot area of the Premises shall be deemed to be wholly untenantable.

**11.2    Major Destruction.** Notwithstanding anything contained herein to the contrary, in the event the Premises are damaged by fire or other casualty so as to render said Premises unquestionably untenantable for one hundred and eighty (180) days or longer, then, in such event, Landlord and Tenant shall each have the option to terminate this Lease by delivering a written notice to the other within thirty (30) days of the occurrence of such damage or destruction. If Landlord and Tenant cannot agree as to whether said Premises are unquestionably untenantable for the aforedescribed period of time, the fact shall be determined by an architect selected by Landlord.

### ARTICLE 12
### CONDEMNATION

**12.1    Condemnation.** In the event the Premises or any part thereof shall be taken in an eminent domain proceeding the following provisions shall be controlling:

**A.** If the whole of the Premises shall be acquired or Condemned by eminent domain for any public or quasi-public use, or purpose (hereinafter "Condemned" or a "Condemnation"), then and in that event the term of this Lease shall cease and terminate from the date of title vesting in such condemning authority and Tenant shall have no claim against Landlord for the value of any unexpired term of said Lease.

**B.** If any part of the Premises shall be Condemned and such partial Condemnation shall render the Premises unsuitable for the business of Tenant, then and in such event Tenant shall have the right to terminate this Lease by delivering a written notice of cancellation to Landlord, whereupon this Lease shall cease and terminate as of the later of (i) the date of title vesting in such condemning authority or (ii) that date which is thirty (30) days after the date Landlord shall have received said notice of cancellation, and Tenant shall have no claim against Landlord for the value of the unexpired term of this Lease.

**C.** In the event (a) any part of the Premises shall be Condemned during the last year of the term of this Lease; or (b) a part of the Premises is Condemned and the cost of restoring the Premises will exceed the proceeds of any condemnation award received by Landlord; or (c) any portion of the common areas or any portion of the Building is Condemned (whether or not any portion of the Premises is Condemned) to such an extent that the project cannot, in the judgment of Landlord, be operated as an integral unit during or following the repair or restoration work to the Building or common areas; or (d) the holder of any indebtedness secured by a mortgage or deed of trust covering the Building requires that the Condemnation proceeds be applied toward such indebtedness, then, in any of such events, Landlord may elect to cancel this Lease by written notice of cancellation given to Tenant, whereupon this Lease shall cease and terminate as of that date which is thirty (30) days following the date upon which Tenant shall receive said notice of cancellation.

**D.** In the event of any Condemnation or taking as hereinbefore provided, either whole or partial, Tenant shall not be entitled to any part of the award as damages or otherwise for such Condemnation and Landlord is to receive the full amount of such award, the Tenant hereby expressly waiving any right or claim to any part thereof; except that

Tenant shall be entitled to make application for, receive and retain any amounts which may be specifically awarded to it in such Condemnation proceedings because of the taking of its trade fixtures and for relocation expenses. It is understood that in the event of the termination of this Lease as aforesaid, neither Landlord nor Tenant shall have any claim against the other for the value of any unexpired term of this Lease and Tenant shall have no right or claim to any part of the award on account thereof.

## ARTICLE 13
### LIENS

**13.1    Liens.** If the Premises or Tenant's leasehold interest therein shall at any time during the term of the Lease become subject to any mechanic's, laborer's or materialmen's lien based upon the furnishing of material or labor to Tenant on the Premises, Tenant shall cause the same, at Tenant's expense, to be discharged within sixty (60) days after notice thereof, unless the lien is then being litigated in good faith by Tenant, in which event Tenant shall indemnify and hold Landlord harmless from and against any such lien and shall secure Landlord to Landlord's satisfaction. Tenant shall have no authority or power, express or implied, to create or cause any lien, charge or encumbrance of any kind against the Premises or Landlord's ownership interest in the Premises.

