**Hearing Date and Time:  January 20, 2010 at 9:45 a.m.**
**Objection Deadline:  January 5, 2010 at 5:00 p.m.**
**Reply Deadline: January 14, 2010 at 5:00 p.m.**

BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, New York 10022
Robert M. Dombroff
Jeffrey S. Sabin
Jared R. Clark
Telephone:    (212) 705-7700
Facsimile:    (212) 752-5378

Attorneys for Deutsche Bank AG

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————X
In re:                                                   :          Chapter 11
                                                            :
MOTORS LIQUIDATION COMPANY, *et al.,*       :          Case No. 09-50026 (REG)
                                                            :
              Debtors.                              :          (Jointly Administered)
———————————————————X

## DECLARATION OF MATTHEW TILOVE IN SUPPORT OF DEUTSCHE BANK AG'S MOTION FOR STAY RELIEF

MATTHEW TILOVE, pursuant to 28 U.S.C. § 1746, hereby declares:

1.      I am a Vice President of Deutsche Bank Securities Inc., an affiliate of Deutsche Bank AG ("**Deutsche Bank**").  As a Vice President of Deutsche Bank Securities Inc., I have responsibility for Deutsche Bank's interest rate derivatives trading with General Motors Corporation ("**GM**").  I also have knowledge of Deutsche Bank's bond positions related to GM.  I make this declaration based on my personal knowledge of the relevant facts, consultation with employees of Deutsche Bank, and review of the relevant documents and monitoring systems maintained by Deutsche Bank.

2.      I submit this declaration in support of Deutsche Bank's Motion for Stay Relief (the

"**Motion**") to permit Deutsche Bank to offset the Settlement Amount[1] against the Bond Amount, as

described in the Motion.

3.      No prior application for the relief sought in the Motion has been made to this or any

Court.

**Deutsche Bank's Swap Transactions with GM**

4.      Annexed hereto as Exhibit A is a true and correct copy of the International Swap

Dealers Master Agreement entered into by Deutsche Bank and GM, dated September 19, 2002 (the

"**Master Agreement**").

5.      Annexed hereto as Exhibit B is a true and correct copy of the Schedule to the Master

Agreement, also dated September 19, 2002.

6.      Under the Master Agreement, Deutsche Bank and GM entered into two interest rate

swap transactions, one on April 23, 2004 (maturing July 3, 2013) and the other on March 9, 2005

(maturing April 15, 2016).

7.      GM's June 1, 2009 bankruptcy filing constituted an Event of Default, as defined in

Section 5 of the Master Agreement.

8.      On June 1, 2009, because GM had defaulted under Section 5 of the Agreement,

Deutsche Bank sent GM a notice of termination (the "**Termination Notice**").  Annexed hereto as

Exhibit C is a true and correct copy of the Termination Notice.

9.      As a result of the Termination Notice, Deutsche Bank determined that it owed GM

$24,040,404 — approximately $17 million for the 2004 transaction and $7 million for the 2005

transaction.

10.      On June 10, 2009, Deutsche Bank sent GM a letter (the "**Valuation Letter**") that

calculated a settlement amount for the interest rate swap arrangement.  Annexed hereto as Exhibit D is

a true and correct copy of the Valuation Letter.

---

[1] All capitalized terms not defined herein shall have the definitions ascribed to them in the Motion.

**Deutsche Bank's GM Bonds**

11.     Between November 2004 and January 2006, Deutsche Bank purchased certain of the following GM bonds:

| Description[2] | CUSIP/ISIN | Trade Dates[3] |
|---|---|---|
| 9.4% $300,000,000 unsecured bonds, maturing July 15, 2021 | 370442AN5 | November 15, 2004 |
| 9.45% $48,175,000 unsecured bonds, maturing November 1, 2011 | 37045EAS7 | June 13, 2005 |
| 7.25% €1,000,000,000 unsecured bonds, maturing July 3, 2013 | XS0171942757 | June 10, 2005; January 9, 2006 |

12.     As of GM's June 1, 2009 bankruptcy filing, the total face amount of those purchased bonds was $24,073,200 — $3,900,000 for the 9.4% bonds; $8,850,000 for the 9.45% bonds; and $11,323,200[4] for the 7.25% bonds.

