## IN THE CIRCUIT COURT OF MILLER COUNTY, ARKANSAS

| | | |
|---|---|---|
| **BOYD BRYANT, ON BEHALF OF** | § | |
| **HIMSELF AND ALL OTHERS** | § | |
| **SIMILARLY SITUATED,** | § | |
| | § | |
| **PLAINTIFFS;** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **VS.** | § | NO. CV-2005-051- |
| | § | |
| **GENERAL MOTORS CORPORATION** | § | |
| **D/B/A CHEVROLET, GMC, CADILLAC,** | § | |
| **BUICK AND OLDSMOBILE,** | § | |
| | § | |
| **DEFENDANT.** | § | |



### FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CLASS CERTIFICATION, AND ORDER CERTIFYING CLASS

### I.

### Introduction

This is a proposed nationwide class action brought by Plaintiff Boyd Bryant, a resident of Fouke, Arkansas. Relying mostly on admissions in Defendant GM's own documents, Mr. Bryant, the owner of a 2002 Chevrolet Tahoe Z-71 sport utility vehicle, claims the parking brakes on nearly four million model year 1999 through 2002 GM pickup trucks and utility vehicles equipped with automatic transmissions are defectively designed in that, due to an improperly engineered spring clip retainer, they do not permit the parking brake lining to adequately float inside the parking brake drum. Mr. Bryant claims this defect exists the very moment each class vehicle rolls off its assembly line, and is persistent. That is, it reveals itself in the form of inadequate lining float each time a class vehicle is driven. Mr. Bryant further claims this lack of adequate lining float can cause additional problems relating to parking brake functionality, most significantly brake "self application" or "self energizing." Mr. Bryant

- 1 -

P2458

describes this condition as the parking brake lining – due to the inadequate float problem – sticking out of position and making contact with the spinning parking brake drum. Mr. Bryant asserts this contact grinds down the linings to such a degree that the space between the lining and drum becomes too wide. This results in the linings and drum making no or insufficient contact when the parking brake pedal is depressed.

Mr. Bryant has asserted claims for breach of express and implied warranty of merchantability, both under the Uniform Commercial Code ("UCC") and the federal Magnusson-Moss Warranty Act. 15 U.S.C. §2301 *et seq*. He has also brought claims for unjust enrichment and fraudulent concealment because, he claims, GM knew about the defective parking brake, yet knowingly concealed its existence from class members, including class members that had not yet purchased class vehicles. Mr. Bryant believes GM concealed the alleged defect so that the limited warranties on certain GM vehicles would expire, facilitating non-payment of warranty claims.

Claiming the parking brakes on his own Tahoe Z-71 are defective and will not hold his vehicle on a hill, and further that he was defrauded by GM, Mr. Bryant has moved for class certification. The Court has received briefing from Mr. Bryant in support of his motion. It has also received briefing from GM in support of its position that Mr. Bryant's case is not suitable for class certification. Attached to the briefing filed by both Mr. Bryant and of GM is extensive documentary evidence, nearly all of which consists of GM's own documents produced in this litigation. At the September 28, 2006 class certification hearing, over no objection from the parties, the Court admitted into evidence all documents attached to the parties' briefing. It also admitted into evidence GM's responses to Mr. Bryant's requests for admission; a GM-produced CD containing written limited warranties applicable to class vehicles; affidavits from Mr.

– 2 –

Bryant and William Coleman[1], an expert witness retained by Mr. Bryant; and a document

containing the National Highway Traffic and Safety Administration's (NHTSA) finding that it

would not further entertain a recall of class vehicles. Moreover, the Court received stipulations

from the parties that Mr. Bryant currently owns his 2002 Chevrolet Z-71 Tahoe, that his vehicle

is registered in Arkansas, and that Mr. Bryant received a typical GM three year/36,000 mile

written limited warranty at the time he purchased his vehicle. Finally, GM stipulated to the

Rule 23(a)(1) class-certification element of numerosity. The parties called no live witnesses to

testify at the class-certification hearing.

The Court has been asked by GM to make written findings of fact and conclusions of

law in connection with ruling on Mr. Bryant's motion for class certification. *See* Ark. R. Civ. P.

52. The Court has carefully taken notice of and reviewed the pleadings currently on file, the

briefing and evidence submitted by the parties, and evaluated their respective oral arguments

made at the September 28, 2006 hearing. The Court, exercising its discretion to do so,

determines this matter is suitable for class certification under Ark. R. Civ. P. 23(a) and (b) and

orders that it be certified as a class action. Its Rule 52 findings of fact and conclusion of law

supporting this ruling and order are set forth herein as follows.

## II.

### Findings of Fact

1.    Defendant General Motors Corporation ("GM") manufactured and sold through dealers

throughout the United States the following vehicles:

    i)    Model-year 1999-2004 C/K 15 Series pickup trucks with a Gross Vehicle
Weight Rating ("GVWR") of less than or equal to 6400 lbs. (with the exception
of 2003-2004 Silverado SS model);

---

[1]    Attached to Mr. Coleman's affidavit were authenticated pictures of Mr. Bryant's parking brakes, as well as
a DVD containing a roll demonstration involving Mr. Bryant's vehicle conducted by Mr. Bryant and Mr. Coleman.

-- 3 --

P2460

ii)    Model-year 1999-2004 C/K 15 Series SUV/UUVs with a GVWR of less than or equal to 7200 lbs.;

iii)    Model-year 2002 K15706 Cadillac Escalade and 2002 K15936 Cadillac Escalade.

P. Exh. "1", p. 1.  The "C" signifies two-wheel drive, while "K" signifies four-wheel drive.  P. Exh. "22", p. 101, lines 14-23.

2.    GM collectively describes these vehicles as "1500 Series pickups and utilities."  P. Exh. 2, *passim;* Exh. 9, *passim;* P. RFA Answers 1-5.  GM also refers to these vehicles as "GMT 800 1500 Series vehicles."[2]

3.    All 1500 Series pickups and utilities were originally equipped, manufactured and sold by GM with a single shoe, PBR 210x30 Drum-in-Hat parking brake system.  P. Exh. "2", GM000036104 ("The entire population of 1500 Series vehicles is equipped with the PBR single-shoe parking brake system with the exception of certain crew cab models.");  P. RFA Answers 1-5.

4.    GM is responsible for integrating the PBR 210x30 Drum-in-Hat park brake system into these vehicles.  P. Exh. "2", GM000036113;  P. Exh. "9", p. 11 of 13;  P. Exh. "23", p. 34 (lines 5-9).

5.    The PBR 210x30 Drum-in-Hat parking brake system in 1500 Series pickups and utilities is operated by foot pedal near the vehicle floor to the left of the accelerator pedal and service brake.  It has an intended use as a parking assist device to be used in conjunction with the transmission in its "park" position (automatic transmission) or in reverse gear (manual transmission).  P. Exh. "8", GM000036753;  P. Exh. "15", GM000025715;  P. Exh. "22", p. 145 (lines 18-25); 146 (lines 1-11);  P. Exh. "23", p. 88 (lines 4-9).

---

[2]    The Court will adopt GM's terminology and refer to the vehicles described in paragraph 1. above as "1500 Series pickups and utilities".

— 4 —

P2481

6.    In numerous places in its owners' manuals for 1500 Series pickups and utilities, GM cautions "[i]t is dangerous to get out of your vehicle if the shift lever is not fully in PARK (P) with the parking brake firmly set. Your vehicle can roll." P. Exh. "24", pp. 2-32; 2-39; 2-41; 2-42; 4-89; P. Exh. "15", GM000025718.  Given this language – which makes no distinction between manual and automatic transmission vehicles -- the Court finds the parking brake, even on automatic transmission vehicles, is not a superfluous item as GM seems to suggest in its briefing.[3]

7.    GM expects people will use their owner's manuals. The information is there for their benefit in how to maintain their vehicle and how to operate their vehicle. P. Exh. "22", p. 127 (lines 10-18). GM owners' manuals, as a general proposition, prescribe how GM believes 1500 Series pickups and utilities should ordinarily be used by their owners or operators.  P. RFA Answer 54.

8.    Most vehicles with automatic transmissions experience infrequent parking brake application by their owners, drivers, or users in normal operations. P. RFA Answer 56.

9.    The parking brake's linings, made of a friction material known as T103, sit inside a hollow metal cylinder or drum attached to the inboard portion of the vehicle's wheel.  Exh.

---

[3]    As additional support for the idea that parking brakes on GM vehicles are not unnecessary, even on automatic transmission vehicles, the GM Vehicle Technical Specifications (VTS) for model-year 1999-2002 1500 Series pickups and utilities specify the park brake *shall* hold the vehicle stationary at Gross Vehicle Weight (GVW) with the transmission in neutral. P. Exh. "15", GM000025714; P. Exh. "19", VTS 3.2.1.13.7.1 "Vehicle Parking Gradeability" ("The park brake shall hold the vehicle stationary at GVW, with the transmission in neutral."); P. Exh. "23", p. 46 (line 25); p. 47 (lines 1-20). Moreover, without distinguishing between manual and automatic transmission vehicles, the GM VTS applicable to the model-year 1999-2002 1500 Series pickups and utilities require the PBR 210x30 Drum-in-Hat parking brake system to enable and endure a total of 20 simulated police style U-turns without loss of function. P. Exh. "19", VTS 3.2.1.5.7.2 "Simulated Police-Style U-turns". The applicable VTS also require the parking brake system to enable and endure 4 dynamic stops at 60 mph without loss of function. P. Exh. "19", VTS 3.2.1.5.7.3 "Dynamic Park Brake Stop". Finally, federal motor vehicle safety regulations governing vehicles such as model-year 1999-2002 1500 Series pickups and utilities state such vehicles "shall be manufactured with a parking brake system of a friction type with a solely mechanical means to retain engagement." P. Exh. "20". GM has admitted that if its vehicles do not meet federal safety standards, it cannot sell such non-compliant vehicles. P. Exh. "23", p. 49 (lines 2-5)

-- 5 --

"23", p. 94 (lines 20-24). When the wheel turns, the drum (also referred to as a "rotor") likewise turns. When the parking-brake foot pedal is depressed a cable-actuated piston causes the parking brake's linings to travel or expand outward and contact the inner portion of the drum. *See* P. Exh. "8", GM000036753. The design intent is that the contact of the parking brake's lining with the drum will, as a matter of friction and torque, prevent the wheel from turning and hold the vehicle motionless while parked, even if the transmission is in neutral or out of gear. *Id.*

10.     The PBR 210x30 Drum-in-Hat parking brake system on 1999-2002 model-year 1500 Series pickups and utilities was originally assembled and distributed with what GM calls a "high-force spring clip retainer." P. Exh. "6", GM000036718.

11.     The specific GM model codes for the1999-2002 model-year 1500 Series pickups and utilities containing parking brakes with high-force spring clip retainers are as follows:

| 1500 Series Pickup: | C-K15703 (MY 99-02) |
| | C-K15753 (MY 99-02) |
| | C-K15903 (MY 99-02) |
| | C-K15953 (MY 99-02) |
| | |
| 1500 Series Utility: | C-K15706 (MY 00-02) |
| | C-K15906 (MY 00-02) |
| | C-K15936 (MY 02 only) |

P. Exh. "6", GM000036718. In light of GM's 2005 recall of manual transmission vehicles, discussed *infra*, the automatic-transmission versions of these vehicles are the only ones at issue in Mr. Bryant's proposed class action. That is, the automatic-transmission versions of these model-coded vehicles are the class vehicles.[4]

---

[4]     GM manufactured 3,905,481 model-year 1999-2002 1500 Series pickups and utilities vehicles with automatic transmissions and equipped with parking brakes containing high-force spring clip retainers. P. Exh. "2", GM000036106.

-- 6 --

P2463

12.    The function of the spring-clip retainer is to ensure the parking brake linings, when not in use, are retracted and properly positioned – concentric with the drum – such that when the foot pedal is depressed and the linings travel outward, they are properly centered and make contact with the correct place on the interior of the drum. P. Exh. "8", GM000036754.

13.    GM admits the high-force spring clip retainer installed on model-year 1999-2002 1500 Series pickups and utilities does not function properly in that it exerts more retaining force than aligning forces tending to center the parking brake linings in relation to the drum. P. Exh. "2", GM000036107; P. Exh. "8", GM000036754; P. Exh. "9", p. 2 of 13; P. Exh. "23", p. 77 (lines 1-18); p. 78 (lines 1-7).

