FOR __3M__ COMPANY**

9-13-6
Date

Signature: Paul Narog
Name (print): Paul Narog
Title: Manager Env. Operations
Address: 900 Bush Ave.
St. Paul MN 55106
Bldg 42-2E-27, PoBox 33331
St. Paul, MN 55133-3381

Agent Authorized to Accept Service on Behalf of Above-signed Party:

David W. Reger, Esq.
Name (print): Donald J. Camerson II, Esq.
Title: Attorneys
Address: Bressler, Amery & Ross, P.C.
P.O. Box 1980
Morristown, NJ 07962
Ph. Number: (973) 514-1200

*/ A separate signature page must be signed by each corporation, individual or other legal entity
that is settling with the United States.

** Formerly known as Minnesota Mining and Manufacturing Company.

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 2 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 13 of 73

                                    Union Carbide Corporation
                        FOR _____ COMPANY, INC. */


  9/14/06                    Signature: _____
  Date                       Name (print): Sandi VanWormer
                             Title:  Authorized Representative
                             Address:  2030 Dow Center
                                       Midland, MI  48674
                                       _____
                                       _____


Agent Authorized to Accept Service on Behalf of Above-signed Party:


                             Name (print):  The Corporation Trust Company
                             Title:  Authorized Agent
                             Address: 820 Bear Tavern Rd 3rd Floor
                                      West Trenton, NJ 08628

                             Ph. Number:  _____


  */  A separate signature page must be signed by each corporation, individual or other legal entity
that is settling with the United States.

APPENDIX A

09-50026-mg   Doc 4655-3   Filed 12/11/09   Entered 12/11/09 17:02:37   Exhibit A
(part three)   Pg 4 of 63
Case 2:06-cv-06077-FSH-PS   Document 5-2   Filed 06/15/2007   Page 15 of 73

# RECORD OF DECISION

Operable Unit 2 - Soil and Groundwater

Horseshoe Road and Atlantic Resources Corporation Sites,

Sayreville Township, Middlesex County, New Jersey

United States Environmental Protection Agency

Region II

September 2004

## DECLARATION STATEMENT

### RECORD OF DECISION

## SITE NAME AND LOCATION

Horseshoe Road Site (EPA ID# NJD980663678)
Atlantic Resources Corporation Site (EPA ID# NJD981558430)
Sayreville Township, Middlesex County, New Jersey
Operable Unit 2 - Soil and Groundwater

## STATEMENT OF BASIS AND PURPOSE

This decision document presents the Selected Remedy for
contaminated soil and groundwater located on the Horseshoe Road
site and the neighboring Atlantic Resources Corporation site, in
Sayreville, Middlesex County, New Jersey.  The Selected Remedy
was chosen in accordance with the Comprehensive Environmental
Response, Compensation and Liability Act (CERCLA), as amended,
and to the extent practicable, the National Oil and Hazardous
Substances Pollution Contingency Plan (NCP).  This decision is
based on the Administrative Record file for these sites.

The State of New Jersey concurs with the Selected Remedy.

## ASSESSMENT OF THE SITE

The response actions selected in this Record Of Decision (ROD)
are necessary to protect public health or welfare or the
environment from actual or threatened releases of hazardous
substances from the sites into the environment.

## DESCRIPTION OF THE SELECTED REMEDY

The response action described in this document represents the
second of three planned remedial phases, or operable units, for
the Horseshoe Road and Atlantic Resources Corporation sites.  It
addresses soil and groundwater contamination at the sites.  The
previous ROD, signed in September 2000, addressed the demolition
of on-site buildings and structures.

The Selected Remedy described in this document involves the
excavation and off-site disposal of surface and subsurface soils,
and long-term groundwater monitoring and institutional controls
for groundwater.  The major components of the selected response
measure include:

- excavation of approximately 12,000 and 10,000 cubic yards of
  contaminated soil and debris on the Horseshoe Road and
  Atlantic Resources Corporation sites, respectively,

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 6 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 17 of 73

including an estimated 10,000 and 6,000 cubic yards of
deeper soils that act as a continuing source of groundwater
contamination on the Horseshoe Road and the Atlantic
Resources Corporation sites, respectively;

- off-site transportation and disposal of contaminated soil
  and debris, with treatment as necessary;

- off-site treatment of all RCRA-hazardous wastes prior to
  land disposal;

- backfilling and grading of all excavated areas with clean
  fill, with the exception of the Horseshoe Road Drum Dump
  area (HRDD), which would be graded to become part of the
  neighboring marsh;

- institutional controls, such as a deed notice or covenant,
  to prevent exposure to residual soils that may exceed levels
  that would allow for unrestricted use;

- institutional controls, including a Classification Exception
  Area, to restrict the installation of wells and the use of
  groundwater in the area of groundwater contamination; and

- implementation of a long-term groundwater sampling and
  analysis program to monitor the nature and extent of
  groundwater contamination at the sites, in order to assess
  the migration and possible attenuation of the groundwater
  contamination over time.

EPA evaluated alternatives for the remediation of groundwater
contamination found in the clay and silt substrate at the sites,
and concluded that no practicable alternatives could be
implemented. Consequently, EPA is invoking an Applicable or
Relevant and Appropriate Requirement (ARAR) waiver for the
groundwater at these sites due to technical impracticability.

## DECLARATION OF STATUTORY DETERMINATIONS

### Part 1: Statutory Requirements

The Selected Remedy is protective of human health and the
environment, complies with Federal and State requirements that
are applicable or relevant and appropriate to the remedial
actions to the extent practicable given the subsurface conditions
found at the sites, and is cost-effective. EPA has determined
that the Selected Remedy represents the maximum extent to which
permanent solutions and treatment technologies can be utilized in
a practicable manner at the sites. In addition, EPA is invoking

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 7 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 18 of 73

an ARAR waiver due to technical impracticability for groundwater
at these sites since groundwater remediation is not practicable.

## Part 2: Statutory Preference for Treatment

The Selected Remedy for groundwater will not meet the statutory
preference for the use of remedies that involve treatment as a
principal element. However, the soils that are determined to be
RCRA-hazardous will be treated at an off-site treatment facility.

## Part 3: Five-Year Review Requirements

This remedy will result in hazardous substances, pollutants, or
contaminants remaining on the Horseshoe Road and Atlantic
Resources Corporation sites above levels that would allow for
unlimited use and unrestricted exposure. Pursuant to Section
121(c) of CERCLA,, a statutory review will be conducted within
five years of the initiation of the remedial action to ensure
that the remedy is, or will be, protective of human health and
environment.

## ROD DATA CERTIFICATION CHECKLIST

The following information is included in the Decision Summary
section of this ROD. Additional information can be found in the
Administrative Record file for the two sites.

- Chemicals of concern and their respective concentrations may
  be found in the "Site Characteristics" section.

- Baseline risk represented by the chemicals of concern may be
  found in the "Summary of Site Risks" section.

- A discussion of cleanup levels for chemicals of concern may
  be found in the "Remedial Action Objectives" section.

- A discussion of source materials constituting principal
  threats may be found in the "Principal Threat Waste"
  section.

- Current and reasonably-anticipated future land use
  assumptions are discussed in the "Current and Potential
  Future Site and Resource Uses" section.

- A discussion of potential land use that will be available at
  the sites as a result of the Selected Remedy is discussed in
  the "Remedial Action Objectives" section.

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 8 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 19 of 73

- Estimated capital, annual operation and maintenance (O&M), and total present worth costs are discussed in the "Description of Alternatives" section.

- Key factors that led to selecting the remedies (i.e., how the Selected Remedy provides the best balance of tradeoffs with respect to the balancing and modifying criteria, highlighting criteria key to the decisions) may be found in the "Comparative Analysis of Alternatives" and "Statutory Determinations" sections.


*William McCabe*                            9-30-04

George Pavlou, Director                     Date
Emergency and Remedial
Response Division
EPA - Region II

-4-

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 9 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 20 of 73

APPENDIX B

09-50026-mg   Doc 4655-3   Filed 12/11/09   Entered 12/11/09 17:02:37   Exhibit A
(part three)   Pg 10 of 63
Case 2:06-cv-06077-FSH-PS   Document 5-2   Filed 06/15/2007   Page 21 of 73

### APPENDIX B
### STATEMENT OF WORK

Atlantic Resources Corporation Site, and
the Horseshoe Road Drum Dump Portion of the Horseshoe Road Site
Operable Unit 2
Sayreville, New Jersey

## I. WORK TO BE PERFORMED

"Work," as defined in Section IV of the Consent Decree (the "Consent Decree") to which this Statement of Work ("SOW") is attached means:

> [a]ll activities Settling Defendants are required to perform under this Consent Decree, except those required by Section XXV (Retention of Records). This definition of Work does not include remedial action at the HRDD [Horseshoe Road Drum Dump] Site.

The remedial action objectives for the Atlantic Resources Corporation Site ("ARC Site") and the Horseshoe Road Drum Dump ("HRDD") portion of the Horseshoe Road Site (hereinafter collectively referred to as "the Sites"), as set forth in the Environmental Protection Agency's (EPA's) September 30, 2004 Record of Decision (ROD) for Operable Unit 2 at the Sites, attached as Appendix A to the Consent Decree, are to:

- Reduce or eliminate the direct contact threat associated with contaminated soil to levels protective of a commercial or industrial use, and protective of the environment;

- Prevent public exposure to contaminated groundwater that presents a significant risk to human health and the environment;

- Minimize or eliminate contaminant migration to the groundwater and surface waters; and

- Minimize or eliminate organic vapor migration from groundwater into future indoor environments that may be built on the sites.

These objectives shall be met fully at the ARC Site through design and implementation of the remedy selected. The objectives will be met partially at HRDD because the Consent Decree provides for design of the remedy selected for HRDD, but not remedial action. The Settling Defendants shall finance and perform the Work in accordance with the Consent Decree, the ROD, and this SOW, including all terms, conditions and schedules set forth herein or developed and approved hereunder.

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 11 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 22 of 73

The major components of the Selected Remedy on the ARC Site follow:

- excavation of approximately 10,000 cubic yards of contaminated soil and debris, including an estimated 6,000 cubic yards of deeper soils that act as a continuing source of groundwater contamination;

- off-site transportation and disposal of contaminated soil and debris, with treatment as necessary;

- off-site treatment of all RCRA-hazardous wastes prior to land disposal;

- backfilling and grading of all excavated areas with clean fill;

- institutional controls, such as a deed notice or covenant, to prevent exposure to residual soils that may exceed levels that would allow for unrestricted use;

- institutional controls, including a Classification Exception Area, to restrict the installation of wells and the use of groundwater in the area of groundwater contamination; and

- implementation of a long-term groundwater sampling and analysis program to monitor the nature and extent of groundwater contamination at the Sites, in order to assess the migration and possible attenuation of the groundwater contamination over time.

