1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026 (REG)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


MOTORS LIQUIDATION COMPANY, et al.,

f/k/a GENERAL MOTORS CORPORATION, et al.,


                    Debtors.


- - - - - - - - - - - - - - - - - - - -x


              U.S. Bankruptcy Court

              One Bowling Green

              New York, New York


              December 16, 2009

              2:07 PM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Motion by Debtors for Entry of Order Authorizing

3   Rejection of Certain Personal Property Agreements and/or

4   Abandonment of Equipment (Filed by Jenner & Block)

5

6   HEARING re Debtors' Ninth Omnibus Motion Pursuant to 11 U.S.C.

7   Section 365 to Reject Certain Executory Contracts and Unexpired

8   Leases of Nonresidential Real Property (with respect to

9   Fountain Lakes I, LLC only)

10

11  HEARING re Debtors' Tenth Omnibus Motion Pursuant to 11 U.S.C.

12  Section 365 to Reject Certain Executory Contracts (with respect

13  to Class Action Settlement Agreement with Castillo Claimants,

14  and with DRA, Inc. only)

15

16  HEARING re Application of Federal Republic of Germany for an

17  Order Pursuant to Rule 2004 of the Federal Rules of Bankruptcy

18  Procedure Authorizing and Directing (A) the Production of

19  Documents and (B) the Oral Examination of Individuals

20  Designated by the Debtors and Believed to Have Knowledge of the

21  Relevant Matters

22

23

24

25

3

1

2    HEARING re Application of Florian Hinrichs for an Order

3    Pursuant to Rule 2004 of the Federal Rules of Bankruptcy

4    Procedure Authorizing and Directing (A) the Production of

5    Documents and (B) the Oral Examination of Individuals

6    Designated by the Debtors and Believed to Have Knowledge of the

7    Relevant Matters

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed By:  Clara Rubin

25

4

1

2    A P P E A R A N C E S:

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors and Debtors-in-Possession

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:    JOSEPH H. SMOLINSKY, ESQ.

9           EVAN S. LEDERMAN, ESQ.

10

11   JENNER & BLOCK LLP

12        Attorneys for Debtors and Debtors-in-Possession

13        919 Third Avenue

14        37th Floor

15        New York, NY 10022

16

17   BY:    ELIZABETH A. EDMONDSON, ESQ.

18

19   BEASLEY ALLEN LAW FIRM

20        Attorneys for Mr. Hinrichs

21        218 Commerce Street

22        Montgomery, AL 36104

23

24   BY:    RICHARD D. MORRISON, ESQ., ADMITTED PRO HAC VICE

25

5

1

2    KLESTADT & WINTERS, LLP

3        Attorneys for the Federal Republic of Germany and Florian

4         Hinrichs

5        292 Madison Avenue

6        17th Floor

7        New York, NY 10017

8

9    BY:   SAMIR "SAM" GEBRAEL, ESQ.

10

11   KRAMER LEVIN NAFTALIS & FRANKEL LLP

12        Attorneys for the Official Committee of Unsecured

13         Creditors

14        1177 Avenue of the Americas

15        New York, NY 10036

16

17   BY:   LAUREN M. MACKSOUD, ESQ.

18

19   OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.

20        Attorneys for Wachovia Financial Services Inc.

21        230 Park Avenue

22        New York, NY 10169

23

24   BY:   STEVEN B. SOLL, ESQ.

25

6

1

2    U.S. DEPARTMENT OF JUSTICE

3         U.S. Attorney's Office

4         86 Chambers Street

5         3rd Floor

6         New York, NY 10007

7

8    BY:   JOSEPH N. CORDARO, AUSA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1                    P R O C E E D I N G S

2          THE COURT:  Have seats, please.  Okay, GM.  I know I

3    have the two contested 2004s.  We also have a number of

4    unopposed matters.

5          Mr. Smolinsky, what's your pleasure as to how you'd

6    like to proceed?

7          MR. SMOLINSKY:  Thank you, Your Honor.  Good

8    afternoon.  Joseph Smolinsky, Weil, Gotshal & Manges, for the

9    debtors.

