Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------------x
                                          :
In re                                     :      Chapter 11 Case No.
                                          :
MOTORS LIQUIDATION COMPANY, et al.,       :      09-50026 (REG)
        f/k/a General Motors Corp., et al.  :
                                          :
                    Debtors.              :      (Jointly Administered)
                                          :
---------------------------------------------------------------x
```

**NOTICE OF HEARING**
**ON DEBTORS' OBJECTION TO PROOF OF CLAIM**
**NO. 903 FILED BY SUSAN B. ANGELL AND PRUDENCE REID**

    **PLEASE TAKE NOTICE** that upon the annexed Objection, dated January 29,

2010 of Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated

debtors, as debtors in possession (collectively, the "**Debtors**"), to the allowance of Proof of

Claim No. 903 filed by Susan B. Angell and Prudence Reid (the "**Angell Putative Class**

**Claim**"), all as more fully set forth in the Objection, a hearing will be held before the Honorable

Robert E. Gerber, United States Bankruptcy Judge, in Room 621 of the United States

Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New

York 10004, on **March 2, 2010 at 9:45 a.m. (Eastern Time),** or as soon thereafter as counsel

may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses to the Objection must

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules

of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically in

accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by

registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest,

on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other

Windows-based word processing format (with a hard copy delivered directly to Chambers), in

accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and

served in accordance with General Order M-242, and on (i) Weil, Gotshal & Manges LLP,

attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn:  Harvey R.

Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (ii) the Debtors, c/o

Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit, Michigan 48243

(Attn:  Ted Stenger); (iii) General Motors, LLC, 300 Renaissance Center, Detroit, Michigan

48265 (Attn:  Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham & Taft LLP,

attorneys for the United States Department of the Treasury, One World Financial Center, New

York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United States Department of the

Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, DC 20220 (Attn:  Joseph

Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export Development Canada, 1633

Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael J. Edelman, Esq. and

Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory

committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036

(Attn:  Thomas Moers Mayer, Esq., Amy Caton, Esq., Adam C. Rogoff, Esq., and Gregory G.

Plotko, Esq.); (viii) the Office of the United States Trustee for the Southern District of New

York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Diana G. Adams,

Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York,

New York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz, Esq.); (x) all entities

that requested notice in these chapter 11 cases under Bankruptcy Rule 2002, and (xi) Susan B.

Angell and Prudence Reid, by and through their attorneys of record, Thomas P. Sobran, Esq., 7

Evergreen Lane, Hingham, Massachusetts 02043, so as to be received no later than **February 23,**

**2010 at 4:00 p.m. (Eastern Time)** (the "**Response Deadline**").

        **PLEASE TAKE FURTHER NOTICE** that if no response is timely filed and

served with respect to the Objection, the Debtors may, on or after the Response Deadline, submit

to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Objection, which order may be entered with no further notice or opportunity to be heard offered

to any party.

Dated: New York, New York
      January 29, 2010

                            /s/ Joseph H. Smolinsky
                            Harvey R. Miller
                            Stephen Karotkin
                            Joseph H. Smolinsky

                            WEIL, GOTSHAL & MANGES LLP
                            767 Fifth Avenue
                            New York, New York 10153
                            Telephone: (212) 310-8000
                            Facsimile: (212) 310-8007

                            Attorneys for Debtors
                            and Debtors in Possession

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                            :
**In re**                                   :    **Chapter 11 Case No.**
                                            :
**MOTORS LIQUIDATION COMPANY,** *et al.*,   :    **09-50026 (REG)**
    **f/k/a General Motors Corp.,** *et al.*  :
                                            :
      **Debtors.**               :    **(Jointly Administered)**
                                            :
------------------------------------------------------------x

## DEBTORS' OBJECTION TO PROOF OF CLAIM
## NO. 903 FILED BY SUSAN B. ANGELL AND PRUDENCE REID

# TABLE OF CONTENTS

Page

RELIEF REQUESTED.................................................................................... 1

JURISDICTION ............................................................................................... 4

RELEVANT FACTS TO ANGELL PUTATIVE CLASS CLAIM.............................. 4

THE RELIEF REQUESTED SHOULD BE APPROVED BY THE COURT............................ 7

    I.    Application of Bankruptcy Rule 7023 to a Class Proof of Claim Is
           Discretionary and Should Be Denied in This Case................................ 7

          A.    The Angell Plaintiffs Failed to Comply with Bankruptcy Rules
                 9014 and 2019........................................................................... 9

          B.    Allowing the Angell Claim to Proceed as a  Class Action Will Not
                 Be Effective or Efficient ....................................................... 12

          C.    The Angell Claim Was Not Certified Prior to the Commencement
                 Date........................................................................................ 14

          D.    Adequate Notice of the Bankruptcy Case and the Bar Date Was
                 Provided to the Putative Angell Class .................................... 15

    II.    The Angell Putative Class Claim  Cannot Satisfy the Requirements of
           Rule 23 ................................................................................................ 17

           A.    The Injunctive Relief Sought by the Angell Putative Class Claim
                 Under Rule 23(b)(2) Is Mooted by the Debtors' Liquidation.................. 19

          B.    Numerous Individual Issues Predominate Over Any Common
                 Questions............................................................................... 19

               1.    Variations in the Law of 51 Jurisdictions Defeat
                        Predominance............................................................. 20

               2.    Necessity of Individual Fact Determinations Destroys
                        Predominance............................................................. 24

           C.    The Angell Plaintiffs Cannot Establish that a Class  Action Is
                 Superior to Other Available Methods for  Fairly and Efficiently
                 Adjudicating this Controversy ............................................... 28

          D.    Neither "Commonality" nor "Typicality"  Can Be Established by
                 the Angell Plaintiffs .............................................................. 29

          E.    The Angell Plaintiffs Are Not Adequate Representatives ...................... 31

          F.    The Members of the Putative Angell Classes Are Not Properly
                 Identifiable ............................................................................ 32

NOTICE........................................................................................................ 33

i

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981), *reh'g denied*, 450 U.S. 971 (1981) .................21

*In re Am. Reserve Corp.*, 840 F.2d 487 (7th Cir. 1988)..............................................7, 9

*Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014 (11th Cir. 1996), *reh'g denied*, 104 F.3d 373 (11th Cir. 1996) .........................................................................27

*In re Baldwin-United Corp.*, 52 B.R. 146 (Bankr. S.D. Ohio 1985) .............................11

*In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616 (Bankr. S.D.N.Y.), *aff'd*, 411 B.R. 142 (S.D.N.Y. 2009)................................................................7, 8

*Barasich v. Shell Pipeline Co.*, No. 05-4180, 2008 WL 6468611 (E.D. La. June 19, 2008) ...................................................................................32, 33

*Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158 (N.D. Cal. 2008)........................................33

*In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003)......................................................................21

*Caro v. Proctor & Gamble Co.*, 18 Cal. App. 4th 644 (1993) ....................................31

*Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996)................................22, 27, 28

*In re Charter Co.*, 876 F.2d 866 (11th Cir. 1989), *cert. dismissed*, 496 U.S. 944 (1990).......................................................................................7

*In re Chateaugay Corp.*, 10 F.3d 944 (2d Cir. 1993) ...............................................34

*Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998) ........................................20, 27

*In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285 (2d Cir. 1992), *cert. dismissed*, 506 U.S. 1088 (1993) .................................................................18

*Edwards v. McCormick*, 196 F.R.D. 487 (S.D. Ohio 2000) .......................................31

*In re Elec. Theatre Rests. Corp.*, 57 B.R. 147 (Bankr. N.D. Ohio 1986) .......................11

*In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1 (S.D.N.Y. 2005)................................8, 9, 10, 14, 19

*Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982) ............................20

i

*In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360 (E.D. La. 1997),
    *reconsideration denied*, 1997 WL 191488 (E.D. La. Apr. 17, 1997).........................23, 28

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332
    (D.N.J. 1997)................................................................................................20, 28

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 194 F.R.D. 484
    (D.N.J. 2000), *reconsideration denied*, 2001 WL 1869820 (D.N.J. Feb. 8, 2001) ..........23

*In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214 (E.D. La. 1998)...............................22

*In re GAC Corp.*, 681 F.2d 1295 (11th Cir. 1982).........................................................................11

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ...................................................................29

*Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675 (Tex. 2002), *reh'g denied*,
    102 S.W.3d 675 (Tex. 2002)...........................................................................................21

*Hurd v. Monsanto Co.*, 164 F.R.D. 234 (S.D. Ind. 1995)...............................................................28

*In re Jamesway Corp.*, No. 95 B 44821 (JLG), 1997 WL 327105
    (Bankr. S.D.N.Y. June 11, 1997).........................................................................9, 15, 16

*Kaczmarek v. Int'l Bus. Mach.*, 186 F.R.D. 307 (S.D.N.Y. 1999)..........................................20, 23

*In re Kaiser Group Int'l, Inc.*, 278 B.R. 58 (Bankr. D. Del. 2002)..................................................7

*Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir. 1987), *reh'g denied*,
    832 F.2d 1267 (11th Cir. 1987), *cert. denied*, 485 U.S. 959 (1988)................................22

*In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475 (S.D.N.Y. 1989), *aff'd*,
    969 F.2d 15 (2d Cir. 1992)..........................................................................................21, 22

*Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*, 993 F.2d 11 (2d Cir. 1993),
    *cert. denied*, 510 U.S. 959 (1993)......................................................................................30

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997) .......................................................29

*Marisol A. by Forbes v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) ...................................................29

*In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417
    (E.D. La. 1997) ................................................................................................................29

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323
(S.D.N.Y. 2002) ...................................................................................24, 32

*Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002) .........................................17

*In re Omegas Group, Inc.*, 16 F.3d 1443 (6th Cir. 1994) .............................................18

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 214 F.R.D. 614
(W.D. Wash. 2003) ...............................................................................27

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ...........................................20, 21

*In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555 (E.D. Ark. 2005) ...........................20

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456
(S.D.N.Y. 2005) ...................................................................................18

*Reid v. White Motor Corp.*, 886 F.2d 1462 (6th Cir. 1989), *cert. denied*,
494 U.S. 1080 (1990)...........................................................................7, 11

*In re Ret. Builders, Inc.*, 96 B.R. 390 (Bankr. S.D. Fla. 1988).....................................14

*In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61 (S.D.N.Y. 2002),
*reconsideration denied*, 224 F.R.D. 346 (S.D.N.Y. 2004) ...........................20, 27

*Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995), *cert. denied*, 516 U.S. 867
(1995)...............................................................................................28, 29

*In re Sacred Heart Hosp.*, 177 B.R. 16 (Bankr. E.D. Pa. 1995)...........................7, 8, 14

*Sanneman v. Chrysler Corp.*, 191 F.R.D. 441 (E.D. Pa. 2000) ...............................24, 26

*Sikes v. Teleline, Inc.*, 281 F.3d 1350 (11th Cir. 2002), *reh'g denied*,
35 F. App'x 859 (11th Cir. 2002), *cert. denied*, 537 U.S. 884 (2002)...............27

*In re Standard Metals Corp.*, 817 F.2d 625 (10th Cir. 1987), *reh'g granted*,
839 F.3d 1383 (10th Cir. 1987), *cert. dismissed*, 488 U.S. 881 (1988)...............12

*Strain v. Nutri/System, Inc.*, No. Civ. A. 90-2772, 1990 WL 209325
(E.D. Pa. Dec. 12, 1990) .........................................................................28

*Sunbird Air Servs., Inc. v. Beech Aircraft Corp.*, Civ. A. No. 89-2181-V,
1992 WL 193661 (D. Kan. July 15, 1992) ...................................................28

*In re Thomson McKinnon Sec. Inc.*, 133 B.R. 39 (Bankr. S.D.N.Y. 1991),
   *aff'd*, 141 B.R. 31 (S.D.N.Y. 1992)...................................................................7, 8, 9, 10, 13

*In re Thomson McKinnon Sec., Inc.*, 143 B.R. 612 (Bankr. S.D.N.Y. 1992) ..............................34

*In re Thomson McKinnon Sec., Inc.*, 150 B.R. 98 (Bankr. S.D.N.Y. 1992) ................................10

*In re Trebol Motors Distrib. Corp.*, 220 B.R. 500 (1st Cir. BAP 1998) .....................................14

*Truckway, Inc. v. Gen. Elec.*, No. Civ. A. 91-0122, 1992 WL 70575
   (E.D. Pa. Mar. 30, 1992)......................................................................................................28

*In re United Cos. Fin. Corp.*, 277 B.R. 596 (Bankr. D. Del. 2002)...............................................7

*In re Vioxx Prods. Liab. Litig.*, No. MDL 1657, 2008 WL 4681368
   (E.D. La. Oct. 21, 2008), *aff'd*, 300 F. App'x 261 (5th Cir. Nov. 17, 2008)....................33

*Wallis v. Ford Motor Co.*, 208 S.W.3d 153 (Ark. 2005) .............................................................25

*Walsh v. Ford Motor Co.*, 130 F.R.D. 260 (D.D.C. 1990), *reconsideration denied*,
   130 F.R.D. 514 (D.D.C. 1990), *appeal dismissed*, 945 F.2d 1188
   (D.D. Cir. 1991) ...................................................................................................................23

*In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. 365
   (Bankr. S.D.N.Y. 1997) ............................................................7, 8, 9, 10, 12, 13, 14,
                                                                                                    17, 22, 26, 31, 32

*In re Worldcom, Inc.*, 343 B.R. 412 (Bankr. S.D.N.Y. 2006) ..........................................21, 22, 24

*In re Zenith Labs., Inc.*, 104 B.R. 659 (D.N.J. 1989) .................................................................10

## Rules, Statutes and Other

11 U.S.C. § 105(a) ........................................................................................................................33

11 U.S.C. § 502..................................................................................................................1, 15, 34

28 U.S.C. § 157.................................................................................................................................4

28 U.S.C. § 1334...............................................................................................................................4

Fed. R. Civ. P. 23 ................................................................................................................. *passim*

Fed R. Bankr. P. 2019....................................................................................................9, 10, 11

Fed. R. Bankr. P. 3001(b) ...........................................................................................................11

Fed. R. Bankr. P. 3003(c)(3)...................................................................................................1, 15

Fed. R. Bankr. P. 7001.................................................................................................................7

Fed. R. Bankr. P. 7023.................................................................................................7, 9, 11, 17

Fed. R. Bankr. P. 9014.......................................................................................... 3, 7, 8, 9, 10

*3 Newburg on Class Actions*, Ch. 20 ........................................................................................12

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and

its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") respectfully

represent:

### **Relief Requested**

1.      The Debtors file this objection (the "**Objection**"), pursuant to section 502

of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 3007(d) of the Federal

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and this Court's Order Pursuant to

Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the

Deadline for Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section

503(b)(9)) and Procedures Relating Thereto and Approving the Form and Manner of Notice

Thereof (the "**Bar Date Order**") [Docket No. 4079], establishing November 30, 2009 as the bar

date (the "**Bar Date**").  Through this Objection, Debtors seek entry of an order disallowing and

expunging Proof of Claim No. 903 (the "**Angell Putative Class Claim**") for $615 million filed

by Susan B. Angell and Prudence Reid (the "**Angell Plaintiffs**"), individually and on behalf of

two-putative nationwide sub-classes.  A copy of the Angell Putative Class Claim is annexed

hereto as **Exhibit "A."**

2.      Attached to the Angell Putative Class Claim was a purported class action

complaint (the "**Second Amended Complaint**") which alleges causes of action for breach of

contract; violations of Massachusetts General Law ("**MGL**") chapter 106, §2-314 regarding the

alleged breach of implied warranty of merchantability; violations of MGL chapter 106; §2-313

regarding the alleged breach of express warranty, breach of express warranty to repair and/or

express service contract to repair; violations of MGL chapter 93A regarding unfair and deceptive trade practices; and unjust enrichment/restitution. These claims purportedly arise from the Debtors' marketing, maintenance, and sale of certain Saab vehicles (the "**Debtors' Products**"), which the Angell Plaintiffs allege had engines that were defective with respect to their design and workmanship, materials and manufacture, predisposing them to "oil sludge" deposits. The Angell Plaintiffs seek, through the Second Amended Complaint, *inter alia*, (1) to certify the putative sub-classes (Angell Putative Class Claim at 66), (2) monetary damages (*id.* at 66-67), (3) injunctive relief compelling the Debtors to inspect, replace, and clean various engine and vehicle parts (*id.*), (4) restitution for all engine repairs resulting from the allegedly defectively designed engines and allegedly incorrect engine oil recommendations (*id.* at 67), (5) restitution for all increased relevant past, present, and future maintenance costs (*id.*), (6) disgorgement of the Debtors' revenue from their alleged unlawful conduct, (7) establishment of a constructive trust "funded by the benefits conferred upon" the Debtors (*id.* at 67), (8) a permanent injunction enjoining the Debtors "from denying Angell's, Reid's and class members' class vehicle oil sludge damage claims for an eight year period commencing from the initial date of sale or lease regardless whether complete maintenance records are available." (*Id.* at 68.)

       3.     As discussed below, while federal courts (including courts in this district) have allowed the filing of class proofs of claims in some bankruptcy cases, whether to permit a class claim to proceed lies within the sound discretion of the court. In exercising their discretion, courts consider, among other things, whether (i) the claim satisfies the strict requirements of Rule 23 of the Federal Rules of Civil Procedure ("**Rule 23**"), and (ii) the benefits that generally support class certification in civil litigation are realizable in the bankruptcy case.

4.      The Angell Putative Class Claim should be disallowed in its entirety because, *inter alia*, (i) the Angell Plaintiffs have failed to satisfy the basic procedural requirements of Bankruptcy Rules 9014 and 2019(a), (ii) the putative sub-classes do not satisfy Rule 23, and (iii) even if the putative sub-classes did satisfy Rule 23, the benefits that generally support class certification in civil litigation are not realizable in these chapter 11 cases.  The Angell Putative Class Claim does not satisfy Rule 23 because of the numerous issues of fact that would predominate over any common questions and because the Angell Plaintiffs are neither typical of the putative sub-classes nor adequate class representatives.  In addition, the need for injunctive relief has been mooted and would provide no deterrent effect, as the Debtors no longer operate a business and are liquidating.  Further, the Angell Plaintiffs' request for a constructive trust is improper in the context of this bankruptcy proceeding, and their claims for breaches of express warranties are barred by the plain terms of the Purchase Agreement, as such liabilities are no longer the Debtors' obligations.

5.      Despite notice by publication of the Bar Date to the putative class members encompassed by the Angell Putative Class Claim, other than the claims filed by the Angell Plaintiffs and by one other individual represented by putative class counsel for the Angell Plaintiffs,[1] there have been no claims filed in this Court seeking damages or requesting relief in connection with the alleged defect of Debtors' Products.  Moreover, because the Debtors have

---

[1] In addition to the Angell Putative Class Claim, the Angell Plaintiffs each filed individual claims apparently based upon the same allegations as the Angell Putative Class Claim.  *See* Proofs of Claim Nos. 18916 & 18918, annexed hereto as **Exhibits "B"** and **"C,"** respectively.  Further, Mr. Sobran, the same attorney who filed the Angell Putative Class Claim on behalf of the Angell Plaintiffs, also filed a separate claim on behalf of third individual, Jo Ann Adams.  *See* Proof of Claim No. 18917, annexed hereto as **Exhibit "D"** (the "**Adams Claim**").  However, included in the documents in support of the Adams Claim is a contingency fee arrangement between Ms. Adams and Mr. Sobran, which was signed in connection with the putative class action alleged in the Second Amended Complaint.  *See* Adams Claim at 3 ("In the event there is no certification of the Saab proposed class action entitled *Angell, et al v. Saab Automobile AB, et al . . .*, Attorney may withdraw from representation of Client.").

provided such notice, it would be unfair and unnecessary to burden the Debtors' estates with the

additional cost and associated delay of providing these potential claimants with a second

opportunity to assert claims as class claimants.  Allowing the Angell Putative Class Claim to

proceed could drain the estates' limited resources if additional notice is required to be given by

the Debtors to the putative class members.  But even worse, the confirmation of the Debtors'

cases and the distribution of the Debtors' assets could be delayed while the Angell Putative Class

Claim is litigated and liquidated.  Such litigation and resultant delay would further deplete the

pool of assets available for distribution to the Debtors' creditors.  As a result, the Court should (i)

disallow the Angell Putative Class Claim in its entirety, or (ii) in the alternative, not allow the

Angell Putative Class Claim to proceed as a class claim.

## Jurisdiction

6.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relevant Facts to Angell Putative Class Claim

7.      On September 16, 2009, this Court entered the Bar Date Order which,

among other things, established November 30, 2009 as the Bar Date and set forth specific

procedures for filing proofs of claims.  The Bar Date Order requires, among other things, that a

proof of claim must "set forth with specificity" the legal and factual basis for the alleged claim

and include supporting documentation or an explanation as to why such documentation is not

available.  (Bar Date Order at 2.)

8.      On July 28, 2009, the Angell Plaintiffs filed the Angell Putative Class

Claim.  The Angell Putative Class Claim was not certified before June 1, 2009 (the

"**Commencement Date**")[2], when each of the Debtors commenced a case under chapter 11 of the

Bankruptcy Code in the Bankruptcy Court for the Southern District of New York (the

"**Bankruptcy Court**"), and the Angell Plaintiffs have not sought class certification from this

Court.  The Angell Putative Class Claim attaches a Second Amended Complaint, originally filed

in the United States District Court of the District of Massachusetts, Civil Action No. 1 08-CV-

11201-DPW, which sets forth various causes of action related to breach of contract, breach of

express and implied warranty, unfair and deceptive trade practices, and unjust

enrichment/restitution (*see* Angell Putative Class Claim at 45-65), on behalf of two putative

nationwide sub-classes.  The first putative sub-class includes:

> All owners, former owners, lessees and former lessees of class
> vehicles whether individuals or business entities sustaining
> monetary loss incurred from repairing and/or replacing the class
> engine and components affected by oil sludge.

(*Id.* at 10-11 ¶ 41.)  The second putative sub-class includes:

> All owners, former owners, lessees and former lessees of class
> vehicles whether individuals or business entities sustaining
> monetary loss incurred by diminution of class vehicle resale value,
> increased vehicle operating costs caused by the use of more
> expensive engine oil and more frequent oil changes than initially
> recommended in their respective class vehicle owner's manual
> (including but not limited to maintenance stated in Saab's "special
> policy") and decreased engine performance resulting from engine
> oil sludge.

(*Id.*)  Collectively, these two putative sub-classes are referred to herein as the "**Putative**

**Classes**."

> 9.    The Angell Plaintiffs' claims purportedly arise from the Debtors'

marketing, maintenance, and sale of Debtors' Products, which the Angell Plaintiffs allege had

---

[2] Capitalized terms used but not defined in this section shall have the definitions ascribed to them below.

engines that were defective with respect to their design and workmanship, materials and

manufacture, predisposing them to "oil sludge" deposits, which deposits "accelera[te] engine

wear" and purportedly cause engines to fail "after accumulating only one quarter to one-half of

their reasonably anticipated useful lifetime mileage." (*See id.* at 2-4 ¶¶ 7, 15-17.) Moreover, the

Angell Plaintiffs allege that the Debtors wrote and distributed owner's manuals that prescribed

the incorrect maintenance program in regard to the type of oil that should be used and the

frequency of oil changes for the Debtors' Products and that this incorrect maintenance program

prescribed in the owner's manuals caused the "oil sludge" deposits. (*See*, *e.g.*, *id.* at 4 ¶¶ 13-14.)

The Angell Plaintiffs further lodge a myriad of allegations regarding the Debtors' attempts to

fraudulently conceal the defects in their products and the errors in the owner's manuals and other

notices to consumers "in order to sell class vehicles to uninformed consumers" and to "protect . .

. corporate profits from loss of sales from adverse publicity and warranty repairs." (*Id.* at 17, 31,

34, 36 ¶¶ 92-94, 116, 129, 138.)

        10.    The Second Amended Complaint seeks, *inter alia*, (1) to certify the

putative nationwide classes (*id.* at 66), (2) monetary damages (*id.* at 66-67), (3) injunctive relief

compelling the Debtors to inspect, replace, and clean various engine and vehicle parts (*id.*), (4)

restitution for all engine repairs resulting from the allegedly defectively designed engines and

allegedly incorrect engine oil recommendations (*id.* at 67), (5) restitution for all increased

relevant past, present, and future maintenance costs (*id.*), (6) disgorgement of the Debtors'

revenue from their alleged unlawful conduct, (7) establishment of a constructive trust "funded by

the benefits conferred upon" the Debtors (*id.* at 67), (8) a permanent injunction enjoining the

Debtors "from denying Angell's, Reid's and class members' class vehicle oil sludge damage

claims for an eight year period commencing from the initial date of sale or lease regardless

whether complete maintenance records are available." (*Id.* at 68.)

### The Relief Requested Should Be Approved by the Court

I. **Application of Bankruptcy Rule 7023 to a Class Proof of
Claim Is Discretionary and Should Be Denied in This Case**

11.    There is no absolute right to file a class proof of claim under the

Bankruptcy Code. *See In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 619 (Bankr.

S.D.N.Y.), *aff'd*, 411 B.R. 142 (S.D.N.Y. 2009); *In re Sacred Heart Hosp.*, 177 B.R. 16, 22

(Bankr. E.D. Pa. 1995) (noting that the class action device may be utilized in appropriate

contexts, but should be used sparingly). Application of Bankruptcy Rule 7023 to class proofs of

claim[3] lies within the ***sound discretion*** of the court.[4] In determining whether to exercise

discretion and permit a class proof of claim, courts primarily look at (i) whether the class

---

[3] Part VII of the Bankruptcy Rules, which includes Bankruptcy Rule 7023, only applies to adversary proceedings. *See* Fed. R. Bankr. P. 7001. Bankruptcy Rule 9014, however, adopts certain of the rules from Part VII for application in contested matters. Bankruptcy Rule 7023 is not among them. *See* Fed. R. Bankr. P. 9014. Thus, plaintiffs seeking the application of Bankruptcy Rule 7023 (and by implication, Rule 23) to a class proof of claim are required to *move* under Bankruptcy Rule 9014 for a court to apply the rules in Part VII. Fed. R. Bankr. P. 9014; *accord In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. 365, 369 (Bankr. S.D.N.Y. 1997) (stating that "[f]or a Class Claim to proceed . . . the bankruptcy court must direct Rule 23 to apply"). *See, e.g.*, *Reid v. White Motor Corp.*, 886 F.2d 1462, 1470 (6th Cir. 1989), *cert. denied*, 494 U.S. 1080 (1990); *In re Charter Co.*, 876 F.2d 866, 876 (11th Cir. 1989) , *cert. dismissed,* 496 U.S. 944 (1990) (holding that proof of claim filed on behalf of class of claimants is valid, but that "does not mean that the appellants may proceed, without more, to represent a class in their bankruptcy action. Under the bankruptcy posture of this case, Bankruptcy Rule 7023 and class action procedures are applied at the discretion of the bankruptcy judge."

