**PRESENTMENT DATE AND TIME: March 1, 2010 at 12:00 noon (Eastern Time)**
**OBJECTION DEADLINE: March 1, 2010 at 11:30 a.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                        :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **MOTORS LIQUIDATION COMPANY**, *et al.*, | : | **09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x

**NOTICE OF PRESENTMENT OF**
**ORDER PURSUANT TO 11 U.S.C. §§ 105(a)**
**AND 363(b) AUTHORIZING THE EMPLOYMENT AND**
**RETENTION OF HILCO INDUSTRIAL LLC AND MAYNARDS**
**INDUSTRIES (1991) INC. AS EXCLUSIVE MARKETING AND**
**SALES AGENTS TO THE DEBTORS *NUNC PRO TUNC* TO OCTOBER 1, 2009**

PLEASE TAKE NOTICE that upon the annexed Application, dated February 12,

2010 (the "**Application**"), of Motors Liquidation Company (f/k/a General Motors Corporation)

and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**"), for an order

pursuant to sections 105(a) and 363(b) of title 11, United States Code (the "**Bankruptcy Code**"),

approving the retention and employment of Hilco Industrial, LLC ("**Hilco**") and Maynards

Industries (1991) Inc. ("**Maynards**", and together with Hilco, "**Hilco/Maynards**") as the

Debtors' exclusive marketing and sales agents with respect to certain assets (the "**Assets**"), *nunc*

*pro tunc* to October 1, 2009, all as more fully set forth in the Application, the Debtors will

present the attached proposed order to the Honorable Robert E. Gerber, United States

Bankruptcy Judge, for signature on **March 1, 2010 at 12:00 noon (Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the

proposed order must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure

and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a)

electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with a hard copy delivered

directly to Chambers), in accordance with General Order M-182 (which can be found at

www.nysb.uscourts.gov), and served in accordance with General Order M-242, and on (i) Weil,

Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York

10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.);

(ii) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit,

Michigan 48243 (Attn:  Ted Stenger); (iii) General Motors, LLC, 300 Renaissance Center,

Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham &

Taft LLP, attorneys for the United States Department of the Treasury, One World Financial

Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United States

Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, DC

20220 (Attn:  Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export Development

Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman,

Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP, attorneys for the

statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York

10036 (Attn:  Thomas Moers Mayer, Esq., Amy Caton, Esq., Adam C. Rogoff, Esq., and

Gregory G. Plotko, Esq.); (xii) the Office of the United States Trustee for the Southern District

of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Diana G.

Adams, Esq.); (xiii) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New

York, New York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz, Esq.); (xiv) Hilco

Industrial, LLC, Industrial Asset Management, Suite 207, 31555 West Fourteen Mile Road,

Farmington Hills, Michigan 48334 (Attn:  Robert C. Levy); (xv) Hilco Trading, LLC, 5 Revere

Drive, Northbrook, Illinois 60062 (Attn:  Joseph A. Malfitano); and (xvi) Maynards Industries

(1991) Inc., 21700 Northwestern Highway, Suite 1180, Southfield, Michigan 48075 (Attn:  Taso

Sofikitis), so as to be received no later than **11:30 a.m.** on **March 1, 2010 (Eastern Time)** (the

"**Objection Deadline**").   Unless objections are received by the Objection Deadline, the ordre

may be signed.

Dated:  New York, New York
        February 12, 2010

                                        /s/ Stephen Karotkin
                                        Harvey R. Miller
                                        Stephen Karotkin
                                        Joseph H. Smolinsky

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Debtors
                                        and Debtors in Possession

**PRESENTMENT DATE AND TIME:  March 1, 2010 at 12:00 noon (Eastern Time)**
**OBJECTION DEADLINE:  March 1, 2010 at 11:30 a.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                             :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, | : | **09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x

**APPLICATION OF DEBTORS FOR ENTRY OF**
**ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) AUTHORIZING**
**THE EMPLOYMENT AND RETENTION OF HILCO INDUSTRIAL LLC**
**AND MAYNARDS INDUSTRIES (1991) INC. AS EXCLUSIVE MARKETING**
**AND SALES AGENTS TO THE DEBTORS *NUNC PRO TUNC* TO OCTOBER 1, 2009**

# TABLE OF CONTENTS

**Page**

Relief Requested ........................................................................................................................... 1

Jurisdiction ................................................................................................................................... 2

Background ................................................................................................................................... 2

Services To Be Provided by Hilco/Maynards ............................................................................. 3

Professional Compensation .......................................................................................................... 6

Indemnification ............................................................................................................................ 8

Disinterestedness of Professional ................................................................................................ 9

The Relief Requested Should Be Approved by the Court ......................................................... 10

Waiver of Bankruptcy Rule 6004(h) ......................................................................................... 10

Notice ......................................................................................................................................... 11

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Comm. of Equity Sec. Holders v. Lionel Corp.*
    *(In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)...........................................10

*In re Del. & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991) ....................................10

*Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ......................................10

**Statutes & Rules**

11 U.S.C. § 101(14) ...........................................................................................................9

11 U.S.C. § 105(a) ....................................................................................................1, 10, 11

11 U.S.C. § 327 ...................................................................................................................9

11 U.S.C. § 327(a) ..............................................................................................................9

11 U.S.C. § 330 .............................................................................................................1, 8

11 U.S.C. § 331.............................................................................................................1, 8

11 U.S.C. § 363(b).....................................................................................................1, 8, 10

11 U.S.C. § 363(b)(1).......................................................................................................10

28 U.S.C. § 157 .................................................................................................................2

28 U.S.C. § 157(b) ...........................................................................................................2

28 U.S.C. § 1334...............................................................................................................2

Fed. R. Bank. P. 1015(c)...............................................................................................11

Fed. R. Bank. P. 6004(h)...............................................................................................10

Fed. R. Bank. P. 9007 ...................................................................................................11

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and

its affiliated debtors, as debtors in possession (collectively with MLC, the "**Debtors**"),

respectfully represent:

## **Relief Requested**

1.      By this Application (the "**Application**"), the Debtors seek entry of an

order pursuant to sections 105(a) and 363(b) of title 11, United States Code (the "**Bankruptcy**

**Code**"), approving the retention and employment of Hilco Industrial, LLC ("**Hilco**") and

Maynards Industries (1991) Inc. ("**Maynards**", and together with Hilco, "**Hilco/Maynards**") as

their exclusive marketing and sales agents with respect to certain Assets (as defined below).  The

Debtors seek to retain and employ Hilco/Maynards on the terms set forth in that certain Asset

Marketing Agreement dated November 12, 2009 between Hilco/Maynards and MLC (the

"**AMA**"), *nunc pro tunc* to October 1, 2009, all as more fully described in the AMA, a copy of

which is annexed hereto as **Exhibit "A."**

2.      The Debtors further request Hilco/Maynards not be required to submit

interim or final fee applications pursuant to sections 330 and 331 of the Bankruptcy Code and

Hilco/Maynards' compensation not be subject to the standard of review under section 330 of the

Bankruptcy Code.  Instead, the Debtors request Hilco/Maynards be compensated pursuant to the

*De Minimis* Asset Sale Order (as defined below) or by a separate motion for sale of property

pursuant section 363(b) of the Bankruptcy Code in which approval of Hilco/Maynards'

compensation would be requested.

**Jurisdiction**

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**Background**

4.      Having completed the sale of substantially all of their operating assets, the

Debtors are now in the process of liquidating their remaining assets and intend to propose a

liquidating chapter 11 plan as expeditiously as possible.  MLC remains the owner of certain

machinery, equipment, and other assets currently located in the fifteen (15) facilities listed on

**Exhibit "A"** of the AMA and at certain other non-manufacturing locations that are owned or

leased by MLC (the "**Assets**").  None of the Assets are essential to the Debtors' ongoing wind-

down effort and the Debtors intend to liquidate the Assets in accordance with the Order Pursuant

to 11 U.S.C. §§ 105 and 363 (A) Establishing Procedures for the Disposition of *De Minimis*

Assets, and (B) Authorizing the Debtors to (i) Pay Related Fees, and (ii) Assume, Assume and

Assign, or Reject Related Executory Contracts or Unexpired Leases [Docket No. 3830] (the "***De***

***Minimis* Asset Sale Order**") entered by the Court on August 18, 2009.

5.      Under the *De Minimis* Asset Sale Order, the Debtors have authority to pay

reasonable brokers' commissions and auctioneer fees for brokers and auctioneers utilized in

connection with the sale of *de minimis* assets.  The Debtors have interviewed several auctioneers

and have evaluated each proposed auctioneer's global infrastructure, financial strength,

international marketing capabilities, product knowledge, involvement and commitment of

principals, technology, proximity, sales methodologies, references of previous clients, and

auctioneering capabilities.  Based on this process, MLC has selected and desires to engage

Hilco/Maynards as its exclusive agent to sell the Assets.  The Debtors believe that the sale

process will operate efficiently and cost effectively, thereby providing greater return to the

Debtors' estates, if it is coordinated by a single auctioneer.  Although the *De Minimis* Asset Sale Order grants the Debtors authority to sell the Assets and pay reasonable brokers' and auctioneers' fees associated therewith, due to the magnitude of the sales with respect to quantity and overall value, through this Application and in an abundance of caution, the Debtors seek approval of the Court to employ Hilco/Maynards as the exclusive marketing and sales agent of the Assets.

### Services To Be Provided by Hilco/Maynards

6.      Subject to the approval of this Court, the Debtors have requested that Hilco/Maynards provide exclusive marketing and sales services with respect to the Assets, as Hilco/Maynards and the Debtors deem appropriate, including, but not limited to, the following:[1]

(i)      developing an advertising and marketing plan for all of the Assets in consultation with MLC;

(ii)      implementing the advertising and marketing plan in consultation with MLC;

(iii)      providing adequate information to prospective out-of-town buyers regarding travel time and travel information (including hotel, motel, car rental and airline information);

(iv)      providing an absentee bid process on Hilco/Maynards' website to enable bidders who do not want to travel to an auction an alternative method of bidding;

(v)      making available to all buyers any drawings, mechanical specs or any other relevant information that Hilco/Maynards may have it its possession;

---

[1]   The following is only a summary of the services set forth in the AMA and should not be construed to modify or amend such agreement.  The actual terms of the AMA govern the scope of services to be provided to the Debtors by Hilco/Maynards.

(vi)      with respect to auctions, assigning a sale site coordinator from Hilco/Maynards to oversee (A) auction sale routing, sorting and grouping of all sale items into suitable sized lots, (B) the creation of a buyer's lot catalog, (C) public inspection, and (D) the delivery of all sold items for an agreed upon period after completion of the applicable auction;

(vii)     preparing for the sale of the Assets, including gathering specifications and photographs for pictorial brochures and arranging the Assets in a manner, which in Hilco/Maynards' reasonable judgment, would be designed to enhance the value of the Assets;

(viii)    with respect to auctions, providing Robert Levy from Hilco as MLC's lead auctioneer (or another auctioneer acceptable to MLC), to auction the Assets for cash to the highest bidder "as is" or "where is," pursuant to the form of Bill of Sale attached to the AMA (the "**Bill of Sale**"), and otherwise in accordance with the terms of the AMA;

(ix)     contacting local riggers to assist buyers in the orderly removal of Assets from the relevant facilities;

(x)      charging and collecting from all purchasers any purchase price together with all applicable taxes in connection therewith;

(xi)     providing a complete auction crew to handle computerized accounting functions necessary to provide auction buyers with invoices and MLC with a complete accounting of all items sold at each auction;

(xii)    no later than two weeks after the sale of any Asset, accounting for, and paying over to MLC in immediately available funds, proceeds from such sale, less the applicable Buyer's Premium (as defined below) and/or the commissions or expenses to be reimbursed by MLC pursuant to the AMA, plus the sales taxes collected by

Hilco/Maynards, which MLC shall be responsible for remitting to the appropriate taxing authorities;

(xiii)   subject to clause (xii) above, depositing all proceeds into a separate client trust account; and

(xiv)   submitting an auction report to MLC within two weeks after the collection of funds from each auction and provide MLC with a monthly statement which sets forth in reasonable detail (i) the total gross Asset sales for that month, (ii) the total gross Asset sales for that month, less expenses, (iii) the Buyers' Premium for that month, and (iv) the Base Commission (as defined below) for that month.

7.      Pursuant to the AMA, the term of Hilco/Maynards' engagement will extend until the earlier of (i) four years from the date of the AMA unless all of the Assets or Facilities (as defined in the AMA) have been sold prior to the expiration of the term, (ii) the termination of the AMA (x) by MLC, upon a material breach of the AMA by Hilco/Maynards, or (y) by Hilco/Maynards, upon a material breach of the AMA by MLC, in each case, if such breach remains uncured after seven (7) days' written notice, or (iii) the date on which a plan of liquidation or reorganization for MLC that provides for the transfer of any of MLC's remaining Assets to a successor of MLC has been declared effective except where MLC has assigned its rights and obligations under this Agreement with respect to any such transferred Assets to any such MLC successor.

8.      Hilco/Maynards' is a highly respected and experienced marketing and sales services firm, and is frequently engaged by companies that have chapter 11 cases pending in United States bankruptcy courts.  The Debtors believe that Hilco/Maynards possesses extensive expertise useful in these cases and that Hilco/Maynards is well-qualified to assist the Debtors as provided in the AMA.  Furthermore, the Debtors selected Hilco/Maynards because of

its expertise in providing marketing and sales services and other services to debtors and creditors

in chapter 11 cases and other distressed situations.

### **Professional Compensation**

9.      Pursuant to the AMA, the Debtors have agreed to compensate

Hilco/Maynards as follows:

(i)      Subject to the rebate obligation below, Hilco/Maynards shall be entitled to charge and retain for its own account an industry standard buyer's premium in connection with the sale of the Assets which is currently thirteen and one half percent (13.5%) for standard auction sale buyers and sixteen percent (16%) for all online and liquidation sales (the "**Buyers' Premium**"). For purposes of clarification, the Buyers' Premium is a fee charged in addition to the sale price of any Assets that are sold by Hilco/Maynards pursuant to the AMA and is paid for by the buyer of the Asset(s). Such Buyers' Premium shall be segregated by Hilco/Maynards upon collection of proceeds from the applicable buyer(s) and, subject to the rebate obligation below, retained by Hilco/Maynards.

(ii)     Hilco/Maynards shall pay MLC a rebate of the collected Buyers' Premiums in accordance with the following schedule:

| Sales Range US$ (net of taxes) | Rebate to MLC |
| --- | --- |
| $0-$10,000,000 | 22.22% |
| $10,000,001-$15,000,000 | 14.81% |
| $15,000,001-$20,000,000 | 7.41% |
| Above $20,000,001 | 0% |

To the extent a payment is owed to MLC, Hilco/Maynards shall remit such payment to MLC at the same time it provides the monthly reconciliation and statements that are required under Section III.A.(xiv) of the AMA.

(iii)    Hilco/Maynards will also charge a commission on gross Asset sales based on the following schedule (the "**Base Commission**"):

| Sales Range US$ (net of taxes) | Base Commission |
| --- | --- |
| $0-$30,000,000 | 0% |
| $30,000,001-$35,000,000 | 1% |
| $35,000,001-$40,000,000 | 2% |
| $40,000,001-$45,000,001 | 3% |
| $45,000,001-$50,000,000 | 5% |
| Above $50,000,000 | 10% |

(iv)    In the event that a Facility (as defined in the AMA) is sold by MLC to a buyer who agrees to purchase (or lease) all of the real estate, buildings and contents of a Facility, the "Sales Range" thresholds for the rebate of the Buyer's Premium and Base Commission structure outlined above shall be reduced depending on which Facility is sold in accordance with the following table:

| | |
|---|---|
| Moraine Assembly | $      831,250 |
| Pontiac Assembly | $    1,243,750 |
| Wilmington Assembly | $    1,250,000 |
| Shreveport Assembly | $    1,750,000 |
| Grand Rapids Stamping | $    8,833,334 |
| Indianapolis Stamping | $    3,250,000 |
| Mansfield Stamping | $    4,250,000 |
| Pittsburgh Stamping | $    1,050,000 |
| Pontiac Stamping | $    1,500,000 |
| Flint North Powertrain | $    5,000,000 |
| Fredericksburg Powertrain | $      750,000 |
| Livonia Powertrain | $    1,983,334 |
| Massena Powertrain | $      943,750 |
| Parma Powertrain | $    2,500,000 |
| Willow Run Powertrain | $  12,500,000 |
| Non-Manufacturing Facilities | $      200,000 |

By way of example, if Wilmington Assembly is sold by MLC to a buyer who agrees to purchase (or lease) all of the real estate, buildings and contents of such Facility, the thresholds will be reduced by $1,250,000.  In the event that only a portion of a Facility and its contents is sold (or leased) by MLC to a third party, Hilco/Maynards shall remain MLC's exclusive agent to sell any remaining Assets that were not acquired by the buyer of the Facility, and the thresholds referred to above shall be adjusted as mutually agreed between the Parties in good faith to reflect the value of the remaining Assets that Hilco/Maynards is permitted to sell.

10.    In addition, the Debtors shall reimburse Hilco/Maynards' reasonable out-of-pocket expenses incurred in connection with the performance of the services required under the AMA, including, but not limited to, advertising, promotion and sales costs, auction set-up, labor costs (including internal labor at hourly rates ranging from $30 to $90 fully burdened),

transportation, lodging, and miscellaneous expenses, in all cases up to, but not exceeding, the amounts set forth in the Budget (as defined in the AMA).

11.    The Debtors believe that the fees of Hilco/Maynards are fair and reasonable in light of industry practice, market rates both in and out of chapter 11 cases, Hilco/Maynards' experience in reorganizations, and the scope of work to be performed pursuant to its retention.  In addition, given (i) the proposed compensation structure, which compensates Hilco/Maynards on a commission basis, (ii) the *De Minimis* Asset Sale Order, which authorizes the Debtors to pay reasonable brokers' commissions and auctioneer fees for brokers and auctioneers utilized in connection with any sales pursuant to the *De Minimis* Sale Procedures (as defined in the *De Minimis* Asset Sale Order), and (iii) asset sales not covered by the *De Minimis* Sale Procedures will require a separate motion pursuant to section 363(b) of the Bankruptcy Code in which approval of Hilco/Maynards' compensation will be requested, the Debtors believe that it would be unnecessary to require Hilco/Maynards to submit interim or final fee applications pursuant to sections 330 and 331 of the Bankruptcy Code.  Thus, the Debtors respectfully request that Hilco/Maynards be permitted to receive compensation for their services pursuant to the compensation structure outlined in the AMA without filing interim or final fee applications and not subject to the standard of review under section 330 of the Bankruptcy Code.

## **Indemnification**

12.    Pursuant to the AMA and subject to the approval of this Court, MLC has agreed to indemnify and hold Hilco/Maynards harmless from any claims, causes of action, damages and liabilities of any kind arising from or in connection with (i) MLC's breach of any of its representations, warranties or covenants in the AMA, or (ii) any inaccurate statements or representations concerning the Assets made by MLC to Hilco/Maynards or any prospective buyer, excluding any claims resulting from the willful misconduct or gross negligence of

Hilco/Maynards.  Hilco/Maynards agrees to reciprocally hold MLC harmless from any and all

claims, liabilities, losses, damages and expenses arising out of or based upon Hilco/Maynards'

breach of any representations, warranties or covenants in the AMA or gross negligence or willful

misconduct on the part of Hilco/Maynards, or their representatives or agents.

### Disinterestedness of Professional

13.    Although the Debtors submit that the retention of Hilco/Maynards is not

governed by section 327 of the Bankruptcy Code, the Debtors attach the Malfitano Affidavit (as

defined below) and the Sofikitis Affidavit (as defined below).

14.    Based upon the Malfitano Affidavit and the Sofikitis Affidavit, to the best

of the Debtors' knowledge, information and belief, the principals and professionals of

Hilco/Maynards (i) do not have any material connection with the Debtors, their creditors, or any

other party in interest, or their respective attorneys or accountants; (ii) are not creditors or

insiders of the Debtors; (iii) are "disinterested persons" as such term is defined in

section 101(14) of the Bankruptcy Code and as required under section 327(a) of the Bankruptcy

Code; and (iv) do not hold or represent an interest materially adverse to the Debtors' estates, or

to any class of creditors or equity security holders, by reason of direct or indirect relationship to,

connection with, or interest in the Debtors, or for any other reason, except as set forth in the

affidavit of Joseph A. Malfitano, Vice President and Assistant General Counsel of Hilco, (the

"**Malfitano Affidavit**"), annexed hereto as **Exhibit "B"** and the affidavit of Taso Sofikitis,

President of Maynards, (the "**Sofikitis Affidavit**" and together with the Hilco Affidavit, the

"**Affidavits**"), annexed hereto as **Exhibit "C."**  Accordingly, the Debtors believe that

Hilco/Maynards is a "disinterested person" as defined by section 101(14) of the Bankruptcy

Code.

### The Relief Requested Should Be Approved by the Court

15.     Section 363(b)(1) provides, in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a).

16.     Under applicable case law, in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring an "articulated business justification"); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, the court defers to the trustee's judgment so long as there is a "legitimate business justification"); *In re Del. & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).

17.     Based upon the foregoing, the Debtors submit that the relief requested herein is an exercise of the Debtors' reasonable business judgment and is essential, appropriate, and in the best interest of the Debtors' estates and creditors, and therefore, should be granted in these chapter 11 cases.

### Waiver of Bankruptcy Rule 6004(h)

18.     To implement the foregoing immediately, the Debtors seek a waiver of the the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

19.    Notice of this Motion has been provided to Hilco/Maynards and parties in interest in accordance with the Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated August 3, 2009 [Docket No. 3629].  The Debtors submit that such notice is sufficient and no other or further notice need be provided.

20.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: New York, New York
February 12, 2010

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**Exhibit A**

**Asset Marketing Agreement**

PRIVILEGED AND CONFIDENTIAL

# ASSET MARKETING AGREEMENT

This agreement (the "Agreement") is made as of the this 12th day of November, 2009, by and between Hilco Industrial, LLC ("Hilco"), Maynards Industries (1991) Inc. ("Maynards", and together with Hilco, "Hilco/Maynards JV"), and Motors Liquidation Company (f/k/a General Motors Corporation) ("MLC").

