UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                              :

In re                         :         **Chapter 11 Case No.**
                              :

**MOTORS LIQUIDATION COMPANY, et al.,**  :     **09-50026 (REG)**
     **f/k/a General Motors Corp., et al.,**    :

             **Debtors.**        :     **(Jointly Administered)**
                              :
---------------------------------------------------------------X

## OBJECTION TO MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. 105(A) AND GENERAL ORDER M-390 AUTHORIZING IMPLEMENTATION OF ALTERNATIVE DISPUTE RESOLUTION PROCEDURES, INCLUDING MANDATORY MEDIATION

      **WHEREAS** the City of Anderson is the owner of certain former General Motors properties identified as Scatterfield Road and Columbus Avenue; and

      **WHEREAS** the City of Anderson took title to these properties as a result of a Donation Agreement with General Motors executed September 20, 2006.  See attached Exhibit A; and

      **WHEREAS** General Motors expressly retained all liability for environmental remediation required by the USEPA and Indiana Department of Environmental Management at the donated properties; and

      **WHEREAS** the City of Anderson was not party to and has no ability to enforce agreements with contractors and sub-contractors by General Motors to perform the required remediation activities; and

      **WHEREAS** the City of Anderson has no ability to mitigate the costs of the previously agreed to remediation activities,

      **NOW THEREFORE** the City of Anderson objects to implementation of the Alternative Dispute Resolution procedures proposed by the Debtor in its motion.

*Objection to Motion of Debtors for Entry of Order Pursuant to 11 U.S.C 105(A) and General Order M-390*
*Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation*

Page 2

Respectfully submitted:

_____
ANN MARIE BAUER, #10874-48
Attorney for the City of Anderson
1106 Meridian Street, Suite 109
Anderson, Indiana  46016
Telephone:  (765) 643-0511


Notice of this Objection to Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. 105(A) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation has been sent to the following February 2, 2010:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153

Attn:  Harvey R. Miller, Esq.

GENERAL MOTORS, LLC
300 Renaissance Center
Detroit, MI 48265
Attn:  Lawrence S. Buonomo, Esq.

THE UNITED STATES DEPARTMENT
OF TREASURY
1500 Pennsylvania Avenue NW
Washington, DC  20220
Attn:  Joseph Samarias, Esq.

KRAMER LEVIN NAFTALIS
& FRANKEL, LLP
1177 Avenue of Americas
New York, NY  10036

Attn:  Thomas Moers Mayer, Esq.

U.S. ATTORNEYS OFFICE, S.D.N.Y
86 Chambers Street
Third Floor
New York, NY  10007
Attn:  David S. Jones, Esq.

MOTORS LIQUIDATION COMPANY
500 Renaissance Center
Suite 1400
Detroit, MI  48243
Attn:  Ted Stenger

CADWALADER, WICKERSHAM & TAFT, LLP
One World Financial Center
New York, NY  10281
Attn:  John J. Rapisardi, Esq.

VEDDER PRICE, P.C
1633 Broadway
47th Floor
New York, NY  10019
Attn:  Michael J. Edelman, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
FOR THE SOUTHERN DISTRICT OF NEW YORK
33 Whitehall Street
21st Floor
New York, NY  10004
Attn:  Diana G. Adams, Esq.

_____
ANN MARIE BAUER, #10874-48
Attorney for the City of Anderson

## AGREEMENT FOR DONATION OF PROPERTY

This **AGREEMENT FOR DONATION OF PROPERTY** (this "**Agreement**") is made effective as of the 20.th day of _September_ 2006 (the "**Effective Date**"), by and between GENERAL MOTORS CORPORATION, a Delaware corporation, with its principal address at 300 Renaissance Center, P. O. Box 300, Detroit, Michigan 48265-3000 ("**GM**"), and THE ANDERSON REDEVELOPMENT COMMISSION, an Indiana statutory redevelopment commission with its principal address at 120 East 8th Street, Anderson, Indiana 46018 ("**ARC**").

## RECITALS:

This Agreement is based on the following recitals:

A.    GM owns numerous parcels of industrial property more particularly described on **Exhibit A** attached hereto in the City of Anderson, County of Madison, and State of Indiana (collectively, the "**Properties**" and individually, a "**Property**") located in general areas known as the "**Scatterfield Road Parcels – East**", the "**Scatterfield Road Parcels – West**", the "**Columbus Avenue Parcels**", the **Monroe Street Parcels**", and the "**Madison Avenue Parcel**," as designated on **Exhibit A-1**.

B.    ARC is an Indiana statutory redevelopment commission formed for the purpose of identifying, creating, monitoring, and funding redevelopment activities that will enhance the esthetic qualities of the community, increase the tax base, create new jobs, and improve the economic development conditions in the City of Anderson ("**City**").

C.    The City has requested that GM donate the Properties to ARC to be held by ARC pending their redevelopment and reuse for industrial, commercial, or recreational purposes by a third party developer or user ("**Developer**").

D.    GM is willing to donate the Properties to ARC, and ARC is willing to accept such donation, in accordance with the terms and provisions of this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing recitals, the mutual covenants, promises, and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, and intending to be legally bound, GM and ARC agree as follows:

(1)    PROPERTIES: The Properties to be donated by GM to ARC pursuant to this Agreement are more particularly depicted and/or described on **Exhibit A-1** and are generally referred to by GM as follows:

   (a)    Scatterfield Road Parcels - East:

      (i)      Parcel 1 (Plant 17: vacant land; and Plant 18: vacant office building)
      (ii)     Parcel 2 (Land between Plant 17 and 20)
      (iii)    Parcel 3 (Plant 20: facility leased to Delphi through December 31, 2008; and three land lots part of Plant 20)
      (iv)    Parcel 4 (Mounds Road: vacant land)
      (v)     Parcel 5 (Mounds Road: vacant land)

   (b)    Scatterfield Road Parcels – West:

      (i)      Parcel 6 (Plant 11)
      (ii)     Parcel 7 (Lot 3: vacant land)

   (c)    Monroe Street Parcels:

(i)     Parcel 8 (Plant 3 and slab 10)
(ii)    Parcel 8a (Monroe Street Parking Lots (1 of 2) south of 27th)
(iii)   Parcel 8b (Monroe Street Parking Lots (2 of 2) south of 27th)
(iv)    Parcel 9 (Monroe Street Parking Lot north of 27th)
(v)     Parcel 15 (Plant 7 slab and storage building)
(vi)    Parcel 16 (Wastewater Treatment Plant)

(d)     <u>Columbus Avenue Parcels</u>:

(i)     Parcel 10 (Plant 1 Parking Lot)
(ii)    Parcel 11 (Former Plant 1: vacant land)
(iii)   Parcel 12 (Former Plants 2 and 4)
(iv)    Parcel 17 (Plant 16: facility leased to Delco Remy America through
September 30, 2006)
(v)     Parcel 18 (Former Plants 6 and 8)
(vi)    Parcel 19 (Plant 5 slab)

(e)     <u>Madison Avenue Parcel</u>:

(i)     Parcel 14 (Lot 5 Madison Avenue: vacant land)

The Properties will be conveyed to ARC in their existing condition, except as provided in Sections (6), (7), (10), and (12), and subject to the existing leases and tenancies. ARC hereby acknowledges and agrees that GM anticipates donating certain power lines and equipment to the Anderson Light and Power Company ("**ALP**") pursuant to a separate donation agreement, which equipment is located on and which power lines currently run across the Properties, and such equipment and power lines are excluded from the donation of the Properties to ARC pursuant to this Agreement. ARC shall coordinate and work with ALP to create the necessary easements over and across the Properties for such power lines and equipment.

(2)     **AGREEMENT FOR DONATION OF PROPERTIES**: GM shall donate to ARC, and ARC shall accept from GM the donation of, the Properties, subject to the exceptions and other matters, and upon the terms and conditions, set forth in this Agreement.

(3)     **CLOSING**: Subject to the terms and conditions of Sections (8), (9), and (10), all of the Properties shall be conveyed to ARC in one closing, which closing shall in no event be later than October 31, 2006; provided that ARC shall have the right to: (a) waive further inspection of the Properties and conditions of closing under Sections (8), (9), and (10); and (b) accelerate the closing to a date as soon as September 1, 2006. The closing shall occur by Federal Express or other reliable overnight courier with all deliveries being sent to Land America Financial Group, Inc., 150 Wilshire Drive, Suite 310, Troy, Michigan, 48084. At closing: (a) GM shall convey to ARC title to the Properties by deed of gift described in Section (4); and (b) ARC and GM shall execute a closing statement setting forth any pro rations or other disbursements in the manner provided herein.

(4)     **DEED OF GIFT**: GM shall convey, and ARC shall accept, title to the Properties by Deeds of Gift in the form attached hereto as **Exhibit B**. ARC shall take title to the Properties subject to the applicable restrictions relating to the use and occupancy of the Properties set forth in Section (14), which restrictions shall: (a) be contained in the Deeds of Gift; (b) run with the land; (c) be enforceable against ARC and its successors and assigns; (d) be enforceable by: (i) the U.S. Environmental Protection Agency Region V ("**EPA**"), as a third party beneficiary, with respect to the RCRA Action Properties (as defined in Subsection 7(a)); and (ii) the Indiana Department of Environmental Management ("**IDEM**"), as a third party beneficiary,

C:\Documents and Settings\deo\Local Settings\Temporary Internet
Files\OLK16\DETROIT-#1423685-v21-GM_ARC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

with respect to the IDEM Action Properties (as defined in Subsection 7(a)); and (e) inure to the benefit of, and be enforceable by, GM and its successors and assigns.

(5)  PRORATIONS; COSTS:  On or before the date of closing, GM shall pay all taxes and assessments with respect to the Properties that are due and payable by GM prior to the date of closing. Current taxes and assessments for the period in which the closing occurs shall be prorated in accordance with prevailing local practice on a per diem basis as of the date of closing, based upon the most recent tax bills.  No adjustments shall be made after closing.  GM shall deliver the Deeds of Gift in recordable form, and ARC shall be responsible for any local or state revenue or documentary stamps and the recording fees for recording the Deeds of Gift.  Rents payable by tenants, and charges payable by the landlord, under any leases affecting the Properties for the month of closing shall be prorated based on the number of days during the month each of GM and ARC owned the Properties.  Reimbursements by tenants under any leases affecting the Properties payable other than monthly shall be prorated so that the party bearing the expense for which the reimbursement is paid receives such reimbursement.

(6)  DEMOLITION:

(a)  Demolition Work.  GM shall undertake the following demolition activities, which demolition activities are more particularly described in the demolition scope of work documents referenced in **Exhibit L-1** ("**Demolition Work**"):

(i)  Scatterfield Road Parcels - West:

(A)  Demolition of plant on Parcel 6 (Plant 11)
(B)  Removal of slab on Parcel 6 (Plant 11)
(C)  Removal of Sub-Station #4 on Parcel 6 (Plant 11)

(ii)  Monroe Street Parcels:

(A)  Removal of slab on Parcel 15 (Plant 7)
(B)  Demolition of Wastewater Treatment Plant (Parcel 16)

(iii)  Columbus Avenue:

(A)  Removal of slab on Parcel 19 (Plant 5)
(B)  Removal of slab on Parcel 12 (Former Plants 2 and 4)
(C)  Removal of slab on Parcel 18 (Former Plants 6 and 8)

The specific areas of each of the foregoing Properties on which the Demolition Work is to be performed are described in the demolition scope of work documents referenced on **Exhibit L-1** (each such area, a "**Demolition Area**").

(b)  Completion of Work.  GM shall use commercially reasonable efforts to complete the Demolition Work in accordance with the schedule set forth in the demolition scope of work referenced on **Exhibit L-1** (the "Demolition Schedule").  GM shall complete or caused to be completed the Demolition Work: (i) in a good and workmanlike manner; and (ii) in accordance with all applicable federal, state, and local laws, statutes, ordinances, rules, and/or regulations (the "**Laws**").

C:\Documents and Settings\dao\Local Settings\Temporary Internet
Files\OLK16\DETROIT-#1423685-v21-GM_AIRC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

(c)    Closing Before Completion.  If, on the closing date, the Properties include any Demolition Areas, then: (i) at the closing, GM shall provide to ARC an indemnity pursuant to which GM indemnifies and holds harmless ARC from and against any and all costs, claims, expenses, and causes of action arising from or in connection with the performance by GM of the Demolition Work on the Demolition Areas; and (ii) from and after the date of the closing until completion of the Demolition Work on the Demolition Areas, GM shall cause its demolition contractors to maintain public liability insurance with the minimum coverages set forth on **Exhibit N**, which insurance shall name ARC as an additional insured.

(7)    **AGENCY RESPONSE ACTIVITIES:**

(a)    Agency Response Activities.  ARC and GM acknowledge that:

(i)    The Properties delineated on the site plan attached hereto as **Exhibit A-2** (the "Site Plan") as the "**RCRA Action Properties**" require corrective action pursuant to requirements of the Resource, Conservation and Recovery Act, and the regulations promulgated thereunder ("**RCRA**"), and the EPA.  The RCRA Action Properties are subject to a RCRA Corrective Action project under a Consent Order with the EPA.  The portions of the RCRA Action Properties where surficial work or installations are planned are described in the documents referenced on **Exhibit J** (the "**RCRA Action Areas**").

(ii)    The proposed corrective action to be completed with respect to each of the RCRA Action Properties is described in the documents referenced on **Exhibit J** (the "**Required RCRA Remediation**"), and the schedule for completing the Required RCRA Remediation is set forth in the documents referenced on **Exhibit J** (the "**RCRA Remediation Schedule**").

(iii)    Properties 17, 18, and 19 (the "**IDEM Action Properties**"), as delineated on the site plan attached hereto as **Exhibit A-3** (the "**Columbus Avenue Site Plan**") may require corrective action pursuant to requirements of applicable state Laws and IDEM or other governmental agencies.  The portion of the IDEM Action Properties where surficial work or installations are planned are described in the documents referenced on **Exhibit K** (the "**IDEM Action Areas**").

(iv)    The proposed corrective action to be completed with respect to each of IDEM Action Properties is described in the documents referenced on **Exhibit K** (the "**Proposed IDEM Remediation**"), and the schedule for completing the Proposed IDEM Remediation is set forth in the documents referenced on **Exhibit K**.

The Required RCRA Remediation and the Proposed IDEM Remediation, collectively, are the "**Agency Response Activities**".  The RCRA Remediation Schedule and the IDEM Remediation Schedule, collectively, are the "**Remediation Schedules**".

(b)    Intentionally Deleted.

C:\Documents and Settings\dao\Local Settings\Temporary Internet
Files\OLK16\DETROIT-#1423685-v21-GM_ARC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

(c)    Completion. GM shall exercise commercially reasonable efforts to complete the Agency Response Activities in accordance with the applicable Remediation Schedules, which obligation shall survive the acquisition by ARC of the RCRA Action Properties and the IDEM Action Properties; provided that the Remediation Schedules may be modified to reflect requirements imposed by, and delays caused by, EPA, IDEM, or other governmental agencies, as applicable.

(d)    Agency Discussions. Except as and to the extent provided in the Confidentiality Agreement (as defined in Section 10(b)), unless specifically requested by GM, ARC acknowledges and agrees that ARC shall have no right to participate in any discussions and/or negotiations with the EPA, IDEM or any other governmental agency(ies) and shall not independently engage in any discussion and/or negotiations with such agency(ies) regarding the Agency Response Activities. GM shall, if requested by ARC, keep ARC reasonably apprised of the status of any such discussions and/or negotiations affecting the Properties.

(e)    Further Actions.

(i)    If EPA or IDEM requires additional investigations at the Properties in connection with the performance and/or completion of the Agency Response Activities, then GM shall be responsible for conducting such additional investigations or otherwise addressing the concerns of EPA or IDEM; provided that ARC shall provide GM and its agents, employees, and contractors with rights of access consistent with the terms and conditions of Subsection (7)(f), which rights shall terminate at such time as the required investigations have been completed.

(ii)    If EPA or IDEM requires work at the RCRA Action Properties or the IDEM Action Properties in addition to the originally defined Agency Response Activities pursuant to Section 12 hereof, then: (A) GM shall be responsible for completing such additional work pursuant to a plan and schedule approved by EPA or IDEM, as applicable, which plan and schedule, once finalized, shall be included within the definition of Required RCRA Remediation and RCRA Remediation Schedule or Proposed IDEM Remediation and IDEM Remediation Schedule, as applicable, for all purposes under this Agreement; and (B) if the additional Required RCRA Remediation or Proposed IDEM Remediation requires surficial work or installations on any portion of the Properties other than those currently defined as RCRA Action Areas or IDEM Action Areas, respectively, then such portion (and only such portion) shall be included within the definition of RCRA Action Areas or IDEM Action Areas, as applicable, for all purposes under this Agreement.

