1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 1-09-50026-REG

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


MOTORS LIQUIDATION COMPANY, et al.

f/k/a GENERAL MOTORS CORPORATION, et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        March 2, 2010

        11:04 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2      HEARING re Debtors' Third Omnibus Objection to Claims

3      (Duplicate Claims)

4

5      HEARING re Debtors' Motion for Entry of Order Pursuant to 11

6      U.S.C. §§ 105(a) and 363 in Aid of Implementation of Sale

7

8      HEARING re Motion of Sarajuan Gilvary for Relief from the

9      Automatic Stay to Continue a Separate Litigation

10

11     HEARING re Motion of Marla Soffer, Administratrix of the Estate

12     of David Arenas, Deceased, for Relief from the Automatic Stay

13     to Continue a Separate Litigation

14

15     HEARING re Status Conference regarding Motion of ACE American

16     Insurance Company and Affiliated Companies to Compel Debtors to

17     Assume or Reject Insurance Polices and Related Agreements

18

19     HEARING re Debtors' Objection to Proofs of Claim Nos. 02109 and

20     14938 Filed by Lafonza Earl Washington

21

22     HEARING re Debtors' Objection to Proof of Claim No. 903 filed

23     by Susan B. Angell and Prudence Reid

24

25

3

1

2   HEARING re Debtors Eleventh Omnibus Motion Pursuant to 11

3   U.S.C. § 365 to Reject Certain Executory Contracts

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

4

1

2    A P P E A R A N C E S :

3    WEIL GOTSHAL & MANGES LLP

4         Attorneys for Debtor

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   JOSEPH H. SMOLINSKY, ESQ.

9

10    HONIGMAN MILLER SCHWARTZ & COHN, LLP

11         Attorneys for Debtor

12         2290 First National Building

13         660 Woodward Avenue

14         Detroit, MI 48226

15

16    BY:   SETH A. DRUCKER, ESQ. (TELEPHONICALLY)

17

18    UNITED STATES DEPARTMENT OF JUSTICE

19         U.S. Attorneys Office

20         86 Chambers Street

21         Third Floor

22         New York, NY 10007

23

24    BY:   DAVID S. JONES, AUSA

25

5

1

2    MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN

3         Attorneys for M&M Motors

4         200 Lake Drive East

5         Suite 300

6         Cherry Hill, NJ 08002

7

8    BY:   WALTER E. KAWALEC, III, ESQ.

9

10   KENNEDY, CAMPBELL, LIPSKI & DOCHNEY

11        Attorneys for Pompey Dodge Dealership

12        1818 Market Street

13        Suite 2510

14        Philadelphia, PA 19103

15

16   BY:   NANCY E. CAMPBELL, ESQ.

17

18   THE ZAJAC LAW FIRM, LLC

19        Attorneys for Movants, Sarajuan Gilvary and Marla Soffer

20        1818 Market Street

21        30th Floor

22        Philadelphia, PA 19103

23

24   BY:   ERIC G. ZAJAC, ESQ.

25

6

1

2    KRAMER LEVIN NAFTALIS & FRANKEL LLP

3          Attorneys for Official Committee of Unsecured Creditors

4          1177 Avenue of the Americas

5          New York, NY 10036

6

7    BY:   LAUREN M MACKSOUD, ESQ.

8

9    NEW YORK STATE DEPARTMENT OF LAW

10         Attorneys for New York State Department of Conservation

11         120 Broadway

12         New York, NY 10271

13

14   BY:   MAUREEN F. LEARY, AAG

15         (TELEPHONICALLY)

16

17   ALSO PRESENT TELEPHONICALLY:

18         DAVID SEMENZA, Cerberus Capital Management

19

20

21

22

23

24

25

7

1              P R O C E E D I N G S

2        THE COURT:  All right.  GM.  Mr. Smolinsky, you want

3    to quarterback things and help me get your views and

4    recommendations as to how you would like to proceed?

5        MR. SMOLINSKY:  Yes.  Thank you, Your Honor.  Joe

6    Smolinsky of Weil Gotshal & Manges for the debtors.  Before we

7    begin, I'd like to take an opportunity to just introduce

8    Carrianne Basler who's a managing director of AlixPartners who

9    is doing a considerable amount of work on the claims in this

10   case.  So you'll be seeing her.

11        THE COURT:  Okay.  Good morning.  Was that Ms. Basler?

12        MS. BASLER:  Yes.

13        THE COURT:  Thank you.  Okay.

14        MR. SMOLINSKY:  So you'll be seeing her from time to

15   time going forward.  Your Honor, if I could recommend that we

16   just go through the agenda, the amended agenda that we filed

17   with the Court.  I think that's usually an effective way.

18        THE COURT:  Sure.

19        MR. SMOLINSKY:  In the category of contested matters,

20   which is not truly contested, we have an adjourned hearing on

21   the debtors' third omnibus objection to claims.  This is just

22   going to be a status conference today.  We had three remaining

23   claims that were subject to continued work; the first was

24   Liberty Mutual.  They've voluntarily withdrawn their claim so

25   we'll be withdrawing the motion as to them.

8

1        ILCO Site Remediation, they wanted to withdraw the

2    claim through a separate stipulation so we're going to endeavor

3    to do that and put it on file and then withdraw the motion as

4    to them.

5        That leaves Sharyl Carter.  I, just yesterday,

6    received a lengthy letter from Ms. Carter so we're going to

7    continue to see where that goes and we'll adjourn the motion as

8    to that claim and figure out whether we need to come back for

9    some court time.

10        THE COURT:  All right.  Fair enough.

11        MR. SMOLINSKY:  Your Honor, the second matter on the

12    calendar is the debtors' motion for entry of an order in aid of

13    implementation of the sale.  As Your Honor is aware, the master

14    asset purchase agreement that was entered into, to sell

15    substantially all of the assets of Motors Liquidation Company,

16    was done fairly quickly.  There was a lot of discussion, a lot

17    of negotiation.  At the end of the day --

18        THE COURT:  Could you pause for just a second, Mr.

19    Smolinsky?

20         MR. SMOLINSKY:  Yes.

21        THE COURT:  Ms. Leary, are you on the phone?

22        MS. LEARY (TELEPHONICALLY):  I am, Your Honor.

23        THE COURT:  Okay.  You have an interest in this matter

24    as well, right?

25        MS. LEARY:  Yes, a limited one.  And we're trying to

9

1   work on it.  There are a couple of glitches and we're trying to

2   work that out.  But I'm here.

3        THE COURT:  All right.  Back to you, Mr. Smolinsky.

4   Ms. Leary, if you have a need or desire to be heard after Mr.

5   Smolinsky's done, I'll let you.

6        MS. LEARY:  Thank you very much.

7        THE COURT:  Okay.

8        MR. SMOLINSKY:  Your Honor, let me also add just for

9   the record that we received two other letters late yesterday;

10  one from the Mohawk tribe and the other from a group of states,

11  including Missouri, Massachusetts, Michigan, New Jersey, North

12  Carolina, Ohio and California as a joinder to Ms. Leary's

13  objection.

