**HEARING DATE AND TIME: March 25, 2010 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: March 18, 2010 at 4:00 p.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------x
                                                          :
In re                                                     :      **Chapter 11 Case No.**
                                                          :
**MOTORS LIQUIDATION COMPANY,** *et al.*,                 :      **09-50026 (REG)**
        **f/k/a General Motors Corp.,** *et al.*          :
                                                          :
                                **Debtors.**              :      **(Jointly Administered)**
                                                          :
----------------------------------------------------------x

## NOTICE OF DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 365, AND 362(d)(1) AND FED. R. BANKR. P. 9019 TO (I) APPROVE SETTLEMENT AGREEMENTS AND COMPROMISES REGARDING CERTAIN PERSONAL PROPERTY EQUIPMENT LEASES AND (II) REJECT CERTAIN PERSONAL PROPERTY  EQUIPMENT LEASES

PLEASE TAKE NOTICE that upon the annexed motion, dated March 4, 2010

(the "**Motion**"), of Motors Liquidation Company (f/k/a General Motors Corporation) and its

affiliated debtors, as debtors in possession (collectively, the "**Debtors**"), for an order, pursuant to

sections 105, 362, and 365 of title 11, United States Code and Rule 9019 of the Federal Rules of

Bankruptcy Procedure to (i) approve settlement agreements and compromises regarding certain

personal property equipment leases and (ii) reject certain personal property equipment leases, all

as more fully set forth in the Motion, a hearing will be held before the Honorable Robert E.

Gerber, United States Bankruptcy Judge, in Room 621 of the United States Bankruptcy Court for

the Southern District of New York, One Bowling Green, New York, New York 10004, on

**March 25, 2010 at 9:45 a.m. (Eastern Time)**, or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the

Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the

Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a)

electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with a hard copy delivered

directly to Chambers), in accordance with General Order M-182 (which can be found at

www.nysb.uscourts.gov), and served in accordance with General Order M-242, and on (i) Weil,

Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York

10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.);

(ii) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit,

Michigan 48243 (Attn:  Ted Stenger); (iii) General Motors, LLC, 300 Renaissance Center,

Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham &

Taft LLP, attorneys for the United States Department of the Treasury, One World Financial

Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United States

Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, DC

20220 (Attn:  Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export Development

Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman,

Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP, attorneys for the

statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York

10036 (Attn:  Thomas Moers Mayer, Esq., Amy Caton, Esq., Adam C. Rogoff, Esq., and

Gregory G. Plotko, Esq.); (xii) the Office of the United States Trustee for the Southern District

of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Diana G.

Adams, Esq.); (xiii) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New

York, New York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz, Esq.); and (xiv)

those parties listed on Schedule A to the Motion, so as to be received no later than **March 18,**

**2010, at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

If no objections are timely filed and served with respect to the Motion, the

Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order

substantially in the form of the proposed order annexed to the Motion, which order may be

entered with no further notice or opportunity to be heard offered to any party.

Dated: New York, New York
      March 4, 2010

                  /s/ Joseph H. Smolinsky           
                  Harvey R. Miller
                  Stephen Karotkin
                  Joseph H. Smolinsky

                  WEIL, GOTSHAL & MANGES LLP
                  767 Fifth Avenue
                  New York, New York 10153
                  Telephone: (212) 310-8000
                  Facsimile: (212) 310-8007

