Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| Lisa Patrice Gross, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  06-2452 JAR DJW |
| | ) | |
| General Motors Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF DEFENDANT GENERAL MOTORS CORPORATION IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

LATHROP & GAGE L.C.

*/s/ Heather R. Gill*

| | |
|---|---|
| Heather R. Gill | Kansas No. 18847 |
| David C. Vogel | Kansas No. 18129 |

2345 Grand Boulevard, Suite 2800
Kansas City, Missouri 64108-2684
Telephone: (816) 292-2000
Facsimile: (816) 292-2001

Attorney for Defendant General Motors
Corporation

CC 1931837v1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .......................................................................................................... 1

STATEMENT OF UNCONTROVERTED FACTS ................................................................ 1

ARGUMENT ................................................................................................................ 11

I.    GM is Entitled to Summary Judgment on Plaintiff's Hostile Work
      Environment/Hostile Work Environment Claim ............................................ 12

      A.    Plaintiff Was Not Subjected to a Hostile Work Environment ............... 12

      B.    GM Adequately Responded to Plaintiff's Complaints ......................... 14

II.   GM is Entitled to Summary Judgment on Plaintiff's Retaliation Claim ........... 16

III.  GM Did Not Discriminate Against Plaintiff on the Basis of Her Alleged
      Disability .................................................................................................... 20

      A.    Plaintiff is Not Disabled ...................................................................... 21

      B.    GM Did Not Discriminate Against Plaintiff Based on Her Alleged
            Disability ............................................................................................ 24

CONCLUSION ............................................................................................................. 26

## TABLE OF AUTHORITIES

### Cases

*Amro v. Boeing Co.*, 232 F.3d 790 (10th Cir. 2000)...................................................................... 19

*Anderson v. Academy Sch. Dist. 20*, 122 Fed. Appx. 912 (10th Cir. 2004)................................ 17

*Anderson v. Coors Brewing Co.*, 181 F.3d 1171 (10th Cir. 1999) .............................................. 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 12

*Anderson v. Phillips Petroleum Co.*, 861 F.2d 631 (10th Cir. 1988) .......................................... 16

*Annett v. University of Kan.*, 216 F. Supp. 2d 1249 (D. Kan. 2002) ........................................... 17

*Antana v. City and County of Denver*, 488 F.3d 860 (10th Cir. 2007)........................................ 16

*Archuleta v. Colorado Dep't of Inst.*, 936 F.2d 483 (10th Cir. 1991) ........................................ 16

*Atkins v. Southwestern Bell Tel. Co.*, 137 Fed. Appx. 115 (10th Cir. 2005) .............................. 15

*Branson v. Price River Coal Co.*, 853 F.2d 768 (10th Cir. 1988) .............................................. 17

*Bullington v. United Airlines, Inc.*, 186 F.3d 1301 (10th Cir. 1999) .......................................... 16

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) ....................................................... 18

*Campbell v. Merideth Corp.*, 206 F. Supp. 2d 1087 (D. Kan. 2003)........................................... 13

*Carrasco v. Boeing Co.*, 190 Fed. Appx. 650 (10th Cir. 2006).......................................... 13, 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................................... 12

*Chatfield v. Shilling Constr. Co., Inc.*, No. 97-4253-RDR, 1999 WL
    459763 (D. Kan. June 24, 1999)......................................................................................... 19

*Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117 (D. Kan. 2003) .................................. 21, 22

*Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492 (10th Cir. 2000)................................................. 24

*Duncan v. Manager*, 397 F.3d 1300 (10th Cir. 2005) ...................................................... 13, 14, 15

*E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790 (10th Cir. 2007) .............................................. 19, 20, 26

*Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847 (10th Cir. 2000) ............................................. 19

*Holmes v. Utah Dept. of Workforce Servs.*, 483 F.3d 1057 (10th Cir. 2007)............................. 14

*Kitchen v. Burlington Northern & Santa Fe. R.R.*, 298 F. Supp. 2d 1193
    (D. Kan. 2004) .................................................................................................................... 18

*Kourianos v. Smith's Food & Drug Ctrs., Inc.*, 65 Fed. Appx. 238 (10th
    Cir. 2003)................................................................................................................... 9, 21, 23

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574 (1986)........................................... 12

*Medina v. Income Support Div.*, 413 F.3d 1131 (10th Cir. 2005) .............................................. 13

*Munoz v. Western Resources, Inc.*, 225 F.Supp.2d 1265 (D. Kan. 2002).................................. 24

*Oliver v. Peter Kiewit & Sons*, 106 Fed. Appx. 672 (10th Cir 2004) ........................................ 13

*Pack v. Kmart Corp.*, 166 F.3d 1300 (10th Cir. 1999) .............................................................. 23

*Sanchez v. Denver Public Schs.*, 164 F.3d 527 (10th Cir. 1998)............................................... 19

*Smith v. Board of County Comm'ners of Johnson County, Kan.*, 96 F.
    Supp. 2d 1177 (D. Kan. 2000) ............................................................................................ 17

*Steele v. Thiokol Corp.*, 241 F.3d 1248 (10th Cir. 2001)...................................................... 9, 21, 23

*Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999) ................................................................. 24

*Tangires v. John Hopkins Hosp.*, 79 F. Supp. 2d 587 (D. Md. 2000) ........................................ 24

*Temple v. Auto Banc*, 76 F. Supp. 2d 1124 (D. Kan. 1999)....................................................... 12

*Tesh v. U.S. Postal Serv.*, 349 F.3d 1270 (10th Cir. 2003)....................................................... 25

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981) ......................................... 17

*Tran v. Trustees of State Colleges*, 355 F.3d 1263 (10th Cir. 2004) ......................................... 18

*Williams v. Hallmark Cards, Inc.*, 10 Fed. Appx. 790 (10th Cir. 2001)..................................... 22

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................ 11, 12

Defendant General Motors Corporation ("GM") submits the following Memorandum in Support of its Motion for Summary Judgment.

