**Hearing Date and Time: May 5, 2010 at 9:45 a.m. (Eastern Time)**
**Response Deadline: April 26, 2010 at 4:00 p.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
Anthony J. Albanese
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                         :
In re                                    :      Chapter 11 Case No.
                                         :
MOTORS LIQUIDATION COMPANY, et al.,      :      09-50026 (REG)
      f/k/a General Motors Corp., et al. :
                                         :
                      Debtors.           :      (Jointly Administered)
                                         :
-----------------------------------------------------------------x
```

# NOTICE OF HEARING
## ON DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 67357
## FILED BY NEW UNITED MOTOR MANUFACTURING, INC.

PLEASE TAKE NOTICE that upon the annexed Objection, dated April 1, 2010,

of Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as

debtors in possession (collectively, the "**Debtors**"), to the allowance of Proof of Claim No.

67357 (the "**Claim**") filed by New United Motor Manufacturing, Inc. ("**NUMMI**") all as more

fully set forth in the Objection, a hearing will be held before the Honorable Robert E. Gerber,

United States Bankruptcy Judge, in Room 621 of the United States Bankruptcy Court for the

Southern District of New York, One Bowling Green, New York, New York 10004, on **May 5,**

**2010 at 9:45 a.m. (Eastern Time)**, or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the

Stipulation must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and

the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court

(a) electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with a hard copy delivered

directly to Chambers), in accordance with General Order M-182 (which can be found at

www.nysb.uscourts.gov), and served in accordance with General Order M-242, and on (i) Weil,

Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York

10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.);

(ii) the Debtors, c/o Motors Liquidation Company, 500 Renaissance Center, Suite 1400, Detroit,

Michigan 48243 (Attn:  Ted Stenger); (iii) General Motors, LLC, 300 Renaissance Center,

Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham &

Taft LLP, attorneys for the United States Department of the Treasury, One World Financial

Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United States

Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, DC

20220 (Attn:  Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export Development

Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman,

Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP, attorneys for the

statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York

10036 (Attn:  Thomas Moers Mayer, Esq., Amy Caton, Esq., Lauren Macksoud, Esq., and

Jennifer Sharret, Esq.); (xii) the Office of the United States Trustee for the Southern District of

New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Diana G.

Adams, Esq.); (xiii) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor,

New York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (xiv) the

members of the Official Committee of Unsecured Creditors Holding Asbestos Related Claims;

and (xv) attorneys for New United Motor Manufacturing, Inc., Schnader Harrison Segal & Lewis

LLP, One Montgomery Street, Suite 2200, San Francisco, CA 94104 (Attn: George Kalikman,

Esq.), so as to be received no later than **April 26, 2010 at 4:00 p.m. (Eastern Time)** (the

"**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if no objections are timely filed and

served with respect to the Stipulation, the Debtors may, on or after the Objection Deadline,

submit to the Bankruptcy Court an order substantially in the form of the Stipulation, which order

may be entered with no further notice or opportunity to be heard offered to any party.

Dated: New York, New York
      April 1, 2010

/s/ Joseph H. Smolinsky
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
Anthony J. Albanese

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# TABLE OF CONTENTS

**Page**

Relief Requested ............................................................................................................... 1

Jurisdiction ....................................................................................................................... 2

Preliminary Statement ...................................................................................................... 2

NUMMI Proof of Claim ................................................................................................... 4

Background ....................................................................................................................... 5

    A.    The Creation of NUMMI and Annual Vehicle Production Prior to the Petition
Date ..................................................................................................................... 5

    B.    The Documents Referenced in NUMMI's Claim ......................................................... 6

        1.    Shareholders Agreement ..................................................................... 6

        2.    The Subscription Agreement ................................................................. 7

        3.    The Vehicle Supply Agreement, the Component Supply
Agreement and the Production MOU ....................................................... 8

    C.    Events Leading to These Chapter 11 Cases and the Phase Out of the Pontiac
Brand................................................................................................................ 11

    D.    MLC's Attempt to Continue Alternative Production at NUMMI .............................. 14

Argument ....................................................................................................................... 15

    A.    The Claim Should Be Disallowed in Its Entirety Because NUMMI Has Failed
to State a Claim.................................................................................................. 15

        1.    NUMMI Has Failed to State a Claim For Breach of Express
Contract............................................................................................. 16

        2.    NUMMI Has Failed to State a Claim for Breach of Express
Indemnity .......................................................................................... 21

        3.    NUMMI Has Failed to State a Claim for Breach of Implied
Contract............................................................................................. 22

        4.    NUMMI Has Failed to State a Claim for Implied or Equitable
Indemnity .......................................................................................... 24

    B.    NUMMI Has Failed to State a Claim Against the Debtors for Breach of
Fiduciary Duty .................................................................................................. 25

        1.    MLC Is Not a Controlling Shareholder ................................................. 26

        2.    Controlling Shareholders Owe a Duty of Good Faith and
Inherent Fairness In Connection With Change of Control
Transactions and No Such Transaction Is Alleged Here ......................... 28

    C.    There is No Basis to Disregard NUMMI's Corporate Form ....................................... 29

i

## TABLE OF CONTENTS
### (continued)

**Page**

Reservation of Rights ............................................................................................................. 32

Notice ..................................................................................................................................... 32

# TABLE OF AUTHORITIES

## CASES

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1984),*overruled in part on other grounds,*
    *Brehm v. Eisner*, 746 A.2d 805 (Del 2000) ...........................................................27

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ...........................................................................................16

*Associated Vendors, Inc. v. Oakland Meat Co.,*
    210 Cal. App. 2d 825 (Cal. App. 1962) ..................................................................29

*Bay Dev., Ltd. v. The Superior Court of San Diego County (Home Capital Corp.),*
    50 Cal. 3d 1012, 791 P.2d 290 (Cal. 1990)............................................................24

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................16

*Berkla v. Corel Corp.,*
    302 F.3d 909 (9th Cir. 2002) ..................................................................................23

*Carlesimo v. Schwebel,*
    87 Cal. App. 2d 482 (Cal. App. 1948) ....................................................................31

*Crain v. Burroughs Corp.,*
    560 F. Supp. 849 (C.D. Cal. 1983) .........................................................................23

*E. L. White, Inc. v. City of Huntington Beach,*
    21 Cal. 3d 497 (Cal. Sup. Ct. 1978).......................................................................25

*Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.),*
    398 B.R. 736 (S.D.N.Y. 2008).................................................................................16

*Hayden v. Paterson,*
    594 F.3d 150 (2d Cir. 2010).....................................................................................16

*Jones v. Ahmanson & Co.,*
    1 Cal. 3d 93, 460 P.2d 464 (Cal. 1969)...................................................................26

*Lockheed Missiles & Space Co. v. Gilmore Indus., Inc.,*
    135 Cal. App. 3d 556 (Cal. App. 1982) ..................................................................22

## TABLE OF AUTHORITIES
### (continued)

*In re M. Fabrikant & Sons, Inc.*,
   2009 WL 3806683 (Bankr. S.D.N.Y. Nov. 10, 2009) ............................................................16

*McDonald v. John P. Scripps Newspaper*,
   210 Cal. App. 3d 100 (Cal. Ct. App. 1989) ............................................................................18

*Miles, Inc. v. Scripps Clinic & Research Found.*,
   810 F. Supp. 1091 (S.D. Cal. 1993) .......................................................................................28

*Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Investcorp. S.A.*,
   137 F. Supp. 2d 502 (S.D.N.Y. 2001) .....................................................................................29

*Parrish v. Nat'l Football League Players Ass'n*,
   534 F. Supp. 2d 1081 (N.D. Cal. 2007) ..................................................................................18

*Patane v. Clark*,
   508 F.3d 106 (2d Cir. 2007)....................................................................................................16

*Progressive West Ins. Co. v. Dallo*,
   2008 WL 413752 (S.D. Cal. Feb. 14, 2008) ...........................................................................18

*In re Sea-Land Corp. S'holder Litig.*,
   1987 WL 11283 (Del. Ch. May 22, 1987)...............................................................................27

*Sehulster Tunnels/Pre-Con v. Traylor Brothers, Inc./Obayashi Corp.*,
   111 Cal. App. 4th 1328 (Cal. App. 2003) ...............................................................................24

*Solano Concrete Co. v. Lund Constr. Co.*,
   64 Cal. App. 3d 572 (Cal. App. 1976) ....................................................................................22

*Superior Vision Servs, Inc. v. Reliastar Life Ins. Co.*,
   2006 WL 2521426 (Del. Ch. Aug. 25, 2006) .........................................................................28

*Sweet v. Bridge Base, Inc.*, 2009 WL 1514443 (E.D. Cal. May 28, 2009)...................................23

*Wagner v. Glendale Adventist Medical Ctr.*,
   216 Cal. App. 3d 1379 (Cal. Ct. App. 1989) ..........................................................................23

*Weinstein Enters., Inc. v. Orloff*,
   870 A.2d 499 (Del. 2005) .......................................................................................................27

*West v. Superior Court*,
   27 Cal. App. 4th 1625 (1994) .................................................................................................24

## TABLE OF AUTHORITIES
### (continued)

*Western Steamship Lines, Inc. v. San Pedro Peninsula Hosp.*,
   8 Cal. 4th 100 (Cal. 1994) ........................................................................................25

### STATUTES & RULES

11 U.S.C. § 105(a) ........................................................................................................32

11 U.S.C. § 502(b) ..........................................................................................................1

11 U.S.C. § 502(c) ........................................................................................................15

28 U.S.C. § 157 ...............................................................................................................2

28 U.S.C. § 1334 .............................................................................................................2

Fed. R. Bankr. P. 1015(c) ............................................................................................32

Fed. R. Bankr. P. 3003(c)(3) ..........................................................................................1

Fed. R. Bankr. P. 3007(d) ...............................................................................................1

Fed. R. Civ. P. 12(b)(6) ................................................................................................15

Local Bankruptcy Rule 1007-2 .....................................................................................11

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
Anthony J. Albanese
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                        :

**In re**                       :          **Chapter 11 Case No.**
                        :

**MOTORS LIQUIDATION COMPANY,** *et al.*,  :      **09-50026 (REG)**
      **f/k/a General Motors Corp.,** *et al.*   :
                       :

                **Debtors.**   :      **(Jointly Administered)**
                       :
------------------------------------------------------------x

