**Hearing Date and Time: April 8, 2010 at 1:00 p.m. (Eastern Time)**
**Objection Date and Time: April 4, 2010 at 4:00 pm. (Eastern Time)**

Austin L. McMullen
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division St., Ste. 700
P.O. Box 340025
Nashville, TN  37203
Telephone: (615) 252-2307
Facsimile: (615) 252-6307

*Attorneys for Knowledge Learning Corporation*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
|  | : |  |
| In re | : | Chapter 11 |
|  | : |  |
| **MOTORS LIQUIDATION COMPANY, et al.,** | : | Case No. 09-50026 (REG) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |
---------------------------------------------------------------x

**OBJECTION OF KNOWLEDGE LEARNING CORPORATION TO GENERAL
MOTORS LLC'S MOTION (I) FOR DECLARATORY RELIEF REGARDING THE
STATUS OF A CERTAIN SUBLEASE OR, IN THE ALTERNATIVE, RELIEF FROM
THE ASSUMPTION AND ASSIGNMENT OF A CERTAIN SUBLEASE TO GM
PURSUANT TO RULE 60(b) AND (II) TO RESCIND THE AGREEMENT TO
RESOLVE OBJECTION TO CURE NOTICE BETWEEN GM AND KNOWLEDGE
LEARNING CORPORATION DATED AUGUST 14, 2009**

TO:    **THE HONORABLE ROBERT E. GERBER**
       **UNITED STATES BANKRUPTCY JUDGE**

Knowledge Learning Corporation ("KLC"), by its undersigned counsel, hereby objects to

General Motors LLC's Motion (I) For Declaratory Relief Regarding the Status of a Certain

Sublease or, in the Alternative, Relief from the Assumption and Assignment of a Certain

Sublease to GM Pursuant to Rule 60(b) and (II) to Rescind the Agreement to Resolve Objection

to Cure Notice Between GM and Knowledge Learning Corporation Dated August 14, 2009 (the

"Lease Assumption Relief Motion"), and respectfully represents as follows:

## BACKGROUND

1.      On June 1, 2009 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy

Code") in the United States Bankruptcy Court for the Southern District of New York (the

"Court").

2.      Prior to the Petition Date, Saturn, LLC ("Saturn") and KLC entered into a certain

lease agreement (the "Lease Agreement") relating to certain real property located in Spring Hill,

Tennessee.

3.      As set forth in the Lease Assumption Relief Motion, KLC operated a child care

and learning facility (the "Spring Hill Facility") in connection with Saturn's manufacturing

operation in Spring Hill, Tennessee.  KLC continues to operate the Spring Hill Facility.  The

Spring Hill Facility provides child care services to the unionized workforce at Saturn's

manufacturing operation in Spring Hill, Tennessee.  The Lease Agreement provided for the

payment by Saturn of certain tuition subsidies and enrollment guarantees to KLC in connection

with the Spring Hill Facility.

**The Sale Motion and Assumption Notice**

4.      On June 1, 2009, the Debtors filed their Motion Pursuant to 11 U.S.C. §§ 105,

363(b), (f), (k) and (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (i) Approve (a)

the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings

LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances and

Other Interests; (b) the Assumption and Assignment of Certain Executory Contracts and

Unexpired Leases; and (c) Other Relief; and (ii) Schedule Sale Approval Hearing (the "Sale Motion") (Docket No. 92).

5.      Pursuant to the Sale Motion, the Debtors sought to sell substantially all of their assets, and in connection therewith, to assume and assign certain of their executory contracts and unexpired leases.

6.      In connection with the Sale Motion, the Debtors sought to assume and assign the Lease Agreement and to fix any cure amount thereunder at $0.00.

**KLC's Objection to the Cure Amount**

7.      On July 7, 2009, KLC filed an objection (the "Cure Amount Objection") (Docket No. 3030) to this cure amount.  In the Cure Amount Objection, KLC asserted that the appropriate cure amount under the Lease Agreement, as of the date of the Cure Amount Objection, was $123,316.60, not $0.00 as indicated by the Debtors.  (See Cure Amount Objection at ¶ 8.)

8.      As specifically set forth by KLC in the Cure Amount Objection, the Lease Agreement was the agreement at issue in the Sale Motion.  (See Cure Amount Objection at ¶¶ 3, 6-9.)

**GM's Contract Website**

9.      As part of these jointly administered cases, an Internet website under the address www.contractnotices.com (the "Contract Website") was established and maintained by the Debtors and/or the purchaser under the Sale Motion relating to the status of the Debtors' executory contracts and unexpired leases.

10.      A password provided to KLC by the Debtors enabled KLC to access a limited portion of the Contract Website.  Attached as Exhibit A hereto is a true and correct copy of the Contract Website as it appeared to KLC on July 23, 2009, and during the relevant period.

11.     As shown by Exhibit A hereto, the executory contract or unexpired lease to be assumed and assigned under the Sale Motion was designated simply as the "Agreement."

