**Hearing: 4/8/10 at 2:30 p.m.**

Joshua I. Divack
HAHN & HESSEN LLP
488 Madison Avenue
New York, New York 10022
Telephone: (212) 478-7200
Facsimile: (212) 478-7400
jdivack@hahnhessen.com

James C. Morton
Georgia Bar No. 526025
Suite 1350, Two Midtown Plaza
1349 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 966-5133
jcm-law@comcast.net

*Attorneys for William Hardee*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:           Chapter 11
In re                                                                              :
:           Case No. 09-50026 (REG)
MOTORS LIQUIDATION COMPANY., *et al.,*    :
:           (Jointly Administered)
    Debtors.                                                    :
---------------------------------------------------------------x

**REPLY BRIEF IN SUPPORT OF
REQUEST OF WILLIAM HARDEE
FOR PAYMENT OF ADMINISTRATIVE EXPENSES**

**TABLE OF CONTENTS**

**Introduction** ................................................................................................................................ 1
A.  **The Request Is Governed By *Reading Co. v. Brown*, 391 U.S. 471 (1968), Because It Seeks Payment for a Tort Claim and Damages That Arose Post-Petition Caused by Post-Petition Tortious Misconduct by the Debtors-In-Possession in the Operation of Their Business.** ................................................................................................................... 1
    1.  **The Request Satisfies The First *Reading* Element Because The Expenses Arose Post-Petition.** ........................................................................................... 2
    2.  **The Request Satisfies the Second *Reading* Element Because Mr. Hardee's Injuries Resulted from Post-Petition Tortious Misconduct By the Debtors-In-Possession in the Operation of Their Business.** ................................................ 5
        a.  **MLC Had the Duty Post-Petition to Warn of These Dangers Because It Was Required to Comply With Valid State Laws Protecting Consumers.** ........................................................................................... 6
        b.  **Under Georgia Law, MLC Had A Post-Sale (and Post-Petition) Duty To Warn Consumers.** ................................................................................ 7
        c.  **MLC Breached Its Duty to Warn.** ............................................................ 8
    3.  **MLC Was Operating the Debtors' Business Post-Petition.** ............................. 8
    4.  **Personal Injury And Product Liability Claims Are Costs Ordinarily Incident To Operating MLC's Business.** .................................................................... 10
B.  **Congress Presumptively Adopted the *Reading* Doctrine.** ........................................... 10
C.  **The *Old Carco* Opinion Recognized the *Reading* Doctrine.** ....................................... 12
D.  **The *Reading* Policies Support William Hardee's Claim.** ............................................ 13
E.  **There Is No Reported Decision Suggesting this Administrative Claim Should be Disallowed.** ................................................................................................................... 14
**Conclusion** ............................................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Cases**

