**HEARING DATE AND TIME: Apr. 8, 2010 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: Apr. 1, 2010 at 4:00 p.m. (Eastern Time)**

Elihu Inselbuch
Rita C. Tobin
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, New York 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Trevor W. Swett III
Kevin C. Maclay
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W.
Suite 1100
Washington, D.C. 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

*Proposed Attorneys for Movant Official Committee of Unsecured Creditors Holding Asbestos-Related Claims*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | Chapter 11 Case No. |
| f/k/a General Motors Corp., *et al.* | : | |
| | : | 09-50026 (REG) |
| | : | |
| | : | (Jointly Administered) |

**REPLY MEMORANDUM OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS HOLDING ASBESTOS-RELATED CLAIMS IN SUPPORT OF APPLICATION TO RETAIN AND EMPLOY CAPLIN & DRYSDALE, CHARTERED *NUNC PRO TUNC* TO OCTOBER 6, 2009**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 2

ARGUMENT ........ 6

CONCLUSION ........ 14

# TABLE OF AUTHORITIES

## CASES

In re Allegheny Int'l, Inc., 139 B.R. 336 (W.D. Pa. 1992) ........ 9, 10

In re Hasset, Ltd., 283 B.R. 376 (Bankr. E.D.N.Y. 2002) ........ 6, 10

In re Keren Ltd. P'ship, 189 F.3d 86 (2d Cir. 1999) ........ 8, 9, 12

In re Keren Ltd. P'ship, 225 B.R. 303 (S.D.N.Y. 1998), *aff'd*, 189 F.3d 86 (2d Cir. 1999) ........ 8, 9

In re Nat'l Century Fin. Enters., 208 B.R. 112 (Bankr. S.D. Ohio 2003) ........ 9

In re Piecuil, 145 B.R. 777 (Bankr. W.D.N.Y. 1992) ........ 6, 7

In re S.W.G. Realty Assocs., II, L.P., 265 B.R. 534 (E.D. Pa. 2001) ........ 12, 13

In re Serv. Merch. Co., 256 B.R. 738 (Bankr. M.D. Tenn. 1999) ........ 13

In re Standard Steel Sections, Inc., 200 B.R. 511 (S.D.N.Y. 1996) ........ 11

In re Combustion Eng'g, Inc., Case No. 03-10495 (Bankr. D. Del. 2003) ........ 13

## STATUTES

11 U.S.C § 1102(a)(2) ........ 9

11 U.S.C § 1103(a) ........ 1, 7, 8, 11

## OTHER AUTHORITIES

3 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 327.03[3] (15th ed. Rev. 2009) ........ 6, 8

Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 1103.05, at 1103-17 (15th ed. 1995) ........ 11

The Official Committee of Unsecured Creditors Holding Asbestos-Related Claims (the "**Asbestos Claimants Committee**" or "**ACC**") hereby responds to the objection (the "**Objection**") of the United States Trustee ("**UST**") [D.I. 5389] to the ACC's application to retain the law firm of Caplin & Drysdale as its counsel, *nunc pro tunc* as of October 6, 2009 (the "**Application**") [D.I. 5304].

**PRELIMINARY STATEMENT**

The parties agree that Caplin & Drysdale meets all standards under the Bankruptcy Code for retention by an official committee and is well qualified by experience to represent the ACC in this case. Accordingly, the UST states that she "has no objection to the retention of Caplin & Drysdale as of the date of its selection by the Asbestos Committee." Objection at 1. The sole objection made to the Application is the UST's knee-jerk contention that, because she did not appoint the ACC until March 2, 2010, the retention of Caplin & Drysdale as of a prior date would be improper. This argument relies upon a strained inference from section 1103(a) to attempt to impose a limitation that nowhere appears in that provision and is inconsistent with the controlling precedent. More generally, the Objection elevates form over substance and ignores the exceptional circumstances that, under the governing case law, fully warrant an order approving of Caplin & Drysdale's retention *nunc pro tunc* as of October 6, 2009.

October 6, 2009 was the date when Caplin & Drysdale began to render legal services to a proposed fiduciary entity for the benefit of the Debtors' asbestos personal injury creditors and in the interest of expediting the formulation of a plan of liquidation. Expedition has been the watchword in this case from the beginning, yet the UST's limited objection would unfairly

penalize the ACC's counsel for having cooperated in pursuit of that shared goal of all parties in interest.

