

ONE EAST MAIN STREET
POST OFFICE BOX 2719
MADISON, WI 53701-2719
TEL 608-257-3911
FAX 608-257-0609
www.gklaw.com

# MEMORANDUM

---

**TO:**       Interested Parties/In re: *Motors Liquidation Co.*

**DATE:**     April 8, 2010

**SUBJECT:**  Statutory/Administrative Standards

---

On June 1, 2009, General Motors Corporation and some affiliates ("Debtors") filed voluntary Chapter 11 petitions in the Southern District of New York.  On December 23, 2009, the U.S. Bankruptcy Court appointed Brady C. Williamson as Fee Examiner for the proceeding and, on January 19, 2010, the Court authorized the retention of Godfrey & Kahn, S.C. as counsel to the Fee Examiner.  This memorandum addresses the legal standards and requirements that govern the fee review process generally and, more specifically, this case.

The Court has scheduled a hearing for April 29, 2010 on the initial fee applications, covering the period from June 1 to September 1, 2009, for the 14 professionals that have been retained and authorized to provide services for the estate.  The compensation and expenses sought total about $54,716,379.00.  In most instances, the professionals already have been paid 80 percent of their requested fees and all of their costs.  In some instances, the professionals have been paid all of the costs and fees they have requested.  The Court will review and approve, in whole or in part, the compensation sought in each application, whether paid or not, based on the initial retention order, on the application and supporting materials, and on the recommendations of the U.S. Trustee and the Fee Examiner.  The process will result in either payment in full of the amount sought or a reduction in the amount sought with a potential recovery of any amounts already paid that the Court finds unjustified.

For each professional, the Fee Examiner will provide a report on the application and a recommendation.  He also will provide a summary of the applications as a group—in the context of this proceeding and more generally.  This memorandum is the analytical framework for that process.  While the "law" of professional compensation is not particular to this proceeding, it has several remarkable dimensions that necessarily inform the fee review and approval process.  The proceeding involves an iconic corporation that has helped sustain the American economy and directly affected the lives of millions of families since 1908, when GM was founded.  The critical decisions to file this proceeding and to use the provisions of the bankruptcy code—forcefully, creatively and, so far, successfully—were made in a very short period of time.  The U.S. government has been directly involved because of the proceeding's importance to the national economy and because only the federal government was in a position to fund the reorganization.  The United States is, in many ways, the principal creditor.  More precisely, the

American taxpayers are the principal creditors for whose benefit, directly or indirectly, the proceeding even takes place. They are paying the bills.

All of this provides a unique context. So, too, does the continuing analysis by Congress, commissions and commentators of the events and decisions that led to the financial crisis of fall 2008 and the disappearance, reorganization or rescue of other iconic corporations including Lehman Brothers, Chrysler, AIG, Fannie Mae and Freddie Mac. But context does not change the law surrounding the retention and compensation of professionals—without which these and many other corporations would neither be reorganized nor rescued. The law may change as a result of the events of 2008 and this particular proceeding and others, but it is the law today that governs the application and approval process. This memorandum, comprehensive in part because of this context, is incorporated by reference in each report and recommendation filed by the Fee Examiner.

Given the importance of these cases and others, the compensation paid the professionals that help make the reorganization process possible inevitably attracts attention. The U.S. Bankruptcy Courts do all of their work, with very rare exceptions, in public. It is inevitable and not to be regretted that the bigger the corporate reorganization, the more important to the economy, the more people who depend on it for jobs and pensions and health care, and the more people who rely on its products—the more attention the case will attract. That is particularly true for fee applications. And not just in a few judicial districts.[1] Accordingly, this memorandum has an ancillary purpose: to try to help advance public understanding of the process and the role not only of the judges and U.S. Trustees whose public service is indispensable but of the professionals compensated by the estate and, here, the taxpayer.[2]

## STANDARDS

A professional's fee application in a Chapter 11 case is governed primarily by two sections of the Bankruptcy Code: 11 U.S.C. §§ 328 and 330.[3] Whether the court approves a professional's request under section 328 or section 330, however, the court may only approve "reasonable" fees and expenses, in the words of section 330, based on the "nature, the extent and the value" of the services.

---

[1] *See, e.g.*, Michael Oneal, *Fees flourish in bankruptcy cases*, Chi. Trib., Mar. 28, 2010, at 1, *available at* http://articles.chicagotribune.com/2010-03-28/business/ct-biz-0328-fees--20100328_1_fees-debtors-firms-and-other-professionals ("In the 15 months since Chicago-based Tribune Co. filed for bankruptcy, law firms and other professionals have billed the media conglomerate $138 million, or about one-quarter of the company's cash flow last year…. Major cases in recent years—Enron ($793 million), United Airlines ($296 million), Delphi (just under $400 million)—have been colossally expensive."). One of the more colorful articles about this case carried this heading: Daniel Gross, *The Bankruptcy Parasites: GM's Chapter 11 filing will be bad news for everyone—except the lawyers, accountants and paper-pushers who will make a mint off it*, Newsweek, May 29, 2009, http://www.newsweek.com/id/199997. The same article notes that "thanks to the transparency of our legal system, we know precisely how much they bill...."

[2] To that end, the Fee Examiner solicits critical comments and suggestions and, from time to time, will supplement this report.

[3] Other relevant Code sections: section 331, governing requests for interim payment; section 327, governing the employment of professionals; and, section 329, governing mandatory disclosures by attorneys who have provided the debtor services related to the case within one year prior to the bankruptcy petition.

That standard is far more easily stated than applied. The review of professional fee applications is an indispensable part of the bankruptcy process, not only because federal law requires it but because it provides transparency and helps sustain the integrity of that process. Especially in large and complicated cases, however, fee review also imposes a formidable burden on the courts and the U.S. Trustee system. The first interim applications on file in this case total more than 5,000 pages.

Pursuant to section 328, the court may pre-approve the payment of professional fees under reasonable terms and conditions. A professional to be paid through a section 328 agreement and whose fee request is consistent with that agreement's express terms will generally be paid, absent extraordinary circumstances, the full amount of the request. A common example of a professional whose fees are based on fixed terms expressly pre-approved by the court is a financial consultant whose retention calls for a specified monthly amount regardless of the number of hours worked.

In contrast, a fee request by a professional whose total compensation has not been pre-approved under section 328 is analyzed pursuant to section 330—the most common, a request filed by a law firm whose fees are based on hourly rates. The rate and hours spent on the matter are subject to the reasonableness standards in section 330. There are multiple sources of guidance—some binding, some advisory, some merely of interest—for the interpretation of a professional's obligations under section 330. Case law, bankruptcy rules, local rules, state ethics rules, guidelines promulgated by the Office of the United States Trustee ("U.S. Trustee"), and commentary by bankruptcy professionals and academics all are or may be involved, though hardly on an equivalent basis.

### A Short History of Professionals' Fees/Fee Examiners

The standards for professional fees have evolved in significant ways over the last century. Until the adoption of section 330 in 1978, professionals were paid pursuant to the 1898 Bankruptcy Act. *See* Bankruptcy Rules of Procedure 219 (superseded, 1983). Under the Bankruptcy Act, payment for professional services during a liquidation or reorganization had as a primary goal the conservation of the estate. *Id.* To achieve this goal, bankruptcy courts established ceilings for professional fees. *E.g.*, *In re Beverly Crest Convalescent Hospital, Inc.*, 548 F.2d 817, 821 (9th Cir. 1976) (professional fees could not exceed district court judge's salary); *see also* Brittany E. Powell, *Eliminating Fee Enhancements*, 20 Bankr. Dev. J. 207, 209-13 (2003) (discussing history of professional fees).

Congress feared that arbitrary or artificial limitations on professional fees could result in bankruptcy specialists leaving the field to seek better-paying legal work. *See* H.R. Rep. No. 95-595, at 329-30 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6286. To prevent this, Congress passed section 330 with the express purpose of ending doctrinaire limits on professionals' fees.

