1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026 (REG)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


MOTORS LIQUIDATION COMPANY, et al.,

f/k/a GENERAL MOTORS CORP., et al.,


            Debtors.


- - - - - - - - - - - - - - - - - - - -x


            U.S. Bankruptcy Court

            One Bowling Green

            New York, New York


            April 8, 2010

            9:46 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2  HEARING re Application to Employ Caplin & Drysdale, Chartered

3  as Counsel to the Official Committee of Unsecured Creditors

4  Holding Asbestos-Related Claims Nunc Pro Tunc to October 6,

5  2009 [Docket Nos. 5302 and 5304]

6

7  HEARING re Application to Employ Stutzman, Bromberg, Esserman &

8  Plifka, P.C. as Counsel to the Legal Representative for Future

9  Asbestos Personal Injury Claimants [Docket No. 5275]

10

11  HEARING re Request of William Hardee for Payment of

12  Administrative Expenses [Docket No. 4539]

13

14  HEARING re Motion of Sang Chul Lee and Dukson Lee for Relief

15  from the Automatic Stay, filed by Michael S. Kimm [Docket No.

16  3023]

17

18  HEARING re Motion of Sang Chul Lee and Dukson Lee to File Proof

19  of Claim After Claims Bar Date, or Alternatively, to File

20  Amended Proof of Claim [Docket No. 5328]

21

22  HEARING re Motion of Stanley R. Stasko for Relief from the

23  Automatic Stay [Docket No. 5151]

24

25

3

1

2      HEARING re Motion Pursuant to Sections 105 and 1109 of the

3      Bankruptcy Code for an Order Appointing Dean M. Trafelet as

4      Legal Representative for Future Asbestos Personal Injury

5      Claimants [Docket No. 5214]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      Transcribed By:  Clara Rubin

25

4

1

2      A P P E A R A N C E S:

3      WEIL GOTSHAL & MANGES LLP

4            Attorneys for the Debtors

5            767 Fifth Avenue

6            New York, NY 10153

7

8      BY:   JOSEPH H. SMOLINSKY, ESQ.

9

10     BUTLER, WOOTEN & FRYHOFER, LLP

11           Lead Attorneys in the Personal Injury Case

12           2719 Buford Highway

13           Atlanta, GA 30324

14

15     BY:   GEORGE W. FRYHOFER III, ESQ.

16

17     CAPLIN & DRYSDALE

18           Attorneys for Official Committee of Unsecured Creditors

19            Holding Asbestos-Related Claims

20           One Thomas Circle, NW

21           Suite 1100

22           Washington, DC 20005

23

24     BY:   TREVOR W. SWETT, ESQ.

25

5

1

2    CAPLIN & DRYSDALE

3         Attorneys for Official Committee of Unsecured Creditors

4          Holding Asbestos-Related Claims

5         375 Park Avenue

6         New York, NY 10152

7

8    BY:S  ELIHU INSELBUCH, ESQ.

9

10   HAHN & HESSEN LLP

11        Attorney for William Hardee

12        488 Madison Avenue

13        New York, NY 10022

14

15   BY:   JOSHUA I. DIVACK, ESQ.

16        HURIA N. PATWARDHAN, ESQ.

17

18   JAMES C. MORTON, P.C.

19        Attorneys for William Hardee

20        Two Midtown Plaza

21        13449 West Peachtree Street, Suite 1350

22        Atlanta, GA 30309

23

24   BY:   JAMES C. MORTON, ESQ.

25

6

1

2    KRAMER LEVIN NAFTALIS & FRANKEL LLP

3         Attorneys for the Official Committee of Unsecured

4          Creditors

5         1177 Avenue of the Americas

6         New York, NY 10036

7

8    BY:   THOMAS MOERS MAYER, ESQ.

9          JENNIFER R. SHARRET, ESQ.

10

11   STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

12        Attorneys for Ad Hoc Committee of Asbestos Personal

13         Injury Claimants

14        2323 Bryan Street, Suite 2200

15        Dallas, TX 75201

16

17   BY:   SANDER L. ESSERMAN, ESQ.

18

19   U.S. DEPARTMENT OF JUSTICE

20        Office of the United States Trustee

21        33 Whitehall Street, 21st Floor

22        New York, NY 10004

23

24   BY:   ANDREW D. VELEZ-RIVERA, ESQ.

25         LINDA A. RIFFKIN, AUST

7

1

2    U.S. DEPARTMENT OF JUSTICE

3         U.S. Attorney's Office

4         86 Chambers Street

5         3rd Floor

6         New York, NY 10007

7

8    BY:   JOSEPH N. CORDARO, AUSA

9

10   GODFREY AND KAHN

11        Attorneys for Examiner, Brady Williamson

12        One East Main Street

13        Suite 500

14        Madison, WI 53701

15

16   BY:   KATHERINE STADLER, ESQ. (TELEPHONICALLY)

17

18   STANLEY R. STASKO, Creditor (TELEPHONICALLY)

19

20

21

22

23

24

25

8

P R O C E E D I N G S

1           THE COURT:  Okay, GM.

2           Mr. Smolinsky, good morning.  I understand we have

3    five disputed matters today.  I have tentatives on all of them.

4    In my view, about four of them will merit argument; about three

5    of them will merit material argument; tentatives, of course

6    California style, based upon my review of the briefs.  I gather

7    you may also have a few undisputed matters.  I want to handle

8    the lien matters last, but other than that I'm flexible in

9    terms of order.  Do you have a recommendation for me?

10          MR. SMOLINSKY:  Good morning, Your Honor.  Joe

11   Smolinsky of Weil, Gotshal & Manges, for the debtors.  We

12   normally handle contested matters first, but I think this

13   morning it might make sense to handle the two uncontested

14   matters and get them out of the way and then move on to the

15   contested matters.

16          THE COURT:  Sure.

17          MR. SMOLINSKY:  Your Honor, the first uncontested

18   matter is the motion of the debtors to appoint Dean Trafelet as

19   the legal representative for the future asbestos personal

20   injury claimants.  The debtors have spent a fair amount of time

21   with the committee, trying to figure out the best way to handle

22   asbestos claims in this case.  In our view, asbestos is not the

23   driving force in this case, but it's something that we do need

24   to deal with and do want to deal with, and that includes not

9

1   only existing manifestations but also future claims.

2       What we had -- we had talked about the possibility of

3   a subcommittee of the committee, but after dialogue with the

4   U.S. Trustee, the U.S. Trustee has decided to appoint a

5   committee, an official committee, of existing claimants.

6       In order to have a representative for future claimants

7   in order to negotiate a plan of reorganization which allows us

8   to set up a trust in order to allow distributions in a long

9   time in the future to future claimants, we feel it would be

10  appropriate to appoint a future claims representative to

11  participate in that negotiation, to hire its own experts, to

12  look at the debtors' analysis of the asbestos liability, both

13  present and future, and to negotiate an amount that would

14  provide a pro rata portion of the assets that are available for

15  distribution to creditors, to present and future claimants.

16      Mr. Trafelet has a long history of experience with

17  asbestos claims.  He served as a judge for many years and

18  handled -- I believe it was over 35,000 asbestos cases, and

19  since then has represented future claimants in a number of

20  large restructurings, including Armstrong.  He's a well-known

21  quantity.  He -- we believe that he will serve the futures well

22  and will participate to get to a consensual plan in this case

23  as quickly as possible.

24      THE COURT:  All right, and I gather there's no

25  opposition and there's a consensus that it's a constructive

10

1    thing to do?

2         MR. SMOLINSKY:  That's right, Your Honor.

3         THE COURT:  Granted.

4         MR. SMOLINSKY:  Thank you, Your Honor.  The second and

5    last uncontested matter is an application by the official -- by

6    the future asbestos personal injury claimants to retain

7    Stutzman, Bromberg, Esserman & Plifka as our counsel.

8         THE COURT:  Yeah, I see Mr. Esserman out there.

9    Mr. Esserman, we know each other.

10        MR. ESSERMAN:  Yes, Your Honor.

11        THE COURT:  Fine.  Come on up, but I don't know if I

12   need a lot of time from you, Mr. Esserman.  Am I correct that

13   it's unopposed and that there's consensus that you're fine?

14        MR. ESSERMAN:  Yes, Your Honor, and we've got an order

15   that's been negotiated with the U.S. Trustee that the U.S.

16   Trustee signed off and approved.

17        THE COURT:  All right, you're retained.

18        MR. ESSERMAN:  Thank you.

19        THE COURT:  Granted.

20        MR. SMOLINSKY:  Your Honor, again, Joe Smolinsky.  The

21   first contested matter is a motion -- an application by the

22   official committee of asbestos claimants to retain Caplin &

23   Drysdale as their counsel.  There is one opposition to that

24   interposed by the United States Trustee.

25        THE COURT:  Right, and I see Mr. Velez-Rivera and Mr.

11

1      Inselbuch here.

2              Gentlemen, you can come on up, but then once you do

3      I'd like you to sit down.  I have some preliminary comments.

4              MR. VELEZ-RIVERA:  Andrew Velez-Rivera for the U.S.

5      Trustee.

6              THE COURT:  Mr. Inselbuch, you're just going to sit

7      right back there until it's your turn to be heard?

8              MR. INSELBUCH:  I would introduce to you my partner

9      Mr. Swett who will be addressing you today.

10             THE COURT:  Oh, okay.  Was that Swett?

11             MR. SWETT:  Swett, Your Honor.

12             THE COURT:  Okay, thank you.

13             Give me a second.

14         (Pause)

15             THE COURT:  I see it.  Okay.

16             Folks, make your arguments as you see fit, but my

17     tentative, subject to people's rights to be heard, is that one

18     way or another Caplin & Drysdale deserves to be compensated for

19     the reasonable value of its services for sometime earlier than

20     the time that the asbestos committee was formed, either at the

21     beginning of January or back through October.  But before we

22     get into that, and what I want you to address, I'd like both

23     sides to discuss whether this is a tempest in a teapot.  Isn't

24     the situation we have, where services were performed between

25     October and January and then through March, the paradigmatic

12

1    example of a substantial contribution for which counsel would

2    be compensable -- or counsel services would be compensable

3    anyway under 503(b)(3), what we have, subject to your rights to

4    be heard -- and you're telling me that I just missed an obvious

5    fact is you had a creditor -- I think his name is Buttitta; I

6    may have -- my handwriting isn't as good as it should be; I may

7    have gotten it wrong -- on whose behalf -- or on behalf of

8    himself and his counsel, Caplin & Drysdale performed services

9    that benefited the estate, performed a job that it needed to

10    do, and it did so not as a volunteer but because the debtors

11    and the creditors' committee found it constructive.

12        Now, if that's true -- I'm not sure if Caplin &

13    Drysdale cares how it gets paid, but it seems to me that the

14    services were of a benefit to the estate, unless, Mr. Velez-

15    Rivera, you're contending that as a matter of fact, as

16    contrasted to as a matter of law, they weren't.

17        But -- so I want both sides to help me understand if I

18    really need to decide the issue upon which you spend so much

19    time in your briefing.  But assuming that I do, then I want you

20    to slice and dice these issues a little bit.  If the U.S.

21    Trustee had formed a subcommittee of asbestos claimants instead

22    of a full-blown committee -- a subcommittee would have been my

23    preference, but I wouldn't suggest that the U.S. Trustee's

24    Office abused its discretion by deciding how to do it -- we

25    wouldn't have this issue, because it would be a no-brainer/slam

13

1    dunk that the Keren standards would have been satisfied and we

2    would have been going retroactive.

3         So does this alternative form by which the interests

4    of asbestos claimants are being advanced cause lawyers who did

5    something useful, and not as volunteers, to be thrown out of

6    consideration?  I don't think your textual analysis, Mr. Velez-

7    Rivera, subject to your right to be heard, gets me that far.

8    Of course the asbestos committee couldn't appoint a counsel

9    before it existed, but nowhere in the Code does it expressly

10    address nunc pro tuncs, and that's why we have the Keren

11    analysis.  And I assume everybody's going to talk about Keren

12    and whether the facts we have here are extraordinary or not.

13         In ten years I've never encountered a situation like

14    this.  I think they're pretty extraordinary, and so everybody

15    can argue about whether they're extraordinary enough.  And I

16    think, under the circumstances, what I would like is to hear

17    from you first, Mr. Velez-Rivera, even though it's the Caplin &

18    Drysdale firm's retention application.  And then I'll give Mr.

19    Swett a chance to respond, you a chance to reply, Mr. Velez-

20    Rivera, and Mr. Swett a chance to surreply.  Come on up,

21    please.

22         MR. VELEZ-RIVERA:  Thank you.  Andrew Velez-Rivera for

23    the United States Trustee.  Your Honor, this may be one of

24    those days when form and substance actually get juggled a

25    little bit.  My office's mission today, if any, is to ensure

14

1    the integrity of the Bankruptcy Code and of the particular

2    statutes that we're dealing with.  The firm's compensation, as

3    far as my office is concerned, for the period between October

4    and March is actually subsidiary to the sanctity of 1103 and

5    the Keren analysis, if anything else.

6            THE COURT:  Would you pause, please, Mr.

7    Velez-Rivera --

8            MR. VELEZ-RIVERA:  Yes, Judge.

9            THE COURT:  -- because what you say doesn't surprise

10   me in the slightest.  I assumed that was where you were coming

11   from.

12           So if I decide this as a 503(b)(3), do you care?

13           MR. VELEZ-RIVERA:  I care less, Your Honor, because

14   they can file a 503(b) if and when that day comes.  This is a

15   case that's very closely watched, as far as my client is

16   concerned.  Having a retroactive employment order would,

17   precedent -- for precedential matters in other cases, be a harm

18   to the bankruptcy system.

19           Your Honor, we -- and this application has to be taken

20   in a larger context.  We've seen several applications in my

21   office, and we see them all in Chapter 11, which have been

22   pushing the law of retentions very progressively over about the

23   last couple of years.  This may be a byproduct of the bad

24   economy; it probably is.  This application is part of that

25   trend.  Sometimes we can engage in legal fictions to make the

15

1    bankruptcy system work, Your Honor, and we do that with the

2    changing times, but this is not one of those occasions.  We

3    would prefer that there not be the legal fiction of a

4    retroactive employment order to a time when counsel to the

5    asbestos committee just didn't have a client, didn't have

6    anybody official with whom to have an attorney-client

7    relationship, didn't have fiduciary duty to a client that

8    didn't yet exist.  As far as my client is concerned, Judge,

9    those legal fictions, if we have to engage in them, would be

10   far too heavy for the bankruptcy system to bear.

11        We would rather preserve Section 1103(a) as it is and

12   avoid headaches, in this case and others, than treating it as a

13   503(b) matter that gets decided at some point at the end of the

14   case.

15        THE COURT:  Well, do I need to decide it at the end of

16   the case, or can I decide the 503(b) matter as soon as I have

17   enough evidence to determine whether a substantial contribution

18   has been made, which I think I could probably do either today,

19   unless there were material disputes of fact, or in the next

20   week or two?  And I guess an issue that I'm going to ask both

21   you and Mr. Swett to address is whether I can:  get Caplin &

22   Drysdale retained today for the period as to which you agreed

23   they should be retained; reserve the issue of the extent to

24   which it appropriately could go nunc pro tunc; rule either

25   immediately or as soon as due process requires under their

16

1    503(b)(3) requirement and, if turns out that the issue becomes

2    moot, never have to deal with the issue that causes you

3    concern.

