Hearing Date and Time: **April 29, 2010 at 9:45 a.m.** (Prevailing Eastern Time)
Objection Date and Time: **April 22, 2010 at 4:00 p.m.** (Prevailing Eastern Time)

Timothy F. Nixon
Katherine Stadler (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
                                                           :
In re:                                                     :   Chapter 11
                                                           :
MOTORS LIQUIDATION COMPANY, *et al.,*                      :   Case No. 09-50026
   f/k/a General Motors Corp., *et al.,*                   :   (Jointly Administered)
                                                           :
                                         Debtors.          :   Honorable Robert E. Gerber
                                                           :
---------------------------------------------------------- x

# FEE EXAMINER'S PRELIMINARY REPORT ON
# THE FIRST INTERIM FEE APPLICATION OF BAKER & MCKENZIE LLP

**TO:   THE HONORABLE ROBERT E. GERBER**
       **UNITED STATES BANKRUPTCY JUDGE**

The Fee Examiner of General Motors Corporation (n/k/a Motors Liquidation Company), appointed on December 23, 2009, submits this *Preliminary Report* pursuant to the *Stipulation and Order With Respect to Appointment of a Fee Examiner* [Docket No. 4708] (the "**Fee Examiner Order**") in connection with the *First Interim Application of Baker & McKenzie for Compensation and Reimbursement of Expenses for Services Rendered as Special Counsel for the Debtors for the Period June 1, 2009 Through September 30, 2009* [Docket No. 4454] (the "**Fee Application**"). The Court appointed the Fee Examiner to monitor the fees and expenses incurred by professionals in these chapter 11 cases and to provide periodic reports to the Court,

separately or in conjunction with applications submitted for approval by the professionals, with or without a filed objection.

With this *Preliminary Report*, the Fee Examiner summarizes his initial analysis of the Fee Application but makes no concurrent recommendations in light of his negotiations with Baker & McKenzie LLP ("**Baker**").  Instead, Baker has agreed the Fee Application, which requests $1.26 million in fees and about $21,500 in expenses, will be deferred—subject to further audit and subsequent recommendations by the Fee Examiner.  The Fee Examiner respectfully represents:

## SUMMARY STATEMENT

A fee applicant bears the burden of proof on all of the elements of a fee application, including proving that the services provided were necessary and reasonable and that the billed expenses were necessary, reasonable, and actually incurred.  A fee application must additionally comply with the format and content requirements in the applicable guidelines and bankruptcy rules.

In general, the Fee Application is substantively sound.  Nonetheless, after reviewing the Fee Application, counsel for the Fee Examiner raised a series of observations with Baker by letter dated April 1, 2010.  While Baker has not yet responded substantively to the Fee Examiner's inquiries, the firm and the Fee Examiner have had productive discussions about the issues raised.

On April 15, 2010, the Fee Examiner sent Baker a draft of this Report containing a limited objection to certain of Baker's fees, offering a second opportunity for discussion.  Baker responded to the draft report on April 20, 2010, noting that it required additional time to compile supporting materials before the scheduled April 29, 2010 hearing on the Fee Application. Accordingly, Baker and the Fee Examiner have agreed:

  (i)  to a Stipulated Adjournment of the April 29, 2010 Hearing on the First Interim Fee Application of Baker & McKenzie LLP;

  (ii)  to the payment of an additional 10 percent of Baker's requested fees. *See* ¶ 8, below; and,

  (iii)  to subject the Fee Application and all subsequent applications to further audit, the results of which will be presented on the adjourned hearing date.

## BACKGROUND

1. Commencing on June 1, 2009, General Motors Corp. and certain of its affiliates ("**Debtors**") filed in this Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b). The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(2) and 1108.

2. On June 3, 2009, Diana G. Adams, the United States Trustee for the Southern District of New York, appointed the statutory committee of unsecured creditors pursuant to 11 U.S.C. § 1102 (the "**Creditors' Committee**").

