Timothy F. Nixon
Katherine Stadler (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
                                                         :
In re:                                                   :      Chapter 11
                                                         :
MOTORS LIQUIDATION COMPANY, *et al.*,   :      Case No. 09-50026
    f/k/a General Motors Corp., *et al.,*            :      (Jointly Administered)
                                                         :
              Debtors.                             :      Honorable Robert E. Gerber
                                                         :
-------------------------------------------------------- x

**FEE EXAMINER'S REPORT AND STATEMENT OF LIMITED
OBJECTION TO THE FIRST INTERIM FEE APPLICATION OF
<u>KRAMER LEVIN NAFTALIS & FRANKEL LLP</u>**

**TO:    THE HONORABLE ROBERT E. GERBER
       UNITED STATES BANKRUPTCY JUDGE**

      The Fee Examiner of General Motors Corporation (n/k/a Motors Liquidation Company),

appointed on December 23, 2009, submits this *Report and Statement of Limited Objection*

pursuant to the *Stipulation and Order With Respect to Appointment of a Fee Examiner* [Docket

No. 4708] (the "**Fee Examiner Order**") in connection with the *First Interim Application of*

*Kramer Levin Naftalis & Frankel LLP, as Counsel for the Official Committee of Unsecured*

*Creditors, for Allowance of Compensation for Professional Services Rendered and For*

*Reimbursement of Actual and Necessary Expenses Incurred for the Period From June 3, 2009*

*Through September 30, 2009* [Docket No. 4459] (the "**Fee Application**").  The Court appointed

the Fee Examiner to monitor the fees and expenses incurred by professionals in these chapter 11

cases and to provide periodic reports to the Court, separately or in conjunction with applications

submitted for approval by the professionals, with or without a filed objection.

With this *Report and Statement of Limited Objection*, the Fee Examiner identifies

$520,863.97 in fees and expenses, from a total of $4,678,958.27 **requested** in the Fee

Application, that are objectionable.  The Fee Examiner respectfully represents:

## SUMMARY STATEMENT

A fee applicant bears the burden of proof on all of the elements of a fee application,

including proving that the services provided were necessary and reasonable and that the billed

expenses were necessary, reasonable and actually incurred.  A fee application must additionally

comply with the format and content requirements in the applicable guidelines and bankruptcy

rules.

After reviewing the Fee Application, counsel for the Fee Examiner raised significant

concerns about Kramer Levin Naftalis & Frankel LLP's ("**Kramer Levin**" or "**Committee**

**Counsel**") application by letter dated March 31, 2010.  On April 9, 2010, and in response to

counsel's letter, Kramer Levin voluntarily agreed to reduce its fee request by $7,547.33.

Subsequent communications between Kramer Levin and the Fee Examiner have yielded

additional stipulated reductions.  This *Report and Statement of Limited Objection* summarizes

the Fee Examiner's analysis in support of a suggested disallowance of $520,863.97 in fees and

expenses from a total request of $4,678,958.27 in compensation and expenses.

## BACKGROUND

1.      Commencing on June 1, 2009, General Motors Corp. and certain of its affiliates

("**Debtors**") filed in this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The

Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being

jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b). The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(2) and 1108.

2.      On June 3, 2009, Diana G. Adams, the United States Trustee for the Southern District of New York, appointed the statutory committee of unsecured creditors pursuant to 11 U.S.C. § 1102 (the "**Creditors' Committee**").

3.      On December 23, 2009, the United States Trustee, the Debtors, and the Creditors' Committee proposed by stipulation the appointment of Brady C. Williamson as examiner in the above-captioned chapter 11 cases (the "**Fee Examiner**") and, without objection and through the Fee Examiner Order entered that same day, the Court approved the appointment.

4.      On January 5, 2010, the Fee Examiner submitted an *Application of the Fee Examiner for Authorization to Employ and Retain Godfrey & Kahn, S.C. as Counsel to the Fee Examiner, Nunc Pro Tunc to December 28, 2009* and, without objection, the Court entered an Order authorizing the employment of Godfrey & Kahn, S.C. ("**Godfrey & Kahn**") on January 19, 2010 [Docket No. 4833].

5.      The Fee Examiner also filed the *Fee Examiner's Application to Authorize the Limited Retention and Employment of the Stuart Maue Firm as Consultant to the Fee Examiner as of January 22, 2010.* [Docket No. 4910]. Without objection, the *Order Pursuant to Section 327(a) of the Bankruptcy Code Authorizing the Retention and Employment of the Stuart Maue Firm as Consultant to the Fee Examiner Nunc Pro Tunc as of January 22, 2010* was entered on February 17, 2010 [Docket No. 5005], authorizing Stuart Maue (the "**Auditor**") to work with the Fee Examiner and counsel in reviewing the first interim fee and expense request of

Jenner & Block; Kramer Levin Naftalis & Frankel LLP; Brownfield Partners, LLC; LFR, Inc.; and The Claro Group, LLC.

6.      On April 5, 2010, the Fee Examiner submitted the *Fee Examiner's Application to Authorize the Extended Retention and Employment of the Stuart Maue Firm as Consultant to the Fee Examiner as of March 8, 2010* [Docket No. 5431]. On April 19, 2010, the Debtors filed the *Response of Debtors to Fee Examiner's Application to Authorize Extended Retention of the Stuart Maue Firm As Consultant to the Fee Examiner as of March 8, 2010* [Docket No. 5522]. The Application and Response will be scheduled for hearing on April 29, 2009, along with the pending First Interim Fee Applications.

7.      On June 17, 2009, the Official Committee of Unsecured Creditors (the "**Committee**") filed its *Application of The Official Committee of Unsecured Creditors of General Motors Corporation, et al. for An Order Authorizing and Approving the Employment and Retention of Kramer Levin Naftalis & Frankel LLP As Counsel, Nunc Pro Tunc, to June 3, 2009* [Docket No. 1744] (the "**Retention Application**"). There were no objections to the Retention Application, and Kramer Levin was appointed by this Court's *Order Approving Retention of Kramer Levin Naftalis & Frankel LLP as Counsel to the Official Committee of Unsecured Creditors, Nunc Pro Tunc to June 3, 2009* [Docket No. 2854] (the "**Retention Order**").

8.      On November 16, 2009, Kramer Levin filed the Fee Application, seeking fees in the amount of $4,593,910.50 and expenses in the amount of $85,047.77, for total requested compensation of $4,678,958.27 for the period from June 3, 2009 to September 30, 2009. As a result of the Court's *Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 3711] (the

"**Compensation Order**"), Kramer Levin has previously been paid $3,768,801.58 in fees and expenses for services provided and expenses incurred during the first interim fee period, subject to Court review and approval, leaving a holdback in the amount of $910,156.69. As of the date of this report, Kramer Levin has received additional payments totaling approximately $677,000 as reflected in the Debtors' Monthly Operating Reports.

9.      The Fee Examiner has evaluated the Fee Application, the Retention Application, the Retention Order, the *Declaration of Thomas Moers Mayer in Support of Application for Order Approving Retention of Kramer Levin Naftalis & Frankel LLP As Counsel to the Official Committee of Unsecured Creditors* [Docket No. 1744, Ex. A] (the "**Mayer Declaration**"), and the results of the Stuart Maue audit, and *Supplemental Declaration of Thomas Moers Mayer In Support of Application for Order Approving Retention of Kramer Levin Naftalis & Frankel LLP as Counsel to the Official Committee of Unsecured Creditors* [Docket No. 2658] (the "**Supplemental Mayer Declaration**").

