Timothy F. Nixon
Eric J. Wilson (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                     :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.,* | : | Case No. 09-50026 |
| f/k/a General Motors Corp., *et al.,* | : | (Jointly Administered) |
| | : | |
| Debtors. | : | Honorable Robert E. Gerber |
| | : | |

------------------------------------------------------- x

**FEE EXAMINER'S REPORT AND STATEMENT OF LIMITED OBJECTION TO THE**
**FIRST INTERIM FEE APPLICATION OF WEIL, GOTSHAL & MANGES LLP**

**TO:**  **THE HONORABLE ROBERT E. GERBER**
**UNITED STATES BANKRUPTCY JUDGE**

       The Fee Examiner of General Motors Corporation (n/k/a Motors Liquidation Company),

appointed on December 23, 2009, submits this *Report and Statement of Limited Objection*

pursuant to the *Stipulation and Order With Respect to Appointment of a Fee Examiner* [Docket

No. 4708] (the "**Fee Examiner Order**") in connection with the *First Application of Weil,*

*Gotshal & Manges LLP, as Attorneys for the Debtors, for Interim Allowance of Compensation*

*for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses*

*Incurred from June 1, 2009 through September 30, 2009* [Docket No. 4803] (the "**First Fee**

**Application**").  The Court appointed the Fee Examiner to monitor the fees and expenses

incurred by professionals in these chapter 11 cases and to provide periodic reports to the Court,

separately or in conjunction with applications submitted for approval by the professionals, with or without a filed objection.

With this *Report and Statement of Limited Objection*, the Fee Examiner identifies $1,288,820.53 in fees and expenses, from a total of $18,506,169.92 requested in the First Fee Application, that are objectionable. Two components—fees for summer associates/law clerks and a recommended discount—account for 87 percent of this total. The Fee Examiner respectfully represents:

### SUMMARY STATEMENT

A fee applicant bears the burden of proof on all of the elements of a fee application, including establishing that the services provided were necessary and reasonable and that the billed expenses were necessary, reasonable and actually incurred. A fee application must additionally comply with the format and content requirements in the applicable guidelines and bankruptcy rules.

With some exceptions noted below, the First Fee Application submitted by Weil, Gotshal & Manges, LLP ("**Weil**") appears sound. Although the fees requested are significant, Weil does not exaggerate when it describes the tasks it confronted during the fee period, particularly the first six weeks, as "Herculean." First Fee Application, ¶ 2. In performing these tasks, Weil appropriately used timekeepers with lower billable rates. Moreover, the documentation submitted with the Fee Application also demonstrates that the attorneys and staff at Weil worked hard when required but did not unnecessarily or inappropriately record time.

In general, Weil attorneys worked exceedingly long hours every day from the time of the bankruptcy filing on June 1, 2009, until the date of the closing of the section 363 sale transaction on July 10, 2009. These consecutive long billing days largely (and appropriately) ceased, however, after the closing. For example, on the weekend following the closing, almost no one in

the firm billed any time. In sum, as a general matter, the documentation accompanying the First

Fee Application leaves little doubt that Weil timekeepers diligently worked long hours, but—

with some limited exceptions—did so efficiently. Quite simply, the firm billed significant fees

during the fee period because extraordinary circumstances required it to do so.

Nonetheless, after reviewing the First Fee Application, concerns remain that warrant the

Court's attention. In attempting to address these concerns with Weil prior to filing this report,

counsel for the Fee Examiner asked for additional information by letters dated February 23,

2010, March 17, 2010, April 2, 2010, and April 12, 2010. Weil responded to these requests in

letters dated April 9, 2010 and April 16, 2010. Counsel for the Fee Examiner has also had a

continuing dialogue with Weil about its application and this response.

Taking all of this into account, and as summarized in **Exhibit A**, this *Report and

Statement of Limited Objection* suggests disallowance of $1,188,181.39 in fees and $100,639.14

in expenses for a total suggested reduction of $1,288,820.53, from a total request of

$18,506,169.92 in interim compensation.

## BACKGROUND

1.    Commencing on June 1, 2009, General Motors Corporation and certain of its

affiliates ("**Debtors**") filed voluntary cases under chapter 11 of the Bankruptcy Code. The

Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being

jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b). The Debtors

are authorized to operate their businesses and manage their properties as debtors in possession

pursuant to 11 U.S.C. §§ 1107(2) and 1108.

2.    On June 12, 2009, the Debtors filed an application to employ Weil as their

attorneys in the above-captioned chapter 11 cases. *See Application of the Debtors Pursuant to

11 U.S.C. §§ 328(a) and Fed. R. Bankr. P. 2014(a) for Authority to Employ Weil, Gotshal &*

3

*Manges LLP as Attorneys for the Debtors, Nunc Pro Tunc to the Commencement Date*.  [Docket

No. 949] (the "**Retention Application**").  Attached as an exhibit to the Retention Application

was the *Affidavit and Disclosure Statement on Behalf of Weil, Gotshal & Manges LLP Pursuant*

*to Sections 327, 328(a), 329 and 504 of the Bankruptcy Code and Fed. R. Bankr. P. 2014(a)*

*and 2016(b)*, executed by Stephen Karotkin.  There were no objections to the Retention

Application.  Accordingly, on June 25, 2009, the Court appointed Weil as attorneys for the

Debtors.  *See Order Pursuant to 11 U.S.C. §§327(a) and Fed. R. Bankr. P. 2014(a) Authorizing*

*Employment of Weil, Gotshal & Manges LLP as Attorneys for the Debtors Nunc Pro Tunc to the*

*Commencement Date* dated June 25, 2009 [Docket No. 2546] (the "**Retention Order**").

