Hearing Date and Time:  April 29, 2010 at 9:45 a.m. (Prevailing Eastern Time)

Timothy F. Nixon
Katherine Stadler (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                                                        :
In re:                                                  :    Chapter 11
                                                        :
MOTORS LIQUIDATION COMPANY, *et al.,*                   :    Case No. 09-50026
    f/k/a General Motors Corp., *et al.,*               :    (Jointly Administered)
                                                        :
              Debtors.                 :    Honorable Robert E. Gerber
                                                        :
------------------------------------------------------- x

## FEE EXAMINER'S SUMMARY AND RECOMMENDATIONS—FIRST INTERIM FEE APPLICATIONS

The fee review process mandated by federal bankruptcy law requires patience, persistence and attention to detail as well as to context.  It is often unpleasant.  It also is indispensable to the integrity of Chapter 11—particularly when corporate reorganizations involve billions of dollars, multi-million dollar professional fees from a dozen firms, the country's economic well-being, and direct financial support from American taxpayers.

The first interim fee applications pending before the Court for approval, scheduled for a hearing on April 29, 2010, request approximately $54 million in fees and costs.  The 14 firms submitting applications, for the period from June 1 through September 30, 2009, filed more than 5,000 pages of supporting materials, supplementing that with even more material in response to the Fee Examiner's repeated questions.  The Fee Examiner has recommended that the fees and expenses requested be, in most instances, reduced.

The recommended reductions range up to 21 percent of the amount sought—whether for simple errors of arithmetic, for expenses inappropriately charged to the Debtors, for the failure to comply with the established guidelines, for ignoring the terms of their own retention orders, or for a discrepancy between the fees sought and the "value," a statutory term, of the services provided. (The accompanying matrix catalogues the amounts requested and the suggested reductions.) The Fee Examiner has filed 14 individual reports, one for each application. Some of the conclusions are objective and inescapable—there is no basis, for example, to charge the estate for a dry cleaning bill. Some conclusions are unavoidably subjective.

The Fee Examiner's appointment came almost seven months after General Motors filed for reorganization, and neither the examiner nor his counsel had any prior involvement in the case. That distance brings both advantages and disadvantages. Even without direct involvement, however, the record leaves no doubt that the first six weeks of this case were extraordinary, the demands placed on the professionals were virtually unprecedented, and the participation of the federal government and taxpayers was both indispensable and complicating.

Those facts have significantly influenced the review of the first interim applications. The professionals' allocation of resources and the assignment of work that, in another case and at another time, might have warranted objection or skepticism do not always here. Yet the requirements of the U.S. Trustee's guidelines and the Court's rules, grounded in the U.S. Bankruptcy Code, are not suspended by the size, the novelty, or the complexity of the case.

Nor, moreover, are the statutory requirements changed by public necessity or well-warranted public attention. "In 2008, the auto industry lost over 400,000 jobs....In the spring of 2009, GM and Chrysler executed restructurings that many...claimed would be impossible....[T]he near-term jobs [that would have been] at risk from a disorderly liquidation..." were estimated at more than 1 million. *See* Report, Executive Office of the President, "A Look

2

Back at GM, Chrysler and the American Auto Industry," at 1-2 (Apr. 21, 2010). The taxpayer, through the government, now owns $2.1 billion in preferred stock and just over 60 percent of the common stock in the new company created from this proceeding.

The 14 pending applications, from law firms and consulting firms, vary markedly in their compliance with the guidelines and rules. The willingness of the professionals to respond to the inquiries of the Fee Examiner and counsel varied as well—although most, belatedly if not at the outset, cooperated in some measure with the review process. That process leads to a series of very specific and generally applicable recommendations:

- The professionals hold, in the aggregate, $26.4 million in estate funds. Whether or not characterized as retainers, these funds should be used to pay any amounts awarded the professionals in response to their first interim applications and, until those retained funds are exhausted, any subsequent awards. Every month, every professional has been paid all of its expenses and at least 80 percent of its billed fees, and the local rules permit that continued payment—leaving little justification for the comfort provided by a retainer.

- Without exception, upon the approval in whole or in part of the pending applications, each professional should be paid, now, half of the amount that remains unpaid for the first interim period. The balance—generally 10 percent of the application amount—should continue to be carried forward, against the possibility of any inappropriate charges, until at least the next application hearing.

