**Hearing Date and Time: April 29, 2010 at 9:45 a.m. (Eastern Time)**
**Reply Deadline: April 27, 2010 (extended by agreement of the parties)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-3275
Facsimile: (212) 715-8000
Thomas Moers Mayer
Amy Caton

*Counsel for the Official Committee*
*of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 Case No.: |
| GENERAL MOTORS CORP., et al., | : | 09-50026 (REG) |
| Debtors. | : | (Jointly Administered) |

## RESPONSE TO THE FEE EXAMINER'S REPORT AND STATEMENT OF LIMITED OBJECTION TO THE FIRST INTERIM FEE APPLICATION OF KRAMER LEVIN NAFTALIS & FRANKEL LLP

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................2

RESPONSE..................................................................................................................................3

    THE COMMITTEE AND ITS COUNSEL PLAYED MAJOR
    ROLES IN THESE CHAPTER 11 CASES................................................................3

        *Summary Chart of Specific Responses*..................................................................6

    SPECIFIC RESPONSES TO FEE EXAMINER'S OBJECTIONS .............................8

        Objection C: Scope of Work Performed, DIP Financing and
            Cash Collateral...........................................................................................8

        Objection D: Scope of Work Performed, Environmental Issues ............................8

        Objection F: Scope of Work Performed, 363 Sale ..................................................9

        Objection G: Task Allocation and Billing Rates ...................................................10

        Objection K: Block Billing ....................................................................................10

        Objection L: Repetitive and Vague Entries ...........................................................12

CONCLUSION..........................................................................................................................14

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-3275
Facsimile: (212) 715-8000
Thomas Moers Mayer
Amy Caton

*Counsel for the Official Committee*
*of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                          :
In re:                                    :    Chapter 11 Case No.:
                                          :
GENERAL MOTORS CORP., et al.,             :    09-50026 (REG)
                                          :
                            Debtors.      :    (Jointly Administered)
                                          :
-----------------------------------------------------------X

### RESPONSE TO THE FEE EXAMINER'S REPORT AND STATEMENT OF LIMITED OBJECTION TO THE FIRST INTERIM FEE APPLICATION OF KRAMER LEVIN NAFTALIS & FRANKEL LLP

TO:   THE HONORABLE ROBERT E. GERBER,
      UNITED STATES BANKRUPTCY JUDGE:

Kramer Levin Naftalis & Frankel LLP ("**Kramer Levin**"), counsel for the Official Committee of Unsecured Creditors (the "**Committee**") of the above captioned debtors and debtors-in-possession in these chapter 11 cases (collectively, the "**Debtors**"), hereby submits this response (the "**Response**") to the Report and Statement of Limited Objection (the "**Report**") of the Fee Examiner ("**Fee Examiner**") to the First Interim Fee Application ("**First Interim Fee Application**") of Kramer Levin.[1] In support of its Response, Kramer Levin represents as follows:

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Interim Fee Application.

1

**PRELIMINARY STATEMENT**

1. On June 1, 2009, General Motors and its affiliates commenced the largest industrial cases in the history of chapter 11. The cases affected more than $100 billion of secured and unsecured debt, the future of hundreds of thousand of employees and the rights of millions of creditors, dealers, suppliers and retirees, and reflected the unprecedented role of the United States government in the reorganization of one of the countries' largest and most prominent industries.

2. On June 3, 2009, the United States Trustee appointed an extraordinarily large official committee of 15 members to serve as the fiduciary for unsecured creditors in these chapter 11 cases. The Committee members comprised a broad cross section of creditors interested in and directly affected by these cases, including unions, the Pension Benefit Guaranty Corporation, indenture trustees for bondholders, dealers, suppliers, tort creditors and general trade creditors. On that same day, Kramer Levin was retained as counsel for the Committee.

