USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/28/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

IN RE:

MOTORS LIQUIDATION COMPANY, et al.,
  f/k/a GENERAL MOTORS CORP., et al.,

----------------------------------------X          09 Civ. 7794

OLIVER ADDISON PARKER,

                        Appellant,                 OPINION

        -against-

MOTORS LIQUIDATION COMPANY, et al.,

                        Appellees.

----------------------------------------X

A P P E A R A N C E S:


            Pro Se

            OLIVER ADDISON PARKER
            283 Codrington Drive
            Lauderdale by the Sea, FL   33308

            Attorneys for Appellee
            Motors Liquidation Company

            WEIL, GOTSHAL & MANGES LLP
            767 Fifth Avenue
            New York, NY   10153

            Attorneys for Appellee
            The United States of America

            PREET BHARARA
            United States Attorney for the S.D.N.Y.
            86 Chambers Street, 3rd Floor
            New York, NY   10007
            By:  David S. Jones, Esq.

**Sweet, D.J.**

General Motors Corporation and certain of its affiliates (collectively, "GM" or the "Debtors") each commenced a case under chapter 11 of title 11, United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on June 1, 2009 (the "Commencement Date") and immediately thereafter moved for approval of the sale of substantially all of their assets to a United States Treasury-sponsored purchaser, NGMCO, Inc. n/k/a General Motors, LLC (the "Purchaser" or "New GM"), pursuant to Section 363 of the Bankruptcy Code (the "Sale" or the "363 Transaction").  The Bankruptcy Court entered an order approving the 363 Transaction dated July 5, 2009 (the "Sale Order"), and issued an 87-page written decision, In re General Motors Corp., 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (the "Sale Opinion" or "Sale Op.").  Appellant Oliver Addison Parker ("Parker" or the "Appellant"), an attorney appearing pro se, is an unsecured bondholder who objected to the Sale and has now appealed the Sale Order.  Upon the conclusions set forth below, the Sale Order is affirmed.

1

## Prior Proceedings

The facts and prior proceedings are set forth in the Sale Opinion, a July 7 Opinion,[1] and declarations and proceedings before the Bankruptcy Court.

## Background of the Bankruptcy

In response to the troubles plaguing the American automotive industry, the United States of America through the Treasury Department ("Treasury") and the Presidential Task Force on the Auto Industry (the "Auto Task Force") implemented various programs to support and stabilize the domestic automotive industry.  Those programs have included, among other things, providing credit support for receivables issued by certain domestic automobile manufacturers and support for consumer warranties.  See Sale Op. at 477.

---

[1]     The relevant facts also appear in the Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2 (CD-2); the Supplemental Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2 (CD-43); the declaration of Harry Wilson (CD-50), submitted by the U.S. Government; and the transcripts of the evidentiary hearing and related proceedings before the Bankruptcy Court on June 30, 2009 (CD-134), July 1, 2009 (CD-141), and July 2, 2009 (CD-133).  Citations to "CD-__" refer to GM's Statement of Issues on Appeal and Counterdesignation of Additional Items to be Included in the Record on Appeal in Connection with the Appeal of Oliver Addison Parker.

Treasury also provided direct loans to certain automobile manufacturers. See id. Specifically, at GM's request in late 2008 and following arms'-length negotiations, Treasury determined to make available to GM billions of dollars in emergency secured financing (the "Prepetition Loan") to sustain GM's operations while it developed a new business plan. See id. "At the time that the U.S. Treasury first extended credit to GM, there was absolutely no other source of financing available. No party other than Treasury conveyed its willingness to loan funds to GM and thereby enable it to continue operating." Id.

The first loan came in December 2008, after GM submitted its proposed viability plan to Congress. See id. That plan contemplated GM's shift to smaller, more fuel-efficient cars, a reduction in the number of GM brand names and dealerships, and a renegotiation of GM's agreement with its labor union, among other things. As part of its proposed plan, GM sought emergency funding in the form of an $18 billion federal loan. See id.

After negotiations, Treasury and GM entered into a loan agreement on December 31, 2008, that provided GM

3

with up to $13.4 billion in financing on a senior secured
basis.  See id.  Under that term loan facility, GM
immediately borrowed $4 billion, followed by $5.4 billion
less than a month later, and the remaining $4 billion on
February 17, 2009.  See id.  The GM-Treasury loan agreement
required GM to submit a proposed business plan to
demonstrate its future competitiveness that went
significantly further than the one GM had submitted to
Congress.  See id. at 478.  Among other conditions of
Treasury's willingness to provide financing, GM was to
demonstrate its long-term viability by reducing its
outstanding public debt (approximately $27 billion) by at
least two-thirds, and converting from cash to common stock
at least half of the value of its $20 billion contribution
to a union health care trust (the "UAW VEBA").  See id.

        Treasury and GM subsequently entered into amended
credit agreements to provide for an additional $2 billion
in financing that GM borrowed on April 24, 2009, and
another $4 billion that GM borrowed on May 20, 2009.  See
id. at 479.  The $19.4 billion in total funds advanced to
GM under the Prepetition Loan (all on a senior secured
basis) were critical to GM's survival during the months
leading up to GM's bankruptcy, and afterwards.  See id.

4

Although the Government's decision to provide
financing was intended to avoid the drastic and systemic
consequences that would result from a GM liquidation,
Treasury insisted from the start as a condition of its
financial support that GM take the steps necessary to
transform itself into a competitive, and successful, player
in the global automotive market. See id. The Government's
decision to loan substantial additional taxpayer funds to
GM — in the form of an approximately $33.3 billion debtor-
in-possession facility, which provided critical funding to
GM pending the approval and consummation of the asset sale
(the "DIP Loan") — was motivated not only by the threat of
liquidation and the desire to avoid the consequences of
such liquidation, but also because the Government concluded
as a result of an exhaustive analysis conducted by Treasury
and the Auto Task Force that the creation of a new,
competitive GM was a worthwhile pursuit. See id. at 479-
80.

On March 30, 2009, the President announced that
GM's efforts to develop a long-term viability plan had
fallen short and that the advancement of any additional
federal loans to GM beyond the subsequent sixty-day period

5

would require a more aggressive effort to map out a clear

path to long-term viability.  See id. at 479.  In

connection with the effort that followed, Treasury and the

Auto Task Force continued their due diligence and analysis

of all material aspects of a successful New GM.  GM and

other stakeholders conducted their own analyses, as well.

Ultimately, all agreed that the only viable course was for

GM to pursue a transaction under Section 363(b) of the

Bankruptcy Code (the "Sale") with the support of Treasury,

the governments of Canada and Ontario, through Export

Development Canada (collectively, "Canada"), and other

constituents.  See id. at 480, 484-85.


The transaction ultimately agreed upon

contemplated the formation of a new Treasury-sponsored

entity that, assuming GM received no better offer, would

acquire certain substantial assets of GM.  As part of the

Sale, that newly-formed entity (i.e., New GM), as assignee

of Treasury's rights and claims under the Prepetition Loan

and the DIP Loan, was to credit bid substantially all of

GM's indebtedness against certain assets of GM.

Immediately upon closing, New GM was to contribute (a) 10%

of its common equity to the bankruptcy estates (plus two

tranches of warrants at various strike prices, each for an

6

additional 7.5% equity stake) for distribution to creditors
in the bankruptcy court; (b) 17.5% of its common equity on
an undiluted basis to a new Voluntary Employee Beneficiary
Association formed pursuant to an agreement between New GM
and its unionized work force (the "New VEBA"); and (c)
11.7% of its common equity (pre-dilution) to Canada.  See
id. at 479-83 (describing terms of the Sale).  As a result,
upon the full consummation of the Sale and subsequent
allocations of equity, Treasury was contemplated to hold an
undiluted 60.8% stake in New GM.  See id. at 482.

        The Sale and allocations of certain agreed-upon
value from New GM to the New VEBA, Canada, and to Old GM
for disposition in the bankruptcy court garnered support
from a broad spectrum of constituents as GM entered
bankruptcy.  GM, GM's work force, Treasury, Canada, GM's
other secured lenders, and bondholders holding more than
54% of GM's approximately $27 billion of unsecured debt all
supported the Sale and related transactions.  See id. at
473-74.

## The Bankruptcy and the 363 Motion

On June 1, 2009, GM and certain of its
subsidiaries each filed petitions for relief under chapter
11 of the Bankruptcy Code.  See id. at 479.

Also on June 1, 2009, GM and its subsidiaries
filed a motion with the Bankruptcy Court, pursuant to
Sections 105(a), 363 and 365 of the Bankruptcy Code, to
approve the sale of substantially all of its assets, and
the assumption of certain contracts and leases and their
assignment, to the Purchaser (the "363 Motion") in
consideration of a purchase price with a value of over $90
billion.  (CD-5.)  The 363 Motion requested expedited
approval of the 363 Transaction subject to any higher or
better offers.  (Id. at 8 ¶ 15.)  On the same day, GM filed
a motion seeking authorization of Treasury's $33.3 billion
DIP Loan so that GM could maintain its operations pending
the close of the Sale.  See Sale Op. at 479.  The
availability of such financing was expressly conditioned
upon the swift approval and closing of the Sale.  Absent
such financing, GM faced immediate liquidation.  See id. at
480.

The 363 Transaction contemplated that
substantially all of GM's core assets — i.e., those that
Treasury and the Purchaser considered essential for New GM
to be a competitive, economically viable operating entity —
would be sold and transferred to the Purchaser.  (7/1
Hearing Tr. at 135; CD-50, at 6 ¶ 13.)  The consideration
to GM had a total value in excess of $90 billion (CD-19,
Ex. F at 15), consisting of:

- a Section 363(k) credit bid in an amount
  (estimated to be $48.7 billion at July 31,
  2009) equal to the amount of indebtedness owed
  to the Purchaser as of the closing pursuant to
  the UST Credit Facilities and the DIP Facility
  (each as defined in the ["Master Sale and
  Purchase Agreement" and related documents
  ("MPA")]), less approximately $7.7 billion of
  indebtedness under the DIP Facility;

- the cancellation of warrants previously issued
  by GM to Treasury;

- the issuance by the Purchaser to the Debtors
  of 10% of the common stock of the Purchaser as
  of the closing (worth an estimated $3.8 to
  $4.8 billion (CD-19, Ex. F at 14));

- the issuance by the Purchaser to the Debtors
  of warrants to purchase up to an additional
  15% of the shares of common stock of the
  Purchaser; and

- the assumption by the Purchaser of the Assumed
  Liabilities, thus removing tens of billions of
  dollars of claims against the Debtors from the
  chapter 11 cases.

Sale Op. at 482.

**Parker's Objection and Bankruptcy**
**Court Approval of the 363 Transaction**

Parker objected to the 363 Motion on the grounds
that:  (i) the 363 Transaction was a "sub rosa" plan of
reorganization; (ii) "some or all of the U.S. Government's
secured debt should be recharacterized as equity — or,
alternatively, equitably subordinated to unsecured debt";
(iii) the "secured debt held by the U.S. Treasury should be
equitably subordinated"; (iv) bondholders such as Parker
should be "treated as secured creditors" because the
indenture governing his bonds had an "equal and ratable
clause" that was triggered when the 2008 Prepetition
Financing was put in place, thereby "boosting [his] bonds
to secured debt status"; and (v) the "U.S. Government was
not authorized to use [Troubled Asset Recovery Program
("TARP")] funds to assist the auto industry, and hence
. . . the 363 Transaction [was] unlawful."  Sale Op. at
495, 498-99, 517-18.

Once initial discovery requests were served by
objectors, the parties in interest engaged in ten days of
expedited discovery.  GM produced several hundred thousand
pages of documents and responded to dozens of

10

interrogatories.  Parker served document requests on June
26, 2009 and GM provided documents to Parker at the
deposition of Frederick A. Henderson on June 28, 2009, as
Parker requested.  Objectors also deposed three witnesses,
with Parker personally examining two of those witnesses
(Mr. Henderson and Mr. Wilson).[2]  An evidentiary hearing on
the 363 Motion was held over three days, on June 30, July
1, and July 2, 2009, during which five witnesses testified,
and affidavits and declarations were considered.  Parker
cross-examined four witnesses during the hearing.  (CD-2;
CD-4; CD-18; CD-19; CD-20; CD-43; CD-50; CD-110; CD-141, at
205-11.)


