1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


MOTORS LIQUIDATION COMPANY, et al.

f/k/a GENERAL MOTORS CORPORATION, et al.


     Debtors.

- - - - - - - - - - - - - - - - - - - -x


       U.S. Bankruptcy Court

       One Bowling Green

       New York, New York


       April 29, 2010

       9:52 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2   Hearing on Fee Applications

3

4   Fee Examiner's Motion for Adjournment of Hearing on Second

5   Interim Fee Applications

6

7   Second Fee Application Hearing

8

9   Fee Examiner's Motion for Clarification of Appointment Order

10

11   Status Conference re: Amending the Terms of their Engagement

12   with Brownfield Partners, LLC

13

14   Motion for Relief from Stay filed by Lisa Gross

15

16   Motion of Debtors for Entry of Order Pursuant to 11 U.S.C.

17   Section 105(a) and General Order M-390 Authorizing

18   Implementation of Alternative Dispute Resolution Procedures,

19   Including Mandatory Mediation

20

21   Debtors' Objection to Proof of Claim No. 65796 Filed by Rudolph

22   V. Towns

23

24   Application of the Official Committee of Unsecured Creditors of

25   Motors Liquidation Company for Entry of an Order Authorizing

3

1    the Employment and Retention of Bates White, LLC as the

2    Committee's Consultant on the Valuation of Asbestos Liabilities

3    nunc pro tunc to March 16, 2010

4

5    Hearing on Objection to Application to Employ Stuart Maue as

6    Consultant Fee Examiner's Application to Authorize the Limited

7    Retention and Employment of the Stuart Maue Firm as

8    Consultant to the Fee Examiner

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dena Page

4

1

2   A P P E A R A N C E S :

3   WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Debtor

5        767 Fifth Avenue

6        New York, NY 10153

7

8   BY:   STEPHEN KAROTKIN, ESQ.

9        JOSEPH H. SMOLINSKY, ESQ.

10

11

12   JENNER & BLOCK LLP

13        Attorneys for Motors Liquidation Co.

14        919 Third Avenue

15        37th Floor

16        New York, NY 10022

17

18   BY:   PATRICK J. TROSTLE, ESQ.

19

20

21

22

23

24

25

5

```
 1

 2    GODFREY & KAHN, S.C.

 3          Attorneys for the Fee Examiner

 4          One East Main Street

 5          Suite 500

 6          Madison, WI 53701

 7

 8    BY:   BRADY C. WILLIAMSON, ESQ.

 9          KATHERINE STADLER, ESQ.

10          CARLA O. ANDRES, ESQ.

11          TIMOTHY F. NIXON, ESQ.

12

13

14    BAKER & MCKENZIE

15          130 East Randolph Drive

16          Suite 3900

17          Chicago, IL 60601

18

19    BY:   ANDREW MCDERMOTT, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25
```

6

1

2    BRYAN CAVE LLP

3         Attorneys for Evercore Group, LLC

4         211 North Broadway

5         Suite 3600

6         St. Louis, MO 63102

7

8    BY:   BRIAN C. WALSH, ESQ.

9

10

11   BUTZEL LONG

12        380 Madison Avenue

13        22nd Floor

14        New York, NY 10017

15

16   BY:   BARRY N. SEIDEL, ESQ.

17

18

19   CAPLIN & DRYSDALE

20        375 Park Avenue

21        35th Floor

22        New York, NY 10152

23

24   BY:   RITA C. TOBIN, ESQ.

25

7

1

2    GIBSON, DUNN & CRUTCHER LLP

3         200 Park Avenue

4         New York, NY 10166

5

6    BY:   MATT J. WILLIAMS, ESQ.

7

8

9    KRAMER LEVIN NAFTALIS & FRANKEL LLP

10        Attorneys for the Unsecured Creditors' Committee

11        1177 Avenue of the Americas

12        New York, NY 10036

13

14   BY:   THOMAS MOERS MAYER, ESQ.

15

16

17   HONIGMAN MILLER SCHWARTZ AND COHN LLP

18        2290 First National Building

19        660 Woodward Avenue

20        Detroit, MI 48226

21

22   BY:   ROBERT B. WEISS, ESQ.

23

24

25

8

1

2    MCCARTER & ENGLISH, LLP

3         Attorneys to Brownfield Partners

4         Four Gateway Center

5         100 Mulberry Street

6         Newark, NJ 07102

7

8    BY:    JEFF T. TESTA, ESQ. (TELEPHONICALLY)

9

10

11    U.S. DEPARTMENT OF JUSTICE, OFFICE OF THE UNITED STATES TRUSTEE

12         Attorneys for Trustee

13         33 Whitehall Street

14         21st Floor

15         New York, NY 10004

16

17    BY:    ANDREW D. VELEZ-RIVERA, ESQ.

18         LINDA A. RIFFKIN, ESQ.

19

20

21    ALSO PRESENT:

22         DOUGLAS DEEMS, The Claro Group (TELEPHONICALLY)

23         MICHAEL EISENBAND, CPA, FTI Consulting

24         MAUREEN F. LEARY, New York State Department of Law

25              (TELEPHONICALLY)

9

1          STUART MINER, Brownfield Partners (TELEPHONICALLY)

2          JAKE RODD, In Pro Per/Pro Se (TELEPHONICALLY)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

10

1              P R O C E E D I N G S

2          THE COURT:  All right, we're here on GM.  Believe it

3   or not, I've read all of this stuff.  We have a very busy day

4   today, a very long day.  What I want to do is deal with any

5   uncontested matters first because dealing with the fee-related

6   matters and the fee examiner's related motions is going to take

7   a lot of time.  Then I want to deal with the Lisa Gross motion,

8   and then we'll deal with the fee apps, the Maue firm retention,

9   the motion for clarification, and the request for an

10  adjournment, in that order.

11          Is there a need to deal with uncontested motions

12  either by asking me to approve them in a more formal way or to

13  confirm deals on the record?  Mr. Mayer, good morning.

14          MR. MAYER:  Good morning, Your Honor.  Tom Mayer of

15  Kramer Levin for the unsecured creditors' committee.  Your

16  Honor, the committee moved to retain an asbestos expert by the

17  name of Bates White.  There are no objections, and the order

18  has been presented to your chambers.  We would ask that you

19  sign it.

20          THE COURT:  Granted.

21          MR. MAYER:  Thank you.

22          THE COURT:  Mr. Smolinsky, you want to come up,

23  please?  Since I sense that a lot of people are on the phone

24  for anything longer than what Mr. Mayer said, I'd like the main

25  lectern to be used.

11

1        MR. SMOLINSKY:  Good morning, Your Honor.  Joe

2   Smolinsky, Weil, Gotshal & Manges for the debtor.  Your Honor,

3   there are a few uncontested matters such as debtors' twelfth

4   omnibus objection to claims where there was no objection filed

5   and I think Your Honor can just enter the order, if you're

6   inclined to do so.  There are a couple of uncontested matters

7   which I may just want to spend a minute on because there might

8   be some people on the phone that may have statements.

9        THE COURT:  Sure.

10        MR. SMOLINSKY:  Your Honor, on the uncontested

11   matters, item number (sic) C is the debtors' motion for entry

12   of an alternative dispute resolution procedure.  You'll recall,

13   Your Honor, last time we were in court, we reviewed the

14   objections and we carved out certain classes of claims from the

15   ADR procedures, in order to resolve the various objections.

16   Since that time, we've gone back, we've spoken to the parties,

17   and we again want to delete certain classes of claims from the

18   ADR procedures without prejudice to coming back with a separate

19   motion.  And Your Honor, we have a supplement order which

20   withdraws the motion with respect to certain classes of claims

21   that include asbestos-related claims, environmental claims, tax

22   claims excluding taxings that -- indemnity claims, and patent

23   infringement claims.  So we've prepared a supplemental order

24   for Your Honor which would fully dispose of the motion which

25   would allow us to resolve through the ADR procedures all types

12

1    of litigation claims other than these.  I don't believe there

2    are any objections to the procedures, but given -- I looked at

3    the call roster; there might be some people who may want to say

4    something.

5         THE COURT:  All right, does anybody on the phone want

6    to be heard with respect to that?

7         Record will reflect no response, Mr. Smolinsky, and

8    your motion's approved.

9         MR. SMOLINSKY:  Thank you, Your Honor.  The only other

10   uncontested matter which we might want to spend a minute on is

11   the debtors' objection to proof of claim 65796, filed by

12   Rudolph Towns.  I don't know if Your Honor wants to hear or if

13   Mr. Towns is on the phone, we should make sure that his rights

14   are protected.  I did want to note that we served the copy of

15   this motion on Mr. Towns, on Janice Jennings (ph.), who is Mr.

16   Towns' former counsel who actually mechanically filed the proof

17   of claim, Mr. Towns' daughter --

18        THE COURT:  How many billion dollars was this claim

19   for?

20        MR. SMOLINSKY:  Eighty-six billion dollars, Your

21   Honor.

22        THE COURT:  I beg your pardon?

23        MR. SMOLINSKY:  Eighty-six billion dollars.

24        THE COURT:  Um-hum.

25        MR. SMOLINSKY:  And we did confirm that it was

13

1    intended to be billions and not million.

2         So we served Tamara Slaughter-May (ph.), his daughter,

3    and we also served Yolanda Nicholson (ph.), who is a family

4    advisor.  We haven't received any objections.  I'm happy to

5    take Your Honor through the facts, but unless there's an

6    objection, we'd ask that Your Honor enter the order.

7         THE COURT:  Is Mr. Towns on the phone?  Do you wish to

8    be heard?

9         All right, I'm going to grant the estate's motion to

10   expunge, both because it is unopposed and because the debtors

11   are plainly right.  Normally, I wouldn't do this, but on a

12   claim of eighty-six billion dollars, I'll just note that as the

13   estate has properly observed, Mr. Towns hasn't provided any

14   legal or factual support his alleged intrinsic fraud injuries,

15   civil reco, or anything else.

16        You can submit an order in accordance with that, Mr.

17   Smolinsky, at your earliest convenience.

18        MR. SMOLINSKY:  Thank you, Your Honor.  I think the

19   balance of the uncontested matters can be dealt with on

20   submission, which brings us, I believe, to the Lisa Gross

21   motions, which I think was next on your agenda.

22        THE COURT:  Yes.  Ms. Gross, are you on the phone?

23   Ms. Gross?  Am I correct, Mr. Smolinsky, that the estate had

24   agreed that it would pick up the tab for her to appear on the

25   phone if she wanted to appear on this?

14

1        MR. SMOLINSKY:  That's correct, Your Honor.  And we

2    did provide her with the phone number.

3        THE COURT:  Okay.  I do have papers on it, so

4    therefore, I'm not going to default Ms. Gross on the motion,

5    but I have a tentative, based on my homework before the

6    hearing, and without her supplementing her submission in any

7    oral argument, I'm going to make my findings on that.

8        For the record, her motion for a waiver of the filing

9    fee to file her motion is granted, and I'm also granting her

10   request that I not make her serve the entire creditor community

11   in the case.  But on the merits, I find that the debtors are

12   right that New GM assumed the obligations, if any, or

13   liabilities, if any, for which she is seeking recovery, and

14   therefore, there is no need for her to file a claim against the

15   Old GM estate.  And that she doesn't need relief from the stay

16   to proceed against the party that's the real party-in-interest,

17   which is New GM.  Moreover, there has been a failure to

18   address, much less satisfy, the Sonnax factors applicable in

19   this circuit, for relief from the stay to proceed with a

20   litigation elsewhere, in the Tenth Circuit or elsewhere, and

21   accordingly, the motion for relief from the stay is denied.

22       Mr. Smolinsky, have one of your folks settle an order

23   in accordance with the foregoing at your earliest convenience.

24       MR. SMOLINSKY:  At the risk of picking the right

25   address, Your Honor, because she has moved around quite a bit,

15

1    we'll do our best to reach her by phone, as well.

2           THE COURT:  Good.  And of course, you'll be

3    electronically filing the notice of settlement as well.

4           MR. SMOLINSKY:  Yes.

5           THE COURT:  Okay.

6           MR. SMOLINSKY:  Thank you, Your Honor.  I think that

7    leaves the fee issues.

8           THE COURT:  Okay.  Then we're going to deal with the

9    fee issues next, and there are some particular matters that I'm

10   going to want to address, and let me take a motion (sic) to

11   give you my thoughts as to how we need to handle it.

12          When you make your presentations, make them as you see

13   fit, but I want you to address the following questions and

14   concerns.  First of all, as a matter of procedure, I'm going to

15   want to hear from the applicants, starting with Weil.  Then I'm

16   going to give the fee examiner or his counsel the opportunity

17   to respond, professionals to reply, and the examiner -- fee

18   examiner the chance to surreply.  Mr. Velez-Rivera, I see

19   you're here on behalf of the U.S. Trustee's Office, and I'll

20   want you to -- I think you fit in best right after I hear from

21   the fee examiner, and I'm going to give you the same surreply

22   rights, as well.

23          I want both sides to address how I find that fair

24   point between ensuring that the estate isn't ripped off on the

25   one hand and being fair to people who did more work in less

16

1   time than I've seen in thirty-seven years in working on

2   bankruptcy matters.  There is a strong public interest in

3   ensuring fairness to the estate, but there is an equal interest

4   in fairness to people who did the work.  And for the most part,

5   I thought the fee examiner was sensitive to those concerns.

6   And for that reason, my tentative, subject to people's rights

7   to be heard, is to approve in material part specific

8   articulated concerns with respect to identified matters.  But I

9   have reservations objections to fees that may be said to drift

10  away from the underpinnings in the Code and case law for

11  adjustments to requested fees, most significantly in what

12  seemed to be some mechanical percentage reductions in fees for

13  which I'll want both sides, but especially counsel for the fee

14  examiner to address.

15       I don't need to tell you all that over the years -- I

16  did it in the big decision in this case -- I start with textual

17  analysis; I then go to case law.  So help me in that regard,

18  folks.

19       Now, aside from that, I don't need help and I don't

20  want to spend even more time and money discussing the law of

21  compensation in Chapter 11 cases.  I saw that second -- I

22  forgot what it was called -- report by the fee examiner.  I

23  must say that I raised my eyebrows when I saw it.  I don't need

24  something like that to know the law in this area.  I don't

25  think any judge in this district does and I have material

17

1    doubts as to whether most of the judges need that.  I assume

2    that there will be a request to be compensated for that, and

3    we'll deal with that in an appropriate time, but I certainly

4    don't need it for today's hearing.

5         If people want to be excused from guidelines

6    applicable in this court or under the U.S. Trustee Program

7    guidelines, I'll need help as to why I should do that.  I think

8    the starting point for my analysis, subject to people's rights

9    to be heard, is that especially for members who practice

10   regularly in the bankruptcy community, compliance is expected.

11   However, I'll hear argument on how I should deal with failures

12   to comply and whether penalties or bases for cutting fees for

13   failures to comply might be excessive under the circumstances.

14   I'll also want to hear people's views as to what's right for

15   people who don't practice regularly in the bankruptcy courts or

16   provide services to debtors or have to file fee apps, since as

17   environmental consultants, because while I'm not of a mind,

18   subject to people's rights to be heard, to provide get-out-of-

19   jail-free cards for failures to comply, I do need to exercise

20   judicial judgment in terms of what's a fair remedy or sanction

21   or penalty or whatever the appropriate word should be for any

22   failures to comply.

23        With that, let's get to work.  Mr. Karotkin, are you

24   going to take the lead for the estate -- or, excuse me, for

25   your firm, Weil?

18

1      Now, by the way, because I lived with you so much over

2   six weeks, I know many of you.  I don't know everybody.  Excuse

3   me for knowing some but not everyone.  In any event, whether I

4   know you or not, please identify yourself on the record before

5   you speak.

6      MR. KAROTKIN:  Thank you, sir.  Stephen Karotkin,

7   Weil, Gotshal & Manges, counsel for the debtors, for our firm,

8   Weil, Gotshal, with respect to our first interim fee

9   application.  Your Honor, I think you put your finger on it, as

10  you usually do, with respect to the issues pertinent to our fee

11  application.  As you recognize, and as totally mystified us, I

12  must say, the fee examiner's response to our fee application,

13  and in particular, the request for a five percent discount in

14  connection with the work we did during the first interim fee

15  application period, in light of, Your Honor, what the fee

16  examiner stated himself in his response, basically echoing what

17  we submitted in our fee application, Your Honor, as to the

18  Herculean -- and that's a quote -- effort involved, and that

19  our firm -- and again, quoting from Mr. Williamson -- billed

20  significant fees because extraordinary circumstances required

21  us to do so.  I think as Your Honor is well aware because,

22  again, Your Honor, you lived with it, you lived with it with us

23  during the initial period of this case, nobody can question the

24  results achieved, the value enhanced, the value preserved for

25  the benefit of the U.S. economy.  And you referred to that, as

19

1   we noted in our pleadings, several times in your opinion

2   approving the 363 transaction.  I don't think we have to remind

3   anybody of the gravity of this situation which was confronted

4   at the inception of these cases, the systemic risks to the U.S.

5   economy and perhaps, Your Honor, again, as you noted, to the

6   world economy we all faced at that time.  Again, you were there

7   and you addressed that in your opinion.

8           And in light of that, not only, again, were we totally

9   mystified as to how the fee examiner could suggest a five

10  percent discount because there is no basis for it, and to

11  address what Your Honor raised earlier, Mr. Williamson, who was

12  involved with the Bankruptcy Review Commission in 1970 -- I

13  guess 1976 or prior to 1979, should know better than anyone

14  that the concept of the statute is that attorneys involved in

15  bankruptcy matters should be compensated at their normal rates,

16  and a discount is not appropriate.  We don't believe there's

17  any basis for a discount, and we would request that, basically,

18  what is a gratuitous request for a discount should be denied.

