1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026 (REG)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


MOTORS LIQUIDATION COMPANY, et al.,

f/k/a GENERAL MOTORS CORP., et al.,


           Debtors.


- - - - - - - - - - - - - - - - - - - -x


           U.S. Bankruptcy Court

           One Bowling Green

           New York, New York


           April 29, 2010

           5:24 PM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2  HEARING re First Application of Weil, Gotshal & Manges LLP, as

3  Attorneys for the Debtors, for Interim Allowance of

4  Compensation for Professional Services Rendered and

5  Reimbursement of Actual and Necessary Expenses Incurred from

6  June 1, 2009 Through September 30, 2009 [Docket No. 4803]

7

8  HEARING re First Interim Application of Kramer Levin Naftalis &

9  Frankel LLP, as Counsel for The Official Committee of Unsecured

10  Creditors, for Allowance of Compensation for Professional

11  Services Rendered and for Reimbursement of Actual and Necessary

12  Expenses Incurred for the Period from June 3, 2009 Through

13  September 30, 2009 [Docket No. 4459] ("Kramer Fee Application")

14  and Correction and Supplement to the Kramer Fee Application

15  [Docket No. 4715]

16

17  HEARING re Application of Butzel, Long, a Professional

18  Corporation, as Special Counsel to the Official Committee of

19  Unsecured Creditors of Motors Liquidation Company f/k/a General

20  Motors Corporation, for Interim Allowance of Compensation for

21  Professional Services Rendered and Reimbursement of Actual and

22  Necessary Expenses Incurred from June 10, 2009 Through

23  September 30, 2009 [Docket No. 4450]

24

25

3

1

2    HEARING re First Interim Application of FTI Consulting, Inc.

3    for Allowance of Compensation and Reimbursement of Expenses for

4    Services Rendered in the Case for the Period June 3, 2009

5    Through September 30, 2009 [Docket No. 4455]

6

7    HEARING re First Application of Honigman Miller Schwartz and

8    Cohn LLP as Special Counsel for the Debtors, for Interim

9    Allowance of Compensation for Professional Services Rendered

10   and Reimbursement of Actual and Necessary Expenses Incurred

11   from June 1, 2009 Through September 30, 2009 [Docket No. 4446]

12

13   HEARING re First Interim Fee Application of Jenner & Block LLP

14   for Allowance of Compensation for Services Rendered and

15   Reimbursement of Expenses [Docket No. 4451]

16

17   HEARING re First and Final Application of Evercore Group L.L.C.

18   for Compensation and Reimbursement of Expenses [Docket No.

19   4453]

20

21   HEARING re First Interim Application of the Claro Group, LLC

22   for Allowance of Compensation and Reimbursement of Expenses for

23   the Period June 1, 2009 Through September 30, 2009 [Docket No.

24   4506]

25

4

1

2    HEARING re Fee Examiner's Statement Concerning Fee Application

3    of AP Services [Docket No. 5567]

4

5    HEARING re Fee Examiner's Motion for Clarification of

6    Appointment Order [Docket No. 5483]

7

8    HEARING re Fee Examiner's Application to Authorize the Extended

9    Retention and Employment of the Stuart Maue Firm as Consultant

10   to the Fee Examiner as of March 8, 2010 [Docket No. 5431]

11

12   HEARING re Status conference regarding the Order Pursuant to 11

13   U.S.C. Sections 327(a) and 330 Authorizing the Debtors to Amend

14   the Terms of Their Engagement with Brownfield Partners, LLC

15   [Docket No. 5313]

16

17   HEARING re Request for Leave to File Claim [Docket No. 5178]

18   and Request for Relief from Automatic Stay [Docket No. 5179],

19   filed by Lisa Gross.

20

21   HEARING re Second Interim Fee Application of Jenner & Block LLP

22   for Allowance of Compensation for Services Rendered and

23   Reimbursement of Expenses [Docket No. 5263]

24

25

5

1

2    HEARING re Second Interim Application of LFR Inc. for Allowance

3    of Compensation and for Reimbursement of Expenses Rendered in

4    the Case for the Period October 1, 2009 Through January 31,

5    2010 [Docket No. 5270]

6

7    HEARING re Second Interim Application of FTI Consulting, Inc.

8    for Allowance of Compensation and for Reimbursement of Expenses

9    for Services Rendered in the Case for the Period October 1,

10   2009 Through January 31, 2010 [Docket No. 5279]

11

12   HEARING re Second Interim Application of Jones Day, Special

13   Counsel to the Debtors and Debtors-in-Possession, Seeking

14   Allowance of Compensation for Professional Services Rendered

15   and for Reimbursement of Actual and Necessary Expenses for the

16   Period from October 1, 2009 Through January 31, 2010 [Docket

17   No. 5285]

18

19   HEARING re Second Interim Application of the Claro Group, LLC

20   for Allowance of Compensation and Reimbursement of Expenses for

21   the Period October 1, 2009 Through January 31, 2010 [Docket No.

22   5290]

23

24

25

6

1

2    HEARING re Second Interim Application of Brownfield Partners,

3    LLC as Environmental Consultants to the Debtors for Allowance

4    of Compensation and Reimbursement of Expenses for the Period

5    from October 1, 2009 Through January 31, 2010 [Docket No. 5291]

6

7    HEARING re Second Application of Butzel Long, A Professional

8    Corporation, as Special Counsel to the Official Committee of

9    Unsecured Creditors of Motors Liquidation Company, f/k/a

10   General Motors Corporation, for Interim Allowance of

11   Compensation for Professional Services Rendered and

12   Reimbursement of Actual and Necessary Expenses Incurred from

13   October 1, 2009 Through January 31, 2010 [Docket No. 5293]

14

15   HEARING re First Application of Plante & Moran, PLLC, as

16   Accountants for the Debtors, for Interim Allowance of

17   Compensation for Professional Services Rendered and

18   Reimbursement of Actual and Necessary Expenses Incurred from

19   October 9, 2009 Through January 31, 2010 [Docket No. 5294]

20

21   HEARING re Second Application of Weil, Gotshal & Manges LLP, as

22   Attorneys for the Debtors, for Interim Allowance of

23   Compensation for Professional Services Rendered and

24   Reimbursement of Actual and Necessary Expenses Incurred from

25   October 1, 2009, Through January 31, 2010 [Docket no. 5295]

7

1

2    HEARING re Second Interim Application of Kramer Levin Naftalis

3    & Frankel LLP, as counsel for the Official Committee of

4    Unsecured Creditors, for Allowance of Compensation for

5    Professional Services Rendered and for Reimbursement of Actual

6    and Necessary Expenses Incurred for the Period from October 1,

7    2009 Through January 31, 2010 [Docket No. 5296]

8

9    HEARING re First Interim Application of Jones Day, Special

10   Counsel to the Debtors and Debtors-in-Possession, Seeking

11   Allowance of Compensation for Professional Services Rendered

12   and for Reimbursement of Actual and Necessary Expenses for the

13   Period from June 1, 2009 Through September 30, 2009 [Docket No.

14   4448]

15

16   HEARING re Final Application of Alan Chapell, Consumer Privacy

17   Ombudsman, Appointed Pursuant to Section 332 of the Bankruptcy

18   Code for Final Approval and Allowance of Compensation for

19   Services Rendered During the Period From June 8, 2009 Through

20   and Including October 4, 2009 [Docket No. 4456]