## ARTICLE 14
### ASSIGNMENT

**14.1    Assignment.** Tenant shall not transfer, assign, sublet, enter into license or concession agreements, change ownership or hypothecate this Lease or Tenant's interest in and to the Premises without first procuring the prior written consent of Landlord, which will not be unreasonably withheld or delayed. Landlord's consent shall not be required for an assignment or sublease to any subsidiary or affiliate of Tenant, provided Tenant gives Landlord not less than thirty (30) days prior written notice thereof. Any attempted transfer, assignment, subletting, license or concession agreement, change of ownership or hypothecation without Landlord's written consent, shall be void and confer no rights upon any third party. If this Lease or any interest of Tenant herein shall be assigned, or if the whole or any part of the Premises shall be sublet, Tenant shall nevertheless remain fully liable for the full performance of all obligations under this Lease to be performed by Tenant, and Tenant shall not thereby be released in any manner. Landlord's interest in this Lease may be assigned by Landlord in connection with the sale or other conveyance of the Building and, upon such assignment, the obligations of Landlord hereunder (including, but not limited to, refund of any security deposit held under paragraph 3.2 above) shall become obligations solely of such assignee.

**14.2    Landlord Termination Option.** In the event Tenant shall desire to sublet all or any portion of the Premises other than to a subsidiary or affiliate, Tenant shall give Landlord written notice, at least ninety (90) days before the commencement date of such proposed sublease, of Tenant's desire to sublet all or any portion of the Premises. Such notice shall include the commencement date of the proposed sublease, the area to be sublet, the rental to be paid by the subtenant, and all other terms and conditions of the sublease. From and after Landlord's receipt of Tenant's notice of its desire to sublease, Landlord shall have the option of terminating this Lease with respect to all or any portion of the area proposed to be sublet; such termination to be effective upon the date specified in the notice Landlord shall give to Tenant within fifteen (15) days after receiving notice of Tenant's desire to so sublease the Premises. If Landlord elects to terminate this Lease with respect to some portions of the Premises and Tenant will retain other portions of the Premises, the Base Rent and all adjustments thereto specified in this Lease shall be adjusted proportionally on the basis of the square footage of the Premises retained by Tenant and this Lease shall remain in full force and effect in all other respects.

**14.3    General.** In the event that Tenant shall sublet the Premises for a rental in excess of the fixed rent due hereunder from Tenant to Landlord, then, notwithstanding any other provision contained in this Lease to the contrary, the fixed rent provided for in this Lease shall automatically be increased (but in no event decreased) during the term of such sublease to a sum equal to the amount of rent actually paid under such sublease less reasonable subleasing-related expenses incurred by Tenant. In the event that Tenant shall receive any valuable consideration for an assignment of the Tenant's interest in this Lease, then, notwithstanding any other provision contained in this Lease to the contrary, Tenant shall pay to Landlord as additional rent hereunder, fifty percent (50%) of the amount of consideration thereby received after deduction of all expenses incurred in connection therewith.

## ARTICLE 15
### DEFAULT

**15.1    Default.** The following events shall be deemed to be events of default by Tenant under this Lease: (a) if Tenant shall fail to make any payment of rent or additional rent or any other payment required to be made by Tenant hereunder, as the same shall become due and payable

and shall not cure such failure within fifteen (15) days after written notice thereof to Tenant (it being understood, however, that after Tenant has been given written notice of being delinquent in the payment of rent or additional rent on more than two (2) occasions during the term of this Lease, Landlord shall no longer be required to provide Tenant with written notice of such default and a fifteen (15) day period within which to cure such default, and Tenant shall be deemed in default of its obligations under this clause upon Tenant's failure to make any future payment of rent or additional rent as and when due); (b) if Tenant shall fail to comply with any term, provision or covenant of this Lease, other than the payment of rent and additional rent, and shall not cure such failure within thirty (30) days after written notice thereof to Tenant (provided that if such cure is not reasonably capable of being completed within such thirty (30) day period, then so long as Tenant has commenced to cure such default within such thirty (30) day period and diligently pursues the same to completion thereafter, such thirty (30) day period shall be extended for up to an additional sixty (60) days; (c) if Tenant shall become insolvent or shall make a transfer in fraud of its creditors, or shall make an assignment for the benefit of its creditors of Tenant's assets or Tenant's interest in this Lease; or (d) if a receiver or trustee be appointed for all or substantially all of the assets of Tenant and such proceeding shall not be dismissed or stayed within ninety (90) days thereafter.