13.     Deutsche Bank continues to hold the bonds.

**Deutsche Bank's Notice of Intent to Effect Setoff**

14.     By letter dated August 20, 2009, Deutsche Bank notified GM (the "**Setoff Notice**") of its intent to effect a setoff of the Bond Amount (Deutsche Bank's $24,073,200 claim against GM) against the Settlement Amount (the $24,040,404 Deutsche Bank owes GM).  Annexed hereto as Exhibit E is a true and correct copy of the Setoff Notice.

---

[2] The description of the bonds shown in this table has been revised to reflect the correct aggregate issuance amounts of the 9.45% bonds and the 7.25% bonds, which should have been presented in the Setoff Notice as $48,175,000 and €1,000,000,000, respectively.

[3] The Setoff Notice dated August 20, 2009 referenced the purchase dates reflected in Deutsche Bank's records.  Paragraph 11 reflects each actual trade date.

[4] The 7.25% bonds were converted from Euros to US dollars using an exchange rate of 1.4154, which was the rate at 11:00 a.m. New York time on June 1, 2009 according to Reuters.

15.    To avoid the necessity of motion practice, in the Setoff Notice, Deutsche Bank

requested that GM stipulate to relief from the automatic stay.  GM failed to respond.

I declare under penalty of perjury that the foregoing is true and correct to the best of

my knowledge.

Executed at New York, New York on November 23, 2009.

MATTHEW TILOVE

A/73215781.3

# EXHIBIT A

(Multicurrency—Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of   September 19, 2002

between

and

## Deutsche Bank  AG
## New York Branch

## General Motors Corporation

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

**1.    Interpretation**

(a)    *Definitions.*  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions.*
(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)   Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii)  *Liability*. If:—

(1). X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(c)  *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)  *Basic Representations.*

(i)  *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)  *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)  *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4                                                                              ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    Events of Default and Termination Events

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

ISDA® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    . *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)   *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

        (1)   to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)   to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)   *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)   *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)   *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)   *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

        ISDA© 1992

6.    Early Termination

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If:—

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination
Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early
Termination Date will occur on the date so designated, whether or not the relevant Event of Default
or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further
payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will
be required to be made, but without prejudice to the other provisions of this Agreement. The amount,
if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early
Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e)
and will provide to the other party a statement (1) showing, in reasonable detail, such calculations
(including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving
details of the relevant account to which any amount payable to it is to be paid. In the absence of written
confirmation from the source of a quotation obtained in determining a Market Quotation, the records of
the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such
quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date
under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the
case of an Early Termination Date which is designated or occurs as a result of an Event of Default)
and on the day which is two Local Business Days after the day on which notice of the amount payable
is effective (in the case of an Early Termination Date which is designated as a result of a Termination
Event). Such amount will be paid together with (to the extent permitted under applicable law)
interest thereon (before as well as after judgment) in the Termination Currency, from (and including)
the relevant Early Termination Date to (but excluding) the date such amount is paid, at the
Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual
number of days elapsed.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions
shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation"
or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to
designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation"
or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early
Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation.* If the First Method and Market Quotation apply, the
Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the
sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the
Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing
to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts
owing to the Defaulting Party.

(2)    *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay
to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect
of this Agreement.