14.    The exertion of excessive retaining force is also characterized by GM as the high-force spring clip retainer not allowing the brake shoe and attached linings to "float" inside the drum and remain concentric with the drum. P. Exh. "2", GM000036102; P. Exh. "9"; P. Exh. "30", GM000038052; P. Exh. "3", GM000036624. Mr. Bryant contends this alleged inadequate shoe/lining float problem is the principle result of the defectively designed high-force spring clip retainer. Mr. Bryant claims the inadequate shoe/lining float problem exists the very moment each class vehicle rolls off its assembly line, and is persistent. That is, it reveals itself each time a class vehicle is driven. Based on a review of Mr. Bryant's cited evidence, and the evidentiary record as a whole, the Court agrees with Mr. Bryant and finds the high-force spring clip retainer, if it is indeed defectively designed (an issue ultimately to be determined by the trier of fact), to create a common, inadequate shoe/lining float problem in all class vehicles, which is persistent, which occurs each time a class vehicle is driven, and which exists, if at all, from the time class vehicles roll off their respective assembly lines.

-- 7 --

P2464

15.    This exertion of excessive retaining force by the high-force spring clip retainer can result in a loss of concentricity between the linings and drum. P. Exh. "2", GM000036102; P. Exh. "9", p. 4 of 13  This loss of concentricity, which may be prompted by inertia-induced movement of the parking-brake linings during vehicle travel, rough road inputs, and/or axle deflection occurring during certain vehicle cornering or loading conditions[5], can also allow or further result in unintended, intermittent contact between the parking brake linings and drum during vehicle travel. P. Exh. "2", GM000036107; P. Exh. "8", GM000036754; P. Exh. "9", pp. 1 and 2 of 13; P. Exh. "15, GM000025715; Exh. "23" (lines 3-22)(". . . .[a] severe pothole or some other intertial event [] would move the park brake out of its center position, and then this original clip might not allow it to return back to that center position as readily."); P. RFA Answer 35.

16.    This unintended, intermittent contact between the linings and drum during travel – a condition GM has termed parking brake "self-application" or "self-energizing" -- essentially grinds down the parking brake lining and promotes excessive, premature lining wear. *See* P. Exh. "2", GM000036102; P. Exh. 3, GM000036624 ("Park brakes are wearing out due to 'self energizing.'"); P. Exh. "8", GM000036754 ("Relative motion of the drum during driving acts to self-energize the brake so as to maintain drum/lining contact and may occur even in the absence

---

[5]    With regard to inertia-induced movement of the parking-brake linings, and how it affects parking brake performance on 1999-2002 model-year 1500 Series pickups and utilities, GM has further admitted to additional design-related shortcomings regarding the PBR 210x30 Drum In Hat parking brake system. First, it has admitted to design failure in that load-induced axle shaft deflection under high-g cornering was not comprehended as a cause of potential parking brake lining wear in the Design Failure Mode Effects Analysis (DFMEA), and that such failure to comprehend is something representing a process non-existent, inadequate or missed by GM. Exh. "2", GM000036107; Exh. "7"; Exh. "9", p. 11 of 13. Similarly, GM has admitted design failure in that the Subsystem Technical Specification (STS) for 1999 through 2002 model year 1500 Series pickups and utilities did not contain a maximum allowable limit for axle shaft deflection, and that such omission is something representing a process non-existent, inadequate or missed by GM. Exh. "2", GM000036107; Exh. "7"; Exh. "9", p. 11 of 13. Finally, GM has admitted design failure in that in the pre-production design phase it did not adequately test or perform durability validation with respect to the PBR 210x30 Drum-in-Hat parking brake system in 1999 through 2002 model year 1500 Series pickups and utilities vehicles. Exh. "2", GM000036107; Exh. "7"; Exh. "9", p. 11 of 13.

-- 8 --

P2465

of a parking brake application."); P. Exh. "9", p. 2 of 13; P. Exh. "15, GM000025715; P. Exh. "23", p. 83 (lines 6-16) ("The self-energizing is where you get contact between the linings and the rotor that, due to the direction of rotation of the rotor, it tends to pull the lining in. It creates more contact rather than pushing it away.").

17.    Excessive lining wear results in too large of a gap between the lining and the drum such that depressing the park brake will not cause the lining to travel far enough to make sufficient contact with the drum and hold the vehicle motionless. P. Exh. "2", GM000036107; P. Exh. "9", pp. 1 and 2 of 13. In GM's own words, parking brake "[l]ining wear can increase the clearance between the linings and the parking brake drum to a point where the required apply lever travel and associated shoe travel exceed the design capabilities of the apply system, reducing its ability to generate sufficient park brake torque to hold the vehicle motionless." P. Exh. "2", GM000036107; P. Exh. "9", pp. 1 and 2 of 13; P. Exh. "15, GM000025716.

18.    GM has also admitted the design of the PBR 210x30 Drum-in-Hat parking brake system with the high force spring clip retainer is ". . . .less than optimal because it is overly sensitive to proper lining-to-drum clearances." P. Exh. "2", GM000036107; P. Exh. "7"; P. Exh. "9", p. 11 of 13. The Court finds this admission to describe an additional potential design defect in the PBR 210x30 Drum-in-Hat parking brake system in model year 1999-2002 1500 Series pickups and utilities. This potential defect is significant, given GM's apparent position, based on the affidavit of Jason Petric, that the parking brake linings on Mr. Bryant's vehicle were not excessively worn, but rather were merely out of adjustment and gapped too far away from the brake drum. Even if GM is correct (the Court does not believe it is, especially based on the contents of William Coleman's affidavit and measurements on Mr. Bryant's vehicle Mr. Coleman made), the Court finds the condition of the PBR 210x30 Drum-in-Hat parking brake

– 9 –

P2466

system being overly sensitive to proper lining to drum clearances is yet another example of a universal, alleged defect in all class vehicles that persistently exists and is actionable on a class-wide basis.

19.    GM maintains a Problem Resolution Tracking System ("PRTS"). P. Exh. "22", p. 63, lines 17-25. The PRTS was triggered regarding the parking brake due to higher-than-expected-warranty claims. *Id.* at 64, lines 15-19.

20.    The PRTS regarding the defective parking brakes "was initiated at the end of 2000 and was assigned to engineering in early 2001." P. Exh. "22", p. 64, lines 20-25; p. 65, lines 1-5.

21.    The GM Truck Group began 5-Phase Action plan CK800U0331 regarding defective parking brakes on January 29, 2001. P. Exh. 29. In the written document corresponding to that plan, GM noted the park brake "[s]ystem was found in many cases to not be able to hold after a low amount of miles (2500-6000). This condition was found in the system 2A and 2B park brakes."[6] *Id.*, GM000037499.

22.    The component manufacturer of the parking brake, PBR Banksia ("PBR"), performed testing on the PBR 210x30 Drum-in-Hat parking brake system originally utilized in 1999 through 2002 model year 1500 Series pickups and utilities. From its testing it concluded that at 10,048 miles the defective parking brakes needed a first adjustment and that at 27,273 miles the defective parking brakes' linings wear to steel. P. Exh. "10" (bar chart entitled "Wear Life Comparison, Original T800, Low Load, Twin Clip"); P. Exh. "23", p. 23 lines 3-25; p. 24 (entire); p. 25 (lines 1-10); p. 26 (lines 22-25); p. 27 (lines 1-10). PBR has actually estimated the parking brake lining life in 1999-2002 model year 1500 Series pickups and utilities, due to

---

[6]    The "system 2A and 2B park brakes" are in essence the PBR 210x30 Drum-in-Hat parking brake system. P. Exh. "1".

P2467

the alleged defect, to be a mere 30,000 to 35,000 miles, only 1/5 of the expected life of such

vehicles, and before expiration of the 36,000 mile written limited warranty provided by GM to

vehicle purchasers. P. Exh. "11" ("Lining Life Estimates: Original design = 30-35,000 miles");

P. Exh. "25", p. 7 (Section entitled "1999 General Motors Corporation New Vehicle

Warranty").

23.    GM expects the life of all 1500 Series pickups and utilities to be 10 years of exposure or

150,000 miles. P. Exh. "19", VTS 3.2.1.1 "Target Life"; P. Exh. "22", p. 124 (lines 11-14); P.

Exh. "23", p. 27 lines 23-25; p. 28 (lines 1-4). No criteria or performance standards concerning

expected mileage or months of service of the parking brake, including parking brake linings, is

set forth in the GM Vehicle Technical Specification (VTS) or GM Sub-System Technical

Specification (SSTS) for 1500 Series pickups and utilities. P. Exh. "15", GM000025714; P.

Exh. "16", GM000029872; P. Exh. "19"; P. Exh. "22", p. 66 (lines 1-17). Similarly, the VTS

for 1500 Series pickups and utilities indicates parking brake linings are not considered items

that will "wear out" or are "wear out items". Exh. "19", VTS 3.2.3.1."Wearout Items"; VTS

3.2.3.1.1 "Brake Wearout Items"; Exh. "22", p. 72 (lines 18-25); p. 73 (line 1)("The park brake,

if adjusted correctly and maintained, I believe the expectation is that they will not wear out

based on them not being on this wear-out item matrix."); Exh. 23, p. 28 (lines 2-7)(Question: "Is

it your understanding that the park brake linings are supposed to last [the 150,000 mile target

life of the vehicles]?"  Answer: "Yes"). On the other hand, a performance standard of 40,000

miles for the service brake linings is prescribed in the GM Vehicle Technical Specification

(VTS) for 1500 Series pickups and utilities. Exh. "19", VTS 3.2.3.1.1 "Wearout Items"; Exh.

"22", p. 66 (lines 18-25; 67 lines 1-10; p. 70, lines 12-22). In the Court's mind, the only

inference that can be drawn from these omissions and the existence of a specific standard for

P2468

service brakes is that GM has always expected the parking brake linings on these vehicles to last the expected vehicle life, *ie.* 10 years of exposure or 150,000 miles. Indeed, GM's own VTS confirms this, stating the "Target Life" of the parking brake is essentially 10 years of exposure of 150,000 miles. P. Exh. "19", 3.2.3.1 "Target Life".

24.    In October 2001 GM concluded the design of the parking brake, including its spring clip retainer, was faulty. P. Exh. "2", GM000036102; P. Exh. 9, p. 4 of 13.

25.    On October 19, 2001 GM initiated an Engineering Work Order (EWO) to release a spring clip retainer with lower retaining force. P. Exh. "2", GM000036102, GM000036106, GM000036109; P. Exh. "9", p. 4 of 13. This release was effective with 2003 model year start of production. *Id.* ; P. RFA 82 Answer.

26.    GM believed the reduced force spring clip retainer would ". . . .minimize the lining self energizing by allowing the lining to float easier and not "stick" to the inside of the rotor during operation on rough roads." P. Exh. "30", GM000038052.

27.    The implementation of the low-load or reduced force spring clip retainer beginning with model year 2003 1500 Series pickups and utilities has effectively eliminated the intermittent contact condition between the parking brake lining and the parking brake surface or drum during vehicle travel. P. Exh. "9", p. 4 of 13 ("Implementation was effective with 2003 start of production, after which the warranty repair rate due to lining wear became insignificant."); P. Exh. "23", p. 77 (lines 1-18); p. 78 (lines 1-7).

28.    All 1999 through 2002 model year 1500 Series pickups and utilities are covered by a GM bumper-to-bumper new vehicle warranty for three (3) years or 36,000 miles. P. Exh "15", GM000025710 ("The subject vehicles, with the exception of the Cadillac vehicles, are covered by a bumper-to-bumper new vehicle limited warranty for three years or 36,000 miles whichever

— 12 —

P2469

occurs first.); P. Exh. "16", GM000029865 ("The subject vehicles, with the exception of the

Cadillac vehicles, are covered by a bumper-to-bumper new vehicle limited warranty for three

years or 36,000 miles whichever occurs first. The Cadillac subject vehicles are covered by a

bumper-to-bumper new vehicle limited warranty for four years or 50,0000 miles whichever

occurs first."); Exh. "25", pp. 7-11 (Section entitled "1999 General Motors Corporation New

Vehicle Warranty"); GM CD containing warranty booklets admitted into evidence at the class-

certification hearing.  In relevant part, the limited warranty language regarding coverage is as

follows:

### WHAT IS COVERED

#### WARRANTY APPLIES

THIS WARRANTY IS FOR GM VEHICLES REGISTERED IN THE UNITED STATES NORMALLY OPERATED IN THE UNITED STATES OR CANADA, AND IS PROVIDED TO THE ORIGINAL AND ANY SUBSEQUENT OWNERS OF THE VEHICLE DURING THE WARRANTY PERIOD.