The major components of the Selected Remedy for the HRDD:

- excavation of approximately 13,500 cubic yards of fill, contaminated soil, and debris ;

- off-site transportation and disposal of contaminated soil and debris, with treatment as necessary;

- off-site treatment of all RCRA-hazardous wastes prior to land disposal;

- grading with backfilling as necessary, of the drum dump area to become part of the neighboring marsh;

- institutional controls, such as a deed notice or covenant, to prevent exposure to residual soils that may exceed levels that would allow for unrestricted use;

- institutional controls, including a Classification Exception Area, to restrict the installation of wells and the use of groundwater in the area of groundwater contamination; and

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 12 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 23 of 73

- implementation of a long-term groundwater sampling and analysis program to monitor the nature and extent of groundwater contamination at the Sites, in order to assess the migration and possible attenuation of the groundwater contamination over time.

## II. PERFORMANCE STANDARDS

The Remedial Design (RD) shall be designed to achieve compliance with the Performance Standards, which shall include and be consistent with the requirements set forth in the Remedial Action (RA) Objectives section of the ROD, including cleanup levels found in the ROD tables. The RD shall also be designed to achieve compliance with all legally applicable and relevant and appropriate requirements (ARARs), including but not limited to substantive requirements promulgated under the Resource Conservation and Recovery Act (RCRA), the New Jersey Technical Requirements for Site Remediation, N.J.A.C. 7-26E et. seq., and applicable local requirements. For state and local requirements, only those substantive requirements that are more stringent than federal requirements and that do not conflict with the Comprehensive Environmental Response, Compensation , Liability, Act of 1980 (CERCLA) are ARARs.

## III. PROJECT SUPERVISION/MANAGEMENT, PROJECT COORDINATOR

### 1. SUPERVISING CONTRACTOR

The RD, RA, and any other technical work performed by Settling Defendants pursuant to this Consent Decree shall meet any and all requirements of applicable federal, state and local laws and be performed under the direction and supervision of a qualified licensed professional engineering firm. Within ten (10) calendar days after lodging of this Consent Decree, Settling Defendants shall notify EPA, in writing, of the name, title, proposed responsibilities and qualifications of the Supervising Contractor. All plans and specifications shall be prepared under the supervision of, and signed/certified by, a licensed New Jersey professional engineer. Selection of the Supervising Contractor shall be subject to approval by EPA.

### 2. PROJECT COORDINATOR

Within twenty (10) calendar days after lodging of this Consent Decree, Settling Defendants shall notify EPA, in writing, of the name and title of the Project Coordinator who may be an employee of the Supervising Contractor. The Project Coordinator shall be responsible for the day to day management of all Work to be performed pursuant to this Consent Decree. The Project Coordinator shall have adequate technical and managerial experience to manage all Work described in this Statement of Work and under this Consent Decree. The Project Coordinator shall be knowledgeable at all times about all matters relating to activities regarding the RD and RA. The Project Coordinator shall be the primary contact for EPA on all matters relating to Work at the

Sites and should be available for EPA to contact during all working days. The Project Coordinator shall not be an attorney.

## IV. REMEDIAL DESIGN ACTIVITIES

The RD activities to be performed in the implementation of the selected remedy for the Sites include, but are not limited to, the following:

A. Conduct soil sampling on the Sites to characterize the extent of contaminated material that needs to be removed to satisfy the RA objectives. The sampling will include testing for RCRA characteristic wastes as well as contaminants for which EPA has established cleanup goals.

B. Develop plans and specifications to excavate contaminated surface and subsurface soils which exceed cleanup goals specified in the ROD. Plans should describe measures that will be taken to avoid damage to MCUA force mains that run beneath portions of the Sites.

C. Develop plans and specifications to transport excavated soil to an off-site facility for disposal (The transport route shall avoid using the residential portion of Horseshoe Road). Plans should anticipate shipment of RCRA characteristic waste to a RCRA facility when encountered.

D. Develop plans and specifications to backfill excavated areas on the Atlantic Resources Site.

E. Develop plans and specifications to grade, and backfill if necessary, the HRDD area to the level of the surrounding marsh and restore wetland vegetation.

F. Develop plans and specifications for the performance of air monitoring during construction/remedial activities at the Sites to ensure that air emissions resulting from the activities meet applicable or relevant and appropriate air emission requirements.

G. Develop plans to implement institutional controls that will protect future site users from contamination left on-site.

H. Develop plans and specifications for the performance of groundwater monitoring to ensure that groundwater contamination is contained on-site and does not significantly impact down-gradient resources.

## V. REMEDIAL DESIGN WORK PLAN

Within sixty (60) days of the date on which Settling Defendants receive written notification from EPA of the approval of the Supervising Contractor, Settling Defendants

shall submit a detailed RD Work Plan for the design of the selected remedy to EPA for review and approval. The RD Work Plan shall provide for the collection of all data needed for performing the necessary RD activities.

The Work Plan shall comply with CERCLA and relevant EPA guidance, including the EPA document entitled Guidance on Oversight of Remedial Designs and Remedial Actions performed by Potentially Responsible Parties, (OSWER directive 9355.5-01, EPA/540/g-90-001), dated April 1990 and shall be in conformance, inter alia, with the Superfund Remedial Design and Remedial Action Guidance, dated June 1986, and other relevant EPA guidance documents.

The RD Work Plan shall include plans and schedules for implementation of RD tasks, and shall include, but not be limited to, the following items listed in V.A.-C. below:

A. Quality Assurance/Quality Control Project Plan

A Quality Assurance/Quality Control Project Plan (QAPP) shall be prepared consistent with EPA Requirements for Quality Assurance Project Plans for Environmental Data Operations, (EPA QA/R-5, October 1998), and shall include the following elements:

1.    A detailed description of the sampling, analysis, and monitoring that shall be performed during the RD phase, consistent with this SOW, the ROD, and the Consent Decree. At a minimum, the QAPP shall provide a plan for sampling surface and subsurface soils to define the specific limits of the contamination.

2.    All sampling, analysis, data assessment, and monitoring shall be performed in accordance with the Region II CERCLA Quality Assurance Manual, Revision 1, EPA Region 2, dated October 1989, and any updates thereto and the guidelines set forth in the Consent Decree. All testing methods and procedures shall be fully documented and referenced to established methods or standards.

3.    The QAPP shall also specifically include the following items:

a.    An explanation of the way(s) the sampling, analysis, and monitoring will produce data for the RD phase;

b.    A detailed description of the sampling, analysis, and testing to be performed, including sampling methods, analytical and testing methods, sampling locations and frequency of sampling;

c.    A map depicting sampling locations; and

d.    A schedule for performance of specific tasks.

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 15 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 26 of 73

4.    In the event that additional sampling locations and analyses are utilized or required, Settling Defendants shall submit to EPA an addendum to the QAPP for approval by EPA.

5.    The QAPP shall address the following elements:

Project Management

a.    Title and Approval Sheet
b.    Table of Contents and Document Control Format
c.    Distribution List
d.    Project/Task Organization and Schedule
e.    Problem Definition/Background
f.    Project/Task Description
g.    Quality Objectives and Criteria for Measurement Data
h.    Special Training Requirements/Certification
i.    Documentation and Records

Measurement/Data Acquisition

j.    Sampling Process Design
k.    Sampling Methods Requirements
l.    Sample Handling and Custody Requirements
m.    Analytical Methods Requirements
n.    Quality Control Requirements
o.    Instrument/Equipment Testing, Inspection, and Maintenance Requirements
p.    Instrument Calibration and Frequency
q.    Inspection/Acceptance    Requirements    for    Supplies    and Consumables
r.    Data Acquisition Requirements (Non Direct Measurements)
s.    Data Management

Assessment/Oversight

t.    Assessments and Response Actions
u.    Reports to Management

Data Validation and Usability

v.    Data Review, Validation, and Verification Requirements
w.    Validation and Verification Methods
x.    Reconciliation with Data Quality Objectives

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 16 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 27 of 73

6.    In order to provide quality assurance and maintain quality control with respect to all samples to be collected, Settling Defendants shall ensure the following:

a.    Quality assurance and chain-of-custody procedures shall be performed in accordance with standard EPA protocol and guidance, including the Region II CERCLA Quality Assurance Manual, Revision 1, EPA Region 2, dated October 1989, and any updates thereto, and the guidelines set forth in this Consent Decree.

b.    The laboratory to be used must be specified. If the laboratory participates in the Contract Laboratory Program (CLP), for the analyses to be performed for this investigation, then project specific Performance Evaluation (PE) samples will not be required. If the proposed laboratory does not participate in the CLP, then PE samples must be analyzed to demonstrate the capability to conduct the required analysis prior to being approved for use. Once a non-CLP laboratory has been selected, the laboratory should submit a copy of their Laboratory Quality Assurance Program Plan to EPA for review and approval.

For any analytical work performed at a non-CLP laboratory, including that done in a fixed laboratory, in a mobile laboratory, or in on site screening analyses, Settling Defendants must submit to EPA a "Non-CLP Superfund Analytical Services Tracking System" form for each laboratory utilized during a sampling event, within thirty (30) days after receipt of the analytical results. Upon completion, such documents shall be submitted to the EPA Project Coordinator, with a copy of the form and transmittal letter to:

Regional Sample Control Center Coordinator
EPA Region 2
Division of Environmental Science & Assessment
2890 Woodbridge Avenue, Bldg. 209, MS-215
Edison, NJ  08837

c.    The laboratory utilized for analyses of samples must perform all analyses according to accepted EPA methods as documented in the Contract Lab Program Statement of Work for Organic Analysis, (OLM04.2) or the latest revision, and the Contract Lab Program Statement of Work for Inorganic Analysis, ( ILM04.0) or the latest revision, or other EPA approved methods.

d.    Unless indicated otherwise in the approved QAPP, all data will be validated upon receipt from the laboratory.

e.    Unless indicated otherwise in the approved QAPP, submission of the validation package (checklist, report, and Form I containing the final data) to EPA, prepared in accordance with the provisions of Subparagraph g., below.

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 17 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 28 of 73

f.      Assurance that all analytical data that are validated as required by the QAPP are validated according to the procedures stated in the EPA Region II Contract Lab Program Organics Data Review and Preliminary Review (SOP #HW-6, Revision 11), dated June 1996, or the latest revision, and the Evaluation of Metals Data for the Contract Laboratory Program (SOP #HW-2, Revision 11), dated January 1992 or the latest revision, or EPA-approved equivalent procedures.      Region 2 Standard Operating Procedures are available at: http://www.epa.gov/region02/smb/sops.htm

g.      Unless indicated otherwise in the approved QAPP, Settling Defendants shall require deliverables equivalent to CLP data packages from the laboratory for analytical data. Upon EPA's request, Settling Defendants shall submit to EPA the full documentation (including raw data) for this analytical data. EPA reserves the right to perform an independent data validation, data validation check, or qualification check on generated data.

h.      Settling Defendants shall insert a provision in its contract(s) with the laboratory utilized for analyses of samples, which will require granting access to EPA personnel and authorized representatives of  EPA for the purpose of ensuring the accuracy of laboratory results related to the Sites.