10         Your Honor, two days ago we filed an agenda with the

11   Court.  If you don't have your copy, I could hand it up.

12         THE COURT:  No, I do have it, and of course it has the

13   contested matters first --

14         MR. SMOLINSKY:  Correct, and we --

15         THE COURT:  -- as they're supposed to be, and then I

16   saw a whole bunch of uncontested matters.

17         MR. SMOLINSKY:  We can skip to the uncontested matters

18   first and let everybody else leave.  Ms. Evans (sic) from

19   Jenner & Block will be presenting the first uncontested matter.

20   Before I cede the podium, I just wanted to note for Your Honor

21   there was one matter on the calendar outside Napleton, which is

22   number 11 on our agenda, which does not indicate that the

23   matter was adjourned.  We've settled that matter but we don't

24   have an order yet, so we're going to adjourn that matter, as

25   indicated.

8

1          THE COURT:  Okay.

2          MR. SMOLINSKY:  Thank you.

3          MS. EDMONDSON:  Your Honor, Elizabeth Edmondson with

4   Jenner & Block.  We have an uncontested motion for rejection of

5   certain leveraged lease agreements, and I have a revised order.

6   I can walk you through the changes to the order, if you'd like.

7          THE COURT:  Well, frankly, if it's unopposed, I don't

8   think I need you to do that, Ms. Evans (sic), so why don't you

9   just drop the revised order with my courtroom deputy Ms. Blum

10  across the hall.

11         MS. EDMONDSON:  Okay, great.  Thank you.

12         MR. SMOLINSKY:  Your Honor, number 4 on the agenda is

13  the debtors' ninth omnibus motion to reject executory

14  contracts.  This is a motion that has been adjourned with

15  respect to certain of the parties.  Today we want to resolve

16  the matter of Fountain Lakes.  Fountain Lakes filed an

17  objection based on a dispute over ownership of a rack system.

18  We've resolved that issue; we've abandoned the rack system to

19  them.  And we have an order to hand up to Your Honor resolving

20  that objection.

21         THE COURT:  Okay, so I have the same request:  that

22  you or your designee just drop it off with Ms. Blum across the

23  hall.

24         MR. SMOLINSKY:  Absolutely, Your Honor.  Number 5 on

25  the agenda is the debtors' tenth omnibus motion to reject

9

1    contracts.  This is also an adjourned motion.  There are two

2    things happening on this motion today.  With respect to DRA,

3    Inc., we are withdrawing that motion with respect to them, and

4    we will be submitting an order to that effect.

5        THE COURT:  Okay.

6        MR. SMOLINSKY:  The last one is Castillo.  And with

7    respect to the Castillo contract, they filed an objection.

8    They now, after discussion, agree that the contract can be

9    rejected, provided that it's without prejudice to parties'

10   rights with respect to an adversary proceeding that's pending

11   before this Court.  We have an order to that effect, and that

12   resolves the Castillo objection.

13       THE COURT:  Fair enough.

14       MR. SMOLINSKY:  I think that leaves Mr. Hinrichs and

15   the Federal Republic of Germany.

16       THE COURT:  Okay, then I'll hear argument on that.

17   I'll hear it from the two movants together, because they seem

18   to me very closely related to raise similar issues.

19       Folks, if this were a motion for relief from the stay

20   I would have very material concerns, because I suspect there

21   may be hundreds, if not thousands, of people with product

22   liability claims out there, and there really would be huge

23   floodgates issues.  But I have more difficulty seeing why it's

24   a big deal just to give the claimants some information.  And

25   I'll hear people's arguments about that.

10

1        Go ahead.

2        MR. GEBRAEL:  Thank you.  Good afternoon, Your Honor.

3   My name's Samir Gebrael, from Klestadt & Winters, on behalf of

4   the Federal Republic of Germany, which I'll refer to as the

5   FRG, and Mr. Hinrichs.  We represent these both parties in the

6   2004 application for the production of documents and the

7   examination of certain individuals designated by the debtors.