[4] *See, e.g.*, *In re Bally Total Fitness*, 402 B.R. at 620 ("[C]ourts may exercise their discretion to extend Rule 23 to allow the filing of a class proof of claim."); *In re Thomson McKinnon Sec. Inc.*, 133 B.R. 39, 40 (Bankr. S.D.N.Y. 1991) (Bankruptcy Rule 7023 and Rule 23 "give the court substantial discretion to consider the benefits and costs of class litigation") (citing *In re Am. Reserve Corp.*, 840 F.2d 487, 488 (7th Cir. 1988)), *aff'd*, 141 B.R. 31 (S.D.N.Y. 1992); *accord In re United Cos. Fin. Corp.*, 277 B.R. 596, 601 (Bankr. D. Del. 2002) ("Whether to certify a class claim is within the discretion of the bankruptcy court."); *In re Kaiser Group Int'l, Inc.*, 278 B.R. 58, 62 (Bankr. D. Del. 2002) (same); *Reid*, 886 F.2d at 1469-70 (stating that "Rule 9014 authorizes bankruptcy judges, within their discretion, to invoke Rule 7023, and thereby Fed. R. Civ. P. 23, the class action rule, to 'any stage' in contested matters, including, class proofs of claim."); *In re Charter Co.*, 876 F.2d at 876 ("[u]nder the bankruptcy posture of this case Bankruptcy Rule 7023 and class action procedures are applied at the discretion of the bankruptcy judge.").

claimant moved to extend the application of Rule 23 to its proof of claim; (ii) whether the

benefits derived from the use of the class claim device are consistent with the goals of

bankruptcy; and (iii) whether the claims which the proponent seeks to certify fulfill the

requirements of Rule 23.  *See In re Bally Total Fitness*, 402 B.R. at 620; *In re Woodward*, 205

B.R. at 369; *see also In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1, 5 (S.D.N.Y. 2005) ("In

exercising that discretion, the bankruptcy court first decides under Rule 9014 whether or not to

apply Rule 23, Fed. R. Civ. P., to a "contested matter," *i.e.*, the purported class claim; if and only

if the court decides to apply Rule 23, does it then determine whether the requirements of Rule 23

are satisfied.").

       12.       When evaluating these requirements, courts have considered a variety of

factors, including, *inter alia*:

- ***whether claimants are in "compliance with the Bankruptcy procedures regulating the filing of class proofs of claim in a bankruptcy case,"*** *see, e.g., In re Thomson*, 133 B.R. at 41 (disallowing class proof of claim where named plaintiff failed to file a Rule 9014 motion requesting that Rule 7023 apply);

- ***whether the debtor intends to liquidate***, *see In re Thomson*, 133 B.R. at 41 (noting that the context of a liquidating chapter 11 plan supports rejection of class proofs of claim);

- ***whether or not a purported class was previously certified***, *see, e.g., In re Bally Total Fitness*, 402 B.R. at 620 (refusing to allow class proof of claim where class was not certified pre-petition); *In re Sacred Heart Hosp.*, 177 B.R. at 23 (classes certified pre-petition are "best candidates" for a class proof of claim);

- ***whether the class claim device will result in "increased efficiency, compensation to injured parties, and deterrence of future wrongdoing by the debtor,"*** *see In re Woodward*, 205 B.R. at 376 (emphasis added and internal citations omitted); *accord In re Thomson*, 133 B.R. at 40 ("Manifestly, the bankruptcy court's control of the debtor's affairs might make class certification unnecessary.");

- ***whether the entertainment of class claims would subject the administration of the bankruptcy case to undue delay***, *see, e.g., In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 5 ("[A] court sitting in bankruptcy may decline to apply Rule 23 if doing so would . . . 'gum up the works' of distributing the estate."); and

- ***whether or not adequate notice of the bar date was afforded to potential class members***, *see In re Jamesway Corp.*, No. 95 B 44821 (JLG), 1997 WL 327105, at *10 (Bankr. S.D.N.Y. June 11, 1997) (refusing to certify class where adequate notice of bar date was afforded to potential class members, and thus to certify class would be "unwarranted, unfair, and possibly violate the due process rights of other creditors") (internal quotations omitted).

"If application of Bankruptcy Rule 7023 is rejected by the bankruptcy court in an exercise of discretion . . . the result will be that class claims will be denied and expunged." *In re Thomson*, 133 B.R. at 40-41. As set forth below, the Court should exercise its discretion to reject the application of Bankruptcy Rule 7023 and to disallow the Angell Putative Class Claim.

### A.   The Angell Plaintiffs Failed to Comply with Bankruptcy Rules 9014 and 2019

13.    A plaintiff who seeks to bring a class proof of claim must comply with the applicable procedural requirements. *See, e.g., In re Am. Reserve Corp.*, 840 F.2d at 494 (noting the applicability of Bankruptcy Rule 9014 and its procedural requirements); *see In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 6-7 (same). These procedural requirements are not complicated. Because a claim "cannot be allowed as a class claim until the bankruptcy court directs that Rule 23 apply," the putative class representative must file a motion with the bankruptcy court requesting the application of Rule 23. *In re Woodward*, 205 B.R. at 368, 370. ("Rule 23 does not say who must make a timely motion, but the duty ordinarily falls on the proponent of the class action."). In addition, a purported agent or class representative is required to file a verified statement of multiple creditor representation pursuant to Bankruptcy Rule 2019. *See* Fed. R. Bankr. P. 2019.

14.     The requirement that a class claimant timely move under Bankruptcy Rule 9014 to incorporate Rule 23 is intended to protect a debtors' estate from undue delay of the debtors' plan process.  *See In re Thomson McKinnon Sec., Inc.*, 150 B.R. 98, 101 (Bankr. S.D.N.Y. 1992).  In *In re Woodward*, another case in which there was no pre-bankruptcy class certification, the court stated that the class claim should be disallowed if the putative class representative did not expeditiously move in the bankruptcy case for certification of its class claim, as a lengthy certification battle could delay the administration and distribution of the bankruptcy estate.  *See In re Woodward*, 205 B.R. at 370; *see also In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 5 (disallowing class products liability claim because "it is simply too late in the administration of this Chapter 11 case to ask the Court to apply Rule 23 to class proofs of claim.").  As of the date hereof, more than seven months after the Commencement Date and two months after the Bar Date, the Angell Plaintiffs have not sought permission of the Court to file a class proof of claim, or moved for certification of the class.  As a result, if allowed to proceed, the Angell Putative Class Claim would unduly delay the administration of the Debtors' estates and their ability to consummate a plan of liquidation ("**Plan**"), because the adjudication of the claim and its attendant class-certification issues could take months.  Accordingly, this Court should enforce these procedural requirements and disallow the Angell Putative Class Claim. *See, e.g.*, *In re Woodward*, 205 B.R. at 369-71; *In re Thomson*, 150 B.R. at 100-01; *In re Thomson*, 133 B.R. at 41; *In re Zenith Labs., Inc.*, 104 B.R. 659, 664 (D.N.J. 1989); *In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 6-7.

15.     Further, Bankruptcy Rule 2019(a) requires purported agents representing more than one creditor to file a verified statement setting forth the basis of that representative's

right to act for the represented creditors.  Among other things, the required verified statement

must list the name and address of the creditors, the nature and amount of the creditors' claims,

the agent's specific authority empowering him to act on behalf of the creditors, and the relevant

facts and circumstances surrounding the employment of the agent.  *See In re Elec. Theatre Rests.*

*Corp.*, 57 B.R. 147 (Bankr. N.D. Ohio 1986).

16.     Bankruptcy Rule 2019 "is a comprehensive regulation of representation in

. . . chapter 11 reorganization cases."  Fed R. Bankr. P. 2019 (Advisory Committee Note).

Accordingly, non-compliance with the rule constitutes grounds for not recognizing a class proof

of claim.  *See Reid*, 886 F.2d at 1471 ("Failure to comply with Rule 2019 is cause for denial of

the proof of claim."); *In re Baldwin-United Corp.*, 52 B.R. 146, 148 (Bankr. S.D. Ohio 1985)

(ruling that claimants' failure to comply with Rule 2019(a) barred their ability to file class proof

of claim); *In re GAC Corp.*, 681 F.2d 1295, 1299 (11th Cir. 1982) (affirming disallowance of

class proof of claim filed on behalf of debtor's debenture holders where, among other things,

proposed class representative failed to comply with predecessor of Rule 2019).

17.     Further, neither the Angell Plaintiffs nor their counsel can qualify as an

authorized agent pursuant to Bankruptcy Rule 3001(b).  Assuming *arguendo*, however, that the

Angell Plaintiffs or their counsel could be considered an authorized agent, both have failed to file

a verified statement to comply with the requirements of Bankruptcy Rule 2019(a).  Accordingly,

the Court should not exercise discretion to apply Bankruptcy Rule 7023 to the Angell Putative

Class Claim.

**B.    Allowing the Angell Claim to Proceed as a
Class Action Will Not Be Effective or Efficient**

18.    For a class action to proceed, "the benefits that generally support class

certification in civil litigation must be realizable in the bankruptcy case." *In re Woodward*, 205

B.R. at 369 (citing *In re Mortgage & Realty Trust*, 125 B.R. 575, 580 (Bankr. C.D. Cal. 1991)).

In this case, neither the purported class nor the Court would benefit from recognizing a class

proof of claim and allowing a class action to proceed.

19.    The Angell Putative Class Claim does not provide for the most effective or

efficient means of determining the rights of the members of the Putative Classes.  First, a class

proof of claim is not appropriate if individual issues of fact would predominate over any

questions common to the members of the purported class.  For that reason, the court in *In re

Woodward*, in considering putative class claims for false advertising and misrepresentation,

found that a class action is "generally not appropriate to resolve claims based upon common law

fraud." *In re Woodward*, 205 B.R. at 371.

20.    Second, in general, the Bankruptcy Code and Bankruptcy Rules can

provide the same benefits and serve the same purposes as class action procedures in normal civil

litigation.  *See id.* at 376 ("a bankruptcy proceeding offers the same procedural advantages as the

class action because it concentrates all the disputes in one forum"); *3 Newburg on Class Actions*,

Ch. 20 (Class Actions Under the Bankruptcy Laws) § 20.01 at 581 (commenting that

"bankruptcy proceedings are already capable of handling group claims, which operate essentially

as statutory class actions."); *see also In re Standard Metals Corp.*, 817 F.2d 625, 632 (10th Cir.

1987) ), *reh'g granted*, 839 F.3d 1383 (10th Cir. 1987), *cert. dismissed*, 488 U.S. 881 (1988).

Although members of the Putative Classes can no longer file their claims because the Bar Date

has passed, they had ample notice of the Bar Date and opportunity to take advantage of these

bankruptcy procedures.

21.     Third, the bankruptcy claims process is, in some respects, *superior* to class

action procedures.  As the court observed in *In re Woodward*:

> [W]hile the class action ordinarily provides compensation that
> cannot otherwise be achieved by aggregating small claims, the
> bankruptcy creditor can, with a minimum of effort, file a proof of
> claim and participate in distributions.  In addition, there may be
> little economic justification to object to a modest claim, even
> where grounds exist.  Hence, a creditor holding such a claim may
> not have to do anything more to prove his case or vindicate his
> rights.

205 B.R. at 376 (citations omitted).  Here, notwithstanding the chance to do so, none of the

members of the Putative Classes, save for the named plaintiffs (and one individual represented

by the same counsel as the named plaintiffs), filed a claim against the Debtors.

22.     The fact that the Plan that is to be filed by the Debtors is a chapter 11 plan

of liquidation lends further support for denying allowance of a class proof of claim in these

cases.  *See In re Thomson*, 133 B.R. at 41.  "The costs and delay associated with class actions are

not compatible with liquidation cases where the need for expeditious administration of assets is

paramount so that all creditors, including those not within the class, may receive a distribution as

soon as possible."  *Id.*  "Creditors who are not involved in class litigation should not have to wait

for the payment of their distributive liquidated share while the class action grinds on."  *Id.*  To

have $615 million of the Debtors' estates be set aside, without knowing the identity or merit of

the claims held by the members of the Putative Classes, would result in extreme prejudice to the

Debtors' estate and would be unfair to other creditors.  All the Debtors' creditors should not be

forced to wait for payment of their distribution while the Angell Putative Class Claim is litigated and the estates' remaining assets are depleted.

23.    The facts of the instant case are similar to the facts of *In re Woodward*, where the court exercised its discretion to deny the class claim, finding that "the class claim will not deter an insolvent, non-operating debtor's management or shareholders, or induce them to police future conduct [where] . . . the debtor has . . . a liquidating plan that wipes out equity. The managers have moved on to other jobs – the debtor has closed its doors – and the prosecution of the class action will [] not affect how they act in the future." 205 B.R. at 376. Here, the Debtors have discontinued the sale of the Debtors' Products and have subsequently sold substantially all their assets. The Debtors are no longer operating a business.

### C.    The Angell Claim Was Not Certified Prior to the Commencement Date

24.    A number of courts have held that class proofs of claim may be inappropriate where a class representative was not certified prepetition in a non-bankruptcy forum. *See, e.g.*, *In re Trebol Motors Distrib. Corp.*, 220 B.R. 500, 502 (1st Cir. BAP 1998); *In re Sacred Heart Hosp.*, 177 B.R. at 23; *In re Ret. Builders, Inc.*, 96 B.R. 390, 391 (Bankr. S.D. Fla. 1988); *In re Ephedra Prods. Liab. Litig.*, 329 B.R. at 5. The court in *Sacred Heart Hospital* held that use of the class proof of claim device in bankruptcy cases may be appropriate in certain contexts, but "such contexts should be chosen most sparingly." *In re Sacred Heart Hosp.*, 177 B.R. at 22. Specifically, the *Sacred Heart Hospital* court noted that cases where (i) a class has been certified prepetition by a nonbankruptcy court, or (ii) a class action has been filed and allowed to proceed as a class action in a nonbankruptcy forum for a considerable time prepetition, may present appropriate contexts for recognizing a class proof of claim. *See id.*

25.     The purported class in the Angell Action was not certified at the time of the Debtors' chapter 11 filing, and it remains uncertified today. ***The Debtors have been unable to find a single bankruptcy case within the Second Circuit in which a pre-certification class claim was allowed.***

### D.     Adequate Notice of the Bankruptcy Case and the Bar Date Was Provided to the Putative Angell Class

26.     One of the principal goals of the Bankruptcy Code is to ensure that creditors of equal rank receive equal treatment in the distribution of a debtor's assets.  The Bankruptcy Code and Bankruptcy Rules, therefore, require creditors to file proofs of claim before a bar date.  *See* 11 U.S.C. § 502(b)(9); Fed. R. Bankr. P. 3003(c)(3).  Regardless of how worthy their claims may be, claimants who fail to file before an applicable bar date "shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution."  Fed. R. Bankr. P. 3003(c)(2).  These same procedural hurdles must be met by all creditors.

27.     In determining whether a class proof of claim should be allowed, courts consider whether adequate notice of the bar date was afforded to potential class members.  *See In re Jamesway Corp.*, 1997 WL 327105, at *8.  As that court stated:

> The proper inquiry is whether [the debtor] acted reasonably in selecting means likely to inform persons affected by the Bar Date and these chapter 11 proceedings, not whether each claimant actually received notice . . . [a]s to those plaintiffs who might not have received actual notice of the Bar Date, we find that by complying with the terms of the Bar Date Order, mailing a Claim Package to every known creditor and publishing notice of the Bar Date, [the Debtor's] actions satisfy due process."

*Id.* (internal citations omitted).

28.    In this case, the putative members in the Angell Plaintiffs' proposed class received proper notice of the Debtors' chapter 11 cases and the Bar Date in accordance with the provisions of the Bar Date Order.  At great expense to their estates, the Debtors published notice of the Bar Date nationwide in *The Wall Street Journal* (Global Edition – North America, Europe, and Asia), *The New York Times* (National), *USA Today* (Monday through Thursday, National), *Detroit Free Press, Detroit News, LeJournal de Montreal* (French), *Montreal Gazette* (English), *The Globe and Mail*, (National), and *The National Post*.  (*See* Bar Date Order at 7.)  Providing individual notice to all owners of the Debtors' Products would be impossible or, at minimum, prohibitively expensive, as persons resell their vehicles and Debtors would have no way to know the identities of the current owners of their products.  Providing notice of the Debtors' bankruptcy cases and the Bar Date by publication, however, constituted a viable alternative to the impracticability, or perhaps even impossibility, of tracking down and providing individual notice to each of the consumer purchasers of the Debtors' Products.  Additionally, in this case, in particular, the Debtors would be hard-pressed to find a handful of Americans who were not aware of the chapter 11 filing of General Motors Corporation.

29.    No member of the Putative Classes (save for the Angell Plaintiffs and one individual represented by the same counsel as the Angell Plaintiffs) has filed a claim, and members of the Putative Classes who failed to file proofs of claim could not be said to have relied on the filing of the Angell Putative Class Claim because the Putative Classes were not certified as of the Commencement Date.  *See In re Jamesway Corp.*, 1997 WL 327105, at *10 (denying motion for class certification of class claim where "[n]o class was pre-certified such that purported class members who did not chose to file a proof of claim should or could have had

any reasonable expectation that they need not comply with the Bar Date Order").  Because the

Debtors have provided notice by publication to the members  of the Putative Classes

encompassed by the Angell Putative Class Claim, it would be unfair and unnecessary to burden

the Debtors' estates with the additional cost and associated delay of providing these potential

claimants with a second notice.  Further, the only type of notice the Debtors could reasonably

provide these persons today would be another publication notice, effectively duplicating the

notice they have already been provided and extending the Bar Date for a particular sub-group of

general unsecured creditors who are not entitled to special treatment under the Bankruptcy Code.

Since not a single such member of the Putative Classes filed an individual claim prior to the Bar

Date (save for the named Angell Plaintiffs), it is highly unlikely that many, if any at all, would

file claims if given a second opportunity, but the estate would suffer the unnecessary costs of

notice.

## II.    The Angell Putative Class Claim
##        <u>Cannot Satisfy the Requirements of Rule 23</u>

30.    Even if this Court were to permit the Angell Plaintiffs to file a class claim,

the Angell Putative Class Claim would not satisfy Rule 23.  To proceed as a class claim, the

Angell Putative Class Claim must meet all four requirements of subsection (a) of Rule 23, as

made applicable to bankruptcy cases by Bankruptcy Rule 7023.  *See Moore v. PaineWebber,

Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  *See also In re Woodward*, 205 B.R. at 371.  Rule 23(a)

provides:

> (a)  Prerequisites to Class Action.  One or more members of a class may sue or be sued as
> representative parties on behalf of all only if:

> > (1)  the class is so numerous that joinder of all members is
> > impracticable;

(2)  there are questions of law or fact common to the class;

(3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

31.     In addition, to proceed as a class claim, the Angell Putative Class Claim must satisfy subsections (b)(2) and (b)(3) of Rule 23, as the Angell Putative Class Claim seeks injunctive relief and monetary damages.[5] *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 290 (2d Cir. 1992), *cert. dismissed,* 506 U.S. 1088 (1993).  (*See* Angell Putative Class Claim at 10, ¶ 41.)  For purposes of this objection, Rule 23(b)(2) provides in relevant part:

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

Fed. R. Civ. P. 23(b)(2).  In addition, Rule 23(b)(3) provides in relevant part:

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).

---

[5] In addition, the Angell Plaintiffs' request for a constructive trust does not relieve them from satisfying Rule 23(b)(3)'s predominance requirement, as it is merely a sham request for injunctive relief that the Second Circuit has stated cannot support Rule 23(b)(2) certification.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 468 (S.D.N.Y. 2005) ("The plaintiffs' request for a constructive trust is an ill-disguised claim for damages… and cannot support Rule 23(b)(2) certification.").  Moreover, the Angell Plaintiffs' request for a constructive trust fails because a constructive trust "is fundamentally at odds with the general goals of the Bankruptcy Code," as it "clearly thwarts the policy of ratable distribution" by seeking to elevate certain claims above others.  *See In re Omegas Group, Inc.*, 16 F.3d 1443, 1451 (6th Cir. 1994) (internal citations and quotations omitted) ("Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor.").  The judicial creation of a "res" from the Debtors' estate would be antithetical to the goals of the Bankruptcy Code.  *Id.*

32.     As set forth below, numerous individual issues of fact would predominate over any common questions in the Angell Putative Class Claim because the Angell Plaintiffs are neither typical of the members of the Putative Classes nor adequate class representatives. Moreover, class treatment is simply not efficient or superior in these circumstances.  As discussed below, the Angell Plaintiffs' claim raises a host of individual issues of fact regarding each putative class member's right to recovery.  These individual issues would require mini trials as to each class member's right to relief, a result that courts have repeatedly found requires denial of class certification.

A.     **The Injunctive Relief Sought by the Angell Putative Class**
**Claim Under Rule 23(b)(2) Is Mooted by the Debtors' Liquidation**

33.     First, the Angell Putative Class Claim cannot meet the requirements of Rule 23(b)(2), as any claim for injunctive relief is mooted because the Debtors do not presently operate a business and are liquidating.  *See In re Ephedra Prods. Liab. Litig*., 329 B.R. at 9 n.5 ("Insofar as the class claims seek injunctive relief against Twinlabs under Rule 23(b)(2), they are moot now that Twinlabs has gone out of business and existence").  As a result, the Debtors cannot be compelled to, *inter alia*, inspect, replace, and/or clean the allegedly defective engines or engine parts, or permanently enjoined from denying oil sludge damage claims of the members of the Putative Classes for an eight-year period commending from the initial date of sale or lease, as sought by the Angell Plaintiffs.  (*See* Angell Putative Class Claim at 66-68.)

B.     **Numerous Individual Issues Predominate Over Any Common Questions**

34.     The Angell Plaintiffs also fail to satisfy Rule 23(b)(2) because individual issues predominate over common questions and a class action is not a superior method of adjudicating the Angell Putative Class Claims.

### 1.    Variations in the Law of 51 Jurisdictions Defeat Predominance

35.    Federal courts have made it clear time and again that before a court can analyze whether the factors under Federal Rule 23 are satisfied, the court must determine which state's or states' substantive law governs the underlying claims. *See*, *e.g.*, *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 561 (E.D. Ark. 2005) ("Not only must the choice-of-law issue be addressed at the class certification stage – it must be tackled at the front end since it pervades every element of [Federal Rule] 23."); *Chin v. Chrysler Corp*. 182 F.R.D. 448, 457 (D.N.J. 1998). This is logical because it would be impossible to determine whether there are questions of law common to the class, for example, without first determining what the substance of the applicable laws is. Both federal case law and the Constitution mandate that this Court perform a choice of law analysis before determining whether this case is properly certified as a class action. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985).

36.    This requirement begets the question of which state's or states' law should apply to the class claims when a class is comprised of individuals living, and allegedly injured by the defendant's conduct, in every state in the nation. Federal courts in this jurisdiction and across the country have uniformly answered this question by holding that where a purported class action would involve class members from more than one state "the court will apply the law of each of the states from which plaintiffs hail." *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 70-71 (S.D.N.Y. 2002), *reconsideration denied*, 224 F.R.D. 346 (S.D.N.Y. 2004); *Kaczmarek v. Int'l Bus. Mach.,* 186 F.R.D. 307, 312-13 (S.D.N.Y. 1999); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 605 (S.D.N.Y. 1982). To hold otherwise and apply only the forum state's

substantive law to the class certification analysis would violate Constitutional principles of due

process and federalism.  *See Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13, 335-36 (1981),

*reh'g denied*, 450 U.S. 971 (1981).[6]

37.    Compliance with the Constitutional requirement of applying every state's

law to the claims in a nationwide class action is fatal to class certification when the applicable

laws differ from state to state.  This Court and countless others have repeatedly held that "the

need of a court to apply diverse laws and varied burdens of proof to the individual class

members' claims defeats the predominance requirement of Federal Rule 23(b)(3)."  *In re*

*Worldcom, Inc.*, 343 B.R. 412, 427 (Bankr. S.D.N.Y. 2006); *In re Laser Arms Corp. Sec. Litig.*,

794 F. Supp. 475, 495 (S.D.N.Y. 1989) *aff'd*, 969 F.2d 15 (2d Cir. 1992) ("In the absence of a

single state law governing each entire common law claim, common questions of law would not

predominate over individual questions."); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015

(7th Cir. 2002) , *cert. denied*, 537 U.S. 1105 (2003) ("No class action is proper unless all

litigants are governed by the same legal rules."); *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d

675, 698-99 (Tex. 2002), *reh'g denied*, 102 S.W.3d 675 (Tex. 2002) (citing dozens of federal

and state cases that have "rejected class certification when multiple states' laws must be

applied.").

---

[6] The Supreme Court expressly admonished a state court for applying its state's substantive law to a nationwide class action filed within its borders, noting that the state "may not take a transaction with little or no relationship to the forum and apply the law of the forum in order to satisfy the procedural requirement that there be a 'common question of law.'"  *Phillips Petroleum Co.*, 472 U.S. at 821.  The *Phillips Petroleum* Court concluded that the forum state's "lack of 'interest' in claims unrelated to that State and the substantive conflict with" other jurisdictions rendered the application of the forum state's law to every claim in the nationwide class action "sufficiently arbitrary and unfair as to exceed constitutional limits."  *Id.* at 822.

38.     The Angell Plaintiffs have the burden of establishing that variations in the laws of the jurisdictions do not "swamp any common issues and defeat predominance." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996). Here, the Angell Plaintiffs cannot meet this burden as courts have repeatedly determined that variations in the causes of action at issue in this case – *inter alia*, fraudulent misrepresentation/concealment and breach of express and implied warranty – have made certification of nationwide class actions impermissible.

39.     **Fraudulent Concealment/Misrepresentation:**  Courts have denied certification of a nationwide class based on fraud because the necessity to apply the laws of many states defeats the predominance requirement.  *See, e.g.*, *In re Worldcom, Inc.*, 343 B.R. at 427; *In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. at 495; *In re Woodward,* 205 B.R. at 371 (finding that a class action is "generally not appropriate to resolve claims based upon common law fraud"); *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 (11th Cir. 1987), *reh'g denied*, 832 F.2d 1267 (11th Cir. 1987), *cert. denied*, 485 U.S. 959 (1988); *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 222-24 (E.D. La. 1998) ("As far as the Court has been able to determine, state law variations [in fraud claims] exist necessitating multiple jury charges on each of the following issues: the burden of proof, the duty to disclose, materiality, reliance, and the measure of damages.").