WHEREAS, Hilco is a leading international industrial auctioneer and liquidator specializing in valuing and converting idle capital equipment into cash through a multitude of creative sales methodologies and disposition channels including auction, liquidation, private treaty and sealed bid sales. Headquartered in Farmington Hills, Michigan, Hilco operates offices in Chicago, Illinois; Grand Rapids, Michigan; Birmingham, Alabama; London, Birmingham, Leeds and Southampton, England; Mexico City, Monterrey, Guadalajara, Villahermosa and Bajio, Mexico; and Toronto, Canada;

WHEREAS, Maynards is one of the preeminent liquidation, auction and equipment appraisal companies in North America. Maynards' expertise covers all aspects of sale transactions, including consignment, transportation logistics, sale management, asset tracking, financial reporting, payment and final reconciliation. Maynards operates from four locations in North America – Vancouver, Detroit, Toronto and Montreal, as well as in Japan and Europe;

WHEREAS, on June 1, 2009, MLC filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, on July 10, 2009, MLC consummated the sale of substantially all of its assets to General Motors Company, a separate independent company, pursuant to the provisions of section 363 of the Bankruptcy Code and an order of the Court (Docket Number 2968);

WHEREAS, following the Sale Transaction, MLC remains the owner and possessor of certain machinery, equipment and other assets currently located in the 15 facilities listed on Exhibit A attached hereto (the "Manufacturing Facilities") and at certain other non-manufacturing locations that are owned or leased by MLC (the "Non-Manufacturing Facilities" and together with the Manufacturing Facilities, each a "Facility" and collectively, the "Facilities");

WHEREAS, as a result of a competitive search, which included evaluating the proposed auctioneer's global infrastructure, financial strength, international marketing capabilities, product knowledge, involvement and commitment of principals, technology, proximity, sales methodologies, references of previous clients, and auctioneering capabilities, MLC has selected and desires to engage Hilco/Maynards JV as its exclusive agent to sell such assets as more fully described herein;

WHEREAS, MLC seeks to sell certain of the assets within the Facilities as previously communicated to Hilco-Maynards or that MLC identifies after the date of this Agreement and

provides written notice to Hilco-Maynards in accordance with <u>Section VIII.G.</u> of this Agreement (each an "Asset" and collectively, the "Assets"); and

WHEREAS, on August 18, 2009, the Court entered an order (Docket Number 3830) (the "*De Minimis* Asset Sale Order") authorizing procedures (the "*De Minimis* Sale Procedures") for MLC to sell certain assets without further court approval and authorizing MLC to pay reasonable brokers' commissions and auctioneer fees for brokers and auctioneers utilized in connection with any sales pursuant to the *De Minimis* Sale Procedures, a copy of which is attached as <u>Exhibit B</u> hereto.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, MLC and Hilco/Maynards JV (each a "Party" and together, the "Parties") do hereby agree as follows:

## I.    Engagement and Agreement to Market Assets

A.    MLC hereby engages Hilco/Maynards JV as its exclusive marketing and sales agent, and Hilco/Maynards JV hereby accepts such engagement, with respect to the Assets in accordance with the terms of this Agreement.

B.    Hilco/Maynards JV will implement a liquidation strategy to maximize the recoverable value associated with the Assets through a systematic marketing and sales process. The marketing and sales strategy will be discussed and agreed to in advance with MLC and will include, but is not limited to, private sales, online auctions, Global WebCast auctions, sealed bid sales and sales through reclamation. MLC and Hilco/Maynards may mutually agree to change the marketing period for any and all Facilities based on factors including but not limited to holding cost, buyers interested in buildings and/or real estate, or any other factor where the Parties agree an abbreviated marketing period is beneficial to MLC.

## II.    Exclusivity

MLC acknowledges that Hilco/Maynards JV or its affiliated entities may be engaged to sell or market similar assets by other persons or entities, and that any such engagement shall not constitute or be deemed to be a violation of this Agreement. During the Term of this Agreement, all inquiries regarding the Assets made to MLC, its representatives or related parties to MLC shall be redirected to Hilco/Maynards JV.

## III.    Method of Sale and Certain Covenants

A.    In connection with the services to be provided by Hilco/Maynards JV hereunder, Hilco/Maynards JV will:

(i)    develop an advertising and marketing plan for all of the Assets in consultation with MLC;

(ii)    implement the advertising and marketing plan in consultation with MLC;

(iii)    provide adequate information to prospective out-of-town buyers regarding travel time and travel information (including hotel, motel, car rental and airline information);

(iv)    provide an absentee bid process on Hilco/Maynards JV's website to enable bidders who do not want to travel to an auction an alternative method of bidding;

(v)    make available to all buyers any drawings, mechanical specs or any other relevant information that Hilco/Maynards JV may have it its possession;

(vi)    with respect to auctions, assign a sale site coordinator from Hilco/Maynards JV to oversee (A) auction sale routing, sorting and grouping of all sale items into suitable sized lots, (B) the creation of a buyer's lot catalog, (C) public inspection, and (D) the delivery of all sold items for an agreed upon period after completion of the applicable auction;

(vii)    prepare for the sale of the Assets, including gathering specifications and photographs for pictorial brochures and arranging the Assets in a manner, which in Hilco/Maynards JV's reasonable judgment, would be designed to enhance the value of the Assets;

(viii)    with respect to auctions, provide Robert Levy from Hilco as its lead auctioneer (or another auctioneer acceptable to MLC), who will auction the lots for cash to the highest bidder "as is," "where is," pursuant to the form of Bill of Sale attached as Exhibit C hereto (the "Bill of Sale"), and otherwise in accordance with the terms of this Agreement;

(ix)    contact local riggers to be available to assist buyers in the orderly removal of Assets from the Facilities;

(x)    charge and collect from all purchasers any purchase price together with all applicable taxes in connection therewith;

(xi)    provide a complete auction crew to handle computerized accounting functions necessary to provide auction buyers with invoices and MLC with a complete accounting of all items sold at each auction;

(xii)    no later than two weeks after the sale of any Asset, account for, and pay over to MLC in immediately available funds, proceeds from such sale, less the applicable Buyer's Premium (as defined below) and/or the commissions or expenses to be reimbursed by MLC pursuant to this Agreement plus the sales taxes collected by Hilco/Maynards JV, which MLC shall be responsible for remitting to the appropriate taxing authorities;

(xiii)    subject to clause (xii) above, deposit all proceeds into a separate client trust account; and

(xiv)    submit an auction report to MLC within two weeks after the collection of funds from each auction and provide MLC with a monthly statement which sets forth in reasonable detail (i) the total gross Asset sales for that month, (ii) the total gross Asset sales for that month, less expenses, (iii) the Buyers' Premium for that month, and (iv) the Base Commission for that month.

B.      In connection with the services to be provided by Hilco/Maynards JV hereunder, MLC hereby agrees as follows:

(i)     Hilco/Maynards JV shall be entitled to use the name "Motors Liquidation Company (f/k/a General Motors Corporation)" and similar derivations in all of its advertising and promotional activities related to this Agreement. Hilco/Maynards JV's license to use such name shall continue until the earliest of the sale of all of the Assets or the end of the Term of this Agreement. Any use of the GM brand, logo, or trademarks shall be consistent with the Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009, as amended, between MLC and General Motors Company (including any ancillary agreements).

(ii)    Hilco/Maynards JV shall have the right to access and use the Facilities, subject to the consent of General Motors Company to the extent required, during the Term solely for the purpose of performing its obligations under this Agreement. MLC acknowledges and agrees that it will allow Hilco/Maynards JV access to the Facilities upon execution of this Agreement for the purpose of taking photographs and preparing the marketing material for the Assets subject to the supervision of MLC and the coordination and approval of access to the Facilities with and by General Motors Company, to the extent required.

(iii)   Hilco/Maynards JV shall have the right to access and use the Facilities, subject to the supervision of MLC and the consent of General Motors Company to the extent required, for the purpose of performing its obligations under this Agreement during the Term, with no interference from any labor unions or any other third parties.

(iv) Hilco/Maynards JV will occupy the Facilities as licensees and shall not be obligated to pay any rent or other charges therefore. MLC agrees to continue to provide for all utilities during the course of Hilco/Maynards JV's occupancy. MLC also agrees to maintain during the Term (i) all utilities historically provided at the Facilities solely for the purpose of arranging, preparing, and effecting a disposition as set forth herein, (ii) two active and working telephone lines and T1 or DSL service at each Facility insofar as the applicable Facility requires such connectivity for the disposition of the Assets, (iii) trash removal service at the Facilities, and (iv) the services of any security personnel currently available at the Facilities.

(v) Unless otherwise agreed to in writing between the Parties prior to the expiration of the Term, any Assets not removed from the Facilities by the date this Agreement terminates shall be deemed abandoned by Hilco/Maynards JV to MLC.

4

Hilco/Maynards JV shall not be responsible for removing any Assets abandoned hereunder.

## IV.    Commission Payable to Hilco/Maynards JV; Expense Reimbursement

A.    Subject to the rebate obligation below, Hilco/Maynards JV shall be entitled to charge and retain for its own account an industry standard buyer's premium in connection with the sale of the Assets which is currently thirteen and one half percent (13.5%) for standard auction sale buyers and sixteen percent (16%) for all online and liquidation sales (the "Buyers' Premium"). For purposes of clarification, the Buyers' Premium is a fee charged in addition to the sale price of any Assets that are sold by Hilco/Maynard JV pursuant to this Agreement and is paid for by the buyer of the Asset or Assets. Such Buyers' Premium shall be segregated by Hilco/Maynards JV upon collection of proceeds from the applicable buyer(s) and, subject to the rebate obligation below, retained by Hilco/Maynards JV.

B.    Hilco/Maynards JV shall pay MLC a rebate of the collected Buyers' Premiums in accordance with the following schedule:

| Sales Range US$ (net of taxes and collected Buyers' Premiums) | Rebate to MLC |
|---|---|
| $0-$10,000,000 | 22.22% |
| $10,000,001-$15,000,000 | 14.81% |
| $15,000,001-$20,000,000 | 7.41% |
| Above $20,000,001 | 0% |

To the extent a payment is owed to MLC, Hilco/Maynards JV shall remit such payment to MLC at the same time it provides the monthly reconciliation and statements that are required under Section III.A.(xiv) hereof.

C.    Hilco/Maynards will also charge a commission on gross Asset sales based on the following schedule (the "Base Commission"):

| Sales Range US$ (net of taxes and collected Buyers' Premiums) | Base Commission |
|---|---|
| $0-$30,000,000 | 0% |
| $30,000,001-$35,000,000 | 1% |
| $35,000,001-$40,000,000 | 2% |
| $40,000,001-$45,000,001 | 3% |
| $45,000,001-$50,000,000 | 5% |
| Above $50,000,000 | 10% |

D.    In the event that a Facility is sold by MLC to a buyer who agrees to purchase (or lease) all of the real estate, buildings and contents of a Facility the "Sales Range" thresholds for the rebate of the Buyer's Premium and Base Commission structure outlined above shall be reduced depending on which Facility is sold in accordance with the following table:

| | | |
|---|---|---|
| Moraine Assembly | $ | 831,250 |
| Pontiac Assembly | $ | 1,243,750 |
| Wilmington Assembly | $ | 1,250,000 |
| Shreveport Assembly | $ | 1,750,000 |
| Grand Rapids Stamping | $ | 8,833,334 |
| Indianapolis Stamping | $ | 3,250,000 |
| Mansfield Stamping | $ | 4,250,000 |
| Pittsburgh Stamping | $ | 1,050,000 |
| Pontiac Stamping | $ | 1,500,000 |
| Flint North Powertrain | $ | 5,000,000 |
| Fredericksburg Powertrain | $ | 750,000 |
| Livonia Powertrain | $ | 1,983,334 |
| Massena Powertrain | $ | 943,750 |
| Parma Powertrain | $ | 2,500,000 |
| Willow Run Powertrain | $ | 12,500,000 |
| Non-Manufacturing Facilities | $ | 200,000 |

By way of example, if Wilmington Assembly is sold by MLC to a buyer who agrees to purchase (or lease) all of the real estate, buildings and contents of such Facility, the thresholds will be reduced by $1,250,000. In the event that only a portion of a Facility and its contents is sold (or leased) by MLC to a third party, Hilco/Maynards JV shall remain MLC's exclusive agent to sell any remaining Assets that were not acquired by the buyer of the Facility, and the thresholds referred to above shall be adjusted as mutually agreed between the Parties in good faith to reflect the value of the remaining Assets that Hilco/Maynards JV is permitted to sell.

E.      During the Term commencing on the date of this Agreement, Hilco/Maynards JV shall provide monthly budgets (the "Budget") for approval by MLC. Subject to prior approval of the Budget by MLC, Hilco/Maynards JV shall be entitled to reimbursement for all reasonable out-of-pocket expenses in connection with the performance of its services hereunder, including, but not limited to, advertising, promotion and sales costs; sale; auction set-up, labor costs (including internal labor at hourly rates ranging from $30 to $90 fully burdened), transportation, lodging and miscellaneous expenses, in all cases up to, but not exceeding, the amounts set forth in the Budget.

V.      **Representations and Covenants of the Parties**

A.      MLC represents and warrants that (i) subject to the Court's approval of this Agreement, MLC has the requisite power, authority and legal capacity to enter into this Agreement and perform its obligations hereunder, and (ii) MLC has the requisite power, authority and legal capacity to sell the Assets subject to the terms of, and in the manner stipulated by, the *De Minimis* Asset Sale Order.

B.     Hilco/Maynards JV Hilco covenants that it will at all times conduct its activities in such a commercially reasonable manner as to leave each Facility undamaged, ordinary wear and tear expected.

C.     The Parties hereto agree, and MLC hereby expressly acknowledges, that Hilco/Maynards JV shall not be responsible for the removal or disposition of any environmentally hazardous chemicals, solvents or substances found on the Facilities.

(a)     Hilco/Maynards will make buyers aware that (i) the Assets may contain polychlorinated biphenyls ("PCBs") and therefore, may be a regulated PCB Item as defined under Title 40, United States Code of Federal Regulations, Part 761 (40 CFR 761), (ii) the use, disposal and distribution in commerce, including the import and export, of these PCBs item(s) may be subject to specific requirements under Federal Regulations, 40 CFR 761, pursuant to the Federal Toxic Substances Control Act, and (iii) some States and local governments may have additional regulatory requirements on the use, disposal and distribution in commerce of PCBs.

(b)     Hilco/Maynards JV, as well as its representatives and agents, shall use, store, mark, handle, transport and/or properly dispose of the Assets, including all components and materials, in an environmentally safe manner and in compliance with all applicable federal, state and local laws.

(c)     Subject to clause (b) above, MLC hereby agrees to defend and hold Hilco/Maynards JV harmless from any and all claims, losses, damages and liabilities of any kind whatsoever which arise from or are in connection with the breach of any Environmental Laws or Environmental Permits except for those that arise from Hilco/Maynards JV's willful misconduct or gross negligence.

(d)     As used in this Agreement, "Environmental Laws" means all federal, state and local statutes, regulations, ordinances, rules, regulations and policies, all court orders and decrees and arbitration awards, and the common law, which pertain to environmental matters or contamination of any type whatsoever; and "Environmental Permits" means licenses, permits, registrations, governmental approvals, agreements and consents which are required under or are issued pursuant to Environmental Laws.

D.     Hilco/Maynards JV represents that it has read the *De Minimis* Asset Sale Order and covenants that (i) it shall conduct all sales of Assets in accordance with the terms of the *De Minimis* Asset Sale Order, and (ii) prior to the commencement of any auction or other sale procedure in respect of the Assets, it shall notify prospective purchasers that the completion of any sale with respect to an individual Asset for more than $1 million will be subject to the provision of notice by MLC in accordance with the terms of the *De Minimis* Asset Sale Order. Notwithstanding the foregoing, MLC shall be responsible for obtaining the consents required under the *De Minimis* Asset Sale Order and shall advise Hilco-Maynards prior to the sale of any Asset whether all consents necessary under the *De Minimis* Asset Sale Order have been obtained.

E.     Prior to any auction of Assets, Hilco/Maynards JV shall consult with MLC to (i) identify certain assets as major assets (the "Major Assets"), based on their estimated sale prices, and (ii) fix a minimum price bid (the "Minimum Price") for each Major Asset based on the

estimated purchase price of such Asset, in each case, with the prior written agreement of MLC. Hilco/Maynards JV shall not, without MLC's prior written consent, sell any Major Asset for a price less than the applicable Minimum Price agreed to in advance by MLC.

F.     Hilco-Maynards shall sell Assets only pursuant to the Bill of Sale.   Hilco-Maynards and MLC shall enter into a power of attorney in the form set forth as Exhibit D to enable Hilco-Maynards to enter into the Bills of Sale with purchasers of the Assets for and on behalf of MLC.

G.     Hilco/Maynards JV shall act in good faith in the best interests of MLC and shall use its best efforts to complete the sale of Assets during the Term of this Agreement with the objective of securing the greatest proceeds from sales of the Assets reasonably obtainable during such period.

H.     Hilco/Maynards JV shall at all times comply with applicable laws, rules and regulations and shall carry out its obligations under this Agreement with due care in a competent businesslike manner consistent with industry standards and practices.

## VI.    Indemnification

A.     MLC agrees to indemnify and hold Hilco/Maynards JV harmless from any claims, causes of action, damages and liabilities of any kind arising from or in connection with (i) MLC's breach of any of its representations, warranties or covenants hereunder, or (ii) any inaccurate statements or representations concerning the Assets made by MLC to Hilco/Maynards JV or any prospective buyer, excluding any claims resulting from the willful misconduct or gross negligence of Hilco/Maynards JV.

B.     Hilco/Maynards JV shall indemnify and hold MLC harmless from any and all claims. liabilities, losses, damages and expenses arising out of or based upon Hilco/Maynards JV's breach of any of its representations, warranties or covenants hereunder or gross negligence or willful misconduct on the part of Hilco/Maynards JV, or its representatives or agents.

## VII.    Insurance

A.     During Hilco/Maynards JV's access to and use of the Facilities, Hilco/Maynards JV shall procure and maintain an insurance policy in which the limits of public liability shall not be less than Two Million ($2,000,000.00) Dollars for each personal injury or death and not less than Five Hundred Thousand ($500,000.00) Dollars for each instance of property damage as determined by MLC in its sole judgment.  The policy shall name as an insured Hilco/Maynard JV. MLC, any lender of MLC, and other parties in interest as shall be designated by MLC as additional insured parties.

The policy shall contain a clause that the insurer will not cancel or change the policy without first giving the MLC or parties designated by MLC thirty (30) days' prior written notice.  Such insurance may be furnished by Hilco/Maynard JV under any blanket policy carried by it or under a separate policy therefore.  The insurance shall be issued by a company qualified and licensed to do business in the states for which the assets for purchase reside with general policyholder's

ratings of A or better as rated in the most current available "Best's" Insurance Reports and a copy of the paid up policy evidencing such insurance or a certificate or binder from the insurer certifying to the issuance of such policy shall be delivered to MLC or parties designated by MLC prior to any access to any Facility by Hilco/Maynards JV and upon renewals of such policy no less than thirty (30) days prior to the expiration of such coverage.

    B.   MLC agrees to maintain, during the Term, fire and other perils insurance in respect of all Assets until sold. MLC acknowledges that Hilco/Maynards JV is not an insurer of the Assets.

## VIII.  General Provisions

    A.   This Agreement is subject to the approval of the Court. The term of this Agreement (the "Term") shall extend until the earlier of (i) four years from the date of this Agreement unless all of the Assets or Facilities have been sold prior to the expiration of the Term, (ii) the termination of this Agreement (x) by MLC, upon a material breach of this Agreement by Hilco/Maynards JV, or (y) by Hilco/Maynards JV, upon a material breach of this Agreement by MLC, in each case, if such breach remains uncured after 7 days' written notice, or (iii) the date on which a plan of liquidation or reorganization for MLC (the "Plan") that provides for the transfer of any of MLC's remaining Assets to a successor of MLC has been declared effective except where MLC has assigned its rights and obligations under this Agreement with respect to any such transferred Assets to any such MLC successor; provided, however, MLC shall use commercially reasonable efforts to effectuate such assignment and MLC may effectuate such assignment without Hilco/Maynards JV's consent. In the event that this Agreement is terminated in accordance with Section VIII.A.(iii) above, the parties shall, within twenty days after the date of such termination, calculate the aggregate dollar value of (iv) the Buyers' Premiums that Hilco/Maynards JV has paid MLC in accordance with Section IV.B. hereof (the "Original Buyers' Premium Amount"), (v) the Buyers' Premium that Hilco/Maynards JV would have been required to pay if the revised rebate structure that is set forth on Exhibit E hereto (the "Revised Buyers' Premium Amount") were used instead, (vi) the Base Commission that Hilco/Maynards JV has charged MLC in accordance with Section IV.C. hereof (the "Original Base Commission Amount"), and (vii) the Base Commission that Hilco/Maynard's would have received if the revised commission structure that is set forth on Exhibit E hereto (the "Revised Commission Amount") were used instead. To the extent that the Original Buyers' Premium Amount less the Original Base Commission Amount (the "Original Amount") exceeds the Revised Buyers' Premium Amount less the Revised Commission Amount (the "Revised Amount"), MLC shall, within twenty days of finalizing such calculation, refund Hilco/Maynards JV the difference between the Original Amount and the Revised Amount in immediately available funds to a bank account notified by Hilco/Maynards JV to MLC in writing. In order to permit the successful marketing of the Assets, and subject to the earlier termination of this Agreement in accordance with Section VIII.A., MLC grants to Hilco/Maynards JV the exclusive right to sell the Assets during the Term. Upon expiration of the Term, this Agreement shall cease to have any effect and the obligations hereunder shall terminate, in each case, except for the following: (i) Hilco/Maynards JV's obligation to account for and pay to MLC any proceeds from the sale of any Assets pursuant to the terms of this Agreement, including any Buyers' Premiums, (ii) the provisions of Section V.C.(d), Section VI and Section VIII hereof.

B.    All references in this Agreement to "Hilco/Maynards JV" shall mean Hilco and Maynards, jointly and severally.

C.    This Agreement (including the Exhibits hereto) constitutes the entire agreement between the Parties and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

D.    Subject to Section VIII.A.(iii), this Agreement shall be binding upon MLC or any successor or assignee, including but not limited to, a Chapter 11 or 7 trustee, examiner, liquidation trustee or liquidator.