(iii)    If EPA or IDEM requires work at the RCRA Action Properties or the IDEM Action Properties in addition to the originally defined Agency Response Activities other than pursuant to Section 12, then (A) GM, in its sole discretion, shall have the right to determine whether it will undertake any additional work; (B) in the event GM determines that it will undertake any additional work, it shall undertake such work as agreed upon by GM and EPA or IDEM, as applicable; and (C) in the event GM elects not to undertake any additional work or GM and EPA or IDEM do not agree

C:\Documents and Settings\dao\Local Settings\Temporary Internet
Files\OLK16\DETROIT-#1423685-v21-GM_ARC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

upon the scope of such work, ARC may require GM to accept reconveyance of the applicable Property and upon such reconveyance, GM shall indemnify and defend ARC from and against any and all claims, liability, damages, penalties, causes of action, and reasonable costs and expenses specifically relating to the additional work that has caused GM to accept the reconveyance of the applicable Property. GM promptly shall notify ARC in writing with respect to which option it will exercise under this Subsection.

(iv)    If, pursuant to Subsections 7(e)(ii) and (iii) and Section 12 hereof, it is determined that there are additional RCRA Action Areas or IDEM Action Areas, then: (A) the Site Plan or Columbus Avenue Site Plan currently attached hereto shall be amended or replaced, as applicable, with an updated Site Plan or Columbus Avenue Site Plan delineating all RCRA Action Areas, IDEM Action Areas, and Remaining Property (as defined in Subsection (8)(c)); (B) the Exhibits describing the Required RCRA Remediation and the Proposed IDEM Remediation shall be replaced with updated Exhibits that include the additional Required RCRA Remediation and Proposed IDEM Remediation, respectively; and (C) the Exhibits setting forth the RCRA Remediation Schedule and the IDEM Remediation Schedule shall be replaced with updated Exhibits that include the schedule for completing the additional Required RCRA Remediation and Proposed IDEM Remediation.

(f)    Access. ARC shall provide GM and its agents, employees, and contractors with rights: (i) of access over and across the Properties to and from the RCRA Action Areas and/or the IDEM Action Areas, as applicable; provided that, such rights of access, in the case of portions of the Properties other than the RCRA Action Areas and the IDEM Action Areas, shall be limited to reasonable routes designated by ARC that minimize the disruption to any occupants of the Properties; and (ii) to perform the Agency Response Activities in the RCRA Action Areas or the IDEM Action Areas, as applicable; all of which rights shall terminate with respect to each RCRA Action Area or IDEM Action Area at such time as EPA, IDEM, and/or another governmental agency, as applicable, provides written concurrence that the Agency Response Activities have been completed on that RCRA Action Area or IDEM Action Area.

(g)    Cooperation. ARC shall cooperate with GM and its representatives, if such cooperation is reasonably required, in obtaining any requisite governmental approvals, consents, waivers, or permits that may be required, or in filing any required deed notifications and/or restrictions (all of which will be obtained or filed at GM's sole expense) to conduct the Agency Response Activities at the Properties. In conducting the Agency Response Activities, GM shall exercise commercially reasonable efforts to minimize interference with, and interruption of, the occupancy, use, operation, and development of the Properties, and GM promptly shall restore, to the extent reasonably possible, the areas where GM: (i) conducts the Agency Response Activities; or (ii) exercises its rights of access to conduct the Agency Response Activities.

(h)    Considerations. GM, in completing the Agency Response Activities at the Properties, shall have the right to utilize and rely upon the following factors in conducting the Agency Response Activities at the Properties, to the extent that such factors are consistent with the requirements agreed upon by GM, EPA, IDEM, and any other applicable governmental authorities: (i) specific requirements, if any, under applicable

environmental laws as existing and in effect at the time the Agency Response Activities are carried out; and (ii) to the extent not specifically precluded under such applicable environmental laws, consideration of the following: (A) technical feasibility of the response activity; (B) economic reasonableness of the response activity; (C) any deed notifications and/or restrictions related to the use of the Properties; and (D) the following human health and environmental risk-based factors: (1) likely exposure pathways consistent with the Permitted Use (as defined in Subsection (14)(c)); (2) typical simulated exposure distributions consistent with such exposures; (3) fate and transport characteristics; (4) local geology and hydrogeology; and (5) toxicity of the materials in question.

(8)    ENVIRONMENTAL INSURANCE. The obligation of ARC to proceed to closing with respect to the Properties is subject to ARC having determined that it can obtain acceptable environmental insurance with respect to the Properties (the "**Acceptable Environmental Insurance**"). If ARC determines that it is unable to obtain Acceptable Environmental Insurance with respect to any portion of the Properties, then ARC may elect to: (a) waive the condition set forth in this Section and proceed to close on the Properties without Acceptable Environmental Insurance; or (b) terminate this Agreement as to such portion of the Properties under Section (10). In no event shall ARC's determination with respect to Acceptable Environmental Insurance affect any of the obligations of GM under this Agreement.

(9)    SURVEY AND EVIDENCE OF TITLE: GM has provided ARC with copies of the existing surveys of the Properties that are in the possession of GM's Worldwide Real Estate Group at no expense to ARC ("**Surveys**"). All such Surveys are provided to ARC without representation, warranty, or recourse as to accuracy. ARC shall be entitled to obtain, at its own expense, commitments for owner's policies of title insurance ("**Title Commitments**") with respect to the Properties in such form as is reasonably acceptable to ARC. If the Surveys or Title Commitments show any encroachment, lien, encumbrance, or defect in title with respect to any Property to which ARC objects (a "**Defect**"), then ARC shall deliver to GM a written notice from ARC's attorney stating that title to such Property is not in a condition satisfactory to ARC, which letter shall specify each alleged Defect. If ARC fails to furnish GM with such letter and proceeds to close, all Defects shall be deemed waived, and ARC shall accept as satisfactory title to the Property in the condition shown in the Surveys and described in the Title Commitments. If ARC does send GM such written objection, then, within 30 days after the date on which GM receives such written objection, GM shall notify ARC, in writing, as to whether GM intends to attempt to cure any such Defect and, if so, GM shall promptly proceed to attempt to cure such Defect. If GM elects to attempt to cure any Defect, then GM may, by written notice to ARC, extend the closing date for an additional six month period (or such longer period as mutually agreeable to the parties) to cure the Defect. GM shall give written notice to ARC when the Defect is cured and, thereafter, the closing shall occur in accordance with the provisions of Section (3). If GM declines to cure any Defect, or if any Defect is not cured within the six month period described above (as such period may be extended), then ARC may, at its option, waive the Defect in writing and proceed to closing as provided in this Agreement or terminate this Agreement as to such portion of the Properties as to which the Defect pertains by written notice to GM. If, within 10 business days after the expiration of the six month period, ARC has not terminated this Agreement by written notice to GM, then ARC shall be deemed to have waived such Defects.

(10)    INSPECTION BY ARC:

(a)    Closing Condition. The closing of the transactions contemplated under this Agreement are contingent upon ARC determining, on or before the date that is 60 days after the Effective Date, that the condition of the Properties is satisfactory to ARC, in ARC's sole discretion. If ARC elects, by delivering written notice to GM on or before the date that is 60 days after the Effective Date, to terminate this Agreement as to any portion of the Properties, then both parties shall be relieved of any further liability hereunder with respect to such portion of the Properties, except as may otherwise be set forth herein. In

the event that ARC elects to terminate this Agreement as to any portion of the Properties pursuant to this Section or Section (8), GM thereafter may elect to terminate this Agreement as to all Properties, and both parties shall be relieved of any further liability hereunder with respect to the Properties, except as may otherwise be set forth herein.

(b)    Protective Agreements.  ARC has executed and delivered to GM a "**Right of Access Agreement**" in the form attached hereto as **Exhibit D** and a "**Confidentiality Agreement**" in the form attached hereto as **Exhibit E** and collectively known as the "**Protective Agreements**", which Protective Agreements are hereby incorporated herein by reference as if fully set forth herein.  A default by ARC under either of the Protective Agreements that continues beyond applicable cure periods shall be deemed a default by ARC hereunder.    Notwithstanding anything contained herein or in the Protective Agreements to the contrary, all of ARC's obligations under the Protective Agreements shall survive any termination of this Agreement and the closing of the transaction contemplated hereunder; provided that the rights of ARC under the Protective Agreements shall terminate contemporaneously with any termination of this Agreement.

(c)    Environmental Reports.  GM and GM's representatives have conducted an environmental assessment of the Properties.  Pursuant to the Confidentiality Agreement, GM has provided ARC's environmental consultants, Keramida Environmental, Inc., and Hydrotech Corporation (collectively the "**Environmental Consultants**") with copies of (or otherwise has made available to such parties) the current environmental assessment reports described on **Exhibit F** attached hereto (the "**Environmental Reports**"). All Environmental Reports are provided to the Environmental Consultants without representation, warranty, or recourse as to accuracy or as to whether such documents constitute all documents in the possession of GM.

(11)    "AS IS, WHERE IS" CONDITION:  Except as expressly set forth in this Agreement and/or in the documents and instruments delivered to ARC at closing, ARC acknowledges and agrees that neither GM nor any agent, employee, attorney, or representative of GM has made any statements, agreements, promises, assurances, representations, or warranties, whether express, implied, or otherwise, regarding the condition of the Properties, the suitability of the Properties for any uses or purposes contemplated by ARC, the zoning of the Properties, the right to occupy the Properties, the state of title to the Properties and/or any other aspect of or matter pertaining to the Properties or any other fact or matter whatsoever, whether pertaining to GM, the Properties, or otherwise.  ARC further acknowledges and agrees that: (a) prior to closing, it shall have fully examined and investigated to its full satisfaction the physical nature and condition of the Properties, and all aspects thereof, including, without limitation, the environmental condition of the Properties and surrounding properties; (b) it shall acquire the Properties in an "AS IS, WHERE IS" condition as of the closing date, subject to the obligations of GM expressly set forth in this Agreement and/or in any documents and instruments delivered to ARC at closing; (c) it shall acquire certain of the Properties in a so-called "cold shutdown" condition, including, without limitation, any damage resulting therefrom; and (d) except as expressly set forth in this Agreement and/or in the documents and instruments delivered to ARC at closing, GM shall not be responsible for making (or contributing in any way to the cost of making) changes or improvements to the Properties, or any other aspect of or matter pertaining to the Properties.  ARC expressly waives: (a) any right of rescission; provided that such waiver shall not apply to any rescission or reconveyance pursuant to Section 12; and (b) all claims for damages by reason of any statement, representation, warranty, assurance, or promise, if any; provided that such waiver shall not apply to any damages arising out of the breach of any specific undertaking of GM pursuant to this Agreement.  ARC further releases and discharges GM, its affiliates and their respective members, partners, venturers, stockholders, directors, officers, employees, agents, spouses, legal representatives, successors and assigns (collectively, the "**Released Parties**"), from and against any and all claims or causes of action which ARC may now have or hereafter have against GM arising in

C:\Documents and Settings\dao\Local Settings\Temporary Internet
Files\OLK16\DETROIT-#1423685-v21-GM_ARC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

connection with, or out of the condition of, the Properties; provided that such release shall not apply with respect to claims and/or causes of action that ARC may now have or hereafter have against GM with respect to the continuing obligations and/or liabilities of GM with respect to the Properties, as expressly set forth in this Agreement and/or in the documents and instruments delivered to ARC at closing.  ARC's waivers hereunder shall survive the transfer of the Properties to ARC.

(12)    <u>POST-CLOSING DISCOVERIES</u>:

    (a)    Definitions.

        "**Affected Portions**" shall mean the actual portions of the Properties on which ARC constructs or installs ARC Infrastructure Improvements, together with any: (i) related Construction Areas; and (ii) routes used for access to or from such portion of the Properties or such Construction Areas.

        "**Construction Areas**" shall mean any temporary construction, staging, or other areas utilized in connection with the construction or installation of ARC Infrastructure Improvements.

        "**Conveyance**", "**convey**," or "**conveyed**" shall mean, with respect to a portion of the Properties: (i) a conveyance of fee title thereto by ARC to a Developer; (ii) a land contract or other equivalent title retention device; or (iii) a ground lease thereof under which ARC is the landlord and a Developer is the tenant.

        "**Post-Closing Environmental Discovery**" shall mean, with respect to a Property that has been conveyed to ARC, an environmental condition that: (i) can reasonably be determined to have been in existence prior to the conveyance of such Property to ARC; (ii) requires remediation or other response activity under the Laws; and (iii) has not been disclosed in the Environmental Reports.

        "**Released Property**" shall mean: (i) in the case of a Conveyance, the actual portion of the Properties conveyed to a Developer, as determined by reference to the legal descriptions used on the conveyance documents; (ii) in the case of ARC commencing the construction or installation of ARC Infrastructure Improvements (as defined in Subsection 14(a)), the Affected Portions of the Properties; provided that, if, in any case: (i) the area of the Affected Portions of any individual Property; exceeds (ii) 50% of the overall area of that Property; then the entirety of that Property shall be deemed to be a Released Property.

        "**Release Trigger Event**" shall mean, with respect to a Released Property, the first to occur of: (i) Conveyance of the Released Property; or (ii) ARC commencing the construction or installation of ARC Infrastructure Improvements on the Released Property.

    (b)    Pre-Release Discoveries.

C:\Documents and Settings\ad\Local Settings\Temporary Internet Files\OLK16\DETROIT-#1423685-v21-GM_ARC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

(i)      In the event that, following the closing and prior to a Release Trigger Event with respect to a specific Property, there is a Post-Closing Environmental Discovery with respect to that specific Property: (A) ARC shall promptly provide written notice thereof to GM, together with copies of any notices, reports, or other documentation pertaining thereto; and (B) ARC shall permit GM and its representatives reasonable access to that Property to investigate the Post-Closing Environmental Discovery.

(ii)     If GM concurs that a Post-Closing Environmental Discovery requires remediation or other response activities under the Laws, then, except as otherwise set forth in Subsection 12(b)(iii) and (iv), GM shall have the option of: (A) undertaking the required remediation or other response activity; or (B) accepting the reconveyance of the applicable Property from ARC and indemnifying and defending ARC from and against any and all claims, liability, damages, penalties, causes of action, and reasonable costs and expenses specifically relating to the Post-Closing Environmental Discovery that has caused GM to accept the reconveyance of the applicable Property.  GM promptly shall notify ARC in writing with respect to: (A) whether GM concurs that the Post-Closing Environmental Discovery requires remediation or other response activities; and (B) if so, which option it will exercise under this Subsection.

(iii)    If there is a Post-Closing Environmental Discovery with respect to RCRA Action Properties or IDEM Action Properties that requires remediation or other response activities under the Laws, but such remediation or other response activity requires only a non-material addition to, or change in, the Agency Response Activities that GM already is obligated to complete as of the date of the closing, then, notwithstanding anything to the contrary set forth in this Agreement (including the provisions of Subsections (12)(b)(ii)): (A) GM shall undertake the required remediation or other response activity as agreed upon by EPA and/or IDEM, as applicable; (B) GM shall not have the option of accepting the reconveyance of such Property from ARC; and (C) ARC shall not have the option of objecting to the required remediation or other response activity.

(iv)     If there is a Post-Closing Environmental Discovery with respect to the RCRA Action Properties or the IDEM Action Properties that requires remediation or other response activities under the Laws, and such remediation or other response activity requires a material addition to, or change in, the Agency Response Activities that GM already is obligated to complete, then ARC shall have the right to approve the material addition to, or change in, the Agency Response Activities, which approval shall not be unreasonably withheld or delayed, and, notwithstanding anything to the contrary set forth in this Agreement, if ARC does not approve the material addition to, or change in, the Agency Response Activities in its reasonable discretion, then: (A) GM shall have the right to require ARC to reconvey the applicable Properties to GM; and (B) ARC shall have the right to require that GM accept the reconveyance of such Properties from ARC and indemnify and defend ARC from and against any and all claims, liability, damages, penalties, causes of action, and reasonable costs and expenses relating to the specific Post-Closing

Environmental Discovery. If ARC approves the material addition to, or change in, the Agency Response Activities, then, notwithstanding anything to the contrary set forth herein: (A) GM shall undertake the required remediation or other response activity as agreed upon by EPA and/or IDEM, as applicable; (B) GM shall not have the option of accepting the reconveyance of such Property from ARC; and (C) ARC shall not have the option of objecting to the required remediation or other response activity.

(v)    If GM is obligated or elects under Subsection (12)(b)(ii), (iii), or (iv) to undertake required remediation or other response activities with respect to a Post-Closing Environmental Discovery, then GM shall exercise commercially reasonable efforts to: (1) develop and agree upon a plan and schedule for corrective action with respect to the Post-Closing Environmental Discovery, which plan and schedule, once finalized, shall be included within the definition of Required RCRA Remediation and RCRA Remediation Schedule or Proposed IDEM Remediation and IDEM Remediation Schedule, as applicable, for all purposes under this Agreement; and (2) delineate the portion of the Property subject to the newly defined Required RCRA Remediation or Proposed IDEM Remediation, as applicable, which portion (and only such portion) shall be included within the definition of RCRA Action Areas or IDEM Action Areas, as applicable, for all purposes under this Agreement; and (iv) with respect to such newly defined Required RCRA Remediation or Proposed IDEM Remediation, as applicable, the terms and conditions of Section (7) shall apply.