14       THE COURT:  Right.

15       MR. SMOLINSKY:  So, Your Honor, we endeavored to work

16  cooperatively with New GM to work out the various issues that

17  arose.  Most of the issues relate to what constitutes retained

18  property and what constitutes transferred property.  And

19  together with the creditors' committee, who have been actively

20  involved in these discussions and negotiations, we entered into

21  a stipulation which resolves all of the known issues that

22  exist.

23       You will also be seeing another motion shortly, with

24  respect to some further issues that we will bring to the Court

25  because we view it to be material and therefore it should go

10

1    out to notice to everybody.  By material I don't mean hugely

2    material, I mean of a nature that we think, in our own view,

3    should be noticed out.

4         The firestorm that was created by the proposed order

5    related to a provision that we inserted in the order to allow

6    us to resolve these issues from time to time.

7         THE COURT:  Without bringing them to me, again.

8         MR. SMOLINSKY:  Without court order as long as the

9    creditors' committee, you know, is aware and signs off.  We've

10   attempted and we suspect that the state's issue relates to how

11   certain environmental liabilities could be implicated by

12   resolutions that involve real estate.  And we proposed language

13   to Ms. Leary, not sure if it was to her satisfaction, but I

14   took the liberty of revising it slightly and in discussions

15   with the United State of America, who appeared this morning, I

16   want to read into the record a proposal for resolution of the

17   objection.

18        THE COURT:  Has Ms. Leary, the tribe and Missouri and

19   the other states had a chance to see this language yet?

20        MS. LEARY:  No, Your Honor.

21        MR. SMOLINSKY:  Ms. Leary saw substantially this

22   language.  We've made a few tweaks to deal with her reactions

23   to the language that we circulated I think two days ago.  And

24   perhaps I can just read it into the record and see if it

25   resolves her -- it was difficult to understand what Ms. Leary's

11

1    concern was with respect to the language.

2        THE COURT:  I understood what her concern was.  She

3    didn't want you doing anything that could gore her ox on the

4    environmental front without giving her a chance for notice and

5    an opportunity to be heard.

6        MR. SMOLINSKY:  That's right, Your Honor.  The

7    language that we proposed was to give her a period of notice to

8    allow her to object to any settlement and if there was an

9    objection then we would bring it before the Court if we

10    couldn't consensually resolve it.  That was the sum and

11    substance of the language that was proposed.

12        THE COURT:  Well, you can read it in but, frankly, Mr.

13    Smolinsky, the better course, best practices if you will, would

14    have been to let her see exactly what you were going to be

15    reading to me so that she wouldn't have to react to it on the

16    fly.

17        MR. SMOLINSKY:  I understand, Your Honor, and I'm not

18    trying to bulldoze her.  To the extent that she needs

19    additional time to look at the language, we can do that after

20    the hearing today.

21        THE COURT:  Okay.  Why don't you read it in?

22        MR. SMOLINSKY:  Okay.  The ordering paragraph would

23    read, "Ordered that the debtors are authorized to enter into

24    future settlements with New GM with respect to similar disputes

25    under the MSPA without further court approval provided that the

12

1   debtors obtain the prior written consent of the creditors'

2   committee and the United States of America.

3       "Provided further, however, that if any future

4   settlement between the debtors and New GM with respect to

5   similar disputes under the MSPA impacts real property located

6   in a particular state or adjacent to any tribal land, the

7   debtors will provide five business days notice of such

8   settlement to any state representative in the impacted state

9   identified on a notice of appearance in these Chapter 11 cases.

10      "(i) If no objection is received during that five

11  business day period the debtors may proceed to enter into such

12  settlement pursuant to the procedures set forth herein.

13      "(ii) If an objection is received during the five

14  business day period, the debtors will seek to resolve such

15  objection consensually or seek court approval of such

16  settlement."

17      It's substantially identical, I think, to the language

18  that was delivered to Ms. Leary and so I don't know if there

19  are any additional concerns that she would have.

20      THE COURT:  All right.  Mr. Jones, I assume that on

21  behalf of New GM, the U.S. Government, you're cool with this?

22      MR. JONES:  Yes, Your Honor.  As Mr. Smolinsky just

23  read into the record, the United States has been added on par

24  with the creditors' committee in the proposed order.  That was

25  in our request, particularly because the United States interest

13

1    as a lien holder, among other things, we wanted advanced notice

2    and an opportunity to approve.  But we take no position and

3    certainly are not advancing an objection to the order as so

4    modified.

5            THE COURT:  Okay.  I get the point.

6            MR. JONES:  Yes.  And as to the states, we're not

7    pushing but we're not opposing either.

8            THE COURT:  All right.  So, Ms. Leary, let me get your

9    perspective, please.

10           MS. LEARY:  Thank you, Your Honor.  I think that it

11   would be important for me to see this in black and white.  I'm

12   happy that the United States was added.  One comment I have is

13   that the debtor continues to retain some level of discretion

14   over which no one really has any control and that is the

15   discretion to determine whether they think this is going to

16   affect us or not.

17           My second observation is whether they think any

18   amendment to the master sale and purchase agreement is going to

19   affect a particular state or party in interest.

20           THE COURT:  Pause, please, Ms. Leary.  I'm trying to

21   get my arms around your point.  Is your point that an amendment

22   might gore your ox but that the debtor might not think that it

23   gores your ox enough to give you notice so you can be heard in

24   the first place?

25           MS. LEARY:  That's right.  I think the qualifying

14

1   language that gives them that discretion, I mean why not just

2   give us notice and be done with it, not have to have that kind

3   of misunderstanding later.

4          THE COURT:  I see.  Mr. Smolinsky, is there an issue

5   about giving Ms. Leary, the tribe and the several objecting

6   states, Missouri and the people who signed on with Missouri,

7   notice of that character?

8          MR. SMOLINSKY:  Your Honor, I think if you look at the

9   stipulation and what's being affected here, it's basically

10  surety bonds, insurance policies, things of that nature.  I

11  don't have an objection but my concern, when this was raised

12  yesterday, was that if we're going to give all of the states

13  notice we might as well just file another motion.

14         THE COURT:  No.  I think there's quite a bit of a

15  difference because Ms. Leary, Missouri, the Mohawk tribe,

16  they're going to get me really mad if they object when they

17  don't have any skin in the game.

18         But if I hear Ms. Leary right, she's saying that if

19  you make the decision as to whether her ox is gored, you're the

20  wrong guy to decide that and it ain't a big deal to give her a

21  piece of paper in that five days.  You're not talking about a

22  notice, you're just telling her what -- you're going to give

23  her a copy of the stip or whatever the agreement is.  I mean,

24  it's a classic example of what notice and a hearing means under

25  363.  You don't even have to do a motion but she's saying, in

15

1   substance, let her know what's going on.  Don't do it behind

2   her back.

3        Ms. Leary, am I overstating your position because if

4   you're asking for more than that, it might trouble me.  But if

5   that's all that you're asking for, I'm of a mind to ask Mr.

6   Smolinsky whether it's no harm no foul.

7        MS. LEARY:  Your Honor, you've articulated well the

8   position that we bring to the Court today.