                  Attorneys for Debtors
                  and Debtors in Possession

**HEARING DATE AND TIME: March 25, 2010 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: March 18, 2010 at 4:00 p.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                          :
In re                                     :      Chapter 11 Case No.
                                          :
MOTORS LIQUIDATION COMPANY, et al.,       :      09-50026 (REG)
        f/k/a General Motors Corp., et al. :
                                          :
                Debtors.                  :      (Jointly Administered)
                                          :
-------------------------------------------------------------x
```

## DEBTORS' MOTION PURSUANT TO
## 11 U.S.C. §§ 105, 365, AND 362(d)(1) AND
## FED. R. BANKR. P. 9019 TO (I) APPROVE
## SETTLEMENT AGREEMENTS AND COMPROMISES
## REGARDING CERTAIN PERSONAL PROPERTY EQUIPMENT LEASES
## AND (II) REJECT CERTAIN PERSONAL PROPERTY  EQUIPMENT LEASES

# TABLE OF CONTENTS

RELIEF REQUESTED..................................................................................................................1

JURISDICTION ..........................................................................................................................3

BACKGROUND ..........................................................................................................................3

A.     The Lease Transactions Subject to the Settlement Agreements. .........................................3

B.     The Subject Leveraged Lease Transactions.........................................................................4

C.     The SIL Lease Transactions.................................................................................................7

D.     The Mobile Equipment Leases and the Furniture Leases....................................................7

E.     Procedural History of Motions Filed with Respect to the Subject Leveraged Lease
       Transactions. ......................................................................................................................7

F.     The Terms Of The Global Settlement Agreement..............................................................10

G.     The Terms Of The GECC Omnibus Agreement.................................................................13

THE RELIEF REQUESTED SHOULD BE APPROVED BY THE COURT.............................15

A.     The Settlement Agreements Should Be Approved. ...........................................................18

B.     The Debtors Should Be Authorized To Reject The Designated Leases. ............................20

C.     The Automatic Stay Should be Modified to Allow GECC to Preserve Its Rights
       Against Non-Debtors. .......................................................................................................21

NOTICE.....................................................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Balco Equities, Inc.*,
  323 B.R. 85 (Bankr. S.D.N.Y. 2005) ..................................................................18

*In re Child World, Inc.*,
  142 B.R. 87 (Bankr. S.D.N.Y. 1992) ..................................................................18

*In re Dow Corning*,
  198 B.R. 214 (Bankr. E.D. Mich. 1996) ............................................................17

*In re Drexel Burnham Lambert Group, Inc.*,
  960 F.2d 285 (2d Cir. 1992) ..............................................................................17

*In re G Survivor Corp.*,
  171 B.R. 755 (Bankr. S.D.N.Y. 1994), aff'd, 187 B.R. 111 (S.D.N.Y. 1995) ........18

*In re Helm*,
  335 B.R. 528 (Bankr. S.D.N.Y. 1996) ..................................................................18

*In re Ionosphere Clubs, Inc.*,
  156 B.R. 414 (S.D.N.Y. 1993) ............................................................................17

*In re Iridium Operating LLC*,
  478 F.3d 452 (2d Cir. 2007) ..............................................................................17

*In re Lavigne*,
  114 F.3d 379 (2d Cir. 1997) ..............................................................................17

*In re Minges*,
  602 F.2d 38 (2d Cir. 1979) ................................................................................18

*In re Purofied Down Products Corp.*,
  150 B.R. 519 (S.D.N.Y. 1993) ............................................................................17

*In re Trans World Airlines, Inc.*,
  261 B.R. 103 (Bankr. D. Del. 2001) ..................................................................18

*Machinery Terminals, Inc. v. Woodward (In re Albert-Harris, Inc.)*,
  313 F.2d 447 (6th Cir. 1963) ............................................................................17

*NLRB v. Bildisco & Bildisco*,
  465 U.S. 513 (1984) ......................................................................................17, 18

*Nostas Assocs. v. Costich (In re Klein Sleep Products, Inc.)*,
  78 F.3d 18 (2d Cir. 1996) ..................................................................................18

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
 4 F.3d 1095 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994) ......................................17

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
 390 U.S. 414 (1968) ...................................................................................................................16

*Sav-A-Trip v. Belfort*,
 164 F.3d 1137 (8th Cir. 1999) ...............................................................................................19

*Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*
 134 B.R. 499 (Bankr. S.D.N.Y. 1991) ....................................................................................16

**STATUTES**

11 U.S.C. § 105 ...............................................................................................................................1, 21

11 U.S.C § 362 ......................................................................................................................................8

28 U.S.C. § 157 .....................................................................................................................................3

28 U.S.C. § 1334 ...................................................................................................................................3

11 U.S.C. § 365 ......................................................................................................................1,11,16,17,21

**RULES**

Fed. R. Bankr. P. 9019 ....................................................................................................................1,15

**MISC**

9 Collier on Bankruptcy § 9019.02 (15th ed. rev. 2001) ...............................................................15

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and

its affiliated debtors, as debtors in possession (collectively, the "**Debtors**"), respectfully

represent:

### **Relief Requested**

1.       Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), the Debtors request entry of two orders (collectively, the " **Settlement**

**Agreement Orders**") approving and ratifying the following settlement agreements and

compromises:

A.      the **"Global Settlement Agreement"** between (i) General Motors LLC
("**New GM**"), (ii) MLC, (iii) MLCS, LLC (f/k/a Saturn, LLC), (iv) Saturn
County Bond Corporation, (v) HNB Investment Corp., (vi) General Foods
Credit Corporation, (vii) General Foods Credit Investors No. 2
Corporation, (viii) Philip-Morris Capital Corporation, (ix) General Electric
Capital Corporation ("**GECC**"), (x) U.S. Bank, National Association
("**U.S. Bank**"), as owner trustee under certain of the Subject Leveraged
Lease Transactions (as defined below), (xi) The Bank of New York
Mellon, as indenture trustee, pass through trustee or purchase option agent
under certain of the Subject Leveraged Lease Transactions (as defined
below), (xii) Manufacturers and Traders Trust Company, as indenture
trustee, pass through trustee or purchase option agent under certain of the
Subject Leveraged Lease Transactions (as defined below), and (xiii) Wells
Fargo Bank Northwest, National Association, as indenture trustee under
certain of the Subject Leveraged Lease Transactions (as defined below);
and

B.      the **"GECC Omnibus Agreement"** between (i) New GM, (ii) MLC, (iii)
MLCS, LLC (f/k/a Saturn, LLC), (iv) GECC, (v) General Motors of
Canada Limited ("**GM Canada**"), (vi) General Electric Canada
Management Services ("**GECC Canada**"), (vii) U.S. Bank, as owner
trustee under certain of the Subject Leveraged Lease Transactions (as
defined below), and (viii) U.S. Bank Trust, National Association ("**U.S.
Bank Trust**"), as owner trustee under the SIL Lease Transactions (as
defined below).

2.       Pursuant to section 365 of title 11 of the United States Code (the "**Bankruptcy**

**Code**") and Rule 6006 of the Bankruptcy Rules, the Debtors also request authorization to reject

certain personal property equipment leases described in the GECC Omnibus Agreement as the "B-1 Lease", the "Mobile Equipment Leases" and the "Furniture Leases" (collectively, the "**Designated Leases**").  As part of the GECC Omnibus Agreement, GECC and GECC Canada, the counterparties to the Designated Leases, are consenting to the rejection and agreeing to waive any rejection damage claims they may have against the Debtors related to the Designated Leases.

3.      The Global Settlement Agreement is attached hereto as **Exhibit "A"** and the GECC Omnibus Agreement is attached hereto as **Exhibit "B"**.  The proposed order approving the Global Settlement Agreement is attached hereto as **Exhibit "C"** and the proposed order approving the GECC Omnibus Agreement is attached hereto as **Exhibit "D"**.

4.      The Global Settlement Agreement and GECC Omnibus Agreement (collectively, the **"Settlement Agreements"**) are the result of months of collaborative negotiations between the Debtors, the Unsecured Creditors Committee appointed in these chapter 11 cases (the "**UCC**"), New GM, and the various counterparties to the equipment lease transactions subject to the proposed Settlement Agreements.  As more fully set forth below, if approved by the Court, the Settlement Agreements will result in, among other things:

> (i) the satisfaction by New GM of administrative and cure claims against the Debtors in connection with both the assumptions *and the rejections* of the Subject Leveraged Lease Transactions (as defined herein);
>
> (ii) in connection with the Subject Leveraged Lease Transactions being rejected and which are subject to rejection motions currently pending before the Court, the claims against the Debtors will be liquidated and allowed in amounts vetted and approved by both the Debtors and the UCC, all objections to the pending rejection motions will be withdrawn by the relevant counterparties and except for the liquidated, allowed claims, full releases will be provided to the Debtors by substantially all counterparties to such rejected Subject Leveraged Lease Transactions;[1]

---

[1] The sole potential claim issue which is not resolved by the Settlement Agreements is a potential tax indemnity claim by the Owner Participant under the GM 2000 A-3 Subject Leveraged Lease Transaction.

(iii) the purchase by New GM of otherwise unmarketable equipment leased by the Debtors under the Subject Leveraged Lease Transactions being rejected, thereby directly mitigating, or in some cases eliminating, rejection damage claims against the Debtors;

(iv) the purchase by New GM of the Designated Leases being rejected under this Motion and the waiver of rejection damage claims against the Debtors in connection with such rejections; and

(v) in connection with the Subject Leveraged Lease Transactions being assumed, and except for the liquidated, allowed claims proposed hereby, the Debtors will receive full releases from the counterparties to such transactions.

The Debtors believe that the Settlement Agreements represent fair and reasonable settlements and compromises of the matters addressed therein. The Settlement Agreements will result in a reduction of both administrative and general unsecured claims against the Debtors' estates, while at the same time alleviating the financial burden, time and uncertainty associated with litigation of the issues resolved under the Settlement Agreements. Accordingly, the Debtors, with the support of the UCC, respectfully request the entry of the proposed orders authorizing each of the Settlement Agreements.

## Jurisdiction

5.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

A.    The Lease Transactions Subject to the Settlement Agreements

6.    Prior to the date on which the Debtors filed their petitions for relief in the above captioned chapter 11 cases (the "**Commencement Date**"), MLC and MLCS, LLC (f/k/a Saturn, LLC, as successor in interest to Saturn Corporation) (collectively, the "**Lessees**" and each, a "**Lessee**") entered into a series of fixed equipment lease transactions, mobile equipment lease transactions and furniture equipment lease transactions.

7.       As set forth more fully below, the Global Settlement Agreement resolves various issues and provides for the allowance of claims against the Debtors related to certain fixed equipment leveraged lease transactions designated as GM 1991 A-3, GM 2000 A-1, GM 2000 A-3, GM 2001 A-1, GM 2001 A-2, GM 2001 A-3, GM 2001 A-4, GM 2001 A-5, GM 2001 A-6, GM 2001 A-7, and GM 2001 A-8 (individually, a "**Subject Leveraged Lease Transaction**", collectively the "**Subject Leveraged Lease Transactions**").  The GECC Omnibus Agreement addresses certain issues specific to GECC with respect to the Subject Leveraged Lease Transactions designated as GM 2001 A-2, GM 2001 A-4, GM 2001 A-6, and GM 2001 A-8.  In addition, the GECC Omnibus Agreement provides for the rejection of a single investor fixed equipment lease transaction referred to therein as the B-1 Lease, the rejection of the Mobile Equipment Leases, the rejection of the Furniture Leases, and the assumption of a single investor fixed equipment lease transaction referred to therein as the C-1 Lease (together with the B-1 Lease, the "**SIL Lease Transactions**").

B.       The Subject Leveraged Lease Transactions

8.       Each Subject Leveraged Lease Transaction consists of a sale-leaseback financing under which (i) a separate trust (each, an "**Owner Trust**") was established pursuant to a trust agreement between a trustee (each, an "**Owner Trustee**") and an equity investor (each, an "**Owner Participant**"), (ii) the Owner Trustee received an equity investment from the Owner Participant, and concurrently issued equipment notes (the "**Equipment Notes**") to a variety of investors (collectively, the "**Note Purchasers**") to evidence loans made by such Note Purchasers to the Owner Trustee, (iii) the Equipment Notes issued to such Note Purchasers were issued under a trust indenture and security agreement (each, an "**Indenture**") between the respective

Owner Trustee and a trustee (each, an "**Indenture Trustee**") for the Note Purchasers,[2] (iv) the proceeds received by the respective Owner Trustee from the respective Owner Participant and Note Purchasers were used to purchase one or more discrete units (or, in certain cases, undivided interests therein) of automobile manufacturing equipment (the "**Equipment**") from the respective Lessee.  Concurrently with its purchase of the Equipment from the Lessee, the Owner Trustee (i) entered into a lease with such Lessee, as lessee, (ii) assigned the lease for collateral security purposes to the Indenture Trustee pursuant to the Indenture, and (iii) granted a security interest in the Equipment to the Indenture Trustee pursuant to the Indenture to secure the Equipment Notes.

9.    Each Subject Leveraged Lease Transaction was consummated pursuant to a "participation agreement" (each, a "**Participation Agreement**") which, among other things (i) specifies certain ongoing rights and obligations of the various parties to the Subject Leveraged Lease Transaction, (ii) includes closing conditions for the debt and equity investments, and (iii) includes various representations and warranties, covenants, indemnities and miscellaneous additional provisions.  In addition, for each Subject Leveraged Lease Transaction, the respective Lessee entered into an agreement to indemnify the Owner Participant against certain tax consequences (the "**Tax Indemnity Agreement**").  The diagram below describes generally how the Subject Leveraged Lease Transactions operate:

---

[2] In the case of the Subject Leveraged Lease Transactions designated as GM 1991A-3, GM 2000A-1, and GM 2000 A-3, there is one additional step in the transaction.  The Equipment Notes issued under the Indentures in those transactions are issued to a "Pass Through Trustee" under a "Pass Through Trust Agreement" rather than to the ultimate Note Purchasers directly.  Instead, the Pass Through Trustee issues certificates in the Pass Through Trust to the ultimate economic holders.  For convenience, references to the Note Purchasers herein should be read to include these certificate holders under the Subject Leveraged Lease Transactions designated as GM 1991A-3, GM 2000A-1, and GM 2000 A-3.



10.    Each Subject Leveraged Lease Transaction covers certain manufacturing Equipment useful in the manufacture of automobiles.  Most of the Equipment consists of either stamping presses or engine assembly line equipment.  There are several things that can be said about the Equipment without equivocation -- it is all extremely large in size, heavy in weight, highly sophisticated and automated (and in some cases only usable to manufacture to GM designs), and very expensive to disassemble and move.  Moreover, to the extent it is re-usable, re-leaseable, or re-saleable at all, in the current economic environment, prices for such Equipment are severely depressed.  As a result, it is highly likely that the only viable use of the Equipment is with New GM.

C.    The SIL Lease Transactions

11.    The SIL Lease Transactions are similar to the Subject Leveraged Lease Transactions, however under the SIL Lease Transactions, GECC is both the Owner Participant

and the only Note Purchaser, and a security interest was granted to GECC to secure its note instead of being granted to an indenture trustee to secure multiple notes.

D.    The Mobile Equipment Leases and the Furniture Leases

12.    In addition to the Subject Leveraged Lease Transactions and SIL Lease Transactions described above, MLC entered into several Mobile Equipment Leases for the lease of forklifts and other mobile equipment, which leases were subsequently assigned to GECC and GECC Canada.  MLC also entered into several Furniture Leases for the lease of certain furniture, fixtures and other similar equipment with GECC or GECC's predecessors in interest.

E.    Procedural History of Motions Filed with Respect to the Subject
Leveraged Lease Transactions

13.    On July 17, 2009, MLC filed a motion (the "**July Rejection Motion**") seeking to reject three of the Subject Leveraged Lease Transactions designated as GM 2001 A-1, GM 2001 A-2, and GM 2001 A-6 [Dkt. #3212].  On July 30, 2009, Wells Fargo, as indenture trustee under these three Subject Leveraged Lease Transactions filed an objection to the July Rejection Motion [Dkt. #3534].  On August 3, 2009, this Court entered a consensual order authorizing the rejection of the Subject Leveraged Lease Transactions designated as GM 2001 A-1 and GM 2001 A-2 retroactive to July 31, 2009 [Dkt. #3619].  As of the date hereof, the July Rejection Motion remains pending as to the Subject Leveraged Lease Transaction designated as GM 2001 A-6.

14.    On October 30, 2009, New GM entered into certain letter agreements (the "**PMCC Letter Agreements**") with affiliates of the Owner Participants in the Subject Leveraged Lease Transactions designated as GM 1991 A-3, GM 2000 A-1, GM 2001 A-3 and GM 2001 A-5, as well as two non-leveraged lease transactions designated as GM 2002 A-1 and GM 2002 A-2 (all six such transactions, collectively, the "**PMCC Lease Transactions**") setting forth the terms on which New GM would agree to take assignment of the PMCC Lease Transactions from the Debtors.  As a result of New GM's entry into the PMCC Letter Agreements, on the same

day, MLC and MLCS filed (a) the Debtors' Motion To Assume And Assign Certain Unexpired

Leases Of Equipment And Related Executory Contracts [Dkt. # 4331] (the "**October**

**Assumption Motion**"), (b) the Motion by Debtors for Entry of an Order Authorizing Rejection

of Certain Personal Property Agreements and/or Abandonment of Equipment [Dkt. # 4328] (the

"**2000 October Rejection Motion**"), and (c) the Motion By Debtors For Entry Of Order

Authorizing Rejection Of Certain Personal Property Agreements And/Or Abandonment Of

Collateral To Secured Creditors [Dkt. # 4324] (the "**2001 October Rejection Motion**" and

together with the July Rejection Motion, the 2000 October Rejection Motion and the October

Assumption Motion, the "**Motions**").

15.      The October Assumption Motion sought authority for the Debtors to assume and

assign the PMCC Lease Transactions, as well as the Subject Leveraged Lease Transaction

designated as GM 2001 A-4 to New GM.  The 2000 October Rejection Motion sought authority

to reject the Subject Leveraged Lease Transaction designated as GM 2000 A-3 as well as a

leveraged lease transaction which is not the subject of this Motion designated as GM 2000 A-2.

The 2001 October Rejection Motion sought authority to reject the Subject Leveraged Lease

Transactions designated as GM 2001 A-7 and GM 2001 A-8.  The Indenture Trustees for the

2000 and 2001 Subject Leveraged Lease Transactions threatened to object to the relief sought in

each of the October Assumption Motion, the 2000 October Rejection Motion, and the 2001

October Rejection Motion.  In addition, GECC filed an objection to the October Assumption

Motion.  As a result of the threatened objections and the actual objection filed by GECC, the

Debtors adjourned the Motions and began in earnest to negotiate the Settlement Agreements.

16.      On December 16, 2009, this Court entered an order (the "**GM 2000 Rejection**

**Order**") [Dkt. # 4671] granting the October Rejection Motion which required, as a condition to

the effectiveness of the rejection of the Subject Leveraged Lease Transactions designated as GM

2000 A-2 and GM 2000 A-3, the entry into certain settlement agreements.  On January 22, 2010,

pursuant to a settlement and purchase transaction, the rejection of the Subject Leveraged Lease

Transaction designated as GM 2000 A-2 became effective and New GM acquired the Equipment

subject to that transaction.

  17. The current status of the various Motions described above, broken down by each

Subject Leveraged Lease Transaction, can be summarized as follows:

| Subject Leveraged Lease Transaction | Motion Filed | Motion Status |
|---|---|---|
| GM 1991 A-3 | October Assumption Motion [Dkt. # 4331] | Pending. |
| GM 2000 A-1 | October Assumption Motion [Dkt. # 4331] | Pending. |
| GM 2000 A-2 | 2000 October Rejection Motion [Dkt. #4328] | Granted [Dkt. # 4671] |
| GM 2000 A-3 | 2000 October Rejection Motion [Dkt. #4328] | Granted [Dkt. # 4671] |
| GM 2001 A-1 | July Rejection Motion [Dkt. #3212] | Granted. [Dkt. #3619] |
| GM 2001 A-2 | July Rejection Motion [Dkt. #3212] | Granted. [Dkt. #3619] |
| GM 2001 A-3 | October Assumption Motion [Dkt. # 4331] | Pending. |
| GM 2001 A-4 | October Assumption Motion [Dkt. # 4331] | Pending. |
| GM 2001 A-5 | October Assumption Motion [Dkt. # 4331] | Pending. |
| GM 2001 A-6 | July Rejection Motion [Dkt. #3212] | Pending. |
| GM 2001 A-7 | 2001 October Rejection Motion [Dkt. # 4324] | Pending. |
| GM 2001 A-8 | 2001 October Rejection Motion [Dkt. # 4324] | Pending. |
| GM 2002 A-1 | October Assumption Motion [Dkt. # 4331] | Pending. |
| GM 2002 A-2 | October Assumption Motion [Dkt. # 4331] | Pending. |

  18. Subject to Court approval of Settlement Agreements, the counterparties who have

either objected or threatened objections to the motions listed above as "Pending" will either

withdraw, or as the case may be agree not to file, their objections.  In addition, as noted, the Settlement Agreements also resolve nearly all claims arising under the assumption and assignment and rejection motions listed above.

F.    The Terms Of The Global Settlement Agreement

19.    All as more fully set forth in the Global Settlement Agreement, the parties to the Subject Leveraged Lease Transactions have entered into the Global Settlement Agreement, under which (i) New GM will purchase the Equipment subject to the Subject Leveraged Lease Transactions being rejected, (ii) New GM will satisfy the administrative and cure claims against the Debtors in connection with both the assumptions *and the rejections* of the Subject Leveraged Lease Transactions, (iii) in connection with the Subject Leveraged Lease Transactions being assumed, the Debtors will receive full releases from the counterparties to such transactions, (iv) in connection with certain of the Subject Leveraged Lease Transactions being rejected, the Debtors will nonetheless receive full releases from the counterparties to such transactions, and (v) in connection with other Subject Leveraged Lease Transactions being rejected, nearly all the claims against the Debtors will be liquidated and allowed in amounts vetted and approved by both the Debtors and the UCC, and which amounts will be mitigated to the extent of the purchase price paid by New GM for the Equipment subject to such Subject Leveraged Lease Transactions.

20.    Specifically, with respect to administrative expense claims, the Global Settlement Agreement contemplates that (i) the impediments to the Subject Leveraged Lease Transactions designated as GM 1991 A-3, GM 2000 A-1, GM 2001 A-3, GM 2001 A-4 and GM 2001 A-5 being assumed pursuant to the October Assumption Motion, and assigned to New GM, will be resolved, and that New GM will be responsible for the cure amounts due in connection with such assumptions and assignments, and (ii) the obligations of (x) MLC, MLCS or any of their affiliates or (y) New GM or any of its affiliates to make payment in connection with any

administrative or other claim arising under Section 365, 503 or 507 of the Bankruptcy Code

relating to the use or possession of the "Equipment" subject to any of the Subject Leveraged

Lease Transactions designated as GM 2000 A-3, GM 2001 A-1, GM 2001 A-2, GM 2001 A-6,

GM 2001 A-7, and GM 2001 A-8, will be fully and finally satisfied by the allowance of the

following administrative expense claims for the benefit of the relevant Indenture Trustee listed

below, which claims again shall be paid by New GM:

| Rejected Lease Transaction | Amount of Payment | Recipient |
|---|---|---|
| 2000 A-3 Participation Agreement and other 2000 A-3 Operative Documents | $334,425 | M&TT, as 2000 A-3 Indenture Trustee |
| 2001 A-1 Participation Agreement and other 2001 A-1 Operative Documents | $17,459 | Wells Fargo, as 2001 A-1 Indenture Trustee |
| 2001 A-2 Participation Agreement and other 2001 A-2 Operative Documents | $13,720 | Wells Fargo, as 2001 A-2 Indenture Trustee |
| 2001 A-6 Participation Agreement and other 2001 A-6 Operative Documents | $242,198 | Wells Fargo, as 2001 A-6 Indenture Trustee |
| 2001 A-7 Participation Agreement and other 2001 A-7 Operative Documents | $111,665 | Wells Fargo, as 2001 A-7 Indenture Trustee |
| 2001 A-8 Participation Agreement and other 2001 A-8 Operative Documents | $276,445 | Wells Fargo, as 2001 A-8 Indenture Trustee |

21.     With respect to pre-petition rejection damages claims, the Settlement Agreements

contemplate the allowance of pre-petition general unsecured rejection damages claims in favor of

the Indenture Trustees as follows:

| Rejected Lease Transaction | Amount of Claim | Recipient |
|---|---|---|
| 2000 A-3 Participation Agreement and other 2000 A-3 Operative Documents | $44,412,510.92 | M&TT, as 2000 A-3 Indenture Trustee |
| 2001 A-1 Participation Agreement and other 2001 A-1 Operative Documents | $141,305,874.37 | Wells Fargo, as 2001 A-1 Indenture Trustee |
| 2001 A-2 Participation Agreement and other 2001 A-2 Operative Documents | $142,197,253.40 | Wells Fargo, as 2001 A-2 Indenture Trustee |

| 2001 A-6 Participation Agreement and other 2001 A-6 Operative Documents | $45,835,565.21 | Wells Fargo, as 2001 A-6 Indenture Trustee |
| 2001 A-7 Participation Agreement and other 2001 A-7 Operative Documents | $6,753,243.28 | Wells Fargo, as 2001 A-7 Indenture Trustee |
| 2001 A-8 Participation Agreement and other 2001 A-8 Operative Documents | $6,789,209.82 | Wells Fargo, as 2001 A-8 Indenture Trustee |

22.     The Global Settlement Agreement also provides for the allowance of pre-petition general unsecured tax indemnity claims in favor of one of the Owner Participants with respect to Tax Indemnity Agreements entered into in connection the Subject Leverage Lease Transactions designated as GM 2001 A-1 and GM 2001 A-7 as follows:

| Rejected Lease Transaction | Amount of Claim | Recipient |
| --- | --- | --- |
| 2001 A-1 Participation Agreement and Tax Indemnity Agreement | $22,400,000.00 | General Foods No. 2, as 2001 A-1 Owner Participant |
| 2001 A-7 Participation Agreement and Tax Indemnity Agreement | $1,600,000.00 | General Foods No. 2, as 2001 A-7 Owner Participant |

23.     In addition to liquidating these claims, and thereby avoiding the need for further legal proceedings in connection therewith, these provisions and the releases provided to the Debtors in the Settlement Agreements benefit the Debtors by (i) allowing the Indenture Trustees to mitigate their damages with the sale of otherwise unusable Equipment to New GM for a total of $17,500,000, (ii) resulting in the waiver of Tax Indemnity Agreement claims against the Debtors in connection with the Subject Leveraged Lease Transactions designated as GM 2001 A-2, GM 2001 A-6 and GM 2001 A-8, and (iii) resulting in the reduction and compromise of the Tax Indemnity Agreement claims against the Debtors in connection with the Subject Leveraged Lease Transactions designated as GM 2001 A-1 and GM 2001 A-7.[3]

---

[3] In settling and compromising the above mentioned Tax Indemnity Agreement claims, the Debtors and the relevant Owner Participant do not take a position regarding the underlying merits of such claims.  Rather, to avoid protracted litigation (with an uncertain probability of success) regarding the merits of the Tax Indemnity Agreement

G.    The Terms Of The GECC Omnibus Agreement

24.    All as more fully set forth in the GECC Omnibus Agreement, under the GECC

Omnibus Agreement, the parties to the Subject Leveraged Lease Transactions designated as GM

2001 A-2, GM 2001 A-4, GM 2001 A-6, GM 2001 A-8 (excluding the Indenture Trustees), the

SIL Lease Transactions, the Mobile Equipment Leases, and the Furniture Leases have agreed

that:

> (i) Debtors will assume and assign to New GM the A-4 Lease in accordance with, and as modified by, the terms of an assumption, assignment and amendment agreement between New GM and GECC (the "**Amended A-4 Lease**") and all operative documents with respect to the Amended A-4 Lease (together with the Amended A-4 Lease, the "**Amended A-4 Lease Documents**"),

> (ii) Debtors will assume and assign to New GM the C-1 Lease in accordance with, and as modified by, the terms of the assumption, assignment and amendment agreement between New GM and GECC (the "**Amended C-1 Lease**") and all operative documents with respect to the Amended C-1 Lease (together with the Amended C-1 Lease, the "**Amended C-1 Lease Documents**"),

> (iii) Debtors will reject the Designated Leases,

> (iv) New GM will purchase the Equipment subject to the B-1 Lease (the "**B-1 Leased Equipment**"), the forklifts and other mobile equipment subject to the Mobile Equipment Leases (the "**Mobile Equipment Property**") and the furniture, fixtures and other equipment subject to the Furniture Leases (the "**Furniture**" and together with the Equipment subject to the Subject Leveraged Lease Transactions designated as GM 2001 A-2, GM 2001 A-6, and GM 2001 A-8, the "**Purchased Equipment**"),

> (v) in connection with the assumption of the Amended C-1 Lease Documents, the Debtors will receive full releases of all claims from the counterparties to such transactions,

> (vi) the Debtors will seek court approval to reject the Designated Leases by this Motion,

> (vii) in connection with the Subject Leveraged Lease Transactions designated as GM 2001 A-2, GM 2001 A-6 and GM 2001 A-8, the

claims, the Debtors and the relevant Owner Participant agreed to reduce and settle the Tax Indemnity Agreement claims asserted by the Owner Participant.

B-1 Lease, the Mobile Equipment Leases, and the Furniture Leases which are being rejected by this Motion (the "**Rejected Leases**"), the Debtors and New GM will receive full releases of all claims from the counterparties to such transactions (other than in respect of certain claims that are being assigned to the Indenture Trustee under the Global Settlement Agreement),

(viii) in exchange for the releases being given to Debtors, Debtors are waiving and releasing GECC, GECC Canada, U.S. Bank, and/or the Owner Trustees from all claims related to the Rejected Leases and the Purchased Equipment,

(ix) GECC and the Owner Trustees will have no continuing obligations or responsibilities with respect to the Rejected Leases and the Purchased Equipment, including, without limitation, any duty or obligation to retrieve, remove, dispose of, or otherwise deal with the Purchased Equipment,

(x) all defaults or events of default under the Subject Leveraged Lease Transaction designated as GM 2001 A-4 will be deemed remedied, cured and otherwise eliminated, and

(xi) to assist GECC in establishing claims it may have against non-Debtor third parties, the automatic stay will be consensually modified to allow GECC the right to issue notices to the Debtors and an invoice for an amount equal to the Lump Sum Lender Termination Payment (as defined in the GECC Omnibus Agreement) pursuant to the terms and conditions as provided in the GECC Omnibus Agreement (but not to permit GECC to recover any payments from the Debtors or exercise any remedies against the Debtors in connection therewith).

25.     The Debtors believe that the Settlement Agreements represent fair and reasonable settlements and compromises of the matters addressed therein. As noted above, the Settlement Agreements will result in a reduction of both administrative and general unsecured claims against the estate, while at the same time alleviating the financial burden, time and uncertainty associated with litigation of the issues resolved under the Settlement Agreements. Accordingly, the Debtors believe entry into the Settlement Agreements is in the best interests of their estates and creditors and, with the support of the UCC, respectfully request the entry of the proposed orders authorizing each of the Settlement Agreements.

## The Relief Requested Should Be Approved by the Court

26.    Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  This rule empowers bankruptcy courts to approve settlements "if they are in the best interests of the estate."  *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)* 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  A decision to accept or reject a compromise or settlement is within the sound discretion of the Court.  *Id.*; *see also* 9 *Collier on Bankruptcy* ¶ 9019.02 (15th ed. rev. 2001).  The settlement need not result in the best possible outcome for the debtor but must not "fall below the lowest point in the range of reasonableness."  *Drexel Burnham Lambert Group*, 134 B.R. at 505.

27.    Relying on the guiding language of *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968), courts in this Circuit have set forth the following factors regarding the reasonableness of such settlements:

(1)    the probability of success in the litigation;

(2)    the difficulties associated with collection;

(3)    the complexity of the litigation, and the attendant expense, inconvenience, and delay; and

(4)    the paramount interests of the creditors.

*In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992); *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 428 (S.D.N.Y. 1993); *In re Purofied Down Products Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993). The decision to approve a particular settlement lies within the sound discretion of the Bankruptcy Court.  *Machinery Terminals, Inc. v. Woodward (In re Albert-Harris, Inc.)*, 313 F.2d 447, 449 (6th Cir. 1963).  It is the responsibility of the court to examine a settlement and determine whether it "falls below the lowest point in the range of reasonableness."  *In re Dow Corning*, 198

B.R. 214, 222 (Bankr. E.D. Mich. 1996). For the reasons set forth below, the Debtors respectfully submit that the Settlement Agreements meet this standard and are in the best interests of their estates.

28.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984); *see also In re Lavigne*, 114 F.3d 379, 386 (2d Cir. 1997). "[T]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.' " *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994).

29.     Courts defer to a debtor's business judgment in rejecting an executory contract or unexpired lease, and upon finding that a debtor has exercised its sound business judgment, approve the rejection under section 365(a) of the Bankruptcy Code. *See Bildisco & Bildisco*, 465 U.S. at 523 (recognizing the "business judgment" standard used to approve rejection of executory contracts and unexpired leases); *Nostas Assocs. v. Costich (In re Klein Sleep Products, Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996) (recognizing the "business judgment" standard used to approve rejection of executory contracts); *In re Minges*, 602 F.2d 38, 42–43 (2d Cir. 1979) (holding that the "business judgment" test is appropriate for determining when an executory contract can be rejected); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994), *aff'd*, 187 B.R. 111 (S.D.N.Y. 1995) (approving rejection of license by debtor because such rejection satisfied the "business judgment" test); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (stating that a debtor may assume or reject an unexpired lease under § 365(a) in the exercise of its "business judgment").

30.    The "business judgment" standard is not a strict standard; it requires only a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate.  *See In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 1996) ("To meet the business judgment test, the debtor in possession must 'establish that rejection will benefit the estate.' ") (citation omitted); *In re Balco Equities, Inc.*, 323 B.R. 85, 99 (Bankr. S.D.N.Y. 2005) ("In determining whether the debtor has employed reasonable business discretion, the court for the most part must only determine that the rejection will likely benefit the estate.") (*quoting G Survivor*, 171 B.R. at 757)).  Further, under the business judgment standard, "[a] debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice' " *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001).  For the reasons set forth below, the Debtors respectfully submit that the rejection of the Designated Leases are in the best interests of their estates.

31.    While the automatic stay arising under Section 362 of the Bankruptcy Code is intended to protect debtors, the automatic stay does not apply to non-debtor entities. *Sav-A-Trip v. Belfort*, 164 F.3d 1137 (8th Cir. 1999). Likewise, even where the automatic stay applies as against a debtor, a modification of the stay is appropriate for cause shown. 11 U.S.C § 362(d)(1). For the reasons set forth below, the Debtors respectfully submit that the limited modification of the automatic stay should be allowed.

A.    The Settlement Agreements Should Be Approved

32.    The Settlement Agreements fall within the range of reasonableness, as each agreement is fair and equitable and in the paramount interest of the Debtors' and their creditors. The collection of transactions contemplated by the Settlement Agreements are beneficial to the Debtors because in one stroke, they resolve, at a substantial reduction to the Debtors and their estates, nearly all of the remaining issues relating to over $1 billion worth of leveraged lease

transactions and equipment leases which were not resolved by the Debtors' 363 sale of assets to New GM. The Subject Leveraged Lease Transactions and SIL Lease Transactions involve the financing of large, complex manufacturing Equipment, which is of little if any use to any party other than New GM. This Equipment is of no further use to the Debtors in their liquidation efforts, and there is no realistic hope of the Debtors recovering any proceeds from it, given the market conditions for the Equipment and the volume of debt it secures. If anything it is potentially burdensome to the Debtors. Likewise, the Debtors have no use for the Mobile Equipment and Furniture and the value of such assets is substantially less than the amounts owed to GECC and GECC Canada under the applicable leases.

33.     In the aggregate, the Equipment is simply not worth anything close to the over $1 billion owed on it, and given its lack of salability, the Debtors' ability to eliminate administrative costs and minimize the claims against the estate arising from these transactions is heavily dependent on (i) New GM's willingness to take responsibility for as much of these transactions as possible, and (ii) the Debtors' ability to negotiate compromises of the claims held by counterparties to the transactions which New GM is unwilling to assume.