## INTRODUCTION

Plaintiff has been employed by GM for one year and nine months, when she went on a paid medical leave of absence for treatment of her bipolar disorder. Six weeks later, plaintiff's personal physician and an independent medical examiner certified plaintiff to return to work without restrictions, but plaintiff failed to return to work upon the expiration of her leave. As a result, plaintiff was terminated pursuant to the collective bargaining agreement governing her employment. Neither plaintiff's bipolar disorder nor her complaints about her workplace environment had anything to do with GM's decision to terminate plaintiff for her job abandonment. Likewise without merit are plaintiff's allegations that she was subjected to a hostile work environment during her employment. Plaintiff's lawsuit is based on nothing more than her perceptions of unfair treatment, which does not establish a submissible case. Accordingly, GM respectfully requests that it be granted summary judgment with regard to all of plaintiff's claims asserted in this matter.

## STATEMENT OF UNCONTROVERTED FACTS

GM submits the following statement of uncontroverted facts pursuant to Local Rule 56.1.

### Plaintiff's Employment With GM

1.    Plaintiff Lisa Patrice Gross, an African-American female, was employed by GM from February 9, 2004 to January 13, 2006. [Deposition of Lisa Patrice Gross, pp. 41-42, 139, Ex. 1; Amended Complaint, ¶ 13].[1]  Plaintiff was a member of the United Auto Workers union during her employment. [Declaration of Karen DeOrnellas, ¶ 2, Ex. 2].

---

[1] Numerous facts in this Statement are taken from the deposition of plaintiff Lisa Patrice Gross, which is attached hereto as Exhibit 1, and are therefore offered as undisputed for purposes of this Motion only.

2.     Plaintiff was on paid medical leave from April 20, 2005 to June 21, 2005 for stress, depression and anxiety. Plaintiff then went on paid medical leave again from August 9, 2005 to September 13, 2005. [Gross Depo. pp. 135-38].

3.     Between November 1 and 7, 2005, plaintiff was diagnosed with bipolar disorder. [Gross Depo. p.143].

4.     Plaintiff went on her third paid medical leave of absence on November 13 or 14, 2005 and did not thereafter return to work. [Gross Depo. pp. 77, 135-38, 143-44].

5.     In accordance with GM's Disability Management guidelines, plaintiff was administered an independent medical examination on December 7, 2005, by Dr. Fernando Egea. Dr. Egea diagnosed plaintiff with Major Depressive Disorder and assessed global functioning at 70%, which "describes an individual with some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well." Dr. Egea recommended plaintiff return to work on January 9, 2006. [Ex. 3; DeOrnellas Decl., ¶ 4].

6.     Plaintiff's leave of absence was thus set to expire on January 9, 2006. [DeOrnellas Decl., ¶ 4; Gross Depo. p. 156]. The January 9, 2006 expiration of plaintiff's leave of absence is reflected on the disability benefits checks plaintiff received from GM. [Ex. 4 (Gross Depo. Ex. 9); Gross Depo. p. 187].

7.     Plaintiff failed to returned to work within three days of the expiration of her leave. Plaintiff's seniority was broken pursuant to paragraph 111(b) of the collective bargaining agreement and plaintiff was thus discharged from her employment with GM effective January 13, 2006. [DeOrnellas Decl., ¶ 7; Gross Depo. p. 189].

**Facts Demonstrating Plaintiff Was Not Sexually Harassed
or Subjected to a Hostile Work Environment**

8.    Throughout her employment, plaintiff complains that various hourly coworkers and management employees would ask her if she dated. Plaintiff believes her coworkers asked these questions to "see if I'm easy, if I'm an easy woman." Plaintiff would tell her coworkers that she did not date and was a Christian. [Gross Depo. pp. 80-84].

9.    The only supervisor whom plaintiff could specifically identify that asked her these type of questions was Michael Carter, a Caucasian male, who was married to an African-American female. When plaintiff told Carter she did not date, he responded, "I might treat you good." Carter also allegedly let plaintiff know he "took good care of his wife and that his wife was a happy women," which Carter believed "kind of turned on" "a lot of women." Plaintiff also claims Carter commented on her physique, including her breasts and butt. Carter would also pant and pat his heart, as if he were in love with plaintiff. Carter also asked plaintiff "questions about sex." [Gross Depo. pp. 84-85, 89, 213].

10.    Plaintiff "stood her ground" with Carter and he "eventually" stopped making these comments. Plaintiff and Carter then became "good friends." [Gross Depo. pp. 85, 89].

11.    Plaintiff claims that her coworkers circulated a rumor that she was having an affair with Carter. [Amended Complaint, ¶ 18].

12.    On October 2 or 3, 2005, Michael Carter's wife, Flossie Carter, called plaintiff at work and accused her of sleeping with Michael Carter. Flossie Carter never physically threatened plaintiff during his conversation. Plaintiff hung up on her. [Gross Depo. pp. 94-95, 98-99, 116-17; Amended Complaint, ¶ 19].

13.    Plaintiff reported the incident to Phil Johnson, GM's labor relations representative. Johnson agreed to speak with Carter. Later that day, Johnson called plaintiff

back to the labor relations department to meet with Carter. Carter told plaintiff he was going through a nasty divorce and apologized to plaintiff. Carter told plaintiff he would handle the situation. [Gross Depo. pp. 100-01; Amended Complaint, ¶ 20].

14.    Later that day, plaintiff approached Carter when she saw him leaving and apologized. Plaintiff told Carter she was not trying to get him in any trouble but was concerned and felt it was the "best thing" for her to do. Carter told plaintiff she had done nothing wrong and inquired if she was okay. Plaintiff responded she was and Carter hugged her gently on her shoulder. [Gross Depo. p. 101].

15.    Plaintiff did not receive any more phone calls from Flossie Carter after reporting the incident to GM's labor relations department. [Gross Depo. p. 102]. Even though she received no further contact from Flossie Carter and admits that Flossie Carter never physically threatened her, plaintiff believes GM should have offered her "security." [*Id.* pp. 114, 116-17].

16.    Michael Carter died on November 1 or 2, 2005. [Gross Depo. p. 104].

17.    On November 11, 2005, plaintiff discovered a note on a car on the factory line that read, "Daddy, can I have a pony for my b-day? Love me. Lisa, where is your daddy?" Plaintiff discovered an additional ten to twelve similar notes in the next hour. [Gross Depo. pp. 103-05]. None of the other notes bore plaintiff's name, but one of the notes did bear the name "Karl." [*Id.* pp. 110-11].