## DEBTORS' OBJECTION TO PROOF OF CLAIM
## NO. 67357 FILED BY NEW UNITED MOTOR MANUFACTURING, INC.

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

        Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and

its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") respectfully

represent:

### Relief Requested

        1.      The Debtors file this objection pursuant to section 502 of title 11,

United States Code (the "**Bankruptcy Code**"), Rule 3007(d) of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), and this Court's Order Pursuant to Section 502(b)(9) of

the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing

Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(b)(9)) and Procedures

Relating Thereto and Approving the Form and Manner of Notice Thereof (the "**Bar Date**

**Order**") [Docket No. 4079] seeking entry of an order disallowing and expunging Proof of Claim

No. 67357 (the "**Claim**") filed by New United Motor Manufacturing, Inc. ("**NUMMI,**" or the

"**JV Company**").  Annexed hereto as **Exhibit A** is a copy of the Claim.

2.      The Debtors have examined the Claim and have attempted to ascertain the

nature and validity of the Claim.  Because the Debtors have concluded that the Claim contains no

supportable legal or factual basis, the Debtors request the entry of an order disallowing and

expunging the Claim from the Debtors' claims register in its entirety.

### Jurisdiction

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Preliminary Statement

4.      NUMMI, an automobile manufacturer and privately held California

corporation, has filed a Proof of Claim seeking to recover $500 million from the Debtors,

essentially alleging that (i) MLC must assume liability for the dissolution of NUMMI's

operations, and (ii) MLC breached contracts relating to the supply and purchase of automobiles

and component parts.  In addition, NUMMI contends that MLC breached fiduciary duties owed

to NUMMI as a controlling shareholder.  Because these claims are completely lacking in merit,

the Claim should be disallowed in its entirety and expunged.

5.      Founded as a joint venture by Toyota Motor Corporation ("**TMC**") and

MLC in 1983, NUMMI has operated as an independent California corporation engaged in the

production of automobiles and component parts for nearly thirty years.  Notwithstanding its

separate corporate existence and management, NUMMI now contends that this Court should

disregard NUMMI's corporate form, pierce NUMMI's corporate veil and assess MLC, a 50%

shareholder, with 50% of the costs of NUMMI's dissolution and/or wind-down proceedings, on

the grounds that MLC's alleged breaches of contract and fiduciary duty caused the anticipated

shutdown of NUMMI's business.  There is no basis in law or fact to hold MLC accountable for

NUMMI's expected shutdown.  Indeed, as of the Petition Date, MLC's production (consisting

only of the Pontiac Vibe automobile) accounted for approximately 17% of total vehicle

production at NUMMI -- the remainder of NUMMI's production consisted of TMC cars and

trucks.

       6.     This Court should also disallow NUMMI's Claim to the extent it alleges

damages for breach of MLC's production contracts with NUMMI.  The Debtors have not

breached any contract with NUMMI that would entitle NUMMI to recover costs incurred in

connection with the discontinuation of vehicle production at NUMMI's manufacturing facility

by TMC and MLC.  In fact, the terms of the contracts between MLC and NUMMI clearly

establish that MLC was not required to purchase any vehicles from NUMMI, much less

reimburse NUMMI or effectively indemnify NUMMI for costs incurred with the discontinuation

of production of the Pontiac line.

       7.     NUMMI's breach of fiduciary duty claim also lacks merit.  Although

NUMMI contends that MLC was "a controlling shareholder" and as such, owed NUMMI

fiduciary duties, as set forth above, MLC did not hold a majority of NUMMI's outstanding

shares.  Nor did MLC exercise control over NUMMI's business and management affairs.  In fact,

although MLC and TMC each had the right to directly appoint the same number of directors to

3

NUMMI's Board, under the express terms of the Shareholders Agreement, TMC had the right to appoint NUMMI's President, who served on the Board as an additional voting member. Thus, TMC -- and not MLC -- had the power to appoint 5 voting members of NUMMI's 9-member Board of Directors. Even if this Court were to conclude that MLC was a controlling shareholder, however, NUMMI has not alleged the requisite change of control transaction that would implicate fiduciary obligations by MLC.

8.     Finally, the Court should disregard NUMMI's attempt to avail itself of the extreme remedy of piercing its own corporate veil. There is no evidence that MLC exclusively dominated NUMMI such that MLC and NUMMI could not be considered separate entities. To the contrary, NUMMI operated as an independent California corporation for almost thirty years and at all times held itself out to its business partners and creditors as a distinct and wholly separate entity from MLC. Given these facts, this Court should reject NUMMI's blatant attempt to avoid its own liabilities, especially where, as here, NUMMI remains in possession of substantial assets.

## NUMMI Proof of Claim

9.     On November 24, 2009, NUMMI filed its Claim. *See* Claim 67357. The Claim purports to assert claims for (1) breach of contract; (2) implied breach of contract and similar principles, including "detrimental reliance on express/implied representation," "implied contractual indemnity" and "equitable indemnity;" and (3) breach of fiduciary duty. On the basis of these causes of action, NUMMI asserts that it holds claims against the Debtors in the amount of approximately $500 million.

## Background

### A.    The Creation of NUMMI and Annual Vehicle Production Prior to the Petition Date

10.    On or about December 23, 1983, MLC and TMC (together, the

"**Shareholders**") established NUMMI, a California close corporation headquartered in

Freemont, California, for the purposes of sharing automotive technology and manufacturing

automobiles and component parts for resale by MLC and TMC in the United States.  NUMMI

was established as a joint-venture between MLC and TMC, with each owning 50% of the

outstanding capital stock of NUMMI.

11.    NUMMI's manufacturing facility is approximately 53 million square feet

under roof and sits on 378 total acres.  As of the commencement of MLC's chapter 11 case (the

"**Petition Date**"), NUMMI's annual vehicle production volume consisted of approximately

230,000 passenger cars and 160,000 light trucks.  In particular, NUMMI produced the Pontiac

Vibe for MLC and the Toyota Corolla and Toyota Tacoma Truck for TMC.  For calendar years

2008 and 2009, NUMMI's annual vehicle production allocation between TMC and MLC was

approximately:

- 160,000 Toyota Corollas produced for TMC;

- 160,000 Toyota Tacoma Trucks produced for TMC; and

- 65,000 Pontiac Vibes produced for MLC.