**Negotiations to Resolve the Cure Amount Objection**

12.     After KLC filed the Cure Amount Objection, counsel for KLC was contacted by Naeha Dixit, an attorney with Honigman Miller Schwartz and Cohn LLP ("Honigman"), counsel for General Motors, LLC ("GM" or "New GM").   The first such contact occurred via telephone on July 14, 2009.

13.     In a subsequent discussion on July 21, 2009, between Ms. Dixit and counsel for KLC, Ms. Dixit informed counsel for KLC that a representative of the Debtors and/or GM would contact KLC to discuss a potential resolution of the Cure Amount Objection.

14.     Diane N. DeHoyos, identified as GPSC-VSSM Global Commodity Manager – Advertising/Media, then contacted a representative of KLC by telephone.   Ms. DeHoyos' address is in the Renaissance Center, Detroit, Michigan.   In a subsequent e-mail, dated July 23, 2009, Ms. DeHoyos asked KLC to complete a template and provide back-up data within 24 hours.

15.     KLC responded on July 24, 2009, providing Ms. DeHoyos with the completed template and more than sixty (60) pages of supplemental documentation.   As set forth in the completed template sent by KLC to Ms. DeHoyos on July 24, 2009, the proper cure amount for the Lease Agreement was calculated as follows:

| Invoice Date | Invoice Amount | Description |
|---|---|---|
| 5/20/2009 | $3,454.00 | Tuition subsidy, extended hours subsidy |
| 6/20/2009 | $3,373.00 | Tuition subsidy, extended hours subsidy |
| 7/20/2009 | $116,485.60 | Tuition subsidy, extended hours subsidy and enrollment guarantee |
| 6/8/2009 | $1,889.00 | Legal fees |
| 7/7/2009 | $1,286.00 | Legal fees |
| 7/24/2009 | $1,820.00 | Legal fees |
| | $128,307.60 | **TOTAL** |

The supplemental documentation provided to Ms. DeHoyos by KLC on July 24, 2009, contains detailed calculations of the tuition subsidies and enrollment guarantees owed by Saturn to KLC pursuant to the Lease Agreement. The documentation also identifies by name the specific students who attend the Spring Hill Facility.[1]

16.    By e-mail dated July 29, 2009, Ms. DeHoyos stated: "I am in need of the agreement between GM and your organization." A copy of this e-mail is attached hereto as Exhibit B. Later that day, a copy of the Lease Agreement was provided to Ms. DeHoyos by e-mail.

17.    On August 3, 2009, counsel for KLC received a voicemail from Daniel Adams, an attorney with Honigman. In an e-mail dated August 5, 2009, Mr. Adams provided legal research in support of the Debtors' position that KLC was not entitled to recover legal fees as part of the cure amount for the Lease Agreement. A copy of this e-mail is attached hereto as Exhibit C. The case provided by counsel for KLC by Mr. Adams was In re Child Word, Inc., 161 B.R. 349 (Bankr. S.D.N.Y. 1993), a case concerning recovery of attorney's fees in connection with the assumption and assignment of leases of real property.

---

[1] Due to the personally identifiable information contained in the supplemental documentation provided by KLC to Ms. DeHoyos on July 24, 2009, the supplemental documentation is not attached as an exhibit hereto. However, a copy of this documentation will be provided to counsel for GM on request.

18.    In subsequent e-mail correspondence, Mr. Adams and counsel for KLC discussed in detail the merits of the various arguments regarding recovery for attorney's fees based on the Debtor's assumption and assignment of the Lease Agreement.   In one August 5, 2009, e-mail from counsel for KLC to Mr. Adams, counsel for KLC stated that the fees incurred by KLC "have been in its effort to enforce the rental, tax and common area maintenance provisions of the lease . . ."  A copy of this e-mail is attached hereto as <u>Exhibit D</u>.

19.    In an e-mail the following day, August 6, 2009, Mr. Adams argued that KLC was not entitled to recover attorney's fees and made reference to specific provisions of the Lease Agreement – sections 25.1.3 and 25.2.  A copy of this e-mail is attached hereto as <u>Exhibit E</u>.

20.    Counsel for KLC responded by e-mail later on August 6, 2009, with additional arguments about Sections 25.1.1, 25.1.3 and 25.1.4 of the Lease Agreement.  A copy of this e-mail is attached hereto as <u>Exhibit F</u>.  Also as part of this e-mail, counsel for KLC offered to accept a reduced amount of attorney's fees – $5,000 – in order to resolve the issue.

21.    Later on August 6, 2009, Mr. Adams sent the following e-mail to counsel for KLC:

> I've spoken with the GM Team: We have documents supporting $4995.00 in attorney's fees from your client.  I've instructed my client to add these numbers to the cure amount on the settlement letter.

A copy of this e-mail is attached hereto as <u>Exhibit G</u>.  Counsel for KLC confirmed with Mr. Adams that this proposal would be acceptable to KLC.