*Alabama Surface Mining Commission v. N.P. Mining Co. Inc. (In re N.P. Min. Co., Inc.)*, 963 F.2d 1449 (11th Cir. 1992) ............................................................................................... 14
*Avellino & Bienes v. M. Frenville Co.*, 744 F.2d 332 (3rd Cir. 1984) ......................... 3, 4
*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588 (7th Cir. 1998) ................................................................................................................................ 5
*Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867 (2d Cir. 1971) ............ 14
*Chrysler Corp. v. Batten*, 264 Ga. 723, 450 S.E.2d 208 (1994) ................................. 7, 8
*Epstein v. Official Committee of Unsecured Creditors*, 58 F.3d 1573 (11th Cir. 1995) ................ 3
*Fogel v. Zell*, 221 F.3d 955 (7th Cir. 2000) ................................................................... 4
*Ford Motor Co. v. Gibson*, 283 Ga. 398, 659 S.E.2d 346 (2008) ..................................... 7
*Grady v. A.H. Robins Co.*, 839 F.2d 198 (4th Cir. 1988) ................................................. 3
*Houbigant, Inc. v. ACB Mercantile (In re Houbigant, Inc.),* 188 B.R. 347 (Bankr. S.D.N.Y. 1995) ............................................................................................................................ 14
*In re Ames Department Stores, Inc.*, 306 B.R. 43 (Bankr. S.D.N.Y. 2004) ..................... 5
*In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991) ..................................................... 5
*In re N.P. Mining Co.*, 963 F.2d 1449 (11th Cir. 1992) ................................................... 2
*In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104 (Bankr. S.D.N.Y. 1982) .................. 14
*In re Old Carco LLC*, Case No. 09 B 50002 (Bankr. S.D.N.Y. Jan. 5, 2010) ........... 5, 12
*In re Pettibone Corp.*, 90 B.R. 918 (Bankr. N.D. Ill. 1988) ..................................... 14, 15
*In re Remington Rand Corp.*, 836 F.2d 825 (3d Cir. 1988) ............................................ 4
*Janmark, Inc. v. Reidy*, 132 F.3d 1200 (7th Cir. 1997) ................................................... 5
*Jones v. Searle Laboratories*, 444 N.E.2d 157 (Ill. 1982) ............................................... 5
*Lancaster v. Tennessee (In re Wall Tube & Metal Products Co.)*, 831 F.2d 118 (6th Cir. 1987) 14
*Lorillard v. Pons*, 434 U.S. 575 (1978) ......................................................................... 11
*Louisiana Public Service Commission v. Mabey (In re Cajun Electric Power Cooperative, Inc.),* 185 F.3d 446 (5th Cir. 1999) ........................................................................................ 6
*LTV Steel Co. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478 (2d Cir. 1995) ....... 3, 4
*Midlantic National Bank v. New Jersey*, 474 U.S. 494 (1986) ....................................... 6
*N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984) .................................................... 7
*Nathanson v. N.L.R.B.*, 344 U.S. 25 (1952) .................................................................. 11
*Nostas Associates v. Costich (In re Klein Sleep Products),* 78 F.3d 18 (2d Cir. 1996) ............... 14
*Reading Co. v. Brown*, 391 U.S. 471 (1968) .......................................................... passim
*Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579 (6th Cir. 1990) .......................... 6
*Saravia v. 1736 18th St., N.W., Ltd.*, 844 F.2d 823 (D.C. Cir. 1988) ............................. 6
*Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*, 755 F.2d 200 (1st Cir.1985) ..................................................................................................................... 2, 14
*United Trucking Services v. Trailer Rental Co. (In re United Trucking Services),* 851 F.2d 159 (6th Cir. 1988) ............................................................................................................. 14
*Watkins v. Ford Motor Co.*, 190 F.3d 1213 (11th Cir. 1999) ........................................ 8

**Statutes**

11 U.S.C. § 1101 ............................................................................................................. 7
11 U.S.C. § 363(c)(1) ...................................................................................................... 8
11 U.S.C. § 503(b) ................................................................................................... passim

11 U.S.C. § 507(a)(2) .................................................................................................................. 5
11 U.S.C. § 702 ...................................................................................................................... 11
28 U.S.C. § 959(b) .................................................................................................................... 6
The Bankruptcy Act of 1898, 55 Cong. Ch. 541, § 64, 30 Stat. 544, 563 (1898, as amended 1938)
 ................................................................................................................................... 2, 10, 11

**Other Authorities**

4-503 *Collier on Bankruptcy* ¶ 503-06[2][c][i]-[iv] (15th ed. 2008) ............................................. 2
W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 30 (5th ed. 1984) .................... 5

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

William Hardee, by and through counsel, hereby submits this Reply Brief in support of his request for payment of administrative expenses pursuant to 11 U.S.C. § 503(b) [Docket No. 4539] (the "Request"), as follows:

## Introduction

Mr. Hardee urges the Court to find that his **post**-petition personal injury tort claim "qualifies" as an administrative expense, conditioned upon successful liquidation of his claim by an appropriate finder of fact in a court of competent jurisdiction. The timing of payment is not before the Court since the Request does not seek payment until after the claim is liquidated successfully with appropriate findings of fact.

**A.    The Request Is Governed By *Reading Co. v. Brown*, 391 U.S. 471 (1968), Because It Seeks Payment for a Tort Claim and Damages That Arose Post-Petition Caused by Post-Petition Tortious Misconduct by the Debtors-In-Possession in the Operation of Their Business.**

In *Reading Co. v. Brown*, 391 U.S. 471, 473 (1968), the Supreme Court held that owners of property adjoining the debtor were entitled to administrative priority for their claims based upon fire damage from a post-petition fire at the debtor's building, caused by an employee whose negligence was attributable to the bankruptcy receiver. The Court held that damages arising from negligent acts of a receiver were appropriately classified as administrative priority expenses, as costs ordinarily incident to the operation of the debtor's business. *Id.* at 484-85. With this decision, the Court determined that torts committed by the insolvent entity post-petition should be treated as administrative expenses. *Id.* at 483.