As set forth in the attached Supplemental Declaration of Elihu Inselbuch (the "**Inselbuch Supp. Declaration**"), most of Caplin & Drysdale's work during the period for which retroactive retention is sought was performed in January 2010 and thereafter. The UST acknowledges that commencing on January 11, 2010, she was in discussions with the respective counsel for the Debtors and the Official Committee of Unsecured Creditors ("**UCC**") about "the advisability of appointing an additional committee for the purpose of enabling the representation of the interests of current asbestos personal injury claim-holders in the Debtors' plan processes." Objection ¶ 9 at 4. That almost three more months passed before the UST actually appointed the ACC was a circumstance entirely out of Caplin & Drysdale's control. Meanwhile, the UCC put forward for Caplin & Drysdale's consideration certain issues bearing on potential litigation and plan formulation that were both highly sensitive and potentially important to asbestos personal injury claimants as a constituency. These matters required prompt attention, especially in view of the Debtors' stated goal of confirming a plan in April 2010. *See* Inselbuch Supp. Declaration ¶¶ 3, 5. The Objection should be overruled and the Application granted with effect as of October 6, 2009.

## BACKGROUND

Because the appropriateness of *nunc pro tunc* retention turns on the circumstances surrounding the Application, the operative facts should be held clearly in view. *See* Declaration of Elihu Inselbuch ¶¶ 8-18, sworn to on March 18, 2010, and filed concurrently with the Application (the **"Inselbuch Declaration"**).

In early October 2009, counsel for the Debtors and counsel for the UCC proposed to John D. Cooney, Esq. that he serve as a subcommittee of the UCC, in his capacity as attorney for Mark Butitta.[1] This proposal recognized that confirming a plan of liquidation in this case requires estimation of the Debtors' liability for asbestos-related personal injury and wrongful death, so that the parties and this Court may determine what portion of the estate's assets should be distributed to a trust for asbestos victims. *See* Inselbuch Supp. Declaration ¶ 3. In the zero-sum game of allocating the assets, the interests of other creditors are diametrically opposed to those of the asbestos victims. Given this divergence of interests, the existing estate fiduciaries proposed to form an asbestos subcommittee of the UCC as a separate fiduciary entity to speak for the constituency of creditors who hold pending asbestos-related tort claims (the **"Subcommittee"**).[2] As part and parcel of the proposal, the new fiduciary entity was to be authorized to retain separate counsel.

The parties involved all considered it important that legal work begin at once on behalf of the constituency of existing asbestos tort claimants. Time was indeed of the essence, especially because it was the Debtors' announced goal to confirm a plan in April 2010. Inselbuch Supp. Declaration ¶ 3. Mr. Cooney therefore asked Caplin & Drysdale to serve as the Subcommittee's counsel on the understanding that approval of the firm's retention would be sought *nunc pro tunc*. With the knowledge and encouragement of counsel for the Debtors and

---

[1] Mr. Butitta is a current asbestos tort creditor of the Debtors and was a member of the UCC until March 2010. He resigned from the UCC upon being appointed as a member of the ACC.

[2] Another aspect of the proposal was to obtain the appointment of a legal representative for holders of future asbestos claims, whose identities, by definition, cannot now be known. The Debtors moved on March 8, 2010, for this Court to appoint Dean Trafelet as Future Claims Representative (the **"FCR"**) [D.I. 5214], and a hearing on that motion is scheduled to be heard on the same date as the instant Application.

counsel for the UCC, Caplin & Drysdale began to work immediately on matters of particular interest to asbestos creditors.

From the time of Mr. Butitta's appointment to the UCC in June, 2009, Caplin & Drysdale had served as counsel to him and Mr. Cooney with respect to their participation in the affairs of the UCC. *See* Inselbuch Declaration ¶¶ 8, 9. The services rendered by Caplin & Drysdale in that capacity had been quite limited in scope, and the ACC does not seek retention *nunc pro tunc* to June. In his new proposed role as Subcommittee, however, Mr. Cooney was expected to take on much greater responsibility, with particular reference to estimating the Debtors' asbestos liabilities, negotiating related aspects of the plan, and, if necessary, litigating contested issues. Given the nature and scope of the new assignment, and the attendant need for expanded legal services, the Debtors and the UCC recognized that it would be unfair to burden Messrs. Cooney and Butitta personally with the expenses of those legal services, which should instead be borne by the estate. The good sense of that view is not altered by the events described below, in which the idea for a Subcommittee to represent the interests of present asbestos claimants eventually led to the appointment of a full committee — the ACC — through which Messrs. Butitta and Cooney, joined by others, will continue to serve the same constituency of present asbestos claimants. Inselbuch Supp. Declaration ¶ 9.