> Compensation is to be reasonable, for actual necessary services rendered based on the time, the nature, the extent and the value of the services rendered, and on the cost of comparable services other than in a case under the Bankruptcy Code. The effect of the last provision is to overrule *In re Beverly Crest Convalescent Hospital,*

> *Inc.*, …, which set an arbitrary limit on fees payable, based on the
> amount of a district judge's salary, and other, similar cases that
> require fees to be determined based on notions of conservation of
> the estate and economy of administration.  If that case were
> allowed to stand, attorneys that could earn much higher incomes in
> other fields would leave the bankruptcy arena.  Bankruptcy
> specialists, who enable the system to operate smoothly, efficiently,
> and expeditiously, would be driven elsewhere, and the bankruptcy
> field would be occupied by those who could not find other work
> and those who practice bankruptcy law only occasionally almost as
> a public service.

*Id.*; *see also* George W. Kuney, *Hijacking Chapter 11*, 21 Emory Bankr. Dev. J. 19, 21-45
(2004) (discussing the history of the Bankruptcy Code).

In the 30 years since the Code's adoption, however, courts and commentators inevitably
have re-focused their attention on the effective control of professionals' compensation.  *E.g.*, *In
re Busy Beaver Building Centers*, 19 F.3d 833, 844 (3d Cir. 1994) ("Disagreeable as the
[fee-review] chore may be, the bankruptcy court must protect the estate, lest overreaching
attorneys or other professionals drain it of wealth which by right should inure to the benefit of
unsecured creditors."); *In re Fleming Cos.*, 304 B.R. 85, 92-93 (Bankr. D. Del. 2003) (criticizing
billing rates and attorney staffing of case, among other factors, and ordering a fee reduction).[4]

### The Fee Examiner

The Bankruptcy Code has no express provision for the appointment of a fee examiner.
*See In re Collins & Aikman Corp.*, 368 B.R. 623, 626-27 (Bankr. E.D. Mich. 2007) (the
appointment of an examiner under 11 U.S.C. § 1104 does not encompass the examination of
professionals' fees); *In re Continental Airlines, Inc.*, 138 B.R. 439, 440 (Bankr. D. Del. 1992)
(same), rev'd on other grounds, 150 B.R. 334 (D. Del. 1993).  Nonetheless, in large or
particularly complex cases, the court may appoint a fee examiner to assist the court in fulfilling
its responsibility to review professionals fees pursuant to sections 330 and 331.  *Collins*, 368
B.R. at 625.  Some courts that have made such appointments have relied on the authority of
section 105(a) and Federal Rule of Evidence 706(a).  *Id.*; *In re Maruko Inc.*, 160 B.R. 633, 637
(Bankr. S.D. Cal. 1993).  In contrast, other courts have not focused on the statutory basis as
much as on the court's inherent responsibility to protect the estate:

> Most fee application hearings in large or notorious cases
> seem to involve central areas of interest about which the
> determination of the requested compensation is involved, i.e.
> benefit, complexity, undesirability etc.  One element, however, …

---

[4] *See* Cynthia A. Baker, *Other People's Money: The Problem of Professional Fees in Bankruptcy*, 38 Ariz. L. Rev.
35, 37 (1996) ("fees are higher in bankruptcy because a fundamental flaw in bankruptcy's priority system lets the
parties treat professional costs as externalities – costs ignored by parties to a transaction because they are incurred
by other members of society.").  The debate in the academic literature over professional compensation is not new,
but its intensity has increased.  *See infra* at 21-22.  And, no doubt, will continue to increase.  *See supra* at n.1.

> which is seldom addressed or even acknowledged, is that at fee
> hearings *all* of the professionals are represented *fully* as to their
> respective applications, while the interest of general or unsecured
> creditors who will be paying said fees, is, for practical purposes
> unrepresented.… [T]heir interest actually becomes adverse to the
> interest of their own attorney of record. This commonly recurring
> situation, long overdue for discussion, is like an unwanted orphan
> being dropped at the doorstep of the court for attention.

*In re Columbus Mortgage & Loan Corp.*, 155 B.R. 297, 298 (Bankr. D.R.I. 1993) (citation and footnotes omitted). The role of a fee examiner can range from drafting reports to the court, *e.g.*, *Continental Airlines*, 138 B.R. at 441, to line-by-line analyses of fee applications, *e.g.*, *Maruko*, 160 B.R. at 637, to general analyses of the professionals' strategy decisions, *e.g.*, *Collins*, 368 B.R. at 625-26.

### The Compensation of Professionals Retained by The Debtors

The payment of retained professionals in these cases is subject to court orders, local rules, sections 328 and 330, Rules 2014 and 2016, and guidelines promulgated by the U.S. Trustee.

### 1.    Ordinary Course Professionals Generally Not Subject To Review.

On July 1, 2009, the Court approved the Debtors' retention of almost 70 ordinary course professionals (individually, "OC Professional"). *In re Motors Liquidation Co.*, Order Pursuant to 11 U.S.C. §§ 105(a), 327, 328 and 330 Authorizing Debtors to Employ Professionals Utilized in Ordinary Course of Business, No. 09-50026 (Bankr. S.D.N.Y. July 1, 2009) ("OC Retention Order") [Dkt. 2900]. The OC Retention Order was not entered under section 331, which governs interim compensation.

Many of the OC Professionals are law firms, a significant number abroad in more than 20 different countries. Pursuant to the order, the Debtors' counsel must file with the Court an Ordinary Course Professional Declaration and a Retention Questionnaire from each OC Professional. If no party objects within 10 days of the declaration and questionnaire being filed, the OC Professional's retention, employment and compensation are deemed approved pursuant to sections 327 and 328. The OC Retention Order establishes the billing and payment procedures:

- The Debtors are authorized to pay compensation and reimburse each OC Professional, in full, upon receipt of a "reasonably detailed invoice";

- The invoice must reflect the nature of the services rendered, and the OC Professional must have calculated the fee "in accordance with the professional's standard billing practices";

- The Debtors retain the right to dispute any invoice;

- The Debtors are authorized to pay any OC Professional no more than $150,000 in any given month or more than $2 million during the pendency of the case;

- An OC Professional seeking more than $150,000 in any given month must file a fee petition for the full amount of its fees and expenses for that month in accordance with sections 330 and 331;

- An OC Professional seeking more than $2 million in total compensation must file a new retention application pursuant to sections 327 or 328;

- Finally, professionals whose services do not result in fees and disbursements of more than $20,000 per month ("De Minimus Professionals") may receive payment in full from the Debtor without a retention application.

The Debtors are authorized to retain additional ordinary course professionals by having each file an Ordinary Course Professional Declaration and Retention Questionnaire.

The OC Retention Order does not require either the OC Professional or the De Minimus Professional to file "reasonably detailed invoices," but the Debtor must provide the Committee of Unsecured Creditors with monthly reports detailing the fees paid each OC Professional. The order does not make any provision for post-retention objections to the OC Professionals' fees with the exception of disputes raised by the Debtor. Anyone retained pursuant to the OC Retention Order is entitled to compensation without further court approval. Only monthly requests in excess of $150,000 or total requests in excess of $2 million are subject to judicial review for reasonableness.