4         MR. VELEZ-RIVERA:  And that may -- and that may well

5    end up being the end result, Your Honor.  I don't -- we

6    wouldn't be adverse to the entry of a retention order beginning

7    on March the 5th, which was the day that the committee was

8    appointed.  As far as the compensation of the firm is

9    concerned, we could take it under 503(b); we have no problem --

10   the U.S. Trustee has no problem with that.  We don't think

11   there's enough evidence in the record for that issue to be

12   decided today.  We dangled out there the notion that the firm

13   should file its fee application -- its time records for the

14   period between October and March so that we could see what they

15   did, and that would have fulfilled part of their Keren showing.

16   They didn't take the bait.  They would rather have us -- have

17   you and I not see what it was that they did.

18        We don't know what the extraordinary circumstances

19   were between October and March; we just don't know.  They said

20   it a few times in the brief, but saying it just doesn't make it

21   as far as we're concerned.  If the Court would prefer to retain

22   the firm as of today, give the firm leave to file a 503(b)

23   application with time records just like everybody else and with

24   a presentation of the applicable legal standards, I have no

25   problem with that.

17

1        THE COURT:  Um-hum.  Do you want to give me any

2   further legal argument after they filed their reply, beyond

3   what you put in your brief?

4        MR. VELEZ-RIVERA:  I have a few comments, Your Honor.

5   We still posit that the firm, in its reply, did not point to

6   any authority for hiring committee's counsel before the

7   committee was appointed.  It's not in Section 1103(a) or

8   anywhere else in the Code, and I know you may differ at this

9   point, Your Honor, but just as the Code has no authority for a

10  debtor-in-possession's lawyer to be hired before the day the

11  order for relief is entered, just as --

12       THE COURT:  Well, that's a little different, because

13  then you have no bankruptcy.

14       MR. VELEZ-RIVERA:  Well, Your -- but then that lawyer

15  has no client, just like this.

16       THE COURT:  But post hac -- I forgot the Latin.  The

17  fact that it happens afterwards does not necessarily mean that

18  it's causally related by whatever happened before it.

19       MR. VELEZ-RIVERA:  Understood, Your Honor.

20       THE COURT:  There are at least two reasons why your

21  other analogy might be perfectly sound intellectually, but this

22  one doesn't necessarily follow from it.

23       MR. VELEZ-RIVERA:  Okay.  I'll move on.  Your Honor,

24  the firm -- the firm's reply brief put in two cases, SWG Realty

25  and Service Merchandise, for the proposition that committee

18

1    counsel can be employed prior to the date of the formation of a

2    committee, but those are actually back-end fee cases where the

3    deed had already been done.  They aren't -- they weren't front-

4    end retention cases such as this one.

5         Your Honor, we think that, as far as Keren is

6    concerned, the biggest difficulty that the firm has is that --

7    is actually one of delay.  It's one thing for us to process the

8    usual two- or three-week nunc pro tunc retention order, but

9    this is six months at this point.  And that underscores the

10   difficulty of the exercise.

11        THE COURT:  Yeah, but forgive me, Mr. Velez-Rivera,

12   and I know your office, especially in this environment, has

13   plenty of work to do, and I don't fault you for taking the time

14   you need to do the work you do, except when you say the other

15   guy is guilty of delay, but can you help me understand -- and I

16   don't know if I need an evidentiary hearing on this at this

17   juncture, I'd just as soon hear counsel's representations to me

18   how it took (a) between October and approximately January to

19   come to the view on the part of the U.S. Trustee's program that

20   a subcommittee wouldn't skin the cat and that you needed to

21   have an official committee, and, perhaps more importantly,

22   between January and March, when somebody had decided that you

23   wanted to go the full-committee route than the subcommittee

24   route and it took two months for the U.S. Trustee's Office to

25   form -- I think it was March 11; don't hold me to the exact

1    date --

2            MR. VELEZ-RIVERA:  The 5th.

3            THE COURT:  I'm sorry?

4            MR. VELEZ-RIVERA:  The 5th.

5            THE COURT:  Forgive me.  -- the actual asbestos

6    committee.  That's about two months, more or less.  And it's a

7    time during which, at least arguably, the Caplin & Drysdale

8    firm is out there hanging out to dry.

9            MR. VELEZ-RIVERA:  Your Honor, I think I should dispel

10   first of all the notion that my office knew about the

11   subcommittee idea back in October.  As best we can reconstruct

12   the facts, we knew in January.  We had a draft motion for the

13   appointment of subcommittee, which we all saw, we commented on.

14   That was what came into the office in January; it wasn't

15   October.

16           We commented, as best we can recall, towards the --

17   maybe -- it might have been, like, the third week or the fourth

18   week in January -- we needed at that point in my office to re-

19   solicit entirely.  We -- I was the one who actually went back

20   and reviewed all of the old creditors' committee acceptance

21   forms from last summer.  There were no asbestos claimants that

22   were available for service, that -- who we hadn't already

23   solicited.  From the parties, many of whom are here in the

24   courtroom, we went out and we re-solicited; that takes time,

25   because it generally had to be done by mail.  We got those into

20

1    the office, and we appointed the committee as soon as we could.

2    There was actually, at best, four or five weeks between the

3    time we got back to the parties and told them that we would

4    prefer the appointment of an official committee rather than a

5    subcommittee, for which we didn't find too much authority in

6    the Bankruptcy Code.  And four to five weeks during a re-

7    solicitation is about what it takes, Your Honor.

8         THE COURT:  Those also make pretty good reasons to me,

9    Mr. Velez-Rivera, but then what causes me to scratch my head,

10   and where I need your help, is why I would penalize a law firm

11   that was performing services that the estate cared about during

12   that period of time.

13        MR. VELEZ-RIVERA:  Your Honor, we weren't aware of the

14   firm's involvement until we actually had their -- this

15   application in our -- until it came across the transom.  We had

16   no idea that the firm was working.  We knew that the debtor had

17   timing goals for the filing of a plan, but we also knew,

18   because we were discussing the very governance structures that

19   needed to be put in place to get there, that the plan wasn't

20   going to happen any time soon.  As far as my office is

21   concerned --

22        THE COURT:  But that kind of tells me that you guys

23   aren't being mean or arbitrary, but by the same token I still

24   am not persuaded why the law firm should be the victim of that.

25        MR. VELEZ-RIVERA:  As I mentioned to you, Your Honor,

21

1    we're not trying to victimize a law firm.  What I -- my first

2    priority is to actually ensure the integrity of Section

3    1103(a).  They can file a 503(b), and there's a very good

4    chance that if they can demonstrate that their services were

5    necessary, that they won't meet with an objection from my

6    office, assuming they also have the standing to bring it.

7    We're not trying to penalize the firm --

8          THE COURT:  Well, I think in the strictest --

9          MR. VELEZ-RIVERA:  -- for its work there.

10         THE COURT:  -- sense -- I assume Mr. Buttitta's still

11    in the picture.  I mean, it's his presence and the fact that he

12    and other asbestos claimants are benefiting from the services

13    and then, therefore, the estate as a whole, because I think

14    their institutional needs to get a plan finalized that likely

15    got the attention of the debtors and the creditors'

16    committee -- if there is some statutory reason why my concept

17    is analytically unsound, I'd rather the people tell me that now

18    rather than have me do something that in retrospect isn't

19    workable.

20         You're unaware of any problems with the 503(b) process

21    now, but you just want to have -- reserve the right to think

22    about it?  Or exactly where are you in that?

23         MR. VELEZ-RIVERA:  Uh --

24         THE COURT:  You want to caucus with Ms. Riffkin for a

25    minute?

22

1      MR. VELEZ-RIVERA:  May I?  Thank you.

2      THE COURT:  Yeah.

3      (Pause)

4      MR. VELEZ-RIVERA:  Your Honor, like I said before, and

5  I have consulted with Ms. Riffkin, we have no problem with the

6  firm's retention as of March the 5th.  A 503(b) application is

7  a very tangible thing.  We need to see the application to

8  assess whether the applicant actually has the standing to bring

9  it; not everybody does.  And we also need to see whether the

10  services performed were reasonable, necessary, actual and of

11  benefit to the estate.  So as far as the 503(b) part of this

12  equation is concerned, we need to see it.

13      When I told the Court that as far as Keren is

14  concerned we don't know what the firm did, it's actually

15  because we don't have their time records, and we didn't know

16  that the firm was around before it filed an application.  We

17  really didn't know that it was around; we didn't know what it

18  was doing.  I don't have any time records.  I have nothing

19  tangible with which to assess the services that are there.

20      THE COURT:  All right, thank you.

21      MR. VELEZ-RIVERA:  Thank you.

22      THE COURT:  Mr. Swett?

23      MR. SWETT:  Good morning, Your Honor.  Trevor Swett,

24  Caplin & Drysdale, for the official committee of unsecured

25  creditors holding asbestos-related claims.  I will address

23

1    myself first to the question you posed regarding whether the

2    path of least resistance, legally or in the situation we find

3    ourselves in, facing the United States Trustee's objection,

4    wouldn't be a substantial contribution application.

5            I have no problem in principle with going that route,

6    Judge.  I would point out that it will take time and money to

7    prepare that application, and that the substance of the matters

8    is already joined in the retention application, and for reasons

9    that I'll now turn to with Your Honor --

10           THE COURT:  Pause, please, Mr. Swett.  If you wanted

11   to be paid as an ordinary estate professional under 1102 or

12   1103 of the Code -- I forgot the section -- you'd have to give

13   me your timesheets and show me what you did anyway, or at

14   least -- I think it's no secret that I don't give fee apps a

15   lot of review except when I have a case or controversy

16   concerning them, other than the minimal amount necessary to

17   perform my judicial responsibilities.  But one way or another

18   you'd have to give at least the U.S. Trustee's Office and

19   parties-in-interest your time records anyway, wouldn't you,

20   subject only to perhaps redaction for privilege and work

21   product and the like?

22           MR. SWETT:  Precisely, Your Honor, and that's what we

23   anticipated doing in the normal course of the fee application

24   process under the administrative rules in the case.  As I say,

25   we have no problem going the route of a substantial

24

1    contribution application supported by redacted time records,

2    and we would consult with the United States Trustee in advance

3    in order to obviate, if we could, any concerns on their part.

4    This is certainly not about hiding what we were doing between

5    October and March; far from it.

6         Passing to the basis of the present application --

7         THE COURT:  Well, then pause, please.  It's partly my

8    style in running the big cases on my watch, but it's also kind

9    of an expectation that I have that people talk to each other.

10   Is there some reason why you didn't just give the U.S.

11   Trustee's Office your redacted time records?

12        MR. SWETT:  Your Honor, we were approaching this as a

13   retention application in the expectation that we would be

14   provided our time records in due course.  The descriptions

15   provided in the briefs are as follows:  First, in the period

16   October until the end of the --

17        THE COURT:  I read the briefs --

18        MR. SWETT:  Okay.

19        THE COURT:  -- Mr. Swett.  Move on beyond that.

20        MR. SWETT:  Okay.  We have no objection to providing

21   the redacted time records in any context, whether it be in

22   supplementation of the present application in support of a

23   503(b), or in the usual course of events in the fee application

24   process.  And we certainly anticipated at all times that our

25   redacted fee rec -- time charges would be scrutinized in the

25

1    normal way as the cycle works itself through.

2            THE COURT:  Okay.

3            MR. SWETT:  If --

4            THE COURT:  You had the last brief, and you heard what

5    Mr. Velez-Rivera said today.  Do you have anything to add on

6    your legal argument?

7            MR. SWETT:  I do, Your Honor.  The threshold argument

8    made by the United States Trustee is that retention of

9    committee counsel as of a date prior to committee formation

10   would be fatally inconsistent with 1103(a) and that this

11   compels the Court to embrace a per se rule that that can never

12   happen.  We think that the statutory reference is the wrong

13   one.  The correct one is Section 328, which speaks to the terms

14   and conditions of employment that a committee may apply in

15   retaining counsel, with the approval of the Court, on

16   reasonable terms.  And that gets you into the basis for the

17   Keren analysis, which is the Court's discretion to supervise

18   the retention process, including the effective date of the

19   retention.

20           In an area governed by the Court's discretion, it

21   would be inconsistent ever to say never, unless the statute

22   says never, which it doesn't.  In other words, the Court's role

23   under Section 328 in supervising the terms and conditions of

24   employment of committee counsel give you ample scope to decide

25   in your discretion guided by the Keren factors whether the

26

1    circumstances here warrant the reach-back to October.  This is

2    a discretion that you routinely apply.  I would call to the

3    attention of the Court and the parties that just recently you

4    approved an application by the debtor to retain the plant

5    accounting firm retroactively to October.  This did not raise

6    the hackles of the United States Trustee or any other party-in-

7    interest.  The exercise of discretion in this area is a usual

8    function of the process.

9         The facts and circumstances have been laid out, and

10   you're obviously very much aware of them.  I would only

11   emphasize that everything that we did was in the context of two

12   facts.  Number one, from October on, we were to act for the

13   asbestos creditors' present claimants' constituency, and that

14   is true in every iteration, in every form that this process has

15   taken.  It was true of the proposed subcommittee; it is true

16   now of the ACC, which includes Mr. Buttitta, represented by his

17   tort counsel Mr. Cooney, and two of the three members of the

18   ACC are Mr. Cooney's client; the third is Mr. Kazan's.  The

19   constituency represented by this now official committee is the

20   very same constituency for whom we have been acting by

21   agreement of the debtor in the unsecured creditors' committee

22   since October.  There is no discontinuity of interest.  We had

23   very much a client and an attorney-client relationship

24   throughout, and we seek to have that, in effect, ratified by

25   the reach-back to October.

27

1          But Section 328 is the statutory basis for the

2    discretion that you must use, and it is not consistent with a

3    rule of law that would say that you could never retain

4    committee counsel retroactive to beyond the point at which the

5    committee was formed.

6          Your Honor, I think that is the essential point.  The

7    other key fact that pervades everything that we did is that we

8    were operating in an environment where the debtor was saying

9    its goal was to confirm a plan of liquidation by April of this

10   year, by the end of April.  Now, estimating asbestos

11   liabilities for present and future claims is a difficult and

12   time-consuming process.  So we were given to understand from

13   the beginning that since the allocation to an asbestos trust

14   would be an essential part of a plan of liquidation here, and

15   since that plan was intended to be confirmed by the middle of

16   April, we had better get on with it.  And there were things to

17   do; there was work to be done:  First, in working with the UCC

18   and the debtor on the terms of an application to create the

19   subcommittee and appoint the FCR; and, second, commencing in

20   January, very substantial, very sensitive questions involving

21   litigation and potential litigation were brought to the fore

22   and presented for the consideration of our client and us by

23   counsel for the UCC on the basis that time was lapsing and we

24   needed to react promptly.

25          Your Honor, unless you have questions for me, I think

28

1    I've covered the bases.

2         THE COURT:  No.  Thank you.

3         Mr. Mayer.

4         MR. MAYER:  I just wanted to confirm that from the

5    perspective of the creditors' committee, first, the facts that

6    were cited in the Caplin & Drysdale application with respect to

7    their dealings with the creditors' committee are correct, and,

8    second, that we support their application.  And I won't take

9    the Court's time further, unless you have questions.

10        THE COURT:  No, I don't.  Thank you.

11        Mr. Smolinsky, do you want to weigh in in any way?

12        MR. SMOLINSKY:  Your Honor, we really take no

13   position.  We are not, obviously, transparent to what went on

14   at the committee.  We obviously think that the asbestos

15   committee, whether it be a subcommittee or a full committee, is

16   important to this process and moving forward.  This is one of

17   the very few gating issues we have to a consensual plan, and we

18   very much want to move it forward.  We are looking forward to

19   working with Caplin & Drysdale and believe that what they've

20   done so far has been constructive to the process.