3. On December 23, 2009, the United States Trustee, the Debtors, and the Creditors' Committee proposed by stipulation the appointment of Brady C. Williamson as examiner in the above-captioned chapter 11 cases (the "**Fee Examiner**") and, without objection and through the Fee Examiner Order entered that same day, the Court approved the appointment.

4. On January 5, 2010, the Fee Examiner submitted an *Application of the Fee Examiner for Authorization to Employ and Retain Godfrey & Kahn, S.C. as Counsel to the Fee Examiner, Nunc Pro Tunc to December 28, 2009* and, without objection, the Court entered an Order authorizing the employment of Godfrey & Kahn, S.C. ("**Godfrey & Kahn**") on January 19, 2010 [Docket No. 4833].

3

5.	The Fee Examiner filed the *Fee Examiner's Application to Authorize the Limited Retention and Employment of the Stuart Maue Firm as Consultant to the Fee Examiner as of January 22, 2010.* [Docket No. 4910]. Without objection, the *Order Pursuant to Section 327(a) of the Bankruptcy Code Authorizing the Retention and Employment of the Stuart Maue Firm as Consultant to the Fee Examiner Nunc Pro Tunc as of January 22, 2010* was entered on February 17, 2010 [Docket No. 5005], authorizing Stuart Maue (the "**Auditor**") to work with the Fee Examiner and counsel in reviewing the first interim fee and expense request of Jenner & Block LLP; Brownfield Partners, LLC; Kramer Levin Naftalis and Frankel, LLP; LFR, Inc.; and, The Claro Group, LLC.

6.	On April 5, 2010, the Fee Examiner submitted the *Fee Examiner's Application to Authorize the Extended Retention and Employment of the Stuart Maue Firm as Consultant to the Fee Examiner as of March 8, 2010* [Docket No. 5431]. On April 19, 2010, the Debtors filed the *Response of Debtors to Fee Examiner's Application to Authorize Extended Retention of the Stuart Maue Firm As Consultant to the Fee Examiner as of March 8, 2010* [Docket No. 5522]. The Stuart Maue Application and Response will be scheduled for hearing on April 29, 2009, along with the pending first interim fee applications. Notwithstanding the hearing's outcome, Baker has stipulated to a full audit of the Fee Application, which will be incorporated into a subsequent report.

7.	On July 22, 2009, the Debtors filed their *Application of Debtors for Entry of Order Pursuant to 11 U.S.C. § 327(E) and Fed. R. Bankr. P. 2014 Authorizing Retention and Employment of Baker & McKenzie as Special Counsel, Nunc Pro Tunc to the Commencement Date* [Docket No. 3283] (the "**Retention Application**"). There were no objections to the Retention Application, and Baker was appointed by this Court's *Order Pursuant to 11 U.S.C.*

4

*§ 327(e) and Fed. R. Bankr. P. 2014 Authorizing Retention and Employment of Baker & McKenzie as Special Counsel to the Debtors, Nunc Pro Tunc to the Commencement Date* [Docket No. 3634] (the "**Retention Order**").

8.  On November 16, 2009, Baker filed the Fee Application, seeking fees in the amount of $1,262,789.76 and expenses in the amount of $21,619.20, for total requested compensation in the amount of $1,284,408.96 for the period from June 1, 2009 to September 30, 2009. As a result of the Court's *Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 3711] (the "**Compensation Order**"), Baker has previously been paid $963,008.39 in fees and expenses for services provided and expenses incurred during the first interim fee period, subject to Court review and approval. The unpaid amount requested in the Fee Application was $321,400.57. As of the date of this report, Baker has received additional payments totaling approximately $23,000 as reflected in the Debtors' Monthly Operating Reports.