10.     By correspondence dated March 31, 2010, counsel to the Fee Examiner requested supplemental information from Kramer Levin as part of the review of specific matters in the Fee Application.  The supplemental information involved:

    A.      Matter Descriptions;

    B.      Scope of Work Performed;

    C.      Attendance at Hearings;

    D.      Billing Rates and Project Staffing;

    E.      Overcharges and Undercharges;

    F.      Clerical and Administrative Tasks;

    G.      Block Billing;

H.      Billing and Retention Matters;

I.      Legal Research;

J.      Repetitive and Vague Task Descriptions;

K.      Long Billing Days;

L.      Committee Calls and External Communications; and,

M.      Expenses.

The information Kramer Levin provided in response to these inquiries, on April 9, 2010 in writing and in a lengthy series of telephone conversations, has also been considered by the Fee Examiner.

11.      On April 15, 2010, counsel for the Fee Examiner submitted a draft of this pleading to Kramer Levin, permitting additional opportunity for comment and discussion. On April 16, 18, 19 and 20, the Fee Examiner and his counsel had extended e-mail and telephonic discussions with representatives from Kramer Levin to discuss some of the issues raised in this report. Kramer Levin provided additional information and materials pertinent to the Fee Application. All of these communications have been considered by the Fee Examiner in preparation of this report.

## APPLICABLE STANDARDS

12.      The Fee Application has been evaluated for compliance with the *Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, Administrative Order M-104 (Bankr. S.D.N.Y. June 20, 1991), and the *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, Administrative Order M-151 (Bankr. S.D.N.Y. Apr. 19, 1995) (collectively, the "**Local Guidelines**"), the *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330*, 28 C.F.R. Part 58, Appendix A (the "**UST**

6

Guidelines"), the *Fee Examiner's First Status Report and Advisory* [Docket No. 5002] (the

"**First Advisory**"), and the *Fee Examiner's Second Status Report and Advisory* [Docket

No. 5463] (the "**Second Advisory**"), as well as this Court's Compensation Order and Quarterly

Reporting Order—including the extent, if any, that variation has been expressly permitted by

order.

## COMMENTS

13.    **Matter Descriptions**.  The Fee Examiner noted that Kramer Levin divided its

billing descriptions into 39 different task codes, many of which overlapped.  For example, time

spent on the section 363 transaction was segmented into at least seven categories, not including a

separate matter number for "hearings" and another separate matter number for "motions."  While

the Fee Examiner's review necessarily evaluated the substance of the matters described in the

Fee Application, without regard to the task category assigned to the work, Kramer Levin's

expansively-segmented timekeeping makes it more difficult to evaluate the reasonableness and

necessity of some of the work.

14.    In response to the Fee Examiner's inquiry, Kramer Levin asserted in its April 9,

2010 response that the Amended Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases *require* such segmentation:

> To the extent a professional is engaged in rendering services in a
> discrete activity within the case (a) that can reasonably be expected
> to continue over a period of at least three months, and (b) that can
> reasonably be expected to constitute approximately 10-20% or
> more of the fees to be sought for an interim period, the
> professional shall establish a separate record entry for that matter,
> and record time therein separate from any services in the
> case...Examples of such discrete services within a case where such
> separate recordings may be appropriate, in a particular case,
> include...[the]sale of a significant asset or subsidiary...

Kramer Levin's cited language, however, appears in the June 20, 1991 Guidelines ("Order

M-104").  The current United States Trustee Guidelines also address project categories, but in

more general terms.  *See* UST Guidelines.  Under those guidelines:

> To facilitate effective review of the application, all time and
> service entries should be arranged by project categories.  The
> project categories set forth in exhibit A should be used to the
> extent applicable.  A separate project category should be used for
> administrative matters and, if payment is requested, for fee
> application preparation.

*Id.* at (b)(4)(i).

15.    The two guidelines appear to address the same issue – the need to segregate time

into manageably sized categories to facilitate review, each in its own way.  Whether the two

standards are complementary, or contradictory, however, is not relevant.  The Fee Application

fails to meet either standard.  The billings in no project category reach the 10 percent threshold,

much less the 10 percent to 20 percent recommended range.

*In light of the recommended adjustments to the Fee Application elsewhere in this report,
the Fee Examiner does not recommend a deduction for non-compliance with the project billing
guidelines; however, the applicant probably will want to observe the current set of standards
and guidelines on all subsequent applications.*

16.    **<u>Scope of Work Performed—Generally</u>**.  The Fee Examiner raised concerns

about the scope (not the quality) of work performed by Kramer Levin as counsel for the

Creditors' Committee in light of the committee's limited statutory role and the unique nature of

this proceeding.

17.    In response to the Fee Examiner's observation, Kramer Levin notes that creditors'

committees "are the primary negotiating bodies for a chapter 11 plan; they also provide

supervision of the debtor and execute an oversight function; they may investigate the debtor's

assets and affairs; and they may perform such other services as are in the interest of the

unsecured creditor body." April 9, 2010 letter, *citing In re S&B Surgery Ctr., Inc.*, 421 B.R. 546,

549 (Bankr. C.D. Cal. 2009).

    A.    The Fee Examiner acknowledges that he was not a part of this case during

the first interim fee period and, therefore, necessarily lacks first-hand knowledge of many

of the details and nuances of the unique procedure employed in this case. The Fee

Examiner further acknowledges that this proceeding is—in many ways—unprecedented,

making a determination of the proper parameters for review of fee applications even more

challenging.

    B.    The fact remains, however, that very little—if any—specific work was done

on a chapter 11 plan during the first interim fee period, and the Fee Examiner's concerns

about the necessity and reasonableness of some of Committee Counsel's work in certain

areas remains.

    C.    The overarching role of the United States government, moreover,

necessarily altered the traditional role of a committee as "the primary" negotiating entity in

this proceeding.

    D.    No doubt, the Committee played a significant and important role. The task

of the Fee Examiner, however, is to determine—for all professionals—whether the fees

incurred were reasonable and necessary under the circumstances.

    18.    **Scope of Work Performed—DIP Financing and Cash Collateral**. The

Committee Counsel itself has noted the unique nature of the government financing that made this

proceeding possible:

> [T]he [d]ebtors' chapter 11 cases have been structured, at the
> direction of the [U.S.] Treasury, to provide for the sale of certain
> of the [d]ebtors' assets to NewCo. The Treasury, following the
> precedent it set in <u>In re Chrysler LLC</u>, Case No. 09-50002 (AJG)

(Bankr. S.D.N.Y., filed Apr. 30, 2009), pre-negotiated the [d]ebtors' chapter 11 cases in order to ensure that the [d]ebtors move quickly through the bankruptcy process and emerge as a slimmed down, delivered, standalone [sic] reorganized enterprise. To facilitate the implementation of this quick sale and to prevent the liquidation of the [d]ebtors, the Treasury agreed to provide DIP financing to the [d]ebtors.

*Limited Objection of the Official Committee of Unsecured Creditors To the Debtors' Application for An Order Pursuant to Section 327(a) and 328(a) of the Bankruptcy Code Authorizing the Employment and Retention of Evercore Group L.L.C. as Investment Banker and Financial Advisor for the Debtors Nunc Pro Tunc to the Petition Date*, at 6, ¶ 10 [Docket No. 2232].