3.    On June 23, 2009, Weil filed a *Supplemental Affidavit and Disclosure Statement*

*on Behalf of Weil, Gotshal & Manges LLP Pursuant to Sections 327, 328(a), 329 and 504 of the*

*Bankruptcy Code and Fed. R. Bankr. P. 2014(a) and 2016(b)*, executed by Stephen Karotkin

[Docket No. 2347].  On October 23, 2009, Weil filed a *Second Supplemental Affidavit and*

*Disclosure Statement on Behalf of Weil, Gotshal & Manges LLP Pursuant to Sections 327,*

*328(a), 329 and 504 of the Bankruptcy Code and Fed. R. Bankr. P. 2014(a) and 2016(b)*, also

executed by Stephen Karotkin [Docket No. 4287].

4.    On December 23, 2009, the United States Trustee, the Debtors, and the Creditors'

Committee proposed by stipulation the appointment of Brady C. Williamson as examiner in the

above-captioned chapter 11 cases (the "**Fee Examiner**") and, without objection and through the

Fee Examiner Order entered that same day, the Court approved the appointment.

5.    On January 5, 2010, the Fee Examiner submitted an *Application of the Fee*

*Examiner for Authorization to Employ and Retain Godfrey & Kahn, S.C. as Counsel to the Fee*

*Examiner, Nunc Pro Tunc to December 28, 2009* and, without objection, the Court entered an

Order authorizing the employment of Godfrey & Kahn, S.C. on January 19, 2010 [Docket No. 4833].

6.    On January 13, 2010, Weil filed its First Fee Application, seeking fees in the amount of $17,910.963.25 and expenses in the amount of $595,206.67, for total requested compensation in the amount of $18,506,169.92 for the period from June 1, 2009, through September 30, 2009 (the "**First Compensation Period**").  As a result of the Court's *Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 3711] (the "**Compensation Order**"), Weil has previously been paid $14,359,669.80 in fees (representing 80 percent of the fees invoiced for the First Compensation Period) and $597,565.85 in expenses (representing 100 percent of the expenses invoiced for the First Compensation Period), leaving a combined request in the amount of $3,548,934.27, as of the date of the First Fee Application.  *See* First Fee Application, ¶ 18.  The entire amount, whether paid or not, remains subject to Court review and approval.

7.    On February 9, 2010, in response to a request from counsel to the Fee Examiner, Weil sent the Fee Examiner a PDF and a hard copy of the documentation supporting the First Fee Application.  This documentation contained information about each of the individual time entries and expenses comprising the total fees and expenses requested.

8.    On February 9, 2010, counsel to the Fee Examiner also asked Weil to produce the backup documentation for the First Fee Application in Legal Electronic Data Exchange Standard (LEDES) format.  LEDES format is an accepted standard for electronic billing of legal fees and expenses.  On March 5, 2010, Weil produced the documentation to the Fee Examiner in LEDES format.

9.      A review of the documentation submitted by Weil prompted counsel for the Fee Examiner to submit to Weil a series of supplemental requests for information.  By correspondence dated February 23, 2010, counsel to the Fee Examiner requested the following information from Weil:

A.      An explanation of the numeric codes for "disbursement type" that Weil uses to categorize disbursements;

B.      Additional information to evaluate the reasonableness of certain specific expenses;

C.      With regard to hotel expenses, information about the location and number of nights stayed;

D.      With regard to meal expenses, information about the number of people present; and

E.      With regard to in-house duplicating expenses, information about the number of copies corresponding to each expense.

10.      By correspondence dated March 17, 2010, counsel to the Fee Examiner requested the following additional information from Weil:

A.      The current balance of the retainer that Weil received and information about the conditions of its disposition;

B.      A copy of Weil's retention agreement;

C.      A copy of Weil's agreements with Lexis and Westlaw;

D.      A copy or explanation of firm policies with regard to local transportation expenses; and,

       E.      A copy or explanation of firm policies with regard to overtime meal expenses.

11.     By correspondence dated April 2, 2010, counsel to the Fee Examiner requested additional information from Weil.  The letter also reiterated all of the pending requests from the previous letters, almost all of which were open at the time.  The additional information requested included:

       A.      With regard to airfare expenses, information about the class of air travel;

       B.      Information about expenses that appeared to be personal expenses, including laundry;

       C.      Information about an unusual taxi cab expense between New York City and Washington, D.C.;

       D.      A copy of the firm's contract with any car or limousine service where expenses for that service are reflected in the First Fee Application; and,

       E.      Information about time entries billed by "law clerks" in foreign offices.

12.     In the letter dated April 2, 2010, the Fee Examiner also invited Weil to comment on the appropriate treatment for categories of fee entries, including the following:

       A.      Entries that appeared to be double-billed;

       B.      Entries billed at higher billing rates than other law firms;

       C.      Entries billed by summer associates;

       D.      Entries billed for legal research by more senior attorneys;

       E.      Long billing days billed consecutively;

       F.      Entries that were "block billed" without separating individual tasks;

       G.      Entries that were predominantly billed in half-hour and full-hour time increments;

       H.      Entries that were billed with vague task descriptions; and,

       I.      Entries billed for clerical and administrative tasks.

13.      In a letter dated April 9, 2010, Weil responded to the Fee Examiner's pending requests for information ("**April 9 Letter**").  With the April 9 Letter, Weil also provided supplemental information about various expenses.  In response, counsel for the Fee Examiner sent another letter to Weil dated April 12, 2010, seeking clarification on the following issues:

       A.      Whether the Debtors requested a discounted billing rate and, if so, Weil's response to that request;

       B.      Information about meeting expenses associated with creditors' meetings;

       C.      Information about electrical contractor expenses associated with a news conference;

       D.      Information about a trip to Bermuda; and,

       E.      Information about potentially duplicative hotel expenses.

14.      On April 15, 2010, counsel for the Fee Examiner submitted a draft of this *Report and Statement of Limited Objection* to Weil for its review and comment.