- Several professionals provided the Debtors, either on request or voluntarily, with a five percent reduction in the fees charged. Most did not. The Court should require a comparable reduction by certain other professionals with dissonant billing rates—at least until the final fee review and compensation process concludes. The significant rates in this case (as high as $1,160 an hour) may well be justified under the Bankruptcy Code and the marketplace for the most sophisticated and skilled attorneys and firms. Yet discounts—for significant cases and clients—are part of the marketplace as well. Moreover, the absence of a uniform approach to discounts effectively means that there is no incentive to give them. The fact that the reorganization itself has been made possible by the U.S. government and its taxpayers also is part of the marketplace analysis. Notably, AP Services—in effect, the client here as the Debtors' management—itself has given a discount on its hourly charges (in return for incentive payments at the case's conclusion). In addition, the relatively high rates in "normal" reorganizations reflect the inherent risk of nonpayment, less a consideration here.

- The 14 individual reports would not have been possible without the involvement of an auditing firm. The staggering amount of material that the statute and guidelines require professionals to produce has no value—and the fee review and approval process no prospect of real credibility—without an auditor to process the vast universe of data into

3

meaningful quantitative segments. A single law firm has objected to the continued retention of the Stuart Maue firm as the auditor. The Court should overrule the objection.

- The U.S. Trustee guidelines, the Court's local rules, and the statutory mandates in sections 327-330 of the Bankruptcy Code are not advisory, nor can they be ignored, without consequence, by applicants. The reductions recommended in the reports provide a consequence that the Court can enforce. Without that, the professionals only burden the Court with applications that have to be repeatedly amended, corrected or supplemented but only when the problems (trivial or sublime) are identified in the fee review process. In every case, ignoring the rules costs time and money.

- In the aggregate, the 14 professional applications ask for more than $120,000 in electronic research charges and services—presumably, at cost, as the law requires. Despite requests, no firm has provided a copy of its contract with the research service. Vital as computerized research is, the piecemeal approach to this expense is not reasonable. Under an appropriate protective order, the Court should order the production of the contracts so that alternatives to individualized electronic research services can be explored to ensure both efficiency and compliance with the law.

- Virtually without exception, the applications seek compensation for some secretarial and administrative services, including the very time record-keeping that the Fee Examiner has often questioned. Those services should be overhead, not charged to the estate. The issue presented, in all but a few of the applications, is not whether a firm should reimburse its attorneys or staff for dry cleaning, or car service, or the "best" hotels, or first class airfare, or meals—perhaps they should—but whether the Debtors should pay for such expenses.

- In each application that seeks compensation for summer associate work, the Fee Examiner has noted the potential value of these services and, at the same time, this Court's conclusion in another case, *In re Chemtura Corp.*, First Interim Fee Application Hrg. Tr., No. 09-11233 (Bankr. S.D.N.Y. Sept. 29, 2009), that they are not compensable. The Court may want to revisit its conclusion—or, alternatively, reiterate it—to avoid uncertainty in subsequent applications.

- The time devoted to the professionals' retention and fee application process varies with each application, ranging from two to 23 percent. Since the first interim applications reflect time spent on retention applications as well as compensation, the Fee Examiner does not recommend a bright line—notwithstanding the practice in another significant case. *In re Lehman Brothers Holdings Inc.*, Fee Committee Report Pertaining to the Third Interim Fee Applications of All Retained Professionals (June 1, 2009 through September 30, 2009), No. 08-13555 (Bankr. S.D.N.Y. Mar. 10, 2010). When the total time for these services exceeds five or six percent without a compelling explanation, however, the Fee Examiner has recommended a reduction to that level.

- No plan of reorganization has yet been filed, and some aspects of this proceeding are only beginning—for example, the asbestos claims process. When the Fee Examiner has questioned retention applications, at least one firm has questioned his authority to do so. The Court should grant the pending motion to permit the Fee Examiner to comment on—

4

and, if necessary, to object to—fee-related aspects of any professional's retention application.

- In some instances, professionals seem to have equated the necessity of fees or expenses with their reasonableness or vice-versa. Fees and expenses should be *both* reasonable and necessary. Simply because an expense was necessary does not mean that the professional should not ensure that payments made for those expenses are documented and reasonable. If the professional does not serve this gatekeeper role, the Fee Examiner, the U.S. Trustee or the Court must do so later.