3. The Company, its management and board of directors, its legal and financial advisors, the US Auto Task Force and various other parties who were involved in designing the GM bankruptcy case had spent months working nearly full time to plan for these chapter 11 cases. The Committee and its counsel were thrust into this complex structure and were required to operate immediately at the highest level of activity, sophistication and responsiveness for the next 45 days. Since Kramer Levin had most recently served as Committee counsel in the Chrysler bankruptcy, its partners and associates were uniquely suited to assist the Committee in the GM case. Kramer Levin had experienced lawyers immediately prepared to handle the asset sale issues, the financing issues, the sale litigation and appeals, the dealer and supplier issues and the general bankruptcy issues, all of which required immediate attention. Kramer Levin's ability

2

to handle these matters effectively, professionally and without delay or public dispute contributed to the successful sale of substantially all of the Debtors' assets to their successor ("**New GM**"). The Fee Examiner itself recognizes that the "record leaves no doubt that the first six weeks of this case were extraordinary, the demands placed on professionals were virtually unprecedented, and the participation of the federal government and taxpayers was both indispensable and complicating" Fee Examiner's Summary and Recommendations, April 26, 2009 at page 2 [Docket No. 5601].

4. Surprisingly, Kramer Levin now finds itself defending a wholesale, broad based objection to its initial fee application filed by the Fee Examiner appointed in theses cases. Kramer Levin seeks $4,678,956.27 in the Fee Application for the time period June 3, 2009 through September 30, 2009 (the "**First Interim Fee Period**"). The Fee Examiner has objected to $520,863.97 of the fees sought, representing over 11% of the amounts requested. The most troubling aspect of the objection is not the Fee Examiner's technical issues (themselves debatable, see below), but rather, his request for a 5% general fee reduction clearly influenced by his suggestion that the dominance of the United States government marginalized the Committee's role in the case.

5. To the contrary, the unique circumstances of the case cried out for Committee involvement.

## RESPONSE
### THE COMMITTEE AND ITS COUNSEL PLAYED MAJOR ROLES IN THESE CHAPTER 11 CASES.

6. The Debtors' officers involved in selling the Debtors' assets were also, for the most part, officers who would run New GM as the buyer. The Debtors' professionals were focused on closing a transaction that would give New GM the best send-off possible. The United States

3

government was (and is) at one and the same time prepetition secured lender, debtor-in-possession lender, environmental creditor and tax creditor of the Debtors – and majority shareholder of the purchaser. The Committee was the only independent fiduciary solely engaged for unsecured creditors and primarily focused on increasing the benefits of the sale for the Debtors' estates.

7. The Committee objected to the sale on the ground that the U.S. Treasury ("**Treasury**") had committed inadequate funds to the post-sale wind-down. No other party did so. Kramer Levin and FTI carefully analyzed the proposed Wind-Down Budget and on the eve of the last day of the Sale Hearing, engaged in an all-night negotiation session with the Debtors and Treasury to increase the Wind-Down Budget by $225 million – a 20% increase over the amount proposed. Because the Debtors were focused on closing the sale and negotiations over wind-down funding were a threat to closing, Kramer Levin took the lead on most substantive negotiations with Treasury on documentation. This was a major task. Treasury's original draft Wind-Down Credit Agreement had standard terms that did not match the unique terms of the deal, which included limited recourse, no fixed amortization and almost no defaults. It took several rounds of document review, drafting and calls with Treasury, the Debtors and other parties for Kramer Levin to negotiate the final document. There was little time to parcel out and review work by junior lawyers. The work had to be done by senior associates and partners. Kramer Levin's prior experience and credibility with the members of the Auto Task Force and its counsel was instrumental in achieving a swift and effective result for the GM Committee.

8. The Committee's objection also sought to increase the liabilities assumed by New GM. No other estate-paid professional undertook this important role. Kramer Levin drafted the

objection; Kramer Levin negotiated for New GM's assumption of increased amounts of future product liability claims and tens of millions of dollars in priority tax claims.