        The Bankruptcy Court in its 87-page Opinion made
findings of fact that were central to its approval of the
363 Transaction and its conclusion that the Sale was a
proper, prudent exercise of business judgment by GM:

- "There is a good business reason for
  proceeding with the 363 Transaction now, as
  contrasted to awaiting the formulation and
  confirmation of a chapter 11 plan";

- "There is an articulated business
  justification for proceeding with the 363
  Transaction now";

---

[2]     In addition to Messrs. Henderson and Wilson, objectors also
deposed Michael Raleigh on Saturday, June 27, 2009.

11

- "The   363   Transaction   is   an   appropriate exercise of business judgment";

- "The   363   Transaction   is   the   only   available means   to   preserve   the   continuation   of   GM's business";

- "The   363   Transaction   is   the   only   available means to maximize the value of GM's business";

- "There   is   no   viable   alternative   to   the   363 Transaction";

- "The   only   alternative   to   the   363   Transaction is liquidation";

- "No   unsecured   creditor   will   here   get   less   than it would receive in a liquidation";

- "The UAW Settlement is fair and equitable, and is   in   the   best   interests   of   both   the   estate and UAW members";

- "The secured debt owing to the U.S. Government and EDC (both post-petition and, to the extent applicable,   prepetition)   is   not   subject   to recharacterization   as   equity   or   equitable subordination,   and   could   be   used   for   a   credit bid"; and

- "The Purchaser is a purchaser in good faith."

Sale Op. at 485-86.


     As to the challenges raised by Parker, after a thorough legal analysis and review of the evidentiary record, the Bankruptcy Court expressly overruled Parker's objections.

12

As to Parker's sub rosa argument, the Bankruptcy

Court found that while "caselaw (including caselaw in this

Circuit and District) recognizes the impropriety of sub

rosa plans in instances that genuinely exist" — for

example, "when aspects of the transaction dictate the terms

of the ensuing plan or constrain parties in exercising

their confirmation rights" — that was not the situation

here, because the MPA "does not dictate the terms of a plan

of reorganization, as it does not attempt to dictate or

restrict the rights of the creditors of [the Debtors']

estate."   Id. at 495-96.   Rather, the Bankruptcy Court

determined that:

> GM's assets simply are being sold, with
> the consideration to GM to be hereafter
> distributed to stakeholders, consistent
> with their statutory priorities, under
> a subsequent plan.   Arrangements that
> will be made by the Purchaser do not
> affect the distribution of the Debtor's
> property,  and  will  address  wholly
> different   needs   and   concerns   —
> arrangements that the Purchaser needs
> to create a new GM that will be lean
> and healthy enough to survive.

Id. at 474-75.


As to Parker's argument that some or all of

Treasury's secured debt should be recharacterized as

equity, the Bankruptcy Court, found, among other things,

that the U.S. Government's loan "was fully documented as a

13

loan; was secured debt . . ., had interest terms . . . and
maturity terms, and significantly, had separate equity
features [and, therefore,] the Prepetition Secured Debt
was, in fact, debt." Id. at 499.

As to Parker's argument that the secured debt
held by Treasury should be equitably subordinated, the
Bankruptcy Court held that because none of the factors set
forth in In re Mobile Steel Co., 563 F.2d 692, 700 (5th
Cir. 1977), were met, there was "no basis for equitable
subordination." Sale Op. at 499.

As to Parker's "equal and ratable" argument, the
Bankruptcy Court found that the equal and ratable clause in
the bond indenture was not triggered, because the 2008
Prepetition Financing Documents pursuant to which Treasury
loaned money to GM "expressly carved out from the grant of
the security interest under those documents any instance
where it would trigger, inter alia, the equal and ratable
clause." Id. at 517-18.

As to Parker's argument that the U.S. Government
was not authorized to use TARP funds to assist the auto
industry, the Bankruptcy Court ruled that "an unsecured

14

creditor like Mr. Parker does not establish the injury-in-fact necessary to establish constitutional standing under Article III because 'all holders of unsecured claims are receiving no less than what they would receive in a liquidation.'"  Id. at 519.  The Bankruptcy Court also noted that its decision was consistent with a Bankruptcy Court decision approving a similar Section 363 sale by Chrysler LLC ("Chrysler") of substantially all of its assets to Fiat S.p.A. — a decision that the United States Court of Appeals for the Second Circuit affirmed.[3]  Parker's arguments opposing the Sale were not only squarely rejected in the Sale Opinion by the Bankruptcy Court, but many of the same arguments raised by Parker below and in this appeal also had been rejected by Bankruptcy Judge Arthur J. Gonzalez in approving Chrysler's Section 363 sale.  Id. at 518-19; see In re Chrysler LLC, 405 B.R. 79, 83 (Bankr. S.D.N.Y. 2009).

---

[3]     In re Chrysler LLC ("Chrysler I"), 405 B.R. 84 (Bankr. S.D.N.Y. 2009), aff'd (by summary order), 2009 U.S. App. LEXIS 12351, at *2 (2d Cir. June 5, 2009).  Subsequently, the U.S. Supreme Court denied certain Chrysler objectors' application for a stay of that sale order. Ind. State Police Pension Trust v. Chrysler LLC, 129 S. Ct. 2275 (2009).  The Second Circuit then issued its supplemental opinion on August 5, 2009, reaffirming its earlier summary affirmance of the Bankruptcy Court's sale order of May 31, 2009 "for the reasons stated in the opinions of Bankruptcy Judge Gonzalez."  In re Chrysler LLC ("Chrysler II"), 576 F.3d 108, 111 (2d Cir. 2009).  After the Second Circuit filed its supplemental opinion, the Indiana State Teachers' Retirement Fund, et al., filed a petition for certiorari in the Supreme Court of the United States.  On December 14, 2009, the Supreme Court issued a summary order remanding the case to the Second Circuit "with instruction to dismiss the appeal as moot."  Ind. State Police Pension Trust v. Chrysler LLC, 130 S. Ct. 1015, 1015 (2009).

15

The Honorable Robert E. Gerber, Bankruptcy Judge,

denied GM's request to waive the ten-day stay period under

Fed. R. Bankr. P. 6004(h) and 6006(d). He provided for a

four-day stay of the Sale Order, until 12:00 noon on July

9, 2009, so as to permit any objectors to seek and obtain

appellate review or a stay. Sale Op. at 520 n.143.

## The Denial of Certification or a Stay

On July 6, 2009, certain tort claimant objectors

to the 363 Transaction (but not Parker or any other

bondholder) requested that the Bankruptcy Court certify

their appeals (from the sale's being "free and clear" of

such tort claims) directly to the Second Circuit,[4] and one

group of such objectors (not Parker) also sought a stay of

the 363 Transaction. In re General Motors Corp., 409 B.R.

24, 27, 29-30 (Bankr. S.D.N.Y. 2009).

---

[4]    At or about the time that Parker initiated his appeal from the
Sale Order, Callan Campbell and other tort claimant objectors
("Campbell") also filed a Notice of Appeal from the Sale Order that
presented similar issues to those related to the instant appeal.  On
April 13, 2010, the Honorable Naomi Reice Buchwald filed her Memorandum
and Order in Campbell v. Motors Liquidation Co. (In re Motors
Liquidation Co.), No. 09 Civ. 6818, 2010 WL 1524763, at *15 (S.D.N.Y.
Apr. 12, 2010), affirming the Sale Order and denying Campbell's appeal
as moot.

After oral argument, the Bankruptcy Court

declined to certify the appeals, holding that the objectors

failed to satisfy any of the factors required by 28 U.S.C.

§ 158(d)(2).  Id. at 27-30.  The Bankruptcy Court held that

the "most important consideration in advancing the case is

enabling GM to complete the sale of its assets that is

essential to its survival, and which is stayed until

Thursday at noon, but not beyond that."  Id. at 29.


The Bankruptcy Court also denied the application

for a stay:

> Under the circumstances here, [the]
> requirement [of a possibility of
> success on the merits] is not satisfied
> for an appeal to the district court, as
> the district court will be bound by the
> judgment of the Second Circuit [in
> Chrysler I] just as much as I am.  And
> I would also think that it would be as
> sensitive as I am to the importance of
> stare decisis in bankruptcy cases, and
> thus similarly follow Judge Gonzalez's
> [Chrysler I] decision, when it is so
> closely on point.

Id. at 32.  The Bankruptcy Court noted that the "only

alternative to an immediate sale is liquidation — which

would be a disastrous result for GM's creditors, its

employees, the suppliers who depend on GM for their own

existence, and the communities in which GM operates," and

that "[c]ausing all of those interests to be sacrificed for

17

these litigants' ability to avoid mootness arguments is an
intolerable result."  Id. at 32-33.


On July 8, 2009, the Ad Hoc Committee filed an
emergency motion in the District Court for an expedited
appeal and a stay.  The motion was extensively briefed
overnight and then heard the next morning by the Honorable
Lewis Kaplan, U.S. District Judge.  (CD-140, at 2.)  After
argument, Judge Kaplan orally denied the motion and issued
his written opinion later that day.  (Id.)  Judge Kaplan
held that the Ad Hoc Committee's "likelihood of success on
appeal" was "minimal at best" in light of the Second
Circuit's affirmance of Judge Gonzalez's decision approving
the 363 sale of substantially all of Chrysler's assets.
(Id. at 3.)[5]  Judge Kaplan also found it "quite doubtful
whether the [Ad Hoc Committee] established the requisite
threat of irreparable injury" — given the Bankruptcy
Court's unchallenged finding that "the only alternative to
consummation of this sale is liquidation of GM and that the
unsecured creditors would receive nothing in that event."

---

[5]      Judge Kaplan, like the Bankruptcy Court before him, issued his
decision prior to the Second Circuit's issuance, on August 5, 2009, of
its detailed opinion affirming the decision in Chrysler.  The Second
Circuit decision to which Judge Kaplan referred was the Circuit's
earlier summary affirmance "for substantially the reasons stated in the
opinions of Bankruptcy Judge Gonzalez."  In re Chrysler LLC, 2009 U.S.
App. LEXIS 12351, at *2 (2d Cir. June 5, 2009).

(Id. at 2-3.)  Finally, in balancing the hardships, under
the operative documents, Judge Kaplan found that "the entry
of a stay — any stay at all — would be an event that would
permit the United States to terminate DIP financing
immediately."  (Id. at 4.)

The 363 Transaction closed on July 10, 2009, and
has been fully consummated.  (CD-137, at 2 ¶ 4.)

The instant appeal was heard and marked fully
submitted on December 9, 2009.

**The Standard of Review**

While the Bankruptcy Court's legal conclusions
are reviewed de novo, its findings of fact are reviewed
only for clear error.  In re Enron Corp., 419 F.3d 115, 124
(2d Cir. 2005); In re Manville Forest Prods. Corp., 896
F.2d 1384, 1388 (2d Cir. 1990); see also Fed. R. Bankr. P.
8013.  A reviewing court must "'accept the ultimate factual
determination of the fact-finder unless that determination
either is completely devoid of minimum evidentiary support
displaying some hue of credibility or bears no rational
relationship to the supportive evidentiary data.'"

19

Fellheimer, Eichen & Braverman, P.C. v. Charter Techs.,
Inc., 57 F.3d 1215, 1223 (3d Cir. 1995) (citation omitted).