19          He notes that -- I think subsequent, he filed a

20  separate pleading later, I think, on Monday with respect to all

21  of the fee applications where he noted that -- I think his

22  words were something like our rates are higher than market.  Of

23  course, that's not the case, certainly in New York.  He has no

24  evidence that he presented or facts he presented to support

25  that.  And I think he also said that it's appropriate for a

20

1    discount to reflect the risks associated in collecting fees in

2    a Chapter 11 case, basically suggesting, Your Honor, that firms

3    inflate their charges because of the risk of payment in a

4    Chapter 11 case.  That's certainly not the case here, and

5    again, there's no basis for the discount.  The other items --

6         THE COURT:  Pause, please, Mr. Karotkin, because there

7    is or at least at one time was a practice in firms where their

8    bankruptcy lawyers would bill at a higher rate than comparable

9    lawyers in other departments in their same firms would, or at

10   least those who would be subject -- I don't think it was

11   limited to those who would be subject to fee apps.  Your firm's

12   rates are the same across the board?

13        MR. KAROTKIN:  They're the same in connection with

14   these matters across the board.

15        THE COURT:  Continue.

16        MR. KAROTKIN:  Your Honor, to basically go back to the

17   other response or the other issues that Mr. Williamson raised

18   with respect to our fee application, there were, basically,

19   four items.  And then, in addition to that, we have the one

20   item raised by the U.S. trustee, which again, Mr. Williamson,

21   although not raising it in his initial pleading, on Monday, he

22   raised the same issue as to there ought to be a continuing ten

23   percent holdback.  So, the remaining issues as to our

24   application, and I will note that 80 perc -- 87 percent of the

25   adjustments Mr. Williamson seeks relates to either the discount

21

1    or summer associate time.  And I would just like to address

2    briefly, and, again, we've addressed them at length in our

3    pleadings, we have addressed those issues in connection with

4    correspondence that we have provided to his firm and we believe

5    we have adequately addressed each and every item that he has

6    raised but let me just go through them briefly.

7            The first one I've already addressed which is the

8    discount.  The second one was what he characterizes, Your

9    Honor, as long billing days.  Your Honor, as we indicated, that

10   focused on two attorneys in our finance department.  And what

11   Mr. Williamson questions --

12           THE COURT:  Pause, please, Mr. Karotkin.  We all know

13   Mr. Williamson and his status in the financial and legal

14   community, but I don't want to turn this ad hominem.  He's an

15   official rule in this case and I'd appreciate it as a matter of

16   courtesy to him and to me that you refer to him as the fee

17   examiner.

18           MR. KAROTKIN:  Certainly.

19           THE COURT:  Let's not make it ad hominem.

20           MR. KAROTKIN:  I was not intending to do that.

21           What the fee examiner questions was the endurance

22   during essentially what was the ten-day period between the time

23   Your Honor ruled on approving a 363 transaction and when it

24   closed, which was effectively ten days later.  Your Honor, I

25   can attest, personally, to what these attorneys did.  These two

22

1    attorneys spearheaded the closing, they negotiated and

2    consummated all of the financing transactions that were

3    involved with the closing including the DIP financing as well

4    as all of the financing associated with taking the business

5    enterprise out of Chapter 11 and selling it to the government.

6    And, again, in an unprecedented time frame, these two attorneys

7    were largely responsible for closing one of the most complex

8    transactions perhaps in the history of the United States

9    economy in ten days.  They did work day and night.

10           THE COURT:  This was essentially in the zone after I

11   issued the 363 decision on the Fourth of July weekend and the

12   time that Old GM closed with New GM?

13           MR. KAROTKIN:  Yes, sir.  If you were to look at the

14   time records, I think all of the time or essentially all of the

15   time to which the fee examiner is referring is between July 1st

16   and July 10th, which was the date of the closing.

17           THE COURT:  Continue.

18           MR. KAROTKIN:  And, Your Honor, again, as you are well

19   aware, speed was essential here.  Speed was essential to

20   preserving value.  You recognize that in your opinion.  You

21   heard testimony about revenue perishability.  You heard

22   testimony about how important it was to get the brand, to get

23   the General Motors brand and business enterprise out of Chapter

24   11.  And that's what these attorneys -- these two attorneys

25   accomplished.  They did work day and night.  There is no

23

1    evidence to suggest that their time records and what they did

2    were not totally accurate.  And they, Your Honor, are largely

3    responsible for the expeditious closing of the transaction and

4    the preservation of value that was associated with that.  And

5    we don't think there's any basis to discount their time.  And I

6    recall, again, that was one of the, I think, arbitrary

7    percentage discounts that Mr. William -- I'm sorry -- that the

8    fee examiner was referring to.  There's no basis for it and we

9    think that it's appropriate for them to be compensated.

10           The third item, Your Honor, is summer associates and

11   law clerks.  As we stated in our responsive pleading, Your

12   Honor, we are certainly aware of your views.

13           THE COURT:  Right.  And you also, I think, since I

14   said it twice in my decision are aware of my position on stare

15   decisis.

16           MR. KAROTKIN:  I certainly am.

17           THE COURT:  All right.  Do you believe that ruling was

18   manifestare?

19           MR. KAROTKIN:  Absolutely not.

20           THE COURT:  All right.

21           MR. KAROTKIN:  And as we said in our pleadings that

22   although we believe that the summer associates provide valuable

23   services, and if that is your ruling that's your ruling and,

24   obviously, we will deduct that time.

25           THE COURT:  Continue.

24

1          MR. KAROTKIN:  As to law clerks, again, as we've

2    noted, law clerks are not summer associates.  Law clerks were

3    largely attorneys located in our foreign offices working on the

4    General Motors matter who are not yet admitted to the bar.  And

5    we believe that that time is appropriately compensable.  It's

6    not really different from first year associates we have in our

7    office who are awaiting admission to the bar having not

8    received the results yet and then not having completed all the

9    paperwork in that regard.

10          THE COURT:  Are those first year associates who are

11   waiting to get their results or to get their character forms

12   in, are they otherwise billed as lawyers or as law clerks?

13          MR. KAROTKIN:  They are billed as associates. Although

14   when they do sign letters, they do sign them in the capacity as

15   law clerks.

16          THE COURT:  Um-hum.

17          MR. KAROTKIN:  Because they are not yet formally

18   admitted --

19          THE COURT:  And the folks you described have a fully

20   completed legal education in whatever countries they've come

21   from?

22          MR. KAROTKIN:  Yes.  Yes, Your Honor.  All but one

23   which we noted in our responsive pleading which accounted for,

24   I think, 3400 dollars of time, which we would be prepared to

25   deduct as well.

25

1          THE COURT:  Okay.

2          MR. KAROTKIN:  The fourth item which the fee examiner

3    referred to was what the fee examiner characterizes vague

4    entries.  And I believe, again, that our pleading addressed

5    that.  We furnished information to the fee examiners as well.

6    Frankly, Your Honor, we don't think that those entries are

7    vague in the context of when the services were rendered and

8    what was happening in the case.

9          Those services relate to the early stages of the case,

10   again, mostly between the filing date and the closing of the

11   363 transaction.  When we were dealing with, as I'm sure you

12   well know, a multitude of parties on a daily basis, dealing

13   with suppliers, dealing with vendors.  As Your Honor well

14   knows, General Motors had approximately fifty thousand

15   suppliers dealing with employee questions, shareholder

16   questions, dealers calling on a daily basis.  Also dealing a

17   lot of the time to which the fee examiner alluded to was time

18   of people involved in discovery in connection with the 363

19   contested hearing.  All of which was done, as you know, in a

20   hugely truncated time frame.  The other time related to

21   noticing issues during that period and cure issues.  Again,

22   with respect to, as you well know, tens of thousands -- tens of

23   thousands of executory contracts that had to be addressed in

24   the context of the 363 sale.

25         Your Honor, we submit that under the circumstances

1    that existed at that time and what those attorneys were doing

2    to detail, as I believe the fee examiner is concerned about, to

3    detail every single call and every single person with whom

4    those attorneys spoke many, many times during the day was

5    neither practically possible nor efficient.  And I think we

6    have to look at these things in the context of what was going

7    on, what was practical, and the goal that had to be achieved.

8    To impose this type of a requirement on the attorneys at that

9    time to detail every single item they were dealing with, every

10   single executory contract they were dealing with was not

11   practical and would have actually, in fact, detracted from

12   achieving the goal that had to be achieved on an expeditious

13   basis.  And to impose, again, what the fee examiner suggests as

14   a 15 percent discount, we think is arbitrary and not

15   appropriate.

16          And, again, I think there has to be some degree of

17   common sense and practicality in analyzing and considering fee

18   applications.  And I think that in that context and in the

19   context of what was happening when that -- when those time

20   charges were incurred, we don't believe those entries are vague

21   and we think they're appropriate.

22          The other issues -- the other issue raised is the 10

23   percent holdback which was raised by the United States Trustee.

24   And I will get to the disbursements if Your Honor wishes to

25   hear about the disbursements.

1          THE COURT:  Okay.

2          MR. KAROTKIN:  But, let me first address the holdback.

3          We don't believe there is any need for a ten percent

4     holdback.  The fee examiner never raised the issue of a

5     holdback until, apparently, he saw the pleading filed by the

6     United States Trustee.  As I said, that surfaced for the first

7     time in his pleading on Monday.  We don't understand the

8     justification for the holdback.  There is nothing in the statue

9     which requires the holdback. As Your Honor well knows, this

10    case is not over.  We will be here soon on another fee

11    application and there will be others after that.  There is no

12    evidence of administrative insolvency.  In fact, the U.S.

13    Trustee's suggestion that perhaps this case may be

14    administratively insolvent is not based on any fact of reality.

15    As Your Honor knows there is a wind down facility which should

16    be more than sufficient to address all the costs and expenses

17    of the administration in connection with these cases.  And as I

18    said, this is not the last time you will see professionals here

19    on fee applications.  And we would submit to Your Honor that a

20    holdback under these circumstances is not warranted nor really

21    is there any support for it in the statute or based on any

22    facts that exist in this case.

23          I would like to briefly address, Your Honor, the

24    remaining issues raised by the fee examiner which essentially

25    go to disbursements.  And, again, we think we've adequate

28

1    addressed the disbursement issues and the fee application.

2    There are a few that remain outstanding.  We are happy to rely

3    on what we have put forth in our pleading with respect to those

4    items.  We think they're appropriately reimbursable.  But I

5    would like to mention two or three issues which the fee

6    examiner has raised which I think epitomizes where we've gone

7    here and the total lack of practicality that we've reached in

8    certain circumstances.

9           As you'll note from the fee examiner's objection, he

10   objects to two hotel charges and an electrical service charge

11   that were paid by our firm.  One of the hotel charges, Your

12   Honor, relates to a room that we booked at a hotel in Midtown

13   for the organizational meeting of creditors.  That was booked

14   at the request of the Office of the United States Trustee so

15   that the meeting could be held because they don't have the

16   space to do it.  We reserved the room, we paid the charge, we

17   furnished the fee examiner with the invoice and he has objected

18   to it on the basis that we haven't furnished additional

19   information to justify the charge.

20          The other one relates to a similar type charge, again,

21   for the 341 meeting requested again by the Office of the United

22   States Trustee.  We booked a hotel room.  We did order soft

23   drinks and coffee.  We did not, though, Your Honor, as I -- as

24   apparently the fee examiner requested keep track of what people

25   had to drink at the meetings.  We didn't that was appropriate

29

1   nor our job.  And we think that that's appropriate and

2   reimbursable.  We have furnished invoices.  Apparently, that is

3   not sufficient for him.  Frankly, we don't understand that.  If

4   the U.S. trustee asked that we book a room and a hotel room, we

5   book it and that's what we do and that's what we do to

6   accommodate the U.S. trustee.  And if we cannot be reimbursed

7   for that, then the U.S. trustee ought to book the rooms itself.

8          The other item, Your Honor, is with respect to an

9   electrical charge of 8600 dollars, electrical services.  And

10  that as we explained and furnished the copy of the invoice to

11  the fee examiner was in connection with the press conference

12  that was held on the filing date in our offices.  And it was

13  held in our offices because Mr. Henderson was in New York that

14  day for the first day hearing so he could be available in this

15  courthouse.  And, therefore, at the request of General Motors,

16  we set up in one of our conference facilities in our firm

17  everything necessary for a press conference and on one of the

18  most important days in the history of General Motors.  And we

19  incurred electrical charges.  We received a bill and we paid

20  them.  We furnished a copy of the bill to the fee examiner and

21  he said well, that's not good enough.  Go back and find out how

22  many man hours were rendered by the electrical service

23  department -- the electrical supply firm and what other items

24  they furnished to us.  We have not done that.  We don't think

25  that's an appropriate use of our time.  We think it's

30

1    appropriately compensable.  Perhaps, Your Honor, we should have

2    told Mr. Henderson and General Motors that, why don't you delay

3    the press conference so we can bid out all these contracts to

4    save money for the estates.  On the most important day in the

5    company's history, Your Honor, we did not think that was

6    appropriate and we think we should be reimbursed for those

7    charges.

8            Again, our responsive pleading we believe has more

9    than adequate addressed all of the issues raised by the fee

10   examiner.  We have agreed to certain adjustments as reflected

11   in that responsive pleading.  And as I mentioned on the record,

12   Your Honor, we have certainly agreed to abide by your views

13   with respect to summer associates as you indicated in the

14   Chemtura case.  And based on that, we would request that you

15   approve our application as so modified.  Thank you, Your Honor.

16           THE COURT:  All right.  Thank you.  Mr. Mayer?

17           MR. MAYER:  Thank you, Your Honor.  Your Honor, Tom

18   Mayer for Kramer Levin, counsel to the official committee of

19   unsecured creditors.  I won't belabor the points that are set

20   forth in our pleading.  I'd like to provide some additional

21   comment in response to some of Your Honor's questions.

22           First, on the big picture, you asked, how do we ensure

23   that the estate is not ripped off and that the people who

24   worked hard are appropriately compensated?  I have some

25   exhibits that I'd like to hand up.  I have shared them with the

31

1    U.S. Trustee's Office.  I have shared them with the fee

2    examiner.  I don't think they have an objection.  I've marked

3    them as Kramer Levin 1, 2 and 3.  They're directional in

4    nature.  I think it may help address some of the Court's

5    concerns.

6              THE COURT:  In substance, they're demonstrative?

7              MR. MAYER:  They are demonstrative exhibits, Your

8    Honor.

9              THE COURT:  You may hand them up.

10             MR. MAYER:  Thank you.

11             THE COURT:  Provide them to anybody else in the

12   courtroom who thinks he or she needs them if you have enough

13   copies.

14             MR. MAYER:  Your Honor, sometimes to the discomfitures

15   of my partners, I'm a believer in benchmarking.  I like to keep

16   track of how we are doing the case versus other cases that we

17   might view as comparable.  Now, of course, there are no cases

18   that are directly comparable one versus another and that is

19   especially true in this case for all the reasons Mr. Karotkin

20   raised them, I won't belabor.

21             Nonetheless, I view certain things as warning flags

22   and certain things that may provide some assurance to the

23   Court.  If the ratio of committee counsel's fees to assets

24   looks out of whack, that's something people need to be

25   concerned about.  And if the ratio of committee counsel's fees

32

1    to debtors' fees looks out of whack, that's something else

2    people need to be concerned about.  Certainly, if they're out

3    of whack I have some explaining to do.  Based on what was an

4    extremely expedited project, we've attempted to provide some

5    directional aides to the Court in anticipation of the question

6    that you raised.

7         Kramer Levin 1 is a study that we asked FTI to do.

8    And, again, these are directional.  This is a study of

9    creditors' committee's fees in several very large cases.  And

10   they're total fees over a total case and that's different from

11   what we have today although I think it's fair to say that what

12   other cases do in a year or two, this case did in forty-five

13   days.  But again, it's the ratios that count.  So, hopefully

14   this will be of some assistance to the Court.

15        And the cases that are dealt with here are Chrysler,

16   Lyondell, Lehman, Delphi, ASARCO, Budget, Adelphia, Enron and

17   ANC.  Lehman, of course, is not an entire case.  But, again,

18   it's the ratios that count.  If you turn to the second page,

19   you'll see that Kramer Levin, as counsel to the -- this is the

20   second page of Kramer Levin 1, as counsel to the committee in

21   the GM case, we're running at about 25 percent of the debtors'

22   fees.  And in the other cases, the ratio is about 35, 36

23   percent.

24        If you look at our fees as a percentage of book value

25   assets, which is an imprecise measure but we try to be

33

1     comparable, there's no comparison, it's a basis point versus

2     thirty-nine basis points.  So, that's Kramer Levin 1.

3          Now, Kramer Levin 2 is something that my own firm did

4     off of fee applications.  And it tries to hone on -- hone in on

5     Kramer Levin --

6          THE COURT:  Pause.  Before you get to Kramer Levin 2,

7     Mr. Mayer, if I were holding a valuation hearing, which we do

8     from time to time, and an expert were being crossed on

9     comparable -- on a comparable analysis and comparable trading

10    values, comparable companies and the like, we might look at a

11    smaller universe and look at the closest comparables.  For

12    that, I don't know, would Chrysler be the closest comparable?

13         MR. MAYER:  Yes, Your Honor, and that's dealt with in

14    Kramer Levin's 2 and 3, in particular.

15         THE COURT:  Okay.

16         MR. MAYER:  We think Chrysler really is the only

17    comparable.  But even Chrysler, where my firm was counsel to

18    the creditors' committee, it's the principal reason why I'm

19    here today, the committee and General Motors felt that we've

20    been through the fire and we could try to do it again.  If I

21    may move to Chrysler for a moment.