21

22

23

24

25

8

1

2    HEARING re Motion of Debtors for Entry of Order Pursuant to 11

3    U.S.C. Section 105(a) and General Order M-390 Authorizing

4    Implementation of Alternative Dispute Resolution Procedures,

5    Including Mandatory Mediation (the "Debtors' ADR Motion")

6    [Docket No. 4780]

7

8    HEARING re Debtors' Twelfth Omnibus Objection to Claims

9    (Workers' Compensation Claims) [Docket No. 5326]

10

11    HEARING re Debtors' Objection to Proof of Claim No. 65796 Filed

12    by Rudolph V. Towns [Docket No. 5384]

13

14    HEARING re Application of the Official Committee of Unsecured

15    Creditors of Motors Liquidation Company for Entry of an Order

16    Authorizing the Employment and Retention of Bates White, LLC as

17    the Committee's Consultant on the Valuation of Asbestos

18    Liabilities Nunc Pro Tunc to March 16, 2010 [Docket No. 5480]

19

20

21

22

23

24    Transcribed By:  Clara Rubin

25

9

1

2    A P P E A R A N C E S :

3    WEIL GOTSHAL & MANGES LLP

4         Attorneys for the Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   JOSEPH H. SMOLINSKY, ESQ. (TELEPHONICALLY)

9

10   GODFREY & KAHN S.C.

11        Attorneys for the Examiner, Brady Williamson

12        One East Main Street

13        Suite 500

14        Madison, WI 53701

15

16   BY:   ERIC J. WILSON, ESQ.

17

18   U.S. DEPARTMENT OF JUSTICE

19        Office of the United States Trustee

20        33 Whitehall Street

21        21st Floor

22        New York, NY 10004

23

24   BY:   ANDREW D. VELEZ-RIVERA, ESQ.

25

10

1

2     BAKER & MCKENZIE

3           Interested Party

4           130 East Randolph Drive

5           Suite 3900

6           Chicago, IL 60601

7

8     BY:   ANDREW P.R. MCDERMOTT, ESQ. (TELEPHONICALLY)

9

10    BUTZEL LONG, A PROFESSIONAL CORPORATION

11          Attorneys for the Official Committee of Unsecured

12           Creditors

13          380 Madison Avenue

14          22nd Floor

15          New York, NY 10017

16

17    BY:   ERIC B. FISHER, ESQ. (TELEPHONICALLY)

18

19    DICONZA LAW, P.C.

20          Attorneys for LFR

21          630 Third Avenue

22          New York, NY 10017

23

24    BY:   GERARD DICONZA, ESQ. (TELEPHONICALLY)

25

11

1

2     KELLY DRYE & WARREN LLP

3            Attorneys for Creditor, Law Debenture Trust Company of

4             New York

5            101 Park Avenue

6            New York, NY 10178

7

8     BY:   JAMES E. FARRAH, ESQ. (TELEPHONICALLY)

9

10    KRAMER LEVIN NAFTALIS & FRANKEL LLP

11           Attorneys for the Official Committee of Unsecured

12            Creditors

13           1177 Avenue of the Americas

14           New York, NY 10036

15

16    BY:   THOMAS MOERS MAYER, ESQ. (TELEPHONICALLY)

17

18    LOWE FELL & SKOGG

19           Interested Party

20           Republic Plaza

21           370 Seventeenth Street

22           Suite 4900

23           Denver, CO 80202

24

25    BY:   DAVID W. FELL (TELEPHONICALLY)

12

1

2      MCCARTER & ENGLISH, LLP

3            Attorneys for Brownfield Partners

4            Four Gateway Center

5            100 Mulberry Street

6            Newark, NJ 07102

7

8      BY:   JEFFREY T. TESTA, ESQ. (TELEPHONICALLY)

9

10

11     MILBANK, TWEED, HADLEY & MCCLOY LLP

12            Interested Party

13            One Chase Manhattan Plaza

14            New York, NY 10005

15

16     BY:   JEREMY S. SUSSMAN, ESQ. (TELEPHONICALLY)

17

18

19     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

20            Interested Party

21            1285 Avenue of the Americas

22            New York, NY 10019

23

24     BY:   ABIGAIL CLARK, LAW CLERK (TELEPHONICALLY)

25

13

1

2     NEW YORK STATE DEPARTMENT OF LAW

3          Interested Party

4     BY:   MAUREEN F. LEARY, AAG (TELEPHONICALLY)

5

6

7     AURELIUS CAPITAL MANAGEMENT

8          Interested Party

9     BY:   DENNIS A. PRIETO (TELEPHONICALLY)

10

11

12    BROWNFIELD PARTNERS

13          Consultants to the Debtors

14    BY:   STUART L. MINER (TELEPHONICALLY)

15

16

17    THE CLARO GROUP

18    BY:   DOUGLAS DEEMS (TELEPHONICALLY)

19

20

21    LISA P. GROSS, IN PRO PER/PRO SE (TELEPHONICALLY)

22          Creditor

23

24

25    JAKE RODD, IN PRO PER/PRO SE (TELEPHONICALLY)

14

1              P R O C E E D I N G S

2         THE COURT:  All right, good evening.  Has the Weil

3    firm now been able to link up with CourtCall?

4         MR. SMOLINSKY:  Yes, Your Honor.  This is Joe

5    Smolinsky.

6         THE COURT:  All right.  Very good, Mr. Smolinsky.

7         And I have counsel for the fee examiner here in the

8    courtroom.

9         All right, ladies and gentlemen, in the Chapter 11

10   cases of Motors Liquidation Corporation, formerly known as

11   General Motors and Affiliates, I have eleven of an original

12   seventeen contested matters before me, the remainder having

13   been continued or having been resolved, relating to:  interim

14   fee applications by lawyers and other professionals for the

15   estate and its creditors; the request by the fee examiner to

16   extend the retention of a firm called Stuart Maue, which uses

17   computer techniques to analyze fees, and which has been hired

18   by the fee examiner as a consultant; the request by the fee

19   examiner denominated as a clarification of appointment order

20   for an order expanding the scope of its responsibilities beyond

21   examining fees; for a continuance of the hearing on the second

22   interim applications for fees; and a continuation of the final

23   application for Evercore.

24         On these motions and applications, the fee examiner's

25   objections are sustained in part and overruled in part.  The

15

1    Maue firm's retention will be extended for a time sufficient

2    for it to assist in the second round of fee applications, after

3    which we'll do a stop, look and listen to see if the services

4    it provides are worth the cost.

5         The fee examiner's requested clarification will be

6    granted, and upon clarification the motion to expand the nature

7    of the fee examiner's role will be denied.

8         The fee examiner's request for a continuance to give

9    him further time for review will be granted.

10        And the fee examiner's request for a continuance of

11   the Evercore application will be granted.

12        The specifics of my rulings and the bases for the

13   exercise of my discretion in connection with these matters

14   follow.  But before getting to the specifics, some preliminary

15   observations.  Lawyers say about me, according to the Almanac

16   for the Federal Judiciary which issues report cards for judges

17   based on comments based by lawyers, that I closely review fee

18   requests, and it's been said that I'm very tough on fees.

19   Others say that I take a close look at them but I'm all right

20   in the end and that I'm reasonable with respect to fees.  But

21   all of those lawyers are talking about the same judge -- me --

22   and the difference results from the inherent nature of fee

23   requests.