    **15.2** **Remedies of Landlord.** Upon the occurrence of any such event of default, Landlord shall have the option to pursue any one or more of the following remedies (as well as any other remedies provided by law) without any notice or demand whatsoever:

    **A.**    Landlord may terminate this Lease, in which event Landlord may immediately repossess the Premises through the applicable legal process and be entitled to recover sums or damages for which Tenant may be adjudged legally liable to Landlord.

    **B.**    Landlord may terminate Tenant's right of possession and may repossess the Premises by unlawful detainer suit or by taking peaceful possession without terminating this Lease, in which event Landlord may, at Landlord's option, enter into the Premises, remove property, and take and hold possession, all as provided above, without terminating this Lease or releasing Tenant, in whole or in part, from Tenant's obligation to pay rent hereunder for the full term. Upon and after entry into possession without termination of this Lease, Landlord may relet the Premises or any part thereof for the account of Tenant to any person, firm or corporation other than Tenant for such rent, for such period (including periods extending beyond the term of this Lease) and upon such terms as Landlord shall determine to be commercially reasonable. In any such case, Landlord may make such reasonable repairs and alterations to the Premises and redecorate them as deemed by Landlord to be appropriate in order to facilitate reletting of the Premises. All reasonable costs thereof and Landlord's expenses of retaking possession, removing property, and of reletting, including a reasonable lease commission, shall be charged against the first rents collected on any reletting of the Premises. If the rents collected by Landlord upon any such reletting for Tenant's account, after payment of the foregoing expenses, are not sufficient to pay the full amount of the rent reserved in this Lease as it becomes due, Tenant shall pay to Landlord the amount of the deficiency each month upon demand. In the event the rents collected by Landlord upon any such reletting for Tenant's account, after payment of the foregoing expenses, exceed the full amount of the rent reserved in this Lease as it becomes due, such excess shall be retained by Landlord to be applied against any subsequent deficiency, and any excess remaining at the end of the term of this Lease shall be paid to Tenant.

    **C.**    Intentionally Omitted.

    **D.**    Landlord may make such repairs, obtain insurance and otherwise pay or perform any obligation of Tenant hereunder, in which case, Tenant shall promptly reimburse Landlord for all amounts so expended by Landlord together with interest thereon at the rate of one percent (1%) per month or at the highest lawful rate, whichever is less, all of which shall constitute additional rent hereunder. Nothing herein shall impose any duty on the part of Landlord to do any such work or pay any such expense which Tenant may be required to perform or pay, nor shall it constitute a waiver of Tenant's default in failing to do or pay the same.

    No waiver by Landlord of any violation or breach of any of the terms, provisions and covenants of this Lease shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default.

**ARTICLE 16**
**COMPLIANCE WITH LAWS**

**16.1    Code Compliance.** Tenant shall, at Tenant's sole cost and expense, comply or cause the Premises to comply with all applicable laws, rules, regulations, requirements and ordinances now in force or which may hereafter be in force (hereinafter collectively referred to as "Laws"), including, without limitation, The Americans With Disabilities Act (the "ADA"), which have been or which may be enacted or imposed by any governmental unit concerning the Premises or Tenant's use of the Premises; provided, however, that this provision shall not apply to any building wide alteration, maintenance or restoration required to all of the space in the Building or to compliance by the Building or the Premises (as opposed to Tenant's use thereof) on the Lease Commencement Date with any existing law, rule or regulation. Landlord represents and warrants that the Premises, including the Base Building Improvements, shall be in compliance with all applicable laws, rules, regulations, requirements and/or ordinances, including, without limitation, ADA requirements, on the Lease Commencement Date.