(3)    *Second Method and Market Quotation.* If the Second Method and Market Quotation apply,
an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

ISDA© 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)  *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties.* If there are two Affected Parties:—

(A)  if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)  if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA© 1992

7.    **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    **Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

9.    Miscellaneous

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    Offices; Multibranch Parties

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)    if sent by telex, on the date the recipient's answerback is received;

    (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

    (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

    (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

    (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

    (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

                                                                    ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**DEUTSCHE BANK AG
NEW YORK BRANCH**

By: _____
Name:    PAUL B. McHUGH
Title:         DIRECTOR
          CREDIT RISK MANAGEMENT

**GENERAL MOTORS CORPORATION**

By: _____
Name: Eric A. Feldstein
Title: Vice President, Treasurer

By: _____
Name:
Title:         SUSAN N. ISQUITH
                  DIRECTOR
          CREDIT RISK MANAGEMENT

18

# EXHIBIT B

SCHEDULE
to the
Master Agreement

dated as of September 19, 2002

between Deutsche Bank AG, a German Corporation, acting out of its New York Branch ("Party A") and General
Motors Corporation, a Delaware corporation ("Party B").

Part 1
Termination Provisions

(a)     "Specified Entity" means Not applicable.

(b)     "Specified Transaction" will have the meaning specified in Section 14 of this Agreement.

(c)     The "Cross Default" provisions of Section 5(a)(vi) will not apply to Party A or Party B.

(d)     The "Credit Event Upon Merger" provisions of Section 5(b)(iv) will apply to Party A and will apply to
Party B.

(e)     The "Automatic Early Termination" provision of Section 6(a) will not apply to Party A or Party B.

(f)     Payments on Early Termination.  For the purpose of Section 6(e) of this Agreement and subject to the
provisions of Part 5 of this Schedule:

        (i)     Market Quotation will apply to all Transactions unless otherwise specified in the Confirmation for
        a particular Transaction.

        (ii)    The Second Method will apply.

(g)     Unless otherwise designated in a Confirmation for a particular Transaction, "Termination Currency" means
United States Dollars.

(h)     "Additional Termination Event" will not apply to either party.

Part 2
Tax Representations

(a)     Payer Representations.  For the purpose of Section 3(e) of this Agreement, Party A will make the following
representation and Party B will make the following representation:

        It is not required by any applicable law, as modified by the practices of any relevant governmental revenue
        authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax
        from any payment (other than interest under Section 2(e), 6(d)(ii), or 6(e) of this Agreement) to be made by
        it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of
        any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction
        of the agreement contained in Section 4(a)(i) or (iii) of this Agreement and the accuracy and effectiveness

1

of any document provided by the other party pursuant to Section 4(a)(i) or (iii) of this Agreement, and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    <u>Payee Representation</u>.

    (1)    For the purpose of Section 3(f) of this Agreement, Party A represents it is a "foreign person" within the meaning of the applicable U.S. Treasury Regulations concerning information reporting and backup withholding tax (as in effect on January 1, 2001), unless Party A provides written notice to Party B that it is no longer a foreign person. In respect of each Transaction it enters into through an office or discretionary agent in the United States or which otherwise is allocated for United States federal income tax purposes to such United States trade or business, each payment received or to be received by it under such Transaction will be effectively connected with its conduct of a trade or business in the United States.

    (2)    For the purpose of Section 3(f) of this Agreement, Party B represents that it is a corporation organized and existing under the laws of the State of Delaware.

Part 3
Agreement to Deliver Documents

For the purpose of Sections 4(a)(i), (ii) and (iii) of this Agreement, each party agrees to deliver the following documents, as applicable:

| Party Required to Deliver Document | Form/Document/ Certificate | Date for Delivery | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A | Evidence of the authority, incumbency and specimen signature of each person executing any document on its behalf or in connection with the Agreement, any Credit Support Document and any Confirmation. | As soon as practicable after execution and delivery of Agreement. | Yes |