#### REPAIRS COVERED

THE WARRANTY COVERS REPAIRS TO CORRECT ANY VEHICLE DEFECT RELATED TO MATERIALS OR WORKMANSHIP OCCURRING DURING THE WARRANTY PERIOD. NEEDED REPAIRS WILL BE PERFORMED USING NEW OR REMANUFACTURED PARTS.

#### WARRANTY PERIOD

THE WARRANTY PERIOD FOR ALL COVERAGES BEGINS ON THE DATE THE VEHICLE IS FIRST DELIVERED OR PUT IN USE AND ENDS AT THE EXPIRATION OF THE COVERAGE PERIOD.

#### BUMPER-TO-BUMPER COVERAGE

THE COMPLETE VEHICLE IS COVERED FOR 3 YEARS OR 36,000 MILES, WHICHEVER COMES FIRST. . . . NO CHARGE

WARRANTY REPAIRS, INCLUDING TOWING, PARTS AND LABOR, WILL BE MADE AT NO CHARGE, LESS ANY APPLICABLE DEDUCTIBLE.

OTHER TERMS: THIS WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS AND YOU MAY ALSO HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE.

GENERAL MOTORS DOES NOT AUTHORIZE ANY PERSON TO CREATE FOR IT ANY OTHER OBLIGATION OR LIABILITY IN CONNECTION WITH THESE VEHICLES. ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE APPLICABLE TO THIS VEHICLE IS LIMITED IN DURATION TO THE DURATION OF THIS WRITTEN WARRANTY. PERFORMANCE OF REPAIRS AND NEEDED ADJUSTMENTS IS THE EXCLUSIVE REMEDY UNDER THIS WRITTEN WARRANTY OR ANY IMPLIED WARRANTY. GENERAL MOTORS SHALL NOT BE LIABLE FOR

-- 13 --

P2470

INCIDENTAL OR CONSEQUENTIAL DAMAGES (SUCH AS, BUT NOT LIMITED TO, LOST WAGES OR VEHICLE RENTAL EXPENSES) RESULTING FROM THE BREACH OF THIS WRITTEN WARRANTY OR ANY IMPLIED WARRANTY.

The Court finds this coverage language is identical in material respects for all 1999 through 2002 model year 1500 Series pickups and utilities. *Id.*

29.    On September 17, 2002 (eleven months after issuance of the GM engineering work order to re-engineer the high-force spring clip retainer) GM released technical service bulletin #02-05-26-011 to its dealers. P. Exh. "22", p. 46, lines 2-7. In this bulletin it was noted "[a] rear parking brake retaining spring clip kit has been released for service." Significantly, however, it also stated "Important – The spring clip kits mentioned in this bulletin do not address any parking brake concerns." Exh. "13" The Court finds, as Mr. Bryant has argued, that this language is troubling and can be construed as an effort on GM's part to conceal – to the detriment of all class members -- its responsibility for problems with the PBR 210x30 Drum-in-Hat parking brake system to avoid paying warranty claims. To begin with, the Court does not understand why GM waited eleven (11) months after it re-engineered the high-force spring clip retainer on October 19, 2001 to issue a bulletin regarding vehicles that had been manufactured with the high-force clip. For the bulletin to then contain this language, in the Court's view, is triable evidence GM wanted to conceal its responsibility for the design problem from all class members. The fact the three-year GM limited warranties were beginning to expire in August 2001 only reinforces the Court's view that GM's conduct may have been inappropriate, designed either to avoid paying warranty claims or to induce prospective sales of class vehicles.

30.    On January 28, 2003 -- roughly two years after GM engineering received notice of parking brake problems -- GM published technical service bulletin 02-05-26-002A and sent it to dealers. It was in this service bulletin that GM first acknowledged to outside entities such as

– 14 –

P2471

dealers that scraping noise from the rear of vehicles "may [sic] due to the parking brake shoe contacting the drum in hat rotor without the parking brake being applied, causing premature wear on the shoe lining." P. Exh. "2", GM000036109; P. Exh. "14"; P. Exh. "22", p. 46.

31.    In December 2003 the National Highway Traffic and Safety Administration (NHTSA) issued Preliminary Evaluation Information Request ("IR") PE03-057 regarding allegations of parking brake ineffectiveness on model year 1999-2003 full-size pickup trucks built on the GMT 800 platform and equipped with manual transmissions and drum-in-hat parking brakes. P. Exh. "2", GM000036103; P. Exh. "9", p. 4 of 13

32.    In mid-February 2004 GM provided a response to the NHTSA IR and thereafter engaged in vehicle testing regarding the defective parking brake. P. Exh. "2", GM000036103; P. Exh. "15".

33.    On November 18, 2004 NHTSA issued engineering analysis IR EA04-011, which expanded the scope of the initial IR to include all model year 1998-2004 full-size pickup trucks and utilities built on either the GMT 400 or GMT 800 platform and equipped with either a manual or automatic transmission. P. Exh. "2", GM000036102.

34.    The primary concern of the NHTSA investigation directed at the PBR 210x30 Drum-in-Hat parking brake system in 1999 through 2002 model year 1500 Series pickups and utilities was vehicle rollaways. P. Exh. "8", GM000036756.

35.    On April 18, 2005, after the issue of the defective parking brake was presented to the Senior Management Committee, GM's Field Action Decision Committee decided to conduct a safety recall. P. Exh. "17", p. 2

36.    On April 20, 2005 GM sent NHTSA written notification of this decision. P. Exh. "17" In that correspondence GM stated "General Motors has decided that a defect, which relates to

-- 15 --

P2472

motor vehicle safety, exists in certain 1999-2002 C/K Series (PBR parking brake system). . .

.pickups with manual transmissions. Some of these vehicles have a condition in which the

parking brake friction linings may wear to an extent where the parking brake can become

ineffective in immobilizing a parked vehicle." P. Exh. "17", p. 1

37.    In July 2005 GM issued Recall Bulletin 05042, which applied only to manual

transmission versions of 1999-2002 1500 Series pickups and utilities.  P. Exh. "18".

38.    GM projected the cost to recall only 1999-2002 1500 Series pickups and utilities manual

transmission vehicles with defective parking brakes to be $6,645,793.  P. Exh. "4",

GM000036679-80.

39.    In contrast, GM projected the cost to recall both the manual and automatic transmission

version of such vehicles to be fifty (50) times greater, or $350,083,047.  P. Exh. "4",

GM000036679-80.

40.    To date GM has neither contacted owners of nor recalled any of the 3,905,481 model-

year 1999-2002 1500 Series pickups and utilities with automatic transmissions, the class

vehicles here, based on parking brake concerns. Exh. "22", p. 39, lines 13-17; p. 42, lines 7-10.

41.    The PBR 210x30 Drum-in-Hat park brake system utilized in manual transmission 1999-

2002 1500 Series pickups and utilities is identical to the PBR 210x30 Drum-in-Hat park brake

system installed on automatic-transmission 1999-2002 1500 Series pickups and utilities.

Moreover, "the same physical parking brake wear mechanism is also present on vehicles with

automatic transmissions. . . ." P. Exh. "5"; P. Exh. "22", p. 43, lines 5-9; P. P. Exh. "23", p. 36

(lines 20-25); p. 37 (lines 1-25); p. 38 (lines 1-8).

42.    The remedy in Recall Bulletin 05042 is that GM instructs dealers to "inspect the parking

brake lining thickness on both rear brakes, and depending on the amount of lining remaining,

-- 16 --

P2473

install either a reduced force parking brake retainer spring clip on both rear brakes or parking brake shoe kits, which includes the reduced force clip." P. Exh. "18", p. 1.

43.     In all cases GM's recall remedy is to supply a reduced force spring clip retainer. *Id.* This is consistent with GM's belief that implementation of the low-load or reduced force spring clip retainer beginning with model year 2003 1500 Series pickups and utilities effectively eliminates the intermittent contact condition between the parking brake lining and the parking brake surface or drum during vehicle travel.

44.     GM's recall test for excessive lining wear is that the parking brake lining thickness must equal or exceed 1.5 millimeters (.06 inches) in at least 6 places on each side of the vehicle. P. Exh. 2, GM000036108; P. Exh. "18", p.4. As per GM's recall materials, in the event parking brake lining thickness is less than 1.5 millimeters (.06 inches) on any of at least 6 places on each side of the vehicle, GM instructed its dealers to install a new parking brake lining on both sides of the vehicle. Exh. 2, GM000036108; Exh. "18", p.4.

45.     In sum, if the linings are not sufficiently worn, Recall Bulletin 05042 only entails installation of a reduced force parking brake retainer spring clip on both rear brakes. However, if the linings are excessively worn, the recall requires both the replacement of the linings and a reduced force spring clip retainer.

46.     GM's dealer sales and service agreement requires its dealers nationwide to perform recall-related repairs. P. RFA Answer 157.

47.     GM has estimated .9 hours per vehicle at an hourly labor rate of $71.19 to represent labor costs in terms of dealers inspecting and correcting the parking brake defect. P. Exh. "2", GM000036115; *see also* P. Exh. "4", GM000036679-80; P. RFA Answer 153.

P2474

48.    GM has estimated $4.93 to represent its cost for corrective parts, per vehicle, in terms of dealers inspecting and correcting the parking brake defect. P. Exh. "2", GM000036115; *see also* P. Exh. "4", GM000036679-80; P. RFA Answer 154.

49.    GM has estimated $1.00 per initial notice letter per vehicle (First Class Mail) and $0.36 for "customer follow up" per vehicle as administrative costs associated with dealers inspecting and correcting the parking brake defect. P. Exh. "2", GM000036115; *see also* P. Exh. "4", GM000036679-80; P. RFA Answer 155.

50.    On May 10, 2005 NHTSA's Office of Defect Investigations (ODI) issued an "ODI Resume" and "Engineering Analysis Closing Report" closing its engineering analysis Investigation EA 04-011 regarding the defective parking brakes. P. Exh. "8"

51.    NHTSA closed the investigation because it determined vehicle rollaways – again, the primary concern of the investigation – would be prevented by GM"s recall of manual-transmission 1999-2002 1500 Series pickups and utilities. P. Exh. "8", GM000036756-000036757.

52.    In closing its investigation NHTSA stated, "The Engineering Analysis is closed because GM's recall action will remedy the defect condition in the MY 1999-2003 C/K 1500 pickup trucks equipped with manual transmissions." P. Exh. "8", GM000036757.

53.    As demonstrated by responses to NHTSA and the recall campaign in general, GM has the ability to conduct a Vehicle Identification Number (VIN) search within its internal databases and identify the name, address and telephone number of each original purchaser or owner of 1999 through 2002 model year 1500 Series pickups and utilities. P. Exh. "15", GM000025708; *see also* P. RFA Answers 97-101.

– 18 –

P2475

54.    In addition, on-line internet access at GM's owner website, www.mygmlink.com, provides a way for owners of 1999 through 2002 model year 1500 Series pickups and utilities to obtain personalized information for their specific vehicles. GM controls the format and content of this website, with some limitations. P. Exh. "17", p. 16; *see also* P. RFA Answers 159-161.

55.    GM also has the ability to obtain contact information (name and address) for current or used vehicle owners by contacting an "outside supplier" and having it obtain registration information for all desired or affected VINs. P. Exh. "22", p. 38, lines 14-25.

56.    On April 4, 2002 Plaintiff Boyd Bryant, at the time and currently a resident of Fouke, Miller County, Arkansas, purchased and took delivery of a new 2002 Chevrolet Tahoe Z-71, VIN 1GNEK13282R268414 ("the Bryant vehicle") from Tom Morrick Chevrolet, Inc. in Ashdown, Arkansas. P. Exh. "26". By stipulation of the parties, Mr. Bryant received a standard GM three-year/36,000 mile written limited warranty (as identified and discussed above) at the time he purchased the Bryant vehicle.