B.  Health and Safety Contingency Plan (HSCP)

A Health and Safety Contingency Plan (HSCP) for all activities performed under the Consent Decree shall be developed by Settling Defendants to address the protection of public health and safety and the response to contingencies that could impact public health, safety, and the environment. The HSCP shall satisfy the requirements of the Occupational Safety and Health Guidance for Hazardous Waste Site Activities, (June 1990, DHHS NIOSH Publication No. 90-117), and the Occupational Safety and Health Administration, U.S. Department of Labor (OSHA) requirements cited below:

1.      All site activities shall be performed in such a manner as to ensure the safety and health of personnel so engaged. All site activities shall be conducted in accordance with all pertinent general industry (29 CFR Part 1910) and construction (29 CFR Part 1926) OSHA standards, and EPA's Standards Operating Safety Guides (OSWER, 1988), as well as any other applicable State and municipal codes or ordinances. All site activities shall comply with those requirements set forth in OSHA's final rule entitled Hazardous Waste Operations and Emergency Response, 29 CFR §1910.120, Subpart H.

2.      The HSCP shall include, at a minimum, the following elements:

a.      Plans showing the location and layout of any temporary facilities to be constructed on or near the Sites;

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 18 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 29 of 73

b.    Description of the known hazards and evaluation of the risks associated with the Sites and the potential health impacts related to the site activities;

c.    List of key personnel and alternates responsible for site safety, response operations, and protection of the public;

d.    Description of levels of protection (based on specified standards) to be utilized by all personnel;

e.    Delineation of Work, decontamination, and safe zones, and definitions of the movement of zones;

f.    Description of decontamination procedures for personnel and equipment, and handling and removal of disposable clothing or equipment;

g.    Incidental emergency procedures which address emergency care for personnel injuries and exposure problems, and containment measures. These procedures shall include evacuation routes, internal and external communications procedures for response to fire, explosion, or other emergencies, the name of the nearest hospital and the route to that hospital. Local agencies with the capability to respond to emergencies shall be identified and their capabilities shall be described. A description of the procedures for informing the community of these measures shall be outlined.

h.    Description of the personnel medical surveillance program in effect;

i.    Description of monitoring for personnel safety;

j.    Description of routine and special personnel training programs; and

k.    Description of an air monitoring program to determine concentrations of airborne contaminants to which workers on-site and persons near the site boundary may be exposed. The results of work-zone air monitoring may be used as a trigger for implementing site-boundary air monitoring, additional control measures, and/or cessation of work.

C.  Description of Remedial Design Tasks

The RD Work Plan shall include a detailed description of all other RD tasks (see Sections IV. and V., above) to be performed, along with a schedule for performance of those tasks. Such tasks shall include, at a minimum, the preparation of the RD Reports required by Section VII., below, and tasks necessary to ensure compliance with ARARs, as outlined herein and in the ROD. The RD Work Plan shall include an outline of the requirements of the RD Reports.

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 19 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 30 of 73

1.    Access and Other Approvals

The RD Work Plan shall include descriptions of any approvals which Settling Defendants will need to comply with the Consent Decree, with the exception of those approvals needed from the EPA. This description shall detail how such approvals will be sought, and shall include a schedule for obtaining all necessary approvals. Such approvals shall include the consent of owners of property at or near the site regarding access to conduct sampling, monitoring, remediation, restoration or other activities, in accordance with the Consent Decree, and approval from any off-site facility accepting waste materials from the Sites. This description shall be amended if subsequent approvals are required.

2.    Remedial Design Schedules, Draft Schedule for Remedial Action, and Monitoring

The RD Work Plan shall include a schedule covering all RD activities, including but not limited to, the submittal of the RD Reports listed in Section VII., below. The RD Work Plan shall also include a draft schedule for RA and monitoring activities. The schedule shall be in the form of a task/subtask activity bar chart or critical path method sequence of events.

The draft schedule for RA and monitoring activities may be revised during the remedial process, subject to the EPA's approval.

The RD schedule shall provide for completion and submittal to EPA of the Final RD Report within ten (10) months of EPA's written approval of the RD Work Plan.

The draft schedule for the RA for the ARC Site shall provide for completion of the submittal to EPA of the Final RA Report within eighteen (18) months of EPA's written notification of approval of the RA Work Plan or entry of the Consent Decree, whichever is later.

## VI. APPROVAL OF REMEDIAL DESIGN WORK PLAN

EPA will either approve the RD Work Plan, or require modification of such plan, in accordance with the procedures set forth in Section XI of the Consent Decree. Settling Defendants shall implement the EPA-approved RD Work Plan in accordance with the schedules contained therein.

## VII. REMEDIAL DESIGN

Settling Defendants shall perform the RD activities in conformance with the RD Work Plan approved by the EPA and within the time frames specified in the RD schedule contained therein. The RD shall include the preparation of a Preliminary RD Report (35% completion), a pre-final RD Report (95% completion) and a Final RD Report (100% completion).

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 20 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 31 of 73

A. Preliminary, Pre-Final and Final Remedial Design Reports

The reports shall be submitted to the EPA and NJDEP in accordance with the schedule set forth in the approved RD Work Plan. Each RD report shall include a discussion of the design criteria and objectives, with emphasis on the capacity and ability to meet design objectives successfully. Each report shall also include the plans and specifications that have been developed at that point in time, along with a design analysis. The design analysis shall provide the rationale for the plans and specifications, including results of all sampling and testing performed, supporting calculations and documentation of how these plans and specifications will meet the requirements of the ROD and shall provide a discussion of any impacts these findings may have on the RD. The design reports shall also include the following items (to the extent that work has been performed regarding the items):

    1.    A technical specification for photographic documentation of the remedial construction work;

    2.    A discussion of the manner in which the RA will achieve the Performance Standards;

    3.    A plan for establishing institutional controls (i.e., deed restrictions); and

    4.    A draft schedule for RA activities, and a preliminary schedule for monitoring activities.

B. Additional Preliminary Remedial Design Report Requirements

The preliminary RD report shall include; the design criteria, a discussion and evaluation of the RD activities listed under Section IV., above, and their results, preliminary design drawings showing general arrangement of all RA work planned, and, to the extent available, items C.1. and C.2 below.

C. Additional Pre-Final and Final Remedial Design Report Requirements

The pre-final and final RD reports shall include final plans and specifications, and, shall also include:

    1.    A discussion of the manner in which the design components detailed in Section IV., above, for the RA are considered in the design;

    2.    Table of Contents for the specifications, including a listing of items from the Construction Specifications Institute master format that are expected to be included in the construction specifications. This master format is presented in

the Construction Specifications Institute's Manual of Practice, 1985 edition, available from the Construction Specifications Institute, 601 Madison Street, Alexandria, Virginia 22314;

    3.    Engineering plans representing an accurate identification of existing site conditions and an illustration of the work proposed. Typical items to be provided on such drawings include, at a minimum, the following:

        a.    Title sheet including at least the title of the project, a key map, the name of the designer, date prepared, sheet index, and EPA/NJDEP Project identification;

        b.    All property data including owners of record for all properties within 200 feet of the Sites;

        c.    A site survey including the distance and bearing of all property lines that identify and define the project site;

        d.    All easements, rights of way, and reservations;

        e.    All buildings, structures, wells, facilities, and equipment (existing and proposed) if any;

        f.    A topographic survey, including existing and proposed contours and spot elevations for all areas that will be affected by the remedial activities, based on U.S. Coast and Geodetic Survey data;

        g.    All utilities, existing and proposed;

        h.    Location and identification of all significant natural features including, inter alia, wooded areas, water courses, wetlands, flood hazard areas, and depressions;

        i.    Flood hazard data and 100-year and 500-year flood plain delineation;

        j.    North arrow, scale, sheet numbers and the person responsible for preparing each sheet;

        k.    Decontamination areas, staging areas, borrow areas and stockpiling areas;

        l.    Miscellaneous detail sheets;

        m.    Definitions of all symbols and abbreviations; and

09-50026-mg   Doc 4655-3   Filed 12/11/09   Entered 12/11/09 17:02:37   Exhibit A
(part three)   Pg 22 of 63
Case 2:06-cv-06077-FSH-PS   Document 5-2   Filed 06/15/2007   Page 33 of 73

n.   A specification for a sign at the site. The sign should describe the project, the name of the contractor performing the RD/ RA work or the PRP Group, state that the project is being performed under EPA oversight, and provide EPA contact for further information.

4.   Survey work that is appropriately marked, recorded and interpreted for mapping, property easements and design completion;

5.   Drawings of all proposed equipment, improvements, details and all other construction and installation items to be developed in accordance with the current standards and guidelines of the State of New Jersey. Drawings shall be of standard size, approximately 24" x 36". A list of drawing sheet titles will be provided;

6.   Engineering plans (as necessary) indicating, at a minimum, the following:

a.   Site security measures;

b.   Roadways; and

c.   Electrical, mechanical, structural, as required.

7.   Any value engineering proposals.

8.   A Construction Quality Assurance Project Plan (CQAPP), which shall detail the approach to quality assurance during construction activities at the Sites, shall specify a quality assurance official (QA Official), independent of the RA Contractor, to conduct a quality assurance program during the construction phase of the project. The CQAPP shall address sampling, analysis, and monitoring to be performed during the remedial construction phase of the Work. Quality assurance items to be addressed include, at a minimum, the following:

a.   Inspection and certification of the Work;

b.   Measurement and daily logging;

c.   Field performance and testing;

d.   As built drawings and logs; and

e.   Testing of the RA Work to establish whether the design specifications have been attained.

9.    A report describing those efforts made to secure access and institutional controls and obtain other approvals and the results of those efforts (see Sections IV. G., and V.C., above).   Legal descriptions of property or easements to be acquired shall be provided, along with the final engineer's construction cost estimate.

10.    A plan for implementation of construction and construction oversight.

11.    A method for selection of the construction contractor(s).

12.    An engineer's construction cost estimate (final estimate shall be included in Final RD).

13.    A proposed schedule for implementing all of the above.

## VIII.  APPROVAL OF REMEDIAL DESIGN REPORTS

A.    EPA will review and comment on the RD Reports.  Settling Defendants shall make those changes required by the EPA's comments/modifications in accordance with the procedures set forth in Section XI of the Consent Decree.

B.    Changes required by EPA's comments on the Preliminary RD Report shall be made in the Pre-final RD Report.  Changes required by EPA's comments on the Pre-final RD Report shall be made in the Final RD Report.

C.    EPA will either approve the Final RD Report or require modifications, in accordance with the procedures set forth in Section XI of the Consent Decree.

## IX.  REMEDIAL ACTION

A.    Within sixty (60) days of EPA's approval of the Final Design Report, Settling Defendants shall award a contract for the RA at the ARC Site, Settling Defendants shall notify EPA in writing of the name, title, and qualifications of any construction contractor proposed to be used in carrying out work under this Consent Decree. With respect to any proposed construction contractor, Settling Defendants shall demonstrate that the proposed construction contractor has a quality system that complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs (American National Standard, January 5, 1995), by submitting a copy of the proposed project manager's QMP.  The QMP should be prepared in accordance with the specifications set forth in "EPA Requirements for Quality Management Plans (QA/R-2)," (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by EPA.  EPA shall thereafter provide written notice of the name(s) of the contractor(s) it approves, if any.  Settling Defendants may select any approved contractor from that list and shall notify EPA of the name of the contractor selected within twenty one (21) days of EPA's designation of approved

contractors. If at any time Settling Defendants proposes to change the construction contractor, Settling Defendants shall notify EPA and shall obtain approval from EPA as provided in this paragraph, before the new construction contractor performs any work under this Consent Decree. If EPA disapproves of the selection of any contractor as the construction contractor, Settling Defendants shall submit a list of contractors that would be acceptable to them to EPA within thirty (30) days after receipt of EPA's disapproval of the contractor previously selected.