8        I also have with me Mr. Morrison, Rick Morrison, and

9   he has been admitted pro hac vice.  His order just was entered

10  last night.  Currently, he's counsel for Mr. Hinrichs in the

11  Alabama state case.  And I'll go over the outline of our

12  application, but if there's any specific questions that you

13  would like to ask regarding the underlying claim, he's here to

14  answer that.

15        THE COURT:  Well, I mean, I've read the papers; I

16  don't want you to repeat what's in them.  I want you folks,

17  both sides, to focus on giving me comfort that you're not

18  trying to make a claim against the estate out of assets of the

19  estate, and if in fact it is the case, that all you're looking

20  for is confirmation that the debtor has or doesn't have

21  insurance and you're of a mind to go solely against the

22  insurance.  Both sides can help me as to why you weren't able

23  to just trade that kind of information and get on with life.

24        Mr. Gebrael, if this is the first step toward bringing

25  litigation where you would be looking for relief from the stay

11

1    before me or trying to bring on a tort litigation in this court

2    or in the district court, I would have material problems with

3    that.  But I need help from both sides on whether it indeed is

4    the case that all you're looking to do is find out if the

5    debtor has insurance, and if so, to get that answer.

6         So go ahead.

7         MR. GEBRAEL:  Your Honor, that's exactly right.

8    That's all we're trying to do.  This is just about due

9    diligence.  We filed our application about four or five months

10   ago, and in the last four months we've received in total six

11   pages of documents.  Three pages were a declaration of Mr. Chu,

12   who is purportedly an expert on the issue of claim coverage.

13   The other three documents were a declaration page that was

14   redacted.  Perhaps counsel was trying to figure out some kind

15   of way to resolve this, so I'm not saying that, you know,

16   giving us a redacted declaration page was something that they

17   were doing that we oppose.  But with the declaration page that

18   was redacted came a condition that we would then have to

19   withdraw our 2004 application once we saw the unredacted

20   declaration page.  We simply could not agree to that condition.

21        And that went on for a few months.  And finally

22   perhaps seeing the unreasonable standard they took, last Friday

23   they did agree to withdraw that condition and they did turn

24   over the unredacted declaration page of the self-insurance

25   policy, if you want to call it.  However, they did not turn

12

1    over what we had asked for, which is the entire policy.  There

2    might be caveats in there, there might be some kind of terms in

3    there that we need to understand.  This is about doing our due

4    diligence and this is about making sure that we do turn every

5    stone and make sure that we do read every document as

6    fiduciaries to Mr. Hinrichs and the Federal Republic of

7    Germany.

8            THE COURT:  Did you offer to take it on an attorneys'-

9    eyes-only basis and not to share it with any other tort

10   litigants?

11           MR. GEBRAEL:  Of course, Your Honor.  We immediately

12   signed a confidentiality agreement using whatever terms they

13   would like.  We didn't change any of the terms of their

14   confidentiality agreement to see the declaration page, and we

15   were willing to also sign the same confidentiality agreement to

16   see the entire policy.  It's also about the excess policy that

17   they said that we're not allowed to see.

18           It is true that Mr. Hinrichs filed a claim for twenty-

19   five million dollars, but that is an estimate of what the claim

20   is for.  The claim can be for more money, for more -- for a

21   bigger amount, and we explained that to them, and they said,

22   well, since it's only for twenty-five million, file the twenty-

23   five million, then you're not allowed to see the excess or

24   umbrella which goes over the thirty-five million mark.

25           Again, we don't see any harm in turning over this

13

1    policy.  In fact, it's a benefit to their estate to turn over

2    these documents.

3         THE COURT:  Why is it that?

4         MR. GEBRAEL:  Well, if in fact there is a policy, that

5    we can somehow negotiate a modification -- not now, we're not

6    looking to do this now, but down the line -- a modification of

7    the stay to go over just those proceeds from that policy, then

8    it would benefit the estate.

9         There are some, again, some other questions that

10   remain unanswered.  We had asked them to provide information

11   regarding the -- and if there's any reserves that had been set.

12        THE COURT:  The what?

13        MR. GEBRAEL:  Any reserves that had been set related

14   to the underlying claim; any monies set aside.