40.     **Breach of Warranty:**[7]  Courts in this jurisdiction and others have denied class certification upon finding that common questions of law do not predominate where the

---

[7] The Angell Plaintiffs' Second Amended Complaint contains causes of action for breach of express warranty.  (*See* Angell Putative Class Claim at 49-55 ¶¶ 204-28.)  The Debtors have no liability for such claims, and they were expressly assumed by the purchaser under the terms of the Master Sale and Purchase Agreement, dated as of June 1, 2009 (as amended, the "**Purchase Agreement**").  Specifically, pursuant to the Purchase Agreement, the purchaser assumed "all liabilities arising under express written warranties of Sellers that are specifically identified as

plaintiff alleges breach of warranty, whether those warranty claims involve common law, state

statutes, or the federal Magnuson-Moss Warranty Act:

> the states have diverse bodies of law on warranty . . . . The state
> laws on these claims present different procedural and substantive
> elements, including differing requirements of privity, demand,
> scienter and reliance.  In addition, bringing the case under the
> Magnuson-Moss Act does not make uniform the plaintiffs'
> warranty claims because liability under that Act depends on state
> law which differs on issues of express and implied warranties. . . .
> Defendant's counsel presents a lengthy analysis of the diverse laws
> of the various states and has shown sufficiently that many of the
> jurisdictions have different standards and elements of proof for the
> claims of breach of express and implied warranty . . .

*Kaczmarek*, 186 F.R.D. at 313; s*ee also In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,

194 F.R.D. 484, 489-90 (D.N.J. 2000), *reconsideration denied*, 2001 WL 1869820 (D.N.J. Feb.

8, 2001) (warranty "claims [arising from a recall] vary significantly from state to state"); *In re*

*Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 369 (E.D. La. 1997),

*reconsideration denied*, 1997 WL 191488 (E.D. La. Apr. 17, 1997) ("with respect to contract and

warranty claims, the various states have different" laws); *Walsh v. Ford Motor Co.*, 130 F.R.D.

260, 271 (D.D.C. 1990), *reconsideration denied*, 130 F.R.D. 514 (D.D.C. 1990), *appeal*

*dismissed*, 945 F.2d 1188 (D.D. Cir. 1991) ("numerous variations exist among sates' laws

concerning the scope and application of implied warranty claims").

   41. Because the Court must apply the substantive laws of all jurisdictions

from which the putative Angell Class Plaintiffs hail, and such application results in conflicting

laws, the putative Angell class action cannot be certified.

---

warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or
remanufactured motor vehicles and equipment (including service parts, accessories, engines and transmissions)
manufactured or sold by Sellers or Purchaser prior to or after the Closing."  (*See* Purchase Agmt. § 2.3(vii).)

2.    <u>**Necessity of Individual Fact Determinations Destroys Predominance**</u>

42.    Courts also deny certification where "individualized issues of fact abound." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 349 (S.D.N.Y. 2002); *see also In re Worldcom, Inc.*, 343 B.R. at 427, n.26 ("the need to evaluate factual differences along with divergent legal issues defeats the predominance requirement under Rule 23(b)(3)") (internal quotes and citations omitted).   Courts have specifically held that class actions alleging motor vehicle product liability claims and seeking economic loss damages should not be certified because individual questions of fact will predominate:

> . . . the need to establish injury and causation with respect to each class member will necessarily require a detailed factual inquiry including physical examination of each vehicle, a mind-boggling concept that is preclusively costly in both time and money.  We will not certify a class that will result in an administrative process lasting for untold years, where individual threshold questions will overshadow common issues regarding Defendant's alleged conduct. Accordingly, we conclude that Plaintiff has not adequately shown that common issues predominate over individual issues.  *Courts are hesitant to certify classes in litigation where individual use factors present themselves, such as cases involving allegedly defective motor vehicles and parts.*  The administrative burdens are frequently too unmanageable for a class action to make sense in such cases.

*Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 449 (E.D. Pa. 2000) (emphasis added).

43.    The "preclusively costly" "administrative burdens" warned about in the *Sanneman* case would certainly be present in this action involving "in excess of 130,000 class vehicles."  (Angell Putative Class Claim at 11 ¶ 42.)  The Putative Classes purport to include all owners of select model year vehicles "sustaining monetary loss" (i) "incurred from repairing and/or replacing the class engine and components affected by oil sludge" or (ii) "incurred from diminution of class vehicle resale value, increased vehicle operating costs cause by the use of more expensive engine oil and more frequent oil changes than initially recommended in their

respective class vehicle owner's manual . . . and decreased engine performance resulting from engine oil sludge." (*Id.* at 10-11 ¶ 41.) Thus, the issue of whether a particular plaintiff's engine has "oil sludge" buildup caused by the alleged defects in the Debtors' Products would— alone— lead to a sharp divergence in the factual underpinnings of each claim. Such an individualized analysis is crucial in this case because a class member cannot succeed on a product liability-based claim unless that specific class member's product has had an actual malfunction. *See, e.g.*, *Wallis v. Ford Motor Co.*, 208 S.W.3d 153, 159 (Ark. 2005) (plaintiff must "allege that the vehicle has actually malfunctioned").

44.    Additionally, individualized factual inquiries would need to be performed to address the issues of: (i) if, or when, "oil sludge" buildup occurs; (ii) the causation of any such "oil sludge" buildup; (iii) whether the allegedly defective engine is covered by warranty; (iv) whether the allegedly defective engine was already repaired by MLC; (v) whether the class member provided proper notice of the alleged breach of warranty to MLC; (vi) whether the class member properly maintained their vehicle; (vii) whether MLC and/or the consumer had knowledge of the alleged engine defect; (viii) whether the class member relied on MLC's alleged misrepresentations regarding the engine or the oil change recommendations, including the "special policy letter"; (ix) whether such alleged misrepresentations were material; (x) whether the class member timely submitted a claim under the "special policy letter"; (xi) whether such claims, if submitted, include proper documentation; (xii) whether a class member's claims are barred by the statue of limitations or other affirmative defenses such as comparative negligence (cause by, *inter alia*, the plaintiffs' failure to properly maintain the vehicle[8] or improper use of

---

[8] For instance, Plaintiff Angell herself avers that "her husband and/or Jiffy Lube" may have used "low-quality" oil when servicing the engine. (*See* Angell Putative Class Claim at 22 ¶ 76.)

the vehicle); (xiii) and what the appropriate remedy should be for any particular class member. This *nonexclusive* list provides a mere sampling of the myriad of factual differences that will "overshadow common issues." *See Sanneman*, 191 F.R.D. at 449. When coupled with the variations in law relevant to determining the foregoing facts, the Angell Plaintiffs cannot meet their burden of satisfying the predominance requirement and, thus, the class fails to meet the requirements of Rule 23.

45.     Further individualized issues predominate because the Angell Putative Class Claim is based, in part, on fraudulent misrepresentation allegations that raise a host of individual issues of fact that render class treatment wholly unmanageable, including individual questions as to: the fact of product purchase or ownership; the differing marketing or statements; whether each class member was exposed to allegedly deceptive marketing or statements; and whether each class member purchased products as a result of such marketing or statements.

46.     For example, the Angell Plaintiffs seek damages resulting from the increased costs of more frequent oil changes in order to comply with a "special policy letter" that was issued by the Debtors that changed the oil change recommendation for the Debtors' Products. (*See* Angell Putative Class Claim at 31 ¶ 115.) Angell Plaintiffs further allege that such "special policy letter" fraudulently concealed the "real cause of oil sludge." (*Id.* at 31 ¶ 116.) But there is no way to tell which putative members of the class received or reviewed this "special policy letter," or if such putative members in any way relied on the representations made in such "special policy letter." *See In re Woodward*, 205 B.R. at 372 (holding issue of fraud as common question of law or fact under Rule 23(b)(3) would require a showing of reliance on the part of each class member, and such a showing was "[l]acking in this case [where reliance on an

advertisement is at issue] is the single set of operative facts that can be applied on a class wide

basis . . . Because the incidents did not occur in a single place, at the same time, or under

identical conditions, individualized issues of causation arise.").  Accordingly, individualized

issues regarding reliance alone would prohibit certification.  Further, given the absence of any

objective evidence of who purchased such products or relied upon any of the Debtors' alleged

misrepresentations, the Court would be required, at the threshold, to make a series of individual

credibility determinations as to who is and is not a member of the Putative Classes.  *See In re*

*Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 214 F.R.D. 614, 618 (W.D. Wash. 2003)

(motion to certify class asserting consumer fraud claims on behalf of non-injured consumers of

PPA products denied primarily because of difficulty in determining who had even purchased

products at issue).

47.    Numerous individual issues also exist as to whether any alleged

misrepresentation caused each particular class member to purchase any product, precluding class

certification.  For this reason, courts routinely reject class certification of cases claiming unfair

trade practices, breach of warranty, unjust enrichment and other claims similar to those alleged

here – including in cases in which plaintiffs allege a common, class-wide product defect –

because of the overwhelming number of *individual issues* relating to reliance, causation, and

materiality.[9]

---

[9] *See, e.g.*, *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1362-66 (11th Cir. 2002) (certification of fraud class action
vacated because individual issues of reliance and causation predominated); *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d
1014, 1024-25 (11th Cir. 1996), *reh'g denied*, 104 F.3d 373 (11th Cir. 1996) (same); *Castano*, 84 F.3d at 737, 745
(denying certification in action where claims included "violation of state consumer protection statutes" and
"disgorge[ment]" of profits, holding that class action "cannot be certified when individual reliance will be an
issue"); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. at 68-69 (individual issues would predominate on claim for
restitution of purchase price arising from alleged undisclosed product dangers); *Chin*, 182 F.R.D. at 455-47 (denying
class certification in case asserting latent product defect in light of many individual issues of fact, including

48.    Finally, determination of whether each class member suffered "actual injury," would require an individualized inquiry into the degree of efficacy of the product for that particular class member – an inquiry that would, once again, swamp any common issues and render class treatment wholly unmanageable.

### C.    The Angell Plaintiffs Cannot Establish that a Class Action Is Superior to Other Available Methods for Fairly and Efficiently Adjudicating this Controversy

49.    In addition to the requirement that common questions of law or fact must predominate over individual issues, the Angell Plaintiffs must also establish "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Given the vast number of individual variations of law and fact that would be involved with allowing this case to proceed as a nationwide class action, the action would be unmanageable as a single trial.  The issue of MLC's liability would have to be litigated in thousands of trials which, even if logistically feasible, would violate the constitutional mandate that "entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues."  *Castano*, 84 F.3d at 750 (denying certification for lack of superiority); *see also Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995),

---

ascertainable injury, causation, reliance and privity); *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. at 372-75 (same); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. at 342-44 (same); *Truckway, Inc. v. Gen. Elec.*, No. Civ. A. 91-0122, 1992 WL 70575, at *5, *7 (E.D. Pa. Mar. 30, 1992) (individual issues predominated in state consumer fraud action "[b]ecause  not all members of the class would have relied on the alleged fraudulent material omissions and misrepresentation . . . and because a determination of whether each member of the class was defrauded . . . would require each class member to individually prove the issue of reliance and fraud on a case by case basis").  *See also Hurd v. Monsanto Co.*, 164 F.R.D. 234, 240 n.3 (S.D. Ind. 1995) ("The necessity of proving reliance by each class member upon the alleged fraudulent misrepresentations causes individual issues to predominate."); *Sunbird Air Servs., Inc. v. Beech Aircraft Corp.*, Civ. A. No. 89-2181-V, 1992 WL 193661, at *5 (D. Kan. July 15, 1992) ("individual issues of causation and reliance as to each class member would predominate over the common issues of liability"); *Strain v. Nutri/System, Inc.*, No. Civ. A. 90-2772, 1990 WL 209325, at *6 (E.D. Pa. Dec. 12, 1990) (class certification denied where "each class member [would have] to narrate a story which includes individualized proof of which advertisements he saw and whether they indeed enrolled in reliance of those advertisements").

*cert. denied*, 516 U.S. 867 (1995) (same); *In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 427 (E.D. La. 1997) (same). Given that a class action is not manageable in this case, it is not superior to other available methods for fairly and efficiently adjudicating the controversy, and thus, the Putative Classes cannot meet the requirements of Rule 23.

**D.    Neither "Commonality" nor "Typicality"
    Can Be Established by the Angell Plaintiffs**

50.    To proceed as a class claim, Rule 23(a)(2) and Rule 23(a)(3) require that the putative class representative also demonstrate commonality and typicality. To establish typicality, plaintiffs must show that they are situated similarly to class members.[10] The Court cannot "presume" that plaintiffs' claims are typical of other claims. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158, 160 (1982) ("actual, not presumed, conformance with Rule 23(a) remains, however, indispensable").

51.    The Angell Plaintiffs' claims are not typical of those alleged on behalf of any of their respective Putative Classes. First, each Angell Plaintiff's claim allegedly arises from certain of the Debtors' Products that the Angell Plaintiffs claim to have purchased and operated, allegedly in reliance upon defendants fraudulent representations as to the oil change maintenance recommendations and the standard and quality of the engines in such vehicles. (*See* Angell Putative Class Claim at 10 ¶ 41.) Yet, the Putative Classes would include plaintiffs who followed *differing* maintenance programs, operated their vehicles *differently*, and that purchased

---

[10] *See Marisol A. by Forbes v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (typicality "requires that the claims of the class representative be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each member makes similar arguments to prove the defendant's liability'") (quoting *In re Drexel*, 960 F.2d at 291); *see, e.g.*, *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 341 (7th Cir. 1997) ("The typicality and commonality requirements of the Federal Rules ensure that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class").

vehicles under a variety of *different* factual circumstances.  *See*, *e.g.*, *Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*, 993 F.2d 11, 14 (2d Cir. 1993), *cert. denied*, 510 U.S. 959 (1993) (typicality defeated by plaintiff's broad definition of class as all individuals who signed similar automobile lease agreements).

52.    Finally, the Angell Plaintiffs' claims cannot be typical of those of all members of the Putative Classes because the bases of the unfair and deceptive trade practices claims vary greatly.  The claims are based on a variety of allegedly deceptive marketing practices, including, but not limited to, the Debtors' false representations of Debtors' Products as "designed by aeronautical engineers" (Angell Putative Class Claim at 50 ¶ 207); that such products were "of a particular standard or quality when in fact [they] were not" (*id.* at 50 ¶ 207); that the owner's manual and service booklet that accompanied the class vehicles contained the wrong oil change recommendations (*id.* at 25 ¶ 92); that the Debtors falsely represented that "low quality oil and/or poor maintenance and/or certain driving conditions caused [the Angell Plaintiffs'] engine failures (*id.* at 20 ¶ 67); that the Debtors' fraudulently concealed the Debtors' Products alleged "defects and incorrect class engine maintenance recommendations concerning oil specifications, engine oil type and oil change intervals" (*id.* at 25 ¶ 92);  that Debtors made false representations regarding "reliable long-life efficient engines, low vehicle maintenance and inexpensive operating costs" (*id.* at 25 ¶ 93); and that the "special policy letter" issued by the Debtors "fraudulently concealed the real cause of oil sludge" (*id.* at 31 ¶ 116).  Each member of the Putative Classes might base his or her unfair and deceptive trade practice claim on one or more of the foregoing assertions, might have seen or been induced to purchase by one or a combination of statements, and might have considered some, all, or none of the foregoing

assertions to be material.  On the face of the Angell Putative Class Claim, there could be no

"typical" plaintiff for the unlimited permutations of factual predicates for the claims alleged.

### E.    The Angell Plaintiffs Are Not Adequate Representatives

53.    To establish that it will adequately represent the proposed class, the Angell

Plaintiffs must have common interests with the unnamed members of the class, and it must

appear that the Angell Plaintiffs will vigorously prosecute the interests of the class through

qualified counsel.  *See, e.g.*, *Edwards v. McCormick*, 196 F.R.D. 487, 495 (S.D. Ohio 2000).

Initially, without evidence of who would actually comprise the class, a court cannot evaluate

whether the Angell Plaintiffs have a common interest with the unnamed class members, and any

determination of adequate representation would be purely speculative.  *Id.*  Furthermore, the

required elements that the plaintiffs have "claims or defenses typical of the class" and that they

can "adequately represent and protect the interests of other members of the class"  are

intertwined: "to be an adequate representative, plaintiff must show that his claims are typical of

the claims of the class."  *See, e.g.*, *Caro v. Proctor & Gamble Co.*, 18 Cal. App. 4th 644, 669

(1993) ("[T]o be an adequate representative, plaintiff must show that his claims are typical of the

claims of the class.") (quoting *Stephens v. Montgomery Ward*, 193 Cal. App. 3d 411, 422

(1987)).  As described above, there can be no "typical" plaintiff and, thus, no adequate

representative for any of the Putative Classes.

54.    Moreover, the burden to move expeditiously for class certification and

recognition within a bankruptcy proceeding, in compliance with Rule 23(c)(1), falls on the class

representative and "the class representative's failure to move for class certification is a strong

indication that he will not fairly and adequately represent the interests of the class."  *In re*

*Woodward*, 205 B.R. at 370.  As the Angell Putative Class Claim fails to meet the requirements

of Rule 23, the Court should not allow it to proceed as a class claim, and it should be disallowed.

### F.    The Members of the Putative Angell Classes Are Not Properly Identifiable

55.    Inherent in Rule 23 is the requirement that a proposed class be

"identifiable" or ascertainable.  *See In re MTBE Prods. Liab. Litig.*, 209 F.R.D. at 336-37.  This

requirement is not satisfied if a court must conduct a merits inquiry merely to determine who is

included in the proposed class.  For example, the identity of a class defined as "all individuals

harmed by defendants' negligence" would not be ascertainable, because a court would need to

determine if the defendant was negligent and who was harmed by such negligence merely to

identify the putative class members.  *See Barasich v. Shell Pipeline Co.*, No. 05-4180, 2008 WL

6468611, at *4 (E.D. La. June 19, 2008) (striking class allegations of class defined as "[a]ll

commercial oystermen whose oyster leases were contaminated by oil discharged during

Hurricane Katrina due to the negligence of defendants").

56.    The class definitions of the Putative Classes in the Angell Putative Class

Claim suffer from this same defect.  The first proposed sub-class includes:

> All owners, former owners, lessees and former lessees of class
> vehicles whether individuals or business entities sustaining
> monetary loss incurred from repairing and/or replacing the class
> engine and components ***affected by oil sludge***.

(*Id.* at 10-11 ¶ 41 (emphasis added).)  The second putative sub-class includes:

> All owners, former owners, lessees and former lessees of class
> vehicles whether individuals or business entities sustaining
> monetary loss incurred by diminution of class vehicle resale value,
> increased vehicle operating costs caused by the use of more
> expensive engine oil and more frequent oil changes than initially
> recommended in their respective class vehicle owner's manual

(including but not limited to maintenance stated in Saab's "special policy") and decreased engine performance *resulting from engine oil sludge*.

(*Id.* (emphasis added).)

57.     In order to determine class membership, the Court would, thus, need to first determine whether the putative class members' vehicles were negatively affected by "oil sludge."  Accordingly, the members of the Putative Classes are not properly ascertainable under Rule 23 and should be disallowed.  *See In re Vioxx Prods. Liab. Litig.*, No. MDL 1657, 2008 WL 4681368, at *9-10 (E.D. La. Oct. 21, 2008), *aff'd*, 300 F. App'x 261 (5th Cir. Nov. 17, 2008); *Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158, 1167 (N.D. Cal. 2008); *Barasich*, 2008 WL 6468611, at *4.

## Notice

58.     Notice of this Motion has been provided to the Angell Plaintiffs and to the parties in interest in accordance with the Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated August 3, 2009 [Docket No. 3629].  The Debtors submit that such notice is sufficient and no other or further notice need be provided.

59.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.[11]

Dated:  New York, New York
        January 29, 2010

/s/ Joseph H. Smolinsky
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

---

[11] Should the Court find it appropriate to permit the Angell Putative Class Claim to proceed as a class claim in whole or in part, the Debtors reserve their rights to request that an expedited procedure be established in this Court to quickly liquidate such claim and an expedited hearing to estimate the Angell Putative Class Claim pursuant to section 502(c) of the Bankruptcy Code.  *See* 11 U.S.C. § 502(c) ("There **shall** be estimated for purposes of allowance under this section – (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case…") (emphasis added); *see also In re Chateaugay Corp.*, 10 F.3d 944, 957 (2d Cir. 1993); *In re Thomson McKinnon Sec., Inc.*, 143 B.R. 612, 619 (Bankr. S.D.N.Y. 1992).  Further, should an estimation proceeding go forward, the Angell Plaintiffs should be required to provide substantial documentation to support the alleged nature of their $615 million claim.

**Exhibit A**

**Angell Putative Class Claim**
**Proof of Claim No. 903**

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT  Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>Motors Liquidation Company formerly known as General Motors Corporation | Case Number<br>09-50026 |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (the person or other entity to whom the debtor owes money or property)<br>Susan B. Angell, et al (products liability class action plaintiffs) | ☐ Check this box to indicate that this claim amends a previously filed claim |
|---|---|
| Name and address where notices should be sent<br>Thomas P. Sobran, Esquire<br>7 Evergreen Lane<br>Hingham, MA 02043<br><br>Telephone number<br>(781) 741-6075 | **FILED - 00903**<br>**MOTORS LIQUIDATION COMPANY**<br>**F/K/A GENERAL MOTORS CORP**<br>**SDNY # 09-50026 (REG)** | Court Claim Number _____<br>(If known)<br><br>Filed on _____ |

| Name and address where payment should be sent (if different from above)<br><br><br><br>Telephone number | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |
|---|---|

| | |
|---|---|
| 1. Amount of Claim as of Date Case Filed        $        615,000,000.00 | 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount. |
| If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured, do not complete item 4. | |
| If all or part of your claim is entitled to priority, complete item 5. | Specify the priority of the claim |
| ☐Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| 2. Basis for Claim        defective engines<br>(See instruction #2 on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4) |
| 3. Last four digits of any number by which creditor identifies debtor: _____ | |
| 3a. Debtor may have scheduled account as _____<br>(See instruction #3a on reverse side) | |
| 4. Secured Claim (See instruction #4 on reverse side)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information. | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5) |
| Nature of property or right of setoff: ☐Real Estate ☐Motor Vehicle ☐Other<br>Describe: | ☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7) |
| Value of Property $_____ Annual Interest Rate_____% | |
| Amount of arrearage and other charges as of time case filed included in secured claim, | ☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8) |
| if any $_____ Basis for perfection _____ | |
| Amount of Secured Claim $_____ Amount Unsecured $_____ | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___) |
| 6. Credits The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | |
| 7. Documents Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.) | Amount entitled to priority:<br><br>$_____ |
| DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | *Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |

(stamp: THE GARDEN CITY GROUP, INC.   JUL 28 2009)

| Date<br>07/14/2009 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Thomas P. Sobran | FOR COURT USE ONLY<br><br>JUL 16 2009 |
|---|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SUSAN B. ANGELL and
PRUDENCE REID,
individually and on
behalf of all others
similarly situated,
  Plaintiffs,

v                                    CIVIL ACTION NO  1 08-CV-11201-DPW

SAAB AUTOMOBILE AB,
SAAB CARS USA, INC ,
SAAB CARS HOLDINGS CORP , and,
GENERAL MOTORS CORPORATION,
  Defendants.

SECOND AMENDED CLASS ACTION COMPLAINT AND REQUEST FOR JURY TRIAL

Introduction

1.  Susan  B   Angell  (hereinafter  "Angell")  and  Prudence  Reid

(hereinafter  "Reid")  through  their  counsel,  on  behalf  of

themselves  and  all  other  individuals  and  entities  similarly

situated (as more fully discussed *infra*), initiate this proposed

class  action  involving  1999  through  and  including  2003  model

year  Saab  9-5  vehicles  equipped  with  a  four  cylinder  engine,

2000  through  and  including  2002  model  year  Saab  9-3  vehicles,

2000  through  and  including  2003  model  year  Saab  9-3  convertible

vehicles  and  1999  through  and  including  2002  model  year  Saab

Viggen  vehicles  sold  in  the  United  States  (hereinafter  "class

vehicle"  or  "class  vehicles")

2   Class vehicles are equipped with four cylinder multi-valve turbocharged engines (hereinafter "class engine" or "class engines").

3   All class engines are predisposed to partial deterioration and/or complete and total destruction within the express warranty period caused by engine oil sludge and carbon deposits

4. Oil sludge results from thermal and chemical degradation of engine oil.[1]

5   While some engine mechanical wear is anticipated during normal operation of any motor vehicle, class vehicles have abnormally accelerated wear to internal engine components (such as camshafts, engine bearings, camshaft chains and balance chains together with dozens of other expensive to repair associated parts) caused by the formation of engine oil sludge [2]

6.  The class engine turbochargers also experience abnormally accelerated wear to the bearings, shafts and seals resulting in premature failure at less than one third of its anticipated useful life

7   Class engines are defective with respect to their design and workmanship, materials and manufacture predisposing the class

---

[1] Oil sludge refers to both the viscous sludge and hard carbon deposits.

[2] Class engines did not perform satisfactorily from the date of first use through to the truncated life of the engine

2

engines to oil sludge deposits caused in part by the low friction design.

8. Low friction pistons, piston rings and other components increase the amount of combustion by-products escaping from the cylinders into the crankcase during the compression and power phases of engine operation.

9. The class engine crankcase ventilation system is improperly designed and manufactured and fails to adequately vent crankcase gases that are toxic to the engine oil and create oil sludge

10. While class vehicles operate in their intended and foreseeable environment, engine oil sludge is concurrently generated by the defectively designed crankcase ventilation system

11. The only corrective measure to remedy class engine defects is a redesign of the engine block and internal components and the crankcase ventilation system  These modifications were subsequently undertaken for second generation 9-3 and 9-5 Saab vehicles.

12. Class vehicles are defective since they were accompanied by an owner's manual and service record booklet that incorporated incorrect engine oil recommendations (including but not limited to the use of mineral oil, semi-synthetic oil and viscosity) and oil change intervals of 10,000.

3

13. Another concurrent cause of oil sludge deposits in class engines is use of improperly recommended oil and oil change intervals  Specifically, use of mineral oil or semi-synthetic engine oil leads to the formation of oil sludge, loss of oil lubrication properties, deposits in the engine oil passages and crankcase breathing tubes and eventual engine failure even if the initial and supplemental maintenance recommendations are followed.

14  Mineral oil or semi-synthetic oil satisfying the American Petroleum Institute specifications and viscosity recommended by the owner's manuals accompanying class vehicles causes oil sludge in class engines, particularly where recommended 10,000 mile oil change intervals are followed.

15  Engine oil sludge deposits cause reduced and/or complete loss of internal engine component lubrication by restricting the oil tube pickup screen, oil passages and galleries resulting in increased friction between contact surfaces severely damaging or destroying class engines

16  Engine oil sludge disrupts the heat transfer of internal engine components, further accelerating engine wear

17. Class engines are inherently defective and are failing due to oil sludge after accumulating only one quarter to one-half of their reasonably anticipated useful lifetime mileage

4

18.  Angell, Reid and members of the proposed class request
injunctive relief, monetary damages including treble damages,
court costs and attorneys' fees under theories of breach of
contract, breach of express and implied warranties, unfair and
deceptive business act practices prohibited by M.G L  c 93A, §9
and unjust enrichment and restitution

## Parties to this Proceeding

19  Angell is an adult individual who resides at 109 Lunenburg
Road, West Townsend, Middlesex County, Massachusetts, 01474
Angell owns a 2000 model year Saab 9-3. Angell initially leased
her class vehicle through Village Saab, an authorized
Massachusetts Saab dealership in March of 2000.    Angell
purchased the vehicle in May of 2002

20  Reid is an adult individual who resides at 100 Waite Street,
Revere, Middlesex County, Massachusetts, 02151.    At all times
relevant to this class action complaint, Reid owned a 2001 model
year Saab 9-5 equipped with a four-cylinder engine   Reid
purchased her class vehicle from a Massachusetts car dealership
in 2003 while the vehicle was still within the original warranty
that was fully transferable to her    The prior owner and/or
dealer did not furnish any maintenance records for Reid's class
vehicle at the time of purchase or any subsequent time.