E.    The parties hereto agree, and MLC hereby expressly acknowledges, that Hilco/Maynards JV has not guaranteed to MLC any return from the sale of the Assets.

F.    MLC and Hilco/Maynards JV shall deal with each other fairly and in good faith so as to allow both Parties to perform their duties and earn the benefits of this Agreement.

F.    Except as otherwise set forth in this Agreement, MLC recognizes and acknowledges that the services to be provided by Hilco/Maynards JV pursuant to this Agreement are, in general, transactional in nature, and Hilco/Maynards JV will not be billing MLC by the hour nor maintaining time records, other than for internal hourly labor costs associated with the sale of the Assets or for costs incurred in connection with the Budget.  Except as otherwise set forth in this Agreement, it is agreed that Hilco/Maynards JV is not requested nor required to maintain time records and that its compensation will be fixed on the percentages set forth herein.

G.    Any correspondence or required notice shall be addressed as follows:

If to Hilco or Hilco/Maynards JV:   Hilco Industrial, LLC
5 Revere Drive
Suite 206
Northbrook, Illinois 60062
Tel. (847) 849-1100
Fax  (847) 897-0868
Attn:  Joseph Malfitano, VP, Assistant General Counsel

And

31555 West 14 Mile Road
Farmington Hills, MI 48334
Tel (248) 254-9999
Fax (248) 254-9995
Attn:  Robert Levy, President

If to Maynards:                    Maynards Industries (1991) Inc.
21700 Northwestern Highway
Southfield, MI 48075
Attn:  Taso Sofikitis, President

10

If to MLC:                          GM Global Headquarters
                                    Att. Mail Code 482-C37-A99
                                    300 Renaissance Dr.
                                    Detroit , Michigan 48265
                                    Attn: Christian B. Cook

                                    And

                                    Weil, Gotshal & Manges LLP
                                    767 Fifth Avenue
                                    New York, NY 10153
                                    Tel (212) 310-8000
                                    Fax (212) 310-8007
                                    Attn: Stephen Karotkin Esq.

H.      This Agreement shall be deemed drafted by the Parties hereto, and there shall be no presumption against either Party in the interpretation of this Agreement.

I.      By executing or otherwise accepting this Agreement, MLC and Hilco/Maynards JV acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein.

J.      MLC shall provide Hilco/Maynards JV with:

        •    all reasonably requested Asset information to the extent to the extent that such information is in MLC's possession; and

        •    information on prospect interest and evidence of all Asset inquiries, to the extent that MLC has such information and evidence.

K.      This Agreement may be executed in original counterparts, and if executed and delivered via facsimile shall be deemed the equivalent of an original.

L.      This Agreement creates no third-party beneficiaries.

M.      Any and all issues, disputes, claims or causes of action which relate or pertain to, or result or arise from this Agreement or Hilco/Maynards JV's services hereunder, shall be settled by the Court. The parties hereto irrevocably and unconditionally (a) agree not to commence any such action, suit or proceeding except in such court), (b) waive any objection to the laying of venue of any such action, suit or proceeding in any such courts and (c) waive and agree not to plead or claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum

N.      Neither MLC, nor Hilco, Maynard or Hilco/Maynards JV will be liable to any other person for any consequential, incidental, indirect, special or punitive

11

damages, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof.

O.    Hilco, Maynard and Hilco/Maynards JV shall not be entitled to set-off any obligation hereunder against any claim asserted by them, except with respect to Hilco/Maynards JV's right to reimbursement under this Agreement.

## IX.    Miscellaneous

A.    This Agreement shall be governed by and interpreted under the laws of the State of New York (without regard to its principles of conflicts of laws).    The Parties hereto irrevocably and unconditionally (a) consent to submit to the jurisdiction of the Court, or, if the Bankruptcy Case has closed, the courts of the State of New York and of the United States of America located in the State of New York, for any action, suit or proceeding arising out of or relating to this Agreement (and the Parties irrevocably and unconditionally agree not to commence any such action, suit or proceeding except in such courts), (b) waive any objection to the laying of venue of any such action, suit or proceeding in any such courts and (c) waive and agree not to plead or claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.    For the purposes of this Section, "Bankruptcy Case" means the jointly administered proceedings under Case No. 09-50026 pursuant to voluntary petitions for relief under the chapter 11 of title 11 of the Bankruptcy Code filed by MLC and certain of its subsidiaries.

B.    Subject to Section VIII.A.(iii). hereof, this Agreement may not be transferred or assigned without the express written consent of the other Parties.

C.    The Parties hereto are acting as independent contractors and nothing contained herein shall be deemed to create any other type of agency, partnership, joint venture or other relationship.

D.    This Agreement may not be modified or amended except by an instrument in writing executed by an authorized representative of each party to this Agreement.

E.    If any part or subpart of this Agreement is found or held to be invalid, that invalidity shall not affect the enforceability and binding nature of any other part of this Agreement.

*            *            *

12

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date written below.

**MOTORS LIQUIDATION COMPANY**
**(F/K/A GENERAL MOTORS CORPORATION)**

By: Christian B. Cook
Title: Vice President, Manufacturing Assets
Date: 12-NOV-09

**HILCO INDUSTRIAL, LLC**

By: Robert Levy
Title: President, Hilco Industrial
Date: 11/10/09

**MOTORS LIQUIDATION COMPANY**
**(F/K/A GENERAL MOTORS CORPORATION)**

By: Ted Stenger
Title: Executive Vice President
Date: 11/24/09

**MAYNARDS INDUSTRIES (1991) INC.**

By: Taso Sofikitis
Title: President
Date: 11/12/09

# EXHIBIT A

## FACILITIES

| Facility | City |
|---|---|
| Moraine Assembly | Moraine, OH |
| Massena Powertrain | Massena, NY |
| Pittsburgh Stamping | West Miffin, PA |
| Wilmington Assembly | Wilmington, DE |
| Grand Rapids Stamping | Wyoming, MI |
| Pontiac Assembly | Pontiac, MI |
| Pontiac Stamping | Pontiac, MI |
| Livonia Powertrain | Livonia, MI |
| Mansfield Stamping | Mansfield, OH |
| Parma Powertrain | Parma, OH |
| Willow Run Powertrain | Ypsilanti, MI |
| Fredericksburg Powertrain | Fredericksburg, VA |
| Flint North Powertrain | Flint, MI |
| Shreveport Assembly | Shreveport, LA |
| Indianapolis Stamping | Indianapolis, IN |

## EXHIBIT B

*DE MINIMIS* ASSET SALE ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------x
                                               :
**In re**                                      :         **Chapter 11 Case No.**
                                               :
**MOTORS LIQUIDATION COMPANY,** *et al.,*      :         **09-50026 (REG)**
        f/k/a **General Motors Corp.,** *et al.*   :
                                               :         **(Jointly Administered)**
                **Debtors.**                   :
                                               :
---------------------------------------------------x

**ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 363 (A)**
**ESTABLISHING PROCEDURES FOR THE DISPOSITION OF**
***DE MINIMIS* ASSETS, AND (B) AUTHORIZING THE DEBTORS TO**
**(i) PAY RELATED FEES, AND (ii) ASSUME, ASSUME AND ASSIGN, OR**
<u>**REJECT RELATED EXECUTORY CONTRACTS OR UNEXPIRED LEASES**</u>

Upon the Motion, dated July 29, 2009 (the "**Motion**"),[1] of Motors Liquidation

Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession

(collectively, the "**Debtors**"), pursuant to sections 105(a) and 363 of title 11 of the United States

Code establishing procedures for the sale of *de minimis* assets, whether by private sale or

auction, including the payment of related brokers' commissions and auctioneer fees and the

assumption, assumption and assignment, or rejection of related executory contracts or unexpired

leases, all as more fully set forth in the Motion; and due and proper notice of the Motion having

been provided, and it appearing that no other or further notice need be provided; and the Court

having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set

---
[1]     Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such
terms in the Motion.

forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED THAT:

1.      The relief requested in the Motion is GRANTED as provided herein.

2.      The *De Minimis* Sale Procedures are approved as follows:

A.   <u>Sale Price Less than or Equal to $1 Million</u>

3.      The Debtors are hereby authorized to sell any asset for total consideration of a value less than or equal to $1 million (a "**Non-Noticed *De Minimis* Sale**") without further Court approval, and without providing notice of the Non-Noticed *De Minimis* Sale to any party, whether by private sale or by auction; <u>provided</u> <u>that</u> (a) all assets with known existing environmental contamination, and (b) the Debtors' interests in the Centerpoint Business Campus in Pontiac, Michigan shall only be sold pursuant to the Noticed *De Minimis* Sale procedures (as defined below). The Debtors are also authorized to take any actions that are reasonable and necessary to close the Non-Noticed *De Minimis* Sale and obtain the sale proceeds.

4.      If the Debtors seek to assume, assume and assign, or reject executory contracts or unexpired leases relating to and in connection with an asset sale that would otherwise qualify as a Non-Noticed *De Minimis* Sale, the Debtors shall seek to sell those assets pursuant to the Noticed De Minimis Sale procedures (as defined below). In addition, if the Debtors seek to sell assets encumbered by liens (other than assets encumbered solely by liens granted in favor of the DIP Lenders, as defined and described in more detail below) in connection with an asset sale that would otherwise qualify as a Non-Noticed *De Minimis* Sale, the Debtors shall seek to obtain the consent of the lienholder. If the Debtors are unable to obtain

the consent of the lienholder, the Debtors may sell the encumbered assets pursuant to the Noticed

*De Minimis* Sale procedures.

B.    <u>Sale Price Greater than $1 million but Less than or Equal to $15 Million</u>

5.    The Debtors are hereby authorized to sell any asset for total consideration

of a value that is greater than $1 million but less than or equal to $15 million (a "**Noticed *De***

***Minimis* Sale**"), without further Court approval, after providing notice of the Noticed *De*

*Minimis* Sale to certain parties in accordance with the following procedures.

6.    If the Debtors propose a Noticed *De Minimis* Sale, the Debtors will serve a

notice of such proposed sale (a "**Sale Notice**") by facsimile, email, overnight delivery, hand

delivery, or first class mail on the following parties:

(i)     the United States Trustee for the Southern District of New York (the "**U.S. Trustee**");

(ii)    counsel for the statutory committee of unsecured creditors (the "**Creditors' Committee**");

(iii)   counsel for the lenders under that certain Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of July 10, 2009, among Motors Liquidation Company (f/k/a General Motors Corporation), as Borrower, the Guarantors party thereto, and the Lenders party thereto from time to time;

(iv)    the Office of the United States Attorney for the Southern District of New York, 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz, Esq.);

(v)     the state Attorney General for the state in which any real property to be sold is located;

(vi)    the treasurer or other appropriate representative of the local taxing jurisdiction or governmental unit in which the property to be sold is located;

(vii)   all known parties holding or asserting liens or encumbrances on the assets that are the subject of the proposed Noticed *De Minimis* Sale and their respective counsel, if known; and

(viii)  the counterparties (or such counterparty's counsel) to all executory contracts or unexpired leases related to the property subject of the Sale Notice that the Debtors are seeking to assume and assign to the purchaser of the assets, or reject ((i)-(vi) collectively, the **"Interested Parties"**).

Interested Parties shall have ten (10) business days from service of the Sale Notice to file and serve any objections to a Noticed *De Minimis* Sale (the **"Notice Period"**).

7.  The Sale Notice will specify:

(i)  a description of the asset proposed to be sold, its location, and a statement whether, at the time of the notice, there is any known existing environmental contamination of such asset;

(ii)  an identification of the executory contracts and unexpired leases, if any, to be assumed and assigned, or rejected in connection with the sale, the amounts required to cure any defaults pursuant to section 365(b) of the Bankruptcy Code, and a statement regarding the adequate assurance of future performance by the proposed assignee, consistent with section 365 of the Bankruptcy Code;

(iii)  the identities of any parties holding or asserting liens or other interests or potential interests in the property and a statement indicating how the Debtors propose to satisfy section 363(f) with respect thereto;

(iv)  an affidavit of the broker or auctioneer, if any, pursuant to Rule 2014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), that identifies the broker or auctioneer and the amount of the proposed commissions and contains the disclosures required by Bankruptcy Rule 2014; and

(v)  instructions regarding the procedures to assert objections to the Noticed *De Minimis* Sale.

8.  If the transaction is to be a private sale, the Sale Notice will also specify:

(i)  the identity of the proposed purchaser (including a statement indicating whether the proposed purchaser is an "insider" as defined in section 101(31) of the Bankruptcy Code); and

(ii)  the major economic terms and conditions of the Noticed *De Minimis* Sale;[2]

---

[2]  This information may be provided by attaching the applicable contract or contracts to the Sale Notice.

9.    If the transaction is to be by auction, the Sale Notice will also specify:

    (i)    the date, time and place of the auction;

    (ii)   the minimum acceptable bid; and

    (iii)  any terms and conditions of sale to be imposed at the auction.

10.    Objections to a Noticed *De Minimis* Sale ("**Objections**") must be in writing, filed with the Court, and served on the Interested Parties and counsel to the Debtors so as to be received by all such parties prior to 4:00 p.m. (Eastern Time) on the last day of the Notice Period. Each Objection must state with specificity the grounds for the Objection.

11.    If any significant economic terms of a Noticed *De Minimis* Sale are amended after transmittal of the Sale Notice, but prior to the expiration of the Notice Period, the Debtors will serve a revised Sale Notice on all Interested Parties describing the proposed Noticed *De Minimis* Sale, as amended. If a revised Sale Notice is required, the Notice Period will expire on the later of the original Notice Period expiration date or five (5) calendar days from service of the revised Sale Notice.

12.    If an Objection to a Noticed *De Minimis* Sale is properly filed and served by an Interested Party:

    (i)    The Debtors may negotiate with the party filing the Objection and may change the terms of the sale without the requirement of further notice, as long as the revised terms are no more onerous to the Debtors than those set forth in the Sale Notice.

    (ii)   The Noticed *De Minimis* Sale may not proceed absent (a) withdrawal of the Objection; or (b) entry of an order by the Court specifically approving the Noticed *De Minimis* Sale.

    (iii)  The Debtors may schedule a hearing on the Noticed *De Minimis* Sale and, upon the scheduling of such a hearing, the Debtors will provide notice of the hearing on the party filing the Objection and the Interested Parties.

13.    If no Objection to a Noticed *De Minimis* Sale is filed and served by an

Interested Party consistent with the Noticed *De Minimis* Sale Procedures, such Noticed *De*

*Minimis* Sale will be deemed final and fully authorized by the Court under the terms of this

Order, including the payment of related brokers' commissions or auctioneer fees, if applicable,

and the assumption, assumption and assignment, or rejection of executory contracts or unexpired

leases, if applicable (including the payment of cure costs related thereto), and no further notice or

Court approval to consummate the Noticed *De Minimis* Sale will be required or necessary.

14.    The Debtors may consummate a Noticed *De Minimis* Sale prior to

expiration of the applicable Notice Period if they obtain each Interested Party's written consent

to such Noticed *De Minimis* Sale.

15.    In the case of a Noticed *De Minimis* Sale to proceed by private sale, in the

event the Debtors receive a competing bid the Debtors will only consummate a sale upon

consultation with the Creditors' Committee.

16.    In the case of a Noticed *De Minimis* Sale to proceed by auction, the

Debtors may sell the applicable asset at the auction for any price above the minimum bid, even if

the sale price exceeds the applicable threshold for the *De Minimis* Sale Procedures.

C.    Effects of Sale

17.    The consent of the DIP Lenders is not required to sell estate assets, and all

buyers will take title to the assets free and clear of the DIP Lenders' liens, claims, encumbrances

and other interests, pursuant to section 363(f) of the Bankruptcy Code.  Additionally, pursuant to

section 363(f) of the Bankruptcy Code, all sales of property and interests in property pursuant to

this Order shall be free and clear of all liens, claims and encumbrances, if any, and any such

valid, and where applicable perfected, liens, claims, and encumbrances, including liens, claims,

and encumbrances of the DIP Lenders, will attach to the proceeds of the sale, subject to the

rights, claims, defenses and objections, if any, of the Debtors or the Creditors' Committee.

Notwithstanding the foregoing, nothing in this Order shall be construed to invalidate or

subordinate any duly perfected, non-voidable, valid liens of governmental units for personal

property taxes, real property taxes, special taxes, special assessments, and infrastructure

improvement taxes arising before or after the commencement of these chapter 11 cases to the

extent that such liens of governmental units take priority over previously granted and perfected

consensual liens or security interests in property of the Debtors under applicable non-bankruptcy

law.

18.    All buyers will take assets sold by the Debtors pursuant to the *De Minimis*

Sale Procedures subject to the terms of the documentation executed in connection with the sale,

which may include provisions that the buyers are taking the assets "as is" and "where is,"

without any representations or warranties from the Debtors as to the quality or fitness of such

assets for either their intended purpose or any particular purpose.

19.    All sales consummated in compliance with the *De Minimis* Sale

Procedures shall be deemed to be the result of an arm's-length transaction and the purchaser

shall be deemed a good faith purchaser and shall be entitled to the protections of section 363(m)

of the Bankruptcy Code.

20.    Upon the closing of a private sale or auction pursuant to the *De Minimis*

Sale Procedures above, the Debtors may (a) assume any executory contract or unexpired lease to

be assigned to a proposed purchaser or other third party as a part of the proposed sale and

provide for the payment of the related cure amount and (b) reject any executory contract or

unexpired lease identified for rejection in the Sale Notice.  The counterparties to any executory

contracts or unexpired leases identified in the Sale Notice pursuant to the *De Minimis* Sale

Procedures are hereby barred from asserting any further cure claims in respect of such executory

contracts or unexpired leases after the objection period for a Noticed *De Minimis* Sale has

passed.

21.    With respect to all Noticed *De Minimis* Sales and Non-Noticed *De*

*Minimis* Sales consummated pursuant to this Order, this Order shall be sole and sufficient

evidence of the transfer of title to any particular purchaser, and all such sales consummated

pursuant to this Order shall be binding upon and shall govern the acts of all persons and entities

who may be required by operation of law, the duties of their office, or contract, to accept, file,

register or otherwise record or release any documents or instruments, or who may be required to

report or insure any title or state of title in or to any of the property sold pursuant to this Order,

including without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, administrative agencies, governmental departments,

secretaries of state, and federal, state, and local officials, and each of such persons and entities is

hereby directed to accept this Order as sole and sufficient evidence of such transfer of title and

shall rely upon this Order in consummating the transactions contemplated hereby.

D.    The Quarterly Report

22.    On or before the 30th day after the commencement of each fiscal quarter

commencing with the fiscal quarter beginning on October 1, 2009, the Debtors shall file and

serve on the Creditors' Committee a report summarizing (i) any Noticed *De Minimis* Sales that

were consummated pursuant to the *De Minimis* Sale Procedures during the immediately

preceding fiscal quarter and (ii) any Non-Noticed *De Minimis* Sales for consideration greater

than $250,000 that were consummated pursuant to the *De Minimis* Sale Procedures during the immediately preceding fiscal quarter (a "**Quarterly Report**"). With respect to each applicable sale, each Quarterly Report shall include:

    (i)    a description of the assets sold;

    (ii)    the identity of the purchaser and any relationship such party has with the Debtors; and

    (iii)    the total consideration received in connection with the sale.

E.    <u>Miscellaneous</u>

    23.    The Debtors are authorized to pay reasonable brokers' commissions and auctioneer fees for brokers and auctioneers utilized in connection with any sales pursuant to the *De Minimis* Sale Procedures authorized herein.

    24.    Any (a) sale to an "insider," as defined in section 101(31) of the Bankruptcy Code, (b) Non-Noticed *De Minimis* Sale of real property, and (c) Non-Noticed *De Minimis* Sale of other property for total consideration of a value in excess of $500,000 may only be consummated after consultation with the Creditors' Committee.

    25.    To the extent applicable, the ten-day stay of Federal Rule of Bankruptcy Procedure 6004(h) is hereby waived, and this Order shall be effective immediately. Furthermore, Non-Noticed *De Minimis* Sales and Noticed *De Minimis* Sales shall be deemed authorized pursuant to the terms of this Order and no further or additional waivers of the ten-day stay of Federal Rule of Bankruptcy Procedure 6004(h) shall be required for the Debtors to consummate a Non-Noticed *De Minimis* Sale or a Noticed *De Minimis* Sale, subject to compliance with the notice and other procedures set forth herein.

    26.    The Debtors are authorized, in consultation with the Creditors' Committee, to execute and deliver all instruments and documents, and take such other action as

NOV-30-2009  13:42                                                                                              P.12/23

may be necessary or appropriate to implement and effectuate the transactions contemplated by this Order.

27.     Nothing in this Order or any purchase agreement entered into under this Order releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order.  Nothing in this Order shall be deemed to allow the Debtors to abandon real or personal property in violation of any applicable state or federal laws or regulations, including but not limited to environmental laws and regulations.

28.     Nothing in this Order shall be construed to prevent the Debtors, in their sole discretion, from seeking this Court's approval at any time of any proposed sale after notice and an opportunity for a hearing.

29.     No further orders of this Court are necessary to effectuate the terms set forth herein for the transactions contemplated herein.

30.     Nothing in this Order shall authorize the Debtors to sell assets they do not own, including any leased equipment.

31.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
       *August 18, 2009*

                                        *s/ Robert E. Gerber*
                                        United States Bankruptcy Judge

## **EXHIBIT C**

BILL OF SALE

## BILL OF SALE AND AGREEMENT
### (Ex Works)

This Bill of Sale and Agreement, dated as of _____, is by and between MOTORS LIQUIDATION COMPANY, acting through its undersigned Sales Agent ("**MLC**") and the undersigned Buyer ("**Buyer**").

1.  In consideration of $_____ paid to MLC, MLC does hereby sell, assign, transfer, and set over to Buyer all right, title, and interest of MLC in and to the personal property identified on **Exhibit A** ("**Property**"). Delivery of the Property shall occur pursuant to Sections 4 and 5 below and MLC shall have no liability to Buyer, or anyone claiming through Buyer, for any failure to deliver the Property even if due to the negligence of MLC or its agents.