(vi)    Replacement Exhibits.    If, pursuant to this Subsection, it is determined that there are additional RCRA Action Areas or IDEM Action Areas, then: (A) the Site Plan or Columbus Avenue Site Plan currently attached hereto shall be amended or replaced, as applicable, with an updated Site Plan or Columbus Avenue Site Plan delineating all RCRA Action Areas, IDEM Action Areas, and Remaining Property; (B) the Exhibits describing the Required RCRA Remediation and the Proposed IDEM Remediation shall be replaced with updated Exhibits that include the additional Required RCRA Remediation and Proposed IDEM Remediation, respectively; and (C) the Exhibits setting forth the RCRA Remediation Schedule and the IDEM Remediation Schedule shall be replaced with updated Exhibits that include the schedule for completing the additional Required RCRA Remediation and Proposed IDEM Remediation.

(c)    Post-Release Discovery. In the event that, following a Release Trigger Event with respect to a Property, there is a Post-Closing Environmental Discovery, GM shall have no obligations hereunder with respect to such Post-Closing Environmental Discovery; provided that: (i) nothing in this Subsection shall be construed to release GM from its obligations under Subsection (12)(b); and (ii) after the Conveyance of any portion of the Properties, GM shall not have the option of accepting the reconveyance of such portion of the Properties from ARC, even if a Post-Closing Environmental Discovery requires remediation or other response activities under the Laws.

C:\Documents and Settings\dao\Local Settings\Temporary Internet
Files\OLK16\DETROIT-#1423685-v21-GM_AIRC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

(13)   <u>DEFAULTS; REMEDIES</u>.  If GM is in default hereunder and fails to cure such default within 30 days after receipt of written notice from ARC (or, in the case of a default that, in the exercise of diligent efforts, cannot be cured within 30 days, GM fails to commence a cure of the default within 30 days after receipt of written notice from ARC and thereafter diligently pursue the cure to completion), then ARC shall have all rights and remedies available to it at law and in equity in connection with such default, including the right to: (a) an injunction or an action for specific performance; or (b) an action to recover monetary damages; provided that ARC shall be entitled to recover from GM all costs and expenses incurred by ARC to exercise its rights pursuant to this Subsection (the "**Enforcement Costs**").  In no event shall GM be liable to ARC, a Developer, or a tenant pursuant to this Agreement or in any way relating to the Properties for any incidental, consequential, or special damages; provided that Enforcement Costs shall not be deemed to be incidental, consequential, or special damages.

(14)   <u>ARC'S OWNERSHIP OF THE PROPERTIES AND RESTRICTIONS ON USE AND CONVEYANCE</u>.  ARC's purpose is to identify, create, monitor, and fund redevelopment activities in the City.  It is not the purpose or intent of ARC to directly engage in the development or operation of the Properties.  GM's agreement to donate the Properties to ARC and GM's obligations with respect to the environmental condition of the Properties, as set forth herein, are all predicated on this premise.  Accordingly, and as a material inducement to GM to donate the Properties to ARC, GM and ARC have agreed as follows:

(a)   Except for the ARC Infrastructure Improvements, and subject to Subsection (14)(b), neither ARC nor any of its agents, employees, or contractors shall develop or otherwise utilize, either on a permanent or temporary basis, any of the Properties without prior written notice to GM detailing the proposed use or development.  GM shall have the right, within 30 days after receipt of such notice, to object to, and/or impose reasonable restrictions, conditions, and/or limitations on, such development or use in its reasonable discretion in the event that such development or use reasonably can be expected to: (i) negatively impact the completion of any Agency Response Activity; (ii) negatively impact the environmental condition of a RCRA Action Area and/or an IDEM Action Area; or (iii) exacerbate any existing environmental risks to GM that are associated with any such Property to be developed or utilized by ARC.  ARC shall not develop or use the Properties as proposed if GM objects to the proposed development or use pursuant to the terms and conditions of this Subsection.  If GM does not object to, or impose reasonable restrictions, conditions, and/or limitations on, a proposed development or use in accordance with the terms and conditions of this Subsection within the above-referenced 30 day period, then GM shall be deemed to have waived its right to object to, or impose reasonable restrictions, conditions, and/or limitations on, such proposed development or use.  Notwithstanding anything to the contrary set forth herein, ARC or any of its agents, employees, or contractors may construct or install on any of the Properties: (i) streets, drives, curbs, gutters, sidewalks, walkways, and/or other right-of-way and infrastructure improvements; (ii) bus stops, parking lots, structured parking, covered or uncovered drop-off and pick-up points, and/or other related fixtures and facilities; (iii) sanitary sewer, fire safety, utility, communication, irrigation, and storm water lines, mains, pipes, other sanitary sewer, fire safety, utility, communication, and irrigation fixtures and facilities, and/or other storm water drainage, detention, and retention fixtures and facilities; (iv) signage, lighting, fencing, landscaping, trails, and/or other park or recreational fixtures and facilities (the "ARC Infrastructure Improvements"); provided that, at least 30 days prior to commencing the construction or installation of any ARC Infrastructure Improvement, ARC shall provide prior written notice to GM including: (i) a site utilization plan showing the ARC Infrastructure Improvement; (ii) surveys showing the additional areas that will be Affected Portions; and (iii) legal descriptions of such additional areas.  The terms and conditions of this Subsection shall not apply to the improvements that

C:\Documents and Settings\dao\Local Settings\Temporary Internet
Files\OLK16\DETROIT-#1423685-v21-GM_AIRC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

Developers (or any other assignee or transferee) of any portion of the Properties may construct or install on the Properties; the construction and installation of such improvements shall be governed by the terms and conditions of Subsection (14)(c).

(b)     ARC may continue to lease the improved Properties that are subject to leases at the time such Properties are conveyed by GM.

(c)     The permitted use of all of the Properties (the "**Permitted Uses**") shall be limited to industrial and/or commercial uses, with the exception of Parcels 11, 12, and 18 on Columbus Avenue, which may be used for park-like recreational uses. No interest in any Property shall be conveyed or otherwise transferred by ARC until GM shall have received written notice of: (i) the proposed Developer (or any other assignee or transferee) of such Property; (ii) the uses proposed to be made of such Property by such Developer (or any assignee or transferee); (iii) such Developer's (or assignee's or transferee's) proposed site plan for such Property; and (iv) a copy of the proposed Developer Deed or Memorandum (each as defined in Subsection (15)(d)) and such other evidence as GM reasonably may require to establish that the use and conveyance complies with the applicable terms and conditions of this Agreement. GM shall have the right, within 30 days after receipt of such notice to object to: (i) such use in the event that the use is not a Permitted Use; or (ii) such proposed Developer Deed or Memorandum in the event that the Developer Deed or Memorandum does not comply with the terms and conditions of this Agreement. In addition, GM shall have the right, within 30 days after receipt of such notice to object to, and/or impose reasonable restrictions, conditions, and/or limitations on, such development or site plan in the event that the construction or development activities associated with the development or site plan reasonably can be expected to: (i) negatively impact the completion of any Agency Response Activity; (ii) negatively impact the environmental condition of a RCRA Action Area and/or an IDEM Action Area; or (iii) exacerbate any existing environmental risks to GM that are associated with any such Property to be conveyed or transferred by ARC. ARC shall not close the proposed conveyance of the affected portion of any Property if GM objects to a proposed use, Developer Deed or Memorandum, development, or site plan in accordance with to the terms and conditions of this Subsection. If GM imposes reasonable restrictions, conditions, and/or limitations on a development or site plan in accordance with to the terms and conditions of this Subsection, then the conveyance of the affected portion of any Property shall be made subject to such restrictions, conditions, and/or limitations. Any attempted conveyance of the affected portion of any Property in violation of the terms and conditions of this Subsection shall be null and void *ab initio*. If GM does not object to, or impose reasonable restrictions, conditions, and/or limitations on, a proposed use, Developer Deed or Memorandum, development, or site plan in accordance with the terms and conditions of this Subsection and within the above-referenced 30-day period, then GM shall be deemed to have waived its right to object to, or impose reasonable restrictions, conditions, and/or limitations on, such proposed use, Developer Deed or Memorandum, development, or site plan.

(d)     In the event ARC conveys any of the Properties pursuant to Subsection (14)(c) that are subject to Agency Response Activities, GM shall be entitled to cause ARC to include all or any portion of Section (7) in any conveyance documents to be executed by ARC.

(e)     The foregoing covenants and restrictions related to uses of the Properties shall be included in the Deed of Gift in the form attached hereto as **Exhibit B**, pursuant to which ownership of all or any portion of the Properties is transferred to ARC.

C:\Documents and Settings\dao\Local Settings\Temporary Internet
Files\OLK16\DETROIT-#1423685-v21-GM_AIRC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

(f)     ARC shall adequately maintain and secure the Properties (except the Properties that are subject to GM's Demolition Work during such time that GM is performing the Demolition Work) and shall indemnify, defend and hold the Released Parties harmless from and against all costs, claims, expenses, and causes of action arising after the Effective Date in connection with, or out of any failure to maintain or and/or secure the Properties; provided that the foregoing indemnification shall not apply to causes of action arising after the Effective Date in connection with: (i) the failure of GM to satisfy its obligations under this Agreement; or (ii) the performance by GM of its obligations under this Agreement; in each case including, without limitation, GM's: (i) demolition obligations; or (ii) obligation to complete the Agency Response Activities.

(15)    CONVEYANCE BY ARC TO DEVELOPERS. Any conveyance of any of the Properties by ARC to a Developer, following compliance with the terms and conditions set forth in Subsection (14)(c), shall be subject to the following requirements and conditions which shall be set forth in an agreement between ARC and the Developer, a copy of which shall be delivered to GM for review as provided at the end of this Section:

(a)     ARC shall have the right to designate potential Developers of the Properties and to authorize the release of environmental information regarding the Properties to any such Developer, subject to the requirements set forth herein and in the Confidentiality Agreement; provided that ARC is in good faith discussions or a bid process with such Developer with respect to redevelopment of the Properties in accordance with this Agreement. The Developer shall execute the "Acknowledgement of Confidentiality" attached to the Confidentiality Agreement, pursuant to which the Environmental Consultants will provide the Developer with copies of the Environmental Reports and ARC will provide the Developer with any supplemental environmental assessment reports that may have been obtained by ARC (the "ARC Environmental Reports"); provided that such "Acknowledgement of Confidentiality" is delivered to GM prior to any disclosure of information to the Developer. The Developer shall acknowledge and agree that GM shall not have any obligation, except for the Agency Response Activities, with respect to any cleanup, remediation, investigation, or other actions regarding any matters or issues disclosed in the Environmental Reports, the ARC Environmental Reports or any other matters or issues related to the condition, including the environmental condition, of the Property, including, without limitation, any matters or issues related to: (i) asbestos-containing materials, (ii) surfaces at, in, or on the Property that may have been painted with lead-based paints; or (iii) the disposal or presence of any debris on the Property.

(b)     If there are structures on any portion of the Properties being conveyed to a Developer, then the Developer shall acknowledge that the Property may include equipment and fixtures that may be subject to regulation or compliance under the Laws (including, but not limited to, those governing health and safety). The Developer shall agree that after it acquires the Properties, GM shall not have any further obligation regarding the presence, use, condition, operation, modification, removal, disposal, replacement, repair of, or compliance with such Laws, other than completing the Agency Response Activities, as defined at the time of the conveyance. The Developer shall be and remain solely liable and responsible for such equipment and fixtures (except to the extent that GM is obligated to complete the Agency Response Activities as required under this Agreement), and the Developer shall release ARC and GM from, and indemnify and defend ARC and GM from and against any and all claims, costs, expenses, liability, damages, penalties, and causes of action relating to equipment and fixtures whether such claims arise under federal, state, or local Laws (including, but not limited to, those

C:\Documents and Settings\dao\Local Settings\Temporary Internet
Files\OLK16\DETROIT-#1423685-v21-GM_ARC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

governing health and safety), under contract law, or under common law or equity; provided that, in no event shall the foregoing release and indemnity be deemed to apply to the obligation of GM to complete the Agency Response Activities, as defined at the time of the conveyance and as required under this Agreement.

(c)      The Developer shall represent to ARC and GM that as of the closing, the Developer knows, has examined, and has investigated to its full satisfaction the physical nature and condition, including the environmental condition, of the Property and the improvements thereon. The Developer shall acknowledge that neither ARC, GM, nor any agent, attorney, employee or representative of either of them, has made any representation whatsoever regarding the physical nature and condition, including the environmental condition, of the Property (except, with respect to ARC, to the extent specifically set forth in the agreement by and between ARC and the Developer), and including, without limitation, any matters or issues related to: (i) asbestos-containing materials, (ii) surfaces at, in, or on the Property that may have been painted with lead-based paints; or (iii) the disposal or presence of any debris on the Property. The Developer shall further acknowledge that the Developer has not relied upon any statement or information made or given, directly or indirectly, orally or in writing, by ARC or GM (except, with respect to ARC, to the extent specifically permitted to be relied upon pursuant to the agreement by and between ARC and the Developer), but instead is relying solely on the information obtained by the Developer during the course of its due diligence.

(d)      ARC shall convey and the Developer shall accept title to the Properties by a deed of conveyance in the form attached hereto as **Exhibit G** ("Developer Deed"); provided that, in the event of a ground lease or other conveyance to a Developer, the restrictions set forth in the Developer Deed shall be included in the ground lease and incorporated into a memorandum thereof to be recorded in the Office of the Madison County Recorder. The restrictions included in the Developer Deed or the Memorandum, as applicable, shall be enforceable by: (i) the EPA, as a third party beneficiary, with respect to the RCRA Action Properties; and (ii) IDEM, as a third party beneficiary, with respect to the IDEM Action Properties.

(e)      The Developer's waivers and indemnification obligations hereunder and as set forth in the Developer Deed or the Memorandum shall survive the transfer of the Properties from ARC to the Developer.

ARC shall submit to GM, for its review and confirmation of compliance with the terms and conditions of this Section and Section 14, a copy of the agreement between ARC and the Developer.   If such agreement does not comply with the terms and conditions of this Section, then GM shall have 15 days within which to notify ARC in writing of such non-compliance, which notice shall set forth the specific instance or instances in which the agreement fails to comply with the terms and conditions of this Section. If GM fails to timely deliver such a notification to ARC, then GM shall be deemed to have determined that the agreement complies with the terms and conditions of this Section.

(16)      ARC'S REPRESENTATIONS AND WARRANTIES: As a material inducement for GM to enter into this Agreement and to consummate the closing, ARC makes the following representations and warranties to and covenants with GM. These representations, warranties and covenants shall be true and correct (i) on the Effective Date, and (ii) on the date of the closing as though made at and as of the date of closing. Except as otherwise provided in this Agreement, all of the covenants, agreements, representations and warranties set forth in this Agreement shall survive the closing and shall not merge into any deed, assignment, or other instrument executed or delivered pursuant to this Agreement.

C:\Documents and Settings\dao\Local Settings\Temporary Internet
Files\OLK16\DETROIT-#1423685-v21-GM_AIRC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

(a)      ARC is a redevelopment commission duly organized, validly existing and in good standing in the State of Indiana and has all the requisite corporate power and authority to enter into this Agreement and into ARC's Documents and to carry out the transactions contemplated by this Agreement.   The persons signing this Agreement and ARC's Documents on behalf of ARC have full power and authority to bind ARC.

(b)      ARC has the full power and authority to execute and deliver this Agreement and all other documents or instruments that this Agreement obligates ARC to execute or deliver (collectively, the "**ARC's Documents**"), and to perform and carry out all covenants and obligations arising under this Agreement and ARC's Documents.

(c)      ARC has duly authorized (i) the execution and delivery of this Agreement and ARC's Documents; (ii) the acceptance of the Properties pursuant to this Agreement; and (iii) the performance of the other covenants and obligations to be performed by ARC under this Agreement.   All consents, approvals, or actions by the officers of ARC in connection with this Agreement have been properly and validly obtained and taken.

(d)      This Agreement and ARC's Documents shall constitute the legal, valid, and binding obligation of ARC, enforceable against ARC in accordance with their respective terms, covenants, and conditions.

(17)    <u>GM'S REPRESENTATIONS AND WARRANTIES</u>:  As a material inducement for ARC to enter into this Agreement and to consummate the closing, GM makes the following representations and warranties to and covenants with ARC.  These representations, warranties, and covenants shall be true and correct (i) on the Effective Date; and (ii) on the date of the closing as though made at and as of the closing date.   Except as otherwise provided in this Agreement, all of the covenants, agreements, representations, and warranties set forth in this Agreement shall survive the closing and shall not merge into any deed, assignment, or other instrument executed or delivered pursuant to this Agreement.