9        THE COURT:  All right.  So, Mr. Smolinsky, you don't

10  even have to do a motion.  You've just got to let Ms. Leary and

11  the two or three or four other entities that have climbed on

12  with her, you're going to let her know what's going on and the

13  five days is fine.  And if she overreaches, she's going to get

14  me mad but she will be entitled to a hearing.  And then you may

15  have to tell me more about what you want to do.  But it seems

16  to me that as a matter of fair play Ms. Leary, on behalf of New

17  York State, Missouri, the tribe, the couple of entities that

18  signed on with Missouri you don't even have to do it to

19  everybody else, they didn't object, just give them notice.

20  Give them a copy of whatever you propose to do and they got the

21  five days across the board.  And then we'll move on.

22       MR. SMOLINSKY:  We're happy to do that, Your Honor.

23  We'll revise the order and we'll circulate it.

24       THE COURT:  You cool with that, Ms. Leary?  I'm not --

25  of course, I'm not playing "Let's Make a Deal" with you but

16

1    what I am doing is saying do you have any substantive

2    objections that I didn't focus on.

3            MS. LEARY:  No, Your Honor.  We did ask for seven days

4    but I don't think there's a huge difference between five and

5    seven.  I defer to the Court in terms of what you feel that we

6    adequately can address any objections right now.

7            THE COURT:  I could swear that Mr. Smolinsky said five

8    business days which is what seven days used to look like.  And,

9    frankly, if you got to work a little harder, I think that

10   that's okay.

11           MS. LEARY:  Thank you, Your Honor.

12           THE COURT:  All right.

13           MR. SMOLINSKY:  Thank you, Your Honor.

14           THE COURT:  Okay.  Your motion is approved with the

15   massaging that we just discussed, Mr. Smolinsky.

16           MR. SMOLINSKY:  Your Honor, if I may, in getting ready

17   for the hearing and in further review by the parties with

18   respect to the schedules attached to the stipulation, there

19   were some immaterial clarifying modifications that were made.

20   If I may, I'd like to hand up a blackline of the stipulations.

21           THE COURT:  Sure.  It's in the schedules but not the

22   stip itself?

23           MR. SMOLINSKY:  The only change in the stip is that

24   there was a missing paragraph number which was fixed.

25           THE COURT:  Okay.

17

1       MR. SMOLINSKY:  There was a footnote added.

2       THE COURT:  Footnote 2?

3       MR. SMOLINSKY:  Yes.  It was a small performance of

4   bonds that was deleted because the property was not

5   transferred.  And then the names of the appeal bond issuers was

6   incorrect in a number of instances.  Just the name, not the

7   substance or the account number.

8       THE COURT:  Okay.

9       MR. SMOLINSKY:  Thank you, Your Honor.  We'll

10  circulate the order and submit it to Your Honor.  Thank you.

11      THE COURT:  Fair enough.

12      MR. SMOLINSKY:  Your Honor --

13      MS. LEARY:  May I be excused?

14      THE COURT:  Yes, you may, Ms. Leary.  You can drop

15  off.

16      MS. LEARY:  Thank you very much.

17      THE COURT:  Okay.

18      MR. SMOLINSKY:  Your Honor, the next two matters on

19  the calendar are not the debtors' motions.  One is the motion

20  of Sarajuan Gilvary and the other of Marla Soffer.  The Gilvary

21  motion for relief from the automatic stay was for permission to

22  sue a nondebtor party.  We had agreed to stipulate to that.

23  And then Pompey Dodge, who was the co-defendant, filed an

24  objection.  Similarly, with the Soffer motion, we had filed a

25  statement of no position and the dealer co-defendant, M&M

18

1    Motors, filed in opposition.  So I think at this time, I'll

2    cede the podium to the movants on those two motions.

3            THE COURT:  Yeah.  Am I correct that I have the same

4    movant on both motions but different objectors on it?

5            MR. SMOLINSKY:  That's correct, Your Honor.

6            THE COURT:  Okay.  Come on up, please.  I want to get

7    appearances by everybody and then I have some preliminary

8    comments to all of you folks.

9            MR. ZAJAC:  Good morning, Your Honor.  My name is Eric

10   Zajac, Z-A-J-A-C, and I represent the movant in both of these

11   cases.

12           THE COURT:  Right.  And for the objectors?

13           MS. CAMPBELL:  Your Honor, my name is Nancy Campbell,

14   C-A-M-P-B-E-L-L, for Pompey Dodge.

15           THE COURT:  Okay.

16           MR. KAWALEC:  Good morning, Your Honor.  My name is

17   Walter Kawalec, K-A-W-A-L-E-C, on behalf of M&M Motors.

18           THE COURT:  M&M, right?

19           MR. KAWALEC:  M&M, correct.

20           THE COURT:  Right.  Okay.  Folks, I'll hear Mr. Zajac

21   for the movants briefly, but I really need help from the two

22   objectors.  Whether or not relief from the stay is really

23   required is a matter of debate.  Normally, when a debtor isn't

24   sued and a litigant, like Mr. Zajac on behalf of his two

25   plaintiffs, wants to go forward against a nonparty, the

19

1    bankruptcy judges look to the debtor to see -- guys, is this

2    interfering with your reorganization in any way?  Is this

3    creating a contingent liability for the potential

4    indemnification obligation that's going to gore the ox of your

5    remaining creditor community in a material way?  And if the

6    debtor doesn't step up to the plate at that point and ask us

7    judges to act, we judges say fine, go against the nondebtors.

8    Now, it looks, subject to your rights to be heard, that Mr.

9    Zajac's clients got caught in a buzz saw with the state courts

10   because the state courts didn't want to step on my toes, for

11   which I'm grateful.  But my tentative, subject to your rights

12   to be heard, since the debtors aren't asking me for a third

13   party stay, a third party injunction, is to tell the state

14   courts it's okay.  And if you guys haven't filed proofs of

15   claim for any indemnification rights you might have against the

16   estate even though the bar date might have already gone, my

17   reaction will say okay, I'll give you fifteen or thirty days to

18   file a protective proof of claim or something like that if you

19   haven't already done it.  But I feel that the desire of the

20   stay courts to avoid stepping on my toes is resulting in an

21   injustice to the litigants who want to go against nondebtors.

22          And help me if my understanding as to either the law

23   or the facts are incorrect because I don't want the federal

24   courts to be giving rise to an injustice here.  And I don't

25   think the state courts are playing Three-Card Monte with the

20

1      plaintiffs.  But I don't want anybody playing Three-Card Monte

2      with the plaintiffs.  And they have claims against a nondebtor.

3      I don't know whether or not they're insured.  If they are

4      insured, that would be a matter of even greater concern to me.

5      I know that GM itself has got a huge self-retained exposure.

6      But GM isn't being sued now because the plaintiffs seem to be

7      willing to sever.  So my tentative is to tell the two state

8      courts -- or actually, maybe it's Pennsylvania for both of them

9      and New Jersey for one, thanks, guys, for looking out for me

10     but it's okay.

11          Now, Mr. Zajac, help me first and then I'll hear from

12     Ms. Campbell and Mr. Kawalec.

13          MR. ZAJAC:  Thank you, Your Honor.

14          THE COURT:  You folks can sit down until it's your

15     chance to be heard and to argue.