34.     In that regard, first and foremost, the Settlement Agreements eliminate any question of the Debtors having any administrative, cure or other cash liability arising from these transactions. The amount of administrative and cure claim liability is being liquidated, and New GM is taking responsibility for all of it -- over $28.5 million in the aggregate -- notably even including the payment of administrative rent on certain transactions being rejected.

35.     The Debtors' ability to minimize the potential rejection damages in connection with the Subject Leveraged Lease Transaction and the SIL Lease Transactions, which could run to over $1 billion if the Debtors were forced to reject all the leases, is in substantial part dependent on the ability to assume and assign as many of the Subject Leveraged Lease

Transactions and the SIL Lease Transactions as possible to New GM.  The Global Settlement

Agreement facilitates that process by eliminating potentially serious objections by the Indenture

Trustees, and paving the way for New GM to take assignment of 5 of the 11 Subject Leveraged

Lease Transactions, one of the SIL Lease Transactions, plus two other single investor PMCC

Lease Transactions.  These assumptions alone will eliminate well over $300 million in lease

rejection damages.  Beyond that, the assumptions of Subject Leverage Lease Transactions, and

the releases being given to MLC in, and the compromises embodied in, the Settlement

Agreements will eliminate Tax Indemnity Agreement rejection claims which, while difficult for

MLC to calculate with any precision (because they are dependent on the Owner Participants'

individual tax attributes), would almost surely run in excess of $100 million.  In addition, New

GM's agreement to purchase the otherwise unwanted Equipment on the Subject Leveraged Lease

Transactions to be rejected will mitigate the rejection damages claims by $17.5 million.

Moreover, the GECC Omnibus Agreement enables the Debtors to eliminate all of the potential

rejection damages in connection with the Mobile Equipment Leases and Furniture Leases.

        36.     At bottom, the Settlement Agreements should be approved because together they

will eliminate the Debtors' potential cash liability, and reduce the rejection damages claims

against the estates to a level that is not just a fair estimate of -- but by virtue of the assumptions,

compromises and waivers contemplated by the Settlement Agreements -- substantially below the

actual, legitimate contractual damages claims to which the Debtors' estates could be subject

absent entry into the Settlement Agreements.  At the same time, the Settlement Agreements

eliminate the potential for costly and possibly protracted litigation over these matters.

        37.     The Debtors believe that the compromises represented by the Settlement

Agreements fall well within the range of reasonableness, are in the best interests of the Debtors'

estates and their creditors and should be approved as a sound exercise of the Debtors' business

judgment.

### B.   The Debtors Should Be Authorized To Reject The Designated Leases

38.   In light of the sale of substantially all of the Debtors' assets and subsequent wind-

down, the Debtors have no use for the equipment and furniture that is the subject of the

Designated Leases and the Designated Leases have no value to the Debtors.  The equipment and

furniture leased under the Designated Leases is located in various New GM and MLC facilitates

across the country and any cost in collecting and marketing such equipment and furniture would

far outweigh any value MLC might be able to ascertain from assuming and assigning the

Designated Leases. Most importantly, GECC and GECC Canada, as applicable, have agreed to

waive all rejection damage claims related to the rejection of the Designated Leases. Accordingly,

in the exercise of their business judgment, the Debtors have determined that the rejection of the

Designated Leases, pursuant to section 365 of the Bankruptcy Code, is in the best interests of

their estates.

### C.   The Automatic Stay Should be Modified to Allow GECC to Preserve Its Rights Against Non-Debtors

39.   As a condition to the effectiveness of the GECC Omnibus Agreement, GECC has

required that the Debtors consent to a limited modification of the automatic stay to allow GECC

to provide notices and an invoice to the Debtors under a certain tri-party agreement (the "**Tri-**

**Party Agreement**") between MCL, GECC (as assignee of Newman Financial Services, Inc.) and

Shreveport Red River Utilities, LLC ("**Red River**"). The Tri-Party Agreement relates to

financing GECC provides to Red River.  Red River provides utility services to the Debtors'

Shreveport, Louisiana plant. The requested modification of the automatic stay would allow

GECC solely to meet certain conditions in asserting claims against New GM and/or Red River.

Accordingly, the modification of the automatic stay is expressly limited such that the stay will

continue to preclude GECC from collecting any payments from the Debtors or enforcing any remedies against the Debtors. The referenced notice, if given, will also be without prejudice to the Debtors' rights or the validity of any claims GECC may have against the Debtors under the Tri-Party Agreement. Because the modification of the stay requested does not impact the Debtors, the Debtors believe it is appropriate to grant GECC the requested relief as a condition to their entry into the GECC Omnibus Agreement.

## **Notice**

40.     Notice of this Motion has been provided to parties in interest in accordance with the Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated August 3, 2009 [Dkt. # 3629] and those notice parties listed on **Schedule "A"** annexed hereto.  The Debtors submit that such notice is sufficient and no other or further notice need be provided.

41.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of orders granting the relief requested herein and such other and further relief as is just.

Dated:  New York, New York
        March 4, 2010

                            /s/ Joseph H. Smolinsky
                            Harvey R. Miller
                            Stephen Karotkin
                            Joseph H. Smolinsky

                            WEIL, GOTSHAL & MANGES LLP
                            767 Fifth Avenue
                            New York, New York 10153
                            Telephone: (212) 310-8000
                            Facsimile: (212) 310-8007

                            Attorneys for Debtors
                            and Debtors in Possession

**Exhibit A**

**Global Settlement Agreement**

SETTLEMENT AGREEMENT
(GM 1991 A-3, GM 2000 A-1, GM 2000 A-3,
GM 2001 A-1, GM 2001 A-2, GM 2001 A-3, GM 2001 A-4,
GM 2001 A-5, GM 2001 A-6, GM 2001 A-7, AND GM 2001 A-8)

**EXECUTION VERSION**

<u>SETTLEMENT AGREEMENT</u>
(GM 1991 A-3, GM 2000 A-1, GM 2000 A-3, GM 2001 A-1, GM 2001 A-2, GM 2001 A-3, GM 2001 A-4, GM 2001 A-5, GM 2001 A-6, GM 2001 A-7, AND GM 2001 A-8)

THIS SETTLEMENT AGREEMENT, dated as of March 1, 2010 (this "<u>Agreement</u>" or this "<u>Settlement Agreement</u>"), is entered into by and among (i) GENERAL MOTORS LLC (successor-by-conversion to, and formerly known as, General Motors Company), a Delaware limited liability company (herein, together with its successors and assigns, "<u>New GM</u>"), (ii) MOTORS LIQUIDATION COMPANY (f/k/a General Motors Corporation), a Delaware corporation (herein, together with its successors and assigns, "<u>MLC</u>"), (iii) MLCS, LLC (f/k/a Saturn, LLC), a Delaware limited liability company (herein, together with its successors and assigns, "<u>MLCS</u>"), as the successor in interest to Saturn Corporation, (iv) SATURN COUNTY BOND CORPORATION, a Delaware corporation (herein, together with its successors and assigns, "<u>SC Bond Sub</u>"), (v) HNB INVESTMENT CORP., a Delaware corporation (herein, together with its successors and assigns, "<u>HNB</u>"), (vi) GENERAL FOODS CREDIT CORPORATION, a Delaware corporation (herein, together with its successors and assigns, "<u>General Foods</u>"), (vii) GENERAL FOODS CREDIT INVESTORS NO. 2 CORPORATION, a Delaware corporation (herein, together with its successors and assigns, "<u>General Foods No. 2</u>"), (viii) PHILIP-MORRIS CAPITAL CORPORATION, a Delaware corporation (herein, together with its successors and assigns, "<u>PMCC</u>"), (ix) GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation (herein, together with its successors and assigns, "<u>GECC</u>"), (x) U.S. BANK NATIONAL ASSOCIATION, a national banking association (herein, together with its successors and assigns "<u>U.S. Bank</u>"), not in its individual capacity, but solely as 1991 A-3 Owner Trustee, 2000 A-1 Owner Trustee, 2001 A-1 Owner Trustee, 2001 A-2 Owner Trustee, 2001 A-3 Owner Trustee, 2001 A-4 Owner Trustee, 2001 A-5 Owner Trustee, 2001 A-6 Owner Trustee, 2001 A-7 Owner Trustee, and 2001 A-8 Owner Trustee, (xi) THE BANK OF NEW YORK MELLON, f/k/a The Bank of New York, a New York State banking corporation (herein, together with its successors and assigns, "<u>BNY Mellon</u>"), not in its individual capacity, except as expressly stated herein, but solely as 1991 A-3 Indenture Trustee, 1991 A-3 Pass Through Trustee, and 1991 A-3 Purchase Option Agent, (xii) MANUFACTURERS AND TRADERS TRUST COMPANY (successor in interest to Wilmington Trust Company), a New York corporation (herein, together with its successors and assigns, "<u>M&TT</u>"), not in its individual capacity, except as expressly stated herein, but solely as 2000 A-1 Indenture Trustee, 2000 A-1 Purchase Option Agent, 2000 A-3 Indenture Trustee, and 2000 A Pass Through Trustee, and (xiii) WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, a national banking association (herein, together with its successors and assigns "<u>Wells Fargo</u>"), not in its individual capacity, except as expressly stated herein, but solely as 2001 A-1 Indenture Trustee, 2001 A-2 Indenture Trustee, 2001 A-3 Indenture Trustee, 2001 A-4 Indenture Trustee, 2001 A-5 Indenture Trustee, 2001 A-6 Indenture Trustee, 2001 A-7 Indenture Trustee, and 2001 A-8 Indenture Trustee.

SETTLEMENT AGREEMENT
(GM 1991 A-3, GM 2000 A-1, GM 2000 A-3,
GM 2001 A-1, GM 2001 A-2, GM 2001 A-3, GM 2001 A-4,
GM 2001 A-5, GM 2001 A-6, GM 2001 A-7, AND GM 2001 A-8)

## W I T N E S S E T H:

WHEREAS, MLC (or, in the case of the 1991 A-3 Leveraged Lease Transaction, MLCS), as lessee, leases certain automobile manufacturing equipment pursuant to the 1991 A-3 Leveraged Lease Transaction, the 2000 Leveraged Lease Transactions, and the 2001 Leveraged Lease Transactions;

WHEREAS, on June 1, 2009 (the "Petition Date"), MLC, MLCS, and certain affiliates of MLC (together with MLC and MLCS, collectively, the "Debtors") filed for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in cases jointly administered under case number 09-50026;

WHEREAS, concurrently with their filing for relief under the Bankruptcy Code, the Debtors filed a motion pursuant to, among other provisions, Sections 363 and 365 of the Bankruptcy Code, seeking authority to sell (the "363 Sale") substantially all of their assets to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("VAH") formed by the United States Department of the Treasury;

WHEREAS, prior to the consummation of the 363 Sale, (i) VAH converted to a corporation and was renamed NGMCO, Inc., a Delaware corporation ("NGMCO"), and (ii) NGMCO subsequently changed its name to General Motors Company, a Delaware corporation ("GMC");

WHEREAS, the 363 Sale closed on July 10, 2009;

WHEREAS, on July 17, 2009, MLC filed a motion (the "July Rejection Motion") seeking to reject three 2001 Leveraged Lease Transactions identified as GM 2001 A-1, GM 2001 A-2, and GM 2001 A-6 [Docket #3212];

WHEREAS, on July 30, 2009, Wells Fargo filed an objection to the July Rejection Motion [Docket #3534];

WHEREAS, on August 3, 2009, the Bankruptcy Court entered a consensual order authorizing the rejection of the 2001 Leveraged Lease Transactions identified as GM 2001 A-1 and GM 2001 A-2 retroactive to July 31, 2009 [Docket #3619];

WHEREAS, as of the date of this Agreement, the July Rejection Motion remains pending with respect to the rejection of the 2001 Leveraged Lease Transaction identified as GM 2001 A-6;

WHEREAS on October 16, 2009, GMC was converted to New GM, a Delaware limited liability company;

WHEREAS, on October 30, 2009, (i) New GM and PMCC entered into six separate letter agreements, each dated October 30, 2009 (collectively, the "PMCC/GM Letter Agreements"), relating to, respectively, the 1991 A-3 Leveraged Lease Transaction (the "1991 PMCC/GM

Letter Agreement"), the 2000 Leveraged Lease Transaction identified as GM 2000 A-1 (the "2000 PMCC/GM Letter Agreement"), the two 2001 Leveraged Lease Transactions identified as GM 2001 A-3 and GM 2001 A-5 (the "2001 PMCC/GM Letter Agreements"), and two 2002 Lease Transactions identified as GM 2002 A-1 and GM 2002 A-2 (the "2002 PMCC/GM Letter Agreements"), and (ii) the Debtors filed motions with the Bankruptcy Court seeking to (A) assume and assign to New GM the 1991 A-3 Leveraged Lease Transaction, the 2000 Leveraged Lease Transaction identified as GM 2000 A-1, the three 2001 Leveraged Lease Transactions identified as GM 2001 A-3, GM 2001 A-4, and GM 2001 A-5, and the two 2002 Lease Transactions identified as GM 2002 A-1 and GM 2002 A-2 [Docket #4331] (the "Assumption Motion"), (B) reject the two 2000 Leveraged Lease Transactions identified as GM 2000 A-2 and GM 2000 A-3 [Docket #4328] (the "2000 Rejection Motion"), and (C) reject the two 2001 Leveraged Lease Transactions identified as GM 2001 A-7 and GM 2001 A-8 [Docket #4324] (the "2001 Rejection Motion" and together with the 2000 Rejection Motion and the Assumption Motion, the "October Motions"; and, together with the July Rejection Motion, the "Pending Motions");

WHEREAS, the 2001 A-1 Indenture Trustee, 2001 A-2 Indenture Trustee, 2001 A-3 Indenture Trustee, 2001 A-4 Indenture Trustee, 2001 A-5 Indenture Trustee, 2001 A-6 Indenture Trustee, 2001 A-7 Indenture Trustee, and 2001 A-8 Indenture Trustee objected to the July Rejection Motion and have stated, along with the 2000 A-1 Indenture Trustee, the 2000 A-3 Indenture Trustee, and the 2000 A Pass Through Trustee, their intention to object to the October Motions;

WHEREAS, on December 16, 2009, the Bankruptcy Court entered an order granting the 2000 Rejection Motion which required, as a condition to the effectiveness of the rejection of the 2000 Leveraged Lease Transaction identified as GM 2000 A-3, the entry into this Agreement;

WHEREAS, New GM and the Asset Sale Counterparties have entered into the Asset Purchase Agreements, pursuant to which New GM shall purchase, and the Owner Trustee and the Owner Participant under each of the Rejected Lease Transactions shall sell, the "Purchased Assets" as defined therein (constituting the "Equipment" as defined in the Rejected Lease Transactions identified as GM 2001 A-1, GM 2001 A-2, GM 2001 A-6, GM 2001 A-7, and GM 2001 A-8); and

WHEREAS, as applicable, the parties hereto have agreed to resolve their objections to the Pending Motions and to compromise and settle claims relating to the 1991 A-3 Leveraged Lease Transaction, the 2000 Leveraged Lease Transactions identified as GM 2000 A-1 and GM 2000 A-3, and the 2001 Leveraged Lease Transactions on the terms and conditions provided herein;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, the parties hereto hereby agree as follows:

SECTION 1. Definitions. As used in this Settlement Agreement (including in the introduction and recitals), the following terms have the following meanings:

"Administrative Expense Claims" has the meaning assigned thereto in Section 3(f) of this Agreement.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise. For avoidance of doubt, in no event shall New GM be construed to be an Affiliate of MLC, MLCS or any other Debtor for purposes hereof, and MLC, MLCS and the other Debtors shall not be construed to be Affiliates of New GM for purposes hereof.

"Agreement" has the meaning assigned thereto in the introduction to this Settlement Agreement.

"Agreement Effective Date" has the meaning assigned thereto in Section 2 of this Settlement Agreement.

"Applicable Law" means all applicable laws, statutes, treaties, rules, codes, ordinances, regulations, certificates, orders, interpretations, licenses and permits of any Governmental Authority and judgments, decrees, injunctions, writs, orders or like action of any court, arbitrator or other administrative, judicial or quasi judicial tribunal or agency of competent jurisdiction (including, without limitation, those pertaining to health, safety or the environment).

"Asset Purchase Agreements" means, collectively, (i) the Asset Purchase Agreement (GM 2001 A-1), dated as of March 1, 2010 among General Foods No. 2, the 2001 A-1 Owner Trustee, Wells Fargo, as 2001 A-1 Indenture Trustee, and New GM, (ii) the Asset Purchase Agreement (GM 2001 A-2), dated as of March 1, 2010 among GECC, the 2001 A-2 Owner Trustee, Wells Fargo, as 2001 A-2 Indenture Trustee, and New GM, (iii) the Asset Purchase Agreement (GM 2001 A-6), dated as of March 1, 2010 among GECC, the 2001 A-6 Owner Trustee, Wells Fargo, as 2001 A-6 Indenture Trustee, and New GM, (iv) the Asset Purchase Agreement (GM 2001 A-7), dated as of March 1, 2010 among General Foods No. 2, the 2001 A-7 Owner Trustee, Wells Fargo, as 2001 A-7 Indenture Trustee, and New GM, and (v) the Asset Purchase Agreement (GM 2001 A-8), dated as of March 1, 2010 among GECC, the 2001 A-8 Owner Trustee, Wells Fargo, as 2001 A-8 Indenture Trustee, and New GM.

"Asset Sale Counterparties" means, with respect to an Asset Purchase Agreement, each of the parties thereto other than New GM.

"Assumed Lease Claims" has the meaning assigned thereto in Section 7(f) of this Settlement Agreement.

"Assumed Lease Releasors" has the meaning assigned thereto in Section 7(f) of this Settlement Agreement.

"Assumed Lease Transactions" means, collectively, the 1991 A-3 Leveraged Lease Transaction, the 2000 Leveraged Lease Transaction described in clause (a) of the definition thereof, and the 2001 Leveraged Lease Transactions described in clauses (c), (d), and (e) of the definition thereof.

"Assumption Motion" has the meaning assigned thereto in the eleventh recital to this Settlement Agreement.

"Bankruptcy Code" has the meaning assigned thereto in the second recital of this Settlement Agreement.

"Bankruptcy Court" has the meaning assigned thereto in the second recital of this Settlement Agreement.

"BNY Mellon" has the meaning assigned thereto in the introduction to this Settlement Agreement.

"Business Day" means any day other than a Saturday or Sunday or a day on which commercial banks are required or authorized to close in (i) New York, New York or (ii) Detroit, Michigan.

"Certificateholder" means, collectively, each of the "Certificateholders" as defined in each of the 2000 A-1 Participation Agreement and the 2000 A-3 Participation Agreement.

"Closing Date" has the meaning assigned thereto in Section 4 of this Settlement Agreement.

"Comerica" means Comerica Leasing Corporation, a Michigan corporation.

"Comerica Settlement Agreement" has the meaning assigned thereto in Section 6 hereof.

"Debtors" has the meaning assigned thereto in the second recital of this Settlement Agreement.

"Equipment Notes" means, collectively, each of the "Equipment Notes" as defined in each of the 2001 A-1 Participation Agreement, the 2001 A-2 Participation Agreement, the 2001 A-6 Participation Agreement, the 2001 A-7 Participation Agreement and the 2001 A-8 Participation Agreement.

"GECC" has the meaning assigned thereto in the introduction to this Settlement Agreement.

"GECC Claims" has the meaning assigned thereto in the Section 7(e) of this Settlement Agreement.

"GECC Equity Rent" has the meaning assigned thereto in Section 5(g) of this Settlement Agreement.

"GECC Releasee" and "GECC Releasees" have the respective meanings assigned thereto in Section 7(e) of this Settlement Agreement.

"GECC Releasor" and "GECC Releasors" have the respective meanings assigned thereto in Section 7(e) of this Settlement Agreement.

"GECC Omnibus Agreement" means the Omnibus Agreement, dated as of February 25, 2010, among MLC, New GM, and GECC.

"General Foods" has the meaning assigned thereto in the introduction to this Settlement Agreement.

"General Foods No. 2" has the meaning assigned thereto in the introduction to this Settlement Agreement.

"General Foods No. 3" means General Foods Credit Investors No. 3 Corporation, a Delaware corporation.

"GMC" has the meaning assigned thereto in the fourth recital of this Settlement Agreement.

"Governmental Authority" means, in the case of the United States, any federal, state, county, municipal or other governmental authority or judicial or regulatory agency, board, body, commission, instrumentality, court or quasi governmental authority from time to time, and, in the case of any foreign governmental authority, all similar entities to the foregoing having jurisdiction over any Person that is a party to this Agreement, any property of any of them or any of the transactions contemplated by this Agreement.

"HNB" has the meaning assigned thereto in the introduction to this Settlement Agreement.

"Indenture Trustees" means, collectively, all of the following: the 1991 A-3 Indenture Trustee, the 2000 A-1 Indenture Trustee, the 2000 A-3 Indenture Trustee, the 2001 A-1 Indenture Trustee, the 2001 A-2 Indenture Trustee, the 2001 A-3 Indenture Trustee, the 2001 A-4 Indenture Trustee, the 2001 A-5 Indenture Trustee, the 2001 A-6 Indenture Trustee, the 2001 A-7 Indenture Trustee, and the 2001 A-8 Indenture Trustee, and "Indenture Trustee" means any of the foregoing.

"July Rejection Motion" has the meaning assigned thereto in the sixth recital of this Settlement Agreement.

"Make-Whole Premium" means, collectively, the "Make-Whole Premium" as defined in each of the 2001 A-1 Participation Agreement, the 2001 A-2 Participation Agreement, the 2001 A-6 Participation Agreement, the 2001 A-7 Participation Agreement and the 2001 A-8 Participation Agreement.

"MLC" has the meaning assigned thereto in the <u>introduction</u> to this Settlement Agreement.

"MLC Claims" has the meaning assigned thereto in the <u>Section 7(a)</u> of this Settlement Agreement.

"MLC Releasee" and "MLC Releasees" have the respective meanings assigned thereto in <u>Section 7(a)</u> of this Settlement Agreement.

"MLC Releasor" and "MLC Releasors" have the respective meanings assigned thereto in <u>Section 7(a)</u> of this Settlement Agreement.

"MLCS" has the meaning assigned thereto in the <u>introduction</u> to this Settlement Agreement.

"M&TT" has the meaning assigned thereto in the <u>introduction</u> to this Settlement Agreement.

"New GM" has the meaning assigned thereto in the <u>introduction</u> to this Settlement Agreement.

"New GM Claims" has the meaning assigned thereto in the <u>Section 7(b)</u> of this Settlement Agreement.

"New GM Releasee" and "New GM Releasees" have the respective meanings assigned thereto in <u>Section 7(b)</u> of this Settlement Agreement.

"New GM Releasor" and "New GM Releasors" have the respective meanings assigned thereto in <u>Section 7(b)</u> of this Settlement Agreement.

"NGMCO" has the meaning assigned thereto in the <u>fourth recital</u> of this Settlement Agreement.

"Noteholder" means, collectively, (i) each "Loan Participant" as defined in each of the 2000 A-1 Participation Agreement and the 2000 A-3 Participation Agreement, and (ii) each "Noteholder" as defined in each of the 2001 A-1 Participation Agreement, the 2001 A-2 Participation Agreement, the 2001 A-3 Participation Agreement, the 2001 A-4 Participation Agreement, the 2001 A-5 Participation Agreement, the 2001 A-6 Participation Agreement, the 2001 A-7 Participation Agreement, and the 2001 A-8 Participation Agreement.

"Notice" has the meaning assigned thereto in the <u>Section 11</u> of this Settlement Agreement.

"October Motions" has the meaning assigned thereto in the <u>eleventh recital</u> of this Settlement Agreement.

"OP Claims" has the meaning assigned thereto in the <u>Section 7(d)</u> of this Settlement Agreement.

"Operative Documents" means the 1991 A-3 Operative Documents, the 2000 A-1 Operative Documents, the 2000 A-2 Operative Documents, the 2000 A-3 Operative Documents, the 2001 A-1 Operative Documents, the 2001 A-2 Operative Documents, the 2001 A-3 Operative Documents, the 2001 A-4 Operative Documents, the 2001 A-5 Operative Documents, the 2001 A-6 Operative Documents, the 2001 A-7 Operative Documents, and the 2001 A-8 Operative Documents.

"OP Releasee" and "OP Releasees" have the respective meanings assigned thereto in Section 7(d) of this Settlement Agreement.

"OP Releasor" and "OP Releasors" have the respective meanings assigned thereto in Section 7(d) of this Settlement Agreement.

"Owner Participants" means, collectively, all of the following: HNB, General Foods, General Foods No. 2, and GECC, and "Owner Participant" means any of the foregoing.

"Owner Trustees" means, collectively, all of the following: the 1991 A-3 Owner Trustee, the 2000 A-1 Owner Trustee, the 2001 A-1 Owner Trustee, the 2001 A-2 Owner Trustee, the 2001 A-3 Owner Trustee, the 2001 A-4 Owner Trustee, the 2001 A-5 Owner Trustee, the 2001 A-6 Owner Trustee, the 2001 A-7 Owner Trustee, and the 2001 A-8 Owner Trustee, and "Owner Trustee" means any of the foregoing.

"Participation Agreements" means, collectively, all of the following: the 1991 A-3 Participation Agreement, the 2000 A-1 Participation Agreement, the 2000 A-3 Participation Agreement, the 2001 A-1 Participation Agreement, the 2001 A-2 Participation Agreement, the 2001 A-3 Participation Agreement, the 2001 A-4 Participation Agreement, the 2001 A-5 Participation Agreement, the 2001 A-6 Participation Agreement, the 2001 A-7 Participation Agreement, and the 2001 A-8 Participation Agreement, and "Participation Agreement" means any of the foregoing.

"Pass Through Trustees" means, collectively: the 1991 A-3 Pass Through Trustee, and the 2000 A Pass Through Trustee, and "Pass Through Trustee" means any of the foregoing.

"Pending Motions" has the meaning assigned thereto in the eleventh recital of this Settlement Agreement.

"Person" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated organization, Governmental Authority or any other entity.

"Petition Date" has the meaning assigned thereto in the second recital of this Settlement Agreement.

"PMCC" has the meaning assigned thereto in the introduction to this Settlement Agreement.

"PMCC/GM Letter Agreement" and "PMCC/GM Letter Agreements" have the meanings assigned thereto in the eleventh recital of this Settlement Agreement.

"Purchase Option Agents" means the 1991 A-3 Purchase Option Agent and the 2000 A-1 Purchase Option Agent, collectively, and "Purchase Option Agent" means either of the foregoing.

"Rejected Lease Transactions" means the 2000 Leveraged Lease Transaction described in clause (c) of the definition thereof, and the 2001 Leveraged Lease Transactions described in clauses (a), (b), (f), (g), and (h) of the definition thereof.

"SC Bond Sub" has the meaning assigned thereto in the introduction to this Settlement Agreement.

"Settlement Agreement" has the meaning assigned thereto in the introduction to this Agreement.

"Trustee Claims" has the meaning assigned thereto in the Section 7(c) of this Settlement Agreement.

"Trustee Releasee" and "Trustee Releasees" have the respective meanings assigned thereto in Section 7(c) of this Settlement Agreement.

"Trustee Releasor" and "Trustee Releasors" have the respective meanings assigned thereto in Section 7(c) of this Settlement Agreement.

"Trustees" means, collectively, all of the following: the Owner Trustees, the Indenture Trustees, the Pass Through Trustees, and the Purchase Option Agents, and "Trustee" means any of the foregoing.

"U.S. Bank" has the meaning assigned thereto in the introduction to this Settlement Agreement.

"VAH" has the meaning assigned thereto in the third recital of this Settlement Agreement.

"Wachovia" means Wachovia Financial Services, Inc. (formerly known as First Union Commercial Corporation), a North Carolina corporation.

"Wells Fargo" has the meaning assigned thereto in the introduction to this Settlement Agreement.

"1991 A-3 Indenture Trustee" has the meaning assigned to the term "Indenture Trustee" in the 1991 A-3 Participation Agreement.

"1991 A-3 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 1991 A-3 Participation Agreement.

"1991 A-3 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 1991 A-3 Participation Agreement.

"1991 A-3 Leveraged Lease Transaction" means the transaction contemplated by the 1991 A-3 Participation Agreement and the other 1991 A-3 Operative Documents.

"1991 A-3 Participation Agreement" means the Participation Agreement (GM 1991 A-3), dated as of September 23, 1991, as amended, among MLCS, as lessee, MLC, as guarantor, HNB, as Owner Participant, U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, PMCC, as guarantor, SC Bond Sub, and BNY Mellon, as 1991 A-3 Indenture Trustee, 1991 A-3 Pass Through Trustee, and 1991 A-3 Purchase Option Agent.

"1991 A-3 Pass Through Trustee" has the meaning assigned to the term "Pass Through Trustee" in the 1991 A-3 Participation Agreement.

"1991 A-3 Purchase Option Agent" has the meaning assigned to the term "Purchase Option Agent" in the 1991 A-3 Participation Agreement.

"1991 PMCC/GM Letter Agreement" has the meaning assigned thereto in the eleventh recital to this Settlement Agreement.

"2000 A Pass Through Trustee" has the meaning assigned to the term "Pass Through Trustee" in each of the 2000 A-1 Participation Agreement and the 2000 A-3 Participation Agreement.

"2000 A-1 Indenture Trustee" has the meaning assigned to the term "Indenture Trustee" in the 2000 A-1 Participation Agreement.

"2000 A-1 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 2000 A-1 Participation Agreement.

"2000 A-1 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 2000 A-1 Participation Agreement.

"2000 A-1 Participation Agreement" means the Participation Agreement (GM 2000 A-1), dated as of December 15, 2000, as amended, among MLC, as lessee, General Foods, as Owner Participant, U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, Doraville Bond Corporation, and Wilmington Trust Company, as predecessor to M&TT, as 2000 A-1 Indenture Trustee, 2000 A Pass Through Trustee, and 2000 A-1 Purchase Option Agent.

"2000 A-1 Purchase Option Agent" has the meaning assigned to the term "Purchase Option Agent" in the 2000 A-1 Participation Agreement.

"2000 A-2 Indenture Trustee" has the meaning assigned to the term "Indenture Trustee" in the 2000 A-2 Participation Agreement.

"2000 A-2 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 2000 A-2 Participation Agreement.

"2000 A-2 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 2000 A-2 Participation Agreement.

"2000 A-2 Participation Agreement" means the Participation Agreement (GM 2000 A-2), dated as of December 15, 2000, as amended, among MLC, as lessee, Wachovia, as Owner Participant, U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, and Wilmington Trust Company as predecessor to M&TT, as 2000 A-2 Indenture Trustee and 2000 A Pass Through Trustee.

"2000 A-2 Settlement Agreement" means the Settlement Agreement, dated as of December 22, 2009 among (i) New GM, (ii) MLC, (iii) Wachovia, (iv) U.S. Bank, in its capacity as 2000 A-2 Owner Trustee, and (v) the 2000 A-2 Indenture Trustee and the 2000 A Pass Through Trustee.

"2000 A-3 Indenture Trustee" has the meaning assigned to the term "Indenture Trustee" in the 2000 A-3 Participation Agreement.

"2000 A-3 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 2000 A-3 Participation Agreement.

"2000 A-3 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 2000 A-3 Participation Agreement.

"2000 A-3 Participation Agreement" means the Participation Agreement (GM 2000 A-3), dated as of December 15, 2000, as amended, among MLC, as lessee, Comerica, as Owner Participant, U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, and Wilmington Trust Company, as predecessor to M&TT, as 2000 A-3 Indenture Trustee and 2000 A Pass Through Trustee.

"2000 Leveraged Lease Transactions" means the transactions contemplated by (a) the 2000 A-1 Participation Agreement and the other 2000 A-1 Operative Documents, (b) the 2000 A-2 Participation Agreement and the other 2000 A-2 Operative Documents, and (c) the 2000 A-3 Participation Agreement and the other 2000 A-3 Operative Documents.

"2000 PMCC/GM Letter Agreement" has the meaning assigned thereto in the eleventh recital to this Settlement Agreement.

"2000 Rejection Motion" has the meaning assigned thereto in the eleventh recital to this Settlement Agreement.

"2001 A-1 Indenture Trustee" has the meaning assigned to the term "Indenture Trustee" in the 2001 A-1 Participation Agreement.

"2001 A-1 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 2001 A-1 Participation Agreement.

"2001 A-1 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 2001 A-1 Participation Agreement.

"2001 A-1 Participation Agreement" means the Participation Agreement (GM 2001 A-1), dated as of December 18, 2001, as amended, among MLC, as lessee, General Foods, as Owner Participant, U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, Wells Fargo, as 2001-A Indenture Trustee, and the "Note Purchasers" party thereto.

"2001 A-2 Indenture Trustee" has the meaning assigned to the term "Indenture Trustee" in the 2001 A-2 Participation Agreement.

"2001 A-2 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 2001 A-2 Participation Agreement.

"2001 A-2 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 2001 A-2 Participation Agreement.

"2001 A-2 Participation Agreement" means the Participation Agreement (GM 2001 A-2), dated as of December 18, 2001, as amended, among MLC, as lessee, GECC, as Owner Participant, U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, Wells Fargo, as 2001 A-2 Indenture Trustee, and the "Note Purchasers" party thereto.

"2001 A-3 Indenture Trustee" has the meaning assigned to the term "Indenture Trustee" in the 2001 A-3 Participation Agreement.

"2001 A-3 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 2001 A-3 Participation Agreement.

"2001 A-3 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 2001 A-3 Participation Agreement.

"2001 A-3 Participation Agreement" means the Participation Agreement (GM 2001 A-3), dated as of December 18, 2001, as amended, among MLC, as lessee, General Foods No. 2, as Owner Participant, U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, Wells Fargo, as 2001 A-3 Indenture Trustee, and the "Note Purchasers" party thereto.

"2001 A-4 Indenture Trustee" has the meaning assigned to the term "Indenture Trustee" in the 2001 A-4 Participation Agreement.

"2001 A-4 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 2001 A-4 Participation Agreement.

"2001 A-4 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 2001 A-4 Participation Agreement.

"2001 A-4 Participation Agreement" means the Participation Agreement (GM 2001 A-4), dated as of December 18, 2001, as amended, among MLC, as lessee, GECC, as Owner Participant, U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, Wells Fargo, as 2001 A-4 Indenture Trustee, and the "Note Purchasers" party thereto.

"2001 A-4 Trust Agreement" has the meaning assigned thereto in Section 5(g) of this Settlement Agreement.

"2001 A-5 Indenture Trustee" has the meaning assigned to the term "Indenture Trustee" in the 2001 A-5 Participation Agreement.

"2001 A-5 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 2001 A-5 Participation Agreement.

"2001 A-5 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 2001 A-5 Participation Agreement.

"2001 A-5 Participation Agreement" means the Participation Agreement (GM 2001 A-5), dated as of December 18, 2001, as amended, among MLC, as lessee, General Foods No. 2, as Owner Participant, U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, Wells Fargo, as 2001 A-5 Indenture Trustee, and the "Note Purchasers" party thereto.

"2001 A-6 Indenture Trustee" has the meaning assigned to the term "Indenture Trustee" in the 2001 A-6 Participation Agreement.

"2001 A-6 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 2001 A-6 Participation Agreement.

"2001 A-6 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 2001 A-6 Participation Agreement.

"2001 A-6 Participation Agreement" means the Participation Agreement (GM 2001 A-6), dated as of December 18, 2001, as amended, among MLC, as lessee, GECC, as Owner Participant, U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, Wells Fargo, as 2001 A-6 Indenture Trustee, and the "Note Purchasers" party thereto.

"2001 A-7 Indenture Trustee" has the meaning assigned to the term "Indenture Trustee" in the 2001 A-7 Participation Agreement.

"2001 A-7 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 2001 A-7 Participation Agreement.

"2001 A-7 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 2001 A-7 Participation Agreement.

"2001 A-7 Participation Agreement" means the Participation Agreement (GM 2001 A-7), dated as of December 18, 2001, as amended, among MLC, as lessee, General Foods No. 2, as Owner Participant, U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, Wells Fargo, as 2001 A-7 Indenture Trustee, and the "Note Purchasers" party thereto.

"2001 A-8 Indenture Trustee" has the meaning assigned to the term "Indenture Trustee" in the 2001 A-8 Participation Agreement.

"2001 A-8 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 2001 A-8 Participation Agreement.

"2001 A-8 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 2001 A-8 Participation Agreement.

"2001 A-8 Participation Agreement" means the Participation Agreement (GM 2001 A-8), dated as of December 18, 2001, as amended, among MLC, as lessee, GECC, as Owner Participant, U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, Wells Fargo, as 2001 A-8 Indenture Trustee, and the "Note Purchasers" party thereto.

"2001 Leveraged Lease Transactions" means the transactions contemplated by (a) the 2001 A-1 Participation Agreement and the other 2001 A-1 Operative Documents, (b) the 2001 A-2 Participation Agreement and the other 2001 A-2 Operative Documents, (c) the 2001 A-3 Participation Agreement and the other 2001 A-3 Operative Documents, (d) the 2001 A-4 Participation Agreement and the other 2001 A-4 Operative Documents, (e) the 2001 A-5 Participation Agreement and the other 2001 A-5 Operative Documents, (f) the 2001 A-6 Participation Agreement and the other 2001 A-6 Operative Documents, (g) the 2001 A-7 Participation Agreement and the other 2001 A-7 Operative Documents, and (h) the 2001 A-8 Participation Agreement and the other 2001 A-8 Operative Documents.

"2001 PMCC/GM Letter Agreements" has the meaning assigned thereto in the eleventh recital to this Settlement Agreement.

"2001 Rejection Motion" has the meaning assigned thereto in the eleventh recital to this Settlement Agreement.

"2002 A-1 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 2002 A-1 Participation Agreement.

"2002 A-1 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 2002 A-1 Participation Agreement.

"2002 A-1 Participation Agreement" means the Participation Agreement (GM 2002 A-1), dated as of December 20, 2002, as amended, among MLC, as lessee, General Foods No. 3, as Owner Participant, and U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee.

"2002 A-2 Operative Documents" has the meaning assigned to the term "Operative Documents" in the 2002 A-2 Participation Agreement.

"2002 A-2 Owner Trustee" has the meaning assigned to the term "Owner Trustee" in the 2002 A-2 Participation Agreement.

"2002 A-2 Participation Agreement" means the Participation Agreement (GM 2002 A-2), dated as of December 20, 2002, as amended, among MLC, as lessee, HNB, as Owner Participant, and U.S. Bank, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee.

"2002 Lease Transactions" means the transactions contemplated by (a) the 2002 A-1 Participation Agreement and the other 2002 A-1 Operative Documents, and (b) the 2002 A-2 Participation Agreement and the other 2002 A-2 Operative Documents.

"2002 PMCC/GM Letter Agreements" has the meaning assigned thereto in the eleventh recital to this Settlement Agreement.

"363 Sale" has the meaning assigned thereto in the third recital of this Settlement Agreement.

"9019 Motion " has the meaning assigned thereto in Section 3(c) of this Settlement Agreement.

"9019 Order" has the meaning assigned thereto in Section 3(d) of this Settlement Agreement.

SECTION 2.    Conditions to Agreement Effective Date.    This Agreement shall become effective on and as of the date (the "Agreement Effective Date") when the last of the following conditions precedent shall have been satisfied or waived in accordance with this Agreement:

(a)    This Agreement.    This Agreement shall have been duly authorized, executed and delivered by each of the respective parties hereto (provided, that, in the case of an Indenture Trustee, a Pass Through Trustee, or a Purchase Option Agent, such Indenture Trustee, Pass Through Trustee, or Purchase Option Agent shall have been duly requested and instructed to execute and deliver this Agreement by any Person authorized or required to so request or instruct such Indenture Trustee, Pass Through Trustee, or Purchase Option Agent), and all requisite approvals and consents of third Persons, including Governmental Authorities (other than orders approving the Pending Motions and the 9019 Order), with respect hereto shall have been obtained and shall be in full force and effect, and executed counterparts of this Agreement shall have been delivered to New GM.

(b)    Deliveries to New GM.    New GM shall have received the following, in each case in form and substance reasonably satisfactory to it and its counsel:

(i)    a copy of the direction letter authorizing each of the 2000 A-1 Indenture Trustee, the 2000 A-1 Purchase Option Agent, the 2000 A-3 Indenture Trustee, the 2000