18.    Even though plaintiff had never heard these words used at the plant, she believes the phrase, "who is your daddy," was a sexual innuendo. [Gross Depo. pp. 118-19].

19.    Plaintiff complained to her supervisor, Julie Mullins, about the notes. Mullins allegedly responded that the notes were "no big deal" and "just a practical joke." Plaintiff then

asked to go to GM's labor relations department and Mullins refused. Plaintiff ignored Mullins' directive and left the line to go to the labor relations department. [Gross Depo. pp. 105-07].

20.    Mullins denied plaintiff's request because GM's labor relations department was closed at the time of plaintiff's request, although plaintiff claims she was not aware of this fact at the time of her request. [Gross Depo. p. 112; DeOrnellas Decl., ¶ 9].

21.    When Gross returned from the labor relations department, plaintiff claims Mullins put plaintiff on notice that she was going to administer disciplinary action to her for leaving the line without permission. [Gross Depo. pp. 107-09]. Plaintiff admits that leaving the line after her supervisor had denied her permission to do so, could be deemed insubordination. [*Id.* p. 123].

22.    While plaintiff believes she was disciplined the following week, GM's records show she was not disciplined as a result of this event. [Gross Depo. pp. 107-09; Amended Complaint, ¶ 28; DeOrnellas Decl.¶ 9].

23.    During plaintiff's next scheduled shift, plaintiff requested to go to the labor relations department. The department was open that day and plaintiff was allowed to go. [Gross Depo. pp. 124-25].

24.    GM's labor relations department investigated the incident involving the notes and informed plaintiff that its investigation revealed that the notes were written by an employee named Wendy for another employee named Karl. Even though Karl's name appeared on one of the notes and plaintiff had witnessed Wendy came into work with "a pony on a stick" the week after the notes were written, plaintiff disagrees with the conclusion reached by GM's labor relations department. [Gross Depo. pp. 110-11, 118]. Plaintiff admits, however, that after November 11, she did not receive any similar notes. [*Id.* pp. 111, 125].

## Facts Demonstrating GM Adequately Responded to Plaintiff's Complaints

25.    GM has established corporate policies that detail expected behavior for employees, including specific provisions prohibiting discrimination and harassment. GM's policies prohibiting discrimination contain a complaint and reporting provision. [Ex. 5 (Gross Depo. Ex. 2)].

26.    The collective bargaining agreement between GM and the United Auto Workers, of which plaintiff was a member, reiterates GM's policies against discrimination and allows union employees to raise complaints of discrimination by filing a grievance. [DeOrnellas Decl., ¶ 11].

27.    Plaintiff received training on GM's anti-discrimination and sexual harassment policies and reporting procedures in her first two weeks of employment with GM. Plaintiff was also shown where these policies were posted in the plant. [Gross Depo. pp. 70-73, 140-41; Ex. 5]. Plaintiff was aware she could make complaints to discrimination to GM's human resources department or to her union. [Gross Depo. p. 141].

28.    Plaintiff never complained to GM's human resources department or any GM supervisor about her coworkers' questions or Carter's comments. [Gross Depo. pp. 84, 86; *see also* Statement of Fact ("SOF") 8-9].

29.    When plaintiff complained about Flossie Carter's phone call to her (*see* SOF 12-13), GM's labor relations department responded to plaintiff's complaint that same day by speaking with Michael Carter, who apologized for his wife's behavior and agreed to assure the incident was not repeated. Plaintiff did not receive any more phone calls from Flossie Carter after reporting the incident to GM's labor relations department. [Gross Depo. pp. 100-03].

30.    In the weeks between Flossie Carter's phone call to plaintiff and Michael Carter's
death, plaintiff also believes Carter was trying to get any rumors that she and Carter were having
an affair stopped [Gross Depo. p. 90].

31.    When plaintiff complained to GM's labor relations department about the notes she
discovered (*see* SOF 23-24), GM's labor relations department investigated the incident and
informed plaintiff that its investigation had revealed that the notes were written by and directed
to other employees. [Gross Depo. pp. 110-11, 118]. Plaintiff did not receive any similar notes
after GM's investigation concluded. [*Id.* pp. 111, 125].

32.    On November 14, 2005, while plaintiff was on leave, she mailed a videotape to
Kathleen Barclay, in GM's Human Resources department in Detroit, Michigan. Plaintiff claims
that she addressed the rumors prior to Flossie Carter's phone call and her concerns for her safety.
Plaintiff also claims she mentioned her diagnosis with a psychiatric disorder and stated she
would be requesting a reasonable accommodation for it. [Gross Depo. pp. 141-43].

33.    Although plaintiff was on leave, Pamela Goodwin, GM's labor relations
representative, and Tom Mestdagh from GM's security department, met with plaintiff off-site at a
hotel on January 4, 2006, to address her concerns. [Gross Depo. pp. 167-68]. During this
meeting, plaintiff complained of sexual innuendoes by Carter (now deceased), but admitted she
never reported any harassment by Carter. Plaintiff also complained again about the notes she
had discovered, and Goodwin reiterated that the notes were directed to another employee and
were a practical joke being played on someone else. Because Carter was deceased and plaintiff's
complaints about the notes had already been investigated, no further action was taken by GM.
[Declaration of Pamela Goodwin, ¶ 3, Ex. 6].

## Facts Demonstrating GM Did Not Retaliate Against Plaintiff

34.     Plaintiff's Amended Complaint alleges GM retaliated against her by disciplining
her for leaving the line on November 11, 2005.  [Amended Complaint, ¶¶ 40-41; *see also* SOF
22].  However, in her deposition, plaintiff did not identify this alleged event as the basis of her
retaliation claim.   [Gross Depo. pp. 204-06].   Regardless, plaintiff was not disciplined.
[DeOrnellas Decl. ¶ 9].

35.     Instead, plaintiff testified that she believes Phil Johnson, GM's Labor Relations
Representative, retaliated against her during an incident which occurred on December 15, 2005,
while plaintiff was on sick leave.  On that date, plaintiff went to the plant to review her medical
file.  In accordance with GM policy, GM's security department refused to allow plaintiff to enter
the plant because she was on sick leave.  Plaintiff alleges Johnson then appeared, screamed at her
and also refused her access because she was on sick leave.[2]  Plaintiff felt like it was "a strange
situation" and called the police.  [Gross Depo. pp. 111-13, 127-28, 131; DeOrnellas Decl. ¶ 10].