Thus, approximately 71% of the passenger cars and 100% of the light trucks produced at

NUMMI were allocated to TMC and, in total, MLC's allocation of vehicles was approximately

17% of the total vehicle production at NUMMI prior to the Petition Date.  While NUMMI

produced vehicles primarily for MLC at its founding, for at least the past decade, as market

conditions changed, NUMMI has produced substantially more vehicles for TMC than for the

Debtors.

## B.    The Documents Referenced in NUMMI's Claim

12.    Although NUMMI references no less than ten "contracts" in its Claim,

none of these agreements require MLC to purchase any specific or minimum amount of Products

manufactured by NUMMI, nor do they support any claim for indemnification by MLC as a 50%

shareholder.  Indeed, only five documents are even arguably relevant to claims asserted therein:

the Shareholders Agreement, the Subscription Agreement, the Vehicle Supply Agreement, the

Component Supply Agreement and the Memorandum of Understanding Regarding Vehicle

Production (all as defined below).  As set forth below and in the Argument, each of these five

documents shows that the Claim is entirely lacking in any legal or factual basis.[1]

### 1.    Shareholders Agreement

13.    On February 21, 1984, MLC, TMC and NUMMI entered into a

Shareholders Agreement (as amended, the "**Shareholders Agreement**"), relating to the

---

[1] NUMMI also references and relies upon certain other agreements to substantiate its Claim, including the:
(1) Product Responsibility Agreement (the "**PRA**"), dated as of February 21, 1984, attached hereto as **Exhibit C**,
(2) Service Parts Supply Agreement (the "**SPA**"), dated as of June 17, 2008 attached hereto at **Exhibit D**,
(3) Service Parts Purchase Manual (the "**SPM**"), dated as of June 17, 2008 attached hereto as **Exhibit E**, (4) 1984
Memorandum on Technical Assistance (the "**Technical Assistance MOU**"), attached hereto as **Exhibit F**; and
(5) Memorandum of Understanding Regarding Tooling Costs ("**Tooling MOU**"), dated as of November 7, 1994
attached hereto as **Exhibit G**.  However, the first four of these agreements (the PRA, the SPA, the SPM and the
Technical Assistance MOU) were all *assumed and assigned* to New GM in accordance with the procedures
approved in the Court's Order entered on July 5, 2009, (i) Authorizing Sale of Assets Pursuant to the MSPA (the
"**363 Transaction**"), (ii) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired
Leases in connection with the Sale and (iii) Granting Related Relief (the "**Sale Order**") [Docket No. 2968].
Accordingly, obligations, if any, due under these agreements have either been cured by New GM or are now
obligations of New GM as the counterparty to such agreements. Thus, these agreements cannot serve as a basis for
any claim by NUMMI and are not substantively addressed herein.  With respect to the Tooling MOU, as is evident
from the face of the documents, it is nothing more than unsigned notes and correspondence between TMC, NUMMI
and MLC.  With respect to the Technical Assistance MOU, NUMMI is not even a party to the agreement.  As such,
neither the Tooling MOU nor the Technical Assistance MOU is an executed and binding agreement between MLC
and NUMMI, cannot give rise to any contractual obligations and is therefore also not substantially addressed herein.

management and governance of NUMMI, which is annexed hereto as **Exhibit B**.  The

Shareholders Agreement specifically states that NUMMI has a "separate and distinct existence

from each of its Shareholders" (Ex. B at 1) and that except for each of the Shareholder's initial

contributions made pursuant to a separate Subscription Agreement (as defined below), NUMMI

would fund its own working capital requirements and "be responsible for the payment of all of

its own expenses."  (Ex. B at §§ 4.2; 4.3).  Since its inception and in accordance with the

Shareholders Agreement, NUMMI has observed all corporate formalities and operated and held

itself out to creditors and business partners as a distinct legal entity from MLC.

14.     With respect to the corporate governance of NUMMI, the Shareholders

Agreement further provides that MLC and TMC would elect or designate an equal number of

directors on the board of directors of NUMMI (the "**Board**"), but that the President of NUMMI,

also a voting Board member, would be designated by TMC and serve "at the pleasure of a

majority of the [TMC] Directors."  (Ex. B at §§ 3.5; 4.3).  Accordingly, because the President

was selected by TMC and also served as a voting Board member, TMC had the power to control

a majority of the Board.[2]  Additionally, the Shareholders Agreement provides that all other

officers of NUMMI are selected by the TMC designated President (after consultation with the

Board) and "serve at the pleasure of the President." (Ex. B at §3.5).  Thus, TMC had both the

power to exercise majority control of the Board and to select all of NUMMI's officers.

2.     **The Subscription Agreement**

15.     In connection with entering into a Shareholders Agreement, MLC, TMC

and NUMMI entered into a Subscription Agreement, dated February 21, 1984 (as amended, the

"**Subscription Agreement**"), to provide for the funding and capitalization of NUMMI.  The

---

[2] In August 2009, each of the MLC designated directors resigned and were replaced by non-MLC designees.

Subscription Agreement is attached hereto as **Exhibit H**.  Pursuant to the Subscription

Agreement, MLC and TMC each initially contributed assets valued at approximately

$100 million to fund NUMMI: (i) MLC contributed the Freemont, California manufacturing

facility and adjacent land valued in the Subscription Agreement at $89 million in 1984[3] and

$11 million in cash, and (ii) TMC contributed $100 million in cash.  (Ex. H at §§ 1.1; 2.2-3.2).

16.    The Shareholders amended the Subscription Agreement on December 15,

1989 to provide for an additional $30 million cash contribution from each of MLC and TMC,

and again amended the Subscription Agreement on December 1, 1992, to provide for an

additional $25 million in cash contribution from each of MLC and TMC.  (Ex. H Amendment at

1-2; Ex. H Second Amendment at 1-2.).  In accordance with its limited obligations under the

Subscription Agreement, MLC has made all required contributions and discharged all of its

duties and responsibilities required under the Subscription Agreement and amendments related

thereto.

**3.    The Vehicle Supply Agreement, the Component Supply Agreement
and the Production MOU**

17.    In connection with entering into the Shareholders Agreement and

Subscription Agreement, TMC, MLC and NUMMI also entered into other separate agreements

and memoranda of understanding relating to automobile and component parts production,

including the (1) Vehicle Supply Agreement (the "**VSA**"), dated February 21, 1984 attached

hereto as **Exhibit I**; (2) Component Supply Agreement ("**CSA**"), dated as of October 24, 1998

---

[3] According to recent press reports, the Alameda County Assessor provided three different assessments in 2009 that
totaled $1.07 billion for the land, equipment and buildings initially contributed by MLC to NUMMI pursuant to the
Subscription Agreement. See Katherine Conrad, *Real estate developers peg NUMMI a 'once-in-a-lifetime
opportunity'*, March 19, 2010, http://sanjose.bizjournas.com/sanjose/stories/
2010/03/22/story5.html?b=1269230400^3062481&page=1 (last visited April 1, 2010).

attached hereto as **Exhibit J**; and (3) Memorandum of Understanding Regarding Vehicle

Production ("**Production MOU**"), dated as of March 22, 2006 attached hereto as **Exhibit K**.

18.     The VSA outlines the framework for the supply and purchase of vehicles

and component equipment (collectively, the "**Products**") manufactured at NUMMI.  Although

the VSA sets forth certain aspirations and market expectations between the parties regarding

production demand for the Products, it does not provide for a commitment or requirement from

MLC to purchase any minimum number of Products from NUMMI.  Rather, the VSA

specifically states that "market demand for the Products that can be generated in the areas in

which [MLC] expects to sell them will govern the purchase commitments of the parties as to all

Products."  (Ex. I at § 4.16).

19.     In fact, under the VSA, all purchase commitments by MLC of NUMMI

Products were governed by separate individual sales contracts, which were negotiated on an

ongoing basis based on fluctuating market demand for the Products.  To this end, the VSA states

that "each purchase and sale transaction between the JV Company and [MLC] relating to the

Products shall be governed by an individual sales contract, it being agreed within that context

that the JV Company *has no obligation to supply and [MLC] has no obligation to purchase any

Products* until the parties enter into such a contract." (Ex. I at § 4.2) (emphasis added).