**The Debtors Assume the Lease Agreement and Assign it to GM**

22.      By Order dated July 5, 2009, the Court authorized the sale of the Debtors' assets to NGMCO, Inc. and the assumption and assignment of executory contracts and unexpired leases.

23.      On July 10, 2009, the transaction between the Debtors and NGMCO, Inc. closed. As part of this transaction, the Lease Agreement, assumed by the Debtors, was assigned to NGMCO, Inc.

24.      NGMCO, Inc. subsequently became known as General Motors, LLC ("GM").

25.      On August 14, 2009, KLC and GM executed that certain Agreement to Resolve Objection to Cure Notice (the "Settlement Agreement"), a true and correct copy of which is attached as Exhibit H hereto.  A copy of the Settlement Agreement is also attached to the Lease Assumption Relief Motion as Exhibit 5.

26.      The Settlement Agreement provides that the status of the Lease Agreement on the Contract Website would be changed to reflect that the Lease Agreement had been assumed.  The Settlement Agreement further provides for payment to KLC by GM of the proper cure amount of $128,307.60 and withdrawal by KLC of the Cure Amount Objection.  The Settlement Agreement also states that GM "will perform all obligations that arise or come due under the Agreement(s) on or after the Petition Date as and when such obligations come due in accordance with the Agreement(s)' terms in the ordinary course of business . . ."

27.      Pursuant to the Settlement Agreement, KLC withdrew the Cure Amount Objection.  (See Docket No. 3993.)

28.     Also pursuant to the Settlement Agreement, the status of the Lease Agreement on the Contract Website was changed to "Assumed July 10, 2009."  This is reflected on the screen print-out from the Contract Website attached hereto as <u>Exhibit A</u>.

29.     The Contract Website includes a Contract Status Legend that defines "Assumed" as follows: "The contract has been fully and finally assigned to New GM as of the date indicated."  Although this Contract Status Legend can be viewed, it cannot be printed and, thus, is not attached as an exhibit hereto.

30.     Prior to the assumption of the Lease Agreement by the Debtors and assignment of the Lease Agreement to GM, the Contract Website designated the Lease Agreement as "Noticed," which the Contract Website defines as a contract "that has been designated by [GM] for potential assumption and assignment to New GM."

**KLC Continues Operating the Spring Hill Facility**

31.     Based on the Settlement Agreement executed by GM and the assumption and assignment of the Lease Agreement to GM, KLC continued to operate the Spring Hill Facility. Indeed, KLC's operation of the Spring Hill Facility continues to this day consistent with KLC's obligations to its customers in the Spring Hill, Tennessee area.

32.     KLC's operation of the Spring Hill Facility has been at a substantial financial loss, which GM is required to subsidize pursuant to the Lease Agreement.  Through February 20, 2010, KLC has invoiced GM for the tuition subsidies and enrollment guarantees, as follows:

| Invoice Date | Invoice Amount | Description |
|---|---|---|
| 5/20/2009 | $3,454.00 | Tuition subsidy, extended hours subsidy |
| 6/20/2009 | $3,373.00 | Tuition subsidy, extended hours subsidy |
| 7/20/2009 | $116,485.60 | Tuition subsidy, extended hours subsidy and enrollment guarantee |
| 8/20/2009 | $2,856.00 | Tuition subsidy, extended hours subsidy |
| 9/20/2009 | $2,765.00 | Tuition subsidy, extended hours subsidy |
| 10/20/2009 | $145,728.00 | Tuition subsidy, extended hours subsidy and enrollment guarantee |
| 11/20/2009 | $2,667.00 | Tuition subsidy, extended hours subsidy |
| 12/20/2009 | $2,501.00 | Tuition subsidy, extended hours subsidy |
| 1/20/2010 | $143,087.00 | Tuition subsidy, extended hours subsidy and enrollment guarantee |
| 2/20/2010 | $2,388.00 | Tuition subsidy, extended hours subsidy |
| | $425,304.60 | **TOTAL** |

33.     Additional tuition subsidy and enrollment guarantee obligations have accrued and are continuing to accrue as KLC operates the Spring Hill Facility.

34.     KLC contacted GM on numerous occasions inquiring about the status payment for the tuition subsidies and enrollment guaranties required under the Lease Agreement. GM's responses never included the position taken by GM in the Lease Assumption Relief Motion.

**Debtors' Lease Rejection Motion**

35.     On October 23, 2009, the Debtors filed their Eighth Omnibus Motion Pursuant to 11 U.S.C. § 365 to Reject Certain Executory Contracts and Unexpired Leases of Nonresidential Real Property (the "Lease Rejection Motion") (Docket No. 4291). Pursuant to the Lease Rejection Motion, the Debtors sought to reject certain executory contracts, including the Lease Agreement.

36.     On November 2, 2009, KLC objected to the Lease Rejection Motion, arguing, among other things, that the Debtors could not reject the Lease Agreement because the Debtors

were no longer parties to the Lease Agreement, given that the Lease Agreement had been assumed and assigned to GM. (Docket No. 4338.)