The Supreme Court also concluded that "preserving the estate" in the predecessor to Bankruptcy Code § 503(b) includes the larger objective, common to arrangements and reorganizations, of operating the debtor's business with a view to rehabilitating it. *Id.* at 476-77. Thus *Reading* set forth two elements that must be present in order to allow a tort claim as an administrative expense: first, that it arise post-petition; and second; that the damages arising from tortious acts of a debtor-in-possession be costs ordinarily incident to the operation of the debtor's business.[1]

    **1.    The Request Satisfies The First *Reading* Element Because The Expenses Arose Post-Petition.**

In liquidating his claim, Mr. Hardee will plead and prove the following: (i) post-petition, on June 11, 2009, Mr. Hardee operated a 1995 Chevrolet S-10 pickup truck that debtor General Motors Corporation ("GM") designed, manufactured and first sold into commerce pre-petition; (ii) Mr. Hardee never owned the vehicle but was merely operating it at the time of the injury; (iii) the vehicle had an unreasonably dangerous, weak roof design that made it unsafe and "uncrashworthy" in rollover collisions; (iv) the debtor had a duty to warn consumers of that danger; (v) that duty to warn existed and continued post-petition under Georgia law; (vi) the debtor failed post-petition to warn Mr. Hardee or anyone else of the danger; (vii) Mr. Hardee sustained injuries in a post-petition crash as a direct and proximate result of GM's failure to warn of an unreasonably dangerous condition in the vehicle – *i.e.*, a weak roof that could (and did) collapse on Mr. Hardee during a rollover collision on June 11, 2009, fracturing Mr. Hardee's neck and paralyzing him. *See* Affidavit of William Hardee dated March 29, 2010 (setting forth facts known to him) (attached as Exhibit A to this brief); *id.* at Exhibit A (photo depicting

---

[1] Although decided under the Bankruptcy Act of 1898, the *Reading* doctrine survived the enactment of the Bankruptcy Code in 1978. *See, e.g., In re N.P. Mining Co.*, 963 F.2d 1449 (11th Cir. 1992); *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*, 755 F.2d 200 (1st Cir.1985); 4-503 *Collier on Bankruptcy* ¶ 503-06[2][c][i]-[iv] (15th ed. 2008).

2

catastrophic roof crush on Mr. Hardee's driver's side; the passenger on the opposite side of the cab, where the roof did not crush, was uninjured); *see also infra* at 7-8 (discussing post-sale duty to warn under Georgia law).

These factors, if found by a tribunal liquidating this claim, demonstrate that this claim "arose" post-petition as a matter of law under the "state law accrual" concept of *Avellino & Bienes v. M. Frenville Co.*, 744 F.2d 332 (3rd Cir. 1984) ("*Frenville*"); the "conduct test" of *Grady v. A.H. Robins Co.*, 839 F.2d 198 (4th Cir. 1988); the "prepetition relationship" test of *Epstein v. Official Committee of Unsecured Creditors*, 58 F.3d 1573 (11th Cir. 1995); or any combination thereof.

The Debtors recognized in their "Response of Debtors to Request by William Hardee for Payment of Administrative Expenses" [Docket No. 4945] ("Debtors' Response") at paragraph 10: "[i]n the Second Circuit, a claim will be deemed to have arisen prepetition when it arises out of a prepetition relationship recognized in the law of contracts or torts. *See LTV Steel Co. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 497 (2d Cir. 1995)." ("*Chateaugay II*") That case provides little guidance here because it merely held that Coal Act contributions are taxes entitled to administrative priority. *Id.* at 498. It did not discuss whether tort victims injured by the debtors' **pre**-petition conduct had "claims" under Bankruptcy Code § 101(5). It certainly did not address whether tort victims injured by the debtors' **post**-petition conduct would have administrative expense priority rather than general unsecured status. The full quotation from *Chateaugay II*, of which the Debtors recited only part, does state a general principle relevant to this Request:

> A claim will be deemed pre-petition when it arises out of a relationship recognized in, for example, the law of contracts or torts. "A claim exists only if before the filing of the bankruptcy petition, the relationship between the debtor

3

and the creditor contained all of the elements necessary to give rise to a legal obligation – a 'right to payment' – under the relevant non-bankruptcy law."