After a time, the Debtors, the UCC, and the UST entered into a prolonged discussion of the Subcommittee proposal. Neither Mr. Cooney nor Caplin & Drysdale was involved in or invited to participate in those discussions. We understand, however, that the UST recognized the need to create a fiduciary entity for holders of asbestos claims, but concluded after consideration that a full committee, rather than the Subcommittee, would be the preferable

vehicle for meeting that need. Rather than compounding the delays, the Debtors and the UCC bowed to the UST's view, and the UST went on to constitute the ACC and appoint its three members: Mark Butitta (whose appointment was conditioned on his resigning from the UCC), Sally Maziarz, and Charles Cantrell. Like Mr. Butitta, Ms. Maziarz is a client of Mr. Cooney; Mr. Cantrell is a client of attorney Steven Kazan. Inselbuch Declaration ¶¶ 8-9, 15-16.

The UST publicly announced the appointees to the ACC on March 5, 2010, and the ACC informed Mr. Inselbuch on the same day of Caplin & Drysdale's selection as counsel. *See* Inselbuch Supp. Declaration ¶ 2. On March 18, 2010, the ACC filed its application to retain Caplin & Drysdale. No objection to the retention has been received, except for the UST's limited objection, which challenges only the ACC's request that its counsel be deemed retained as of October 6, 2009.

By the time the ACC was officially formed, Caplin & Drysdale had accrued charges of approximately $100,000 in performing legal services under the rubric of the now-superseded Subcommittee. The bulk of these charges were incurred after January 1, 2010. From October 6, 2009 through December 31, 2009, Caplin & Drysdale's time charges came to about $8,000. The remainder were incurred from January 1, 2010 through March 5, 2010, during which the UCC requested Caplin & Drysdale's consideration, on behalf of asbestos claim-holders, of sensitive matters regarding potential litigation and bearing on plan formulation. *See* Inselbuch Supp. Declaration ¶ 5.

Caplin & Drysdale's work during the period proposed for retroactive retention was performed on behalf of Messrs. Cooney and Butitta, as the Subcommittee, for the benefit of

the same constituency of present asbestos creditors for whom they (along with Ms. Maziarz, Mr. Cantrell, and Mr. Kazan) will now act through the ACC. *See* Inselbuch Supp. Declaration ¶¶ 3, 7, 9. In that work, Caplin & Drysdale was rendering services that were and are necessary for the formulation of the plan of liquidation that the estate fiduciaries are laboring to complete. The estates and their creditors will benefit from the timely rendering of those services, just as they would have benefited if the UST had embraced the Subcommittee rather than forming the ACC.

**ARGUMENT**

Contrary to the apparent position taken by the UST in its objection, there is no *per se* prohibition in the Second Circuit against committee counsel being appointed *nunc pro tunc* to a date prior to the official appointment of the committee. To the contrary, the law is clear that this Court has discretion to grant *nunc pro tunc* retentions in the exercise of its equitable powers, taking account of the relevant facts and circumstances. The ACC respectfully submits that, given the relevant facts and circumstances in this case, the Court should authorize the retention of Caplin & Drysdale as the ACC's counsel with effect as of October 6, 2009.

"[B]ankruptcy courts, as courts of equity, are empowered to grant *nunc pro tunc* retention orders." 3 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 327.03[3] (15th ed. rev. 2009). *See* In re Hasset, Ltd., 283 B.R. 376, 379 (Bankr. E.D.N.Y. 2002) (approving *nunc pro tunc* retention application and noting that retroactive retentions have been permitted where the attorney performs services of "value" to the estate); In re Piecuil, 145 B.R. 777, 783 (Bankr. W.D.N.Y. 1992) ("the applicable case law permits this Court, as a court of equity, latitude to grant relief where the failure to file a timely [retention] application

has been explained, and the explanation has been found reasonable"). Indeed, this Court previously exercised such discretion in the case at bar when it appointed counsel for the UCC on July 1, 2009, *nunc pro tunc* to June 3, 2009. *See* Order, In re Motors Liquidation Co. (f/k/a General Motors Corp.), Case No. 09-50026 (Bankr. S.D.N.Y. July 1, 2009) [D.I. 2854].