## 2. Professionals Subject To Review.

Compensation of case professionals is subject to the Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, *In re Motors Liquidation Co.*, No. 09-50026 (Bankr. S.D.N.Y. Aug. 7, 2009) ("Compensation Order") [Dkt. 3711]. Pursuant to this order, a professional submitting an invoice ("Monthly Statement") to the Debtor, as explained below, will receive payment from the Debtor of 80 percent of its requested fees and 100 percent of expenses.[5] Compensation Order at ¶ (g). The payments do not relieve the professional of the obligation to file an application with the Court for interim or final payments pursuant to sections 330 and 331, nor is the process intended to alter any of those Code requirements. *Id.* at ¶ (c). The interim compensation applications must additionally comply with the requirements of Order M-389 and

---

[5] Other courts also have allowed partial interim payment directly from the Debtor pending subsequent court approval, holding back varying percentages of the fees. *E.g*, *In re UAL Corp.*, Procedures for Interim Compensation and Reimbursement of Expenses for Professionals, No. 02-B48191 (Bankr. N.D. Ill. Dec. 11, 2002) (allowing interim payment of 90 percent of fees and 100 percent of expenses pending court approval). According to one empirical analysis, courts that allow partial monthly payments allow an average of 82 percent of fees to be paid automatically, albeit invariably subject to subsequent review. Stephen J. Lubben, *Corporate Reorganization & Professional Fees*, 82 Am. Bankr. L.J. 77, 101 (2008) ["*Corporate Reorganization*"].

the guidelines issued by the U.S. Trustee.[6]  *See* Administrative Order M-389, Amended
Guidelines for Fees and Disbursements for Professionals in Southern District of New York
Bankruptcy Cases (Bankr. S.D.N.Y. Nov. 25, 2009) (discussed in more detail below).

Under the Compensation Order, a professional submitting a Monthly Statement for
reimbursement of all expenses and payment of 80 percent of fees—in advance of the formal
interim fee application to the Court—must serve a monthly statement on the Debtors, the
Debtors' counsel, counsel for the Creditors' Committee, and the U.S. Trustee (individually, a
"Notice Party")[7] that includes:

- The list of individuals, with their respective title, who provided services during
  the period covered by the Monthly Statement;

- Their respective billing rates and the aggregate hours spent by each individual;

- A reasonably detailed breakdown of disbursements incurred, but only if the
  disbursement is permitted by the U.S. Trustee's fee guidelines; and

- Contemporaneously maintained time entries for each individual in tenths of an
  hour (or as close to that as practicable) unless the professional's retention
  application contains an alternate billing requirement.[8]

Compensation Order at ¶¶ (a), (d).  Once submitted, the partial payment is virtually assured.  In
this proceeding, no objections apparently have been made to the Monthly Statements—none, at
least, that has become part of the record.

The Monthly Statement must be served on or before the 30th day of the month following
the month for which compensation is sought.[9]  *Id.* at ¶ (a).  Each Notice Party shall have at least
15 days to review the professional's Monthly Statement and to serve an objection, if any, on that
professional and the other Notice Parties ("Objection Deadline").  *Id.* at ¶ (e).  Upon expiration

---

[6] Order M-389 went into effect on December 4, 2009, superseding prior orders governing fee requests in Southern
District of New York bankruptcy cases.  Fee requests filed prior to the effective date of Order M-389 are governed
by Order M-104, Guidelines for Fees and Disbursements for Professionals in Southern District of New York
Bankruptcy Cases (Bankr. S.D.N.Y. June 20, 1991), and Order M-151, Amended Guidelines for Fees and
Disbursements for Professionals in Southern District of New York Bankruptcy Cases (Bankr. S.D.N.Y. Apr. 19,
1995).  Order M-389 is not materially different from Order M-151 for fee standards and review.

[7] The Compensation Order was entered before the appointment of the Fee Examiner and, thus, does not require the
applicant to serve a copy of the Monthly Statement on the Fee Examiner.  Pursuant to the Court's order appointing
the Fee Examiner, however, all professionals subject to the Compensation Order must cooperate with the Fee
Examiner.  *In re Motors Liquidation Co.*, Stipulation and Order with Respect to Appointment of a Fee Examiner at
¶ 4, No. 09-50026 (Bankr. S.D.N.Y. Dec. 23, 2009) [Dkt. 4708].  In any event, all fee applications and related
pleadings and orders are public documents, accessible through PACER.

[8] *E.g.*, *In re Motors Liquidation Co.*, Order Authorizing the Employment and Retention of Evercore Grp. LLC as
Investment Banker and Financial Advisor for the Debtors *Nunc Pro Tunc* to the Petition Date at 2-3, No. 09-50026
(Bankr. S.D.N.Y. Oct. 28, 2009) [Dkt. 4304] (authorizing Evercore to maintain time records in half-hour
increments).

[9] The Monthly Statement for June 2009 must have been served on or before August 14, 2009.  Compensation Order
at 2 ¶ (b).

of the Objection Deadline, the Debtor shall withhold payment of any fees or expenses for which
an unresolved objection is pending.

In effect, a Notice Party can serve an objection to the compensation request no later than
45 days following the month for which compensation is sought. *Id.* at ¶ (e). If an objection to a
Monthly Statement is resolved after the Debtor has made the 80 percent / 100 percent payment
described above, the Debtor shall promptly pay 80 percent of the fees and 100 percent of the
expenses that had been the subject of that objection. *Id.* at ¶ (i). Objections not resolved by the
professional and Notice Parties are preserved and presented to the Court at an interim or final fee
application hearing. *Id.* at ¶ (j). Failure to object to a Monthly Statement, however, does *not*
constitute a waiver of any kind or prejudice anyone's right to object to any subsequently filed fee
application or the final application. *Id.* at ¶ (k).

Participation in the interim monthly compensation procedure is not mandatory. *See*
Compensation Order at 2 ("all professionals in this case *may* seek interim compensation in
accordance with the following procedure") (emphasis added). But whether or not a professional
participates and unless the professional's retention agreement calls for a different procedure, the
professional must file an interim fee application commencing for the period ending
September 30, 2009 and at four-month intervals after that. ("Interim Fee Period").[10] *Id.* at ¶ (l).
The interim fee applications must be filed within 45 days of the end of each Interim Fee Period.
Any professional that fails to file a timely interim fee application, seeking approval for
compensation and expenses previously paid pursuant to a Monthly Statement, is ineligible to
receive further monthly payments until the professional files an interim application. *Id.* at ¶ (n).

### Analyzing a Fee Request

The fee review process generally involves four steps: (1) determining the employment
and payment terms approved by the court; (2) analyzing whether the request for payment
satisfies the statutory standards for payment, the local orders and the guidelines promulgated by
the U.S. Trustee; (3) reviewing payments made to the professional, including interim payments
under section 331; and (4) determining whether the professional has satisfied collateral
requirements, such as filing mandatory notices.[11] The burden of proof is *always* on the fee
applicant to prove each component of the fee application, including its reasonableness. *E.g.*, *In
re Northwest Airlines Corp.*, 382 B.R. 632, 645 (Bankr. S.D.N.Y. 2008) (citation omitted).

> In order to be compensated from the estate, the professional must
> demonstrate – not just recite – that the fees sought are reasonable,
> necessary, and of benefit to the estate and that the expenses sought
> to be reimbursed are actual and necessary and that no other
> reasonable, less expensive alternatives were available.

---

[10] Thus, January 31, 2010; May 31, 2010; and September 30, 2010.

[11] Other factors may be relevant to a fee review under unusual circumstances. *E.g.*, Ben Fidler, *Collins & Aikman
Advisors Slammed*, Daily Deal, Oct. 25, 2007, *available at* 2007 WLNR 20945799 (fee examiner concluding that
due to delays in making the decision to liquidate, the estate was charged more than $8.6 million in unnecessary
professional fees).

*In re Fibermark, Inc.*, 349 B.R. 385, 395 (Bankr. D. Vt. 2006).

The exercise of billing judgment by attorneys is ethically mandated; it is an inherent and unavoidable component of every fee application. *See In re Bennett Funding Group, Inc.*, 213 B.R. 234, 241 (Bankr. N.D.N.Y. 1997); *see infra* at 21. A fee applicant must make a good faith effort to exclude excessive, redundant or otherwise unnecessary hours from a fee request. *Id.* In the Southern District of New York, a fee applicant must identify all voluntary reductions to the lodestar, calculated by multiplying the billing rate by the reasonable number of hours worked, including the amount of the reduction. Order M-389 at D.