21        THE COURT:  I understand.  Thank you.

22        Mr. Velez-Rivera, any reply?

23        MR. VELEZ-RIVERA:  Just a very minor one, Your Honor,

24   and it actually is a very, very technical point mentioned by

25   Mr. Swett with respect to the redaction of time records.  My

29

1    office has reserved its rights with respect to the submission

2    of redacted time records.  We get lots -- several redacted time

3    records, and often we're given the opportunity to see the

4    unredacted versions are mildly redacted versions.  I need to

5    reserve my rights on that.  Other than that, nothing, Your

6    Honor.  Thank you.

7            THE COURT:  Okay.

8            Everybody sit in place for a second.

9        (Pause)

10           THE COURT:  All right, ladies and gentlemen, the

11   motion -- or application to retain Caplin & Drysdale is granted

12   nunc pro tunc back at least to March 5th, 2010, with the matter

13   of retroactivity prior to March 5th to be subject to a further

14   evidentiary hearing where I can more closely look at the Keren

15   factors and thereafter consider in the context of that further

16   evidence and more fundamental legal principles, matters as to

17   the legal threshold concerns that were articulated by the U.S.

18   Trustee's Office.  In other words, for the avoidance of doubt,

19   Caplin & Drysdale is authorized to act instantly, or more than

20   instantly, back as of March 5th.  And when I have the benefit

21   of the further evidence and have made a final determination as

22   to the legal-threshold issues, I will then decide whether it

23   should be made further retroactive back to October.

24           I would invite, but not order, Caplin & Drysdale to

25   file a 503(b)(3) application promptly, because it could moot

30

1    out all of the further issues.  I'm also going to direct Caplin

2    & Drysdale to provide redacted time records to the U.S.

3    Trustee's Office so the U.S. Trustee's Office can evaluate the

4    services that were performed both for any Keren analysis, if I

5    ultimately determine that I need to address the threshold legal

6    issue that the U.S. Trustee's Office articulates, and because

7    it would be no less relevant, and perhaps more so, to any

8    503(b)(3) application.

9         The U.S. Trustee's Office's rights to request

10   unredacted entries are reserved, but I'm not ruling today on

11   whether the redactions would have a material effect on the U.S.

12   Trustee's Office's ability to evaluate those applications, or

13   on any other issue related to whether or not redaction is

14   appropriate or not.

15        Not by way of re-argument, are there any open issues,

16   anything I failed to address?

17      (No response)

18        THE COURT:  Hearing none, I'll take the next matter.

19        Mr. Smolinsky, your recommendation on that?

20        MR. SMOLINSKY:  Thank you, Judge.

21        THE COURT:  Oh, Mr. Mayer, you're coming --

22        MR. MAYER:  Yes, Your Honor.  I was expecting to

23   attend just for the purpose of that matter.  Would it be all

24   right if I left the balance of the hearing --

25        THE COURT:  You bet.

31

1          MR. MAYER:  -- to my colleague?

2          THE COURT:  Sure.  Thank you.

3          MR. MAYER:  Thank you.

4          MR. VELEZ-RIVERA:  May I also be excused, Judge?

5          THE COURT:  Yes, Mr. Velez-Rivera.  Same.

6          MR. SWETT:  And I, Your Honor?

7          THE COURT:  Mr. Swett.

8          MR. SWETT:  Thank you.

9      (Pause)

10         MR. SMOLINSKY:  Your Honor, again, Joe Smolinsky from

11     Weil, Gotshal & Manges, for the debtor.  I don't often find

12     myself in this defensive a position at our omnibus hearings.  I

13     think it may make sense to do the Stanley Stasko matter next.

14     I don't know if Mr. Stasko is in the court or on the phone.

15         MR. STASKO:  I'm on the phone.

16         THE COURT:  Okay, Mr. Stasko.  I'll let you be heard

17     first, Mr. Stasko.  I've read all of the papers.  My tentative,

18     California style, is that, Mr. Stasko, I'm going to have to

19     deny your motion for relief from the stay, both by reason of

20     your failure to show that you're entitled to that relief under

21     the Second Circuit Sonnax factors and because you didn't file a

22     proof of claim.  If you want to be heard on the tentative and

23     to present to me any matters that are not set forth in your

24     briefs, by all means do so.

25         MR. STASKO:  Okay, thank you, Your Honor.  I would

32

1    like to begin by thanking you for hearing my motion.  At this

2    time, even though my mental state has improved, it's still not

3    fully back.  So I will just go from notes that I have written.

4    I would like to begin.  I received the General Motors

5    opposition to the motion on April the 2nd, and I since then had

6    a chance to look up some legal references and therefore I'd

7    like to discuss my notes.  The first note that I would like to

8    make would be -- I would like to discuss the burden of proof.

9    According to the Bankruptcy Code, the Bankruptcy Code places

10   burden of proof on the debtor for all issues other than the

11   debtor's equity and property.  I repeat that the Bankruptcy

12   Code places the burden of proof on the debtor, and I cite the

13   Bankruptcy Code Title 11 U.S.C. Section 362(d)(1), Section

14   362(g), Section 362(g)(1).

15        If I may move on, the second thing is that in the

16   debtors' opposition to the motion for my relief of automatic

17   stay on pages 7 and 8, paragraph 16, the General Motors cited

18   the Sonnax Industries v. Tri Com Products.  I --

19        THE COURT:  Right, and that's where I'd like you to

20   put most of your attention, sir.

21        MR. STASKO:  Yes, and that's where I'm going at this

22   time.  The debtors cited twelve factors to be considered when

23   deciding to lift the automatic stay.  I would first like to

24   direct the Court's attention to factor number 9, that quoting

25   factor 9 was that a movant's success in the other proceeding,

33

1     in this case the other proceeding being the civil case in the

2     Eastern -- in the United States District Court, Eastern

3     District of Michigan, would result in a judicial lien.  I would

4     argue that this does apply, because if the -- if the civil case

5     of Stansfield v. General Motors finds in favor of Stasko, then

6     there would be a judicial lien placed on the creditor.

7           THE COURT:  On the creditor?

8           MR. STASKO:  On General Motors.

9           THE COURT:  How would there be a lien on assets of a

10    bankruptcy estate after the filing, Mr. Stasko?

11          MR. STASKO:  I'm sorry, I -- the whole issue of --

12    I'll leave my lit -- I'm not a lawyer -- leave my --

13          THE COURT:  I understand, and I won't interrupt you

14    again.  Why don't you just take the next five minutes to tell

15    me everything you want to tell me?

16          MR. STASKO:  Okay.  And the third point is that now

17    I'd like to direct the Court's attention to factor number 11.

18    Quoting factor 11:  whether the parties are ready for trial in

19    the other proceeding.  As I indicated earlier, I received the

20    debtors' opposition to motion on April the 2nd.  On Saturday,

21    April the 3rd, I express-mailed to the bankruptcy court and to

22    General Motors my response to the debtors' opposition.  Within

23    a few hours of that mailing, I received a notice of motion from

24    the United States District Court, Eastern District of Michigan,

25    requesting -- ordering that I and General Motors appear on

34

1    Monday, April the 12th, 2010 at 2 p.m. to -- for a hearing

2    regarding the request for a clerk entry of default filed March

3    the 19th, and request for the clerk entry of judgment filed

4    March 19th.  This was an admission as taken by the United

5    States District Court, Eastern District of Michigan, itself.

6    Therefore, the district court in Eastern District of Michigan

7    is continuing the trial and proceeding in that trial itself.

8         I did not send to the bankruptcy court a copy of that,

9    because I received that notice just a few hours after I mailed

10   the information to the bankruptcy court, my response to -- my

11   response.  If you would like a copy, I could send a copy of

12   that to you.

13        The third thing is now I would like to direct the

14   Court's attention to factors number 10 and number 1.  Quoting

15   factor number 10:  the interests of judicial economy and the

16   expeditious and economical resolution of litigation.  And

17   quoting factor number 1:  whether relief would result in the

18   partial or complete resolution of the issues.

19        I filed a civil suit against General Motors

20   Corporation in U.S. District Court on December 11, 2009, less

21   than two weeks after the bar date order of November the 30th,

22   2009 establishing -- established by the bankruptcy court.  In

23   nearly the four months since Stasko filed his complaint in U.S.

24   District Court, the defendant General Motors has filed to

25   challenge the complaint made by Stasko.  As mentioned

35

1    previously, Stasko and General Motors Corporation were notified

2    to appear before the Honorable Judge Cook for a hearing on

3    Monday, April the 12th, 2010 at 2 p.m. regarding the request

4    for the clerk's entry of default and request for the clerk's

5    entry of judgment itself.  The relief from the automatic stay

6    would at minimum be a partial resolution of the district -- of

7    the civil suit, because General Motors is contending that the

8    civil suit should not have gone forward.  And depending on the

9    outcome of the district court's hearing on December (sic) the

10   12th, 2010, a more complete resolution or nearly completely

11   resolution of Michigan -- of civil suit of Stasko v. General

12   Motors might be seen as appropriate.

13        Now I'd like to indicate to the Court -- well, those

14   are my arguments from Sonnax v. Tri Com as such, Your Honor.

15        THE COURT:  All right, thank you.

16        I'll hear from the debtors' side now.

17        MR. SMOLINSKY:  Your Honor, I'll be brief.  I think it

18   would be a gross injustice to the estate to grant the motion

19   here.  This motion is based on a post-petition action that was

20   filed in the District Court for the Eastern District of

21   Michigan on December 11, 2009, significantly after the filing

22   of our bankruptcy petition on June 1st, 2009.

23        After being notified of the automatic stay and the

24   failure to file that action, Mr. Stasko did not withdraw the

25   action but, rather, decided to file a motion to seek a default

36

1   judgment against the debtors.  I think that the Court properly

2   acted in setting a hearing for April 12th for the purpose of

3   determining why it is that the Court should be doing anything

4   in this matter.

5        As the -- as Your Honor indicated, Mr. Stasko did not

6   file a proof of claim in this case, and that is a further

7   impediment to him asserting a claim against the debtors.

8        I don't want to get too far into the merits, but I do

9   think that when you look at the balance of harms and some of

10  the other Sonnax factors, it is relevant in part as to whether

11  or not there's a basis to move forward with litigation in the

12  other forum.  I don't know if Your Honor had an opportunity to

13  review the seventy-three page essay that was submitted as part

14  of the district court complaint, which explains Mr. Stas -- the

15  basis for Mr. Stasko's complaints, but you'll note that the

16  facts upon which this claim is based are more than ten years

17  old.

18       It seems that there are two bases for the claim:  One

19  is discrimination in his employment, on the basis of not being

20  elevated to higher levels of management within the company, and

21  the second is race-baiting.  I think Your Honor can draw

22  conclusions or summary conclusions from reading those factors.

23  They all seem to stem from the fact that he believes that the

24  level that he was initially hired when he came out of college

25  was at a level that was below where he believed to be.  But the

1    statute of limitations has long passed on those types of

2    claims.

3         And in terms of the race-baiting, my conclusion is

4    that the -- based on his -- the history of his earlier life,

5    which I won't get into here, but it seems like that's the basis

6    for his allegations against General Motors.

7         In terms of the Sonnax factors, we believe that there

8    is less than a low degree of likelihood that he would prevail

9    even if Your Honor were to allow a late-filed claim, which in

10   this case we don't believe that Your Honor should, and believe

11   that it would unnecessarily deplete the estate if we were

12   forced to go to Michigan and defend this action.

13        Your Honor, we would ask that Your Honor not only deny

14   the motion but also direct Mr. Stasko to withdraw the action

15   that's currently pending as void and in violation of the

16   automatic stay.

17        THE COURT:  All right, thank you.

18        Mr. Stasko, you can have a couple of minutes to reply.

19   Try to do it briefly, please.

20        MR. STASKO:  Well, Your Honor, I only want to point

21   out for the Court that my action against General Motors' action

22   began in 2005 when my memory started to clear up.  I would

23   point to the fact in the third letter that I wrote to General

24   Motors that I was looking for possible discrimination against

25   General Motors, and so therefore I was already implying back in

38

1    2005 that there was possibly going to be legal action against

2    General Motors.  And it's because I couldn't find legal help to

3    help me and I was not in a mental state that I could represent

4    myself that explains the lag between 2005 and now.

5         As for the General Motors comments regarding why in

6    the civil action, I part -- discuss great detail as to it's

7    more than just my entry into -- when I first enter into General

8    Motors.  And I will spare the bankruptcy court all that detail.

9    I'll give more detail on Monday, if necessary, in the U.S.

10   District Court itself.

11        What I wanted to ask the Court is that this proof of

12   claim -- is this some form that I could obtain from online?  Is

13   it something that I was missing that I should have filed with

14   my initial motion?  Not being a lawyer, I don't know if I

15   missed something or what exactly is this proof of claim.

16        THE COURT:  Well, sir, I'm not in a position to give

17   you legal advice.  I can tell you that there was a bar date,

18   that is, a deadline for the filing of proofs of claim, that has

19   come and gone.  And because I can't give you legal advice, I

20   don't think I should say more than that.

21        MR. STASKO:  Okay.  Okay.  Then, yes, I guess I go

22   back to -- I guess the last two things that I -- well, the last

23   thing I'd want to make mention, to go back to the beginning in

24   discussing the --

25        THE COURT:  No, you can't go back to the beginning.

39

1    The purpose of a reply is to respond to anything that Mr.

2    Smolinsky said when it was his time to respond to what you had

3    said the first time.

4         MR. STASKO:  All right.  Okay.  Okay.  Okay, I think

5    I'm done.

6         THE COURT:  Very well.

7         All right, everybody sit in place for a minute.

8         (Pause)

9         THE COURT:  Ladies & gentlemen, in this contested

10   matter in a case under Chapter 11 of the Code, Claimant Stasko

11   moves for relief from the stay to continue with a litigation

12   that he commenced after the filing date of this case.  The

13   motion is denied.  And consistent with the debtors' request

14   under the unusual facts of this case, I am also ordering that

15   Mr. Stasko do two things:  one, to tell the district court that

16   I denied relief from the stay, and, two, that I have directed

17   Mr. Stasko to withdraw his lawsuit entirely and to not allow it

18   to merely be stayed.  And the following are my findings of

19   fact, conclusions of law and bases for the exercise of my

20   discretion in connection with this determination.

21        MR. STASKO:  Do you want me to --

22        THE COURT:  No, I'm in the middle of dictating a

23   ruling, Mr. Stasko.  I'll --

24        MR. STASKO:  Sorry.

25        THE COURT:  -- allow you to ask questions at the end.

40

1        MR. STASKO:  Sorry.

2        THE COURT:  Uniquely in my ten years as a judge, as a

3    bankruptcy judge, and forty years as a lawyer, this is the

4    first time that I've had a fellow or an entity who actually

5    filed a litigation after the bankruptcy case was filed and then

6    asked for relief from the stay to continue in the filing of --

7    or prosecution of a litigation that should never have been

8    filed in the first place.

9        It is not uncommon for debtors to file bankruptcy when

10   litigations that were preexisting at the time of the bankruptcy

11   filing are pending, and in that case we deal with the so-called

12   Sonnax factors here in the Second Circuit, which I'll address

13   momentarily, to determine whether we should allow that

14   litigation to proceed or not.

15       But Mr. Stasko, with respect, I can't underscore the

16   importance of you understanding that once a bankruptcy case has

17   been filed, you can't bring another lawsuit -- or bring a

18   lawsuit against the debtor.  Now, I'll assume for the sake of

19   discussion that you didn't know about the bankruptcy when you

20   filed the action in the Eastern District of Michigan, but once

21   you heard about it, proceeding to try to get a default against

22   the debtor was just dead wrong.  And because you're not a

23   lawyer, I'm not going to use one of the stronger words that I

24   would use, but that's real bad, okay?