9.  The Fee Examiner has evaluated the Fee Application, the Retention Application, the Retention Order, the *Declaration of A. Duane Webber and Disclosure Statement of Baker & McKenzie Pursuant to Sections 327(e), 329 and 504 of the Bankruptcy Code and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure in Support of Application of Debtors for Entry of Order Pursuant to 11 U.S.C. §§ 327(E) and Fed. R. Bankr. 2014 Authorizing Retention and Employment of Baker & McKenzie as Special Counsel, Nunc Pro Tunc to the Commencement Date* [Docket No. 3283, Ex. A] (the "**Webber Declaration**") and the *Amended and Restated Declaration of A. Duane Webber and Disclosure Statement of Baker & McKenzie Pursuant to Sections 327(e), 329 and 504 of the Bankruptcy Code and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure in Support of Application of Debtors for Entry of Order Pursuant to*

5

*11 U.S.C. §§ 327(e) and Fed. R. Bankr. 2014 Authorizing Retention and Employment of Baker & McKenzie as Special Counsel, Nunc Pro Tunc to the Commencement Date* [Docket No. 3597] (the "**Amended Webber Declaration**").

10. By correspondence dated April 1, 2010, counsel to the Fee Examiner requested supplemental information from Baker as part of the review of specific matters in the Fee Application. The supplemental information involved:

- A. Context of Work Performed;
- B. Currency Conversions;
- C. Transition Issues;
- D. Prepetition Fees;
- E. Overcharges;
- F. Block Billing;
- G. Billing and Retention Matters;
- H. Vague Tasks and Vague Communications; and,
- I. Expenses.

On April 5, counsel for the Fee Examiner again contacted Baker regarding time entries that appeared to be missing from the Fee Application; Baker supplied those time entries later the same day by email. This *Preliminary Report* is based on a manual review of the Fee Application without Stuart Maue's quantitative analysis.

11. On April 15, 2010, counsel for the Fee Examiner submitted a draft of this pleading to Baker, permitting additional opportunity for comment and discussion. Baker responded to the draft report on April 20, 2010, noting that it required additional time to compile

6

supporting materials before the scheduled April 29, 2010 hearing on the Fee Application. Accordingly, Baker and the Fee Examiner have agreed:

(i) to a Stipulated Adjournment of the April 29, 2010 Hearing on the First Interim Fee Application of Baker & McKenzie LLP;

(ii) to the payment of an additional 10 percent of Baker's requested fees. *See* ¶ 8, below; and,

(iii) to subject the Fee Application and all subsequent applications to further audit, the results of which will be presented on the adjourned hearing date.

## APPLICABLE STANDARDS

12. The Fee Application has been evaluated, without an audit, for compliance with the *Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, Administrative Order M-104 (Bankr. S.D.N.Y. June 20, 1991), and the *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, Administrative Order M-151 (Bankr. S.D.N.Y. April 19, 1995) (collectively, the "**Local Guidelines**"), the *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under U.S.C. § 330*, 28 C.F.R. Part 58, Appendix A (the "**UST Guidelines**"), the *Fee Examiner's First Status Report and Advisory* [Docket No. 5002] (the "**First Advisory**"), the *Fee Examiner's Second Status Report and Advisory* (the "**Second Advisory**") [Docket No. 5463], as well as this Court's Compensation Order and Quarterly Reporting Order—including the extent, if any, that variation has been expressly permitted by order. The Fee Examiner and Baker have stipulated that a full audit will permit the Fee Examiner to make additional recommendations to the Court.

## COMMENTS

13. **Transition**. The Fee Examiner noted that, in Baker's initial retention documents, in its amended and restated declarations in support of retention, and in the fee application itself,

7

some confusion surrounded the assignment of responsibility for the payment of Baker's bills. Responsibility for billings to the "Project Beam" transaction, for example, ultimately fell to NewGM after the July 10 closing of the section 363 sale. Baker's fee application, however, discloses that the "Project Beam" transaction did not close (at least not during the fee application period), raising questions about the assignment of the responsibility for the fees associated with the transaction to the Debtors' estate.