19.    Despite the applicant's own characterization of the unique Debtor-In-Possession ("**DIP**") financing arrangements in this case, the applicant charged $240,942.50 for work on DIP financing and cash collateral matters, including "significant time reviewing, understanding, summarizing, commenting on and negotiating the terms of" various aspects of the DIP financing and cash collateral orders.  Fee Application at 14.

20.    Notwithstanding the absence of a plan of reorganization during the first interim fee period and the involvement of the U.S. Treasury as the primary (and only possible) post-petition lender, Committee Counsel asserts that the scope of its work properly included work on the following major and critical tasks:

- Successfully advocate for an increase in financing from the U.S. Treasury, and for the increase of New GM's assumption of priority claims, to assure that Old GM could pay all administrative expense and priority claims, and work with the Debtors to minimize the administrative expense and priority claims that remained;

- Successfully recommend changes to the sale documents so that Old GM could continue to function after all of its employees moved to New GM; and,

- Encourage NewGM to assume as many unsecured liabilities of Old GM as possible— to reduce dilution and increase value to one part of the Committee's constituency. Claims at issue included future warranty claims, more than $600 million in asbestos claims and up to $4 billion in OPEB for the United Steelworkers and Industrial Union

of Engineers.  (The Committee has characterized its work on this final task as partially successful).

21.    The Committee further argues, despite its assertions opposing the Debtors' retention of Evercore, that the U.S. Treasury had not agreed in advance to fully fund the wind down and asserts that the increase in the budget (for which the Committee appears to claim most of the credit) will permit the payment of all priority and administrative expense claims without undermining the value of the stocks and warrants reserved for unsecured creditors.

22.    The Fee Examiner reviewed all of the pertinent docket entries, including the available transcripts of the DIP financing hearings.  Notwithstanding the Committee's assertion, the records suggest that the ultimate increase in the DIP funding from $950 million to $1.175 billion reflected, at least in part, a pre-existing commitment from the U.S. Treasury to provide the capital necessary to fully fund the wind-down, *see* June 30 Tr. [Docket No. 3087] at 304-06, and to provide an equity cushion to protect stocks and warrants set aside for unsecured creditors.  *See* July 1 Tr. [Docket No. 3205] at 128-29.  The Fee Examiner, of course, has no way of independently verifying the Committee's assertion that it was, in effect, the lone voice advocating for the increased financing; the record alone does not support that assertion.

*It remains unclear whether the Committee Counsel's participation in the DIP financing discussions was, as the Committee asserts, the sole or even the primary reason for an increase in DIP financing.  The Fee Examiner is satisfied, however, that Kramer Levin's work on the cash collateral order and involvement in the wind-down facility negotiations were reasonable and necessary in light of the provisions in the final DIP order requiring the Committee's involvement in those activities.  It added value.  The Fee Examiner notes that DIP financing activities were not adequately segregated in the billing records from cash collateral negotiations, so it is difficult to identify the amount directly attributable to either effort.  In light of this difficulty— caused, at least in part, by the Applicant's timekeeping practices—the Fee Examiner recommends a five percent reduction of fees for a total of $12,047.13.*

23.    **Scope of Work Performed—Creditor Communications**.  Kramer Levin billed $97,236.00 to the task category "Creditor Communication," including time spent "setting up the content and continually updating the Committee Website."  The committee also hired Epiq

11

Bankruptcy Solutions, LLC for the website.  Epic, separately, billed $66,557 during the first

interim fee period, which is not nominally subject to Fee Examiner review because, in general,

claims' agents are not considered section 327(a)-330 case professionals.  In addition, the Debtors

maintain their own website (www.motorsliquidation.com) containing a great deal of information

pertinent to unsecured creditors.  Through its own clams and noticing agent, The Garden City

Group, LLC, the Debtors also maintain a claims register and docket website

(www.motorsliquidationdocket.com) that creditors can easily use to track the proceedings.  Both

of these websites, of course, are in addition to the material publicly available through PACER.

24.     The Fee Examiner initially concluded that duplicating the content of other

websites and publicly-available sources of information was not reasonable or necessary.  In

response, Kramer Levin noted that maintenance of the website was essential:

> [It was] a necessary part of the Committee's purpose, as elaborated
> in section 1102 of the Bankruptcy Code.  The Committee has two
> informational requirements under Section 1102.  First, under
> Section 1102(b)(3)(A), the Committee must "provide access to
> information for creditors."  Second, under Section 1102(b)(3)(B),
> the Committee is required to "solicit and receive comments" from
> creditors…. The Committee's Website satisfies both of these
> requirements.  It is common in Chapter 11 cases, especially one of
> this size and complexity, for the Committee to have its own
> website.

April 9 Letter.  Kramer Levin also emphasized, in response to the Fee Examiner's inquiry, that

of the $97,236.00 billed to the Creditor Communications task code, only $4,634.00 was related

to the establishment of the Committee's website.

25.     Kramer Levin has noted that, if ever there were a case for a committee website,

this is the case.  The Fee Examiner does not doubt that the maintenance of a website as a means

of communication with creditors is appropriate; rather, he suggests professionals link to other

12

reputable sources of public information where possible to avoid unnecessary duplication of

efforts.

*In light of the supplemental information provided in response to the Fee Examiner's request and the relatively low expenditure of time on website-related activities, no reduction is recommended.*

26.    **Scope of Work Performed—Environmental Issues**.  Kramer Levin billed

$346,727.00  (520 hours at a blended rate of $665 an hour) to the environmental issues task code.

The Fee Application asserts that, in conjunction with the Committee's financial advisor, FTI

(which will be the subject of a separate report), Kramer Levin:

- Devoted a significant amount of time to reviewing the environmental liabilities associated with the Debtors' manufacturing sites in the wake of the sale transaction;

- Organized and participated in conference calls with FTI, the Debtors and their environmental consultants in order to understand the costs of environmental remediation associated with each site;

- Extensively researched the interplay of environmental issues with bankruptcy law;

- Reviewed the environmental provisions and schedules of the Transition Services Agreement to ensure that the allocation of liabilities during the term of the Transition Services Agreement would not prejudice the Debtors after the sale and that New GM would provide the services necessary to deal with environmental issues during the transition period; and,

- Reviewed the Sale Order and the decision approving the sale transaction to understand how environmental liabilities may be addressed.

Fee Application at 21-22.

The Fee Examiner evaluated this description, along with the pertinent docket entries and

other publicly available information, all in light of the statutory role of a creditors' committee.

The role of Committee Counsel in the management of a debtor's environmental liabilities could

have been more limited:  to understanding and monitoring the environmental issues affecting the

estate so that their status and concerns could be communicated to the unsecured creditors.  The

Debtors have hired environmental consultants (most of which have submitted their own

significant fee applications) to review and report on environmental liabilities.  Particularly in a taxpayer-funded chapter 11 proceeding, the work product of the Debtors' environmental consultants and legal counsel (including research on the "interplay of environmental issues with bankruptcy law" and "how environmental liabilities may be addressed in this case") might well have been better utilized.

27.    The docket reflects no motions, objections, briefs, or other filings that would suggest that the Creditors' Committee played a very significant role in the Debtors' handling of environmental claims.  It is difficult to decipher, based on the available information, whether the work in this area added measurable benefit to the outcome for unsecured creditors.  Thus, the compensation permitted in this task category might well be limited to work expended for the professionals to inform themselves about the environmental assessment done by others and to communicate with the Debtors, their advisors, and the creditors themselves on the course and status of the environmental claims.