15.      The following day, in a letter dated April 16, 2010 ("**April 16 Letter**"), Weil responded to the requests for information in the letter from counsel for the Fee Examiner dated April 12, 2010.

16.      On April 21, 2010, Weil contacted counsel for the Fee Examiner to discuss the draft *Report and Statement of Limited Objection*.  Weil informed counsel for the Fee Examiner that it had no further substantive input regarding the report.

17.    The Fee Examiner has evaluated the Retention Application, the Retention Order, the accompanying affidavits and disclosure statements, the First Fee Application, the voluminous documentation accompanying the First Fee Application, and the supplemental information supplied by Weil with the April 9 letter and in telephone conversations.

## APPLICABLE STANDARDS

18.    The First Fee Application has been evaluated for compliance with the *Amended Guidelines for Fees and Disbursements for Professionals in the Southern District of New York Bankruptcy Cases*, Administrative Order M-389 (Bankr. S.D.N.Y. Nov. 25, 2009) (the "**Local Guidelines**"),[1] the *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses filed under 11 U.S.C. § 330*, 28 C.F.R. Part 58, Appendix A (the "**UST Guidelines**"), and the *Fee Examiner's First and Second Status Reports and Advisories* [Docket Nos. 5002 and 5463] (the "**Advisories**"), as well as this Court's Compensation Order and Quarterly Reporting Order—including the extent, if any, that variation has been expressly permitted by Order.

## COMMENTS

19.    **Pre-Petition Retainers.**  In its Retention Application last June, and again in its First Fee Application in January, Weil stated that it had received "approximately $5.9 million" from the Debtors as a retainer prior to the bankruptcy filing on June 1, 2009.  Retention Application, ¶ 12; First Fee Application, ¶ 21.  In response to a request from counsel to the Fee Examiner, Weil has specified that the balance of this retainer was $6,504,983 as of April 1, 2010.

---

[1] Weil filed the First Fee Application on January 13, 2010, subsequent to the adoption of this latest version of the Local Guidelines.  In the First Fee Application, Weil does not refer to this version, instead citing the two previous versions, adopted on June 20, 1991, and April 19, 1995, respectively.  First Fee Application, ¶ 12.  The Fee Examiner has not identified any significant instances where the recommendations with respect to the First Fee Application filed by Weil would differ under previous versions of the Local Guidelines.

April 9 Letter, ¶ 20.  Weil has further informed the Fee Examiner that it intends to hold the entire

retainer until the conclusion of these bankruptcy cases.  *Id.*

20.    The Fee Examiner asks that the Court determine that it is not reasonable for

Weil—or any other firm—to continue to hold this retainer under the unique circumstances of this

case.  In a similar context, another court noted the relevant factors in judging the reasonableness

of a pre-petition retainer:

> (1) whether terms of an engagement agreement reflect normal
> business terms in the marketplace; (2) the relationship between the
> Debtor and the professionals, i.e., whether the parties involved are
> sophisticated business entities with equal bargaining power who
> engaged in an arms-length negotiation; (3) whether the retention,
> as proposed, is in the best interests of the estate; (4) whether there
> is creditor opposition to the retention and retainer provisions; and
> (5) whether, given the size, circumstances and posture of the case,
> the amount of the retainer is itself reasonable, including whether
> the retainer provides the appropriate level of "risk minimization,"
> especially in light of the existence of any other "risk-minimizing"
> devices, such as an administrative order and/or a carve-out.

*In re Insilco Technologies*, *Inc.*, 291 B.R. 628, 634 (Bankr. D. Del. 2003).  As the *Insilco* court

pointed out, this list is not exhaustive, and different factors may be more or less important under

certain circumstances.  *Id.*

21.    The Fee Examiner has asked Weil for a copy of its engagement agreement with

the Debtor but has not received a copy.  *See Insilco*, 291 B.R. at 636 (noting that law firm should

have attached a copy of its engagement agreement to its retention application to provide full

disclosure).  In any event, given the directives of the Compensation Order, whereby case

professionals can and do receive 80 percent of charged fees on a monthly basis, their ability to

file interim fee applications to recover the remaining 20 percent, and the amount of working

capital afforded the Debtors by the United States Treasury, Weil need not retain in excess of

$6 million of estate assets going forward.

*The Fee Examiner suggests the compensation due under the First Fee Application, as allowed by the Court, be paid from the pre-petition retainer received by Weil.*

22.    **Billable Rates**.  A comparison of billing rates among the nationally-known and respected law firms providing services in this case suggests that Weil's rates at most experience levels are higher than many of its peers.  Certainly, the reasonableness of any attorney's rate will vary—based on knowledge, experience, and geographical location, among other things.

23.    Nonetheless, other law firms retained by the Debtors have voluntarily provided a discount from their customary billing rates.  Weil does not provide such a discount.  Counsel for the Fee Examiner asked Weil whether the Debtors requested such a discount and, if so, how Weil responded.  Weil stated that, in its view, this information is irrelevant to the First Fee Application but that, in any event, it could not recall if the Debtors made such a request.  April 16 Letter, ¶ 1. Given the discounts offered by other firms, a five percent discount would be appropriate.

24.    The Fee Examiner suggests that the Court should apply this discount against the balance of fees remaining after making any other deductions.  The total of other fee deductions suggested by the Fee Examiner in this report are $308,034.98, leaving the balance of fees requested at $17,602,928.27.  A five percent discount from that amount is $880,146.41.