Of the 14 applicants, three have stipulated to the deferral of their applications so that they can provide additional materials or explanations. For AP Services, which staffs and manages Motors Liquidation Co., there was no fee application as such but, rather, a series of quarterly reports equivalent to an application and a prelude to anticipated "success" fees later in the case. Several other firms have compensation agreements that include similar fees, potentially earned or to be earned. These fees, not nominally based on an hourly rate, cannot be evaluated this soon in the proceeding. In the aggregate, they could exceed $50 million.

This initial fee review process has placed demands on all of the participants. In part, that has been attributable to the process itself, designed to encourage dialogue. For each applicant, the Fee Examiner first raised questions and concerns in a series of letters, emails, personal meetings and telephone conversations—beginning in January and continuing through April 22, when the reports and objections were filed. Earlier in April, draft reports and objections went to each professional, reflecting the Fee Examiner's initial conclusions and the applicants' explanations, as well as additional materials and documents submitted in response to the inquiries. There has been no want of consultation or due process.

While there surely has been negotiation, give and take, explanations and more questions, the guidelines and local rules do not always permit compromise. Moreover, the order appointing the Fee Examiner anticipates more than a negotiated resolution of specific charges and fees. To that end, the Fee Examiner has filed two advisory reports—and anticipates additional reports—

that address broader points and that may prove helpful and, at least potentially, contribute to the transparency and credibility of the fee review process.

Dated: Madison, Wisconsin
April 26, 2010.

         GODFREY & KAHN, S.C.

     By:  */s/ Katherine Stadler*
        Katherine Stadler (KS 6831)
        Timothy F. Nixon (TN 2644)

        GODFREY & KAHN, S.C.
        780 North Water Street
        Milwaukee, Wisconsin 53202
        E-mail: kstadler@gklaw.com
           tnixon@gklaw.com

        *Attorneys for Fee Examiner*

4895522_1

6

First Interim Applications Noticed for Hearing on April 29, 2010

Motors Liquidation Company, *et al.*, Debtors
Chapter 11 Case No. 09-50026 (REG)

| Name of Retained Professional | Date Fee Application Submitted [Dkt. No.] | Period Covered by Fee Application | Amounts Requested | | Amounts Recommended For Disallowance / Status | | Amounts Already paid to Retained Professionals[1] 80% of Fees and 100% of Expenses | | Amounts Allowed by the Court | | Holdback on Fees (10% recommended) | | Examiner's report/ Statement [Dkt. No.] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Fees | Costs | Fees | Costs | Fees | Costs | Fees | Costs | Fees | Costs | |
| 1. Alan Chapell (Final) | 11/16/2009 [4456] | 06/08/2009-10/04/2009 | 72,900.00 | 0 | 0 | 0 | 57,120.00 | 0 | | | | | 02/16/2010 [4990] |
| 2. Baker McKenzie | 11/16/2009 [4454] | 06/01/2009-09/30/2009 | 1,262,789.76 | 21,619.20 | Adjourned by stipulation | Adjourned by stipulation | 941,389.19 | 21,619.20 | | | | | 04/22/2010 [5543] |
| 3. Brownfield Partners, LLC | 11/16/2009 [4457] | 06/01/2009-09/30/2009 | 213,914.75 | 16,294.80 | Adjourned by stipulation | Adjourned by stipulation | 170,031.80 | 16,294.80 | | | | | 04/22/2010 [5565] |
| 4. Butzel Long, PC | 11/16/2009 [4450] | 06/10/2009-09/30/2009 | 237,775.50 | 21,265.87 | 45,899.49 | 206.32 | 190,272.74 | 21,265.87 | | | | | 04/22/2010 [5548] |
| 5. Evercore Group | 11/16/2009 [4453] | 06/01/2009-07/10/2009 | 16,029,032.00 | 2,920.62 | Motion to Adjourn Pending | 1,042.34 | 11,690,398.00 | 2,920.62 | | | | | 04/22/2010 [5549] |
| 6. FTI Consulting, Inc. | 11/16/2009 [4455] | 06/03/2009-09/30/2009 | 4,435,036.25 | 74,500.84 | 188,831.46 | 3,141.07 | 3,548,029.00 | 74,500.84 | | | | | 04/22/2010 [5557] |
| 7. Honigman Miller Schwartz & Cohn LLP | 11/16/2009 [4446] | 06/01/2009-09/30/2009 | 2,297,160.00 | 16,799.46 | 16,703.08 | 569.01 | 1,792,828.80 | 13,944.02 | | | | | 04/22/2010 [5544] |
| 8. Jenner & Block LLP | 11/16/2009 [04451] | 06/01/2009-09/30/2009 | 4,950,322.95 | 270,439.26 | 50,554.90 | 8,058.20 | 3,795,112.70 | 261,403.77 | | | | | 04/22/2010 [5545] |
| 9. Jones Day | 11/16/2009 [4448] | 06/01/2009-09/30/2009 | 455,396.65 | 4,359.53 | 0 | 0 | 364,183.74 | 4,359.53 | | | | | 04/22/2010 [5546] |
| 10. Kramer Levin Naftalis & Frankel LLP | 11/16/2009 [4459] | 06/03/2009-09/30/2009 | 4,593,910.50 | 85,047.77 | 520,633.39 | 230.58 | 3,683,753.81 | 85,047.77 | | | | | 04/22/2010 [5555] |