9. The sale left the Debtors under the management of AP Services with effectively no board of directors. The Committee – and no other party – renegotiated the terms of AP Services' retention to set a target for a chapter 11 plan and a target for claim allowance. The Committee fought to give creditors board representation – and won the right to appoint two board members. Kramer Levin and FTI negotiated AP Services' retention; Kramer Levin negotiated for the board seats.

10. As noted above, the negotiation of the original transaction documents involved Old GM officers who would soon be running New GM. Not surprisingly, the Committee found in the transaction documents numerous material issues that were prejudicial to the Debtors and their "left-behind" creditors. The Fee Examiner's Report reflects only a partial list of the issues Kramer Levin negotiated to successful resolution.

11. Kramer Levin believes that its efforts on behalf of the Committee, as demonstrated in the Fee Application, were necessary, appropriate and valuable. With approximately $6 billion of New GM Equity Interests at stake for general unsecured creditors, Kramer Levin's $4.5 million in fees and disbursements were eminently reasonable. No private party in a $6 billion deal would have spent less, and, given its previous experience representing the official committee in Chrysler, Kramer Levin believes no other firm could have worked more efficiently and with more effect for its client.

12. The following table itemizes the Fee Examiner's objections and summarizes Kramer Levin's responses.

| Fee Examiner Objection (fees sought) | Disallowance Sought | Kramer Levin Response |
|---|---|---|
| **A. Matter Descriptions** (n/a)<br><br>Fee Examiner says too many Matter Descriptions | n/a | Matters reflect different aspects of the Sale Transaction to avoid more than 10 – 20% of the total time billed being aggregated in one matter category.[2] |
| **B. Scope of Work (Generally)** (n/a)<br><br>Fee Examiner questions the scope of Kramer Levin's work | n/a | Kramer Levin disagrees, see above. |
| **C. DIP Financing/Cash Collateral:** ($240,942.50)<br><br>Fee Examiner questions Committee's role; says DIP and Cash Collateral negotiations not adequately segregated. | $12,047.13 | See above for Kramer Levin's role.<br><br>The DIP and Cash Collateral Orders could not easily be segregated, see below. |
| **D. Environmental Issues** ($346,727)<br><br>Fee Examiner suggests Committee counsel should limit its role to understanding and monitoring environmental issues | $52,009.05 | Importance of environmental claims justified fees, see below. |
| **E. Pre-Petition Collateral Review** ($163,571)<br><br>Fee Examiner recommends deferring evaluation until results of the adversary proceeding are ascertainable | None at this time | Collateral review is not an option, it is a requirement – a necessary expense even if no litigation results. In this case, litigation did result: Kramer Levin's collateral review related to a potential lien defect that could yield the estate $1.5 billion. Kramer Levin's fees were reasonable given the unprecedented size of the GM's collateral package and the Fee Examiner's evaluation should not be contingent on the ultimate success of the action. |
| **F. 363 Sale** ($1.5 million +)<br><br>Fee Examiner questions need for Committee involvement | None at this time | Kramer Levin disagrees, see above. Kramer Levin's fees were reasonable, see below. |

---

[2] If Kramer Levin would had grouped all of the Sale Transaction categories together, approximately 37% of the time billed would have been in one category.