        The decision to approve a Section 363 sale is
committed to the discretion of the Bankruptcy Judge:  a
challenge thereto must establish an abuse of that
discretion.  A Bankruptcy Court abuses its discretion when
it arrives at "(i) a decision resting on an error of law
(such as application of the wrong legal principle) or a
clearly erroneous factual finding, or (ii) a decision that,
though not necessarily the product of a legal error or a
clearly erroneous factual finding, cannot be located within
the range of permissible decisions."  In re Aquatic Dev.
Group, Inc., 352 F.3d 671, 678 (2d Cir. 2003) (internal
quotation and alteration marks omitted).


        The Bankruptcy Court's finding of good faith, in
particular, is either a factual question or mixed question
of fact and law that must be reviewed for clear error.  See
In re Angelika Films 57th, Inc., Nos. 97 Civ. 2293, 97 Civ.
2241, 1997 WL 283412, at *6 (S.D.N.Y. May 29, 1997).

**The Appeal is Moot**

Pursuant to Section 363(m) of the Bankruptcy
Code, an order authorizing a Section 363 sale may not be
appealed — except as to the purchaser's good faith — unless
the authorization and the sale itself were stayed:

> The reversal or modification on appeal
> of an authorization under subsection
> (b) . . . of this section of a sale
> . . . of property does not affect the
> validity of a sale or lease under such
> authorization to an entity that
> purchased or leased such property in
> good faith, whether or not such entity
> knew of the pendency of the appeal,
> unless such authorization and such sale
> . . . were stayed pending appeal.

11 U.S.C. § 363(m) (emphasis added); see H.R. Rep. No. 95-
595, at 346 (1978), reprinted in 1978 U.S.C.C.A.N. 5963,
6302 (Section 363(m) "protects good faith purchasers of
property . . . from a reversal on appeal of the sale
authorization, unless the authorization for the sale and
the sale itself were stayed pending appeal") (emphasis
added); see also In re Metromedia Fiber Network, Inc., 416
F.3d 136, 144-45 (2d Cir. 2005) (failure to seek or obtain
a stay is fatal to prosecution of appeal from an order
confirming a chapter 11 plan notwithstanding impropriety of
certain provisions of the plan). Because Parker did not
seek a stay of the Sale Order, his appeal from the Sale

21

Order is moot.  Licensing by Paolo, Inc. v. Sinatra (In re

Gucci) ("Gucci I"), 105 F.3d 837, 839 (2d Cir. 1997); In re

Andy Frain Servs., Inc., 798 F.2d 1113, 1125 (7th Cir.

1986).


                    Section 363(m) limits the appealability of a

Section 363 sale order that has been consummated to the

issue of the purchaser's good faith.  See 11 U.S.C.

§ 363(m).  The Second Circuit has strictly enforced Section

363(m), holding that "appellate jurisdiction over an

unstayed sale order issued by a bankruptcy court is

statutorily limited to the narrow issue of whether the

property was sold to a good faith purchaser."  Gucci I, 105

F.3d at 839 (emphasis in original); see also In re Colony

Hill Assocs., 111 F.3d 269, 273 (2d Cir. 1997) (similar).

"[R]egardless of the merit of an appellant's challenge," an

appellate court "may neither reverse nor modify the

judicially-authorized sale if the entity that purchased or

leased the property did so in good faith and if no stay was

granted."  Gucci I, 105 F.3d at 840; see In re Sax, 796

F.2d 994, 997 (7th Cir. 1986) ("Section 363(m) does not say

that the sale must be proper under § 363(b); it says the

sale must be authorized under § 363(b)." (emphasis in

original)).  Thus, in light of the Bankruptcy Court's

                                   22

finding (which is subject only to "clear error" review)
that there was "no proof that the Purchaser . . . showed a
lack of integrity in any way," Sale Op. at 494, section
363(m) is dispositive of the Parker appeal.[6]

     Although Parker purports to challenge New GM's
good faith (App. Br. at 58-61), he fails to meet the
controlling standard set forth by the Second Circuit in
Licensing by Paolo, Inc. v. Sinatra (In re Gucci) ("Gucci
II"), 126 F.3d 380, 390 (2d Cir. 1997).  The Second Circuit
in Gucci II established, and the Bankruptcy Court
recognized, Sale Op. at 494, that good faith "is shown by
the integrity of [the purchaser's] conduct during the
course of the sale proceedings; where there is a lack of
such integrity" — as a result of "'fraud, collusion between
the purchaser and other bidders or the trustee, or an
attempt to take grossly unfair advantage of other bidders'"
— "a good faith finding may not be made."  126 F.3d at 390
(quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198

---

[6]     See also Sale Op. at 494 ("To the contrary, the evidence
establishes that the 363 Transaction was the product of intense arms'-
length negotiations.  And there is no evidence of any efforts to take
advantage of other bidders or get a leg up over them.  In fact, the sad
fact is that there were no other bidders.").

23

(7th Cir. 1978)); Sale Op. at 494 & n.59; see also Colony
Hill, 111 F.3d at 276.[7]

The only argument advanced by Parker that
actually speaks to the Government's good faith in the
conduct of negotiations is his contention that because
"Treasury was the only source of funding for an insolvent
Debtor," Treasury had "influence over the Debtor and the
Debtor's decisions." (App. Br. at 60.) The only evidence
cited by Parker in support of this accusation is that
Treasury "brought about" the resignation of GM's former
CEO. See id.

Treasury's witness testified that Treasury
conveyed to the CEO that it "did not have confidence in his
leadership," and that subsequently the CEO resigned. See
7/1 Hearing Tr. at 63-64. In any case, Treasury admitted
that it was likely GM's "lender of last resort" and that,
as result, it had "leverage" over GM. See id. at 57-58.
But that leverage speaks to GM's desperate financial
condition in the early 2009, not to the Government's bad

---

[7]     It does not impact the good faith inquiry that there was pressure
to conclude the relevant sale expeditiously where, as here, there was
full disclosure of the salient facts.   See Colony Hill, 111 F.3d at
276-78.

24

faith.  As the Bankruptcy Court expressly found, after

hearing all of this testimony, the Government was "a

purchaser in good faith."  Sale Op. at 486.


Parker has also cited his contentions about sub

rosa plans, TARP funds, and the "nationalization" of GM as

evidence of bad faith.  However, these contentions do not

actually speak to the Government's (or New GM's) alleged

bad faith within the meaning of section 363.  As the Second

Circuit explained in Gucci II, bad faith in this context

refers to bad faith in the conduct of negotiations,

something that Parker has not demonstrated.  Moreover,

these contentions were conclusively rejected in the

Chrysler bankruptcy.


Parker contends that New GM effected the 363

Transaction (i) with "misappropriated" funds or (ii) with

knowledge that the transfer of the Debtors' "net operating

loss carryforwards" ("NOLs") violated the United States Tax

Code.  (See App. Br. at 59-60.)[8]  Neither of these

---

[8]    Reopening a consummated Section 363 sale just to question the
inclusion of specific assets (such as the NOLs here) has been held to
be a purpose prohibited by Section 363(m), so as to "afford[] 'finality
to judgments by protecting good faith purchasers, the innocent third
parties who rely on the finality of bankruptcy judgments in making
their offers and bids.'"  In re Chateaugay Corp., No. 92 CIV. 7054,
1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (citations omitted); see

contentions casts any doubt on New GM's integrity or good
faith under the above-referenced standard.  There is no
suggestion here, nor could there be, that New GM or its
sponsor, Treasury, engaged in fraud or collusion.  See
Gucci II, 126 F.3d at 390.  There were no other bidders
and, indeed, no other entities that exhibited any interest
in GM's assets, despite the widespread knowledge that the
assets were for sale.

        Moreover, the fact that Treasury possessed
leverage in negotiating the Sale (see App. Br. at 60-61) —
not surprisingly, as GM's "lender of last resort" from
December 2008 forward (7/1 Hearing Tr. at 57) — is not
dispositive.  The uncontroverted evidence before the
Bankruptcy Court established that the 363 Transaction was
the Debtors' only viable option and that the Debtors' sole
alternative was a liquidation that would have yielded a
mere fraction of the sale assets' going concern value to
the Debtors and nothing at all for the Debtors' general
unsecured creditors, including Parker.  (See id.)  The
Bankruptcy Court found as a matter of fact, based on the
substantial, unrebutted record evidence, that "the 363

---

also In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir.
1986) (citing same policy reasons).

26

Transaction was the product of intense arms'-length

negotiations."   Sale Op. at 494.


     It is conceded that Treasury favored a Section

363 sale.   (See App. Br. at 18.)   However, no impropriety

in having opted for a Section 363 sale has been

established.   Indeed, "cherry picking" of assets and

liabilities to assume is exactly what Section 363 allows,

as the Second Circuit expressly noted in In re Chrysler LLC

("Chrysler II"):

> [T]he assets are typically burnished
> (or "cleansed") because (with certain
> limited exceptions) they are sold free
> and clear of liens, claims and
> liabilities. . . .   A § 363 sale can
> often yield the highest price for the
> assets because the buyer can select the
> liabilities it will assume and purchase
> a business with cash flow (or the near
> prospect of it).

576 F.3d 108, 115-16 (2d Cir.) (internal citation omitted)

(emphasis added), cert. dismissed, 130 S.Ct. 41, vacated

130 S.Ct. 1015 (2009); see also id. at 126 (finding that

"[t]he possibility of transferring assets free and clear"

of certain liabilities "was a critical inducement to the

Sale").


27

In addition, the 363 Transaction, as noted, has

been consummated, with all of the attendant consequences of

transferring and transforming a multibillion dollar

enterprise, including its relationship to third parties,

governmental entities, suppliers, customers and the

communities in which it does business.  The doctrine of

equitable mootness thus applies.  In re Delta Air Lines,

Inc., 374 B.R. 516, 522 (S.D.N.Y. 2007), aff'd, 309 F.

App'x 455 (2d Cir. 2009), cert. denied, 2009 WL 357941

(U.S. Nov. 2, 2009); Metromedia Fiber Network, 416 F.3d at

144.  The doctrine is "especially pertinent in bankruptcy

proceedings, where the ability to achieve finality is

essential to the fashioning of effective remedies."  In re

Chateaugay Corp., 988 F.2d 322, 325 (2d Cir. 1993).


The doctrine has been applied in two situations,

both of which are implicated here:  "when an unstayed order

has resulted in a 'comprehensive change in circumstances,'

and when a reorganization is 'substantially consummated.'"

Delta, 374 B.R. at 522 (quoting Allstate Ins. Co. v.

Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994)).  The doctrine

may be overcome only by an appellant satisfying all of the

following factors (the "Chateaugay Factors"):

28

(a) the court can still order some effective relief; (b) such relief will not affect "the re-emergence of the debtor as a revitalized corporate entity"; (c) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court"; (d) the "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings"; and (e) the appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."

In re Chateaugay Corp. ("Chateaugay II"), 10 F.3d 944, 952-53 (2d Cir. 1993) (citations omitted). Parker has not met this heavy burden.

Parker failed to "pursue with diligence all available remedies to obtain a stay of execution" of the Sale Order; and that failure "create[d] a situation rendering it inequitable to reverse the order[ ] appealed from." Id.; see also Kassover v. Gibson, No. 02 Civ. 7978, 2003 WL 21222341, at *2 (S.D.N.Y. May 27, 2003) (appeal from order approving settlement and stock purchase agreement creating new entity was equitably moot where

appellant had opportunity to, but did not, apply for stay

prior to consummation of merger, resulting in a

comprehensive change of circumstances), aff'd, In re

Kassover, 98 F. App'x 30 (2d Cir. 2004). As the Second

Circuit explained in Metromedia Fiber Network:

> A chief consideration under Chateaugay
> II is whether the appellant sought a
> stay of confirmation. If a stay was
> sought, we will provide relief if it is
> at all feasible, that is, unless relief
> would "knock the props out from under
> the authorization for every transaction
> that has taken place and create an
> unmanageable, uncontrollable situation
> for the Bankruptcy Court." But if the
> appellant failed to seek a stay, we
> consider additionally whether that
> failure renders relief inequitable
> . . . . We insist that a party seek a
> stay even if it may seem highly
> unlikely that the bankruptcy court will
> issue one . . . .
>
> In the absence of any request for a
> stay, the question is not solely
> whether we can provide relief without
> unraveling the Plan, but also whether
> we should provide such relief in light
> of fairness concerns.