22         The fees in GM compare favorably with the fees in

23    Chrysler on a couple of grounds, some of which were shown on

24    this chart and some of which are not.  The cases had similar

25    timelines with this major difference.  In Chrysler, the

34

1    debtors' firms had some chance -- strike that.

2         In General Motors, the debtors' firms had more chance

3    to prepare for the filing.  In Chrysler, there was much greater

4    fire drill immediately before.  My impression was the treasury

5    was very committed to reorganizing General Motors and its

6    decision to reorganize Chrysler wasn't done until fairly late.

7    So, there wasn't the same degree of preparation for Chrysler

8    that there was for General Motors.

9         Also, with respect to General Motors, there's real

10   value going to the folks that are left behind.  It's probably

11   appropriate to talk a little bit, take a step back and talk

12   about functions of committee counsel in these two cases because

13   they're different than they are in the run of the mill cases.

14        There's two sources of value for these cases, for

15   Chrysler and General Motors, for unsecured creditors.  And one

16   source of value is who gets taken along.  Clearly, if the

17   purchaser --

18        THE COURT:  You mean, for instance, by assume and

19   assign for the vendor community?

20        MR. MAYER:  Correct.

21        THE COURT:  The supplier community?

22        MR. MAYER:  Supplier community, two-thirds of the

23   dealers, the Pension Benefit Guaranty Corporations Pension

24   Plan, the modified Retired Medical Benefit Plan for the UAW,

25   there were constituencies here that got taken along.  And

1    there's nothing wrong with that.  That happens in virtually

2    every transaction.  The purchaser decides which liabilities it

3    wants to take along and which liabilities it wants to stay

4    behind.  And there are theoretical, sometimes not so

5    theoretical arguments about how fair that is and whether it's

6    being done for the proper purpose, but that is a fact of life.

7    There are people who are taken along and there are people that

8    are left behind.

9         In Chrysler, the focus of the first forty-five days

10   was on the terms by which people were taken along and there was

11   a lot of work done on that.  What was left behind for

12   creditors, initially, was pretty close to nothing.  For a

13   period after --

14        THE COURT:  Because Chrysler had so much secured debt?

15        MR. MAYER:  There were -- wasn't -- that's an

16   interesting question.  Chrysler's secured debt was

17   disproportionately large as a percentage of its total debt

18   structure.  GM had approximately twenty-three billion dollars

19   of unsecured bonds and a -- my recollection's around eight

20   million dollars of secured debt.  That doesn't always translate

21   into an asset ratio, but GM had raised a lot more money and had

22   spent that money on plant and equipment, etcetera, with respect

23   to unsecured creditors, so it was a different set up.

24        With respect to General Motors, there was a deal cut

25   prior to this case between representatives of the bondholders

1    and the United States Treasury.  We are custodians of that

2    deal.  We did not cut it.  We came into this case and as I

3    think Your Honor knows, we were told there's warrants and stock

4    of New GM that's going to be issued to Old GM for unsecured

5    creditors.  Your job is to make sure that stock gets to

6    unsecured creditors.  That's my job on the second part of this

7    case.  The first part of this case was, A, hoping, trying to

8    make sure that that happened, and B, increasing the number of

9    claims that were taken along.

10            One of the odd dynamics of this case is that the

11    people who were left behind, there wasn't the phenomenon we

12    sometimes see of the crab grabbing the crab that's escaping

13    from the bucket and saying, no, you have to suffer with me.

14    The people who were being left behind, principally bondholders,

15    wanted to see as many obligations go to New GM as possible

16    because it would diminish the dilution that they would suffer

17    if they were left behind.  So, the -- this actually led to a

18    very interesting committee.

19            A committee is down by six members since the sale

20    closed.  We started off with fifteen.  That committee, and I

21    bow to the United States trustee's judgment in this, she put

22    together an extraordinary balanced committee.  The reason that

23    the committee filed what we called a limited objection, if you

24    take a look at it there were certain things that weren't

25    limited at all to the sale, is that there was a majority of the

37

1    committee that was against the sale as originally constructed.

2    Because you had people who were being taken along, people who

3    were being left behind and people who realize they would

4    benefit if more people were taken along.  And everyone who was

5    being left behind was vitally interested in how much money

6    there would be to pay for the expenses of the case.  So, you

7    run short of money, you start raking into our stock and

8    warrants, and that for us is anathema.

9          So, one of the things that was -- that took a lot of

10   time in this case, unlike in Chrysler where the division on the

11   committee was pretty clear, most of the people on the committee

12   were being taken along.  They wanted to see the sale go

13   through.  They wanted to fine tune it here and there.  They

14   wanted to be supportive of the debtors to get the sale through.

15   And the opposition in Chrysler to getting a sale through was

16   much greater.  But the basic value in Chrysler during the first

17   part of the case was just making sure that people got taken

18   along and they got taken along on a fair basis.  Again, this is

19   probably more than you need on Chrysler.  I should probably --

20   unless you're interested in more color.

21        THE COURT:  Well, I had observed that the creditor

22   committee fees as a percentage of debtor fees in Chrysler were,

23   if I read your exhibit correctly, 26.3 and here they're 25.6;

24   that looks pretty close to me.

25        MR. MAYER:  Yes, and I think that that's a fair

38

1    comment.   I mean we personally think that in this case, during

2    one of the conversations with the fee examiner he pointed out

3    that our fees were roughly the same as Jenner & Block's.   And

4    my response to that was, Jenner & Block worked on this case for

5    six months, seven months, prior to the filing.   We had thirty

6    to forty-five days.   That's not fair either.   I mean we've

7    showed that in Kramer Levin 2 where our fees are showed as a

8    ratio of Weil, Gotshal and Jenner & Block's fees including

9    their prepetition work; that's an exaggeration.   A lot of stuff

10   happened prepetition that didn't have anything to do with this

11   case.   It's not easy to back out.   But unlike Chrysler where

12   Jones Day was largely handled -- handed a fire drill and said

13   get this ready immediately, this was a case that was some time

14   in gestation.   There was an exchange offer that didn't work.

15   And that both created a fair amount of legal work for GM's

16   counsel pre-bankruptcy which isn't appropriate to measure us

17   against but also created a fair amount of work pre-bankruptcy

18   that it is appropriate to measure us against.

19         So, I think we are comparable to Chrysler in terms of

20   the level of fees and if you want to take a look at fees to

21   value, clearly GM is a much bigger company than Chrysler.   And

22   the value going to unsecured creditors was much greater both in

23   terms of how much got taken along and how much was left behind.

24         This number is sufficiently in the public domain that

25   I don't have a problem mentioning it here.   The original

39

1    guesstimate as to how much that GM stock and -- New GM stock

2    and warrants were worth.  And this is a nine month old number.

3    It's not material because whatever the circumstance were that

4    gave this number during the negotiations are no longer present

5    today.  But the original guess was that that was six billion

6    dollars of that.

7           Now, I realize, and people think this case is over --

8           THE COURT:  That's the number I used in my opinion, if

9    I recall.

10          MR. MAYER:  I think that that's correct.  I would have

11   to go back and take a look.  That was before Toyota had

12   problems with its accelerators.  I apologize.  In any event --

13          THE COURT:  Would that suggest that it's worth more

14   now?

15          MR. MAYER:  I'm not an investment banker, Your Honor.

16   The auto industry is doing a lot better.  Toyota has its

17   problems.  There's a lot of interest in the stock.  I know I

18   have bondholder representatives who are champing at the bit

19   saying, why the heck aren't we out yet, because they're very

20   eager to get that stock.

21          So, there was a lot of value here.  And I think that

22   the level should also be compared, not just to the increased

23   size of General Motors, but the fact that we were really

24   dealing here with a lot of value that had to be preserved.

25          In Chrysler, we didn't really care too much about the

40

1    transition services agreement, about how the estate was going

2    to be managed going forward.  We didn't have that much at

3    stake.  Here, we had a lot at stake.  Here, we had six billion

4    dollars at stake in addition to all of the agreements that were

5    being assumed and the creditors who were being taken along.

6          So, what Kramer Levin 2 does, is take a ratio of

7    Kramer Levin's fees to debtors' fees in various cases.

8    Chrysler is the most comparable.  The other two, Delphi is the

9    largest auto related case before the major -- the OEM's filed.

10   Dana was probably the second to largest auto parts supplier

11   case before the OE's filed.  It was one we were involved in so

12   the data was readily available.  And we took six month periods

13   in those cases because those were six months leading up to

14   plans which were comparable to the forty-five days that we had

15   to get this deal done.  And, again, these are directional, but

16   I think they may help the Court in getting some handle as to

17   whether or not Kramer Levin in any way took advantage of this

18   estate through the amount of work that we did.  I think the

19   answer to that question is, no.

20         The fee examiner's report, the thing that bothered us

21   and, frankly, bothered our client the most was that it was

22   tinged with a view that there was nothing here for the

23   committee to do and our roles are limited and so what the heck

24   are we doing here anyway.  We completely reject that.  There

25   are hundreds of thousands of creditors out there who are

41

1    depending on the committee to deliver value to them.  We are

2    the only estate fiduciaries on one side of this trade.  That's

3    not meant to be criticism of anybody.  The debtor was

4    legitimately focused on getting the deal done and moving the

5    operations to New GM and saving the business and the United

6    States economy.

7        Granted, we were focused on getting value to unsecured

8    creditors.  Those two are not the same and, frankly, we thought

9    we played a very important role in identifying ways that

10   creditors could realize the maximum from these cases.  That

11   they would not have to worry about having their stock diluted.

12   That as many of them would be taking along a possible.

13       Just to take the most -- the brightest example.  The

14   debtors' had no interest in arguing that New GM should take

15   along as many claims as possible.  We have an interest in

16   making sure that that happened.  We didn't get as much as we

17   wanted and, actually, from time to time we still think about

18   ways we might revisit that issue but that's not for today.

19       The debtors' had agreed on a budget with treasury.  We

20   opposed the sale because we thought he budget was low and we

21   got another 225 million dollars.  In our view, we were

22   materially helpful.

23       THE COURT:  On the wind-down budget you're referring

24   to?

25       MR. MAYER:  On the wind-down budget.  One of the

42

1    specific issues that the examiner raised with our fees was how

2    much we spent on environmental claims.  Your Honor, this case

3    is months behind schedule.  We really hoped we'd have a plan on

4    file now; we'd be looking at the finish line.

5         The reason it's not making progress is the

6    environmental claims.  That's the single biggest stumbling

7    block to getting out of this case.  You've got state after

8    state after state with its hand out saying we need more money

9    for cleanup.  And you've got the debtors' saying you do not

10   need more money for cleanup.  And you have the treasury in

11   between.

12        This is a huge gating item in this case and we have

13   devoted, so far in my view, not a terribly large amount of

14   resources to being involved in this matter.  Well, we're going

15   to be involved more going forward because without fixing this

16   problem, we can't get out.  So for the examiner to say that we

17   just, sort of, sat back and, you know, read the occasional memo

18   from Weil, Gotshal, I don't think is correct.  I've been in

19   other cases with large environmental claims.

20        In the ASARCO case, I represented two bondholders that

21   had 300 million dollars of unsecured claims.  I had a committee

22   in that case, you had the debtors' -- you had all sorts of

23   people.  And yes, we were trying to make a bid for control of

24   the company through the plan but we were also looking at other

25   people, in effect, buying our company from us.  We ended up

43

1    spending five million dollars on environmental claims because

2    there was a billion three of un -- of environmental claims in

3    that case.  Fortunately, most of them unsecured.  It was a

4    dilutive matter rather than an administrative expense matter.

5         In the Dana case, there was a 300 million dollar

6    claim, unsecured claim, came out of the woodwork at the last

7    minute.  And we had to spend several hundred thousand dollars

8    on that.  This case -- the biggest single item in the wind-down

9    budget by far -- and I don't believe that number is public --

10   is a reserve for environmental claims.  We have to bring this

11   case in under that reserve.

12        So I really take issue with the examiner's view that

13   the committee should not have spent resources -- the estate's

14   resources on the environmental claims.  That is a critical item

15   in this case.

16        Since I'm ticking through some of the examiner's

17   points, the examiner wanted to reserve rights with respect to

18   our collateral review.  I don't understand that.  Collateral

19   review is something that creditors committee has to do.  It's

20   not an option.  You don't come into a case with eight billion

21   dollars of secured debt and say gee, I guess I won't look at

22   their lien structure.  You have to do that.  It's --

23        THE COURT:  But don't I have the billion dollar

24   adversary before me that involves disputes as to collateral?

25        MR. MAYER:  Yes, you do, Your Honor.  And I don't want

44

1    to take credit where no credit is due.  In fairness, one of the

2    banks counsel called me up early in the case and said this is

3    what you're going to find.  We don't think it has any material

4    difference to the case but you're going to find that we filed a

5    UCC 3 releasing the lien with respect to a billion five of

6    collateral.  In our view, it wasn't authorized, it was a

7    mistake, it has not effect.

8         Well, the first thing you do when you get that call is

9    you look hard to see if there's anything else.  The amount of

10   money we spent reviewing the GM collateral was not out of line

11   with respect to Chrysler.  And GM is a much bigger company.  So

12   as an absolute matter, the amount we spent, frankly, was

13   trivial to the dollars of liens we were looking at.

14        But second, we were looking hard because there was

15   already something to look at.  Your Honor, conflicts counsel

16   has taken over.  There are forty financial institutions

17   involved in that lawsuit and I think you'll have an interesting

18   hearing on summary judgment and I don't think we need to get

19   into the merits.  That's not a trivial action.

20        Butzel Long has done an excellent job of taking the

21   ball from us because we got to a point where there were going

22   to be conflicts after we did our review.  We have waivers in

23   place to review these matters but not to litigate them.  And

24   that's why we have Butzel Long's conflicts counsel.  They are

25   litigating. It's a billion five.  You don't turn your back on a

45

1    billion five.  I think it's an interesting lawsuit.  I won't go

2    further.

3           We agree with Mr. Karotkin that a five percent across

4    the discount -- there's no basis for it in the law.  The fee

5    examiner, I think, believes that it would be appropriate

6    nationwide for people to start taking five percent discounts

7    because the reason he gave in his response was that it will

8    encourage discounts in other cases.  I don't think that's a

9    justification for discount here.

10          Frankly, Your Honor, if this were a completely private

11   transaction and attorneys for the seller and perhaps the

12   seller's independent board of directors -- which in a way is

13   what a creditors committee is in a circumstance like this.  We

14   were involved in a transaction involving 130 billion dollars of

15   book value assets, nobody would be billing at a hundred percent

16   of time.  There wouldn't be a discount applied to those fees.

17   There would be premiums paid.

18          Nobody's asking for a premium in this case.  There's

19   enough trouble in the world.  But I reject the examiner's view

20   that the circumstances of this case indicate that a discount is

21   appropriate.  I just don't think that's right.  I don't think

22   there's a basis in the law for it.

23          With respect to the summers, we'll follow Weil,

24   Gotshal's lead.  We don't have a problem with writing off the

25   summer associates.  With respect to associates not yet admitted

46

1    to the bar, Your Honor, people come to work for us right out of

2    law school.  Some of them have already taken the bar; some of

3    them take the bar six month later.  The moment they hit our

4    offices, they're working.  They're being billed at the same

5    rates, they're being -- they're certainly collecting salary and

6    bonus at the same rates.  They are treated as associates.

7    Hopefully, they pass the bar immediately.  Every now and then,

8    that doesn't happen.  But they function as lawyers for who m

9    other clients pay standard rates.

10          And with respect to your earlier question of Mr.

11   Karotkin, the rates I charge to this estate or Chrysler are the

12   same rates I charge to my other clients.  I actually had, as it

13   turns out, in another case, a major case -- I believe this is a

14   matter of public record in the Netherlands.  The Dutch trustee

15   in the Lehman case sought to retain Kramer Levin or another

16   firm and asked us whether we would be prepared to take a

17   discount on our rates and I said no.  I said you're going to

18   require our full attention.  We're going to be providing what

19   we believe to be service that is worthy of the hire and we

20   don't believe in discounting our rates.  We think our services

21   are very much in demand.

22          And this is -- anecdotal.  I had to resign from

23   various representations to take this one.  I left some very

24   unhappy clients in connection with, for example, General Motors

25   Acceptance Corporation.  And not that this is relevant to

47

1    anything really but in January of '08, I followed a number of

2    my clients in buying, as a personal investment, notes of

3    General Motors Acceptance Corporation and when this company

4    filed, I had to sell them at a substantial loss because I

5    couldn't figure out a way to justify representing the official

6    committee of GM and still hold GMAC paper.  So I took a

7    personal loss on that matter.  It's not -- it's all in our

8    affidavit of disinterestedness.  I don't think a discount

9    across the board is appropriate.

10        I want to deal with what are, to me, the toughest

11   parts of the examiner's -- fee examiner's report.  Well, let me

12   deal with one thing -- I mean, there are certain things --

13   other things in the examiner's report which I think are

14   misguided.  I've never been on a case where someone said to me

15   give me your Westlaw and Lexis contracts.  These are the same

16   contracts we have with respect to all of our clients.  We never

17   pass -- do anything but pass through the exact charges.  If we

18   get discounts, we pass through the discounts.

19        There are confidentiality agreements covering these

20   agreements.  I don't -- I've never seen, in any case I've ever

21   been in, the fee examiner say we want the Court to enter a

22   protect order so we can get your contracts with vendors and

23   audit them.  At some point, I think the expense of complying

24   with this kind of investigation, outweighs the benefit that is

25   intended to be provided to the estate.