24        Fee requests by their nature take money out of the

25   pockets of creditors, so of course we judges care about them

16

1    and will be tough, as some lawyers say, in cases where we're

2    uncomfortable with what we see.  But we judges, especially

3    those of us who've had large Chapter 11 cases on our watch for

4    many years, hoping to keep companies alive, save jobs and get

5    money into the hands of creditors, have come to understand that

6    achieving those ends requires a lot of work and, necessarily,

7    fees by the people who do the work.  Though there's not a

8    perfect correlation, since higher fees can result from a host

9    of factors, such as thorny commercial issues such as

10   environmental issues, intercreditor and interdebtor disputes,

11   and even the need to replace corporate officers who've been

12   indicted, our larger cases almost always result in larger fees

13   and materially larger fees.  The challenge for a judge is in

14   achieving fairness in finding the appropriate balance between

15   keeping the fees as low as is necessary to do the job and to

16   maximize value for the creditor community without unfairly

17   penalizing lawyers and others doing the work.

18        To his credit, the fee examiner here did what I would

19   hope he would do:  engaging in a dialogue with the parties to

20   get more information and explanation when warranted, to secure

21   voluntary reductions in instances of error on the part of

22   professionals and, conversely, to drop objections when

23   appropriate.  He also could, and did, sometimes compromise

24   issues of potential dispute, which comprises I would approve

25   except in any instances wherein I thought the compromise was

17

1  beyond the range of reasonableness, and all of which comprises

2  I find reasonable and approve today.

3         But if the parties can't agree, the matter goes to the

4  judge.  At the risk of stating the obvious, a fee examiner,

5  like any examiner, is not a special master -- masters aren't

6  authorized in bankruptcy cases (C.F.R. BP 9031) -- nor is he or

7  she a judge.  On those issues where agreement could not be

8  reached, the judge must decide them.

9         Doing so, I sustain some of the objections and

10  overrule others.  Many of the issues apply to multiple

11  applicants.  The requested fees are largest with respect to

12  Weil, and the largest number of issues applied to Weil, but

13  when my ruling set forth general principles applicable to many,

14  they'll of course apply across the board.

15         Turning first to the objections insofar as they

16  involve Weil, and then turning first to the matter of

17  retainers, the fee examiner suggested that amounts still on a

18  pre-petition retainer should be applied to the fee awards for

19  this period as compared and contrasted to being held on account

20  of future payments risk.  Weil has consented to this, and I'll

21  so order it here for both Weil and any others similarly

22  affected, because on the facts of this case I think that's the

23  right thing to do.

24         But because everything we judges say in this court

25  seems to have a life of its own, even when simply part of a

18

1      dictated decision, I'll briefly explain.  Retainers are sought

2      and held by lawyers as a hedge against the risk of not being

3      paid in the future; that's in the nonbankruptcy context and

4      also in the bankruptcy context.  In the bankruptcy context,

5      they're also important to ensure that the lawyer isn't a

6      creditor of the estate at the time of the filing as a lawyer

7      retained, as anything other than special counsel must be

8      disinterested, as that expression is used in bankruptcy

9      parlance.

10             The pre-petition receipt of a retainer, assuming that

11      it exceeds the amount of fees due for pre-petition services,

12      helps ensure that the lawyer isn't a creditor of the estate and

13      in fact is the opposite.  It creates a debt from the lawyer to

14      the client to pay back the excess of any retainer over the

15      value of the fees that were earned.

16             There's no hard-and-fast rule as to when I'll require

17      a retainer to be applied to post-petition services.  Since it's

18      a debt to the estate that will need to be paid back if it isn't

19      earned, but it may well be earned in the future, I determine,

20      based on factors -- including the liquidity of the estate, its

21      administrative solvency or insolvency, the extent of secured

22      debt and assets that aren't secured creditor collateral, and

23      the nature of any cash collateral obligations or conditions --

24      whether there's a risk of nonpayment in the future.  If there's

25      not, I'd be more inclined, as I'm more inclined here, to

19

1    require application of the retainer before the end of the case.

2    If there is a material risk of nonpayment, I'd be less inclined

3    to make the professional apply it to past services and, hence,

4    go unprotected going forward.  Here, I believe that there's no

5    material risk of nonpayment going forward, and it's in the best

6    interest of the estate that the retainer be applied sooner

7    rather than later.

8         Turning next to summer associates and law clerks, the

9    fee examiner objects to Weil's charges for summer associates

10   and law clerks.  I'm sustaining the fee examiner's objection to

11   charges for summer associates but overruling his objection to

12   law clerks.  I think we need to slice and dice that objection a

13   little more finely, because we're talking about different

14   things.

15        Turning first to summer associates, I recognize that

16   there's contrary authority in other districts, such as in the

17   Recycling Industries case in Colorado, but as I ruled in

18   earlier cases when that issue was presented to me, the best

19   known of these being Chemtura, I don't approve payment for

20   summer associate time.  I've ruled that way based on lessons

21   learned in thirty years in a large firm before I came on the

22   bench ten years ago, in two of which I ran that firm's summer

23   program.  As I think I've stated the reasons that I've so ruled

24   at greater length in one or more other decisions, I won't lay

25   out now all of the reasons why I don't think summer associate

20

1    time is properly compensable, but I'll state some of them.

2          Summer associates aren't, of course, associates as we

3    normally think of them; they're law students, most commonly who

4    are two-thirds of the way through law school.  They sometimes

5    make valuable contributions, but they're hired principally as a

6    recruitment device, not for their productivity, to get the best

7    and the brightest law students before another law firm gets

8    them.  And with very few exceptions, they're dreadfully

9    inefficient and require extraordinary handholding by more

10   senior lawyers, even when, though it's often not the case,

11   they've taken the course work or already had the training they

12   need for the matters to which they're assigned.

13         Additionally, of course, I've noted over and over

14   again, including in this case -- that is, in the GM case --

15   that I believe in the importance of consistency and

16   predictability in bankruptcy cases and follow the earlier

17   decisions of other bankruptcy judges, including myself, in the

18   absence of manifest error.  I'm staying true to that principle

19   today.

20         By contrast, law clerks, which in this context means

21   law school graduates who aren't yet admitted to the bar, have

22   the benefits of law degrees and permanence.  Subject to any

23   other applicable considerations and reasons for disallowance,

24   their time will generally be compensable, and I'm ruling that

25   for any who are law school graduates it's compensable here.

21

1          Turning now to long billing days, I also have an

2     expression of concern by the fee examiner as to lawyers billing

3     more than twelve hours a day and an objection to compensation

4     for two attorneys who worked an average of eighteen hours a day

5     for eleven days.  I assume that these hours were really worked;

6     of course, if they hadn't I'd be ballistic, but there's been no

7     suggestion or showing that such is the case.  I won't

8     disapprove those charges.  Those of us with experience in large

9     matters and large Chapter 11 cases, in this district and

10    elsewhere, know that lawyers on those matters must from time to

11    time work extraordinarily hard.  And anyone who was present

12    during the first six weeks of this case knows what was going on

13    during that time.  In fact, if I could bill by the hour, I'd be

14    subject to much of the same criticism.

15         Turning next to vague entries, the fee examiner also

16    challenges vague time entries in the timesheets supporting

17    Weil's efforts.  I accept as true Weil's response that the

18    entries were made when the time pressure and number of matters

19    that required immediate attention were extraordinary, but

20    timekeeping is something that should be routine for a

21    bankruptcy lawyer, and nonbankruptcy lawyers working on

22    bankruptcy matters must learn to do it right as well or suffer

23    the consequences of failing to do so, especially if they work

24    at firms that have major bankruptcy practices.  I agree with

25    Weil that perfect compliance may not be commercially or

22

1    professionally practical, as, for example, might be the case if

2    a lawyer is fielding many calls or doing many things in a

3    single six-minute increment or is extraordinarily stressed or

4    harried.