**16.2    Environmental Covenants.** Tenant shall not use, store, manufacture, dispose of or discharge any pollutants, contaminants, or harmful or hazardous substances from or on the Premises or otherwise occupy or permit the Premises to be occupied or used in a manner which (i) violates any law, regulation, rule or other governmental requirement, (ii) impairs the health, safety or condition of any person or property or (iii) adversely affects the use, enjoyment or value of the Premises or the surrounding property. Tenant shall promptly notify Landlord of the breach, or the potential or threatened breach, of any of the provisions of this paragraph. Tenant shall indemnify and hold Landlord and its officers, shareholders, partners, employees, and agents, harmless from any loss, claim, liability or expense (including, without limitation, attorneys' fees, court costs, consultant fees, expert fees, penalties, fines, removal, clean-up, transportation, disposal and restoration expenses) arising in connection with Tenant's failure to comply with the provisions of this paragraph. A breach of the provisions of this paragraph shall be a material default enabling Landlord to exercise any of the remedies set forth in this Lease. Tenant's obligation hereunder shall survive the termination of this Lease. Landlord represents that to the best of its knowledge, as of the Commencement Date, the Premises shall be free of any pollutants, contaminants or harmful or hazardous substances which (i) violate any law, regulation, rule or other governmental requirement; (ii) impair the health, safety or condition of any person or property; or (iii) materially adversely affect the use, enjoyment or value of the Premises or the surrounding property. Landlord represents and warrants that, to the best of its knowledge, the Premises does not contain: (i) any underground storage tanks nor have there ever been any underground storage tanks on the Premises; (ii) asbestos in any form, including insulation or flooring: (iii) PCB-containing equipment, including transformers or capacitors; or (iv) any other hazardous wastes, hazardous substances, or toxic substances which could affect or impair Tenant's use of or operations at the Premises or the health or safety of Tenant's employees. Landlord shall not cause, or permit to be caused, to exist, a hazardous condition at the Premises or Building in violation of any applicable Laws and if Landlord becomes aware of a hazardous condition in violation of Laws on the Premises prior to its occupancy by Tenant or at any time thereafter, Landlord shall (a) promptly give Tenant written notice of such condition; and (b) unless such condition has been caused by Tenant, its guests, invitees, employees or contractors, Landlord shall, in a prompt manner, take such action as required by Law to bring such hazardous condition into compliance with applicable laws, ordinances, and requirements of governmental authorities with competent jurisdiction, that it will indemnify, defend and hold Tenant, its affiliates and their respective members, partners, venturers, stockholders, directors, officers, employees, agents, spouses, legal representatives, successors and assigns harmless from and against any damage, liability, fines, penalties, costs (including, without limitation, reasonable attorneys' fees and costs), or losses to which Tenant may be subjected as a result of Landlord's breach of any of its representations, warranties or covenants.

**16.3    Bankruptcy.** If a petition is filed by or against Tenant for relief under Title 11 of the United States Code, as amended (the "Bankruptcy Code"), and Tenant (including for purposes of this section Tenant's successor in bankruptcy, whether a trustee or Tenant as debtor in possession) assumes and proposes to assign, or proposes to assume and assign, this Lease pursuant to the provisions of the Bankruptcy Code to any person or entity who has made or accepted a bona fide offer to accept an assignment of this Lease on the terms acceptable to Tenant, then notice of the proposed assignment setting forth (a) the name and address of the proposed assignee, (b) all of the terms and conditions of the offer and proposed assignment, and (c) the adequate assurance to be furnished by the proposed assignee of its future performance under this Lease, shall be given to Landlord by Tenant no later than twenty (20) days after Tenant has made or received such offer, but in no event later than ten (10) days prior to the date on which Tenant applies to a court of competent jurisdiction for authority and approval to enter into the proposed assignment. Landlord shall have the prior right and option, to be exercised by notice to Tenant given at any time prior to the date on which the court order authorizing such assignment becomes final and non-appealable to take an assignment of this Lease upon the same terms and conditions, and for the same consideration, if any, as the proposed assignee, less any brokerage commission which may otherwise be payable out of the consideration to be paid by the proposed assignee for the assignment of this Lease. If this Lease is assigned pursuant to the provisions of the Bankruptcy Code, Landlord: (i) may require from the assignee a deposit or other security for the performance of its obligations under this Lease in an amount substantially the same as would have been required