2

| Party A | Copy of Articles of Association of Party A. | As soon as practicable after execution and delivery of Agreement. | Yes |
|---|---|---|---|
| Party B | Certified copy of resolution of Board of Directors of Party B or of its relevant committee, authorizing Party B to enter into Agreement and each Transaction entered into under Agreement, and incumbency certificate. | As soon as practicable after execution of Agreement. | Yes |
| Party B | Copy of Form 10-K or the annual report for such party containing audited financial statements for the most recent fiscal year. | Upon request, as publicly available. | Yes |
| Party A | A copy of the most recent annual report containing consolidated financial statements of each party or its Credit Support Provider, if any, and such other public information respecting the condition or operations, financial or otherwise of such party or its Credit Support Provider, if any, as the other party may reasonably request from time to time. | Upon request, as publicly available. | Yes |
| Party A and Party B | IRS Form W-8ECI or W-8BEN, as applicable. | As soon as practicable after execution of the Agreement. | No |

3

Part 4
Miscellaneous

(a)    Addresses for Notice.  For purposes of Section 12(a) of this Agreement:

Address for notices or communications to Party A under Sections 5 or 6 (other than notices under Section 5(a)(i)):

**Deutsche Bank AG, New York Branch**
**31 W. 52nd Street**
New York, New York 10019

Attn:  Swap Group
**Tel:  (1)(212) 469 4338**
Fax:  (1)(212) 469 4654
Telex:  429166
Answerback:  DEUTNYK

All other notices to Party A shall be sent directly to the Office through which Party A is acting for the relevant Transaction, using the address and contact particulars specified in the Confirmation of that Transaction or otherwise notified.

Address for notices or communications to Party B (for all purposes):

| | |
|---|---|
| Address: | General Motors Corporation |
| | 767 Fifth Avenue, 24th Floor |
| | New York, New York  10153 |
| Attention: | Director of Corporate Financing and Investments |
| Fax No.: | (212) 418-6253 |
| Telephone No.: | (212) 418-6262 |

Any notice under the Agreement given by telephone will be sufficient if given to the telephone number for such party set forth above.

(b)    Process Agent.

Party A: Deutsche Bank AG
        31 West 52nd Street
        New York, NY 10019

Party B:  Not applicable.

(c)    Offices.  The provisions of Section 10(a) will apply to this Agreement.

(d)    Multibranch Party.  For purposes of Section 10(c) of this Agreement:

Party A is not Multibranch Party,

4

Party B is not a Multibranch Party.

(e)    <u>Calculation Agent</u>.  The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)    <u>Credit Support Documents</u>.  None.

(g)    <u>Credit Support Provider</u>.  Credit Support Provider means in relation to Party A:  Not Applicable.

Credit Support Provider means in relation to Party B:  Not Applicable.

(h)    <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)    <u>Netting of Payments</u>.  Subparagraph (ii) of Section 2(c) of this Agreement will apply to this Agreement.

(j)    <u>Service of Process</u>.  With respect to the third sentence of Section 13(c) of this Agreement, notwithstanding the reference therein to Section 12 of this Agreement, no consent is given by either party to service of process by telex.

(k)    <u>Consent to Telephone Recording</u>.  Each party (i) consents to the recording of the telephone conversations of trading and marketing personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction; (ii) agrees to obtain any necessary consent of and give notice of such recording to such personnel of it and its affiliates; and (iii) agrees that recordings may submitted in evidence in any Proceedings relating to this Agreement.

(l)    "<u>Affiliate</u>" will have the meaning specified in Section 14 of this Agreement.

Part 5
Other Provisions

(1)    Set Off. Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without setoff or counterclaim, except that each party to this Agreement (such party, "Party X") agrees that, upon an Early Termination Date resulting from an Event of Default or a Credit Event Upon Merger with respect to Party X the other party hereto (such other party, the "Non-Defaulting Party" or the "Non-Affected Party", as the case may be) may reduce any or all amounts owing to Party X under this Agreement or any other transactions between Party X and the Non-Defaulting Party or the Non-Affected Party or any Affiliate of such Party (whether or not then due) by setting off against such amounts any or all amounts to the Non-Defaulting Party or the Non-Affected Party or any Affiliate of such Party by Party X (whether or not then due).