57.    Mr. Bryant presently owns the Bryant vehicle; it has approximately 81,000 miles on it.

58.    The Bryant vehicle falls within the description of 1999 through 2002 model year 1500 Series pickups and utilities and, more particularly, is one of the "utilities" in that description.

59.    The Bryant vehicle was originally equipped with a PBR 210x30 Drum-in-Hat park brake system utilizing high-force spring clip retainers. P. Exh. "28", p. 8 (". . . .the parking brake on Mr. Bryant's vehicle was a PBR parking brake."). The Bryant vehicle is still equipped with a PBR 210x30 Drum-in-Hat park brake system utilizing high-force spring clip retainers. *See* photographs attached to William Coleman's affidavit.

60.    Plaintiff's engineer expert, William Coleman, measured the parking brake lining thickness on the Bryant vehicle, and in at least one place on the passenger side it is less than 1.5

-- 19 --

P2478

millimeters (.06 inches). *See* William Coleman affidavit; photographs attached to and authenticated by Mr. Coleman's affidavit. Based on this measurement, the Court finds the Bryant vehicle is exhibiting lining wear consistent with the inadequate lining float Mr. Bryant alleges is associated with GM's use of the high-force spring clip retainers.

61.    Mr. Coleman also tested the Bryant vehicle for parking brake functionality. With the parking brake fully depressed and the transmission in neutral, the Bryant vehicle rolls on both steep and lesser hills or grades. William Coleman affidavit; *see* DVD containing videotaped footage of the hill testing of the Bryant vehicle. Accordingly, the Bryant vehicle[7] is exhibiting lack-of-parking-brake functionality consistent with the presence of the defect associated with GM's use of the high-force spring clip retainers.

62.    As per his affidavit, Mr. Bryant has reviewed the original and amended pleadings in this matter, and understands the allegations against GM. He also understands his duties and obligations as a class representative and has testified that he has complied with them by, among

---

[7]    According to GM, the 1500 Series utilities like the Bryant vehicle (ie. sport utility vehicles such as Chevrolet Tahoes and Suburbans, and GMC Yukons and Yukon XLs) have experienced the defect-related premature lining wear more than any other category of vehicles in the 1999 through 2002 model year 1500 Series pickups and utilities class of vehicles. P. Exh. "5". By GM's own admission, the reason the 1999-2002 1500 series utilities are more prone to poor parking brake performance is that 1500 Series utilities have the following unique design characteristics or traits:

–    Small axle shaft diameters relative to other vehicles in the 1999 through 2002 model year 1500 Series pickups and utilities class of vehicles;

–    The highest GVW ratings relative to other vehicles in the 1999 through 2002 model year 1500 Series pickups and utilities class of vehicles;

–    The greatest unladen weights relative to other vehicles in the 1999 through 2002 model year 1500 Series pickups and utilities class of vehicles,

–    They have coil-spring suspensions with unique spring and shock absorber calibrations compared to other vehicles in the 1999 through 2002 model year 1500 Series pickups and utilities class of vehicles.

P. Exh. "2", GM000036106; Exh "5". These factors subject the 1500 Series utilities to greater parking brake shoe inertia and axle shaft deflection, resulting in accelerated parking brake lining wear. *Id.*

P2477

other things, giving a deposition in this case, assisting with written discovery answers, and by staying in touch with representative counsel during this litigation to keep aware of status and progress of this lawsuit. In that vein, the Court notes Mr. Bryant not only participated in at least two inspections of Z-71 Tahoe, as well as a roll test of this vehicle, but he also attended part of the class-certification hearing, even though it occurred on one of his off days from his employment.

63.      Mr. Bryant further agrees to fairly and adequately represent other members of any designated class with similar claims and damages because of the importance that all benefit from this lawsuit equally.

64.      Finally, he states there is no collusion or conflicting interest between members of the proposed class and him.

## III.

### Conclusions of Law

A.      **Mr. Bryant's Class Definition.**

1.      Before the six (6) criteria for class certification under Rule 23 are analyzed, the trial court must determine whether a class, in fact, exists. *E.g. State Farm Fire & Cas. Co. v. Ledbetter*, 355 Ark. 28, 129 S.W.3d 815 (2003). A class must be susceptible to precise definition. Its description must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class, and the identity of the class members must be ascertainable by reference to objective criteria. *Arkansas Blue Cross and Blue Shield v. Hicks*, 349 Ark. 269, 78 S.W.3d 58 (2002). Part of the "objective criteria" requirement is that a class may not be defined in a manner that would require the trial

court to inquire into the merits of each class member's case in order to determine whether he is a suitable class member. *Ledbetter*, 355 Ark. at 37.

2.      Mr. Bryant has moved under Ark. R. Civ. P. 23 for certification of the following nationwide class of GM vehicle owners:

> *"Owners" or "subsequent owners" of 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer[8], that registered his vehicle in any state in the United States.*

Excluded from Mr. Bryant's proposed class are the following individuals or entities:

a.      Individuals or entities, if any, who timely opt out of this proceeding using the correct protocol for opting out that will be formally established by the Court;

b.      Any and all federal, state, or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

c.      Any currently sitting Arkansas state court judge or justice in the current style and/or any persons within the third degree of consanguinity to such judge or justice;

d.      Any person who has given notice to GM, by service of litigation papers or otherwise, and alleged he or she has suffered personal injury or collateral property damage due to an alleged defect in any braking component, including the parking brake, in 1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer;

---

[8]      The term "1999-2002 1500 Series pickups and utilities originally equipped with an automatic transmission and a PBR 210x30 Drum-in-Hat parking brake system utilizing a high-force spring clip retainer" as utilized in his class definition refers to the following GM model-year and model-coded vehicles equipped with automatic transmissions:

| 1500 Series Pickup: | C-K15703 (MY 99-02) |
| --- | --- |
| | C-K15753 (MY 99-02) |
| | C-K15903 (MY 99-02) |
| | C-K15953 (MY 99-02) |
| 1500 Series Utility: | C-K15706 (MY 00-02) |
| | C-K15906 (MY 00-02) |
| | C-K15936 (MY 02 only) |

-- 22 --

P2479

e.    Any person, "owner", or "subsequent owner" whose GM vehicle was included in GM's July 2005 recall bulletin No. 05042, or any supplements or amended versions of that bulletin that have previously been issued.

3.    The Court concludes the nationwide class for which Mr. Bryant seeks certification both exists and is susceptible to precise definition. The terms "owners" and "subsequent owners" are taken from GM's own warranty publications. Thus GM cannot complain of the class not being susceptible to precise definition, nor of it not being ascertainable by reference to objective criteria. Moreover, GM has admitted it has the ability to provide personal information (name, address, telephone number) regarding original vehicle purchasers via its warranty database, as well as current vehicle owners via third party vendors that conduct VIN searches. Finally, the fact GM has conducted a recall on the manual-transmission versions of class vehicles demonstrates it is administratively feasible for GM not only to identify class members, but also to contact them.

4.    GM contends the class is not susceptible to precise definition because class member status is dependent upon "when the alleged damage (parking brake failure) occurred." GM also contends Mr. Bryant's class definition is flawed because it "continu[es] to shift on a daily basis as large numbers of the four million vehicles are sold. . . ." Both of GM's arguments lack merit. First, the Court has concluded the "failure" as alleged by Mr. Bryant -- the inadequate lining float – occurs from day one off the assembly line. Consequently, all "owners" and "subsequent owners" experienced the "failure" at delivery and are continuing to experience it, if it is ultimately proven to exist. There is no single post-purchase date of "failure" which might taint Mr. Bryant's class definition here. As for GM's other argument, there will obviously be some daily shift in class vehicle ownership that may occur. But this would be the case in most any products-based class action. The Court fails to see how this shift in product ownership, alone,

-- 23 --

P2480

provides any basis to attack Mr. Bryant's class definition. GM has admitted its warranty database provides the identity of and contact information for all original owners of class vehicles. In addition, GM personnel have admitted third-party firms can conduct VIN searches and obtain a snapshot regarding present owners of class vehicles. So there are numerous ways to objectively determine the individuals that are members of Plaintiff's proposed class. GM's concerns are unwarranted.

**B.      Rule 23(a)(1) Numerosity.**

5.      As noted, GM has stipulated to the Rule 23 element of numerosity. The Court accepts this stipulation and concludes the nationwide class proposed by Mr. Bryant is sufficiently numerous to satisfy Ark. R. Civ. P. 23(a)(1).

**C.      Rule 23(a)(2) Commonality.**

6.      The second requirement, set forth in Rule 23(a)(2), is commonality. As written by Professor Newberg, a legal scholar frequently cited by the Arkansas Supreme Court in class action opinions,

> Rule 23(a)(2) does not require that all questions of law or fact raised in the litigation be common. The test or standard for meeting the rule 23(a)(2) prerequisite is ... that is there need be only a single issue common to all members of the class... When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected.

Herbert B. Newberg, *Newberg on Class Actions*, § 3.10 (3d ed. 1993); *BPS, Inc. v. Richardson*, 341 Ark. 34, 20 S.W.3d 403, 407 (2000.

7.      These common issues of law and fact asserted to exist by Mr. Bryant arise principally from Mr. Bryant's allegation that the class vehicles contain defectively designed PBR 210x30 Drum-in-Hat parking brake systems, and that GM engaged in a cover up to avoid paying

-- 24 --

P2481

warranty claims. Among others, Mr. Bryant believes the common issues of law and fact satisfying Rule 23(a)(2) in this matter are:

**BREACH OF EXPRESS WARRANTY:** Whether, based on the terms of GM's written limited warranty, the alleged design flaw in the parking brakes in class vehicles constitutes a "vehicle defect related to materials or workmanship occurring during the Warranty Period."

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY:** Whether the alleged design flaw in the parking brakes on class vehicles has rendered those vehicles "not fit for [their] ordinary purpose."

**MAGNUSON-MOSS WARRANTY ACT:** Whether GM, by virtue of the parking brake's allegedly defective design, has failed to comply with its own "written warranty" or an "implied warranty."

**UNJUST ENRICHMENT:** Whether GM, by allegedly defectively designing the parking brake and concealing the defect to avoid paying warranty claims, has unjustly retained benefits that it should restore to Plaintiff and class members.

**FRAUDULENT CONCEALMENT:** Whether GM, once it acquired knowledge of the parking brake's defect in late 2000 (or sometime later), was clothed with a duty to speak to existing owners of class vehicles so they could obtain warranty relief. In addition, whether GM, once it acquired knowledge of the parking brake's defect in late 2000 (or some time later), owed a duty to speak to prospective purchasers of class vehicles, alerting them to the existence of the defect.

**DAMAGES:** Whether Mr. Bryant and the class members have suffered and are entitled to damages.

**RESTITUTION:** Whether Mr. Bryant and class members are entitled to restitution based on, without limitation, GM's unjust-enrichment-related misconduct and/or having previously paid for repairs to the defective parking brakes.

8.    In view of its factual findings regarding the alleged defective parking brake and GM's alleged cover up, and Mr. Bryant's pleadings, the Court agrees with Mr. Bryant and concludes the foregoing issues of law and fact are sufficiently common to establish Rule 23(a)(2)'s element of commonality.

-- 25 --

P2482

**D.    Rule 23(a)(3) Typicality.**

9.    The Arkansas Supreme Court has also cited Professor Newberg's work in defining the contours of typicality required by Rule 23(a)(3):

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct. In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of varying fact patterns which underlie individual claims. [Footnotes omitted.]

*Summons v. Missouri Pac. R.R.*, 306 Ark. 116, 813 S.W.2d 240, 243 (1991)(citing H. Newberg, *Class Actions*, § 3.13 (2d ed. 1985)); *Cheqnet Systems, Inc. v. Montgomery*, 322 Ark. 742, 911 S.W.2d 956, 959 (1995); *Mega Life & Health Ins. Co. v. Jacola*, 330 Ark. 261, 954 S.W.2d 898, 904 (1997). When analyzing typicality, the focus should be "upon the defendant's conduct and not the injuries or damages suffered by the plaintiffs." *Jacola*, 954 S.W.2d at 904. Similarly, "even if allegations about injuries or damages are different, claims are typical when they 'arise from the same wrong allegedly committed against the class.'" *Farm Bureau Mutual Ins. Co. of Ark., Inc. v. Lee*, 323 Ark. 706, 918 S.W.2d 129, 131 (1996)(citing *Cheqnet Systems, Inc.*, 911 S.W.2d at 959); *THE/FRE, Inc. v. Martin*, 349 Ark. 507, 78 S.W.3d 723, 729 (2002)("Our case law is clear that the essence of the typicality requirement is the conduct of the defendants and not the varying fact patterns and degree of injury or damage to individual class members".).