B.      Within sixty (60) days of the award of the RA contract, Settling Defendants shall submit an RA Work Plan for remedial construction activities at the ARC Site. The RA Work Plan shall include, at a minimum, the following items:

i)      If applicable, a "Request for Modification of Approved Final RD Report," including any requests for modification of the approved Final Design Report, based on construction methods identified by the contractor(s), or proposed modification of the construction schedule developed under Section VII., above, or any other requests for modification, subject to EPA approval in its sole discretion.

ii)      A Site Management Plan (SMP) for RA activities. The SMP for RA shall include, at a minimum, the following items:

(1)      Tentative identification of the RA Project Team (including, but not limited to the Construction Contractor).

(2)      A final schedule for the completion of the RA and all major tasks therein, as well as a schedule for completion of required plans, and other deliverables (see Section V. C., above).

(3)      Methodology for implementation of the Construction Quality Assurance Project Plan (developed during the RD).

(4)      Procedures and plans for the decontamination of construction equipment and the disposal of contaminated materials.

(5)      Methods for satisfying any permitting requirements.

(6)      Discussion of the methods by which construction operations shall proceed. Discussion shall include the following:

(a)      Timing of and manner in which activities shall be sequenced;

(b)      Preparation of the Sites including security, utilities, decontamination facilities, construction trailers, and equipment storage;

(c)      Coordination of construction activities;

(d)    Site maintenance during the RA;

(e)    Coordination with local authorities regarding contingency planning and potential traffic obstruction; and

(f)    Entry and access to the Sites during the construction period(s) and periods of inactivity, including provisions for decontamination, erosion control, and dust control.

(7)    Identification of all off-site facilities to which site material will be sent, and description, for each facility, of the proposed materials for disposal and method of management of those materials.

(8)    Implementation of the photograph/slide plan to record the progress of the remedial construction work.

(9)    Discussion of construction quality control, including:

(a)    Methods of performing the quality control inspections, including when inspections should be made and what to look for;

(b)    Control testing procedures for each specific test. This includes information which authenticates that personnel and laboratories performing the tests are qualified and the equipment and procedures to be used comply with applicable standards;

(c)    Procedures for scheduling and managing submittals, including those of subcontractors, off-site fabricators, suppliers, and purchasing agents;

(d)    Reporting procedures including frequency of reports and report formats; and

(e)    Procedures to be used to determine whether performance standards are being achieved, and reporting procedures and frequency for results of such testing.

(iii)    A Quality Assurance/Quality Control Project Plan (QAPP) for the Remedial Construction phase of the Work shall be prepared consistent with EPA Requirements for Quality Assurance Project Plans for Environmental Data Operations, (EPA QA/R-5, October 1998) (see Section V. A., above, for QAPP requirements).

(iv)    An updated HSCP for the RA phase of the Work (see Section V. B., above, for HSCP requirements). The HSCP shall address health and safety measures to be implemented and observed by construction personnel, as well as

recommended health and safety measures for the adjacent community and general public. The HSCP shall include the name of the person responsible in the event of an emergency situation, as well as the necessary procedures that must be taken in the event of an emergency, as outlined in the Consent Decree.

C. Approval of Remedial Action Work Plan

EPA will either approve the RA Work Plan or require modification of it in accordance with the procedures set forth in Section XI of the Consent Decree.

D. Performance of Remedial Action

i)      Upon the EPA's written approval of the RA Work Plan for the ARC Site, Settling Defendants shall initiate and perform the remedial action in accordance with the RA Work Plan and the approved Final Design Report, which includes the approved RA schedule.

ii)     During performance of the RA, Settling Defendants may identify and request EPA approval for field changes to the approved RA Work Plan for the ARC Site, Final Design Report and RA schedule, as necessary, to complete the work. EPA will either approve, disapprove, or require modification of any requests for field changes in accordance with the procedures set forth in Section XI of the Consent Decree.

## X. PRE-FINAL AND FINAL INSPECTIONS, REMEDIAL ACTION REPORT, NOTICE OF CONSTRUCTION COMPLETION

A.      At least fourteen (14) days prior to the completion of construction, Settling Defendants and their contractor(s) shall be available to accompany EPA personnel and/or their representatives on a pre-final inspection. The pre-final inspection shall consist of a walkover of the Sites to determine the completeness of the construction its consistency with the RD Reports, the Consent Decree, the ROD and applicable federal and state laws, rules, and regulations.

B.      Following the pre-final inspection, EPA will either specify the necessary corrective measures to the construction phase of the RA, or determine that construction is complete. If EPA requires corrective measures, Settling Defendants shall undertake the corrective measures according to a schedule approved by EPA. Within fourteen (14) days after completion of the construction of the corrective measures, Settling Defendants and their contractor(s) shall be available to accompany EPA personnel or their representatives on an inspection as provided for in the preceding paragraph. Said inspection will be followed by further directions and/or notifications by EPA as provided above in this paragraph.

C.      Within twenty-one (21) days of the date that Settling Defendants concludes that they have met the Performance Standards as specified in the ROD and this SOW, Settling Defendants shall schedule and conduct a final inspection to be attended by

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 27 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 38 of 73

Settling Defendants, EPA, NJDEP, and/or their respective representatives. The final inspection will consist of a walk-through of the project to determine the completeness of the RA and its consistency with the ROD, this SOW, and the consent decree. EPA may direct Settling Defendants to correct any deficiencies identified during the inspection. Settling Defendants shall implement the tasks necessary to correct any deficiencies in accordance with the specifications and schedules established by EPA.

D.    Within fourteen (14) days of completion of the tasks, Settling Defendants shall be available to accompany EPA and NJDEP personnel and/or their respective representatives on a follow-up inspection. Within thirty (30) days of EPA's determination that construction is complete as set forth in Subsection B., above, Settling Defendants shall submit a Draft RA Report, as set forth in Subsection E., below.

E.    The Draft RA Report for the Atlantic Resources site set forth in Subsection D, above, shall include the following sections:

    i)    <u>Introduction</u>

        (1)    Include a brief description of the location, size, environmental setting, and operational history of the Sites.

        (2)    Describe the operations and waste management practices that contributed to contamination of the Sites.

        (3)    Describe the regulatory and enforcement history of the Sites.

        (4)    Describe the major findings and results of site investigation activities.

        (5)    Describe prior removal and remedial activities at the Sites.

    ii)    <u>Background</u>

        (1)    Summarize requirements specified in the ROD. Include information on the cleanup goals, institutional controls, monitoring requirements, operation and maintenance requirements, and other parameters applicable to the design, construction, operation, and performance of the RA.

        (2)    Provide additional information regarding the basis for determining the cleanup goals, including planned future land use.

        (3)    Summarize the RD, including any significant regulatory or technical considerations or events occurring during the preparation of the RD.

09-50026-mg   Doc 4655-3   Filed 12/11/09   Entered 12/11/09 17:02:37   Exhibit A
(part three)   Pg 28 of 63
Case 2:06-cv-06077-FSH-PS   Document 5-2   Filed 06/15/2007   Page 39 of 73

(4) Identify and briefly discuss any ROD amendments, explanation of significant differences, or technical impracticability waivers.

iii)   Construction Activities

(1) Provide a step-by-step summary description of the activities undertaken to construct and implement the RA (e.g., mobilization and site preparatory work; operation of the treatment/stabilization technology; associated site work, such as fencing and water collection and control; and sampling activities).

(2) Refer the reader to the Appendices for characteristics, site conditions, and operating parameters for the system.

iv)   Chronology of Events

(1) Provide a tabular summary that lists the major events for the RA and associated dates of those events, starting with ROD signature.

(2) Include significant milestones and dates, such as, RD submittal and approval; ROD amendments; mobilization and construction for the remedy; significant operational events such as treatment system, application start-up, monitoring and sampling events, system modifications, operational down time, variances or noncompliance situations, and final shutdown or cessation of operations; final sampling and confirmation-of-performance results; required inspections; demobilization; and startup of post-construction operation & maintenance activities.

v)   Performance Standards and Construction Quality Control

a. Describe the overall performance of the technology in terms of comparison to Performance Standards.

b. For treatment remedies, identify the quantity of material treated, the strategy used for collecting and analyzing samples, and the overall results from the sampling and analysis effort.

c. Provide an explanation of the approved construction quality assurance and construction quality control requirements or cite the appropriate reference for this material. Explain any substantial problems or deviations.

d. Provide an assessment of the performance data quality, including the overall quality of the analytical data, with a brief discussion of QA/QC procedures followed, use of a QAPP, comparison of analytical data with data quality objectives.

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 29 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 40 of 73

vi)    <u>Final Inspection and Certifications</u>

a.    Report the results of the various RA contract inspections, and identify noted deficiencies.

b.    Briefly describe adherence to health and safety requirements while implementing the RA. Explain any substantial problems or deviations.

c.    Summarize details of the institutional controls (e.g., the type of institutional control, who will maintain the control, who will enforce the control).

d.    Describe results of pre-certification inspection.

e.    This section shall include a certification statement, signed by a responsible corporate official of one or more of the Settling Defendants or by the Settling Defendants' Project Coordinator, which states the following:

"To the best of my knowledge, after thorough investigation, I certify that the information contained in or accompanying this submission is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

vii)    <u>Summary of Project Costs</u>

a.    Provide the actual final costs for the project. If actual costs are not available, provide estimated costs.

b.    Provide the costs previously estimated in the ROD for the selected remedy, including, as applicable, RA capital costs, RA operating costs, and number of years of operation. Adjust the estimates to the same dollar basis year as the actual project costs, and provide the index used.

c.    Compare actual RA costs to the adjusted ROD estimates. If outside range of -30 to +50 percent, explain the reasons for differences.

d.    For treatment remedies, calculate unit costs based on the sum of the actual RA capital and RA operating costs divided by the quantity of material treated.

e.    Refer the reader to the Appendix for a detailed breakdown of costs.

viii)    <u>Observations and Lessons Learned</u>

Provide site-specific observations and lessons learned from the project, highlighting successes and problems encountered and how they were resolved.

09-50026-mg   Doc 4655-3   Filed 12/11/09   Entered 12/11/09 17:02:37   Exhibit A
(part three)   Pg 30 of 63
Case 2:06-cv-06077-FSH-PS   Document 5-2   Filed 06/15/2007   Page 41 of 73

ix)   <u>Contact Information</u>

Provide contact information (names, addresses, phone numbers, and contract/reference data) for the major design and remediation contractors, as applicable.

x)   <u>Appendices: Cost and Performance Summary</u>

a.   The specific parameters for documenting cost and performance information are presented in the Guide to Documenting and Managing Cost and Performance Information for Remediation Projects, EPA 542-B-98-007.

b.   Identify the matrix characteristics and site conditions that most affected the cost and performance, the corresponding values measured for each characteristic or condition, and the procedures used for measuring those characteristics or conditions.

c.   Identify the operating parameters specified by the remediation contractor that most affected the cost and performance, the corresponding values measured for each parameter, and the procedures used for measuring those parameters.

d.   Provide a detailed breakout of the actual RA capital costs.

e.   Provide supplemental information in appendices to the RA Report. These could include a map of the Sites and operable unit, supplemental performance information, and a list of references.

f.   EPA will either approve the Draft RA Report, thus making it the Final RA Report, require modifications, and/or require corrective measures to fully and properly implement the RA(s), in accordance with Subsection X.B. or C., above.