15        THE COURT:  Why would that possibly be relevant?

16        MR. GEBRAEL:  Your Honor, if there was any --

17        THE COURT:  Because I was wondering, Mr. Gebrael, how

18   it could be that a matter of this seeming simplicity could

19   engender so many lawyers coming into my courtroom, including

20   one being Alabama counsel.  And if it were just going over the

21   pieces of paper or refusal to do that, it would cause me to

22   scratch my head.  But when you start talking about other

23   things, I'm beginning to wonder whether something's under the

24   covers.

25        I have never, in -- I'm coming up on my fortieth year

14

1    as a lawyer and a judge -- ever seen a Court order discovery of

2    one litigant's reserve or estimate of its liability to its

3    opponent.  And that's unthinkable to me as a bankruptcy judge,

4    as a bankruptcy lawyer or as the civil litigator that I once

5    was before I was either.

6         MR. GEBRAEL:  You're right, Your Honor.  That's not

7    our main concern here.  I do agree with you; we're not looking

8    for the actual amount.  You're right.  The other thing we're

9    looking for is the self-insurance, the program, how it is it's

10   set and how -- you know, if there was any communications

11   regarding this claim.  They were basically saying that all that

12   information regarding the self-insurance program is privileged.

13   And we had asked that if it was in fact privileged, then they

14   give us some more detail about exactly what is privileged.

15        Again, those two are actually secondary issues.  Our

16   main issue here really is about the policy and seeing that

17   policy and making sure that we've gone through the policy and

18   making sure there isn't any caveats, there aren't any

19   exceptions for our client.

20        In regards to the declaration, Your Honor, we --

21   actually, going back to even the information about the --

22   sorry, regarding the -- sorry -- about if there's -- the way

23   that -- the procedure for setting up the self-insurance

24   retention, they had replied to us that, you know, again, that

25   there is no procedure or that most of the information is

15

1   privileged or that most -- that they just simply don't have the

2   information, and they replied to us through e-mails.  And,

3   again, in light of the magnitude here that we're dealing with a

4   twenty-five million dollar claim, and in light of -- I don't

5   really want to get into this too much, but we do have some

6   information regarding that there's a history that this debtor

7   might be obstructive sometimes when it comes to discovery in

8   these type of matters, we felt that it was prudent that we get

9   every answer through a sworn declaration and not through an

10  e-mail.  It's just simply due diligence, Your Honor.  And they

11  refused and they said they've done everything they could and

12  e-mails will have to suffice.  We couldn't accept that answer.

13       They're arguing here that, Your Honor, the 2004

14  application somehow seems restricted discovery.  It does not.

15  It's simply asking for insurance information related to

16  coverage possibilities involving the assets within or outside

17  of the estate.

18       And time is of the essence here.  Mr. Hinrichs is a

19  quadriplegic.  I'm not -- we're not saying -- representing that

20  he's, you know, going to pass away soon, but, still, the

21  damages he has suffered, he'd like to get answers soon.

22       THE COURT:  Well, then why is time of the essence?

23  Because I assume that even if the debtors gave you information,

24  and even if it turned out that there was insurance information,

25  and even if you then negotiated a stip with the debtors of the

16

1   type that's so often entered into, under which you have relief

2   from the stay so long as you agree to go solely against

3   insurance, you then got to proceed with discovery in Alabama or

4   wherever the underlying litigation is, get on a trial calendar

5   in Alabama, get an Alabama judgment, and then, unless the

6   insurance company is of a mind to write you out a check, to

7   wait until that matter is resolved on appeal, since in my

8   experience you normally can't write out a check to yourself on

9   a supersedeas bond.  Am I mistaken in any of those

10  understandings?

11       MR. GEBRAEL:  No, I -- you're right, Your Honor, but

12  we want to get that process started as soon as possible if in

13  fact there is such a policy out there.

14       THE COURT:  Go on.

15       MR. GEBRAEL:  In terms of the burdens, Your Honor,

16  they've asserted time and again that they don't have possession

17  of these documents.  We find that very difficult to believe in

18  light of the fact that -- well, first they assert there are

19  thousands of claims such as these.  If in fact it's true that

20  they have thousands of these claims, then why don't they have

21  the policy?