21.   Saab Automobile AB (hereinafter "Saab AB") is a duly organized Swedish corporation located in Trollhattan, Sweden Saab AB designed, manufactured and tested Angell's 2000 model year Saab 9-3, Reid's 2001 model year 9-5 and all other class vehicles

22   Saab AB had substantial participation in drafting the owner's manual and warranties (including the so-called "special policy letter") that accompanied Angell's Saab, Reid's Saab and all other class vehicles.  Saab AB has substantial participation in the importation, advertisement, marketing, distribution and sale of Saab motor vehicles in the United States, including Angell's 2000 model year Saab 9-3, Reid's 2001 model year 9-5 and all other class vehicles

23   Saab AB had substantial participation in drafting service and repair publications for class vehicles including Technical Service Bulletins and Technical News as well as other related materials.

24. At all relevant times, Saab Cars USA, Inc (hereinafter "Saab Cars") was a duly organized Delaware corporation with a principal place of business at Renaissance Center, Detroit, Michigan, 48265.  Saab Cars imports, advertises, markets, distributes and sells Saab motor vehicles manufactured by Saab

AB, including Angell's 2000 model year Saab 9-3, Reid's 2001 model year 9-5 and all other class vehicles.

25   Saab Cars had substantial participation in drafting the owner's manual and warranties (including the so-called "special policy letter") that accompanied Angell's 2000 model year Saab 9-3, Reid's 2001 model year 9-5 and all other class vehicles.

26   Saab Cars had substantial participation in drafting service and repair publications for class vehicles including Technical Service Bulletins and Technical News as well as other related materials.

27. At all relevant times, Saab Cars acted as an agent of Saab AB and General Motors Corporation, including activities concerning warranties, warranty repairs, dissemination of technical information and monitoring the performance of Saab vehicles in the United States.

28. At all relevant times, Saab Cars Holdings Corp (hereinafter "Saab Holdings") was a duly organized Delaware corporation with a principal place of business at Renaissance Center, Detroit, Michigan, 48265.

29. In October of 2007, Saab Cars merged into Saab Holdings Saab Holdings assumed the assets, liabilities (including all warranty obligations) and duties of Saab Cars.

7

30    Saab  Holdings  acts  as  an  agent  of  Saab  AB,  including activities    concerning    warranties,    warranty    repairs, dissemination  of  technical  information  and  monitoring  the performance of Saab vehicles in the United States

31. General  Motors  Corporation  (hereinafter  "GM")  is  a  duly organized  Delaware  corporation  with  a  principal  place  of business at Renaissance Center, Detroit, Michigan, 48265    GM also does business as Saab Automobile USA and Saab USA in the United States.

32   GM imports, advertises, markets, distributes and sells Saab motor vehicles manufactured by Saab AB including Angell's 2000 model year Saab 9-3, Reid's 2001 model year 9-5 and all other class vehicles

33. GM had substantial participation in the drafting of the owner's manual and warranties (including the so-called "special policy letter") that accompanied all class vehicles.

34   GM had substantial participation in drafting of service and repair  publications  for  class  vehicles  including  Technical Service  Bulletins  and  Technical  News  as  well  as  other  related materials.

35. In  October  of  2007,  GM  assumed  the  assets,  liabilities (including all warranty obligations) and duties of Saab Cars
36. GM  acts  as  an  agent  of  Saab  AB,  including  activities

8

concerning warranties, warranty repairs, dissemination of technical information and monitoring the performance of Saab vehicles in the United States.

37. GM is the parent company of Saab AB, Saab Cars, Saab Automobile and Saab Holdings (hereinafter collectively referred to as "defendants").

Jurisdictional and Venue Statement

38. This district court has original jurisdiction under 28 U.S C §1332(d)(2)(A)-(C), 28 U.S.C. §1332(d)(5)(B), 28 U.S.C §1332(d)(6) and 28 U.S C §1367 since diversity jurisdiction exists between Angell, Reid and the defendants, there are in excess of 130,000 proposed class members and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs

39 In personam jurisdiction exists over the defendants under the so-called Massachusetts long arm statute, M.G.L c 223A, §3 [3] The defendants are persons within the context of M G.L. c 223A, §1. The defendants directly and through their agents regularly transact business and otherwise derive substantial revenue in Massachusetts. The defendants conduct continuous and systematic economic activities in Massachusetts. The defendants intentionally and purposefully placed their vehicles and/or

---

[3] Chapter 223A is captioned "Jurisdiction of Courts of the Commonwealth Over Persons in Other States and Countries "

components in the stream of commerce in Massachusetts.
Subjecting the defendants to in personam jurisdiction in the
Commonwealth of Massachusetts does not violate the defendants'
due process rights and comports with requirements of fair play
and substantial justice

40. Venue is conferred by 28 U S C §1391 as the defendants
regularly and purposefully do business in this judicial district
and a substantial part of the events giving rise to the claim
occurred here.[4]

Class Action Allegations[5]

41 Angell and Reid bring this class action pursuant to Fed. R
Civ P 23(b)(1), 23(b)(2) and 23(b)(3) on behalf of themselves
and all members of the two proposed sub-classes (hereinafter
collectively referred as "proposed class members") defined as
follows (sub-class no. 1) All owners, former owners, lessees
and former lessees of class vehicles whether individuals or
business entities sustaining monetary loss incurred from

---

[4] Saab Cars and GM maintained offices and training facilities in
Massachusetts during the relevant time period

[5] M.G L c 93A §9(2) allows class certification under less
stringent requirements than Fed. R Civ. P. 23(a) Under §9(2),
Angell may commence a class action on behalf of herself and
others "if the use or employment of the unfair or deceptive act
or practice has caused similar injury to numerous other persons
similarly situated and if the court finds in a preliminary
hearing that [s]he adequately and fairly represents such other
persons,"

repairing and/or replacing the class engine and components
affected by oil sludge; and, (sub-class no 2) All owners,
former owners, lessees and former lessees of class vehicles
whether individuals or business entities sustaining monetary
loss incurred by diminution of class vehicle resale value,
increased vehicle operating costs caused by the use of more
expensive engine oil and more frequent oil changes than
initially recommended in their respective class vehicle owner's
manual (including but not limited to maintenance stated in
Saab's "special policy") and decreased engine performance
resulting from engine oil sludge.    Excluded from the proposed
sub-classes    are    the    defendants,    their    United    States
subsidiaries, agents and representatives    Also excluded from
the proposed sub-classes are all persons claiming personal
injuries caused by engine defects in the class vehicles.
Further excluded from the proposed sub-classes are the presiding
judge and magistrate to this proceeding and any immediate
family

Numerosity of the Class

42. The proposed class is so numerous that individual joinder of
all potential members is impracticable under Fed  R. Civ. P  19
or 20    There are in excess of 130,000 class vehicles imported
into the United States.    Although the number, location and

11

identity of all proposed class members cannot be presently ascertained, this information is obtainable through discovery from the defendants.

Existence of Common Questions of Law and Fact

43. Common questions of law and fact exist as to all members of the proposed sub-classes and predominate any and all issues of law and fact affecting individual members of the class   These issues include but are not limited to

   a.    Whether class engines are defectively designed and/or manufactured so as to predispose the engine to the accumulation of oil sludge and resulting engine failure;

   b.    Whether class engines sustained damage directly or indirectly by accumulation of oil sludge;

   c.    Whether class vehicles were sold with incorrect oil and owner's manuals incorporating incorrect engine oil recommendations and oil change intervals;

   d    Whether the defendants breached their contract for the sale of class vehicles by unilaterally modifying class engine oil recommendations and oil change intervals for class vehicles,

   e    Whether the defendants breached their implied warranties in that class vehicles were defective with respect to engine design and manufacture,

12

f.  Whether the defendants breached their implied warranties
    in that class vehicles were accompanied by an owner's
    manual incorporating incorrect engine oil recommendations
    and oil change intervals;

g.  Whether the defendants breached their express warranties
    in that class vehicles were defective with respect to
    engine design and manufacture;

h.  Whether the defendants breached their express warranties
    in that class vehicles were accompanied by an owner's
    manual incorporating incorrect engine oil recommendations
    and oil change intervals;

i.  Whether the defendants fraudulently or negligently
    misrepresented material facts concerning the
    characteristics of class vehicles;

j.  Whether the defendants were aware of defects in class
    vehicles and actively, affirmatively and fraudulently
    concealed the existence of defects in the vehicles and/or
    accompanying manuals,

k.  Whether the defendants committed unfair and deceptive
    business trade act practices in the sale of class
    vehicles, vehicle warranties and the special policy;

l.  Whether the defendants had a duty to disclose their
    knowledge of class vehicle engine defects and knowledge

13

that the owner's manual for class vehicles set forth incorrect engine oil recommendations and oil change intervals,

m    Whether the defendants breached representations set forth in the special policy letter concerning reimbursement and repairs to class engine components,

n.    Whether the defendants were unjustly enriched by their warranty breaches, misrepresentations and deceptive business practices,

o    Whether proposed class members are entitled to restitution, monetary damages and/or injunctive relief;

p    Whether the court should establish a constructive trust funded by the benefits conferred upon the defendants by their wrongful and unlawful conduct;

q    Whether class vehicles have a diminished life and residual value;

r    Whether proposed class members are able to afford individual litigation against the defendants; and,

s    Whether the defendants had a duty to disclose the safety risks of unanticipated sudden engine failure caused by oil sludge.

14

Typicality of Claims or Defenses of a Definable Class

44    The claims and defenses of proposed class representatives Angell and Reid are typical of the claims and defenses of proposed class members.    Class claims arise out of ownership and/or lease of class vehicles as defined in ¶1    The defendants in this proposed class action have no counterclaims or defenses unique to proposed class representatives Angell and/or Reid

Adequate Representation

45.    Proposed class representatives Angell and Reid have no conflicting interests with any other class member    Angell and Reid will fairly and adequately protect the interests of the class.    Claims of proposed class representatives Angell, Reid, and the proposed class members' claims are so interrelated that the interests of the proposed class members will be fairly and adequately protected in their absence    Angell and Reid have retained counsel adequate to protect the interests of all proposed class members.

Superiority of a Class Action

46.    Maintenance of a class action is the most economical procedural device to litigate the class vehicle defect claims Prosecution of separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that

would establish incompatible standards of conduct for the defendants as recognized by Fed. R. Civ P 23(b)(1)(A)

47 Prosecution of separate actions by or against individual class members would create the risk of inconsistent adjudications with respect to individual class members which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests as recognized by Fed R Civ. P Rule 23(b)(1)(B).

48. There is a substantial likelihood that the defendants will act or refuse to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate as recognized by Fed. R Civ P. 23(b)(2)

49 Questions of law and fact common to members of the class predominate over any questions affecting any individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy as recognized by Fed R. Civ P 23(b)(3)

Further Allegations

50. Angell, Reid and proposed class members had valid and binding contracts with Saab AB, Saab Cars and GM and were

reasonably expected by these defendants to use their respective class vehicles in the manner in which the vehicles were used

51    Angell, Reid and proposed class members complied with all contractual obligations including all warranty, maintenance and product use obligations for their respective class vehicles

52    Angell, Reid and proposed class members operated their vehicles under normal anticipated driving conditions and did not meet any elements specified by the defendants as requiring additional vehicle maintenance

53    Angell, Reid and proposed class members changed the engine oil more frequently than the 10,000 mile intervals recommended in the owner's manual and service booklet that accompanied their class vehicles

54    Angell used mineral based oil and in her class engine. The owner's manual and service booklet that accompanied her class vehicle authorized the use of mineral oil, semi or full synthetic oil

55.    In June of 2003, Angell's 2000 Saab 9-3 class engine sustained engine failure caused by engine oil sludge

56    Within forty-eight hours of engine failure, Angell had her vehicle towed to the authorized Saab dealer (Village Saab) from whom she purchased the vehicle and provided requisite notice of

the defendants' breaches of warranties with respect to her vehicle.

57. Saab Cars received Angell's breach of warranties notice through Village Saab

58. Saab Cars refused to reimburse or compensate Angell for any class engine repair expenses or provide substitute transportation.

59. Although the engine failure occurred outside the express warranty period, Angell's vehicle exhibited unmistakable symptoms (known only by Saab AB, Saab Cars and GM) of engine oil sludge within the express warranty

60 Those symptoms include the engine turbocharger failure and two crankcase ventilation system failures requiring installation of system upgrades [6]

61 Through no fault of her own, Angell did not possess sufficient automotive technical expertise to recognize these symptoms of impending engine failure although this information was well known to Saab AB, Saab Cars and GM but kept secret

---

[6] The turbocharger was replaced under warranty because Saab Cars accepted the vehicle's oil change documentation and maintenance history, including the two oil changes performed by Angell's husband at 28,000 and 36,000 miles Prior to engine failure, other major component failures included the ignition discharge module and climate control system Angell's ignition discharge module failed in June of 2002. In October of 2005, Saab Cars announced a warranty recall and reimbursement program for this component.

62. Saab Cars (through the service department of authorized
dealer Village Saab) fraudulently informed Angell that her
engine failed as the result of the use of low quality grade
mineral engine oil that did not meet the recommendations set out
in the owner's manual for her vehicle.

63. Angell believed and relied on the information she received
from Saab Cars that mineral oil provided by her husband and/or
Jiffy Lube caused engine failure

64. Material misrepresentations and fraudulent statements were
made by employees of Saab Cars within days of when Angell had
her vehicle towed to Village Saab for engine repair.

65. These statements were repeated over the course of several
months by the employees of Village Saab who were in contact with
the regional Saab Cars representative whose approval was
required for reimbursement of expensive warranty engine repairs.

66. The regional Saab Cars representative denied any warranty
repair on the basis that Angell used low quality engine oil and
this caused engine failure. When asked as to the cause of her
vehicle's engine failure, Saab Cars actively and fraudulently
concealed the existence of class engine design and manufacture
defects and that class vehicles were accompanied by an owner's

manual that incorporated improper oil recommendations and oil change intervals.[7]

67    The representations made by Saab Cars to Angell (shortly after the engine failure in her vehicle and by Saab Cars, Saab AB and/or GM to other class members after their engines failed or were badly sludged) that low quality oil and/or poor maintenance and/or certain driving conditions caused their respective engine failures were false and fraudulent.

68. Authorized Saab dealers did not have knowledge of and/or were counseled not to admit that any defects existed in the class engine or improper maintenance recommendations were incorporated in the owner's manual or service booklet.

69. Saab dealers (who also had a vested financial interest in concealing and suppressing the actual cause of engine oil sludge) blamed oil sludge on low quality mineral oil, poor maintenance and certain driving conditions.

70. Saab AB and Saab Cars discontinued recommending mineral oil for all 2001-2003 model year class vehicles.    Saab AB, Saab Cars and GM knew that the use of any mineral based engine oil

---

[7] Additional information supporting allegations of this fraud and fraudulent conduct is in the control of the defendants. This information includes but is not limited to engineering analyses, warranty claims and internal corporate communications concerning how to deal with consumers who claim their class vehicles were damaged by engine oil sludge

was causing engine oil sludge and engine failures in class vehicles.[8]

71  Initially, Saab AB, Saab Cars and GM attempted to remedy oil sludge accumulation caused by defective class engines by crankcase ventilation system modifications and recommending only semi and full synthetic oil

72  Angell incurred approximately $4000 00 in expenses replacing the engine in her class vehicle.  Angell lost the use of her 2000 Saab 9-3 for over five months and incurred substantial inconvenience and expense in obtaining alternative transportation

73. In 2003, J  G. Service replaced the engine in Angell's vehicle   J G  Service is a competent independent Saab repair facility with extensive experience and specialization in the repair of Saab vehicles.  In 2003, J. G  Service believed that engine sludge in class vehicle was caused by the use of low quality mineral oils

74.  J. G. Service did not know design defects in the engines of class vehicles were causing and/or substantially contributing to the formation of engine oil sludge and that any type of mineral

---

[8] The owner's manual and service booklet did not alter the recommended 10,000 mile oil change interval for class vehicles manufactured after September of 2000 (2001-2003 model year class vehicles). No notice was sent to owners of 1999-2000 class vehicles concerning the use of mineral based engine oil.

oil (high quality, medium quality or low quality), would result in oil sludge in class engines even if recommended service intervals were followed

75. When asked by Angell, the mechanics at J. G. Service incorrectly opined that the engine failure was caused by low quality mineral oil

76 Angell believed that her engine failed because her husband and/or Jiffy Lube used low quality mineral oil when servicing the engine. This belief was induced by fraudulent statements made by Saab Cars and incorrect statements made by employees of J. G Service.

77 Angell had no reason to believe that the engine in her vehicle failed from a cause other than the use of low quality mineral oil.

78 Angell diligently and dutifully inquired as to other causes of her vehicle's premature engine failure and found no evidence contradicting what she had been told by Saab Cars or mechanics at J.G. Service who she believed to be (and in fact were) competent independent Saab mechanics.

79 Expert Saab engine mechanics would not have known prior to 2005 that design and manufacture defects in the engine (and not the use of mineral oil) were causing engine oil sludge.

80. Expert Saab engine mechanics would not have known that the class vehicle manufacturer (Saab AB) and/or Saab Cars recommended incorrect oil service for class vehicles given the design and manufacture of the engine.

81 This type of information was propriety in nature and known only by Saab AB, Saab Cars and GM until 2005 when first disclosed by Saab AB in Europe.

82. A reasonable person in Angell's position would have believed that engine failure was the result of using low quality mineral oil.

83 A reasonable person in Angell's position making an inquiry into the cause of engine failure would not have discovered that class engines had design and manufacture defects and improper maintenance recommendations because those facts were inherently unknowable and were further concealed by Saab AB, Saab Cars and GM's affirmative acts (including active fraud with the intent to deceive).

84 Angell acted diligently and made reasonable inquiries but failed to learn that a cause of action existed for her vehicle's engine failure until 2005

85. Saab AB, Saab Cars and GM had actual knowledge that oil sludge was causing extensive irreversible premature wear in

class engines in July of 1998, before sales of class vehicles commenced in the United States.

86. Prior to Angell's engine failure in 2003, Saab AB, Saab Cars and GM had actual knowledge that the low friction engine design, crankcase ventilation system together with incorrect oil and maintenance recommendations were causing engine oil sludge and premature class engine failure

87. This information was technical in nature and not known by the ordinary consumer or the public including Angell, Reid and proposed class members

88  Angell, Reid and proposed class members were ignorant of this technical information through no fault of their own

89. Independent repair facilities were not knowledgeable or informed as to the causes of class vehicle engine oil sludge until 2005 when this information began to disseminate.[9]

90. Although Saab AB, Saab Cars and GM knew defects in class engines and incorrect oil maintenance recommendations in the owner's manuals caused engine oil sludge, these defendants knowingly and actively concealed material information from prospective purchasers and actual purchasers with the intent to deceive purchasers and promote class vehicle sales.

---

[9]  To date, none of the defendants has disclosed or admitted that design and manufacture defects and improper oil recommendations were responsible for the formation of oil sludge in class vehicles.

91 This material information concerned the propensity of class vehicles to accumulate unreasonable amounts of engine oil sludge in normal vehicle operation causing premature engine failure

92. Material information fraudulently concealed and/or actively suppressed by Saab AB, Saab Cars and GM includes but is not limited to class vehicle engine defects and incorrect class engine maintenance recommendations concerning engine oil specifications, engine oil type and oil change intervals.

93. Material information was fraudulently concealed and/or actively suppressed in order to sell class vehicles to uninformed consumers (including Angell, Reid and proposed class members) premised on affirmations and representations of reliable long-life efficient engines, low vehicle maintenance and inexpensive operating costs.

94. Material information was fraudulently concealed and/or actively suppressed in order to protect Saab AB, Saab Car and GM's (and authorized Saab dealers') corporate profits from loss of sales from adverse publicity and warranty repairs.

95. In July of 1998, Saab AB and Saab Cars issued Service Information No 210-1991 to authorized dealers discussing engine deposits and reduction of oil service intervals for 9-3 class vehicles together with other vehicles equipped with four cylinder turbocharged engine

96    None of the oil sludge specific information contained in
Service Information No  210-1991 was incorporated in the class
vehicle owner's manual or disclosed to class vehicle purchasers
at the time of sale or prior to the special policy letter sent
to known class vehicle owners in mid 2005

97    Saab AB and Saab Cars issued Technical News Bulletins to
authorized Saab dealers in July of 2000 and again in October of
2002 detailing new recommended engine oils (non mineral) for
class vehicles.

98    Despite knowledge that design and manufacturing defects
were causing oil sludge and premature engine failure in class
vehicles, Saab AB and Saab Cars attempted to remedy class engine
defects by recommending higher quality semi and full synthetic
engine oils and reduced oil intervals to lower the incidence of
oil sludge related engine failures.

99    Although Saab AB, Saab Cars and GM knew that mineral based
engine oil (recommended in class vehicle owner's manuals) in
conjunction with engine design defects was accelerating the
accumulation of oil sludge and causing severe premature engine
damage, these defendants did not issue supplemental owner's
manual inserts for class vehicles or otherwise notify class
vehicle owners that only "Saab High Performance Turbo Oil 0W-40

26

Fully synthetic" or "Saab Turbo Oil 5W-30 Semi-Synthetic" should be used as per the Technical News Bulletin Nbr 00-07-210

100  Issued in July of 2000, Technical News Bulletin Nbr 00-07-210 entitled "Recommended oil grades" announced that- "Synthetic engine oil is now used during assembly (as of April 2000) and is the standard oil in cars leaving the plant." This bulletin "recommended" the use of only semi or full synthetic engine oil for class vehicles and stated that- "By using the oils tested by Saab, results such as the build up of contaminants [oil sludge] are avoided Such contaminants can block the lubricating system and damage engine components " Mineral oils were specifically not recommended for use in class engines in this bulletin

101. A second Technical News Bulletin, Nbr 02-10-210 entitled "Recommended oil grade, replaces TN 00-07-210" was sent to authorized Saab dealers in October of 2002 superseding the July 2000 oil bulletin. This new oil recommendation conspicuously noted that- "All cars leaving the factory are filled with synthetic engine oil" and that Saab AB no longer recommended the use of mineral oil for class engines. The bulletin further stated- "Using recommended oils avoids the tendency to build up residue [oil sludge] inside the engine that can block the lubricating system, increase wear and damage engine components "

27

102. This second bulletin issued additional oil specifications and mandated only the use of full synthetic oil for certain class vehicles including oils satisfying GM-LL standards (the highest quality synthetic oil standard when issued).

103. The defendants knew or should have known information contained in the Technical News Bulletins would not be disseminated to individual class vehicle owners and particularly to owners who did not service their vehicles at Saab authorized dealers.

104. Technical News Bulletins, Service Information bulletins and Technical Service Bulletins were not available to members of the general public or independent service shops and were only for the use of mechanics and service personnel at authorized Saab dealerships.

105. No independent instruction and/or warning was sent to class vehicle owners in the United States concerning the discontinuation of mineral based or semi synthetic engine oil in class vehicles until the special policy letter in mid 2005.

106. In mid 2005, Saab Cars contacted known class vehicle owners with a letter to advise that class engines were susceptible to oil sludge formation under certain conditions and stated-

> The primary cause of engine oil sludge is premature
> decomposition of oil due to a number of factors or
> combination of factors  These factors include: short
> driving trips of 5 to 10 minutes when the engine does

28

not warm up sufficiently, driving in stop-and-go traffic, driving in dusty conditions, towing trailers, using low-grade-specification oil not recommended by Saab, or oil changes not meeting the minimum requirements as recommended in the service schedule. When these factors or combination of factors occur, the engine oil thickens making it more difficult to provide adequate engine lubrication.[10]

107.   The so-called "special policy letter" recommends that mineral based and semi synthetic engine oils (originally recommended in the owner's manual for class vehicles) should no longer be used and that – "Saab recommends using a full synthetic oil and considering if your driving conditions require more frequent maintenance . "

108. The special policy letter recommended more frequent class vehicle maintenance.

109   As a result of this letter (and as knowledge of the propensity of class engines to form oil sludge), authorized Saab dealers, independent automobile repair facilities and quick change oil shops reduced the oil change intervals for class vehicles from 10,000 miles to 5,000 miles.

110.   The special policy letter supplemental maintenance recommendations issued by Saab AB and Saab Cars quadruples oil maintenance costs for class vehicles by recommending full synthetic oil and more frequent oil changes in order to prevent

---

[10]  The letter ends by reciting that– "Saab stands behind its products and is focused on our traditional values of Safety and Reliability."

formation of oil sludge and for the extended special policy to be valid [11]

111    Since the defendants' special policy letter recommended the use of full synthetic engine oil to prevent the formation of engine sludge, Angell, Reid and class members switched from mineral oil to these newly recommended more expensive engine oils.

112. Angell, Reid and class members also reduced the oil change interval to the now recommended 5,000 mile oil change interval instead of the initially recommended 10,000 mile interval

113    Angell, Reid and class members followed the new oil recommendations and oil change intervals in order to prevent the

---

[11] The special policy letter sent to Angell dated May 17, 2005 and Angell's reimbursement request are appended to this complaint as Exhibits 1 and 2, respectively. Owner's manuals and warranty booklets for class vehicles do not mandate specific oil types or specifications.   Saab manuals and booklets employ the terms "recommend(s)" or "recommended" when discussing class vehicle engine oil.   The Saab 9-3 and 9-5 Warranty and Service Record Booklets recommend oil change service at 10,000 mile intervals except under extreme conditions not applicable to Angell, Reid and other class members.   The owner's manual for Angell's vehicle states in no terms uncertain- **"These** [recommended] **oils contain the additives required for the engine to function well   We advise against the use of further additives**." (emphasis in original)   As Saab dealers, independent repair facilities and class vehicle owners became aware of the engine sludge problems, use of mineral and semi synthetic engine oil was discontinued and oil change intervals were shortened to 5,000 miles. The increased cost of an oil change with a full synthetic oil is in excess of $45 00 at an authorized Saab dealer.

accumulation of oil sludge and to protect their vehicles'
engines.

114.   Angell, Reid and class members followed these
recommendations to protect their respective vehicles' engines
from oil sludge induced damage beyond the special policy period
of eight years.

115. The special policy letter recommended increased oil change
maintenance costs over the anticipated class vehicle life
increases oil maintenance costs in excess of $500.00 per
vehicle.