2.  MLC warrants that it is the owner of the Property free and clear of any liens or other encumbrances. Except for warranty of title, the Property is sold AS IS, WITH ALL FAULTS AND WITHOUT WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OF FITNESS FOR PARTICULAR PURPOSE AND ANY WARRANTY OF NON-INFRINGEMENT OF THE PROPRIETARY RIGHTS OF THIRD PARTIES; MLC HEREBY DISCLAIMS AND BUYER HEREBY WAIVES ANY OBLIGATION, LIABILITY, RIGHT, CLAIM, OR DEMAND IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, PATENT INFRINGEMENT, OR OTHERWISE WITH RESPECT THERETO. Without limiting the generality of the foregoing, Buyer acknowledges and agrees that General Motors Corporation neither represents nor warrants that the Property will operate satisfactorily in Buyer's facilities or that any such items comply with any applicable federal, state, or local laws, ordinances, regulations, or standards, including, but not limited to, regulations and standards promulgated under federal and state environmental or occupational safety and health laws.

3.  Buyer acknowledges that it has been afforded full and complete opportunity to inspect and investigate, has inspected and investigated the Property, and is purchasing the Property "as is," based solely upon its own evaluation of the property.

4.  The sale of the Property is Ex Works; delivery of the Property takes place, and title and risk of loss to the Property passes from MLC to Buyer, upon the commencement of the earliest of disconnection, dismantling, removal, loading or shipment thereof, at MLC's facility, without movement. Buyer shall promptly (and no later than [●], 2009), at a time during regular business hours duly and reasonably scheduled in advance with MLC, remove the Property from MLC's facility. Should Buyer fail to remove the Purchased Assets pursuant to this Section 4, the Property shall be deemed to be abandoned and forfeited to MLC, and MLC may, at its discretion, dispose of the Property in any manner it deems fit without any responsibility to Buyer, including with respect to the Purchase Price.

    A.  MLC shall be responsible for, and at its own cost and expense shall effect, the disconnecting of the Property from all utility outlets.

    B.  Buyer shall be responsible for, and at its own cost and expense shall effect, the dismantling, packaging, preparation for shipment, loading, shipment (including without limitation, skidding, movement to, and removal from MLC's facility), and transportation of the Property from MLC's facility to its ultimate destination. Buyer shall cause the Property to be completely dismantled and removed from MLC's facility on or before date agreed upon by Buyer and Sales Agent.

    C.  Such dismantling, packaging, preparation for shipment, loading, shipment, and other activities relating thereto shall be performed in a careful and workmanlike manner without damage to the premises and facilities of MLC and at such times and in such manner reasonably approved by MLC so as to not interfere with or disrupt other activities at MLC's facility. Buyer, its employees, agents, representatives, and contractors, shall comply with all applicable federal, state, and local laws and regulations and all applicable MLC safety rules and regulations while on MLC's premises. In the event Buyer does not completely dismantle and remove the Property on or before the date set forth above, MLC may dismantle and move such Property to a place of its reasonable choice at Buyer's expense.

5.  If heavy moving, lifting or other rigging equipment is required to remove the Property, Buyer shall obtain, prior to the commencement of the disconnection, dismantling, removal, loading or shipment of the Property, and maintain, until the Property has been completely removed and transported from MLC's facility, the following types of insurance coverage from one or more reputable carriers, with the corresponding minimum limits set forth: (i) Public liability insurance with a minimum limit of $2,000,000 for each personal injury or death and $500,000 for each instance of property damage, covering the all aspects of the removal of the Property; (ii) workers compensation insurance with minimum statutory limits; and (iii) employee liability insurance with minimum limits of $500,000 for each employee for bodily injury by accident, and $500,000 for each employee for bodily injury by disease. MLC shall be named as an additional insured under such liability insurance policy (excluding workers' compensation and employers' liability policies). Buyer shall not be permitted to commence disconnection, dismantling, removal, loading or shipment of the Property without providing to MLC evidence (to the satisfaction of MLC) of compliance with this Section 5.

6.  In the event (i) the Property is lost or destroyed by any cause whatsoever (excluding, however, any caused by the acts or omissions of Buyer or its agents), or (ii) MLC is prohibited from selling the Property to Buyer by the operation of the order (the "**Order**") that the United States Bankruptcy Court for the Southern District of New York entered on August 18, 2009 (Docket Number 3830), this Agreement shall terminate with respect to such items. In such case, any purchase price paid will be returned

to the Buyer. MLC shall have no other liability to the Buyer with respect to any Property that is lost, damaged or destroyed or that MLC is prohibited from selling pursuant to the Order.

7. **MLC SHALL NOT BE LIABLE TO BUYER FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR EXEMPLARY DAMAGES ARISING OUT OF ANY ACT OR OMISSION REFERRED TO IN OR RELATED TO THE PERFORMANCE OF THIS AGREEMENT, OR TO THE USE, OPERATION, OR MAINTENANCE OF THE PROPERTY BY ANY PERSON, WHETHER OCCASIONED BY BREACH OF CONTRACT, BREACH OF WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, ENVIRONMENTAL PATENT INFRINGEMENT, OR OTHERWISE.**

8. Buyer, at its sole expense, shall defend, indemnify and hold harmless MLC, its officers, directors, agents, and employees, from all claims, suits, liabilities, damages, and losses (including death, personal injury and property damage), judgments, obligations, fines, penalties, costs of defending or settling (including attorney's fees and court costs) of any kind or character (whether based on breach of contract, breach of warranty, tort (including strict liability), intellectual property rights or otherwise), arising out of or related to (a) the breach by Buyer of its obligations under this Agreement, or (b) the acts or omissions of Buyer, its agents or employees, (c) the transportation, operation, use, handling, storage, sale, transfer or disposal of the Property, or any products or materials produced from, used with or relating to the Property after delivery of the Property to Buyer.

9. Buyer acknowledges that the sale of the Property does not include any sale, transfer, or assignment of any patents, licenses, copyrights, or technical or proprietary information with respect to the Property. If Buyer requires any patent, license, copyright, or technical or proprietary information to operate any Property, Buyer must obtain the applicable patent, license, copyright or technical or proprietary information from the owner of such proprietary information and Buyer shall, at its sole expense, defend, indemnify and hold harmless MLC, its officers, directors, agents, and employees, from all claims, suits, liabilities and losses associated with any unlicensed or unauthorized use of the Property including, without limitation, any unlicensed or unauthorized use of any patents, licenses, copyrights, or technical or proprietary information that is associated with, forms part of, or is contained in the Property.

10. Buyer also acknowledges that it is not acquiring any rights in or to any trade names or trademarks of General Motors Company or MLC under this Agreement, and agrees not to use any trade name or trademark of General Motors Company or MLC in connection with the manufacture, sale, or service of any goods produced with the Property. Buyer shall conspicuously mark and identify any goods produced by it utilizing the Property as being the products of Buyer. Buyer shall promptly, and in event before disposing of or parting with the Property, remove any trademark or trade name of General Motors Company or MLC from the Property.

11. Buyer also acknowledges that the Property and all products and materials produced or used with, or relating to, the Property may be subject to federal, state or local environmental laws or regulations, including, but not limited to CERCLA, RCRA, TSCA and DOT. MLC hereby informs Buyer that the Property may contain polychlorinated biphenyls ("**PCBs**") and therefore, may be a regulated PCB Item as defined under Title 40, United States Code of Federal Regulations, Part 761 (40 CFR 761). The use, disposal and distribution in commerce, including the import and export, of these PCBs Item(s) may be subject to specific requirements under Federal Regulations, 40 CFR 761, pursuant to the Federal Toxic Substances Control Act. Some states and local governments may have additional regulatory requirements on the use, disposal and distribution in commerce of PCBs. Buyer, as well as its representatives and agents, shall use, store, mark, handle, transport and/or properly dispose of the Property and all related products, components and materials in an environmentally safe manner and in compliance with all applicable federal, state and local laws.

12. Buyer shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the Property or goods produced with the Property, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, and occupational health/safety. Buyer further represents that it will not utilize slave, prisoner or any other form of forced or involuntary labor in connection with the refurbishment or use of the Property or goods produced with the Property. At MLC's request, Buyer shall certify in writing its compliance with the foregoing.

13. Buyer shall pay any and all sales, use, transfer, filing, and other similar taxes or governmental charges with respect to the sale or purchase of the Property.

14. This Bill of Sale and Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns. This Bill of Sale and Agreement shall be governed by, and construed in accordance with, the laws of the jurisdiction of the MLC plant at which the Property was located.

15. This Bill of Sale and Agreement constitutes the entire agreement between the parties, and supersedes all prior and contemporaneous agreements and negotiations. This Bill of Sale and Agreement may only be modified, amended, or supplemented by written amendment executed by authorized representatives of the parties. Failure by either party to enforce any term or condition herein or to exercise any of its rights hereunder, shall not be construed as thereafter waiving such terms,

2

conditions or rights.  In no event shall any course of dealing, custom or usage of trade modify, alter or supplement any of the terms or provisions contained herein.

3

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale and Agreement to be duly executed on the date set forth above.

Buyer:_____

By _____

Name: _____

Title: _____

Address: _____

Date:_____

**Sales Agent For Motors Liquidation Company:**

[Hilco Industrial, LLC] / [Maynards Industries (1991) Inc.]

By _____

Name: _____

Title: _____

Address: _____

## Certification of Compliance with Export Controls Laws

**"THE UNDERSIGNED" hereby acknowledges responsibility to, and agreement to, comply with all applicable export control laws for any item obtained from Motors Liquidation Company. "THE UNDERSIGNED" understands that Motors Liquidation Company reserves the right to reject any transaction determined to be in violation, or possible violation, of any applicable export control laws.**

Please indicate the ultimate destination for the assets purchased.

_____
(Print Ultimate Country Destination)

_____
Signature

_____
Printed Name

_____
Company Represented (if applicable)

_____
Date

4

5

5

## EXHIBIT D

POWER OF ATTORNEY

NOV-30-2009  13:42                                                                                    P.20/23

## LIMITED POWER OF ATTORNEY
## PURSUANT AND SUBJECT TO ASSET MARKETING AGREEMENT

Know all by these presents, that Motors Liquidation Company ("MLC") hereby makes, constitutes and appoints each of Hilco Industrial, LLC ("Hilco") and Maynards Industries (1991) Inc. ("Maynards", and together with Hilco, "Hilco-Maynards"), acting together or individually, as MLC's true and lawful attorneys-in-fact, with power and authority on behalf of and in the name, place and stead of MLC to:

(1)    market, auction and sell Assets pursuant to and in accordance with the terms of that certain Asset Marketing Agreement by and among MLC, Hilco and Maynards, dated as of November [●], 2009 (the "Marketing Agreement");

(2)    execute, deliver and perform the obligations of MLC under Bills of Sale pursuant to and in accordance with the terms of the Marketing Agreement; and

(3)    perform such other acts as are required to be conducted on behalf of MLC pursuant to Hilco-Maynards' obligations under the Marketing Agreement;

*provided, however,* that, (A) this Power of Attorney is subject, in all respects, to the Marketing Agreement, and power and authority to act on behalf or in the name of MLC is granted hereby to Hilco-Maynards only insofar as the same is exercised pursuant to, for the purpose of, and consistent with, the Marketing Agreement; (B) this Power of Attorney, and the power and authority granted to Hilco-Maynards hereby, is not coupled with an interest and may be revoked at any time by MLC without any obligation on the part of MLC; and (C) this Power of Attorney, and the power and authority granted to Hilco-Maynards hereby, shall remain in force and effect only for the Term of the Marketing Agreement or, if earlier, until revoked by MLC in a signed writing delivered to each of Hilco and Maynards.

Capitalized terms not defined herein shall have the meanings ascribed thereto in the Marketing Agreement. References to Hilco-Maynards, shall mean Hilco and Maynards, acting together or individually.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this ____ day of November, 2009.

Motors Liquidation Company
By: _____
Name:
Title:

STATE OF _____        )
                             )ss
COUNTY OF _____        )

On this ____ day of November, 2009, _____ personally appeared before me, and acknowledged that he executed the foregoing instrument on behalf of Motors Liquidation Company for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public

My Commission Expires:

## EXHIBIT E

### REVISED BUYERS' PREMIUM AND BASE COMMISSION STRUCTURE

**(A) Buyers' Premium:**

| Sales Range US$ (net of taxes) | Rebate to MLC |
|---|---|
| $0-$10,000,000 | 0% |
| $10,000,001-$15,000,000 | 7.41% |
| $15,000,001-$20,000,000 | 14.8% |
| $20,000,000-$30,000,000 | 22.2% |
| Above $30,000,000 | 29.6% |

**(B) Base Commission:**

| Sales Range US$ (net of taxes) | Base Commission |
|---|---|
| $0-$30,000,000 | 0% |
| $30,000,001-$35,000,000 | 0% |
| $35,000,001-$40,000,000 | 0% |
| $40,000,001-$45,000,001 | 0% |
| $45,000,001-$50,000,000 | 0% |
| Above $50,000,000 | 0% |

**Example:**

The Agreement is terminated in accordance with Section VIII.A.(iii) after $12,000,000 of Assets have been sold.

Hilco/Maynards JV has collected a Buyer's Premium of $1,620,000 (i.e., 13.5% of the total sale proceeds).

In accordance with Section IV.B. of the Agreement, Hilco/Maynards JV has paid MLC the following rebate:

22.22% of Buyers' Premium on $10,000,000, plus 14.81% of Buyers' Premium on $2,000,000
OR
(22.22% X 13.5% X $10,000,000) + (14.81% X 13.5% X $2,000,000) = $339,957.00

# Note: No Base Commission would have been paid at this sales level pursuant to Section IV.C. of the Agreement.

Under the revised Buyers' Premium and Base Commission structure as set forth above:

Hilco/Maynards JV would have collected a Buyers' Premium of $1,620,000 (i.e., 13.5% of the total sale proceeds).

18

MLC would have been paid:

0% of the Buyers' Premium on $10,000,000, plus 7.41% of the Buyers' Premium on $2,000,000
OR
$(0\% \times 13.5\% \times \$10,000,000) + (7.41\% \times 13.5\% \times \$2,000,000) = \$20,007.00$

THEREFORE

Pursuant to Section VIII.A.(iii), MLC would return $339,957 - $20,007.00 = $319,950 to Hilco/Maynards JV.

# **Exhibit B**

## **Malfitano Affidavit**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re                                          :         Chapter 11 Case No.
                                               :
MOTORS LIQUIDATION COMPANY, *et al.*,          :         09-50026 (REG)
    f/k/a General Motors Corp., *et al.*          :
                                               :
                 Debtors.          :         (Jointly Administered)
                                               :
------------------------------------------------------------x

## AFFIDAVIT OF HILCO INDUSTRIAL, LLC
### PURSUANT TO BANKRUPTCY RULE 2014 AND LOCAL RULE 2014-1

STATE OF ILLINOIS            )
                               ) ss:
COUNTY OF COOK               )

        Joseph A. Malfitano, being duly sworn, hereby deposes and says:

        1.        I am a Vice President and the Assistant General Counsel of Hilco Trading

LLC, a member of Hilco Industrial, LLC ("**Hilco**" or the "**Company**"), which maintains an

office at 5 Revere Drive, Suite 206, Northbrook, Illinois 60062.

        2.        Motors Liquidation Company (f/k/a General Motors Corporation) and

certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11

cases (collectively, the "**Debtors**"), have requested that the Company provide services in

connection with the proposed sale(the "***De Minimis* Sale**") of certain assets of the Debtors

pursuant to the Order Pursuant to Sections 105 and 363 of the Bankruptcy Code (A) Establishing

Procedures for the Disposition of *De Minimis* Assets and (B) (i) Authorizing the Debtors to Pay

Related Fees, and (ii) Assume, Assume and Assign, or Reject Related Executory Contracts or

Unexpired Leases entered by the United States Bankruptcy Court for the Southern District of

New York (the "**Bankruptcy Court**") in the Debtors' chapter 11 cases on August 18, 2009

[Docket No. 3830] (the "**Sale Order**").  The Company has consented to provide such services.

        3.      I make this declaration on behalf of the Company in connection with the

*De Minimis* Sale in accordance with the Sale Order, Rule 2014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2014-1 of the Local Rules of the

Bankruptcy Court.

        4.      To review potential conflicts of interest, as well as to determine all

"connections" (as such term is used in Bankruptcy Rule 2014) to the Debtors, their creditors,

other parties in interest, their respective attorneys and accountants, the United States Trustee for

the Southern District of New York (the "**U.S. Trustee**") or any person employed in the office of

the U.S. Trustee, the Debtors provided the Company with a comprehensive list of the types of

entities who may have contacts with the Debtors.  Except as set forth on **Exhibit A,** to the best of

my knowledge, the Company does not have any connection with or any interest adverse to the

Debtors, their creditors, or any other party in interest or their respective attorneys and

accountants.

        5.      The Company is duly licensed and is authorized to conduct auctions in

accordance with the Asset Marketing Agreement, attached hereto as **Exhibit B** (the "**AMA**").

The Company has the relevant experience and expertise to assist the Debtors in connection with

the *De Minimis* Sale.  The Company is a leading international industrial auctioneer and liquidator

specializing in valuing and converting idle capital equipment into cash through a multitude of

creative sales methodologies and disposition channels including auction, liquidation, private

treaty and sealed bid sales.  Headquartered in Farmington Hills, Michigan, the Company operates

offices in Chicago, Illinois; Grand Rapids, Michigan; Birmingham, Alabama; London,

Birmingham, Leeds and Southampton, England; Mexico City, Monterrey, Guadalajara,

Villahermosa and Bajio, Mexico; and Toronto, Canada.

6.    The Debtors and the Company have agreed that in exchange for services

rendered by the Company in connection with the sale of the assets as set forth in the AMA, the

Debtors will compensate the Company in accordance with the AMA.

Executed on: _September 29, 2009_

> OFFICIAL SEAL
> BEVERLY L LASCOLA
> NOTARY PUBLIC - STATE OF ILLINOIS
> MY COMMISSION EXPIRES:09/22/10

Joseph A. Malfitano
**VP, Assistant General Counsel, Member**

Subscribed and sworn to before me
this 29 day of Sept , 2009

Notary Public

## EXHIBIT A

a.  MTGLQ, Inc., an affiliate of Goldman Sachs is a member of Hilco Trading, LLC, which is the majority member of Hilco Industrial, LLC.

b.  In matters unrelated to the Debtors, affiliates of Hilco have previously performed appraisal services for (or related to) the following entities:

Banc One Corporation
First Chicago Corporation
Goldman Sachs Group Inc.
Eastman Kodak
Goodyear Tire & Rubber Co.
Wachovia Corporation
Merrill Lynch & Co. Inc.
GE Capital
GE Commercial Finance
US Bank
Credit Suisse
Barclays Capital
Citigroup
JP Morgan
Lehman Brothers
UBS
Delphi
Lear Corporation
Inteva Products
International Automotive
AK Steel Corp.
Dana Corporation
Mando America Corp.
Shiloh Industries Inc.
Borg Warner
Continental Tire
Yorozu Automotive Tennessee
Henniges Automotive
NYX Inc.
PNC Business Credit
Black Diamond
Caterpillar Financial
Brunswick Corp.
Next Inc.
Winnebago Industries, Inc.
Challenge Mfg Co.
Cloyes Gear & Products Inc.
Cooper-Standard Holdings Inc.

Hayes Lemmerz International, Inc.
Mold Masters Co.
Noble International Ltd.
Timken Co. Inc.
AIG
Bank of America
Fifth Third Bank

Hilco does not believe that these connections create a conflict of interest regarding the Debtors or these chapter 11 cases.

c. Hilco Merchant Resources, LLC ("HMR"), an affiliate of Hilco, previously performed certain asset disposition services for Winn-Dixie Stores, Inc. HMR is a sister company to Hilco. HMR and Hilco each have their own management team and operate independently as separate businesses under the Hilco Trading family of companies. HMR has no financial interest in Hilco and Hilco has no financial interest in HMR.

d. Hilco Real Estate, LLC ("HRE"), an affiliate of Hilco, previously performed certain real estate consulting services for Krispy Kreme Doughnuts Inc. HRE is a sister company to Hilco. HRE and Hilco each have their own management team and operate independently as separate businesses under the Hilco Trading family of companies. HRE has no financial interest in Hilco and Hilco has no financial interest in HRE.

e. Hilco Appraisal Services, LLC ("HAS"), an affiliate of Hilco, has in the past and is currently engaged by Milbank, Tweed, Hadley & McCloy LLP to perform certain valuation work with respect to the Debtors. HAS is a sister company to Hilco. HAS and Hilco each have their own management team and operate independently as separate businesses under the Hilco Trading family of companies. HAS has no financial interest in Hilco and Hilco has no financial interest in HAS.

f. In matters unrelated to the Debtors, Hilco performed certain asset disposition services for (i) Johnson Controls LP, (ii) American Axle & Mfg Holdings Inc., (iii) Hitachi Ltd., (iv) Shape Corp., and (v) Fifth Third Bank

g. Hilco Trading, LLC, Hilco Real Estate, LLC and Hilco Consumer Capital, LLC, affiliates of Hilco, and Hilco DSI, LLC, a wholly owned subsidiary of an affiliate of Hilco Real Estate, LLC, have credit facilities in place with Bank of America, N.A.

h. In matters unrelated to the Debtors, the following forms have represented certain Hilco affiliates: (i) Skadden, Arps, Slate, Meagher & Flom LLP, (ii) Sonnenschein Nath & Rosenthal LLP, (iii) Paul, Weiss, Rifkand, Wharton & Garrison LLP, (iv) Morgan, Lewis & Bockius, (v) Jones Day, and (vi) Kirkland & Ellis, LLP.

i. Because of the magnitude of the entire creditor list in these cases, it is possible that Hilco may represent or may have represented other creditors of the Debtors but does not represent any such creditors in connection with these cases. Hilco presently or in the past has served as

a professional person in other matters, wholly unrelated to the Debtors or these cases, in which other attorneys, accountants and other professionals of the Debtors, creditors, or other parties in interest may have also served or serve as professional persons.