(a)      GM is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all the requisite corporate power and authority to enter into this Agreement and into GM's Documents and to carry out the transactions contemplated by this Agreement.   The persons signing this Agreement and GM's Documents on behalf of GM have full power and authority to bind GM.

(b)      GM has the full power and authority to execute and deliver this Agreement and all other documents or instruments that this Agreement obligates GM to execute or deliver (collectively "**GM's Documents**") and to perform and carry out all covenants and obligations arising under this Agreement and GM's Documents.

(c)      GM has duly authorized (i) the execution and delivery of this Agreement and GM's Documents; (ii) the donation to ARC of the Properties pursuant to this Agreement; and (iii) the performance of the other covenants and obligations to be performed by GM under this Agreement.   All consents, approvals, or actions by the officers of GM in connection with this Agreement have been properly and validly obtained and taken.

(d)      The Rent Roll attached hereto as <u>**Exhibit H**</u> is a true and correct list of all of the leases and other occupancy agreements presently in force and affecting the Properties and truly and accurately sets forth the information contained or to be contained therein in all material respects; there are no leases or occupancy agreements to which GM is a party currently in effect which affect the Properties other than those listed on <u>**Exhibit H**</u>;

C:\Documents and Settings\deo\Local Settings\Temporary Internet
Files\OLK16\DETROIT-#1423685-v21-GM_AJRC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

no amendment of any kind of the leases exists other than as specified thereon; all rental and other payments due under the leases as of the Effective Date have been paid in full, except as shown on **Exhibit H**; and GM has paid in full all expenses connected with the execution and delivery of the leases, and there are no tenant allowances, concessions, rebates or free rent outstanding, except as shown on **Exhibit H**.

(e)    GM has not contracted for any services or employment and has made no commitments or obligations therefor which will bind ARC as a successor in interest with respect to the Properties (except those contracts listed in **Exhibit I** which ARC will assume at closing). GM shall pay all amounts due under any contracts not listed on **Exhibit I** and cause such contracts to be discharged or terminated at no expense to ARC.

Notwithstanding anything to the contrary set forth in this Section, the representations and warranties set forth in this Section shall survive, with respect to the Properties, for a period of one year after the closing, whereupon the same shall be void and of no further force or effect and ARC shall be precluded for bringing any action for breach thereof.

(18)    <u>AGREEMENT NOT TO BE RECORDED</u>: Each party agrees that, other than the Deed of Gift and any other documents executed in connection with the closing that customarily are recorded, it shall not cause or permit this Agreement or any notice of this Agreement to be recorded.

(19)    <u>NOTICES</u>: All notices or other communications provided for under this Agreement shall be in writing, signed by the party giving the same, and shall be sent by certified or registered mail, return receipt requested, or sent by a reputable national overnight delivery service. Such notices shall be deemed properly given and received upon the earlier of receipt or refusal to accept receipt and shall be sent to the following addresses:

If to GM:    General Motors Corporation
c/o Worldwide Real Estate
200 Renaissance Center
MC 482-B38-LCN
Detroit, Michigan 48265-2000
Attention: Executive Director

and:    GM WFG Remediation Team
General Motors Corporation
2000 Centerpoint Parkway
MC 483-520-190
Pontiac, Michigan 48341
Attn: Ann M. Langenstein

with copies to:    Honigman Miller Schwartz and Cohn LLP
2290 First National Building
Detroit, Michigan 48226
Attention: Lawrence D. McLaughlin, Esq.

If to ARC:    Linda Dawson, Director
Anderson Redevelopment Commission
120 East 8th Street
Anderson, Indiana 46018

with copies to:    Wallack Somers & Haas, P.C.

One Indiana Square
Suite 1500
Indianapolis, Indiana 46204
Attention:  Karl P.  Haas, Esq.

Each party shall have the right to designate other or additional addresses or addressees for the delivery of notices, by giving notice of the same to the other party hereto (such other or additional addresses or addressees being effective from and after the date of receipt of notice of the same by the other party).

(20)    ENTIRE AGREEMENT:  This Agreement and the attached exhibits (which are incorporated herein and made a part hereof by this reference) represent the entire understanding between the parties with respect to the subject matter of this Agreement, and all prior agreements and understandings between the parties with respect to the subject matter of this Agreement shall be deemed merged in this Agreement.

(21)    OFF-SITE CONTAMINATION.  This Agreement does not address responsibility or liability for environmental contamination on property other than the Properties.  To the extent that GM is or would be responsible or liable for any off-site environmental contamination: (a) GM shall retain such responsibility or liability; and (b) such responsibility or liability is not being assumed by ARC.  ARC shall provide GM and its agents, employees, and contractors with rights of access over and across the Properties, which access shall be limited to reasonable routes designated by ARC that minimize the disruption to any occupants of the Properties in order for GM to carry out its responsibilities with respect to any off-site environmental contamination.

(22)    AMENDMENT; MODIFICATION:  No amendments, waivers, or modifications of this Agreement shall be made or deemed to have been made unless in writing executed by both GM and ARC.

(23)    ASSIGNABILITY:  Neither this Agreement nor the rights of ARC under this Agreement may be assigned or transferred, in whole or in part, to any other party without the prior written consent of GM, which consent may be withheld for any reason or for no reason.

(24)    SUCCESSORS AND ASSIGNS:  Subject to Section (23), this Agreement shall be binding upon and inure to the benefit of the parties hereto and, as the case may be, their respective heirs, representatives, successors and assigns.

(25)    CAPTIONS FOR CONVENIENCE:  All headings and captions used in this Agreement are for convenience only and are of no meaning in the interpretation or effect of this Agreement.

(26)    APPLICABLE LAW:  This Agreement shall be interpreted and enforced according to the laws of the state of Indiana.

(27)    NO WAIVERS:  Any waiver of a breach of any provision contained in this Agreement must be in writing.  No waiver of any breach shall be deemed a waiver of any preceding or succeeding breach, nor of any other breach of a provision contained in this Agreement.

(28)    CONSTRUCTION:  GM and ARC hereby acknowledge that both parties participated equally in the negotiation of this Agreement, and that no court construing this Agreement shall construe it more stringently against one party than against the other, regardless of which party's counsel drafted this Agreement.

(28)    TIME OF THE ESSENCE:  Time is of the essence with respect to performance required under this Agreement.

(30)    <u>SURVIVAL</u>:  The covenants and agreements of GM and ARC set forth in this Agreement shall survive the closing of the transaction contemplated under this Agreement.

(31)    <u>BINDING EFFECT</u>:  This Agreement is not an offer by GM and, under no circumstances, shall this Agreement have any binding effect upon ARC or GM, unless and until ARC and GM shall each have executed this Agreement and delivered executed counterparts hereof to each other.

C:\Documents and Settings\dao\Local Settings\Temporary Internet
Files\OLK16\DETROIT-#1423685-v21-GM_ARC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

IN WITNESS WHEREOF, GM has signed this instrument this *20th* day of *September*, 2006, and ARC has signed this instrument this *8th* day of *September*, 2006.

EXECUTION RECOMMENDED
WORLDWIDE REAL ESTATE

By *[signature]*

GENERAL MOTORS CORPORATION,
a Delaware corporation

By: _____
Name: _____
Title: _____

ANDERSON                    REDEVELOPMENT
COMMISSION,
a redevelopment commission

By: _____
Name: _____
Title: _____

*[signature]* K. A. Šulc
Secretary - Treasurer

C:\Documents and Settings\dso\Local Settings\Temporary Internet
Files\OLK10\DETROIT-#1423685-v21-GM_AIRC_Contribution_Agreement.DOC
DETROIT.1423685.21

05Sep06

**EXHIBIT A-1**
**PROPERTIES**

DETROIT.1423685.21



figure A.1

PROPERTY LOCATIONS
GENERAL MOTORS CORPORATION
ENVIRONMENTAL DUE DILIGENCE BRIEFING PACKAGE
*Anderson, Indiana*

SOURCE: USGS MAP: ANDERSON SOUTH, INDIANA

LEGEND

SUBJECT PROPERTIES

15063-35(050)GN-WA008 FEB 20/2006

**EXHIBIT A-2**
**SITE PLAN**



figure A.2

SCATTERFIELD ROAD PROPERTIES
GENERAL MOTORS CORPORATION
ENVIRONMENTAL DUE DILIGENCE BRIEFING PACKAGE
*Anderson, Indiana*

**EXHIBIT A-3**
**COLUMBUS AVENUE SITE PLAN**

DETROIT.1423685.21



COLUMBUS AVE. AREA PROPERTIES
GENERAL MOTORS CORPORATION
ENVIRONMENTAL DUE DILIGENCE BRIEFING PACKAGE
Anderson, Indiana

figure A-3

**Exhibit A-4**
**Madison Avenue Site Plan**



figure A.4

MADISON AVENUE PROPERTY
GENERAL MOTORS CORPORATION
ENVIRONMENTAL DUE DILIGENCE BRIEFING PACKAGE
*Anderson, Indiana*

15063-35(050)GN-WA016 FEB 20/2006

EXHIBIT B
DEED OF GIFT

**THIS DEED OF GIFT**, executed the __ day of _____, 2006, to be effective as of the _____ day of _____, 2006, between **GENERAL MOTORS CORPORATION**, a Delaware corporation, with its principal address at 300 Renaissance Center, P.O. Box 300, Detroit, Michigan 48265-3000, hereinafter referred to as GM, and the **ANDERSON REDEVELOPMENT COMMISSION**, an Indiana statutory redevelopment commission with its principal address at _____, hereinafter referred to as ARC,

**WHEREAS**, ARC desires the tract of land hereinafter more particularly described, and GM, as owner of such tract, is agreeable to conveying such tract to ARC as a gift.

**NOW, THEREFORE, WITNESSETH**, in consideration of GM's willingness to convey the described tract of land as a gift to ARC and ARC's acceptance of the delivery of this Deed of Gift of such tract of land, GM does by these presents GRANT, BARGAIN, SELL, REMISE, RELEASE, AND FOREVER QUITCLAIM unto ARC, its successors and assigns, land situated in the City of Anderson, County of Madison, and State of Indiana (the "Property"), described as follows:

### SEE ATTACHED <u>EXHIBIT A</u>

**TOGETHER WITH** all and singular the hereditaments and appurtenances thereunto belonging or in any way appertaining.

**TO HAVE AND TO HOLD** the Property unto ARC, its successors and assigns, forever, as provided herein.

This conveyance is subject to existing easements and restrictions of record and those matters which would be shown by the Survey or would be evident by a personal inspection of the Property.

This conveyance is further subject to the following restrictions which will run with the Property and be binding upon ARC and all subsequent owners, tenants, and users:

1.	Except for, or with respect to, the specific obligations of GM set forth in the Agreement for Donation of Property pursuant to which this Deed is given (the "Agreement"), and except as otherwise expressly set forth in the Agreement and/or in the documents and instruments delivered to ARC at closing, ARC acknowledges and agrees that it is acquiring the Property in an "AS IS, WHERE IS" condition as of the date hereof, subject to satisfaction of the specific obligations of GM expressly set forth in the Agreement, but otherwise without any right of action under: (a) contract; (b) any applicable federal, state, or local environmental laws, regulations, or ordinances, including, without limitation, those governing health and safety (the "Laws"); (c) common law; or (d) equity; against GM in connection with, or relating to, the Property, including, without limitation, the physical and/or environmental nature and/or condition of the Property, such as matters or issues related to: (a) asbestos-containing materials; (b) surfaces at, in, or on the Property that may have been painted with lead-based paints; or (c) the disposal or presence of any debris on the Property.

2.	Except for, or with respect to, the specific obligations of GM set forth in the Agreement, and except as otherwise expressly set forth in the Agreement and/or in the documents and instruments delivered to ARC at closing, ARC expressly: (a) waives and releases any right of rescission and all claims for damages by reason of any statement, representation, warranty, assurance, promise, or agreement, if any, relating to the Property; and (b) releases and discharges GM from any and all claims or causes of action which ARC may now have or hereafter have against GM relating to the Property.

3.        ARC agrees that:

(a)    ARC shall: (i) not "treat," "store," or "dispose" of any "hazardous substances," "hazardous wastes," or "toxic substances" as those terms are defined under CERCLA, 42 U.S.C. 9601 et. seq., RCRA, 42 U.S.C. 6901 et. seq., or TSCA, 15 U.S.C. 2601 et. seq., or under similar applicable state law, on, at or below the Property; and (ii) maintain generator-only status or no generator of hazardous waste status; provided, however, that the Developer may: (i) accumulate such substances or wastes as allowed under the Laws for off-site treatment, off-site storage, or off-site disposal, and (ii) use and store commercial products on-site that may contain such substances.

(b)    ARC, in its use and development of the Property, shall comply with all Laws, including, but not limited to, those governing health and safety, applicable to the use of or operations at the Property, including any current or future development, excavation, improvements, structures, utilities, facilities, renovations, demolition, modifications, parking lots, or storage areas, to the extent performed, constructed, or undertaken by ARC; provided, however, that the improvements that ARC or any of its agents, employees, or contractors may construct or install on any of the Properties shall be limited to: (i) streets, drives, curbs, gutters, sidewalks, walkways, and/or other right-of-way and infrastructure improvements; (ii) bus stops, parking lots, structured parking, covered or uncovered drop-off and pick-up points, and/or other related fixtures and facilities; (iii) sanitary sewer, fire safety, utility, communication, irrigation, and storm water lines, mains, pipes, other sanitary sewer, fire safety, utility, communication, and irrigation fixtures and facilities, and/or other storm water drainage, detention, and retention fixtures and facilities; (iv) signage, lighting, fencing, landscaping, trails, and/or other park or recreational fixtures and facilities (the "ARC Infrastructure Improvements"); provided that: (i) at least 30 days prior to commencing the construction or installation of any ARC Infrastructure Improvement, ARC shall provide prior written notice to GM including: (A) a site utilization plan showing the ARC Infrastructure Improvement; (B) surveys showing the additional areas that will be Affected Portions; and (C) legal descriptions of such additional areas; and (ii) in no event shall this limitation be deemed to apply to improvements that Developers (or any other assignee or transferee) of any portion of the Properties may construct or install on the Properties in accordance with the other terms and conditions of this Deed of Gift.

(c)    The use of groundwater at, in, or under the Property by any person or entity for any purpose, including potable and non-potable uses, shall be prohibited; provided that, the foregoing prohibition shall not apply to short-term dewatering for construction purposes; provided that the dewatering (including, without limitation, management and disposal of the groundwater): (i) is conducted in accordance with the Laws and any applicable restrictive covenants encumbering the Property; and (ii) does not cause, or result in: (A) a new release; (B) exacerbation of existing contamination; or (C) any other violation of Laws.

(d)    ARC shall not excavate, construct or cause to be constructed any improvements in the areas depicted [or legally described] on **Exhibit B** attached hereto.  **[GM to Identify any "No Build Areas" on the Property]**.

(e)    Any and all soil and/or debris management and surface water and/or groundwater management required or necessary because of excavation, demolition, or soil disturbance by ARC related to future use, development, or construction at or of the Property by ARC shall be conducted in accordance with all Laws.

4.    In addition to the restrictions set forth in Section 1, neither ARC nor any of its agents, employees or contractors shall develop or otherwise utilize, either on a permanent or temporary basis, any of the Property without prior written notice to GM detailing the proposed use or development.

5.    ARC may continue to lease the Properties that are subject to leases at the time such Properties are conveyed to GM.

6.      The permitted use of the Property shall be limited to industrial or commercial uses. **[The Deed for Parcels 11, 12, and 18 shall allow park-like recreational uses]**. No interest in the Property shall be conveyed or otherwise transferred by ARC until GM shall have received written notice of: (i) the proposed assignee or transferee of the Property; and (ii) the uses proposed to be made of the Property by such assignee or transferee. In addition, at such time as the assignee or transferee completes a site plan for its proposed use, a copy of such site plan shall be provided to GM.

The foregoing restrictions shall be covenants running with the land, shall be binding upon ARC and its successors and assigns and shall inure to the benefit of GM, its successors and assigns. The restrictions are not intended to and shall not be deemed to create in the GM a possibility of reverter, a power of termination, or any other future interest in the Property.

**The following shall be included when applicable:**

For Properties 1 through 9, 15 and 16:

GM and ARC also acknowledge and agree that the foregoing restrictions and covenants may be enforced in perpetuity against ARC and ARC's successors in title by: (i) GM; and (ii) the United States Environmental Protection Agency (the "EPA"), as a third party beneficiary. ARC agrees that: (a) the agreement to comply with the terms and obligations of this Deed shall be expressly included by ARC, and its successors and assigns, in any instrument transferring complete or partial possession or ownership of the Property; (b) the EPA shall be expressly named in any such instrument as a third party beneficiary of the right to enforce such restrictions and covenants; and such instrument shall provide that the EPA may directly enforce the restrictions and covenants in this Deed as against the transferee under such instrument and any successor to any such transferee; (c) any such instrument, or memorandum thereof, effecting such transfer shall be recorded with the Madison County Register of Deeds; and (d) the requirements of this paragraph shall run with the Property.