16          MR. ZAJAC:  And, Your Honor, just to provide you with

17     a little bit of further context because you obviously have read

18     the papers, Pennsylvania is one of those states where an

19     intermediate seller or distributor of the vehicle is as

20     responsible as the manufacturer for design defect.  To sort of

21     cut to the chase here, I think what's happening is --

22          THE COURT:  Well, pause, Mr. Zajac, because I thought

23     there was a dispute between you and your opponents on that.

24     But by the same token, I didn't see that it was necessary for

25     me to decide that issue.

21

1      MR. ZAJAC:  No.  It isn't necessary for the Court to

2   decide that issue.  But to follow up on your comment about

3   whether the nondebtors are insured, the dealership/nondebtors

4   who are objecting to the relief that we're requesting are

5   insured and they're very well insured.  They appear to be

6   sufficiently insured to cover the claim.  So, in all due

7   respect to my colleagues here behind me, these objections

8   really are about concern for holding the bag for design

9   defects.

10      THE COURT:  Well, you can't blame them for not wanting

11   to hold the bag because the carriers who they may ultimately be

12   acting for could, if you win your lawsuit -- I don't know

13   whether you deserve to win it or not.  But if you win it, they

14   could write out a check to you and then their reimbursement is

15   going to come in little baby bankruptcy dollars.  And if they

16   can't get their act together quickly enough, their claim could

17   be disallowed because contingent claims have to be liquidated

18   within a reasonable time under the Bankruptcy Code.

19      MR. ZAJAC:  Nobody blames them for that.  The carriers

20   are in the position that they do not envy in these cases,

21   obviously, the carriers for the dealerships.  But the bigger

22   point is, while we don't blame them for their position, is

23   their position legally sound in terms of trying to lift the

24   stay so that I can proceed against those claims.  I think the

25   law in this area is very clear that the stay should not be

22

1    preventing my client from pursuing her claims against these

2    nondebtor defendants, the dealerships, under the applicable

3    legal principles in state law.  In fact, this Court itself

4    recognized in a footnote, in a published decision, 407

5    Bankruptcy Reporter 463, that folks like my clients may need to

6    resort to the dealers to be made whole in their personal injury

7    claims. Three-Card Monte

8            THE COURT:  I remember when I said that, yes.

9            MR. ZAJAC:  And that's why I'm here.  That's why my

10   clients have asked me to file these motions so that we can get

11   these comfort orders given to the Pennsylvania state courts so

12   they understand it's okay.  My clients should be able to

13   proceed against these other -- these nondebtor defendants.

14           Other than that, I'm going to rest on my papers.

15           THE COURT:  I'll let you reply --

16           MR. ZAJAC:  Okay.

17           THE COURT:  -- but I want to give Ms. Campbell and Mr.

18   Kawalec a chance to be heard.  Ms. Campbell, come on up,

19   please.

20           MS. CAMPBELL:   Good morning, Your Honor.

21           THE COURT:  Good morning.

22           MS. CAMPBELL:  I will be very brief.  One of the cases

23   that the plaintiff has quoted is Chao v. Hospital Staffing

24   Services, Inc., which is 270 F.3d 376, which is a Sixth Circuit

25   case from 2001, which is an action that discussed the

23

1    jurisdiction between the bankruptcy court and any other court.

2    And in that decision, the Court said, "Assuming its

3    jurisdiction is otherwise sound, the nonbankruptcy court may

4    enter orders not inconsistent with the terms of the stay and

5    orders entered by the bankruptcy court respecting that stay."

6    And that was a quote from page 384.

7             In this particular case, there's concurrent

8    jurisdiction.  Everybody concedes to that point.  In this

9    particular case --

10            THE COURT:  Concurrent jurisdiction to do what?

11            MS. CAMPBELL:  There's concurrent jurisdiction over

12   the debtor, both in the state court and in this bankruptcy

13   court.  The plaintiffs made the decision to go to the state

14   court first, not to come here to the bankruptcy court but to go

15   to the state court and file a motion to sever the debtor, GM,

16   from the state court action.  That state court made a decision.

17   That decision was to deny that motion at that particular time.

18   My issue here is that they're trying to do an end around --

19            THE COURT:  Did it do so in a reasoned decision under

20   which it went through the Sonnax factors and/or determine the

21   extent to which A.H. Robbins v. Piccinin, or otherwise

22   applicable authority, might or might not create constraints

23   upon the state court?  Because I would agree that under Rooker-

24   Feldman I can't sit as a court of appeals of a state court.

25   But I got to make sure that it actually ruled on this issue

24

1   because otherwise, a plaintiff is going to be denied his or her

2   day in court without a reasoned decision from anybody.  And I'm

3   not going to be a party to that.

4        MS. CAMPBELL:  Your Honor, the lower court issued an

5   order.  And the plaintiff then did not --

6        THE COURT:  An order.  Did it issue an opinion?

7        MS. CAMPBELL:  No.  And that's my position is that the

8   plaintiff here needs to go back to that lower court and

9   determine the basis for that order before the Court -- before

10  they come up to here.  My position is they've already gone to

11  one of the courts with concurrent jurisdiction.  They have an

12  order.  They need to go back to that court to get that

13  decision, to get that opinion, before they come here, because

14  they're trying to do an end-around.  They're trying to make you

15  into an appellate court.

16       THE COURT:  Well, pause, please, Ms. Campbell.  Do you

17  understand why I used the expression before "Three-Card Monte"?

18       MS. CAMPBELL:  To be honest, Your Honor, no.

19       THE COURT:  I'm sorry?

20       MS. CAMPBELL:  To be honest --

21       THE COURT:  Three-Card Monte is a game that's played

22  on the streets of New York where less than fully reputable

23  people are moving a little -- I've never looked underneath

24  those things to see exactly what's there.  I suspect it's a

25  ball or a marble or a token or something like that.  And the

25

1    poor sucker who's playing the game loses because things are

2    moving on him too fast and it's like a moving target.  And

3    what -- you have somebody who's been injured here.  And the

4    person originally had claims against both GM that made the

5    vehicle and the dealer who sold the vehicle to the injured

6    party or the injured party's friend or roommate or whatever the

7    facts are in this case.  And we have a scenario under which a

8    plaintiff is losing -- in one case, it's a her.  I forgot the

9    gender of the other plaintiff -- a day in court because

10   everybody is saying well, you got to go down to the next door,

11   you've got to do this, you've got to do that, all because of

12   the bankruptcy stay and I am the gatekeeper of the bankruptcy

13   stay.  And there are times when I have to make hard decisions

14   but I have difficulty seeing why this is a hard decision for me

15   to say the bankruptcy court is not going to stand in the way of

16   this lawsuit.

17           Now, if the stay court had issued a written opinion

18   under which it had said I have analyzed all of the federal

19   cases and I have concluded that the automatic stay is a barrier

20   to this severance motion then I'd have to give that serious

21   consideration.  But it's not my understanding based upon my

22   review of the papers that the stay court did that.  It issued

23   an order without explanation denying a motion for a severance

24   which had the consequence of keeping this litigant away from

25   her day in court.  Do you see why as a judge that offends me,

26

1    Ms. Campbell?

2         MS. CAMPBELL:  Your Honor, in terms of the facts of

3    this case, I just want to briefly give you just a little bit of

4    the information about this case.  I represent Pompey Dodge,

5    which is obviously a Chrysler company.  And we sold a used car

6    but we didn't sell it to the person who was driving at the time

7    of Ms. Gilvary's accident.  We were two sellers back from that.