A Pass Through Trustee, the 2001 A-1 Indenture Trustee, the 2001 A-2 Indenture Trustee, the 2001 A-3 Indenture Trustee, the 2001 A-4 Indenture Trustee, the 2001 A-5 Indenture Trustee, the 2001 A-6 Indenture Trustee, the 2001 A-7 Indenture Trustee, and the 2001 A-8 Indenture Trustee to execute, deliver, and perform this Agreement;

(ii)    a copy of each approval and consent of any third Person, including Governmental Authorities (but excluding the orders granting the Pending Motions and the 9019 Order), which is required in connection with the execution, delivery, or performance by each Indenture Trustee, each Pass Through Trustee, each Purchase Option Agent, each Owner Trustee, and each Owner Participant of this Agreement, and each such approval or consent shall be in full force and effect.

All certificates and other documents to be delivered on the Agreement Effective Date by any Person, and all other matters to be accomplished prior to or on the Agreement Effective Date, shall be reasonably satisfactory in the judgment of New GM and its counsel.

SECTION 3.    Actions to Occur or Deemed to Occur upon the Agreement Effective Date. Upon the Agreement Effective Date:

(a)    Consent to Pending Motions. Each of the Indenture Trustees, each of the Owner Participants, each of the Owner Trustees, each of the Pass Through Trustees, and each of the Purchase Option Agents, and Old GM severally, shall be deemed to have consented to the relief requested in the Pending Motions and, to the extent that any such Person shall have filed any objections to the Pending Motions, such Person shall promptly file notices of withdrawal thereof.

(b)    Consent to PMCC/GM Letter Agreements; Effectiveness Thereof. Each of the Indenture Trustees, each of the Pass Through Trustees, and each of the Purchase Option Agents, severally, shall be deemed to have consented to the transactions contemplated by the PMCC/GM Letter Agreements.

(c)    Settlement Motion. MLC and MLCS shall file a motion pursuant to Fed. R. Bankr. P. 9019 (the "9019 Motion") seeking Bankruptcy Court approval of this Settlement Agreement.

(d)    Allowance of Indenture Trustee Claims. The proposed Order granting the 9019 Motion (the "9019 Order") shall provide for the allowance of pre-petition general unsecured rejection damages claims in favor of the Indenture Trustees with respect to each of the Rejected Lease Transactions as follows:

| Rejected Lease Transaction | Amount of Claim | Recipient |
|---|---|---|
| 2000 A-3 Participation Agreement and other 2000 A-3 Operative Documents | $44,412,510.92 | M&TT, as 2000 A-3 Indenture Trustee |
| 2001 A-1 Participation Agreement and other 2001 A-1 Operative Documents | $141,305,874.37 | Wells Fargo, as 2001 A-1 Indenture Trustee |
| 2001 A-2 Participation Agreement and other 2001 A-2 Operative Documents | $142,197,253.40 | Wells Fargo, as 2001 A-2 Indenture Trustee |
| 2001 A-6 Participation Agreement and other 2001 A-6 Operative Documents | $45,835,565.21 | Wells Fargo, as 2001 A-6 Indenture Trustee |
| 2001 A-7 Participation Agreement and other 2001 A-7 Operative Documents | $6,753,243.28 | Wells Fargo, as 2001 A-7 Indenture Trustee |
| 2001 A-8 Participation Agreement and other 2001 A-8 Operative Documents | $6,789,209.82 | Wells Fargo, as 2001 A-8 Indenture Trustee |

Each of the respective Owner Trustees and Owner Participants under each of the 2001 A-1 Operative Documents, the 2001 A-2 Operative Documents, the 2001 A-6 Operative Documents, the 2001 A-7 Operative Documents and the 2001 A-8 Operative Documents acknowledges, consents and agrees, and the 9019 Order shall provide, that except as provided in Section 3(e) hereof, any and all claims against MLC for damages for or on account of the rejection and/or breach by MLC of such Operative Documents and any and all related claims have been, and are hereby, assigned, outright and unconditionally, as part of the transactions contemplated hereby to the relevant Indenture Trustee for the sole benefit of the relevant Noteholders and the relevant Certificateholders and the amount of such claims shall not be reduced or otherwise affected by reason of any contract or other agreement between the relevant Owner Participant, the relevant Owner Trustee, MLC or any other person; provided that, (i) with respect to any Rejected Lease Transaction, upon the final payment in full in cash of all amounts owing to the relevant Indenture Trustee, the relevant Noteholders and the relevant Certificateholders under the relevant Operative Documents (including the payment in full of all of the relevant Equipment Notes, including all principal, interest (including default interest), Make-Whole Premium (the payment of which shall be secured by the claims allowed in this Section 3(d) but shall not be an obligation of the respective Owner Trustee) and other amounts), the relevant Indenture Trustee shall pay any remaining amounts (if any) to the relevant Owner Trustee for distribution pursuant to the terms of the relevant Operative Documents and (ii) no consent or approval of any Owner Trustee or any Owner Participant shall be required for any Indenture Trustee (or any Noteholder or Certificateholder) to take any action in respect of the aforementioned assigned claims.

(e)    <u>Allowance of Owner Participant Claims</u>. The 9019 Order shall provide for the allowance of pre-petition general unsecured tax indemnity claims in favor of General Foods No. 2 as Owner Participant with respect to the Rejected Lease Transactions specified below as follows:

| Rejected Lease Transaction | Amount of Claim | Recipient |
|---|---|---|
| 2001 A-1 Participation Agreement and Tax Indemnity Agreement | $22,400,000 | General Foods No. 2, as 2001 A-1 Owner Participant |
| 2001 A-7 Participation Agreement and Tax Indemnity Agreement | $1,600,000 | General Foods No. 2, as 2001 A-7 Owner Participant |

Each of the relevant Owner Trustees and the relevant Indenture Trustees acknowledges, consents and agrees, and the 9019 Order shall provide, that the claims specified in this <u>Section 3(e)</u> against MLC for damages constitute "Excepted Property," as defined in the 2001 A-1 Participation Agreement and the 2001 A-7 Participation Agreement, respectively. The allowance of claims pursuant to this <u>Section 3(e)</u>, or the allowance of a tax indemnity claim, if any, in connection with the 2000 A-3 Participation Agreement and other 2000 A-3 Operative Documents, shall not diminish or impair the claims allowed pursuant to <u>Section 3(d)</u>.

(f)    <u>Allowance of Administrative Claims for Rejected Lease Transactions</u>. The 9019 Order shall provide that in full and final settlement of any obligation of (x) MLC, MLCS or any of their Affiliates or (y) New GM or any of its Affiliates to make payment in connection with any administrative or other claim arising under Section 365, 503 or 507 of the Bankruptcy Code relating to the use or possession of the "Equipment" subject to any of the Rejected Lease Transactions during the period from the Petition Date to the Closing Date, the Indenture Trustees identified below shall have the allowed administrative claims specified below (collectively, the "<u>Administrative Expense Claims</u>"), which shall be paid on the Closing Date by New GM (to the extent, with respect to the Leveraged Lease Transactions identified as GM 2001 A-2, GM 2001 A-6 and GM 2001 A-8, such payments have not been previously made), which payments shall be applied in accordance with the respective "Operative Documents" under and as defined in the underlying Leveraged Lease Transactions:

| Rejected Lease Transaction | Amount of Payment | Recipient |
|---|---|---|
| 2000 A-3 Participation Agreement and other 2000 A-3 Operative Documents | $334,425 | M&TT, as 2000 A-3 Indenture Trustee |
| 2001 A-1 Participation Agreement and other 2001 A-1 Operative Documents | $17,459 | Wells Fargo, as 2001 A-1 Indenture Trustee |
| 2001 A-2 Participation Agreement and other 2001 A-2 Operative Documents | $13,720 | Wells Fargo, as 2001 A-2 Indenture Trustee |
| 2001 A-6 Participation Agreement and other 2001 A-6 Operative Documents | $242,198 | Wells Fargo, as 2001 A-6 Indenture Trustee |
| 2001 A-7 Participation Agreement and other 2001 A-7 Operative Documents | $111,665 | Wells Fargo, as 2001 A-7 Indenture Trustee |
| 2001 A-8 Participation Agreement and other 2001 A-8 Operative Documents | $276,445 | Wells Fargo, as 2001 A-8 Indenture Trustee |

(g)    Consent to Asset Purchase Agreements.  MLC shall be deemed to have consented to the transactions contemplated by the Asset Purchase Agreements.

SECTION 4.  Conditions to Closing Date.  The closing shall occur on the date (the "Closing Date") on which the actions described or referred to in Section 5 occur, and shall be on or as soon as reasonably practicable after the date when the last of the following conditions precedent shall have been satisfied or waived in accordance with this Agreement:

(a)    9019 Order.  The Bankruptcy Court shall have entered the 9019 Order approving this Settlement Agreement and the transactions contemplated hereby, and such order shall have become final and non-appealable; provided, however that the parties hereto may elect, by mutual written consent, to waive the condition that the 9019 Order have become final and non-appealable.

(b)    Assumption and Assignment of Assumed Lease Transactions/Rejection of Rejected Lease Transactions.  The relief requested in the Pending Motions shall have been granted by final and non-appealable orders of the Bankruptcy Court; provided, however that the parties hereto may elect, by mutual written consent, to waive the condition that the orders granting the Pending Motions have become final and non-appealable.

(c)    Satisfaction of Asset Purchase Agreement Conditions.  Each of the conditions precedent to the "Closing," under and as defined in each Asset Purchase Agreement, shall have been satisfied or waived.

SECTION 5.  Actions to Occur or Deemed to Occur upon the Closing Date.  Upon the Closing Date:

(a)    Payment of Administrative Claims for Rejected Lease Transactions.  New GM shall pay the Administrative Expense Claims.

(b)    Purchase of Rejected Equipment.  Subject to the satisfaction or waiver of the conditions precedent to the "Closing," under and as defined in each of the Asset Purchase Agreements, the respective parties thereto shall consummate the "Closing" (as defined therein) under each of the Asset Purchase Agreements.  Notwithstanding anything to the contrary under this Agreement, any of the Asset Purchase Agreements, or any of the Operative Documents, any proceeds from the sale of any purchased assets pursuant to each Asset Purchase Agreement shall be distributed to the relevant Indenture Trustee (for further distribution to its respective Noteholders and/or Certificateholders) under the 2000A-3 Operative Documents, the 2001A-1 Operative Documents, the 2001A-2 Operative Documents, the 2001A-6 Operative Documents, the 2001A-7 Operative Documents and the 2001A-8 Operative Documents as set forth in the summary of distribution of settlement payments table attached hereto as Exhibit A.  The parties hereto do not object to such distribution.

(c)    Payment of Fees.  On the Closing Date, but subject to New GM's receipt of an invoice therefor, and such additional documentation as it may reasonably request in support thereof, New GM shall reimburse each Indenture Trustee and each Pass Through Trustee for all of their reasonable costs and out-of-pocket expenses (including legal, appraisal, accounting and investment banking fees and expenses) incurred in connection with or related to this Settlement Agreement, the transactions contemplated hereby, the Assumed Lease Transactions, the Rejected Lease Transactions, the Asset Purchase Agreements, the 9019 Motion, and the Pending Motions in an amount for all costs and expenses not to exceed $2,000,000 in the aggregate (without inclusion of any fees and expenses payable to the 1991 A-3 Indenture Trustee or the 1991 A-3 Pass Through Trustee).  For avoidance of doubt, any obligation New GM may have to reimburse such expenses under or in connection with the Pending Motions, the 2000 A-2 Settlement Agreement, the Comerica Settlement Agreement, if any, any Operative Document, or any other document, instrument, order or agreement shall be integrated into its obligation hereunder and all of such obligations, in the aggregate, shall not exceed $2,000,000 (without inclusion of any fees and expenses payable to the 1991 A-3 Indenture Trustee or the 1991 A-3 Pass Through Trustee).  The Indenture Trustees and the Pass Through Trustees (excluding the 1991 A-3 Indenture Trustee and the 1991 A-3 Pass Through Trustee) hereby acknowledge that $1 million of such $2 million aggregate cap has already been funded in connection with the 2000 A-2 Settlement Agreement such that New GM's additional funding obligation under this paragraph shall not exceed $1 million.  Notwithstanding anything herein or in any of the Operative Documents to the contrary, the Indenture Trustees shall have no claims against the respective Owner Trustees for any such costs and expenses.  The immediately preceding sentence, however, shall not impair any obligation of PMCC under the provisions of any of the PMCC/GM Letter Agreements.

(d)    Payment of Cure Amounts.  New GM shall pay the Cure Amounts (as defined in the Pending Motions) in connection with each Leveraged Lease Transaction assumed and assigned pursuant to the Pending Motions.

(e)    GECC Omnibus Agreement. The GECC Omnibus Agreement shall be in full force and effect and each of the conditions precedent to the "Closing", under and defined in the GECC Omnibus Agreement shall have been satisfied or waived in accordance with the terms thereof. The 2001 A-4 Indenture Trustee hereby consents to the assumption and assignment of the Amended A-4 Lease (as defined in the GECC Omnibus Agreement).

(f)    Assumed Lease Transactions/Termination of Defaults. Upon satisfaction of the condition set forth in Section 5(d) hereof, with respect to each of the Assumed Lease Transactions, from and after the Closing Date, each Indenture Default, Indenture Event of Default, and Event of Default (each, as defined in the respective Participation Agreement), or event that with the giving of notice or passage of time or both would mature into an Event of Default, existing on or prior to the Closing Date, shall cease to be continuing. Consequently, on the Closing Date any right of an Indenture Trustee or any holder of a promissory note issued under the respective Indenture (as defined in the respective Participation Agreement) to accelerate the repayment of such promissory note, to exercise any other remedy under such Indenture or promissory note, or to demand payment of a "Make-Whole Premium" (as defined in the respective Indenture) or any other premium, penalty, breakage, or similar amount, from the Owner Trustee, MLC, MLCS, New GM, or any other Person, in any case as a result of any such Indenture Default, Indenture Event of Default, Event of Default or other event existing prior to the Closing Date shall irrevocably terminate.

(g)    Payment of GECC Equity Rent. The 2001 A-4 Indenture Trustee shall release to the 2001 A-4 Owner Trustee the portion of payments made by New GM to the 2001 A-4 Indenture Trustee for post-petition rent obligations in the amount of $709,118.26 (the "GECC Equity Rent") held by the 2001 A-4 Indenture Trustee pursuant to Section 3.2 of that certain Trust Indenture And Security Agreement (GM 2001A-4), dated as of December 18, 2001, between the 2001 A-4 Owner Trustee, as successor in interest to State Street Bank and Trust Company of Connecticut, National Association, not in its individual capacity but solely as owner trustee under the Trust Agreement, dated as of December 18, 2001, between the 2001 A-4 Owner Trustee and GECC, as Owner Participant, (the "2001 A-4 Trust Agreement") and the 2001 A-4 Indenture Trustee. Upon receipt of funds described in the immediately preceding sentence, the 2001 A-4 Owner Trustee shall distribute such funds in accordance with the terms and conditions of the 2001 A-4 Trust Agreement.

SECTION 6. New GM's Commitment to Bid on 2000 A-3 Equipment. For a period commencing with the Closing Date and ending on the second anniversary thereof, New GM absolutely and unconditionally commits that it will (i) upon the written concurrence of all other parties signatory thereto, enter into a settlement agreement (the "Comerica Settlement Agreement") and related asset purchase agreement in exactly the forms attached hereto as Exhibits B and C (or with such variances from such forms as are acceptable to New GM in its sole and absolute discretion), with the 2000 A-3 Owner Trustee, Comerica and M&TT, as 2000 A-3 Indenture Trustee and 2000A Pass Through Trustee, to purchase all of the "Equipment" subject to the "Indenture" referred to in the 2000 A-3 Participation Agreement for a purchase price of $6.2 million, or (ii) bid not less than $6.2 million at any commercially reasonable foreclosure sale conducted on an "AS-IS-WHERE-IS" basis, without recourse, representation or warranty (other than any representation or warranty customary in a public foreclosure sale for

equipment similar to the "Equipment" (as defined in the 2000 Rejection Motion)) by auction by or on behalf of M&TT, as 2000 A-3 Indenture Trustee, of not less than all of the "Equipment" subject to the "Indenture" referred to in the 2000 A-3 Participation Agreement.

SECTION 7.    Releases.

(a)    Releases By MLC and MLCS.  Effective from and as of, and subject to the occurrence of, the Closing Date, and except as otherwise expressly provided herein, each of MLC and MLCS, on behalf of itself, its Affiliates, and their respective successors and assigns (each, a "MLC Releasor" and collectively, the "MLC Releasors" provided that in no event shall New GM be construed as an MLC Releasor), forever releases, remises and discharges (w) New GM, its Affiliates, and their respective successors and assigns, (x) the Trustees, solely in their capacities as such, (y) the Indenture Trustees and the Pass Through Trustees on behalf of each Certificateholder and Noteholder who has directed the Indenture Trustees and the Pass Through Trustees in writing to execute this Settlement Agreement and authorized the Indenture Trustees and the Pass Through Trustees to grant the releases granted under Section 7(c) hereof, and (z) the Owner Participants (excluding GECC), solely in their capacities as such (each, a "MLC Releasee" and collectively, the "MLC Releasees"), from any and all actions, causes of action, suits at law or in equity, complaints, claims, counterclaims, cross-claims, obligations, demands, dues, debts, liabilities, costs, expenses and damages (including without limitation, environmental damage claims and claims based upon environmental laws), in each case relating to the Assumed Lease Transactions or the Rejected Lease Transactions, the "Equipment" (as defined therein) thereunder, and the relief requested in the Pending Motions (collectively, the "MLC Claims"), and hereby agrees and covenants not to assert against any of the MLC Releasees any MLC Claims that any of the MLC Releasors ever had, may have or hereafter may have.

(b)    Releases By New GM.  Effective from and as of, and subject to the occurrence of, the Closing Date, and except as otherwise expressly provided herein, New GM, on behalf of itself, its Affiliates, and their respective successors and assigns (each, a "New GM Releasor" and collectively, the "New GM Releasors" provided that in no event shall any Debtor be construed as a New GM Releasor), forever releases, remises and discharges (w) MLC, its Affiliates, and their respective successors and assigns, (x) the Trustees, solely in their capacities as such, (y) the Indenture Trustees and the Pass Through Trustees on behalf of each Certificateholder and Noteholder who has directed the Indenture Trustees and the Pass Through Trustees in writing to execute this Settlement Agreement and authorized the Indenture Trustees and the Pass Through Trustees to grant the releases granted under Section 7(c) hereof, and (z) the Owner Participants (excluding GECC), solely in their capacities as such (each, a "New GM Releasee" and collectively, the "New GM Releasees"), from any and all actions, causes of action, suits at law or in equity, complaints, claims, counterclaims, cross-claims, obligations, demands, dues, debts, liabilities, costs, expenses and damages (including without limitation, environmental damage claims and claims based upon environmental laws), in each case relating to the Rejected Lease Transactions, the "Equipment" (as defined therein) thereunder, and the relief requested in the Pending Motions (collectively, the "New GM Claims"), and hereby agrees and covenants not to assert against any of the New GM Releasees any New GM Claims that any of the New GM Releasors ever had, may have or hereafter may have.

(c)    <u>Releases By the Trustees</u>. Effective from and as of, and subject to the occurrence of, the Closing Date, and except as otherwise expressly provided herein, (m) each Trustee, in its capacity as such, on behalf of itself in such capacity, and its respective successors and assigns in such capacity, and (n) the Indenture Trustees and the Pass Through Trustees on behalf of each Certificateholder and Noteholder who has directed the Indenture Trustees and the Pass Through Trustees in writing to execute this Settlement Agreement and authorized the Indenture Trustees and the Pass Through Trustees to grant the releases granted under this <u>Section 7(c)</u> (each, a "<u>Trustee Releasor</u>" and collectively, the "<u>Trustee Releasors</u>"), forever releases, remises and discharges (w) MLC, its Affiliates, and their respective successors and assigns, (x) New GM, its Affiliates, and their respective successors and assigns, (y) each other Trustee, solely in its respective capacity as such, and (z) the Owner Participants, solely in their capacities as such (each, a "<u>Trustee Releasee</u>" and collectively, the "<u>Trustee Releasees</u>"), from any and all actions, causes of action, suits at law or in equity, complaints, claims, counterclaims, cross-claims, obligations, demands, dues, debts, liabilities, costs, expenses and damages (including without limitation, environmental damage claims and claims based upon environmental laws), in each case relating to the Rejected Lease Transactions, the "Equipment" (as defined therein) thereunder, and the relief requested in the Pending Motions (collectively, the "<u>Trustee Claims</u>"), and hereby agrees and covenants not to assert against any of the Trustee Releasees any Trustee Claims that any of the Trustee Releasors ever had, may have or hereafter may have. The 2001 A-1 Indenture Trustee represents and warrants that with respect to the terms of clause (n) of this <u>Section 7(c)</u> and any other provision herein that similarly refers to directing Noteholders, the Noteholders who have directed such Indenture Trustee to enter into this Settlement Agreement represent not less than eighty percent (80%) of the outstanding principal balance of the "Notes" issued under the terms of the 2001 A-1 Participation Agreement. The 2001 A-2 Indenture Trustee represents and warrants that with respect to the terms of clause (n) of this <u>Section 7(c)</u> and any other provision herein that similarly refers to directing Noteholders, the Noteholders who have directed such Indenture Trustee to enter into this Settlement Agreement represent not less than eighty percent (80%) of the outstanding principal balance of the "Notes" issued under the terms of the 2001 A-2 Participation Agreement. The 2001 A-6 Indenture Trustee represents and warrants that with respect to the terms of clause (n) of this <u>Section 7(c)</u> and any other provision herein that similarly refers to directing Noteholders, the Noteholders who have directed such Indenture Trustee to enter into this Settlement Agreement represent not less than seventy percent (70%) of the outstanding principal balance of the "Notes" issued under the terms of the 2001 A-6 Participation Agreement. The 2001 A-7 Indenture Trustee represents and warrants that with respect to the terms of clause (n) of this <u>Section 7(c)</u> and any other provision herein that similarly refers to directing Noteholders, the Noteholders who have directed such Indenture Trustee to enter into this Settlement Agreement represent not less than seventy percent (70%) of the outstanding principal balance of the "Notes" issued under the terms of the 2001 A-7 Participation Agreement. The 2001 A-8 Indenture Trustee represents and warrants that with respect to the terms of clause (n) of this <u>Section 7(c)</u> and any other provision herein that similarly refers to directing Noteholders, the Noteholders who have directed such Indenture Trustee to enter into this Settlement Agreement represent not less than seventy percent (70%) of the outstanding principal balance of the "Notes" issued under the terms of the 2001 A-8 Participation Agreement.

(d)    Releases By the Owner Participants (excluding GECC). Effective from and as of, and subject to the occurrence of, the Closing Date, and except as otherwise expressly provided herein, each Owner Participant (excluding GECC), in its capacity as such, on behalf of itself in such capacity, and its respective successors and assigns in such capacity (each, an "OP Releasor" and collectively, the "OP Releasors"), forever releases, remises and discharges (w) MLC, its Affiliates, and their respective successors and assigns, (x) New GM, its Affiliates, and their respective successors and assigns, (y) the Indenture Trustees and the Pass Through Trustees on behalf of each Certificateholder and Noteholder who has directed the Indenture Trustees and the Pass Through Trustees in writing to execute this Settlement Agreement and authorized the Indenture Trustees and the Pass Through Trustees to grant the releases granted under Section 7(c) hereof, and (z) each Trustee, solely in its respective capacity as such (each, an "OP Releasee" and collectively, the "OP Releasees"), from any and all actions, causes of action, suits at law or in equity, complaints, claims, counterclaims, cross-claims, obligations, demands, dues, debts, liabilities, costs, expenses and damages (including without limitation, environmental damage claims and claims based upon environmental laws), in each case relating to the Rejected Lease Transactions, the "Equipment" (as defined therein) thereunder, and the relief requested in the Pending Motions (collectively, the "OP Claims"), and hereby agrees and covenants not to assert any of the OP Releasees any OP Claims that any of the OP Releasors ever had, may have or hereafter may have.

(e)    Releases By GECC. Effective from and as of, and subject to the occurrence of, the Closing Date, and except as otherwise expressly provided herein, GECC, in its capacity as Owner Participant, on behalf of itself in such capacity, and its respective successors and assigns in such capacity (each, an "GECC Releasor" and collectively, the "GECC Releasors"), forever releases, remises and discharges (y) the Indenture Trustees and the Pass Through Trustees on behalf of each Certificateholder and Noteholder who has directed the Indenture Trustees and the Pass Through Trustees in writing to execute this Settlement Agreement and authorized the Indenture Trustees and the Pass Through Trustees to grant the releases granted under Section 7(c) hereof, and (z) each Trustee, solely in its respective capacity as such (each, an "GECC Releasee" and collectively, the "GECC Releasees"), from any and all actions, causes of action, suits at law or in equity, complaints, claims, counterclaims, cross-claims, obligations, demands, dues, debts, liabilities, costs, expenses and damages (including without limitation, environmental damage claims and claims based upon environmental laws), in each case relating to the Rejected Lease Transactions, the "Equipment" (as defined therein) thereunder, and the relief requested in the Pending Motions (collectively, the "GECC Claims"), and hereby agrees and covenants not to assert against any of the GECC Releasees any GECC Claims that any of the GECC Releasors ever had, may have or hereafter may have.

(f)    Releases of MLC relating to Assumed Lease Transactions. For avoidance of doubt, from and as of, and subject to the occurrence of, the Closing Date, each New GM Releasor, Trustee Releasor, and OP Releasor (collectively, the "Assumed Lease Releasors"), forever releases, remises and discharges MLC, its Affiliates, and their respective successors and assigns (but expressly excluding New GM), from any and all actions, causes of action, suits at law or in equity, complaints, claims, counterclaims, cross-claims, obligations, demands, dues, debts, liabilities, costs, expenses and damages (including without limitation, environmental damage claims and claims based upon environmental laws), in each case relating to the Assumed

Lease Transactions (collectively, the "Assumed Lease Claims") and hereby agrees and covenants not to assert against MLC, its Affiliates, or their respective successors and assigns (but expressly excluding New GM), any Assumed Lease Claims that any of the Assumed Lease Releasors ever had, may have or hereafter may have.

(g)    Limitation Of Releases. Nothing in this Section 7 shall be construed to release (a) any party hereto or any other Person from any obligation arising under this Agreement, any Asset Purchase Agreement, any PMCC/GM Letter Agreement, or the GECC Omnibus Agreement, (b) any party or other Person, other than MLC, from any obligation first arising after the Closing Date and arising under or in connection with the Assumed Lease Transactions, (c) any claims that are unrelated to the Rejected Lease Transactions, the Assumed Lease Transactions, the "Equipment" thereunder or the relief requested in the Pending Motions, or (d) any claims of any Owner Trustee against any Owner Participant for indemnification or any other obligation under the respective Operative Documents. In the event that any release of, or covenant not to sue in respect of, any party or other Person by any other party is prohibited by or unenforceable or invalid under Applicable Law, the corresponding release of, or covenant not to sue in respect of, such other party or Person by such party shall be deemed ineffective to the extent of such prohibition, unenforceability or invalidity.

(h)    Preservation of Releases in GECC Omnibus Agreement. Notwithstanding any limitations on the releases included in this Section 7, nothing herein shall limit, abrogate or impair, expand, or otherwise alter any releases given by any Person in the GECC Omnibus Agreement entered into in connection herewith.

SECTION 8.    Representations and Warranties. Each party hereto, severally and for itself alone (and, in the case of each Trustee, in its respective individual and trust capacities to the extent applicable), hereby represents and warrants as of the Agreement Effective Date and as of the Closing Date that, subject to the approval of this Settlement Agreement by the Bankruptcy Court:

(a)    it has all requisite power and authority and legal right to execute, deliver, and perform its obligations under this Agreement, to consummate the transactions contemplated by this Agreement and to carry out and perform its obligations under this Agreement;

(b)    its execution, delivery, and performance of this Agreement (i) have been duly authorized by all necessary action, (ii) do not violate any Applicable Law, (iii) do not require the consent or approval of, the giving notice to, or the registration with, or the taking of any other action with respect to, any Governmental Authority or any third Person (except such as shall have been duly obtained or given and are in full force and effect), and (iv) do not contravene or constitute a default under its organizational documents or any indenture, mortgage, contract or agreement to which it is party or by which it is bound, or any judgment or order binding on it;

(c)    no action or proceeding has been instituted by it, and it is not aware of (i) any action or proceeding that has been instituted by any other Person, or (ii) any action, proceeding or Governmental Action that is threatened before any Governmental Authority, or (iii) any order, judgment or decree that has been issued or proposed to be issued, at the

Agreement Effective Date or the Closing Date, as the case may be, to set aside, restrain, enjoin or prevent the completion and consummation of the transactions contemplated by this Agreement; and

(d)    this Agreement constitutes the legal, valid and binding obligation of such party and is enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and by general principles of equity.

(e)    in the case of each Indenture Trustee and Pass Through Trustee, such party is and remains the duly appointed Indenture Trustee or Pass Through Trustee, as the case may be, and has been duly instructed by the applicable Noteholders or Certificateholders, as the case may be, to enter into and perform this Agreement.

SECTION 9.  Tolling.  From Agreement Effective Date through the earlier of (x) the Closing Date and (y) March 15, 2010 (or such later date as may be agreed to in writing by all of the Indenture Trustees) the running of the 180-day periods set forth in Sections 8.3(a) of the "Indenture" (as defined in each of the 2000 Leveraged Lease Transactions identified as GM 2000 A-1 and GM 2000 A-3 and the 2001 Leveraged Lease Transactions) shall be tolled.  In the event that the Closing Date does not occur on or before March 15, 2010 (or such later date), all obligations of the parties hereto shall terminate and be of no force and effect.

SECTION 10. Payment of Fees.  Except as expressly provided in this Settlement Agreement, including Section 5(c) hereof, each of the parties hereto will bear its own costs and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with this Settlement Agreement, the transactions contemplated hereby, the Assumed Lease Transactions, the Rejected Lease Transactions, the 9019 Motion, and the Pending Motions, whether or not such transactions are consummated.  No party hereto may make any offset against amounts due to another party pursuant to this Agreement or otherwise.  The provisions of this section are not intended to derogate from the provisions of any PMCC/GM Letter Agreement.

SECTION 11. Notices.  All notices, consents, approvals and requests required or permitted hereunder (each, a "Notice") shall be given in writing and shall be effective for all purposes only if hand delivered with receipt acknowledged, or sent by a nationally recognized overnight delivery service (such as FedEx), in each case addressed as follows (or to such other address or person as a party shall designate from time to time by Notice to the other parties):

If to New GM, to:

General Motors LLC
New York Treasurer's Office
767 Fifth Avenue, 14th Floor,
New York, NY 1015
Attention: Director, Global Funding & Cash Management
Facsimile: (212) 418-6419

with a copy to

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
Attention:  Michael S. Terrien
Fax (312) 923-2728
mterrien@jenner.com

If to MLC, to:

Motors Liquidation Company
500 Renaissance Center
Suite 1400
Detroit, Michigan 48265-3000
Attention:  David Head

with a copy to

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Evan S. Lederman
Facsimile:  (212) 310-8007

If to MLCS, to:

MLCS, LLC
500 Renaissance Center
Suite 1400
Detroit, Michigan 48265-3000
Attention:  David Head

with a copy to

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Evan S. Lederman
Facsimile:  (212) 310-8007

If to SC Bond Sub, to:

Saturn County Bond Corporation
c/o General Motors LLC
New York Treasurer's Office
767 Fifth Avenue, 14th Floor,
New York, NY 1015
Attention: Director, Global Funding & Cash Management
Facsimile: (212) 418-6419

with a copy to

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
Attention:  Michael S. Terrien
Fax (312) 923-2728
mterrien@jenner.com

If to HNB, to:

HNB Investment Corp
c/o Philip Morris Capital Corporation
225 High Ridge Road
Suite 300 West
Stamford, Connecticut 06905
Attention: Vice President -- Asset and Portfolio Management
Fax:  (203) 708-8297

with a copy to

HNB Investment Corp.
c/o Altria Client Services Inc.
6603 W. Broad St.
P.O. Box 85088
Richmond, Virginia 23285
Attention: C. Anthony Reale, Senior Assistant General Counsel
Fax:  (914) 272-4384

If to General Foods, to:

General Foods Credit Corporation
c/o Philip Morris Capital Corporation
225 High Ridge Road
Suite 300 West
Stamford, Connecticut 06905
Attention: Vice President--Asset & Portfolio Management
Fax:  (203) 708-8297

with a copy to

General Foods Credit Corporation
c/o Altria Client Services Inc.
6603 W. Broad St.
P.O. Box 85088
Richmond, Virginia 23285
Attention: C. Anthony Reale, Senior Assistant General Counsel
Fax:  (914) 272-4384

If to General Foods No. 2, to:

General Foods Credit Investors No. 2 Corporation
c/o Philip Morris Capital Corporation
225 High Ridge Road
Suite 300 West
Stamford, Connecticut 06905
Attention: Vice President--Asset & Portfolio Management
Fax:  (203) 708-8297

with a copy to

General Foods Credit Investors No. 2 Corporation
c/o Altria Client Services Inc.
6603 W. Broad St.
P.O. Box 85088
Richmond, Virginia 23285
Attention: C. Anthony Reale, Senior Assistant General Counsel
Fax:  (914) 272-4384

If to PMCC, to:

Philip-Morris Capital Corporation
225 High Ridge Road
Suite 300 West
Stamford, Connecticut 06905
Attention: Vice President--Asset & Portfolio Management
Fax:  (203) 708-8297

with a copy to

Philip-Morris Capital Corporation
c/o Altria Client Services Inc.
6603 W. Broad St.
P.O. Box 85088
Richmond, Virginia 23285
Attention: C. Anthony Reale, Senior Assistant General Counsel
Fax:  (914) 272-4384

If to GECC, to:

General Electric Capital Corporation
3 Capital Drive
Eden Prairie, MN 55344
Attention:  Kurt Bjorklund
Fax:  (952) 828-2742

with a copy to

Latham & Watkins LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL  60606-6401
Attention:  Douglas Bacon
Fax:  (312) 993-9767

If to U.S. Bank, as 1991 A-3 Owner Trustee, 2000 A-1 Owner Trustee, 2001 A-1 Owner Trustee, 2001 A-2 Owner Trustee, 2001 A-3 Owner Trustee, 2001 A-4 Owner Trustee, 2001 A-5 Owner Trustee, 2001 A-6 Owner Trustee, 2001 A-7 Owner Trustee, and 2001 A-8 Owner Trustee, to:

U.S. Bank National Association
Corporate Trust Services
One Federal Street - 3rd Floor
Boston, Massachusetts 02110
Attention: Deborah Ibrahim
Fax: (617) 603-6640

with a copy to

Edwards Angell Palmer & Dodge LLP
111 Huntington Avenue
Boston, Massachusetts 02119
Attn: Richard Hiersteiner, Esq.
Fax: (617) 227-4420

If to BNY Mellon, in its individual capacity or as 1991 A-3 Indenture Trustee, 1991 A-3 Pass Through Trustee, or 1991 A-3 Purchase Option Agent, to:

The Bank of New York Mellon
101 Barclay Street - 8W
New York, New York 10286
Attn: Martin N. Feig, Vice President
Fax: (732) 667-4756

with a copy to

Emmet, Marvin & Martin, LLP
120 Broadway
New York, New York 10271
Attn: Edward P. Zujkowski
Fax: (212) 238-3021

If to M&TT, in its individual capacity or as, 2000 A-1 Indenture Trustee, 2000 A-1 Purchase Option Agent, 2000 A-3 Indenture Trustee, or 2000 A Pass Through Trustee, to:

Manufacturers and Traders Trust Company
25 South Charles Street
16th Floor
Mail Code: MD2-CS58
Baltimore, MD 21201
Attention:  Dante Monakil
Facsimile No.:  (302) 651-1576

with a copy to

Drinker Biddle & Reath LLP
1500 K Street, N.W.
Washington, District of Columbia  20005-1209
Attention:  Kristin K. Going
Facsimile No.:  (202) 842-8465

If to Wells Fargo Bank Northwest, National Association, in its individual capacity or and as 2001 A-1 Indenture Trustee, 2001 A-2 Indenture Trustee, 2001 A-3 Indenture Trustee, 2001 A-4 Indenture Trustee, 2001 A-5 Indenture Trustee, 2001 A-6 Indenture Trustee, 2001 A-7 Indenture Trustee, or 2001 A-8 Indenture Trustee, to:

Wells Fargo Bank Northwest, National Association
Corporate Trust Services
MAC: U1228-120
299 S. Main Street, 12th Floor
Salt Lake City, UT 84111
Attention:  Marcus Foulger
Facsimile No.: (801) 246-5053

with a copy to

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005-1413
Attention:  Tyson Lomazow
Facsimile No.:  (212) 822-5367

SECTION 12. Miscellaneous.

(a)    Cooperation, Further Assurances.  From and after the Agreement Effective Date, each of the parties hereto will use commercially reasonable efforts to take or cause to be

taken all action and to do or cause to be done, as soon as possible, all things necessary, proper or advisable (subject to any Applicable Laws) to cause the Closing Date to occur and to consummate the transactions contemplated by this Agreement, including the negotiation, execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement or any other instrument or agreement referred to herein to which it is a party. None of the parties hereto will, without the prior written consent of the other parties, take or fail to take, or permit its respective Affiliates to take or fail to take, any action, which would reasonably be expected to prevent or materially impede, interfere with or delay the consummation, as soon as practicable, of the transactions contemplated by this Agreement. Without limiting the foregoing, (i) each of the parties hereto will use commercially reasonable efforts to take or cause to be taken all action, including by giving consent, and to do or cause to be done, as soon as possible, all things necessary, proper or advisable in order to effect the rejection of the Rejected Lease Transactions and the assumption and assignment of the Assumed Lease Transactions by MLC pursuant to Section 365 of the Bankruptcy Code, and (ii) prior to the Closing Date, the parties hereto will use commercially reasonable efforts to give all notices required to be given and to obtain all material waivers, consents, approvals or authorizations of any third Persons that are required in connection with the transactions contemplated by this Agreement. Nothing contained in this Agreement will require any party hereto to pay any consideration to any other Person from whom any such consents, waivers, approvals or authorizations are requested.