36.     Interestingly, plaintiff admits that two weeks before she attempted to access GM's
facility, she told her physician she was having homicidal thoughts toward her coworkers.  [Gross
Depo. p. 218].

37.     Plaintiff also believes "most of the people in the human resources department"
retaliated against her because they were all in "cahoots" in "making sure that I didn't come back
to work."  [Gross Depo. p. 205].  Plaintiff admits, however, that the only reason she has ever
been given for her discharge is that she failed to return to work after her leave of absence
expired.  [*Id.* p. 189].

---

[2] Johnson denies yelling or screaming at plaintiff.

## Facts Demonstrating Plaintiff is Not a Qualified Individual With a Disability

38.    Plaintiff believes she is disabled due to her bipolar disorder.  Plaintiff claims her bipolar disorder "limits certain activities that can affect me, the way I function, how I sleep, it could even limit how I work, how I care for myself, my concentration." [Gross Depo. p. 143-44].[3]

39.    Plaintiff lives with her five-year old son.  Plaintiff is able to care for her son's daily needs, including cooking for him, feeding him and taking him to day care, school, and wherever else he needs to go.  Plaintiff can also drive, shop for groceries and clothing, calculate correct amounts of money and bathe and clean herself. Plaintiff does not need a caregiver to assist her in her daily needs. [Gross Depo. pp. 144-47].

40.    Plaintiff is currently employed as a taxi-cab driver. [Gross Depo. pp. 191-92].

41.    Plaintiff's doctors have told her condition is controllable with medication, but plaintiff refuses to take her medication. [Gross Depo. pp. 147-48].

## Facts Demonstrating GM Met its Duty of Accommodation to Plaintiff

42.    Plaintiff never made a request for an accommodation prior to taking disability leave for her bipolar disorder. [DeOrnellas Decl. ¶ 3].

43.    At her January 4, 2006 meeting with Pamela Goodwin (*see* SOF 33), plaintiff asked Goodwin if she could work day shifts. Plaintiff believes she could "balance out" her bipolar condition better if she had worked on the first shift. Plaintiff explains that she needs eight hours of sleep per night and was unable to get that sleep while working the second shift,

---

[3] While plaintiff's Amended Complaint also claims plaintiff is disabled due to depression and anxiety, Amended Complaint, ¶ 46, plaintiff admitted in her deposition that her disability claim was based solely on her bipolar disorder. [Gross Depo. p. 143]. In any event, however, neither depression nor anxiety constitute a disability under the ADA. *See, e.g., Kourianos v. Smith's Food & Drug Ctrs., Inc.,* 65 Fed. Appx. 238, 240 (10th Cir. 2003) (depression and anxiety did not render employee disabled); *Steele v. Thiokol Corp.,* 241 F.3d 1248, 1254 (10th Cir. 2001) (depression and obsessive compulsive order did not render employee disabled).

because she did not get to sleep until 2 to 4 a.m. and her son would then get up at 7 a.m. Plaintiff could not sleep after her son woke up because she was worried about him. [Gross Depo. pp. 149-52].

44.    Goodwin informed plaintiff that GM could not accommodate her request to work the day shift because there was no opening and plaintiff did not have sufficient seniority under the terms of the collective bargaining agreement. [Gross Depo. pp. 168-69].

45.    In early January 2006, GM's plant medical director, Dr. Donald Knepper, received a letter from plaintiff dated December 29, 2005 and requesting reasonable accommodations. Plaintiff's letter attached a December 22, 2005 letter from Dr. Everson indicating possible accommodations. [Ex. 7 (Gross Depo. Ex. 5); DeOrnellas Decl., ¶ 5]. Dr. Everson's note copied the text of a letter plaintiff had provided to him. [Ex. 8 (Gross Depo. Ex. 7); Gross Depo. pp. 173-74].

46.    In response to plaintiff's letter, DeOrnellas contacted plaintiff to schedule a meeting between DeOrnellas and plaintiff for them to discuss reasonable accommodations for plaintiff. The meeting was set for January 20, 2006. [Gross Depo. pp. 175-76; DeOrnellas Decl., ¶ 6].

47.    In preparing for the meeting, DeOrnellas learned that plaintiff's seniority had been broken effective January 13, 2006. Because plaintiff was thus not returning to her employment with GM, DeOrnellas called plaintiff and cancelled their meeting. [Gross Depo. p. 176; DeOrnellas Decl. ¶ 7],

48.    Plaintiff thereafter brought a note from Dr. Everson to DeOrnellas in which Dr. Everson, agreed to extend plaintiff's leave of absence to January 22, 2006. [Gross Depo. 156, DeOrnellas Decl., ¶ 8]. GM had never received this note prior to January 13, 2006, and thus

contacted Dr. Everson's office for verification. In response, Dr. Everson wrote GM on January 24, 2006, and confirmed his decision to no longer validate plaintiff's disability leave effective January 1, 2006. [DeOrnellas Decl., ¶ 8; Ex. 9 (Gross Depo. Ex. 8)].

49.    Plaintiff admits that on December 22, 2005, Dr. Everson told plaintiff he was discontinuing his treatment of plaintiff because she refused to take her medication. [Gross Depo. p. 148, 156-57, 162-63].

50.    Sedgwick Claims Management Services, Inc. ("Sedgwick") administers requests for medical leaves of absence for employees of GM. On January 4, 2006, Charlene Cantu, a claims examiner at Segdwick, also contacted Dr. Everson to inquire about plaintiff's treatment plan and return-to-work prognosis. [Declaration of Charlene Cantu, ¶ 2, Ex. 10].

51.    On January 5, 2006, Dr. Everson told Cantu that he had discharged plaintiff from his care weeks ago because she was not following his medical advice, had not returned to work per his recommendation and had not taken her prescribed medication correctly. [Cantu Decl. ¶ 3].