20.     Moreover, the VSA provides that "[a]ny delay in or failure of the

performance of any party…shall be excused if and to the extent caused by occurrences beyond

such party's control, including, but not limited to, . . . discontinuance or curtailment of the

manufacture of the Products ordered."  (Ex. I at § 6.1).  As discussed in more detail below, the

Pontiac brand, which was the only line of MLC vehicles manufactured at NUMMI prior to the

Petition Date, was discontinued after the Debtors and the United States Government (the

"**Federal Government**") and Export Development Canada ("**EDC**", and together with the

Federal Government, the "**Government Lenders**") -- the Debtors' lenders of last resort --

determined that MLC needed to phase out Pontiac and its other non-core brands as a central

component of its comprehensive business reorganization.

21.     The CSA sets forth certain agreements governing the provision of

component parts by MLC to be utilized by NUMMI in their production of GM vehicles.  Similar

to the VSA, the CSA does not require MLC to provide any minimum amount of components to

NUMMI.  Rather, the CSA provides that "if agreed to by NUMMI and [MLC]," components

shall be supplied to NUMMI to enable NUMMI to manufacture vehicles for MLC (Ex. J at

§ 3.1).  The CSA further provides that "[t]he specific terms of sale and delivery of components

supplied by [MLC] to NUMMI, including without limitation price, payment, scheduling, product

change, quality assurance, shipping and transportation terms and procedures, shall be agreed to

by [MLC] and NUMMI in separate documents." (Ex. J at § 3.2).

22.     In addition, the CSA provides that component prices would be

"reviewed semiannually," that "new prices will be determined by negotiation between [MLC]

and NUMMI" and that no party shall be liable under the CSA for "incidental, special or

consequential damages" related to the CSA.  (Ex. J at §§ 3.2(b); 5.2).  Most importantly for

purposes of this Objection, the CSA was not an agreement under which NUMMI generated any

revenue or profits.  In fact, it was just the opposite: the CSA was an agreement by which

NUMMI purchased component parts from MLC to manufacture its vehicles.

23.     The Production MOU relates to the production and pricing of Pontiac

Vibes and Toyota Corollas to be manufactured at NUMMI from January 2008 through

December 2012.  Just as with the VSA and CSA, the Production MOU sets forth certain

aspirations and market expectations for the demand of these vehicles, but does not provide

for a commitment by MLC to purchase any minimum number of vehicles from NUMMI.

24.    To this end, the MOU specifically states that "[MLC] will have a right to,

*but not an obligation to,* purchase the Products [vehicles] from NUMMI" (Ex. K at §§ 1(3); (6))

(emphasis added).  In addition, as further evidence that the Production MOU was contingent on

uncertain market demands and fluctuations, the parties also agreed to "annually review all of the

contents described in the [Production MOU]" because "changes in the market conditions for the

Products might make the Memorandum of Understanding inconsistent with the continued

viability of NUMMI and the profitability on sales of the Products." (Ex. K at §7).

25.    None of the agreements discussed above and relied upon by NUMMI to

substantiate their Claim require MLC to purchase any specific or minimum amount of Products

manufactured by NUMMI, nor do they give rise to any liabilities on behalf of MLC as a 50%

shareholder in NUMMI.  Accordingly, as discussed below, the Claim contains no supportable

legal or factual basis and should be expunged and disallowed in its entirety.

**C.    Events Leading to These Chapter 11 Cases and the Phase Out of the Pontiac Brand**

26.    The events leading up to the bankruptcy filing of MLC have been

described at length in the Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy

Rule 1007-2 (the "**Henderson Affidavit**") [Docket No. 21], and in countless other pleadings

filed in these chapter 11 cases by the Debtors and various other parties in interest.  By now, the

Court and all parties in interest are intimately familiar with, among other things, the global

economic crisis and drastic decline in market demand for MLC vehicles that led to the

commencement of these chapter 11 cases.  (*See* Henderson Affidavit at ¶¶ 9-14; 30-47).

Therefore, they will not be repeated at length here.  However, for the purposes of this Objection,

it is important to reiterate some of the key events that took place prior to the Petition Date,

especially as they relate to MLC's decision, upon consultation with the Government Lenders,

to discontinue the Pontiac brand as part of MLC's comprehensive business restructuring.

(*See* Henderson Affidavit at ¶¶13; 49-64).

27.    From January, 2008 to January, 2009, the seasonally adjusted annualized

sales rate of new vehicles sold in the United States declined from 15.6 million vehicles to

9.8 million vehicles, representing a 37% decline.  (*See* Henderson Affidavit at ¶11).  On or

around November 3, 2008, MLC publicly announced that its sales for October had plunged 45%

from the same month the year before, and that it might run out of cash by the end of the year

without help from the Federal Government.  *See* Kate Linebaugh, *U.S. Auto Sales Plunged in*

*October*, November 4, 2008, http://online.wsj.com/article/SB122573166905093595.html (last

visited April 1, 2010); Jeffrey Green, *GM Says it May Run Out of Operating Cash This Year*,

November 7, 2008,

http://www.bloomberg.com/apps/news?pid=20601103&sid=aPtO113gTIUs&refer=news  (last

visited April 1, 2010).

28.    With respect to the Pontiac brand (and the Vibe in particular), sales had

been seriously deteriorating for almost a decade and were trending even lower prior to the

Petition Date.  Between 1999 and 2008, the amount of Pontiac cars sold in the U.S. decreased

from 552,350 to 246,659, an astounding 55.3 percent drop in annual Pontiac vehicles sold.

Specifically, with respect to the Vibe, from 2005 through the first half of 2009, the annual

amount of Vibe sales decreased from 64,271 Vibes sold in 2005 to 46,551 Vibes sold in 2008,

representing an approximate 28% drop.  More importantly, the Vibe continually had negative

margins and lost money for MLC.

29.     As MLC vehicle sales continued to plunge and the global economic crisis deepened, MLC was compelled to seek financial assistance from the Federal Government in November of 2008.  (*See* Henderson Affidavit at ¶¶13; 48-66). The Federal Government understood the draconian consequences of a failure and of an MLC collapse.  (*Id.*)  The Federal Government also recognized the likelihood of systemic failure throughout the domestic automotive industry and the significant harm to the overall U.S. economy from the loss of hundreds of thousands of jobs and the sequential shutdown of hundreds of ancillary businesses if MLC were compelled to cease operations.  (*Id.*)  Therefore, the Federal Government, in late December 2008, provided the necessary financing to temporarily sustain MLC's operations. (*Id.*)

30.     The Federal Government, however, provided such financing on the *express* condition that MLC develop comprehensive business viability plans that would fundamentally transform MLC (operationally and financially) into a viable and profitable vehicle manufacturer capable of meeting the competitive and environmental challenges of the 21st century.  (*See* Henderson Affidavit at ¶¶13; 49-64).  In connection with the continued receipt of aide from the Federal Government, MLC was required, among other things, to reduce or eliminate costly and unprofitable brands, nameplates and retail outlets.  (*Id.*)  In particular, MLC knew that satisfaction of the Federal Government would require that it focus on continuing to build its core brands (*i.e.*, Chevrolet, Cadillac, Buick, and GMC), while phasing out or dramatically transforming all of its other brands.  (*See* Henderson Affidavit at ¶¶13; 49-64). On December 2, 2008, in need of continuing government aide, MLC publicly announced that it was considering eliminating numerous brands, including Pontiac.  *See* GM's Restructuring Plan for Long Term Viability, December 2, 2008, available at

13

http://online.wsj.com/public/resources/documents/gm_restructuring_plan120208.pdf (last visited

April 1, 2010).

31.    On April 27, 2009, MLC, after extensive consultation with President

Obama's Auto Task Force, publicly announced that the Pontiac brand would be phased out by

the end of 2010.  *See* Chris Isidore, *GM Goes For Broke*, April 27, 2009,

http://money.cnn.com/2009/04/27/news/companies/gm_announcement/ (last visited April 1,

2010).  The consolidation of 8 MLC brands to 4 brands was deemed critical to the future survival

of MLC and was a key element of the Federal Government's continuing support of MLC's

restructuring and the 363 Transaction.

**D.    MLC's Attempt to Continue Alternative Production at NUMMI**

32.    Approximately one month after publicly announcing that the Pontiac

brand would be phased out as part of MLC's restructuring, MLC informed NUMMI, on May 21,

2009, that it was discontinuing production of the Pontiac Vibe at NUMMI.  MLC further

informed NUMMI that it was in discussions with TMC regarding a possible replacement vehicle

to be produced at NUMMI's facility.