37.     By e-mail dated December 21, 2009, counsel for the Debtors indicated that the Debtors would withdraw the Lease Rejection Motion as it related to the Lease Agreement.

38.     On January 27, 2010, the Debtors withdrew the Lease Rejection Motion as it related to the Lease Agreement. (Docket No. 4890.)

**GM's Competitive Assistance Program**

39.     In the Lease Assumption Relief Motion, GM argues that there were actually two (2) agreements that existed between the Debtors and KLC: first, the Lease Agreement, and, second, a 2010 Model Year Competitive Assistance Program Agreement (the "CAP Agreement"). According to GM, a copy of the CAP Agreement is attached as Exhibit 1 to the Lease Assumption Relief Motion.

40.     The CAP Agreement is dated August 14, 2009. Additionally, the CAP Agreement is not signed by any representative of GM or KLC.

41.     By its terms, the CAP Agreement does not obligate KLC to any performance whatsoever.

## ARGUMENT

42.     GM's Lease Assumption Relief Motion is based on the proposition that two (2) executory contracts and/or unexpired leases existed between GM and KLC – the CAP Agreement and the Lease Agreement. In fact, during the relevant period only one of these agreements was actually an executory contract or unexpired lease – the Lease Agreement. Moreover, the CAP Agreement was never designated to KLC in any manner as the contract that was being assumed and assigned. All communications concerning assumption and assignment

discussed the Lease Agreement, not the CAP Agreement.  To the extent a mistake occurred, it was entirely unilateral on the part of the Debtors and GM, not KLC.  Finally, based on the representations that were made, KLC has continued to operate the Spring Hill Facility at a substantial financial loss.  No relief should be granted on GM's Lease Assumption Relief Motion unless KLC is, at a minimum, compensated under the Lease Agreement through a period when KLC can lawfully terminate its obligations to the parents who use the Spring Hill Facility.

**The CAP Agreement could not have been assumed and assigned because it is not a contract and, moreover, is not an executory contract**

43.     In the Lease Assumption Relief Motion, GM argues that the CAP Agreement was assumed and assigned to GM on July 10, 2009.  (<u>See</u> Lease Assumption Relief Motion at ¶ 26.)

44.     This cannot be so because the CAP Agreement was not even a legal contract on July 10, 2009.  First, the CAP Agreement is dated August 14, 2009.  (<u>See</u> Lease Assumption Relief Motion at Ex. 1, p. 2, 3, 4.)  This is more than a month after GM claims the CAP Agreement was assumed and assigned.  Second, the CAP Agreement is not signed by any party, whether a representative of GM or a representative of KLC.  (<u>See</u> Lease Assumption Relief Motion at Ex. 1, p. 4.)  Clearly the CAP Agreement could not have been the subject of the Sale Motion and Assumption Notice in June of 2009 when the CAP Agreement was not even in existence at that time and was not a contract executed by any party.

45.     The CAP Agreement could not have been assumed and assigned to GM on July 10, 2009, for the additional reason that it is not an executory contract.  Only executory contracts and unexpired leases may be assumed and assigned.  11 U.S.C. § 365(a).  The Bankruptcy Code does not define "executory contract."  <u>See</u> <u>In re Murexco Petroleum, Inc.</u>, 15 F.3d 60, 62 (5th Cir.

1994).  The prevailing standard for determining whether a contract is executory is that suggested by Professor Vern Countryman:

> a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.

Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 460 (1973).

46.    Even assuming the CAP Agreement were a signed, valid agreement as of July 10, 2009, which it was not, the CAP Agreement is not an executory contract.  The CAP Agreement does not require the purchase of any goods, but merely specifies a price at which the purchaser can obtain the goods in question should the purchaser decide to buy the goods.  (See Lease Assumption Relief Motion at Ex. 1.)  See also General Motors Corp. v. Alumi-Bunk, Inc., 2007 WL 2118796 at *4 (Mich. App. July 24, 2007), rev'd on other grounds 757 N.W.2d 859 (Mich. 2008); Brief of General Motors before Michigan Supreme Court, at 9 ("The CAP agreement simply confirmed that [purchaser] could receive substantial discounts in the event [purchaser] purchased the vehicles from a dealership.") http://courts.michigan.gov/supremecourt/Clerk/11-08/135117/135117-AppelleeBrief.pdf.

47.    Since the CAP Agreement was not an executory contract nor even a legal contract at all, it could not have been the agreement between KLC and the Debtors that was intended for assumption and assignment in June or July of 2009.  Accordingly, the Court must reject GM's argument that the CAP Agreement, rather than the Lease Agreement, was assumed and assigned to GM.

48.    Indeed, the only executory contract or unexpired lease that existed during the relevant period is the Lease Agreement.  As a result, when a non-specific "Agreement" was

listed on the GM Contract Website, it must have referred to the Lease Agreement, given that the

Lease Agreement was the only agreement that existed at the time.