53 F.3d at 497 (citation omitted).[2]

Most, if not all, of the reported decisions discussed in *Chateaugay II*, along with *Frenville, A.H. Robins* and the other "claim recognition" cases, do not address the issues before the Court. Those cases determined whether tort victims injured pre-petition by the debtors' pre-petition tortious acts, but whose injuries have not manifested themselves by the petition date or plan confirmation date, are "creditors" bound by the concepts of plan injunction and discharge. Those decisions are inapposite to these facts because William Hardee suffered post-petition breaches of duty and injury. The questions the above-referenced cases address, such as whether pre-petition injury plus post-petition manifestation or discovery equals pre-petition bankruptcy claim, provide no guidance where the victim-claimant had no injurious contact at all until after the petition date. In any case, Mr. Hardee had no pre-petition relationship since he did not own the vehicle, and had no *injurious* contact, exposure, impact or privity with it or the Debtors pre-petition. Since the claim did not arise pre-petition, it necessarily arose post-petition.

Judge Posner's thought-provoking observations in *Fogel v. Zell*, 221 F.3d 955, 960 (7th Cir. 2000), also explain why William Hardee's claim clearly arose post-petition:

> A right that can be made the basis of a claim in bankruptcy may be contingent on something happening, such as the signing of a contract, *e.g.*, *In re Remington Rand Corp.*, 836 F.2d 825, 827 (3d Cir. 1988); *In re M. Frenville Co.*, 744 F.2d 332, 336-37 (3d Cir. 1984), but if the contingency can be the tort itself, this spells trouble, both practical and conceptual. Suppose a manufacturer goes bankrupt after a rash of products-liability suits. And suppose that ten million people own automobiles manufactured by it that may have the same defect that gave rise to those suits but, so far, only a thousand have had an accident caused by the defect. Would it make any sense to hold that all ten million are tort creditors of the manufacturer and are therefore required, on pain of having their claims

---

[2] Query whether this quotation signals an unintentional and indirect adoption of the much criticized *Frenville* approach, *i.e.*, that (tort) claims arise when they accrue under state law.

4

subordinated to early filers, to file a claim in the bankruptcy proceeding? Does a pedestrian have a contingent claim against the driver of every automobile that might hit him? We are not alone in thinking that the answer to these questions is "no." *See In re Chateaugay Corp.*, 944 F.2d 997, 1003 (2d Cir. 1991). Driving carelessly is not a tort and neither is the sale of a defective product. The products-liability tort occurs when the defect in the design or manufacture of the product causes a harm, and this didn't happen to Denver until the defective pipes burst. It is a fundamental principle of tort law that there is no tort without a harm, *e.g.*, *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 592 (7th Cir. 1998); *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997); *Jones v. Searle Laboratories*, 444 N.E.2d 157, 162 (Ill. 1982); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 30, p. 165 (5th ed. 1984), and so until the harm occurs, the tort hasn't occurred.

By any measure, William Hardee's "claim" can only have arisen post-petition.

**2. The Request Satisfies the Second *Reading* Element Because Mr. Hardee's Injuries Resulted from Post-Petition Tortious Misconduct By the Debtors-In-Possession in the Operation of Their Business.**

Not every post-petition expense must be allowed as an administrative expense. Under the "traditional approach" generally applied to expense claims for goods and services, only expenses that arise "out of a transaction between the creditor and the . . . debtor-in-possession" and in which there is consideration supplied to the debtor-in-possession that benefits it in operating the business are appropriately allowed as administrative expenses. *In re Ames Department Stores, Inc.*, 306 B.R. 43, 55 (Bankr. S.D.N.Y. 2004).

"An exception to the requirement that there be an actual benefit to the estate before a claim can be accorded administrative priority has developed in the context of torts committed by the trustee or debtor-in-possession during the course of a chapter 11 proceeding." *In re Old Carco LLC*, Case No. 09 B 50002 at 13 (Bankr. S.D.N.Y. Jan. 5, 2010) [Docket No. 6160] ("*Old Carco* opinion") (citing *Reading*) (Opinion Denying Motion of The 23 Affected Dealers for Allowance of Administrative Expenses pursuant to 11 U.S.C. §§ 503(b) and 507(a)(2)). MLC tortiously injured Mr. Hardee during the course of this Chapter 11 proceeding by negligently

5

breaching its post-sale duty to warn consumers of foreseeable dangers connected with operation of the Chevrolet S-10 pickup truck Mr. Hardee was operating when injured post-petition.