In her Objection, the UST cites and relies upon various generic principles as to why court approval is required for retention under section 1103(a) of the Bankruptcy Code, while ignoring the facts and circumstances that demonstrate the appropriateness of Caplin & Drysdale's request for *nunc pro tunc* retention here. Of course, the ACC and Caplin & Drysdale acknowledge the necessity for this Court's approval of Caplin & Drysdale's retention, which is the subject of the Application. The UST does not deny that this Court has discretion to grant *nunc pro tunc* retentions where appropriate, as has been clearly enunciated by the relevant precedent. Yet, she argues for a cut-and-dried approach that would unduly limit this Court's exercise of such discretion by barring the retention of committee counsel retroactively for any services rendered before formal creation of the committee, irrespective of the facts and circumstances.

Moreover, the UST's own description of such cases on page 6 of the Objection shows that they are inapposite. Far from being an "officious intermeddler or a gratuitous volunteer," Objection at 6, Caplin & Drysdale was asked in October 2009 to represent pressing interests of the same constituency for which it now seeks *nunc pro tunc* retention. Mr. Cooney, the Debtors, and the UCC all recognized that exigent circumstances — especially the goal of confirming a plan in April 2010 — called for Caplin & Drysdale to begin work immediately.

*See* Inselbuch Declaration ¶ 12; Inselbuch Supp. Declaration ¶ 3. The UST has pointed to no "duplication of effort." Objection at 6.

Citing the Bankruptcy Code's provision in section 1103(a) for committees to select counsel, the UST draws the inference that *nunc pro tunc* retention can never be allowed for any period before a committee is formally constituted. But this is a great leap to a conclusion the statute itself neither states nor implies. Section 1103(a) does not purport to address the authority of bankruptcy courts to issue retroactive retention orders. Nor does the UST cite a single case that has adopted its rigid and formalistic position.

To the contrary, the Second Circuit has set forth a flexible test allowing *nunc pro tunc* retentions. In re Keren Ltd. P'ship, 189 F.3d 86, (2d Cir. 1999), *aff'g* In re Keren Ltd. P'ship, 225 B.R. 303, 306 (S.D.N.Y. 1998). Keren holds that, in exercising discretion on applications for *nunc pro tunc* retention, bankruptcy courts should consider whether, "(i) if the application had been timely, the court would have authorized the appointment, and (ii) the delay in seeking court approval resulted from extraordinary circumstances."[3] The UST acknowledges Keren (Objection at 7-8) but abandons the basic premises of that decision by insisting that retention of committee counsel retroactive to any date before official formation of the committee is impermissible *per se*. *See* Objection at 8.

With respect to the first Keren factor, no one has suggested that the Court would have rejected the Application in October 2009 if the ACC had been appointed at that time. It is

---

[3] *See* 3 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 327.03[3] (15th ed. rev. 2009) (noting that, although the Second Circuit previously adhered to a *per se* rule, it "[has] retreated from this approach and [has] indicated that an order approving *nunc pro tunc* retention can be granted in 'extraordinary circumstances'").

undisputed that Caplin & Drysdale is both disinterested and well-qualified to represent the ACC.

In considering the second Keren factor — whether "extraordinary circumstances" warrant relief — a bankruptcy court takes into account "whether the applicant or some other person bore responsibility for applying for approval; whether the applicant was under time pressure to begin service without approval; the amount of delay after the applicant learned that initial approval had not been granted; the extent to which compensation to the applicant will prejudice innocent third parties; and other relevant factors." In re Keren Ltd. P'ship, 225 B.R. 303, 306-07 (S.D.N.Y. 1998), *aff'd*, 189 F.3d 86 (2d Cir. 1999).

Caplin & Drysdale was of course unable to move for retention by the ACC until the UST appointed that committee, which did not occur until the UST had concluded discussions with the Debtors and the UCC about the specific form that a representative entity for asbestos creditors should take. Until that appointment, neither the ACC nor the Subcommittee that was already operating informally had the official existence requisite to its moving for retention of counsel. Thus, no one had the responsibility or even the ability to seek Caplin & Drysdale's retention before March 2, 2010, when the ACC was formed.[4] There is no question but that the ACC made its Application promptly, once it was in a position to do so.