## 1.    Standards For Payment Pursuant To Section 328.

Congress has given the courts broad authority to authorize the employment of professionals on a range of reasonable terms, including monthly flat-fees. 11 U.S.C. § 328. Significantly, absent a showing of unforeseeable developments in the case, courts may not rely on hindsight to reduce (or increase) professional compensation under terms which it has analyzed for reasonableness and pre-approved.[12] *Id.* Section 328 reads, in relevant part:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

Whether a payment term has been "pre-approved" is subject to varying interpretation. *In re Smart World Techs., LLC*, 552 F.3d 228, 233 (2d Cir. 2009) (discussing circuit split). In the U.S. Court of Appeals for the Second Circuit, the court must consider the totality of the circumstances including whether the professional's retention application or the court's retention order cited section 328 and whether the court evaluated the propriety of the fee arrangement before granting final, rather than preliminary, approval. *Id.*; *see also In re Circle K. Corp.*, 279 F.3d 669, 673 (9th Cir. 2001) (fees for a professional whose retention order does not unambiguously specify section 328 retention will be analyzed under section 330).

A professional whose retention is governed by section 328, and where compensation is not based on the number of hours worked, may nonetheless be required to include the number of

---

[12] Because of this limitation, the scrutiny of a section 328 retention application can be strict. *See, e.g.*, H. Jefferson LeForce & Michael P. Richman, *New Restrictions on Investment Banker Employment and Compensation Arrangements*, Am. Bankr. Inst. J., Oct. 2009, at 22 (discussing *In re Energy Partners, Ltd.*, 409 B.R. 211 (Bankr. S.D. Tex. 2009)).

hours worked in the professional's application for compensation.  *See* Fed. R. Bankr. P. 2016(a) ("[a]n entity seeking interim or final compensation for services … shall file an application setting forth a detailed statement of … time expended"); *In re Circle K Corp.*, 165 B.R. 653, 656-57 (Bankr. D. Ariz. 1994) (professional retained on a monthly flat-fee must still file time entries so the court may determine if the professional actually did the work).  That requirement is not uniformly applied.[13]  *E.g.*, *In re Enron Corp.*, Final Application of the Blackstone Group, L.P. as Financial Advisor to the Debtors and Debtors-in-Possession for Allowance of Compensation for Necessary Services Rendered and For the Reimbursement of all Actual and Necessary Out-of-Pocket Expenses Incurred During the Period of December 2, 2001 Through July 15, 2004, Appendix A at 8, No. 01-16034 (Bankr. S.D.N.Y. Nov. 1, 2004) (amended engagement letter stating that "Blackstone shall not be required to maintain detailed time records") and Appendix B at 1 (authorizing Blackstone's retention on the terms in the amended engagement letter).

Finally, the court's authority to adjust a professional's pre-approved fee terms, whether by increasing or decreasing the fee due, is limited and may not be based on hindsight.  *E.g.*, *Smart World*, 552 F.3d at 232 ("Where the court pre-approves the terms and conditions of the retention under section 328(a), its power to amend those terms is severely constrained."); *Northwest Airlines*, 382 B.R. at 639 (barring a finding of improvident circumstances, financial advisors are entitled to monthly payments pre-approved by the court); *In re XO Commc'ns, Inc.*, 398 B.R. 106, 115 (Bankr. S.D.N.Y. 2008) ("section 328 prevents a 'look back' once the 'reasonableness' determination has been made").

## 2.    Standards For Payment Pursuant To Section 330.

Sections 330 and 328 are mutually exclusive.[14]  *Smart World*, 552 F.3d at 232-33.  Under section 330, the court must consider the "nature, the extent and the *value* of such services" before awarding "reasonable compensation for actual, necessary services."  11 U.S.C. § 330(a) (emphasis added).  Moreover and again in contrast to section 328, "[s]ection 330 authorizes the bankruptcy court to award the retained professional 'reasonable compensation' based on an *after-the-fact* consideration."  552 F.3d at 232 (emphasis added).  The factors the bankruptcy court must consider in a section 330 analysis are quite specific:

- The time spent on such services;

- The rates charged for such services;

- Whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

---

[13] *See* James W. Giddens, *Compensation of Investment Bankers in Bankruptcy Proceedings:  Just or Unjust Enrichment?*, 23 Ann. Rev. Banking & Fin. L. 485 (2004) ["*Investment Bankers*"] (discussing issues raised by time-keeping requirements for professionals paid flat-rate fees).

[14] Some courts in large bankruptcy cases, however, have made section 330 review a contractual term of a section 328 retention agreement.  *See Investment Bankers* at 527-28 (discussing a compensation agreement in the *Enron* case).  The enforceability of this type of provision can be unclear.  *E.g.*, *In re NorthWestern Corp.*, 344 B.R. 40 (D. Del. 2006).

- Whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

- With respect to an individual, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

- Whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in non-bankruptcy cases.

*See* §§ 330(a)(3)(A)-(F). The factors are applicable to both interim and final fee awards for retentions not pre-approved pursuant to section 328. *See* 1 Ginsberg & Martin on Bankruptcy § 4.06[C] (Susan V. Kelley ed., 5th ed. 2008 & Supp. 2010-1).[15] Courts take differing positions on the application of the "value" standard in fee applications. *Compare*, *e.g.*, *In re Ames Dep't Stores*, 76 F.3d, 66, 71-72 (2d Cir. 1996), overruled in part by *Lamie v. United States Tr.*, 540 U.S. 526 (2004) (largely deferring to counsel's strategy choices), with *Collins*, 368 B.R. at 625-26 (appointing fee examiner to review reasonableness of strategy choices and consequent charges to the estate).

Courts and commentators are divided on whether the bankruptcy judge should consider factors in addition to those enumerated in section 330(a)(3). In particular, some courts have also utilized the factors, supported by substantial case law, that apply to fee-shifting statutes such as claims for civil rights violations. *E.g.*, *In re First Colonial Corp.*, 544 F.2d 1291 (5th Cir. 1977); *but see Busy Beaver*, 19 F.3d at 842 (distinguishing bankruptcy cases from "statutory fee" cases for the purposes of fee review).

The first step in a section 330 analysis is to calculate the lodestar—that is, multiplying the reasonable billing rate by the reasonable number of hours expended.[16] *E.g.*, *In re Brous*, 370 B.R. 563, 570 (Bankr. S.D.N.Y. 2007). This calculation includes most, but not all, of the factors relevant to determining a reasonable fee. *Id.* For example, the lodestar calculation reflects the novelty and complexity of the matter and, obviously, the billing rate and number of hours worked. *See id*. In appropriate circumstances, the court may depart upward or downward from the lodestar. Such deviations generally are appropriate, however, only in exceptional circumstances. The lodestar calculation does not, almost by definition, completely measure "value."

---

[15] Although awards of interim compensation are tentative, the court should not award interim compensation if it has any doubts that administrative expenses will not be paid in full to prevent those fee applicant claimants from receiving a larger portion of allowable compensation than other administrative claimants. *Id*.

[16] The standards for analyzing fee requests not based on hours worked, such as success fees, are discussed in subsection (C) below.

### A.      Reasonable billing rate.

There is no consensus on the definition of a "reasonable billing rate" any more than there
is consensus on the term "reasonable."[17]   A court may look to the attorney's customary local
billing rate; to the customary billing rates in the forum district; or to a market-driven approach.
*See* 3 Collier on Bankruptcy ¶ 330.04[3][c] (Alan N. Resnick & Henry J. Sommer eds., 15th ed.
rev. 2009) ["Collier"] and cases cited.

In a market-driven analysis, the nature, extent and value of the services along with the
cost of comparable services, "with the principal emphasis being on the cost of comparable
services (market rates)—essentially provide the basis for computing the 'reasonable hourly rate'
used in the 'lodestar' calculations." *Busy Beaver*, 19 F.3d at 849.  The Second Circuit appears to
have embraced the "market-driven" approach. *See Ames Dep't Stores*, 76 F.3d at 71.