25       Now, turning to the Sonnax factors, assuming for the

41

1    sake of discussion that that inappropriate and improper conduct

2    doesn't deprive you of the entitlement to relief, we all agree

3    that the Second Circuit's Sonnax factors are applicable to a

4    motion for relief from the stay to proceed with litigation in

5    another form.  In my experience, the most important of the

6    factors as a general rule are factors 2, 7 and 12, and we're

7    going to talk about those.

8         Here, before I do that, though, I need to note as a

9    finding of fact, and it's an important fact, that no proof of

10   claim was filed and that, Mr. Stasko, you have proceeded to

11   bring this lawsuit when you didn't even file a proof of claim.

12   There are circumstances, such as those that we're going to deal

13   with later on in the calendar, where there are some good

14   arguments that, having put the debtor on notice of things that

15   took place and/or by reason of surrounding circumstances, might

16   make the failure to file a proof of claim, and a later request

17   to file a late one, subject to legitimate debate, but this is

18   not one of them.

19        Factor number 7 is whether litigation in another forum

20   would prejudice the interests of other creditors.  That's

21   important, because when he's managing a bankruptcy case, a

22   bankruptcy judge like me has to consider everybody in the case.

23   And allowing this litigation to proceed would prejudice the

24   interests of other creditors, because the debtor would have to

25   expend scarce resources litigating the case in Michigan, as

1      well as being subject to an onslaught of similar lift-stay

2      motions that would likely ensue if I granted this one.

3           The second factor, lack of any connection with or

4      interference with the bankruptcy case, once more invokes the

5      concern I just articulated.  The estate's use of its resources

6      to defend litigation in another forum is the least economical

7      way to deal with that, and it interferes with the bankruptcy

8      case and the debtors' ability to serve the other creditors.

9           The twelfth factor, the balance of harms, is one of

10     the most important.  I've already talked about the burdens on

11     the estate and the need to defend this case in post-petition

12     dollars.  There is, in addition, no prejudice, because even if

13     the action had been allowed to proceed, the claimant could not,

14     without a further order from me, get estate assets anyway,

15     because of the failure to file the proof of claim.

16          Other factors are not applicable in any material

17     respect.  The eleventh factor, whether the parties are ready

18     for trial in the other proceeding, is a factor that we take

19     into account to a substantial way when it's true, but here the

20     lawsuit was just filed.  And all we've done is, up to this

21     point, is initiated a suit and then gotten the request for a

22     default, which, as I noted previously, wasn't appropriate.

23          For the foregoing reasons, the debtors' objection to

24     the motion is sustained and the motion is denied.  The debtors

25     are to settle an order on Mr. Stasko in accordance with this

1    ruling.

2          Mr. Stasko, your time to appeal this decision's going

3    to run from the time of entry of the order, and not from the

4    date that I'm dictating this ruling.  Now, I can't give you

5    legal advice.  Do you have any question other than me giving

6    you legal advice?

7          MR. STASKO:  No, I'm going to -- I'm going to have to

8    try to seek legal counsel on an appeal.  Thank you very much,

9    sir, for your time, Your Honor.

10          THE COURT:  All right.  I just want to warn you that

11    you don't have much time to bring an appeal after the time that

12    order is entered.  It used to be ten days.  It may now be

13    fourteen.  I'm not sure which.  Again, I can't give you legal

14    advice on that, but be aware that if you do decide to appeal,

15    you don't have a lot of time to do it.

16          MR. STASKO:  Thank you very much for your time today,

17    Your Honor.

18          THE COURT:  Very well.  Have a good day.

19          MR. STASKO:  Bye-bye.

20          THE COURT:  I think the next one we have, Mr.

21    Smolinsky, is the admin claim brought on behalf of --

22          MR. SMOLINSKY:  Mr. Hardee.

23          THE COURT:  -- forgive me, I forgot his name.

24          MR. SMOLINSKY:  William Hardee, sir.

25          THE COURT:  Right.  Mr. Divack, do you want to come on

44

1    up here?  Mr. Divack, have a seat for a second, because I have

2    some preliminary observations.

3            MR. DIVACK:  Thank you, Your Honor.

4            THE COURT:  I just need to find my notes.

5        (Pause)

6            THE COURT:  All right.  Gentlemen, on this one, my

7    tentative, subject to your rights to be heard, is to deem the

8    debtors' motion or objection to the admin claim and the motion

9    for the admin claim itself, to be regarded as what amounts to a

10   demurrer to that aspect of the admin claim that seeks post-

11   petition treatment for the claim, and to rule that if the

12   underlying allegations for the failure-to-warn aspect of the

13   claim can be established, they could, if satisfactorily proven,

14   comply with the requirements of Reading Company v. Brown, and

15   give rise to an entitlement to payment on a post-petition admin

16   claim basis in the amount later to be liquidated; but that to

17   the extent there are any allegations relating to inappropriate

18   design, unsatisfactory manufacture, or anything where those

19   aspects of the claim took place before the filing date, they

20   would be pre-petition claims.

21           Subject to your rights to be heard -- well, let me put

22   it this way.  I want either of you to tell me -- I guess, Mr.

23   Smolinsky -- whether you quarrel with Reading v. Brown being --

24   Reading Company -- still being good law, applicable here.  And

25   I need both sides to address, but especially the debtors' side,

45

1    applicable distinctions between contract and tax claims and

2    other claims that are premised on preexisting consensual or

3    legal relationships and torts, where the claimant hasn't shown

4    up for any reason other than the fact that he got hurt.

5            Mr. Divack, I do have a problem -- a material problem

6    with your reliance on Frenville.  In this circuit and district,

7    Frenville -- I know the Third Circuit has held it and I know

8    the Third Circuit hasn't overruled it -- but I think our

9    position on Frenville in this district is pretty well-known.  I

10   need you to help me better understand why you're relying on

11   Frenville, because I don't accept Frenville.  I just think it's

12   wrong.

13           On the other hand, Mr. Smolinsky, when it's your turn

14   to argue, I think that if you combine manufacturing -- excuse

15   me -- a failure to warn, which is alleged to have been failed

16   to be done after the filing date, and an injury after the

17   filing date, I need you to help me understand why Reading v.

18   Brown doesn't give him a post-petition claim for that aspect of

19   their claim.

20           Now, I don't see that as applying to people who had

21   their cars manufactured before the filing date and got hurt

22   before the filing date.  And I see this as applying to that

23   relatively narrow group of people who have both post-petition

24   pre-closing claims and claims for failure to warn, where the

25   allegation, if proven, would be that there was something the

46

1    debtor should have done in that post-petition period and before

2    the closing that it didn't do.

3         But that's what I want you guys to focus on.  I want

4    you to focus on Reading v. Brown.  Mr. Divack, if you want to

5    tell me that there's something that I'm disagreeing with you on

6    that you think I'm mistaken, then by all means, do it.  But

7    that's the way I see it right now.  Mr. Divack, come on up and

8    make your arguments.  When you do, help me better understand

9    whether you're pressing only a post -- a failure to warn claim

10   where the alleged failure to warn took place between June 1st,

11   or whenever the GM case was filed, and the closing date; or

12   whether you're arguing additional tortious conduct as well.

13        MR. DIVACK:  Your Honor, I'm pleased to address Your

14   Honor's concerns as a threshold question.  But as a threshold

15   to your threshold, I'd like to introduce my co-counsel, Mr.

16   James Morton, of the Georgia Bar, who has previously been

17   admitted pro hac in this case.  And as between us, it's his

18   argument --

19        THE COURT:  Oh.

20        MR. DIVACK:  -- not mine.

21        THE COURT:  All right.  I -- forgive me, Mr. Morton.

22   You're certainly welcome here.  I've just seen Mr. Divack in

23   other matters involving bankruptcy law issues.  And if I

24   assumed something improperly, I apologize.

25        MR. MORTON:  Not at all, Your Honor.  I'm pleased to

1    be here.  Along with me is George Fryhofer from Atlanta, who is

2    the lead attorney in the personal injury case, and who's the

3    expert on Georgia personal injury law, in case we need his

4    input.

5         Addressing, Your Honor, the questions that you put

6    before us.  First, this request seeks only damages based on

7    post-petition conduct, that is, for failure to warn between

8    June 1, 2009 and July -- or June 11, 2009, when the accident

9    occurred.  Our claim or -- I use claim in the very loose

10   sense -- will not be based at all on any pre-petition design,

11   manufacture, or anything like that, simply because Georgia

12   statute of repose, bars those claims after ten years.  This is

13   a 1995 truck.  Those claims are time-barred.

14        Talking about Frenville, we simply included Frenville.

15   It's not our -- the basis for our argument or the -- we're not

16   arguing that the Frenville test is the one that the Court

17   should adopt.  We simply included it to reflect the continuum

18   of different tests the courts have applied.  The Frenville

19   being at one end, the relation test, or modified relation test,

20   the accrual theory.  Different courts have -- the narrow

21   conduct theory.  And I can go into that theoretical discussion.

22   I don't think it really is important for our purposes, except

23   to say, we recognize that Frenville is very much disfavored.

24   And virtually all the other circuits that have had an

25   opportunity to weigh in on it, have said they don't think very

48

1      much of it.

2              And I understand that cases in the Second Circuit have

3      also expressed their disapproval of it, by drawing the

4      distinction between having access to a state court and having a

5      claim that is recognized in bankruptcy, and simply observing

6      that those two are not coextensive, that they're different

7      concepts.  We recognize that.

8              I think the most substantive and perhaps most

9      difficult question that the Court raised is the one where you

10     ask us to discuss distinctions between -- I'm not sure my notes

11     captured this correctly -- between contract and tax claims and

12     other relations.

13             THE COURT:  Well, frankly, that was something that I'm

14     going to mainly need Mr. Smolinsky to address, because I think

15     that the Second Circuit's McFarlands case and other cases that

16     observe, quite clearly, that we bankruptcy judges get nervous

17     when people are making post-petition claims, to a very great

18     extent, involve monetary dealings between people who are

19     dealing with each other and don't apply in any material

20     respect, subject to your right to be heard, Mr. Smolinsky, to

21     torts.  And in most tort situations, there's such a small

22     period of time between the time that the debtor does something

23     bad or negligent and the time somebody gets hurt, that we don't

24     focus on that.

25             But I'm wondering if there is a distinction there

49

1    between the general tort situation and the post-petition

2    contract type of situation or post-petition benefit from one.

3           MR. MORTON:  I'd be happy to stand aside and allow

4    debtors' counsel to address that, Your Honor, and if I can --

5           THE COURT:  Sure.  I'll give you a chance to reply.

6           MR. MORTON:  I will.

7           THE COURT:  Mr. Smolinsky.

8           MR. SMOLINSKY:  Your Honor, I think you're focusing on

9    exactly the right issues in this matter.  I believe that

10   Reading stands for the proposition that if a debtor-in-

11   possession commits a post-petition tort, then that could give

12   rise to an administrative expense claim against the estate.

13   And when you're dealing with torts, torts usually happen at an

14   instant where, when you're dealing with contracts or tax

15   claims, they accrue over a period of time, and there's privity

16   that continues off into the future.

17          Courts in this circuit have narrowly construed

18   priorities.  And therefore I think your comment is also right

19   that courts are reluctant to grant administrative expense

20   claims unless there's a basis to do so.  If you look at the

21   motion that Mr. Hardee filed, there are no allegations that

22   there was a tort committed by the debtor-in-possession between

23   June 1st and June 11th, when the accident occurred.  What Mr.

24   Hardee is arguing is that there was a defect -- that there was

25   a failure to warn, and that that tort is continuing, so that

50

1    every day, the debtor -- pre-petition debtor and then the post-

2    petition debtor, is committing a tort.

3          And the -- if you look at the Georgia state statute,

4    it talks about knowledge that a tort has occurred, and then

5    having to give notice -- reasonable notice -- to those parties

6    who foreseeable -- who are in foreseeable danger as a result of

7    that defect.

8          Mr. Hardee relies on two cases or two lines of cases

9    for the proposition that because it's a continuing tort, even

10    though -- and this has yet to be proven that General Motors

11    even knew about this defect and had a duty to warn -- but he --

12    I don't think that he argues that we learned about the defect

13    between June 1st and June 11th.  If that's what he is arguing,

14    then I agree with Your Honor that perhaps we need some narrow

15    evidence as to what basis he has for coming to the conclusion

16    that we learned about this defect between June 1st and June

17    11th and didn't warn him before he had the accident on June

18    11th.

19          But in this case, he seems to be arguing that the

20    defect is continuing from an earlier time that General Motors

21    learned of this defect.  And he relies on the Chrysler v.

22    Batten case for, as he indicated, the proposition that there's

23    a continuing tort.  But that line of cases deals with the

24    notion that for purposes of statutes of limitation, or statutes

25    of repose in that case, that if the plaintiff didn't know about

51

1    the defect, that he would -- plaintiff would not be barred by

2    the statute of limitations to assert a claim.  That case is a

3    nonbankruptcy case.  It doesn't at all -- it talks about

4    whether under state law a claim exists.  And there's no doubt

5    that state law governs when whether a claim exists.  The

6    priority of that claim is a federal issue.  And the Batten case

7    didn't deal with that.

8         I think in terms of -- the other line of cases is the

9    A.H. Robins type of case, where there are post-confirmation

10   claims that are asserted.  And the argument is that they are

11   barred by the confirmation order and the discharge, because

12   they didn't file a claim prior to the bar date.  Again, there's

13   nothing in those cases which argue that if you had a post-

14   petition injury as a result of a pre-petition failure to notice

15   the defect, that that would give rise to an administrative

16   expense claim.  In the A.H. Robins case, there were parties

17   that were injured as a result of the defect.  The defect was

18   known by A.H. Robins pre-petition.  They failed to warn,

19   although they did make modifications in their devices.

20        But if you had a post-petition claim arising from

21   post-petition injury, that was relegated as a claim that was

22   treated as a pre-petition claim.  And then you had the cases

23   which dealt with post-confirmation cases, as to whether they

24   were discharged.  But that's not the issue here.

25        The way we structured this case, we're only

52

1    responsible for tort claims -- product liability claims that

2    occur between the filing date and the date of the closing, and

3    New GM, of course, is responsible for any accident that occurs

4    after.  So when we had our bar date, that was a deadline for

5    which parties could file a proof of claim based on the pre-

6    petition acts, whether it's a product liability claim or a

7    failure to warn pre-petition, that they would file those claims

8    and they would be adjudicated within --

9         THE COURT:  Well, pause, please, Mr. Smolinsky.  I had

10   always assumed that New GM could, in essence, undertake

11   responsibility for any claims that it elected to take, and --

12   but that your deal with New GM on who would take what and who

13   would retain what, as a practical matter, affected New GM more

14   than it affected you, except to the extent, of course, that

15   whatever New GM took, then you wouldn't have to worry about.

16   But I didn't understand it to address whether whatever is left

17   with you is a pre-petition claim or a post-petition claim.  Am

18   I right in that understanding?

19        MR. SMOLINSKY:  It didn't, Your Honor.  But in order

20   to avoid the A.H. Robins post-confirmation issue, if New GM had

21   not agreed to take on those liabilities, we would be sitting

22   here today deciding should we do a supplemental bar date at the

23   end to make sure, you know, to publish again, and make sure the

24   people that had an accident between the closing and the

25   confirmation could file a claim.  I would still argue

53

1    strenuously that those claims would be claims under 1015 and

2    would be unsecured pre-petition claims, unless it could be

3    proven, as Your Honor indicated, that there was a specific tort

4    committed during the post-petition period, which --

5        THE COURT:  And that's where I need help from both

6    sides.  But I don't know if I can do that today, Mr. Smolinsky.