14. Uncertainty also surrounded responsibility for the Delphi Steering Acquisition fees, "Project Two" and "Project Three" fees, as well as for the fees arising from Baker's work on federal tax matters. Billings for these matters comprise the vast majority of Baker's $1.2 million fee request. The Fee Examiner has directed inquiries to the Debtors on the matter; however, the Fee Examiner has not reached any conclusion about the ultimate responsibility for those fees. They may not be the Debtors' responsibility at all, requiring reimbursement in whole or in part from NewGM.

15. **Project Staffing**. Baker's services have been provided by four position titles for attorneys and at least ten position titles for non-attorneys. Baker professionals from nearly two dozen offices across the United States and abroad worked on matters covered by the Fee Application; those professionals billed their time in U.S. dollars, Australian dollars and Euros. The professionals' rates, in U.S. dollars, supplied by Baker in the Fee Application are based on currency conversions done on various dates and not on the date of the Fee Application, which is required by local order. *See* Fee Application, Ex. B, Summary of Professionals & Paraprofessionals Rendering Services (the "**Attorney Summary**"); *Order Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals*, General Order M-348 (Bankr. S.D.N.Y. Mar. 21, 2008) (amending General Order M-219). The

8

Fee Examiner requested a recalculation of fees and expenses as of the date of the Fee Application in the April 1, 2009 letter to Baker. Baker did not respond; however the parties anticipate that the audit process will help clarify the currency conversion issues.

16. Baker disclosed that its current hourly rates for associates and partners outside the United States range from $200 to $1200—depending on the jurisdiction and the currency conversion. *See* Webber Declaration, ¶ 5. Baker provided a summary sheet identifying each professional who provided services to the Debtors during the first interim fee period along with their title and billing rate.[1] The highest billing partner provided services at $1162.59 an hour.

17. Baker did not disclose the actual billing rates for its professionals in the Retention Application. Instead, Baker disclosed the billing rate ranges for "professionals expected to spend significant time" on the Debtors' matters. Webber Declaration, ¶ 5. The term "significant" was left undefined. The ranges—$325 to $925 for partners; $200 to $700 for of-counsel;[2] $150 to $540 for associates; and $60 to $250 for paraprofessionals—are so broad as to be largely uninformative. Moreover, some billers fall outside the disclosed ranges; for example, one paralegal billed 6.0 hours at $280 per hour. Again, the audit process will permit Baker to explain these variances and, if appropriate, to adjust them.

18. Baker's professional services were provided at a blended rate of $507.61 per hour with a total blended rate, including paraprofessionals, of $480.40 per hour. These blended rates appear to correspond to rates charged by mid-level associates at Baker. The Fee Examiner reviewed the individual professionals' time entries. However, the vagueness of the task

---

[1] The summary's format makes evaluating billing rates more cumbersome than necessary. The summary consists of two spreadsheets: one spreadsheet contains the person's name and title, the second contains the person's name and billing rate. To determine the range of billing rates for any given title (for example, associates), the reviewer must cross reference both spreadsheets. Fee applicants should format their applications to allow for easy reference during the mandatory fee review process.

[2] Baker did not disclose a fee range for special counsel.

descriptions made it difficult for the Fee Examiner to determine whether certain tasks were properly delegated to less experienced professionals capable of completing the work at a lower billing rate or whether professionals had duplicated their efforts. For example, one 2004 Corporate Commercial associate billed at 270 €an hour (approximately $407.70 USD)[3] for drafting various agreements on the Project Beam matter as did a Corporate Commercial partner billing at 460 €an hour (approximately $694.60 USD). The Fee Examiner also noted that certain partners billed for work that might have been more appropriately assigned to a paraprofessional, such as reviewing the docket and filings, or for work that does not appear to have resulted in any product, such as time spent reviewing correspondence.

19. In the absence of extenuating circumstances brought to the attention of the Fee Examiner, the preferred practice is for tasks to be managed by senior personnel with tasks performed at the lowest appropriate billing rate by less senior personnel. The Fee Examiner notes that certain other professionals with pending applications have voluntarily agreed to reduce their standard billing rates for work performed in these cases.