28.    In response to the Fee Examiner's inquiry, Kramer Levin notes that the impact of its work "does not come from the filed documents, but, rather from the behind-the-scenes expertise and advice that Kramer Levin and FTI were able to provide to the Committee, which also enabled no documents to be filed," that "environmental expertise, especially as it related to bankruptcy law, was necessary and provided significant benefit to the Committee," and that "there have been very few issues on the public docket relating to environmental issues that would warrant a pleading filed by the Committee."  April 9, 2010 letter.

29.    Kramer Levin also notes that is was imperative for Committee Counsel to engage in its own analysis of the environmental issues to determine whether the data being proposed and presented by the Debtors and their environmental consultants was accurate.  Kramer Levin has

further characterized the immense environmental liabilities in this case as "the gating issue" preventing any of the parties from proposing a plan of reorganization or liquidation.

30.    Kramer Levin is, of course, correct in this respect:  neither the presence nor absence of pleadings necessarily measures value.  Moreover, the central role that environmental issues play in this proceeding is inescapable.  It is also inescapable that the Committee's financial consultant itself, working closely with Committee Counsel on environmental and other issues, has sought nearly $5 million in compensation through its own Fee Application.

31.    FTI's application, for its part, lacks the detail necessary to determine the portion of its own fees that were devoted to environmental matters.  *See generally Fee Examiner's Report of Statement of Limited Objection to the First Interim Fee Application of FTI Consulting, Inc.* (filed contemporaneously with this report).  Again, it is the fee applicant's burden to prove each component of the Fee Application, including its reasonableness.  *See In re Northwest Airlines Corp.*, 382 B.R. 632, 645 (Bankr. S.D.N.Y. 2008).  If the publicly available records do not allow the benefit of the work performed to be easily ascertained, it is the fee applicant's burden to provide the necessary detail.

*Viewed in light of all the circumstances, Kramer Levin has not met its burden with respect to the work performed in the environmental task category—although an independent assessment of potential environmental liabilities likely was justified at some level.  The Fee Examiner recommends a 15 percent reduction for a total of $52,009.05.*

32.    **Scope of Work Performed—Discovery/Depositions**.  The Fee Application requests $106,253.50 (185.10 hours at a $574 blended rate) to, among other things, "prepare for, attend[] and participate[] in all-day depositions of Fritz Henderson, Michael Raleigh and Harry Wilson."  The transcripts of these depositions, however, are apparently sealed.

33.    In response to the Fee Examiner's inquiry, Kramer Levin stated:

Kramer Levin was actively involved in the expedited discovery
and depositions leading up to the sale hearing.  Kramer Levin

15

attended the depositions, reviewed and analyzed the exhibits and sent real-time updates of the depositions to the Committee. By the time of the depositions, the committee had filed a limited objection to the sale and needed to be apprised of any relevant issues that arose during depositions that would impact negotiations on the sale. In addition, the Committee participated in the designation of documents and portions of the deposition testimony to be included in the record for the sale hearing. Finally, at the time of discovery and depositions (June 27-28, 2009), the Committee had not yet decided to support the Sale. As such, the Committee was involved in substantive negotiations on matters requiring immediate decisions. It was imperative for the Committee to remain completely updated in real-time in order to make a fully informed decision on various Sale issues on an expedited basis.

34.     Absent from Kramer Levin's initial explanation was any information on the purpose of the depositions, whether any Kramer Levin attorney actively participated in the depositions or could have accomplished the same result by reviewing virtually contemporaneous transcripts, and the nature of the substantive negotiations on matters requiring immediate decisions. The Fee Examiner also notes that Kramer Levin's explanation—that as of the time of discovery and depositions, June 27 to 28, 2009, the Committee had not yet decided to support the sale—is unpersuasive. Whatever the level of disagreement yet remaining within the Committee as of that time, as of June 24, 2009, the Committee had already taken a public position that it "generally supports the proposed asset sale." [Docket No. 2362, ¶ 1].

35.     Kramer Levin has subsequently informed the Fee Examiner that the depositions were noticed by an unofficial committee of personal injury claimants, designed to depose key General Motors executives about the key terms of the proposed 363 sale transaction. Kramer Levin has indicated that, had the unofficial committee not done so, it would have noticed the deposition itself. Furthermore, Kramer Levin has noted that while its attorneys did not conduct the bulk of the questioning at the depositions, the topics covered generally included the financial condition of the Debtors and the terms of the proposed sale, which would have been the subject

16

of independent discovery efforts on the part of the Committee had these depositions not been

noticed separately.

*The portions of the transcripts that Kramer Levin evidently selected for inclusion in the sale hearing record remain sealed.  However, the subsequent explanation of the need for and scope of the discovery provided by Kramer Levin satisfies the Fee Examiner that the discovery related, at least in part, to the Committee's decision about whether—and on what terms—to support the sale.*

36.     **Scope of Work Performed—Appellate Issues**.  The Applicant seeks $60,380.50

(101.1 hours at a blended rate of $597.24) for work to oppose the efforts of asbestos and personal

injury claimants to appeal the Sale Order.  The Debtors and the U.S. Treasury also opposed these

motions, and the bankruptcy court's ultimate decision to deny them the day of the hearing (the

same day all three objections were filed) cannot be attributed to the Creditors' Committee work

alone.  Since the motions were so vigorously opposed by the Debtors and the government, a

reduction of fees in this task code might have been warranted.

37.     In response to the Fee Examiner's inquiry, however, Kramer Levin directs the Fee

Examiner to specific portions of the record suggesting that the Committee's involvement in

opposing the appeal of the Sale Order had a direct impact on the Court's ultimate rulings on that

issue.

*In light of the explanation and additional detail provided in response to the Fee Examiner's inquiry, no reduction is recommended.*

38.     **Scope of Work Performed—Pre-Petition Collateral Review**.  The Fee

Application seeks $163,571 in fees for pre-petition collateral review.  The vast majority of this

work appears related to obtaining and assessing security documents.  Ultimately, the Committee

commenced an adversary proceeding challenging the validity of the liens of a significant group

of pre-petition secured lenders.  The Committee, however, outsourced the work on that adversary

to Butzel Long which, itself, billed $150,000 to evaluate and commence the lien avoidance

action. (Kramer Levin billed another $14,655 to a separate task category—General Adversary

Proceedings—to "assist[] Butzel Long through review of the complaint and other proceedings").

39.     In response to the Fee Examiner's inquiry, Kramer Levin noted in its April 9

Letter:

> Kramer Levin's billings were the result of original leg work
> conducted in investigating the liens of the prepetition secured
> creditors. The results of this investigation could directly increase
> unsecured creditors' recovery, as the DIP order specifically
> granted any proceeds from a challenge to the prepetition lenders'
> liens to the Committee. Kramer Levin's collateral review team
> ultimately discovered the termination statement that furnished the
> basis for the commencement of the adversary proceeding against
> the prepetition secured lenders. Kramer Levin was unable to
> pursue the adversary proceeding as a result of a potential conflict
> [of interest due to Kramer Levin's prior representation of certain of
> the prepetition secured lenders]. Kramer Levin delivered the
> results of their investigation to Butzel Long, who conducted the
> legal analysis and is now lead Committee counsel in the adversary
> proceeding. Kramer Levin and Butzel Long did not overlap in
> these tasks.

*The Fee Examiner will defer any evaluation of the expenditure of time in this area until
the results of the adversary proceeding are ascertainable.*

40.     **Scope of Work Performed—363 Sale**. At least six separate task categories

encompass Kramer Levin's services on the section 363 sale, not including separate task

categories for motions and hearings. The total billed for sale-related tasks exceeds $1.5 million.