*Suggested disallowance for discounted billing rates:  $880,146.41.*

25.    **Project Staffing**.  Services provided by Weil reflect three position titles for attorneys (partner, counsel and associate) and various titles for non-attorneys (summer associates, law clerks, and "paraprofessionals and other staff").  The hourly billing rate for partner-level attorneys ranges from $430 to $1,000, with a blended rate of $854.20 for all 72 partner-level attorneys providing services in the time frame covered by the First Fee Application.  *See* **Exhibit B**, at 1-3.  The hourly billing rate for counsel-level attorneys ranges from $650 to $740 with a blended rate of $663.11 for all 11 counsel-level attorneys providing

services during the same period. *See id.* at 3. The hourly billing rate for associate-level

attorneys ranges from $207.50 to $720 with a blended rate of $472.11 for all 222 associate-level

attorneys providing services during the same period. *See id.* at 3-10. The hourly billing rate for

the non-attorneys providing services ranges from $80 to $280. *See id.* at 10-16.

26.     Exhibit B discloses that 17.52 percent of the hours billed during the time frame

covered by the First Fee Application was at partner-level rates. *See id.* at 3. In contrast,

57.84 percent of the hours billed during the same time frame were at associate-level rates. *See

id.* at 10. The overall blended rate for all timekeepers during the time frame covered by the First

Fee Application is $487.12. *See id.* at 16.

27.     In the absence of extenuating circumstances brought to the attention of the Fee

Examiner, the preferred practice is for tasks to be managed by senior personnel with tasks

performed at the lowest appropriate billing rate by less senior personnel. During the First

Compensation Period, there were many tasks that could have been (and were) appropriately

performed by less senior attorneys. As a general matter, the allocation of hours billed by Weil

attorneys during the First Compensation Period appropriately reflects this. For example,

associates billed more than three times as many hours as partners during the First Compensation

Period. Accordingly, the Fee Examiner does not recommend any disallowance based on this

issue.

    *Suggested disallowance for project staffing issues: None.*

28.     **Firm Retention and Compensation.** Weil billed approximately $353,233 on

matters relating to its own retention and compensation. The amount billed to these matters

represents just under two percent of the total fees billed by Weil during the First Compensation

Period.

Although a relatively modest amount compared to the total amount requested in the First Fee Application, there is concern about the amount of time spent by Weil timekeepers reviewing their own time records. For example, during the First Compensation Period, 26 different Weil timekeepers (almost all of whom were paralegals) billed 940 hours to reviewing time records for "compliance with" or "pursuant to" the UST Guidelines. *See* **Exhibit C**. That is the equivalent of one person spending eight weeks doing nothing else but reviewing the time records for compliance with the UST Guidelines.

Even though the time records were voluminous, one might expect their review to take less time than that. Alternatively, if that much time were spent, one might expect the records to contain fewer obvious errors. During the First Compensation Period, however, given the extraordinary level of activity, these errors are more understandable and, accordingly, the Fee Examiner does not intend to challenge the time spent reviewing time records in this First Fee Application. In subsequent fee applications, however, this review process should be managed more efficiently.

*Suggested disallowance for time billed to firm retention and compensation: None.*

*29.* **Conflicts Checks.** Weil billed approximately $5,000 to perform conflicts checks. This amount is reasonable, and perhaps even lower than expected, considering the particular importance of full disclosure in a case with such significance and such multiple interrelationships between interested parties.

*Suggested disallowance for time billed to conflicts checks: None.*

30. **Double Billing.** The Fee Examiner identified some overcharges as a result of apparent double billing, totaling $1,281.00. *See* **Exhibit D**. Although Weil does not necessarily believe that there are errors in these entries, it has no objection to deducting them from its application amount. April 9 Letter, ¶ 1.

13

*Agreed disallowance for double billing:  $1,281.00.*

31.    **Non-Working Travel Time.**  Weil had a project code (340) for non-working

travel time, which was billed at half its normal billing rates.  Several time entries for

non-working travel were not billed to this code, however, resulting in charges at full rates.

**Exhibit E** shows improperly coded time entries billed at full rates, which totaled $27,522.50.  If

properly coded, those entries would have been billed at half the normal billing rate, for a total of

$13,761.25.

*Suggested disallowance for non-working travel time:  $13,761.25.*

32.    **Time Increments.**  The UST Guidelines require time entries to be recorded in

tenths of an hour.  *See* UST Guidelines, at (b)(4)(v).  Several Weil timekeepers, however, with

unusual frequency appeared to record time entries in half-hour or whole-hour increments.

**Exhibit F** lists timekeepers who billed numerous time entries, where more than 40 percent of

those entries were billed in either half-hour or whole-hour time increments.  Some of these

timekeepers billed more than 80 percent of their time in this fashion.  For the timekeepers listed

on Exhibit F, the total number of time entries billed in this fashion exceeded 2,000 entries.

Although the Fee Examiner will not recommend a deduction for this issue, every fee applicant

has the burden to establish compliance with both the Bankruptcy Code and all applicable

guidelines.

*Suggested disallowance for time increments:  None.*

33.    **Long Billing Days.**  The demands of this engagement were, understandably, most

pressing during June and early July.  This time period roughly corresponds to the time period

preceding the Court's July 5, 2009 *Order (I) Authorizing Sale of Assets Pursuant to Amended*

*and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S. Treasury-*

*Sponsored Purchaser; (II) Authorizing Assumption and Assignment of Certain Executory*

*Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief*
[Docket No. 2968] (the "**363 Sale Order**").

34.     During this time period, some Weil professionals documented frequent long
billing days, including (as a matter of course and understandably) weekends and over
consecutive days.  Frequent long billing days by the same professional can raise questions about
project staffing and efficiency and the credibility of the application process.  In addition, long
billing days that do not correspond to time periods of high activity in the case raise questions
about the necessity of the services provided.