---

[1] These figures include additional payments made by the Debtors subsequent to the submission of the first interim fee applications but *does not* include any of the payments reported in rounded numbers in the Debtors' Monthly Operating Reports.

| Name of Retained Professional | Date Fee Application Submitted [Dkt. No.] | Period Covered by Fee Application | Amounts Requested | | Amounts Recommended For Disallowance / Status | | Amounts Already paid to Retained Professionals[1] 80% of Fees and 100% of Expenses | | Amounts Allowed by the Court | | Holdback on Fees (10% recommended) | | Examiner's report/ Statement [Dkt. No.] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Fees | Costs | Fees | Costs | Fees | Costs | Fees | Costs | Fees | Costs | |
| 11. LFR, Inc. | 11/12/2009 [4436] | 06/01/2009-9/30/2009 | 633,772.80 | 43,447.98 | Adjourned, by stipulation | Adjourned, by stipulation | 507,017.84 | 43,447.98 | | | | | 04/22/2010 [5566] |
| 12. Lowe, Fell & Skogg, LLC | 11/18/2009 [4474] | 06/01/2009-07/10/2009 | 261,840.25 | 19,212.25 | 104,252.78 (Application withdrawn) | 19,057.15 (Application withdrawn) | 209,472.20 | 19,057.15 | | | | | 04/22/2010 [5547] |
| 13. The Claro Group, LLC | 11/20/2009 [4506] | 06/01/2009-09/30/2009 | 189,563.00 | 888.05 | 40,458.42 | 878.05 | 151,389.28 | 888.05 | | | | | 04/22/2010 [5558] |
| 15. Weil, Gotshal & Manges LLP | 01/13/2010 [4803] | 06/01/2009-09/30/2009 | 17,910,963.25 | 595,206.67 | 1,188,181.39 | 102,210.51 | 14,359,669.80 | 597,565.85 | | | | | 04/22/2010 [5563 and 5564] |
| **TOTAL FIRST INTERIM FEE APPLICATIONS:** | | | **$53,544,377.66** | **$1,172,002.30** | | | | | | | | | |

| Quarterly Reports | | Period covered by Quarterly Report | Fees | Expenses | | | | Examiner's report/ Statement [Dkt. No.] |
|---|---|---|---|---|---|---|---|---|
| AP Services, LLC | 10/22/2009 [4280] | 06/01/2009-08/31/2009 | 21,884,798.48 | 1,171,226.60 | *See* Quarterly Reports | | | 4/22/2010 [5567] |
| | 01/16/2010 [4828] | 09/01/2009-11/30/2009 | 11,863,361.58 | 825,743.93 | | | | |
| **TOTAL QUARTERLY REPORTS:** | | | **$33,748,160.06**[2] | **$1,996,970.53** | | | | |

4894475_3

---

[2] The scope of the January 16, 2010 Quarterly Report exceeds the First Fee Period (June 1, 2009 – Sept. 30, 2009) by two months. The fees incurred by AP Services during the First Fee Period are $26,273,091.15, plus expenses of $1,508,563.69 (for a total of $27,781,654.84). AP Services has received payment of all fees and expenses reported in the First Fee Period.

2