6

| Fee Examiner Objection (fees sought) | Disallowance Sought | Kramer Levin Response |
|---|---|---|
| **G. Task Allocation/Billing Rates**<br><br>Fee Examiner recommends 5% reduction to avoid "premium billing" and encourage fee reductions in other cases; says tasks should be managed by senior personnel and performed at the lowest appropriate billing rate. | $214,383.01 | Kramer Levin's billing rates are not "premium rates" but standard rates as set out in its retention application. Tight time table required use of senior lawyers. No basis to impose a 5% reduction on Kramer Levin, see below. |
| **H. Summer Associates**<br>($17,952)<br><br>Fee Examiner opposes all charges. | $17,952.00 | Charges were for substantive legal services rendered. Kramer Levin already has reduced these charges and will further reduce at Court's direction. |
| **I. Billing for Clerical and Administrative Tasks**<br><br>Fee Examiner questions work conducted by a first year litigation associate. | $16,896.00 | Associate reviewed and analyzed all pending motions and objections, and an assessment of each objection to the Sale Transaction. This work allowed many other attorneys to quickly digest the elements of the numerous pleadings without duplication. Work was legal, not clerical. |
| **J. Attendance at Hearings**<br><br>Fee Examiner demands that (i) future fee applications state specific reason for attendance and (ii) record time in substantive task category, rather than "hearings" or "motions" | n/a | Future fee applications will state reasons for attendance.<br><br>Time billed to Motions related to review and analysis of miscellaneous motions not in any other billing matter. Creation of a separate matter for each motion would be inconsistent with the Fee Examiner's earlier request for a reduction in matter categories. |
| **K. Block Billing**<br><br>Fee Examiner claims to have identified $412,588.50 of block billing and recommends a 25% reduction | $103,147.12 | Many of the questioned entries were single tasks that could not be easily separated out. See Exhibit 1 (detailed below).<br><br>Emergency nature of transaction impeded time subdivision and block billing reductions not justified, see below. |
| **L. Repetitive and Vague Entries**<br><br>Fee Examiner claims to have identified $213,387.50 of "repetitive tasks," $422,607.03 of "vague communications," and $58,666.05 of "vague tasks" and recommends a 15% reduction | $104,199.08 | Tasks were not repetitive or vague, see below. |
| **M. Pre-Retention Expenses** | $230.58 | Agree to reduction |

**SUPPLEMENTAL RESPONSES TO SPECIFIC OBJECTIONS**

**Objection C. Scope of Work Performed, DIP Financing and Cash Collateral**

13. We address the Fee Examiner's "scope" objections above.

14. The Fee Examiner also objects that DIP financing activities were not adequately segregated in the billing records from cash collateral negotiations. We disagree. As in many other cases, analysis and negotiation of the DIP and Cash Collateral Orders occurred simultaneously. The DIP and Cash Collateral orders contain many overlapping and complimentary provisions, many of which were necessary to review and negotiate in tandem. It would have been difficult, if not impossible, to accurately separate the work into two different categories. The Fee Examiner's demand for different categories contradicts his earlier objections to the number of categories.

**Objection D. Scope of Work Performed, Environmental Issues**

15. The Fee Examiner suggests that the Committee's role in dealing with environmental matters could have been more limited and seeks a significant reduction of 15%. Kramer Levin objects strenuously to the assertion that its role should be limited "to understanding and monitoring" the Debtors work in environmental matters.

16. The Debtors (properly) invited the Committee, through Kramer Levin and FTI, to participate in environmental matters. Kramer Levin participated in many meetings, presentations and calls with the Debtors and their environmental consulting firms. The Debtors worked with Kramer Levin on strategies for dealing with the various state and federal environmental agencies. This was certainly appropriate given the importance of environmental claims to the ultimate success of this chapter 11 case.

8

17. Environmental administrative expenses represent the largest portion of the Wind Down Budget and pose the greatest threat to the distribution of New GM Equity Interests to unsecured creditors. Accordingly, Kramer Levin had a responsibility to analyze and assess the significant environmental issues that could arise in the Debtors' bankruptcy cases. Kramer Levin also provided tangible benefit to the Committee and to the Debtors by identifying more cost efficient alternatives for states to address environmental remediations.