416 F.3d at 144-45 (internal citations omitted) (emphasis

in original).


Parker "concedes that there is no real point to

undoing the sale," asking instead that he receive "payment

of full and just compensation" — presumably, the full face

value of his bonds, plus interest.  (App. Br. at 64.)

Parker in essence suggests that (a) he should vault over

all other bondholders (let alone unsecured creditors) to

receive a full recovery from the estates of the Debtors, or

(b) the terms of a carefully negotiated commercial

transaction should be rewritten to place on New GM the

responsibility to pay at least one bondholder — if not all

of them.

The Second Circuit has held, when confronted with

an appellant's argument that it should modify a small

provision in a sale order rather than reverse the sale

entirely, that an appellate court has no ability to rewrite

the terms of a Section 363 sale:

> The government is correct in arguing
> that the appeal of the sale order is
> moot . . . .  The consummation of the
> sale was not stayed.   The instant
> appeal was briefed and argued months
> after the sale closed.   It is thus
> beyond the power of this Court to
> rewrite the terms of the trustee's sale
> of the assets of [debtor] Certified and
> Transit Mix to the Quad companies.
>
> Our conclusion that we must leave the
> terms of sale undisturbed furthers the
> policy of finality in bankruptcy sales.
> Moreover, it assists bankruptcy courts
> in maximizing the price for assets sold
> in   such   proceedings.     Otherwise,
> potential buyers would discount their
> offers   to   the   detriment   of   the

31

> bankruptcy's estate by taking into
> account the risk of further litigation
> and the likelihood that the buyer will
> ultimately lose the asset, together
> with any further investments or
> improvements made in the asset.

United States v. Salerno, 932 F.2d 117, 122-23 (2d Cir.

1991) (emphasis added) (internal citations omitted); see

also In re Adelphia Commc'ns Corp., 367 B.R. 84, 97

(S.D.N.Y. 2007) (holding, in analysis of equitable

mootness, that suggested remedy of ordering "selective

disgorgement from cherry-picked creditors . . . would

rewrite the terms of the bargain, which is beyond the power

of the Court"); In re Source Enterprises, Inc., 392 B.R.

541, 550 (S.D.N.Y. 2008) ("[C]ourts have found it difficult

to sever one piece of a Plan, and have noted that such a

severance might 'ignore the tradeoff that allowed the

parties to settle in the first instance and would treat a

non-severable provision of the Settlement Agreement as

dispensable.'" (quoting Delta, 374 B.R. at 523)); In re

Texaco Inc., 92 B.R. 38, 46 (S.D.N.Y. 1988) (calling it a

"common-sense notion" that the "piece meal dismantling of

the Reorganization Plan in subsequent appeals of individual

transactions is, in practical terms if nothing else, a

virtually impossible task" (internal quotation marks

omitted)); Sale Op. at 517 ("This Court has found that the

32

Purchaser is entitled to a free and clear order. The Court
cannot create exceptions to that by reason of this Court's
notions of equity."). Parker has cited In re Abbotts
Dairies of Pennsylvania, Inc., 788 F.2d 143, 150 (3d Cir.
1986), in support of the proposition that this Court could
order the Bankruptcy Court to enter judgment against the
United States of America to make him (if not all
bondholders) whole. (See App. Br. at 65.) Abbotts Dairies
involved an appeal from a Section 363 sale that was
remanded to the Bankruptcy Court to make the appropriate
finding (required in the Third Circuit as part of approving
a 363 sale) of good faith. 788 F.2d at 150-51. In dicta,
the court commented that the appeal might not be moot with
respect to one appellant because the Bankruptcy Court could
craft an appropriate remedy, such as holding the debtors
liable for breach of fiduciary duty. See id. at 151.
There was no suggestion in Abbotts Dairies that the
purchaser (which owes creditors no fiduciary duty) could be
required to take on more than it bargained for, and
certainly no consideration of the sovereign immunity that
would protect the Government from any such result.

        The only relief available to Parker is unwinding
the sale of assets to New GM in its entirety. But that is

                                33

not "effective relief," for as the Bankruptcy Court found,
the recovery to unsecured creditors (such as Parker) under
what has become the status quo is far better than the only
alternative, a liquidation of GM's assets.  See Sale Op. at
474 ("As nobody can seriously dispute, the only alternative
to an immediate sale is liquidation."); id. at 481 ("The
Court finds that in the event of a liquidation, unsecured
creditors would recover nothing."); (see also CD-140, at 3
("Judge Gerber found, on the basis of a hearing record,
that the only alternative to consummation of this sale is
liquidation of GM and that the unsecured creditors would
receive nothing in that event. . . .  Thus, this case
evokes the old adage that one ought to be careful of what
one wishes.")).


        The second and third Chateaugay factors — whether
the requested relief will "affect the re-emergence of the
debtor as a revitalized corporate entity" or "unravel
intricate transactions so as to knock the props out from
under the authorization for every transaction that has
taken place" — likewise demonstrate why any relief would be
inequitable here.  Chateaugay II, 10 F.3d at 952-53
(internal quotation marks omitted).


34

To apportion the bondholders' $27 billion in
claims from the Debtors to New GM would certainly "affect"
New GM's vitality, which is precisely why Treasury
specifically negotiated for those liabilities to be
excluded. See 7/1/09 Hearing Tr. at 104 ("we did not see
it as our obligation to take on claims to the point at
which New GM was no longer viable. It wasn't a
determination, or frankly, a consideration in our
thinking.").

Parker's requested relief would likewise "knock
the props out" from under the transactions that have
occurred since the sale was consummated. New GM has
entered into numerous transactions since the Sale closed on
July 10, 2009, all of them dependent on the Sale terms' not
being disturbed. Among them, New GM has assumed
approximately 4,100 dealer franchise agreements, see Sale
Op. at 476, as well as substantially all of Old GM's
executory contracts with direct suppliers, see id. at 483.
It has offered employment to all of Old GM's non-unionized
employees and unionized employees represented by the UAW,
see id., and assumed modified collective bargaining
agreements with the UAW, which were ratified by the UAW
membership, see id. at 496.

35

In reliance on the Sale Order's having become
effective, countless new transactions have occurred, and
the ownership of New GM is held by diverse partners
including Treasury, the Governments of Canada and the
Province of Ontario, the UAW, and Motors Liquidation
Company on behalf of its claimants.  Billions of dollars in
DIP and exit financing have already been funded and
expended.  Supplier and dealer networks have been
overhauled, including the rejection of thousands of
executory and dealership contracts.

Parker did not comply with the Second Circuit's
admonition that a party seek a stay or lose the right to
appeal.  Metromedia Fiber Network, 416 F.3d at 144-45.
After Parker opted not to take action to delay the closing,
to grant his appeal would turn back the clock to reopen the
363 Transaction or rewrite the terms of the agreement.
Under these circumstances, the appeal is moot.

## The Bankruptcy Court Appropriately Exercised Its Discretion

### a.   The Business Judgment Was Appropriate

The overriding consideration for approval of a
Section 363 sale is whether a "good business reason" has
been articulated. Chrysler II, 576 F.3d at 114; In re
Iridium Operating LLC, 478 F.3d 452, 466 (2d Cir. 2007); In
re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).

The evidence is uncontroverted that GM had run
out of money:  it owed tens of billions of dollars that
could not be repaid; it had no means to obtain further
loans or capital; and it had no alternative but to
terminate its operations.  The Bankruptcy Court found that
the 363 Transaction was not merely reasonable, but the only
viable means of preserving the value of GM's business
enterprise, maximizing its going concern value and
realizing the greatest value for GM and its creditors.
Sale Op. at 474, 491-92; id. at 495 & n.62 ("[t]he GM
Board's decision would withstand ab initio review, far more
than the business judgment test requires"; "it was the only
responsible alternative available").

Faced with a choice between (i) implementing the
363 Transaction within the parameters negotiated with and
insisted on by the Purchaser, or (ii) liquidating GM's
assets, with no distribution at all to any unsecured

37

creditors, including Parker, see Sale Op. at 474, 481, 484,

491-92, the Bankruptcy Court found that the GM Board

exercised sound business judgment in proceeding with the

363 Transaction.  Indeed, all objectors, including others

who, like Parker, were objecting unsecured bondholders,

conceded that the Sale was in the best interests of GM and

its economic stakeholders.  (CD-133 at 59-60, 71-72.)

Accord In re Chrysler LLC ("Chrysler I"), 405 B.R. 84, 96

(Bankr. S.D.N.Y. 2009) (debtors "established a good

business reason for the sale" in opting for the "only

option . . . currently available," especially where the

"only other alternative" was "immediate liquidation").


        In arguing that the Debtors were without a good

business reason for the Sale, Parker contends that the

record evidence disproves the Debtors' assertion, which the

Bankruptcy Court "accepted," that "auto sales would fall

off a cliff if there was a protracted bankruptcy and

consequently that there [was] no time for a normal Chapter

11 plan of reorganization and confirmation process."  (App.

Br. at 50.)  However, no evidence has been cited to

contradict the findings of the Bankruptcy Court that GM was

out of money and had no access to further funds — in or out

of bankruptcy — so it could not do business regardless of

38

what sales were or might ever be.  Parker also fails to
acknowledge the positive impact of the 363 Transaction
itself (and the well-known prior approval of the Chrysler
Section 363 sale) on GM's sales:  the May/June 2009 up-tick
in sales (albeit still at substantial loss levels) is best
explained by the increased consumer confidence fostered by
the Debtors' well-publicized plans to restructure the
business expeditiously.  See, e.g., Sale Op. at 485
("Although the company did better on retail sales than
expected in June, it did so for a number of reasons, one of
which was the expectation that the chapter 11 case would
move quickly, and that the company, in the 363 process,
would be successful.  And results were 'still terrible.'")
(citations omitted).


         Moreover, in connection with Section 363 sales,
courts also consider the broader public interest, a
critical factor here, given GM's position in the U.S.
automotive industry and the national economy.  As stated in
Trans World Airlines, Inc.:

            [T]here  is  a  substantial  public
            interest in preserving the value of TWA
            as a going concern and facilitating a
            smooth sale of substantially all of
            TWA's  assets  to  American.    This
            includes the preservation of jobs for
            TWA's  20,000  employees,  the  economic

                              39

> benefits the continued presence of a
> major air carrier brings to the St.
> Louis region, and preserving consumer
> confidence in purchased TWA tickets
> American will assume under the sale.
>
> I also believe the Sale Order
> implements the public interest that
> favors an organized rehabilitation
> . . . of a financially distressed
> corporation which lies at the core of
> chapter 11. I conclude that the
> alternative to the Sale Order in this
> case is a free-fall chapter 11 leading
> to a liquidation with the subsequent
> substantial disruption of diverse
> economic relationships and likelihood
> of material adverse harm to a very
> broad spectrum of creditor
> constituencies.

No. 01-00056, 2001 WL 1820326, at *14 (Bankr. D. Del. Apr.

2, 2001). Here, such factors were expressly, and properly,

considered both by Bankruptcy Judge Gerber, Sale Op. at

493, 499, and by Judge Kaplan in denying a stay (CD-140 at

4).


      b.   The Sale Was Not A Sub Rosa Plan


      Parker has also contended that the 363

Transaction is a so-called sub rosa plan of reorganization

(i.e., a transaction that dictates a distribution scheme

and other terms that predetermine any subsequent chapter 11

plan) and provides for a recovery by general unsecured

creditors that is "disproportionately less then [sic] the
distribution given in satisfaction of [the claims of] the
UAW VEBA and other favored creditors . . . of equal rank."
(App. Br. at 57.)  Parker does not address, much less
attempt to satisfy, controlling Second Circuit authority on
sub rosa plans, including the Second Circuit's
substantively analogous decision in Chrysler II, 576 F.3d
at 116-19.  See also Iridium Operating, 478 F.3d at 466.