48

1          Which leads to -- neatly, to the next topic which is

2     the toughest one and that is the examiner's comments on block

3     billing and vague entries.  We believe he -- that there were a

4     could of firms that were subject to the auditor's review, which

5     were us and Jenner & Block, which may have contributed to the

6     detail of the examiner's complaints.  Your Honor was a

7     practicing lawyer.  I'm not going to defend every entry that my

8     colleagues have entered except to say, as Mr. Karotkin did,

9     that when you have thirty days from retention to sale and

10    forty-five days from retention to closing -- forty-two days

11    from retention to closing -- the point about block billing and

12    vague time entries is to make sure that you don't have lawyers

13    who are filling the idle hours by putting down a lot of time.

14         Nobody had idle hours in this case.  Every day you

15    came to work there were new documents.  There were new drafts.

16    We provided real-time reports to the creditors committee which,

17    as I said, was very finely balanced between do we support, do

18    we oppose.  We provided real-time reports on progress on the

19    documents.  We found forty-eight material issues to report to

20    the committee on and progress every day.  There were leases

21    that had to be reviewed, every day.  This was something that we

22    had to look at every day and we don't think that these

23    issues -- we think that some of the block billing complaint are

24    misguided.  We think some of the vague -- the comments of vague

25    communication are just wrong.

49

1          In the short time allowed, we have tried, at

2     considerable expense, and I don't know who'd going to end up

3     bearing that, to try to respond in part to the examiner's

4     concerns about block billing and vague time entries.  Given

5     additional time, I suspect we can account for even more of the

6     entries that we dealt with.  The one thing I'm certain of is

7     that this Court doesn't want to spend its time going through

8     entry by entry.

9          So, we think that under the circumstances of the first

10    forty-five days of this case, the rules on block billing and

11    the request for additional specificity on time entries -- we

12    think that they should be relaxed given the unique

13    circumstances of the case.  I don't have authority to cite to

14    you that says that the law requires or urges that you do that

15    but I do ask that you consider what you've seen before you and

16    determine whether you believe a twenty-five percent across the

17    board cut in time spent, actually spent, is appropriate given

18    the pressure of the case.

19         Under future applications, yes, we need to do better

20    than we did in the first forty-five days and I'm not quarreling

21    with that.  Part of the problem is that you throw a lot of

22    corporate and real estate people at a problem and they don't

23    have the same discipline as the bankruptcy people; but that's

24    my problem, that's nobody else's problem.

25         Finally, with respect to he holdback.  I'm here asking

50

1    for allowance of Kramer Levin fees.  Interim allowance because

2    there is always, of course, a final allowance.  I'm asking for

3    interim allowance of the Kramer Levin fees with the exceptions

4    noted; that is the summer associates we think should be taken

5    off.  There're a couple of other minor things that should be

6    taken off.  And we think our fees should everybody allowed.

7    And we agree that ten percent -- half of the twenty percent

8    holdback should be paid.  We are not asking that Kramer Levin

9    be paid the balance today.

10          I've talked to the committee about this and, again,

11   the committee's view is that it is paramount importance that

12   the stock and the warrants get to creditors and that

13   administrative expense claims not be an obstacle to that.  And

14   as I said --

15          THE COURT:  Am I correct that if this case somehow

16   were to go administratively insolvent the 1145 exemption would

17   be in jeopardy and your clients or your constituency's ability

18   to trade the bonds and warrants could be materially impaired?

19          MR. MAYER:  Basically, yes, Your Honor.  If I may

20   adjust it somewhat, given how much value there is in the stock

21   and warrants, as a technical matter, the estate will never go

22   administratively insolvent but to the extent the cash that's

23   left behind is inadequate to pay priority administrative

24   expense claims, yes, we'd have to figure out how to sell the

25   stock to raise money.

51

1          Nobody wants to think about it.  It won't be an 1145

2     transaction.  It would be a private placement.  We don't want

3     to go there.  And as I've said to my partners and FTI fully

4     understand this, as I said to Your Honor when we were dealing

5     with Evercore, if this case ends up having to sell stock to pay

6     admin, from our perspective it's a failure and all the

7     professionals are going to be subject to extreme scrutiny.

8          And for that reason, we are not asking for that last

9     ten percent to be paid to us today.  We think that's

10    appropriate to be held back.  But we also think we have a real

11    role to play in getting this case out sooner rather than later

12    and getting it out without invasion of that stock and getting

13    it out without too much dilution.

14         All of these things, we really care about and I don't

15    want to go Richard Nixon on this but I do get calls from the

16    little old lady whose SUV blew up in her home and her insurance

17    company settled with GM and got money and GM called her for

18    years saying we want to settle with you but never quite did and

19    then they filed.

20         She's not the worst.  There are people who, Your

21    Honor -- there are people who've claimed that they died or were

22    injured for GM claims.  But they call us.  This was a widow and

23    orphan bond, Your Honor.  Yes, there are large funds out there

24    who hold major lots but GM bonds were bought by everybody.

25    Heck, GMAC bonds were bought by people like me.  They call.

52

1    That's our constituency.  We talk to them.  I don't think the

2    examiner talks to them.  Thank you.

3            THE COURT:  All right.  Thank you.  Next.  Mr.

4    Eisenband is it?

5            MR. EISENBAND:  Yes.

6            THE COURT:  Yeah.  You're FTI if I'm not mistaken.

7            MR. EISENBAND:  Excuse me, Your Honor?

8            THE COURT:  You're FTI.

9            MR. EISENBAND:  Yes, I am.

10            THE COURT:  Okay.  At this point, I've heard fairly

11    extensive presentations from Weil and Kramer Levin so I want

12    you to give due regard to that and try as hard as you can to

13    focus on issue that are unique to FTI, if you would.  Go ahead.

14            MR. EISENBAND:  Thank you, Your Honor.  Michael

15    Eisenband, from FTI, financial advisor to the committee.  And I

16    will comply with that because what I will address is really a

17    singular objection of the fee examiner to FTI.  One that we

18    think is both flawed and illogical.

19            FTI's fee structure was one that, for the first five

20    weeks -- approximately five weeks of the case until the 363

21    sale, we had an hourly fee structure.  And subsequent to the

22    363 sale, our fee structure is fixed in nature, 750,000 dollars

23    per month for the first three months, 500,000 dollars per moth

24    after that with a completion fee.

25            The fee examiner has objected to a certain number of

53

1    hours that we -- that FTI has spent preparing our retention

2    documents and fee preparation.  The issue that they find are

3    the hours that we spent during the fixed fee portion of our fee

4    structure.  We explained to the fee examiner that their

5    objection was both illogical and flawed for several different

6    reasons, primarily because it is a fixed fee structure.

7          A few points that I'd like to make on it.  During our

8    hourly fee period, FTI's hourly -- average hourly rate was

9    approximately 588 dollars per hour.  Now, while we billed

10   subsequent to July 9th on a fixed fee basis, one could take the

11   total fixed fee, divide it by the number of hours that we

12   recorded and one would come to an average hourly of 475 dollars

13   per hour, a full 112 dollars per hour less than what we were

14   charging when we were billing on an hourly basis.

15         If one was to eliminate one hundred percent of all of

16   the time that FTI spent during the fixes fee portion of their

17   structure from fee preparation and retention documents, the

18   average hourly would be approximately 540 dollars, still below

19   what the average hourly was when we were billing on an hourly

20   basis.  FTI considered simply amending its fee application.

21   And -- the number of hours, actually, that the fee examiner

22   said we went over, a five percent of the total for the entire

23   period, was approximately 321 hours.

24         FTI contemplated simply filing an amended application

25   withdrawing the 321 hours.  We thought that would certainly

54

1  prove the point because we're on a fixed fee structure; there

2  would be no deduction from our fees.  But FTI didn't think that

3  was necessarily the right way to go.  We spent the hours; we

4  wanted to come to the Court and explain the position.

5       A couple of other points just on that to explain the

6  point.  If FTI was to have recorded an additional -- any number

7  of hours, one hour, ten hours, on non-fee preparation time, FTI

8  would not be paid for that.  However, if nothing else changed

9  but FTI was to charge just one additional hour to fee

10 preparation, the fee examiner would actually object to an

11 additional 588 dollars.

12      So, in an extreme example, if FTI would've spent 2,000

13 more hours during the fixed fee portion -- 2,000 more hours

14 which would've -- if you would've computed an average hourly,

15 it would have been below 300 dollars an hours, the fee

16 auditor -- the fee examiner still would've looked at it and

17 said well, as a percent of the total hours, you spent too much

18 time on fee preparation, fee retention, we're proposing a

19 reduction.

20      And lastly, I'd just like to point out that the whole

21 nature of a fixed fee billing structure is one that you're not

22 billing on an hourly basis.  So, to the extent that FTI or any

23 firm tat is billing on an hourly basis -- billing on a fixed

24 fee structure, it's the value of the services that we're

25 providing.  The fee examiner had no issue on the value of

55

1   services and, I think, when you look at the value, again,

2   during the fixed fee portion, we didn't bill hourly and the

3   average hourly, if you would just go in and compute, total fees

4   divided by total hours came to 475 dollars and hour.

5        Implicit in that is FTI billing lower than it would

6   have if we were billing on an hourly basis.  And to just

7   compute, the 321 hours is the number of hours the fee examiner

8   said FTI was in excess of the five percent.  If you would have

9   taken that and times it by the 588 dollars per hour, it

10  would've been an addition 480,000 dollars to the estate.

11       And -- I'm sorry, lastly --

12       THE COURT:  You mean the estate would've had to pay

13  that extra if you didn't have the fixed fee arrangement?

14       MR. EISENBAND:  Exactly.  If we would have stayed on

15  an hourly basis --

16       THE COURT:  I got you.

17       MR. EISENBAND:  -- it would have been close to a half

18  a million dollars more.  Additionally, while we don't buy into

19  and we think the fee examiner's logic is -- there is no logic

20  to it; it's flawed.  I would say that they computed it

21  incorrectly even if they were going to compute that because

22  they're objecting to 321 hours.  As I said before, our average

23  hourly, if you just did the computation --

24       THE COURT:  Well, Mr. Eisenband, let me interrupt you.

25  Stick to the broad concepts.  I understood your concept about

56

1    it being a fixed rate.  So, I'm wondering if this point in

2    cumulative.

3            MR. EISENBAND:  Excuse me, Your Honor?

4            THE COURT:  I'm wondering if your last point in

5    cumulative.

6            MR. EISENBAND:  Yes.

7            THE COURT:  Okay.  So, anything else you have?

8            MR. EISENBAND:  Yes.  The only last thing is that if

9    you were going to compute it, under the fee examiner's logic,

10   you would use 400 -- at a minimum or at a maximum you would use

11   the 475 dollar rate not the 588.  But to exacerbate the issue,

12   the FTI employees that work in our fee preparation and

13   retention documents are the lower level employees and if you

14   were going to actually put an average hourly rate on it, if you

15   would look to the hourly portion of the first five weeks,

16   you'll notice that the average hourly of the lower employees

17   are more in the 300 dollar range.

18           THE COURT:  Okay.  Thank you.

19           MR. EISENBAND:  Thank you, Your Honor.

20           THE COURT:  All right.  We'll take -- we're been going

21   for almost an hour and a half.  We'll take a ten minute break

22   and then I'll hear any of the others who feel like they need to

23   supplement what they said in their papers.  We're in recess

24   until 11:20 upon the clock there.

25           (Recess from 11:08 a.m. until 11:17 a.m.)

57

1          THE COURT:  Have a seat, please.

2          Folks I have some concerns that the additional

3     professionals might not be -- need to speak as much as the

4     first couple did.  And I have concerns about our ability to get

5     everything done today if we spend a lot of time getting into

6     some fairly detailed things, detailed numbers and the like.

7          I'm not going to put a sock in everybody's mouth but

8     I'm putting you on notice now, first, that I have a conference

9     call on another matter that's going to keep me off the bench

10    between 3:30 and 4 and, second, that if you want a decision

11    from me today or tonight, while I can work as late as I did

12    during the first six weeks of this case, I don't know if you

13    guys want to sit around that late for a ruling.  So I would

14    encourage you to use some self-discipline in your remarks

15    supplementing things.

16         Obviously, this doesn't apply to the fee examiner who

17    I would expect will want to respond, in length, to everything

18    that's been said.  But for those other than Weil and Kramer

19    Levin, I would -- not order but invite you to show some self-

20    discipline.

21         Okay.  Next professional.

22         MR. WEISS:  Good morning, Your Honor.  Robert Weiss on

23    behalf of Honigman Miller Schwartz and Cohn.  And I think my

24    presentation will be a perfect segue to the Court's remarks.

25    We've had a dialogue with the fee examiner's counsel.  We

58

1    are -- accept the reductions that are proposed by the fee

2    examiner and unless the Court has any questions, I have nothing

3    further to say and we rely upon our filing.

4         THE COURT:  Very well.  I don't.  Thank you very much.

5         MR. WEISS:  Thank you, Your Honor.

6         MR. TROSTLE:  Good morning, Your Honor.  Patrick

7    Trostle from Jenner & Block.  We are special counsel to the

8    debtors.  Like the prior professional, we also have been in a

9    dialogue with the fee examiner.  We have accepted the

10   recommendations for reduction from the fee examiner so we have

11   no objection here today.

12        THE COURT:  Very well, thank you.  Mr. Seidel?

13        MR. SEIDEL:  Good morning, Your Honor.  Barry Seidel,

14   Butzel Long.  Butzel Long is special counsel to the creditors

15   committee in this case.  We have had discussions with the fee

16   examiner and have reached agreement as to all points save for

17   one.  And as we mentioned in our reply we filed a couple of

18   days ago, we have a dispute as to whether or not the fee

19   examiner's recommended five percent cap on

20   retention/compensation matters is appropriate.

21        It's particularly inappropriate with respect to Butzel

22   Long because during the fee period, we had little to do.  We

23   assisted the committee with respect to supplier issues which

24   was part of our mandate and that was over fairly quickly.  As

25   Your Honor knows and as Mr. Mayer remarked, we are handling an

59

1    adversary proceeding to try to recover a billion and a half

2    dollars for the estate and that work has only started in the

3    second fee period.

4            So the question I ask is what should it cost to get

5    retained and what it should it cost -- what's reasonable to

6    prosecute a fee application?  And as my reply suggests, it's

7    not a percentage issue with respect to any particular

8    professional, it costs based on, it would seem to me, the

9    average of similarly situated professionals, roughly 40,000

10   dollars.  Eighty to a hundred hours to get retained and maybe

11   twenty-five or fort hours to prosecute the fee -- monthly fee

12   statements and fee applications.

13           And Butzel Long comes in at about 40,000 to get

14   retained and 15,000 to get paid.  A total of 55,000 dollars of

15   which the fee examiner wishes to reduce that about by 44,000.

16   So roughly we're asking for 230,000 dollars in fees.  Applying

17   a five percent cap, that would equal about 11,000 dollars, Your

18   Honor.  And the difference between the 55 that it actually

19   costs and the 11 that is the five percent is the 44,000 that

20   remains in dispute.

21           THE COURT:  All right.  Thank you.

22           MR. SEIDEL:  Thank you, Your Honor.

23           MR. WALSH:  Good morning, Your Honor.  Brian Walsh of

24   Bryan Cave on behalf of Evercore Group.  Your Honor, I want to

25   heed your several admonitions this morning to keep it brief.  I

60

1    think the fundamental issue between the fee examiner and

2    Evercore is whether this hearing ought to be adjourned as to

3    Evercore.  We don't believe that would be appropriate.

4         The fee -- the principal fee -- the transaction fee

5    was earned when this transaction closed in July.  Evercore's

6    engagement concluded at that point.  Evercore's not providing

7    for the services to the estate at this point.  After that

8    point, there were lengthy negotiations with representatives of

9    the creditors because Evercore's engagement was not approved by

10   the Court until October -- late October of last year, long

11   after the work had concluded, all the facts were on the table

12   about the work that Evercore had performed and the value that

13   it had provided.

14        At that point, the payment of the fee was restructured

15   so that 4.33 million dollars of the transaction fee, payment

16   will be deferred until confirmation of a plan that meets

17   requirements set out by the creditors' committee.  Mr. Mayer

18   referred to the negotiations with Evercore in his presentation

19   earlier today.

20        The creditors, at that time, had the benefit of

21   hindsight.  They negotiated modifications that they believed

22   sufficient to protect their interest in the estate.  Evercore

23   is not asking to be paid on terms any different than what it

24   previously negotiated, but there's no reason for those fees not

25   to be allowed at this point, subject to the previously

61

1    negotiated payment contingency.  Given the unusual procedural

2    posture here, we don't think it's appropriate that Evercore be

3    left in limbo when it is not providing further services, has no

4    ability to affect the course of this case going forward.

5            Your Honor asked the parties to address how do we

6    ensure fairness on one hand, to the estate, and on the other

7    hand, to the professionals.  In the circumstances we have here,

8    I would suggest to the Court that honoring the restructured fee

9    previously negotiated with full knowledge by the relevant

10   parties-in-interest, would be the way to ensure fairness to

11   both of those parties.  Other than that issue, Your Honor, I'm

12   happy to rely on what we've put in our papers, unless the Court

13   has any questions at the moment.

14           THE COURT:  No, I don't.  Thank you.

15           MR. WALSH:  Thank you, Your Honor.

16           THE COURT:  All right.  I've given everybody who

17   needed a chance to be heard orally an opportunity to --

18           MR. KAROTKIN:  Pardon me, Your Honor.  I believe the

19   Claro Group is on the phone.

20           THE COURT:  Claro?

21           MR. KAROTKIN:  Yes.

22           MR. DEEMS:  Yes, Your Honor.  This is Douglas Deems

23   for the Claro Group.