5        I think there's some room for taking those

6    considerations into account, but I agree with the fee examiner

7    that failures to comply with the guidelines must have at least

8    some consequences.  In this case, I agree with the fee examiner

9    that many of the entries are too vague, including enough to

10   support the fee examiner's recommendation that fifteen percent

11   of the time charges supported by the allegedly vague entries be

12   the subject of fee reductions.  Thus, the fee examiner's

13   objection in this regard and his request that fifteen percent

14   of those time charges be disallowed will be sustained.

15       On first-class air travel, I'll sustain the fee

16   examiner's objection as well, though I think that Weil has

17   already addressed this on its own.  While it's easier to work

18   on a plane with the extra space that first class provides, the

19   U.S. Trustee Guidelines provide that first-class travel will

20   normally be objectionable, and here we got a commitment early

21   in this case not to charge for first-class travel.  While

22   lawyers can still fly by that means, their firms will normally

23   have to absorb the incremental cost.  And here I'm ruling that

24   under the facts of this case, professional firms will have to

25   absorb the extra cost.  I'm expressly not ruling on the

23

1    circumstances that could warrant an exception, other than to

2    recognize the possibility that such circumstances could exist.

3         The fee examiner also objects to hotel rates charged.

4    Of course, rates for hotels vary materially depending on the

5    city involved.  And though I've never stayed overnight in a New

6    York City hotel, there seems to be no serious dispute that New

7    York's rates are among the highest.  I'm going to provide

8    generalized guidance here and leave it to the parties to work

9    the details out.  To the extent that Weil or any other firm was

10   paying no more than the going rate for business traveler-type

11   hotels in New York City, I'll approve reimbursement for such

12   hotel charges even if the rate for a room exceeds a defined

13   price point, such as the 400 dollars per night that was

14   mentioned.  To the extent that any of the hotels stayed at were

15   at luxury hotels more expensive than those normally used by

16   business travelers or had rooms in those hotels which were at

17   luxury-level rates, with two daily rates in particular that

18   were described in the objection being a matter of concern to

19   me, I'm disapproving reimbursement for the incremental cost and

20   Weil will have to absorb it.

21        The fee examiner also objects to certain local

22   transportation charges, contending that they should be regarded

23   as overhead.  I agree in part, but only in part.  New York,

24   unlike most other parts of the U.S., is not a city where most

25   employees drive to work and where driving home in one's own car

24

1    is an option.  And exigent needs, including, by way of example,

2    when one is working the great bulk of the day and late in the

3    day for a single client, can make charging a taxi or car

4    service home appropriate.  On the other hand, where there is a

5    lesser strain on the lawyer, charging a debtor client may be

6    inappropriate.

7         Which side of the line that the issue falls on will at

8    least generally be fact-specific, and it is here as well.

9    Weil's local transportation policy generally conforms to that

10   historically considered to be appropriate in this Court and to

11   the policies in place at other law firms.  But I agree with the

12   fee examiner that, to the extent that local transportation was

13   charged for after the closing with New GM, charging the estate

14   for local transportation would be inappropriate.  The fee

15   examiner's local transportation objections in this regard and

16   to this extent will be sustained.

17        The fee examiner also objects to certain personal

18   expenses, including reimbursing lawyers for costs they incurred

19   when they had to cancel vacations, and paying laundry expenses

20   for out-of-town lawyers working in New York.  While I agree

21   that it was appropriate as a matter of human decency for Weil

22   to pay those charges, I think that under all the circumstances

23   Weil should have absorbed them as overhead, to the extent it

24   did not already do so, which I believe it did do on its own for

25   the vacations.  The fee examiner's objections in this regard,

25

1    to the extent not moot, are sustained.

2         Turning now to double-billing, nonworking travel time,

3    and mistakenly charged expenses, the fee examiner found

4    instances of double-billing, nonworking travel time and

5    mistakenly charged expenses.  I sense that when the fee

6    examiner discovered them and called them to Weil's attention,

7    Weil agreed to make the corrections immediately and without

8    objection.  To the extent, however, that they're not moot, the

9    fee examiner's objections in these areas will be sustained.

10        The fee examiner also challenges about 53,000 dollars

11   in charges for miscellaneous expenses, of which about 44,000

12   was for a hotel's food, beverage and miscellaneous charges for

13   creditor meetings, and about 9,000 dollars in miscellaneous

14   charges that was not documented until Weil filed its response

15   to the fee examiner's objections.

16        The creditors' meetings were for the organizational

17   meetings -- meeting of creditors and for a 341 meeting.  I'm

18   not troubled by a debtor paying such charges.  It's common, if

19   not also customary, for debtors to pick up the tab for those

20   things.  And I remember back in my first life as a lawyer that

21   when I represented a debtor estate in a medium or large Chapter

22   11, we would advance those funds as a courtesy or service to

23   the U.S. Trustee.  Likewise, if the debtors hadn't advanced

24   those charges and instead stuck them on the U.S. Trustee, or

25   the creditors' committee for example, I'd approve reimbursement

26

1    from the estate to whomever picked up those charges.  So I'm

2    not troubled by the debtors paying them, and I'll overrule that

3    objection to the extent that it remains after the debtors

4    explained exactly what they spent the money for.

5          Likewise, while I understand why the fee examiner

6    objected to the previously unexplained additional miscellaneous

7    charges and would have preferred that they be explained before

8    they became a subject of a fee examiner objection, Weil has now

9    satisfactorily explained them.  It's explained that they were

10   for an invoice for electrical services incurred by Weil, at the

11   request of GM, for setting up the CEO's press conference held

12   at Weil on the day Chapter 11s were -- the Chapter 11 cases

13   were commenced.  As Weil fairly observed, that was one of the

14   most important days in GM's history.  Such an expense is

15   entirely reasonable.

16         Weil has now provided an invoice for the electrical

17   services and I would think that its doing so puts the matter to

18   rest.  I'm not going to require that Weil get an itemization

19   from the electrical contractor of labor hours or itemized

20   material charges; I'm a little surprised that such was even

21   requested.  If payment for electrical services have been made

22   by GM instead of Weil, the cost would have been exactly the

23   same and the issue would not have come up.  This isn't the

24   first time that a lawyer advanced the funds for a client's

25   otherwise reasonable expenses, and I'm confident that it won't

27

1    be the last.  Since the underlying expense is for an entirely

2    understandable purpose, I won't disapprove reimbursement for it

3    now.

4         I should say in this connection, however, that the

5    controversy as to this alerts me as to an underlying issue:

6    The failure to simply provide the electrical services invoice

7    from the outset resulted in a back-and-forth which had its own

8    costs associated with it.  On matters relating to

9    disbursements, I think time charges might be in a different

10   category, as discussed in connection with the Kramer Levin

11   application below.  I'm going to require going forward that

12   backup be either provided or, perhaps more realistically, be

13   made available for inspection on request routinely from the

14   outset so a fee reviewer needn't do anything more than say I

15   need to see it.  The idea is to save creditors the cost of the

16   back-and-forth.  I don't think that's as practical for

17   explanation as to why services were performed or were

18   reasonable, matters that I discuss below, but I think that, for

19   disbursements, making that backup available is no big deal.