by Landlord upon the initial leasing to a tenant similar to the assignee; and (ii) shall be entitled to receive as additional Rent, any amounts received by Tenant in connection with such assignment. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or documentation to have assumed all of the Tenant's obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption. No provision of this Lease shall be deemed a waiver of Landlord's rights or remedies under the Bankruptcy Code to oppose any assumption and/or assignment of this Lease, or to regain possession of the Premises if this Lease has neither been assumed nor rejected within sixty (60) days after the date of the order for relief. Notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord, under this Lease, whether or not expressly denominated as rent, shall constitute rent for the purposes of Section 502(b)(6) of the Bankruptcy Code.

## ARTICLE 17
## SUBORDINATION

**17.1    Subordination.**  Tenant shall, within fifteen (15) days after written request from Landlord, execute and deliver to Landlord such documents as may be reasonably necessary or appropriate, from time to time, to subordinate this Lease to any mortgage or deed of trust now or hereafter affecting the Building, provided such document contains reasonable assurances that in the event of a foreclosure or other conveyance of title to the holder of such mortgage or deed of trust or its designee, so long as Tenant is not in default of any of its obligations hereunder, the right of Tenant to possession of the Premises upon the terms set forth herein shall not be disturbed.

## ARTICLE 18
## SIGNS

**18.1    Signs.**  Tenant, at Tenant's sole cost and expense, may install one building sign on the exterior of the Premises. Any such signage must be approved in advance by Landlord, which approval shall not be unreasonably withheld if it is in compliance with all applicable laws and regulations. Upon termination of this Lease Tenant shall remove such sign and repair any damage caused thereby, all at Tenant's sole cost and expense. No other signs, advertisements or notices shall be placed by Tenant on the outside of the Building. No sign, fixture, advertisement or notice shall be displayed, inscribed, painted or fixed by Tenant on any part of the inside of the Building or Premises without the prior written consent of Landlord, which may be withheld for any reason whatsoever. Directional signs may be placed on the exterior of the Premises to regulate traffic and pedestrian movements, so long as the same are approved in writing by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

## ARTICLE 19
## SURRENDER AND HOLDING OVER

**19.1    Surrender and Holding Over.**  Upon the expiration of the term of this Lease, or upon an earlier termination of this Lease, Tenant shall surrender up peaceable possession of the Premises in the same condition as the Premises are in at the commencement of this Lease, reasonable wear and tear and casualty excepted. In the event that Tenant or any party holding under Tenant shall remain in possession of the Premises without Landlord's consent beyond the expiration of the term of this Lease or any renewal term thereof, whether by limitation or forfeiture, such party shall pay one hundred fifty percent (150%) rent hereunder during such holdover period.

## ARTICLE 20
## NOTICES

**20.1    Notices.**  Any notice under this Lease shall be in writing and shall be deemed to be duly given only when (i) delivered personally; (ii) three (3) days following mailing by certified mail return receipt requested, or (iii) one (1) day after delivery to a nationally recognized courier service for overnight delivery addressed to Landlord at Landlord's notice address or to Tenant at Tenant's notice address. The addresses may be changed from time to time by either party by serving notice to the other party in the manner above provided.

## ARTICLE 21
## ESTOPPEL CERTIFICATES

**21.1    Estoppel Certificates.**  Within fifteen (15) business days following any written request which Landlord may make from time to time, Tenant shall execute and deliver to Landlord a statement certifying: (a) the date of commencement of this Lease; (b) the fact that this Lease is unmodified and in full force and effect (or if there have been modifications hereto, that this Lease is in full force and effect, as modified, and stating the date and nature of such modifications); (c) the date to which the rental and other sums payable under this Lease have been paid; (d) the fact that

there are no current defaults under this Lease by either Landlord or Tenant except as specified in Tenant's statement; and (e) such other matters reasonably requested by Landlord. Landlord and Tenant intend that any statement delivered pursuant to this paragraph may be relied upon by any mortgagee, beneficiary, purchaser or prospective purchaser of the Building or any interest therein. Tenant's failure to deliver such statement within such time shall be conclusive upon Tenant (a) that this Lease is in full force and effect, without modification except as may be represented by Landlord; (b) that there are no uncured defaults in Landlord's performance; and (c) that not more than one (1) month's rental has been paid in advance.