(2)    Definitions. The definitions and provisions contained in the 1991 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions") are hereby incorporated in this Agreement. In the event of any inconsistency (1) between the provisions of the Definitions and this Agreement, this Agreement will prevail, (2) between the provisions of a Confirmation and the Definitions, the Confirmation will prevail, and (3) between the provisions of a Confirmation and this Agreement, such Confirmation will prevail for the purpose of the relevant Transaction.

(3)    Change of Account. Section 2(b) is hereby amended by adding the following at the end thereof:

"and provided that, unless the other party consents (which consent shall not be unreasonably withheld), such new account shall be in the same tax jurisdiction as the original account."

(4)    Agreements--Notices. Section 4(d) of this Agreement is hereby deleted in its entirety and replaced by the following:

"(d) Notice. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure and it will give written notice of the occurrence of any Event of Default or Potential Event of Default promptly upon learning of such event."

(5)    Default Under Specified Transactions. The provisions of Section 5(a)(v) of this Agreement are modified by adding, immediately prior to the semicolon at the end thereof, the following:

"provided, however, that it shall not constitute an Event of Default under Section 5(a)(v) if (A) such event of default or failure to pay arises in the ordinary course of business by mistake, oversight, or transfer difficulties and (B) such event of default or failure to pay is remedied on or before the fifth Business Day after the occurrence or existence of such event of default or failure to pay"

(6)    Two Affected Parties. If an Early Termination Date is designated pursuant to Sections 5(b)(i) or (ii) of this Agreement, both parties shall be deemed to be Affected Parties for the purpose of determining the Settlement Amount pursuant to Section 6(e)(ii) of this Agreement.

(7)    Credit Event Upon Merger. Section 5(b)(iv) is hereby deleted in its entirety and replaced by the following:

"(iv) Credit Event Upon Merger. If Credit Event Upon Merger is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X (A) consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to,

6

another entity, (B) effectuates a complete recapitalization, liquidating dividend or leveraged buyout, or (C) reorganizes, incorporates or reconstitutes into or as another entity and, in any such event, such action does not constitute and event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity, or the reorganized, incorporated, or reconstituted entity, as the case may be, is materially weaker that that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party), provided that any transaction affected by Party B primarily for the purpose of eliminating either or both of the Class E Common Stock or the Class H Common Stock of party B (including but not limited to transactions involving a spin-off of Hughes Electronic Corporation) will not be deemed a "complete recapitalization" under subsection (B) of this Section.

(8)    Two-Way Payments.  Section 6(d)(ii) is amended by inserting after the words "Applicable Rate" the following:

> "as to an amount due by the Defaulting Party and at the Default Rate minus 1%
> per annum as to an amount due by the other party".

(9)    Payment Date During Transfer Period.  If the parties are required by Section 6(b)(ii) to make efforts to transfer certain obligation under this Agreement in connection with a Termination Event, and a Payment Date (as defined in the related Confirmation) will occur under the relevant Affected Transaction during the period specified in Section 6(b) for those efforts, then the payment(s) due to be made on that Payment Date shall be postponed until the earlier of (i) the Business Day following the day on which a transfer is effected in consequence of such efforts; (ii) the Business Day following the day on which such period ends, if an Early Termination Date is not designated by a party on such day; and (iii) the Early Termination Date for the relevant Affected Transaction, with such postponed amounts then being treated as Unpaid Amounts.  In either case, the postponed payment(s) shall bear interest (before as well as after judgment) at the Default Rate less 1% per annum from (and including) such Payment Date to (but excluding) the date of actual payment.