10.    With regard to defenses GM may raise, the Arkansas Supreme Court has repeatedly refused to examine such defenses at the certification stage, especially in the course of evaluating typicality. *See Lee*, 918 S.W.2d at 130 (Characterizing as "false" appellee's premise that a

— 26 —

P2483

plaintiff "'individually must have a claim before he can seek certification of a class.'"); *Jacola*, 954 S.W.2d at 905 (explicit refusal to consider merits-based argument that Jacolas were inadequate representatives because they did not read their insurance policy); *BNL Equity Corp. v. Pearson*, 340 Ark. 351, 10 S.W.2d 838, 841 (2000) (accusing defendant of "plowing old ground" in arguing potential defenses against the putative class representatives should be examined in the course of, among other things, addressing typicality); *Direct General Ins. Co. v. Lane*, 328 Ark. 476, 944 S.W.2d 528, 531 (1997)("Moreover, it is apparent that Direct Insurance, by asserting that Ms. Lane has not suffered any damages, has attempted to defeat class certification by delving into the merits of the case. That is inappropriate."); *USA Check Cashers of Little Rock, Inc. v. Island*, 349 Ark. 71, 76 S.W.3d 243, 248 (2002)("Moreover, this court has repeatedly held that we will not look either to the merits of the class claims or to the appellant's defenses in determining the procedural issue of whether the Rule 23 factors are satisfied.").

11.     The Court is satisfied a sufficient relationship exists between the alleged injury to Mr. Bryant and GM's alleged conduct affecting the class to satisfy the requirement of typicality. Mr. Bryant purchased and currently owns a class vehicle. He has also received GM's written limited warranty with his purchase. Mr. Bryant has suffered the alleged parking brake problem this litigation concerns. The wrong allegedly committed against the class – GM designing and implementing a defectively designed parking brake into class vehicles, then engaging in a cover up -- is the precise wrong Mr. Bryant contends he has suffered, especially because he purchased his vehicle in April 2002, which is after October 21, 2001 but before the issuance of GM's January 28, 2003 service bulletin. Finally, because the damages sought in this matter appear to be essentially uniform, there is no concern Mr. Bryant's damages are any different from or at

P2484

odds with those of other class members (which is not a concern the Arkansas Supreme Court would entertain anyway). In fact, the apparent uniformity of damages here does nothing but strengthen the case for typicality and for fulfillment of the other Rule 23 requirements.

12.    GM contends Mr. Bryant is subject to "unique defenses" that defeat typicality because he didn't give pre-suit notice to GM, and he didn't maintain his vehicle according to his owner's manual. The Court disagrees. First, if the notice issue has any significance whatsoever (the Court believes it does not, *see* footnote 16, *infra)*, it only affects the warranty claims asserted by Mr. Bryant and class members. Mr. Bryant has asserted claims other than for breach of warranty. Lack of notice will not be a defense, let alone a "unique defense" to those claims. Second, Mr. Bryant's assertion of parking brake "failure", with which the Court agrees, negates GM's lack-of-maintenance argument. Not even daily maintenance could cure the alleged parking brake defect and the "failure" it allegedly produces. Third, and finally, even assuming Mr. Bryant is subject to GM's lack of notice and failure-to-maintain defenses, then a population of class members will almost certainly be as well. If class representatives and class members have potential exposure to the same defenses, such defenses are not sufficiently "unique" to defeat typicality. *Barnes*, 349 Ark. at 529, 78 S.W. 3d at 736; *USA Check Cashers of Little Rock, Inc.*, 349 Ark. at 81; 76 S.W.3d at 248. GM's lack of typicality argument based on these factors is rejected. The Court concludes Mr. Bryant has established Rule 23(a)(3) typicality.

**E.    Rule 23(a)(4) Adequacy of Representation.**

13.    Rule 23(a)(4)'s requirement of adequacy of representation was first addressed in the Arkansas Supreme Court's decision in *First National Bank of Fort Smith* as follows:

> The elements of the requirement are: (1) the representative counsel must be qualified experienced and generally able to conduct the litigation; (2) that there be no evidence of collusion or conflicting interest between the representative and the class; and (3) the representative must display some minimal level of interest

— 28 —

P2485

in the action, familiarity with the practices challenged, and ability to assist in decision making as to the conduct of the litigation.

*First National Bank of Fort Smith v. Mercantile Bank*, 304 Ark. 196, 801 S.W.2d 38, 40-41 (1990)(citing *Gentry v. C&D Oil Co.*, 102 F.R.D. 490, 493 (W.D. Ark. 1984)).

14.    As for the first element, absent a showing to the contrary, it is presumed that the representative's attorney will vigorously and competently pursue the litigation. *BPS, Inc.*, 20 S.W.3d at 408 (citing *Jacola*, 954 S.W.2d at 904).   Mr. Bryant's counsel has entered their firm resumes into evidence detailing their various backgrounds and experiences handling complex civil litigation, including class actions.  Representative counsel have also vigorously pursued this litigation, diligently conducting voluminous discovery, hiring expert witnesses, seeking class certification, and preparing for trial on the merits.  This first element is established.

15.    With regard to the second element, there is no evidence that collusion or conflicting interests exist between Mr. Bryant and the class.  That element is easily satisfied.

16.    Third, and finally, Mr. Bryant owns a class vehicle, alleges he has been harmed by GM's misconduct affecting all class members, and has educated himself concerning GM's alleged practices bringing about that harm.  He is very much interested in obtaining relief for himself and class members both in Arkansas and throughout the United States. He is not at all reluctant to assist with written discovery requests, participate in oral discovery, and generally assist representative counsel with the decisions that need to be made during the course of this litigation.

17.    All in all, Mr. Bryant has satisfied the Court that he is an adequate class representative. The Rule 23(a)(4) element of adequacy is met.

– 29 –

P2486

F.    **Rule 23(b) Predominance.**

18.    Mr. Bryant, as noted, has established the existence of common issues of law and fact as

required by Rule 23(a)(2). *BPS, Inc.*, 20 S.W.3d at 408 ("We have held that the starting point

for our examination of the predominance issue is whether a common issue of law or fact exists

in the case for all class members."); *Lenders Title Co. v. Chandler*, No. 04-41, 2004 Ark. LEXIS

399 *15 (Ark. June 17, 2004)("Lender's II"). Accordingly,

> the next issue is whether the common question predominates over individual
> questions. When deciding whether common questions predominate over other
> questions affecting only individual members, [the Arkansas Supreme Court] does
> not merely compare the number of individual versus common claims. [*BPS, Inc.*,
> 20 S.W.3d at 408] Rather, [it] decides if the issues common to all class members
> "predominate over" the individual issues, which can be resolved during the
> decertified stage of a bifurcated proceeding. *Id.* Thus, the mere fact that
> individual issues and defenses may be raised regarding the recovery of individual
> members cannot defeat class certification where there are common questions
> concerning the defendant's alleged wrongdoing that must be resolved for all class
> members. *USA Check Cashers*, 349 Ark. 71, 76 S.W.3d 243.

*Id.* It is the element of Rule 23(b) predominance that GM contends is most lacking in this case.

The Court will address GM's contentions in turn.

I.    **Individual Inspections and Use Factors.**

20.    GM principally argues predominance is lacking because each class member's vehicle

must be inspected in order to determine whether a parking brake "failure" has occurred, and

because individual-use factors such as related component failure, rough road conditions,

excessive dirt in the brake, owner modification, lack of service or maintenance, overloading,

error by third-party service technician, or prior accident all may contribute to parking brake

"failure". GM attempts to shore up these arguments by claiming parking brake "failure" can

only be defined in ultimate, safety-related terms -- that is, as the parking brake's linings

excessively wearing to the point of not being able to hold a vehicle on a hill or grade. GM also

P2487

cites two Arkansas cases – *Mittry* and *Baker* – as establishing a rule that "where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member" Rule 23(b) predominance cannot be found. *Mittry v. Bancorpsouth Bank*, No. 04-829, 2005 Ark. LEXIS 6 (Ark. Jan. 6, 2005); *Baker v. Wyeth-Aherst Labs Division*, 338 Ark. 242, 992 S.W.2d 797, 800 (1999).

21.     The Court disagrees that Rule 23(b) predominance is lacking due either to a requirement of individual vehicle inspections, or the individual-use factors alleged by GM.  Both Mr. Bryant's pleadings and the evidence adduced demonstrate the primary alleged "failure" in the parking brake is the allegedly defective high-force spring clip retainer not permitting the shoe and attached linings to adequately float inside the brake drum.  The Court has seen nothing to convince it that this alleged defect is not present in all class vehicles, or that it doesn't occur or manifest itself each time a class vehicle is used.  To the contrary, and as stressed by Mr. Bryant a the class certification hearing, the alleged inadequate float problem appears to be something that is present in all class vehicles and which occurs each time a class vehicle is used.  This is because all class vehicles utilize the PBR 210x30 Drum-in-Hat park brake system, and GM has admitted in numerous documents, with little to no equivocation, that the inadequate float problem regarding that brake system is a real one.

22.     As for *Mittry* and *Baker*, even if those cases stand for what GM says they stand for, the presence of this common inadequate float problem negates GM's argument that there is no one set of operative facts that establishes liability, or no single proximate cause that equally applies

– 31 –

P2488

to each potential class member. For that reason, neither *Mittry* nor *Baker* gives the Court any pause whatsoever.[9]

23.    Even assuming *arguendo* the parking brake "failure" should, as GM says, be defined more broadly such that individual inspections for lining wear and/or consideration of individual use factors might be necessary, Rule 23(b) predominance still exists. The Court views any need for individual inspections and/or the individual use factors merely as individual determinations relating to right to recovery or damages that pale in comparison to the common issues surrounding GM's alleged defectively designed parking brake and cover up to avoid paying warranty claims. In *Seeco*, the Arkansas Supreme Court discussed the significance of such individual, right-to-recover determinations as follows:

> Challenges based on the statute of limitations, fraudulent concealment, releases, causation, or reliance have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability.

*Seeco, Inc. v. Hales*, 330 Ark. 402, 954 S.W.2d 234, 238 (1997) *quoting* 1 Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 4.26, at 4-104 (3d ed. 1992).[10]

24.    The predominance concerns arising from individual use factors or inspections are no different from the ones the Arkansas Supreme Court in recent years addressed and rejected in

---

[9]    As discussed in paragraph 18 of the Court's findings of fact, GM has also admitted the design of the PBR 210x30 Drum-in-Hat parking brake system with the high force spring clip retainer is ". . . .less than optimal because it is overly sensitive to proper lining-to-drum clearances." P. Exh. "2", GM000036107; P. Exh. "7"; P. Exh. "9", p. 11 of 13. In the Court's view, this is yet another potential defect in the parking brake system that existed from day one off the assembly line in all class vehicles, and which reveals itself each time class vehicles are driven. This alleged defect also defeats GM's argument that there is no common defect that uniformly harms Mr. Bryant and class members.

[10]    The identical excerpt from Professor Newberg's treatise is also cited for the same proposition in both *USA Check Cashers* and *Tay-Tay, Inc.* in support of the Arkansas Supreme Court's affirming the trial court's finding of predominance. *See USA Check Cashers of Little Rock, Inc.*, 76 S.W.3d at 249-250; *Tay-Tay, Inc. v. Young*, 349 Ark. 675, 80 S.W.3d 365, 372 (2002).

-- 32 --

P2489

*Seeco* and other cases.[11] Mr. Bryant relies on these cases in his briefing, and rightly so. GM has not convinced the Court these cases should not have direct bearing on the predominance analysis in this case.