## XI. INTERIM MONITORING PLAN

A.   Within 60 days after lodging of the Consent Decree, the Settling Parties shall submit to EPA an Interim Monitoring Plan ("IMP") to evaluate ground-water conditions at the ARC Site during the implementation of the RD and RA.

B.   The IMP shall include:

1.   A plan for monitoring the ground-water at the ARC Site on a quarterly basis, unless a decrease in sampling frequency has been approved by EPA.

2.   A QAPP for IMP activities consistent with Section V.A., above.

3.   An HSCP for IMP activities;

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 31 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 42 of 73

4.    A description of work to be performed under the IMP; and

5.    A IMP schedule that identifies the frequency of monitoring and when these activities commence.

C.    EPA will either approve the IMP Plan, or require modification of it, in accordance with the procedures set forth in the Consent Decree.

D.    The Settling Parties may request less frequent sampling subject to EPA's approval.

## XII.  LONG-TERM MONITORING PLAN

A.    Within sixty (60) days of approval of the Remedial Action Report, the Settling parties shall submit to EPA a long-term Monitoring ("LTM") Plan.

B.    The LTM Plan shall include, at a minimum, the following:

1.    A plan to monitor the ground-water at the ARC site on a quarterly basis, unless a decrease in sampling frequency has been approved by EPA.

2.    A QAPP for LTM activities consistent with Section V.A., above.

3.    An HSCP for LTM activities;

4.    A description of work to be performed under LTM activities; and

5.    A LTM schedule, that identifies the frequency of monitoring and when these activities will commence.

C.    EPA will either approve the LTM Plan, or require modification of it, in accordance with the procedures set forth in Section XI of the Consent Decree.

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 32 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 43 of 73

APPENDIX C



09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 34 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 45 of 73

APPENDIX D

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 35 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 46 of 73

APPENDIX D

to Consent Decree in the matter of
*United States of America v.*
relating to the Atlantic Resources Corp. Superfund Site
form of

ENVIRONMENTAL PROTECTION EASEMENT
[in the event deed restrictions have been finalized at the time this easement is
executed, add:  AND  DECLARATION OF RESTRICTIVE COVENANTS]

This Environmental Protection Easement [in the event deed restrictions have
been finalized at the time this easement is executed, add:  and Declaration of
Restrictive Covenants] is made this _____ day of _____, 200__ by and
between _____ ("Grantor")], having an
address of _____ _____ and
_____, ("Grantee") having an address of

WITNESSETH:

WHEREAS, Grantor is the owner of a parcel of land located in the county of
Middlesex, State of New Jersey, more particularly described on Exhibit A
attached hereto and made a part hereof together with any buildings and
improvements thereon and appurtenances thereto (the "Property"); and

WHEREAS, the Property is part of the Atlantic Resources Corp. Superfund Site
("ARC Site"), which the U.S. Environmental Protection Agency ("EPA"), pursuant
to Section 105 of the Comprehensive Environmental Response, Compensation
and Liability Act ("CERCLA"), 42 U.S.C. § 9605, placed on the National Priorities
List, as set forth in Appendix B of the National Oil and Hazardous Substances
Pollution Contingency Plan ("NCP"), 40 C.F.R. Part 300, by publication in the
Federal Register on September 5, 2002, Fed. Reg. ___; and

WHEREAS, in a Record of Decision dated September 30, 2004 (the "ROD"), the
Regional Administrator of EPA Region II selected, and the State of New Jersey
concurred with, a remedial action for the ARC Site, which provides, in part, for
the following actions: (1) excavation of contaminated soils for transport for
disposal or treatment; (2) backfilling and grading of all excavated areas with
clean fill; (3) institutional controls, such as a deed notice or covenant, to prevent
exposure to contaminated residual soils that may exceed levels that would allow
for unrestricted use, (4) institutional controls, including a Classification Exception
Area, to restrict the installation of wells and the use of groundwater in the area of
groundwater contamination; and (5) implementation of a long-term groundwater

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 36 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 47 of 73

sampling and analysis program to monitor the nature and extent of groundwater contamination at the Site, in order to assess the migration and possible attenuation of the groundwater contamination over time; and

WHEREAS, grantee _____ has agreed to perform the remedial action selected in the ROD for the ARC Site in accordance with the Consent Decree; and

WHEREAS, the parties hereto have agreed that Grantor shall grant [in the event deed restrictions have been finalized at the time this easement is executed replace: "an easement" with "a permanent easement"] an easement and covenant to provide a right of access over the Property to the Grantee [or the United States on behalf of the EPA and its representative] for purposes of implementing, facilitating and monitoring the response action; and [in the event deed restrictions have been finalized at the time this easement is executed add: to provide a means of enforcing the restrictions imposed on the Property pursuant to the Consent Decree that will run with the land for the purpose of protecting human health and the environment;]

NOW, THEREFORE:

1.    Grant: Grantor, on behalf of itself, its successors and assigns, in consideration of the terms of the Consent Decree in the case of *United States of America v. _____*, Civ. No. _____ United States District Court for the District of New Jersey ("Consent Decree") and other good and valuable consideration, does hereby give, grant, covenant and declare in favor of the Grantee that the Property shall be subject to the rights of access set forth below in paragraph 5, and does give, grant and convey to the Grantee with general warranties of title the [in the event deed restrictions have been finalized at the time this easement is executed, add: perpetual] right to enforce the rights of access [in the event deed restrictions have been finalized at the time this easement is executed, add: and restrictions on use imposed pursuant to the Consent Decree, and delete "during performance of the Work"] during performance of the Work in the area of the Property to which the easement is granted.

2.    Purpose: It is the purpose of this instrument to convey to the Grantee an easement which will run with the land, for access for the purpose of conducting any activity related to, the Consent Decree [in the event deed restrictions have been finalized a the time this easement is executed, add: and for the purpose of enforcing land/water use restrictions or other restrictions imposed pursuant to the Consent Decree].

1.    Restrictions on use: The following restrictions on use apply to the use of the Property, run with the land and are binding on the Grantor:  Institutional Controls in the form of deed restrictions and/or deed notices may be required to restrict

2

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 37 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 48 of 73

exposure to contaminated residual soils at the ARC Site that may exceed levels that would allow for unrestricted use and for the purpose of restricting the installation of wells and the use of ground water until ground water cleanup standards are achieved. If such Institutional Controls are required, Settling Defendant shall secure Institutional Controls in accordance with the procedures set forth in the Consent Decree. The restrictions shall be maintained until EPA notifies Settling Defendant that EPA has determined, after a reasonable opportunity for review and comment by the State of New Jersey, that the restrictions may be lifted from the Site, or a portion of the Site, without posing a threat to human health and the environment.

2.    Modification or termination of restrictions: The restrictions on use specified in the preceding paragraph of this instrument may only be modified, or terminated in whole or in part, in writing, by the Grantee, with the prior consent of EPA, provided, however, that any modification or termination of said restrictions shall not adversely affect the remedy selected by EPA for the ARC Site. If requested by the Grantor, such writing will be executed by Grantee in recordable form.

3.    Terms of Right of access: A right of access to the Property at all reasonable times for the following purposes shall run with the land and be binding on Grantor:

      a.    monitoring the Work;
      b.    verifying any data or information submitted to the United States (or the State);
      c.    conducting investigations relating to contamination at or near the ARC Site;
      d.    obtaining samples;
      e.    assessing the need for, planning, or implementing additional response actions (e.g., as set forth in paragraph 19 of the Consent Decree) at or near the ARC Site;
      f.    implementing the Work pursuant to the conditions set forth in Paragraph __ of the Consent Decree;
      g.    inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Settling Defendant or its agents, consistent with Section XXIV (Access to Information) of the Consent Decree;
      h.    assessing Settling Defendant's compliance with the Consent Decree; and
      i.    determining whether the ARC Site or other property is being used in a manner that is prohibited or restricted; or that may need to be prohibited or restricted, by or pursuant to the Consent Decree;

3

09-50026-mg   Doc 4655-3   Filed 12/11/09   Entered 12/11/09 17:02:37   Exhibit A
(part three)   Pg 38 of 63
Case 2:06-cv-06077-FSH-PS   Document 5-2   Filed 06/15/2007   Page 49 of 73

[in the event that deed restrictions have been finalized at the time this easement is executed, add: (j) enforcing restrictions, or any modifications thereto, on use imposed pursuant to the Consent Decree.]

 f. Reserved rights of Grantor:  Grantor hereby reserves unto itself, its successors, and assigns, all rights and privileges in and to the use of the Property which are not incompatible with the restrictions, controls, rights, covenants and easements granted herein.

 g. Federal authority:  Nothing in this document shall limit or otherwise affect EPA's rights of entry and access or EPA's authority to take response actions under CERCLA, the NCP, or other federal law.

 h. No public access and use:  No right of access or use by the general public to any portion of the Property is conveyed by this instrument.

 i. Public notice:  Grantor agrees to include in each instrument conveying any interest in any portion of the Property, including but not limited to deeds, leases and mortgages, a notice which is in substantially the following form:

**NOTICE:  THE INTEREST CONVEYED HEREBY IS SUBJECT TO AN ENVIRONMENTAL PROTECTION EASEMENT, DATED _____, 20\_\_, RECORDED IN THE COUNTY CLERK'S OFFICE, _____ COUNTY, STATE OF NEW JERSEY, ON _____, 20\_\_ , IN BOOK _____, PAGE \_\_\_\_\_, IN FAVOR OF, AND ENFORCEABLE BY, THE [insert name of grantee] AND BY THE UNITED STATES OF AMERICA AND THE STATE OF NEW JERSEY AS THIRD PARTY BENEFICIARIES.**

Within thirty (30) days of the date any such instrument of conveyance is executed, Grantor agrees to provide Grantee and EPA with a certified true copy of said instrument and, if it has been recorded in the public land records, its recording reference.

 j. Enforcement:  The Grantee shall be entitled to enforce the terms of this instrument by resort to specific performance.  All remedies available hereunder shall be in addition to any and all other remedies at law or in equity, including CERCLA.  Any forbearance, delay or omission to exercise Grantee's rights under this instrument in the event of a breach of any term of this instrument shall not be deemed to be a waiver by the Grantee of such term or of any of the rights of the Grantee under this instrument.