22       Another point, Your Honor, is that the debtors are

23  still named as secondary insured on the policies.  So, again,

24  we find it hard to believe the secondary insured that they

25  don't have this policy.

17

1        And, finally, on Friday they did produce the

2   unredacted version of this declaration page.  So, again, it

3   shows that they do have possession of these documents.

4        And finally, just based on the nature of this

5   proceeding, based on the fact that if today a claimant would

6   file a claim against New GM, New GM would have to go to, in a

7   sense, to Old GM to get documents in regards to vehicles

8   manufactured before the filing.  So it seems like there might

9   be some kind of a document exchange agreement between them, and

10  it seems unbelievable that they would say that they just simply

11  don't have the requisite control to turn over these documents.

12        That's it, Your Honor.

13        THE COURT:  Okay.

14        MR. GEBRAEL:  For those reasons, we ask that you allow

15  our application.

16        THE COURT:  Fair enough.

17        Who's going to argue for the debtors?  Mr. Smolinsky.

18        MR. SMOLINSKY:  Thank you, Your Honor.  Again, Joe

19  Smolinsky for the debtors.

20        Your Honor, just for the record and by way of update,

21  we did last week deliver to counsel for Mr. Hinrichs a copy of

22  declaration pages for the excess layer of coverage.  Despite

23  what's said in the papers about the fact that we conditioned

24  the delivery of those papers on -- which were on the motion,

25  with prejudice, we didn't ask for withdrawal of the prejudice.

1    What we asked is that if we give you the declaration pages

2    which demonstrate that there's a thirty-five million dollar

3    threshold before any indemnity insurance is available, would

4    that resolve the issues, because I think what you're hearing

5    from Mr. Gebrael today is a little bit about what we've been

6    going through over the last several months.  They say they just

7    want to know whether there's coverage.

8         THE COURT:  Well, I hear you loud and clear on that,

9    Mr. Smolinsky, and I've been scratching my head to figure out

10   why this wasn't consensually resolved and why everybody got to

11   so much brief-writing.  And I sense from some of the questions,

12   or at least there's an issue in my mind from some of the

13   questions that went back and forth, that this goes beyond just

14   getting a copy of the policy and some things that might be

15   fairly regarded as overreaching.  But I guess the question I

16   want to ask you is why didn't you give him the stuff that would

17   have been obvious to give him and then say over my dead body if

18   you want anything else?

19        MR. SMOLINSKY:  Your Honor, let me go there and then

20   come back to why generally we're taking the position that we

21   are, from the debtors' perspective, because I think it is

22   relevant to try to resolve all of these claims that we have.

23        But let me give you some insight into the position of

24   New GM, because, at bottom, that's one of the reasons why --

25   it's not the debtors' reason, but it's one of the reasons why

19

1    we have not turned over the policy.  Under the master sale and

2    purchase agreement, these policies constitute purchased assets;

3    so they acquired the policies.  That doesn't necessarily mean

4    that we don't have access to the indemnity as an insured, but

5    it does mean that they are the owners of the policy.

6          And they have told us that these policies are

7    considered confidential and proprietary.  And over the past

8    many years, their experience is that they have not been

9    required to turn over these policies, and now they are the

10   successor to the policy.

11         THE COURT:  Well, until June 1st of this year they

12   were never in bankruptcy, were they?

13         MR. SMOLINSKY:  I understand, Your Honor.  We -- in an

14   effort to avoid a situation where parties have to subpoena -- I

15   want to make clear, we do have copies of the policy.  When we

16   talked about custody and control, what we were talking about is

17   whether or not we are authorized to turn over a policy that

18   belongs to someone else when they say that it's proprietary and

19   confidential.

20         What Mr. Gebrael is interested in, which I think you

21   alluded to before, is whether or not you would agree to a

22   stipulation lifting the automatic stay and agreeing to go after

23   insurance.  And here that's not plausible because this company

24   had a thirty-five million dollar self-insured retention.  The

25   proof of claim that was filed is in a fixed liquidated amount

20

1    of twenty-five million dollars.  It doesn't say an amount at

2    least twenty-five million dollars; it doesn't say an amount to

3    be determined by the Court.  It's a proof of claim in the

4    amount of twenty-five million dollars.  Therefore, this policy

5    is not necessarily relevant to this proof of claim.