116   The special policy letter fraudulently concealed the real
cause of oil sludge ("premature decomposition of the oil") which
is caused by engine design and manufacture defects (as more
fully set out in ¶195)

117. The low friction engine design increases allows a greater
amount of combustion by-products to enter the engine crankcase.
These combustion by-products are inadequately disposed of by the
defective class engine crankcase ventilation system.

118. Combustion by-products are toxic to the engine oil and
deplete the oil and oil additives resulting in oil sludge.[12]

---

[12] The engine oil is the victim of a defective engine and not the
villain causing oil sludge as alleged by Saab AB, Saab Cars and
GM.

119.   Although Saab AB, Saab Cars and GM knew that design engine
defects were causing oil sludge and severe premature damage in
class engines (particularly with the use of mineral oil), the
defendants fraudulently attempted to shift the responsibility
and repair costs for oil sludge damage to individual vehicle
owners premised on low quality oil, poor maintenance and certain
driving conditions as set forth in the special policy letter

120.   Saab AB and Saab Cars recommended higher quality full
synthetic oil in service publications and the special policy
letter and more frequent oil changes because this forestalls but
does not eliminate oil sludge accumulation and eventual (and
predictable) premature engine failure.

121.   The only way to remedy premature class engine failures
caused by oil sludge is an engine and crankcase ventilation
system redesign.[13]

122.   The defendants also affirmatively and actively concealed
manifestations of engine oil sludge under provisions of the
special policy announced in mid 2005   The special policy letter
distributed to class vehicle owners in the United States is

---

[13]   The special policy letter fraudulently claims that—"This
special policy covers internally lubricated engine components
for   defects   in   material   and   workmanship "   Under   this
affirmation, the low friction pistons, piston rings and other
defective internal engine components should have been replaced
in all class engines, which they were not

similar to the letter Saab AB sent out in Europe during January of 2005

123.    The defendants imposed unreasonable and unconscionable levels of maintenance documentation for warranty repair and/or reimbursement of repairs under the special policy

124. Unless the vehicle owner can produce extensive maintenance documentation over the life of the vehicle (including receipts going back as far as eight years), the engine oil sludge repairs are refused under the special policy.[14]

125. Saab AB, Saab Cars and GM are aware that the vast majority of vehicle owners do not retain receipts or other documentation evidencing class vehicle oil changes and but for the defective engine design and wrong initial oil service recommendations, the class engines would not have failed.

126   Saab AB, Saab Cars and GM saddled class vehicle owners with proving that vehicles were properly maintained, rather than admitting that class vehicles are defectively designed and manufactured.

---

[14] This documentation is often impossible to produce because the original purchaser did not save all the maintenance records for the subsequent purchaser including individuals like plaintiff Reid whose engine turbocharger prematurely failed due to engine oil sludge.  Class vehicle purchasers were not aware at the time of purchase that a special policy would be enacted and that oil service documentation was required to participate in the special policy

33

127   The special policy warranty expressly excludes repairs or replacement for the class engine turbocharger and turbocharger components

128   Class engine turbocharger failure is a manifestation of moderate to severe levels of engine oil sludge and portends engine failure. Turbochargers should last the life of the engine which is reasonably expected to be in excess of 150,000 miles

129   The fraudulent conduct of Saab AB, Saab Cars and GM tolls any applicable statutes of limitations since the fraudulent misrepresentations concerning the true cause of engine oil sludge formation in class vehicles was an inherently unknowable fact given the technical nature of the class engine design defects and engine oil tribology [15]

130. Class vehicle owners do not possess the requisite technical skills in automotive engineering to discern the design and manufacture defects in their vehicles or the requisite technical skills in tribology to surmise the proper engine lubricants and engine oil maintenance intervals for class engines

---

[15]   Other information supporting allegations of fraud and concealment are in the control of the defendants. This information includes but is not limited to class vehicle service bulletins, engineering analyses, root cause analysis, warranty document claims and internal corporate communications   This information will be obtained in discovery from the defendants

131. In March of 2005, Angell learned that design defects in her class engine and initial improper oil recommendations caused oil sludge and resulting engine failure

132   M G L. c.260, §12 tolls Angell's statutes of limitations from June of 2003 (the date of her engine failure) until March of 2005 (when she first learned defects in the engine caused her engine to fail and that incorrect oil recommendations hastened her engine's failure)

133. Saab AB together with Saab Cars (and GM who approved the letter) made other fraudulent representations to Angell, Reid and class members in the 2005 special policy letter.

134. Saab AB, Saab Cars and GM fraudulently represented in the special policy letter that class vehicle owners who submitted requested documentation prior to December 31, 2005 would be reimbursed for oil sludge related engine repairs

135   Angell and class members fulfilled all conditions precedent for reimbursement under the special policy prior to the December 31, 2005 special policy document submission deadline.

136. Despite full compliance with the provisions of the special policy, Angell, Reid and proposed class members were denied reimbursement without adequate explanation.

137. Saab AB, Saab Cars and GM knew or should have known these fraudulent misrepresentations in the special policy letter and

35

other conduct would induce proposed class members (including Angell) from commencing litigation because class vehicle owners reasonably believed they would be compensated under the special policy for oil sludge damage or have their engines repaired

138. Angell, Reid and other class members relied on these fraudulent misrepresentations in their respective special policy letters and delayed bringing suit against Saab AB, Saab Cars and GM. These defendants fraudulently administered the special policy for class vehicles by their refusal to reimburse Angell, Reid and proposed class members.

139. Saab AB, Saab Cars and GM are estopped from asserting that statutes of limitations were running for the duration of time class members relied on the fraudulent representations (both as to the cause of oil sludge and the special policy remedy) in the special policy letter that vehicle owners would receive reimbursement for engine oil sludge repairs.

140. Angell relied on the engine oil sludge reimbursement representations in the special policy letter and was not aware that the defendants would fraudulently deny her claim until March of 2006, when Saab Cars declined her request for special policy reimbursement

141. Angell appealed Saab Cars' non-reimbursement decision through April of 2006.

142   Angell decided to pursue engine replacement reimbursement
under the terms of the special policy and not resort to legal
action from May of 2005 until April of 2006

143. The defendants are equitably estopped from asserting the
statutes of limitations were running against Angell's claims
from May of 2005 until March of 2006 at minimum (and until April
2006 at maximum)

144   Saab AB, Saab Cars and GM had a duty to disclose to owners
of class vehicles that there were design and manufacture defects
in the engine and that the owner's manual set forth the wrong
oil recommendations and oil change intervals.

145   This duty arose because these defendants knew that there
were defects in the vehicles and manuals that affected vehicle
operation and safety while the class vehicle owners were not
cognizant of these defects and dangers.

146. Saab AB, Saab Cars and GM breached their affirmative duty
of disclosure to class vehicle owners (and particularly to
owners who inquired as to the cause of engine oil sludge and
engine failures).

147. Saab AB, Saab Cars and GM had superior and exclusive
knowledge of class vehicle design and manufacture defects and

37

owed class vehicle owners a fiduciary duty to disclose defects
including those defects creating an unreasonable risk of harm [16]

148. Saab AB, Saab Cars and GM breached express and implied
warranties and actively and affirmatively misrepresented,
fraudulently concealed and suppressed the existence of defects
in class engines and accompanying owner's manuals and service
booklets.

149. The warranties accompanying the Angell, Reid and all other
class vehicles were unconscionable under M.G L  c 106, §2-302
because of the disparity in bargaining power of the parties,
lack of meaningful alternatives, disparity in sophistication of
the parties, unfair terms in the warranty, absence of effective
warranty competition and the fact that class engines failed with
substantially fewer miles of operation than competitive vehicles
from other manufacturers.

150. Class vehicle warranties are oppressive, unreasonable and
unconscionable because of increased unanticipated class engine
maintenance costs, engine defects and premature engine failure
constitute an unfair contractual surprise for Angell, Reid and
proposed class members.

---

[16] Since unanticipated engine failure (particularly on limited
access highways) is a serious safety issue, the defendants had
an affirmative duty to disclose the engine defects together with
the risks associated with engine oil sludge.

38

151   Given the conduct of Saab AB, Saab Cars and GM and the design defects in class vehicles (that these defendants knew were inherently defective), the durational limitations of the warranties are oppressive, unreasonable and unconscionable because the warranty disclaimers of Angell, Reid and proposed class members were neither knowing nor voluntary

152. Angell, Reid and proposed class members had an absence of meaningful choice in the purchase of class vehicles and the contractual terms were unreasonably favorable to Saab AB, Saab Cars and GM.   The bargaining position of the defendants for the sale of class vehicles was grossly disproportionate and vastly superior to that of individual vehicle purchasers including Angell, Reid and proposed class members

153   Saab AB, Saab Cars and GM included unfair contractual provisions concerning the length and coverage of the express warranty when they knew that class vehicles were inherently defective and dangerous.   This conduct renders the vehicle purchase contract so one-sided as to be unconscionable under the circumstances existing at the formation of the vehicle purchase contract

154   The durational limitation of the express warranties accompanying the class vehicles are unreasonable and unconscionable since Saab AB, Saab Cars and GM actively

39

concealed   known   engine   defects   and   issued   incorrect   oil
specifications  and  oil  service  intervals.  Angell,  Reid  and
proposed  class  members  had  no  notice  of  the  defects  or  ability
to detect the defects [17]

155. Engines in competitive vehicles manufactured and sold at
the  time  the  class  vehicle  engines  were  manufactured  and  sold
ordinarily   last   longer   than   warranties   accompanying   class
vehicles

156   Saab   AB,   Saab   Cars   and   GM   engaged   in   unconscionable
fraudulent   commercial   practices   including   issuance   of   the
special  policy  letter  that  attempted  to  conceal  class  engine
design defects and improperly recommended oil maintenance.

157   The special policy letter fraudulently claims that certain
driving   conditions,   using   "low-grade-specification   oil   not
recommended  by  Saab,  or  oil  changes  not  meeting  the  minimum
requirements  as  recommended  in  the  service  schedule"  caused  oil
sludge.

158. Saab AB and Saab Cars' special policy letter fraudulently
and  actively  concealed  the  fact  that  the  low  friction  engine
design,   a   defective   crankcase   ventilation   system   and   other

---

[17] The defendants' unconscionable conduct precludes any exclusion
of incidental and consequential damages or any other limitation
of remedies.

defects in the class engines substantially contributed to and
caused engine oil sludge.

159. The special policy letter fraudulently and actively
concealed the fact that class vehicles were accompanied by an
owner's manual and service record booklet that incorporated
incorrect engine oil recommendations (including but not limited
to the use of mineral oil) and oil change intervals that
substantially contributed to and caused engine oil sludge.

160. The special policy letter was fraudulent because the oil
and oil service "recommendations" contradicted Technical Service
Bulletins, Technical News bulletins and Service Information
bulletins recommending the use of synthetic oil and shorter
duration (5,000 mile) oil change intervals.

161. Saab AB, Saab Cars and GM knew that the recommendations in
the special policy letter that allowed the continued use of
improper mineral and/or semi synthetic engine oils and 10,000
mile oil change intervals were destructive to class engines and
contradicted their internal service publications

162. Saab AB, Saab Cars and GM calculated that specifically
allowing the continued use of improper oil recommendations would
further they aims of concealing class engine defects.

163 Saab AB, Saab Cars (and successor Saab Holdings) and GM are
engaged in a continuing fraud concerning the underlying and true

41

cause of oil sludge in class engines which are defective engines.

164. Saab AB, Saab Cars and GM knew in July of 1998 (and issued written advisories to authorized Saab dealers) that more frequent oil changes would prevent the formation of oil sludge in class engines

165. These defendants knew in July of 1998 (and issued written advisories to authorized Saab dealers) that oil sludge was occurring in class engines and that the only way to monitor this condition was an inspection procedure that included partial engine disassembly.

166  The defendants failed to adequately test class vehicles for formation of engine oil sludge using different grades of oil and gasoline in an appropriate environment.

167. Reid maintained her class vehicle in conformity with the owner's manual and service booklet  In December of 2005, the turbocharger on Reid's vehicle prematurely failed due to engine oil sludge.

168. Reid applied for reimbursement under the special policy and submitted the appropriate forms within the December 31, 2005 deadline   Reid's request for special policy reimbursement was denied.

42

169   Saab  AB,  Saab  Cars  and  GM  knew  that  class  engine turbochargers  failed  at  an  abnormally  premature  mileage  because of  oil  sludge.

170.  Saab AB,  Saab Cars  and  GM  concealed  from  Reid  and  proposed class  members  the  fact  that  turbocharger  failure  was  caused  by engine  design  defects  and  that  the  owner's  manual  and  service booklet  incorporated  incorrect  engine  oil  recommendations  and oil  change  intervals.

171.  Reid  and  proposed  class  members  incurred  substantial expense  in  repairing  and/or  replacing  class  engine  turbochargers damaged  by  engine  oil  sludge.

172   Angell,  Reid  and  proposed  class  members  lost  the  use  of their  class  vehicles  and  incurred  substantial  inconvenience  and expense  in  obtaining  alternative  transportation  because  of  oil sludge  related  vehicle  repairs

173   Repair  costs  for  class  engine  failures  caused  by  oil  sludge range  between  $2,800.000  and  $10,000 00,  depending  on  the  extent of  the  damage.   Some  class  engines  damaged  by  oil  sludge  are  not repairable.

174.  Even  if  class  engines  do  not  fail,  class  vehicle  owners have  sustained  an  ascertainable  loss  that  includes  increased maintenance  costs  and  substantially  reduced  engine  performance caused  by  engine  oil  sludge.   This  translates  into  less  net

43

horsepower   output,   increased   fuel   consumption   and   decreased
mileage.

175. Individuals who own or have owned class vehicles sustained
diminution of the resale value of their class vehicles since
knowledge of oil sludge problems with the class engine became
public information

176. Saab AB, GM, Saab Cars and Saab Holdings conspired to
conceal   and   suppress   information   concerning   class   vehicle
defects in order to protect corporate profits and goodwill, sell
class vehicles and deprive class vehicle owners of preventative
engine   repairs   under   warranty   and/or   pursue   engine   repair
reimbursement outlined in the special policy.[18]

177. If Angell, Reid and proposed class members had been
informed of the defects in the class vehicles, they would not
have purchased their respective class vehicles or would have paid
substantially less.[19]

---

[18]   Preventive repairs would include engine disassembly and oil
sludge and cleaning of engine components set forth in Technical
Service Bulletin 210-2554 ed  4 and crankcase ventilation system
upgrades.   Technical   Service   Bulletin   No   210-2554   ed   4
entitled "Noise from the timing chain and oil sludge in the
engine" is attached as Exhibit 3

[19] Given the vast disparity in expertise, including knowledge of
automotive design, manufacture and testing processes, Angell and
proposed   class   members   had   to   rely   on   the   defendants'
representations and warranties concerning the class vehicles

COUNT I
BREACH OF CONTRACT BY THE DEFENDANTS RESULTING IN FINANCIAL HARM

178. Angell, Reid and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

179. When class vehicles were sold and/or leased to Angell, Reid and proposed class members, the original maintenance recommendations for the vehicles were a material part of the basis of the bargain included in the contract for the sale of class vehicles.

180 Angell, Reid and class members had valid and enforceable contracts with the defendants concerning the purchase of their class vehicles.

181. Angell, Reid and proposed class members complied with all contractual obligations.

182. The defendants unilaterally modified and knowingly breached the contract by specifying new recommended maintenance requirements set forth in the 2005 special policy letter.

183. The defendants unilaterally imposed new class vehicle maintenance requirements that breached the terms of the original contracts without assent from or consideration to class vehicle owners

184 The defendants received timely and adequate notice of the breach of contract from Angell, Reid and proposed class members.

45

185    The intentional breach of contract by the defendants
excuses any notice requirements from class vehicle owners
including Angell and Reid

186    The new oil maintenance terms recommended the use of more
expensive oils and more frequent oil changes that quadrupled oil
maintenance costs for class vehicles

187    The defendants were obligated to conform to the terms the
original maintenance requirements for class vehicles or
compensate class vehicle owners for increased maintenance costs.

Wherefore, Angell, Reid and proposed class members demand
judgment against defendants including damages, interest, costs
and attorneys' fees

COUNT II
BREACH OF M G.L  c  106, §2-314· IMPLIED WARRANTY OF
MERCHANTABILITY BY THE DEFENDANTS RESULTING IN FINANCIAL HARM

188.   Angell, Reid and proposed class members incorporate by
reference all allegations in the above preceding paragraphs as
if set forth fully in this count.

189    The defendants impliedly warranted to the public, owners
and lessees of class vehicles that class vehicles were
merchantable and fit for the ordinary purposes for which
passenger vehicles are used.

190    The defendants are merchants with respect to passenger
motor vehicles

46

191. Angell, Reid and proposed class members purchased the class vehicles for non-commercial purposes

192. As manufacturers of consumer goods, the defendants are precluded from excluding or modifying an implied warranty of merchantability or limiting a consumer's remedies for breach of this warranty

193. Class vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used. The defendants received adequate notice of their breach of the implied warranty of merchantability.

194 The defendants breached their implied warranties in that class vehicles were defective with respect to engine design and manufacture.

195. Engines in class vehicles are predisposed to the formation of harmful engine oil sludge and other deposits because one or more of the following conditions existed at the time these vehicles were manufactured. (1) The respective class vehicle's owner's manual and accompanying literature set forth the wrong engine oil maintenance recommendations including oil type, oil viscosity, API specifications and/or engine oil change interval, (2) The class engines have insufficient engine oil sump capacity; (3) The class engines have a defectively designed oil pump, (4) The class engines have an inadequate engine oil

cooler; (5) The class engines have a defective crankcase ventilation system; (6) The class vehicles have insufficient heat shielding between the catalytic converter and engine oil sump; and/or (7) The class engines produce excessive combustion blow-by gases

196  These defects render the class vehicles unfit for providing transportation and unfit to drive at the time the vehicles were delivered since total unanticipated engine failure occurs which also creates an unreasonably risk of personal injury.

197  Class vehicles are not reliable and owners of these vehicles have lost confidence in the ability of class vehicles to perform the function of safe reliable transportation.

198  Even though Angell, Reid and proposed class members complied with engine maintenance recommendations for their respective class vehicles, their respective vehicles were damaged by engine oil sludge.[20]

199. Angell, Reid and proposed class members reasonably relied upon the expertise, skill, judgment and knowledge of the defendants and upon their implied warranty that class vehicles were of merchantable quality and fit for their intended use.

---

[20] Even if recommended engine oil maintenance for class engines is meticulously followed, oil sludge and resulting engine damage occurs.

200. Angell, Reid and proposed class members relied on implied warranties of merchantability made by the defendants concerning the class vehicles and sustained financial injury resulting from the breach of those warranties by the defendants

201. Angell, Reid and proposed class members had a legitimate expectation that the class vehicles would travel well in excess of 150,000 miles before requiring any major engine repairs [21]

202  Angell, Reid and proposed class members could not have reasonably discovered the defective condition of the class vehicles at the time of purchase

203.  The  defendants'  breach  of  implied  warranties  of merchantability was the direct and proximate cause of financial harm to Angell, Reid and the proposed class members.

Wherefore, Angell, Reid and proposed class members demand judgment against defendants including damages, interest, costs and attorneys' fees

### COUNT III
### BREACH OF M.G L. c. 106, §2-313: BREACH OF EXPRESS WARRANTY BY THE DEFENDANTS RESULTING IN FINANCIAL HARM

204  Angell, Reid and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

---

[21] The service booklet accompanying the class vehicles has record forms for oil services performed at 150,000 miles.

205. The defendants expressly warranted to the public including Angell, Reid and proposed class members, that class vehicles were merchantable and fit for the ordinary purposes for which passenger vehicles are used.

206. The defendants are merchants with respect to passenger vehicles.

207. The defendants extensively advertised that class vehicles were designed by aeronautical engineers and otherwise extolled the quality and virtues of class vehicles including superior design and manufacture, safety, durability and reliability

208  The defendants fraudulently represented that the engines in class vehicles were of a particular standard or quality when they in fact were not.

209. The defendants' representations were made in newspapers, magazines and television advertising viewed by Angell, Reid and proposed class members.

210  The defendants breached their express warranties in that class vehicles were defective with respect to engine design and manufacture.  The defendants received adequate notice of their breach of their express warranties including merchantability

211  Engines in class vehicles are predisposed to formation of harmful engine oil sludge and other deposits because one or more of the following conditions existed at the time these vehicles

50

were manufactured  Engines in class vehicles are predisposed to
the formation of harmful engine oil sludge and other deposits
because one or more of the following conditions existed at the
time these vehicles were manufactured. (1) The respective class
vehicle's owner's manual and accompanying literature set forth
the wrong engine oil maintenance recommendations including oil
type, oil viscosity, API specifications and/or engine oil change
interval; (2) The class engines have insufficient engine oil
sump capacity, (3) The class engines have a defectively designed
oil pump, (4) The class engines have an inadequate engine oil
cooler, (5) The class engines have a defective crankcase
ventilation system; (6) The class vehicles have insufficient
heat shielding between the catalytic converter and engine oil
sump; and/or (7) The class engines produce excessive combustion
blow-by gases

212. These defects render the class vehicles unfit for providing
transportation and unfit to drive at the time the vehicles were
delivered since total unanticipated engine failure occurs which
also creates an unreasonably risk of personal injury

213  Class vehicles are not reliable and owners of these
vehicles have lost confidence in the ability of class vehicles
to perform the function of safe reliable transportation

214    Even    though    Angell,    Reid    and    proposed    class    members    complied    with    engine    maintenance    recommendations    for    their    respective    class    vehicles,    their    respective    vehicles    were    damaged by engine oil sludge

215. Angell's    car    first    manifested    engine    oil    sludge    related    damage within    the express warranty period when the turbocharger    failed    at    49,989    miles    in    October    2002.    The    authorized    Saab    dealer    replaced    the    turbocharger,    cleaned    out    the    oil    trap    and    performed a crankcase ventilation system upgrade.[22]

216    The    authorized    Saab    dealer    failed    to    inspect    the    Angell    engine    at    that    for    engine    oil    sludge    because    the    Saab    AB,    Saab    Cars    and    GM    withheld    information    concerning    class    engine    oil    sludge    formation    from    its    authorized    dealers    and    class    vehicle    owners until 2005.

217. Angell's    vehicle    experienced    engine    failure    in    June    of    2003.

218. Angell, Reid and proposed class members relied on express    warranties made by the defendants concerning the class vehicles

---

[22] At    least    five    major    modifications    were    performed    to    crankcase    ventilation systems    of    class    engines    between    late    1999    and    2006    as set forth in Technical Service Bulletins issued by Saab Cars.    At    least    three    different    modifications    were    performed    to    the    class    engine    oil    pumps    as    indicted    by    different    part    designations

52

and sustained financial injury resulting from the breach of those warranties by the defendants [23]

219. Angell, Reid and proposed class members could not have reasonably discovered the defective condition of the class vehicles.

220  The defendants' breach of their express warranties (including the extended express warranty announced in the special policy letter in mid 2005) was the direct and proximate cause of cause of financial harm to Angell, Reid and the proposed class members

    Wherefore, Angell, Reid and proposed class members demand judgment against defendants including damages, interest, costs and attorneys' fees

COUNT IV
BREACH OF EXPRESS WARRANTY TO REPAIR AND/OR EXPRESS SERVICE
CONTRACT TO REPAIR BY THE DEFENDANTS RESULTING IN FINANCIAL HARM

221. Angell, Reid and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count

222. Angell, Reid and class members requested reimbursement for engine repair and/or engine replacement expenses as set forth in Saab AB's and Saab Car's special policy letter

---

[23]  Angell, Reid and proposed class members also relied on the express warranties set forth in the special policy letter sent to class vehicle owners in 2005 which was dishonored by the defendants

223. The special policy as delineated in the correspondence from
Saab Cars to Angell (dated May 17, 2005) and other class members
is an express warranty to repair and/or express contract to
repair separate and distinct from warranties that initially
accompanied the class vehicle.

224. Angell, Reid and proposed class members completed the
requisite forms, supplied the requested documentation and
returned the materials prior to the December 31, 2005 deadline.

225. Requests of Angell, Reid and class members for
reimbursement were declined without sufficient explanation on
multiple occasions despite full compliance by Angell, Reid and
proposed class members with the special policy terms including
presentation of extensive maintenance records.

226. The defendants breached the terms of the special policy and
engaged in unconscionable commercial practices

227. The defendants received due notice from Angell, Reid and
proposed class members that the defendants breached their
express warranty to repair and/or express contract to repair as
set forth in correspondence sent to class vehicle owners in May
of 2005.

228. The defendants' breach of their express warranty to repair
and/or express contract to repair was the direct and proximate

cause of financial harm to Angell, Reid and proposed class members

Wherefore, Angell, Reid and proposed class members demand judgment against defendants including damages, interest, costs and attorneys' fees.

COUNT V

VIOLATION OF M.G L  c.93A  UNFAIR AND DECEPTIVE TRADE PRACTICES

229  Angell, Reid and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

230  The defendants are persons within the context of M G L c 93A, §1.

231  Saab AB, Saab Cars and GM fraudulently, intentionally, negligently, and/or recklessly misrepresented to Angell, Reid and proposed class members the required maintenance and/or operating costs of the class vehicles with respect to engine oil and oil change intervals.

232. Saab AB, Saab Cars and GM fraudulently, intentionally, negligently and/or recklessly misrepresented to Angell, Reid and proposed class members the characteristics of class vehicles with respect to engine design and manufacture.

233. Saab AB, Saab Cars and GM fraudulently, intentionally, negligently and/or recklessly concealed from Angell, Reid and proposed class members the defects in the class engines causing

engine oil sludge even though these defendants knew or should have known of oil sludge problems shortly after production of the class vehicle commenced.

234. Saab AB, Saab Cars and GM had actual knowledge that oil sludge was causing extensive irreversible premature wear in class engines shortly after production of the class vehicle commenced.

235 Saab AB, Saab Cars and GM actively suppressed the fact that class engines were failing because of engine oil sludge caused by engine design and manufacture defects, incorrect oil and oil service interval recommendations

236 Saab AB, Saab Cars and GM secretly repaired some class vehicle engines to prevent dissemination of class engine defects

237. Saab AB, Saab Cars and GM intended or should have known that Angell, Reid and proposed class members would rely upon misrepresented characteristics of class vehicles with respect to engine design and manufacture and information in the owner's manuals and service booklets for class vehicles that incorporated incorrect engine oil recommendations and oil change intervals.

238. Angell, Reid and proposed class members complied with maintenance recommendations for their respective class vehicles.

56

239   Although Saab AB, Saab Cars and GM knew defects in class engines and misinformation in the owner's manuals and service booklets were causing engine oil sludge, these defendants attempted to shift the responsibility and cost for oil sludge repairs to individual vehicle owners.

240. One scheme included blaming engine oil sludge formation on the class vehicle owner for poor or improper maintenance or use of low quality oil.