**EXHIBIT B**

From: The Hilco Organization   Page: 2/15   Date: 9/21/2009 9:35:25 AM

09/20/2009 01:25   2485699793   MAYNARDS   PAGE 02/15

*BILL— 313-665-0977*
*NOWICKE*
*HILCO*

# ASSET MARKETING AGREEMENT

This agreement (the "Agreement") is made as of the 18th day of September, 2009, by and between Hilco Industrial, LLC ("Hilco"), Maynards Industries (1991) Inc. ("Maynards", and together with Hilco, "Hilco-Maynards"), and Motors Liquidation Company (f/k/a General Motors Corporation) ("MLC").

WHEREAS, Hilco is a leading international industrial auctioneer and liquidator specializing in valuing and converting idle capital equipment into cash through a multitude of creative sales methodologies and disposition channels including auction, liquidation, private treaty and sealed bid sales. Headquartered in Farmington Hills, Michigan, Hilco operates offices in Chicago, Illinois; Grand Rapids, Michigan; Birmingham, Alabama; London, Birmingham, Leeds and Southampton, England; Mexico City, Monterrey, Guadalajara, Villahermosa and Bajio, Mexico; and Toronto, Canada;

WHEREAS, Maynards is one of the preeminent liquidation, auction and equipment appraisal companies in North America. Maynards' expertise covers all aspects of sale transactions, including consignment, transportation logistics, sale management, asset tracking, financial reporting, payment and final reconciliation. Maynards operates from four locations in North America – Vancouver, Detroit, Toronto and Montreal, as well as in Japan and Europe;

WHEREAS, on June 1, 2009, MLC filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, on July 10, 2009, MLC consummated the sale of substantially all of its assets to General Motors Company, a separate independent company, pursuant to the provisions of section 363 of the Bankruptcy Code and an order of the Court (Docket Number 2968);

WHEREAS, following the Sale Transaction, MLC remains the owner and possessor of certain machinery, equipment and other assets currently located at the Sterling Heights Tooling Center located at 33500 Mound Road, Sterling Heights Michigan (the "Facility"), including, but not limited to, the items listed on Exhibit A attached hereto (collectively, the "Facility Assets").

WHEREAS, MLC seeks to sell certain of the Facility Assets that MLC has identified or will identify to Hilco-Maynards (collectively, the "Assets").

WHEREAS, on August 18, 2009, the Court entered an order (Docket Number 3830) (the "De Minimis Asset Sale Order") authorizing procedures (the "De Minimis Sale Procedures") for MLC to sell certain assets without further court approval and authorizing MLC to pay reasonable brokers' commissions and auctioneer fees for brokers and auctioneers utilized in connection with any sales pursuant to the De Minimis Sale Procedures, a copy of which is attached as Exhibit B hereto.

US_ACTIVE:\43164384\03\43164384_3.DOC\72240.0639

This fax was received by Hilco's fax server. http://www.hilcotrading.com

From: The Hilco Organization   Page: 3/15   Date: 9/21/2009 9:35:25 AM

09/20/2009  01:25   2485699793                    MAYNARDS                        PAGE  03/15

## I.   Engagement and Agreement to Market Assets

A.   MLC hereby engages Hilco-Maynards as its exclusive marketing and sales agent for the Term of this Agreement, and Hilco-Maynards hereby accepts such engagement, in each case, with respect to all Assets located in the Facility.

B.   Hilco-Maynards will implement an on-line auction sale strategy to sell the assets and will market these assets on a best efforts basis given the limited time to market the assets.

## II.   Exclusivity

In order to permit successful marketing of the Assets, MLC grants to Hilco-Maynards the exclusive right to sell the Assets during the Term (as defined below) of this Agreement. MLC acknowledges that Hilco-Maynards or its affiliated entities may be engaged to sell or market similar assets by other persons or entities, and that any such engagement shall not constitute or be deemed to be a violation of this Agreement. During the Term of this Agreement, all inquiries regarding the Assets made to MLC, its representatives or related parties to MLC shall be redirected to Hilco-Maynards.

## III.   Method of Sale and Certain Covenants

A.   In connection with the services to be provided by Hilco-Maynards hereunder, Hilco-Maynards will:

(i)   develop an advertising and marketing plan for all of the Assets on a best efforts basis given the limited time allotted;

(ii)   implement the advertising and marketing plan;

(iii)   provide adequate information to prospective out-of-town buyers regarding travel time and travel information (including hotel, motel, car rental and airline information);

(iv)   with respect to auctions, assign a sale site coordinator from Hilco-Maynards to oversee auction sale routing, sorting and grouping of all sale items into suitable sized lots, the creation of a buyer's lot catalog, public inspection, and supervising the delivery of all sold items for an agreed upon period after completion of the auction;

(v)   prepare for the sale of the Assets, including gathering specifications and photographs for pictorial brochures and arranging the Assets in a manner, which in Hilco-Maynards' judgment, would be designed to enhance the value of the Assets;

(vi)   with respect to auctions, provide an online bidding system and will auction the lots for cash to the highest bidder "as is," "where is," pursuant to a form Bill of Sale, which shall have been approved in writing by MLC (the "Bill of Sale"), in accordance

2

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

09/20/2009  01:25    2485699793    MAYNARDS    PAGE  04/15

with the *De Minimis* Asset Sale Order, and otherwise in accordance with the terms of this Agreement.

    (vii)    contact local riggers to be available to assist buyers in the orderly removal of Assets from the Facility;

    (viii)    charge and collect from all purchasers any purchase price together with all applicable taxes in connection therewith;

    (ix)    provide a complete auction crew to handle computerized accounting functions necessary to provide auction buyers with invoices and MLC with a complete accounting of all items sold at the auction;

    (x)    no later than two weeks after the sale of any Asset, account for, and pay over to MLC in immediately available funds, proceeds from such sale, less the applicable Buyer's Premium (as defined below) and the expenses to be reimbursed by MLC pursuant to this Agreement;

    (xi)    subject to clause (xii) above, deposit all proceeds into a separate client trust account; and

    (xii)    submit an auction report to MLC within two weeks after the earlier of the completion of the auction or the completion of the Term of this Agreement, and remit a statement of sales less expenses for this auction.

    B.    In connection with the services to be provided by Hilco-Maynards hereunder, MLC hereby grants to Hilco-Maynards the following rights and authority and covenants as follows:

    (i)    Hilco-Maynards shall be entitled to use the name "Motors Liquidation Company (f/k/a General Motors Corporation)" and similar derivations in all of its advertising and promotional activities related to this Agreement. Hilco-Maynards' license to use such name shall continue until the earliest of the sale of all of the Assets or the end of the Term of this Agreement. Any use of the GM brand, logo, or trademarks shall be consistent with the Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009, as amended, between MLC and General Motors Company (including any ancillary agreements).

    (ii)    Hilco-Maynards shall have the right to access and use the Facility, subject to the consent of General Motors Company to the extent required, during the Term solely for the purpose of performing its obligations under this Agreement. MLC acknowledges and agrees that it will allow Hilco-Maynards access to the Facility upon execution of this Agreement for the purpose of taking photographs and preparing the marketing material for the Assets subject to coordination and approval of access to the Facility with and by General Motors Company, to the extent required.

3

PAGE 03    TO 300 37 TC    318-966-9477    09/18/2009 09:33

This fax was received by Hilco's fax server. http://www.hilcotrading.com

From: The Hilco Organization    Page: 5/15    Date: 9/21/2009 9:35:25 AM

09/20/2009  01:25    2485699793    MAYNARDS    PAGE  05/15

(iii)    Hilco-Maynards shall have the right to access and use the Facility, subject to the consent of General Motors Company to the extent required, for the purpose of performing its obligations under this Agreement during the term of this Agreement, with no interference from any labor unions or any other third parties.

(iv) Hilco-Maynards will occupy the Facility as licensees and shall not be obligated to pay any rent or other charges therefore. MLC agrees to continue to provide for all utilities during the course of Hilco-Maynards' occupancy. MLC also agrees to maintain during the Term (i) all utilities historically provided at the Facility solely for the purpose of arranging, preparing, and effecting a disposition as set forth herein, (ii) two active and working telephone lines and T1 or DSL service at each Facility insofar as the Facility requires such connectivity for the disposition of the Assets, (iii) trash removal service at the Facility, and (iv) the services of any security personnel currently available at the Facility. Hilco-Maynards shall not be responsible for removing any Asset not sold by the conclusion of the Term of this Agreement.

## IV.    Commission Payable to Hilco-Maynards; Expense Reimbursement

A.    Subject to the rebate obligation below, Hilco-Maynards shall be entitled to charge and retain for its own account an industry standard buyer's premium in connection with the sale of the Assets which is sixteen percent (16%) for this on-line auction sale buyers, (the "Buyers' Premium"). For purposes of clarification, the Buyers' Premium is a fee charged in addition to the sale price and is paid for by the buyer of the Asset or Assets. Such Buyers' Premium shall be segregated by Hilco-Maynards upon collection of proceeds from the applicable buyer(s). Gross sales amounts will be credited to thresholds for Buyer's Premium rebate for any other sales conducted by Hilco-Maynards in the future for MLC. Schedule for rebates will be negotiated as part of the agreement that will encompass other MLC manufacturing sites.

B.    MLC shall be entitled to a rebate of the collected Buyers' Premiums in accordance with a schedule to be negotiated at a later date as stated above.

C.    Prior to the sale of Assets, Hilco-Maynards shall provide a budget (the "Budget") for approval by MLC. Subject to prior approval of the Budget by MLC, Hilco-Maynards shall be entitled to reimbursement in an amount not exceeding $10,000 in the aggregate (or such greater amount, if any, agreed to in writing by MLC in its discretion) for all reasonable and documented out-of-pocket expenses in connection with the performance of its services hereunder, including, but not limited to, advertising, promotion and sales costs; sale; auction set-up, labor costs (including internal labor at hourly rates ranging from $30 to $90 fully burdened), transportation, lodging and miscellaneous expenses. MLC agrees that such amounts may be withheld from the proceeds of the sale of the Assets.

## V.    Representations and Covenants of the Parties

A.    MLC represents and warrants that (i) MLC has the requisite power, authority and legal capacity to enter into this Agreement and perform its obligations hereunder subject to the terms of the *De Minimis* Asset Sale Order and (ii) MLC has the requisite power, authority and

4

legal capacity to sell the Assets subject to the terms of, and in the manner stipulated by, the *De Minimis* Asset Sale Order.

B.    Hilco-Maynards Hilco covenants that it will at all times conduct its activities in such a commercially reasonable manner as to leave the Facility undamaged, ordinary wear and tear expected.

C.

(a)    The Parties hereto agree, and MLC hereby expressly acknowledges, that Hilco-Maynards shall not be responsible for the removal or disposition of any environmentally hazardous chemicals, solvents or substances found on the Facility or in the Assets.

(b)    Hilco/Maynards will make buyers aware that the Assets may contain polychlorinated biphenyls ("PCBs") and therefore, may be a regulated PCB Item as defined under Title 40, United States Code of Federal Regulations, Part 761 (40 CFR 761). The use, disposal and distribution in commerce, including the import and export, of these PCBs Item(s) may be subject to specific requirements under Federal Regulations, 40 CFR 761, pursuant to the Federal Toxic Substances Control Act. Some states and local governments may have additional regulatory requirements on the use, disposal and distribution in commerce of PCBs.

(c)    Hilco-Maynards, as well as its representatives and agents, shall use, mark, and handle the the Assets, including all components and materials, in an environmentally safe manner and in compliance with all applicable federal, state and local laws, provided that, nothing herein shall require Hilco-Maynards to transport or dispose of any environmentally hazardous chemicals, solvents or substances found on the Facility or in the Assets.

(d)    Subject to clause (c) above, MLC hereby agrees to defend, and hold Hilco-Maynards harmless from any and all claims, losses, damages and liabilities of any kind whatsoever which arise from or are in connection with the breach of any Environmental Laws or Environmental Permits except for those that arise from Hilco-Maynards' willful misconduct or gross negligence.

(e)    As used in this Agreement, "Environmental Laws" means all federal, state and local statutes, regulations, ordinances, rules, regulations and policies, all court orders and decrees and arbitration awards, and the common law, which pertain to environmental matters or contamination of any type whatsoever; and "Environmental Permits" means licenses, permits, registrations, governmental approvals, agreements and consents which are required under or are issued pursuant to Environmental Laws.

D.    Hilco-Maynards represents that it has read the De Minimis Asset Sale Order and covenants that it shall conduct all sales of Assets in accordance with the terms of the De Minimis Asset Sale Order, provided that, MLC shall be responsible for obtaining the required consents required under the De Minimis Asset Sale Order and shall advise Hilco-Maynards prior to the sale of any Asset whether all consents necessary under the De Minimis Asset Sale Order have obtained. Notwithstanding the foregoing, Hilco-Maynards is not permitted to sell any Asset for a purchase price in excess of $1,000,000 without MLC's prior written consent, which may only be

5

This fax was received by Hilco's fax server. http://www.hilcotrading.com

withheld on grounds that applicable notice procedures have not been complied with or that required consents have not been obtained.

E.     Prior to the auction, Hilco-Maynards shall consult with MLC to (i) identify certain assets as major assets (the "Major Assets"), based on their estimated sale prices and (ii) fix a minimum price bid (the "Minimum Price") for each Major Asset based on the estimated purchase price of such Asset, in each case, with the prior written agreement of MLC. Hilco-Maynards shall not, without MLC's prior written consent, sell any Major Asset for a price less than the applicable Minimum Price agreed to in advance by MLC.

F.     Hilco-Maynards shall sell Assets only pursuant to the Bill of Sale. Hilco-Maynards and MLC shall enter into a power of attorney in the form set forth as Exhibit C to enable Hilco-Maynards to enter into the Bills of Sale, with purchasers of the Assets for and on behalf of MLC.

G.     Hilco-Maynards shall act in good faith in the best interests of MLC and shall use its best efforts to complete the sale of Assets during the Term of this Agreement with the objective of securing the greatest proceeds from sales of the Assets reasonably obtainable during such period.

H.     Hilco-Maynards shall at all times comply with applicable laws, rules and regulations and shall carry out its obligations under this Agreement with due care in a competent businesslike manner consistent with industry standards and practices.

## VI.    Indemnification

A.     MLC hereby agrees to indemnify and hold Hilco-Maynards harmless from any and all claims by any buyer or prospective buyer of the Assets based on any of MLC's representations or warranties or performance hereunder. MLC further agrees to indemnify and hold Hilco-Maynards harmless from any claims, causes of action, damages and liabilities of any kind arising from or in connection with the demonstration and sale of the Assets or any inaccurate statements or representations concerning the Assets made by MLC to Hilco-Maynards or any prospective buyer, excluding any claims resulting from the willful misconduct or gross negligence of Hilco-Maynards.

B.     Hilco-Maynards shall indemnify and hold MLC harmless from any and all claims, liabilities, losses, damages and expenses arising out of or based upon Hilco-Maynards' breach of any of its representations, warranties or covenants hereunder or gross negligence or willful misconduct on the part of Hilco-Maynards, or its representatives or agents.

## VII.   Insurance

A.     During Hilco-Maynards' access to and use of the Facility, Hilco-Maynards shall procure and maintain, insurance, in which the limits of public liability shall not be less than Two Million ($2,000,000.00) Dollars for each personal injury or death and not less than Five Hundred Thousand ($500,000.00) Dollars for each instance of property damage. The policy shall name MLC as an additional insured.

6

This fax was received by Hilco's fax server. http://www.hilcotrading.com

The policy shall contain a clause that the insurer will not cancel or change the policy without first giving the MLC or parties designated by MLC thirty (30) days' prior written notice. Such insurance may be furnished by Hilco-Maynards under any blanket policy carried by it or under a separate policy therefore. The insurance shall be issued by a company qualified and licensed to do business in Michigan with general policyholder's ratings of A or better as rated in the most current available "Best's" Insurance Reports and a copy of the paid up policy evidencing such insurance or a certificate or binder from the insurer certifying to the issuance of such policy shall be delivered to MLC or parties designated by MLC prior to any access to the Facility by Hilco-Maynards and upon renewals of such policy no less than thirty (30) days prior to the expiration of such coverage.

B.    MLC agrees to maintain, during the Term of this Agreement, fire and other perils insurance in respect of all Assets until sold. MLC acknowledges that Hilco-Maynards is not an insurer of the Assets.

### VIII.  General Provisions

A.    The term of this Agreement (the "Term") shall extend until the earlier of (i) September 30, 2009 or, if later, the effective date of rejection of MLC's lease with respect to the Facility pursuant to section 365 of the Bankruptcy Code (as defined below), or (ii) the termination of this Agreement (x) by MLC, upon a material breach of this Agreement by Hilco-Maynards, or (y) by Hilco-Maynards, upon a material breach of this Agreement by MLC, in each case, if such breach remains uncured after 7 days' written notice. Upon expiration of the Term, this Agreement shall cease to have any effect and the obligations hereunder shall terminate, in each case, except for the following: (i) Hilco-Maynards' obligation to account for and pay over proceeds of sale, less any Buyers' Premium or reimbursable expenses that Hilco-Maynards is entitled to withhold pursuant to this Agreement, (ii) The provisions of Section V(C)(d), Section VI and Section VIII hereof.

B.    All references in this Agreement to "Hilco-Maynards" shall mean Hilco and Maynards, jointly and severally.

C.    This Agreement (including the Exhibits hereto) constitutes the entire agreement between the Parties and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

D.    This Agreement shall be binding upon MLC or any successor or assignee, including but not limited to, a Chapter 11 or 7 trustee, examiner, liquidation trustee or liquidator.

E.    The parties hereto agree, and MLC hereby expressly acknowledges, that Hilco-Maynards has not guaranteed MLC any return from the sale of the Assets.

F.    MLC and Hilco-Maynards shall deal with each other fairly and in good faith so as to allow both parties to perform its duties and earn the benefits of this Agreement.

7

This fax was received by Hilco's fax server. http://www.hilcotrading.com

F.    MLC recognizes and acknowledges that the services to be provided by Hilco-Maynards pursuant to this Agreement are, in general, transactional in nature, and Hilco-Maynards will not be billing MLC by the hour nor maintaining time records, other than for internal hourly labor costs associated with the sale of the Assets. It is agreed that Hilco-Maynards is not requested or required to maintain such time records and that its compensation will be fixed on the percentages set forth herein.

G.    Any correspondence or required notice shall be addressed as follows:

If to Hilco or Hilco-Maynards:    Hilco Industrial, LLC
5 Revere Drive
Suite 206
Northbrook, Illinois 60062
Tel. (847) 849- 1100
Fax (847) 897-0868
Attn: Joseph Malfitano, VP, Assistant General Counsel

And

31555 West 14 Mile Road
Farmington Hills, MI 48334
Tel (2480 254-9999
Fax (248-254-9995
Attn: Robert Levy, President

If to Maynards:    Maynards Industries (1991) Inc.
21700 Northwestern Highway
Southfield, MI 48075
Attn: Taso Sofikitis, President

If to MLC:    GM Global Headquarters
Att. Mail Code 482-C37-A99
300 Renaissance Dr.
Detroit , Michigan 48265
Attn: Christian B. Cook

H.    This Agreement shall be deemed drafted by the parties hereto, and there shall be no presumption against either party in the interpretation of this Agreement.

I.    By executing or otherwise accepting this Agreement, MLC and Hilco-Maynards acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein.

8

This fax was received by Hilco's fax server. http://www.hilcotrading.com

J.    MLC shall provide Hilco-Maynards with:

•    all reasonably requested Asset information to the extent in MLC's possession;

•    information on prospect interest and evidence of all Asset inquiries, to the extent that MLC has such information and evidence; and

•    all titles to titled vehicles prior to the sale effort for any titled vehicle commencing.

K.    This Agreement may be executed in original counterparts, and if executed and delivered via facsimile shall be deemed the equivalent of an original.

L.    This Agreement creates no third-party beneficiaries.

M.    Any and all issues, disputes, claims or causes of action which relate or pertain to, or result or arise from this Agreement or Hilco-Maynards' services hereunder, shall be settled by the Court. The parties hereto irrevocably and unconditionally (a) agree not to commence any such action, suit or proceeding except in such Court), (b) waive any objection to the laying of venue of any such action, suit or proceeding in the Court and (c) waive and agree not to plead or claim that any such action, suit or proceeding brought in the Court has been brought in an inconvenient forum

N.    Neither MLC, nor Hilco, Maynard or Hilco-Maynards will be liable to any other person for any consequential, incidental, indirect, special or punitive damages, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof.

O.    Absent further order of the Court specifically permitting the same, Hilco, Maynard and Hilco-Maynards shall not be entitled to set-off any obligation hereunder against any claim asserted by them, except with respect to Hilco-Maynards' right to reimbursement under this Agreement.

## IX.    Miscellaneous

This Agreement shall be governed by and construed in accordance with Chapter 11 of Title 11 of the United States Code, if applicable, and otherwise, the laws of the State of New York, in each case, without giving effect to conflict of laws provisions. This Agreement may not be transferred or assigned without the express written consent of the other Parties. The Parties hereto are acting as independent contractors and nothing contained herein shall be deemed to create any other type of agency, partnership, joint venture or other relationship. This Agreement may not be modified or amended except by an instrument in writing executed by an authorized representative of each party to this Agreement. If any part or subpart of this agreement is found

9

This fax was received by Hilco's fax server. http://www.hilcotrading.com

From: The Hilco Organization    Page: 11/15    Date: 9/21/2009 9:35:25 AM

or held to be invalid, that invalidity shall not affect the enforceability and binding nature of any other part of this agreement.

*            *            *

10

From: The Hilco Organization    Page: 12/15    Date: 9/21/2009 9:35:26 AM

09/20/2009  01:25    2485699793    MAYNARDS    PAGE  12/15

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date written below.