For Properties 10, 11, 12, 14, 17, 18, 19:

GM and ARC also acknowledge and agree that the foregoing restrictions and covenants may be enforced in perpetuity against ARC and ARC's successors in title by: (i) GM; and (ii) the Indiana Department of Environmental Management ("IDEM"), as a third party beneficiary. ARC agrees that: (a) the agreement to comply with the terms and obligations of this Deed shall be expressly included by ARC, and its successors and assigns, in any instrument transferring complete or partial possession or ownership of the Property; (b) IDEM shall be expressly named in any such instrument as a third party beneficiary of the right to enforce such restrictions and covenants; and such instrument shall provide that IDEM may directly enforce the restrictions and covenants in this Deed as against the transferee under such instrument and any successor to any such transferee; (c) any such instrument, or memorandum thereof, effecting such transfer shall be recorded with the Madison County Register of Deeds; and (d) the requirements of this paragraph shall run with the Property.

IN WITNESS WHEREOF, GM has duly executed this Deed of Gift this _____ day of _____, 2006, to be effective as of the ___ day of _____, 2006.

GENERAL MOTORS CORPORATION, a Delaware corporation

By:
Name:
Title:

ATTEST:

Assistant Secretary

STATE OF MICHIGAN            )
                             ) ss.
COUNTY OF WAYNE              )

The foregoing instrument was acknowledged before me this _____ day of _____, A.D. _____, by _____ and _____, _____ and Assistant Secretary, respectively, of General Motors Corporation, a Delaware corporation, on behalf of the corporation.

_____
Notary Public, Wayne County, Michigan
My Commission Expires:

WHEN RECORDED RETURN TO:

_____
_____
_____

SEND SUBSEQUENT TAX BILLS TO:

_____
_____
_____

THIS INSTRUMENT PREPARED BY:

Lawrence D. McLaughlin, Esq
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
Detroit, Michigan 48226

AFFIRMATION OF SSN REDACTION:

DETROIT.1423685.21

I affirm, under the penalties for perjury, that I have taken reasonable care to redact each Social Security Number in the document, unless required by law: Lawrence D. McLaughlin, Esq

# DRAWING OF LEGAL DESCRIPTIONS

**PARCEL "A"**

A part of Lot 2 in the Anderson Redevelopment Industrial Park I in the City of Anderson, Indiana, described as follows:

Commencing at a point marking the Northeast corner of Lot 2 in the Anderson Redevelopment Industrial Park I in the City of Anderson, Indiana, the plat of which is recorded in Plat Book 21, Pages 58 and 59 in the Office of the Recorder of Madison County, Indiana, and running thence North 89 degrees 33 minutes 11 seconds West (plat bearing) along the North line of said Lot and said lot line extended West 480.18 feet to a point marking the POINT OF BEGINNING of this description; thence South 00 degrees 56 minutes 30 seconds West 7.32 feet to a point; thence North 89 degrees 01 minute 30 seconds West 100.00 feet to a point; thence North 00 degrees 56 minutes 30 seconds East 100.00 feet to a point; thence South 89 degrees 01 minute 30 seconds East 100.00 feet to a point; thence South 00 degree 56 minutes 30 seconds West 92.19 feet to the point of beginning.

**PARCEL "B"**

A part of Lot 2 in the Anderson Redevelopment Industrial Park I in the City of Anderson, Indiana, described as follows:

Commencing at a point marking the Northeast corner of Lot 2 in the Anderson Redevelopment Industrial Park I in the City of Anderson, Indiana, the plat of which is recorded in Plat Book 21, Pages 58 and 59 in the Office of the Recorder of Madison County, Indiana, and running thence North 89 degrees 33 minutes 11 seconds West (plat bearing) along the North line of said Lot 2 a distance of 235.29 feet to a point on the West right-of-way line of McKinley Street; thence South 00 degree 41 minutes 42 seconds West along the West projected right-of-way line of McKinley Street 354.58 feet to a point; thence North 89 degrees 01 minute 30 seconds West 245.00 feet to a point marking the POINT OF BEGINNING of this description; thence South 00 degree 58 minutes 30 seconds West 185.00 feet to a point; thence North 89 degrees 01 minute 30 seconds West 200.00 feet to a point; thence North 00 degrees 58 minutes 30 seconds East 185.00 feet to a point; thence South 89 degrees 01 minute 30 seconds East 200.00 feet to the point of beginning.

**PARCEL "C-1"**

A part of Lot 4 in the Anderson Redevelopment Industrial Park I in the City of Anderson, Indiana, described as follows:

Commencing at a point marking the Northeast corner of Lot 2 in the Anderson Redevelopment Industrial Park I in the City of Anderson, Indiana, the plat of which is recorded in Plat Book 21, Pages 58 and 59 in the Office of the Recorder of Madison County, Indiana, and running thence North 89 degrees 33 minutes 11 seconds West along the North line of said Lot 2 a distance of 235.29 feet to a point marking the West right-of-way line of McKinley Street; thence South 00 degree 41 minutes 42 seconds West along the West projected line of McKinley Street 557.19 feet to a point; thence North 89 degree 01 minute 30 seconds West 50.41 feet to the POINT OF BEGINNING of this description; thence South 00 degree 58 minutes 30 seconds West 100.00 feet to a point; thence South 89 degrees 01 minute 30 seconds West 70.90 feet to a point on the West line of Lot 4 in said Plat; thence North 00 degrees 51 minutes 43 seconds East along the West line of said Lot 4 a distance of 100.00 feet to a point; thence North 89 degrees 01 minute 30 seconds East 71.88 feet to the point of beginning.

**PARCEL "C-2"**

A part of Lot 2 in the Anderson Redevelopment Industrial Park I in the City of Anderson, Indiana, described as follows:

Commencing at point marking the Northeast corner of Lot 2 in the Anderson Redevelopment Industrial Park I in the City of Anderson, Indiana, the plat of which is recorded in Plat Book 21, Pages 58 and 59 in the Office of the Recorder of Madison County, Indiana, and running thence North 89 degrees 33 minutes 11 seconds West along the North line of said Lot 2 a distance of 235.29 feet to a point marking the West right-of-way line of McKinley Street; thence South 00 degree 41 minutes 42 seconds West along the West projected line of McKinley Street 557.19 feet to a point; thence South 89 degrees 01 minute 30 seconds West 182.08 feet to a point on the East line of Lot 2 in said Plat and also being the POINT OF BEGINNING of this description; thence South 00 degree 51 minutes 43 seconds West along the East line of said Lot 2 a distance of 100.00 feet to a point; thence South 89 degrees 01 minute 30 seconds West 64.10 feet to a point; thence North 00 degrees 58 minutes 30 seconds East 100.00 feet to a point; thence North 89 degrees 01 minute 30 seconds East 83.32 feet to the point of beginning.

Description prepared by:    Richard E. Ward  REGISTERED LAND SURVEYOR NO. 80432



**RICHARD E. WARD & ASSOCIATES**
PROFESSIONAL LAND SURVEYORS

DRAWING OF LEGAL DESCRIPTIONS OF PART OF ANDERSON REDEVELOPMENT
INDUSTRIAL PARK I, IN THE CITY OF ANDERSON, MADISON COUNTY, INDIANA

| SCALE: 1" = 100' | REVISIONS | JOB NO. | SHEET |
| DATE: 08/28/03 | | 02R106-23552a | 1 |
| DRAWN BY: EEM | | | OF TWO |
| CHECKED BY: REW | | | |

# DRAWING OF LEGAL DESCRIPTIONS

**PARCEL "D-1"**
A part of Lot 2 in the Anderson Redevelopment Industrial Park II to the City of Anderson, Indiana, described as follows:

Commencing at a point marking the Southwest corner of Lot 2 in the Anderson Redevelopment Industrial Park II to the City of Anderson, Indiana, the plat of which is recorded in Plat Book 31, Pages 66 and 67 in the Office of the Recorder of Madison County, Indiana, and running thence North 89 degrees 55 minutes 27 seconds East (plat bearing) along the South line of said Lot 2 a distance of 192.57 feet to a point marking the Southeast corner of said Lot 2; thence North 00 degree 49 minutes 38 seconds East along the East line of said Lot 2 a distance of 192.30 feet to a point marking the POINT OF BEGINNING of this description; thence continuing North 00 degree 49 minutes 38 seconds East along the East line of said Lot 2 a distance of 224.42 feet to a point; thence North 07 degrees 23 minutes 48 seconds East 55.22 feet to a point; thence North 89 degrees 57 minutes 50 seconds East 197.04 feet to a point; thence South 00 degree 07 minutes 13 seconds West 290.19 feet to a point; thence North 89 degrees 55 minutes 40 seconds West 197.08 feet to the point of beginning.

**PARCEL "D-2"**
A part of Lot 2 in the Anderson Redevelopment Industrial Park II to the City of Anderson, Indiana, described as follows:

Commencing at a point marking the Southwest corner of Lot 2 in the Anderson Redevelopment Industrial Park II to the City of Anderson, Indiana, the plat of which is recorded in Plat Book 31, Pages 66 and 67 in the Office of the Recorder of Madison County, Indiana, and running thence North 89 degrees 55 minutes 27 seconds East along the South line of said Lot 2 a distance of 192.57 feet to a point marking the Southeast corner of said Lot 2; thence North 00 degree 49 minutes 38 seconds East along the East line of said Lot 2 a distance of 192.30 feet to the POINT OF BEGINNING of this description; thence North 89 degrees 55 minutes 40 seconds West 0.25 feet to a point; thence North 08 degrees 54 minutes 57 seconds East 204.31 feet to a point; thence North 07 degrees 23 minutes 48 seconds East 55.48 feet to a point on the East line of said Lot 2; thence South 00 degree 49 minutes 38 seconds West along the East line of said Lot 2 a distance of 292.48 feet to the point of beginning.

Descriptions prepared by:    Richard E. Ward  REGISTERED LAND SURVEYOR No. 50433

**RICHARD E. WARD & ASSOCIATES**
PROFESSIONAL LAND SURVEYORS
LOT & PINS SURVEYS · SUBDIVISION LAYOUTS · MORTGAGE SURVEYS
P. O. BOX 172 · ANDERSON, INDIANA 46015 · (765) 642-6378

| DRAWING OF LEGAL DESCRIPTIONS OF PART OF ANDERSON REDEVELOPMENT INDUSTRIAL PARK II, IN THE CITY OF ANDERSON, MADISON COUNTY, INDIANA | | | |
|---|---|---|---|
| SCALE: 1" = 90' | REVISIONS | JOB NO. | SHEET |
| DATE: 06/28/06 | | 062106-2605RD | **1** |
| DRAWN BY: EVM | | | OF TWO |
| CHECKED BY: REW | | | |





**EXHIBIT C**

**INTENTIONALLY DELETED**

**EXHIBIT D**
**RIGHT OF ACCESS AGREEMENT**

## RIGHT OF ACCESS AGREEMENT

Formatted: Level 1

**THIS RIGHT OF ACCESS AGREEMENT** (this "Agreement"), made this ___ day of December, 2005, between **GENERAL MOTORS CORPORATION**, a Delaware corporation, with its principal address at 300 Renaissance Center, P.O. Box 300, Detroit, Michigan 48265 ("GM"), and **THE CITY OF ANDERSON**, a political subdivision of the State of Indiana, with its principal address at 120 East 8th Street, P.O. Box 2100, Anderson, Indiana 46018 ("City").

## RECITALS:

Formatted: Level 1

This Agreement is based on the following recitals:

A.    The parties to this Agreement intend to enter into an Agreement for Donation of Property (the "Donation Agreement") pertaining to numerous parcels of industrial property owned by GM more particularly described on Exhibit A attached hereto in the City of Anderson, County of Madison, and State of Indiana (collectively, the "Property").

B.    This Agreement is intended solely to grant City the right of access to the Property to assure a thorough analysis of operational and environmental matters as contemplated by the Donation Agreement and confers no other rights whatsoever with respect to the Property.

**NOW THEREFORE**, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.    This Agreement shall be effective until the closing date for the donation of the Property as contemplated by the Donation Agreement.

2.    (a)    GM hereby grants to the City, its agents, employees, consultants, and contractors permission to enter upon the Property for the sole purpose of making a physical inspection thereof, including the environmental condition of the Property, at the City's sole expense.

(b)    The City shall notify GM in writing of any proposed testing, boring, sampling, or any other inspection procedures, which shall be subject to the prior approval of GM. In the event that GM objects to the inspection procedures proposed by City, City shall either cancel the inspection or revise such procedures as required in order to obtain GM's approval thereof. In the event that GM does not object to the inspection procedures within five business (5) days after receipt of written notice from the City, GM shall be deemed to have agreed to the inspection procedures. The City shall schedule the inspection procedures so that GM's representative may observe such inspections.

(c)    The City shall conduct such inspections at reasonable times of the day in a manner that does not unreasonably interfere with GM's or its tenants' activities at the Property.

DETROIT.2030733.2

(d)    The City shall restore the Property to substantially the same condition existing prior to the commencement of its inspections.

(e)    The City shall provide GM with copies of any and all data, results, conclusions and reports, in final form, generated as a result of or during the City's inspections.

3.    (a)    To assist City with its inspections, GM shall make available for review by the City copies of property records, plans and specifications for the improvements on the Property, operating and repair records for the Property and such other documents reasonably requested which are in the possession of GM's Worldwide Real Estate Group, subject, however, to the clear understanding that (i) such records, if available, may not be fully complete and may cover a relatively current period of time only; and (ii) GM is under no obligation to provide City with documents deemed confidential by GM.

(b)    Notwithstanding anything herein contained to the contrary, the City acknowledges that for the purposes of this Agreement GM has not made any representations or warranties to the City and the City shall examine and investigate to the full satisfaction of the City the physical nature and environmental condition of the Property and the City has not and shall not rely upon any information or statement provided to the City by GM or any agent, attorney, employee, or representative of GM.

4.    (a)    The City shall be responsible for any and all damage to property or injury or death to persons, and from any and all claims, actions, or liabilities, arising out of City's inspection including any claims or actions which may be asserted against GM.

(b)    In the event City's assessment of the Property includes the performance of any subsurface investigation, the City acknowledges and agrees that the City is the owner of any and all residual soil, water or other environmental media collected or produced in connection with the City's assessment.  The City shall be solely responsible for the lawful removal and arrangement for disposal of any such materials collected or produced in connection with the City's assessment. The City acknowledges and agrees that the City shall make reasonable efforts to use techniques and practices to minimize the volume of soils, surface and groundwater collected or produced during the City's assessment.

(c)    Prior to entering upon the Project, the City shall, at its sole cost and expense, procure and keep in force and effect during the entire term of this Agreement a comprehensive general liability insurance policy including insurance against assumed or contractual liability under this Agreement with respect to all of the City's activities in, on or about the Property. The limits of such policy with respect to personal liability and property damage shall be not less than Three Million Dollars ($3,000,000) per occurrence. GM shall be listed as an additional named insured on such policy and copies of such policies or certificates thereof shall be delivered to GM prior to the City's entry upon the Property. The insurer under such policy shall agree not to cancel, materially change or fail to renew the coverage provided by such policy, without first giving GM ten (10) days' advance written notice.

2

(d)    GM does not assume any risk, liability, or responsibility or duty of care as to the City, its employees, agents, consultants, or contractors when on the Property to conduct its physical inspection. The City acknowledges and agrees that the City, its employees, agents, consultants, or contractors enter the Property and conduct their investigation thereon at their own risk.

5.    (a)    This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective successors, successors in interest, and assigns; provided, however, that the City shall not have the right to assign its rights under this Agreement without GM's advance written consent.

(b)    All notices desired or required to be given hereunder shall be sent by certified or registered mail, return receipt requested, or by facsimile, Federal Express, or other overnight courier service to the parties at the addresses shown on the first page hereof or at such other address as either of the parties may notify the other in writing. A copy of any notice to GM shall also be sent to General Motors Corporation, 200 Renaissance Center, Mail Code 482-B38-C96, Detroit, Michigan 48265, Attention: Director of Worldwide Real Estate. All such notices shall be deemed effective upon receipt.

6.    The City acknowledges and agrees that any and all information obtained by the City or its employees, agents, consultants, or contractors during or as a result of its inspection shall be subject to the terms of the Confidentiality Agreement executed by GM, the City, HydroTech Corporation, and Keramida Environmental, Inc. simultaneously herewith.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement this 1st day of MAy , 2006.