8    We happen to be identified as the seller.  This vehicle was

9    sold six times during the history of the vehicle up and to the

10   day of the accident.  We just happened to be one of those

11   sellers who happens to be a Chrysler dealership who sold a GM

12   vehicle so that there is no direct contact between my client

13   and the facts of this accident except that somewhere along the

14   line, we happened to sell a used car that now we're going to

15   have to defend against.  That's number one.

16        Number two, I just go back to my point -- is we don't

17   know the basis of the judge's order.  And I think we should

18   have that opportunity and that should be presented to you.  And

19   it's a simple motion for Mr. Zajac to go back to the lower

20   court and say can you give us an opinion.  If at that point,

21   the Court says no then we're back in front of you.  But if the

22   Court says yes, then you have the information that you need to

23   review before you make your decision.  I'd have to have you

24   come in as the appellate court on the lower court decision when

25   that lower court decision may be based on everything that you

27

1    think it should be.  We don't know that yet. And I'm simply

2    asking for one process in between to go back and request that

3    of the lower court before Your Honor makes that decision.

4    That's all I'm asking.

5             THE COURT:  Okay.  Thank you, Ms. Campbell.  All

6    right.  Mr. Kawalec?

7             MR. KAWALEC:  I think Ms. Campbell pretty much covered

8    the argument and I would join in in that argument.  I would

9    also like to add --

10            THE COURT:  Well, Mr. Kawalec, are your facts the same

11   as Ms. Campbell's or are they --

12            MR. KAWALEC:  Strikingly so.

13            THE COURT:  To what extent in your M&M Motors

14   situation was there an affirmative ruling by the Pennsylvania

15   state court determining issues before me?

16            MR. KAWALEC:  The Pennsylvania's -- everything that I

17   know at this point -- all I know at this point is that they

18   issued an order.  I checked the dockets this morning.  It was

19   dated the 26th.  There's some indication on the docket that it

20   was actually sent out yesterday.  So I --

21            THE COURT:  Yesterday?

22            MR. KAWALEC:  I'm sorry?  Yesterday, the 1st.

23            THE COURT:  You mean, after the briefs were filed in

24   this matter --

25            MR. KAWALEC:  Yes.

28

1          THE COURT:  -- before me?

2          MR. KAWALEC:  Yes.  That's correct.

3          THE COURT:  And this is by the appellate court or by

4     the lower court, court of common pleas or whatever you call it

5     in Pennsylvania?

6          MR. KAWALEC:  The appellate court, the Superior Court,

7     which is the first level court.  I don't know whether it was

8     accompanied by an order -- by an opinion.  I do know that in

9     our motion, we presented a number of different options --

10          THE COURT:  Well, the problem I have, Mr. Kawalec, or

11     at least the question I have is that if the automatic stay

12     doesn't apply then the Pennsylvania courts have no business

13     preventing Mr. Zajac from going against your client.  But if

14     the automatic stay does apply then any order that they issued

15     at this point would seemingly be void as violative of Section

16     362 of the Code.  Am I missing something?

17          MR. KAWALEC:  I think so.  And here is -- one of my

18     objections here was essentially that Mr. Zajac is asking for

19     Your Honor to lift the stay.  Where has that stay been entered

20     as to my client?  My client, as a nondebtor, isn't covered by

21     the automatic stay.  We would have to ask for it.  Now we've

22     asked for Your Honor to do the analysis in this court and

23     extend it to my client.  We did the same thing in the

24     Pennsylvania court.  But in the Pennsylvania court, there's

25     also case law in Pennsylvania that establishes that severing

29

1    the case is at that court's discretion.  And one of the reasons

2    why it would be a situation like this where you have the right

3    to indemnification and so forth -- but also if there are

4    problems with, say, for example, discovery which would overrule

5    and prejudice my client, the Court is then empowered under

6    Pennsylvania law to deny the severance until that situation is

7    resolved.  And we argued before the appellate court in

8    Pennsylvania that it should not grant the severance for those

9    reasons because it would be unduly prejudicial and --

10          THE COURT:  But -- pause, please, Mr. Kawalec.

11          MR. KAWALEC:  Sure.

12          THE COURT:  The federal law is pretty clear, isn't it,

13   that while the automatic stay protects debtors from lawsuits

14   against them plus certain other things, one of the things that

15   it doesn't protect them against is compliance with discovery

16   obligations although I suppose the bankruptcy court has the

17   ability to protect them if any particular discover obligation

18   is unduly burdensome.  But I think the law is pretty clear that

19   362 is not a Get Out of Jail Free card for debtors in terms of

20   compliance with discovery obligations.

21          MR. KAWALEC:  Correct.

22          THE COURT:  Am I correct?

23          MR. KAWALEC:  Correct.  And it is in the possibility

24   that there may be difficulties, as Your Honor has detailed,

25   especially in light of the fact that, because of the way

30

1    Pennsylvania law is, if the plaintiff is able to establish the

2    fact of the defective product as against M&M Motors, okay, then

3    that finding should apply to General Motors as well.  So they

4    might be in a situation where because of that fact --

5         THE COURT:  Well, it may or may not be binding against

6    General Motors when General Motors wasn't in the courtroom in

7    Pennsylvania.

8         MR. KAWALEC:  Well, that would be one of the

9    questions.  But the other question is would that then provide

10   the absolute indemnification that Pennsylvania law -- that's

11   established by Pennsylvania law.  And we would argue that it

12   absolutely does.  So at that point, then you would have

13   essentially a finding against GM by virtue of the finding

14   against M&M Motors which is the basis of our argument why 362

15   should apply to us.  And we made that argument both here and in

16   Pennsylvania appellate courts that, because of that, it's

17   essentially the Queen case here and -- I forget the name of the

18   other case, the A.H. --

19        THE COURT:  A.H. Robbins v. Piccinin, I think it's

20   called.

21        MR. KAWALEC:  That this situation that we have here

22   because of the peculiarities of Pennsylvania law that it would

23   establish that as a matter of law.

24        THE COURT:  Okay.

25        MR. KAWALEC:  If I could, Your Honor, you also

31

1    mentioned --

2         THE COURT:  Of course.

3         MR. KAWALEC:  -- the fifteen and thirty-day protective

4    proof of claim if, in fact, Your Honor decides to grant

5    plaintiff's motion.

6         THE COURT:  Have you already filed a proof of claim on

7    behalf of your client?

8         MR. KAWALEC:  I didn't, no.  That's why I would like

9    to ask for that possibility.

10        THE COURT:  Stand where you are.  Ms. Campbell, did

11   you on behalf of your client?

12        MS. CAMPBELL:  No, Your Honor, so I would request

13   that.

14        THE COURT:  Mr. Smolinsky, has the bar date come and

15   gone in June?

16        MR. SMOLINSKY:  Yes, Your Honor.  The bar date was

17   November 30th, 2009.

18        THE COURT:  Does the debtor have a position as to

19   whether it would object if I were to give these folks fifteen

20   or thirty days to file protective proofs of claim?