(b)    <u>Entire Agreement</u>. This Settlement Agreement, the Asset Purchase Agreements, the 1991 PMCC/GM Letter Agreement, the 2000 PMCC/GM Letter Agreement, the 2001 PMCC/GM Letter Agreements, and the GECC Omnibus Agreement shall constitute the entire agreement among the parties with respect to the 1991 A-3 Leveraged Lease Transaction, the 2000 Leveraged Lease Transactions identified as GM 2000 A-1 and GM 2000 A-3, and the 2001 Leveraged Lease Transactions, and shall supersede all prior negotiations, agreements, arrangements and understandings, both oral and written, between the parties with respect to such subject matter. Nothing herein shall constitute or be construed as an admission by any party hereto as to whether (x) the 2000 Leveraged Lease Transactions are integrated or separate transactions, or (y) the 2001 Leveraged Lease Transactions are integrated or separate transactions.

(c)    <u>Amendment</u>. This Settlement Agreement may not be amended or modified in any respect, except by the mutual written agreement of the parties.

(d)    <u>No Third Party Beneficiary</u>. Except for the releases granted in <u>Section 7</u> hereof to the Indenture Trustees and the Pass Through Trustees on behalf of each Certificateholder and Noteholder who has directed the Indenture Trustees and the Pass Through Trustees in writing to execute this Settlement Agreement and authorized the Indenture Trustees and the Pass Through Trustees to grant the releases granted under <u>Section 7(c)</u> hereof, nothing in this Settlement Agreement shall be construed to confer upon or give any Person any rights or remedies under or by reason of this Settlement Agreement, other than the parties, and the beneficiaries of the releases set forth herein, and each of their respective successors and assigns.

(e)   <u>Waivers and Remedies/Survival</u>.   The waiver by any party of another party's prompt and complete performance, or breach or violation, of any provision of this Settlement Agreement, shall not operate nor be construed as a waiver of any subsequent breach or violation, and the waiver by any party of the right to exercise any right or remedy that it may possess hereunder shall not operate nor be construed as a bar to the exercise of any right or remedy by such party upon the occurrence of any subsequent breach or violation.   The representations and warranties, covenants or agreements of the parties hereto contained in this Agreement will survive the Closing Date indefinitely, except that those covenants and agreements which by their terms are to be performed or observed for shorter periods will survive until the expiration of such shorter period.

(f)   <u>Governing Law</u>.   The laws of the State of New York, without regard to the conflicts of laws rules thereof, shall govern the rights and obligations of the parties under this Settlement Agreement, as well as the interpretation and construction and enforceability thereof, and any issues relating to the transactions contemplated herein.

(g)   <u>Compromise and Settlement</u>.   It is expressly understood and agreed that this Settlement Agreement, the Asset Purchase Agreements, the PMCC/GM Letter Agreements, and the GECC Omnibus Agreement, any negotiations or proceedings in connection herewith or therewith or any prior drafts hereof or thereof do not constitute and may not be construed as, or deemed to be, evidence or an admission or concession of any validity or lack of merit whatsoever on the part of any party as to any claim or defense such party has asserted, or has the right to assert prior to the Closing Date, against another party.   The act of entering into or carrying out this Settlement Agreement, the Asset Purchase Agreements, the PMCC/GM Letter Agreements, and the GECC Omnibus Agreement, any negotiations or proceedings related hereto or thereto, or any prior drafts hereof or thereof, shall not be used, offered or received into evidence in any action or proceeding in any court, administrative agency or other tribunal for any purpose whatsoever other than to enforce the provisions of this Settlement Agreement, the Asset Purchase Agreements, the PMCC/GM Letter Agreements, or the GECC Omnibus Agreement.

(h)   <u>Severability</u>.   If any paragraph, section, sentence, clause or phrase contained in this Settlement Agreement shall become illegal, null or void or against public policy, for any reason, or shall be held by any court of competent jurisdiction to be illegal, null or void or against public policy, the remaining paragraphs, sections, sentences, clauses or phrases, as the case may be, contained in this Settlement Agreement, shall not be affected thereby to the extent that the intent of the parties can be carried out in the absence thereof.

(i)   <u>Counterparts</u>.   This Settlement Agreement may be executed in two or more separate original, PDF or facsimile counterparts, each of which shall be an enforceable document, but all of which together shall constitute one and the same document.

(j)   <u>Rule of Construction</u>.   The parties acknowledge that each party and its counsel have reviewed this Settlement Agreement and the parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Settlement Agreement, any of the Asset

SETTLEMENT AGREEMENT
(GM 1991 A-3, GM 2000 A-1, GM 2000 A-3,
GM 2001 A-1, GM 2001 A-2, GM 2001 A-3, GM 2001 A-4,
GM 2001 A-5, GM 2001 A-6, GM 2001 A-7, AND GM 2001 A-8)

Purchase Agreements, any of the PMCC/GM Letter Agreements, or the GECC Omnibus Agreement.

    (k)    <u>Captions and Headings</u>.    The captions, headings and titles in this Settlement Agreement are inserted only as a matter of convenience and for reference and in no way define or limit the scope of this Settlement Agreement and shall not be used in construing this Settlement Agreement.

[SIGNATURE PAGES IMMEDIATELY FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement as of the date first above written.

GENERAL MOTORS LLC

By: _____
Name: _____
Title: _____


MOTORS LIQUIDATION COMPANY

By: _____
Name: _____
Title: _____


MLCS, LLC

By: _____
Name: _____
Title: _____


SATURN COUNTY BOND CORPORATION

By: _____
Name: _____
Title: _____


HNB INVESTMENT CORP.

By: _____
Name: _____
Title: _____

GENERAL FOODS CREDIT CORPORATION

By: _____
Name: _____
Title: _____


GENERAL FOODS CREDIT INVESTORS NO. 2
CORPORATION

By: _____
Name: _____
Title: _____


PHILIP MORRIS CAPITAL CORPORATION

By: _____
Name: _____
Title: _____


GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____
Name: _____
Title: _____

U.S. BANK NATIONAL ASSOCIATION, not in
its individual capacity but solely as 1991 A-3
Owner Trustee, 2000 A-1 Owner Trustee, 2001 A-1
Owner Trustee, 2001 A-2 Owner Trustee, 2001 A-3
Owner Trustee, 2001 A-4 Owner Trustee, 2001 A-5
Owner Trustee, 2001 A-6 Owner Trustee, 2001 A-7
Owner Trustee, and 2001 A-8 Owner Trustee

By:     _____
Name:   _____
Title:  _____


MANUFACTURERS AND TRADERS TRUST
COMPANY, as 2000 A-1 Indenture Trustee, 2000
A-1 Purchase Option Agent, 2000 A-3 Indenture
Trustee, and 2000 A Pass Through Trustee

By:     _____
Name:   _____
Title:  _____


THE BANK OF NEW YORK MELLON, as 1991
A-3 Indenture Trustee, 1991 A-3 Pass Through
Trustee, and 1991 A-3 Purchase Option Agent

By:     _____
Name:   _____
Title:  _____]

WELLS FARGO BANK NORTHWEST,
NATIONAL ASSOCIATION, as 2001 A-1
Indenture Trustee, 2001 A-2 Indenture Trustee,
2001 A-3 Indenture Trustee, 2001 A-4 Indenture
Trustee, 2001 A-5 Indenture Trustee, 2001 A-6
Indenture Trustee, 2001 A-7 Indenture Trustee, and
2001 A-8 Indenture Trustee

By: _____

Name: _____

Title: _____

SETTLEMENT AGREEMENT
(GM 1991 A-3, GM 2000 A-1, GM 2000 A-3,
GM 2001 A-1, GM 2001 A-2, GM 2001 A-3, GM 2001 A-4,
GM 2001 A-5, GM 2001 A-6, GM 2001 A-7, AND GM 2001 A-8)

## EXECUTION VERSION

## <u>EXHIBIT A</u>

## Summary of Distribution of Settlement

| Lease | Principal Balance as of Petition Date | Amount of original $8.1m offer attributable to relevant lease | Administrative Rent | New principal balance | Amount of $9.4m settlement attributable to lease (as a %) | Amount of $9.4m settlement attributable to lease (in $) | Total amount of $17.5m settlement attributable to lease* |
|---|---|---|---|---|---|---|---|
| 2001A-1 | 85,800,554.00 | 1,400,000.00 | 17,459.00 | 84,383,095.00 | 38.6979322% | 3,637,605.63 | 5,037,605.63 |
| 2001A-2 | 85,486,456.00 | 1,400,000.00 | 13,720.00 | 84,072,736.00 | 38.5556022% | 3,624,226.60 | 5,024,226.60 |
| 2001A-6 | 29,772,475.00 | 2,200,000.00 | 242,198.00 | 27,330,277.00 | 12.5336148% | 1,178,159.79 | 3,378,159.79 |
| 2001A-7 | 3,101,807.00 | 0.00 | 111,665.00 | 2,990,142.00 | 1.3712736% | 128,899.72 | 128,899.72 |
| 2001A-8 | 3,050,444.00 | 0.00 | 276,445.00 | 2,773,999.00 | 1.2721508% | 119,582.18 | 119,582.18 |
| 2000A-3 | 19,940,000.00 | 3,100,000.00 | 334,425.00 | 16,505,575.00 | 7.5694264% | 711,526.08 | 3,811,526.08 |
| Total | 227,151,736.00 | 8,100,000.00 | 995,912.00 | 218,055,824.00 | 1 | 9,400,000.00 | 17,500,000.00 |

* The allocations of the $17.5m set forth above shall be reduced, on a pro-rata basis, by the amounts necessary to satisfy outstanding fees and/or expenses of the relevant Indenture Trustee, if any, not paid by New GM in accordance with the terms of the Settlement Agreement.

SETTLEMENT AGREEMENT
(GM 1991 A-3, GM 2000 A-1, GM 2000 A-3,
GM 2001 A-1, GM 2001 A-2, GM 2001 A-3, GM 2001 A-4,
GM 2001 A-5, GM 2001 A-6, GM 2001 A-7, AND GM 2001 A-8)

EXECUTION VERSION

## <u>EXHIBIT B</u>

**[THIS EXHIBIT OMITTED DUE TO SIZE.  IT IS AVAILABLE UPON REQUEST
FROM DEBTORS' COUNSEL]**

SETTLEMENT AGREEMENT
(GM 1991 A-3, GM 2000 A-1, GM 2000 A-3,
GM 2001 A-1, GM 2001 A-2, GM 2001 A-3, GM 2001 A-4,
GM 2001 A-5, GM 2001 A-6, GM 2001 A-7, AND GM 2001 A-8)

**EXECUTION VERSION**

## <u>EXHIBIT C</u>

**[THIS EXHIBIT OMITTED DUE TO SIZE.  IT IS AVAILABLE UPON REQUEST
FROM DEBTORS' COUNSEL]**

**<u>Exhibit B</u>**

**<u>GECC Omnibus Agreement</u>**

**EXECUTION COPY**

# OMNIBUS AGREEMENT

(1) Motors Liquidation Company, (f/k/a/ General Motors Corporation) ("OldCo"), (2) MLCS, LLC (f/k/a Saturn, LLC and as successor in interest to Saturn Corporation) ("Saturn"), and certain of OldCo's subsidiaries (together with OldCo and Saturn, the "Debtors"), as debtors and debtors-in-possession before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in case number 09-50026, (3) General Motors LLC (f/k/a General Motors Company) ("Purchaser"), (4) General Motors of Canada Limited ("GM Canada"), (5) General Electric Capital Corporation ("GECC"), (6) General Electric Canada Management Services ("GE Canada"), (7) U.S. Bank National Association, as successor in interest to State Street Bank and Trust Company of Connecticut, National Association, not in its individual capacity but solely as owner trustee under the Leveraged Leases (as defined below) (in each such capacity, a "Leveraged Lease Owner Trustee"), and (8) U.S. Bank Trust National Association, not in its individual capacity but solely as owner trustee under the SIL Leases (as defined below) (in each such capacity, an "SIL Owner Trustee", and together with the Leveraged Lease Owner Trustees, the "Owner Trustees", and the Owner Trustees, together with the Debtors, Purchaser, GM Canada, GECC and GE Canada, the "Parties"), enter into this Omnibus Agreement (this "Agreement") on February 25, 2010.

## *Background*

A.     On June 1, 2009 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court. The Debtors' chapter 11 cases (the "Chapter 11 Cases") have been jointly administered by the Bankruptcy Court.

B.     On June 1, 2009, the Debtors filed the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), And (m), And 365 And Fed. R. Bankr. P. 2002, 6004, And 6006, To Approve (A) The Sale Pursuant To The Master Sale And Purchase Agreement With Vehicle Acquisition Holdings LLC, A U.S. Treasury-Sponsored Purchaser, Free And Clear Of Liens, Claims, Encumbrances, And Other Interests; (B) The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; And (C) Other Relief* (the "Sale Motion"), pursuant to which the Debtors sought approval from the Bankruptcy Court to approve the sale of certain of their assets to Purchaser.

C.     On June 15, 2009, GECC and the Owner Trustees filed the *Objection of GE Capital Corporation and Certain of its Affiliates and U.S. Bank, as Owner Trustee on its Behalf, to (I) Debtors' Motion to Assume and Assign Certain Executory Contracts and (II) to Notice of (A) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property and Unexpired Leases of Nonresidential Real Property and (B) Cure Amounts Related Thereto*, pursuant to which GECC and Owner Trustees objected to the Debtors' proposed procedures for dealing with GECC's leased property in connection with the Sale Motion (the "GECC Assumption Objection").

D.     On June 19, 2009, GECC and the Owner Trustees filed the *Limited Objection of GE Capital Corporation, and Certain of its Affiliates, and U.S. Bank, As Owner Trustee on its Behalf, to Debtors' Motion to* Approve *the Sale Pursuant to the Master Sale and Purchase*

*Agreement*, pursuant to which GECC and the Owner Trustees incorporated the GECC Assumption Objection by reference and sought to preserve their rights against the Debtors by filing a separate objection to the Sale Motion.

    E.    On July 2, 2009, GECC and the Debtors agreed to and obtained from the Bankruptcy Court a *Stipulation and Order Resolving Objection to Sale Motion*, pursuant to which GECC and the Debtors reached an agreement to resolve certain of GECC's objections to the Debtors' Sale Motion (the "Stipulated Order"). In a letter to GECC and the Debtors dated July 10, 2009, Purchaser agreed to be bound by all the terms and conditions of the Stipulated Order.

    F.    On July 5, 2009, the Debtors obtained from the Bankruptcy Court the *Order (I) Authorizing Sale Of Assets Pursuant To Amended And Restated Master Sale And Purchase Agreement With NGMCO, Inc., A U.S. Treasury-Sponsored Purchaser; (II) Authorizing Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases In Connection With The Sale; And (III) Granting Related Relief*, pursuant to which, among other things, the Bankruptcy Court granted the Sale Motion.

    G.    On July 17, 2009, the Indenture Trustee (as defined below), GECC, the Debtors and Purchaser agreed to and obtained from the Bankruptcy Court a *Supplemental Stipulation and Order Resolving Objection to Sale Motion*, pursuant to which GECC, the Debtors and Purchaser agreed that the Stipulated Order did not modify, alter, impair or amend the rights of the Indenture Trustee with respect to the Leveraged Leases (the "Supplemental Stipulated Order").

    H.    On July 17, 2009, the Debtors filed the *Motion by Debtors for Entry of Order Authorizing the Rejection of Certain Personal Property Agreements and/or Abandonment of Collateral to Secured Creditors* [Dkt. # 3212], pursuant to which the Debtors sought entry of an order from the Bankruptcy Court authorizing rejection of certain personal property agreements, including the A-2 Lease (as defined below) and the A-6 Lease (as defined below) (the "A-2/A-6 Lease Rejection Motion").

    I.    On August 3, 2009, the Court entered the *Order Authorizing Rejection of Certain Personal Property Agreements and/or Abandonment of Collateral to Secured Creditors* [Dkt. # 3619], pursuant to which the Court granted, among other things, the motion as to the Debtors' rejection of the A-2 Lease and adjourned the hearing as to the Debtors' rejection of the A-6 Lease until (as subsequently extended) March 10, 2010.

    J.    On October 30, 2009, the Debtors filed the *Debtors' Motion to Assume and Assign Certain Unexpired Leases of Equipment and Related Executory Contracts* [Dkt. # 4331] (the "A-4 Lease Assumption Motion"), pursuant to which the Debtors sought approval from the Bankruptcy Court to approve, among other things, the assumption of the A-4 Lease (as defined below) and assignment of the A-4 Lease to Purchaser.

    K.    On October 30, 2009, the Debtors filed the *Motion By Debtors For Entry of Order Authorizing Rejection of Certain Personal Property Agreements and/or Abandonment of Collateral to Secured Creditors* [Dkt. # 4324] (the "A-8 Lease Rejection Motion"), pursuant to which the Debtors sought approval from the Bankruptcy Court to approve, among other things, the rejection of the A-8 Lease (as defined below).

EXECUTION COPY

L.    On November 5, 2009, GECC and the Owner Trustees filed the *Limited Objection of GE Capital Corporation and U.S. Bank, As Owner Trustee on its Behalf, to Debtors' Motion to Assume and Assign Certain Unexpired Leases of Equipment and Related Executory Contracts,* pursuant to which GECC and the Owner Trustees sought to preserve their rights against the Debtors with respect to the assumption of the A-4 Lease.

M.    On December 15, 2009, the Indenture Trustee, Philip Morris Capital Corporation, Wachovia Financial Services, Inc., GECC and the Debtors agreed to and obtained from the Bankruptcy Court a *Stipulation to Adjourn (I) Motion for Entry of Order Authorizing Rejection of Certain Personal Property Agreements and/or Abandonment of Collateral to Secured Creditors (Dkt. # 3212); (II) Debtors' Motion to Assume and Assign Certain Unexpired Leases of Equipment and Related Executory Contracts (Dkt. # 4331); and (III) Motion by Debtors for Entry of Order Authorizing Rejection of Certain Personal Property Agreements and/or Abandonment of Collateral to Secured Creditors (Dkt. # 4324),* pursuant to which the Indenture Trustee, Philip Morris Capital Corporation, Wachovia Financial Services, Inc., GECC and the Debtors agreed, among other things, to adjourn the hearing as to (i) the A-6 Lease under the A-2/A-6 Rejection Motion, (ii) the A-4 Lease Assumption Motion and (iii) the A-8 Lease Rejection Motion until March 10, 2010.

N.    On (1) December 1, 1994, First American Capital Management Group, Inc. ("First American"), as lessor, and OldCo, as lessee, entered into that certain Master Lease Agreement (as amended, modified, and supplemented by equipment schedules thereto or otherwise, the "December 1994 Mobile Equipment MLA"); (2) May 1, 1995, First American, as lessor, and OldCo, as lessee, entered into that certain Master Lease Agreement (as amended, modified, and supplemented by equipment schedules thereto or otherwise, the "May 1995 Mobile Equipment MLA"); (3) January 10, 1997, NMHG Financial Services, Inc. ("NMHG"), as lessor, and Saturn, as lessee, entered into that certain Master Lease Agreement (as amended, modified, and supplemented by equipment schedules thereto or otherwise, the "NMHG Mobile Equipment MLA"); (4) January 10, 1997, Yale Financial Services, Inc. ("Yale"), as lessor, and Saturn, as lessee, entered into that certain Master Lease Agreement (as amended, modified, and supplemented by equipment schedules thereto or otherwise, the "Yale Mobile Equipment MLA"); (5) May 16, 2000, First American, as lessor, and OldCo or GM Canada, as lessee, entered into that certain Master Lease Agreement (as amended, modified, and supplemented by equipment schedules thereto or otherwise, the "May 2000 Mobile Equipment MLA"); (6) September 5, 2000, Heller Financial Canada, Ltd. ("Heller"), as lessor, and GM Canada, as lessee, entered into that certain Master Lease Agreement (as amended, modified, and supplemented by equipment schedules thereto or otherwise, the "September 2000 Mobile Equipment MLA"); (7) December 31, 2000, Minority Alliance Capital, LLC ("Minority Alliance"), as lessor, and OldCo, as lessee, entered into that certain Master Lease Agreement (as amended, modified, and supplemented by equipment schedules thereto or otherwise, the "December 2000 Mobile Equipment MLA," and (8) October 19, 2001, Pacific Rim Capital, Inc. ("Pacific Rim"), as lessor, and OldCo, as lessee, entered into that certain Master Lease Agreement (as amended, modified, and supplemented by equipment schedules thereto or otherwise, the "October 2001 Mobile Equipment MLA", together with the December 1994 Mobile Equipment MLA, the May 1995 Mobile Equipment MLA, the NMHG Mobile Equipment MLA, the Yale Mobile Equipment MLA, the May 2000 Mobile Equipment MLA, the September 2000 Mobile Equipment MLA, and the December 2000 Mobile Equipment MLA, the "Mobile Equipment MLAs"). The Mobile Equipment MLAs were entered into for the lease of

3

**EXECUTION COPY**

forklifts and other mobile equipment. GECC is the successor in interest to NMHG, Yale and Pacific Rim and GE Canada is the successor in interest to First American, Heller and Minority Alliance with respect to the Mobile Equipment Property (as defined below) leased by OldCo, Saturn or GM Canada pursuant to certain schedules which incorporate by reference the terms of the respective Mobile Equipment MLAs (individually, a "Mobile Equipment Schedule", collectively, the "Mobile Equipment Schedules"). Each Mobile Equipment Schedule, together with the respective Mobile Equipment MLAs, constitutes a separate instrument of lease (individually, a "Mobile Equipment Lease", collectively, the "Mobile Equipment Leases").

O.    On December 31, 2000, Minority Alliance Capital, LLC ("Minority"), as lessor, and OldCo, as lessee, entered into that certain Master Lease Agreement (as amended, modified, and supplemented by equipment schedules thereto or otherwise, the "Furniture MLA") for the lease of certain furniture, fixtures and other equipment. GECC is the successor in interest to Minority with respect to the Furniture (as defined below) leased by OldCo pursuant to certain schedules which incorporate by reference the terms of the Furniture MLA (individually, a "Furniture Schedule", collectively, the "Furniture Schedules"). Each Furniture Schedule, together with the Furniture MLA, constitutes a separate instrument of lease (individually, a "Furniture Lease", collectively, the "Furniture Leases").

P.    On December 18, 2001, OldCo, as lessee, each Leveraged Lease Owner Trustee, as lessor, Wells Fargo Bank Northwest, as indenture trustee (the "Indenture Trustee") and GECC, as owner participant (the "Owner Participant"), entered into four leveraged equipment lease transactions (individually, the "A-2 Lease", "A-4 Lease", "A-6 Lease" and "A-8 Lease", respectively, and collectively, the "Leveraged Leases") pursuant to each of which certain automobile manufacturing equipment is leased to OldCo.

Q.    On each of September 30, 2003 and December 10, 2003, OldCo, as lessee, each SIL Owner Trustee, as lessor, and GECC, as Owner Participant, entered into two single investor equipment lease transactions (the "B-1 Lease" and "C-1 Lease", respectively, and collectively, the "SIL Leases") pursuant to each of which certain automobile manufacturing equipment is leased to OldCo.

R.    In connection herewith and on the date hereof, Purchaser, GECC, the Leveraged Lease Owner Trustees and the Indenture Trustee, have entered into the following asset purchase agreements, which concern the purchase of assets by Purchaser of all leased equipment under the following Leveraged Leases: (i) the Asset Purchase Agreement (GM 2001 A-2) (the "A-2 Purchase Agreement"), (ii) the Asset Purchase Agreement (GM 2001 A-6) (the "A-6 Purchase Agreement"), and (iii) the Asset Purchase Agreement (GM 2001 A-8) (the "A-8 Purchase Agreement," together with the A-2 Purchase Agreement, the A-6 Purchase Agreement and any other agreements executed in connection with such purchase agreements to which GECC is a party, the "2001 Purchase Agreements").

S.    In connection herewith and on the date hereof, Purchaser, GECC and various other entities, including the Indenture Trustee, have entered into a Settlement Agreement (the "Settlement Agreement").

T.    The Parties have entered into this Agreement to resolve various issues relating to the Leveraged Leases, the SIL Leases, the Mobile Equipment Leases, and the Furniture Leases

4

(collectively, the "GECC Agreements"), and certain matters related thereto upon the terms and subject to the conditions set forth herein. For convenience, the A-2 Lease, the A-6 Lease, the A-8 Lease, the B-1 Lease, the Mobile Equipment Leases and the Furniture Leases are referred to collectively as the "Rejected Leases".

U.    For convenience, unless otherwise provided, references to Sections, Schedules or Exhibits refer to Section of, and Schedules and Exhibits attached to, this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**Section 1.    Treatment of Leveraged Leases**. The Parties agree to the following with respect to the Leveraged Leases:

(a)    A-2 Lease (Rejected; Purchaser to Acquire). The Debtors rejected the A-2 Lease effective July 31, 2009, pursuant to an order of the Bankruptcy Court dated August 3, 2009. GECC, solely in its capacity as Owner Participant under the A-2 Lease, and the applicable Leveraged Lease Owner Trustee agree to waive any right to administrative rent under the A-2 Lease. The Parties agree that (i) on the Closing Date (as defined in Section 14), Purchaser will purchase all assets leased under the A-2 Lease pursuant to the A-2 Purchase Agreement and the Settlement Agreement, and (ii) from and after the Closing Date, (x) GECC and the applicable Leveraged Lease Owner Trustee shall have no continuing obligations or responsibilities with respect to the A-2 Lease and the underlying leased equipment subject thereto, including, without limitation, any duty or obligation to retrieve, remove, dispose of, or otherwise deal with the underlying leased equipment and (y) the Debtors and Purchaser shall have no further obligations to GECC under the Stipulated Order with respect to the A-2 Lease. This Agreement shall not affect any rights of the Indenture Trustee with respect to the A-2 Lease or to the underlying leased equipment subject thereto.

(b)    A-4 Lease (Assumption and Assignment to Purchaser Pending). The Parties agree that in connection with the A-4 Lease Assumption Motion, the Debtors shall assume and assign to Purchaser, and Purchaser shall assume, in accordance with the requirements set forth in Section 365(b) of the Bankruptcy Code, the A-4 Lease in accordance with, and as modified by, the terms of the assumption, assignment and amendment agreement in the form attached hereto as **Exhibit A** (as amended by such amendment, the "Amended A-4 Lease") and all operative documents with respect to the Amended A-4 Lease listed on **Schedule 1** attached hereto (together with the Amended A-4 Lease, the "Amended A-4 Lease Documents"). Upon the Debtors' assignment of the Amended A-4 Lease Documents to Purchaser and the assumption of the Amended A-4 Lease Documents by Purchaser, the Debtors shall have no further obligations under the A-4 Lease and all operative documents with respect to the A-4 Lease (the "A-4 Lease Documents"). The Parties acknowledge and agree that there are no monetary amounts due and owing from any monetary defaults that occurred prior to the Petition Date under the A-4 Lease. From and after the Closing Date, the Debtors and Purchaser shall have no further obligations to GECC under the Stipulated Order with respect to the A-4 Lease Documents, it being agreed and understood that the Amended A-4 Lease Documents shall govern the relationship among GECC, the applicable Leveraged Lease Owner Trustee and Purchaser with respect to the Amended A-4 Lease after the Closing Date.

(c)    <u>A-6 Lease (Rejection Pending; Purchaser to Acquire)</u>. GECC, solely in its capacity as Owner Participant under the A-6 Lease, and the applicable Leveraged Lease Owner Trustee agree (i) to waive any right to administrative rent under the A-6 Lease and (ii) not contest, oppose or otherwise interfere with the A-2/A-6 Lease Rejection Motion with respect to the rejection of the A-6 Lease effective July 31, 2009. The Parties agree that (i) on the Closing Date, Purchaser will purchase all assets leased under the A-6 Lease pursuant to the A-6 Purchase Agreement and the Settlement Agreement and (ii) from and after the Closing Date, (x) GECC and the applicable Leveraged Lease Owner Trustee shall have no continuing obligations or responsibilities with respect to the A-6 Lease and the underlying leased equipment subject thereto, including, without limitation, any duty or obligation to retrieve, remove, dispose of, or otherwise deal with the underlying leased equipment and (y) the Debtors and Purchaser shall have no further obligations to GECC under the Stipulated Order with respect to the A-6 Lease. This Agreement shall not affect any rights of the Indenture Trustee with respect to the A-2/A-6 Lease Rejection Motion, the A-6 Lease, or to the underlying leased equipment subject thereto.

(d)    <u>A-8 Lease (Rejection Pending; Purchaser to Acquire)</u>. GECC, solely in its capacity as Owner Participant under the A-8 Lease, and the applicable Leveraged Lease Owner Trustee agree (i) to waive any right to administrative rent under the A-8 Lease from and after December 31, 2009 and (ii) not to contest, oppose or otherwise interfere with the A-8 Lease Rejection Motion with respect to the rejection of the A-8 Lease. The Parties agree that (i) on the Closing Date, Purchaser will purchase all assets leased under the A-8 Lease pursuant to the A-8 Purchase Agreement and the Settlement Agreement and (ii) from and after the Closing Date, (x) GECC and the applicable Leveraged Lease Owner Trustee shall have no continuing obligations or responsibilities with respect to the A-8 Lease and the underlying leased equipment subject thereto, including, without limitation, any duty or obligation to retrieve, remove, dispose of, or otherwise deal with the underlying leased equipment and (y) the Debtors and Purchaser shall have no further obligations to GECC under the Stipulated Order with respect to the A-8 Lease. This Agreement shall not affect any rights of the Indenture Trustee with respect to the A-8 Lease Rejection Motion, the A-8 Lease, or to the underlying leased equipment subject thereto.

(e)    <u>GECC and Applicable Leveraged Lease Owner Trustee Warranty</u>. The Parties agree that in respect of the equipment and other assets subject to the 2001 Purchase Agreements (the "<u>Leveraged Leased Equipment</u>"), the sale to Purchaser of all of GECC's and the applicable Leveraged Lease Owner Trustee's rights, title and interests in and to the Leveraged Leased Equipment shall be free and clear of all liens, liabilities, claims and encumbrances that arise from or are attributable to GECC or the applicable Leveraged Lease Owner Trustee. Neither GECC nor the applicable Leveraged Lease Owner Trustee has made, or is making, any representation or warranty of any kind or nature, express or implied, at law or in equity, in respect of any of the Leveraged Leased Equipment, or with respect to any information provided to Purchaser and/or its representatives, including (A) with respect to condition, description, value, design, quality, manufacture, operation, merchantability, fitness for any particular purpose or use, title or non-infringement, and (B) any express or implied representation or warranty arising from course of performance, course of dealing or usage of trade, and in each case, any such other representations or warranties are expressly disclaimed and excluded herefrom. The Leveraged Leased Equipment shall be sold, assigned and transferred to Purchaser on an "as-is, where-is" basis. Without limiting the generality of the foregoing, neither GECC nor the applicable Leveraged Lease Owner Trustee has made, or is making, any representation or warranty regarding the accuracy or the completeness of any information

6

**EXECUTION COPY**

regarding the Leveraged Leased Equipment furnished or made available to Purchaser and/or its representatives, except as expressly set forth in this Section 1, and neither of GECC nor the applicable Leveraged Lease Owner Trustee shall be liable to Purchaser or any other person resulting from the distribution to Purchaser, or Purchaser's use of or reliance on, any information, documents or material made available in any form in expectation of, or in connection with, the purchase and sale of the Leveraged Leased Equipment.

      **Section 2.**    **Treatment of SIL Leases**.  The Parties agree to the following with respect to the SIL Leases:

      (a)    **B-1 Lease – Rejection**.  The Debtors shall promptly reject the B-1 Lease and all operative documents with respect to the B-1 Lease listed on **Schedule 2** attached hereto (the "<u>B-1 Lease Documents</u>"), effective December 31, 2009.  GECC and the applicable SIL Owner Trustee acknowledge that they have been paid in full for all administrative rent owed from the Petition Date through December 31, 2009 under the B-1 Lease.  The Parties agree that from and after the Closing Date (a) GECC and the applicable SIL Owner Trustee shall have no continuing obligations or responsibilities with respect to the B-1 Lease and the underlying leased equipment subject thereto, including, without limitation, any duty or obligations to retrieve, remove, dispose of, or otherwise deal with the underlying leased equipment and (b) the Debtors and Purchaser shall have no further obligations to GECC under the Stipulated Order with respect to the B-1 Lease.

      (b)    **B-1 Lease – Purchase of All Leased Equipment**.  Purchaser shall purchase all assets leased under the B-1 Lease (the "<u>B-1 Leased Equipment</u>") by paying to GECC by wire transfer the B-1 Leased Equipment Cash Purchase Price (as identified and described in the Ancillary Agreement (as defined in Section 12)) in cash or cash equivalents in return for the transfer of title pursuant a bill of sale substantially in the form attached hereto as **Exhibit B** (the "<u>B-1 Leased Equipment Bill of Sale</u>").  Except as provided in Section 6 below, neither GECC nor the applicable SIL Owner Trustee has made, or is making, any representation or warranty of any kind or nature, express or implied, at law or in equity, in respect of any of the B-1 Leased Equipment or otherwise, or with respect to any information provided to Purchaser and/or its representatives, including (A) with respect to condition, description, value, design, quality, manufacture, operation, merchantability, fitness for any particular purpose or use, title or non-infringement, and (B) any express or implied representation or warranty arising from course of performance, course of dealing or usage of trade, and in each case, any such other representations or warranties are expressly disclaimed and excluded herefrom.  The B-1 Leased Equipment shall be sold, assigned and transferred to Purchaser on an "as-is, where-is" basis.  Without limiting the generality of the foregoing, neither GECC nor the applicable SIL Owner Trustee has made, or is making, any representation or warranty regarding the accuracy or the completeness of any information regarding the B-1 Leased Equipment furnished or made available to Purchaser and/or its representatives, except as expressly set forth in this Section 2(b) and Section 6 below, and neither of GECC nor the applicable SIL Owner Trustee shall be liable to Purchaser or any other person resulting from the distribution to Purchaser, or Purchaser's use of or reliance on, any information, documents or material made available in any form in expectation of, or in connection with, the purchase and sale of the B-1 Leased Equipment.

      (c)    **C-1 Lease – Assumption and Assignment to Purchaser**.  The Parties agree that on the Closing Date, the Debtors shall assume and assign to Purchaser, and Purchaser shall

7

**EXECUTION COPY**

assume, in accordance with the requirements set forth in Section 365(b) of the Bankruptcy Code, the C-1 Lease in accordance with, and as modified by, the terms of the assumption, assignment and amendment agreement in the form attached hereto as **Exhibit C** (as amended by such amendment, the "Amended C-1 Lease") and all operative documents with respect to the Amended C-1 Lease listed on **Schedule 3** attached hereto (together with the Amended C-1 Lease, the "Amended C-1 Lease Documents"), with the economic amendments identified and described in the Ancillary Agreement. Upon the Debtors' assignment of the Amended C-1 Lease Documents to Purchaser and the assumption of the Amended C-1 Lease Documents by Purchaser, the Debtors shall have no further obligations under the C-1 Lease and all operative documents with respect to the C-1 Lease (the "C-1 Lease Documents"). The Parties acknowledge and agree that there are no monetary amounts due and owing from any monetary defaults that occurred prior to the Petition Date under the C-1 Lease. From and after the Closing Date, the Debtors shall have no further obligations to GECC or the applicable SIL Owner Trustee under the Stipulated Order with respect to the C-1 Lease, it being agreed and understood that the Amended C-1 Lease Documents shall govern the relationship between GECC, the applicable SIL Owner Trustee and Purchaser with respect to the Amended C-1 Lease after the Closing Date.

**Section 3.** **Mobile Equipment Lease Rejection and Purchase of Mobile Equipment**. The Parties agree to the following with respect to the Mobile Equipment Leases:

(a) Rejection of Mobile Equipment Leases. The Debtors shall promptly reject the Mobile Equipment Leases, effective upon entry of the Approval Order (defined below). GECC and GE Canada agree to waive the right to any further or additional administrative rent in respect of the Mobile Equipment Leases. The Parties agree that from and after the Closing Date GECC and GE Canada shall have no continuing obligations or responsibilities with respect to the Mobile Equipment Leases and the underlying leased equipment subject thereto, including, without limitation, any duty or obligation to retrieve, remove, dispose of, or otherwise deal with the underlying leased equipment.

(b) Sale of Mobile Equipment Property to Purchaser. On the Closing Date, GECC and GE Canada, as applicable, shall sell, transfer, and convey to Purchaser, and Purchaser shall accept, all of GECC's and GE Canada's rights and title to certain units of personal property described in the Mobile Equipment Schedules, owned by GECC or GE Canada and leased by the Debtors or GM Canada pursuant to the Mobile Equipment Leases, and identified on **Schedule 4** attached hereto (the "Mobile Equipment Property"), including GECC's and GE Canada's rights, title and interest, if any, to all batteries, accessories and/or attachments to any of the Mobile Equipment Property. Except as provided in Section 6 below, neither GECC nor GE Canada has made, or is making, any representation or warranty of any kind or nature, express or implied, at law or in equity, in respect of any of the Mobile Equipment Property, or with respect to any information provided to Purchaser and/or its representatives, including (A) with respect to condition, description, value, design, quality, manufacture, operation, merchantability, fitness for any particular purpose or use, title or non-infringement, and (B) any express or implied representation or warranty arising from course of performance, course of dealing or usage of trade, and in each case, any such representations or warranties are expressly disclaimed and excluded herefrom. The Mobile Equipment Property shall be sold, assigned and transferred to Purchaser on an "as-is, where-is" basis. Without limiting the generality of the foregoing, neither GECC nor GE Canada has made, or is making, any representation or warranty regarding the

CH\1114120.28

accuracy or the completeness of any information regarding the Mobile Equipment Property furnished or made available to Purchaser and/or its representatives, except as expressly set forth in this Section 3(b) and Section 6 below, and neither GECC nor GE Canada shall be liable to Purchaser or any other person resulting from the distribution to Purchaser, or Purchaser's use of or reliance on, any information, documents or material made available in any form in expectation of, or in connection with, the purchase and sale of the Mobile Equipment Property. On the Closing Date, Purchaser shall pay to GECC by wire transfer the Mobile Equipment Property Cash Purchase Price (as identified and described in the Ancillary Agreement) in cash or cash equivalents in return for the transfer of title pursuant to a bill of sale substantially in the form of **Exhibit D** attached hereto (the "Mobile Equipment Property Bill of Sale").

**Section 4.**     **Furniture Lease Rejection and Purchase of Furniture**. The Parties agree to the following with respect to the Furniture Leases:

(a)     Rejection of Furniture Leases.     The Debtors shall promptly reject the Furniture Leases, effective upon entry of the Approval Order. GECC agrees to waive the right to any further or additional administrative rent in respect of the Furniture Leases. The Parties agree that from and after the Closing Date, GECC shall have no continuing obligations or responsibilities with respect to the Furniture Leases and the underlying leased property subject thereto, including, without limitation, any duty or obligation to retrieve, remove, dispose of, or otherwise deal with the underlying leased property.