52.    On January 9, 2006, Dr. Everson's office told Cantu that plaintiff was discharged on December 29, 2005 and told to return to work on January 1, 2006. Dr. Everson discharged plaintiff because Dr. Everson believed plaintiff was non-compliant with his treatment and care and to the best of his knowledge plaintiff was just looking for a way to stay off work with pay. [Cantu Decl. ¶ 5].

## ARGUMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As a prerequisite to summary judgment, a moving party must

demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The nonmoving party may not rest on mere allegations or denials of his pleading, but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e) and adding emphasis). See also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co.* 475 U.S. at 587 (citations omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'" and summary judgment is, therefore proper. *Id.* (citation omitted)

Summary judgment is not a "disfavored procedural shortcut," but is rather "an important procedure 'designed to secure the just, speedy and inexpensive determination of every action.'" *Temple v. Auto Banc*, 76 F. Supp. 2d 1124, 1128 (D. Kan. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Under these standards, plaintiff's claims fail and GM is entitled to judgment as a matter of law.

I.    **GM is Entitled to Summary Judgment on Plaintiff's Hostile Work Environment/Hostile Work Environment Claim**

A.    **Plaintiff Was Not Subjected to a Hostile Work Environment**

To establish the existence of a hostile work environment actionable under Title VII, plaintiff must show (1) that she was discriminated against because of her sex, and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms and conditions of her employment and created an abusive work environment. *Medina v. Income Support Div.*,

413 F.3d 1131, 1134 (10th Cir. 2005). Ordinary tribulations of the workplace, including sporadic use of abusive language, gender-related jokes and occasional teasing will not amount to discriminatory changes in the terms and conditions of employment. *Campbell v. Merideth Corp.*, 206 F. Supp. 2d 1087, 1101 (D. Kan. 2003).

The events identified by plaintiff are insufficient to show the existence of a hostile work environment. The rumors that plaintiff, a female, was having an affair with Carter, a male, and the notes between plaintiff's coworkers Wendy and Karl are not actionable because they were not based on plaintiff's gender. [SOF 11, 17, 24]. *See Duncan v. Manager*, 397 F.3d 1300, 1312, 1314 (10th Cir. 2005) (holding distribution of sexually explicit article to both female and male coworkers and rumors female plaintiff had relationships with male officers could not be used to support hostile work environment claim because actions were not based on plaintiff's gender). Moreover, the notes left by Wendy for Karl did not contain any sexually explicit language. The phrase "who's your daddy" is far less offensive than other language courts have found to be non-actionable. [SOF 17]. *See Oliver v. Peter Kiewit & Sons*, 106 Fed. Appx. 672, 674 (10th Cir 2004) (graphic jokes and offensive language did not create hostile work environment). Likewise, plaintiff's coworkers' inquiries as to whether she dated is not offensive and, at most, represents non-actionable teasing of plaintiff. [SOF 8]. *See Campbell*, 260 F. Supp. 2d at 1103 (graffiti "constituted simple teasing" and was not actionable).

Furthermore, all the events identified by plaintiff are too isolated to show plaintiff's workplace was permeated with discriminatory conduct. The notes and Flossie Carter's call to plaintiff were one-time incidents. [SOF 12, 15, 17, 24]. *See Carrasco v. Boeing Co.*, 190 Fed. Appx. 650, 652 (10th Cir. 2006) (four harassing statements in one-year period held insufficient). In addition, GM cannot be held liable for Flossie Carter's phone call to plaintiff because Ms.

Carter was not employed by GM. *Holmes v. Utah Dept. of Workforce Servs.*, 483 F.3d 1057, 1068 (10th Cir. 2007) (employers have no duty to protect employees against conduct of non-employees).

Similarly, Carter's flirtation with plaintiff ended long before plaintiff was terminated. In fact, plaintiff considered Carter a "good friend" by at least October 2005. [SOF 10]. *See Carrasco v. Boeing Co.*, 190 Fed. Appx. 650, 652 (10th Cir. 2006) (four harassing statements in one-year period, including supervisor asking if he could measure plaintiff's shorts from inside of her thigh and see plaintiff's thong underwear, inquiry whether plaintiff tanned naked and compliment on plaintiff's hair, were not severe or pervasive). Moreover, Carter only touched plaintiff once, when he hugged her shoulder, and this act, by plaintiff's own testimony, was motivated by their friendship and plaintiff did not find it offensive. [SOF 14]. As a matter of law, these events are insufficient to give rise to a hostile work environment.

### B.    GM Adequately Responded to Plaintiff's Complaints

An employer is liable for a sexually hostile work environment only if it fails to take adequate remedial and preventative responses to any actually or constructively known harassment. *Holmes*, 483 F.3d at 1069. If the employer adequately responds to claims of sexual harassment, it may not be held liable under Title VII. *Id.*; *Duncan*, 397 F.3d at 1313.

In *Holmes*, the employee felt harassed by a non-employee's actions and complained. 483 F.3d at 1069. In response, the employer barred the person from their premises. The court held the employer's reasonable and prompt response addressing the conduct protected the employer from liability. *Id.* In *Duncan*, the employer investigated the plaintiff's complaints that a sexually explicit magazine article had been distributed to employees and concluded that the article was insufficient to demonstrate sexual harassment. *Id.* at 1314. The employer also investigated rumors the plaintiff complained had been started that she was having affairs with various

employees. *Id.* at 1313. The employer found both the plaintiff and the instigator of the rumors had acted inappropriately and issued disciplinary action. *Id* The court held the employer's investigations relieved the employer of liability because "Title VII provides no remedy for bad taste," and "[t]here is no requirement that the City muzzle its employees before they make an offensive statement; rather the burden placed on the City is to penalize harassing actions by its employees in a prompt and effective manner. The City met that burden here." *Id.* at 1313-14.

Here, too, GM's prompt remedial responses to plaintiff's complaints protects them GM liability. Plaintiff never complained to GM's human resources department or any GM supervisor about her coworkers questions or Carter's comments. [SOF 28, 33]. *See Atkins v. Southwestern Bell Tel. Co.*, 137 Fed. Appx. 115, 118 (10th Cir. 2005) (employer was not liable for conduct which plaintiff failed to report).