33.    On June 12, 2009, at a NUMMI Board meeting, MLC provided NUMMI

and TMC with an extensive overview of the bankruptcy timeline and the planned phase-out of

the Pontiac brand.  While MLC did not believe it had any contractual requirements to do so,

MLC also attempted to soften the impact of its decision on NUMMI in light of NUMMI's

importance to the local economy in which it was situated.  Therefore, at this meeting, MLC

expressed its willingness to continue discussions with the parties regarding a replacement vehicle

to be produced at NUMMI after the Pontiac Vibe was phased out.  Throughout the month of

June, MLC continued these discussions with NUMMI and TMC and made a good faith effort to

14

provide, on commercially reasonable terms, a replacement vehicle to be manufactured at

NUMMI, including re-badging the TMC Tacoma as a Chevy light truck, or shifting the Pontiac

Vibe to an alternative brand.  TMC and NUMMI, however, demanded unrealistic transfer pricing

that would have made the production of any new vehicle unprofitable for MLC.  Consequently,

MLC was not able to reach a deal with TMC and NUMMI to continue manufacturing vehicles

and informed NUMMI at the end of June that the last day of Vibe production would be

August 17, 2009.

34.    After the parties were unable to agree on terms regarding the production of

an alternative vehicle to the Pontiac Vibe, MLC informed NUMMI, on or about June 29, 2009,

that the purchaser of MLC's assets did not intend to acquire MLC's 50% shareholder interest in

NUMMI as part of the 363 Transaction.  On or about August 13, 2009, all New GM employees

serving as directors on NUMMI's Board tendered their resignation letters to NUMMI President

and Chairman of the Board Kunihiko Ogura.

35.    On or about August 27, 2009, TMC informed NUMMI that it also planned

to discontinue production of all vehicles at NUMMI as of March 31, 2010.

## Argument

### A.    The Claim Should Be Disallowed in Its Entirety Because NUMMI Has Failed to State a Claim

36.    The Court should expunge NUMMI's Claim because it fails to state

plausible claims on which relief may be granted.  Dismissal of a proof of claim under 11 U.S.C.

§ 502(c) is equivalent to dismissing a claim under Fed. R. Civ. P. 12(b)(6) for failure to state a

claim on which relief can be granted.  *See Flake v. Alper Holdings USA, Inc. (In re Alper*

*Holdings USA, Inc.*), 398 B.R. 736, 748 (S.D.N.Y. 2008) (affirming bankruptcy court's dismissal of proof of claim for failure to state a plausible claim on which relief may be granted).

37.     A plaintiff must plead more than the possibility of relief to survive a motion to dismiss. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (applying New York law) (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). As the Supreme Court has recently made clear: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to survive a motion to dismiss. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Rather, "[i]n order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.'" *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

38.     In ruling on a motion to dismiss, the Southern District of New York applies a two-part analysis. "First, the court should begin by 'identifying pleadings that, because they are no more than [legal] conclusions, are not entitled to the assumption of the truth.'" *In re M. Fabrikant & Sons, Inc.*, 2009 WL 3806683, at *11 (Bankr. S.D.N.Y. Nov. 10, 2009) (citing *Iqbal*, 129 S. Ct. at 1950). Second, the court should "give all 'well-pleaded factual allegations' an assumption of veracity and determine whether, together, they plausibly give rise to an entitlement of relief." *Id.* (quoting *Iqbal*, 129 S. Ct. at 1950). The Claim here fails to meet this standard, and this Court should disallow it in its entirety.

### 1.    NUMMI Has Failed to State a Claim For Breach of Express Contract

39.    This Court should disallow NUMMI's Claim based on breach of contract because the Debtors have not breached any contract with NUMMI that entitles NUMMI to recover various costs relating to the discontinuation of the Pontiac Vibe[4] and the "wind-down process expected to occur" in connection with NUMMI's dissolution and end of production.[5] Indeed, the express terms of agreements entered into between and among NUMMI, TMC and MLC establish that NUMMI is not entitled to the relief sought.  Accordingly, the Claim should be disallowed in its entirety and expunged.

40.    In addition, NUMMI failed to allege the requisite factual allegations to establish its right to relief based on breach of contract, which alone is fatal to NUMMI's Claim. In its Claim, NUMMI provides a list of ten "contracts" between and/or among MLC, TMC and/or NUMMI.[6]  NUMMI does not, however, identify or quote a single contractual provision in *any* of the ten contracts allegedly breached by the Debtors.  Instead, NUMMI avers generally that the contracts obligate the Debtors to, *inter alia*:  (1) "purchase minimum quantities of vehicles and parts from NUMMI," (2) "pay the costs incurred by NUMMI as a result of a decision to cancel orders or discontinue production of vehicles," and (3) "purchase tooling and other infrastructure used in the production of vehicles and parts from NUMMI in the event production of vehicles and parts for the Debtor[s] terminates."  Claim at 2.

---

[4] The Pontiac Vibe-related claims include claims for: (1) capital expenditures (2) the cost of raw materials rendered obsolete, and (3) obligations due to NUMMI suppliers based on Vibe specific claims.

[5] The "wind-down claims" include claims for: (1) employee obligations that NUMMI will incur in connection with its expected wind-down (including NUMMI's health insurance, workers' compensation and pension obligations), (2) lease termination costs, (3) product liability costs, (4) environmental site preparation and remediation and (5) estimated post-production operational and wind-down costs.

[6] At least five of the documents cited have no bearing on the Claim whatsoever.  *See, e.g.,* discussion *supra* ¶ 12, n.1.  In addition, four of the agreements were assumed and assigned to New GM.  *Id.*

41.     To state a claim for breach of contract under California law,[7] a plaintiff

must plead: (1) the existence of the contract, (2) plaintiff's performance, (3) defendant's breach

and (4) damages resulting therefrom.  *See McDonald v. John P. Scripps Newspaper*, 210 Cal.

App. 3d 100, 104 (Cal. Ct. App. 1989).  In particular, with respect to pleading the existence of a

contract, a plaintiff must identify the contract terms that were allegedly breached.  *See, e.g.*,

*Progressive West Ins. Co. v. Dallo*, 2008 WL 413752 (S.D. Cal. Feb. 14, 2008) (dismissing

counterclaim for breach of contract for failing to plead provision of the contract supporting the

claim); *Parrish v. Nat'l Football League Players Ass'n*, 534 F. Supp. 2d 1081, 1096 (N.D. Cal.

2007) (dismissing breach of contract claim where plaintiffs failed to allege which contract

provision was breached).  NUMMI ignores this fundamental requirement.

42.     As set forth below, because the Debtors were not required to purchase ***any***

vehicles from NUMMI, much less pay NUMMI for costs incurred as a result of the

discontinuation of the Pontiac Vibe, NUMMI's breach of contract claims lack merit.  Notably,

there is not a single contractual provision in the VSA -- or in any other agreement between

and/or among TMC, NUMMI and MLC -- that requires the Debtors to reimburse NUMMI for

capital expenditures, sunk costs or supplier claims in connection with the discontinuation of the

Pontiac Vibe, or to contribute to the costs of winding up NUMMI's operations.  This Court

should not accept NUMMI's invitation to rewrite the parties' contractual obligations.

43.     The express terms of the VSA, the governing agreement with respect to

the parties' purchase and sale obligations, make clear that the Debtors have no purchase

---

[7] The VSA provides that the "Agreement shall be construed and enforced in accordance with and governed by the laws of the State of California, without giving effect to the principles of choice of law thereof.  Ex. I at § 7.6.  The other agreements contain similar provisions.  *See also, e.g.,* Ex. J at § 5.8; Ex. B at § 10.6; Ex. H at § 4.6.

obligations.  Section 4.1 of the VSA, entitled "General Understanding" sets forth the principles

that applied to purchase and sale agreements between NUMMI and MLC:

> 4.1    General Understanding:  (a)  The  general  principles
> contained  in  this  Section  4.1  will  apply  to  supply  and  purchase
> arrangements under this Agreement.
> (b)      The  parties  hereto  are  establishing  supply  and  purchase
> arrangements  under  which  [NUMMI]  shall  supply  and  [MLC]
> shall  purchase  the  Product  on  a  continuous  and  stable  basis.   It  is
> acknowledged  that  [NUMMI]  is  making  substantial  amounts  of
> capital  expenditures  in  its  facilities  relying  on  [MLC's]  present
> projection that market demand for the vehicles will exceed 200,000
> units  per  annum.    ***However, it is further acknowledged that
> market demand for the Products that can be generated in the
> area  in  which  [MLC]  expects  to  sell  them  will  govern  the
> purchase commitments of the parties as to all products***.