**Rule 60(b)(1) does not provide a basis for the relief GM seeks**

49.    GM argues that the Court should grant GM relief from the assumption and

assignment on the basis of GM's mistake.  (See Lease Assumption Relief Motion at ¶¶ 32-44.)

50.    Rule 60(b)(1), Federal Rules of Civil Procedure, incorporated herein by Rule

9024, Federal Rules of Bankruptcy Procedure, states as follows:

> On motion and just terms, the court may relieve a party or its legal
> representative from a final judgment, order, or proceeding for the
> following reasons . . . mistake, inadvertence, surprise, or excusable
> neglect . . .

Fed. R. Civ. P. 60(b)(1); Fed. R. Bankr. P. 9024.

51.    GM seeks to undo the parties' agreement and orders of the Court providing that

the Lease Agreement would be assumed and assigned.  One commentator has observed that

"judgments entered as a result of settlements may be reopened when fraud or mutual mistake is

shown."  Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d, § 2858 at n. 15

(1995).  "Under New York law, a contract may be reformed only if there is mutual mistake or a

unilateral mistake by one party and fraud by the other."  In re Hillsborough Holdings Corp., 203

B.R. 1000, 1007 (Bankr. M.D. Fla. 1996).  See also Brown v. County of Genesee, 872 F.2d 169,

174 (6th Cir. 1989) ("only the existence of fraud or mutual mistake can justify reopening an

otherwise valid settlement agreement"); Audio Fidelity Corp. v. Pension Benefit Guarantee

Corp., 624 F.2d 513, 518 (4th Cir. 1980) (reformation requires that the party seeking reformation

present clear and convincing evidence showing that "the mistake [was] mutual, or if unilateral, it

[was] accompanied by fraud on the part of the other contracting party").

52.    Here, there was no mistake.    Both KLC and representatives of GM and the Debtors indicated that the Lease Agreement was the operative agreement being assumed and assigned.    Thus, no mistake occurred.    There is no communication whatsoever in which the Debtors or GM indicated that the agreement to be assumed and assigned would be the CAP Agreement.    The initial communication from the Debtors to KLC concerning assumption and assignment was a notice directing KLC to the GM Contract Website.    (See Lease Assumption Relief Motion at Ex. 2.)  Upon visiting the GM Contract Website, the agreement between KLC and the Debtors was identified simply as "Agreement."    (See Exhibit A hereto.)    At the time KLC received these notices, only one agreement existed – the Lease Agreement.    (See ¶¶ 47-48, supra.)    Accordingly, KLC could reach only one conclusion – that the Debtors intended to assume and assign the Lease Agreement.    KLC's belief that the Lease Agreement was the agreement at issue was confirmed in the Cure Amount Objection, in which KLC repeatedly indicated that the operative agreement was the Lease Agreement.    (See Cure Amount Objection at ¶¶ 3, 6-9.) This conclusion was reinforced in subsequent communications with GM.  Upon the direction of counsel for GM, KLC communicated with Ms. DeHoyos, the Global Commodity Manager.    KLC provided Ms. DeHoyos with the information and documents she requested, including a copy of the Lease Agreement and copies of invoices containing calculations of the tuition subsidies and enrollment guarantees due under the Lease Agreement.    Counsel for GM and counsel for KLC then engaged in several rounds of communication, all of which were consistent with the Lease Agreement being the operative agreement.    Never once did the Debtors, GM or their counsel express in any way that the operative agreement was the CAP Agreement.    Now, months later, after KLC has incurred hundreds of thousands of dollars in expenses operating the Spring Hill Facility, GM comes forward to identify the CAP Agreement

and claim for the first time publicly that the CAP Agreement, rather than the Lease Agreement, was assumed and assigned. GM relies upon undisclosed, private communication indicating that GM and the Debtors wanted to reject the Lease Agreement.[2] Yet neither KLC nor the Court can rely on the secret, unexpressed intention of GM and the Debtors. The Debtors themselves apparently recognized as much when they withdrew their Lease Rejection Motion. (See Docket No. 4890.)

53.     Since only one agreement – the Lease Agreement – existed throughout the relevant period, and all communications were consistent with the Lease Agreement being the operative agreement, there was no mistake. However, if there was a mistake, it was a unilateral mistake by GM. KLC certainly made no mistake because it intended that the Lease Agreement was the operative agreement and, in fact, the communications by all parties are consistent with the Lease Agreement being assumed and assigned.