      **a.**      **MLC Had the Duty Post-Petition to Warn of These Dangers Because It Was Required to Comply With Valid State Laws Protecting Consumers.**

Because a bankruptcy trustee must "manage and operate the property" pursuant to valid state law under 28 U.S.C. § 959(b), MLC had the duty to warn consumers post-petition that the S-10 pickup truck had an unreasonably dangerous, weak roof design that made it unsafe and "uncrashworthy" in rollover collisions. MLC had the duty to manage and operate its business post-petition according to the requirements of valid state laws, with the same force as pre-petition. "Congress has repeatedly expressed its legislative determination that the trustee is not to have *carte blanche* to ignore nonbankruptcy law." *Midlantic National Bank v. New Jersey*, 474 U.S. 494, 502 (1986). "[Section] 959(b) . . . supports our conclusion that Congress did not intend for the Bankruptcy Code to preempt all state laws that otherwise constrain the exercise of a trustee's powers." *Id.* at 505. That legislative intent is particularly evident with respect to laws directed toward consumer protection, safety, or similar police or regulatory laws. *Id.* at 503-04 (discussing exception to automatic stay for governmental entities enforcing such laws). "'[T]he import' of this section is that 'the general bankruptcy policy of fostering the rehabilitation of debtors [will not] serve to preempt otherwise applicable state laws dealing with public safety and welfare.'" *Louisiana Public Service Commission v. Mabey (In re Cajun Electric Power Cooperative, Inc.),* 185 F.3d 446, 453-54 (5th Cir. 1999) (quoting *Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 589 (6th Cir. 1990) (quoting *Saravia v. 1736 18th St., N.W., Ltd.*, 844 F.2d 823, 827 (D.C. Cir. 1988))).

6

Under Bankruptcy Code § 1101, the debtor in possession is the debtor in any case in which no "person that has qualified" and "is serving as trustee." "For our purposes, it is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing." *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984).

### b. Under Georgia Law, MLC Had A Post-Sale (and Post-Petition) Duty To Warn Consumers.

Under Georgia law, MLC had a duty to warn consumers of foreseeable, unreasonable dangers making its vehicles not "crashworthy" in a motor vehicle collision. *See Chrysler Corp. v. Batten*, 264 Ga. 723, 724, 450 S.E.2d 208, 211 (1994) (noting in post-sale failure to warn "crashworthiness" case against Chrysler that "'the manufacturer of a product which, to its actual or constructive knowledge, involves dangers to users, has a duty to give warning of such danger'") (citation omitted); *see also Ford Motor Co. v. Gibson*, 283 Ga. 398, 403, 659 S.E.2d 346, 351 (2008) (upholding post-sale failure to warn verdict where "Ms. Gibson was unaware of (and could not have obviously known about) the potential dangers posed by the Marquis, that Ford was aware of the dangers and failed to adequately warn Ms. Gibson of them, and that the very dangers of which Ford failed to warn Ms. Gibson came to fruition during the car accident that ultimately killed her"). As explained in *Batten*, Georgia imposes a post-sale duty to warn that exists post-petition up to the occurrence of the incident and the infliction of the damages post-petition. 264 Ga. at 724, 450 S.E.2d at 211 (duty to warn may arise "from a manufacturer's post-sale knowledge acquired months, years, or even decades after the date of the first sale of the product.").

7

Georgia law distinguishes between a claim for defective design at the time of manufacture (which Hardee does not allege) and a failure to warn claim, which he does allege. In *Batten*, the court explained the distinct purpose of each claim:

> The complaint in this case sets forth two separate causes of action in negligence: one based on the sale of a defective product and the other based on the failure to warn of a danger arising from the use of that product. The distinction between these causes of action reflects the different duties that devolve upon manufacturers. While a manufacturer has a duty to exercise reasonable care in manufacturing its products so as to make products that are reasonably safe for intended or foreseeable uses, "the manufacturer of a product which, to its actual or constructive knowledge, involves danger to users, has a duty to give warning of such danger." Breach of these different duties hence gives rise to separate and distinct claims.

*Id.* at 724, 450 S.E.2d at 211 (citations omitted).

Applying *Batten* several years later, the Eleventh Circuit again distinguished the post-sale failure to warn claim from a claim that the vehicle was designed or manufactured defectively. This "duty to warn is a continuing one and may arise 'months, years or even decades after the date of the first sale of the product.'" *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1218 (11th Cir. 1999) (quoting *Batten*, 264 Ga. 723, 724, 450 S.E.2d 208, 211 (1994)).

### c.   MLC Breached Its Duty to Warn.

As reflected above, the duty to warn existed post-sale, after the petition date, and up to the incident on June 11, 2009, when the uncrashworthy roof collapsed on the driver's side of Mr. Hardee's vehicle, paralyzing him. Mr. Hardee was never warned of these dangers, which, on information and belief, were known to MLC. *See supra* at 2-3, 7-8.