---

[4] The UST goes further and argues that "[t]here is, however, no authority in the Bankruptcy Code, the Rules or decisional law for the official appointment or standing of subcommittees, much less their retention of separate counsel." Objection at 10. This is incorrect. *See, e.g.,* In re Nat'l Century Fin. Enters., 298 B.R. 112, 114, 118 (Bankr. S.D. Ohio 2003) (approving the application of "the Official NPF VI Noteholders' Subcommittee" to retain two sets of counsel over the objection of the UST, after previously directing the UST to appoint such subcommittee from the unsecured creditors' committee). The decision in In re Allegheny Int'l, Inc., 139 B.R. 336, 346 (W.D. Pa. 1992), cited by the UST, is clearly distinguishable. In that case, the approval of the court pursuant to section 1102(a)(2) had

There was pressure for Caplin & Drysdale to begin work before its retention could be approved by the Court. The Debtors, the UCC and Mr. Cooney on behalf of the current asbestos constituency all considered it necessary for Caplin & Drysdale to commence working in October so that issues affecting the constituency of current asbestos creditors could be framed and addressed in time for the Debtors to meet what was then their goal of confirming a plan of liquidation in April 2010. Inselbuch Supp. Declaration ¶ 3; *see also* Inselbuch Declaration ¶ 12. As requested, therefore, Caplin & Drysdale turned immediately to the task of representing that constituency through the Subcommittee.

No third parties will suffer any prejudice if Caplin & Drysdale's retention is approved retroactively as of October 6, 2009. Neither the Debtors nor the UCC have objected to the *nunc pro tunc* retention of Caplin & Drysdale requested by the ACC. Indeed, through their own respective counsel, both the Debtors and the UCC were aware and approved of Caplin & Drysdale's beginning work in October, which served their shared goal of expediting the formulation and confirmation of a plan and was thus of value to the Debtors' estates. *See, e.g.*, In re Hasset, Ltd., 283 B.R. at 379 ("Because all parties in interest, including the Debtor, were aware that Scupp was serving as its counsel and because certain of the services performed by Scupp were of 'value' to the estate, the Court believes that *nunc pro tunc* approval of Scupp's retention should be granted."). Under the circumstances, it was more than reasonable for Caplin & Drysdale to begin work on behalf of the constituency of asbestos claim-holders without awaiting the formalities that were certain to follow. The delay in the

---

neither been sought nor granted. *Id.* (emphasis added). In this case, by contrast, it was contemplated from the outset that the Debtors would move for the Court's approval of the Subcommittee, and that counsels' retention would be sought *nunc pro tunc*. *See* Inselbuch Declaration ¶ 12; Inselbuch Supp. Declaration ¶ 11.

formal appointment of the ACC was outside of Caplin & Drysdale's control, and the law firm should not be penalized for it.

The UST quotes In re Standard Steel Sections, Inc., 200 B.R. 511, 513 (S.D.N.Y. 1996) in arguing that there was no "necessity" for Caplin & Drysdale's services before the ACC was officially formed in early March 2010. *See* Objection at 10. But Standard Steel itself demonstrates that the contrary is true under the correct standard: By October 2009 it had become clear that current asbestos claim-holders have "a distinct and potentially conflicting interest in the disposition of the assets of the estate that requires separate legal representation." 200 B.R. at 513. Moreover, "as the legislative history of § 1103(a) indicates, Congress believed that separate legal representation of disparate and adversarial interests in a bankruptcy was necessary to the fair and efficient distribution of the assets of the estate and therefore ought to be eligible for reimbursement as an estate expense." *Id.* (citing Collier's on Bankruptcy ¶ 1103.05, at 1103-17 (15th ed. 1995)). Indeed, the UST does not dispute that Caplin & Drysdale's retention is "necessary" now; her objection goes only to timing.