While the court in *Ames* did not discuss the reasonableness of the billing rates of the
professionals whose counsel was at issue, the court adopted an approach to ensure that
bankruptcy professionals' compensation would be commensurate with non-bankruptcy
specialists. *Id*. at 70-71.  The district court had reasoned that "[s]ome benefit to the estate must
be found before an attorney can recover fees in a bankruptcy proceeding." *Id*. at 70 (quoting
district court); *see also* § 330(a)(3)(C).  After the district court determined that an appeal taken
by the law firm accomplished nothing for the estate, the district court denied all the fees
associated with the appeal, about $35,000. *Id*.  The Second Circuit reversed:

> Prior to the 1978 enactment of 11 U.S.C. § 330, economy of
> administration was the byword in bankruptcy proceedings, and
> applications for fee awards were closely scanned with this thought
> in mind.  In enacting section 330, Congress departed somewhat
> from this doctrine of strict review, taking the position that
> "compensation in bankruptcy matters be commensurate with the
> fees awarded for comparable services in non-bankruptcy cases."
> With the 1994 amendments of section 330, Congress made another
> move towards greater equity in estate management.
>
> ….
>
> Upon remand, this is the test the bankruptcy court should apply in
> an objective manner, based upon what services a reasonable lawyer
> or legal firm would have performed in the same circumstances.

76 F.3d at 71-72 (internal citations omitted); *see Fleming Cos.*, 304 B.R. at 92 (noting the
reverse problem: that bankruptcy attorneys were not paid commensurately with their peers

---

[17] According to a December survey by ALM Media Properties LLC, the publisher of *American Lawyer*, about
thirteen partners at larger law firms have charged hourly rates of $1,000 or more to companies in bankruptcy.  Linda
Sandler, *Weil Gotshal Bills Lehman $1,000 an Hour for Lawyers*, Business Week, Mar. 31, 2010,
http://www.businessweek.com/news/2010-03-31/weil-gotshal-bills-lehman-1-000-per-hour-for-lawyers-update1-
.html.

because they regularly billed at *higher* rates than similarly-experienced attorneys at the firm working in other areas of law).

The fee applicant must prove more than just that each professional who recorded time has done so at a reasonable rate. The fee applicant must additionally show that the applicant staffed the matter appropriately and that tasks could not have been performed by a less experienced professional at a lower rate. *Fibermark*, 349 B.R. at 396; *see* § 330(a)(3)(B), (D). Additionally, in certain districts, including those in the Second Circuit, travel time is compensable at half the professional's usual hourly rate. *Fibermark*, 349 B.R. at 406; *Wilder v. Bernstein*, 975 F. Supp. 276, 283-84 (S.D.N.Y. 1997) (holding in a nonbankruptcy context that "courts in this circuit customarily reimburse attorneys for travel time at fifty percent of their hourly rates") (citations omitted); *see also In re Old Carco LLC*, Response of the United States Trustee Regarding Second Interim Applications for Compensation and Reimbursement of Expenses at 9, No. 09-50002 (S.D.N.Y. Feb. 22, 2010) and cases cited.

Finally, the compensation sought for law clerks and attorneys not yet admitted to practice in any jurisdiction should be consistent with the principle that it is unreasonable to bill the estate for training or educational purposes.[18] *See In re Wepsic*, 238 B.R. 845, 848 (Bankr. S.D. Cal. 1999) (citation omitted). In another case pending in this Court, fees for summer associates have been held noncompensable. *In the Matter of Chemtura Corp.*, First Interim Fee Application Hr'g Tr., 37-38, No. 09-11233 (Bankr. S.D.N.Y. Nov. 2, 2009).

### B.      Reasonable hours expended.

The bankruptcy court has an affirmative duty to examine the propriety of fees even when no objections are raised. *E.g.*, *In re Poseidon Pools of Am.*, 216 B.R. 98, 100 (E.D.N.Y. 1997). When reviewing the number of hours billed, the second lodestar factor, a court may consider:

- The nature and number of issues involved;

- Whether the hours claimed deviate significantly from the number of hours expended by a comparable professional in similar matters;

- The characteristics of the debtor: for example, in larger Chapter 11 cases, more hours may be needed for due diligence;

- Whether the counsel claiming fees initiated needless litigation or, instead, was forced to take action by circumstances or opposing counsel;

---

[18] In certain cases, the United States Trustee's Office has taken the position that summer associate time should be treated as overhead and is not compensable. *E.g.*, *In re DPH Holdings Corp.*, Objection of the United States Trustee to the Final Fee Applications of the Retained Professionals at 13, No. 05-44481 (Bankr. S.D.N.Y. Mar. 1, 2010) citing *In re ACT Mfg., Inc.*, 281 B.R. 468, 485 (Bankr. D. Mass. 2002); *but see, e.g.*, *In re Recycling Indus., Inc.*, 243 B.R. 396, 404-05 (Bankr. D. Colo. 2000) (recognizing that summer associates "can be valuable and worthy of billing clients at reasonable rates"); *see also Missouri v. Jenkins by Agyei*, 491 U.S. 274, 286-89 (1989) (holding that under the Civil Rights Act fee-shifting statute, work performed by paralegals, law clerks and recent law school graduates should be compensable at market rates—if the prevailing practice in that market is to bill separately for those services so that "an attorney's fee awarded under § 1988 is to yield the same level of compensation that would be available from the market.") (citation omitted).

- Whether the amount of time claimed for the preparation of the fee request itself is excessive;[19] and

- Whether the professional has exercised, and demonstrated, billing judgment.

*In re Atwell*, 148 B.R. 483, 491-92 (Bankr. W.D. Ky. 1993). A court may not allow compensation for fees for duplicative services. *See* § 330(4). As a result, and especially because the burden of proof always rests with the applicant, a fee application may be deficient when it includes internal conferences and communications where the time recorded by one professional is not consistent with another, where the professional fails to identify the recipients and the subject matter of an internal communication, or where the professional otherwise fails to "demonstrate the benefit [to] the estate" from multiple attendance at hearings or conferences or internal communications. *Fibermark*, 349 B.R. at 396.

Other non-compensable services include clerical and administrative "[d]uties appropriate for office staff [that] are considered part of a professional's overhead expenses and may not be billed to the estate."[20] *Fibermark*, 349 B.R. at 397; *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758, 769 (Bankr. E.D.N.Y. 2005) (overhead not compensable); *but see Bennett Funding*, 213 B.R. at 247-48 (discussing differing approaches to clerical work at professional rates). These overhead activities may include: mailing, photocopying, word processing (including the creation of templates), formatting, creating spreadsheets, printing, organizing files, checking for docket updates, creating binders, and secretarial overtime. *Fibermark*, 349 B.R. at 396-97. By local order in the Southern District of New York, overtime expenses for non-professionals and paraprofessionals may be compensable, but must first be explained and justified. Order M-389 at ¶ E(5); *see also* M-151 at ¶ F(5).

Vague entries do not allow the court to determine the reasonableness and necessity of the effort expended, and fees may be denied or reduced when insufficiently documented. *E.g.*, *Bennett Funding*, 213 B.R. at 245-46. Entries for legal research must identify the issue and explain the research need. *Fibermark*, 349 B.R. at 397. Research on basic issues within a professional's competence are non-compensable. *Id.* For example, an accounting firm retained

---

[19] The Code expressly allows a professional to bill for the time required to prepare the fee petition. 11 U.S.C. § 330(a)(6). Some courts have identified different components in a fee application, however, and only some of those components may be compensable. *See In re CF&I Fabricators*, 131 B.R. 474, 482-89 (Bankr. D. Utah 1991) (discussing approaches to compensation for fee application preparation). In particular, the time spent maintaining time records or defending an objection to a fee petition may be noncompensable. *Id.* at 484; *Brous*, 370 B.R. at 572; *In re St. Rita's Assocs. Private Placement*, 260 B.R. 650, 652 (Bankr. W.D.N.Y. 2001) (distinguishing time spent preparing a fee application from time spent defending a fee request); *compare id.* with *Bond v. Stanton*, 630 F.2d 1231, 1235 (7th Cir. 1980) (prevailing party in Civil Rights Act suits entitled to attorneys fees for time spent litigating their fee request); *Bettendorf v. Microsoft Corp.*, 2010 WI App 13, ¶ 28, 779 N.W.2d 34 (under state law, it is within the court's discretion to grant fees-on-fees, and defendant who forced the fee applicant to litigate its fees must bear the consequences of that decision).