7    I don't know if I fully have my arms around whether there was a

8    post-petition tort.  But I am nervous that I should be ruling

9    today that there wasn't a post-petition tort.

10        MR. SMOLINSKY:  Here's what I would say, Your Honor,

11    to that.  And I understand your discomfort.  I agree that for

12    you to rule that there was no post-petition tort, the only

13    basis for doing that is the fact that they didn't plead it in

14    their papers.  And --

15        THE COURT:  Yeah, but you know what, for those of us

16    who were brought up on Conley v. Gibson, and even if you look

17    at that new stuff the Supreme Court has laid down, I mean, if

18    you're hurt in a car wreck, I think your claim is plausible.

19        I think that before I could decide whether -- I mean,

20    the complaint, as I understand it, or claim as I understand it,

21    says the guy was hurt in a car wreck and that GM didn't warn.

22    Now, you can slice and dice it in terms of saying it knew of

23    the injur -- of the risk before the filing date, and it had a

24    day-to-day duty to warn, or you could say it learned of the

25    risk thereafter, but that strikes me as a matter of evidence

54

1    more -- and at least arguably of state law, even though I agree

2    with you that the priority of a claim is federal law.  That

3    seems to me the kind of thing where I would want to get my

4    ar -- that most judges would allow leave to amend if there were

5    some perception that it hadn't been pled satisfactorily.  And

6    you'd want to find out what the real evidence is.

7         MR. SMOLINSKY:  Here's what I think you can rely on

8    today, Your Honor.  Mr. Hardee, in his papers, says that

9    there's no case law or legal basis in which to determine that

10   this claim is not an administrative expense claim.  And we

11   disagree with that notion.  There's one case which we didn't

12   think worthy of filing a surreply, but I wanted to bring to

13   Your Honor's attention.  And we do have copies for everybody.

14   It's the In re Piper Aircraft Corporation case.  This is not

15   the -- this is not the Eleventh Circuit case which deals with

16   post-confirmation damages.  But this is the Southern District

17   of Florida case which deals with the post-petition aircraft

18   accident.

19        And on page 780 of that case, the Court says:  "The

20   remaining factual allegations all relate to pre-petition

21   conduct, including the sale of the plane, defective design at

22   the time of the sale, negligence in the manufacture and sale,

23   and breach of express and implied warranty at time of sale.

24   Given the nature of the claim, the fact that the accident

25   occurred post-petition does not mean that the claim, if

55

1    allowed, would be entitled to treatment as an administrative

2    expense under 503(b) of the code."

3            THE COURT:  Sure.  But that's just another way of

4    saying that Frenville is garbage.  And I --

5            MR. SMOLINSKY:  Then it goes on, Your Honor, if I may?

6            THE COURT:  Yes, please.  Because I'm waiting to hear

7    what's relevant, because that doesn't help you that much.

8            MR. SMOLINSKY:  It goes on, Your Honor, to say:  "If

9    Calabro can prevail in proving a post-petition failure to warn,

10   damages awarded on that theory would be entitled to

11   administrative expense priority, since the debtor-in-possession

12   would be the tortfeasor.  If, on the other hand, Calabro can

13   only establish liability based on the debtor's pre-petition

14   design and manufacture, there is no basis for treating the

15   claim as an administrative expense.  That result follows

16   because the actionable conduct was by the pre-petition debtor

17   and provided no benefit to the debtor-in-possession during the

18   administration of the case."

19           THE COURT:  Well, while you were reading, you couldn't

20   see me nodding, but I agree with that, but I think that with --

21   where you drew the line, which was what I was saying in my

22   early remarks --

23           MR. SMOLINSKY:  But I think Your Honor could find that

24   there has to be a post-petition tort, not a continuation, the

25   failure to get up every day and warn Mr. Hardee don't go in

56

1   this car.  The facts indicate, and there was actually a

2   declaration filed with the Court as part of the reply, that

3   makes clear, and we don't dispute this, that the car is not

4   owned by Mr. Hardee, it's owned by Mr. Hardee's parents.  But

5   the indication is that he drove that car.  He drove that car

6   pre-petition.  He drove that car post-petition.

7        And there is a case, and it's the Pettibone case, not

8   the Payne Pettibone case, but the Ramirez case, which says that

9   there's a huge difference from a failure to warn between

10   connecting -- having contact with that defective product for

11   the first time post-petition as opposed to pre-petition.  And

12   the Court says in that case:  "One of Ramirez's theories is an

13   asserted breach of duty to warn while he was in use of the

14   forklift after the bankruptcy was filed; that the equipment was

15   dangerous and he should take precautions in its operation.  In

16   this regard, he clearly pleaded a post-petition claim in which

17   the debtors' acts or omissions complained of were all post-

18   petition.  There was no pre-petition omission to warn Ramirez

19   nor any impact on Ramirez of such omissions pre-petition,

20   because he did not start use of the equipment until post-

21   petition.  Debtor therefore is not alleged to have asserted any

22   wrong against him under this theory, except post-petition.

23   Under all the cited authority, Ramirez has no pre-petition

24   right of payment and no conceivable claim pre-petition,

25   contingent, unmatured or otherwise."

57

1          Here, if Mr. Hardee had driven the car pre-petition,

2      the debtors -- and we don't even know that the debtors were

3      aware ever that there was a defect.  But assuming that they

4      did -- were aware pre-petition, and Mr. Hardee drove the car

5      and had contact with the car, I think it's a pre-petition

6      claim, because the first time he walked into that car, he had a

7      contingent claim.  It may have not ripened into an injury until

8      post-petition.

9          So, what Your Honor could rule today is that we have a

10     very narrow issue in an evidentiary hearing, which is, did

11     General Motors commit a tort post-petition in that eleven-day

12     period, by learning of the injury pre-petition and then the

13     injury occurring prior to the closing date?  But even then, we

14     would reserve rights to argue that because he had contact with

15     that defective product pre-petition, that all his claims are

16     unsecured.

17         But that would certainly narrow the scope, because if

18     we're going to get into a very expensive, lengthy discovery

19     process on whether General Motors ever knew that there was a

20     defect, I don't know -- I don't think that that's relevant

21     under these two cases.  I think what may be relevant is whether

22     there was a new tort committed.  And the notion in Mr. Hardee's

23     papers that there's a continual tort every day, I think goes to

24     issues like statute of limitations and statute of repose, and

25     not to priority of claims.

58

1        When you have product liability claims and negligence

2   claims -- and this is -- under Georgia law, a duty to warn is a

3   negligence claim -- the date of the tort is when the negligence

4   happened.  The negligence happened, if ever, when GM learned of

5   the defect and didn't warn.

6        THE COURT:  Um-hum.  All right.  Mr. Moore, do you

7   want to reply?

8        MR. MORTON:  Thank you, Your Honor.

9        THE COURT:  I said Moore.  I apologize, it's Mr.

10  Morton.

11       MR. MORTON:  Yes, Your Honor, Jim Morton.  First, Your

12  Honor, our initial request for payment in paragraph 6 makes

13  perfectly clear that we're seeking to limit our claim to

14  damages resulting from a post-petition failure to warn.  I

15  don't see how -- of course having prepared them, I'm more

16  familiar with them than debtors' counsel, and I'm sure he

17  wasn't just overlooking that.  I don't -- it's hard to see how

18  anybody could be misled.

19       It's perfectly clear, standing here today, that's the

20  basis of our claim.  Georgia law has completely separate torts

21  for products liability and failure to warn.  They're

22  independent.  They can be pursued separately and independently.

23  They're not dependent on one another in any respect.  The

24  product liability claims are subject to the statute of repose.

25  The failure-to-warn claims are not.  They can be brought, as we

59

1          say in our brief, five, ten, fifteen years later.

2                  We, in our brief, refer to Section 1101 of the

3      Bankruptcy Code, and to Bildisco v. Bildisco in the Supreme

4      Court, in which the Court held that for some purposes, the

5      debtor-in-possession can be viewed as the same entity as the

6      pre-petition debtor.

7                  THE COURT:  Oh, sure.  In this district, at least,

8      that's not controversial anymore.

9                  MR. MORTON:  So if GM had that institutional knowledge

10     pre-petition, the Court may be called upon to rule whether it

11     can then claim amnesia on the day it filed bankruptcy.

12                 THE COURT:  Well, that's actually a little different.

13     That's a matter of Georgia law, as to your amnesia argument.

14     But when I was tending to agree with you, I was saying that I

15     would not be receptive to an argument that the debtor-in-

16     possession is a wholly different entity than the pre-petition

17     debtor would be.

18                 MR. MORTON:  And as Bildisco said, for certain

19     purposes.  The question is, is this one of them?  And that, as

20     I say, is an issue that the Court may be called upon to address

21     at some point.

22                 The Ramirez-Pettibone case was another -- it's one we

23     cite in our brief.  We think that case supports our position.

24     We think it's the case, factually, that's closest to this case.

25     It's a forklift rollover case, another vehicle rollover case.

60

1    The sole factual distinction between the Ramirez case -- or the

2    Pettibone case and this case is that Ramirez was not even

3    employed by the purchaser/owner of the vehicle, the Air Force,

4    until post-petition.  And of course, the use and the rollover

5    and the injury all occurred post-petition.

6         In our case the auto or the vehicle, the Chevrolet

7    S-10 pickup truck, was owned by William's mother.  And he did

8    drive it.  So there is that factual distinction.  It did not

9    seem to us to be sufficient to disallow this claim, simply

10   because any contact that William had with that truck up until

11   the time it rolled over, was non-injurious conduct.  And as we

12   discuss in our brief, Judge Posner in the -- and some people

13   are fans of Judge Posner and others are anti-Posnerians, and

14   regardless, sometimes even those who don't necessarily find

15   him --

16        THE COURT:  I'm a fan of his, but I don't always agree

17   with him.

18        MR. MORTON:  Well, even if you don't find him your cup

19   of tea, sometimes he does say things that make sense.

20        THE COURT:  Yes, sir, he sometimes does.

21        MR. MORTON:  And he has -- the portion of his opinion

22   that we cited in our case from the Fogel decision -- or in our

23   brief from the Fogel decision, where he talks about -- and this

24   is on page 960 of that opinion:  "A right that can be made the

25   basis of a claim in bankruptcy may be contingent on something

1    happening, such as the signing of a contract."  And then he

2    cites some cases, including the detested Frenville.  "But if

3    contingency can be the tort itself, this spells trouble, both

4    practical and conceptual.  Suppose a manufacturer goes bankrupt

5    after a rash of chronic liability suits, and suppose that ten

6    million people own automobiles manufactured by it, that may

7    have the same defect that gave rise to those suits, but so far

8    only 1,000 have had an accident caused by the defect.  Would it

9    make any sense to hold that all ten million are tort creditors

10   of the manufacturer and are therefore required on pain of

11   having their claims subordinated to early filers, to file a

12   claim in the bankruptcy proceeding?"

13         THE COURT:  Yeah, I think I saw that in your reply

14   brief.  And that was one of the things I was thinking about

15   when saying that I like him and respect him, but I don't always

16   agree with him.  I think that goes too far, because that proves

17   too much.  If you took that literally, that would mean that all

18   the people who bought GM cars ever would have admin claims, and

19   that can't be the law, if they got injured thereafter.  On --

20         MR. MORTON:  Respectfully --

21         THE COURT:  -- on defective manufacture, defective

22   design, claims that you made clear that you're not pressing, I

23   think you would have had a huge problem, even though Posner

24   might have agreed with you.

25         MR. MORTON:  And we don't suggest that it be taken

62

1    that far.  We really point to his reference to Chateaugay I,

2    and what the Second Circuit said in Chateaugay I, where they

3    posed their own sort of hypothetical in that case.  And I think

4    it had -- if my memory serves me correctly, that's the one

5    about the -- maybe the one about the bridges.  If a company

6    built so many bridges and statistically they can say how many

7    fall down, you know, every year, is there a statistical

8    likelihood of there being claims, and therefore there should be

9    even a class of claims, perhaps, that should be represented in

10   the case.

11        That really moves into Judge Mark's opinion in the

12   Piper case, which Mr. Smolinsky talked about, the bankruptcy

13   court opinion, which is an excellent opinion, very thoughtfully

14   written.  But that case had to do with appointing a claims

15   representative.  That's what that was about.  It wasn't whether

16   a tort claim should be allowed as an administrative claim or

17   not.

18        That points up really the whole problem in this area,

19   which is that it's easy to be distracted by the claim -- claim-

20   arising cases.  Because there's a lot of them.  And they come

21   up in all different kinds of contexts.  Whether the automatic

22   stay applies, for example; whether something -- whether a claim

23   is barred by the plan, so that somebody can't later bring it;

24   how claims are treated.  It comes up in all different -- when

25   does a claim for indemnity arise?  These things come up in

63

1        different contexts all the time.

2            The problem with importing all of those cases and

3        seeking to be guided by them in resolving this issue, is that

4        there are many policies that inform the Bankruptcy Code, not

5        just one or two.  I mean, we can say that there's the

6        reorganization principle and there's the equity principle and

7        then put them under different categories.  But courts have to

8        balance, as this Court knows far better than I, have to balance

9        the various policies that inform the Bankruptcy Code in

10       reaching a decision on issues.  And sometimes some of those

11       policies are found to produce a more satisfactory result, and

12       they're given primacy.

13           What may give a satisfactory result in a claim-arising

14       case having to do with whether asbestos claims should be

15       allowed to go forward under the automatic stay or whether

16       they're time-barred and can't be brought post-confirmation,

17       really those policies having to do with enabling an effective

18       reorganization, for instance, in the Johns Manville cases,

19       because if those claims were allowed to all go forward, the

20       debtor would have been drowned, and if they hadn't been deemed

21       to have arisen pre-petition, they could have, when the

22       manifested themselves for years and years and years.  And the

23       case never would have ended, or it would have been a succession

24       of filings.  And so that was a policy that was underlying that.

25       But it really has no -- it's no help here.

64

1          This issue is quite narrow.  Post-petition conduct,

2     post-petition injury.  It's a tort claim.  We have Reading,

3     which I can only imagine, when it came down and thereafter,

4     must be one that bankruptcy courts really don't like, because

5     it's an exception and sort of an awkward exception.  But

6     nonetheless, it's there.  It's been followed by circuit courts

7     on a regular basis, at least cited.  And Congress has done

8     nothing to change it.  And as we talk about in our reply brief,

9     there's a presumption that it adopted that doctrine into the

10    Bankruptcy Code.

11         Curiously enough, and interestingly, Reading itself is

12    a failure-to-warn case.  The fact -- some of the facts that

13    aren't apparent from the Supreme Court opinion, but they're in

14    the record, are that the fire started because on December 30,

15    1963, it was very, very cold, everybody was off work.  The

16    building engineer turned the heat down and the sprinkler system

17    froze.  When he discovered that, he turned off the water so

18    that the building wouldn't be flooded, and he did some rewiring

19    because he had disabled the sprinkler system.  That rewiring is

20    what caused the fire.  It was badly done.

21         Part of the claim that was asserted by the Reading

22    Company was that the trustee had failed to post a fire watch,

23    that is, failed to give warning of a dangerous condition that

24    it knew or reasonably should have known might exist.  Had there

25    been that fire watch, they could have gone and warned the

65

1    neighboring buildings; they could have called the Fire

2    Department.  So Reading itself, in that context, is a failure-

3    to-warn case.