20. The Fee Examiner has considered the extraordinary circumstances surrounding the initial period of this engagement. However, the lack of precision in recordkeeping by certain timekeepers and staffing of routine tasks by experienced professionals suggest that a percentage fee reduction may be reasonable and appropriate, depending in part on the results of the audit.

21. **<u>Length, Frequency and Distribution of Long Billing days</u>**. Some Baker professionals reported long billing days, which generally corresponded with periods of high activity. The Fee Examiner's general willingness to accept, essentially at face value, billed and reported time of more than 12 hours a day carries an implicit assumption now made explicit: that

---

[3] The Euro-to-dollar exchange rate used by Baker appears to have been $1.51 USD to 1.00 €. The rate can be determined by comparing the USD billing rate for a particular professional listed in the Attorney Summary with that professional's billing rate in Euros as determined by the time entries.

10

the billing attorney spent all of his or her time that day working on this matter. It is the professional's responsibility to ensure that is the case and that the application warrants that fact.

22. **<u>Overcharges and Undercharges</u>**. The Fee Examiner identified several billing discrepancies on the basis of a manual review that appear to have resulted in a net undercharge to the estate. A full audit will identify all billing discrepancies.

23. **<u>Double Billing</u>**. The Fee Examiner identified some overcharges as a result of double billing, totaling $153.45 (Delphi Project, Mexico City Office). A full audit will identify all billing discrepancies.

24. **<u>Transient Billers</u>**. The Fee Examiner identified multiple Baker professionals who billed approximately five hours or less. Their compensation request totals $116,680.86. While certain of these billers appear to have worked on discrete tasks, others billed for reviewing documents, for example—work that does not appear to have been necessary for any subsequent services they provided. It is the affirmative duty of every fee applicant to review the application to ensure that the application only includes necessary services actually provided for the benefit of the estate and that each professional's time entry be sufficiently detailed that the necessity and value of such service are readily apparent. A full audit will more precisely quantify the transient biller issue.

25. **<u>Law Clerks and Other Similar Paraprofessionals</u>**. Baker billed 137 hours, representing $27,020.39 in fees, for work performed by one summer associate, four law clerks, one "International Clerk," and three trainee solicitors. The summer associate's work accounted for $2,445 in fees.

26. Work performed by summer associates, or law students more generally, may be compensable, subject of course to the same reasonableness review as other professionals. *E.g.*,

*In re Recycling Indus.*, 243 B.R. 396, 404-05 (Bankr. D. Colo. 2000) (recognizing that summer associates "can be valuable and worthy of billing clients at reasonable rates"); *see also Missouri v. Jenkins*, 491 U.S. 274, 286-89 (1989) (non-bankruptcy context). Given this Court's disinclination to allow professionals to recoup summer associate fees through the section 330 process, however, the Fee Examiner recommends disallowance of all fees associated with summer associate billing. *See*, *e.g.*, *In re Chemtura Corp.*, First Interim Fee Application Hr'g Tr., at 37-38, No. 09-11233 (Bankr. S.D.N.Y. Sept. 29, 2009).

27.     The Fee Examiner's willingness to accept fees for work performed by law clerks carries with it the implicit assumption that Fee Applicants will voluntarily identify and reduce all fees associated with work performed by paraprofessionals who are functionally summer associates, even if they provide services under a different title. A full audit will identify all of the billing by summer associates or their equivalents.

28.     **Administrative Staff**. The Fee Examiner identified at least one instance where Baker billed for administrative staff time for services provided by a legal assistant at a cost of $457.99 in fees for 1.3 hours of work. Generally, expenses associated with administrative staff are a part of the professional's overhead. It appears this assistant provided services generally available through a paralegal. Although paralegal expenses may be compensable, the Fee Examiner considers the $352.30 hourly rate excessive and will recommend allowing such expenses at $250 per hour, the high end of Baker's disclosed paralegal rate. A full audit will comprehensively identify all instances of administrative staffing.