A.     Again, the Fee Examiner's evaluation of work done in this area was

informed by Committee Counsel's own characterization of the sale and overarching

influence of the U.S. Treasury. Certainly, a tremendous amount of work was required to

conduct due diligence and review all of the documents necessary for such an extraordinary

commercial transaction in such a short period of time.

B.     However, Kramer Levin's statutory role as Committee Counsel under the

Bankruptcy Code in a government-sponsored 363 sale is unclear. The role may most

properly be to comment upon and report to creditors on the sale transaction's terms and support or object to the sale as appropriate. In fact, with the exception of several issues raised regarding successor liability [Docket No. 2362], Kramer Levin's involvement in the sale appears to have been largely—and appropriately—observational.

41.     Ultimately, changes were made to the Master Purchase Agreement requiring the assumption of products liability claims arising post-sale, although various consumer groups and state attorneys general seem to have claimed credit for that concession. In addition, Kramer Levin contributed to the drafting of the Transition Services Agreement and Master Lease Agreement in conjunction with the lead counsel responsible for the transaction: yet, with every benefit of the doubt, the expenditure of more than $1.5 million (nearly 33 percent of the total requested) on a sale transaction largely conducted by other law firms remains of concern. In addition, the nature of many of the time entries related to the sale transaction makes it impossible to evaluate, in any meaningful way, the reasonableness or necessity of at least some of the sale-related time entries. As a result, Committee Counsel may not be able to meet its burden with respect to a significant portion of these fees.

42.     In response to the Fee Examiner's inquiry, Committee Counsel noted that "it is the Committee's duty to be active and to watch over the creditors' interests with vigor and care." In addition, Kramer Levin has itemized twenty separate concessions (some, but not all, of which were disclosed in the Fee Application) that it directly attributes to its work, including:

- Limited NewGM's ability to remove Dealer Deferred Termination and Participation Agreements from Assumable Executory Contracts;

- Elimination of broad preemption of state law language;

- Greater transparency with respect to assumption/rejection of Assumable Executory Contracts, including more definitive deadlines for assumption;

- Old GM does not bear any tax liabilities of subsidiaries sold to NewGM;

- NewGM takes all liabilities with respect to product liability for accidents that occur post-Closing;

- NewGM will assume all express warranties and warranties pursuant to state "Lemon Laws";

- No representations or warranties by Old GM survive Closing;

- Adjustment shares are excluded from collateral securing the Wind-Down Facility;

- NewGM will assume obligations for Michigan workers' compensation claims;

- NewGM must use reasonable best efforts to become a reporting company by a specified time;

- Old GM granted "most favored nation" status along with other stockholders of NewGM;

- Old GM not required to indemnify NewGM to a greater degree than NewGM's other stockholders;

- Warrants contain stronger anti-dilution protections;

- Expansion of "Blacke-Scholes Protection" in warrants;

- Revisions to limit NewGM's termination rights under Transition Services Agreement;

- Extension of duration of Transition Services Agreement and modifications to provision of benefit/personnel by NewGM;

- NewGM will serve as "creditworthy" tenant under Master Lease Agreement and provide a full guaranty;

- Expanding detrimental short notice provisions under Master Lease Agreement;

- NewGM responsible for all real estate taxes for subdivision properties under Master Lease Agreement; and,

- Eliminating impairment to Old GM's right to manage and dispose of properties under Master Lease Agreement.

*The Fee Examiner cannot independently verify whether the enumerated concessions obtained in the 363 transaction were attributable to the work of Committee Counsel or materially improved the position of unsecured creditors. In light of the extraordinary circumstances surrounding the sale transaction, however, the Fee Examiner will not now recommend a reduction of fees in this area.*

43.    **Task Allocation and Billing Rates**.  Services have been provided by three position titles for attorneys and three position titles for non-attorneys. Kramer Levin's professional services were at a blended rate of $772.99 per hour for partners, $683.34 per hour for Special Counsel, and $547.52 per hour for associates with a total blended rate, including paraprofessionals, of $598.50 per hour.

A.    A comparison of billing rates among the law firms providing services in this case suggests that Kramer Levin's rates at most experience levels are higher than many of its peers.  In addition, 32.83 percent of the hours and 42.40 percent of the fees computed were performed by partners.

B.    Furthermore, a number of Kramer Levin timekeepers raised their rates by as much as $45 per hour during the Fee Application period, though Kramer Levin has explained that those rate increases are the result of changes in seniority in late summer, occurring as a matter of course.

C.    In response to the Fee Examiner's inquiry, Kramer Levin responded that comparison of Kramer Levin's rates to some of the other professionals working on this case "is not an appropriate comparison"—in part, because some of the other firms capped their rates and billed from international offices.  In addition, Kramer Levin asserts that, given the time constraints of the engagement, it was necessary for more senior attorneys to do work themselves rather than supervising less efficient junior attorneys.

*In the absence of the extenuating circumstances brought to the attention of the Fee Examiner, the preferred practice is for tasks to be managed by senior personnel with tasks performed at the lowest appropriate billing rate by less senior personnel.  The Fee Examiner acknowledges that such task allocation was not possible or practical here, and recommends no reduction based on task allocation.  However, some professionals in this case have voluntarily agreed to reduce their standard billing rates by five percent; the Fee Examiner encourages all professionals to consider a voluntary rate reduction in this and any other case being funded by the taxpayer.  The Fee Examiner has considered the extraordinary circumstances surrounding*

*the initial period of this engagement and concludes that a percentage fee reduction is appropriate to offset the high billing rates in this application. To allow some firms to charge premium rates for their work while others offer voluntary reductions of their standard rates would provide a disincentive for future fee applicants to offer favorable rate concessions in other large cases.*

*Suggested disallowance for project staffing and billing rates: $214,383.01, representing five percent of the total requested fees, after other adjustments.*

44.    **Length, Frequency and Distribution of Long Billing Days**. Some Kramer

Levin professionals documented long billing days, which generally corresponded with periods of

high activity.

*Frequent long billing days by the same professional can raise questions about project staffing and efficiency and the credibility of the application process. In addition, long billing days that do not correspond to time periods of high activity in the case raise questions about the necessity of the services provided. The Fee Examiner's general willingness to accept, essentially at face value, billed and reported time of more than 12 hours a day carries an implicit assumption now made explicit: that the billing attorney spent all of her or his time that day working on this matter. It is the professional's internal responsibility to ensure that is the case and that the application warrants that fact. The Fee Examiner encourages professionals to explain instances of frequent extended billing days in their fee applications. Given the extraordinary circumstances of the time period in question, however, and the timing of the long billing days the Fee Examiner identified, no disallowance is suggested.*

45.    **Overcharges and Undercharges**. The Fee Examiner identifies several billing

discrepancies that have resulted in $5,198 in undercharges and $4,792.25 in overcharges. Since

the net effect of these billing discrepancies is nominal, the Fee Examiner recommends no further

adjustment.

*Suggested disallowance for billing discrepancies: none.*

46.    **Summer Associates and Other Professionals Not Yet Admitted**. Kramer

Levin billed 56 hours, representing $17,952.00 in fees, for work performed by summer

associates. *See* **Exhibit A**. In addition, Kramer Levin billed 297.8 hours ($122,267.00) for work

by attorneys that Kramer Levin represented in the Fee Application had not yet been admitted to

any bar at rates ranging from $385 to $520 per hour. *See* **Exhibit B**.