35.     The Fee Examiner repeatedly has encouraged professionals to explain instances of
frequent long billing days in their fee applications.  The general willingness to accept, essentially
at face value, billed and reported time of more than 12 hours a day carries an implicit assumption
now made explicit—that the billing attorney spent all of her or his time that day working on this
matter.  It is the professional's internal responsibility to ensure that is the case and that the
application warrants this assumption of fact.

36.     Given the extraordinary circumstances of the time period in question, however,
the Fee Examiner generally will not comment on the number of hours worked by individual Weil
timekeepers, even when those hours might seem unusually high in other circumstances.  For
example, the Fee Examiner did not question isolated instances where individual timekeepers
billed extremely long hours—sometimes 20 hours or more—in a single day, particularly because
those timekeepers described the tasks they performed with sufficient detail.  The same is true for
timekeepers who billed extremely long hours over consecutive days.  The Fee Examiner fully
recognizes that the tasks performed by Weil leading up to the section 363 sale were daunting,
resulting in work schedules that in many cases were highly unusual.

15

37.    There are, however, two exceptions that warrant the Court's attention.  As shown on **Exhibit G**, one attorney (admitted in 1998 with an hourly billing rate of $725) billed 264.00 hours over 14 straight days, for an average of 18.85 hours per day.  Another attorney (admitted in 2002 with an hourly billing rate of $640) billed 205.80 hours over 11 consecutive days, for an average of 18.71 hours per day.  Between the two attorneys, their time entries over these periods totaled $323,112.00.

38.    The Fee Examiner has brought the entries for these two attorneys to Weil's attention.  Weil objects to any reduction, stating that that the attorneys "literally worked around the clock and were instrumental in the closing of one of the most complex transactions in recent history."  April 9 Letter, ¶ 5.  The Fee Examiner does not dispute that these attorneys worked exceptionally long hours and made valuable contributions as a result.  Given the number of days over which they reported this sustained billing activity, the vagueness of many of their time entries, and the prevalence of half-hour and whole-hour time increments with those time entries, the entries test the limits of their face value as well as personal endurance.

*Suggested disallowance for long billing days:  $32,311.20 (10 percent deduction).*

39.    **Transient Billers.**  Several Weil professionals billed fewer than ten hours to the case during the First Compensation Period.  In ordinary circumstances, tasks performed by timekeepers like these could be unnecessary in light of efforts by the many others devoted to the case full-time or might reflect contributions that were not meaningful.  During the First Compensation Period, however, exigencies justified the employment of personnel who might not otherwise have billed time to the matter under ordinary circumstances.  Accordingly, the Fee Examiner will not recommend any deduction for these sorts of timekeepers with respect to this First Fee Application.

40.     The Fee Examiner notes, however, that Weil grouped several timekeepers together in the summary sheet for its First Fee Application, when those timekeepers each billed fewer than ten hours.  The UST Guidelines require a summary sheet that lists the hours billed for "each person" who billed time during the fee period.  *See* UST Guidelines, at (b)(3)(iv).  In subsequent fee applications, to comply with the UST Guidelines, Weil should identify "each" timekeeper in its summary sheet.

*Suggested disallowance for transient billers:  None.*

41.     **Summer Associates.**  Weil billed 761.10 hours, representing $190,275 in fees, for work performed by sixteen different summer associates, each of whom had an hourly billing rate of $250—roughly equivalent to the highest billing rate for a Weil paralegal.  After considering the rates billed by these summer associates and the tasks assigned to them, and considering the breadth of tasks that Weil needed to perform during the First Compensation Period, the Fee Examiner concluded that the fees were generally reasonable for work necessarily performed.

42.     Work by summer associates, or law students more generally, may be compensable, subject of course to the same reasonableness review as other professionals.  *See, e.g.*, *In re Recycling Indus.*, 243 B.R. 396, 404-05 (Bankr. D. Colo. 2000) (recognizing that summer associates "can be valuable and worthy of billing clients at reasonable rates").  Indeed, Weil has informed the Fee Examiner that its summer associates "provided valuable services at rates generally lower than would be charged if other attorneys were performing the services they rendered."  April 9 Letter, ¶ 3.  Weil also has informed the Fee Examiner that it "already reduced to some extent [the] summer associate time charged," *id.*, although the nature and degree of these reductions remains unclear.

43.     This Court, however, has taken a contrary view, holding that time billed by summer associates is generally not compensable.  *See*, *e.g.*, *In re Chemtura Corp.*, First Interim

Fee Application Hr'g Tr. at 37-38, No. 09-11233 (Bankr. S.D.N.Y.  Sept. 29, 2009).  The

Court's position has legal support.  *See, e.g.*, *In re ACT Mfg.,* 281 B.R. 468, 485 (Bankr. D.

Mass. 2002).  In sum, given the Court's disinclination to allow professionals to recoup summer

associate fees (without regard to value) through the section 330 process, and the legal support for

that position, the Fee Examiner suggests disallowance of summer associate fees.

> *Suggested disallowance for summer associates:  $190,275.*

44.    **Law Clerks.**   Weil also billed 233.60 hours, representing $54,860 in fees, for

work performed by eight timekeepers described as "law clerks," all of whom appear to have

worked in foreign offices with hourly billing rates ranging from $145 to $280.  In its letter to

Weil dated April 2, 2010, counsel to the Fee Examiner sought clarification regarding whether

these "law clerk" positions were akin to summer associates.  Weil responded that reductions or

adjustments to the application for time billed by law clerks would be inappropriate but did not

address the nature of their employment.  April 9 Letter, ¶ 3.  In the absence of any further

clarification from Weil, and given that the time entries by Weil "law clerks" suggest that they

generally performed the same duties as summer associates, the Court probably will adopt the

same approach for Weil law clerks as it does for summer associates.