18. Kramer Levin spent approximately $346,000 on environmental issues during the First Interim Fee Period, which is reasonable in light of fees expended on environmental issues in other cases. For example, in the chapter 11 case of Asarco LLC, Kramer Levin was bankruptcy counsel to holders of $300 million in unsecured bonds. These holders spent over $5.6 million of their own money on separate special environmental counsel and consultants. In addition, in the Dana Corp. bankruptcy case, the Committee (represented by Kramer Levin) was asked to investigate environmental claims in the last three months of the case, resulting in fees (approved by the Bankruptcy Court) for approximately $438,000. The Committee will need to become more involved in environmental issues as plan negotiations continue and any reduction in fees is unwarranted.

**Objection F. Scope of Work Performed, 363 Sale**

19. Without recommending a reduction in fees at this time, the Fee Examiner questions the Committee's active role in the Sale Transaction. As noted above, the Committee's objection to the Sale Transaction and ensuing negotiations resulted in New GM's assumption of increased amounts of additional liabilities.

20. The Fee Examiner further states that "with every benefit of the doubt, the expenditure of more than $1.5 million (nearly 33 percent of the total requested) on a sale

9

transaction largely conducted by other law firms remains of concern." Report at ¶41. From December 11, 2008 through the Petition Date, Jenner & Block received more than $11,250,000 in fees and expenses relating to the chapter 11 cases and billed approximately $3.5 million from June through September 2009 on matters relating to the Sale Transaction. *See* Jenner & Block Retention Application [Docket No. 950] and First Interim Fee Application [Docket No. 4451]. Kramer Levin had only 45 days and spent $1.5 million analyzing the same documents, identifying approximately 50 material issues and obtaining material concessions.

**Objection G. Task Allocation and Billing Rates**

21. The Fee Examiner suggests that Kramer Levin should reduce its fees by 5%, after other adjustments, in the amount of $214,383.01. The suggested reduction is arbitrary and merely an attempt to offset the Fee Examiner's disapproval of standard New York billing rates.

22. Kramer Levin had 45 days to master and participate in a transaction that had been brewing for six months. Senior lawyers are more efficient than junior lawyers, and the senior lawyers in question had just finished working on Chrysler. Kramer Levin's billing rates are not "premium rates" but standard rates as set out in its retention application. These rates are commensurate with comparable New York firms. The Fee Examiner's desire to encourage fee reductions in this or other cases provides no basis to impose a 5% reduction on Kramer Levin.

**Objection K. Block Billing**

23. The Fee Examiner identified $412,588.50 of "objectionable" entries for block billing and recommends an arbitrary 25% reduction of $103,147.12. Kramer Levin believes that many of the time entries were not block billing, but rather, were single tasks that could not easily be separated out. For example, the Fee Examiner questions the following entry for Lauren Macksoud on 9/16/2009:

10

> "Drafting summary of arguments to discuss on next Committee call; reviewing relevant case law regarding same."

Reviewing the relevant case law and drafting the summary of arguments was an integrated single task. Kramer Levin previously informed the Fee Examiner that this was a single task, and yet the Fee Examiner declined to remove this item, along with many others, from his Report.

24. In addition, the Fee Examiner questions many entries for "block billing" where the professional spent time on a specific task (reviewing, analyzing or drafting a document) followed by a telephone conversation with another Kramer Levin professional. In many instances, these phone calls lasted less than a minute or two. We believe that is not necessary to separate out the time spent on de minimis conversations, particularly where the estate would be charged for a full six minutes of conversation. Attached as <u>Exhibit 1</u> is Kramer Levin's supplemental response with explanations for approximately $150,000 of the questioned entries.[3]

25. Moreover, given the expedited time frame of the Sale Transaction, professionals were required to spend a significant amount of time on substantive issues while juggling many items at a rapid pace. Kramer Levin will caution its professionals against any form of block billing but does not believe that such a significant reduction is necessary here given the circumstances that occurred during the First Interim Fee Period. We submit that block billing objections should only be used to correct abuse where it appears that lawyers are "running the clock" to fill idle hours. The enormous workload and extraordinary pressures of the GM transaction left no time for idle hours. Kramer Levin's First Interim Fee Application does not warrant this type of wholesale objection.