A "sale of assets is permissible under § 363(b);
and it is elementary that the more assets sold that way,
the less will be left for a plan of reorganization, or for
liquidation."  Chrysler II, 576 F.3d at 117; see also
Chrysler I, 405 B.R. at 96 ("A debtor may sell
substantially all of its assets as a going concern and
later submit a plan of liquidation providing for the
distribution of the proceeds of the sale.").  "But the size
of the transaction, and the residuum of corporate assets,
is, under [Second Circuit] precedent, just one
consideration for the exercise of discretion by the
bankruptcy judge(s), along with an open-ended list of other
salient factors."  Chrysler II, 576 F.3d at 117 (citing In
re Lionel Corp., 722 F.3d 1063, 1071 (2d Cir. 1983)).
Thus, while the Chrysler sale, for example, had "inevitable

41

and enormous influence on any eventual plan of
reorganization or liquidation," it was "not a 'sub rosa
plan' in the [In re] Braniff [Airways, Inc., 700 F.2d 935
(5th Cir. 1983),] sense because it [did] not specifically
'dictate,' or 'arrange' ex ante, by contract, the terms of
any subsequent plan." Id. at 118 n.9.

        Here, the Bankruptcy Court appropriately
concluded that the 363 Transaction "merely brings in
value," and that "[c]reditors will thereafter share in that
value pursuant to a chapter 11 plan subject to confirmation
by the Court. A section 363 transaction to preserve and
enhance value does not amount to a sub rosa plan." Sale
Op. at 495-96 (citation omitted); see also In re Naron &
Wagner, Chartered, 88 B.R. 85, 88 (Bankr. D. Md. 1988)
("The sale proposed here is not a sub rosa plan because it
seeks only to liquidate assets, and the sale will not
restructure rights of creditors, as in the Braniff case.").
As aptly explained in Trans World Airlines:

                    [N]othing  in  § 363  suggests  that
                    disparate treatment of creditors,  such
                    as   is   likely   to   occur   here,
                    disqualifies a transaction from court
                    approval.   The purpose of a § 363(b)
                    sale is to transform assets . . . into
                    cash in an effort to maximize value.
                    Distribution of the value generated in
                    accordance   with   § 1129   and   other

> priority provisions occurs and is
> intended to occur subsequent to the
> sale.
>
> . . .
>
> The treatment of creditors in a
> § 363(b) context is dictated by the
> fair market value of those assets of
> the debtor that the purchaser in its
> business judgment elects to purchase.
> A purchaser cannot be told to assume
> liabilities that do not benefit its
> purchase objective. Thus, the
> disparate treatment of creditors occurs
> as a consequence of the sale
> transaction itself and is not an
> attempt by the debtor to circumvent the
> distribution scheme of the Code.
>
> . . .
>
> It is true, of course, that TWA is
> converting a group of volatile assets
> into cash. It may also be true that
> the value generated is not enough for a
> dividend to certain groups of unsecured
> creditors. It does not follow,
> however, that the sale itself dictates
> the terms of TWA's future chapter 11
> plan. The value generated through the
> Court approved auction process reflects
> the market value of TWA's assets and
> the conversion of the assets into cash
> is "the contemplated result under
> § 363(b)."

2001 WL 1820326, at *11-12 (quoting Braniff, 700 F.2d at
739-40).


Under these authorities, the Bankruptcy Court

held that the 363 Transaction meets all of the traditional

43

elements of a Section 363 sale and is not a sub rosa plan.
See Sale Op. at 495-98.

Parker has contended here that the 363
Transaction constitutes an impermissible sub rosa plan
because it "force[s] the bondholders and the other
disfavored unsecured creditors to take a [lesser]
distribution." (App. Br. at 57.)  He has not identified
any provision of the MPA to support the contention that the
363 Transaction compels subsequent distributions of the
Debtors' assets.  The 363 Transaction documents evidence
that there will be no distribution or allocation of any
estate assets or sale proceeds to any creditors; and that
those assets, including all of the Sale proceeds, will be
allocated and distributed only at a future date pursuant to
a negotiated chapter 11 plan subject to the provisions of
Section 1129 of the Bankruptcy Code.  For this reason,
Parker's reliance on In re WestPoint Stevens, Inc., 333
B.R. 30 (S.D.N.Y. 2005), for the proposition that "'section
363(b) is not to be utilized as a means of avoiding Chapter
11's plan confirmation procedures'" (App. Br. at 55-56
(quoting WestPoint, 333 B.R. at 52)), is misplaced.  In
addition to the fact that the objectors in WestPoint were,
unlike Parker, secured creditors, the Honorable Laura T.

44

Swain there approved the 363 sale and made clear that the
"Sale Order, which" — unlike here — "authorized and
directed . . . the direct distribution to creditors of the
consideration paid for th[e] assets and the termination of
liens and other interests, clearly constituted an attempt
to determine or preempt plan issues in the context of the
Section 363(b) sale and was improper to that extent."    333
B.R. at 52 (emphasis added).

          Parker has contended that the issuance of
ownership interests in New GM that Treasury and New GM
itself agreed to assign directly to certain of the Debtors'
creditors (just as they assigned 10% of such ownership, as
well as warrants for additional equity, to the Debtors)
upon consummation of the 363 Transaction reflects a
distribution or allocation of estate assets in violation of
the absolute priority rule.  (App. Br. at 57-58.)  New GM
determined its ownership composition and capital structure
outside of the bankruptcy context (including in its own
negotiations with third parties, such as the UAW), based on
New GM's business judgment with respect to the requirements
necessary for it to successfully conduct the acquired
business.  The allocation by New GM of its equity interests
is not a distribution by or of the Debtors' assets; nor is

45

it even an allocation of the proceeds from the sale of such

assets.  See Sale Op. at 496-98.  As Judge Gonzalez made

clear in Chrysler I, the "allocation of ownership interests

in the new enterprise is irrelevant to the estates'

economic interests."  405 B.R. at 99.  The Second Circuit

agreed.  See Chrysler II, 576 F.3d at 118, 119 (finding "no

abuse of discretion" in conclusion that "all the equity

stakes in New Chrysler were entirely attributable to new

value . . . which were not assets of the debtor's estate").

As correctly stated by the Bankruptcy Court, the

"objectors' real problem is with the decisions of the

Purchaser, not with the Debtor, nor with any violation of

the Code or caselaw."  Sale Op. at 496.


New GM decided to allocate 17.5% of its equity

interests (as well as $6.5 billion in preferred stock and

warrants) to the Voluntary Employee Beneficiary Association

Trust ("VEBA"), which provides healthcare benefits to

current and future UAW retirees, in consideration for the

UAW entering into a new collective bargaining agreement.

This separate agreement between New GM and the UAW provides

consideration which is not value that would otherwise inure

to the benefit of the Debtors' estates.  See, e.g.,

Chrysler I, 405 B.R. at 99 ("In negotiating with those

groups essential to its viability, New Chrysler made
certain agreements and provided ownership interests in the
new entity, which was neither a diversion of value from the
Debtors' assets nor an allocation of the proceeds from the
sale of the Debtors' assets."). The Second Circuit, again,
agreed. See Chrysler II, 576 F.3d at 118-19.[9] Ultimately,
the confirmation of the Debtors' chapter 11 plan will
provide for the distribution of the Debtors' assets,
including the value received by the Debtors in the 363
Transaction (i.e., 10% of the New GM equity plus warrants)
in accordance with Section 1129 of the Bankruptcy Code.

### c.    The Sale Constituted an Appropriate Reorganization

Parker has also contended that the transactions
contemplated by the MPA do not qualify as a
"reorganization" under Section 368(a)(1)(G) of the Internal
Revenue Code of 1986, as amended (the "Tax Code") (a so-
called "G" reorganization), and thus, that the 363

---

[9]    See also Chrysler I, 405 B.R. at 99-100 (explaining that the
"UAW, VEBA, and the Treasury are not receiving distributions on account
of their prepetition claims. Rather, consideration to these entities
is being provided under separately-negotiated agreements with New
Chrysler. . . . As part of those negotiations, New Chrysler and the
workers have reached agreement on terms of collective bargaining
agreements with the UAW. . . . That New Chrysler and the UAW have
agreed to fund the VEBA with equity and a note is part of a bargained-
for exchange between New Chrysler and the UAW. . . . The consideration
provided by New Chrysler in that exchange is not value which would
otherwise inure to the benefit of the Debtors' estates.").

Transaction did not result in a transfer of the Debtors'
NOLs to New GM, on the ground that a "G" reorganization
requires a plan of reorganization under the Bankruptcy Code
and that "[u]nder the plain and unambiguous language of
sections 368(a)(1)(G) and 368(a)(3)(B), unless there was a
bona fide 'plan of reorganization' approved by the
Bankruptcy Court and the transfer of assets was made
'pursuant to that plan,' section 368(a)(1)(G) does not
apply." (App. Br. at 20.)   Parker's argument is meritless
and misconstrues the Tax Code.


        The term "plan of reorganization" is used
throughout section 368(a) of the Tax Code in connection
with various types of transactions that qualify as tax
reorganizations.   But the term "plan of reorganization"
under the Tax Code does not require a plan of
reorganization under chapter 11 of the Bankruptcy Code.
Rather, the Tax Code requires only a "plan of
reorganization" in the tax sense.   An entity need not even
be a debtor in a case filed under the Bankruptcy Code to
have a "plan of reorganization" in the tax sense.   See,
e.g., Swanson v. United States, 479 F.2d 539, 544 (9th Cir.
1973) (in non-bankruptcy case, court stated that

reorganization under Section 368(a)(1)(D) of the Tax Code
requires plan of reorganization).

A plan of reorganization within the context of
the Tax Code is an agreement among the parties to the
transaction that "contemplate[s] the bona fide execution of
one of the transactions specifically described as a
reorganization in section 368(a) and for the bona fide
consummation of each of the requisite acts under which
nonrecognition of gain is claimed." Treas. Reg. § 1.368-
1(c) (2008); see also id. § 1.368-2(g) ("The term plan of
reorganization has reference to a consummated transaction
specifically defined as a reorganization under section
368(a)."). The MPA pursuant to which the 363 Transaction
was consummated does that.

One kind of transaction that qualifies as a
"reorganization" for U.S. federal income tax purposes is a
"G" reorganization, in the course of which the target
corporation transfers its net operating loss carryforwards
and other tax attributes to an acquirer of substantially
all of the target's assets. The basic statutory
requirements of a "G" reorganization are "a transfer by a
corporation of all or part of its assets to another

49

corporation in a title 11 or similar case" for stock (and

possibly other consideration), "if, in pursuance of the

plan [of a Tax Code reorganization], stock or securities of

the corporation to which the assets are transferred are

distributed" in liquidation by the transferor and the

"transfer is pursuant to a plan of reorganization approved

by the court."   I.R.C. § 368(a)(1)(G), (3)(B)(ii).   The "G"

reorganization provisions set forth in the Tax Code are

applicable not only in a chapter 11 case, but also in any

other "title 11 or similar case."   Id. § 368(a)(1)(G).   By

the Tax Code's terms, a "G" reorganization can equally

apply in "a receivership, foreclosure or similar proceeding

in a Federal or State court," such as a chapter 7 case or a

case under the Securities Investor Protection Act of 1970

(15 U.S.C. § 78aaa et seq.), as amended ("SIPA").   Id.

§ 368(a)(3)(A)(ii).   These terms establish that the concept

of a plan of reorganization for "G" reorganization purposes

is a tax concept and not a chapter 11 concept.