24           THE COURT:  Yes.  Mr. Deems, do you want to tell me

25   first -- of course I'm going to want to hear the fee examiner's

62

1   perspective as well -- as to the extent -- after you provided

2   additional information to the fee examiner, which may have been

3   after the fee examiner objected and after you filed your

4   pleading, you still have differences?  I did notice that the

5   amount that the fee examiner wants to chop, which I recall may

6   have been as high as 44,000 bucks, was a pretty major portion

7   of your fee app, which as I understand it, was for providing

8   environmental services to help the debtors address their

9   environmental responsibilities.

10         MR. DEEMS:  Yes, Your Honor.  It was even after -- I

11   received an e-mail last night from counsel for the fee

12   examiner, agreeing to withdraw their additional objection to

13   our suggested evidence.  But by my math, the reduction that

14   remains around 35,000 dollars, so it still remains almost

15   twenty percent of our fee application.  And so, yeah, we do

16   have a substantial difference, and primarily relating to the

17   issue of what is perceived to be a failure to bill in point --

18   in tenths of an hour, which amounts to probably 22,000 of the

19   34,000 at issue.

20         THE COURT:  Right.  Now, Mr. Deems, how many -- how

21   often had your firm been involved in bankruptcy cases before

22   this one?

23         MR. DEEMS:  Well, the professional -- we don't work in

24   the bankruptcy context at all.  We've done it once or twice

25   before, Your Honor.  But it's not a regular part of our

63

1    practice.

2            THE COURT:  Um-hum.

3            MR. DEEMS:  So I believe that we followed your initial

4    comments about those who really don't operate in this world.

5            THE COURT:  Tell me about that once or twice.  Were

6    you then subject to the requirements for tenth of hour time

7    recording?

8            MR. DEEMS:  In that case, it was different set of

9    professionals involved.  And I don't believe we were in that

10   case.  But I, you know, to be honest, I'm not a hundred percent

11   sure, Your Honor.

12           THE COURT:  Um-hum.

13           MR. DEEMS:  There's only one other matter that I can

14   recall where we submitted our billing to the bankruptcy court.

15           THE COURT:  All right.  Further points you want to

16   make?

17           MR. DEEMS:  Yeah, the only thing that I would say,

18   Your Honor, that's not perhaps clear in our papers, is the

19   value that we provided to the estate was unique, and that

20   because we had particular expertise and knowledge about these

21   sites prebankruptcy, the estate got substantial value from

22   getting us involved, because they didn't have to get the other

23   environmental professionals up to speed about these sites.  We

24   generally knew about the sites and were able to sort of

25   leverage that knowledge.  And I just want to make sure that in

64

1    deciding or making a decision on our fee application, that it's

2    recognize.  Because I think that resulted in thousands if not

3    hundreds of thousands of dollars of savings to the estate in

4    this first application.

5            THE COURT:  Okay.

6            MR. KAROTKIN:  May I be heard briefly on the --

7            THE COURT:  Yes, if you want, Mr. Karotkin.

8            Mr. Deems, you willing to yield to Mr. Karotkin?  Mr.

9    Deems?

10           MR. DEEMS:  Yes, Your Honor.

11           THE COURT:  Are you willing to yield to Mr. Karotkin?

12           MR. DEEMS:  Absolutely.

13           MR. KAROTKIN:  Just very briefly, Your Honor.  On

14   behalf of the debtors, the Claro Group -- let me just go back a

15   minute.  As Mr. Mayer indicated, the environmental claims are

16   perhaps the major item -- gating item for a plan.  What he said

17   was absolutely correct.  And in addressing this issue with the

18   United States Treasury, the United States EPA and the states,

19   Claro is instrumental in this process in trying to come with

20   the appropriate estimates of the cleanup costs.  And they are

21   vitally involved.  And from the debtors' perspective, the

22   services that they have provided are really invaluable to

23   moving that process forward.

24           THE COURT:  All right.  Thank you.

25           Okay.  Am I correct that you're now done, Mr. Deems?

65

1        MR. DEEMS:  I am.  Thank you, Your Honor.

2        THE COURT:  Okay.  Is it now time to give the fee

3    examiner's counsel an opportunity to be heard -- or the fee

4    examiner himself?

5        Mr. Williamson, good morning.

6        MR. WILLIAMSON:  Good morning, Your Honor.  Thank you

7    very much.  For the most part, this morning, I will speak for

8    myself, but several of my colleagues from Godfrey & Kahn are

9    here and will be able to address individual components that

10   have been raised by counsel for interested parties.

11       Let me start, Your Honor by noting how struck I was by

12   the points of agreement this morning.  Of course this case was

13   extraordinary.  Of course the professionals were skilled, added

14   value, worked long, long hours.  That's not in doubt.  I think

15   the one constant in cases that involve a fee examiner is

16   criticism.  I did not take this assignment thinking that it

17   would be a popularity contest, because if I had, I know that I

18   would have lost the popularity contest.

19       THE COURT:  I share your seat in that regard, Mr.

20   Williamson.

21       MR. WILLIAMSON:  Some cases, Your Honor, where there's

22   been a fee examiner, the examiner has been criticized for

23   focusing on the trees not the forest.  What we've tried to do

24   is to focus on the forest.  But to do that, one needs to look

25   at the trees.  And with the assistance of Stuart Maue, we've

66

1    looked at all the trees, including an electrical bill,

2    including a 24,000 dollar hotel charge that has an invoice

3    which merely says "miscellaneous".

4         But we've really tried to get at the value, because

5    that word is embedded in the code, as Your Honor knows.  And

6    the value provided by the professionals here was extraordinary.

7    And to the extent that we have quarrels and disagreements, they

8    are not between counsel for an interested party and the fee

9    examiner, they're about the statute and the U.S. Trustee's

10   guidelines and the local rules of this court.

11        We wrote that memorandum, Your Honor, not for your

12   benefit, because it surely was gratuitous in that sense, but

13   because even at first blush, in those early days in January and

14   February, it was clear to us that for reasons good and not

15   good, the professionals in this case, with some exceptions, did

16   not follow the U.S. Trustee guidelines or the local practices

17   of this court -- the court at large, in the case of the

18   Southern District of New York.

19        We looked at fourteen individual applications, Your

20   Honor, and provided the Court with fourteen individual reports.

21   We have also tried to pull some threads together.  And one

22   reason that we hope this Court will take a bit of time to

23   render its decision, is because we think there is guidance

24   needed on some of these generic points.  Administrative

25   overhead, block billing, keeping time in increments, the entire

67

1    spectrum of questions about expenses.

2         Your Honor, the issue is not where a lawyer from

3    Detroit ought to stay when he's in Manhattan.  She can stay

4    wherever she likes.  The question is, who should pay for it.

5    And that basic question, who should pay, applies across the

6    board, whether we're talking about car services or computer

7    research.  Some firms, for example, in this case, don't charge

8    for computer research.  Others do.  I think that having the

9    contracts, just to pick one item, would help us collectively

10   understand if there's a better way than firm-by-firm, incurring

11   125,000 dollars in computerized research.  Perhaps there's no

12   other way, but as I see my assignment, it's to look for larger

13   issues, not just micro but macro.  The other reason --

14        THE COURT:  Pause, please, Mr. Williamson, because you

15   raised a provocative thought, but I am trying to get my arms

16   around it in terms of what might be a lack of uniformity as

17   between different professionals in, by way of example, how they

18   charge for computerized research.  It's my impression that if

19   there were a case of the Second Circuit, or something binding

20   on me, I'd know about it.  And I also think if there were a

21   case in the Southern District that had ruled on it, kind of

22   like I ruled on summer associate time in Chemtura, with

23   people's memories, they would bring it to my attention.

24        So I think the question is, is that something, in your

25   view, that I should do by a ruling now, or query whether it's

68

1    something that would be -- if we're going to lay out a rule for

2    the future for the financial community or bankruptcy community

3    to follow, whether it might be better for the Court to

4    implement guidelines on that subject, or a local court rule,

5    rather than me kind of issuing a ruling -- hopefully it

6    wouldn't be arbitrary, but it wouldn't have the benefit of case

7    law -- for the financial community to know going forward?

8              MR. WILLIAMSON:  Your Honor, I think either course

9    would be appropriate and productive.  But one of the reasons we

10   don't have a decision from the Second Circuit or from the

11   district court is precisely because these issues haven't been

12   addressed explicitly in a somewhat adversarial setting.

13             Now, you used the world provocative, Your Honor.  In

14   some ways, I think that's part of my assignment, is to raise

15   issues in a way, civilly, respectfully, and professionally,

16   that need to be raised in the context of a case that is not

17   only huge in terms of billions of dollars; but everyone in this

18   courtroom knows that the decisions of this Court, this

19   particular Court, don't apply outside the four walls.  But it

20   would be naive to think that this case and the conduct of

21   professionals, fee examiner, the Court, the U.S. Trustee, are

22   not being watched across the country, because they are.

23             And I don't happen to think that lawyers in New York

24   have a corner on skill or wisdom -- or judges for that matter.

25   But I do know that there are awfully sophisticated judges in

69

1   this city, and awfully sophisticated lawyers who practice

2   before this Court and other courts.

3        The other reason that I hope the Court doesn't keep

4   itself up at night -- tonight, or the professionals, is because

5   we've agreed, and I believe the U.S. Trustee concurs, that

6   every single professional should get half of the amount held

7   back, right now.  And Mr. Stenger, the CEO for Motors

8   Liquidation, is in the courtroom.  If he brought his checkbook

9   with him, he can write checks to every single professional for

10  half of the amount of the holdback.

11       THE COURT:  Pause, please.  Are you talking about the

12  delta between the amount authorized on the interim fee order

13  that was entered early in the case, as compared and contrasted

14  to the ten percent holdback that Mr. Velez-Rivera and his

15  colleagues have asked me to do?  Or in other words, I was under

16  the impression that the U.S. Trustee wants a ten-percent

17  holdback of everything.  But -- and I'm not sure if you're

18  talking about something where you're not on the same page with

19  the U.S. Trustee's Office or whether there is another delta

20  between the amount whose payment was authorized without fee

21  app, on a monthly basis.

22       MR. WILLIAMSON:  Your Honor, I think we're on the same

23  page, but I will not speak for the U.S. Trustee, only for

24  myself.  If the XYZ firm has received eighty percent to date,

25  and that eighty percent leaves twenty percent or 500,000,

70

1    simply to pick a number, unpaid, my belief is that half of the

2    unpaid amount can be paid today.  And part of the reason for

3    that is simply because this Court's jurisdiction over fees is

4    forever.  And it continues from this hearing to the next to the

5    next and to the final.

6           THE COURT:  I think I'm with you now, Mr. Williamson,

7    but forgive me if I take a minute to make sure.  So subject to

8    the particular objections you've made, an attorney -- if I, by

9    way of example, were to have overruled every single one of your

10   objections -- something which isn't realistic, but which I say

11   for the sake of discussion -- a professional could be brought

12   up to ninety percent, the way you see it?

13          MR. WILLIAMSON:  Correct.

14          THE COURT:  Okay, continue, please.

15          MR. WILLIAMSON:  Let me turn, now, Your Honor, to what

16   may be the most contentious point of disagreement, and that's

17   the five-percent recommended adjustment.  First, let me be

18   clear that all of our language in this courtroom is precise.

19   It's not across the board.  It does not apply to FTI.  It

20   doesn't apply to the Claro Group.  It applies to the firms --

21   one for the debtor, one for the committee, that have requested

22   the most substantial amount of money.  And there are three

23   bases -- generic bases for the recommendation.

24          The first is that other professionals in this case

25   have given discounts.  The second is that in terms of blended

1   hourly rates for partners and associates, there is a dissonance

2   between those two firms and all of the other law firms.  We can

3   provide specifics.  I didn't think that was appropriate in this

4   setting.  But there is a significant difference.  The third is

5   really the nature of the case.

6            And counsel for the debtors and counsel for the

7   committee have spoken eloquently about it.  I have said

8   countless times and no doubt will continue to say, we weren't

9   here, and we can't fully appreciate the dimensions of this

10  case, particularly in the first six weeks.  But we have done

11  everything humanly possible to factor all of that in.  And the

12  fact is, this case does involve the American economy.  It does

13  involve, directly or indirectly, the American taxpayer.  And

14  the odds of an administrative insolvency, which certainly go

15  into my rates in a Chapter 11, shouldn't be a factor here.  And

16  if they are, we can make an adjustment later.  But it strikes

17  me that if some firms, whether motivated by altruism, self-

18  interest, are giving a modest discount, that it -- that's part

19  of the marketplace too.

20           Now, the debtors' counsel, the committee counsel, are

21  paid significant hourly rates and they deserve every penny of

22  those rates defined by the market.  But the market includes

23  discounts.  And we're all aware of at least one other mega-

24  case, Lehman Brothers, where discounts are also given,

25  according to media reports.  And it simply struck us, in trying

72

1  to make one of those forest decisions, that that warranted the

2  Court's attention.  That was something that the Court ought to

3  give some thought to.  And again, we hope that the Court's

4  decision -- I'm sure it will be thoughtful, whenever it's

5  rendered -- but if the Court might take some time with this, it

6  would benefit everyone.  Again, not from a precedential

7  standpoint, but in terms of what people, lawyers, judges,

8  throughout this country think when they look at the disposition

9  of this case.

10        It's been a stunning success so far.  I have no reason

11  to doubt that six months or six -- I won't say six years -- six

12  months or longer, when we're done, that it will continue to be

13  a stunning success.  But the issues here, Your Honor, involve

14  very mundane matters:  the Trustee guidelines, the local rules.

15  And I really think that's what is at stake here.  And that's

16  where our focus ought to be.

17        In the summary pleading -- thankfully only five

18  pages -- that we filed on Monday, Your Honor, we raised eight

19  generic issues.  These are threads that we think apply --

20  forgive the phrase -- across the board.  Let me just tick them

21  off, because some we've already addressed.  The first is the

22  question of retainers.  Twenty-six million dollars of estate

23  money is being held by professionals.  In this case, we don't

24  see a basis for that.  And at least one firm, the debtors'

25  counsel, seems to have agreed with that.  The ten-percent

1    holdback.  That's been discussed.  Summer associates; been

2    discussed.  Electronic research; been discussed.

3        The amounts charged for retention and fee

4    applications.  Obviously that was a concern of several

5    professionals, and obviously it's something we looked at,

6    because it lends itself to a quantitative analysis.  And we

7    learned, Your Honor, that the range -- the percentage range was

8    two to twenty-three percent in terms of time spent on retention

9    and fee applications.  Now, I'm sure the Court is aware that in

10   another large case the fee examiner has recommended a flat one-

11   percent ceiling.  I happen to disagree with that.

12       THE COURT:  Pause, please, Mr. Williamson, because

13   I've been thinking about that, and the issue is kind of in our

14   face, as noted by Mr. Seidel of Butzel Long.  And it appears to

15   me that, subject to the usual reasonableness scrutiny, there is

16   what we can roughly think of -- and I wouldn't suggest that

17   it's more than rough -- as a fixed cost for getting oneself

18   retained or getting one's retainer approved by the Court, and

19   to a lesser degree but some, a filing of fee app.  I suppose

20   that the more work you do, the longer you fee app has to be.

21   But there's still a fixed cost element of that.

22       And Mr. Seidel, in his comments, suggests to me that a

23   court has to look at it with due regard for the fact that an

24   element of the work is a fixed cost.  And impliedly in what he

25   said, because I suspect that his opponents in that billion and

74

1    a half dollar avoidance action are going to put him through his

2    paces, he's going to have to work the matter a lot more in the

3    next fee period or the one after that, than he's going to have

4    to do now.

5         How do you think a guy like me should deal with the

6    fact that those aspects do have a fixed cost element?  And

7    what's fair to the professionals and the estate in getting my

8    arms around an issue of that character, if I haven't stated the

9    question, too vaguely?

10        MR. WILLIAMSON:  This is what I would say, if I were

11   in your seat.  I would say you make a fair point, but the fee

12   examiner is understandably concerned about the amount of time

13   that's being devoted to this.  And I will defer the fee

14   examiner's objection until we see the course of this.

15        And by the way, Your Honor, that same point goes to

16   Evercore; it goes to FTI; it goes to every professional that

17   has a hybrid fee arrangement.  Because we can't tell today

18   whether Evercore's services warrant the compensation that was

19   initially awarded.  And the Court knows full well why I say

20   initially.  Because I think at the end, everyone -- fee

21   examiner included -- is subject to hindsight.  Not because I

22   want it, but because that's what the code provides.

23        But, you know, Your Honor, you've put your finger I

24   think, on a very important point, that again, becomes generic

25   here.  It's not just about checking for conflicts or doing your

75

1    fee applications or keeping time.  Of course we need to be

2    careful with conflicts.  Of course time needs to be kept in

3    tenths of an hour.  The question, again, is who pays for it?

4    That's the real question here.

5           I would like nothing better than to avoid a discussion

6    of electrical charges, dry cleaning, first-class airfare, car

7    services.  I'd like to ignore all that.  But number one, the

8    U.S. Trustee's guidelines won't let me ignore all that.  But I

9    suggest that it's subsumed in this larger question of overhead

10   and administrative expenses.  Is the estate, under the

11   reasonable and necessary standard of the code obligated -- is

12   it fair to the estate that it should pay those kinds of

13   discretionary expenses?

14          At the risk of being hyperbolic, I'd compare and

15   contrast the services that the debtors' lead counsel provides

16   in presenting argument to this Court with a charge,

17   undocumented, for beverages and other services at a 363

18   meeting.  I mean those are worlds apart.  We're not debating

19   the reasonableness and value of the first set.  But it would be

20   nice to have an invoice that says more than "miscellaneous" for

21   the second.

22          And again, if we're on the subject of keeping track of

23   time and justifying your fees and expenses; if that detail were

24   provided in the first interim applications, Your Honor, we

25   wouldn't have had to write the memorandum, in our view, and we

76

1    wouldn't be here today discussing those issues.  We first

2    started raising the issues and concerns with the professionals

3    in mid-March, six, seven weeks ago.  And in almost every case,

4    we have had a dialogue that in almost every case has been

5    civil, professional and productive.