20        Turning now to the billing rates and the request for

21   the five percent reduction, the most emotional issue that I

22   need to address is whether I should require Weil, creditors'

23   committee counsel Kramer Levin, and any others similarly

24   situated to discount their rates by five percent, not because

25   work wasn't performed or was otherwise reasonable but because

28

1    other firms might have lower hourly rates and/or voluntarily

2    offered the discount.

3        I welcome and applaud the voluntary steps taken by

4    those others, but as a judge I'm not authorized to dock

5    professionals for otherwise reasonable claims for their

6    services based on private notions of propriety, either the fee

7    examiner's or my own, especially by a mechanical and arithmetic

8    computation.  Rather, I think that a request of that character

9    must be analyzed under the law and then under the applicable

10   facts.

11       As a matter of law I haven't been shown any basis in

12   the code or case law for imposing what amounts to an arbitrary

13   reduction of five percent or any other figure.  Those who have

14   appeared before me know that I start my analysis of matters

15   under the code with textual analysis, and that I also rely

16   heavily on case law precedent.  Authority from either source

17   for honoring that request is conspicuously lacking.  See, for

18   example, the fee examiner's Weil objection at paragraphs 22 to

19   44.

20       While I try to get a fair result in every case I do so

21   in the context of statutory provisions that Congress has

22   provided for the use of the judicial branch, and of case law

23   that's developed over the years.  I'm extraordinarily

24   uncomfortable in departing from the code or the case law.

25       As a factual matter everyone acknowledges the efforts

29

1    and success in Weil's representation which, as the fee examiner

2    noted were Herculean.  And it appears to be agreed that

3    attorneys at Weil, "Worked hard when required but did not

4    unnecessarily or inappropriately record time."  The efforts

5    were performed in the context of a case with liabilities of 172

6    billion, with a capital B.  See 407 B.R. at 475.  The efforts

7    helped save the jobs of 235,000 employees worldwide, 95,000 of

8    whom were in the U.S., and saved thousands of additional jobs

9    at GM's suppliers.

10          In general, at least, lawyer's fees are set in the

11   marketplace.  And the fees are at market rates.  I'm reluctant

12   to question them in the absence of statutory or case law

13   authority to do so.  To be sure, if it were shown that a firm's

14   rates for lawyers, subject to fee review, were higher than

15   those for its lawyers performing similar services on non-

16   bankruptcy matters, and hence did not fully conform to the

17   rates in the marketplace, that would be a matter of concern for

18   me, which is why I asked the questions at argument that I did.

19   But there having been no showing of that matter of concern

20   here, I don't need to address any issues with respect to that

21   today.  For these reasons I won't require the requested

22   discounts.

23          Turning now to the Kramer Levin application, starting

24   first with summer associate time and law clerk time, several of

25   the rulings I just made apply equally to the Kramer Levin firm,

30

1   counsel to the creditors' committee.  I won't repeat them now.

2   For the reasons stated in my rulings on the Weil application

3   I'm sustaining the fee examiner's objection to Kramer Levin's

4   summer associate time, and overruling them with respect to

5   permanent lawyers with law degrees who are not yet admitted to

6   the bar.

7        Turning next to clerical and administrative tasks,

8   vague and repetitive entries, and block billing, likewise by

9   reason of an analysis that's essentially factual I'm sustaining

10  the fee examiner's objections to billing for clerical and

11  administrative tasks, resulting in a 16,000 dollar reduction.

12       I'm also sustaining the fee examiner's objections in

13  part to the vague and repetitive entries and block billing.

14  I'm sustaining them to the extent of requiring a 30,000 dollar

15  reduction for vague and repetitive entries, and 50,000 for

16  block billing.  I sustain those objections in part, but only in

17  part, by reason of the difficulty in describing certain

18  activities with greater precision, and because if many of the

19  more discrete tasks were separately described doing so would

20  consume much of the day.

21       I agree with Kramer Levin's contention that the

22  purpose of the block billing rule is to correct abuse where it

23  might appear that lawyers are "running the clock" to fill idle

24  hours.  And if I were ever to see that I'd not just disallow

25  the time but consider sanctions.  But there's no evidence in

31

1    the record to suggest that such a concern would have any

2    applicability or relevance here.

3         As I noted previously, the fee examiner is right when

4    he says that failures to comply with applicable rules and

5    guidelines must have consequences.  Thus, I'm imposing the

6    consequences I've described here.  But I also believe that the

7    circumstances at the time the services are performed and the

8    practicalities of perfect compliance must be weighed in

9    assessing the penalty for non-compliance.  Under all the

10   circumstances I believe the adjustments described above best

11   balance the competing interests.

12        Turning next to billing rates and five percent

13   reduction requests for Kramer Levin, as I indicated, I'm

14   overruling the objection seeking the arbitrary five percent

15   reduction in fees for reasons I discussed in connection with

16   Weil as a matter of law.  I'm also overruling them for similar,

17   though not identical, reasons based on the facts of the case,

18   which include the skill Kramer Levin brought to this case,

19   presumably aided in material part by its experience in

20   Chrysler.  The reasons that are based in fact, as contrasted to

21   law, overlap with those based on the contentions that Kramer

22   Levin engaged in unnecessary work to which I turn next.

23        In that connection and additionally, I disagree with

24   the fee examiner's contentions that work Kramer Levin did was

25   unnecessary or excessive.  Rather, I find as a fact to the

32

1    contrary.  While I recognize that the fee examiner wasn't here

2    during the first six weeks of this case, I was, with the

3    possible exception of the creditors' committee counsel in

4    Adelphia where the fee committee that I had there did not make

5    a similar recommendation.  And even though the fees in

6    Adelphia, as a percentage of debtors' fees were much higher,

7    principally I think by reason of major litigation brought by

8    the Adelphia creditors' committee against secured lenders, I've

9    never seen a creditors' committee counsel perform as

10   effectively and economically in a Chapter 11 case on my watch,

11   as I saw Kramer Levin perform here.

12          But, first, as a preliminary matter a threshold issue.

13   How much detail must a professional put into a fee application

14   to show that its work was necessary and appropriate?  I have no

15   memory of having had to rule on this before, or having seen any

16   other judge's answer to this question, but I think the answer

17   to this is at the easier end of the spectrum of the issues I

18   need to address today.  There should be enough detail in the

19   fee application to make a prima facie case and to touch the

20   basis.  But I think it would be wrong for courts or U.S.

21   Trustee personnel or fee examiners to require an exegesis on

22   matters of necessity and reasonableness.  If we were to do that

23   it would require much more work on the part of the professional

24   than the preparation of the fee application, especially if the

25   application were to be filed on paying of fees disallowance.

33

1    Most of the time the need for the work to be done, and

2    much of the work that was done, will be obvious to the major

3    constituencies in the case and to the judge, and there is no

4    reason in my view to require extra detail in the fee

5    application, or argumentative or persuasive writing in the fee

6    application to bolster reasonableness or necessity, which extra

7    writing would only have to be paid for by the estate or its

8    creditors.

9    Rather, I think that in those rare cases where the

10   need for the services or the professional's work is in

11   question, the matter would be better addressed by providing

12   answers to questions informally and, if necessary, addressing

13   them in the courtroom, as, of course, was done here.  I don't

14   want to create a rule that requires professionals to put even

15   more work at resulting greater expense into their fee apps when

16   such usually will not be necessary.