## ARTICLE 22
## <u>MISCELLANEOUS PROVISIONS</u>

**22.1    <u>Partial Invalidity</u>.** If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

**22.2    <u>Attorneys' Fees</u>.** In the event it becomes necessary for either party to employ an attorney to bring suit against the other party for breach of this Lease, then the nonprevailing party shall pay all costs and expenses, including reasonable attorneys' fees of the prevailing party. In addition, should Landlord employ an attorney to recover any sum due under this Lease or because of the breach of any provision of this Lease by Tenant, whether or not suit is filed, Tenant shall pay as additional rent all costs and expenses incurred by Landlord, including reasonable attorneys' fees. Should Landlord be named as a defendant in any suit brought against Tenant in connection with or arising out of Tenant's occupancy hereunder, Tenant shall pay to Landlord its costs and expenses incurred in any suit including reasonable attorneys' fees.

**22.3    <u>Waiver of Liability</u>.** Anything contained in the Lease to the contrary notwithstanding, Tenant agrees that, other than with respect to any indemnification provision, for which Landlord shall be fully personally liable, Tenant shall look solely to the estate and property of Landlord in the land and buildings comprising the Premises for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord to Tenant in the event of any default or breach by Landlord with respect to any of the terms and provisions of this Lease to be observed and/or performed by Landlord, subject, however, to the prior rights of any holder of any mortgage covering the Premises, and no other assets of the Landlord shall be subject to levy, execution or other judicial process for the satisfaction of Tenant's claim.

**22.4    <u>Brokers</u>.** Landlord represents and warrants that, except for the commission payable by Landlord to both Brokers named on the Lease Cover Page, there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease by Landlord, and Tenant represents and warrants that, except for the Tenant's Broker, Tenant has not been represented by any other Broker in this transaction. Landlord agrees to indemnify Tenant and hold Tenant harmless from all liabilities arising from any claims (including, without limitation, attorneys' fees) for commissions to the Brokers referenced on the Lease Cover Page and all other brokers representing Landlord. Tenant agrees to indemnify Landlord and hold Landlord harmless from all liabilities arising from any claims (including, without limitation, attorneys' fees) for commissions from brokers representing Tenant excluding the Brokers referenced on the Lease Cover Page.

**22.5    <u>Rules</u>.** Landlord shall have the right, from time to time, to make, establish or promulgate reasonable rules and regulations with regard to the Premises, provided such rules and regulations are not inconsistent with the terms of this Lease, and Tenant hereby covenants that it will observe, keep and comply with such rules and regulations promulgated by the Landlord.

**22.6    <u>Assignment by Landlord</u>.** The term "Landlord" as used in this Lease means only the owner at the time of the fee of the Premises, so that in the event of any sale of the Premises, the seller, transferor or assignor shall be entirely relieved of all further obligations of Landlord herein.

**22.7    <u>Sole Agreement</u>.** This Lease contains the entire agreement between the parties hereto and no term or provision hereof may be changed, waived, discharged or terminated unless the same be in writing executed by Landlord and Tenant.

**22.8    <u>Confidentiality</u>.** The terms and conditions of this Lease may not be disclosed by Tenant to third parties other than Tenant's attorney, accountant and other business advisors as may be necessary for the proper conduct of Tenant's business without the prior written consent of Landlord.

**22.9    <u>Missouri Law Governs</u>.** The law of the State of Missouri shall govern the construction, performance and enforcement of this Lease.

**22.10    Time of Essence.** Time shall be of the essence in the performance of every term, covenant and condition of this Lease.