(10)    All Confirmations.  With respect to each Transaction, Party A will, on or promptly after the Trade Date thereof, send Party B a Confirmation substantially in the form of Confirmation used by Party A or in such other form as agreed by the parties.  Party B will promptly thereafter (a) confirm the accuracy of such Confirmation or (b) request the correction of such Confirmation, indicating how the terms of such Confirmation should be correctly stated and such other terms should be added to or deleted from such Confirmation to make it correct.

(11)    Transfer.  The consent referred to in Section 7 shall not (after consideration of any tax or other consequences to a party of consenting to such assignment) be unreasonably withheld.

(12)    Escrow.  If (whether because of the time difference between the cities in which payments are to be made or otherwise) it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may on two Business Days' notice elect for payments due to that date to be deposited in escrow.  In such case, deposit of the payment due earlier on that date shall be made not later than 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party (and to which the other party has not raised a reasonable objection), accompanied by irrevocable payment instructions (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow.  The party that elects to have payments made in escrow shall pay all the costs of the escrow arrangements.

7

(13)    <u>Representations.</u>

*Representations of All Parties.* Each party will be deemed to represent to the other party on the date that it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i)    *Non-Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction: it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered to be investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii)    *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii)    *Status of Parties.* The other party is not acting as a fiduciary for or adviser to it in respect of that Transaction.

(14)    <u>Tax Provisions.</u>

(a)    The definition of Tax Event, Section 5 (b)(ii), is hereby modified by adding the following provision at the end thereof:

"provided, however, that for purposes of clarification, the parties acknowledge that the introduction or proposal of legislation, shall not, in and of itself, give rise to a presumption that a Tax Event has occurred."

8

(15)    <u>Additional Representations of Party B.</u>  Party B represents to Party A on and as of the date hereof and at all times until the termination of this Agreement that:

(1)  with respect to each source of funds to be used by it to enter into such Transactions (each such source being referred to herein as a "Source"), the Source is not the assets of any "plan" (as such term is defined in Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code")) subject to Section 4975 of the Code or any "employee benefit plan" (as such term is defined in Section 3(3) of the employee Retirement Income Security Act of 1974, as amended ("ERISA")) subject to Title I of ERISA, or otherwise out of "plan assets" within the meaning of United States Department of Labor regulation § 2510.3-101, 29CFR § 2510-3-101; and

(2)  Each Transaction is intended to be exempt from, or otherwise not subject to regulation under, the Investment Company Act of 1940 and Party B is exempt from regulation under such Act.

Confirmed as of the date first written.

DEUTSCHE BANK AG   NEW YORK BRANCH

By:_____
        PAUL B. McHUGH
        DIRECTOR
Title:____CREDIT RISK MANAGEMENT_____


By:_____
        SUSAN N. ISQUITH
Title:_____DIRECTOR_____
        CREDIT RISK MANAGEMENT

GENERAL MOTORS CORPORATION

By:_____

Title: Vice President, Treasurer

# EXHIBIT C

**Deutsche Bank**

Deutsche Bank AG New York
Legal Department
60 Wall Street, 36th Floor
New York, NY 10005-2858

Tel 212-250-2500

**To:**    **General Motors Corporation**
767 Fifth Avenue, 14th Floor
New York, NY 10153

Attention: Adil Mistry, Assistant Treasurer

**Date**    **June 1, 2009**

**Originals of this notice delivered by hand or courier**

Dear Ladies and Gentlemen:

Reference is made to the ISDA Master Agreement (as amended, modified or supplemented from time to time and together with all schedules attached thereto, and all confirmations entered into in connection therewith, the "Master Agreement") dated as of September 19, 2002 between Deutsche Bank AG New York Branch ("Deutsche Bank") and General Motors Corporation ("Counterparty"). Capitalised terms used herein and not otherwise defined shall have the meaning provided in the Master Agreement.

Deutsche Bank hereby notifies Counterparty that an Event of Default has occurred and is continuing under Section 5(a)(vii of the Master Agreement.