25.    In fact, it appears the Arkansas Supreme Court in *Snowden* addressed and rejected an argument nearly identical to GM's regarding the need for individual inspections as they pertain to wrecked cars.[12] The inspections of wrecked cars in      *Snowden* were required to make an assessment of diminished value. The *Snowden* inspections, in the Court's view, are more individualized that anything that may be required in this case, as they required not only individual inspections, but individual, case-by-case damage calculations based on what was seen. By contrast, the Court understands Mr. Bryant to allege that new, non-defective low-force

---

[11]      See *Jacola*, 954 S.W.2d at 903; *Seeco*, 954 S.W.2d at 238; *Fraley v. Williams Ford Tractor & Equip. Co.*, 339 Ark. 322, 5 S.W.3d 423, 438 (1999); *BNL Equity*, 10 S.W.3d at 842-843; *Arkansas Blue Cross and Blue Shield v. Hicks*, 349 Ark. 269, 78 S.W.3d 58, 63 (2002); *Lenders II*, 2004 Ark. LEXIS 399 at **16-17; *American Abstract & Title Co. v. Rice*, No. 03-754, 2004 Ark. LEXIS 401 at **12-14 (July17, 2004); *Farmers Ins. Co., Inc. v. Snowden*, No. 05-527, 2006 Ark. LEXIS 298 at *19 (April 13, 2006).

[12]      In *Snowden* the plaintiff filed class action against defendant auto insurer claiming it had breached insurance contracts by refusing to pay, in addition to cost of repairs, diminished value of policyholders' automobiles that had endured collision damage. The trial court determined two predominating issues existed: 1) whether the Arkansas Personal Auto Policy in issue obligated the defendant to compensate insureds for diminished value; and 2) whether Plaintiff and class members had any obligations other than presenting their claim to Farmers to receive compensation for diminished value. In affirming the trial court's finding, the Court wrote

In the instant case, the class is made up of insureds who all had the same policy with Farmers. The overarching issue is whether the policy owned by all the insureds bound Farmers to pay proper claims for diminished value, which is a question that does not rely on factors such as meeting of the minds or when the contract was created. It is a question on which this case turns and is a strict question of Arkansas law and contract interpretation.

*Snowden*, 2006 Ark. LEXIS 298 at *19. In addressing the insurer's complaint that the damages each aggrieved policyholder suffered would be vastly different and thus defeat predominance, the Court responded,

As previously noted, the common questions in the instant case do not rely on individualized factors, rather they turn on Arkansas law and contract interpretation. The individualized factors, including the factors discussed by appellant's expert, are only relevant to the issue of damages, determining whether or not a certain insured has a valid claim for diminished value and is entitled to that compensation from Farmers.

*Id.* at **21-22.

— 33 —

spring retaining clips are necessary for all class members. No individual inspections are required for class members to obtain that relief. GM's inspection concern arises only because Mr. Bryant's contends that if the alleged defect has cause excessive lining wear as per GM's service bulletin or recall criteria, then lining replacement is also necessary. But the inspection of brake linings can occur in conjunction with the clip replacement, requires only a few measurements, and is a task Mr. Bryant asserts must occur anyway, incidental to the clip replacement. Moreover, the cost of new parking brake linings appears to be certain or fixed, unlike the diminution-in-value damages assessment discussed in *Snowden*. In sum, because the Arkansas Supreme Court found no unconquerable predominance problems in *Snowden* on the basis of individual inspections, the Court will find none in this case.

### II.    Potential Application of Multiple States' Laws.

26.    GM also insists that the potential application of multiple states' laws to create predominance concerns. The Court disagrees.

27.    First, beginning with *In re Prempro*, the cases GM cites for the proposition that application of multiple states' laws is necessary are all federal cases requiring a "rigorous analysis" of Fed. R. Civ. P. 23 class-certification factors, including the impact state-law variations has on predominance.[13] Importantly, the Arkansas Supreme Court requires no such "rigorous analysis". *Lenders II*, 2004 Ark. LEXIS 399 at *7-8 ("As stated in *Lenders I*, [Ark. R. Civ. P. 23] does not require the trial court to conduct a rigorous analysis; rather, the trial court

---

[13]    *E.g. In re Prempro Prod. Liab. Litig.*, 230 F.R.D. 555, 565 (E.D. Ark. 2005)("A class should not be certified until the district court has found through rigorous analysis, that all the prerequisites of Rule 23(a) have been satisfied.")(internal quotes omitted); *Zinser v. Accuflex Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001)("Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23."); *Spence v. Glock*, 227 F.3d 308, 313 (5th Cir. 2000)("Before *Castano*, then-Judge Ginsburg wrote that class action plaintiffs must provide an 'extensive analysis' of state law variations to reveal whether these pose "insuperable obstacles" to certification."); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1078-79 (6th Cir. 1996)("The Supreme Court has required district courts to conduct a rigorous analysis into whether the prerequisites of Rule 23 are met before certifying a class.")

-- 34 --

P2491

must undertake enough of an analysis to enable [the reviewing court] to conduct a meaningful review of the certification issue."); *Lender's Title Co. v. Chandler*, 353 Ark. 339, 107 S.W.3d 157 (2003)("Lender's I"); *Jacola*, 330 Ark. 261, 954 S.W.2d 901 ("We have not, as argued by the dissent, previously required the court to enter into the record a detailed explanation of why it concluded that certification was proper, and we refuse to impose such a requirement on the trial court at this time."). The Court prefers to follow Arkansas Supreme Court precedent in determining whether class certification is appropriate. GM's attempt to engraft a "rigorous analysis" requirement onto the elements of class certification under Ark. R. Civ. P. 23 is not well taken and is rejected.

28.      Second, the Court agrees with Mr. Bryant that trial judges in Arkansas have wide discretion to certify class actions. It also agrees with Mr. Bryant that trial courts have wide discretion to *manage* class actions. *BNL Equity Corp.*, 10 S.W.3d at 838. *BNL Equity* was a securities class action which, by all accounts, would require complex and individual inquiries into the level of knowledge each class member possessed about a fraudulent investment. The appellants, similar to GM regarding application of multiple states' laws here, "rais[ed] the spectre that with the potential for individual suits splintering on issues like investor knowledge, trial of the class action could unravel and turn into a procedural nightmare." *Id.* at 844. The Arkansas Supreme Court, however, viewed appellants' concern as no deterrent to predominance or superiority, or to class certification in general:

> We will not speculate on this eventuality. We simply hold that at this stage there is a common issue related to the appellants' conduct and liability that predominates over individual questions and renders a class action the superior method for litigating the matter.

*Id.* The Court in *BNL Equity* then observed:

-- 35 --

P2492

This court has recognized that the ability to manage and guide a class action is a necessary part of a trial court's decision to certify. *See International Union of Elec., Radio & Mach. Workers v. Hudson, supra.* We further have alluded to the substantial power in the trial court to manage a class action. *Id.; see also Summons v. Missouri Pac., R.R., supra.*

We have also noted the ability of the trial court to decertify should the action become too unwieldy. Rule 23 specifically contemplates that circumstance when it states: "An order under this section may be conditional and it may be altered or amended before the decision on the merits." Ark. R. Civ. P. 23(b). In the recent case of *Fraley v. Williams Ford Tractor & Equip. Co., supra,* we quoted from *Newberg On Class Actions* regarding the decertification option and the fact that this flexibility in the trial court is vital to "judicious use of the class device." *See I Newberg On Class Actions* § 7.47, at 146 (3d ed. 1992).

We have no hesitancy in placing the management of this class action in the trial court. That is what the rule contemplates, and, as already described, real efficiencies can be obtained by resolving common issues, both for the plaintiff class and the appellants. Were we, on the other hand, to speculate on class management or direct the trial court at this stage to present the parties with a management plan, we would be interfering in matters that clearly fall within the trial court's bailiwick.

*Id.* at 845. *BNL Equity*'s message is that an important component of a trial court's discretion to certify class actions is its autonomy or "substantial powers" to manage them. Thus trial courts are not required to justify their certification decisions by, for example, rigorously analyzing the Rule 23 certification elements. *Lenders II, Lender's I, Jacola, supra.* Nor are they required to justify certification decisions by creating detailed "management plan[s]" addressing how a case may be managed and tried. *BNL Equity, supra.*

29.    Importantly, the Arkansas Supreme Court alluded to trial court autonomy and "substantial [class management] powers" in addressing the precise issue GM now raises: application of multiple states' laws. *Security Benefit Life Ins. Co. v. Graham,* 306 Ark. 39, 810 S.W.2d 943 (1991). *Graham* involved a potential class of 1,419 annuitants residing in thirty-nine (39) different states. The annuitants claimed Security Benefit remained liable for annuity obligations because it never provided notice another company, now insolvent, had assumed the

-- 36 --

P2493

obligations. Security Benefit argued, in part, the doctrine of novation might provide it a defense, and claimed ". . . . the law of thirty-nine states relative to novation would have to be explored and [] would splinter the class action into individual lawsuits," thus creating Rule 23(b) predominance concerns. *Id.* at 945. The Court rejected the defendant's argument:

> The mere fact that choice of law may be involved in the case of some claimants living in different states is not sufficient in and of itself to warrant a denial of class certification. *C.f., Sun Oil Co.* v. *Wortman,* 486 U.S. 717 (1988). And though we are not convinced at this stage that reference to the laws of thirty-nine states will be necessary, should it be required, this does not seem a particularly daunting or unmanageable task for the parties or for the trial court.

*Id.* at 946. In footnote 18 of its Brief In Opposition GM contends "*Security Benefit* does not help Plaintiff. In that matter, the court determined that 'Arkansas law is the law to be applied' under the contract at issue." GM's contention is wrong. The choice of law issue confronted by the Court in *Graham* concerned novation; it did not, as GM says, center on a contractual term. *Id.* In any event, the Court in *Graham* clearly saw potential application of many states' laws as not germane to class certification. It instead viewed choice of law as a task for the trial court to undertake later in the course of exercising its autonomy and "substantial powers" to manage the class action.

30.    This leads the Court to its third reason why Arkansas law does not support GM's argument, especially GM's suggestion the Court must resolve the apparent choice of law dispute before class certification. Arkansas trial courts are not permitted to delve into the merits of a case in deciding whether to certify it as a class action. *BNL Equity, Fraley, supra.* In truth, there is no greater merits-intensive determination than the one regarding choice of law. Choice of law has everything to do with a case's merits. In many cases it is not briefed, analyzed and determined until the litigation's later stages. So it would be premature for the Court, at this stage in the case, to make the call on choice of law.

-- 37 --

P2494

31.     Fourth, and finally, it is not as if a decision to certify this matter as a class without resolving the choice of law issue will create incurable problems. The Arkansas Supreme Court has repeatedly stated ". . . .a circuit court can always decertify a class should the action become too unwieldy." *THE/FRE, Inc.*, 78 S.W. 3d 723; *USA Check Cashers of Little Rock, Inc. v. Island*, 349 Ark. 71, 76 S.W.3d 243, 248 (2002); *The Money Place v. Barnes*, 349 Ark. 518, 78 S.W. 3d 730 (2002); *F&G Fin. Servs. v. Barnes*, 349 Ark. 675, 80 S.W. 3d 365 (2002). If application of multiple states' laws is eventually required here, and it proves too cumbersome or problematic, the Court can consider decertifying the class. As noted in the Arkansas Supreme Court's *Fraley* decision:

> Rule 23 of the Arkansas Rules of Civil Procedure specifically states that "an order under this section may be conditional and it may be altered or amended before the decision on the merits." Ark. R. Civ. P. 23; *See also* NEWBERG ON CLASS ACTIONS, § 7.47. Class rulings are often reconsidered, and subsequently affirmed, altered, modified, or withdrawn. *Id.*
>
> > Although the court's initial decision under Rule 23(c)(1) that an action is maintainable on a class basis in fact may be the final resolution of the question, it is not irreversible and may be altered or amended at a later date. This power to change the class certification decision has encouraged many courts to be quite liberal in certifying a class when that decision is made at an early stage, noting that the action always can be decertified or the class description altered if later events suggest that it is appropriate to do so.
>
> WRIGHT, MILLER & KANE: FEDERAL PRACTICE & PROCEDURE 2D § 1785 at pp. 128-31 (2d Ed. 1986)(citations omitted). "The ability of a court to reconsider its initial class rulings . . . is a vital ingredient in the flexibility of courts to realize the full potential benefits flowing from the judicious use of the class device." NEWBERG ON CLASS ACTIONS, § 7.47 at pp. 7-146. Class action certification is necessarily an ongoing process in light of Rule 23's opt-out and decertification provisions.