4

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 39 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 50 of 73

k.  Waiver of certain defenses:  Grantor hereby waives any defense of laches, estoppel, or prescription.

l.  Covenants:  Grantor hereby covenants to and with the Grantee and its assigns, that the Grantor is lawfully seized in fee simple of the Property, that the Grantor has a good and lawful right and power to sell and convey it or any interest therein, subject only to the encumbrances listed in Exhibit B, that the Property is free and clear of encumbrances and that the Grantor will forever warrant and defend the title thereto and the quiet possession thereof.

m.  Notices:  Any notice, demand, request, consent, approval, or communication under this instrument that either party desires or is required to give to the other shall be in writing and shall either be served personally or sent by first class mail, postage prepaid, addressed as follows:

To Grantor:                              To Grantee:

_____        _____

_____        _____

_____        _____

A copy of each such communication shall also be sent to the following:

To EPA:                              To NJDEP:

Chief, New Jersey Superfund Branch        [Insert name and address]
Emergency and Remedial Response Division
U.S. Environmental Protection Agency, Region II
290 Broadway, 19th Floor
New York, NY  10007-1866
      Attention: Atlantic Resources Corp. Superfund Site
Remedial Project Manager

      and to:

Chief, New Jersey Superfund Branch
Office of Regional Counsel
U.S. Environmental Protection Agency, Region II
290 Broadway, 17th Floor
New York, NY  10007-1866
      Attention: Atlantic Resources Corp. Superfund Site Attorney

n.  General provisions:

5

a)    Controlling law: The interpretation and performance of this instrument shall be governed by the laws of the State of New Jersey.

b)    Liberal construction: Any general rule of construction to the contrary notwithstanding, this instrument shall be liberally construed in favor of the grant to effect the purpose of this instrument and the policy and purpose of CERCLA. If any provision of this instrument is found to be ambiguous, an interpretation consistent with the purpose of this instrument that would render the provision valid shall be favored over any interpretation that would render it invalid.

c)    Severability: If any provision of this instrument, or the application of it to any person or circumstance, is found to be invalid, the remainder of the provisions of this instrument, or the application of such provisions to persons or circumstances other than those to which it is found to be invalid, as the case may be, shall not be affected thereby.

d)    Entire agreement: This instrument and those portions of the Consent Decree to which it refers set forth the entire agreement of the parties with respect to rights and restrictions created herein; provided that nothing in this instrument shall be deemed to alter or modify the Consent Decree.

e)    No forfeiture: Nothing contained herein will result in a forfeiture or reversion of Grantor's title in any respect.

f)    Joint obligation: If there are two or more parties identified as Grantor herein, the obligations imposed by this instrument upon them shall be joint and several.

g)    Successors: The covenants, easements, terms, conditions, and restrictions of this instrument shall be binding upon, and inure to the benefit of, the parties hereto and their respective personal representatives, heirs, successors, and assigns and shall continue as a servitude running in perpetuity with the Property. The term "Grantor", wherever used herein, and any pronouns used in place thereof, shall include the persons and/or entities named at the beginning of this document, identified as "Grantor" and their personal representatives, heirs, successors, and assigns. The term "Grantee", wherever used herein, and any pronouns used in place thereof, shall include the persons and/or entities named at the beginning of this document, identified as "Grantee" and their personal representatives, heirs, successors, and assigns.

h)    Captions: The captions in this instrument have been inserted solely for convenience of reference and are not a part of this instrument and shall have no effect upon construction or interpretation.

6

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 41 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 52 of 73

i)    <u>Counterparts</u>:  The parties may execute this instrument in two or more counterparts, which shall, in the aggregate, be signed by both parties; each counterpart shall be deemed an original instrument as against any party who has signed it.  In the event of any disparity between the counterparts produced, the recorded counterpart shall be controlling.

j)    <u>Third-Party Beneficiary</u>: Grantor and Grantee hereby agree that EPA and NJDEP shall be, on behalf of the public, third-party beneficiaries of the benefits, rights and obligations conveyed to Grantee in this instrument; provided that nothing in this instrument shall be construed to create any obligations on the part of EPA or NJDEP.

TO HAVE AND TO HOLD unto the Grantee and its assigns forever.

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 42 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 53 of 73

IN WITNESS WHEREOF, Grantor has caused this instrument to be signed in its name.

Executed this _____ day of _____, 200___.

_____

By: _____

Its: _____

STATE OF _____ )
                                          ) ss
COUNTY OF _____ )

On the _____ day of _____ in the year _____ before me personally came _____ to me known, who, being duly sworn, did depose and say that he/she/they reside(s) in _____[if the place of residence is in a city, include the street and street number, if any, thereof]; that he/she/they is [are] the [president or other officer or director or attorney in fact duly appointed] of the [name corporation], the corporation described in and which executed the above instrument; that he/she/they know(s) the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by authority of the board of directors of said corporation, and that he/she/they signed his/her/their name(s) thereto by like authority.

Witness my hand and official seal hereto affixed the day and year written above.

_____
Notary Public in and for the
State of _____

My Commission Expires: _____.

8

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 43 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 54 of 73

This instrument is accepted this _____ day of _____, 200__.

[insert name of grantee]

By: _____

_____

STATE OF _____)
) ss
COUNTY OF _____)

On the _____ day of _____ in the year _____ before me personally came
_____ to me known, who, being duly sworn, did depose and say that
he/she/they reside(s) in _____[if the place of residence is in a city, include
the street and street number, if any, thereof]; that he/she/they is [are] the [president or
other officer or director or attorney in fact duly appointed] of the [name corporation], the
corporation described in and which executed the above instrument; that he/she/they
know(s) the seal of said corporation; that the seal affixed to said instrument is such
corporate seal; that it was so affixed by authority of the board of directors of said
corporation, and that he/she/they signed his/her/their name(s) thereto by like authority.

Witness my hand and official seal hereto affixed the day and year written above.

_____
Notary Public in and for the
State of _____

My Commission Expires: _____.

Attachments:        Exhibit A    -    legal description of the Property
                    Exhibit B    --   List of encumbrances

9

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 44 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 55 of 73

## ARC/HRDD RD/RA TRUST AGREEMENT

THIS TRUST AGREEMENT is made as of this _____ day of _____, 2006, by and among the parties identified on Appendix A attached hereto ("Transferors"), whose authorized representatives have executed this Agreement, and *de maximis, inc.* ("Trustee"), whose authorized representative has executed this Agreement;

WHEREAS the United States Environmental Protection Agency ("EPA") alleges there have been releases and threats of releases of hazardous substances at the Atlantic Resources Corporation Superfund Site ("ARC Site") and the Horseshoe Road Drum Dump portion of the Horseshoe Road Superfund Site ("HRDD Site") in Sayreville, New Jersey (hereinafter, collectively referred to as the "Sites"), and, as a result, the EPA designated the Sites as Superfund sites by placing them, pursuant to Section 105 of CERCLA, 42 U.S.C. Section 9605, on the National Priorities List;

WHEREAS EPA has incurred costs for response actions in connection with both the ARC and HRDD Sites;

WHEREAS Transferors and the "Settling Federal Agency" as defined below have agreed to resolve liability by and between themselves and the EPA to finance costs related to performance of the "Work" on "Operable Unit Two" activities at ARC Site and the HRDD Site, as prescribed within a Remedial Design & Remedial Action Consent Decree (Civil Action No.: _____, executed on _____) (hereinafter the "Consent Decree") and to resolve claims for payment of Past and Future Response Costs as more fully defined by and described in said Consent Decree;

WHEREAS the Consent Decree requires the establishment of a trust fund for the receipt of settlement payments to be made by the "Settling Federal Agency" to Transferors under the Consent Decree, including the payment of the estimated costs to perform the Work and to reimburse EPA for Future Response Costs under the Consent Decree;

WHEREAS Trustee and the Transferors intend to establish a "qualified settlement fund" under Section 468B of the Internal Revenue Code and the Treasury Regulations thereunder; and

WHEREAS Transferors have entered into a separate agreement between and among themselves known as the Joint Defense and Participation Agreement For Operable Unit 2 PRP Group (the "Participation Agreement") and the ARC/HRDD RD/RA Remediation Trust Agreement to provide, *inter alia,* a funding mechanism for meeting the Settling Defendants' obligations of the Consent Decree.

NOW THEREFORE, the Trustee hereby agrees it will receive, hold, disburse, invest and reinvest the Monies contributed to the trust established herein ("Trust"), subject to the terms, provisions and conditions hereinafter set forth:

PRV\827136\1

1    DEFINITIONS

1.1    The term "Consent Decree" shall mean the Consent Decree (Civil Action No.: _____, executed on _____) providing for the performance of a Remedial Design/Remedial Action ("RD/RA") at the Atlantic Resources Corporation Superfund Site ("ARC Site") and Remedial Design at the Horseshoe Road Drum Dump portion of the Horseshoe Road Superfund Site ("HRDD Site") in Sayreville, New Jersey. A copy of the Consent Decree is attached hereto as Appendix B.

1.2    The term "Sites" shall mean the ARC Site located at Horseshoe Road, in the City of Sayreville, Middlesex County, New Jersey designated as Block 256, Lot 2.03 on the Municipal Tax Map of the Borough of Sayreville and any areas where hazardous substances have migrated therefrom and the HRDD Site shall mean the Horseshoe Road Drum Dump portion of the Horseshoe Road Superfund Site adjacent to the ARC Site as depicted on the map attached hereto as Appendix C.

1.3    The term "Trustee" shall mean *de maximis, inc.*, and any successor or successors who act as Trustee hereunder.

1.4    The terms "Transferors" and "Settling Defendants" shall mean, collectively, the parties listed on Appendix A whose authorized representatives have executed this Agreement.

1.5    The term "Executive Committee" or "Technical Committee" shall mean the group of individuals designated by the Transferors to oversee certain aspects of the "Work" and to deal with the Trustee, as provided herein.

1.6    The term "Settling Federal Agency" shall mean shall mean the United States Department of Defense, including all of its departments, offices, agencies, activities, commands, and instrumentalities, which is resolving any claims which have been or could be asserted against it with regard to the Sites as provided in the Consent Decree.

1.7    The term the "Work" shall mean all activities Transferors are required to perform under the Consent Decree, except those required by Section XXV (Retention of Records). This definition of "Work" does not include Remedial Action at the HRDD Site.

1.8    "Operable Unit Two" shall mean those response actions pertaining to soils and groundwater at the Sites.

1.9    "Contractor" shall mean a qualified person or entity designated to perform the Work on behalf of the Settling Defendants.

1.10    The term "EPA" shall mean the United States Environmental Protection Agency.

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 46 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 57 of 73

3

## 2.    NAME AND PURPOSE OF THE TRUST.

This Trust establishes the ARC/HRDD RD/RA Trust Fund (the "Trust" or "Fund"). The purpose of the Trust is to, obtain, hold, invest, and disburse funds that are necessary to finance costs that are required for completion of the Work and such other purposes as provided in Paragraph 55.a.(ii) and 55.b. of the Consent Decree. However, in no event shall the Trust property be used to pay stipulated penalties that may be required to be paid pursuant to Section XX of the Consent Decree, nor shall it be used to pay attorney's fees or other litigation costs of the Transferors. To fulfill this purpose, the Trustee shall thoroughly familiarize itself with the terms of the Consent Decree and the Participation Agreement and will take all actions within its power necessary to ensure that the Consent Decree is fully effectuated with respect to the performance of the Work.

All property funds contributed to this Trust will be contributed by the Grantors and the Settling Federal Agency and all income and principal of the Trust shall be held and administered for or distributed to the Transferors subject to the duties and powers of the Trustee.