6         This is not the situation where we should be -- that

7    we as debtors felt that we should embark in litigation with New

8    GM over this or whether we should participate in subpoenas and

9    the like.  I think the goal of the debtors was to work with New

10   GM to try to provide as much information as was necessary at

11   this juncture of the proceedings.

12        We have had a number of requests by parties for

13   information on the insurance, and we have been able to resolve

14   those requests by providing them with information that there's

15   a thirty-five million dollar retention.  And when asked whether

16   they want to lift the stay to proceed against the insurance,

17   the answer is a resounding no.

18        Mr. Gebrael always wants to know more.  He wants to

19   know, well, how much do you have on reserve for this case, and

20   he wants to know, well, if this is a self-insured case, where's

21   the self-insurance policy, where's the money that's sitting

22   there for the self-insured claims.  And we keep --

23        THE COURT:  I'm not sure if I understand that

24   question.

25        MR. SMOLINSKY:  We don't either, Your Honor.  What we

21

1   explained is -- this is not like workers' comp coverage where

2   if you're self-insured you have to have a process of having

3   sureties or whatever.  This is just a self-insured plan, which

4   means that we cover the first thirty-five million dollars of

5   any expenses or judgments or settlements arising out of it, and

6   only after we pay out thirty-five million dollars are we

7   allowed to seek indemnity from the insurer.

8       THE COURT:  Yes, I understand very well.  I mean, I

9   don't know if you were in the courtroom when I said, if I were

10  king of the world, parties wouldn't be allow to self-insure,

11  and corporations, just like people who drive on the highway,

12  would be required to have insurance.  But in the United States

13  we allow corporations to self-insure.

14      MR. SMOLINSKY:  And I don't disagree with that, and

15  I've seen through my career a lot of very unfortunate

16  circumstances.  Self-insured health plans are the same.  And we

17  have thousands of these cases, and they're sad cases.  We

18  have -- virtually every major accident that happens in America

19  that involves a GM car we end up with a lawsuit, and we have to

20  deal with all those lawsuits.

21      And going back to the debtors' perspective on this, I

22  want you to understand where we're coming from.  November 30th

23  was the bar date for the first filed debtors.  We are in the

24  process of processing those claims.  There are so far more than

25  68,000 claims, which are for the face amount, not including

22

1    unliquidated claims, of more than 217 billion dollars.

2            Now, unlike a typical case where you have a lot of

3    fixed liquidated claims, in this case a lot of the day-to-day

4    fixed liquidated claims were assumed by the purchaser.  So a

5    substantial majority of these claims that I'm talking about are

6    unliquidated litigation claims.  And it's our job as the

7    debtors and as fiduciaries to try to reconcile those claims as

8    quickly as possible and to try to manage that process so we can

9    make meaningful distributions to creditors, to bondholders, as

10   quickly as possible without having to reserve the majority of

11   the funds.  And we have a way to do that.  We've been working

12   with the committee on putting together a comprehensive ADR

13   procedure that we hope to have in front of Your Honor by the

14   end of this month.

15           And there are a number of these requests, and I think

16   that our focus should be on dealing with the substance of the

17   claims, particularly where we have a twenty-five million dollar

18   claim and a thirty-five million dollar excess policy that may

19   become relevant in a discussion over the merits of the claim

20   and resolving the underlying claim.

21           We're not trying to keep that coverage away.  To the

22   extent that it's available to a settlement, then we clearly

23   would consider that and analyze that.  And plaintiffs are going

24   to have the risk of whether or not that coverage is available.

25   There are issues as to whether or not the insurance company,

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

23

1    under the policy, would cover where we don't pay out the

2    thirty-five million dollars of cash.

3         But what we should be focusing on is the claims and

4    not sitting in depositions and not sitting -- and not

5    responding to repetitive questions about the underlying

6    insurance, because at this point I think the important issue is

7    that there is no insurance below thirty-five million dollars.