241. Another scheme involves the special policy announced in 2005 by Saab AB and Saab Cars which fraudulently attempted to conceal the true cause of class engine failures from oil sludge and not remedy existing oil sludge accumulations by disassembling, cleaning and re-assembling the engine.

242   Under the special policy, Saab AB and Saab Cars refuse to inspect (or pay for an inspection) for engine oil sludge unless there are "abnormal noises from the engine and or the oil pressure warning light is illuminated" [24]

243. Rather than conduct an open and fair inspection and repair procedure for all class vehicles, Saab AB, Saab Cars and GM employed the special policy to inspect and repair only those vehicles at the precipice of total engine failure.

---

[24] The letter announcing the special policy recites that "Saab dealers will **not** inspect vehicles if either of the conditions noted above [abnormal noises/low oil pressure warning light illuminated] are not present." (emphasis in original).

244. Class vehicles with light or moderate oil sludge damage are excluded from special policy inspection and/or repair even though engine performance is substantially reduced by oil sludge.

245. The "special policy" does not compensate class vehicle owners for increased oil maintenance costs, substantially diminished useful engine life, markedly reduced engine performance or diminution of vehicle resale value caused by the specter of engine damage resulting from oil sludge.

246 When abnormal engine noises and/or the low oil pressure warning light is illuminated, the class engine has already sustained severe engine damage Unless the vehicle owner can produce extensive maintenance documentation over the life of the vehicle (going back as far as eight years), engine oil sludge inspection and repairs are refused under the special policy

247 If Saab AB, Saab Cars and GM had not concealed engine oil sludge formation from Angell at the time her vehicle was manifesting oil sludge symptoms within the express warranty period in 2002, the engine in her vehicle would have repaired without cost to Angell under the original warranty.

248. The defendants fraudulently concealed unmistakable manifestations of oil sludge accumulations within the express warranty periods and under the special policy without

inspecting, repairing or replacing damaged internal class engine components [25]

249  Angell, Reid and proposed class members complied with all terms of the special policy.

250. Saab AB, Saab Cars and GM refused reimbursement to Angell, Reid and proposed class members and thereby breached the terms of the special policy

251. The special policy was improperly and fraudulently applied to Angell, Reid and class members

252.  The  defendants  imposed  unreasonable  and  unconscionable levels of maintenance documentation for warranty repair of class engines damaged by oil sludge under the original warranty and special policy.

253  The defendants are aware of recent statistical studies that indicate 80 percent of vehicle owners cannot fully document vehicle maintenance histories because the original and/or subsequent vehicle owner does not retain maintenance records and receipts

254. Even if only one oil change cannot be documented, there is no special policy reimbursement or repair.

---

[25]  Class engine oil sludge manifestations include turbocharger failure, crankcase ventilation system failure and oil leaks  The defendants initiated multiple modifications to the engine oil pump and at least five upgrades of the crankcase ventilation system in an attempt to remedy engine oil sludge.

255.  It is unreasonable and unconscionable to expect class vehicle owners to retain all receipts for all oil changes going back as much as eight years in order to comply with the provisions of the special policy.

256   The special policy did not require the submission of documents for oil changes performed by individual vehicle owners including Angell's husband [26]

257. Angell was not able to document with receipts oil purchased by her husband when he changed the oil in her vehicle four years before she received the special policy letter.

258. Angell's oil maintenance documentation was sufficient for purposes of warranty repairs but deemed inadequate for purposes of the special policy.[27]

259. Angell, Reid and class members were not informed why their requests for reimbursement of class engine repair expenses were rejected when all condition precedent were satisfied

---

[26]  The special policy provisions with respect to documentation of class vehicle oil changes recites:"If the oil and filter changes were completed by a service facility other than a Saab dealer, properly documented business receipts must be available and verifiable."

[27]  When Angell's turbocharger was replaced under warranty in October of 2002, oil service performed by her husband was accepted as proof of proper maintenance. When Angell submitted documentation for engine reimbursement under the special policy, oil maintenance performed by her husband was apparently not credited and reimbursement under the special policy was denied.

260. Also not covered under the special policy are expensive class engine catalytic converters, engine turbochargers, crankcase ventilation systems and other components prematurely failing because of the defective engine design and incorrect oil "recommendations "

261  The special policy recommends the use of full synthetic engine oil for class vehicles while Saab AB and Saab Cars Technical Service Bulletins mandate the use of full synthetic oil as a "requirement" for engine repairs performed under the special policy "and for the extended special policy to be valid "

262. Technical Service Bulletin 210-2554 entitled "Noise from the timing chain and oil sludge in the engine" (dated April 2005, one month before the special policy letter of May 2005) mandates that after flushing the engine out with semi synthetic oil that the mechanic should "Refill [the class engine] with FULL-SYNTHETIC oil" (emphasis in original)    The bulletin continues by stating- "When filling the oil for the second time, and for the extended policy to be valid, a full synthetic long-life oil in accordance with Saab Automobile's requirements specifications is strongly recommended    This requirement also applies for engines where the previous recommendation was mineral or synthetic based oil "

61

263. Sixteen months after the special policy letter was sent to Angell, this requirement was again repeated in Technical Service Bulletin 210-2554 ed 4 also entitled "Noise from the timing chain and oil sludge in the engine" (dated October 2006) *See* Exhibit 3 at p. 5.

264  The defendants were issuing one set of mandatory requirements to employees of Saab authorized dealers who repaired engines under warranty and were paid by Saab Cars and much less forceful instructions to class vehicle owners in order to conceal class engine defects.

265. This special policy fraudulently attempts to shift the repair costs for defective class engines (including the $1,500.00 replacement cost for the catalytic converters and expensive replacement or repairs to the turbocharger, etc.) to vehicle owners and/or to deter owners from initiating engine warranty claims because of unreasonable maintenance documentation and fraudulently stating the true cause of engine oil sludge.

266  Saab AB, Saab Cars and GM violated 940 Mass. Code Regs. 3.16 and c.93A by failing to inform class vehicle purchasers that the class vehicles were defectively designed and

manufactured    and    were    accompanied    by    incorrect    oil
recommendations and oil change intervals.[28]

267    The defendants committed unfair and deceptive business
trade act practices as set forth in all preceding counts and as
described in the preceding paragraphs in this count.

268    As a proximate and direct result of the defendants' unfair
and    deceptive    business    trade    practices,    Angell,    Reid    and
proposed class members purchased class vehicles

269    Angell,    Reid and proposed class members experienced oil
sludge    induced damage to their engines, diminution of vehicle
resale    value,    increased maintenance costs and incurred other
monetary damages

270. On April 28, 2008, M.G.L c.93A demand letters were sent to
Saab Cars General Manager Steve Shannon and GM President Rick
Wagoner via certified mail, return receipt requested.

271. Counsel for Angell, Reid and proposed class members did not
receive any written response from Saab Cars or GM to the c 93A

---

[28]    This    regulation    recites    that    "an    act    or    practice    is    a
violation of M.G.L. c  93A, §2 if·
(1) It is oppressive or otherwise unconscionable in any respect;
or
(2) Any person or other legal entity subject to this act fails
to disclose to a buyer or prospective buyer any fact, the
disclosure of which may have influenced the buyer or prospective
buyer not to enter into the transaction;"

demand letters within thirty days of receipt of the letters by Saab Cars, Saab Holding or GM.

272. When GM finally responded to the c. 93A demand letters via facsimile on June 6, 2008, GM declined any compensation or remedial measures requested in the demand letter.

273  Saab Cars and Saab Holdings failed to respond to Angell's c. 93A demand letter.

Wherefore, Angell, Reid and proposed class members demand judgment against Saab AB, Saab Cars, Saab Holdings and GM together with multiple damages, interest, costs and attorneys' fees

## COUNT VI
### UNJUST ENRICHMENT / RESTITUTION

274. Angell, Reid and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count

275  Angell, Reid and proposed class members do not have an adequate remedy at law

276  Angell, Reid and proposed class members conferred a monetary benefit on the defendants, but for the defendants' misrepresentations, active acts of concealment and other

fraudulent conduct Angell, Reid and the proposed class members would not have conferred.[29]

277   The defendants obtained financial gain by selling class vehicles and replacement parts for class engines that abnormally and prematurely failed due to engine oil sludge.

278. The defendants obtained further financial gain from selling oil that is more expensive, parts and labor for the increased class engine oil services

279. Angell, Reid and proposed class members sustained monetary damages.

280   Allowing the defendants to retain their unjust monetary enrichment from their wrongful and unlawful acts would violate the fundamental principles of justice and would be otherwise inequitable.

Wherefore Angell, Reid and proposed class members request that the defendants disgorge their profits from their wrongful and unlawful conduct and that the court establish a constructive trust funded by the benefits conferred upon the defendants. Angell, Reid and proposed class members should be designated beneficiaries of the trust and obtain restitution for their out of pocket expenses caused by the defendants' conduct.

---

[29]   This monetary benefit includes purchasing replacement parts for class engines and paying for repairs that should have been covered under warranty.

## RELIEF REQUESTED

Wherefore, Angell, Reid and proposed class members request.

a. A class certification order pursuant to Fed. R Civ P. 23(c) designating as class members those entities defined in ¶41 with any modifications to the class or sub-classes as required for the efficient and equitable administration of justice in this proceeding,

b. An Order appointing Angell and Reid as representatives of the class and designating Thomas P Sobran as counsel for the class pursuant to Fed R. Civ P 23(g),

c Judgment for Angell, Reid and class members against the defendants on all issues and counts,

d Damages for Angell, Reid and class members including but not limited to multiple damages together with prejudgment interest, costs and attorneys' fees;

e Injunctive relief compelling the defendants to perform the following procedures without monetary charge to all class vehicles. (1) Inspect the engine's oil pump and oil pump pickup screen for obstructions and wear and replace as necessary; (2) Inspect and replace as necessary the engine crankshaft, cam and balance shafts, chains, chain tensioner systems and all bearings and bearing surfaces, (3) Clean the engine block interior to remove oil sludge and other

deposits; and, (4) Inspect and replace where necessary the engine turbocharger and feed and return lines, oil cooler, oil filter holder, catalytic converter, crankcase ventilation components and related vacuum components for obstructions and wear and replace as necessary.

f   Restitution for all engine repairs incurred by Angell, Reid and class members resulting from the defectively designed and manufactured class engines and incorrect engine oil recommendations and oil change intervals as set forth in the class vehicles' owner's manuals including compensation for turbocharger and catalytic converter replacement costs;

g. Restitution for all increased past, present and future maintenance costs incurred by the Angell, Reid and proposed class members resulting from the defendants' special policy class vehicle engine oil recommendations and oil change intervals,

h. Disgorgement of the defendants' revenue from their wrongful and unlawful conduct and the establishment of a constructive trust funded by the benefits conferred upon the defendants.   Angell, Reid and class members should be designated beneficiaries of the trust and obtain restitution for their out of pocket expenses caused by the defendants' conduct,

1. A permanent injunction enjoining the defendants from denying Angell's, Reid's and class members' class vehicle oil sludge damage claims for an eight year period commencing from the initial date of sale or lease regardless whether complete maintenance records are available, and,

j Any other relief deemed necessary or appropriate by the court.

## REQUEST FOR JURY TRIAL

Angell, Reid and proposed class members request trial by jury on all issues and counts.

>           Susan B Angell and
>           Prudence Reid,
>           By their attorney, on behalf
>           of themselves and proposed
>           class members,
>
>           /s/ Thomas P Sobran
>           Thomas P. Sobran, P C
>           7 Evergreen Lane
>           Hingham, MA 02043
>           (781) 741-6075
>           BBO #471810

## Certificate of Service

I certify that a copy of the above document entitled SECOND AMENDED CLASS ACTION COMPLAINT AND REQUEST FOR JURY TRIAL was docketed on 2/6/2009 through the Electronic Case Filing system to all identified participants on the Notice of Electronic Filing

>           /s/ Thomas P. Sobran
>           Thomas P Sobran

THOMAS P. SOBRAN, PC
COUNSELLOR AT LAW
7 EVERGREEN LANE
HINGHAM, MASSACHUSETTS 02043

TELEPHONE (781) 741-6075
FACSIMILE (781) 741-6074
EMAIL tsobran@sobranlaw.com

July 15, 2009

Bankruptcy Clerk
U S. Bankruptcy Court SDNY
One Bowling Green
New York, NY 10004

Re. In Re Motors Liquidation Company, Southern District of New
York Bankruptcy Court Case No  09-50026

Dear Sir or Madam.

    Enclosed please find proof of claim form for the above-
referenced proceeding together with a stamped self-address
return envelope.  Please return acknowledgement of receipt of
the proof of claim in the return envelope

                                Very truly yours

                                Thomas P  Sobran

TPS/awm
Enclosures

**Exhibit B**

**Proof of Claim No. 18916**

# UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**PROOF OF CLAIM**

| Name of Debtor (Check Only One) | Case No |
|---|---|
| ☒ Motors Liquidation Company (f/k/a General Motors Corporation) | 09-50026 (REG) |
| ☐ MLCS, LLC (f/k/a Saturn, LLC) | 09-50027 (REG) |
| ☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) |
| ☐ MLC of Harlem, Inc (f/k/a Chevrolet-Saturn of Harlem, Inc ) | 09-13558 (REG) |

NOTE *This form should not be used to make a claim for an administrative expense arising after the commencement of the case but may be used for purposes of asserting a claim under 11 U S C § 503(b)(9) (see Item # 5) All other requests for payment of an administrative expense should be filed pursuant to 11 U S C § 503*

Name of Creditor (the person or other entity to whom the debtor owes money or property) ANGELL, SUSAN B

Name and address where notices should be sent

ANGELL, SUSAN B
SOBRAN, THOMAS P
7 EVERGREEN LN
HINGHAM MA 02043-1047

Telephone number *781 741 6075*
Email Address *T SOBRAN @ SobranLaw com*

Name and address where payment should be sent (if different from above)

**FILED - 18916
MOTORS LIQUIDATION COMPANY
F/K/A GENERAL MOTORS CORP
SDNY # 09-50026 (REG)**

Telephone number

**Your Claim is Scheduled As Follows.**

Motors Liquidation Company

Unsecured  Unknown

Contingent / Unliquidated / Disputed

[STAMP: THE GARDEN CITY GROUP, INC. NOV 2 2009]

☐ Check this box to indicate that this claim amends a previously filed claim

Court Claim Number: _____
(If known)

Filed on _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim  Attach copy of statement giving particulars

☐ Check this box if you are the debtor or trustee in this case

If an amount is identified above you have a claim scheduled by one of the Debtors as shown (This scheduled amount of your claim may be an amendment to a previously scheduled amount) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor you do not need to file this proof of claim form  EXCEPT AS FOLLOWS If the amount shown is listed as DISPUTED UNLIQUIDATED or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim  If you have already filed a proof of claim in accordance with the attached instructions you need not file again

| | |
|---|---|
| **1** Amount of Claim as of Date Case Filed, June 1, 2009  $ *5,000 00 Plus Increase and Attorneys fees* | **5** Amount of Claim Entitled to Priority under 11 U S C § 507(a) If any portion of your claim falls in one of the following categories, check the box and state the amount |
| If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured, do not complete item 4  If all or part of your claim is entitled to priority, complete item 5  If all or part of your claim is asserted pursuant to 11 U S C § 503(b)(9), complete item 5 | |
| ☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim  Attach itemized statement of interest or charges | Specify the priority of the claim |
| **2** Basis for Claim *DEFECTIVE GOODS* (See instruction #2 on reverse side ) | ☐ Domestic support obligations under 11 U S C § 507(a)(1)(A) or (a)(1)(B) |
| **3** Last four digits of any number by which creditor identifies debtor _____ | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor s business, whichever is earlier  11 U S C § 507(a)(4) |
| **3a** Debtor may have scheduled account as _____ (See instruction #3a on reverse side ) | |
| **4** Secured Claim (See instruction #4 on reverse side )  Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information | ☐ Contributions to an employee benefit plan - 11 U S C § 507(a)(5) |
| Nature of property or right of setoff  ☐ Real Estate  ☐ Motor Vehicle  ☐ Equipment  ☐ Other  Describe | ☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U S C § 507(a)(7) |
| Value of Property $_____  Annual Interest Rate____% | |
| Amount of arrearage and other charges as of time case filed included in secured claim, if any  $_____ | ☐ Taxes or penalties owed to governmental units  11 U S C § 507(a)(8) |
| Basis for perfection _____ | |
| Amount of Secured Claim  $_____  Amount Unsecured  $_____ | ☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case - 11 U S C § 503(b)(9) (§ 507(a)(2)) |
| **6** Credits  The amount of all payments on this claim has been credited for the purpose of making this proof of claim | ☐ Other  Specify applicable paragraph of 11 U S C § 507(a)(__ ) |
| **7** Documents  Attach redacted copies of any documents that support the claim  such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements  You may also attach a summary  Attach redacted copies of documents providing evidence of perfection of a security interest  You may also attach a summary  (See instruction 7 and definition of 'redacted' on reverse side ) | **Amount entitled to priority** |
| DO NOT SEND ORIGINAL DOCUMENTS  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING | $_____ |
| If the documents are not available, please explain in an attachment | *Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment* |

| | FOR COURT USE ONLY |
|---|---|
| Date *11/24/09*  Signature  The person filing this claim must sign it  Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above  Attach copy of power of attorney, if any  *Thomas P* *Thomas P Sobran, Attorney for Angell* | |

*Penalty for presenting fraudulent claim  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571*
**Modified B10 (GCG) (12/08)**

THOMAS P. SOBRAN, P.C.
COUNSELLOR AT LAW
7 EVERGREEN LANE
HINGHAM, MASSACHUSETTS 02043

TELEPHONE (781) 741-6073
FACSIMILE (781) 741-6074
EMAIL tsobran@sobranlaw.com

October 28, 2009

The Garden City Group, Inc.
Attn: Motors Liquidation Company Claims Processing
P.O. Box 9386
Dublin, OH 43017

Re: In Re Motors Liquidation Company, Southern District of New
York Bankruptcy Court Case No. 09-50026

Dear Sir or Madam:

Enclosed please find the proof of claims of Susan B. Angell, Prudence Reid and Joanne Adams in the above-referenced proceeding together with a stamped self-address return envelope. Please return acknowledgement of receipt of the proof of claims in the return envelope.

Very truly yours

Thomas P. Sobran

TPS/awm
Enclosures

## CONTINGENT FEE AGREEMENT
(Executed in Duplicate)

Sue Angell residing at 109 Lunenburg Road, West Townsend, Massachusetts 01474 (hereinafter "Client") retains THOMAS P SOBRAN, P C , 7 Evergreen Lane, Hingham, Massachusetts 02043, (hereinafter "Attorney") to perform the legal services mentioned in Paragraph 1 below   The Attorney agrees to perform the services faithfully and with due diligence.

1   The claim, controversy and other matters with reference to which the services are to be performed are   Resolution of her 2000 Saab 9-3 engine oil sludge repair costs

2   The contingency upon which compensation is to be paid is   the collection of moneys following settlement in favor of the Client or verdict in favor of the Client on the claim, controversy and other matters set forth in Paragraph 1 above

3   The Client is not liable to pay compensation otherwise than from amounts collected for her by the Attorney except as follows   Not applicable, the only compensation is set forth in ¶4

4   Reasonable compensation on the foregoing contingency is to be paid by resolution of the proposed class action in an amount to be approved by the court or at trial.

5   If the Attorney is discharged by the Client prior to the resolution of the claim, controversy and other matters referenced in paragraph 1, the Attorney shall be entitled to compensation for expenses and disbursements together with the fair value of services rendered to the Client prior to the discharge of the Attorney at the time the claim, controversy and other matters are concluded.

This agreement and its performance are subject to Rule 3 05 of the Supreme Judicial Court of Massachusetts

  THIS CONTINGENT FEE AGREEMENT HAS BEEN READ BY THE CLIENT BEFORE SIGNING AND RECEIPT OF A COPY OF THE AGREEMENT IS ACKNOWLEDGED

_____
Witness to Client signature

_____
Witness to Attorney signature

_____
Signature of Client

_____
Signature of Attorney

Dated   4/   /2008

J.G  SERVICE       (978) 342-6860
346 ELECTRIC AVENUE ROUTE 13
LUNENBURG, MA  01462
SPECIALIZED IN SAAB REPAIR

| | | DATE | INVOICE # | TERMS |
|---|---|---|---|---|
| | | 11/10/2003 | 8895 | Upon Receipt |
| | | HOME PHONE | WORK PHONE | EXTRA PHONE |
| | | 597-8212 | | |

| SERIAL # | YS3DD55H3Y2017904 | ODOMETER | LICENSE # | COLOR |
|---|---|---|---|---|
| | BILL TO | 74,948 | 63F L08 | Green |

Susan Angell
109 Lunenburg Road
Townsend, MA  01469

| DEL DATE | DEALER | WRITTEN BY |
|---|---|---|
| | | IVG |

| YEAR,MAKE,MODEL | 00 93 5Dr -Stan |
|---|---|

| QTY | PART # | DESCRIPTION | LABOR | AMOUNT |
|---|---|---|---|---|
| | | 1 )Engine noisy, (car towed in). | | |
| | | 1 )Start-up engine, engine noisy, disconnect battery, jack-up car, drain oil, loosen and remove front exhaust pipe, both front lower under body panels, engine flywheel cover, loosen right side sub-frame, loosen and remove engine oil pan assembly, found engine bearing material in oil pan, loosen and check engine oil pick-up screen, found engine oil pick-up screen plugged with sludge, loosen and remove number four engine main bearing and rod bearing caps to check for bearing wear, found number four engine rod bearing worn, replacement engine needed, add engine hoist, remove battery and charge, drain engine coolant, loosen and remove, engine air filter housing assembly, engine air inlet hose  both front wheels, lower sub-frame assembly, engine polly v-belt, clutch hose, shifter rod, power steering pump hoses, battery ground and positive cables, engine fuel lines, disconnect engine wiring harness, all coolant hoses, turbo outlet pipe, engine and transmission mounts, lower engine/transmission assembly and rise car, remove right side axle assembly, alternator assembly, starter assembly, power steering pump assembly, disconnect transmission from engine, remove engine flywheel assembly, R &R  bad engine assembly with used one, (owner has used engine assembly), remove wiring harness and engine flywheel from replacement engine, R &R  broken power steering pump holding bracket, install engine flywheel, starter motor assembly, alternator assembly, power steering pump assembly, right side axle assembly, check engine spark plugs, okay mount transmission to engine and tighten bolts, install engine/transmission assembly into car, connect and tighten engine and transmission mounts, install engine holding beam tool, install and tighten sub-frame assembly, engine flywheel cover, remove engine holding beam, install and tighten front exhaust pipe, R &R  one exhaust system clamp and bolts install and tighten lower under body panels, both front wheels, connect clutch hose, power steering pump hoses, drain brake fluid tank, add new fluid and bleed clutch assembly, connect all engine coolant hoses, turbo outlet hose, air inlet hose, wiring harness, fuel lines, battery ground and positive cables, connect and set shifter rod to transmission, install engine polly v-belt, replace one engine inlet sensor wiring connector with old connector, install air filter housing assembly, R &R  dirty engine air filter, add new engine coolant, replace engine oil filter, add ~~~~~ washer to engine drain plug, add new oil, top-up transmission oil level, add ~~~~~~~~~~~~~~~~~~~~~~~ connect battery, set clock, lower car, start engine and check for leak~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ comes on, okay test drive car | 25 00 | |
| | | 2 )R &R  bad l~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~inner C V joint as~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ | 3 | |
| | | 3 )R~~~~~~~ right side headlight bulb, both headlight parking light bulbs and right side plate light bulb~~~~ | 1 | |
| | | 4 )Add missing left side headlight wiper blade | | |
| 1 | 4754263 | Bracket,engine 93 | | 47 00 |
| 1 | 9144445 | Filter,oil V4,99,900,9000,9-3,9-5 | | 6 00 |
| 1 | 9132937 | Washer,engine oil drain 900,9000 | | 1 10 |
| 1 | 4876074 | Filter,air 00-93 | | 26 00 |
| 1 | 4229811 | Clamp,exhaust 94-900 | | 3 50 |
| 1 | 4229829 | Clamp,exhaust 94-900 | | 4 70 |
| 2 | 7978190 | Bolt,exhaust clamp 94-900 @ 1 40 = | | 2 80 |

Any outstanding balance remaining due after 30 days of invoice date will incur 1 5% interest per month

## Invoice                    ## Total

I authorize the above repair work along with the necessary materials  You and your employees may operate the above vehicle for purposes of testing inspection, or delivery at my risk  An express mechanics lien is acknowledged on above vehicle to secure the amount of repairs thereto  It is also understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control
SIGNATURE

**J.G. SERVICE**        (978) 342-6860
346 ELECTRIC AVENUE ROUTE 13
LUNENBURG, MA  01462
SPECIALIZED IN SAAB REPAIR

| DATE | INVOICE # | TERMS |
|---|---|---|
| 11/10/2003 | 8895 | Upon Receipt |

| HOME PHONE | WORK PHONE | EXTRA PHONE |
|---|---|---|
| 597-8212 | | |

| SERIAL # | YS3DD55H3Y2017904 | ODOMETER | LICENSE # | COLOR |
|---|---|---|---|---|
| | BILL TO | 74,948 | 63F L08 | Green |

Susan Angell
109 Lunenburg Road
Townsend MA 01469

| DEL DATE | DEALER | WRITTEN BY |
|---|---|---|
| | | JVG |

| YEAR,MAKE,MODEL | 00 93 5Dr -Stan |
|---|---|

| QTY | PART # | DESCRIPTION | LABOR | AMOUNT |
|---|---|---|---|---|
| 1 | 4483517 | Boot,outer C V  94-900 | | 49 00 T |
| 1 | 8549180 | Wiper,headlight 93-9000 | | 25 00 T |
| 1 | 5141775 | Bulb,headlight 9003 | | 10 00 T |
| 3 | 9512880 | Bulb,5W @ 1 90 = | | 5 70 T |
| 4 | 0268177 | Saab antifreeze @ 2 25 = | | 9 00 T |
| 4 | 0286609 | Oil,1 liter Saab turbo 5w-30 semi-synthetic @ 2 60 = | | 10 40 T |
| 1 | 8748733 | Gearlube,synthetic 900 | | 0 00 T |
| 18 | Power | Ounce of power steering fluid,@  30 = | | 5 40 T |
| | | Parts subtotal | | 205 60 |
| | | | | |
| 25 4 | Repair | Labor @ $60 00 an hour = | | 1 524 00 |
| | | | | |
| | | Notes | | |
| | | 1 )Tires worn, left front tire leaks | | |
| | | 2 )Front brake pads and rotors worn | | |
| | | 3 )Oil and filter change every 5,000 miles, next oil and filter change at  79,950 miles | | |
| | | 4 )Car needs service every 10,000 miles | | |
| | | Massachusetts state sales tax @ 5% = | | 10 28 |

Any outstanding balance remaining due after 30 days of invoice date will incur 1 5% interest per month

## Invoice

**Total** $1 739 88

I authorize the above repair work along with the necessary materials  You and your employees may operate the above vehicle for purposes of testing, inspection, or delivery at my risk  An express mechanics lien is acknowledged on above vehicle to secure the amount of repairs thereto  It is also understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control
SIGNATURE

Page 2

December 23, 2005

Saab Customer Assistance Center
Saab Cars USA
4405-A International Blvd.