**MOTORS LIQUIDATION COMPANY**
**(F/K/A GENERAL MOTORS CORPORATION)**

By: _J Selzer_
Title: VP & Treasurer
Date: 9.18.09

**MAYNARDS INDUSTRIES (1991) INC.**
By: _____
Title: President
Date: 9/18/09

**HILCO INDUSTRIAL, LLC**

Robert Levy  Digitally signed by Robert Levy
DN: cn=Robert Levy, o, ou,
email=rlevy@hilcoind.com, c=US
Date: 2009.09.21 09:34:56 -04'00'

By: _____
Title: _____
Date: _____

09/18/2009  09:33    313-665-0977    T 300 37 TC    PAGE  11

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

## EXHIBIT A

- (2) Eagle and Addison McKey Tube Benders
- (2) Williams & White Hydraulic Presses up to 5000 Ton (Subject to final MLC approval)
- Danly 3500 Ton Double Action Press (Subject to final MLC approval)
- Leblond Lathe
- (2) 25/10 Ton Overhead Cranes
- (2) Forklifts
- Dake Shop Press
- Quincy Air Compressors
- Substations (Subject to final MLC approval)
- Small hand tools and more

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

From: The Hilco Organization    Page: 14/15    Date: 9/21/2009 9:35:26 AM

09/28/2009  01:25    2485699793    MAYNARDS    PAGE  14/15

## EXHIBIT B

### *DE MINIMIS* ASSET SALE ORDER

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                                :
In re                                           :          Chapter 11 Case No.
                                                :
MOTORS LIQUIDATION COMPANY, *et al.*,           :          09-50026 (REG)
        f/k/a General Motors Corp., *et al.*    :
                                                :          (Jointly Administered)
                Debtors.                        :
                                                :
-----------------------------------------------------------x

## ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 363 (A) ESTABLISHING PROCEDURES FOR THE DISPOSITION OF *DE MINIMIS* ASSETS, AND (B) AUTHORIZING THE DEBTORS TO (i) PAY RELATED FEES, AND (ii) ASSUME, ASSUME AND ASSIGN, OR REJECT RELATED EXECUTORY CONTRACTS OR UNEXPIRED LEASES

Upon the Motion, dated July 29, 2009 (the "**Motion**"),[1] of Motors Liquidation

Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession

(collectively, the "**Debtors**"), pursuant to sections 105(a) and 363 of title 11 of the United States

Code establishing procedures for the sale of *de minimis* assets, whether by private sale or

auction, including the payment of related brokers' commissions and auctioneer fees and the

assumption, assumption and assignment, or rejection of related executory contracts or unexpired

leases, all as more fully set forth in the Motion; and due and proper notice of the Motion having

been provided, and it appearing that no other or further notice need be provided; and the Court

having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set

---

[1]         Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is

ORDERED THAT:

1.    The relief requested in the Motion is GRANTED as provided herein.

2.    The *De Minimis* Sale Procedures are approved as follows:

A.    <u>Sale Price Less than or Equal to $1 Million</u>

3.    The Debtors are hereby authorized to sell any asset for total consideration

of a value less than or equal to $1 million (a "**Non-Noticed *De Minimis* Sale**") without further

Court approval, and without providing notice of the Non-Noticed *De Minimis* Sale to any party,

whether by private sale or by auction; <u>provided</u> <u>that</u> (a) all assets with known existing

environmental contamination, and (b) the Debtors' interests in the Centerpoint Business Campus

in Pontiac, Michigan shall only be sold pursuant to the Noticed *De Minimis* Sale procedures (as

defined below). The Debtors are also authorized to take any actions that are reasonable and

necessary to close the Non-Noticed *De Minimis* Sale and obtain the sale proceeds.

4.    If the Debtors seek to assume, assume and assign, or reject executory

contracts or unexpired leases relating to and in connection with an asset sale that would

otherwise qualify as a Non-Noticed *De Minimis* Sale, the Debtors shall seek to sell those assets

pursuant to the Noticed De Minimis Sale procedures (as defined below). In addition, if the

Debtors seek to sell assets encumbered by liens (other than assets encumbered solely by liens

granted in favor of the DIP Lenders, as defined and described in more detail below) in

connection with an asset sale that would otherwise qualify as a Non-Noticed *De Minimis* Sale,

the Debtors shall seek to obtain the consent of the lienholder. If the Debtors are unable to obtain

the consent of the lienholder, the Debtors may sell the encumbered assets pursuant to the Noticed *De Minimis* Sale procedures.

B.    Sale Price Greater than $1 million but Less than or Equal to $15 Million

5.    The Debtors are hereby authorized to sell any asset for total consideration of a value that is greater than $1 million but less than or equal to $15 million (a "**Noticed *De Minimis* Sale**"), without further Court approval, after providing notice of the Noticed *De Minimis* Sale to certain parties in accordance with the following procedures.

6.    If the Debtors propose a Noticed *De Minimis* Sale, the Debtors will serve a notice of such proposed sale (a "**Sale Notice**") by facsimile, email, overnight delivery, hand delivery, or first class mail on the following parties:

| | |
|---|---|
| (i) | the United States Trustee for the Southern District of New York (the "**U.S. Trustee**"); |
| (ii) | counsel for the statutory committee of unsecured creditors (the "**Creditors' Committee**"); |
| (iii) | counsel for the lenders under that certain Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of July 10, 2009, among Motors Liquidation Company (f/k/a General Motors Corporation), as Borrower, the Guarantors party thereto, and the Lenders party thereto from time to time; |
| (iv) | the Office of the United States Attorney for the Southern District of New York, 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz, Esq.); |
| (v) | the state Attorney General for the state in which any real property to be sold is located; |
| (vi) | the treasurer or other appropriate representative of the local taxing jurisdiction or governmental unit in which the property to be sold is located; |
| (vii) | all known parties holding or asserting liens or encumbrances on the assets that are the subject of the proposed Noticed *De Minimis* Sale and their respective counsel, if known; and |

    (viii)   the counterparties (or such counterparty's counsel) to all executory contracts or unexpired leases related to the property subject of the Sale Notice that the Debtors are seeking to assume and assign to the purchaser of the assets, or reject ((i)-(vi) collectively, the **"Interested Parties"**).

Interested Parties shall have ten (10) business days from service of the Sale Notice to file and serve any objections to a Noticed *De Minimis* Sale (the **"Notice Period"**).

7.    The Sale Notice will specify:

    (i)   a description of the asset proposed to be sold, its location, and a statement whether, at the time of the notice, there is any known existing environmental contamination of such asset;

    (ii)   an identification of the executory contracts and unexpired leases, if any, to be assumed and assigned, or rejected in connection with the sale, the amounts required to cure any defaults pursuant to section 365(b) of the Bankruptcy Code, and a statement regarding the adequate assurance of future performance by the proposed assignee, consistent with section 365 of the Bankruptcy Code;

    (iii)   the identities of any parties holding or asserting liens or other interests or potential interests in the property and a statement indicating how the Debtors propose to satisfy section 363(f) with respect thereto;

    (iv)   an affidavit of the broker or auctioneer, if any, pursuant to Rule 2014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), that identifies the broker or auctioneer and the amount of the proposed commissions and contains the disclosures required by Bankruptcy Rule 2014; and

    (v)   instructions regarding the procedures to assert objections to the Noticed *De Minimis* Sale.

8.    If the transaction is to be a private sale, the Sale Notice will also specify:

    (i)   the identity of the proposed purchaser (including a statement indicating whether the proposed purchaser is an "insider" as defined in section 101(31) of the Bankruptcy Code); and

    (ii)   the major economic terms and conditions of the Noticed *De Minimis* Sale;[2]

---

[2]   This information may be provided by attaching the applicable contract or contracts to the Sale Notice.

9.    If the transaction is to be by auction, the Sale Notice will also specify:

    (i)    the date, time and place of the auction;

    (ii)    the minimum acceptable bid; and

    (iii)    any terms and conditions of sale to be imposed at the auction.

10.    Objections to a Noticed *De Minimis* Sale ("**Objections**") must be in writing, filed with the Court, and served on the Interested Parties and counsel to the Debtors so as to be received by all such parties prior to 4:00 p.m. (Eastern Time) on the last day of the Notice Period. Each Objection must state with specificity the grounds for the Objection.

11.    If any significant economic terms of a Noticed *De Minimis* Sale are amended after transmittal of the Sale Notice, but prior to the expiration of the Notice Period, the Debtors will serve a revised Sale Notice on all Interested Parties describing the proposed Noticed *De Minimis* Sale, as amended. If a revised Sale Notice is required, the Notice Period will expire on the later of the original Notice Period expiration date or five (5) calendar days from service of the revised Sale Notice.

12.    If an Objection to a Noticed *De Minimis* Sale is properly filed and served by an Interested Party:

    (i)    The Debtors may negotiate with the party filing the Objection and may change the terms of the sale without the requirement of further notice, as long as the revised terms are no more onerous to the Debtors than those set forth in the Sale Notice.

    (ii)    The Noticed *De Minimis* Sale may not proceed absent (a) withdrawal of the Objection; or (b) entry of an order by the Court specifically approving the Noticed *De Minimis* Sale.

    (iii)    The Debtors may schedule a hearing on the Noticed *De Minimis* Sale and, upon the scheduling of such a hearing, the Debtors will provide notice of the hearing on the party filing the Objection and the Interested Parties.

13.    If no Objection to a Noticed *De Minimis* Sale is filed and served by an

Interested Party consistent with the Noticed *De Minimis* Sale Procedures, such Noticed *De*

*Minimis* Sale will be deemed final and fully authorized by the Court under the terms of this

Order, including the payment of related brokers' commissions or auctioneer fees, if applicable,

and the assumption, assumption and assignment, or rejection of executory contracts or unexpired

leases, if applicable (including the payment of cure costs related thereto), and no further notice or

Court approval to consummate the Noticed *De Minimis* Sale will be required or necessary.

14.    The Debtors may consummate a Noticed *De Minimis* Sale prior to

expiration of the applicable Notice Period if they obtain each Interested Party's written consent

to such Noticed *De Minimis* Sale.

15.    In the case of a Noticed *De Minimis* Sale to proceed by private sale, in the

event the Debtors receive a competing bid the Debtors will only consummate a sale upon

consultation with the Creditors' Committee.

16.    In the case of a Noticed *De Minimis* Sale to proceed by auction, the

Debtors may sell the applicable asset at the auction for any price above the minimum bid, even if

the sale price exceeds the applicable threshold for the *De Minimis* Sale Procedures.

C.    Effects of Sale

17.    The consent of the DIP Lenders is not required to sell estate assets, and all

buyers will take title to the assets free and clear of the DIP Lenders' liens, claims, encumbrances

and other interests, pursuant to section 363(f) of the Bankruptcy Code. Additionally, pursuant to

section 363(f) of the Bankruptcy Code, all sales of property and interests in property pursuant to

this Order shall be free and clear of all liens, claims and encumbrances, if any, and any such

valid, and where applicable perfected, liens, claims, and encumbrances, including liens, claims,

and encumbrances of the DIP Lenders, will attach to the proceeds of the sale, subject to the

rights, claims, defenses and objections, if any, of the Debtors or the Creditors' Committee.

Notwithstanding the foregoing, nothing in this Order shall be construed to invalidate or

subordinate any duly perfected, non-voidable, valid liens of governmental units for personal

property taxes, real property taxes, special taxes, special assessments, and infrastructure

improvement taxes arising before or after the commencement of these chapter 11 cases to the

extent that such liens of governmental units take priority over previously granted and perfected

consensual liens or security interests in property of the Debtors under applicable non-bankruptcy

law.

18.    All buyers will take assets sold by the Debtors pursuant to the *De Minimis*

Sale Procedures subject to the terms of the documentation executed in connection with the sale,

which may include provisions that the buyers are taking the assets "as is" and "where is,"

without any representations or warranties from the Debtors as to the quality or fitness of such

assets for either their intended purpose or any particular purpose.

19.    All sales consummated in compliance with the *De Minimis* Sale

Procedures shall be deemed to be the result of an arm's-length transaction and the purchaser

shall be deemed a good faith purchaser and shall be entitled to the protections of section 363(m)

of the Bankruptcy Code.

20.    Upon the closing of a private sale or auction pursuant to the *De Minimis*

Sale Procedures above, the Debtors may (a) assume any executory contract or unexpired lease to

be assigned to a proposed purchaser or other third party as a part of the proposed sale and

provide for the payment of the related cure amount and (b) reject any executory contract or

unexpired lease identified for rejection in the Sale Notice. The counterparties to any executory

contracts or unexpired leases identified in the Sale Notice pursuant to the *De Minimis* Sale

Procedures are hereby barred from asserting any further cure claims in respect of such executory

contracts or unexpired leases after the objection period for a Noticed *De Minimis* Sale has

passed.

        21.     With respect to all Noticed *De Minimis* Sales and Non-Noticed *De*

*Minimis* Sales consummated pursuant to this Order, this Order shall be sole and sufficient

evidence of the transfer of title to any particular purchaser, and all such sales consummated

pursuant to this Order shall be binding upon and shall govern the acts of all persons and entities

who may be required by operation of law, the duties of their office, or contract, to accept, file,

register or otherwise record or release any documents or instruments, or who may be required to

report or insure any title or state of title in or to any of the property sold pursuant to this Order,

including without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, administrative agencies, governmental departments,

secretaries of state, and federal, state, and local officials, and each of such persons and entities is

hereby directed to accept this Order as sole and sufficient evidence of such transfer of title and

shall rely upon this Order in consummating the transactions contemplated hereby.

D.    The Quarterly Report

        22.     On or before the 30th day after the commencement of each fiscal quarter

commencing with the fiscal quarter beginning on October 1, 2009, the Debtors shall file and

serve on the Creditors' Committee a report summarizing (i) any Noticed *De Minimis* Sales that

were consummated pursuant to the *De Minimis* Sale Procedures during the immediately

preceding fiscal quarter and (ii) any Non-Noticed *De Minimis* Sales for consideration greater

than $250,000 that were consummated pursuant to the *De Minimis* Sale Procedures during the immediately preceding fiscal quarter (a "**Quarterly Report**"). With respect to each applicable sale, each Quarterly Report shall include:

   (i)  a description of the assets sold;

   (ii)  the identity of the purchaser and any relationship such party has with the Debtors; and

   (iii)  the total consideration received in connection with the sale.

E. Miscellaneous

  23.  The Debtors are authorized to pay reasonable brokers' commissions and auctioneer fees for brokers and auctioneers utilized in connection with any sales pursuant to the *De Minimis* Sale Procedures authorized herein.

  24.  Any (a) sale to an "insider," as defined in section 101(31) of the Bankruptcy Code, (b) Non-Noticed *De Minimis* Sale of real property, and (c) Non-Noticed *De Minimis* Sale of other property for total consideration of a value in excess of $500,000 may only be consummated after consultation with the Creditors' Committee.

  25.  To the extent applicable, the ten-day stay of Federal Rule of Bankruptcy Procedure 6004(h) is hereby waived, and this Order shall be effective immediately. Furthermore, Non-Noticed *De Minimis* Sales and Noticed *De Minimis* Sales shall be deemed authorized pursuant to the terms of this Order and no further or additional waivers of the ten-day stay of Federal Rule of Bankruptcy Procedure 6004(h) shall be required for the Debtors to consummate a Non-Noticed *De Minimis* Sale or a Noticed *De Minimis* Sale, subject to compliance with the notice and other procedures set forth herein.

  26.  The Debtors are authorized, in consultation with the Creditors' Committee, to execute and deliver all instruments and documents, and take such other action as

may be necessary or appropriate to implement and effectuate the transactions contemplated by this Order.

27.    Nothing in this Order or any purchase agreement entered into under this Order releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order.  Nothing in this Order shall be deemed to allow the Debtors to abandon real or personal property in violation of any applicable state or federal laws or regulations, including but not limited to environmental laws and regulations.

28.    Nothing in this Order shall be construed to prevent the Debtors, in their sole discretion, from seeking this Court's approval at any time of any proposed sale after notice and an opportunity for a hearing.

29.    No further orders of this Court are necessary to effectuate the terms set forth herein for the transactions contemplated herein.

30.    Nothing in this Order shall authorize the Debtors to sell assets they do not own, including any leased equipment.

31.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
    *August 18, 2009*

                                        *s/ Robert E. Gerber*
                                        United States Bankruptcy Judge

09/20/2009  01:25    2495699793    MAYNARDS    PAGE  15/15

## EXHIBIT C

POWER OF ATTORNEY

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

## LIMITED POWER OF ATTORNEY
### PURSUANT AND SUBJECT TO ASSET MARKETING AGREEMENT

Know all by these presents, that Motors Liquidation Company ("MLC") hereby makes, constitutes and appoints each of Hilco Industrial, LLC ("Hilco") and Maynards Industries (1991) Inc. ("Maynards", and together with Hilco, "Hilco-Maynards"), acting together or individually, as MLC's true and lawful attorneys-in-fact, with power and authority on behalf of and in the name, place and stead of MLC to:

(1)      market, auction and sell Assets pursuant to that certain Asset Marketing Agreement by and among MLC, Hilco and Maynards, dated as of September [•], 2009 (the "Marketing Agreement");

(2)      execute, deliver and perform the obligations of MLC under Bills of Sale pursuant the Marketing Agreement; and

(3)      perform such other acts as are required to be conducted on behalf of MLC pursuant to Hilco-Maynards' obligations under the Marketing Agreement;

provided, however, that, (A) this Power of Attorney is subject, in all respects, to the Marketing Agreement, and power and authority to act on behalf or in the name of MLC is granted hereby to Hilco-Maynards only insofar as the same is exercised pursuant to, for the purpose of and consistent with the Marketing Agreement; (B) this Power of Attorney, and the power and authority granted to Hilco-Maynards hereby, is not coupled with interest and may be revoked at any time by MLC without any obligation on the part of MLC; and (C) this Power of Attorney, and the power and authority granted to Hilco-Maynards hereby, shall remain in force and effect only for the Term of the Marketing Agreement or, if earlier, until revoked by MLC in a signed writing delivered to each of Hilco and Maynards.

Capitalized terms not defined herein shall have the meanings ascribed thereto in the Marketing Agreement.  References to Hilco-Maynards, shall mean Hilco and Maynards, acting together or individually.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this ____ day of September, 2009.

Motors Liquidation Company
By: _____
Name:
Title:

STATE OF _____          )
                               )ss
COUNTY OF _____        )

    On this ____ day of September, 2009, _____ personally appeared before me, and acknowledged that he executed the foregoing instrument on behalf of Motors Liquidation Company for the purposes therein contained.

    IN WITNESS WHEREOF, I have hereunto set my hand and official seal.


_____
Notary Public


My Commission Expires:

## **Exhibit C**

## **Sofikitis Affidavit**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                            :
In re                                       :        Chapter 11 Case No.
                                            :
MOTORS LIQUIDATION COMPANY, *et al.*,       :        09-50026 (REG)
        f/k/a General Motors Corp., *et al.*  :
                                            :
                        Debtors.            :        (Jointly Administered)
                                            :
------------------------------------------------------------x

## AFFIDAVIT OF MAYNARDS INDUSTRIES (1991) INC. PURSUANT TO BANKRUPTCY RULE 2014 AND LOCAL RULE 2014-1

STATE OF MICHIGAN          )
                           ) ss:
COUNTY OF OAKLAND          )

Taso Sofikitis, being duly sworn, hereby deposes and says:

1.      I am a President of Maynards Industries (1991) Inc.. ("**Maynards**" or the "**Company**"), which maintains an office at 21700 Northwestern Highway, Suite 1180, Southfield, MI 48075.

2.      Motors Liquidation Company (f/k/a General Motors Corporation) and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), have requested that the Company provide services in connection with the proposed sale(the "**Noticed *De Minimis* Sale**") of certain assets of the Debtors pursuant to the Order Pursuant to Sections 105 and 363 of the Bankruptcy Code (A) Establishing Procedures for the Disposition of *De Minimis* Assets and (B) (i) Authorizing the Debtors to Pay Related Fees. and (ii) Assume. Assume and Assign, or Reject Related Executory Contracts or Unexpired Leases entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Debtors' chapter 11 cases on August 18,

2009 [Docket No. 3830] (the "**Sale Order**"). The Company has consented to provide such services.

3.    I make this declaration on behalf of the Company in connection with the Noticed *De Minimis* Sale in accordance with the Sale Order, Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2014-1 of the Local Rules of the Bankruptcy Court.

4.    To review potential conflicts of interest, as well as to determine all "connections" (as such term is used in Bankruptcy Rule 2014) to the Debtors, their creditors, other parties in interest, their respective attorneys and accountants, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") or any person employed in the office of the U.S. Trustee, the Debtors provided the Company with a comprehensive list of the types of entities who may have contacts with the Debtors. Except as set forth on **Exhibit A**, to the best of my knowledge, the Company does not have any connection with or any interest adverse to the Debtors, their creditors, or any other party in interest or their respective attorneys and accountants.

5.    The Company is duly licensed and is authorized to conduct auctions in accordance with the Asset Marketing Agreement, attached hereto as **Exhibit B** (the "AMA"). The Company has the relevant experience and expertise to assist the Debtors in connection with the *De Minimis* Sale. The Company is a leading international industrial auctioneer and liquidator specializing in valuing and converting idle capital equipment into cash through a multitude of creative sales methodologies and disposition channels including auction, liquidation, private treaty and sealed bid sales. Headquartered in Vancouver, British Columbia, Canada the

Company operates offices in Southfield, Michigan, Toronto, Ontario, Munich, Germany and Tokyo, Japan.

      6.     The Debtors and the Company have agreed that in exchange for services rendered by the Company in connection with the sale of the assets as set forth in the AMA, the Debtors will compensate the Company in accordance with the AMA.

Executed on: 10/2/09

_____

Taso Sofikitis

President, Maynards Industries (1991) Inc.


Subscribed and sworn to before me
this 2nd day of October, 2009

_____
Notary Public

GAIL GILCHRIST
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES Jul 8, 2014
ACTING IN COUNTY OF

EXHIBIT A

a) In matters unrelated to the Debtors, affiliates of Maynards have previously performed appraisal services for (or related to) the following entities:

ABN Amro
Adam Opel GmbH
Alix Partners
Arthur Andersen
Bank of America
Bank of Montreal
Bank of Nova Scotia
Borg Warner
Catalyst, Inc.
CIBC
Citibank
Citigroup
Deloitte & Touche
Delphi
Deutsche Bank
Ernst & Young LLP
Fifth Third Bank
GE Capital
GM Saturn Corporation
GMAC
HSBC
JP Morgan
Key Bank
KPMG
Lear Corporation
Magna Inc.
Merrill Lynch Canada Finance Company
Morgan Stanley
RBS
Saturn Corporation
Saturn Motor Car Corporation
Standard Chartered Bank
US Bank
Wachovia Corporation

Maynards does not believe that these connections create a conflict of interest regarding the Debtors of theses chapter 11 cases

b) Because of the magnitude of the entire creditor list in these cases, it is possible that
Maynards may represent or may have represented other creditors of the Debtors but
does not represent any such creditors in connection with these cases.  Maynards
presently or in the past has served as a professional person in other matters, wholly
unrelated to the Debtors or these cases, in which other attorneys, accountants and
other professionals of the Debtors, creditors, or other parties in interest may have
served or serve as professional persons.