In the presence of:

GENERAL MOTORS CORPORATION,
a Delaware corporation

By _____

Its _____   Project Manager

THE CITY OF ANDERSON,
a political subdivision of the State of Indiana

By _____

Its _____   Deputy Mayor - Anderson

Formatted: Level 1

3

**EXHIBIT A**

**DESCRIPTION OF THE PROPERTIES**

4

**EXHIBIT E**
**CONFIDENTIALITY AGREEMENT**



| Economic Development and Enterprise Services | General Motors Corporation<br>Worldwide Real Estate<br>200 Renaissance Center -<br>38th Floor<br>Mail Code 482-B38-C96<br>Detroit, MI USA 48265- |
|---|---|

February 14, 2006

Ms. Vicky Keramida
Keramida Environmental, Inc.
330 N. College Avenue
Indianapolis, IN 46202

Mr. Tony Rogers
HydroTech Corporation
125 W. 11th Street
Anderson, IN 46016

Anderson Redevelopment Commission
c/o David A. Happe, Esq.
120 E. 8th Street
Anderson, Indiana 46016

Karl P. Haas, Esq.
Wallack Somers & Haas, PC
One Indiana Square
Suite 1500
Indianapolis, Indiana 46204

Curt DeVoe, Esq.
Plews Shadley Racher & Braun
1346 North Delaware Street
Indianapolis, Indiana 46202

Re:    Confidentiality Agreement for Donation of Properties

Dear Ms. Keramida, Mr. Rogers, Mr. Happe, Mr. Haas, and Mr. DeVoe:

We understand that Keramida Environmental, Inc., HydroTech Corporation, Wallack Somers & Haas, PC, and Plews Shadley Racher & Braun (hereinafter referred to as the "ARC's Environmental Consultants") have been retained by the Anderson Redevelopment Commission ("ARC") to provide environmental consulting services in connection with the

DETROIT.1937343.6

proposed donation to the ARC of certain properties currently owned by General Motors Corporation ("GM") located in Anderson, Indiana (the "Project"). The ARC, through their representatives and legal counsel (collectively referred to as the "ARC's Representatives"), have requested that GM provide certain information regarding the environmental status of the Project, which GM will provide to the ARC's Environmental Consultants under the following terms of this Confidentiality Letter Agreement ("Agreement"):

(1)    The ARC's Environmental Consultants acknowledge and agree that any and all information, whether written or verbal, regarding the environmental status of the Project provided to the ARC's Environmental Consultants under this Agreement shall be considered the sole and exclusive property of GM and is considered and will be kept confidential by the ARC's Environmental Consultants in perpetuity and, except as specifically provided herein, will not be discussed with or provided to any third party, without the prior written consent of GM. The ARC's Environmental Consultants may review, provide summaries of, and discuss the environmental information provided hereunder with the ARC's Representatives with the express understanding and agreement that ARC's Environmental Consultants may not provide the ARC's Representatives access to or copies of the information. The ARC hereby acknowledges and agrees that it will not be provided access to or copies of the information. GM makes no representations or warranties regarding the information and the information is not intended to be relied upon by the ARC or the ARC's Environmental Consultants or as a substitute for the complete and thorough investigation of the Project by the ARC and the ARC's Environmental Consultants.

(2)    GM, the ARC, the ARC's Representatives, and the ARC's Environmental Consultants hereby agree that any and all documents relating to the environmental status of the Project that are a matter of public record and/or exist in the public domain at any federal, state and/or local governmental agency or branch are not considered confidential and are outside the terms of this Agreement ("Public Documents"). Notwithstanding the foregoing, GM, the ARC, the ARC's Representatives, and the ARC's Environmental Consultants hereby agree that any and all summaries, abstracts, analyses, excerpts, and any similar variation of the Public Documents shall be considered confidential and included within the scope of this Agreement, it being the intent of the parties that only Public Documents in their complete and public form are considered outside the terms of this Agreement.

(3)    The ARC, the ARC's Representatives and the ARC's Environmental Consultants shall have the right to engage in discussions and/or negotiations with the U.S. Environmental Protection Agency, and any other governmental agency(ies) regarding the environmental status of the Project; provided, however, that the ARC, the ARC's Representatives and/or ARC's Environmental Consultants shall provide GM with reasonable advance notice of any such discussions and/or negotiations and GM shall have the right to have a representative participate in any such discussions and/or negotiations. For purposes of the notice obligations under this Paragraph 3, the GM contact persons shall be Ann Langenstein (Telephone: 248-753-5796; Fax: 248-753-5829; E-mail: ann.langenstein@gm.com) and Marilyn Dedyne (Telephone: 248-753-5594; Fax: 248-753-5829; E-mail: marilyn.j.dedyne@gm.com).

(4)    The ARC's Environmental Consultants agree that any and all information obtained by the ARC's Environmental Consultants relating to environmental matters as a result of any inspection of the Project, pursuant to that certain Right of Access Agreement, of even date or otherwise, shall be deemed confidential and subject to the terms of this Agreement as if supplied to the ARC's Environmental Consultants hereunder.

(5)    The ARC's Environmental Consultants acknowledge and agree that any and all information regarding the environmental status of the Project provided to the ARC's Environmental Consultants, essential employees or agents of ARC's Environmental Consultants, or other acceptable third parties approved by GM in its discretion shall be promptly returned to GM as reasonably directed in writing by GM in the event the Project does not proceed. GM shall be entitled to injunctive relief if the ARC's Environmental Consultants fail to so promptly return such information to GM.

(6)    The ARC's Environmental Consultants agree to have any employees, agents, and any other third parties, deemed acceptable by GM in its discretion, who are provided access to information under this Agreement, sign the attached "Acknowledgment of Confidentiality" and will promptly provide copies of such signed acknowledgments to GM.  The ARC's Environmental Consultants are hereby permitted to provide access to the information covered by this Agreement to a third party that is authorized by the ARC as a developer for the Project under that certain Agreement for the Donation of Property, provided that any such developer signs the attached "Acknowledgment of Confidentiality" and such signed acknowledgment is provided to GM prior to any disclosure of information.  GM hereby acknowledges and agrees that consultants for the ARC other than the ARC's Environmental Consultants may require access to the information covered by this Agreement ("Additional Consultant"), and GM hereby agrees that the ARC's Environmental Consultants may disclose such information to the Additional Consultant, provided that, before any such information is disclosed (a) the Additional Consultant signs the attached "Acknowledgment of Confidentiality", and (b) GM is provided with five (5) business days advance notice of the identity of the Additional Consultant so that GM has an opportunity to object to the Additional Consultant within such five (5) business day period based on a conflict of interest or other reasonable cause, in which event the ARC's Environmental Consultants shall not have the right to disclose any information covered by this Agreement to the Additional Consultant. For purposes of the notice obligations under this Paragraph 6, the GM contact persons shall be Ann Langenstein and Marilyn Dedyne as provided in Paragraph 3.

(7)    Notwithstanding anything herein contained to the contrary, in the event the ARC's Environmental Consultants are required to disclose any such information to any governmental entity pursuant to applicable law or court order, prior to disclosing the same, the ARC's Environmental Consultants shall notify GM in writing and provide GM with copies of all information which the ARC's Environmental Consultants intend to so disclose. Such notice and information shall be provided to GM by the ARC's Environmental Consultants in writing at least five (5) business days prior to the disclosure of the same to any such governmental authority.

(8)    The ARC's Environmental Consultants acknowledge and agree that they are only being provided access to this information, and GM is under no obligation whatsoever to provide the

DETROIT.1937383.6

ARC's Environmental Consultants with written copies of any information or to update or review such information.

(9)    If the ARC's Environmental Consultants, their employees, agents, or other acceptable third parties disclose information in violation of the provisions of this Agreement, then the ARC's Environmental Consultants agree that it shall be liable to GM for liquidated damages in the amount of TEN THOUSAND DOLLARS ($10,000) for each such situation involving disclosure. The ARC's Environmental Consultants acknowledge that GM will suffer substantial damages if such information is wrongfully disclosed, but the determination of the exact amount of such damages would be difficult or impossible. The setting of the TEN THOUSAND DOLLARS ($10,000) liquidated damage amount is reasonable in light of all relevant facts now available to the parties. GM shall also be entitled to injunctive relief in order to prevent disclosure of any such information in violation of this Agreement.

(9)    Except as otherwise provided herein, any notice required to be given hereunder shall be sent by certified or registered mail, return receipt requested, to General Motors Corporation, c/o Worldwide Real Estate, 200 Renaissance Center, MC 482-B38-LCN, Detroit, Michigan 48265-2000, Attention: Executive Director, or at such other address as GM may designate. All such notices shall be deemed effective upon receipt.

If the foregoing is acceptable to you, please so indicate by signing this letter in the space provided below, and return it to me as soon as possible. The enclosed duplicate copy is for your records.

Very truly yours,

GENERAL MOTORS CORPORATION

By: _____

Title: _____

Date: _____

RECEIPT AND ACCEPTANCE ACKNOWLEDGED

ANDERSON REDEVELOPMENT COMMISSION

By: _____

Title:   Attorney for Anderson Redevelopment Commission

Date:   February 23, 2006

KERAMIDA ENVIRONMENTAL, INC.

By: _____

Title:   President & CEO

Date:   2/27/06

HYROTECH CORPORATION

By: _____

Title: _____

Date:   2-28-06

WALLACK SOMERS & HAAS, PC

By: _____

Title:   Haas, Partner

Date:   2/27/06

PLEWS SHADLEY RACHER & BRAUN

By: _____

Title:   S. Curtis DeVoe, Partner

Date:   February 24, 2006

DETROIT.1937303.6

EXHIBIT F
ENVIRONMENTAL REPORTS

1.  All reports associated with these properties that have been submitted to a government agency(ies).

2.  Plant 18 Decommissioning Activities Report, Conestoga-Rovers and Associates, dated April 2006.

3.  Environmental Cleaning and Demolition of Plant 11 and Miscellaneous Buildings, 2911 S. Scatterfield Rd., Anderson, IN, Scope of Work, General Motors Corporation Worldwide Facilities Group, dated December 21, 2005.

4.  Environmental Cleaning and Demolition of Waste Water Treatment Facility, 2700 & Monroe Street, Anderson, IN, Scope of Work, General Motors Corporation Worldwide Facilities Group, dated June 2006.

5.  Final Corrective Measures Proposal, Conestoga-Rovers and Associates, dated April 29, 2004 as revised September 16, 2005 and December 19, 2005.

6.  Former Plant 7 Containment System Final Design Report, Conestoga-Rovers and Associates, dated May 5, 2006.

7.  Project Specifications, Former Plant 7 Containment System, Conestoga-Rovers and Associates, dated May 2006.

8.  Groundwater Monitoring Report April 2005 Through March 2006, Conestoga-Rovers and Associates, dated May 2006.

9.  Remediation Work Plan, Conestoga-Rovers and Associates, dated June 2006.

10. Closure Report, Former Plant 16 UST, Conestoga-Rovers and Associates, dated June 2006.

11. Electronic Slide Show - overview of Properties, presented February 28, 2006.

12. Site Investigation Report, prepared by ATEC, dated August 5, 1996 Site Investigation Report – Delphi Energy & Engine Management Systems Plant 18, IDEM Facility I.D. No. 016798, IDEM Incident No. 9601077 along with associated cover letter, dated August 8, 2006 and letter to IDEM dated June 6 1996 from ATEC and Hoosier Equipment Service Inc., Gasoline Underground Storage Tank System Closure Report, Plant 18, IDEM Incident No. 9601077, dated July 5, 1996.

13. No Further Action Letter from IDEM dated July 6, 2005 for LUST Incident No. 199606505 Facility ID No. 16797, Plant 17.

14. Additional Historical Layout drawing for former Plant 17

15. Print showing sewer lines for Plant 17, last revision dated 4/1988

16. Print showing sewer lines for Plant 18, last revision dated 9/6/1991

17. GM 1638 Construction General Conditions, May 2005

18. Notice of Final Decision and Response to Comments for Selected Final Corrective Measures and subsequent revisions, July 14, 2006

DETROIT.1423685.21

19. Environmental Cleaning and Demolition of Waste Water Treatment Facility 2700 Monroe Street, Anderson IN, dated June 2006 (Bid Specification)

| PROPERTY | REPORT TITLE |
|---|---|
| 1 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 1 - FORMER PLANT 17 AND PLANT 18, KEY CODE 999-71, ANDERSON, INDIANA |
| 2 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 2 - VACANT LOT, KEY CODE 52-28-02Z, NEAREST INTERSECTION SUNSET BOULEVARD AND LORAL DRIVE, ANDERSON, INDIANA |
| 2 | PHASE II ENVIRONMENTAL SITE INVESTIGATION ADDENDUM, PROPERTY NO. 2 VACANT LOT – KEY CODE 52-28-02Z, SCATTERFIELD ROAD FACILITY, ANDERSON, INDIANA |
| 3 | PHASE I ENVIRONMENTAL SITE ASSESSMENT/ PHASE II ENVIRONMENTAL SITE INVESTIGATION, PROPERTY NO. 3 – PLANT 20, KEY CODES 9999-1A-10Z, 55-11AZ, 55-12-01Z, AND 55-12-02Z, 2620 EAST 38th STREET, ANDERSON, INDIANA |
| 4 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 4 - VACANT LOT, KEY CODE 52-20-AZ, NORTH OF PLANT 17 AND SOUTH OF MOUNDS ROAD, ANDERSON, INDIANA |
| 4 | PHASE II ENVIRONMENTAL SITE INVESTIGATION ADDENDUM, PROPERTY NO. 4 VACANT LOT – KEY CODE 52-20-AZ, SCATTERFIELD ROAD FACILITY, ANDERSON, INDIANA |
| 5 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 5 - VACANT LOT, KEY CODE 52-10-2Z, NORTH OF PLANT 17 AND SOUTH OF MOUNDS ROAD, ANDERSON, INDIANA |
| 5 | PHASE II ENVIRONMENTAL SITE INVESTIGATION ADDENDUM, PROPERTY NO. 5 VACANT LOT – KEY CODE 52-10-2Z, SCATTERFIELD ROAD FACILITY, ANDERSON, INDIANA |
| 6 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 6 - PLANT 11, KEY CODE 9999-1B-02, 2911 SOUTH SCATTERFIELD ROAD, ANDERSON, INDIANA |
| 6 | PHASE II ENVIRONMENTAL SITE INVESTIGATION, PROPERTY NO. 6 PLANT 11 – KEY CODE 9999-1B-02, SCATTERFIELD ROAD FACILITY, ANDERSON, INDIANA |
| 7 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 7 - VACANT LOT, KEY CODE 9999-1B-03, NORTHWEST CORNER OF 32nd STREET AND SOUTH SCATTERFIELD ROAD, ANDERSON, INDIANA |
| 8 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 8 - FORMER PLANTS 3 AND 10, PORTION OF KEY CODE 9999-1A-08, ANDERSON, INDIANA |
| 8 | PHASE II ENVIRONMENTAL SITE INVESTIGATION ADDENDUM, PROPERTY NO. 8 PARKING LOTS – PORTION OF KEY CODE 9999-1A-08, SCATTERFIELD ROAD FACILITY, ANDERSON, INDIANA |
| 9 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 9 - VACANT LOT, KEY CODE 9999-1A-11Z, NORTHWEST CORNER OF MONROE STREET AND EAST 27th STREET, ANDERSON, INDIANA |
| 9 | PHASE II ENVIRONMENTAL SITE INVESTIGATION ADDENDUM, PROPERTY NO. 9 PARKING LOT – KEY CODE 9999-1A-11Z, SCATTERFIELD ROAD FACILITY, ANDERSON, INDIANA |
| 10 | PHASE I ENVIRONMENTAL SITE ASSESSMENT/ PHASE II ENVIRONMENTAL SITE INVESTIGATION, PROPERTY NO. 10 - PARKING LOT, KEY CODE 9999-1A-07, ANDERSON, INDIANA |
| 11 | PHASE I ENVIRONMENTAL SITE ASSESSMENT/ PHASE II ENVIRONMENTAL SITE INVESTIGATION, PROPERTY NO. 11 - FORMER PLANT 1, PORTION OF KEY CODE 9999-1A-05, ANDERSON, INDIANA |

| 12 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 12 - FORMER PLANTS 2 AND 4, PORTION OF KEY CODE 9999-1A-04, ANDERSON, INDIANA |
|---|---|
| 12 | PHASE II ENVIRONMENTAL SITE INVESTIGATION, PROPERTY NO. 12 - FORMER PLANTS 2 AND 4, PORTION OF KEY CODE 9999-1A-04, ANDERSON, INDIANA |
| 13 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 13 – VACANT LOT, PORTION OF KEY CODE 9999-1A-05, SOUTHWEST CORNER OF 23rd AVENUE AND JEFFERSON STREET, ANDERSON, INDIANA |
| 13 | PHASE II ENVIRONMENTAL SITE INVESTIGATION ADDENDUM, PROPERTY NO. 13 PARKING LOT – INTERSECTION OF 23rd STREET AND JEFFERSON STREET, COLUMBUS AVENUE FACILITY, ANDERSON, INDIANA |
| 14 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 14 - VACANT LOT, KEY CODE 566-11A-5, SOUTHEAST CORNER OF 29th STREET AND MADISON AVENUE, ANDERSON, INDIANA |
| 14 | PHASE II ENVIRONMENTAL SITE INVESTIGATION ADDENDUM, PROPERTY NO. 14 VACANT LOT, KEY CODE 566-11A-5, MADISON AVENUE FACILITY, ANDERSON, INDIANA |
| 15 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 15 – FORMER PLANT 7 , PORTION OF KEY CODE 9999-1A-08, 1600 EAST 27TH STREET, ANDERSON, INDIANA |
| 16 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 16 – DELPHI WASTEWATER TREATMENT PLANT, PORTION OF KEY CODE 9999-1A-08 ,2620 MONROE STREET, ANDERSON, INDIANA |
| 17 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 17 - PLANT 16, PORTION OF KEY CODE 9999-1A-05, 9999-1A-05A, 9999-1A-06, 886-11, 886-21, 886-22, 886-2, AND 110-18, ANDERSON, INDIANA |
| 18 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 18 – FORMER PLANTS 6 AND 8, PORTION OF KEY CODE 9999-1A-04, ANDERSON, INDIANA |
| 19 | PHASE I ENVIRONMENTAL SITE ASSESSMENT, PROPERTY NO. 19 – FORMER PLANT 5, KEY CODE 9999-1A-03, ANDERSON, INDIANA |
| ALL | ENVIRONMENTAL DUE DILIGENCE BRIEFING PACKAGE, FORMER GENERAL MOTORS/DELPHI FACILITIES, ANDERSON, INDIANA |

EXHIBIT G
FORM OF DEVELOPER DEED
**QUIT CLAIM DEED OF CONVEYANCE**

**THIS QUIT CLAIM DEED**, executed the ___ day of _____, 200_ to be effective as of the _____ day of _____, 200_, between ANDERSON REDEVELOPMENT COMMISSION, an Indiana statutory redevelopment commission, with its principal address at _____, hereinafter referred to as ARC, and the _____, a _____ with its principal address at _____, hereinafter referred to as Developer.