21        MR. SMOLINSKY:  Your Honor, subject to, of course, our

22   reservation of rights to review the claim and take a position

23   as to substance, we won't stand in your way if you think it's

24   appropriate.

25        THE COURT:  Thank you.  Okay.  Anything else, Mr.

VERITEXT REPORTING COMPANY

32

1    Kawalec?

2         MR. KAWALEC:   No.  That's all, Your Honor.

3         THE COURT:  Okay.

4         MR. KAWALEC:   Thank you, Your Honor.

5         THE COURT:  Mr. Zajac, would you like to reply?

6         MR. ZAJAC:   Thank you, Your Honor.  I just want to try

7    to make sure that with respect to the Soffer motion, we're

8    grounded in talking about the same order that led us here.  The

9    order that led us here was from June of 2009 issued from the

10   Pennsylvania Superior Court.

11        THE COURT:   Which is the Pennsylvania intermediate

12   appellate court?

13        MR. ZAJAC:   Correct.  The case had been on appeal on a

14   venue issue when the bankruptcy was filed.  If you'd like, I

15   could hand up the order but it specifically basically says --

16        THE COURT:   Would you, please?

17        MR. ZAJAC:   Yes.  I --

18     (Pause)

19        MR. ZAJAC:   May I approach, Your Honor?

20        THE COURT:   Yes.  Give me a moment, please.  Okay.

21   This is the one that had been made reference to in one or all

22   of the briefs involving M&M, as best I remember of what I read

23   in those briefs.  But what -- it doesn't seem to speak to a

24   severance in any way.

25        MR. ZAJAC:   No.  My motion for severance was filed

33

1    months ago and perhaps -- I'm sorry if I --

2           MR. KAWALEC:  Kawalec.

3           MR. ZAJAC:  Kawalec.  Perhaps Mr. Kawalec was

4    referring to some order that has just been released but not

5    received by anybody on that particular motion.  The order that

6    you see there was just entered sua sponte by the Court as soon

7    as the suggestion of bankruptcy was filed.  So --

8           THE COURT:  Would you stand in place for a second,

9    please, Mr. Zajac, because this is the order that I was talking

10   about when I was talking about the Pennsylvania courts trying

11   not to step on my toes.  But if I heard you right, Mr. Kawalec,

12   you were saying that an order had been received by the

13   intermediate Pennsylvania appellate court in the last day or

14   two not back in '09 and that it dealt with severance.  Did I

15   hear you right?

16          MR. KAWALEC:  That is correct, Your Honor.  There was

17   a motion filed by Mr. Zajac a few months ago.  And as I said, I

18   checked the website for the court at their dockets online and

19   there was an indication that the order was entered.  It was

20   dated the 26th and sent to the lower court judge on the 1st.

21   So it indicated to me that it may have actually been put online

22   on the 1st.

23          THE COURT:  The 1st of March?

24          MR. KAWALEC:  The 1st of March, correct.

25          THE COURT:  Being yesterday?

34

1          MR. KAWALEC:  I'm sorry.

2          THE COURT:  Being yesterday.

3          MR. KAWALEC:  Yesterday, denying the order.  I

4    actually did that -- again, I'm ninety-nine percent sure I did

5    it this morning but, frankly, I could have done it last night.

6    I stayed over and I've been doing work on this case since last

7    night.  But they indicated that they denied the order --

8          THE COURT:  Okay.

9          MR. KAWALEC:  They denied the motion for severance.

10         THE COURT:  Thank you.  Mr. Zajac, you want to

11   continue, please?  It sounds to me, however, like you and Mr.

12   Kawalec were talking about two separate orders.

13         MR. ZAJAC:  Yes.  I appreciate that we've been able to

14   clarify exactly what we're talking about here.  And assuming

15   that the Superior Court did deny my motion, it puts us in the

16   same plight.  It doesn't really change the dynamic of why we're

17   here.

18         THE COURT:  That being your severance motion?

19         MR. ZAJAC:  Correct.

20         THE COURT:  But it does, at least seemingly, put M&M

21   in the same category as Ms. Campbell's dealership, Pompey, I

22   think it's called.

23         MR. ZAJAC:  Yes.

24         THE COURT:  Okay.

25         MR. ZAJAC:  Same -- they're on the same position and

35

1   we're seeking the same relief.

2           Let me just address finally this proposal that's been

3   made that the Gilvary case be sent back to the trial judge

4   again.  Your Honor, you spoke about injustices.  We were about

5   two and a half weeks away from our trial date in June of 2009

6   on this case involving a nineteen year old girl who is

7   paralyzed from the neck down and who has, since the accident,

8   who's been a ward of the state living on welfare.  And here we

9   are at a hearing nine months later trying to get this case back

10  on track dealing with a trial court judge's one sentence order

11  that doesn't explain why he wouldn't sever the motion and a

12  request that we send it back to that judge.  And then depending

13  on what that judge does, we may come back here again.

14          It is not too cynical for me to point out that when I

15  filed my motion to sever, Ms. Campbell opposed it attaching an

16  order from another Philadelphia trial judge who specifically

17  wrote in his order denying the severance, "The motion is

18  properly addressed to the bankruptcy court."  Okay?  So her

19  position, when I filed my motion for severance was that this is

20  a matter for the bankruptcy court.  And here we are in the

21  bankruptcy court and she's saying it's a matter for the state

22  court.  Thank you, Judge.

23          THE COURT:  Okay.  I want you guys to sit in place.  I

24  may need to take a recess for a few minutes but at this point I

25  want you to sit in place.

36

1        (Pause)

2          THE COURT:  Ladies and gentlemen, I'm going to grant

3    Mr. Zajac's motion for relief from the stay to the extent an

4    order from me is appropriate.  And incident to my authority to

5    do so, I'm going to articulate at some length the underlying

6    federal rationale under which I'm doing what I'm doing.  But I

7    am going to refrain, at least today, from ruling on matters

8    that might be appropriately or more appropriately regarded as

9    matters of state law and for the Pennsylvania courts to decide

10   without prejudice to parties' rights to come back to me if the

11   matters that are on my watch aren't satisfactorily resolved.

12   And I'll flesh that out in greater detail.

13          As all parties recognize, the two lawsuits are not

14   going forward against GM.  Or the proposal is that to the

15   extent they were once brought against GM, they're not going to

16   be brought against GM now.  The law is clear that the automatic

17   stay that is put forward under Section 362 of the Bankruptcy

18   Code doesn't apply to suits against co-defendants.  The Courts

19   may, on motion, extend the stay in unusual circumstances such

20   as where a lawsuit against a third party impairs the debtor's

21   ability to reorganize or the suit is effectively against the

22   debtor.

23          Under those circumstances, however, the normal way by

24   which we Courts do that is to permit the debtor to come into

25   the court to say, Judge, we need the extra protection and then

37

1    we judges grant that result or that relief upon an appropriate

2    showing of cause.  Here, all agree, I think, as to the

3    seriousness of the stakes, both to the plaintiffs in these

4    suits and for that matter, for the dealerships that have to

5    defend them even if they're defending them with insurance.  But

6    the lawsuit doesn't affect the debtor's ability to reorganize

7    and it may or may not result in a claim against GM, a matter

8    that I don't need to decide today and don't decide today.