(b)     Sale of Furniture to Purchaser.     On the Closing Date, GECC shall sell, transfer, and convey to Purchaser, and Purchaser shall accept, all of GECC's rights and title to certain units of personal property described in the Furniture Schedules, owned by GECC and leased by OldCo pursuant to the Furniture Leases, and identified on **Schedule 5** attached hereto (the "Furniture"). Except as provided in Section 6 below, GECC has not made, nor is making, any representation or warranty of any kind or nature, express or implied, at law or in equity, in respect of any of the Furniture, or with respect to any information provided to Purchaser and/or its representatives, including (A) with respect to condition, description, value, design, quality, manufacture, operation, merchantability, fitness for any particular purpose or use, title or non-infringement, and (B) any express or implied representation or warranty arising from course of performance, course of dealing or usage of trade, and in each case, any such other representations or warranties are expressly disclaimed and excluded herefrom. The Furniture shall be sold, assigned and transferred to Purchaser on an "as-is, where-is" basis. Without limiting the generality of the foregoing, GECC has not made, nor is making, any representation or warranty regarding the accuracy or the completeness of any information regarding the Furniture furnished or made available to Purchaser and/or its representatives, except as expressly set forth in this Section 4(b) and Section 6 below, and GECC shall not be liable to Purchaser or any other person resulting from the distribution to Purchaser, or Purchaser's use of or reliance on, any information, documents or material made available in any form in expectation of, or in connection with, the purchase and sale of the Furniture. On the Closing Date, Purchaser shall purchase the Furniture by paying to GECC by wire transfer the Furniture Cash Purchase Price (as identified and described in the Ancillary Agreement) in cash or cash equivalents in return for the transfer of title pursuant to a bill of sale substantially in the form of **Exhibit E** attached hereto (the "Furniture Bill of Sale").

9

**Section 5.** **Payment of Administrative Rent**. The Parties agree to the following with respect to the payments of all administrative rent with respect to the period from June 1, 2009 through and including the Closing Date under the GECC Agreements, as applicable:

(a)    Stipulated Order Rent Payments.  The Parties agree that Purchaser has fully satisfied the obligations for administrative rent owed pursuant to the Stipulated Order from the Petition Date through the Closing Date with respect to the A-4 Lease, A-8 Lease, B-1 Lease, C-1 Lease, the Mobile Equipment Leases and the Furniture Leases and in full satisfaction of GECC's and the Owner Trustee's claims for administrative rent related to such agreements.

(b)    Amended C-1 Lease Rent Reconciliation.  Upon Closing, GECC shall remit to Purchaser by wire transfer the amount corresponding to the Amended C-1 Lease Rent Reconciliation as identified and described in the Ancillary Agreement in cash or cash equivalents.

**Section 6.** **GECC Limited Warranties and GECC and GE Canada Limited Indemnification**.

(a)    Notwithstanding anything to the contrary in the B-1 Leased Equipment Bill of Sale, the only representations and warranties being made by GECC regarding the B-1 Leased Equipment are the following:

(i)    GECC has not sold, transferred, assigned, conveyed or delivered to any third party any right, title or interest in the B-1 Lease or in the B-1 Leased Equipment; and

(ii)    the sale to Purchaser of all of GECC's rights, title and interests in and to the B-1 Leased Equipment shall be free and clear of all liens, liabilities, claims and encumbrances that arise from or are attributable to GECC.

(b)    GECC and GE Canada, as applicable, will indemnify Purchaser if (i) GECC or GE Canada have sold, transferred, assigned, conveyed or delivered to any third party any right, title or interest in the Mobile Equipment Leases or in the Mobile Equipment Property, (ii) GECC has sold, transferred, assigned, conveyed or delivered to any third party any right, title or interest in the Furniture Leases or in the Furniture, (iii) the sale to Purchaser of all of GECC's rights, title and interests in and to the Mobile Equipment Property is not free and clear of all liens, liabilities, claims, and encumbrances that arise from or are attributable to GECC or to GE Canada, or (iv) the sale to Purchaser of all of GECC's and GE Canada's rights, title and interests in and to the Furniture is not free and clear of all liens, liabilities, claims, and encumbrances that arise from or are attributable to GECC; provided, however, that Purchaser's sole remedy if any of (i) through (iv) occur is rescission of the purchase of the applicable item of Mobile Equipment Property or Furniture and payment by GECC or GE Canada, as applicable, in an amount equal to the amount paid by Purchaser for such applicable item of Mobile Equipment Property or Furniture pursuant to this Agreement.

**Section 7.** **SIL Owner Trustee Limited Warranties**.  Notwithstanding anything to the contrary in the B-1 Leased Equipment Bill of Sale, the only representations and warranties being made by the applicable SIL Owner Trustee regarding the B-1 Leased Equipment are the following:

10

**EXECUTION COPY**

(a)    the applicable SIL Owner Trustee has not sold, transferred, assigned, conveyed or delivered to any third party any right, title or interest in the B-1 Lease or in the B-1 Leased Equipment; and

(b)    the sale to Purchaser of all of the applicable SIL Owner Trustee's rights, title and interests in and to the B-1 Leased Equipment shall be free and clear of all liens, liabilities, claims and encumbrances that arise from or are attributable to the applicable SIL Owner Trustee.

## Section 8.    <u>Mutual Releases</u>.

(a)    <u>Releases by the Debtors</u>. Except as set forth in Section 8(g) hereof, effective as of the Closing Date, the Debtors, on behalf of themselves, their respective subsidiaries, and their successors and assigns (each, a "<u>Debtor Releasor</u>" and collectively, the "<u>Debtor Releasors</u>"), do hereby forever release, remise and discharge (i) GECC, solely in its capacity as Owner Participant or as successor in interest, as applicable, under the Rejected Leases, the A-4 Lease and the C-1 Lease (together with the A-4 Lease, the "<u>Assumed Leases</u>"), (ii) GE Canada, solely in its capacity as successor in interest under the Mobile Equipment Leases, as applicable, (iii) the Owner Trustees under the Rejected Leases and the Assumed Leases, (iv) U.S. Bank National Association, in its individual capacity ("<u>US Bank</u>") and (v) U.S. Bank Trust National Association, in its individual capacity ("<u>US Bank Trust</u>"), from any and all actions, causes of action, suits at law or in equity, complaints, claims, counterclaims, cross-claims, obligations, demands, dues, debts, liabilities, costs, expenses and damages (including without limitation, environmental damage claims and claims based upon Environmental Law (as defined in Section 11 hereof)), in each case relating to the Rejected Leases, the Purchased Equipment (as defined below), the Assumed Leases, and/or the underlying leased equipment subject to the Assumed Leases (the "<u>Assumed Lease Equipment</u>") (collectively, the "<u>Lease Damage Claims</u>"), and hereby agree and covenant not to assert against GECC, GE Canada, US Bank, US Bank Trust and/or the Owner Trustees any Lease Damage Claims that any of the Debtor Releasors ever had, may have or hereafter may have.

(b)    <u>Releases by Purchaser</u>. Except as set forth in Section 8(g) hereof, Purchaser, on behalf of itself, its subsidiaries, successors and assigns (each, a "<u>Purchaser Releasor</u>" and collectively, the "<u>Purchaser Releasors</u>"), does hereby forever release, remise and discharge (i) GECC, solely in its capacity as Owner Participant or as successor in interest, as applicable, under the Rejected Leases and the Assumed Leases, (ii) GE Canada, solely in its capacity as successor in interest under the Mobile Equipment Leases, as applicable, (iii) the Owner Trustees under the Rejected Leases and the Assumed Leases, (iv) US Bank and (v) US Bank Trust from any and all Lease Damage Claims, and hereby agrees and covenants not to assert against GECC, GE Canada, US Bank, US Bank Trust and/or the Owner Trustees any Lease Damage Claims that any of the Purchaser Releasors ever had, may have or hereafter may have.

(c)    <u>Releases by GM Canada</u>. Except as set forth in Section 8(g) hereof, GM Canada, on behalf of itself and its successors and assigns (each, a "<u>GM Canada Releasor</u>" and collectively, the "<u>GM Canada Releasors</u>"), does hereby forever release, remise and discharge (i) GECC, solely in its capacity as successor in interest , as applicable, under the Mobile Equipment Leases and the Furniture Leases and (ii) GE Canada, solely in its capacity as successor in interest

11

**EXECUTION COPY**

under the Mobile Equipment Leases, as applicable, from any and all actions, causes of action, suits at law or in equity, complaints, claims, counterclaims, cross-claims, obligations, demands, dues, debts, liabilities, costs, expenses and damages (including without limitation, environmental damage claims and claims based upon Environmental Law (as defined in Section 11 hereof)), in each case relating to the Mobile Equipment Leases, the Mobile Equipment Property, the Furniture Leases and/or the Furniture (collectively, the "GM Canada Claims"), and hereby agree and covenant not to assert against GECC and/or GE Canada any GM Canada Claims that any of the GM Canada Releasors ever had, may have or hereafter may have.

(d)     Releases by GECC.  Except as set forth in Section 8(g) hereof, and exclusive of any claims that are being assigned to the Indenture Trustee under the Settlement Agreement, GECC, solely in its capacity as Owner Participant or successor in interest, as applicable, under the Rejected Leases and the Assumed Leases, on behalf of itself and its successors and assigns (each, a "GECC Releasor" and collectively, the "GECC Releasors"), does hereby forever release, remise and discharge the (i) Debtors, (ii) Purchaser and (iii) GM Canada from any and all Lease Damage Claims (including, for the avoidance of doubt, any tax indemnity claims against the Debtors), and hereby agrees and covenants not to assert against the Debtors, Purchaser and/or GM Canada any Lease Damage Claims that any of the GECC Releasors ever had, may have or hereafter may have.

(e)     Releases by GE Canada.  Except as set forth in Section 8(g) hereof, GE Canada, solely in its capacity as successor in interest under the Mobile Equipment Leases, as applicable, on behalf of itself and its successors and assigns (each, a "GE Canada Releasor" and collectively, the "GE Canada Releasors"), does hereby forever release, remise and discharge the (i) Debtors, (ii) Purchaser and (iii) GM Canada from any and all actions, causes of action, suits at law or in equity, complaints, claims, counterclaims, cross-claims, obligations, demands, dues, debts, liabilities, costs, expenses and damages (including without limitation, environmental damage claims and claims based upon Environmental Law (as defined in Section 11 hereof)), in each case relating to the Mobile Equipment Leases and/or the Mobile Equipment Property (collectively, the "GE Canada Claims"), and hereby agrees and covenants not to assert against the Debtors, GM Canada and/or Purchaser any GE Canada Claims that any of the GE Canada Releasors ever had, may have or hereafter may have.

(f)     Releases by the Owner Trustees.  Except as set forth in Section 8(g) hereof, the Owner Trustees, solely in their capacities as owner trustees under the Rejected Leases, as applicable, and the Assumed Leases, on behalf of themselves and their successors and assigns (each, an "OT Releasor" and collectively, the "OT Releasors"), do hereby forever release, remise and discharge the (i) Debtors and (ii) Purchaser from any and all actions, causes of action, suits at law or in equity, complaints, claims, counterclaims, cross-claims, obligations, demands, dues, debts, liabilities, costs, expenses and damages (including without limitation, environmental damage claims and claims based upon Environmental Law (as defined in Section 11 hereof)), in each case relating to the Rejected Leases, the Purchased Equipment, the Assumed Leases, and/or the Assumed Lease Equipment (collectively, the "OT Claims"), and hereby agrees and covenants not to assert against the Debtors and/or Purchaser any OT Claims, that any of the OT Releasors ever had, may have or hereafter may have.

(g)     Limitation of Releases.  Nothing in this Section 8 shall be construed to release any Party from any obligations under this Agreement or any claims that are unrelated to

12

the Rejected Leases, the Purchased Equipment, the Mobile Equipment Property, the Assumed Leases, or the Assumed Lease Equipment. For avoidance of doubt, nothing in this Section 8 shall be construed to release Purchaser, GECC and/or the Owner Trustees from any obligations or claims arising under the Amended A-4 Lease Documents, the Amended C-1 Lease Documents and/or the Amended Lease Equipment on or after the Closing Date. Nothing herein shall be construed to release, waive, or modify any rights of the Indenture Trustee with respect to the applicable Rejected Leases and/or the applicable Purchased Equipment. In the event any release of, or covenant not to sue in respect of, any party by any other party is prohibited by or unenforceable or invalid under applicable law, the corresponding release of, or covenant not to sue in respect of, such other party by such party shall be deemed ineffective to the extent of such prohibition, unenforceability or invalidity.

Section 9.    **Taxes**.

(a)    In respect of the equipment and other assets subject to the Amended A-4 Lease and the Amended C-1 Lease (the "Amended Lease Equipment"), the respective rights and obligations of the Parties with respect to the payment of Taxes (as defined in the Amended A-4 Lease Documents and the Amended C-1 Lease Documents, as applicable) will be on the terms and subject to the conditions set forth in Amended A-4 Lease Documents or the Amended C-1 Lease Documents, as applicable. Notwithstanding the foregoing, Purchaser will assume and be liable for and will pay all unpaid tax liabilities (and any tax indemnity obligations) of OldCo and outstanding on the Closing Date under the A-4 Lease Documents and the C-1 Lease Documents; and

(b)    In respect of (i) the Leveraged Leased Equipment and (ii) the equipment and other assets subject to the B-1 Lease, the Mobile Equipment Leases and the Furniture Leases (together with the Leveraged Leased Equipment, the "Purchased Equipment"), notwithstanding any provision as set forth in the Settlement Agreement, Purchaser will assume and be liable for and will pay when due (x) all taxes, assessments and other governmental charges or levies imposed on or after the Closing Date upon (or relating or attributable to) the Purchased Equipment, (y) any tax liability of the Debtors and/or GECC (or any other Party) accruing or arising during (or otherwise relating or attributable to) the period prior to the Closing Date, but only to the extent such tax liability was the lessee's obligation or responsibility under the Rejected Leases, and (z) any sales, use, transfer or similar taxes, and any recording fees or similar charges, imposed upon the Debtors, Purchaser, GECC, or any other Party in respect of the transactions contemplated by this Agreement; provided, however, that Purchaser shall not be responsible to pay any personal property Taxes or other taxes, assessments or other governmental charges or levies if and to the extent that any Debtor or Purchaser has previously made payments to GECC prior to the Closing Date that were expressly designated as payment of such Taxes or other taxes, assessments or other governmental charges or levies and were not used for that purpose, to the extent so provided under any of the Rejected Leases, as applicable.

Section 10.    **Approval Order**. On or before March 8, 2010, the Parties agree that the Debtors shall file a motion pursuant to Federal Rules of Bankruptcy Procedure 9019 (the "9019 Motion") seeking Bankruptcy Court approval of this Agreement. The Debtors agree to use their reasonable best efforts to obtain the entry of an order from the Bankruptcy Court in form and substance acceptable to each of the Parties (the "Approval Order") that, among other things, (i) authorizes the Debtors to enter into this Agreement, (ii) approves the transactions described

13

**EXECUTION COPY**

herein, including the requirement that Purchaser cure the defaults provided herein on or before the Closing Date, (iii) finds that (a) upon the assumption and assignment of the Amended A-4 Lease Documents, pursuant to Section 1(b) of this Agreement, all defaults or events of default under the A-4 Lease Documents (including, without limitation, Events of Default as defined in Section 15 of the A-4 Lease) shall have been remedied, cured and otherwise eliminated and (b) upon assumption by Purchaser of the Amended A-4 Lease Documents, Purchaser shall thereafter be the Lessee under the Amended A-4 Lease Documents, (iv) finds that GECC and the applicable Owner Trustee shall have no continuing obligations or responsibilities with respect to the A-2 Lease, the A-6 Lease and the A-8 Lease and the underlying leased equipment subject thereto, as applicable, (v) authorizes the rejection of the B-1 Lease and acknowledges that GECC and the applicable Owner Trustee shall have no continuing obligations or responsibilities with respect to the B-1 Lease and the underlying leased equipment subject thereto, (vi) authorizes the rejection of the Mobile Equipment Leases and acknowledges that GECC and GE Canada shall have no continuing obligations or responsibilities with respect to the Mobile Equipment Property subject thereto, as applicable, (vii) authorizes the rejection of the Furniture Leases and acknowledges that GECC shall have no continuing obligations or responsibilities with respect to the Furniture subject thereto, (viii) satisfies the requirements of Section 4(b) of the Settlement Agreement, and (ix) effectuates the modification of the automatic stay pursuant to the terms and conditions as set forth in Section 13(e) of this Agreement. If the Approval Order is not entered by April 15, 2010, or such other date agreed to by the Parties, or is not in form and substance acceptable to GECC in its reasonable discretion, this Agreement shall be void and of no further force and effect and shall not be admissible for any purpose.

**Section 11.** **Environmental Obligations – Purchased Equipment and Amended Lease Equipment**. In respect of the Purchased Equipment and the Amended Lease Equipment, the Parties agree that:

(a)     Debtors and Purchaser agree that from and after the Closing Date, GECC, GE Canada and the applicable Owner Trustee shall have no further obligations or responsibilities whatsoever with respect to the Rejected Leases or the Purchased Equipment;

(b)     Purchaser and Debtors agree that they will not assert any claims, including but not limited to environmental damage claims, against GECC, GE Canada or the applicable Owner Trustee for costs and expenses of maintaining, storing, removing, disposing of or otherwise handling the Purchased Equipment;

(c)     If and to the extent that Purchaser elects to remove and/or abandon any of the Purchased Equipment, Purchaser agrees to:

(i)     prior to its removal, at Purchaser's expense, decommission the Purchased Equipment in accordance with all applicable laws and regulations, including without limitation, Environmental Law (as defined below) and in accordance with all applicable internal GM policies and procedures for decommissioning equipment (a "Proper Decommissioning"); or

(ii)     indemnify and hold GECC, GE Canada and the applicable Owner Trustee harmless from and against any and all claims from third parties resulting from Purchaser's failure to comply with subparagraph 11(c)(i) above.

14

**EXECUTION COPY**

For certainty, a Proper Decommissioning will include, without limitation, the proper handling and disposal of any Hazardous Substances (as defined below) or wastes contained in or on the surface of such equipment, and leaving any premises where the Purchased Equipment is or was located in a safe condition, all in compliance with all applicable laws, including Environmental Law (as defined below);

(d)     Purchaser also agrees that if Purchaser uses, removes or disposes of the Purchased Equipment, Purchaser will indemnify, defend and hold harmless GECC, GE Canada and the applicable Owner Trustee from any and all claims of third parties as a result of Purchaser's use, removal or disposal of the Purchased Equipment, including in respect to any damage or injury to persons or the property of others. The forgoing indemnification will include Purchaser's failure to comply with any applicable laws and regulations, including without limitation Environmental Law, in connection with Purchaser's use, removal or disposal of the Purchased Equipment;

(e)     Upon reasonable prior notice to Purchaser, GECC shall have the right, but not the obligation, to retain, at GECC's sole expense, an environmental consultant to inspect and take samples of (to the extent such sampling does not damage or render the subject equipment unusable) any substances in or on the Amended Lease Equipment; provided, however, any inspections by GECC or its consultant shall not unreasonably interfere with any ongoing operations or decommissioning activities. Neither GECC nor any consultant hired by GECC shall have any obligation to endorse or warrant the efficacy of any potential decommissioning or whether it complies with applicable Environmental Law;

(f)     "Environmental Law" shall mean all federal, state and local statutes and regulations pertaining to environmental, health and safety matters (and the common law related thereto) including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 et seq.) ("CERCLA"), the Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.) ("RCRA"), the Toxic Substances Control Act (15 U.S.C. §2601 et seq.) ("TSCA"), the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.) ("Clean Water Act" or "CWA"), the Clean Air Act (42 U.S.C. §7401 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), ("HMTA"), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.) ("OSHA");

(g)     "Hazardous Substances" shall mean all materials, substances or wastes that are defined, listed or regulated as "hazardous" or "toxic" (or words of similar meaning and intent) under applicable Environmental Law, including, without limitation "hazardous substances" as defined in CERCLA, "hazardous waste" as defined in RCRA, "toxic substances" (including PCBs) as defined in TSCA, petroleum, and petroleum products or substances; and

(h)     If Purchaser uses, removes or disposes of the Purchased Equipment through agents or independent contractors, Purchaser agrees that it will be liable for the acts and omissions of such agents and independent contractors to the extent such acts or omissions would have been covered by the terms of this Section 11 if done or omitted by Purchaser.

(i)     Notwithstanding anything to the contrary in this Section 11, Purchaser shall have no obligation to provide any notice to GECC of any use, removal, decommissioning or disposal of the Purchased Equipment.

15

**EXECUTION COPY**

**Section 12.    Confidentiality of Settlement Economics.**  The Parties acknowledge and agree that the certain ancillary agreement dated as of the date of this Agreement (the "Ancillary Agreement") describes certain of the economic terms agreed to between GECC, GE Canada, GM Canada and Purchaser with respect to certain GECC Agreements and the Amended C-1 Lease Documents, as applicable, and as referenced in this Agreement shall not be filed with the Bankruptcy Court and shall remain confidential in all respects.

**Section 13.    Conditions to Closing.**  The Parties' obligation to effect the Closing (as defined below) is subject to the satisfaction, or the express written waiver of GECC, at or prior to the Closing of the following conditions:

        (a)    Omnibus Agreement Approval Order.  The Bankruptcy Court shall have granted the 9019 Motion and entered the proposed approval Order (the "Approval Order") approving this Agreement and the transactions contemplated hereby, and such Approval Order shall be in full force and effect and shall have become final and non-appealable;

        (b)    Effectiveness and Satisfaction of Closing Conditions of Settlement Agreement.  The Settlement Agreement shall have become effective and the conditions contained in Section 4 and Section 5(g) of the Settlement Agreement shall have been satisfied;

        (c)    GECC Financing.  The separate agreement between Purchaser and GECC regarding certain matters related to financing provided by GECC to special purpose entities that provide utility services to Purchaser and/or certain Debtors shall have become effective;

        (d)    Outside Date for Closing.  If the Closing Date (as defined below) has not occurred by April 30, 2010, or such other date agreed to by the Parties, this Agreement may be terminated by any Party (the "Terminating Party") upon written notice to the Parties ("Notice of Termination"); provided, however, that such Terminating Party is not, either prior to such Notice of Termination or as a result of such Notice of Termination, in breach of any representation or warranty, covenant or other obligation under this Agreement;

        (e)    Modification of Automatic Stay.  The Approval Order shall authorize the modification of the automatic stay solely to allow GECC to issue notices to OldCo and an invoice for an amount equal to the Lump Sum Lender Termination Payment (as defined in the Amended and Restated Tri-Party Agreement, dated December 14, 2000, among Shreveport Red River Utilities, LLC ("Red River"), as Debtor, GECC (as assignee of Newman Financial Services, Inc.), as Lender, and OldCo (the "Tri-Party Agreement")); such notices and invoices are sometimes collectively and individually herein referred to as the "Default Notices/Lump Sum Invoices") in connection with any GM Default (as defined in the Tri-Party Agreement) or any event which with the giving of notice or lapse of time would become a GM Default under the Tri-Party Agreement; provided, however, that for the avoidance of doubt (i) the modification of the stay set forth herein is limited to solely providing the Default Notices/Lump Sum Invoices, (ii) GECC has no right to take any enforcement action or exercise any remedies against the Debtors or their assets (other than the issuance of the Default Notices/Lump Sum Invoices) without seeking further relief from the stay in the Chapter 11 Cases, (iii) the Debtors' failure to respond to the Default Notices/Lump Sum Invoices will not have any effect on the Debtors' obligations, if any, to Red River, GECC or any other party, and (iv) the Default Notices/Lump Sum Invoices may be given for the sole purpose of (A) preserving rights GECC has or may have

16

**EXECUTION COPY**

against persons or entities other than the Debtors, and (B) evidencing GECC's assertion that the obligations as specifically referenced in any such Default Notices/Lump Sum Invoices are due and owing; and

      (f)     <u>OT Fees and Expenses</u>.  Purchaser shall reimburse (i) the Leveraged Lease Owner Trustee under the A-4 Lease (the "<u>A-4 Owner Trustee</u>") and (ii) the SIL Owner Trustee under the C-1 Lease (the "<u>C-1 Owner Trustee</u>") by paying to the A-4 Owner Trustee and the C-1 Owner Trustee, as applicable, by wire transfer the A-4 Owner Trustee Fees and Expenses and the C-1 Owner Trustee Fees and Expenses (as identified and described in the Ancillary Agreement) in cash or cash equivalents for their reasonable costs (including trustee fees) and out-of-pocket expenses (including legal expenses) incurred in connection with or related to this Agreement which in the aggregate shall not exceed $47,417.72.

      **Section 14.**   **Closing Date**.   The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") will take place on the date as provided in Section 4 of the Settlement Agreement, or such other date as shall be mutually agreed upon in writing by the Parties (the "<u>Closing Date</u>").

      **Section 15.**    **Notices**.   Whenever any of the Parties desires to give or serve upon another any such communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be addressed to the party to be notified as follows:

      (a)     If to GECC, at:

           General Electric Capital Corporation
           3 Capital Drive
           Eden Prairie, MN 55344
           Attention:  Kurt Bjorklund
           (952) 828-2742 (fax)
           Electronic Mail:  kurt.bjorklund@ge.com

           with copies to:

           Latham & Watkins LLP
           233 South Wacker Drive
           Suite 5800
           Chicago, IL  60606-6401
           Attention:  Douglas Bacon
           (312) 993-9767 (fax)
           Electronic Mail:  douglas.bacon@lw.com

      (b)     If to GE Canada, c/o GECC according to the above instructions.

      (c)     If to Purchaser, at:

           General Motors LLC
           767 Fifth Avenue

**EXECUTION COPY**

New York, NY 10153
Attention: Director of Global Funding and Cash Management

with copies to:

Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Attention: Donald F. Baty, Jr.
(313) 465-7315 (fax)
Electronic Mail: dbaty@honigman.com

(d)     If to GM Canada, c/o Purchaser according to the above instructions.

(e)     If to Saturn, c/o Purchaser according to the above instructions.

(f)     If to the Leveraged Lease Owner Trustee, at:

U.S. Bank National Association, as Owner Trustee
Corporate Trust Services
One Federal Street – 3rd Floor
Boston, MA 02110
Attention: Deborah A. Ibrahim
Fax: (617) 603-6610

With copies to:

Edwards Angell Palmer & Dodge LLP
111 Huntington Ave.
Boston, MA 02199-7613 USA
Attention: Richard Hiersteiner
(617) 227-4420 (fax)
Electronic Mail: rhiersteiner@eapdlaw.com

(g)     If to the SIL Owner Trustee, to US Bank Trust National Association according to the above instructions.

(h)     If to the Debtors, at:

Motors Liquidation Company
500 Renaissance Center
Suite 1400
Detroit, Michigan 48265-3000
Attention: David Head            .

with copies to:

CH\1114120.28

**EXECUTION COPY**

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY 10153
> Attention: Joseph Smolinsky
> (212) 310 8007 (fax)
> Electronic Mail: joseph.smolinsky@weil.com

or at such other address as may be substituted by notice given as herein provided. Every notice, demand, request, consent, approval, declaration or other communication hereunder shall be deemed to have been validly served, given or delivered (i) upon the earlier of actual receipt and three (3) Business Days after the same shall have been deposited with the United States mail, registered or certified mail, return receipt requested, with proper postage prepaid, (ii) upon transmission, when sent by facsimile transmission or electronic mail, (iii) one (1) Business Day after deposit with a reputable overnight carrier with all charges prepaid or (iv) when delivered, if hand-delivered by messenger.

**Section 16.** **<u>Miscellaneous</u>.**

(a) <u>Reliance on Legal Counsel</u>. The Parties acknowledge that they have been represented in the negotiations for and in the execution of this Agreement by counsel of their own choice and that they have read this Agreement and have had it fully explained to them by their counsel and that they are fully aware of the contents of this Agreement and its legal effect.

(b) <u>No Representations or Promises Not Contained Herein</u>. Each of the Parties represents and warrants that it has not relied upon or been induced by any representation, statement or disclosure by the other Party, but has relied upon its own knowledge and judgment and upon the advice and representation of its counsel in entering into this Agreement. In making this Agreement each of the Parties represents and warrants that it relied wholly upon its own judgment, belief and knowledge.

(c) <u>Due Authorization</u>. Each of the Parties represents and warrants to the other that (1) this Agreement has been duly authorized, executed and delivered, (2) it has the power to enter into this Agreement, and (3) it has not assigned, transferred, sold or otherwise conveyed any rights, claims or causes of action against the other party to any third person.

(d) <u>Entire Agreement</u>. This Agreement, the Ancillary Agreement, the 2001 Purchase Agreements and the Settlement Agreement, with the exception of the Stipulated Order and the Supplemental Stipulated Order, constitute the entire agreement of the Parties with respect to the matters covered herein, and no other agreement, statement or promise regarding such matters made by either Party, or by any employee, director, officer, agent or attorney of either Party, which is not contained in this Agreement, the Ancillary Agreement, the 2001 Purchase Agreements and/or the Settlement Agreement shall be binding or valid; provided, however, that, notwithstanding anything herein to the contrary, the execution, delivery and performance of other undertakings and agreements by certain parties hereto may constitute, in part, consideration for the execution, delivery and performance of this Agreement by certain other parties hereto, and the execution, delivery and performance of this Agreement by certain parties hereto may constitute, in part, consideration for the execution, delivery and performance of other undertakings and agreements by other certain parties hereto. Without limiting the foregoing, the

19

**EXECUTION COPY**

Parties acknowledge and agree that the express terms of this Agreement, the Ancillary Agreement, the 2001 Purchase Agreements and the Settlement Agreement shall control and supersede the Stipulated Order and the Supplemental Stipulated Order to the extent the terms of the Stipulated Order and/or the Supplemental Stipulated Order are inconsistent with any of the terms herein. Unless and until the Closing occurs, this Agreement, the Ancillary Agreement, the 2001 Purchase Agreements and/or the Settlement Agreement shall not affect the rights and obligations of the Parties pursuant to the Stipulated Order and the Supplemental Stipulated Order.

(e)    <u>Controlling Law</u>. This Agreement shall be governed by, construed in accordance with, and enforced under the laws of the state of New York, without giving effect to the principles of comity or conflicts of law thereof.

(f)    <u>Effect of Captions</u>. Captions of the Sections of this Agreement are for convenience and reference only, and the words contained therein shall in no way be employed to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Agreement.

(g)    <u>Severability</u>. If any provision of this Agreement is held, determined, or adjudged to be invalid, unenforceable, or void for any reason whatsoever, the remainder of that provision (if any) and the remaining provisions of this Agreement will remain in full force and effect.

(h)    <u>Construction</u>. This Agreement shall be construed as if prepared jointly by the Parties, and any uncertainty or ambiguity shall not be interpreted against either one of the Parties.

(i)    <u>Rights and Liabilities of Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, and the Parties' respective predecessors, successors and assigns, including, without limitation, any subsequently appointed chapter 7 trustee, liquidating trustee or receiver.

(j)    <u>Execution in Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which counterparts together shall constitute one and the same instrument. Facsimile or other electronically transmitted signature pages shall be deemed to be an original.

(k)    <u>Amendment</u>. This Agreement may be modified, amended or otherwise changed only in a writing signed by all of the Parties.

(l)    <u>Consent to Jurisdiction</u>. ALL ACTIONS BROUGHT ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND THE BANKRUPTCY COURT SHALL RETAIN EXCLUSIVE JURISDICTION TO DETERMINE ANY AND ALL SUCH ACTIONS. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY DISPUTE ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.

CH\1114120.28

**EXECUTION COPY**

      (m)   <u>Further Assurances</u>. Each Party, without further consideration, shall use its commercially reasonable efforts to take or cause to be taken all actions necessary, proper or advisable to enable the other Party to consummate the undertakings contemplated by this Agreement.

      (n)   <u>Settlement Purposes Only</u>. This Agreement represents a negotiated settlement of a dispute and, as such, if the Approval Order has not been entered, contents of this Agreement shall, except as to any litigation seeking to enforce the terms of this Agreement, be of no force and effect and shall have no evidentiary value in any future litigation on any of the subjects or events described herein.

      (o)   <u>Other Agreements</u>. GECC and its affiliates have a substantial amount of contractual relationships with the Debtors and Purchaser. This Agreement shall not affect any contractual relationships between the Parties other than with respect to the GECC Agreements, the Ancillary Agreement, the 2001 Purchase Agreements and/or the Settlement Agreement.

      (p)   <u>No Third-Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies upon any party other than the Parties and their respective successors and permitted assigns.

      (q)   <u>Saturn and GM Canada</u>. Saturn and GM Canada are executing this Agreement solely for the purpose of consenting to (i) the rejection of certain Mobile Equipment Leases entered into by Saturn and GM Canada, as applicable, (ii) Purchaser's purchase of the Mobile Equipment Property subject to such rejected Mobile Equipment Leases and (iii) the release of the Lease Damage Claims, the GM Canada Claims and the GE Canada Claims as set forth in Sections 8(a), 8(c), 8(d) and 8(e), respectively.

      (r)   <u>GE Canada</u>. GE Canada is executing this Agreement solely for the purpose of consenting to (i) the rejection of certain Mobile Equipment Leases entered into by GE Canada, (ii) Purchaser's purchase of the Mobile Equipment Property subject to such rejected Mobile Equipment Leases and (iii) the release of the GE Canada Claims as set forth in Section 8(e).

      (s)   <u>US Bank</u>. US Bank and US Bank Trust are executing this Agreement solely in their respective capacities as owner trustee under the applicable trust agreements relating to the respective Leveraged Leases and SIL Leases, on behalf of, and upon instruction by, GECC, as Owner Participant thereunder, for the purpose of consenting to and facilitating (i) the rejection of the Rejected Leases, (ii) the assumption and assignment of the Amended A-4 Lease Documents, (iii) Purchaser's purchase of the B-1 Leased Equipment and all assets leased under the A-2 Lease, the A-6 Lease and the A-8 Lease, (iv) the assumption and assignment of the Amended C-1 Lease Documents and (v) the release of the OT Claims as set forth in Section 8(f).

      (t)   <u>Recitals Incorporated</u>. The Parties agree that the recitals (subparagraphs A through U) set forth in the Background section above are expressly part of this Agreement, are true and correct as of the date hereof and are incorporated herein as integral provisions of this Agreement.

CH\1114120.28

**EXECUTION COPY**

(u)    <u>Wire Instructions</u>.  The Parties agree that the payments contemplated by this Agreement and identified and described in the Ancillary Agreement shall be made pursuant to the terms and conditions as set forth in the Ancillary Agreement.

*[signature page follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on their behalf by their officers thereunto duly authorized, as of the date first above written.

**MOTORS LIQUIDATION COMPANY,** as a Debtor

By: _____

Name/Title: _____

**GENERAL MOTORS LLC,** as Purchaser

By: _____

Name:   Maurita Sutedja

Title:    Director, Global Funding & Cash Management

**GENERAL MOTORS OF CANADA LIMITED**

By: _____

Name/Title: _____

**MLCS, LLC,** as a Debtor

By: _____

Name/Title: _____

[SIGNATURE PAGE TO OMNIBUS AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on their behalf by their officers thereunto duly authorized, as of the date first above written.


**MOTORS LIQUIDATION COMPANY,** as a Debtor

By: _____
Name/Title: _____


**GENERAL MOTORS LLC,** as Purchaser

By: _____
Name:   Maurita Sutedja
Title:    Director, Global Funding & Cash Management


**GENERAL MOTORS OF CANADA LIMITED**

By: _____
Name: Shawn Severs
Title:   Vice President Finance


**MLCS, LLC,** as a Debtor

By: _____
Name/Title: _____


[SIGNATURE PAGE TO OMNIBUS AGREEMENT]

**GENERAL ELECTRIC CAPITAL CORPORATION**

By: _____

Name/Title: __Laura Lugo, Duly Authorized Signatory__

**GENERAL ELECTRIC CANADA MANAGEMENT SERVICES**

By: _____

Name/Title: _____

**U.S. BANK NATIONAL ASSOCIATION,** as Owner Trustee under the Leveraged Leases

By: _____

Name/Title: _____

**U.S. BANK TRUST NATIONAL ASSOCIATION,** as Owner Trustee under the SIL Leases

By: _____

Name/Title: _____

[SIGNATURE PAGE TO OMNIBUS AGREEMENT]

**GENERAL ELECTRIC CAPITAL CORPORATION**

By: _____
Name/Title: _____


**GENERAL ELECTRIC CANADA MANAGEMENT SERVICES**

By: _____
Name/Title: Ranjit L. Sharma
Vice President, Finance
By: _____
Name/Title: Bruce L. Fulford
Secretary

**U.S. BANK NATIONAL ASSOCIATION,** as Owner Trustee under the Leveraged Leases

By: _____
Name/Title: _____


**U.S. BANK TRUST NATIONAL ASSOCIATION,** as Owner Trustee under the SIL Leases

By: _____
Name/Title: _____


[SIGNATURE PAGE TO OMNIBUS AGREEMENT]

**GENERAL ELECTRIC CAPITAL CORPORATION**

By: _____
Name/Title: _____


**GENERAL ELECTRIC CANADA MANAGEMENT SERVICES**

By: _____
Name/Title: _____


**U.S. BANK NATIONAL ASSOCIATION,** as Owner Trustee under the Leveraged Leases

By: _____
Name/Title: _____Deborah A. Ibrahim_____
                Vice President


**U.S. BANK TRUST NATIONAL ASSOCIATION,** as Owner Trustee under the SIL Leases

By: _____
Name/Title: _____Deborah A. Ibrahim_____
                Vice President


[SIGNATURE PAGE TO OMNIBUS AGREEMENT]

**Schedule 1**

**AMENDED A-4 LEASE DOCUMENTS**

| Document | Parties |
|---|---|