When plaintiff broke her silence and complained, GM promptly and adequately addressed those complaints. *Id.* When plaintiff complained about Flossie Carter's phone call to her, GM's labor relations department responded to plaintiff's complaint that same day by speaking with Michael Carter, who apologized for his wife's behavior and agreed to assure the incident was not repeated. [SOF 13]. Plaintiff did not receive any more phone calls from Flossie Carter after reporting the incident to GM's labor relations department. [SOF 15]. In the weeks between Flossie Carter's phone call to plaintiff and Michael Carter's death, Carter also tried to get any rumors that she and Carter were having an affair stopped [SOF 30].

When plaintiff complained to GM's labor relations department about the notes she discovered, GM's labor relations department investigated the incident and informed plaintiff that its investigation had revealed that the notes were written by and directed to another employee.

[SOF 24]. Plaintiff did not receive any similar notes after GM's investigation concluded. [SOF 24].

When plaintiff mailed a videotape to Barclay, GM met with plaintiff to discuss her complaints, even though plaintiff was on leave. [SOF 32-33]. Because plaintiff's complaints about Carter involved a deceased supervisor and her complaints about the notes had already been investigated, no further action was taken by GM. [SOF 33].

While plaintiff may disagree with the results of GM's investigations, it is neither plaintiff nor this Court's role to "act as a super personnel department that second guesses employers' business judgments." *Antana v. City and County of Denver*, 488 F.3d 860, 865 (10th Cir. 2007). Because GM promptly addressed all of plaintiff's complaints, her hostile work environment claim is barred.

## II.  GM is Entitled to Summary Judgment on Plaintiff's Retaliation Claim

In order to establish a prima facie case of retaliation, plaintiff must show (1) that she engaged in protected opposition to discrimination, (2) that she was subjected to an adverse action by the employer following the protected activity, and (3) that a causal connection exists between the protected activity and the adverse action. *See, e.g., Archuleta v. Colorado Dep't of Inst.*, 936 F.2d 483, 486 (10th Cir. 1991).

After the plaintiff establishes a prima facie case, the *McDonnell Douglas* burden-shifting approach is utilized to determine whether plaintiff has made out a submissible claim. *See Anderson v. Phillips Petroleum Co.*, 861 F.2d 631, 634 (10th Cir. 1988). Under this approach, "the burden shifts to [the employer] to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Bullington v. United Airlines, Inc.*, 186 F.3d 1301, 1316 (10th Cir. 1999). "If [the employer] offers a legitimate, nondiscriminatory reason for its actions, the burden reverts to [the plaintiff] to show [the employer's] proffered reason was a pretext for"

retaliation. *Id.* "To establish pretext a plaintiff must show either that 'a [retaliatory] reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). "However, the plaintiff's 'mere conjecture that [the] employer's explanation is a pretext for [retaliation] is an insufficient basis for denial of summary judgment.'" *Id.* (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)).

GM concedes that plaintiff's January 4, 2006 complaint to Goodwin that she believed Carter (then deceased for two months) had sexually harassed her constitutes protected activity. [SOF 33]. GM submits, however, the remainder of plaintiff's complaints plaintiff do not constitute protected activity because they did not oppose any practice made illegal by Title VII or any other act prohibiting discrimination in the workplace. Plaintiff complaint about Flossie Carter's call did not include any allegation of sexual harassment against Michael Carter. [SOF 13]. Likewise, when plaintiff complained about the notes she discovered, she made no claim the notes created a hostile work environment. [SOF 23]. Plaintiff may not, therefore, rely on these complaints to support her retaliation claim. *See Anderson v. Academy Sch. Dist. 20*, 122 Fed. Appx. 912, 916 (10th Cir. 2004) ("But a vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or another category protected by Title VII) does not constitute protected activity and will not support a retaliation claim"); *see also Annett v. University of Kan.*, 216 F. Supp. 2d 1249, 1256 (D. Kan. 2002) (complaints to EEOC that employer had violated conciliation agreement held not protected activity); *Smith v. Board of County Comm'ners of Johnson County, Kan.*, 96 F. Supp. 2d 1177, 1193 (D. Kan. 2000) (general complaints of harassment held not protected activity).

The timing of plaintiff's protected activity is important when considering the alleged adverse actions identified by plaintiff because plaintiff's alleged November 11, 2005 discipline and Johnson's statements to her on December 15, 2005 when she tried to access the plant while on leave occurred <u>before</u> plaintiff ever engaged in any protected activity. [SOF 21, 33, 35]. Obviously, GM could not retaliate against plaintiff for protected activity which she had not yet engaged in.

Plaintiff's ability to rely on the November 11 and December 15, 2005 events is also foreclosed by the fact that neither constitute adverse actions as defined by the law. The Tenth Circuit has adopted a case-by-case approach in defining what constitutes an adverse action for purposes of discrimination or retaliation claims. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999). In doing so, however, it is guided by the United States Supreme Court's 1998 statement that a "tangible" employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Kitchen v. Burlington Northern & Santa Fe. R.R.*, 298 F. Supp. 2d 1193, 1204 (D. Kan. 2004) (conduct generally qualifies as an adverse employment action if it "constitutes a significant change in [the plaintiff's] employment status") (citations and internal quotations omitted); *Tran v. Trustees of State Colleges*, 355 F.3d 1263, 1267 (10th Cir. 2004) (noting that *Ellerth* definition of tangible employment action "has often been used to describe what constitutes an adverse employment action for purposes of a Title VII retaliation claim").

Accordingly, although this circuit gives the phrase "adverse action" a liberal interpretation, it does not extend to "a mere inconvenience or an alteration of job

responsibilities." *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000). Where an employee continues "working in the same job, for the same pay, with the same benefits," she cannot state a claim for an adverse employment action as that term is defined under the law. *Id.*

Under these standards, plaintiff's allegations that she received an oral reprimand from Mullins on November 11, 2005 and was prohibited from entering the plant on December 15, 2005, involve actions which are not legally adverse. *Sanchez v. Denver Public Schs.,* 164 F.3d 527, 533 (10th Cir. 1998) ("unsubstantiated oral reprimands" do not constitute adverse action); *Amro v. Boeing Co.*, 232 F.3d 790, 795-99 (10th Cir. 2000) (supervisor calling plaintiff a "fucking foreigner," placing his hands around plaintiff's neck, throwing papers at plaintiff and otherwise speaking unpleasantly to plaintiff "not severe or pervasive enough to be an adverse employment action"). In addition, plaintiff may not rely on the oral reprimand she received as she abandoned this claim during her deposition. [SOF 34]. *Chatfield v. Shilling Constr. Co., Inc.*, No. 97-4253-RDR, 1999 WL 459763, at *1 fn.1 (D. Kan. June 24, 1999).