(Ex. I) (emphasis added).  Accordingly, although MLC "projected" that market demand would

exceed 200,000 vehicles on an annual basis, the parties expressly agreed that market demand for

the products would govern MLC's purchasing obligations with respect to all products.

> 44.      The VSA further provides that each purchase and sale transaction between

the parties was to be governed by an individual sales contract.  Absent such a contract, MLC had

no obligation to purchase ***any*** vehicles from NUMMI:

> 4.2    Individual  Sales  Contracts:  (a)  Within  the  general
> principles  set  forth  in  Section  4.1  hereof,  each  purchase  and  sale
> transaction  between  [NUMMI]  and  [MLC]  relating  to  the  Products
> shall  be  governed  by  an  individual  sales  contract,  it  being  agreed
> within that context that ***[NUMMI] has no obligation to supply*** and
> ***[MLC]  has  no  obligation  to  purchase***  any  Products  until  the
> parties enter such a contract.  The terms of this agreement  (insofar
> as applicable) shall apply to each such sales contract.

(Ex. I) (emphasis added).  Here, NUMMI has failed to allege the existence of an individual sales

contract governing the purchase and sale of the Pontiac Vibe.  Thus, NUMMI cannot establish

that MLC had any purchase obligations relating to the Pontiac Vibe whatsoever.

45.    The VSA also provides that in the event of the discontinuation of the

manufacture of the Products ordered, any failure of performance is excused:

6.1    Force Majeure.  Any delay in or failure of the performance of any party hereunder shall be excused if and to the extent caused by occurrences beyond such parties control, including, but not limited to, acts of God; fire or flood; war; governmental regulations, policies or actions; closure of foreign exchange markets; any labor, material, transportation or utility shortage or curtailment; *discontinuation or curtailment of the manufacture of the Products ordered*; or any labor trouble in the manufacturing plants of [NUMMI] in Fremont, California or any of its suppliers.

(Ex. I) (emphasis added).  Accordingly, to the extent that the Court finds that NUMMI and MLC

were operating under an individual sales contract requiring MLC to purchase the Vibe from

NUMMI for an indefinite period or in perpetuity -- which NUMMI has not alleged in its Claim

and MLC does not concede -- any performance by MLC was excused in its entirety because of

the discontinuation of the manufacture of all Pontiac vehicles.

46.    Similarly, the CSA does not require MLC to provide any minimum

amount of components to NUMMI:

3.1    Supply and Purchase:  Subject to the terms of this Agreement, *if agreed to by NUMMI and [MLC],* [MLC] shall supply components to NUMMI to enable NUMMI to meet its obligations to manufacture Vehicle and Optional Equipment and otherwise to satisfy its obligations pursuant to the terms of the Vehicle Agreement.

(Ex. J) (emphasis added).  Much like VSA, the CSA also called for the "specific terms of sale

and delivery of Components supplied by MLC to NUMMI to be "agreed to by [MLC] and

NUMMI in separate documents."  (Ex. J at § 3.2).  And although NUMMI points to this

agreement to support its purported breach of contract claims against MLC, the CSA, in fact, was

the operative agreement governing NUMMI's purchase of parts *from* MLC.  It is therefore

inconceivable how it could possibly support NUMMI's claim for breach of express contract

relating to MLC's discontinuance of production.

47.    The Production MOU further contradicts any notion that the Debtors were

obligated to purchase vehicles from NUMMI.  Although it recites the parties' "basic

understanding . . . regarding the production and pricing of new car models to be produced at

NUMMI," including the Pontiac Vibe, the Production MOU does not require MLC to purchase

any vehicles from NUMMI.  Under the express terms of the Production MOU, although MLC

had a right to purchase at least 65,000 Vibe vehicles from NUMMI, it was not obligated to do so:

> (3)    The parties understand that, assuming that 225,000 units of
> the Products are scheduled to be produced in a year, the Products
> will be allocated between TMC and [MLC] under the following
> formula, where each of TMC and *[MLC] will have a right to, but
> not an obligation to, purchase the products* from NUMMI.
>
> TMC Corolla          at least 160,000          (71.11%)
>
> GMC Vibe             at least 65,000           (28.89%)

(Ex. K at § 1(3)).  The Production MOU also provides that the parties were to conduct an

annual review to determine its feasibility going forward, because any market changes

"might make the [MOU] inconsistent with the continued viability of NUMMI and the

profitability on sales of the Products."  (Ex. K at § 7).

**2.    NUMMI Has Failed to State a Claim for Breach of Express Indemnity**

48.    NUMMI also has failed to state a claim against MLC for breach of an

express indemnity agreement.  NUMMI does not identify any express indemnity agreement

between MLC and NUMMI.  Instead, NUMMI contends that certain contracts "acknowledge

that NUMMI will incur tooling, labor, and other infrastructure costs," which "imply an

obligation by the Debtor to indemnify NUMMI for any costs resulting from cessation of

21

production." Claim at 3. Express indemnity agreements must be in writing and signed to be

enforceable under California law. *See Lockheed Missiles & Space Co. v. Gilmore Indus., Inc.*,

135 Cal. App. 3d 556, 559 (Cal. App. 1982); *see also Solano Concrete Co. v. Lund Constr. Co.*,

64 Cal. App. 3d 572, 575 (Cal. App. 1976). Here, NUMMI does not (because it cannot) cite any

provision of any agreement that it has signed with MLC that requires MLC to provide

indemnification of any kind, including, but not limited to, costs incurred in connection with

MLC's discontinuation of the Pontiac Vibe. Accordingly, to the extent it relies on a legally

sufficient claim for breach of an express indemnity, the Claim should be disallowed.

### 3.    NUMMI Has Failed to State a Claim for Breach of Implied Contract

49.    The Claim also should be disallowed because it fails to state a claim for

breach of an implied contract. Throughout its Claim, NUMMI alleges that MLC "made other

oral and written representations," including a representation to "order the NUMMI produced

Pontiac Vibe through 2012" in connection with the Production MOU. Because of the long-

standing rule that there can be no claim for breach of implied contract where the subject matter is

governed by an express contract, these claims fail as a matter of law. Even if, however, this

Court were to conclude that the parties' express agreements do not serve as a bar to a claim for

breach of implied contract, NUMMI has failed to allege sufficient facts from which this Court

could conclude that there was an implied agreement between the parties.

50.    A claim for breach of an implied contract is barred when an express

contract on the same subject exists. *See Berkla v. Corel Corp.*, 302 F.3d 909, 918 (9th Cir. 2002)

("There cannot be a valid express contract and an implied contract, each embracing the same

subject, existing at the same time.") (quotations omitted); *Crain v. Burroughs Corp.*, 560 F.

Supp. 849, 852 (C.D. Cal. 1983) ("There cannot be a valid express contract and also a

contradictory implied contract embracing the same subject matter."). To read a performance obligation in the absence of a contract would be completely inconsistent with the parties' express agreement that their purchase and sale obligations would be governed by individual sales contracts. *See Wagner v. Glendale Adventist Med. Ctr.*, 216 Cal. App. 3d 1379, 1393 (Cal. Ct. App. 1989) (holding that there can be no implied contractual term completely at variance with an express term of a contract). Here, the parties agreed that individual sales contracts were to govern the parties' respective purchase and sale obligations. In addition, other agreements provided that the Debtors' purchases, if any, would be tied to market demand and that any failure of performance -- if performance was, in fact, required -- was excused to the extent caused by the discontinuation of the manufacture of the products ordered.

51. Finally, to state a claim for implied breach of contract, a plaintiff "must allege facts from which the court could infer there was an agreement between the parties." *Sweet v. Bridge Base, Inc.*, 2009 WL 1514443, at *4 (E.D. Cal. May 28, 2009) (dismissing implied breach of contract claim under California law). Here, rather than supporting its claim with any facts that would support its contention that the Debtors have breached an implied contract to reimburse NUMMI for reliance-based costs and other indemnification obligations, NUMMI alleges that "NUMMI incurred costs and expenses" . . . "in reliance upon the Debtors' representations to NUMMI that the Debtor would order the NUMMI-produced Pontiac Vibe through 2012." Claim at 3. NUMMI fails, however, to provide any facts to support this allegation beyond the existence of the Production MOU. Accordingly, NUMMI's breach of implied contract claim is barred and should be disallowed.