54.     A unilateral mistake is not a sufficient grounds for the relief GM seeks in the Lease Assumption Relief Motion. A unilateral mistake in the negotiation of a contact or settlement is not the type of mistake for which Rule 60(b)(1) provides relief. See Federal Deposit Ins. Corp. v. Currier, 198 F.3d 257 at *2 (10th Cir. 1999) (table); see also Brown v. County of Genesee, 872 F.2d 169, 174 (6th Cir. 1989) ("only the existence of fraud or mutual mistake can justify reopening an otherwise valid settlement agreement"); Audio Fidelity Corp. v. Pension Benefit Guarantee Corp., 624 F.2d 513, 518 (4th Cir. 1980) (reformation requires that the party seeking reformation present clear and convincing evidence showing that "the mistake

---

[2] In the Lease Assumption Relief Motion, at 15, n. 13, GM argues that the exhibit to KLC's objection to the Lease Rejection Motion reflects that GM's Contract Website stated that the designated contract was "(CAP) (One Model Year)." As the exhibits to KLC's objection to the Lease Rejection Motion indicate, this additional information was present on the Contract Website on November 2, 2009, months after the relevant period. (Cf. Docket No. 4338 at Ex. B with Docket No. 4338 at Ex. C.)

[was] mutual, or if unilateral, it [was] accompanied by fraud on the part of the other contracting party"); In re Hillsborough Holdings Corp., 203 B.R. 1000, 1007 (Bankr. M.D. Fla. 1996) ("Under New York law, a contract may be reformed only if there is mutual mistake or a unilateral mistake by one party and fraud by the other").  In the case at bar, the mistake – to the extent there was a mistake – was a unilateral mistake by GM.  Unilateral mistake can serve as a basis for relief only if the mistake is the result of fraud by the other party.  GM offers no proof of fraud by KLC, nor was there any fraud, so even a unilateral mistake by GM cannot justify granting the relief GM seeks.

55.    In the Lease Assumption Relief Motion, GM admits that the evidence in support of a Rule 60(b) motion must be "highly convincing."  (Lease Assumption Relief Motion at ¶ 34 (citing Kotlicky v. United States Fidelity & Guar. Co., 817 F.2d 6 (2d Cir. 1987); Security Pacific Mortg. and Real Estate Svcs. v. Herald Center, 731 F. Supp. 605, 610 (S.D.N.Y. 1990).)  Additionally, the movant must show "exceptional circumstances."  Freedom, N.Y., Inc. v. United States, 438 F. Supp. 2d 457, 462 (S.D.N.Y. 2006).  GM has completely failed to present highly convincing evidence of a mutual mistake in this case.  On the contrary, all the evidence suggests that there was no mistake at all, or that the mistake was solely by GM.

56.    GM also admits that it must offer good cause for not acting sooner.  (Lease Assumption Relief Motion at ¶ 34 (citing Kotlicky v. United States Fidelity & Guar. Co., 817 F.2d 6 (2d Cir. 1987); Security Pacific Mortg. and Real Estate Svcs. v. Herald Center, 731 F. Supp. 605, 610 (S.D.N.Y. 1990).)  Here, KLC contacted GM repeatedly about the payment of the tuition subsidies and enrollment guarantees.  During that time, GM never indicated to KLC that it disputes in any way that the Lease Agreement was assumed and assigned.  Accordingly, KLC has continued to operate the Spring Hill Facility at a financial loss in reliance on GM's

payment of the tuition subsidies and enrollment guarantees.  Given GM's failure to act sooner

and KLC's reliance on the assumption and assignment of the Lease Agreement, it is apparent

that GM has failed to establish the good cause that is required for the relief GM seeks.

57.     KLC's good faith reliance on the assumption and assignment of the Lease

Agreement leads to the third element that GM points out in the Lease Assumption Relief Motion

– that no undue hardship is imposed on other parties.  (Lease Assumption Relief Motion at ¶ 34

(citing Kotlicky v. United States Fidelity & Guar. Co., 817 F.2d 6 (2d Cir. 1987); Security

Pacific Mortg. and Real Estate Svcs. v. Herald Center, 731 F. Supp. 605, 610 (S.D.N.Y. 1990).)

The hardship that would be unjustly imposed on KLC if it cannot recover the tuition subsidies

and enrollment guarantees for the period it has operated the Spring Hill Facility is substantial and

cannot be lightly dismissed as GM suggests in the Lease Assumption Relief Motion.  As detailed

above, KLC is entitled to more than $425,000 in tuition subsidies and enrollment guarantees for

the continued operation of the Spring Hill Facility, with additional subsidies and guarantees

accruing as the Spring Hill Facility remains open for parents in the Spring Hill, Tennessee area.

58.     The detrimental reliance of KLC on GM's unilateral mistake is a critical fact that

distinguishes this case from the otherwise similar case of In re UAL Corporation, 411 F.3d 818

(7th Cir. 2005), cited by GM in the Lease Assumption Relief Motion, at ¶ 38.  In UAL, the debtor

had sixty (60) days within which to give notice of its intent to assume or reject its airplane leases.