### 3.   MLC Was Operating the Debtors' Business Post-Petition.

The record is replete with evidence that MLC continued to operate its business post-petition and up to the July 10 asset sale. For example, as a part of their first day motions, the Debtors filed a "Motion Of Debtors For Entry Of Order Pursuant To 11 U.S.C. §§ 363(c)(1) and

8

503(b)(1)(A) Granting Administrative Expense Status To Undisputed Obligations To Vendors Arising From Postpetition Delivery Of Goods And Services Ordered Prepetition And Authorizing Debtors To Pay Such Obligations In Ordinary Course Of Business" [Docket No.27] ("First Day Admin. Exp. Motion") which the Court granted by its Order entered June 1, 2009 [Docket No. 161]. As the Debtors recited in that motion, "[a]s of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down. A number of those assembly facilities that currently are shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved." Motion of Debtors at 19. The Debtors went on to represent that "[n]otwithstanding the Temporary Shutdown, the attendant disruption to the continuous flow of goods and services to the Debtors could adversely affect the Debtors' ability to maintain and control the production and delivery of their products. Such a disruption could, in turn, jeopardize customer confidence in the Debtors' ability to conduct business." *Id.* at 34. The Debtors also asserted that post-petition payment for goods and services ordered pre-petition was authorized "under section 363(c)(1) of the Bankruptcy Code (debtor in possession "may use property of the estate in the ordinary course of business without notice or a hearing"). Any impairment of the Debtors' ability to obtain or access goods and/or services that are required in the operation of their businesses will, in turn, impair the Debtors' ability to operate efficiently and comply with customer deadlines, adversely affecting the Debtors' ability to preserve enterprise value." *Id.* at 35.

Exhibit B to the Debtors' Interim Report, page 1 [Docket No. 3762] for the post-petition, pre-asset sale period of June 1, 2009 through July 10, 2009 shows Total Operating Receipts of $6.045 billion during that period, including $2.86 billion in "Vehicle Receipts", and Operating Disbursements of $6.549 billion, including $261 million in net payroll. These facts demonstrate

9

the Debtors' continued operation of their business post-petition and at the time Mr. Hardee's right to payment arose.

### 4. Personal Injury And Product Liability Claims Are Costs Ordinarily Incident To Operating MLC's Business.

It seems beyond serious argument that personal injury and product liability claims are costs ordinarily incident to operating a motor vehicle manufacturing business. Paragraph 12 of Exhibit A to the Debtors' Interim Report, page 9 [Docket No. 3762] discusses balance sheet reserves MLC made for those claims:

> 12. Litigation
>
>    a. MLC litigation liabilities include product liability, asbestos liability, and other litigation. These reserves are for actual claims and lawsuits filed as well as an estimate for incidents incurred but not reported (IBNR). The product liability claims are for incidents that occurred prior to July 10, 2009 and are primarily related to property damages, personal injuries and breach of warranty claims.

As costs ordinarily incident to the operation of MLC, tort claims based on product liability, including personal injuries and property damages, are "actual, necessary costs" under *Reading*. 391 U.S. at 483.

### B. Congress Presumptively Adopted the *Reading* Doctrine.

Section 64(a)(1) of the Bankruptcy Act, at issue in *Reading*, is substantially identical to Bankruptcy Code § 503(b). Section 64(a)(1) provided in part as follows: "The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be (1) the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition . . . ." Although by its terms this section applied to liquidations ("straight

10

bankruptcies"), the Act provides elsewhere that § 64 governs Chapter XI arrangements. 11 U.S.C. § 702.

Congress is presumed to be aware of, and to adopt, a judicial interpretation of a statute when it reenacts that law without change. *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). When Congress enacted the Bankruptcy Reform Act of 1978, it incorporated almost verbatim into 11 U.S.C. §503(b) the language of Bankruptcy Act §64a(1) applied by the Court in *Reading*.[3] Congress therefore is presumed to have adopted the Supreme Court's inclusion of post-petition tort claims within the definition of "administrative expenses." Congress thereafter amended §503 of the Bankruptcy Code numerous times (1984, 1986, 1994, 2005) without making any change that would undermine the *Reading* doctrine.