Most important, although Caplin & Drysdale performed work under the aegis of the Subcommittee whose formal creation the UST ultimately declined to endorse, that work now inures to the benefit of the same constituency of asbestos victims that the ACC is meant to serve. *See* Inselbuch Supp. Declaration ¶¶ 3, 4. Somewhat coyly, the UST suggests without actually asserting that there could be a conflict of interest between the Subcommittee and the ACC, based on her apparent premise that the Subcommittee must have purported to represent the interests of future asbestos claimants, as well as asbestos victims with existing claims. But that premise is flatly mistaken. The Debtors, the UCC, Mr. Cooney, and Caplin & Drysdale

all understood from the beginning that the Subcommittee would represent only the interests of present, not future, asbestos claimants, and that the Debtors would move (as indeed they have done) for appointment of an FCR to act for future asbestos claimants. *See* Inselbuch Supp. Declaration ¶¶ 3-7. Underscoring the essential continuity of interest from the Subcommittee to the ACC is the fact that Mr. Cooney, who, as attorney for Mr. Butitta, was the sole member of the abortive Subcommittee, serves as attorney for two of the ACC's members, Mr. Butitta and Ms. Maziarz. The UST's objection gains nothing from the fact that the ACC also has a third member, Mr. Cantrell, represented by Mr. Kazan. Of course, all three members of the ACC are current (not future) asbestos claimants, as was the member of the Subcommittee.[5]

In sum, the circumstances are "extraordinary," Keren, 189 F.3d at 87, and justify Caplin & Drysdale's retention *nunc pro tunc* as of October 6, 2009, as a matter of the Court's sound discretion. Although the specific situation at hand is undoubtedly unique, the retention of committee counsel as of a date preceding the formation of the committee itself is not without example in the cases. In In re S.W.G. Realty Associates, II, L.P., 265 B.R. 534, 538 (E.D. Pa. 2001), the district court affirmed the bankruptcy court's order allowing an attorney for a creditors committee to receive compensation for services rendered prior to formation of the committee. The district court reasoned that such services had benefited the estate, and it noted that the bankruptcy court had earlier approved counsel's retention retroactively to the commencement of the chapter 11 case, which of course preceded the appointment of the

---

[5] The UST's notion that present asbestos claim-holders could have no need of representation until an FCR was in place (Objection at 2, 13-14) does not make sense. The allocation of estate assets between present and future claimants, through negotiations between the ACC and the FCR, is only one aspect of the case that implicates the interests of present asbestos claim-holders. Many other issues affect that constituency and therefore call for legal representation. *See* Inselbuch Supp. Declaration ¶¶ 3, 5-6.

committee. *Id.* at 538-39. *See also* In re Combustion Eng'g, Inc., Case No. 03-10495 (Bankr. D. Del. May 21, 2003) (order approving retention of future claimants representative and its special counsel *nunc pro tunc* to the petition date), (copy attached as Exhibit A)[6]; In re Serv. Merch. Co., 256 B.R. 738, 740-41 (Bankr. M.D. Tenn. 1999) (awarding fees to committee's professionals for work done prior to the existence of the committee where *nunc pro tunc* employment had earlier been ordered as of the petition date, before the committee's formation). In these cases, the retention of counsel retroactively to a date preceding formation of the applicant-committee was apparently unopposed. As such, we do not cite them as laying down any rule of law. But they do tend to show that, not infrequently, as in this case, the parties whose interests are actually at stake recognize the practical imperatives and considerations of fairness that should lead this Court to exercise discretion and grant the Application in its entirety, including the ACC's request to retain Caplin & Drysdale's *nunc pro tunc* as of October 6, 2009.

---

[6] The referenced order from Combustion Engineering was initially sought on noticed motion, but it appears that, after the filing of a certification of no objection, the motion was granted without a hearing.

**CONCLUSION**

For all of the foregoing reasons and those set forth in the Application and the declarations submitted in support thereof, the ACC respectfully requests that the Court enter an order authorizing it to retain and employ Caplin & Drysdale as its counsel *nunc pro tunc* as of October 6, 2009 and granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
April 5, 2010

Respectfully submitted,

CAPLIN & DRYSDALE, CHARTERED

/s/ Elihu Inselbuch

Elihu Inselbuch
Rita C. Tobin
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755
E-mail: ei@capdale.com; rct@capdale.com

Trevor W. Swett III
Kevin C. Maclay
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Suite 1100
Washington, D.C. 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
E-mail: tws@capdale.com; kcm@capdale.com

*Proposed Attorneys for Movant Official Committee of Unsecured Creditors Holding Asbestos-Related Claims*