[20] The fees related to docket review and calendaring of "critical dates" are sometimes a point of contention with the argument that some of those fees should be overhead. *E.g.*, *In re Fleetwood Enterp. Inc.*, Opposition of United Sates Trustee to First Interim Fee Application of Pachulski Stang Ziehl & Jones LLP as Attorneys for the Official Committee of Creditors Holding Unsecured Claims (March 20 Through December 31, 2009) at 4-5, No. 09-14254 (Bankr. C.D. Cal. Mar. 16, 2010) (arguing that some calendaring tasks billed at professional rates is to be expected in a large bankruptcy but suggesting that some of that time should be overhead).

as an expert in bankruptcy issues will not be compensated for researching basic bankruptcy issues since the professional's retention rested on just that expertise. *Id.*

Finally, under guidelines promulgated by the U.S. Trustee, a fee applicant may not block bill where the aggregate amount of time spent on the discreet tasks identified in the block billed entry exceeds one-half hour. 28 C.F.R. Pt. 58, App. A (2009) ("UST Guidelines"). This type of block billing, known as "lumping," "makes it difficult to determine if the timekeeper spent a reasonable amount of time on each discreet task." *Brous*, 370 B.R. at 576; *see also In re Baker*, 374 B.R. 489, 495 (Bankr. E.D.N.Y. 2007) (block billing makes it difficult for the court to evaluate if multiple attorneys on a single project provided complementary or duplicative services). The judicial response to "lumping" varies. Some summarily disallow all fees in excess of one-half hour for each lumped entry, *e.g.*, *Brous*, 370 B.R. at 577, whereas other courts apply an across the board percentage reduction, *e.g.*, *Baker*, 374 B.R. at 496. Across the board cuts range from five percent to 100 percent. *See id.* at 495 n.7 and cases cited. Percentage reductions have the advantage of preventing a court from misusing its own time "set[ting] forth item-by-item findings" about possibly voluminous filings. *Id.* 496 (citations omitted).

### C.    Fee requests not facially based on hours worked.

"Back-end fees," including success and completion fees, are a compensation method for certain types of professionals including financial advisors and crisis management professionals.[21] Such professionals are often paid both a monthly fee and a back-end fee:

> The purpose of the monthly retainer is to ensure that a financial advisor receive some compensation for its efforts in case the transaction is never consummated. The restructuring fee is a percentage of the value of some or all of the debt to be restructured. In that regard, the market places value on the results that may be brought about by the professional. At the outset of the engagement, the agreement is formulated from a prospective viewpoint and, subsequently, there is no "look back" to examine the reasonableness of the compensation in the context of the nexus between the effort expended by the financial advisor and the culmination of the transaction…. Once in bankruptcy, the same prospective analysis usually applies if the financial advisor's compensation is sought to be approved under 11 U.S.C. § 328 at the outset of the actual engagement.

*XO Commc'ns*, 398 B.R. at 111. A back-end fee whose amount has not been expressly pre-approved, or that does not express the standards for its award, is not "pre-approved" pursuant to section 328. Instead, it is subject to the reasonableness standards of section 330. *Northwest Airlines*, 382 B.R. at 641 ("there were no 'terms' set forth in the Lazard Retention App.

---

[21] Another type of fee not calculated by the lodestar method are those associated with an executive bonus program. *E.g.*, *In re Tribune Company*, Order Authorizing, But Not Directing, The Debtors To Implement 2009 MIP Program, No. 08-13141 (Bankr. Del. Jan. 28, 2010) (authorizing $46.5 million dollars in executive bonus payments).

informing the Court as to the proposed fee amount or the terms under which it would be earned.").

Since a fee applicant always bears the burden of proof, a back-end fee consistent with market rates but which is to be analyzed under section 330 may nonetheless be disallowed.  *E.g.*, *In re Northwest Airlines Corp.*, 400 B.R. 393, 402 (Bankr. S.D.N.Y. 2009).  To determine whether the applicant's total compensation request, including any back-end fee, is reasonable, the court may consider the number of hours the professional worked.  *Id.* at 401.  In *Northwest Airlines*, the court noted that the monthly compensation for the firm hired to provide financial advice resulted in a blended hourly rate of $876 for each of the firm's professionals.  *Id.*  With the addition of the back-end fee, the financial advisor would have been compensated at a blended rate of $1,398 an hour.  *Id.*  That blended rate would have resulted in an hourly payment for the financial advisor's associates and accountants that exceeded by 65 percent the highest billing rate of the Debtor's most experienced bankruptcy counsel, partners that each had between 32 and 40 years' experience.  *Id.* at 401-02.  The court disallowed the fee:

> While Lazard may feel it is under-compensated when compared to the amounts it routinely receives in other engagements, Lazard has not met its burden of proof that award of the Completion Fee in this case is reasonable based upon the work Lazard performed and its impact upon the reorganization.  Thus, the single fact that comparably skilled financial advisors received "substantially larger fees" in this case and in similar cases does not justify the Completion Fee requested by Lazard under the totality of the circumstances in this case.

*Id.* at 402.

An alternative method for analyzing the reasonableness of a success fee is to measure it against the estate's outstanding debt.  *E.g.*, *In re XO Commc'ns*, 323 B.R. 330, 343-44 (Bankr. S.D.N.Y. 2005) (calculating success fee as a percentage of debtor's outstanding debt and as a percentage of the debtor's secured debt), *aff'd*, 369 B.R. 111 (S.D.N.Y. 2007).  At least one court has found that 40 basis points against the debt may be a reasonable fee consistent with market practices.  *See id.* at 344.

Finally, even when a back-end fee is subject to post-completion review for reasonableness, it can be difficult to determine the standard a court used.  *E.g.*, *In re SemCrude, L.P.*, Order Granting Application by AP Services, LLC As Crisis Managers to the Debtors for Approval of the Contingent Success Fee, No. 08-11525 (Bankr. D. Del. Mar. 4, 2010) ("March 4 Order").  In *SemCrude*, for example, the court authorized the employment of a crisis management firm on a monthly retainer and ordered that "'back-end' fees shall be approved by the Court at the conclusion of the case on a reasonableness standard and are not being pre-approved by entry of this Order."  Order Authorizing the Debtors to Employ AP Services, LLC and Designating Lisa Donahue as Chief Restructuring Officer *Nunc Pro Tunc* to the Commencement Date at 3**,** No. 08-11525 (Bankr. D. Del. Aug. 18, 2008).  The court subsequently approved a success fee of $6,825,000, instead of the $7,500,000 requested, without explaining the reduction.  March 4 Order at 2.

However one analyzes the reasonableness of success and other "back-end" fees, those fees can represent a substantial amount of compensation for financial advisors and related professionals. *E.g.*, *In re Calpine Corp.*, Order Granting Applications of Professionals for Allowance of Eighth Interim and Final Compensation For Services Rendered and Reimbursement of Actual and Necessary Expenses, No. 05-60200 (Bankr. S.D.N.Y. Mar. 27, 2008) (awarding financial advisor and investment banker compensation of $28,718,090); Summary of the Seventh and Final Application of Miller Buckfire & Co., LLC, Financial Advisors and Investment Bankers for the Debtors for (A) Compensation and Reimbursement of Expenses for the Period from October 1, 2007, through January 31, 2008, and (B) Final Allowance of Compensation and Reimbursement of Expenses for the Period from December 21, 2005 through January 31, 2008, No. 05-60200 (Bankr. S.D.N.Y. Mar. 4, 2008) (fee consisted of a net $12,031,910 "Restructuring Transaction Fee"; a $4,500,000 "Financing Fee"; and $3,936,180 in "Specified Asset Sale Fees").