4           I think I've addressed the important issues raised.

5    If I've missed any that the Court's interested in, I'd be happy

6    to address them.

7           THE COURT:  No, I think we're good.  Everybody sit in

8    place for a minute, please.

9           (Pause)

10          THE COURT:  Gentlemen, I telegraphed my thinking as to

11   this when I articulated my tentative at the outset of this

12   argument.  And after hearing full argument, supplementing the

13   earlier briefs, nothing has come to my attention to cause me to

14   believe that the instincts I articulated at that time were

15   materially wrong.

16          I'll issue a more precise ruling now, which is that

17   deeming the debtor response to the admin claim motion to be a

18   demurrer and to be suggesting that as a legal matter there is

19   no basis upon which Mr. Hardee can establish a post-petition

20   claim, that demurrer is denied.  And I rule that there may

21   be -- not that there are -- but there may be facts that could

22   establish a post-petition tort that could be compensable as an

23   admin claim, upon appropriate proof.

24          I think we need to hear evidence of the exact nature

25   of the post-petition alleged wrongful conduct.  And I do not

66

1    think that I appropriately can determine today, especially

2    given parties' rights to flesh out their allegations within

3    reason, that there is no basis upon which an admin claim can be

4    established.

5         I agree with you, Mr. Smolinsky, that the issue is

6    whether a new tort was committed in the post-petition period.

7    I don't really think that there is a dispute between you and

8    the claimant's side on that.  I think you're undoubtedly going

9    to argue whether there was a new tort, in fact, and what it

10   would take to prove one.  But I don't see that as an

11   appropriate issue for today.  And I think that while, as I

12   indicated in oral argument, priority of claim is a federal

13   issue and not a state law issue -- is a federal law issue and

14   not a state law issue, in terms of what it takes to prove a

15   claim under Georgia law cannot be divorced from this inquiry,

16   and once the claimant tries to make the showing that's required

17   under Georgia law, I think it's the responsibility of the judge

18   to see whether the facts established consistent with that goal,

19   then measure up as a federal matter to what it takes to make a

20   post-petition claim.  I don't think you can do that without

21   more evidence and seeing exactly what the allegations are, at

22   the least.  And perhaps as well what evidence is adduced to

23   prove those allegations.

24        Therefore, at this point, the motion for the admin

25   claim is going to continue.  I will allow discovery on the

67

1     general subject matter of whether a new tort was committed.

2     And I'm not going to limit discovery on that issue or that

3     matter in any evidentiary hearing thereafter to the relatively

4     major extent you advocated, Mr. Smolinsky.  I think a party is

5     entitled to get evidence concerning all facts reasonably

6     related to the ultimate issues to be tried.  And though there's

7     a lesser tighter standard for admissibility of evidence at

8     trial than there is in discovery, I'm certainly not going to

9     rule on that today.

10          Since this is a classic interlocutory order, I'm going

11    to so order the record.  But if either side wants a written

12    order from which it can seek leave to appeal, either side can

13    settle one.

14          That's my ruling.

15          MR. SMOLINSKY:  Your Honor, your ruling gets into the

16    age old issue for us that to the extent the discovery is beyond

17    what happened during those eleven days but into possible

18    defects about these parts way back in the past, we are going to

19    have the New GM issue on discovery issues.  So rather than --

20          THE COURT:  Refresh my recollection as to what those

21    are?

22          MR. SMOLINSKY:  Well, the books and records were

23    purchased as part of the sale, so now they reside with New GM.

24    New GM has whatever documents exist with respect to these

25    particular parts; whether there was testing, whether there were

68

1    other accidents, all the other things that may be relevant to a

2    broad discovery exercise.  I have no idea sitting here today

3    whether New GM is going to be cooperative with that effort or

4    not.

5            THE COURT:  Well, tell them if they want to make me

6    order that I'm going to enforce a subpoena, I will.

7            MR. SMOLINSKY:  We will, Your Honor.  And we have been

8    advising them that --

9            THE COURT:  Okay.

10           MR. SMOLINSKY:  -- rather than set a schedule now --

11           THE COURT:  I'm not setting concrete deadlines, I'm

12   talking about concepts.

13           MR. SMOLINSKY:  We will work with New GM to try to

14   make sure that this is done cooperatively and quickly.  I just

15   wanted to make sure that we weren't scheduling an evidentiary

16   hearing in a month and --

17           THE COURT:  Of course not.  I'm not expecting quickly

18   but I am expecting cooperatively, you can tell them that.

19           MR. SMOLINSKY:  Right.  Thank you, Your Honor.

20           THE COURT:  Okay.  Mr. Morton.

21           MR. MORTON:  Your Honor, from our perspective this

22   raises the question of the procedural future of this matter.

23   We recognize that the resolution of administrative claims is a

24   core matter for the Court.

25           THE COURT:  And you're also recognizing that this is a

69

1    PI matter that might invoke 157 concerns, and you're trying to

2    be diplomatic about it?

3          MR. MORTON:  One never profits by being undiplomatic.

4          THE COURT:  I understand the issue.  I think, though,

5    that this is a sufficiently sophisticated issue that I

6    shouldn't try to deal with it today.  And I want you and the

7    other side to see if you can agree upon a way of teeing it up

8    in terms of the fact that in many respects I now have a PI

9    action on my watch which I am more than happy to yield

10   jurisdiction onto the district court.  Although, I wonder

11   whether even though the ultimate settlement might be in

12   different kinds of currency, whether it would be profitable for

13   you guys to use the ADR methods on PI claims that the debtors

14   have recommended for other types of things.  And, certainly, I

15   would hope that you would at least have a dialogue on

16   settlement, although I don't know if I have the power to order

17   anything.

18         Frankly, I -- given everything I have on my watch,

19   folks, I don't have a great taste for trying a PI action.  I'll

20   do what they pay me for.  I think at this juncture I would like

21   you guys to talk amongst yourselves, not just with respect to

22   settlement, but as to the best method to get the issues

23   determined if you have to agree to disagree.  Both sides have

24   legitimate concerns here.  You have an interest in getting a

25   recovery if you can prove it for an injured client.  Mr.

70

1    Smolinsky has an interest in not getting into a litigation

2    Vietnam.  And I can't imagine that there are a lot of cases

3    with the unique type of fact situation that you have here of

4    what amount to injuries on an eleven-day gap.  So I'm not sure

5    how much of a precedent concern there is.  But I'd like you

6    folks to talk amongst yourselves to talk not just about

7    settlement but also how and where the litigation would be

8    litigated if you can't reach a settlement.

9         MR. MORTON:  We have some thoughts on that and we'll

10    do it, Your Honor.

11        THE COURT:  Very good.  Okay.  What I would like to do

12    now if we have nothing further on the Hardee matter is to take

13    a ten-minute recess and continue with the Lee matter.

14        Anybody who has been here on other stuff is free to

15    leave if he or she doesn't want to be around.

16        Thanks, we're in recess.

17      (Recess from 11:42 a.m. until 11:57 a.m.)

18        THE COURT:  Okay.  Everybody want to come up on the

19    Lee matters, please.

20        Let me get appearances.

21        MR. LIU:  Francis Liu, Kimm Law Firm for creditor,

22    Dukson Lee.

23        THE COURT:  Did you say your name was Liu?

24        MR. SMOLINSKY:  Yes, L-I-U.

25        THE COURT:  Okay, thank you.  And Mr. Smolinsky again.

71

1          Folks, we have two motions here.  One the motion for

2     relief from stay.  And the second for leave to file a proof of

3     claim after the bar date.

4          Folks, my tentative on that is that for many of the

5     same reasons that I denied relief from the stay in the Stasko

6     matter I have to deny relief from the stay here as well.  But I

7     think the arguments in support of filing the late proof of

8     claim are much stronger.  And I think there is a material

9     likelihood that I would grant leave to file the late proof of

10    claim.  Although, if either side wanted an evidentiary hearing

11    which, in fact, might be necessary to explore the quality of

12    notice that the counsel for the Lee family got and to explore

13    all the communications that went on between counsel for the Lee

14    family and debtors' counsel since the time seemingly long ago

15    when the motion for relief from the stay was first filed.  I

16    think either side would be entitled to that.

17          I think it's hard to wholly separate the two issues

18    because as you heard in Stasko when the guy hadn't filed the

19    proof of claim I did take that into account on my relief from

20    stay determination.  But here we have a situation where the

21    state of play is roughly that I would probably allow leave to

22    file the late claim, but I am not there yet.

23          So, Mr. Liu, let me hear from you first and then I'll

24    hear from Mr. Smolinsky with the usual rights for reply and

25    surreply.

72

1          MR. LIU:  Thank you, Your Honor.  Good morning.  In

2   our moving papers the motion requests that the proof of claim

3   be timely filed, or in the alternative, that our original

4   motion to lift the stay, filed July 2nd, 2009, be deemed an

5   informal proof of claim.

6          With regards to the former, it seems that debtors

7   contend that there is prejudice to the debtor and that the

8   reason for the delay does not constitute excusable neglect.

9   And I'll take them in order briefly.

10         With regards to the danger of prejudice that has been

11  substantially reduced given the fact that the debtor has had

12  its breathing spell to refocus and rehabilitate itself through

13  the transition of selling the majority of its assets to

14  restructuring through the claims process.

15         It's been about ten months since the bankruptcy has --

16  bankruptcy proceedings have begun, and at this point the

17  breathing spell has been had by debtors.  Moreover, the debtors

18  have always known from day one of creditors intents in this

19  case.  There have been a myriad of e-mails forwarded between

20  the previously associate at my firm and Ms. Brianna Benfield

21  located in Washington, evidencing questions about insurance

22  policies, even settlement offers.  And debtors has always known

23  about the claim that creditors intended to assert against them.

24         And number three, briefly, with regard to the fear of

25  a floodgate situation, though it's necessary to be aware of

73

1    such a situation ten months in the ECF docket report, the

2    history of that, does not seem to suggest that floodgate

3    situation will appear.  I did a control find function on it and

4    I was not able to find --

5            THE COURT:  What function?

6            MR. LIU:  A control find function.

7            THE COURT:  Obviously -- oh, you mean when you hit the

8    control key and an F and you can find things in a document?

9            MR. LIU:  That's correct.  And I was trying to find

10    through document 1 through 5000 and something how many motions

11    to lift stay and briefs of law accompanying them were filed.

12    And I didn't find too many considering this is the second or

13    third largest bankruptcy case in U.S. history.  So the danger

14    of prejudice creditors maintain is low and has been

15    substantially reduced by the amount of time that has elapsed.

16            Going towards the reason for delay.  Admittedly there

17    was an oversight by creditor's counsel.  However, at the same

18    time there has been confusion and oversight on debtors' side as

19    well.  We, the Kimm Law Firm, are the litigation counsel for

20    the parents of Janel Lee who died in an automobile accident.

21    We are not the counsel of record in the Arizona action, that is

22    the Law Offices of John Travone PC.  He was never served with

23    the bar date.  In fact, looking at the exhibits debtors'

24    counsel has provided, it seems that a Mr. Richard E. Gilbranson

25    was served.

74

1          Initially, I had no idea who this person was.  After

2     further going through our case file it seems that Mr. Richard

3     Gilbranson is a partner in a law firm that the Lee's initially

4     retained for this action.  However, there was a formal

5     substitution of attorney.  John Travone is now the counsel of

6     record.  His name has appeared on many documents, he's appeared

7     for them, debtors' counsel Brook & Bowman LLP in Phoenix,

8     they've communicated with Mr. Travone.  And since debtors'

9     counsel has been on notice of this fact it seems that perhaps a

10    lack of focus on whoever was designated to serve the bar notice

11    claim contributed to this unfortunate mishap.

12          Regarding the notices that were sent to the Kimm law

13    firm, it appears that debtors contend that one was sent to 41B

14    Banker Street and two were sent to 41W Banker Street.  Now, 41B

15    Banker Street doesn't exist.  Our building is 41 with an east

16    and west entrance with multiple entities in it.  It's, in

17    essence, a warehouse.  And we, despite a diligent housecleaning

18    search, have not been able to find a claims bar notice in our

19    files.

20          THE COURT:  Now, pause please, Mr. Liu.

21          MR. LIU:  Sure.

22          THE COURT:  Because you like any other lawyer, I take

23    you at your word.  But you can understand why if there is a he

24    said she said on whether you got notice that might require an

25    evidentiary hearing to ultimately resolve.

75

1        MR. LIU:  Absolutely.

2        THE COURT:  All right, continue, please.

3        MR. LIU:  Turning to the motion to lift stay being an

4    informal proof of claim, debtors' counsel maintains that two

5    elements are missing for the motion to lift stay to past

6    muster.  And those elements are that the motion does not set

7    forth the creditors' intent to hold the bankruptcy estate

8    liable, and that the motion does not set forth an amount.

9        Now, with regards to the former, the motion clearly

10   sets forth creditor's intent to hold the bankruptcy estate

11   liable.  The motion recites the Arizona action's facts.  The

12   debtors' automobile; glaring defects in the automobile

13   contributed to her death and that the creditors request that

14   the lift stay granted so that they could proceed to trial,

15   obtain a judgment and recovery from debtor.

16       Your Honor, what more needs to be said regarding the

17   intent.  With regards to setting forth an amount, the claim is

18   unliquidated.  The Arizona complaint does set forth an amount

19   we are seeking.  However, because the claim is unliquidated it

20   cannot be adequately ascertained what that amount is going to

21   be.  We filed a late proof of claim with an amount and, again,

22   that's just what we're seeking, that's not the amount that's

23   going to be decided, because it's unliquidated.

24       THE COURT:  This is a wrongful death case that's

25   contrasted to a - like a paraplegic case, or something like

76

1      that?

2              MR. LIU:  I'm sorry?

3              THE COURT:  The underlying claim is for the actual

4      death of an individual, am I correct?

5              MR. LIU:  That's correct.  Because of a defect in the

6      automobile.

7              THE COURT:  Right.

8              MR. LIU:  I rest with regarding the motion to file a

9      late claim.  Your Honor, do you want me to discuss the motion

10     to lift stay at this time?

11             THE COURT:  While you're up here why don't you do

12     that.  Yes, please, Mr. Liu.

13             MR. LIU:  Sure.  I'll keep this really brief, and I'll

14     try to stay away from the merits of the case and just focus

15     solely on the relevant Sonnax factors.

16             The most important factors are 2, 7 and 12.  Taking 12

17     first, being the balance of harms, this is the most critical

18     factor.  And lifting the stay at this point would not severely

19     harm the debtors' estate because they've already received their

20     breathing spell.  Conversely, to the creditors, they would

21     suffer substantial harm.  They would lose their substantive

22     rights to litigate their claim against debtors.  They've been

23     waiting for seven years --

24             THE COURT:  Well, time out, Mr. Liu.  If I grant the

25     other motion  to allow you to file a proof of claim your

77

1      clients don't lose the right to assert the claim it just may

2      affect the place at which it's done, am I correct?

3            MR. LIU:  Well, it's our position that the claim --

4      this personal injury claim needs to be sent back to Arizona,

5      completed there because it is close to trial.  And then sent

6      back here to determine damages.

7            THE COURT:  The trial in Arizona is only for liability

8      and not for damages?

9            MR. LIU:  Well, it's our understanding that the

10     damages would be ultimately determined by this Court, but the

11     trial in Arizona is a necessary component of that process

12     because it would determine the liability.  And it is a little

13     messy with co-defendants in the picture.

14           THE COURT:  Uh-huh.  What's the state of play of the

15     action going against the co-defendant?