29.     **Internal Communications**. Baker professionals spent significant time corresponding, reviewing correspondence and emails, and conferring more generally. The Fee Examiner notes, for example, that some professionals in the Rome office describe much of their

12

time as "reviewing emails" rather than producing or aiding in the analysis, drafting or strategy of benefit to the estate. There are occasions when more than one person needs to participate in conference calls and internal meetings or must otherwise keep abreast of developments in a project, particularly at the outset of retention or when a project involves issues related to the law of multiple jurisdictions. Yet professionals need to explain such circumstances in their fee applications.

30. Notwithstanding the extraordinary circumstances of the time period in question, the Fee Examiner, after a full audit, may well recommend a fee reduction for the categories identified above.

31. **Events Staffing/Unexplained Travel**. The Fee Examiner's review addressed Baker's practice of staffing events with multiple professionals—staffing that can result in unnecessary charges for duplicative work being billed to the estate. The Fee Examiner in particular notes one 2006 Corporate Commercial associate who traveled three times from the London office to Zurich and back for negotiations on Project Beam that were also staffed by two Baker partners. The cost for those trips, on June 14 to 15, July 6 and July 8 was 15,660 €in fees and 3,777.65 €in travel-related expenses. Assuming a currency exchange rate of 1.51 dollars to the Euro, this amounts to $23,646.60 in fees and $5,704.25 in expenses. After audit and in the absence of any explanation for the necessity of such travel, the Fee Examiner may recommend that all fees and travel expenses associated with these trips be disallowed.

32. **Billing for Firm Retention and Compensation Matters**. Baker billed $122,222.32 in fees, or approximately 9.7 percent of its fee request, on matters identified as relating to Baker's Retention and Fee Applications. The time entries for June and July 2009, representing $80,772.81 in fees, largely describe compensable activities related to Baker's

13

retention. Beginning in August 2009, however, most if not all of the tasks consist of time spent that should be part of a professional's overhead, including editing time entries and creating and editing monthly bills.

33. The Fee Examiner notes that the line between compensable fee application and retention application activities and those that should be considered overhead is not clearly demarcated in the cases; however, professionals should make every effort to demonstrate in their fee applications that the tasks associated with their preparation are directly related to compliance with the Bankruptcy Code and not merely with every professional's ethical obligation to disclose the basis of fees charged. After audit and in the absence of further explanation from Baker, the Fee Examiner may recommend a reduction in fees charged for retention and compensation.

34. **Pre-Petition and Post-Sale Fees**. The Fee Examiner identified several time entries for pre-petition work. The Fee Examiner also identified a time entry for work performed by one timekeeper on July 31, 2009 on the U.S. Tax Liability project. Baker disclosed that all fees and expenses for the U.S. Tax Liability project from July 10, 2010 forward were being directed to NewGM. *See* Fee Application at 10. A full audit will identify all pre-petition and post-sale fees.

35. **Block Billing**. Pursuant to the UST Guidelines, time entries for multiple tasks in excess of 0.5 hours in aggregate time must identify the amount of time spent on each discrete task. The Fee Examiner identified numerous Baker professionals who failed to comply with this guideline on a consistent basis, which impeded the reasonableness review. Some examples: every time entry over 0.5 hours for each professional working in the Rome office on the Delphi Steering Acquisition project (total billing on the project: $21,912.69);[4] many time entries by a

---

[4] The Fee Examiner notes the common overlap between block-billed and vague entries throughout the Fee Application.

14

2004 Corporate Commercial associate (total fees $81,977.04); a Corporate Commercial partner (total fees $123,098.90); a 2006 Corporate Commercial associate (total fees $90,677.71); a 2005 Corporate Commercial associate (total fees $78,450.45); and, all time entries over 0.5 for work performed on Project Two and Project Three (total billing on the project $248,217.16). Baker did not respond to the Fee Examiner's general inquiry regarding Baker professionals' block billing practices.