47.     Work performed by summer associates, or law students more generally, may be compensable—subject, of course, to the same reasonableness review as other professionals. *E.g.*, *In re Recycling Indus.*, 243 B.R. 396, 404-05 (Bankr. D. Colo. 2000) (recognizing that summer associates "can be valuable and worthy of billing clients at reasonable rates"); *c.f. Missouri v. Jenkins*, 491 U.S. 274, 286-89 (1989) (non-bankruptcy context).  Given this Court's already-stated disinclination to allow professionals to recoup summer associate fees through the section 330 process, however, the Court may disallow all fees associated with law clerk billing in this case.  *See, e.g.*, *In re Chemtura Corp.*, First Interim Fee Application Hr'g Tr. at 37-38, No. 09-11233 (Bankr. S.D.N.Y. Sept. 29, 2009).

48.     Work performed by attorneys not yet admitted to the bar should be billed at a rate not to exceed the firm's highest paralegal rate.  For Kramer Levin, that rate is $275 per hour.  In response to the Fee Examiner's inquiry on this topic, Kramer Levin initially responded that "Kramer Levin does not differentiate hourly rates for associates not yet admitted in its standard practice for other clients and does not believe it is necessary or appropriate to do so here."

49.     Upon further investigation, however, Kramer Levin responded that two of the five attorneys identified as not being admitted to the bar had, in fact, been admitted before the first interim fee period.  In addition, Kramer Levin provided evidence that two timekeepers had passed the New York bar in 2008 and the remaining timekeeper had passed in July 2009.  Those timekeepers who have been admitted or passed the bar, therefore, are not within the scope of the Fee Examiner's objection.

*Suggested disallowance for law clerks:  $17,952.00.*

*Suggested partial disallowance for work done by attorneys not yet admitted to any bar: none.*

50.    **Billing for Clerical and Administrative Tasks**.  Kramer Levin professionals billed more than $140,000 for tasks that may have been clerical or administrative in nature.  Such tasks are part of a professional's overhead and should not be billed at professional rates to the estate.  The Fee Examiner identified one associate who billed 151.7 hours at a rate of $385 to $440 per hour, representing $58,613.50 in fees, whose task descriptions suggested that the majority of his work may have consisted of uncompensable administrative tasks.  *See* **Exhibit C**.  In response to the Fee Examiner's inquiry, Kramer Levin explained that this associate's "work was not administrative.  [The associate] provided the first-level of legal analysis on the vast amounts [sic] of documents on the docket….[The associate] was responsible for the preparation of a detailed chart of all motions and objections and their current status."  April 9, 2010 letter.

51.    The fees related to docket review and calendaring of "critical dates" may more properly be billed as overhead.  *E.g.*, *In re Fleetwood Enter. Inc.*, Opposition of United States Trustee to First Interim Fee Application of Pachulski Stang Ziehl & Jones LLP as Attorneys for the Official Committee of Creditors Holding Unsecured Claims (March 20 Through December 31, 2009) at 4-5, No. 09-14254 (Bankr. C.D. Cal. Mar. 16, 2010) (arguing that some calendaring tasks billed at professional rates are to be expected in a large bankruptcy but suggesting that some of that time should be overhead).

52.    Some of the time spent creating and maintaining a chart of motions and objections may well have been reasonable, necessary, and not properly characterized as administrative expense or overhead.  However, this work was performed at an average rate of $386.38 per hour and could have been performed by a qualified paraprofessional.

*Suggested disallowance for fees associated with docket review and monitoring: $16,896.00 (reduction to maximum paralegal rate).*

53.    **Attendance at Hearings**.  The Fee Examiner's review included Kramer Levin's

practice (hardly uncommon in this or any other significant case) of staffing hearings with

multiple professionals.  Regardless of how common, such staffing can result in unnecessary

charges for duplicative work being billed to the estate.  At least four Kramer Levin attorneys

(sometimes more) attended each of the major hearings in this case, though not all contributed

directly with a speaking role or written work product that is evident from a review of Kramer

Levin's time entries.

54.    In response to the Fee Examiner's inquiry, Kramer Levin states:

> Kramer Levin sent attorneys who had knowledge of specific issues
> raised at a hearing, notwithstanding whether it was necessary for
> them to speak during the hearing.  Particularly during the early
> periods of the case, it was necessary for numerous attorneys to
> attend the various hearings in order for Kramer Levin to properly
> accomplish all of its legal and advisory tasks and for the
> Committee to be fully apprised of all the ongoing proceedings.
> Different attorneys were in charge of and working on specific areas
> of the bankruptcy and, especially at omnibus hearings, where many
> issues were being discussed, it was imperative for those attorneys
> whose topic was being directly addressed to be present.  In
> addition, the increased attendance at the hearings also provided for
> increased efficiency in the case.  It was easier and quicker to
> provide current information to the Committee and for the
> subsequent preparation of minutes.  Further, when certain attorneys
> were responsible and needed to be prepared to speak, it was more
> prudent to have an additional attorney present to survey the
> proceedings and report back to the Committee, creditors, and
> attorneys not present.

55.    In addition, Kramer Levin defends its practice of segregating time spent preparing

for and attending hearings from other project-related work.

> Often, especially in cases as large and complex as this, there are
> many motions being dealt with at each hearing.  When preparing
> for a hearing it is simpler and more efficient to deal with the time
> spent in one task code, as opposed to dividing the time amongst the
> various substantive items.  Furthermore, attempting to tease out the
> exact time spent on each matter at a hearing can be very difficult, if

25

not impossible, especially when one is also attempting to work simultaneously.

56.     The former explanation, of course, tests the validity of the latter.  If a professional prepared for and attended a hearing because of work on "specific areas of the bankruptcy," it should have been just as "simple" and "efficient" for that timekeeper to record his or her time under the "specific area" of the contribution rather than under the generic "hearings" project category.  Furthermore, the purpose of the applicable guidelines and requirements is not only to make the fee application process simple or efficient for the fee applicant.  The purpose is to facilitate the effective review of the application.

57.     The Fee Examiner well understands the exigencies of the early days of this case and Kramer Levin's retention:  the attendance of non-participating attorneys at hearings may well have been necessary.  The written explanation of the need for those attorneys' attendance, however, was not apparent from the time entries themselves.  If an attorney attends a hearing "just in case" a subject matter within her particular knowledge or expertise arises, the time entries should reflect that purpose for attendance.  In many instances, those explanations were not evident from Kramer Levin's Fee Application.

*In light of Kramer Levin's subsequent explanation for the attendance of multiple attorneys at the extended hearings conducted during the initial phase of this case, the Fee Examiner will not recommend a reduction.  However, all subsequent fee applications should delineate, either in the time records themselves or in the narrative accompanying the application, the specific reason for each attorney's attendance at each hearing or event.  Only then can anyone fairly evaluate the reasonableness and necessity of that attorney's expenditure of time in attendance at a hearing or other event.  In addition, every effort should be made to record time in a substantive task category, when applicable, rather than in catch all categories such as "hearings" or "motions."*

58.     **Billing for Firm Retention and Compensation Matters**.  Kramer Levin billed $105,429.25 on matters identified as relating to Kramer Levin's Retention and Fee Applications and another $146,625.55 on the retention of other professionals.  Combined, the figures

26

aggregate to just over five percent of Kramer Levin's total billings.  The line between

compensable fee application and retention application activities and those that should be

considered overhead is not clearly demarcated in the cases.  However, professionals should make

every effort to demonstrate in their fee applications that the tasks associated with their

preparation are directly related to compliance with the Bankruptcy Code and not merely with

every professional's ethical obligation to disclose the basis of fees charged.