> *Suggested disallowance for law clerks:  $54,860.*

45.    **Legal Research.**   Given the extraordinary circumstances surrounding the early

stages of this engagement, and the legal issues presented, Weil's on-line legal research expenses

did not appear manifestly unreasonable.  There were, however, a few instances of unusually long

individual research sessions (*e.g.*, longer than ten hours).  In subsequent fee applications, a more

exacting approach may be warranted, including separate justification for larger computerized

research expenses.

46.    The Fee Examiner also requested copies of Weil's agreement with Lexis and Westlaw to better ascertain the computerized legal research expenses that Weil charged to the estate.  Weil has declined to provide a copy of these agreements on the ground that the firm considers the agreements confidential.  Weil has further informed the Fee Examiner that "it believes that it does not make a profit on these services as a whole although the cost of any particular search is difficult to ascertain."  April 9 Letter, ¶ 21.  Unfortunately, this representation is not sufficient for the Court to assess the computerized legal research charges included in the First Fee Application.

47.    Nonetheless, the Fee Examiner does not now recommend any deduction for computerized legal research.  Although not necessarily acknowledging that any deductions are appropriate, Weil has indicated a willingness to address this matter.  April 9 Letter, ¶ 21.  The Fee Examiner will continue to discuss this with Weil and other professionals retained by the estate to make a recommendation in connection with subsequent and final fee applications.

48.    Furthermore, most of Weil's legal research during the First Compensation Period appears to have been performed by attorneys at an appropriate seniority level.  There were a few exceptions, however, where senior associates with higher billing rates performed research that presumably could have been performed by less senior attorneys at lower billing rates.  Given the exigencies during the First Compensation Period, however, the Fee Examiner does not suggest any disallowance for these entries, which were atypical and resulted in relatively modest marginal fee increases for those particular tasks.

*Suggested disallowance for legal research:  None.*

49.    **Block Billing.**  The Fee Examiner identified approximately $64,000 in fees for which the timekeeper appears to have combined multiple tasks into one time entry of longer than one-half hour, contrary to the UST Guidelines.  *See* UST Guidelines, at (b)(4)(v).  It is within the

Court's discretion to disallow fees requested for entries in excess of 0.5 hours that are

block-billed or to apply an across the board percentage cut.  Due to the relatively limited number

of block-billed entries and the exigent circumstances of the time period in question, however, the

Fee Examiner does not recommend a disallowance.

> *Suggested disallowance for block billing:  None.*

50.      **Clerical and Administrative Tasks.**  Ordinarily, clerical and administrative tasks

appropriate for secretarial staff are part of a law firm's overhead and may not be billed to the

estate.  As a general matter, given the extraordinary circumstances surrounding the early portion

of this engagement, the Fee Examiner does not take issue with most of the ways in which Weil

allocated work during this time.

51.      The Fee Examiner did note an unusual amount of time billed by one senior

attorney (admitted in 1992 with an hourly rate of $650) on tasks that appeared to be essentially

clerical or administrative, such as updating calendars.  *See* **Exhibit H.**  The attorney billed

$57,915 in fees to these tasks.  In response to the Fee Examiner's expressed concerns about these

entries, Weil specifically noted the following:

> [This attorney] has been responsible for coordinating assignments,
> managing workstreams and various other tasks and overseeing the
> court calendar and all pleadings. . . . [I]n cases of this magnitude,
> the importance of these items cannot be underestimated and cannot
> prudently be relegated to a staff person or junior attorney.  It is
> critically important that all matters be appropriately coordinated
> and tracked and the amount of time [this attorney] has devoted to
> these tasks is reasonable and essential to the orderly administration
> of these cases.  In fact, in our view, the rendering of these services
> by [this attorney] has promoted efficiency and economy to the
> benefit of all parties in interest.

April 9 Letter, ¶ 9.  The Fee Examiner understands the role played by this attorney, particularly

as clarified by Weil in its latest submission.  Weil is, of course, correct that managing the

workstream among various timekeepers on a significant engagement like this one is a task

appropriately assigned to the partner level. Moreover, with the understanding that this attorney

is *the* Weil partner primarily tasked with oversight, the amount of time spent on these tasks is not

unreasonable.

>     *Suggested disallowance for clerical and administrative tasks: None.*

52.    **Vague Entries.**  To be compensable, all time entries must be sufficiently detailed

to allow the Court to determine their compliance with applicable codes, rules, standards, and

guidelines.  In light of the exigent circumstances during the First Compensation Period, and the

manner in which most Weil timekeepers recorded their time, the Fee Examiner does not question

every hour spent on vaguely-defined tasks.  Rather, the Fee Examiner attempted to identify

particular timekeepers where the number of vague time entries was sufficiently significant to

raise concern.  **Exhibit I** is a list of those timekeepers—with time entries totaling $103,643.50.

53.    The Fee Examiner provided this exhibit to Weil, which offered the following

response:

> Many of the items set forth on [the exhibit] relate to the early
> stages of these cases where the time pressure and number of
> matters that required immediate attention were extraordinary.  This
> included retention matters involving a very large number of
> professionals, responding to supplier, shareholder and dealer
> inquiries, noticing, discovery in connection with the 363 sale
> (which likely was unprecedented in volume and the timeframe in
> which it was conducted), assumption and cure matters with respect
> to thousands of executory contracts, and debtor in possession
> financing.  In this context, the time entries do not appear to be
> vague and, in our view, adequately describe the matters addressed.
> Again, we will remind our attorneys to be appropriately
> descriptive, taking into account matters which are privileged or
> otherwise confidential.

April 9 Letter, ¶ 8.  The Fee Examiner does not dispute Weil's characterizations regarding the

extraordinary demands that the firm confronted and, as repeatedly noted, the Fee Examiner did

examine all of the professional applications in that context.  Even considering those demands,

however, the Fee Examiner submits that certain timekeepers—at least as set forth in **Exhibit I**—should have described their time in more detail.