---

[3] Please note that these are the entries that Kramer Levin was able to easily identify and supplement in the short timeframe to prepare this Response to the Fee Examiner's Report. Kramer Levin submits that there might be additional entries that could be further supplemented or explained as proper.

11

**Objection L. Repetitive and Vague Entries**

26. The Fee Examiner identified $213,387.50 of "repetitive tasks," $422,607.03 of "vague communications," and $58,666.05 of "vague tasks." The Fee Examiner recommends an arbitrary 15% reduction of $104,199.08.

27. The "repetitive tasks" were not repetitive at all; rather in the first 45 days of the bankruptcy case, certain professionals did spend time on the same issues each day. For example, Michael Fein was special counsel in Kramer Levin's real estate department and spent time almost every day of the First Interim Fee Period reviewing the revised leases and Transition Services Agreement and preparing an issue list on the documents. In addition, Mr. Rogoff, one of the principal partners overseeing this case, spent time every day on staffing and project allocation issues to ensure that the team worked as efficiently as possible under the circumstances. Mr. Rogoff also spent a significant amount of time working with the various dealers on the Committee, coordinating with Kramer Levin's environmental group and focusing on plan structure, supplier, and executory contract issues as well as the many pleadings filed in these cases.

28. Kramer Levin believes that all of the alleged "repetitive tasks" are appropriate entries for substantive work performed by its professionals on a particular day and that no reduction is warranted. Kramer Levin should not be penalized for failing to be creative in the time entries if the professional spent time on the same tasks for consecutive days or weeks.

29. Kramer Levin believes that many of the "vague communications" were not vague at all and each need to be viewed under its Matter Category. Moreover, if Kramer Levin attended an all-hands meeting or conference call with other Kramer Levin professionals, FTI or any of the Debtors' advisors, it should not be required to detail every attendee at the meetings. Attached as

12

Exhibit 2 is Kramer Levin's supplemental response with explanations for approximately $375,000 of the questioned entries for "vague communications."[4]

30. As with the block billing, Kramer Levin will caution its professionals against future recording of vague communications but does not believe that such a significant reduction is necessary here given the circumstances that occurred during the First Interim Fee Period.

31. Finally, the "vague tasks" were not vague at all. Almost all of the questioned entries for "vague tasks" are where the professional included the words "attention to" or "follow up" in the time entry. Kramer Levin believes that these terms are appropriate descriptions, particularly as almost all of these entries are for an hour or less. In addition, the Fee Examiner questions many of the time entries of Jeffrey Trachtman, a partner in the litigation department for descriptions such as "read materials and filings" and "review and edit memos." As explained to the Fee Examiner, these all related to the Sale Transaction pleadings and revising the successor liability memos, as is evidenced by the Matter Category. Once again, we believe that the Fee Examiner is not reviewing the time entries under the appropriate Matter Category (as in "vague communications") and no reduction is warranted.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[4] Please note that these are the entries that Kramer Levin was able to easily identify and supplement in the short timeframe to prepare this Response to the Fee Examiner's Report. Kramer Levin submits that there might be additional entries that could be further supplemented or explained as proper.

## **CONCLUSION**

32. For all of the reasons set forth above, Kramer Levin respectfully requests that the compensation and reimbursement requested in its First Interim Fee Application be allowed, subject to the adjustments Kramer Levin has agreed to, and that it be granted such other and further relief as is just.

Dated: April 27, 2010
      New York, New York

                                     **KRAMER LEVIN NAFTALIS & FRANKEL LLP**

                                     By:   /s/ Thomas Moers Mayer
                                   Thomas Moers Mayer
                                   Amy Caton
                                   1177 Avenue of the Americas
                                   New York, New York 10036
                                   (212) 715-3275

                                   *Counsel for the Official Committee of Unsecured Creditors*