                Parker has contended that "[s]ince section

368(a)(1)(G) explicitly refers to the Bankruptcy Code, in a

pure and simple 'title 11 case' the phrase 'plan of

reorganization' must have the meaning given to it by the

Bankruptcy Code."   (App. Br. at 20.)   However, the Supreme

50

Court has held that a transfer of substantially all of a
corporation's assets to a creditor-owned entity pursuant to
a bankruptcy court-approved credit bid for the assets can
qualify as a "plan of reorganization" for tax
reorganization purposes. Helvering v. Ala. Asphaltic
Limestone Co., 315 U.S. 179, 184 (1942). In Helvering,
which involved a predecessor statute to one of the other
types of tax reorganizations, the plan was formulated by
the creditors prior to the commencement of the bankruptcy
case and implemented through a trustee-conducted auction
process in which the creditors were the highest bidders —
and not through a chapter 11 plan. Id. at 181-82.

        The cases cited by Parker for the proposition
that a "plan of reorganization" for purposes of a "G"
reorganization refers to a formally-adopted chapter 11 plan
fail to support Parker's contention. Parker has cited
Swanson, but the sale in Swanson was outside the bankruptcy
context. In Davis v. Bankhead Hotel, Inc., 212 F.2d 697
(5th Cir. 1954), the issue was whether events occurring
more than four years prior to the bankruptcy case should be
considered together with the transactions occurring
pursuant to the court-approved plan in the bankruptcy case.
The court held that such events could not be considered

51

together.  Id. at 700-01.  Here, all necessary elements of
the tax plan are embodied in the MPA that was approved by
the Bankruptcy Court.


        Parker also contends that, if the Sale Order were
reversed as to the transfer of the net operating loss
carryforwards, the net operating loss carryforwards that
would remain with the Debtors would result in "tax savings
to the New GM . . . between $10 and $12 billion," that the
Debtors would have an opportunity to sell such net
operating loss carryforwards to New GM as part of a chapter
11 plan, and that "[e]ven if [they] only brought $1
billion, that would create an additional 2.85 cents on the
dollar for creditors."  (App. Br. at 19.)  In the absence
of the net operating loss carryforwards and other tax
attributes of GM being transferred to New GM as part of the
363 Transaction — i.e., outside the "G" reorganization and
the attendant Tax Code treatment — such net operating loss
carryforwards and other tax attributes would have no value
to New GM and only speculative value to the remaining
creditors, as they could not be readily sold or readily
used.

d.    The Sale Did Not Alter the
      Unsecured Status of the Appellant

Parker, who purports to own 200,000 shares of
6.250% Series C Convertible Senior Debentures (due 2033)
issued pursuant to a 1995 indenture ("1995 Indenture")
(App. Br. at 1), has asserted that the Bankruptcy Court
erred in failing to treat holders of such unsecured bonds,
such as himself, as secured creditors.   (App. Br. at 22.)
He has contended that by virtue of GM's entering into the
Loan and Security Agreement, dated as of December 31, 2008,
with Treasury (the "LSA"), the "equal and ratable" clause
of the 1995 Indenture was violated, thereby elevating
Parker's bonds to "secured debt equal and ratable with the
Treasury's debt."   (Id.)   The Bankruptcy Court
appropriately found this argument to be factually wrong in
view of the terms of the 1995 Indenture and LSA.

Section 4.06 of the 1995 Indenture, on which
Parker relies, provides:

> [GM] will not, nor will it permit any
> Manufacturing Subsidiary to, issue or
> assume any Debt secured by a Mortgage
> upon    any    Principal    Domestic
> Manufacturing Property of [GM] or any
> Manufacturing Subsidiary or upon any
> shares of stock or indebtedness of any
> Manufacturing Subsidiary . . . without

53

> in any such case effectively providing
> concurrently with the issuance or
> assumption of any such Debt that the
> Securities . . . shall be secured
> equally and ratably with such debt.

(CD-157.) Parker claims that when GM entered into the LSA,

"Treasury acquired a lien on the Debtor's domestic

manufacturing plants and facilities" in breach of Section

4.06. (App. Br. at 24.)


However, the terms of the LSA establish that such

loans are not secured by liens on any "Principal Domestic

Manufacturing Property" of GM or any "Manufacturing

Subsidiary." Section 4.01 of the LSA provides for the

granting of liens and security interests to the Lender

under the LSA. Within Section 4.01 is the defined term

"Excluded Collateral," which is expressly excluded from the

collateral-granting clause:

> provided that, notwithstanding anything
> to the contrary contained herein or in
> any other Loan Document, the term
> "Collateral" and each other term used
> in the definition thereof shall not
> include, and the Borrower is not
> pledging or granting a security
> interest in, any Property to the extent
> that such Property constitutes
> "Excluded Collateral."

(CD-155, at 29 (LSA, Section 4.01) (emphasis added).)

"Excluded Collateral" includes:

54

> (v) <u>any</u> Property, including any debt or
> Equity Interest and any manufacturing
> plant or facility which is located
> within the continental United States,
> <u>to the extent that the grant of a</u>
> <u>security interest therein to secure the</u>
> <u>Obligations will result in a lien, or</u>
> <u>an obligation to grant a lien, in such</u>
> <u>Property to secure any other</u>
> <u>obligation.</u>

(CD-155, at 5-6 (LSA, Section 1) (emphasis added).)

Accordingly, the Bankruptcy Court correctly held

that the LSA "expressly carved out from the grant of the

security interest under those documents any instance where

it would trigger, inter alia, the equal and ratable clause"

on which Parker relies. Sale Op. at 517-18 (citing Section

4.01 of the LSA and the definition of "Excluded

Collateral"). The Bankruptcy Court correctly concluded

that "when liens were granted in favor of the U.S. Treasury

in December 2008, the U.S. Treasury was not granted a lien

on any of the Excluded Collateral — including, as relevant

here, anything that would trigger the equal and ratable

clause." Id. at 518.[10]

---

[10]    Parker's contention that there was no Excluded Collateral because
certain schedules attached to the LSA were blank fails. (App Br. at
23-24; 27.) The LSA expressly carved out, as Excluded Collateral, any
property that would give rise to a breach of the equal and ratable
provision of the 1995 Indenture — "<u>notwithstanding</u> anything to the
contrary contained herein or in any other Loan Document." That the
schedule Parker points to does not list Excluded Collateral thus is not
evidence to support the notion that the 1995 Indenture was breached.

As the terms of the LSA unequivocally establish,
Parker's arguments are without any foundation, as the
Bankruptcy Court determined, although he has raised
arguments on appeal that were not argued below.

Parker has contended that in the Affidavit of
Frederick Henderson, filed on June 1, 2009, "the Debtor
admitted that under the LSA the Treasury acquired 'a first
priority lien on and security interest in substantially all
of the unencumbered assets of GM and the guarantors, as
well as a junior lien on encumbered assets." (App. Br. at
25.) Parker concludes that this language proves that
"Treasury acquired a lien of one sort or another on
substantially all of the Debtor's assets." (Id.) However,
the contract language quoted above is controlling. In any
event, Mr. Henderson's statement in no way establishes (or
even addresses) that the "equal and ratable" provision of
the 1995 Indenture was violated or how the Bankruptcy Court
erred below. Moreover, the date of Mr. Henderson's
affidavit establishes that although Parker had every
opportunity to make this argument before the Bankruptcy
Court, he did not do so. Accordingly, this argument has
been waived. See In re Nortel Networks Corp. Sec. Litig.,

56

539 F.3d 129, 132 (2d Cir. 2008) ("[W]e conclude that
Milberg has waived this argument by failing to present it
below.  It is a well-established general rule that an
appellate court will not consider an issue raised for the
first time on appeal." (internal quotation marks omitted)).


            Parker has also contended on appeal that
AlixPartners' Liquidation Analysis likewise somehow proves
that "Treasury must have acquired a lien on the Debtor's
domestic manufacturing plans and facilities" (App. Br. at
25), thereby violating the 1995 Indenture.  The contention
appears to be that under the Liquidation Analysis, because
the Debtor's Real Estate, Plant and Equipment constituted
62% of the Debtor's assets, and of that amount, 64%
comprised the Debtor's Machinery and Equipment, "at least
some of the Debtor's Real Estate must have been used for
manufacturing plants and facilities, thus simple math and
common sense say that over forty percent (40%) of the
Debtor's assets must have consisted of domestic
manufacturing plans and facilities."  (Id.)  The contention
is without evidentiary support.  Even if it were correct,
the AlixPartners' Liquidation Analysis obviously could not
change the terms of the LSA.  In any event, this argument

also was not raised below and is not properly raised for

the first time on appeal.   Nortel, 539 F.3d at 132.[11]

### e.   The Use of TARP Funds Was Appropriate

Initially, Parker has not established standing to

challenge Treasury's use of TARP funds.   The Sale involved

a so-called "credit bid" of Treasury's secured debt

pursuant to Section 363(k) of the Bankruptcy Code.   See 11

U.S.C. § 363(k) ("At a sale under subsection (b) of this

section of property that is subject to a lien that secures

an allowed claim . . . the holder of such claim may bid at

such sale, and . . . such holder may offset such claim

against the purchase price of such property.").   That is,

Treasury assigned its debt to New GM, which functionally

agreed to forgive (most of) the debt as part of the

consideration for GM's assets.   For Parker to challenge the

legality of loaning TARP funds to GM, he had to do so in

connection with the DIP Loan.   See Sale Op. at 518.

Parker has admitted that he could not have

objected at the time the Bankruptcy Court approved the DIP

---

[11]   The remaining arguments set forth in this section of Parker's
brief also are being raised for the first time on appeal and likewise
fail.   (See App. Br. at 26-28.)

58

Loan because the fact of the loan itself caused him no

injury.  (See App. Br. at 30.)  Putting aside the fact that

the DIP Loan was made in explicit contemplation of the

Sale, Parker also lacks standing even if it is assumed that

the Sale involved TARP funds because Parker suffered no

injury from the use of TARP funds.

        The Court of Appeals rejected an identical

challenge to the use of TARP funds in the Chrysler sale

(which did involve direct payment for the assets with TARP

funds, as opposed to a credit bid) on standing grounds,

finding that the objectors (in that case, secured creditors

objecting to the release of their collateral) had suffered

no injury-in-fact:

> However, the [objectors'] argument
> ignores the bankruptcy court's finding
> that, in the absence of another buyer,
> the only viable alternative —
> liquidation — would yield an even lower
> return than the one achieved through
> the sale funded by TARP money.  Judge
> Gonzalez found, as a fact, that the
> liquidation value of the collateral was
> no greater than $2 billion, i.e., the
> same amount the first lien secured
> lenders are receiving under the
> transaction.  Since the [objectors]
> will receive [their] pro-rata
> distribution of the value of the
> collateral, they simply cannot allege
> injury in fact.  The release of
> collateral for fair (but less-than-

> hoped-for) value is not injury in fact
> sufficient to support standing.

Chrysler II, 576 F.3d at 123 (internal quotation marks and
emphases omitted).

        Judge Gerber made the analogous finding here —
that unsecured creditors received more in the Sale than the
liquidation value of GM's assets — and Parker does not
contest it. See Sale Op. at 485 ("No unsecured creditor
will here get less than it would receive in a
liquidation."). Accordingly, Parker has no standing to
contest the Government's financing of GM with TARP funds,
or the credit bid of its secured debt as part of the Sale.

        GM's assets were purchased pursuant to a
publicly-announced, Bankruptcy Court-approved Section 363
sale bidding process by a private entity sponsored in part
by Treasury.  Treasury was well within its constitutional
and statutory authority under the Emergency Economic
Stabilization Act of 2008 ("EESA"), which established the
Troubled Asset Relief Program ("TARP," and the funds
provided in connection with TARP, the "TARP funds"), when,
in an effort to save the automotive industry and the
national economy from certain calamity, it loaned TARP

funds to GM on a secured basis, both before and after the
filing of the Debtors' chapter 11 cases. [12]   Treasury then
transferred its interests in the sellers' assets to the
Purchaser, an entity whose equity is owned by Treasury,
Canada, the VEBA, and, pursuant to the 363 Transaction,
Motors Liquidation Company itself.   The Purchaser, in turn,
credit bid the security interests contributed by Treasury,
as part of the consideration paid to the Debtors
(including, in addition to the substantial equity
interests, and warrants to purchase additional shares in
the Purchaser itself), to acquire substantially all of GM's
assets pursuant to the 363 Transaction.