6         In many instances, the professionals responded to our

7    inquiries by giving us information that, quite frankly, should

8    have been in the fee applications to begin with.  And I know

9    that other fee examiners have encountered this same phenomenon,

10   practice, tendency.  And the question which I know bedevils the

11   U.S. Trustee, is what to do about that.

12        Now, issues have been raised about our recommended

13   reductions -- fifteen percent, twenty-five percent, ten

14   percent.  Could it be twenty percent?  Absolutely.  Could it be

15   ten percent?  Absolutely.  But, Your Honor, unless there is

16   some consequence, we are left with two alternatives.  And the

17   two alternatives are:  a line-by-line analysis, which we do

18   have precedent on, and the Court says that's a waste of your

19   time; and the other alternative is to basically say, you know,

20   you're great lawyers, you're good men and women, it's an

21   important case, if that's what you say it was, that's what it

22   was.  But again, we run into a headlong collision with the

23   Trustee guidelines, with the local rules of this court, and in

24   some cases, with clear precedential decisions.

25        Now, I think I have taxed the Court sufficiently with

1    broad issues.  Each of my colleagues could respond to

2    specifics -- various specifics on Kramer, on FTI, on Claro.

3    But I think we said essentially what we had to say in our

4    reports, Your Honor.  And remember, each of those reports

5    followed a tennis match:  tell us about this; okay; tell us

6    about that; okay; and here's a report.  And one of the reasons

7    we did fourteen was so that any professional who was unhappy

8    with what we said and you decided, has something they can take

9    to the district court or take to the Second Circuit.  Because

10   speaking as a practitioner, especially one that's been

11   immersed, now, for four months in this case, I think guidance

12   is needed.

13        You know, the Claro Group, just to use the last

14   example, obviously not used to bankruptcy practice and Trustee

15   guidelines.  The creditors' committee counsel, just to use

16   another example, in the first six weeks, wasn't as precise as

17   it might have been.  I think we can stipulate to that.  But at

18   some point, Your Honor, the guidelines apply to all cases or

19   they don't.  And when we went through these, again, with the

20   assistance of Stuart Maue, believe me, we gave the benefit of

21   the doubt everywhere we could.  We recognized the exigencies of

22   this case.  But when an entry says, "Attention to file, 6.2,"

23   it doesn't offend me personally, but it doesn't comply with the

24   guidelines.

25        And so rather than suggesting that the Court

1    microanalyze this, we said we think fifteen percent is a fair

2    adjustment.  And if there is no consequence, Your Honor, if

3    there is no consequence to not complying with the guidelines,

4    then when we're here on the second interim applications, I will

5    be saying gee, Your Honor, we still have this problem; block

6    billing, incremental time records, invoices that don't appear

7    to have been vetted appropriately.  That doesn't mean that the

8    electrical work at Weil, Gotshal was improvident but it means

9    there has to be some explanation.  And with four of the

10   professionals as the Court knows, we have adjourned the first

11   to the second, so that, you know, putting aside whether all of

12   us should have started this earlier so that we can continue the

13   dialogue.  Four professionals took advantage of that offer that

14   we made in general; others didn't, which is fine because we had

15   to come here.

16        I want to walk out of here perhaps not literally but

17   in a week or two whenever the Court's schedule permits with a

18   written decision that at least addresses some of these larger

19   points.  If debtors' counsel is right, there should be no

20   holdback.  The Court should tell us.  If committee counsel is

21   right, that all of the value that it brought to the case should

22   not be undercut by imperfect recordkeeping; fine, tell us that.

23   If administrative overhead fairly includes first class airfare,

24   tell us that.

25        So, I will conclude on this note.  We've heard a lot

79

1   today about context.  I think context is extraordinarily

2   important.  We've heard a lot today about the market for

3   professionals.  I think the market and this, the Second Circuit

4   has told us, is important.  But the market imposes limits, as

5   well as freedoms.  And again, I don't pretend to have a corner

6   on wisdom, least of all when it comes to legal fees, Your

7   Honor, but I do think it's fair to conclude after four months

8   immersed in this that we would all benefit by some additional

9   guidance in the context of a case in which the professionals

10  have done an extraordinary job and the beneficiaries have been

11  this country and its taxpayers.  But extraordinary service is

12  not a free pass on complying with the guidelines and the rules.

13          So, I will stop.  I think in a rebuttal, if we have

14  time for that, we can address any of the, what I will call

15  micro issues but I think I have covered generically the points

16  that I hoped to bring to the Court's attention.

17          THE COURT:  Fair enough.  Do you want to yield to any

18  of your colleagues to deal with any of the other things before

19  I get other folks an opportunity -- oh, I guess the U.S.

20  Trustee would be next but --

21          MR. WILLIAMSON:  Your --

22          THE COURT:  Before you and your firm sit down, do you

23  want to invite any of them to speak or me to invite any of them

24  to speak?

25          MR. WILLIAMSON:  Your Honor, I would like to -- I

80

1   think that the amount of time they will take is three minutes

2   or less.  Let me just explain, one of my colleagues focused on

3   the law firm applications.  One of my colleagues focused on the

4   non-law firms and one of my colleagues because of the magnitude

5   of the application focused on Weil, Gotshal.

6          So I think that I have addressed the Weil, Gotshal

7   issues sufficiently.  So at that point, Your Honor, I will ask

8   Katherine Stadler, who focused on the law firms other than Weil

9   and then Carla Andres who focused on the non-law firms.  And I

10  am sure they kept good notes professional by professional.

11         THE COURT:  Okay.  Ms. Stadler, do you want to come on

12  up then please.

13         MS. STADLER:  Katherine Stadler, Godfrey & Kahn

14  appearing for the fee examiner.  Thank you for -- I'll try to

15  stay in three minutes.

16         As Mr. Williamson said, we divided the work at our

17  firm in the manner that he described.  I worked primarily on

18  evaluating in detail the applications of the non-lead debtor

19  counsel law firms that included Kramer Levin, Baker & McKenzie,

20  Jones Day, Jenner & Block and Honigman Miller.  All but one of

21  those fee applications has been either resolved, as you heard

22  from the counsel today or deferred, so that leaves Kramer Levin

23  and the creditors' committee counsel.

24         The points made in response to the fee examiner's

25  objections fall generally into three categories.  The first is

81

1    the committee counsel taking umbrage with the fee examiner's

2    characterization of the committee counsel's role.  The second

3    is in -- as Mr. Williamson has referred to them, micro areas,

4    specific sub-areas of the retention.  Whether or not the fee

5    application demonstrated the reasonableness and necessity of

6    the work, not whether the work was reasonable or necessary but

7    whether the fee application as is required to do under the code

8    met the applicant's burden to show the reasonableness and

9    necessity.  And the committee takes issue -- committee counsel

10   takes issue with our continued confusion at the end of this

11   process of being able to decipher from the application and the

12   supporting materials, whether that burden has been met.

13          And the third has to do with the guideline issues, the

14   block billing, the vague billing.  And I'll address those very

15   briefly in turn.  With respect to the scope of the retention, I

16   think Mr. Williamson has addressed it adequately in the context

17   of the whole case.  The committee role is clearly defined in

18   the code.  It is not so clearly defined when a case operates

19   the way this case operated.  We all know how committee counsel

20   works to gather constituencies together for purposes of

21   creating classes to vote on a plan of confirmation, a plan of

22   reorganization and a confirmation of such a plan.

23          We're less clear on how that's supposed to work in the

24   363 sale context.  And that is the basis for the questions that

25   we've raised; not challenges per se, not necessarily even --

82

1    you know, Mr. Mayer seems to think that we think they shouldn't

2    have done anything but sit there and read memos and certainly

3    that's not true.  The bulk of the charges in the Kramer Levin

4    application aren't objectionable or to the extent they are

5    objectionable, they're excusable under the circumstances in the

6    case, at least in the fee examiner's view.

7         But there are a couple of areas where the question

8    arises and because we're dealing in an arena of cases that

9    aren't like anything we've seen before, we can't look back and

10   say oh, yeah, this is what a creditors' committee counsel is

11   supposed to do when there's a giant 363 sale that has to happen

12   in six weeks.  We don't know.

13        And as the fee examiner stated in his own remarks, we

14   view his role in this proceeding as illuminating issues like

15   that so that if the trend of 363 sales instead of Chapter 11

16   plans continues, we all have some basis for knowing what a

17   creditors' committee is supposed to do and what a creditors'

18   committee counsel's supposed to do.  So that fits into the

19   global picture points that Mr. Williamson made.

20        With respect to the sub-issues again, it's a question

21   of burden; the burden being on the applicant not on the fee

22   examiner to decipher what was provided in terms of value but on

23   the applicant itself to demonstrate that value.

24        And on the micro issues of block billing and

25   vagueness, we heard some feedback from Mr. Mayer that perhaps

83

1    he didn't have enough time and as Mr. Williamson said, we began

2    this dialogue with the professionals more than a month ago.

3    And so I would just point out that to the extent that there was

4    more time needed, you know, Kramer Levin had the same option

5    that all of the professionals had to ask for that and to defer

6    these proceedings.  And again, I would revert to my comments

7    about the burden.  It's their burden to go forward with the fee

8    application today and they've chosen to do that.  They had the

9    option not to.  So to the extent there's any constraints

10   associated with timing, I think it's not appropriate to give

11   them a free pass because of that.

12        THE COURT:  Okay.  Thank you, Ms. Stadler.  Come on

13   up, please.  Is it Ms. Andros (sic)?

14        MS. ANDRES:  Andres, Your Honor, Carla Andres, Godfrey

15   & Kahn.  Your Honor, as the fee examiner explained, we broke

16   these types of fee petitions into different categories and I

17   had the non-lawyer professionals.  So specifically, I will

18   limit my comments here today to the Butzel Long fee

19   application, FTI fee application.

20        THE COURT:  Well, Butzel is a law firm or are you

21   talking about non-lead.

22        MS. ANDRES:  I'm sorry.  No, Your Honor, you're

23   absolutely correct.  Butzel is a law firm and that was one that

24   at the time when we divided the fee applications out, Butzel

25   was a smaller piece and I did do the review for Butzel law.  So

84

1    although I have the non-lawyers, I do have that particular law

2    firm and I had Lowell Feld also, which I have believe has been

3    withdrawn, that fee application.  And finally, Claro.

4         Starting with Butzel because it does have a unique

5    issue that Mr. Seidel presented to the Court today, I won't

6    spend much time on that for the Court because I believe the

7    parties have adequately addressed that.  The retention and

8    compensation issues have been addressed minimally by a few

9    courts.  We have looked at Lehman to see what's been done.  We

10   looked at the Enron case to see some things that have been

11   addressed.

12        But generally, we're left in a vacuum and I think that

13   it's very interesting to hear Mr. Seidel's comments because

14   certainly there is some level at which it costs to get retained

15   and I certainly agree with the Court's comments on that front.

16        I also recognize the fee examiner's position that on a

17   going forward basis, that may perhaps be the best way to

18   evaluate the current objection as we look at how retention and

19   compensation fit into the total picture for Butzel Long.  So

20   without withdrawing the objection, I think that may be an

21   appropriate way to deal with it, is to defer it.

22        FTI, the comment that I would have in response to Mr.

23   Eisenband is simply to note that in connection with FTI's flat

24   monthly rate, there was certainly a period of the retention

25   that was hourly.  There was a period that is monthly and then

1      there is a separate completion fee.

2            Mr. Eisenband has referred to the fact that he

3      perceives a flat fee as being something that is a flat fee.

4      It's a monthly rate and that there shouldn't be commentary on

5      hours that are expended within that time period, whether they

6      are in one category or another and whether there's a great deal

7      of hours or a few hours but I would simply remind the

8      professionals in this case that the order of retention for FTI

9      required FTI to keep track of their time within half hour

10     increments during the flat monthly periods as part of the fee

11     examiner's ultimate review for reasonableness for the fees.

12            Again, I personally did speak with Mr. Eisenband and

13     some of the representatives of FTI.  They were very cooperative

14     in discussions along the way and certainly a valid point that

15     was raised was well if we have a month where we don't have a

16     great deal of billable work but we have a month or several

17     months where the hours that we expend would result in a very

18     low hourly rate for us.

19            And towards that point, again this may be a matter in

20     which it's appropriate to be looking long term at how things

21     fit into the reasonableness of fees on a final fee petition or

22     any larger period of time than an interim billing.  I don't

23     know that that necessarily applies in connection with the

24     retention and application issues that we've raised but it

25     certainly is a consideration I think on a going forward basis

1    for FTI.

2         Evercore, just a quick comment there as well, the

3    question here is that Evercore has been retained for a forty-

4    day period of time.  Evercore has performed all of its services

5    under that retention.  Evercore has also been paid for the

6    services that they've been provided with the exception as Mr.

7    Walsh had stated of a remaining approximately 4.3 million

8    dollars which is to be paid in connection with the entry of an

9    order confirming a plan that meets particular qualifications.

10        At this point in time, it is difficult for the fee

11   examiner to review the reasonableness of Evercore's fee overall

12   without seeing how this case is completed.  So in connection

13   with Evercore, we would simply ask to have that hearing

14   adjourned until such time as we see final fee applications.  I

15   would point out that FTI, Evercore, and AP Services are all

16   three different professionals who have completion fees, success

17   fees, bonus fees, whatever a party would like to call them,

18   that are tied to either the 363 sale or a confirmation order or

19   some hybrid of the two.

20        THE COURT:  Who was the third besides AP Services and

21   Evercore?

22        MS. ANDRES:  FTI.

23        THE COURT:  Continue, please.

24        MS. ANDRES:  And finally, the last and perhaps the

25   most detailed response is simply in connection with the Claro

87

1   Group.  Mr. Deems was on the phone today and I had a fair

2   amount of interaction and I can tell you that between the date

3   that we sent the draft report to professionals and the date

4   that the fee examiner's report was filed with the Court, Mr.

5   Deems and I were able to work through a large number of issues.

6        So the initial suggested disallowance for Claro was

7   even larger than the current one.  He was very cordial.  We

8   were able to work through a number of those issues.  As an

9   example, at least one of the issues which was based on clerical

10  and administrative costs which under the guidelines are not

11  compensable, we had identified an amount of 6,000 dollars, give

12  or take, and after my discussions with him, we voluntarily

13  reduced the suggested amount to a fifty percent disallowance.

14       And that was just based upon really an entirely

15  subjective decision of discussing with Mr. Deems where the

16  Claro Group was, the fact that they hadn't been involved in

17  these cases and how things were and were not detailed in their

18  time records.  There's a number of areas that he did provide

19  supplemental information.  We were able to reduce those.

20       Most recently, as he indicated, we did review some

21  further information from him and I sent him an e-mail last

22  night or this morning, I am not sure which, so that the new

23  request is a reduction in fees of $34,363.43 and expense of

24  $450.59.

25            THE COURT:  So you're still asking for a reduction of

88

1       about 35,000 bucks.

2              MS. ANDRES:  That's correct, Your Honor and as Mr.

3       Deems indicated on the call, the lion's share of that is, in

4       fact, based upon that time increment issue and I will raise

5       that because I think it sounds hyper technical and I think that

6       a number of people have been upset by that adherence to the

7       guideline.  At the same time, I will point out that what we've

8       looked at in these cases is how much of an individual or a

9       professional's time was billed in half hour increments as

10      opposed to tenth of an hour increments.  And in many cases, we

11      would find that there were forty percent, sixty percent of a

12      certain timekeeper and it appeared that there would be a

13      rounding error which could be up, could be down, admittedly

14      from the fee examiner's perspective, we don't know that.  The

15      Claro Group -- we asked for the reduction here which I will

16      point out is a fifteen percent reduction of approximately

17      153,000 dollars' worth of time that was billed by seven

18      timekeepers.  Of those seven timekeepers, ninety-five percent

19      of their hours were in half-hour increments.

20             So certainly we leave to the Court's discretion

21      whether that's an appropriate recommendation or whether the

22      Court, you know, wants to grant some sort of leniency towards

23      the Claro Group being a group that isn't commonly in bankruptcy

24      and we do recognize that that's a different issue for non-

25      attorney practitioners.

89

1          That is a brief summary of the issues that were raised

2     in connection with the groups that I evaluated.  As I

3     mentioned, Lloyd Feld had withdrawn theirs.  The other two

4     environmental groups were Brownfield and LFR, both of whom

5     elected to adjourn so that they could continue the dialogue

6     with further information.

7          THE COURT:  Okay.  Thank you.

8          MS. ANDRES:  Thank you.

9          THE COURT:  Any of your other folks, Mr. Williamson?

10         MR. WILLIAMSON:  No, Your Honor.  I think that's

11    sufficient.

12         THE COURT:  Okay.  Mr. Velez-Rivera, will you take the

13    lead for the U.S. Trustee's Office?

14         MR. VELEZ-RIVERA:  Andrew Velez-Rivera for the United

15    States Trustee, Your Honor.  I have, I think on my sheet four

16    items to address, most of which you've actually heard today.

17    So most of what I will be doing is underscoring.

18         In terms of process which is my first point, Your

19    Honor, I would like to identify for the Court that the fee

20    examiner's review has been independent of the review of the fee

21    applications that my office has done.  We've reviewed them, as

22    well.  We --

23         THE COURT:  You did?  Because I had kind of hoped that

24    by having the fee committee or a fee examiner, I could relieve

25    burdens on your office.

90

1          MR. VELEZ-RIVERA:  You did, Your Honor.

2          THE COURT:  That was what I thought I was approving

3     when I approved the various stips and orders we've entered over

4     the years to do that.