17   Here, based on facts of which I'm aware by judicial

18   notice of the case on my watch, and by Kramer Levin's

19   supplemental showing, I can and do easily find that Kramer

20   Levin's services were substantial, necessary and reasonable.

21   Kramer Levin faced challenges in this case because

22   like most creditors' committee counsel it wished to maximize

23   the recovery for the unsecured creditors' community.  But it

24   couldn't do so in a way that would blow the 363 sale, by which

25   the creditors would be fragged by their own grenade.

34

1        As I ruled in my Section 363 decision, which now has

2   been affirmed by two judges of the district court, apart from a

3   third judge's ruling on a stay application, the alternative for

4   the unsecureds in this case to the 363 sale was liquidation, a

5   disastrous result.

6        Kramer Levin had some very sympathetic members of its

7   constituency, most significantly tort victims.  But if it

8   pushed too hard to advance unsecured creditors' interests, or

9   the interest any subset of them it could poison the deal by

10  which all in the unsecured creditors' community would do much

11  better.  It negotiated an additional assumption of liabilities

12  by New GM that may benefit hundreds, if not thousands, of

13  people injured in accidents.  A result whose desirability

14  nobody in this case I think would quarrel.  It also negotiated

15  a 225 million dollar increase in the war chest for

16  administrative expenses, to which I'll turn in a moment.

17       The great bulk of the consideration for the 363 sale

18  and the amount that would effectively go to unsecureds

19  estimated to be six billion dollars, at the time was in the

20  form of New GM stock, which creditors would want to be able to

21  trade consistent with the federal securities laws, and which

22  would require an 1145 exemption obtainable only under a

23  confirmed plan.  And I well remember Kramer Levin's efforts to

24  increase the size of the funding for administrative expenses by

25  225 million dollars, so as to better enable a confirmable plan.

35

1    Securing that additional 225 million dollars would decrease

2    risks of the need to sell some of that New GM stock privately,

3    which if it had to be done would reduce the stock available for

4    the unsecured creditor community.  This was a major

5    accomplishment for which I think Kramer Levin justly may claim

6    credit.

7         I also cannot agree with the fee examiner's dismissal

8    of the Kramer Levin attention to environmental claims, which

9    for the debtors, creditors and me were and are still matters of

10   substantial concern.  As evidenced most recently in Lyondell

11   Chemical and Chemtura, two other massive cases on my watch,

12   with material environmental concerns the interplay between

13   environmental law and bankruptcy is among the most difficult

14   issues that parties in bankruptcy cases and bankruptcy judges

15   face.

16        Material environmental liabilities could and still may

17   massively affect creditor recoveries.  It's no wonder that

18   Kramer Levin spent time on these issues.  I would have been

19   surprised and disappointed if it had not.

20        Likewise, I've considered the other suggestions that

21   Kramer Levin overworked the case, and as findings of fact

22   reject them.

23        Accordingly, I overrule such objections and decline to

24   reduce Kramer Levin's compensation based on those factual

25   premises.

36

1        Turning last in the Kramer Levin case to matter

2    descriptions, the fee examiner also objects to Kramer Levin's

3    use of many detailed categories to describe the work Kramer

4    Levin performed.  Contending that work in many areas that the

5    fee examiner would have preferred to consider in a combined way

6    were separately described, making the fee examiner's work more

7    difficult.  I assume that the way Kramer Levin did it did make

8    the fee examiner's work more difficult.  But Kramer Levin

9    argues that such was required under this Court's local court

10   rules, and Kramer Levin is right in this regard.  More

11   specificity in my view is a good thing, not a bad thing.  In

12   any event, whatever one's preferences may be for best practices

13   in data gathering and presentation, and even assuming that it

14   made the work for the fee examiner more difficult, I will not

15   penalize Kramer Levin for recording its time with the greater

16   specificity that its use of more categories entailed.

17       Turning next to FTI, FTI's issues are largely subsumed

18   within my earlier rulings, with one material exception.  The

19   fee examiner objects to the amount of time FTI incurred on firm

20   retention and compensation maters, contending that it should be

21   capped at five percent of the amount of the total billings in

22   the absence of extraordinary circumstances.  But FTI responds

23   that the objection has an insufficient time to reasonableness.

24   And, in particular, fails to take into account that the value

25   of the services provided by a professional like FTI might

37

1    exceed the cost of the monthly payments that had to be made

2    under the retention.  More importantly, FTI argues that its fee

3    was based on a fixed fee arrangement.  And that when FTI did

4    more work, as it might, for example, if it were asked to do

5    more on something other than retention or compensation, FTI

6    wouldn't get anymore compensation for doing so.

7          Though, neither sides has provided me with any cases

8    on point, and the matter is, so far as I'm aware, one of first

9    impression that I've never seen in the thirty-seven years since

10   I started in the bankruptcy business, I agree with FTI as to

11   this issue.  Though hourly rates for professionals retained on

12   a fixed basis are computed and analyzed by many of us, we

13   judges require those hourly rate equivalents computed to help

14   protect the estate against windfalls, not because those hourly

15   equivalents for those compensated on a fixed fee basis, have

16   independent legal significance.

17         Where the fee is on a fixed fee basis irrespective of

18   hours worked, the extra time spent on a retention or fee

19   application doesn't matter.  I see no basis in law or equity

20   for docking the professional based on a perception that the

21   professional put in more work on retention or anything else

22   than the one questioning the fee application regards as

23   reasonable.

24         Turning now to Butzel Long, the fee examiner also

25   objects in part to the fee request of Butzel Long, co-counsel

38

1    to the creditors' committee, seeking a disallowance of about

2    46,000 dollars in fees.  I sustained the fee examiner's

3    objection to summer associate time for the reasons I've

4    described above.  But the fee examiner's principal objection is

5    to costs incurred incident to getting Butzel Long retained as

6    the cost of the retention effort amounts to about twenty-three

7    percent of Butzel Long's total fees for that period.  That's

8    because the remainder of Butzel Long's fees were relatively

9    modest during that time.

10         The fee examiner's objection raises what amounts or

11   almost amounts to a philosophical issue.  How do we treat the

12   cost of getting retained, which is compensable under applicable

13   law and which largely is a fixed cost, when the actual work to

14   be done is modest, or is modest in the applicable fee period?

15   Though, neither side has presented me with any authority on

16   point, I think the answer must be that such time is

17   compensable.  And that if we think the substantive work to be

18   done by the professional to be retained is so de minimis that

19   the retention costs will be disproportionately high, we should

20   think about that before retaining the professional in the first

21   place.

22         I start with the recognition that the cost of getting

23   retained is compensable under the case law and that within

24   broad limits it's largely a fixed cost.  There isn't a

25   suggestion here, and there normally won't be a suggestion in

39

1    most large Chapter 11 cases, that the professional can get

2    itself retained materially more cheaply.  In fact, I don't want

3    people cutting corners on their retention applications, as we

4    all agree on the importance of full disclosure of connections

5    and potentially adverse interests, and we want thorough

6    conflict checks.  So the ratio of retention costs on the one

7    hand, and costs for services for the real work, if I can call

8    it that, on the other, is a function not so much of the

9    retention costs as it is for the size and scope of the real

10   work performed and to be performed.  And it will sometimes be

11   the case as it is here that the real work will be modest in one

12   fee period, but may be much greater in the later period.  Of

13   course in that case the objection will likely be moot, because

14   it would be unfair to dock the professional for work performed

15   in period one when the work performed in period two is much

16   greater.

17        But if it isn't, that raises questions as to the

18   wisdom of hiring the professional.  But I think it's better for

19   the fiduciaries for the estate and its creditors to consider

20   whether the professional should be hired if the service will be

21   de minimis before retaining the professional in the first

22   place.