**22.11    Captions.** The paragraph captions are inserted for convenience of reference and are in no way to be construed as a part of this Lease or as a limitation on the scope of the paragraph to which they refer.

**22.12    Benefit.** This Lease shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, legal representatives, successors, and assigns.

**22.13    Lender Approval.** This Lease and all terms contained herein are made subject to and conditioned upon Landlord's lender's approval by not later than five (5) business days after the date this Lease is executed by both Landlord and Tenant, which Landlord shall request forthwith. Tenant agrees to provide such financial information as may reasonably be required by Landlord or its lender to enable it to render such approval. Landlord agrees that it will not disclose any such information to third parties other than Landlord's lender, attorney, accountant and other business advisors, or to obtain Landlord's lender's approval or as required by law, without the prior written consent of Tenant.

**22.14    Quiet Enjoyment.** Subject to the provisions of this Lease, Landlord covenants that Tenant, upon paying the rent and performing the covenants of this Lease on Tenant's part to be performed, shall and may peaceably have, hold and enjoy the Premises for the term of this Lease.

**22.15    Waiver of Jury Trial:** Landlord and Tenant each waive trial by jury in any action, proceeding, or counterclaim brought by either of the parties to this Lease against the other on any matter whatsoever arising out of or in any way connected with this lease or its termination, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim, injury or damage related thereto.

**22.16    Force Majeure.** Any provision, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials, governmental restrictions, regulations or controls, enemy or hostile government action, civil commotion, fire or other casualty or other causes beyond the reasonable control of the party required to perform shall excuse the performance by such party for a period equal to any such prevention, delay or stoppage, except for the obligations imposed with regard to Rent and other charges to be paid by Lessee pursuant to this Lease.

**22.17    ERISA.** To the best of its knowledge after reasonable inquiry, Tenant has discovered no documents or other evidence indicating that it is a contributing employer to any of the plans participating in the AFL-CIO Building Investment Trust (the "Trust"), a list of which is attached hereto as Exhibit F (the "Participating Plans"); nor does the Tenant, to the best of its knowledge after reasonable inquiry, have any discretionary authority, control, responsibility or influence with respect to any Participating Plan's investment of assets in, or the withdrawal of assets by any Participating Plan from, the Trust. Notwithstanding any contrary provision of this Lease, Tenant shall not assign this Lease or sublease all or any portion of the Premises unless (i) such assignee or subtenant delivers to Landlord a certification (in form and content satisfactory to Landlord) substantially similar to the representation of the Tenant as set forth in the preceding sentence; and (ii) such assignee or subtenant agrees to the UBIT restrictions in Section 22.18. This provision shall remain in effect only so long as there are benefit plan investors (as defined in DOL Reg. §2510.3-101(f)(2)) that own an interest in the Landlord or any successor to the Landlord.

**22.18    UBIT.** Notwithstanding any contrary provision of this Lease, Tenant shall not (a) sublease all or any portion of the Premises under a sublease in which the rent is based on the net income or net profits of any person, or (b) without the approval of the Landlord, take any action to increase its leased floor space in the Fountain Lakes office park to greater than twenty five percent (25%) of the leasable floor space in such office park if, as a result of such action, the Trust would be subject to the Unrelated Business Income Tax under Sections 511 through 514 of the Code. This provision shall remain in effect only so long as there are benefit plan investors (as defined in DOL Reg. §2510.3-101(f)(2)) that own an interest in the Landlord or any successor to the Landlord.

**22.19    Annual Financial Statement.** At any time during the Lease Term that Tenant is not a "publicly traded company" (i.e., ownership interests are listed on a public securities exchange), then within one hundred twenty (120) days after the end of each fiscal year of Tenant, Tenant shall furnish to Landlord a financial statement, in form and substance satisfactory to Landlord, showing the complete results of Tenant's operations for its immediately preceding fiscal year, certified as true and correct by a certified public accountant and prepared after audit in accordance with generally accepted accounting principles applied on a consistent basis from year to year.