This letter constitutes notice designating an Early Termination Date pursuant to Section 6(a) of the Master Agreement. Pursuant to Section 6(a), Deutsche Bank, as the Non-defaulting Party, hereby designates **June 1, 2009** as the Early Termination Date with respect to all Transactions and Confirmations pursuant to the Master Agreement.

Deutsche Bank will calculate the amount owing under Section 6(e) of the Master Agreement and will notify Counterparty of that amount as soon as practicable.

Nothing contained herein will be deemed to be a waiver or modification by Deutsche Bank of any of our rights under the Master Agreement, the confirmations or under applicable law.

Sincerely,

DEUTSCHE BANK AG

By_____
Name:
Title:

Steven Kessler
Director

By_____
Name:
Title:

Travis McCullough
Director

# EXHIBIT D

**Deutsche Bank** ╱

To       **General Motors Corporation**
         767 Fifth Avenue
         14th Floor
         New York, NY 10153

         Attention: Adil Mistry, Assistant Treasurer

         With a copy to:  Ying Liu, Manager, Commodities Risk Management
                       Ying.liu@gm.com

Deutsche Bank AG New York
Legal Department
60 Wall Street, 36th Floor
New York, NY 10005-2858

Tel 212-250-2500

Date       **June 10, 2009**

Originals of this notice delivered by hand or courier

Dear Ladies and Gentlemen:

    Reference is made to the notice of termination dated June 1, 2009 (the "Notice of Termination") with respect to the ISDA Master Agreement (as amended, modified or supplemented from time to time and together with all schedules and exhibits thereto, and all confirmations entered into in connection therewith, the "Master Agreement"), dated as of September 19, 2002 between Deutsche Bank AG New York Branch ("Deutsche Bank") and General Motors Corporation ("Counterparty"). Capitalized terms used herein and not otherwise defined shall have the meaning provided in the Master Agreement

    The Notice of Termination designated June 1, 2009 as the Early Termination Date of the Master Agreement. This notice constitutes the statement required by Section 6(d)(i) of the Master Agreement of the calculations contemplated by Section 6(e) of the Master Agreement.

    Attached is a spreadsheet setting forth the Settlement Amount reasonably determined in good faith under Section 6(e)(i)(3) to be that incurred by Deutsche Bank in terminating the Terminated Transactions or group of Terminated Transactions, together with any Unpaid Amounts.

    As shown in the attached spreadsheet, the amount payable pursuant to Section 6(e)(i)(3) is equal to the amount of USD (24,040,404.). This amount is subject to Set-off under Section 6(e) and Part 5(1) of the Master Agreement. Accordingly, Deutsche Bank will Set-off the full amount owed under the Master Agreement against other amounts owed to Deutsche Bank by the Counterparty.

    Nothing contained herein will be deemed to be a waiver or modification by us of any of our rights under the Master Agreement, the Confirmations, or under applicable law, all of which are expressly reserved.

                              Very truly yours,

                              DEUTSCHE BANK AG

                              By_____
                              Name:   Steven Kessler
                              Title:    Director

                              By_____
                              Name:   KATHLEEN YOHE
                              Title:    DIRECTOR

Details of trades comprising the ISDA Claim - RATES

| Reference Number | Notional Ccy | Notional | Type of Transaction | Trade Date | Maturity Date | Net Mark (USD) |
|---|---|---|---|---|---|---|
| N370596N | USD | 75,000,000 | Interest Rate Swap | 9-Mar-05 | 15-Apr-16 | 7,003,141 |
| 894686N | USD | 10,000,000 | Interest Rate Swap | 23-Apr-04 | 3-Jul-13 | 17,037,264 |
| | | | | Sub -total | - | 24,040,404 |

| | | |
|---|---|---|
| | | USD |
| Value of Transactions | - | 24,040,404 |
| Total | - | 24,040,404 |