*Fraley*, 5 S.W.3d at 438-39 (1999). A trial court's ability to decertify class actions is an additional component of its wide discretion to manage class actions. These flexible standards

— 38 —

P2495

likely frustrate GM, particularly as to its assertion that application of multiple states' laws will create Rule 23(b) predominance problems and frustrate management of this case. However, Mr. Bryant filed this case in an Arkansas state court, not in federal court. GM is therefore bound by Ark. Civ. P. 23 and the Arkansas Supreme Court decisions interpreting it.

### iii.    GM's Issues With Mr. Bryant's Proposed Trial Plan.

32.    Further contesting Rule 23(b) predominance and other Rule 23(b) elements, manageability in particular, GM contends Mr. Bryant's trial plan does not feasibly deal with potential state law variations, or supposed individual class member issues such as: notice of warranty breach; whether an individual's parking brake has been repaired under warranty; expiration of factory warranty based on mileage; individual knowledge of parking brake defect; fraud-related materiality and reliance; the entity to recover with regard to leased vehicles; application of statutes of limitation; comparative fault, if available; and the damages a given class member can recover.    GM argues all these factors create incurable Rule 23(b) predominance, superiority and manageability concerns. The Court disagrees with GM.

33.    As just discussed, now is not the time to decide whether the laws of multiple states will apply. Neither is Mr. Bryant required, at this juncture, to submit a detailed trial plan which the Court must analyze and adopt, reject or modify in determining whether class certification is proper. Nevertheless, for the sake of addressing GM's criticism of Mr. Bryant, the Court, in the past, has examined many of the variations in state warranty, fraudulent concealment and unjust enrichment laws GM contends here to be insurmountable.  While some legal variations may exist amongst different states, the Court does not perceive them to create any barrier to class certification. Second, in the event application and additional analysis of multiple states' laws yields a concern, it is important to note that Arkansas trial courts have multiple tools at their

P2496

disposal to negotiate matters such as state-law variations, as well as the supposed individual

issues GM complains of. Many of those tools, such as the option to decertify, have already

been discussed. But perhaps the most useful tool, not yet discussed, is case bifurcation:

> This court has repeatedly recognized that conducting a trial on the common issue in a representative fashion can achieve judicial efficiency. *See Summons v. Missouri Pac. R.R.*, 306 Ark. 116, 813 S.W.2d 240 (1991); *International Union of Elect., Radio & Mach. Workers v. Hudson*, 295 Ark. 107, 747 S.W.2d 81 (1988). Moreover, this court has routinely found the bifurcated process of class actions to be consistent with Rule 23(d), which allows the trial court to enter orders necessary for the appropriate management of the class action. *Mega Life*, 330 Ark. 261, 954 S.W.2d 898; *Hudson*, 295 Ark. 107, 747 S.W.2d 81. In fact, this court has expressed its approval for the bifurcated approach to the predominance element by allowing trial courts to divide the case into two phases: (1) certification for resolution of the preliminary, common issues; and (2) decertification for the resolution of the individual issues. *Mega Life*, 330 Ark. 261, 954 S.W.2d 898. The bifurcated approach has only been disallowed where the preliminary issues to be resolved were individual issues rather than common ones. *See Arthur v. Zearley*, 320 Ark. 273, 895 S.W.2d 928 (1995).

*Arkansas Blue Cross & Blue Shield v. Hicks*, 349 Ark. 269, 286, 78 S.W. 3d 58, 68 (2002). In

this case, numerous common issues exist and are suitable to resolve in a "phase I" trial. The

Court has previously described many of those issues, all centering on GM's alleged defective

design and subsequent cover up to avoid paying warranty claims.

34.    First, as Mr. Bryant discusses in his trial plan, given the identical wording in GM's

written warranty to him and class members, GM's express-warranty liability can be litigated

unconstrained by variations in state law warranty defect standards. In addition, despite what

GM argues, the Uniform Commercial Code ("UCC") as adopted and applied by all states except

Louisiana does provide uniform legal standards governing the sales of goods.[14] In particular, it

---

[14]     *See e.g. Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022-23 (9th Cir. 1998)("In this case, although some class members may possess slightly differing remedies based on state statute or common law, the actions asserted by the class representatives are not sufficiently anomalous to deny class certification. On the contrary, to the extent distinct remedies exist, they are local variants of a generally homogenous collection of causes which include products liability, breaches of express and implied warranties, and 'lemon laws.'"); *Cheminova Am. Corp. v.*

-- 40 --

provides a nearly universal defect standard for implied warranties: whether the defect renders the good in issue "fit for its ordinary purpose."[15] The issue of whether the parking brake defect meets or falls short of that standard is perfectly suitable for a "phase I" trial. Warranty causation can also be addressed during "phase I", especially given Mr. Bryant's contention, with which the Court agrees, that the parking brake "failure" at issue is the inadequate lining float. Because inadequate lining float is alleged to occur in each GM vehicle owned by class members, the causation question should be a universal, class-wide one. Finally, during "phase II" individual warranty-related concerns, if any, can be litigated. These include, without limitation, whether an individual class member has provided notice[16]; when, if at all, a class member's warranty expired due to mileage; the type of ownership a given class member

---

*Corker*, 779 So. 2d 1175, 1180 (Ala. 2000)("The principles of the Uniform Commercial Code ("U.C.C.") can be easily applied on a classwide basis. Under U.C.C. Article 2, some version of which has been adopted in all states except Louisiana, a description of a product on a label creates an express warranty."); *Tesauro v. Quigley Corp.*, No. 1011, Control 051340, 2002 WL 372947 at * 5-6, 9 (Pa. Com. Pl. Jan. 25, 2002)(certifying nationwide class of consumers who purchased "Cold-Eze" under implied warranty and unjust enrichment theories); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 957 (E.D. Tex. 2000)(recognizing the law under the UCC is uniform and that "[f]or decades, courts have certified [national] product defect class actions.").

[15]    As noted by one group of legal scholars:

> A multistate class action based on breach of implied warranty of merchantability need not be further subclassed because after the exclusion of relatively few states that still require vertical privity for economic loss claims (and also excluding used goods and business purchasers in a few other states), state implied warranty law under UCC §2-314(2)(c) (whether the product is "fit for the ordinary purposes") is uniform as incorporated by Magnuson-Moss (15 U.S.C. §2301(7)), both in terms of statutory language and judicial interpretation.

Brantley, Logan, and Moore, *Class Action Reports*, "Commonality of Applicable State Law In Nationwide or Multistate Class Actions – Breach of Implied Warranty", I. Introduction, p. 2 of 58 (2000).

[16]    However, because GM had actual notice of the parking brake issue in late 2000, well before Mr. Bryant and many class members purchased their vehicles, the Court does not agree with GM's contention that individual notice under UCC §2-607 is a required showing in this case, especially now that Mr. Bryant has given additional notice by filing suit. *E.g. Prutch v. Ford Motor Co.*, 618 P.2d 657, 661 (Colo. 1980)("When, as here, the purposes of the notice requirement have been fully served by actual notice, the notice provision should not operate as a technical procedural barrier to deny claimants the opportunity to litigate the case on the merits."); *City of Wichita v. U.S. Gypsum Co.*, 828 F. Supp. 851, 857 (D. Kan. 1993)("For example, "[a] comparably strict application of the notice requirement . . . may not be appropriate in a case involving a consumer's claim of breach.'") *rev'd on other grounds*, 72 F.3d 491 (10th Cir. 1996); *Shooshanian v. Wagner*, 672 P.2d 455, 462 (Alaska 1983)("We . . . are of the opinion that a complaint filed by a retail consumer within a reasonable period after goods are accepted satisfies the statutory notice requirement.").

-- 41 --

P2498

possesses (*eg.* purchase v. lease); and limitations-related issues. Warranty damages -- which the Court believes will be essentially uniform -- can also be addressed during a "phase II" trial.

35.    Next, as to Mr. Bryant's fraudulent concealment claim, during "phase I" Mr. Bryant can present evidence not only of GM's defective design, but also concerning GM's alleged later cover up to avoid paying warranty claims. Mr. Bryant may then submit jury interrogatories[17], appropriately accounting for state-law variations, if any, concerning non-individualized elements of fraudulent concealment, *ie.* GM's knowledge of the defect and its *scienter* (*ie.* whether its withholding of knowledge was done with the fraudulent purpose to induce class members to buy defective vehicles or avoid paying warranty claims). The more individualized issues of whether GM owed a given class member a duty to disclose or whether a particular class member relied on GM's failure to disclose can be reserved for a "phase II" trial. The issue of damages can also be reserved for "phase II".

36.    Finally, Mr. Bryant envisions trying nearly all elements of unjust enrichment in "phase I". The Court, at this point, cannot say this would be an altogether impossible task. During such a trial Mr. Bryant may present evidence not only of GM's alleged defective design, but also of its alleged cover up. Mr. Bryant may then submit jury interrogatories, appropriately accounting for state-law variations, if any, concerning the basic liability issue of whether GM was unjustly enriched by its alleged conduct. Mr. Bryant also believes that during "phase I" it can ask the jury, for purposes of disgorgement, to calculate the sum of money GM wrongfully retained. The jury in "phase I" may also make individual fault determinations regarding class members residing in states, if any, which recognize comparative fault or the like as a defense to unjust

---

[17]    "We have consistently held that the question of submitting special interrogatories to a jury is within the sound discretion of the trial court." *Shearer v. Morgan*, 240 Ark. 616, 623, 401 S.W.2d 21, 23 (1966) (citing *Missouri Pacific Transportation Co. v. Parker*, 200 Ark. 620, 140 S. W. 2d 997 (1940)).

P2499

enrichment.  Finally, the equitable division of the disgorged sum amongst deserving class members can be reserved for a "phase II" trial.

37.    GM attacks Mr. Bryant's bifurcated trial plan as unconstitutional under *Castano* and similar cases. *See Castano v. The American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996).  GM cites *Castano* for the Seventh Amendment "mandate" that "parties [] have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues." *Castano*, 84 F.3d at 750.  The Court agrees *Castano* provides authority for this general rule. *See also In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir.), *cert denied*, 133 L.Ed. 2d 122, 116 S.Ct. 184 (1995)("The right to a jury trial. . . .is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and no reexamined by another finder of fact.")  But the court in *Castano* also noted bifurcated trials are permissible when ". . . .[the] issues are so separable that the second jury will not be called upon to reconsider findings of fact by the first[.]" *Id.*   GM is not in a position argue Mr. Bryant's trial plan in this case is unconstitutional.  The reason is obvious: the final trial plan, if one is even required, has not been developed by the Court.  The issue is simply not ripe for determination.  Still, the trial plan Mr. Bryant has described, in the Court's view, creates no constitutional concerns at all.  Mr. Bryant contemplates trying fundamental or core liability issues in "phase I", leaving "phase II" for the individualized issues such as GM's affirmative defenses, reliance and the like.  In some cases damages may also be tried in "phase II."  The issues tried in each phase will be sufficiently separable; there will be no risk the jury in "phase II" will reconsider findings by the "phase I" jury.  The Court is confident it can, as Judge Posner described in *Rhone-Poulenc,* "carve at the joint" in such a way that the same issues are not reexamined by different juries.

-- 43 --

P2500

38.    In sum, Mr. Bryant's trial plan, while not necessary at this stage, is appropriate and adequately accounts for potential application of multiple states' laws. GM's arguments to the contrary are rejected.   The Court concludes Mr. Bryant has established Rule 23(b) predominance.

**G.    Rule 23(b) Superiority.**

39.    Rule 23(b) requires that a class action be superior to other available methods for the fair and efficient adjudication of the controversy.  Ark. R. Civ. P. 23(b); *see USA Check Cashers*, 349 Ark. at 71, 76 S.W.3d at 243.  The superiority requirement is satisfied if class certification is the more efficient way of handling the case, and it is fair to both sides.  *Id.*  The Arkansas Supreme Court has held that where a cohesive and manageable class exists, "real efficiency can be had if common, predominating questions of law or fact are first decided, with cases then splintering for the trial of individual issues, if necessary."  *BPS, Inc.*, 20 S.W.3d at 410; *Lender's II*, 2004 Ark. LEXIS at *18.  The Court, for several reasons, concludes Mr. Bryant has satisfied the Rule 23(b) requirement of superiority.