## 3.    CONTRIBUTION TO THE FUND.

3.1    **Initial Payments into the Fund.** The Fund will be established upon receipt of payment to be made by the Settling Federal Agency pursuant to Paragraph 55.a.(ii) of the Consent Decree which shall constitute the initial contribution to the Fund.

3.2    **Additional Payments to the Fund.** Additional Payments to the Fund will be made by Settling Federal Agency if and only to the extent required by and in compliance with Paragraph 55.b. of the Consent Decree. Without limitation of the foregoing, Transferors remain committed to ensure completion of the Work consistent with the Consent Decree through a separate funding mechanism or mechanisms which will be sufficient to complete the Work. The Trustee shall keep a record of the total contributions to the Fund by the Settling Federal Agency.

3.3    **Nature of Contributions.** All contributions by the Settling Federal Agency to the Trustee for the Fund shall be made in immediately available funds. All such contributions, together with the earnings thereon, shall be held as a trust fund for the payment of the costs and expenses to be incurred by the Trustee on behalf of the Trust herein provided.

3.4    **No Transferability of Interest.** Any interest of any of the Transferors herein, and their obligation to provide funds under this Section, is not transferable, except to a successor corporation or corporations, and any such transferee corporation shall assume the obligations of the transferring Transferors by executing such documents as the Trustee may require.

## 4.    DISPOSITIVE PROVISIONS.

4.1    **Payment from the Fund.** During the term of this Trust, the Trustee shall make

PR\48273641

4

payments from the Fund as directed by the Executive Committee in order to pay all bills and invoices approved for payment in writing by the Executive Committee or its designated representative. Bills and invoices to be paid by the Trustee after approval by the Executive Committee include, but are not limited to, bills from Contractor(s) and bills for oversight or administration costs incurred with respect to the Sites by or on behalf of the Transferors. Any payment to the United States hereunder shall be made either to the ARC Special Account of the EPA Hazardous Substance Superfund or the HRDD Special Account of the EPA Hazardous Substance Superfund depending on which Site Work is performed as advised by EPA under and in accordance with the Consent Decree.

4.2    **No Authority to Conduct Business.** The purpose of the Fund is limited to the matters set forth in Sections 2 and 3 hereof, and this Agreement shall not be construed to confer upon the Trustee any authority to carry on any business or activity for profit or to divide the gains therefrom among the Transferors or any of them.

4.3    **Time of Termination of Trust.** This Trust shall terminate upon the earlier of EPA's approval of Settling Defendants' Certification of Completion of the Work as provided in Paragraph 52 of the Consent Decree or depletion of fund balances through performance of the Work unless the EPA and the Settling Federal Agency otherwise consent to an earlier termination.

4.4    **Distribution of Fund Upon Termination.** Upon EPA's approval of Settling Defendants' Certification of Completion of the Work as provided in Paragraph 52 of the Consent Decree, the Trustee shall liquidate the assets of the Fund and, notwithstanding Section 4.2 hereof, thereupon distribute the remaining trust property, including all accrued accumulated and undistributed net income, to each of the Transferors in such amounts as determined by the Executive Committee in accordance with the Participation Agreement or any subsequent agreement on allocation among the Transferors.

4.5    **Alterations, Amendments, and Revocation.** This Trust Agreement may be altered, amended, or revoked from time to time by an instrument in writing executed by the Trustee and by the Transferors.

4.6    **Removal of Trustee.** The Trustee may be removed with or without cause by the Executive Committee, subject to notice to the Settling Federal Agency and EPA, upon thirty (30) days advance written notice to the Trustee from the Executive Committee.

4.7    **Tax Treatment.** It is intended that this Trust be a qualified settlement fund under Internal Revenue Code Section 468B and Reg. s. 1468B-1 and taxable as a so-called complex trust to which Internal Revenue Code Sections 661, 662 and 663 apply and not as a partnership, corporation or grantor trust, that is, a trust whose property is deemed to be owned by one or more grantors or other persons pursuant to one or more of Internal Revenue Code Sections 671 through 678. The Trustee shall file income tax returns for the Trust on the assumption that it is a qualified settlement fund, unless and until it is determined or Trustee otherwise has reason to

PR\482736\1

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 48 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 59 of 73

5

believe the Trust is other than a qualified settlement fund. In the event this Trust is determined, or is, in the sole judgment of Trustee, at risk of being determined to be other than a trust which is taxable as such a complex trust and it is prudent to reorganize the Trust so that it shall be such a complex trust, then Trustee is authorized to execute such amendment to this Trust, restatements of this Trust, a new trust declaration, instruments of assignment, plans of reorganization and other documents as are appropriate to enable the Trust or a successor to the assets of the Trust to be a trust which is taxable as such a complex trust; provided always, that in no event shall any such reorganization change the purposes hereof, divert the assets of this Trust to purposes other than the original purposes set forth herein or enlarge the powers or responsibilities of Trustee.

5.    TRUST MANAGEMENT

The Trustee shall invest and reinvest the principal and income of the Fund and keep the Fund invested in one or more accounts which shall be treated as a single fund without distinction between principal and income. Such investments shall be made in accordance with reasonable guidelines and direction provided to the Trustee by the Executive Committee. All investments shall be made so as to at all times provide sufficient liquidity to meet the anticipated cash needs of the Fund.

5.1    Trustee shall invest and reinvest the principal and income of the Trust only in Permitted Investments. For purposes hereof, "Permitted Investments" shall mean:

(i)    any obligation issued or guaranteed by the United States of America or any State or territory thereof, or any agency or instrumentality of the foregoing, or any money fund which invests solely in the foregoing obligations;

(ii)    any obligation issued or guaranteed by any state or municipality in the United States, or any agency or instrumentality thereof, which is rated A (or better) by Standard & Poor's corporation or Moody's Investor's Service, Inc. at the time of investment;

(iii)    certificates of deposit of, accounts with, repurchase obligations of, or money funds or other obligation of banks or of corporations endowed with trust powers having capital and surplus in excess of $100,000,000;

(iv)    certificates of deposit of, accounts with, or other obligations of any bank or corporation endowed with trust powers, provided that the full amount of any such certificate of deposit, account, or other obligation is insured by FDIC or FSLIC; and

(v)    commercial paper at the time of investment rated A-1+ by Standard & Poor's Corporation or P-1 by Moody's Investor's Service, Inc.

5.2    In investing, reinvesting, exchanging, selling and managing the Trust funds, Trustee shall discharge its duties with respect to the Trust solely in the interest of accomplishing of the purposes and objectives of this Trust. Trustee may engage the services of an investment adviser or manager, may rely on the advice of such adviser or manager, and may delegate investment decision-making authority to such adviser or manager with respect to management of the Trust. Trustee shall not be personally liable for any action or inaction taken in good faith reliance on the advice of such adviser or manager, nor for prudently delegating, in good faith, its investment decision-making authority to such advisor or manager.

PR\482736\1

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 49 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 60 of 73

6

## 6.    EXPRESS POWERS OF TRUSTEE.

Without limiting the powers and discretion conferred upon the Trustee by any other provisions of this Trust Agreement or by law, the Trustee is expressly authorized and empowered as follows:

6.1    **Payment of Expenses of Administration.** To incur and pay any and all charges, taxes, and expenses upon or connected with the Fund in the discharge of its fiduciary obligations under this Agreement. All such payments shall be made using the assets of the Fund.

6.2    **Retention of Property.** To hold and retain all or any part of the Fund in the form in which the same may be at the time of the receipt by the Trustee, as long as they shall deem advisable, notwithstanding that the same may not be authorized by the laws of any state or rules of any court for the investment of trust funds, and without any liability for any loss of principal or income by reason of such retention.

6.3    **Preservation of Principal.** Notwithstanding any other provision in this Agreement, at all times during the term of this Agreement, to hold, invest and reinvest the assets of the Fund, as directed by the Executive Committee, in a manner designed to preserve the accrued income and principal of the Fund for the purposes of the Fund.

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 50 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 61 of 73

7

6.4    **Retention of Investment Advisor and Other Consultants.** If directed by the Executive Committee, to engage the services of (and pay reasonable compensation to) an investment advisor, accountants, agents, managers, or other consultants with respect to the management of investments of the Fund, the management of the Fund, or any other matters.

6.5    **Execution of Documents or Transfer.** If directed by the Executive Committee, to make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

6.6    **Extension of Obligations and Negotiations of Claims.** To renew or extend the time of payments of any obligation payable to or by the Fund for such periods of time and on such terms as determined by the Executive Committee and to compromise or otherwise adjust all claims in favor of or against the Fund.

6.7    **Litigation.** To institute and defend litigation on behalf of and in the name of the Fund at the direction of the Executive Committee and upon assurance of reasonable indemnity by the Transferors.

6.8    **Execution of Contracts and Agreements.** To make, execute, acknowledge and deliver, as Agent for the Trust, any and all contracts or agreements as may be specifically authorized in this Trust Agreement and otherwise at the direction of the Executive Committee.

6.9    **Authority of Trustee.** To do any and all other acts which they shall deem proper to effectuate the purpose hereof and to exercise the powers specifically conferred upon them by this Trust Agreement.

6.10    **Authority to Make Tax Elections.** To make any tax elections necessary to ensure the qualification of the Trust as a qualified settlement fund, including, if necessary, relation-back election under Treas. Reg. 1.468B-1(j)(2).

6.11    **Discretion in Exercise of Powers.** To do any and all other acts which it shall deem proper to effectuate the purpose hereof and to exercise the powers specifically conferred upon it by this Trust.

7.    ADVICE OF COUNSEL.

The Trustee may from time to time consult with counsel, who may be counsel to the Transferors or any of them, with respect to any question arising as to compliance with this Trust Agreement. The Trustee shall be fully protected, to the extent permitted by law, in acting in reliance upon the advice of counsel.

PR\4827736\1

8

## 8.   TRUSTEE COMPENSATION.

Trustee shall be entitled to reasonable compensation for its services as a Trustee under this Trust Agreement, including reimbursement for expenses, reasonably incurred by it in the performance of its duties as Trustee. Fees of Trustee shall be in accordance with a schedule of such fees attached to this Trust Agreement as Appendix F. Any change in fee schedule shall become effective only upon the written approval of the Executive Committee and the representative of the United States designated in paragraph 10.1 for receipt of quarterly reports.

## 9.   RESIGNATION AND APPOINTMENT OF TRUSTEE.

9.1    Trustee may resign at any time by delivering its resignation, in writing, to the Executive Committee, such resignation to take effect ten days after receipt by those parties.

9.2    The Executive Committee may remove the Trustee at any time, by delivering notice of such removal in writing to Trustee, such removal to take effect thirty days thereafter.

9.3    In the event of the bankruptcy, insolvency, death, disability, resignation or removal, as provided above, of the then Trustee, a successor Trustee: (1) shall become Trustee, (2) shall have all of the rights, powers, duties, authority, and privileges as if initially named as a Trustee hereunder; and (3) shall thereupon be vested with title to the Trust without the necessity of any conveyance or instrument.

9.4    Any new successor Trustee shall be designated by the Executive Committee.

9.5    Acceptance of appointment as a new successor Trustee shall be in writing and shall be effective upon delivery to the Executive Committee.