8    We've stated that loud and clear, we've provided a declaration

9    of Mr. Chu to that effect, and that's been sufficient with

10   respect to the other inquirers on those issues.

11        Your Honor, I think that -- on the legal issues, I

12   think that it's -- we fully briefed, and I won't go over those

13   issues again.  But I wanted Your Honor to know about the two

14   underlying issues:  first, our issue that we want this to be

15   fair, we want to get the process of reconciling these claims

16   going as quickly as possible, and that there are parties out

17   there who want to resolve their claims, and we're establishing

18   a procedure for doing that; and secondly, the New GM issue,

19   which is an issue that I think we -- you know, we've had to

20   deal with it, and we've been able to get New GM to provide the

21   basic information which I think is necessary, through

22   declarations, through declaration pages.

23        And just on that, when we sent the first few

24   declaration pages of the policy, it was redacted, but the

25   information that was redacted is clearly indicated as the

24

1   premiums that are paid for the policy, and I don't think that

2   that's relevant to Mr. Hinrichs' inquiries.

3          THE COURT:  Okay.

4          Reply?

5          MR. GEBRAEL:  I just wanted to add one final thing,

6   Your Honor.  In a sense, what you had said is very true that if

7   it was for any other company, a self-insurance program of

8   thirty-five million dollars would just be unheard of.  And as

9   Mr. Morrison -- you know, we had discussed this before the

10  filing.  This would just be thirty-five million self-retention;

11  fine, nobody would question that, but because -- we are kind of

12  in this new situation that we're maybe pushing a little bit

13  further to make sure that we've asked all the questions that we

14  need to ask and see all the documents that we need to see.

15         That's it, Your Honor.  Thank you.

16         THE COURT:  All right.

17         Everybody sit in place.

18     (Pause)

19         THE COURT:  All right, folks, the motion will be

20  granted in part and denied in part, and the following are the

21  specifics of my ruling and the bases for the exercise of my

22  discretion.

23         The motion is granted to the extent of requiring GM to

24  produce the entire policy on an attorneys'-eyes-only basis,

25  those attorneys' eyes being an attorney who practices in the

25

1    United States Bankruptcy Court for the Southern District of New

2    York, under a suitable confidentiality agreement, which

3    agreement or any associated order expressly provides that the

4    information provided to counsel will not be shared with counsel

5    for other litigants, and which may, if the GM estate chooses

6    to, the Old GM estate, redact the premiums that were paid for

7    that policy if they appear in the policy that would be

8    produced.

9          The motion is also granted to the extent of permitting

10   discovery of Mr. Chu or another knowledgeable witness to the

11   extent of a deposition not to exceed an hour and a half and to

12   be limited to explaining his understanding of what the policy

13   provides and saying if it is a subject of inquiry, and if it is

14   of course true, that that's the only policy that's out there.

15         The request is otherwise denied.  I am expressly

16   denying the request for discovery of reserves with respect to

17   this or any other litigation.  I am expressly denying discovery

18   with respect to the mental impressions of any lawyer or

19   businessperson associated with Old GM or New GM, with respect

20   to this or any other litigation that I'm expressly denying

21   discovery with respect to the crafting of the self-insurance

22   program.  In other words, we're not going to inquire into GM's

23   noninsurance, except to confirm that the policy is the only

24   insurance.

25         The underlying rationale upon which I'm authorizing

26

1   this discovery is that I do believe that it is appropriate for

2   discovery, in a bankruptcy context, in unusual cases, this

3   being one of them, to permit discovery to ascertain whether

4   entering into the traditional stip by which partial relief in

5   the stay is authorized to allow one to go against insurance is

6   a practical option.  The purpose is not to inquire as to the

7   underlying claim, most obviously the extent to which GM made a

8   quality car or made design errors in connection with it or

9   anything that might be a subject of inquiry in an underlying

10  tort action, nor is it appropriate to ascertain anything about

11  Old GM Motors Liquidation Company's -- I think its present name

12  is -- ability to satisfy a claim if liability were ever to be

13  found.