Norcross, GA 30093
USA

Dear Sir/Madam

Thank you for providing your customers with this extended warranty and/or reimbursement should they have already experienced or may experience engine breakdown due to sludge build up. This happened to me, and I have enclosed the supporting documentation. Unfortunately, the engine that replaced the 2000 problematic engine is a 2001 engine. I'm afraid that I may experience a similar problem with this one as well. Therefore, I am requesting reimbursement in the amount of $3,893 88 and I would like to be given the extended warranty on this engine as well

I am also asking to be reimbursed for the IDM which I had replaced in the amount of $443 75. This brings the total to $4,283 63

Thank you again,

Susan

109 Lunenburg Road
West Townsend, MA 01474

Apnl 29, 2006





# LKQ ROUTE 16 AUTO PARTS
## 4 OLD DOUGLAS ROAD
## WEBSTER, MA 01570
## 800-423-4006

| SOLD TO | SHIP TO |
|---|---|
| MODIFIED<br>RETAIL - WEBSTER, MA 01570<br>01570<br>SUSAN ANGEL<br>978-877-1918 | A/C/C/T R01570 |
| | 9:09 AM    INV 5505<br>JG SERVICE<br>346 ELECTRIC AVE<br>LUNINBURG MA 01462<br>9783426860 |

| | CASH | CHARGE | COD | ROA | CREDIT | PHONE NUMBER | ORDER BY | DEPARTMENT | PO NUMBER | SHIPPING DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| TERMS | Card | | | | | | SUSAN | | | 11/03/03 |

| WORK ORDER NO | MAIL COPY | DISMANTLER | READY | CORE EXCHANGE | R/O NUMBER | TRUCK LINE | SALES PERSON | DATE ORDERED |
|---|---|---|---|---|---|---|---|---|
| 662429 | | | | CORE DUE | | | DWF163 | 10/30/03 |

| ITEM / DESCRIPTION | STOCK NO. | | |
|---|---|---|---|
| **ENGINE ASSEMBLY**<br>1 SAAB93 01 IC# 90920 -B250L,VIN-H,UTR,NT,(CSS)<br>V- - PO#87232#4 540 | W31817<br>#0007 - /8/23/ | | 2000.00 |
| **CORE-DUE**<br>2 ENGINE ASSEMBLY | # | | 0.00 |
| | #0000 | | |

Doc # :71281

RECEIVED BY X

| | |
|---|---|
| SUB TOTAL | 2000.00 |
| SALES TAX | 100.00 |
| SHIPPING & HANDLING | 0.00 |
| **TOTAL** | 2,100.00 |

THANK YOU    DAVE EXT 283 Purchase Order 87232
YARD 540 WO 178764
CREDIT CARD AUTH 113402

Amount paid: 2,100.00
Amount due: 0.00

LKQ Corporation offers an Optional Service Agreement on many parts An Optional Service Agreement is not included unless indicated on this invoice. By signing this invoice I accept the terms above and the warranty limitations on the reverse

RENTAL CARS, TAXIS, AND COMMERCIAL
VEHICLES EXCLUDED FROM WARRANTY

**Exhibit C**

**Proof of Claim No. 18918**

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT Southern District of New York | PROOF OF CLAIM |
|---|---|

Name of Debtor
Motors Liquidation Company (f/k/a General Motors Corporation)

Case Number
09-50026 (REG)

NOTE *This form should not be used to make a claim for an administrative expense arising after the commencement of the case A request for payment of an administrative expense may be filed pursuant to 11 U S C § 503*

Name of Creditor (the person or other entity to whom the debtor owes money or property)
Prudence Reid

☐ Check this box to indicate that this claim amends a previously filed claim

Name and address where notices should be sent
Thomas P Sobran
7 Evergreen Lane
Hingham, MA 02043

Telephone number
(781) 741-6075

Court Claim Number _____
(If known)

Filed on _____

[Stamp: THE GARDEN CITY GROUP INC. NOV 2 2009]

Name and address where payment should be sent (if different from above)

FILED - 18918
MOTORS LIQUIDATION COMPANY
F/K/A GENERAL MOTORS CORP
SDNY # 09-50026 (REG)

Telephone number

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim Attach copy of statement giving particulars

☐ Check this box if you are the debtor or trustee in this case

1  Amount of Claim as of Date Case Filed          $                1,431 00  *not including interest and attorney's fees*

If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured, do not complete item 4

If all or part of your claim is entitled to priority, complete item 5

☑ Check this box if claim includes interest or other charges in addition to the principal amount of claim Attach itemized statement of interest or charges

2  Basis for Claim    defective goods
(See instruction #2 on reverse side)

3  Last four digits of any number by which creditor identifies debtor _____

3a  Debtor may have scheduled account as _____
(See instruction #3a on reverse side)

4  Secured Claim (See instruction #4 on reverse side)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information

Nature of property or right of setoff    ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe

Value of Property $_____  Annual Interest Rate_____%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any  $_____  Basis for perfection _____

Amount of Secured Claim  $_____  Amount Unsecured  $_____

5  Amount of Claim Entitled to Priority under 11 U S C §507(a)  If any portion of your claim falls in one of the following categories, check the box and state the amount

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C §507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U S C §507 (a)(4)

☐ Contributions to an employee benefit plan – 11 U S C §507 (a)(5)

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U S C §507 (a)(7)

☐ Taxes or penalties owed to governmental units – 11 U S C §507 (a)(8)

☐ Other – Specify applicable paragraph of 11 U S C §507 (a)(__)

Amount entitled to priority

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

6  Credits  The amount of all payments on this claim has been credited for the purpose of making this proof of claim

7  Documents  Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements You may also attach a summary  Attach redacted copies of documents providing evidence of perfection of a security interest  You may also attach a summary  (See instruction 7 and definition of "redacted" on reverse side)

DO NOT SEND ORIGINAL DOCUMENTS  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available, please explain

| Date
10/28/2009 | Signature  The person filing this claim must sign it  Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above  Attach copy of power of attorney, if any | FOR COURT USE ONLY |
|---|---|---|

Thomas P Sobran, Attorney for Prudence Reid

*Penalty for presenting fraudulent claim  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571*

THOMAS P. SOBRAN, P.C.
COUNSELLOR AT LAW
7 EVERGREEN LANE
HINGHAM, MASSACHUSETTS 02043

TELEPHONE (781) 741-6075
FACSIMILE (781) 741-6074
EMAIL tsobran@sobranlaw.com

October 28, 2009

The Garden City Group, Inc.
Attn: Motors Liquidation Company Claims Processing
P.O. Box 9386
Dublin, OH 43017

Re: In Re Motors Liquidation Company, Southern District of New York Bankruptcy Court Case No. 09-50026

Dear Sir or Madam:

Enclosed please find the proof of claims of Susan B. Angell, Prudence Reid and Joanne Adams in the above-referenced proceeding together with a stamped self-address return envelope. Please return acknowledgement of receipt of the proof of claims in the return envelope.

Very truly yours

Thomas P. Sobran

TPS/awm
Enclosures



**SAAB CARS USA, INC**

Saab Cars USA, Inc
Claim Reimbursement Form

Date Claim Submitted. 12/25/05

Vehicle Identification Number (VIN): YS3ED+8E9130007-97

Mileage at Time of Repair 71,210

Claimant Name (Please Print): PRUDENCE F REID

Street Address 100 WAITE STREET

City, State, Zip Code REVERE MA 02151-2419

Daytime Telephone Number. (781) 286-1623

Evening Telephone Number (781) 286-1623

Amount of Reimbursement Requested 1341 74

Please mail this form and required documents to
Saab Cars USA, Inc
4405-A International Blvd
Norcross, GA 30093

My signature to this document attests that all attached documents are genuine and I request
reimbursement for the expense I incurred for the repair identified on the repair invoice

Claimant's signature _____ Prudence Reid

THE FOLLOWING DOCUMENTATION MUST ACCOMPANY THIS CLAIM FORM

Original or a clear copy of all receipts, invoices and/or repair orders that show

- The name and address of the person who paid for the repair
- The Vehicle Identification Number (VIN) of the vehicle that was repaired
- What problem occurred, what repair was done, when it was done and who did it
- The total cost of the repair expense that is being claimed
- Payment for the repair in question and the date of payment Copy of front and back of
  cancelled check or copy of credit card receipt

All scheduled maintenance performed on the vehicle in accordance with the intervals
recommended by Saab, should be completed on the attached Service Documentation chart

If you meet all requirements detailed in the Special Policy information, submit this form and
the Service Documentation form prior to December 31, 2005 Saab will contact you within
60 days of claim submission

December 25, 2005

Saab Cars USA, Inc.
4405-A International Blvd
Norcorss, GA 30093

Dear Sirs

I am writing you in regard to the Saab oil sludge problem  As you are well aware of this problem and the damage it has caused to thousands of vehicles, I am reporting the problem it has caused to my Saab 2001 9-5  I have found hundred of articles and complaints as mine on the Internet  I believe you have acknowledged an inherent engine design flaw, but have failed to uphold your product standards with all the faithful Saab owners

Seized engines seen to be a common factor despite various maintenance records.

The only thing I don't have in common with the other Saab owners is that my engine hasn't seized YET[1]  That seems to be the order of maintenance   Oil sludge, blown turbo, seized engine, class action suit[1]

I have had the oil sludge maintenance done to my car and have religiously had my car in for it's required mile checkups, as well as in between 3,000 mile oil check-ups

The dealer has told me the oil sludge problem was the cause of my turbo blow out   And I think anyone could interpret that a turbo engine turning at high speeds without an oil supply will eventually go[1]

<u>I am requesting a refund for the turbo replacement on my car (1341 74) which includes the labor costs</u>

All documentation is included from the dealer

Thanking you in advance for your attention in this matter

Sincerely,

Prudence F Reid
100 Waite Street
Revere, MA 02151

Saab 9-5 2001
VIN  YS3ED48E913000797



 

| | FORD | SAAB | VOLVO |
|---|---|---|---|
| | (781) 944-7760 | (781) 224-3700 | (781) 224-3700 |
| | 88-98 Walkers Br Dr | 614 North Ave | 614 North Ave |
| | P O Box 487 | P O Box 586 | P O Box 586 |
| | READING, MA 01867 | WAKEFIELD, MA 01880 | WAKEFIELD, MA 01880 |

**128 COLLISION CENTER**
275 MAIN ST
WILMINGTON, MA 01887
(978) 988-2300

| 156141 | | VICTOR R. MANGIACO 158 | 626T | 12/21/05 | SACP434362 |
|---|---|---|---|---|---|
| PRUDENCE REID | | 90.00 | 11YD17 | 71,210 | STEEL GRAY/ | 1E005 |
| 100 WAITE ST | | 01/SAAB/9-5/4 DOOR | | 09/27/00 | 5,146 |
| REVERE, MA 02151 | | Y S 3 E D 4 8 E 9 1 3 0 0 0 7 9 7 | | 0036 | |
| | | | | 12/20/05 | |

781-286-1623 | | | | | MO: 71210

LABOR & PARTS
J# 1 24SAZ       ENGINE MINOR       HOURS.   6.00 TECH(S) 111       540 00
                 REPORTS SMOKING FROM TAILPIPE
                 TRACED TO FAULT OF TURBO  REPLACED TURBO AS NEEDED

| PARTS | QTY | FP NUMBER | DESCRIPTION | UNIT PRICE | |
|---|---|---|---|---|---|
| JOB # 1 | 1 | PKTURBO | TURBO | **** | **** |
| JOB # 1 | 1 | 93 186 554 | OIL FILTER | 6 50 | 6 50 |
| JOB # 1 | 1 | 91 32 937 | SEAL WASHER | 1 60 | 1 60 |
| JOB # 1 | 2 | 41-61 162 | WASHER | 4 90 | 9 80 |
| JOB # 1 | 2 | 44 43 883 | SEAL | 4 90 | 9 80 |
| JOB # 1 | 1 | 75 02 263 | O RING | 6 00 | 6 00 |
| JOB # 1 | 1 | 91 13 937 | GASKET | 8 90 | 8 90 |
| JOB # 1 | 3 | 51 25 000 | NUT | 4 90 | 14 70 |
| JOB # 1 | 4 | 92-150 435 | GASKET | 3 30 | 13 20 |
| JOB # 1 | 1 | 91 07 582 | SEAL | 4 90 | 4 90 |
| JOB # 1 | 7 | 75 20-190 | STUD | 12.00 | 84 00 |
| JOB # 1 | 4 | 11 066 422 | GASKET | 4 90 | 19 60 |
| JOB # 1 | 1 | 02 68 177 | ANTIFREEZE | 11 00 | 11 00 |
| JOB # 1 | 4 | 30-520-445 | NUT | 7 70 | 30 80 |
| JOB # 1 | 1 | 59 55 703 | TURBCHGB205L235 | 1081 00 | 1081 00 |
| JOB # 1 | 1 | 59 55 703 | CORE RETURN | 450 00 | 450 00 |
| JOB # 1 | 4 | OIL | (QT) OIL | 1 75 | 7 00 |
| | | | JOB #  1 TOTAL PARTS | | 858 80 |
| | | | JOB #  1 TOTAL LABOR & PARTS | | 1398 80 |

| MISC | CODE | DESCRIPTION | CONTROL NO | |
|---|---|---|---|---|
| JOB # 1 | S20P | SAAB 20% OFF PARTS | | 25 00 |
| JOB # 1 | S20P | SAAB 20% OFF PARTS | | 25 00 |
| JOB # 1 | S20P | SAAB 20% OFF PARTS | | 25 00 |
| JOB # 1 | S20L | SAAB 20% OFF LABOR | | 25 00 |
| | | | TOTAL   MISC | 100 00 |




**128**

**FORD**
(781) 944-7760
88-98 Walkers Br Dr
P O Box 487
**READING, MA 01867**

**SAAB**
(781) 224-3700
614 North Ave
P O Box 586
**WAKEFIELD, MA 01880**

**VOLVO**
(781) 224-3700
614 North Ave
P O Box 586
**WAKEFIELD, MA 01880**

**128 COLLISION CENTER**
275 MAIN ST
**WILMINGTON, MA 01887**
(978) 988-2300

| CUSTOMER NO. | | ADVISOR | | TAG NO | INVOICE DATE | INVOICE NO |
|---|---|---|---|---|---|---|
| 156141 | | VICTOR R. MANGIACO 158 | | 626T | 12/21/05 | SACP434362 |

PRUDENCE REID
100 WAITE ST
REVERE, MA 02151

| LABOR RATE | LICENSE NO | MILLAGE | COLOR | STOCK NO |
|---|---|---|---|---|
| 90.00 | 11YD17 | 71,210 | STEEL GRAY/ | 1E005 |

| YEAR / MAKE / MODEL | DELIVERY DATE | DELIVERY MILES |
|---|---|---|
| 01/SAAB/9-5/4 DOOR | 09/27/00 | 5,146 |

| VEHICLE I.D NO | SELLING DEALER NO | PRODUCTION DATE |
|---|---|---|
| Y S 3 E D 4 8 E 9 1 3 0 0 0 7 9 7 | 0036 | |

| F T E NO | P O NO | R O DATE |
|---|---|---|
| | | 12/20/05 |

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS | |
|---|---|---|---|
| 781-286-1623 | | | MO: 71210 |

TOTALS-

****************** THE 1 2 8 PLEDGE *********************

WE ARE RESPONSIBLE FOR YOUR TOTAL SERVICE SATISFACTION
            100% SATISFACTION IS OUR GOAL
IF YOU ARE NOT "COMPLETLEY SATISFIED" OR COULD NOT
"DEFINITELY RECOMMEND"OUR SERVICE DEPARTMENT CONTACT US
FORD/VOLVO       BRIAN DENN        AT      781-944-7760
FORD             LUDLOW BERKELEY   AT      781-944-7760

     " WE NEVER FORGET YOU HAVE A CHOICE "
        THANK YOU FOR CHOOSING 128
           SALES AND SERVICE

************************************************************

| | |
|---|---|
| TOTAL LABOR | 540 00 |
| TOTAL PARTS. | 858 80 |
| TOTAL SUBLET . | 0 00 |
| TOTAL G O.G.. | 0 00 |
| TOTAL MISC CHG | 0 00 |
| TOTAL MISC DISC | 100.00 |
| TOTAL TAX. .... | 42 94 |
| **TOTAL INVOICE $** | **1341.74** |

CUSTOMER SIGNATURE

**<u>Exhibit D</u>**

**<u>Proof of Claim No. 18917</u>**

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT  Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>Motors Liquidation Company (f/k/a General Motors Corporation) | Case Number<br>09-50026 (REG) |
|---|---|

NOTE  *This form should not be used to make a claim for an administrative expense arising after the commencement of the case  A request for payment of an administrative expense may be filed pursuant to 11 U S C § 503*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property)<br>Jo Ann Adams | ☐ Check this box to indicate that this claim amends a previously filed claim |
| Name and address where notices should be sent<br>Thomas P Sobran<br>7 Evergreen Lane<br>Hingham, MA 02043<br>Telephone number<br>(781) 741-6075 | THE GARDEN CITY GROUP, INC.<br>NOV 2 2009<br><br>Court Claim Number _____<br>*(If known)*<br><br>Filed on _____ |
| Name and address where payment should be sent (if different from above)<br>**FILED - 18917**<br>**MOTORS LIQUIDATION COMPANY**<br>**F/K/A GENERAL MOTORS CORP**<br>**SDNY # 09-50026 (REG)**<br>Telephone number | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim  Attach copy of statement giving particulars<br><br>☐ Check this box if you are the debtor or trustee in this case |

| | |
|---|---|
| 1   Amount of Claim as of Date Case Filed     $          6,045 00  *Plus interest and attorney's fee*<br><br>If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured, do not complete item 4<br><br>If all or part of your claim is entitled to priority, complete item 5<br><br>☑ Check this box if claim includes interest or other charges in addition to the principal amount of claim  Attach itemized statement of interest or charges | 5  Amount of Claim Entitled to Priority under 11 U S C §507(a)  If any  portion of your claim falls in one of the following categories, check the box  and state the amount<br><br>Specify the priority of the claim<br><br>☐ Domestic support obligations under 11 U S C §507(a)(1)(A) or (a)(1)(B) |
| 2   Basis for Claim    defective goods<br>   (See instruction #2 on reverse side ) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U S C §507 (a)(4) |
| 3   Last four digits of any number by which creditor identifies debtor _____<br><br>    3a  Debtor may have scheduled account as _____<br>       (See instruction #3a on reverse side ) | |
| 4  Secured Claim (See instruction #4 on reverse side )<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information<br><br>Nature of property or right of setoff   ☐ Real Estate   ☐ Motor Vehicle   ☐ Other<br>Describe<br><br>Value of Property $_____   Annual Interest Rate_____%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any  $_____   Basis for perfection _____<br><br>Amount of Secured Claim  $_____   Amount Unsecured $_____ | ☐ Contributions to an employee benefit plan – 11 U S C §507 (a)(5)<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U S C §507 (a)(7)<br><br>☐ Taxes or penalties owed to governmental units – 11 U S C §507 (a)(8) |
| 6   Credits  The amount of all payments on this claim has been credited for the purpose of making this proof of claim | ☐ Other – Specify applicable paragraph of 11 U S C §507 (a)(__) |
| 7   Documents  Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements  You may also attach a summary  Attach redacted copies of documents providing evidence of perfection of a security interest  You may also attach a summary  *(See instruction 7 and definition of "redacted" on reverse side )*<br><br>DO NOT SEND ORIGINAL DOCUMENTS  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING<br><br>If the documents are not available, please explain | Amount entitled to priority<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment* |
| Date:<br>10/28/2009   Signature  The person filing this claim must sign it  Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above  Attach copy of power of attorney, if any<br><br>Thomas P Sobran, Attorney for Jo Ann Adams | FOR COURT USE ONLY |

*Penalty for presenting fraudulent claim*  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571

THOMAS P. SOBRAN, P.C.
COUNSELLOR AT LAW
7 EVERGREEN LANE
HINGHAM, MASSACHUSETTS 02043

TELEPHONE (781) 741-6075
FACSIMILE (781) 741-6074
EMAIL tsobran@sobranlaw.com

October 28, 2009

The Garden City Group, Inc.
Attn: Motors Liquidation Company Claims Processing
P.O. Box 9386
Dublin, OH 43017

Re: In Re Motors Liquidation Company, Southern District of New
York Bankruptcy Court Case No. 09-50026

Dear Sir or Madam:

Enclosed please find the proof of claims of Susan B. Angell, Prudence Reid and Joanne Adams in the above-referenced proceeding together with a stamped self-address return envelope. Please return acknowledgement of receipt of the proof of claims in the return envelope.

Very truly yours

Thomas P. Sobran

TPS/awm
Enclosures

## CONTINGENT FEE AGREEMENT
(Executed in Duplicate)

Joanne Adams residing at 18967 Forrer Street, Detroit, MI 48235 (hereinafter "Client") retains THOMAS P. SOBRAN, P C , 7 Evergreen Lane, Hingham, Massachusetts 02043, (hereinafter "Attorney") to perform the legal services mentioned in Paragraph 1 below.    The Attorney agrees to perform the services faithfully and with due diligence

1. The claim, controversy and other matters with reference to which the services are to be performed are: Resolution of her Saab engine oil sludge repair costs through a pending proposed class action.

2  The contingency upon which compensation is to be paid is  the collection of moneys following settlement in favor of the Client or verdict in favor of the Client on the claim, controversy and other matters set forth in Paragraph 1 above

3. The Client is not liable to pay compensation otherwise than from amounts collected for her by the Attorney except as follows· Not applicable, the only compensation is set forth in ¶4.

4  Reasonable compensation on the foregoing contingency is to be paid by resolution of the proposed class action in an amount to be approved by the court or at trial from the damages settlement or award

5  If the Attorney is discharged by the Client prior to the resolution of the claim, controversy and other matters referenced in paragraph 1, the Attorney shall be entitled to compensation for expenses and disbursements together with the fair value of services rendered to the Client prior to the discharge of the Attorney at the time the claim, controversy and other matters are concluded.

6  In the event there is no certification of the Saab proposed class action entitled *Angell, et al  v. Saab Automobile AB, et al* , United States District Court, District of Massachusetts, Boston, Civil Action  No  1.08-CV-11201-DPW,  Attorney  may  withdraw  from representation of Client.