# EXHIBIT B

From: The Hilco Organization      Page: 2/15      Date: 9/21/2009 9:35:25 AM

09/20/2009  01:25    2485699793                    MAYNARDS                            PAGE  02/15

BILL- 313-665-0977
NOWICKE
MLCo

## ASSET MARKETING AGREEMENT

This agreement (the "Agreement") is made as of the 18th day of September, 2009, by and between Hilco Industrial, LLC ("Hilco"), Maynards Industries (1991) Inc. ("Maynards", and together with Hilco, "Hilco-Maynards"), and Motors Liquidation Company (f/k/a General Motors Corporation) ("MLC").

WHEREAS, Hilco is a leading international industrial auctioneer and liquidator specializing in valuing and converting idle capital equipment into cash through a multitude of creative sales methodologies and disposition channels including auction, liquidation, private treaty and sealed bid sales. Headquartered in Farmington Hills, Michigan, Hilco operates offices in Chicago, Illinois; Grand Rapids, Michigan; Birmingham, Alabama; London, Birmingham, Leeds and Southampton, England; Mexico City, Monterrey, Guadalajara, Villahermosa and Bajio, Mexico; and Toronto, Canada;

WHEREAS, Maynards is one of the preeminent liquidation, auction and equipment appraisal companies in North America. Maynards' expertise covers all aspects of sale transactions, including consignment, transportation logistics, sale management, asset tracking, financial reporting, payment and final reconciliation. Maynards operates from four locations in North America – Vancouver, Detroit, Toronto and Montreal, as well as in Japan and Europe;

WHEREAS, on June 1, 2009, MLC filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court");

WHEREAS, on July 10, 2009, MLC consummated the sale of substantially all of its assets to General Motors Company, a separate independent company, pursuant to the provisions of section 363 of the Bankruptcy Code and an order of the Court (Docket Number 2968);

WHEREAS, following the Sale Transaction, MLC remains the owner and possessor of certain machinery, equipment and other assets currently located at the Sterling Heights Tooling Center located at 33500 Mound Road, Sterling Heights Michigan (the "Facility"), including, but not limited to, the items listed on Exhibit A attached hereto (collectively, the "Facility Assets").

WHEREAS, MLC seeks to sell certain of the Facility Assets that MLC has identified or will identify to Hilco-Maynards (collectively, the "Assets").

WHEREAS, on August 18, 2009, the Court entered an order (Docket Number 3830) (the "De Minimis Asset Sale Order") authorizing procedures (the "De Minimis Sale Procedures") for MLC to sell certain assets without further court approval and authorizing MLC to pay reasonable brokers' commissions and auctioneer fees for brokers and auctioneers utilized in connection with any sales pursuant to the De Minimis Sale Procedures, a copy of which is attached as Exhibit B hereto.

US_ACTIVE:\43164384\03\43166284_3.DOC\73240.0639

This fax was received by Hilco's fax server. http://www.hilcotrading.com

I.    **Engagement and Agreement to Market Assets**

A.    MLC hereby engages Hilco-Maynards as its exclusive marketing and sales agent for the Term of this Agreement, and Hilco-Maynards hereby accepts such engagement, in each case, with respect to all Assets located in the Facility.

B.    Hilco-Maynards will implement an on-line auction sale strategy to sell the assets and will market these assets on a best efforts basis given the limited time to market the assets.

II.    **Exclusivity**

In order to permit successful marketing of the Assets, MLC grants to Hilco-Maynards the exclusive right to sell the Assets during the Term (as defined below) of this Agreement. MLC acknowledges that Hilco-Maynards or its affiliated entities may be engaged to sell or market similar assets by other persons or entities, and that any such engagement shall not constitute or be deemed to be a violation of this Agreement. During the Term of this Agreement, all inquiries regarding the Assets made to MLC, its representatives or related parties to MLC shall be redirected to Hilco-Maynards.

III.    **Method of Sale and Certain Covenants**

A.    In connection with the services to be provided by Hilco-Maynards hereunder, Hilco-Maynards will:

(i)    develop an advertising and marketing plan for all of the Assets on a best efforts basis given the limited time allotted;

(ii)    implement the advertising and marketing plan;

(iii)    provide adequate information to prospective out-of-town buyers regarding travel time and travel information (including hotel, motel, car rental and airline information);

(iv)    with respect to auctions, assign a sale site coordinator from Hilco-Maynards to oversee auction sale routing, sorting and grouping of all sale items into suitable sized lots, the creation of a buyer's lot catalog, public inspection, and supervising the delivery of all sold items for an agreed upon period after completion of the auction;

(v)    prepare for the sale of the Assets, including gathering specifications and photographs for pictorial brochures and arranging the Assets in a manner, which in Hilco-Maynards' judgment, would be designed to enhance the value of the Assets;

(vi)    with respect to auctions, provide an online bidding system and will auction the lots for cash to the highest bidder "as is," "where is," pursuant to a form Bill of Sale, which shall have been approved in writing by MLC (the "Bill of Sale"), in accordance

2

This fax was received by Hilco's fax server. http://www.hilcotrading.com

From: The Hilco Organization    Page: 4/15    Date: 9/21/2009 9:35:25 AM

09/28/2009  01:25    2485699793                    MAYNARDS                    PAGE  04/15

with the *De Minimis* Asset Sale Order, and otherwise in accordance with the terms of this Agreement.

(vii)    contact local riggers to be available to assist buyers in the orderly removal of Assets from the Facility;

(viii)    charge and collect from all purchasers any purchase price together with all applicable taxes in connection therewith;

(ix)    provide a complete auction crew to handle computerized accounting functions necessary to provide auction buyers with invoices and MLC with a complete accounting of all items sold at the auction;

(x)    no later than two weeks after the sale of any Asset, account for, and pay over to MLC in immediately available funds, proceeds from such sale, less the applicable Buyer's Premium (as defined below) and the expenses to be reimbursed by MLC pursuant to this Agreement;

(xi)    subject to clause (xii) above, deposit all proceeds into a separate client trust account; and

(xii)    submit an auction report to MLC within two weeks after the earlier of the completion of the auction or the completion of the Term of this Agreement, and remit a statement of sales less expenses for this auction.

B.    In connection with the services to be provided by Hilco-Maynards hereunder, MLC hereby grants to Hilco-Maynards the following rights and authority and covenants as follows:

(i)    Hilco-Maynards shall be entitled to use the name "Motors Liquidation Company (f/k/a General Motors Corporation)" and similar derivations in all of its advertising and promotional activities related to this Agreement. Hilco-Maynards' license to use such name shall continue until the earliest of the sale of all of the Assets or the end of the Term of this Agreement. Any use of the GM brand, logo, or trademarks shall be consistent with the Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009, as amended, between MLC and General Motors Company (including any ancillary agreements).

(ii)    Hilco-Maynards shall have the right to access and use the Facility, subject to the consent of General Motors Company to the extent required, during the Term solely for the purpose of performing its obligations under this Agreement. MLC acknowledges and agrees that it will allow Hilco-Maynards access to the Facility upon execution of this Agreement for the purpose of taking photographs and preparing the marketing material for the Assets subject to coordination and approval of access to the Facility with and by General Motors Company, to the extent required.

3

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

From: The Hilco Organization    Page: 5/15    Date: 9/21/2009 9:35:25 AM
09/28/2009   01:25    2485699793    MAYNARDS    PAGE   05/15

(iii)    Hilco-Maynards shall have the right to access and use the Facility, subject to the consent of General Motors Company to the extent required, for the purpose of performing its obligations under this Agreement during the term of this Agreement, with no interference from any labor unions or any other third parties.

(iv) Hilco-Maynards will occupy the Facility as licensees and shall not be obligated to pay any rent or other charges therefore. MLC agrees to continue to provide for all utilities during the course of Hilco-Maynards' occupancy. MLC also agrees to maintain during the Term (i) all utilities historically provided at the Facility solely for the purpose of arranging, preparing, and effecting a disposition as set forth herein, (ii) two active and working telephone lines and T1 or DSL service at each Facility insofar as the Facility requires such connectivity for the disposition of the Assets, (iii) trash removal service at the Facility, and (iv) the services of any security personnel currently available at the Facility. Hilco-Maynards shall not be responsible for removing any Asset not sold by the conclusion of the Term of this Agreement.

## IV.    Commission Payable to Hilco-Maynards; Expense Reimbursement

A.    Subject to the rebate obligation below, Hilco-Maynards shall be entitled to charge and retain for its own account an industry standard buyer's premium in connection with the sale of the Assets which is sixteen percent (16%) for this on-line auction sale buyers. (the "Buyers' Premium"). For purposes of clarification, the Buyers' Premium is a fee charged in addition to the sale price and is paid for by the buyer of the Asset or Assets. Such Buyers' Premium shall be segregated by Hilco-Maynards upon collection of proceeds from the applicable buyer(s). Gross sales amounts will be credited to thresholds for Buyer's Premium rebate for any other sales conducted by Hilco-Maynards in the future for MLC. Schedule for rebates will be negotiated as part of the agreement that will encompass other MLC manufacturing sites.

B.    MLC shall be entitled to a rebate of the collected Buyers' Premiums in accordance with a schedule to be negotiated at a later date as stated above.

C.    Prior to the sale of Assets, Hilco-Maynards shall provide a budget (the "Budget") for approval by MLC. Subject to prior approval of the Budget by MLC, Hilco-Maynards shall be entitled to reimbursement in an amount not exceeding $10,000 in the aggregate (or such greater amount, if any, agreed to in writing by MLC in its discretion) for all reasonable and documented out-of-pocket expenses in connection with the performance of its services hereunder, including, but not limited to, advertising, promotion and sales costs; sale; auction set-up, labor costs (including internal labor at hourly rates ranging from $30 to $90 fully burdened), transportation, lodging and miscellaneous expenses. MLC agrees that such amounts may be withheld from the proceeds of the sale of the Assets.

### V.    Representations and Covenants of the Parties

A.    MLC represents and warrants that (I) MLC has the requisite power, authority and legal capacity to enter into this Agreement and perform its obligations hereunder subject to the terms of the *De Minimis Asset Sale Order* and (ii) MLC has the requisite power, authority and

4

This fax was received by Hilco's fax server. http://www.hilcotrading.com

From: The Hilco Organization    Page: 6/15    Date: 9/21/2009 9:35:25 AM

09/28/2009   01:25    2495699793                        MAYNARDS                        PAGE  06/15

legal capacity to sell the Assets subject to the terms of, and in the manner stipulated by, the *De Minimis* Asset Sale Order.

B.    Hilco-Maynards Hilco covenants that it will at all times conduct its activities in such a commercially reasonable manner as to leave the Facility undamaged, ordinary wear and tear expected.

C.

(a)    The Parties hereto agree, and MLC hereby expressly acknowledges, that Hilco-Maynards shall not be responsible for the removal or disposition of any environmentally hazardous chemicals, solvents or substances found on the Facility or in the Assets.

(b)    Hilco/Maynards will make buyers aware that the Assets may contain polychlorinated biphenyls ("PCBs") and therefore, may be a regulated PCB Item as defined under Title 40, United States Code of Federal Regulations, Part 761 (40 CFR 761). The use, disposal and distribution in commerce, including the import and export, of these PCBs Item(s) may be subject to specific requirements under Federal Regulations, 40 CFR 761, pursuant to the Federal Toxic Substances Control Act. Some states and local governments may have additional regulatory requirements on the use, disposal and distribution in commerce of PCBs.

(c)    Hilco-Maynards, as well as its representatives and agents, shall use, mark, and handle the the Assets, including all components and materials, in an environmentally safe manner and in compliance with all applicable federal, state and local laws, provided that, nothing herein shall require Hilco-Maynards to transport or dispose of any environmentally hazardous chemicals, solvents or substances found on the Facility or in the Assets.

(d)    Subject to clause (a) above, MLC hereby agrees to defend, and hold Hilco-Maynards harmless from any and all claims, losses, damages and liabilities of any kind whatsoever which arise from or are in connection with the breach of any Environmental Laws or Environmental Permits except for those that arise from Hilco-Maynards' willful misconduct or gross negligence.

(e)    As used in this Agreement, "Environmental Laws" means all federal, state and local statutes, regulations, ordinances, rules, regulations and policies, all court orders and decrees and arbitration awards, and the common law, which pertain to environmental matters or contamination of any type whatsoever; and "Environmental Permits" means licenses, permits, registrations, governmental approvals, agreements and consents which are required under or are issued pursuant to Environmental Laws.

D.    Hilco-Maynards represents that it has read the De Minimis Asset Sale Order and covenants that it shall conduct all sales of Assets in accordance with the terms of the De Minimis Asset Sale Order, provided that, MLC shall be responsible for obtaining the required consents required under the De Minimis Asset Sale Order and shall advise Hilco-Maynards prior to the sale of any Asset whether all consents necessary under the De Minimis Asset Sale Order have obtained. Notwithstanding the foregoing, Hilco-Maynards is not permitted to sell any Asset for a purchase price in excess of $1,000,000 without MLC's prior written consent, which may only be

3

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

withheld on grounds that applicable notice procedures have not been complied with or that required consents have not been obtained.

E.    Prior to the auction, Hilco-Maynards shall consult with MLC to (i) identify certain assets as major assets (the "Major Assets"), based on their estimated sale prices and (ii) fix a minimum price bid (the "Minimum Price") for each Major Asset based on the estimated purchase price of such Asset, in each case, with the prior written agreement of MLC. Hilco-Maynards shall not, without MLC's prior written consent, sell any Major Asset for a price less than the applicable Minimum Price agreed to in advance by MLC.

F.    Hilco-Maynards shall sell Assets only pursuant to the Bill of Sale. Hilco-Maynards and MLC shall enter into a power of attorney in the form set forth as Exhibit C to enable Hilco-Maynards to enter into the Bills of Sale, with purchasers of the Assets for and on behalf of MLC.

G.    Hilco-Maynards shall act in good faith in the best interests of MLC and shall use its best efforts to complete the sale of Assets during the Term of this Agreement with the objective of securing the greatest proceeds from sales of the Assets reasonably obtainable during such period.

H.    Hilco-Maynards shall at all times comply with applicable laws, rules and regulations and shall carry out its obligations under this Agreement with due care in a competent businesslike manner consistent with industry standards and practices.

## VI.    Indemnification

A.    MLC hereby agrees to indemnify and hold Hilco-Maynards harmless from any and all claims by any buyer or prospective buyer of the Assets based on any of MLC's representations or warranties or performance hereunder. MLC further agrees to indemnify and hold Hilco-Maynards harmless from any claims, causes of action, damages and liabilities of any kind arising from or in connection with the demonstration and sale of the Assets or any inaccurate statements or representations concerning the Assets made by MLC to Hilco-Maynards or any prospective buyer, excluding any claims resulting from the willful misconduct or gross negligence of Hilco-Maynards.

B.    Hilco-Maynards shall indemnify and hold MLC harmless from any and all claims, liabilities, losses, damages and expenses arising out of or based upon Hilco-Maynards' breach of any of its representations, warranties or covenants hereunder or gross negligence or willful misconduct on the part of Hilco-Maynards, or its representatives or agents.

## VII.    Insurance

A.    During Hilco-Maynards' access to and use of the Facility, Hilco-Maynards shall procure and maintain, insurance, in which the limits of public liability shall not be less than Two Million ($2,000,000.00) Dollars for each personal injury or death and not less than Five Hundred Thousand ($500,000.00) Dollars for each instance of property damage. The policy shall name MLC as an additional insured.

6

The policy shall contain a clause that the insurer will not cancel or change the policy without first giving the MLC or parties designated by MLC thirty (30) days' prior written notice. Such insurance may be furnished by Hilco-Maynards under any blanket policy carried by it or under a separate policy therefore. The insurance shall be issued by a company qualified and licensed to do business in Michigan with general policyholder's ratings of A or better as rated in the most current available "Best's" Insurance Reports and a copy of the paid up policy evidencing such insurance or a certificate or binder from the insurer certifying to the issuance of such policy shall be delivered to MLC or parties designated by MLC prior to any access to the Facility by Hilco-Maynards and upon renewals of such policy no less than thirty (30) days prior to the expiration of such coverage.

     B.    MLC agrees to maintain, during the Term of this Agreement, fire and other perils insurance in respect of all Assets until sold. MLC acknowledges that Hilco-Maynards is not an insurer of the Assets.

## VIII.  General Provisions

     A.    The term of this Agreement (the "Term") shall extend until the earlier of (i) September 30, 2009 or, if later, the effective date of rejection of MLC's lease with respect to the Facility pursuant to section 365 of the Bankruptcy Code (as defined below), or (ii) the termination of this Agreement (x) by MLC, upon a material breach of this Agreement by Hilco-Maynards, or (y) by Hilco-Maynards, upon a material breach of this Agreement by MLC, in each case, if such breach remains uncured after 7 days' written notice. Upon expiration of the Term, this Agreement shall cease to have any effect and the obligations hereunder shall terminate, in each case, except for the following: (i) Hilco-Maynards' obligation to account for and pay over proceeds of sale, less any Buyers' Premium or reimbursable expenses that Hilco-Maynards is entitled to withhold pursuant to this Agreement, (ii) The provisions of Section V(C)(d), Section VI and Section VIII hereof.

     B.    All references in this Agreement to "Hilco-Maynards" shall mean Hilco and Maynards, jointly and severally.

     C.    This Agreement (including the Exhibits hereto) constitutes the entire agreement between the Parties and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

     D.    This Agreement shall be binding upon MLC or any successor or assignee, including but not limited to, a Chapter 11 or 7 trustee, examiner, liquidation trustee or liquidator.

     E.    The parties hereto agree, and MLC hereby expressly acknowledges, that Hilco-Maynards has not guaranteed MLC any return from the sale of the Assets.

     F.    MLC and Hilco-Maynards shall deal with each other fairly and in good faith so as to allow both parties to perform its duties and earn the benefits of this Agreement.

<div align="center">7</div>

This fax was received by Hilco's fax server. http://www.hilcotrading.com

F.    MLC recognizes and acknowledges that the services to be provided by Hilco-Maynards pursuant to this Agreement are, in general, transactional in nature, and Hilco-Maynards will not be billing MLC by the hour nor maintaining time records, other than for internal hourly labor costs associated with the sale of the Assets.  It is agreed that Hilco-Maynards is not requested or required to maintain such time records and that its compensation will be fixed on the percentages set forth herein.

G.    Any correspondence or required notice shall be addressed as follows:

If to Hilco or Hilco-Maynards:    Hilco Industrial, LLC
                                  5 Revere Drive
                                  Suite 206
                                  Northbrook, Illinois 60062
                                  Tel. (847) 849- 1100
                                  Fax  (847) 897-0868
                                  Attn:  Joseph Malfitano, VP, Assistant General Counsel

                                  And

                                  31555 West 14 Mile Road
                                  Farmington Hills, MI 48334
                                  Tel (2480 254-9999
                                  Fax (248-254-9995
                                  Attn:  Robert Levy, President


If to Maynards:                   Maynards Industries (1991) Inc.
                                  21700 Northwestern Highway
                                  Southfield, MI 48075
                                  Attn:  Taso Sofikitis, President

If to MLC:                        GM Global Headquarters
                                  Att. Mail Code 482-C37-A99
                                  300 Renaissance Dr.
                                  Detroit , Michigan 48265
                                  Attn: Christian B. Cook


H.    This Agreement shall be deemed drafted by the parties hereto, and there shall be no presumption against either party in the interpretation of this Agreement.

I.    By executing or otherwise accepting this Agreement, MLC and Hilco-Maynards acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein.

8

This fax was received by Hilco's fax server. http://www.hilcotrading.com

J.    MLC shall provide Hilco-Maynards with:

* all reasonably requested Asset Information to the extent in MLC's possession;

* information on prospect interest and evidence of all Asset inquiries, to the extent that MLC has such information and evidence; and

* all titles to titled vehicles prior to the sale effort for any titled vehicle commencing.

K.    This Agreement may be executed in original counterparts, and if executed and delivered via facsimile shall be deemed the equivalent of an original.

L.    This Agreement creates no third-party beneficiaries.

M.    Any and all issues, disputes, claims or causes of action which relate or pertain to, or result or arise from this Agreement or Hilco-Maynards' services hereunder, shall be settled by the Court. The parties hereto irrevocably and unconditionally (a) agree not to commence any such action, suit or proceeding except in such Court), (b) waive any objection to the laying of venue of any such action, suit or proceeding in the Court and (c) waive and agree not to plead or claim that any such action, suit or proceeding brought in the Court has been brought in an inconvenient forum

N.    Neither MLC, nor Hilco, Maynard or Hilco-Maynards will be liable to any other person for any consequential, incidental, indirect, special or punitive damages, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof.

O.    Absent further order of the Court specifically permitting the same, Hilco, Maynard and Hilco-Maynards shall not be entitled to set-off any obligation hereunder against any claim asserted by them, except with respect to Hilco-Maynards' right to reimbursement under this Agreement.

## IX.    Miscellaneous

This Agreement shall be governed by and construed in accordance with Chapter 11 of Title 11 of the United States Code, if applicable, and otherwise, the laws of the State of New York, in each case, without giving effect to conflict of laws provisions. This Agreement may not be transferred or assigned without the express written consent of the other Parties. The Parties hereto are acting as independent contractors and nothing contained herein shall be deemed to create any other type of agency, partnership, joint venture or other relationship. This Agreement may not be modified or amended except by an instrument in writing executed by an authorized representative of each party to this Agreement. If any part or subpart of this agreement is found

9

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

From: The Hilco Organization       Page: 11/15       Date: 9/21/2009 9:35:25 AM

09/20/2009   01:25    2485699793                MAYNARDS                        PAGE   11/15

or held to be invalid, that invalidity shall not affect the enforceability and binding nature of any other part of this agreement.

*                    *                    *

10

From: The Hilco Organization    Page: 12/15    Date: 9/21/2009 9:35:26 AM
09/20/2009   01:25    2485699793                          MAYNARDS                                      PAGE   12/15

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of
the date written below.