**WHEREAS**, Developer desires the tract of land hereinafter more particularly described, and ARC, as owner of such tract, is agreeable to conveying such tract to Developer.

**NOW, THEREFORE, WITNESSETH**, for and in consideration of _____ and 00/100 Dollars ($_____), the receipt whereof is hereby acknowledged, ARC does by these presents GRANT, BARGAIN, SELL, REMISE, RELEASE, AND FOREVER QUIT CLAIM unto Developer, its successors and assigns, land situated in the City of Anderson, County of Madison, and State of Indiana (the "Property"), described as follows:

**SEE ATTACHED EXHIBIT A**

**TOGETHER WITH** all and singular the hereditaments and appurtenances thereunto belonging or in anywise appertaining.

**TO HAVE AND TO HOLD** the Property unto the Developer, its successors and assigns, forever, as provided herein.

This conveyance is subject to existing easements and restrictions of record and those matters which would be shown by the Survey or would be evident by a personal inspection of the Property.

This conveyance is further subject to the following restrictions which will run with the Property and be binding upon Developer and all subsequent owners, tenants, and users:

1.  [Except for the remedial action being undertaken by General Motors Corporation ("GM") under a Consent Order with the U.S. Environmental Protection Agency Region V as part of a RCRA Corrective Action Project or Proposed IDEM Remediation] The Developer represents that it is acquiring the Property in its "AS IS, WHERE IS" condition as of the date hereof, without any right of action under contract, under any applicable federal, state, or local environmental laws, regulations, or ordinances, under any other federal, state, or local statutes, regulations, or ordinances including, but not limited to, those governing health and safety (collectively, the "Laws"), or under common law or equity against the ARC or GM in connection with or relating to the Property, including, without limitation, the physical nature or condition, including the environmental condition, of the Property, and including, without limitation, any matters or issues related to: (i) asbestos-containing materials, (ii) surfaces at, in, or on the Property which may have been painted with lead-based paints which may be present at the Property, or (iii) the disposal or presence of any debris on the Property. The Developer expressly waives any right of rescission and all claims for damages by reason of any statement, representation, warranty, assurance, promise, or agreement, if any, relating to the Property. The Developer further releases and discharges the ARC and GM from any and all claims or causes of action which the Developer may now have or hereafter have against the ARC or GM relating to the Property and after the date hereof the Developer shall indemnify and hold the ARC and GM harmless from and against costs, claims, expenses, and causes of action arising under: (1) the Laws, or (2) under common law or equity in connection with or relating to the existence of hazardous materials on the Property (collectively, the "Laws"), including, without limitation, any matters or issues related to: (i)

asbestos-containing materials, (ii) surfaces at, in, or on the Property which may have been painted with lead-based paints which may be present at the Property, or (iii) the disposal or presence of any debris on the Property.

2. The Developer warrants and agrees that it shall not "treat," "store," or "dispose" of any "hazardous substances," "hazardous wastes," or "toxic substances" as those terms are defined under CERCLA, 42 U.S.C. 9601 et. seq., RCRA, 42 U.S.C. 6901 et. seq., or TSCA, 15 U.S.C. 2601 et. seq., or under similar applicable state law, on, at or below the Property, and shall maintain generator-only status or no generator of hazardous waste status; provided, however, that the Developer may: (i) accumulate such substances or wastes as allowed under applicable laws and regulations for off-site treatment, off-site storage, or off-site disposal, and (ii) use and store commercial products on-site which may contain such substances.

3. The Developer warrants that it shall comply with all Laws, including, but not limited to, those governing health and safety, applicable to the use of or operations at the Property, including any current or future development, excavation, improvements, structures, utilities, facilities, renovations, demolition, modifications, parking lots, or storage areas.

4. The Developer warrants and agrees that the use of Property shall be limited to industrial and commercial purposes [except for Parcels 11, 12, and 18 on Columbus Avenue which may be used for park-like recreational uses].

5. The Developer warrants and agrees that any and all soil and/or debris management and surface water and/or groundwater management required or necessary because of excavation, demolition, or soil disturbance related to future use, development, or construction at or of the Property, is the sole obligation and liability of the Developer. Such soil and/or debris management and surface water and/or groundwater management may include in-place management, excavation, sediment and erosion control, and disposal or other soil and debris management options which are allowed or required under the Laws.

6. The Developer warrants and agrees that use of groundwater at, in, or under the Property by any person or entity for any purpose, including potable and non-potable uses shall be prohibited; provided that, the foregoing prohibition shall not apply to short-term dewatering for construction purposes provided that the dewatering (including, without, limitation, management and disposal of the groundwater) (i) is conducted in accordance with all Laws and applicable restrictive covenants encumbering the Property; and (ii) does not cause or result in: (A) a new release; (B) exacerbation of existing contamination; or (C) or any other violation of Laws.

7. Developer warrants and agrees that it shall not excavate, construct or cause to be constructed any improvements in the areas depicted [or legally described] on **Exhibit B** attached hereto. [GM to identify any "No Build Areas" on the Property].

The Developer agrees that any contract, agreement, deed, lease or other instrument transferring title or possession of all or any part of the Property, by sale, lease, or otherwise, to any successor, assignee, or tenant shall incorporate the restrictions set forth in this Quit Claim Deed. The restrictions contained in this Quit Claim Deed are deemed covenants running with the land and shall inure to the benefit of the ARC, GM and their respective successors and assigns. The restrictions are not intended to and shall not be deemed to create in the ARC or GM a possibility of reverter, a power of termination, or any other future interest in the Property.

[The following provisions shall be a part of the Deed, as applicable:]

[For Properties 1 through 9, 15 and 16 - Developer also acknowledges and agrees that the foregoing restrictions and covenants may be enforced in perpetuity against Developer and Developer's successors in title by GM and the United States Environmental Protection Agency ("U.S. EPA"), as a third party beneficiary. Developer hereby agrees that (a) agreement to comply with the terms and obligations of this Deed shall be expressly included by Developer, its successors and assigns in any instrument

transferring complete or partial possession or ownership of the Property; (b) U.S. EPA shall be expressly named in any such instrument as a third party beneficiary of the right to enforce the restrictions and covenants in this Deed and such instrument shall provide that U.S. EPA may directly enforce the restrictions and covenants in this Deed as against the transferee under such instrument and any successor to any such transferee; (c) any such instrument, or memorandum thereof, effecting such transfer shall be recorded with the Madison County Register of Deeds; and (d) the requirements of this paragraph shall run with the Property.]

[For Properties 10, 11, 12, 14, 17, 18, 19 - Developer also acknowledges and agrees that the foregoing restrictions and covenants may be enforced in perpetuity against Developer and Developer's successors in title by GM and the Indiana Department of Environmental Management ("IDEM"), as a third party beneficiary. Developer hereby agrees that (a) agreement to comply with the terms and obligations of this Deed shall be expressly included by Developer, its successors and assigns in any instrument transferring complete or partial possession or ownership of the Property; (b) IDEM shall be expressly named in any such instrument as a third party beneficiary of the right to enforce the restrictions and covenants in this Deed and such instrument shall provide that IDEM may directly enforce the restrictions and covenants in this Deed as against the transferee under such instrument and any successor to any such transferee; (c) any such instrument, or memorandum thereof, effecting such transfer shall be recorded with the Madison County Register of Deeds; and (d) the requirements of this paragraph shall run with the Property.]

IN WITNESS WHEREOF, ARC has duly executed this Quit Claim Deed this _____ day of _____, 200_, to be effective as of the ___ day of _____, 200__.

ANDERSON REDEVELOPMENT COMMISSION, a
_____

By:_____
Name:_____
Title:_____


STATE OF INDIANA          )
                          ) ss.
COUNTY OF MADISON         )

The foregoing instrument was acknowledged before me this _____ day of _____, A.D. 200_, by _____   the _____ of   Anderson Redevelopment Commission, a _____, on behalf of the _____.

_____
Notary Public, _____ County, _____
My Commission Expires:_____


WHEN RECORDED RETURN TO:

_____
_____
_____

SEND SUBSEQUENT TAX BILLS TO:

_____
_____
_____

THIS INSTRUMENT PREPARED BY:

Lawrence D. McLaughlin, Esq
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
Detroit, Michigan 48226

**EXHIBIT H**
**RENT ROLL**

1. Plant 20 Leased to Delphi Automotive Systems through 12/31/08 - $468,140 / annum – nnn

2. Plant 16 Leased to Delco Remy America through 9/30/06 - $138,000 /annum gross

**EXHIBIT I**
**CONTRACTS**

**None.**

**EXHIBIT J-1**
**REQUIRED RCRA REMEDIATION**

1.    Consent Agreement and Final Order between the United States Environmental Protection Agency and General Motors Corporation dated May 2002, Docket No. RCRA05-2001-0011; Final Decision from EPA (July 13-14, 2006)

2.    Final Corrective Measures Proposal, Conestoga-Rovers and Associates, dated April 29, 2004 as revised September 16, 2005 and December 19, 2005.

3.    Former Plant 7 Containment System Final Design Report, Conestoga-Rovers and Associates, dated May 5, 2006.

4.    Project Specifications, Former Plant 7 Containment System, Conestoga-Rovers and Associates, dated May 2006.

5.    Groundwater Monitoring Report April 2005 Through March 2006, Conestoga-Rovers and Associates, dated May 2006.

**EXHIBIT K**
**PROPOSED IDEM REMEDIATION**

1.      Remediation Work Plan, Conestoga-Rovers and Associates, dated June 2006 (Incident Number 1999-06-010 – Columbus Avenue).

**EXHIBIT L-1**
**DEMOLITION SCOPE OF WORK DOCUMENTS**

1.  Environmental Cleaning and Demolition of Plant 11 and Miscellaneous Buildings, 2911 S. Scatterfield Rd., Anderson, IN, Scope of Work, General Motors Corporation Worldwide Facilities Group, dated December 21, 2005.

2.  Environmental Cleaning and Demolition of Waste Water Treatment Facility, 2700 & Monroe Street, Anderson, IN, Scope of Work, General Motors Corporation Worldwide Facilities Group, dated June 2006.

3.  GM 1638 Construction General Conditions, General Motors Corporation, dated May 2005.

**EXHIBIT N**

**INSURANCE REQUIREMENTS**

1.  Insurance requirements as set forth in General Motors Corporation and Affiliates Construction General Conditions – "GM 1638 (05/05)"



**GENERAL MOTORS CORPORATION**

**AND AFFILIATES**

**CONSTRUCTION GENERAL CONDITIONS**

**GM 1638 (05/05)**

**Supersedes Earlier Versions**

11.1.3    Contractor shall at all times be in material compliance with all applicable laws, ordinances, codes and regulations pertaining to Hazardous Materials and the environment; shall obtain and maintain all permits, licenses, and authorizations; required for Contractor's business, equipment, and operations on and in connection with the Work; shall comply with all material terms and conditions of such permits, licenses, and authorizations, and shall comply with all material and applicable requirements, orders, and directives of governmental agencies. Contractor shall be given a reasonable period of time, within which to come into compliance with any applicable laws ordinances, codes, or regulations enacted after award of the Contract.

11.1.4    Contractor shall promptly notify Owner in writing of any reportable release of Hazardous Materials on the Work or the Site, specifying the nature and quantity of the release, the location of the release, and the measures taken to contain and clean up the release and ensure that future releases do not occur.

11.1.5    The Contractor shall promptly notify the Owner in writing if the Contractor encounters Hazardous Materials at the Site. In the event of a release of Hazardous Materials or if the Contractor encounters Hazardous Materials at the Site, the Contractor shall immediately stop all Work in affected areas until the Owner directs the Contractor in writing to proceed with such Work.

11.1.6    The Contractor shall strictly comply with the applicable requirements of the Chart, Contractor Insurance Requirements attached hereto as Appendix L and incorporated herein by reference.

## 11.2    INDEMNIFICATION

11.2.1    General indemnification provision as set forth in the Contract Documents apply.

11.2.2    See Construction Regional Requirements – Appendix A, R11.

## 11.3    TESTING

Owner may conduct any testing, sampling, borings, and analyses of Hazardous Materials or suspected Hazardous Materials it deems necessary. Such testing shall be at Contractor's expense if Contractor, its agents, employees, subcontractors or their agents and employees have caused Hazardous Materials to be on the Work or the Site. This applies also if Owner has a reasonable basis for suspecting the presence of Hazardous Materials which has been caused by or resulted from the activities of Contractor, its agents, employees, Subcontractors, or their agents or employees. In addition to any other right granted by law or the Contract, if Contractor is in material noncompliance with any Environmental Law Owner may, at its option, take whatever action it deems necessary and appropriate at Contractor's sole expense, which sums shall be immediately due and payable to Owner. Upon termination of the Contract, or abandonment of the Work by Contractor for any reason, Contractor shall remove all of its equipment, materials, and other items which may cause, contribute to, or result in contamination. At all times during the construction of the Work, Contractor shall, if required by Owner or any governmental agency, promptly take whatever steps are necessary to stop any and all equipment, materials, and other items which may cause, contribute to, or result in contamination from causing, contributing to, or resulting in such contamination. Nothing set forth herein shall limit or modify the Contractor's obligation under the Construction General Requirements and other Contract Documents to perform quality control and other construction testing in connection with the Work.

## ARTICLE 12: INSURANCE

## 12.1    CONTRACTOR'S INSURANCE REQUIREMENTS

12.1.1    Contractor shall as a minimum maintain insurance coverage referenced in the Chart attached hereto as Appendix N, as may be applicable to Contractor's activities, including all conditions specified on Page 2 of such Chart.

12.1.2    In addition, Contractor agrees to require that all of its Subcontractors as a minimum maintain insurance coverage referenced in the Chart attached as Appendix N, and to secure and maintain in its records all certificates of insurance from all Subcontractors.

12.1.3    If requested by the Owner, within three (3) days after such request, the Contractor shall submit to the Owner's Representative certificates of insurance evidencing coverage required to be provided by the Contractor under by the Contract Documents. The Contractor shall require each Subcontractor to submit to the Contractor the Subcontractor's certificate of insurance, evidencing insurance of the Subcontractor meeting the requirements of the Contract Documents, prior to commencement of the Subcontractor's work for the Project. The Contractor shall maintain such certificates in the Project documents. Contractor further agrees that if requested by Owner, all Subcontractor certificates of insurance required for this Contract will be furnished to Owner within three (3) days of request.

## 12.2    PROPERTY AND CASUALTY INSURANCE (BUILDER'S RISK)

12.2.1    The Owner will procure and maintain Builder's Risk property insurance to cover the completed construction for the Project, the material and other property delivered to the Project Site which are to become a part of the permanent construction for the Project or are to be consumed on the Owner's premises in the process of constructing the Project.

12.2.2    The property insurance policy of the Owner required to be provided under Section 12.2.1 hereof shall include as loss payees the Contractor, Subcontractors at any tiers, Materialmen, Architects and Engineers in an amount equal to the actual cash value for all risks of direct physical loss.  Flood and earthquake losses are limited to $125.0 Million each occurrence.

12.2.3    The coverage provided by the Owner under Section 12.2.1 does not insure against loss caused by:

(i)    Wear and tear, deterioration, rust or corrosion, mold, wet or dry rot.

(ii)    Smog, smoke, vapor, liquid or dust discharged from agricultural or industrial operation.

(iii)    Mechanical breakdown, including rupture or bursting caused by centrifugal force.

(iv)    Settling, cracking, shrinkage, bulging or expansion of pavements, foundations, walls, floors, roofs or ceilings unless loss by a peril not excluded.

(v)    Dampness or dryness of atmosphere, resulting from extremes or changes of temperature.

(vi)    Interference by employees or others with customary operations.

(vii)    Theft or attempted theft of any property which at the time of loss is in the open outside of buildings located on the Owner's premises or, when designated by the Owner before a loss occurs, the Contractor's security service is not constantly in attendance.

(viii)    Unexplained or mysterious disappearance of any property or shortage disclosed on taking inventory; or caused by any willful or dishonest act or omission of the insured or any associate, employee or agent of any insured.

(ix)    Errors in design, poor workmanship or use of faulty materials.

(x)    The cost of or resulting from the cost of making good any faulty workmanship, material, construction or design to buildings or structures, but this exclusion shall not apply to loss caused by an insured peril arising as a consequence of faulty workmanship, material, construction or design.

(xi)    Electrical or magnetic injury, disturbance or erasure of electronic recordings.

(xii)    Nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled, or be in whole or in part caused by, contributed to, or aggravated by any of the perils insured against.

(xiii)    Pollution accident of any sort.

12.2.4    The policy provided by the Owner under Section 12.2.1 does not insure against loss to:

(i)    Steam boilers (including equipment attached to and forming a part thereof), steam turbines, steam engines, steam pipes interconnecting any of the foregoing or gas turbines caused by any condition or occurrence within such pressure vessels, loss caused by or resulting from explosion, rupture, bursting, cracking, burning or bulging of boilers, pressure vessels, or piping or apparatus attached thereto.

(ii)    Electrical appliances, devices, fixtures, wiring, or other electrical equipment caused by electrical currents.

(iii)    Lawns, plants, shrubs, trees, standing timber.

(iv)    Personal property in the open caused by exposure to elements of the weather.

(v)    Contractors' and Subcontractors' machinery, tools and equipment used in the erection of property covered unless the total capital value of such property is directly and specifically charged to the job.

(vi)    Personal property undergoing alterations, repairs, testing, installation or servicing, including materials and supplies, therefore, if directly attributable to the operations or work being performed thereon, unless loss is caused by an insured peril.

12.2.5    Unless the Special Conditions provide otherwise, the Contractor shall be responsible to pay Five Thousand ($5,000) Dollars of the deductible portion of any loss due to the Contractor's negligence or due to theft of the Contractor's materials. Unless the Special Conditions provide otherwise, the Owner shall assume responsibility for payment of other deductible amounts for an insured loss under the property insurance required to be provided by the Owner under Section 12.2.1.

12.2.6    Unless the Special Conditions provide otherwise, the Contractor shall be responsible to provide property insurance for materials and equipment provided by the Contractor for the Project in transit, stored in a location other than the Project Site, or not otherwise covered by the property insurance required to be provided by the Owner under Section 12.2.1.

12.2.7    Unless the Special Conditions provide otherwise, the Contractor shall purchase and maintain boiler and machinery insurance covering steam boilers (including equipment attached to and forming a part thereof), steam turbines, steam engines, steam pipes interconnecting any of the foregoing or gas turbines provided by the Contractor as part of the Work for the Project, which insurance shall specifically cover such insured objects during installation, testing and start-up and until Final Acceptance by the Owner. This insurance shall include the interests of the Owner, Contractor and Subcontractors of any tier in the Work, and Owner and Contractor shall be named as insureds.

12.2.8    Notwithstanding anything to the contrary set forth in these Construction General Conditions, the Contractor shall be responsible for all direct property losses (up to Five Thousand ($5,000) Dollars, or other amount set forth in the Special Conditions) under the insurance provided by the Owner under Section 12.2.1, due to the Contractor's negligence or due to theft, however caused, and such losses shall not be the responsibility of the Owner or the Owner's insurance.

12.2.9    The Owner and Contractor each waive all rights of subrogation against each other with respect to losses caused by fire or other perils to the extent covered by the property insurance required to be provided by the Owner and the Contractor, respectively, under this Section 12.2. The Owner shall provide a similar waiver from Owner in favor of the Subcontractors at any tier, Architects and Engineers or Materialmen. The Contractor shall provide a similar waiver, in favor of the Owner and Owner's agents and separate contractors, from the Contractor's Subcontractors at every tier, Architects, Engineers and Materialmen. All insurance policies required hereunder shall permit and recognize such waivers of subrogation.

12.2.10    The foregoing provisions shall not relieve the Contractor, Subcontractors at any tiers, Architects or Engineers or Materialmen from their respective liability and responsibility for loss or damage to real or personal property of the Owner or others, which loss or damage is not specifically stated to be included in the insurance coverage to be provided by the Owner for this Project as set forth and limited in this Section 12.2, which loss or damage is caused by the acts, omissions or operations of the Contractor, Subcontractors, Architects, Engineers, or Materialmen, their employees, agents, servants or representatives.

12.2.11    In addition to other required insurance, the Contractor, Subcontractors at any tiers, Materialmen, Architects and Engineers shall maintain Contractor's Equipment Floater insurance for their respective tools, equipment, tarpaulins, field offices or construction buildings, employees' tools and clothing, materials and other property which will not become a part of the permanent construction or be consumed on the Owner's premises in the process of completing the Project.

12.2.12    In the event of loss covered by the Owner's property insurance required to be provided under Section 12.2.1, the Contractor shall submit a complete written damage report to the Owner. Reports shall be submitted within seventy-two (72) hours after a loss occurs and shall include an estimate of repair or replacement cost. Except in an emergency endangering life or property, the Contractor shall proceed with repairs or replacement only in pursuance of a Field Order from the Owner under Article 13 of these Construction General Conditions.

## 12.3    MISCELLANEOUS INSURANCE PROVISIONS

12.3.1    The Owner may elect at any time during the term of this Contract to require the Contractor to procure and maintain other or additional insurance not specified in Section 12.1 hereof. Notice of such election shall be given to the Contractor at least sixty (60) days prior to the effective date of the requirement. Any additional costs incurred by Contractor in securing such additional insurance shall be reimbursed by the Owner and an appropriate Change Order covering such reimbursement shall be issued.

12.3.2    In order to facilitate Owner's purchase and maintenance of the insurance called for under Section 12.2 above, the Contractor shall supply the Owner with such information relative to the Contractor, the Subcontractors, the Sub-Subcontractors and their performance of the Work as the Owner may request. Such information may include, by way of example and not limitation, information concerning payroll "job loading" by separate trades.

12.3.3    The Contractor agrees (i) to maintain, and to cause all Subcontractors and Sub-Subcontractors to maintain, separate payroll records for the Work performed under this Contract, and (ii) to make such records available to Owner upon its request.

## 12.4    OWNER - CONTROLLED INSURANCE PROGRAM

12.4.1    Owner shall have the option to provide an Owner-Controlled Insurance Program ("OCIP") for the Project

12.4.2    The Contractor shall cooperate with the Owner as necessary in connection with the application for OCIP coverage and shall promptly provide all information requested by the Owner regarding the Contractor's insurance claims history, accident and safety record and similar matters.

## ARTICLE 13: CHANGES IN THE WORK

## 13.1    OWNER'S RIGHT TO CHANGE THE WORK

13.1.1    The Owner shall have the right at any time to require alterations in, additions to and deductions from the Work without rendering void the Contract. Unless the Owner agrees otherwise in writing, all changes in the Work shall be completed within the Contract Time set forth in the Contract.

13.1.2    The Owner shall have the right, in the Owner's reasonable discretion, to have changed Work performed by another contractor.

13.1.3    The Contractor shall not proceed with the changed Work until the changed Work is authorized in writing by the Owner's Purchasing Department or Designate by:

(i)    A Field Order, as defined in Section 1.1 hereof; or

(ii)    A Purchase Order Alteration, as defined in Section 1.1 hereof; or

(iii)    A Contract Change Order, as defined in Section 1.1 hereof.

13.1.4    RECEIPT OF DRAWINGS, BULLETINS, OR ORAL ORDERS FROM THE OWNER'S REPRESENTATIVE OR OTHERS SHALL NOT CONSTITUTE AUTHORIZATION TO PROCEED WITH A CHANGE IN THE WORK.

## 13.2    PROCEDURE

13.2.1    If the Owner issues a Field Order or a Bulletin describing a change to the Work, the Contractor shall submit a written Quotation, as defined in Section 1.1 hereof, for such change within the time required by the Field Order or Bulletin (or within fourteen (14) days after the date of the Field Order or Bulletin if no other time is stated in the Field Order or Bulletin.). The Quotation shall comply with all requirements of this Article 13.

13.2.2    The Quotation shall be itemized in detail to facilitate checking by the Owner. Forms GM 1784, GM 1784A (Appendix C), and/or related Owner forms, properly completed, shall be submitted with the Quotation. As applicable (as described in this Article 13), Forms GM 1781, GM 1782 and GM 1783 (Appendix C) setting forth pre-established rates will be used to prepare the Quotation.

13.2.3    Each Bulletin or Field Order item number must be priced separately.

13.2.4    The Quotation shall be priced in accordance with Section 13.3, the applicable requirements of the Construction Requirements in Appendix A, R13 and the following:

13.2.4.1    The Quotation for a Bulletin shall be based on Method 1 (Unit Prices), Method 2 (Estimated Cost Plus Percentage Fees), or a combination of the two, as indicated in the Bulletin. If unit prices are stated in the Contract, and if the Bulletin indicates that Method No. 1 will be used, such unit prices shall be used to calculate the Quotation (See Section 13.3).

13.2.4.2    The Quotation for a Field Order shall be based on Method 1 (Unit Prices), Method 2 (Estimated Cost Plus Percentage Fees), Method 3 (Cost Plus Percentage Fees), or a combination of the three, as indicated in the Field Order. If unit prices are stated in the Contract, and if the Field Order indicates that Method No. 1 will be used, such unit prices shall be used to calculate the Quotation (See Section 13.3).

13.2.4.3    If the Bulletin or Field Order directs the Quotation to be determined under Method No. 2 (Estimated Cost Plus Percentage Fees), or Method 3 (Cost Plus Percentage Fees), the estimated cost shall be determined in accordance with Section 13.3.2, or

## CONTRACTOR INSURANCE REQUIREMENTS (1)
(Dollars in Thousands)

| WORK DESCRIPTION | General Liability (2) & (3) | Automotive Liability (2) & (4) | Worker's Comp. Employers' Liability (5) | Contractor Pollution Liability (2) & (6) | Pollution Legal Liability (7) | Aviation Liability (2) |
|---|---|---|---|---|---|---|
| A. All construction managers or general contractors acting Construction Manager not involved with hazardous waste, hazardous material. | 5,000 | 5,000 | Statutory $250/250/250 or $100/500/100 | N/A | N/A | (12) |
| B. All contractors and transporters not involved with hazardous waste, hazardous material or asbestos. | 1,000 | 1,000 | Statutory 250/250/250 or 100/500/100 | N/A | N/A | (12) |
| C. All contractors who treat or store hazardous waste on GM property but do not transport hazardous waste or hazardous material. | 5,000 | 1,000 | Statutory 250/250/250 or 100/500/100 | 1,000/2,000 | N/A | (12) |
| D. All contractors who either transport hazardous material to GM property or transport hazardous waste either on or off GM property. | 5,000 | 5,000(8) | Statutory 250/250/250 or 100/500/100 | N/A | 1,000/2,000 (9) | (12) |
| E. All contractors who do not transport hazardous waste or hazardous material but do treat, store, or dispose of hazardous waste off GM property. | 5,000 | 1,000 | Statutory 250/250/250 or 100/500/100 | N/A | 1,000/2,000 (10) or 4,000/8,000 | (12) |
| F. All contractors who handle hazardous waste on GM property, transport off GM property and treat, store or dispose of hazardous waste off GM property. | 5,000 | 5,000(8) | Statutory 250/250/250 or 100/500/100 | 1,000/2,000 | 1,000/2,000 (10) or 4,000/8,000 | (12) |
| G. All asbestos contractors who do not transport asbestos. | 1,000/5,000(11) | 1,000 | Statutory 250/250/250 or 100/500/100 | N/A | N/A | (12) |
| H. All asbestos contractors who transport asbestos off GM property. | 1,000/5,000(11) | 5,000(8) | Statutory 250/250/250 or 100/500/100 | N/A | N/A | (12) |
| I. All contractors involved in blasting and not involved with hazardous waste, hazardous material or asbestos. | 10,000 | 1,000 | Statutory 250/250/250 or 100/500/100 | N/A | N/A | (12) |

PAGE 2 OF CHART IDENTIFIES ADDITIONAL REQUIREMENTS AND INFORMATION ASSOCIATED WITH LISTED FOOTNOTES.

GM 1638 (05/05) APPENDIX N: CONTRACTOR INSURANCE REQUIREMENTS

GM

108

## CONTRACTOR INSURANCE REQUIREMENTS
### (Page 2 of 2)

In the event of a conflict between coverages and limits referenced herein and any governing regulations, the more stringent requirements shall apply.

Certificate(s) of Insurance must be in a form acceptable to Owner, underwritten by insurance company(ies) satisfactory to Owner and licensed to do business in the state of operation where the work is to be performed. The purchase of appropriate insurance coverage by Contractor or the furnishing of the certificate(s) of insurance shall not limit or release the Contractor from its respective obligations or liabilities under this contract. All policies of insurance maintained by Contractor shall be primary to any coverage that may be available to Owner.

(1)     Limits shown are per occurrence minimum limits of coverage except as may be noted otherwise. All policies of insurance shall be endorsed to provide Owner with written notice thirty (30) days prior to cancellation, modification, or material change to any policy. If professional services are provided under the contract then Professional Liability Insurance of $5 million is required and must not include a pollution exclusion if the professional services are related to environmental work.

(2)     GM must be named as additional insured. With respect to, and only to the extent of, claims, loss, cost and expenses for which the Contractor is required to indemnify the Construction Manager, if any, the Architect/Engineer, if any, and the Process Engineer, if any, under Section 3.16.1 of GM 1638 (05/05); the Construction Manager (if any), the Architect/Engineer (if any) and the Process Engineer (if any) shall be named as additional insureds on the Contractor's Commercial General Liability policies.

(3)     All Commercial (Broad Form Comprehensive) General Liability policies must include products, completed operations (maintained for period of two years from final acceptance of the work by the Owner); and contractual liability coverage. Per occurrence limits shown are combined single limits for personal injury and property damage. All general liability annual aggregate limits of coverage must be at least equivalent to the per occurrence limits shown, except as noted otherwise. All general liability policies (with the exceptions of Work Description C, D, E, and F of Page 1) must be written on an occurrence policy form.

(4)     All Automobile Liability policies must include coverage for owned, hired, and non-owned vehicles. Per occurrence limits shown are combined single limits for bodily injury and property damage.

(5)     All states endorsement is required if performing work outside of home office state.

(6)     Contractor Pollution Liability policy must be endorsed to provide coverage for all services performed by Contract on behalf of Owner.

(7)     Pollution Legal Liability coverage must be maintained for the Contractor's sites being utilized for the work under this contract.

(8)     Automobile liability policy must include Environmental Restoration coverage (MCS-90 Endorsement) at statutory required limits.

(9)     Required if Contractor stores hazardous waste for more than ten (10) days.

(10)    Under the Federal Resource Conservation and Recovery Act (RCRA), hazardous waste treatment, storage and disposal facilities must maintain liability coverage for sudden and accidental pollution incidents at limits at least $1 million per occurrence, with an annual aggregate of at least $2 million. Owners and operators of surface impoundment, landfill or land treatment facilities must additionally maintain liability coverage for gradual (non-sudden) pollution incidents of at least $3 million per occurrence, with an annual aggregate of at least $6 million. Policies, that is, policies combining coverage for both sudden and accidental and gradual (non-sudden) occurrences, must be at least $4 million per occurrence ($1 million sudden plus $3 million non-sudden and $8 million annual aggregate ($2 million sudden plus $6 million non-sudden)

(11)    Commercial (Broad Form Comprehensive) General Liability policy must be written on an occurrence basis (without a sunset clause) and include asbestos abatement liability coverage.

(12)    Required limit of aviation liability coverage is $5 million per occurrence if Contractor utilized aircraft service of any type.