9    Plainly, that's a matter that's not properly before me now.

10          But I think the better view is that parties need to

11    affirmatively ask the bankruptcy court to extend the stay when

12    the lawsuit is brought against a co-defendant.  But while

13    that's so, to the extent the stay automatically applies, I'm

14    granting relief from the stay.  I am conditioning that despite

15    the fact that I think that Mr. Smolinsky was biting his tongue

16    when he said he didn't object.  I am granting each of the two

17    dealerships fifteen business days to file protective proofs of

18    claim for indemnification without prejudice to the rights of

19    the estate -- and by "estate", I mean the debtors or their

20    creditors' committee -- to object to those claims for any

21    lawful ground whether because the showing for indemnity hasn't

22    been satisfactorily made or because the claim remains

23    contingent and can't be liquidated in a satisfactory period of

24    time.

25          But as a matter of bankruptcy law, the way this plays

38

1    out is the bankruptcy court doesn't stand in the way of a

2    lawsuit against third parties.  And the third parties, if they

3    think they have indemnification rights, either by contract or

4    by state law, can file claims against the estate to get their

5    share of the estate's assets and the estate has the ability to

6    object to them.  That's the drill, folks.

7          Now, here we have a situation where the Pennsylvania

8    courts, for sure, and possibly the New Jersey courts as well,

9    have tried to accommodate bankruptcy concerns by entering this

10   order dated June 22, 2009 which is a very typical way of an

11   appellate court to avoid stepping on the toes of a bankruptcy

12   court.  And we have two -- one described in the papers and,

13   apparently, one that Mr. Kawalec has just described to me,

14   unexplained orders of Pennsylvania courts denying the motion to

15   sever.  I don't know whether they did that because of the

16   desire, like the Pennsylvania Superior Court did, to deal with

17   the bankruptcy concerns.  Unexplained orders are very difficult

18   for another judge to get their meaning.  And while I would

19   think that under Rooker-Feldman, I cannot sit as a court of

20   appeals to reverse a decision of a state court if it was on a

21   stated ground, I can't tell from what's been done whether those

22   orders are void or not.  I can't tell whether they were based

23   upon federal law or not.  And, frankly, I don't know why they

24   were entered into although the most likely explanation is that

25   those courts didn't want to step on my toes.  Now I'm telling

39

1    those courts that they're not stepping on my toes by letting

2    the litigation proceed against the dealership even though the

3    lawsuit can't proceed against GM.

4         I am today both authorized to and it is my duty to

5    send a clear message to the Pennsylvania and New Jersey courts

6    that I'm giving them whatever comfort they need to know that

7    they wouldn't be stepping on my toes or by acting contrary to

8    federal law if they allowed the lawsuits to proceed against the

9    dealerships now that the plaintiff has said -- plaintiffs have

10   said that they won't go against GM.  From a perspective of

11   federal law, proceeding against the dealerships and severing

12   out GM is perfect okay.  In fact, it's what we bankruptcy

13   judges normally expect.  But I am not today, without prejudice

14   to whether I ever could or not, ruling on what is essentially a

15   state court question as to whether a severance is proper under

16   state law.  I'm giving everybody a reservation of rights to

17   come back to me.  It's my suspicion that once the Pennsylvania

18   courts know that it's perfectly okay to sever against the

19   dealerships that they'll allow the plaintiffs to have their day

20   in court against the dealerships with the understanding that

21   the dealerships then have the ability to seek indemnification

22   against GM.

23         Mr. Zajac is quite correct that this was one of the

24   premises upon which I issued the original ruling that Mr. Zajac

25   cited back on the 4th of July weekend of last year when I

40

1    agreed with GM on the issues -- and new GM even more so than

2    Old GM -- on the matters of success or liability.  I issued

3    that ruling with the expressly stated understanding that

4    plaintiffs, like those that Mr. Zajac represents, would be

5    allowed to go against the dealerships.  I'm assuming without

6    deciding that they have rights under Pennsylvania law against

7    the dealers.  But if they don't, that's a matter that the

8    Pennsylvania courts are perfectly free to decide.

9         But the important thing that I'm saying, folks, is the

10   fact that while GM could have once been sued as a defendant,

11   and while the dealers might well have rights of indemnification

12   against GM, to the extent the automatic stay prevented the

13   Pennsylvania courts from hearing that litigation, the automatic

14   stay is no longer a problem.  And I'm granting relief from the

15   stay so the Pennsylvania courts can allow the lawsuits to

16   proceed against the dealerships.  Federal law is not an

17   impediment to their hearing those claims.

18        Mr. Zajac, you are to settle an order at your earliest

19   reasonable convenience consistent with this ruling stating in

20   substance that for the reasons set forth on the record, your

21   motion is granted and that to the extent the automatic stay

22   imposed by federal law was an impediment to your proceeding

23   against the dealers, it no longer is.  And you are to further

24   state that to the extent that any party wishes further relief

25   or clarification from the bankruptcy court with respect to any

41

1    matter of federal law, this Court, the bankruptcy court,

2    retains jurisdiction to hear any such matter without prejudice

3    of the rights to any of the parties to take or oppose any

4    position in further proceedings in this court.

5         Not by way of re-argument, are there any open issues?

6    Oh, forgive me.  Mr. Zajac, you're also to say in baby talk

7    that the dealers have -- I think I said fifteen business days

8    to file protective proofs of claim for indemnification if they

9    elect to do so.

10        Come on up, please, Mr. Zajac.

11        MR. ZAJAC:  Thank you, Your Honor.  I'll be happy to

12   submit a proposed order.

13        THE COURT:  Settle it as we use that expression in New

14   York federal law.  That means you submit the proposed order,

15   you give your opponents no less than two business days' notice

16   if you serve by hand, fax or e-mail.  And add whatever the

17   local court rules say if you decide to use snail mail.  And

18   although you, as a practical matter, have two opponents, you

19   also have to serve it on the debtor and on the U.S. attorney's

20   office representing the federal government and New GM so that

21   they have the opportunity to weigh in on it even though they're

22   not really your opponents on this matter.

23        Mr. Smolinsky?  Don't necessarily go, Mr. Zajac.  I

24   just want to give Mr. Smolinsky a chance to be heard now.

25        MR. SMOLINSKY:  Your Honor, I stand for a

42

1  clarification.  I fully support Your Honor doing what you think

2  is the right thing with respect to the extension of the bar

3  date to allow these two dealers to file claims.  As Your Honor

4  knows, there are thousands of similar product liability and

5  personal injury cases and there will be cases going forward

6  against dealers.  So that I understand going forward how we're

7  supposed to deal with dealers who have not filed claims by the

8  bar date, I'm not a hundred percent sure what the rationale is

9  for allowing a dealer who knew that they had contribution

10  claims or indemnity claims and didn't file claims.  I need --

11  but I'd like --

12          THE COURT:  Well, the rationale for that, Mr.

13  Smolinsky, was pretty much limited to these two dealers because

14  it's my understanding -- and if this is incorrect, please tell

15  me.  But hasn't this motion been kicked a number of times?

16          MR. SMOLINSKY:  Yes, Your Honor.  That's the

17  clarification that I was essentially looking for.  I just want

18  to make sure the --

19          THE COURT:  It's for these two guys.  It's not for the

20  whole world.

21          MR. SMOLINSKY:  Thank you, Your Honor.

22          THE COURT:  Okay.  Mr. Zajac?

23          MR. ZAJAC:  I think I understand what my task is to

24  settle this order and the associated housekeeping issues and I

25  will proceed accordingly.

43

1           THE COURT:  Very good.

2           MR. ZAJAC:  Thank you.

3           THE COURT:  Okay.  Thank you very much, folks.  Have a

4   good day.

5           MS. CAMPBELL:  Thank you, Your Honor.

6           MR. ZAJAC:  Thank you, Your Honor.

7           MR. SMOLINSKY:  Your Honor, we still have matters --

8           THE COURT:  Forgive me.  Okay.  Anybody who was here

9   on the two dealership issues is free to go.  And, Mr.

10  Smolinsky, I apologize to you.  We'll take care of your other

11  stuff although am I right that nothing else is opposed?

12          MR. SMOLINSKY:  Your Honor, nothing else is opposed.

13  It should go fairly quickly but there's one matter that I'd

14  like Your Honor to perhaps focus a bit of time and that's the

15  objection to the Lafonza Earl Washington claim.

16          Your Honor, number 5 on the agenda is the status

17  conference on the motion of ACE American Insurance Company.

18  That relates to an assumption and assignment of certain

19  insurance policies to New GM and the impact that that would

20  have on continuing claims that Old GM would have under the

21  policy.  We finally, after months of discussion, have an

22  agreement that's signed off by the creditors' committee as well

23  as the parties will be submitting that.  And that will resolve

24  finally this ACE motion that's been carried from time to time

25  on the calendar.  So we should have that to you certainly in

44

1    the next twenty or thirty days.

2            THE COURT:  Sure.  Okay.

3            MR. SMOLINSKY:  Number 6, Your Honor, is the debtors'

4    objection to proofs of claim filed by Lafonza Washington.

5    Lafonza Washington has been a fixture in this case for some

6    time.  He's filed various applications to the Court which Your

7    Honor has summarily dismissed.  He's --

8            THE COURT:  Are those the ones that I dismissed by

9    endorsed orders that pretty much said that after I read it I

10   couldn't understand what he was asking for and, basically, that

11   he had failed to state a prima facie claim for relief?

12           MR. SMOLINSKY:  That's correct, Your Honor.  He's also

13   served writs of attachment seeking to execute on his so-called

14   judgment of 1.6 billion dollars.  And he certainly has spoken

15   to many, many lawyers in my firm, at times have been verbally

16   abusive to various staff members of my firm.  And what we tried

17   to do in this objection is to provide you with the smattering

18   of some of the history of what we think makes Mr. Washington

19   believe to be a creditor in this case although we certainly

20   don't agree that there's any basis.  We think it has something

21   to do with a class action settlement that was ordered by the

22   district court in Michigan on behalf of thousands of parties.

23   I think Mr. Washington believes that he's the judgment creditor

24   in that case.  But we wanted to give you the ability to look

25   behind the proof of claim and see some of the other things that

45

1    he's filed in Michigan as well as in the Delphi case.

2        We don't think that things have gotten to the point of

3    me asking for a Martin-Trigona type of injunction.

4        THE COURT:  I was about to ask you that.  I mean, it

5    sounds to be very near the point if it's not over the point

6    where it's a classic example of Martin-Trigona type territory.

7        MR. SMOLINSKY:  So, Your Honor, I don't know if you

8    need to hear anything else or if you want us to do anything

9    else with respect to his repeated violence.  But we would ask

10   that these claims be expunged for lack of basis and foundation.

11       THE COURT:  Okay.  And is he in the courtroom today?

12       MR. SMOLINSKY:  I don't see him, Your Honor.  I don't

13   know if he's on the phone.  I don't think he has a history of

14   necessarily appearing when his motions are heard.

15       THE COURT:  Okay.  I'm sustaining your objections to

16   the claim without prejudice to your additional right if you get

17   continued harassment to seek a Martin-Trigona order.  I think

18   if you do seek one, and I can -- I thought of Martin-Trigona

19   before you had mentioned the words.  I think you still have to

20   do that by a formal motion.  But for now, your claims objection

21   is sustained.  And if you think you want to go the next step,

22   you have my without prejudice order to allow you to do so.

23       MR. SMOLINSKY:  Thank you, Your Honor.  We'll submit

24   an order.  Number 7 on the agenda is the debtors' objection to

25   a proof of claim.  This is a class proof of claim filed by

46

1   Susan Angell.  We filed responsive papers.  In discussions with

2   the claimants, they've decided to withdraw those claims and to

3   simply seek their personal claims.  So they will be, over the

4   next few days, withdrawing their claim and then we will file a

5   withdrawal of the motion.

6        THE COURT:  Sure.  That's okay.

7        MR. SMOLINSKY:  The last matter for today is the

8   debtors' eleventh omnibus motion to reject certain executory

9   contracts.  We did file one notice of withdrawal with respect

10  to the contracts with Electro-Motive Diesel.  Other than that,

11  we've received no objections to the relief sought in that

12  motion.

13       THE COURT:  Okay.  So I'm granting it for the non-

14  objectors.  And did you say you're kicking the one for Electro-

15  Motive Diesel?

16       MR. SMOLINSKY:  No.  We've withdrawn the motion with

17  respect to that claim.

18       THE COURT:  Oh.

19       MR. SMOLINSKY:  So the schedule attached to the order

20  excludes those contracts from the relief sought.

21       THE COURT:  That's fine.

22       MR. SMOLINSKY:  Other than that, everything else is

23  adjourned.

24       THE COURT:  Okay.  And I apologize for prematurely

25  adjourning the hearing.  I think we're really done now?

47

1          MR. SMOLINSKY:  Now we're really done.

2          THE COURT:  Okay.  Thank you.

3          MR. SMOLINSKY:  Thank you, Your Honor.

4          THE COURT:  We're adjourned.

5      (Whereupon these proceedings were concluded at 12:10 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

48

1

2                        I N D E X

3

4                      R U L I N G S

5     DESCRIPTION                                PAGE     LINE

6     Debtors' third omnibus objection to claims      16       14

7     approved as modified on the record

8

9     Motions of Sarajuan Gilvary and Marla Soffer    36        2

10    for relief from the automatic stay to continue

11    separate litigations granted

12

13    Pompey Dodge and M&M Motors dealerships granted   37       16

14    fifteen business days to file protective proofs

15    of claim for indemnification without prejudice

16    to the rights of the estate

17

18    Debtors' objection to proofs of claim filed by   45       15

19    Lafonza Earl Washington sustained

20

21    Debtors' eleventh omnibus motion to reject       46       13

22    certain executory contracts granted

23

24

25

49

1

2                    C E R T I F I C A T I O N

3

4      I, Lisa Bar-Leib, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      _____

8      LISA BAR-LEIB

9      AAERT Certified Electronic Transcriber (CET**D-486)

10

11     Veritext

12     200 Old Country Road

13     Suite 580

14     Mineola, NY 11501

15

16     Date:  March 3, 2010

17

18

19

20

21

22

23

24

25