| Participation Agreement (GM 2001A-4), dated December 18, 2001 | (1) General Electric Capital Corporation, (2) State Street Bank and Trust Company of Connecticut, National Association, (3) Wells Fargo Bank Northwest, National Association, (4) the Note Purchasers (as defined therein) and (5) General Motors Corporation |
| Lease Agreement (GM 2001A-4), dated December 18, 2001 | (1) State Street Bank and Trust Company of Connecticut, National Association and (2) General Motors Corporation |
| Lease Supplement (GM 2001A-4), dated December 18, 2001 | (1) State Street Bank and Trust Company of Connecticut, National Association and (2) General Motors Corporation |
| Tax Indemnity Agreement (GM 2001A-4), dated December 18, 2001 | (1) General Electric Capital Corporation and (2) General Motors Corporation |
| Trust Indenture and Security Agreement (GM 2001A-4), dated December 18, 2001 | (1) State Street Bank and Trust Company of Connecticut, National Association and (2) Wells Fargo Bank Northwest, National Association. |
| Indenture Supplement No.1 (GM 2001A-4), dated December 18, 2001 | (1) State Street Bank and Trust Company of Connecticut, National Association and (2) Wells Fargo Bank Northwest, National Association. |

CH\1114120.28

**Schedule 2**

## B-1 LEASE DOCUMENTS

| DOCUMENT | PARTIES |
|---|---|
| Participation Agreement (GM 2003B-1), dated September 30, 2003 | (1) General Electric Capital Corporation, (2) U.S. Bank Trust National Association and (3) General Motors Corporation |
| Lease Agreement (GM 2003B-1), dated September 30, 2003 | (1) U.S. Bank Trust National Association and (2) General Motors Corporation |
| Lease Supplement (GM 2003B-1), dated September 30, 2003 | (1) U.S. Bank Trust National Association and (2) General Motors Corporation |
| Tax Indemnity Agreement (GM 2003B-1), dated September 30, 2003 | (1) General Electric Capital Corporation and (2) General Motors Corporation |

**Schedule 3**

## AMENDED C-1 LEASE DOCUMENTS

| DOCUMENT | PARTIES |
|---|---|
| Participation Agreement (GM 2003C-1), dated December 10, 2003 | (1) General Electric Capital Corporation, (2) U.S. Bank Trust National Association and (3) General Motors Corporation |
| Lease Agreement (GM 2003C-1), dated December 10, 2003 | (1) U.S. Bank Trust National Association and (2) General Motors Corporation |
| Lease Supplement (GM 2003C-1), dated December 10, 2003 | (1) U.S. Bank Trust National Association and (2) General Motors Corporation |
| Tax Indemnity Agreement (GM 2003C-1), dated December 10, 2003 | (1) General Electric Capital Corporation and (2) General Motors Corporation |

**Schedule 4**

<u>**MOBILE EQUIPMENT PROPERTY**</u>

**This Schedule is voluminous in nature and will be provided upon request of Debtor's counsel or upon approval of the Court.**

**Schedule 5**

## **FURNITURE**

CH\1114120.28

**This Schedule is voluminous in nature and will be provided upon request of Debtor's counsel or upon approval of the Court.**

**EXHIBIT A**

**<u>Amended A-4 Lease</u>**

## EXHIBIT A

## ASSUMPTION, ASSIGNMENT AND AMENDMENT AGREEMENT
## (GM 2001A-4)

This ASSUMPTION, ASSIGNMENT AND AMENDMENT AGREEMENT dated as of _____, 2010 (this "Agreement") is entered into by and among Motors Liquidation Company (f/k/a General Motors Corporation) and certain of its subsidiaries, as assignor (collectively, the "Assignor"), and General Motors LLC (f/k/a General Motors Company), as assignee (the "Assignee") and US Bank National Association, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, (the "Lessor").

WHEREAS, the Assignor, the Assignee, the Lessor and certain other parties have entered into that certain Omnibus Agreement dated as of _____, 2010 (the "Omnibus Agreement");

WHEREAS, pursuant to the terms of the Omnibus Agreement, the Assignor has agreed to assign to the Assignee all of its rights, interests, duties, obligations and liabilities in, to and under the lease documents described on Exhibit A (the "Assigned Agreements") and the Assignee has agreed to assume the assignment of all of the Assignor's rights, interests, duties, obligations and liabilities in, to and under the Assigned Agreements without regard to when such right, interest, duty, obligation or liability arose or may arise;

WHEREAS, pursuant to the terms of the Omnibus Agreement, the Assignee and the Lessor have agreed to amend the Lease Agreement (GM 2001A-4) dated as of December 18, 2001 between Lessor, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, as Lessor, and the Assignor, as Lessee (the "Lease");

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

SECTION 1.   ASSIGNMENT.

The Assignor hereby assigns, transfers and conveys to the Assignee all of its rights, interests, duties, obligations and liabilities in, to and under the Assigned Agreements, without regard to when such right, interest, duty, obligation or liability arose or may arise.

SECTION 2.   ASSUMPTION.

The Assignee hereby accepts the assignment and assumes all of the duties, obligations and liabilities of the Assignor in, to and under the Assigned Agreements, without regard to when such right, interest, duty, obligation or liability arose or may arise.

SECTION 3.   AMENDMENTS.

(a)   Information.   As and after the date hereof, notwithstanding anything in the Participation Agreement Section 10(e) or in any other Assigned Agreement to the contrary, the

Lessee shall deliver to the Lessor (with a copy to the Indenture Trustee) the financial statements described in Exhibit B attached to this Agreement at the times described in Exhibit B attached to this Agreement.

(b)    Return.    As and after the date hereof, notwithstanding anything in the Lease Section 5 to the contrary, for any Equipment which is required to be returned to the Lessor at the end of the Base Term or any Renewal Term or pursuant to Section 9 or Section 16 of Lease, the Lessor and any prospective purchaser or lessee of the Equipment from the Lessor shall during the period that is nine months before the date of such return have reasonable access during normal working hours and upon reasonable notice to the Lessee at their own expense and risk to inspect the Equipment and observe its operation.

(c)    Inspection.    As and after the date hereof, notwithstanding anything in Section 12 of the Lease or in any other Assigned Agreement to the contrary, in addition to the inspection on the days specified in the Inspection Schedule to the Lease, upon reasonable prior written notice to the Lessee on one additional time during each calendar year, the Lessor, the Owner Participant and, so long as the Indenture is in effect, the Indenture Trustee and the Noteholders or their designated agents (including in the case of the Owner Participant an independent equipment servicer selected by it) may, within the 45 days following such notice (on such a date to be mutually agreed with Lessee) at their own expense and risk conduct a visual inspection of the Equipment (including a visual inspection sufficient to identify model numbers and serial numbers for all Equipment and its Parts reasonably considered material by the Owner Participant and inventory them); provided that after the occurrence and during an Event of Default or a Material Default, the number of inspections shall not be limited and all such inspections shall be at the Lessee's expense and risk.    No such additional inspection shall interfere with the use, operation or maintenance of the Equipment or the normal conduct of Lessee's business, and the Lessee shall not be required to undertake or incur any additional liabilities in connection therewith.

SECTION 4.   MISCELLANEOUS.

(a)    Reliance on Legal Counsel. The Parties acknowledge that they have been represented in the negotiations for and in the execution of this Agreement by counsel of their own choice and that they have read this Agreement and have had it fully explained to them by their counsel and that they are fully aware of the contents of this Agreement and its legal effect.

(b)    No Representations or Promises Not Contained Herein. Each of the Parties represents and warrants that it has not relied upon or been induced by any representation, statement or disclosure by the other Party, but has relied upon its own knowledge and judgment and upon the advice and representation of its counsel in entering into this Agreement.  In making this Agreement each of the Parties represents and warrants that it relied wholly upon its own judgment, belief and knowledge.

(c)    Due Authorization. Each of the Parties represents and warrants to the other that (1) this Agreement has been duly authorized, executed and delivered, (2) it has the power to enter into this Agreement, and (3) it has not assigned, transferred, sold or otherwise conveyed any rights, claims or causes of action against the other party to any third person.

(d)    <u>Entire Agreement</u>.  This Agreement and the Omnibus Agreement constitute the entire agreement of the Parties with respect to the matters covered herein, and no other agreement, statement or promise regarding such matters made by either Party, or by any employee, director, officer, agent or attorney of either Party, which is not contained in this Agreement and/or the Omnibus Agreement shall be binding or valid.

(e)    <u>Controlling Law</u>.  This Agreement shall in all respects be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether in the State of New York or in any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(f)    <u>Effect of Captions</u>.    Captions of the Sections of this Agreement are for convenience and reference only, and the words contained therein shall in no way be employed to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Agreement.

(g)    <u>Severability.</u>  If any provision of this Agreement is held, determined, or adjudged to be invalid, unenforceable, or void for any reason whatsoever, the remainder of that provision (if any) and the remaining provisions of this Agreement will remain in full force and effect.

(h)    <u>Construction</u>.  This Agreement shall be construed as if prepared jointly by the Parties, and any uncertainty or ambiguity shall not be interpreted against either one of the Parties.

(i)    <u>Rights and Liabilities of Successors and Assigns</u>.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, and the Parties' respective predecessors, successors and assigns, including, without limitation, any subsequently appointed chapter 7 trustee, liquidating trustee or receiver.

(j)    <u>Execution in Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which counterparts together shall constitute one and the same instrument.  Facsimile or other electronically transmitted signature pages shall be deemed to be an original.

(k)    <u>Amendment</u>.  This Agreement may be modified, amended or otherwise changed only in a writing signed by all of the Parties.

(l)    <u>Further Assurances</u>.  Each Party, without further consideration, shall use its commercially reasonable efforts to take or cause to be taken all actions necessary, proper or advisable to enable the other Party to consummate the undertakings contemplated by this Agreement.

(m)    <u>No Other Third-Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any party other than the Parties, the Indenture Trustee, the Lenders and the Owner Participant and their respective successors and permitted assigns.

(n)    <u>US Bank</u>.  US Bank National Association is executing this Agreement solely in its capacity as Owner Trustee on behalf of, and upon instruction by the Owner Participant.

(o)    <u>Effect of Assignment, Assumption and Amendment</u>.  As assigned, assumed and amended by this Agreement, the Assigned Agreements shall continue in full force and effect.

[signature page follows]

IN WITNESS WHEREOF, of the parties hereto have has caused this Assumption, Assignment and Amendment Agreement to be duly executed as of the date first written above.

MOTORS LIQUIDATION COMPANY, as Assignor


By_____
Name:
Title:


GENERAL MOTORS LLC, as Assignee


By_____
Name:
Title:


US BANK NATIONAL ASSOCIATION, not in its individual capacity but solely as Owner Trustee


By_____
Name:
Title:

## EXHIBIT A

## ASSIGNED AGREEMENTS (GM 2001A-4)

Lease Agreement (GM 2001A-4) dated as of December 18, 2001 between US Bank National Association, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee (the "Owner Trustee"), as Lessor, and Motors Liquidation Company (f/k/a General Motors Corporation), as Lessee

Lease Supplement (GM 2001A-4) dated as of December 18, 2001 between the Owner Trustee, as Lessor, and Motors Liquidation Company (f/k/a General Motors Corporation), as Lessee

Participation Agreement (GM 2001A-4) dated as of December 18, 2001 between Motors Liquidation Company (f/k/a General Motors Corporation), as Lessee, General Electric Capital Corporation, as Owner Participant, and the Owner Trustee not in its individual capacity except as expressly stated therein, but solely as Owner Trustee

Tax Indemnity Agreement (GM 2001A-4) dated as of December 18, 2001 between General Electric Capital Corporation and Motors Liquidation Company (f/k/a General Motors Corporation)

**EXHIBIT B**

**INFORMATION**

A.      Within ten (10) days after General Motors Company, a Delaware corporation formerly known as General Motors Holding Company (together with its successors and permitted assigns, "Holdco"), has filed the same with the SEC, copies of quarterly and annual reports and of the information, documents and other reports (or copies of such portions of any of the foregoing as the SEC may from time to time by rules and regulations prescribe) which Holdco filed or files with the SEC pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934; or, if Holdco is not required to file information, documents or reports pursuant to either of such sections, then, within ten (10) days after Holdco has filed the same with the SEC, copies of the supplementary and periodic information, documents and reports which Holdco filed or files with the SEC and which may be required by Section 13 of the Securities Exchange Act of 1934 in respect of a security listed and registered on a national securities exchange as the SEC may from time to time by rules and regulations prescribe (it being understood and agreed that the quarterly and annual reports, information, documents and other reports that Holdco files with the SEC via the EDGAR filing system (or any successor system thereto) or otherwise makes widely available via electronic means within ten (10) days after the date that Holdco files the same with the SEC shall be deemed to be delivered in compliance with the provisions of this Section A and Section B below.

B.      As soon as available, but in any event not later than 55 days after the end of the third fiscal quarter of the Lessee's 2009 fiscal year, and each fiscal quarter thereafter until Holdco is required under the Securities Exchange Act of 1934 to make the quarterly and annual reports referred to in paragraph A. of this Exhibit B, the unaudited balance sheet of Holdco and its consolidated subsidiaries as at the end of such quarter and the related unaudited consolidated statement of operations and statement of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by the Holdco as being fairly stated in all material respects (subject to the absence of footnotes and to normal year-end audit adjustments); provided, that with respect to the Holdco's quarterly financial statements to be provided for the third fiscal quarter of 2009, such financial statements shall be provided on a modified basis within 55 days after the end of such third fiscal quarter, with GAAP-compliant versions of such financial statements to be provided within 90 days after the end of its 2009 fiscal year.

# EXHIBIT B

## B-1 Leased Equipment Bill of Sale

## EXHIBIT B

## B-1 LEASED EQUIPMENT BILL OF SALE

This **BILL OF SALE** (this "Bill of Sale"), dated _____ __, 2010 (the "Effective Date"), is by and between General Electric Capital Corporation, a Delaware Corporation ("Seller"), and General Motors LLC, a Delaware limited liability company ("Purchaser").

**WHEREAS,** Seller and Purchaser have entered into that certain Omnibus Agreement, dated as of February 25, 2010; and

**WHEREAS,** subject to the terms of the Omnibus Agreement, Seller has agreed to sell the B-1 Leased Equipment to Purchaser and Purchaser has agreed to purchase the B-1 Leased Equipment from Seller;

**NOW, THEREFORE**, in consideration of the amounts set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby covenant and agree as follows:

1.    **Definitions**.  Unless otherwise defined herein, all capitalized terms used in this Bill of Sale shall have the meanings set forth in the Omnibus Agreement.

2.    **Transfer**.    Pursuant to the terms of the Omnibus Agreement (including representations, warranties, and covenants, if any), Seller hereby sells, transfers, assigns, conveys, and delivers to Purchaser, and Purchaser accepts, all of its rights and title to the B-1 Leased Equipment, as defined in the Omnibus Agreement. In consideration of the sale of the B-1 Leased Equipment, Purchaser shall pay to Seller by wire transfer, contemporaneous with the delivery of this Bill of Sale, an amount equal to $_____ in cash or cash equivalents.

3.    **Severability**.  If any provision of this Bill of Sale is held to be illegal, invalid, or unenforceable, such provision shall be fully severable and this Bill of Sale shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part hereof; the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as part of this Bill of Sale a legal, valid, and enforceable provision as similar in its terms to such illegal, invalid, or unenforceable provision as may be possible.

4.    **Miscellaneous**.  This Bill of Sale may be modified only by a writing signed by each party hereto.  There are no oral agreements between the parties to this Bill of Sale.  This Bill of Sale may be executed in counterparts.  Faxed copies of manually executed signature page(s) to this Bill of Sale will be fully binding and enforceable without the need for delivery of the manually executed signature page(s).  Seller may not assign any of its rights hereunder or delegate any of its duties hereunder. Any Exhibit referred to herein is incorporated by reference herein.  The captions in this Bill of Sale are for convenience of reference only and are not to be

considered in interpreting this Bill of Sale. Use of "herein," "hereof," "hereby," or similar terms refer to this Bill of Sale as a whole. The reference to any gender shall be construed to include the masculine, feminine, and neuter. This Bill of Sale is binding on the parties hereto and their heirs, estates, personal representatives, successors, and assigns. This Bill of Sale shall not be construed against the party responsible for or primarily responsible for, preparing this Bill of Sale. Time is of the essence with respect to all of Seller's obligations in this Bill of Sale. This Bill of Sale shall be governed by, construed in accordance with, and enforced under the laws of the state of New York, without giving effect to the principles of comity or conflicts of law thereof.

*{Remainder of page intentionally left blank.}*

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Bill of Sale as of the Effective Date.

**SELLER**:

GENERAL ELECTRIC CAPITAL CORPORATION

By: _____

Name: _____

Title: _____


**PURCHASER:**

GENERAL MOTORS LLC

By: _____

Name: _____

Title: _____

## EXHIBIT C

### Amended C-1 Lease

**EXHIBIT C**

**ASSUMPTION, ASSIGNMENT AND AMENDMENT AGREEMENT**
**(GM 2003C-1)**

This ASSUMPTION, ASSIGNMENT AND AMENDMENT AGREEMENT dated as of _____, 2010 (this "Agreement") is entered into by and among Motors Liquidation Company (f/k/a General Motors Corporation) and certain of its subsidiaries, as assignor (collectively, the "Assignor"), and General Motors LLC (f/k/a General Motors Company), as assignee (the "Assignee") and US Bank Trust National Association, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, (the "Lessor").

WHEREAS, the Assignor, the Assignee, the Lessor and certain other parties have entered into that certain Omnibus Agreement dated as of _____, 2010 (the "Omnibus Agreement");

WHEREAS, pursuant to the terms of the Omnibus Agreement, the Assignor has agreed to assign to the Assignee all of its rights, interests, duties, obligations and liabilities in, to and under the lease documents described on Exhibit A (the "Assigned Agreements") and the Assignee has agreed to assume the assignment of all of the Assignor's rights, interests, duties, obligations and liabilities in, to and under the Assigned Agreements without regard to when such right, interest, duty, obligation or liability arose or may arise;

WHEREAS, pursuant to the terms of the Omnibus Agreement, the Assignee and the Lessor have agreed to amend the Lease Agreement (GM 2003C-1) dated as of September 30, 2003 between Lessor, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee, as Lessor, and the Assignor, as Lessee (the "Lease");

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

SECTION 1.    ASSIGNMENT.

The Assignor hereby assigns, transfers and conveys to the Assignee all of its rights, interests, duties, obligations and liabilities in, to and under the Assigned Agreements, without regard to when such right, interest, duty, obligation or liability arose or may arise.

SECTION 2.    ASSUMPTION.

The Assignee hereby accepts the assignment and assumes all of the duties, obligations and liabilities of the Assignor in, to and under the Assigned Agreements, without regard to when such right, interest, duty, obligation or liability arose or may arise.

SECTION 3.    AMENDMENTS.

(a)    Information.    As and after the date hereof, notwithstanding anything in the Participation Agreement Section 10(e) or in any other Assigned Agreement to the contrary, the

Lessee shall deliver to the Lessor the financial statements described in Exhibit B attached to this Agreement at the times described in Exhibit B attached to this Agreement.

(b)    Return.  As and after the date hereof, notwithstanding anything in the Lease Section 5 to the contrary, for any Equipment which is required to be returned to the Lessor at the end of the Base Term or any Renewal Term or pursuant to Section 9 or Section 16 of Lease, the Lessor and any prospective purchaser or lessee of the Equipment from the Lessor shall during the period that is nine months before the date of such return have reasonable access during normal working hours and upon reasonable notice to the Lessee at their own expense and risk to inspect the Equipment and observe its operation.

(c)    Inspection.  As and after the date hereof, notwithstanding anything in Section 12 of the Lease or in any other Assigned Agreement to the contrary, in addition to the inspection on the days specified in the Inspection Schedule to the Lease, upon reasonable prior written notice to the Lessee on one additional time during each calendar year, the Lessor, the Owner Participant or their designated agents (including in the case of the Owner Participant an independent equipment servicer selected by it) may, within the 45 days following such notice (on such a date to be mutually agreed with Lessee) at their own expense and risk conduct a visual inspection of the Equipment (including a visual inspection sufficient to identify model numbers and serial numbers for all Equipment and its Parts reasonably considered material by the Owner Participant and inventory them); provided that after the occurrence and during an Event of Default or a Material Default, the number of inspections shall not be limited and all such inspections shall be at the Lessee's expense and risk.  No such additional inspection shall interfere with the use, operation or maintenance of the Equipment or the normal conduct of Lessee's business, and the Lessee shall not be required to undertake or incur any additional liabilities in connection therewith.

(d)    Amended and Restated Schedules to Lease Supplement.  As and after the date hereof all references in the Lease and any other Assigned Agreement to the following schedules to the Lease Supplement: Schedule II (Base Rent Payments), Schedule II-A (Base Rent Payment Allocations), Schedule II-B (467 Loan Schedule), Schedule III (Stipulated Loss Value Schedule), Schedule IV (Termination Value Schedule) and Schedule V (Early Fixed Price Purchase Option) to the Lease Supplement shall be deemed to be references to Amended and Restated Schedule II to Lease Agreement (Base Rent Payments), Amended and Restated Schedule II-A to Lease Agreement (Base Rent Payment Allocations), Amended and Restated Schedule II-B to Lease Agreement (467 Loan Schedule), Amended and Restated Schedule III to Lease Agreement (Stipulated Loss Value Schedule), Amended and Restated Schedule IV to Lease Agreement (Termination Value Schedule) and Amended and Restated Schedule V to Lease Agreement (Early Fixed Price Purchase Option) attached to this Agreement, respectively.

SECTION 4.   MISCELLANEOUS.

(a)     Reliance on Legal Counsel. The Parties acknowledge that they have been represented in the negotiations for and in the execution of this Agreement by counsel of their own choice and that they have read this Agreement and have had it fully explained to them by their counsel and that they are fully aware of the contents of this Agreement and its legal effect.

(b)     No Representations or Promises Not Contained Herein. Each of the Parties represents and warrants that it has not relied upon or been induced by any representation, statement or disclosure by the other Party, but has relied upon its own knowledge and judgment and upon the advice and representation of its counsel in entering into this Agreement. In making this Agreement each of the Parties represents and warrants that it relied wholly upon its own judgment, belief and knowledge.

(c)     Due Authorization. Each of the Parties represents and warrants to the other that (1) this Agreement has been duly authorized, executed and delivered, (2) it has the power to enter into this Agreement, and (3) it has not assigned, transferred, sold or otherwise conveyed any rights, claims or causes of action against the other party to any third person.

(d)     Entire Agreement. This Agreement and the Omnibus Agreement constitute the entire agreement of the Parties with respect to the matters covered herein, and no other agreement, statement or promise regarding such matters made by either Party, or by any employee, director, officer, agent or attorney of either Party, which is not contained in this Agreement and/or the Omnibus Agreement shall be binding or valid.

(e)     Controlling Law.  This Agreement shall in all respects be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether in the State of New York or in any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(f)     Effect of Captions.   Captions of the Sections of this Agreement are for convenience and reference only, and the words contained therein shall in no way be employed to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Agreement.

(g)     Severability.  If any provision of this Agreement is held, determined, or adjudged to be invalid, unenforceable, or void for any reason whatsoever, the remainder of that provision (if any) and the remaining provisions of this Agreement will remain in full force and effect.

(h)     Construction.  This Agreement shall be construed as if prepared jointly by the Parties, and any uncertainty or ambiguity shall not be interpreted against either one of the Parties.

(i)     Rights and Liabilities of Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, and the Parties' respective

predecessors, successors and assigns, including, without limitation, any subsequently appointed chapter 7 trustee, liquidating trustee or receiver.

(j)    <u>Execution in Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which counterparts together shall constitute one and the same instrument.  Facsimile or other electronically transmitted signature pages shall be deemed to be an original.

(k)    <u>Amendment</u>.  This Agreement may be modified, amended or otherwise changed only in a writing signed by all of the Parties.

(l)    <u>Further Assurances</u>.  Each Party, without further consideration, shall use its commercially reasonable efforts to take or cause to be taken all actions necessary, proper or advisable to enable the other Party to consummate the undertakings contemplated by this Agreement.

(m)    <u>No Other Third-Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any party other than the Parties, the Indenture Trustee, the Lenders and the Owner Participant and their respective successors and permitted assigns.

(n)    <u>US Bank</u>.  US Bank Trust National Association is executing this Agreement solely in its capacity as Owner Trustee on behalf of, and upon instruction by the Owner Participant.

(o)    <u>Effect of Assignment, Assumption and Amendment</u>.  As assigned, assumed and amended by this Agreement, the Assigned Agreements shall continue in full force and effect.

[signature page follows]

IN WITNESS WHEREOF, of the parties hereto have has caused this Assumption, Assignment and Amendment Agreement to be duly executed as of the date first written above.

MOTORS LIQUIDATION COMPANY, as Assignor

By_____
Name:
Title:

GENERAL MOTORS LLC, as Assignee

By_____
Name:
Title:

US BANK TRUST NATIONAL ASSOCIATION, not in its individual capacity but solely as Owner Trustee

By_____
Name:
Title:

## Schedule II - Base Rent Payments

[to be attached]

## Schedule II-A - Base Rent Payment Allocations

[to be attached]

## Schedule II-B - 467 Loan Schedule

[to be attached]

CHI:2370373.1

## Schedule III - Stipulated Loss Value Schedule

[to be attached]

**Schedule IV - Termination Value Schedule**

[to be attached]

CHI:2370373.1

## Schedule V - Early Fixed Price Purchase Option

[to be attached]

# EXHIBIT A

## ASSIGNED AGREEMENTS (GM 2003C-1)

Lease Agreement (GM 2003C-1) dated as of September 30, 2003 between US Bank Trust National Association, not in its individual capacity except as expressly stated therein, but solely as Owner Trustee (the "Owner Trustee"), as Lessor, and Motors Liquidation Company (f/k/a General Motors Corporation), as Lessee

Lease Supplement (GM 2003C-1) dated as of September 30, 2003 between the Owner Trustee, as Lessor, and Motors Liquidation Company (f/k/a General Motors Corporation), as Lessee

Participation Agreement (GM 2003C-1) dated as of September 30, 2003 between Motors Liquidation Company (f/k/a General Motors Corporation), as Lessee, General Electric Capital Corporation, as Owner Participant, and the Owner Trustee not in its individual capacity except as expressly stated therein, but solely as Owner Trustee

Tax Indemnity Agreement (GM 2003C-1) dated as of September 30, 2003 between General Electric Capital Corporation and Motors Liquidation Company (f/k/a General Motors Corporation)

## EXHIBIT B

## INFORMATION

A.     Within ten (10) days after General Motors Company, a Delaware corporation formerly known as General Motors Holding Company (together with its successors and permitted assigns, "Holdco"), has filed the same with the SEC, copies of quarterly and annual reports and of the information, documents and other reports (or copies of such portions of any of the foregoing as the SEC may from time to time by rules and regulations prescribe) which Holdco filed or files with the SEC pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934; or, if Holdco is not required to file information, documents or reports pursuant to either of such sections, then, within ten (10) days after Holdco has filed the same with the SEC, copies of the supplementary and periodic information, documents and reports which Holdco filed or files with the SEC and which may be required by Section 13 of the Securities Exchange Act of 1934 in respect of a security listed and registered on a national securities exchange as the SEC may from time to time by rules and regulations prescribe (it being understood and agreed that the quarterly and annual reports, information, documents and other reports that Holdco files with the SEC via the EDGAR filing system (or any successor system thereto) or otherwise makes widely available via electronic means within ten (10) days after the date that Holdco files the same with the SEC shall be deemed to be delivered in compliance with the provisions of this <u>Section A</u> and <u>Section B</u> below.

B.     As soon as available, but in any event not later than 55 days after the end of the third fiscal quarter of the Lessee's 2009 fiscal year, and each fiscal quarter thereafter until Holdco is required under the Securities Exchange Act of 1934 to make the quarterly and annual reports referred to in paragraph A. of this Exhibit B, the unaudited balance sheet of Holdco and its consolidated subsidiaries as at the end of such quarter and the related unaudited consolidated statement of operations and statement of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by the Holdco as being fairly stated in all material respects (subject to the absence of footnotes and to normal year-end audit adjustments); <u>provided</u>, that with respect to the Holdco's quarterly financial statements to be provided for the third fiscal quarter of 2009, such financial statements shall be provided on a modified basis within 55 days after the end of such third fiscal quarter, with GAAP-compliant versions of such financial statements to be provided within 90 days after the end of its 2009 fiscal year.

**EXHIBIT D**

<u>**Mobile Equipment Property Bill of Sale**</u>

**EXHIBIT D**

**MOBILE EQUIPMENT PROPERTY BILL OF SALE**

This **BILL OF SALE** (this "Bill of Sale"), dated _____ __, 2010 (the "Effective Date"), is by and between General Electric Capital Corporation, a Delaware Corporation, ("GECC"), General Electric Canada Management Services, an Ontario General Partnership (together with GECC, the "Sellers"), and General Motors LLC, a Delaware limited liability company ("Purchaser").

**WHEREAS,** Sellers and Purchaser have entered into that certain Omnibus Agreement, dated as of February 25, 2010; and

**WHEREAS,** pursuant to the terms of the Omnibus Agreement, Sellers agreed to sell the Mobile Equipment Property to Purchaser and Purchaser agreed to purchase the Mobile Equipment Property from Sellers;

**NOW, THEREFORE,** in consideration of the amounts set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby covenant and agree as follows:

1. **Definitions**. Unless otherwise defined herein, all capitalized terms used in this Bill of Sale shall have the meanings set forth in the Omnibus Agreement.

2. **Transfer**. Pursuant to the terms of the Omnibus Agreement (including representations, warranties, and covenants, if any) Sellers hereby sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser accepts, all of Sellers' rights and title to the Mobile Equipment Property, as identified on Schedule 4 to the Omnibus Agreement, including all of Sellers' rights and title, if any, to all batteries, accessories, and/or attachments to any of the Mobile Equipment Property. In consideration of the sale of the Mobile Equipment Property, Purchaser shall pay to Sellers by wire transfer, contemporaneous with the delivery of this Bill of Sale, an amount equal to **$_____** in cash or cash equivalents.

3. **Severability**. If any provision of this Bill of Sale is held to be illegal, invalid, or unenforceable, such provision shall be fully severable and this Bill of Sale shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part hereof; the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as part of this Bill of Sale a legal, valid, and enforceable provision as similar in its terms to such illegal, invalid, or unenforceable provision as may be possible.

4. **Miscellaneous**. This Bill of Sale may be modified only by a writing signed by each party hereto. There are no oral agreements between the parties to this Bill of Sale. This Bill of Sale may be executed in counterparts. Faxed copies of manually executed signature

page(s) to this Bill of Sale will be fully binding and enforceable without the need for delivery of the manually executed signature page(s). Sellers may not assign any of its rights hereunder or delegate any of its duties hereunder. Any Exhibit referred to herein is incorporated by reference herein. The captions in this Bill of Sale are for convenience of reference only and are not to be considered in interpreting this Bill of Sale. Use of "herein," "hereof," "hereby," or similar terms refer to this Bill of Sale as a whole. The reference to any gender shall be construed to include the masculine, feminine, and neuter. This Bill of Sale is binding on the parties hereto and their heirs, estates, personal representatives, successors, and assigns. This Bill of Sale shall not be construed against the party responsible for or primarily responsible for, preparing this Bill of Sale. Time is of the essence with respect to all of Sellers' obligations in this Bill of Sale. This Bill of Sale shall be governed by, construed in accordance with, and enforced under the laws of the state of New York, without giving effect to the principles of comity or conflicts of law thereof.

*{Remainder of page intentionally left blank.}*

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Bill of Sale as of the Effective Date.

**SELLERS**:

GENERAL ELECTRIC CAPITAL CORPORATION


By: _____
Name: _____
Title: _____


GENERAL ELECTRIC CANADA MANAGEMENT SERVICES


By: _____
Name: _____
Title: _____


**PURCHASER:**

GENERAL MOTORS LLC

By: _____
Name: _____
Title: _____

**EXHIBIT E**

**<u>Furniture Bill of Sale</u>**

EXHIBIT E

**FURNITURE BILL OF SALE**

This **BILL OF SALE** (this "Bill of Sale"), dated _____ __, 2010 (the "Effective Date"), is by and between General Electric Capital Corporation, a Delaware Corporation ("Seller"), and General Motors LLC, a Delaware limited liability company ("Purchaser").

**WHEREAS,** Seller and Purchaser have entered into that certain Omnibus Agreement, dated as of February 25, 2010; and

**WHEREAS,** pursuant to the terms of the Omnibus Agreement, Seller agreed to sell the Furniture to Purchaser and Purchaser agreed to purchase the Furniture from Seller;

**NOW, THEREFORE,** in consideration of the amounts set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby covenant and agree as follows:

1.    **Definitions**.  Unless otherwise defined herein, all capitalized terms used in this Bill of Sale shall have the meanings set forth in the Omnibus Agreement.

2.    **Transfer**.  Pursuant to the terms of the Omnibus Agreement (including representations, warranties, and covenants, if any) Seller hereby sells, transfers, assigns, conveys, and delivers to Purchaser, and Purchaser accepts, all of its rights and title to the Furniture, as identified on Schedule 5 to the Omnibus Agreement.   In consideration of the sale of the Furniture, Purchaser shall pay to Seller by wire transfer, contemporaneous with the delivery of this Bill of Sale, an amount equal to $_____ in cash or cash equivalents.

3.    **Severability**.  If any provision of this Bill of Sale is held to be illegal, invalid, or unenforceable, such provision shall be fully severable and this Bill of Sale shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part hereof; the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as part of this Bill of Sale a legal, valid, and enforceable provision as similar in its terms to such illegal, invalid, or unenforceable provision as may be possible.

4.    **Miscellaneous**.  This Bill of Sale may be modified only by a writing signed by each party hereto.  There are no oral agreements between the parties to this Bill of Sale.  This Bill of Sale may be executed in counterparts.  Faxed copies of manually executed signature page(s) to this Bill of Sale will be fully binding and enforceable without the need for delivery of the manually executed signature page(s).  Seller may not assign any of its rights hereunder or delegate any of its duties hereunder.  Any Exhibit referred to herein is incorporated by reference herein.  The captions in this Bill of Sale are for convenience of reference only and are not to be

FURNITURE BILL OF SALE

considered in interpreting this Bill of Sale.  Use of "herein," "hereof," "hereby," or similar terms refer to this Bill of Sale as a whole.  The reference to any gender shall be construed to include the masculine, feminine, and neuter.  This Bill of Sale is binding on the parties hereto and their heirs, estates, personal representatives, successors, and assigns.  This Bill of Sale shall not be construed against the party responsible for or primarily responsible for, preparing this Bill of Sale.  Time is of the essence with respect to all of Seller's obligations in this Bill of Sale.  This Bill of Sale shall be governed by, construed in accordance with, and enforced under the laws of the state of New York, without giving effect to the principles of comity or conflicts of law thereof.

*{Remainder of page intentionally left blank.}*

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Bill of Sale as of the Effective Date.

**SELLER**:

GENERAL ELECTRIC CAPITAL CORPORATION


By: _____
Name: _____
Title: _____


**PURCHASER:**

GENERAL MOTORS LLC

By: _____
Name: _____
Title: _____

**<u>Exhibit C</u>**

**<u>Order Authorizing the Global Settlement Agreement</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
                                         :
In re                                    :         Chapter 11 Case No.
                                         :
MOTORS LIQUIDATION COMPANY, et al.,      :         09-50026 (REG)
        f/k/a General Motors Corp., et al.   :
                                         :
                      Debtors.           :         (Jointly Administered)
                                         :
-------------------------------------------------------------x
```

## ORDER PURSUANT TO FED. R. BANKR. P. 9019
## APPROVING GLOBAL SETTLEMENT AGREEMENT AND COMPROMISE

Upon the Motion, dated March 4, 2010 (the "**Motion**"),[1] of Motors Liquidation

Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession

(collectively, the "**Debtors**"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), for entry of an order approving and ratifying, among other things, the

settlement agreement (the **"Global Settlement Agreement"**), attached to the Motion as **Exhibit "A"**,

between (i) General Motors LLC ("**New GM**"), (ii) MLC, (iii) MLCS, LLC (f/k/a Saturn, LLC), (iv)

Saturn County Bond Corporation, (v) HNB Investment Corp., (vi) General Foods Credit Corporation,

(vii) General Foods Credit Investors No. 2 Corporation, (viii) Philip-Morris Capital Corporation, (ix)

General Electric Capital Corporation, (x) U.S. Bank, National Association, as owner trustee under

certain lease arrangements, (xi) The Bank of New York Mellon, as indenture trustee, pass through

trustee or purchase option agent under certain lease arrangements, (xii) Manufacturers and Traders

Trust Company, as indenture trustee, pass through trustee or purchase option agent under certain lease

arrangements, and (xiii) Wells Fargo Bank Northwest, National Association, as indenture trustee under

certain lease arrangements, all as more fully described in the Motion; and due and proper notice of the

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the
Motion.

Motion having been provided, and it appearing that no other or further notice need be provided; and

the Court having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set forth

in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient

cause appearing therefore, it is ordered that:

1. The Debtors' entry into the Global Settlement Agreement is in the best interests

of the Debtors and their estates;

2. The settlements and compromises embodied in the Global Settlement

Agreement are within the range of reasonableness;

3. The Debtors' entry into the Global Settlement Agreement is authorized, ratified

and directed and the Debtors and all parties to the Global Settlement Agreement are authorized to take

all steps necessary and appropriate to consummate and otherwise effectuate the terms of the Global

Settlement Agreement without further order of this Court;

4. Upon entry of this Order, all terms and conditions of the Settlement Agreement

shall become effective;

5. This Order is the order referenced in paragraph 3(b) of this Court's December

16, 2009 "Order Authorizing Rejection of Certain Personal Property Agreements and/or Abandonment

of Equipment" [Docket No. 4671];

6. The automatic stay is lifted to the extent necessary to consummate the sales of

the Equipment subject to the Subject Leveraged Lease Transactions known as GM 2000 A-3, GM

2001 A-1, GM 2001 A-2, GM 2001 A-6, GM 2001 A-7 and GM 2001 A-8 as contemplated by the

Global Settlement Agreement;

7. Upon the closing of the sales of the Equipment subject to the Subject Leveraged

Lease Transactions known as GM 2000 A-3, 2001 A-1, GM 2001 A-2, GM 2001 A-6, GM 2001 A-7

2

and GM 2001 A-8, all other parties to such Subject Leveraged Lease Transactions shall be permanently enjoined from asserting any claims against New GM on account of such Equipment or such Subject Leveraged Lease Transactions, or otherwise interfering with New GM's use and quiet enjoyment of such Equipment;

8. The Indenture Trustees are authorized to distribute the proceeds of such sales to the Noteholders and Certificateholders (each, as defined in the Global Settlement Agreement) in accordance with the terms of the Global Settlement Agreement;

9. As set forth in the Global Settlement Agreement, there shall be allowed pre-petition general unsecured rejection damages claims (the "**Allowed Prepetition Rejection Damages Claims**") in favor of the Indenture Trustees with respect to the Subject Leveraged Lease Transactions as follows:

| Rejected Lease Transaction | Amount of Claim | Recipient |
|---|---|---|
| 2000 A-3 Participation Agreement and other 2000 A-3 Operative Documents | $44,412,510.92 | M&TT, as 2000 A-3 Indenture Trustee |
| 2001 A-1 Participation Agreement and other 2001 A-1 Operative Documents | $141,305,874.37 | Wells Fargo, as 2001 A-1 Indenture Trustee |
| 2001 A-2 Participation Agreement and other 2001 A-2 Operative Documents | $142,197,253.40 | Wells Fargo, as 2001 A-2 Indenture Trustee |
| 2001 A-6 Participation Agreement and other 2001 A-6 Operative Documents | $45,835,565.21 | Wells Fargo, as 2001 A-6 Indenture Trustee |
| 2001 A-7 Participation Agreement and other 2001 A-7 Operative Documents | $6,753,243.28 | Wells Fargo, as 2001 A-7 Indenture Trustee |
| 2001 A-8 Participation Agreement and other 2001 A-8 Operative Documents | $6,789,209.82 | Wells Fargo, as 2001 A-8 Indenture Trustee |

US_ACTIVE:\43326236\01\72240.0639

10.     As set forth in the Global Settlement Agreement, there shall be allowed pre-petition general unsecured tax indemnity claims (the "**Allowed Prepetition TIA Claims**") in favor of the Owner Participants on account of the rejection of the Tax Indemnity Agreements as follows:

| Rejected Lease Transaction | Amount of Claim | Recipient |
|---|---|---|
| 2001 A-1 Participation Agreement and Tax Indemnity Agreement | $22,400,000 | General Foods No. 2, as 2001 A-1 Owner Participant |
| 2001 A-7 Participation Agreement and Tax Indemnity Agreement | $1,600,000 | General Foods No. 2, as 2001 A-7 Owner Participant |

11.     The Allowed Prepetition TIA Claims constitute "Excepted Property," as defined in the Participation Agreements with respect to the Subject Leveraged Lease Transactions known as GM 2001 A-1 and GM 2001 A-7;

12.     In full and final settlement and satisfaction of any obligation of (x) MLC, MLCS or any of their Affiliates or (y) New GM or any of its Affiliates, to make payment in connection with any administrative or other claim arising under Section 365, 503 or 507 of the Bankruptcy Code relating to the use or possession of the "Equipment" subject to any of the Subject Leveraged Lease Transactions identified in the table below during the period from the Petition Date to the Closing Date, the Indenture Trustees identified below shall have the allowed administrative claims (the "**Allowed Administrative Claims**") specified below, which shall be paid on the Closing Date by New GM (to the extent such payments have not been previously made), which payments shall be applied in accordance with the respective agreement governing the respective Subject Leveraged Lease Transactions:

4

| Rejected Lease Transaction | Amount of Payment | Recipient |
|---|---|---|
| 2000 A-3 Participation Agreement and other 2000 A-3 Operative Documents | $334,425 | M&TT, as 2000 A-3 Indenture Trustee |
| 2001 A-1 Participation Agreement and other 2001 A-1 Operative Documents | $17,459 | Wells Fargo, as 2001 A-1 Indenture Trustee |
| 2001 A-2 Participation Agreement and other 2001 A-2 Operative Documents | $13,720 | Wells Fargo, as 2001 A-2 Indenture Trustee |
| 2001 A-6 Participation Agreement and other 2001 A-6 Operative Documents | $242,198 | Wells Fargo, as 2001 A-6 Indenture Trustee |
| 2001 A-7 Participation Agreement and other 2001 A-7 Operative Documents | $111,665 | Wells Fargo, as 2001 A-7 Indenture Trustee |
| 2001 A-8 Participation Agreement and other 2001 A-8 Operative Documents | $276,445 | Wells Fargo, as 2001 A-8 Indenture Trustee |

13.     The mutual releases provided in Section 7 of the Global Settlement Agreement shall be effective and binding on all parties thereto, subject to the limitations as set forth in Section 7(g) of the Global Settlement Agreement;

14.     The Allowed Prepetition Rejection Damage Claims shall be in full and final satisfaction of any claims that might be asserted by any Noteholder or Certificateholder (each, as defined in the Global Settlement Agreement) under or in connection with the Subject Leveraged Lease Transactions known as GM 2000 A-3, GM 2001 A-1, GM 2001 A-2, GM 2001 A-6, GM 2001 A-7 and GM 2001 A-8, and that any such claims separately asserted by any Noteholder or Certificateholder under such Subject Leveraged Lease Transactions is hereby disallowed;

15.     Except with respect to Allowed Prepetition TIA Claims, any and all claims against MLC for damages for or on account of the rejection and/or breach by MLC of the agreements

5

underlying the Leveraged Lease Transactions known as GM 2001 A-1, GM 2001 A-2, GM 2001 A-6,

GM 2001 A-7, and GM 2001 A-8, and any and all related claims, shall, on the Agreement Effective

Date (as defined in the Global Settlement Agreement) be assigned, outright and unconditionally, as

part of the transactions contemplated thereby, to the relevant Indenture Trustee for the sole benefit of

the relevant Noteholders and the relevant Certificateholders (each, as defined in the Global Settlement

Agreement) and the amount of such claims shall not be reduced or otherwise affected by reason of any

contract or other agreement between the relevant Owner Participant, the relevant Owner Trustee, MLC

or any other person; provided that, (i) with respect to any of the Subject Leveraged Lease Transactions

designated GM 2000 A-3, 2001 A-1, GM 2001 A-2, GM 2001 A-6, GM 2001 A-7 and GM 2001 A-8,

upon the payment in full of all amounts owing to the relevant Indenture Trustee, the relevant

Noteholders and the relevant Certificateholders (including the payment in full of all of the relevant

Equipment Notes, including all principal, interest (including default interest), Make-Whole Premium

and other amounts), the relevant Indenture Trustee shall pay any remaining amounts (if any) to the

relevant Owner Trustee for distribution pursuant to the terms of the relevant Subject Leveraged Lease

Transaction agreements and (ii) no consent or approval of any Owner Trustee or any Owner

Participant shall be required for any Indenture Trustee (or any Noteholder or Certificateholder) to take

any action in respect of the aforementioned assigned claims;

16.     To the extent any of the parties to the Global Settlement Agreement have filed

proofs of claims in the Debtors' chapter 11 cases which have been settled pursuant to the terms of the

Global Settlement Agreement, such parties shall promptly withdraw any such proofs of claims;

17.     To the extent any conflict exists between the terms and conditions of the Global

Settlement Agreement and this Order, this Order shall control; and

18.     This Court shall retain jurisdiction to hear and determine all matters arising from

6

or related to the implementation, interpretation and/or enforcement of this Order.

Dated: New York, New York
        March __, 2010


_____
United States Bankruptcy Judge

US_ACTIVE:\43326236\01\72240.0639

**Exhibit D**

**Order Authorizing the GECC Omnibus Agreement**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                                    :
In re                                               :        Chapter 11 Case No.
                                                    :
MOTORS LIQUIDATION COMPANY, *et al.*,               :        09-50026 (REG)
    f/k/a General Motors Corp., *et al.*            :
                                                    :
                            Debtors.                :        (Jointly Administered)
                                                    :
-------------------------------------------------------------x

## ORDER PURSUANT TO 11 U.S.C. §§ 105, 365, AND 362(d)(1) AND FED. R. BANKR. P. 9019 APPROVING (I) OMNIBUS SETTLEMENT AGREEMENT AND COMPROMISE AND (II) REJECTION OF CERTAIN PERSONAL PROPERTY EQUIPMENT LEASE AGREEMENTS

Upon the Motion, dated March 4, 2010 (the "**Motion**"),[1] of Motors Liquidation

Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession

(collectively, the "**Debtors**"), pursuant to sections 105, 365, and 362(d)(1) of title 11, United

States Code (the "**Bankruptcy Code**") and Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), for entry of an order approving and ratifying, among other

things, the omnibus settlement agreement and compromise attached as **Exhibit B** to the Motion

(the "**Omnibus Agreement**"), between (i) Motors Liquidation Company, (ii) MLCS, LLC (f/k/a

Saturn, LLC), (iii) General Motors LLC, (iv) General Motors Canada Limited, (v) General

Electric Capital Corporation, (vi) General Electric Canada Management Services, (vii) U.S.

Bank National Association, as owner trustee under certain of the Subject Leveraged Leases

Transactions, and (viii) U.S. Bank Trust National Association, as owner trustee under the SIL

Lease Transactions, as more fully described in the Motion; and due and proper notice of the

Motion having been provided, and it appearing that no other or further notice need be provided;

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

and the Court having found and determined that the relief sought in the Motion is in the best

interests of the Debtors, their estates, creditors, and all parties in interest and that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein; and after

due deliberation and sufficient cause appearing therefore, it is ordered that:

1.      The Debtors' entry into the Omnibus Agreement is in the best interests of the

Debtors and their estates;

2.      The settlements and compromises embodied in the Omnibus Agreement are

within the range of reasonableness;

3.      The Debtors' entry into the Omnibus Agreement is authorized, ratified, and

directed, and the Debtors and all parties to the Omnibus Agreement are authorized to take all

steps necessary and appropriate to consummate and otherwise effectuate the terms of the

Omnibus Agreement without further order of this Court;

4.      Upon entry of this Order, all terms and conditions of the Omnibus Agreement

shall become effective;

5.      The Debtors, New GM, GM Canada, GECC, GE Canada, U.S. Bank, as owner

trustee under the Subject Leveraged Lease Transactions designated as GM 2001 A-2, GM 2001

A-4, GM 2001 A-6 and GM 2001 A-8 (the "**Leveraged Lease Owner Trustee**"), and U.S. Bank

Trust, as owner trustee under the SIL Lease Transactions (the "**SIL Owner Trustee**," and

together with the Leveraged Lease Owner Trustee, the "**Owner Trustees**") have negotiated and

entered into the Omnibus Agreement in good faith;

6.      The rejection of the Rejected Leases (i) constitutes an exercise of sound business

judgment by the Debtors, made in good faith and for legitimate commercial reasons, (ii) is

appropriate and necessary under the circumstances described in the Motion, and (iii) is warranted

and permissible under Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006;

7. The Subject Leveraged Lease Transaction designated as GM 2001 A-6 is deemed

rejected effective as of July 31, 2009;

8. The Subject Leveraged Lease Transaction designated as GM 2001 A-8 is deemed

rejected effective as of December 31, 2009;

9. The B-1 Lease is deemed rejected effective as of January 31, 2010;

10. The Mobile Equipment Leases and Furniture Leases are deemed rejected effective

as of the date of this Order;

11. The automatic stay is lifted to the extent necessary to consummate the sale of the

B-1 Leased Equipment, the Mobile Equipment Property and the Furniture as contemplated by the

Omnibus Agreement;

12. All prepetition and postpetition payments previously made by MLC or New GM,

respectively, (i) to the Indenture Trustees pursuant to the terms of the Subject Leveraged Lease

Transactions designated GM 2001 A-2, GM 2001 A-4, GM 2001 A-6, and GM 2001 A-8 (the

"**Leveraged Leases**") or pursuant to the *Stipulation and Order Resolving Objection to Sale*

*Motion*, dated July 2, 2009 [Dkt. # 2947] (the "**Stipulated Order**"), as applicable, for the benefit

of GECC under the Leveraged Leases, (ii) to the Owner Trustees under the SIL Lease

Transactions pursuant to the terms of the SIL Lease Transactions or pursuant to the Stipulated

Order, as applicable, for the benefit of GECC, or (iii) directly to GECC under the Mobile

Equipment Leases and the Furniture Leases are deemed approved and indefeasible;

13. Pursuant to section 365(a) and (f) of the Bankruptcy Code and Bankruptcy Rules

6006 and 9014 and the Court's Order [Docket No. 92] (the "**Assumption Procedures Order**")

authorizing certain Sale and Assumption Procedures in these chapter 11 cases, the Debtors are authorized to assume and assign the Subject Leveraged Lease Transaction designated as GM 2001 A-4 and the C-1 Lease to General Motors LLC in accordance with, and as modified by, the Amended A-4 Lease Documents and the Amended C-1 Lease Documents, respectively;

14.     From and after the Closing Date, GECC and the Owner Trustees shall have no continuing obligations or responsibilities with respect to the Rejected Leases and the Purchased Equipment, including, without limitation, any duty or obligation to retrieve, remove, dispose of, or otherwise deal with the Purchased Equipment;

15.     Upon the assumption by the Debtors and assignment to Purchaser of the Amended A-4 Lease Documents, all defaults or events of default under the Subject Leveraged Lease Transaction designated as GM 2001 A-4 (including, without limitation, "Events of Default" as defined in Section 15 of the lease agreement for the Subject Leveraged Lease Transaction designated as GM 2001 A-4)  shall be deemed remedied, cured and otherwise eliminated and any counterparty to the Amended A-4 Lease Documents, its successors, assigns or transferees, shall be prohibited from exercising any rights or remedies against any Debtor or non-Debtor party (including without limitation GECC in its capacity as Owner Participant and the Owner Trustee under the Subject Leveraged Lease Transaction designated as GM 2001 A-4) to such Amended A-4 Lease based on an asserted default, including, without limitation, any lease event of default arising from or related to these chapter 11 cases, or event of default that occurred on, prior to, or as a proximate result of the assumption and assignment, including the types of default specified in § 365(b)(1)(A) of the Bankruptcy Code;

16.     The mutual releases provided in Section 8 of the Omnibus Agreement shall be effective and binding on all parties thereto, subject to the limitations as set forth in Section 8(g) of the Omnibus Agreement;

17.     The automatic stay is modified to allow GECC the right to issue notices to the Debtors and an invoice for an amount equal to the Lump Sum Lender Termination Payment solely to the extent provided in section 13(e) of the Omnibus Agreement;

18.     To the extent not otherwise addressed by the terms of this Order, the terms and conditions of the Omnibus Agreement are incorporated by reference and approved by this Court;

19.     To the extent any conflicts exist between the terms and conditions of the Omnibus Agreement and this Order, this Order shall control;

20.     To the extent any of the parties to the Omnibus Agreement have filed proofs of claim in the Debtors' chapter 11 cases which have been settled pursuant to the terms of the Omnibus Agreement, such parties shall promptly withdraw (or amend, as appropriate) any such proofs of claim.

21.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.


Dated: _____, 2010
        New York, New York

                            _____
                            UNITED STATES BANKRUPTCY JUDGE

**<u>Schedule A</u>**

**<u>Notice Parties</u>**

| | |
|---|---|
| General Motors LLC<br>New York Treasurer's Office<br>767 Fifth Avenue, 14th Floor<br>New York, NY 1015<br>Attention: Director, Global Funding & Cash Management<br>Facsimile No.: (212) 418-6419 | Jenner & Block LLP<br>353 N. Clark Street<br>Chicago, IL 60654-3456<br>Attention: Michael S. Terrien<br>Facsimile No.: (312) 923-2728 |
| Motors Liquidation Company<br>500 Renaissance Center<br>Suite 1400<br>Detroit, Michigan 48265-3000<br>Attention: David Head | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attention: Evan S. Lederman<br>Facsimile No.: (212) 310-8007 |
| MLCS, LLC<br>500 Renaissance Center<br>Suite 1400<br>Detroit, Michigan 48265-3000<br>Attention: David Head | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attention: Evan S. Lederman<br>Facsimile No.: (212) 310-8007 |
| Saturn County Bond Corporation<br>c/o General Motors LLC<br>New York Treasurer's Office<br>767 Fifth Avenue, 14th Floor,<br>New York, NY 1015<br>Attention: Director, Global Funding & Cash Management<br>Facsimile No.: (212) 418-6419 | Jenner & Block LLP<br>353 N. Clark Street<br>Chicago, IL 60654-3456<br>Attention: Michael S. Terrien<br>Facsimile No.: (312) 923-2728 |
| HNB Investment Corp<br>c/o Philip Morris Capital Corporation<br>225 High Ridge Road<br>Suite 300 West<br>Stamford, Connecticut 06905<br>Attention: Vice President -- Asset and Portfolio Management<br>Facsimile No.: (203) 708-8297 | Kaye Scholer LLP<br>425 Park Avenue<br>New York, NY 10022-3598<br>Attention: Richard G. Smolev<br>Facsimile No. (212) 836-6583 |
| HNB Investment Corp.<br>c/o Altria Client Services Inc.<br>6603 W. Broad St.<br>P.O. Box 85088<br>Richmond, Virginia 23285<br>Attention: C. Anthony Reale, Senior Assistant General Counsel | Kaye Scholer LLP<br>425 Park Avenue<br>New York, NY 10022-3598<br>Attention: Richard G. Smolev<br>Facsimile No. (212) 836-6583 |

| | |
|---|---|
| Facsimile No.:  (914) 272-4384 | |
| General Foods Credit Corporation<br>c/o Philip Morris Capital Corporation<br>225 High Ridge Road<br>Suite 300 West<br>Stamford, Connecticut 06905<br>Attention: Vice President--Asset & Portfolio Management<br>Facsimile No.:  (203) 708-8297 | Kaye Scholer LLP<br>425 Park Avenue<br>New York, NY  10022-3598<br>Attention:  Richard G. Smolev<br>Facsimile No. (212) 836-6583 |
| General Foods Credit Corporation<br>c/o Altria Client Services Inc.<br>6603 W. Broad St.<br>P.O. Box 85088<br>Richmond, Virginia 23285<br>Attention: C. Anthony Reale, Senior Assistant General Counsel<br>Facsimile No.:  (914) 272-4384 | Kaye Scholer LLP<br>425 Park Avenue<br>New York, NY  10022-3598<br>Attention:  Richard G. Smolev<br>Facsimile No. (212) 836-6583 |
| General Foods Credit Investors No. 2 Corporation<br>c/o Philip Morris Capital Corporation<br>225 High Ridge Road<br>Suite 300 West<br>Stamford, Connecticut 06905<br>Attention: Vice President--Asset & Portfolio Management<br>Facsimile No.:  (203) 708-8297 | Kaye Scholer LLP<br>425 Park Avenue<br>New York, NY  10022-3598<br>Attention:  Richard G. Smolev<br>Facsimile No. (212) 836-6583 |
| General Foods Credit Investors No. 2 Corporation<br>c/o Altria Client Services Inc.<br>6603 W. Broad St.<br>P.O. Box 85088<br>Richmond, Virginia 23285<br>Attention: C. Anthony Reale, Senior Assistant General Counsel<br>Facsimile No.:  (914) 272-4384 | Kaye Scholer LLP<br>425 Park Avenue<br>New York, NY  10022-3598<br>Attention:  Richard G. Smolev<br>Facsimile No. (212) 836-6583 |
| Philip-Morris Capital Corporation<br>225 High Ridge Road<br>Suite 300 West<br>Stamford, Connecticut 06905<br>Attention: Vice President--Asset & Portfolio Management | Kaye Scholer LLP<br>425 Park Avenue<br>New York, NY  10022-3598<br>Attention:  Richard G. Smolev<br>Facsimile No. (212) 836-6583 |

| | |
|---|---|
| Facsimile No.:  (203) 708-8297 | |
| Philip-Morris Capital Corporation<br>c/o Altria Client Services Inc.<br>6603 W. Broad St.<br>P.O. Box 85088<br>Richmond, Virginia 23285<br>Attention: C. Anthony Reale, Senior Assistant<br>General Counsel<br>Facsimile No.:  (914) 272-4384 | Kaye Scholer LLP<br>425 Park Avenue<br>New York, NY  10022-3598<br>Attention:  Richard G. Smolev<br>Facsimile No. (212) 836-6583 |
| General Electric Capital Corporation<br>3 Capital Drive<br>Eden Prairie, MN 55344<br>Attention:  Kurt Bjorklund<br>Facsimile No.:  (952) 828-2742 | Latham & Watkins LLP<br>Sears Tower, Suite 5800<br>233 South Wacker Drive<br>Chicago, IL  60606-6401<br>Attention:  Douglas Bacon<br>Facsimile No.:  (312) 993-9767 |
| U.S. Bank National Association<br>Corporate Trust Services<br>One Federal Street - 3rd Floor<br>Boston, Massachusetts 02110<br>Attention:  Deborah Ibrahim<br>Facsimile No.:  (617) 603-6640 | Edwards Angell Palmer & Dodge LLP<br>111 Huntington Avenue<br>Boston, Massachusetts 02119<br>Attn:  Richard Hiersteiner, Esq.<br>Facsimile No.:  (617) 227-4420 |
| The Bank of New York Mellon<br>101 Barclay Street - 8W<br>New York, New York 10286<br>Attn:  Martin N. Feig, Vice President<br>Facsimile No.:  (732) 667-4756 | Emmet, Marvin & Martin, LLP<br>120 Broadway<br>New York, New York 10271<br>Attn:  Edward P. Zujkowski<br>Facsimile No.:  (212) 238-3021 |
| Manufacturers and Traders Trust Company<br>25 South Charles Street<br>16th Floor<br>Mail Code: MD2-CS58<br>Baltimore, MD 21201<br>Attention:  Dante Monakil<br>Facsimile No.:  (302) 651-1576 | Drinker Biddle & Reath LLP<br>1500 K Street, N.W.<br>Washington, District of Columbia  20005-1209<br>Attention:  Kristin K. Going<br>Facsimile No.:  (202) 842-8465 |
| Wells Fargo Bank Northwest, National<br>Association<br>Corporate Trust Services<br>MAC: U1228-120<br>299 S. Main Street, 12th Floor<br>Salt Lake City, UT 84111<br>Attention:  Marcus Foulger | Milbank, Tweed, Hadley & McCloy LLP<br>1 Chase Manhattan Plaza<br>New York, New York 10005-1413<br>Attention:  Tyson Lomazow<br>Facsimile No.:  (212) 822-5367 |

| | |
|---|---|
| Facsimile No.: (801) 246-5053 | |
| Comerica Leasing Corporation<br>29201 Telegraph Road, 2nd Floor<br>Southfield, MI 48034-1392 | Bodman LLP<br>1901 St. Antoine Street<br>6th Floor at Ford Field<br>Detroit, Michigan 48226<br>Attention:  Colin T. Darke<br>Facsimile No.:  (313) 393-7579 |
| Each of the GM 2001 A-1, GM 2001 A-2, GM 2001 A-3, GM 2001 A-4, GM 2001 A-5, GM 2001 A-6, GM 2001 A-7, and GM 2001 A-8 Trust Certificateholders listed on the Register maintained by Wells Fargo Bank Northwest, N.A., as 2001 A-1 Indenture Trustee, 2001 A-2 Indenture Trustee, 2001 A-3 Indenture Trustee, 2001 A-4 Indenture Trustee, 2001 A-5 Indenture Trustee, 2001 A-6 Indenture Trustee, 2001 A-7 Indenture Trustee, and 2001 A-8 Indenture Trustee, respectively | Each of the GM 2000A Pass Through Trust Pass Through Certificateholders listed on the Register maintained by Manufacturers and Traders Trust Company, as successor 2000A Pass Through Trustee |
| | |