What remains, therefore, to support plaintiff's retaliation claim is her January 4, 2006 complain to Goodwin and her January 13, 2006 termination. [SOF 33, 37]. While close in time, temporal proximity alone is insufficient to allow an inference of a causal connection between two events. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 804 (10th Cir. 2007). Because GM has articulated a legitimate non-discriminatory reason for terminating plaintiff—her failure to return to work upon the expiration of her medical leave—plaintiff must show this reason is pretextual to proceed with her retaliation claim. *Id.* To show pretext, plaintiff must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally

find them unworthy of credence and hence infer that the employer did not act for the asserted

non-discriminatory reasons." *Id.* at 805. Plaintiff cannot meet this burden.[4]

Plaintiff's personal physician certified plaintiff to return to work on January 1, 2006.

[SOF 48]. The independent medical examiner, more generous in his assessment, set plaintiff's

return to work date as January 9, 2006 and GM adhered to his advice when it set plaintiff's

return-to-work date. [SOF 5-6]. When plaintiff failed to return to work within three days of

January 9, 2006, she was terminated pursuant to paragraph 111(b) of the collective bargaining

agreement. [SOF 7]. Plaintiff admits that her failure to return to work after her leave of absence

is the only reason she has ever been given for her termination. [SOF 37]. Any attempt by

plaintiff to create pretext by relying on her doctor's note setting a January 22, 2006 return to

work date fails because the note was not provided to GM until one week after plaintiff was

discharged and plaintiff's doctor had rescinded the note in December 2005 when he discharged

plaintiff from his care. [SOF 48-52]. Because plaintiff cannot establish GM's decision to follow

medical assessments made by two physicians and to adhere to the terms of the collective

bargaining agreement is pretextual, GM is entitled to summary judgment on plaintiff's retaliation

claim.

**III.    GM Did Not Discriminate Against Plaintiff on the Basis of Her Alleged Disability**

To establish a prima facie case of disability discrimination under the Act, a plaintiff must

show that (1) she is disabled within the meaning of the ADA; (2) she is qualified for her

employment position; and (3) the defendant discriminated against her because of her disability.

---

[4] GM has also articulated nondiscriminatory reasons for the other alleged adverse actions. The alleged oral
reprimand originated from plaintiff's failure to obey her supervisor, which plaintiff concedes was insubordination.
[SOF 21]. GM refused to allow plaintiff to enter the plant on December 15, 2005, because its policies prohibited her
access. [SOF 35]. It is difficult to understand how plaintiff can criticize GM's judgment on this issue when plaintiff
was harboring homicidal thoughts toward her coworkers at the time. [SOF 36]. Plaintiff also offers no evidence
these reasons are pretextual.

*Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1128 (D. Kan. 2003). Plaintiff cannot meet this burden.

### A.   Plaintiff is Not Disabled

The ADA's definition of disability includes " (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual." *Id.* at 1128-29. Plaintiff claims she is so disabled due to her bipolar disorder.[5]   [SOF 38].   However, to show her bipolar disorder renders her disabled, plaintiff must show that an impairment substantially limits at least one major life activity. *Id.* at 1129. This definition contains three elements. First, the plaintiff must have a recognized impairment; second, the plaintiff must identify one or more appropriate major life activities; and third, the plaintiff must show that the impairment substantially limits one or more of those activities. *Id.* Plaintiff "must articulate with precision the impairment alleged and the major life activity affected by that impairment." *Id.*

A physical or mental impairment is substantially limiting if the affected individual is:

(i)     Unable to perform a major life activity that the average person in the general population can perform; or

(ii)    Significantly restricted as to the condition, manner or duration under which an individual can perform a particular life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Id.* at 1130. In making this determination, courts consider three factors: " (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment." *Id.* Courts also take into consideration "any mitigating or corrective

---

[5] Again, any depression and anxiety that plaintiff may suffer also do not render her disabled. *Kourianos*, 65 Fed. Appx. at 240; *Steele*, 241 F.3d at, 1254.

measures utilized by the individual, such as medications." *Id.* Thus to establish that she was substantially limited in the major life activities she identified, plaintiff is required to show, under the factors set out above, either that she was unable to perform these activities or was significantly restricted in her ability to perform them when compared to the average person in the general population. *Id.*

In *Doebele*, the plaintiff contended she was disabled due to her bipolar condition. *Id.* at 1331. The court rejected this argument, finding that the plaintiff had failed to show she was significantly limited in her ability to communicate or interact with others. *Id.* The court noted plaintiff presented no evidence her communications were characterized by high levels of hostility, social withdrawal or failure to communicate with others. *Id.* Likewise, in *Williams v. Hallmark Cards, Inc.*, 10 Fed. Appx. 790 (10th Cir. 2001), the Court held that an employee with bipolar manic depression was not disabled because he had not shown his condition substantially limited his ability to sleep or urinate. *Id.* at 792. While the employee's medication allegedly caused him difficulty sleeping, there was no evidence that this difficulty was severe, long term, or had a permanent impact. *Id.*

Here, too, plaintiff cannot establish her bipolar condition substantially limits any of her major life activities. Plaintiff first claims her conditions affects her sleep, but it is clear from her deposition testimony that that difficulty arose from her work schedule and lack of child-care, not her bipolar disorder. [SOF 38, 43]. Plaintiff testified her second-shift schedule did not allow her to get eight-hours of sleep her night because she would not go to bed until 2 to 4 am., her five-year old son would rise at 7 a.m. and plaintiff could not sleep after he awoke because she was worried about him. [SOF 43]. These facts have nothing to do with plaintiff's bipolar condition. Moreover, plaintiff offers no evidence her sleep problems were long-term, made it difficult for

her to work or otherwise affected her overall health. *Steele*, 241 F.3d at 1254; *Pack v. Kmart Corp.*, 166 F.3d 1300, 1306 (10th Cir. 1999).

Plaintiff next claims her ability to work and concentrate are affected, but plaintiff had no difficulty performing her job at GM. *Kourianos*, 65 Fed. Appx. at 240 (plaintiff who could perform her job duties satisfactorily was not disabled). Moreover, two physicians certified plaintiff to return to work in early January 2006. [SOF 5, 48]. Plaintiff's personal physician not only felt plaintiff was able to return to work, but also believed plaintiff was just looking for a way to stay off work. [SOF 52]. Nonetheless, even plaintiff admits she was ready to return to work in late January 2006. [SOF 48]. Furthermore, plaintiff currently works full time as a taxi cab driver, a job which obviously requires her to interact on a regular basis with others. [SOF 40]. Plaintiff cannot claim a substantial limitation on her ability to work when such a limitation is not supported by medical or other evidence.

Plaintiff finally claims her ability to care for herself is affected but plaintiff admits she is able to care for her five-year-old son's daily needs, including cooking for him, feeding him and taking him to day care, school, and wherever else he needs to go. Plaintiff can also drive, shop for groceries and clothing, calculate correct amounts of money and bathe and clean herself. Plaintiff does not need a caregiver to assist her in her daily needs. [SOF 39]. Given these facts, plaintiff cannot establish a substantial limitation on her ability to care for herself. *See Kourianos*, 65 Fed. Appx. at 240 (plaintiff who could care for herself and small child was not disabled).

In addition, plaintiff's physicians have told her that her condition is controllable with medication, but plaintiff refuses to take the medication. [SOF 41]. Plaintiff's personal physician even discharged plaintiff from his care based on this refusal. [SOF 51-52]. The United States Supreme Court has made clear that whether a person has a disability within the meaning of the

ADA must be made with reference to corrective mitigating measures, including medication. *Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999). In *Sutton*, the court concluded that the plaintiffs were not disabled where their severe myopia was corrected to 20/20 vision with glasses because "[a] person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently substantially limits a major life activity." *Id.*; *see also Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 498 (10th Cir. 2000) (plaintiff whose sleeping problems were mitigated by medication could not establish she was disabled); *Tangires v. John Hopkins Hosp.*, 79 F. Supp. 2d 587, 596 (D. Md. 2000) ("Since plaintiff's asthma is correctable by medication and since she voluntarily refused the recommended medication, her asthma did not substantially limit her in any major life activity."). Because plaintiff's condition is also controlled by medication, plaintiff cannot establish she is disabled within the meaning of the ADA.

### B.    GM Did Not Discriminate Against Plaintiff Based on Her Alleged Disability

Even if plaintiff could establish she was disabled (which she is not), plaintiff cannot establish GM discriminated against her on the basis of her alleged disability. Plaintiff first claims GM discriminated against her by failing to accommodate her alleged disability. Under the ADA, discrimination is defined to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Munoz v. Western Resources, Inc.*, 225 F.Supp.2d 1265, 1276 (D. Kan. 2002). The statute thus establishes a cause of action for disabled employees whose employers fail to reasonably accommodate them. *Id.* However, an employer is not required to always provide employee with the best possible accommodations or in the specific manner the employee requested. *Id.*

Plaintiff was not diagnosed with her alleged disability of bipolar disorder until early November 2005. [SOF 3]. Within one week of her diagnosis, plaintiff went on paid medical leave. [SOF 4]. Plaintiff did not make any requests for an accommodation during that one week period and did not thereafter return to work. [SOF 6-7, 42]. Plaintiff's personal physician and the independent medical examiner both released plaintiff to work without restriction. [SOF 5, 48]. *See id.* at 1277 (holding employer had no duty to accommodate employee released to work without restriction).

The only proposed accommodations which plaintiff presented were accommodations she created, then had her personal physician sign off on. [SOF 45]. Plaintiff did not, however, present her requests to GM until early January 2006, when she was on leave. [SOF 45]. The only request she discussed with GM, transfer to the first shift, was motivated by her child-care situation, not her condition and was also prohibited by the collective bargaining agreement. [SOF 43-44]. *See Tesh v. U.S. Postal Serv.*, 349 F.3d 1270, 1276 (10th Cir. 2003) (employer could not be held liable for failure to accommodate a restriction which was unrelated to the disability that employee claimed in his discrimination suit). Although plaintiff was not disabled, GM was willing to consider plaintiff's other requests and scheduled a meeting with plaintiff to discuss them, but plaintiff denied GM the opportunity to consider her requested accommodations by failing to return to work upon the expiration of her leave. [SOF 45-47]. GM cannot be held liable for failing to accommodate any alleged disability plaintiff may have had when it never was given the opportunity to act upon plaintiff's requests.

In addition, plaintiff has no evidence that GM's failure to accommodate or GM's termination decision were related to her disability. GM's adherence to the collective bargaining agreement dictating denial of plaintiff's request for transfer to the first shift and dictating her

termination constitute legitimate nondiscriminatory reasons for GM's actions.  [SOF 7, 43-44].

As set forth above, plaintiff has no evidence these reasons are pretextual.  *PVNF*, 487 F.3d at

805.  GM is also entitled to summary judgment on plaintiff's disability discrimination claim.

## CONCLUSION

WHEREFORE, General Motors Corporation prays the Court to enter summary judgment

in its favor and against plaintiff on each and every claim raised in plaintiff's Complaint and/or

the Pretrial Order, award GM its costs and expenses incurred in defending against these claims,

and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

LATHROP & GAGE L.C.

/s/ Heather R. Gill
Heather R. Gill          Kansas No. 18847
David C. Vogel          Kansas No. 18129
2345 Grand Boulevard, Suite 2800
Kansas City, Missouri 64108-2684
Telephone: (816) 292-2000
Facsimile: (816) 292-2001

Attorney for Defendant General Motors
Corporation

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was electronically filed with the
Court this 6th day of September, 2007, which will send a notice of electronic filing to the
following counsel of record:

Mark Meyer
606 NE Applewood
Lee's Summit, MO 64063

Attorney For Plaintiff

/s/ Heather R. Gill
An Attorney for Defendant

CC 1931837v1                                    26