### 4.    NUMMI Has Failed to State a Claim for Implied or Equitable Indemnity

52.    NUMMI also purports to assert claims for implied contractual and

equitable indemnity.  According to NUMMI, because certain contracts "acknowledge" that

NUMMI will incur costs in connection with manufacturing vehicles, those contracts "imply an

obligation by the Debtor to indemnify NUMMI" for, *inter alia*, "costs resulting from the early

cessation of production" as well as "environmental remediation costs."  Claim at 3.  The

California Supreme Court has explained that an implied contractual indemnity claim is a claim

"based on contractual language not specifically dealing with indemnification."  *Bay Dev., Ltd. v.

The Superior Court of San Diego County (Home Capital Corp.)*, 50 Cal. 3d 1012, 1029 (Cal.

1990) (internal citation omitted).  Where, as here, NUMMI does not allege -- nor could they --

that the relevant agreements contain any express provision to indemnify, this Court must

determine whether there is a basis for an implied contractual indemnity claim based on other

contractual language.  Because NUMMI has failed to allege an underlying breach of contact,

however, its claim for breach of implied contract must fail.

53.    Although implied contractual indemnity may arise from contracts that are

silent as to indemnification, "[t]he right to implied contractual indemnity is predicated [on] the

indemnitor's breach of contract."  *Sehulster Tunnels/Pre-Con v. Traylor Brothers, Inc./Obayashi

Corp.*, 111 Cal. App. 4th 1328, 1350 (Cal. App. 2003) (citing *West v. Superior Court*, 27 Cal.

App. 4th 1625, 1633 (1994)).  As shown throughout this Objection, because NUMMI has failed

to plead any underlying breach of contract in connection with the discontinuation of the Pontiac

Vibe, NUMMI's claims for implied contractual and equitable indemnity must fail.[8]

---

[8] Although NUMMI purports to assert separate claims for contractual and equitable indemnity, implied contractual
indemnity is simply a form of equitable indemnity.  *See id.*

54.     NUMMI's implied contractual indemnification claims also should be rejected because the equities of the case do not merit any sort of equitable recovery outside of the contracts entered into by NUMMI and MLC.  In considering NUMMI's implied and equitable indemnification claims, this Court should consider "the equities of the particular case" in determining whether to apply the doctrine.  *Bay Development*, 50 Cal. 3d at 1029 (citing *E. L. White, Inc. v. City of Huntington Beach*, 21 Cal. 3d 497, 506-507 (Cal. Sup. Ct. 1978)).  The application of equitable indemnity "is not available where it would operate against public policy."  *Western Steamship Lines, Inc. v. San Pedro Peninsula Hosp.*, 8 Cal. 4th 100, 110 (Cal. 1994).  Permitting NUMMI to recover under a theory of implied or equitable indemnification here is entirely inconsistent with the parties' express agreement that market demand and individual contracts would determine the parties' purchase and sale obligations.  To allow NUMMI to recover on equitable grounds would deprive these sophisticated parties of their right to be governed by these agreements and reduce the overall recovery of creditors holding valid claims against the Debtors.  To avoid such a result, this Court should disallow NUMMI's implied contractual and equitable indemnification claims.

**B.     NUMMI Has Failed to State a Claim Against the Debtors for Breach of Fiduciary Duty**

55.     Unable to state a claim for breach of contract, NUMMI alternatively styles its claim as one against the Debtors for breach of fiduciary duty.  Claim at 3-4.  NUMMI contends that MLC owed a fiduciary duty to NUMMI because it was "a controlling shareholder in NUMMI" and because it exercised management control over NUMMI through the MLC-designees on the NUMMI Board of Directors.  Claim at 3.  As an equal 50% shareholder with TMC, however, MLC was not a controlling shareholder with concomitant fiduciary

obligations to NUMMI and TMC.  Even if MLC were a controlling shareholder, however, NUMMI has failed to allege -- and cannot allege -- the existence of a change of control transaction implicating such duties.  Thus, even a cursory reading of this claim demonstrates that it is nothing other than an attempt to recast NUMMI's doomed breach of contract claims under a different theory of recovery.

>    1.    **MLC Is Not a Controlling Shareholder**

>    56.    MLC and TMC each hold exactly half of NUMMI's outstanding shares and each had the right to appoint 4 of NUMMI's 8 directors.  In addition, TMC had the right to appoint NUMMI's President, who also served as a voting member on the Board.  NUMMI is a California close corporation, and there are no public or other shareholders, including minority shareholders.  Accordingly, NUMMI, TMC and MLC -- all sophisticated parties -- entered into contractual agreements to protect themselves and to define their obligations, including the Shareholders' Agreement and the Subscription Agreement, which governed the terms of the parties' relationship.

>    57.    Under California law, "***majority*** shareholders, either singly or acting in concert to accomplish a joint purpose, have a fiduciary responsibility to the minority and to the corporation to use their ability to control the corporation in a fair, just, and equitable manner." *Jones v. Ahmanson & Co.*, 460 P.2d 464, 471 (Cal. 1969) (emphasis added).  The Courts of Delaware agree that majority ownership generally is required to establish control: "[S]tock ownership alone, at least when it amounts to less than a majority, is not sufficient proof of domination or control."  *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984); *overruled in part on other grounds*, *Brehm v. Eisner*, 746 A.2d 805 (Del. 2000); *see also Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005) (emphasizing that "control exists when a stockholder

owns, directly or indirectly, more than half a corporation's voting power").  Here, where TMC

and MLC are both 50% shareholders, there is no basis for this Court to impose a fiduciary

obligation on the Debtors.

> 58.    NUMMI also fails to allege facts that would establish that notwithstanding

its less than majority ownership of NUMMI's outstanding shares, MLC exercised actual control

over NUMMI's business.  Under Delaware law, a shareholder who owns less than a majority of a

company's outstanding shares will not be considered a "controlling shareholder" with fiduciary

obligations, unless a plaintiff show the actual exercise of control over the corporation's conduct.

*See Weinstein*, 870 F.2d 507 ("For a stockholder owning less than a numerical majority of a

corporation's voting shares to be deemed a controlling stockholder for purposes of imposing

fiduciary obligations, the plaintiff must establish the *actual exercise* of control over the

corporation's conduct by that otherwise minority stockholder.") (emphasis in original).  Here,

NUMMI alleges in a conclusory fashion that MLC "exercised management control over

NUMMI through its agents, the MLC-designated members who served on the Board of

Directors."  Claim at 3.  But it cannot be disputed that TMC and MLC each had the right to

appoint an equal number of directors, with TMC having the right to appoint the President, a ninth

voting member.  Accordingly, MLC did not have the power to control the Board, much less

NUMMI's management.  In any event, the nomination of directors, standing alone, does not

amount to domination and control.  *See*, *e.g.*, *In re Sea-Land Corp. S'holder Litig.*, 1987 WL

11283, at *5 (Del. Ch. May 22, 1987) ("[e]ven if Simmons had caused its nominees to be elected

to the Sea-Land board, that fact, without more, does not establish domination or control.").

> 59.    Finally, to the extent that NUMMI bases its allegation that MLC was a

controlling shareholder on MLC exercising its right to discontinue production of the Pontiac

Vibe in a manner entirely consistent with the express terms of the VSA and Production MOU, it

is well settled that "a significant shareholder, who exercises a duly-obtained contractual right that

somehow limits or restricts the actions that a corporation otherwise would take, does not, without

more, become a 'controlling shareholder' for that particular purpose." *Superior Vision Servs,*

*Inc. v. Reliastar Life Ins. Co.*, 2006 WL 2521426, at * 5 (Del. Ch. Aug. 25, 2006).

> **2.    Controlling Shareholders Owe a Duty of Good Faith and
> Inherent Fairness In Connection With Change of Control
> Transactions and No Such Transaction Is Alleged Here**

60.    Even if this Court were to conclude that MLC was a controlling

shareholder, under longstanding California law (which is consistent with Delaware law), a

controlling shareholder has fiduciary duties to minority shareholders and the corporation in

connection with a "transaction where control of the corporation is material." *Jones,* 1 Cal. 3d at

112; *see also Miles, Inc. v. Scripps Clinic & Research Found.*, 810 F. Supp. 1091, 1099 (S.D.

Cal. 1993) ("The general rule of limited liability of corporations is that shareholders do not owe

each other a fiduciary duty") (citing *Jones* as the "exception").

61.    As no change of control transaction of any kind has been alleged -- nor

could one be -- even if this Court were to find that MLC was a controlling shareholder, there is

no basis for a breach of fiduciary duty claim based on the duty of care.[9]  Although Delaware

courts have "referred to a duty of care for controlling shareholders, each of those cases involved

controlling shareholders who breached their duty of loyalty by acting to benefit themselves to the

detriment of minority shareholders" in connection with change of control transactions. *Official*

*Committee of the Unsecured Creditors of Color Tile, Inc. v. Investcorp. S.A.*, 137 F. Supp. 2d

---

[9] In addition, because MLC is not a majority shareholder, the "*Jones* exception" does not apply.  *See*, *e.g.*, *Miles*, 801 F. Supp. at 1099 (rejecting argument that 50% shareholder owed fiduciary duty to the other 50% shareholder on the grounds that "neither party is a majority shareholder").

502, 515 (S.D.N.Y. 2001) (citing change of control cases).  The rationale for treating a

controlling shareholder as a fiduciary under those circumstances is to ensure that the controlling

shareholder does not abuse its position to obtain a benefit not available to minority shareholders.

*See id.*  Here, where MLC was not the controller shareholder and there are no minority

shareholders, there is no basis to impose a fiduciary duty of care on MLC in its capacity as a

50% shareholder.  To the extent NUMMI's Claim is based an a breach of fiduciary duty, it

should be disallowed in its entirety.

**C.    There is No Basis to Disregard NUMMI's Corporate Form**

62.    As a remedy for MLC's purported breaches on contract and fiduciary

duty, NUMMI seeks to have this Court disregard NUMMI's corporate form -- to pierce

NUMMI's corporate veil -- and hold the Debtors accountable for 50% of the losses it currently

anticipates will be incurred in connection with the dissolution of NUMMI.  As set forth below,

NUMMI has failed to allege any facts to support the extreme remedy of disregarding the

corporate form.

63.    Under California law, there are two basic requirements for piercing the

corporate veil:  first, that there be "such unity of interest and ownership that the separate

personalities of the corporation and the individual no longer exist" and second, that "if the acts

are treated as those of the corporation alone, an inequitable result will follow."  *Associated*

*Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 837 (Cal. App. 1962).  Generally

speaking, "*both* of these requirements must be found to exist before the corporate existence will

be disregarded."  *Id*. (emphasis in original).

64.    In practice, courts applying the veil piercing test focus on a variety of

factors including, *inter alia*, whether the corporation commingles funds and other assets with

another person or entity, diverts funds or assets to non-corporate uses, holds itself out to creditors

as being separate from other entities, uses the same business location as another entity, fails to

maintain minutes or adequate records, confuses records between separate entities, is

undercapitalized as an entity, conceals or misrepresents the identity of the responsible ownership

or management or shares identical equitable ownership and/or common officers and directors

with another entity.  *Id.* 838-840.  None of these factors, standing alone, is dispositive.  *Id*. at

840.  Rather, courts typically require several of these factors be present before they will pierce

the corporate veil.

65.    Here, the Claim contains no facts whatsoever that would support this

Court disregarding NUMMI's corporate structure and holding MLC accountable for 50% of

NUMMI's estimated incremental wind-down costs.  To the contrary, the record is replete with

evidence that NUMMI existed for many years as a separate and wholly distinct entity from

MLC.

66.    First, and most important, MLC does not dominate or exclusively control

NUMMI.  The company was founded in 1983 as a joint venture between MLC and TMC; by the

terms of NUMMI's article of incorporation, TMC and MLC are each 50% owners.  This

structure, combined with Section 3.2(b) of the Shareholders Agreement, which provides that

"there shall be an equal number of Series A Directors and Series B Directors," ensures that

NUMMI is not dominated by TMC or MLC.  (Ex. B at § 3.2(b)).  In fact, because NUMMI's

Board also includes its President as a voting member, NUMMI's Board has effectively been

composed of 5 TMC-appointed voting members and only 4 MLC-appointed voting members.

Because MLC does not even have the power to appoint a majority of NUMMI's board, it is

inconceivable that NUMMI could show how there is "such unity of interest and ownership" that

the separate corporate personalities of MLC and NUMMI no longer exist as required for this Court to pierce NUMMI's corporate veil.

67.    Second, NUMMI observes corporate formalities and holds itself out to its creditors and business partners as a separate entity from MLC.  The company conducts board meetings, keeps adequate minutes and even maintains a website on which it describes itself as an "independent California corporation."[10]  The company maintains separate business offices from both MLC and TMC.  Further, NUMMI has, by its own account, raised substantial capital for itself and negotiated labor contracts with the UAW that resulted in employing 3,700 union members.  *Id.*  For NUMMI to now effectively contend that it is the alter ego of MLC flies in the face of the facts and defies logic.

68.    Finally, there is no evidence whatsoever that NUMMI is undercapitalized. In California, courts generally will not pierce the corporate veil unless an entity's capital is "illusory or trifling compared with the business to be done and the risks of loss." *Carlesimo v. Schwebel*, 87 Cal. App. 2d 482, 492 (Cal. App. 1948) (citing *Ballantine on Corporations* (1946 Ed.) at 302).  NUMMI was established in 1983 with $450 million in capital and debt.  Given NUMMI's 27-year history of operations and production of ,millions of vehicles, it can hardly be said that the company's capitalization was "illusory" or "trifling."   In fact, it is not even clear here that NUMMI will be unable to satisfy all of its debts in full.  According to press reports, NUMMI has settled with its labor unions on all liabilities connected to the shutdown and NUMMI still maintains substantial assets, including valuable real and personal property.

---

[10]*See* NUMMI, http://www.nummi.com/ (follow "Jobs" hyperlink; then follow "culture" hyperlink) (last visited April 1, 2010).

**Reservation of Rights**

69.    This Objection is limited to the grounds stated herein.  Accordingly, it is

without prejudice to the right of the Debtors or any other interested party to object to the Claims

on any other ground whatsoever, and the Debtors expressly reserve all further substantive and/or

procedural objections they may have.  The Debtors also reserve all of their rights to assert claims

and/or counterclaims against NUMMI.

**Notice**

70.    Notice of this Motion has been provided to NUMMI and to the parties in

interest in accordance with the Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P.

1015(c) and 9007 Establishing Notice and Case Management Procedures, dated August 3, 2009

[Docket No. 3629].  The Debtors submit that such notice is sufficient and no other or further

notice need be provided.

71.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

72.    WHEREFORE the Debtors respectfully request entry of an order granting

the relief requested herein and such other and further relief as is just.

Dated: New York, New York
       April 1, 2010

                                    /s/ Joseph H. Smolinsky
                                    Harvey R. Miller
                                    Stephen Karotkin
                                    Joseph H. Smolinsky
                                    Anthony J. Albanese

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    Attorneys for Debtors
                                    and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
:
In re                             :         Chapter 11 Case No.
:
**MOTORS LIQUIDATION COMPANY,** *et al.,*  :        **09-50026 (REG)**
    **f/k/a General Motors Corp.,** *et al.*  :
:
                  **Debtors.**      :         **(Jointly Administered)**
:
------------------------------------------------------------x

## ORDER GRANTING DEBTORS' OBJECTION TO
## PROOF OF CLAIM NO. 67357 FILED BY NEW
## UNITED MOTOR MANUFACTURING, INC.

Upon the objection dated April 1, 2010 (the "**Objection**") to Proof of Claim No.

67357 filed by New United Motor Manufacturing, Inc. (the "**Claim**") of Motors Liquidation

Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession

(collectively, the "**Debtors**"), pursuant to section 502(b) of title 11, United States Code (the

"**Bankruptcy Code**"), Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), and this Court's Order Pursuant to Section 502(b)(9) of the Bankruptcy

Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim

(Including Claims Under Bankruptcy Code Section 503(b)(9)) and Procedures Relating Thereto

and Approving the Form and Manner of Notice Thereof [Docket No. 4079], seeking entry of an

order disallowing and expunging claim number 67357 on the grounds that the claim fails to

allege facts sufficient to support a claim, all as more fully described in the Objection; and due

and proper notice of the Objection having been provided, and it appearing that no other or further

notice need be provided; and the Court having found and determined that the relief sought in the

Objection is in the best interests of the Debtors, their estates, creditors, and all parties in interest

and that the legal and factual bases set forth in the Objection establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Objection is granted as provided

herein; and it is further

ORDERED that, pursuant to section 502(b) of the Bankruptcy Code, the Claim is

disallowed and expunged in its entirety; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: New York, New York
       _____, 2010


                                        _____
                                        United States Bankruptcy Judge