Id. at 820.  The decision to assume or reject a particular airplane lease was an economic decision

based on the cure amount that would be owed under the lease.  Id.  The team appointed by the

debtor to analyze its airplane leases mistakenly believed that no money was owed on three (3)

leases and advised the debtor's management team not to abandon the leases.  Id. at 820-21.  The

management team followed through on this recommendation and sent notice of its intent to retain

the leases.  Id.  This decision was approved in a bankruptcy court order.  Id. at 821.  When the

owners of the planes covered by the three (3) leases began demanding payment of the cure

amount, the debtor filed a motion to vacate the order.  Id.  The bankruptcy court granted the

motion, and the owners appealed.  Id.  The Seventh Circuit rejected the debtor's arguments about

the press of time and number of leases that had to be analyzed:

> United's mistake in failing to abandon the leaes was excusable, but
> not because their number and complexity and the 60-day deadline
> for sorting through them and figuring out which to abandon and
> which to keep made mistakes inevitable.  That would make it a
> case not of excusable *neglect*, but of unavoidable error.  United is a
> huge company represented by one of the nation's largest law firms
> (Kirkland & Ellis).  Sixty days in which to sort through some 460
> leases requires examining on average fewer than eight leases per
> day, and all that had to be determined was whether United owed
> any money on the lease; if is did, it would abandon the lease and if
> not, not.

Id. at 822-23 (emphasis in original) (internal citation omitted).  Although these arguments were

unconvincing, the Seventh Circuit permitted the order to be vacated because the owners of the

planes had not relied to their detriment on the debtor's mistake.  Id. at 823 ("Had the

beneficiaries of the mistake, the airplanes' owners, relied to their detriment on it, United would

not be entitled to relief").

59.    Of course, KLC, unlike the owners of the airplanes, detrimentally relied on GM's

mistake and continued to operate the Spring Hill Facility.  GM should not be allowed to walk

away from the obligations it assumed through assignment of the Lease Agreement.

60.    The fact that the Lease Agreement was assumed by the Debtors and assigned to

GM presents another important distinction between the instant case and UAL.  "When an

innocent mistake can be rectified without harm to anyone," the Seventh Circuit wrote in UAL,

"it should be."  Id. at 823-24.  Especially where the cost "will be borne not by its maker – United

– but by creditors no less innocent than the airplanes' owners." Id. at 824. In UAL, the Seventh

Circuit was concerned that the cost of the debtor's mistake would be imposed on the debtor's

creditors, who were equally innocent with the owners of the airplanes. Here, on the other hand,

if the Court were to deny GM's Lease Assumption Relief Motion, the cost of the mistake would

not be borne by the Debtors or creditors of the Debtors. Instead, the cost would be borne by GM,

which is the party that made the mistake. In fact, if the Court grants the relief GM seeks, the

creditors of these Debtors will be harmed. GM proposes in the Lease Assumption Relief Motion

that if the assumption and assignment of the Lease Agreement is undone, KLC will have a

rejection claim and administrative expense claim against the Debtors' estates. (See Lease

Assumption Relief Motion at ¶ 38.) For the reasons identified by the Seventh Circuit in UAL,

id. at 824, the Court should not relieve GM of the consequences of its unilateral mistake and

impose that harm on innocent parties such as KLC and the creditors of the Debtors' estates in

these cases.

61.     In several other cases, courts have rejected unilateral mistake as a basis for

altering a judgment or reforming a contract. For example, where a party misunderstood the

meaning of a paragraph of a settlement stipulation and believed that he had agreed to something

"entirely different," the mistake was not covered by Rule 60(b). Cashner v. Freedom Stores,

Inc., 98 F.3d 572 (10th Cir. 1996). The Tenth Circuit stated:

> If the mistake alleged is a party's litigation mistake, we have
> declined to grant relief under Rule 60(b)(1) when the mistake was
> the result of a deliberate and counseled decision by the party.
> "Generally speaking, a party who takes deliberate action with
> negative consequences . . . will not be relieved of the
> consequences [by Rule 60(b)(1)] when it subsequently develops
> that the choice was unfortunate." Similarly, Rule 60(b)(1) relief is
> not available for a party who simply misunderstands the legal
> consequences of his deliberate acts.

Id. at 577 (quoting 7 Moore, Federal Practice ¶ 60-22 [2], p. 60-182).  Rule 60(b)(1) is intended

for mistakes "a party could not have protected against."  Cashner, 98 F.3d at 577.  The instant

case is similar to UAL, where the Seventh Circuit held that the unilateral mistake of one party

was not an "unavoidable error."  411 F.3d at 822.  Similarly, here both the Debtors and GM had

available the services of several large law firms and numerous personnel, both in-house and

through outside consultants, to analyze "approximately 590 contract assumption and assignment

objections . . ." (Lease Assumption Relief Motion at ¶ 36.)  Also as in the UAL case, the instant

settlement agreement was finalized more than two (2) months after the petition date.  Certainly

this was not an "unavoidable error" and is a mistake that GM could have protected against.  To

use the words of the Tenth Circuit in Cashner, this was a "counseled decision," with the

following, at a minimum, involved on behalf of GM: Ms. DeHoyos, the Global Commodity

Manager, Mr. Adams, GM's outside counsel at Honigman, and the "GM Team" identified by

Mr. Adams.  GM's Lease Assumption Relief Motion also identifies a "GM Command Center"

that GM used to analyze the 590 contract assumption and assignment objections.  (See Lease

Assumption Relief Motion at ¶ 18.)

      62.    In another case, parties disagreed as to when a party could exercise an option.

See Praxair, Inc. v. Hinshaw & Culbertson, 235 F.3d 1028 (7th Cir. 2000).  The agreement said

the option had to be exercised by January 16, which happened to be a Sunday.  Id. at 1030.  The

following day was a legal holiday.  Id.  So, the party tried to exercise the option on January 18, a

Tuesday.  Id.  The argument was made that a mutual mistake had occurred.  Id. at 1034.  The

Seventh Circuit disagreed, stating:

> The doctrine of mutual mistake is limited to cases in which both
> parties were reasonable in their inconsistent interpretations; cases,
> in other words, of irremediable ambiguity; more precisely, cases in

> which neither party is more at fault than the other. If neither party can be assigned the greater blame for the misunderstanding, there is no nonarbitrary basis for deciding which party's understanding to enforce, so either party is allowed to abandon the contract without liability. But a party whose interpretation is a product of carelessness cannot obtain relief unless the other party was equally careless, for without an equality of blame there is no basis for shifting the loss by permitting rescission. Professor Farnsworth cites authority that lack of care does not bar a claim of mutual mistake. But an asymmetrical lack of care does. If one party is careless and the other is not, the careless party cannot rescind, because he has offered no reason why the court should make him better off than his opponent.

Id. (internal quotation marks and citations omitted). The Seventh Circuit found that the party arguing that the option was limited to Sunday was careless, while the party seeking to exercise the option on Tuesday was not careless. Id. "When only one of the contracting parties was mistaken, we have a case of unilateral rather than mutual mistake. And unilateral mistake is generally not a ground for rescinding or reforming a contract." Id. Here, if any party was mistaken, it was GM only. KLC intended that the Lease Agreement was the agreement being assumed and assigned, and all communications reflect that the Lease Agreement was the operative document.

WHEREFORE, Knowledge Learning Corporation respectfully requests that this Court deny General Motors LLC's Motion (I) For Declaratory Relief Regarding the Status of a Certain Sublease or, in the Alternative, Relief from the Assumption and Assignment of a Certain Sublease to GM Pursuant to Rule 60(b) and (II) to Rescind the Agreement to Resolve Objection to Cure Notice Between GM and Knowledge Learning Corporation Dated August 14, 2009 and grant such other and further relief as is just and appropriate.

DATED: April 2, 2010.

Respectfully submitted,


/s/ Austin L. McMullen_____
Austin L. McMullen (admitted *pro hac vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
P. O. Box 340025
Nashville, Tennessee 37203
Phone: (615) 252-2307
Fax: (615) 252-6307
Email: AMcMullen@BABC.com

*Attorneys for Knowledge Learning Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was forwarded electronically to all parties consenting to service through the Court's electronic filing systems and electronically or by Federal Express overnight delivery to:

Motors Liquidation Company
<u>Attn</u>: Ted Stenger
300 Renaissance Center
Detroit, MI 48265

WEIL, GOTSHAL & MANGES LLP
<u>Attn</u>:   Harvey R. Miller, Esq.
             Stephen Karotkin, Esq.
             Joseph H. Smolinsky, Esq.
767 Fifth Avenue
New York, New York 10153

General Motors Company
<u>Attn</u>:  Lawrence S. Buonomo, Esq.
300 Renaissance Center
Detroit, MI 48265

Cadwalader, Wickersham & Taft LLP
<u>Attn</u>:   John J. Rapisardi, Esq.
One World Financial Center
New York, New York 10281

U.S. TREASURY
<u>Attn</u>:   Matthew Feldman, Esq.
1500 Pennsylvania Avenue, N.W.
Room 2312
Washington, D.C. 20220

VEDDER PRICE, P.C.
<u>Attn</u>:   Michael J. Edelman, Esq.
             Michael L. Schein, Esq.
1633 Broadway, 47th Floor
New York, New York 10019

Kramer Levin Naftalis & Frankel LLP
<u>Attn</u>:   Adam C. Rogoff, Esq.
             Robert T. Schmidt, Esq.
             Amy Caton, Esq.
1177 Avenue of the Americas
New York, NY 10036

Office of the U.S. Trustee
<u>Attn</u>:   Diana G. Adams, Esq.
33 Whitehall Street, Suite 2100
New York, NY 10004

U.S. Attorney's Office
<u>Attn</u>:   David S. Jones, Esq.
             Matthew L. Schwartz, Esq.
86 Chambers Street, Third Floor
New York, NY 10007

on this the 2nd day of April, 2010.

/s/ Austin L. McMullen_____
Austin L. McMullen