It is noteworthy that in the 2005 amendment, Congress added language to §503(b)(1)(A) that expressly overturned the Supreme Court's decision in *Nathanson v. N.L.R.B.*, 344 U.S. 25 (1952) ("*Nathanson*"), cited by the debtor. In *Nathanson*, the Court held, in relevant part, that employee back pay claims awarded by the NLRB against an involuntarily bankrupt employer were not entitled to administrative priority under Bankruptcy Act §64(a)(5) as a "debt due to the United States" entitled to administrative priority in full. Instead, the Court held that back pay claims were entitled to administrative priority under Bankruptcy Act §64(a)(2) as wage claims, limited to the statutory amount per employee if earned within the three months prior to the bankruptcy filing. 344 U.S. at 28-29. By amending § 503(b) in 2005 to change the *Nathanson* holding, Congress plainly demonstrated its ability to alter bankruptcy law governing administrative expenses when it has that intent. By declining to amend that statute to affect the *Reading* doctrine, Congress is presumed to have adopted that doctrine.

---

[3] *Compare* §64a ("the actual and necessary costs and expenses of preserving the estate . . .") *with* §503(b)(1)(A) ("the actual, necessary costs and expenses of preserving the estate . . .").

11

Accordingly, Congress must be presumed to have adopted the principle that post-petition tort claims in a Chapter 11 case are entitled to allowance as administrative expense claims under Bankruptcy Code § 503(b) and payment in full in administratively solvent cases under Bankruptcy Code § 507(a)(1).

## C.  The *Old Carco* Opinion Recognized the *Reading* Doctrine.

If it has any relevance to this Request, the *Old Carco* opinion cited by the Debtors supports this Request rather than the Debtors' opposition to it.  First, *Old Carco* primarily held that the dealers' "claims stemming from the rejection, and resulting breach, of the Dealer Agreements are not entitled to administrative expense priority" because they were a "pre-petition general unsecured claim pursuant to section 365(g) of the Bankruptcy Code." *Id.* at 25.  The Court held that any state laws that sought to limit rejection of the Dealer Agreements in bankruptcy were preempted, and there was no federal policy that would override the bankruptcy policy of allowing a debtor to reject burdensome contracts.  Thus the holding in the *Old Carco* opinion has no relation to this Request.

Despite having ruled that the dealers' claims were pre-petition contract rejection damages claims, and therefore ineligible for allowance as administrative expenses, the Court went on in the *Old Carco* opinion "in the interest of completeness" to state that, even if the damages were not pre-petition claims, *Reading* would be inapplicable because the debtor "effectively ceased all manufacturing operations at the commencement of the cases with a view to liquidating the estate for a distribution to creditors." *Id.* at 23.  Accordingly, the Court observed, any claims did not arise in the course of continuing business operations.  As discussed above, *see supra* at 8-10, these Debtors clearly continued to operate post-petition.

12

**D.      The *Reading* Policies Support William Hardee's Claim.**

In *Reading*, the Supreme Court articulated several grounds for its ruling that support Mr. Hardee's claim as an administrative expense. First, the Court pointed out that there was a statutory objective in bankruptcy of "fairness to all persons having claims against an insolvent." 391 U.S. at 477. The Court observed that this policy was "decisive" in assessing the relative primacy of competing bankruptcy goals, such as facilitating reorganization and preservation of assets for creditors. The Court held that reorganizations were conducted largely for the benefit of pre-petition creditors, and that it was "more natural and just" for the fire claimants to collect ahead of those creditors. *Id.* at 482. In support of that concept, the Court made its oft-quoted statement that "the present petitioner did not merely suffer injury at the hands of an insolvent business: it had an insolvent business thrust upon it." *Id.* at 478. The principle articulated there was plain: the burdens should rest most heavily upon those who stand to benefit from reorganization. "Existing creditors are, to be sure, in a dilemma not of their own making, but there is no obvious reason why they should be allowed to attempt to escape that dilemma at the risk of imposing it on others equally innocent." *Id.* at 482-83.

The Court further recognized that allowing tort claims against receivers was consistent with historical practice outside bankruptcy. *Id.* at 483. The Court set out the principle that "'actual and necessary costs' should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible," observing that other classes of claims not essential for operation, such as taxes, were allowed as "actual and necessary expenses" of administration. *Id.* at 484. The Court summarized its holding thus: "[D]amages resulting from the negligence of a receiver acting within the scope of his authority as receiver give rise to 'actual and necessary costs' of a Chapter XI arrangement." *Id.* at 485.

13

In considering the scope of Bankruptcy Code § 503(b), it is often stated that the terms "actual" and "necessary" are construed narrowly so as "to keep fees and administrative expenses to a minimum." *E.g., In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 121 (Bankr. S.D.N.Y. 1982). In practice, however, courts have recognized a wide variety of administrative expenses: tort, *Reading,* 391 U.S. at 485; trademark infringement, *Houbigant, Inc. v. ACB Mercantile (In re Houbigant, Inc.),* 188 B.R. 347, 356 (Bankr. S.D.N.Y. 1995); patent infringement, *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.,* 443 F.2d 867, 874 (2d Cir. 1971); breach of contract, *United Trucking Services v. Trailer Rental Co. (In re United Trucking Services),* 851 F.2d 159, 162-63 (6th Cir. 1988); *Nostas Associates v. Costich (In re Klein Sleep Products),* 78 F.3d 18, 26 (2d Cir. 1996); compensatory civil fine, *In re Charlesbank Laundry, Inc.*, 755 F.2d at 203; post-petition costs incurred by state in cleaning up chapter 7 estate's hazardous waste site, *Lancaster v. Tennessee (In re Wall Tube & Metal Products Co.)*, 831 F.2d 118, 123 (6th Cir. 1987); civil fines imposed to punish violation of environmental regulations, *Alabama Surface Mining Commission v. N.P. Mining Co. Inc. (In re N.P. Min. Co., Inc.)*, 963 F.2d 1449, 1461 (11th Cir. 1992).

**E.     There Is No Reported Decision Suggesting this Administrative Claim Should be Disallowed.**

The Debtors have not directed the Court's attention to any authority with facts similar to those presented here that suggests that this Request should be disallowed. A case closely on point with this Request is *In re Pettibone Corp.*, 90 B.R. 918 (Bankr. N.D. Ill. 1988) ("*Pettibone*"). In that case, Ramirez, an employee of the purchaser of a forklift Pettibone manufactured, sustained injuries when the forklift overturned. Pettibone manufactured and delivered the forklift to the employer **pre**-petition. Ramirez sustained his injuries **post**-petition.

14

The Court held that Ramirez might hold an administrative claim based on a post-petition failure to warn if he prevailed on that theory at the trial liquidating his claim. The Court observed that "[a] manufacturing debtor-in-possession which, like Pettibone, continues in Chapter 11 to produce and sell goods and equipment may well under state tort law owe a duty to warn users of products about pre-petition design defects and dangers of its products purchased pre-petition. . . . If so, failure to fulfill that duty would be sufficient 'transaction' with Ramirez . . . because its duty and omission impacted on him during the bankruptcy reorganization." *Id.* at 933-34.

The Court went on to state:

> The debtor-in-possession benefitted by the continued confidence in its products by purchasers of its post-petition products. That confidence carries with it a business expectation that the products are reasonably safe and that known dangers will be disclosed. So long as debtor-in-possession continues in operation and sales, it benefits from such business confidence and the resulting goodwill of its customers. If there was a duty to warn Ramirez, the omission to do so was also a breach of that confidence of current customers and product users which has kept the Debtor alive and growing in Chapter 11.

*Id.* at 934.

This same benefit the Court recognized in *Pettibone* has been enjoyed by MLC in pursuing its stated goals of protecting "customer confidence in the Debtors' ability to conduct business" and "preserv[ing] enterprise value" as set forth in the First Day Admin. Exp. Motion.

## Conclusion

As Chief Justice Warren observed in his dissent in *Reading*:

> [T]he Court today singles out one class of tort claims for special treatment. After today's decision, the status of a tort claimant depends entirely upon whether he is fortunate enough to have been injured after rather than before a receiver has been appointed. And if the claimant is in the select class, he may be permitted to exhaust the estate to the exclusion of the general creditors . . . .

391 U.S. at 486.

15

Chief Justice Warren disapproved, but plainly understood the effect, of the majority decision in *Reading*. Despite numerous opportunities to change that rule over the last 42 years, Congress has declined to do so, and is presumed to have adopted that judicial interpretation of Bankruptcy Code § 503. A variety of courts have recognized that *Reading* creates a post-petition tort doctrine for administrative expense requests, and William Hardee respectfully urges the Court to recognize his claim pursuant to that well established doctrine.

Dated: New York, New York
April 2, 2010

**HAHN & HESSEN LLP**

By:  /s/  Joshua I. Divack
Joshua I. Divack

488 Madison Avenue
New York, New York 10022
Telephone: (212) 478-7200
Facsimile: (212) 478-7400
jdivack@hahnhessen.com

- and –

James C. Morton
Georgia Bar No. 526025
Suite 1150, Two Midtown Plaza
1349 West Peachtree Street
Atlanta, GA  30309
Telephone: (404) 966-5133
Facsimile: 404-806-2525
jcm-law@comcast.net

*Attorneys for William Hardee*