### Standards For Payment Of Expenses

Pursuant to section 330(a)(1)(B), the court is authorized to reimburse a professional for "actual, necessary expenses." Because only "actual" expenses are compensable, a fee applicant may be required to provide copies of the receipts for those expenses. *See Bennett Funding*, 213 B.R. at 251; *Korea Chosun*, 337 B.R. at 769 ("Expenses are considered 'actual' if they are in fact incurred rather than constructively incurred based on a pro rata allocation, a formula, or estimation.") (citation omitted); *Fibermark*, 349 B.R. at 398 (disallowing *per diem* expenses which "by their very nature, fail to support a finding that the expenses are actual, necessary or justified."). To determine whether an expense is compensable, the court usually will consider whether the expense was necessary, beneficial at the time it was incurred, and reasonably likely to benefit the estate. *Korea Chosun*, 337 B.R. at 769.

Pursuant to Order M-389, the reimbursement rates for certain expenses have been fixed for bankruptcy cases in the Southern District of New York:

- photocopying fees are reimbursable at the lesser of 20 cents per page or the actual cost of copying;

- long-distance out-going facsimile charges are reimbursable at the lower of the toll charge or, if the toll charge is not readily determinable, at $1.25 per page for domestic and $2.50 per page for international transmissions;

- in-coming facsimile charges are not reimbursable;

- routine use of cellular telephones is not reimbursable;

- overtime expenses for non-professional and paraprofessional staff are not reimbursable unless fully explained and justified; the fee applicant must at a minimum indicate that:

  - services after normal closing hours were absolutely necessary; and

  - that charges are for overtime expenses actually paid.

- overtime expenses for professionals required to work after 8:00 p.m. are reimbursable provided that if the professional dines before 8:00 p.m., the professional returns to the office to work for at least one and one-half hours;

- meal expenses may not exceed $20 per individual;[22]

- daytime meals are reimbursable only if the individual is participating in a necessary meeting about the case during the meal.

*See* Order M-389 at ¶ E; *see also* Order M-151 at ¶ F. In any event, "the disbursements sought must be billed at rates and in accordance with practices customarily employed by the applicant and generally accepted by the applicant's clients." Order M-389 at ¶ A.

Courts disagree about whether the costs associated with computerized legal research are compensable from the estate. *See Fibermark*, 349 B.R. at 399-400 (citing cases). Courts that disallow compensation for those expenses take the position that computerized legal research costs are part of the services included in the hourly rate—in other words, overhead.[23] *E.g.*, *In re Sapolin Paints*, 38 B.R. 807, 816 (Bankr. E.D.N.Y. 1984). Overhead expenses, of course, are generally non-compensable. 349 B.R. at 400 (overhead expenses include postage, office supplies, and local travel). Other courts, however, have allowed compensation for those expenses upon a showing that the costs were reasonable and necessary. *E.g.*, *id.* (agreeing with *In re Drexel Burnham Lambert Group*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991)).

At least one court requires a fee applicant to (1) demonstrate that the charges were reasonable and necessary by including a description of the research topic and the length of time spent on each topic; (2) affirm that the applicant bills its nonbankruptcy clients for computerized legal research costs; (3) identify the rate at which it charges its nonbankruptcy clients for those expenses; and (4) certify the invoiced cost from the vendor. *Id.*, *see also In re Lehman Bros. Holdings Inc.*, Fee Committee Report Pertaining to the Final Recommended Deductions from the Second Interim Fee Applications of All Retained Professionals at 10, No. 08-13555 (Bankr. S.D.N.Y. Dec. 14, 2009) [hereinafter "Lehman Bros. Final Rpt."] (requiring that all professionals who utilize computerized research services disclose their billing arrangements with the service providers and requiring computerized research charges of over $1,000 per session to be separately explained).

PACER charges are similar to copying charges, which are compensable, and PACER charges generally will be compensable as long as they include an explanation of the documents obtained and their necessity to the case. *Fibermark*, 349 B.R. at 400.

Legal fees are not reimbursable as expenses. *E.g.*, *In re Midland Capital Corp.*, 82 B.R. 233, 241 (Bankr. S.D.N.Y. 1988). Allowing reimbursement for a fee applicant's retention of its

---

[22] *But see In re Lehman Bros. Holdings Inc.*, Fee Committee Report Pertaining to First Interim Fee Applications of All Retained Professionals at 5, No. 08-13555 (Bankr. S.D.N.Y. Aug. 3, 2009) (differentiating between in-house meals and meals involving travel).

[23] The Southern District of New York at one point expressly allowed compensation of computerized legal research costs. Order M-104 at 10. The order now in effect does not address the issue. *See* Order M-389.

own legal counsel as an expense circumvents the requirement that the court approve the firm's retention and employment.  *See id.; see also In re Cenargo Int'l, PLC*, 294 B.R. 571, 606 (Bankr. S.D.N.Y. 2003) (fee applicant who did not seek the court's approval of its retention of British barristers not entitled to payment of the barristers' fees); Lehman Bros. Final Rpt. at 10 (requiring that, prospectively, all foreign attorneys hired by a fee applicant must be retained as ordinary course professionals).

### *Additional Requirements*

The court may disallow or reduce a fee request, independently of whether the request meets section 328 and 330 standards, if the petition fails to meet other requirements.  Those can include a failure to prepare the fee petition in accordance with guidelines promulgated by the U.S. Trustee or the court or to meet certain notice requirements.

### 1.    U.S. Trustee Fee Guidelines And Order M-389.

Pursuant to the Bankruptcy Reform Act of 1994, the U.S. Trustee has authority to review fee applications seeking compensation under section 330 of the Code.  *See* 28 U.S.C. § 586 (setting forth the duties of a United States Trustee).  The U.S. Trustee is also authorized to file comments with the court and, if appropriate, objections to fee applications for compensation and reimbursement under section 330.  *See* 28 U.S.C. § 586(3)(A)(ii).  To facilitate its review, the United States Trustee's office has promulgated guidelines to be uniformly applied to all cases unless the circumstances warrant different treatment.

> All applications should include sufficient detail to demonstrate compliance with the standards set forth in 11 U.S.C. § 330.  The fee application should also contain sufficient information about the case and applicant so that the Court, the creditors, and the United States Trustee can review it without searching for relevant information in other documents.

UST Guidelines ¶ (b); 28 U.S.C. § 586(3)(A)(i).  The UST Guidelines require information about the applicant and the application and case status; the preparation of a summary sheet; a prescribed billing format; and standards for reimbursement of actual, necessary expenses.  To facilitate the effective review of the application, all time and service entries should be arranged by project categories.  UST Guidelines ¶ (b)(4)(i).

Standing Order M-389 complements the UST Guidelines.  Under the Order, the professional must certify that (a) the professional has read the application; (b) the fees and disbursements satisfy Order M-389 and the UST Guidelines, to the best of the professional's knowledge, information and belief formed after a reasonable inquiry; (c) the fees and disbursements (if they are permitted by Order M-389 and the UST Guidelines) are in accordance with the practices customarily employed by the professional and are generally accepted by the professional's other clients; and (d) the professional is not making a profit on any reimbursable service.  Order M-389 at ¶ A(1); *see also* Order M-151 at ¶ B(1).

## 2.    Rule 2014(a): Verified Statements For Professionals Retained Pursuant To Section 327.

Under the Code, professionals retained pursuant to section 327 must file a verified statement setting forth the professional's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants. Fed. R. Bankr. P. 2014(a). The purpose of this rule is to ensure that the professional is disinterested and does not hold an adverse interest to the estate. *See* § 327(a); *see also* 2 Norton Bankr. Law and Practice ¶ 30.4 (Hon. William L. Norton, Jr. and William L. Norton III eds., 3d ed. rev. 2009) (discussing disinterestedness requirement). Failure to make the required disclosure may result in a reduction or denial in a fee request or, if appropriate, a sanction. *See In re LSS Supply Inc.*, 247 B.R. 280 (Bankr. D. Ariz. 2000).

## 3.    Rule 2016(a): Payments Made Or Promised In Connection With The Case.

Fee applications are also subject to Bankruptcy Rule 2016. Under it, professionals seeking interim or final compensation or reimbursement of expenses must file an application containing a detailed statement of the services rendered, time expended and expenses incurred, and the amounts requested. Fed. R. Bankr. P. 2016(a). The professional must additionally include:

> [A] statement as to what payments have theretofore been made or promised to the applicant for services rendered ... in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised, whether any compensation previously received has been shared and whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefore, except that details of any agreement by the applicant for the sharing of compensation as a member or regular associate of a firm of lawyers or accountants shall not be required.

*Id.*

## 4.    Section 329 Attorney Disclosures.

Attorneys have an additional disclosure obligation under section 329(a) to file with the court "a statement of the compensation paid or agreed to be paid, if such payment or agreement" was made within one year prior to the debtor's petition. 11 U.S.C. § 329(a); *see* Fed. R. Bankr. P. 2016(b). This obligation applies to all attorneys who have represented the debtor "in a case under this title, or in connection with such a case." The requirement is independent of the attorney's decision to seek compensation from the court. *Id.* Some courts have denied *all* fees to any attorney who fails to make the proper disclosure. *E.g.*, *In re Downs*, 103 F.3d 472 (6th Cir.

1996) (upholding sanctions and total disgorgement of retainer); *In re Futuronics Corp.*, 655 F.2d 463 (2d Cir. 1981) (decided under precursor to Rule 2016).

Without the section 329 disclosure, the court or an interested party may be unable to determine whether a retained professional's fee request for post-petition services is reasonable in light of pre-petition services already provided.  In addition, a court that finds the attorney has received an unreasonable amount in pre-petition fees may require the attorney to return those fees.  *Id.*; *see also*, § 329(b).

### General Ethics Rules

Fees are also subject to state ethics rules, including the New York Rules of Professional Conduct 1.5 (2009) ("Rule 1.5").  Under Rule 1.5, attorneys are prohibited from charging excessive fees.  A fee is excessive when "after a review of the facts, a reasonable lawyer would be left with a definite and firm conviction that the fee is excessive."  Factors used in making this determination may include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent or made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

These factors are not exclusive.  *See* Rule 1.5 cmt [1].  Significantly, many of these factors overlap with the section 330(a) standards and the factors subsumed by the lodestar calculation.  *See supra* at 9-10.  Rule 1.5 also prohibits attorneys from charging illegal fees, including fees prohibited by law or rule of court or fees based on fraudulent billing.  A billing is fraudulent if it is knowingly and intentionally based on false or inaccurate information.  *See* Rule 1.5 cmt [1A].

With respect to costs, the American Bar Association has interpreted Model Rule 1.5 to prohibit a lawyer from profiting from the reimbursement of out-of-pocket expenses.  A lawyer may not charge more than the direct cost of services like photocopying plus a reasonable allocation of costs directly attributable to the service—for example, personnel costs.  ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 93-379 (1993).

### Commentary on Fee Requests and Procedures in Larger Chapter 11 Cases

There has been an ever increasing number of Chapter 11 bankruptcies and, in particular, large Chapter 11 bankruptcies.  Business filings for the first half of 2009 increased by 64 percent over the same period in 2008.  *See* Press Release, American Bankruptcy Institute, Total U.S. Bankruptcies in First Half of 2009 up 36 Percent over First Half of 2008; Chapter 11 Business Filings Increase 113 Percent (Aug. 13, 2009).  In fact, 2009 had the third largest total of Chapter 11 and Chapter 7 filings by publicly-traded companies in history.  Press Release, BankruptcyData.com, 2009 3rd Largest All-Time Bankruptcy Count (Jan. 6, 2010).  The overall number of Chapter 11s in 2009, compared to 2008, rose by 50 percent to 15,189 filings.  Diane

Davis, *Bankruptcy Statistics: Bankruptcy Filings in 2009 Increase 31.9 Percent over Last Year, AOUSC Says*, Bankr. L. Daily, Mar. 3, 2010, at d6.  The increasing number of those petitions has coincided with increasing academic and media commentary that bankruptcy professionals' fees should be scrutinized more thoroughly and possibly contained.

There is some empirical support, though not uncontested, for the proposition that courts do not often reject professionals' retention or significantly reduce the amounts sought in fee applications.  *See Corporate Reorganization* at 77-78, 99, 101; *see also Routine Illegality in Bankruptcy Court, Big-Case Fee Practices*, 83 Am. Bankr. L.J. 423, 425 (2009) (fee reductions reportedly average just over one percent of fees requested).  That same study found no significant measurable effect on the costs of a Chapter 11 bankruptcy from the participation of a fee examiner or auditor.  *See Corporate Reorganization* at 108.

Some commentators have attempted to identify procedural mechanisms in large Chapter 11 cases that they believe impede a court's ability to review professionals' fee applications and that, they allege, contravene the express statutory language of the Bankruptcy Code and Rules.[24]  *E.g.*, *Routine Illegality* at 423-30.  This criticism itself is immune neither from criticism nor rebuttal.  *E.g.*, Martin J. Bienenstock *et al.*, *Response to Routine Illegality in Bankruptcy Court, Big-Case Fee Practices*, 83 Am. Bankr. L.J. 549 (2009).

Whether or not fixed interim payments pending court approval meet the requirements of section 331 is not always an academic question.  Although disburse-first orders often include a "hold-back," *e.g.*, Compensation Order, and courts have the authority to order disgorgement of fees later determined to have been improvidently approved, 11 U.S.C. § 330(a)(5), it is conceivable that this may not adequately protect the estate.  *See Routine Illegality* at 465-66 (discussing a $10 million fraud by a consulting firm paid, in part, through disburse-first orders and that later filed for bankruptcy itself).

Monthly disbursements pending later court approval is not a new practice.  A survey conducted by American Bankruptcy Institute's Committee on Professional Compensation between 1989 and 1991 found instances of the practice 20 years ago.  *See* American Bankruptcy Institute National Report on Professional Compensation in Bankruptcy Cases 106-107 (G. Ray Warner reporter, 1991).  Indeed, one of the principal cases cited for the proposition that the Code permits disbursements pending later approval is from 1988.  *In re Knudsen*, 84 B.R. 668, 669 (B.A.P. 9th Cir. 1988).

This is not the place to continue, let alone take sides in, the academic discussion.  It is enough to note the obvious:  that the debate will continue, growing in intensity as the cases and the professional fees grow larger, and that the bankruptcy courts will continue, case-by-case, to exercise their statutory responsibility to determine the reasonableness of professional fees.

---

[24] There may be other structural issues as well.  Some courts, for example, have identified factors they believe reduce the likelihood that counsel for a party will raise an objection to another professional's fee request.  *Busy Beaver*, 19 F.3d at 843 (citing cases discussing the effect of perceived professional courtesy, the fear of retaliation and questions of cost effectiveness).

**Conclusion**

Fee review and approval are governed primarily by the Bankruptcy Code.  Pursuant to sections 328, 330 and 331, the court is authorized to retain and compensate professionals on reasonable terms.  A reasonableness review pursuant to section 330 must consider statutory factors contained in that section as well as case law interpretations, local rules and U.S. Trustee-issued guidelines.

More than 30 years have passed since Congress revisited, comprehensively, the system and standards for retaining and compensating professionals in Chapter 11 reorganizations.  The remarkable events of the last 18 months, affecting the national economy and the largest American corporations, may lead to yet another review.  For now, notwithstanding media attention or academic commentary, the standards are relatively straightforward and transparent. They still require, inevitably, an exercise of informed judgment—by the professional, the U.S. Trustee, a fee examiner if there is one and, ultimately, the court.

4553342_6