16           MR. LIU:  Well, debtors' counsel has maintained that

17     as of the last status conference Mr. Jiung, the co-defendant,

18     could not be located.

19           THE COURT:  Oh, he's the guy who has now been found in

20     Korea --

21           MR. LIU:  That's correct.

22           THE COURT:  -- according to your supplemental

23     declaration?

24           MR. LIU:  That's correct, Your Honor.  He has been

25     found and he is going to be brought back --

78

1          THE COURT:  And he was the driver of the vehicle?

2          MR. LIU:  That's right.  He negligently drove.

3          THE COURT:  And is there an issue as to whether the

4     accident -- if I'm oversimplifying, forgive me.  Was caused by

5     the negligence of the driver or some kind of fault in the

6     design or manufacture of the vehicle?

7          MR. LIU:  It appears that with regards to Old GM and

8     Mr. Jiung, they're both liable.  Mr. Jiung tried to pass in a

9     two-lane highway because cars in front of him were going,

10    according to him, too slow.  He sped up, saw another car

11    coming, started hitting the breaks.  That's when in our expert

12    report filed and the Arizona case confirms, that the anti-lock

13    braking system failed and the stabilizer failed.  Two glaring

14    defects, which then caused the car to fishtail and roll over

15    nine times ejecting Janel Lee from the car, which ultimately

16    caused her death.

17         THE COURT:  Was she wearing a seatbelt?

18         MR. LIU:  She was in the back seat, she was not

19    wearing a seat belt.

20         THE COURT:  Okay.  But obviously this is all merits

21    based.

22         MR. LIU:  Right.

23         THE COURT:  You're just helping me understand the

24    picture of the case.

25         MR. LIU:  Right.  Moving back to the Sonnax factors,

79

1    factors 2 and 7 are also important.  And admittedly factor 7

2    with regards to the other creditors in the case slightly weighs

3    in favor of debtors' estate.  However, again, the ample

4    breathing spell time has elapsed.  So the restructuring is

5    substantially in place.  There is the notion that litigating

6    this claim would drain the estate's assets, but thereby

7    prejudicing the creditors.  But, again, that's not set in

8    stone.  For example, Old GM might actually win the case and not

9    have any damages.  Old GM already has counsel, maybe they're

10   not currently retained, but they still have the files, they

11   still have the documents, they have all the discovery, they

12   have the expert reports, they're all ready.  The only thing

13   pending is depositions.  So our position is that --

14        THE COURT:  That's a pretty major aspect of any PI

15   case, isn't it?

16        MR. LIU:  Depositions?

17        THE COURT:  Yeah.

18        MR. LIU:  Yes, it is important.  But the paper

19   discovery is all complete.  So the next step is to take

20   depositions and after that wait for a trial date.

21        THE COURT:  Okay, go on.

22        MR. LIU:  Okay.  And along that vane of thinking,

23   factor 2, the interference with the bankruptcy case is also

24   slight.  Reiterating that the Arizona action is near the tail-

25   end of discovery only depositions remain to be taken, and all

1    paper discovery is complete.  The defense of litigating this

2    claim is not as great as it would be had this case been in its

3    initial stages.  But since we're now nearing the tail-end of

4    discovery the expenses raised are not as great and thus the

5    weight of factor 2 should be lessened accordingly.

6         And going along with that and all these factors are

7    relevant to each other, factor 11 militates in favor of the

8    creditors because, again, discovery is essentially complete,

9    only depositions remain and then trial date can be set and we

10   can finally proceed.  This action was first filed in 2003 in

11   the District of Arizona, and it went through some hoops and it

12   went to New Jersey, went back to Superior Court of Arizona, and

13   now it's finally ready, almost, to go to trial and finally get

14   to finality for the creditors in that respect.

15        And with that, I believe that's all the Sonnax factors

16   that are relevant in this case.  Sorry, that I went longer than

17   I told you I would.  And I rest.

18        THE COURT:  Thank you.  Mr. Smolinsky.

19        MR. SMOLINSKY:  Your Honor, I think I'll handle the

20   late filed claim issue first, because I think that's a

21   threshold matter to the motion to lift the stay.

22        THE COURT:  Okay.

23        MR. SMOLINSKY:  Just to make clear on our position,

24   Your Honor.  Our position is not to take this to the mat.  Our

25   position is -- especially in a liquidation case, is to enforce

81

1    the orders of the Court and enforce the Bankruptcy Code.  And

2    for that reason we oppose the late filed claims in violation of

3    the bar date order and the Bankruptcy Code.

4         Nevertheless, we recognize that 3003 gives this Court

5    discretion to allow a late filed claim for cause.  And,

6    therefore, we think it's our job to educate Your Honor on the

7    factors -- the factual issues that Your Honor should consider

8    in determining whether a late filed claim is appropriate in

9    this case.

10        THE COURT:  I would welcome that, Mr. Smolinsky.  But

11   I also have to tell you that given the very unique and lengthy

12   dialogue that went on between the estate and the Lee family

13   side, in which it might need to be fleshed out in evidentiary

14   hearing if people disputed it.  But I gather people were

15   talking all the time and the estate knew painfully well, and if

16   I'm not mistaken, their relief from the stay motion was kicked

17   three or four or five times, that this really is a very sui

18   generes case in terms of de facto or informal proof of claim,

19   so that it's -- I have never yet approved an informal proof of

20   claim request, but I think this could very well be the first.

21        MR. SMOLINSKY:  Your Honor, and that's fine.  We want

22   you to be aware of certain elements of that for your

23   consideration.

24        THE COURT:  Go ahead, please.

25        MR. SMOLINSKY:  The first is one of the issues as a

82

1    late filed claim is whether the motion intended to be an

2    informal proof of claim.  And I would just draw your attention

3    to the fact that the motion, itself, says, "That upon

4    information and belief the debtors do not expect their plan

5    will provide a distribution for unsecured creditors."  And

6    that's why we draw the conclusion.  They talk about the

7    insurance, they're wrong on the amounts.  They say that there's

8    insurance above five million, but one could draw the

9    conclusion --

10           THE COURT:  The actual number is what, thirty-five

11   million?

12           MR. SMOLINSKY:  Thirty-five million.  So, Your Honor,

13   one could draw the conclusion that this wasn't an attempt to

14   assert a claim against the estate, this was an attempt to go

15   forward with other defendants or go against insurance and not

16   against the debtors.

17           The second element goes to intent, I think.  I'm not

18   sure if Your Honor is aware, but the Lee's filed an appeal to

19   the sale order.  And that appeal is still pending.  The issues

20   on appeal are that they're a successor liability and now New GM

21   is the one responsible for paying the claim.

22           I think that that has some import because it indicates

23   perhaps an intent on their part not to file a proof of claim if

24   they thought that that filing a proof of claim may somehow

25   prejudice their appeal.  Which I don't think it would, but it

83

1    is interesting to note that they were -- at the same time that

2    they were talking to us, they have a pending appeal as to

3    whether we're even the party that is liable for this claim.

4          I think Your Honor is looking at this claim very

5    narrowly.  But I did want to make Your Honor aware of what is

6    happening with respect to late filed claims in this case, to

7    the extent it's relevant to your determination as to the

8    slippery slope or the precedence of ruling that this late claim

9    should be allowed.  And I apologize, I don't have anyone to lay

10   a foundation for this but I just --

11         THE COURT:  You haven't lied to me yet, I'll hear what

12   you have to say.

13         MR. SMOLINSKY:  Thank you, Your Honor.

14         THE COURT:  Just like I heard what Mr. Liu had to tell

15   me without subjecting him to an oath, I'll do the same with

16   you.

17         MR. SMOLINSKY:  Thank you.  Your Honor, late filed

18   claims is an issue in this case that we've only started to deal

19   with.  Since the bar date we've received through last week 2417

20   late filed claims.  The liquidated amounts of those claims are

21   in excess of 1.8 billion dollars.  That's the liquidated

22   portion.  So if there are personal injury actions, for example,

23   now they may very well be unliquidated at this point.

24         Knowing that there are issues of cause and knowing

25   that we're not of the view, subject to Your Honor's willingness

84

1    to change your order -- your bar date order, that there may be

2    a reason to allow claims that are filed very shortly after the

3    bar date.  The bar date was set on a Monday following a long

4    Thanksgiving Day weekend.  And we've had these discussions with

5    the committee to try to reach a consensus on what we should do

6    about it.  But there are issues.  If we allow just the late

7    filed claims in the week after the bar date that would be only

8    278 million of the 1.8 billion dollars filed within that one

9    week.  The second week there were over a billion dollars of

10   late filed claims.  So the question ultimately is how you

11   figure out what's fair and what's not fair, and whether you

12   should simply enforce the order of the Court that was entered.

13           So we would ask if Your Honor looks at these specific

14   circumstances that it does so with the understanding that any

15   order can implicate substantially more than this particular

16   claim.  I do agree there are some motions to lift the stay that

17   are pending, there are not an avalanche of those types of

18   motions that are currently pending.

19           In terms of prejudice, you can look at prejudice two

20   ways.  You could look at delaying the administration of the

21   estate.  We are making significant progress on the claims side.

22   Your Honor may recall it was part of the ADR process.  We

23   incorporated a capping procedure where parties with

24   unliquidated litigation claims could cap their claims at a

25   number which more reasonably reflects the amount of their

85

1    damages likely to be received.  In exchange for that, we've

2    moved them to the front of the line in the ADR program.  And

3    that has been wildly successful.  So we're very happy we're

4    moving ahead.

5          We haven't filed the plan yet, although that's coming.

6    But that's the structure -- that's the timing of the case in

7    terms of prejudice to the ultimate administration of the case.

8    If we were to allow a lot of these late filed claims to come in

9    we may be delaying the ability to make meaningful distribution

10   to creditors.

11         The other is prejudice to the other creditors.  And I

12   would submit that a forty million dollar claim, such as this,

13   as large as it may be in any other case, is not going to move

14   the needle in terms of prejudicing other parties.

15         THE COURT:  Well, that's true.  And, of course, just

16   as you pointed out that -- when you asked other tort claimants

17   to cap their claims at a more reasonable amount it was wildly

18   successful.  Somehow I suspect that if that same approach were

19   used here you wouldn't be faced with a forty billion buck claim

20   anymore.

21         MR. SMOLINSKY:  We would hope so, Your Honor.

22         Of course, if 1.8 million dollars or more are allowed

23   as late claims that would be a meaningful dilution of creditor

24   recoveries.  So that's really it on the late filed claims.  We

25   just wanted to make sure that Your Honor was aware, and to do

86

1    what we think the estate's responsibility is, is to give you

2    the law which dictates what cause should exist to allow a late

3    filed claim.

4         With respect to the motion to lift the stay, you know,

5    you can go through the Sonnax factors again.  Gerber's top list

6    of 2, 7 and 12.

7         THE COURT:  You did them pretty thoroughly in your

8    brief, so you can say what you choose.  But I don't know if you

9    need to spend that much time on the Sonnax factors.

10        MR. SMOLINSKY:  Maybe I'll just spend one or two

11   minutes talking about some of the most significant ones.  The

12   burden of the estate, this trial which, by the way, is still in

13   the discovery phase as noted, the expert depositions haven't

14   been completed, the defendant driver has not been deposed.

15   This is an eighteen-defendant case.  And the notion that the

16   debtors are going to go to Arizona and try an eighteen-

17   defendant case and sit three depositions with eighteen

18   defendants is a substantial burden.  The amount of -- the same

19   amount of resources that we would expend on trying that case

20   could adjudicate, through the mediation process, a much larger

21   number.

22        THE COURT:  Pause please, Mr. Smolinsky, because maybe

23   I missed it, maybe it was there and I missed it, but I

24   understand from what Mr. Liu told me about how there's a claim

25   asserted against GM, and it sounds to me pretty obvious that

87

1    there would be a claim against the driver under the facts that

2    he described.  But who are the other sixteen?  Are they parties

3    in the supply chain or what?

4            MR. LIU:  Your Honor --

5            THE COURT:  Your Honor, do you mind being interrupted

6    by Mr. Liu --

7            MR. SMOLINSKY:  No, not at all, Your Honor.

8            THE COURT:  -- so he can answer my question?

9            MR. SMOLINSKY:  Not at all.

10           MR. LIU:  Can I answer from here?

11           THE COURT:  Yeah, sure.

12           MR. LIU:  Your Honor, I'm only aware of one more

13   defendant which is ANC Car Rental Corporation.  I believe they

14   do business as Alamo --

15           THE COURT:  Yeah.

16           MR. LIU:  -- rental corporation.  I'm not aware of any

17   other defendants.

18           MR. SMOLINSKY:  Let me see where I saw it in the

19   papers, Your Honor.  Maybe I misread it, but I don't think that

20   I did.

21           I'm sorry, Your Honor.  I don't mean to hold you up.

22           I think what I saw, actually, is on page 11 of the

23   brief and maybe I read it too fast.  It says, "While it's

24   possible that the litigation against the seventeen nondebtor

25   defendants could proceed, claims against them are severed from

88

1      claims of debtors."

2          THE COURT:  Well, that would certainly give me the

3      same conclusion you drew.

4          MR. SMOLINSKY:  It may have been a reference to the

5      case cited, New York Med Group, but it says the rollover

6      plaintiffs in the next clause, which is a defined term.

7          THE COURT:  All right, continue, please.

8          MR. SMOLINSKY:  Just in terms of fairness, Your Honor,

9      there are hundreds, if not thousands of similar product

10     liability cases that I'm sure, many of which are close to

11     trial, perhaps much closer than this one, and we have not seen

12     a large number of motions to lift the stay.  We've seen

13     significant cooperation in the mediation process.  And we think

14     that we should have the ability to endeavor to settle this

15     case, along with the others, in the ordinary course at a

16     fraction of the cost that it would cost to try this case.

17         In terms of the prejudice to creditors, I think the

18     fact that they didn't file a claim, to the extent you allow the

19     claim, should not be the basis for which they should be

20     advantaged versus other claimants who are patiently waiting for

21     their claim to be adjudicated in the bankruptcy court through

22     the ADR process.  I think Your Honor has a whole host of facts

23     in evidence before you from other matters about the number of

24     litigation claims that we are dealing with, and I don't see any

25     basis for preferring this plaintiff to the others, in terms of

89

1    getting on the docket and expending resources of this estate.

2          THE COURT:  All right, thank you.

3          MS. SHARRET:  My apologies for not making an

4    appearance earlier.  Jennifer Sharret from Kramer Levin on

5    behalf of the official committee of unsecured creditors.

6          THE COURT:  Sure, can I just get your last name again,

7    please?

8          MS. SHARRET:  Sharret.

9          THE COURT:  Sharret?

10          MS. SHARRET:  Yes.

11          THE COURT:  Thank you.

12          MS. SHARRET:  I just wanted to confirm what Mr.

13    Smolinsky stated regarding the committee's great concern about

14    the amount of claims that are filed.  And while a 40 million

15    dollar claim will not move the needle, 1.8 billion dollars

16    certainly will, and we are in communications with the debtors

17    on to a procedure to establish for which claims -- if they're

18    claims just late by a day or a week -- should not be objected

19    to.  And we are not in a position to comment on the facts of

20    the notice which Mr. Liu received or Mr. Liu's clients

21    received.  But if the Court were to allow this claim, we would

22    certainly ask that it be very limited to these very specific

23    facts as Your Honor noted.

24          THE COURT:  And driven by the unique facts concerning

25    the lack of notice.

90

1          MS. SHARRET:  Yes, Your Honor.

2          THE COURT:  Yeah, I understand.

3          MS. SHARRET:  Thank you.

4          THE COURT:  Thank you.  All right, Mr. Liu, do you

5     wish to reply?

6          MR. LIU:  Very briefly.  Thank you.  Your Honor, I'm

7     just going to reply to the late file claim motion.  Debtors'

8     counsel indicates and discusses prejudice to other creditors,

9     but I'm not aware that that's a factor in a motion to file late

10    claim under the Pioneer factors or under the Dana test for an

11    amended proof of claim.  So I'm not sure that's relevant to the

12    motion to file late claim.  It's absolutely relevant to the

13    motion to lift stay.  And I've already said my piece on that

14    part.  I think just one comment.  We need to focus on the

15    oversight that was provided by the debtors' estate as well as

16    the creditors'.  There was oversight, in this case, by both

17    parties, and that contributed to the mess we're in now.  And

18    that is unique; it's very unique.  I don't expect that -- I

19    don't think that debtors have encountered a situation where

20    there have been change of attorneys where they have been

21    sending notices to one person on behalf of the creditors who

22    actually live in another country, so instead of sending them to

23    their house in the U.S., they relied on the attorney they

24    thought was representing them.  So the notices that were sent

25    to creditors went to the attorney they thought was representing

1    them.  Then they also sent notices to that attorney they

2    thought was representing them, and that was -- that constitutes

3    the majority of the bar notice packages that were sent out.

4    Only two of them reportedly reached the law offices of the Kim

5    law firm.  And again, I'm in front of you representing that I

6    sat on the ground, looked through all the files, and I have not

7    found a hard copy of it, although we have found the e-mail

8    notice of your order stating that, from December 2009.

9            THE COURT:  Um-hum.

10           MR. LIU:  That's it.  Thank you.

11           THE COURT:  All right, thank you.

12           Folks, I'm denying the motion for relief from the stay

13   and continuing for a further evidentiary hearing the motion to

14   file the late claim on the basis of excusable neglect or to

15   deem the prior dialogue and the notice that the debtor

16   previously got as an informal proof of claim.  And I'll dictate

17   a formal decision on the Sonnax and say a little more, vis-a-

18   vis the continued portion, although I think it's self-evident.

19           On the motion for relief from the stay, movants Sang

20   Chul Lee and Dukson Lee, as plaintiffs and the natural

21   guardians of Jin Ah Lee, decedent, in the personal injury and

22   wrongful death actions in Arizona State Court stemming from the

23   single-car rollover crash seek an order pursuant to Section

24   362(d) of the Code, modifying the automatic stay to permit them

25   to continue litigating the Arizona State Court action, which

1    I'll refer to as the Arizona action.

2        The Lees' motions is denied with the following being

3    my findings of fact, conclusions of law, and bases for the

4    exercise of my discretion in connection with this

5    determination.  As facts, I find that the Arizona action was

6    commenced approximately five years ago and that discovery is

7    ongoing but not yet substantially complete.  While document

8    discovery is said to have been substantially completed,

9    deposition discovery, which is an important aspect of any tort

10   litigation, is not.  And expert discovery, which is a

11   particularly important aspect of any products liability case,

12   is not.  In the Arizona action, the movants sued GM as well as

13   the rental car company and the driver of the vehicle, possibly

14   but not clearly having also sued others, alleging that GM

15   produced an unsafe automobile, partly responsible for the death

16   of their adult daughter in a car crash in June 2003.

17       The Arizona action was stayed on August 8, 2005 and

18   resumed activity in mid-2007.  The defendant driver of the

19   relevant vehicle has only recently been located.  No trial date

20   has yet been set.

21       GM does not have first dollar insurance coverage over

22   product liability claims such as those alleged in this action.

23   All product liability claims are subject to a thirty-five

24   million dollar self-insured retention policy, which means, as a

25   practical matter, that the debtors are responsible for the

93

1    first thirty-five million of any liability imposed for a single

2    claim.  Also, the debtors' insurance policies do not cover the

3    debtors' defense costs for any product liability cases.

4         On February 3rd, 2010, I authorized the implementation

5    of alternative dispute resolution procedures, including

6    mandatory mediation for personal injury claims.  If I were to

7    deny the motion for relief from the stay, and if in the related

8    motion, I ultimately honored the creditors' proofs of claim,

9    that alternative dispute resolution mechanism would provide a

10   useful, if not grossly superior, mechanism for addressing the

11   needs and concerns of both sides.

12        After the sale of substantially all of the debtors'

13   assets, which I approved on July 5, 2009, the debtors no longer

14   have in-house counsel, nor do they employ the engineers or

15   other personnel who designed the vehicle at issue in the

16   Arizona action.  Of course, as we heard in the matter before

17   this, certain employees and personnel and, presumably,

18   documents can be subpoenaed, but while that is an available

19   mechanism, it's not the ideal mechanism.  The debtors have also

20   not officially retained outside counsel in the Arizona action.

21        Now, turning to my conclusions of law and bases for

22   the exercise of my discretion, 362(d) of the Code provides that

23   the automatic stay may be modified for cause.  In determining

24   whether cause has been shown, courts consider the particular

25   circumstances of the case and a request to modify the stay to

94

1    permit the continued litigation against the estate invoke what

2    we, in the Second Circuit, call the Sonnax factors, named after

3    the Second Circuit's decision in the case of In re Sonnax

4    Industries, 907 F.2d 1280.  Sonnax embodied standards by which

5    we bankruptcy judges determine, in the exercise of our

6    discretion, whether a particular litigation should be allowed

7    to proceed or not.  Only those factors relevant to a particular

8    case need to be considered, and some factors carry far more

9    weight, or more weight, than others.  See In re Touloumis,

10   170 B.R. 825, 828.

11        I'm going to deal with the various Sonnax factors and

12   the facts related to them in a single discussion, without

13   laying out all those factors and then coming back to repeat

14   them to talk about how they apply or don't apply.  They're not

15   exclusive, but most of the time, relying on the specific

16   articulated Sonnax factors is sufficient to make a reasoned

17   determination.  Whenever you have listed factors that are

18   applicable to a broad array of circumstances, it's common that

19   individual factors apply to greater or lesser degrees, and I'll

20   deal with them as they go forward.  In my experience, the most

21   important of those factors, as Mr. Liu noted, are factors 2, 7,

22   and 12.

23        Factor 7 is whether litigation in another forum would

24   prejudice the interests of other creditors.  That's important

25   because when managing a bankruptcy case, a bankruptcy judge has

95

1    to consider everybody in the case, including the universe of

2    unsecured creditors or the other unsecured creditors, and where

3    applicable, even secured creditors, and has to address the

4    needs and concerns of the movant in the context of the needs of

5    all of the other creditors in the case.  Allowing the Arizona

6    action to continue would prejudice the interests of other

7    creditors because the debtors would have to expend scarce

8    resources litigating the case at issue, here, as well as

9    similar lift-stay motions that would be likely to ensue if I

10   were to grant the motion for relief from the stay here.  Mr.

11   Liu has pointed out with some force that the number of stay

12   relief motions filed so far, roughly twenty, is fairly modest

13   in the context of this case which is, as he argues, one of the

14   largest in bankruptcy history.  Nevertheless, a matter of this

15   sort is of concern both in this case and as an institutional

16   matter.  And of course, while we're now engaged in what I might

17   called reasoned speculation, the issue, if I were to grant

18   this, wouldn't be so much the stay relief motions that were

19   already filed that were picked up in the database search, but

20   those that might be filed if they knew the courts were

21   receptive to it, going forward.  So the analysis is not quite

22   complete by only looking at the twenty that have been filed, so

23   far.

24        As importantly, or more so, allowing the Arizona

25   action to proceed would require the debtors to write out checks

96

1    in post-petition dollars for the lawyers and other costs

2    associated with the defense of the case, which would raise the

3    risk, if not the certainty, of taking money out of the pockets

4    of all of the other members of the unsecured creditor community

5    who have an understandable desire that the estate shepherd its

6    resources to the maximum extent possible to deal with the

7    claims against the estate in the most economical fashion

8    available.  The parties don't dispute that the cost of

9    defending the action in Arizona would fall on the debtors, and

10   therefore, deplete the estate's resources to the prejudice of

11   other creditors.

12        Now, when we talk about the second factor, lack of any

13   connection with or interference with the bankruptcy case, the

14   estate's use of its resources to defend litigation in the least

15   economical fashion interferes with the bankruptcy case.  As I

16   noted, addressing these claims in a distant forum in state

17   court is the least efficient way of addressing that on the

18   merits.

19        Turning now to the twelfth factor, in my experience,

20   the impact of the stay on the parties in the balance of harm,

21   factor number 12 is one of the most important.  Lifting the

22   stay would harm the debtors' estates, whereas preserving the

23   stay would not materially harm the movants, if, in fact, it

24   would harm them at all.  There has been no showing and I have

25   no basis for the belief that the inference is reasonable that

1    the movants would recover in excess of thirty-five million

2    dollars in the Arizona action, so the movants would suffer no

3    injury from having their claim litigated -- liquidated within

4    the bankruptcy process, which, as I've noted, would be done at

5    much greater efficiency and reduced cost, and any other

6    recovery to which they may be entitled will be paid directly

7    from the estates' assets as a general, unsecured claim.

8            We talked about the availability of alternative

9    mechanisms to facilitate addressing this claim into ultimately

10   address the needs and concerns of both sides and the debtors'

11   alternative dispute resolution provides one such option.

12   Lifting the stay would harm the debtors' estates because if the

13   debtors have to go through this litigation elsewhere and pay

14   the cost of defending it in one hundred cent administrative

15   expense bankruptcy dollars, that will be notably harmful to the

16   estates and the remainder of the creditor community.

17           The fifth factor, whether the debtors' insurer has

18   assumed full responsibility for defending the debtor, is a

19   factor that militates in favor of relief from the stay, when

20   it's present.  But it's not, here.  Looking at the interest of

21   judicial economy and the expeditious and economical resolution

22   of the litigation, I've already talked about the advantages of

23   utilization of the ADR mechanisms that we already have here.

24   Sending this and similar litigation to other forums would be

25   inconsistent with the use of that mechanism here and would

98

1    forfeit a valuable benefit.

2           The eleventh factor, whether the parties are ready for

3    trial in the other proceeding, also militates in favor of the

4    stay when present, but I can't make such a finding here.  To

5    say that discovery is substantially complete because paper

6    discovery has been completed, in my view, miscomprehends the

7    importance of deposition testimony in any tort injury case.

8    Without taking into account deposition discovery, there simply

9    is, in my view, no way to argue that discovery is substantially

10   complete.

11          For the foregoing reasons, I exercise my discretion by

12   denying relief from the stay.  The debtors are to settle an

13   order in accordance with the foregoing at their earliest

14   reasonable convenience.  The time to appeal from this

15   determination will run from the time of the resulting order and

16   not from the time of this dictated decision.

17          Now, the second matter that's before me involves

18   whether the Lee family should be allowed to proceed with a

19   claim with the claims processes in this court.  I am not in a

20   position to reach a final decision as to this, and ultimately,

21   it will require, if it's not consensually resolved, an

22   evidentiary hearing as to which I'm going to continue this

23   motion for such purpose.

24          The facts here, as alleged, not proven -- at least not

25   proven with the degree of fact-finding that I think any dispute

99

1    would require -- suggests that some or all of the notices to

2    the debtors were not sent to addresses which reasonably could

3    result in notice, that 1 out of 5,000 or so docket entries was

4    overlooked when e-mailed notice of the entry of an order was

5    provided, and that there may be a lot of fault to go all

6    around.  It is not clear to me that even with that, the Pioneer

7    standards have been satisfied, but I think the Lee's alternate

8    motion, that the debtors were well aware of the fact that the

9    Lee family wanted to recover on a lawsuit from them arising out

10   of a car crash, is a much stronger position.  Ultimately, I

11   would need evidence as to the dialogue that went on between

12   counsel for the Lee family and counsel for the estate in

13   connection with all of the communications that seem to have

14   gone back and forth.  But I think it's sufficiently possible

15   that I or another trier of fact could determine that the debtor

16   knew that the Lees really wanted to proceed with the lawsuit

17   against the estate and that they wanted to recover for whatever

18   the ultimate evidence would support, causes me to believe that

19   they should have their day in court on that issue, and that

20   this may be the paradigmatic case for the first time that I

21   will ever authorize a late filing or bless an informal proof of

22   claim.  Not finding it today, but I certainly think the Lee

23   family has caused me to really scratch my head and wonder

24   whether the debtors were really in the dark about what they

25   were trying to do.

100

1        I am very sensitive to the estate's concerns about

2    late claims.  And if I were required to decide the Pioneer

3    prong of this, I would want to hear even more about that.   But

4    the dialogue that went on between counsel for the Lee family

5    and counsel for the estate would at least seemingly raise very

6    unique circumstances, and I'm going to need to hear more

7    evidence about that.

8        While you guys are getting ready for the continued

9    evidentiary hearing which will be held at a date convenient to

10    both of you and, as importantly, to the Court, I do want you to

11    redouble your efforts to see if there is a basis upon which

12    there can be an agreement as to an allowed claim to be paid in

13    bankruptcy dollars here.  If there isn't, then we'll go by the

14    rules.  I would think that if the debtors are willing, allowing

15    the Lees into the ADR program might be beneficial, but I leave

16    it to you to decide that.  Obviously, each side has the ability

17    to stand by its rights and to proceed with the evidentiary

18    hearings which I'm stating we're going to have to have on that

19    aspect of the motion I haven't decided yet.

20        All right, on the latter part, I'm merely going to so

21    order the record, unless the somebody wants an interim order.

22        Do we have any further business, Mr. Smolinsky?

23        MR. SMOLINSKY:  That's it, Your Honor.  Thank you.

24        THE COURT:  Good.  Have a good day.  We're adjourned.

25        (Proceedings concluded at 12:49 PM)

101

1

2                              I N D E X

3

4                            R U L I N G S

5    DESCRIPTION                                    PAGE      LINE

6    Motion for an Order Appointing Dean M.          10         3

7    Trafelet as Legal Representative for

8    Future Asbestos Personal Injury Claimants,

9    granted

10

11   Application to Employ Stutzman, Bromberg,       10        19

12   Esserman & Plifka, P.C. as Counsel to the

13   Legal Representative for Future Asbestos

14   Personal Injury Claimants, granted

15

16   Application to Employ Caplin & Drysdale,        29        12

17   Chartered as Counsel to the Official

18   Committee of Unsecured Creditors Holding

19   Asbestos-Related Claims Nunc Pro Tunc

20   To at least March 5, 2010, granted

21

22   Motion of Stanley R. Stasko for Relief          39        13

23   from the Automatic Stay, denied

24

25

1

2                          I N D E X (cont'd.)

3

4                          R U L I N G S (cont'd.)

5        DESCRIPTION                              PAGE      LINE

6        Debtors' Objection/Demurrer to Request    65        20

7        of William Hardee for Payment of

8        Administrative Expenses, denied

9

10       Request of William Hardee for Payment of  67        25

11       Administrative Expenses, continued

12

13       Motion of Sang Chul Lee and Dukson Lee for  91      12

14       Relief from the Automatic Stay, filed by

15       Michael S. Kimm, denied

16

17       Motion of Sang Chul Lee and Dukson Lee to   91      13

18       File Proof of Claim After Claims Bar Date,

19       or Alternatively, to File Amended Proof of

20       Claim, continued due to excusable neglect

21

22

23

24

25

103

C E R T I F I C A T I O N

I, Clara Rubin, certify that the foregoing transcript is a true

and accurate record of the proceedings.

_____

Clara Rubin

AAERT Certified Electronic Transcriber (CET**D-491)

Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501

Date: April 9, 2010