36. After a full audit and in the absence of additional billing detail, the Fee Examiner may recommend a reduction for block billing.

37. **Billing Increments**. Several Baker professionals appear to routinely bill in increments other than tenths of an hour, including half-hour increments. Other timekeepers' billing is difficult to decipher on this basis. *See*, *e.g.*, Melbourne office associate (2003 graduate) billing on July 7, 2009 for 20 minute, 35 minute, 10 minute and 25 minute tasks. Billing in tenth-of-an-hour increments is required of all fee applicants. A full audit will identify all instances of improper billing increments.

38. **Vague Entries**. Multiple Baker professionals, including attorneys billing a large number of hours or at high hourly rates or both, routinely failed to adequately describe the tasks they performed. This lack of detail not only makes a review of that professional's fees more difficult, it also impedes the review of the fees billed by that professional's colleagues. After audit and in the absence of further billing detail, the Fee Examiner may recommend a reduction for vaguely-billed time entries.

39. **Expenses**. The Fee Examiner requested information from Baker regarding charges for local travel, documentation for out-of-town travel, and other expenses; Baker did not respond to these inquiries. The Fee Application contains charges that appear excessive: for

15

example, single night hotel stays for $673.20; improperly documented charges, such as charges for "Searches"; charges for expenses that are generally considered part of a fee applicant's overhead, such as postage; and finally, charges that simply do not appear to be reimbursable absent an explanation for their necessity and propriety. Notable among these types of charges are "Local Tax" and "Value Added Tax."

40. The Fee Examiner additionally notes some expenses that appear to be for legal or other professionals' fees in the amount of $395.45 for three professionals.[5] Professional fees are generally not reimbursable as expenses because they allow a professional to circumvent the retention process. *See, e.g.*, *In re Midland Capital Corp.*, 82 B.R. 233, 241 (Bankr. S.D.N.Y. 1988). Although there is no order in place addressing sub-retentions by professionals, the Court's ordinary course professionals order [Docket No. 2900] provides guidance. It authorizes the Debtors to employ *De Minimus* Professionals earning less than $20,000 each month without filing a retention application or seeking prior authorization from the Court.

41. A full audit will identify and quantify all of the questionable expenses, and the Fee Examiner will then make a recommendation for their reduction.

## CONCLUSION

This report is intended to advise the Court, the professionals, and the U.S. Trustee of the Fee Examiner's preliminary observations. It is not intended to be an exhaustive or exclusive list of possible objections and does not preclude or limit the Fee Examiner's scope of review or objection on this or any subsequent interim fee applications or final fee applications. All professionals subject to the Fee Examiner review should be aware, as well, that while the Fee

---

[5] The Sao Paolo office billed for two outside counsel for $111.82 and $223.63 in the Delphi Steering Acquisition project, and there is a charge for reimbursement for $60 to Baker & McKenzie Consulting LLP in the Technology Company project.

16

Examiner has made every effort to apply standards uniformly across the universe of professionals in this case, some degree of subjective judgment will always be required.

As the fee review and analysis continue, the Fee Examiner continues to develop a heightened sense of the complex landscape of this proceeding. The conclusions and recommendations in this report are, therefore, subject to further refinement upon receipt and review of the auditor's report and upon receipt of supporting detail from Baker.

WHEREFORE, the Fee Examiner respectfully submits this *Preliminary Report* for Baker's first interim fee application.

Dated: Madison, Wisconsin
April 22, 2010.

                              GODFREY & KAHN, S.C.

By:     */s/ Katherine Stadler*
       Katherine Stadler (KS 6831)
       Timothy F. Nixon (TN 2644)

       GODFREY & KAHN, S.C.
       780 North Water Street
       Milwaukee, Wisconsin 53202
       Telephone: (414) 273-3500
       Facsimile: (414) 273-5198
       E-mail: kstadler@gklaw.com
              tnixon@gklaw.com

*Attorneys for Fee Examiner*

4885423_1