*The Fee Examiner does not recommend a reduction of fees in this area.*

59.    **Block Billing**.  Pursuant to the UST Guidelines, time entries for multiple tasks in

excess of 0.5 hours in aggregate time must identify the amount of time spent on each discrete

task.  The Fee Examiner initially identified $495,209.00 in time entries that failed to comply

fully with this guideline.  In response to the Fee Examiner's general inquiry regarding Kramer

Levin professionals' block billing, Kramer Levin cited Order M-104, which states:

> In recording time, each professional and paraprofessional may
> describe in one entry the nature of the services rendered during that
> day and the aggregate time expended for that day without
> delineating the actual time spent on each discrete activity,
> provided, however, that if the professional or paraprofessional
> expends more than 1 hour on a particular activity, the time record
> for that day must include, internally in the description of services
> for that day, the amount of time spent on that activity.

This rule is inconsistent with the lumping rule in the UST Guidelines.

60.    Through the Bankruptcy Reform Act of 1994, the Executive Office of the United

States Trustees was authorized to promulgate guidelines to inform that office's review of

applications for compensation and reimbursement of expenses under section 330.  On April 21,

1995, Administrative Order M-151 for the Bankruptcy Court of the Southern District of New

York was signed.  That order recognizes the guidelines promulgated by the United States

Trustee's office.  The fee application requirements in Order M-151 supplement those in the UST

Guidelines.  *See* Order M-151 at 1.  Pursuant to that order, Order M-104 continued in effect for all cases filed earlier than October 22, 1994 and fee applications filed earlier than May 1, 1995. All other fee applications "for compensation and reimbursement covered by the UST Guidelines must be prepared in accordance with" Order M-151.  Order M-151 at A.  Order M-151 does not address lumping and, in particular, does not contain the language from M-104 quoted by Kramer Levin.

61.     The prohibition against lumping has been applied in cases from the Southern District of New York.  *E.g.*, *In re Brous*, 370 B.R. 563, 576 (Bankr. S.D.N.Y. 2007) (cutting fees associated with lumped tasks in excess of 0.5 hours in aggregate on the basis of the UST Guidelines and making no reference to order M-104's rule allowing up to one hour).  The Fee Examiner has applied (and will continue to apply in the absence of a contrary ruling from this court) the "anti-lumping" standard in the UST Guidelines, 28 C.F.R. Part 58, App. A:

> Services should be noted in detail and not combined or "lumped" together, with each service showing a separate time entry; however, tasks performed in a project which total a de minimus amount of time can be combined or lumped together if they do not exceed .5 hours on a daily aggregate.

(b)(4)(v).  Numerous Kramer Levin time entries fail to meet either standard.

62.     After reviewing the Fee Examiner's draft report, Kramer Levin provided additional billing detail that has allowed the Fee Examiner to more fully evaluate the tasks described.  In response to that additional detail, the Fee Examiner reduced the number of entries that are objectionable.  *See* **Exhibit D**.  In addition, after Kramer Levin noted that certain tasks were subject to discounts under more than one billing format deficiency category (*e.g.* a block billed entry that also contained vague task descriptions), the Fee Examiner revised **Exhibits D, F, G** and **H** so that entries deficient in multiple categories appear on only one exhibit.

The Bankruptcy Code requires contemporaneous timekeeping, and the Fee Examiner necessarily questions the accuracy of both task descriptions and time segregation taking place more than six months after the work was completed.

*In light of the considerable expenditure of attorney time to ensure compliance with applicable billing requirements, see ¶ 58 above, a deduction for block billed entries is warranted. The Fee Examiner suggests a reduction in the amount of $103,147.12 (25 percent of block billed entries).*

63.    **Billing Increments**.  Several Kramer Levin professionals appear to bill routinely in increments other than tenths of an hour, including half-hour increments, totaling more than $120,000 in fees.  Billing in tenth of an hour increments is required.  In response to the Fee Examiner's inquiry, Kramer Levin responded that all questioned timekeepers "are fully aware of the UST Guidelines," "reported at least some of their time not in full- or half-hour intervals,"[1] and "[were] not overbilling or rounding."  Again the Fee Examiner emphasizes every fee applicant's burden to establish compliance with both the Bankruptcy Code and all applicable billing guidelines.  Blanket statements that timekeepers were aware of—or not always violating—the standards do not meet this burden.  On the other hand, the Fee Examiner acknowledges the likelihood that some tasks, may, in fact, have consumed full or half-hour blocks of time.

*Given the other suggested reductions and the relatively small amount of problematic billing in this area, no additional disallowance is suggested.  In subsequent applications, however, time entries that occur in disproportionate half or full-hour increments will be recommended for a partial reduction.*

64.    **Legal Research**.  Stuart Maue's audit revealed $253,669.55 in timekeeper charges for legal research.  *See* **Exhibit E**.  The blended rate for research exceeds $525 an hour.

A.    Though that blended rate corresponds to mid-level associate work within Kramer Levin's rate structure, many research tasks apparently could have been

---

[1] In fact, at least three timekeepers recorded *all* time in half or full hour increments.

accomplished at lower rates.  More importantly, the Creditors' Committee selected Kramer

Levin as its counsel based on its well-known "extensive experience in the fields of

bankruptcy and creditors' rights and, in particular, [its prior representation of] official

creditors' committees in some of the largest and most complex chapter 11 reorganization

cases of recent years."  Fee Application, ¶ 6.

       B.    A great deal of the research effort expended in this case was described so

generally ("research 363 sale issues," "research successor liability issues") that it is

difficult to determine its value.  In addition, Committee Counsel was hired for its

established expertise in many of the areas addressed in the Fee Application.

      65.    In response to the Fee Examiner's inquiry, Kramer Levin noted that it

"specifically did not address the specifics of the research issues in the fee detail at the time for

privilege purposes," that "despite the use of general descriptive terms, it is clear that the legal

research being performed was on nuanced issues within those general areas," and that "the legal

research was used by the Committee throughout the case in order to maximize the creditors'

recovery."  In addition, Kramer Levin notes that it "researched and drafted two comprehensive

memorandums addressing successor liability issues, which included a survey of the treatment of

successor liability under all fifty state laws."  Subsequently Kramer Levin provided substantial

additional detail about attorneys' research that contributed to the memoranda and the role those

memoranda played in advising the Committee.

     *If privilege issues remain at the time of the Fee Application's preparation, the better
approach is to seek a narrowly-tailored protective order to shield sensitive information from
disclosure.  Claims of privilege do not shift the burden of proof on a fee application.  However,
in light of the subsequent additional detail provided to the Fee Examiner, no deduction is
recommended.*

      66.    **Repetitive and Vague Entries**.  Multiple Kramer Levin professionals billed

many hours to vaguely-described repetitive tasks (for example, "attention to sale issues") or

failed to adequately describe the tasks they performed.  This lack of detail not only makes a

review of that professional's fees more difficult, it also impedes the review of the fees billed by

that professional's colleagues.   In response to the Fee Examiner's inquiry on this issue, Kramer

Levin asked for an itemization of all problematic entries.  The Fee Examiner, on April 9, 2010,

provided Kramer Levin with earlier versions of the attached **Exhibit F** (Repetitive Task

Descriptions), **Exhibit G** (Vague Communications), and **Exhibit H** (Vague Tasks).  Kramer

Levin has provided additional detail to the Fee Examiner allowing a more thorough analysis of

the time entries and has identified certain tasks that may not be properly characterized as vague.

The exhibits have subsequently been adjusted.

*The Bankruptcy Code requires contemporaneous timekeeping, and the Fee Examiner necessarily questions the accuracy of both task descriptions and time segregation taking place more than six months after the work was completed.  In light of the considerable expenditure of attorney time to ensure compliance with applicable billing requirements, see ¶ 58 above, and the overall prevalence of vague timekeeping in this Fee Application, a deduction for vague timekeeping is warranted.  The Fee Examiner suggests a reduction in the amount of $104,199.08 (15 percent of remaining vague and repetitive entries).*

67.    **Committee Calls and External Communications**.  The Fee Examiner identified

more than $397,000 in charges for "nonfirm" conferences—including committee calls and

meetings, communications with the Debtors, and dealings with various professionals and

consultants.  Many of these external communications involved more than a few timekeepers.  In

response to the Fee Examiner's inquiry, Kramer Levin explained its practices:

> The size and complexity of this case necessitates [sic] dividing projects up among various attorneys across multiple practice-area groups.  To the extent an attorney is working on an issue being discussed during the weekly teleconference that member generally participates in that portion of the call or meeting to address any questions or concerns of the Committee.  Prior to each call, an agenda is circulated to the Committee's professionals to ensure that only those professionals currently working on an issue to be discussed on the call participate on the call.  A typical teleconference lasts less than sixty minutes, with approximately

four to five professionals from Kramer Levin participating as
needed.

In addition to this general explanation, Kramer Levin provided detailed descriptions of several committee calls and each timekeeper's role in the call that the Fee Examiner had questioned (those occurring on August 4, September 2, and September 10).

68.     The need of Committee Counsel to communicate regularly with its constituency is not in doubt.  The written explanation of the need for multiple attorneys' participation in these calls, however, was not apparent from the time entries themselves.  If an attorney participates in a call because a subject matter within the particular knowledge or expertise of that attorney is on the agenda, the time entries should reflect that purpose for attendance.  In many instances, those explanations were not evident.

*In light of Kramer Levin's subsequent explanation for the participation of multiple attorneys on the committee calls, the Fee Examiner will not recommend a reduction.  However, all subsequent fee applications should delineate, either in the time records themselves or the narrative accompanying the application, the specific reason for each attorney's participation in each call.  Only then can the Court fairly evaluate the reasonableness and necessity of that attorney's expenditure of time on the call.*

69.     **Legal Research Expenses**.  Kramer Levin billed $22,185.61 for Lexis/Nexis and Westlaw online research.  The Fee Examiner has requested that *all* case professionals submit copies of their contracts with Lexis and Westlaw to ensure that legal research expenses are charged at actual cost and to ensure that the use of such services in large multi-professional cases is cost effective.  Kramer Levin responded that it will not provide copies of its contracts due to confidentiality requirements.

70.     The Fee Examiner notes that other case professionals charged legal research services through accounts billed directly to GM.  Charge for legal research fees through a global contract with the Debtors rather than separately through law firm contracts is reasonable and

32

appropriate, and the Fee Examiner recommends that other professionals pursue a similar

approach in subsequent fee applications.

    *Suggested for disallowance for legal research fees: none.  The Fee Examiner requests that the Court enter an appropriate protective order to allow a comparison of the rates charged by legal research providers across firms and to maximize uniformity among professionals.*

71.    **Pre-Retention Expenses**.  Kramer Levin erroneously billed for $230.58 in

expenses incurred prior to Kramer Levin's retention date of June 3, 2009.  Kramer Levin has

agreed to voluntarily reduce its Fee Application by this amount.

    *Suggested for disallowance for pre-retention expenses:  $230.58.*

72.    **Cab Fares/Car Service**.  The Fee Application seeks $12,305.74 for local cab

fares.  The Fee Examiner has asked for a statement of the date, description, name of person

incurring the expense, method of computation, and purpose of each such expense.  In addition to

providing most of the requested detail, Kramer Levin explained its policy:

> As with most New York law firms, Kramer Levin's Attorney Policy Manual provides that those attorneys who live in the five boroughs of New York City who work past 10:00 pm and those attorneys who live outside the five boroughs who work past 9:00 pm are permitted to take a  cab or car service home. . . . As such, the car service and cab fares are not overhead, but rather are necessary expenditures for late work and attendance at hearings and meetings.

73.    A firm policy allowing attorneys to take cabs home after hours does not

necessarily establish that the fare is properly chargeable to the client as opposed to overhead,

although Kramer Levin attorneys verbally confirmed that it is the firm's customary practice to

charge these fares to clients.  During the first six weeks of Kramer Levin's retention, the Fee

Examiner has applied a presumption that:

    A.    Each professional charging a cab or car service to the Debtors was, in fact,

working on this case for the vast majority of the day; and

B.      The firm's policy would otherwise allow for passing the cab or car fare charge to the client.

Subsequent fee applications, however, should not benefit from this presumption, and they should be accompanied by a detailed itemization of each charge, along with a statement of the project-related need for the expense and that the charge would typically be passed to a non-bankruptcy client.

*Suggested for disallowance for local travel:  none.*

74.      **In-House Meals**.  Kramer Levin's Fee Application requests $4,421.65 in reimbursement for in-house meals.  The Amended S.D.N.Y. Guidelines permit in-house meal charges for "professionals required to work after 8:00 p.m. and for meals taken prior to 8:00 p.m. If the professional returns to the office to work at least one and one-half hours."  Kramer Levin's Fee Application did not disclose enough detail to evaluate compliance with this guideline; however, Kramer Levin did provide the requested detail in response to the Fee Examiner's inquiry.

*Suggested for disallowance for in house meals:  none.*

75.      **Photocopying, Research Services, and "Other Meetings".**  In response to the Fee Examiner's request for documentation of photocopying expenses, Kramer Levin provided a satisfactory itemization of charges.

*Suggested for disallowance for expenses:  none.*

*Total Fees Suggested for Disallowance:  $520,633.39.*

*Total Expenses Suggested for Disallowance:  $230.58.*

*Total Fees and Expenses Suggested for Disallowance:  $520,863.97.*

## CONCLUSION

This report is intended to advise the Court, the professionals, and the U.S. Trustee of the limited basis for objections to the Fee Application.  It is not intended to be an exhaustive or exclusive list of possible objections and does not preclude or limit the Fee Examiner's scope of review or objection on future interim fee applications or on final fee applications.  All professionals subject to the Fee Examiner review should be aware, as well, that while the Fee Examiner has made every effort to apply standards uniformly across the universe of professionals in this case, some degree of subjective judgment will always be required.

As the Fee Examiner's review and analysis continues, the Fee Examiner continues to develop a heightened sense of the complex landscape of this proceeding.  The conclusions and recommendations in this report are, therefore, subject to further refinement upon each professional's submission of its subsequent and final fee applications.

WHEREFORE, the Fee Examiner respectfully submits this *Report and Statement of Limited Objection* to the Fee Application.

Dated: Madison, Wisconsin
April 22, 2010.

GODFREY & KAHN, S.C.

By:    /s/ *Katherine Stadler*

Katherine Stadler (KS 6831)
Timothy F. Nixon (TN 2644)

GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198
E-mail: kstadler@gklaw.com
          tnixon@gklaw.com

*Attorneys for Fee Examiner*

4884186_1