*Suggested disallowance for vague entries:  $15,546.53 (15 percent of the total amount of vague entries).*

## COMMENTS / EXPENSES

54.     **Pre-Petition Expenses.  Exhibit J** identifies $756.99 in expenses in the First Fee Application that appear to have been incurred prior to the filing of the bankruptcy petition on June 1, 2009.  Weil has agreed to credit these amounts against its retainer.  April 9 Letter, ¶ 13.

*Agreed disallowance for pre-petition expenses:  $756.99.*

55.     **Mistakenly Charged Expenses.**  In the *Second Application of Weil, Gotshal & Manges LLP, as Attorneys for the Debtors, for Interim Allowance of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred from October 1, 2009 through January 31, 2010* [Docket No. 5295], at n.2, Weil identifies $2,964.57 of duplicating expenses that "were mistakenly charged to the Debtors" during the First Compensation Period.  The Fee Examiner notes this solely for purposes of commenting on the First Fee Application; the second fee application has not been reviewed here.

56.     In addition, Weil also has identified a lunch mistakenly charged on July 28, 2009, which Weil indicated it would deduct from the amount of disbursements for which it seeks reimbursement.  April 9 Letter, ¶ 18.  Presumably, that mistaken charge relates to a $149.88 charge from "Carousel Beverages" on that date.

57.     The Fee Examiner recommends a deduction for these two expenses, which were mistakenly charged as part of the First Fee Application.  Together, the expenses total $3,114.45.

*Suggested disallowance for mistakenly charged expenses:  $3,114.45.*

58.    **Airfare Expenses.    Exhibit K** reflects a total of $10,747.47 in airfare expenses
that do not appear to be for coach class travel.  The Fee Examiner brought these expenses to
Weil's attention, and Weil has agreed to reduce them to the extent they are not coach fares.  *See*
UST Guidelines, at (b)(5)(i) ("first class and other luxurious travel mode or accommodations will
normally be objectionable").  The Fee Examiner recommends a 25 percent reduction in these
airfare expenses.

*Suggested disallowance for airfare expenses:  $2,686.87*

59.    **Hotel Expenses.**  The information initially submitted with the First Fee
Application contained insufficient detail to assess the reasonableness of some hotel expenses.  In
response to requests by counsel to the Fee Examiner, Weil submitted information about these
expenses.  April 9 Letter, Attachment C.  As a result, the Fee Examiner has narrowed its
objection to four separate hotel stays, totaling $13,947.37, which appear to relate to visits to New
York by Weil attorneys from other Weil offices outside New York.  *See* **Exhibit L**.

60.    Weil asserts that these expenses were reasonable because of the difficulty in
finding affordable hotel accommodations in New York City.  April 9 Letter, ¶ 17.  Although the
Fee Examiner does not dispute that hotels in New York can be expensive, the UST Guidelines
provide  that "luxurious" accommodations "will normally be objectionable."  *See* UST
Guidelines, at (b)(5)(i).  The hotels at issue are luxury hotels.  Moreover, other Weil timekeepers
managed to find hotels in New York during the same time period costing less, including a
ten-night stay at one of the same hotels (the Sherry-Netherland) that averaged less than $300 a
night.

61.    The Fee Examiner submits that a $400/night maximum for hotel accommodations
is appropriate.  Consequently, the Fee Examiner recommends a deduction of $3,947.37 for hotel
expenses that exceeded this recommended maximum.

*Suggested disallowance for hotel expenses:  $3,947.37.*

62.      **Meal Expenses.**  In its letters to Weil dated February 23, 2010, March 17, 2010, and April 2, 2010, counsel to the Fee Examiner requested further information regarding meal expenses, and Weil responded by providing the description for various meal expenses.  *See* April 9 Letter, Attachment D.  Weil has noted that it will make the appropriate adjustments to its application to the extent any meal charges are in excess of applicable guidelines.  *Id.*, ¶ 18.  The enclosed **Exhibit M** outlines $26,882.62 of meal expenses charged in excess of the $20/person limit.

*Suggested disallowance for meal expenses:  $26,882.62.*

63.      **Local Transportation Expenses**.  Under most circumstances, expenses associated with firm personnel taking a taxi or car service home after hours should be characterized as overhead.  In fact, firms in this case other than Weil, most notably Jenner & Block, did characterize these expenses in this fashion.  To help evaluate these expenses, the Fee Examiner asked Weil for a copy of any contracts it has with local car or limousine services, but Weil has not responded.

64.      Weil did provide the Fee Examiner with a copy of its firm policy regarding overtime transportation.  *See* April 9 Letter, Attachment F.  That policy states as follows: "Except under extraordinary circumstances, when leaving the office, it is not appropriate to take a taxi home at client or Firm expense if it is before 8:30 p.m.  It is further expected that commuter trains or buses be used where possible when going home and, generally, that taxi rides be taken only to public transportation terminals (*e.g.*, Grand Central, Penn Station, etc.)." *Id.*

65.      The Fee Examiner acknowledges, however, the unusual need for such travel during the initial phase of this engagement at a cost that may have exceeded amounts reasonably included as overhead, especially considering the fact that some Weil timekeepers worked their

entire day on this matter during that period.  After the sale confirmation, however, the extraordinary need for chargeable local travel should have declined substantially.  Indeed, of the expenses submitted for overtime local transportation, most of them were incurred prior to the closing.

66.       Counsel to the Fee Examiner has asked for information about the project-related needs for such travel after July 10, 2009, but has not received a response.  Accordingly, the Fee Examiner recommends disallowance of these expenses in their entirety.  **Exhibit N** details the amount of local transportation expenses, $6,274.67, that appear to relate to overtime transportation after July 10, 2009.

*Suggested disallowance:  $6,274.67.*

67.       **Administrative Expenses.  Exhibit O** outlines $2,869.96 in expenses (such as bates labeling, binding and supplies) that appear to be more properly considered overhead.

*Suggested disallowance for administrative expenses:  $2,869.96*

68.       **Personal Expenses.  Exhibit P** outlines $1,534.64 in personal expenses that do not appear to be appropriately charged to the estate.  Of the expenses listed, Weil has agreed to deduct the two $500 expenses corresponding to the cancellation of a vacation.[2]  April 9 Letter, ¶ 11.  The remaining expenses all appear to be laundry expenses incurred by a partner from the Dallas office working in New York.  Weil takes the position that these expenses are neither unreasonable nor excessive.  *Id.*

69.       While the Fee Examiner agrees that most of the expenses are not excessive (although the same cannot be said for one $364.14 dry cleaning bill), it would be inappropriate to charge these expenses to the estate.  Indeed, the Fee Examiner notes that on at least one other

---

[2] Half of these expenses, amounting to $500, are also included in the exhibit for pre-retention expenses. Consequently, the Fee Examiner has deducted that amount from the recommended disallowance here.

occasion a Weil partner specifically deducted laundry charges from his hotel bill when

submitting the bill for reimbursement from the client.

*Suggested disallowance for personal expenses: $1,034.64, of which Weil has agreed to $500.*

70.   **Miscellaneous Expenses.   Exhibit Q** lists $53,071.57 of expenses that may very

well have been appropriately charged, but for which the Fee Examiner does not have sufficient

information to make that determination.  The bulk of these expenses ($44,464.14) relates to two

separate meetings at the Hilton New York hotel in Manhattan, where the hotel charged Weil

$24,523.49 for "food and beverage charges" and $19,940.65 for "miscellaneous."  According to

Weil, one of the meetings was an organizational meeting for purposes of appointing a creditors'

committee and the other meeting was the section 341 meeting for creditors.  April 9 Letter, ¶ 16.

71.   Counsel for the Fee Examiner asked Weil, both in writing and verbally, to provide

additional information to allow the Fee Examiner to evaluate these expenses—for example,

Weil's purchase of $19,940.65 of "miscellaneous" expenses or the number of people attending

these meetings who consumed $24,523.49 in food and beverages.  Weil informed counsel for the

Fee Examiner that it would not provide further information.

72.   The Fee Examiner does not question whether disbursements in connection with

these meetings were necessary; without doubt, these creditors meetings were important.  Simply

because the meetings were necessary, however, does not mean that the Debtors should

automatically pay any expense submitted by a vendor *ex post facto* without consideration of

whether the expense bears some reasonable relation to the goods or services provided.  In this

particular circumstance, it may be that the expenses charged by the hotel were reasonable.  But

no one can make that determination based on the information provided.  Because the Fee

Examiner does not have sufficient information to evaluate the reasonableness of $44,464.14 in

purchases in connection with these two meetings, the Fee Examiner recommends the
disallowance of these expenses.

73.    The remaining expense on Exhibit Q relates to $8,607.43 for electrical work
associated with the news conference held at Weil in connection with the bankruptcy filing.
Although Weil did provide the Fee Examiner with a copy of the invoice for this work, the
invoice does not list labor hours or itemized material charges.  Like the hotel meeting expense
charges noted above, the Fee Examiner does not dispute the necessity of performing electrical
work to prepare for an important news conference.  Again, simply because the work was
necessary does not mean that the Debtors should automatically pay whatever expense the vendor
submits after the fact.  Because the Fee Examiner does not have sufficient information to
evaluate the reasonableness of this expense, the Fee Examiner recommends its disallowance.

74.    **Exhibit R** lists $1,571.37 of expenses for a trip by a Weil attorney to Bermuda.
Weil has explained:  "GM's insurance carriers are in Bermuda. . . . Bermuda insurers cannot
attend meetings in the United States and cannot even participate in conference calls emanating
from the United States.  Accordingly, the meeting was held in Bermuda."  Given the relatively
modest expense involved, the Fee Examiner has elected not to pursue the rationale for a Weil
attorney attending this meeting in person rather than by telephone or videoconference.

*Suggested total disallowance:  $53,071.57.*

## CONCLUSION

This report is intended to advise the Court, the professionals, and the U.S. Trustee of the
basis for limited objections to the First Fee Application.  It is not intended to be an exhaustive or
exclusive list of possible objections and does not preclude or limit the Fee Examiner's scope of
review or objection on future interim fee applications or on final fee applications.  All
professionals subject to Fee Examiner review should be aware, as well, that while the Fee

Examiner has made every effort to apply standards uniformly across the universe of professionals in this case, some degree of subjective judgment will always be required.

As the Fee Examiner's review and analysis continues, the Fee Examiner continues to develop a heightened sense of the complex landscape of this proceeding.  The conclusions and recommendations in this report are, therefore, subject to further refinement upon each professional's submission of its subsequent and final fee applications.

WHEREFORE, the Fee Examiner respectfully submits this *Report and Statement of Limited Objection* to the First Fee Application.

Dated:  Madison, Wisconsin
           April 22, 2010.

                                     GODFREY & KAHN, S.C.


                          By:      /s/ *Eric J. Wilson*
                                   Timothy F. Nixon (TN 2644)
                                   Eric J. Wilson (EW 1047241)

                                   GODFREY & KAHN, S.C.
                                   780 North Water Street
                                   Milwaukee, Wisconsin 53202
                                   Telephone: (414) 273-3500
                                   Facsimile: (414) 273-5198
                                   E-mail: tnixon@gklaw.com
                                            ewilson@gklaw.com

                                   *Attorneys for Fee Examiner*

4884608_2