       The Second Circuit addressed a similar challenge
to Treasury's use of TARP funds in Chrysler and concluded
that creditors like Parker lack constitutional standing to
bring such a challenge.   Although the Second Circuit
observed in Chrysler II that the "scope of TARP is a
consequential and vexed issue that may inevitably require
resolution in some later case," 576 F.3d at 122, this

---

[12]      The pre-chapter 11 LSA provided GM with up to $13.4 billion in
financing on a senior secured basis.   See Sale Op. at 477.   It was
later amended to provide for another $6 billion in financing.   Id. at
479.   Neither Parker nor any other bondholder — or anyone else — sought
to preclude such financing.   Treasury also provided debtor in
possession financing for the Debtors through the chapter 11 process.
Id. at 480.

Court, like the Bankruptcy Court below and the Chrysler

courts, need not consider the issue because Parker has no

standing to raise the issue.   See Port Washington Teachers'

Ass'n v. Bd. of Ed., 478 F.3d 494, 502 (2d Cir. 2007)

(finding that plaintiffs failed to demonstrate an injury in

fact to establish standing and concluding, "[h]aving

decided that plaintiffs lack standing, we need not and do

not consider the other arguments that they make on this

appeal").


          Contrary to Parker's contention, section 1109(b)

of the Bankruptcy Code does not satisfy or replace the

constitutional and prudential limitations on standing.

Rather, a party must establish both.   In re James Wilson

Assocs., 965 F.2d 160, 169 (7th Cir. 1992) ("we do not

think that [section 1109(b)] was intended to waive other

limitations on standing, such as that the claimant be

within the class of intended beneficiaries of the statute

that he is relying on for his claim"); see also Southern

Blvd., Inc. v. Martin Paint Stores, 207 B.R. 57, 61

(S.D.N.Y. 1997) (notwithstanding Section 1109(b), a party

must still satisfy the general requirements of the standing

doctrine).

"[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004). In the bankruptcy context, the Court must assess whether an appellant has standing not just to raise a general objection to an order, but whether appellant has standing to advance specific arguments in opposition to that order. Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 642-43 (2d Cir. 1988) (holding that, under the prudential standing doctrine, appellant had standing to raise only certain of his challenges to an order confirming a plan); see also In re Quigley Co., 391 B.R. 695, 703-05 (Bankr. S.D.N.Y. 2008) (citing cases for proposition that the "court should decide questions of standing . . . on an issue-by-issue basis"). It is well settled that as an "'irreducible constitutional minimum,' Article III standing requires that: (1) the plaintiff suffer an injury in fact; (2) the injury be fairly traceable to the challenged conduct; and (3) the injury will likely be redressed by a favorable decision from the court." Chrysler II, 576 F.3d at 122. Parker has not demonstrated an injury in fact, nor has he traced his supposed "injury" to any conduct by Treasury.

"An injury in fact is 'an invasion of a legally
protected interest which is (a) concrete and
particularized, and (b) 'actual or imminent, not
conjectural or hypothetical.'" Id. at 123.  Here, as in
Chrysler, Parker did not demonstrate an injury in fact
because the Bankruptcy Court concluded as a matter of
undisputed fact that Parker, an unsecured creditor, is
receiving nothing less as a result of the 363 Transaction
than he would receive in a liquidation — the only viable
alternative to the 363 Transaction.  Sale Op. at 519.
Specifically, the Bankruptcy Court made a finding of fact
that the value of the Debtors' assets in a liquidation
"would range between approximately $6 billion and $10
billion."  Id. at 481.  The Court further found that the
Debtors' general unsecured claims would exceed $116.5
billion.  Id.  Secured claims far exceeded $20 billion.
(CD-21); Sale Op. at 480 (finding secured indebtedness to
be nearly $50 billion).  The Bankruptcy Court therefore
found that "in the event of a liquidation, unsecured
creditors would recover nothing."  Id.  Parker adduced no
evidence to undermine that conclusion, and offered no
credible argument in this appeal to counter that
conclusion.  Accordingly, because Parker has not suffered

an injury in fact, as a matter of law, he does not have
standing to challenge Treasury's use of TARP funds here.

            Parker also lacks standing to challenge the use
of TARP funds because, as the Bankruptcy Court concluded,
his alleged injury is not fairly traceable to the
challenged action.  Parker has contended that "[w]hat the
Bankruptcy Court has missed is that the Appellant's main
objection is not to the source of the funding but to the
identity of the purchaser — to the fact that it is the
Treasury (and not some third party borrower) that is making
the purchase."  (App. Br. at 32.)  Yet, as a threshold
matter, Parker has made no factual showing below that the
Purchaser was a mere alter ego of Treasury and, thus, a
government actor.  It is a matter of uncontroverted fact
that the VEBA and Canadian governmental entities are also
equity owners of the Purchaser.  The Bankruptcy Court
concluded that "'the [alleged] injury is not fairly
traceable to the U.S. Treasury's actions because [Parker]
would suffer the same injury regardless of the identity of
the lender.'"  Sale Op. at 519.  The alleged injury claimed
by Parker, is not fairly traceable to Treasury's actions
because Parker would suffer the same injury regardless of
the identity of the purchaser.  The purported injury

complained of here is the product of the 363 Transaction
itself, not any particular action by Treasury, either as
lender or purchaser.  Thus, Parker has no standing to
challenge Treasury's use of TARP because his alleged injury
is not fairly traceable to Treasury.

          Even if Parker could establish a cognizable
injury in fact, he nonetheless lacks standing to
collaterally attack Treasury's use of TARP Funds because a
"valid claim of standing rests upon more than [the]
assertion of a [judicially] cognizable injury."  Harrington
v. Bush, 553 F2d 190, 206 n.68 (D.C. Cir. 1977).  In that
regard, the Court must also assess "whether the interest
sought to be protected by the complainant is arguably
within the zone of interests to be protected or regulated
by the statute or constitutional guarantee in question."
Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397
U.S. 150, 153 (1970).

          Parker's alleged injury bears no relation to the
interests that are to be served by Section 101 of EESA, 12
U.S.C.A. § 5211.  An inquiry into whether a litigant falls
within the zone of interests of a particular statutory
provision must start with an examination of the statute

66

itself.  See Warth v. Seldin, 422 U.S. 490, 500 (1975).
Parker has cited nothing in the language of EESA that
indicates that Congress ever gave any consideration to,
much less was seeking to protect, the contract rights of
unsecured bondholders when it limited eligibility for TARP
Funds to a "financial institution," as that term is defined
by the statute and relevant regulatory interpretation.
Section 5211 does not speak to the rights of unsecured
bondholders or purport to regulate their activities, and
confers no rights upon them, either expressly or by
implication.  12 U.S.C. § 5211.  Instead, the section
speaks only to the authority and duties of the Secretary of
the U.S. Treasury in purchasing troubled assets.
Accordingly, as Parker is not within EESA's zone of
interests, he lacks prudential standing.

Even if Parker had established standing to
challenge Treasury's use of TARP funds, his interpretation
of EESA ignores Congress's stated intent to prevent the
imminent collapse of the national economy, the sweeping
authority Congress vested in Treasury to stabilize the
economy, the broad language of the relevant provision, the
realities of the automobile industry, and the deference
afforded to the Treasury Secretary to implement EESA.  U.S.

Nat'l Bank v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 455 (1993) (explaining that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." (quoting United States v. Heirs of Boisdoré, 49 U.S. 113, 122 (1849))). Because EESA authorizes Treasury to provide funding to automotive companies, Parker's statutory argument is meritless.  (CD-3, at 11.)

EESA vests the Secretary with the flexibility and power to take bold actions necessary to stabilize the economy.  In particular, to achieve that end, Congress saw fit "to immediately provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United States." 12 U.S.C. § 5201.

EESA requires the Treasury Secretary to "publish program guidelines" that set forth, inter alia, mechanisms for purchasing troubled assets and the criteria Treasury will employ for identifying such troubled assets.[13]   Id.

---

[13]     Most relevant to this case, Treasury has promulgated guidelines for allocation of TARP funds to establish the Automotive Industry Financing Program ("AIFP").  The AIFP was designed to "prevent a

§ 5211(d).  The statute also empowers the Secretary "to

take such actions as the Secretary deems necessary to carry

out the authorities in this Act, including, without

limitation . . . [i]ssuing such regulations and other

guidance as may be necessary or appropriate to define terms

or carry out the authorities or purposes of this chapter."

Id. § 5211(c).[14]


    EESA defines the term "financial institution"

broadly:

> (5) FINANCIAL INSTITUTION. — The term
> "financial   institution"   means   any
> institution, <u>including, but not limited
> to</u>,  any  bank,  savings  association,
> credit  union,  security  broker  or
> dealer,   or   insurance   company,
> established  and  regulated  under  the
> laws of the United States or any State,
> territory, or possession of the United
> States . . . and having significant
> operations in the United States . . . .

Id. § 5202(5) (emphasis added).

---

significant disruption of the American automotive industry that poses a
systemic risk to financial market stability and will have a negative
effect on the real economy of the United States."  U.S. Dep't of the
Treasury, Guidelines for Automotive Industry Financing Program,
http://www.financialstability.gov/docs/AIFP/AIFP guidelines.pdf.

[14]    However, while the Secretary's authority is broad, it is not
unfettered.  See Chrysler II, 576 F.3d at 122.  Congress legislated a
number of mechanisms to maintain its significant oversight over the
expenditure of TARP Funds.

Consistent with EESA's overall purpose, the
examples enumerated therein expressly do not constitute an
exhaustive list.  See, e.g., Fed. Land Bank of St. Paul v.
Bismarck Lumber Co., 314 U.S. 95, 99-100 (1941) (the "term
'including' is not one of all-embracing definition, but
connotes simply an illustrative application of the general
principle"); CSX Corp. v. Children's Inv. Fund Mgmt., 562
F. Supp. 2d 511, 540 (S.D.N.Y. 2008) (noting that the term
"includes" makes plain that the language that follows does
not exhaust the circumstances in which one might come
within the term).  Thus, to determine whether the Treasury
Secretary exceeded his authority in determining which other
entities are appropriately encompassed within "financial
institution," consideration is given to (i) EESA's
underlying purpose to resuscitate the economy; (ii) the
interpretation of the statute by the governmental agency
charged with its implementation;[15] and, (iii) the
relationship of automotive companies and their related

---

[15]    See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467
U.S. 837, 844 (1984) (holding that "considerable weight should be
accorded to an executive department's construction of a statutory
scheme it is entrusted to administer"); see also United States v. Mead
Corp., 533 U.S. 218, 234-35 (2001) (holding that "an agency's
interpretation may merit some deference whatever its form, given the
specialized experience and broader investigations and information
available to the agency, and given the value of uniformity in its
administrative and judicial understandings of what a national law
requires" (internal citations and quotation marks omitted)).

financial institutions as they pertain to that statutory
purpose.

As the Second Circuit noted in Chrysler II, "[i]t
is clear that TARP gives the Secretary broad discretion to
apply financial aid when and where he decides it will best
promote the stated goal of restoring the stability to the
financial markets."   576 F.3d at 122.   EESA's broad
definition of "financial institution" is flexible enough to
encompass automobile companies, and the legislation grants
the Treasury Secretary the discretion to respond to a
monumental financial crisis.

Based upon Parker's construction of statements
made by former Treasury Secretary Paulson at a hearing
before the House Committee on Financial Services, Parker
has contended that providing TARP funds to certain
automobile companies exceeded Treasury's authority under
EESA.   (App. Br. at 35.)   However, such post-enactment
statements do not constitute "legislative history" and Mr.
Paulson's statements do not represent the intent of
Congress but rather ex post facto comments that are a
"hazardous basis for inferring . . . intent."   Pension
Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650 (1990)

71

(noting also that it is a particularly dangerous ground on which to rest an interpretation of a statute when it concerns a proposal that does not become law).

Parker has argued that Congress's failure to pass the Auto Industry Financing and Restructuring Act of 2008 (H.R. 7321) evidences a legislative intent to exclude auto companies from receiving TARP Funds.  (App. Br. at 37.) However, failed legislative proposals are entitled to little or no weight in interpreting a prior statute.  See, e.g., United States v. Craft, 535 U.S. 274, 287 (2002); United States v. Gagliardi, 506 F.3d 140, 146 (2d Cir. 2007).  Congressional inaction lacks "persuasive significance" because "several equally tenable inferences" may be drawn from such inaction, "including the inference that the existing legislation already incorporated the offered change."  Pension Benefit Guar. Corp., 496 U.S. at 650 (internal quotation marks omitted); see United States v. Wise, 370 U.S. 405, 411 (1962).  It is just as likely that Congress declined to pass the legislation on account of a view that Treasury's authority under EESA was adequate to protect the automotive industry.  The nonpassage of that legislative proposal does not establish that GM was not entitled to receive TARP funds.

f.    The Sale Was Not an Unconstitutional Taking

Parker has contended that the Sale was an
"unconstitutional taking" for which "just compensation" is
owed.  (App. Br. at 40-48).  It is well-settled that if a
"claim is unsecured, it is not 'property' for purposes of
the Takings Clause."  In re Treco, 240 F.3d 148, 161 (2d
Cir. 2001) (citing Lousiville Joint Stock Land Bank v.
Radford, 295 U.S. 555, 602 (1935)).  Thus, as an unsecured
creditor, Parker has no standing to assert a constitutional
takings claim.

Indeed, by definition, an unsecured creditor has
no particularized property interest in the Debtors'
estates.  As Judge Gonzalez explained in Chrysler I, "An
objection [under] the Takings Clause of the Fifth Amendment
. . . is overruled because the objector holds an unsecured
claim, rather than a lien in some collateral that is
property of the estate, which is a necessary prerequisite
to a Fifth Amendment Takings Clause claim in the bankruptcy
context."  405 B.R. at 111-12 (citing United States v.
Security Indus. Bank, 459 U.S. 70 (1982)).

73

Second, a market transaction for fair

consideration by definition is not a taking "without just

compensation." U.S. Const. amend. V.  As the Bankruptcy

Court found, see Sale Op. at 481 ("the purchase price was

fair to GM, from a financial point of view.  No contrary

evidence has been submitted to the Court."), and Parker

expressly agreed, the Government paid a fair price for the

assets New GM acquired.  See 7/2 Hearing Tr. at 84-85

("Now, I want to make clear, I'm not objecting to the sale

price . . . .  I think that's a fair price for General

Motors; I'm not quibbling over that."  (closing statement

of Mr. Parker)).  Accordingly, there was no

unconstitutional taking.

For the reasons set forth above, Parker lacks

standing to challenge Treasury's use of federal funds to

sponsor the purchase of the Debtors' assets and to

challenge the 363 Transaction as an unconstitutional taking

on those grounds.  See, e.g., Chrysler II, 576 F.3d at 121-

23.

Parker has contended that "[u]nder the provisions

of the Fifth Amendment, whenever the Government acquires

property for public use, it must pay 'just compensation,'"

74

and that the "compensation being offered to Appellant (and
all other similarly situated creditors) is constitutionally
inadequate." (App. Br. at 43.)  However, "[i]f there was
no taking, there is no entitlement to just compensation."
Garelick v. Sullivan, No. 91 Civ. 4524, 1992 WL 71946, at
*2 (S.D.N.Y. Mar. 24, 1992) (internal quotation marks
omitted).  Parker's "recharacterization" and "equitable
subordination" arguments also lack merit and fail for the
reasons articulated by the Bankruptcy Court.  First, the
Bankruptcy Court concluded as a matter of law and fact that
"the Prepetition Secured Debt was, in fact, debt . . . ."
Sale Op. at 498-99.  Parker has offered nothing to
demonstrate that the Bankruptcy Court's finding of fact was
clearly erroneous and, thus, that its conclusion of law is
not equally sound.  Second, the Bankruptcy Court found that
none of the factors set forth "in the famous case of Mobile
Steel" had been established in connection with Parker's
objection to the 363 Transaction.  Id. at 499.  Parker does
not demonstrate how the relevant legal test is satisfied in
this case.

Parker's contentions concerning the supposed
allocation of the sale proceeds have no bearing on his
"takings" arguments.  Moreover, as an unsecured creditor,

75

Parker will share in a pro rata distribution of the
consideration paid for the Debtors' assets in the Sale
under an eventual chapter 11 plan, consistent with the
statutory priority provisions.  Parker can hardly complain
about that result because, as the Bankruptcy Court found,
"[i]n the event of a liquidation, creditors now trying to
increase their incremental recoveries would get nothing."
Sale Op. at 474 (emphasis added).  In any event, the
evidence below established that the compensation the
Purchaser paid to the Debtors was more than fair, was paid
after an opportunity was provided for any and all bidders
to offer more, and exceeded the value otherwise attainable.
(CD-21.)

Parker's contentions may be distilled to one
complaint:  that the MPA impinged upon his (and the other
unsecured bondholders') rights under the 1995 Indenture.
If he has a theoretical claim for breach of contract
against the Debtors under the 1995 Indenture or claims
sounding in tort against the federal government, such
claims have no constitutional dimension, and had no
relevance to the 363 Motion before the Bankruptcy Court.

## **Due Process Requirements Were Satisfied**

The U.S. Supreme Court has repeatedly emphasized the flexibility of the due process requirement, which simply "calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972) ("It has been said so often by this Court and others as not to require citation of authority that due process is flexible . . . ."). An "elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950); see also Baker v. Latham Sparrowbush Assocs., 72 F.3d 246, 254 (2d Cir. 1995) ("If a party receives actual notice that apprises it of the pendency of the action and affords an opportunity to respond, the due process clause is not offended."); In re Drexel Burnham Lambert Group Inc., 995 F.2d 1138, 1144 (2d Cir. 1993) (holding that "the Due Process Clause requires the best notice practical under the circumstances"). In short, the constitutional requirements of due process are satisfied if notice is given with "due regard for the

practicalities and peculiarities of the case." Mullane,
339 U.S. at 314-15.

Parker has urged that the speed with which the
363 Transaction was approved violated his due process
rights.  Similar contentions, however, were raised and
rejected in several recent analogous chapter 11 cases in
which a debtor sold all or substantially all of its assets
pursuant to an expedited sale process under Section 363 of
the Bankruptcy Code.  In Chrysler I, for example, the
Bankruptcy Court held that shortened notice procedures
(similar to those used here) did not deny the objectors'
due process rights.  405 B.R. at 109.  The Second Circuit
affirmed the Bankruptcy Court's approval of the Chrysler
sale "[u]pon extensive findings of fact and conclusions of
law," holding that the sale was not an abuse of the
Bankruptcy Court's discretion.  Chrysler II, 576 F.3d at
112.

An even shorter period of time was found not to
have violated any parties' due process rights in the
chapter 11 case of In re Lehman Bros. Holdings, Inc., 415
B.R. 77 (S.D.N.Y. 2009).  In affirming the Bankruptcy
Court's order approving the sale of the debtors' registered

78

broker/dealer subsidiary to Barclays Capital, Inc.,

including its determination that the sale did not violate

the objectors' due process rights, the District Court

observed:

> In approving the expedited schedule,
> the bankruptcy court explicitly
> considered due process issues. It
> heard arguments that financial markets
> participants had known for months that
> Lehman's assets were for sale. It also
> took judicial notice of the fact that
> interested parties and spectators
> filled two courtrooms and overflow
> rooms for the hearing: "there's no
> question that parties-in-interest and
> parties who are just plain interested
> know about today's hearing."
> Acknowledging that the proposed sale
> was "an absolutely extraordinary
> transaction with extraordinary
> importance to the capital markets
> globally," the bankruptcy court
> scheduled the sale hearing for two days
> later, September 19.

Id. at 80.  The Honorable Denise Cote held that the

Bankruptcy Court "appropriately considered and resolved due

process interests throughout the sale process [and]

correctly determined that [the objecting funds] had

sufficient notice and opportunity to be heard."  Id. at 85

n.7 (citing Mullane, 339 U.S. at 314).

Other courts have found similarly expedited

schedules for sale hearings to be compliant with due

79

process requirements. See, e.g., In re Vanguard Oil &

Serv. Co., 88 B.R. 576, 580 (E.D.N.Y. 1988) (bankruptcy

court acted within its discretion in approving sale,

despite objection to improper notice, where delay in

accepting purchaser's offer risked decreasing value of

assets in estate and appellant failed to demonstrate how it

was materially prejudiced by alleged due process

violation); In re Haven Eldercare, LLC, 390 B.R. 762, 769

(Bankr. D. Conn. 2008) (under "unique and extraordinary

circumstances," cause existed for shortening to two days

the twenty-day notice period to approve sale to credit

bidder where debtors were in "financial extremis," value of

assets was deteriorating, debtors were unable to find cash

purchaser to bring into auction process, and there was "no

credible evidence to support a claim that additional notice

might materially enhance the outcome for any . . .

constituency").

Here, over a period of ten days, the Debtors

provided full and prompt discovery to every party that

requested it, including Parker. Such discovery included,

but was not limited to, the Debtors' production of over

384,000 pages of responsive, non-privileged documents, as

well as the depositions of Frederick Henderson and Michael

Raleigh, both in their individual capacities and as

designees under Fed. R. Civ. P. 30(b)(6).  Treasury

likewise provided extensive document discovery and made its

witness, Harry Wilson, available for deposition pursuant to

Rule 30(b)(6).  At the Sale Hearing, counsel for the tort

claimant objectors acknowledged and praised the Debtors'

(and Treasury's) conduct in the discovery process.  (7/1

Hearing Tr. at 295-96.)


        Moreover, unlike Lehman, where "[a]t no time

before the sale hearing did [the objecting funds] attempt

to take any discovery from Barclays," 415 B.R. at 80,

Parker (and other objectors) participated fully in the

discovery process.  (CD-142; CD-143.)  In addition, at the

Sale Hearing, Parker cross-examined four witnesses (Messrs.

Henderson, Worth, Koch and Wilson) at length (CD-134; CD-

141) and presented oral arguments.  Parker cannot credibly

contend he was not given a full and complete opportunity to

participate in the proceedings below.


        The Bankruptcy Court determined that, like

Chrysler and Lehman, there was a "need for speed" in

approving the 363 Transaction:


                            81

> Absent prompt confirmation that the
> [S]ale has been approved and that the
> transfer of the assets will be
> implemented, GM will have to liquidate.
> There are no realistic alternatives
> available.

> There are no merger partners,
> acquirers, or investors willing and
> able to acquire GM's business. Other
> than the U.S. Treasury and EDC, there
> are no lenders willing and able to
> finance GM's continued operations.
> Similarly, there are no lenders willing
> and able to finance GM in a prolonged
> chapter 11 case.

> The continued availability of the
> financing provided by the Treasury is
> expressly conditioned upon approval of
> [the 363 Motion] by July 10, and prompt
> closing of the 363 Transaction . . . .
> Without such financing, GM faces
> immediate liquidation.

> . . .

> Even if funding were available for an
> extended bankruptcy case, many
> consumers would not consider purchasing
> a vehicle from a manufacturer whose
> future was uncertain and that was
> entangled in the bankruptcy process.

Sale Op. at 484.

Manifestly, the record clearly demonstrates that
adequate notice was provided and Parker was in no way
prejudiced by the expedited schedule which was necessitated
by the unique and compelling circumstances of the Debtors'
chapter 11 cases and the national interest.

82

## Conclusion

The Sale Order is affirmed in all respects.

It is so ordered.

New York, NY
April 27, 2010

ROBERT W. SWEET
U.S.D.J.