5          MR. VELEZ-RIVERA:  We did -- you did, Your Honor.  You

6     did relieve a great burden from my office but nonetheless, the

7     review that we undertook, it's fair to characterize it as more

8     abbreviated than we would have in other cases for sure.

9          What we did not do, as you could see from the pleading

10    we filed was abdicate entirely.  My client is statutorily

11    charged with reviewing fees and we did do that in this case in

12    very general terms.  What the trends, then the patterns that

13    the examiner found, we also found.  So we didn't burden the

14    Court with anything lengthier than with what we've presented.

15         My second issue, Your Honor, is with respect to the

16    holdback.  I will be very brief on that.  You've heard Mr.

17    Mayer and you've heard the importance of the preservation of

18    costs in this case and its implications upon the return to

19    unsecured creditors, hopefully at the end of the day.  We echo

20    that.

21         We also note that in other cases in this district

22    including Lyondell, Dana and Chrysler, these same sorts of

23    holdbacks, they're car cases and car supplier cases, Your

24    Honor, with the exception of Lyondell.  This is what we do.

25         Your Honor, my third point --

91

1          THE COURT:  Could you refresh my recollection,

2     Mr. Velez-Rivera, as to what I did vis-a-vis holdback in

3     Lyondell?  I would be surprised if I had provided for a zero

4     holdback but I wonder whether I provided for the full ten

5     percent or even twenty percent or I provided for a five percent

6     or something of that character.

7          MR. VELEZ-RIVERA:  Your Honor, I don't have the number

8     with me.  I am told that Your Honor instituted a partial

9     release.  I just don't have the number with me.

10          THE COURT:  But did not go far -- so far as a zero

11     holdback.

12          MR. VELEZ-RIVERA:  I'm led to believe that that's

13     right.

14          THE COURT:  Continue, please.

15          MR. VELEZ-RIVERA:  Your Honor, my third point is my

16     need to express the concern of my office with respect to the de

17     facto suspension of the guidelines.  In certain instances,

18     despite the size and the complexity of this case, it was no

19     different than many others with respect to the initial rush

20     that happened at the beginning.

21          Our guidelines, including the Court's guidelines don't

22     really provide exemptions for busy periods and for traffic

23     jams.  It would be detrimental to the fee process if our

24     guidelines would be effectively suspended during busy traffic

25     periods, Your Honor.  We're very concerned about that.  It also

92

1    bears remembering that at the time of applying to this court

2    for their retention, virtually every professional in this case

3    and others says I will comply with the guidelines.  And then we

4    have the problem.

5        Your Honor, finally Ms. Adams has asked that I

6    underscore for the Court that she views the five percent

7    reduction that we're talking about today as entirely

8    appropriate.  She doesn't view it as arbitrary.  Others have

9    taken reductions in this case and again, every dollar -- this

10   is her view -- every dollar that we could save at the top and

11   Mr. Mayer said it as well, eventually goes to creditors.

12   That's all I have, Your Honor.

13       THE COURT:  Very well.  Thank you.

14       Mr. Mayer, I was going to give you a chance to reply

15   later but if you would like to do it now, I won't say you

16   can't.

17       MR. MAYER:  Thank you, Your Honor.  I just -- I don't

18   wish to take any time to reply to what the fee examiner said.

19   I think we've hashed over that ground.  Just a correction; the

20   money that is saved in this case will go to creditors if there

21   isn't room in the cash to pay all of the administrative expense

22   and priority claims, otherwise it does not go to creditors as

23   Your Honor knows that it goes back to the treasurer.

24       THE COURT:  Okay.  Thank you.

25       Mr. Karotkin, reply?  Try to keep it as brief as

93

1    circumstances permit.

2         MR. KAROTKIN:  Stephen Karotkin, Weil, Gotshal &

3    Manges.  I will be very, very brief, Your Honor; just a couple

4    of items.

5         Number one, with respect to the discount and the fee

6    examiner's, for the three reasons he gave for the discount,

7    frankly, Your Honor, none of those reasons as far as we are

8    concerned, compel the granting of the discount in the

9    circumstances of this case.  The fact that other professionals

10   out of town may have given a discount is irrelevant.  The fact

11   that the blended hourly rate may be higher than our blended

12   hourly rate.  I am quite sure, although I have not done a study

13   that that is an account of rates in New York being higher than

14   outside of New York, as opposed to which I am very, very

15   confident of our firm rates being higher in the New York market

16   than other firms.  I don't believe that is at all true and, in

17   fact, I know of several firms in New York including your former

18   firm where there are attorneys practicing bankruptcy law who

19   bill significantly higher than Harvey Miller.

20        THE COURT:  Fair enough, Mr. Karotkin but I have been

21   away from my former firm for ten years and I like to think that

22   I do my job now with a more global perspective.

23        MR. KAROTKIN:  I am just pointing it out, Your Honor.

24        I think something that Mr. Williamson said -- I'm

25   sorry, the fee examiner said during his remarks, he said he

1    wasn't here at the beginning of the case.  He wasn't here to

2    evaluate what happened.  He certainly has a good idea as to

3    what happened and he explained how impressed he was with what

4    happened at the beginning of the case.

5         But nevertheless in that context he still thinks a

6    five percent discount is appropriate.  Again, we vehemently

7    disagree with that.  And I will tell you, Your Honor, if this

8    were not a bankruptcy case, in a situation like this, the

9    results achieved in the remarkable period of time, we would

10   have sought a premium and had been paid a premium outside of

11   bankruptcy.  And I think that's relevant here.  We're not

12   seeking a premium, of course, but we certainly don't think a

13   discount is appropriate.

14        I think I have addressed the holdback.  I don't

15   believe a holdback is appropriate here.  There is no chance of

16   administrative insolvency.  If Your Honor has a policy

17   otherwise, obviously we'll abide by it.  And Mr. Rivera

18   indicated compliance with the guidelines.  As far as my firm is

19   concerned, we are not seeking an exemption from the guidelines.

20   We believe we have fully complied with all of the guidelines.

21        And lastly, and I really don't want to belabor this

22   but with respect to the hotel charges and the electrical

23   bill  -- first with respect to the electrical bill, I furnished

24   to the fee examiner's office an itemized bill from Star Delta

25   Electric which is fairly detailed and I am happy to hand it up

95

1    to the Court.  And the funny thing is when Mr. Smolinsky just

2    took a look at it, he said to me that's more detailed than any

3    bill I got when I did work at my house.  And I would like to

4    hand it up to Your Honor.

5         And we also did furnish him five pages of bills from

6    the Hilton Hotel with respect to the rooms and I will leave it

7    at that.  I am happy to furnish them to the Court.

8         THE COURT:  I take it you've already given them to Mr.

9    Williamson or one of his partners.

10        MR. KAROTKIN:  Yes, sir.

11        THE COURT:  If you want to hand them up to me, you

12   may.

13        MR. KAROTKIN:  Thank you.

14        THE COURT:  Okay.

15        MR. KAROTKIN:  And as to the remaining items, we've

16   addressed them and are happy to rely on our pleadings.

17        THE COURT:  All right.  Fair enough.  Unless somebody

18   has something super, super compelling to say, I am not inclined

19   to get any further reply from anybody other than Kramer Levin

20   at this point.  Mr. Mayer, do you want to supplement what you

21   said?

22        MR. MAYER:  Only so much, Your Honor, at the risk of

23   incurring the ire of my coprofessionals, I was not expecting to

24   wait around for you to render a decision today.  There's no

25   emergency here.  We hope to receive your decision in due

1    course.   That's all.

2         THE COURT:  Well, folks, I have the practical problem

3    that I have many, many cases on my watch and I don't know if I

4    have the luxury of taking still another one under submission.

5    Every six months I have to report to the AO on matters under

6    submission and my thought had been, it may take hours, but for

7    you to get a ruling late this afternoon or this evening.

8         Mr. Williamson, I understand your desire for a

9    precedent.  If I can dispose of something like ten other

10   matters that I have sub judice, I could give you a written

11   decision confirming and amplifying on what I tell you orally

12   but I think that just like they told me in judge's school, I

13   got to get my work out and I think the better course of action

14   is to dictate something. It could take me an hour or two to

15   dictate but sometime before -- hopefully before midnight

16   tonight.  Now you guys can decide whether you want to wait

17   around for it or not but that's my inclination.

18        However, to keep things moving forward, I want to move

19   to the remaining three things that I have on the calendar and

20   without shortcutting due process rights, I am going to give you

21   my tentatives, California-style on those rulings and give you

22   folks a chance to be heard on them.

23        On the Maue retention, and if I am mispronouncing it,

24   that's because I only know what I read in papers.  Nobody's

25   spoken to me orally.  My tentative, subject to your rights to

97

1    be heard is by reason of the supplemental submission having

2    been provided to me after I issued the endorsed order, to grant

3    the motion to the extent that Maue's services would carry us

4    through the second interim fee app round and then to do a stop,

5    look, and listen to see whether we're getting our money's worth

6    by reason of the Maue firm's services.

7         I fully recognize that if I were to do that, I would

8    more than double the cost to the estate that we had originally

9    budgeted for.  And frankly, that's a matter of concern to me

10   but my tentative, subject to your rights to be heard, is to

11   hold my nose and allow the fee examiner to do his job but to

12   have a closer look at whether we're getting our money's worth

13   from that firm's services thereafter.

14        Mr. Karotkin, I am going to give you a chance to be

15   heard.

16        MR. KAROTKIN:  Can I just impose -- that's acceptable

17   to us if it's acceptable to the fee examiner.  So maybe we can

18   just dispose of that.  I'm sorry to interrupt.

19        THE COURT:  Well for that purpose, I guess an

20   interruption ain't so bad.  Mr. Mayer, I don't know if you

21   share Mr. Karotkin's view or whether you want to be heard on

22   that.

23        MR. MAYER:  I have no difference with the debtor on

24   this point.

25        THE COURT:  All right.  Mr. Williamson, is that

98

1    agreeable to you for this much of what I've said?

2         MR. WILLIAMSON:  It is.

3         THE COURT:  Okay.  On the adjournment of the second

4    round, my tentative is also to grant the fee examiner's request

5    on this.  I think we're in a zone where you guys are going to

6    agree to disagree on things and you already have, and chances

7    are you are in the future and I am going to have to decide

8    things now and going forward but as annoying as it may be to

9    professionals who have to wait to get paid, their pain has been

10   ameliorated in part by the monthly fee order.  And I think that

11   the system -- confidence in the system, if you will, requires

12   allowing the fee examiner to do his job.  So my tentative

13   subject to people's rights to be heard is to grant the fee

14   examiner's adjournment application.

15        Mr. Karotkin, you're rising again.

16        MR. KAROTKIN:  Yes, again.  Hopefully just -- we

17   obviously will not object to that.

18        THE COURT:  Okay.

19        MR. KAROTKIN:  We do not need to be heard.  I assume,

20   Your Honor, that we will be able to get a convenient date in

21   June in accordance with the request of the fee examiner.

22        THE COURT:  I think I can give you that, assuming as I

23   do that we can get it all done in a day or less of court time.

24   I think that however I rule today on disputed matters, my view

25   is there's going to be a one-bite rule, kind of like you learn

1  in freshman torts and then I am going to hold people to a

2  higher standard once they know what I am going to be ruling.

3       Now it is true that the second interim fee apps were

4  done when people didn't have the benefit of my thinking but --

5  and I am going to take that into account and if there is a

6  third round of fee apps, I am especially going to take failures

7  to comply with my statements of my expectation into account.

8  But I would hope and expect that the second round will be

9  shorter than the first and the third round is going to be

10 shorter than its two predecessors.

11      My third tentative which is on the expansion of the

12 role of the fee examiner -- well it's denominated as

13 clarification and I think a clarification is appropriate but

14 upon clarification, I am of the view that I am going to deny

15 subject to your rights to be heard, a change in the fee

16 examiner's role.

17      My view on that, subject to your rights to be heard,

18 is that the fee examiner here is going to perform a function

19 similar to the fee committees that I had in place in Adelphia,

20 Global Crossing, I think and I think I did the same thing in

21 Lyondell but I can stand to be corrected in that regard.

22      I see and I understand and respect Mr. Rivera's

23 perspective.  The role of the fee examiner doing something

24 where I had hoped to reduce burdens on the U.S. Trustee's

25 Office which was to facilitate consideration of fee apps.  On

1    other matters, subject to your rights to be heard such as

2    whether somebody is retained in the terms of that, my tentative

3    folks is that that is a judicial responsibility and that's what

4    I got to do.  And my tentative, but I will let you, Mr.

5    Williamson, be heard or any of your partners or colleagues, is

6    that I will give you as my earlier rulings indicated, the

7    support you need to do your job and what I understood to be the

8    appropriate role of the fee examiner in this case and I will

9    give you the time to do it to insure that the job is done right

10   but I am not of a mind subject to your rights to be heard, to

11   change the nature of your responsibilities.

12        But if there is a desire for oral argument on that

13   third tentative, I will give anybody in the room that right

14   most significantly, of course, the fee examiner.

15        MR. WILLIAMSON:  Your Honor, my response will be

16   muted.  We obviously have no difficulty with the Court's order.

17   The genesis of it was that relatively early on as we were

18   seeing applications to retain professionals, simply reading

19   them on their face raised questions that we thought and

20   continued to think will have ramifications when we are before

21   you on another day.

22        So we have no difficulty with the Court's ruling.  We

23   would simply keep in mind that six months from now if we say

24   you're twenty percent increase in rates we object to and we

25   would have objected to it earlier but our role is limited to

101

1   review.  So we have no difficulty with that, Your Honor.

2        THE COURT:  Fair enough.  Is there a desire by anybody

3   else to speak after Mr. Williamson spoke?

4        MR. MAYER:  No, sir.

5        THE COURT:  Okay.  Fair enough.

6        MR. WILLIAMSON:  Your Honor, I have one practical

7   question.

8        THE COURT:  Yes, sir.

9        MR. WILLIAMSON:  For those of you that -- for those of

10  us that aren't frequently before the Court, is it necessary or

11  desirable to remain until the Court issues its decision?

12       THE COURT:  It's going to be your call.  My hope is

13  that I could have something for you by perhaps 4 o'clock.  If

14  you want to detail one of your partners or colleagues to hang

15  around and be excused, it goes without saying that you or

16  anybody else in the room can.  It's more burdensome obviously

17  to wait around if you're an out-of-town professional and I will

18  give people every courtesy in that regard.

19       But I don't think -- for the same reason you wanted me

20  to take it under submission and to write, Mr. Williamson, I

21  don't think I should rush a dictated ruling and I am going to

22  do it, taking the amount of time it takes to give you people

23  confidence that I've thought it through.

24       THE COURT:  Mr. Mayer?

25       MR. DEEMS:  Judge, this is Doug Deems with the Claro

102

1   Group.  For those of us on the conference call, should we call

2   back in, should we stay on the line?  Do you have any

3   suggestions?

4          THE COURT:  Well I would advise you not to stay on the

5   line but I would suggest and frankly, I don't get into this in

6   that level of detail, to see whether CourtCall or whoever we're

7   using can provide a line for you folks to perhaps call in on

8   say fifteen minutes' notice or something like that.

9          And if by the way anybody wants to do that from a cell

10  phone, as long as the cell phone is in a listen-only mode,

11  because cell phones can be disruptive of my courtroom

12  otherwise, I wouldn't object to that.

13         I want to give you folks courtesies in terms of

14  opportunity to know my ruling but first and fundamentally, I

15  have to get the ruling done and in a way that it's

16  satisfactorily thought through.

17         Mr. Mayer?

18         MR. MAYER:  Your Honor, if I may?  It would, I think,

19  be a benefit to everybody in the courtroom to actually stay, if

20  your clerk could send an e-mail notice that you're prepared to

21  render a ruling and we could then dial in, and that way we

22  would be able to do so remotely and not that I am suggesting

23  you would need more time than you had budgeted, but if it

24  turned out you wanted to, the clerk could let us all know that

25  we should dial in tomorrow or --

1          THE COURT:  I think that's an excellent idea and I

2     will either have my courtroom deputy or one of my law clerks do

3     so.  Just be sure that if you like to take yourself up on Mr.

4     Mayer's suggestion, that you've given my law clerks the

5     necessary e-mail information, so that we can do that.

6          MR. MAYER:  Thank you, Your Honor.

7          THE COURT:  All right.

8          MR. WILLIAMSON:  Your Honor, if I may --

9          THE COURT:  Yes, sir.

10         MR. WILLIAMSON:  -- two quick conclusory points.

11         THE COURT:  Yes, by all means.

12         MR. WILLIAMSON:  First to correct the historical

13    record, I believe I was given creditor blame for the 1978 code.

14         THE COURT:  I think it was the review commission which

15    the lobbyist then ignored.

16         MR. WILLIAMSON:  Right.  With respect to Ken Klee and

17    Rich Levin, I probably want to acknowledge their role which was

18    substantial.  And secondly, simply to express my appreciation

19    for the Court's tolerance on the volume of materials that we've

20    submitted.  I make no apology for it but I do express

21    appreciation.  Thank you.

22         THE COURT:  All right.  Well thank you very much.

23         MR. VELEZ-RIVERA:  Your Honor, I have one factual

24    matter.

25         THE COURT:  Mr. Velez-Rivera and then Mr. Smolinsky or

104

1   Mr. Smolinsky and then Mr. Velez-Rivera.  He got up quicker.

2          MR. VELEZ-RIVERA:  He took the stage.  I will address

3   the Court from here, if allowed.

4          THE COURT:  Well pull the microphone up to you Oprah

5   Winfrey style.

6          MR. VELEZ-RIVERA:  I am told, Your Honor, that in the

7   Lyondell case,  that on the first round of the interim fees,

8   Your Honor withheld twenty percent and I am told that at the

9   second round, Your Honor withheld five percent.

10          THE COURT:  Thanks, I appreciate that.  Give me a

11   second though.  That's worthy of taking a note.  Mr. Velez-

12   Rivera, I don't know if you know this but if one of your folks

13   could help you, too, how far along in Lyondell did I cut it

14   down to five percent and in particular, was it before or after

15   the creditors' committee and the secured lenders developed a

16   little more piece in the valley?

17          MR. VELEZ-RIVERA:  I don't know the answer to that,

18   Your Honor.  I wasn't personally involved.

19          THE COURT:  All right.

20          MR. VELEZ-RIVERA:  We sent a quick e-mail in response

21   to your prior query.  That's beyond my knowledge at the moment

22   but we could probably get an answer to that.

23          THE COURT:  If people aren't offended due process-

24   wise, I wonder if you can send an e-mail to the Gerber chambers

25   with copies to debtors' counsel, creditor's committee counsel

105

1    and the fee examiner or his designee noting that fact without

2    argument.

3            MR. MAYER:  Well, Your Honor can take judicial notice.

4    I don't think this is a problem.

5            THE COURT:  Okay.

6            MR. VELEZ-RIVERA:  We will respond by e-mail

7    nonetheless, Your Honor.  That's fine.

8            THE COURT:  Thank you.

9            Mr. Smolinsky?

10           MR. SMOLINSKY:  Your Honor, you have efficiently gone

11   through the calendar today.  There was one more matter on the

12   calendar that hasn't been addressed and that's the status

13   conference for Brownfield Partners.

14           Mr. Testa from McCarter & English has been patiently

15   on the phone all day, so I wanted to give him an opportunity to

16   be heard.  But just to lay out a foundation, you've heard more

17   about environmental issues today than I think you have in the

18   entire case so far and you'll be hearing --

19           THE COURT:  Not really because since Ms. Leary talked

20   about it early in the 363 hearing, it's been a matter of

21   concern to me.

22           MR. SMOLINSKY:  Your Honor, I think that the

23   discussions have been a lot more successful than you might

24   glean from Mr. Mayer's comments but that has not come easily

25   and it's come with a lot of help from the company's

1    environmental consultants.  We have three consultants.

2         Initially, Brownfield Partners was retained on a very

3    quick basis prior to the sale in order to do some minimal work

4    in connection with getting to the 363 sale.  After that point,

5    and they had a 200,000 dollar cap for that work -- after that

6    point, the -- Brownfield Partners started doing more and more

7    and becoming more integral into the process of developing the

8    budgets for environmental remediation, as well as negotiation

9    to the hopefully agreed upon numbers.

10        And with that came an increase in cap but along with

11   that, Brownfield Partners revisited what the details of the

12   arrangement was and realized that in order to take on those

13   increased responsibilities, they would have to commit a large

14   portion of their firm to this project which would prevent them

15   from taking on more lucrative assignments.  It's a small

16   percentage of their assignments which are on an hourly basis

17   and they came to the debtors and asked for an increase in

18   rates.  And ultimately, MLC --

19        THE COURT:  Rates as contrasted to budget?

20        MR. SMOLINSKY:  That's right.

21        THE COURT:  Uh-huh.

22        MR. SMOLINSKY:  And MLC, after discussions with them,

23   agreed as a matter of business judgment to increase their rates

24   in a range from ten dollars an hour to fifty dollars an hour,

25   depending on seniority which would raise the top rate to I

1    believe about 350 dollars.  We thought that that was a

2    reasonable request.  We agreed to it.  We filed a notice of

3    proposed order which approved not only the increase in the cap

4    to I believe 1.1 million dollars but also an increase in the

5    rates.

6         We got an informal request for information from the

7    fee examiner.  We provided the fee examiner with not only a

8    full description of how the different environmental consultants

9    work, so that he could evaluate the scope of the services but

10   also background as to why the -- if fee increases were

11   appropriate.

12        We ultimately got the consent of the fee examiner with

13   respect to the scope and they agreed not to object to it but

14   they did want to reserve their rights with respect to the rates

15   until fee application time.

16        In order to get the matter resolved because we really

17   needed Brownfield Partners fully engaged, we all agreed that we

18   can go forward with and get the order entered but with respect

19   to the rate issue, that we would give Brownfield Partners an

20   opportunity to address that issue sooner than maybe six months

21   down the line when we're fighting in a fee application context

22   to understand whether they're going to get the benefits of

23   their bargain in terms of the work that they're doing.

24        Unlike the law firms and other professionals that are

25   active every day in the bankruptcy court, Brownfield Partners

108

1    rarely, if ever, appears in bankruptcy court and I could

2    understand that when they reach an agreement on a rate

3    structure, that they would receive those rates.  And for that

4    reason, I think it was appropriate to give them an opportunity

5    to have a conference on that issue.

6         We are sensitive to the fact that Brownfield Partners

7    has a thirty-day termination right in their agreement.  While I

8    hope and expect that they wouldn't exercise that, I do fully --

9    I am fully sensitive to the fact that they're a small shop,

10   that they're taking on a very substantive role in this case and

11   that if they reach agreement with the debtors as a matter of

12   business judgment on rates, that they should expect it unless

13   there's an ultimate determination by the fee examiner that for

14   reasonableness standards based on the value of services, that

15   there's an objection to the hours spent, as opposed to the

16   rates charged.

17        THE COURT:  What are the parties recommending to me as

18   to the best time to have that follow-up conference?

19        MR. SMOLINSKY:  Your Honor, we set for today -- I know

20   that we've been here a long time.  I will let --

21        THE COURT:  Oh, you mean for me actually to fix the

22   rate?

23        MR. SMOLINSKY:  Well to at least have an understanding

24   of how Your Honor wants to approach it.  And I will defer to

25   Mr. Testa to speak on what he would expect.

1    THE COURT:  Well, okay.  The question that I am going

2    to ask Mr. Testa and then you and anybody else who wants to be

3    heard on it, Mr. Smolinsky, is there a way under which we can

4    get that firm working to help the debtor both address its

5    issues and to get any messes that need to be cleaned up,

6    cleaned up, as quickly as possible if I can give you a prompt

7    conference thereafter considering all of the things we have on

8    for today?

9        MR. SMOLINSKY:  That would be fine with the debtors,

10   Your Honor, and I don't know if that's an evidentiary hearing

11   or simply a conference to discuss the roles and appropriate

12   rates, certainly in comparison with the other environmental

13   consultants that the company has hired.

14       THE COURT:  Well let me invite Mr. Testa to weigh in

15   on this but I am going to probably need the help more of people

16   in this room rather than Mr. Testa, whether anybody wants me to

17   hold an evidentiary hearing on the issue.  So let me get Mr.

18   Testa's thoughts first and then let people scratch their heads

19   in the courtroom and tell me whether they're going to want an

20   evidentiary hearing.

21       MR. SMOLINSKY:  Thank you, Your Honor.

22       THE COURT:  Mr. Testa?

23       MR. TESTA:  Thank you, Your Honor.  Jeffrey Testa from

24   McCarter & English.  As was very well stated by debtors'

25   counsel, Brownfield reached agreement with the debtor on day

1    one in this case, like every other professional, they jumped

2    in.  Their role has expanded greatly to a project management-

3    type role.  While we agreed that the cap should be raised,

4    we're also seeking really just a slight raise in rate.  The top

5    rate would be 330 dollars which is still 150 dollars less than

6    some of the other environmental professionals.  It's a very

7    small firm and we would like to continue doing work.  We really

8    don't think an evidentiary hearing would be necessary.  We have

9    an agreement with the debtors who are willing to retain us for

10   the revised rate.  The initial retainer order made clear that

11   rates could be increased during the course of the case and if

12   new work came on, really we think we can hopefully get this

13   resolved via a consent or other type of order entered by Your

14   Honor.

15        And I would just like to also note that we took the

16   fee examiner's recommendations very seriously.  We've been on

17   the phone with Ms. Andres a number of times and we agreed to

18   adjourn our fee application on the first interim hearing today

19   to the second because we are really making efforts -- we

20   understand our role, to work out an agreement so Your Honor

21   doesn't have to make a ruling and we can reach agreement with

22   the fee examiner.

23        So to sum it up, we would like obviously to get this

24   resolved as soon as possible before our next fee app.  It's

25   really a slight increase in rate and we would really like the

111

1    fee examiner to reexamine this issue, so we can continue our

2    work.  As we said, our work has expanded greatly and we are a

3    very small firm that would like to get this resolved before we

4    commit ourselves further.

5          THE COURT:  Does anybody in the courtroom want to

6    weigh in on this?  Mr. Williamson?

7          MR. WILLIAMSON:  Your Honor, again I was the skunk or

8    one of the skunks at the garden party here.  We were trouble by

9    the increase in rate, not by the increase in scope.  Obviously

10   the Court's ruling on the motion makes clear that in hindsight,

11   we can question rates but Brownfield is correct, we have been

12   talking, we'll continue to talk.  Speaking only for myself, I

13   don't see a need for an evidentiary hearing.

14         THE COURT:  I will tell you the way I see it, folks

15   but it's not going to be a final, final ruling.  I'm going to

16   give you folks a chance to be heard if my approach makes you

17   uncomfortable in any way.  I think a need has been shown to

18   increase the scope and I think all agree that Brownfield's

19   would be paid no less than its existing rate but it also

20   appears to me that it's unfair for them to be hanging out too

21   long with uncertainty as to whether they're going to be paid

22   the incremental rate if it turns out that that might be

23   material to them.

24         So what I want to do is offer you folks a hearing at

25   that sweet spot that allows an interchange in dialogue vis-a-

112

1    vis facts, so that the need for a hearing can be obviated but

2    which isn't so far out that the firm is hanging out there not

3    knowing what its compensation is going to be.  And I sense that

4    Brownfield's already provided parties in interest with

5    information as to why it thinks its rates make sense but if we

6    ever got to an evidentiary hearing, the way we would be doing

7    that is in accordance with my case management order in which

8    case direct would go in by a declaration or affidavit and then

9    people would have the right to cross if anybody thought they

10   needed it.

11          Mr. Testa, I think it would be constructive if you

12   provided an explanation as to the rates by means of a

13   declaration that will both give people the information they

14   need and could do double duty in case I ever had to have an

15   evidentiary hearing.  Then people could tell me whether they

16   really think there's a need to cross or not.

17          And that way, I could get your guys under way pronto

18   which I think is in the interest of both the estate, the

19   estate's unsecured creditor community and frankly, the

20   environmental community that is looking for enforcement of

21   environmental laws.

22          So does anybody feel uncomfortable with that approach?

23   I will give you a chance to argue it ab initio.

24          MR. TESTA:  That's fine, Your Honor.  Thank you very

25   much.

113

1       THE COURT:  I would recommend a hearing in the week to

2   two week range, if you need one.

3       MR. TESTA:  That's fine.  We will submit a declaration

4   and hopefully there will be no objections.  If there are, we

5   will call chambers to schedule that hearing.

6       THE COURT:  Mr. Smolinsky, I don't know if you're

7   quite frowning but do you have a desire to be heard on this?

8       MR. SMOLINSKY:  I wasn't frowning, Your Honor.  Joe

9   Smolinsky.  I think my client behind me might have been

10  frowning a little bit because of the expense and time that he

11  sees this taking up.  But --

12      THE COURT:  Well I would waive it, the declaration if

13  others are willing to.  But one way or another, we've got to

14  make -- get peace in the valley on this issue and you've got to

15  get him to work.

16      MR. SMOLINSKY:  And we will work actively to try to

17  get the fee examiner comfortable with this issue.

18      THE COURT:  Fair enough.  Do you think it would be

19  constructive -- I am asking you but I guess I should be asking

20  everybody in the room, to delay the need to submit a

21  declaration if you think that you can reach an agreement

22  without a declaration?

23      MR. SMOLINSKY:  I think you could leave that up to us

24  to work out.  We could have an initial call with the examiner

25  and see whether it's likely that it could be resolved without

1    the need for further declarations.

2        THE COURT:  I think that's a good idea because to tell

3    you the truth, if we make these guys do a declaration, I am

4    going to pay them for it and that's going to come out of the

5    estate and it's kind of like defeating the whole purpose in

6    some ways.

7        MR. SMOLINSKY:  We're painfully aware of that, Your

8    Honor.

9        THE COURT:  Yes, I understand.  All right.  Well you

10   guys have your legal rights and you have your common sense

11   needs and concerns and hopefully you'll balance those.  Okay.

12       I think that does it for what we're going to do in

13   open court today until I issue my ruling. I'm going to do it in

14   an open courtroom, so anybody who wants to be here will have

15   that opportunity.  But I --

16       MR. RODD:  Your Honor?

17       THE COURT:  Yes, just a second, Mr. Testa.  Let me

18   finish my thought.  But I assume that most of the people in the

19   room may just want to call in.

20       Mr. Testa, did you have some further thought?  Was it

21   Mr. Testa?

22       MR. TESTA:  No, Your Honor, that was not me.

23       MR. RODD:  No, Your Honor, it was me.  My name is Jake

24   Rodd. I'm docket number 48925 and docket number 5001.

25       Will the Court be hearing personal motions today or is

115

1    it just for the lawyers and their cases?

2         THE COURT:  Can you tell me your name again because I

3    thought I dealt with that matter a long time ago.

4         MR. RODD:  You did, sir?

5         THE COURT:  Wait.  Time out.  Is this on the objection

6    to claim or is this on something else?

7         MR. RODD:  This is on the objection to claim.

8         MR. SMOLINSKY:  Your Honor, if I can maybe amplify for

9    everyone's benefit.  Mr. Rodd filed a proof of claim.  I

10   believe it's a 500,000 dollar proof of claim.

11        THE COURT:  Oh, this is a different one than the one

12   we dealt with before.

13        MR. SMOLINSKY:  Yes, yes.

14        THE COURT:  I'm sorry.

15        MR. SMOLINSKY:  Yes, he filed a response to the ADR

16   motion.  He didn't object to the procedures but wanted his

17   claim resolved.  We've had several conversations with Mr. Rodd.

18   MLC is working to formulate a settlement offer for his claim

19   and beyond that, I am not sure what's before you today.

20        THE COURT:  Am I correct that you have no motion

21   before me today that would affect his rights in any way?

22        MR. SMOLINSKY:  I don't believe there's anything on

23   today that would affect his rights.  That's correct.

24        THE COURT:  Okay.  Are you comfortable now, Mr. Rodd?

25        MR. RODD:  Yes, sir, but the thing was, sir, when I

1    called in and was speaking to him, they told me I was one in

2    70,000 claims, right?  And that it would be years before we

3    settled.  And what I was protesting in my initial petition to

4    the Court is that we do this in a timely manner.  But however,

5    when I made an offer to Mr. Smolinsky to give me an offer, he

6    could not.  So --

7            THE COURT:  Well I feel for you, Mr. Rodd but the

8    problem that I have as a judge is the basis upon which I give

9    you a leg up over the other 70,000 creditors in the case.

10           MR. RODD:  Oh, yes, sir, I am not seeking preferential

11   treatment.  No, sir, I was not.  But I just wanted you to be

12   aware of the situation, the Court to be aware --

13           THE COURT:  Okay.  Well now I am aware and I think Mr.

14   Smolinsky's aware but I am not in a position to order anything

15   today and I am not doing that.

16           MR. RODD:  I understand, sir.

17           THE COURT:  Okay.

18           MR. RODD:  Thank you for your time, sir.

19           THE COURT:  Very well.  Okay, folks.  We are now

20   adjourned and somebody in my chambers will give you fifteen

21   minutes' notice before a call.  Thank you.  Have a good day.

22           MR. SMOLINSKY:  Thank you, Your Honor.

23           MR. WILLIAMSON:  Thanks, Judge.

24       (Proceedings adjourned at 2:54 PM)

25

117

1

2                              I N D E X

3

4                              RULINGS

5                                          Page        Line

6    Application of the Official         8           20

7    Committee of Unsecured Creditors

8    Of Motors Liquidation Company

9    for Entry of an Order Authorizing

10   the Employment and Retention

11   of Bates White, LLC as the

12   Committee's Consultant on the

13   Valuation of Asbestos

14   Liabilities Granted

15

16   Motion of Debtors for Entry of      10          8

17   Order Pursuant to 11 U.S.C.

18   Section 105(a) and General Order

19   M-390 Authorizing Implementation

20   of Alternative Dispute Resolution

21   Procedures, Including Mandatory

22   Mediation Approved

23

24   Debtors' Objection to Proof of      11          10

25   Claim No. 65796 Filed by

118

1    Rudolph V. Towns and Motion to

2    Expunge Granted

3

4    Motion of Lisa Gross for a Waiver    12        8

5    of the Filing Fee to File

6    Motion Granted

7

8    Request by Lisa Gross to not Serve   12        9

9    the Entire Creditor Community

10   Granted

11

12   Motion for Relief from Stay filed    12        21

13   by Lisa Gross Denied

14

15   Limited Retention and Employment     96        22

16   of the Stuart Maue Firm as

17   Consultant to the Fee Examiner

18   Granted on Temporary Basis

19

20   Fee Examiner's Adjournment           97        24

21   Application Granted

22

23   Change in Fee Examiner's Role        99        9

24   Denied

25

119

1

2                    C E R T I F I C A T I O N

3

4      I, Dena Page, certify that the foregoing transcript is a true

5      and accurate record of the proceedings.

6

7      _____

8      Dena Page

9

10     Also transcribed by:

11     Tzipporah Geralnik, AAERT Certified Electronic Transcriber

12     (CET**D-489)

13

14     Veritext

15     200 Old Country Road

16     Suite 580

17     Mineola, NY 11501

18

19     Date:  April 30, 2010

20

21

22

23

24

25

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400