23        Since fees are based on the reasonableness of the

24   services performed, and in most cases the retention

25   application, itself, will have been prepared for a reasonable

40

1    price, it's hard to find a statutory or even commonsense basis

2    for denying compensation for a professional's necessary efforts

3    in getting itself retained.  And I won't disapprove that

4    component of the fee application here for that reason.

5         Turning next to Claro Associates, the fee examiner

6    also objects to the application of Claro Associates, a

7    consulting firm that helped GM address its environmental

8    responsibilities.  He seeks to disallow about 35,000 of the

9    190,000 requested, which is about 18 percent of the total fees,

10   down from an earlier 41,000 dollars which was roughly 22

11   percent of the total.

12        Many of the problems seem to arise from the fact that

13   Claro was guilty of classic vagueness and bulk billing offenses

14   which in turn seem to arise from the fact that Claro isn't

15   accustomed to the higher standards of detail and of

16   explanations for work performed that we customarily expect in

17   bankruptcy cases, and that Claro did the work that it did

18   without complying with those rules.

19        Claro billed for its time in half hour increments

20   rather than the tenths of an hour that we require; used

21   descriptions  of its services broader than those that we

22   require; described its work in terms that we'd regard as

23   excessively vague, and put professionals to work on matters

24   that could fairly be characterized as administrative or

25   clerical.

41

1    The objections to these practices were well taken, and

2    as I've noted above, failures to comply with applicable court

3    rules and guidelines should have consequences.  But I think

4    that in determining the appropriate penalty it's appropriate to

5    consider whether an entity is a regular player in the

6    bankruptcy system and should know better.  I also think that

7    it's not just appropriate but critical to consider whether the

8    professional was previously warned or otherwise advised of the

9    need to comply, as parties in this case will be warned and

10   advised for their services going forward.

11   Here I can't wholly close my eyes to Claro's failures

12   to do a better job in substantiating its fee request and think

13   some penalty is appropriate.  But for an entity that doesn't

14   regularly provide services to the bankruptcy community and

15   hasn't previously been warned, I think that the penalty that's

16   been proposed is excessively punitive.

17   While I'd likely agree with the fee examiner if he'd

18   noted the same deficiencies by a law firm, accountant or

19   financial advisor that's more frequently retained in bankruptcy

20   cases, I'm not going to be that harsh on a relatively small

21   player providing environmental remediation counseling here for

22   this first offense.  The fee examiner's proposed disallowance

23   will be reduced from 35,000 to 18,000 with the consequence that

24   Claro's fee application will be reduced by the 18,000 dollars

25   which I still think must be imposed.

42

1    Turning now to AP Services.  AP Services, the crisis

2    managers now serving and for all practical purposes running

3    Motors Liquidation, disputes the fee examiner's contention that

4    AP Services is subject to fee examiner review, right to audit,

5    and right to object to the compensation of AP Services.  It

6    contends that the fee examiner's authority applies only to

7    retained professionals in the case.

8    While a reading of the relevant orders would at least

9    seemingly support AP Services' position in this regard, the

10    dispute isn't yet ripe for a decision as the fee examiner

11    hasn't tried to audit or object to AP Services' fees and the

12    fee examiner hasn't responded to the points AP Services made in

13    its objection, presumably being consumed with the many fee

14    applications to which the fee examiner has objected.

15    Accordingly, I'm not deciding these issues today.  If

16    there is an objection, AP Services can dust off and re-file its

17    submission, or if it prefers give me a new one.  And each side

18    will now have a reservation of rights with respect to these

19    issues.

20    Finally, the fee examiner objects to the fee request

21    of Evercore, the debtors' investment banker.  The fee examiner

22    contends that the request is premature but goes on to seek the

23    disallowance of particular itemized disbursement amounts.  I

24    agree that it's premature because Evercore's remaining

25    entitlement will be subject to a condition that hasn't

43

1    transpired yet, and while most parties won't have the right to

2    object to reasonableness hereafter, the U.S. Trustee's office

3    will.  So I don't think I can or should issue substantive

4    rulings on Evercore today, including on the disbursements.

5    They can be considered when the much more substantial payment

6    to Evercore comes up for review or is otherwise up for

7    allowance.

8          Turning next to the U.S. Trustee Office's response.

9    The U.S. Trustee requests a ten percent deferral of payment or

10    a, quote, "holdback" of fees.  That request is granted.  As

11    I've stated many times before, albeit only, I think, in

12    dictated decisions, holdbacks are imposed for two reasons.

13    They're a hedge against uncertainty in the future of the case,

14    and in particular the risk of administrative insolvency, and

15    they function as a carrot to incentivize professionals to get

16    the case wrapped up and to get plan consideration into the

17    pockets of creditors.

18          In this case the unsecured creditors are relying on

19    their receipt of stock and warrants that can be distributed

20    consistent with the requirements of the federal securities laws

21    only if and when a plan is confirmed.  And if the

22    administrative expenses get too high and can't be paid in cash,

23    some of that critically important stock may have to be sold to

24    keep the plan together.

25          Thus, while I have no reason to doubt the diligence of

44

1      the professionals in this case, I'm going to grant the U.S.

2      Trustee's request. This ruling is without prejudice, however,

3      to any later request that I reduce the holdback to five percent

4      when the debtors' environmental issues are settled or

5      judicially resolved and to any request that I reduce the

6      holdback to zero percent when the debtors have accomplished

7      that -- that is, the environmental resolution -- and also have

8      filed a plan that has creditors' committee's support.  For now,

9      however, the U.S. Trustee's request is granted, and the ability

10     to reduce the holdback further will await those other major

11     forward steps in the case.

12          As the U.S. Trustee's other principal point was that

13     she generally concurs with the fee examiner's suggestions --

14     see U.S. Trustee response at page 9 -- I needn't address them

15     separately now.

16          Then in a point applicable to all or many of the

17     applicants, or at least all that are law firms, the fee

18     examiner asked me to approve scrutiny of contracts with

19     electronic research services like Westlaw and Lexis.  I'm

20     declining to provide for that and here's why.  Applicable rules

21     and guidelines already prohibit professionals from making a

22     profit on disbursements.  And I don't understand expenses for

23     electronic research like Westlaw and Lexis to be an exception.

24     And if I'm not mistaken, professionals must certify that

25     they're not making a profit, and I of course regard a false

45

1     certification to be serious business.

2           If certifications are no longer required -- I haven't

3     gotten into the details of my cases on that issue in a long

4     time -- I'd order in a heartbeat that parties do so certify if

5     anyone wants it.  But I'm not sure if it's appropriate for a

6     judge, much less a fee examiner, to tell lawyers how they

7     should do their research or, especially, whether they should or

8     should not do it by electronic means for cost or for other

9     reasons.

10          Also, the particular circumstances of a firm could

11    affect its decision as to how to get its research done as, for

12    example, whether the firm has alternatives such as the hard

13    copies of books and what the costs of various alternatives are.

14    For example, the U.S. courts, in a cost saving measure, are

15    trying to get judges to do away with reading books and to rely

16    on electronic services.  They're asking us to do exactly the

17    opposite of what the fee examiner would want to explore here.

18          So long as nobody is making a profit on legal research

19    I don't think it's appropriate for me to rule on this issue on

20    a one off basis.  Any law firm will use its law library and

21    electronic research services to meet its needs in serving many

22    clients.  And this goes too close to the matter of

23    professionalism or a matter of professionalism, how lawyers do

24    their jobs, for my comfort.  Imposing a requirement in this

25    area would go beyond adjudication; it would amount to rule

46

1    making.

2           Any requirement for when electronic research materials

3    might appropriately be used would require, in my view, at the

4    least, a local court ruling issued after an opportunity for

5    public comment.  And if we're not going to have that any time

6    soon, at least, it's unnecessary and inappropriate to make

7    lawyers hand over their contracts with their electronic

8    research providers.

9           For the foregoing reasons, the fee examiner's

10   objections are sustained in part and overruled in part.  To the

11   extent that the fee examiner did not object or consensually

12   resolved its objections, fees are approved and the resolutions

13   of those objections are ratified and approved by me.

14          I'm not going to micromanage the further proceedings

15   by getting involved in applying my rulings to individual time

16   entries.  You're to apply the rulings and principles I

17   articulated to the individual fee applications involved and

18   agree on the fees that are appropriately payable now in

19   accordance with those rulings.

20          If you somehow can't agree we can address any issues

21   by conference call off the record, or if anybody wants it, on

22   the record.  Except as disallowed as a consequence of my

23   rulings described above, the professionals can and should be

24   paid up to the level of the U.S. Trustee holdback level that I

25   likewise described above.

47

1          Finally, I ruled on the request for the Maue retention

2     extension, the motion for clarification, and the second interim

3     fee applications' continuance in the hearing itself earlier

4     today.  I explained the reasons that would underlie my rulings

5     in the tentatives that I announced then.  I see no reason to

6     repeat or amplify upon them now.

7          I would ask the debtors, if they're willing, to take

8     the lead on converting my ruling into an order after each of

9     the individual professionals have had an opportunity to agree

10    or at least confer with the fee examiner on the implementation

11    of this ruling.  I would like the parties to get the

12    supplemental distributions that would be occasioned by this as

13    early as is practical with due regard to the highest priority,

14    which is the underlying needs of the Chapter 11 case.

15         Folks, it's been a very long day and evening.  It's

16    now after twenty to 7.  We're adjourned.  Have a good evening.

17    Thank you.

18         (Proceedings concluded at 6:42 PM)

19

20

21

22

23

24

25

48

I N D E X

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| The Maue firm's retention will be extended for a time sufficient for it to assist in the second round of fee applications. | 15 | 1 |
| Motion of the fee examiner for clarification of appointed order, granted, and upon clarification the motion to expand the nature of the fee examiner's role will be denied. | 15 | 6 |
| Request of the fee examiner for a continuance to give him further time for review, granted. | 15 | 9 |
| Request of the fee examiner for a continuance of the Evercore application, granted. | 15 | 10 |

```
                                                                      49

  1

  2                      R U L I N G S (cont'd.)

  3      DESCRIPTION                                    PAGE      LINE

  4      Amounts still on a pre-petition retainer        17        18

  5      should be applied to the fee awards for

  6      this period as compared and contrasted to

  7      being held on account of future payments

  8      risk.

  9

 10      Objection of the fee examiner to charges        19        10

 11      for summer associates, sustained.

 12

 13      Objection of the fee examiner to charges        19        11

 14      for law clerks, overruled.

 15

 16      Objection of the fee examiner to charges        21         7

 17      for long billing days, overruled.

 18

 19      Objection of the fee examiner to vague          22        14

 20      time entries and his request that fifteen

 21      percent of those time charges be

 22      disallowed, sustained.

 23

 24      Objection of the fee examiner to charges        22        15

 25      for first-class travel, sustained.
```

50

1

2                        R U L I N G S (cont'd.)

3     DESCRIPTION                              PAGE      LINE

4     To the extent that Weil or any other firm    23        11

5     was paying no more than the going rate for

6     business traveler-type hotels in New York

7     City, such reimbursement for hotel charges,

8     even if the rate for a room exceeds a

9     defined price point, is approved.

10

11    Objections of the fee examiner to         24        16

12    reimbursement to Weil for charges for

13    local transportation in connection with

14    work performed after the closing with

15    New GM, sustained.

16

17    Objection of the fee examiner regarding   25         1

18    charges for personal expenses, to the

19    extent not moot, sustained.

20

21    To the extent issues relating to double-  25         9

22    billing, nonworking travel time, and

23    mistakenly charged expenses are not moot,

24    the fee examiner's objections are sustained.

25

51

2                         R U L I N G S (cont'd.)

3      DESCRIPTION                                PAGE      LINE

4      Objection of the fee examiner to 44,000      26        2

5      dollars for miscellaneous expenses, to the

6      extent it remains after the debtors

7      explained exactly what they spent the

8      money for, overruled.

9

10     Objection of the fee examiner to 9,000       26        15

11     dollars in miscellaneous charges,

12     overruled.

13

14     Objection of the fee examiner to charges     30        9

15     for clerical and administrative tasks,

16     sustained, resulting in a 16,000 dollar

17     reduction.

18

19     Objection of the fee examiner to charges     30        14

20     for vague and repetitive entries are

21     sustained in part, to the extent of

22     requiring a 30,000 dollar reduction for

23     vague and repetitive entries, and 50,000

24     for block billing.

25

52

```
1
2                        R U L I N G S (cont'd.)

3       DESCRIPTION                              PAGE      LINE

4       Objection of the fee examiner to billing     31       14

5       rates and arbitrary five percent reduction

6       requests for Kramer Levin, overruled.

7

8       Objection of the fee examiner to Kramer      36       14

9       Levin's use of many detailed categories

10      to describe the work Kramer Levin

11      performed, overruled.

12

13      First interim application of FTI Consulting,  37       19

14      Inc. for compensation and reimbursement

15      of expenses for the period from 6/3/09

16      through 9/30/09, approved.

17

18      Second interim application of FTI            37       19

19      Consulting, Inc. for compensation and

20      for reimbursement of expenses for the

21      period from 10/1/09 through 1/31/10,

22      approved.

23

24

25
```

53

1                   R U L I N G S (cont'd.)

2    DESCRIPTION                                  PAGE      LINE

3    Objections of the fee examiner to the        40         3

4    fee request of Butzel Long, seeking a

5    disallowance of about 46,000 dollars in

6    fees, overruled.

7

8    The fee examiner's proposed disallowance      41        23

9    to the application of Claro Associates to

10   be reduced from 35,000 to 18,000 dollars.

11

12   Request of the U.S. Trustee for a ten         43        10

13   percent deferral of payment or a holdback

14   of fees, granted, with option to

15   reduce holdback as detailed on the record.

16

17   Request of the fee examiner to approve        44        20

18   scrutiny of contracts with electronic

19   research services like Westlaw and Lexis,

20   overruled in part and sustained in part.

21   To the extent the fee examiner did not

22   object or consensually resolved its

23   objections, fees are approved and the

24   resolutions of those objections are

25   ratified and approved.

54

1

2                         R U L I N G S (cont'd.)

3       DESCRIPTION                              PAGE      LINE

4       Ruling on the fee examiner's statement     42        15

5       concerning the fee application of AP

6       Services, reserved.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

55

1

2                    C E R T I F I C A T I O N

3

4        I, Clara Rubin, certify that the foregoing transcript is a true

5        and accurate record of the proceedings.

6

7        _____

8        Clara Rubin

9        AAERT Certified Electronic Transcriber (CET**D-491)

10

11       Veritext

12       200 Old Country Road

13       Suite 580

14       Mineola, NY 11501

15

16       Date: May 2, 2010

17

18

19

20

21

22

23

24

25