| Dealer | Quotes | |
| --- | --- | --- |
| | N370596N | 894686N |
| UBS AG | ($6,960,000.00) | (€ 11,830,000.00) |
| Bank of America NA | ($6,981,664.00) | (€ 12,389,324.00) |
| JPMorgan Chase Bank NA | ($7,058,500.00) | (€ 12,050,000.00) |
| Barclays Bank PLC | ($7,024,617.00) | (€ 12,473,806.00) |
| | | |
| Highest quote | ($6,960,000.00) | (€ 11,830,000.00) |
| Lowest quote | ($7,058,500.00) | (€ 12,473,806.00) |
| | | |
| Average excluding high and low | **($7,003,140.50)** | **(€ 12,219,662.00)** |
| FX rate vs. USD | 1.0000 | 1.3943 |
| Close-out amount in USD | ($7,003,140.50) | ($17,037,263.74) |

| Total for ISDA | **($24,040,404.24)** |
| --- | --- |

# EXHIBIT E

# BINGHAM

Jeffrey S. Sabin
Direct Phone: 212.705.7747
Direct Fax:    212.752.5378
jeffrey.sabin@bingham.com

August 20, 2009

**Via U.S. Mail**

Stephen Karotkin
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Re: General Motors Corporation ("GM") bond holdings

Dear Mr. Karotkin,

Reference is hereby made to the letter dated as of June 10, 2009 from Deutsche Bank AG ("Deutsche Bank") to GM concerning the valuation of an interest rate swap governed by the ISDA Master Agreement, dated as of September 19, 2002, by and between Deutsche Bank and GM (the "Valuation Letter"). A copy of the Valuation Letter is enclosed for your reference. As noted in the Valuation Letter, the settlement amount for the interest rate swap is $24,040,404 due to GM by Deutsche Bank (the "Settlement Amount"). In the Valuation Letter, Deutsche Bank expressed its belief that it has the right to set-off the Settlement Amount against other amounts owed to Deutsche Bank by GM.

Pursuant to your request, Deutsche Bank hereby provides the information concerning the other amounts owed to Deutsche Bank by GM referenced in the Valuation Letter:

| Description | CUSIP/ISIN | Purchase Date(s) | Face Amount |
|---|---|---|---|
| 9.4% $300,000,000 unsecured bonds, maturing July 15, 2021 | 370442AN5 | November 16, 2004 | $3,900,000 |
| 9.45% $48,175 unsecured bonds, maturing November 1, 2011 | 37045EAS7 | June 14, 2005 | $8,850,000 |
| 7.25% €1,000,000 unsecured bonds, maturing July 3, 2013 | XS0171942757 | June 5, 2005; January 9, 2006 | $11,323,200[1] |
| | | | $24,073,200 |

All of the bonds listed in the table above are held by Deutsche Bank AG. Because the aggregate face amount of the bonds ($24,073,200) exceeds the Settlement Amount by

---

[1] The face amount of the euro-denominated bonds was calculated based on an exchange rate of 1.4154, which was the average exchange rate on June 1, 2009, the date on which Deutsche Bank terminated the interest rate swap.

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Walnut Creek
Washington

Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022-4689

T 212.705.7000
F 212.752.5378
bingham.com

Stephen Karotkin
August 20, 2009
Page 2

$32,797 (such amount, the "Setoff Deficiency"), Deutsche Bank hereby reserves its right to file a general unsecured claim for the Setoff Deficiency.

Deutsche Bank hereby requests GM to stipulate to relief from the automatic stay imposed by Section 362 of the Bankruptcy Code in order that Deutsche Bank may affect the set-off of its bond holdings against the Settlement Amount.

Sincerely,

Jeffrey S. Sabin

Enclosure

cc:    Steven Kessler
       Director and Counsel
       Deutsche Bank AG New York Branch
       60 Wall Street
       New York, NY  10005

       Adil Mistry
       Assistant Treasurer
       General Motors Corporation
       767 Fifth Avenue
       14th Floor
       New York, NY  10153