40.    First, the Arkansas Supreme Court affirmed the trial court's finding of superiority in *Jacola, Seeco, Fraley, BNL Equity, Hicks, Lenders II, American Abstract & Title Co.*, and *Snowden* cases cited in footnote 11, *supra*.  This speaks volumes to the wide discretion trial judges possess in deciding class certification issues, managing class trials, to superiority being found even where numerous individualized issues exist, and to the fact real efficiency can be gained by disposing of basic liability questions on a class-wide basis. *See Cheqnet Systems, Inc. v. Montgomery*, 322 Ark. 742, 911 S.W.2d 956, 960 (1995)("The question of predominance of common questions *and of superiority* are 'very much related to the broad discretion conferred on a trial court faced with them.'")(Citation omitted)(Emphasis added).  In its first modern-era

-- 44 --

P2501

class action opinion, *Hudson*, the Arkansas Supreme Court addressed all of these concepts thusly:

> By limiting the issue to be tried in a representative fashion to the one that is common to all, the trial court can achieve real efficiency. The common question here is whether the unions can be held liable for the actions of their members during the strike. If that question is answered in the negative, then the case is over except for the claims against the named individual defendants which could not be certified as a class action. If the question is answered affirmatively, then the trial court will surely have "splintered" cases to try with respect to the damages asserted by each member of each of the subclasses, but efficiency will still be achieved, as none of the plaintiffs would have to prove the unions' basic liability.

> Is that unfair? It is not unfair to the unions, as they will be able to defend fully on the basic liability claim, and they will have the opportunity to present individual defenses to the claims of individual class members if their liability has been established in the first phase of the trial. They lose nothing. Would it be fair to the class members to require them to sue individually? The evidence so far shows that each putative class member has a claim that is too small to permit pursuing it economically. If they cannot sue as a class, the chances are they will not sue at all. We agree with the unions' argument that the sole fact that the claims are small is not a reason to permit a class action, but it is a consideration which has appeared when other courts, as we must do, have considered whether the class action is superior to other forms of relief. *See* C. Wright, A. Miller, and M. Kane, *supra*, § 1779, n. 21, citing *Roper v. Consurve, Inc.*, 578 F.2d 1106 (5th Cir. 1978), affirmed on other grounds, sub nom. *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326 (1980); *Werfel v. Kramarsky*, 61 F.R.D. 674 (D.C.N.Y. 1974); and *Buchholtz v. Swift & Co.*, 62 F.R.D. 581 (D.C. Minn. 1973).

> We recognize that the trial court has substantial power to manage a class action even though the directions given in our Rule 23 are not as extensive as those given in the comparable federal rule. This power to manage the action contributes to the discretion we find in the trial court to determine whether a class should be certified. We conclude there was no abuse in this case.

*Int'l Union of Electrical, Radio, and Machine Workers v. Hudson*, 295 Ark. 107, 747 S.W.2d 81, 87 (1988).

41.    Second, the uniform relief sought by Mr. Bryant and the class is relatively small if sought on an individual basis. Accordingly, it is not economically feasible for members of the class to pursue GM on an individual basis. The Arkansas Supreme Court has recognized real

-- 45 --

P2502

efficiencies and benefits inure to plaintiffs and class members in small-individual-damages cases. *Lenders II*, 2004 Ark. LEXIS 399 at *18 ("The smallness of the claims is a factor to be considered in deciding superiority; however, it may not be the sole basis for certifying a class.")[18]; *BNL Equity*, 10 S.W.3d at 844.

42.     Third, the Arkansas Supreme Court has identified the possibility of multiple trials supplying inconsistent results and wasting judicial resources as a factor supporting rather than detracting from superiority. *Lenders II*, 2004 Ark. LEXIS 399 at *18 (". . . .we think it is apparent from the context that the inconsistent results envisioned by the trial court are those that would arise from the individual cases having to be tried in different courts, by different judges and juries. In this respect, the trial court's finding supports its conclusion on the criterion of superiority."); *BNL Equity*, 10 S.W.3d at 844 ("Furthermore, here the alternative to a class action would be numerous joinders, wholesale intervention, and several hundred small lawsuits which would be totally inefficient and wholly unmanageable. Surely, neither the parties nor the judicial system would benefit from a legion of lawsuits that are numerous, duplicative, and time consuming.").

43.     Fourth, the Arkansas Supreme Court has expressed concern that absent certification of a class "numerous meritorious claims might go unaddressed." *BNL Equity*, 10 S.W.3d at 844 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 86 L.Ed. 2d 628, 105 S.Ct. 2965 (1985). This principle is of unique importance here since, by GM's own admission, some population of owners of automatic-transmission class vehicles may not regularly use their parking brake and thus be aware of the defect. If nothing else, this class action will serve to alert class members

---

[18]     The fact attorney fees may be recoverable as a component of one or more asserted causes of action does not, in general, affect the superiority analysis. *Lender's II*, 2004 Ark. LEXIS 399 at *20 ("However, we do not view the availability of attorney's fees, standing alone, as negating the trial court's analysis on superiority.").

-- 46 --

P2503

that their parking brakes may be defective and need service. It would indeed be unfortunate for one or more class members to be deprived notice of the defect. Such deprivation could have harmful consequences.

44.     Fifth, even GM may derive substantial benefit from class certification. In *BNL Equity*, the Court wrote,

> We also note that there is a real benefit to the appellants in a class action in that they have the opportunity to nip multiple claims in the bud with common defenses such as the investors' knowledge of the investment purchased, lack of the appellants' knowledge concerning the misrepresentations, and statute of limitations. We conclude that the superiority requirement has been met.

*BNL Equity*, 10 S.W.3d at 844. There is no reason to believe GM cannot potentially achieve some of the same benefits the defendant in BNL achieved, post-certification.

45.     GM challenges Rule 23(b) superiority on manageability grounds. Apart from the potential application of multiple states' laws, which the Court has addressed, GM raises manageability concerns arising from the prospect of 4,000,000 individual trials having to be conducted in this matter.

46.     First, the Court does not believe for one moment that 4,000,000 individual, phase II trials will be conducted in this case. Among other things, potential opt outs and claims dismissed under a summary disposition procedure that can be developed will greatly reduce the number of potential phase II trials.

47.     Second, *Lenders II* concerned a class of 50,000 potential members and the Arkansas Supreme Court took no issue with it proceeding as a class action. *Lenders Title Co. v. Chandler*, No. 04-41, 2004 Ark. LEXIS 399 (Ark. June 17, 2004)("Lender's II"). In the Court's view, the prospect of trying 50,000 cases is no different, from a manageability standpoint, than trying a potentially greater number of cases.

-- 47 --

P2504

48.     Third, the fact GM's allegedly defective design has adversely affected so many consumers is not Mr. Bryant's fault. Mr. Bryant and the class should not be penalized for the widespread nature of GM's alleged defect and subsequent cover up. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 660-661 (7th Cir. 2004)("But although the district judge might have said more about manageability, the defendants have said nothing against it except that there are millions of class members. That is no argument at all. The more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class action 17 million suits each seeking damages of $15 to $30.").

49.     Finally, in at least in the context of discussing class definition, the Arkansas Supreme Court has rejected lack of administrative feasibility as an excuse to avoid class certification. *Lenders II*, 2004 Ark. LEXIS 399 at *11-12)("We are not persuaded by the argument that it is not administratively feasible for Lenders to have to manually review each of the more than 50,000 closing files to identify the class members. Instead, we agree with Chandler that Lenders should not be allowed to defeat class certification by relying on its inadequate filing and record system."). The Court believes the Arkansas Supreme Court would similarly reject GM's similar argument that class size, alone, counsels against a finding of Rule 23(b) predominance.

50.     GM also argues the NHTSA recall process is superior to Mr. Bryant's proposed class action. However, none of the cases GM's cites hold the availability of a NHTSA recall remedy *ipso facto* negates superiority. *See Amalgamated Workers Union v. Hess Oil Virgin Islands Corp.*, 478 F.2d 540, 543 (3rd Cir. 1973)("As we view it, it would appear [Federal Rule 23(b)(3)'s superiority component] was not intended to weigh the superiority of a class action

-- 48 --

against possible administrative relief."). Rather, the courts in each of these cases determined the class wasn't certifiable for other reasons, then mentioned – in dicta -- that the class members could still petition NHTSA.

51.    Here, there are multiple reasons why a class action is a superior method to resolve the claims of Mr. Bryant and the class. Moreover, as brought to light at the class certification hearing, the record reveals frustrated consumers have at least twice (most recently in mid 2006) petitioned NHTSA about the alleged parking brake defect in automatic transmission vehicles, and NHTSA rejected the petitions. Accordingly, the Court does not understand why GM believes NHTSA will provide a superior remedy to Mr. Bryant and class members. The Court concludes GM's NHTSA-based superiority argument has no merit. Mr. Bryant has established Rule 23(b) superiority.

**H.    The *Wallis* Matter.**

52.    The Court also takes note of GM's assertion in its briefing that Mr. Bryant's claims concerning the allegedly defective parking brake are not cognizable because they, at most, assert a "no injury" case against GM barred under the Arkansas Supreme Court's *Wallis* case. *Wallis v. Ford Motor Company*, No. 04-506, 2005 Ark. LEXIS 301 (May 12, 2005). The Court, however, is unwilling to rule on that assertion at this time for two reasons.

53.    First, the proper mechanism by which to raise such an assertion is either a motion to dismiss or motion for summary judgment. GM previously filed a motion to dismiss based on *Wallis*, among other things. But that motion is now moot, given the fact Mr. Bryant amended his pleadings before the class certification hearing.

54.    Second, the determination of whether class certification is appropriate is essentially procedural in nature. *BNL Equity Corp.*, 340 Ark. at 356-57, 10 S.W.3d at 841. Accordingly,

— 49 —

neither the trial court nor an appellate court may delve into the merits of the underlying claim when deciding whether the requirements of Rule 23 have been met. *Id.*; *Fraley*, 339 Ark. at 335, 5 S.W.3d at 431. The Court views the *Wallis* "no injury" issue to be inherently merits oriented and thus irrelevant to the class certification motion at hand.

## IV.

### Conclusion and Order

On the basis of the foregoing findings of fact and conclusions of law establishing Mr. Bryant has satisfied all class-certification elements in Ark. R. Civ. P. 23, the Court hereby GRANTS IN ALL THINGS Mr. Bryant's motion for class certification and ORDERS that the nationwide class of individuals described above (in paragraph III. A. 2.) is certified as a class for purposes of litigating this matter under Ark. R. Civ. P. 23. Mr. Bryant is appointed as class representative of the certified class and shall adhere to all duties such an appointment entails. In addition, the law firms of Patton, Roberts, McWilliams, & Capshaw, L.L.P. (James C. Wyly and Sean F. Rommel) and Bailey/Crowe & Kugler, L.L.P. (David Crowe and John Arnold) are appointed representative counsel to represent Mr. Bryant and the class in prosecuting this matter to final judgment. The Court, by separate order, will at some time in the near future issue a briefing schedule regarding the manner in which notice of class certification is to be given under Ark. R. Civ. P. 23(c) and/or (d).

Finally, the evidence the Court had before it in ruling on the issue of class certification was evaluated only in the context of considering the elements of Mr. Bryant's underlying claims in order to determine, for example, whether questions arising from those claims are common to the class and whether they will resolve the issue. *E.g. Williamson v. Sanofi Winthrop Pharmaceuticals, Inc.*, 347 Ark. 89, 98, 60 S.W.3d 428, 432 (2001). The Court has fully

— 50 —

P2507

complied with the general rule that trial courts are not to delve into the merits of the underlying

claims in determining whether class certification is appropriate. *BNL Equity, Fraley, supra.* In

ordering that class certification is appropriate in this case, the Court has not, in any way, made

findings of fact or conclusions of law regarding the merits of the claims or causes of action Mr.

Bryant has asserted in his pleadings.

**IT IS SO ORDERED** this 11th day of January, 2007.

JIM HUDSON, PRESIDING JUDGE

FILED

2007 JAN 11 P 4 10

MARY PARKEY, CIRCUIT CLERK

BY_____

DEPUTY

51                                                              P2508