## 10.   INSTRUCTIONS TO THE TRUSTEE.

Notwithstanding any provision herein to the contrary, the Trustee is hereby directed to do the following in addition to other duties set forth in other provisions in this Trust Agreement:

10.1    **Quarterly Reports.** Have prepared quarterly financial reports describing the manner in which all of the assets of the Fund are then invested and the current market value of such assets, as well as the obligations, income, and expenses of the Fund. Copies of such reports shall be transmitted in writing to the Executive Committee and to the United States Department of Justice ("USDOJ"). As to the latter, reports shall be sent to [NEED INSERT FROM DOJ] or such other person hereinafter designated in writing to the Trustee by USDOJ.

10.2    **Annual Statements.** Have prepared annual financial statements describing the manner in which all of the assets of the Fund are then invested and the current market value of such assets, as well as the obligations, income, and expenses of the Fund. All financial statements shall be prepared on an annual accrual basis, and shall be in accordance with Generally Accepted Accounting Principles, applied on a consistent basis. Copies of such

PR\482736\1

9

statements shall be transmitted in writing to the Executive Committee.

10.3 **Counsel.** Advise, consult and confer with and otherwise inform the Executive Committee with respect to matters arising out of this Trust Agreement, administration of the Fund, or any other matter which the Trustee, in its discretion, deems appropriate to bring to the attention of the Executive Committee.

10.4 **Records.** Maintain records of all actions taken by the Trustee with respect to matters arising out of this Trust Agreement or administration of the Fund. Copies of said records shall be provided to the Executive Committee upon request, and upon termination of this Trust said records shall be transmitted, together with all other records of the Trustee, to the Executive Committee.

The Trustee shall have the right to assume, in the absence of written notice to the contrary, that a notice purporting to be from the Executive Committee or Technical Committee has been authorized by such Committee.

11. INDEMNIFICATION

11.1 The Trustee acts as Trustee only and not personally. For any contract, obligation of liability made or incurred by the Trustee in good faith, all persons shall look solely to the Fund and not the Trustee personally. The Trustee shall not incur any liability personal or corporate, of any nature in connection with any act or omission, made in good faith and without negligence, of the Trustee or the Transferors in the administration of the Fund. The Transferors, jointly and severally, will indemnify, defend, and hold harmless, the Trustee from and against any and all claims including but not limited to, any and all liabilities, suits, actions, causes of action, debts, accounts, damages (including injury to persons whether employees or otherwise and to all property), fines, judgments, losses, judicial or administrative proceedings, and reasonable costs and expenses (including attorney, consultant and expert fees), to the extent the same arise out of, or are in any way related to: (1) the Transferors' noncompliance with applicable federal, state, and local laws; (2) the Transferors' noncompliance with the terms and conditions of this Agreement; (3) the Transferors' negligence or willful misconduct that relate, in any way, to the performance of this Agreement; or, (4) Transferors' financial obligations to third parties.

11.2 The Trustee will indemnify, defend, and hold harmless the Transferors and their directors, officers, shareholders, agents or affiliates and subcontractors from and against any and all claims including, but not limited to, any and all liabilities, suits, actions, causes of action, debts, accounts, damages, fines, judgments, losses, judicial or administrative proceedings, and reasonable costs and expenses (including attorney, consultant and expert fees), to the extent the same arise out of or are in any way related to: (1) the Trustee's non-compliance with applicable federal, state and local laws; (2) the Trustee's non-compliance with the terms and conditions of this Agreement; or (3) the Trustee's negligence or willful misconduct that relate in any way to

PR\482736\1

10

the performance of this Agreement.

11.3    Upon receipt of an indemnified claim, the Indemnitor, at its own cost and expense, shall: (1) take control of the defense and investigation of the lawsuit or action; and (2) employ counsel of its choice, reasonably satisfactory to the Indemnitee to handle and defend same.  The Indemnitee at its sole cost and expense, may retain separate counsel and such separate counsel shall have the right, but not the obligation, to suggest or otherwise recommend any and all defenses, crossclaims and/or counterclaims. The Indemnitor shall not consent to the entry of any judgment or enter into any settlement of the indemnified claim without the written consent of the Indemnitee which consent shall not be unreasonably withheld or delayed.

11.4    If Indemnitor fails to assume the defense of the indemnified claim within 15 days after receipt of the notice of indemnified claim, the Indemnitee shall have the right to undertake, at Indemnitor's sole cost and expense (including but not limited to counsel and expert fees), the defense, compromise or settlement of the indemnified claim, provided Indemnitor shall have the right to approve any final settlement or compromise of the indemnified claim, which approval shall not be unreasonably withheld.

11.5    This section shall survive the termination of the Trust for acts or omissions by the Trustee during the course of performing his or her duties prior to such termination.

12.    INTERESTS NOT ASSIGNABLE OR SUBJECT TO CLAIMS OR CREDITORS.

The interest of any Grantor in the Fund shall not be subject to anticipation or assignment nor subject to the claims of any creditor of any Grantor, and any interest reserved to any Grantor shall be made available to the Grantor only upon termination of this Trust pursuant to Section 4 herein.

13.    CHOICE OF LAW.

This Trust Agreement shall be administered, construed, and enforced according to the internal laws of the State of New Jersey, except to the extent that federal law shall apply to questions arising under the Comprehensive Environmental Response, Compensation and Liability Act, or the National Contingency Plan promulgated thereunder.

13.    INTERPRETATION.

As used in this Trust Agreement, words in the singular include the plural and words in the plural include the singular. The descriptive heading for each Section and Subsection of this Trust Agreement shall not affect the interpretation or the legal efficacy of this Trust Agreement. It is agreed that neither the act of entering into this Trust Agreement nor any contribution to the Fund nor any action taken under this Trust Agreement shall be deemed to constitute an admission of any liability or fault on the part of the Trustee or the Transferors, or any of them,

PR\48273G\1

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 54 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 65 of 73

11

with respect to the Sites or otherwise, nor does it constitute a commitment or agreement, either expressed or implied, by any or all of them to undertake any Work. This document shall not be admissible in any court proceeding except to enforce its terms.

14.    SEPARATE DOCUMENTS.

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15.    NOTICE.

Any notice required herein shall be given in writing to the signatories hereto, or to their respective designee or designees.

16.    EFFECTIVE DATE.

This Agreement shall become effective as of the day and year first written above.

WITNESS the execution hereof by the Trustee:

By: _____, Trustee
For de maximis, inc., Trustee

Name of Signatory: _____

Title of Signatory: _____

Telephone Number: _____

Facsimile Number: _____

Email Address: _____

WITNESS the execution hereof by the authorized representative of.

PRV\8273G\1

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 55 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 66 of 73

12

By: _____

Name of Signatory: _____

Title of Signatory: _____

Company Taxpayer Identification Number: _____

Designated Representative for Receipt of Notice and Invoices:

Name: _____

Address: _____

_____

_____

Telephone Number: _____

Facsimile Number: _____
Email Address: _____

WITNESS the execution hereof by the authorized representative of.

By: _____

Name of Signatory: _____

Title of Signatory: _____

Company Taxpayer Identification Number: _____

Designated Representative for Receipt of Notice and Invoices:

Name: _____

Address: _____

_____

_____

PR\482736\1

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 56 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 67 of 73

13

Telephone Number: _____

Facsimile Number: _____
Email Address: _____

14
## APPENDIX A

### List of Transferors

15

# APPENDIX B

## Consent Decree

16
## APPENDIX C

### Site Map

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 60 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 71 of 73

17
## APPENDIX D

### Schedule of Fees

C:\DOCUME~1\enonnoe\LOCALS~1\Temp\notes0EF97DA\XNDQ01_DOC

09-50026-mg    Doc 4655-3    Filed 12/11/09    Entered 12/11/09 17:02:37    Exhibit A
(part three)    Pg 61 of 63
Case 2:06-cv-06077-FSH-PS    Document 5-2    Filed 06/15/2007    Page 72 of 73

*de maximis, inc.*

## PROFESSIONAL SERVICES RATE SCHEDULE
### JANUARY 1, 2006

| MANAGEMENT | HOURLY RATE |
|---|---|
| Expert Testimony | $125.00 –250.00 |
| Senior Project Director | $125.00 –170.00 |
| Project Director | $110.00 –124.00 |
| Senior Project Manager | $ 95.00 –109.00 |
| Project Manager | $ 80.00 – 94.00 |

| TECHNICAL | |
|---|---|
| Senior Project Engineer/Geologist | $ 65.00 – 90.00 |
| Project Engineer/Geologist | $ 55.00 – 64.00 |
| Project Specialist | $ 45.00 –54.00 |

| FUND ADMINISTRATION | |
|---|---|
| Fund Administrator/Trustee | $140.00 |
| Fund Officer | $115.00 |
| Accountant | $ 85.00 |
| Account Support | $ 69.00 |

| SUPPORT SERVICES | |
|---|---|
| Records Coordinator/Administrative Support | $ 65.00 |
| Word Processing Support | $ 52.00 |

## PERSONNEL CHARGES

- Management and technical personnel time charges will be invoiced according to the Rate Schedule above.

- Personnel time charges for direct project support activities such as report typing and reproduction are invoiced according to the Rate Schedule above. Charges include indirect support staff, text processing, equipment, computer connect charges, and nominal communication charges.

- All time is rounded to the nearest quarter hour.

PROFESSIONAL SERVICES RATE SCHEDULE
JANUARY 1, 2006
(continued)

## TRAVEL AND LIVING EXPENSES

- Travel and living expenses are charged at cost plus 10%.

## OTHER CHARGES AND REIMBURSABLE EXPENSES

- All project-related purchases will be invoiced at cost plus 10%, including materials, subcontractor costs, fees, equipment purchased, and other costs incurred specifically for the project.

- A miscellaneous charge equal to 5% of professional services billed will be added to cover routine project-related telephone usage, postage, and photocopying.

- Non-routine project-related charges such as overnight mailings, outside copying charges, and teleconferences will be invoiced at cost plus 3%.

  X  A nominal fee for document retention and preservation may be charged to each project on a yearly basis as necessary to cover the cost of such activity.

Rates are subject to change no more than annually upon written approval from the client(s).

2006 Fund Administration Rate Schedule



From:    Origin ID: PRIA    (609)716-6500
Lori Mills
Drinker Biddle & Reath LLP
105 College Road East
Suite 300
Princeton, NJ 08542

Ship Date: 23NOV09
ActWgt: 1 LB
CAD: 9857158/WBUS0200
Account#: S *********

Delivery Address Bar Code

Ref #    014378.049517-MILLSLA
Invoice #
PO #
Dept #

SHIP TO: (609)716-6632        BILL SENDER

**The Garden  City Group, Inc.**
**Attn:  Motors Liquidation Company**
**5151 Blazer Pkwy Ste A**

**Dublin, OH 430179306**



TRK#    7928 1149 9495        TUE - 24NOV        A2
0201                    PRIORITY OVERNIGHT

**NU CMHA**

43017
OH-US
LCK



- - - - FOLD on this line and place in shipping pouch with bar code and delivery address visible

1. Fold the first printed page in half and use as the shipping label.
2. Place the label in a waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
3. Keep the second page as a receipt for your records. The receipt contains the terms and conditions of shipping and information useful for tracking your package.