14       I think I telegraphed in my questioning why I consider

15  information as to reserves inappropriate; I'm not going to

16  repeat that.  I will incorporate the assumptions that were in

17  my question by reference.  I never have, nor, barring something

18  extraordinarily unforeseen, never will, require one party to

19  produce to its adversary its views either subjectively or by

20  dollar monetization as to what it might owe to somebody else

21  vis-a-vis a nonliquidated dispute toward litigation.  Likewise,

22  the crafting of the self-insurance program would not be

23  relevant.  The extent, if any, to which it would be relevant is

24  to simply find out whether there is a policy which folks could

25  agree would be the sole provider of any recovery in the event

27

1    of any future motion or stip for relief from the stay.

2         I well understand the desire of New GM not to share

3    this information, but New GM's desires in this regard can't be

4    controlling upon me; I have a Chapter 11 case under my watch.

5    And while the existence of insurance would obviously not be

6    relevant in a nonbankruptcy situation, except for purposes that

7    are not before me here, it becomes relevant because of the

8    limited ability of Old GM to satisfy claims of any type on an

9    unsecured basis.  And that's why I'm so ruling.

10        For the avoidance of doubt, and at the risk of my

11   repeating myself, there shall be no discovery on the merits of

12   the underlying litigation now pending in Alabama.

13        I wonder under all of this whether our needs and

14   concerns can be satisfied simply by a one-page letter of

15   transmittal handing over whatever number of pages there are in

16   the full policy after it's been redacted.  But if there is a

17   desire or need to depose an Old GM witness, Chu or a pinch

18   hitter can be examined for no more than an hour and a half.

19        I'm going to so order the record, but either side can

20   provide for a written order if that's perceived as desirable by

21   either side.

22        Not by way of re-argument, are there any questions?

23        Mr. Smolinsky.

24        MR. SMOLINSKY:  Thank you, Your Honor.  Just one point

25   of clarification.  If the deposition does go forward, are the

28

1    attendees limited to the bankruptcy lawyers who are going to be

2    reviewing the policy?

3          THE COURT:  Yes, but I think if your creditors'

4    committee's bankruptcy lawyers want to attend, you should let

5    them attend also.

6          MR. SMOLINSKY:  Absolutely.

7          THE COURT:  Yes.

8          Anything else, anybody?

9          Let me just underscore that the reason for the last

10   ruling that Mr. Smolinsky asked for clarification on was not to

11   be mean to tort lawyers or lawyers outside of this

12   jurisdiction.  The point is that the purpose of this is

13   bankruptcy-driven; it is not tort litigation-driven.  And on an

14   attorneys'-eyes-only document of this sensitivity, I want Mr.

15   Klestadt or one of his colleagues -- Mr. Klestadt I obviously

16   know, because I can rely on his integrity in complying with one

17   of my orders.  That's not to be mean or to say anything bad

18   about people I don't know; it's just that I have confidence

19   that Mr. Klestadt will comply with one of my orders.

20         Anything else, anybody?

21         Okay, have a good day, folks.  We're adjourned.

22         (Proceedings concluded at 2:51 PM)

23

24

25

29

1                        I N D E X

2

3                       R U L I N G S

4     DESCRIPTION                              PAGE      LINE

5     Application of Federal Republic of        24        20

6     Germany and Florian Hinrichs for an

7     Order Pursuant to Rule 2004 of the

8     Federal Rules of Bankruptcy Procedure

9     Authorizing and Directing (A) the

10    Production of Documents and (B) the

11    Oral Examination of Individuals

12    Designated by the Debtors and Believed

13    to Have Knowledge of the Relevant Matters,

14    Granted in Part and Denied in Part

15

16

17

18

19

20

21

22

23

24

25

30

1

2                        C E R T I F I C A T I O N

3

4        I, Clara Rubin, certify that the foregoing transcript is a true

5        and accurate record of the proceedings.

6

7        _____

8        Clara Rubin

9        AAERT Certified Electronic Transcriber (CET**D-491)

10

11       Veritext

12       200 Old Country Road

13       Suite 580

14       Mineola, NY 11501

15

16       Date: December 17, 2009

17

18

19

20

21

22

23

24

25