This agreement and its performance are subject to Rule 3 05 of the Supreme Judicial Court of Massachusetts

THIS CONTINGENT FEE AGREEMENT HAS BEEN READ BY THE CLIENT BEFORE SIGNING AND RECEIPT OF A COPY OF THE AGREEMENT IS ACKNOWLEDGED

Jo Ann Adams
_____
Signature of Client

_____
Signature of Attorney

Dated.  10/    /2008






**AUTOMOTIVE GROUP**

28000 Telegraph Road
SOUTHFIELD, MICHIGAN 48034
Phone (248) 354 3300 • 1-800 354 5558 • Fax (248) 372 5366

WE HONOR

CASH

CELL: 313-421-1364
STATE REGISTRATION F 1009/9

| | | | |
|---|---|---|---|
| CUSTOMER NO 8362655 | KIM 592 233 | 10/10/08 | SACSZ69893 |
| JOANN ADAMS 18967 FORRER ST DETROIT, MI 48235 | TDWF23 | MILEAGE 73,971 | WHITE/ 25P146 |
| | 02/SAAB/9-5 SERIES/4DR | 08/24/02 | 39,271 |
| NO EMAIL | YS3EB49E523033303 | | |
| | F T E NO | P O NO 10/09/08 | |
| 313-836-2655 313-421-1364 | COMMENTS | | MOT 73972 |

**LABOR & PARTS**

**J# 1 11SAZ04    FLUID LEAK-ENGINE    UNITS: 18 00 TECH(S) 434    2148 88**
LAST VISIT FOUND FRONT COVER LEAKING OIL AND LEAKING ONTO
BELT TENSIONER AND BELT  PLEASE REPAIR
NEC TO R&R FRONT COVER AND RESEAL. REPLACED HEAD GASKETS,
HEAD BOLTS  VALVE COVER GASKETS, WATER PUMP, FILLED WITH
COOLANT, AND REPLACED BELT AND TENSIONER

| PARTS | QTY | FP NUMBER | DESCRIPTION | UNIT PRICE | |
|---|---|---|---|---|---|
| JOB # 1 | 1 | 12-346 290 | LONGLIFECOOLANT | 25 07 | 25 07 |
| JOB # 1 | 1 | 93 186-554 | OIL FILTER | 9 00 | 9 00 |
| JOB # 1 | 1 | 91 32-937 | SEAL WASHER | 2 30 | 2 30 |
| JOB # 1 | 10 | 59-55 794 | SCREW | 5 50 | 55 00 |
| JOB # 1 | 1 | 88 22 041 | GASKET KIT 4 CY | 45 00 | 45 00 |
| JOB # 1 | 1 | 59 60 083 | HEAD GASKET | 55 00 | 55 00 |
| JOB # 1 | 1 | 55 559 824 | OIL PRESSURE SE | 20 00 | 20 00 |
| JOB # 1 | 1 | 48 98 755 | BELTTENSIONER | 149 00 | 149 00 |
| JOB # 1 | 1 | 93 166 829 | WATER PUMP KIT | 162 74 | 162 74 |
| JOB # 1 | 1 | 55-563 222 | BELT | 48 00 | 48 00 |
| | | | JOB # 1 TOTAL PARTS | | 571 11 |
| | | | JOB # 1 TOTAL LABOR & PARTS | | 2719 99 |

**J# 2 46SAZ    WHEELS/TIRES    UNITS    TECH(S) 434    0 00**
CHECK TIRE PRESSURE
SET TIRE PRESSURE

| PARTS | QTY | FP NUMBER | DESCRIPTION | UNIT PRICE | |
|---|---|---|---|---|---|
| | | | JOB # 2 TOTAL PARTS | | 0 00 |
| | | | JOB # 2 TOTAL LABOR & PARTS | | 0 00 |

**J# 3 70SALOANER    SAAB LOANER VEHICLE  UNITS    TECH(S) 434    0 00**

| PARTS | QTY | FP NUMBER | DESCRIPTION | UNIT PRICE | |
|---|---|---|---|---|---|
| | | | JOB # 3 TOTAL PARTS | | 0 00 |
| | | | JOB # 3 TOTAL LABOR & PARTS | | 0 00 |

**J# 4 51SAZ    BODY ELECTRICAL    UNITS    TECH(S) 434    0 00**
RESET CLOCK AND DATE
DONE

| PARTS | QTY | FP NUMBER | DESCRIPTION | UNIT PRICE | |
|---|---|---|---|---|---|
| | | | JOB # 4 TOTAL PARTS | | 0 00 |
| | | | JOB # 4 TOTAL LABOR & PARTS | | 0 00 |

**J# 5 40SAZ    BRAKES    UNITS    TECH(S) 434    0 00**
CLIENT REQUEST TO INSPECT BRAKES
BRAKES ARE GOOD  60 70% LIFE LEFT

| PARTS | QTY | FP NUMBER | DESCRIPTION | UNIT PRICE | |
|---|---|---|---|---|---|
| | | | JOB # 5 TOTAL PARTS | | 0 00 |

YOU MAY RECEIVE A SURVEY FROM
THE MANUFACTURER  IF YOU ARE NOT
COMPLETELY SATISFIED PLEASE CONTACT
OUR SERVICE DEPARTMENT

We guarantee our service work for 12 months or 12,000 miles  except  aftermarket parts  whichever  comes first  If our
replacement fails in normal service within that period  We fix it free of charge  parts and labor

**SERVICE INVOICE**







**AUTOMOTIVE GROUP**

28000 Telegraph Road
SOUTHFIELD, MICHIGAN 48034
Phone (248) 354-3300 • 1 800 354 5558 • Fax (248) 372 5366

WE HONOR

☐ VISA  ☐ MasterCard  ☐  CASH

CELL  313-421-1364
STATE REGISTRATION F 100979

| | | | |
|---|---|---|---|
| CUSTOMER NO 8362655 | PT PARTS PROPERLY COMPLETED & CHECKED BY KIM  592 | TAG NO 233 | 10/10/08  SACS269893 |
| JOANN ADAMS 18967 FORRER ST DETROIT, MI 48235 | LIC NO 1DWF23 | MILEAGE 73,971 | WHITE/  25P146 |
| | YEAR/MAKE/MODEL 02/SAAB/9-5 SERIES/4DR | | 06/24/02  39,271 |
| NO EMAIL | VEHICLE ID NO S 3 E B 4 9 E 5 2 3 0 3 3 3 0 3 | | SELLING DEALER NO  PRODUCTION DATE |
| | FTE NO | P.O NO | 10/09/08 |
| RESIDENCE PHONE 313-836-2655 | BUSINESS PHONE 313-421-1364 | COMMENTS | MMO 073972 |

JOB #  5 TOTAL LABOR & PARTS          0 00

G O G  & SUPPLIES
JOB # 1   1 0  5QTS SEMI SYNTH OIL        @    14 900   /UNIT          TOTAL   GOG     14 90
                                                                                        14 90

MISC     CODE      DESCRIPTION                       CONTROL NO
JOB # A       SS  ENVIRONMENTAL DISP /SHOP SUPPLIES                  TOTAL   MISC     20 00
                                                                                        20 00

ESTIMATE
CUSTOMER HEREBY ACKNOWLEDGES RECEIVING
         ORIGINAL ESTIMATE OF  $2840 00 (+TAX)
COMMENTS

TECHNICIAN CERTIFICATION
         434          JAMES              M232141

TOTALS

```
*******************************************
*  [ ] CASH   [ ] CHECK  CK NO. [      ]  *
*                                         *
*  [ ] VISA   [ ] MASTERCARD  [ ] DISCOVER *
*                                         *
*  [ ] AMER XPRESS   [ ] OTHER  [ ] CHARGE *
*******************************************
```

TOTAL LABOR      2148 88
TOTAL PARTS       571 11
TOTAL SUBLET        0 00
TOTAL G.O.G.       14 90
TOTAL MISC CHG     20 00
TOTAL MISC DISC     0 00
TOTAL TAX          35 16

**TOTAL INVOICE $    2790 05**

THANK YOU FOR THE OPPORTUNITY TO SERVICE YOUR VEHICLE   OUR
GOAL IS TO HAVE YOU COMPLETELY SATISFIED WITH ALL SERVICES
PROVIDED   IF FOR ANY REASON YOU ARE NOT COMPLETELY
SATISFIED  PLEASE CONTACT SERVICE MANAGEMENT IMMEDIATELY

_____

CUSTOMER SIGNATURE

**ATTENTION CASHIER**

YOU MAY RECEIVE A SURVEY FROM
THE MANUFACTURER IF YOU ARE NOT
COMPLETELY SATISFIED PLEASE CONTACT
OUR SERVICE DEPARTMENT

**SERVICE INVOICE**

**SAAB**

**SUBARU**

# GLASSMAN
## AUTOMOTIVE GROUP

28000 Telegraph Road
SOUTHFIELD, MICHIGAN 48034
Phone (248) 354-3300 • 1 800 354 5558 • Fax (248) 372 5066

**HYUNDAI**



DEALER COD
SAAB 1/71
HYUNDAI MI
KIA MI 001
SUBARU 070

WE HONOR

VISA   MasterCard   [   ]   CASH

CELL. 313-421-136
STATE REGISTRATION F 100979

| CUSTOMER NO 8362655 | | TAG NO 876 | INVOICE DAT 05/01/08 | INVOICE NO SACS25934 |
| JOANN ADAMS 18967 FORRER ST DETROIT, MI 48235 | 1DWF23 | MILEAGE 70,015 | COLOR WHITE/ | 25P146 |
| | 02/SAAB/9-5 SERIES/4DR | | 06/24/02 | DELIVERED MILE 39,271 |
| | Y S 3 E B 4 9 E 5 2 3 0 3 3 3 0 3 | P O NO | 04/30/08 | |
| 313 836 2655    313 421 1364 | COMMENTS | | 04/30/08 | MO: 70020 |

LABOR & PARTS

J# 1 00SAZLOF    *LUBE,OIL&FILTER    UNITS.  0 40 TECH(S):434                 23 00
CUSTOMER REQUESTS LUBE, OIL AND FILTER
(BRAKE SQUEAL ADVISE)
MILEAGE INTERVAL
LOF COMPLETE

| PARTS | QTY | -FP NUMBER | DESCRIPTION | UNIT PRICE | |
| JOB # 1 | 1 | 93 186 554 | OIL FILTER | 9 00 | 9 00 |
| JOB # 1 | 1 | 91-32 937 | SEAL WASHER | 2 30 | 2.30 |
| JOB # 1 | 1 | 12 795 070 | BULBPARK | 3 70 | 3 70 |
| | | ADD PART PER TECH | | | |

JOB #  1 TOTAL PARTS      15 00

JOB #  1 TOTAL LABOR & PARTS      38.00

J# 2+11SAZ04    FLUID LEAK-ENGINE    UNITS: 10 50 TECH(S):434              1185 88
CUST STATES THE VEHICLE IS LEAKING FLUID
OIL LEAKING FROM HEAD GASKET AND OIL SENDING UNIT,
NECESSARY TO REPLACE HEADGASKET AND ASORTED SEALS,
AND FASTENERS, ALSO REPLACED OIL SEANING UNIT,
REASSEMBLED AND TESTED, NO OTHER OIL LEAKS DETECTED AT
THIS TIME.

| PARTS | QTY | --FP NUMBER | DESCRIPTION | UNIT PRICE | |
| JOB # 2 | 1 | 59-60 083 | HEAD GASKET | 66 83 | 66.83 |
| JOB # 2 | 10 | 59 55 794 | SCREW | 9 00 | 90 00 |
| JOB # 2 | 1 | 88-22 041 | GASKET KIT 4 CY | 61 06 | 61 06 |
| JOB # 2 | 1 | 30 577 561 | THERMOSTAT KIT | 32 20 | 32 20 |
| JOB # 2 | 1 | 55-559 824 | OIL PRESSURE SE | 29 50 | 29 50 |
| JOB # 2 | 1 | 12 346 290 | LONGLIFECOOLANT | 25 07 | 25 07 |
| JOB # 2 | 1 | 93 99 973 | HOSECRANKVNTR71 | 37 00 | 37 00 |
| JOB # 2 | 1 | 75 08 690 | GASKET | 10 90 | 10 90 |

JOB #  2 TOTAL PARTS      352 56

JOB #  2 TOTAL LABOR & PARTS    (1538 44)

J# 3+40SAZ    BRAKES    UNITS:  1 00 TECH(S):434                 104.95
CUST REQUEST FRT BRAKE PADS (SQUEAL)
AFTER MARKET DISC BRAKE PADS  NOISEY
NECESSARY TO REPLACE AFTER MARKET FRT DISC BRAKE PADS
WITH OEM, AND RETEST

| PARTS | QTY | FP NUMBER | DESCRIPTION | UNIT PRICE | |
| JOB # 3 | 1 | 55 32 544 | BRAKPADWATERRES | 100 45 | 100 45 |

JOB #  3 TOTAL PARTS      100 45

JOB #  3 TOTAL LABOR & PARTS    205 40

J# 4+70SAZ12    COURTESY TRANSPORT. UNITS    TECH(S):434      INTERNAL
ENTERPRISE
PROVIDED ENTERPRISE RENTAL ONE DAY  PER REPAIRS

| PARTS | QTY | FP NUMBER | DESCRIPTION | UNIT PRICE | |

ATTENTION CASHIER

[CONTINUED ON NEXT PAGE] 11:09am

## SERVICE INVOICE



DEALER CODE
SAAB 1/21
HYUNDAI MI-00
KIA MI 001
SUBARU 0/048

**SAAB**
**SUBARU**

# GLASSMAN
## AUTOMOTIVE GROUP

28000 Telegraph Road
SOUTHFIELD, MICHIGAN 48034
Phone (248) 354-3300 • 1 800 354 5558 • Fax (248) 372-5J66

**HYUNDAI**
**KIA**

WE HONOR

VISA    MasterCard    CASH

CELL: 313-421-1364
STATE REGISTRATION F 100979

| CUSTOMER NO. 8362655 | | | | | | | |
|---|---|---|---|---|---|---|---|
| JOANN ADAMS 18967 FORRER ST DETROIT, MI 48235 | DAN 407 | TAG NO. 876 | INVOICE DATE 05/01/08 | INVOICE NO. SACS259341 | | | |
| | LICENSE NO. 1DWF23 | MILEAGE 70,015 | COLOR WHITE/ | STOCK NO. 25P146 | | | |
| | YEAR/MAKE/MODEL 02/SAAB/9-5 SERIES/4DR | | DELIVERY DATE 06/24/02 | DELIVERY MILE 39,271 | | | |
| | VEHICLE I.D. NO. YS3EB49E523033303 | | | PRODUCTION DATE | | | |
| | F.T.E.NO. | | DELIVERY DATE 04/30/08 | | | | |
| RESIDENCE PHONE 313-836-2655 | BUS./BUS. PHONE 313-421-1364 | COMMENTS | | RO: 70020 | | | |

JOB # 4 TOTAL PARTS                0 00

JOB # 4 TOTAL LABOR & PARTS          0 00

J# 5+61SAZ07       ORNAMENTS/EMBLEMS   UNITS:      TECH(S) 434          0 00
CUST STATES THE HOOD EMBLEM IS PEELING
REPLACED PEELING HOOD EMBLEM  CUSTOMER GOODWILL

PARTS     QTY   FP NUMBER          DESCRIPTION              UNIT PRICE
                                  JOB # 5 TOTAL PARTS          0 00

JOB # 5 TOTAL LABOR & PARTS          0 00

J# 6+60SAZ        INTERIOR TRIM     UNITS:  1.00 TECH(S).434        104.95
CUSTOMER STATES REAR LIGHT FAILURE ON SID PLEASE CHECK AND A
DVISE
OPEN CURCUIT IN TRUNK HARNESS AND SHORTED THIRD BRAKE LIMP
BULB
NECESSARY TO REPAIR TRUNK WIRING HARNESS AND REPLACE THIRD B
ULB.

PARTS     QTY   FP NUMBER          DESCRIPTION              UNIT PRICE
                                  JOB # 6 TOTAL PARTS          0 00

JOB # 6 TOTAL LABOR & PARTS        104 95

G O G  & SUPPLIES
JOB # 1    5.0 1QT SEMI SYNTH OIL        @    3 500  /UNIT      17 50
                                              TOTAL  GOG      17 50

MISC     CODE       DESCRIPTION              CONTROL NO
JOB # A       SS   ENVIRONMENTAL DISP /SHOP SUPPLIES            20 00
JOB # 1       LOF  LOF LABOR DISCOUNT   GM                       4.54
                                              TOTAL  MISC      15 46

ESTIMATE
CUSTOMER HEREBY ACKNOWLEDGES RECEIVING
     ORIGINAL ESTIMATE OF  $2061 00 (+TAX)
COMMENTS

TECHNICIAN CERTIFICATION
     434             JAMES KEHL               M232141

INFINANCE TO
CLAIM
DEDUCTIBLE
AMOUNT

ATTENTION CASHIER
DEDUCTIBLE          BETTERMENT
OTHER     AMOUNT      TOTAL TAX
SIGNATURE

TERMS  are cash on delivery ESTIMATES ARE FOR
LABOR ONLY MATERIAL IS EXTRA  Storage will be
charged  10 hours  after repairs  are completed  Not
responsible  for loss  or damage to vehicle  left in cars
in case of loss  but to prevent  accident or any other cause
beyond our control  An express mechanic's lien is hereby
acknowledged on above  car or truck to secure the amount of
repair  thereto

X

YOU MAY RECEIVE A SURVEY FROM
THE MANUFACTURER  If you are not
COMPLETELY SATISFIED PLEASE CONTACT
OUR SERVICE DEPARTMENT

SERVICE INVOICE






**AUTOMOTIVE GROUP**

28000 Telegraph Road
SOUTHFIELD, MICHIGAN 48034
Phone (248) 354-3300 • 1 800 354-5558 • Fax (218) 372 5366

DEALER CODES
SAAB 1/21
HYUNDAI MI 007
KIA MI 001
SUBARU 070484

WE HONOR

CASH

CELL: 313-421-1364
STATE REGISTRATION F 100979

| CUSTOMER NO | 8362655 | | 407 | 876 | 05/01/08 | SACS259341 |
|---|---|---|---|---|---|---|

JOANN ADAMS
18967 FORRER ST
DETROIT, MI 48235

| | 1DWF23 | MILEAGE 70,015 | WHITE/ | 25P146 |
|---|---|---|---|---|

02/SAAB/9-5 SERIES/4DR     06/24/02     39,271

Y S 3 E B 4 9 E 5 2 3 0 3 3 3 0 3

04/30/08

313-836-2655     313-421-1364

MOX 70020

TOTALS

```
*******************************
* [ ] CASH    [ ] CHECK  CK NO [        ] *
*                                        *
* [ ] VISA    [ ] MASTERCARD  [ ] DISCOVER *
*                                        *
* [ ] AMER XPRESS  [ ] OTHER  [ ] CHARGE *
*                                        *
*******************************
```

| | |
|---|---|
| TOTAL LABOR. | 1418 78 |
| TOTAL PARTS | 468.01 |
| TOTAL SUBLET | 0 00 |
| TOTAL G.O.G | 17.50 |
| TOTAL MISC CHG | 20 00 |
| TOTAL MISC DISC | -4 54 |
| TOTAL TAX . | 29 13 |
| **TOTAL INVOICE $** | **1948.88** |

THANK YOU FOR THE OPPORTUNITY TO SERVICE YOUR VEHICLE   OUR
GOAL IS TO HAVE YOU COMPLETELY SATISFIED WITH ALL SERVICES
PROVIDED   IF FOR ANY REASON YOU ARE NOT COMPLETELY
SATISFIED, PLEASE CONTACT SERVICE MANAGEMENT IMMEDIATELY

**ATTENTION CASHIER**

CUSTOMER SIGNATURE

X

YOU MAY RECEIVE A SURVEY FROM
THE MANUFACTURER IF YOU ARE NOT
COMPLETELY SATISFIED PLEASE CONTACT
OUR SERVICE DEPARTMENT

PAGE 1 OF 1     CUSTOMER COPY     END OF INVOICE

**SERVICE INVOICE**



# GLASSMAN
## AUTOMOTIVE GROUP

**SAAB**
**SUBARU**



HYUNDAI   KIA

HYUNDAI MI 007
KIA MI 001
SUBARU 070481

28000 Telegraph Road
SOUTHFIELD, MICHIGAN 48034
Phone (248) 354 3300 • 1-800-354-5558 • Fax (248) 372-5366

WE HONOR
VISA   MasterCard   CASH

CELL: 313-421-1364
STATE REGISTRATION # 100979

| CUSTOMER NO | | |
|---|---|---|
| 8362655 | REPAIRS PROPERLY COMPLETED & CHECKED BY XMICHAEL BORG   TAG NO 504   122 | INVOICE DATE 07/12/07   INVOICE NO SACS239594 |

JOANN ADAMS
18967 FORRER ST
DETROIT, MI 48235

| LICENSE NO 1DWF23 | MILEAGE 62,708 | COLOR WHITE/ | STOCK NO 25P146 |
|---|---|---|---|
| YEAR / MAKE / MODEL 02/SAAB/9-5 SERIES/4DR | | DELIVERY DATE 06/24/02 | DELIVERY MILES 39,271 |
| VEHICLE I D NO YS3EB49E523033303 | | SELLING DEALER NO | PRODUCTION DATE |
| FTE NO | P O NO | R O DATE 07/10/07 | |

| RESIDENCE PHONE 313-836-2655 | BUSINESS PHONE 313-421-1364 | COMMENTS | MILEAGE OUT MO: 62710 |

LABOR & PARTS
J# 1 10SAZ            DRIVEABILITY         UNITS:   6 00 TECH(S):434                624 00
CUST REPORTS SMOKE FROM THE ENGINE. A RATTLE IS
HEARD ON ACCELERATION
INTERNAL FAILURE TURBO CHAGER
NECESSARY TO DIAGNOSE AND REPLACE FAILED TURBO CHARGER
R&R INNER COOLER TO FLUSH OIL OUT CLEAN EXHAUST AND
CHANGE OIL AND FILTER. TEST DROVE VEHICLE

| PARTS | QTY - FP NUMBER | DESCRIPTION | UNIT PRICE | |
|---|---|---|---|---|
| JOB # 1 | 1    55 560-913 | TURBOCHARGER | 726.25 | 726 25 |
| JOB # 1 | 6    11 066 422 | GASKET | 9 24 | 55 44 |
| JOB # 1 | 6    92 150 435 | GASKET | 6 60 | 39 60 |
| JOB # 1 | 1    91 13 937 | GASKET | 16 74 | 16 74 |
| JOB # 1 | 7    75 20 190 | STUD | 21 58 | 151 06 |
| JOB # 1 | 7    30 520-445 | NUT | 14 00 | 98 00 |
| JOB # 1 | 1    12 346 290 | LONGLIFECOOLANT | 21 33 | 21 33 |
| JOB # 1 | 1    90 490-362 | O RINGTURBOCHGR | 6 60 | 6 60 |
| JOB # 1 | 1    90 490 305 | SEALTURBOCHRGR | 3 30 | 3 30 |
| JOB # 1 | 1    93 186 554 | OIL FILTER | 7.70 | 7 70 |
| JOB # 1 | 1    91 32-937 | SEAL WASHER | 2 30 | 2 30 |
| JOB # 1 | 2    41 61 162 | WASHER | 9.00 | 18 00 |
| JOB # 1 | 2    44 43 883 | SEAL | 9.00 | 18 00 |

                                    JOB #  1 TOTAL PARTS              1164 32

                              JOB #  1 TOTAL LABOR & PARTS          1788 32

J# 2+09SAZ06     . B/G FUEL INDUCTION  UNITS:      TECH(S)·434                84 30
PERFORM B/G FUEL INDUCTION SERVICE
MAINTENANCE
COMPLETE SERVICE

| PARTS· | QTY·- FP NUMBER        · | DESCRIPTION | UNIT PRICE | |
|---|---|---|---|---|
| JOB # 2 | 1    2112 | INDUCT/KI | 45 65 | 45 65 |

                                    JOB #  2 TOTAL PARTS              45 65

                              JOB #  2 TOTAL LABOR & PARTS          129.95

G O G. & SUPPLIES
JOB # 1    1 0 5QTS SEMI SYNTH OIL    @   14 900  /UNIT          14 90
                                    TOTAL   GOG           14 90

MISC     CODE     DESCRIPTION              CONTROL NO  - -
JOB # A      SS ENVIRONMENTAL DISP /SHOP SUPPLIES                20 00
                                    TOTAL  MISC           20 00

ESTIMATE
CUSTOMER HEREBY ACKNOWLEDGES RECEIVING
   ORIGINAL ESTIMATE OF  $104 00 (+TAX)
APPROVED REVISED ESTIMATE (# 1) OF  $2000 00 (+TAX) ON 07/10/07 AT 02 34pm
BY JOANN ADAMS         COMMENTS 4334
COMMENTS
TOWED IN

YOU MAY RECEIVE A SURVEY FROM
THE MANUFACTURER IF YOU ARE NOT
COMPLETELY SATISFIED PLEASE CONTACT
OUR SERVICE DEPARTMENT

TERMS are cash on delivery ESTIMATES ARE FOR
LABOR ONLY MATERIAL IS EXTRA  Storage will be
charged 18 hours after repairs are completed. Not
responsible for loss of damage to car or articles left in care
in case of fire, theft, or any accident or any other cause
beyond our control. An express or implied mechanics lien
is acknowledged on above car or truck to secure the amount of
repairs thereto.

We guarantee our service work for 12 months or 12,000 miles, except aftermarket parts whichever comes first If our repair or
replacement fails in normal service within that period, we will repair or replace it free of charge, parts and labor.

CONTINUED ON NEXT PAGE] 02 33pm

## SERVICE INVOICE



## GLASSMAN
### AUTOMOTIVE GROUP

SAAB

SUBARU.

HYUNDAI

KIA

HYUNDAI MI 007
KIA MI 001
SUBARU 070484

28000 Telegraph Road
SOUTHFIELD, MICHIGAN 48034
Phone (248) 354-3300 • 1 800-354 5558 • Fax (248) 372 5366

WE HONOR     VISA   MasterCard     CASH

STATE REGISTRATION No 3132721 00373364

| | |
|---|---|
| CUSTOMER NO **8362655** | |

REPAIRS PROPERLY COMPLETED & CHECKED BY X**MICHAEL BORG**

TAX NO 504     122

INVOICE DATE 07/12/07

INVOICE NO SACS239594

JOANN ADAMS
18967 FORRER ST
DETROIT, MI 48235

LICENSE NO **1DWF23**

MILLAGE **62,708**

COLOR **WHITE/**

STOCK NO **2SP146**

YEAR / MAKE / MODEL **02/SAAB/9-5 SERIES/4DR**

DELIVERY DATE **06/24/02**

DELIVERY MILES **39,271**

VEHICLE ID NO **Y S 3 E B 4 9 E 5 2 3 0 3 3 3 0 3**

FTE NO

P O NO

R O DATE **07/10/07**

RESIDENCE PHONE **313-836-2655**

BUSINESS PHONE **313-421-1364**

COMMENTS

MILEAGE OUT MO: **62710**

TECHNICIAN CERTIFICATION
434          JAMES KEHL          M232141

TOTALS

```
***************************************
*  [ ] CASH    [ ] CHECK   CK NO [      ]  *
*                                          *
*  [ ] VISA    [ ] MASTERCARD  [ ] DISCOVER *
*                                          *
*  [ ] AMER XPRESS   [ ] OTHER  [ ] CHARGE  *
*                                          *
***************************************
```

| | |
|---|---|
| TOTAL LABOR | 708 30 |
| TOTAL PARTS | 1209 97 |
| TOTAL SUBLET | 0 00 |
| TOTAL G O G | 14 90 |
| TOTAL MISC CHG | 20 00 |
| TOTAL MISC DISC | 0 00 |
| TOTAL TAX . | 73 49 |

**TOTAL INVOICE $     2026.66**

**ATTENTION CASHIER**

THANK YOU FOR THE OPPORTUNITY TO SERVICE YOUR VEHICLE. OUR
GOAL IS TO HAVE YOU COMPLETELY SATISFIED WITH ALL SERVICES
PROVIDED   IF FOR ANY REASON YOU ARE NOT COMPLETELY
SATISFIED, PLEASE CONTACT SERVICE MANAGEMENT IMMEDIATELY

THE ORIGINAL ESTIMATE HAS BEEN REVISED

_____

CUSTOMER SIGNATURE

TERMS are cash on delivery ESTIMATES ARE FOR
LABOR ONLY MATERIAL IS EXTRA storage will be
charged 48 hours after repairs are completed Not
responsible for loss or damage to car or article left in car
in case of fire theft freezing or other cause
beyond our control An express or implied lien for the
amount of repairs thereto is hereby
acknowledged on above car or truck to secure the amount of
repairs thereto

X

YOU MAY RECEIVE A SURVEY FROM
THE MANUFACTURER IF YOU ARE NOT
COMPLETELY SATISFIED PLEASE CONTACT
OUR SERVICE DEPARTMENT

We guarantee our service work for 12 months or 12,000 miles, whichever comes first If a component of
repair fails in normal service within that period, we'll fix it free of charge   parts and labor

CUSTOMER COPY          END OF INVOICE   02 33pm

## SERVICE INVOICE

HEARING DATE AND TIME: March 2, at 9:45 a.m. (Eastern Time)
RESPONSE DEADLINE: February 23, 2010 at 4:00 p.m. (Eastern Time)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                            :
In re                                       :    **Chapter 11 Case No.**
                                            :
**MOTORS LIQUIDATION COMPANY**, *et al.*,   :    **09-50026 (REG)**
     **f/k/a General Motors Corp.**, *et al.* :
                                            :
                           **Debtors.**     :    **(Jointly Administered)**
                                            :
------------------------------------------------------------x

## ORDER GRANTING DEBTORS' OBJECTION TO
## PROOF OF CLAIM NO. 903 FILED BY SUSAN B. ANGELL AND PRUDENCE REID

Upon the Objection dated January 29, 2010 (the "**Objection**") to Proof of Claim

No. 903 filed by Susan B. Angell and Prudence Reid (the "**Angell Putative Class Claim**") of

Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as

debtors in possession (collectively, the "**Debtors**"), pursuant to section 502(b) of title 11, United

States Code (the "**Bankruptcy Code**"), Rule 3007(d) of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), and this Court's Order Pursuant to Section 502(b)(9) of

the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing

Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(b)(9)) and Procedures

Relating Thereto and Approving the Form and Manner of Notice Thereof (the "**Bar Date**

**Order**") [Docket No. 4079], seeking entry of an order disallowing and expunging claim number

903 on the grounds that adjudication of the Angell Putative Class Claim fails to comply with

Bankruptcy Rules 9014 and 2019, all as more fully described in the Objection; and due and

proper notice of the Objection having been provided, and it appearing that no other or further

notice need be provided; and the Court having found and determined that the relief sought in the

Objection is in the best interests of the Debtors, their estates, creditors, and all parties in interest

and that the legal and factual bases set forth in the Objection establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Objection is granted as provided

herein; and it is further

ORDERED that, pursuant to section 502(b) of the Bankruptcy Code, the Angell

Putative Class Claim is disallowed and expunged in its entirety; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: New York, New York
_____, 2010

_____
United States Bankruptcy Judge