MOTORS LIQUIDATION COMPANY                    HILCO INDUSTRIAL, LLC
(F/K/A GENERAL MOTORS CORPORATION)

                                              Robert Levy    Digitally signed by Robert Levy
                                                             DN: cn=Robert Levy, o, ou,
                                                             email=rlevy@hilcoind.com, c=US
                                                             Date: 2009.09.21 09:34:36-04'00'

By: _____                   By: _____
Title: VP & Treasurer                         Title: _____
Date: 9-18-09                                 Date: _____

MAYNARDS INDUSTRIES (1991) INC.
By: _____
Title: PRESIDENT
Date: 9/17/09

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

## EXHIBIT A

- (2) Eagle and Addison McKey Tube Benders
- (2) Williams & White Hydraulic Presses up to 5000 Ton (Subject to final MLC approval)
- Danly 3500 Ton Double Action Press (Subject to final MLC approval)
- Leblond Lathe
- (2) 25/10 Ton Overhead Cranes
- (2) Forklifts
- Dake Shop Press
- Quincy Air Compressors
- Substations (Subject to final MLC approval)
- Small hand tools and more

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

From: The Hilco Organization    Page: 14/15    Date: 9/21/2009 9:35:26 AM
09/20/2009  01:25    2485699793    MAYNARDS    PAGE  14/15

# EXHIBIT B

## *DE MINIMIS* ASSET SALE ORDER

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                            :

In re                       :       Chapter 11 Case No.

MOTORS LIQUIDATION COMPANY, *et al.*,  :       09-50026 (REG)
      f/k/a General Motors Corp., *et al.*  :

                    :       (Jointly Administered)
           Debtors.     :

                    :
---------------------------------------------------------------x

### ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 363 (A) ESTABLISHING PROCEDURES FOR THE DISPOSITION OF *DE MINIMIS* ASSETS, AND (B) AUTHORIZING THE DEBTORS TO (i) PAY RELATED FEES, AND (ii) ASSUME, ASSUME AND ASSIGN, OR REJECT RELATED EXECUTORY CONTRACTS OR UNEXPIRED LEASES

Upon the Motion, dated July 29, 2009 (the "**Motion**"),[1] of Motors Liquidation

Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession

(collectively, the "**Debtors**"), pursuant to sections 105(a) and 363 of title 11 of the United States

Code establishing procedures for the sale of *de minimis* assets, whether by private sale or

auction, including the payment of related brokers' commissions and auctioneer fees and the

assumption, assumption and assignment, or rejection of related executory contracts or unexpired

leases, all as more fully set forth in the Motion; and due and proper notice of the Motion having

been provided, and it appearing that no other or further notice need be provided; and the Court

having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set

---

[1]      Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is

ORDERED THAT:

1. The relief requested in the Motion is GRANTED as provided herein.

2. The *De Minimis* Sale Procedures are approved as follows:

A. Sale Price Less than or Equal to $1 Million

3. The Debtors are hereby authorized to sell any asset for total consideration

of a value less than or equal to $1 million (a "**Non-Noticed *De Minimis* Sale**") without further

Court approval, and without providing notice of the Non-Noticed *De Minimis* Sale to any party,

whether by private sale or by auction; provided that (a) all assets with known existing

environmental contamination, and (b) the Debtors' interests in the Centerpoint Business Campus

in Pontiac, Michigan shall only be sold pursuant to the Noticed *De Minimis* Sale procedures (as

defined below). The Debtors are also authorized to take any actions that are reasonable and

necessary to close the Non-Noticed *De Minimis* Sale and obtain the sale proceeds.

4. If the Debtors seek to assume, assume and assign, or reject executory

contracts or unexpired leases relating to and in connection with an asset sale that would

otherwise qualify as a Non-Noticed *De Minimis* Sale, the Debtors shall seek to sell those assets

pursuant to the Noticed De Minimis Sale procedures (as defined below). In addition, if the

Debtors seek to sell assets encumbered by liens (other than assets encumbered solely by liens

granted in favor of the DIP Lenders, as defined and described in more detail below) in

connection with an asset sale that would otherwise qualify as a Non-Noticed *De Minimis* Sale,

the Debtors shall seek to obtain the consent of the lienholder. If the Debtors are unable to obtain

the consent of the lienholder, the Debtors may sell the encumbered assets pursuant to the Noticed *De Minimis* Sale procedures.

B.    <u>Sale Price Greater than $1 million but Less than or Equal to $15 Million</u>

        5.      The Debtors are hereby authorized to sell any asset for total consideration of a value that is greater than $1 million but less than or equal to $15 million (a "**Noticed** *De Minimis* **Sale**"), without further Court approval, after providing notice of the Noticed *De Minimis* Sale to certain parties in accordance with the following procedures.

        6.      If the Debtors propose a Noticed *De Minimis* Sale, the Debtors will serve a notice of such proposed sale (a "**Sale Notice**") by facsimile, email, overnight delivery, hand delivery, or first class mail on the following parties:

(i)     the United States Trustee for the Southern District of New York (the "**U.S. Trustee**");

(ii)    counsel for the statutory committee of unsecured creditors (the "**Creditors' Committee**");

(iii)   counsel for the lenders under that certain Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of July 10, 2009, among Motors Liquidation Company (f/k/a General Motors Corporation), as Borrower, the Guarantors party thereto, and the Lenders party thereto from time to time;

(iv)   the Office of the United States Attorney for the Southern District of New York, 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz, Esq.);

(v)    the state Attorney General for the state in which any real property to be sold is located;

(vi)   the treasurer or other appropriate representative of the local taxing jurisdiction or governmental unit in which the property to be sold is located;

(vii)  all known parties holding or asserting liens or encumbrances on the assets that are the subject of the proposed Noticed *De Minimis* Sale and their respective counsel, if known; and

    (viii)   the counterparties (or such counterparty's counsel) to all executory contracts or unexpired leases related to the property subject of the Sale Notice that the Debtors are seeking to assume and assign to the purchaser of the assets, or reject ((i)-(vi) collectively, the "**Interested Parties**").

Interested Parties shall have ten (10) business days from service of the Sale Notice to file and serve any objections to a Noticed *De Minimis* Sale (the "**Notice Period**").

7.    The Sale Notice will specify:

    (i)   a description of the asset proposed to be sold, its location, and a statement whether, at the time of the notice, there is any known existing environmental contamination of such asset;

    (ii)   an identification of the executory contracts and unexpired leases, if any, to be assumed and assigned, or rejected in connection with the sale, the amounts required to cure any defaults pursuant to section 365(b) of the Bankruptcy Code, and a statement regarding the adequate assurance of future performance by the proposed assignee, consistent with section 365 of the Bankruptcy Code;

    (iii)   the identities of any parties holding or asserting liens or other interests or potential interests in the property and a statement indicating how the Debtors propose to satisfy section 363(f) with respect thereto;

    (iv)   an affidavit of the broker or auctioneer, if any, pursuant to Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), that identifies the broker or auctioneer and the amount of the proposed commissions and contains the disclosures required by Bankruptcy Rule 2014; and

    (v)   instructions regarding the procedures to assert objections to the Noticed *De Minimis* Sale.

8.    If the transaction is to be a private sale, the Sale Notice will also specify:

    (i)   the identity of the proposed purchaser (including a statement indicating whether the proposed purchaser is an "insider" as defined in section 101(31) of the Bankruptcy Code); and

    (ii)   the major economic terms and conditions of the Noticed *De Minimis* Sale;[2]

---

[2]    This information may be provided by attaching the applicable contract or contracts to the Sale Notice.

9.      If the transaction is to be by auction, the Sale Notice will also specify:

     (i)      the date, time and place of the auction;

     (ii)     the minimum acceptable bid; and

     (iii)    any terms and conditions of sale to be imposed at the auction.

10.     Objections to a Noticed *De Minimis* Sale ("**Objections**") must be in writing, filed with the Court, and served on the Interested Parties and counsel to the Debtors so as to be received by all such parties prior to 4:00 p.m. (Eastern Time) on the last day of the Notice Period. Each Objection must state with specificity the grounds for the Objection.

11.     If any significant economic terms of a Noticed *De Minimis* Sale are amended after transmittal of the Sale Notice, but prior to the expiration of the Notice Period, the Debtors will serve a revised Sale Notice on all Interested Parties describing the proposed Noticed *De Minimis* Sale, as amended. If a revised Sale Notice is required, the Notice Period will expire on the later of the original Notice Period expiration date or five (5) calendar days from service of the revised Sale Notice.

12.     If an Objection to a Noticed *De Minimis* Sale is properly filed and served by an Interested Party:

     (i)      The Debtors may negotiate with the party filing the Objection and may change the terms of the sale without the requirement of further notice, as long as the revised terms are no more onerous to the Debtors than those set forth in the Sale Notice.

     (ii)     The Noticed *De Minimis* Sale may not proceed absent (a) withdrawal of the Objection; or (b) entry of an order by the Court specifically approving the Noticed *De Minimis* Sale.

     (iii)    The Debtors may schedule a hearing on the Noticed *De Minimis* Sale and, upon the scheduling of such a hearing, the Debtors will provide notice of the hearing on the party filing the Objection and the Interested Parties.

13.    If no Objection to a Noticed *De Minimis* Sale is filed and served by an Interested Party consistent with the Noticed *De Minimis* Sale Procedures, such Noticed *De Minimis* Sale will be deemed final and fully authorized by the Court under the terms of this Order, including the payment of related brokers' commissions or auctioneer fees, if applicable, and the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases, if applicable (including the payment of cure costs related thereto), and no further notice or Court approval to consummate the Noticed *De Minimis* Sale will be required or necessary.

14.    The Debtors may consummate a Noticed *De Minimis* Sale prior to expiration of the applicable Notice Period if they obtain each Interested Party's written consent to such Noticed *De Minimis* Sale.

15.    In the case of a Noticed *De Minimis* Sale to proceed by private sale, in the event the Debtors receive a competing bid the Debtors will only consummate a sale upon consultation with the Creditors' Committee.

16.    In the case of a Noticed *De Minimis* Sale to proceed by auction, the Debtors may sell the applicable asset at the auction for any price above the minimum bid, even if the sale price exceeds the applicable threshold for the *De Minimis* Sale Procedures.

C.    Effects of Sale

17.    The consent of the DIP Lenders is not required to sell estate assets, and all buyers will take title to the assets free and clear of the DIP Lenders' liens, claims, encumbrances and other interests, pursuant to section 363(f) of the Bankruptcy Code. Additionally, pursuant to section 363(f) of the Bankruptcy Code, all sales of property and interests in property pursuant to this Order shall be free and clear of all liens, claims and encumbrances, if any, and any such valid, and where applicable perfected, liens, claims, and encumbrances, including liens, claims,

and encumbrances of the DIP Lenders, will attach to the proceeds of the sale, subject to the

rights, claims, defenses and objections, if any, of the Debtors or the Creditors' Committee.

Notwithstanding the foregoing, nothing in this Order shall be construed to invalidate or

subordinate any duly perfected, non-voidable, valid liens of governmental units for personal

property taxes, real property taxes, special taxes, special assessments, and infrastructure

improvement taxes arising before or after the commencement of these chapter 11 cases to the

extent that such liens of governmental units take priority over previously granted and perfected

consensual liens or security interests in property of the Debtors under applicable non-bankruptcy

law.

        18.     All buyers will take assets sold by the Debtors pursuant to the *De Minimis*

Sale Procedures subject to the terms of the documentation executed in connection with the sale,

which may include provisions that the buyers are taking the assets "as is" and "where is,"

without any representations or warranties from the Debtors as to the quality or fitness of such

assets for either their intended purpose or any particular purpose.

        19.     All sales consummated in compliance with the *De Minimis* Sale

Procedures shall be deemed to be the result of an arm's-length transaction and the purchaser

shall be deemed a good faith purchaser and shall be entitled to the protections of section 363(m)

of the Bankruptcy Code.

        20.     Upon the closing of a private sale or auction pursuant to the *De Minimis*

Sale Procedures above, the Debtors may (a) assume any executory contract or unexpired lease to

be assigned to a proposed purchaser or other third party as a part of the proposed sale and

provide for the payment of the related cure amount and (b) reject any executory contract or

unexpired lease identified for rejection in the Sale Notice. The counterparties to any executory

contracts or unexpired leases identified in the Sale Notice pursuant to the *De Minimis* Sale

Procedures are hereby barred from asserting any further cure claims in respect of such executory

contracts or unexpired leases after the objection period for a Noticed *De Minimis* Sale has

passed.

21.    With respect to all Noticed *De Minimis* Sales and Non-Noticed *De
Minimis* Sales consummated pursuant to this Order, this Order shall be sole and sufficient

evidence of the transfer of title to any particular purchaser, and all such sales consummated

pursuant to this Order shall be binding upon and shall govern the acts of all persons and entities

who may be required by operation of law, the duties of their office, or contract, to accept, file,

register or otherwise record or release any documents or instruments, or who may be required to

report or insure any title or state of title in or to any of the property sold pursuant to this Order,

including without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, administrative agencies, governmental departments,

secretaries of state, and federal, state, and local officials, and each of such persons and entities is

hereby directed to accept this Order as sole and sufficient evidence of such transfer of title and

shall rely upon this Order in consummating the transactions contemplated hereby.

D.    The Quarterly Report

22.    On or before the 30th day after the commencement of each fiscal quarter

commencing with the fiscal quarter beginning on October 1, 2009, the Debtors shall file and

serve on the Creditors' Committee a report summarizing (i) any Noticed *De Minimis* Sales that

were consummated pursuant to the *De Minimis* Sale Procedures during the immediately

preceding fiscal quarter and (ii) any Non-Noticed *De Minimis* Sales for consideration greater

than $250,000 that were consummated pursuant to the *De Minimis* Sale Procedures during the

immediately preceding fiscal quarter (a "**Quarterly Report**"). With respect to each applicable

sale, each Quarterly Report shall include:

> (i)    a description of the assets sold;
>
> (ii)   the identity of the purchaser and any relationship such party has with the Debtors; and
>
> (iii)  the total consideration received in connection with the sale.

E.    Miscellaneous

    23.    The Debtors are authorized to pay reasonable brokers' commissions and

auctioneer fees for brokers and auctioneers utilized in connection with any sales pursuant to the

*De Minimis* Sale Procedures authorized herein.

    24.    Any (a) sale to an "insider," as defined in section 101(31) of the

Bankruptcy Code, (b) Non-Noticed *De Minimis* Sale of real property, and (c) Non-Noticed *De

Minimis* Sale of other property for total consideration of a value in excess of $500,000 may only

be consummated after consultation with the Creditors' Committee.

    25.    To the extent applicable, the ten-day stay of Federal Rule of Bankruptcy

Procedure 6004(h) is hereby waived, and this Order shall be effective immediately.

Furthermore, Non-Noticed *De Minimis* Sales and Noticed *De Minimis* Sales shall be deemed

authorized pursuant to the terms of this Order and no further or additional waivers of the ten-day

stay of Federal Rule of Bankruptcy Procedure 6004(h) shall be required for the Debtors to

consummate a Non-Noticed *De Minimis* Sale or a Noticed *De Minimis* Sale, subject to

compliance with the notice and other procedures set forth herein.

    26.    The Debtors are authorized, in consultation with the Creditors'

Committee, to execute and deliver all instruments and documents, and take such other action as

may be necessary or appropriate to implement and effectuate the transactions contemplated by this Order.

27.     Nothing in this Order or any purchase agreement entered into under this Order releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order. Nothing in this Order shall be deemed to allow the Debtors to abandon real or personal property in violation of any applicable state or federal laws or regulations, including but not limited to environmental laws and regulations.

28.     Nothing in this Order shall be construed to prevent the Debtors, in their sole discretion, from seeking this Court's approval at any time of any proposed sale after notice and an opportunity for a hearing.

29.     No further orders of this Court are necessary to effectuate the terms set forth herein for the transactions contemplated herein.

30.     Nothing in this Order shall authorize the Debtors to sell assets they do not own, including any leased equipment.

31.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
         *August 18, 2009*

                                                *s/ Robert E. Gerber*
                                                United States Bankruptcy Judge

From: The Hilco Organization     Page: 15/15     Date: 9/21/2009 9:35:26 AM
09/20/2009    01:25    2495699793                    MAYNARDS                              PAGE   15/15

## EXHIBIT C

POWER OF ATTORNEY

This fax was received by Hilco's fax server.  http://www.hilcotrading.com

LIMITED POWER OF ATTORNEY
PURSUANT AND SUBJECT TO ASSET MARKETING AGREEMENT

Know all by these presents, that Motors Liquidation Company ("MLC") hereby makes, constitutes and appoints each of Hilco Industrial, LLC ("Hilco") and Maynards Industries (1991) Inc. ("Maynards", and together with Hilco, "Hilco-Maynards"), acting together or individually, as MLC's true and lawful attorneys-in-fact, with power and authority on behalf of and in the name, place and stead of MLC to:

(1)    market, auction and sell Assets pursuant to that certain Asset Marketing Agreement by and among MLC, Hilco and Maynards, dated as of September [●], 2009 (the "Marketing Agreement");

(2)    execute, deliver and perform the obligations of MLC under Bills of Sale pursuant the Marketing Agreement; and

(3)    perform such other acts as are required to be conducted on behalf of MLC pursuant to Hilco-Maynards' obligations under the Marketing Agreement;

provided, however, that, (A) this Power of Attorney is subject, in all respects, to the Marketing Agreement, and power and authority to act on behalf or in the name of MLC is granted hereby to Hilco-Maynards only insofar as the same is exercised pursuant to, for the purpose of and consistent with the Marketing Agreement; (B) this Power of Attorney, and the power and authority granted to Hilco-Maynards hereby, is not coupled with interest and may be revoked at any time by MLC without any obligation on the part of MLC; and (C) this Power of Attorney, and the power and authority granted to Hilco-Maynards hereby, shall remain in force and effect only for the Term of the Marketing Agreement or, if earlier, until revoked by MLC in a signed writing delivered to each of Hilco and Maynards.

Capitalized terms not defined herein shall have the meanings ascribed thereto in the Marketing Agreement.  References to Hilco-Maynards, shall mean Hilco and Maynards, acting together or individually.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this ____ day of September, 2009.

<div style="margin-left:50%;">

_____

Motors Liquidation Company
By: _____
Name:
Title:

</div>

STATE OF _____      )
                             )ss
COUNTY OF _____       )


    On this ____ day of September, 2009, _____ personally appeared before me, and acknowledged that he executed the foregoing instrument on behalf of Motors Liquidation Company for the purposes therein contained.

    IN WITNESS WHEREOF, I have hereunto set my hand and official seal.


_____
Notary Public


My Commission Expires:

**Exhibit D**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                  :

In re                             :          **Chapter 11 Case No.**
                                  :

**MOTORS LIQUIDATION COMPANY,** *et al.,*  :       **09-50026 (REG)**
     **f/k/a General Motors Corp.,** *et al.*   :
                                  :

                   **Debtors.**      :          **(Jointly Administered)**
                                  :
------------------------------------------------------------x

### ORDER PURSUANT TO 11 U.S.C. §§ 105(a) and 363(b) AUTHORIZING THE EMPLOYMENT AND RETENTION OF HILCO INDUSTRIAL LLC AND MAYNARDS INDUSTRIES (1991) INC. AS EXCLUSIVE MARKETING AND SALES AGENTS TO THE DEBTORS *NUNC PRO TUNC* TO OCTOBER 1, 2009

Upon the Application, dated February 12, 2010 (the "**Application**"),[1] of Motors

Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and its affiliated debtors, as

debtors in possession (collectively, the "**Debtors**"), pursuant to sections 105(a) and 363(b) of

title 11, United States Code (the "**Bankruptcy Code**") for entry of an order authorizing the

retention and employment of Hilco Industrial, LLC ("**Hilco**") and Maynards Industries (1991)

Inc. ("**Maynards**", and together with Hilco, "**Hilco/Maynards**") as their exclusive marketing

and sales agents with respect to certain assets (the "**Assets**") on the terms set forth in that certain

Asset Marketing Agreement dated November 12, 2009 between Hilco/Maynards and MLC (the

"**AMA**") in connection with these chapter 11 cases, *nunc pro tunc* to October 1, 2009, all as

more fully described in the Application; and due and proper notice of the Application having

been provided, and it appearing that no other or further notice need be provided; and the Court

having found and determined that the relief sought in the Application is in the best interests of

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

the Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases

set forth in the Application establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

ORDERED that the Application is granted as provided herein; and it is further

ORDERED that, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code,

the Debtors are authorized to retain and employ Hilco/Maynards as their exclusive sales and

marketing agents with respect to the Assets, *nunc pro tunc* to the October 1, 2009 on the terms

and conditions generally described in the Application and more fully set forth in the AMA; and it

is further

ORDERED that Hilco/Maynards shall be permitted to receive compensation for

their services pursuant to the compensation structure set forth in the AMA without filing interim

or final fee applications and without being subject to the standard of review under section 330 of

the Bankruptcy Code; and it is further

ORDERED that all requests of Hilco/Maynards for payment of indemnity

obligations pursuant to the AMA shall be made by means of an application (interim or final as

the case may be) and shall be subject to review by the Court to ensure that payment of such

indemnity conforms to the terms of the AMA and is reasonable based upon the circumstances of

the litigation or settlement in respect of which indemnity is sought; and it is further

ORDERED that MLC shall indemnify and hold Hilco/Maynards harmless from

any claims, causes of action, damages and liabilities of any kind arising from or in connection

with (i) MLC's breach of any of its representations, warranties or covenants under the AMA, or

(ii) any inaccurate statements or representations concerning the Assets made by MLC to

Hilco/Maynards or any prospective buyer; <u>provided</u>, <u>however</u>, that MLC shall not indemnify

Hilco/Maynards from any claims resulting from the willful misconduct, gross negligence, bad-faith, self-dealing, or breach of fiduciary duty of Hilco/Maynards; and it is further

ORDERED that Hilco/Maynards shall indemnify MLC from any and all claims, liabilities, losses, damages and expenses arising out of or based upon Hilco/Maynards' breach of any representations, warranties or covenants under the AMA or gross negligence or willful misconduct on the part of Hilco/Maynards, or their representatives or agents; and it is further

ORDERED that to the extent this Order is inconsistent with the AMA, this Order shall govern; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), the terms and provisions of the Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: _____, 2010
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE